KRISTEN K. WAGGONER,
OR Bar No. 067077
*Lead Counsel*

RYAN J. TUCKER*
AZ Bar No. 034382
MARK A. LIPPELMANN*
AZ BAR No. 036553
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
Telephone: (480) 444-0020
kwaggoner@ADFlegal.org
rtucker@ADFlegal.org
mlippelmann@ADFlegal.org

DAVID A. CORTMAN*
GA Bar No. 188810
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Rd. NE
Suite D-1100
Lawrenceville, GA 30043
Telephone: (770) 339-0774
dcortman@ADFlegal.org

*Application for Admission Pending*

*Attorneys for Proposed Intervenor-Defendants*

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## EUGENE DIVISION

| | |
|---|---|
| ELIZABETH HUNTER, et al., <br><br> *Plaintiffs*, <br><br> v. <br><br> U.S. DEPARTMENT OF EDUCATION, et al., <br><br> *Defendants*, <br><br> v. <br><br> WESTERN BAPTIST COLLEGE d/b/a CORBAN UNIVERSITY; WILLIAM JESSUP UNIVERSITY; PHOENIX SEMINARY, <br><br> *[Proposed] Defendant-Intervenors*. | Case No. 6:21-cv-00474-AA <br><br><br> **MOTION TO INTERVENE AND MEMORANDUM IN SUPPORT** |

**MOTION TO INTERVENE AS DEFENDANTS**

Western Baptist College d/b/a Corban University ("Corban"), William Jessup University ("Jessup"), and Phoenix Seminary (together, "Religious Schools") move to intervene as party defendants under Federal Rule of Civil Procedure 24(a) and (b). In compliance with Local Civil Rule 7-1(a)(1)(A), counsel for Religious Schools made a good faith effort to discuss this motion by calling the existing parties, leaving voicemails describing Religious Schools' intention to file a motion to intervene. Plaintiffs oppose this motion, but following these attempts, counsel for Religious Schools was not able to reach the defendants.

Although Title IX generally forbids differential treatment based on sex, that prohibition does not apply to religious educational institutions if it conflicts with their "religious tenets." 20 U.S.C. § 1681(a)(3) ("Religious Exemption"). Plaintiffs oppose this accommodation and seek to delete it. But the Religious Exemption does not protect any party to this lawsuit. And none of the current parties face the loss of federal funding, intrusion upon their religious belief, or violations of their rights were Plaintiffs' lawsuit successful. Religious Schools, however, have all this at stake. They are the direct beneficiaries of the Religious Exemption. Without it, Religious Schools—and their students—would lose access to vital federal educational funds. They have a right to intervene.

Plaintiffs seek a judgment declaring that the Religious Exemption is unconstitutional, request an injunction rescinding and prohibiting all exemptions for religious beliefs "as applied to sexual and gender minorities," seek vague injunctive relief for institutions to "respect" students' sexual or gender identities, and ask the Court to mandate the U.S. Department of Education ("Department") to disregard religious institutions' beliefs in connection with Title IX. Religious Schools are educational institutions controlled by religious organizations. They are exempt from Title IX and its accompanying regulations to the extent those laws are

interpreted to curtail Religious Schools' freedom to act in accordance with their religious convictions. And Religious Schools' sincere religious beliefs conflict with application of Title IX to the extent that Title IX's definition of "sex" is interpreted to include "sexual orientation" and "gender identity." As such, Religious Schools directly benefit from the Religious Exemption, and disposing of this action could significantly impair their statutory and constitutional rights. Indeed, Plaintiffs' Class Action Complaint admits that one of the Religious Schools—Corban University—currently benefits from the Religious Exemption. Compl. ¶ 10.

As set forth in the memorandum below, Religious Schools satisfy the requirements for intervention of right under Rule 24(a). Their motion is timely because Plaintiffs filed their Class Action Complaint less than 2 weeks ago and no party has filed a responsive pleading. Because Religious Schools stand to lose their longstanding access to religious exemptions under Title IX, they have a substantial interest in the subject matter of this case and the outcome of this matter may impair their interests. And Religious Schools' interests will not be adequately represented by the named parties because federal officials representing the Department cannot raise First Amendment defenses and do not have the same interests as religious educational institutions who stand to lose the Religious Exemption.

Alternatively, Religious Schools also meet the requirements for permissive intervention under Rule 24(b). Religious Schools seek to defend the challenged Religious Exemption from the beginning of the lawsuit, so this filing is timely, and their participation will cause no undue delay or prejudice to the original parties. Religious Schools' legal position in support of the religious exemption also "shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1)(B).

So as not to delay the proceedings or prejudice the original parties, and to ensure the earliest opportunity to participate in this case, Religious Schools have

moved to intervene before the government's filing of any responsive pleading. Consistent with the Ninth Circuit's practical approach to interpreting Rule 24(c), Religious Schools have not included a proposed pleading with their motion, which itself notifies the existing parties of Religious Schools' interests in the litigation. *See Ctr. for Biological Diversity v. Jewell*, No. CV-15-00019-TUC-JGZ, 2015 WL 13037049, at *1 (D. Ariz. May 12, 2015) ("[W]ithin the Ninth Circuit, failure to comply with the technical requirements of Rule 24, by failing to attach a pleading, will not affect the outcome of a motion for intervention, assuming the motion otherwise meets Rule 24's substantive requirements.). Having provided the parties with notice of their interest in this action, as well as their intent to defend the constitutionality of the challenged Religious Exemption, Religious Schools intend to file a responsive pleading or motion on or before the government's deadline to do so, or as otherwise instructed by the Court.

