Herbert G. Grey, OSB # 810250
4800 SW Griffith Drive, Suite 320
Beaverton, Oregon 97005-8716
Telephone: (503) 641-4908
Email: herb@greylaw.org

Gene C. Schaerr, DC Bar # 416368*
Email: gschaerr@schaerr-jaffe.com
Nicholas Miller, MI Bar# P70694*
Email: nmiller@schaerr-jaffe.com
Joshua J. Prince, DC Bar # 1685532*
Email: jprince@schaerr-jaffe.com
Schaerr | Jaffe LLP
1717 K Street NW, Suite 900
Washington, D.C. 20006
Telephone: (202) 787-1060

* *Pro hac vice* application forthcoming
*Counsel for Proposed Defendant-Intervenor*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

Eugene Division

ELIZABETH HUNTER, et al.,

                Plaintiffs,

      v.

U.S. DEPARTMENT OF EDUCATION, et al.,

                Defendants,

      v.

COUNCIL FOR CHRISTIAN COLLEGES & UNIVERSITIES,

    Proposed Defendant-Intervenor.

No. 6:21-CV-00474-AA

PROPOSED DEFENDANT-INTERVENOR CCCU'S MOTION TO INTERVENE AND MEMORANDUM IN SUPPORT

ORAL ARGUMENT REQUESTED

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ 3

LR 7-1(A) CERTIFICATION ........................................................................................... 7

MOTION AND INTRODUCTION.................................................................................... 7

STATEMENT .................................................................................................................. 10

    A. Legal Background ............................................................................................... 10

    B.  Religious higher education brings enormous benefits to society. ...................... 12

    C.  CCCU represents over one hundred colleges controlled by religious organizations........ 13

ARGUMENT ................................................................................................................... 15

    I.   CCCU Has Associational Standing To Protect The Interests Of Its Member Colleges. .. 15

    II.  CCCU Is Entitled To Intervene As Of Right. .................................................... 18

        A.  CCCU's member colleges have a significantly protectable interest in Title IX's religious exemption because it directly protects them from claims that would interfere with their ability to live according to their religious doctrines. ................................. 19

        B.  If this Court found Title IX's religious exception unconstitutional, even in part, those protections would be lost or compromised. ............................................................. 21

        C.  Defendants are unlikely to represent CCCU's interests adequately. .......................... 22

    III. Alternatively, CCCU Should Be Allowed Permissive Intervention. ................................ 26

        A.  CCCU's member colleges—many of which were mentioned by name in the Complaint—are currently entitled to the Title IX exception. ..................................... 27

        B.  The constitutional defenses that CCCU will raise share common issues of law with the main action because they will respond directly to plaintiffs' constitutional attacks on the Title IX exemption. ........................................................................................ 27

CONCLUSION.................................................................................................................. 29

CERTIFICATE OF SERVICE ......................................................................................... 30

CERTIFICATE OF COMPLIANCE................................................................................31

EXHIBITS

Declaration of Shirley Hoogstra ..................................................................EXHIBIT A

Proposed Rule 24(c) Answer In Intervention .............................................EXHIBIT B

Proposed Motion to Dismiss.........................................................................EXHIBIT C

# TABLE OF AUTHORITIES

**Cases**

*Am. Diabetes Ass'n v. U.S. Dep't of the Army*,
  938 F.3d 1147 (9th Cir. 2019) ............................................. 15

*Arizona v. Jewell*,
  2016 WL 3475333 (D. Ariz. 2016) ........................................ 19

*Beckman Indus., Inc. v. Int'l Ins. Co.*,
  966 F.2d 470 (9th Cir.1992) ............................................... 26

*Citizens for Balanced Use v. Montana Wilderness Association*,
  647 F.3d 893 (9th Cir. 2011) .............................................. 23

*County of Fresno v. Andrus*,
  622 F.2d 436 (9th Cir.1980) ............................................... 19

*Donnelly v. Glickman*,
  159 F.3d 405 (9th Cir. 1998) .............................................. 19

*Espinoza v. Montana Department of Revenue*,
  140 S. Ct. 2246 (2020) ..................................................... 27

*Forest Conservation Council v. United States Forest Service*,
  66 F.3d 1489 (9th Cir. 1995) .............................................. 22

*Freedom from Religion Found.*, Inc. *v. Geithner*,
  644 F.3d 836 (9th Cir. 2011) .............................................. 26

*Greene v. United States*,
  996 F.2d 973 (9th Cir. 1993) .............................................. 19

*Humane Soc'y of the United States v. Hodel*,
  840 F.2d 45 (D.C.Cir.1988) ................................................ 16

*Hunt v. Wash. State Apple Adver. Comm'n*,
  432 U.S. 333 (1977) ........................................................ 15

*Klamath-Siskiyou Wildlands Ctr. v. Grantham*,
  2018 WL 6338740 (E.D. Cal. Dec. 5, 2018) ............................. 15

*League of United Latin Am. Citizens v. Wilson*,
  131 F.3d 1297 (9th Cir. 1997) ............................................ 26

*Linda R.S. v. Richard D.*,
  410 U.S. 614 (1973) ........................................................ 15

*Nw. Forest Res. Council v. Glickman*,
  82 F.3d 825 (9th Cir. 1996) ............................................... 22

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
  140 S. Ct. 2049 (2020) ................................................ 7, 12

*Perry v. Proposition 8 Off. Proponents*,
  587 F.3d 947 (9th Cir. 2009) ...................................................................... 22

*Presidio Golf Club v. National Park Service*,
  155 F.3d 1153 (9th Cir. 1998) ............................................................. 16, 17

*Smith v. Los Angeles Unified Sch. Dist.*,
  830 F.3d 843 (9th Cir. 2016) ...................................................................... 18

*Sw. Ctr. For Biological Diversity*,
  268 F.3d 810 (9th Cir. 2001) ...................................................................... 22

*Thomas v. Rev. Bd. of Indiana Emp. Sec. Div.*,
  450 U.S. 707 (1981)............................................................................... 23, 27

*Trbovich v. United Mine Workers*,
  404 U.S. 528 (1972).................................................................................... 22

