**Paul Carlos Southwick (OSB 095141)**
**TRIAL ATTORNEY**
**Religious Exemption Accountability Project**
**Paul Southwick Law, LLC**
8532 N. Ivanhoe St. #208
Portland, OR 97203
Email: paul@paulsouthwick.com
Phone: 503-806-9517

**Timothy R. Volpert (OSB 814074)**
**Tim Volpert PC**
2111 NE Hancock St. Ste. 2B
Portland, OR 97212
Email: tim@timvolpertlaw.com
Phone: 503-703-9054

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

### EUGENE DIVISION

| | |
|---|---|
| Elizabeth HUNTER; Veronica Bonifacio PENALES; Alex DURON; Zayn SILVA; Rachel MOULTON; Victoria Joy BACON; Avery BONESTROO; Nathan BRITTSAN; Hayden BROWN; Brooke C.; Gary CAMPBELL; Tristan CAMPBELL; Natalie CARTER; Rachel HELD; Lauren HOEKSTRA; Chandler HORNING; Louis JAMES; Jonathan JONES; Ashtin MARKOWSKI; Cameron MARTINEZ; Joanna MAXON; Mackenzie MCCANN; Darren MCDONALD; Scott MCSWAIN; Faith MILLENDER; Jaycen MONTGOMERY; Journey MUELLER; Jake PICKER; Danielle POWELL; Megan STEFFEN; Spencer J. VIGIL; Lucas WILSON; Audrey WOJNAROWISCH; Saren CRAIG; Jamie LORD; Mortimer HALLIGAN; Justin TIDWELL-DAVIS; Daniel TIDWELL-DAVIS, Devin BRYANT; and Consolata BRYANT, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF EDUCATION; and Suzanne GOLDBERG, in her official capacity as Acting Assistant Secretary for the Office of Civil Rights, U.S. Department of Education.<br><br>Defendants. | Case No. 6:21-cv-00474-AA<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**DECLARATORY AND INJUNCTIVE RELIEF**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs, by and through undersigned counsel, hereby allege as follows:

## INTRODUCTION

1.      Forty Plaintiffs bring this class action to put an end to the U.S. Department of Education's complicity in the abuses and unsafe conditions thousands of LGBTQ+ students endure at hundreds of taxpayer-funded, religious colleges and universities. The Plaintiffs seek safety and justice for themselves and for the countless sexual and gender minority students whose oppression, fueled by government funding, and unrestrained by government intervention, persists with injurious consequences to mind, body and soul.

2.      The Department's inaction leaves students unprotected from the harms of conversion therapy, expulsion, denial of housing and healthcare, sexual and physical abuse and harassment, as well as the less visible, but no less damaging, consequences of institutionalized shame, fear, anxiety and loneliness.

3.      The U.S. Department of Education is duty-bound by Title IX and the U.S. Constitution to protect sexual and gender minority students at taxpayer-funded colleges and universities, including private and religious educational institutions that receive federal funding. The religious exemption to Title IX, however, seemingly permits the Department to breach its duty as to the more than 100,000 sexual and gender minority students attending religious colleges and universities where discrimination on the basis of sexual orientation and gender identity is codified in campus policies and openly practiced.

4.      When taxpayer-funded religious institutions require sexual and gender minority students to hide their identity out of fear, or to behave contrary to their fundamental sexual or gender identity, the unsurprising consequences are intense pain, loneliness and self-harm. Students perceive that their campus, and even their government, believes that they are inferior in dignity and worth. The status quo, where the Department leaves such students on their own in this perilous

FIRST AMENDED CLASS ACTION COMPLAINT

Religious Exemption Accountability Project
Paul Southwick Law, LLC

limbo, results in concrete, verifiable and widespread harms. Each Plaintiff has their own story of oppression to tell, and each Plaintiff represents thousands more whose stories deserve to be heard.

5.      Religious exemptions may be constitutionally permissible, or even compelled, when the government regulates private action, even where some amount of harm to members of the community is involved. However, when the government provides public funds to private actors, like the colleges and universities represented by Plaintiffs, the Constitution restrains the government from allowing such private actors to use those funds to harm disadvantaged people. This Constitutional principle remains true even when the private actors are operating according to sincerely held religious beliefs, and it remains true whether the people they are harming are racial or ethnic minorities, sexual or gender minorities or those who reflect multiple, intersecting identities.

6.      Consequently, while the statutory religious exemption to Title IX may permit, or even require, the Department to refuse assistance to sexual and gender minority students like the Plaintiffs, the Constitution forbids such inaction. Plaintiffs ask this Court to declare that the religious exemption to Title IX, as applied to sexual and gender minority students, is unconstitutional and that the Department must enforce the protections of Title IX at all taxpayer-funded educational institutions, including at those institutions that discriminate and cause harm on the basis of sincerely held religious beliefs.

## JURISDICTION AND VENUE

7.      This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the First and Fifth Amendments to the U.S. Constitution, the Administrative Procedures Act and the Religious Freedom Restoration Act.

FIRST AMENDED CLASS ACTION COMPLAINT
Religious Exemption Accountability Project
Paul Southwick Law, LLC

8.      This Court has jurisdiction under 28 U.S.C. § 1361 to compel an officer of the United States or any federal agency to perform their duty.

9.      This Court has jurisdiction pursuant to 5 U.S.C. § 702, as it challenges the action of a federal agency.

10.     This Court has jurisdiction to issue declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202 and Rule 57 of the Federal Rules of Civil Procedure.

11.     Venue is proper in the District of Oregon under 28 U.S.C. § 1391(e)(1) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this judicial district. The Department of Education permits at least five universities in this district, including George Fox University, where one Plaintiff is a current student and another Plaintiff is a former student, to openly discriminate against sexual and gender minority students, and has affirmatively granted religious exemptions from Title IX as applied to sexual and gender minority students to multiple universities in this district.

12.     Divisional venue is appropriate because the Department of Education permits at least two universities in this division to openly discriminate against sexual and gender minority students, and has affirmatively granted at least one university in this division, Corban University, a religious exemption from Title IX as applied to sexual and gender minority students. Consequently, a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this division.

**PARTIES**

13.     Plaintiff Elizabeth Hunter is a resident of Greenville, South Carolina. She graduated from Bob Jones University (Greenville, South Carolina). Plaintiff Hunter describes her experience at Bob Jones University in her Declaration attached as Exhibit A.

FIRST AMENDED CLASS ACTION COMPLAINT

14.    Plaintiff Veronica Bonifacio Penales is a resident of Waco, Texas. She is a student at Baylor University (Waco, Texas). Plaintiff Penales describes her experience at Baylor in her Declaration attached as Exhibit B.

15.    Plaintiff Alex Duron is a resident of Fresno, California. His admission to a graduate nursing program was rescinded by Union University (Jackson, Tennessee). Plaintiff Duron describes his experience with Union in his Declaration attached as Exhibit C.

16.    Zayn Silva is a resident of New York City, New York. He was denied admission to Nyack College (Manhattan, NYC). Plaintiff Silva describes his experience with Nyack in his declaration attached as Exhibit D.

17.    Rachel Moulton is a resident of Riverside, California. She attended Brigham Young University-Idaho (Rexburg, Idaho). Plaintiff Moulton describes her experience at BYUI in her Declaration attached as Exhibit E.

18.    Victoria Joy Bacon is a resident of Rowlett, Texas. Fae graduated from Lipscomb University (Nashville, Tennessee). Plaintiff Bacon describes faer experience at Lipscomb in faer Declaration attached as Exhibit F.

19.    Nathan Brittsan is a resident of San Jose, California. He was expelled by Fuller Theological Seminary (Pasadena, California). Plaintiff Brittsan describes his experience at Fuller in the Declaration attached as Exhibit G.

20.    Hayden Brown is a resident of York, Nebraska. They are a student at York College (York, Nebraska). Plaintiff Brown describes their experience at York College in the Declaration attached as Exhibit H.

21.    Brooke C. is a resident of Cedarville, Ohio. They are a student at Cedarville University (Cedarville, Ohio). Brook is using a pseudonym because she fears for her safety and

FIRST AMENDED CLASS ACTION COMPLAINT

status at Cedarville University if her true identity was known. Plaintiff C. describes her experience at Cedarville in the Declaration attached as Exhibit I.

22.     Gary Campbell is a resident of Apollo Beach, Florida. He was expelled by Clarks Summit University (Scranton, Pennsylvania). Plaintiff Gary Campbell describes his experience at Clarks Summit University in the Declaration attached as Exhibit J.

23.     Tristan Campbell is a resident of Belmont, Massachusetts. He attended Oklahoma Christian School (Edmond, Oklahoma) and Oklahoma Baptist University (Shawnee, Oklahoma). Plaintiff Tristan Campbell describes his experience at Oklahoma Baptist University in the Declaration attached as Exhibit K.

24.     Natalie Carter is a resident of College Park, Georgia. She is currently a student at Toccoa Falls College (Toccoa, Georgia). Natalie is using a pseudonym because she fears for her safety and status at Toccoa Falls College if her true identity was known. Plaintiff Carter describes her experience at Toccoa Falls in the Declaration attached as Exhibit L.

25.     Rachel Held is a resident of Mechanicsburg, Pennsylvania. She is currently a student at Messiah University (Mechanicsburg, Pennsylvania). Plaintiff Held describes her experience at Messiah in the Declaration attached as Exhibit M.

26.     Lauren Hoekstra is a resident of Sioux Center, Iowa. They are currently a student at Dordt University (Sioux Center, Iowa). Plaintiff Hoekstra describes her experience at Dordt in the Declaration attached as Exhibit N.

27.     Chandler Horning is a resident of Meridian, Idaho. He graduated from Brigham Young University-Idaho (Rexburg, Idaho). Plaintiff Horning describes his experience at BYUI in the Declaration attached as Exhibit O.

FIRST AMENDED CLASS ACTION COMPLAINT
Religious Exemption Accountability Project
Paul Southwick Law, LLC

28.     Louis James is a resident of Marion, Indiana. He is a current student at Indiana Wesleyan University (Marion, Indiana). Louis James is using a pseudonym because he fears for his safety and status at Indiana Wesleyan University if his true identity were known. Plaintiff James describes his experience at Indiana Wesleyan in the Declaration attached as Exhibit P.

29.     Jonathan Jones is a resident of Azusa, California. He is a current student at Azusa Pacific University (Azusa, California). Plaintiff Jones describes their experience at Azusa Pacific in the Declaration attached as Exhibit Q.

30.     Ashtin Markowski is a resident of Springville, Utah. She graduated from Brigham Young University-Provo (Provo, Utah). Plaintiff Markowski describes her experience at BYU-Provo in the Declaration attached as Exhibit R.

31.     Cameron Martinez is a resident of Riverside, California. They are a current student at La Sierra University (Riverside, California). Plaintiff Martinez describes their experience at La Sierra in the Declaration attached as Exhibit S.

32.     Joanna Maxon is a resident of Hurst, Texas. She was expelled by Fuller Theological Seminary (Pasadena, California). Plaintiff Maxon describes her experience at Fuller in the Declaration attached as Exhibit T.

33.     Mackenzie McCann is a resident of Bethlehem, Pennsylvania. She attended Liberty University (Lynchburg, Virginia). Plaintiff McCann describes their experience at Liberty in the Declaration attached as Exhibit U.

34.     Darren McDonald is a resident of Portland, Oregon. He is a graduate of Westmont College (Santa Barbara, California) and Fuller Theological Seminary (Pasadena, California). Plaintiff McDonald describes his experiences at Westmont and Fuller in the Declaration attached as Exhibit V.

FIRST AMENDED CLASS ACTION COMPLAINT
Religious Exemption Accountability Project
Paul Southwick Law, LLC

35.     Scott McSwain is a resident of Tacoma, Washington. He is a graduate of Union University (Jackson, Tennessee). Plaintiff McSwain describes his experience at Union in the Declaration attached as Exhibit W.

36.     Faith Millender is a resident of St. Davids, Pennsylvania. She is a current student at Eastern University (St. Davids, Pennsylvania). Plaintiff Millender describes her experience at Eastern in the Declaration described as Exhibit X.

37.     Jaycen Montgomery is a resident of Portland, Oregon. He previously attended George Fox University (Newberg, Oregon). Plaintiff Montgomery describes his experience at George Fox in the Declaration attached as Exhibit Y.

38.     Journey Mueller is a resident of Longmont, Colorado. She attended Colorado Christian University (Lakewood, Colorado). Plaintiff Mueller describes her experience at Colorado Christian in the Declaration attached as Exhibit Z.

39.     Jake Picker is a resident of Waco, Texas. He is a current student at Baylor University (Waco, Texas). Plaintiff Picker describes his experience at Baylor in the Declaration attached as Exhibit AA.

40.     Danielle Powell is a resident of New Orleans, Louisiana. They were expelled by Grace University (Omaha, Nebraska). Plaintiff Powell describes their experience at Grace in the Declaration attached as Exhibit BB.

41.     Megan Steffen is a resident of Chicago, Illinois. She graduated from Moody Bible Institute (Chicago, Illinois). Plaintiff Steffen describes her experience at Moody Bible Institute in the Declaration attached as Exhibit CC.

FIRST AMENDED CLASS ACTION COMPLAINT
Religious Exemption Accountability Project
Paul Southwick Law, LLC

42.     Spencer Vigil is a resident of Seattle, Washington. He graduated from Seattle Pacific University (Seattle, Washington). Plaintiff Vigil describes his experience at Seattle Pacific in the Declaration attached as Exhibit DD.

43.     Lucas Wilson is a resident of Toronto, Canada. He graduated from Liberty University (Lynchburg, Virginia). Plaintiff Wilson describes his experience at Liberty in the Declaration attached as Exhibit EE.

44.     Audrey Wojnarowisch is a resident of Newberg, Oregon. She is a current student at George Fox University (Newberg, Oregon). Plaintiff Wojnarowisch describes her experience at George Fox in the Declaration attached as Exhibit FF.

45.     Avery Bonestroo is a resident of Sioux Center, Iowa. She is a current student at Dordt University (Sioux Center, Iowa). Plaintiff Bonestoo describes her experience at Dordt in the Declaration attached as Exhibit GG.

46.     Saren Craig is a resident of Portland, Oregon. They attended College of the Ozarks (Point Lookout, Missouri).

47.     Jamie Lord is a resident of Virginia Beach, Virginia. She is a current student at Regent University School of Law (Virginia Beach, Virginia).

48.     Mortimer Halligan is a resident of Franklin, PA. Mortimer is a student at Indiana Wesleyan University (Marin, Indiana).

49.     Justin Tidwell-Davis is a resident of Bremerton, Washington. Justin graduated from Baylor University (Waco, Texas).

50.     Daniel Tidwell-Davis is a resident of Bremerton, Washington. Daniel graduated from Lee University (Cleveland, Tennessee).

FIRST AMENDED CLASS ACTION COMPLAINT

Religious Exemption Accountability Project
Paul Southwick Law, LLC

51.     Devin Bryant is a resident of Colleyville, Texas. Devein attended Covenant Christian Academy (Colleyville, Texas).

52.     Consolata Bryant is a resident of Colleyville, Texas. Consolata is Devin Bryant's mother.

53.     The Plaintiffs are or have been federal income taxpayers.

54.     Most Plaintiffs remain in debt for the money they borrowed from the U.S. Department of Education to attend their respective colleges and universities.

55.     Defendant U.S. Department of Education ("the Department") is a federal agency headquartered in Washington, D.C. The Department establishes and implements policies on federal financial aid to educational institutions, including private and religious colleges and universities, and is charged with prohibiting discrimination and ensuring equal access to education.

56.     The Department's Office of Civil Rights (OCR) enforces several federal civil rights laws that prohibit discrimination in programs or activities that receive federal financial assistance from the Department, including Title IX of the Education Amendments of 1972, which prohibits sex, sexual orientation and gender identity discrimination.

57.     Defendant Suzanne Goldberg is the Acting Assistant Secretary, Office of Civil Rights, at the Department. In this capacity, Goldberg oversees the Department's Title IX enforcement.

