**Paul Carlos Southwick (OSB 095141)**
**Religious Exemption Accountability Project**
**Paul Southwick Law, LLC**
8532 N. Ivanhoe St. #208,
Portland, OR 97203
Email: paul@paulsouthwick.com
Phone: 503-806-9517

**Timothy R. Volpert (OSB 814074)**
**Tim Volpert PC**
211 NE Hancock St. Ste. 2B
Portland, OR 97212
Email: tim@timvolpertlaw.com
Phone: 503-703-9054

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF OREGON
## EUGENE DIVISION

| | |
|---|---|
| Elizabeth HUNTER; Veronica Bonifacio PENALES; Alex DURON; Zayn SILVA; Rachel MOULTON; Victoria Joy BACON; Avery BONESTROO; Nathan BRITTSAN; Hayden BROWN; Devin BRYANT; Consolata BRYANT; Brooke C.; Gary CAMPBELL; Tristan CAMPBELL; Natalie CARTER; Saren CRAIG; Mortimer HALLIGAN; Rachel HELD; Lauren HOEKSTRA; Chandler HORNING; Louis JAMES; Jonathan JONES; Jamie LORD; Ashtin MARKOWSKI; Cameron MARTINEZ; Joanna MAXON; Mackenzie MCCANN; Darren MCDONALD; Scott MCSWAIN; Faith MILLENDER; Jaycen MONTGOMERY; Journey MUELLER; Jake PICKER; Danielle POWELL; Megan STEFFEN; Justin TIDWELL-DAVIS; Daniel TIDWELL-DAVIS; Spencer J. VIGIL; Lucas WILSON; and Audrey WOJNAROWISCH, on behalf of themselves and all others similarly situated,<br><br>                              Plaintiffs,<br><br>          v.<br><br>U.S. DEPARTMENT OF EDUCATION; and Suzanne GOLDBERG, in her official capacity as Acting Assistant Secretary for the Office of Civil Rights, U.S. Department of Education.<br>                              Defendants. | Case No. 6:21-cv-00474-AA<br><br>**PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY PRELIMINARY INJUNCTION SHOULD NOT ENTER; MEMORANDUM OF LAW IN SUPPORT THEREOF**<br><br>PURSUANT TO FRCP 65<br><br>ORAL ARGUMENT REQUESTED<br><br>EXPEDITED HEARING REQUESTED |

# Table of Contents

LR 7-1 CONFERRAL ................................................................................................... 8

I.      INTRODUCTION ............................................................................................ 9

II.     PROCEDURAL HISTORY ............................................................................ 10

III.    FACTS .............................................................................................................. 11

        A.      Religious exemptions to civil rights laws are rooted in racism and sexism. ........ 13

        B.      Increased visibility for LGBTQ+ Americans renders them a new target for
                religious-based discrimination. ............................................................................ 15

        C.      More than 100,000 LGBTQ+ students attend NFBCUs and are at heightened risk
                for violence, abuse, and expulsion. ...................................................................... 19

        D.      Plaintiffs' Title IX complaints are in immediate danger of dismissal. ................. 21

IV.     ARGUMENT .................................................................................................... 22

        A.      Plaintiffs Satisfy Traditional and Serious Question Tests for TRO and Preliminary
                Injunction ............................................................................................................. 22

        B.      Plaintiffs are Likely to Succeed on the Merits of their Substantive Claims. ........ 22

                1.      Plaintiffs are likely to succeed on the merits of their Establishment Clause
                        Claim. ........................................................................................................ 22

                2.      Plaintiffs are likely to succeed on the merits of their Substantive Due Process
                        claim. ......................................................................................................... 29

                3.      Plaintiffs are Likely to Succeed on the Merits of their APA Claim. ............... 33

                4.      Plaintiffs are likely to succeed on the merits of their Religious Freedom
                        Restoration Act claim. ................................................................................. 39

MOTION FOR TEMPORARY RESTRAINING ORDER
AND ORDER TO SHOW CAUSE WHY PRELIMINARY
INJUNCTION SHOULD NOT ENTER

C.      Plaintiffs will Suffer Irreparable Harm in the Absence of a Preliminary Injunction.

.............................................................................................................. 42

D.      The Balance of the Equities Weigh Sharply in Favor of the Plaintiffs................. 43

E.      An Injunction is in the Public Interest ................................................................ 44

V.    CONCLUSION.................................................................................................... 44

MOTION  FOR  TEMPORARY  RESTRAINING  ORDER
AND ORDER TO SHOW CAUSE WHY PRELIMINARY
INJUNCTION SHOULD NOT ENTER

Page(s)

**Cases**

*Alliance for the Wild Rockies v. Cottrell,*
  632 F.3d 1127 (9th Cir. 2011) ........................................................................ 22, 45
*Bob Jones University v. Johnson,*
  396 F.Supp. 597 (1974) ...................................................................................... 14
*Bob Jones University v. United States,*
  461 U.S. 574 (1983) ............................................................................................ 15
*Bolling v. Sharpe,*
  347 U.S. 497 (1954) ............................................................................................ 30
*Bostock v. Clayton County,*
  140 S.Ct. 1731 (2020)............................................................................ 17, 19, 23
*Brown v. Board of Education,*
  347 U.S. 483 (1954) .................................................................................... 12, 13
*California v. Azar,*
  911 F.3d 558 (9th Cir. 2018) .............................................................................. 45
*Calvary Chapel Dayton Valley v. Sisolak,*
  982 F.3d 1228 (9th Cir. 2020) ........................................................................... 30
*Carson v. Makin,*
  979 F.3d 21 (1st Cir. 2021)................................................................................. 43
*Christian Legal Soc. Chapter of the University of California v. Martinez,*
  561 U.S. 661 (2010) ............................................................................................ 27
*Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-day Saints v. Amos,*
  483 U.S. 327 (1987) ............................................................................................ 26
*Craig v. Boren,*
  429 U.S. 190 (1976) ............................................................................................ 32
*Cutter v. Wilkinson,*
  544 U.S. 709 (2005) ............................................................................................ 26
*Dep't of Homeland Sec. v. Regents of the Univ. of California,*
  140 S. Ct. 1891, 207 L. Ed. 2d 353 (2020)....................................................... 39
*E. Bay Sanctuary Covenant,*
  964 F.3d (9th Cir. 2020) ..................................................................................... 35
*EEOC v. Fed. Express Corp.,*
  558 F.3d 842 (9th Cir. 2009) .............................................................................. 47
*Encino Motorcars, LLC v. Navarro,*
  136 S. Ct. 2117 (2016)........................................................................................ 37
*Estate of Thornton v. Caldor, Inc.,*
  472 U.S. 703 (1985) ............................................................................................ 33
*F.C.C. v. Fox Television Stations, Inc.,*
  556 U.S. 502 (2009) ............................................................................................ 40
*F.S. Royster Guano Co. v. Virginia,*
  253 U.S. 412 (1920) ............................................................................................ 30
*Gillette v. United States,*
  401 U.S. 437 (1971) ............................................................................................ 23

MOTION FOR TEMPORARY RESTRAINING ORDER
AND ORDER TO SHOW CAUSE WHY PRELIMINARY
INJUNCTION SHOULD NOT ENTER

*Goldman, Sachs & Co. v. City of Reno*,
  747 F.3d 733 (9th Cir. 2014) ........................................................................ 22
*Grove City College v. Bell*,
  465 U.S. 555 (1984) .......................................................................... 26, 27, 33
*Halet v. Wend Inv. Co.*,
  672 F.2d 1305 (9th Cir. 1982) ...................................................................... 31
*Harris v. McRae*,
  , 448 U.S. 297, 322 (1980) (1980).............................................................. 30
*Hernandez v. Comm'r*,
  490 U.S. 680 (1989) ...................................................................................... 42
*Houdini Inc. v. Goody Baskets LLC*,
  166 F. App'x 946 (9th Cir. 2006) ................................................................ 22
*Irish 4 Reproductive Health v. U.S. Dept. Health & Human*,
  434 F.Supp.3d 683 (N.D. Ind. 2020)........................................................... 25
*Johnson v. Lincoln Christian College*,
  150 Ill.App.3d 733 (1986) ........................................................................... 16
*Kiryas Joel Village Sch. Dist. v. Grument*,
  512 U.S. 687 (1994) ................................................................................ 22, 29
*Landwatch v. Connaughton*,
  905 F.Supp.2d 1192 (D. Or. 2012) .............................................................. 22
*Larkin v. Grendel's Den, Inc.*,
  459 U.S. 116 (1982) ...................................................................................... 28
*Larson v. Valente*,
  456 U.S. 228 (1982) ...................................................................................... 25
*Lawrence v. Texas*,
  539 U.S. 558 (2003) ...................................................................................... 16
*Loving v. Virginia*,
  388 U.S. 1 (1967) .......................................................................................... 31
*Masterpiece Cakeshop Ltd. V. Colorado Civil Rights Comm'n*,
  138 S. Ct. 1719 (2018).................................................................................. 12
*Maxon, et al. v. Fuller, et al.*,
  2020 WL 6305460 (C.D. Cal. Oct. 7, 2020) ............................................... 22
*Melendres v. Arpaio*,
  695 F.3d 990 (9th Cir. 2012) ....................................................................... 47
*Michigan v. EPA*,
  135 S. Ct. 2699 (2015).................................................................................. 35
*Navajo Nation v. United States Forest Serv.*,
  535 F.3d 1058 (9th Cir. 2008) ......................................................... 41, 42, 43
*Navarro v. Block*,
  72 F.3d 712 (9th Cir. 1995) ......................................................................... 32
*Newman v. Piggie Park Enterprises, Inc.*,
  390 U.S. 400 (1968) ...................................................................................... 13
*Norsworthy v. Beard*,
  87 F. Supp. 3d 1104 (N.D. Cal. 2015)......................................................... 30

