**From:**            (b)(6); (b)(7    (b)(

**Sent:**            4 Apr 2014 17:15:32 +0000

**To:**              OCR Seattle

**Cc:**              (b)(6); (b)(7    (b)(

**Subject:**         Title IX Sex Discrimination Complaint against George Fox University (Newberg, OR)

**Attachments:**     (b)(6); (b)  Discrimination Complaint.pdf

To Whom It Concerns:

Attached is a Title IX Discrimination Complaint I'm filing on behalf of a (b)(6);   (b)(6); (b)(7(C)   He has signed the Complaint and the consent form. I am (b)(6);   attorney.

(b)(

(b)(6  (b)(6);  (b)(7(  | Davis Wright TremaineLLP
1300 SW Fifth Avenue, Suite 2400 | Portland, OR 97201
Tel: (503) 778-5266 | Fax: (503) 276-5766
Email: (b)(6); (b)(7(C)          | Website: www.dwt.com

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Shanghai | Washington, D.C.



## United States Department of Education
## Office for Civil Rights

## DISCRIMINATION COMPLAINT FORM

**You do not have to use this form to file a complaint with the U.S. Department of Education's Office for Civil Rights (OCR). You may send OCR a letter or e-mail instead of this form, but the letter or e-mail must include the information in items one through nine and item fourteen of this form. If you decide to use this form, please type or print all information and use additional pages if more space is needed. An on-line version of this form, which can be submitted electronically, can be found at: http://www.ed.gov/about/offices/list/ocr/complaintintro.html.**

Before completing this form please read all information contained in the enclosed packet including: Information About OCR's Complaint Resolution Procedures, Notice of Uses of Personal Information and the Consent Form.

1.    Name of person filing this complaint:

Last Name: ___(b)(6); (b)(7)(C)___    First Name: ___(b)(6);___    Middle Name: _____

Address: 1300 SW Fifth Ave., Suite 2400

City: Portland _____    State: OR    Zip Code: 97201

Home Telephone: _____    Work Telephone: 503-778-5266

E-mail Address: ___(b)(6); (b)(7)(C)___

2.    Name of person discriminated against (if **other** than person filing). If the person discriminated against is age 18 or older, we will need that person's signature on this complaint form and the consent/release form before we can proceed with this complaint. If the person is a minor, and you do not have the legal authority to file a complaint on the student's behalf, the signature of the child's parent or legal guardian is required.

Last Name: ___(b)(6); (b)(7)(C)___    First Name: ___(b)(6); (b)(7)(C)___    Middle Name: _____

Address: George Fox University

City: Newberg    State: OR    Zip Code: 97132

Home Telephone: ___(b)(6); (b)(7)(C)___    Work Telephone: _____

E-mail Address: _____

*Our Mission is to ensure equal access to education and to promote educational excellence throughout the Nation.*

Page 2 of 11 – U.S. Department of Education, Office for Civil Rights
Discrimination Complaint Form, Consent Form, and Complaint Processing Procedures

3.      OCR investigates discrimination complaints against institutions and agencies which
        receive funds from the U.S. Department of Education and against public educational
        entities and libraries that are subject to the provisions of Title II of the Americans
        with Disabilities Act.  Please identify the institution or agency that engaged in the
        alleged discrimination.  If we cannot accept your complaint, we will attempt to refer
        it to the appropriate agency and will notify you of that fact.

**Name of Institution:** George Fox University

**Address:** 414 N. Meridian St.

**City:** Newberg          **State:** Oregon   **Zip Code:** 97132

**Department/School:** Student Life/Residence Life

4.      The regulations OCR enforces prohibit discrimination on the basis of race, color,
        national origin, sex, disability, age or retaliation.  Please indicate the basis of your
        complaint:

☐      Discrimination **based on race (specify)**

_____

_____

☐      Discrimination **based on color (specify)**

_____

_____

☐      Discrimination **based on national origin (specify)**

_____

_____

☑      Discrimination **based on sex (specify)**

Discrimination on the basis of sex, failure to conform to sex
stereotypes, gender, gender identity and transgender status in
violation of Title IX.

_____

Page 3 of 11 – U.S. Department of Education, Office for Civil Rights
Discrimination Complaint Form, Consent Form, and Complaint Processing Procedures

☐   Discrimination **based on disability (specify)**

_____

_____

_____

☐   Discrimination **based on age (specify)**

_____

_____

_____

☐   **Retaliation because you filed a complaint or asserted your rights (specify)**

_____

_____

_____

☐   **Violation of the Boy Scouts of America Equal Access Act (specify)**

_____

_____

_____

5.   Please describe each alleged discriminatory act. For each action, please include the
     date(s) the discriminatory act occurred, the name(s) of each person(s) involved and,
     why you believe the discrimination was because of race, disability, age, sex, etc. Also
     please provide the names of any person(s) who was present and witnessed the
     act(s) of discrimination.

See attached statement.
_____

_____

_____

_____

_____

_____

EXHIBIT T                                                                          4

Page 4 of 11 – U.S. Department of Education, Office for Civil Rights
Discrimination Complaint Form, Consent Form, and Complaint Processing Procedures

6.    What is the most **recent date** you were discriminated against?

Date: **April 3, 2014**

7.    If this date is **more than 180 days ago,** you may request a waiver of the filing
       requirement.

       ☐   I am requesting a waiver of the 180-day time frame for filing this complaint.
             Please explain why you waited until now to file your complaint.

_____

_____

_____

8.    Have you attempted to resolve these allegations with the institution through an
       internal grievance procedure, appeal or due process hearing?

       ● **YES**        ○ **NO**

       If you answered **yes**, please describe the allegations in your grievance or hearing,
       identify the date you filed it, and tell us the status. If possible, please provide us
       with a copy of your grievance or appeal or due process request and, if completed,
       the decision in the matter.

Housing discrimination in violation of Title IX. [(b)(6);] was denied
request to live with other male students on campus. He had
multiple meetings with university administrators. Final appeal to
University President on March 27. Appeal denied on April 3.

9.    If the allegations contained in this complaint have been filed with any other Federal,
       state or local civil rights agency, or any Federal or state court, please give details and
       dates. We will determine whether it is appropriate to investigate your complaint
       based upon the specific allegations of your complaint and the actions taken by the
       other agency or court.

**Agency or Court:** _____

**Date Filed:** _____

**Case Number or Reference:** _____

**Results of Investigation/Findings by Agency or Court:**

_____

_____

Page 5 of 11 – U.S. Department of Education, Office for Civil Rights
Discrimination Complaint Form, Consent Form, and Complaint Processing Procedures

10. If we cannot reach you at your home or work, we would like to have the name and telephone number of another person (relative or friend) who knows where and when we can reach you. This information **is not required**, but it will be helpful to us.

Last Name:_____ First Name:_____ Middle Name:_____

Home Telephone_____ Work Telephone:_____

11. What would you like the institution to do as a result of your complaint — what remedy are you seeking?

Allow (b)(6); to live in an on-campus house, apartment or suite
with other male students who have agreed to live with him.

_____

_____

_____

12. We cannot accept your complaint if it has not been signed. Please sign and date your complaint below.

4/3/14
(Date)

04/3/14
(Date)

(b)(6); (b)(7)(C)

(Signature)

(b)(6); (b)(7)(C)

Please mail the completed and signed Discrimination Complaint Form, your signed consent form and copies of any written material or other documents you believe will help OCR understand your complaint to the OCR Enforcement Office responsible for the state where the institution or entity about which you are complaining is located. You can locate the mailing information for the correct enforcement office on OCR's website at http://wdcrobcolp01.ed.gov/CFAPPS/OCR/contactus.cfm.

Page 6 of 11 – U.S. Department of Education, Office for Civil Rights
Discrimination Complaint Form, Consent Form, and Complaint Processing Procedures

## CONSENT FORM- FOR USE OF PERSONAL INFORMATION

Complainant's Name (print or type): [(b)(6);] [(b)(6); (b)(7)(C)]

Institution Against Which Complaint is Filed: **George Fox University**

### Please sign and date section A, section B or section C and return to the address below:

I have read the section, "Investigatory Uses of Personal Information" in the OCR document "Information about OCR's Complaint Processing Procedures," which explains OCR's use of personal information. I understand that the Privacy Act of 1974, 5 U.S.C. § 552a, and the Freedom of Information Act (FOIA), 5 U.S.C. § 552, govern the use of personal information submitted to all Federal agencies and their individual components, including OCR. I will cooperate with OCR's investigation and complaint resolution activities undertaken on my behalf. I understand that my failure to cooperate with OCR's investigation may result in the closure of my complaint.

A.  I **give** OCR my consent to reveal my identity (and/or that of my minor child/ward on whose behalf the complaint is filed) to the institution alleged to have discriminated, as well as other persons and entities, if OCR, in the course of its investigation or for enforcement activities, finds it necessary to do so.

_____          _____
Signature                                          Date

OR

B.  I **do not** give OCR my consent to reveal my identity (and/or that of my minor child/ward on whose behalf the complaint is filed). I understand that OCR may have to close this complaint if OCR is unable to proceed with an investigation without releasing my identity (and/or that of my minor child/ward on whose behalf the complaint is filed).

_____          _____
Signature                                          Date

C.  Alternatively, if you are not filing this complaint on your own behalf or on behalf of your own minor child/ward, you are responsible for obtaining written consent from the person on whose behalf the complaint is filed or, if he or she is a minor, that person's parent/guardian.

I have read this document, and I agree with the person who filed this complaint. I wish you to proceed with OCR's investigation and resolution process. I give my consent for OCR to reveal my identity (and/or that of my minor child/ward on whose behalf the complaint is filed) to other persons to the extent necessary for the purpose of resolution or investigation of this complaint.

Name (print or type): [(b)(6); (b)(7)(C)]  [(b)(6); (b)(7)(C)]

[(b)(6); (b)(7)(C)]                    *04/03/14*
                                                   Date

[(b)(6);] (he goes by [(b)(6);] is currently a sophomore at George Fox University. He is a transgender male, or an FTM (Female to Male).

Transitioning can be an extensive process. In [(b)(6);] case, he has already taken many steps. To begin, he legally changed his name to [(b)(6);] through the court system. Additionally, he started gender therapy over a year ago. After being in therapy for several months, he received a letter from his doctor granting him the ability to start testosterone, which he has been taking for over a year. In addition, [(b)(6);] presents as a male and only goes by male pronouns such as he, his, him etc.

Moreover, on March 20, 2014, [(b)(6);] started the process necessary to complete his legal gender change. This included filling out the forms, obtaining a letter from his doctor, signing in front of a notary, and posting his legal gender change request in public at the Multnomah County Courthouse. In the next week, [(b)(6);] will appear before a judge, at which time the judge will issue a court order affirming his gender change. After this, he will quickly change his name and sex/gender marker on his Oregon Driver's license and with the Social Security Administration. All of these steps will be complete well before the start of the next school year.

On December 26, 2013, [(b)(6);] emailed [(b)(6); (b)(7)(C)] Associate Dean of Students, to tell him that he was going to live with other males for the next academic year. At the time, [(b)(6);] didn't think that the university would have a problem with him living on campus with other men. He asked [(b)(6); (b)(7)(C)] if he needed to start thinking about changing his gender markers on his documents before the housing selection process began or whether he could live with other men without needing to make those changes. On January 11, 2014, [(b)(6); (b)(7)(C)] responded that he had a number of thoughts but nothing coherent yet, remarking that keeping [(b)(6);] with his current roommates would work because he was physiologically female at the time.

On January 15, 2014, [(b)(6);] met with [(b)(6); (b)(7)(C)] and told him that he wanted to live with other males and asked what he would need to do to make that happen. [(b)(6); (b)(7)(C)] did not make a decision at this time. He mentioned that [(b)(6); (b)(7)(C)] Dean of Community Life, was in the process of putting together a policy related to GFU transgender students and housing and that he would get back to [(b)(7)/C] about his situation. However, [(b)(6); (b)(7)(C)] did not follow up with [(b)(6);] so [(b)(6);] took it upon himself to contact him again. On January 23, 2014, [(b)(6);] emailed [(b)(6); (b)(7)(C)] to inform him that he was going to move forward with his gender marker change so that it could be done by housing selection time. [(b)(6);] also told him that he spoke with his future roommates and that they were all comfortable living with him.

On February 4, 2014, [(b)(6); (b)(7)(C)] emailed [(b)(6);] to say that the GFU transgender housing policy was not complete and that he wanted to meet with [(b)(6);] and [(b)(6); (b)(7)(C)] to discuss his situation. The meeting, originally set for February 7, 2014, was cancelled due to weather, and was rescheduled for February 12, 2014. [(b)(6); (b)(7)(C)] was unable to make the new date, so [(b)(6);] only met with [(b)(6); (b)(7)(C)] at that time.

On February 12, 2014, [(b)(6);] with [(b)(6); (b)(7)(C)] and [(b)(6); (b)(7)(C)] told [(b)(6);] that his initial decision was that [(b)(6);] would have to live with female students next year. In response, [(b)(6);] told [(b)(6); (b)(7)(C)] his story and explained that he wanted to live with other males. [(b)(6); (b)(7)(C)] told him that he would present [(b)(6);] request to [(b)(6); (b)(7)] Vice President for Student Life, and four

members of the Board of Trustees. Then, on February 14, [(b)(6); (b)(7)(C)] met with [(b)(6)] and [(b)(6);] mother. They shared their stories and both asked that [(b)(6);] be able to live with his male friends during the next academic year.

On February 18, 2014, [(b)(6);] mother sent [(b)(6); (b)] an email stating in part, "I am a parent with serious concerns regarding the mental health and well being of my son…. I understand that [(b)(6);] lives as a male and is asking Campus Housing to be allowed to live with other males…..Conditions such as transgender are not a choice…[A]s a concerned parent I am asking, on [(b)(6); (b)] behalf, that serious consideration be given, at this time, to addressing [(b)(6); (b)] situation on an individual, case by case, basis related to his overall mental health and well being needs."

On February 18, [(b)(6); (b)] acknowledged [(b)(6);] mother's email and indicated that he would communicate her concerns to the Board of Trustees committee that was considering a transgender housing policy for GFU.

According to [(b)(6); (b)(7)(C)] the GFU Board of Trustees met on February 20 and decided that more conversation was needed before they could implement a policy of housing students by their biological birth sex.

