

Training and Education in Professional Psychology
© 2019 American Psychological Association
1931-3918/20/$12.00
2020, Vol. 14, No. 3, 249–256
http://dx.doi.org/10.1037/tep0000272

This document is copyrighted by the American Psychological Association or one of its allied publishers. This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

# Protecting Sexual and Gender Minorities in Academic Institutions With Disallowing Policies: Psychological, Ethical, and Accreditation Concerns

Joshua R. Wolff
Northwestern University

Jane E. Atieno Okech and Lance C. Smith
University of Vermont

Paul J. Carlos Southwick
Davis Wright Tremaine LLP, Portland, Oregon

Sexual and gender minority (SGM) college students and employees receive important protections from discrimination through various laws and accreditation standards from professional associations in the United States. However, many SGM people attend or are employed at disallowing religious universities/colleges (DRUs), which have restrictive disciplinary policies that prohibit expressions of nonheterosexual, noncisgender identities. These SGM individuals receive little to no protections under the law, nor from accreditors, due to various exemptions. Such policies and campus climates create unique risk factors and challenges for SGM students who attend DRUs. This interdisciplinary article reviews the current psychological research on SGM college student health and campus climate at DRUs, ethical standards that pertain to diversity and higher education for psychologists and counselors, and standards of accreditation from the authors' respective professional accreditors, the American Psychological Association and the Council for Accreditation of Counseling and Related Educational Programs. Further, the authors provide a basic overview of legal and public policy actions that address protections for SGM college students who attend DRUs. We then offer systemic recommendations to improve the safety and well-being of SGM people at DRUs through changing campus policies and stronger oversight from accrediting bodies and the United States government, while also safeguarding religious freedom and diversity.

*Public Significance Statement*
This article may impact accreditation standards, and enforcement thereof, related to diversity in psychology and counselor education programs accredited by the American Psychological Association and the Council for Accreditation of Counseling and Related Educational Programs. This article also provides recommendations for the U.S. Department of Education.

*Keywords:* sexual minority, transgender, religion, higher education, accreditation

This article was published Online First July 25, 2019.

JOSHUA R. WOLFF, PhD, is a Staff Psychologist at The Family Institute at Northwestern University and serves as the co-chair of the APA Division 44 (Society for the Psychology of Sexual Orientation & Gender Diversity) Education & Training Committee. He received his doctorate from Biola University and completed an APA Congressional Fellowship in the United States Senate Health, Education, Labor, and Pensions (HELP) Committee. His professional work includes multiple collaborations with the U.S. Department of Health & Human Services (HHS) to reduce health disparities for LGBTQ+ Americans under the Obama Administration.

JANE E. ATIENO OKECH, PhD, is Professor and Chair of the Department of Leadership and Developmental Sciences at the University of Vermont. She received her doctorate in Counselor Education and Supervision from Idaho State University. Her research primarily focuses on the advancement of proficiencies in the practice of group psychotherapy and clinical supervision with diverse populations. Her scholarship also examines models of clinical supervision and the development of core supervision intervention proficiencies across various domains of clinical practice. Associated aspects of this scholarship foci are its intersection with counselor training, professional ethics and standards of practice.

LANCE C. SMITH, PhD, is an Associate Professor and the coordinator of the Graduate Program in Counseling at the University of Vermont. He received his doctorate in Counselor Education and Supervision at Syracuse University. His research agenda has included surfacing racist and heterosexist implicit bias within the fields of mental health, developing psychometrically sound instruments to measure critical consciousness, and examining the heteronormative "blindfold" of beneficent counselors.

PAUL J. CARLOS SOUTHWICK, JD, is an attorney in the litigation department of the law firm Davis Wright Tremaine LLP. He received his law degree from the University of Michigan Law School. His research and professional interests include constitutional issues relating to the free exercise rights of religiously affiliated organizations and policy issues impacting the rights and welfare of sexual and gender minorities who attend religiously affiliated colleges and universities.

CORRESPONDENCE CONCERNING THIS ARTICLE should be addressed to Joshua R. Wolff, The Family Institute, Northwestern University, Chicago, IL 60603. E-mail: jwolff@family-institute.org

EXHIBIT F

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

There are likely many reasons why faith-based higher education could appeal to sexual and gender minority (SGM) college students or employees, which include those who are lesbian, gay, bisexual, transgender, queer/questioning (LGBTQ), or same-sex attracted (Yarhouse, Stratton, Dean, & Brooke, 2009). These reasons may be complex. For example, Biaggio (2014, p. 94) noted the following:

> Perhaps [SGM students and employees] embrace the institution's religion and want to obtain or provide an education within this perspective, maybe they wish to actively suppress or change perceived homosexual tendencies in view of their religion, or perhaps when they entered they did not have such tendencies.

