

**COMMONWEALTH OF PENNSYLVANIA OFFICE OF ATTORNEY GENERAL JOSH SHAPIRO ATTORNEY GENERAL**

**STATE OF CALIFORNIA OFFICE OF THE ATTORNEY GENERAL XAVIER BECERRA ATTORNEY GENERAL**

**STATE OF NEW JERSEY OFFICE OF THE ATTORNEY GENERAL GURBIR S. GREWAL ATTORNEY GENERAL**

January 30, 2019

*VIA Federal eRulemaking Portal & Mail*
The Honorable Betsy DeVos
Secretary
U.S. Department of Education
400 Maryland Avenue S.W.
Washington D.C. 20202

Re:     Comment on Proposed Rule Regarding Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance—Docket ID ED–2018–OCR–0064 (83 Fed. Reg. 61,462 (Nov. 29, 2018))

Dear Secretary DeVos:

On behalf of the Commonwealths of Pennsylvania and Kentucky, the States of New Jersey, California, Delaware, Hawaiʻi, Illinois, Iowa, Maine, Maryland, Minnesota, Nevada, New Mexico, North Carolina, Oregon, Rhode Island, Vermont, Washington, and the District of Columbia, we write to express our strong opposition to the *Proposed Rule Regarding Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance* (the "proposed rule"), published by the Department of Education (the "Department") in the Federal Register on November 29, 2018. This rule seeks to impose procedures for the implementation of Title IX of the Education Amendments Act of 1972 (Title IX). Unfortunately, many of these proposed procedures would thwart the very purpose of Title IX—to provide equal access to educational opportunities. For this reason, we urge you to withdraw this rule.

EXHIBIT O

Proper enforcement of Title IX is an issue of immense importance to our states, our resident students and families, our teachers, and our communities. The ability to learn in a safe environment free from violence and discrimination is critical and something that we as states prioritize and value.

Conduct that violates Title IX may also violate criminal laws, and state attorneys general, along with county and local prosecutors, have the responsibility to investigate and prosecute these violations when warranted. Many of our states prohibit discrimination based on sex.[1] We have a strong interest in vigorous enforcement of these laws and in ensuring that our own enforcement efforts are not undermined by a weaker federal regime.

Title IX applies to public K-12 schools as well as public colleges and universities, so the states are regulated entities under the proposal. And the states themselves regulate, and in many cases provide funding for, private educational institutions within their borders, which will be subject to the proposed rule to the extent they receive federal funds. Most importantly, the states have a profound interest in protecting the well-being of their students and in ensuring that they are able to obtain an education free of sexual harassment, violence, and discrimination.

We represent states in which schools[2] have worked to bring their procedures in line with Title IX's requirements: to provide students an educational environment free from discrimination based on sex, including sexual harassment and violence. The proposed rule imposes new requirements on schools and complainants that would mark a significant departure from that fundamental purpose of Title IX.

In this comment letter, we address aspects of the proposed rule that would be incompatible with Title IX, inappropriate exercises of the Department's authority, and unsupported by the facts. Section I of the comment provides relevant factual and legal background on sexual harassment and violence and its impact on education. Section II addresses the Department's proposal for a general rule to govern schools' obligations to respond to sexual harassment and violence. Section III addresses the proposed definitions of "complainant," "formal complaint," and "supportive measures." Section IV details problems with the Department's proposed formal grievance procedures. Section V requests clarification regarding how the proposed rule will interact with other federal, state, and local laws and policies. Section VI addresses other issues with the proposed rule. Section VII identifies flaws in the

---

[1] *E.g.*, Cal. Const., art. I, § 7(a) & (b); Cal. Educ. Code § 220; Cal. Gov't Code § 11135; Minn. Stat. § 363A.13; N.J.S.A. 10:5-12; Pa. Const. art. I, § 28.

[2] For purposes of this letter, "school" is defined consistent with the statute to include "any education program or activity receiving Federal financial assistance," which includes but is not limited to most elementary and secondary schools and institutions of undergraduate and higher graduate education. 20 U.S.C. § 1681, *et. seq.* We use "school" synonymously with the term "recipient" used by the proposed rule.

EXHIBIT O

Department's regulatory impact analysis. And Section VIII speaks to the effective date of any Title IX rule adopted by the Department.

Finally, we are concerned that during the notice and comment process the Department of Education has not proactively released required records under the Administrative Procedure Act (APA). The APA requires federal agencies to reveal "for public evaluation" the "technical studies and data upon which the agency relies" in rulemaking, including reports and information relied on by the agency in reaching its conclusions.[3] We understand that studies relied on by the Department in preparing the Regulatory Impact Analysis[4] have not been made available to the public in contravention of the APA. In addition, tens of thousands of comments already submitted to Regulations.gov are also not available to the public,[5] even though the Notice of Proposed Rulemaking (NPRM) specifically indicates "all public comments about these proposed regulations" will be available for inspection "[d]uring and after the comment period" by accessing Regulations.gov. 83 Fed. Reg. at 61,463. We ask that the Department promptly make this information public and provide sufficient time for a meaningful response.

---

[3] *American Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 236 (D.C. Cir. 2008) (internal quotations and citations omitted).

[4] *See, e.g.*, 83 Fed. Reg. at 61,485 (discussing "examin[ation of] public reports of Title IX reports and investigations at 55 [institutions of higher education] nationwide").

[5] *Compare* https://www.regulations.gov/document?D=ED-2018-OCR-0064-0001 (stating that approximately 96,800 comments have been submitted as of 2:00 PM ET on January 30, 2019), *with* https://www.regulations.gov/docketBrowser?rpp=25&po=0&dct=PS&D=ED-2018-OCR-0064&refD=ED-2018-OCR-0064-0001 (allowing the public to access only 8,909 comments as of 2:00 PM ET on January 30, 2019).

EXHIBIT O

Table of Contents

I.      Title IX Guarantees Students an Equal Education Free of Sexual Harassment,
        Which is Pervasive and Deeply Harmful to Students. .......................................................... 7

II.     The Department of Education's Title IX Standards Are Contrary to Title IX and
        Weaken Students' Protections Against Sexual Harassment and Violence. ...................... 12

        A.      The Proposed Rule Would Narrow the Definition of "Sexual Harassment"
                In Ways that Would Undermine the Objectives of Title IX. ............................... 13

                1.      The Proposed Definition of "Sexual Harassment" Would
                        Significantly Depart from Previous Title IX Policy. ............................... 13

                2.      The Proposed Definition of "Sexual Harassment" Would Fail to
                        Account for the Context in Which Sexual Harassment Occurs. .............. 17

                3.      The Proposed Definition of "Sexual Harassment" Would Chill
                        Reporting........................................................................................................ 18

        B.      The Proposed Rule Would Inappropriately Limit Schools' Obligation to
                Respond to Sexual Harassment and Violence by Excusing Failures to
                Respond to Conduct that Does Not Occur "In an Education Program or
                Activity."............................................................................................................. 19

        C.      The "Actual Knowledge" Standard is Too Restrictive. .................................... 22

                1.      The Proposed Rule Undermines the Purpose of Title IX and
                        Creates an Improper Incentive to Willfully Ignore Sexual
                        Harassment Because it Requires Schools to Respond Only if They
                        Have "Actual Knowledge" of the Harassment. ....................................... 22

                2.      Constructive Knowledge and Agency Principles Should Apply to
                        the School's Notice of Sexual Harassment and Violence........................ 24

        D.      The Proposed Rule Would Adopt a "Deliberate Indifference" Standard
                That Is Not Appropriate for Administrative Enforcement of Title IX................. 26

        E.      Safe Harbor Provisions Are Inappropriate and Schools Must Investigate
                Any Potential Hostile Environment. .................................................................. 28

III.    The Department Should Adopt Policies for Complaints that Maximize Reporting. ........ 31

        A.      The Department's Proposed Definition of "Complainant" Is Too
                Restrictive. ......................................................................................................... 31

        B.      The Definition of "Formal Complaint" Creates a Barrier to Filing for
                Complainants, Particularly Underage Students, and Does Not Provide for
                Reasonable Accommodation. ............................................................................. 32

        C.      "Supportive Measures" Should be Responsive to a Complainant's Needs. ......... 33

IV.     The Proposed Grievance Procedure Fails to Provide a Fair and Equitable Process
        for Resolving Formal Title IX Complaints........................................................................ 34

EXHIBIT O                                                                                                                4

|     | A. | Credibility Determinations Should Not Be Based Solely on Person's Status. | 35 |
|     | B. | The Presumption of Non-Responsibility Improperly Tilts the Process in Favor of the Respondent. | 35 |
|     | C. | The Department Should Provide Prompt Timeframes and Should Not Encourage Good Cause Delay for Concurrent Law Enforcement Proceedings. | 36 |
|     | D. | When Issuing a Notice Upon Receipt of a Formal Complaint, Schools Should be Required to Protect Confidentiality and Preserve the Integrity of the Investigation. | 38 |
|     | E. | Schools Should be Allowed to Place Limited, Reasonable Restrictions on Discussions by the Parties. | 39 |
|     | F. | The Proposed Hearing Procedures Will Chill Reporting, Burden Schools, and Harm Both Complainants and Respondents. | 39 |
|     | G. | Schools Should Not be Required to Provide Parties With Access to All Collected Evidence. | 42 |
|     | H. | The Standard of Proof Should Remain Preponderance of the Evidence. | 43 |
|     | I. | The Written Determination Must Include Steps to Eliminate Any Hostile Environment. | 47 |
|     | J. | The Department Should Clarify that both Complainants and Respondents Have Equal Access to the Appeal Process. | 47 |
|     | K. | Any Informal Resolution Must Empower Complainants and Seek Restorative Justice. | 47 |
|     | L. | The Recordkeeping Retention Period Should Be Extended. | 48 |
| V. | | The Department Should Not Adopt a Title IX Rule that Adversely Affects Schools' Ability to Go Beyond Title IX's Requirements in Addressing Sexual Harassment and Violence, Including Their Ability to Comply with Other Applicable Laws. | 49 |
|     | A. | Title IX Cannot, And Does Not, Restrict The Ability of States and Schools To Provide Broader Protections Against Sex Discrimination. | 49 |
|     | B. | State Laws Provide Greater Protections for Students In Their States. | 52 |
| VI. | | Other Areas That Should Be Addressed Before Any Final Rule is Adopted. | 56 |
|     | A. | Any Final Rule Should Reinstate the Longstanding Prohibition of Policies That "Suggest" Sex Discrimination. | 56 |
|     | B. | The Proposal to Eliminate the Requirement that Institutions Invoke the Statute's Religious Exemption in Writing Raises Concerns of Fair Notice to Students. | 59 |

5

C.      Restriction of Remedies to Exclude "Damages" and Lack of Definition Inconsistently Limits Remedial Scheme Which Was Intended to Strike at the Entire Spectrum of Discrimination on the Basis of Sex. ................................. 60

D.      Any Final Rule Should Include Guidelines for Confidentiality. .......................... 61

E.      Schools Have Continuing Obligations Following a Finding of Responsibility or Following an Independent Investigation. ................................. 62

F.      The Proposed Rule Fails to Sufficiently Address the Family Educational Rights and Privacy Act (FERPA). ........................................................................... 63

VII.    The Regulatory Impact Assessment Fails to Accurately Assess the Effect of the Proposed Rule. ..................................................................................................................... 63

A.      Ignored Costs. ..................................................................................................... 63

1.      Allegations that Do Not Meet the Proposed Stringent Requirements May Still Resurface as Costly Lawsuits. ........................... 64

2.      The Department Should Consider the Relationship Between Uninvestigated Allegations and Short- and Long-Term Absences........... 65

3.      Costs to Transgender Students. ................................................................ 65

B.      Unreasonably Low Estimate of Percentage of Title IX Complaints Based on Sexual Harassment or Sexual Violence. ......................................................... 66

C.      The Department Provides Unreasonably Low Cost Estimates for Implementing the Proposed Rule. ........................................................................ 66

VIII.   The Department Should Delay the Effective Date of the Rule. ........................................ 68

IX.     Conclusion ....................................................................................................................... 69

EXHIBIT O

## I.    Title IX Guarantees Students an Equal Education Free of Sexual Harassment[6], Which is Pervasive and Deeply Harmful to Students.

Title IX of the Education Amendments Act of 1972 is a civil rights statute that guarantees students equal access to educational programs and activities free of discrimination based on sex.[7] Since at least 1992, this right has been applied to protect students from sexual harassment and sexual violence that would limit or deny their ability to participate equally in the benefits, services, and opportunities of federally funded educational programs and activities.[8]

Sexual harassment of students occurs far too frequently—at all grade levels and to all types of students. More than 20 percent of girls aged 14 to 18 have been kissed or touched without consent.[9] In grades 7–12, 56 percent of girls and 40 percent of boys are sexually harassed every year, with nearly a third of the harassment taking place online.[10] In college, nearly two thirds of both men and women will experience sexual harassment.[11] More than 1 in 5 women and nearly 1 in 18 men in college were survivors of sexual assault or sexual misconduct due to physical force, threats of force, or incapacitation.[12] The federal government's own studies reaffirm these statistics: the U.S. Department of Justice's Bureau of Justice Statistics found that, on average, 20.5 percent of college women had experienced sexual assault since entering college,[13] while the Centers for Disease Control and Prevention found that one in five women

---

[6] Sexual violence and sexual assault can both be forms of sexual harassment. The term "sexual harassment" as used herein includes sexual violence, which courts and the Department have recognized is a subset of actionable conduct under the term "sexual harassment." *See, e.g.*, U.S. Dep't of Educ., Off. for Civil Rights, *Dear Colleague Letter*, at 1 (Apr. 4, 2011, withdrawn Sept. 22, 2017) (the "2011 DCL") ("Sexual harassment of students, which includes acts of sexual violence, is a form of sex discrimination prohibited by Title IX.").

[7] 20 U.S.C. § 1681(a).

[8] *Franklin v. Gwinnett Cty. Pub. Schs.,* 503 U.S. 60 (1992).

[9] Nat'l Women's Law Center, *Let Her Learn: Stopping School Pushout for: Girls Who Have Suffered Harassment and Sexual Violence* 1 (Apr. 2017), https://nwlc.org/resources/stopping-school-pushout-for-girls-who-have-suffered-harassment-and-sexual-violence.

[10] Catherine Hill & Holly Kearl, *Crossing the Line: Sexual Harassment at School*, AAUW 11 (2011), https://www.aauw.org/files/2013/02/Crossing-the-Line-Sexual-Harassment-at-School.pdf.

[11] Catherine Hill & Elena Silva, *Drawing the Line: Sexual Harassment on Campus*, AAUW 17, 19 (2005), https://history.aauw.org/files/2013/01/DTLFinal.pdf (noting differences in the types of sexual harassment and reactions to it).

[12] *E.g.*, David Cantor et al., *Report on the AAU Campus Climate Survey on Sexual Assault and Sexual Misconduct*, Association of American Universities 13-14 (Sept. 2015, reissued Oct. 2017), https://www.aau.edu/sites/default/files/AAU-Files/Key-Issues/Campus-Safety/AAU-Campus-Climate-Survey-FINAL-10-20-17.pdf.

[13] *See generally*, Campus Climate Survey Validation Study, Final Technical Report (Jan. 2016), Appx. E, https://www.bjs.gov/content/pub/pdf/App_E_Sex-Assault-Rape-Battery.pdf; *see also* Sofi Sinozich & Lynn Langton, *Rape and Sexual Assault Victimization Among College-Age Females, 1995–*

EXHIBIT O                                                                                              7

have experienced sexual assault in their lifetimes.[14] And harassment is not limited to women: Men and boys are far more likely to be subjected to sexual assault than to be falsely accused of it.[15] Historically marginalized and underrepresented groups—such as girls who are pregnant or raising children, LGBTQ students, and students with disabilities—are more likely to experience sexual harassment than their peers.[16]

Despite the frequency of campus sexual harassment and violence, those subjected to it often refrain from reporting it. In 2016, only 20 percent of rape and sexual assault survivors reported these crimes to the police.[17] Only 12 percent of college survivors[18] and two percent of female survivors ages 14–18[19] reported sexual assault to their schools or the police. One national

*2013*, U.S. DOJ, Office of Justice Programs, Bureau of Justice Statistics (Dec. 2014), https://www.bjs. gov/content/pub/pdf/rsavcaf9513.pdf.

[14] Ctrs. for Disease Control & Prevention, *National Intimate Partner and Sexual Violence Survey*, https://www.cdc.gov/violenceprevention/pdf/nisvs_report2010-a.pdf; *see also* Ctrs. for Disease Control & Prevention, *Understanding Sexual Violence Fact Sheet*, https://www.cdc.gov/violenceprevention/pdf/sv-factsheet.pdf (last checked Jan. 21, 2019) (reporting that 1 in 2 women and 1 in 5 men experienced sexual violence other than rape during their lifetimes, about 1 in 5 women have experienced completed or attempted rape, 1 in 21 men have been made to penetrate someone else in their lifetime, and 1 in 3 female rape victims experienced it for the first time between 11-17 years old and 1 in 9 reported that it occurred before age 10).

[15] *E.g.*, Tyler Kingkade, *Males Are More Likely To Suffer Sexual Assault Than To Be Falsely Accused Of It*, Huffington Post (Oct. 16, 2015), https://www.huffingtonpost.com/2014/12/08/false-rape-accusations_n_6290380.html.

[16] Nat'l Women's Law Center, *Let Her Learn: Stopping School Pushout for Girls Who Are Pregnant or Parenting* 12 (2017), https://nwlc.org/resources/stopping-school-pushout-for-girls-who-are-pregnant-or-parenting (56 percent of girls aged 14 to 18 who are pregnant or raising children are touched or kissed without consent); Joseph G. Kosciw et al., *The 2017 National School Climate Survey: The Experiences of Lesbian, Gay, Bisexual, Transgender, and Queer Youth in Our Nation's Schools*, GLSEN 26 (2018), https://www.glsen.org/article/2017-national-school-climate-survey-1; *AAU Campus Climate Survey*, *supra* note 12, at 13–14 (nearly 25 percent of transgender or gender non-conforming students are sexually assaulted in college); Nat'l Women's Law Center, *Let Her Learn: Stopping School Pushout for: Girls With Disabilities* 7 (2017), https://nwlc-ciw49tixgw5lbab.stackpathdns.com/wp-content/uploads/2017/04/Final_nwlc_Gates_GirlsWithDisabilities.pdf ("[C]hildren with disabilities were 2.9 times more likely than children without disabilities to be sexually abused.").

[17] DOJ, Bureau of Justice Stats., *Criminal Victimization, 2016: Revised*, at 7 (Oct. 2018), https:// www.bjs. gov/content/pub/pdf/cv16.pdf.

[18] *Poll: One in 5 Women Say They Have Been Sexually Assaulted in College*, Wash. Post (June 12, 2015), https://www.washingtonpost.com/graphics/local/sexual-assault-poll; *see also Drawing the Line: Sexual Harassment on Campus*, *supra* note 11, at 2 ("[L]ess than 10 percent of these students tell a college or university employee about their experiences and an even smaller fraction officially report them to a Title IX officer.").

[19] *Let Her Learn: Stopping School Pushout for: Girls Who Have Suffered Harassment and Sexual Violence*, supra note 9, at 2.

EXHIBIT O

survey found that of 770 rapes on campus during the 2014–2015 academic year, only 40 were reported to authorities under the Clery Act guidelines.[20] Students often choose not to report for fear of reprisal, because they believe their abuse was not important enough, or because they think that no one would do anything to help.[21] Reporting is even less likely among students of color,[22] undocumented students,[23] LGBTQ students,[24] and students with disabilities.[25]

When not addressed properly, sexual harassment can have a debilitating impact on a student's access to education.[26] For example, 34 percent of college survivors of sexual assault drop out of college,[27] often because they no longer feel safe on campus.[28]

This is why effective Title IX enforcement is crucial: Protecting students from the devastating effects of sexual harassment is a necessary component of an equal education free

---

[20] N.J. Task Force on Campus Sexual Assault, *2017 Report and Recommendations*, https://www.nj.gov/highereducation/documents/pdf/index/sexualassaulttaskforcereport2017.pdf.

[21] RAINN, *Campus Sexual Violence: Statistics*, https://www.rainn.org/statistics/campus-sexual-violence.

[22] Colleen Murphy, *Another Challenge on Campus Sexual Assault: Getting Minority Students to Report It*, The Chronicle of Higher Education (June 18, 2015) (discussing underreporting by student of color), https://www.chronicle.com/article/Another-Challenge-on-Campus/230977; *see also* Kathryn Casteel, Julie Wolfe & Mai Nguyen, *What We Know About Victims of Sexual Assault in America*, Five Thirty Eight Projects (last checked Jan. 21, 2019), https://projects.fivethirtyeight.com/sexual-assault-victims (reporting results of the 2017 National Crime Victimization Survey (NCVS), finding that 77 percent of incidents of rape and sexual assault were not reported to the police and that 15 percent of the incidents of rape and sexual assault in the NCVS were reported by Hispanic respondents and 13 percent by non-Hispanic black respondent).

[23] *See* Jennifer Medina, *Too Scared to Report Sexual Abuse. The Fear: Deportation*, N.Y. Times (Apr. 30, 2017), https://www.nytimes.com/2017/04/30/us/immigrants-deportation-sexual-abuse.html?mcubz=3.

[24] National Center for Transgender Equality, *The Report of the 2015 U.S. Transgender Survey: Executive Summary* 12 (Dec. 2016), https://transequality.org/sites/default/files/docs/usts/USTS-Executive-Summary-Dec17.pdf.

[25] Nat'l Women's Law Center, *Let Her Learn: Stopping School Pushout for: Girls with Disabilities* 7 (2017), https://nwlc-ciw49tixgw5lbab.stackpathdns.com/wp-content/uploads/2017/04/Final_nwlc_Gates_GirlsWithDisabilities.pdf.

