CAROL FEDERIGHI
TX Bar No. 06872950
*Lead Counsel*
ELLIOTT M. DAVIS
NY Reg. No. 4596755

BRIAN M. BOYNTON
Acting Assistant Attorney General
CARLOTTA P. WELLS
Assistant Director
United States Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, DC  20044
Phone: (202) 514-4336
elliott.m.davis@usdoj.gov

*Attorneys for Defendants*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF OREGON
### EUGENE DIVISION

| | |
|---|---|
| ELIZABETH HUNTER, *et al.*,<br><br>  Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF EDUCATION, *et al.*,<br><br>  Defendants. | Civil Action No. 6:21–cv–00474–AA<br><br>**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY PRELIMINARY INJUNCTION SHOULD NOT ISSUE** |

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

BACKGROUND ................................................................................................................3

    I.     LEGAL BACKGROUND ................................................................................3

    II.    THE PRESENT MOTION ..............................................................................5

ARGUMENT ....................................................................................................................5

    I.     THIS COURT LACKS DIVISIONAL VENUE AND THEREFORE LACKS
          AUTHORITY TO GRANT ANY INJUNCTIVE RELIEF ............................5

    II.    PLAINTIFFS ARE NOT ENTITLED TO A TEMPORARY RESTRAINING
          ORDER OR PRELIMINARY INJUNCTION ...............................................7

         A.    The Requested Injunctive Relief Would Upend the Status Quo .....................8

         B.    Plaintiffs Have Not Demonstrated Entitlement To a Mandatory Injunction .8

         C.    Plaintiffs Have Not Demonstrated Irreparable Harm .....................................10

         D.    Plaintiffs Are Unlikely To Succeed on the Merits .............................................16

               1.     Plaintiffs Lack Standing ...........................................................................17

               2.     Plaintiffs Are Unlikely To Succeed on Their Causes of Action ...........19

                    (a)    Plaintiffs Are Unlikely To Succeed on Their First Cause of
                           Action ..............................................................................................19

                    (b)    Plaintiffs Are Unlikely To Succeed on Their Second Cause of
                           Action ..............................................................................................24

                    (c)    Plaintiffs Are Unlikely To Succeed on Their Fourth Cause of
                           Action ..............................................................................................29

                    (d)    Plaintiffs Are Unlikely To Succeed on Their Fifth Cause of
                           Action ..............................................................................................33

          E.    The Balance of Equities Weighs Against an Injunction ...................................34

CONCLUSION ..................................................................................................................35

# TABLE OF AUTHORITIES

**Cases**

*Am. Mfgs. Mut. Ins. Co. v. Sullivan,*
 526 U.S. 40 (1999) ...................................................................................................*passim*

*Bell v. Becker-Green,*
 No. C17–5319, 2017 WL 6452234 (W.D. Wash. Dec. 18, 2017)......................................16

*Blum v. Yaretsky,*
 457 U.S. 991 (1982) ................................................................................................. 19, 20

*Bond v. Brown,*
 No. 6:20–cv–1656, 2021 WL 1237114 (D. Or. Apr. 2, 2021) ...........................................12

*Brittain v. Hansen,*
 451 F.3d 982 (9th Cir. 2006) ..........................................................................................23

*Brown v. U.S. Forest Serv.,*
 465 F. Supp. 3d 1119 (D. Or. 2020) ..................................................................................9

*California v. Azar,*
 911 F.3d 558 (9th Cir. 2018) ..........................................................................................22

*California Pharmacists Assoc. v. Kent,*
 No. 19–cv–02999–JSW, 2020 WL 4460547 (N.D. Cal. Feb. 21, 2020) ..............................8

*Cannon v. Univ. of Chicago,*
 441 U.S. 677 (1979) .........................................................................................4, 10, 35

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,*
 467 U.S. 837 (1984) ..............................................................................................31, 32, 33

*Coalition for Econ. Equity v. Wilson,*
 122 F.3d 718 (9th Cir. 1997) ............................................................................................8

*Cohen v. City of Des Plaines,*
 8 F.3d 484 (7th Cir. 1993) ..............................................................................................26

*Comm. Concerning Cmty. Improvement v. City of Modesto,*
 583 F.3d 690 (9th Cir. 2009) ..........................................................................................21

*Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos,*
 483 U.S. 327 (1987) ..............................................................................................24, 25, 27

*Cutter v. Wilkinson,*
 544 U.S. 709 (2005) .......................................................................................................28

*Decker Coal Co. v. Commonwealth Edison Co.*,
    805 F.2d 834 (9th Cir. 1986) ...............................................................................6

*DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*,
    489 U.S. 189 (1989) .............................................................................................23

*D'Lil v. Best Western Encina Lodge & Suites*,
    538 F.3d 1031 (9th Cir. 2008) .............................................................................17

*Drakes Bay Oyster Co. v. Jewell*,
    747 F.3d 1073 (9th Cir. 2014) ...............................................................................7

*Droz v. Commissioner*,
    48 F.3d 1120 (9th Cir. 1995) ...............................................................................29

*Edge v. City of Everett*,
    929 F.3d 657 (9th Cir. 2019) ...............................................................................16

*Ehlers-Renzi v. Connelly Sch. of the Holy Child, Inc.*,
    224 F.3d 283 (4th Cir. 2000) ...............................................................................26

*Encino Motorcars, LLC v. Navarro*,
    136 S. Ct. 2117 (2016) ................................................................................. 29, 30

*Espinoza v. Montana Dep't of Revenue*,
    140 S. Ct. 2246 (2020) ........................................................................................26

*F.C.C. v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009) .............................................................................................29

*Foothill Church v. Watanabe*,
    -- F. App'x --, 2021 WL 3039417 (9th Cir. 2021) ....................................... 24, 28

*Forter v. Young*,
    No. 6:18–cv–01171–JR, 2020 WL 1917331 (D. Or. Apr. 20, 2020) ..................24

*Fox Television Stations, Inc. v. BarryDriller Content Sys., PLC*,
    915 F. Supp. 2d 1138 (C.D. Cal. 2012) ................................................................7

*Garcia v. Google, Inc.*,
    786 F.3d 733 (9th Cir. 2015) ............................................................................ 7, 9

*Gaylor v. Mnuchin*,
    919 F.3d 420 (7th Cir. 2019) ....................................................................24, 26, 27

*Gillette v. United States*,
    401 U.S. 437 (1971) ...................................................................................... 28, 29

*Goldie's Bookstore, Inc. v. Superior Court,*
   739 F.2d 466 (9th Cir. 1984) ................................................................................16

*Gross v. Progressive Cas. Ins. Co.,*
   No. 1:17–cv–00828, 2017 WL 6945173 (D. Or. Dec. 5, 2017) .................................6

*Hankins v. Lyght,*
   441 F.3d 96 (2d Cir. 2006) ................................................................................27

*Harrison v. Kernan,*
   971 F.3d 1069 (9th Cir. 2020) ...........................................................................22

*Heineke v. Santa Clara Univ.,*
   965 F.3d 1009 (9th Cir. 2020) ......................................................................19, 20

*Hendricks v. Bank of Am., N.A.,*
   408 F.3d 1127 (9th Cir. 2005) ..........................................................................5, 6

*Hernandez v. Oregon Legislature,*
   No. 6:21–cv–00238–MK, 2021 WL 661897 (D. Or. Feb. 20, 2021) .................*passim*

*Hobbie v. Unemployment Appeals Comm'n of Fla.,*
   480 U.S. 136 (1987) ........................................................................................22

*Humane Soc'y of U.S. v. Johanns,*
   No. 06–cv–265, 2006 WL 8460551 (D.D.C. Mar. 14, 2006) ......................................8

*In re Bozic,*
   888 F.3d 1048 (9th Cir. 2018) ..............................................................................6

*Juliana v. United States,*
   217 F. Supp. 3d 1224 (D. Or. 2016) .................................................................23, 24

*Kreisner v. City of San Diego,*
   1 F.3d 775 (9th Cir. 1993) ................................................................................25

*Larkin v. Grendel's Den, Inc.,*
   459 U.S. 116 (1982) ........................................................................................27

*Lee v. City of Los Angeles,*
   250 F.3d 668 (9th Cir. 2001) ............................................................................21

*Lujan v. Defs. of Wildlife,*
   504 U.S. 555 (1992) ........................................................................................18

*Massachusetts v. U.S. Dep't of Health & Human Servs.,*
   -- F. Supp. 3d --, 2021 WL 185243 (D. Mass. Jan. 15, 2021) ..................................27

*Maxon v. Fuller Theological Seminary,*
  No. 2:19–cv–09969, 2020 WL 6305460 (C.D. Cal. Oct. 7, 2020) ...................................................*passim*

*Mayweathers v. Newland,*
  314 F.3d 1062 (9th Cir. 2002) ...........................................................................................................25

*Mazurek v. Armstrong,*
  520 U.S. 968 (1997) ................................................................................................................... 7, 16

*McGowan v. Maryland,*
  366 U.S. 420 (1961) ................................................................................................................. 28, 29

*Medina v. Catholic Health Initiatives,*
  877 F.3d 1213 (10th Cir. 2017) ................................................................................................ 24, 27

*Methode Elecs., Inc. v. Adam Techs., Inc.,*
  No. 03–C–2971, 2003 WL 21799934 (N.D. Ill. July 25, 2003) .............................................................5

*Minnesota v. Rounds,*
  530 F.3d 724 (8th Cir. 2008) ....................................................................................................... 8, 34

*Minority Television Project, Inc. v. FCC,*
  736 F.3d 1192 (9th Cir. 2013) ...........................................................................................................23

*Molina-Aviles v. Dist. of Columbia,*
  824 F. Supp. 2d 4 (D.D.C. 2011) .....................................................................................................23

*Mueller v. Allen,*
  463 U.S. 388 (1983) .........................................................................................................................26

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.,*
  545 U.S. 967 (2005) .........................................................................................................................31

*Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.,*
  366 F.3d 930 (D.C. Cir. 2004) .................................................................................................... 10, 11

*Norsworthy v. Beard,*
  87 F. Supp. 3d 1104 (N.D. Cal. 2015) ..............................................................................................22

*Oakland Tribune, Inc. v. Chronicle Publ'g Co.,*
  762 F.2d 1374 (9th Cir. 1985) ...........................................................................................................12

*O'Bannon v. Town Court Nursing Ctr.,*
  447 U.S. 773 (1980) .........................................................................................................................23

*Ohio Forestry Ass'n, Inc. v. Sierra Club,*
  523 U.S. 726 (1998) .............................................................................................................2, 18, 34, 35

*Or. Rest. & Lodging Ass'n v. Perez,*
    816 F.3d 1080 (9th Cir. 2016)..................................................................................31

*P.O.P.S. v. Gardner,*
    998 F.2d 764 (9th Cir. 1993)....................................................................................22

