**EXHIBIT A**

Herbert G. Grey, OSB # 810250
Email: herb@greylaw.org
4800 SW Griffith Drive, Suite 320
Beaverton, Oregon 97005-8716
Telephone: (503) 641-4908

Gene C. Schaerr, DC Bar # 416368*
Email: gschaerr@schaerr-jaffe.com
Nicholas Miller, MI Bar# P70694*
Email: nmiller@schaerr-jaffe.com
Joshua J. Prince, DC Bar # 1685532*
Email: jprince@schaerr-jaffe.com
Schaerr | Jaffe LLP
1717 K Street NW, Suite 900
Washington, D.C. 20006
Telephone: (202) 787-1060

* Admitted *pro hac vice*
*Counsel for Proposed Defendant-Intervenor*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

### Eugene Division

| | |
|---|---|
| ELIZABETH HUNTER, et al., | |
| Plaintiffs, | |
| v. | No. 6:21-CV-00474-AA |
| U.S. DEPARTMENT OF EDUCATION, et al., | |
| Defendants, | PROPOSED INTERVENOR CCCU'S PROPOSED MOTION TO DISMISS AND MEMORANDUM IN SUPPORT |
| v. | |
| COUNCIL FOR CHRISTIAN COLLEGES & UNIVERSITIES, | ORAL ARGUMENT REQUESTED |
| Proposed Defendant-Intervenor. | |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

LR 7-1(A) CERTIFICATION .............................................................................................. 1

MOTION AND INTRODUCTION....................................................................................... 1

    A.  Religious higher education plays a crucial role in American higher education generally.. 3

    B.  The Title IX exemption is crucial to the survival of American religious higher
education. .................................................................................................................. 11

ARGUMENT ....................................................................................................................... 12

I.  None of Plaintiffs' Counts States a Claim Upon Which Relief Can Be Granted Because
Something Like the Title IX Exemption Is Constitutionally Required. ................................ 12

II.  In All Events, Plaintiffs Also Fail to State a Claim Under The APA. .................................. 16

III.  Plaintiffs Have Failed to Name Necessary Parties, the Vast Majority of Which Are Beyond
The Court's Jurisdiction to Add. .......................................................................................... 19

    A.  The religious schools named in the Amended Complaint are necessary parties to this
action........................................................................................................................ 21

    B.  It would not be feasible to join many of the necessary parties because the Court lacks
personal jurisdiction over them................................................................................ 23

    C.  The action cannot, in fairness, proceed without the named religious schools................. 25

CONCLUSION..................................................................................................................... 27

CERTIFICATE OF SERVICE ............................................................................................. 28

## TABLE OF AUTHORITIES

**Cases**

*Confederated Tribes of Chehalis Indian Rsrv. v. Lujan*,
  928 F.2d 1496 (9th Cir. 1991) ............................................................................. 25

*Corp. of the Presiding Bishop v. Amos*,
  483 U.S. 327 (1986)............................................................................................... 1

*County of Fresno v. Andrus*,
  622 F.2d 436 (9th Cir.1980) ................................................................................ 22

*Cutter v. Wilkinson*,
  544 U.S. 709 (2005)................................................................................................ 1

*EEOC v. Peabody Western Coal Co.*,
  400 F.3d 774 (9th Cir. 2005) ......................................................................... 20, 23

*Enter. Mgmt. Consultants, Inc. v. United States ex rel. Hodel*,
  883 F.2d 890 (10th Cir. 1989) ............................................................................. 25

*Espinoza v. Mont. Dep't of Revenue*,
  140 S. Ct. 2246 (2020)..................................................................................... 1, 13

*FCC v. Prometheus Radio Project*,
  141 S. Ct. 1150 (2021)......................................................................................... 16

*Fulton v. Philadelphia*,
  141 S. Ct. 1868 (2021)..................................................................................... 1, 15

*Int'l Shoe Co. v. Washington*,
  326 U.S. 310 (1945).............................................................................................. 23

*IPSL LLC v. College of Mount Saint Vincent*,
  383 F.Supp.3d 1128 (D. Or. 2019) ..................................................................... 24

*Larson v. Valente*,
  456 U.S. 228 (1982).............................................................................................. 13

*Makah Indian Tribe v. Verity*,
  910 F.2d 555 (9th Cir. 1990) ............................................................................... 22

Makah Indian Tribe v. Verity,
  910 F.2d 555 (9th Cir.1990) ................................................................................ 20

*Martinez v. Clark Cty., Nev.*,
  846 F. Supp. 2d 1131 (D. Nev. 2012).................................................................. 22

*Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*,
  138 S. Ct. 1719 (2018)..................................................................................... 3, 14

*Maxon v. Fuller Theological Seminary*,
  2020 WL 6305460 (C.D. Cal. Oct. 7, 2020)................................................. 17, 18

*Natal v. Christian and Missionary All.*,
    878 F.2d 1575 (1st Cir. 1989) ......................................................................... 13

*Native Vill. of Point Hope v. Salazar*,
    680 F.3d 1123 (9th Cir. 2012) ....................................................................... 16

*Obergefell v. Hodges*,
    576 U.S. 644 (2015) ................................................................................... 2, 11

*Or. Nat. Res. Council v. Allen*,
    476 F.3d 1031 (9th Cir. 2007) ....................................................................... 16

*Ordonez v. United States*,
    680 F.3d 1135 (9th Cir. 2012) ....................................................................... 26

*Paiute-Shoshone Indians of Bishop Colony, Cal. v. City of Los Angeles*,
    637 F.3d 993 (9th Cir. 2011) ......................................................................... 20

*Schwarzenegger v. Fred Martin Motor Co.*,
    374 F.3d 797 (9th Cir. 2004) ......................................................................... 24

*Shermoen v. United States*,
    982 F.2d 1312 (9th Cir. 1992) ............................................................. 20, 21, 22

*Sperring v. LLR, Inc.*,
    995 F.3d 680 (9th Cir. 2021) ......................................................................... 21

*Tandon v. Newsom*,
    141 S. Ct. 1294 (2021) ............................................................................... 1, 15

*Thomas v. Rev. Bd. Of Ind. Emp. Security Div.*,
    450 U.S. 707 (1981) ...................................................................................... 13

*Union Pac. R.R. Co. v. Runyon*,
    320 F.R.D. 245 (D. Or. 2017) ........................................................................ 22

*Valenzuela Gallardo v. Lynch*,
    818 F.3d 808 (9th Cir. 2016) ......................................................................... 19

*Ward v. Apple Inc.*,
    791 F.3d 1041 (9th Cir. 2015) ....................................................................... 21

*Zelman v. Simmons-Harris*,
    536 U.S. 639 (2002) ...................................................................................... 12

**Statutes**

20 U.S.C. § 1681 ............................................................................................. 15

20 U.S.C. § 1686 ............................................................................................. 15

42 U.S.C. §1988 .............................................................................................. 26

Higher Education Opportunity Act of 2008,
    Pub. L. No. 110–15 (2008) ............................................................................. 4

## Other Authorities

154 Cong. Rec. H7633 (2008) ................................................................................ 4

7 C. Wright & A. Miller,
*Federal Practice & Procedur*e ....................................................................... 20

*Abraham Kuyper: A Centennial Reader* (James D. Bratt ed., 1998) ............................ 4

Arizona Christian University,
*Spiritual Life: Service* ................................................................................. 6

Avi Lazerson,
*Holiness and Judaism*, Jewish Magazine (Jan. 2001) ....................................... 7

Blue Zones,
*Loma Linda, California: A group of Americans living 10 years longer* ................... 9

CCCU,
*The Case for Christian Higher Education* (2018) ............................................. 5

