**Paul Carlos Southwick (OSB 095141)**
**Religious Exemption Accountability Project**
**Paul Southwick Law, LLC**
8532 N. Ivanhoe St. #208,
Portland, OR 97203
Email: paul@paulsouthwick.com
Phone: 503-806-9517

**Timothy R. Volpert (OSB 814074)**
**Tim Volpert PC**
211 NE Hancock St. Ste. 2B
Portland, OR 97212
Email: tim@timvolpertlaw.com
Phone: 503-703-9054

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF OREGON
## EUGENE DIVISION

| | | |
|---|---|---|
| Elizabeth HUNTER; Veronica Bonifacio PENALES; Alex DURON; Zayn SILVA; Rachel MOULTON; Victoria Joy BACON; Avery BONESTROO; Nathan BRITTSAN; Hayden BROWN; Devin BRYANT; Consolata BRYANT; Brooke C.; Gary CAMPBELL; Tristan CAMPBELL; Natalie CARTER; Saren CRAIG; Mortimer HALLIGAN; Rachel HELD; Lauren HOEKSTRA; Chandler HORNING; Louis JAMES; Jonathan JONES; Jamie LORD; Ashtin MARKOWSKI; Cameron MARTINEZ; Joanna MAXON; Mackenzie MCCANN; Darren MCDONALD; Scott MCSWAIN; Faith MILLENDER; Jaycen MONTGOMERY; Journey MUELLER; Jake PICKER; Danielle POWELL; Megan STEFFEN; Justin TIDWELL-DAVIS; Daniel TIDWELL-DAVIS; Spencer J. VIGIL; Lucas WILSON; and Audrey WOJNAROWISCH, on behalf of themselves and all others similarly situated, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No. 6:21-cv-00474-AA<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**<br><br>ORAL ARGUMENT REQUESTED |
| Plaintiffs, | ) | |
| v. | ) ) | |
| U.S. DEPARTMENT OF EDUCATION; and Suzanne GOLDBERG, in her official capacity as Acting Assistant Secretary for the Office of Civil Rights, U.S. Department of Education.<br>Defendants. | ) ) ) | |

# TABLE OF CONTENTS

I.     *INTRODUCTION*.................................................................**4**

II.     *PROCEDURAL HISTORY* ..............................................**5**

III.     *ARGUMENT* ........................................................**6**

    A.     **VENUE IS PROPER IN EUGENE.** .............................................**7**

    B.     **PLAINTIFFS HAVE STANDING.** ...........................................**7**

        1.     Avowedly Invidious Discrimination and Stigmatic Injuries Confer Substantive Due Process and Establishment Clause Standing. .......................................................................... 8

        2.     Plaintiffs Satisfy Traditional and Taxpayer Standing Requirements for the Establishment Clause and RFRA Claims.................................................................. 17

        3.     Standing for RFRA claim is established.................................................. 22

        4.     5 U.S.C. § 702 Confers APA Standing.................................................. 22

        5.     Plaintiffs Satisfy Standing and have Alleged Sufficient Facts to Support their First Amendment Speech, Free Exercise, Assembly and Association Claims ........................................... 23

        6.     Plaintiffs' Claims are Ripe ......................................................... 24

    C.     **PLAINTIFFS CLAIMS SHOULD NOT BE DISMISSED.** ....................................**25**

        1.     Establishment Clause – First Amendment ............................................... 25

        2.     Administrative Procedures Act – 5 U.S.C. § 706...................................... 29

        3.     Substantive Due Process/Equal Protection – Fifth Amendment ............................ 30

        4.     Religious Freedom Restoration Act - 42 U.S.C. § 2000bb-1 ................................ 32

IV.     *CONCLUSION* ................................................**33**

**Table of Authorities**

Cases

*Allen v. Wright*,
 468 U.S. 737 (1984) ................................................................................ 11, 12

*Am. Fuel & Petrochemical Mfrs. v. O'Keeffe*,
 134 F. Supp. 3d 1270 (D. Or. 2015) ........................................................ 7, 25

*Ariz. Christian Sch. Tuition Org. v. Winn*,
 563 U.S. 125 (2011) ...................................................................................... 22

*Arlington Heights v. Metropolitan Housing Development Corp.*,
 429 U.S. 252 (1977) ................................................................................ 30, 31

*Barnes-Wallace v. City of San Diego*,
 530 F.3d 776 (9th Cir. 2008) .......................................................................... 12

*Barron v. Reich*,
 13 F.3d 1370 (9th Cir. 1994) ............................................................................ 6

*Bell Atlantic Corp. v. Twombly*,
 550 U.S. 544 (2007) ........................................................................................ 7

*Bob Jones University v. Johnson*,
 529 F.2d 5143 (4th Cir. 1975) ........................................................................ 10

*Bowen v. Kendrick*,
 487 U.S. 589 (1988) ...................................................................................... 32

*Branch v. Tunnell*,
 14 F.3d 449 (9th Cir. 1994) .............................................................................. 7

*Burton v. Wilmington Parking Authority*,
 365 U.S. 715 ................................................................................................. 16

*Cammack v. Waihee*,
 932 F.2d 765 (9th Cir. 1991) .......................................................................... 26

*Cannon v. University of Chicago*,
 441 U.S. 677 (1979) ...................................................................................... 21

*Cooper v. Aaron*,
 358 U.S. 1 (1958) .......................................................................................... 10

*Cornelius v. Benevolent Protective Order of Elks*,
 382 F. Supp. 1182 (D. Conn. 1974) .................................................................. 9

*Corp. of Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos*,
 483 U.S. 327 (1987) ............................................................................ 25, 26, 27

*Cutter v. Wilkinson*,
 544 U.S. 709 (2005) ...................................................................................... 21

*Deal v. Mercer Cnty. Bd. of Educ.*,
 911 F.3d 183 (4th Cir. 2018) .......................................................................... 21

*Elrod v. Burns*,
 427 U.S. 347 (1976) ...................................................................................... 24

*Emp. Div., Dep't of Hum. Res. of Oregon v. Smith*,
 494 U.S. 872 (1990) ...................................................................................... 20

*Flast v. Cohen*,
  392 U.S. 83 (1968) ............................................................................................... 18

*Galbraith v. Cnty. of Santa Clara*,
  307 F.3d 1119 (9th Cir. 2002) ............................................................................. 7

*Gilligan v. Jamco Dev. Corp.*,
  108 F.3d 246 (9th Cir. 1997) ............................................................................... 6

*Gilmore v. City of Montgomery*,
  417 U.S. 556 (1974) ............................................................................................. 9

Hall v. American Nat'l Red Cross,
  86 F.3d 919 (9th Cir. 1996) ............................................................................... 32

*Heckler v. Mathews*,
  465 U.S. 728 (1984) ............................................................................................. 9

*Hein v. Freedom From Religion Foundation*,
  127 S. Ct. 2553 (2007) ...................................................................................... 19

*Hobbie v. Unemployment Appeals Comm'n of Fla.*,
  480 U.S. 136 (1987) ..............................................................................20, 22, 25

*Jackson v. Birmingham Bd. of Educ.*,
  544 U.S. 167 (2005) ........................................................................................... 20

*Kreisner v. City of San Diego*,
  1 F.3d 775 (9th Cir. 1993) ................................................................................. 26

*Latta v. Otter*,
  771 F.3d 456 (9th Cir. 2014) ............................................................................. 30

*Lemon v. Kurtzman*,
  , 403 U.S. 602, 612 (1971) (1971) .................................................................... 25

*Lemon*,
  , 403 U.S. at 612-13 ........................................................................................... 25

*Lewis v. Casey*,
  518 U.S. 343 (1996) ............................................................................................. 7

*Litman v. George Mason University*,
  5 F.Supp.2d 366 (E.D. Va. 1998) ..................................................................... 20

