CAROL FEDERIGHI
TX Bar No. 06872950
*Lead Counsel*
ELLIOTT M. DAVIS
NY Reg. No. 4596755

BRIAN M. BOYNTON
Acting Assistant Attorney General
CARLOTTA P. WELLS
Assistant Director
United States Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, DC  20044
Phone: (202) 514-4336
elliott.m.davis@usdoj.gov

*Attorneys for Defendants*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF OREGON
### EUGENE DIVISION

|  |  |
|---|---|
| ELIZABETH HUNTER, *et al.*,<br><br>           Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF EDUCATION, *et al.*,<br><br>           Defendants. | Civil Action No. 6:21–cv–00474–AA<br><br>**DEFENDANTS' REPLY IN FURTHER SUPPORT OF THEIR MOTION TO DISMISS** |

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................1

ARGUMENT ...............................................................................................................................1

I.      THIS CASE SHOULD BE TRANSFERRED TO THE PORTLAND DIVISION
        OR DISMISSED FOR LACK OF DIVISIONAL VENUE ................................................1

II.     PLAINTIFFS LACK STANDING AND THEIR CLAIMS ARE UNRIPE .........................3

        A.      Plaintiffs Lack Standing Based on a Stigmatic Injury ..........................................5

        B.      *Norwood* Does Not Support Plaintiffs' Standing ................................................7

        C.      Plaintiffs Lack Taxpayer Standing To Assert Their Establishment Clause
                Claim  ..................................................................................................................9

        D.      Plaintiffs Lack Standing To Bring Their APA Claims ........................................11

III.    PLAINTIFFS' FIRST, SECOND, THIRD, AND FIFTH CAUSES OF ACTION
        DO NOT STATE A CLAIM ............................................................................................14

        A.      Plaintiffs' First and Third Causes of Action Do Not State a Claim.............................14

                1.      Plaintiffs' Alleged Injuries Result from Private Action ....................................14

                2.      Plaintiffs Do Not State an Equal Protection Claim for Other
                        Independent Reasons ......................................................................................19

                3.      Plaintiffs Do Not State a Substantive Due Process Claim for Other
                        Independent Reasons ......................................................................................22

        B.      Plaintiffs' Second Cause of Action Does Not State a Claim..........................................23

                1.      The Religious Exemption Has a Plausible Secular Purpose.............................23

                2.      The Religious Exemption Does Not Advance Religion ...................................25

                3.      The Religious Exemption Does Not Excessively Entangle the
                        Government with Religion ..............................................................................26

        C.      Plaintiffs' Fifth Cause of Action Does Not State a Claim..........................................27

CONCLUSION...........................................................................................................................28

# TABLE OF AUTHORITIES

## Cases

*Access Fund v. U.S. Dep't of Agric.,*
499 F.3d 1036 (9th Cir. 2007).................................................................................................25

*Ali v. Carnegie Inst. of Wash.,*
967 F. Supp. 2d 1367 (D. Or. 2013) ........................................................................................3

*Allen v. Wright,*
468 U.S. 737 (1984)................................................................................................*passim*

*Am. Mfgs. Mut. Ins. Co. v. Sullivan,*
526 U.S. 40 (1999)..................................................................................................16

*Bell v. City of Kellogg,*
922 F.2d 1418 (9th Cir. 1991).................................................................................13

*Blum v. Yaretsky,*
457 U.S. 991 (1982)................................................................................................*passim*

*Bob Jones University v. Johnson,*
396 F. Supp. 597 (D.S.C. 1974)........................................................................... 7, 8

*Bostock v. Clayton Cnty.,*
140 S. Ct. 1731 (2020)............................................................................................7

*Brittain v. Hansen,*
451 F.3d 982 (9th Cir. 2006)..................................................................................22

*Brown v. Woodland Joint Unified Sch. Dist.,*
27 F.3d 1373 (9th Cir. 1994)..................................................................................26

*Burton v. Wilmington Parking Authority,*
365 U.S. 715 (1961)........................................................................................... 17, 18

*Cannon v. Univ. of Chicago,*
441 U.S. 677 (1979)................................................................................................20

*Clapper v. Amnesty Int'l USA,*
568 U.S. 398 (2013).................................................................................................4

*Corp. of the Presiding Bishop of the Church of Jesus Christ of
Latter-Day Saints v. Amos,*
483 U.S. 327 (1987) ......................................................................... 23, 24, 25, 26

*Darensburg v. Metro. Transp. Comm'n,*
No. C–05–01597, 2005 WL 2277031 (N.D. Cal. Sept. 19, 2005) .......................6

*DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*,
489 U.S. 189 (1989)............................................................................................22

*Ehlers-Renzi v. Connelly Sch. of the Holy Child, Inc.*,
224 F.3d 283 (4th Cir. 2000)..................................................................... 23, 25

*Espinoza v. Montana Dep't of Revenue*,
140 S. Ct. 2246 (2020).........................................................................................11

*Flast v. Cohen*,
392 U.S. 83 (1968) ....................................................................................... 10, 11

*Flemming v. Nestor*,
363 U.S. 603 (1960) ............................................................................................19

*Freedom From Religion Found., Inc. v. Nicholson*,
536 F.3d 730 (7th Cir. 2008) ...............................................................................9

*Fulton v. City of Philadelphia*,
141 S. Ct. 1868 (2021).........................................................................................7

*Gaylor v. Mnuchin*,
919 F.3d 420 (7th Cir. 2019) ......................................................................... 26, 27

*Gilmore v. City of Montgomery*,
417 U.S. 556 (1974)........................................................................................ 8, 9

*Guadalupe Police Officer's Ass'n v. City of Guadalupe*,
No. 10–cv–8061, 2011 WL 13217671 (C.D. Cal. Mar. 29, 2011) ....................4

*Hall v. American National Red Cross*,
86 F.3d 919 (9th Cir. 1996) .......................................................................... 27, 28

*Heckler v. Mathews*,
465 U.S. 728 (1984) ....................................................................................... 5, 6

*Hein v. Freedom From Religion Found., Inc.*,
551 U.S. 587 (2007) .................................................................................9, 10, 11

*Heineke v. Santa Clara Univ.*,
965 F.3d 1009 (9th Cir. 2020)............................................................................15

*Hendricks v. Bank of Am., N.A.*,
408 F.3d 1127 (9th Cir. 2005).............................................................................2

*In re Bozic*,
888 F.3d 1048 (9th Cir. 2018).............................................................................2

*Juliana v. United States,*
   217 F. Supp. 3d 1224 (D. Or. 2016) ..................................................................................22

*Kreisner v. City of San Diego,*
   1 F.3d 775 (9th Cir. 1993) ...................................................................................... 23, 24

*Latta v. Otter,*
   771 F. 3d 456 (9th Cir. 2014) .................................................................................. 19, 21

*Loving v. Virginia,*
   388 U.S. 1 (1967) ................................................................................................................21

*Lujan v. Defs. of Wildlife,*
   504 U.S. 555 (1992) ..............................................................................................................6

*Lynch v. Donnelly,*
   465 U.S. 668 (1984) ...........................................................................................................26

*Manhattan Cmty. Access Corp. v. Halleck,*
   139 S. Ct. 1921 (2019) .......................................................................................................15

*Mapes v. United States,*
   217 Ct. Cl. 115 (1978) ......................................................................................................22

*Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission,*
   138 S. Ct. 1719 (2018) .........................................................................................................8

*Mayweathers v. Newland,*
   314 F.3d 1062 (9th Cir. 2002) ................................................................................. 23, 24

*McLaughlin v. Florida,*
   379 U.S. 184 (1964) ...........................................................................................................17

*McLean v. Crabtree,*
   173 F.3d 1176 (9th Cir. 1999) ..........................................................................................19

*Milonas v. Williams,*
   691 F.2d 931 (10th Cir. 1982) ..........................................................................................18

*Nat'l Urban League v. Ross,*
   977 F.3d 698 (9th Cir. 2020) ..............................................................................................1

*Northeastern Florida Chapter of Associated General Contractors of America v. City of Jacksonville,*
   508 U.S. 656 (1993) ..............................................................................................................6

*Norwood v. Harrison,*
   413 U.S. 455 (1973) ....................................................................................................*passim*

*Nurre v. Whitehead,*
   580 F.3d 1087 (9th Cir. 2009)................................................................................26

*O'Bannon v. Town Court Nursing Ctr.,*
   447 U.S. 773 (1980)..............................................................................22, 23

*Obergefell v. Hodges,*
   576 U.S. 644 (2015)..........................................................................................21

*Parsons v. Del Norte Cnty.,*
   728 F.2d 1234 (9th Cir. 1984)...........................................................21, 22

*Pasadena Republican Club v. W. Justice Ctr.,*
   985 F.3d 1161 (9th Cir. 2021).............................................................................17

*Pro-Eco, Inc. v. Bd. of Comm'rs,*
   57 F.3d 505 (7th Cir. 1995)..................................................................................17

