Shawn M. Lindsay, OSB #020695
shawn@hbclawyers.com
Harris Berne Christensen LLP
15350 SW Sequoia Parkway, Suite 250
Portland, OR 97224
Telephone: (503) 968-1475

AUSTIN KNUDSEN
Montana Attorney General
DAVID M.S. DEWHIRST
  *Solicitor General*
CHRISTIAN B. CORRIGAN*
  *Assistant Solicitor General*
Montana Department of Justice
215 North Sanders
P.O. Box 201401
Helena, MT 59620-1401
406-444-2707
David.Dewhirst@mt.gov
Christian.Corrigan@mt.gov
*Pro hac vice*

Attorneys for Amicus Curiae

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| ELIZABETH HUNTER, et al., | Case No. 6:21-cv-00474-AA |
| *Plaintiffs*, | |
| v. | **AMICUS CURIAE BRIEF OF MONTANA AND THIRTEEN OTHER STATES IN SUPPORT OF DEFENDANTS AND PROPOSED DEFENDANT-INTERVENORS** |
| U.S. DEPARTMENT OF EDUCATION, et al., | |
| *Defendants*, | |
| WESTERN BAPTIST COLLEGE d/b/a CORBAN UNIVERSITY, et al., | |
| *[Proposed] Defendant-Intervenors.* | |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...........................................................II

INTEREST OF AMICI ............................................................... 1

INTRODUCTION ...................................................................... 1

ARGUMENT ............................................................................ 4

I.    Religious Education is Protected by the First Amendment ............................. 4

    A.    The Framers Vigorously Protected Religious Independence and
Freedom of Conscience ................................................... 4

    B.    Religious Institutions Have Played a Key Role in Education
Since the Founding ........................................................ 5

    C.    The Church Autonomy Doctrine Protects Religious Education ............. 8

    D. The Coreligionist Exemption Applies to All Activities of Religious
Schools ................................................................. 11

II.    Denying Religious Schools the Title IX Religious Exemption Violates the
First Amendment ................................................................ 12

    A.    The First Amendment Requires This Court to Broadly Construe
the Control Test .......................................................... 13

    B.    Non-discrimination Provisions Do Not Trump First Amendment
Freedoms ............................................................... 16

        1.    Applying Title IX to Religious Schools Does Not Survive Strict
Scrutiny ............................................................. 17

        2.    Schools' Religious Liberty Claims are Bolstered by Freedom of
Association .......................................................... 23

    C.    The Spending Clause Does Not Limit the First Amendment
Rights of Religious Schools .............................................. 25

CONCLUSION........................................................................ 28

CERTIFICATE OF COMPLIANCE..................................................... 30

## TABLE OF AUTHORITIES

### CASES

*Bostock v. Clayton County,*
140 S. Ct. 1731 (2020) ............................................................................ 20, 21, 28

*Bouldin v. Alexander,*
82 U.S. 131 (1872) ............................................................................................ 13

*Bowen v. Kendrick,*
487 U.S. 589 (1988) ......................................................................................... 12

*Boy Scouts of America v. Dale,*
530 U.S. 640 (2000) ............................................................................... 3, 23, 24

*Cf. Burwell v. Hobby Lobby Stores, Inc.,*
573 U.S. 682 (2014) ......................................................................................... 14

*Church of Lukumi Babalu Aye v. City of Hialeah,*
508 U.S. 520 (1993) .............................................................................. 5, 16, 17

*Connick v. Myers,*
461 U.S. 138 (1983) ......................................................................................... 28

*Corporation of Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos,*
483 U.S. 327 (1987) .............................................................................. 11, 12, 22

*EEOC v. Mississippi Coll.,*
626 F.2d 477 (5th Cir. 1980) ........................................................................... 11

*Emp't Div. v. Smith,*
494 U.S. 872 (1990) ................................................................................... 17, 23

*Everson v. Board of Education,*
330 U.S. 1, 64 (1947) .................................................................................... 5, 26

*Frazee v. Ill. Dep't of Emp't Sec.,*
489 U.S. 829 (1989) ......................................................................................... 15

*Fulton v. City of Phila.,*
141 S. Ct. 1868 (2021) ............................................................................ passim

*Gebser v. Lago Vista Indep. Sch. Dist.,*
524 U.S. 274 (1998) ......................................................................................... 20

*Hall v. Baptist Mem'l Health Care Corp.*,
   215 F.3d 618 (6th Cir. 2000) ......................................................... 11, 12

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*,
   565 U.S. 171 (2012) ..................................................................... passim

*Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*, 515 U.S. 557
   (1995) ......................................................................................... 3, 24

*Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church*,
   344 U.S. 94 (1952) ............................................................................ 8

*Kennedy v. St. Joseph's Ministries, Inc.*,
   657 F.3d 189 (4th Cir. 2011) ........................................................... 11

*Larson v. Valente*,
   456 U.S. 228 (1982) ..................................................................... 2, 14

*Little v. Wuerl*,
   929 F.2d 944 (3d Cir. 1991) ............................................................. 11

*Maxon v. Fuller Theological Seminary*, No. 2:19-cv-09969-CBM-MRW,
   2020 U.S. Dist. LEXIS 202309, (C.D. Cal. Oct. 7, 2020)..................... 14

*McGowan v. Maryland*,
   366 U.S. 420 (1961) .......................................................................... 5

*Mitchell v. Helms*,
   530 U.S. 793 (2000) .......................................................................... 7

*NLRB v. Catholic Bishop of Chi.*,
   440 U.S. 490 (1979) ........................................................................ 11

*Obergefell v. Hodges*,
   576 U.S. 644 (2015) ................................................................... passim

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
   140 S. Ct. 2049 (2020) .............................................................. passim

Perry v. Sindermann,
   408 U.S. 593 (1972) ........................................................................ 28

*Roberts v. United States Jaycees*,
   468 U.S. 609 (1984) ........................................................................ 23

*Serbian Eastern Orthodox Diocese v. Milivojevich*,
   426 U.S. 696 (1976) ................................................................... passim

*Sherbert v. Verner,*
    374 U. S. 398 (1963) ................................................................................ 17

*Thomas v. Review Bd. of Indiana Employment Security Division*
    450 U.S. 707 (1981) ................................................................................ 27

*Trinity Lutheran Church of Columbia, Inc. v. Comer,*
    137 S. Ct. 2012 (2017) .................................................................. 3, 26, 27

*United States v. Virginia,*
    518 U.S. 515 (1996) .......................................................................... 19, 20