**WHEREFORE**, Religious Schools respectfully request that the Court grant their motion, allowing them to intervene as defendants and uphold their constitutional and statutory rights.

# TABLE OF CONTENTS

MOTION TO INTERVENE AS DEFENDANTS.............................................................. 2

TABLE OF CONTENTS ................................................................................................... 5

TABLE OF AUTHORITIES............................................................................................... 6

INTRODUCTION .............................................................................................................. 8

STATEMENT OF FACTS.................................................................................................. 8

      A. The Religious Schools and their religious beliefs ......................................... 8

      B. Title IX and its Religious Exemption......................................................... 12

      C. This lawsuit ................................................................................................. 14

ARGUMENT .................................................................................................................... 15

I.     Religious Schools are entitled to intervene as a matter of right..................... 16

      A. Religious Schools' motion is timely............................................................ 16

      B. Religious Schools directly benefit from the challenged Religious
         Exemption and thus have important, legally protected interests at stake
         in this case. ................................................................................................. 17

      C. Religious Schools' ability to protect their interests may be impaired. ...... 19

      D. No existing parties adequately represent Religious Schools' interests..... 20

II.    Alternatively, Religious Schools satisfy the requirements for permissive
     intervention. ................................................................................................... 25

CONCLUSION................................................................................................................. 25

CERTIFICATE OF SERVICE........................................................................................ 27

# TABLE OF AUTHORITIES

**Cases**

*California Dump Truck Owners Association v. Nichols*,
  275 F.R.D. 303 (E.D. Cal. 2011) ....................................................................... 24

*California ex rel. Lockyer v. United States*,
  450 F.3d 436 (9th Cir. 2006) ..................................................................... 17, 19

*Center for Biological Diversity v. Jewell*,
  No. CV-15-00019-TUC-JGZ, 2015 WL 13037049 (D. Ariz. May 12,
  2015) ................................................................................................................... 4

*Citizens for Balanced Use v. Montana Wilderness Association*,
  647 F.3d 893 (9th Cir. 2011) ..................................................................... 19, 24

*Donnelly v. Glickman*,
  159 F.3d 405 (9th Cir. 1998) ............................................................................ 16

*Forest Conservation Council v. United States Forest Service*,
  66 F.3d 1489 (9th Cir. 1995) ............................................................... 15, 19, 24

*Idaho Farm Bureau Federation v. Babbitt*,
  58 F.3d 1392 (9th Cir. 1995) ............................................................................ 16

*League of United Latin American Citizens v. Wilson*,
  131 F.3d 1297 (9th Cir. 1997) .......................................................................... 16

*Prete v. Bradbury*,
  438 F.3d 949 (9th Cir. 2006) ............................................................................ 16

*Smith v. Los Angeles Unified School District*,
  830 F.3d 843 (9th Cir. 2016) ............................................................................ 16

*Southwest Center for Biological Diversity v. Berg*,
  268 F.3d 810 (9th Cir. 2001) ..................................................................... 17, 24

*Trbovich v. United Mine Workers of America*,
  404 U.S. 528 (1972) .......................................................................................... 20

*United States v. Alisal Water Corporation*,
  370 F.3d 915 (9th Cir. 2004) ............................................................................ 15

*Wilderness Society v. United States Forest Service*,
  630 F.3d 1173 (9th Cir. 2011) .......................................................................... 15

## Statutes

28 C.F.R. Part 41 ....................................................................................... 23

34 C.F.R. Part 106 ..................................................................................... 12

34 C.F.R. § 106.12 ............................................................................ 13, 14, 20

86 Fed. Reg. 7023 ................................................................................. 21, 22

86 Fed. Reg. 13803 ..................................................................................... 22

Fed. R. Civ. P. 24(a)(2) ............................................................................ 3,15

20 U.S.C. § 1681 ...................................................................................... 2, 12

20 U.S.C. § 1682 ....................................................................................... 20

## Other Authorities

Biden-Harris, The Biden Plan to Advance LGBTQ+ Equality in America and
       Around the World, https://joebiden.com/lgbtq-policy/ ...................................... 20

*Application of* Bostock v. Clayton County *to Title IX of the Education
       Amendments of 1972* (Mar. 26, 2021), ............................................................ 23

## INTRODUCTION

The very existence of Title IX's Religious Exemption is at stake here, yet none of the current parties are religious educational institutions that benefit from this exemption. This case asks whether the Department may continue to grant and recognize religious exemptions enshrined in Title IX and required by the Constitution and the Religious Freedom Restoration Act. Religious Schools are Christian universities and seminaries that qualify for the Religious Exemption. Each holds, teaches, and strives to live consistent with perennial Christian beliefs about sex, gender, anthropology, marriage, and sexual morality. But Plaintiffs claim these beliefs deserve no protection. They ask the Court to declare the Religious Exemption unconstitutional and seek a permanent injunction rescinding and prohibiting religious exemptions for institutions that hold beliefs about marriage, sexuality, and gender disfavored by some. *See* Compl. at 66.