*United Food and Commercial Workers Union Local 751 v. Brown Group, Inc.*,
  517 U.S. 544 (1996).................................................................................... 17

*United States v. Brooks*,
  164 F.R.D. 501 (D. Or. 1995) .................................................................... 18

*United States v. City of Los Angeles*,
  288 F.3d 391 (9th Cir. 2002) ...................................................................... 21

*United States v. Washington*,
  86 F.3d 1499 (9th Cir. 1996) ...................................................................... 18

*Venegas v. Mitchell*,
  495 U.S. 82 (1990)...................................................................................... 26

*Venegas v. Skaggs*,
  867 F.2d 527 (9th Cir. 1989) ...................................................................... 26

*Wedgewood Ltd. P'ship v. Twp. of Liberty*,
  2005 WL 1211305 (S.D. Ohio 2005).......................................................... 21

*Wilderness Soc. v. U.S. Forest Serv.*,
  630 F.3d 1173 (9th Cir. 2011) (en banc) .................................................... 18

**Statutes**

20 U.S.C. §1681(a) ........................................................................... *passim*

Equality Act, H.R. 5, 117th Cong. (2021) .................................................. 24

**Other Authorities**

A.S. Singleton Memo (Feb. 1985)................................................................ 11

Biden Harris, *The Biden Plan To Advance LGBTQ+ Equality In America And Around The World*,
  https://joebiden.com/lgbtq-policy/ .......................................................... 9, 24

CCCU, *List of CCCU Institutions*,
  https://www.cccu.org/members_and_affiliates/ ......................................... 15

CCCU,
*The Case for Christian Higher Education* (2018), https://www.cccu.org/wp-
content/uploads/2018/08/2018-Case-for-CHE_WEB_pages.pdf ............................................ 12

EDSmart,
*College Sexual Assault Statistics of Top Ranked Schools 2015*,
http://www.edsmart.org/college-sexual-assault-statistics-top-ranked-schools/#stats............... 12

Ellen B. Stolzenberg, et al.,
Higher Education Research Institute at UCLA, *Undergraduate Teaching Faculty: The HERI
Survey*, 2016-2017 (2019), https://heri.ucla.edu/monographs/HERI-FAC2017-
monograph.pdf ..................................................................................................................... 12

Joe Biden,
*Joe Biden: Americans must stand with LGBT people around the world*, The Washington Post
(May 16, 2017), https://www.washingtonpost.com/opinions/joe-biden-americans-must-stand-
with-lgbt-people-around-the-world/2017/05/16/3d42d360-3a51-11e7-8854-
21f359183e8c_story.html ..................................................................................................... 24

Kif Augustine Adams,
*Religious Exemptions to Title IX*, 65 U. Kan. L. Rev. 327 (2016) ......................................... 20

Office for Civil Rights,
*Exemptions from Title IX*,
https://www2.ed.gov/about/offices/list/ocr/docs/t9-rel-exempt/index.html ............................ 20

Office for Civil Rights,
*Other Correspondence*,
https://www2.ed.gov/about/offices/list/ocr/correspondence/other.html .................................. 10

Office for Civil Rights,
*Religious Exemptions Index 2009-2016*,
https://www2.ed.gov/about/offices/list/ocr/docs/t9-rel-exempt/z-index-links-list-2009-
2016.html .............................................................................................................................. 10

Office for Civil Rights,
*Religious Exemptions Index Prior to 2009*,
https://www2.ed.gov/about/offices/list/ocr/docs/t9-rel-exempt/z-index-links-list-
pre-2009.html........................................................................................................................ 10

Principal Deputy Assistant Attorney General Pamela S. Karlan,
*Memorandum*, Application *of* Bostock v. *Clayton County to Title IX of the Education
Amendments of 1972* (Mar. 26, 2021),
https://www.justice.gov/crt/page/file/1383026/download ..................................................... 24

The White House,
*Executive Order on Preventing and Combating Discrimination on the Basis of Gender Identity
or Sexual Orientation* (Jan. 20, 2021), https://www.whitehouse.gov/briefing-
room/presidential-actions/2021/01/20/executive-order-preventing-and-combating-
discrimination-on-basis-of-gender-identity-or-sexual-orientation/ ......................................... 24

The White House,
  *Statement by President Joseph R. Biden, Jr. on the Introduction of the Equality Act in
  Congress* (Feb. 19, 2021), https://www.whitehouse.gov/briefing-room/statements-
  releases/2021/02/19/statement-by-president-joseph-r-biden-jr-on-the-introduction-of-the-
  equality-act-in-congress/ ........................................................................................................ 24

**Regulations**

34 C.F.R. §106.12(b) ............................................................................................................ 10, 19

34 C.F.R. §106.12(c) .................................................................................................................. 11

**Rules**

Fed. R. Civ. P. 12(b) .................................................................................................................. 18

Fed. R. Civ. P. 24(a) ................................................................................................. 7, 9, 18, 29

Fed. R. Civ. P. 24(b) ............................................................................................... 7, 9, 26, 29

Fed. R. Civ. P. 24(c) ............................................................................................................ 18, 28

**Scriptural Authorities**

1 Corinthians 1:18 (NIV) ......................................................................................................... 23

Exodus 20:14 (NIV) ................................................................................................................. 20

Genesis 5:1–2 (NIV) ................................................................................................................ 20

Mark 10:7 (NIV) ...................................................................................................................... 20

## LR 7-1(A) CERTIFICATION

The proposed intervenor certifies that, as required by LR 7-1(A), it has conferred with counsel for the parties. The United States take no position currently, and the Plaintiffs oppose this motion.

## MOTION AND INTRODUCTION

The Council for Christian Colleges & Universities ("CCCU") moves to intervene as a defendant as of right under Fed. R. Civ. P. 24(a) or, in the alternative, by permission under Fed. R. Civ. P. 24(b)(1).  Although Plaintiffs' claims are legally frivolous, it is important that CCCU— widely recognized as one of the leading voices of American religious higher education—be permitted to assert and defend its members' interests in preserving the important provision of Title IX that Plaintiffs challenge here.