## FACTUAL ALLEGATIONS

## PLAINTIFFS AND THEIR COLLEGES OR UNIVERSITIES

### Elizabeth Hunter – Bob Jones University

58.     "The campus culture at BJU is toxic for LGBTQ+ people.  Homophobia among the student body, faculty, and administration is rampant.  LGBTQ+ students have to hide who we are and will suffer grave consequences if we come out and stand up for ourselves."

FIRST AMENDED CLASS ACTION COMPLAINT
Religious Exemption Accountability Project
Paul Southwick Law, LLC

59.     Elizabeth Hunter was a student at Bob Jones University. She graduated in 2019.

60.     Bob Jones University ("BJU") enrolls 3,008 students.[1]

61.     BJU has requested and received religious exemptions from the Department that purportedly allow BJU to discriminate against LGBTQ+ students. See Exhibit HH.

62.     Elizabeth was in the child welfare system until she was ten years old. She survived a sexual assault during this period of her life.

63.     Elizabeth was eventually placed with a Texas family that was part of an infamous Christian fundamentalist cult.

64.     Elizabeth attended Bob Jones because, as a woman, her parents believed she should not attend college.  She thought that BJU was the only school her parents would allow her to go to, because of its highly conservative policies.  She applied to the school without her parents' knowledge.

65.     Bob Jones is notorious for these extreme policies.  In 1983, the US Supreme Court required it to reverse policies that disallowed interracial dating.

66.     A 2014 report found that BJU promoted an environment whereby sexual assault survivors were blamed for their abuse. The report also faulted BJU for failing to report these crimes to local authorities.

67.     BJU targets its LGBTQ+ population with cruel policies, including a human sexuality policy that categorizes being gay with bestiality and polygamy as prohibited behaviors.

68.     "As someone figuring out their sexuality while at college, Bob Jones University's policies on sexuality and marriage created a scary, harsh environment for me," Elizabeth says.

_____

[1] Data based on most recent government data available at https://nces.ed.gov/collegenavigator/

FIRST AMENDED CLASS ACTION COMPLAINT
Religious Exemption Accountability Project
Paul Southwick Law, LLC

69.    Elizabeth was never out about her sexuality at BJU.  However, she suffered harsh discipline from the school after BJU discovered her online activity.

70.    BJU disciplined Elizabeth for posting about LGBTQ+ issues on social media, including her posts about reading a book with a lesbian main character, and about writing a book including a lesbian relationship. School administrators called upon Elizabeth to meet with them.

71.    This meeting lasted for three hours.

72.    Bob Jones University administrators referred to print-outs of Elizabeth's social media post history as evidence she must be gay.  They then attempted to force her to admit she was homosexual.

73.    Elizabeth adamantly denied that she had been sexually active with women or men. She did, however, tell the administration that she was "not straight" and was possibly asexual, like the apostle Paul.

74.    Elizabeth was disciplined by BJU authorities when she refused to disavow her support for LGBTQ+ rights and relationships.  School authorities removed Elizabeth from a beloved, on-campus position, forced her into mandatory counseling with the Dean of Women, and required her to pay a monetary fine.

75.    "For the rest of my time at BJU, I was forced completely back in the closet and had to hold my head down in shame." Elizabeth also says, "this was the darkest month of my entire life.  I felt depressed and suicidal."

76.    Elizabeth says that BJU's policy towards LGBTQ+ students "creates extreme shame and confusion by lumping all sexual behavior outside of heterosexual marriage, including homosexuality, adultery, and bestiality, into the same category."

**Veronica Bonifacio Penales – Baylor University**

FIRST AMENDED CLASS ACTION COMPLAINT

Religious Exemption Accountability Project
Paul Southwick Law, LLC

77.    "The school's common response to my reporting hate on campus is that I should go to counseling.  As a result, I stopped reporting incidents."

78.    Veronica is a queer, nineteen-year-old woman who attends Baylor University.

79.    Baylor enrolls 18,033 students.

80.    Baylor has requested and received a religious exemption from the Department relating to "premarital unchastity" and other issues. Exhibit II.

81.    Veronica has been harassed online and on campus by other Baylor students because of her sexuality.

82.    A Bible with anti-LGBT passages highlighted in it was left at her dorm door with a note saying, "I'm praying for you."

83.    An anonymous student frequently leaves post-it notes on her dorm door with the slur "FA*."

84.    Veronica reported these incidents to Baylor but Baylor did not respond to her complaints, and she continued to find hateful notes posted on her door.

85.    Baylor's policy on Human Sexuality states: "Baylor will be guided by the biblical understanding that human sexuality is a gift from God and that physical sexual intimacy is to be expressed in the context of marital fidelity."

86.    The policy goes on to state that "temptations to deviate from this norm include both heterosexual sex outside marriage and homosexual behavior."

87.    Baylor encourages its students "struggling" with same-sex attraction to attend its counseling center.

88.    Baylor forbids "advocacy groups which promote understandings of sexuality that are contrary to biblical teaching."

FIRST AMENDED CLASS ACTION COMPLAINT

89.     Baylor's civil rights policy states, "as a religiously controlled institution of higher education, Baylor is exempt from compliance with select provisions of certain civil rights laws[.]"

90.     Baylor's policies show that the school's "love your neighbor" lifestyle does not extend to sexual and gender minority students.

91.     Veronica feels that "Baylor cares more about its right to discriminate against its queer and other students than it does about the health and safety of its queer and other students."

92.     For the past ten years, the LGBTQ+ students at Baylor have asked Baylor to approve the charter of their LGBTQ+ student club. Baylor has denied their request every time.

93.     Baylor's LGBTQ+ students gather unofficially for support through their club Gamma Alpha Epsilon, but they do so as a second-class, unapproved organization.

### Alex Duron – Union University

94.     "I went into shock. I felt like I was going to pass out."

95.     Alex Duron is an ICU nurse whose admission to a graduate nursing program at Union University in Jackson, Tennessee was revoked in August of 2020 because Alex is gay and engaged to a man.

96.     Union enrolls 3,172 students.

97.     Union sought and received religious exemptions from the Department to facilitate its discrimination towards sexual and gender minorities. See Exhibit JJ.

98.     Alex is a Latinx, Catholic man from Texas who is a first generation college graduate.

99.     Alex worked hard to build a nursing career by obtaining an Associate's degree from San Antonio College and a Bachelor's degree from the University of Texas, Arlington.

100.    Alex worked as an ICU nurse for six and a half years before his admission to Union.

FIRST AMENDED CLASS ACTION COMPLAINT

Religious Exemption Accountability Project
Paul Southwick Law, LLC

101.    After Union University admitted Alex to its program, Alex prepared to start the next chapter at his life by moving from San Antonio, Texas to Jackson, Tennessee. Alex sold his car, quit his nursing job, paid his deposits to Union and secured graduate student housing.

102.    Alex was proud of himself, and his family and nursing colleagues were proud of Alex.

103.    However, without warning, and only days before Alex was to start the Doctor of Nursing Practice (DNP) program at Union, he received an email from Union telling him that his admission was being rescinded because Alex is gay and engaged to man.

104.    "I remember the moment I received that email vividly," Alex says.

105.    "My future was ripped away from me."

106.    "It felt like all my work as an ICU nurse and all my prior degrees meant nothing."

107.    Alex, a grown man with a successful career, loving family and fiancé, went into his closet, curled up into a ball, and cried.

108.    At the time Union rescinded Alex's admission, Union had a blanket ban on homosexuality in its student handbook.

109.    Union later changed its Community Values Statement to prohibit: "homosexual behavior, even in the context of marriage."

110.    Other LGBTQ+ students, many closeted, remain on campus at Union University.

111.    Many of them are afraid that what Union did to Alex will be done to them if they come out or are outed by other students.

**Zayn Silva – Nyack College**

FIRST AMENDED CLASS ACTION COMPLAINT

Religious Exemption Accountability Project
Paul Southwick Law, LLC

112.    "Nyack's rejection hurt and caused me anxiety and to feel depressed.  I didn't immediately apply to another seminary because this rejection pushed me off course.  I didn't want to go through a rejection from another school."

113.    Zayn Silva was in the process of applying to Nyack College, with intent to enter its seminary program.  In his application, he openly admitted to being a trans man and described how this influenced his calling to the ministry.

114.    Nyack enrolls 1,981 students.

115.    Zayn is a Pentecostal Christian.  His family's church rejected him due to being trans.

116.    Despite this early rejection by his church, Zayn remains "a Christian with deep faith."

117.    Zayn started an online platform as a way to help trans youth find a ministry.

118.    According to Zayn, "I was further led by God to pursue a seminary education."

119.    Zayn applied to Nyack after being told by multiple representatives from the school that there would be no issues with him being trans.

120.    Depending on these representations, Zayn described his faith journey and gender transition in his application.   Part of the application stated that "I dedicate every day to letting the youth know, especially the marginalized LGBT, that God is the answer.

121.    However, shortly after filing his application, he was contacted by the director of admissions.  The director informed Zayn that Nyack declined his application because he was transgender and not ashamed nor repentant about it.

FIRST AMENDED CLASS ACTION COMPLAINT

Religious Exemption Accountability Project
Paul Southwick Law, LLC

122.    While the school claimed that they appreciated Zayn's honesty about being trans, Nyack rejected admission based on Zayn's openness and disclosure of his gender identity in his application.

123.    Zayn was informed that the school's board of trustees rejected his application because they believe in "male and female."

124.    Nyack communicated about their rejection solely by telephone.  The school ignored Zayn's requests to put the rejection in writing.  School authorities also ignored his requests to know which of Nyack's policies at the time he had violated.  His follow-up requests were also ignored.

125.    Nyack does not have a written policy or position statement on gender identity.

126.    Zayn is starting a different educational program in the fall yet hopes to pursue a seminary education soon.

## Rachel Moulton – Brigham Young University-Idaho

127.    "They compared LGBTQ+ people, who just wanted the right to marry the person they love, to agents of Satan who were attacking the family."

128.    Rachel Moulton was a student at Brigham Young University-Idaho ("BYUI") through the end of 2020.

129.    BYUI enrolls 39,145 students.

130.    BYUI requested and received a religious exemption from the Department to facilitate its discrimination against transgender students. See Exhibit KK.

131.    BYUI and BYU-Provo are doing little make sure their LGBT students are safe - mentally, emotionally, or spiritually.

132.    Part of this destructive atmosphere includes teaching that even if Rachel and other LGBT women "struggle with same-sex attraction, [they] could be happy marrying a man."  LGBT

FIRST AMENDED CLASS ACTION COMPLAINT

students at BYU are also taught that they would "no longer experience same-sex attraction in the afterlife."

133.    The teaching that there will be no same-sex attraction in the next life is a dangerous one.  It triggers suicidal ideation in some students who, like Rachel, would do "anything not to be gay", even if that includes ending their own lives.

134.    This damaging message being communicated by BYU and the LDS church led Rachel to attempt suicide halfway through her first semester at BYU Idaho.

135.    "I felt damaged, cursed.  I felt like I needed to be fixed, but no one and nothing could fix me."

136.    By promulgating these messages, BYU policy makes some students desperate to rid themselves of same-sex attraction, as they are taught they must do, and as they are told they can do in the afterlife.  This is a dangerous and irresponsible message.

137.    BYU routinely teaches its students that "it was a sin to be married to the same gender or act on homosexual feelings" and "we will never be as happy marrying someone of the same gender as we would be if we followed the commandment to marry someone of the opposite sex."

138.    BYUI students have formed an unofficial LGBT support group, which is not allowed to meet on campus.

139.    BYU has a history of forcing its students into conversion therapy.

140.    BYU briefly changed its honor code, seemingly allowing its LGBT students to date and be open about their identity on campus.  This led many LGBT students to believe it was safe to come out as who they were.

FIRST AMENDED CLASS ACTION COMPLAINT
Religious Exemption Accountability Project
Paul Southwick Law, LLC

141.    This position was reversed by BYU, forcing its LGBT students to go back in the closet while once again opening up those students to the risk of disciplinary action by the school.

142.    Ultimately, Rachel left BYU.  She briefly attended online classes, but upon realizing that BYU's toxicity was not limited to in-person learning, she left once more to protect her mental health.

143.    Rachel has attended therapy for years, attempting to reconcile being gay and being an LDS church member and former BYU student.  "I know I am a child of God," she says. "I know now that being gay and being a child of God can both be true.  This acceptance of myself has healed me from a lot of the religious trauma I experienced earlier in my life."

**Victoria Joy Bacon – Lipscomb University**

144.    "I feel that Lipscomb's policies towards sexual morality are left vague so they can enforce the present policy how and when they feel like it.  This puts queer and trans students at risk of punishment and in a state of fear."

145.    Lipscomb is a Christian university in Nashville, TN. It has a short and vague statement on sexuality that says, "all students should practice biblical standards of sexual morality. Sexual immorality of any kind is prohibited."

146.    Although Victoria was open about their identity in high school, at Lipscomb "I felt unsafe on campus from the first day I moved in.  As a result, I initially went back into the closet as a freshman." School officials would often make homophobic and transphobic statements to Victoria.  Lipscomb administrators would often overlook hateful behavior or statements.  Students and administrators at Lipscomb would subject Victoria to a barrage of hateful language, even slurs. RA's would witness Victoria being called slurs and would do nothing to intervene.

147.    "I also felt in danger of physical harassment from other students," Victoria says.

FIRST AMENDED CLASS ACTION COMPLAINT
Religious Exemption Accountability Project
Paul Southwick Law, LLC

148.    Queer and trans students asked the school to condemn a hateful speech given during chapel.  The school rejected this request, saying that intervention on behalf of its LGBT students would offend donors.

149.    "This experience created a time of intense trauma for me and the queer students on campus," Victoria says.

150.    Victoria attempted to set up an LGBTQ+ group on campus, but Lipscomb refused to accept the new club despite the application meeting all Lipscomb's requirements.

151.    Lipscomb's decision to allow this group to form was ultimately delayed until after Victoria graduated.

152.    During their time at Lipscomb, Victoria was sexually assaulted and did not feel safe reporting it to the school.  "I had heard from other sexual assault survivors how Lipscomb never really helped them when they reported sexual assault."  As a result, Victoria never reported the assault.

### Avery Bonestroo – Dordt University

153.    "I fear that I will be forbidden to graduate or be forced to participate in conversion therapy if I do come out."

154.    Avery is bisexual and gender fluid.  They are a student at Dordt University.  Avery feels compelled to remain closeted because of Dordt University's policies.  These policies indicate that Avery could face extreme discipline by the school, including possible expulsion or forced therapy meant to "cure" them.

155.    Dordt has several policies in its student handbook that discriminate against LGBT students.  Not only does the school forbid "homosexual relations" or "transgendered behavior," but the school even "prohibits promoting or advocating such activity."

FIRST AMENDED CLASS ACTION COMPLAINT
Religious Exemption Accountability Project
Paul Southwick Law, LLC

156.    Avery stands to be disciplined under Dordt's policies for everything from dating their girlfriend to using the name or pronouns that reflect their gender identity.

157.    Students and faculty have told Avery to dress and act "more feminine". Additionally, Dordt repeatedly hosts speakers on campus who advocate for a non-affirming view of LGBT students.  Some professors teach that LGBT students are sinful and rejected by God.

158.    Dordt does not provide an avenue for expressing positions that may not agree with the school's stance.

159.    Dordt's position on "homosexual relations" and "transgendered behavior" is not only vague but casts suspicion on the school's LGBT students.  They must constantly be on guard, or they could face disciplinary action.

160.    The school's policies are damaging to Avery and other LGBT students at Dordt. Avery suffers from depression and anxiety.  There are few resources in the part of Iowa where Dordt is located that provide affirming support or assistance.

161.    Dordt fails to curtail harassing behavior by students based on their animosity towards LGBT students, making the campus unsafe for those students as a whole.

**Nathan Brittsan – Fuller Theological Seminary**

162.     "Fuller's actions made me feel like a second-class Christian. They wanted to be rid of me as fast as possible and offered me no love or grace."

163.    In his 20's, after coming out, Nathan Brittsan drifted away from the church of his youth.  As he states, "more than adrift, I also felt pushed away from the church."