5

MOTION FOR TEMPORARY RESTRAINING ORDER
AND ORDER TO SHOW CAUSE WHY PRELIMINARY
INJUNCTION SHOULD NOT ENTER

*Norwood v. Harrison*,
    413 U.S. 455 (1973) ............................................................................... 12, 27
*Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*,
    477 F.3d 668 (9th Cir. 2007) ............................................................................ 35
*Obergefell v. Hodges*,
    576 U.S. 644 (2015) .................................................................... 17, 29, 31, 32
*Pavan v. Smith*,
    137 S. Ct. 2075 (2017)....................................................................................... 32
*Perez v. Mortgage Bankers Ass'n*,
    135 S. Ct. 1199 (2015)....................................................................................... 40
*Pers. Adm'r of Massachusetts v. Feeney*,
    442 U.S. 256 (1979) .......................................................................................... 31
*Plyler v. Doe*,
    457 U.S. 202 (1982) .......................................................................................... 30
*Portland Cement Ass'n v. E.P.A.*,
    665 F.3d 177 (D.C. Cir. 2011).......................................................................... 37
*Presbytery of New Jersey*,
    902 F.Supp........................................................................................................ 43
President Biden issued,
    Executive Order 14021 ..................................................................................... 19
*Reno v. Flores*,
    507 U.S. 292 (1993) .......................................................................................... 33
*Republic of the Philippines v. Marcos*,
    862 F.2d 1355 (9th Cir. 1988) .......................................................................... 22
*Roberts v. Jaycees*,
    486 U.S. (1984) ................................................................................................. 32
*Roberts*,
    468 U.S. ............................................................................................................ 43
*Romer v. Evans*,
    517 U.S. 620, (1996) ......................................................................................... 33
*Runyon v. McCrary*,
    427 U.S. 160 (1976) .......................................................................................... 33
*San Jose Christian Coll.*,
    360 F.3d ............................................................................................................ 32
*Schwenk v. Hartford*,
    204 F.3d 1187 (9th Cir. 2000) .......................................................................... 30
*Sessions v. Morales-Santana*,
    137 S. Ct. 1678, fn. 1 (2017) ............................................................................ 29
*SmithKline Beecham Corp. v. Abbott Labs.*,
    740 F.3d 471 (9th Cir. 2014) ............................................................................ 30
*Snoqualmie Indian Tribe v. FERC*,
    545 F.3d 1207, fn. 3 (9th Cir. 2008) ................................................................. 42
*State v. U.S. Bureau of Land Mgmt.*, -- F.Supp.,
    2017 WL 4416409 (N.D. Cal. 2017) ................................................................ 37

MOTION FOR TEMPORARY RESTRAINING ORDER
AND ORDER TO SHOW CAUSE WHY PRELIMINARY
INJUNCTION SHOULD NOT ENTER

*Texas Monthly, Inc., v. Bullock*,
  489 U.S. 1 (1989) ........................................................................ 23, 24, 26
*Thomas v. Review Bd. of Ind. Emp't Sec. Div.*,
  450 U.S. 707 (1981) .............................................................................. 42
*Torcaso v. Watkins*,
  367 U.S. 488 (1961) ......................................................................... 23, 24
*United States Dep't of Agric. v. Moreno*,
  413 U.S. 528 (1973) .............................................................................. 32
*United States v. Windsor*,
  570 U.S. 744 (2013) .............................................................................. 16
*Wright v. Council of Emporia*,
  407 U.S. 451 (1972) .............................................................................. 32

## Statutes

5 U.S.C. §§ 706(2)(A)-(C) ........................................................................ 34
20 U.S.C. § 1681(3) .................................................................................. 23
20 U.S.C. § 1681(a)(3) ............................................................................. 34
20 U.S.C.S. § 1066c ................................................................................. 36
25 U.S.C.S. § 1801 ................................................................................... 36
29 U.S.C.S. § 1002 ................................................................................... 36
42 U.S.C. § 3607(a) .................................................................................. 36
42 U.S.C.S. at § 2000bb-1 ........................................................................ 41
42 U.S.C.S. § 2000cc-5 ............................................................................ 42
42 U.S.C.S. § 2000e-2 .............................................................................. 36
U.S. Const. amend. I ................................................................................. 22

## Rules

Fed. R. Civ. P. 65(b)(1)(A) ......................................................................... 9
FRCP 65 .............................................................................................. 1, 8

## Regulations

34 C.F.R. 106.12(b) ........................................................................... 15, 34
34 C.F.R. § 106.12 ................................................................................... 34
34 C.F.R. § 106.12(c) ............................................................................... 34
85 FR 59916 (September 23, 2020) ................................................ 34, 36, 38, 39
85 FR 30026 (May 19, 2020) ............................................................ 34, 40, 41

## Other Authorities

Federally Funded And Religiously Exempt: Exploring Title IX Exemptions And Their
  Discriminatory Effect On LGBT Students,
  81 U. Pitt. L. Rev. 735 (2020) .................................................................. 39

MOTION FOR TEMPORARY RESTRAINING ORDER
AND ORDER TO SHOW CAUSE WHY PRELIMINARY
INJUNCTION SHOULD NOT ENTER

## LR 7-1 CONFERRAL

The parties made a good faith effort through telephone conference and email to resolve the issues in dispute in this Motion but have been unable to do so. Counsel for Plaintiffs provided counsel for Defendants with advance notice of the filing of this Motion.

## MOTION

Plaintiffs hereby move for a Temporary Restraining Order ("TRO"), pursuant to Rule 65 of the Federal Rules of Civil Procedure, to protect them from further violations of their constitutional rights under the First and Fifth Amendments to the U.S. Constitution and of their statutory and procedural rights under the Administrative Procedures Act ("APA") and the Religious Freedom Restoration Act ("RFRA"). This Motion is supported by the enclosed Memorandum of Law; the Declarations of Plaintiffs; and the Declarations of Lauren Swain, Josiah Robinson, Paul Southwick, Andrew Hartzler, Rosalyn Simon, and Joni McLeod.

Plaintiffs specifically seek an order enjoining Defendants and their agents from dismissing Plaintiffs' Title IX complaints based on the unlawful application of the statutory religious exemption to Title IX and related administrative regulations. Plaintiffs Title IX complaints are currently pending before several regional offices of the U.S. Department of Education ("DOE"), Office of Civil Rights ("OCR"), and are in danger of being dismissed in a matter of days.

This Motion – with its supporting materials – confirms that Plaintiffs' requested TRO is necessary, because "immediate and irreparable injury, loss or damage will result to the movant[s] before the adverse party can be heard in opposition." Fed. R. Civ. P. 65(b)(1)(A). Thus, Plaintiffs respectfully request that the Court grant Plaintiffs' Motion and enter the requested TRO.

## MEMORANDUM OF LAW

MOTION FOR TEMPORARY RESTRAINING ORDER
AND ORDER TO SHOW CAUSE WHY PRELIMINARY
INJUNCTION SHOULD NOT ENTER

## I.       INTRODUCTION

Thirty-five of the Plaintiffs in this case have pending Title IX administrative complaints before the DOE. Plaintiffs filed these complaints against their taxpayer-funded, religious educational institutions for gross violations of their civil rights as LGBTQ+ Americans. They, and thousands of students like them, endure pervasive harassment from administrators, faculty and students. Their colleges monitor their social media accounts when they are suspected of being LGBTQ+. They are disciplined, or even expelled, when they are outed or come out of the closet on their own. They are coerced into the dangerous and discredited practice of "ex-gay" conversion therapy. They are sexually assaulted but unable to report their sexual assaults because it would reveal their LGBTQ+ identities and relationships.

Plaintiffs desperately need this Court's urgent assistance because Defendants are about to dismiss their complaints based on an unconstitutional application of the religious exemption to Title IX. Despite Plaintiffs' counsel's request, Defendants refuse to allow Plaintiffs' Title IX complaints to remain open and to process them like other Title IX complaints during the pendency of this Motion. Declaration of Paul Southwick ("Southwick Decl."), ¶ 2.

Defendants have a history of dismissing Title IX complaints based on the religious exemption and related administrative regulations. The pending complaints are in danger of being dismissed at any moment. Declaration of Lauren Swain ("Swain Decl."), ¶¶ 5-6. Plaintiffs request a temporary restraining order to preserve the *status quo* by keeping Plaintiffs' pending Title IX complaints open in advance of a preliminary injunction hearing to determine whether dismissal of Plaintiffs' Title IX complaints based on the statutory religious exemption violates the First or Fifth Amendments to the U.S. Constitution, the Administrative Procedures Act or RFRA.

MOTION FOR TEMPORARY RESTRAINING ORDER
AND ORDER TO SHOW CAUSE WHY PRELIMINARY
INJUNCTION SHOULD NOT ENTER

Plaintiffs' request for a TRO and preliminary injunction is limited and reasonable. Plaintiffs' do not ask the Court to invalidate the religious exemption on its face. Plaintiffs do not ask the Court to take away the federal funding from any educational institutions. Plaintiffs do not ask the Court to require a specific outcome for their Title IX complaints.

Rather, Plaintiffs request that the Court direct Defendants to refrain from using the religious exemption to dismiss Plaintiffs' Title IX complaints during the pendency of this litigation. So long as such a preliminary order remains in effect, Plaintiffs' Title IX complaints will be processed by Defendants in the normal course. Defendants will remain free to analyze and weigh the constitutional rights at issue, as well as the facts and other jurisdictional issues, to determine whether, in a given case, they will move forward with an investigation and resolution process.

If the Court grants Plaintiffs' request, Plaintiffs will be spared the indignity of having their own government close the door on an administrative remedy that they desperately need and that is generally available to other students. Plaintiffs seek this remedy now so that the current students among them will know their rights before the upcoming academic year.

## II.    PROCEDURAL HISTORY

On March 29, 2021, thirty-three Plaintiffs filed a class action Complaint for injunctive and declaratory relief against DOE and Suzanne Goldberg, in her official capacity as Acting Assistant Secretary for the Office of Civil Rights, U.S. Department of Education. Dkt. 1.

On April 9, 2021, three religious colleges moved to intervene. Dkt. 8.

On April 20, 2021, Carol Federighi, U.S. Department of Justice, appeared on behalf of Defendants. Dkt. 21.

On May 12, 2021, the Council for Christian Colleges & Universities ("CCCU") moved to intervene. Dkt. 26.

MOTION FOR TEMPORARY RESTRAINING ORDER
AND ORDER TO SHOW CAUSE WHY PRELIMINARY
INJUNCTION SHOULD NOT ENTER

On June 7, 2021, seven new Plaintiffs joined the original thirty-three Plaintiffs in filing a First Amended Complaint, seeking injunctive and declaratory relief alleging violations of their rights pursuant to (1) the Fifth Amendment's Substantive Due Process and Equal Protection guarantees; (2) the First Amendment's Establishment Clause; (3) the First Amendment's Freedom of Religion, Speech, Assembly, and Association guarantees; (4) the APA; and (5) RFRA. Dkt. 35.