On February 24, 2014, [(b)(6); (b)(7)(C)] sent [(b)(6);] a letter informing him of the university's decision with respect to his housing. [(b)(6); (b)(7)(C)] informed [(b)(6);] that he decided to "conditionally approve" [(b)(6); (b)(7)(C)] request but only to live *off-campus* with male students for the 2014-2015 school year. He made clear, however, that this arrangement "may only be off-campus and is only a one-year exception; and it may change depending on the Board's development of a policy."

[(b)(6); (b)(7)(C)] also stated that [(b)(6);] could live on-campus in a single room, which he subsequently said he is holding for [(b)(6);] should he choose this "option." However, as even [(b) (6);] [(b)(6); (b)] acknowledged in his letter, [(b)(6);] and [(b)(6); (b)(7)(C)] "agreed that this was not a good option," because of [(b)(6);] mental health and related concerns. For [(b)(6);] it is actually not an option at all, as it would harm him psychologically and socially and make it impossible for him to receive a safe and quality educational experience at George Fox.

Additionally, even to live off-campus with other male students, [(b)(6); (b)(7)(C)] informed [(b)(6);] that he would need to take the following steps:

1. Legally change his name and gender, and provide copies of the following to [(b) (6); ] [(b)(6); (b)] by June 1, 2014:
   - Driver's License
   - Birth Certificate
   - Social Security Card
2. The male students he would live with must meet the criteria and be approved to live off-campus in 2014-15.
3. [(b)(6); (b)(7)(C)] would need to meet with [(b)(6);] roommates and affirm that they understand his story, are willing to live with him and that they have informed their parents about this living arrangement.

4.  They would need to abide by all GFU lifestyle standards and policies.

The only item that [(b)(6), (b)(7)(C)] indicated he would reconsider is whether June 1, 2014 was a realistic timeframe in which [(b)(6);] could accomplish everything required by #1 above. [(b)(6);] met with [(b)(6); (b)(7)(C)] regarding this letter on February 25, 2014.

After a couple weeks, [(b)(6); (b)(7)] asked me to represent him in relation to his housing situation.

On March 18, I asked [(b)(6); (b)(7)(C)] if there was an internal grievance procedure, appeal or due process hearing [(b)(6); (b)(7)(C)] could utilize to contest the university's February 24, 2014 decision. On March 20, [(b)(6); (b)(7)(C)] responded to me discussing the history of the situation and informing me that [(b)(6);] would be able to appeal his decision but that he could only do so in writing by 5:00 p.m. on Thursday, March 27.

Through correspondence with me and meetings with [(b)(6); (b)(7)] and [(b)(6);] mother, [(b)(6), (b)] eventually removed two requirements for the off-campus option, namely, the requirement that [(b)(6);] essentially "out" himself to his roommates' parents and the requirement that he change his birth certificate (since [(b)(6);] was born in one of the few states where this is currently impossible to do).

On March 27, [(b)(6); (b)(7)] appealed the denial of his on-campus housing request to President Baker. On April 3, President Baker denied his appeal.

EXHIBIT T                                                                                     10



UNITED STATES DEPARTMENT OF EDUCATION
OFFICE FOR CIVIL RIGHTS

915 2ND AVE., SUITE 3310
SEATTLE, WA 98174-1099

July 1, 2014

REGION X
ALASKA
AMERICAN SAMOA
GUAM
HAWAII
IDAHO
MONTANA
NEVADA
NORTHERN MARIANA
 ISLANDS
OREGON
WASHINGTON

Mr. (b)  (b)(6); (b)(7C)
Davis, Wright, Tremaine, LLP
1300 SW Fifth Avenue, Suite 2400
Portland, Oregon 97201

Re:    George Fox University
       OCR Reference No. 10142152

Dear Mr. (b)(6); (b)(7C)

The U.S. Department of Education, Office for Civil Rights (OCR) has completed its
evaluation of your discrimination complaint against George Fox University (university),
which was received on April 4, 2014. In your complaint, you alleged that the university
discriminated against a student based on sex, by denying the student's request to live with
other male students on campus.

OCR has the authority to enforce title IX of the Education Amendments of 1972.
Title IX prohibits discrimination in programs and activities receiving federal financial
assistance from the U.S. Department of Education. The university receives federal
financial assistance from this Department. OCR's case processing guidelines provide
that OCR will close a complaint where the complaint allegations are foreclosed by
previous decisions of the U.S. Secretary of Education, or the U.S. Department of
Education's Civil Rights Reviewing Authority, or where the complaint allegations
are foreclosed by OCR policy determinations.

Prior to the filing of your complaint, the university requested that the Assistant Secretary
grant the university a religious exemption from Title IX, pursuant to the Title IX
regulation at 34 CFR §106.12. The Assistant Secretary has granted that exemption as it
applies to housing (34 CFR §106.32), comparable facilities such as restrooms and locker
rooms (34 CFR §106.33), and athletics (34 CFR §106.41). A copy of the letter granting
the exemption is enclosed.

Based on the issuance of the letter of exemption granted by the Assistant Secretary, OCR
is administratively closing your complaint and will take no further action regarding the
complaint.

This letter sets forth OCR's determination in an individual OCR case. This letter is not
a formal statement of OCR policy and should not be relied upon, cited, or construed as

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness
by fostering educational excellence and ensuring equal access.*

EXHIBIT T                                                                                    11
www.ed.gov

Page 2 – OCR Reference No. 10142152

such. OCR's formal policy statements are approved by a duly authorized OCR official and made available to the public.

Thank you for bringing this matter to our attention. If you have any questions, please contact Timothy Sell, Senior Attorney, by telephone at (206) 607-1639, or by e-mail at timothy.sell@ed.gov.

Sincerely,



Monique M. Malson
Program Manager

Enclosure



UNITED STATES DEPARTMANT OF EDUCATION

OFFICE FOR CIVIL RIGHTS

THE ASSISTANT SECRETARY

May 23, 2014

Dr. Robin Baker
President
George Fox University
414 N. Meridian St.
Newberg, Oregon   97132

Dear Dr. Baker:

The purpose of this letter is to respond to your March 31, 2014, letter to the U.S.
Department of Education, Office for Civil Rights (OCR), in which you requested a
religious exemption for George Fox University (University) of Newberg, Oregon
from Title IX of the Education Amendments of 1972 (Title IX), 20 U.S.C. § 1681.
Title IX prohibits discrimination on the basis of sex in any education program or
activity operated by a recipient of Federal financial assistance.

The implementing regulation at 34 C.F.R. § 106.12 provides that Title IX does not
apply to educational institutions controlled by religious organizations to the extent that
application of Title IX would be inconsistent with the institution's religious tenets.
Therefore, such educational institutions are allowed to request an exemption from
Title IX by identifying the provisions of Title IX that conflict with a specific tenet of
the religious organization.  The request must identify the religious organization that
controls the educational institution and specify the tenets of that organization and the
provisions of the law and/or regulation that conflict with those tenets.

Your request explained that the University, which is owned by the Northwest Yearly
Meeting of Friends (part of the Quaker movement), is "a Christ-centered community"
that is "committed to providing a Christian education."  You note that four of the
University's seven Board of Trustees members must be Friends.  You state that the
University's biblical belief is that human beings are created male and female, and that the
University "cannot in good conscience support or encourage an individual to live in
conflict with biblical principles."

Your exemption request points to a recent OCR resolution agreement in which a school
district agreed to allow a transgender male student to use the restroom, locker room, and
living facilities consistent with the student's gender identity, and to play on boys' athletic
teams.  You explain that the University "would not be able to make similar
accommodations consistent with [your] religious beliefs."  You further state that, for
these reasons, the University is requesting an exemption from Title IX and its

400 MARYLAND AVE. S.W., WASHINGTON, DC 20202-1100
www.ed.gov

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness
by fostering educational excellence and ensuring equal access.*

Dr. Robin Baker, George Fox University
May 23, 2014
Page 2 of 2

implementing regulation to the extent that they prohibit discrimination based on gender identity. We interpret this statement as a request for exemption from provisions 34 C.F.R. §§ 106.32 (governing housing), 106.33 (governing comparable facilities such as restrooms and locker rooms), and 106.41 (governing athletics). The University is exempt from these provisions to the extent that they require a recipient to treat students consistent with their gender identity, but doing so would conflict with the controlling organization's religious tenets.

Please note that this letter should not be construed to grant exemption from the requirements of Title IX and the regulation other than as stated above. In the event that OCR receives a complaint against your institution, we are obligated to determine initially whether the allegations fall within the exemption here granted. Also, in the unlikely event that a complainant alleges that the practices followed by the institution are not based on the religious tenets of the controlling organization, OCR is obligated to contact the controlling organization to verify those tenets. If the organization provides an interpretation of tenets that has a different practical impact than that described by the institution, or if the organization denies that it controls the institution, this exemption will be rescinded.

I hope this letter responds fully to your request. If you have any questions, please do not hesitate to contact me.

Sincerely,

(b)(6), (b)(7)(C)

Catherine E. Lhamon
Assistant Secretary for Civil Rights
Office for Civil Rights
U.S. Department of Education

**From:**          (b)(6); (b)(7   (b)(
**Sent:**          29 Aug 2014 23:39:54 +0000
**To:**            OCR Seattle
**Cc:**            Jackson, Gary;Sell, Timothy; (b)(6); (b)(7(C)
**Subject:**       Title IX Sex/Gender Identity Discrimination Complaint Against George Fox
University (Newberg, OR)
**Attachments:**   (b)   OCR Complaint August 29, 2014.pdf

To Whom It Concerns:

Attached is a Title IX discrimination complaint I'm filing on behalf of (b)(6);   (b)(6); (b)   (b)(6); (b)(7(C)   He
has signed the complaint and the consent form. I'm (b)(6);   attorney and you can contact (b)   through
me. This complaint specifically alleges that George Fox University's denial of safe and appropriate on-
campus housing is not based on the religious tenets of a controlling religious organization.

Thank you,

(b)(

(b)(6)  (b)(6);  (b)(7(  | Davis Wright TremaineLLP
1300 SW Fifth Avenue, Suite 2400 | Portland, OR 97201
Tel: (503) 778-5266 | Fax: (503) 276-5766
Email: (b)(6); (b)(7(C)          | Website: www.dwt.com

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Shanghai | Washington, D.C.



**United States Department of Education**
**Office for Civil Rights**

### DISCRIMINATION COMPLAINT FORM

You do not have to use this form to file a complaint with the U.S. Department of Education's Office for Civil Rights (OCR). You may send OCR a letter or e-mail instead of this form, but the letter or e-mail must include the information in items one through nine and item fourteen of this form. If you decide to use this form, please type or print all information and use additional pages if more space is needed. An on-line version of this form, which can be submitted electronically, can be found at: http://www.ed.gov/about/offices/list/ocr/complaintintro.html.

Before completing this form please read all information contained in the enclosed packet including: Information About OCR's Complaint Resolution Procedures, Notice of Uses of Personal Information and the Consent Form.

1.  Name of person filing this complaint:
Last (b)(6); (b)(7(C)     First (b)(6); (b)(7( Southwick   Middle Name:_____

Address: 1300 SW Fifth Ave., Suite 2400

City: Portland           State: OR    Zip Code: 97201

Home Telephone:_____  Work Telephone: 503-778-5266

E-mail Address: (b)(6); (b)(7(C)

2.  Name of person discriminated against (if **other** than person filing). If the person discriminated against is age 18 or older, we will need that person's signature on this complaint form and the consent/release form before we can proceed with this complaint. If the person is a minor, and you do not have the legal authority to file a complaint on the student's behalf, the signature of the child's parent or legal guardian is required.
Last (b)(6); (b)(7(C)     First (b)(6); (b)(7(C)   Middle Name:_____

Address: George Fox University

City: Newberg           State: OR    Zip Code: 97132

Home Telephone: (b)(6); (b)(7(C)   Work Telephone:_____

E-mail Address: _____

*Our Mission is to ensure equal access to education and to promote educational excellence throughout the Nation.*

Page 2 of 12 – U.S. Department of Education, Office for Civil Rights  Discrimination
Complaint Form, Consent Form, and Complaint Processing Procedures

3.    OCR investigates discrimination complaints against Institutions and agencies which
      receive funds from the U.S. Department of Education and against public educational
      entities and libraries that are subject to the provisions of Title II of the Americans
      with Disabilities Act.  Please identify the institution or agency that engaged in the
      alleged discrimination.  If we cannot accept your complaint, we will attempt to refer
      it to the appropriate agency and will notify you of that fact.

Name of Institution: George Fox University

Address: 414 N. Meridian St.

City: Newberg                         State: OR         Zip Code: 97132

Department/School: Student Life/Residence Life

4.    The regulations OCR enforces prohibit discrimination on the basis of race, color,
      national origin, sex, disability, age or retaliation.  Please indicate the basis of your
      complaint:

☐     Discrimination based on race (specify)

_____

_____

☐     Discrimination based on color (specify)

_____

_____

☐     Discrimination based on national origin (specify)

_____

_____

☑     Discrimination based on sex (specify)

Discrimination based on sex, gender, gender identity and
transgender status in violation of Title IX. George Fox University's
discriminatory practices are not based on the religious tenets of a
controlling religious organization.

_____

Page 3 of 12 – U.S. Department of Education, Office for Civil Rights  Discrimination
Complaint Form, Consent Form, and Complaint Processing Procedures

☐    Discrimination **based on disability (specify)**

_____

_____

☐    Discrimination based on age (specify)

_____

_____

☐    **Retaliation because you filed a complaint or asserted your rights (specify)**

_____

_____

☐    **Violation of the Boy Scouts of America Equal Access Act (specify)**

_____

_____

_____

5.    Please describe each alleged discriminatory act.  For each action, please include the
date(s) the discriminatory act occurred, the name(s) of each person(s) involved and,
why you believe the discrimination was because of race, disability, age, sex, etc. Also
please provide the names of any person(s) who was present and witnessed the
act(s) of discrimination.
See attached statement.