SGM people may also wish to obtain training in the integration of religion, spirituality, and models of clinical care. Regardless, SGM students, faculty, and staff may face unique challenges and possible risks in the college environment when they attend disallowing religious universities/colleges (DRUs), which include Evangelical Christian, some Roman Catholic, and Church of Latter-Day Saints (Mormon) institutions. DRUs condemn and/or prohibit LGBTQ identities and expression through policies such as (but not limited to) barring admission of SGM students, prohibiting same-sex romantic expression or gender nonbinary identities, prohibiting gender affirming medical procedures, requiring counseling for SGM students, and/or prohibiting/limiting student organizations that affirm SGM identities (McEntarfer, 2011; Smith & Okech, 2016a; Wolff & Himes, 2010). Failure to comply with these standards may lead to dismissal, termination, or other consequences. DRUs share a common thread in explicitly teaching that LGBTQ identities and expressions are sinful (i.e., immoral, disordered) based on Christian tenets (see the appendix of Smith & Okech, 2016a). Hence, DRUs inherently reject scientific perspectives which normalize sexual and gender diversity (Biaggio, 2014).

Recent media coverage has highlighted negative experiences of some SGM students and employees who attend or are employed at DRUs in the United States, with most coverage focused on Evangelical Christian universities (Wheeler, 2016). Such reports document SGM individuals being dismissed due to their sexual orientation or gender identity, transgender students being barred from housing that aligns with their gender identity, and hostile environments toward allies (Cruz, 2015; Hunt & Pérez-Peña, 2014; Rokos, 2014).

Situations that involve conflict between institutional religious beliefs and nondiscrimination policies present difficult clinical, ethical, and legal tensions for DRUs, as well as the associations and governing bodies which accredit them. As such, the purpose of this interdisciplinary review is to critically synthesize legislative policies, research, professional ethical standards, and current accreditation standards from health-service psychology and clinical mental health counseling in the hope that future accreditation policies and regulatory actions will be grounded in sound available data, ethical principles, and professional guidelines.

## Legislative and Public Policy Overview

The aforementioned media reports, in combination with student and organizational activism, generated legislation in the state of California as well as actions taken by the U.S. Department of Education (DoE) in 2015 due to concerns about the welfare of SGM students who attend DRUs (California State Legislature, 2016; DoE, 2016). For example, Title IX is a federal statute prohibiting sex discrimination by educational institutions that receive federal funding. During the Obama-era, DoE began publishing Title IX exemption letters, which have been submitted by DRUs to immunize themselves from compliance with DoE's former interpretation that Title IX protects transgender students from discrimination. Many DRUs sought exemptions related to sexual orientation as well as gender identity to safeguard, among other things, their code of conduct policies and hiring and admission practices that are grounded in disaffirming religious doctrine. However, in February of 2017, the Trump Administration withdrew the previous Obama-era guidance on protections for transgender students under Title IX (Green, 2017). Further, DoE (2018) recently updated its website to state that "an institution's [Title IX] exempt status is not dependent upon its submission of a written statement to [the DoE]."

At the U.S. state level, California introduced legislation, which, in its original form, would have barred all colleges and universities that discriminate based on sexual orientation and gender identity from receiving state funds. However, this part of the legislation was ultimately defeated due to strong opposition from DRUs (McGreevy, 2016). Given the controversial nature of this topic, along with the inherent challenges of placing limits on religious expressions, this is likely to be only the beginning of future judicial and legislative disputes in ongoing efforts to advance protections for SGM students in the U.S. education system.

Setting an important legal precedent, the Supreme Court of Canada (2018) recently upheld the decision of two law societies, which regulate the legal profession in Canada, to deny accreditation to a law school proposed by Trinity Western University (TWU), a DRU. The law societies denied accreditation because TWU's code of conduct policy prohibits sexual expression between same-sex partners, even when such conduct occurs off campus and within a legal same-sex marriage. The law societies determined that such a policy would have the effect of denying equal access to the legal profession, diminishing diversity within the bar, and causing harm to LGBTQ law students. The Supreme Court of Canada agreed and concluded that "The reality is that most LGBTQ individuals will be deterred from attending TWU's proposed law school, and those who do attend will be at the risk of significant harm" (see paragraph 39 of Supreme Court of Canada, 2018).

## Psychological Risk-Factors for SGM Students Who Attend DRUs

Several recent studies suggest that SGM students who attend DRUs face multiple risk factors, some of which may be unique or more pronounced at DRUs than other colleges. Among sexual minority (SM; e.g., lesbian, gay, bisexual) DRU students, Wolff, Himes, Soares, and Miller Kwon (2016) found that more than one third (37%) reported being bullied or harassed at school because of their sexual orientation. This number is almost twice the national average (23%) for SGM college students found by Rankin, Weber, Blumenfeld, and Frazer (2010). SM students who reported being bullied because of their sexual orientation were more likely to also report symptoms of depression (Wolff et al., 2016). Another study at a Roman Catholic university found that half of SGM undergrad-

uate students reported being harassed or bullied on campus, and that up to 16% experienced violence (Lockhart, 2013). However, students rarely reported these incidents due to fears of not being taken seriously, being treated with disrespect, outing themselves in an unsupportive environment, and worsening the situation (Lockhart, 2013). Another study of 104 SM students suggests that DRU campus climates are perceived as largely negative toward LGBTQ issues, with most derogatory remarks toward SM persons coming from other students, not from faculty or staff (Yarhouse et al., 2009). However, recent data suggest that some DRU faculty make derogatory remarks and jokes about SGM individuals in classes or are silent when derogatory remarks occur (Craig, Austin, Rashidi, & Adams, 2017).