[26] *E.g.*, Audrey Chu, *I Dropped Out of College Because I Couldn't Bear to See My Rapist on Campus*, Vice (Sept. 26, 2017), https://broadly.vice.com/en_us/article/qvjzpd/i-dropped-out-of-college-because-i-couldnt-bear-to-see-my-rapist-on-campus.

[27] Cecilia Mengo & Beverly M. Black, *Violence Victimization on a College Campus: Impact on GPA and School Dropout*, 18(2) J.C. Student Retention: Res., Theory & Prac. 234, 244 (2015), https://doi.org/10.1177/1521025115584750.

[28] *E.g.*, Alexandra Brodsky, *How Much Does Sexual Assault Cost College Students Every Year?*, Wash. Post (Nov. 18, 2014), https://www.washingtonpost.com/posteverything/wp/2014/11/18/how-much-does-sexual-assault-cost-college-students-every-year/.

EXHIBIT O                                                                                                    9

from discrimination. In enacting Title IX, Congress intended to ensure that all students, regardless of sex, have equal access to education. Title IX places the obligation on schools—not students—to provide educational programs and activities free from sex discrimination, sexual harassment, and sexual violence. A school's compliance with Title IX is not limited to responding appropriately to individual reports or formal complaints filed by students. Instead, schools have an affirmative legal obligation to stop harassment, eliminate hostile educational environments, prevent recurrence of harassment, and remedy its effects not only on those subjected to sexual harassment, but on the entire student body.[29]

Consistent with the purpose of the law, any Title IX regulation should focus on maximizing student access to an education free of sexual discrimination, harassment, assault, stalking, and domestic violence.[30] Yet the proposed rule does the opposite. It prioritizes reducing the number of Title IX investigations a school conducts, flipping Title IX on its head. It narrows the scope of schools' responsibility, contrary to decades of established law and practice, and ignores the reality of how sexual harassment affects a student's access to education. It will chill reporting of sexual harassment—which is already severely underreported—by imposing onerous burdens on students who seek to report sexual harassment and to vindicate their right to an equal education. It will make the standard for non-compliance so high that only schools who deliberately and intentionally flout the law will be required to take even the most basic remedial and preventative action, leaving many students without recourse or help from their school. And it will allow systemic harassment and toxic campus cultures to flourish by removing schools' well-established obligation to seek out and remedy such violations.

Equally concerning, the proposal blurs the lines between the procedures governing criminal proceedings and those applicable to non-criminal proceedings under Title IX. As a civil rights statute, Title IX is focused on ensuring equal access to educational programs and activities, not denying life and liberty to the guilty. In non-criminal proceedings, both parties are treated equally, with neither side receiving greater procedural protections than the other and with procedures designed to find the truth when the parties dispute the facts. But the proposed rule provides greater protections to respondents, and imposes significant and inappropriate burdens on complainants. Criminal procedures and protections do not apply in the Title IX context.

---

[29] *See generally Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 288 (1998) ("In the event of a violation, [under OCR's administrative enforcement scheme] a funding recipient may be required to take 'such remedial action as [is] deem[ed] necessary to overcome the effects of [the] discrimination.' §106.3."); U.S. Dep't of Educ., Off. for Civil Rights, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties*, at 20 (66 Fed. Reg. 5512, Jan. 19 2001) (the "2001 Guidance").

[30] The Violence Against Women Act, 42 U.S.C. 12291, recognizes the need to protect against domestic violence, assault, and stalking. Similarly, it is appropriate for the implementation of Title IX to recognize that domestic violence, assault, and stalking may impermissibly restrict access to educational opportunities on the basis of sexual discrimination.

At the end of the day, Title IX sets the floor—not the ceiling—on what schools must do to provide non-discriminatory education to all their students. Any Title IX regulation should encourage schools to uncover and prevent any harassment that negatively affects a student's access to education—not incentivize schools towards willful ignorance. And any Title IX regulations certainly cannot bar state and local governments and schools from responding more robustly to campus sexual harassment, or interfere with schools' compliance with other applicable federal, state, and local laws and policies that require such a response. Schools must continue to enjoy a right to establish codes of conduct and protections for students that go beyond what Title IX requires.

Working with the Department's Office for Civil Rights (OCR), many schools across the country have developed Title IX procedures that are fair to all parties, that reflect each school's unique circumstances, and that further the statute's anti-discrimination mandate. In many places, the proposed rule subverts these carefully refined policies. The Department's proposal is based on the misguided belief that schools are facing a torrent of frivolous Title IX complaints, but the effect will be to reduce the filing of bona fide complaints. The proposed rule introduces new biases into the process, imposes uniform requirements ill-suited to many schools' circumstances, and undermines the goal of a discrimination-free campus. The Department's proposal would reverse practices endorsed by both Democratic and Republican administrations;[31] contravene Supreme Court and other legal precedent and requirements, including the mandates of the APA; ignore the reality of where campus sexual assault occurs; impose onerous burdens on complainants; and run contrary to Title IX itself and other federal laws. The result will chill reporting of sexual harassment and prevent schools from effectively addressing its insidious effects.

It is vital that the Department's regulations support schools in fulfilling their Title IX obligations. As the Department noted in 2001, a "grievance procedure applicable to sexual harassment complaints cannot be prompt or equitable unless students know it exists, how it works, and how to file a complaint."[32] But the Department lacks statutory authority to issue regulations, such as the proposed rule, that would impede enforcement of Title IX and limit schools' ability to rid their programs and activities of sex discrimination. Title IX mandates that no student "be excluded from participation in, denied benefits of, or be subjected to discrimination under any education program or activity" on the basis of sex.[33] And the Department's instruction from Congress is to "effectuate" this anti-discrimination mandate.[34] By effectively mandating ceilings to schools' Title IX investigations and tilting grievance

---

[31] *E.g.*, 2001 Guidance; U.S. Dep't of Educ., Off. for Civil Rights, *Dear Colleague Letter* (Jan. 25, 2006) (the "2006 DCL"); 2011 DCL.

[32] *E.g.*, 2001 Guidance at 20.

[33] 20 U.S.C. § 1681(a).

[34] 20 U.S.C. § 1682.

EXHIBIT O                                                                      11

procedures against complainants, the rule undermines Title IX under the guise of enforcing it. The Department may not promulgate regulations that limit the effectiveness of the statutory mandate or hinder schools' efforts to combat discrimination even more vigorously than the statute requires.

## II.    The Department of Education's Title IX Standards Are Contrary to Title IX and Weaken Students' Protections Against Sexual Harassment and Violence.

The Department has proposed a general standard for the sufficiency of a school's response to sexual harassment that would mark a significant retreat from decades-long, bipartisan efforts to combat sexual harassment and its impact on equal access to education. Proposed § 106.44(a) would provide that "[a] recipient with actual knowledge of sexual harassment in an education program or activity of the recipient against a person in the United States must respond in a manner that is not deliberately indifferent." This proposed standard—as well as the proposed definitions of "sexual harassment," "actual knowledge," "program or activity," and "deliberate indifference"—depart from current law and policy without any sound justification. As a result, the proposed rule does not effectuate the anti-discrimination mandate of Title IX as it applies to sexual harassment; rather, the rule would undermine it.

The Department's stated reason for proposing this rule is that "the administrative standards governing recipients' responses to sexual harassment should be generally aligned with the standards developed by the Supreme Court in cases assessing liability under Title IX for money damages in private litigation." 83 Fed. Reg. at 61,466. But the Department's "alignment" of the proposed rule with Supreme Court precedent is only partial and arbitrarily selective, incorrect as a matter of law, and unreasonable as a matter of policy. This proposal is ill-advised and should be withdrawn.

The Department does not point to any unfairness in the previous definition of sexual harassment, the application of constructive knowledge or agency principles, the requirement that schools address off-campus conduct, or the reasonableness standard—all of which have been in place for decades (and many of which continue to apply under Title VII[35]). The Department reverses course and removes protection for student subject to sexual assault based on an unreasoned desire to equate Title IX government investigations with private civil actions for money damages.

The Supreme Court distinguishes between the Department's administrative enforcement of Title IX and its decisions involving monetary damages actions. Unlike private civil money damages cases, the risk of significant monetary damages resulting from an OCR Title IX investigation is substantially reduced. This is because "Title IX requires OCR to attempt to

---

[35] Title VII of the 1964 Civil Rights Act prohibits employment discrimination based on race, color, religion, sex and national origin. 42 U.S.C. § 2000e *et seq*.

EXHIBIT O                                                                                    12

secure voluntary compliance" in the first instance.[36] In contrast, the Court's fear in *Gebser*[37] was allowing private parties "unlimited recovery of damages under Title IX" without actual notice to the schools.[38] In the Department's administrative enforcement scheme, a school is obligated to take corrective action, and rarely, if ever, loses its Title IX funding.[39] This does not raise the possibility of large damages awards or significant risk of losing federal funding, which the *Gebser* court acknowledged as its "central concern."[40] The Court was concerned that because Title IX was adopted under the Spending Clause, by simply accepting federal funds schools would make themselves liable for monetary damages for conduct that they were not only unaware of, but also that they would have remedied had they been made aware.[41] Conversely, "OCR always provides the school with actual notice and the opportunity to take appropriate corrective action before issuing a finding of violation."[42] The Department's application of the standards for private civil suit damages to Title IX enforcement actions ignores the distinctions the Supreme Court has drawn between administrative enforcement actions and cases seeking monetary damages.

    A.    **The Proposed Rule Would Narrow the Definition of "Sexual Harassment" In Ways that Would Undermine the Objectives of Title IX.**

        1.    **The Proposed Definition of "Sexual Harassment" Would Significantly Depart from Previous Title IX Policy.**

       In § 106.44(e)(1), the Department has proposed a narrow definition of "sexual harassment" that represents a significant departure from its longstanding understanding of the term. The Department has done so without providing any meaningful justification for the abrupt change in decades' worth of consistent policy—which went through a notice and comment making process—and practice. Proposed § 106.45(b)(3) also requires schools to cease investigating any complaint of sexual harassment that does not meet the definition.

       In its 1997 Guidance, the Department recognized that sexual harassment results from conduct that is "sufficiently severe, persistent, **or** pervasive that it adversely affects a student's

---

    [36] 2001 Guidance at 15.

    [37] *Gebser*, 524 U.S. 274.

    [38] *Gebser* 524 U.S at 286.

    [39] 2001 Guidance at 14–15.

    [40] *Gebser*, 524 U.S at 287. *See also Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 639 (1999); 20 U.S.C. §§ 1682 & 1683 (identifying that among other things, prior to termination of funds the department shall provide notice of the failure to comply, determine that compliance cannot be secured by voluntary means, file a written report with the committees of the House and Senate and wait thirty days, and provide for judicial review of the decision); 2001 Guidance at 14–15.

    [41] *Gebser* 524 U.S. at 287; *See also Davis* 526 U.S. at 639; 2001 Guidance at iii–iv.

    [42] 20 U.S.C. §§ 1682 & 1683; 2001 Guidance at iv.

EXHIBIT O                             13

education or creates a hostile or abusive educational environment."[43] After the Supreme Court in *Davis*[44] established a narrower definition of harassment for money damages actions, the Department in its 2001 guidance reinforced its interpretation that Title IX prohibits conduct of a sexual nature that is "severe, persistent, **or** pervasive."[45] It also reinforced the notion that the question of whether sexual harassment occurred requires a flexible analysis.[46] In 2001, the Department further recognized sexual harassment includes "unwelcome sexual advances" and "physical conduct of a sexual nature."[47] The Department has repeatedly emphasized in its guidance that the prohibition on sexual harassment requires schools to investigate "hostile environment" harassment[48] and to "eliminate discrimination based on sex in education programs and activities."[49] A prudential assessment is used to determine whether conduct is sufficiently severe or pervasive.[50] According to the Department, "the more severe the conduct, the less the need to show a repetitive series of incidents."[51] Thus, a single severe incident, or for example, repeated unwelcome sexual comments and solicitations, could create a hostile environment.

The Department now seeks to abandon its long-standing policy, backed by case law, in favor of a definition more restrictive than the Title IX statute and more restrictive than what is set forth in *Gebser* and *Davis*, which was created for the very different context of civil actions involving money damages. In § 106.44(e)(1), it proposes to require that harassment be severe,

---

[43] *See* U.S. Dep't of Educ., Off. for Civil Rights, *Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties*, 62 Fed. Reg. 12,034 (Mar. 13, 1997) (the "1997 Guidance"). As the Supreme Court recognized in *Cannon v. University of Chicago*, Title IX is patterned after Title VI, except for the substitution of the word "sex." 441 U.S. 677, 694-95 (1979). The Department's 1994 "Racial Incidents and Harassment Against Students at Educational Institutions" is another example of this consistent policy, as it sets forth the same definition of harassment for Title VI claims on the basis of race, color, or national origin. 59 Fed. Reg. 11,448, 11,449 (Mar. 10, 1994) ("A violation of Title VI may also be found if a recipient has created or is responsible for a racially hostile environment --- i.e., harassing conduct (e.g., physical, verbal, graphic, or written) that is sufficiently severe, pervasive or persistent so as to interfere with or limit the ability of an individual to participate in our benefit from the services, activities or privileges provided by a recipient.").

[44] 526 U.S. 629 (1999).

[45] 2001 Guidance at v.

[46] 2001 Guidance at vi ("We also believe that the factors described in both the 1997 guidance and the revised guidance to determine whether sexual harassment has occurred provide the necessary flexibility for taking into consideration the age and maturity of the students involved and the nature of the school environment.").

[47] 2001 Guidance at 2.

[48] 2001 Guidance at 5–7.

[49] 2001 Guidance at i.

[50] 2001 Guidance at 6.

[51] 2001 Guidance at 6.

EXHIBIT O                                                                                    14

pervasive, **and** objectively offensive for administrative enforcement of Title IX claims, thus adding a requirement that the conduct be objectively offensive and removing the possibility that a violation could be found on any one of three bases—the severity, the persistence, or the pervasiveness of the misconduct. In this part, it adopts part of the definition from the Court's requirements for sexual harassment in money damages actions. However, the Department also proposes to require that the harassment "effectively den[y]" the individual access to the school's education program or activity. Proposed § 106.44(e)(1)(ii). This is a sea change from the statute, which states that victims should not "be excluded from" or "denied" the benefits of an educational program or activity and from the Supreme Court's definition, which requires the harassment to "deprive" a victim of access to educational opportunities or benefits to be actionable.[52] By requiring that the harassment "effectively deny" the victim of equal access to educational programs or activities, the Department deviates significantly from its Title IX authority.

In its NPRM, the Department states its belief, without justification, that "responses to sexual harassment should be generally aligned with the standards developed by the Supreme Court" in private litigation for damages. 83 Fed. Reg. at 61,466. The Department extols the virtue of a uniform standard and states that the Court's decisions are rooted in textual interpretation of Title IX. *Id.* However, in doing so, the Department ignores both the uniformity with which sexual harassment has long been defined and enforced under both Title IX and Title VII, as well as the Supreme Court's own acknowledgment that administrative enforcement of Title IX can be more flexible than the Court's decisions regarding private money damages.[53]

The Department also ignores the prudential considerations that the Supreme Court identified in developing the standard for a civil suit for damages where Congress has not spoken on an issue, which are inapplicable in the administrative enforcement context. The *Gebser* court identified that while Congress expressly authorized administrative enforcement of Title IX, it did not expressly authorize either civil actions or the right for individual parties to obtain damages in court. Rather, the Supreme Court identified these rights by implication.[54] The Department cannot

---

[52] *Davis*, 526 U.S. at 650.

[53] *Davis*, 526 U.S. at 639 ("Federal Departments or agencies . . . may rely on any . . . means authorized by law . . . to give effect to the statute's restrictions.") (internal quotations omitted); *Gebser* 524 U.S. at 292 (stating that the Department of Education could administratively require the school to promulgate a grievance procedure because "[a]gencies generally have authority to promulgate and enforce requirements that effectuate the statute's non-discrimination mandate . . . even if those requirements do not purport to represent a definition of discrimination under the statute.") (internal quotations and citations omitted). *See supra* Section II.

[54] *See Gebser* 524 U.S. at 292 (acknowledging the power of the Department to "promulgate and enforce requirements that effectuate [Title IX's] nondiscrimination mandate, which are distinct from circumstances giving rise to a civil action for monetary damages); *id.* at 289 (discussing the difference between the "statute's *express* system of enforcement to require notice to the recipient and an opportunity to come into voluntary compliance" and a "judicially *implied* system of enforcement" that "permits

EXHIBIT O                                                                                              15

lawfully improperly restrict the enforcement and application of Title IX based on its misapplication of Supreme Court precedent.

Moreover, although Title VII does not provide a perfect analogy to Title IX, in this instance, it is instructive. Title VII regulations describe workplace harassment as "[u]nwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature."[55] The Supreme Court has reaffirmed the unwelcome component of harassment stating that "[t]he gravamen of any sexual harassment claim is that the alleged sexual advances were unwelcome."[56] The Supreme Court has also reaffirmed that to create a hostile environment the harassment can be either severe **or** pervasive, such that it either limits or alters the conditions of employment. In adopting the broader definition of sexual harassment for Title VII, the Court recognized that Congress had explicitly authorized a civil action in damages. The Court thereby further reinforced that its decisions in *Gebser* and *Davis* are limited to civil actions in damages, where Congress has not spoken, but do not extend to Federal agency enforcement of the statute, where Congress' clear mandate is to affirmatively "'protect' individuals from discriminatory practices carried out by recipients of federal funds."[57]

We are also concerned because Title VII prohibits gender-based harassment that is not sexual, which the Department has also consistently recognized under Title IX in its policy guidance and its enforcement practices.[58] This interpretation is consistent with the text and purpose of Title IX and Supreme Court cases interpreting Title VII in the employment context.[59] Despite this, the proposed regulations do not specifically address the prohibition against gender-based harassment. Thus, we recommend that, in issuing the final rule, the Department state explicitly that "unwelcome conduct on the basis of sex," in § 106.44(e)(1)(ii), covers all sex-based conduct.

Once again, by disregarding Supreme Court precedent and Title VII in its formulation of the proposed rule, the Department has embraced the notion that students in a school environment

---

substantial liability without regard to the recipient's knowledge or its corrective actions upon receiving notice").

[55] 29 C.F.R. § 1604.11(a).

[56] *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 68 (1986) (internal quotation marks omitted).

[57] *Gebser*, 524 U.S. at 287.

[58] 2001 Guidance at v; U.S. Dep't of Educ., Off. for Civil Rights, *Dear Colleague Letter Re: Title IX Coordinators* (Apr. 24, 2015), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201504-title-ix-coordinators.pdf ("In addition, a recipient should provide Title IX coordinators with access to information regarding . . . incidents of sex-based harassment. Granting Title IX coordinators the appropriate authority will allow them to identify and proactively address issues related to possible sex discrimination as they arise.").

[59] *See, e.g.*, *Oncale v. Sundowner Offshore Serv., Inc*., 523 U.S. 75, 81–82 (1998); EEOC, *Sex-Based Discrimination*, https://www.eeoc.gov/laws/types/sex.cfm ("Harassment does not have to be of a sexual nature, however, and can include offensive remarks about a person's sex.").

EXHIBIT O                                                                                                  16

should be unprotected from sex-based harassment, even though they would be protected in the employee-employer context. The Department lacks authority to carve out exclusions to this landmark civil rights legislation not drafted in statute and inconsistent with courts' precedent.

### 2. The Proposed Definition of "Sexual Harassment" Would Fail to Account for the Context in Which Sexual Harassment Occurs.

The Department's proposed definition of "sexual harassment" is drafted to preclude schools, in many circumstances, from addressing hostile environment harassment, an important component of the schools' educational responsibilities and the Department's enforcement responsibilities. The requirement that harassment be severe, pervasive, **and** objectively offensive fails to take into account how harassment in a school setting frequently arises in a gradually escalating manner. Isolated and infrequent harassing behavior can become pervasive over time if left uncorrected, but the definition in the proposed rule does not require any remedial action until smaller problems have become larger, more significant ones. Failure to promptly address potential hostile environments could engender distrust in the institutions' ability to address sexual harassment on campus and create situations where the conduct that could have been prevented has exploded into something much more severe and potentially dangerous. This could increase liability under other legal theories, where a school could have stopped the conduct from escalating much sooner. Many schools are concerned that if they are not permitted to address conduct under Title IX until it becomes sufficiently severe, pervasive, and objectively offensive, they will fail to proactively avoid potential liability and fail to respond adequately to many harassing behaviors and will therefore be unsuccessful in establishing a welcome educational environment, free from gender discrimination.

Likewise, the severity requirement may exclude, for example, a situation in which the same group of students repeatedly makes unwelcome sexual comments or derogatory sex-based comments at multiple women walking by a fraternity house, thereby causing each of those women to alter their walking path. Even though the conduct is persistent, the school might not consider the offensive behavior severe enough or pervasive enough to warrant remedial action, given the one-time nature of the act as experienced by each of the women. But under Title IX, a school should address sexual harassment affecting multiple students before the harassing behavior escalates to the point where it is severe, pervasive, **and** objectively offensive for an individual student.[60]

Finally, the Department acknowledges that employee-on-student harassment includes instances where the provision of some aid or benefit is made contingent upon an individual's participation in unwelcome sexual conduct. However, the proposed rule improperly restricts this type of misconduct to employee-on-student conduct only. Students may engage in *quid pro quo*

---

[60] 2001 Guidance at 13–14 ("In other cases, the pervasiveness of the harassment may be enough to conclude that the school should have known of the hostile environment—if the harassment is widespread, openly practiced, or well-known to students and staff.").

EXHIBIT O                                                                                                    17

harassment as well. There are circumstances in which, for example, a student conditions assistance with studying on unwelcome sexual conduct. Likewise, students in positions of authority, such as teaching assistants or resident advisors, as well as students serving on boards, student government, clubs, or other activities, may condition the provision of aid or a school benefit on engaging in unwelcome sexual conduct. Conduct of this type contributes to a hostile sexual environment for students, and is undoubtedly a type of sexual harassment against which Title IX should protect.