*Parsons v. Del Norte Cnty.,*
    728 F.2d 1234 (9th Cir. 1984)..................................................................................22

*Pers. Adm'r of Mass. v. Feeney,*
    442 U.S. 256 (1979).................................................................................................21

*Pieszak v. Glendale Adventist Med. Ctr.,*
    112 F. Supp. 2d 970 (C.D. Cal. 2000).......................................................24, 25, 27

*Preskar v. United States,*
    248 F.R.D. 576 (E.D. Cal. 2008)..............................................................................11

*Ramos v. Wolf,*
    975 F.3d 872 (9th Cir. 2020)....................................................................................21

*Rendell-Baker v. Kohn,*
    457 U.S. 830 (1982).................................................................................................20

*Single Moms, Inc. v. Montana Power Co.,*
    331 F.3d 743 (9th Cir. 2003)....................................................................................19

*SmithKline Beecham Corp. v. Abbott Labs.,*
    740 F.3d 471 (9th Cir. 2014)....................................................................................22

*Stimac v. Barr,*
    10 F.3d 808, 1993 WL 483837 (9th Cir. 1993)................................................11, 35

*Sutton v. Providence St. Joseph Med. Ctr.,*
    192 F.3d 826 (9th Cir. 1999)..............................................................................19, 33

*Texas Monthly, Inc. v. Bullock,*
    489 U.S. 1 (1989).....................................................................................................26

*Townsend v. Jones,*
    No. 2:19–cv–01674, 2020 WL 2311548 (D. Or. May 8, 2020)................................9

*Trudeau v. Fed. Trade Comm'n,*
    456 F.3d 178 (D.C. Cir. 2006) .................................................................................11

*Trump v. New York,*
    141 S. Ct. 530 (2020)...............................................................................................35

*USA Recycling, Inc. v. Town of Babylon,*
    66 F.3d 1272 (2d Cir. 1995) ................................................................................10

*Video Gaming Techs., Inc. v. Bureau of Gambling Control,*
    356 F. App'x 89 (9th Cir. 2009) .................................................................... 2, 34

*Village of Bensenville v. Federal Aviation Administration,*
    457 F.3d 52 (D.C. Cir. 2006) ...........................................................................33

*Walz v. Tax Comm'n,*
    397 U.S. 664 (1970) ................................................................................. 24, 26

*Williams v. California,*
    764 F.3d 1002 (9th Cir. 2014) ...........................................................24, 25, 27

*Winter v. Natural Res. Def. Council,*
    555 U.S. 7 (2008) ......................................................................................*passim*

*Women's Equity Action League v. Cavazos,*
    906 F.2d 742 (D.C. Cir. 1990) ................................................................ 11, 35

*Yazzie v. Hobbs,*
    977 F.3d 964 (9th Cir. 2020) ...........................................................................17

**Statutes**

Educational Amendments of 1972,
    Pub. L. No. 92–318, 86 Stat. 235 (1972) ..........................................................8

20 U.S.C. § 1681(a) .................................................................................1, 3, 14, 22

20 U.S.C. § 1682 ..............................................................................................4

28 U.S.C. § 1406(a) ..........................................................................................6

42 U.S.C. § 2000bb–4 ................................................................................ 17, 33

**Rules**

Fed. R. Civ. P. 5.1(a) ......................................................................................10

**Regulations**

34 C.F.R. § 100.7(b) ........................................................................................15

34 C.F.R. § 100.8(a) ..........................................................................................4

34 C.F.R. § 106.12 .................................................................................. 3, 4, 33

34 C.F.R. § 106.81 ..............................................................................................4

**Other Authorities**

2 William B. Rubenstein,
  *Newberg on Class Actions § 6:36 (5th ed.)* ..................................................................................6

11A Charles Alan Wright & Arthur R. Miller,
  *Federal Practice & Procedure § 2948.1 (3d ed.)* .........................................................10

Direct Grant Programs,
  85 Fed. Reg. 59,916, 59,918 (Sept. 23, 2020).....................................................3, 29, 30, 31

Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal
    Financial Assistance,
  85 Fed. Reg. 30,026 (May 19, 2020).............................................................3, 29, 32

U.S. Dep't of Educ., Questions and Answers on the Title IX Regulations on Sexual Harassment
    (July 2021),
  https://perma.cc/S4ZL-7LUL .................................................................................14

## INTRODUCTION

Title IX provides individuals with two avenues to challenge discrimination by educational institutions on the basis of sex, sexual orientation, or gender identity: they may file administrative claims with the Department of Education ("ED"), which are then evaluated by the agency's Office for Civil Rights ("OCR"); and they may assert Title IX claims directly against their educational institutions in federal court. Plaintiffs, however, seek a temporary restraining order and a preliminary injunction because they fear that one of those avenues will soon yield an unfavorable result. Specifically, they have asked this Court to enjoin an aspect of OCR's administrative process because of the possibility that OCR may dismiss their administrative complaints based on Title IX's Religious Exemption, 20 U.S.C. § 1681(a)(3). Plaintiffs are not entitled to that relief.

As an initial matter, Plaintiffs do not face any imminent irreparable injury. Even if OCR were to dismiss their administrative complaints based on the Religious Exemption, Plaintiffs have an adequate alternate remedy: a private right of action. Plaintiffs may challenge the constitutionality of Title IX's Religious Exemption in private suits regardless of whether or how OCR resolves their administrative complaints—and, in fact, two Plaintiffs have already done so. Moreover, Plaintiffs' delay in seeking preliminary relief undermines their position that they face irreparable harm without injunctive relief. Plaintiffs generally experienced the alleged conduct of their educational institutions months or even years ago. Yet they waited months after commencing this action to file administrative complaints and seek preliminary injunctive relief. Finally, Plaintiffs have not demonstrated that OCR will imminently deny Plaintiffs' administrative complaints based on the Religious Exemption. Rather, Plaintiffs' own declaration reflects that an administrative complaint submitted in June 2021 is still pending, and OCR is still determining whether some, all, or none of the allegations therein would be subject to the Religious Exemption.

Nor do Plaintiffs otherwise demonstrate an entitlement to preliminary relief.  At the threshold, Plaintiffs filed this action in the wrong division.  The Court lacks divisional venue and, accordingly, lacks authority to afford Plaintiffs any preliminary injunctive relief.  Moreover, Plaintiffs have not shown a likelihood of success on the merits.  As explained below and in greater detail in Defendants' motion to dismiss (Doc. 56, "USA Mot."), this entire action should be dismissed for lack of ripeness and lack of standing, and Plaintiffs' non-APA claims do not state a claim as a matter of law.  Plaintiffs' APA claims are similarly unlikely to succeed.

Finally, the balance of equities tips toward Defendants.  Plaintiffs will sustain no irreparable harm if the Court denies them preliminary injunctive relief because they have an adequate alternate remedy.  And the Court will benefit from OCR's unencumbered resolution of Plaintiffs' administrative complaints:  OCR's resolution will crystallize the presently inchoate dispute, and is consistent with the Supreme Court's instruction that federal courts should not interfere with agency processes until they "ha[ve] been formalized and [their] effects felt in a concrete way by the challenging parties."  *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 732–33 (1998).  On the other hand, courts have recognized that the government "suffers irreparable injury whenever an enactment of its people or their representatives is enjoined."  *Video Gaming Techs., Inc. v. Bureau of Gambling Control*, 356 F. App'x 89, 92 (9th Cir. 2009).

To be clear, Defendants do not condone the alleged actions that Plaintiffs attribute to their educational institutions.  Eliminating discrimination that targets LGBTQI+ students is a critical part of ED's mission, and ED is committed to enforcing Title IX and other federal civil rights laws to the fullest extent permissible under the existing laws.  To the extent Plaintiffs seek to change a statutory exemption enacted by Congress, this litigation is not the proper vehicle for such an effort.  In all events, Plaintiffs have not demonstrated their entitlement to preliminary relief.  For these reasons, Plaintiffs' motion for a temporary restraining order and preliminary injunction should be denied.

## BACKGROUND

## I.    LEGAL BACKGROUND

The relevant background is set forth in more detail in Defendants' motion to dismiss.  *See generally* USA Mot.  In brief, Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ."  20 U.S.C. § 1681(a).  The statute further provides that it "shall not apply to an educational institution which is controlled by a religious organization if the application of this subsection would not be consistent with the religious tenets of such organization."  *Id.* § 1681(a)(3) (the "Religious Exemption").

ED's regulations implementing Title IX at 34 C.F.R. Part 106 contain a provision setting forth the procedures for an institution wishing to invoke the Religious Exemption.  *See* 34 C.F.R. § 106.12. In 2020, ED made two sets of changes to this regulation, both of which Plaintiffs challenge in their Fourth Cause of Action.  First, ED revised the regulation to clarify that institutions are not required to submit a written statement to the Assistant Secretary for Civil Rights prior to invoking the Religious Exemption.  *See* Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 85 Fed. Reg. 30,026, 30,031, 30,475–82 (May 19, 2020) (the "August 2020 Rule").  The revised regulation now clarifies that "[a]n educational institution that seeks assurance of the exemption set forth in paragraph (a) of this section *may* do so" by submitting a written request to the Assistant Secretary.  34 C.F.R. § 106.12(b) (emphasis added).  The regulation further specifies that "[a]n institution is not required to seek assurance from the Assistant Secretary in order to assert such an exemption."  *Id.*

Second, the Department revised the regulation to add a new subsection addressing how educational institutions may demonstrate that they are "controlled by a religious organization" within the meaning of the Religious Exemption.  *See* Direct Grant Programs, 85 Fed. Reg. 59,916, 59,918

(Sept. 23, 2020) (the "November 2020 Rule").  The revised regulation now sets forth a list of six criteria, any one of which "shall be sufficient to establish that an educational institution is controlled by a religious organization."  34 C.F.R. § 106.12(c).

Individuals who allege injuries from discriminatory practices at an educational institution receiving federal funds from ED may proceed via two routes to obtain judicial or administrative relief. First, they can sue the educational institution directly in court.  *See Cannon v. Univ. of Chicago*, 441 U.S. 677, 717 (1979).  Second, they can file an administrative complaint against the school with OCR.  *See* 34 C.F.R. § 106.81 (incorporating the procedures applicable to Title VI of the Civil Rights Act of 1964, 34 C.F.R. §§ 100.6–100.11); *id.* § 100.7(b).