College Pulse,
*The LGBTQ+ Student Divide* (March 2021),
https://f.hubspotusercontent00.net/hubfs/5666503/LGBTQStudentDivide_March2021Report_
REAP_CollegePulse.pdf ............................................................................... 10

Concordia University Irvine,
*Concordia Serves 2021* ............................................................................... 6

Conrad Harvey,
*A Buddhist perspective on Health and Spirituality*, 9 Scottish Journal of Healthcare
Chaplaincy 33 (2006) .................................................................................. 8

Econsult Solutions, Inc.,
*Building The Common Good: The National Impact Of Council For Christian Colleges &
Universities (CCCU) Institutions* (2017) ....................................................... 5

EDSmart,
*College Sexual Assault Statistics of Top Ranked Schools 2015* ........................... 6

Ellen B. Stolzenberg, et al.,
Higher Education Research Institute at UCLA, *Undergraduate Teaching Faculty: The HERI
Survey*, 2016-2017 (2019) ........................................................................... 8

Elliot N. Dorff,
*The Jewish Tradition: Religious Beliefs and Healthcare Decisions*, Advocate Health (2002).. 9

Gayle M. Wells, *The effect of religiosity and campus alcohol culture on collegiate alcohol
consumption*, 58 J. Am. Coll. Health. 295 (2010) ........................................... 9

George Fox University,
*Resources for Current Students* ................................................................... 6

Kristen Whitney Daniels,
*Muslim Students Find Catholic Haven*, Nat'l Cath. Rep. (Nov. 4, 2016) .................. 6

Maren Greathouse *et al.*,
   *Queer-spectrum and trans-spectrum student experiences in American higher education: the analyses of national survey findings*, Rutgers, Tyler Clementi Center 23–25 (Aug. 2018), https://rucore.libraries.rutgers.edu/rutgers-lib/60802/ ............................................................ 10

Mehmet Eskin,
   *The Effects of Religious Versus Secular Education on Suicide Ideation and suicidal Attitudes in Adolescents in Turkey*, 39 Soc. Psychiatry Psychiatric Epidemiology 536 (2004) ................ 9

Nevada Christian College,
   *About* ................................................................................................................................ 6

Richard Isralowitz & Alexander Reznik,
   *Impact of Religious Education and Religiosity on Adolescent Alcohol Use and Risk-Taking Behavior*, 110 J. of the Religious Ed.  (2015) .......................................................................... 9

Salman Assad et al.,
   *Health and Islam*, 4 Journal of Mid-Life Health 65 (2013) ....................................................... 8

Tad Walch,
   *Stone-Cold Sober XXIII: BYU repeats (and repeats) atop Princeton Review list*, Deseret News (Aug. 18, 2020) ........................................................................................................................ 9

Tanya Loudenback,
   *The 25 safest college campuses in America*, Business Insider (Jan. 12, 2016) ......................... 6

Whitworth University,
   *Ministry/Service Opportunities* ................................................................................................ 6

Yale, Slavery & Abolition,
   *The Story of Yale Abolitionists* ................................................................................................ 7

Yeshiva University,
   *Jewish Living and Learning* .................................................................................................... 4

**Rules and Regulations**

34 C.F.R. § 106.12 ........................................................................................................................ 16

*August Rule*,
   85 Fed. Reg. 30,026 (May 19, 2020) ........................................................................................ 17

Fed. R. Civ. P. 12 .............................................................................................................. 1, 25, 26

Fed. R. Civ. P. 19(a) ............................................................................................................. *passim*

*November Rule*,
   85 Fed. Reg. 59,916 (Sept. 23, 2020) ...................................................................................... 18

**Regulations**

Deuteronomy 10 (NIV) ................................................................................................................ 4

Exodus 22 .................................................................................................................................... 5

James 1:27 (NIV) .......................................................................................................................... 5

Luke 12 (NIV) ............................................................................................................................... 5

Matthew 25 (NIV)................................................................................................... 4, 5, 7

Mosiah 2 ................................................................................................................... 4

Quran 16 ................................................................................................................... 4

Quran 17 ................................................................................................................... 5

Revelation 14 (NIV) ................................................................................................. 7

Sahih al-Bukhari 6416 ............................................................................................. 7

Talmud ..................................................................................................................... 4

## LR 7-1(A) CERTIFICATION

The proposed intervenor certifies that, as required by LR 7-1(A), it has made a good faith effort to confer with counsel for the parties. Plaintiffs oppose this motion; the United States has been contacted but has not provided a position.

## MOTION AND INTRODUCTION

Proposed Defendant-Intervenor Council for Christian Colleges and Universities ("CCCU") moves to dismiss the Amended Complaint under Federal Rules of Civil Procedure 12(b)(1) because Plaintiffs cannot demonstrate standing and because, under Rules 12(b)(6) and 12(b)(7), the Amended Complaint both fails to state a claim upon which relief can be granted and fails to include necessary parties.

The Title IX religious exemption serves the important government purposes of disentangling the government from religious issues and ensuring that religious organizations that provide valuable social benefits can participate in public assistance programs while operating according to their religious beliefs. The Supreme Court has long recognized that such exemptions to anti-discrimination laws like Title IX survive constitutional scrutiny. *Corporation of the Presiding Bishop v. Amos*, 483 U.S. 327 (1986); *Cutter v. Wilkinson*, 544 U.S. 709 (2005). But the Court's cases go further than just allowing such exemptions—in many instances, religious exemptions are constitutionally *required* to avoid unconstitutional government entanglement with religious organizations, ensure that religious organizations are not punished for their religious character, and guarantee that religious organizations are put on equal footing with secular organizations. *See, e.g., Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246 (2020); *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021); *Fulton v. Philadelphia*, 141 S. Ct. 1868, 1877–78 (2021). The Title IX religious exemption serves each of those vital purposes. For that reason, the Constitution would require it (or something like it) even if Congress had not.

That was the point CCCU made when it first lodged a Proposed Motion to Dismiss the initial Complaint as an exhibit to its original Motion to Intervene. *See* Exhibit C at 24-25, ECF No. 26-3. Since then, the Plaintiffs have amended their complaint in response to many deficiencies CCCU noted in its original Motion to Dismiss. First Am. Compl., ECF No. 35 (FAC). The federal defendants (collectively, the Department) have now filed their own motion to dismiss that Amended Complaint. Defs.' Mot. to Dismiss, ECF No. 56 (Dep't's Mot.). CCCU agrees with the Department that the Amended Complaint is inadequate and flawed. CCCU thus joins and supports the Department's arguments that Plaintiffs lack standing, and that the first, second, third, and fifth causes of action fail to state a claim. *Id.* at 11–34. CCCU also writes separately to make several points that the Department does not make in its motion to dismiss, including that the Title IX religious exemption is constitutionally required, that the Department followed the APA's procedures when it enacted the August and November 2020 final rules, and that Plaintiffs failed to include necessary parties.

But that is not all. CCCU also addresses one point that would not have been needed but for the Department's motion, which repeatedly disparages some of the "decent and honorable religious" beliefs of religious schools around the country. *Obergefell v. Hodges*, 576 U.S. 644, 672 (2015). The Department's Opposition to Plaintiffs' TRO Motion takes the same tactic. Defs' Mem. of Law in Opp'n to Pls.'s Mot. for a TRO at 2, ECF No. 62 (Dep't's TRO Opp'n). This repeated criticism of Intervenors' religious beliefs and practices provides yet another reason for this Court to deny the relief Plaintiffs seek, and require the Department to enforce the Title IX exemption: The Department cannot always be trusted to adjudicate claims on these issues with the neutrality that the First Amendment requires, in the absence of the congressionally-crafted guidance provided

by the Title IX religious schools exemption. *See, e.g., Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 138 S. Ct. 1719, 1723 (2018).