*Loving v. Virginia*,
  388 U.S. 1 (1967) ............................................................................................... 17

*Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*,
  138 S. Ct. 1719 (2018) ...................................................................................... 10

*Milburn v. City of Lebanon*,
  221 F. Supp. 3d 1217 (D. Or. 2016) ................................................................... 6

*Milonas v. Williams*,
  691 F.2d 931 (10th Cir. 1982) ........................................................................... 16

*Moton v. Lambert*,
  508 F.Supp. 367 (N.D. Miss. 1981) .................................................................. 14

*NAACP v. Thompson*,
  648 F. Supp. 195 (D. Md. 1986) ....................................................................... 15

*Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*,
  508 U.S. 656 (1993) ........................................................................................... 14

*Newdow v. Lefevre*,
  598 F.3d 638 (9th Cir. 2010) ............................................................................. 22

*NLRB v. Hanna Boys Ctr.*,
940 F.2d 1295 (9th Cir. 1991) ........................................................................ 25

*Norwood v. Harrison*,
413 U.S. 455 (1973) ...............................................................................Passim

*Obergefell*,
576 U.S. ............................................................................................................ 17

*Pitts v. Department of Revenue*,
333 F. Supp. 662 (E.D. Wis. 1971) ................................................................ 12

*Reitman v. Mulkey*,
387 U.S. 369 (1967) ........................................................................................ 15

*Rosenberger v. Rector & Visitors of the Univ. of Va.*,
515 U.S. 819 (1995) ........................................................................................ 32

*Sch. Dist. of Abington Twp. v. Schempp*,
374 U.S. 203 ......................................................................................... 9, 18, 24

*Simon v. Eastern Ky. Welfare Rights Organization*,
426 U.S. 26 (1976) .......................................................................................... 13

*Spokeo, Inc. v. Robins*,
136 S. Ct. 1540 (2016) .................................................................................... 22

*Texas Monthly, Inc. v. Bullock*,
489 U.S. 1 (1989) ............................................................................................ 21

*Usher v. Los Angeles*,
828 F.2d 556 (9th Cir. 1987) ............................................................................ 6

*Valley Forge Christian College v. Americans for the Separation of Church and State*,
454 U.S. 464 (1982) ................................................................................. 11, 18

*Village of Bensenville v. Federal Aviation Administration*,
457 F.3d 52 (D.C. Cir. 2006) .......................................................................... 33

*Walz v. Tax Commission*,
397 U.S. 664 (1970) ........................................................................................ 25

*Washington v. Davis*,
426 U.S. 229 *(1976)* ...................................................................................... 30

*Williams v. California*,
990 F. Supp. 2d 1009 (C.D. Cal. 2012) .......................................................... 25

*Goldsboro Christian Schools, Inc. v. United States of America*,
1982 WL 1044699 (1982) ............................................................................... 18


Statutes

5 U.S.C. § 702................................................................................................... 22
5 U.S.C. § 706................................................................................................... 29
42 U.S.C. § 2000bb-1(c)................................................................................... 22

Rules

Fed. R. Civ. P. 8(a)(2) ................................................................................. 6
Federal Rule of Civil Procedure 12(b)(6) ...................................................... 6

**MEMORANDUM OF LAW**

## I. INTRODUCTION

Defendants purportedly do "not condone the alleged actions that Plaintiffs attribute to their educational institutions[.]" (Dkt. 56, p 2). Defendants publicly tell students that "Eliminating discrimination that targets LGBTQI+ students is a critical part of the Department's mission, and ED is committed to enforcing Title IX and other federal civil rights laws to the fullest extent permissible under the existing laws." *Id*. However, Defendants' funding of invidious discrimination and refusals to aid LGBTQ+ students in need at taxpayer-funded educational institutions renders Defendants' commitments illusory for Plaintiffs.

In their Motion, Defendants attempt to avoid responsibility for their unconstitutional actions by contending that Plaintiffs are the wrong parties to challenge TIXRE or its application. But if these Plaintiffs are not the proper party, who could be? All Plaintiffs have been directly affected by the Departments' funding and application of TIXRE. Plaintiffs are not merely members of the public attempting to intercede on behalf of LGBTQ+ students they see being oppressed at taxpayer-funded NFBCUs. Rather, Plaintiffs, all of whom attend, attempted to attend, or previously attended NFBCUs, have a direct stake in the outcome of this case. Indeed, some Plaintiffs have risked their safety and future in order to plead for their government's protection through this litigation. Given that LGBTQ+ youth are no longer proper targets for government oppression, the Constitution demands that Defendants stop treating Plaintiffs as if they are. The Court must put an end to government sponsored invidious discrimination.

Many, if not all, of Defendants' arguments in this Motion were made to some degree in their Opposition to Plaintiffs' Motion for a TRO (Dkt. 62). Defendants claims predominantly relate to standing, ripeness, and failure to state a claim. Likewise, many, if not all, of Defendants

arguments were rebutted or addressed in Plaintiffs' Motion for a TRO/PI (Dkt. 44), Plaintiffs'
Reply to Defendants' Opposition to Plaintiffs' Motion for a TRO (Dkt. 64) and Plaintiffs' Motion
to Amend Motion for TRO/PI (Dkt. 75). Plaintiffs hereby incorporate their arguments expressed
in those briefs as if fully set forth herein. The Court should reject Defendants' arguments because
(1) venue is proper, (2) Plaintiffs have standing, and (3) Plaintiffs state valid claims for relief.

Of note, Defendants do *not* move to dismiss Plaintiffs' APA claims for failure to state a
claim. Consequently, if this Court determines that Plaintiffs have standing to assert such claims,
and that such claims are ripe, the parties agree that Plaintiffs have stated valid claims for relief
pursuant to the APA.

## II. PROCEDURAL HISTORY

On March 29, 2021, Plaintiffs filed their Complaint for Declaratory and Injunctive Relief
(Dkt. 1). On April 9, 2021, Phoenix Seminary, Western Baptist College, and William Jessup
University filed a Motion to Intervene (Dkt. 8).

On April 20, 2021, the Department of Justice appeared on behalf of all Defendants (Dkt.
21).

On May 12, 2021, the Council for Christian Colleges & Universities filed a Motion to
Intervene (Dkt. 26). On May 13, 2021, Phoenix Seminary, Western Baptist College, and William
Jessup University filed a Proposed Motion to Dismiss (Dkt. 32).

On June 7, 2021, Plaintiffs filed their First Amended Complaint (Dkt. 35) ("FAC").

On August 5, 2021, Plaintiffs filed their Motion for Temporary Restraining Order and
Order to Show Cause Why Preliminary Injunction Should Not Enter (Dkt. 44) ("Plaintiffs' Motion
for TRO/PI").

Defendants filed their Motion to Dismiss Plaintiffs' FAC on August 9, 2021 (Dkt. 56). On August 13, 2021, Defendants filed their Memorandum in Opposition to Plaintiffs' Motion for TRO/PI (Dkt. 62). On August 17, 2021, Plaintiffs filed their Reply in Support of Plaintiffs' Motion for TRO/PI (Dkt. 64).

A hearing on Plaintiffs' Motion for TRO/PI is scheduled for August 31, 2021 (Dkt. 58).