*Regan v. Taxation with Representation of Wash.,*
   461 U.S. 540 (1983)..........................................................................................25

*Rendell-Baker v. Kohn,*
   457 U.S. 830 (1982)..........................................................15, 16, 18, 27

*Robert S. v. Stetson Sch., Inc.,*
   256 F.3d 159 (3d Cir. 2001).................................................................................18

*Schlesinger v. Reservists Comm. To Stop the War,*
   418 U.S. 208 (1974)..........................................................................................13

*Simon v. E. Ky. Welfare Rights Org.,*
   426 U.S. 26 (1976)..............................................................................................4

*Sims v. Eyman,*
   405 F.2d 439 (1969)..........................................................................................16

*Spokeo, Inc. v. Robins,*
   136 S. Ct. 1540 (2016).................................................................................13, 14

*Summers v. Earth Island Inst.,*
   555 U.S. 488 (2009)..........................................................................................13

*Texas v. United States,*
   523 U.S. 296 (1998)............................................................................................3

*United States v. LSL Biotechnologies,*
   379 F.3d 679  (9th Cir. 2004)...............................................................................1

*United States v. Richardson*,
 418 U.S. 166 (1974) ................................................................................................ 10, 14

*United States v. Zannino*,
 895 F.2d 1 (1st Cir. 1990) ...................................................................................... 16, 21

*United States ex rel. Buonoraba v. Comm'r of Corr.*,
 316 F. Supp. 556 (S.D.N.Y. 1970) ............................................................................ 17

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*,
 454 U.S. 464 (1982) ...................................................................................................... 13

*Village of Bensenville v. FAA*,
 457 F.3d 52 (D.C. Cir. 2006) ...................................................................................... 27

*Walz v. Tax Commission of the City of New York*,
 397 U.S. 664 (1970) ...................................................................................................... 25

*Washington v. Davis*,
 426 U.S. 229 (1976) ...................................................................................................... 19

*Williams v. California*,
 764 F.3d 1002 (9th Cir. 2014) ................................................................................ 23, 26

## Statutes

5 U.S.C. § 702 .................................................................................................................... 5, 13

20 U.S.C. § 1681 ........................................................................................................... 7, 19, 24

28 U.S.C. § 1404 ..................................................................................................................... 3

28 U.S.C. § 1406(a) ................................................................................................................ 2

42 U.S.C. § 2000bb–1(a) ........................................................................................................ 7

42 U.S.C. § 2000bb–3(a) ........................................................................................................ 7

42 U.S.C. § 2000bb–4 ........................................................................................................... 27

Educational Amendments of 1972
 Pub. L. No. 92–318, 86 Stat. 235 (Jan. 18, 1972) .................................................. 20

## Rules

Fed. R. Civ. P. 12(h)(1) .......................................................................................................... 2

Civ. L.R. 3–2 ........................................................................................................................... 2

## <u>Other Authorities</u>

Paul C. Sweeney, *Abuse Misuse & Abrogation of the Use of Legislative History:*
*Title IX & Peer Sexual Harassment*, 66 UKMC L. Rev. 41, 67 (Fall 1997).................................................20

## INTRODUCTION

Defendants have explained that they do not condone the alleged actions that Plaintiffs attribute to their educational institutions. That said, this Court is not the correct forum for Plaintiffs to advocate for the elimination of Title IX's Religious Exemption. The role of the Judicial Branch "is to apply the laws that Congress passes and the executive branch enforces unless those laws violate the Constitution." *United States v. LSL Biotechnologies*, 379 F.3d 679, 679 (9th Cir. 2004); *see also Nat'l Urban League v. Ross*, 977 F.3d 698, 711 (9th Cir. 2020) (Bumatay, J., dissenting from denial of administrative stay) ("Congress makes laws, the Executive enforces them, and we interpret them in the course of adjudicating disputes. Absent the metaphorical 'striking down' of an unconstitutional statute, we are impotent to set aside congressionally enacted laws."), *stay granted*, 141 S. Ct. 18 (2020).

As explained in Defendants' opening brief and explained further below, the Religious Exemption passes constitutional muster. Only Congress can reconsider whether the Religious Exemption ought to remain intact. The Court, however, need not pass on the merits of Plaintiffs' legal claims because Plaintiffs lack standing and their claims are unripe, thus rendering subject-matter jurisdiction lacking. This action should be transferred to the Portland Division and then dismissed.

## ARGUMENT

## I.  THIS CASE SHOULD BE TRANSFERRED TO THE PORTLAND DIVISION OR DISMISSED FOR LACK OF DIVISIONAL VENUE

Defendants do not object to the Court's continuing to preside over this action. *See* Op. & Order, Doc. 88, at 7 n.2. But this action should not remain in the Eugene Division because divisional venue in this District exists only in the Portland Division.

Plaintiffs admit that "none of the named plaintiffs have attended" a college within the Eugene Division, Doc. 64 ("TRO–PI Reply") at 21, and they cite no case to support their proposition that their claims could encompass religious exemptions provided to a college that none of them attended. Indeed, under Plaintiffs' theory, if the only plaintiff were the lead plaintiff—a South Carolina resident

who attended a South Carolina college, *see* Doc. 35 ("FAC") ¶ 13—venue would still be proper in the District of Oregon and divisional venue would still be proper in the Eugene Division, because, in their view, that plaintiff's claims would encompass "each grant of a religious exemption at taxpayer-funded religious colleges and universities." TRO–PI Reply at 21. That is not the law. *See, e.g.*, *In re Bozic*, 888 F.3d 1048, 1053 (9th Cir. 2018) ("[I]n a class action, the 'events' in question are only those involving the named plaintiffs. . . . Otherwise, a nationwide class action could be transferred to any district in the country, thus abrogating the venue statute altogether.").[1]

Plaintiffs' waiver argument, *see* TRO–PI Reply at 22, is similarly unfounded. Defendants "did not waive [their] venue . . . defense[] because [they] raised [it] in a timely manner in [their] first responsive pleading"—their motion to dismiss. *Hendricks v. Bank of Am., N.A.*, 408 F.3d 1127, 1135 (9th Cir. 2005); *see also* Fed. R. Civ. P. 12(h)(1) (setting out when venue defenses are waived). Plaintiffs cite no authority for the proposition that venue is waived by noticing attorney appearances, participating in a Rule 26(f) conference, or "requesting to respond to" a TRO–PI motion, *see* TRO–PI Reply at 22, and they have not addressed (let alone distinguished) *Hendricks*, which Defendants raised in their TRO–PI opposition brief. *See* Doc. 62 at 6 n.1.[2]

Because divisional venue is not proper in the Eugene Division, the Court "shall dismiss, or if it be in the interest of justice, transfer such case to any . . . division in which it could have been brought." 28 U.S.C. § 1406(a). Though Defendants believe that transfer would be in the interest of justice, *see*

---

[1]    Unless expressly included, all citations, footnotes, and internal quotation and alteration marks have been omitted.

[2]    Plaintiffs have also argued that one of the proposed intervenors is a religious college based within the Eugene Division. *See* TRO–PI Reply at 21. Plaintiffs do not explain how divisional venue could properly be based on the location of a proposed intervenor—particularly a proposed intervenor whose intervention Plaintiffs oppose. *See* Mot. to Intervene, Doc. 8, at 2 ("Plaintiffs oppose this motion."); *see also* Civ. L.R. 3–2 (defining divisional venue).

Doc. 56 ("Mot.") at 9–11, Plaintiffs have argued against transfer.  *See* TRO–PI Reply at 22–23.[3]  And

the Court would be well within its discretion to dismiss this action for improper divisional venue.

After all, as explained in a case cited approvingly by Plaintiffs, *see id.*, "[d]ismissal" on venue grounds

"is appropriate when," as here, "the case was obviously or deliberately filed in the wrong court."  *Ali*

*v. Carnegie Inst. of Wash.*, 967 F. Supp. 2d 1367, 1392 (D. Or. 2013).  In all events, this action should

not remain in the Eugene Division, and therefore should either be transferred to the Portland Division

(and then dismissed for lack of standing and failure to state a claim), or dismissed outright for improper

divisional venue.

## II.    PLAINTIFFS LACK STANDING AND THEIR CLAIMS ARE UNRIPE

Plaintiffs do not directly dispute that, based on their allegations in the First Amended

Complaint, "[t]he lack of formalized agency decisions here" renders their claims unripe.  *See* Mot. at

12–15.[4]  And though Plaintiffs allege discrimination at the hands of their educational institutions, *see,*

*e.g.*, Doc. 86 ("Opp.") at 23–24, Plaintiffs have effectively acknowledged that their educational

---

[3]    Plaintiffs' convenience and conservation-of-resources arguments are off point as Defendants have not moved for a discretionary change of venue based on 28 U.S.C. § 1404.  To the extent that these arguments have any relevance, Plaintiffs have not explained how the Eugene Division is convenient or efficient for anyone, as none of the Plaintiffs reside in the Eugene Division, and Plaintiffs' four attorneys of record each list Portland office addresses.