*Watson v. Jones,*
    80 U.S. 679 (1871) ......................................................................... passim

*West Virginia Bd. of Ed. v. Barnette,*
    319 U.S. 624 (1943) ................................................................................ 24

*Widmar v. Vincent,*
    454 U.S. 263 (1981), ......................................................................... 15, 16

*Wisconsin v. Yoder,*
    406 U.S. 205 (1972) ............................................................................ 3, 16

*Witt v. Dep't of the Air Force,*
    527 F.3d 806 (9th Cir. 2008) ................................................................ 19

*Zummo v. Zummo,*
    574 A.2d 1130 (Pa. 1990) ....................................................................... 5

## FEDERAL AUTHORITIES

United States Code
    20 U.S.C. § 1681 .......................................................................... 2, 13, 20
    20 U.S.C. § 1686 .................................................................................... 20
    42 U.S.C. § 2000 .................................................................................... 21

Code of Federal Regulations
    34 C.F.R. § 106.12 ................................................................................ 14
    34 C.F.R. § 106.32 ................................................................................ 20
    34 C.F.R. § 106.33 ................................................................................ 20

Federal Register
    85 Fed. Reg. 59916 ....................................................................... 14
    85 Fed. Reg. 59958 (Sept. 23, 2020)....................................................... 14

## OTHER AUTHORITIES

1 Annals of Cong. (1789)................................................................... 4

2 T. Hughes, History of the Society of Jesus in North America:
    Colonial and Federal (1917)…………………………………………………………10

4 W. Blackstone, Commentaries on the Laws of England (8th ed. 1778) ................. 9

Act of Uniformity, 1662, 14 Car. 2, ch. 4.. ................................................ 9

Baillyn, Bernard, *Education in the Forming of American Society* (1960)…………….6

Catechism of the Catholic Church, 2d ed., (1997) ..................................... 18

Dear College Letter: First Amendment, U.S. Dep't of Educ. Office for Civil Rights,
    July 28, 2003,......................................................................... 26

Madison, James, *Memorial and Remonstrance Against Religious Assessments*......... 5

Rousseau, Jean-Jacques, *The Social Contract* ........................................... 7

Maurice Cranston trans., Penguin ed., (1968) ........................................... 7

McConnell, Michael W., *Establishment and Disestablishment at the Founding, Part I: Establishment of Religion*,
    Wm. & Mary L. Rev. 2105....................................................... 5, 6, 7, 9

McConnell, Michael W., *Religion and Constitutional Rights: Why Is Religious Liberty the "First Freedom"?*,
    21 Cardozo L. Rev. 1243 (2000) ...................................................... 4, 7

Tocqueville, Alex D., *Democracy in America* 340,
    (Henry Reeve ed., 2002). ............................................................ 6

## INTEREST OF AMICI

Amici Curiae State of Montana, State of Alabama, State of Arizona, State of Arkansas, State of Indiana, State of Kansas, State of Kentucky, State of Louisiana, State of Mississippi, State of Nebraska, State of Oklahoma, State of South Carolina, State of Texas, and State of Utah (collectively "the States") seek to preserve religious liberty and protect the rights of conscience for their citizens and institutions of faith. The States are represented by their respective Attorneys General, who bear the duty and authority to represent the States in court.  Hundreds of higher education institutions across the country bear a religious imprint.  These schools contribute to the vibrant civic life of the States.  But to preserve their unique character and honor their religious tenets, they require exemption from Title IX.  The States support a broad application of this religious exemption—it protects these unique schools from religious-based discrimination and prevents the government from interfering in religious matters of theology, membership, and conduct.

## INTRODUCTION

The Framers of the Constitution and the Bill of Rights struck a perfect and necessary balance—vigorously protecting religious liberty and preventing the government from interfering with religious teachings, all while avoiding the fractious sectarian battles of the past.  Religious education has been an integral part of faith in America since the Founding, often shielding and nurturing minority beliefs from majoritarian coercion.

Christian institutions—like proposed Defendant-Intervenors—seek to educate the next generation of Christians in a way that comports with their religious tenets. Those tenets include Biblical teaching regarding sexual behavior and marriage. These institutions expect their students to affirm, agree, and adhere to these tenets. For this reason, religious schools have sought and long maintained a religious exemption from Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681 *et seq.* ("Title IX").

Plaintiffs' constitutional claims lack merit. Each claim runs afoul of well-settled religious and associational freedoms protected by the First Amendment. Denying religious schools an exemption would violate the church autonomy doctrine, which protects the right of "churches and other religious institutions to decide matters of faith and doctrine without government intrusion." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2060 (2020) (quotations omitted).

Title IX does not apply to schools that are "controlled by" religious organizations if the application of Title IX "would not be consistent with the religious tenets of such organization[s]." 20 U.S.C. § 1681(a)(3). To avoid discriminating against religious schools, § 1681(a)(3) (known as the "control test") must be interpreted broadly to accommodate all faiths and non-ecclesiastical religious structures. *See Our Lady*, 140 S. Ct. at 2063–64; *Larson v. Valente*, 456 U.S. 228 (1982). And just like churches, religious schools have a right to select their members, and exclude those who do not believe or abide by their tenets. *Serbian Eastern Orthodox Diocese v. Milivojevich*, 426 U.S. 696 (1976); *Watson v. Jones*, 80 U.S. 679 (1871). So the schools' religious

freedoms are therefore buttressed by their associational freedoms. *Boy Scouts of America v. Dale*, 530 U.S. 640 (2000); *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*, 515 U.S. 557 (1995).

Religious liberty must be respected, even when it conflicts with another important interest. *Fulton v. City of Phila.*, 141 S. Ct. 1868 (2021); *Wisconsin v. Yoder*, 406 U.S. 205 (1972). Non-discrimination laws are unquestionably important, but those interests are disserved (and grow markedly less compelling) when used as implements of discrimination against religious groups. And this is particularly true given the vast number of choices in higher education. No one *must* attend these institutions.

These cornerstone First Amendment protections apply regardless of whether a religious school participates in a government program. And simply accepting federal funds doesn't turn religious schools into state actors. No religious school should be forced to choose between its religious convictions and participating in widely available government programs. *See Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012 (2017). The counter-discrimination Plaintiffs peddle violates the First Amendment. If embraced by the Court, this narrow view of religious freedom would sharply curtail these institutions' positive contributions to our States and communities.

This Court should dismiss this case.