The Court should not assess the Religious Exemption's constitutionality without hearing from the very institutions the exemption was designed to protect. Because Religious Schools satisfy Rule 24's requirements, the Court should grant this motion to intervene.

## STATEMENT OF FACTS

### A.    The Religious Schools and their religious beliefs

Corban is a Christian non-profit university in Salem, Oregon, which traces its history back to 1935.[1] Declaration of Sheldon C. Nord, Ph.D., ¶¶ 2-3. Corban's mission is to educate Christians who will make a difference in the world for Jesus Christ. *Id.* ¶ 7. In 1985, the Department's Office for Civil Rights granted Corban an assurance of religious exemption from Title IX (under its prior name, "Western Baptist College"). *Id.* ¶ 4. The Department recognized that the university was

[1] In accordance with Local Civil Rule 10-3(a), the above-referenced declarations are contemporaneously filed as separate documents.

controlled by a religious organization and that it held religious tenets that conflict with Title IX, including the university's ability to take disciplinary action against students for violation of its religious beliefs on sexual morality. *Id.* Today, Corban is "controlled by a religious organization" under the meaning of Title IX. Corban requires its faculty and students to engage in religious practices of, and espouse a personal belief in, the Christian religion. *Id.* ¶ 5. Corban's bylaws include a doctrinal statement of faith and standards of conduct, and require that its faculty, employees, and students agree to comply with the statement of faith and standards of conduct. *Id.* Corban has published its bylaws articulating the university's statement of faith and institutional mission—approved by the Board of Trustees— that includes, refers to, and is predicated upon Christian beliefs and teachings. *Id.*

Jessup is a religious nonprofit, Christ-centered institution of higher learning based in Rocklin, California, which traces its history back to 1939. Declaration of John Jackson, Ph.D., ¶¶ 2, 5. In 2016, Jessup sought and received confirmation from the Department that it is exempt from Title IX and its accompanying regulations to the extent that they are interpreted to curtail Jessup's freedom to act in accordance with its religious convictions. *Id.* ¶ 3. Specifically, the Department's Office of Civil Rights sent Jessup a letter acknowledging that the University was exempted from those provisions "to the extent that they prohibit discrimination on the basis of gender identity, sexual orientation, or abortion and compliance would conflict with the controlling organization's religious tenets." *Id.* ¶ 27. Jessup is "controlled by a religious organization" within the meaning of Title IX. Jessup is affiliated with the Independent Christian Church ("ICC") and the non-denominational Restoration Movement, so Jessup explicitly identifies itself as non-denominationally Christian. Jessup's bylaws recognize its historic connection and ongoing commitment to the Restoration Movement, the tenets of which are woven into Jessup's mission and statement of faith. *Id.* ¶¶ 9-11.

Phoenix Seminary is a Protestant, evangelical, graduate-level seminary that has operated in Phoenix, Arizona, and traces its history back to 1987. Declaration of Brian Arnold, Ph.D., ¶¶ 2-3. Phoenix Seminary's mission is to train men and women for Christ-centered ministry for the building up of healthy churches in Phoenix and the world. *Id.* ¶ 9. Phoenix Seminary is "controlled by a religious organization" within the meaning of Title IX because it is a school of divinity, offering the following degree programs: Master of Divinity (M.Div.); Doctor of Ministry (D.Min.); Master of Theology (Th.M.); Master of Arts in Counseling (M.A.C.); Master of Arts in Ministry (M.A.M.); Master of Arts (Biblical and Theological Studies); and Graduate Diploma in Biblical and Theological Studies. *Id.* ¶ 11.

Collectively, Religious Schools exist as institutions of higher education to speak, spread, teach, and live out the Christian faith. Nord Decl. ¶ 7; Jackson Decl. ¶ 7; Arnold Decl. ¶ 9. Religious Schools hold and teach Christian doctrines, including ancient and perennial beliefs regarding sex, gender, marriage, and sexual morality. Nord Decl. ¶ 9; Jackson Decl. ¶¶ 20-21; Arnold Decl. ¶ 20. Specifically, Religious Schools believe and teach that sexual activity should only occur in the context of a lifelong marriage between one man and one woman. Nord Decl. ¶ 9; Jackson Decl. ¶ 20; Arnold Decl. ¶ 20. Religious Schools also believe and teach that God wonderfully and immutably creates each human person as either male or female, and that each person should live in accordance with their biological sex. Nord Decl. ¶ 9; Jackson Decl. ¶ 21; Arnold Decl. ¶ 20.