The First Amendment's Religion Clauses protect the right of religious colleges, like other religious institutions, to decide and further their beliefs "without government intrusion." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2060 (2020). This freedom is "essential" to their "central mission" of furthering the "religious education and formation of students." *Id.* at 2055. Making decisions about teachers, the issue in *Our Lady of Guadalupe*, is only one "component" of religious colleges' "autonomy with respect to internal management decisions that are essential" to fulfilling that mission. *Id.* at 2060. Another is through setting belief-based conduct codes applicable to students and faculty alike. For nearly 50 years, Congress has protected religious colleges' right to set such conduct codes, exempting them from Title IX whenever its application would require them to violate religious tenets. 20 U.S.C. § 1681(a)(3).

The member colleges of the CCCU benefit from that exemption. CCCU comprises a wide variety of religious colleges, many of which have core religious tenets that conflict with Plaintiffs'

understanding of Title IX. Thus, to CCCU's member colleges, the Title IX religious exemption has proven indispensable as contemporary notions of sexuality and gender depart, often substantially, from the religious beliefs that animate every aspect of Christian campus life. Because it contests the constitutionality of that exemption, this case presents an existential threat to religious higher education: Removing Title IX's religious exemption, as applied to LGBT students or otherwise, will deprive religious colleges of the oxygen that gives them life by forbidding them, on pain of losing federal assistance for their students, from teaching and expecting adherence to their core religious beliefs.

Moreover, although the Complaint mentions many religious colleges by name—including eighteen of CCCU's members—it included none as defendants. *See* Compl., Dkt. 1, ¶¶ 9–43. Unless this Court grants this motion, many of the very colleges that directly benefit from the exemption and that are the specific subjects of plaintiffs' attacks will go unheard, even as the exemption, if Plaintiffs prevail, is largely eviscerated.

As explained in more detail below, CCCU (by asserting the rights of its member religious colleges) is entitled to intervene under Rule 24(a). CCCU's member schools have a powerful interest in preserving the Title IX exemption in all its applications. Only through intervention can CCCU ensure that this Court fully understands the vital importance of the religious exemption to religious colleges in an ever-changing world. And, because the current Administration has already promised to "reverse" what it calls the "misuse of broad exemptions" to "discriminate against LGBTQ+ people"—a characterization of religious exemptions that the proposed intervenor categorically rejects—it is unlikely that the federal defendants will adequately represent the interests of CCCU's member colleges. *See* Biden Harris, *The Biden Plan To Advance LGBTQ+*

*Equality in America and Around the World*, https://joebiden.com/lgbtq-policy/.  Accordingly, CCCU is entitled to intervene to ensure the exemption's continued vitality.

But even if this Court finds that intervention as of right is inappropriate, it should nevertheless allow CCCU to intervene because it could do so without harming any of the parties and because the defenses it will raise are directly related to the underlying challenge to the Title IX religious exemption.  Indeed, as shown in the proposed motion to dismiss attached as Exhibit C (which CCCU will formally file after intervention is granted), CCCU intends to move to dismiss all of Plaintiffs' claims on three independent grounds:  Plaintiffs lack standing; they failed to join necessary parties; and their legal claims are all frivolous.

In short, because CCCU satisfies all the requirements of Rule 24(a) and, alternatively, Rule 24(b)(1)(B), the motion should be granted.

## STATEMENT

### A. Legal Background

Section 901 of Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance[.]" 20 U.S.C. § 1681(a). This seemingly general prohibition, however, is subject to multiple exceptions, including an exemption for single-sex or military institutions. *Id.* § 1681(a)(4), (5). Most notable here, Congress carved out an exception for religious educational institutions when Title IX's application would "not be consistent with the religious tenets of such organization." *Id.* § 1681(a)(3). Whenever the application of Title IX would be inconsistent with a religious school's core religious beliefs, the exemption applies, whether or not the school has applied for it. 34 C.F.R. § 106.12(b).[1]

Educational institutions demonstrate that they are controlled by a religious organization by showing that they satisfy *any* of the following conditions:

(1) are a divinity school or department;

(2) require their faculty, students, or employees to have some relationship with the controlling organization, such as formal membership or personal beliefs in the doctrine;

---

[1] Although not necessary, many schools—including many of the Council for Christian Colleges & Universities' member colleges, have expressly sought recognition that the exemption belongs to them by submitting in writing an enumerated list of reasons why Title IX's application would require them to violate their religious beliefs. *See, e.g.*, Office for Civil Rights, *Religious Exemptions Index 2009-2016*, https://www2.ed.gov/about/offices/list/ocr/docs/t9-rel-exempt/z-index-links-list-2009-2016.html; Office for Civil Rights, *Other Correspondence*, https://www2.ed.gov/about/offices/list/ocr/correspondence/other.html (cataloging, among other things, requests from Jan. 1, 2017 to the present); Office for Civil Rights, *Religious Exemptions Index Prior to 2009*, https://www2.ed.gov/about/offices/list/ocr/docs/t9-rel-exempt/z-index-links-list-pre-2009.html. In response to such letters, presidential administrations since Title IX's enactment have uniformly acknowledged the exemption's application to protect religious institutions' religious practices and beliefs.

(3) have controlling or official documents expressly mentioning that the institution is controlled by the religious organization, committed to its doctrines, subject to its leadership appointments, and significantly funded by the religious organization or its subparts;

(4) have a doctrinal statement of religious practices or beliefs, including a requirement that members engage with those practices or espouse the beliefs of the religion itself;

(5) have a published institutional religious mission that mentions the importance of religious tenets, beliefs, or teachings; or

(6) are able to demonstrate other indicia of religious control.

34 C.F.R. § 106.12(c); A.S. Singleton Memo (Feb. 1985), https://perma.cc/2P9F-W98H. Any single factor is itself "sufficient to establish that an educational institution is controlled by a religious organization." *Ibid.*

Currently, the Title IX religious exemption either applies to a religious college—meaning that Title IX's general prohibition of sex discrimination does not—or it does not apply to the religious college—meaning that the college is subject to the full force of Title IX (unless, of course, another exception to Title IX applies). Congress did not engage in line drawing: If applying Title IX would require a religious college to violate its religious tenets, then Title IX simply does not apply. 20 U.S.C. § 1681(a)(3).