164.    Yet after having "profound spiritual experiences outside the church" and finding other LGBT Christians, like himself, Nathan felt called to the ministry.

FIRST AMENDED CLASS ACTION COMPLAINT
Religious Exemption Accountability Project
Paul Southwick Law, LLC

165.    "I felt like God was calling me to an evangelical seminary like Fuller. I felt like bridge-building needed to be done between the evangelical community and the LGBTQ+ community," Nathan says.

166.    Because of this calling, Nathan applied to and was admitted to Fuller Theological Seminary in September 2017.

167.    Unfortunately, Nathan only attended for several days before the school expelled him for being gay and married to a man.

168.    Fuller's community standards state that "sexual union must be reserved for marriage, which is a covenant between one man and one woman." The community standards also say that "homosexual forms of explicit sexual conduct [are] inconsistent with the teaching of Scripture."

169.    When Nathan attempted to change his last name on school records to reflect his marriage to a man, Fuller officials investigated Nathan. Fuller found that he was violating its community standards and expelled him just days into his first term.

170.    Fuller officials repeatedly blocked Nathan from appealing its decision.

171.    Fuller also claims that it is allowed to expel Nathan under a Title IX religious exemption, in spite of Fuller's policies stating that they do not discriminate based on sex and gender identity.

172.    Fuller sends the message of "love the sinner, hate the sin" through its policies, which is detrimental to LGBT students by causing self-loathing and depression.

**Hayden Brown – York College**

173.    "My relationship with York College is very tumultuous. There are days where I skip across campus because I am ecstatic and cannot wait to see my friends, but there are other

FIRST AMENDED CLASS ACTION COMPLAINT

Religious Exemption Accountability Project
Paul Southwick Law, LLC

days where I do not have enough energy to get out of bed because I do not want to deal with all of the microaggressions, stares, comments, and issues that York College brings into my life."

174.    Hayden Brown attended York College because they were struggling with their sexuality.  They felt that their sexuality was sinful and that they should reject it.  They attended York College hoping to "pray the gay away" and because their parents would pay for them to go there.

175.    "I became very depressed my freshman year because my attempt to be heterosexual wasn't working."

176.    Hayden came out to their parents their freshman year. Their parents set them to a non-affirming therapist and also another non-affirming therapist on campus.

177.    This therapy was all an attempt to make Hayden "less gay."

178.    Eventually, Hayden came out on Twitter and in person.

179.    After coming out on campus, school officials often subjected Hayden to disciplinary action, most commonly due to dress code violations for wearing feminine style clothing.  As a result, the school asked Hayden to wear less feminine clothing.

180.    York asked Hayden to withdraw from a study abroad program in Vienna, Austria, due to their sexuality.

181.    Hayden has been working with York's Title IX coordinator and the person who maintains York's student handbook, along with other administrators at the school, to help it become more accepting of its LGBT students.

182.    These administrators refused to add sexual orientation and gender identity to the school's non-discrimination policy.  They also declined to change the school's definition of marriage to be more inclusive.

FIRST AMENDED CLASS ACTION COMPLAINT
Religious Exemption Accountability Project
Paul Southwick Law, LLC

183.    York rejected a suggestion to start a gay-straight alliance for being "too divisive."

184.    There is an unofficial LGBTQ+ club on campus, which Hayden helped to found. York disapproves of the club.  As a result, the club cannot meet or promote meetings or events on campus.  York also forbids the group from advertising on social media.

185.    Hayden is often called slurs in their dorm or on campus.  "I could not count the number of times I've heard it [the "f" word] on campus."

186.    Hayden also feels at risk of attack on campus, taking extra precautions when coming to and from their dorm room when it is dark.

187.    Other students on campus receive similar treatment.

188.    York College maintains that it has no duty to protect its LGBT students because it has a Title IX religious exemption through the Department of Education.

### Brooke C. – Cedarville University

189.    "I am told bluntly in classes and chapel that I am unnatural, inherently bad, and deserving of eternal damnation because of who God made me."

190.    Brooke is using a pseudonym for this case.  She fears for her safety and expects retaliation from Cedarville University.  She is concerned about disciplinary action or expulsion if Cedarville discovers her identity and involvement in this lawsuit.

191.    Brooke is a demisexual, pansexual, cis woman who is in a long-term relationship with her non-binary partner.

192.    Cedarville University has policies surrounding sexual purity, including strict policies regarding LGBT identity.

FIRST AMENDED CLASS ACTION COMPLAINT
Religious Exemption Accountability Project
Paul Southwick Law, LLC

193.    Part of this policy states, "consistent with our desire to teach and model a biblical approach to sex, the university prohibits same-sex dating behaviors and public advocacy for the position that sex outside a biblically defined marriage is acceptable."

194.    This prohibition on same-sex dating and advocacy of anything other than heteronormative relationships creates a chilling effect on discussions of sexuality and gender.

195.    While clubs on campus propagate racist and homophobic rhetoric with the approval of Cedarville, students who wish to express LGBT affirming views are denied a venue.

196.    According to Brooke, "Even being discovered to have brought a book by a queer affirming author would get me in trouble and monitored."

197.    Brook says, "I feel completely unsafe on campus." Cedarville will discipline students for even slight infractions.  The School also has been known to throw students out when they are known to vary from the School's biblical perspective of gender, marriage, and sexuality.

198.    There are no queer-affirming groups or even any affirming role models on campus.

199.    "Every day on campus is one of secrecy and anxiety," Brooke says.

200.    Brooke suffers from extreme depression and anxiety and says she is terrified of coming out or being outed.

201.    Cedarville University has a religious exemption with the Department of Education. It weaponizes this exemption against its LGBT students.  This weaponization creates an environment for these students which is unsafe – emotionally, spiritually, and even physically.

202.    Brooke fears assault on campus. Cedarville has a reputation for dismissing students filing Title IX complaints about sexual harassment or other sexual misconduct.

203.    According to Brooke, Cedarville often considers these assault survivors to have violated school policy.  "If I were assaulted on campus, I would not feel safe reporting it to

FIRST AMENDED CLASS ACTION COMPLAINT
Religious Exemption Accountability Project
Paul Southwick Law, LLC

Cedarville because of their religious exemption to Title IX, 'purity' policies, and anti-queer policies," Brooke says.

204.    Brooke is looking forward to a time when it is safe for her to join an already established group of LGBT Alumni from Cedarville.

### Gary Campbell – Clark's Summit University (Formerly Baptist Bible College)

205.    "My school's policies made me feel very small, watched, subpar, subhuman, broken, and damaged."

206.    Gary Campbell was a student at Baptist Bible College in the early 2000s.  He attended after being persuaded to by a youth pastor.

207.    Gary's parents and pastoral staff at the school agreed Gary would seek treatment and accountability for his "homosexual sin." Gary was also subjected to increased scrutiny by the school.  He was spoken to and even disciplined for school policy violations related to his sexuality.

208.    On one alarming occasion, Gary was coerced into kissing and touching a dorm mate.  The dorm mate pressured Gary into these activities with the express purpose of setting him up to be disciplined.

209.    "I convinced myself this was justifiable behavior by the other student. I now realize I was violated," Gary says.  "I would not have been a willing participant in an activity specifically and solely geared towards getting me punished."

210.    This "setting up" of LGBT students to coerce them into violating school policies also happened to other students Gary was going to school with at the time.  This indicates systematic attacks by the school's students against other students, all being ignored by the college.

211.    Eventually, Gary left the school after he decided to no longer pursue his degree there. From this point, Gary lived openly and dated a man. However, he was dealing with the psychological damages of his time at Baptist Bible College.  Gary was suffering the effects of

FIRST AMENDED CLASS ACTION COMPLAINT
Religious Exemption Accountability Project
Paul Southwick Law, LLC

Religious Trauma Syndrome.  He was also self-medicating with alcohol at the time.  This coping mechanism resulted in multiple hospitalizations and two stints in rehab.

212.    Gary did get sober.  In 2019, after reaching two years of sobriety, Gary tried to enroll in his school again, now named Clark's Summit University.

213.    Gary was reaccepted to the school and was assured his sexuality would no longer be an issue with the school.  He was called by the Dean of Men, who congratulated him on going back to school.  Gary had six credits left to complete.

214.    Two weeks before starting, Gary's reacceptance to Clark's Summit University was rescinded because Gary is gay.

215.    "I felt devastated by this decision.  I worked incredibly hard after years of alcoholism to rebuild my life.  This decision also brought back the trauma of what happened at the school back in the early 2000s."

216.    Gary suffers from continued depression and anxiety, for which he takes medication.  "I struggle with not feeling good enough and am hypersensitive to criticism.  I feel unsafe around other Christians," Gary says.

### Tristan Campbell – Oklahoma Baptist University

217.    "He [the dean of students] told me that what he was trying to say is that if I came out publicly and remained a student at OBU, he couldn't guarantee my safety."

218.    Tristan Campbell came out as bisexual on Coming Out Day 2015. OBU's response was to dismiss Tristan from the school without notice.  He found out when the registrar informed him he'd been administratively withdrawn and asked Tristan where he would like his transcripts sent.

FIRST AMENDED CLASS ACTION COMPLAINT

Religious Exemption Accountability Project
Paul Southwick Law, LLC

219.    OBU has a section about human sexuality in its student handbook, which includes the wording "due to sin and human brokenness, human experiential perception of sex and gender is not always that which God the Creator originally designed." There are descriptions of prohibited behaviors, which seem hyper-focused on trans and other LGBT individuals.

220.    According to Tristan, these policies were consistent with his belief system at the time.  Tristan says he spent years trying to "overcome same-sex attraction" through "prayer, reading books, and self-discipline."

221.    This did not work for Tristan, and "my mental health started deteriorating, and I made no progress towards overcoming my attractions despite my several years of intense efforts."

222.    After Tristan found himself counseling a youth on overcoming his same-sex attraction, things changed for him. "I knew I was giving this youth dangerous, false advice, and it troubled me."

223.    After this incident and another where a resident director told Tristan that he couldn't trust an RA because they were gay, Tristan said his anxiety got very bad, and he decided to get some help.

224.    Tristan came out to his therapist in the spring of 2015. He later came out to friends. "This was very good for my mental health," Tristan said.

225.    While faculty and students that Tristan came out to were generally supportive, OBU reacted with condemnation and discipline.

226.    Tristan was fired as a resident assistant.  The school told him that, as a bisexual, he was not allowed to serve in this role.  The school also said that other students who came out were harassed, and the school couldn't guarantee Tristan's safety.  OBU eventually dismissed Tristan from OBU without notice.

FIRST AMENDED CLASS ACTION COMPLAINT

Religious Exemption Accountability Project
Paul Southwick Law, LLC

227.    During his time at OBU, Tristan was assaulted by a romantic partner.  Tristan felt unsafe filing a Title IX complaint for various reasons, including that he would face repercussions from OBU.  Tristan was forced to forgo protections and still had to continue attending classes, and even lived in the same dorm as his assailant.

228.    Tristan started an LGBTQ+ group for OBU students and alumni.  Through this group, he learned of other such incidents surround OBU and LGBT students. These students have "lost scholarships, been removed from sports teams, and been harassed."

229.    OBU has a religious exemption with the Department of Education.  The group that Tristan founded has been trying to convince OBU to give back this exemption to no avail.

230.    "Current LGBTQ+ students at OBU are at immediate risk of anxiety, depressions, disciplinary action, and expulsion because of their LGBTQ+ identities and relationships," says Tristan.

### Natalie Carter – Toccoa Falls College

231.    Natalie is using a pseudonym as she fears repercussions from Toccoa Falls

232.    College if they were to discover who she is and her participation in this suit.

233.    Natalie began attending Toccoa Falls College in Toccoa Falls, Georgia in August 2016.  She expects to graduate in July 2021.

234.    Toccoa Falls College's student handbook states that "The College expects all members of the community to refrain from any form of sexual immorality including, but not limited to, any form of extramarital sexual activity, adultery, promiscuity, touching of intimate parts above or below clothing, homosexual behavior, transgenderism, viewing/participating in pornography, or sharing sexual images of one's self or others.  Cohabitation is also not allowed."

FIRST AMENDED CLASS ACTION COMPLAINT
Religious Exemption Accountability Project
Paul Southwick Law, LLC

235.    Students are then encouraged to go to counseling for "proactive education or assistance with relationship issues."

236.    Natalie is a queer woman.

237.    Natalie did not want to go to Toccoa Falls College from the moment she stepped on campus for a tour there during her senior year of high school.  She felt a strong vibe that this was not the school for her.  She had not come fully to terms with her sexuality and was suppressing it.

238.    Natalie does not feel safe on campus and feels strongly that she would not be supported if she came out.

239.    Natalie feels silenced, and she experiences stomach distress knowing that she cannot safely express all that she is.

240.    Toccoa Falls College puts out messaging about loving people wholeheartedly and loving all that each person is.  But Natalie feels like she is not being loved for who she is, but only for half of who she is.  If people at the school were to discover the other half, she feels she would be disowned.

241.    Natalie does not feel safe coming out on social media because she is afraid of other students at the school outing her or the school finding out about her sexual orientation on its own.

242.    Natalie feels like the school would throw her out if she were outed.

### Rachel Held – Messiah University

243.    "It is scary knowing that such an intimate part of life can be policed by university administrators."

244.    Rachel is a bisexual woman who is attending Messiah University.  They are engaged to a cis man who does not attend Messiah.

FIRST AMENDED CLASS ACTION COMPLAINT
Religious Exemption Accountability Project
Paul Southwick Law, LLC

245.    Rachel says that they are comfortable talking about their fiancé on campus because he is a cis man.  But Rachel is keenly aware that "I would not feel comfortable talking about my fiancé on campus, and could be subject to disciplinary action if my fiancé was a female or a transgender male."

246.    Rachel fears that if the wrong people at Messiah found out they are bisexual, they could be disciplined or even dismissed by Messiah.

247.    Messiah believes that the Bible teaches that marriage is between one man and one woman.  Its policies towards LGBT students encourage them to "refrain from same-sex sexual expression."  The school forbids LGBT students from identifying as a couple or "exhibiting expressions of physical intimacy."

248.    Rachel must take precautions with whom they decide to come out to.  "I feel safe coming out to my friends and some professors and staff.  However, I would not publicize it to people I don't know."

249.    The school holds relatively progressive philosophies compared to other religious schools.  Its animosity towards its LGBT students contrasts with that.  Messiah tolerates homophobia.

250.    "Messiah University says that 'students who identify as LGBT are welcomed at Messiah University' However, I feel like Messiah's welcome falls short because they adopt the 'love the sinner, hate the sin' mentality. It is almost more painful than an explicitly unwelcoming environment because it makes me think I will be fully safe and accepted as a bisexual student on campus, when in fact, I am not," Rachel says.

### Lauren Hoekstra – Dordt University

251.    "We are held to a different, stricter level than straight students."

FIRST AMENDED CLASS ACTION COMPLAINT

252.    Lauren is a queer woman who attends Dordt University.

253.    Dordt strictly regulates romantic relationships, especially for its LGBTQ+ students. Dordt's student handbook details forbidden behaviors, including sexual behaviors, and takes a stance against LGBTQ+ students.

254.    Among the activities that the school has declared unbiblical include "promoting or advocating sexually immoral activity," "extramarital sexual relations," "homosexual relations," and "transgendered behavior."

255.    Homophobia is rampant at Dordt and LGBTQ+ students fear coming out.  They risk discipline, expulsion, and rejection and harassment from other students.

256.    Students have sent Lauren harassing messages, professors have taught that people who practice homosexuality will burn in hell, and a Dordt administrator told her that she could come out but only if she didn't blatantly promote homosexuality or put her relationship "in the face" of the people on campus.

257.    Nevertheless, Lauren did come out and has lost friends at Dordt as a result.

258.    There are no LGBTQ+ role models at Dordt to help students feel accepted.  There is no place on campus for LGBTQ+ students to get support.

259.    LGBTQ+ students are left at the whim of Dordt's policies and how Dordt chooses to enforce those policies.

260.    Lauren suffers from anxiety about the reactions she may receive due to her coming out. She also feels depression related to feeling different from other students.  Lauren states that she feels "repressed in my own identity and feelings."