On June 23, 2021, Plaintiff Halligan filed a Title IX complaint with OCR. *See* Swain Decl., Ex. B, pp. 1-4. On July 27, 2021, thirty-two Plaintiffs filed Title IX administrative complaints with OCR. *Id*., Exs. A-D. On July 30, 2021, Plaintiff James filed a Title IX complaint with OCR. *Id*., Ex. B. On August 2, 2021, Plaintiff Mueller filed a Title IX complaint with OCR. *Id*., Ex. C, pp. 25-27.[1]

Defendants' Answer to Plaintiffs' First Amended Complaint is currently due on August 9, 2021. Dkt. 43.

## III.    FACTS

LGBTQ+ youth, especially those in fundamentalist families, often hide deep in the closet for their own safety. If they are outed to non-affirming parents, or if they come out on their own, they are often shamed, shunned, and sometimes disowned. Many end up in the child welfare system or homeless. Some attempt suicide. Others appease their families by undergoing conversion ("ex-gay") therapy. If they go on to college, they, like Plaintiffs, often end up at non-affirming, faith-based colleges and universities ("NFBCUs"). These NFBCU's are taxpayer-funded. Collectively, the 28 NFBCUs attended by Plaintiffs receive approximately $2B in federal financial assistance annually. Southwick Decl., Ex. W (Federal Funding Chart).

---

[1] Five plaintiffs did not file Title IX complaints with OCR. Their claims are not directly at issue in this Motion.

MOTION FOR TEMPORARY RESTRAINING ORDER
AND ORDER TO SHOW CAUSE WHY PRELIMINARY
INJUNCTION SHOULD NOT ENTER

Plaintiffs' NFBCUs, though tainted by invidious discrimination, offer valuable degrees in numerous fields, from nursing, medicine, and social work, to engineering, education and law, and their graduates contribute greatly to society. However, in the case before this Court, as in earlier cases where otherwise well-regarded, religious educational institutions practiced racial segregation or banned interracial marriage and dating based on sincerely held religious beliefs, the "legitimate educational function" of these institutions, "cannot be isolated from [their] discriminatory practices…. [as] discriminatory treatment exerts a pervasive influence on the entire educational process." *Norwood v. Harrison*, 413 U.S. 455, 469 (1973) (citing *Brown v. Board of Education*, 347 U.S. 483 (1954)). The oppression of LGBTQ+ students by taxpayer-funded colleges and universities pervades our entire educational system, sending the message to students, LGBTQ+ and straight alike, from high schoolers applying to college, to the fresh graduates entering our workforce, that it is acceptable to treat LGBTQ+ people as socially inferior. *See* Robinson Decl., Ex. D (data demonstrating discrimination against LGBTQ+ students in schools).

The government does not have a legitimate interest in supporting this message. We are now at a point in American history where "Our society has come to the recognition that gay persons and gay couples cannot be treated as social outcasts or as inferior in dignity and worth." *Masterpiece Cakeshop Ltd. V. Colorado Civil Rights Comm'n*, 138 S. Ct. 1719, 1727 (2018). But the religious exemption to Title IX does exactly that—putting the moral and financial backing of the federal government behind educational institutions that, based on sincerely held religious beliefs, treat LGBTQ+ youth as social outcasts and as inferior in dignity and worth. The First and Fifth Amendments to the Constitution have long forbidden the government from providing such material aid for private invidious discrimination. Consequently, if the government is going to

12

continue funding Plaintiffs' NFBCUs, then it must protect Plaintiffs by enforcing their rights under Title IX.

### A.  Religious exemptions to civil rights laws are rooted in racism and sexism.

In 1954, *Brown v. Board of Education* ushered in the desegregation of public schools in the United States. In response, White fundamentalists in the South opened private religious schools, now known as segregation academies, to escape integration. During this period, many religious colleges denied admission to Black students, maintained separate dorms for Black students and/or forbid interracial dating and interracial marriage. *See, e.g.* Baylor University (Texas), Bob Jones University (South Carolina), Moody Bible Institute (Illinois).

Congress eventually passed the Civil Rights Act of 1964 ("CRA"), outlawing discrimination based on race in voting (Title I), public accommodations (Title II), public facilities (Title III), public education (IV), **by recipients of federal financial assistance (Title VI)**, and in employment (Title VII). Opposition to CRA was fierce in some parts of the country and religious objectors sought exemptions from compliance. *See Newman v. Piggie Park Enterprises, Inc.*, 390 U.S. 400 (1968) (*per curium*) (restaurant chain owner arguing "his religious beliefs compel him to oppose any integration of the races whatever.").

Shortly after the passage of CRA, Congress passed the Higher Education Act of 1965 ("HEA"), which dramatically increased direct federal financial assistance for colleges, as well as indirect federal financial assistance through grants, federal work-study funds and low-interest student loans. Some private religious colleges, seeing the writing on the wall and seeking to capitalize on the newly available federal funding through the HEA, ended their racially discriminatory policies shortly before or after the passage of CRA and HEA. *See* DESEGREGATING

13

MOTION  FOR  TEMPORARY  RESTRAINING  ORDER
AND ORDER TO SHOW CAUSE WHY PRELIMINARY
INJUNCTION SHOULD NOT ENTER

PRIVATE HIGHER EDUCATION IN THE SOUTH, Melissa Kean, Louisiana State University Press, pp. 176-233 (2008); *but see* Bob Jones University (maintained interracial dating ban until year 2000).

During this same timeframe, homosexuality was illegal throughout the United States. The American medical establishment considered homosexuality a mental disorder. The federal government considered gay men and lesbians a menace and a national security risk. Disgust and hatred towards LGBTQ+ Americans manifested in numerous ways. Gay, lesbian and bisexual Americans were subjected to horrible forms of conversion therapy, including at religious colleges and universities. In 1965, five gay men committed suicide at BYU-Provo in a single year.[2]

In 1970, as some religious objectors continued to resist racial integration, the IRS determined that it would no longer grant tax-exempt status to racially segregated religious schools. Similarly, the Veterans Administration cut off federal assistance to religious colleges that practiced racial discrimination. In 1974, a federal court upheld the VA's termination of payments to Bob Jones University, rejecting the university's Free Exercise arguments and noting that "the federal government cannot, consistent with the Due Process Clause of the Fifth Amendment, provide direct grants-in-aid to public or private entities which discriminate on the basis of race." *Bob Jones University v. Johnson*, 396 F.Supp. 597, 608 (1974) (*Bob Jones University I*).

In 1972, Congress, as a follow-up to CRA, passed Title IX of the Education Amendments Act ("Title IX"). Title IX prohibits sex discrimination at all educational institutions that receive federal financial assistance. However, unlike CRA, Title IX contained a religious exemption for educational institutions "controlled by a religious organization." Federal regulations in effect at

---

[2] https://www.usgabyu.com/single-post/byuhistory

MOTION FOR TEMPORARY RESTRAINING ORDER
AND ORDER TO SHOW CAUSE WHY PRELIMINARY
INJUNCTION SHOULD NOT ENTER

the time required the highest ranking official of an educational institution controlled by a religious organization to formally request a religious exemption from DOE in writing. 34 C.F.R. 106.12(b).

Beginning in 1975, religious educational institutions began making such requests, primarily to allow them to regulate women's bodies (pregnancy, abortion, dress code) and status (restriction from certain degree programs, social clubs, etc.) but also to allow them to regulate sexual conduct, including prohibitions on pre-marital sex, adultery, incest, bestiality, and homosexual conduct. Fundamentalist religious colleges sent hundreds of these exemption request letters to DOE during the 1970s and 1980s.[3]

In the 1980s, same-sex relationships and identities remained criminalized in much of the country, including at many fundamentalist universities, one of which continued to criminalize interracial relationships as well. That university, Bob Jones University, took its religiously motivated fight to discriminate to the Supreme Court. However, in an 8-1 decision, the Supreme Court held that Bob Jones University did not have a First Amendment right to federal taxpayer support because its prohibition on interracial dating, though grounded in sincerely held religious beliefs, violated the strong public policy against racial discrimination in education. *Bob Jones University v. United States*, 461 U.S. 574 (1983) (*Bob Jones University II*).

**B. Increased visibility for LGBTQ+ Americans renders them a new target for religious-based discrimination.**

In the 1980s, nascent, often underground, LGBTQ+ campus activism emerged at fundamentalist, Catholic and other religious colleges. *See* GAY ON GOD'S CAMPUS, Jonathan Coley, The University of North Carolina Press, pp. 23, 29 (2018). However, budding progress at some religious colleges was not felt at fundamentalist colleges. In 1981, Lincoln Christian College

---

[3] https://www2.ed.gov/about/offices/list/ocr/docs/t9-rel-exempt/z-index-links-list-pre-2009.html

MOTION FOR TEMPORARY RESTRAINING ORDER
AND ORDER TO SHOW CAUSE WHY PRELIMINARY
INJUNCTION SHOULD NOT ENTER

informed a gay student that it "would hold a hearing in less than 24 hours at which [he] would be required to defend himself…[and if he could not] that he would be dismissed from LCC because of his alleged homosexuality, and that **the reason for his dismissal would be stamped across his transcript**." *Johnson v. Lincoln Christian College*, 150 Ill.App.3d 733 (1986) (emphasis added).

During this period, with the rise of the Moral Majority and the Christian Coalition, a backlash against the LGBTQ+ community erupted. Congress and the president bowed to the political pressure. President Clinton signed "Don't Ask, Don't Tell" ("DODT") in 1994 and the Defense of Marriage Act ("DOMA") in 1996. Tragically, the continued vitriol toward LGBTQ+ Americans led to the brutal murder of 21-year-old college student Matthew Shepard in 1998.

While more Americans began to sympathize with the LGBTQ+ community after the horrors of the AIDS epidemic and Matthew Shepard's widely publicized murder, only 35% of Americans supported same-sex marriage by the end of the century and political efforts to secure federal civil rights protections for LGBTQ+ people failed.

However, in 2003, the Supreme Court invalidated Texas' sodomy law, making same-sex sexual activity legal throughout the country. *Lawrence v. Texas*, 539 U.S. 558 (2003). The cultural and political tides began to shift, and LGBTQ+ rights organizations challenged the constitutionality of DOMA. The U.S. Department of Justice ("DOJ") under President Obama initially defended the constitutionality of DOMA in court. However, in 2011, after pressure from LGBTQ+ rights organizations, and with a rising national tide of support for same-sex marriage, the DOJ reversed its position. In 2013, the Supreme Court ruled DOMA unconstitutional as a violation of the Due Process Clause of the Fifth Amendment. *United States v. Windsor*, 570 U.S. 744 (2013).