_____

_____

_____

_____

_____

EXHIBIT T

Page 4 of 12 – U.S. Department of Education, Office for Civil Rights  Discrimination
Complaint Form, Consent Form, and Complaint Processing Procedures

6.    What is the most **recent date** you were discriminated against?

**Date:** August 28, 2014.

7.    If this date is **more than 180 days ago**, you may request a waiver of the filing
      requirement.

      ☐    I am requesting a waiver of the 180-day time frame for filing this complaint.
           Please explain why you waited until now to file your complaint.

8.    Have you attempted to resolve these allegations with the institution through an
      internal grievance procedure, appeal or due process hearing?

      ◉ YES        ◯ NO

      If you answered **yes**, please describe the allegations in your grievance or hearing,
      identify the date you filed it, and tell us the status.  If possible, please provide us
      with a copy of your grievance or appeal or due process request and, if completed,
      the decision in the matter.

Housing discrimination in violation of Title IX. The university
denied (b)(6);  request to live with other male students on
campus. He participated in multiple meetings with university
administrators from January through March 2014. Final appeal to
university president on March 27. Appeal denied on April 3.

9.    If the allegations contained in this complaint have been filed with any other Federal,
      state or local civil rights agency, or any Federal or state court, please give details and
      dates.  We will determine whether it is appropriate to investigate your complaint
      based upon the specific allegations of your complaint and the actions taken by the
      other agency or court.

**Agency or Court:** _____

**Date Filed:** _____

**Case Number or Reference:** _____

**Results of Investigation/Findings by Agency or Court:**

Page 5 of 12 – U.S. Department of Education, Office for Civil Rights  Discrimination
Complaint Form, Consent Form, and Complaint Processing Procedures

10.    If we cannot reach you at your home or work, we would like to have the name and
       telephone number of another person (relative or friend) who knows where and
       when we can reach you.  This information **is not required**, but it will be helpful to
       us.

Last Name:_____ First Name:_____ Middle Name:_____

Home Telephone_____ Work Telephone:_____

11.    What would you like the institution to do as a result of your complaint — what
       remedy are you seeking?

Allow (b)(6); to live in an on-campus house, apartment or suite
with other male students who have agreed to live with him.
Revise its housing policies for transgender students. Stop
revealing private medical information about (b)(6);

_____

_____

12.    We cannot accept your complaint if it has not been signed.  Please sign and date
       your complaint below.

(b)(6), (b)(7)(C)

8/29/14
_____
(Date)

8/29/14
_____
(Date)

(b)(6), (b)(7)(C)

Please mail the completed and signed Discrimination Complaint Form, your signed consent
form and copies of any written material or other documents you believe will help OCR
understand your complaint to the OCR Enforcement Office responsible for the state where
the institution or entity about which you are complaining is located.  You can locate the
mailing information for the correct enforcement office on OCR's website at
http://wdcrobcolp01.ed.gov/CFAPPS/OCR/contactus.cfm.

## CONSENT FORM - FOR REVEALING NAME AND PERSONAL INFORMATION TO OTHERS
(Please print or type except for signature line)

**Your Name:** [(b)(6); (b)(7)(C)] [(b)(6); (b)(7)(C)]

**Name of School or Other Institution That You Have Filed This Complaint Against:** _____

# George Fox University

- This form asks whether the Office for Civil Rights (OCR) may share your name and other personal information when OCR decides that doing so will assist in investigating and resolving your complaint.

- For example, to decide whether a school discriminated against a person, OCR often needs to reveal that person's name and other personal information to employees at that school to verify facts or get additional information. When OCR does that, OCR informs the employees that all forms of retaliation against that person and other individuals associated with the person are prohibited. OCR may also reveal the person's name and personal information during interviews with witnesses and consultations with experts.

- If OCR is not allowed to reveal your name or personal information as described above, OCR may decide to close your complaint if OCR determines it is necessary to disclose your name or personal information in order to resolve whether the school discriminated against you.

  NOTE: If you file a complaint with OCR, OCR can release certain information about your complaint to the press or general public, including the name of the school or institution; the date your complaint was filed; the type of discrimination included in your complaint; the date your complaint was resolved, dismissed or closed; the basic reasons for OCR's decision; or other related information. Any information OCR releases to the press or general public will not include your name or the name of the person on whose behalf you filed the complaint.

  NOTE: OCR requires you to respond to its requests for information. Failure to cooperate with OCR's investigation and resolution activities could result in the closure of your complaint.

### Please sign section A or section B (but not both) and return to OCR:
- If you filed the complaint on behalf of yourself, you should sign this form.
- If you filed the complaint on behalf of another specific person, that other person should sign this form.

  EXCEPTION: If the complaint was filed on behalf of a specific person who is younger than 18 years old or a legally incompetent adult, this form must be signed by the parent or legal guardian of that person.

- If you filed the complaint on behalf of a class of people, rather than any specific person, you should sign the form.

A. **I give OCR my consent to reveal my identity (and that of my minor child/ward on whose behalf the complaint is filed) to others to further OCR's investigation and enforcement activities.**

[(b)(6); (b)(7)(C)]

**8/29/14**
Date

**OR**

B. **I do not give OCR my consent to reveal my identity (and that of my minor child/ward on whose behalf the complaint is filed) to others. I understand that OCR may have to close my complaint.**

_____                    _____
Signature                                  Date

I declare under penalty of perjury that it is true and correct that I am the person named above; and, if the complaint is filed on behalf of a minor child/ward, that I am that person's parent or legal guardian. This declaration only applies to the identity of the persons and does not extend to any of the claims filed in the complaint.

*Updated April 2014*

EXHIBIT T                                                                    21

**The Northwest Yearly Meeting of Friends Church ("NWYMFC") Does Not Own or Control George Fox University**

In George Fox University's ("GFU") March 31, 2014 request for a religious exemption from the requirements of Title IX as applied to [(b)(6), (b)] housing needs, President Baker stated that "the University is owned by the Northwest Yearly Meeting of Friends (in fact, 4/7 of the Board of Trustees must be Friends)." See Exhibit A. President Baker's assertions appear to be inaccurate. To begin, NWYMFC does not appear to own GFU. NWYMFC describes GFU as a "related organization" that is "accountable to" NWYMFC but does not describe itself as the owner of GFU. Additionally, in GFU's "Year Seven Self-Evaluation Report" prepared for the Northwest Commission on Colleges and Universities on March 3, 2014, and submitted by President Baker as part of GFU's accreditation process, GFU states in a section regarding its governing board that "George Fox University is an <u>independent</u> university founded in 1891 by what has become Northwest Yearly Meeting of Friends Church. A 42-member board governs the university." See Exhibit B (emphasis added). Moreover, GFU continues to file with the Oregon Secretary of State as a "Public Benefit" nonprofit corporation, rather than as a religious nonprofit. See Exhibit C. Additionally, GFU's current bylaws do not mention the university having an owner, member, shareholder or other controlling entity. See Exhibit D (last accessed through the GFU website on 8/29/14). These statements and facts are inconsistent with President Baker's claim that NWYMFC owns GFU.

Moreover, President Baker's statement that "4/7 of the Board of Trustees must be Friends" is misleading. According to GFU's current bylaws, "at least four-sevenths of the members of the Board shall be members in good standing of the <u>Friends Church</u> and of these, at least two-thirds shall be members of <u>NWYMFC</u>." See Exhibit D, Art. IV, Section 1.a (emphasis added). Consequently, only a minority of the board, two-thirds of four-sevenths, are required to be members of the alleged controlling organization, NWYMFC. The other Friends required to be on the board can come from Friends churches outside of the denomination, meaning from churches operating under different theologies and governance structures and unaffiliated with NWYMFC. And a full 3/7 do not need to have an affiliation with any Friends church or denomination whatsoever. Consequently, only eight (8) of every twenty-one (21) GFU board members are required to be NWYMFC. This fraction constitutes a clear minority of the board.[2]

In light of the fact that GFU describes itself to its accrediting body as an "independent university," files with the State of Oregon as a "public benefit" nonprofit, and operates under bylaws that do not mention ownership by any other entity and that merely require a minority of the board to be affiliated with NWYMFC, the Department of Education should investigate GFU's claim of ownership and control by NWYMFC.

---

[1] [(b)(6)] is his legal name but he goes by [(b)]
[2] Additionally, while NWYMFC must approve all GFU board members, thirteen out of fourteen board members elected at the annual meeting are nominated by the GFU Board of Trustees and the GFU Alumni Association (the other board member is nominated by the George Fox Evangelical Seminary Board of Regents). See Exhibit D, Art. IV, Section 2.a. Through this nominations process, GFU maintains control over its board and can accurately describe itself as an independent, rather than sectarian, institution, and as a public benefit nonprofit, rather than a religious corporation.

1

**GFU's Discriminatory Actions Toward [(b)(6);] Are Not Based on the Religious Tenets of NWYMFC**

NWYMFC has no religious tenet, position or policy regarding transgender people or transitioning one's sex or gender. Indeed, GFU's March 31, 2014 request for a religious exemption from Title IX does not reference a single religious tenet, policy or position of NWYMFC, let alone a religious tenet relating to transgender people. Indeed, as stated by two senior pastors in the NWYMFC denomination, [(b)(6); (b)(7(C)] Pastor at Camas Friends Church, and [(b)(6); (b)(7(C)] Pastor at West Hills Friends Church, there is no basis in NWYMFC's religious tenets for GFU's actions. As the pastors stated in a joint press release to numerous media outlets following [(b)(6);] denial of safe and appropriate on-campus housing:

> As pastors in NW Yearly Meeting, we urge George Fox University to provide safe housing for [(b)(6), (b)(7(C)] It is our understanding that our 'Faith and Practice' provides no theological grounds whatsoever for excluding transgender students from housing consistent with their gender identity. As Quakers, the biblical teaching that men and women are created in the image of God convicts us that '… all persons have equal value and are created in the image of God' (Vision, Mission and Values: 1). The theological framework of our Faith & Practice affirms the inherent dignity of all people, regardless of their gender identity:

> *We witness to the dignity and worth of all persons before God. We repudiate and seek to remove discrimination based on gender, race, nationality, or class. We deplore the use of selfish ends to gain unfair advantage, and we urge political, economic, and social justice for all peoples. We consider civil order most just when conscience is free and religious faith uncoerced* (Faith Expressed through Witness: 11).

> The same Faith & Practice urges us to consider: *Do you speak out for justice and morality, and against oppression, exploitation, and public wrong? Do you recognize the equality of persons regardless of race, gender, or economic status* (The Queries #18: 13)?

> Based upon these theological convictions, we ask George Fox University to honor the housing requests of its transgender students. Let us follow the example of Jesus Christ, and extend hospitality to those who might otherwise be unsafe and unwelcome in our communities.

In light of GFU's complete failure to point to any NWYMFC religious tenet regarding transgender people, and in light of these strong statements by NWYMFC senior pastors, and in light of the fact that nothing to the contrary has been reported or stated by NWYMFC itself, it is clear that GFU's decision to deny [(b)(6);] safe and appropriate on-campus housing is not based on compliance with the religious tenets of NWYMFC. Consequently, the religious exemption

2

granted to GFU should be rescinded and GFU should be required to comply with Title IX regarding [(b)(6).] housing needs.[3]

Moreover, while GFU's justifications for its decision to deny safe and appropriate on-campus housing to [(b)(6).] have changed over time, they have never been based on explicit, or even implicit, references to the religious tenets of the NWYMFC. When GFU originally refused to allow [(b)(6).] to live with his male friends on campus in February 2014, [(b)(6), (b)(7)(C)] said that the university was considering adding a statement to the student housing policy that would house students based on "biological birth sex," but that "after a lengthy conversation with the Board of Trustees," *not with NWYMFC*, "it was decided that the housing policy needs more time to be developed[.]" [(b)(6), (b)(7)(C)] made no reference to any religious tenet of NWYMFC.

Now, rather than pursuing a policy based on "biological birth sex," the university has embraced a housing policy for students based on "anatomy." See http://www.georgefox.edu/transgender/ The new policy based on anatomy allows a post-surgery transgender person to be housed in safe and appropriate on-campus housing, but does not allow a pre-surgery transgender person to be housed in safe and appropriate on-campus housing.[4] GFU does not point to a religious tenet of NWYMFC justifying, let alone requiring, this position. Moreover, GFU's announcement of its new anatomy-based policy, accessed through the web link above, and the accompanying discussion of [(b)(6).] and his housing situation, does not make a single reference to NWYMFC or any religious tenet concerning gender identity or transgender people.

In fact, GFU's religious exemption request appears largely based on opposition to homosexuality. [(b)(6).] however, is not contesting GFU or NWYMFC's religious tenets or positions with respect to homosexuality, homosexual conduct or same-sex marriage. Sexuality and gender are separate aspects of a person's identity. [(b)(6).] gender is male, his sexuality is heterosexual. [(b)(6).] is attracted to women and is taking testosterone under the supervision of a medical doctor. [(b)(6).] is not trying to live with men for any sexual purpose whatsoever. GFU's opposition to *homosexuality* cannot serve as the basis for an exemption from Title IX's requirements as they relate to *gender identity*.

---

[3] Moreover, GFU's request for a religious exemption appears inconsistent with its own statements to its students and to the institution that accredits the university. In GFU's "Year Seven Self-Evaluation Report" prepared for the Northwest Commission on Colleges and Universities on March 3, 2014, GFU states under its "Non-Discrimination" section that "We respect the dignity of each person and operate in a non-discriminatory way. Our student handbook includes an 'anti-discrimination policy. The policy states: Discrimination or harassment due to race, color, sex, sexual orientation, marital status, religion, creed, age, national origin, citizenship status, worker's compensation status, physical or mental disability, veteran status, or any other status protected under applicable local, state, or federal law; or any other distinguishing characteristic protected by non-discrimination law, is prohibited." Exhibit B (emphasis added). GFU's non-discrimination statement is not accompanied by any limiting clause stating, for example, "except to the extent required to comply with the religious tenets of NWYMFC." Consequently, there appears to be no basis, in NWYMFC's religious tenets or otherwise, for GFU's departure from its non-discrimination commitments.

[4] GFU does not state what constitutes "surgery" and whether its policy requires both top and bottom surgery. Additionally, the policy appears to only apply to GFU's dorms, not to its on-campus apartments, houses and suites. [(b)(6).] however, was denied access to all on-campus housing with his male friends, including apartments, houses and suites. The only on-campus housing option GFU offered [(b)] was a single room where [(b)] would be required to live by himself.