SGM students attending DRUs may experience unique challenges and risks related to identity disclosure and development. For example, studies show that SM students at DRUs overwhelmingly publicly identify as heterosexual (Stratton, Dean, Yarhouse, & Lastoria, 2013) and conceal their identities due to a pervasive "culture of fear" and various safety concerns, which are linked to depression and suicide attempts (Craig et al., 2017, p. 9; Lockhart, 2013).

Recent studies show evidence of inadequate and harmful mental health services being provided to SGM students who attend DRUs. Two studies, one by Craig and colleagues (2017) and the other by Wolff et al. (2016) found that SM students reported that a mental health professional had attempted to change their sexual orientation (i.e., conversion therapy), which is widely condemned by professional associations (e.g., American Counseling Association [ACA], 2013; APA, 2009). Other students who received campus counseling at DRUs reported that they had been misdiagnosed with psychiatric illnesses (e.g., eating disorders) because of underlying gender dysphoria (Wolff, Stueland Kay, Himes, & Alquijay, 2017). Several participants also raised concerns about inadequate training for DRU staff on SGM issues. Of note, stigma, potential disciplinary action, and lack of provider competency may also partially explain low utilization rates of campus services among SGM students. For example, in one study only 14% of SM students sought counseling services at their DRU, despite recognition of services (Yarhouse et al., 2009).

Little research exists on how denominational types of DRU may influence SGM student experiences. However, Wolff et al.'s (2016) study found a link between more disallowing Christian denominations and the degree of difficulty SM students have with integrating their sexual orientation and religious beliefs. Hence, SM students who attended Mormon, Evangelical, and nondenominational Christian DRUs had significantly more difficulty coming to terms with their sexual orientation than those in Catholic or Mainline Protestant (e.g., Lutheran) universities.

Research also indicates that institutional policies and campus climates at DRUs may create difficulties for students in forming LGBTQ-affirming spaces. Wolff et al. (2016) found that less than half of SM students at DRUs were involved with an affirming campus organization, such as a Gender and Sexuality Alliance (GSA). Yet those students who were involved with a GSA had significantly less difficulty with resolving their sexual orientation, less negative sexual identities, and less religious incongruence (tension between one's faith and sexual orientation) than those students not involved. McEntarfer (2011) found that SGM students used four major strategies to create GSA's at DRUs: (1) *collaborative* (i.e., finding common ground with school administrators); (2) *conciliatory* (i.e., accepting restrictions of what can be done); (3) *assertive* (e.g., public, nonviolent protests and rejection of campus policies); and (4) *underground/subversive* (i.e., promoting change and advocacy via nonidentified students). Regardless of approach, these students and allied faculty made diversity a core focus of their advocacy, which required significant time, energy, and stress. In fact, several students who were heavily involved in GSA formation did not complete their degrees at these institutions. Though some DRU faculty and staff were visibly supportive of SGM students in McEntarfer's study, other research portrays situations in which affirming employees are much less visible due to fears of job loss and other repercussions (Getz & Kirkley, 2006).

Extremely limited data exist on the experiences of gender minority (GM; e.g., transgender, nonbinary) students who attend DRUs. However, Wolff et al. (2017) found four major themes among GM students attending DRUs, including (1) invisibility of GM identities on campus, (2) interpersonal rejection due to GM expression and identity, (3) ongoing tension and ambivalence related to GM students' religious beliefs and gender identities, and (4) resilience among GM students found through support systems. Specific examples included difficulty finding information about transgender issues on campus, a general sense of "don't ask, don't tell" around transgender issues; gender-based bullying and harassment on campus; leaving one's religious community to find an affirming alternative; and finding affirming faculty, mental health, and medical resources on campus or nearby.

This small, but growing, body of research suggests wide variation in SGM student experiences, mental health, and overall perceptions within DRUs. As such, sweeping assumptions cannot be made about SGM student experiences at DRUs. However, when taken overall, the literature summarized above raises substantial concerns related to mental health risk-factors (e.g., depression, suicide), potentially unethical and unsupported mental health practices such as "conversion therapy," lack of campus resources, barriers to forming social support groups (e.g., GSAs), and bullying/harassment of SGM students who attend DRUs.

### Ethical and Professional Issues

Faculty affiliated with counselor education and psychology departments are compelled to adhere to the ACA (2014) Code of Ethics and American Psychological Association (APA) Ethical Principles of Psychologists and Code of Conduct (2010), respectively. Both codes promote client and student welfare and safety, and avoidance of doing harm, as paramount (ACA, 2014, Part A.1.a; APA, 2010, Preamble, p. 3). Further, they address issues of discrimination based on diversity factors, including those related to sexual orientation and gender identity (e.g., see APA, 2010, Part 3.01), hold practitioners and educators to the same standards, and articulate that professionals adhering to the aforementioned codes will maintain an awareness of their personal values and beliefs and the potential discriminatory nature of such values and beliefs (see ACA, 2014, Part A.4.B.). To this effect, APA (2010) mandates that "[p]sychologists try to eliminate the effect biases based on those factors have on their work, and that they do not knowingly participate in or condone activities of others based upon such prejudices" (Principle E, p. 4).