### 3.    The Proposed Definition of "Sexual Harassment" Would Chill Reporting.

The rate of student reporting of incidents of sexual harassment in grades K-12 and on college campuses is already exceedingly low.[61] Survivors often fail to report sexual harassment as a result of trauma (13 percent of female sexual assault survivors attempt suicide[62] and 34 percent of college survivors drop out of college),[63] lack of confidence in the institution's protection and procedures, and lack of knowledge in the processes offered.[64]

A heightened requirement for sexual harassment will exacerbate the factors that prevent students from reporting the harassment they experience. Many students would question whether institutions will take their experiences seriously. Some will wonder whether their harassment will be seen as sufficiently severe by the school to warrant a response. And in many cases, individuals subjected to sexual harassment will not know whether the offensive conduct that they experienced was pervasive or an isolated event. The complicated definition of sexual harassment may also confuse students, many of whom already report a lack knowledge about or understanding of the Title IX grievance processes.[65] This restrictive definition turns the purpose of Title IX—to prevent and combat sexual violence—on its head. It fosters confusion and distrust among students and will likely chill reporting of sexual harassment, thus restricting

---

[61] *See supra* Section I.

[62] RAINN, *Victims of Sexual Violence Statistics*, https://www.rainn.org/statistics/victims-sexual-violence. By comparison, a national survey estimated that 0.5 percent of adults 18 years or over attempted suicide nationally. *See* American Foundation for Suicide Prevention, *Suicide Statistics*, https://afsp.org/about-suicide-statistics/.

[63] Senate Health, Education, Labor & Pensions Committee, Letter from Senators Murray and Hassan, Advocates and Survivors of Sexual Assault Urge Secretary DeVos to Withdraw Title IX Rule, Urge Students and Survivors to Make Their Voices Heard (Nov. 28, 2018), https://www.help.senate.gov/ranking/newsroom/press/murray-hassan-advocates-and-survivors-of-sexual-assault-urge-secretary-devos-to-withdraw-title-ix-rule-urge-students-and-survivors-to-make-their-voices-heard.

[64] Rutgers, The State University of New Jersey, Center on Violence Against Women and Children, *#iSpeak Student Experience, Attitudes and Beliefs about Sexual Violence Results*, *New Brunswick*, 1, 31 (2015) (hereinafter "Rutgers Survey"), https://socialwork.rutgers.edu/centers/center-violence-against-women-and-children/research-and-evaluation/campus-climate-project/reports-findings.

[65] Rutgers Survey, *supra* note 64, at 31–32.

EXHIBIT O                                                                                            18

schools' knowledge of harassment on campus and hampering their ability to address and prevent it.

**B.    The Proposed Rule Would Inappropriately Limit Schools' Obligation to Respond to Sexual Harassment and Violence by Excusing Failures to Respond to Conduct that Does Not Occur "In an Education Program or Activity."**

Proposed § 106.44(a) requires a response only to "sexual harassment *in* an education program or activity." Proposed § 106.45(b)(3) similarly requires dismissal of Title IX complaints, even when the conduct alleged would constitute sexual harassment, if the conduct "did not occur *within* the recipient's program or activity." The proposed regulations thereby improperly narrow the scope of Title IX and sexual harassment complaints that will be investigated by focusing on whether the alleged *incident(s)* occurred in an education program or activity, rather than focusing on whether the incident(s) gave rise to *discrimination* in an educational institution's program or activity.

This change in focus directly contradicts the plain language of Title IX. Regardless of whether an incident giving rise to an alleged Title IX violation itself occurs in an education program or activity, Title IX protects students who, based on sex, are "excluded from participation in [or] . . . denied the benefits of . . . any education program or activity receiving Federal financial assistance."[66]

In keeping with the clear statutory text, both courts and the Justice Department have concluded a school may violate Tile IX by failing to respond adequately to alleged misconduct that occurred in a location outside the control of the school if that conduct causes a hostile environment in the education setting. As the U.S. Justice Department itself has explained: "When assessing whether off-campus rape creates a hostile environment on campus, courts have recognized that the pernicious effects of rape by another student are not limited to the event itself and can permeate the educational environment. This is due to the daily potential of the victim student encountering her assailant as they both live and learn at the college."[67]

The Department's proposed change is also an unjustified departure from preexisting and continuously repeated Department policy in effect since at least 2001. In 2001, the Department published guidance after engaging in a notice and comment process, stating that in determining whether a hostile environment exists, the educational institution must determine whether "the conduct denies or limits a student's ability to participate in or benefit from the program based on

---

[66] 20 U.S.C. § 1681(a).

[67] Statement of Interest of the United States 12–13, *Weckhorst v. Kan. State Univ.*, No. 16-2255 (D. Kan. filed July 1, 2016), ECF 26 (citations omitted) (collecting cases); *see also id.* at 11–14; Statement of Interest of the United States 12–21, *Farmer v. Kan. State Univ.*, No. 16-2256 (D. Kan. filed July 1, 2016), ECF 32; *Doe 12 v. Baylor Univ.*, 336 F. Supp. 3d 763, 780-81 (W.D. Tex. 2018).

EXHIBIT O                                                                                    19

sex."[68] On January 25, 2006, the Department reiterated its support for existing policy by directing educational institutions to rely on the 2001 Guidance for their obligations regarding preventing and remedying sexual harassment.[69]

In 2011, the Department reiterated that schools have an obligation to assess whether there is a nexus between alleged off-campus harassment and the denial of access to an education program or activity. In this regard, the Department stated that "[s]chools may have an obligation to respond to student-on-student sexual harassment that initially occurred off school grounds, outside a school's education program or activity . . . [b]ecause students often experience the continuing effects of off-campus sexual harassment in the educational setting [and, therefore] schools should consider the effects of the off-campus conduct when evaluating whether there is a hostile environment on campus."[70] Then on September 22, 2017—in this current administration—the Department stated that, "schools are responsible for redressing a hostile environment that occurs on campus even if it relates to off-campus activities."[71] This longstanding policy is also consistent with the Supreme Court's interpretation of Title IX.[72] By confining Title IX's jurisdiction to only sexual harassment and assault that occurred in the first instance "within" an education program or activity, § 106.45(b)(3), the proposed regulation ignores this precedent and is flatly inconsistent with the statutory text.[73]

Furthermore, there are a number of situations that underscore the need to evaluate the effect of conduct that occurs off-campus or outside an education program or activity to be consistent with Title IX protections. For example, a student forced to perform a sex act by students from his or her school at an off-campus location should be able to pursue Title IX remedies to protect her or him from further harassment on campus. Similarly, a student who is sexually abused by a teacher or professor near campus or off-campus should be protected by Title IX. In addition, an athlete who was sexually assaulted by a school trainer or doctor at any

---

[68] 2001 Guidance at 5.

[69] 2006 DCL at 6.

[70] 2011 DCL at 4.

[71] U.S. Dep't of Educ., Off. for Civil Rights, *Q&A on Campus Sexual Misconduct*, 1 n.3 (Sept. 22, 2017).

[72] *See, e.g.*, *Davis*, 526 U.S. at 644 (the statute "confines the scope of prohibited conduct based on the recipient's degree of control over the harasser and the environment in which the harassment occurs."); *Gebser*, 524 U.S. at 278, 279 (assuming sexual harassment of the student complainant by the teacher under Title IX, even where sexual contact occurred in her home while giving her a book and "never on school property" but during school time).

[73] Requiring a recipient to only respond "to conduct that occurs *within* its 'education program or activity,'" 83 Fed. Reg. at 61,468 (emphasis added), is also directly contradictory to proposed § 106.44(a), which requires a response from "[a] recipient with actual knowledge of sexual harassment *in* an education program or activity." *Id.* (emphasis added).

EXHIBIT O                                                                                              20

time should be protected by Title IX. This is so even where the sexual assault occurred off campus—in the homes of the athletes who used the University's facilities, as well as other locations not operated or controlled by the University, such as hotels during events. If the proposed rule becomes final, school districts and Universities would be required to dismiss similarly egregious Title IX complaints simply because they occurred off-campus, even if they result in a hostile educational environment.

The Department's focus on the context in which sexual misconduct itself occurs also contradicts studies showing that off-campus conduct may create a hostile environment on campus, thus leading a student to be denied the benefits of an educational program or activity.[74] Even the studies relied on by the Department to justify the current policy changes, which are used to highlight the costs of sexual assault, do not distinguish between on- and off-campus assault.[75] Universities themselves acknowledge the effect off-campus activities can have on a student's on-campus learning.[76] It is arbitrary to assume that only harassment that occurs *in* an educational program or activity affects a student's access to the educational program or activity.

It is similarly arbitrary to limit Title IX's protections to activity occurring only in an educational program or activity when the Clery Act, 20 U.S.C. § 1092 (f), specifically recognizes that information regarding crimes occurring on "[p]ublic property . . . immediately adjacent to and accessible from the campus" is relevant to understand the crime statistics for the campus.[77] The Department attempts to clarify that "Title IX's 'education program or activity' language should not be conflated with Clery Act geography [because] these are distinct jurisdictional schemes," but this is a distinction without any obvious or appropriate purpose. It does not make sense to alert potential students to, for example, a rape that may occur outside the specific confines of an educational program or activity if that same incident would never affect the student's access to the educational program or activity.

In sum, the inquiry as to whether conduct that occurs off-campus or outside a school's program and activities creates a hostile environment under an education program or activity on the basis of sex is fact-specific and requires a school's careful assessment. The language of the

---

[74] *See, e.g.*, Christopher P. Krebs, Ph.D., et al., *The Campus Sexual Assault (CSA) Study,* National Institute of Justice 5–19 (Oct. 2007), https://www.ncjrs.gov/pdffiles1/nij/grants/221153.pdf (finding two-thirds of campus sexual assaults occur off-campus but can still severely impact a student's access to the educational program).

[75] 83 Fed. Reg. at 61,485 (citing Cora Peterson et al, *Lifetime Economic Burden of Rape Among U.S. Adults*, 52 AM. J. of Preventative Med. 691 (2017)).

[76] *See, e.g.*, Isa Gonzalez, *Title IX Coordinator Discusses How Proposed Education Dept. Reforms Could Impact UD*, Flyer News (Dec. 17, 2018) (quoting University of Dayton's Title IX coordinator as explaining "[e]ven [for] students who live in landlord housing or near the campus footprint, their experience is often as if they are a residential student."), https://tinyurl. com/ybboqxn2.

[77] 34 C.F.R. § 668.46.

EXHIBIT O                                                                                    21

proposed regulation ignores this, in contravention of existing and long-held Department policy, as well as judicial, OCR, and Justice Department interpretations.

C.    **The "Actual Knowledge" Standard is Too Restrictive.**

1.    **The Proposed Rule Undermines the Purpose of Title IX and Creates an Improper Incentive to Willfully Ignore Sexual Harassment Because it Requires Schools to Respond Only if They Have "Actual Knowledge" of the Harassment.**

Previous Department policy required schools to address all student-on-student sexual harassment allegations if the school knew or reasonably should have known about them.[78] The Department has also long-imputed notice to a school when "any employee with authority to take action to redress the harassment, who has the duty to report to appropriate school officials . . . or an individual who a student could reasonably believe has this authority or responsibility" has notice of the harassment.[79] Finally, the Department has required agency principles (i.e., vicarious liability) to apply to most instances of employee-on-student harassment.[80] As the Department has previously recognized, including the "good judgment and common sense of teachers and school administrators" is key to judging compliance with Title IX.[81]

Now, absent adequate justification, the Department proposes to eliminate these elements of notice. Under proposed § 106.44(e)(6), a school lacks actual knowledge unless allegations are brought to the attention of an employee with the authority to institute corrective measures (or when a formal complaint is filed with the Title IX Coordinator). Teachers at the K-12 level are deemed officials with the authority to institute corrective measures, but not at the university level. Furthermore, the proposed rule eliminates vicarious liability for employee-on-student sexual harassment, requiring the "actual knowledge" standard in this context as well. In all contexts, if the respondent is the only one with notice, actual knowledge is not imputed to the school.

By defining "actual knowledge" narrowly and ignoring situations in which a school clearly ought to have known of sexual harassment, the proposed rule virtually abandons Title IX's overriding goal of addressing hostile environments, eliminating sexual harassment, and creating an educational environment free from discrimination on the basis of sex. The actual knowledge requirement shifts the burden from schools to students. Instead of requiring schools to address instances of sexual harassment of which they are aware because an employee who a student would reasonably believe has the authority to report or assist has received notice, the proposed rule would flip Title IX on its head and require students to report sexual harassment to

---

[78] 2001 Guidance at 13.

[79] *Id.*

[80] 2001 Guidance at 10.

[81] 2001 Guidance at ii.

EXHIBIT O                                                                                                    22

authority figures whom they are generally hesitant to seek out or of whom they may not be aware.

The proposed rule creates an improper incentive structure for schools that discourages them from uncovering allegations and instead incentivizes them to shield themselves from learning about wrongdoing. In the very different context of civil suits for damages, the dissent in *Gebser* warned specifically about this phenomenon, stating that as long as schools "can insulate themselves from knowledge about this sort of conduct, they can claim immunity from damages liability."[82] The ongoing prospect of administrative enforcement of Title IX, even in the absence of "actual knowledge" of harassment, has deterred schools from ignoring problems. The Department now proposes to do away with that incentive. Instead, the proposed rule could create a situation where multiple employees, such as teachers (at the university level), resident advisors, campus medical personnel, school resource officers, or guidance counselors are fully aware of allegations of sexual harassment, but absent an explicit obligation to report to an official with authority to institute corrective measures, the school would not have a responsibility to investigate or take remedial action.

It is clear that in crafting the proposed rule, the Department ignored the evidence that students subjected to sexual harassment hesitate to report to officials with authority to take corrective action, due to various barriers, including lack of knowledge of reporting procedures, fear of being disbelieved, or fear of facing negative repercussions and additional harassment.[83] Campus climate surveys demonstrate that those subjected to sexual harassment often report to close acquaintances, and officials may find students reluctant to formally report.[84] Only 17 percent of students in one survey reported disclosing sexual harassment incidents to formal campus resources, while 77 percent disclosed to close friends and 52 percent reported to roommates.[85] However, the Department now requires students to directly report to specific authorities or file formal complaints. The proposed rule should not disregard such clear evidence that reporting on campus is complex and requires schools to be more vigilant in addressing sexual harassment.

---

[82] *Gebser* 524 U.S. at 298.

[83] Rutgers Survey, *supra* note 64, at 32.

[84] *Id.*

[85] Rutgers Survey, *supra* note 64, at 31–32.

EXHIBIT O                                                                                    23

2.    **Constructive Knowledge and Agency Principles Should Apply to the School's Notice of Sexual Harassment and Violence.**

The Department has not demonstrated any unfairness with the constructive knowledge or agency principles it has long-implemented, and there is no adequate justification for reversing course now.[86]

The Department has long required that a school should investigate, if a school knew or reasonably should have known of sexual harassment, whether by employees, students, or third parties.[87] This standard provides the required flexibility for universities since a constructive knowledge standard considers the school's size, its available resources, the public nature of the harassment, and the status of the individuals to whom the harassment was reported. Importantly, the "should have known" standard does not impute knowledge for isolated instances that a school, taking reasonable care, would not be aware of. However, a constructive notice standard prevents schools from willfully ignoring obvious signs of harassment, such as graffiti in public places,[88] systemic abuse of power by a teacher, constant unwelcome cat-calling, or other abusive behavior of a sex-based nature at known locations. Requiring schools to act on constructive knowledge ensures investigations into a hostile environment or culture of harassment, which is a primary purpose of Title IX. Constructive knowledge has been the Department's long-standing position in Title IX cases, and the Department has put forward no convincing rationale for abandoning this eminently sound approach.[89]

In the proposed rule, the Department also reverses course on agency principles, upending years of federal government positions on this important issue and even flouting Supreme Court

---

[86] If the Department nevertheless adopts the proposed "actual knowledge" standard, it should adopt mandatory, prompt reporting requirements for all non-confidential employees, so that Title IX Coordinators and other officials with authority to institute corrective measures are notified of sexual harassment more quickly. Mandatory reporters should include those individuals are considered "responsible employees" under current policy. *See* 2001 Guidance at 13. At the same time, students should have people to confide in, while knowing that their discussions will be kept confidential. Following best practices and prior Department guidance and practice schools should be required to make public (1) the individuals to whom students can report confidentially with no fear of being required to file a formal complaint and (2) the individuals who are required to report harassment to officials with corrective authority. *E.g.*, U.S. Dep't of Educ., Off. for Civil Rights, *Questions and Answers on Title IX and Sexual Violence*, at D-4, E-13, 16, 22 (Apr. 29, 2014, withdrawn Sept. 22, 2017) (the "2014 Q&A"). Converting Department policy into a proposed rule could help to mitigate (but not resolve) the problems with the proposed "actual knowledge" standard.

[87] 2001 Guidance at 13–14.

[88] 2001 Guidance at 14

[89] *See* 2001 Guidance at 14 ("If a school otherwise knows or reasonably should know of a hostile environment and fails to take prompt and effective corrective action, a school has violated Title IX even if the student has failed to use the school's existing grievance procedure or otherwise inform the school of the harassment.")

EXHIBIT O                                                                      24

guidance.[90] Agency principles should continue to apply to employee-on-student harassment, just as they do to supervisor-on-employee harassment. The Department previously explained that notice to a school is triggered when the employee is or appears to be acting in the context of carrying out his or her responsibility to students.[91] In *Gebser*, the U.S. Department of Justice stated that it is appropriate to hold a school responsible in such instances because "the teacher was aided in accomplishing the harassment by his agency relationship with the recipient or his apparent authority."[92] In light of this, it is particularly disturbing that the proposed rule exempts the school from actual knowledge when the only person with actual knowledge is also the respondent. This requirement would apply to the K-12 context as well. It sets up a scenario in which a student would have no valid Title IX claim when any school employee, including a school leader such as a superintendent, principal, or vice principal, repeatedly harasses or sexually assaults them in class or during school-related activities, unless the misconduct was known by another responsible school official.[93] This proposed rule must be stricken. As indicated in prior guidance, a school should be required to address conduct by an individual taking advantage of the position of authority and concomitant access to students afforded to them by the education institution, regardless of the school's notice.[94]

The 2001 guidance articulated the standards and possible scenarios for applying agency principles in situations involving employee-on-student harassment.[95] The guidance appropriately recognized that the application of vicarious liability to schools would require a determination that the employee was acting or appearing to act in the context of the employee's duties, and it set out multiple potential factors to consider before imposing liability.[96] That careful approach, based on evidence and experience, should not be reversed without ample justification. Requiring schools to take action based on constructive knowledge and agency principles also provides an opportunity to protect schools from later dealing with situations that could have been resolved with much less damage had the school acted more quickly to alleviate the problems.

---

[90] *Franklin*, 503 U.S. 60 (implying that agency principles may be appropriate in the Title IX context).

[91] 2001 Guidance at 10.

[92] *Gebser*, 524 U.S. 274, No. 96-1866, Statement of Interest of the United States, 9 (filed Jan. 16, 1998).

[93] *See, e.g. Salazar v. South San Antonio Independent Sch. District*, 2017 WL 2590551 (5th Circuit), cert. denied, 138 S. Ct. 369 (holding that district could not be liable under Title IX for principal of elementary schools repeated sexual molestation of an elementary school student, because the principal who engaged in the molestation was the only one aware of the conduct).

[94] 2001 Guidance at 10.

[95] 2001 Guidance at 10-12.

[96] 2001 Guidance at 10-11.

EXHIBIT O

Once again, Title VII is instructive. Under Title VII, the definition of "employer" includes any "agent of the employer,"[97] and courts routinely look to agency principles to determine employer liability for employee harassment.[98] Here, as in other areas of the proposed regulations, the Department sets up a scenario in which school employees are afforded better protection from harassment than students, who are far more vulnerable due to their age and experience. If a school can be held liable for monetary damages for supervisor-on-employee harassment under Title VII, then surely the Department of Education should require schools to at least respond to employee-on-student harassment under Title IX. Furthermore, schools arguably have more responsibility to protect their K-12 students, because they act *in loco parentis* while students are in attendance. [99]

The Department has failed to articulate intervening circumstances, facts, or evidence that would justify a reversal from the application of consistent agency policy and decisions to employee-on-student harassment. The proposed rule change should not be adopted.

### D.     The Proposed Rule Would Adopt a "Deliberative Indifference" Standard That Is Not Appropriate for Administrative Enforcement of Title IX.

Since at least 1997, the Department has understood Title IX to require schools to act reasonably in taking steps to end sexual harassment and prevent its recurrence.[100] Specifically, schools are required to act in a "reasonable, commonsense" manner in addressing sexual harassment and to take "prompt and effective" steps once they have knowledge of harassment.[101] Moreover, the existing regulations, in effect since 1975, have required schools to have procedures that provide a "prompt and equitable" response to any complaint of sex discrimination, a requirement that the Department has consistently enforced for decades and applied to all forms of sex discrimination, including sexual harassment.[102]

Under the proposed rule, even a school that responds unreasonably, untimely, and ineffectively to sexual harassment may avoid repercussions, so long as the school's response is not "deliberately indifferent." Proposed § 106.44(a). And "only" a "response to sexual harassment" that is "intentionally" and "clearly unreasonable in light of the known circumstances" will be considered "deliberately indifferent." *Id.*

---

[97] 42 U.S.C. § 2000e(b).

[98] *Vinson* at 72 ("[W]e do agree with the EEOC that Congress wanted court to look to agency principles for guidance in this area.")

[99] *Veronia School District 47J v. Acton*, 515 U.S. 646, 656 (1995) (discussing that the duty is both "custodial and tutelary").

[100] 1997 Guidance.

[101] 2001 Guidance at iii, 15

[102] 34 C.F.R. 106.8(b).