OCR initially evaluates administrative complaints to determine whether the information provided is subject to further processing pursuant to the applicable statutes and regulations and OCR's Case Processing Manual ("CPM"; *see* Doc. 50–23).  This evaluation includes but is not limited to an assessment of the timeliness of the complaint and subject-matter jurisdiction over the allegations.  *See* CPM Article I.  If OCR determines that the complaint does not meet these initial considerations, OCR dismisses the complaint.  *Id.* § 108.  If not dismissed, the complaint is opened for investigation.  *Id.* § 111.  If sufficient evidence of discrimination is found after investigation, OCR works to reach voluntary resolution with the institution.  *Id.* § 304.  If that process is unsuccessful, OCR will either: (1) initiate administrative proceedings to suspend, terminate, or refuse to grant or continue financial assistance to the recipient; or (2) refer the case to the United States Department of Justice for judicial proceedings to enforce any rights of the United States.  *See* 20 U.S.C. § 1682; 34 C.F.R. § 100.8(a); CPM §§ 601–602.  There is no administrative-exhaustion requirement.  Complainants may at any point in this process bring suit in federal court against the institution.  CPM § 111.

## II.    THE PRESENT MOTION

Plaintiffs are current and former students who identify as LGBTQI+ and who attend, attended, or sought to attend certain religious educational institutions.  1st Am. Compl., Doc. 35 ("FAC") ¶¶ 1, 13–51.  They bring the present suit as a putative class action to challenge the Religious Exemption as applied to LGBTQI+ students at such schools.  *Id.* ¶¶ 1–6.  They assert five causes of action against Defendants based on the First and Fifth Amendments, the Administrative Procedure Act, and the Religious Freedom Restoration Act.  *Id.* ¶¶ 621–708.

The FAC alleged that only one plaintiff had filed an administrative complaint with ED and received a decision, though that decision likely occurred many years ago.  FAC ¶¶ 395, 407.  After the FAC was filed, most of the other plaintiffs filed administrative complaints with OCR.  *See* Doc. 44 ("Pl. Mot.") at 10.  Plaintiffs then filed their present motion for a temporary restraining order and a preliminary injunction, asserting that their recently filed administrative complaints "are in danger of being dismissed in a matter of days" and accordingly seeking "an order enjoining Defendants and their agents from dismissing Plaintiffs' Title IX complaints" based on application of the Religious Exemption and related regulations.  *Id.* at 8.

## ARGUMENT

## I.    THIS COURT LACKS DIVISIONAL VENUE AND THEREFORE LACKS AUTHORITY TO GRANT ANY INJUNCTIVE RELIEF

As a threshold matter, Plaintiffs' motion should be denied because the Court lacks divisional venue to hear this action, and thus is not empowered to grant Plaintiffs any injunctive relief.  *See, e.g.,* *Hendricks v. Bank of Am., N.A.*, 408 F.3d 1127, 1135 (9th Cir. 2005) (a defendant's "procedural defenses bear on the district court's power to issue [an] injunction, because the court would lack authority to grant relief if . . . venue was improper . . . ."); *Methode Elecs., Inc. v. Adam Techs., Inc.*, No. 03–C–2971, 2003 WL 21799934, at *3 (N.D. Ill. July 25, 2003) ("[I]f this court lacked venue, we would in no event grant a temporary restraining order."), *aff'd*, 371 F.3d 923 (7th Cir. 2004).

As Defendants explained in their motion to dismiss, venue is not proper in the Eugene Division because none of the named Plaintiffs purport to live in, or to attend or to have formerly attended a college or university within, the counties comprising the Eugene Division. *See generally* USA Mot. at 9–11.[1] Divisional venue is proper in "the division of the Court in which a substantial part of the events or omissions giving rise to the claim occurred," Civ. LR 3–2(b), and "in a class action," "[t]he analysis of where a substantial part of the events took place . . . looks to the events concerning the named plaintiffs' claims, not all of the class members' claims." 2 William B. Rubenstein, *Newberg on Class Actions* § 6:36 (5th ed.) (quoted approvingly in *In re Bozic*, 888 F.3d 1048, 1053 (9th Cir. 2018)).

Nor is divisional venue optional. "[C]ourts in this District have held that LR 3–2 is a *mandatory* requirement under which a case *must* be transferred if it was brought in the wrong division." *Gross v. Progressive Cas. Ins. Co.*, No. 1:17–cv–00828, 2017 WL 6945173, at *7 (D. Or. Dec. 5, 2017) (emphases added), *report and recommendation adopted by* 2018 WL 401532 (D. Or. Jan. 12, 2018) (Aiken, J.); *see also Decker Coal Co. v. Commonwealth Edison Co.*, 805 F.2d 834, 841 (9th Cir. 1986) ("We review venue determinations de novo as a question of law."); *see* 28 U.S.C. § 1406(a) (district court that lacks divisional venue "*shall* dismiss, or if it be in the interest of justice, transfer such case to any . . . division in which it could have been brought.") (emphasis added).[2]

Because venue in the Eugene Division is improper, this Court therefore "lack[s] authority to grant [injunctive] relief." *Hendricks*, 408 F.3d at 1135.

---

[1] Defendants timely asserted their divisional-venue defense in their first responsive pleading: their motion to dismiss. *See Hendricks*, 408 F.3d at 1135 ("Mutual did not waive its venue and personal jurisdiction defenses because it raised them in a timely manner in its first responsive pleading after securing several reasonable extensions of the filing deadline to facilitate settlement negotiations.").

[2] Unless expressly included, all citations, footnotes, and internal quotation and alteration marks have been omitted.

## II.    PLAINTIFFS ARE NOT ENTITLED TO A TEMPORARY RESTRAINING ORDER OR PRELIMINARY INJUNCTION

Even if this action had been filed in the proper division, Plaintiffs would still not be entitled to any preliminary injunctive relief.  "A TRO is an 'extraordinary and drastic remedy.'"  *Hernandez v. Oregon Legislature*, No. 6:21–cv–00238–MK, 2021 WL 661897, at *3 (D. Or. Feb. 20, 2021) (Aiken, J.) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)), as is a preliminary injunction, *Mazurek*, 520 U.S. at 972.  "The same general legal standards govern TROs and preliminary injunctions."  *Hernandez*, 2021 WL 661897, at *3.

In the context of a prohibitory injunction, a plaintiff seeking preliminary injunctive relief "*must* establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, *and* that an injunction is in the public interest."  *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 22 (2008) (emphases added).  "When the government is a party, these last two factors merge."  *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).  Plaintiffs argue that they need not necessarily show a likelihood of success on the merits to obtain relief here, *see* Pl. Mot. at 22, but that proposition conflicts with *Winter*, as well as the rule stated by the Ninth Circuit, sitting *en banc*, that "when a plaintiff has failed to show the likelihood of success on the merits, we need not consider the remaining three *Winter* elements."  *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc).[3]

---

[3] Though certain Ninth Circuit panels and district courts continue to restate the Ninth Circuit's pre-*Winter* "serious question" test, the serious-question test is no longer good law in light of *Winter*, the *en banc Garcia* decision, and the Ninth Circuit panel opinion that immediately followed *Winter*.  *See, e.g.*, *Fox Television Stations, Inc. v. BarryDriller Content Sys., PLC*, 915 F. Supp. 2d 1138, 1141 n.6 (C.D. Cal. 2012) ("The Court will not apply the [serious-question test], as it views that standard as being in conflict with both the Supreme Court's ruling in *Winter* and the Ninth Circuit's own subsequent adoption of the *Winter* standard.").  In all events, Plaintiffs' causes of action would not pass the serious-question test and, as explained below, the balance of equities does not tip—let alone sharply tip—in Plaintiffs' favor.

The Court may enter a temporary restraining order or preliminary injunction "only . . . upon a *clear* showing that" Plaintiffs are "entitled to such relief." *Winter*, 555 U.S. at 22 (emphasis added). "The burden on a plaintiff challenging the operation of a statute is particularly heavy because 'it is clear that [the government] suffers irreparable injury whenever an enactment of its people or their representatives is enjoined.'" *California Pharmacists Assoc. v. Kent*, No. 19–cv–02999–JSW, 2020 WL 4460547, at *3 (N.D. Cal. Feb. 21, 2020) (quoting *Coalition for Econ. Equity v. Wilson*, 122 F.3d 718, 719 (9th Cir. 1997)). That "more rigorous standard 'reflects the idea that governmental policies implemented through legislation or regulations developed through presumptively reasoned democratic processes are entitled to a higher degree of deference and should not be enjoined lightly.'" *Id.* (quoting *Minnesota v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008)).

### A.    The Requested Injunctive Relief Would Upend the Status Quo

"The purpose of" preliminary injunctive relief "is to preserve the status quo." *Hernandez*, 2021 WL 661897, at *3. Here, the Religious Exemption *is* the status quo, as Title IX has included a religious exemption since its enactment. *See* Educational Amendments of 1972, Pub. L. No. 92–318, § 901(a)(3), 86 Stat. 235, 373 (1972). "Such a request for a preliminary injunction under these circumstances is highly atypical." *Humane Soc'y of U.S. v. Johanns*, No. 06–cv–265, 2006 WL 8460551, at *12 (D.D.C. Mar. 14, 2006) (denying preliminary injunctive relief in challenge to a program that had been in place "for approximately thirty (30) years"). Plaintiffs' proposed injunctive relief would upend rather than preserve the status quo. Accordingly, their motion should be denied.

### B.    Plaintiffs Have Not Demonstrated Entitlement To a Mandatory Injunction

Plaintiffs' requested relief is ambiguous. At the beginning of their motion, Plaintiffs represent that they simply "seek an order enjoining Defendants and their agents from dismissing Plaintiffs' Title IX complaints based on the . . . application of the statutory religious exemption to Title IX and related administrative regulations." Pl. Mot. at 8. But elsewhere in their motion, Plaintiffs suggest that they

do not merely contemplate a prohibitory injunction against Religious Exemption dismissals. Instead, they suggest that preliminary injunctive relief would obligate OCR to "process[]" administrative complaints that might otherwise be subject to dismissal under the Religious Exemption, such that OCR would "determine whether, in a given case, [it] will move forward with an investigation and resolution process." Mot. at 10; *see also id.* at 43 (suggesting that, with injunctive relief, ED "will make individualized determinations based on the facts and constitutional issues at play in each separate Title IX complaint.").

To the extent that Plaintiffs seek injunctive relief that would obligate Defendants "to take affirmative action"—like investigating complaints that should otherwise be dismissed under the governing law, *see* Pl. Mot. at 10—Plaintiffs request a mandatory preliminary injunction. *Garcia*, 786 F.3d at 740. And Plaintiffs have not demonstrated entitlement to a mandatory preliminary injunction.

Mandatory injunctions "go[] well beyond simply maintaining the status quo *pendente lite*" and "[are] particularly disfavored." *Id.* "The district court should deny such relief unless the facts and law clearly favor the moving party." *Id.* As this Court has noted, "when a plaintiff requests a mandatory injunction, that already high [TRO or preliminary injunction] standard is further heightened, and the plaintiff must establish that the law and facts *clearly favor* her position, not simply that she is likely to succeed." *Brown v. U.S. Forest Serv.*, 465 F. Supp. 3d 1119, 1127 (D. Or. 2020) (Aiken, J.) (emphasis in original), *appeal dismissed*, No. 20–35591, 2020 WL 5814263 (9th Cir. Aug. 12, 2020).