Thus, the Department's motion, correct as it is to ask that the Amended Complaint be dismissed because Plaintiffs lack standing and because it raised claims that are legally unsustainable and even frivolous, is incomplete and has its own deficiencies. CCCU's motion to dismiss complements the Department's motion, and both have the same goal—that the Amended Complaint should be dismissed.

## BACKGROUND

Before considering the legal reasons for dismissing Plaintiffs' claims, it is important for the Court to understand the stakes of getting the legal questions right. Such an understanding requires a clear view of (a) the important role religious higher education plays in American higher education generally, including its role in serving LGBTQ students, and (b) the importance of the Title IX exemption to the health and even survival of religious higher education in America.

### A.    Religious higher education plays a crucial role in American higher education generally.

In addition to being academically competitive with non-religious schools, religious colleges and universities offer advantages that are often not as readily available in non-religious institutions. These include the opportunity to study academic disciplines guided by faith and to naturally integrate community service into higher education. Religious colleges also often provide greater physical safety to their students and a broader diversity of philosophical and political perspectives among professors and students.

1. Part of the appeal of religious colleges to students and their families is the promise of studying academic disciplines in a way that integrates faith.[1] To students and their families, this integration is extremely valuable and important.

2. Congress recognized an additional benefit of religious institutions in the Higher Education Opportunity Act of 2008—i.e., that they help students integrate community service into their educations. Pub. L. No. 110–15 (2008). That is one reason why the Act requires accrediting bodies to "respect[] the *** religious missions" of such institutions. 154 Cong. Rec. H7633, H7668 (2008). Noting that "[t]he time to recognize and encourage an increased commitment to public service is now," the House Report on this legislation emphasized, as a reason for congressional protection, the growing number of students at religious colleges who serve religious missions or perform other kinds of service. 154 Cong. Rec. at H7661. These observations reflect that community service is one important way religious colleges contribute to society.

It is no accident that religious colleges foster community service. Students and professors are typically encouraged by their foundational religious texts, traditions, and teachings to take care of the foreigner, the poor, and the needy.[2] They are consequently more likely to embrace the

---

[1] *E.g.*, *Abraham Kuyper: A Centennial Reader* 488 (James D. Bratt ed., 1998); Yeshiva University, *Jewish Living and Learning,* https://www.yu.edu/jll.

[2] *See, e.g.*, Talmud ("It is a bounden duty to visit the sick."); Deuteronomy 10:18–9 (NIV) ("He defends the cause of the fatherless and the widow, and loves the foreigner residing among you, giving them food and clothing. And you are to love those who are foreigners, for you yourselves were foreigners in Egypt."); Matthew 25:40 (NIV) ("The King will reply, 'Truly I tell you, whatever you did for one of the least of these brothers and sisters of mine, you did for me.'"); Quran 16:90 (Sahih International) ("Allah orders justice and good conduct and giving to relatives and forbids immorality and bad conduct and oppression."); Mosiah 2:17 (Book of Mormon) ("[W]hen ye are in the service of your fellow beings ye are only in the service of your God.").

principle that the value of one's life is measured not predominantly by what one achieves, but by how well one serves others.[3]

Thus, for instance, the Book of Exodus might inspire a sociology major at a Jewish college to address the plight of refugees from war-torn lands,[4] the Quran might lead a student in a Muslim school to look for opportunities to serve local immigrants,[5] or the New Testament might move a student at a Catholic law school to give *pro bono* assistance to unwed mothers or foster children.[6] These benefits are not merely hypothetical: On average, students at religious colleges spend significantly more time in community service than students at non-religious colleges, public or private.[7] Their service brings immense benefits to their communities.

---

[3] *See, e.g.*, Luke 12:15 (NIV) ("[L]ife does not consist in an abundance of possessions.'").

[4] *See, e.g.*, Exodus 22:20, https://tinyurl.com/ChabadExodus ("And you shall not mistreat a stranger, nor shall you oppress him, for you were strangers in the land of Egypt.").

[5] *See, e.g.*, Quran 17:26 ("[G]ive *** to the needy and the wayfarer.").

[6] *See, e.g.*, Matthew 25:35 (NIV) ("For I was hungry and you gave me something to eat, I was thirsty and you gave me something to drink, I was a stranger and you invited me in[.]"); James 1:27 (NIV) ("Religion that God our Father accepts as pure *** is this: to look after orphans and widows in their distress.").

[7] *See* CCCU, *The Case for Christian Higher Education* 8-10 (2018), https://tinyurl.com/ChristianHigherEd (citing Econsult Solutions, Inc., *Building The Common Good: The National Impact Of Council For Christian Colleges & Universities (CCCU) Institutions* (2017), https://tinyurl.com/EconsultReport).

Students at religious colleges also serve communities both locally[8] and globally.[9] Overseas service trips regularly focus on the temporal needs of those they serve.[10] Both the students and the communities they serve benefit from this service, not only because of the physical relief it provides, but also because it tends to reduce cultural divides.

3. Religious colleges and universities also often provide greater physical safety. Indeed, of the top twenty-five safest universities in America, eighteen (or 72 percent) are religious.[11] Moreover, colleges classified as "most religious" consistently report lower rates of sexual assault than the national average.[12] Accordingly, for students and parents concerned about physical safety, religious colleges and universities provide an attractive option.[13] And the mere existence of such

---

[8]    *See e.g.*, Concordia University Irvine, *Concordia Serves 2021*, https://tinyurl.com/ConcordiaServes ("Last year, over 1,000 members of our CUI family stepped into the community on one day, called to give to others from the abundance they have been given.").

[9]    See *e.g.*, Arizona Christian University, *Spiritual Life: Service*, https://tinyurl.com/ACUSpiritualLife ("[S]tudents and staff/faculty go on missions trips, reaching the world with the hope of the gospel."); George Fox University, *Resources for Current Students*, https://tinyurl.com/GFUResources (Students take "service trips" and engage in "ministry opportunities that have a local and global impact.").

[10]    *See* Whitworth University, *Ministry/Service Opportunities*, https://tinyurl.com/WhitworthMinistry (advertising how students "tutor[] in local schools"); Nevada Christian College, *About*, https://www.nvcc.school/about (explaining how students provided "comfort to orphans in southern India, lending their energy to a cultural development project in Africa or partnering with nonprofits closer to home").

[11]    Tanya Loudenback, *The 25 safest college campuses in America*, Business Insider (Jan. 12, 2016), https://tinyurl.com/SafeCampuses.

[12]    EDSmart, *College Sexual Assault Statistics of Top Ranked Schools 2015*, https://tinyurl.com/EDSmartStats.

[13]    Indeed, though there are few American colleges in the Islamic faith tradition, Muslim students are increasingly flocking to universities run by other faiths. *See, e.g.*, Kristen Whitney Daniels, *Muslim Students Find Catholic Haven*, Nat'l Cath. Rep. (Nov. 4, 2016), https://tinyurl.com/NCRMuslimStudents ("[S]ome Muslim students have found an unexpected haven in Catholic universities and colleges.)

options in the higher-education market helps ensure that other institutions place greater emphasis on student safety.

4. Religious colleges also contribute substantially to the diversity of American higher education. In most religious traditions, the call of faith is a challenge to think and live differently from the rest of society. From the Islamic command to "[b]e in the world as if you were a stranger or a traveler" to Jesus' command that his disciples be "a light to the world,"[14] to Revelation's injunction to for the eternal gospel to go to "every nation, tribe, language and people,"[15] people of faith are encouraged to transcend the cultures in which they live.