## III.     ARGUMENT

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the claims asserted in the complaint. The issue on a motion to dismiss for failure to state a claim is not whether the claimant will ultimately prevail, but whether the claimant is entitled to offer evidence to support the claims asserted. *Gilligan v. Jamco Dev. Corp.,* 108 F.3d 246, 249 (9th Cir. 1997). Rule 12(b)(6) is read in conjunction with Rule 8(a), which requires only a short and plain statement of the claim showing that the pleader is entitled to relief. Fed. R. Civ. P. 8(a)(2). "When considering a motion to dismiss, a court construes a complaint in favor of the plaintiff and takes all factual allegations as true." *Milburn v. City of Lebanon*, 221 F. Supp. 3d 1217, 1220 (D. Or. 2016) (Aiken, J.); *Usher v. Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987) ("On a motion to dismiss for failure to state a claim, the court must presume all factual allegations of the complaint to be true and draw all reasonable inferences in favor of the nonmoving party."). The district court may also consider additional facts in materials that the district court may take judicial notice, *Barron v. Reich*, 13 F.3d 1370, 1377 (9th Cir. 1994), as well as "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading," *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994), overruled in part on other grounds by *Galbraith v. Cnty. of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002). "To survive a motion to dismiss, the complaint must allege 'enough facts to state a claim to relief that is

plausible on its face.'" *Am. Fuel & Petrochemical Mfrs. v. O'Keeffe*, 134 F. Supp. 3d 1270, 1276-77 (D. Or. 2015) (Aiken, J.) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

## A. VENUE IS PROPER IN EUGENE.

For the reasons set forth in Plaintiffs' Reply in Support of Plaintiffs' Motion for TRO/PI, venue is proper in Eugene. Dkt. 64, p. 21-23. Plaintiffs' claims relate, in part, to Defendants' unconstitutional conduct occurring in this district. Moreover, Defendants have been participating in the litigation in this district, including participating in a Rule 26(f) conference with Plaintiffs, for several months.

Likewise, and in the alternative, if venue is not proper in Eugene, this Court should transfer to Portland but continue to preside over this case.

## B. PLAINTIFFS HAVE STANDING.

"[E]ach element of standing must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.,* with the manner and degree of evidence required at the successive stages of the litigation." *Lewis v. Casey*, 518 U.S. 343, 358 (1996). "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." *Id.*

As alleged in the FAC, Plaintiffs' standing is based on three distinct, and independent, grounds, each of which is sufficient to grant standing: (1) Defendants' funding of invidious discrimination at avowedly discriminatory educational institutions, FAC ¶¶ 579-82; (2) Defendants' facilitation and encouragement of invidious discrimination through preemptive religious exemption letters, OCR's informal and formal guidance to NFBCUs, and the use of TIXRE to close Title IX complaints filed by Plaintiffs and other LGBTQ+ students at NFBCUs,

FAC ¶¶ 584-593; and (3) the specific acts of discrimination by NFBCUs attributable to Defendants because of the state action doctrine, FAC ¶¶ 58-571.

Just as Black students could not be denied full and equal access to private schools receiving any type of government assistance (including the mere provision of neutral textbooks to segregated schools) because of their race, so too our clients have an Equal Protection right to full and equal access to the benefits of educational programs and activities receiving federal funds, without denial of admission to, or discrimination in, those programs because of their sex, regardless of the private motivations behind that discrimination. *See Norwood v. Harrison*, 413 U.S. 455, 469 (1973) ("The private school that closes its doors to defined groups of students on the basis of constitutionally suspect criteria manifests, by its own actions, that its educational processes are based on private belief that segregation is desirable in education. Such private bias is not barred by the Constitution, nor does it invoke any sanction of law, but neither can it call on the Constitution for material aid.")

### 1. *Avowedly Invidious Discrimination and Stigmatic Injuries Confer Substantive Due Process and Establishment Clause Standing.*

Defendants concede that they provide federal financial assistance to avowedly discriminatory educational institutions that practice invidious discrimination. Defendants concede that Plaintiffs attend, attended, or attempted to attend some of these avowedly discriminatory educational institutions that practice invidious discrimination. Given such concessions, Plaintiffs have more than sufficiently demonstrated standing.

The Constitution protects Plaintiffs from the stigmatic injury caused by Defendants' funding of educational programs that target LGBTQ+ youth for discrimination, as well as the other injuries stemming from the denial of equal access to federally funded educational programs and activities. *See Gilmore v. City of Montgomery*, 417 U.S. 556, 570–71 (1974) (policy permitting the

exclusive use of parks by racially discriminatory private schools sufficiently alleged "direct cognizable injury to their right to nondiscriminatory access to the public parks.").

The Supreme Court has long recognized that stigmatic injury is a serious consequence of discriminatory government action and is sufficient to support standing for an Equal Protection Claim. *See Heckler v. Mathews*, 465 U.S. 728, 739-40 (1984) (stigmatic injury suffered as a direct result of having personally been denied equal treatment solely because of their membership in a disfavored group sufficient to support standing). The injury of a stigmatic harm stems from the government's perpetuation of "archaic stereotypic notions" signaling that a disfavored group is "innately inferior" and they are thus "less worthy in in the community" because of their membership in that disfavored group. *See Heckler*, 465 U.S. at 739–40. Students "who are directly affected by the laws and practices against which their complaints are directed" may also have standing based on "a spiritual stake in First Amendment values." *Sch. Dist. of Abington Twp. v. Schempp*, 374 U.S. 203, 224, n.9.

Here, Defendants directly injure Plaintiffs, stigmatically and procedurally, by (a) certifying NFBCUs as meriting Title VI funds, and (b) providing billions in direct and indirect federal financial assistance to avowedly discriminatory educational institutions. *The federal financial assistance itself*, apart from any specific conduct by NFBCUs,[1] unconstitutionally funds, supports, and condones invidious discrimination in violation of Plaintiffs' equal protection rights under the

---

[1] The degree of government support necessary for a conclusion that the Constitution prohibits such support is lower than the degree of government support necessary to conclude that the Constitution prohibits the underlying private discrimination. *See Cornelius v. Benevolent Protective Order of Elks*, 382 F. Supp. 1182, 1189 (D. Conn. 1974) ("it is one thing to sue on Fourteenth Amendment grounds to halt state assistance to an otherwise private entity; it is quite another to seek on those grounds to restrain the entity in its own conduct. If the latter suit is successful, the entity may have no choice but to alter its practices; if the former suit is successful, the entity can choose between continuing to practice racial discrimination at the cost of forfeiting further state assistance, or abandoning its discriminatory practices and policies so that the state might constitutionally continue its assistance.").

Fifth Amendment. *Norwood*, 413 U.S. at 467 (Constitution requires government to "steer clear…of giving significant aid to institutions that practice racial or other invidious discrimination.");[2] *see also Bob Jones University v. Johnson*, at 608, *aff'd without published opinion*, 529 F.2d 5143 (4th Cir. 1975) ("Each time the VA approves an application for benefits to be used at Bob Jones, it extends a benefit to whites which it cannot grant to some blacks. While this is an outcome of private discrimination, it is clear that no[t] only is the government prohibited from authoring state sponsored discrimination, it is also prohibited from acquiescence in the discriminatory practices of public or private entities which participate in the federal program."). *See also Cooper v. Aaron,* 358 U.S. 1, 19 (1958) ("State support of segregated schools through any arrangement, management, funds, or property cannot be squared with the [Fourteenth] Amendment's command that no State shall deny to any person within its jurisdiction the equal protection of the laws").

Indeed, by funding educational institutions that practice invidious sex, sexual orientation, and gender identity discrimination, the government sends a profoundly damaging message to America's LGBTQ+ youth that they are inferior in dignity and worth. But "[o]ur society has come to the recognition that gay persons and gay couples cannot be treated as social outcasts or as inferior in dignity and worth. For that reason the laws and the Constitution can, and in some instances must, protect them in the exercise of their civil rights. The exercise of their freedom on terms equal to others must be given great weight and respect by the courts." *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719, 1727 (2018). Thus, pursuant to

---

[2] Defendants argue that *Norwood* does not apply here because it must be limited to the context of race discrimination in Mississippi, a state subject to a federal desegregation order. Dkt. 56, p. 23-24. Not so. As noted above, *Norwood* forbids governments from financially aiding institutions that practice racial "*or other invidious discrimination.*" 413 U.S. at 467 (emphasis added).