[4]    Rather than mount a direct response to this argument, Plaintiffs instead refer the Court to their TRO–PI Reply, *see* Opp. at 24, in which they argued that their "alleged injuries are sufficiently ripe . . . because Plaintiffs have put forward [supposedly] uncontested evidence that Defendants have historically used TIXRE to dismiss Title IX complaints by LGBTQ+ students against NFBCUs, on every occasion, and that at least one [U.S. Department of Education, Office for Civil Rights ('OCR')] official currently processing Plaintiffs' complains [sic] has [allegedly] stated that the TIXRE issue could be decided any day now with respect to Plaintiff Mortimer."  TRO–PI Reply at 17–18.  The Court has already rejected this argument:  "Although it is possible OCR might dismiss some of the complaints under the religious exemption, the Court cannot, at this stage, find that OCR is likely to do so, as opposed to dismissing on any other grounds provided in the Case Processing Manual."  Op. & Order, Doc. 88, at 9–10; *see also Texas v. United States*, 523 U.S. 296, 300 (1998) ("A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all.").

institutions may "decide to forgo federal funding in the future to avoid compliance with Title IX," *id.* at 14, thus breaking the chain of causation between their alleged injuries and Defendants, and rendering purely speculative the ability of this Court to redress any such injuries.  *Cf.* Mot. at 17 ("Plaintiffs can only speculate that [their educational] institutions would alter their policies.").[5]  In similar circumstances, the Supreme Court has found traceability and redressability lacking.  *See Allen v. Wright*, 468 U.S. 737, 758 (1984) (no traceability where, *inter alia*, "it is entirely speculative . . . whether withdrawal of a tax exemption from any particular [racially discriminatory] school would lead the school to change its policies"); *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 43, 45–46 (1976) (finding "no substantial likelihood that victory in this suit would result in respondents' receiving the hospital treatment they desire" because "it is just as plausible that the hospitals to which respondents may apply for service would elect to forgo favorable tax treatment to avoid the undetermined financial drain of an increase in the level of uncompensated services").[6]

In an effort to avoid these jurisdictional hurdles, Plaintiffs principally argue that they are sustaining or have sustained a "stigmatic injury caused by Defendants' funding of educational programs that target LGBTQ+ youth for discrimination."  Opp. at 8; *see generally id.* at 8–16.  Plaintiffs also contend that they have standing based on *Norwood v. Harrison*, 413 U.S. 455 (1973), *see* Opp. at 10–11, 13–15; that they have standing to assert their Establishment Clause claim based on the

---

[5]    "An injunction or declaration cannot redress a past harm; only damages can."  *Guadalupe Police Officer's Ass'n v. City of Guadalupe*, No. 10–cv–8061, 2011 WL 13217671, at *4 (C.D. Cal. Mar. 29, 2011) (emphasis omitted).  And Plaintiffs do not dispute that they have "identif[ied] no applicable waiver of sovereign immunity that would afford them damages from the federal government."  Mot. at 18.

[6]    Plaintiffs argue that "the causation element of standing is relaxed" in this case.  Opp. at 13. To the contrary, the Supreme Court has explained that its "standing inquiry has been *especially rigorous* when reaching the merits of the dispute would force [the Court] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013) (emphasis added).  Plaintiffs' citation to *Norwood v. Harrison*, 413 U.S. 455 (1973), for the contrary position is unavailing.  *See infra* Part II.B.

taxpayer-standing doctrine, *see* Opp. at 18–20; and that 5 U.S.C. § 702 vests them with standing to assert their Administrative Procedure Act ("APA") claims, *see* Opp. at 22–23. Plaintiffs are incorrect on all fronts.[7]

### A.    Plaintiffs Lack Standing Based on a Stigmatic Injury

The Supreme Court has recognized—and Defendants agree—that "by perpetuating 'archaic and stereotypic notions' or by stigmatizing members of [a] disfavored group as 'innately inferior' and therefore as less worthy participants in the political community,' "discrimination itself . . . can cause serious non-economic injuries to those persons who are personally denied equal treatment solely because of their membership in a disfavored group." *Heckler v. Mathews*, 465 U.S. 728, 739–40 (1984). And "[t]here can be no doubt that this sort of noneconomic injury is one of the most serious consequences of discriminatory government action and is sufficient in some circumstances to support standing." *Allen*, 468 U.S. at 755.

As *Allen* indicates, standing based on stigmatic injury requires "discriminatory *government* action." *Id.* (emphasis added). Plaintiffs apparently agree. They acknowledge that "[t]he Supreme Court has long recognized that stigmatic injury is a serious consequence of discriminatory *government* action," Opp. at 9 (emphasis added), and note that "[t]he injury of a stigmatic harm stems from the *government's* perpetuation of 'archaic [and] stereotypic notions.'" *Id.* (quoting *Heckler*, 465 U.S. at 739–40). So when the *government* perpetuates archaic stereotypes that result in a denial of equal treatment, an affected person may have standing based on stigmatic injury. For this reason, "[c]ourts have found standing based on stigmatic injuries in suits challenging overt, facially discriminatory classifications, such as the gender-based classification in a pension offset exception to receipt of social security

---

[7]    Plaintiffs' standing section, *see* Opp. at 7–24, includes arguments that relate to merits questions, not standing. *See* Opp. at 16–17 (government-action doctrine); *id.* at 17 (burden on the right to marry). Defendants address these arguments below. *See infra* Parts III.A.1 & III.A.2.

benefits in *Heckler* and the race-based classification in a city ordinance providing preferential treatment in contracting to minority-owned businesses in *Northeastern Florida* [*Chapter of Associated General Contractors of America v. City of Jacksonville*, 508 U.S. 656 (1993)]." *Darensburg v. Metro. Transp. Comm'n*, No. C–05–01597, 2005 WL 2277031, at *4 (N.D. Cal. Sept. 19, 2005).

Here, in contrast, it is the alleged conduct of Plaintiffs' educational institutions—not the federal government—that stigmatizes Plaintiffs. As Defendants have previously explained, "[t]he Religious Exemption is facially neutral, there is no evidence of discriminatory intent, and the Religious Exemption does not classify students on any basis." TRO–PI Opp., Doc. 62, at 21 n.7. "The rationale holding that the stigma arising from overtly discriminatory schemes is a sufficiently concrete, actual injury to confer standing . . . is that the very classification by itself is inherently degrading." *Darensburg*, 2005 WL 2277031, at *4. Here, however, the Religious Exemption does not classify students, or any other complainants, on any basis.

Even assuming *arguendo* that Plaintiffs could demonstrate a stigmatic injury traced to Defendants, Plaintiffs still cannot establish that it is "'likely,' as opposed to merely 'speculative,' that the[ir] injury will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). Plaintiffs argue that their "stigmatic harms will be redressed by a finding of unconstitutionality, as funding will no longer be provided to institutions that discriminate against students on the basis of sex." Opp. at 14. But Plaintiffs do not explain how an injunction against Defendants' application of the Religious Exemption would result in the automatic termination of federal funding to their respective educational institutions. Even if the Religious Exemption were no longer in force, "OCR interprets its statutes and regulations consistent with the requirements of the First Amendment, and all actions taken by OCR must comport with First Amendment principles." U.S. Dep't of Educ., Off. for Civil Rights, Case Processing Manual, Doc. 50–23, § 109 (Aug. 26, 2020). And Plaintiffs cannot predict how any First Amendment issues that arise in the context of specific allegations might affect

OCR's enforcement of Title IX.  In fact, Plaintiffs appear to acknowledge in their TRO–PI motion that even if Defendants were enjoined from applying the Religious Exemption, the First Amendment might nonetheless preclude the relief that they seek.  *See* TRO–PI Mot., Doc. 44, at 10 ("Plaintiffs do not ask the Court to require a specific outcome for their Title IX complaints. . . .  Defendants will remain free to analyze and weigh *the constitutional rights at issue*, as well as the facts and other jurisdictional issues, to determine whether, in a given case, they will move forward with an investigation and resolution process.") (emphasis added).[8]  Moreover, Title IX is subject to the Religious Freedom Restoration Act ("RFRA"), which generally provides that the "[g]overnment shall not substantially burden a person's exercise of religion."  42 U.S.C. § 2000bb–1(a); *see also id.* § 2000bb–3(a); *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1754 (2020).  Plaintiffs cannot predict how OCR might apply RFRA in adjudicating any of their administrative complaints if Defendants were enjoined from enforcing the Religious Exemption.  For these reasons, Plaintiffs have not carried their burden of demonstrating that enjoining Defendants from applying the Religious Exemption would be likely to redress any stigmatic injuries.