## ARGUMENT

### I.   Religious Education is Protected by the First Amendment

#### A.   The Framers Vigorously Protected Religious Independence and Freedom of Conscience

The Framers of the Bill of Rights understood that religious institutions must remain independent of official control and coercion.  Religious liberty in the First Amendment is therefore rooted in two distinct rationales.  First, religious liberty furthers a major end of liberal government by shielding the church from state power. Michael W. McConnell, *Religion and Constitutional Rights: Why Is Religious Liberty the "First Freedom"?*, 21 CARDOZO L. REV. 1243, 1247 (2000) [hereinafter "McConnell, *Religion and Constitutional Rights*"].  "If the state does not have power over the church, it follows that the power of the state is limited…. Such a conception of limits on the legitimate reach of the state is a necessary precondition to constitutionalism." *Id.*  Once government power is limited in that realm, it thus becomes possible to limit government authority in other spheres.  *See id.*

Second, the First Amendment's authors aimed to safeguard individual freedom of conscience.  *Id.* at 1251.  Freedom of conscience assures "each person is free to pursue the good life in the manner and season most agreeable to his or her conscience, which is the voice of God."  *Id.* at 1251–52; *see also Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 183–84 (2012) (citing 1 Annals of Cong. 730–31 (1789) (remarks of J. Madison) (noting that the Establishment Clause addressed the fear that "one sect might obtain a pre-eminence, or two combine together, and establish a religion to which they would compel others to conform")).  As Madison

wrote, "[t]he Religion then of every man must be left to the conviction and conscience of every man; and it is the right of every man to exercise it as these may dictate." *Everson v. Board of Education*, 330 U.S. 1, 64 (1947) (quoting James Madison, *Memorial and Remonstrance Against Religious Assessments* ¶1).

Freedom of conscience protects minority and disfavored religious views. *See McGowan v. Maryland*, 366 U.S. 420, 464 (1961) (Frankfurter, J., separate opinion) (Framers were "sensitive to the then recent history of those persecutions and impositions of civil disability with which sectarian majorities in virtually all of the Colonies had visited deviation in the matter of conscience"). "Indeed, it was historical instances of religious persecution and intolerance that gave concern to those who drafted the Free Exercise Clause." *Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 532 (1993) (quotations omitted). After hundreds of years of religious turmoil in England and the colonies, therefore, "[t]he sword of justice which had been bloodied in aid of religious oppression in Europe was sheathed by the First Amendment[.]" *Zummo v. Zummo*, 574 A.2d 1130, 1135 (Pa. 1990). With God—not the state—as the ultimate arbiter of religious disputes, the First Amendment fostered a pluralistic society where religious convictions and practices were insulated from government intrusion.

## B.    Religious Institutions Have Played a Key Role in Education Since the Founding

Religious schooling was largely indistinguishable from churches during the Founding era. In the colonial and early-Republic periods, most schools were taught or directed by local ministers. Michael W. McConnell, *Establishment and*

*Disestablishment at the Founding, Part I: Establishment of Religion*, 44 WM. & MARY L. REV. 2105 (2003), *supra*, at 2171.  Alexis De Tocqueville observed that "the greater part of education [in America] is entrusted to the clergy." McConnell, *Establishment and Disestablishment, supra*, at 2174 (*citing* ALEXIS DE TOCQUEVILLE, DEMOCRACY IN AMERICA 340 (Henry Reeve ed., 2002)).  In New England, "[t]he Puritan belief in every person's religious obligation to read and understand the Bible led to an early emphasis on education."  McConnell, *Establishment and Disestablishment, supra*, at 2172.  Even as some states began moving toward disestablishmentarianism in the early republic, "most schools in the United States were conducted under religious auspices."  *Id.* at 2173 (citing BERNARD BAILYN, EDUCATION IN THE FORMING OF AMERICAN SOCIETY (1960) (discussing the close connection between religion and education)).

According to Tocqueville, America's vibrant religious character in the nineteenth century—including its schools—was its moral anchor and preserved its free and democratic society.  He observed that our Republic's civic health depended upon voluntary associations and churches creating and maintaining private schools.  *See* TOCQUEVILLE, *supra*, at 756–60.  In Europe, activities like schooling that had formerly been administered by churches, guilds, and municipalities were being centralized under the national government.  *See id.* at 757–58.  This took "the child from the arms of his mother" and turned the child over to the "agents" of the national government—setting the table for soft despotism.  *See id.* at 758.  Independent control of education in America was key to maintaining our freedoms and national character.

*See* McConnell, *Religion and Constitutional Rights*, *supra*, at 1249 (discussing Rousseau's desire for a "new civil religion" that which would "'bind the hearts of the citizens to the State,' and would banish all citizens who refuse to conform." (quoting Jean-Jacques Rousseau, The Social Contract 179—81 (Maurice Cranston trans., Penguin ed., 1968) (1762)).

By the Civil War, northern and western states had established their own public or "common" schools.  McConnell, *Establishment and Disestablishment*, *supra*, at 2174. But the common school movement was really meant to assimilate Catholic and Jewish immigrants into nondenominational Protestantism.  *See* McConnell, *Religion and Constitutional Rights*, *supra*, at 2174.  "Catholic and Jewish schools sprang up because the common schools were not neutral on the matters of religion."  Faced with public schools that were culturally Protestant and with curricul[a] and textbooks that were, consequently, rife with material that Catholics and Jews found offensive, many Catholics and Orthodox Jews created separate schools."  *Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246, 2272 (2020) (Alito, J., concurring) (quotations omitted); *see also Mitchell v. Helms*, 530 U.S. 793, 828 (2000) (open secret that the use of "sectarian" in Blaine Amendments was a code-word for "Catholic").  As for the South, during Reconstruction "[m]ost of the schools for the former slaves … funded by Congress under the Freedman's Bureau Act, were run by Protestant missionary societies."  McConnell, *Establishment and Disestablishment*, *supra*, at 2174.

Religious schooling is wound tightly into our national fabric. These institutions have provided both refuge to religious minorities and the civic and academic training necessary for the maintenance of the republic.

### C. The Church Autonomy Doctrine Protects Religious Education

For 150 years, the Supreme Court has recognized that courts should not wade into religious disputes. *See Watson,* 80 U.S. at 733 (courts do not resolve matters "concern[ing] theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required of them"). The church autonomy doctrine prohibits civil court review of internal church disputes involving matters of faith, doctrine, church governance, and polity. *Our Lady*, 140 S. Ct. at 2060–61; *Serbian Eastern Orthodox Diocese,* 426 U.S. at 710; *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church*, 344 U.S. 94, 116–17 (1952).