Religious Schools' religious beliefs regarding gender and human sexuality conflict with application of Title IX to the extent that Title IX's definition of "sex" is interpreted to include "sexual orientation" and "gender identity." Nord Decl. ¶ 6; Jackson Decl. ¶ 4; Arnold Decl. ¶ 8. Consistent with their religious convictions, Religious Schools engage in the following:

- Religious Schools require and offer courses where their faculty teach and discuss Christian doctrines on gender and human sexuality, encourage students to refrain from sexual activity outside of a lifelong marriage between one man and one woman, and inspire students to gratefully accept and live in accordance with the biological sex that each individual receives as a gift from God. Nord Decl. ¶ 10; Jackson Decl. ¶ 25; Arnold Decl. ¶ 22.

- Religious Schools require and encourage students to attend religious chapel services, where ministers and faculty teach Christian doctrines, including encouraging students to live consistent with Biblical views on marriage and human sexuality, encouraging students to reserve sexual activity for marriage between a man and a woman, and encouraging students to live consistent with the biological sex they received as a gift from God. Nord Decl. ¶ 16; Jackson Decl. ¶ 25.

- Religious Schools publish policies and handbooks containing their statements of faith and codes of conduct (including dress codes). Consistent with Religious Schools' religious beliefs, these policies articulate Religious Schools' beliefs on gender and human sexuality, state that sexual activity should only occur between a married husband and wife, and state that individuals should live in accordance with their biological sex. Nord Decl. ¶ 31; Jackson Decl. ¶ 25; Arnold Decl. ¶ 20.

- Religious Schools provide counseling services to their students, covering a wide range of topics and issues, including career counseling, conflict resolution, eating disorders, depression, anxiety, domestic abuse, loss and grieving, pregnancy and abortion counseling, time management, stress management, alcohol abuse, substance abuse, human sexuality, sexual identity, pornography addiction, and sex addiction. Consistent with

Religious Schools' religious beliefs, counselors advise that sexual activity should be reserved for marriage and that individuals should live in accordance with their biological sex. Nord Decl. ¶¶ 27, 31; Jackson Decl. ¶ 23; Arnold Decl. ¶ 19.

- Religious Schools separate some of their facilities (including residence hall spaces, restrooms, and locker rooms) in accordance with individuals' biological sex. Nord Decl. ¶ 31; Jackson Decl. ¶ 26; Arnold Decl. ¶ 29.

- Religious Schools separate athletic teams and competitions in accordance with individuals' biological sex. Nord Decl. ¶ 31; Jackson Decl. ¶ 26.

Religious Schools are recipients of federal funds. Nord Decl. ¶ 29; Jackson Decl. ¶ 31; Arnold Decl. ¶ 8. If Religious Schools were no longer eligible for a religious exemption under Title IX, the loss of enrollment and federal funding would severely threaten their institutions and limit their students' ability to attend the school of their choice. Nord Decl. ¶ 32; Jackson Decl. ¶ 32; Arnold Decl. ¶ 31.

### B.     Title IX and its Religious Exemption

Title IX generally provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance, . . . ." 20 U.S.C. § 1681(a). But this prohibition does not apply across the board; indeed, Title IX enumerates nine exceptions. *Id.* One guarantees religious freedom: the law's requirements "shall not apply to an educational institution which is controlled by a religious organization if the application of this subsection would not be consistent with the religious tenets of such organization." *Id.* at § 1681(a)(3). The rest carve out exemptions for a variety of secular reasons. *See id.* at § 1681(a)(1)-(9).

The Department is responsible for the administration and enforcement of Title IX and its implementing regulations, 34 C.F.R. Part 106. Under the

implementing regulations, an educational institution may assert the Religious Exemption without making a formal request for recognition by the Department. 34 C.F.R. § 106.12(b). However, an educational institution may obtain formal assurance that it is exempt by submitting a written statement from the institution's highest-ranking official to the Department's Assistant Secretary of the Office for Civil Rights, identifying the provisions of Title IX that conflict with specific tenets of the religious organization. *Id.*

Under the Department's regulations, an educational institution may establish that it is controlled by a religious organization—and is therefore eligible for the Religious Exemption—by demonstrating one or more of the following:

1. That the educational institution is a school or department of divinity;

2. That the educational institution requires its faculty, students, or employees to be members of, or otherwise engage in religious practices of, or espouse a personal belief in, the religion of the organization by which it claims to be controlled;

3. That the educational institution, in its charter or catalog, or other official publication, contains an explicit statement that it is controlled by a religious organization or an organ thereof, or is committed to the doctrines or practices of a particular religion, and the members of its governing body are appointed by the controlling religious organization or an organ thereof, and it receives a significant amount of financial support from the controlling religious organization or an organ thereof;

4. That the educational institution has a doctrinal statement or a statement of religious practices, along with a statement that members of the institution community must engage in the religious practices of, or espouse a personal belief in, the religion, its practices, or the doctrinal statement or statement of religious practices;

5. That the educational institution has a published institutional mission that is approved by the governing body of an educational institution and that includes, refers to, or is predicated upon religious tenets, beliefs, or teachings; or

6. Other evidence sufficient to establish that an educational institution is controlled by a religious organization, pursuant to 20 U.S.C. 1681(a)(3).