This case, brought by thirty-three named plaintiffs who are or were students at private religious colleges or universities whose students receive federal funding, seeks to narrow that categorical exemption. Compl. ¶1. Plaintiffs concede that the religious exemption currently protects these colleges. *See, e.g.*, Compl., Dkt. 1, ¶¶ 52, 71, 88, 121, 162, 179, 192, 220, 385, 397. They claim this protection is unconstitutional insofar as it allows religious colleges to teach and require compliance with their religious beliefs on gender and human sexuality, including the proper role of marriage. *Id.* ¶ 3; *id.* at 66. Because of this, they seek, among other things, to enjoin

the religious exemption as applied to "sexual and gender minority students" and to revoke the exemption to the extent it affects such students. *Id.* at 66.

### B. Religious higher education brings enormous benefits to society.

Congress's adoption of the Title IX religious exemption reflects the well-settled value and importance of religious higher education in America. In addition to being academically competitive with non-religious schools, religious colleges and universities typically offer advantages that are often not as readily available in non-religious institutions. These include the opportunity to study academic disciplines guided by faith,[2] and to naturally integrate community service into higher education.[3]  Religious colleges also often provide greater physical safety to their students[4] and a broader diversity of philosophical and political perspectives among professors and students.[5]

Since before the Founding, moreover, religious colleges and universities have played a crucial role in educating the next generation of believing citizens and leaders.  At such institutions, teachers teach and students learn through the lens of faith.  Indeed, that is the distinctive promise a typical religious college makes to students and their families—that all instruction will be shaped by the school's particular theological understandings. Thus, the social-work course, the math course, and the English literature course are all taught and studied from a faith-based perspective.

---

[2] *See Our Lady*, 140 S. Ct. at 2066 (exploring the "close connection that religious institutions draw between their central purpose and educating the young in the faith").

[3] *See* CCCU, *The Case for Christian Higher Education* 8-10 (2018), https://www.cccu.org/wp-content/uploads/2018/08/2018-Case-for-CHE_WEB_pages.pdf.

[4] *See* EDSmart, *College Sexual Assault Statistics of Top Ranked Schools 2015*, http://www.edsmart.org/college-sexual-assault-statistics-top-ranked-schools/#stats (last visited May 1, 2021).

[5] Ellen B. Stolzenberg, et al., Higher Education Research Institute at UCLA, *Undergraduate Teaching Faculty: The HERI Survey*, 2016-2017, at 38 (2019), https://heri.ucla.edu/monographs/HERI-FAC2017-monograph.pdf.

Faith is not a mere additive to the educational experience; it is the oxygen that gives it life. To deliver on that promise, many religious colleges believe it is important that all members of the community live the basic precepts taught by that community—including principles related to marriage and sexuality.

### C. CCCU represents over one hundred colleges controlled by religious organizations.

Founded in 1976, the Council for Christian Colleges & Universities is the largest association of protestant Christian institutions of higher learning. Exhibit A, Declaration of Shirley Hoogstra ¶ 1. Its 189 member colleges span the globe, and over 140 of them are in the United States. *Id.* Each of its members is accredited and provides the comprehensive educational opportunities to their students, leavened by faith-based instruction and perspectives. *Id.* CCCU's stated mission is to "advance the cause of Christ-centered higher education" and help its members "transform lives by faithfully relating scholarship and service to biblical truth." *Id.* ¶ 2. Although CCCU's member colleges represent more than 30 different Christian denominations, they are united by CCCU's mission. *Id.* Each of CCCU's member institutions strives to further the Christian faith by teaching its students, and serving as models of, genuine Christian living. *Id.*

Many of CCCU's schools have sincere religious beliefs that squarely conflict with contemporary understandings about sex and gender. *Id.* ¶ 3. Those beliefs are grounded in biblical teachings, including the ideas (1) that a person's biological sex is innate and unchangeable; (2) that marriage, properly understood, is between one man and one woman; (3) that sexual contact is only proper within the confines of such a marriage; and (4) that men and women are different and should be separated in certain situations and in certain facilities. *Id.* Faculty at these member schools teach these doctrines to their students. *Id.* ¶ 4. Consistent with these beliefs, and guided by the further belief that biblical teachings can be instilled through righteous living, many of CCCU's

member schools have enacted codes of conduct for their students, staff, and faculty. *Id.* Those codes often require that students live according to the biblical principles described above, including forbidding sexual intimacy outside of marriage or between members of the same sex, forbidding gender transitioning, and forbidding same-sex marriages. *Id.*

If, as Plaintiffs allege (Compl. ¶ 3), Title IX's definition of "sex" does include "sexual orientation" and "gender identity," then CCCU's member schools have core religious tenets on gender and sexually that directly conflict with Title IX. Hoogstra Decl. ¶ 5. Moreover, the vast majority of CCCU schools have students that receive federal funding. *Id.* ¶ 6. Several of CCCU's member colleges—though certainly not all—have reached out to the Department of Education expressly to guarantee that Title IX's religious exemption protects them and their students. *Id.* If not for the Title IX religious exemption, their students would be subject to severe sanctions and burdens on their religious exercise, simply for adhering to their codes of conduct and for teaching their students biblical concepts about sex and gender. *Id.*

## ARGUMENT

### I.   CCCU Has Associational Standing To Protect The Interests Of Its Member Colleges.

Preliminarily, proposed intervenor CCCU has associational standing to intervene on behalf of its member colleges, many of which were mentioned by name in the Complaint.   An organization has standing to assert its members interests if "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purposes; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Am. Diabetes Ass'n v. U.S. Dep't of the Army*, 938 F.3d 1147, 1155 (9th Cir. 2019); *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 344–45 (1977). Moreover, at least one court in the Ninth Circuit has held that proposed intervenor defendants have standing to sue on behalf of their members if the requirements for associational standing are met. *Klamath-Siskiyou Wildlands Ctr. v. Grantham*, 2018 WL 6338740, at *3 (E.D. Cal. Dec. 5, 2018).