**Chandler Horning – Brigham Young University-Idaho**

FIRST AMENDED CLASS ACTION COMPLAINT
Religious Exemption Accountability Project
Paul Southwick Law, LLC

261.    Chandler started attending Brigham Young University Idaho (BYUI) in Rexburg, ID in September 2015.  He graduated in April 2020.

262.    He chose to stay at Brigham Young after he came out because he was too far into his time at school to be able to logically and easily transfer his credits.

263.    BYU's recent history regarding its stance on queer students is volatile.  In February 2020, the school removed language banning same-sex romantic attraction from its policies.  However, a few weeks later, a commissioner from the LDS church sent out a letter stating in no uncertain terms that "the moral standards of the Church did not change" and that "same-sex romantic behavior cannot lead to eternal marriage and is therefore not compatible with the principles included in the honor code."

264.    Presently BYU's honor code states that students, faculty, and staff must "live a chaste and virtuous life, including abstaining from any sexual relations outside of a marriage between a man and a woman."

265.    BYUI also has a page on their counselling center website specifically discussing same sex attraction that says: "Sadly, anxiety, depression, social difficulties, feelings of isolation, and even suicidal thoughts may arise for individuals experiencing same-gender attraction."  The resources on this page lead only to LDS-approved materials.

266.    Chandler is a gay man.

267.    Chandler did not feel safe coming out on campus.  After he did come out, he switched to attending school online.  When he had to go back to on-campus learning, he put himself back in the closet for two semesters.

268.    If Chandler had acted in any way on his sexuality, even if it was to hold hands with a man, he could have been expelled.

FIRST AMENDED CLASS ACTION COMPLAINT

Religious Exemption Accountability Project
Paul Southwick Law, LLC

269.    BYUI policies make Chandler feel like "a flawed alien not worthy to live or exist."

270.    Chandler feared that he would not only get expelled but he would also be evicted from his BYU housing for breaking the honor code.

271.    Students who are expelled or suspended are evicted within three days from BYUI's mandatory, approved unmarried student housing.

272.    Losing his housing would have left Chandler homeless in rural Idaho.

### Louis James – Indiana Wesleyan University

273.    "I thought everyone was staring at me, thinking I was gay too."

274.    Louis is using a pseudonym for this case. He fears discrimination, dismissal, and academic harm from students, faculty, and staff if Indiana Wesleyan University discovers his identity.

275.    IWU requires students to "refrain from inappropriate sexual relationships outside of a marriage between one man and one woman," and states that "sexual relationships outside of marriage and sexual relationships between persons of the same sex are immoral and sinful."

276.    IWU goes on to say that "we believe the grace of God sufficient to overcome the practice of such activity and the perversion leading to its practice."

277.    Louis, who himself had to largely go back into the closet at IWU, knows that "there are so many IWU students in hiding."

278.    IWU told Louis that they accept LGBTQ+ students, but their handbook says otherwise.

279.    Louis worries about whether he'll be kicked out for being gay.

280.    In August of 2020, Louis saw that a bunch of students were sharing a post about an RA who was fired for being gay. That made Louis think he had made a mistake in coming to IWU.

FIRST AMENDED CLASS ACTION COMPLAINT
Religious Exemption Accountability Project
Paul Southwick Law, LLC

281.    As a result of IWU's policies and actions towards its LGBTQ community, Louis went into an emotional spiral last year, not sleeping and barely eating. He felt anxiety whenever he walked around campus.

282.    Louis wants people to remember that LGBTQ+ students have feelings too and need safety and freedom just like everyone else.

### Jonathan Jones – Azusa Pacific University

283.    "This was a very scary time. I had started feeling safe coming out. Other students had started to feel safe coming out. And now this felt like a trick, like a trap."

284.    Jonathan Jones is bisexual, non-binary, and gender fluid. They currently attend Azusa Pacific University ("APU").

285.    In Jonathan's sophomore year, Azusa Pacific announced that it was reversing its stance on same-sex dating and that it would no longer be banned.

286.    This reversal led many students, including Jonathan, to celebrate. These students believed they would be able to integrate their faith and their sexual identity and feel safe on campus.

287.    However, APU then reversed course again after pressure from some constituencies, reinstating its ban on same-sex dating.

288.    Soon after, APU appeared to reverse itself for the third time and now no longer addresses same-sex dating in its student policies. However, it remains unclear whether same-sex dating is allowed.

289.    In addition to shifting back and forth on whether LGBTQ+ students are permitted to date, APU refuses to grant club status to the LGBTQ+ student group on campus.

FIRST AMENDED CLASS ACTION COMPLAINT
Religious Exemption Accountability Project
Paul Southwick Law, LLC

290.     The school designates the LGBTQ+ group as a ministry rather than a club.  This puts the LGBTQ+ group on an unequal financial footing with clubs. Also, the group cannot fully decide on its programming and a staff member must be present at meetings. APU even forced the group to change its name from Haven, to Tapestry.

291.     APU's separate but equal treatment of the LGBTQ+ student group is not truly equal and feels stigmatizing.

292.     For all of these reasons, Jonathan feels unsafe at APU on an institutional level.

293.     Jonathan also feels unsafe because APU routinely caters to its conservative donors, putting its LGBTQ+ students' health and safety at risk.

**Ashtin Murkowski – Brigham Young University-Provo**

294.     Ashtin started attending Brigham Young University in Provo, UT in September 2014.  She graduated in December 2020.

295.     Ashtin chose Brigham Young because of family tradition and religious affiliation.

296.     Ashtin is a lesbian woman.

297.     Ashtin did not generally feel safe coming out on the BYU campus.

298.     Ashtin held an on-campus job at the Missionary Training Center where she trained missionaries and taught people about her church online.  She did this for two and a half years.

299.     Ashtin was fired from this job after she cut her hair to better match her gender expression.  This firing was done according to the school's purported rules, saying that her hair was "extreme and distracting" and that it was "too masculine, not feminine enough".

300.      Ashtin did not feel that she was going against the school's dress and grooming standards and that BYU's interpretation of these rules was very subjective.  This seemed especially

FIRST AMENDED CLASS ACTION COMPLAINT
Religious Exemption Accountability Project
Paul Southwick Law, LLC

subjective because the school had just hired a man with bleached hair, which was against the rules for men.

301.    Even though Ashtin graduated months ago, she still feels like she is going to "get in trouble" because of how she constantly had to worry that she would be thrown out of school for dating someone of the same gender.

302.    Like many other BYU students, Ashtin was thrilled when BYU changed their Honor Code to remove the prohibition on "homosexual behavior".

303.    When the church responded by declaring that "homosexual behavior does not lead to eternal marriage" it did not make sense to Ashtin.

304.    Ashtin felt like BYU wanted an excuse to not allow non-sexual same-gender behavior such as dating, handholding, kissing, or cuddling.

305.    As a result of her time at BYU and because of their policies, Ashtin was diagnosed with generalized anxiety disorder and major depressive disorder.  She is currently working with a LGBTQ+ affirming therapist for religious trauma and C-PTSD.

**Cameron Martinez – La Sierra University**

306.    Cameron began attending La Sierra University in September 2017.  They expect to graduate in June 2022.

307.    La Sierra has a Sexual Morality policy listed in its student handbook which addresses both LGBTQ students and cohabitating students.  It states, in part, "we resolve to live consistently within traditional Christian values and teaching on sexuality."  The statement goes on to say "La Sierra's policies are informed by an Adventist understanding of biblical principles.  The university acknowledges the complexity of issues surrounding sexuality and is committed to the

FIRST AMENDED CLASS ACTION COMPLAINT
Religious Exemption Accountability Project
Paul Southwick Law, LLC

open and rigorous study of Scripture and discussion of all perspectives, both inside and outside the classroom."

308.    La Sierra's student handbook states that it supports "the Seventh-day Adventist position on Homosexuality."

309.    The Seventh-Day Adventist position on Homosexuality states: "The Bible makes no accommodation for homosexual activity or relationships.  Sexual acts outside the circle of a heterosexual marriage are forbidden[.]"

310.    The Seventh-day Adventist position statement refers to Bible verses that state: "'If a man has sexual relations with a man as one does with a woman, both of them have done what is detestable. They are to be put to death; their blood will be on their own heads." Leviticus 20:13.

311.    Cameron is a queer, non-binary person.

312.    As a student, Cameron's problems have been with the administration and its actions, rather than with other students.

313.    Because of vague and problematic policies or their performative activism, queer students aren't protected at La Sierra.

314.    When LGBTQ+ students have filed complaints of discrimination, staff and faculty use their discretion to justify the lack of change on campus.

315.    The administration does not fully support the LGBTQ+ group on campus as it is not allowed to be an officially recognized club.

316.    While La Sierra no longer punishes a student merely for identifying as LGBTQ+, the school continues to adhere to a policy that considers homosexual activities and relationships to be "detestable," as is stated in the Seventh-day Adventist position on Homosexuality that is formally adopted by La Sierra in its Sexual Morality policy.

FIRST AMENDED CLASS ACTION COMPLAINT

317.    During Cameron's time as a criminal justice student, they witnessed ample amounts of homophobia and transphobia on campus.

318.    Cameron was once sat down by the director of the Corona, California campus to listen to the director's statements promoting the righteousness of heterosexuality.

319.    Cameron has personally witnessed professors using hate speech about queer identities during lectures, with students present.

### Joanna Maxon – Fuller Theological Seminary

320.    "I spent nearly a year holding the pain and anger inside and not talking with friends or a therapist about it because I was not emotionally able to face what Fuller had done to me."

321.    Joanna Maxon was very proud of her admission to Fuller Theological Seminary. "Earlier in life, I struggled to finish life goals," she says, "it was really important to me to finish the program."

322.    Joanna never graduated from Fuller, unfortunately. She was expelled with just a few remaining credits after Fuller discovered she was married to a woman.

323.    Joanna was expelled after a financial aid employee reported her to the school's administration. Joanna disclosed her marriage to a woman on a financial aid document.

324.    However, as Joanna states: "I felt safe being out about my sexuality with other students and professors at Fuller.  I spoke and wrote about my family, including my wife and daughter. None of my professors or other students expressed concern to me about my same-sex marriage."

325.    Fuller's Title IX administrator was one of the people enforcing Fuller's discriminatory actions against Joanna. Fuller did not provide a Title IX administrator with whom Joanna could seek help.

FIRST AMENDED CLASS ACTION COMPLAINT
Religious Exemption Accountability Project
Paul Southwick Law, LLC

326.    At the time of her expulsion, Joanna was five classes short of completing her degree, after having attended Fuller for three years.

327.    Joanna currently attends therapy for emotional distress resulting from her expulsion and the issues that it brought up.  She says she felt "lost and confused."

328.    "I do not want anyone else to be injured in the way I have been," Joanna says.

### Mackenzie McCann – Liberty University

329.    "From the minute I set foot on Liberty's campus, I knew it'd never be safe to be authentically myself."

330.    Mackenzie is a queer, non-binary former student of Liberty University.

331.    Liberty has a reputation for its conservative beliefs. Its student handbook, for example, has a section on sexuality and relationships that states, "sexual relations outside of a biblically ordained marriage between a natural-born man and natural-born women are not permissible."

332.    Mackenzie describes their time at Liberty as filled with misogynistic and homophobic comments.  These comments came from faculty and students alike.  This included words to "pray for a lesbian" and slurs, along with comments about Mackenzie's appearance.

333.    "Students at Liberty behave in homophobic and anti-queer ways because they know they can do so with relative impunity.  Liberty's culture enables such conduct and makes students feel like Liberty is backing them," Mackenzie says.

334.    During her time at Liberty, Mackenzie started dating a woman, long-distance.  They describe how this period at Liberty caused serious emotional distress.  "The secrecy and self-doubt was a huge strain and source of anxiety.  I felt like I could not trust my heart because my beliefs

FIRST AMENDED CLASS ACTION COMPLAINT
Religious Exemption Accountability Project
Paul Southwick Law, LLC

and Liberty's policies told me my heart desired something sinful," Mackenzie says of their experience.

335.    Mackenzie left Liberty after one semester "for my own emotional safety."

336.    "My mental health struggles stemmed from the repercussions of Liberty's campus climate, in which my queer identity was demonized as something evil," Mackenzie says.

**Darren McDonald – Westmont College, Fuller Theological Seminary**

337.    "I did not feel safe coming out.  I did not feel safe existing.  The cultural climate at Westmont and Fuller was harsh with homosexuality positioned as an 'issue' and an enemy of the church."

338.    Darren attended Westmont College in Santa Barbara, California, graduating in 2002.  He also attended Fuller Theological Seminary in Pasadena, California, graduating in 2006.

339.    Darren is a gay man. He is also partially sighted.

340.    "I grew up knowing I had to follow the rules because I needed the approval of my parents and church for my safety and protection," Darren says.  He later goes on to say, "I found a lot of acceptance in the church because I was not viewed as a blind, fat kid like I was at school. I was viewed as a whole person and part of a family."

341.    Darren was bullied heavily at the public school that he attended.  He says that he chose both Westmont and Fuller because of the bullying he faced.

342.    Both Westmont and Fuller have statements in their handbooks regarding human sexuality and marriage.

343.    Westmont only allows sexual expression within the bounds of heterosexual marriage, forbidding sexual relations between same-sex partners. Westmont also says that "when a student approaches us and communicates that he or she is struggling with sexual purity or same-

FIRST AMENDED CLASS ACTION COMPLAINT
Religious Exemption Accountability Project
Paul Southwick Law, LLC

sex attraction, we aim to offer safety that promotes openness, to communicate personal acceptance, and provide accountability and assistance to support students to live consistently with biblical teaching."

344.    Fuller's statement is similar in many ways and states that marriage is between one man and one woman.  It forbids "homosexual forms of explicit sexual conduct." Fuller also encourages abstinence from "unbiblical sexual practices" amongst members of its community.

345.    Darren says he was deeply in denial about his sexuality.  "I suppressed my sexuality for a long time, in part, because of the cultural narrative that treats disabled people as non-sexual beings."

346.    He also did not feel safe coming out at Westmont or Fuller. He did "not feel safe existing."

347.    Darren faced harassment and discrimination at both institutions.  He was forced to act as a gay stereotype at a Westmont student event.  The result was ridicule from the other students.  "I felt like a contemptible monstrosity.  I internalized it for a very long time," Darren says.

348.    Darren also had to deal with issues at Fuller, such as being forced to participate in a lecture that framed lesbians wanting to join a church as a controversial issue.

349.    Darren felt the need to drink to survive his classes emotionally.  He says he felt suicidal.

350.    Both schools suggested conversion therapy to treat his emotional distress and suicidality.

351.    "I still suffer from depression, anxiety, shame, and internalized homophobia as a result of attending these schools," Darren says.

FIRST AMENDED CLASS ACTION COMPLAINT
Religious Exemption Accountability Project
Paul Southwick Law, LLC

## Scott McSwain – Union University

352.    Scott started attending Union University in Jackson, TN in July 2006.  He graduated in May 2010.

353.    Scott was originally supposed to attend Murray State University in Kentucky but, when his father found out Scott's roommate to be was gay, his family decided it was best to attend a school where surrounding Scott with godly people would have a more "positive" effect on him.

354.    Union has included "Community Values Statements" in the student handbook that goes to all students.   These statements address a number of the school's moral and ethical standards, including standards affecting queer and gender non-conforming students.

355.    "The "Community Values Statements" include a paragraph on "Sexually Impure Relationships" that states "Sexually impure relationships include but are not limited to participation in or appearance of engaging in premarital sex, extramarital sex, homosexual activities, or cohabitation. Union affirms that sexual relationships are designed by God to be expressed solely within a marriage between a man and a woman. The Bible condemns all sexual relationships outside of marriage (Matt. 5:27-29; Gal. 5:19). The promotion, advocacy, defense or ongoing practice of a homosexual lifestyle (including same-sex dating behaviors) is also contrary to our community values. Homosexual behaviors, even in the context of a marriage, remain outside Union's community values. We seek to help students who face all types of sexual temptation, encouraging single students to live chaste, celibate lives, and encouraging married students to be faithful to their marriage and their spouse."