MOTION FOR TEMPORARY RESTRAINING ORDER
AND ORDER TO SHOW CAUSE WHY PRELIMINARY
INJUNCTION SHOULD NOT ENTER

Two years later, the Supreme Court ruled that the Due Process Clause and the Equal Protection Clause guarantee same-sex couples the fundamental right to marry the person they love. *Obergefell v. Hodges*, 576 U.S. 644 (2015). In 2020, the Supreme Court held that Title VII of the CRA prohibits employment discrimination against LGBTQ+ Americans because any such discrimination is necessarily discrimination based on sex. *Bostock v. Clayton County*, 140 S.Ct. 1731 (2020).

As for the Executive Branch, DOE began to enforce Title IX to protect transgender students in 2013, and in 2016, the DOJ and DOE issued joint guidance to education institutions, instructing them that Title IX prohibits discrimination based on gender identity.[4]

DOE enforces Title IX regulations and guidance through a variety of mechanisms, including student-initiated complaint investigation and resolution, agency-initiated cases (compliance reviews), voluntary resolutions, and mandated compliance. As part of DOE's compliance process, DOE analyzes First Amendment issues to determine whether the Constitution permits compliance in any given case. Southwick Decl., Ex. X (OCR Processing Manual).

The Obama administration's executive action to protect transgender students under Title IX prompted a new wave of religious exemption requests from NFBCUs. Between 2013 and 2015, fifty-six religious colleges requested exemptions to allow them to discriminate against LGBTQ+ students based on sexual orientation or gender identity ("SOGI"). The Human Rights Campaign, the largest LGBTQ+ rights organization in the United States, issued a report entitled HIDDEN DISCRIMINATION: TITLE IX RELIGIOUS EXEMPTIONS PUTTING LGBT STUDENTS AT RISK (2015),

---

[4] The following year, the DOJ and DOE under the Trump Administration rescinded that guidance.

MOTION FOR TEMPORARY RESTRAINING ORDER
AND ORDER TO SHOW CAUSE WHY PRELIMINARY
INJUNCTION SHOULD NOT ENTER

noting the "alarming trend" of some NFBCUs "relying on a little-known provision in Title IX to seek waivers that exempt them from treating LGBT students equally." Robinson Decl., Ex. A.

NFBCUs requested exemptions from a variety of Title IX regulations, including those regarding admissions, recruiting, financial aid, counselling, housing, disciplinary procedures, health insurance and employment. *See* Southwick Decl., Ex. Q (Exemption Chart). Some institutions requested exemptions for sexual orientation only, some for gender identity only, and some for both. *Id*. DOE granted all the requests.

However, after the public outcry against the discrimination, some NFBCUs, who had yet to formally request exemptions, sought assurances from DOE that they would be allowed to claim the exemption without having to formally request it. In response, DOE, relying on informal guidance from decades prior, informed the NFBCUs that they inherently possessed the exemption and did not need to officially claim it through the regulatory process.[5] After this assurance, the wave of formal requests for exemption from Title IX became a trickle, as NFBCUs discovered that they could claim the exemption without having to inform the government, the public, or prospective students.[6]

Moreover, during the Trump Administration, DOE refused to interpret Title IX as protecting students based on SOGI. In 2020, DOE undertook two administrative rulemakings related to the Title IX religious exemption ("TIXRE"). These rulemakings greatly expanded TIXRE and formally removed the transparency and notice regulation.

---

[5] https://www2.ed.gov/about/offices/list/ocr/docs/t9-rel-exempt/index.html ("An institution's exempt status is not dependent upon its submission of a written statement to OCR.")
[6] https://www2.ed.gov/about/offices/list/ocr/correspondence/other.html (list of religious exemptions organized by timeframe and educational institution)

MOTION FOR TEMPORARY RESTRAINING ORDER
AND ORDER TO SHOW CAUSE WHY PRELIMINARY
INJUNCTION SHOULD NOT ENTER

On March 8, 2021, after a change in administrations, President Biden issued Executive Order 14021 on Guaranteeing an Educational Environment Free from Discrimination on the Basis of Sex, Including [SOGI]. Robinson Decl., Ex. L. The Executive Order directs the Secretary of Education "to account for the significant rates at which students who identify as lesbian, gay, bisexual, transgender, and queer (LGBTQ+) are subject to sexual harassment, which encompasses sexual violence[.]" *Id.* On March 26, 2021, the DOJ issued a Memorandum stating that "the best reading of Title IX's prohibition on discrimination 'on the basis of sex' is that it includes discrimination on the basis of [SOGI].'" *Id.*, Ex. M.

On June 16, 2021, Defendant Goldberg, on behalf of DOE's Office for Civil Rights, issued a Notice of Interpretation regarding Enforcement of Title IX with Respect to Discrimination Based on SOGI in Light of *Bostock v. Clayton County*. *Id.*, Ex. N. The document acknowledges the conflicting interpretations of recent administrations and states that, based on *Bostock*, the "Department issues this Interpretation to make clear that the Department interprets Title IX's prohibition on sex discrimination to encompass discrimination based on [SOGI]." DOE's interpretation of TIXRE, however, remained unchanged.

### C.  More than 100,000 LGBTQ+ students attend NFBCUs and are at heightened risk for violence, abuse, and expulsion.

Approximately one million students attend more than 200 taxpayer-funded NFBCUs that openly discriminate against LGBTQ+ students in both policy and practice. Robinson Decl., Ex. B. Of these students, approximately 12% identify as LGBTQ+ and 22% identify as LGBTQ+ or as experiencing some level of same-sex attraction. *Id.* These percentages are consistent with the general youth population, as nearly 16% of Generation Z (born 1997-2002) identify as LGBT. Robinson Decl., Ex. S.

MOTION FOR TEMPORARY RESTRAINING ORDER
AND ORDER TO SHOW CAUSE WHY PRELIMINARY
INJUNCTION SHOULD NOT ENTER

However, at fundamentalist colleges, many LGBTQ+ students remain closeted out of fear and necessity. Robinson Decl., Ex. B (19% completely closeted; 56% have told five or fewer people). Others are outed against their will by roommates, administrators or unknown informants. *See* Dkt. 35, Exs. A, C, Z, CC.

Being out, or outed, is often dangerous at NFBCUs, where being LGBTQ+ remains criminalized. Examples of policy language at Plaintiffs' institutions include:

> "[T]he University prohibits same-sex dating behaviors….[and] the public advocacy for or act of altering one's birth-gender identity through medical transition or transgender expression is prohibited" – Cedarville University

> "[D]ressing or acting differently than the biological gender that God created a student to be" is prohibited – Colorado Christian University

> "Sexual perversion – adultery, fornication, homosexuality" is prohibited – Bob Jones University

These policies have real life consequences for LGBTQ+ Americans. To begin, the 1.5 million Americans who are married to a same-sex spouse, *see* Robinson Decl., Ex. S, are explicitly prohibited from attending these institutions, even though their own tax dollars help finance the institutions. Plaintiffs D. Tidwell-Davis, J. Tidwell-Davis, Maxon and Brittsan are among them, and Plaintiffs Markowski and Lord, recently engaged, are soon to join their ranks.

Moreover, particularly for the 17, 18, or 19-year-olds, the mental health consequences of discrimination are devastating. In May 2021, eighteen professional psychology societies issued a joint statement urging DOE to protect LGBTQ+ students at NFBCUs, noting that "[d]ecades of psychological research has consistently found discrimination toward LGBTQ+ people is harmful, and can result in increased rates of suicide, mental health symptoms, substance abuse, isolation, and lower academic achievement in school settings." Robinson Decl., Ex. K. The statement went on to report that:

20

MOTION FOR TEMPORARY RESTRAINING ORDER
AND ORDER TO SHOW CAUSE WHY PRELIMINARY
INJUNCTION SHOULD NOT ENTER

LGBTQ+ students and employees at [NFBCUs] are discriminated against in admission, retention, and employment due to a combination of restrictive policies, stigma, absence of formal social support groups, and lack of legal protections. Recent studies and reports suggest that LGBTQ+ students at NFBCUs may experience higher rates of bullying and harassment than their heterosexual and cisgender peers, and develop mental health symptoms *because of psychological distress and isolation.*

*Id.*; *see also* Robinson Decl., Exs. B, F, I-K, R (social science data demonstrating mental health harms of LGBTQ+ students at NFBCUs); Robinson Decl., Ex. T (demonstrating widespread harms at NFBCUs); *and see* Hartzler Decl. (discussing discrimination and suffering at NFBCU).

**D.  Plaintiffs' Title IX complaints are in immediate danger of dismissal.**

Plaintiffs experience horrible abuses, violence and discrimination at their taxpayer-funded colleges and universities, including expulsions, pervasive harassment, inability to report sexual assault, coercion into conversion therapy, and refusal to recognize LGBTQ+ support groups. Dkt. 35, Exs. A-HH; Swain Decl. Exs. A-D.

Between June 23 and August 2, 2021, Plaintiffs filed thirty-five Title IX complaints against NFBCUs. They seek DOE's protection and remedies for the discrimination they experienced, as well as the ongoing discrimination against the other LGBTQ+ students suffering at their NFBCUs. Currently, DOE refuses and/or is prevented from intervening on behalf of students like Plaintiffs because of TIXRE.

In the five known cases in which LGBTQ+ students at fundamentalist educational institutions previously submitted Title IX complaints to DOE, DOE dismissed them every single time, including the prior complaints filed by Plaintiffs Montgomery and T. Campbell. Southwick Decl., Ex. T; Dkt. #35, Ex. K. Additionally, Plaintiffs Brittsan and Maxon filed Title IX claims in

MOTION FOR TEMPORARY RESTRAINING ORDER
AND ORDER TO SHOW CAUSE WHY PRELIMINARY
INJUNCTION SHOULD NOT ENTER

federal court but the court dismissed their complaints on the basis of the Trump Administration's interpretation of TIXRE. *Maxon, et al. v. Fuller, et al.*, 2020 WL 6305460 (C.D. Cal. Oct. 7, 2020).

Plaintiffs bring this Motion because they have nowhere else to turn, and absent action by this Court, will continue to suffer the grave harms detailed above.

## IV.    ARGUMENT

### A. Plaintiffs Satisfy Traditional and Serious Question Tests for TRO and Preliminary Injunction

To obtain a preliminary injunction under the traditional test, one or more Plaintiffs must demonstrate that (1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in their favor, and (4) an injunction is in the public interest. *Goldman, Sachs & Co. v. City of Reno*, 747 F.3d 733, 738 (9th Cir. 2014).