EXHIBIT T                                                                                          24

In Catherine Lhamon's May 23, 2014 letter to President Baker granting GFU a limited religious exemption to Title IX, Ms. Lhamon states that if "a complainant alleges that the practices followed by the institution are not based on the religious tenets of the controlling organization, OCR is obligated to contact the controlling organization to verify those tenets. If the organization provides an interpretation of tenets that has a different practical impact than that described by the institution, or if the organization denies that it controls the institution, this exemption will be rescinded."

(b)(6); alleges that GFU's practices are not based on NWYMFC's religious tenets and requests that OCR contact NWYMFC, the alleged controlling organization, to determine whether it controls GFU, and if it does, whether it has religious tenets that require denying (b)(6); request to live with other male friends on campus in a house, apartment or suite.

**The Facts Surrounding GFU's Denial of Safe and Appropriate On-Campus Housing to (b)(6); Demonstrate Discrimination Based on Sex, Gender Identity and Transgender Status in Violation of Title IX**

(b)(6); is starting his junior year at George Fox University. He is a transgender male, or an FTM (Female to Male).

Transitioning can be an extensive process. In (b)(6); case, he has already taken many steps. To begin, he legally changed his name to (b)(6); (b)(7)(C) through the court system. Additionally, he started gender therapy over a year ago. After being in therapy for several months, he received a letter from his doctor granting him the ability to start testosterone, which he has been taking for over a year. In addition, (b)(6); presents as a male and only goes by male pronouns such as he, his, him etc.

Moreover, on March 20, 2014, (b)(6); started the process necessary to complete his legal gender change. This included filling out the forms, obtaining a letter from his doctor, signing in front of a notary, and posting his legal gender change request in public at the Multnomah County Courthouse. (b)(6); then appeared before a judge, who, on April 11, 2014, issued a court order affirming his gender change. See Exhibit E. (b)(6); has also changed his name and sex/gender marker on his Oregon Driver's license and with the Social Security Administration.

On December 26, 2013, while (b)(6); was a sophomore, (b)(6); emailed (b)(6); (b)(7)(C) Associate Dean of Students, to tell him that he was going to live with other males for the next academic year. At the time, (b)(6); did not think that the university would have a problem with him living on campus with other men. He asked (b)(6); (b)(7)(C) if he needed to start thinking about changing his gender markers on his documents before the housing selection process began or whether he could live with other men without needing to make those changes. On January 11, 2014, (b)(6); (b)(7)(C) responded that he had a number of thoughts but nothing coherent yet, remarking that keeping (b)(6); with his current roommates would work because he was physiologically female at the time.

On January 15, 2014, (b)(6); met with (b)(6); (b)(7)(C) and told him that he wanted to live with other males and asked what he would need to do to make that happen. (b)(6); (b)(7)(C) did not make a decision at this time. He mentioned that (b)(6); (b)(7)(C) Dean of Community Life,

4

was in the process of putting together a policy related to GFU transgender students and housing and that he would get back to [(b)(6);] about his situation. However, [(b)(6); (b)(7)(C)] did not follow up with [(b)(6);] so [(b)(6);] took it upon himself to contact him again. On January 23, 2014, [(b)(6);] emailed [(b)(6); (b)(7)(C)] to inform him that he was going to move forward with his gender marker change so that it could be done by housing selection time. [(b)(6);] also told him that he spoke with his future roommates and that they were all comfortable living with him.

On February 4, 2014, [(b)(6); (b)(7)(C)] emailed [(b)(6);] to say that the GFU transgender housing policy was not complete and that he wanted to meet with [(b)(6);] and [(b)(6); (b)(7)(C)] to discuss his situation. The meeting, originally set for February 7, 2014, was cancelled due to weather, and was rescheduled for February 12, 2014. Mr. [(b)(6); (b)(7(] was unable to make the new date, so [(b)(6);] only met with [(b)(6); (b)(7)(C)] at that time.

On February 12, 2014, [(b)(6);] met with [(b)(6); (b)(7)(C)] and [(b)(6); (b)(7)(C)] told [(b)(6);] that his initial decision was that [(b)(6);] would have to live with female students next year. In response, [(b)(6);] told [(b)(6); (b)(7)(C)] his story and explained why it was so important for him to live with other males. [(b)(6); (b)(7)(C)] told him that he would present [(b)(6);] request to [(b)] [(b)] Vice President for Student Life, and four members of the Board of Trustees. Then, on February 14, [(b)(6); (b)(7)] met with [(b)(6);] and [(b)(6);] mother. They shared their stories and both asked that [(b)(6); (b)(7)] be able to live with his male friends during the next academic year.

On February 18, 2014, [(b)(6);] mother sent [(b)(6); (b)] an email stating in part, "I am a parent with serious concerns regarding the mental health and well being of my son.... I understand that [(b)(6);] lives as a male and is asking Campus Housing to be allowed to live with other males.....Conditions such as transgender are not a choice...[A]s a concerned parent I am asking, on [(b)(6); (b)] behalf, that serious consideration be given, at this time, to addressing [(b)(6); (b)] situation on an individual, case by case, basis related to his overall mental health and well being needs."

On February 18, [(b)(6); (b)(7)(C)] acknowledged [(b)(6);] mother's email and indicated that he would communicate her concerns to the Board of Trustees committee that was considering a transgender housing policy for GFU.

According to [(b)(6); (b)(7)(C)] the GFU Board of Trustees met on February 20 and decided that more conversation was needed before they could implement a policy of housing students by their "biological birth sex." See Exhibit F.

On February 24, 2014, [(b)(6); (b)(7)(C)] sent [(b)(6);] a letter informing him of the university's decision with respect to his housing (Exhibit F). [(b)(6); (b)(7)(C)] informed [(b)(6);] that he decided to "conditionally approve" [(b)(6);] request but only to live *off-campus* with male students for the 2014-2015 school year. He made clear, however, that this arrangement "may only be off-campus and is only a one-year exception; and it may change depending on the Board's development of a policy."

[(b)(6); (b)(7)(C)] also stated that [(b)(6);] could live on-campus in a single room, which he subsequently said he is holding for [(b)(6);] should he choose this "option." However, as even [(b)(6); (b)] acknowledged in his letter, [(b)(6);] and [(b)(6); (b)(7)(C)] "agreed that this was not a good



option," because of [(b)(6);] mental health and related concerns. For [(b)(6);] it is actually not an option at all, as it would harm him psychologically and socially and make it impossible for him to receive a safe and quality educational experience at George Fox.

Additionally, even to live off-campus with other male students, Mr. [(b)(6); (b)] informed [(b)(6);] that he would need to take the following steps:

1. Legally change his name and gender, and provide copies of the following to [(b)(6);] [(b)(6); (b)] by June 1, 2014:
   • Driver's License
   • Birth Certificate
   • Social Security Card
2. The male students he would live with must meet the criteria and be approved to live off-campus in 2014-15.
3. [(b)(6); (b)(7)(C)] would need to meet with [(b)(6);] roommates and affirm that they understand his story, are willing to live with him and that they have informed their parents about this living arrangement.
4. They would need to abide by all GFU lifestyle standards and policies.

The only item that [(b)(6); (b)(7)(C)] indicated he would reconsider is whether June 1, 2014 was a realistic timeframe in which [(b)(6);] could accomplish everything required by #1 above. [(b)(6);] met with [(b)(6); (b)(7)(C)] regarding this letter on February 25, 2014. After a couple weeks, [(b)(6);] asked me to represent him in relation to his housing situation.

[(b)(6); (b)(7)(C)] had also asked [(b)(6);] for the names of his future roommates so that he could ask them what they knew about [(b)(6);] situation and to allow them "to freely tell [(b)(6); (b)(7)(C)] about their desire to live with [(b)(6); (b)] [(b)(6);] sent [(b)(6); (b)(7)(C)] their names the following day. One of the future roommates [(b)(6);] had indicated to [(b)(6); (b)(7)(C)] also contacted [(b)(6); (b)(7)(C)] on March 11 and asked when he could speak with him regarding their housing situation with [(b)(6);] next year. On March 17, without informing [(b)(6);] or me, [(b)(6); (b)(7)(C)] rather than allowing [(b)(6);] future roommates to have a meeting in which they could "freely tell him about their desire to live with [(b)(6); (b)]" told [(b)(6);] future roommate that he should sign up through on-campus housing without [(b)(6);]

On March 18, I asked [(b)(6); (b)(7)(C)] if there was an internal grievance procedure, appeal or due process hearing [(b)(6);] could utilize to contest the university's February 24, 2014 decision. On March 20, [(b)(6); (b)(7)(C)] responded to me discussing the history of the situation and informing me that [(b)(6);] would be able to appeal his decision but that he could only do so in writing by 5:00 p.m. on Thursday, March 27.

Through correspondence with me and meetings with [(b)(6);] and [(b)(6);] mother, [(b)] [(b)(6); (b)] eventually removed two requirements for the off-campus option, namely, the requirement that [(b)(6);] essentially "out" himself to his roommates' parents and the requirement that he change his birth certificate (since [(b)(6);] was born in one of the few states where this is currently impossible to do).

· 6

Prior to the March 20 GFU housing deposit deadline, [(b)(6)] paid his housing deposit. Prior to the March 21 housing deadline, [(b)(6)] secured the agreement of all his future roommates to live with him. One of these roommates made a request to [(b)(6); (b)(7C)] that [(b)(6)] be able to live on-campus with him and the other male students he had previously indicated. [(b)(6); (b)(7C)] denied this request.

On March 27, [(b)(6)] appealed the denial of his on-campus housing request to President Baker. On March 31, President Baker requested a religious exemption from the requirements of Title IX as applied to transgender students. On April 3, President Baker denied [(b)(6)] appeal. On May 23, 2014 the Department of Education granted GFU a limited religious exemption to Title IX as applied to transgender students. On July 1, 2014, OCR closed [(b)(6)] original complaint on the basis of the May 23, 2014 religious exemption.

I have been encouraged by OCR staff to re-file [(b)(6)] complaint as a new complaint rather than as an appeal to the July 1, 2014 closure of his complaint. Consequently, I am filing this as a new complaint with OCR. To the extent OCR needs to consider this an appeal to [(b)(6)] original complaint, it may do so. However, [(b)(6)] and I would prefer OCR to treat this as a new complaint. [(b)(6)] remains enrolled at George Fox University and continues to be excluded from the on-campus housing options available to other male students.

EXHIBIT T                                                                                                28

# Exhibit A



414 N. Meridian St., Newberg, OR 97132
503.538.8383

March 31, 2014

Catherine Lhamon, Assistant Secretary
U.S. Department of Education, Office for Civil Rights
Lyndon Baines Johnson Department of Education Building
400 Maryland Avenue, SW
Washington, DC 20202-1100

Re:    George Fox University's Request for Title IX Religious Exemption

Dear Ms. Lhamon:

I have become aware that the Departments of Education and Justice recently interpreted Title IX's ban on sex discrimination in education to include discrimination based on gender identity.[1] As President of George Fox University, a private, religious liberal arts college in Oregon, I hereby request, under 34 C.F.R. §106.12, an exemption for George Fox from this interpretation of Title IX, due to the religious beliefs of our institution.

George Fox University, a Christ-centered community, prepares students spiritually, academically, and professionally to think with clarity, act with integrity, and serve with passion. Since its founding more than a century ago, George Fox has been committed to providing a Christian education – from its early days as Friends Pacific Academy, established in 1885, to the present. Its name honors the founder of the Friends (Quaker) movement and the University is owned by the Northwest Yearly Meeting of Friends (in fact, 4/7 of the Board of Trustees must be Friends).

In its Statement of Faith, the University expresses its belief that, "[i]n love and joy, God creates and sustains the universe, including humanity, male and female, who are made in God's image."[2] The University believes "that God inspired the Bible and has given it to us as the uniquely authoritative, written guide for Christian living and thinking. As illumined by the Holy Spirit, the Scriptures are true and reliable." These theological beliefs are also embedded in the doctrinal statements of the Northwest Yearly Meeting of Friends.

The University believes that human beings, fashioned by God in His own image, are created male and female (Genesis 1:27). In the New Testament, Jesus confirms the heterosexual creation of human beings: God made them male and female (Matthew 19:4). Like the rest of

---

[1] Resolution Agreement Between the Arcadia Unified School District, the U.S. Department of Education, Office for Civil Rights, and the U.S. Department of Justice, Civil Rights Division, *available at*
http://www.justice.gov/crt/about/edu/documents/arcadiaagree.pdf

[2] George Fox University, *About George Fox- Statement of Faith*,
http://www.georgefox.edu/about/mission_vision_values/faith_statement.html (last visited Mar. 17, 2014).

PRINTED ON 100% POST-CONSUMER RECYCLED PAPER

Letter to Ms. Catherine Lhamon
March 31, 2014
Page 2 of 3


God's creation, the sexual differences between man and woman are pronounced "very good" (Genesis 1:31).

This distinction between men and women is also assumed in our lifestyle statement with regard to issues of sexual morality. The statement says that "in regard to sexual morality, we believe that only marriage between a man and a woman is God's intention for the joyful fulfillment of sexual intimacy. This should always be in the context of mutual compassion, love, and fidelity. Sexual behaviors outside of this context are inconsistent with God's teaching. We recognize these principles may conflict with the practice or opinion of some within the larger culture. We are convinced that this is God's design for providing the most loving guidance and practice for individuals and our community."

We affirm the dignity of all human beings. We also separate the value of each person from the behavioral choices one makes. We believe that, as Christians, we are called to treat all people with compassion, and to extend the gospel of repentance, forgiveness, and transformation through Jesus Christ to such persons without reservation. However, in keeping with our biblical beliefs surrounding the morality of such actions, we cannot in good conscience support or encourage an individual to live in conflict with biblical principles.

Based on the resolution recently entered into by the Department and a California school district,[3] it appears that the Department is now interpreting Title IX's ban on discrimination in education because of sex to also mean that educational institutions may not "discriminate" on the basis of "gender identity." Specifically, the school district in that dispute was ordered to allow a female student presenting herself as male to use the restroom, locker room, and living accommodations of her choice, and to participate in boys' athletic programs.