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

The ACA and APA standards cover pedagogical, clinical, and administrative policies and practices. Furthermore, both codes hold their professionals responsible for gaining competence in areas that impact the populations that they serve and recommend consultation and supervision as they gain additional experience with marginalized populations (ACA, 2014; APA, 2010). This standard is critical, given research findings related to attempts at sexual orientation change efforts (Craig et al., 2017; Wolff et al., 2016) and inaccurate diagnoses with SGM students (Wolff et al., 2017) by mental health professionals. Both findings suggest some professionals at DRUs may lack competence in addressing SGM-related concerns.

Within the ACA and APA codes, both recognize students as potentially vulnerable populations, particularly during supervision and during self-reflection aspects of clinical training which may require self-disclosure. The ACA code highlights an expectation that, "Counselor educators actively infuse multicultural/diversity competency in their training and supervision practices. They actively train students to gain awareness, knowledge, and skills in the competencies of multicultural practice" (F.11.C). APA Standard 2.01(e) states that

> [p]sychologists respect the dignity and worth of all people, and the rights of individuals to privacy, confidentiality, and self-determination. Psychologists are aware that special safeguards may be necessary to protect the rights and welfare of persons or communities whose vulnerabilities impair autonomous decision making (https://www.apa.org/ethics/code/index).

Hence, this standard protects SGM students against coercion to share personal information regarding aversive personal experiences or stigmatized identities, thus further emphasizing boundaries of competence in DRU environments.

In sum, the responsibility to recognize, respect, and protect SGM people in environments that have disallowing policies is clearly embedded in both ACA and APA professional ethical codes. Counselor educators, counselors, and psychologists who adhere to their professional codes and standards of practice, therefore, have an obligation to advocate for the safety and equity of students who identify as SGMs, particularly in DRUs where those rights are very limited and SGM students and employees are explicitly marginalized by various policies.

### Accreditation Standards

Numerous counseling and psychology graduate training programs that are housed in DRUs have received accreditation by their respective professional accrediting bodies. The Council for Accreditation of Counseling and Related Educational Programs (CACREP) accredits masters and doctoral counseling programs. Health service psychology programs are accredited by the APA Commission on Accreditation (CoA). Both accrediting bodies are charged with setting and monitoring precise standards for promoting consistent quality training across their accredited programs— including programs housed within DRUs.

APA's Standards of Accreditation for Health Services Psychology and CACREP's 2016 Standards have clear guidelines regarding ethical practice, issues of diversity, and multicultural competence. Both accreditation bodies define cultural diversity as including, but not limited to sexual orientation and gender identity.

Moreover, both mandate standards that if applied with fidelity, would leave little room for disallowing policies. In reference to the ethical standards mentioned earlier, CACREP (2016) standards require faculty within accredited programs to evaluate counselors in training in a manner that is "consistent with . . . ACA Code of Ethics" (p. 5), whereas APA standards state that "all policies and procedures used by the program must be consistent with the profession's current ethics code" (APA, 2016, p. 11). CACREP (2016) also requires counselors to be trained "in eliminating biases, prejudices, and processes of intentional and unintentional oppression and discrimination" (see Sec II, 2f, p. 9). Both accrediting bodies call for systematic efforts to recruit and retain faculty, staff and students from diverse backgrounds, including SGM backgrounds (APA, 2016, p. 31; CACREP, 2016, p. 6).

Although CACREP (2016) standards do not explicitly address the conflicts between DRUs and SGM students, they do so indirectly by calling on counseling programs to challenge "institutional and societal barriers that impede access, equity and success for clients" (p. 8). APA accredited programs are "to ensure a supportive and encouraging learning environment" for diverse students and faculty and to avoid "restricting access . . . either directly or by imposing significant and disproportionate burdens on the basis of personal and demographic characteristics set forth in the definition of cultural diversity" (APA Standards, 2016, p. 9). The APA Standards (2016) go further to state the following:

> This requirement does not exclude programs from having a religious affiliation or purpose and adopting and applying admission and employment policies that directly relate to this affiliation or purpose, so long as public notice of these policies has been made to applicants, students, faculty, and staff. . . . These policies may provide a preference for persons adhering to the religious purpose or affiliation of the program, but they shall not be used to preclude the admission, hiring, or retention of individuals because of the personal and demographic characteristics set forth under the definition of cultural diversity. (p. 9)

Hence, neither counseling nor psychology accreditation standards grant training programs housed in DRUs the freedom to exclude SGM identity and expressions from their definition of cultural diversity. Faculty within these programs are not exempted from addressing social injustices and inequities that impede access and equity for persons who identify as SGM. Despite these standards, APA and CACREP have accredited programs that are housed in DRUs which have taken wide latitudes to impede access and equity for SGM students on the grounds of religious liberty (for a review of CACREP accredited programs, see Smith & Okech, 2016a; Smith & Okech, 2016b; for APA accredited programs, see Biaggio, 2014). Further, codes of conduct which attach disciplinary consequences to SGM students, based solely on the student's sexual or gender identity, would appear inconsistent with the APA accreditation policy that programs not use religion to "preclude retention" of diverse students (APA, 2016, p. 9).