EXHIBIT O

The Department has failed to justify such a policy change. The NPRM does not point to any instances in which schools were burdened or unfairly penalized as a result of the reasonableness standard. To the contrary, the proposed rule neglects the purpose of the Department's administrative enforcement of Title IX, which is to provide schools with an opportunity to correct prior actions in response to sexual harassment and address a hostile environment moving forward (before they incur liability for damages).[103] Rarely does administrative enforcement lead to the dramatic step of withholding Title IX funding; rather, the Department's role is to "make schools aware of potential Title IX violations and to seek voluntary corrective action."[104] Without some basis for demonstrating that the reasonable care standard was inadequate or overly burdensome for schools, it is inconsistent with the intent of Title IX to adopt a standard that is less protective of students who experience discrimination.

Although the Department purports to draw its "deliberately indifferent" standard from case law, it misses the mark. Courts have concluded that "[r]esponses that are not reasonably calculated to end harassment are inadequate."[105] And a failure to investigate alleged sexual harassment can be unreasonable in light of the circumstances, even absent a formal complaint.[106] Again, the requirement that schools not act with deliberate indifference in response to complaints, as adopted by the courts for money damages actions, is immaterial to the Department's administrative enforcement of Title IX.[107] The Department should intervene to ensure schools are responding appropriately to sexual harassment allegations well before the school would be liable for money damages in a civil suit for its failure to act.

In addition, students should receive protection from sexual harassment at least equal to the protection afforded employees in the workplace. Under Title VII, employers (including schools) are liable for acts of sexual harassment in the workplace unless the employer "can show that it took immediate and appropriate corrective action."[108] Students are generally more vulnerable to sexual harassment than adult employees, particularly in grades K-12, since they are both minors and subject to compulsory school attendance requirements.[109] Under the proposed

---

[103] *See North Haven Bd. of Ed. v. Bell,* 456 U.S. 512, 521 (1982) (reiterating that the text of Title IX should be accorded "'a sweep as broad as its language.'").

[104] 2001 Guidance at iii–iv (stating that if OCR finds violations of Title IX, it must first "attempt to secure compliance by voluntary means.").

[105] *See Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 669 (2d Cir. 2012) (holding that a university did not engage in efforts that were "reasonably calculated to end [the] harassment").

[106] *E.g.*, *Feminist Majority Found. v. Hurley*, 911 F.3d 674, 696 (4th Cir. 2018) (holding a school administrator responsible for a claim of retaliation under Title IX, and stating that the retaliation spanned a sufficient period that the University should have taken "reasonable steps to address it").

[107] *See supra* Section II.

[108] 29 C.F.R. §§ 1604.11

[109] *See supra* Section I.

EXHIBIT O                                                                                     27

rule, an employee who is sexually harassed can sue a school *for money damages* if the school fails to take immediate and appropriate corrective action, but the Department of Education cannot take even non-monetary enforcement action against a school that fails to protect a student from sexual harassment unless the school's response failed the much higher "deliberate indifference" standard. Furthermore, graduate students who teach and other student employees of a school may fall under a complicated enforcement scheme, depending on whether they are considered "employees" or "students." The Department should not create this artificial disparity in the enforcement of sexual harassment prohibitions, which would indicate to students that the Government takes student safety less seriously than employee safety. If anything, the Department should afford students greater protection from sexual harassment due to their vulnerabilities.

### E. Safe Harbor Provisions Are Inappropriate and Schools Must Investigate Any Potential Hostile Environment.

The proposed rule provides several safe harbor provisions for schools. Taken together with the deliberate indifference standard, the safe harbor provisions severely curtail the Department's ability to meaningfully enforce Title IX's anti-discrimination objectives. Curtailing OCR's ability to independently review comprehensively how schools handle sexual harassment complaints is contrary to its mandate to investigate compliance with Title IX. The new rule would incentivize schools to do the bare minimum in enforcement of Title IX, contrary to the statutory mandate to provide educational programs and activities that are free from harassment.

The safe harbor provisions take various forms. The first, proposed § 106.44(b)(1), provides schools a safe harbor from a finding of deliberate indifference if they carry out grievance procedures consistent with those outlined in the rule in response to a formal complaint. 83 Fed. Reg. at 61,469. Any failure to fairly and adequately implement those procedures in a manner that is equitable, timely, or effective is seemingly irrelevant. Such a safe harbor erodes schools' responsibility to investigate hostile educational environments. This is of particular concern in the K-12 context where most complaints are taken verbally and informally by a dean, vice principal or other administrator who plays multiple roles.

The other safe harbors are equally untenable. Proposed § 106.44(b)(2) provides a safe harbor to a school where, upon actual knowledge of multiple complaints against the same respondent, the Title IX coordinator files a complaint on the complainant's behalf and the school follows the proposed grievance procedures. The proposed rule, in § 106.44(b)(3), also provides a safe harbor from a finding of deliberate indifference if a school that has actual knowledge of sexual harassment, absent a formal complaint, merely offers the complainant supportive measures. 83 Fed. Reg. at 61,469. Finally, in proposed § 106.44(b)(5), the Department also prevents OCR from a finding of deliberate indifference solely because OCR would have come to a different responsibility conclusion. 83 Fed. Reg. at 61,470.

Title IX imposes an affirmative obligation on schools to ensure that students are not subject to discrimination on the basis of sex. As a result, the Department has long recognized that

schools have an obligation to take reasonable steps to prevent harassment "whether or not the student who was harassed makes a complaint or otherwise asks the school to take action."[110] Consistent with this recognition, the 2001 Guidance made it clear that a school's obligation to investigate and respond to a report of harassment does not depend on the filing of a formal complaint: "Once a school has notice of possible sexual harassment of students—whether carried out by employees, other students, or third parties—it should take immediate and appropriate steps to investigate or otherwise determine what occurred and take prompt and effective steps reasonably calculated to end any harassment, eliminate a hostile environment if one has been created, and prevent harassment from occurring again."[111] Federal courts have reaffirmed schools' affirmative obligation to protect their students from harassment.[112]

    The proposed rule fails to recognize the obligation of schools to address harassment in the absence of a formal complaint (unless, of course, a complainant receives written notice of the available resolution options and, voluntarily and without coercion, decides not to pursue the complaint). By implication, therefore, it suggests that a school's Title IX responsibilities are triggered only when a student begins the formal complaint process. This, of course, is false: nothing in the language of Title IX supports such a narrow view of a school's obligations. To the contrary, Title IX prohibits discrimination on the basis of sex in education programs receiving federal funds, period. So at a minimum, a school that is put on notice of evidence of harassment, through whatever means, has an obligation to investigate and, if it determines that harassment is occurring, take steps to address it and provide notice of the outcome of its process. Any rule purporting to implement Title IX must make this fact clear: once a school has actual knowledge of harassment, it must investigate—even if the student has not reported it to the school.

    Any final rule must also make clear that schools are obligated to investigate and address systemic problems of which they are made aware. The Department has regrettably stepped away from its own obligation to identify systemic violations of Title IX.[113] It should not compound this error by limiting the obligations of schools to investigate such violations. Incidents of harassment rarely occur in a vacuum: too often, they are fueled by the presence of a toxic culture or hostile environment that enables such abuses. Title IX's prohibition on discrimination on the basis of

---

[110] 2001 Guidance at 15.

[111] *Id.*

[112] *Feminist Majority Found.*, 911 F.3d at 692 ("We are satisfied that the University was obliged to investigate and seek to identify those students who posted the threats and to report the threats to appropriate law enforcement agencies."); *see also Abbott v. Pastides*, 900 F.3d 160, 173 (4th Cir. 2018) (observing that "universities have obligations not only to protect their students' free expression, but also to protect their students").

[113] *E.g.,* Adam Harris, *Memo Outlines Education Dept. Plans to Scale Back Civil-Rights Efforts,* The Chronicle of Higher Education (June 15, 2017), https://www.chronicle.com/blogs/ticker/memo-outlines-education-dept-plans-to-scale-back-civil-rights-efforts/118937.

EXHIBIT O                                                                                           29

sex thus requires schools that are made aware of systemic discrimination to respond, and to do so in a manner commensurate to the scope of the problem. By failing to affirmatively state that schools have such an obligation, the proposed rule rewrites Title IX in a way that is inconsistent with its plain language and clear purpose.

In the same vein, creating a safe harbor for merely providing supportive measures to a student subjected to sexual harassment (or a parent complainant) who was not informed of or was otherwise unaware of the procedural step of filing a formal written and signed complaint is particularly unjust. Under the proposed rule, a school with knowledge of sexual assault against a student cannot be found to have responded inadequately as long as it offered the survivor a change of class schedule or some other similarly meager support. Deeming a school to have fully satisfied its Title IX obligations by providing only supportive measures to individuals subjected to sexual harassment who do not file formal complaints is likely to chill reporting and reduce investigations into a hostile educational environment, as individuals subjected to sexual harassment will find the process inadequate and will likely lose trust in the institution's processes.

Additionally, any provision on supportive measures must ban schools from pressuring students subjected to sexual harassment into accepting supportive measures in lieu of an investigation or grievance mechanism. The Department should prohibit even subtle incentives to accept supportive measures over formal adjudications. Any indication of students being steered or pressured into accepting only supportive measures or being discouraged from pursuing other options (such as local law enforcement) should be thoroughly investigated by OCR and remediated by the school.

Finally, the safe harbors remove OCR's discretion in Title IX enforcement. OCR's independent weighing of the evidence surely is a relevant factor in determining whether a school has been or is being deliberately indifferent (or unreasonable). Suppose, for example, OCR finds that, despite adopting the proper procedures for addressing formal complaints, the school's decision-makers always find in favor of complainants, or always find in favor of respondents. Absolute safe harbors remove OCR's ability to determine a school's liability if there is a pattern or practice of shielding respondents or favoring complainants. The Assistant Secretary, after a thorough investigation, should have the discretion to decide whether a school's determination of responsibility was discriminatory, or whether a school's overall climate is a discriminatory one.

The Department should remove the safe harbor provisions from the proposed rule.[114]

---

[114] While we strongly oppose the existence of any safe harbor in any final rule, if the Department nevertheless continues to include them, we strongly recommend any safe harbor incentivize schools to provide additional protections.

EXHIBIT O                                                                                    30

### III.    The Department Should Adopt Policies for Complaints that Maximize Reporting.

### A.    The Department's Proposed Definition of "Complainant" Is Too Restrictive.

Proposed § 106.44(e)(2) defines "complainant" as "an individual who has reported being the victim of conduct that could constitute sexual harassment, or on whose behalf the Title IX Coordinator has filed a formal complaint."[115] This definition raises many problems.

Importantly, the proposed definition of "complainant," in conjunction with the proposed definition of "formal complaint" (which must be "a document signed by a complainant or by the Title IX Coordinator"), effectively preclude third parties from filing formal complaints of sexual harassment, which triggers the recipient's obligation under the proposed rule to initiate an investigation or proceedings to address the allegations.[116] This is a departure from prior guidance, which recognized that a school must investigate and take appropriate remedial action "regardless of whether the student [subjected to sexual harassment], student's parent, or a third party files a formal complaint."[117]

The proposed shift in policy regarding who may file a formal complaint of sexual harassment ignores the realities of how sexual harassment is reported on campus. Only a small percentage of campus sexual violence is formally reported, for reasons previously articulated.[118] And instances of sexual harassment are often communicated to close confidants, who may report such incidences to appropriate officials. In K-12 schools, instances of sexual harassment or violence are often reported by a parent or guardian on behalf of a student or another student or employee witness to the sexual harassment. By eliminating the requirement that schools initiate investigations in response to information reported by third parties, the Department's proposal will result in more harassment going unacknowledged and unaddressed. The proposed definition

---

[115] "For purposes of this definition, the person to whom the individual has reported must be the Title IX Coordinator or another person to whom notice of sexual harassment results in the recipient's actual knowledge under [the proposed rule]." These comments address this part of the definition of "complainant" in their discussion of the "actual knowledge" standard.

[116] In some States, a parent or guardian could file a formal complaint on behalf of a minor child, but on this issue, the Department's proposed rule would defer to state law and local educational practice. *See* 83 Fed. Reg. at 61,482.

[117] 2014 Q&A at D-2, 15–16. Existing Department guidance also recognizes that, in some instances, the survivor may not want the school to proceed with an investigation and appropriately established several factors for a school to weigh in balancing whether to move forward over a survivor's objections. The factors to weigh include the survivor's wishes along with the school's duty to provide a safe and nondiscriminatory environment for all students, the seriousness of the alleged harassment, the age of the student harassed, whether there have been other reports of harassment against the alleged harasser, and the rights of the accused individual to receive information about the accuser and the allegations, where a formal proceeding with sanctions may result. 2001 Guidance at 17-18.

[118] *See supra* Section I & Section II.C.

EXHIBIT O

should be modified to clarify that a third party, such as a witness, parent, guardian, or school employee, may file a formal complaint.[119]

More broadly, the proposed rule will yield results that cannot be squared with schools' obligations under Title IX and the case law applying it. Schools have a legal obligation to take reasonable steps to prevent and eliminate sexual harassment, including hostile environment harassment.[120] Yet the proposed rule places the burden on individuals subjected to sexual harassment to report harassment in a particular manner. In addition, a hostile environment "can occur even if the harassment is not targeted specifically at the individual complainant. For example, if a student, group of students, or a teacher regularly directs sexual comments toward a particular student, a hostile environment may be created not only for the targeted student, but also for others who witness the conduct."[121] Similarly, a school's repeated failure to respond appropriately to allegations of sexual assault may contribute to a hostile environment for students who have not themselves been the subject of an assault. It is not clear from the Department's proposal whether students who have witnessed but who have not been "targeted" by harassment may qualify as individuals who may file a formal complaint. Consistent with existing policy, the Department should clarify that these individuals may file formal complaints.

### B. The Definition of "Formal Complaint" Creates a Barrier to Filing for Complainants, Particularly Underage Students, and Does Not Provide for Reasonable Accommodation.

Proposed § 106.44(e)(5) defines the "formal complaint," which must be filed to trigger most of the protections set forth in the remainder of the regulation, as "a document signed by a complainant or by the Title IX Coordinator alleging sexual harassment . . . and requesting initiation of the recipient's grievance procedure." *Id.* This requirement is inconsistent with the objective of the statute because it creates an unnecessary barrier to obtaining the protections against discrimination promised unequivocally by Title IX's text. It is also a departure from the existing regulations, which require a recipient to establish procedures for addressing "*any action* which would be prohibited by*" the regulation.[122] As applied, a recipient could dismiss a meritorious complaint of which it has notice or fail to take action solely for immaterial technical reasons, such as the complaint not being signed or failing to include specific language "requesting initiation" of the grievance procedures.

---

[119] We recognize that schools reasonably may respond differently to complaints filed by those subjected to sexual harassment and complaints filed by third parties, but the appropriateness of a school's response should be fact-specific. *See* 2001 Guidance at 18 (identifying "factors" that "will affect the school's response" when "information about harassment is received from a third party (such as from a witness to an incident or an anonymous letter or telephone call)").

[120] *E.g.*, 2001 Guidance at 5–14.

[121] 2001 Guidance at 6 & n. 43 (collecting cases).

[122] 34 C.F.R. § 106.8(b) (emphasis added).

Furthermore, the proposed regulation ignores the reality in elementary and secondary schools throughout the nation that complaints of sexual harassment are most often brought to the attention of administrators verbally by children, many of whom will be unaware of the proposed regulation's prescriptions. As such, the proposed regulation will too often result in K-12 students being deprived of their rights under Title IX based on the mere technicality of not filling out and signing a written document. In this regard, we note that the Department has included no cost estimate for training students (or their parents and guardians) on the new sweeping changes in the regulations. They will nonetheless be responsible for meeting these procedural requirements to obtain any relief.

In addition, the proposed rule runs afoul of other federal civil rights laws because it fails to specify that reasonable accommodations in the grievance process shall be provided for individuals whose disabilities may inhibit their ability to read, write, and sign a complaint.[123] Moreover, for a complainant who is under 18, as many in the schools affected by this regulation are, the proposed regulations do not address how schools will implement this requirement if a parent later disagrees with a child complainant's decision to file or is not consulted prior to filing. The change also creates unnecessary administrative costs, paperwork, and delay because schools must create or receive a signed document before executing their clear responsibilities under the law to investigate and, as necessary, stop the harassment, prevent its recurrence, and remedy its effects.

C.    "Supportive Measures" Should be Responsive to a Complainant's Needs.

Under prior guidance, the Department acknowledged that Title IX may require a school to take "interim measures" to protect a complainant and other students before the conclusion of an investigation.[124] In § 106.44(e)(4), the proposed rule would introduce the new term "supportive measures" and would provide that implementing supportive measures may itself be an adequate response in some cases of sexual harassment.

The proposed rule provides a safe harbor to a school that "offers and implements supportive measures *designed to* effectively restore or preserve the complainant's access to the recipient's education program or activity," without regard to whether the supportive measures are actually (or even reasonably) effective in accomplishing that objective. Further, for supportive measures to be effective, a school must acknowledge the crucial role of the complainant and, as needed, the respondent in crafting such measures and work with the parties to design appropriate measures after assessing what is needed to stop the harassment, prevent its recurrence, and address its effects. The Department should clarify that although schools should not be required to provide every measure the student requests, they should give due

---

[123] *See generally* Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794; Americans with Disabilities Act of 1990 as amended, 42 U.S.C. § 12131, *et. seq*.

[124] 2001 Guidance at 16, 18 ("It may be appropriate for a school to take interim measures during the investigation of a complaint.")

consideration to what the student who was harassed deems appropriate supportive measures in light of the circumstances, so that access to programs and activities can be assured.

The proposed rule would provide that supportive measures offered to a complainant or respondent should be designed to avoid "unreasonably burdening the other party." 83 Fed. Reg. at 61,496. By comparison, Department policy issued between 2001 and 2014 consistently emphasized that, in adopting interim measures, schools should minimize the burden on the student who was harassed. For example, the 2001 Guidance stated that such measures should "be designed to minimize, as much as possible, the burden on the student who was harassed."[125] The 2014 Guidance stated that schools should minimize the burden on the complainant. For example, if the complainant and alleged perpetrator share the same class or residence hall, the school should not, as a matter of course, remove the complainant from the class or housing while allowing the alleged perpetrator to remain without carefully considering the facts of the case."[126]

We agree that schools should endeavor to avoid "unreasonably burdening" alleged perpetrators, but we believe this principle requires elaboration. The Department should clarify that, consistent with prior policy, there should be a presumption against imposing unnecessary burdens on the complaining student when devising supportive measures. By crafting appropriate and individualized measures, this can be done even while protecting the due process rights of the respondent during the pendency of the investigation.

And the Department should likewise make clear that schools retain their local flexibility to deal immediately with potentially predatory or violent situations, even in ways that significantly burden one or more students, and even before a formal complaint has been filed or there has been an adjudication of responsibility, when necessary to meet their responsibilities for student safety and well-being. In such situations, to ensure the safety and well-being of its students, a school may need to impose a temporary and immediate suspension on a student, subject to the right for that student to have a prompt hearing with a right to return to the educational environment.

## IV.  The Proposed Grievance Procedure Fails to Provide a Fair and Equitable Process for Resolving Formal Title IX Complaints.

In 2001, the Department recognized that "[s]trong policies and effective grievance procedures are essential to let students and employees know that sexual harassment will not be tolerated and to ensure that they know how to report it."[127] This is why the Department has consistently required school grievance procedures to provide for "prompt and equitable resolution of sex discrimination complaints."[128] In many places, the proposed rule fails to meet

---

[125] 2001 Guidance at 16.

[126] 2014 Q&A at G-2, 33.

[127] 2001 Guidance at iii.

[128] 2001 Guidance at 14.

EXHIBIT O                                                                                    34

this standard: it improperly tilts the proceedings in favor of the respondent, it prevents schools from imposing reasonable controls that protect confidentiality and ensure fair proceedings, and it burdens schools and students alike with untenable hearing requirements. In other places, the proposed rule requires clarification to ensure a truly equitable process. As such, the proposed grievance procedures must be substantially revised in order to comply with Title IX.

### A.    Credibility Determinations Should Not Be Based Solely on Person's Status.

To ensure that all evidence is evaluated objectively, the proposed rule states that "credibility determinations may not be based on a person's status as a complainant, respondent, or witness." Proposed § 106.45(b)(1)(ii). We agree that all evidence must be considered fairly and objectively by recipient schools. But fact-finders should not be categorically prohibited from considering any factor—including the person's status and motivations for offering their testimony—when determining credibility. As the EEOC has recognized in the employment context, no single factor is determinative of credibility.[129] Instead, the final rule should state that "credibility determinations may not be based <u>solely</u> on a person's status as a complainant, respondent, or witness."

### B.    The Presumption of Non-Responsibility Improperly Tilts the Process in Favor of the Respondent.

The proposed rule states that there is a "presumption" that the respondent is "not responsible" for the alleged sexual harassment. §§ 106.45(b)(1)(iv) & (b)(2)(i)(B). The presumption appears aimed at protecting respondents in a manner akin to the presumption of innocence in criminal cases. But the grievance procedures are non-criminal in nature, so a criminal presumption by another name is not appropriate. Relatedly, but more fundamentally, the presumption contradicts the regulation's stated goal of promoting impartiality by inherently favoring the respondent's denial over the complainant's allegation. Instead the allegation and the denial must be treated neutrally, as competing assertions of fact whose truth can only be determined after an investigation. The problem would be even starker if any final regulation were to retain recipients' ability to choose a "clear and convincing" evidence standard (which we contend is not appropriate). The presumption of non-responsibility and the "clear and convincing" standard of evidence likely would, in practice, compound one another and raise an exceedingly high bar to any finding of responsibility for sexual harassment.

Accordingly, there should be no presumption regarding the respondent's responsibility.

---

[129] EEOC, Enforcement Guidance on Vicarious Employer Liability for Unlawful Harassment by Supervisors (June 18, 1999), https://www.eeoc.gov/policy/docs/harassment.html.