Plaintiffs "do not demonstrate a *clear* likelihood of either success on the merits or irreparable harm to warrant . . . mandatory injunctive relief," *Townsend v. Jones*, No. 2:19–cv–01674, 2020 WL 2311548, at *1 (D. Or. May 8, 2020) (Aiken, J.) (emphasis added)—indeed, they do not argue that they would satisfy the "further heightened" standard necessary to obtain a mandatory injunction. *Brown*, 465 F. Supp. 3d at 1127. Accordingly, if certain of Plaintiffs' administrative complaints should be dismissed pursuant to the Religious Exemption, Plaintiffs are not entitled to an injunction that would

obligate Defendants to nevertheless affirmatively investigate those complaints, *contra* Mot. at 10.  To the extent that any injunction may be entered (and none should be, as explained below), Defendants may at most be enjoined from dismissing those complaints based on the Religious Exemption.

But in all events, Plaintiffs are not entitled to a temporary restraining order or any preliminary injunctive relief, as explained below.

### C.    Plaintiffs Have Not Demonstrated Imminent, Irreparable Harm

A party moving for a temporary restraining order or preliminary injunction "must demonstrate a significant threat of impending irreparable injury, irrespective of the magnitude of the injury." *Hernandez*, 2021 WL 661897 at *9 (emphasis omitted); *USA Recycling, Inc. v. Town of Babylon*, 66 F.3d 1272, 1294–95 (2d Cir. 1995) ("irreparable harm" is "the *sine qua non* for preliminary injunctive relief"). "Speculative injury does not constitute irreparable injury."  *Hernandez*, 2021 WL 661897 at *9. Preliminary injunctive relief may not issue where there is only "a possibility of irreparable harm." *Winter*, 555 U.S. at 22.  Plaintiffs have not demonstrated harm that is both imminent and irreparable.

*First*, even if the dismissal of an administrative complaint constitutes an injury, that injury is not irreparable because Plaintiffs "ha[ve] an adequate alternate remedy."  11A Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2948.1 (3d ed.) ("[A] preliminary injunction usually will be denied if it appears that the applicant has an adequate alternate remedy in the form of . . . other relief."); *Norland v. Moynihan*, No. 6:12–cv–1641, 2012 WL 12882722, at *1 (D. Or. Nov. 2, 2012) (Aiken, J.) (no irreparable harm where, *inter alia*, "plaintiff is able to address the legality of the forcible entry and detainer action in the state courts").  Specifically, Plaintiffs may bypass OCR and file private Title IX lawsuits directly against their respective schools, *see Cannon v. Univ. of Chicago*, 441 U.S. 677, 706 n.41 & 717 (1979), in which they may challenge the constitutionality of the Religious Exemption. *See, e.g.*, Fed. R. Civ. P. 5.1(a); *Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 947 (D.C. Cir. 2004) ("challenges to the lawfulness of the Department's policies in fact may be aired in a suit against

a university, to the extent that the defendant university attempts to justify its actions by reference to those policies"), *abrogated on other grounds by Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178 (D.C. Cir. 2006).

In fact, Plaintiffs Joanna Maxon and Nathan Brittsan did just that:  they filed a private Title IX suit against Fuller Theological Seminary.  *See Maxon v. Fuller Theological Seminary*, No. 2:19–cv–09969, 2020 WL 6305460 (C.D. Cal. Oct. 7, 2020) (granting motion to dismiss), *appeal docketed*, No. 20–56156 (9th Cir. Nov. 4, 2020).  And just last week, those Plaintiffs argued that the Ninth Circuit "should determine that the religious exemption is unconstitutional as applied to" them.  Appellees' Reply Brief at 11, *Maxon v. Fuller Theological Seminary*, No. 20–56156 (9th Cir. Aug. 4, 2021), 2021 WL 3520457.

Such private suits constitute—at minimum—an "adequate" alternate remedy.  The Ninth Circuit has recognized that persons aggrieved by an agency's "fail[ure] to investigate the alleged discrimination" "ha[ve] an adequate [Title IX] remedy against" their private colleges.  *Stimac v. Barr*, 10 F.3d 808, 1993 WL 483837, at *1 (9th Cir. 1993) (unpublished memorandum); *see also, e.g.*, *Nat'l Wrestling Coaches Ass'n*, 366 F.3d at 945 ("the availability of a private cause of action directly against universities that discriminate in violation of Title IX constitutes an adequate remedy that bars appellants' case"); *Women's Equity Action League v. Cavazos*, 906 F.2d 742, 751 (D.C. Cir. 1990) (R.B. Ginsburg, J.) ("Congress considered private suits to end discrimination not merely adequate but in fact the proper means for individuals to enforce . . . antidiscrimination statutes."); *Preskar v. United States*, 248 F.R.D. 576, 584 (E.D. Cal. 2008) (Title VI's "implied right of action is an 'adequate' remedy to redress the discrimination allegedly suffered by plaintiffs")

Plaintiffs, of course, are not guaranteed success in such private lawsuits.  *Cf. Maxon*, 2020 WL 6305460.  But Plaintiffs are similarly not guaranteed a favorable outcome even if OCR were to process their complaints in the absence of the Religious Exemption—which Plaintiffs appear to acknowledge. *See* Pl. Mot. at 10 ("Plaintiffs do not ask the Court to require a specific outcome for their Title IX complaints. . . .  Defendants will remain free to analyze and weigh the constitutional rights at issue, as

well as the facts and other jurisdictional issues, to determine whether, in a given case, they will move forward with an investigation and resolution process."). Because Plaintiffs have an adequate alternate remedy in the absence of preliminary injunctive relief, they cannot establish irreparable harm.

*Second*, Plaintiffs' "long delay before seeking" a temporary restraining order and preliminary injunctive relief "implies a lack of urgency and irreparable harm." *Oakland Tribune, Inc. v. Chronicle Publ'g Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985). Several months, and in many instances years, passed between the alleged conduct and Plaintiffs' initiation of the present action in March 2021. *See* Compl., Doc. 1.[4] And even after Plaintiffs amended their complaint in June 2021, they did not move for preliminary injunctive relief immediately, waiting weeks more until August 5, 2021. Plaintiffs cannot delay seeking injunctive relief and then claim urgency necessitating the "'extraordinary and drastic remedy,'" *Hernandez*, 2021 WL 661897, at *3, of a temporary restraining order or preliminary injunction. *See Bond v. Brown*, No. 6:20–cv–1656, 2021 WL 1237114, at *2 (D. Or. Apr. 2, 2021) (Aiken, J.) ("Plaintiff did not commence this action or seek an injunction until September 23, 2020, more than six months after the statewide emergency was declared. This weighs against finding that Plaintiff faces an emergent irreparable harm.").

*Third*, the fact that certain Plaintiffs recently filed administrative complaints does not change the calculus. Plaintiffs do not sufficiently explain why they waited until late July and early August to file their administrative complaints, when the conduct underlying those complaints generally took place long ago. *Compare, e.g.*, Docs. 1–1 through –33 (declarations dating from early 2021 regarding even earlier conduct) and Docs. 35–1 through –33 (same) *with* Docs 48–1 through –4 (administrative complaints that, with one exception, request waiver of the general 180-day time frame for filing

---

[4] *See, e.g.*, Hunter Decl., Doc. 1–1, ¶¶ 6–35 (describing conduct that took place between 2015 and 2019); Duron Decl., Doc. 1–3, ¶¶ 29–47 (describing conduct that took place in July 2020); Silva Decl., Doc. 1–4, ¶¶ 24–39 (describing conduct that took place in February 2020).

complaints). Plaintiffs argue that many of them "will be returning to campus in the coming weeks," Pl. Mot. at 44, but that circumstance was entirely predictable and only raises the question of why they did not file their administrative complaints months earlier. This delay runs contrary to their position that they now require emergent relief.

*Finally*, Plaintiffs assert that they "desperately need this Court's urgent assistance because Defendants are about to dismiss their complaints based on . . . the religious exemption" and that Defendants will do so "in a matter of days." Pl. Mot. at 8–9. But Plaintiffs do not support these assertions with sufficient evidence. Since filing their motion, Plaintiffs have clarified to Defendants that an email they referenced as forming a basis of their need for emergent relief, Swain Decl., Doc. 48, ¶ 7, is not as described. *See* Ex. A to Declaration of Elliott M. Davis. And earlier today, they filed a corrected declaration that deletes the reference to the email and instead now references a supposed conversation not mentioned in the earlier declaration. *Compare* Swain Decl., Doc. 48, ¶ 7 *with* Corrected Swain Decl., Doc. 61, ¶ 7.[5]

In all events, the passage of time since Plaintiffs filed their motion and the evidence they submit indicate that there is no need for emergency relief. Plaintiffs' declarant, Ms. Swain, states that she "submitted the Title IX complaint form for our first complainant, Mortimer Halligan, to the OCR on June 23, 2021"—over seven weeks ago. Corrected Swain Decl. ¶ 4. Defendants did not dismiss her complaint "in a matter of days." Instead, as Ms. Swain represents, an OCR attorney "interviewed Mortimer twice" and Plaintiff Halligan's administrative complaint remains pending. *Id.* ¶¶ 4–6. Ms. Swain submitted the other 34 administrative complaints "on July 27, 2021 or later," *id.* ¶ 8, and, according to Plaintiffs, OCR has not acknowledged receipt of all of them, *see id.* With respect to these

---

[5] Defendants have not yet had an opportunity to fully investigate the revised assertion in Plaintiffs' corrected declaration, and reserve their right to respond to it. In any event, the corrected declaration—which now references a conversation that took place *two weeks* before Plaintiffs filed their present motion—only further undermines Plaintiffs' alleged need for emergency injunctive relief.

complaints, there is even less reason to conclude there is a "significant threat" that any injury is "impending," *cf. Hernandez*, 2021 WL 661897 at \*9 (emphasis omitted)—let alone that these complaints will be dismissed "in a matter of days," Pl. Mot. at 8.