Throughout the Nation's history, this effort to live differently has encouraged numerous religious schools to depart from contemporaneous norms—compelling them, for example, to help lead the fight against slavery long before it became fashionable.[16] Thus, it is no surprise that educational institutions founded and run by religious groups offer perspectives and emphases that differ, sometimes dramatically, from those offered by other educational institutions.

For example, a comprehensive study addressing the political leanings of university faculties confirms that religious colleges and universities provide value in part because they do a far better job than secular institutions in attracting professors and students from across the political spectrum. The study found that, at non-religious, public universities, 65.7 percent of faculty across disciplines self-identify as either "liberal" or "far left," while only 7.8 percent identify as

---

[14] *See also* Sahih al-Bukhari 6416, https://sunnah.com/bukhari/81/5 ("Be in this world as if you were a stranger or a traveler."); Avi Lazerson, *Holiness and Judaism*, Jewish Magazine (Jan. 2001), http://www.jewishmag.com/39mag/holy/holy.htm (directing Jews to "liv[e] in this world, marrying, procreating, working and at the same time not to be affected by the daily worldly occurrences"); Matthew 5 (NIV) :14–15 (NIV) (Christians are to be a "light" to the world).

[15] Revelation 14:6 (NIV).

[16] Yale, Slavery & Abolition, *The Story of Yale Abolitionists*, http://www.yaleslavery.org/Abolitionists/abolit.html.

"conservative" or "far right."[17] In contrast (aside from Catholic colleges[18]), at religious colleges only 42.6 percent of faculty identify as "liberal" or "far left" while 25.9 percent identify as "conservative" or "far right"[19]—still far lower than the percentage who identify as "liberal," but nearly four times the percentage of faculty identifying as "conservative" at non-religious institutions.

As a result, religious colleges are more likely than others to provide students meaningful exposure to diverse political views.[20] Congress has long valued such diversity in Higher Education, which it considers one of the key strengths of American higher education." 20 U.S.C. §1011a(a)(2). The Title IX religious exemption helps ensure that students at diverse religious colleges can contribute to that effort.

5. The religious education offered by religious colleges and universities also promotes overall health and well-being. For example, Islam teaches the importance of personal hygiene, stress management, and eating healthfully.[21] So too Buddhism teaches the importance of avoiding alcoholic beverages and drugs, both of which can cloud the mind.[22] The Judeo-Christian tradition

---

[17] Ellen B. Stolzenberg, et al., Higher Education Research Institute at UCLA, *Undergraduate Teaching Faculty: The HERI Survey*, 2016-2017, at 38 (2019), https://tinyurl.com/HERIStudy.

[18] The study does not explicitly provide a category for non-Catholic religious universities as opposed to colleges. *Ibid. Amici* have no reason to believe that the ideologies of professors at non-Catholic religious universities differ in any meaningful respect from those at non-Catholic religious colleges.

[19] *Ibid.* Professors in Catholic colleges more closely align with national ideological averages, with 57.5 percent identifying as "liberal" or "far left" and 13.5 percent identifying as "conservative" or "far right." *Ibid*.

[20] CCCU, *The Case for Christian Higher Education*, *supra*, at 12 (reporting that 67% of CCCU students say their courses "often" or "very often" address topics such as religion).

[21] Salman Assad et al., *Health and Islam*, 4 J. of Mid-Life Health 65 (2013).

[22] Conrad Harvey, *A Buddhist Perspective on Health and Spirituality*, 9 Scottish J. of Healthcare Chaplaincy 33 (2006).

also emphasizes the importance of healthy living. Christianity teaches the importance of confessing sins to mental well-being, and Judaism emphasizes how our bodies belong to God and should be taken care of by maintaining proper diet, exercise, sleep, hygiene, and a healthy mind.[23] Seventh-day Adventists teach abstinence from harmful substances, promote vegetarianism and healthy eating, produce members that live on average almost a decade longer than the general population,[24] and operate a string of medical schools and hospitals in America and around the world. In part because of these beliefs, religious schools have been shown effective in combating risky health behaviors such as alcohol use,[25] violence,[26] and suicidal ideation.[27]

No doubt because of these many benefits and advantages, many students at religious colleges not only identify as LGBTQ+, but also find meaning and joy in attending an institution with teachings and standards that reflect traditional Judeo-Christian sexual ethics.  In that regard, Plaintiffs' claim that religious colleges systematically cause them and their peers various kinds of harm is refuted by the very study on which they appear to rely—a non-peer reviewed survey

---

[23] Elliot N. Dorff, *The Jewish Tradition: Religious Beliefs and Healthcare Decisions*, Advocate Health (2002), https://tinyurl.com/EDorff.

[24] Blue Zones, *Loma Linda, California: A group of Americans living 10 years longer*, https://tinyurl.com/7DAarticle.

[25] Brigham Young University, for example, has been the No. 1 "Stone-Cold Sober School" for 23 consecutive years. Tad Walch, *Stone-Cold Sober XXIII: BYU repeats (and repeats) atop Princeton Review list*, Deseret News (Aug. 18, 2020), https://tinyurl.com/BYUSoberCampus. Students at secular universities, by contrast, are four times more likely than students at religious colleges to be moderate or heavy drinkers. Gayle M. Wells, *The effect of religiosity and campus alcohol culture on collegiate alcohol consumption*, 58 J. Am. Coll. Health 295 (2010).

[26] Richard Isralowitz & Alexander Reznik, *Impact of Religious Education and Religiosity on Adolescent Alcohol Use and Risk-Taking Behavior*, 110 J. of the Religious Ed. Ass'n 303 (2015).

[27] Mehmet Eskin, *The Effects of Religious Versus Secular Education on Suicide Ideation and suicidal Attitudes in Adolescents in Turkey*, 39 Social Psychiatry Psychiatric Epidemiology 536 (2004).

commissioned by the Religious Exemption Accountability Project (REAP), the organization sponsoring their lawsuit. There are, of course, many reasons to question the findings of a non-peer reviewed report designed by unknown persons that was commissioned to deal with issues raised in a lawsuit by the plaintiffs' own lawyers. But even if the study's findings are taken at face value, that very study, when compared with the results of peer-reviewed studies by professional researchers at major academic institutions, show that, in many important categories, LGBTQ+ persons at religious colleges do better, and are treated better, than at secular universities.[28]

In each of these ways, religious colleges provide significant benefits to their communities, including the LGBTQ community.

---

[28] These conclusions are supported by a meta-analysis of seven national studies spearheaded by Rutgers University and supported by Indiana University, University of Minnesota, and UCLA. A full comparison of these two studies is not practicable in this context, but a longer discussion is included in CCCU's proposed answer, ECF No. 26-2, at ¶ 1. When compared with the REAP study, the Rutgers study shows that that LGBT students do measurably worse than their heterosexual/cisgender peers at *both* religious and secular/public colleges. Further, the REAP report itself shows that, in some important respects, such as acceptance on campus, rates of loneliness, and rate of physical and sexual abuse, LGBTQ+ students do measurably and substantially better at religious colleges than they do at their secular, public counterparts. *Compare* Maren Greathouse *et al.*, *Queer-spectrum and trans-spectrum student experiences in American higher education: the analyses of national survey findings*, Rutgers, Tyler Clementi Center 23–26 (Aug. 2018), https://rucore.libraries.rutgers.edu/rutgers-lib/60802/, *with* College Pulse, *The LGBTQ+ Student Divide* 7–9 (March 2021), https://f.hubspotusercontent00.net/hubfs/5666503/LGBTQStudentDivide_March2021Report_REAP_CollegePulse.pdf.