*Norwood*, *Bob Jones University*, *Masterpiece Cakeshop*, and the long line of cases that give students standing to challenge government funding of invidious discrimination at their schools, Plaintiffs have standing to challenge government funding of educational institutions that openly and avowedly practice invidious discrimination against LGBTQ+ students as violations of their equal protection rights under the Fifth Amendment.

Indeed, "each time [DOE] approve an application for benefits to be used at [NFBCUs], it extends a benefit to [straight and cisgender students] which it cannot grant to some [LGBTQ+ students (*e.g.* students who are married to a same-sex partner, transgender students who have medically or socially transitioned, etc.)]. While this is an outcome of private discrimination, it is clear that no[t] only is the government prohibited from authoring state sponsored discrimination, it is also prohibited from acquiescence in the discriminatory practices of public or private entities which participate in the federal program." *See Bob Jones University*, *supra* at 608.

Moreover, *Allen v. Wright,* 468 U.S. 737 (1984), is inapposite. Unlike the plaintiffs in *Allen*, the Plaintiffs here actually enrolled, or attempted to enroll, at the avowedly discriminatory educational institutions but were rejected and/or were discriminated against pursuant to school policies. Plaintiffs are not LGBTQ+ students from Hawaii "roaming the country" and filing lawsuits against state government support for anti-LGBTQ+ schools in Maine. *See Allen,* 468 U.S. at 756 (seeking to avoid circumstances where "a [B]lack person in Hawaii could challenge the grant of a tax exemption to a racially discriminatory school in Maine," utilizing the courts merely to "vindicate the interests of concerned bystanders."); *Valley Forge Christian College v. Americans for the Separation of Church and State*, 454 U.S. 464, 487 (1982) (denying standing to those "who 'roam the country in search of governmental wrongdoing.'").

Rather, Plaintiffs have a rational and direct relationship to the consequences of federally funded invidious discrimination that they felt concretely, personally, and keenly, at their own schools. FAC, Exs. A-GG; *see also Pitts v. Department of Revenue*, 333 F. Supp. 662, 669-670 (E.D. Wis. 1971) (Black plaintiff had standing to sue State regarding constitutionality of tax exemption for private organization that denied him membership because of his race in violation of 14th Amendment); *Barnes-Wallace v. City of San Diego*, 530 F.3d 776, 785, n. 5 (9th Cir. 2008) ("In *Allen*, the Supreme Court held that a stigmatic injury caused by racial discrimination could support standing only if the plaintiffs personally had been or were likely to be subject to the challenged discrimination. The injury of which the Barnes–Wallaces and Breens complain is the offensiveness of having to deal with the Boy Scouts in order to use park facilities that they wish to use, and would use, but for the control of the Boy Scouts over those facilities. We conclude that this injury is sufficiently immediate to these plaintiffs to permit standing under the rationale of *Allen*.") (internal citations omitted).

Indeed, Defendants' misplaced reliance on *Allen* also "ignores both the context and the severity of sexual minority experiences on evangelical college campuses."[3] At Plaintiffs' NFBCUs, there is "a school atmosphere that is described as highly negative, negative, unacceptable, or unsafe. It is a campus climate that drives sexual minority students to loneliness, isolation, depression, and despair. The dignitary injury to sexual minority students goes far beyond mere knowledge that someone, somewhere disapproves of them, but is direct and personal, experienced on a near constant basis, and serious enough to cause psychological harm." *Id*.

---

[3] Hubertz, Love the Sinner, 35 QUINNIPIAC LAW REV. 147, 215 (2017).

Because unlike in *Allen*, here the stigmatic injury has also been accompanied by discriminatory treatment, both through the direct acts of Congress and the DOE, and through the private actions of the schools attended by Plaintiffs, the stigmatic injuries are sufficient to confer standing.

### a. *Causation and Redressability Are Established.*

As for causation, in the context of government funding for invidious discrimination, the causation element of standing is relaxed. In *Norwood*, the Court stated that:

> District Court laid great stress on the absence of a showing by appellants that 'any child enrolled in private school, if deprived of free textbooks, would withdraw from private school and subsequently enroll in the public schools.' We can accept this factual assertion; we cannot and do not know on this record at least, whether state textbook assistance is the determinative factor in the enrollment of any students in any of the private schools in Mississippi. *We do not agree with the District Court in its analysis of the legal consequences of this uncertainty*, for the Constitution does not permit the State to aid discrimination *even when there is no precise causal relationship between state financial aid to a private school and the continued well-being of that school.* A State may not grant the type of tangible financial aid here involved if that aid has a significant tendency to facilitate, reinforce, and support private discrimination.

413 U.S. at 465-66 (internal citations omitted) (emphasis added).

Here, Defendants rely on *Simon v. Eastern Ky. Welfare Rights Organization*, 426 U.S. 26, 41–42 (1976) to argue that Plaintiffs cannot demonstrate causation or redressability. Dkt. 56, p. 17. In *Simon*, the Court held that indigent Americans could not challenge the tax-exempt status of hospitals because the decisions hospitals might make in response to withdrawal of tax-exempt status were sufficiently uncertain to break the chain of causation. *Id*. at 45. The Court held that "It is purely speculative whether the denials of service specified in the complaint fairly can be traced to petitioners' 'encouragement' or instead result from decisions made by the hospitals without regard to the tax implications. *Id*. at 43.

However, *Simon* is inapposite in the federal funding analysis presently before the Court because *Simon* did not overrule *Norwood* and because *Simon* did not involve invidious discrimination against a protected class. *See Moton v. Lambert*, 508 F.Supp. 367 (N.D. Miss. 1981) ("Since *Norwood* was not overruled by the *Simon* Court, we deem it controlling. *Simon* may also be distinguished from the case *sub judice* since it did not involve the question of racial discrimination prohibited by the fourteenth amendment."); s*ee also Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666, 113 (1993) ("When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier in order to establish standing. The 'injury in fact' in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit.").

Here, Plaintiffs' stigmatic harms will be redressed by a finding of unconstitutionality, as funding will no longer be provided to institutions that discriminate against students on the basis of sex, and by injunctive relief from this Court as requested in Plaintiffs' Prayer for Relief. Plaintiffs ask the Court to, *inter alia*, require Defendants to refrain from using TIXRE to dismiss Title IX complaints against educational institutions *that currently receive federal financial assistance*. Regardless of whether some NFBCUs decide to forgo federal funding in the future to avoid compliance with Title IX, the Court can redress the stigmatic, emotional, and procedural injuries that Plaintiffs are experiencing at educational institutions that currently receive Title IX funding.

**b.** ***Defendants Facilitate and Encourage Invidious Discrimination at Avowedly Discriminatory Educational Institutions Plaintiffs Attend or Attended.***

Defendants' additional direct actions harm Plaintiffs stigmatically and procedurally, including OCR's issuance of preemptory religious exemption letters, which discourage students from filing Title IX complaints, OCR's informal guidance to NFBCUs and its later August 2020 Rulemaking, which encourage NFBCUs to hide their discriminatory practices from students and the public, OCR's November 2020 formal rulemakings, which unlawfully expanded TIXRE, and OCR's *documented and uncontested history* of using TIXRE to close every Title IX complaint ever filed by an LGBTQ+ student at an NFBCU.

Defendants conduct described above, apart from any specific conduct by NFBCUs, supports, facilitates and condones invidious discrimination. *See Norwood, supra; see also Reitman v. Mulkey*, 387 U.S. 369, 375 (1967) (prohibited state involvement can be found "even where the state can be charged with only encouraging, rather than commanding discrimination."); *NAACP v. Thompson*, 648 F. Supp. 195, 224-25 (D. Md. 1986) "[H]ere, government has brought into being a permit system which the Klan has used to cause certain members of the public to be excluded from public rallies on private property because of race or religion. In essence, government has looked the other way while a racially discriminatory result has been originated and accomplished by private actors who have been subject to governmental supervision.").