### B.    *Norwood* Does Not Support Plaintiffs' Standing

Plaintiffs also argue that they "have standing to challenge government funding of educational institutions that openly and avowedly practice invidious discrimination against LGBTQ+ students," "pursuant to *Norwood, Bob Jones University* [*v. Johnson*, 396 F. Supp. 597 (D.S.C. 1974), *aff'd without opinion*,

---

[8]    Plaintiffs refer to Title IX as "a neutral and generally applicable" law.  *See* Opp. at 21, 26, 27. In doing so, they insinuate that, in the absence of the Religious Exemption, Title IX's application against religiously controlled educational institutions would not be subject to strict scrutiny under the Free Exercise Clause as "laws incidentally burdening religion are ordinarily not subject to strict scrutiny under the Free Exercise Clause so long as they are neutral and generally applicable."  *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1876 (2021).  The question of how Title IX would operate in the absence of the Religious Exemption is not before this Court.  That said, Plaintiffs' apparent position that Title IX without the Religious Exemption would be "generally applicable" is not necessarily correct. *Compare id.* at 1877 *with* 20 U.S.C. § 1681(a)(1)–(2), (4)–(9).

529 F.2d 514 (4th Cir. 1975) (table)], *Masterpiece Cakeshop*[*, Ltd. v. Colorado Civil Rights Commission*, 138 S. Ct. 1719 (2018)], and" other unmentioned "cases that give students standing to challenge government funding of invidious discrimination at their schools." Opp. at 10–11. Plaintiffs' position is incorrect.

As a threshold matter, *Bob Jones University* and *Masterpiece Cakeshop* do not concern standing doctrine at all. In *Bob Jones University*, the plaintiffs challenged the Veterans Administration's decision to "terminat[e] the right of eligible veterans seeking education at Bob Jones to receive veterans' benefits" because plaintiff Bob Jones University "failed to comply with Title VI of the Civil Rights Act of 1964 . . . and the VA regulations implementing the statute requiring non-discrimination in federally assisted programs." 396 F. Supp. at 598–99. And *Masterpiece Cakeshop* concerned an appeal from the Colorado Civil Rights Commission's determination that a bakery and its owner, which had refused to bake a custom wedding cake for a gay couple, violated Colorado's Anti-Discrimination Act and were thus subject to various equitable remedies. 138 S. Ct. at 1724–27. Neither of these cases supports Plaintiffs' standing here.

*Norwood* also does not support the broad standing proposition that Plaintiffs press. The *Norwood* plaintiffs were "parents of four schoolchildren in Tunica County, Mississippi" who challenged a Mississippi textbook lending program that "lent [textbooks] to students in both public and private schools, without reference to whether any participating private school ha[d] racially discriminatory policies." 413 U.S. at 456–57. *Norwood* does not stand for the proposition that students have "standing to challenge government funding of invidious discrimination at their schools." Opp. at 10–11. In fact, as the Supreme Court later explained, "[t]he [*Norwood*] Court did not expressly address the basis for the plaintiffs' standing." *Allen*, 468 U.S. at 763. "In *Gilmore* [*v. City of Montgomery*, 417 U.S. 556 (1974)], however, the Court identified the basis for standing in *Norwood*: 'The plaintiffs in *Norwood* were parties to a school desegregation order and the relief they sought was directly related to the

concrete injury they suffered.'"  *Allen*, 468 U.S. at 763 (quoting *Gilmore*, 417 U.S. at 570 n.10). "Through the school-desegregation decree, the [*Norwood*] plaintiffs had acquired a right to have the State 'steer clear' of any perpetuation of the racially dual school system that it had once sponsored." *Id.* (quoting *Norwood*, 413 U.S. at 467).  "The interest acquired [by the *Norwood* plaintiffs] was judicially cognizable because it was a personal interest, created by law, in having the State refrain from taking specific actions." *Id.*

Plaintiffs here are not akin to the *Norwood* plaintiffs.  Plaintiffs have not alleged that they are parties to anything resembling the school desegregation order in *Norwood*.  Instead, they are like the plaintiffs in *Allen* who also lacked standing to challenge alleged discriminatory conduct, in the sense that they "have no injunctive rights against the [Department of Education] that are allegedly being harmed by the challenged" Departmental conduct.  *Allen*, 468 U.S. at 763 (distinguishing *Norwood*). *Norwood* does not establish Plaintiffs' standing.

### C.    Plaintiffs Lack Taxpayer Standing To Assert Their Establishment Clause Claim

Plaintiffs do not have standing as taxpayers—a doctrine that they concede as being "exceedingly narrow"—to pursue their Establishment Clause claim.  *Contra* Opp. at 17–20.

Taxpayer standing is premised on the notion that taxpayers, "having paid lawfully collected taxes into the Federal Treasury at some point . . . have a continuing, legally cognizable interest in ensuring that those funds are not used by the Government in a way that violates the Constitution." *Hein v. Freedom From Religion Found., Inc.*, 551 U.S. 587, 599 (2007) (plurality opinion); *see also Freedom From Religion Found., Inc. v. Nicholson*, 536 F.3d 730, 738 n.11 (7th Cir. 2008) (*Hein*'s plurality opinion "is controlling because it expresses the narrowest position taken by the Justices who concurred in the judgment.").  The Supreme Court "ha[s] consistently held that this type of interest is too generalized and attenuated to support Article III standing."  *Hein*, 551 U.S. at 599.

In *Flast v. Cohen*, 392 U.S. 83 (1968), the Supreme Court "carved out a narrow exception to the general constitutional prohibition against taxpayer standing." *Hein*, 551 U.S. at 602. But in the decades since *Flast* was decided, "the *Flast* exception has largely been confined to its facts" and "[i]n effect," the Supreme Court "ha[s] 'limited the expansion of federal taxpayer and citizen standing in the absence of specific statutory authorization to an outer boundary drawn by the results in *Flast*.'" *Hein*, 551 U.S. at 609–10 (quoting *United States v. Richardson*, 418 U.S. 166, 196 (1974) (Powell, J., concurring)). In particular, the Supreme Court "ha[s] declined to lower the taxpayer standing bar in suits alleging violations of any constitutional provision apart from the Establishment Clause." *Id.* at 609.

Per *Hein*, the question whether Plaintiffs have established the narrow exception to the general prohibition against taxpayer standing turns on whether Plaintiffs are simply applying *Flast* to *Flast*-like facts, or whether, in actuality, they are seeking to extend *Flast* to new circumstances. *See Hein*, 551 U.S. at 614–15 (reversing the court of appeals, explaining: "The Court of Appeals did not apply *Flast*; it extended *Flast*."). Plaintiffs' Establishment Clause claim does not resemble the one in *Flast*. Accordingly, Plaintiffs lack standing as taxpayers to pursue their Establishment Clause claim.

As described by the controlling plurality decision in *Hein*, the *Flast* plaintiffs "challenged the distribution of federal funds to religious schools under the Elementary and Secondary Education Act of 1965, alleging that *such aid* violated the Establishment Clause." *Hein*, 551 U.S. at 602 (emphasis added). Although Plaintiffs argue in their opposition that they too "are challenging expenditures funded by a specific appropriation," pointing to the Higher Education Act, Opp. at 19, Plaintiffs in this lawsuit are *not* seeking to enjoin Higher Education Act funding to religious colleges, *see generally* FAC at 86–88 (prayer for relief), nor do they argue that federal funding of religious colleges violates

the Establishment Clause.[9]  Indeed, Plaintiffs do not even express any concerns with government funding of religious *seminaries* like Fuller Theological Seminary, *see* FAC ¶ 166—so long as those seminaries do not discriminate on the basis of sex.  Instead, they argue that the Religious Exemption is what violates the Establishment Clause.  *See id.* ¶¶ 647–657.  That is, rather than arguing that the Higher Education Act "aid" itself "violate[s] the Establishment Clause," *cf. Hein*, 551 U.S. at 602, Plaintiffs argue that Congress's legislative decision not to impose a particular funding condition constitutes the supposed Establishment Clause violation.  Plaintiffs point to no case affording taxpayer standing to a plaintiff who challenged the lack of a funding condition, rather than the actual use of the subject funds.  And since the rationale of the *Flast* exception is premised on the notion that taxpayers—in exceedingly limited circumstances—have an interest "in ensuring that . . . funds are not used by the Government in a way that violates the Constitution," *Hein*, 551 U.S. at 599, this case is not like *Flast*.  Accordingly, Plaintiffs provide no basis for the Court to extend the exceedingly narrow *Flast* exception to this new context.  *See Hein*, 551 U.S. at 614–15.

### D.    Plaintiffs Lack Standing To Bring Their APA Claims

In their opening brief, Defendants explained that Plaintiffs "have not specifically alleged that the regulatory changes" they challenge "have led or contributed to the alleged discriminatory harm they have experienced."  Mot. at 16.  And since Defendants filed their motion to dismiss, Plaintiffs have represented to the Court that "in the 50 years since Title IX was enacted, the DOE-OCR has never denied a claim to religious exemptions," TRO–PI Reply at 26—and that only further "undermin[es] any argument that the amended regulation has made it easier to qualify or changed the institutions eligible for an exemption," Mot. at 16.