One fundamental aspect of church autonomy is the prerogative to select those who play key roles. *Our Lady*, 140 S. Ct. at 2060 ("The independence of religious institutions in matters of faith and doctrine is closely linked to independence in … matters of church government.") (quotations and citations omitted). The "ministerial exception," prevents courts from wading into employment disputes involving certain important positions within churches and other religious institutions. *Id.* at 2060.

The ministerial exception's history and rationale show that church autonomy protections extend to religious schools' decisions related to student conduct. As the Court explained in *Our Lady*, "a church's independence on matters of faith and

doctrine requires the authority to select, supervise, and if necessary, remove a minister without interference by secular authorities." *Id.* at 2060 (quotations omitted). Without the ministerial exception, a church's leadership would be powerless to discipline or remove a wayward minister whose behavior violates the church's core beliefs. *Id.* at 2060–61 (citing McConnell, *Establishment and Disestablishment*, *supra*, at 2141 (politically appointed ministers in colonial Virginia were often "less than zealous in their spiritual responsibilities and less than irreproachable in their personal morals")).

The First Amendment must be understood as a response to the English Crown's pernicious meddling in ecclesiastical affairs. *See id.* at 2061. More specifically, *Our Lady* recognized that the Crown's interference in religious *educational* matters was a major factor underlying the Religion Clauses. *See id.* at 2061 ("British law continued to impose religious restrictions on education in the 18th century and past the time of the adoption of the First Amendment."). The Reformation Parliament, for example, enacted a law requiring "all schoolmasters, private tutors, and university professors" to "conforme to the Liturgy of the Church of England" and not "to endeavour any change or alteration of the church." *Id.* at 2061 (quoting Act of Uniformity, 1662, 14 Car. 2, ch. 4.). And Blackstone discussed an Eighteenth-Century law that forestalled Catholics from teaching by requiring schoolmasters and tutors to obtain licenses from Anglican bishops; the law similarly penalized those who sent others abroad to be educated in Catholicism. *Id.* 2061–62 (citing 4 W. Blackstone, Commentaries on the Laws of England 55–56 (8th ed. 1778)).

In the American colonies, similar religious restrictions on education persisted. A 1704 Maryland law "'prohibited any Catholic priest or lay person from keeping school, or taking upon himself the education of youth.'"  *Id.* at 2062 (quoting 2 HUGHES, HISTORY OF THE SOCIETY OF JESUS IN NORTH AMERICA: COLONIAL AND FEDERAL 443–44 (1917)). "In 1771, the Governor of New York was instructed to require that all schoolmasters arriving from England obtain a license from the Bishop of London." *Id.* (citing 3 C. LINCOLN, THE CONSTITUTIONAL HISTORY OF NEW YORK 485, 745 (1906)). From the beginning, therefore, there has existed a close connection between "ministers" and educators.

And that's why the rationale underpinning the ministerial exception applies with equal force not only to clergy but also to faculty *and* students at religious schools. These schools require the ability to select, supervise, and remove individuals who do not comport with their beliefs. *See Our Lady*, 140 S. Ct. at 2060. Without that prerogative, religious schools would be forced to matriculate nonconforming members and thereby submit to official dictates contrary to the schools' conceptions of faith and orthodoxy. *See id.* at 2060–61; *Milivojevich*, 426 U.S. at 713–14.

These church autonomy doctrine principles apply to religious schools for the simple reason that they must. These schools—like churches—operate, by design, according to the dictates of religious principle. If the exception may extend no further than the pulpit, it is a hollow protection indeed.

### D. The Coreligionist Exemption Applies to All Activities of Religious Schools

The First Amendment protects activities of religious organizations from the burden of government interference with those organizations' missions. *See Corporation of Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327, 336 (1987). To that end, the "coreligionist exemption" to Title VII allows religious nonprofits to establish faith-based employment rules for all employees—regardless of the role they play in the organization. Religious institutions are permitted to only hire "coreligionists"—those who agree with their teachings and do not seek to change their theology. The Courts have consistently applied the coreligionist exemption to religious schools and this Court should do so here. *See NLRB v. Catholic Bishop of Chi.*, 440 U.S. 490, 502 (1979) (barring the NLRB from exercising jurisdiction over religious schools where the "challenged actions were mandated by their religious creeds"); *Hall v. Baptist Mem'l Health Care Corp.*, 215 F.3d 618, 622–23 (6th Cir. 2000) (rejecting a suit by an employee of a religious college who was terminated by the school after disclosing she was a lesbian ordained by an LGBT-friendly church and declining to accept a different position); *Little v. Wuerl*, 929 F.2d 944, 951 (3d Cir. 1991) (upholding Catholic school's right not to renew a teacher's contract after she divorced and remarried); *Kennedy v. St. Joseph's Ministries, Inc.*, 657 F.3d 189, 195 (4th Cir. 2011) (upholding Catholic facility's right to dismiss a nursing assistant for donning Church-of-the-Brethren attire that conflicted with the facility's religious principles); *EEOC v. Mississippi Coll.*, 626 F.2d 477, 485 (5th Cir. 1980) (barring sex-

discrimination probe involving a professor denied a full-time position at a religious college).

The coreligionist exemption recognizes that restricting religious organizations' ability to employ those aligned with their mission burdens their religious exercise, even when those employees do not engage in expressly religious activity.  *See Amos*, 483 U.S. at 336.  And, even the provision of "secular" social services and charitable works that do not involve "explicitly religious content" and are not "designed to inculcate the views of a particular religious faith," *Bowen v. Kendrick*, 487 U.S. 589, 621 (1988), may still be "religiously inspired," *id*., and play an important part in the "furtherance of an organization's religious mission." *Amos*, 483 U.S. at 342 (Brennan, J., concurring).

Courts cannot "dictate to religious institutions how to carry out their religious missions or how to enforce their religious practices."  *Hall*, 215 F.3d at 626.  First Amendment protections are not confined to the employment law context and neither is the reasoning of the coreligionist cases.  Similar protections—rooted in the First Amendment—protect the religious schools here.