34 C.F.R. § 106.12(c).

### C.    This lawsuit

Thirty-three (33) individually named plaintiffs filed a Class Action Complaint on March 29, 2021. Plaintiffs allege that they are current or former students of private religious educational institutions that receive federal funding. *See* Compl. ¶1. Plaintiffs assert that many of these institutions qualify for Title IX's Religious Exemption and hold religious views that require or allow differential treatment on the basis of sexual orientation, gender identity, and gender expression. *See, e.g.,* Compl. ¶¶ 52, 71, 88, 121, 162, 179, 192, 220, 385, 397. Plaintiffs claim that Title IX's Religious Exemption improperly protects the right of these educational institutions to hold, teach, and act in accordance with certain religious views about marriage, gender, and human sexuality. *See id.* ¶ 3.

Plaintiffs assert that the Religious Exemption violates the Establishment Clause, the Equal Protection Clause, and Plaintiffs' substantive due process rights. *Id.* ¶¶ 492-524. Plaintiffs request various forms of relief, including: (1) an order that this case may be maintained as a class action; (2) judgment declaring that the Religious Exemption is unconstitutional as applied to "sexual and gender minority students;" (3) a permanent injunction prohibiting the Department from granting further religious exemptions as applied to "sexual and gender minority students;" (4) a permanent injunction rescinding all prior religious exemptions that affect "sexual and gender minority students;" (5) a permanent injunction mandating that

the Department make no distinction between secular and religious educational institutions in evaluating Title IX complaints from "sexual and gender minority students;" and (6) a permanent injunction "[r]equiring the Department to ensure that all federally-funded educational institutions respect the sexual orientation, gender identity and gender expression of their students." *Id.* at 66.

## ARGUMENT

Federal Rule of Civil Procedure 24 allows both intervention as of right and permissive intervention. The Ninth Circuit liberally evaluates these requirements in favor of granting intervention. "[T]he requirements for intervention are broadly interpreted in favor of intervention," *United States v. Alisal Water Corp.*, 370 F.3d 915, 919 (9th Cir. 2004), precisely because a "liberal policy in favor of intervention serves both efficient resolution of issues and broadened access to the courts." *Forest Conservation Council v. United States Forest Serv.*, 66 F.3d 1489, 1496 n.8 (9th Cir. 1995) (internal citation omitted) (abrogated by further broadening of intervention under a specific statute in *Wilderness Soc'y v. United States Forest Serv.*, 630 F.3d 1173 (9th Cir. 2011)).

Religious Schools satisfy the requirements for intervention as of right and permissive intervention as party defendants. This case concerns the statutory and constitutional rights of religious educational institutions and the Executive Branch's ability to ignore a clear Congressional mandate accommodating religion. Plaintiffs ask this Court to declare the Religious Exemption unconstitutional, and to the extent that the exemption has allowed religious schools and seminaries to follow their beliefs about human anthropology and sexual morality, to rescind all prior religious exemptions and prohibit them in the future. This case thus directly concerns the rights of religious institutions like Religious Schools that directly benefit from the challenged exemption. This Court should grant intervention to

Religious Schools, as the parties best equipped to defend their own constitutional and statutory rights.

## I.    Religious Schools are entitled to intervene as a matter of right.

Given the Ninth Circuit's liberal policy favoring intervention, courts broadly construe the following four criteria when evaluating intervention requests under Fed. R. Civ. P. 24(a)(2): (1) the application must be timely; (2) the applicant must have a significant protectable interest in the action; (3) the disposition of the action may, as a practical matter, impair or impede the applicant's ability to protect its interest; and (4) the existing parties may not adequately represent the applicant's interest. *See Prete v. Bradbury*, 438 F.3d 949, 954 (9th Cir. 2006); s*ee also Donnelly v. Glickman*, 159 F.3d 405, 409 (9th Cir. 1998). Courts "are guided primarily by practical and equitable considerations" in assessing these criteria. *Donnelly*, 159 F.3d at 409.

### A.    Religious Schools' motion is timely.

The Ninth Circuit gauges timeliness using "three factors: (1) the stage of the proceeding at which an applicant seeks to intervene; (2) the prejudice to other parties; and (3) the reason for and length of the delay." *League of United Latin Am. Citizens v. Wilson*, 131 F.3d 1297, 1302 (9th Cir. 1997) (cleaned-up). Even a motion filed four months after a lawsuit begins is considered filed at "a very early stage" in the Ninth Circuit. *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1397 (9th Cir. 1995).

Here, Religious Schools filed  their  motion  less than  two weeks  after Plaintiffs filed their Class Action Complaint. No Defendant has yet filed an answer, and Religious Schools do not seek to alter any Court deadlines, so no party can possibly be prejudiced. *See Smith v. Los Angeles Unified Sch. Dist.*, 830 F.3d 843, 857 (9th Cir. 2016) (holding that "the only 'prejudice' that is relevant under

this factor is that which flows from [the] prospective intervenor's" delay) (citation omitted). Religious Schools have therefore satisfied the timeliness factors.