CCCU satisfies each requirement, and it therefore has standing to represent its institutions' interests. *First*, its member institutions would otherwise have standing to intervene. It is well established that, when Congress enacts statutes "creating legal rights, the invasion of [those rights] creates standing, even though no injury would exist without the statute." *Linda R.S. v. Richard D.*, 410 U.S. 614, 617 n.3 (1973). Here, CCCU's member colleges, eighteen[6] of which are mentioned

---

[6] Baylor University, Nyack College, Lipscomb University, Dordt University, Fuller Theological Seminary, York College-Nebraska, Clarks Summit University, Oklahoma Baptist University, Toccoa Falls College, Messiah University, Indiana Wesleyan University, Azusa Pacific University, George Fox University, Seattle Pacific University, Moody Bible Institute, Colorado Christian University, Eastern University, and Westmont College—all of which are listed in the Complaint (at ¶¶ 49–471)—are all CCCU institutions. CCCU, *List of CCCU Institutions*, https://www.cccu.org/members_and_affiliates/. Because these eighteen named institutions will suffer direct harm if Plaintiffs are successful, CCCU meets the standing requirement. *See generally Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009).

by name in the Complaint, are religious colleges that have sincere religious beliefs—enshrined in campus policies—about the proper role of sexuality and gender. Hoogstra Decl. ¶ 7. CCCU's member schools—whether expressly named or not— are currently protected by a categorical exemption from Title IX's reach if its application would violate their religious tenets. 20 U.S.C. § 1681(a)(3). If this Court grants plaintiffs the relief they seek, then that categorical exemption will be narrowed in a way that would make students' ability to receive federal funding conditional on their schools' agreement to abandon their beliefs about sexuality and gender. Hoogstra Decl. ¶ 6. CCCU's member institutions have standing, therefore, to defend their legal interests in the continued constitutionality of the categorical Title IX religious exemption.

*Second*, the interests that CCCU seeks to protect are germane to its mission. The "germaneness test" is so "undemanding" that some courts have found it satisfied when there is "mere pertinence between litigation subject and organizational purpose." *Presidio Golf Club v. Nat'l Park Serv.*, 155 F.3d 1153, 1159 (9th Cir. 1998) (quoting *Humane Soc'y of the United States v. Hodel*, 840 F.2d 45, 58 (D.C. Cir.1988)). CCCU, comprised of more than 140 U.S. religious colleges, is the "leading national voice of Christian higher education." Hoogstra Decl. ¶ 8. Its stated mission is to "advance the cause of Christ-centered higher education" and help its members "transform lives by faithfully relating scholarship and service to biblical truth." *Id.* ¶ 8. CCCU's member colleges are cognizant of that goal and have joined CCCU because of their shared commitment to it. *Id.* This case directly threatens that goal—if successful, CCCU's member colleges will be forced to either (1) refuse student's federal aid, forcing those students to withdraw or find alternative funding, or (2) abandon their Christian beliefs on sexuality and gender because of the risk of Title IX liability. Regardless of which option they choose, the cause of Christ-centered higher education will be hindered.  *Id.* ¶ 8.

*Third*, CCCU's members are not required to participate here. This prong of associational standing is prudential and focuses not on the Constitution's case or controversy requirement, but rather on "matters of administrative convenience and efficiency." *United Food and Commercial Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 557 (1996). Because the interests "asserted in this lawsuit" are "undifferentiated among members and similar to the interests and claims" of CCCU, it would be more efficient to allow CCCU to assert the standing of its members than require each individual member to intervene. *Presidio Golf Club*, 155 F.3d at 1159.

For these reasons, CCCU has standing to represent its members' interests in this case.

## II. CCCU Is Entitled To Intervene As Of Right.

Moreover, because this case challenges the constitutionality of a key statutory protection that CCCU's member schools have enjoyed for nearly 50 years and that is unlikely to be adequately defended by the defendants, CCCU is entitled to intervene, as of right.[7]

Under Rule 24(a)(2), a person seeking to intervene as of right must show (1) that their motion is timely; (2) that they have a "significantly protectable interest" in the action's subject; (3) that the "disposition of the action may as a practical matter impair or impede" their ability to protect that interest; and (4) that the current parties will not adequately represent that interest. Because a "liberal policy in favor of intervention serves both efficient resolution of issues and broadened access to the courts," *Wilderness Soc. v. U.S. Forest Serv.*, 630 F.3d 1173, 1179 (9th Cir. 2011) (en banc), the Ninth Circuit has "repeatedly instructed" its courts to interpret these factors "broadly" to favor intervention, *Smith v. Los Angeles Unified Sch. Dist.*, 830 F.3d 843, 854 (9th Cir. 2016). Given that this motion is being filed before any responsible pleading, timeliness is obviously not an issue.[8] As explained below, moreover, CCCU readily meets each of the other requirements for intervention as of right, particularly when viewed through the Ninth Circuit's pro-intervention lens. The motion should be therefore granted.

---

[7] A proposed answer is included with this motion solely to comply with the technical requirements of Rule 24(c). Should this Court grant the motion to intervene, CCCU will first file a motion under Rule 12(b) to comply with its requirement that a motion come before a responsive pleading.

[8] Courts reviewing the timing of a motion to intervene consider the stage of the proceedings, prejudice to the parties, and the reason for and length of any delay. *United States v. Washington*, 86 F.3d 1499, 1503 (9th Cir. 1996). Here, CCCU is moving to intervene before the defendants have filed either an answer or a Rule 12 dispositive motion, meaning that there has been no delay whatsoever. Nor will the parties be prejudiced by the timing of this motion because the case is still in its infancy. *See, e.g.*, *United States v. Brooks*, 164 F.R.D. 501, 503 (D. Or. 1995) (motion filed seven months after the complaint was timely when little had happened in the case). Accordingly, there can be no serious question that the motion is timely.