356.    The policy goes on to address transgender students in a "Gender Identity" paragraph which states: "Union adheres to the biblical tenet that God created only two genders, that He fashioned each one of us and thus designated our gender/sex. Therefore, identifying oneself

FIRST AMENDED CLASS ACTION COMPLAINT
Religious Exemption Accountability Project
Paul Southwick Law, LLC

as a gender other than the gender assigned by God at birth is in opposition to the University's community values. Further, engaging in activities or making any efforts to distinguish or convert one's gender/sex to something other than the gender/sex to which you were biologically born and which was God-given (i.e. transvestites, transsexuals, transgenders, etc.) is prohibited."

357.    The school dress code also commands that faculty, students, and staff must "dress in such a way that represents their legal gender".

358.    Scott is a gay man.

359.    During his time at Union, the school found out Scott was gay.

360.    Union officials took Scott into a dimly lit room where they told him that he was going to hell and that the school was worried for his soul.

361.    Union officials told Scott that he would be thrown out and all of his credits taken away if he did not attend sexual conversion therapy.

362.    Scott was given vouchers for an Exodus International approved therapist.

363.    Scott was also required to install software that would send the school his online history every week.

364.    During his time in conversion therapy, Scott was sexually assaulted by his therapist.

365.    Union University subjected Scott to severe psychological torture through their discipline.

366.    Union's policies made Scott feel that he was subpar and subhuman in their eyes.

367.    As a result of Union's actions, Scott was diagnosed with anxiety and panic disorder. Scott has been to urgent care multiple times for panic attacks, including as recently as August of 2020.

**Faith Millender – Eastern University**

FIRST AMENDED CLASS ACTION COMPLAINT

Religious Exemption Accountability Project
Paul Southwick Law, LLC

368.    "I feel like I am disregarded and that my sexuality makes me 'less than' other students because of these policies."

369.    Faith is a bisexual/queer woman who attends Eastern University.

370.    She is co-president of Eastern's official LGBTQIA+ club, Refuge.  Refuge's goals are "To provide a safe place for queer students and allies, to be seen and heard," and to "[p]rovide advocacy and education for the non-affirming constituencies on our campus."

371.    Eastern sanctioned the club in 2017.

372.    Eastern prohibits sexual expression outside a biblically-sanctioned marriage between one man and one woman.

373.    Despite Eastern's partial support for its LGBTQ+ students, the school is not an affirming one.  Its policies ultimately result in LGBTQ+ students not feeling safe and accepted at Eastern.

374.    Eastern's policies lead to anxiety amongst LGBT students because it is unclear whether it is safe to come out on campus.

375.    Faith does not feel safe with some faculty and staff members because of their homophobia.

376.    Additionally, Faith's program at Eastern, nursing, does not educate about LGBTQ+ health care.

377.    Faith believes that her nursing program administrators would not protect her if she faced discrimination from patients or providers.

378.    According to Faith, "while Eastern provides a better environment for queer students than some other Christian colleges, I still feel frustrated and invalidated because of my school's policies on sexual orientation."

FIRST AMENDED CLASS ACTION COMPLAINT
Religious Exemption Accountability Project
Paul Southwick Law, LLC

**Journey Mueller – Colorado Christian University**

379.    "I barely survived this experience."

380.    Journey Mueller says that to stay alive, she had to leave Colorado Christian University ("CCU").

381.    Journey, a lesbian woman, attended CCU from August 2017 until April 2018.

382.    While a student, Journey's roommates locked her in a dorm room and forced her to confess to being attracted to women. Journey's roommates then reported her to the school for breaking the school's policy on sexuality.

383.    The school did not discipline Journey's roommates for locking her in her room. Rather, the school instead severely punished Journey for her sexual orientation, eventually forcing her to leave for mental health reasons.

384.    CCU's current sexuality policy for students states that "some human beings experience confusion regarding their gender identity and/or sexual orientation. When students at CCU find themselves with questions regarding their gender identity, or sexual orientation, they are encouraged to come forward and take advantage of the University's Counseling Center services and pastoral resources to help guide and direct them through their struggle. At times it may be necessary to remove a student from specific involvement such as athletic team participation, leadership positions, or other University activities either temporarily or permanently. The University will allow students to continue their enrollment at the University as long as they can remain celibate, and as they undergo counseling and mentoring….If a student does engage in a same-sex relationship, violates the policy on same-sex behavior, or exhibits same-sex intimate relationship behavior anytime during the mentoring, he or she will be disciplined within the terms of the sexual conduct/activity policy."

FIRST AMENDED CLASS ACTION COMPLAINT
Religious Exemption Accountability Project
Paul Southwick Law, LLC

385.    "CCU endorses healthy heterosexual relationships that uphold God's desire for sexual purity and which seek to honor Him through a holistic biblical relationship."

386.    Acting pursuant to its student policies, CCU disciplined Journey by forcing her to participate in conversion therapy with the goal of making her straight. CCU also compelled Journey to attend "ex-gay" chapels at the school where same-gender relationships were demonized and abstinence was touted as the solution to same-sex attraction.

387.    Additionally, school officials removed Journey from her dorm and forced her into a housing situation where she would not be around women and was isolated.

388.    CCU also blocks access to Pro-LGBTQ+ websites and resources on its campus internet. This blocked Journey and continues to block other students from essential resources and support.

389.    The toxic policies of CCU resulted in a snitching culture and policies that seek to eliminate CCU's queer population. CCU encourages an environment that allows bullying and peer pressure, harassment, isolation, and extreme psychological damage of LGBTQ+ students.

390.    As a direct result of CCU's discriminatory practices, Journey suffered greatly. Her emotional health suffered to the point of suicide attempts and self-harm.

391.    Journey was clinically diagnosed with PTSD due to her experience at CCU.

392.    Journey's relationship with her parents also suffered.

393.    As a result of CCU's actions, she experienced a period of housing instability.

394.    CCU sought and received a religious exemption from Defendant U.S. Department of Education. This exemption effectively enables the discrimination and harassment of LGBTQ+ students at CCU.

**Jaycen Montgomery – George Fox University**

FIRST AMENDED CLASS ACTION COMPLAINT

Religious Exemption Accountability Project
Paul Southwick Law, LLC

395.    Jaycen started attending George Fox University (GFU) in Newberg, Oregon in August 2012.  He left in March 2016 without graduating.

396.    GFU has a "Lifestyle Statement" which states, "In regard to sexual morality, we believe that only marriage between a man and a woman is God's intention for the joyful fulfillment of sexual intimacy. This should always be in the context of mutual compassion, love, and fidelity. Sexual behaviors outside of this context are inconsistent with God's teaching. We recognize these principles may conflict with the practice or opinion of some within the larger culture. We are convinced that this is God's design for providing the most loving guidance and practice for individuals and our community."

397.    GFU's student handbook states that "George Fox University accepts the biblical standards that prohibit all sexual immorality" and that "we believe the power of God and the wisdom of the Holy Spirit combine to provide the means to live victoriously with respect to sexual purity."

398.    Jaycen is a transgender man of open sexuality.

399.    George Fox University's policies and practices made him feel excluded and unrecognized.

400.    Jaycen dealt with a lot of anxiety and depression as well as not feeling safe as one should expect to feel in their school.

401.    While a student at GFU, Jaycen requested to move from women's housing to and to live with other men after his transition.

402.    Living in a women's dorm meant that each day, the first thoughts Jaycen had were about his struggles living in a body that never felt right to him.

FIRST AMENDED CLASS ACTION COMPLAINT

Religious Exemption Accountability Project
Paul Southwick Law, LLC

403.    Living in women's housing while undergoing testosterone therapy was especially challenging for Jaycen.

404.    George Fox officials initially denied his request to live with other men because Jaycen is a transgender man.

405.    Jaycen filed a Title IX complaint with the U.S. Department of Education regarding this housing discrimination.

406.    George Fox University requested a religious exemption from the U.S. Department of Education so that they could maintain their discriminatory housing policy while continuing to receive federal funding.

407.    The U.S. Department of Education granted GFU's request for a religious exemption and closed Jaycen's complaint file with the Department as a result of that exemption.

408.    GFU currently maintains a policy on transgender students, which states, in part: "Given the varying circumstances of students identifying as transgender, addressing their particular needs will be evaluated on a case-by-case basis, prioritizing the well-being of the individual and community alike."

### Jake Picker – Baylor University

409.    "Baylor claims to love its LGBTQ+ students, yet they refuse to grant us access to any form of student support system.  They treat our existence like there is something inherently wrong with us."

410.    Jake is a pre-med student at Baylor and a bisexual man.

411.    Jake is in a leadership position at Gamma Alpha Upsilon, the only "official" unofficial LGBTQ+ support group for Baylor students.

FIRST AMENDED CLASS ACTION COMPLAINT

Religious Exemption Accountability Project
Paul Southwick Law, LLC

412.    Baylor refuses to grant Gamma Alpha Upsilon's charter, cutting off an important source of representation and restricting the ability of LGBTQ+ students to support one another.

413.    Baylor has an official stance on human sexuality, which includes a definition of marriage as between a man and a woman. The policy also states that Baylor students are expected to refrain from participating in groups that "promote understandings of human sexuality that are contrary to biblical teaching."

414.    Baylor also encourages its students who are "struggling" with their sexual identity to attend counseling at an on-campus counseling center.

415.    While Baylor is unlikely to discipline its queer students for being queer, it creates a hostile environment for its LGBTQ+ students.

416.    For example, an LGBTQ+ student is likely to face discipline if they openly show affection for a same-sex partner on campus.

417.    "Baylor has made its LGBTQ+ students feel like they are less than and undesirable."

**Danielle Powell – Grace University**

418.    "I have lost so much due to Grace University's actions. I lost respect, equal treatment, vocational opportunities, financial earnings, anonymity, etc.  I do not want other students to have to face the same losses."

419.    Danielle Powell was a student at Grace University, which is now permanently closed.

420.    Included in Grace's student policies was a section on dating.  It stated, in part, "sexual fulfillment is reserved by God for heterosexual marriage." The policy also promised discipline for "homosexual acts," among other things.

FIRST AMENDED CLASS ACTION COMPLAINT
Religious Exemption Accountability Project
Paul Southwick Law, LLC

421.    Danielle started to question her sexuality in her senior year at Grace when she started having feelings for her best friend – a woman.

422.    "I did not know in detail the consequences of coming out at that time," says Danielle.  "I did not know that the culture of Grace University did not accept homosexuality."

423.    When she came out, Danielle was separated from her peers in housing within 24 hours.  She was subjected to questioning about her faith and was shamed during disciplinary proceedings.

424.    Danielle was not allowed to spend time alone with her girlfriend.

425.    Ultimately, Grace expelled Danielle.

426.    To make matters worse, Grace University demanded that Danielle repay over $6,000 in institutional scholarship funds and initially refused to release her transcripts until she did so.

427.    After Danielle's expulsion, Grace changed its wording to expressly forbid same-sex dating.  Danielle says this change "made me feel vindicated as I realized other students would not face the same problem I did when it came to misleading language in the code of conduct."

**Megan Steffen – Moody Bible Institute**

428.    "I found myself in an environment that actively hated me and wanted me gone.  I felt like I was in survival mode every day."

429.    Megan Steffen was a student at Moody Bible Institute (MBI) in Chicago, Illinois.

430.    She attended MBI for many reasons, including that her sister went there, it was an alcohol-free campus that would support her sobriety, and it was a Christian school.

431.    According to Megan, "I did not consider MBI's stance towards LGBTQ+ students at the time I decided to attend as I was not out, even to myself, yet."

FIRST AMENDED CLASS ACTION COMPLAINT
                              Religious Exemption Accountability Project
                              Paul Southwick Law, LLC

432.    Moody's human sexuality statement states, "We conclude that non-marital sex, homosexual sex, same-sex relationships, and transgender expressions are deviations from God's standard, misrepresenting the nature of God Himself."

433.    Megan says her early years at Moody Bible Institute were good.  However, when she began coming out to close friends and family, her peers at MBI primarily responded negatively.

434.    Megan began hearing about negative reactions to her sexual identity after she posted pro-LGBTQ+ content on social media.

435.    Fellow students began asking Megan to defend her sexuality and told her that her lifestyle was wrong and sinful.  She received anonymous mail telling her she should be ashamed of herself for being a lesbian.  She would occasionally get reported to MBI officials for her social media posts.

436.    Megan says, "Attending MBI, which had felt safe and supportive before I came out, became a place of fear that had turned against me."

437.    Megan landed on the school administration's radar after they told her they had problems with her attending the Women's March.

438.    Megan was forced to attend meetings with an MBI administrator at least ten times. At these meetings, she would have to discuss social media posts, relationship status, and sexual identity.

439.    In 2019, Megan received an official warning from MBI due to a social media post where she said she was a lesbian.  As a result, she had to agree to no longer post on social media until Spring 2020, when she was done with school.

FIRST AMENDED CLASS ACTION COMPLAINT

Religious Exemption Accountability Project
Paul Southwick Law, LLC

440.   She maintained her social media silence until she finished her classes and was no longer on campus. However, she resumed posting prior to her graduation ceremony.

441.   When Megan posted again about an LGBTQ+ event that she attended, the school threatened not to allow her to graduate.

442.   The school claimed professors had expressed concern about whether she should be allowed to get her diploma from MBI.

443.   "The result of this was that, less than a week before graduation, I had to defend why I deserved a diploma," says Megan.

444.   Megan continues, "it was clear during this meeting that I would not get my diploma unless the answers I gave to their questions aligned with MBI's policies about sexuality and marriage. Because I had been placed in an impossible situation and my hard-earned degree was on the line, I told MBI that I agreed with their non-affirming policies and planned to live according to them. As a result, MBI allowed me to receive my diploma."

445.   Megan graduated in May 2020 with a degree in Human Services. She said she was so shaken by her final experience at Moody that she was scared for several months that she might do something to upset MBI.

446.   Due to her experience at Moody, Megan's depression and anxiety became very severe. She had panic attacks, she couldn't get out of bed, had insomnia, and dealt with suicidal thoughts.

447.   "I cannot imagine ever finding myself in as abusive and manipulative of an environment as I did at Moody," Megan says.

**Spencer Vigil – Seattle Pacific University**

FIRST AMENDED CLASS ACTION COMPLAINT

Religious Exemption Accountability Project
Paul Southwick Law, LLC

448.    "I felt like I was always doing something wrong being who I was.  SPU's grace had edges."

449.    Spencer Vigil attended Seattle Pacific University (SPU). He wanted to go to college in a larger and more liberal city.  Unfortunately, his experience as a trans man at SPU was one of discrimination and harassment.

450.    One of SPU's statements on human sexuality states that "human beings are created in the image of God, male and female," and "human sexuality is both a relational truth and gender differentiated."

451.    It goes on to say that "while we affirm the institution of marriage, we also recognize and affirm the call of some to singleness and celibacy."

452.    Spencer tried to come out as trans in 2019.  He began using his new name at SPU but was publicly humiliated for his new name by a professor when Spencer asked that professor to refer to him as "Spencer".  In front of the class, the professor said: "I am not going to call you that."

453.    SPU confronted Spencer after he tried out for a male part in a theater department production.  "This was important to me because I wanted to play a character on-stage whose gender was consistent with my gender off-stage."

454.    He was asked to meet with a professor and given a document for "my and the department's protection."

455.    This document stated that Spencer knew he was breaking lifestyle expectations at SPU.  It also detailed the various types of discipline he could face for doing this, including removal from the school.

FIRST AMENDED CLASS ACTION COMPLAINT
Religious Exemption Accountability Project
Paul Southwick Law, LLC

456. "I did not agree with these things, but, at the time, I felt I had no other option. So, I signed it," Spencer says. When looking back on this, Spencer remembers, "I was so emotionally devastated that I had trouble sleeping for months."

457. Spencer reported SPU's discrimination to SPU but SPU did not take action in response to Spencer's report.

458. Spencer continues to suffer from anxiety, depression, and insomnia because of his experiences at SPU.

**Lucas Wilson – Liberty University**

459. "Repression, deep-seated shame, self-hatred: these were the enduring fruits of my meetings. At the time, I didn't understand that you can't fix what isn't broken."