The Ninth Circuit recognizes that a preliminary injunction may also issue where plaintiffs raise serious questions going to the merits and where the balance of hardships tips sharply in the plaintiffs' favor. *Landwatch v. Connaughton*, 905 F.Supp.2d 1192 (D. Or. 2012) (granting preliminary injunction on basis of serious question doctrine); *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (serious questions test). Plaintiffs satisfy either test.[7]

### B. Plaintiffs are Likely to Succeed on the Merits of their Substantive Claims.

#### 1. Plaintiffs are likely to succeed on the merits of their Establishment Clause Claim.

"Congress shall make no law respecting an establishment of religion[.]" U.S. Const. amend. I; s*ee also Kiryas Joel Village Sch. Dist. v. Grument*, 512 U.S. 687, 703 (1994)

---

[7] Plaintiffs submit declarations and other evidence in support of their Motion.  The Court may consider such evidence at this preliminary stage of the proceedings. *See Houdini Inc. v. Goody Baskets LLC*, 166 F. App'x 946, 947 (9th Cir. 2006) ("the district court did not abuse its discretion in considering hearsay and biased evidence ... because the rules of evidence do not strictly apply to preliminary injunction proceedings.") (citing *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1363 (9th Cir. 1988)).

MOTION FOR TEMPORARY RESTRAINING ORDER
AND ORDER TO SHOW CAUSE WHY PRELIMINARY
INJUNCTION SHOULD NOT ENTER

("government should not prefer one religion to another, or religion to irreligion"). Here, the Establishment Clause prohibits application of TIXRE to all thirty-five of Plaintiffs' Title IX complaints because TIXRE is not neutral with respect to religion, substantially burdens third parties, and results in excessive entanglement between church and state.

### a.  TIXRE undermines Title IX's neutrality with respect to religion

Congress must legislate in a manner that is neutral with respect to religion. *Torcaso v. Watkins*, 367 U.S. 488, 495 (1961) (government cannot "constitutionally pass laws or impose requirements which aid all religions as against non-believers."). Here, Title IX prohibits sex discrimination at all educational institutions (public, secular private and religious) that receive federal funding. Moreover, consistent with the Supreme Court's ruling in *Bostock*, Defendants interpret Title IX's prohibition on sex discrimination to encompass discrimination on the basis of sexual orientation and gender identity. *See Bostock*, 140 S. Ct. at 1743, 1748–50; Robinson Decl., Ex. N.

While Title IX's central anti-discrimination provision is neutral and generally applicable, TIXRE is not neutral as it favors a subset of religious educational institutions, namely, those controlled by religious organizations whose tenets conflict with Title IX, over religious educational institutions that lack control by a religious organization or whose religious organization's tenets do not conflict with Title IX. *See* 20 U.S.C. § 1681(3). The Establishment Clause prohibits such favoritism. *See Texas Monthly, Inc., v. Bullock*, 489 U.S. 1, 8 (1989) ("the Constitution prohibits, at the very least, legislation that constitutes an endorsement of one or another set of religious beliefs"); *Gillette v. United States*, 401 U.S. 437, 450 (1971) ("the Establishment Clause prohibits government from…favor[ing] the adherents of any sect or religious organization."). If Congress had categorically exempted all religious educational institutions from Title IX, this type of

23

favoritism would not be an issue. However, Congress only exempted a subset of religious educational institutions, and the exemption applies to varying degrees, depending on the specific regulations a religious organization claims to conflict with its religious tenets. Consequently, on its face, TIXRE discriminates among religious educational institutions.

TIXRE also favors educational institutions controlled by religious organizations over secular educational institutions because secular educational institutions cannot benefit from the immunity offered by TIXRE as they, by nature, are not controlled by a religious organization. The Establishment Clause also forbids this type of favoritism. *Texas Monthly,* 489 U.S. at 8; *see also Torcaso v. Watkins*, 367 U.S. 488, 495 (1961) ("[n]either a State nor the Federal Government can constitutionally…pass laws or impose requirements which aid all religions as against non-believers").

This favoritism is illustrated as follows: A soccer coach at a taxpayer-funded educational institution kicks a lesbian player off the team after the player announces her engagement to another woman. The lesbian player then files a Title IX complaint with DOE. DOE receives the complaint. Now, the fate of the lesbian player's complaint is determined by which type of educational institution she attends: (A) a public or secular, private educational institution; (B) a religious educational institution, but one that is independent, not controlled by a religious organization; (C) a religious educational institution, controlled by a religious organization, but with religious tenets that state that homosexuality is good and that God blesses same-sex marriages; or (D) a religious educational institution, controlled by a religious organization, with religious tenets that state that homosexuality is sinful and that only heterosexual marriages are valid.

Because of TIXRE's inherent favoritism, only in the last case, (D), is the educational institution relieved of the burden of submitting to DOE's compliance process. DOE will not

MOTION FOR TEMPORARY RESTRAINING ORDER
AND ORDER TO SHOW CAUSE WHY PRELIMINARY
INJUNCTION SHOULD NOT ENTER

investigate or resolve the lesbian soccer player's complaint at institution (D). Because of TIXRE, the educational institution is absolved of responsibility, even if the soccer coach acted out of personal animus towards lesbians, rather than religious conviction, and even though the soccer coach's actions may have punished the lesbian soccer player for exercising her fundamental right to marry the person she loves.

As demonstrated above, TIXRE does not treat all educational institutions the same. TIXRE favors certain religious educational institutions, based on their relationship to a controlling religious organization and the controlling religious organizations' tenets. Religious educational institutions that qualify for TIXRE benefit from the same sources of federal financial assistance as other educational institutions but are privileged by being relieved of participation in DOE's compliance process. Moreover, the effect of this favoritism is that the lesbian student at institution (D) is stigmatized, denied access to equal educational opportunities, and may lose athletic scholarships tied to her participation on the soccer team.

Consequently, TIXRE undermines Title IX's neutrality with respect to religion and violates the Establishment Clause. *See Larson v. Valente,* 456 U.S. 228, 244 (1982) ("The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another," or over no religion at all.)*; Irish 4 Reproductive Health v. U.S. Dept. Health & Human Srvs.*, 434 F.Supp.3d 683, 708 (N.D. Ind. 2020) (denying motion to dismiss where plaintiffs alleged that ACA religious exemptions unconstitutionally favored religious beliefs of Notre Dame and would "harm Plaintiffs by depriving them, or limiting, their access to critical contraceptive services").

MOTION FOR TEMPORARY RESTRAINING ORDER
AND ORDER TO SHOW CAUSE WHY PRELIMINARY
INJUNCTION SHOULD NOT ENTER

### b. TIXRE substantially burdens third parties by denying students protection from discrimination.

Not all religious exemptions are unconstitutional or unlawful. *See Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327 (1987) (upholding the much narrower religious exemption to Title VII). However, in *Texas Monthly, Inc. v. Bullock*, the Court held that a law granting special privileges to religious organizations is unconstitutional if it "is not required by the Free Exercise Clause and…either burdens nonbeneficiaries markedly or cannot reasonably be seen as removing a significant state-imposed deterrent to the free exercise of religion." 489 at 15; *see also Cutter v. Wilkinson*, 544 U.S. 709, 720 (2005) ("courts must take adequate account of the burdens a requested accommodation may impose on nonbeneficiaries").

In *Amos*, the Court upheld the religious exemption to Title VII because the exemption is much narrower, limited to an exemption for the hiring of co-religionists, and exists for the "proper purpose of lifting a regulation which burdens religion." *Amos*, at 338. Title VII regulates private employers, regardless of whether they are recipients of federal funding. Consequently, religious employers are unable to avoid Title VII's reach into their internal affairs by forgoing federal funding. The exemption is necessary to lift a burden that cannot otherwise be lifted.

That rationale falters here. Title IX places no similar burden on religion, as religious universities are free to discriminate based on sex, sexual orientation and gender identity, so long as they do not use government funds to do so. For example, in *Grove City College v. Bell*, 465 U.S. 555 (1984), the Court flatly rejected a religious college's First Amendment challenge to compliance with Title IX, stating:

> Grove City's final challenge to the Court of Appeals' decision—that conditioning federal assistance on compliance with Title IX infringes First Amendment rights of the College and its students—warrants only brief consideration. Congress is free to attach reasonable and unambiguous conditions to federal financial assistance that educational institutions are not obligated to accept…Requiring Grove City to

MOTION FOR TEMPORARY RESTRAINING ORDER
AND ORDER TO SHOW CAUSE WHY PRELIMINARY
INJUNCTION SHOULD NOT ENTER

> comply with Title IX's prohibition of discrimination as a condition for its continued eligibility to participate in the BEOG program infringes no First Amendment rights of the College or its students.)

*Id*. at 575-76; *see also Bob Jones University II* (private religious university that maintained religiously motivated racially discriminatory admission practices did not have a constitutional right to favorable tax treatment under Internal Revenue Code); *Christian Legal Soc. Chapter of the University of California v. Martinez*, 561 U.S. 661 (2010) (law school's policy requiring officially recognized religious student groups to comply with school's nondiscrimination policy regarding sexual orientation did not violate First Amendment).

As the Court noted in *Martinez*, while the Constitution may require toleration of private discrimination in some circumstances it does not require state support for such discrimination because the government "is dangling the carrot of subsidy, not wielding the stick of prohibition." *Id*. at 683; *see also Norwood,* 413 U.S. at 469 ("The private school that closes its doors to defined groups of students on the basis of constitutionally suspect criteria manifests, by its own actions, that its educational processes are based on private belief that segregation is desirable in education…Such private bias is not barred by the Constitution, nor does it invoke any sanction of law, but neither can it call on the Constitution for material aid.").

Additionally, TIXRE is unconstitutional because its broad immunization of taxpayer-funded NFBCUs from nondiscrimination laws substantially burdens LGBTQ+ students by denying them protection from invidious discrimination. *See* Dkt. 35, Exs. A-GG (detailing Plaintiffs' experiences of harassment, discipline, monitoring of social media, expulsion, conversion therapy, inability to report sexual assault).

27

MOTION FOR TEMPORARY RESTRAINING ORDER
AND ORDER TO SHOW CAUSE WHY PRELIMINARY
INJUNCTION SHOULD NOT ENTER

### c. *TIXRE results in excessive entanglement.*

Under TIXRE, the religious organizations that control taxpayer-funded educational institutions determine whether application of Title IX would "be consistent with the religious tenets of such organization." If a religious organization determines that application of Title IX would not be consistent with its religious tenets, DOE defers to that determination, and the religious organization's educational institution becomes exempt from Title IX to the extent the religious organization claims exemption.