We would not be able to make similar accommodations consistent with our religious beliefs. Because of our biblical beliefs regarding gender and sexual morality, our practices might be deemed a violation of this interpretation of Title IX. However, under 20 U.S.C. §1681(a)(3) and 34 C.F.R. §106.12(a), this interpretation does not apply to George Fox: "This part does not apply to an educational institution which is controlled by a religious organization to the extent application of this part would not be consistent with the religious tenets of such organization."

Thus, on behalf of George Fox University, I hereby request an official exemption from compliance with that interpretation of Title IX. George Fox gladly complies with Title IX with respect to granting equal opportunities in educational programs or employment to members of both sexes; our request for exemption is limited to the recent interpretation that "sex" under Title IX also includes gender identity.

---

[3] See *supra* note 1.

Letter to Ms. Catherine Lhamon
March 31, 2014
Page 3 of 3

If you require anything further, please do not hesitate to contact me.

(b)(6); (b)(7)(C)

Dr. Robin Baker
President
George Fox University

cc:   (b)(6); (b)(7)(C)

# Exhibit B



# GEORGE FOX
## UNIVERSITY

# Year Seven Self-Evaluation Report

Prepared for:                                    Submitted by:

Northwest Commission on                          Robin Baker, President
Colleges and Universities                        Patrick Allen, Provost
                                                 Associate Provost Debra Drecnik Worden
March 3, 2014



EXHIBIT T

## Table of Contents

Institutional Overview ................................................................................................... 4
  Our history. ........................................................................................................... 4
  George Fox University today ............................................................................... 4
Preface ....................................................................................................................... 6
  Institutional updates. ............................................................................................ 6
    Brief update on institutional changes since the Year Three report. ..................... 6
    Responses to Year Three recommendations. ...................................................... 6
  Standard 1.A: Mission. ........................................................................................... 8
    Definition of mission components. ..................................................................... 8
    Interpretation of mission fulfillment. ................................................................. 9
    Interpretation of an acceptable threshold. ........................................................ 11
  Standard 1.B Core Themes. ................................................................................... 11
    Core theme #1: Excellence in liberal arts foundation ........................................ 12
    Core theme #2: Excellence in professional preparation .................................... 15
    Core theme #3: Christ-centered community ..................................................... 18
    Core theme #4: Local and global engagement ................................................. 22
  Chapter Summary .................................................................................................. 26
Chapter Two: Resources and Capacity ....................................................................... 27
  Standard 2.A governance: 2.A.1 – 2.A.30. ............................................................. 27
    Institutional governance: 2.A.1 – 2.A.3. ............................................................ 27
    Governing board: 2.A.4 – 2.A.8 ......................................................................... 28
    Leadership and management: 2.A.9 – 2.A.11 .................................................... 30
    Policies and procedures: 2.A.12 – 2.A.30. ......................................................... 32
  Standard 2.B Human Resources ............................................................................. 46
  Standard 2.C Education resources: 2.C.1 – 2.C.19 .................................................. 51
    Education resources: 2.C.1 – 2.C.8. ................................................................... 51
    Undergraduate programs: 2.C.9 – 2.C.11. ........................................................ 59
    Graduate programs: 2.C.12 – 2.C.15 ................................................................. 64
    Continuing education and non-credit programs: 2.C.16 – 2.C.19. ...................... 69

Standard 2.D Student Support Resources: 2.D.1 – 2.D.14.................................................... 72

Standard 2.E Library and Information Resources: 2.E.1 – 2.E.4.......................................... 83

Standard 2.F Financial Resources: 2.F.1 – 2.F.8. ............................................................... 85

Standard 2.G Physical and Technological Infrastructure: 2.G.1 – 2.G.8. ........................... 89

    Physical infrastructure: 2.G.1 – 2.G.4. ...................................................................... 89

    Technological infrastructure: 2.G.5 – 2.G.8. .............................................................. 90

Conclusion....................................................................................................................... 93

Chapter Three: Planning and Implementation......................................................................... 97

Standard 3.A Institutional Planning: 3.A.1-3.A.5 ............................................................. 97

Standard 3.B Core Theme Planning: 3.B.1-3.A.3 ............................................................. 101

Chapter Four: Effectiveness and Improvement....................................................................... 103

Standard 4.A  Assessment:  4.A.1 – 4.A.6....................................................................... 103

Standard 4.B  Improvement:  4.B.1 – 4.B.2 .................................................................... 105

Chapter Five:  Mission Fulfillment, Adaptation, and Sustainability ...................................... 107

Standard 5.A  Mission Fulfillment:  5.A.1 – 5.A.2 .......................................................... 107

Standard 5.B  Adaptation and Sustainability:  5.B.1 – 5.B.3.......................................... 108

Appendices ............................................................................................................................ 110

Appendix A:.................................................................................................................... 110

    Executive summary of eligibility requirements 4 through 21. ...................................... 110

Appendix B ..................................................................................................................... 114

    2013-2014 Support Staff and Administrative FTE ........................................................ 114

## List of Tables

Table 1 Primary alignment of mission outcomes.................................................................... 9

Table 2 Key core theme #1 objectives that serve as indicators of mission fulfillment.............. 10

Table 3 Key core theme #2 objectives that serve as indicators of mission fulfillment.............. 10

Table 4 Key core theme #3 objectives that serve as indicators of mission fulfillment.............. 10

Table 5 Key core theme #4 objectives that serve as indicators of mission fulfillment.............. 11

Table 6 Core theme #1: excellence liberal arts foundation...................................................... 12

Table 7 Core theme #2: excellence in professional preparation .............................................. 16

Table 8 Core theme #3: Christ-centered community ............................................................... 19

Table 9 Core theme #4: local and global engagement ............................................................ 22

Table 10 Student satisfaction levels with disability services ................................................... 35

Table 11 GFU athletic team participation 2009-2012.............................................................. 37

Table 12 Faculty evaluation schedule.................................................................................... 50

Table 13 Traditional undergraduate graduates by major: 2006-2011 .......................................... 52
Table 14 Graduate and adult degree program graduates: 2006-2011 ........................................ 53
Table 15 General education program goals and student learning outcomes ............................... 61
Table 16 Alignment of LEAP ELO with essential learning outcome elements & GFU outcomes ............... 63
Table 17 Graduate program information .................................................................................. 65
Table 18 Graduate program performance requirements ............................................................. 67
Table 19: ARC usage data .......................................................................................................... 72
Table 20: ASP cohort persistence rates ..................................................................................... 73
Table 21 ACHA-NCHA survey Serve data .................................................................................... 80

## List of Figures

Figure 1 Student perceptions of the community accountability process ........................................... 34
Figure 2 Attendance for first-year and senior students at campus events/activities ....................... 39
Figure 3 Curriculum approval flowchart ..................................................................................... 56
Figure 4 Student life programs and services ............................................................................... 79
Figure 5 NSSE data: level to which GFU experience enhanced understanding of people of other racial and
ethnic backgrounds ................................................................................................................... 80
Figure 6 Number of students living on campus since 1995 ........................................................... 81
Figure 7 Program status in TracDat (2/27/14) .......................................................................... 104
Figure 8 TracDat Example .......................................................................................................... 107

EXHIBIT T                                                                                    37

# Appendices

Appendix A:

### *Executive summary of eligibility requirements 4 through 21.*

**#4 Operational Focus and Independence:** George Fox University's programs and services are solely concerned with providing students education that leads to post secondary degrees. We offer the following undergraduate and graduate degrees: BA, BS, BSW, BSAT, MA, MAT, MATS, MBA, MDiv, Med, EdS, EdD, DBA, DMin, DMGT and PsyD. The University is structured in ways that allow it to design and deliver undergraduate and graduate education that meet the Commission's standards and eligibility requirements. George Fox was founded as an educational institution and remains so, not operating any other sorts of businesses.

**#5 Non-Discrimination:** George Fox University is a Christ-centered university. Our Quaker heritage and Christian values and commitments are foremost in guiding our decisions and programs. We respect the dignity of each person and operate in a non-discriminatory way. Our student handbook includes an "anti-discrimination" policy. The policy states:

Discrimination or harassment due to race, color, sex, sexual orientation, marital status, religion, creed, age, national origin, citizenship status, workers' compensation status, physical or mental disability, veteran status, or any other status protected under applicable local, state, or federal law; or any other distinguishing characteristic protected by non-discrimination law, is prohibited.

**#6 Institutional Integrity:** George Fox University is a Christ-centered university, and its Christian mission and Quaker heritage guide its interaction with its constituents and with the public. The university operates in an ethical manner consistent with its Christian mission and has policies and procedures in place to protect individual rights.

**#7 Governing Board:** George Fox University is an independent university founded in 1891 by what has become Northwest Yearly Meeting of Friends Church. A 42-member board governs the university. The Board of Trustees is responsible for monitoring the quality and integrity of the institution to ensure that the university's mission and associated core themes are being achieved. The general superintendent of Northwest Yearly Meeting of Friends and the chair of the board of regents of George Fox Evangelical Seminary also serve on the board. The university employs no member of the board, nor has any financial interest.

**#8 Chief Executive Officer:** President Robin Baker serves as the Chief Executive Officer of the university and the official adviser to the Chair of the Board of Trustees and its Executive Committee. The president, as educational and administrative head of the university, exercises general superintendence over all the affairs of the institution. The president serves as an ex officio member of the Board without a vote.

**#9 Administration:** In addition to our Chief Executive Officer, our senior administrative leadership is comprised of the vice presidents team (VP Team). The VP Team provides counsel

# Exhibit C



Secretary of State
Corporation Division
255 Capitol Street NE, Suite 151
Salem, OR 97310-1327

Phone:(503)986-2200
www.filinginoregon.com

**2014 ANNUAL REPORT**
**Registry Number:** 069130-16
**Date of Incorporation:** 06/28/1962
**Fee:** $50.00
**Due Date:** 06/28/2014
**Type:** DOMESTIC NONPROFIT CORPORATION



0269
GEORGE FOX UNIVERSITY
FINANCE DEPT
414 N MERIDIAN ST
NEWBERG OR 97132

# FILED

JUN 0 2 2014

**Name of Domestic Nonprofit Corporation**
GEORGE FOX UNIVERSITY

OREGON
SECRETARY OF STATE

**Jurisdiction:** OREGON

**Nonprofit Type:** Public Benefit

The following information is required by statute. Please complete the entire form. If any of the information is incorrect, you can make changes on this form. Failure to submit this Annual Report and fee by the due date may result in inactivation on our records.

**Registered Agent**
ROBIN E BAKER
414 N MERIDIAN
NEWBERG OR 97132

If the Registered Agent has changed, the new Agent has consented to the appointment. Oregon street address required.

**1) Type of Business**

**2) Principal Place of Business** (Str. address,city,state,zip)

414 N MERIDIAN ST
NEWBERG OR 97132

**3) Mailing Address** (Address,city,state,zip)

FINANCE DEPT
414 N MERIDIAN ST
NEWBERG OR 97132

**4) President Name and Address**
ROBIN E BAKER
414 N MERIDIAN ST
NEWBERG OR 97132

**5) Secretary Name and Address**
DAVID WOOLSEY
414 MERIDIAN ST
NEWBERG OR 97132

**6) Signature**

**8) Date**
5·27·14

GEORGE FOX UNIVERSITY

6913016-15243652    RENANA

Make check payable to "Corporation Division" and mail completed form with payment to: ~~s,~~
Corporation Division, 255 Capitol ST NE Suite 151, Salem, OR 97310-1327.
Note: You can also fax to (503) 378-4381. Filing fees may be paid with VISA or MasterCard. Submit the card number and expiration date on a separate page for your protection.

ANRPF1 05/09/14

EXHIBIT T

40

OREGON SECRETARY OF STATE

► **Corporation Division**

HOME

business information center   **business name search**   oregon business guide

referral list        business registry/renewal   forms/fees   notary public

uniform commercial code        uniform commercial code search   documents & data services

Business Name Search

New Search    Printer Friendly    **Business Entity Data**    08-28-2014
18:00

| | Entity Type | Entity Status | Jurisdiction | | | |
|---|---|---|---|---|---|---|
| 069130-16 | DNP | ACT | OREGON | 06-28-1962 | 06-28-2015 | |
| | GEORGE FOX UNIVERSITY | | | | | |
| | | | | | | |
| | PUBLIC BENEFIT | | | | | |

New Search    Printer Friendly    Associated Names

| | PPB | PRINCIPAL PLACE OF BUSINESS | | | | |
|---|---|---|---|---|---|---|
| | | 414 N MERIDIAN ST | | | | |
| | | NEWBERG | OR | 97132 | | UNITED STATES OF AMERICA |

Please click here for general information about registered agents and service of process.

| | AGT | REGISTERED AGENT | | 06-03-2008 | | |
|---|---|---|---|---|---|---|
| | | ROBIN | E | BAKER | | |
| | | 414 N MERIDIAN | | | | |
| | | | | | | |
| | | NEWBERG | OR | 97132 | | UNITED STATES OF AMERICA |

| | MAL | MAILING ADDRESS | | | | |
|---|---|---|---|---|---|---|
| | | FINANCE DEPT | | | | |
| | | 414 N MERIDIAN ST | | | | |
| | | NEWBERG | OR | 97132 | | UNITED STATES OF AMERICA |

| | PRE | PRESIDENT | | | | |
|---|---|---|---|---|---|---|
| | | ROBIN | E | BAKER | | |
| | | 414 N MERIDIAN ST | | | | |

EXHIBIT T                                                  41

| | NEWBERG | OR | 97132 | | | UNITED STATES OF AMERICA |
|---|---|---|---|---|---|---|

| | SEC | SECRETARY | | | | |
|---|---|---|---|---|---|---|
| | DAVID | | WOOLSEY | | | |
| | 414 MERIDIAN ST | | | | | |
| | | | | | | |
| | NEWBERG | OR | 97132 | | | UNITED STATES OF AMERICA |

New Search    Printer Friendly    ## Name History

| | | Name Type | Name Status | | |
|---|---|---|---|---|---|
| GEORGE FOX UNIVERSITY | | EN | CUR | 06-24-1996 | |
| GEORGE FOX COLLEGE | | EN | PRE | 06-28-1962 | 06-24-1996 |

Please read before ordering Copies.