### Recommendations for Protecting SGM People at DRUs

In the spirit of protecting SGM students, improving campus safety, building stronger campus communities, and respecting religious diversity and freedom, we propose several recommendations below for APA and CACREP accredited programs and the

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

U.S. Department of Education (DoE). The recommendations are derived from the integration of the research, accreditation policies, professional ethical codes and standards, and law/policy described earlier, with a core understanding that these exist to protect vulnerable populations, such as SGM people.

## Recommendation 1: Prohibit Accredited Programs From Linking Sexual and Gender Minority Identities to Disciplinary Consequences

The emerging (but steady) body of research, in combination with anecdotal media coverage, make clear that SGM students who attend DRUs may have unique risk factors for bullying, victimization, mental health problems, and exposure to harm. Further, a recent flurry of legal actions at the state and national level have arisen to promote and protect the safety of SGM students who attend DRUs, suggesting that the time for formal oversight has arrived. We support DRUs in their rights to maintain their own distinctive religious belief systems and traditions and note that accreditors must not violate their own professional standards with respect to religious diversity (Smith & Okech, 2016b). However, we believe it is unethical for DRU programs to force students and employees to adhere to behavioral codes which uniquely single-out and link SGM identities, including behaviors related to SGM identities, to disciplinary consequences. Such policies disregard the widely accepted scientific and ethical standards established by the APA and ACA. Moreover, SGM students are already a highly marginalized, at-risk population, therefore such policies likely threaten their safety and psychological well-being, a hypothesis tentatively supported by the studies cited above. Therefore, DRUs which maintain disciplinary policies that marginalize SGM people and place them at-risk should be held accountable by losing accreditation. Along with prohibiting these policies, accreditors should enforce existing standards that protect SGM students from being forced to disclose their identities (APA, 2010; ACA, 2014).

Some may counter that this process would unfairly single out faith-based programs based on their beliefs. However, for accreditation to be fair and consistent, all programs (regardless of religious affiliation) should be held to the same basic nondiscrimination and student safety standards. In the same vein, it equalizes codes of conduct for all students without targeting SGM students (e.g., if sexual relations before marriage are prohibited, why specify the gender of the sexual partners?). We also note that many Roman Catholic programs still maintain a unique religious identity without resorting to disciplinary consequences targeted at SGM students.

DRUs may argue that policies that disallow SGM identities are permissible since most of these institutions require students and faculty to sign a statement of faith and/or a behavioral conduct agreement prior to matriculation (Sells & Hagedorn, 2016). However, exploring and accepting one's sexual and or gender identity is a developmental process long supported by the extant literature (Bockting & Coleman, 2007). In other words, many SGMs in late adolescence through early adulthood have yet to develop the skills and knowledge necessary to own and voice their historically marginalized identities. Indeed, a recent study suggests that among highly religious SM men, coming out occurs later in life (Hoffarth & Bogaert, 2017). Further, Yarhouse and colleagues (2009) found that among Evangelical SMs who attend DRUs, they do not disclose same-sex attraction until they are 18 and one half years old, on average (i.e., during their freshman year of college). Therefore, it is reasonable to deduce that many SGM employees and students may have signed such statements of faith while still unsure of their sexual or gender identity, or perhaps very early in their coming out process. For such individuals, embracing an identity after they have already begun a degree program within DRUs carries the burden of potential loss of course credit, tuition deposits and the duress of relocating to another program. For these reasons, disciplinary actions targeted toward SGM students fail to take personal development into consideration. Thus, for DRUs to use preadmission informed consent to defend disciplinary policies toward SGM students is an unscientific and deeply flawed argument.

## Recommendation 2: Ensure That Nondiscrimination and Antiharassment/Violence Policies Include Sexual Orientation and Gender Identity

Regardless of theological doctrine on SGM identities/expressions, we believe there is substantial room for common ground in eliminating bullying or harassment of SGM students. As such, we call upon all DRUs accredited by APA and CACREP to explicitly add language to their nondiscrimination and antiharassment policies which includes gender identity and sexual orientation. Adding this language to existing policies sends a visible message that bullying of SGM students will not be tolerated. Of note, some DRUs which prohibit SGM expression have in fact added this language to their antidiscrimination policies (e.g., George Fox University, n.d.), which is a reasonable and positive step in creating safer campus environments while holding religious convictions. Further, DRUs should notify students about nondiscrimination and antiharassment policies, where to report complaints, where to receive medical and psychological support, and protect SGM individuals who make reports from retaliation. Moreover, DRUs should provide and publicize protections for SGM students who disclose their SGM identity, even if it violates the code of conduct, when reporting acts of sexual/gender violence or harassment. This would remove barriers to reporting harassment and sexual violence for SGM students who are victimized.