**C.    The Department Should Provide Prompt Timeframes and Should Not Encourage Good Cause Delay for Concurrent Law Enforcement Proceedings.**

Since 1980, the regulations have required that schools provide a "prompt" resolution to any allegation of discrimination prohibited by this part.[130] Department policy interpreting the regulations has also required grievance procedures for resolving allegations of sexual harassment to be completed "promptly."[131] Proposed § 106.45(b)(1)(v) would require schools to establish "reasonably prompt timeframes for conclusion of the grievance process." According to the preamble, the Department has selected the language "reasonably prompt" to track "the language in the Clery Act regulations at 34 C.F.R. § 668.46(k)(3)(i)(A)." 83 Fed. Reg. at 61,473. We are concerned that schools will likely construe "reasonably prompt" as imposing a more relaxed timeliness obligation than "promptly." Other than a desire to provide consistency with the Clery Act, the Department does not provide an adequate justification for a change that may result in further delays in completion of the resolution process for both parties to a sexual harassment investigation, each of whom have a significant interest in a prompt resolution. The Department should strike "reasonably," so that change in wording does not constitute a departure from its long-established guidance without adequate justification.

In addition, we urge the Department to reaffirm, in issuing any final rule, the goal of completing investigations of formal complaints in a 60-day timeframe,[132] subject to the institutions' need for flexibility for practical concerns and to protect due process rights. Timely resolution of grievance procedures is vital for complainants who may be re-victimized as the process drags on without resolution or relief. As the Department has recognized, "OCR experience" had shown that "a typical investigation takes approximately 60 calendar days following receipt of the complaint," although "the complexity of the investigation and the severity and extent of the harassment" can necessitate a longer process.[133] In the proposed rule, the Department notes that "[s]ome recipients felt pressure in light of prior Department guidance to resolve the grievance process within 60 days." But nowhere does the Department claim that OCR's experience has changed. Rather than abandon this timeline, the Department should provide schools with guidelines for timeliness that continue to recognize that grievance procedures can vary in length based on the complexity of the investigation, the severity of the harassment, and factors outside of the schools' control, such as the unavailability of witnesses.[134]

---

[130] *See* current 34 C.F.R. § 106.8(b), proposed § 106(c).

[131] *E.g.*, 2001 Guidance at 19; 2011 DCL at 8.

[132] Of course, other stages such as appeals will have a separate prompt timeframe, as OCR has consistently recognized.

[133] 2011 DCL at 12; *see also* 2014 Q&A at 31.

[134] *E.g.*, state administrative procedures that require multiple stages but are still completed within a prompt timeframe.

EXHIBIT O                                                                                            36

Such a definition will also provide clear notice to schools of the Department's expectations for a prompt resolution.

Finally, the Department provides in proposed § 106.45(b)(1)(v) that schools many temporarily delay the process for good cause, which can include "concurrent law enforcement activity." For several reasons, any final rule should be clear that concurrent law enforcement activity, without more, is not good cause to delay Title IX proceedings. First, "because legal standards for criminal investigations are different, police investigations or reports may not be determinative of whether harassment occurred under Title IX and do not relieve the school of its duty to respond promptly and effectively."[135] Conduct may restrict a student's access to education even though it does not rise to the level of a criminal violation. Second, as we discuss more fully elsewhere, schools generally have an independent obligation under Title IX to investigate and resolve complaints of sexual harassment—regardless of any parallel criminal investigation.

Generally, school and law enforcement officials should de-conflict their investigations to avoid prejudicing each other's investigation. Although concurrent law enforcement activity should not be considered sufficient grounds for delaying Title IX proceedings, some limited circumstances would support good cause for a temporary delay. For example, a school may find good cause to delay a portion of a Title IX investigation at the request of a prosecutor to protect the integrity of a criminal investigation, or "a school may need to delay temporarily the fact-finding portion of a Title IX investigation while the police are gathering evidence."[136] But "once notified that the police department has completed its gathering of evidence (not the ultimate outcome of the investigation or the filing of any charges), the school must promptly resume and complete its fact-finding for the Title IX investigation."[137] And schools should not refrain from providing supportive measures in the interim.

Therefore, if the Department finalizes its proposal, § 106.45(b)(1)(v) should be revised to reflect that "concurrent law enforcement activity" may be grounds for delaying Title IX proceedings only when there is good cause beyond the mere existence of concurrent law enforcement activity. That said, any final rule should also clarify that schools must tell complainants of their right to file a concurrent criminal complaint and not dissuade them from doing so.

---

[135] 2001 Guidance at 21 & n.110 (citing *Academy School Dist. No 20*, OCR Case No. 08-93-1023 (school's response determined to be insufficient in a case in which it stopped its investigation after complaint filed with police); *Mills Public School Dist.*, OCR Case No. 01-93-1123 (not sufficient for school to wait until end of police investigation)).

[136] 2011 DCL at 10 & n.25.

[137] *Id.* (noting that in "one recent OCR sexual violence case, the prosecutor's office informed OCR that the police department's evidence gathering stage typically takes three to ten calendar days, although the delay in the school's investigation may be longer in certain instances").

EXHIBIT O                                                                                    37

### D.    When Issuing a Notice Upon Receipt of a Formal Complaint, Schools Should be Required to Protect Confidentiality and Preserve the Integrity of the Investigation.

In § 106.45(b)(2)(i)(B), the proposed rule defines the notice a school must provide upon receipt of a formal complaint. We agree that due process requires that a respondent have access to information about the complained-of conduct in order to have a meaningful opportunity to prepare an effective response. But by requiring schools in all circumstances to send written notices that identify the complainant and detail the allegations, the proposed rule fails to address the potential confidentiality concerns of both the complainant and the respondent. For example, a written notice sent to the parties that names the complainant and details the allegations could be leaked or forwarded to unrelated third parties. This could damage the respondent's reputation,[138] invite retaliation against the complainant, threaten both parties' access to education, and, depending on the information disclosed regarding the complainant's medical information related to sexual violence, violate state and federal health care privacy laws.[139]

We are also concerned by the proposal's mandate that the required notice be provided "[u]pon receipt of a formal complaint," proposed § 106.45(b)(2)(i)(B), and then supplemented on an "ongoing" basis, "[i]f, in the course of an investigation, the recipient decides to investigate allegations not included in the notice provided pursuant to paragraph (b)(2)(i)(B)." § 106.45(b)(2)(ii). As long as the respondent receives the necessary information early enough to have a meaningful opportunity to prepare a response, schools should retain some discretion as to when they provide a respondent information about allegations being investigated. For example, a school may wish to conduct a preliminary investigation to determine whether the new allegations are credible or whether alleged systemic conduct is occurring. Schools may also need to delay notice to avoid prejudicing the investigation.

To avoid these problems, any final rule should instead advise schools to provide the respondent with prompt written notice of the filing of a formal Title IX complaint, including the specific allegations against her or him, the applicable grievance procedures and conduct code sections, a prompt timeframe for providing access to relevant information about the allegations, and an opportunity to respond. This would allow schools to continue to protect both parties by, for example, sending respondents only an initial written notice about the existence of a complaint and specific allegations, and then providing him or her with relevant information in person, including additional details about the alleged conduct and the identity of the complainant. Any final rule should also allow schools to protect respondents and complaints in other ways, such as by barring them from disclosing personally identifiable information except as necessary to prepare a response.

---

[138] *E.g.*, 2001 Guidance at 18 ("Publicized accusations of sexual harassment, if ultimately found to be false, may nevertheless irreparably damage the reputation of the accused.").

[139] *E.g.*, 2001 Guidance at 17–18.

EXHIBIT O                                                                                          38

Any final rule should also allow schools to withhold the identity of the complainant in certain circumstances. We agree that in many circumstances, the respondent must be informed of the complainant's identity to prepare an adequate response. But there are circumstances in which a school may not need to identify a complainant who has requested confidentiality, such as when the complaint involves harassment in a public setting (e.g., a teacher saying something to a whole class or systemic problems at a fraternity). In addition, when a school moves forward with a complaint on behalf of a student who has requested confidentiality, the school can still provide prospective relief, such as sexual harassment training and guidance that can meets it obligations to prevent harassment and address its effects. Students who have declined to pursue a formal investigation should not be identified against their will if appropriate corrective measures can still be pursued.

Finally, any final rule should require any notice to include a warning that retaliation against the complainant, including by making statements or spreading rumors intended to intimidate or dissuade him/her from filing or pursuing a Title IX complaint, constitutes an independent Title IX violation.

### E.    Schools Should be Allowed to Place Limited, Reasonable Restrictions on Discussions by the Parties.

In § 106.45(b)(3)(iii), the proposed rule bars schools from restricting the parties from discussing the allegations under investigation. We agree that parties cannot be barred from disclosing information needed to prepare a response or prepare for an interview or hearing. But there are several circumstances in which a school may need to place reasonable limitations on the ability of both parties to discuss the allegations. For example, a school may be able to respect a complainant's request for confidentiality by requiring the respondent to not disclose the complainant's identity unless necessary to prepare his or her response. In addition, schools should be allowed to limit (in the short term) discussions to preserve the integrity of the investigation, such as limiting conversations between parties and witnesses to prevent witness tampering. Finally, effective interim supportive measures should continue to include a school's ability to restrict the respondent from contacting the complainant or otherwise harassing or retaliating against him or her during the pendency of the investigation. Therefore, any final rule should state that the school must not restrict the ability of either party to discuss the allegations under investigation as necessary to prepare a response or prepare for an interview or hearing.

### F.    The Proposed Hearing Procedures Will Chill Reporting, Burden Schools, and Harm Both Complainants and Respondents.

Proposed § 106.45(b)(3)(vi) allows K-12 institutions to conduct live hearings at their discretion. Live hearings place a sharp spotlight on both parties. K-12 students—particularly those in elementary and middle school—will typically lack the maturity necessary to participate. They also have greater vulnerability to potential traumatization or re-traumatization. In addition, allowing live hearings raises serious privacy concerns for children, particularly with respect to

39

student witnesses. The final rule should not allow live hearings in the K-12 context unless otherwise required by state law.

If live hearings do take place in K-12 schools, the final rule should include minimum protections for student parties and witnesses who testify, and require schools to protect the confidentiality of the participants and the process. Given the privacy considerations for underage minors and potential for re-traumatization, the complaining and responding student should never be required to testify in the same room or to face each other in any cross-examination. The regulation should also provide exceptions for student testimony and participation where the student's maturity level would make in-person participation inappropriate.

In § 106.45(b)(3)(vii), the proposed rule requires all institutions of higher education to conduct live hearings at which each party's advisor must be allowed to conduct cross-examination of the other party. As we discuss below, any final rule should not mandate live hearings, return advisors to a supporting role only, and only allow party questioning via neutral third parties.

First, although some states require them, live hearings can pose problems. Schools may have a legitimate interest in avoiding circumstances that may subject the complainant to further harassment. Particularly in cases of sexual violence, requiring the complainant to face the respondent risks re-traumatizing a survivor. In addition, live hearings can be burdensome on institutions. They are typically overseen by faculty members or school staff who, no matter how dedicated they are to a fair process, are not professional mediators or judges. Months or even years can pass between hearings, which can undermine the efficacy of training, while the presence of attorneys for either party risks intimidating the panel and overtaking the proceedings. And finding a time when the panel members, the parties, and all witnesses are available can delay proceedings. To avoid these problems, some schools instead have the fact-finder or investigator conduct hearings with, or take sequential evidence from, all parties and witnesses, with the parties able to submit questions in advance. This allows for the solicitation of live testimony and enables the fact-finder to personally evaluate the speaker's credibility.[140]

Therefore, the final rule should permit investigations via methods other than live hearings, subject to constitutional due process protections.

Second, requiring cross-examination by a party's advisor during a live hearing will create serious problems to both the school and the parties. The opportunity for the parties to pose questions is an important element of fact-finding. Indeed, the ability to pose questions of witnesses and the other party protects both respondents and complainants. But the Department's shift to cross-examination by advisors has created even greater problems—problems that will

---

[140] *E.g.*, *Doe v. Univ. of S. California*, 241 Cal. Rptr. 3d 146, 163 (Cal. Ct. App. 2018) (holding that "[w]here a university's determination turns on witness credibility, the adjudicator must have an opportunity to assess personally the credibility of critical witnesses," but not finding due process violation in the university's decision to not hold a live hearing).

inhibit the Department's stated goals of discovering the truth and reducing the burden on schools. 83 Fed. Reg. at 61,476.

Advisor-led cross-examination will be untenable. Some parties may choose to bring in attorney advisors. This risks disparate treatment if, for example, the complainant has an attorney advisor and the respondent has an institution-provided faculty member advisor. In cases in which the school is required to provide the advisor, schools are concerned that they could later be challenged for failing to provide an adequate advisor. Attorney-advisor cross-examination also risks intimidating the non-lawyer faculty or staff member(s) who typically oversee Title IX hearings. To ensure that the fact-finder can run a fair and effective hearing, schools may feel the need to hire attorneys to serve as dedicated Title IX fact-finders, which would impose an even greater expense and burden on institutions. In addition, cross-examination by an advisor of the party's choice—which could be an attorney, a family member, or a fellow student—risks harassing the respondent, retraumatizing the complainant, and further deterring survivors from filing formal complaints.[141]

To avoid these problems, any final rule should permit the practice already widely used in schools that hold live hearings. Each party should be allowed to bring to a hearing or interview an advisor of his or her choice who serves only a supportive function. The complainant and respondent should be allowed to pose questions through a neutral third party, such as the fact-finder overseeing the hearing. This would balance the need for each party to ask questions of the other party, the need for the fact-finder to evaluate how the parties respond to live questions, and the need to protect all parties from trauma, intimidation, and further harassment. The Department must also ensure that adjudicators are sufficiently empowered to control the proceedings and place some reasonable limitations on the questioning of the parties and witnesses. By making relevance the only ground for excluding questions, 83 Fed. Reg. at 61,476, the Department's proposal would result in protracted and unwieldy hearings that would impose additional costs on schools and parties (costs not reflected in the Department's regulatory impact analysis). Such hearings may not ultimately protect respondents and complainants from abusive or harassing questioning or, most importantly, facilitate the discovery of truth.

---

[141] *See, e.g.*, Tom Lininger, *Bearing the Cross*, 74 Fordham L. Rev. 1353, 1357 (2005) ("As a general matter, victims willingness to report crimes varies inversely with their fear of embarrassment during cross-examination."); Anoosha Rouhanian, *A Call for Change: The Detrimental Impacts of Crawford v. Washington on Domestic Violence and Rape Prosecutions*, 37 B.C.J.L. & Soc. Just. 1, 35 (2017); William J. Migler, *An Accused Student's Right to Cross-Examination in University Sexual Assault Adjudicatory Proceedings*, 20 Chap. L. Rev. 357, 370 (2017); H. Hunter Bruton, *Cross-Examination, College Sexual-Assault Adjudications, and the Opportunity for Tuning Up the "Greatest Legal Engine Ever Invented"*, 27 Cornell J.L. & Pub. Pol'y 145, 176 (2017).

EXHIBIT O                                                                41

### G.    Schools Should Not be Required to Provide Parties With Access to All Collected Evidence.

In § 106.45(b)(3)(viii), the proposed rule details how institutions must prepare investigative reports and provide the parties with access to evidence. These provisions raise several serious concerns.[142]

First, no platform exists that is wholly immune from "downloading or copying the evidence." Among many other vulnerabilities, the relevant evidence could easily be photographed using a smartphone camera. The final rule should not require schools to provide such sensitive information in a way that exposes both the respondent and the complainant.

Second, providing all parties access to "any evidence obtained as part of the investigation that is directly related to the allegations raised in a formal complaint, including the evidence upon which the recipient does not intend to rely in reaching a determination regarding responsibility" is overbroad. Schools should not be required to provide the parties with access to evidence that is privileged and confidential, such as "communications between the complainant and a counselor or information regarding the complainant's sexual history."[143] Schools also cannot provide parties with access to evidence that it itself cannot use, such as an illegal voice recording in a state such as Pennsylvania that requires two-party consent.[144] Nor should a school provide either party with evidence that was collected as part of the investigation but which is irrelevant.

Nor can schools be required to provide access to information where doing so is barred by the Family Educational Rights and Privacy Act (FERPA). The Department mischaracterizes the law when it asserted in the preamble that this provision "is consistent" FERPA, "under which a student has a right to inspect and review records that directly relate to that student." 83 Fed. Reg. at 61,475. FERPA does not allow one student to review information about other students. 34 C.F.R. § 99.12(a). And not every piece of evidence obtained as part of an investigation is necessarily "directly related to" *each* student who is a party to an investigation for the purposes of FERPA.[145] For example, a complainant's full medical history, even if obtained as part of an investigation to ascertain the extent of alleged physical injuries, is both irrelevant to the specific

---

[142] *See, e.g.*, Richard Reed, *Feds concerned about loophole that may have enabled UO to get alleged rape victim's records,* The Oregonian (June 13, 2015), https://www.oregonlive.com/education/index.ssf/2015/06/feds_voice_concern_about_looph.html (discussing disclosure of student's confidential counseling records regarding an alleged rape on campus and the impact on the survivor and other legal liability).

[143] 2011 DCL at 11 n.29.

[144] Digital Media Law Project, *Recording Phone Calls and Conversations*, http://www.dmlp.org/legal-guide/recording-phone-calls-and-conversations (last checked Jan. 18, 2019).

[145] 20 U.S.C. § 1232g(a)(4)(A)(i).

EXHIBIT O                                                                                              42

allegation at issue and not at all "directly related" to the respondent. Likewise, "if a school introduces an alleged perpetrator's prior disciplinary records to support a tougher disciplinary penalty, the complainant would not be allowed access to those records."[146]

Therefore, any final rule should permit schools to place reasonable limitations on a respondent's access to information.

### H.    The Standard of Proof Should Remain Preponderance of the Evidence.

Proposed regulation § 106.45(b)(4)(i) requires the recipient to:

[A]pply either the preponderance of the evidence standard or the clear and convincing evidence standard, although the recipient may employ the preponderance of the evidence standard only if the recipient uses that standard for conduct code violations that do not involve sexual harassment but carry the same maximum disciplinary sanction. The recipient must also apply the same standard of evidence for complaints against students as it does for complaints against employees, including faculty.

Although the proposed regulation expressly provides an "option" regarding the standard that may be used, requiring that the preponderance of the evidence standard only be used if it is also used in other specific contexts could effectively eliminate the preponderance of the evidence standard in Title IX proceedings. This proposal is presented under a veneer of treating complaints equitably, but would, in fact, often create an inequitable situation at odds with Title IX's text and intent, exceed the Department's authority under Title IX, and be strikingly unfair to those subjected to sexual harassment and sexual violence.

First, the idea that a heightened standard of proof should apply to claims of sexual harassment and violence in school disciplinary processes misapprehends these proceedings' fundamental purpose. While of great consequence to all parties involved, these are not criminal proceedings. In criminal proceedings, a heightened standard of proof is constitutionally mandated and appropriate given the retributive nature of criminal sanctions, as well as the potential of loss of life or liberty. In contrast, student disciplinary proceedings must be viewed in light of the institutions' educational missions. As stated in a publication by the Association for Student Conduct Administration, "[t]he goal is to protect the academic environment."[147] That goal is undermined by a standard that "says to the victim/survivor, 'Your word is not worth as

---

[146] 2011 DCL at 11.

[147] Chris Loschiavo & Jennifer Waller, PhD, *Preponderance of the Evidence Standard: Use in Higher Education Campus Conduct Processes*, 1, 3, Association for Student Conduct Administration, https://www.theasca.org/files/The%20Preponderance%20of%20Evidence%20Standard.pdf.

EXHIBIT O                                                                              43

much to the institution as the word of accused' or, even worse, that the institution prefers that the accused student remain a member of the campus community over the complainant."[148]

Second, the "preponderance of the evidence" standard in this context is widespread and has been in use for decades. In fact, the Department has required schools to employ this standard since at least 1995, under both Democratic and Republican administrations.[149] Further, contemporaneous surveys showed that the majority of colleges and universities employed this standard even before the Department's 2011 guidance.[150] Tellingly, multiple rounds of comments on Title IX guidance in the past 20 years yielded no complaints about, or even mention of, the preponderance of evidence standard.[151]

While the proposed rule pushes back on the analogy to civil litigation as one of its rationales for employing the clear and convincing standard, 83 Fed. Reg. at 61,477, the Department cannot dispute that the preponderance of the evidence standard is typical in civil lawsuits, including ones in which civil rights violations—such as Title IX and Title VII—are alleged.[152] The 2001 Guidance noted that "[w]hile *Gebser* and *Davis* made clear that Title VII agency principles do not apply in determining liability for money damages under Title IX, the *Davis* Court also indicated, through its specific references to Title VII caselaw, that Title VII remains relevant in determining what constitutes hostile environment sexual harassment under Title IX."[153] The Department's proposed rule turns Title IX on its head, making it harder for a victim of sex discrimination to obtain relief than a respondent. In this regard, a respondent will now be able to sue a school for a "due process" violation of Title IX and only have to prove the

---

[148] *Id.* at 4.

[149] Katherine K. Baker, et al., *Title IX & the Preponderance of the Evidence: A White Paper*, Feminist Law Professors 1, 10 (Aug. 7, 2016), http://www.feministlawprofessors.com/wp-content/uploads/2017/07/Title-IX-Preponderance-White-Paper-signed-7.18.17-2.pdf (citing Letter from Gary D. Jackson, Reg'l Civil Rights Dir., Off. for Civil Rights, U.S. Dep't of Educ., to Jane Jervis, President, The Evergreen St. Coll. (Apr. 4, 1995) (Clinton Administration); Letter from Howard Kallem, Chief Att'y, D.C. Enforcement Off., Off. for Civil Rights, U.S. Dep't of Educ., to Jane Genster, Vice President and General Counsel, Georgetown Univ. (Oct. 16, 2003) (George W. Bush Administration)).

[150] *Id.* at 7 (citing two studies showing that shortly before 2011 DCL, (1) 80 percent of schools with a standard of evidence used the preponderance standard and (2) 61 percent of college and university administrators surveyed used the preponderance standard).

[151] *Id.* at 9–10.

[152] *See, e.g.*, *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 99 (2003) (noting that under the "conventional rule of civil litigation," the preponderance of the evidence standard generally applies in cases under Title VII); *Price Waterhouse v. Hopkins*, 490 U.S. 228, 252–55 (1989) (approving preponderance standard in Title VII sex discrimination case) (plurality opinion); *id.* at 260 (White, J., concurring in the judgment); *id.* at 261 (O'Connor, J., concurring in the judgment).