Nor do Plaintiffs demonstrate that Defendants "are about to dismiss their complaints based on . . . the religious exemption." Pl. Mot. at 9; *see id.* at 43. At most, as recounted by a third party, an OCR attorney "informed Mortimer that their case against Indiana Wesleyan University *may* be dismissed *if* the OCR finds that IWU *is qualified* for a religious exemption." Corrected Swain Decl. ¶ 5 (emphases added). The multiple qualifiers in this representation are inconsistent with Plaintiffs' assertion that a dismissal based on the Religious Exemption is a foregone conclusion. Nor does OCR's disposition of a handful of other individual complaints in years past, *see, e.g.*, Doc. 50–19, suffice to predict how OCR will evaluate Plaintiffs' pending administrative complaints, which are leveled against a number of different institutions and allege many different types of harm. Rather, as Plaintiff Halligan's experience reflects, OCR does not reflexively dismiss administrative complaints based on the Religious Exemption. Rather, it evaluates complaints on a case-by-case—and even an allegation-by-allegation—basis. *See* 20 U.S.C. § 1681(a)(3) (Religious Exemption applies only to the extent that "the application of" Title IX "would not be consistent with the religious tenets of [the controlling religious] organization"); U.S. Dep't of Educ., Questions and Answers on the Title IX Regulations on Sexual Harassment (July 2021) at 32, https://perma.cc/S4ZL-7LUL ("A religious exemption is not a blanket exemption from Title IX, and a school's religious exemption extends only as far as the conflict between the Title IX regulations and the religious tenets of the controlling religious organization.").

Indeed, most if not all of Plaintiffs' administrative complaints may be subject to possible dismissal for threshold reasons that would obviate any need to consider the Religious Exemption. For example, "OCR will take action only with respect to those allegations . . . that have been filed within 180 calendar days of the date of the alleged discrimination, unless the complainant is granted a waiver

under [Case Processing Manual] Section 107." CPM § 106. Acknowledging that their administrative complaints are untimely, all but one of the Plaintiffs who have submitted administrative complaints have requested a waiver, *see* Docs. 48–1 through –4, but waivers are discretionary in nature. *See* 34 C.F.R. § 100.7(b) ("A complaint must be filed not later than 180 days from the date of the alleged discrimination, unless the time for filing is extended by the responsible Department official or his designee."); CPM § 107 ("OCR *may* grant a waiver of the 180 calendar day filing requirement for [certain] reasons . . . .") (emphasis added).

In addition, several administrative complaints were lodged by plaintiffs who no longer attend the college at issue and have not expressed any intention of returning. In certain circumstances, OCR may dismiss such complaints. *See, e.g.*, CPM § 108 & 108(s) ("OCR will dismiss an allegation, or, if appropriate, the complaint in its entirety, when . . . OCR determines that the complaint is moot or unripe"). And Plaintiffs Maxon's and Brittsan's administrative complaints may be subject to dismissal because they filed a private lawsuit against the educational institution at issue and OCR dismisses complaints when "[t]he same or a similar allegation based on the same operative facts has been filed either by the complainant or someone other than the complainant against the same recipient with a state or federal court." CPM § 108 & 108(j). In sum, Plaintiffs do not substantiate their position that OCR will expeditiously deny Plaintiffs' administrative complaints based on the Religious Exemption, and they accordingly do not show "impending" irreparable harm, as necessary for preliminary injunctive relief. *See Hernandez*, 2021 WL 661897 at *9.

In their brief discussion of irreparable harm, Plaintiffs primarily argue that "[w]hen Constitutional rights are at stake, the mere fact that those rights are either threatened, or are in fact being impaired at the time relief is requested, is generally sufficient alone to constitute irreparable injury," and also rely on their allegations of "a broad range of harms." Pl. Mot. at 42. But as explained above, Plaintiffs' months- and in some cases years-long delay in pursuing relief cuts against a finding

of emergent irreparable harm.  Moreover, "[w]hile plaintiff[s] [are] correct that a showing of a substantial likelihood of a constitutional violation generally constitutes irreparable harm, 'a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion.'" *Bell v. Becker-Green*, No. C17–5319, 2017 WL 6452234, at *1 (W.D. Wash. Dec. 18, 2017) (quoting *Mazurek*, 520 U.S. at 972) (emphasis in original). So "when a plaintiff seeking a preliminary injunction order"—like Plaintiffs here—"makes an argument that relies on the alleged constitutional deprivation itself to show irreparable injury, the likelihood of success element of the applicable standard must establish by a clear showing that the Plaintiff is suffering or will imminently suffer a constitutional deprivation." *Id.*; *see Goldie's Bookstore, Inc. v. Superior Court*, 739 F.2d 466, 472 (9th Cir. 1984) ("tenuous" constitutional claims cannot form the basis of irreparable harm).  In other words, Plaintiffs cannot avoid establishing  actual irreparable harm simply by relying on the fact that they have asserted constitutional claims, unless they show a *clear* constitutional violation.  As explained in Defendants' motion to dismiss,  Plaintiffs not only lack standing, *see* USA Mot. at 11–19, but also all of their constitutional claims should be dismissed as a matter of law, *see id.* at 19–34.

### D.    Plaintiffs Are Unlikely To Succeed on the Merits

In determining whether to award preliminary injunctive relief, a "[l]ikelihood of success on the merits is the most important factor." *Edge v. City of Everett*, 929 F.3d 657, 663 (9th Cir. 2019).  "[I]f a movant fails to meet this threshold inquiry, [a court] need not consider the other factors." *Id.*  Plaintiffs contend that they are likely to succeed on their First, Second, Fourth, and Fifth Causes of Action. *Compare* Pl. Mot. at 22–42 *with* FAC ¶¶ 621–657, 672–708. [6]  As explained below and in greater detail in Defendants' motion to dismiss, Plaintiffs lack standing to bring any of these causes of action, and

---

[6] Plaintiffs do not argue that they are likely to succeed on their Third Cause of Action for alleged violations of various First Amendment rights.  *See* FAC ¶¶ 658–671.

Plaintiffs' First, Second, and Fifth Causes of Action should be dismissed because they do not state a claim. In particular, Plaintiffs' brief does not discuss: (i) the government-action requirement, which requires the dismissal of their First Cause of Action; (ii) the governing *Lemon* test, the operation of which requires the dismissal of their Second Cause of Action; or (iii) 42 U.S.C. § 2000bb–4, which requires the dismissal of their Fifth Cause of Action. Plaintiffs also are not likely to succeed on their Fourth Cause of Action.

### 1.    *Plaintiffs Lack Standing*

"At th[e] preliminary injunction stage," Plaintiffs "must make a clear showing of each element of standing." *Yazzie v. Hobbs*, 977 F.3d 964, 966 (9th Cir. 2020) (per curiam). As explained in greater detail in Defendants' motion to dismiss (USA Mot. at 11–19), Plaintiffs do not make such a showing.

First, Plaintiffs have not alleged a sufficiently ripe injury-in-fact. *See id.* at 12–15. In determining standing, the Court should confine its consideration to the facts as they existed at the time the complaint was filed and not consider the evidence submitted with Plaintiffs' present motion regarding post-FAC events. *See D'Lil v. Best Western Encina Lodge & Suites*, 538 F.3d 1031, 1036 (9th Cir. 2008). Plaintiffs' FAC purports to raise as-applied challenges to the Religious Exemption. But Plaintiffs had not yet submitted any of the pending administrative complaints when the FAC was filed. *See* Pl. Mot. at 11. Plaintiffs' challenges to ED's actions are therefore not ripe because the FAC does not, and could not, allege that the Religious Exemption has yet been applied by ED to Plaintiffs' recent administrative complaints. Indeed, even if the Court were to consider post-FAC events, Plaintiffs' recently submitted administrative complaints remain pending and Plaintiffs have still not obtained administrative determinations from ED as to any of the underlying conduct alleged in the FAC. Until ED makes a determination as to these administrative complaints, ascertaining the specific circumstances involved in each allegation of discrimination and if, and how, the Religious Exemption

may apply, court consideration of the issues involved is premature and Plaintiffs lack a sufficiently ripe injury. *See Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 732–33 (1998).

Plaintiffs also havenot sufficiently alleged the other required elements of standing: causation and redressability. *See generally* USA Mot. at 15–19. First, Plaintiffs have not shown how their claimed injuries are "fairly trace[able] to the challenged action of" Defendants. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (alteration in original). Plaintiffs' complaint is not that ED directly discriminated against them through its own actions. Instead, they allege that educational institutions—who are not parties to this case—discriminated against Plaintiffs and that ED would refuse, if presented with a complaint, to redress those injuries as a result of the Religious Exemption. But the FAC does not plausibly allege any causal connection between these two events—the actions of the institutions that Plaintiffs allege directly caused their injuries and ED's potential future application of a statutory exemption. Rather, the FAC implies that the decisions were made by these institutions independently and without regard to whether they had been granted (or would be granted) a religious exemption. Accordingly, Plaintiffs' injuries cannot fairly be attributed to the Defendants.

Plaintiffs also have not alleged that the relief sought would be likely to redress their injuries. The majority of the Plaintiffs have either left the educational institutions at issue—through graduation or otherwise—or are no longer seeking attendance there. Even if this Court were to grant Plaintiffs the ultimate relief they seek, and declare ED's current application of the Religious Exemption invalid, that relief would not remedy Plaintiffs' past injuries. And, prospectively, Plaintiffs can only speculate that the institutions would alter their policies if the Religious Exemption is enjoined in certain circumstances, but such speculation is insufficient to establish a "likelihood" of redressability. The institutions may well decline federal funding, as they would be permitted to do, which, as Plaintiffs acknowledge, *see* Mot. at 26, would mean that Title IX would not apply to them. Accordingly, whether

the relief Plaintiffs seek will actually redress their alleged injuries is speculative—and not sufficiently likely to establish standing.

       2.     *Plaintiffs Are Unlikely To Succeed on Their Causes of Action*

Plaintiffs argue that they are likely to succeed on their First, Second, Fourth, and Fifth Causes of action. *See generally* Pl. Mot. at 22–42. Plaintiffs are incorrect.

       (a)     Plaintiffs Are Unlikely To Succeed on Their First Cause of Action

Plaintiffs' First Cause of Action, which asserts equal-protection and substantive-due-process claims under the Fifth Amendment, does not state a claim primarily because it is based on actions taken by private religious colleges and universities—not the federal government. *See generally* USA Mot. at 19–25. As explained in greater detail in Defendants' motion to dismiss, the Constitution "protects individual rights only from *government* action, not from *private* action." *Single Moms, Inc. v. Montana Power Co.*, 331 F.3d 743, 746 (9th Cir. 2003). "[C]onstitutional standards" may be "invoked only when it can be said that the State is *responsible* for the *specific conduct* of which the plaintiff complains." *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982) (second emphasis added). This government-action requirement "excludes from its reach merely private conduct, no matter how discriminatory or wrongful." *Am. Mfgs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999). The Ninth Circuit "start[s] with the presumption that private conduct does not constitute governmental action," *Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 835 (9th Cir. 1999), and that presumption "may be overcome" only "in limited circumstances," *Heineke v. Santa Clara Univ.*, 965 F.3d 1009, 1012 (9th Cir. 2020).