**B.    The Title IX exemption is crucial to the survival of American religious higher education.**

Many religious colleges and universities throughout America—including the vast majority of CCCU's members—rely heavily on Title IX's religious exemption to provide the previously mentioned benefits as well as the faith-filled educational experience that is critical to most of their students and their families. This is so because the implementation and enforcement of Title IX, under the authority of the federal Department of Education, often reflects secular standards and mores that are in tension with the sex-and-gender-related standards and mores embraced by many religious colleges. As the Supreme Court emphasized in *Obergefell v. Hodges,* even where those standards and mores run counter to prevailing culture, these "decent and honorable" religious beliefs "long ha[ve] been held—and continue[] to be held—in good faith by reasonable and sincere people," especially people of faith. 576 U.S. at 657, 672. The Title IX exemption is thus critical to the ability of educational communities organized by such "reasonable and sincere people" to convey their faith to the next generation of believers.

This case threatens the ability of religious colleges to provide those benefits to their students. As CCCU made clear in its response to Plaintiffs' TRO request, if Plaintiffs are successful, religious colleges will remain religious colleges, although they will no doubt operate on a smaller scale. Proposed Defendant-Intervenor CCCU's Opp'n to Pls.'s Mot. for a TRO, ECF No. 53 at 11-12. It is their students, who receive federal funding, who will be harmed the most. Students unable to secure private loans will be unable to take advantage of the numerous benefits that religious colleges and university provide. The communities these religious colleges serve will also suffer as fewer students attend the religious schools in their communities. The Title IX religious exemption stands as a shield against such harms, even as it protects all of the previously-described benefits.

11-Proposed Motion to Dismiss and Memorandum in Support

## ARGUMENT

CCCU agrees with the Department of Education that Plaintiffs lack standing to allege their claims against the Department and, rather than repeat those arguments, it incorporates them by reference here. Dep't's Mot. at 11-18. CCCU also agrees with the Department that Plaintiffs' First, Second, Third, and Fifth Causes of Action fail to state a claim on which relief can be granted. *Id.* at 19-34. CCCU writes separately to make several points that—though important to the proper resolution of this case—are missing from the Department's motion. *First*, the fact that the Title IX religious exemption is constitutionally required provides another powerful reason why this Court cannot grant relief on any of Plaintiffs' claims. *Second*, Plaintiffs' APA claim, like all the others, cannot provide them relief as the rule being enforced is Congressional, not merely administrative. And *third*, Plaintiffs have failed to name necessary parties that are beyond this Court's jurisdiction, and they cannot adequately be added. For these reasons and the reasons discussed in the Department's motion, this case should be dismissed.

## I.    None of Plaintiffs' Counts States a Claim Upon Which Relief Can Be Granted Because Something Like the Title IX Exemption Is Constitutionally Required.

Apart from the jurisdictional issues addressed by the Department, the clearest reason that the Amended Complaint should be dismissed is that Plaintiffs' requested relief—invalidating the Title IX religious exemption as applied to LGBT students—is itself unconstitutional.

1. The Department cannot constitutionally deny students attending religious colleges access to religiously neutral, generally available public benefits because of their or their school's religious beliefs or practices. Religiously neutral aid that goes directly to students who can decide which school to attend has long been held to be constitutional. *E.g., Zelman v. Simmons-Harris*, 536 U.S. 639 (2002). Further, the Supreme Court has recognized that the Establishment Clause's "clearest command" is that "one religious denomination cannot be officially preferred over

another," *Larson v. Valente*, 456 U.S. 228, 244 (1982), and the Free Exercise Clause forbids the government from using a school's religious affiliation to deny it and its students access to religiously neutral and generally available federal funding. *Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246, 2256 (2020) (invalidating state law conditioning eligibility for "government aid" on a school's decision to "divorce itself from any religious control or affiliation"); *see also Larson*, 456 U.S. at 245 ("This constitutional prohibition of denominational preferences is inextricably connected with the continuing vitality of the Free Exercise Clause."); *Thomas v. Review Bd. Of Ind. Emp. Security Div.*, 450 U.S. 707, 717–18 (1981) (recognizing that governments burden religion when they "den[y] … a benefit because of conduct mandated by religious belief").

Invalidating the Title IX religious exemption as Plaintiffs request would violate these controlling decisions, as it would allow the government to prefer religious colleges and universities with certain religious views of sexuality and gender over other religious schools without them. If Plaintiffs are successful, those religious colleges that lack "counter-cultural" policies on marriage and sexuality-related issues would be free to continue to allow their students to receive federal funding. But the students of those with such policies would be denied access to funding solely because they follow religious beliefs that the Department disagrees with. And regardless of whether a religious school had such policies, *every* religious school in the country would be under constant review by the Department to determine Title IX eligibility.

On top of the constitutional problems inherent in denying religious colleges access to a public benefit because of their religious beliefs and practices, the Establishment Clause forbids the government—including courts—from constantly reviewing religious "policy, administration, and governance," *Natal v. Christian and Missionary All.*, 878 F.2d 1575, 1578 (1st Cir. 1989), such as the Department would need to do if Plaintiffs received the relief they seek. *See* FAC at 88

(requesting a court-appointed monitor that will have "access to all relevant documents and information necessary" to "ensure compliance").

2. Those problems with facially invalidating the Title IX religious exemption whenever its application would apply to beliefs or practices on sexuality and gender identity are highlighted by the Department's arguments in this very case. The Supreme Court has made clear—in a case, no less, involving allegations of LGBT discrimination—that government entities have an "obligation of religious neutrality." *Masterpiece Cakeshop, Ltd. v. Col. C.R. Comm'n*, 138 S. Ct. 1719, 1723 (2018). The Free Exercise Clause bars even "subtle departures from neutrality" on matters of religion. *Id.* at 1731 (quotation omitted). Such neutrality forbids the government from basing the enforcement of "laws or regulations on hostility to a religion or religious viewpoint." *Ibid.*

Throughout its motion to dismiss and its opposition to Plaintiffs' motion for a TRO, however, the Department has departed from that requirement of religious neutrality. Dep't's Mot. at 2 ("The Department does not condone the alleged actions that Plaintiffs attribute to their educational institutions."); *id.* at 22 ("Defendants do not condone the conduct alleged by Plaintiffs[.]"); *id.* at 24 ([T]he federal government in no way condones the private conduct alleged in the FAC."); Dep't's TRO Opp'n at 2 ("Defendants do not condone the alleged actions that Plaintiffs attribute to their educational institutions."). That departure from neutrality requires dismissal of Plaintiffs' request for relief that the Department be freed from the guidance of the Congressionally-created Title IX religious schools exemption: Under the First Amendment, a government actor that has expressly criticized certain religious beliefs cannot be allowed to determine qualifications for federal funding based on compliance with those very beliefs.[29] The

---

[29] The government's criticism of the religious practices at CCCU's member institutions and other religious colleges provide yet another reason why CCCU's motion to intervene should

Department should not, as Plaintiffs urge, be freed from the Congressional directive regarding the weighing of religious conviction on issues of sex and gender.

3. The Free Exercise Clause requires the Title IX religious exemption for yet another reason. Title IX's prohibition of discrimination because of sex includes many exceptions. Those exceptions are listed in 20 U.S.C. § 1681(a)(2)-(9) and 20 U.S.C. § 1686. Where, as here, a statute allows some exemptions against a generally applicable rule, it must also provide them, absent a compelling government interest, for religious institutions. *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021) ("[G]overnment regulations are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat *any* comparable secular activity more favorably than religious exercise.") (emphasis added); *Fulton v. Philadelphia*, 141 S. Ct. 1868, 1877–78 (2021).