Plaintiffs' stigmatic and procedural injuries caused by Defendants' conduct in this second category are felt most deeply by Plaintiff Montgomery, whose Title IX complaint as a transgender student seeking safe and affirming housing, was dismissed by OCR based on a retroactive application of TIXRE, FAC ¶¶ 395-408, and Plaintiff Maxon and Brittson, whose Title IX lawsuit

against their NFBCU was dismissed based on the court's deference to Defendants' Trump-era informal guidance on the scope and application of TIXRE. FAC ¶¶ 162-172, 320-328.

### c. _State Action Doctrine Applies and Confers Standing._

Similarly, the acts of Plaintiffs' NFBCUs have also injured Plaintiffs and, because of the state action doctrine, also confer standing. _See Burton v. Wilmington Parking Authority_, 365 U.S. 715, 1961 (A private restaurant operator's refusal to serve African-Americans constituted state action and violated the Establishment clause, because building and parking area were leased from Government creating a "symbiotic relationship."). Here, the conduct of the NFBCUs constitute state action because, in addition to funding, Defendants profit from the existence of NFBCUs and the students, like Plaintiffs, who take out student loans that they must repay with interest. _See Milonas v. Williams_, 691 F.2d 931 (10th Cir. 1982) ("In the instant case, the state has so insinuated itself with the Provo Canyon School as to be considered a joint participant in the offending actions.").

Defendants' involvement in the injuries caused by NFBCUs supports a finding of state action for discrimination related injuries because: (1) Defendants provide billions in financial aid to NFBCUs, FAC ¶¶ 579-581; (2) Defendants derive profits from their relationship with NFBCU's and the injured Plaintiffs, in the form of repayment of interest-bearing student loans, FAC, Exs. A-GG; (3) Congress explicitly permitted the discrimination through legislation (_e.g._ TIXRE); (4) Defendants receive religious exemption requests from NFBCUs and respond by granting the requests, knowing that such responses will be used to justify discrimination against LGBTQ+ students, FAC ¶¶ 589-593; and (5) Defendants receive Title IX complaints from LGBTQ+ students against NFBCUs and dismiss such complaints on the basis of TIXRE, FAC ¶¶ 590-91.

While the acts of Plaintiffs' NFBCUs are sufficient for finding that Plaintiffs satisfy constitutional standing requirements, they are not necessary. As described above, Defendants direct actions (funding, facilitating and encouraging invidious discrimination) are sufficient to confer standing. The Court can favorably decide Plaintiffs' Motion based on Defendants' direct actions alone.

### d. <u>The Fundamental Right to Marry is Burdened.</u>

"Marriage [including same-sex marriage] is sacred to those who live by their religions and offers unique fulfillment to those who find meaning in the secular realm." *Obergefell*, 576 U.S. at 656-57; *see also* Swain Declaration (Dkt. 44), Exs. E-F (Plaintiffs' Religious Belief Declarations). The fundamental right to same-sex marriage is guaranteed by the Due Process Clause and the Equal Protection Clause. *Obergefell*, 576 U.S. at 668-675. Indeed, the Courts have repeatedly struck down laws that abridge the right to marry. *See, e.g., Loving v. Virginia*, 388 U.S. 1, 12 (1967) (invalidating interracial marriage bans under both the Due Process Clause and the Equal Protection Clause); *see also Driggs v. Comm'r of SSA*, No. CV-18-03915-PHX-DJH, at *12-13 (D. Ariz. May 29, 2020) (discussing unconstitutionality of discriminatory "barriers to same-sex marriage" even with "otherwise permissible results").

NFBCUs explicitly ban same-sex marriage and expel students for exercising their fundamental right to same-sex marriage. *See e.g.* FAC ¶¶ 109, 193, 264, 275636-37. TIXRE prevents Defendants and courts from providing a Title IX remedy for such discrimination.

### 2. *Plaintiffs Satisfy Traditional and Taxpayer Standing Requirements for the Establishment Clause and RFRA Claims.*

Plaintiffs satisfy standing for their Establishment Clause claim under the traditional requirements of standing through direct injury, and under the doctrine of taxpayer standing. *See*

*Sch. Dist. of Abington Twp.*, 374 U.S. 203, 224, n.9 ("It goes without saying that the laws and practices involved here can be challenged only by persons having standing to complain. But the requirements for standing to challenge state action under the Establishment Clause, unlike those relating to the Free Exercise Clause, do not include proof that particular religious freedoms are infringed. The parties here are school children and their parents, who are directly affected by the laws and practices against which their complaints are directed. These interests surely suffice to give the parties standing to complain.") (internal citations omitted).

In 1982, the ACLU and American Jewish Committee filed an amicus brief at the Supreme Court in *Bob Jones University v. United States*,[4] arguing that "it would be unconstitutional to except sectarian schools from the constitutionally mandated general policy of denying tax-exempt status to racially discriminatory schools." *Id*. Their brief explained that "Far from violating the Establishment Clause, as petitioners contend, the uniform application of the I.R.S. rule to all racially discriminatory schools -- including sectarian schools whose discrimination is based on religious beliefs -- is the only policy consistent with the Establishment Clause... Furthermore, a special exception for religiously-based discrimination would amount to special government financial assistance to religious institutions, a classic violation of the Establishment Clause." *Id*.

### a. *Taxpayer standing is established.*

The taxpayer standing doctrine is exceedingly narrow. However, Plaintiffs, as taxpayers, may challenge TIXRE as spending clause legislation that violates the Establishment Clause. *See Flast v. Cohen*, 392 U.S. 83, 88 (1968); *Valley Forge Christian College v. Americans for the Separation of Church and State*, 454 U.S. 464 (1982) (*Flast* taxpayer standing limited to

---

[4] *Goldsboro Christian Schools, Inc. v. United States of America*, 1982 WL 1044699 (1982).

challenges directed "only [at] exercises of congressional power" under the Taxing and Spending Clause.); *Hein v. Freedom From Religion Foundation*, 127 S. Ct. 2553 (2007) (requiring specific congressional enactment).

For purposes of the Establishment Clause, a plaintiff may have taxpayer standing to raise challenges to actions exceeding specific constitutional limitations (such as the Establishment Clause) taken by Congress under Article I's Taxing and Spending Clause. *See Hein v. Freedom From Religion Found., Inc.*, 551 U.S. 587, 593 (2007) ("[a] plaintiff asserting an Establishment Clause claim has standing to challenge a law authorizing the use of federal funds in a way that allegedly violates the establishment clause.").

Taxpayer standing has two prongs. First, the "taxpayer must establish a logical link between that status, and the type of legislative enactment attacked." *Hein v. Freedom From Religion Found., Inc.*, 551 U.S. 587, 602 (2007). This means that "a taxpayer will be a proper party to allege the unconstitutionality only of exercises of congressional power under the Taxing and Spending Clause of Art. 1, § 8 of the Constitution." *Id*. Second, "the taxpayer must establish a nexus between that status and the precise nature of the constitutional infringement alleged. Under this requirement, the taxpayer must show that the challenged enactment exceeds specific constitutional limitations imposed upon the exercise of the congressional taxing and spending power and not simply that the enactment is generally beyond the powers delegated to Congress by Art. I, § 8." *Id*.

Here, plaintiffs satisfy both prongs. First, the plaintiffs as taxpayers are challenging expenditures "funded by a specific congressional appropriation," and "which were dispersed… pursuant to a direct and unambiguous congressional mandate." *Hein*, 551 U.S. at 604. The Higher Education Act, which authorizes financial assistance to the educational institutions, and Title IX,

which regulates recipients of that financial assistance, are Spending Clause statutes. *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 181 (2005) ("Title IX was enacted as an exercise of Congress' powers under the Spending Clause"); *Litman v. George Mason University*, 5 F.Supp.2d 366 (E.D. Va. 1998) ("The language of Title IX, its legislative history, and analogous case law, demonstrate that Title IX was passed pursuant to Congress' powers under the Spending Clause.").