---

[9]      Nor would any such argument be meritorious.  As Defendants have explained, "[t]he Supreme Court 'ha[s] repeatedly held that the Establishment Clause is not offended when religious observers and organizations benefit from neutral government programs.'"  TRO–PI Opp., Doc. 62, at 26 (quoting *Espinoza v. Montana Dep't of Revenue*, 140 S. Ct. 2246, 2254 (2020)).

Moreover, Plaintiffs' own evidentiary submissions prove that the Department of Education has historically recognized religious exemptions at educational institutions that, in Plaintiffs' view, are not controlled by religious organizations.  Plaintiffs contend that Baylor University, Bob Jones University, Cedarville University, Clark's Summit, College of the Ozarks, Colorado Christian University, Dordt University, Lee University, Liberty University, and Toccoa Falls College are not, in fact, controlled by religious organizations.  *See* Chart, Doc. 50–17.  But Plaintiffs have also submitted documents reflecting that the Department of Education has assured each of these institutions of certain religious exemptions before the amended regulation was promulgated.  *See, e.g.*, Doc. 50–1 at 3–5 (Baylor University); Doc. 50–2 at 5–7 (Bob Jones University); Doc. 50–4 at 5–6 (Cedarville); Doc. 50–5 at 3–5 (predecessor to Clark's Summit); Doc. 50–6 at 4–5 (College of the Ozarks); Doc. 50–7 at 9–11 (Colorado Christian University); Doc. 50–10 at 6–8 (Lee); Doc. 50–11 at 5–6 (Liberty University); Doc. 50–13 at 5–7 (Toccoa Falls College).  In short, Plaintiffs' own submissions contradict their position that the amended regulation has "expanded" the Religious Exemption in a manner that has injured them.  *Contra* Opp. at 29.

Plaintiffs also argue that the amended regulation has "empowered institutions to conceal their discriminatory practices from students."  Opp. at 29.  Yet Plaintiffs do not allege or argue that any of them were personally injured—or in any way affected—by any supposed concealment.  Indeed, Plaintiffs do not allege that any of their educational institutions have hidden their discriminatory conduct.  To the contrary, they repeatedly describe their educational institutions as "*avowedly* discriminatory."  *Id.* at 7, 8, 9, 11, 15 (emphasis added); *see also id.* at 11 ("Plaintiffs have standing to challenge government funding of educational institutions that *openly and avowedly* practice invidious discrimination . . . .") (emphasis added).  And Plaintiffs describe their putative class as "a class of more than 100,000 LGBTQ+ students who attend taxpayer-funded religious colleges and universities that *openly* discriminate against them in both policy and practice."  FAC ¶ 574 (emphasis added); *see also,*

*e.g.*, FAC ¶ 3 ("The religious exemption to Title IX, however, seemingly permits the Department to breach its duty as to the more than 100,000 sexual and gender minority students attending religious colleges and universities where discrimination on the basis of sexual orientation and gender identity is *codified* in campus policies and *openly practiced*.") (emphases added).

Rather than address any of these standing defects, Plaintiffs instead argue that "5 U.S.C. § 702 [c]onfers APA [s]tanding." Opp. at 22–23. It does not. Section 702 affords persons aggrieved by agency action a private cause of action; it does not—and cannot—confer Article III standing. "[I]t is settled that Congress cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547–48 (2016). And the Ninth Circuit has expressly rejected the proposition that 5 U.S.C. § 702 could vest a plaintiff with standing. *See Bell v. City of Kellogg*, 922 F.2d 1418, 1422 n.3 (9th Cir. 1991) ("For authority to challenge the Forest Service action, Bell . . . relies on 5 U.S.C. § 702. A citation to a statute creating a private cause of action is not enough to have standing to bring the action.").[10]

\*          \*          \*

"[I]f these Plaintiffs are not the proper party" to challenge the Religious Exemption, "who could be?" Plaintiffs ask rhetorically. Opp. at 4. But "[t]he assumption that if [certain plaintiffs] have no standing to sue, no one would have standing, is not a reason to find standing." *Schlesinger v. Reservists Comm. To Stop the War*, 418 U.S. 208, 227 (1974). Such a view "would convert standing into a requirement that must be observed only when satisfied." *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 489 (1982). In all events, "the absence of any particular

---

[10]    Plaintiffs also contend that they have sustained "procedural injuries," *e.g.*, Opp. at 14, but they do not explain what those injuries comprise. In all events, Plaintiffs cannot "allege a bare procedural violation, divorced from any concrete harm, and satisfy the injury-in-fact requirement of Article III." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1549 (2016); *see also Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009) ("[D]eprivation of a procedural right without some concrete interest that is affected by the deprivation . . . is insufficient to create Article III standing.").

individual or class to litigate these claims gives support to the argument that the subject matter is committed to the surveillance of Congress, and ultimately to the political process." *Richardson*, 418 U.S. at 179.

Rooted in Article III, standing doctrine "developed in our case law to ensure that federal courts do not exceed their authority as it has been traditionally understood" and "limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong." *Spokeo, Inc.*, 136 S. Ct. at 1547. As Plaintiffs have not carried their "burden of establishing" the necessary elements of standing, this action must be dismissed. *Id.*

## III. PLAINTIFFS' FIRST, SECOND, THIRD, AND FIFTH CAUSES OF ACTION DO NOT STATE A CLAIM

Plaintiffs' opposition underscores that they have not stated a constitutional or RFRA claim as a matter of law. Plaintiffs avoid any mention of the multiple, controlling Supreme Court and Ninth Circuit opinions that, as Defendants explained in their opening brief, mandate the dismissal of Plaintiffs' First and Third Causes of Action for lack of challengeable government action. Plaintiffs also argue that the Religious Exemption fails the *Lemon* test, but Supreme Court and Ninth Circuit precedent (as well as persuasive precedent from other Circuits) show that the Religious Exemption clears each of *Lemon*'s prongs. And Plaintiffs do not identify a single comparable religious exemption that was found to violate the Establishment Clause. Finally, Plaintiffs do not dispute that if their Establishment Clause claim is dismissed, their RFRA claim necessarily must be dismissed as well. But even if their Establishment Claim somehow survives, Plaintiffs' RFRA claim still should be dismissed for lack of challengeable government action.

### A. Plaintiffs' First and Third Causes of Action Do Not State a Claim

#### 1. *Plaintiffs' Alleged Injuries Result from Private Action*

In the first paragraph of their opposition brief, Plaintiffs challenge "Defendants' *funding* of invidious discrimination and *refusals to aid* LGBTQ+ students in need at taxpayer-funded educational

institutions." Opp. at 4 (emphasis added). But, as Defendants explained in their opening brief, "neither allegations of federal funding nor statutorily mandated 'inaction,' without more, suffices to transform private conduct into governmental conduct" subject to constitutional scrutiny. Mot. at 22; *see generally id.* at 19–25, 28–29. Plaintiffs do not grapple with any of the squarely-on-point Supreme Court and Ninth Circuit cases that Defendants discussed in their motion. As their First and Third Causes of Action assert First and Fifth Amendment challenges based on actions taken, not by the federal government, but by private religious colleges and universities, Plaintiffs' First and Third Causes of Action should be dismissed as a matter of law.

As to federal funding, the Supreme Court has made clear that a private entity's "receipt of public funds does not make [its] decisions acts of the State." *Rendell-Baker v. Kohn*, 457 U.S. 830, 840 (1982); *see also, e.g., Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1931–32 (2019) (allegation that "the government funds or subsidizes a private entity" "does not convert the private entity into a state actor"); *Blum v. Yaretsky*, 457 U.S. 991, 1011 (1982) (allegation "[t]hat programs undertaken by the [government] result in substantial funding of the activities of a private entity" does not "demonstrat[e] that the [government] is responsible for decisions made by the entity."); *Heineke v. Santa Clara Univ.*, 965 F.3d 1009, 1013 (9th Cir. 2020) ("Receipt of government funds is insufficient to convert a private university into a state actor, even where 'virtually all of the school's income is derived from government funding.'"). Plaintiffs do not address these cases, all of which control the outcome here.[11]

As to the supposed "refusal[] to aid LGBTQ+ students," Opp. at 4; *accord id.* at 32, Defendants explained "that 'legislative decision[s] not to intervene in' certain 'dispute[s]'—like the Religious

---

[11]    Plaintiffs argue that "Defendants' financial support is government action." Opp. at 32 (emphasis omitted). But that does not speak to the relevant question here: whether government funding suffices to transform the private conduct that is the source of their claims into challengeable government conduct.

Exemption here—do not transform private action into government action." Mot. at 23 (quoting *Am. Mfgs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 53–54 (1999)). Indeed, a government "normally can be held responsible for a private decision only when it has exercised *coercive power* or has provided *such significant encouragement*, either overt or covert, that the choice must in law be deemed to be that of the" government. *Blum*, 457 U.S. at 1004 (emphasis added). And the Supreme Court does "not tolerate the imposition of [constitutional] restraints on private action by the simple device of characterizing the [government's] inaction as 'authorization' or 'encouragement.'" *Am. Mfgs. Mut. Ins. Co.*, 526 U.S. at 54. Plaintiffs again acknowledge neither *Blum* nor *American Manufacturers*.