## II.    Denying Religious Schools the Title IX Religious Exemption Violates the First Amendment

The First Amendment broadly protects the right of religious schools to teach students in a manner that conforms with their religious beliefs, regardless of organizational structure or whether the students are training to become clergy.  *See Hosanna-Tabor*, 565 U.S. at 189 (First Amendment gives "special solicitude to the rights of religious organizations"); *Our Lady*, 140 S. Ct. at 2060–61.  Because religious

schools are themselves religious organizations, "[t]he First Amendment ensures that … [they] are given proper protection as they seek to teach the principles that are so fulfilling and so central to their lives and faiths, and to their own deep aspirations to continue the family structure they have long revered." *Obergefell v. Hodges,* 576 U.S. 644, 679–80 (2015). Churches may, under the First Amendment, select and govern their ministers and members pursuant to their religious precepts; so too with religious schools and their students. *See Hosanna-Tabor*, 565 U.S. at 185–86 ("whenever the questions of discipline, or of faith, or ecclesiastical rule, custom, or law have been decided by the highest of [the] church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them.") (quotations omitted); *Watson*, 80 U.S. at 733 (courts exercise no jurisdiction over matters concerning "the conformity of the members of the church to the standard of morals required of them"); *Milivojevich*, 426 U.S. at 714 (quoting *Watson*, 80 U.S. at 733–34); *Bouldin v. Alexander*, 82 U.S. 131, 139–40 (1872).

### A.    The First Amendment Requires This Court to Broadly Construe the Control Test

Title IX does not apply to educational institutions that are "controlled by a religious organization," where Title IX's application "would not be consistent with the religious tenets of such organization."

(a)(3). Notably, the statute does not directly address how educational institutions demonstrate that they are controlled by a religious organization. Plaintiffs lament that religious institutions are entitled to the exemption "even where the educational institution has no denominational ties" and "receives little or no income from

an affiliated church or denomination." ECF 35 at ¶ 584. So what? Any interpretation of the control test must recognize that a recipient of federal financial assistance *can itself be* a religious organization. To do otherwise would impermissibly favor certain church-controlled religious schools and disfavor others, at the expense of their Free Exercise rights.

The Religion Clauses prohibit the government from favoring one religion over another or discriminating against a particular religion due to its beliefs. The Department of Education ("Department") amended 34 C.F.R. § 106.12 to expressly acknowledge that a religious school can itself be a religious organization that controls its own operations, curriculum, or other decisions. The amended rule recognized that the Department was constitutionally obligated to interpret the control test broadly to avoid discriminating *between* religions. 85 Fed. Reg. 59916, 59958 (Sept. 23, 2020) (citing *Larson v. Valente*, 456 U.S. 228, 244 (1982) ("The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another.")).

Most of the Plaintiffs argue that non-denominational Christian institutions with traditional views cannot obtain the religious exemption. *See* ECF 35 at ¶ 586–87.[1] These arguments fail to recognize that these—and other religious schools—are themselves religious organizations. *Cf. Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S.

_____

[1] Plaintiff Maxon has already unsuccessfully sued her institution, Fuller Theological Seminary ("Fuller"), in a separate case arguing that Fuller was not entitled to Title IX's religious exemption. *See Maxon v. Fuller Theological Seminary*, No. 2:19-cv-09969-CBM-MRW, 2020 U.S. Dist. LEXIS 202309, at *18–28 (C.D. Cal. Oct. 7, 2020).

682, 703 (2014) (closely held corporation exercised religion because its statement of purpose proclaimed that the company was committed to "[h]onoring the Lord in all we do by operating "in a manner consistent with Biblical principles."); *Frazee v. Ill. Dep't of Emp't Sec.*, 489 U.S. 829, 834 (1989) ("we reject the notion that to claim the protection of the Free Exercise Clause, one must be responding to the commands of a particular religious organization").[2]

Such superficial characterization of religious organizations was expressly rejected as discriminatory by the Supreme Court in *Our Lady*. In determining whether an employee satisfied the ministerial exception, the Court made clear that "since many religious traditions do not use the title 'minister,' it cannot be a necessary requirement" and, moreover, "[r]equiring the use of the title would constitute impermissible discrimination." *Id.* at 2063–64. "[A]ttaching too much significance to titles would risk privileging religious traditions with formal organizational structures over those that are less formal." *Id.* at 2064. Similarly, in *Widmar v. Vincent*, 454 U.S. 263 (1981), the Supreme Court rejected a proposal to permit students to use buildings at a public university for all religious activities except those constituting "religious worship." The Court observed that the distinction between "religious worship" and other forms of religious expression "[lacked] intelligible content," and that

---

[2] As the Final Rule recognizes, the structures of religious entities differ widely. 85 Fed. Reg. at 59918. "Some educational institutions are controlled by a board of trustees that includes ecclesiastical leaders from a particular religion or religious organization who have ultimate decision-making authority for the educational institutions. Other educational institutions are effectively controlled by religious organizations that have a non-hierarchical structure, such as a congregational structure." *Id.*

it was "highly doubtful that [the distinction] would lie within the judicial competence

to administer." *Id.* at 269 n.6. To even draw such a distinction would impermissibly

"require the [State]—and ultimately the Courts—to inquire into the significance of

words and practices to different religious faiths, and in varying circumstances by the

same faith." *Id.*

 The Supreme Court has consistently rejected the overly-formalistic approach

to religious protections that Plaintiffs take here—and for good reason. Protecting

minority, non-traditional, or non-hierarchical religious entities is precisely the pur-

pose of the First Amendment. And the government can no more parse a religious

school's strictures than it can a church's beliefs or practices. *See Lukumi*, 508 U.S.

at 531 (religious beliefs need not be acceptable, logical, consistent, or comprehensible

to others to receive protection).

### B. Non-discrimination Provisions Do Not Trump First Amendment Freedoms

 Sometimes in our pluralistic society, free exercise and competing values inev-

itably conflict. *See Obergefell*, 576 U.S. at 711 (Roberts, C.J., dissenting) ("Hard

questions arise when people of faith exercise religion in ways that may be seen to

conflict with the new right to same-sex marriage—when, for example, a religious

college provides married student housing only to opposite-sex married couples ...."). 

Title IX's religious exemption, however, reinforces what the Supreme Court has

made clear: religious liberty is a sui generis value that does not take a back seat to

other constitutional or statutory mandates. *See Yoder*, 406 U.S. at 214 (values

underling the First Amendment "have been zealously protected, sometimes even at the expense of other interests of admittedly high social importance").