**B.    Religious Schools directly benefit from the challenged Religious Exemption and thus have important, legally protected interests at stake in this case.**

Second, Religious Schools have a legally protected interest as the direct beneficiaries of the Religious Exemption. A proposed intervenor will be found to have a "significant protectable interest in an action if (1) it asserts an interest that is protected under some law, and (2) there is a relationship between its legally protected interest and the plaintiff's claim." *Cal. ex rel. Lockyer v. United States*, 450 F.3d 436, 441 (9th Cir. 2006) (quoting *Donnelly*, 159 F.3d at 409). Granting intervention is particularly appropriate where "the injunctive relief sought by the plaintiffs will have direct, immediate, and harmful effects upon [the proposed intervenor's] legally protectable interests." *Southwest Ctr. for Biological Diversity v. Berg*, 268 F.3d 810, 818 (9th Cir. 2001) (quoting *Forest Conservation Council*, 66 F.3d at 1494). Specifically, Religious Schools have statutory interests under Title IX's Religious Exception and under the Religious Freedom Restoration Act, and they have constitutional interests under the First Amendment.

This lawsuit takes aim at some of Religious Schools' most foundational interests. Plaintiffs seek an injunction rescinding and prohibiting all religious exemptions under Title IX for religious educational institutions holding beliefs that Plaintiffs consider objectionable. Plaintiffs also seek a declaratory judgment to nullify the Religious Exemption altogether. Simply put, the requested relief would force Religious Schools to choose between violating their religious convictions and foregoing religious speech about important issues like sex, gender, anthropology, marriage, and sexual morality, and losing critical federal funding

for their institutions and students. That not only violates the express text of Title IX and Congress' intent, but it also violates Religious Schools' rights under the First Amendment and the Religious Freedom Restoration Act (RFRA).

Specifically, the requested relief would compromise Religious Schools' ability to operate their institutions in accord with their religious convictions, including but not limited to the following:

- Oral and written speech in chapel, in the classroom, in confidential student counseling, and in school policies and handbooks—all of which encourage students to live consistently with Biblical views on marriage and human sexuality, to reserve sexual activity for marriage between a man and a woman, and to live consistently with the biological sex they received as a gift from God;
- Standards of conduct (including dress codes) for faculty, students, and staff to cultivate and reflect the Christian faith, including doctrines on sex, gender, marriage, sexual morality, and gender identity;
- Separation based on biological sex for certain facilities, including residence halls, restrooms, and locker rooms;
- Separation based on biological sex for certain activities, including sex-separated athletic teams.

The requested relief would force Religious Schools to decide between abandoning their religious convictions or forfeiting federal funding. The requested relief also presents an impossible situation for many of Religious Schools' students, especially those with limited means, who want to attend institutions with Christian convictions yet need federal assistance to pursue higher education at all.

Because the requested relief would clearly have "direct, immediate, and harmful effects upon" Religious Schools, the significant protectable interest factor

Motion to Intervene and Memorandum in Support                                    18

is satisfied. *See, e.g.*, *Lockyer*, 450 F.3d at 441 (finding a significant protectable interest where federal law "provide[d] an important layer of protection" to intervenors, and where intervenors would "likely . . . be forced to choose between adhering to their beliefs and losing their professional licenses" in the event such a law were to be struck down as a result of the underlying litigation). Indeed, it is difficult to imagine a case where this factor is more clearly met than here.

## C.    Religious Schools' ability to protect their interests may be impaired.

A significantly protectable interest is closely linked with the third requirement for intervention of right—that the outcome of the challenge may impair the proposed intervenor's interest. Indeed, once a court finds that the intervenor has a protectable interest in the litigation, it should have "little difficulty concluding that the disposition of th[e] case may, as a practical matter, affect" the intervenor. *Citizens for Balanced Use v. Montana Wilderness Ass'n*, 647 F.3d 893, 898 (9th Cir. 2011) (citation omitted).

Here, the possibility of impairment is obvious. If Plaintiffs prevail, Religious Schools would be stripped of an important statutory exemption that allows them to operate consistently with their religious convictions, unhindered by the existential threat associated with loss of federal funding for the school and its students. And if Religious Schools are not permitted to intervene, they may "have no legal means to challenge [any] injunction" that might be granted by this Court. *Forest Conservation Council*, 66 F.3d at 1498; *see Lockyer*, 450 F.3d at 443 (finding impairment where proposed intervenors would have "no alternative forum . . . [to] . . . contest [the] interpretation" of a law that was "struck down" or had its "sweep [] substantially narrowed"). Under these circumstances, Religious Schools satisfy the impairment factor.

**D.     No existing parties adequately represent Religious Schools'
interests.**

To satisfy this factor, an intervenor need only "show [] that representation of
[its] interest '*may be*' inadequate," and "the burden of making that showing should
be treated as minimal." *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538
n.10 (1972) (emphasis added). As demonstrated below, Religious Schools' interests
are not adequately represented by any party in this action.

Both the Department and its Acting Assistant Secretary for the Office for
Civil Rights are currently charged with effectuating section 1681(a), which includes
the Religious Exemption. *See* 20 U.S.C. § 1682; 34 C.F.R. § 106.12. The Ninth
Circuit has yet to address whether Title IX's prohibition against discrimination "on
the basis of sex" includes discrimination based on sexual orientation or gender
identity. The answer to that question controls whether this Court should reach
Plaintiffs' challenge to the religious exemption in Title IX and its implementing
regulations. And the Department will likely take the position in this case that Title
IX's prohibition against sex discrimination includes discrimination based on sexual
orientation and gender identity.