**A. CCCU's member colleges have a significantly protectable interest in Title IX's religious exemption because it directly protects them from claims that would interfere with their ability to live according to their religious doctrines.**

CCCU's member colleges have a "significant protectable interest" in ensuring the continued vitality of the Title IX religious exemption. The first prong of the intervention-as-of-right inquiry is satisfied if (1) an intervenor "asserts an interest that is protected under some law," and (2) "there is a relationship between its legally protected interest and the plaintiff's claims." *Donnelly v. Glickman,* 159 F.3d 405, 409 (9th Cir. 1998) (cleaned up). There is "[n]o specific legal or equitable interest" that need[s] be established" to show that an intervenor has an interest in the law. *Greene v. United States,* 996 F.2d 973, 976 (9th Cir. 1993). Instead, courts make a "practical, threshold inquiry," *id.*, to allow as many "concerned persons" as possible to be involved in a case so that claims can be disposed of efficiently and consistent with due process. *County of Fresno v. Andrus,* 622 F.2d 436, 438 (9th Cir.1980). Once an interest has been established, there is a relationship between that interest and the plaintiffs' claims "if the resolution of the plaintiff's claims actually will affect the applicant." *Arizona v. Jewell*, 2016 WL 3475333, at *1 (D. Ariz. 2016) (quoting *Donelly*, 159 F.3d at 410) (granting Utah's motion to intervene when the resolution of a case could hinder its ability to protect wildlife in its boundaries). CCCU satisfies each point.

*First*, although under *Greene* no such interest is required, CCCU's member colleges have a legal interest protected by Title IX and its implementing regulations. 20 U.S.C. § 1681(a)(3) expressly exempts religious educational institutions from the general prohibition against sex discrimination if its application "would not be consistent with the religious [institutions'] tenets." By its terms and by regulation, that exemption applies regardless of whether a religious educational institution has affirmatively sought it. *See* 85 Fed. Reg. 30026, 30031 (2020); 34 C.F.R. 106.12(b) ("An institution is not required to seek assurance from the Assistant Secretary … to assert such an exemption."); Office for Civil Rights, *Exemptions from Title IX,*

https://www2.ed.gov/about/offices/list/ocr/docs/t9-rel-exempt/index.html ("An institution's exempt status is not dependent upon its submission of a written statement to OCR."). Thus, although there are plenty of schools who have affirmatively sought the exemption,[9] every religious school in the country—including, of course, CCCU's member colleges—is currently protected by it.

The Title IX religious exemption allows CCCU's member colleges to both (1) accept students who rely on federal funding and (2) continue to uphold their religious beliefs on sexuality, gender, and marriage. Specifically, because of the exemption, CCCU's member colleges are able to teach their students key religious doctrines, including the importance of keeping sexual activity between a lawfully wedded husband and wife, *see* Exodus 20:14 (NIV) ("You shall not commit adultery."); Mark 10:7 (NIV) ("For this reason a man will leave his father and mother and be united to his wife[.]"), and the importance and divine nature of gender, *see* Genesis 5:1–2 (NIV) ("When God created mankind, he made them in the likeness of God. He created them male and female and blessed them."), without their students losing access to federal funding. Hoogstra Decl. ¶ 6. Many of CCCU's member colleges require their students to live consistently with those divinely inspired truths. *Id*. ¶ 4. This requires them to avoid pre-marital sexual activity, avoid same-sex marriage, and accept their gender as determined at birth by their bodies, which are gifts from a benevolent God. *Id.* ¶ 4.

*Second*, the relationship between that interest and the Plaintiffs' claims is clear from the Complaint's face. Plaintiffs seek (1) a "judgment declaring that the religious exemption to Title IX, as applied to the class of sexual and gender minority students, is unconstitutional as it violates

---

[9] *See, e.g.*, Kif Augustine Adams, *Religious Exemptions to Title IX*, 65 U. Kan. L. Rev. 327, 327 (2016) ("More than forty years after the passage of Title IX, the score is 285 to 0, religious exemptions recognized versus those denied.").

the First, Fifth and Fourteenth Amendments of the U.S. Constitution," and (2) a permanent injunction (a) prohibiting religious exemptions as applied to such students; (b) rescinding all prior exemptions granted as applied to that group; (c) mandating the federal government to treat the Title IX complaints of LGBT students the same as other complaints at all taxpayer-funded religious colleges; and (d) requiring the government to respect the sexual orientations and gender identities of all students at all federally funded institutions. Compl., Dkt. 1, at 66. Granting that relief would have an irreparable and permanent effect on the legal rights that CCCU's member colleges currently enjoy under Title IX. CCCU's member colleges, therefore, have a significant protectable interest in a right threatened by this case.

### B. If this Court found Title IX's religious exception unconstitutional, even in part, those protections would be lost or compromised.

The next prong of the intervention inquiry is "[c]losely related to the second prong." *Wedgewood Ltd. P'ship v. Twp. of Liberty*, 2005 WL 1211305, at *2 (S.D. Ohio 2005) (unpublished). In the Ninth Circuit, the "relevant inquiry" is not whether a case's resolution will necessarily impair the proposed intervenor's rights, but rather whether it *may* impair those rights. *United States v. City of Los Angeles*, 288 F.3d 391, 401 (9th Cir. 2002).

Here, Plaintiffs are seeking to enjoin the application of Title IX's religious exemption in cases involving sexual and gender minorities. The exemption currently protects CCCU's member colleges categorically if Title IX's application would violate their core religious tenets, including tenets concerning human sexuality and gender identity. Hoogstra Decl. ¶¶ 3–4. Because plaintiffs are seeking to narrow that categorical exemption, there is at least the possibility that this case will impair rights that CCCU's member colleges currently enjoy. Indeed, if this Court agrees with Plaintiffs that the Title IX religious exemption is unconstitutional as applied to sexual or gender minorities, CCCU's member colleges will lose key elements of a foundational statutory

right and be forced to choose between their students having access to federal funding and their religious beliefs. Hoogstra Decl. ¶ 6.