460. Lucas was a student at Liberty University. The "meetings" Lucas describes are conversion therapy. Lucas chose to attend this therapy. "It pains me that conversion therapy remains an available option at Liberty and is encouraged by the administration."

461. Lucas also attended a group now called "Armor Bearers," a conversion therapy group for men. According to Liberty, "this is a group that helps male students struggling with same-sex attraction and sex addiction."

462. Conversion therapy is offered as part of a "menu" by Liberty. A "menu" of educational opportunities" from which students who accept responsibility for violating school policies are given a choice.

463. "Even if I was comfortable as a gay man and even if I accepted myself, I would never have come out because of how homophobic the campus is," Lucas says. He goes on to say, "I was very anxious when I was on campus that people would know that I am gay, so I constantly

FIRST AMENDED CLASS ACTION COMPLAINT

Religious Exemption Accountability Project
Paul Southwick Law, LLC

monitored how I presented myself.  The school caused me a profound sense of shame, which let me hate who I was for a long time."

464.    Liberty University, by pushing students into conversion therapy or otherwise disciplining them for being LGBTQ+, continues to treat students poorly, actively discriminates against them, and attempts to change their sexual orientation.

465.    Lucas says that many LGBTQ+ students "continue to face such immense hatred on a daily basis and must live in a queer subterfuge."

### Audrey Wojnarowisch - George Fox University

466.    "We need George Fox to acknowledge our existence, affirm our identities, and stop policing our relationships and our bodies."

467.    Audrey Wojnarowisch is a student at George Fox University who will be graduating in May 2022.

468.    She decided to go to George Fox for many reasons, including that it was close to her family, it was a small school, and it had a Christian culture.  "I appreciated the intimate 'Be Known' promise of a community that would see who I am and care for me as an individual," Audrey says.

469.    George Fox University maintains a lifestyle agreement that discriminates against its LGBTQ+ community.  It dictates that "only marriage between a man and a woman is God's intention for the joyful fulfillment of sexual intimacy."  The sexuality and relationships section of the student handbook prohibits "sexual immorality."

470.    The school does not explicitly state that same-sex dating and displays of affection are prohibited, but it is also unclear how GFU defines "sexual immorality."  It is difficult for LGBTQ+ students to navigate these nebulous rules.

FIRST AMENDED CLASS ACTION COMPLAINT
Religious Exemption Accountability Project
Paul Southwick Law, LLC

471.   Audrey came out her freshman year after another student came out at school and received a positive reaction.

472.   The head of the student government issued a statement supporting and affirming George Fox's LGBTQ+ students. Audrey felt this was a great affirmation from the campus.

473.   However, this affirming message prompted the president of GFU to reiterate the school's official policy on sexuality.

474.   While there are affirming members of faculty, those same faculty members fear getting fired for their support.

475.   Even at the campus health and counseling center, there are no guarantees that LGBTQ+ students would not be discriminated against.

476.   "I do not feel safe on campus.  My needs and the needs of my fellow queer classmates are constantly being ignored and minimized," Audrey says.

477.   One need of Audrey's that was ignored was the duty GFU owed to her under Title IX after she reported a sexual assault.

478.   Audrey was sexually assaulted in her freshman year after being stalked and sent hundreds of messages.  She reported the assault to a resident advisor, who reported it to an area coordinator.  The area coordinator was supposed to file a Title IX complaint about the incident but failed to do so.

479.   "Because George Fox did nothing to help me, I had to figure out how to handle this as an 18-year-old freshman, who was unfamiliar with sex and dating, all on my own."

480.   Audrey says, "I want George Fox's policies to change so that I won't be at the risk of discipline for my identity or relationships so I, like other LGBTQ+ students, will be protected if we experience unsafe situations, harassment, or violence."

FIRST AMENDED CLASS ACTION COMPLAINT
Religious Exemption Accountability Project
Paul Southwick Law, LLC

## Saren Craig – College of the Ozarks

481.    "A campus counselor told me that my sexuality and gender orientation were pathological and because of my history of abuse."

482.    Saren was born in Cassville, MO on a cattle farm one hour from College of the Ozarks ("C of O"). They attended C of O from 2001-2003.

483.    Saren's family was very religious and believed homosexuality and being transgender or non-binary were sinful.

484.    Saren's father graduated from C of O.

485.    Saren's family expected Saren to also attend C of O for college.

486.    Saren became very close with a female friend while at C of O. This caused confusion and anxiety for Saren.

487.    C of O has a history of abusing and discriminating against its LGBTQ+ students.

488.    A gay student killed himself in a C of O dean's garage after receiving messages of rejection from his campus community.

489.    C of O's current policy on sexual orientation and gender identity states:

> College of the Ozarks is guided by a long-standing traditional, biblical worldview which reflects the understanding that human sexuality is a gift from God, and that: sex assigned at birth is a person's God-given, objective gender, whether or not it differs from their internal sense of "gender identity" (Genesis 1:27; Leviticus 18:22; Matthew 19:4; Romans 1:26-27; 1 Corinthians 6:9-10); sexual relations are for the purpose of the procreation of human life and the uniting and strengthening of the marital bond in self-giving love, purposes that are to be achieved solely through heterosexual relationships in marriage (Genesis 1:28; 2:24; Exodus 20:14; Proverbs 5:15-23; Matthew 19:5; 1 Corinthians 6:12-20, 7:2-5; 1 Thessalonians 4:3) .
>
> Misuses of God's gift of human sexuality will be understood to include, but not be limited to gender expression inconsistent with sex assigned at birth (transgender), gender transition, sexual abuse, sexual harassment, sexual assault, heterosexual misconduct, homosexual conduct, or possession of pornographic materials. In addition, the College considers indiscreet public display of affection as inappropriate behavior…Toward this end, the College may subject to disciplinary action any employee or student who engages in or encourages:

FIRST AMENDED CLASS ACTION COMPLAINT

Religious Exemption Accountability Project
Paul Southwick Law, LLC

*1 . Gender expression inconsistent with sex assigned at birth;*
*2 . Gender transition;*
*3 . Sexual relations with a person other than his/her spouse;*
*4 . Sexual relations with a person of the same sex;*
*5 . Touching, caressing, and other physical conduct of a sexual nature with a person of the same sex;*
*6 . Touching, caressing, and other physical conduct of a sexual nature with a person of the opposite sex that is inappropriate to the time and place in which it occurs .*
*Disciplinary action may include disciplinary dismissal.*

490.    While Saren attended C of O, one of C of O's counselors came to a class and told students that if there was something in their past that they wanted to discuss, they could come and talk with her.

491.    Saren took the counselor up on her offer. In the course of the counselling, Saren informed the counselor that they were queer.

492.    Saren's campus counselor told Saren that their queerness was the result of their past abuse. This message from the counselor compounded the harm done by the abuse and caused Saren to become very depressed. Saren experienced this counselling as psychological abuse that increased their shame around sexuality.

493.    Saren eventually had to stop attending class at C of O because of their depression.

494.    Saren left college and Missouri and joined the Air Force.

495.    After completing their military service, Saren finished their undergraduate degree at the University of Missouri-Kansas City in 2014. Saren completed their master's degree in Counseling and Guidance – Mental Health in 2018, also from University of Missouri-Kansas City.

496.    Saren now helps LGBTQIA+ people come to terms with their identities and writes letters for gender confirmation surgeries.

**Jamie Lord – Regent University School of Law**

FIRST AMENDED CLASS ACTION COMPLAINT

Religious Exemption Accountability Project
Paul Southwick Law, LLC

497.    "A teacher told me I would go to hell for being a lesbian and that if I prayed hard enough, God would save me from my sinful ways."

498.    Jamie was not raised in a highly religious family.

499.    Jamie attended Regent for law school because they offered her a large scholarship.

500.    Regent also told Jamie that she did not need to espouse Regent's religious values to attend the law school.

501.    Jamie informed Regent that she is a lesbian and Regent told her that would not be a problem and that the law school welcomed diversity.

502.    Regent's statement turned out to be false.

503.    Within the first week of class, Jamie learned that if she told people she was a lesbian, she would be treated differently.

504.    Jamie had to hide her sexuality while also listening to professors and members of the Regent community condemn LGBTQ+ people.

505.    Jamie attended many classes where professors described LGBTQ+ people as pedophiles, child molesters, undeserving of marriage, and as destined for hell.

506.    Jamie felt terrified, as she had never experienced such an abusive and hostile environment.

507.    Jamie reported these incidents to Regent administration but the administration took no action.

508.    During Jamie's second year at Regent, a specific professor harassed her because of her sexual orientation.

FIRST AMENDED CLASS ACTION COMPLAINT
Religious Exemption Accountability Project
Paul Southwick Law, LLC

509.    Jamie was at a breaking point and talked with a dean at Regent who recommended that she speak with a professor who the dean described as a loving and caring professor she could talk to.

510.    This professor quickly voiced that being gay is not okay, that his brother was gay and that he did not accept the lifestyle. This professor told Jamie that if she prayed hard enough, God would make her straight and that she was just confused.

511.    Jamie instantly got very upset and left immediately.

512.    From that time forward, this professor frequently insulted LGBTQ+ people in class. He went on many rants about how gay people are pedophiles, that you can act straight if you try hard enough, gay marriage should not be called marriage, and gay people should not be able to adopt children.

513.    This professor kept referring to LGBTQ+ people as "the gays," despite requests to discontinue that language.

514.    Regent also told Jamie that, per the school's policy, she could be kicked out of the school for having "premarital sex," even though they could not give her an answer as to what constituted pre-martial, lesbian sex.

515.    Regent told Jamie that if she brought her girlfriend on campus, she could be kicked out of school.

516.    Regent's student handbook contains the following: *Sexual Conduct. Regent University fully accepts the teachings of the traditional Biblical view with regard to the goodness of our sexuality, the importance of chastity, and the place of heterosexual marriage as God's intended context for complete sexual expression to occur (Gen. 2:21-24). Husbands and wives are called to exclusive sexual fidelity to one another and single persons are called to abstinence.*

FIRST AMENDED CLASS ACTION COMPLAINT
Religious Exemption Accountability Project
Paul Southwick Law, LLC

*Sexual misconduct that is prohibited includes disorderly conduct or lewd, indecent, or obscene conduct or expression, involvement with pornography, premarital sex, adultery, homosexual conduct or any other conduct that violates Biblical standards.*

*517.*    This sexual conduct policy applies to law school students.

518.    According to the Regent University School of Law Policies and Procedures Manuel: *After reviewing this manual, the School of Law Honor Code, the Regent University Graduate Catalog, and the Regent University Student Handbook, a student should be familiar with the general policies and practices followed in the law school.*

*519.*    The Manuel also states: *The School fully accepts the teaching of the traditional biblical view with regard to sexual conduct outside the bonds of matrimony, and consistent with those teachings, the School does not discriminate purely on the basis of an individual's professed sexual orientation, but only with regard to accompanying sexual conduct or other actions that undermine the University's Christian character.*

520.    After routinely hearing from professors and the Regent community that she is unworthy and going to hell, and that her identity and relationship are shameful, Jamie's depression and anxiety became significantly elevated.

521.    Jamie now feels further from God than she has ever felt.

522.    Jamie hopes that future LGBTQ+ law students at Regent will be spared the abuse and terrors that she has faced.

**Daniel Christopher Tidwell-Davis – Lee University**

523.    "I knew a student who was expelled for having a DVD of the feature film Latter Days, a gay themed movie, in his room. I knew of another student who was expelled for having been seen on a date with another man over the summer when he was at home in another state. I

FIRST AMENDED CLASS ACTION COMPLAINT
Religious Exemption Accountability Project
Paul Southwick Law, LLC

realized that other students were being expelled because they were LGBTQ, and that my participation in the conversion therapy group was a way to keep that from happening to me."

524.    For most of his time at Lee University, Daniel was completely closeted.

525.    Daniel attended Lee from 2002-2007.  He was 17 when he enrolled.

526.    LGBTQ+ students were isolated and denied protections against discrimination and harassment while Daniel was there.

527.    LGBTQ+ support groups were disallowed at Lee. Some students who participated in unsanctioned LGBTQ+ support groups were expelled.

528.    As a Resident Assistant, Daniel was required to search residents' rooms for LGBTQ+ materials and to watch for any indications that students were in same-sex relationships.

529.    Daniel was the target of harassment. Students exposed themselves to him, harassed him with heterosexual pornography and used homophobic slurs.

530.    During one extreme incident of harassment, Daniel was awakened in the middle of the night by students throwing pool balls at his bedroom door. Daniel laid in bed, crying, hoping they would leave.

531.    After the students persisted, and relentlessly pounded on his door with their fists, he was forced to open his door to confront them. He was met by the ringleader of the group, completely naked, doing a handstand in his doorway with his genitals inches from Daniel's face, while 8-10 young men stood behind him howling with laughter.

532.    In that moment, Daniel didn't know if he was going to be assaulted, or if he reported it, if he would be expelled for being gay.

533.    He cried himself to sleep that night.

FIRST AMENDED CLASS ACTION COMPLAINT

Religious Exemption Accountability Project
Paul Southwick Law, LLC

534.    While a student at Lee, Daniel was aware of multiple straight and LGBTQ+ students who experienced sexual assault and did not report it due to fear of being expelled.

535.    Daniel never filed a Title IX report with Lee or with the Department because he believed he would not prevail due to the religious exemption to Title IX.

536.    Daniel believed that he would be expelled, lose his scholarship and be forced to come out to his hostile family if he reported the harassment, abuse and discrimination.

### Justin Tidwell-Davis – Baylor University

537.    "Baylor's policies on homosexuality played a significant role in my motivation to seek out conversion therapy."

538.    Justin attended Baylor University from 2001-2009. He was 17 when he enrolled.

539.    As a student, Baylor's sexual misconduct policy listed "homosexual acts" as a disciplinary offense alongside sexual abuse, incest and adultery.

540.    Trying to make sense of his sexuality while a student at Baylor, the ambiguity and threatening language of Baylor's sexual misconduct policy filled Justin with a persistent state of dread and anxiety.

541.    Justin wondered: Would I be disciplined if I went on a date? Held another man's hand?  Shared a kiss? What if someone reported me for doing so off campus or out of town? Would I be expelled? How would I explain that to my parents? Would I be disowned?

542.    Justin believed that by undergoing conversion therapy, he would have some protection from Baylor's disciplinary procedures if he were ever to "mess up" and be caught.

543.    Justin recalls a Baylor professor erasing a message of support for LGBTQIA+ students, a simple "God loves you" with a rainbow, from the sidewalk by scrubbing it off with his foot.

FIRST AMENDED CLASS ACTION COMPLAINT
Religious Exemption Accountability Project
Paul Southwick Law, LLC

544.     Justin internalized the message "We will erase you."

545.     While Justin was at Baylor, a gay graduate student was outed and had his scholarship revoked.

546.     Justin has spoken with other Baylor alumni who report being subjected to exorcisms by other students, shunned, told they were mentally ill or demonically possessed for being LGBTQIA+.

547.     Some of Justin's friends at Baylor didn't report sexual harassment and assault because they feared that they would be punished for having been assaulted by someone of the same-sex.

548.     Justin continues to feel sadness, anger and pain, not only for his own experiences at Baylor, but in knowing that Baylor continues to harm its LGBTQ+ students and to shape generations of students who go into the world believing that it is there imperative and right to discriminate against LGBTQ+ people.

### Devin and Consolata Bryant – Covenant Christian Academy

549.     "I feel like the reason why I was expelled wasn't due to 'struggling with same-sex attraction.' I feel that the problem is that I was comfortable with my queer identity."

550.     Devin Bryant is a recent high school graduate who is 18 years old. He joins the case with his mother, Consolata Bryant.

551.     Devin had attended Covenant Christian Academy since pre-school. His mother sent him to CCA because "I wanted Devin to attend a Christian School and receive a solid education. I expected the school to teach my children about honesty, love, and kindness."