TIXRE immunity also allows educational institutions controlled by religious organizations to effectively eliminate, or place burdensome conditions on, financial benefits and rights otherwise guaranteed to LGBTQ+ students by the Higher Education Act, GI Bill and Title IX. *See Larkin v. Grendel's Den, Inc.*, 459 U.S. 116, 122-27 (1982) (statute which vests churches with discretionary power to effectively veto liquor licenses violates Establishment Clause). Moreover, there is no limit to TIXRE; it is *carte blanche* to invidiously discriminate—even permitting retaliation against LGBTQ+ victims of sexual assault who disclose forbidden LGBTQ+ identities, relationships or conduct while reporting their assault.

In *Larkin*, the Court analyzed whether a Massachusetts statute, which gave churches the power to veto liquor licenses for premises within a 500-foot radius of the church by objecting to the license application, violated the Establishment Clause. *Id*. The Court determined that the statute created "a fusion of governmental and religious functions" and that "[t]he Framers did not set up a system of government in which important, discretionary governmental powers would be delegated to or shared with religious institutions." *Id*. at 126-127. The Court found the statute violated the Establishment Clause because of excessive entanglement between Church and State.

28

MOTION FOR TEMPORARY RESTRAINING ORDER
AND ORDER TO SHOW CAUSE WHY PRELIMINARY
INJUNCTION SHOULD NOT ENTER

Here, Congress vested DOE with important, discretionary powers to enforce the Title IX rights of students. DOE does so through Title IX complaint resolution, agency-initiated cases (compliance reviews), voluntary resolutions and mandated compliance. Southwick Decl., Ex. X (OCR Processing Manual). However, for educational institutions controlled by religious organizations, Congress substituted the determination of DOE with the determination of the religious organizations. Religious organizations can now veto complaint resolution and other DOE compliance mechanisms by claiming that compliance would be contrary to the religious tenets of their religious organization. Such vetoes have been successfully asserted at several of Plaintiffs' educational institutions. Southwick Decl., Exs. S-V. This delegation of authority results in excessive entanglement. *See Kiryas Joel Village Sch. Dist. v. Grument*, 512 U.S. 687, 696-97 (1994) (the prohibition on excessive entanglement means, at a minimum, that "a State may not delegate its civic authority to a group chosen according to a religious criterion").

### 2. Plaintiffs are likely to succeed on the merits of their Substantive Due Process claim.

The Fifth Amendment guarantees that no person "be deprived of life, liberty, or property, without due process of law." Const. Amend. 5. *See Sessions v. Morales-Santana*, 137 S. Ct. 1678, 683, fn. 1 (2017) (where case involves federal not state legislation, applicable equality guarantee is found in Fifth Amendment's Due Process Clause.). Here, Plaintiffs' Due Process rights prohibit application of TIXRE to all thirty-five of their Title IX complaints.

Under the Due Process Clause, the "fundamental liberties" protected encompass those rights enumerated in "most of the rights enumerated in the Bill of Rights" and the "personal choices central to individual dignity and autonomy, including intimate choices that define personal identity and beliefs." *Obergefell*, 576 U.S. at 663. Under the Equal Protection Clause, "all persons similarly

MOTION FOR TEMPORARY RESTRAINING ORDER
AND ORDER TO SHOW CAUSE WHY PRELIMINARY
INJUNCTION SHOULD NOT ENTER

circumstanced shall be treated alike." *Plyler v. Doe*, 457 U.S. 202, 216 (1982) (quoting *F.S. Royster Guano Co. v. Virginia*, 253 U.S. 412, 415 (1920)).

Here, TIXRE is "so unjustifiable as to be violative of due process" as well as "equal protection of the laws," *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954), because (1) it denies LGBTQ+ students equal protection because of their suspect classification as sexual, gender, and religious minorities; (2) it structurally prevents LGBTQ+ students from exercising fundamental rights like same-sex marriage; (3) it fails intermediate and strict scrutiny analyses; (4) the government cannot claim a compelling interest in the invidious and structural discrimination of LGBTQ+ students; and (5) even if a compelling interest exists, TIXRE is not narrowly tailored.

### a. TIXRE Targets and Denies LGBTQ+ Students Equal Protection Because of Their SOGI and Religious Beliefs.

Equal protection under the Fifth Amendment guarantees freedom from invidious discrimination based on suspect classifications. *See Harris v. McRae*, 448 U.S. 297, 322 (1980). Classifications based on sexual orientation, gender identity, and religion are suspect classifications. *See Calvary Chapel Dayton Valley v. Sisolak*, 982 F.3d 1228, 1232-33 (9th Cir. 2020) (disparate treatment of religion triggers strict scrutiny review.); *Norsworthy v. Beard*, 87 F. Supp. 3d 1104, 1119 (N.D. Cal. 2015) (citing *Schwenk v. Hartford*, 204 F.3d 1187, 1201 (9th Cir. 2000)) ("[D]iscrimination based on transgender status independently qualifies as a suspect classification under the Equal Protection Clause."); *Smallwood v. Pope*, No. 2:17-cv-01517-TC, at *7 (D. Or. Sep. 12, 2018) (citing *SmithKline Beecham Corp. v. Abbott Labs*., 740 F.3d 471, 481-84 (9th Cir. 2014) ("[S]exual orientation is a protected classification and subject to heightened scrutiny.").

Here, TIXRE violates equal protection guarantees because the known and intended impact of the exemption is that LGBTQ+ students are singled out and targeted for unequal protection

30

because of their status in a suspect class based on their sexual orientation, gender identity, and religious beliefs. *See Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 260 (1979) (A "facially neutral law may violate equal protection if it has a discriminatory impact.").

### b.  TIXRE Burdens LGBTQ+ Students' Exercise of the Fundamental Right to Same-Sex Marriage.

"Marriage [including same-sex marriage] is sacred to those who live by their religions and offers unique fulfillment to those who find meaning in the secular realm." *Obergefell*, 576 U.S. at 656-57; *see* Swain Declaration, Exs. E-F (Plaintiffs' Religious Belief Declarations). The fundamental right to same-sex marriage is guaranteed by the Due Process Clause and the Equal Protection Clause. *Obergefell*, 576 U.S. at 668-675. Indeed, the Courts have repeatedly struck down laws that abridge the right to marry. *See, e.g., Loving v. Virginia*, 388 U.S. 1, 12 (1967) (invalidating interracial marriage bans under both the Due Process Clause and the Equal Protection Clause); *see also Driggs v. Comm'r of SSA*, No. CV-18-03915-PHX-DJH, at *12-13 (D. Ariz. May 29, 2020) (discussing unconstitutionality of discriminatory "barriers to same-sex marriage" even with "otherwise permissible results").

Here, Plaintiffs NFBCUs explicitly ban same-sex marriage and expel students for exercising their fundamental right to same-sex marriage. TIXRE prevents Defendants and courts from providing a Title IX remedy for such discrimination.

### i.    TIXRE Cannot Survive Strict Scrutiny.

This Court should apply strict scrutiny because classifications that impermissibly interfere "with the exercise of a fundamental right [*i.e.* marriage] or operates to the peculiar disadvantage of a suspect class" [*i.e.* LGBTQ+ status] must survive strict scrutiny. *Halet v. Wend Inv. Co.*, 672 F.2d 1305, 1310 (9th Cir. 1982). To survive strict scrutiny, the law must be narrowly tailored to

MOTION FOR TEMPORARY RESTRAINING ORDER
AND ORDER TO SHOW CAUSE WHY PRELIMINARY
INJUNCTION SHOULD NOT ENTER

achieve a compelling government interest, *San Jose Christian Coll.*, 360 F.3d at 1030, which Defendants cannot demonstrate here.

Moreover, even if intermediate scrutiny were to apply LGBTQ+ status, it would require the classification be substantially related to achieving an important government interest, which Defendants also cannot demonstrate. *See Navarro v. Block*, 72 F.3d 712, 716 (9th Cir. 1995) (citing *Craig v. Boren*, 429 U.S. 190, 197 (1976)).

> ii. **Defendants Cannot Claim a Legitimate Government Interest in Funding and Ignoring Invidious Discrimination.**

"For if the constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean that a bare congressional desire to harm a politically unpopular group cannot constitute a legitimate governmental interest." *United States Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973); *see Pavan v. Smith*, 137 S. Ct. 2075, 2078 (2017) (requiring equal access of rights granted to same-sex couples as those granted to different-sex couples). The "existence of a permissible purpose cannot sustain an action that has an impermissible effect." *Wright v. Council of Emporia*, 407 U.S. 451, 462 (1972). If at one time in history a legitimate government interest existed to justify invidious discrimination towards LGBTQ+ students, "new insights and societal understandings can reveal unjustified inequality within our most fundamental institutions that once passed unnoticed and unchallenged." *Obergefell*, 576 U.S. at 673. Here, the federal government cannot claim a legitimate governmental interest in invidious SOGI discrimination. *See Roberts v. Jaycees*, 486 U.S. 609 (1984) ("[A]cts of invidious discrimination…cause unique evils that government has a compelling interest to prevent…Accordingly…such practices are entitled to no constitutional protection.")

MOTION FOR TEMPORARY RESTRAINING ORDER
AND ORDER TO SHOW CAUSE WHY PRELIMINARY
INJUNCTION SHOULD NOT ENTER

Moreover, TIXRE is not necessary to address a government interest in avoiding infringement of educational institutions' constitutional rights. *See e.g., supra, Grove City College v. Bell*, 465 U.S. 555 (1984) ("Congress is free to attach reasonable and unambiguous conditions to federal financial assistance that educational institutions are not obligated to accept"); *Estate of Thornton v. Caldor, Inc.*, 472 U.S. 703, 710 (1985) ( "The First Amendment ... gives no one the right to insist that in pursuit of their own interests others must conform their conduct to his own religious necessities."); *Runyon v. McCrary*, 427 U.S. 160 (1976) (statute requiring private schools to admit Black students does not violate associational rights).

### iii.    Even if a Legitimate Government Interest Existed, TIXRE is Not Narrowly Tailored.

Even if a legitimate government interest exists, the regulation of the fundamental right must be "narrowly tailored to serve a compelling state interest." *Reno v. Flores*, 507 U.S. 292, 302 (1993). Here, TIXRE is not narrowly tailored as it does not allow the burdens or interests of affected students to be considered. Moreover, unlike the religious exemptions to Title VII and the Fair Housing Act, TIXRE is not limited to co-religionists. Since TIXRE "impose[s] a broad and undifferentiated disability on a single named group,"—including burdening LGBTQ+ students' fundamental right to same-sex marriage—it cannot be considered narrowly tailored. *See Romer v. Evans*, 517 U.S. 620, 632, (1996).