New Search    Printer Friendly    ## Summary History

| | | | | Status | | |
|---|---|---|---|---|---|---|
| ○ | AMENDED ANNUAL REPORT | 06-02-2014 | | FI | | |
| ○ | AMENDED ANNUAL REPORT | 06-26-2013 | | FI | | |
| ○ | AMENDED ANNUAL REPORT | 06-06-2012 | | FI | | |
| ○ | AMENDED ANNUAL REPORT | 06-02-2011 | | FI | | |
| ○ | AMENDED ANNUAL REPORT | 06-03-2010 | | FI | | |
| ○ | AMENDED ANNUAL REPORT | 06-01-2009 | | FI | | |
| | AMENDED ANNUAL REPORT | 06-03-2008 | | FI | Agent | |
| | AMNDMT TO ANNUAL RPT/INFO STATEMENT | 07-10-2007 | | FI | | |
| | ANNUAL REPORT | 06-18-2007 | | FI | | |
| | ANNUAL REPORT PAYMENT | 05-22-2006 | 05-19-2006 | SYS | | |
| | AMNDMT TO ANNUAL RPT/INFO STATEMENT | 05-25-2005 | | FI | | |
| | ANNUAL REPORT | 05-23-2005 | 05-20- | SYS | | |

EXHIBIT T

42

# Exhibit D

# BYLAWS OF GEORGE FOX UNIVERSITY
## AS AMENDED BY BOARD OF TRUSTEES

### ARTICLE I
### IDENTIFICATION

<u>Section 1.</u>    Name

The name of this corporation is George Fox University (hereinafter referred to as the "University").

*Hist:    Amended 2/96*

<u>Section 2.</u>    Corporate Seal



The Corporate seal of the University shall be circular inform and mounted upon a paper. About the periphery of the seal shall appear the words, "GEORGE FOX UNIVERSITY."

*Hist:    Amended 2/96*

<u>Section 3.</u>    Fiscal Year

The fiscal year of the University shall begin on the first day of July in each year and end on the last day of June in the following year.

*Hist:    Adopted 12/80; amended 2/94; amended 2/96*

### ARTICLE II
### PURPOSES OF THE BOARD OF TRUSTEES

The Board of Directors (hereinafter referred to as the "Board of Trustees" or the "Board") shall have the following purposes:

1.   Assure that the University has a clear sense of its Christ-centered mission and a strategic plan to maintain it
   a.  Take responsibility to develop the mission and plan
   b.  Monitor implementation of the mission and plan.
2.   Appoint, support, and monitor the President
   a.  Assure the financial integrity of the University
   b.  Assure enrollment goals
   c.  Assure the quality of all university programs
3.   Be responsible for Board development
   a.  Board orientation
   b.  On-going Board education
   c.  Recruitment of new Board members
   d.  Train future Board leadership
   e.  Regularly evaluate the Board

*Hist:   Amended 3/04*

## ARTICLE III
## POWERS OF THE BOARD OF TRUSTEES

The Board shall have the power to manage the property and business of the University and shall have the power to carry out any other functions that are authorized under Oregon's Nonprofit Corporation Law or are permitted by the Articles of Incorporation, or these Bylaws, except insofar as such powers may be limited by law. These powers shall include, but not be limited to the following:

a.   Appoint or remove the Officers of the University, including the President of the University, the Vice President for Financial Affairs and Treasurer of the University, and the President's other immediate subordinates in accordance with these Bylaws. The power to appoint or remove the Vice President for Financial Affairs and Treasurer of the University and the President's other immediate subordinates may, in the discretion of the Board, be delegated to the President of the University;

b.   Award Academic Degrees upon recommendation of the faculty and of the Academic Affairs Committee of the Board; award honorary degrees upon recommendation of the Executive Committee of the Board;

c.   Establish and review the educational programs of the University and establish the academic standards to be observed by the University;

d.   Establish annually the budget of the University, which shall be submitted to it upon recommendation of the Property and Finance Committee;

e.   Establish the salaries of the President, professors and other administrators and employees of the University;

f.    Authorize the construction of new buildings and major renovations of existing buildings;

g.    Authorize the sale and purchase of land, buildings, or major equipment for the use of the University;

h.    Institute and promote major fund raising efforts of the University;

i.    Authorize any changes in tuition and fees within the University;

j.    Authorize Officers or agents of the University to accept gifts for the University;

k.    Authorize the incurring of debts by the University and securing thereof by mortgage and pledge of real and personal property, tangible and intangible;

l.    Retain custody of the books, records, buildings and other property of the University;

m.    Prescribe the discipline to be observed in the University and establish the spiritual and social standards to be observed by the entire University community.

*Hist:    Adopted 12/80; amended 12/83; amended 2/96; amended 3/04*

## ARTICLE IV
## MEMBERSHIP OF THE BOARD

<u>Section 1.</u>    Composition of the Board

a.    The Board of Trustees shall consist of not more than forty-two members, and ex officio, the President of the University, the General Superintendent of Northwest Yearly Meeting of Friends Church (hereinafter also referred to as "NWYMFC"), and the Chair of the Board of Regents of George Fox Evangelical Seminary.

b.    At least four-sevenths of the members of the Board shall be members of good standing of the Friends Church and of these, at least two-thirds shall be members of NWYMFC.

c.    No person shall be eligible for election prior to attaining the age of 18 years, nor shall any Trustee be elected to serve a term commencing after the Trustee has attained the age of 75 years.

d.    A Trustee shall become an Honorary Trustee at the expiration of the term of office after reaching age 75, if at that time the Trustee has served for nine years or more. Honorary Trustees shall be entitled to receive notices of all meetings of the Board, to attend and speak at all such meetings, to receive minutes of all meetings of the Board and Executive Committee, and to be members of all committees except the Executive Committee. They shall have the power to vote in meetings of any committee on which they may serve, but

shall not have voting powers in meetings of the Board of Trustees.  An Honorary Trustee shall not be counted as a member of the Board of Trustees for any purpose.

e.    The General Superintendent of NWYMFC and the Chair of the Board of Regents of George Fox Evangelical Seminary shall be voting members of the Board and any committees on which they serve.  They shall be counted as the forty-third and forty-fourth members of the Board for purposes of voting, but shall not be counted among the forty-two members of the Board when computing the number of Friends on the Board. The President of the University shall be an ex officio member of the Board without power to vote and shall not be counted as a member of the Board or any committee for any purpose.

f.    No person directly employed by the University, with the exception of the President of the University, shall serve on the Board during such employment.

*Hist:    Amended 2/96; amended 3/04*

Section 2.    Election

a.    At each annual meeting of NWYMFC, not more than fourteen trustees shall be elected for a three-year term by NWYMFC.  Of the not more than fourteen members of the board to be elected annually, not more than eleven shall be nominated by the Board of the University, not more than two by the Alumni Association of the University, and not more than one by the George Fox Evangelical Seminary Board of Regents, all after having been reviewed and approved by the Committee on Trustees.  All nominations to fill vacancies shall be approved by the NWYMFC.

b.    Trustees shall serve for three-year terms commencing September 1 of the year of appointment and shall serve until their successors are elected and qualified and may succeed themselves in office.

c.    Any member of the Board of Trustees may be removed from office, for cause, by NWYMFC.

*Hist:    Adopted 12/80; amended 5/85; amended 2/94; amended 2/96; amended 3/04*


**ARTICLE V**
**MEETINGS OF THE BOARD**

Section 1.    Regular and Special Meetings

a.    Regular meetings of the Board shall be held annually the third Saturday of October (sometimes referred to herein as the "annual Meeting"), and the second Saturday in March (sometimes referred to herein as the "Semiannual Meeting") or on such other date and at such other time as set forth in written notice given to each board member.  The

4 -    Bylaws of George Fox University
        as amended by the Board of Trustees
EXHIBIT 1                                                                                              47

Board may provide, by resolution, the time and place, either within or without the State of Oregon, for the holding of additional regular meetings without other notice than the resolution.

b.      Special meetings of the Board of Trustees may be called at any time by the chair, upon ten (10) days notice. Notice of any special meeting shall be in writing and may be personally delivered, sent by facsimile, or by electronic mail, or mailed by first class mail. The notice is deemed to be properly given on the date it is actually delivered or sent by facsimile or electronic mail, or if mailed, when deposited in the United States mail, addressed to the trustee. The notice shall specify the purpose of the meeting, and no business shall be transacted at such meeting that does not relate to the purposes stated.

c.      Whenever notice is required to be given under the provisions of statutes or of the Articles of Incorporation or of these Bylaws, a waiver thereof in writing signed by the persons entitled to said notice, whether before or after the time stated therein, shall be deemed equivalent thereto. Attendance at any meeting by a Trustee shall be conclusively deemed a waiver of notice of that meeting unless objection be made thereto at such meeting.

d.      A majority of the Trustees shall be necessary and sufficient to constitute a quorum for the transaction of business, and the act of a majority of the Trustees present and voting at a duly called meeting of the Board or any committee shall be the act of the Board of Trustees or that committee, except as may be provided by statute or by the Articles of Incorporation, or by these Bylaws.

e.      All regular and special meetings of the Board shall be held at the University unless otherwise indicated in the authorized notice.

*Hist:   Amended 2/96; amended 9/97; amended 2/01; amended 3/04*

Section 2.   Action Without a Meeting

Any action required or permitted to be taken by the Board of Trustees or a committee may be taken without a meeting if all the trustees or committee members take the action, each one signs a written consent describing the action taken, and the consents are filed with the records of the corporation. Action taken by consent is effective when the last trustee or committee member signs the consent, unless the consent specifies a different effective date. A signed consent has the effect of a meeting vote and may be so described in any document.

*Hist:   Adopted 12/80; amended 5/85; amended 4/87; amended 2/94; amended 2/01*

## ARTICLE VI
## STATEMENT OF FAITH

All nominees for Trustees shall be in harmony with the Constitution and Discipline of NWYMFC and its statement of faith, in essence as follows:

5 -   Bylaws of George Fox University
     as amended by the Board of Trustees
EXHIBIT T                                                        48

a.    The Trinity. We believe in one eternal God, the source and goal of life, who exists as three persons in the Trinity – the Father, the Son, and the Holy Spirit. In love and joy, God creates and sustains the universe, including humanity, male and female, who are made in God's image.

b.    God the Father. We believe in God the Father Almighty, whose love is the foundation of salvation and righteous judgment, and who calls us into covenant relationship with God and with one another.

c.    God the Son. We believe in Jesus Christ, the Word, who is fully God and fully human. He came show us God and perfect humanity, and, through his life, death, and resurrection, to reconcile us to God. He is now actively present with us as Savior, Teacher, Lord, Healer, and Friend.

d.    God the Holy Spirit. We believe in the Holy Spirit, who breathed God's message into the prophets and apostles, opens our eyes to God's Truth in Jesus Christ, empowers us for holy living, and carries on in us the work of salvation.

e.    Salvation. We believe that salvation comes through Jesus Christ alone, to whom we must respond with repentance, faith, and obedience. Through Christ we come into a right relationship with God, our sins are forgiven, and we receive eternal life.

f.    The Bible. We believe that God inspired the Bible and has given it to us as the uniquely authoritative, written guide for Christian living and thinking. As illumined by the Holy Spirit, the Scriptures are true and reliable. They point us to God, guide our lives, and nurture us toward spiritual maturity.

g.    The Christian Life. We believe that God has called us to be and to make disciples of Jesus Christ to be God's agents of love and reconciliation in the world. In keeping with the teaching of Jesus, we work to oppose violence and war, and we seek peace and justice in human relationships and social structures.

h.    The Church. We believe in the Church as the people of God, composed of all who believe in Jesus Christ, who support and equip each other through worship, teaching, and accountability, who model God's loving community, and who proclaim the gospel to the world.

i.    Christian Worship. We believe Christ is present as we gather in His name, seeking to worship in spirit and in truth. All believers are joined in the one Body of Christ, are baptized by the Spirit, and live in Christ's abiding presence. Christian baptism and communion are spiritual realities, and, as Christians from many faith traditions, we celebrate these in different ways.

j.    The Future. We believe in the personal return of Jesus Christ, in the resurrection of the dead, in God's judgment of all persons with perfect justice and mercy, and in eternal

reward and punishment. Ultimately, Christ's Kingdom will be victorious over all evil, and the faithful will reign with him in eternal life.

*Hist:    Adopted 12/80; amended 6/89; amended 9/00; amended 3/04*

## ARTICLE VII
## OFFICERS OF THE BOARD

Section 1.    Officers of the Board of Trustees

The Officers shall be the Chair, Vice Chair, and Secretary of the Board of Trustees. The Board may appoint an Assistant Secretary who is not a member of the Board, to assist the Secretary. All Officers shall be appointed by the Trustees.

*Hist:    Amended 3/04*

Section 2.    Election of Officers

a.    At the Annual meeting, the Board shall elect by ballot from the Committee on Trustees' recommendations or from nominations from the floor, a Chair, Vice Chair, and Secretary to serve as officers of the Board for one year or until their successors shall have been elected.

b.    The Chair of the Board shall serve no more than five (5) consecutive years in office. Other officers shall serve such terms as may be determined by the Board of Trustees.

c.    In the event of a vacancy in the office of the President, the Board shall appoint a special Presidential Search Committee to submit nominations of candidates for that office.

d.    A vacancy in any of the offices of the Board may be filled at any meeting of the Board of Trustees.

*Hist:    Amended 3/04*

Section 3.    Powers and Duties of the Chair of the Board of Trustees

The Chair of the Board shall:

a.    Preside at all meetings of the Board of Trustees; have a right to vote on all questions; appoint to all committees the members who are not appointed by the Board of Trustees; and have such other  powers and duties as the Board from time to time may prescribe.

b.    Act as agent of the University to sign on behalf of the University instruments authorized by the Board, if the signature of the Chair is required by the Board or outside regulatory authorities.

7 -    Bylaws of George Fox University
       as amended by the Board of Trustees

c.      Maintain cooperation between the President of the University and the Board.

d.      Serve as Chair of the Executive Committee and be ex officio member of all committees.

*Hist:   Amended 2/96; amended 3/04*

Section 4.    Powers and Duties of the Vice Chair

a.      In the absence of the Chair, the Vice Chair shall perform the duties of the Chair.

b.      The Vice Chair also shall perform such other duties as the Chair shall assign.