## Recommendation 3: Improve Transparency

We applaud the previous Obama-era DoE for publicizing the requests of DRUs wanting to discriminate against SGM students via Title IX exemption (DoE, 2016). Moreover, DoE should require formal exemption request letters from DRUs and remove the guidance on its website that states otherwise (DoE, 2018). Though DRUs may be within their statutory rights to request and be granted such exemptions, DoE should provide greater transparency regarding both the actual requests and how the exemptions are granted. Further, it may help prospective students when selecting a college or university that is the right "fit" for them considering their values, gender identity, and/or sexual orientation. Similarly, we call upon the APA CoA and CACREP to follow the DoE's lead and publish searchable public lists of accredited programs that have requested exemptions from diversity, admission, hiring, and retention standards related to SGM identities. Further, concerns raised by CACREP or the APA CoA about any program's diversity during programmatic reviews should be made public.

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

Case 6:21-cv-00474-AA   Document 59-6   Filed 08/11/21   Page 6 of 8

### Recommendation 4: Ensure Access to Culturally Competent Medical and Psychological Services

Medical and behavioral health providers that work for DRUs must be equipped to deliver clinical services which can address the complex intersection of gender, sexual orientation, and religion/spirituality for SGM students. This is not so easy a task and warrants significant institutional investment into training opportunities for staff. At DRUs that do not provide these services on-campus, careful attention must be paid to the qualifications of providers to whom students are referred. DRUs should implement screenings to ensure provider competence in working with SGM individuals and adherence to established professional guidelines. We raise this concern in light of Wolff and colleagues (2016) finding that a sizable portion of SGM students who attended DRUs had experienced attempted sexual orientation change by a professional. Further, Wolff et al. (2017) noted the importance of allowing transgender students access to medical providers who are knowledgeable about transition and other unique medical needs.

### Recommendation 5: APA and ACA Should Develop Resources to Assist SGM Students Who Attend DRUs

We believe that psychology and counseling should also strive to promote research and develop resources for DRUs wishing to maintain their religious identities while also adhering to professional standards. We call upon ACA, APA, and CACREP to fund research and to develop task forces which produce formal guidelines to protect SGM people who attend/work at DRUs. Such guidelines should include how to address SGM diversity in course curriculum, establish appropriate housing for gender minorities, reduce bullying/harassment, and perform self-studies to assess their program climate regarding SGM concerns. Such guidance could be of great benefit to the programs which these associations accredit or assist, though these may be limited in scope to the specific programs or departments. Hence, we hope a broader, more comprehensive list of resources could be created by DoE and made widely available. Finally, we call upon the APA and ACA to set up and publicize confidential SGM related consultation resources (e.g., phone number) for students in accredited programs.

### Recommendation 6: Protect and Promote Full Academic Freedom

Faculty, students, and staff should not be penalized for holding open dialogue in an academic environment, especially when the views espoused may be contrary to that of the institution. We raise this concern considering research and anecdotal reports suggesting that faculty and staff who express support for SGM students may face retaliation (Cruz, 2015; Getz & Kirkley, 2006). These actions are extremely concerning, as they assert that mere difference of thought can be policed in university settings, even when an individual has not violated any behavioral standards. These also imply that faculty, staff, and students must maintain static views on rapidly changing social issues, an unreasonable expectation, especially in education. Our concerns appear to be consistent with accreditation language. For example, APA's standards of accreditation (2016) state that "regardless of a program's setting, the program may not constrain academic freedom [. . .]" (p. 8). We interpret this language to be a strong endorsement of the importance of dialogue on campus which examines different viewpoints, a critical function of any academic institution. Policies which attach disciplinary consequences (e.g., employment termination) to faculty/staff who develop affirming views of SGM identities clearly violate such accreditation requirements and therefore warrant oversight from accreditors.

### Recommendation 7: Allow SGM Students to Organize Social Support Networks Without Retaliation

GSAs can provide many potential benefits for SGM students who attend DRUs, including assistance for working through identity concerns, social support, decreased negative identities, and decreased religious incongruence (Lockhart, 2013; Wolff et al., 2016). Moreover, research indicates that GSA's can provide resources to decrease bullying/harassment, improve perceptions of campus safety and belonging, educate via campus outreach, improve GPA's, and act as a protective factor against depression and substance abuse for SGM students (Heck et al., 2014; Ioverno, Belser, Baiocco, Grossman, & Russell, 2016; Poteat, Sinclair, DiGiovanni, Koenig, & Russell, 2013; Seelman, Forge, Walls, & Bridges, 2015). Of note, the impact of a GSA may not be immediate, and, as such, DRUs should strive to make a sustained commitment to GSAs (Ioverno et al., 2016).