[153] 2001 Guidance at vi; *see also Jennings v. Univ. of N.C.*, 482 F.3d 686, 695 (4th Cir. 2007) ("We look to case law interpreting Title VII of the Civil Rights Act of 1964 for guidance in evaluating a claim brought under Title IX.").

EXHIBIT O                                                                                              44

case by a preponderance of the evidence, whereas the complainant would have to prove sexual harassment in the first instance by the higher clear and convincing standard.

Further, as acknowledged in the NPRM, the Department's own OCR uses a preponderance of the evidence standard. 83 Fed. Reg. at 61,477. OCR's Case Processing Manual requires that a noncompliance determination be supported by the preponderance of the evidence when resolving allegations of discrimination under all the statutes enforced by OCR, including Title IX.[154]

The "preponderance of the evidence" standard is the only standard of proof that can provide for an "equitable resolution" of student harassment complaints,[155] as required under Title IX.[156] Absent a statutory instruction to the contrary, the Department has no authority to depart from the usual allocation of risk between parties to grievance proceedings. In discussing appellate rights, the Department recognizes that each party in grievance proceedings is equally deserving of an accurate outcome. 83 Fed. Reg. at 61,478–79. This recognition makes the Department's proposal to use a standard other than preponderance of the evidence—which privileges one party's interests over others' and the search for truth—all the more inexplicable.

To be sure, this proposed regulation applies by its terms to complaints against employees as well, and some colleges and universities have policies for faculty under which a higher standard of proof is used. But schools have a qualitatively different relationship with their employees than their students. In the modern university context, courts "have increasingly recognized a college's duty to provide a safe learning environment both on and off campus."[157] This most obviously manifests itself in the student housing context, where students are almost entirely dependent on the university for security, and have little to no power to enhance their security themselves.[158] The proposed regulation's requirement that schools can only use a preponderance of the evidence standard for student complaints if they use that same standard for

---

[154] U.S. Dep't of Educ., *Case Processing Manual,* Art. III, § 303, https://www2. ed.gov/about /offices/list/ocr/docs/ocrcpm.pdf. Notably, this Manual was updated under this Administration (in November 2018) and retained the preponderance of the evidence standard.

[155] *Herman & Maclean v. Huddleston*, 459 U.S. 375, 390 (1983) ("A preponderance-of-the-evidence standard allows both parties to 'share the risk of error in roughly equal fashion.' Any other standard expresses a preference for one side's interests.") (internal quotation marks omitted). *See also Steadman v. SEC*, 450 U.S. 91, 96 (1981) (same).

[156] *See* 34 C.F.R. §106.8(c) (construing Title IX to require equitable resolution of grievances).

[157] Kristen Peters, Protecting the Millennial College Student, 16 S. Cal. Rev. L. & Soc. Just. 431, 448 (2007); *see also Duarte v. State*, 88 Cal. App. 3d 473 (Cal. 1979) (noting that students "in many substantial respects surrender[]the control of [their] person[s], control of [their] own security to the university"); *Mullins v. Pine Manor Coll.*, 449 N.E.2d 331, 335–36 (Mass. 1983) (holding that "[p]arents, students, and the general community . . . have a reasonable expectation, fostered in part by colleges themselves, that reasonable care will be exercised to protect resident students from foreseeable harm.").

[158] *See Mullins*, 449 N.E.2d at 335.

complaints against employees ignores the fundamental fact that schools are obliged to protect their students in different ways than their employees, which is especially true for students who are minors.[159]

The proposed rule prohibits schools from having a different standard of proof for allegations of sexual harassment than it does for other infractions that carry the same potential sanctions. The reasons provided for this change further highlight the inherent one-sidedness underlying the proposal to alter the standard of proof. Here, the Department only discusses the "heightened stigma often associated with a complaint regarding sexual harassment," 83 Fed. Reg. 61,477, but fails to recognize the trauma associated with being subjected to sexual harassment or violence, and how this could be exacerbated by applying an evidentiary standard of proof favoring the accused over the individual subjected to sexual harassment or violence.

The proposed rule will have the effect of deterring complainants from filing administrative school complaints and instead encourage additional costly civil litigation, an additional cost impact for which the Department fails to account. Assuming that the Department's proposed regulations are adopted, a complainant filing a civil lawsuit under Title IX would now be required to meet the same extremely high burdens—e.g., standards for deliberate indifference, actual knowledge, and sexual harassment—in school as in court. But the court case would be adjudicated under the preponderance of the evidence standard, a lower burden of proof than would be available in many school grievance proceedings under the proposed rule. In addition, the complainant would be able to obtain damages in court, something that the Department's proposed rule explicitly prohibits in the administrative context.

The problem is that civil adjudication is only an alternative for students with means to pursue it. Students without the financial means would be uniformly disadvantaged in pursuing sexual harassment complaints. Additionally, where school proceedings are perceived unfair or unduly burdensome, some students may choose to pursue criminal actions, which can be re-traumatizing for a person subjected to sexual harassment and more stigmatizing for the accused.

Finally, the proposed rule may also prove unworkable for many institutions that will be unable to meet two masters. To meet the second requirement of consistency between faculty and student complaints, colleges and universities will most frequently be required to adopt the higher standard of proof, clear and convincing, since tenured faculty often are entitled by law and contract to an application of the higher standard. But to meet the first requirement of consistency between conduct code violations with similar maximum penalties, many colleges and universities that handle all conduct code violations using a preponderance of the evidence standard would be required to adopt the higher standard of proof. The Department's rule will thus likely require colleges and university to enact far reaching changes to conduct violation policies and practices that extend well beyond the scope of the Department's authority to regulate under Title IX, inappropriately reaching conduct that has nothing to do with

---

[159] *See supra* note 99.

EXHIBIT O                                                                                    46

discrimination on the basis of sex—for example, cheating and simple battery. Further, the Department provides no explanation for why these proceedings—faculty disciplinary standards and code of conduct complaints—are more appropriate analogues to Title IX's disciplinary proceedings than Title VII or sexual harassment civil proceedings in court.

I.    **The Written Determination Must Include Steps to Eliminate Any Hostile Environment.**

Proposed § 106.45(b)(4)(ii) provides a summary of what the final written determination must include. Any final rule should confirm that the written determination must also include assurances that the school will take steps to prevent recurrence of harassment, correct its discriminatory effects, and prevent any retaliation against the complainant.[160] As we have discussed, the effects of harassment can go beyond the complainant and the respondent. The Department has long recognized that Title IX requires schools to "eliminate any hostile environment that has been created," which may require implementing corrective measures throughout the education community.[161]

J.    **The Department Should Clarify that both Complainants and Respondents Have Equal Access to the Appeal Process.**

As currently written, § 106.45(b)(5) states that "[i]n cases where there has been a finding of responsibility, although a complainant may appeal on the ground that the remedies are not designed to restore or preserve the complainant's access to the recipient's education program or activity, a complainant is not entitled to a particular sanction against the respondent." This could be read to suggest that a complainant can only appeal the remedies provided and not the substantive findings. To avoid a rule that could be read to favor one party over another, any final rule should clarify that both complainant and respondent should be given equal grounds for appeal. In addition, the final rule should clarify that even if a complainant is not entitled to a particular sanction, complainant can still appeal and seek a different sanction than the one imposed.

K.    **Any Informal Resolution Must Empower Complainants and Seek Restorative Justice.**

In § 106.45(b)(6), the Department proposes to allow informal resolution of any sexual harassment complaint. The use of informal resolution has been shown to have powerful remedial benefits in the criminal justice system.[162] But any use of informal resolution under Title IX must be voluntary and only initiated after the parties have full notice of their options, including the right to proceed with a formal resolution process. In addition, informal resolution should allow

---

[160] 2001 Guidance at 17.

[161] 2001 Guidance at 16.

[162] *E.g.*, Common Justice, *Common Justice Model*, https://www.commonjustice.org/common _justice_model (last checked Jan. 29, 2019).

EXHIBIT O                                                                                              47

for an option to access voluntary restorative justice. And schools should have the option not to offer informal resolution in cases of sexual violence or assault, which may raise more difficult issues that some schools may not have the resources to adequately address.

To that end, any final rule that allows schools to offer an informal resolution process must require them to provide complainants and respondents with written notice of the options for informal resolution at the outset, but not pressure students to pursue an informal resolution. Confirmation that the parties received written notice of the availability of informal resolution should be maintained by the school. Any final rule should also state that any informal resolution process must involve a trained staff member. With voluntary written consent of both parties, a face-to-face meeting may be part of an informal process, but at no point should a complainant be required to resolve the problem alone with the respondent.[163] Both parties must receive written notice of the outcome of the informal resolution process, including any remedies and sanctions. Finally, both parties must be informed of the right to discontinue the informal process at any time and file a formal complaint.[164]

### L.    The Recordkeeping Retention Period Should Be Extended.

Sections 106.45(b)(7)(i)–(ii) of the proposed rule set forth a requirement that all recipients "create, make available to the complainant and respondent, and maintain for a period of three years records of" any sexual harassment investigation, the results of that investigation, any appeal from that investigation, and all training materials relating to sexual harassment. The explicit requirement to retain such records is a positive step that will help improve consistency in investigations and allow the Department to assess compliance with Title IX.

But the Clery Act requirement to report all crimes that occurred within the last three years has little to do, as a matter of policy or law, with how long recipients should *retain records* of sexual harassment and sexual assault after they have been reported. It does not follow that the period of *retention* for such records should be tied to the Clery Act's limitation period for *reporting* specific campus crimes.[165]

In fact, when interpreting the Clery Act's requirement to "Retain Records," the Department has explicitly held that all three years of records relied upon for annual reporting must be kept for another three years *after* the publication of that year-end report—or "in effect,

---

[163] 2001 Guidance at 21.

[164] *Id.* In some cases, informal resolution may also require the existence of a safety guardrail to ensure that the school has made a sufficient inquiry to determine the scope of likely harm to the complainant and others in the school community and the extent of the injuries to fashion appropriate redress.

[165] *See* The Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act ("Clery Act"), 20 U.S.C. § 1092(f); 34 C.F.R. 668.46(c)(1) (requiring schools to annually report all crimes which occurred in the prior three calendar years by the end of the following year).

seven years."[166] The proposed regulation asserts that it "tracks the language in the Clery Act," thereby implying that this proposed change is consistent with current law. 83 Fed. Reg. at 61,471, 61,473, 61,475, 61,476, 61,478. However, as demonstrated above, the proposed three-year retention requirement is inconsistent with the Clery Act's seven-year retention requirements. The retention period in the proposed regulations therefore should be, at minimum, seven years.

In addition, as a practical matter, a three-year recordkeeping requirement could undermine criminal prosecutions related to the incidents at issue. For example, several states have no statute of limitations for rape or certain other serious sexual offenses.[167] In other states, the statutes of limitations for sexual offenses far exceed the three-year recordkeeping requirement.[168] And sexual offenses against minors are often subject to significantly lengthened statutes of limitations.[169]

The proposed regulations therefore would permit recipients to discard vital records that could help the criminal prosecution of sexual assault and rape well before the statute of limitations for such crimes has run, thereby potentially letting the perpetrators of these serious crimes go free. Given that so many related crimes have statutes of limitations substantially longer than the three-year requirement in the proposed regulations, the retention policy is inadequate, and should be extended in any final rule.

## V.    The Department Should Not Adopt a Title IX Rule that Adversely Affects Schools' Ability to Go Beyond Title IX's Requirements in Addressing Sexual Harassment and Violence, Including Their Ability to Comply with Other Applicable Laws.

### A.    Title IX Cannot, And Does Not, Restrict The Ability of States and Schools To Provide Broader Protections Against Sex Discrimination.

The proposed rule's new general standard and definitions of terms, as discussed above,[170] would narrow schools' obligations to respond to sexual harassment and assaults and decrease the

---

[166] U.S. Dep't of Educ., *The Handbook for Campus Safety and Security Reporting* 9–11 (2016 Ed.); *see also id.* at 6–11 ("As with all other Clery Act-related documentation, your institution is required to keep emergency test documentation for seven years.").

[167] *See, e.g.*, Cal. Penal Code §§ 261, 799; N.J.S.A. 2C:1-6a(1).

[168] Any "major sexual offense" committed in the state of Pennsylvania can be prosecuted within twelve years of its occurrence. 42 Pa.C.S.A. § 5552(b)(1).

[169] In California, for example, assaults against minors can be prosecuted at any point up until the victim's 40th birthday. Cal. Penal Code § 801.1(a)(2). In Pennsylvania, assaults against minors can be prosecuted until the victim's 50th birthday. 42 Pa.C.S.A. § 5552(c)(3). In New Jersey, "criminal sexual contact" involving minor victims may be prosecuted up to five years after the victim turns 18. N.J.S.A. 2C:1-6b(4).

[170] *See supra* Section II.

EXHIBIT O                                                                                                          49

protections afforded to those subjected to sexual harassment and assault. In addition, this newly-narrowed definition of sexual harassment could potentially have negative consequences in other contexts. Section 106.45(b)(3) of the proposed regulation holds that whenever "the conduct alleged by the complainant would not constitute sexual harassment as defined in section 106.44(e) . . . , the recipient *must dismiss* the formal complaint with regard to that conduct." (emphasis added). One reading of this requirement would dictate that no recipient could attempt to address sexual harassment or assault if the basis of those claims did not fit within the newly-narrowed federal definition provided in the proposed regulations, even where the recipient's own policy or state law would nevertheless prohibit the actions alleged by the complainant. We believe that the proposed rule at § 106.45(b)(3), if finalized, must be revised to state, consistent with other parts of the proposed regulation,[171] that Title IX cannot, and does not, restrict the ability of states and schools to provide broader protections against sex discrimination. Further, we believe that the Department should ensure that schools can continue to enforce additional civil rights protections.

Even if the proposed rule allows broader protections against sex discrimination, mandating that schools dismiss Title IX complaints that fall outside of the regulations' scope will still burden schools by requiring them to create two separate procedures: one for Title IX sexual harassment and one for conduct that may constitute sexual harassment under other applicable law or policies but not under the Department's interpretation of Title IX. 83 Fed. Reg. at 61,475 (noting that "a recipient remains free to respond to conduct that does not meet the Title IX definition of sexual harassment"). Yet the Department has long held that Title IX does not require a school "to provide separate grievance procedures for sexual harassment complaints."[172] Indeed, many schools prohibit sexual harassment in the school's code of student conduct.[173]

---

[171] Other sections of the proposed regulation accurately reflect that Title IX does not preempt the field of sex discrimination. *See, e.g.*, 83 Fed. Reg. at 61,475 ("a recipient remains free to respond to conduct that does not meet the Title IX definition of sexual harassment"); (responses could include "responding with supportive measures for the affected student or investigating the allegations through the recipient's student conduct code" and that "such decisions are left to the recipient's discretion in situations that do not involve conduct falling under Title IX's purview").

[172] 2001 Guidance at 19.

[173] *E.g.*, Uni. of Pittsburgh, *Title IX—Policies and Procedures*, https://www.titleix.pitt.edu /policies-procedures (Jan. 17, 2019); San Francisco Unified School District (SFUSD), *Administrative Regulation 5145.3* (Aug. 8, 2016), http://www.sfusd.edu/en/assets/sfusd-staff/Equity/Nondiscrimination, %20Harassment%20-%20AR%205145.3%20-%20English%20(8.8.16).pdf (defining harassment on the basis of sex as "[a]cts of verbal, nonverbal, or physical aggression, intimidation, or hostility that are based on sex, gender identity, or gender expression, regardless of whether they are sexual in nature, where the act has the purpose or effect of having a negative impact on the student's academic performance or of creating an intimidating, hostile, or offensive educational environment …."); Rutgers, the State University of New Jersey, *Policy Prohibiting Discrimination and Harassment,* Section 60.1.12 (rev. Jul. 5, 2016), http://catalogs.rutgers.edu/generated/ejbppp_current/pg67.html (including indirect harassment and hostile environment created by generalized harassing behaviors); The George Washington Univ., *The Sexual and*

Moreover, it's unclear what a school would do differently when considering a non-Title IX sexual harassment complaint, given that the Department purports to believe that its grievance proposals constitute the floor of fair and equitable proceedings.

If the Department were, however, to impose regulations that inhibit state laws or recipient codes of conduct that are more protective of those subjected to sexual harassment for behavior that falls outside of the Department's narrowed definition of sexual harassment under Title IX, those regulations would be inconsistent with civil rights law and Title IX generally. In creating the Department of Education, Congress explicitly announced its intention "to protect the rights of State and local governments and public and private educational institutions in the areas of educational policies and administration of programs," and specifically not to "to increase the authority of the Federal Government over education or diminish the responsibility for education which is reserved to the States and the local school systems and other instrumentalities of the

---

*Gender-Based Harassment and Interpersonal Violence Policy* (July 1, 2018), https://my.gwu.edu/files/ policies/SexualHarassmentFINAL.pdf (defining gender-based harassment to include "harassment based on gender, sexual orientation, gender identity or gender expression, which may include acts of aggression, intimidation or hostility, whether verbal or non-verbal, graphic, physical or otherwise …."); Georgetown Univ., *Code of Student Conduct 2018-2019*, Section 33, https://studentconduct.georgetown.edu/code-of- student-conduct (defining sexual harassment "as any unwelcome conduct of a sexual nature, including sexual advances, request for sexual favors, or other verbal or physical conduct of a sexual or gender-based nature when: [1] Submission to such conduct is made explicitly or implicitly a term or condition of an individual's employment or academic relationship; or [2] Submission to or rejection of such conduct is used as a basis for making an employment or academic decision affecting an individual; or [3] Such conduct has the purpose or effect of interfering with an individual's work or academic performance, denying or limiting an individual's ability to participate in or benefit from the University's education programs, or creating an intimidating, hostile, or offensive environment for work or academic pursuit"); Howard Univ., *Code of Student Conduct* (Apr. 18, 2015), Section VI.23, http://www.howard.edu/ secretary/documents/StudentCodeofConductApprovedApril182015.pdf (same); D.C. Code § 38- 1802.04(C)(1A)(5) ("title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.) … shall apply to a public charter school"); District of Columbia Public Charter School Board, *Resources for Transgender and Gender-Nonconforming Students* (last checked Jan. 24, 2019), https://www.dcpcsb.org/ resources-transgender-and-gender-nonconforming-students ("Title IX protects all students, including transgender and gender-nonconforming students, from sex discrimination. Title IX encompasses discrimination based on a student's nonconformity with sex stereotypes and gender identity, including a student's transgender status"); Office of the State Superintendent of Education, *Civil Rights and Gender Equity Methods of Administration (MOA) Coordination*, https://osse.dc.gov/service/civil-rights-and- gender-equity-methods-administration-moa-coordination ("Under federal law, all students in the District are protected against discriminatory actions based upon a student's sex, race, ethnic origin or disability. [Career and Technical Education] [()CTE[)] students and families should expect the following: … Your school and school district must post the federal laws that explicitly note your rights that protect you against any type of discrimination that would prevent deter you from equal access to enrolling and completing CTE courses; … [ and] Your school and school district must draft grievance policies, let you know how to file a grievance, and who the contact person is …."); Wash. Admin. Code § 478-121-155 (2017) (prohibiting, in the Student Conduct Code for the University of Washington, sexual harassment).

EXHIBIT O                                                                                    51

States.[174] Moreover, federal laws that are designed to protect citizens are presumed to allow for the enactment of state and local legislation that is more protective, barring explicit *congressional* intent to the contrary.[175] For example, Title VII, which prohibits discrimination in employment in certain contexts, does not bar states from prohibiting discrimination in employment in other contexts that are not covered by Title VII.

Nothing within Title IX's text or history suggests Congress intended the unusual result of impeding state and local efforts to protect those subjected to sexual harassment more broadly than Title IX or preventing schools from proactively avoiding Title IX liability (or for that matter, impeding their efforts to comply with other federal laws that may apply, such as Title VII).

### B.    State Laws Provide Greater Protections for Students In Their States.

As might be expected, states already have enacted laws that provide greater protections than those required by Title IX.

For example, California defines sexual harassment as "unwelcome sexual advances, requests for sexual favors, and other verbal, visual, or physical conduct of a sexual nature, made by someone from or in the work or educational setting," so long as the conduct would have "the purpose or effect of having *a negative impact* upon the individual's work or academic performance, or of creating an intimidating, hostile, or offensive work or educational environment."[176] This definition goes beyond the definition in the proposed regulation, which would require that the objectionable conduct "effectively den[y]" the complainant of equal access to the educational program or activity. 83 Fed. Reg. at 61,496. California also provides clear protection against discrimination for sex-based and gender-based harassment, including harassment on the basis of gender identity and sexual orientation. Sexual harassment can be proved based on a showing of severity or pervasiveness, which, as discussed provides additional protections not in the proposed rule.

---

[174] 20 U.S.C. § 3403(a).

[175] *See Ferebee v. Chevron Chem. Co.*, 736 F.2d 1529, 1543 (D.C. Cir. 1984) ("[F]ederal legislation has traditionally occupied a limited role as the floor of safe conduct; before transforming such legislation into a ceiling on the ability of states to protect their citizens, and thereby radically adjusting the historic federal-state balance, . . . courts should wait for a clear statement of congressional intent."); *Home Builders Ass'n of Greater Chicago v. U.S. Army Corps of Engineers*, 335 F.3d 607, 617 (7th Cir. 2003) ("[M]any federal regulatory laws, establish a floor, but not a ceiling, on state and local regulation.").

[176] Cal. Ed. Code § 212.5(c); *see also* Cal. Educ. Code 48900.2 (sexual harassment must "be sufficiently severe **or** pervasive to have a negative impact upon the individual's academic performance or to create an intimidating, hostile, or offensive environment").