Plaintiffs' First Cause of Action seeks to hold Defendants liable for the alleged conduct of certain private colleges. *See generally* FAC ¶¶ 1–5, 629, 635–637. Their theory is that the federal government is "complicit[] in the abuses and unsafe conditions thousands of LGBTQ+ students endure at hundreds of taxpayer-funded[] religious colleges and universities." *Id.* ¶ 1. But the government conduct alleged is limited to: (i) the fact that "the government provides public funds" to

religious colleges and universities, *id.* ¶ 5; and (ii) "[t]he Department's [supposed] inaction" in the face of the complained-of private conduct at issue, *id.* ¶ 2.  These allegations do not transform private conduct into governmental conduct.  *See Blum*, 457 U.S. at 1004.

As to funding, the Supreme Court has made clear that even when a private school derives "virtually all of [its] income . . . from government funding," "the school's receipt of public funds does not make the [school's] . . . decisions acts of the State."  *Rendell-Baker v. Kohn*, 457 U.S. 830, 840 (1982).  And based on this holding, the Ninth Circuit has recognized that "[r]eceipt of government funds is insufficient to convert a private university into a state actor, even where 'virtually all of the school's income is derived from government funding.'"  *Heineke*, 965 F.3d at 1013 (quoting *Rendell-Baker*, 457 U.S. at 840).  As the Supreme Court held in *Blum*, the fact "[t]hat programs undertaken by the [government] result in substantial funding of the activities of a private entity" does not "demonstrat[e] that the [government] is responsible for decisions made by the entity."  457 U.S. at 1011.

Nor does the federal government's alleged "inaction," *e.g.*, FAC ¶¶ 2 & 6, suffice to transform the consequent private actions of religious colleges and universities into federal actions subject to constitutional scrutiny.  The Supreme Court has explained that "legislative decision[s] not to intervene in" certain "dispute[s]"—like the Religious Exemption here—do not transform private action into government action.  *Am. Mfgs. Mut. Ins. Co.*, 526 U.S. at 53–54; *accord Blum*, 457 U.S. at 1004–05.  "[O]ur cases," the Supreme Court reasoned, "will not tolerate the imposition of [constitutional] restraints on private action by the simple device of characterizing the State's inaction as 'authorization' or 'encouragement.'"  *Am. Mfgs. Mut. Ins. Co.*, 526 U.S. at 54.

Plaintiffs' equal-protection claim also falters because Plaintiffs have demonstrated no discriminatory intent or purpose behind the Religious Exemption.  *See generally* USA Mot. at 25–27 (more-detailed discussion).  "[P]roof of . . . discriminatory intent or purpose is required to show a violation of the Equal Protection Clause."  *Ramos v. Wolf*, 975 F.3d 872, 896 (9th Cir. 2020)  "Where,"

as here, "the challenged governmental policy is 'facially neutral,'"—that is, the Religious Exemption is silent as to LGBTQI+ students—"proof of its disproportionate impact on an identifiable group can satisfy the intent requirement only if it tends to show that some invidious or discriminatory purpose underlies the policy." *Lee v. City of Los Angeles*, 250 F.3d 668, 686 (9th Cir. 2001).[7]  To show discriminatory intent, Plaintiffs need to plausibly allege that Congress "selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979).  In the context of a facially neutral policy, "[i]f there is no evidence of intentional discrimination, then the court assumes that the challenged actions were not based on discrimination and must inquire only whether the actions were rationally related to a legitimate governmental interest." *Comm. Concerning Cmty. Improvement v. City of Modesto*, 583 F.3d 690, 703 (9th Cir. 2009).

Plaintiffs do not argue in their motion that Congress intended to discriminate against LGBTQI+ students when it enacted Title IX and its Religious Exemption.  *Cf.* Pl. Mot. at 14–15 (briefly describing the enactment of Title IX).  And where, as here, Plaintiffs present "no evidence of intentional discrimination, then the court assumes that the challenged actions were not based on discrimination and must inquire only whether the actions were rationally related to a legitimate governmental interest." *Comm. Concerning Cmty. Improvement*, 583 F.3d at 703.  The Religious Exemption is rationally related to the legitimate governmental interest in accommodating religious practice.  *See Hobbie v. Unemployment Appeals Comm'n of Fla.*, 480 U.S. 136, 144–45 (1987) ("[T]he government may (and sometimes must) accommodate religious practices and . . . it may do so without violating the Establishment Clause.").

---

[7] Plaintiffs argue that "[e]qual protection under the Fifth Amendment guarantees freedom from invidious discrimination based on suspect classifications," Pl. Mot. at 30, but that point is not relevant here.  The Religious Exemption is facially neutral, there is no evidence of discriminatory intent, and the Religious Exemption does not classify students on any basis.

Even assuming *arguendo* that Plaintiffs could demonstrate a discriminatory intent or purpose, their equal-protection claim is still unlikely to succeed.  Equal-protection claims based on sexual orientation or gender identity call for the application of intermediate scrutiny.  *See SmithKline Beecham Corp. v. Abbott Labs.*, 740 F.3d 471, 481 (9th Cir. 2014) (sexual orientation), *reh'g en banc denied*, 759 F.3d 990 (9th Cir. 2014); *Norsworthy v. Beard*, 87 F. Supp. 3d 1104, 1119 (N.D. Cal. 2015) (gender identity).  A statute passes intermediate scrutiny if it "serve[s] important government objectives" and "the discriminatory means employed are substantially related to the achievement of those objectives." *Harrison v. Kernan,* 971 F.3d 1069, 1076 (9th Cir. 2020).[8]

The Religious Exemption passes intermediate scrutiny.  The Ninth Circuit has recognized "that free exercise of religion and conscience is undoubtedly, fundamentally important." *California v. Azar*, 911 F.3d 558, 582 (9th Cir. 2018).  And exempting religiously controlled educational institutions from Title IX—and only to the extent that a particular application of Title IX would not be consistent with a specific tenet of the controlling religious organization, *see* 20 U.S.C. § 1681(a)(3)—is substantially related to the government's objective of accommodating religious exercise in the context

---

[8] Plaintiffs argue that the religious exemption would be subject to strict scrutiny because it interferes with the fundamental right to marry.  *See* Pl. Mot. at 31–32.  But the Ninth Circuit has held that strict scrutiny applies "[o]nly when a government regulation *directly* and substantially interferes with the fundamental incidents of marriage." *Parsons v. Del Norte Cnty.*, 728 F.2d 1234, 1237 (9th Cir. 1984) (per curiam) (emphasis added).  "A regulation does not become subject to strict scrutiny as involving a suspect class merely because in some way it touches upon the incidents of marriage." *Id.*; *see also P.O.P.S. v. Gardner*, 998 F.2d 764, 768 (9th Cir. 1993) (declining to apply strict scrutiny to child support schedule even though its operation may pressure individuals to divorce or deter entering into marriage; "The Schedule does not directly and substantially interfere with marriage.").

of education programs and activities.[9]  For these additional reasons, Plaintiffs' equal-protection claim is unlikely to succeed.[10]

Plaintiffs are also unlikely to succeed on their substantive-due-process claim for additional independent reasons.  *See generally* USA Mot. at 28–29.  "[T]o establish a substantive due process claim a plaintiff must show," *inter alia*, "a *government* deprivation of life, liberty, or property." *Brittain v. Hansen*, 451 F.3d 982, 991 (9th Cir. 2006) (emphasis added).[11]  As explained above, Plaintiffs only allege harms inflicted on them by private religious colleges and universities. *E.g.*, FAC ¶¶ 1, 3–5.  "But nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors." *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989).  Nor does it matter, for purposes of the due-process analysis, that these private actors may benefit from federal funds because "the due process provision of the Fifth Amendment does not apply to the indirect adverse effects of governmental action." *O'Bannon v. Town Court Nursing Ctr.*, 447 U.S. 773, 789 (1980).  Furthermore, "the Due Process Clause" generally "does not impose on the government an affirmative obligation to act, even when 'such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual.'" *Juliana v. United States*, 217 F. Supp. 3d 1224, 1250–51 (D. Or. 2016) (Aiken, J.) (quoting *DeShaney*, 489 U.S.

---

[9] Plaintiffs argue that "the federal government cannot claim a legitimate governmental interest in invidious [sexual-orientation and gender-identity] discrimination."  Pl. Mot. at 32.  The government of course makes no such claim.

[10] Plaintiffs argue that the Religious Exemption "is not necessary to address a government interest in avoiding infringement of educational institutions' constitutional rights."  Pl. Mot. at 33.  Even if true, "[u]nlike strict scrutiny, intermediate scrutiny does not require that the means chosen by Congress be the least restrictive." *Minority Television Project, Inc. v. FCC*, 736 F.3d 1192, 1204 (9th Cir. 2013) (en banc).

[11] "The same analysis that applies to a substantive due process claim under the Fourteenth Amendment applies to a substantive due process claim under the Fifth Amendment." *Molina-Aviles v. Dist. of Columbia*, 824 F. Supp. 2d 4, 9 n.8 (D.D.C. 2011).

at 196), *rev'd and remanded on other grounds*, 947 F.3d 1159 (9th Cir. 2020).[12]  Here, Plaintiffs do not

challenge any government action.  Instead, they allege that "[t]he Department's *inaction* leaves students

unprotected" from a number of harms, and that "the Constitution forbids such *inaction*."  FAC ¶¶ 2,

6 (emphases added).  For these additional reasons, Plaintiffs' substantive-due-process claim is unlikely

to succeed.

> (b)    Plaintiffs Are Unlikely To Succeed on Their Second Cause of Action

Plaintiffs are unlikely to succeed on their Second Cause of Action, which challenges the

Religious Exemption on Establishment Clause grounds.  *See generally* USA Mot. at 29–34 (explaining

that Plaintiffs' Establishment Clause claim should be dismissed).  Courts—including the Supreme

Court—have regularly rejected Establishment Clause challenges to religious exemptions.  *See, e.g.*, *Corp.*

*of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327 (1987) (Title

VII's religious exemption); *Walz v. Tax Comm'n*, 397 U.S. 664 (1970) (religious exemption to state

property taxes); *Gaylor v. Mnuchin*, 919 F.3d 420, 432 (7th Cir. 2019) (federal tax exemption for church-

provided parsonages); *Medina v. Catholic Health Initiatives*, 877 F.3d 1213, 1230–34 (10th Cir. 2017)

(ERISA's church-plan exemption); *Pieszak v. Glendale Adventist Med. Ctr.*, 112 F. Supp. 2d 970, 996–97

(C.D. Cal. 2000) (religious exemption to California's Fair Employment and Housing Act).  The

Religious Exemption likewise passes constitutional muster.