Within the Title IX framework, Congress included exemptions for the military, fraternities and sororities, youth groups, beauty pageants, father-daughter or mother-son activities, boys or girls conferences, and living facilities. *See* 20 U.S.C. § 1681(a)(2)-(9); 20 U.S.C. § 1686. *Tandon* and *Fulton* make clear that this kind of statute, pregnant with exemptions, is anything but generally applicable. Because of this long list of exemptions to Congress's attempts to prevent sex discrimination, even if Congress had failed to include the Title IX religious exemption, the Constitution would require Courts to find one for religious institutions within the bounds of strict scrutiny analysis.

In sum, the Title IX religious schools exemption is constitutionally required (1) because the alternative would allow the government to provide funding to students at some religious

---

be granted: The government, being critical of their interests, cannot be trusted to fully defend those interests.

colleges, but not others, solely because of their religious beliefs and practices; (2) because the Department—who would be tasked with deciding such questions—has demonstrated dislike and antipathy to those religious beliefs in this very case; and (3) because Title IX is not a generally applicable law, but has numerous exemptions for other, non-religious schools and actors.

## II.    In All Events, Plaintiffs Also Fail to State a Claim Under The APA.

Even if it were legally possible to eliminate the Title IX exemption or its functional equivalent, Plaintiffs' Amended Complaint should be dismissed for failure to state a claim on which relief can be granted. The Department's motion correctly explains why this is true of all plaintiffs' claims except their APA claim. But even that claim is subject to dismissal for failure to state a claim.

Plaintiffs' APA claim alleges that two final rules issued in August and November 2020 arbitrarily and capriciously amended the text of 34 C.F.R. § 106.12. FAC ¶¶ 688, 697. Because the Department followed the APA to the letter when it issued its rules, and because those rules were based on its reasoned judgment, Plaintiffs have failed to state a claim.

As relevant here, the APA requires courts to invalidate "arbitrary" or "capricious" agency action. 5 U.S.C. § 706(2)(A). The inquiry itself, however, is "deferential," *Native Vill. of Point Hope v. Salazar*, 680 F.3d 1123, 1129 (9th Cir. 2012), and "narrow." *Oregon Nat. Res. Council v. Allen*, 476 F.3d 1031, 1036 (9th Cir. 2007). The Supreme Court has held that, for agency action to survive arbitrary-and-capricious review, the action must be "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021). If an "agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision," an agency action will survive. *Ibid.* Both the August and the November rule satisfy that deferential standard.

1. The August Rule codified a policy that the Department had long followed that provided that religious educational institutions were exempt from Title IX regardless of whether they actively sought such an exemption. *August Rule*, 85 Fed. Reg. 30,026, 30,475 (May 19, 2020). In codifying the rule, the Department emphasized that a contrary policy could not be supported by the statutory text. *Ibid.* Last year, a federal court (in a case involving two of the plaintiffs in this case) agreed, finding that requiring religious schools to provide notice or seek the Department's permission before invoking the exemption "would contradict the plain language of the Religious Organization Exemption, which automatically exempts from the prohibitions of Section 1681 any educational institution that meets the statutory criteria for the exemption." *Maxon v. Fuller Theological Seminary*, 2020 WL 6305460, at *6 (C.D. Cal. Oct. 7, 2020) (unpublished).

Certainly, the notification that colleges and universities give their students about lifestyle standards or codes of conduct at or before the time they enroll should be relevant and important to students seeking to attend those schools. But because the plain text of Title IX does not require such notice, either to the Department or to the students themselves, the APA is inapposite.

But even if an APA claim were appropriate, Plaintiffs cannot plausibly claim that the Department's action was not the product of reasonable decision-making or that it was inadequately explained. The Department emphasized that, after receiving tens of thousands of comments during the notice-and-comment period, it considered how the rule would affect LGBT students. 85 Fed. Reg. at 30,055, 30,475-30,482. The Department's decision to codify longstanding policy, *see* 85 Fed. Reg. at 30475, required by the statutory text, after considering the very claims Plaintiffs accuse them of ignoring, *see* FAC ¶693, demonstrates that the August 2020 final rule clears the deferential hurdle of arbitrary-and-capricious review. Because the August Rule merely codifies

"the intent of Congress, as evidenced by the plain language of Section 1681," *Maxon,* 2020 WL 6305460, at *6, Plaintiffs' fail to state a claim against it.

2. The November Rule similarly survives arbitrary-and-capricious review. That rule codified "long recognized exemptions for educational institutions" whether their controlling religious organization has a "hierarchical" or a "non-hierarchical" structure. *November Rule*, 85 Fed. Reg. 59,916, 59,918 (Sept. 23, 2020). In other words, the November rule provides that a college is controlled by a religious organization whether the institution that controls the university is external and superior to the university or not, such as with a religious board of trustees.

This rule does nothing but codify "non-binding guidance issued to OCR personnel dating back more than 30 years." *Id.* at 59,949. Here again, the Department received and considered thousands of comments during its notice-and-comment period, *id.* at 59,919, and directly responded to claims in those comments that the rule would affect the rights of LGBT students. *Id.* at 59,940-41, 59,946-50.

Plaintiffs' claim (FAC ¶¶ 676-77) that those issues weren't considered is therefore belied by the administrative record. Moreover, as the Court in *Maxon* explained, this implementation was consistent with the statutory text: "although the text of the Religious Organization Exemption may be read to require the 'religious organization' and 'educational institution' to be two separate entities, the ordinary meaning of the term 'organization' is sufficiently broad to include the board of directors [of the school]." *Maxon,* 2020 WL 6305460, at *8.

The Department thus reasonably included that it was required "to broadly interpret" Title IX's use of the phrase "'controlled by a religious organization' to avoid religious discrimination among institutions of varying denominations." *Id.* at 59,918. To read the Act as requiring control by a wholly *external* church body would penalize those congregational-style churches that are not

large enough individually to run a college or university directly, but instead need to collaborate with a network of churches to sustain an institution. This reading would allow only hierarchical churches and large integrated denominations to operate universities protected by the exemption.

The Department thus made a fully informed decision to protect religious colleges and universities controlled by churches of various kinds of ecclesiastical order. That decision, grounded as it was in a desire to avoid raising constitutional problems, is entitled to deference. *Valenzuela Gallardo v. Lynch*, 818 F.3d 808, 816 (9th Cir. 2016). And under no circumstances can such a reasonable decision be considered arbitrary or capricious under the APA.

For these reasons, Plaintiffs' claims that the August and November 2020 Final Rules were arbitrary and capricious cannot provide them relief. On their face, both interpretations are reasonable and fully informed, and both do nothing more than codify the Department's long-governing policies. This claim, like the others, should be dismissed both because plaintiffs lack standing to raise it, and because it fails on the merits.

## III.    Plaintiffs Have Failed to Name Necessary Parties, the Vast Majority of Which Are Beyond the Court's Jurisdiction to Add.

Rule FRCP 12(b)(7) provides yet another reason to dismiss, as (1) Plaintiffs have failed to join necessary parties under Rule 19(a)(1)(B)(i)—the religious colleges named in the Amended Complaint who benefit from the Title IX religious exemption—and (2) it would not be feasible to join them, as they are beyond the Court's jurisdiction. In brief: Plaintiffs' allegations of harm rest on direct factual allegations about the purported conduct of religious schools that they name in the Amended Complaint, yet none of those schools has been included as a defendant. That failure is fatal to Plaintiffs' claims, and the Amended Complaint must therefore be dismissed.