Plaintiffs also meet the second prong because the Establishment Clause creates a specific limitation on the exercise of Congress' taxing and spending power, which is exceeded by the religious exemption to Title IX. *See Norwood v. Harrison*, 413 U.S. at 469 ("The private school that closes its doors to defined groups of students on the basis of constitutionally suspect criteria manifests, by its own actions, that its educational processes are based on private belief that segregation is desirable in education. Such private bias is not barred by the Constitution, nor does it invoke any sanction of law, but neither can it call on the Constitution for material aid.")

### b. *TIXRE Exceeds Establishment Clause Boundaries.*

While pursuant to the Free Exercise Clause, Congress is permitted to create "non-discriminatory religious-practice exemptions," these are not "Constitutionally required" and Courts are to discern the "appropriate occasions" for their creation. See *Emp. Div., Dep't of Hum. Res. of Oregon v. Smith*, 494 U.S. 872, 890 (1990). However, these "non-discriminatory religious practice exemptions" are constitutionally prohibited from devolving into "an unlawful fostering of religion" in violation of the Establishment Clause. *See id.; Hobbie v. Unemployment Appeals Comm'n of Fla.*, 480 U.S. 136, 145 (1987).

A legislative religious accommodation is most appropriate where a law places an affirmative burden on a religious practice or belief. For example, a law restricting the wearing of hats could appropriately contain an exemption for individuals whose religion requires head

coverings. However, to the extent that an exemption does more than simply alleviate that burden, but instead grants license to harm, or encroach on the rights of others, it clearly surpasses the limits of the Establishment Clause. *See Texas Monthly, Inc. v. Bullock*, 489 U.S. 1, 15 (1989) (holding that a law granting special privileges to religious organizations is unconstitutional if it "is not required by the Free Exercise Clause and…either burdens nonbeneficiaries markedly or cannot reasonably be seen as removing a significant state-imposed deterrent to the free exercise of religion."); *see also Cutter v. Wilkinson*, 544 U.S. 709, 720 (2005) ("courts must take adequate account of the burdens a requested accommodation may impose on nonbeneficiaries").

Moreover, Title IX does not regulate purely private conduct. Rather, it regulates the conduct of those seeking government funding. Indeed, Title IX is a neutral and generally applicable law, which Congress implemented to (1) "avoid the use of federal resources to support discriminatory practices," and (2) to "provide individual citizens effective protection against those practices." *See Cannon v. University of Chicago,* 441 U.S. 677, 704 (1979). The legislative religious exemption alleviates no burdens, as a legislative condition on the receipt of federal funds which prohibits discrimination on the basis of sex, is neutral and generally applicable, and creates no burdens for any entity that wishes to receive taxpayer dollars to operate their educational programs and activities. Each entity, freely and independently, may determine whether or not they wish to accept the conditions and in return access taxpayer funds.

### c. *Traditional standing is established.*

Plaintiffs also satisfy non-taxpayer standing requirements for their Establishment Clause claim. "The concept of injury for standing purposes is particularly elusive in Establishment Clause cases. This is so because Establishment Clause injuries are often spiritual and value-laden, rather than tangible and economic." *Deal v. Mercer Cnty. Bd. of Educ.*, 911 F.3d 183, 186 (4th Cir. 2018).

As such, an Establishment Clause injury "may be shown in various ways." *Ariz. Christian Sch.*

*Tuition Org. v. Winn*, 563 U.S. 125, 129 (2011). When Congress creates a religious

accommodation that exceeds the scope required by the Free Exercise clause, and in its application

targets and burdens a discreet minority by endorsing and funding religiously motivated

discrimination, that accommodation has devolved into "an unlawful fostering of religion" *Hobbie*

*v. Unemployment Appeals Comm'n of Fla.*, 480 U.S. 136, 145 (1987). Here, Plaintiffs are the

victims of, or are in imminent risk of becoming victims of, Defendants' support and endorsement

of invidious discrimination and have thereby suffered Constitutional injuries. *See Spokeo, Inc. v.*

*Robins*, 136 S. Ct. 1540, 1548 (2016). ("[a]lthough tangible injuries are perhaps easier to

recognize, we have confirmed in many of our previous cases that intangible injuries can

nevertheless be concrete.").

### 3. *Standing for RFRA claim is established.*

Likewise, Plaintiffs satisfy standing requirements for RFRA for the reasons set forth above

under the Establishment Clause standing analysis. *Newdow v. Lefevre*, 598 F.3d 638, 646 (9th Cir.

2010) ("Standing to bring a RFRA challenge is 'governed by the general rules of standing under

article III of the Constitution,' 42 U.S.C. § 2000bb-1(c), so our standing analysis in this section

applies equally to [the] Establishment Clause and RFRA claims."). Plaintiffs also argue that there

can be no RFRA claim, as the exemption does not violate the Establishment Clause, however, as

demonstrated *supra* in Section III(B)(2)(b), the exemption clearly exceeds the play within the

joints between the Free Exercise and Establishment Clauses.

### 4. *5 U.S.C. § 702 Confers APA Standing.*

For the reasons described above and in Plaintiffs' other briefing, Plaintiffs satisfy standing

requirements for their APA claims as to Title IX regulations. *See* 5 U.S.C. § 702 ("A person

suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.").

Moreover, contrary to Defendants' assertion that "private suits against the schools provide an adequate alternative remedy", Dkt. 56, p. 3, a private suit against NFBCUs would be inadequate to remedy Plaintiffs' injuries sustained *from Defendants*. In a private suit between Plaintiffs and their educational institutions, this Court would not have jurisdiction over Defendants and could not compel Defendants' to cease their unconstitutional practices that are in violation of the APA. Indeed, a private suit against their NFBCU's would not provide a remedy against Defendants for the arbitrary and capricious expansion of TIXRE and unlawful regulatory changes. Thus, a private suit against NFBCUs would be inadequate for Plaintiffs' APA claim.

### 5. *Plaintiffs Satisfy Standing and have Alleged Sufficient Facts to Support their First Amendment Speech, Free Exercise, Assembly and Association Claims*

Title IX's religious exemption pressures Plaintiffs to alter their communications, expressive conduct, associations, and assemblies, and to acquiesce to the discriminatory practices of the universities that they attend in order to continue to receive federal funding for their education.

Plaintiffs suffer concrete harms in the deprivation of their constitutional rights, as they are not permitted to form LGBTQ+ support or advocacy groups at their universities, or to date or marry someone of the same sex, are prohibited from advocating for their equal rights, and are punished for advocating for equality on social media, on campus and off campus. FAC, Exs. A-GG. Additionally, Plaintiffs have alleged that in order to receive the benefits of the federally funded programs, they are coerced into signing statements regarding sexuality and gender identity that conflict with their religious beliefs and/or stigmatize their identities and relationships. *See* Dkt.

44, Swain Decl., Exs. E-F (Plaintiffs' Religious Beliefs Declarations). This compelled speech and expressive conduct violate Plaintiffs' Constitutional rights to freedom of speech and expression. Students "who are directly affected by the laws and practices against which their complaints are directed" have standing based on "a spiritual stake in First Amendment values." *Sch. Dist. of Abington Twp. v. Schempp*, 374 U.S. 203, 224, n.9.

These harms are directly traceable to the government, as to enjoy full benefits of the government programs, students must embrace these conditions on their speech rights. The effect of TIXRE signals to students that to appreciate full and equal status that their peers enjoy, they must adopt the language and conduct promoted by the religious universities attended. Plaintiffs are required to give up their advocacy for LGBTQ+ rights, abstaining from speech that might support causes contrary to the tenets of the religious organization, and feel compelled to adopt the religious beliefs instilled by the institution in order receive equal standing with their peers.