Plaintiffs instead principally rely on *Norwood*, which, in their view, controls the outcome here. *See* Opp. at 8, 9–10 & n.2, 15. Plaintiffs are incorrect. As explained above, *see supra* Part II.B, the Supreme Court has explained that *Norwood* was animated by the federal "school desegregation order" in Mississippi that Mississippi's textbook-lending program was undermining. *Allen*, 468 U.S. at 763; *see Norwood*, 413 U.S. at 467 ("[T]he constitutional infirmity of the Mississippi textbook program is that it significantly aids the organization and continuation of a separate system of private schools which, under the District Court holding, may discriminate if they so desire."). And to the extent that *Norwood* ever stood for the broader proposition that—outside of the context of maintaining state-sponsored segregation—all federal funding alone may suffice to attribute all private action to the government such that it may be subject to constitutional scrutiny, the Supreme Court has squarely rejected that premise in *Rendell-Baker* and *Blum*.[12]

---

[12]    As *Norwood* does not apply in this context, Plaintiffs' description of their educational institutions' alleged conduct as "invidious discrimination" does not alter the analysis. In all events, Plaintiffs neither define the term "invidious" nor analyze in what contexts religiously based discrimination may be considered invidious in nature. They have thus waived the argument. *See United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones."); *see also Sims v. Eyman*, 405 F.2d 439, 444 (1969) (defining "invidious discrimination" as "a classification which is arbitrary, irrational, and not reasonably related to a

Plaintiffs' passing citations to other government-action cases, *see, e.g.*, Opp. at 16, only further demonstrate that Plaintiffs have not alleged any challengeable government action here. *Burton v. Wilmington Parking Authority*, 365 U.S. 715 (1961), for example, emphasized that the Fourteenth Amendment's Equal Protection Clause "erects no shield against merely private conduct, however discriminatory or wrongful." *Id.* at 721. Nevertheless, the *Burton* Court held that a state agency was responsible for the discriminatory conduct of its private commercial lessee because—based on the "peculiar facts [and] circumstances present"—"[t]he State ha[d] so far insinuated itself into a position of interdependence with [the private lessee] that it must be recognized as a joint participant in the challenged activity." *Id.* at 725–26; *see, e.g., id.* at 723–24 ("[T]he commercially leased areas were not surplus state property, but constituted a physically and financially integral and, indeed, indispensable part of the State's plan to operate its project as a self-sustaining unit."). "In all," the Ninth Circuit recently explained, "*Burton* teaches us that 'substantial coordination' and 'significant financial integration' between the private party and government are hallmarks of a symbiotic relationship." *Pasadena Republican Club v. W. Justice Ctr.*, 985 F.3d 1161, 1168 (9th Cir. 2021), *petition for cert. filed*, No. 20–1773 (S. Ct. docketed June 23, 2021). "Heeding the Supreme Court's own instruction to limit *Burton*'s holding to 'the peculiar facts or circumstances present,'" the Ninth Circuit "ha[s] repeatedly distinguished *Burton* and declined to expand its applicability." *Id.* Rather, "[t]o apply the ruling in *Burton*, the private party's conduct of which the plaintiff complains must be inextricably intertwined with that of the government." *Id.* at 1164.

In stark contrast to *Burton*, the federal funding and congressionally mandated "inaction" to which Plaintiffs point, *see* Opp. at 16, do not render the federal government "inextricably intertwined"

---

legitimate purpose") (citing *McLaughlin v. Florida*, 379 U.S. 184, 191 (1964)), *judgment vacated in part on other grounds*, 408 U.S. 934 (1972); *accord, e.g., Pro-Eco, Inc. v. Bd. of Comm'rs*, 57 F.3d 505, 514 (7th Cir. 1995); *United States ex rel. Buonoraba v. Comm'r of Corr.*, 316 F. Supp. 556, 564 (S.D.N.Y. 1970).

with Plaintiffs' religious colleges.  *See also Blum*, 457 U.S. at 1011 ("[P]rivately owned enterprises providing services that the State would not necessarily provide, even though they are extensively regulated, do not fall within the ambit of *Burton*."); *Rendell-Baker*, 457 U.S. at 843 ("Here the school's fiscal relationship with the State is not different from that of many contractors performing services for the government.  No symbiotic relationship such as existed in *Burton* exists here.").

Plaintiffs' citation to *Milonas v. Williams*, 691 F.2d 931 (10th Cir. 1982), *see* Opp. at 16, is similarly off-point.  The private school in *Milonas* was "not a school in the traditional, ordinary or classic sense."  *Milonas*, 691 F.2d at 935.  It was "also a correctional and detention facility" and a "mental health facility" where students were "restricted to the grounds," "confined," and "hunted down" if they "le[ft] without permission."  *Id*.  Critically, "[m]any of the members of the class were placed at the school involuntarily by juvenile courts and other state agencies."  *Id*. at 940.  Based in part on these facts, the *Milonas* court concluded that "the state ha[d] so insinuated itself with the [school] as to be considered a joint participant in the offending actions."  *Id*.  Plaintiffs allege no comparable federal action here.[13]

In short, Plaintiffs' First and Third Causes of Action are foreclosed by the government-action doctrine, as set forth in the very cases with which Plaintiffs have declined to engage.

---

[13]    The *Milonas* court mentioned significant state funding of tuition, and that the school had also entered into contracts with various school districts.  *See Milonas*, 691 F.2d at 940.  But as then-Judge Alito explained in discussing *Milonas*, "[t]he *Milonas* court's reliance on 'significant state funding of tuition' and the detailed contracts between the school and local school districts appears to us to be squarely inconsistent with *Rendell-Baker*."  *Robert S. v. Stetson Sch., Inc.*, 256 F.3d 159, 168 (3d Cir. 2001) (Alito, J.); *see also id*. ("*Milonas* is not binding on us, and we cannot agree entirely with the court's reasoning."); *id*. at 168 n.10 (noting "tension" between *Milonas* and other Supreme Court precedent).

      2.      *Plaintiffs Do Not State an Equal Protection Claim for Other Independent Reasons*

Even assuming *arguendo* that Defendants may be held liable for private actions notwithstanding these cases, Plaintiffs' equal-protection claim should be dismissed for two additional, independent reasons.

*First*, Plaintiffs have not at all demonstrated—let alone with the requisite "clearest proof," *Flemming v. Nestor*, 363 U.S. 603, 617 (1960) (Harlan, J.)—that the Religious Exemption was enacted with the discriminatory intent or purpose necessary to sustain an equal-protection claim. *See generally* Mot. at 25–27. Plaintiffs argue that the Religious Exemption "is not facially neutral," Opp. at 30, but that proposition is demonstrably incorrect. The Religious Exemption does not, for example, state that it applies only to Title IX complaints filed by LGBTQI+ students. Rather, it applies to educational institutions controlled by a religious organization, and only to the extent that the application of Title IX "would not be consistent with the religious tenets of such organization." 20 U.S.C. § 1681(a)(3). The Religious Exemption is thus neutral on its face.[14]

To be sure, it is possible that the Religious Exemption may result in a disparate impact on LGBTQI+ students. But disparate impact alone does not suffice to trigger an equal-protection claim. Rather, in challenging facially neutral laws, "[p]roof of discriminatory intent is required to show that state action having a disparate impact violates the Equal Protection Clause." *McLean v. Crabtree*, 173 F.3d 1176, 1185 (9th Cir. 1999); *see Washington v. Davis*, 426 U.S. 229, 242 (1976) ("Disproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious racial discrimination forbidden

---

[14]      For support, Plaintiffs cite an excerpt of Judge Berzon's concurring opinion in *Latta v. Otter*, 771 F. 3d 456 (9th Cir. 2014). Judge Berzon concluded that Idaho's and Nevada's prohibitions on gay and lesbian couples' marriages "facially classif[ied] on the basis of sex" because they provided that "[o]nly women may marry men, and only men may marry women." *Id.* at 480 (Berzon, J., concurring). That reasoning has no bearing on the Religious Exemption, which does not classify complainants in any way.

by the Constitution.  Standing alone, it does not trigger the rule that racial classifications are to be subjected to the strictest scrutiny and are justifiable only by the weightiest of considerations.").