### 1.  Applying Title IX to Religious Schools Does Not Survive Strict Scrutiny

It should therefore be no surprise that the Free Exercise Clause easily extinguishes Plaintiffs' Equal Protection claim.  Laws which burden the Free Exercise of Religion are subject to strict scrutiny unless they are "neutral and generally applicable." *Fulton*, 141 S. Ct. at 1876 (citing *Emp't Div. v. Smith*, 494 U.S. 872, 878–82 (1990)).  The Supreme Court recently reaffirmed that statutes with individualized exemptions—such as Title IX—are not "generally applicable."  *Fulton*, 141 S. Ct. at 1879 ("The creation of a formal mechanism for granting exceptions renders a policy not generally applicable … because it invite[s] the government to decide which reasons for not complying with the policy are worthy of solicitude ….") (quotations omitted); *see also id.* at 1877 (citing *e.g., Sherbert v. Verner*, 374 U. S. 398 (1963)).  So Title IX applies to a school's religious practices "only if it advances 'interests of the highest order' and is narrowly tailored to achieve those interests." *Fulton*, 141 S. Ct. at 1881 (quoting *Lukumi*, 508 U.S. at 546).  The attempt here to withhold the Title IX exemption from religious schools doesn't pass that test.

Plaintiffs troublingly assert that traditional religious views regarding marriage and sexuality do not qualify for exemptions from Title IX.  ECF 35 at ¶ 600.  But putting religious schools to the choice of violating their convictions or closing their doors undoubtedly burdens their sincere and long-settled religious beliefs.  These issues implicate central tenets of faith for Christians and many others.  *See*

*Obergefell*, 576 U.S. at 656–57 (majority opinion) ("Marriage is sacred to those who live by their religions"); *Lukumi*, 508 U.S. at 531 (looking to "the historical association between animal sacrifice and religious worship" to find that animal sacrifice is an integral part of a religion). The Catholic Church teaches that God created marriage and family to reveal and reflect the Holy Trinity itself. Catechism of the Catholic Church, 2d ed., (1997) § 2205 ("The Christian family is a communion of persons, a sign and image of the communion of the Father and the Son in the Holy Spirit."). And the Protestant Reformers promoted marriage and family for their ministers, compared to Catholicism's high regard for clerical celibacy. Today—no less than before—religious groups' beliefs about the meaning of marriage and sexual morality remain elemental and integral to their identities. As the Court said in *Obergefell*, "religions, and those who adhere to religious doctrines, may continue to advocate with utmost, sincere conviction that, by divine precepts, same-sex marriage should not be condoned." 576 U.S. at 679. These religious voices may have fallen from cultural favor, but if we take seriously our commitment to a pluralistic society, they must be protected and respected.

As Plaintiffs' allegations concede, religious institutions require students and faculty to abide by statements of faith or codes of conduct that are consistent with the schools' religious beliefs. *See* ECF 35 at ¶¶ 76, 85–88, 92, 108, 123, 137, 145, 155, 168, 182, 192, 207, 219, 234, 247, 275, 287, 303, 307–10, 331, 372, 384, 396, 420, 432, 450–51, 489. Students, like congregants, give direct or implied consent to abide by

these doctrinal precepts. *See Watson,* 80 U.S. at 729 (members of religious groups give "implied consent to [church] government, and are bound to submit to it").

The government's interest in withholding the Title IX religious exemption, by contrast, is minimal. Non-discrimination protections often advance important societal values, but the Court made clear in *Fulton* that high-level generalities such as "equal treatment" don't suffice. *Fulton,* 141 S. Ct. at 1881–82. The government must show both that it "has a compelling interest in enforcing its non-discrimination policies generally" but also that "it has such an interest in denying an exception" to these schools, specifically. *Id.* at 1881. It cannot meet this burden.

First, the availability of a statutory exemption for some religious schools is significant. *See id.* at 1882. There is "no compelling reason why [the government] has a particular interest in denying an exception to [one party] while making them available to others." *Id.* Plaintiffs argue some of these schools shouldn't have the exemption because of their nonsectarian, non-hierarchical structures, or because of their beliefs. But these rationales cannot be sufficient because both would require the government to referee on matters of religious government and doctrine. *Hosanna-Tabor,* 565 U.S. at 185–86.

Second, Congress recognized by adding a statutory exemption that "sex" and religion have a unique relationship. That sex discrimination is subject to only "heightened" or "intermediate" judicial review while Free Exercise burdens are subject to strict scrutiny demonstrates the Supreme Court's recognition of this truth. *See Fulton,* 141 S. Ct. at 1881; *United States v. Virginia,* 518 U.S. 515, 555 (1996); *see*

*also Witt v. Dep't of the Air Force*, 527 F.3d 806, 819 (9th Cir. 2008) (applying heightened scrutiny to claims of discrimination on the basis of sexual orientation).

Religious schools may have legitimate theological reasons for different treatment of the sexes (as opposed to different treatment based on race or other characteristics). *See Virginia*, 518 U.S. at 533 ("Supposed 'inherent differences' are no longer accepted as a ground for race or national origin classifications. Physical differences between men and women, however, are enduring[.]") (citations omitted). Look at the Catholic Church's deeply enshrined teaching and tradition that determines clerical eligibility based—in part—on sex. Title IX and its implementing regulations, after all, permit—and may require—consideration of a person's biological sex. *See, e.g.*, 20 U.S.C. §§ 1681(a), 1686; 34 C.F.R. §§ 106.32(b), 106.33. Now that the definition of "sex" in Title VII has been interpreted to cover sexual orientation and gender identity, *Bostock v. Clayton County*, 140 S. Ct. 1731, 1743 (2020), and the Biden Administration has indicated its intent to follow suit as to Title IX,[3] many religious schools will require exemptions from Title IX for the first time to continue their longstanding religious practices.[4]

---

[3] Enforcement of Title IX of the Education Amendments of 1972 With Respect to Discrimination Based on Sexual Orientation and Gender Identity in Light of *Bostock v. Clayton County*, 86 Fed. Reg. 32,637, 32,637, 32,639 (June 22, 2021).

[4] Amici only respond *arguendo* that sexual orientation and gender identity are included in the definition of "sex" in Title IX. The Supreme Court didn't apply the *Bostock* holding to other statutes such as Title IX—and for good reason. Title IX has different operative text than Title VII, is subject to different statutory exceptions, and is rooted in a different Congressional power. *See Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 275, 286–87 (1998).

The tension between religious freedom and non-discrimination arose in *Bostock*, where the Court decided that sex discrimination prohibited by Title VII included discrimination based on sexual orientation or transgender status. But the majority explained that it was "deeply concerned with preserving the promise of the free exercise of religion enshrined in our Constitution; that guarantee lies at the heart of our pluralistic society." *Id.* at 1754. The Court noted that Title VII contains an exemption for religious employers. *Id.* at 1754 (citing 42 U.S.C. § 2000e-1(a)). And the *Bostock* Court also pointed to the ministerial exception as additional protection for religious entities. *Id.* (citing *Hosanna-Tabor*, 565 U. S. at 188).