In campaigning for President, then-candidate Joseph R. Biden, Jr. promised
that he would "take action using his executive authority" to "immediately reverse"
what he claimed were the "discriminatory actions of the Trump-Pence
Administration" and "then go further to end discrimination against LGBTQ+
individuals."[2] Toward that aim, then-Candidate Biden proclaimed that he would
"reinstate the Obama-Biden guidance revoked by the Trump-Pence Administration,
which will restore transgender students' access to sports, bathrooms, and locker
rooms in accordance with their gender identity" and would "direct his Department

---

[2] Biden-Harris, The Biden Plan to Advance LGBTQ+ Equality in America and
Around the World, https://joebiden.com/lgbtq-policy/ (last viewed Apr. 8, 2021).

of Education to vigorously enforce and investigate violations of transgender students' civil rights." Biden-Harris, *supra* note 1. Mr. Biden also added that he would "end the misuse of broad [religious] exemptions to discriminate." *Id.*

Immediately after taking office, President Biden signed Executive Order 13,988 of January 20, 2021 (Preventing and Combatting Discrimination on the Basis of Gender Identity or Sexual Orientation). *See* 86 Fed. Reg. 7023 (Jan. 25, 2021). That order declares:

A.    "It is the policy of my Administration to prevent and combat discrimination on the basis of gender identity or sexual orientation, and to fully enforce Title VII and other laws that prohibit discrimination on the basis of gender identity or sexual orientation. It is also the policy of my Administration to address overlapping forms of discrimination." *Id.*, § 1.

B.    "Under [the reasoning of *Bostock v. Clayton County*, 590 U.S. __, 140 S. Ct. 1731 (2020)], laws that prohibit sex discrimination—*including Title IX* of the Education Amendments of 1972, as amended (20 U.S.C. 1681 et seq.), the Fair Housing Act, as amended (42 U.S.C. 3601 et seq.), and section 412 of the Immigration and Nationality Act, as amended (8 U.S.C. 1522), along with their respective implementing regulations—prohibit discrimination on the basis of gender identity or sexual orientation, so long as the laws do not contain sufficient indication to the contrary." *Id.* (emphasis added).

C.    "The head of each agency shall, as soon as practicable and in consultation with the Attorney General, as appropriate, review all existing orders, regulations, guidance documents, policies, programs or other agency actions ('agency actions') that: (i) were promulgated or are administered by the agency under Title VII or any other statute or regulation that prohibits sex discrimination . . . ; and (ii) are or may be inconsistent with the policy set forth in section 1 of this order." *Id.* § 2(a).

D.     "The head of each agency shall, as soon as practicable and as appropriate and consistent with applicable law, including the Administrative Procedure Act (5 U.S.C. 551 et seq.), consider whether to revise, suspend, or rescind such agency actions, or promulgate new agency actions, as necessary to fully implement statutes that prohibit sex discrimination and the policy set forth in section 1 of this order." *Id.* § 2(b).

E.     "The head of each agency shall, as soon as practicable, also consider whether there are additional actions that the agency should take to ensure that it is fully implementing the policy set forth in section 1 of this order. If an agency takes an action described in this subsection or subsection (b) of this section, it shall seek to ensure that it is accounting for, and taking appropriate steps to combat, overlapping forms of discrimination, such as discrimination on the basis of race or disability." *Id.* § 2(c).

The White House thus began requiring every federal agency to implement Executive Order 13988 in every civil rights law.

But Executive Order 13988 was not the President's last statement on Title IX. On March 8, 2021, President Biden issued an Executive Order announcing that "[i]t is the policy of my Administration that all students should be guaranteed an educational environment free from discrimination on the basis of sex . . . including discrimination on the basis of sexual orientation or gender identity." Exec. Order 14021, 86 Fed. Reg. 13803, § 1 (Mar. 8, 2021). "[T]his guarantee," the Order declares, "*is codified*, in part, in Title IX . . . , which prohibits discrimination on the basis of sex in education programs or activities receiving Federal financial assistance." *Id.* (emphasis added). The Order directs the Secretary of Education to "consider suspending, revising, or rescinding" any regulations or agency actions that are inconsistent with the policy set forth above. *Id.* at § 2(a)(iii). And just this week, on April 6, 2021, the Secretary of Education published a letter announcing that, as

required by the Executive Order, the Department's Office for Civil Rights is undertaking a comprehensive review of existing regulations, orders, guidance, policies, and other similar agency actions, including Title IX regulations. Dept. of Educ. Ltr. Regarding Exec. Order 14,021, attached as **Exhibit 1**.