**C. Defendants are unlikely to represent CCCU's interests adequately.**

As to the last prong of the mandatory intervention analysis:  The Ninth Circuit imposes a "minimal" burden on proposed intervenors, requiring only that the intervenor "show that representation of its interests by existing parties *may be* inadequate." *Sw. Ctr. for Biological Diversity*, 268 F.3d 810, 823 (9th Cir. 2001) (emphasis added; cleaned up); *Trbovich v. United Mine Workers*, 404 U.S. 528, 538 n.10 (1972) (same). In determining whether would-be intervenors satisfy this minimal burden, courts in the Ninth Circuit "consider[s] (1) whether the interest of a present party is such that it will *undoubtedly* make *all* the intervenor's arguments; (2) whether the present party is capable and *willing* to make such arguments; and (3) whether the would-be intervenor would offer any necessary elements to the proceedings that other parties would neglect." *Nw. Forest Res. Council v. Glickman*, 82 F.3d 825, 838 (9th Cir. 1996) (emphasis added), *as amended on denial of reh'g* (May 30, 1996). If the proposed intervenor shares the same "ultimate objective" with one of the parties, then there is a presumption that its representation will be adequate. *Perry v. Proposition 8 Off. Proponents*, 587 F.3d 947, 951 (9th Cir. 2009). Here, there are three independent reasons to think the defendants will not adequately represent the interests of either CCCU.

*First*, in asserting the rights of its members, CCCU is asserting a personal interest in the religious exemption that is not shared with the public. It is seeking to defend its member schools' right to continue teaching and living out their religious beliefs without abandoning the right of their students to access federal funding. Hoogstra Decl. ¶ 6. In such circumstances, the Ninth Circuit has emphasized that inadequate representation is "likely to be found." *Forest Conservation Council v. U.S. Forest Serv.*, 66 F.3d 1489, 1499 (9th Cir. 1995) (citations omitted); *see also Citizens*

*for Balanced Use v. Montana Wilderness Ass'n*, 647 F.3d 893, 899 (9th Cir. 2011) (explaining that the "public interest" differs from the "individual parochial interest").

*Second*, the defendants are unlikely to fully understand the importance of the religious exemption to religious colleges. Indeed, CCCU is uniquely situated to address that importance and the consequences of abolishing it. As the Supreme Court has recognized, the "determination of what is a 'religious' belief or practice is more often than not a difficult and delicate task" because "religious beliefs" may not be "acceptable, logical, consistent, or comprehensible to others." *Thomas v. Rev. Bd. of Indiana Emp't Sec. Div.*, 450 U.S. 707, 714 (1981).[10] Secular government organizations, such as defendants here, are ill-equipped to understand the religious implications of narrowing Title IX's religious exemption. CCCU will fill that gap and explain—in a way that a federal department cannot—the practical ways in which the loss of Title IX's religious exemption would harm its members' educational operations and impact their students. It will thus be able to assist the Court with the resolution of the legal issues before it.

*Third*, statements from President Biden and his administration demonstrate that, even if defendants *could* understand the importance of the religious exemption to CCCU's members, the current administration is unlikely to make those arguments. In any event, there is at a minimum a "doubt" as to whether the administration will make the same arguments as CCCU—and that is sufficient under the Ninth Circuit precedent cited above.

If anything, there is ample evidence that the current administration will not only *fail* to make the points necessary to defend Title IX's religious exemptions as applied to sexual and gender minorities, but it may also instead be openly hostile to them. The Biden Administration

---

[10] This point is also well born out in scripture. *See also* 1 Corinthians 1:18 (NIV) (teaching that the "message of the cross" is, to unbelievers, "foolishness").

has already announced its intent to ensure that *Bostock* is fully implemented in the Title IX context,[11] and President Biden has argued that "[u]sing religion … to license discrimination" against "LGBT individuals" or to "score political points" is unjustifiable.[12] Consistent with this belief, his website promises to end what he calls the "misuse of broad exemptions" to, as he puts it, "discriminate" in the name of religious freedom.[13] His open support for the Equality Act, a bill that "makes explicit that existing Federal statutes prohibiting sex discrimination in … education also prohibit sexual orientation and gender identity discrimination," Equality Act, H.R. 5, 117th Cong. § 2(a)(14) (2021), is thus nothing more than the culmination of a campaign promise.[14] These statements indicate that the Biden Administration will have different "ultimate objectives" than CCCU, and will more than clear the minimal hurdle of showing that it is unlikely to represent CCCU's interests. These facts thus provide an independent reason to believe that the rights of CCCU's member colleges will go unrepresented and, thus, unprotected.

---

[11] Principal Deputy Assistant Attorney General Pamela S. Karlan, *Memorandum*, *Application of* Bostock v. Clayton County *to Title IX of the Education Amendments of 1972* (Mar. 26, 2021), https://www.justice.gov/crt/page/file/1383026/download (concluding that Title IX "prohibit[s] discrimination on the basis of gender identity and sexual orientation"); The White House, *Executive Order on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation* (Jan. 20, 2021), https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/20/executive-order-preventing-and-combating-discrimination-on-basis-of-gender-identity-or-sexual-orientation/.

[12] Joe Biden, *Joe Biden: Americans must stand with LGBT people around the world*, The Washington Post (May 16, 2017), https://www.washingtonpost.com/opinions/joe-biden-americans-must-stand-with-lgbt-people-around-the-world/2017/05/16/3d42d360-3a51-11e7-8854-21f359183e8c_story.html.

[13] Biden Harris, *The Biden Plan to Advance LGBTQ+ Equality In America and Around the World*, https://joebiden.com/lgbtq-policy/.

[14] *See* The White House, *Statement by President Joseph R. Biden, Jr. on the Introduction of the Equality Act in Congress* (Feb. 19, 2021), https://www.whitehouse.gov/briefing-room/statements-releases/2021/02/19/statement-by-president-joseph-r-biden-jr-on-the-introduction-of-the-equality-act-in-congress/.

****

CCCU's member colleges will only be able to further their religious missions if they are able to teach and adhere to their doctrines without interference from the government. Because this litigation threatens their ability to do that whenever doing so would affect a sexual or gender minority, it threatens to suffocate religious higher education in America. For these reasons, combined with the fact that only religious colleges can fully understand the importance of the exemption and the current Administration's open hostility to the arguments necessary to fully defend the Title IX religious exemption, CCCU is entitled to intervene as of right. Its timely motion should therefore be granted.