FIRST AMENDED CLASS ACTION COMPLAINT
Religious Exemption Accountability Project
Paul Southwick Law, LLC

552.     What Devin experienced instead was hatred and bigotry when he was expelled by a new headmaster who was only on the job for several days.  Devin was dismissed because he identifies as queer.

553.     Devin felt safe coming out at CCA because he had attended the school for his entire life and knew everybody.  He felt safe coming out in his junior year of high school.

554.     Shortly before his senior year, Devin submitted artwork for approval that was meant for display in his senior parking spot, per school tradition.  This art disclosed Devin's sexual orientation.

555.     Administrators called Devin into a meeting.  In this meeting, the administration told him that he could not be openly queer and still attend CCA. He agreed to the school's demands that he keep his sexuality private and not date anyone – either inside or outside of school.

556.     There were no allegations that Devin had committed any sexual conduct violation.

557.     However, a new headmaster, within days of assuming his position, expelled Devin from the school.

558.     Devin's expulsion cut him off from his social support network at CCA.  "Everyone else was able to move on, including my teachers and other students," Devin says, "but I am stuck in it all."

559.     Consolata says, "Devin's friends have been disappearing since the expulsion."

560.     Devin attends therapy because of his expulsion from CCA.  He was required to make up extra classes at the public school he was forced to attend after CCA expelled him.

### Mortimer Halligan – Indiana Wesleyan University

561.     "I would like to feel safe on campus."

562.     Mortimer Halligan is a first-generation college student.

FIRST AMENDED CLASS ACTION COMPLAINT

Religious Exemption Accountability Project
Paul Southwick Law, LLC

563.    Mortimer applied to Indiana Wesleyan University ("IWU") knowing very little about colleges.

564.    They chose IWU because Mortimer's church youth group staged an event on the IWU campus.

565.    Mortimer is a member of a group of students who are attempting to start an LGBTQ+ student group at IWU.

566.    IWU does not recognize their student group, so they cannot recruit or receive funds.

567.    For their safety, the group meets off campus.

568.    The group constantly faces harassment from other IWU students and alumni, including harassment through social media and the destruction of the group's materials.

569.    IWU fails to adequately confront this harassment, despite repeated complaints by LGBTQ+ students.

570.    IWU disciplines LGBTQ+ students for expressing their sexual and/or gender identities (*e.g.* coming out as queer, dating someone of the same sex, wearing certain clothing).

571.    Campus feels unsafe for Mortimer.

**CLASS ACTION ALLEGATIONS**

572.    This action is properly maintained as a class action pursuant to Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure.

573.    The class is sufficiently numerous to make joinder impracticable.

574.    Plaintiffs represent a class of more than 100,000 LGBTQ+ students who attend taxpayer-funded religious colleges and universities that openly discriminate against them in both policy and practice.

FIRST AMENDED CLASS ACTION COMPLAINT
Religious Exemption Accountability Project
Paul Southwick Law, LLC

575.    The Plaintiffs' experiences described above are typical and common of the class they represent. LGBTQ+ students at religious colleges experience higher rates of harassment, bullying, depression, anxiety, eating disorders, alcohol abuse and sexual and physical violence, than their heterosexual and cisgender peers.

576.    Many students in this class are expelled, disciplined, subjected to conversion therapy or other punishments.

577.    The LGBTQ+ students in the class are unable to turn to the Department of Education for protection because their institutions have either affirmatively, or impliedly, received religious exemptions from Title IX.

578.    The Plaintiff class representatives will adequately represent the class because they are either current students, expelled students or otherwise former students of taxpayer-funded religious colleges and universities that openly discriminate against LGBTQ+ students in policy and practice.

**The Title IX Religious Exemption**

579.    The U.S. Department of Education and other federal agencies provide billions of dollars annually ($4.2B in 2018) in funding to religious colleges and universities that discriminate against LGBTQ+ students.

580.    The expenditures by the Department to Plaintiffs' educational institutions are a direct exercise of Congress's taxing and spending powers.

581.    Plaintiffs' educational institutions receive federal funding through specific congressional appropriations, including through the Higher Education Act and its reauthorizations,

582.    Title IX prohibits sex discrimination at all educational institutions that receive federal funding. However, Title IX provides an exemption for educational institutions that are

FIRST AMENDED CLASS ACTION COMPLAINT
Religious Exemption Accountability Project
Paul Southwick Law, LLC

controlled by religious organizations to the extent that complying with Title IX would conflict with the religious tenets of the controlling organization. *See* 20 U.S.C. § 1681(a)(3).

583.        Prior to August 14, 2020, the federal regulations implementing the Title IX religious exemption required an educational institution to affirmatively apply for a religious exemption from the Department and to demonstrate that it was controlled by a religious organization.

584.        The Department has never rejected an educational institution's assertion that it is controlled by a religious organization. This remains true even where the educational institution has no denominational ties, allows students from any religion or no religion at all to enroll in its courses, and receives little or no income from an affiliated church or denomination.

585.        At times, the Department has sought additional information regarding the religious control of an educational institution, either from the institution or from the denomination or church that purportedly controls the educational institution, to make a determination of whether the educational institution met the Department's standard for religious control.

586.        Of the numerous religious exemptions sought by educational institutions seeking permission from the Department to discriminate against sexual and gender minorities, all, or nearly all, of the religious institutions have been institutions affiliated with the Christian faith.

587.        Indeed, most of the institutions seeking religious exemptions are evangelical Christian institutions affiliated with the Council for Christian Colleges & Universities (CCCU).

588.        Finally, if an educational institution demonstrates that it is controlled by a religious organization, it must also demonstration that application of Title IX would be inconsistent with its religious tenants.

FIRST AMENDED CLASS ACTION COMPLAINT
Religious Exemption Accountability Project
Paul Southwick Law, LLC

589.     The Department has never denied a religious exemption when a religious educational institution asserts a religious objection, no matter how vague or broad that objection might be, and regardless of the severity of harm inflicted on the student whose complaint, or mere existence, gave rise to the exemption request.

590.     The Department has relied on religious exemptions to close Title IX complaints filed by sexual and gender minority students against their colleges or universities.

591.     The Department will continue to rely on religious exemptions to close Title IX complaints filed by sexual and gender minority students against their colleges or universities.

592.     The Department has never engaged in an enforcement action or reached a resolution with respect to a Title IX complaint brought by an LGBTQ+ student against an educational institution asserting a religious exemption to Title IX.

593.     The Department's conduct discourages LGBTQ+ students from filing Title IX complaints with their educational institutions or with the Department.

594.     The religious exemption to Title IX differs significantly from the religious exemptions to Title VII and the Fair Housing Act.

595.     The religious exemptions to Title VII and the Fair Housing Act merely exempt co-religionists from their coverage, meaning that a religious employer can restrict hiring to someone of the religious employer's faith. However, the exemptions do not exempt employers or housing providers from discrimination on the basis of race, sex, sexual orientation or any other protected category.

596.     Additionally, Title VII and the Fair Housing Act regulate purely private conduct, whereas Title IX only regulates government funding and does not apply to purely private educational institutions.

FIRST AMENDED CLASS ACTION COMPLAINT
Religious Exemption Accountability Project
Paul Southwick Law, LLC

597.    The religious exemptions to Title VII and the Fair Housing Act do not require a government agency to determine whether an employer or housing provider is controlled by a religious organization or whether the religious tenants of the controlling religious organization would be burdened by compliance with Title VII or the Fair Housing Act.

598.    Unlike the religious exemptions to Title VII and the Fair Housing Act, the religious exemption to Title IX invites entanglement and interference with religion and examination of religious beliefs.

599.    The religious exemption to Title IX endorses religious views that hold homosexuality, bisexuality, transgender identity and gender non-conformity to be immoral, sinful and worthy of condemnation because those are the only religious views regarding sexuality and gender identity that generate exemption from Title IX's requirements and enforcement by OCR.

600.    Religious views that hold homosexuality, bisexuality, transgender identity and gender non-conformity to be moral, good and worthy of celebration do not generate exemptions from Title IX's requirements or enforcement by OCR.

601.    The religious exemption to Title IX discriminates on the basis of sex, sexual orientation and gender identity. Congress enacted Title IX to combat sex discrimination. Congress enacted the religious exemption to permit discrimination based on sex, sexual orientation and gender identity.

### Injuries to Plaintiffs from the Title IX Exemption

602.    Plaintiffs' injuries are traceable to the Defendants' actions and inactions, which are based on the Department's compliance with the Title IX religious exemption.

603.    Defendants' conduct, in granting every religious exemption presented to Defendants, and in closing student Title IX complaints on the basis of a religious exemption to

FIRST AMENDED CLASS ACTION COMPLAINT
Religious Exemption Accountability Project
Paul Southwick Law, LLC

Title IX, is a substantial factor in the abuse and discrimination Plaintiffs' experienced and continue to experience.

604.    If this Court enjoins enforcement of the religious exemption to Title IX, all taxpayer funded religious educational institutions, including Plaintiffs' institutions, will need to comply with Title IX, according to the timetable set by the Court.

605.    Moreover, many taxpayer-funded religious educational institutions will choose to continue participating in federal funding, despite the requirement of Title IX compliance.

606.    Historically, most religious educational institutions that banned interracial dating and interracial marriage on the basis of sincerely held religious beliefs changed their racist policies to comply with nondiscrimination provisions for federal funding.

607.    Educational institutions will not need to change their religious beliefs to comply with Title IX, they will need to change their policies and practices that conflict with Title IX's requirements.

608.     Moreover, if this Court enjoins enforcement of the religious exemption to Title IX, tens of thousands of LGBTQ+ students at these institutions will be given the anti-discrimination protections afforded to other students.

609.    All of the educational institutions Plaintiffs attended, or attempted to attend, claim a religious exemption from Title IX as applied to equal treatment of their LGBTQ+ students.

610.    Some educational institutions have formally applied for a religious exemption, while others claim an inherent exemption based on the statute.

611.    Defendants, by funding Plaintiffs' educational institutions, and permitting them to receive funding while operating according to policies and practices that abuse, stigmatize and discriminate against LGBTQ+ students, play a substantial role in causing Plaintiffs' injuries.

FIRST AMENDED CLASS ACTION COMPLAINT

612.     Moreover, Plaintiffs are harmed by Defendants when they are denied a remedy for the harms done to them by their educational institutions.

613.     Plaintiffs are vulnerable young people whose injuries include conversion therapy, expulsion, harassment, stigmatizing policies and dignitary harms.

614.     Defendants further harm Plaintiffs by rejecting their pleas for help.

615.     Defendants harm Plaintiffs by closing their Title IX complaints, cutting off their only avenue for protection.

616.     Defendants harm Plaintiffs by emboldening Plaintiffs' educational institutions to engage in harmful and discriminatory practices.

617.     Defendants harm Plaintiffs by sending a message to LGBTQ+ students that their government will not help them.

618.     Defendants actions create a chilling effect that discourages LGBTQ+ students from coming to Defendants or the Title IX offices at their educational institutions for help.

619.     The relief Plaintiffs request from this Court would provide them with redress for their injuries because they would be given access to the regulatory protections that are available to other students at taxpayer-funded educational institutions.

620.     The relief Plaintiffs request from this Court would provide them with redress for their injuries because their educational institutions receive federal financial assistance and would be required to comply with the Department of Education's rules, regulations and policies that protect sexual and gender minority students.

## CAUSES OF ACTION
### FIRST CAUSE OF ACTION
#### (Substantive Due Process/Equal Protection – Fifth Amendment)

621.     Plaintiffs reallege and incorporate the preceding paragraphs.

FIRST AMENDED CLASS ACTION COMPLAINT

Religious Exemption Accountability Project
Paul Southwick Law, LLC

622.     Laws that target a socially despised group for legal disfavor violate the Equal Protection of the laws guaranteed by the Fifth and Fourteenth Amendments.

623.     The religious exemption to Title IX targets Americans for disfavored treatment based on their sex, including targeting based on sexual orientation and gender identity.

624.     The Department's policy and practice of denying Title IX claims based on Title IX's religious exemption targets Americans for disfavored treatment based on their sex, including targeting based on sexual orientation and gender identity

625.     LGBTQ+ people are a historically despised group in America.

626.     LGBTQ+ people remain a despised group in many parts of America.

627.     LGBTQ+ youth suffer from significant mental and physical health disparities, as well as bullying and harassment at school.

628.     The federal government cannot claim a legitimate governmental interest in furthering discrimination that harms sexual and gender minority students.

629.     Deference to an educational institution's desire to harm an unpopular group, even when based on sincerely held religious beliefs, cannot constitute a legitimate government interest.

630.      The Department lacks a legitimate interest in supporting a desire to harm sexual and gender minority students, whether the desire to harm is based on the sexual or gender minority status of a student, or based on a student's living in accordance with that status through the clothes they wear or the gender of person they hold hands with on campus.

631.     The law does not recognize an identity/conduct distinction.

632.     The law does not recognize "love the sinner, hate the sin."

633.     Policies and laws targeting "homosexual conduct" or "transgender conduct" in fact target LGBTQ+ identity.

FIRST AMENDED CLASS ACTION COMPLAINT
Religious Exemption Accountability Project
Paul Southwick Law, LLC

634.    Additionally, the freedom to marry someone of the same sex is a fundamental constitutional right.

635.    The religious exemption to Title IX impermissibly burdens the fundamental marriage rights of same-sex couples seeking to attend taxpayer funded religious educational institutions that prohibit their marriages.

636.    College and university policies prohibiting same-sex marriage at certain taxpayer-funded institutions make LGBTQ+ students reluctant to exercise their fundamental right to marriage while applying to or enrolled at such a college or graduate school out of fear that they will be expelled.

637.    Many LGBTQ+ students delay their engagements and/or marriages out of fear of retaliation from their colleges and universities.

638.     When sincerely held religious beliefs become enacted as school policies that harm LGBTQ+ students at taxpayer-funded colleges and universities, the necessary consequence is that the U.S. Department of Education has put its imprimatur on an exclusion that demeans and stigmatizes sexual and gender minorities.

639.    The equal protection guarantee of the Due Process Clause requires Defendants to not only avoid operating a system of schools segregated by sexual orientation or gender identity, "but also of giving significant aid to institutions that practice racial or other invidious discrimination." *Norwood v. Harrison*, 413 U.S. 455, 467 (1973).

640.    Explicit and invidious sexual orientation and gender identity discrimination in education exert "a pervasive influence on the entire educational process," affecting not only LGBTQ+ students, but signaling to all students that sexual orientation and gender identity

FIRST AMENDED CLASS ACTION COMPLAINT
Religious Exemption Accountability Project
Paul Southwick Law, LLC

discrimination is acceptable, values they will carry with them when they move into the workforce. *Bob Jones University v. U.S.*, 461 U.S. 574, 595 (1983).

641.     Here, the religious exemption to Title IX, and the Department's implementation of that exemption, result in concrete, verifiable and widespread harms to sexual and gender minority students in violation of the due process and equal protection guarantees of the Firth Amendment.

642.     Defendants lack a compelling governmental interest in burdening Plaintiff's due process rights as private educational institutions do not have a constitutional right to use federal funding in furtherance of invidious discrimination in higher education.

643.     Moreover, Title IX's religious exemption is not narrowly tailored in furtherance of a compelling governmental interest. For example, Title IX's religious exemption could have been limited to an exemption for co-religionists, as are the religious exemptions for Title VII and the Fair Housing Act.

644.     The named Plaintiffs, and all members of the class, have been and/or are at risk of being deprived of substantive due process and equal protection rights conferred upon them by the Fifth Amendment to the United States Constitution.

645.     These constitutional rights include:

1.   The right to bodily integrity, autonomy and dignity, including the freedom from bias-related violence, abuse and harassment, including the right to be free from conversion therapy;

2.   The right to freedom from systemic discrimination based on sexual orientation, gender identity and gender expression;

3.   The right to marry the person of one's choosing, regardless of sex or gender;

4.   The right to intimate relationships and intimate conduct;

FIRST AMENDED CLASS ACTION COMPLAINT

Religious Exemption Accountability Project
Paul Southwick Law, LLC

5.  The right to privacy regarding sexual orientation, gender identity and gender expression;

6.  The right to medically necessary gender-affirming medical and psychological care;

7.  The right to culturally competent sexual and reproductive health services, including HIV prevention and treatment; and

8.  The right to be clothed and groomed consistent with one's sexual orientation, gender expression and gender identity.

**SECOND CAUSE OF ACTION**

**(Establishment Clause – First Amendment)**

646.    Plaintiffs reallege and incorporate the preceding paragraphs.

647.    The religious exemption to Title IX does not serve a secular legislative purpose.

648.    The religious exemption to Title IX benefits some religious educational institutions over other religious educational institutions.