### 3.    Plaintiffs are Likely to Succeed on the Merits of their APA Claim.

If Plaintiffs succeed on their APA claim, it would prohibit application of TIXRE to twenty-six of Plaintiffs' thirty-five Title IX complaints. The twenty-six affected Title IX complaints would not qualify for TIXRE because the educational institutions at issue did not request a religious exemption (12 complaints), are not controlled by a religious organization (26 complaints) or both (12 complaints). Southwick Decl., Ex. R (Controlling Organizations).

33

MOTION FOR TEMPORARY RESTRAINING ORDER
AND ORDER TO SHOW CAUSE WHY PRELIMINARY
INJUNCTION SHOULD NOT ENTER

On September 23, 2020, DOE issued a new final rule, which went into effect on November 23, 2020, that amends the Title IX regulation at 34 C.F.R. § 106.12(c) ("November 2020 Final Rule").[8] Prior, on May 19, 2020, DOE issued a new final rule, which went into effect on August 14, 2020, that amends 34 C.F.R. § 106.12(b) ("August 2020 Final Rule").[9]

The APA requires that a reviewing court "hold unlawful and set aside agency action, findings, and conclusions found to be— (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right[.]" 5 U.S.C. §§ 706(2)(A)-(C). Here, Plaintiffs are likely to succeed in demonstrating both the November 2020 Final Rule and the August 2020 Final Rule violate the APA.

> ### a. *Plaintiffs are likely to succeed in demonstrating that the November 2020 Final Rule violates the APA because it arbitrarily expands the exemption in conflict with preexisting law.*

TIXRE requires (1) an "education institution" and (2) a controlling "religious organization" with "religious tenets." 20 U.S.C. § 1681(a)(3). However, subsections (1), (4), and (5) of the new 34 C.F.R. § 106.12 arbitrarily expand TIXRE by strike the controlling religious organization requirement entirely, even though the statute clearly requires a controlling religious organization. Second, subsection (4) expands the law to include "religious practices," but the statute does not grant exemptions based on religious practices, only on "religious tenets." Third, subsection (6) expands the law as a "catch-all" provision that allows "other evidence" to "establish that an educational institution is controlled by a religious organization."

---

[8] Non Discrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 85 FR 59916 (September 23, 2020).
[9] Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 85 FR 30026 (May 19, 2020).

MOTION FOR TEMPORARY RESTRAINING ORDER
AND ORDER TO SHOW CAUSE WHY PRELIMINARY
INJUNCTION SHOULD NOT ENTER

Defendants may not disregard statutory text as they have done to include institutions that Congress did not exempt. *See Michigan v. EPA*, 135 S. Ct. 2699, 2708 (2015) (*Chevron* deference "does not license interpretive gerrymanders under which an agency keeps parts of statutory context it likes while throwing away parts it does not."). Thus, the November 2020 Final Rule is not the product of reasoned decisionmaking. *See E. Bay Sanctuary Covenan*t, 964 F.3d at 849 (9th Cir. 2020) ("[T]he touchstone of arbitrary and capricious review … is reasoned decisionmaking") (internal quotation marks and citations omitted); *Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668, 681-86 (9th Cir. 2007) (setting aside agency action where action is contrary to governing law).

The Title IX religious exemption language is different from the religious exemption language in other statutes. For example, in Title VII, Congress provided an exemption for religious discrimination in employment at some private schools if the school is: "[1] in whole or in substantial part, owned, supported, controlled, or managed by a particular religion or by a particular religious corporation, association, or society, *or* [2] if the curriculum of such school, college, university, or other educational institution or institution of learning is directed toward the propagation of a particular religion." 42 U.S.C.S. § 2000e-2 (emphasis added). However, Congress chose not to use this language in TIXRE. DOE acknowledged this language difference during the rulemaking but ignored its significance. *See* 85 FR 59954.

Second, the Fair Housing Act exempts the dwelling of "any nonprofit institution or organization operated, supervised or controlled by or in conjunction with a religious organization, association, or society." 42 U.S.C. § 3607(a). DOE acknowledged this language during the rulemaking but ignored its significance. *See* 85 FR 59954.

Third, Congress used similar language when it defined "tribally controlled college or university" to mean "an institution of higher education which is formally controlled, or has been formally sanctioned, or chartered, by the governing body of an Indian tribe or tribes, except that no more than one such institution shall be recognized with respect to any such tribe." 25 U.S.C.S. § 1801. DOE acknowledged this language but again ignored it. *See* 85 FR 59954; *see also* 29 U.S.C.S. § 1002 (mentions organizations "controlled by *or associated* with a church or a convention or association of churches.") (emphasis added); 20 U.S.C.S. § 1066c (discrimination prohibition "shall not apply to an institution which is controlled by *or* which is *closely identified* with the tenets of a particular religious organization if the application of this section would not be consistent with the religious tenets of such organization") (emphasis added).

While Congress has repeatedly used "control" language *in addition to* other extensive language in granting religious exemptions, Congress chose not to make that same extension in Title IX. Thus, because the November 2020 Final Rule permits educational institutions that are not controlled by religious organizations to claim a religious exemption, the November 2020 Final Rule arbitrarily expands the scope of the exemption in conflict with preexisting law.

> **b.  *Plaintiffs are likely to succeed in demonstrating that the November 2020 Final Rule and August 2020 Final Rule violates the APA.***

"New presidential administrations are entitled to change policy positions, but to meet the requirements of the APA, they must give reasoned explanations for those changes and address the prior factual findings underpinning a prior regulatory regime." *State v. U.S. Bureau of Land Mgmt.*, -- F.Supp.3d. --, 2017 WL 4416409, at *11 (N.D. Cal. 2017) (quotation marks and brackets omitted); *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016) (declining to defer to agency where it demonstrated awareness it was changing policy but provided insufficiently reasoned explanation for "why it deemed it necessary to overrule its previous position."). Agencies

36

MOTION FOR TEMPORARY RESTRAINING ORDER
AND ORDER TO SHOW CAUSE WHY PRELIMINARY
INJUNCTION SHOULD NOT ENTER

have an "obligation to acknowledge and account for a changed regulatory posture the agency creates—especially when the change impacts a contemporaneous and closely related rulemaking." *Portland Cement Ass'n v. E.P.A.*, 665 F.3d 177, 187 (D.C. Cir. 2011).

Here, the November 2020 Final Rule and the August 2020 Final Rule were arbitrary and violated the APA because DOE failed to provide sufficiently reasoned explanation or adequately consider public health, public safety, public interest, reasonable alternatives, inequitable positions, or reliance interests by LGBTQ+ students' in not being subject to invidious discrimination at taxpayer-funded NFBCUs.

During the rulemaking, commentors expressed concerns for the safety and protection of LGBTQ+ students who are victims of sexual violence at religious institutions. *See* 85 FR 59947. For example, an LGBTQ+ student may disclose their sexual orientation while reporting harassment and subsequently face expulsion from the school for being a sexual minority. Comments stressed that "the Department should not allow schools to discriminate against students who are victims of and survivors of sexual violence[.]" *Id.* DOE ignored these grave concerns and failed to provide a reasoned explanation or any assurance that LGBTQ+ victims of sexual violence will be protected. *See* 85 FR 59948.

Commentors also expressed concerns for the health and wellbeing of LGBTQ+ students while also providing substantial research findings about widespread harassment and assault experienced by LGBTQ+ students. *See* 85 FR 59949. Comments also highlighted the massive suicide rates among LGBTQ+ youth. *Id.*; *see also* Robinson Decl., Exs. C, J (additional data on suicide among LGBTQ+ populations). DOE entirely ignored these grave realities, in violation of public interest concerns.

MOTION FOR TEMPORARY RESTRAINING ORDER
AND ORDER TO SHOW CAUSE WHY PRELIMINARY
INJUNCTION SHOULD NOT ENTER

Additionally, many students have no reasonable alternative for higher education except a religious institution, [10] forcing LGBTQ+ students into hostile and unsafe environments while jeopardizing their financial wellbeing and mental and physical health. DOE failed to provide a reasoned explanation or acknowledge any consideration of alternatives to address this concern. Rather, DOE merely responded by stating that "a recipient that meets the criteria for a religious exemption is entitled to the protections that the statute affords it." *Id.*

### c. Defendants failed to consider that the former notice requirement engendered justifiable reliance by LGBTQ+ students.

Agency action is arbitrary and capricious if it fails to consider "that longstanding policies may have engendered serious reliance interests[.]" *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1913, 207 L. Ed. 2d 353 (2020) (internal quotation marks and citations omitted). When a "prior policy has engendered serious reliance interest," DOE must "provide a more detailed justification." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009); *see also Perez v. Mortgage Bankers Ass'n*, 135 S. Ct. 1199, 1209 (2015) (the government must provide still greater justification for the reversal "when its policy has engendered serious reliance interests that must be taken into account.").

Here, the August 2020 Final Rule eliminated the transparency and notice requirements for NFBCUs intending to discriminate against LGBTQ+ students. Now, NFBCUs rely on the August 2020 Final Rule to maintain vague and indeterminate policies and practices with respect to compliance with Title IX as applied to LGBTQ+ students. Consequently, the August 2020 Final

---

[10] The fallacy of school choice argument rejects a complex set of factors including geographic location, occupational ambitions, socioeconomic restraints, familial pressures, family traditions, athletics, spiritual convictions, and application and admission criteria, as well as the complexity inherent in conscious understanding and acceptance of one's own sexual orientation and gender identity. *See* NOTE: Federally Funded And Religiously Exempt: Exploring Title IX Exemptions And Their Discriminatory Effect On LGBT Students, 81 U. Pitt. L. Rev. 735, 760-61 (2020).

MOTION FOR TEMPORARY RESTRAINING ORDER
AND ORDER TO SHOW CAUSE WHY PRELIMINARY
INJUNCTION SHOULD NOT ENTER

Rule exposes more LGBTQ+ students to the risk of abuse, harassment, and loss of their constitutional rights at taxpayer-funded, religious colleges and universities.