Section 5.    Powers and Duties of the Secretary

The Secretary shall keep a full and complete record of all proceedings of the Board, shall send promptly to each Board member a copy of the minutes of each meeting of the Board, and shall give notice of meetings to be held or order the same to be done. The Assistant Secretary, if named, is empowered to sign any and all documents requiring the signature of the Secretary if the Secretary is not available to provide such signature.

*Hist:   Adopted 12/80; amended 2/94; amended 3/04*


## ARTICLE VIII
## COMMITTEES OF THE BOARD

Section 1.    Organization of Committees

a.      The Board shall establish the following standing committees:

        1.    Program and Personnel Committee
        2.    External Affairs Committee
        3.    Property and Finance Committee
        4.    Committee on Trustees
        5.    Executive Committee

b.      The Chair and members of all standing committees shall be members of the Board (including Honorary Trustees) in order to be eligible.

c.      Each standing committee shall consist of a Chair, at least three elected members, and ex officio the President of the University and the Chair of the Board. A record of the actions of each committee shall be kept and reported to the Board for approval at its next regular meeting. Proposed action involving changes of policy shall receive approval by the Board prior to implementation.. Each standing committee may establish one or more subcommittees.

d.    For all standing committees, a quorum shall consist of a majority of the members.

e.    The Board of Trustees may at any time establish or discontinue any standing committee for such time as may be determined; the duties of any committee so discontinued shall be performed during such discontinuance by the Executive Committee.

f.    The President of the University may appoint a member of the administrative staff to serve as a liaison between a committee and the office of the President. Such liaison person shall assist the committee in carrying out of its duties.

g.    All standing committees shall meet at least two times annually.

h.    There may be such special or ad hoc committees as the Board of Trustees may from time to time establish for the discharge of particular duties. The Chair of the Board shall appoint special or ad hoc committees and shall inform them of their charges and terms of service. When the Board deems it appropriate, non-trustees may be appointed as members of special or ad hoc committees.

*Hist:    Amended 2/96; amended 3/04*

Section 2.    Powers and Duties of the Program and Personnel Committee ("PPC")

a.    The PPC shall have fifteen members. It will monitor and oversee all university programs and the personnel that provide these programs..

b.    The PPC will approve all new academic programs for recommendation to the Board of Trustees.

c.    PPC will approve all recommendations for faculty promotion and tenure.

    1.    A sub-group of not less than 4 committee members will interview each candidate for faculty tenure for recommendation to PPC.
    2.    Recommendations for faculty promotion in rank will be received with written documentation.

d.    The PPC will monitor the university's lifestyle requirements and receive recommendations for change.

e.    All university programs (academic and student life) will be reviewed at least every 5 years for quality and "fit" with the university mission. Issues of program size, adequacy of financial support, program expenses, and effectiveness will be considered in the review.

f.    PPC will seek to advance the racial and ethnic diversity of the University community and will supervise the implementation of the Blueprint for Diversity.

9 -    Bylaws of George Fox University
    as amended by the Board of Trustees
EXHIBIT T                                                                                      52

g.     PPC will monitor the spiritual, social, health and athletic life of the student body.

h.     PPC will seek to advance the religious life of the University community, keeping in view the global integration of Christ-centered faith, learning and service.

i.     PPC will monitor the effectiveness of Institutional Technology (IT), intercollegiate athletics, and Tilikum.

*Hist: Amended 2/96; amended 3/04*

Section 3.     Powers and Duties of the External Affairs Committee ("EAC")

a.     The EAC shall have fifteen members, and will focus its attention on the external constituencies of the University, including marketing and positioning the University.

b.     The EAC will monitor and oversee enrollment, including

     1. Approving enrollment goals for traditional undergraduate, Department of Professional Studies, and graduate departments.

     2. Establishing and monitoring strategies for achieving enrollment goals.

c.     The EAC will consider and recommend to the Board requests for capital improvements, including new buildings, equipment and capital campaigns.

d.     EAC will monitor and oversee all advancement functions of the University, including fundraising, planned giving, deferred gifts and trust administration.

e.     The EAC will review and approve the University's marketing plan annually.

f.     The EAC will review the effectiveness and assure quality of external relations efforts, including University publications, Alumni, church and community relations.

*Hist: Amended 2/96; amended 3/04*

Section 4.     Powers and Duties of the Property and Finance Committee ("PFC")

a.     The PFC shall consist of ten members. Its primary duty is to monitor and assure the financial integrity of the University.

b.     The PFC will propose to the board a preliminary budget for the following fiscal year at the spring (March) meeting of the Board of Trustees. The final budget will be recommended to the Board for approval at the fall (October) meeting.

c.     The PFC will provide for an annual audit of university finances by an external auditor. A written report of the financial condition of the university will be received and considered as soon as possible after the close of the fiscal year (June 30).

10 - Bylaws of George Fox University
as amended by the Board of Trustees
EXHIBIT T                                              53

d.    The PFC will consider and recommend to the Board and/or Executive Committee annuities and life-income arrangements.

e.    Not less frequently than every three years the Committee will receive and review a report on the condition of all buildings owned and operated by the University and report to the Board the condition of the same. It shall recommend such changes and improvements as in its judgment should be made to keep the buildings in good condition.

f.    The PFC will establish a group of not less than 5 trustees to invest university funds within the guidelines of the investment policy established by the Board of Trustees.
1.    This group may employ investment council and may delegate authority to purchase and sell securities for the university to such investment council, to any university administrator, or to the GFES Board of Regents subject to such limitations as the committee may impose.
2.    This group will report to the PFC and the Board of Trustees at each meeting on the George Fox University investment status. It will provide investment information for PFC at PFC's request.

g.    The PFC will monitor and oversee the University's financial aid expense.

*Hist:    Amended 2/96; amended 3/04*

Section 5.    Powers and Duties of the Committee on Trustees ("COT")

a.    The COT shall have six members, including the Chair..

b.    The COT will be responsible for recruitment of new board members, board orientation, and evaluation of the board.

c.    COT will develop and maintain
1.    Criteria for board membership
2.    A board handbook
3.    A proper demographic, gender ratio, vocational and ethnic distribution of board members.

d.    Provide in-service board education.

e.    Anticipate future board leadership.

f.    Recommend board appointments and reappointments to the board and to the Northwest Yearly Meeting of Friends.

g.    Evaluate Board Structure every three years.

*Hist:    Amended 2/96; amended 3/04*
Section 6.    Powers and Duties of the Executive Committee

a.    The Executive Committee shall be composed of the Chair, Vice Chair, and Secretary of the Board, the Chair of each standing committee, not more than three subcommittee chairs, two members at large, and the Superintendent of the Northwest Yearly Meeting of Friends Church. The Chair of the Board shall be the Chair of the Executive Committee.

b.    The Executive Committee shall monitor the University's adherence to its Christ-centered mission and monitor the University's planning process and implementation of the strategic plan adopted by the Board. It shall develop, in consultation with the President, agendas for meetings of the Board. Between meetings of the Board of Trustees, the Executive Committee shall act on behalf of the Board on all matters, except that it may not take any action inconsistent with a prior act of the Board of Trustees, alter bylaws, locate permanent buildings on tax-exempt property held for university purposes, remove or appoint the President of the University, or take any action that has been reserved by the Board.

c.    The Executive Committee shall meet every other month, or at the call of the Chair of the Board. Special meetings also may be called by the Secretary on the written request of at least three members of the Executive Committee.

d.    The minutes of the meetings of the Executive Committee shall be distributed promptly after each meeting to each member of the Board of Trustees. At each meeting of the Board of Trustees, the proceedings and actions taken by the Executive Committee since the last meeting of the Board shall be reported to the Board.

e.    The Executive Committee shall recommend to the Board persons to receive honorary degrees and faculty members and others to be given emeritus positions. The Executive Committee also shall recommend to the Board persons to be recognized as Honorary Trustees but who do not meet the criteria of age and/or length of service stated in Article II, Section 1, of these Bylaws.

*Hist:    Adopted 12/80; amended 5/83; amended 5/85; amended 12/92; amended 2/94, amended 2/96; amended 2/98; amended 10/02; amended 3/04*

Section 7.    Powers and Duties of the George Fox Evangelical Seminary Board of Regents

a.    The George Fox Evangelical Seminary Board of Regents, consisting of not more than thirty-five members, will act in an advisory role to the Board of Trustees of George Fox University. The Board of Regents will advise on the administration of the George Fox Evangelical Seminary endowment fund and those programs and staff that are part of the George Fox Evangelical Seminary curriculum.

b.    The Board of Regents shall serve at the discretion and pleasure of the Board of Trustees of George Fox University. Replacement members and subsequent appointments to the

Board of Regents shall be made by the Board of Trustees of George Fox University upon recommendation by the Board of Regents, with the review and approval of the Committee on Trustees.

*Hist:    Adopted 2/96; amended 3/04*

## ARTICLE IX
## OFFICERS OF THE UNIVERSITY

Section 1.    Powers and Duties of the President of the University

a.    The President of the University shall be the Chief Executive Officer of the University and the official adviser to the Chair of the Board of Trustees and its Executive Committee. The President, as educational and administrative head of the University, shall exercise a general superintendence over all the affairs of the institution, and bring such matters to the attention of the Board as are appropriate to keep the Board fully informed to meet its policy-making responsibilities.

b.    The President shall have power, on behalf of the Board, to perform all acts and execute all documents to make effective the actions of the Board or its Executive Committee.

c.    Except as otherwise provided in these bylaws, the President shall be ex officio a member of all committees of the Board, without power to vote.

d.    The President shall make an annual report of the condition of the University to the Board and to NWYMFC.

e.    The President shall issue all faculty contracts after selection has been made using procedures as set forth in the Manual of Operation.

f.    The President shall annually give to the Board a review of any research performed, any papers published, or postgraduate study completed by members of the faculty.

g.    In the event of absence from the campus, the President shall appoint an immediate subordinate to act on his or her behalf. Normally the Provost shall be so designated.

*Hist:    Amended 2/96; amended 3/04*

Section 2.    Powers and Duties of the Vice President for Financial Affairs and Treasurer of the University.

a.    The Vice President for Financial Affairs and Treasurer of the University shall be the Chief Financial Officer of the University and one of the President's immediate subordinates. The Vice President for Financial Affairs and Treasurer shall receive and have general charge of all the funds, securities, and valuables of the University, except

the endowment funds, which are held and managed by the Investment Committee of the Board.

b.  The Vice President for Financial Affairs and Treasurer shall payout money only upon the general or special authorization of the Board and/or Executive Committee, said authorization to be recorded in the minutes of the Board or Executive Committee. The Vice President for Financial Affairs and Treasurer shall keep full and complete annual accounting showing all of the assets of the University together with all receipts or disbursement of funds or properties received or paid out during the last preceding year and shall render a report thereof to the Board at each Annual meeting.

c.  The Vice President for Financial Affairs and Treasurer shall give bond or bonds as shall be required by the Board. Such bonds shall be executed in due form with sufficient and responsible securities, it being the intent of these bylaws to provide that the Vice President for Financial Affairs and Treasurer shall at all times give such bonds as shall be complete and unquestionable security for the money under his or her control.

d.  Additional duties and responsibilities of the Vice President for Financial Affairs and Treasurer shall be stated in the Faculty Handbook as specified in Section 4 of this article.

*Hist:  Amended 2/96; amended 3/04*

Section 3.    Powers and Duties of Other Officers of the University

The President's other immediate subordinates shall be considered Officers of the University in accordance with Article III(a) of these Bylaws. Duties and powers of these Officers, normally the Provost, the Vice President for Student Affairs and Dean of Students, and the Vice President for Marketing and Advancement but regardless of title, shall be stated in the Faculty Handbook as specified in Section 4 of this article.

*Hist:  Amended 2/96; amended 3/04*

Section 4.    Duties of University Personnel

The duties and privileges of the offices, administrators, faculty and employees of the University shall be given in handbooks or Faculty Handbook, edited by the Administration, and subject to the concurrence of the Board.

*Hist:   Adopted 12/80; amended 12/83; amended 2/94; amended 2/96; amended 3/04*

## ARTICLE X
## INDEMNIFICATION

Each Trustee and Officer of the University shall be indemnified by it against all expenses actually and necessarily incurred by such Trustee or Officer in connection with the defense of

any action, suit, or proceeding to which he or she has been made a party by reason of being or having been such Trustee or Officer, except in relation to matters as to which such Trustee or Officer shall be adjudicated in such action, suit, or proceeding to be liable for gross negligence or willful misconduct in the performance of duty.

*Hist:   Adopted 12/80; amended 2/96; amended 3/04*

## ARTICLE XI
## CONFLICTS OF INTEREST

A Trustee shall be considered to have a conflict of interest if: such Trustee has existing or potential financial or other interests which impair or might reasonably appear to impair such member's independent, unbiased judgment in the discharge of responsibilities to the University; or such Trustee is aware that a member of his or her family (which for purposes of this paragraph shall be spouse or child) or any organization in which such Trustee (or member of his or her family) is an officer, director, employee, member, partner, trustee, or controlling stockholder, has such existing or potential financial interests. All Trustees shall disclose to the Board any possible conflict of interest at the earliest practicable time. No Trustee shall vote on any matter, under consideration at a Board or committee meeting, in which such Trustee has a conflict of interest. The minutes of such meeting shall reflect that a disclosure was made and that the Trustee having a conflict of interest abstained form voting. Any Trustee who is uncertain whether he or she has a conflict of interest in any matter may request the Board or Executive Committee to determine whether a conflict of interest exists, and the Board or Executive committee shall resolve the question by majority vote.

*Hist;   Adopted 12/80; amended 2/96; amended 3/04*

## ARTICLE XII
## REVIEW AND AMENDMENT OF BYLAWS

### Section 1.

These Bylaws may be changed or amended at any meeting of the Board of Trustees by a two-thirds vote of those present, provided notice of the substance of the proposed amendment is sent to all the Trustees at least ten days before the meeting.

### Section 2.

Prior to each Annual meeting of the Board of Trustees, the Executive Committee shall review these Bylaws and suggest any necessary changes thereto.

### Section 3.

No change shall be made in these Bylaws affecting the relationship with Northwest

Yearly Meeting of Friends Church without the consent of Northwest Yearly Meeting of Friends Church.