Past research indicates that SM students who attend DRUs may not identify with labels such as *gay* or *lesbian* (Yarhouse et al., 2009). As such, the phrase "GSA" may not work well for groups at some DRUs. Further, the structure of each group would need to be modified depending on the nature of the institution at a DRU. For example, some groups may be focused more on questioning individuals, rather than students who have resolved identity concerns. Though exact names and structure may vary, it is of utmost importance that SGM students be allowed to form such groups, and that disclosures in such groups not be used against them. DRUs should not subject such groups to additional monitoring, beyond what is required of other campus groups. Further, faculty/staff advisors of such groups must be adequately trained in SGM issues and respect the privacy of all members by not disclosing membership lists nor what is revealed in meetings, unless required by law (e.g., if a student is at-risk for self-harm).

### Conclusion

Faith-based higher education has undoubtedly enriched the lives of many individuals who have been educated at these institutions. Actions taken to improve campus safety and a sense of belonging for SGM students only serve to strengthen these institutions. Though this task is difficult, it can be achieved through collaboration between diverse stakeholders (e.g., accreditors, administrators, faculty, students, and staff). Important steps include prohibiting discipline linked to SGM identities, adding sexual orientation and gender identity to antiharassment/violence policies, improving transparency, creating SGM-related resources, improving SGM competence in medical and psychological services, protecting academic freedom, and allowing SGM students to form important social support networks.

**References**

American Counseling Association [ACA]. (2013). *Ethical issues related to conversation or reparative therapy*. Retrieved from https://www.counseling.org/news/updates/2013/01/16/ethical-issues-related-to-conversion-or-reparative-therapy

American Counseling Association [ACA]. (2014). *ACA code of ethics*. Alexandria, VA: Author.

American Psychological Association [APA]. (2009). *Resolution on appropriate therapeutic response to sexual orientation distress and change efforts*. Retrieved from http://www.apa.org/about/policy/sexual-orientation.aspx

American Psychological Association [APA]. (2010). *Ethical principles of psychologists and code of conduct*. Washington, DC: Author.

American Psychological Association [APA]. (2016). *Standards for accreditation for health services psychology*. Retrieved from http://www.apa.org/ed/accreditation/about/policies/standards-of-accreditation.pdf

Biaggio, M. (2014). Do some APA-accredited programs undermine training to serve clients of diverse sexual orientations? *Psychology of Sexual Orientation and Gender Diversity, 1,* 93–95. http://dx.doi.org/10.1037/sgd0000027

Bockting, W. O., & Coleman, E. (2007). Developmental stages of the transgender coming out process: Toward an integrated identity. In R. Ettner, S. Monstrey, & E. Eyler (Eds.), *Principles of transgender medicine and surgery* (pp. 185–208). New York, NY: Hawthorn.

California State Legislature. (2016). *SB-1146 Discrimination: Postsecondary education*. Retrieved from https://leginfo.legislature.ca.gov/faces/billNavClient.xhtml?bill_id=201520160SB1146

Council for Accreditation of Counseling and Related Educational Programs. (2016). *2016 CACREP standards*. Retrieved from https://www.cacrep.org/for-programs/2016-cacrep-standards/

Craig, S. L., Austin, A., Rashidi, M., & Adams, M. (2017). Fighting for survival: The experiences of lesbian, gay, bisexual, transgender, and questioning students in religious colleges and universities. *Journal of Gay & Lesbian Social Services, 29,* 1–24. http://dx.doi.org/10.1080/10538720.2016.1260512

Cruz, E. (2015, December 11). *A Christian university toughens its anti-LGBT stances*. Retrieved from http://www.advocate.com/religion/2015/12/11/christian-university-toughens-its-anti-lgbt-stances

George Fox University. (n.d.). *Graduate/DPS student life policies: Discrimination and harassment*. Retrieved from http://www.georgefox.edu/grad-dps-policies/harassment-discrimination.html

Getz, C., & Kirkley, E. (2006). Shaking up the status quo: Challenging intolerance of the lesbian, gay and bisexual community at a private Roman Catholic university. *College Student Journal, 40,* 857–869.

Green, E. (2017, March). *The Trump Administration may have doomed Gavin Grimm's case*. Retrieved from https://www.theatlantic.com/politics/archive/2017/03/the-trump-administration-may-have-doomed-gavin-grimm/518676/

Heck, N. C., Livingston, N. A., Flentje, A., Oost, K., Stewart, B. T., & Cochran, B. N. (2014). Reducing risk for illicit drug use and prescription drug misuse: High school gay-straight alliances and lesbian, gay, bisexual, and transgender youth. *Addictive Behaviors, 39,* 824–828. http://dx.doi.org/10.1016/j.addbeh.2014.01.007

Hoffarth, M. R., & Bogaert, A. F. (2017). Opening the closet door: Openness to experience, masculinity, religiosity, and coming out among same-sex attracted men. *Personality and Individual Differences, 109,* 215–219. http://dx.doi.org/10.1016/j.paid.2017.01.011

Hunt, J., & Pérez-Peña, R. (July 24, 2014). *Housing dispute puts Quaker University at front of fight over transgender issues*. Retrieved from http://www.nytimes.com/2014/07/25/us/transgender-student-fights-for-housing-rights-at-george-fox-university.html?_r=0

Ioverno, S., Belser, A. B., Baiocco, R., Grossman, A. H., & Russell, S. T. (2016). The protective role of gay–straight alliances for lesbian, gay, bisexual, and questioning students: A prospective analysis. *Psychology of Sexual Orientation and Gender Diversity, 3,* 397–406. http://dx.doi.org/10.1037/sgd0000193

Lockhart, J. (2013, April). *Sexual and gender minority students speak out: A campus climate survey*. Paper presented at the Fordham University Undergraduate Research Symposium. Fordham University, New York, New York.