EXHIBIT O                                                                                    52

Another example is the state of Oregon, which has a number of laws that protect the civil rights of students.[177] By statute and regulation, Oregon prohibits discrimination on the basis of sex,[178] and also prohibits sexual harassment of students by staff and other students.[179] Higher

---

[177] The Oregon Attorney General represents both the Oregon Department of Education and the Higher Education Coordinating Commission, which have roles in addressing discrimination in Oregon's colleges and universities.

[178] Oregon Revised Statute (ORS) 659.850(1) prohibits discrimination defined as: "… any act that unreasonably differentiates treatment, intended or unintended, or any act that is fair in form but discriminatory in operation, either of which is based on race, color, religion, sex, sexual orientation, national origin, marital status, age or disability. "Discrimination" does not include enforcement of an otherwise valid dress code or policy, as long as the code or policy provides, on a case-by-case basis, for reasonable accommodation of an individual based on the health and safety needs of the individual." It further provides in (2) that: "A person may not be subjected to discrimination in any public elementary, secondary or community college education program or service, school or interschool activity or in any higher education program or service, school or interschool activity where the program, service, school or activity is financed in whole or in part by moneys appropriated by the Legislative Assembly."

[179] Oregon Administrative Rule (OAR), Chapters 589-021; ORS 342.704. The latter provides in relevant part:

(1)     (b) Sexual harassment of students includes:

(A) A demand for sexual favors in exchange for benefits; and

(B) Unwelcome conduct of a sexual nature that has the purpose or effect of unreasonably interfering with a student's educational performance or that creates an intimidating, offensive or hostile educational environment; …

(c) All complaints about behavior that may violate the policy shall be investigated;

(d) The initiation of a complaint in good faith about behavior that may violate the policy shall not adversely affect the educational assignments or study environment of the student; and

(e) The student who initiated the complaint and the student's parents shall be notified when the investigation is concluded.

(2) The State Board of Education shall adopt by rule minimum requirements for school district policies on sexual harassment of staff by students and other staff including, but not limited to, requirements that:

(a) All staff and students are subject to the policies;

(b) Sexual harassment of staff includes:

(A) A demand for sexual favors in exchange for benefits; and

(B) Unwelcome conduct of a sexual nature that has the purpose or effect of unreasonably interfering with a staff person's ability to perform the job or that creates an intimidating, offensive or hostile work environment;

(c) All complaints about behavior that may violate the policy shall be investigated;

EXHIBIT O                                                                                          53

Education Coordinating Commission (HECC) regulations, which apply to both private career schools and post-secondary universities, prohibit schools from "otherwise limiting any student in their enjoyment of a right, privilege or opportunity," which likely includes harassment claims.[180] Aggrieved students can file a complaint with HECC, which then reviews the complaint and determines whether it is valid.[181] Once HECC issues its order, such order would be subject to a contested case hearing through the Oregon Office of Administrative Hearings.[182]

All universities in Oregon are also required to have a written sexual assault protocol,[183] but many of the proposed rule's provisions would create inconsistencies. The protocol applies to

---

(d) The initiation of a complaint in good faith about behavior that may violate the policy shall not adversely affect any terms or conditions of employment or work environment of the staff complainant; and

(e) The staff member who initiated the complaint shall be notified when the investigation is concluded.

[180] OAR 715-011-0050(8).

[181] OAR 715-011-0075

[182] OAR 715-011-0085.

[183] ORS 350.255 provides:

(1) Each public university listed in ORS 352.002 (Public universities), community college and Oregon-based private university or college shall adopt a written protocol to ensure that victims of sexual assault receive necessary services and assistance in situations where:

(a) The alleged victim of the sexual assault is a student at the university or college and the alleged sexual assault occurred on the grounds or at the facilities of the university or college; or

(b) The alleged perpetrator of the sexual assault is a student at the university or college, or a member of the faculty or staff of the university or college, regardless of where the alleged sexual assault occurred.

(2) A written protocol adopted under subsection (1) of this section must ensure that each victim who reports a sexual assault is provided with a written notification setting forth:

(a) The victim's rights;

(b) Information about what legal options are available to the victim, including but not limited to:

(A) The various civil and criminal options the victim may pursue following an assault; and

(B) Any campus-based disciplinary processes the victim may pursue;

(c) Information about campus-based services available to the victim;

(d) Information about the victim's privacy rights, including but not limited to information about the limitations of privacy that exist if the victim visits a campus health or counseling center; and

(e) Information about and contact information for state and community-based services and resources that are available to victims of sexual assault.

(3) A written notification provided under subsection (2) of this section must:

EXHIBIT O                                                                                                    54

situations in which the alleged victim is a student and the assault occurred on the grounds or at the facilities of the university or if the alleged perpetrator is a student or member of faculty of the university, regardless of the location. As such, under Oregon law, universities have the ability to regulate activities of students that occur off-campus.[184] Under Oregon law, the complainant may provide notice to the university generally in order to trigger a review required by state standards; the complainant need not inform an official with authority to take corrective action as required under the proposed rule. Under Oregon law, public universities, including community colleges, and Oregon-based private universities and colleges, regardless of religious affiliation, are required to follow the sexual harassment and assault protocol.[185] Accordingly, in Oregon, the Department's proposed rule will drastically narrow the scope of Title IX investigations by imposing bottlenecks on almost every phase of the process, including the physical locations subject to the law, the level of formality of the notice required to initiate a grievance process, the applicable definition of "harassment," and the standard by which culpability must be determined. As a result, the proposed rule conflicts with Oregon's multiple discrimination statutes.

Another example is the state of Washington, which provides broad civil rights protections to individuals subjected to harassment and violence on the basis of sex and sexual orientation through its Law Against Discrimination (WLAD).[186] Because the Department's proposed Title IX regulation does not mention sexual orientation, Washington's law arguably provides greater civil rights protections. Further, because the purpose of the law is to deter and to eradicate discrimination in Washington, it requires liberal construction, and "nothing contained in the law shall 'be construed to deny the right to any person to institute any action or pursue any civil or criminal remedy based upon an alleged violation of his or her civil rights[.]'"[187]

Similarly, the state of Nevada, like California, defines sexual harassment more broadly than the proposed rule contemplates. Nevada's sexual harassment codes and guidelines are

---

(a) Be written in plain language that is easy to understand;

(b) Use print that is of a color, size and font that allow the notification to be easily read; and

(c) Be made available to students:

(A) When a sexual assault is reported;

(B) During student orientation; and

(C) On the Internet website of the university or college.

[184] ORS 350.255.

[185] *Id.*

[186] Wash. Rev. Code § 49.60; Wash. Rev. Code § 49.60.030(1) ("The right to be free from discrimination because of … sex, … sexual orientation, is recognized as and declared to be a civil right."); *see also* Const. art. XXXI, §§ 1–2 (amend. 61) (equality of right shall not be denied or abridged on account of sex).

[187] *Marquis v. City of Spokane*, 922 P.2d 43, 49 (Wash. 1996).

EXHIBIT O                                                                                           55

designed to permit State agencies and organizations to be proactive and discipline or remove an employee before his/her actions subject the State to liability.[188] Further, Nevada's Clark County School District, like California, includes a broader definition of sexual harassment than the proposed regulation, identifying prohibited conduct as "sufficiently severe, persistent, **or** pervasive to limit a student's ability to participate in or benefit from an educational program or to create an intimidating, hostile, or offensive educational or work environment."[189]

Likewise, the University of Nevada, in Las Vegas and Reno, defines sexual harassment more broadly than the proposed rule, explaining sexual harassment incudes "sexual advancements, requests for sexual favors, and other visual, verbal or physical conduct of a sexual or gender bias nature" in situations including when "[t]he conduct has the purpose or effect of substantially interfering with an individual's academic or work performance, or of creating an intimidating, hostile or offensive environment in which to work or learn."[190]

The proposed rule's conflict with a number of current proactive laws and policies that deal with sexual harassment in many of our states, together with the decreased protections the proposed rule would afford to victims of sexual harassment, is yet another reason we oppose the proposed rule.

## VI.    Other Areas That Should Be Addressed Before Any Final Rule is Adopted.

### A.    Any Final Rule Should Reinstate the Longstanding Prohibition of Policies That "Suggest" Sex Discrimination.

Section 106.8(b)(2)(ii) of the proposed regulation unnecessarily, and without adequate justification, narrows the types of discriminatory publications that a recipient is prohibited from using and distributing to its applicants, students, and employees. The current regulation states that a recipient cannot "use or distribute a publication . . . which *suggests*, by text or illustration, that such recipient treats applicants, students, or employees differently on the basis of sex."[191] For many years, this section has addressed the use and distribution of materials by recipient

---

[188] *E.g.*, Nevada Admin. Code 284.0995.

[189] Clark County School District Regulation, *Discipline: Harassment*, https://ccsd.net/district/policies-regulations/pdf/5141.2_R.pdf; *see also* Washoe County School District's policy, https://www.washoeschools.net/site/default.aspx?PageType=3&ModuleInstanceID=1853&ViewID=7b97f7ed-8e5e-4120-848f-a8b4987d588f&RenderLoc=0&FlexDataID=6800&PageID=1189 ("Sexual Harassment is a form of sexual discrimination that involves unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when submission to or rejection of this conduct explicitly or implicitly affects an individual's employment, unreasonably interferes with an individual's work performance or creates an intimidating, hostile or offensive educational or work environment. The term sexual harassment includes sexual violence under Title IX of the Educational Amendments.").

[190] *See* University of Nevada, Las Vegas, *Policy Against Sexual Harassment,* § 4(c), https://www.unlv.edu/hr/policies/harassment#7 (last checked Jan. 28, 2019).

[191] 34 C.F.R. 106.9(b)(2) (emphasis added).

EXHIBIT O                                                                                              56

educational institutions that promote and perpetuate sex stereotypes through images or pictures, thereby discouraging applicants of one sex or another from applying or participating in a career path or type of class or program. The proposed change limits the prohibition to only publications that explicitly "state" a school's policy of engaging in different treatment on the basis of sex. This change is fundamentally inconsistent with Title IX's goals, for at least two reasons.

First, the proposed change is contrary to clearly established Supreme Court precedent that explicitly recognizes the right to be protected from discrimination and harassment based on sex, including sex stereotyping.[192] The Department has provided no statistical or other evidence to show that the rationale for this important provision has changed, or that sex-stereotyping no longer needs to be remedied in our educational institutions.[193] Nor has it provided any justification for retreating from clearly-established Supreme Court law on this issue.

---

[192] *See Price Waterhouse*, 490 U.S. at 251 ("As for the legal relevance of sex stereotyping, we are beyond the day when an employer could evaluate employees by assuming or insisting that they matched the stereotype of their group . . ."); *Oncale.,* 523 U.S. at 80 (recognizing that harassment on the basis of sex can include harassment of a female in "sex-specific and derogatory terms" motivated by "general hostility to the presence of women"); *see also* 2001 Guidance at 3 (recognizing that "gender-based harassment, which may include acts of verbal . . . hostility based on sex or sex-stereotyping . . . is also a form of sex discrimination to which a school must respond, if it rises to a level that denies or limits a student's ability to participate in or benefit from the educational program.").

[193] The published policies and other distributed materials of a school can be particularly susceptible to "suggestions" of sex stereotyping, even where they do not "state" discriminatory rules. A prospective student is often introduced to an educational institution and its course offerings through the visual images in its publications issued by mail or posted on its website. Both male and female students continue to be subjected to sex stereotyping in the forms of visual images, statements, and conduct that discourages them from engaging in, limits, or denies their access to vocational and education career paths based on sex. This includes male students discouraged from engaging in dance or theater because these occupations are not sufficiently "masculine," and female students discouraged from participating in science or engineering based on stereotypical conceptions of a woman's ability to do math and science. *See, e.g.*, Rachael Pells, *Sexism in schools: 57% of teachers admit to stereotyping girls and boys*, Independent (Feb. 8, 2017), https://www.independent.co.uk/news/education/education-news/sexism-schools-poll-teachers-stereotypes-boys-girls-stem-subjects-sciences-maths-tech-a7567896.html (also noting that female employees in the US account for less than a quarter of STEM workers, despite making up almost half the overall workforce); Daniel Reynolds, *You Throw Like a Girl: Gender Stereotypes Ruin Sports for Young Women*, Healthline (July 2, 2018) (girls receive less encouragement from teachers and family members to be physically active and participate in sports; as a result, girls ages 8 to 12 are 19 percent less active, according to 2016 study), https://www.healthline.com/health-news/gender-stereotypes-ruin-sports-for-young-women#1; Claire Cain Miller, *Many Ways to Be a Girl, but One Way to Be a Boy: The New Gender Rules*, N.Y. Times (Sept. 14, 2018) (three quarters of girls 14 to 19 said they felt judged as a sexual object or unsafe as a girl, and three-quarters of boys said strength and toughness were the male character traits most valued by society), https://www.nytimes.com/2018/09/14/upshot/gender-stereotypes-survey-girls-boys.html; Suzanne Vranica, *Stereotypes of Women Persist in Ads*, Wall St. J. (Oct. 17, 2003).

EXHIBIT O                                                                                              57

Second, the proposed change is fundamentally inconsistent with the plain language of § 1681(a), which states that no person shall be "excluded from participation in [or] be denied the benefits of . . . any education program or activity receiving Federal financial assistance."[194] As the Supreme Court has recognized, Title IX protects students "not only . . . from discrimination, but also . . . from being 'excluded from participation in' or 'denied the benefits of' any 'education program or activity receiving federal financial assistance'."[195] Therefore, a school can violate Title IX where a student is denied access to educational benefits and opportunities on the basis of gender, even in the absence of a facially discriminatory policy.[196]

The proposed change is inconsistent with and unsupported by the plain language of Title IX because it only prohibits explicit intentional discrimination while allowing implicit discrimination, which can nevertheless deny students a fair and equal education. Courts have consistently recognized and upheld Title IX regulations that prohibit policies found to have a discriminatory effect on one sex.[197] Indeed, this proposed change itself constitutes a discriminatory policy in violation of Title IX.

Moreover, prohibiting policies that "suggest" discrimination is not unique to the Title IX context; the Fair Housing Act and its implementing regulations have similarly been interpreted to prohibit publications advertising housing that "suggests" that a particular race would be disadvantaged.[198]

Finally, the proposed regulation's stated justification—that it would "remove subjective determination" from evaluating violations and make the requirement "more clear"—cannot excuse a result that harms the intended beneficiaries of Title IX—those subjected to discrimination on the basis of sex. 83 Fed. Reg. at 61,482. The justification also rings hollow, since, for more than thirty years, courts and administrators of Title IX have applied this regulation and others to address sex-stereotyping without apparent difficulty. The Department

---

[194] 20 U.S.C. § 1681(a).

[195] *Davis*, 526 U.S. at 650; *see also Vinson*, 477 U.S. at 64 (stating in the employment context that Title VII's arguably narrower discriminatory prohibitions "evince[] a congressional intent to strike at the entire spectrum of disparate treatment of men and women").

[196] *See Davis*, 526 U.S. at 650 ("The statute makes clear that . . . students must not be denied access to educational benefits and opportunities on the basis of gender.").

[197] *See Mabry v. State Bd. of Cmty. Colleges & Occupational Educ.*, 813 F.2d 311, 317 n.6 (10th Cir. 1987) (compiling "regulations implementing Title IX [that] prohibit some facially neutral policies."); *Sharif by Salahuddin v. New York State Educ. Dep't*, 709 F. Supp. 345, 361 (S.D.N.Y. 1989) ("Several Title IX regulations specifically prohibit facially neutral policies. . . . with a discriminatory *effect* on one sex.").

[198] *See, e.g.*, *Corey v. Sec'y, U.S. Dep't of Hous. & Urban Dev. ex rel. Walker*, 719 F.3d 322, 326 (4th Cir. 2013) (interpreting Fair Housing Act, 42 U.S.C. 3604(c) (prohibiting any publication which "indicates" discrimination); *Ragin v. New York Times Co.*, 923 F.2d 995, 999 (2d Cir. 1991) (same).

EXHIBIT O                                                                 58

provides no support, empirical or otherwise, for its position that schools or courts have been hampered by a lack of clarity in this rule.

In sum, the stated basis for such a dramatic change is unsupported and inconsistent with Title IX's plain statutory language and objectives, established case law, and congressional intent.

**B.    The Proposal to Eliminate the Requirement that Institutions Invoke the Statute's Religious Exemption in Writing Raises Concerns of Fair Notice to Students.**

The Department proposes to amend § 106.12 to eliminate the current requirement that an educational institution "shall" advise OCR "in writing" if it wishes to invoke Title IX's statutory exemption for educational institutions controlled by religious organizations to the extent application of Title IX "would not be consistent with the religious tenets of such organization."[199] The proposed amendment is unnecessary and raises a concern that students at some institutions will not know their rights under Title IX until it is too late.

The proposed amendment is unwarranted because schools' burden in notifying the Department regarding religious exemptions is minimal. The Department characterizes the current rule as "confusing," 83 Fed. Reg. at 61,482, but identifies no basis for confusion. And schools have successfully asserted religious exemption in letters to the Department hundreds of times over the past several decades.

In addition, we are concerned that the proposed amendment will lead to more students unknowingly enrolling in schools that believe themselves to be exempted from Title IX but do not claim the exemption publically, only to learn of their school's position after they seek to assert their Title IX rights. Students should know before they matriculate whether (and to what extent) their school intends to comply with Title IX, and they should be able to assume that they will enjoy Title IX's full protections unless the school has informed them otherwise. No student should learn, only after becoming a victim of discrimination, that their school considered itself exempt from the relevant requirements of Title IX. Even worse, under the proposal, a school seemingly could wait to assert its exemption from Title IX until after it initiates grievance procedures and a complainant undergoes cross-examination and has personal information shared with the respondent and others.

If the Department eliminates the current rule's letter requirement, the Department should require schools to disclose their Title IX exemption status to current and prospective students in writing and bar schools from claiming an exemption after the fact if they have affirmatively represented that they comply with Title IX.

---

[199] 20 U.S.C. § 1681(a)(3).

C.    **Restriction of Remedies to Exclude "Damages" and Lack of Definition Inconsistently Limits Remedial Scheme Which Was Intended to Strike at the Entire Spectrum of Discrimination on the Basis of Sex.**

Even in circumstances where an egregious violation of Title IX might warrant relief to an individual subjected to sexual violence and assault, proposed § 106.3(a) removes the ability of the Department to assess "damages," a remedy long available under common law. 83 Fed. Reg. at 61,495. In addition, the proposed regulation fails to define "damages," potentially leaving it open to an overly broad interpretation with a great impact on the intended beneficiaries of the statute, those subjected to sex discrimination. Therefore, the scope and impact of the change proposed by the Department on intended beneficiaries of the statute, and on the Department's ability to address and remedy noncompliance has not been adequately explained.

Specifically, the proposed change is contrary to the plain language of the statute, which authorizes the use of "any other means authorized by law."[200] The change inconsistently limits the Department's authority to provide remedies for noncompliance to only those means authorized in equity. The statutory enforcement language in Title IX mirrors language from the Civil Rights Act of 1964. But there, the drafters identified precisely where remedies would be limited.[201] Congress did not provide such a limit here. Yet the Department would impose one for the first time, more than 45 years after the passage of Title IX. This undermines Title IX's purpose and improperly usurps Congress's role.

Furthermore, OCR's public resolution agreements reflect that where noncompliance is found, the Department has historically provided compensatory or remedial services (e.g., counseling, tutoring, and academic support) to overcome or remedy the effects of harassment on the student, including, as warranted, funding for tuition where a student withdraws from the institution because a recipient has created, encouraged or permitted a hostile environment on the basis of sex.[202] Without a definition of damages, we are concerned that the proposed change may

---

[200] 20 U.S.C. § 1682.

[201] 42 U.S.C. 2000a-3 (limiting relief to "preventative relief" only).

[202] *Southern Methodist University*, OCR Complaint Nos. 06-11-2126; 06-13-2081; 06-13-2088, https://www2.ed.gov/documents/press-releases/southern-methodist-university-agreement.pdf (in sexual harassment/sexual violence matter, requiring University to reimburse complainant for all university-related expenses (tuition/fees, housing/food, and books) incurred for the fall semester minus any scholarship and grant assistance received, and all counseling expenses incurred over a two-year period); *Tufts University*, OCR Complaint No. 01-10-2089, https://www2.ed.gov/about/offices/list/ocr/docs/investigations/01102089-b.html (in sexual harassment/sexual violence matter, voluntary resolution agreement includes reimbursement to the student complainant for educational and other reasonable expenses, incurred during a year time period, and a complaint review which, as appropriate, would provide remedies, such as referrals to counseling); *Princeton University*, OCR Complaint No. 02-11-2025, https://www2.ed.gov/about/offices/list/ocr/docs/investigations/02112025.html (in sexual harassment/sexual violence matter, voluntary resolution agreement includes reimbursement for appropriate University-related expenses, as well as expenses for counseling, that Students 1-3 incurred

EXHIBIT O                                                                                      60

be used to impermissibly limit the authority granted by Congress to the Department to utilize "any other means authorized by law," thereby resulting in remedies and regulations that are inconsistent with the statute and its objectives, which include providing "individual citizens effective protection against [discriminatory] practices" and "overcom[ing] the effects" of such discrimination.[203]

### D.    Any Final Rule Should Include Guidelines for Confidentiality.

Issues relating to the confidentiality of information are critical to any discussion of how to effectively investigate and remedy sexual harassment and assault. As a result, any rule implementing Title IX should separately address schools' obligations with respect to requests by complainants to keep information confidential.[204] A school must, for instance, take all reasonable steps to honor a request from a complainant to keep his or her identity confidential. They should, however, notify the complainant that maintaining confidentiality may limit the schools' ability to effectively investigate and respond to allegations of harassment and that, depending on the nature of the complaint, certain information—including the identity of the complainant—must be disclosed if the student wishes to file a Title IX complaint. The school should inform the student of the actions it will take regardless of whether the student wishes to go forward with a formal complaint, including that it will take reasonable steps to prevent retaliation.