"Establishment Clause violations are determined according to the three-pronged test

articulated in *Lemon v. Kurtzman*."  *Williams v. California*, 764 F.3d 1002, 1013–14 (9th Cir. 2014); *see also*

*Foothill Church v. Watanabe*, -- F. App'x --, 2021 WL 3039417, at *1 (9th Cir. 2021) (rejecting

Establishment Clause challenge based on "the three-prong test in *Lemon*"); *Forter v. Young*, No. 6:18–

cv–01171–JR, 2020 WL 1917331, at *8 (D. Or. Apr. 20, 2020) ("[T]he Ninth Circuit continues to rely

---

[12]  This principle is subject to two limited exceptions, *see Juliana*, 217 F. Supp. 3d at 1250–51, neither of which applies here.

predominantly on the *Lemon* test to evaluate claimed violations of the Establishment Clause."), *appeal docketed*, No. 20–35452 (9th Cir. May 22, 2020).  "A statute or regulation will survive an Establishment Clause attack if (1) it has a secular legislative purpose, (2) its primary effect neither advances nor inhibits religion, and (3) it does not foster excessive government entanglement with religion." *Williams*, 764 F.3d at 1014.  Plaintiffs do not analyze the Religious Exemption under the governing *Lemon* test. *See* Pl. Mot. at 22–29.  The Religious Exemption passes each of its prongs.

   *First*, the Religious Exemption has a secular purpose.  "A practice will stumble on the [secular] purpose prong only if it is motivated *wholly* by an impermissible purpose." *Kreisner v. City of San Diego*, 1 F.3d 775, 782 (9th Cir. 1993) (emphasis added).  "A reviewing court must be reluctant to attribute unconstitutional motives to government actors in the face of a plausible secular purpose." *Id.*  Here, there is a more-than-plausible secular purpose:  the Supreme Court has recognized that "it is a permissible legislative purpose to alleviate significant governmental interference with the ability of religious organizations to define and carry out their religious missions." *Amos*, 483 U.S. at 336; *accord, e.g.*, *Pieszak*, 112 F. Supp. 2d at 996–97.  As applied here, by "protect[ing] the exercise of religion in institutions from unwarranted and substantial infringement," the Religious Exemption constitutes "a secular legislative purpose." *Mayweathers v. Newland*, 314 F.3d 1062, 1068 (9th Cir. 2002) (holding that the Religious Land Use and Institutionalized Persons Act of 2000 "intends a secular legislative purpose").

   *Second*, the primary effect of the Religious Exemption neither advances nor inhibits religion.  "A law is not unconstitutional simply because it *allows* churches to advance religion, which is their very purpose." *Amos*, 483 U.S. at 337 (emphasis in original).  "For a law to have forbidden 'effects' under *Lemon*, it must be fair to say that the *government itself* has advanced religion through its own activities and influence." *Id.* (emphasis in original).  Nor is it relevant to the Establishment Clause analysis that the federal government provides funding to religiously controlled educational institutions because the

government *also* provides funding to educational institutions that are not religiously controlled.  The Supreme Court "ha[s] repeatedly held that the Establishment Clause is not offended when religious observers and organizations benefit from neutral government programs." *Espinoza v. Montana Dep't of Revenue*, 140 S. Ct. 2246, 2254 (2020).  Just like the religious-education tax deduction upheld in *Mueller v. Allen*, 463 U.S. 388 (1983), and the property-tax exemption for religious organizations upheld in *Walz v. Tax Commission of the City of New York*, 397 U.S. 664 (1970), the Religious Exemption does not constitute an advancement of religion *by the government*.  As the Fourth Circuit explained in upholding a religious exemption to a county zoning ordinance, "[a]ny advancement of religion that follows would be the result of the religious schools' own acts in light of the exemption, as opposed to [the government's] elimination of an otherwise applicable requirement." *Ehlers-Renzi v. Connelly Sch. of the Holy Child, Inc.*, 224 F.3d 283, 291 (4th Cir. 2000); *see also, e.g., Cohen v. City of Des Plaines*, 8 F.3d 484, 492 (7th Cir. 1993) (holding that zoning exemption did not constitute impermissible advancement of religion; "The religious component of child care and education activities in Des Plaines will come from church members or leaders, not from government officials.").

Plaintiffs point to the three-Justice plurality opinion in *Texas Monthly, Inc. v. Bullock*, 489 U.S. 1 (1989), as standing for the proposition that the Religious Exemption improperly advances religion. *See* Pl. Mot. at 26.  But Plaintiffs omit from their *Texas Monthly* quotation an important qualifier:  *Texas Monthly* concerned a situation where the government "direct[ed] a subsidy *exclusively* to religious organizations." 489 U.S. at 15 (plurality opinion) (emphasis added).  That is not the case at bar.  In any event, *Texas Monthly*'s plurality opinion has no bearing here.  "Because Justice Blackmun decided [*Texas Monthly*] on Establishment Clause grounds, and on a narrower basis than [the plurality] opinion . . . Justice Blackmun's concurrence sets the rule of decision of *Texas Monthly*." *Gaylor*, 919 F.3d at 433.  And because Justice Blackmun's concurrence "did not comment on what constitutes a

forbidden effect under *Lemon*," "*Texas Monthly* does not alter [the] analysis of th[e] second [*Lemon*] prong." *Gaylor*, 919 F.3d at 433.

*Finally*, the Religious Exemption does not entangle the government with religion—let alone excessively so. "A relationship results in an excessive entanglement with religion if it requires sustained and detailed interaction between church and State for enforcement of statutory or administrative standards." *Williams*, 764 F.3d at 1015–16. The Religious Exemption requires nothing of the sort. To the contrary, religious exemptions like Title IX's *disentangle* government from religion. As in *Amos*, "[i]t cannot be seriously contended that" Title IX's religious exemption "impermissibly entangles church and state." 483 U.S. at 339. Rather, the exemption "effectuates a more complete separation of the two." *Id.*; *see Gaylor*, 919 F.3d at 434 (though "some level of church-state interaction is unavoidable," "[t]he alternative" to the religious exemption would be "more entangling"); *Medina*, 877 F.3d at 1234 ("[F]ar from entangling the government in the affairs of religious institutions, [ERISA's] church-plan exemption avoids the entanglement that would likely occur in its absence."); *Pieszak*, 112 F. Supp. 2d at 997 ("The [Fair Employment and Housing Act] exemption clearly creates a strong separation between church and state."); *cf., e.g.*, *Hankins v. Lyght*, 441 F.3d 96, 108 (2d Cir. 2006) ("[T]here is no question that the [Religious Freedom Restoration Act] decreases rather than fosters government entanglement with religion . . . .").

Plaintiffs nonetheless maintain that the Religious Exemption excessively entangles church and state, pointing to *Larkin v. Grendel's Den, Inc.*, 459 U.S. 116 (1982), for support. *See* Pl. Mot. at 28–29. But Plaintiffs' reliance on *Larkin* is misplaced. *Larkin* concerned a statute that "vest[ed] in the governing bodies of churches and schools the power effectively to veto applications for liquor licenses within a five hundred foot radius of the church or school." 459 U.S. at 117. The Court held that "delegating a governmental power to religious institutions" violated the Establishment Clause. *Id.* at 124. Here, the Religious Exemption does not delegate governmental powers to religiously controlled

institutions—it simply exempts them from Title IX to the extent that its application would not be consistent with the religious tenets of such organizations. *See Massachusetts v. U.S. Dep't of Health & Human Servs.*, -- F. Supp. 3d --, 2021 WL 185243, at \*9 (D. Mass. Jan. 15, 2021) (rejecting this *Larkin*-based argument), *appeal docketed*, No. 21–1076 (1st Cir. Jan. 28, 2021).[13]

The Religious Exemption passes the *Lemon* test, so Plaintiffs are unlikely to succeed on their Establishment Clause challenge. In any event, Plaintiffs' two other Establishment Clause-related arguments are incorrect. *First*, Plaintiffs argue that the Religious Exemption violates the Establishment Clause because it "favors educational institutions controlled by religious organizations over secular educational institutions." Pl. Mot. at 24. The Supreme Court has rejected this argument in upholding the institutionalized-persons provision of the Religious Land Use and Institutionalized Persons Act: "Religious accommodations . . . need not come packaged with benefits to secular entities." *Cutter v. Wilkinson*, 544 U.S. 709, 724 (2005); *see also id.* ("Were the Court of Appeals' view the correct reading of our decisions, all manner of religious accommodations would fall.").

*Second*, Plaintiffs argue that the Religious Exemption violates the Establishment Clause "as it favors a subset of religious educational institutions, namely, those controlled by religious organizations whose tenets conflict with Title IX, over religious educational institutions that lack control by a religious organization or whose religious organization's tenets do not conflict with Title IX." Pl. Mot. at 23. But the Religious Exemption does not "single out any religious organization or religious creed for special treatment," *Gillette v. United States*, 401 U.S. 437, 451 (1971), and a law does not violate the Establishment Clause "merely" because it "happens to coincide or harmonize with the tenets of some or all religions." *McGowan v. Maryland*, 366 U.S. 420, 442 (1961); *accord Foothill Church*, 2021 WL

---

[13] In those areas where a religiously controlled institution is not exempt from Title IX under the Religious Exemption, enforcement of Title IX is appropriately limited to the extent necessary to protect individuals from statutorily prohibited sex discrimination.

3039417, at *1. The Supreme Court and Ninth Circuit have upheld against Establishment Clause challenges several provisions that have the effect of benefiting certain religious adherents over others. *See, e.g.*, *Gillette*, 401 U.S. at 450–54 (exempting from the draft persons who, by reason of religious training and belief, were conscientiously opposed to participation in war); *McGowan*, 366 U.S. at 444–45 (upholding Sunday-closing laws even though Sunday is "a day of particular significance for the dominant Christian sects"); *Droz v. Commissioner*, 48 F.3d 1120, 1121, 1124 (9th Cir. 1995) (upholding Social Security tax exemption that only exempts "members of religious sects that have tenets or teachings opposed to participation in the Social Security system and that provide reasonable support to their dependent members").

(c)      Plaintiffs Are Unlikely To Succeed on Their Fourth Cause of Action

Plaintiffs are also not likely to succeed on their APA claims as they cannot establish that the regulatory revisions made by ED in 2020 are arbitrary and capricious.

First, Plaintiffs argue that ED did not sufficiently address its "change [in] policy position" when revising both rules. Pl. Mot. at 36–37, 38–39. But the rule revisions were not a change in position; they largely codified existing practice and clarified a few issues on which ED had not yet formally spoken. *See* 85 Fed. Reg. at 30,475 (explaining that the changes codified "longstanding OCR practice"); *id.* at 59,918 (explaining that the criteria "codify existing factors" that had been included "in non-binding guidance dating back more than 30 years," in addition to "addressing concerns that there may be other means of establishing the requisite control"). Thus, the regulatory revisions were not a policy "reversal" requiring a "more detailed justification." *See F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 514 (2009) (finding "no basis in the Administrative Procedure Act or in our opinions for a requirement that all agency change be subjected to more searching review"). *Cf. Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016) (agency has "duty to explain why it deemed it necessary to *overrule* its previous position") (emphasis added).