CCCU can of course speak for its members against Plaintiffs' facial challenge to the Title IX religious exemption's application in cases involving LGBT students. But CCCU is not able to respond to the numerous allegations brought by the multiplicity of Plaintiffs against 29 different colleges, only 21 of which are CCCU members, and of whose day-to-day operations CCCU has no meaningful knowledge. For this Court to fairly assess these challenges to the application of the religious exemption would require the response and involvement of the individual colleges discussed in the Amended Complaint.

Courts in the Ninth Circuit conduct the necessary-party analysis in three steps. *First*, they determine if the party is "necessary" to a full resolution of the issues. *Shermoen v. United States*, 982 F.2d 1312, 1317 (9th Cir. 1992). *Second*, they ask whether, if a party is necessary, that party can feasibly be joined. *EEOC v. Peabody Western Coal Co.*, 400 F.3d 774, 779 (9th Cir. 2005). Third, and finally, they ask "in equity and good conscience" whether, if a necessary party cannot feasibly be joined, the action can proceed with the existing parties. *Ibid.* "By its very nature," this inquiry is "heavily influenced by the facts and circumstances of individual cases," 7 C. Wright & A. Miller, *Federal Practice & Procedure* § 1604, and the rule itself is "designed to avoid the harsh results of rigid application." *Makah Indian Tribe v. Verity,* 910 F.2d 555, 558 (9th Cir.1990). Applying that approach here—and accepting Plaintiffs' factual allegations and drawing all factual inferences in their favor, *Paiute-Shoshone Indians of Bishop Colony, Cal. v. City of Los Angeles*, 637 F.3d 993, 996 n.1 (9th Cir. 2011), it is apparent that the colleges Plaintiffs have named are necessary parties, that  joinder would not be feasible, and that this case cannot proceed without them.

**A.    The religious schools named in the Amended Complaint are necessary parties to this action.**

As relevant here,[30] an "absent party is necessary" when it has (1) a "'legally protected' interest," FRCP 19(a), that is "more than a financial stake, and more than speculation about a future event[,]" *Ward v. Apple Inc.*, 791 F.3d 1041, 1050–51 (9th Cir. 2015), *abrogated on other grounds*, *Sperring v. LLR, Inc.*, 995 F.3d 680 (9th Cir. 2021), and that (2) it will be unable to protect without joining the action. FRCP 19(a). A party can have a legally protected interest in a case's outcome even if "the very existence of [its] interest depends on the legality of the Act" being challenged— in other words, all that a party must show is "a *claim* to an interest[.]" *Shermoen*, 982 F.2d at 1317 (emphasis in original).

In *Shermoen*, for example, a group of Native Americans sought to invalidate a statute that created a reservation for each of two tribes—the Hoopa Valley Tribe and the Yurok Tribe. *Id.* at 1316. The plaintiffs' case was ultimately dismissed because neither tribe was included as a defendant, and the tribes stood to lose their reservations if the plaintiffs succeeded. *Id.* at 1317. In affirming the Rule 12(b)(7) dismissal, the Ninth Circuit held that the tribes had a legally protected interest in the case because the complaint challenged the constitutionality of the very act creating their reservations. *Id.* at 1318.

By analogy, the same is true here. Like the tribes in *Shermoen*, the religious colleges named in the Amended Complaint[31] have a legally protected interest in the constitutionality of the Title

---

[30] A party is also necessary if, in its absence, the Court will be unable to afford complete relief to the existing parties. FRCP 19(a)(1)(A). But CCCU does not rely upon that provision here.

[31] Indeed, the loss of this right would impact the nearly 1,000 religious colleges and universities found throughout the United States. Though CCCU is not claiming here that Rule 19 "require[s] Plaintiffs to join every other person who *conceivably* may be affected by a declaration that the challenged law is unconstitutional on the equal protection and establishment challenges presented," at least those colleges directly named in relation to plaintiffs' as-applied challenge are

IX religious exemption as applied to LGBT students. Congress intended to protect all religious schools from the full weight of Title IX whenever Title IX's application would conflict with their religious tenets. Should this Court agree with the plaintiffs' claims, then these religious schools will lose their right to rely on this exemption in all such circumstances.

After a court determines that a party has an interest, it must then determine "whether that interest will be *impaired or impeded* by the suit" in the party's absence. *Makah Indian Tribe v. Verity*, 910 F.2d 555, 558 (9th Cir. 1990). This Court has recognized that adequate representation can minimize the risk of harm. *Union Pac. R.R. Co. v. Runyon*, 320 F.R.D. 245, 251–52 (D. Or. 2017) (Aiken, J.). And the Ninth Circuit has instructed courts to ask the same questions as they do with FRCP 24's intervention-as-of-right-inquiry to determine the adequacy of an existing party's representation:

- whether "the interests of a present party to the suit are such that it will undoubtedly make all" of the absent party's arguments;
- whether the party is "capable of and willing to make such arguments"; and
- whether the absent party would "offer any necessary element to the proceedings" that the present parties would neglect.

*Shermoen*, 982 F.2d at 1318 (quoting *County of Fresno v. Andrus*, 622 F.2d 436, 439 (9th Cir.1980).

On this point too, the facts in *Shermoen* are instructive. There, although several members of one tribe had intervened to represent their own interests in the constitutionality of the act, the Ninth Circuit held that there was "no credible claim that they could sufficiently represent the interest" of the other tribe. 982 F.2d at 1318. Even if both tribes would have defended the constitutionality of the same challenged act, that was not enough.

---

necessary, because of their need to respond to the factual allegations in the Amended Complaint. *Martinez v. Clark Cty., Nev.*, 846 F. Supp. 2d 1131, 1149 (D. Nev. 2012) (emphasis added).

It is likewise very unlikely that the interests of the religious schools named in the Amended Complaint will be fully protected here. Though CCCU can—and will—support the general, facial constitutionality of Title IX's religious exemption, it is not positioned to respond to the factual allegations that pervade the Amended Complaint regarding the application of that exemption to each of the Plaintiffs' situations. Certainly, CCCU will not be able to assert factual responses with respect to the schools that are not among its members, and really cannot practicably do so, absent extraordinary burden and cost, even for its own members.

In sum, only the named individual schools have the institutional knowledge necessary to respond to the factual allegations made against them, and, in their absence, those claims will likely go unrebutted. For these reasons, the individual religious colleges named in the Amended Complaint are necessary parties.

### B.     It would not be feasible to join many of the necessary parties because the Court lacks personal jurisdiction over them.

The next thing a party seeking dismissal under Fed. R. Civ. P. 12(b)(7) must show is that it would not be feasible to merely add the missing necessary parties to the litigation. Rule 19 recognizes "three circumstances in which joinder is not feasible:" (1) "when venue is improper"; (2) when the Court lacks personal jurisdiction over the necessary parties; and (3) when joinder would destroy subject-matter jurisdiction. *Peabody Western Coal Co.*, 400 F.3d at 779. Here, joinder is not feasible because this Court lacks personal jurisdiction over many of the necessary parties.

In that regard, it is hornbook law that courts have personal jurisdiction over defendants located outside of a forum state *only* when those defendants have sufficient "minimum contacts with [the forum state] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). "The

plaintiff bears the burden" of demonstrating personal jurisdiction over the defendant by showing (1) that the defendant "purposefully direct[ed] his activities" to the forum state and (2) that the claim "arises out of or relates to the defendant's forum-related activities[.]" *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004). Under this framework, courts lack specific jurisdiction even when an injury is suffered in the forum state if the defendant's conduct causing the injury was not itself directed at the state. *IPSL, LLC v. College of Mount Saint Vincent*, 383 F.Supp.3d 1128, 1139–40 (D. Or. 2019) (dismissing tort claims for lack of personal jurisdiction when the defendant New York college, despite phone calls, letters, and physical visits to Oregon, had not aimed the alleged harmful conduct at the forum state).