### 6. *Plaintiffs' Claims are Ripe*

First, any contention by Defendants that Plaintiffs' claims are unripe is misplaced. Dkt 56, pp. 12-13. To the contrary, Plaintiffs' claims are ripe for adjudication because they are suffering the dignitary harms right now. Defendants are currently funding, and profiting from, institutions that practice invidious discrimination. This is a current and ongoing harm, among the various other harms described throughout this motion. Moreover, claims are also sufficiently ripe for all the reasons set forth in Plaintiffs' Reply to Defendants' Opposition to Plaintiffs' Motion for a TRO (Dkt. 64, pp. 17-19). *See also Reg'l Rail Reorg. Act Cases*, 419 U.S. 102, 143 (1974) ("One does not have to await the consummation of threatened injury to obtain preventive relief."); *Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.").

## C.  PLAINTIFFS CLAIMS SHOULD NOT BE DISMISSED.

Plaintiffs have alleged sufficient facts to state a claim for relief on each of their claims that is plausible on its face. *See Am. Fuel & Petrochemical Mfrs. v. O'Keeffe*, 134 F. Supp. 3d 1270, 1276-77 (D. Or. 2015) (Aiken, J.).

### 1.  *Establishment Clause – First Amendment*

#### a.  <u>*TIXRE fails the Lemon test.*</u>

Defendants contend that TIXRE passes constitutional muster. Dkt. 56, p. 30. However, "[t]he establishment clause of the first amendment *requires* government neutrality with respect to religion." *NLRB v. Hanna Boys Ctr.*, 940 F.2d 1295, 1303 (9th Cir. 1991) (emphasis added).

Sponsorship and financial support are two of "the three main evils against which the Establishment Clause was intended to afford protection." *Lemon v. Kurtzman*, 403 U.S. 602, 612 (1971) (citing *Walz v. Tax Commission*, 397 U.S. 664, 668 (1970)). Specifically, a "statute or regulation will survive an Establishment Clause attack if (1) it has a secular legislative purpose, (2) its primary effect neither advances nor inhibits religion, and (3) it does not foster excessive government entanglement with religion." *Williams v. California*, 990 F. Supp. 2d 1009, 1022 (C.D. Cal. 2012) (citing *Lemon*, 403 U.S. at 612-13).

TIXRE fails each prong. "At some point, accommodation may devolve into 'an unlawful fostering of religion.'" *Corp. of Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327, 334-35 (1987) (quoting *Hobbie v. Unemployment Appeals Com.*, 480 U.S. 136, 145 (1987)). That is precisely the case here.

### i. TIXRE's Purpose of Facilitating Discrimination is Impermissible.

First, TIXRE has an impermissible purpose. "A government practice or statute fails the purpose prong of *Lemon* if its purpose is to endorse a religious custom or viewpoint." *Kreisner v. City of San Diego*, 1 F.3d 775, 782 (9th Cir. 1993). "Government endorsement of religion has been found when the government conveys or attempts to convey a message that a particular religion is favored or preferred, or when it promotes one religion or religious theory against another or even against the militant opposite." *Cammack v. Waihee*, 932 F.2d 765, 773 (9th Cir. 1991), *cert. denied*, 112 S. Ct. 3027 (1992). Defendants' sponsorship of invidious discrimination conveys a clear message: religion-based invidious discrimination against LGBTQ+ students is endorsed by the federal government.

Plaintiffs point to *Amos*, where a religious exemption was upheld, as demonstrating that Title IX's exemption should also pass Constitutional muster. It does not. *Amos* was in the context of a legislative burden placed on religious entities, while here there is no legislative burden, rather a neutral and generally applicable condition on eligibility for taxpayer funds. The two circumstances are inapposite.

In *Amos*, it was deemed to be a permissible legislative purpose to alleviate "significant governmental interference with the ability of religious organizations to define and carry out its mission" in the context of a Title VII, which placed hiring requirements on religious entities, even where such entities do not receive any federal funding. *Amos*, 483 U.S. at 329. The religious exemption at issue in *Amos* merely allowed religious employers to limit hiring to co-religionists. The exemption does not, however, permit religious employers to refuse to hire based on race or sex.

Here, however, there is no "significant governmental interference" with NFBCUs that needs to be remedied through a religious exemption, much less an extremely broad religious exemption like TIXRE. Unlike in *Amos*, Congress, through Title IX, has created no law interfering with NFBCUs' ability to define and carry out their missions. Instead, government has placed a neutral and generally applicable condition on funding that religious organizations are under no obligation to accept. Consequently, the exemption removes no governmental interference, and simply acts to advance and endorse a specific religious tenet, not shared by all religions, namely, that LGBTQ+ students are morally inferior and their identities and relationships are unworthy of equal protection. Thus, TIXRE fails the first prong of the *Lemon* test.

### ii. The Primary Effect of TIXRE is to Advance Religion

Second, the primary effect of TIXRE is advancing religion, sponsoring and financial supporting targeted discrimination on the basis of sex. The government advances religion "through its own activities and influence," including "sponsorship, financial support, and active involvement of the sovereign in religious activity." *See Amos*, 483 U.S. at 337. In *Amos*, the financial savings the religious entity might have attained by not being required to comply with employment statutes was not sufficient to advance religion. That is the polar opposite of the context here, where TIXRE's primary function is to ensure financial support for institutions who engage in a religious practice of discrimination on the basis of sex. TIXRE ensures that funds will continue to flow to these programs that are discriminating on the basis of sex, actively involving taxpayer funds in the perpetuation and promulgation of that religious practice.

### iii. TIXRE Inevitably Creates Excessive Entanglement

Third, TIXRE creates an inextricable and excessive entanglement between government and religion. Administrative agencies are charged with implementing the statute, but the statute itself requires a determination of when a universities' "religious tenets" would prohibit them from refraining from discriminating against students on the basis of sex. The DOE has at times simply allowed religious universities to determine when its application would be consistent with their religious tenets, and at other times has required them to request exemptions when they believed compliance would not be consistent with their religious tenets. The Defendants' contention that TIXRE "disentangles" government and religion is without basis, as evidenced by the hundreds of exemption letters and requests sent between government and religious institutions. FAC, ¶¶ 1, 61, 80, 130, 406, 579-610.

Moreover, in practice, NFBCUs define the extent of the religious exemption and, therefore, the extent of Plaintiffs' Title IX rights. This is not only entanglement, but it violates Constitutional non-delegation doctrines as articulated in Plaintiffs' Motion. Dkt. 44, pp. 28-29.

Even if TIXRE did satisfy the first two prongs of Lemon, the plain language of the statute inherently requires entanglement with religion by mandating that TIXRE apply "only to the extent that a particular application of Title IX would not be consistent with a specific tenet of the controlling religious organization." Dkt. 62, p. 22. Such requirement mandates investigation and consideration of LGBTQ+ students' complaints by examining religious entities' religious beliefs.

Thus, because TIXRE's purpose is to ensure the continuation of funding for religiously motivated discrimination, has the primary effect of advancing religion, and creates excessive entanglement between the government and religious institutions, it violates all three prongs of *Lemon*, and fails Constitutional muster.

## 2. Administrative Procedures Act – 5 U.S.C. § 706

### a. *The APA applies to students.*

Defendants contend the regulatory changes under the APA do not apply to Plaintiffs and instead "affect processes and standards that apply only to schools, as institutions." Dkt. 56, p. 3. This is entirely fallacious. Students of NFBCUs that invidiously discriminate against LGBTQ+ students with the funding and support of Defendants are *exactly* who is affected by regulatory changes. Processes and standards are inextricable from student impact. The August 2020 Final Rule empowered institutions to conceal their discriminatory practices from students. The November 2020 Final Rule expanded TIXRE to endanger more students. And both Rules together solidified Defendants' stamp of approval of invidious LGBTQ+ discrimination and further entangled the federal government's complicity with religious institutions discriminatory policies and practices. Undoubtedly, the APA regulatory changes affect (and harm) students.