In an effort to demonstrate discriminatory intent, Plaintiffs simply argue (without support or citation) that "[t]he primary, if not exclusive, intent behind [the Religious Exemption] is to allow sex discrimination."  Opp. at 30.  But the Religious Exemption has been part and parcel of Title IX—a statute passed to *prohibit* sex discrimination—since it was enacted in 1972.  *See* Educational Amendments of 1972, Pub. L. No. 92–318, § 901(a)(3), 86 Stat. 235, 373 (1972).  After all, before Title IX (with its various provisions including the Religious Exemption) was enacted, recipients of federal funding were not necessarily required to refrain from sex discrimination in educational programs or activities.  It is far more accurate to state that, as Congress moved in 1972 to generally prohibit "the use of federal resources to support [sex-based] discriminatory practices," *Cannon v. Univ. of Chicago*, 441 U.S. 677, 704 (1979), it left undisturbed the status quo in certain limited circumstances, including those encompassed by the Religious Exemption.

Certainly, Plaintiffs point to no actual evidence that the Religious Exemption was born out of some congressional desire to encourage sex discrimination at religiously controlled educational institutions.  To the contrary, Title IX's drafting history indicates that the Religious Exemption was the product of a legislative compromise.  *See* Paul C. Sweeney, *Abuse Misuse & Abrogation of the Use of Legislative History: Title IX & Peer Sexual Harassment*, 66 UKMC L. Rev. 41, 67 (Fall 1997).  The Senate and House versions of Title IX differed in that the House version included the "Erlenborn Amendment," which "restricted the coverage of Title IX to graduate institutions."  *Id.*  At conference, the House agreed to recede from the Erlenborn Amendment, and the Senate "agreed to insert [various] special exceptions," including certain exemptions for military institutions, traditionally single-sex institutions, and religiously controlled educational institutions.  *Id.*  Simply put, nothing in Title IX's drafting history suggests that the Religious Exemption was enacted as part of some congressional

intent or purpose to, as Plaintiffs put it, "empower sex discrimination." *Contra* Opp. at 30 (emphasis omitted).

 *Second*, even assuming *arguendo* that Plaintiffs could plausibly plead a discriminatory intent or purpose, Defendants have explained:  (i) that equal-protection claims based on sexual orientation or gender identity call for the application of intermediate scrutiny,[15] and (ii) the Religious Exemption satisfies intermediate scrutiny.  *See generally* Mot. at 27–28.  Plaintiffs simply state that the Religious Exemption fails intermediate scrutiny, *see* Opp. at 31–32, but they do not explain why or offer any legal analysis to support that proposition, and have thus waived the point.  *Cf. Zannino*, 895 F.2d at 17.

 Nor does Plaintiffs' argument that strict scrutiny applies, *see* Opp. at 17 & 31, fare any better. Pointing to *Obergefell v. Hodges*, 576 U.S. 644 (2015) and *Loving v. Virginia*, 388 U.S. 1 (1967), Plaintiffs argue that the Religious Exemption similarly burdens the fundamental right to marriage and is thus subject to strict scrutiny.  *See* Opp. at 17 & 31.  Plaintiffs' comparison does not hold.  *Obergefell* concerned state laws "that define[d] marriage as a union between one man and one woman," 576 U.S. at 653–54, which thus directly burdened state recognition of gay and lesbian couples' marriages.  *Loving* concerned "a comprehensive statutory scheme aimed at prohibiting and punishing interracial marriages," 388 U.S. at 4, which thus directly burdened interracial marriage.  In contrast, the Religious Exemption can—at most—be said to burden marriage *indirectly* (in that its application may permit some subset of religiously controlled educational institutions to privately burden marriage in certain contexts without running afoul of Title IX), and "[a] regulation does not become subject to strict scrutiny as involving a suspect class merely because in some way it touches upon the incidents of marriage."  *Parsons v. Del Norte Cnty.*, 728 F.2d 1234, 1237 (9th Cir. 1984) (per curiam); *see* Mot. at 27 n.8.  Were the converse true, all manner of federal laws that indirectly burden marriage (and whose

---

[15] Plaintiffs apparently agree.  *See* Opp. at 30 ("'sex discriminatory'" laws "'must be subjected to intermediate scrutiny'") (quoting *Latta*, 771 F.3d at 484 (Berzon, J., concurring)).

impact is less indirect than that of the Religious Exemption) would be subject to strict scrutiny.  But that is not the law.  *See, e.g.*, *Mapes v. United States*, 217 Ct. Cl. 115, 123–24 (1978) (federal tax system's "marriage penalty" is not subject to strict scrutiny even though it "might in fact dissuade some couples from entering into matrimony") (cited approvingly in *Parsons*, 728 F.2d at 1237).[16]

       3.       *Plaintiffs Do Not State a Substantive Due Process Claim for Other Independent Reasons*

Plaintiffs do not dispute that:  (i) "to establish a substantive due process claim," they "must show," among other things, "a *government* deprivation of life, liberty, or property," *Brittain v. Hansen*, 451 F.3d 982, 991 (9th Cir. 2006) (emphasis added); (ii) "the due process provision of the Fifth Amendment does not apply to the indirect adverse effects of governmental action," *O'Bannon v. Town Court Nursing Ctr.*, 447 U.S. 773, 789 (1980); and (iii) "the Due Process Clause" generally "does not impose on the government an affirmative obligation to act, even when 'such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual,'" *Juliana v. United States*, 217 F. Supp. 3d 1224, 1250–51 (D. Or. 2016) (Aiken, J.) (quoting *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 196 (1989)), *rev'd and remanded on other grounds*, 947 F.3d 1159 (9th Cir. 2020);[17] *see generally* Mot. at 28–29.

In response, Plaintiffs simply point to allegations regarding what they characterize as "inaction," Opp. at 32—that is, Congress's legislative decision that Defendants should not intervene in certain disputes pursuant to the Religious Exemption, which legislatively mandated non-intervention may manifest through the "closure of Title IX complaints" and "issuance of exemption letters."  *Id.*  The only affirmative action to which Plaintiffs point is Defendants' "financial support" to religious colleges

---

[16]     Plaintiffs contend that the Religious Exemption does not survive strict-scrutiny review.  *See* Opp. at 31–32.  Because the Religious Exemption is, at most, subject to intermediate scrutiny, Defendants have no occasion here to opine on whether the Religious Exemption would or would not satisfy strict-scrutiny review in any particular context.

[17]     As Defendants explained, this general proposition is subject to two limited exceptions.  *See* Mot. at 29 n.10.  Plaintiffs do not argue that either of these limited exceptions applies here.

and universities. *Id.* But Defendants' funding of religious colleges does not directly deprive Plaintiffs of life, liberty, or property. And, again, Plaintiffs cannot sustain a Fifth Amendment claim based on "the indirect adverse effects of governmental action." *O'Bannon*, 447 U.S. at 789.

**B.    Plaintiffs' Second Cause of Action Does Not State a Claim**

Plaintiffs agree that their Establishment Clause claim requires them to demonstrate that the Religious Exemption fails "the three-pronged test articulated in *Lemon v. Kurtzman*." *Williams v. California*, 764 F.3d 1002, 1013–14 (9th Cir. 2014); *see* Opp. at 25–28 (arguing that the Religious Exemption fails the *Lemon* test). Plaintiffs do not demonstrate that the Religious Exemption fails even one of *Lemon*'s prongs. Accordingly, Plaintiffs' Establishment Clause claim should be dismissed.

*1.    The Religious Exemption Has a Plausible Secular Purpose*

Plaintiffs do not dispute that: (i) "[a] practice will stumble on the [secular] purpose prong only if it is motivated *wholly* by an impermissible purpose," *Kreisner v. City of San Diego*, 1 F.3d 775, 782 (9th Cir. 1993) (emphasis added); (ii) courts "must be reluctant to attribute unconstitutional motives to government actors in the face of a plausible secular purpose," *id.*; (iii) the secular-purpose prong constitutes a "fairly low hurdle," *Ehlers-Renzi v. Connelly Sch. of the Holy Child, Inc.*, 224 F.3d 283, 288 (4th Cir. 2000); and (iv) "it is a permissible legislative purpose to alleviate significant governmental interference with the ability of religious organizations to define and carry out their religious missions," *Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327, 335 (1987). *Compare* Mot. at 31 *with* Opp. at 26–27. Plaintiffs do not demonstrate that the Religious Exemption was motivated by any impermissible purpose—let alone that Congress was "wholly" motivated by such an impermissible purpose. And the Court should not attribute to Congress any unsupported unconstitutional motives, especially in light of the fact that the Supreme Court has recognized that alleviating governmental interference with religion constitutes a secular purpose. *See Amos*, 483 U.S. at 335; *see also Mayweathers v. Newland*, 314 F.3d 1062, 1068 (9th Cir. 2002) (Religious

Land Use and Institutionalized Persons Act of 2000 "intends a secular legislative purpose:  to protect the exercise of religion in institutions from unwarranted and substantial infringement.").