Though different than Title IX, Title VII's religious exemption highlights a key point. It is widely accepted that "discrimination" on the basis religion is wrong in most settings. It is, however, also widely accepted that religious organizations necessarily may "discriminate" on the basis of religion when choosing their ministers and members. There is no moral stigma associated with limiting a church's membership to people who share its essential beliefs. Buddhist temples need not extend membership to Evangelical Christians. Synagogues need not hire Shiite Muslims as rabbis. Catholic universities may deny admission to non-Catholics. But what does it mean to "be Catholic" or to "be Hindu"? Unlike other protected classes like race, religion itself calls for complicated and personal assessments of faith and conscience.

And therein lies the heart of the matter. Religious schools have the right to define what *they* mean by "Christian." Disputes over marriage and sexuality are fundamental theological questions. Religious schools should be able to admit, exclude,

discipline, or expel students based upon their adherents to the schools' beliefs and rules. *See Hosanna-Tabor*, 565 U.S. at 187 (First Amendment allows "'religious organizations to establish their own rules and regulations for internal discipline and government, and to create tribunals for adjudicating disputes over these matters.'") (quoting *Milivojevich*, 426 U.S. at 724); *Amos*, 483 U.S. at 342 (Brennan, J., concurring) ("Determining that certain activities are in furtherance of an organization's religious mission, and that only those committed to that mission should conduct them, is thus a means by which a religious community defines itself.").

Perhaps most notably, students who attend these religious institutions—including Plaintiffs—do so *voluntarily* and have adequate notice of the schools' religious tenets and codes of conduct when they apply. *See Watson,* 80 U.S. at 728–29. Religious schools aren't the only game in town. Students have myriad choices when it comes to higher education and are not forced to attend institutions where the codes of conduct conflict with their own religious or moral beliefs. There are approximately 5,300 colleges and universities in the United States, and most are not religiously affiliated. Secular schools have their own codes of conduct that students must follow. Religious schools simply reflect religious components in their codes. In fact, it is much more likely that religious students on secular campuses are forced to condone or associate with behavior that violates their convictions. Religious schools therefore not only provide an alternative and haven for religious students, they define and demonstrate their notion of the good. Plaintiffs can't demand alteration of beliefs they once voluntarily endorsed simply because they've now changed their minds.

### 2.    Schools' Religious Liberty Claims are Bolstered by Freedom of Association

Religious schools are entitled to the same First Amendment freedom of association protections as secular organizations, even if the exercise of that right conflicts with other important interests. *Roberts v. United States Jaycees*, 468 U.S. 609, 618 (1984) ("freedom of association receives protection as a fundamental element of personal liberty" and as "a right to associate for the purpose of engaging in those activities protected by the First Amendment"); s*ee also Smith*, 494 U.S. at 882 (noting that the constitutional interest in freedom of association may be "reinforced by Free Exercise Clause concerns"). In fact, "[t]he Constitution guarantees freedom of association … as an indispensable means of preserving other individual liberties." *Roberts*, 468 U.S. at 618.

For example, in *Boy Scouts of America v. Dale*, 530 U.S. 640 (2000), the Court dealt with the conflict between freedom of association and a state public accommodation statute when the Boy Scouts dismissed a homosexual scout leader. Despite acknowledging that the state had a compelling interest in eliminating discrimination, *see id.* at 657, it was outweighed by the Boy Scouts' First Amendment right to associate with those of its choosing and to communicate its moral beliefs. *Id.* at 661 ("[P]ublic or judicial disapproval of a tenet of an organization's expression does not justify the State's effort to compel the organization to accept members where such acceptance would derogate from the organization's expressive message."). The Free Exercise Clause, similarly, allows religious institutions, including schools, to select members that abide by their beliefs and moral codes. As the Court said in *Hosanna-*

*Tabor*, "[r]equiring a church to accept or retain an unwanted minister"—or an unwanted teacher of religion—would "interfere[] with the internal governance of the church" by "depriving the church of control over the selection of those who will personify its beliefs." *See* 565 U.S. at 188; *see also id.* at 200 (Alito, J. and Kagan, J., concurring) (free expression principle from *Dale* "applies with special force with respect to religious groups, whose very existence is dedicated to the collective expression and propagation of shared religious ideals").

Freedom of association also encompasses the right to not be associated publicly with symbols or messaging with which one disagrees. *See West Virginia Bd. of Ed. v. Barnette*, 319 U.S. 624, 632 (1943). Just as the government may not sanction individuals for refusing to salute the flag, *id.* at 632, it may not force religious schools to affirm conduct that violates their religious principles. *See Dale* at 648 ("forced inclusion of an unwanted person in a group infringes on the group's freedom of expressive association if the presence of that person affects in a significant way the group's ability to advocate public or private viewpoints").

The Court resolutely affirmed this principle when it unanimously decided in *Hurley,* 515 U.S. 557, that a Massachusetts public accommodation statute could not force a private organization to allow a gay rights organization to participate in its parade. *Id.* at 569. A religious institution likewise must have the ability to remove students who do not abide by its theological and moral standards. Otherwise, the school would be forced to be associated publicly with members who do not represent its values. *Id.* at 576 ("[W]hen dissemination of a view contrary to one's own is forced

upon a speaker intimately connected with the communication advanced, the speaker's right to autonomy over the message is compromised.").

Plaintiffs' First Amendment free association claim is patently absurd. ECF 35 at ¶¶ 659–71.[5] The same First Amendment principles that protect Plaintiffs' right to choose to attend (or not attend) religious schools protect the right of schools like Defendant-Intervenors to admit, exclude, and dismiss students based on codes of conduct. These schools' free association rights, together with their free exercise rights, will not tolerate the unexempted application of Title IX because its associational activities advance its protected religious mission and character. *See* Part II(B)(1), *supra*.