In addition, the United States Department of Justice—the agency charged with coordinating the implementation and enforcement of the nation's nondiscrimination laws and who will likely represent the Department in this lawsuit[3]—has recently stated its view that discrimination "on the basis of sex" under Title IX includes discrimination based on sexual orientation and gender identity. *See* Pamela S. Karlan, Principal Deputy Assistant General, *Application of Bostock v. Clayton County to Title IX of the Education Amendments of 1972* (Mar. 26, 2021), available at https://www.justice.gov/crt/page/file/1383026/download (last visited Apr. 8, 2021). In her March 26, 2021 memorandum to federal agency civil rights directors, Ms. Karlan states: "After considering the text of Title IX, Supreme Court caselaw, and developing jurisprudence in this area, the [Civil Rights] Division [of the Department of Justice] has determined that the best reading of Title IX's prohibition on discrimination 'on the basis of sex' is that it includes discrimination on the basis of gender identity and sexual orientation." *Id.* at 2. Ms. Karlan offers her memorandum as "a starting point for . . . agencies to ensure the consistent and robust enforcement of Title IX . . . ." *Id.* at 3.

Because the President has ordered the current defendants to review and rescind regulations conflicting with his Administration's policy expanding the definition of sex discrimination to include sexual orientation and gender identity, and because the Department has already begun reviewing Title IX regulations for

---

[3] *See* Executive Order 12250 of November 2, 1980, 28 C.F.R. Part 41, App. A.

potential rescission, the current defendants will not defend the Religious Exemption as vigorously as Religious Schools.

Moreover, the federal government's "representation of the public interest" is not "identical to the individual parochial interest" of Religious Schools. *Citizens for Balanced Use*, 647 F.3d at 899 (internal quotations and citations omitted). This distinction by itself justifies a grant of intervention. *See Forest Conservation*, 66 F.3d at 1499 (finding minimal burden of establishing inadequate representation was met where federal government defendant was "not charged with a duty to represent . . . asserted interests [of proposed intervenor] in defending against. . . injunction"); *see also Cal. Dump Truck Owners Ass'n v. Nichols*, 275 F.R.D. 303, 308 (E.D. Cal. 2011) (even when government agency and proposed intervenor shared the same "ultimate objective," finding inadequate representation where the former's interest was generally to account for the "economic impact its rules [would] have on the state *as a whole*," while the latter's interests were "more '*narrow and parochial*'") (emphasis added). Indeed, "[i]nadequate representation is most likely to be found when the applicant asserts a personal interest that does not belong to the general public." *Forest Conservation*, 66 F.3d at 1499 (quoting 3B Moore's Federal Practice, ¶ 24.07[4] at 24–78 (2d ed. 1995)). That is particularly the case here, where Religious Schools seek to protect their interest to follow and teach their religious beliefs without threat of punishment, whereas the federal government's interest is far more expansive and generalized.

In sum, Religious Schools and the federal defendants have very different interests. Given these facts, the federal defendants will neither "advance the same arguments as" Religious Schools, nor will they "simply confirm" the interests of Religious Schools in this action. *Berg*, 268 F.3d at 824. Thus, Religious Schools have met their minimal burden to establish that no adequate representation exists to

protect their private interests in seeing that the Religious Exemption survives this litigation.

## II.    Alternatively, Religious Schools satisfy the requirements for permissive intervention.

In the alternative, this Court should exercise its discretion and grant permissive intervention. Under Rule 24(b), courts may grant permissive intervention to anyone who "has a claim or defense that shares with the main action a common question of law or fact." This motion is timely and allowing intervention will cause no undue delay or prejudice to the original parties because this lawsuit has just begun. Moreover, Religious Schools' anticipated defense—that the Religious Exemption is not only permissible but rather statutorily and constitutionally *required*—shares a common question of law or fact with this action.

As private religious institutions that have a real and existential stake in this action's outcome, Religious Schools can provide this Court with a perspective that it otherwise would not hear—the burden that eliminating the Religious Exemption would have on religious universities, their students, and their statutory and constitutional rights. As Religious Schools' involvement would aid the Court, they should be allowed to intervene.

## CONCLUSION

The Court should grant Religious Schools' motion and allow them to intervene either as of right or permissively. The Court should not assess the constitutionality of the Religious Exemption without hearing from the very religious educational institutions that the exemption was designed to protect.

Respectfully submitted this 9th day of April, 2021.


David A. Cortman*
GA Bar No. 188810
Alliance Defending Freedom
1000 Hurricane Shoals Rd. NE
Suite D-1100
Lawrenceville, GA 30043
Telephone: (770) 339-0774
dcortman@ADFlegal.org




*Application for Admission Pending

/s/ Kristen K. Waggoner
_____
Kristen K. Waggoner,
OR Bar No. 067077
Lead Counsel

Ryan J. Tucker*
AZ Bar No. 034382
Mark A. Lippelmann*
AZ Bar No. 036553
Alliance Defending Freedom
15100 N. 90th Street
Scottsdale, AZ 85260
Telephone: (480) 444-0020
kwaggoner@ADFlegal.org
rtucker@ADFlegal.org
mlippelmann@ADFlegal.org


Attorneys for Proposed Intervenor-Defendants

## CERTIFICATE OF SERVICE

I hereby certify that on April 9, 2021, the foregoing was served via CM/ECF on counsel for all parties.

/s/ Kristen K. Waggoner
KRISTEN K. WAGGONER,
OR Bar No. 067077
*Lead Counsel*

*Attorneys for Proposed Intervenor-Defendants*