### III. Alternatively, CCCU Should Be Allowed Permissive Intervention.

If this Court nevertheless denies intervention as of right, it should permit CCCU to intervene under Rule 24(b). Rule 24(b) requires "(1) an independent ground for jurisdiction; (2) a timely motion; and (3) a common question of law and fact between the movant's claim or defense and the main action." *Freedom from Religion Found.*, *Inc. v. Geithner*, 644 F.3d 836, 843 (9th Cir. 2011) (quoting *Beckman Indus., Inc. v. Int'l Ins. Co.*, 966 F.2d 470, 473 (9th Cir.1992)). Rule 24(b)'s purpose is to vest "discretion in the district court to determine the fairest and most efficient method of handling a case." *Venegas v. Skaggs*, 867 F.2d 527, 530 (9th Cir. 1989), *aff'd sub nom. Venegas v. Mitchell*, 495 U.S. 82 (1990).

Here, CCCU is seeking to intervene as a defendant and is not raising any new claims in this federal-question case. In such instances, the Ninth Circuit has held that proposed intervenors need not establish the independent-ground prong. *Freedom from Religion Found., Inc.*, 644 F.3d at 844. Nor can there be any question that this motion is timely, for the reasons expressed in detail in Part II. *See League of United Latin Am. Citizens v. Wilson*, 131 F.3d 1297, 1308 (9th Cir. 1997) (holding that the Rule 24(b) timeliness inquiry is the same as the Rule 24(a) inquiry). The only remaining question is whether CCCU's defenses share a common question of law and fact with the main action. For the reasons addressed below, CCCU readily satisfies that requirement.

**A. CCCU's member colleges—many of which were mentioned by name in the Complaint—are currently entitled to the Title IX exception.**

First, CCCU's members are currently entitled to assert the Title IX religious exemption as a defense to any suits brought under that Title. As described above in Section II(A), through that exception, they can teach their religious beliefs on sex, gender, and sexuality without their students having to abandon federal funding. *See also* Hoogstra Decl. ¶¶ 3–6. Equally important, they can require their students to live according to those beliefs by abstaining from sex outside of marriage between one man and one woman and by cherishing the gender that corresponds to their God-given bodies. Hoogstra Decl. ¶ 4.

Indeed, the Complaint mentioned many of these schools by name precisely because they have previously benefited from the religious exemption, as applied to sexual and gender minorities. Accordingly, the relevant questions of fact raised by CCCU's defenses will be the same as those raised by the plaintiffs' claims.

**B. The constitutional defenses that CCCU will raise share common issues of law with the main action because they will respond directly to plaintiffs' constitutional attacks on the Title IX exemption.**

In addition, CCCU will establish that the Title IX exemption is constitutionally *required* to avoid violating the core principles articulated in cases such as *Espinoza v. Montana Department of Revenue*, holding that the government may not deny "otherwise eligible recipients from a public benefit solely because of their religious character" without satisfying the "most exacting scrutiny." 140 S. Ct. 2246, 2255 (2020); *see also Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 717–18 (1981) (holding that the Free Exercise Clause forbids the government from "condition[ing] receipt of an important benefit upon conduct proscribed by a religious faith, or … den[ying] such a benefit because of conduct mandated by religious belief"). If permitted to intervene, CCCU will raise this and other defenses to the constitutionality of the religious

exemption. *See* Exhibit B (containing the responsive pleading required by Rule 24(c)). These are the same issues that the Court will have to consider in resolving the claims in the Complaint, and CCCU is uniquely situated to assist the Court in resolving them.

    For these reasons, should the Court disagree that intervention as of right is appropriate, it should nevertheless grant the motion for permissive intervention.

## CONCLUSION

If this Court agrees with the plaintiffs that the Title IX religious exemption, as applied to LGBT students, is unconstitutional, then many of CCCU's members could lose the benefit of a protection that they have enjoyed—and that has allowed them to survive—for nearly 50 years. Only through CCCU's intervention will these colleges be able to defend that protection as to Plaintiffs' facial challenge. CCCU is therefore entitled to intervene as of right under Rule 24(a)(2), or, at the very least, should be permitted to intervene under Rule 24(b)(1)(B). The motion to intervene should be granted.

DATED this 12th day of May 2021.                    Respectfully submitted,

/s/ Herbert G. Grey
Herbert G. Grey
OSB #810250
4800 SW Griffith Drive, Suite 320
Beaverton, OR 97005-8716
Telephone: (503)641-4908
Email: herb@greylaw.org

Gene C. Schaerr (DC Bar # 416368)*
Nicholas P. Miller (MI Bar# P70694)*
Joshua J. Prince (DC Bar # 1685532)*
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, D.C. 20006
Telephone: (202) 787-1060
Email: gschaerr@schaerr-jaffe.com
* *Pro hac vice* application forthcoming

*Counsel for Defendant-Intervenor*
*Council for Christian Colleges &*
*Universities*

## CERTIFICATE OF SERVICE

I hereby certify that I served the foregoing motion to intervene and memorandum in support was served on the following via the indicated method(s) of service:

_____    **MAILING** certified full, true, and correct copies thereof in a sealed, first class postage-prepaid envelope, addressed to the attorney(s) shown above at their last known office address(es), and deposited with the U.S. Postal Service at Portland/Beaverton, Oregon, on the date set forth below.

__x____    **ELECTRONIC FILING** utilizing the Court's electronic filing system

__x____    **EMAILING** certified full, true, and correct copies thereof to the attorney(s) shown above at their last known email address(es) on the date set forth below.

_____    **HAND DELIVERING** certified full, true, and correct copies thereof to the attorney(s) shown above at their last known office address(es), on the date set forth below.

_____    **OVERNIGHT COURIER** mailing of certified full, true, and correct copies thereof in a sealed, prepaid envelope, addressed to the attorney(s) shown above at their last known office address(es), on the date set forth below.

DATED this 12th day of May 2021.

*/s/ Herbert G. Grey*
Herbert G. Grey
OSB #810250

*Counsel for Defendant-Intervenor Council
for Christian Colleges & Universities*

## CERTIFICATE OF COMPLIANCE

This brief complies with the applicable word-count limitation under LR 7-2(b) because it contains 6145 words, including headings, footnotes, and quotations, but excluding the caption, table of contents, table of cases and authorities, signature block, exhibits, and any certificates of counsel.