649.    To qualify for the exemption, religious educational institutions must operate according to certain governance structures and maintain certain beliefs. Religious educational institutions without such structures or beliefs cannot benefit from the religious exemption.

650.    The religious exemption to Title IX benefits religious educational institutions over non-religious educational institutions. To qualify for the exemption, religious educational institutions must operate according to certain governance structures and maintain certain religious beliefs. Educational institutions without such governance structures or beliefs cannot benefit from the religious exemption.

FIRST AMENDED CLASS ACTION COMPLAINT
Religious Exemption Accountability Project
Paul Southwick Law, LLC

651.    The religious exemptions to Title IX sought for the purpose of discriminating against LGBTQ+ students primarily or exclusively benefit Christian educational institutions.

652.    The religious exemption to Title IX primarily benefits religion because it relieves certain religious institutions of regulatory burdens and liability that all other educational institutions must bear.

653.    The religious exemption to Title IX prevents the Department of Education from conducting its work in a manner that is neutral with respect to religion.

654.    The religious exemption does not operate in an even-handed manner among religions because religious educational institutions that affirm LGBTQ+ identities remain subject to Title IX claims when their agents discriminate against LGBTQ+ students or when they fail to address harassment and bullying of LGBTQ+ students.

655.    Religious educational institutions that do not affirm LGBTQ+ identities receive a license to discriminate from the Department of Education.

656.    The religious exemption to Title IX results in excessive entanglement with religion because the Department must request and analyze the governing structure and religious beliefs of the religious educational institution and/or its governing religious organization to determine whether the institution qualifies for a religious exemption.

657.    Here, the religious exemption to Title IX, and the Department's implementation of that exemption, result in concrete, verifiable and widespread harms to sexual and gender minority students in violation of the Establishment Clause of the First Amendment.

**THIRD CAUSE OF ACTION**

**(Freedom of Religion, Speech, Assembly, and Association – First Amendment)**

658.    Plaintiffs reallege and incorporate the preceding paragraphs.

FIRST AMENDED CLASS ACTION COMPLAINT

Religious Exemption Accountability Project
Paul Southwick Law, LLC

659.     Under the First Amendment to the U.S. Constitution, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people to peaceably assemble[.]"

660.     Title IX must comply with the First Amendment.

661.     The religious exemption to Title IX exerts a chilling effect on the Plaintiffs' exercise of their freedoms of religion, speech, assembly, and association.

662.     The religious exemption to Title IX prevents Plaintiffs from expressing their beliefs and/or engaging in practices based on their religious beliefs about sexuality, gender identity and marriage.

663.     Title IX's religious exemption results in taxpayer funded educational institutions where Plaintiffs are not permitted to form LGBTQ+ support or advocacy groups.

664.     Title IX's religious exemption results in taxpayer funded educational institutions where Plaintiffs are not permitted to date or marry someone of the same sex.

665.     Title IX's religious exemption results in taxpayer funded educational institutions where Plaintiffs are prohibited from advocating for their equal rights.

666.     Title IX's religious exemption results in taxpayer funded educational institutions where Plaintiffs are punished for advocating for their equal rights on social media, on campus and off campus.

667.     Title IX's religious exemption results in taxpayer funded educational institutions that compel speech from Plaintiffs when they are coerced into signing statements regarding sexuality and gender identity that conflict with their religious beliefs and/or stigmatize their identities and relationships.

FIRST AMENDED CLASS ACTION COMPLAINT
Religious Exemption Accountability Project
Paul Southwick Law, LLC

668.    Title IX's religious exemption chills the speech, assembly, association and religious expression of LGBTQ+ college students who might seek to exercise these rights at their taxpayer-funded colleges.

669.    Defendants lack a compelling governmental interest in funding private educational institutions that restrict First Amendment rights that Defendants could not restrict at public educational institutions.

670.    The religious exemption to Title IX is not narrowly tailored to address a compelling governmental interest. For example, Title IX's religious exemption could have been limited to an exemption for co-religionists, as are the religious exemptions for Title VII and the Fair Housing Act.

671.    As a result, the named Plaintiffs and all members of the class, have been, and are, at risk of being deprived of the rights conferred upon them by the First Amendment of the United States Constitution.

## FOURTH CAUSE OF ACTION

### (Administrative Procedures Act – 5 U.S.C. § 706)
### (Count 1)

672.    Plaintiffs reallege and incorporate the preceding paragraphs.

673.    The APA requires that a reviewing court "hold unlawful and set aside agency action, findings, and conclusions found to be— (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right[.]" 5 U.S.C.  §§ 706(2)(A)-(C).

FIRST AMENDED CLASS ACTION COMPLAINT
Religious Exemption Accountability Project
Paul Southwick Law, LLC

674.    On September 23, 2020, the United States Department of Education issued a new final rule, which went into effect on November 23, 2020, that amends the Title IX regulation at 34 C.F.R. § 106.12(c) ("November 2020 Final Rule").

675.    The November 2020 Final Rule states: "Eligibility. Any of the following in paragraphs (c)(1) through (6) of this section shall be sufficient to establish that an educational institution is controlled by a religious organization, as contemplated under paragraph (a) of this section, and is therefore eligible to assert a religious exemption to the extent application of this part would not be consistent with its religious tenets:

1.  That the educational institution is a school or department of divinity;

2.  That the educational institution requires its faculty, students, or employees to be members of, or otherwise engage in religious practices of, or espouse a personal belief in, the religion of the organization by which it claims to be controlled.

3.  That the educational institution, in its charter or catalog, or other official publication, contains an explicit statement that it is controlled by a religious organization or an organ thereof, or is committed to the doctrines or practices of a particular religion, and the members of its governing body are appointed by the controlling religious organization or an organ thereof, and it receives a significant amount of financial support from the controlling religious organization or an organ thereof.

4.  That the educational institution has a doctrinal statement or a statement of religious practices, along with a statement that members of the institution community must engage in the religious practices of, or espouse a personal

FIRST AMENDED CLASS ACTION COMPLAINT
Religious Exemption Accountability Project
Paul Southwick Law, LLC

belief in, the religion, its practices, or the doctrinal statement or statement of religious practices.

5. That the educational institution has a published institutional mission that is approved by the governing body of an educational institution and that includes, refers to, or is predicated upon religious tenets, beliefs, or teachings.

6. Other evidence sufficient to establish that an educational institution is controlled by a religious organization, pursuant to 20 U.S.C. 1681(a)(3).

676.    The November 2020 Final Rule was arbitrary and capricious because Defendants failed to provide adequate reasoned analysis, properly balance costs and benefits, consider and respond to comments, consider all relevant statutory factors, consider reasonable alternatives, or explain the inconsistencies between their position and the full record of research and policy findings before it.

677.    Defendants failed to consider the November 2020 Final Rule's impact on LGBTQ+ students' constitutional rights, safety and privacy.

678.    Defendants failed to consider the reliance interests of LGBTQ+ students in not being subject to discrimination at taxpayer-funded colleges and universities when it promulgated the November 2020 Final Rule.

679.    Defendants acted contrary to their statutory obligation regarding educational institutions of religious organizations with contrary religious tenets: "this section shall not apply to an educational institution which is controlled by a religious organization if the application of this subsection would not be consistent with the religious tenets of such organization."

FIRST AMENDED CLASS ACTION COMPLAINT
Religious Exemption Accountability Project
Paul Southwick Law, LLC

680.    The November 2020 Final Rule permits educational institutions that are not controlled by religious organizations to claim a religious exemption from compliance with Title IX.

681.    As a federal agency, the Department has no power to act unless Congress confers that power. Department actions that are not authorized by Congress are *ultra vires*.

682.    Title IX does not permit the Department to grant religious exemptions to educational institutions that are not controlled by religious organizations.

683.    The November 2020 Final Rule exceeds the Department's authority.

684.    The November 2020 Final Rule contradicts any reasonable reading of Title IX such that the Department functionally exercised lawmaking power reserved only to Congress.

685.    The November 2020 Final Rule imposes disparate impact discrimination against LGBTQ+ students in violation of Title IX.

686.    The November 2020 Final Rule exposes prospective and current LGBTQ+ students to hostile educational environments and an increased risk of abuse, harassment and loss of their constitutional rights at taxpayer-funded, religious colleges and universities.

687.    The November 2020 Final Rule imposes restrictions on student speech, association, free exercise, assembly, privacy, autonomy, dignity, bodily integrity and intimate conduct in violation of the First and Fifth Amendments of the U.S. Constitution.

688.    Accordingly, the November 2020 Final Rule should be vacated as arbitrary and capricious.

### (Count 2)

689.    Plaintiffs reallege and incorporate the preceding paragraphs.

FIRST AMENDED CLASS ACTION COMPLAINT

Religious Exemption Accountability Project
Paul Southwick Law, LLC

690.    The original text of 34 C.F.R. § 106.12(b) stated: "An educational institution which wishes to claim the exemption set forth in paragraph (a) of this section, shall do so by submitting in writing to the Assistant Secretary a statement by the highest ranking official of the institution, identifying the provisions of this part which conflict with a specific tenet of the religious organization."

691.    However, on May 19, 2020, the United States Department of Education issued a new final rule, which went into effect on August 14, 2020, that amends the Title IX regulation at 34 C.F.R. § 106.12(b) ("August 2020 Final Rule").

692.    34 C.F.R. § 106.12(b) now states: "An educational institution that seeks assurance of the exemption set forth in paragraph (a) of this section may do so by submitting in writing to the Assistant Secretary a statement by the highest ranking official of the institution, identifying the provisions of this part that conflict with a specific tenet of the religious organization. An institution is not required to seek assurance from the Assistant Secretary in order to assert such an exemption. In the event the Department notifies an institution that it is under investigation for noncompliance with this part and the institution wishes to assert an exemption set forth in paragraph (a) of this section, the institution may at that time raise its exemption by submitting in writing to the Assistant Secretary a statement by the highest ranking official of the institution, identifying the provisions of this part which conflict with a specific tenet of the religious organization, whether or not the institution had previously sought assurance of an exemption from the Assistant Secretary."

693.    The August 2020 Final Rule was arbitrary and capricious because Defendants failed to provide adequate reasoned analysis, properly balance costs and benefits, consider and respond to comments, consider all relevant statutory factors, consider reasonable alternatives, or explain

FIRST AMENDED CLASS ACTION COMPLAINT

Religious Exemption Accountability Project
Paul Southwick Law, LLC

the inconsistencies between their position and the full record of research and policy findings before it.

694.    The August 2020 Final Rule eliminated transparency and notice for students applying to and enrolled at religious educational institutions that discriminate based on sexual orientation or gender identity.

695.    Religious educational institutions rely on the August 2020 Final Rule to maintain vague and indeterminate policies and practices with respect to compliance with Title IX as applied to LGBTQ+ students.

696.    The August 2020 Final Rule exposes more LGBTQ+ students to the risk of abuse, harassment and loss of their constitutional rights at taxpayer-funded, religious colleges and universities.

697.    Accordingly, the August 2020 Final Rule should be vacated as arbitrary and capricious.

### FIFTH CAUSE OF ACTION

### (Religious Freedom Restoration Act - 42 U.S.C. § 2000bb-1)

698.    Plaintiffs reallege and incorporate the preceding paragraphs.

699.    Defendants are a government agency and official under 42 U.S.C. § 2000bb-2.

700.    The religious exemption to Title IX, as well as the August 2020 Final Rule and November 2020 Final Rule, substantially burden the exercise of religion without being the least restrictive means of advancing a compelling government interest.

701.    Many Plaintiffs maintain sincerely held religious beliefs, including their understanding of sexuality, gender and intimate relationships, which preclude them from complying with campus policies that stigmatize or punish LGBTQ+ identities and relationships.

FIRST AMENDED CLASS ACTION COMPLAINT

Religious Exemption Accountability Project
Paul Southwick Law, LLC

702.    Many Plaintiffs hold the religious belief that they are accepted by God just as they are and that they are beautiful souls made in the image of God.

703.    Acting in compliance with these beliefs is a religious exercise.

704.    For many Plaintiffs, their speech about their sexuality and gender identity is a religious exercise.

705.    If Defendants continue to grant religious exemptions to Title IX, Plaintiffs will be required to either violate their religious beliefs in order to attend, or remain enrolled at, their taxpayer-funded educational institution or they will need to transfer educational institutions, which is a burden in itself and impractical for many students, and/or select from a smaller number of taxpayer-funded educational institutions, which may not be located near where they live or offer comparable academic offerings in their field of study.

706.    The religious exemption to Title IX creates government-imposed coercive pressure on LGBTQ+ students to change or violate their religious beliefs in order to attend a taxpayer-funded educational institution.

707.    Defendants lack a compelling governmental interest in burdening Plaintiff's religious beliefs as private educational institutions do not have a constitutional right to use federal funding in furtherance of invidious discrimination in higher education.

708.    Title IX's religious exemption is not narrowly tailored in furtherance of a compelling governmental interest. For example, Title IX's religious exemption could have been limited to an exemption for co-religionists, as are the religious exemptions for Title VII and the Fair Housing Act.

**PRAYER FOR RELIEF**

FIRST AMENDED CLASS ACTION COMPLAINT

Religious Exemption Accountability Project

Paul Southwick Law, LLC

**WHEREFORE**, Plaintiffs, for themselves and all others similarly situated, pray that this Court:

A.  Order that this action may be maintained as a class action pursuant to Rule 23(b)(1) and Rule 23(b)(2) of the Federal Rules of Civil Procedure.

B.  Enter judgment declaring that the religious exemption to Title IX, as applied to the class of sexual and gender minority students, is unconstitutional as it violates the First, Fifth and Fourteenth Amendments of the U.S. Constitution;

C.  Enter a permanent injunction:

   a.  Prohibiting Defendants from granting further religious exemptions to Title IX as applied to sexual and gender minority students;

   b.  Rescinding all prior religious exemptions to Title IX as applied to sexual and gender minority students;

   c.  Mandating that Defendants treat Title IX complaints from sexual and gender minority students at all taxpayer-funded religious colleges in the same manner as complaints from sexual and gender minority students at taxpayer-funded non-religious colleges.

   d.  Requiring the Department to ensure that all federally-funded educational institutions respect the sexual orientation, gender identity and gender expression of their students.

D.  Defendants shall create a Task Force to determine appropriate compensation for LGBTQ+ survivors of government-sponsored psychological and physical abuse resulting from Defendants' policies and practices described in this Amended Complaint.

FIRST AMENDED CLASS ACTION COMPLAINT
Religious Exemption Accountability Project
Paul Southwick Law, LLC

E.  The Court shall appoint a neutral Monitor, paid for by Defendants, to monitor the terms of this Order. The Monitor shall have access to all relevant documents and information necessary and shall conduct record reviews as necessary to ensure compliance with its terms.

F.  Enter judgment awarding Plaintiffs their costs and reasonable attorneys' fees, pursuant to 28 U.S.C. § 1920, 42 U.S.C. § 1988, and Federal Rules of Civil Procedure 23(e) and (h); and

G.  Grant such other and further relief as the Court deems just, necessary, and proper to protect Plaintiffs and the class members from further harm.

Dated: June 7, 2021

s/ Paul Carlos Southwick

**Paul Carlos Southwick**
**(OSB 095141)**
**TRIAL ATTORNEY**
**Religious Exemption**
**Accountability Project**
**Paul Southwick Law, LLC**
8532 N. Ivanhoe St. #208,
Portland, OR 97203
Email: paul@paulsouthwick.com
Phone: 503-806-9517

FIRST AMENDED CLASS ACTION COMPLAINT

Religious Exemption Accountability Project
Paul Southwick Law, LLC