DOE, without providing support or rational explanation, claims that "students and prospective students likely will know whether an educational institution is controlled by a religious organization so as not to be surprised by a recipient's assertion of such a religious exemption." 85 FR 30478. This claim is without merit. Attorneys General from nineteen different states vigorously opposed the proposed regulation, stating in official comments that "[t]he proposal to eliminate the requirement that institutions invoke the statute's religious exemption in writing raises concerns of fair notice to students." Robinson Decl., Ex. O at pg. 56. They argued this change would lead to "more students unknowingly enrolling in schools that believe themselves to be exempted from Title IX but do not claim the exemption publicly, only [for the students] to learn of their school's position after they seek to assert their Title IX rights." *Id.*

During the rulemaking for the August 2020 Final Rule, commentors also expressed the concern that religious institutions may "intentionally deceive applicants to the school in order to obtain application fees or tuition revenues." 85 FR 30478. In response, DOE again dismissed the concern, leaving students vulnerable. *See* Simon Decl. (discussing deceptive recruitment practices at NFBCU); Swain Decl., Ex. B, pp. 23-26 (Lord Title IX Complaint).

#### 4. Plaintiffs are likely to succeed on the merits of their Religious Freedom Restoration Act claim.

Under RFRA, "Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability" unless the substantial burden "is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C.S. at § 2000bb-1. Establishing a prima facie RFRA claim requires showing (1) "the activities the plaintiff claims are burdened by the

39

MOTION FOR TEMPORARY RESTRAINING ORDER
AND ORDER TO SHOW CAUSE WHY PRELIMINARY
INJUNCTION SHOULD NOT ENTER

government action must be an 'exercise of religion'" and (2) "the government action must 'substantially burden' the plaintiff's exercise of religion." *Navajo Nation v. United States Forest Serv.*, 535 F.3d 1058, 1068 (9th Cir. 2008) (internal citations omitted). Both elements are met here.

### a. Plaintiffs' religious exercises are substantially burdened.

Generally, "'religious exercise' includes any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C.S. § 2000cc-5. Indeed, the answer to that question should not be left to the judiciary. *Hernandez v. Comm'r*, 490 U.S. 680, 699 (1989). And "religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection." *Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 714 (1981).

Here, Plaintiffs' deeply held religious beliefs are inseparable from their sexuality or gender identity. Swain Decl., Exs. E-F (Plaintiffs' Religious Belief Declarations). Plaintiffs exercise their religious beliefs through how they love; how they embrace and live out their sexuality and gender identity; how they reject homophobia and transphobia; and how they treat other LGBTQ+ people.

"Under RFRA, a 'substantial burden' is imposed only when individuals are forced to choose between following the tenets of their religion and receiving a governmental benefit . . . or coerced to act contrary to their religious beliefs by the threat of civil or criminal sanctions." *Navajo Nation*, 535 F.3d at 1069-70; *Snoqualmie Indian Tribe v. FERC*, 545 F.3d 1207, 1220, fn. 3 (9th Cir. 2008) (requiring more than "merely diminish[ing] the quality of an individual's religious experience").

Here, the burden of the discriminatory TIXRE is far greater than diminishing Plaintiffs' spiritual experience; it forces students who may have no reasonable alternative for higher education to either decline the government benefit of taxpayer-funded education or to accept the

MOTION FOR TEMPORARY RESTRAINING ORDER
AND ORDER TO SHOW CAUSE WHY PRELIMINARY
INJUNCTION SHOULD NOT ENTER

benefit but violate their deeply held religious beliefs. This coercive pressure is also felt by students who change their religious beliefs regarding SOGI while in college but are too far along in their degree program to leave their NFBCU.

### b.    TIXRE is not the least restrictive means of furthering a legitimate government interest.

Defendants must "establish a compelling government interest—which must be furthered in the least restrictive means possible—to justify the discriminatory conduct. *See Navajo Nation*, 535 F.3d at 1068. Defendants cannot meet that burden.

First, Defendants cannot establish a legitimate government interest in substantially burdening Plaintiff's religious beliefs and exercises. To the contrary, Plaintiffs' interest in receiving a taxpayer-funded education free from invidious discrimination is supported by compelling government interests. *Roberts*, 468 U.S. at 624 (state has a compelling interest "of the highest order" in eradicating sex discrimination); *Presbytery of New Jersey*, 902 F.Supp. at 521 (finding state interest in eliminating discrimination on the basis of, inter alia, sexual orientation, was "not only substantial but also [could] be characterized as compelling"); *Carson v. Makin*, 979 F.3d 21, 40, n. 6 (1st Cir. 2020) ("the state's assertedly compelling interest in declining to fund discrimination [in education] based on sexual orientation or gender identity").

Second, if a legitimate government interest did exist, the substantial burdening of Plaintiffs' religious exercises is not the least restrictive means of achieving that interest. For example, TIXRE could have been limited to an exemption for co-religionists, like in Title VII and the Fair Housing Act. In contrast, TIXRE grants NFBCUs *carte blanche* to absolve themselves from all twenty-seven Title IX regulations, burdening every aspect of the student experience, from awarding financial aid to housing to employment services and even counseling and healthcare. *See* Southwick Decl., Ex. Q (Exemption Chart); *see also* McLeod Decl. (discussing widespread

41

MOTION FOR TEMPORARY RESTRAINING ORDER
AND ORDER TO SHOW CAUSE WHY PRELIMINARY
INJUNCTION SHOULD NOT ENTER

discriminatory practices at NFBCU). Thus, TIXRE is not the least restrictive means of furthering any compelling government interest.

### C. Plaintiffs will Suffer Irreparable Harm in the Absence of a Preliminary Injunction.

"An irreparable harm is one that cannot be redressed by a legal or equitable remedy following trial." *Optinrealbig.com. LLC v. Ironport Sys.,* 323 F.Supp.2d 1037, 1051 (N.D.Cal.2004) (citing *Public Util. Comm'n v. FERC,* 814 F.2d 560, 562 (9th Cir.1987)). Mere financial injury does not constitute irreparable harm if adequate compensatory relief will be available in the course of litigation. *Sampson v. Murray,* 415 U.S. 61, 89–90 (1974). However, intangible injuries, such as damage to goodwill, qualify as irreparable harm. *Regents of Univ. of Cal. v. American Broadcasting Cos.,* 747 F.2d 511, 519–20 (9th Cir.1984).

When Constitutional rights are at stake, the mere fact that those rights are either threatened, or are in fact being impaired at the time relief is requested, is generally sufficient alone to constitute irreparable injury. *Elrod v. Burns,* 427 U.S. 347, 374 (1976) (Threat to Plaintiff's First Amendment freedoms, even for a small amount of time, "unquestionably constitute[d] irreparable injury.").

Here, Plaintiff's Constitutional rights are clearly threatened and are being impaired at this moment. This, standing alone, unquestionably constitutes irreparable injury. Moreover, in addition to Constitutional harms Plaintiffs are experiencing, they have alleged a broad range of harms, including but not nearly limited to experiencing sexual harassment and assault both on and off campus, being deterred from reporting verbal and sexual assault for fear of expulsion, being denied housing and insurance, and being pressured into conversion therapy to ensure continued educational enrollment. Dkt. 35, Exs. A-GG. These harms are difficult to cope with at any stage of life, and even more so for these young students who are at a vulnerable stage of their

42

MOTION FOR TEMPORARY RESTRAINING ORDER
AND ORDER TO SHOW CAUSE WHY PRELIMINARY
INJUNCTION SHOULD NOT ENTER

development, and will dramatically increase their risks of experiencing depression, self-harm, and suicide. Robinson Decl., Exs. B-K, P-R.

### D.  The Balance of the Equities Weigh Sharply in Favor of the Plaintiffs.

The purpose of preliminary injunctive relief is not to conclusively determine the rights of the parties, but to balance the equities as the litigation moves forward. *California v. Azar*, 911 F.3d 558 (9th Cir. 2018). To grant a preliminary injunction a court must determine that a party is "likely to succeed on the merits." However, where the risk of harm to a party is great, movants need only demonstrate that "serious questions going to the merit were raised." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011)

Here, the balance of the equities tips sharply in favor of Plaintiffs, as the harm they will suffer are immense and irreparable, and a preliminary injunction crafted by this Court is their only viable remedy.

Despite the severity of these harms, LGBTQ+ students have nowhere to turn for relief. Although DOE is charged with enforcing Title IX and protecting students against discrimination on the basis of sex, DOE will simply dismiss Plaintiffs' complaints based on TIXRE. The lack of remedy absent action by this Court will leave Plaintiffs without any viable alternative remedy and vulnerable to a great risk of immense and continuous harm.

In stark contrast to Plaintiffs' risk of harm, Defendants' potential harms are extremely limited. DOE will undoubtedly have additional Title IX claims to review, but that burden is minimal. Religious educational institutions may claim that their rights will be limited for the duration of the injunction, but such claims are premature and hypothetical, as DOE will make individualized determinations based on the facts and constitutional issues at play in each separate Title IX complaint. *See Norwood v. Harrison*, 413 U.S. 455, 471 (1972) ("The proper injunctive

MOTION FOR TEMPORARY RESTRAINING ORDER
AND ORDER TO SHOW CAUSE WHY PRELIMINARY
INJUNCTION SHOULD NOT ENTER

relief can be granted without implying a finding that all the private schools alleged to be receiving textbook aid are in fact practicing restrictive admission policies.").

Consequently, the balance of the harms weighs sharply in favor of the Plaintiffs.

### E.  An Injunction is in the Public Interest

The injunction is in the public interest. First, plainly, because "it is always in the public interest to prevent the violation of a party's constitutional rights." *de Jesus Ortega Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (citations omitted). Second, investigating serious allegations of widespread discrimination is in the public interest. *See EEOC v. Fed. Express Corp.*, 558 F.3d 842, 852 (9th Cir. 2009) (concluding it was in the public interest to "investigate a charge of systemic discrimination" in employment context). Third, ameliorating injury to public health is in the public interest, and the collective psychological wound on the LGBTQ+ community is already well-documented. *See* Robinson Decl., Exs. (B-J) (social science data and reports demonstrating correlations between mental health and pervasive discrimination against LGBTQ+ people).

## V.    CONCLUSION

Many of the Plaintiffs will be returning to campus in the coming weeks. Defendants' actions put their health and safety in jeopardy. Based on the record and arguments presented here, Plaintiffs respectfully request that the Court grant this Motion for a Temporary Restraining Order.

Date: August 5, 2021

s/ Paul Carlos Southwick

**Paul Carlos Southwick
(OSB 095141)**
8532 N. Ivanhoe St. #208,
Portland, OR 97203
Email: paul@paulsouthwick.com
Phone: 503-806-9517

44

MOTION FOR TEMPORARY RESTRAINING ORDER
AND ORDER TO SHOW CAUSE WHY PRELIMINARY
INJUNCTION SHOULD NOT ENTER