*Hist:    Adopted 12/80; amended 3/04*

## ARTICLE XIII
## REVIEW AND AMENDMENT OF BYLAWS

All former bylaws are hereby repealed.

*Hist:    Adopted 12/80; amended 2/94; amended 2/96; amended 3/04*

# Exhibit E

ENTERED

APR 1 1 2014

IN REGISTER BY KH

FILED

14 APR 11 PM 12: 18

4TH JUDICIAL DISTRICT

# FORM 4

## IN THE CIRCUIT COURT OF THE STATE OF OREGON
### For Multnomah County

In the Matter of the Change of Sex of:

Case No. (b)(6); (b)(7)(C)

(b)(6); (b)(7)(C)

Your Name – Last, First , Middle

**GENERAL JUDGMENT OF SEX CHANGE**

Based on the Petition, and the court finding that proper notice to interested parties has been given; that the above-named person has undergone surgical, hormonal, or other treatment appropriate for this person for the purpose of gender transition; that sexual reassignment has been completed; and that no person has shown cause why the requested General Judgment should not be granted,

IT IS HEREBY ORDERED AND ADJUDGED:

The sex of (b)(6); (b)(7)(C) is hereby changed

Name – Last, First, Middle

from [ ] male to female  [X] female to male.  Notice of this legal change shall be posted in a public

place in Multnomah County as required by law.

[ ] This person was born in Oregon.  The sex on the record of live birth maintained by the State

Registrar for the Center for Health Statistics must be changed.

DATED this 11 day of April , 20 14 .

(b)(6); (b)(7)(C)

Circuit Court Judge

SUSAN M. SVETKEY

(b)(6); (b)(7)(C)

(b)(6); (b)(7)(C)

City, State, Zip        Telephone

CERTIFIED TO BE A TRUE COPY OF THE ORIGINAL

DATED        APR 1 1 2014

(b)(6); (b)(7)(C)

Clerk of the Court

Number of Certified Copies of the Sex Change Judgment requested MULTNOMAH COUNTY

22-02C  (09/13)  GENERAL JUDGMENT OF SEX CHANGE --- FORM 4

EXHIBIT T

61

# Exhibit F



414 N. Meridian St., Newberg, OR 97132
503.538.8383

February 24, 2014

(b)    (b)(6); (b)(7)(C)
George Fox University
Box (b)(6);

Dear (b)(6);

Thanks for your conversations and requests regarding your housing placement as a transgender student. I appreciate the manner in which you approached the situation.

I shared with you that we are limited in our on-campus housing and don't have housing options for married students, families, students who are pregnant and in their third trimester, those who are 23 or older, for some medical aspects that we can't accommodate, and possibly others. In these situations, we allow students to live off-campus.

As we discussed, we were in the process of adding to our housing policy that we would house students by his/her biological birth sex. You said you wanted to live with males next year and I told you I would present this to (b)(6) (b)( Vice President for Student Life, and four members of the Board of Trustees. I also reiterated that I was unsure about the outcome and that I could not guarantee any changes.

After a lengthy conversation with the Board of Trustees it was decided that the housing policy needs more time to be developed, and coincide with a theological and philosophical statement for the University. Although this was the case, I was given approval to make a decision on your behalf.

After considering all aspects of your proposal I've decided to conditionally approve your request to live off-campus with male students for the 2014-15 school year. This arrangement may only be off-campus and is only a one-year exception; and it may change depending on the Board's development of a policy.

If you desire to only live on-campus, we may be able to provide a single room for you, although we agreed this was not a good option (though we would certainly do our best to connect you with the larger community if you were in a single room).

Outlined below are the further steps that will need to be completed in order to receive full approval to live off-campus with male students:

1. Legally change your name and gender, and provide copies of the following to me by **June 1, 2014**:
   • Driver's License

PRINTED ON 100% POST CONSUMER RECYCLED PAPER ♻

EXHIBIT T                                                                      63

- • Birth Certificate
- • Social Security Card
2. The male students you will be living with must meet the criteria and be approved to live off-campus in 2014-15. Information can be found at the following link: http://www.georgefox.edu/offices/student-life/residence-life/offcampus.html.
3. I will need to meet with your roommates and affirm they understand your story, are willing to live with you and that they have informed their parents about this living arrangement.
4. As with all students living on or off-campus, you and your roommates need to abide by all GFU lifestyle standards and policies.

If all the above aspects are satisfactorily completed, then you will receive full approval to proceed with this living arrangement. Is June 1 a realistic due date to accomplish what I've asked above in #1? I'm open to discuss this timeframe, but want to make sure it doesn't get too far into the summer.

I recognize this decision may be controversial to some people in our community. However, I think you've provided good rationale that caused us to reconsider the initial decision. Please let me know if you have any questions or concerns. I'm glad to meet with you at any point if that's helpful. Thank you for the way you approached this request and for your patience in the process.

(b)(6): I'm glad you're at Fox and I want to continue to see you be successful here. Please let me know if there is any other way I can support or assist you in your journey.

Sincerely,

(b)(6); (b)(7)(C)

(b)(6); (b)(7)(C)

Dean of Community Life

CC: Student File

(b)(6) (b)(6); (b)(7)(C)

(b)(6), (b)(7)(C)



UNITED STATES DEPARTMENT OF EDUCATION
OFFICE FOR CIVIL RIGHTS

915 2ND AVE., SUITE 3310
SEATTLE, WA 98174-1099

March 9, 2015

REGION X
ALASKA
AMERICAN SAMOA
GUAM
HAWAII
IDAHO
MONTANA
NEVADA
NORTHERN MARIANA
ISLANDS
OREGON
WASHINGTON

Mr. (b) (b)(6); (b)(7)(C)
Davis, Wright, Tremaine, LLP
1300 SW Fifth Avenue, Suite 2400
Portland, Oregon 97201

Re:    George Fox University
       OCR Reference No. 10142258

Dear Mr. (b)(6); (b)(7)(C)

The Office for Civil Rights (OCR) has completed its evaluation of your complaint No. 10142258 against George Fox University (University), which was received on August 29, 2014. In your complaint, you alleged that the university discriminated against a student, based on sex, by denying the student's request to live with other male students on campus.

Your complaint raises the same allegation of discrimination raised in your previous complaint (No. 10132152). By letter dated July 1, 2014, OCR Seattle administratively closed that complaint based on the granting by OCR's Assistant Secretary of a religious exemption under the Title IX regulations as applied to housing (34 C.F.R. §106.32), comparable facilities such as restrooms and locker rooms (34 C.F.R. §106.33), and athletics (34 C.F.R. §106.41). Accordingly, OCR is closing your new complaint No. 10142258 in accordance with its Case Processing Manual, Section 110(k).

However, in your new complaint No. 10142558, you assert that the University practices about which you complained are not based on the religious tenets of a controlling religious organization and thus are not appropriately exempt from Title IX. Accordingly, although your complaint has been closed, because you have challenged the religious exemption granted to the University, OCR Seattle has forwarded your complaint to the Assistant Secretary, who is responsible for addressing claims for religious exemption under Title IX.

This letter sets forth OCR's determination in an individual OCR case. This letter is not a formal statement of OCR policy and should not be relied upon, cited, or construed as such. OCR's formal policy statements are approved by a duly authorized OCR official and made available to the public.

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.*

EXHIBIT T

Page 2 - OCR Reference No. 10142258

Thank you for bringing this matter to our attention. If you have any questions, please contact Timothy Sell, senior attorney, by telephone at (206) 607-1639, or by e-mail at timothy.sell@ed.gov.

Sincerely,

(b)(6); (b)(7(C)

Monique M. Malson
Program Manager

**From:**      OCR
**Sent:**      8 Dec 2014 06:58:26 -0600
**To:**      (b) | (b)(6); (b)(7(C)  Seattle
**Subject:**      RE: Complaint against NNU

Dear Mr. (b)(6); (b)(7

I am writing in response to your November 12, 2014, email inquiry to the U.S. Department of Education (Department), Office for Civil Rights (OCR) regarding a complaint against Northwest Nazarene University in Nampa, Idaho for the religious exemption it seeks in relating to aspects of Title IX. Assistance was requested regarding this matter. I am pleased to respond.

OCR is responsible for enforcing several Federal civil rights laws that prohibit discrimination on the bases of race, color, national origin, sex, disability and age in programs or activities that receive Federal financial assistance from the Department. OCR also enforces Title II of the Americans with Disabilities Act of 1990 (Title II) that prohibits discrimination on the basis of disability by state and local government services whether or not they receive Federal financial assistance. Additionally, OCR enforces the Boy Scouts of America Equal Access Act, which addresses equal access to school facilities for the Boy Scouts and certain other youth groups.

The OCR Seattle Office (Office) is responsible for investigating complaints, conducting compliance reviews and providing technical assistance regarding educational institutions in Idaho. Therefore, I am forwarding your email to OCR's Seattle Office for further review and appropriate handling.  If you wish, you may contact that Office regarding your concerns directly at the following:

Office for Civil Rights, Seattle Office
U.S. Department of Education
915 Second Avenue Room 3310
Seattle, WA 98174-1099
Telephone :206-607-1600
Facsimile   :206-607-1601
TTY          :800-877-8339
Email      :OCR.Seattle@ed.gov

I hope the information provided is of assistance.

Sincerely,


Donna D. Spencer-Nelson
Customer Service Team
Office for Civil Rights

**From:** (b)   (b)(6); (b)   (b)(6); (b)(7(C)
**Sent:** Wednesday, November 12, 2014 11:16 PM
**To:** OCR
**Subject:** Complaint against NNU

To whom it may concern-

I would like to formally file a complaint against Northwest Nazarene University in Nampa, Idaho for the religious exemption it seeks in relating to aspects of Title IX.

Northwest Nazarene cannot have an religious opposition to transgender students, staff or faculty, because the Church of the Nazarene, its parent organization, does not have a stance on matters of gender identity.

The statement on 'Human Sexuality' in the Church of the Nazarene Manual only refers to 'homosexuality' and does not mention 'transgender' or 'gender identity' issues. Furthermore, other documents released by the Church of the Nazarene in order clarify the Manual position again, only focus on sexual orientation, and never have addressed the issue of gender identity.

When I asked a General Superintendent, the highest official in the Nazarene Church, about Church policy on transgender members, he said "The grace of God is extended to every person, whoever they are. It is intrinsic in our understanding of the nature of God."

In the Church of the Nazarene policy is not set by the University, but by the denomination. It is not the University that gets to take the lead when issues are silent, but it is the parent denomination.

An exemption is contrary to NNU statement on 'Human Dignity' that it provided to you. Again it only refers to sexual orientation. Items pertaining to issues of being transgender fall under 'gender identity'. How does "adverse actions" on behalf on the University protect the human dignity of the student or staff?

Furthermore, NNU is a part of a sub-group of Nazarenes called Nazarene Youth International (NYI). NYI 's charter clearly states: "NYI is committed to understanding and celebrating differences and diversity in language, color, race, culture, socioeconomic class, and gender. Our differences do not diminish unity but enhance our potential and effectiveness..." An exemption would be contrary to an organization that NNU is party to within the Church of the Nazarene.

You have given the NNU the power to expel anyone who displays non-gender conforming actions, or based upon a mere rumor or suspicion that a student is transgender. You have offered no protection to anyone accused, or course of action for

EXHIBIT T                                                                                    68

a student to object and appeal the rulings of the NNU administration. Granting of such an exemption will only continue cause physiological and physical harm to the individuals who are transgender. What course of action does one have if they    face "adverse actions" by NNU for being transgender?

Please contact me if you have any additional questions.

Thank you for your time,
(b)(6); (b)(7)(C)
Founder, Nazarene Ally
c. (b)(6); (b)(7)(C)
www.NazareneAlly.com



UNITED STATES DEPARTMENT OF EDUCATION
OFFICE FOR CIVIL RIGHTS

915 2ND AVE., SUITE 3310
SEATTLE, WA 98174-1099

January 22, 2015

REGION X
ALASKA
AMERICAN SAMOA
GUAM
HAWAII
IDAHO
MONTANA
NEVADA
NORTHERN MARIANA
 ISLANDS
OREGON
WASHINGTON

VIA E-MAIL ONLY - (b)(6); (b)(7)(C)


Mr. (b)(6); (b)(6); (b)(7
(b)(7(C)

Re:    Northwest Nazarene University
       OCR Reference No. 10152031

Dear Mr. (b)(6); (b)(7)(C)

On December 8, 2014, the U.S. Department of Education, Office for Civil Rights (OCR) received a copy of your e-mail, dated November 12, 2014, from OCR's customer service office. In your e-mail, you stated that you would like to file a formal complaint against the Northwest Nazarene University (university) for seeking a religious exemption to aspects of title IX of the Education amendments of 1972 (Title IX). The purpose of this letter is to let you know that OCR has completed its evaluation of your complaint.

OCR has the authority to enforce Title IX. Title IX prohibits sex discrimination in programs and activities receiving federal financial assistance from the U.S. Department of Education. The university receives federal financial assistance from this Department.

Any religious exemption sought by an institution would necessarily be reviewed by the U.S. Department of Education's Assistant Secretary for Civil Rights. Any such request would be required to contain a statement by the highest ranking official of the institution, identifying the specific provisions of Title IX that conflict with a specific tenet of the religious organization.

This office is not aware of any religious exemption that has been requested. However, the act of requesting a religious exemption from Title IX is not a potential violation of Title IX. Your complaint did not allege that the University has taken any discriminatory action on the basis of sex that would violate the laws enforced by OCR. Therefore, we are dismissing your complaint as of the date of this letter.

This letter sets forth OCR's determination in an individual OCR case. This letter is not a formal statement of OCR policy and should not be relied upon, cited, or construed as such.

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.*

EXHIBIT T

Page 2 – OCR Reference No. 10152031

OCR's formal policy statements are approved by a duly authorized OCR official and made available to the public. You may have the right to file a private suit in federal court whether or not OCR finds a violation.

We regret that OCR is unable to assist you with your concerns. If you have any questions regarding this matter, please contact Timothy L. Sell, Senior Attorney, by telephone at (206) 607-1639, or by e-mail at timothy.sell@ed.gov.

Sincerely,

(b)(6); (b)(7(C)

Monique Malson
Acting Director
Seattle Office