McEntarfer, H. K. (2011). "Not going away": Approaches used by students, faculty, and staff members to create gay–straight alliances at three religiously affiliated universities. *Journal of LGBT Youth, 8,* 309–331. http://dx.doi.org/10.1080/19361653.2011.607623

McGreevy, P. (2016, September 1). *State senator drops proposal that angered religious universities in California*. Retrieved from http://www.latimes.com/politics/essential/la-pol-sac-essential-politics-updates-senator-drops-proposal-that-had-angered-1470853912-htmlstory.html

Poteat, V. P., Sinclair, K. O., DiGiovanni, C. D., Koenig, B. W., & Russell, S. T. (2013). Gay–straight alliances are associated with student health: A multischool comparison of LGBTQ and heterosexual youth. *Journal of Research on Adolescence, 23,* 319–330. http://dx.doi.org/10.1111/j.1532-7795.2012.00832.x

Rankin, S. R., Weber, G., Blumenfeld, W., & Frazer, S. (2010). *2010 state of higher education for lesbian, gay, bisexual, and transgender people*. Charlotte, NC: Campus Pride.

Rokos, B. (2014, July 11). *Cal Baptist wins on most claims in suit by transgender student*. Retrieved from http://www.pe.com/articles/javier-697433-baptist-university.html

Seelman, K. L., Forge, N., Walls, N. E., & Bridges, N. (2015). School engagement among LGBTQ high school students: The roles of safe adults and gay–straight alliance characteristics. *Children and Youth Services Review, 57,* 19–29. http://dx.doi.org/10.1016/j.childyouth.2015.07.021

Sells, J. N., & Hagedorn, W. B. (2016). CACREP accreditation, ethics, and the affirmation of both religious and sexual identities: A response to Smith and Okech. *Journal of Counseling and Development, 94,* 265–279. http://dx.doi.org/10.1002/jcad.12083

Smith, L. C., & Okech, J. E. A. (2016a). Ethical issues raised by CACREP accreditation of programs within institutions that disaffirm or disallow diverse sexual orientations. *Journal of Counseling and Development, 94,* 252–264. http://dx.doi.org/10.1002/jcad.12082

Smith, L. C., & Okech, J. E. A. (2016b). Negotiating CACREP accreditation practices, religious diversity and sexual orientation diversity [A rejoinder to Sells and Hagedorn]. *Journal of Counseling and Development, 94,* 280–284. http://dx.doi.org/10.1002/jcad.12084

Stratton, S. P., Dean, J., Yarhouse, M., & Lastoria, M. (2013). Sexual minorities in faith-based higher education: A national survey of attitudes, milestones, identity, and religiosity. *Journal of Psychology and Theology, 41,* 3–23. http://dx.doi.org/10.1177/009164711304100101

Supreme Court of Canada. (2018, June 15). *Trinity Western University v. Law Society of Upper Canada, 2018 SCC 33*.

U.S. Department of Education. (2016). *Religious exemption*. Retrieved from https://www2.ed.gov/about/offices/list/ocr/docs/t9-rel-exempt/z-index-links-list-2009-2016.html

U.S. Department of Education. (2018). *Exemptions from Title IX*. Retrieved from https://www2.ed.gov/about/offices/list/ocr/docs/t9-rel-exempt/index.html

Wheeler, D. (2016, March). *The LGBT politics of Christian colleges*. Retrieved from http://www.theatlantic.co/education/archive/2016/03/the-lgbt-politics-of-christian-colleges/473373/

Wolff, J. R., & Himes, H. L. (2010). The purposeful exclusion of sexual minority youth in religious higher education: The implications of discrimination. *Christian Higher Education, 9,* 439–460. http://dx.doi.org/10.1080/15363759.2010.513630

Wolff, J. R., Himes, H. L., Soares, S., & Miller Kwon, E. (2016). Sexual minority student experiences in non-affirming religious higher education: Mental health, outness and identity. *Psychology of Sexual Orien-

*tation and Gender Diversity, 3,* 201–212. http://dx.doi.org/10.1037/sgd0000162

Wolff, J. R., Stueland Kay, T., Himes, H. L., & Alquijay, J. (2017). Transgender and gender non-conforming student experiences in Christian higher education: A qualitative exploration. *Christian Higher Education, 16,* 1–20. http://dx.doi.org/10.1080/15363759.2017.1310065

Yarhouse, M. A., Stratton, S. P., Dean, J. B., & Brooke, H. L. (2009). Listening to sexual minorities on Christian college campuses. *Journal of Psychology and Theology, 37,* 96–113. http://dx.doi.org/10.1177/009164710903700202

Received September 13, 2018
Revision received April 24, 2019
Accepted May 20, 2019 ■

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.