Furthermore, any final rule should make clear that a request by a student to maintain confidentiality does not free the school of its obligation to investigate and respond to the allegation. Rather, the school must still "investigat[e] the complaint to the extent possible,"[205] and it must also take reasonable actions to prevent recurrences of the conduct alleged by the complainant.

As discussed in Section IV.D, it may be possible to conduct a full investigation without revealing the name of the complainant. In other matters, a complete investigation may not be possible, but the school can nonetheless take certain actions, including seeking to identify whether there have been other complaints regarding the same individual and implementing measures that reiterate and reinforce Title IX prohibitions and provide remedies for the complainant that do not impact the due process rights of the respondent. And under all

---

from the date each first reported alleged sexual assault/violence to the date of the resolution); *City University of New York, Hunter College*, OCR Complaint No. 02-13-2052, https://www2.ed.gov/about/offices/list/ocr/docs/investigations/02132052.html (in sexual harassment/sexual violence matter, voluntary resolution agreement includes assessing whether complainant in case 1-3 and 5-7 and 9-12 suffered effects as a consequence of College not offering counseling or other interim measures or from any hostile environment created and take steps to address these effects).

[203] 20 U.S.C. § 1682; *Gebser*, 524 U.S. at 286, 288.

[204] *See* 2001 Guidance at 17–18.

[205] 2001 Guidance at 18.

EXHIBIT O                                                                                          61

circumstances, a school should consider whether other corrective action short of disciplining the accused individual may be appropriate.[206]

Finally, any final rule should make clear that, independent of specific requests by individuals to maintain confidentiality, schools have an affirmative obligation to preserve the confidentiality of all documents and evidence utilized in investigations of Title IX complaints.

### E.    Schools Have Continuing Obligations Following a Finding of Responsibility or Following an Independent Investigation.

The proposed regulations fail to explain the obligations Title IX imposes on schools following a finding of responsibility. Rather, the proposed regulations seem to imply that a school's duties upon such a determination extend no further than disciplining the students determined to be responsible, and then only if the determination was made through a formal proceeding. *E.g.*, Proposed § 106.45(b)(4). But schools' obligations go much further.

First, as discussed in Section II.E, a school has an independent obligation to protect its students by preventing and remedying harassment, even in the absence of a formal report. A school must take steps to end the harassment, if it is ongoing, and to prevent future harassment by the same individual. If the conduct was enabled by or reflects a toxic culture or other systemic problems, the school must address such systemic issues.

Furthermore, schools must address the effects of the harassment, which may include appropriate remedial actions for the complainant or the broader community.[207] It is for this reason that the safe harbor provisions addressed above[208] are inconsistent with Title IX to the extent that they erode schools' continued responsibilities to their students.

Critically, any regulations should also specify that a school's obligation to respond following a determination of harassment is not time-limited, and that the school must take steps to ensure that its remedial efforts are successful and to identify whether further efforts are necessary. The full extent of this obligation will depend in part on the nature and severity of the conduct at issue, but in all circumstances the school should understand that it maintains an obligation to take reasonable steps to address the ongoing impact of a violation of Title IX.

---

[206] *See* 2001 Guidance at 18 ("Examples include conducting sexual harassment training for the school site or academic department where the problem occurred, taking a student survey concerning any problems with harassment, or implementing other systemic measures at the site or department where the alleged harassment has occurred.").

[207] *See, e.g.*, *Gebser*, 524 U.S. at 288–89; *Feminist Majority Found.*, 911 F.3d at 696.

[208] *See supra* Section II.E.

EXHIBIT O                                                                                                    62

F.    **The Proposed Rule Fails to Sufficiently Address the Family Educational Rights and Privacy Act (FERPA).**

As noted in Part IV.G, the proposed regulations do not adequately address the Family Educational Rights and Privacy Act (FERPA).[209] For example, FERPA generally forbids disclosure of information from a student's "education record" without consent of the student (or the student's parent).[210] The regulations need to address whether proposed regulation § 106.45(b)(3)(v)'s requirements that recipients provide each "party whose participation is invited or expected [at a hearing] written notice of the date, time, location, participants, purpose of all hearings, investigative interviews, or other meetings with a party" can include information about the sanction that will be implemented. Additionally, the proposed regulations and their accompanying justification focus only on the rights of respondents to have access to their educational records. *See, e.g.*, 83 Fed. Reg. at 61,475 (citing a student's "right to inspect and review records that directly relate to that student" pursuant to FERPA); 83 Fed. Reg. at 61,476 ("[t]he scope of the parties' right to inspect and review evidence collected by the recipient is consistent with students' privacy rights under FERPA, under which a student has a right to inspect and review records that directly relate to that student."). Equally important, however, and completely unaddressed by the proposed regulations, is the right of the complainant to have their educational records kept private.[211] The interplay of these competing rights should be addressed in any final regulations, particularly in light of Title IX's mandate that grievance procedures be equitable.[212]

VII.    **The Regulatory Impact Assessment Fails to Accurately Assess the Effect of the Proposed Rule.**

The Department asserts the proposed regulations were issued "only on a reasoned determination that their benefits justify their costs," 83 Fed. Reg. at 61,484. However, even a cursory review of the Department's costs analysis reveals its inadequacy. The Department acknowledges that it "cannot estimate the likely effects of these proposed regulations with absolute precision." 83 Fed. Reg. at 61,484. While we agree it is difficult to precisely estimate the costs of the proposed regulations, a minimal review of the Department's analysis shows the costs of the proposed regulations are much higher than it estimates.

A.    **Ignored Costs.**

The Department states the economic analysis explicitly excludes economic consequences of sexual assault incidents themselves, stating that it is "only intended to capture the economic

---

[209] 20 U.S.C. § 1232g.

[210] 20 U.S.C. § 1232g (b)(1).

[211] 20 U.S.C. § 1232g (b)(1).

[212] *See* 34 C.F.R. § 106.8(c) (requiring grievance procedures adopted pursuant to Title IX provide for "equitable resolution" of student complaints).

EXHIBIT O                                                                          63

impacts of this proposed regulatory action." 83 Fed. Reg. at 61,485. The Department's statement is self-contradictory. The proposed regulatory action is exclusively aimed at changing the laws and regulations governing sexual assault and harassment, which have concrete and obvious economic costs. The analysis cannot possibly capture the economic impacts of the proposed regulatory action if it excludes from any analysis the actual economic costs incurred by students subjected to sexual harassment and violence—the very students the regulations govern. To provide a cost estimate that even marginally reflects the realities of the regulation, the costs of sexual assault and harassment must be considered. For example, the cost of rape in the United States has been estimated to be $122,461 per survivor, or $3.1 trillion over all survivor's lifetimes, and these costs are borne by survivors, society, and the government.[213] In addition to considering the costs of sexual assault and harassment, the Department should consider the economic impact on students who will lose access to their education as a result of being denied justice under these proposed regulations.

However, even setting aside the rippling costs of students subjected to sexual harassment whose sexual assaults would be excluded from Title IX's purview, there are additional costs that the proposed regulation ignored.

### 1. Allegations that Do Not Meet the Proposed Stringent Requirements May Still Resurface as Costly Lawsuits.

While the Department finds savings in narrowing Title IX's scope, it ignores the costs stemming from the exclusion of allegations that would no longer fall within that scope. The Department anticipates a decreased number of investigations under the drastically scaled-down requirements in covered conduct/location, as well as the reduction in "responsible employees" to whom conduct may be reported. However, in order to seek justice for themselves, students will be forced file their allegations in court or with law enforcement. It is unreasonable to assume that the proposed changes will simply make these allegations disappear, especially amidst nationwide trends of increasing filings of sexual harassment and assault claims.[214]

The Department has the ability to assess, based on a review of prior and existing cases, how many will not be addressed or resolved under the proposed regulations. But it failed to undertake this task or provide the public with accurate and adequate information about the

---

[213] Peterson et al., *Lifetime Economic Burden of Rape Among US Adults,* 52 Am. J. of Preventative Med. 691 (2017). These costs were not unknown to the Department, as the Department cited this study in their analysis. 83 Fed. Reg. at 61,485 n.16. The Department nevertheless disregarded these costs by assuming they would be unaffected by the proposed regulations. *Id.* at 61,485.

[214] *See* Jamie D. Halper, *In Wake of #MeToo, Harvard Title IX Office Saw 56 Percent Increase in Disclosures in 2018, Per Annual Report*, The Harvard Crimson (Dec. 14, 2018), https://www.thecrimson.com/article/2018/12/14/2018-title-ix-report; U.S. Equal Employment Opportunity Commission, *EEOC Releases Preliminary FY 2018 Sexual Harassment Data*, (Oct. 4, 2018), https://www.eeoc.gov/eeoc/newsroom/release/10-4-18.cfm (stating "charges filed with the EEOC alleging sexual harassment increased by more than 12 percent from fiscal year 2017").

EXHIBIT O                                                                                            64

impact. Nevertheless, it is reasonable to anticipate that because the Department has narrowed its jurisdiction, the nation will see both an increase in Title IX complaints in civil and criminal courts, as well as an increase in costly lawsuits alleging non-Title IX causes of action.

### 2.    The Department Should Consider the Relationship Between Uninvestigated Allegations and Short- and Long-Term Absences.

Complainants whose Title IX allegations are not investigated may also have increased absences, which would decrease receipt of tuition and attendance-related funding by institutions of higher education (IHEs) and local educational agencies (LEAs). The Department did not include lost tuition costs for complainants who drop out or take a leave of absence from colleges or universities, or any decrease in attendance-related funding for LEAs, despite such absences being clearly contemplated as possible supportive measures for sexual misconduct complainants.[215] According to the Campus Climate Survey Validation Study, over 8 percent of rape victims and 1.6 percent of sexual battery victims dropped classes and changed their schedule, and over 21 percent of rape victims and 5.9 percent of sexual battery victims considered taking time off school, transferring, or dropping out.[216] These absences may have direct and indirect costs, which warrant the Department's consideration.[217]

### 3.    Costs to Transgender Students.

Finally, the Department fails to even the mention the term "transgender" in the proposed regulations.[218] This overt exclusion may make transgender students less likely to report on-campus sexual harassment or sexual assault to the designated "coordinator." According to a recent survey of transgender people, 17 percent of K-12 students and 16 percent of college or

---

[215] *Sample Language for Interim and Supportive Measures to Protect Students Following an Allegation of Sexual Misconduct,* White House Task Force to Protect Students from Sexual Assault 1, 6 (Sept. 2014), https://www.justice.gov/archives/ovw/page/file/910296/download.

[216] Krebs et al, *Campus Climate Survey Validation Study Final Technical Report*, Bureau of Justice Statistics Research and Development Series 1, 114 (Jan. 2016), https://www.bjs.gov/content/pub/pdf/ccsvsftr.pdf.

[217] U.S. Dep't of Educ., et al., *Dear Colleague Letter Regarding Chronic Absenteeism* at 1 (Oct. 7, 2015), https://www2.ed.gov/policy/elsec/guid/secletter/151007.html ("A growing and compelling body of research demonstrates that chronic absence from school . . . is a primary cause of low academic achievement and a powerful predictor of which students will eventually drop out of school.").

[218] The Department withdrew its May 13, 2016 Dear Colleague Letter on Transgender Students less than a year after its joint issuance with the U.S. Department of Justice's Civil Rights Division (U.S. Dep't of Educ., Office for Civil Rights, & U.S. DOJ, Civil Rights Division, *Dear Colleague Letter*, 1 (Feb. 22, 2017)).

EXHIBIT O                                                                                    65

vocational school students who were out or perceived as transgender reported leaving school because of mistreatment.[219]

### B.    Unreasonably Low Estimate of Percentage of Title IX Complaints Based on Sexual Harassment or Sexual Violence.

The Department's assumption that sexual harassment and sexual assault make up only 50 percent of Title IX complaints (83 Fed. Reg. at 61,488) is unreasonably low, relies on an unclear baseline, and ignores the nationwide uptick in sexual harassment complaints discussed above. As we have explained, sexual harassment is pervasive.

In addition to the low initial baseline, studies show there is an upward trend of sexual harassment-related Title IX complaints.[220] The Department's own OCR reported that there was a 277 percent increase and an 831 percent increase in its receipt of sexual violence complaints at the K-12 and postsecondary levels, respectively, since Fiscal Year 2011.[221] This upward trend means, at a minimum, that averaging prior years' complaints is not a fair extrapolation of sexual harassment-related Title IX claims.

### C.    The Department Provides Unreasonably Low Cost Estimates for Implementing the Proposed Rule.

The Department significantly underestimates the amount of time that will be required by Title IX coordinators to review any final rule and to revise local grievance procedures accordingly. The Department estimates that for LEAs, the Title IX Coordinator and a lawyer will spend 4 hours and 8 hours, respectively, reviewing any final regulations. 83 Fed. Reg. at 61,486. For IHEs, the Department estimates review would take 8 and 16 hours, respectively. 83 Fed. Reg. at 61,487. Given the dramatic nature of the changes contained in the proposed regulations, and the extensive and nuanced changes that will be required of recipients' own policies, it is unreasonable to assume that Title IX coordinators will require only a day or less to review, and that educational institutions' attorneys will only take two days or less to review. Further, the Department severely underestimates the time that will be required to revise grievance procedures to comply with any new regulations. The Department assumes that for LEAs, Title IX Coordinators will spend 4 hours and lawyers will spend 16 hours on revising grievance procedures. 83 Fed. Reg. at 61,486. The Department estimates these times will be doubled for IHEs. *Id.* This includes no time for stakeholder input on grievance procedure revisions and

---

[219] S.E. James, et al, *The Report of the 2015 U.S. Transgender Survey*, National Center for Transgender Equality 1, 11 & 136 (Dec. 2016), http://www.transequality.org/sites/default/files/docs/USTS-Full-Report-FINAL.PDF.

[220] Celene Reynolds, *The Mobilization of Title IX across U.S. Colleges and Universities, 1994-2014,* 00 Social Problems 1 (Mar. 2018), https://doi.org/ 10.1093/socpro/spy005.

[221] U.S. Dep't of Educ., Off. for Civil Rights, *Securing Equal Educational Opportunity: Report to the President and Secretary of Education* (Dec. 2016), https://www2.ed.gov/about/reports/annual/ocr/report-to-president-and-secretary-of-education-2016.pdf.

EXHIBIT O                                                                                              66

underestimates the amount of time required to revise procedures. Finally, the Department anticipates it will only take a single hour for Title IX coordinators to create or modify a "safe harbor" form for complainants who report sexual harassment but who do not want to file a formal complaint. 83 Fed. Reg. at 61,494. It is unreasonable to assume that a significant document intended to serve as a "safe harbor" would be created in only one (1) hour by a Title IX Coordinator, and that an attorney would not even review it. These cost estimates are arbitrary and unreasonably low.

The Department also assumes the Title IX Coordinator, investigator, and a decision maker will each spend 16 hours in training. 83 Fed. Reg. at 62,486. It is concerning that the Department would contemplate only that a single investigator and a single decision-maker would or should attend the training. 83 Fed. Reg. at 61,486. Especially since the Department is anticipating limiting the number of people who can accept formal complaints, it will be essential to provide training to all staff who interact with students regarding how to counsel students on the appropriate channels for instigating formal complaints. It will also be essential to provide training for students, parents and guardian on how to properly file complaints, so that they do not lose their rights due to an inconsequential procedural mistake. Further, the Department does not accurately represent the costs for training hearing officers and panels during live hearings, where they will need to be versed in evidentiary procedure and taking examination and cross-examination. In addition, the Department "do[es] not calculate additional costs in future years as [it] assume[s] that recipients will resume training of staff one[sic] their prior schedule after Year 1." 83 Fed. Reg. at 61,487. This limitation to one year of training costs and to training only individuals who can receive formal complaints underscores the Department's inappropriate focus away from the protection of students who are meant to be protected by Title IX.

There are also several ways in which the Department inappropriately underestimates the costs of investigations. First, the Department estimates "a reduction in the average number of investigations per IHE per year of 0.75." 83 Fed. Reg. at 61,487. It is unreasonable to assume this reduction, given that reports are, as described above, increasing, and the proposed regulations create significant additional avenues for complaints filed by respondents. Second, while the Department assumes an approximate reduction of 0.18 of the number of IHE investigations by disregarding off-campus sexual harassment (83 Fed. Reg. at 61,487), the Department fails to allocate time for the investigation that would need to occur for the jurisdictional analysis to establish where the incident occurs.

In addition to underestimating the time it will take for a recipient to investigate Title IX complaints, the Department underestimates the cost for the parties' representation in the investigative process. For responses to a formal complaint at the LEA level, the Department assumed that both parties would obtain legal counsel who would work for one hour and, in the alternative, estimated an average cost non-attorney advisor cost would be two attorney hours. 83 Fed. Reg. at 61,487. The calculated cost the Department associated with the representation is flawed in two respect. First, the Department assumes a rate of $90.71 per hour. 83 Fed. Reg. at

61,486. The Department provides no basis for this assumed rate for an attorney, which is significantly lower than the average hourly rate of attorneys.[222] Second, it is unreasonable to assume adequate representation could occur with representation by an attorney for only one hour (or two hours for a non-attorney) for a hearing, particularly one involving a complex investigation of a sexual assault.

Finally, the Department fails to appropriately estimate the costs of the live hearings required under the proposed regulations. The Department will require live hearings at IHEs, but fails to consider many of the increased costs this requirement will entail. For example, the Department does not estimate any costs for transcription and translation services that may be needed. Further, the Department estimates that in 60 percent of IHEs, the Title IX Coordinator also serves as the decision-maker. 83 Fed. Reg. at 61,488. Only allowing costs for an additional adjudicator in 40 percent of hearings is arbitrary and in direct contradiction to proposed regulation § 106.45(b)(4) which precludes the decision-maker from being the same person as the Title IX Coordinator of the investigation.

## VIII.   The Department Should Delay the Effective Date of the Rule.

If the Department adopts a final rule along the lines of its proposal, it should give schools adequate time to respond before the rule takes effect. We believe that an effective date no earlier than three years from the date of the final rule would be appropriate.

A compliance window of three years or more is warranted because the proposed rule represents a stark departure from the substantive and procedural standards that educational institutions have been applying for years. Schools will need time to overhaul their procedures, hire new staff, train employees, and disseminate information to students. Smaller schools in particular will require an extended period to come into compliance. For reasons discussed above, the Department's new rule will cause confusion among students, staff, and other stakeholders however quickly they are implemented, but the confusion will only be compounded if the Department does not allow schools enough time to respond appropriately.

Adopting an earlier effective date would be inconsistent with the Department's recent approach to other regulations that would apply to fewer schools than the proposed Title IX rule, and that would not require such significant programmatic changes. For instance, the Department has seen fit to allow schools until July 2019 to comply with provisions of its 2014 Gainful

---

[222] *See, e.g.*, Jay Reeves, *Top 10 Hourly Rates by City*, Lawyers Mutual Byte of Prevention Blog, (Apr. 6, 2018), https://www.lawyersmutualnc.com/blog/top-10-lawyer-hourly-rates-by-city (listing lawyer rates by practice area ranging from $86/hour to $340/hour); Hugh A. Simons, *Read This Before You Set Your 2018 Billing Rates*, Law Journal Newsletters (Nov. 2017), http://www.lawjournalnews letters.com/2017/11/01/read-this-before-you-set-your-2018-billing-rates/ (indicating first year associates cost their employers approximately $111/hour). Further, it is unreasonable to assume adequate representation could occur with representation by an attorney for only one hour (or two hours for a non-attorney).

Employment rule[223] and its 2016 Borrower Defense rule,[224] and delayed the effective date of the 2016 Program Integrity and Improvement rule until July 2020.[225] Setting aside the reasonableness of the Department's decisions with respect to these other regulations, it would only be appropriate for the Department to adopt a similar compliance period for Title IX rule that would have more far-reaching consequences for many more schools.

## IX.    Conclusion

Proper enforcement of Title IX has an immense impact on our states, our colleges and universities, our K-12 schools, and most importantly, our students. Title IX requires schools to provide an education that is free from sexual harassment, violence, and discrimination. Our educational institutions, relying on prior guidance from the Department, have spent many years developing procedures and policies to address these issues, and they have made great strides in fostering more open and inclusive educational environments. The proposed rule, however, is a step backward, rather than a step forward, in achieving Title IX's goals. It would inject confusion and bias into the Title IX adjudicatory process. Survivors of sexual harassment and violence would face significant reporting obstacles under the new rule, further undermining the already too low sexual violence and harassment reporting rates. The proposed rule is not consistent with Title IX as written and fails to further its goals. It should be withdrawn.

Respectfully submitted,


JOSH SHAPIRO
Attorney General
Commonwealth of Pennsylvania


GURBIR S. GREWAL
Attorney General
State of New Jersey


XAVIER BECERRA
Attorney General
State of California


KATHLEEN JENNINGS
Attorney General
State of Delaware

---

[223] *See* 83 Fed. Reg. 28,177 (June 18, 2018).

[224] *See* 83 Fed. Reg. 6,458 (Feb. 14, 2018); 83 Fed. Reg. 34,047 (July 19, 2018).

[225] 83 Fed. Reg. 31,296 (July 3, 2018).

EXHIBIT O                                                                                                      69



KARL A. RACINE
Attorney General
District of Columbia

AARON M. FREY
Attorney General
State of Maine

CLARE E. CONNORS
Attorney General
State of Hawai'i

BRIAN FROSH
Attorney General
State of Maryland

KWAME RAOUL
Attorney General
State of Illinois

KEITH ELLISON
Attorney General
State of Minnesota

TOM MILLER
Attorney General
State of Iowa

AARON D. FORD
Attorney General
State of Nevada

ANDY BESHEAR
Attorney General
Commonwealth of Kentucky

HECTOR BALDERAS
Attorney General
State of New Mexico

70

JOSH STEIN
Attorney General
State of North Carolina


ELLEN ROSENBLUM
Attorney General
State of Oregon


PETER F. NERONHA
Attorney General
State of Rhode Island


T.J. DONOVAN
Attorney General
State of Vermont


BOB FERGUSON
Attorney General
State of Washington

71

EXHIBIT O                                                                    71