Plaintiffs' position that ED did not adequately consider reliance, health, and safety interests of LGBTQI+ students in promulgating the regulatory revisions, Pl. Mot. at 37–38, is contradicted by the record. ED fully acknowledged commenters' "personal experiences in attending institutions controlled by religious organizations." 85 Fed. Reg. at 59,948. But, for the reasons set forth above, ED "disagree[d] that these proposed regulations will have a significantly increased negative impact upon LGBTQ individuals" because it was not significantly *changing* the regulatory regime but rather "clarify[ing] existing statutory exemptions to Title IX," which have "existed since the statute's enactment in 1972," as well as "the recipients' eligibility for claiming such exemptions." *Id.* at 59,950. "[T]hese final regulations do not create new exceptions to the Title IX statute [but instead] provid[e] much-needed clarity to the meaning of vague terminology utilized in the statute." *Id.* at 59,949. As a result, "based on public comment, the Department does not believe that there are a significant number of educational institutions who have not previously sought a religious exemption, but would be eligible to do so as a result of these final regulations, which include existing factors from OCR's non-binding guidance." *Id.* In addition, in response to the personal experiences of the commenters, ED advised that it "is skeptical that schools will be eligible to assert exemptions from the requirement to respond appropriately to sexual harassment under Title IX or from the prohibition on retaliation against individuals who invoke their rights under Title IX." *Id* at 59,948. These and other statements in the notices indicate that ED acknowledged and fully considered the comments referenced by Plaintiffs and responded appropriately by explaining the scope of the statutory language and the regulatory revisions it was undertaking.

With regard specifically to the November 2020 Rule codifying certain criteria by which an institution can establish that it is "controlled by a religious organization," Plaintiffs contend that the new rule "permits educational institutions that are not controlled by religious organizations to claim a religious exemption" and thereby "arbitrarily expand[s]" the Religious Exemption beyond its statutory

text. Pl. Mot. at 34–35. Plaintiffs focus on subparts (1), (4), (5), and (6) but do not explain how those sections eliminate the controlling-religious-organization requirement. It appears, however, that they are suggesting that these subparts deviate from the statute in not requiring the controlling religious organization to be a separate entity from the institution—*i.e.*, the same argument pursued by Plaintiffs Maxon and Brittsan in their private Title IX suit. *See Maxon*, 2020 WL 6305460, at *7–8.

When faced with evaluating an agency's interpretation of a statute it is charged with administering, the Court applies the two-step framework of *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). Under this framework, if "the statute is silent or ambiguous with respect to the specific issue," the court should defer to the agency's interpretation so long as it is "based on a permissible construction of the statute." *Id.* at 843. That is true "even if the agency's reading differs from what the court believes is the best statutory interpretation." *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005); *see also Or. Rest. & Lodging Ass'n v. Perez*, 816 F.3d 1080, 1086 (9th Cir. 2016) (agency's construction entitled to controlling weight "[e]ven if we believe the agency's construction is not the best construction").

Here, the statute is "silent or ambiguous" as to whether a controlling "religious organization" needs to be a separate entity from the institution claiming the exemption. *See* 85 Fed. Reg. at 59,946 (ED concluding that the statutory language "does not directly address how educational institutions demonstrate whether they are controlled by a religious organization"). Accordingly, the Court must defer to ED's interpretation if it is based on a permissible construction of the statute. ED considered that "religious organizations are organized in widely different ways that reflect their respective theologies" and that it did not wish to "discriminate against educational institutions that are controlled by religious organizations with different types of structures." 85 Fed. Reg. at 59,918. It also determined that it was "constitutionally obligated to broadly interpret 'controlled by a religious organization' to avoid religious discrimination among institutions of varying denominations." *Id.*

Accordingly, ED reasonably concluded that an institution could be "controlled" by its own board of directors or similar internal structure—that is, that the educational institution and the controlling religious organization "can be one and the same." *Id.* at 59,956.  ED further explained that it did not intend to grant exemptions to institutions that had "merely a tenuous tie to a religious organization" and that the provision "does not expand the permissible scope of the statute to mean that literally any evidence—regardless of the amount of evidence, its relevance, or its persuasiveness—is sufficient to establish a religious exemption." *Id.* at 59,948.

Another district court in this Circuit has upheld ED's interpretation, finding it to be reasonable "considering the apparent ambiguity of the term 'religious organization.'" *See Maxon*, 2020 WL at 6305460, at *8 ("[A]lthough the text of the Religious Organization Exemption may be read to require the 'religious organization' and 'educational institution' to be two separate entities, the ordinary meaning of the term 'organization' is sufficiently broad to include the board of directors.").  Plaintiffs have not shown a likelihood that they will be able to obtain a different result here.

Finally, Plaintiffs criticize the August 2020 rule for "eliminating transparency and notice requirements" by making it clear that institutions need not file written (and potentially publicly available) requests for religious exemptions as a prerequisite to claiming the exemption.  Pl. Mot. at 38–39.  In this case, ED previously concluded that this provision codified "longstanding OCR practice [which] aligns with the statute," and Plaintiffs have not offered this Court a reason why that conclusion is incorrect.  *See* 85 Fed. Reg. at 30,475.  Under first step of the *Chevron* framework, if "Congress has spoken to the precise question at issue," both the court and the agency "must give effect to the unambiguously expressed intent of Congress." *Chevron, U.S.A., Inc*, 467 U.S. at 842–43.  ED explained that its regulatory revision "bring[s] § 106.12(b) further in line with the relevant statutory framework in this context" because "[n]o part of the statute requires that recipients receive an assurance letter from OCR, and no part of the statute suggests that a recipient must be publicly on the record as a

religious institution claiming a religious exemption before it may invoke a religious exemption in the context of Title IX." *Id.* The *Maxon* court agreed with this interpretation, concluding that "Plaintiffs' interpretation of 34 C.F.R § 106.12 . . . would contradict the intent of Congress, as evidenced by the plain language of Section 1681. . . . Construing the language of the statute, the Religious Organization Exemption does not condition an educational institution's liability under Section 1681 on its submission of a written claim for exemption." *Maxon*, 2020 WL 6305460, at *6. This Court should reach the same result.

(d)    Plaintiffs Are Unlikely To Succeed on Their Fifth Cause of Action

Plaintiffs are unlikely to succeed on their Fifth Cause of Action, which asserts a Religious Freedom Restoration Act ("RFRA") claim against the Religious Exemption. Plaintiffs argue that the Religious Exemption burdens their exercise of religion and thus violates RFRA. *See* Pl. Mot. at 39–42. But RFRA provides in part that "[g]ranting government funding, benefits, or exemptions, to the extent permissible under the Establishment Clause, shall not constitute a violation of this chapter." 42 U.S.C. § 2000bb–4. Plaintiffs' motion does not mention—let alone address—this provision. Since the Religious Exemption does not violate the Establishment Clause, it is not subject to RFRA.

Even if RFRA applied, to be subject to RFRA liability, "the party charged with the deprivation must be a person who may fairly be said to be a governmental actor." *Sutton*, 192 F.3d at 835. Defendants do not doubt that many of the Plaintiffs "exercise their religious beliefs through how they love" and "how they embrace and live out their sexuality and gender identity," Pl. Mot. at 40, but their religious beliefs are being burdened by private entities, not the government. *See also, e.g., Village of Bensenville v. Federal Aviation Administration*, 457 F.3d 52, 57 (D.C. Cir. 2006) ("[A] federal agency's determination that a City's expansion plan is eligible for federal funding does not render the City's implementation of the plan tantamount to federal action that is the source of the burden on the free exercise of religion.").

### E.    The Balance of Equities Weighs Against an Injunction

As explained above, Plaintiffs will sustain no irreparable harm should the Court decline to enter preliminary injunctive relief, and they are unlikely to succeed on the merits.  On the other hand, the government "suffers irreparable injury whenever an enactment of its people or their representatives is enjoined." *Video Gaming Techs., Inc. v. Bureau of Gambling Control*, 356 F. App'x 89, 92 (9th Cir. 2009).  "[G]overnmental policies implemented through legislation or regulations developed through presumptively reasoned democratic processes . . . should not be enjoined lightly." *Minnesota*, 530 F.3d at 732.  Enjoining a longstanding statute and duly-enacted regulations—based on what Plaintiffs simply *predict* Defendants will do—will intrude on the domains of the coordinate branches of government and thus violate separation-of-powers principles.

Plaintiffs argue that Defendants' countervailing burdens would be "minimal" and that the related burdens on "[r]eligious education institutions" are "premature and hypothetical."  Pl. Mot. at 43.  But what Plaintiffs appear to request is that OCR undertake investigations and possibly reach noncompliance determinations in contexts that Congress expressly exempted when it passed Title IX.

Moreover, the parties and the Court will benefit from the agency's determination as to whether the Religious Exemption would apply in whole or in part to Plaintiffs' administrative complaints. Having leveled a variety of complaints against a number of different institutions, Plaintiffs now ask the Court to bar Defendants from processing and resolving those complaints in the normal course, and seek to prospectively invalidate Title IX's Religious Exemption and regulations based on predicted future events.  But federal courts are not supposed to leapfrog agencies by engaging in such "premature adjudication" and "entangling themselves in abstract disagreements over administrative policies." *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 732–33 (1998).  Rather, the point of the ripeness doctrine is "to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Id.*  "Letting the

Executive Branch's decisionmaking process run its course not only brings more manageable proportions to the scope of the parties' dispute, but also ensures that we act as judges, and do not engage in policymaking properly left to elected representatives." *Trump v. New York*, 141 S. Ct. 530, 536 (2020).

Plaintiffs also argue that "a preliminary injunction crafted by the Court is their only viable remedy" and that they "have nowhere to turn for relief." Pl. Mot. at 43. But again, that proposition is not correct. *See Cannon*, 441 U.S. at 717; *Stimac*, 1993 WL 483837, at *1; *Women's Equity Action League*, 906 F.2d at 751; *Maxon*, 2020 WL 6305460.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for a temporary restraining order and a preliminary injunction should be denied.

DATED:  August 13, 2021                     Respectfully submitted,


                                            BRIAN M. BOYNTON
                                            Acting Assistant Attorney General

                                            CARLOTTA P. WELLS
                                            Assistant Director, Federal Programs Branch

                                            /s/ Elliott M. Davis
                                            CAROL FEDERIGHI, TX Bar No. 06872950
                                            *Lead Counsel*
                                            ELLIOTT M. DAVIS, NY Reg. No. 4596755
                                            United States Department of Justice
                                            Civil Division, Federal Programs Branch
                                            P.O. Box 883
                                            Washington, DC  20044
                                            Phone: (202) 514-4336
                                            elliott.m.davis@usdoj.gov


                                            *Attorneys for Defendants*