Here, only two colleges mentioned by name in the Amended Complaint are in Oregon—George Fox University and Corban University. FAC ¶¶ 11–12. Those colleges are, of course, subject to this Court's general jurisdiction. But none of the other named schools, which are scattered in 19 other states around the country, is subject to that jurisdiction.[32] Web presence, e-mails, phone calls, and even the occasional recruiting visit, do not rise to the level of contacts to justify personal jurisdiction. *See College of Mount Saint Vincent*, 383 F.Supp.3d at 1139–40. And any contacts those schools may have with Oregon are unlikely to be related to plaintiffs' claim that

---

[32] The other schools are located in (1) South Carolina (Bob Jones University); (2) Texas (Baylor University, Covenant Christian Academy); (3) Tennessee (Union University, Lipscomb University, Lee University); (4) New York (Nyack College); (5) Idaho (Brigham Young University-Idaho); (6) California (Fuller Theological Seminary, Azusa Pacific University, La Sierra University, and Westmont College); (7) Nebraska (York College and Grace University); (8) Ohio (Cedarville University); (9) Pennsylvania (Clarks Summit University, Messiah University, and Eastern University); (10) Oklahoma (Oklahoma Christian School and Oklahoma Baptist University); (11) Georgia (Toccoa Falls College); (12) Iowa (Dordt University); (13) Indiana (Indiana Wesleyan University); (14) Utah (Brigham Young University); (15) Virginia (Liberty University; Regent University School of Law); (16) Colorado (Colorado Christian University); (17) Illinois (Moody Bible Institute); (18) Washington (Seattle Pacific University); (19) Missouri (College of the Ozarks). FAC ¶¶ 13–51.

Title IX's religious exemption is unconstitutional. At very least, the Amended Complaint is silent about how, if at all, any of the named schools' reliance on the Title IX religious exemption harmed the plaintiffs in Oregon.

In sum, many of the religious schools necessary to respond to the factual bases of plaintiffs' claims *cannot* be joined because this Court lacks personal jurisdiction over them.

**C. The action cannot, in fairness, proceed without the named religious schools.**

The final question is whether the case can equitably proceed without the necessary parties. And here too, the Court should dismiss under Rule 12(b)(7) because (again assuming the Plaintiffs have stated valid claims) it cannot, in fairness, proceed without the named schools to respond to the Amended Complaint's factual claims.

Rule 19(b) provides four factors to consider in determining whether to dismiss an action: (1) prejudice to any party or to the absent party; (2) whether relief can be shaped to lessen prejudice; (3) whether an adequate remedy, even if not complete, can be awarded without the absent party; and (4) whether there exists an alternative forum. *Confederated Tribes of Chehalis Indian Rsrv. v. Lujan*, 928 F.2d 1496, 1499 (9th Cir. 1991). Only the first two factors are relevant here. And both point decisively toward dismissal.

As to the first factor: For the reasons listed above, the named colleges will be substantially prejudiced if they are not allowed to respond to plaintiffs' factual allegations and ultimately lose their right to rely on the Title IX religious exemption despite their sincere religious beliefs about sex and gender.[33]  To be sure, CCCU as intervenor can protect the interests of the named colleges in resisting Plaintiffs' *facial* challenge to the Title IX exemption. But CCCU's participation cannot

---

[33] In the Ninth Circuit, the Rule 19(b) prejudice analysis is the same as the Rule 19(a) necessary-party analysis. *Enter. Mgmt. Consultants, Inc. v. United States ex rel. Hodel*, 883 F.2d 890, 894 n.4 (10th Cir. 1989).

eliminate the prejudice to the named colleges that would result from their being denied the ability to respond to Plaintiffs' *as-applied* challenges—which necessarily depend on facts specific to each school.

Nor (as to the second factor) will it be possible to lessen the harm that Plaintiffs' requested relief will impose on the named schools by carefully crafting the opinion. If this Court decides that Plaintiffs are correct, and that the Title IX religious exemption as applied with respect to LGBT students violates the Constitution, then, by the force of that holding's logic, Plaintiffs will be entitled to the full declaratory relief they are seeking.[34] In a constitutional challenge seeking injunctive relief as applied to all members of a particular group, it really is all or nothing.

Simply put, the plaintiffs have chosen not to name most of the parties necessary to proper resolution of this case. Even if Plaintiffs stated valid claims (and they do not), this Court cannot fully address Plaintiffs' as-applied claims without the input of those necessary parties. Plaintiffs' Amended Complaint therefore should be dismissed under Rule 12(b)(7).

---

[34] Plaintiffs will not, however, be entitled to attorneys' fees because 42 U.S.C. §1988 does not apply to cases against the federal government and because the government has not waived sovereign immunity. *Ordonez v. United States*, 680 F.3d 1135, 1138 (9th Cir. 2012).

**CONCLUSION**

The Amended Complaint is fatally flawed. Plaintiffs lack standing to challenge the Title IX religious schools exemption by suing the Department and, in their attempts to do so, they have failed to include parties necessary to the resolution of their claims. But even if this Court finds they have cleared the hurdle of standing, and that the case can continue without the religious schools named in the Amended Complaint, the Court must nevertheless dismiss the case, as Plaintiffs' legal claims are frivolous.

Respectfully submitted.

DATED this 18th day of August, 2021.

/s/ Gene C. Schaerr
Gene C. Schaerr (DC Bar # 416368)*
Nicholas Miller (MI Bar# P70694)*
Joshua J. Prince (DC Bar # 1685532)*
Schaerr | Jaffe LLP
1717 K Street NW, Suite 900
Washington, D.C. 20006
Telephone: (202) 787-1060
Email: gschaerr@schaerr-jaffe.com
* Admitted *pro hac vice*

/s/ Herbert G. Grey
Herbert G. Grey, OSB #810250
4800 SW Griffith Drive, Suite 320
Beaverton, OR 97005-8716
Telephone: 503-641-4908
Email: herb@greylaw.org

Attorneys for Defendant-Intervenor
COUNCIL FOR CHRISTIAN COLLEGES
& UNIVERSITIES

## CERTIFICATE OF SERVICE

I hereby certify that I served the foregoing motion to dismiss and memorandum in support

was served on the following via the indicated method(s) of service:

Paul Carlos Southwick
Paul Southwick Law, LLC
8532 N. Ivanhoe St. #208,
Portland, OR 97203
Email: paul@paulsouthwick.com
Phone: 503-806-9517

Carol Federighi,
United States Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, DC 20044
Email: carol.federighi@usdoj.gov
Phone: (202) 514-1903

_____        **MAILING** certified full, true and correct copies thereof in a sealed, first class postage-prepaid envelope, addressed to the attorney(s) shown above at their last known office address(es), and deposited with the U.S. Postal Service at Portland/Beaverton, Oregon, on the date set forth below.

\_\_x\_\_\_\_        **ELECTRONIC FILING** utilizing the Court's electronic filing system

\_\_x\_\_\_\_        **EMAILING** certified full, true and correct copies thereof to the attorney(s) shown above at their last known email address(es) on the date set forth below.

_____        **HAND DELIVERING** certified full, true and correct copies thereof to the attorney(s) shown above at their last known office address(es), on the date set forth below.

_____        **OVERNIGHT COURIER** mailing of certified full, true and correct copies thereof in a sealed, prepaid envelope, addressed to the attorney(s) shown above at their last known office address(es), on the date set forth below.

DATED this 18th day of August, 2021.

/s/ Gene C. Schaerr
Gene C. Schaerr

Of Attorneys for Defendant-Intervenor
COUNCIL FOR CHRISTIAN COLLEGES
& UNIVERSITIES