### b. *Redressability is established.*

Defendants contend "Plaintiffs have not set forth allegations sufficient to show how a decision invalidating the regulatory changes would alter either the behavior of the educational institutions or the outcomes of discrimination complaints or Religious Exemption requests filed with ED under Title IX." Dkt. 56, p. 18. However, Plaintiffs have alleged that invalidating the regulatory changes would limit the scope of TIXRE and would reinstate many of the Plaintiffs' statutory rights and protections under Title IX because their institutions would no longer qualify for TIXRE. *See* FAC ¶¶ 672-697; *see also* Dkt. 44, Southwick Decl., Ex. R (Controlling Organizations) and Ex. Q (Exemption Chart). Plaintiffs would also retain notice and rights. *Id*.

### 3. *Substantive Due Process/Equal Protection – Fifth Amendment*

#### a. <u>Defendants injured Plaintiffs.</u>

Defendants content that they are not responsible for Plaintiffs' injuries, despite funding invidious discrimination. Dkt. 56, p. 19-21. For the reasons set forth above, Defendants are responsible for Plaintiffs' injuries.

#### b. <u>TIXRE's purpose is to empower sex discrimination.</u>

Defendants contend Plaintiffs' equal-protection claim should be dismissed because it lacks discriminatory intent. Dkt. 56, p. 25. However, Defendants argument is entirely misplaced because TIXRE is not facially neutral. Under *Arlington Heights*, "[p]roof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause" only where the claim is based solely on disparate impact, and the statute is not neutral on its face. *See Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 265 (1977). *See also Washington v. Davis*, 426 U.S. 229, 232 *(1976)* (Where a test was neutral on its face, statute required showing of discriminatory intent to sufficiently allege disparate impact).

By its very nature, the purpose of the exemption is to allow sex discrimination at federally funded educational institutions. The primary, if not exclusive, intent behind TIXRE is to allow sex discrimination. The classification is a sex classification because Title IX is a statute prohibiting sex discrimination. It is immaterial that Title IX prohibits sex discrimination against all sexes, genders, and sexual orientations. *See Latta v. Otter*, 771 F.3d 456, 484 (9th Cir. 2014) ("Under all these precedents, it is simply irrelevant that the same-sex marriage prohibitions privilege neither gender as a whole or on average. Laws that strip individuals of their rights or restrict personal choices or opportunities solely on the basis of the individuals' gender are sex discriminatory and must be subjected to intermediate scrutiny. Accordingly, I would hold that Idaho and Nevada's

same-sex marriage prohibitions facially classify on the basis of gender, and that the 'equal application' of these laws to men and women as a class does not remove them from intermediate scrutiny.").

Additionally, to the extent the Court evaluates Plaintiffs' claims under a disparate impact standard, a plaintiff asserting a disparate impact equal protection claim need not "prove that the challenged action rested solely on racially discriminatory purposes" or even that racial discrimination was "the 'dominant' or 'primary'" purpose. *Arlington Heights* 429 U.S. at 265. Rather, Plaintiffs need only show that discrimination was at least "a motivating factor" for the challenged order to prevail on their equal protection claim. *Id.* at 265-66.

Here, assuming *arguendo* that the TIXRE is facially neutral, Plaintiffs have sufficiently alleged that it is not neutral in its application or operation as Defendants have knowingly allowed and facilitated its use to target LGBTQ+ students. FAC, ¶¶ 1, 61, 80, 130, 406, 579-610.

### c. *TIXRE directly interferes with the fundamental right to marry and fails strict scrutiny.*

Defendants content that TIXRE survives intermediate scrutiny and that because TIXRE does not "directly" interfere with the fundamental right to marry, it should not be subject to strict scrutiny. Dkt. 56, p. 27, n. 8. However, TIXRE directly and substantially interferes with the fundamental right to marry, and therefore strict scrutiny should apply. TIXRE manifests as an absolute ban on same-sex marriage at NFBCUs. For example, Fuller Theological Seminary expelled Plaintiff Maxon for her same-sex marriage. FAC ¶ 322-23. Avowedly, NFBCUs ban same-sex marriage with absolute immunity because of TIXRE. It is a direct interference with the fundamental right to marry: students must choose between foregoing the benefit of receiving higher education or exercising the fundamental right. Moreover, for all the reasons set forth in

Plaintiffs Motion for TRO (Dkt. 44, pp. 29-33), TIXRE fails strict scrutiny (as well as intermediate scrutiny).

### d. *Defendants' financial support is government action.*

Defendants contend that Plaintiffs do not challenge any government action. Dkt. 56, p. 28-29. However, in addition to Defendants' violative *inaction and willful ignorance*, Plaintiffs have addressed Defendants' action, tacit approval, financial support, and violative collaboration throughout Plaintiffs' pleadings. FAC ¶¶ 579-593 (billions in funding, closure of Title IX complaints, issuance of exemption letters, etc.). "The government usually acts by spending money." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 843 (1995); *Bowen v. Kendrick*, 487 U.S. 589, 642 (1988) (Blackmun, J., dissenting) ("Public funds may not be used to endorse the religious message."). Thus, Defendants' violative conduct, among other things, is the financial support of invidious discrimination.

### 4. *Religious Freedom Restoration Act - 42 U.S.C. § 2000bb-1*

### a. *TIXRE is subject to, and violates, RFRA.*

Defendants contends TIXRE does not violate the Establishment Clause and therefore cannot be challenged under RFRA. Dkt. 56, p. 34. However, as explained above in Section III(B)(2)(b), TIXRE does violates the Establishment Clause and likewise violates RFRA. Defendants have already conceded that they "do not doubt that many of the Plaintiffs 'exercise their religious beliefs through how they love' and 'how they embrace and live out their sexuality and gender identity'" and that those beliefs are "being burdened." Dkt. 62, p. 33. However, Defendants' support and financial sponsorship of the invidious discrimination constitutes state action under RFRA. See Hall v. American Nat'l Red Cross, 86 F.3d 919, 921-22 (9th Cir. 1996) (applying First Amendment "state action" doctrine to analyze federal action under RFRA).

Defendants also contend that the analysis in *Village of Bensenville v. Federal Aviation Administration*, 457 F.3d 52 (D.C. Cir. 2006) should govern here. Dkt. 56, p. 35. That case is distinguishable though. The court stated: "The expansion plan for the airport, which is owned by the City, was prepared and will be implemented by the City, which is prepared to proceed without federal funds if necessary, and RFRA does not apply to burdens imposed by states or their subdivisions." *Vill. of Bensenville*, 372 U.S. App. D.C. at 411. To the contrary, here, the entire operation of NFBCUs' invidious discrimination is supported and funded by the federal government, not the states or their subdivisions. RFRA applies because the federal government's support and funding is far greater than mere acquiescence.

## IV.    CONCLUSION

For the reasons set forth above and in Plaintiffs' Motion for a TRO/PI (Dkt. 44), Plaintiffs' Reply to Defendants' Opposition to Plaintiffs' Motion for a TRO/PI (Dkt. 64), and Plaintiffs' Motion to Amend Motion for TRO/PI (Dkt. 75), Plaintiffs respectfully request this Court deny Defendants' Motion to Dismiss.

Date: August 27, 2021

s/ Paul Carlos Southwick

**Paul Carlos Southwick
(OSB 095141)
TRIAL ATTORNEY
Religious Exemption
Accountability Project
Paul Southwick Law, LLC**
8532 N. Ivanhoe St. #208,
Portland, OR 97203
Email: paul@paulsouthwick.com
Phone: 503-806-9517