Plaintiffs' arguments to the contrary do not hold.  Defendants agree that a statute fails the secular-purpose prong "if its purpose is to endorse a religious custom or viewpoint." *Kreisner*, 1 F.3d at 781.  But the Religious Exemption does not single out any particular religion or religious belief for favoritism.  It does not exempt, say, only educational institutions affiliated with the Roman Catholic Church.  Rather, the Religious Exemption is available equally to all educational institutions controlled by religious organizations to the extent that Title IX's application would not be consistent with a controlling organization's religious tenets.  20 U.S.C. § 1681(a)(3).  And a religious exemption does not necessarily signal endorsement of exempted organizations' religious practices.  For instance, the Supreme Court declined to hold in *Amos* that the application of Title VII's religious exemption in that case constituted governmental endorsement of The Church of Jesus Christ of Latter-day Saints.

Plaintiffs also argue that "there is no 'significant governmental interference' . . . that needs to be remedied through a religious exemption" because "religious organizations are under no obligation to accept" federal funding.  Opp. at 27.  But this argument simply reduces to a policy disagreement with Congress's legislative decision to provide funding to religiously controlled educational institutions while also affording them a limited exemption from Title IX where application of Title IX would not be consistent with the controlling organization's religious tenets.  That Congress might not have "need[ed]" to proceed down that path, *see id.*, does nothing to alter the conclusion that the Religious Exemption has a plausible secular purpose.

Simply put, by "protect[ing] the exercise of religion in institutions from unwarranted and substantial infringement" by the government, the Religious Exemption has "a secular legislative purpose." *Mayweathers*, 314 F.3d at 1068; *accord Amos*, 483 U.S. at 335.

2.    *The Religious Exemption Does Not Advance Religion*

Plaintiffs argue that "the primary effect of [the Religious Exemption] is advancing religion, sponsoring and financial supporting [sic] targeted discrimination on the basis of sex." Opp. at 27. But Congress's legislative decision that the Executive Branch should not intercede in certain disputes pursuant to the Religious Exemption does not constitute impermissible governmental advancement of religion. *See Amos*, 483 U.S. at 337 ("A law is not unconstitutional simply because it *allows* churches to advance religion, which is their very purpose. For a law to have forbidden 'effects' under *Lemon*, it must be fair to say that the *government itself* has advanced religion through its own activities and influence.") (emphasis in original). And "[t]hat a group of religious practitioners benefits in part from the government's policy does not establish endorsement." *Access Fund v. U.S. Dep't of Agric.*, 499 F.3d 1036, 1045 (9th Cir. 2007).

Plaintiffs' position that the Religious Exemption impermissibly advances religion because it does not interfere with the flow of "taxpayer funds in the perpetuation and promulgation of [certain] religious practice[s]," Opp. at 27, is undercut by the Supreme Court's decision upholding a property-tax exemption for religious organizations in *Walz v. Tax Commission of the City of New York*, 397 U.S. 664, 672 (1970) ("The legislative purpose of a property tax exemption is neither the advancement nor the inhibition of religion.") *cf. Regan v. Taxation with Representation of Wash.*, 461 U.S. 540, 544 (1983) (a tax exemption is "a form of subsidy that is administered through the tax system"). And Plaintiffs do not address, let alone distinguish, *Ehlers-Renzi*, which explains that "[a]ny advancement of religion that follows" a government's "elimination of an otherwise applicable requirement" "would be the result of the religious schools' own acts in light of the exemption"—and *not* the government's own advancement of religion. 224 F.3d at 291.

3.       *The Religious Exemption Does Not Excessively Entangle the Government with Religion*

Plaintiffs argue that the Religious Exemption impermissibly entangles the government with religion, pointing to "the hundreds of exemption letters and requests sent between government and religious institutions" and Defendants' "investigation and consideration of LGBTQ+ students' complaints by examining religious entities' religious beliefs." Opp. at 28. But "[t]he Establishment Clause does not prohibit all entanglements." *Nurre v. Whitehead*, 580 F.3d 1087, 1097 (9th Cir. 2009). After all, "[e]ntanglement is a question of kind and degree." *Lynch v. Donnelly*, 465 U.S. 668, 684 (1984). The Establishment Clause prohibits only "excessive" entanglements, *Nurre*, 580 F.3d at 1097, which are those that "require[] 'sustained and detailed' interaction between church and State for enforcement of statutory or administrative standards." *Williams*, 764 F.3d at 1015–16.

Plaintiffs do not explain how Defendants' consideration of exemption requests could be considered an impermissible "sustained and detailed" interaction. To the contrary, responding to an educational institution's request for assurance of an exemption is a "one-time review" of a religion-based exemption request, which "clearly does not cause the [government] to become entangled with religion." *Brown v. Woodland Joint Unified Sch. Dist.*, 27 F.3d 1373, 1384 (9th Cir. 1994); *accord Nurre*, 580 F.3d at 1097–98.

Though Plaintiffs contend that the Religious Exemption is entangling because it requires comparing Title IX complaints with an organization's religious tenets, Opp. at 28, the alternative that Plaintiffs envision—investigating religiously controlled educational institutions based on religiously motivated conduct, *cf.* TRO–PI Mot. at 10, "weigh[ing] the constitutional rights at issue," *id.*, and monitoring those institutions' compliance with Title IX, *see* FAC at 88 ¶ E—would be significantly more entangling. As in *Amos*, the Religious Exemption effectuates a "more complete separation of" church and State, and thus satisfies *Lemon*'s entanglement prong. 483 U.S. at 339; *see also Gaylor v.*

Defs.' Reply in Further Supp.
of their Mot. to Dismiss

26

*Mnuchin*, 919 F.3d 420, 434 (7th Cir. 2019) (though "some level of church-state interaction is unavoidable," "[t]he alternative" to the religious exemption would be "more entangling").

### C.    Plaintiffs' Fifth Cause of Action Does Not State a Claim

Plaintiffs do not dispute that if the Religious Exemption is permissible under the Establishment Clause, their RFRA claim must be dismissed. *See* 42 U.S.C. § 2000bb–4; Mot. at 34. As Plaintiffs' Establishment Clause claim should be dismissed, *see* Mot. at 29–34; *supra* Part III.B, their RFRA claim should be dismissed as well.

Plaintiffs also acknowledge that a RFRA claim must challenge government action, not private action. *Compare* Mot. at 34–35 *with* Opp. at 32. And as Defendants have explained, *see* Mot. at 19–25, *supra* Part III.A.1, the conduct that Plaintiffs challenge is private in nature. Plaintiffs' inability to distinguish *Village of Bensenville v. FAA*, 457 F.3d 52 (D.C. Cir. 2006), *see* Opp. at 33, proves this point. Just as the federal government's approval of, and agreement to fund, Chicago's plans to expand O'Hare International Airport did not render the federal government liable under RFRA for Chicago's actions, *see Vill. of Bensenville*, 457 F.3d at 57–59, so too here, the federal government's funding of private religious colleges and Congress's legislative decision that the Executive Branch should not intercede in certain disputes pursuant to the Religious Exemption does not render the federal government liable under RFRA for the actions of those private religious colleges.[18]

Plaintiffs' reference to *Hall v. American National Red Cross*, 86 F.3d 919 (9th Cir. 1996), *see* Opp. at 32, only further proves this point. In *Hall*, the plaintiff alleged that the Red Cross discriminated against him on the basis of religion and filed a RFRA claim against the Red Cross. Citing *Blum*, the Ninth Circuit *declined* the plaintiff's invitation to deem the Red Cross a government actor subject to

---

[18]    Plaintiffs argue that *Village of Bensenville* is distinguishable because Chicago was "prepared to proceed without federal funds if necessary." 457 F.3d at 57. But the D.C. Circuit itself made clear that "[t]he receipt of public funds, even of 'virtually all' of an entity's funding, is not sufficient to fairly attribute the entity's actions to the government." *Id.* at 64 (quoting *Rendell-Baker*, 457 U.S. at 840–41).

RFRA based on federal funding: "Hall does not allege that the government coerced or encouraged the Red Cross not to certify him. Absent such participation or coercion, Hall has not established the requisite federal action even if, as Hall alleges, the HIV/AIDS education program is at least partially government funded." *Hall*, 86 F.3d at 922 (citing, *inter alia*, *Blum*, 457 U.S. at 1010–11). So too here, Plaintiffs "ha[ve] not established the requisite federal action" notwithstanding the fact that their educational institutions are "at least partially government funded." *Cf. id.*

## CONCLUSION

This action should be transferred to the Portland Division and then dismissed.


DATED:  September 17, 2021                    Respectfully submitted,


                                             BRIAN M. BOYNTON
                                             Acting Assistant Attorney General

                                             CARLOTTA P. WELLS
                                             Assistant Director, Federal Programs Branch

                                             /s/ Elliott M. Davis
                                             CAROL FEDERIGHI, TX Bar No. 06872950
                                             *Lead Counsel*
                                             ELLIOTT M. DAVIS, NY Reg. No. 4596755
                                             United States Department of Justice
                                             Civil Division, Federal Programs Branch
                                             P.O. Box 883
                                             Washington, DC  20044
                                             Phone: (202) 514-4336
                                             elliott.m.davis@usdoj.gov


                                             *Attorneys for Defendants*