### C. The Spending Clause Does Not Limit the First Amendment Rights of Religious Schools

Plaintiffs' constitutional claims attempt to turn private religious institutions into state actors simply because they accept federal funding. *See* ECF 35 at ¶¶ 3, 4, 6, 574, 587, 604, 605, 619, 635, 636, 638, 663. But they have the paradigm entirely backwards. Spending clause statutes don't turn recipients of federal funding into public institutions. *See* ECF 56 at 19–25. As condition of accepting federal funding, religious schools do agree to be subject to certain civil rights statutes. But this contractual relationship doesn't entail a blanket waiver of their First Amendment rights

---

[5] As a threshold matter, accepting federal funds does not turn private institutions into state actors. *See* Part II(C), *infra*; ECF 56 at 19–25.

as private schools.[6]  To the contrary, the Department has long acknowledged that private institutions receiving federal funds may still restrict free speech and association so long as they do not do so for *purposes of complying with federal law*.[7]

Removing the religious exemption, moreover, would impermissibly discriminate against religious schools.  *Trinity Lutheran Church of Columbia, Inc. v. Comer* made clear that denying a generally available benefit solely on account of religious identity imposes a penalty on the free exercise of religion that can be justified only by a state interest "of the highest order."  137 S. Ct. 2012, 2024 (2017).  And "[g]enerally the government may not force people to choose between participation in a public program and their right to free exercise of religion."  *Trinity Lutheran*, 137 S. Ct. at 2026 (Gorsuch, J., concurring); *see also Espinoza*, 140 S. Ct. at 2261 ("A State need not subsidize private education. But once a State decides to do so, it cannot disqualify some private schools solely because they are religious."); *Lyng v. Northwest Indian Cemetery Protective Assn.*, 485 U.S. 439, 449 (1988) (Free Exercise Clause protects against laws that "penalize religious activity by denying any person an equal share of the rights, benefits, and privileges enjoyed by other citizens."); *Everson*, 330 U.S.

---

[6] By Plaintiffs' logic, the acceptance and use of federal student loans would render them "taxpayer funded"—turning them into state actors subject to First Amendment requirements.  *See* ECF 35 at ¶¶ 3, 4, 6, 574, 587, 604, 605, 619, 635, 636, 638, 663.

[7] *See* Dear College Letter: First Amendment, U.S. Dep't of Educ. Office for Civil Rights, July 28, 2003,  https://www2.ed.gov/about/offices/list/ocr/firstamend.html ("OCR's regulations should not be interpreted in ways that would lead to the suppression of protected speech on public or private campuses.  Any private post-secondary institution that chooses to limit free speech in ways that are more restrictive than at public educational institutions does so on its own accord and not based on requirements imposed by OCR.").

at 16 (a State "cannot exclude … members of any other faith, *because of their faith, or lack of it*, from receiving the benefits of public welfare legislation").  Religious schools here are "not claiming any entitlement to a subsidy," but "instead assert[ing] a right to participate in a government benefit program without having to disavow its religious character." *Trinity Lutheran*, 137 S. Ct. at 2022 (majority opinion); *cf. Fulton*, 141 S. Ct. at 1878 ("We have never suggested that the government may discriminate against religion when acting in its managerial role.").  The moral character of a religious school *is* its religious character.

The Court has successfully navigated the delicate balance between religious beliefs and public programs.  In *Thomas v. Review Bd. of Indiana Employment Security Division*, for instance, it held that a state violated the Free Exercise Clause by denying unemployment compensation to an employee who quit his job producing tank turrets because the job conflicted with the pacifist teachings of his church.  450 U.S. 707, 716 (1981).  The Court laid out an important marker:

> Where the state conditions receipt of an important benefit upon conduct proscribed by a religious faith, or where it denies such a benefit because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs, a burden upon religion exists.

*Id.* at 717–18.

The Court has similarly forbidden government from coercing individuals into giving up First Amendment rights.  In *Perry v. Sindermann*, the Court held that the government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech."  408 U.S.

593, 597 (1972) (quotations and citations omitted).  To do so would impermissibly allow the government to produce a result which it could not command directly.  *Id.*; *see also Connick v. Myers*, 461 U.S. 138, 142 (1983) (government "cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression.").  As discussed, the right of religious schools to dictate the values and activities of their members implicates not only the Religion Clauses, but also the freedom of association.  *See* Part II(B)(2), *supra.*

## CONCLUSION

Freedom of conscience is one of the bedrock guarantees of the First Amendment.  Without it, our pluralistic society is imperiled.  Even as the Supreme Court has blazed new trails in the areas of sex and marriage, it has reaffirmed that sincere religious beliefs must be respected and protected.  *See Fulton*, slip. op at 13–15; *Bostock*, 140 S. Ct. at 1754; *Obergefell*, 576 U.S. at 679.  Any ruling from this Court must recognize that the First Amendment protects the autonomy of religious schools to govern their students in a way that is consistent with their sincerely held religious tenets.

DATED: October 7, 2021.


**HARRIS BERNE CHRISTENSEN LLP**

By:___/s/ Shawn M. Lindsay_____
Shawn M. Lindsay, OSB #020695

Christian B. Corrigan, pro hac vice

AUSTIN KNUDSEN
*Attorney General of Montana*
DAVID. M.S. DEWHIRST
*Solicitor General*
CHRISTIAN B. CORRIGAN
*Assistant Solicitor General*
Office of the Attorney General
215 North Sanders
P.O. Box 201401
Helena, MT 59620-1401
David.Dewhirst@mt.gov
Christian.Corrigan@mt.gov

*Attorneys for Amicus Curiae*

### Additional Counsel for Amici Curiae:

Steve Marshall
ALABAMA ATTORNEY GENERAL

Mark Brnovich
ARIZONA ATTORNEY GENERAL

Leslie Rutte
ARKANSAS ATTORNEY GENERAL

Theodore E. Rokita
INDIANA ATTORNEY GENERAL

Derek Schmidt
KANSAS ATTORNEY GENERAL

Daniel Cameron
KENTUCKY ATTORNEY GENERAL

Jeff Landry
LOUISIANA ATTORNEY GENERAL

Lynn Fitch
MISSISSIPPI ATTORNEY GENERAL

Doug J. Peterson
NEBRASKA ATTORNEY GENERAL

John O'Connor
OKLAHOMA ATTORNEY GENERAL

Alan Wilson
SOUTH CAROLINA ATTORNEY GENERAL

Ken Paxton
TEXAS ATTORNEY GENERAL

Sean Reyes
UTAH ATTORNEY GENERAL

**CERTIFICATE OF COMPLIANCE**

The undersigned hereby certifies that this brief complies with the applicable word-count limitation under LR 7-2(b) because it contains less than 35 pages and less than 11,000 words, including headings, footnotes, and quotations, but excluding the caption, table of contents, table of cases and authorities, signature block, exhibits, and any certificates of counsel.

By:＿＿＿/s/ Shawn M. Lindsay＿＿＿＿＿＿
Shawn M. Lindsay, OSB #020695