Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.*, 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## OBERGEFELL ET AL. *v.* HODGES, DIRECTOR, OHIO DEPARTMENT OF HEALTH, ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

No. 14–556.  Argued April 28, 2015—Decided June 26, 2015*

Michigan, Kentucky, Ohio, and Tennessee define marriage as a union between one man and one woman. The petitioners, 14 same-sex couples and two men whose same-sex partners are deceased, filed suits in Federal District Courts in their home States, claiming that respondent state officials violate the Fourteenth Amendment by denying them the right to marry or to have marriages lawfully performed in another State given full recognition. Each District Court ruled in petitioners' favor, but the Sixth Circuit consolidated the cases and reversed.

*Held*: The Fourteenth Amendment requires a State to license a marriage between two people of the same sex and to recognize a marriage between two people of the same sex when their marriage was lawfully licensed and performed out-of-State. Pp. 3–28.

(a) Before turning to the governing principles and precedents, it is appropriate to note the history of the subject now before the Court. Pp. 3–10.

(1) The history of marriage as a union between two persons of the opposite sex marks the beginning of these cases. To the respondents, it would demean a timeless institution if marriage were extended to same-sex couples. But the petitioners, far from seeking to devalue marriage, seek it for themselves because of their respect—and need—for its privileges and responsibilities, as illustrated by the pe-

---

*Together with No. 14–562, *Tanco et al.* v. *Haslam, Governor of Tennessee, et al.*, No. 14–571, *DeBoer et al.* v. *Snyder, Governor of Michigan, et al.*, and No. 14–574, *Bourke et al.* v. *Beshear, Governor of Kentucky*, also on certiorari to the same court.

titioners' own experiences.  Pp. 3–6.

(2) The history of marriage is one of both continuity and change. Changes, such as the decline of arranged marriages and the abandonment of the law of coverture, have worked deep transformations in the structure of marriage, affecting aspects of marriage once viewed as essential.  These new insights have strengthened, not weakened, the institution.  Changed understandings of marriage are characteristic of a Nation where new dimensions of freedom become apparent to new generations.

This dynamic can be seen in the Nation's experience with gay and lesbian rights.  Well into the 20th century, many States condemned same-sex intimacy as immoral, and homosexuality was treated as an illness.  Later in the century, cultural and political developments allowed same-sex couples to lead more open and public lives.  Extensive public and private dialogue followed, along with shifts in public attitudes.  Questions about the legal treatment of gays and lesbians soon reached the courts, where they could be discussed in the formal discourse of the law.  In 2003, this Court overruled its 1986 decision in *Bowers* v. *Hardwick*, 478 U. S. 186, which upheld a Georgia law that criminalized certain homosexual acts, concluding laws making same-sex intimacy a crime "demea[n] the lives of homosexual persons." *Lawrence* v. *Texas*, 539 U. S. 558, 575.  In 2012, the federal Defense of Marriage Act was also struck down.  *United States* v. *Windsor*, 570 U. S. ___.  Numerous same-sex marriage cases reaching the federal courts and state supreme courts have added to the dialogue.  Pp. 6–10.

(b) The Fourteenth Amendment requires a State to license a marriage between two people of the same sex.  Pp. 10–27.

(1) The fundamental liberties protected by the Fourteenth Amendment's Due Process Clause extend to certain personal choices central to individual dignity and autonomy, including intimate choices defining personal identity and beliefs.  See, *e.g., Eisenstadt* v. *Baird*, 405 U. S. 438, 453; *Griswold* v. *Connecticut*, 381 U. S. 479, 484–486.  Courts must exercise reasoned judgment in identifying interests of the person so fundamental that the State must accord them its respect.  History and tradition guide and discipline the inquiry but do not set its outer boundaries.  When new insight reveals discord between the Constitution's central protections and a received legal stricture, a claim to liberty must be addressed.

Applying these tenets, the Court has long held the right to marry is protected by the Constitution.  For example, *Loving* v. *Virginia*, 388 U. S. 1, 12, invalidated bans on interracial unions, and *Turner* v. *Safley*, 482 U. S. 78, 95, held that prisoners could not be denied the right to marry.  To be sure, these cases presumed a relationship in-

volving opposite-sex partners, as did *Baker* v. *Nelson*, 409 U. S. 810, a one-line summary decision issued in 1972, holding that the exclusion of same-sex couples from marriage did not present a substantial federal question. But other, more instructive precedents have expressed broader principles. See, *e.g., Lawrence, supra,* at 574. In assessing whether the force and rationale of its cases apply to same-sex couples, the Court must respect the basic reasons why the right to marry has been long protected. See, *e.g., Eisenstadt, supra,* at 453–454. This analysis compels the conclusion that same-sex couples may exercise the right to marry. Pp. 10–12.

     (2) Four principles and traditions demonstrate that the reasons marriage is fundamental under the Constitution apply with equal force to same-sex couples. The first premise of this Court's relevant precedents is that the right to personal choice regarding marriage is inherent in the concept of individual autonomy. This abiding connection between marriage and liberty is why *Loving* invalidated interracial marriage bans under the Due Process Clause. See 388 U. S., at 12. Decisions about marriage are among the most intimate that an individual can make. See *Lawrence, supra,* at 574. This is true for all persons, whatever their sexual orientation.

    A second principle in this Court's jurisprudence is that the right to marry is fundamental because it supports a two-person union unlike any other in its importance to the committed individuals. The intimate association protected by this right was central to *Griswold* v. *Connecticut*, which held the Constitution protects the right of married couples to use contraception, 381 U. S., at 485, and was acknowledged in *Turner, supra,* at 95. Same-sex couples have the same right as opposite-sex couples to enjoy intimate association, a right extending beyond mere freedom from laws making same-sex intimacy a criminal offense. See *Lawrence, supra,* at 567.

    A third basis for protecting the right to marry is that it safeguards children and families and thus draws meaning from related rights of childrearing, procreation, and education. See, *e.g., Pierce* v. *Society of Sisters*, 268 U. S. 510. Without the recognition, stability, and predictability marriage offers, children suffer the stigma of knowing their families are somehow lesser. They also suffer the significant material costs of being raised by unmarried parents, relegated to a more difficult and uncertain family life. The marriage laws at issue thus harm and humiliate the children of same-sex couples. See *Windsor, supra,* at ___. This does not mean that the right to marry is less meaningful for those who do not or cannot have children. Precedent protects the right of a married couple not to procreate, so the right to marry cannot be conditioned on the capacity or commitment to procreate.

Syllabus

Finally, this Court's cases and the Nation's traditions make clear that marriage is a keystone of the Nation's social order.   See *Maynard* v. *Hill*, 125 U. S. 190, 211.  States have contributed to the fundamental character of marriage by placing it at the center of many facets of the legal and social order.  There is no difference between same- and opposite-sex couples with respect to this principle, yet same-sex couples are denied the constellation of benefits that the States have linked to marriage and are consigned to an instability many opposite-sex couples would find intolerable.  It is demeaning to lock same-sex couples out of a central institution of the Nation's society, for they too may aspire to the transcendent purposes of marriage.

The limitation of marriage to opposite-sex couples may long have seemed natural and just, but its inconsistency with the central meaning of the fundamental right to marry is now manifest. Pp. 12–18.

(3) The right of same-sex couples to marry is also derived from the Fourteenth Amendment's guarantee of equal protection.  The Due Process Clause and the Equal Protection Clause are connected in a profound way.  Rights implicit in liberty and rights secured by equal protection may rest on different precepts and are not always coextensive, yet each may be instructive as to the meaning and reach of the other.  This dynamic is reflected in *Loving,* where the Court invoked both the Equal Protection Clause and the Due Process Clause; and in *Zablocki* v. *Redhail*, 434 U. S. 374, where the Court invalidated a law barring fathers delinquent on child-support payments from marrying.  Indeed, recognizing that new insights and societal understandings can reveal unjustified inequality within fundamental institutions that once passed unnoticed and unchallenged, this Court has invoked equal protection principles to invalidate laws imposing sex-based inequality on marriage, see, *e.g., Kirchberg* v. *Feenstra*, 450 U. S. 455, 460–461, and confirmed the relation between liberty and equality, see, *e.g., M. L. B.* v. *S. L. J.*, 519 U. S. 102, 120–121.

The Court has acknowledged the interlocking nature of these constitutional safeguards in the context of the legal treatment of gays and lesbians.  See *Lawrence*, 539 U. S., at 575.  This dynamic also applies to same-sex marriage.  The challenged laws burden the liberty of same-sex couples, and they abridge central precepts of equality. The marriage laws at issue are in essence unequal: Same-sex couples are denied benefits afforded opposite-sex couples and are barred from exercising a fundamental right.  Especially against a long history of disapproval of their relationships, this denial works a grave and continuing harm, serving to disrespect and subordinate gays and lesbians.  Pp. 18–22.

(4)  The right to marry is a fundamental right inherent in the liberty of the person, and under the Due Process and Equal Protec-

Syllabus

tion Clauses of the Fourteenth Amendment couples of the same-sex may not be deprived of that right and that liberty.  Same-sex couples may exercise the fundamental right to marry.  *Baker* v. *Nelson* is overruled.  The State laws challenged by the petitioners in these cases are held invalid to the extent they exclude same-sex couples from civil marriage on the same terms and conditions as opposite-sex couples.  Pp. 22–23.

(5) There may be an initial inclination to await further legislation, litigation, and debate, but referenda, legislative debates, and grassroots campaigns; studies and other writings; and extensive litigation in state and federal courts have led to an enhanced understanding of the issue.  While the Constitution contemplates that democracy is the appropriate process for change, individuals who are harmed need not await legislative action before asserting a fundamental right.  *Bowers,* in effect, upheld state action that denied gays and lesbians a fundamental right.  Though it was eventually repudiated, men and women suffered pain and humiliation in the interim, and the effects of these injuries no doubt lingered long after *Bowers* was overruled.  A ruling against same-sex couples would have the same effect and would be unjustified under the Fourteenth Amendment.  The petitioners' stories show the urgency of the issue they present to the Court, which has a duty to address these claims and answer these questions.  Respondents' argument that allowing same-sex couples to wed will harm marriage as an institution rests on a counterintuitive view of opposite-sex couples' decisions about marriage and parenthood.  Finally, the First Amendment ensures that religions, those who adhere to religious doctrines, and others have protection as they seek to teach the principles that are so fulfilling and so central to their lives and faiths.  Pp. 23–27.

(c) The Fourteenth Amendment requires States to recognize same-sex marriages validly performed out of State.  Since same-sex couples may now exercise the fundamental right to marry in all States, there is no lawful basis for a State to refuse to recognize a lawful same-sex marriage performed in another State on the ground of its same-sex character.  Pp. 27–28.

772 F. 3d 388, reversed.

KENNEDY, J., delivered the opinion of the Court, in which GINSBURG, BREYER, SOTOMAYOR, and KAGAN, JJ., joined.  ROBERTS, C. J., filed a dissenting opinion, in which SCALIA and THOMAS, JJ., joined.  SCALIA, J., filed a dissenting opinion, in which THOMAS, J., joined.  THOMAS, J., filed a dissenting opinion, in which SCALIA, J., joined.  ALITO, J., filed a dissenting opinion, in which SCALIA and THOMAS, JJ., joined.

Cite as: 576 U. S. ____ (2015)    1

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

————

Nos. 14–556, 14-562, 14-571 and 14–574

————

JAMES OBERGEFELL, ET AL., PETITIONERS
14–556                          v.
RICHARD HODGES, DIRECTOR, OHIO
DEPARTMENT OF HEALTH, ET AL.;

VALERIA TANCO, ET AL., PETITIONERS
14–562                          v.
BILL HASLAM, GOVERNOR OF
TENNESSEE, ET AL.;

APRIL DeBOER, ET AL., PETITIONERS
14–571                          v.
RICK SNYDER, GOVERNOR OF MICHIGAN,
ET AL.; AND

GREGORY BOURKE, ET AL., PETITIONERS
14–574                          v.
STEVE BESHEAR, GOVERNOR OF
KENTUCKY

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SIXTH CIRCUIT

[June 26, 2015]

JUSTICE KENNEDY delivered the opinion of the Court.

The Constitution promises liberty to all within its reach, a liberty that includes certain specific rights that allow

persons, within a lawful realm, to define and express their identity. The petitioners in these cases seek to find that liberty by marrying someone of the same sex and having their marriages deemed lawful on the same terms and conditions as marriages between persons of the opposite sex.

### I

These cases come from Michigan, Kentucky, Ohio, and Tennessee, States that define marriage as a union between one man and one woman. See, *e.g.,* Mich. Const., Art. I, §25; Ky. Const. §233A; Ohio Rev. Code Ann. §3101.01 (Lexis 2008); Tenn. Const., Art. XI, §18. The petitioners are 14 same-sex couples and two men whose same-sex partners are deceased. The respondents are state officials responsible for enforcing the laws in question. The petitioners claim the respondents violate the Fourteenth Amendment by denying them the right to marry or to have their marriages, lawfully performed in another State, given full recognition.

Petitioners filed these suits in United States District Courts in their home States. Each District Court ruled in their favor. Citations to those cases are in Appendix A, *infra.* The respondents appealed the decisions against them to the United States Court of Appeals for the Sixth Circuit. It consolidated the cases and reversed the judgments of the District Courts. *DeBoer* v. *Snyder*, 772 F. 3d 388 (2014). The Court of Appeals held that a State has no constitutional obligation to license same-sex marriages or to recognize same-sex marriages performed out of State.

The petitioners sought certiorari. This Court granted review, limited to two questions. 574 U. S. ___ (2015). The first, presented by the cases from Michigan and Kentucky, is whether the Fourteenth Amendment requires a State to license a marriage between two people of the same sex. The second, presented by the cases from Ohio,

Opinion of the Court

Tennessee, and, again, Kentucky, is whether the Fourteenth Amendment requires a State to recognize a same-sex marriage licensed and performed in a State which does grant that right.

## II

Before addressing the principles and precedents that govern these cases, it is appropriate to note the history of the subject now before the Court.

### A

From their beginning to their most recent page, the annals of human history reveal the transcendent importance of marriage.  The lifelong union of a man and a woman always has promised nobility and dignity to all persons, without regard to their station in life.  Marriage is sacred to those who live by their religions and offers unique fulfillment to those who find meaning in the secular realm.  Its dynamic allows two people to find a life that could not be found alone, for a marriage becomes greater than just the two persons.  Rising from the most basic human needs, marriage is essential to our most profound hopes and aspirations.

The centrality of marriage to the human condition makes it unsurprising that the institution has existed for millennia and across civilizations.  Since the dawn of history, marriage has transformed strangers into relatives, binding families and societies together.  Confucius taught that marriage lies at the foundation of government. 2 Li Chi: Book of Rites 266 (C. Chai & W. Chai eds., J. Legge transl. 1967).  This wisdom was echoed centuries later and half a world away by Cicero, who wrote, "The first bond of society is marriage; next, children; and then the family."  See De Officiis 57 (W. Miller transl. 1913). There are untold references to the beauty of marriage in religious and philosophical texts spanning time, cultures,

Opinion of the Court

and faiths, as well as in art and literature in all their forms. It is fair and necessary to say these references were based on the understanding that marriage is a union between two persons of the opposite sex.

That history is the beginning of these cases. The respondents say it should be the end as well. To them, it would demean a timeless institution if the concept and lawful status of marriage were extended to two persons of the same sex. Marriage, in their view, is by its nature a gender-differentiated union of man and woman. This view long has been held—and continues to be held—in good faith by reasonable and sincere people here and throughout the world.

The petitioners acknowledge this history but contend that these cases cannot end there. Were their intent to demean the revered idea and reality of marriage, the petitioners' claims would be of a different order. But that is neither their purpose nor their submission. To the contrary, it is the enduring importance of marriage that underlies the petitioners' contentions. This, they say, is their whole point. Far from seeking to devalue marriage, the petitioners seek it for themselves because of their respect—and need—for its privileges and responsibilities. And their immutable nature dictates that same-sex marriage is their only real path to this profound commitment.

Recounting the circumstances of three of these cases illustrates the urgency of the petitioners' cause from their perspective. Petitioner James Obergefell, a plaintiff in the Ohio case, met John Arthur over two decades ago. They fell in love and started a life together, establishing a lasting, committed relation. In 2011, however, Arthur was diagnosed with amyotrophic lateral sclerosis, or ALS. This debilitating disease is progressive, with no known cure. Two years ago, Obergefell and Arthur decided to commit to one another, resolving to marry before Arthur died. To fulfill their mutual promise, they traveled from

Ohio to Maryland, where same-sex marriage was legal. It was difficult for Arthur to move, and so the couple were wed inside a medical transport plane as it remained on the tarmac in Baltimore. Three months later, Arthur died. Ohio law does not permit Obergefell to be listed as the surviving spouse on Arthur's death certificate. By statute, they must remain strangers even in death, a state-imposed separation Obergefell deems "hurtful for the rest of time." App. in No. 14–556 etc., p. 38. He brought suit to be shown as the surviving spouse on Arthur's death certificate.

April DeBoer and Jayne Rowse are co-plaintiffs in the case from Michigan. They celebrated a commitment ceremony to honor their permanent relation in 2007. They both work as nurses, DeBoer in a neonatal unit and Rowse in an emergency unit. In 2009, DeBoer and Rowse fostered and then adopted a baby boy. Later that same year, they welcomed another son into their family. The new baby, born prematurely and abandoned by his biological mother, required around-the-clock care. The next year, a baby girl with special needs joined their family. Michigan, however, permits only opposite-sex married couples or single individuals to adopt, so each child can have only one woman as his or her legal parent. If an emergency were to arise, schools and hospitals may treat the three children as if they had only one parent. And, were tragedy to befall either DeBoer or Rowse, the other would have no legal rights over the children she had not been permitted to adopt. This couple seeks relief from the continuing uncertainty their unmarried status creates in their lives.

Army Reserve Sergeant First Class Ijpe DeKoe and his partner Thomas Kostura, co-plaintiffs in the Tennessee case, fell in love. In 2011, DeKoe received orders to deploy to Afghanistan. Before leaving, he and Kostura married in New York. A week later, DeKoe began his deployment, which lasted for almost a year. When he returned, the two

Opinion of the Court

settled in Tennessee, where DeKoe works full-time for the Army Reserve. Their lawful marriage is stripped from them whenever they reside in Tennessee, returning and disappearing as they travel across state lines. DeKoe, who served this Nation to preserve the freedom the Constitution protects, must endure a substantial burden.

The cases now before the Court involve other petitioners as well, each with their own experiences. Their stories reveal that they seek not to denigrate marriage but rather to live their lives, or honor their spouses' memory, joined by its bond.

### B

The ancient origins of marriage confirm its centrality, but it has not stood in isolation from developments in law and society. The history of marriage is one of both continuity and change. That institution—even as confined to opposite-sex relations—has evolved over time.

For example, marriage was once viewed as an arrangement by the couple's parents based on political, religious, and financial concerns; but by the time of the Nation's founding it was understood to be a voluntary contract between a man and a woman. See N. Cott, Public Vows: A History of Marriage and the Nation 9–17 (2000); S. Coontz, Marriage, A History 15–16 (2005). As the role and status of women changed, the institution further evolved. Under the centuries-old doctrine of coverture, a married man and woman were treated by the State as a single, male-dominated legal entity. See 1 W. Blackstone, Commentaries on the Laws of England 430 (1765). As women gained legal, political, and property rights, and as society began to understand that women have their own equal dignity, the law of coverture was abandoned. See Brief for Historians of Marriage et al. as *Amici Curiae* 16–19. These and other developments in the institution of marriage over the past centuries were not mere superficial changes.

Rather, they worked deep transformations in its structure, affecting aspects of marriage long viewed by many as essential. See generally N. Cott, Public Vows; S. Coontz, Marriage; H. Hartog, Man & Wife in America: A History (2000).

These new insights have strengthened, not weakened, the institution of marriage. Indeed, changed understandings of marriage are characteristic of a Nation where new dimensions of freedom become apparent to new generations, often through perspectives that begin in pleas or protests and then are considered in the political sphere and the judicial process.

This dynamic can be seen in the Nation's experiences with the rights of gays and lesbians. Until the mid-20th century, same-sex intimacy long had been condemned as immoral by the state itself in most Western nations, a belief often embodied in the criminal law. For this reason, among others, many persons did not deem homosexuals to have dignity in their own distinct identity. A truthful declaration by same-sex couples of what was in their hearts had to remain unspoken. Even when a greater awareness of the humanity and integrity of homosexual persons came in the period after World War II, the argument that gays and lesbians had a just claim to dignity was in conflict with both law and widespread social conventions. Same-sex intimacy remained a crime in many States. Gays and lesbians were prohibited from most government employment, barred from military service, excluded under immigration laws, targeted by police, and burdened in their rights to associate. See Brief for Organization of American Historians as *Amicus Curiae* 5–28.

For much of the 20th century, moreover, homosexuality was treated as an illness. When the American Psychiatric Association published the first Diagnostic and Statistical Manual of Mental Disorders in 1952, homosexuality was classified as a mental disorder, a position adhered to until 1973. See Position Statement on Homosexuality and Civil

Rights, 1973, in 131 Am. J. Psychiatry 497 (1974). Only in more recent years have psychiatrists and others recognized that sexual orientation is both a normal expression of human sexuality and immutable. See Brief for American Psychological Association et al. as *Amici Curiae* 7–17.

In the late 20th century, following substantial cultural and political developments, same-sex couples began to lead more open and public lives and to establish families. This development was followed by a quite extensive discussion of the issue in both governmental and private sectors and by a shift in public attitudes toward greater tolerance. As a result, questions about the rights of gays and lesbians soon reached the courts, where the issue could be discussed in the formal discourse of the law.

This Court first gave detailed consideration to the legal status of homosexuals in *Bowers* v. *Hardwick*, 478 U. S. 186 (1986). There it upheld the constitutionality of a Georgia law deemed to criminalize certain homosexual acts. Ten years later, in *Romer* v. *Evans*, 517 U. S. 620 (1996), the Court invalidated an amendment to Colorado's Constitution that sought to foreclose any branch or political subdivision of the State from protecting persons against discrimination based on sexual orientation. Then, in 2003, the Court overruled *Bowers*, holding that laws making same-sex intimacy a crime "demea[n] the lives of homosexual persons." *Lawrence* v. *Texas*, 539 U. S. 558, 575.

Against this background, the legal question of same-sex marriage arose. In 1993, the Hawaii Supreme Court held Hawaii's law restricting marriage to opposite-sex couples constituted a classification on the basis of sex and was therefore subject to strict scrutiny under the Hawaii Constitution. *Baehr* v. *Lewin*, 74 Haw. 530, 852 P. 2d 44. Although this decision did not mandate that same-sex marriage be allowed, some States were concerned by its implications and reaffirmed in their laws that marriage is

Opinion of the Court

defined as a union between opposite-sex partners. So too in 1996, Congress passed the Defense of Marriage Act (DOMA), 110 Stat. 2419, defining marriage for all federal-law purposes as "only a legal union between one man and one woman as husband and wife." 1 U. S. C. §7.

The new and widespread discussion of the subject led other States to a different conclusion. In 2003, the Supreme Judicial Court of Massachusetts held the State's Constitution guaranteed same-sex couples the right to marry. See *Goodridge* v. *Department of Public Health*, 440 Mass. 309, 798 N. E. 2d 941 (2003). After that ruling, some additional States granted marriage rights to same-sex couples, either through judicial or legislative processes. These decisions and statutes are cited in Appendix B, *infra*. Two Terms ago, in *United States* v. *Windsor*, 570 U. S. ___ (2013), this Court invalidated DOMA to the extent it barred the Federal Government from treating same-sex marriages as valid even when they were lawful in the State where they were licensed. DOMA, the Court held, impermissibly disparaged those same-sex couples "who wanted to affirm their commitment to one another before their children, their family, their friends, and their community." *Id.,* at ___ (slip op., at 14).

Numerous cases about same-sex marriage have reached the United States Courts of Appeals in recent years. In accordance with the judicial duty to base their decisions on principled reasons and neutral discussions, without scornful or disparaging commentary, courts have written a substantial body of law considering all sides of these issues. That case law helps to explain and formulate the underlying principles this Court now must consider. With the exception of the opinion here under review and one other, see *Citizens for Equal Protection* v. *Bruning*, 455 F. 3d 859, 864–868 (CA8 2006), the Courts of Appeals have held that excluding same-sex couples from marriage violates the Constitution. There also have been many

Opinion of the Court

thoughtful District Court decisions addressing same-sex marriage—and most of them, too, have concluded same-sex couples must be allowed to marry. In addition the highest courts of many States have contributed to this ongoing dialogue in decisions interpreting their own State Constitutions. These state and federal judicial opinions are cited in Appendix A, *infra*.

After years of litigation, legislation, referenda, and the discussions that attended these public acts, the States are now divided on the issue of same-sex marriage. See Office of the Atty. Gen. of Maryland, The State of Marriage Equality in America, State-by-State Supp. (2015).

## III

Under the Due Process Clause of the Fourteenth Amendment, no State shall "deprive any person of life, liberty, or property, without due process of law." The fundamental liberties protected by this Clause include most of the rights enumerated in the Bill of Rights. See *Duncan* v. *Louisiana*, 391 U. S. 145, 147–149 (1968). In addition these liberties extend to certain personal choices central to individual dignity and autonomy, including intimate choices that define personal identity and beliefs. See, *e.g., Eisenstadt* v. *Baird*, 405 U. S. 438, 453 (1972); *Griswold* v. *Connecticut*, 381 U. S. 479, 484–486 (1965).

The identification and protection of fundamental rights is an enduring part of the judicial duty to interpret the Constitution. That responsibility, however, "has not been reduced to any formula." *Poe* v. *Ullman*, 367 U. S. 497, 542 (1961) (Harlan, J., dissenting). Rather, it requires courts to exercise reasoned judgment in identifying interests of the person so fundamental that the State must accord them its respect. See *ibid.* That process is guided by many of the same considerations relevant to analysis of other constitutional provisions that set forth broad principles rather than specific requirements. History and tradi-

tion guide and discipline this inquiry but do not set its outer boundaries. See *Lawrence, supra*, at 572. That method respects our history and learns from it without allowing the past alone to rule the present.

The nature of injustice is that we may not always see it in our own times. The generations that wrote and ratified the Bill of Rights and the Fourteenth Amendment did not presume to know the extent of freedom in all of its dimensions, and so they entrusted to future generations a charter protecting the right of all persons to enjoy liberty as we learn its meaning. When new insight reveals discord between the Constitution's central protections and a received legal stricture, a claim to liberty must be addressed.

Applying these established tenets, the Court has long held the right to marry is protected by the Constitution. In *Loving* v. *Virginia*, 388 U. S. 1, 12 (1967), which invalidated bans on interracial unions, a unanimous Court held marriage is "one of the vital personal rights essential to the orderly pursuit of happiness by free men." The Court reaffirmed that holding in *Zablocki* v. *Redhail*, 434 U. S. 374, 384 (1978), which held the right to marry was burdened by a law prohibiting fathers who were behind on child support from marrying. The Court again applied this principle in *Turner* v. *Safley*, 482 U. S. 78, 95 (1987), which held the right to marry was abridged by regulations limiting the privilege of prison inmates to marry. Over time and in other contexts, the Court has reiterated that the right to marry is fundamental under the Due Process Clause. See, *e.g., M. L. B.* v. *S. L. J.*, 519 U. S. 102, 116 (1996); *Cleveland Bd. of Ed.* v. *LaFleur*, 414 U. S. 632, 639–640 (1974); *Griswold, supra*, at 486; *Skinner* v. *Oklahoma ex rel. Williamson*, 316 U. S. 535, 541 (1942); *Meyer* v. *Nebraska*, 262 U. S. 390, 399 (1923).

It cannot be denied that this Court's cases describing the right to marry presumed a relationship involving opposite-sex partners. The Court, like many institutions,

Opinion of the Court

has made assumptions defined by the world and time of which it is a part. This was evident in *Baker* v. *Nelson*, 409 U. S. 810, a one-line summary decision issued in 1972, holding the exclusion of same-sex couples from marriage did not present a substantial federal question.

Still, there are other, more instructive precedents. This Court's cases have expressed constitutional principles of broader reach. In defining the right to marry these cases have identified essential attributes of that right based in history, tradition, and other constitutional liberties inherent in this intimate bond. See, *e.g., Lawrence*, 539 U. S., at 574; *Turner*, *supra*, at 95; *Zablocki*, *supra*, at 384; *Loving*, *supra*, at 12; *Griswold*, *supra*, at 486. And in assessing whether the force and rationale of its cases apply to same-sex couples, the Court must respect the basic reasons why the right to marry has been long protected. See, *e.g., Eisenstadt*, *supra*, at 453–454; *Poe*, *supra*, at 542–553 (Harlan, J., dissenting).

This analysis compels the conclusion that same-sex couples may exercise the right to marry. The four principles and traditions to be discussed demonstrate that the reasons marriage is fundamental under the Constitution apply with equal force to same-sex couples.

A first premise of the Court's relevant precedents is that the right to personal choice regarding marriage is inherent in the concept of individual autonomy. This abiding connection between marriage and liberty is why *Loving* invalidated interracial marriage bans under the Due Process Clause. See 388 U. S., at 12; see also *Zablocki*, *supra,* at 384 (observing *Loving* held "the right to marry is of fundamental importance for all individuals"). Like choices concerning contraception, family relationships, procreation, and childrearing, all of which are protected by the Constitution, decisions concerning marriage are among the most intimate that an individual can make. See *Lawrence*, *supra*, at 574. Indeed, the Court has noted it would

Opinion of the Court

be contradictory "to recognize a right of privacy with re-
spect to other matters of family life and not with respect to
the decision to enter the relationship that is the founda-
tion of the family in our society." *Zablocki*, *supra*, at 386.

Choices about marriage shape an individual's destiny.
As the Supreme Judicial Court of Massachusetts has
explained, because "it fulfils yearnings for security, safe
haven, and connection that express our common human-
ity, civil marriage is an esteemed institution, and the
decision whether and whom to marry is among life's mo-
mentous acts of self-definition." *Goodridge*, 440 Mass., at
322, 798 N. E. 2d, at 955.

The nature of marriage is that, through its enduring
bond, two persons together can find other freedoms, such
as expression, intimacy, and spirituality. This is true for
all persons, whatever their sexual orientation. See *Wind-
sor*, 570 U. S., at ___– ___ (slip op., at 22–23). There is
dignity in the bond between two men or two women who
seek to marry and in their autonomy to make such pro-
found choices. Cf. *Loving, supra*, at 12 ("[T]he freedom to
marry, or not marry, a person of another race resides with
the individual and cannot be infringed by the State").

A second principle in this Court's jurisprudence is that
the right to marry is fundamental because it supports a
two-person union unlike any other in its importance to the
committed individuals. This point was central to *Griswold*
v. *Connecticut*, which held the Constitution protects the
right of married couples to use contraception. 381 U. S., at
485. Suggesting that marriage is a right "older than the
Bill of Rights," *Griswold* described marriage this way:

    "Marriage is a coming together for better or for worse,
    hopefully enduring, and intimate to the degree of be-
    ing sacred. It is an association that promotes a way of
    life, not causes; a harmony in living, not political
    faiths; a bilateral loyalty, not commercial or social

projects. Yet it is an association for as noble a purpose as any involved in our prior decisions. ” *Id.*, at 486.

And in *Turner*, the Court again acknowledged the intimate association protected by this right, holding prisoners could not be denied the right to marry because their committed relationships satisfied the basic reasons why marriage is a fundamental right. See 482 U. S., at 95–96. The right to marry thus dignifies couples who "wish to define themselves by their commitment to each other." *Windsor*, *supra,* at ___ (slip op., at 14). Marriage responds to the universal fear that a lonely person might call out only to find no one there. It offers the hope of companionship and understanding and assurance that while both still live there will be someone to care for the other.

As this Court held in *Lawrence*, same-sex couples have the same right as opposite-sex couples to enjoy intimate association. *Lawrence* invalidated laws that made same-sex intimacy a criminal act. And it acknowledged that "[w]hen sexuality finds overt expression in intimate conduct with another person, the conduct can be but one element in a personal bond that is more enduring." 539 U. S., at 567. But while *Lawrence* confirmed a dimension of freedom that allows individuals to engage in intimate association without criminal liability, it does not follow that freedom stops there. Outlaw to outcast may be a step forward, but it does not achieve the full promise of liberty.

A third basis for protecting the right to marry is that it safeguards children and families and thus draws meaning from related rights of childrearing, procreation, and education. See *Pierce* v. *Society of Sisters*, 268 U. S. 510 (1925); *Meyer*, 262 U. S., at 399. The Court has recognized these connections by describing the varied rights as a unified whole: "[T]he right to 'marry, establish a home and bring up children' is a central part of the liberty protected by the Due Process Clause." *Zablocki*, 434 U. S., at 384

Opinion of the Court

(quoting *Meyer*, *supra*, at 399). Under the laws of the
several States, some of marriage's protections for children
and families are material. But marriage also confers more
profound benefits. By giving recognition and legal struc-
ture to their parents' relationship, marriage allows chil-
dren "to understand the integrity and closeness of their
own family and its concord with other families in their
community and in their daily lives." *Windsor*, *supra*, at
___ (slip op., at 23). Marriage also affords the permanency
and stability important to children's best interests. See
Brief for Scholars of the Constitutional Rights of Children
as *Amici Curiae* 22–27.

As all parties agree, many same-sex couples provide
loving and nurturing homes to their children, whether
biological or adopted. And hundreds of thousands of chil-
dren are presently being raised by such couples. See Brief
for Gary J. Gates as *Amicus Curiae* 4. Most States have
allowed gays and lesbians to adopt, either as individuals
or as couples, and many adopted and foster children have
same-sex parents, see *id.,* at 5. This provides powerful
confirmation from the law itself that gays and lesbians can
create loving, supportive families.

Excluding same-sex couples from marriage thus con-
flicts with a central premise of the right to marry. With-
out the recognition, stability, and predictability marriage
offers, their children suffer the stigma of knowing their
families are somehow lesser. They also suffer the signifi-
cant material costs of being raised by unmarried parents,
relegated through no fault of their own to a more difficult
and uncertain family life. The marriage laws at issue here
thus harm and humiliate the children of same-sex couples.
See *Windsor*, *supra,* at ___ (slip op., at 23).

That is not to say the right to marry is less meaningful
for those who do not or cannot have children. An ability,
desire, or promise to procreate is not and has not been a
prerequisite for a valid marriage in any State. In light of

Opinion of the Court

precedent protecting the right of a married couple not to
procreate, it cannot be said the Court or the States have
conditioned the right to marry on the capacity or commit-
ment to procreate. The constitutional marriage right has
many aspects, of which childbearing is only one.

Fourth and finally, this Court's cases and the Nation's
traditions make clear that marriage is a keystone of our
social order. Alexis de Tocqueville recognized this truth
on his travels through the United States almost two cen-
turies ago:

> "There is certainly no country in the world where the
> tie of marriage is so much respected as in America . . .
> [W]hen the American retires from the turmoil of pub-
> lic life to the bosom of his family, he finds in it the im-
> age of order and of peace . . . . [H]e afterwards carries
> [that image] with him into public affairs." 1 Democ-
> racy in America 309 (H. Reeve transl., rev. ed. 1990).

In *Maynard* v. *Hill*, 125 U. S. 190, 211 (1888), the Court
echoed de Tocqueville, explaining that marriage is "the
foundation of the family and of society, without which
there would be neither civilization nor progress." Mar-
riage, the *Maynard* Court said, has long been "'a great
public institution, giving character to our whole civil
polity.'" *Id.,* at 213. This idea has been reiterated even as
the institution has evolved in substantial ways over time,
superseding rules related to parental consent, gender, and
race once thought by many to be essential. See generally
N. Cott, Public Vows. Marriage remains a building block
of our national community.

For that reason, just as a couple vows to support each
other, so does society pledge to support the couple, offering
symbolic recognition and material benefits to protect and
nourish the union. Indeed, while the States are in general
free to vary the benefits they confer on all married cou-
ples, they have throughout our history made marriage the

Opinion of the Court

basis for an expanding list of governmental rights, benefits, and responsibilities. These aspects of marital status include: taxation; inheritance and property rights; rules of intestate succession; spousal privilege in the law of evidence; hospital access; medical decisionmaking authority; adoption rights; the rights and benefits of survivors; birth and death certificates; professional ethics rules; campaign finance restrictions; workers' compensation benefits; health insurance; and child custody, support, and visitation rules. See Brief for United States as *Amicus Curiae* 6–9; Brief for American Bar Association as *Amicus Curiae* 8–29. Valid marriage under state law is also a significant status for over a thousand provisions of federal law. See *Windsor*, 570 U. S., at ___ – ___ (slip op., at 15–16). The States have contributed to the fundamental character of the marriage right by placing that institution at the center of so many facets of the legal and social order.

There is no difference between same- and opposite-sex couples with respect to this principle. Yet by virtue of their exclusion from that institution, same-sex couples are denied the constellation of benefits that the States have linked to marriage. This harm results in more than just material burdens. Same-sex couples are consigned to an instability many opposite-sex couples would deem intolerable in their own lives. As the State itself makes marriage all the more precious by the significance it attaches to it, exclusion from that status has the effect of teaching that gays and lesbians are unequal in important respects. It demeans gays and lesbians for the State to lock them out of a central institution of the Nation's society. Same-sex couples, too, may aspire to the transcendent purposes of marriage and seek fulfillment in its highest meaning.

The limitation of marriage to opposite-sex couples may long have seemed natural and just, but its inconsistency with the central meaning of the fundamental right to marry is now manifest. With that knowledge must come

18                    OBERGEFELL *v.* HODGES

the recognition that laws excluding same-sex couples from
the marriage right impose stigma and injury of the kind
prohibited by our basic charter.

   Objecting that this does not reflect an appropriate fram-
ing of the issue, the respondents refer to *Washington* v.
*Glucksberg*, 521 U. S. 702, 721 (1997), which called for a
"'careful description'" of fundamental rights. They assert
the petitioners do not seek to exercise the right to marry
but rather a new and nonexistent "right to same-sex mar-
riage." Brief for Respondent in No. 14–556, p. 8. *Glucks-
berg* did insist that liberty under the Due Process Clause
must be defined in a most circumscribed manner, with
central reference to specific historical practices. Yet while
that approach may have been appropriate for the asserted
right there involved (physician-assisted suicide), it is
inconsistent with the approach this Court has used in
discussing other fundamental rights, including marriage
and intimacy. *Loving* did not ask about a "right to inter-
racial marriage"; *Turner* did not ask about a "right of
inmates to marry"; and *Zablocki* did not ask about a "right
of fathers with unpaid child support duties to marry."
Rather, each case inquired about the right to marry in its
comprehensive sense, asking if there was a sufficient
justification for excluding the relevant class from the
right. See also *Glucksberg*, 521 U. S., at 752–773 (Souter,
J., concurring in judgment); *id.,* at 789–792 (BREYER, J.,
concurring in judgments).

   That principle applies here. If rights were defined by
who exercised them in the past, then received practices
could serve as their own continued justification and new
groups could not invoke rights once denied. This Court
has rejected that approach, both with respect to the right
to marry and the rights of gays and lesbians. See *Loving*
388 U. S., at 12; *Lawrence*, 539 U. S., at 566–567.

   The right to marry is fundamental as a matter of history
and tradition, but rights come not from ancient sources

alone. They rise, too, from a better informed understanding of how constitutional imperatives define a liberty that remains urgent in our own era. Many who deem same-sex marriage to be wrong reach that conclusion based on decent and honorable religious or philosophical premises, and neither they nor their beliefs are disparaged here. But when that sincere, personal opposition becomes enacted law and public policy, the necessary consequence is to put the imprimatur of the State itself on an exclusion that soon demeans or stigmatizes those whose own liberty is then denied. Under the Constitution, same-sex couples seek in marriage the same legal treatment as opposite-sex couples, and it would disparage their choices and diminish their personhood to deny them this right.

The right of same-sex couples to marry that is part of the liberty promised by the Fourteenth Amendment is derived, too, from that Amendment's guarantee of the equal protection of the laws. The Due Process Clause and the Equal Protection Clause are connected in a profound way, though they set forth independent principles. Rights implicit in liberty and rights secured by equal protection may rest on different precepts and are not always coextensive, yet in some instances each may be instructive as to the meaning and reach of the other. In any particular case one Clause may be thought to capture the essence of the right in a more accurate and comprehensive way, even as the two Clauses may converge in the identification and definition of the right. See *M. L. B.*, 519 U. S., at 120–121; *id.*, at 128–129 (KENNEDY, J., concurring in judgment); *Bearden* v. *Georgia*, 461 U. S. 660, 665 (1983). This interrelation of the two principles furthers our understanding of what freedom is and must become.

The Court's cases touching upon the right to marry reflect this dynamic. In *Loving* the Court invalidated a prohibition on interracial marriage under both the Equal Protection Clause and the Due Process Clause. The Court

Opinion of the Court

first declared the prohibition invalid because of its un-
equal treatment of interracial couples. It stated: "There
can be no doubt that restricting the freedom to marry
solely because of racial classifications violates the central
meaning of the Equal Protection Clause." 388 U. S., at 12.
With this link to equal protection the Court proceeded to
hold the prohibition offended central precepts of liberty:
"To deny this fundamental freedom on so unsupportable a
basis as the racial classifications embodied in these stat-
utes, classifications so directly subversive of the principle
of equality at the heart of the Fourteenth Amendment, is
surely to deprive all the State's citizens of liberty without
due process of law." *Ibid.* The reasons why marriage is a
fundamental right became more clear and compelling from
a full awareness and understanding of the hurt that re-
sulted from laws barring interracial unions.

The synergy between the two protections is illustrated
further in *Zablocki*. There the Court invoked the Equal
Protection Clause as its basis for invalidating the chal-
lenged law, which, as already noted, barred fathers who
were behind on child-support payments from marrying
without judicial approval. The equal protection analysis
depended in central part on the Court's holding that the
law burdened a right "of fundamental importance." 434
U. S., at 383. It was the essential nature of the marriage
right, discussed at length in *Zablocki*, see *id.,* at 383–387,
that made apparent the law's incompatibility with re-
quirements of equality. Each concept—liberty and equal
protection—leads to a stronger understanding of the other.

Indeed, in interpreting the Equal Protection Clause, the
Court has recognized that new insights and societal un-
derstandings can reveal unjustified inequality within our
most fundamental institutions that once passed unnoticed
and unchallenged. To take but one period, this occurred
with respect to marriage in the 1970's and 1980's. Not-
withstanding the gradual erosion of the doctrine of cover-

Opinion of the Court

ture, see *supra*, at 6, invidious sex-based classifications in marriage remained common through the mid-20th century. See App. to Brief for Appellant in *Reed* v. *Reed*, O. T. 1971, No. 70–4, pp. 69–88 (an extensive reference to laws extant as of 1971 treating women as unequal to men in marriage). These classifications denied the equal dignity of men and women. One State's law, for example, provided in 1971 that "the husband is the head of the family and the wife is subject to him; her legal civil existence is merged in the husband, except so far as the law recognizes her separately, either for her own protection, or for her benefit." Ga. Code Ann. §53–501 (1935). Responding to a new awareness, the Court invoked equal protection principles to invalidate laws imposing sex-based inequality on marriage. See, *e.g., Kirchberg* v. *Feenstra*, 450 U. S. 455 (1981); *Wengler* v. *Druggists Mut. Ins. Co.*, 446 U. S. 142 (1980); *Califano* v. *Westcott*, 443 U. S. 76 (1979); *Orr* v. *Orr*, 440 U. S. 268 (1979); *Califano* v. *Goldfarb*, 430 U. S. 199 (1977) (plurality opinion); *Weinberger* v. *Wiesenfeld*, 420 U. S. 636 (1975); *Frontiero* v. *Richardson*, 411 U. S. 677 (1973). Like *Loving* and *Zablocki*, these precedents show the Equal Protection Clause can help to identify and correct inequalities in the institution of marriage, vindicating precepts of liberty and equality under the Constitution.

Other cases confirm this relation between liberty and equality. In *M. L. B.* v. *S. L. J.*, the Court invalidated under due process and equal protection principles a statute requiring indigent mothers to pay a fee in order to appeal the termination of their parental rights. See 519 U. S., at 119–124. In *Eisenstadt* v. *Baird*, the Court invoked both principles to invalidate a prohibition on the distribution of contraceptives to unmarried persons but not married persons. See 405 U. S., at 446–454. And in *Skinner* v. *Oklahoma ex rel. Williamson*, the Court invalidated under both principles a law that allowed steriliza-

tion of habitual criminals.  See 316 U. S., at 538–543.

In *Lawrence* the Court acknowledged the interlocking nature of these constitutional safeguards in the context of the legal treatment of gays and lesbians.  See 539 U. S., at 575.  Although *Lawrence* elaborated its holding under the Due Process Clause, it acknowledged, and sought to remedy, the continuing inequality that resulted from laws making intimacy in the lives of gays and lesbians a crime against the State.  See *ibid.*  *Lawrence* therefore drew upon principles of liberty and equality to define and protect the rights of gays and lesbians, holding the State "cannot demean their existence or control their destiny by making their private sexual conduct a crime."  *Id.*, at 578.

This dynamic also applies to same-sex marriage.  It is now clear that the challenged laws burden the liberty of same-sex couples, and it must be further acknowledged that they abridge central precepts of equality.  Here the marriage laws enforced by the respondents are in essence unequal: same-sex couples are denied all the benefits afforded to opposite-sex couples and are barred from exercising a fundamental right.  Especially against a long history of disapproval of their relationships, this denial to same-sex couples of the right to marry works a grave and continuing harm.  The imposition of this disability on gays and lesbians serves to disrespect and subordinate them. And the Equal Protection Clause, like the Due Process Clause, prohibits this unjustified infringement of the fundamental right to marry.  See, *e.g., Zablocki*, *supra*, at 383–388; *Skinner*, 316 U. S., at 541.

These considerations lead to the conclusion that the right to marry is a fundamental right inherent in the liberty of the person, and under the Due Process and Equal Protection Clauses of the Fourteenth Amendment couples of the same-sex may not be deprived of that right and that liberty.  The Court now holds that same-sex couples may exercise the fundamental right to marry.  No

Opinion of the Court

longer may this liberty be denied to them. *Baker* v. *Nelson* must be and now is overruled, and the State laws challenged by Petitioners in these cases are now held invalid to the extent they exclude same-sex couples from civil marriage on the same terms and conditions as opposite-sex couples.

## IV

There may be an initial inclination in these cases to proceed with caution—to await further legislation, litigation, and debate. The respondents warn there has been insufficient democratic discourse before deciding an issue so basic as the definition of marriage. In its ruling on the cases now before this Court, the majority opinion for the Court of Appeals made a cogent argument that it would be appropriate for the respondents' States to await further public discussion and political measures before licensing same-sex marriages. See *DeBoer*, 772 F. 3d, at 409.

Yet there has been far more deliberation than this argument acknowledges. There have been referenda, legislative debates, and grassroots campaigns, as well as countless studies, papers, books, and other popular and scholarly writings. There has been extensive litigation in state and federal courts. See Appendix A, *infra*. Judicial opinions addressing the issue have been informed by the contentions of parties and counsel, which, in turn, reflect the more general, societal discussion of same-sex marriage and its meaning that has occurred over the past decades. As more than 100 *amici* make clear in their filings, many of the central institutions in American life—state and local governments, the military, large and small businesses, labor unions, religious organizations, law enforcement, civic groups, professional organizations, and universities—have devoted substantial attention to the question. This has led to an enhanced understanding of the issue—an understanding reflected in the arguments now presented

Opinion of the Court

for resolution as a matter of constitutional law.

Of course, the Constitution contemplates that democracy is the appropriate process for change, so long as that process does not abridge fundamental rights. Last Term, a plurality of this Court reaffirmed the importance of the democratic principle in *Schuette* v. *BAMN*, 572 U. S. ___ (2014), noting the "right of citizens to debate so they can learn and decide and then, through the political process, act in concert to try to shape the course of their own times." *Id.*, at ___ – ___ (slip op., at 15–16). Indeed, it is most often through democracy that liberty is preserved and protected in our lives. But as *Schuette* also said, "[t]he freedom secured by the Constitution consists, in one of its essential dimensions, of the right of the individual not to be injured by the unlawful exercise of governmental power." *Id.,* at ___ (slip op., at 15). Thus, when the rights of persons are violated, "the Constitution requires redress by the courts," notwithstanding the more general value of democratic decisionmaking. *Id.,* at ___ (slip op., at 17). This holds true even when protecting individual rights affects issues of the utmost importance and sensitivity.

The dynamic of our constitutional system is that individuals need not await legislative action before asserting a fundamental right. The Nation's courts are open to injured individuals who come to them to vindicate their own direct, personal stake in our basic charter. An individual can invoke a right to constitutional protection when he or she is harmed, even if the broader public disagrees and even if the legislature refuses to act. The idea of the Constitution "was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts." *West Virginia Bd. of Ed.* v. *Barnette*, 319 U. S. 624, 638 (1943). This is why "fundamental rights may not be submitted to a vote; they depend on the outcome of no elections." *Ibid.*

Opinion of the Court

It is of no moment whether advocates of same-sex marriage now enjoy or lack momentum in the democratic process. The issue before the Court here is the legal question whether the Constitution protects the right of same-sex couples to marry.

This is not the first time the Court has been asked to adopt a cautious approach to recognizing and protecting fundamental rights. In *Bowers*, a bare majority upheld a law criminalizing same-sex intimacy. See 478 U. S., at 186, 190–195. That approach might have been viewed as a cautious endorsement of the democratic process, which had only just begun to consider the rights of gays and lesbians. Yet, in effect, *Bowers* upheld state action that denied gays and lesbians a fundamental right and caused them pain and humiliation. As evidenced by the dissents in that case, the facts and principles necessary to a correct holding were known to the *Bowers* Court. See *id.*, at 199 (Blackmun, J., joined by Brennan, Marshall, and Stevens, JJ., dissenting); *id.,* at 214 (Stevens, J., joined by Brennan and Marshall, JJ., dissenting). That is why *Lawrence* held *Bowers* was "not correct when it was decided." 539 U. S., at 578. Although *Bowers* was eventually repudiated in *Lawrence*, men and women were harmed in the interim, and the substantial effects of these injuries no doubt lingered long after *Bowers* was overruled. Dignitary wounds cannot always be healed with the stroke of a pen.

A ruling against same-sex couples would have the same effect—and, like *Bowers*, would be unjustified under the Fourteenth Amendment. The petitioners' stories make clear the urgency of the issue they present to the Court. James Obergefell now asks whether Ohio can erase his marriage to John Arthur for all time. April DeBoer and Jayne Rowse now ask whether Michigan may continue to deny them the certainty and stability all mothers desire to protect their children, and for them and their children the childhood years will pass all too soon. Ijpe DeKoe and

Opinion of the Court

Thomas Kostura now ask whether Tennessee can deny to one who has served this Nation the basic dignity of recognizing his New York marriage. Properly presented with the petitioners' cases, the Court has a duty to address these claims and answer these questions.

Indeed, faced with a disagreement among the Courts of Appeals—a disagreement that caused impermissible geographic variation in the meaning of federal law—the Court granted review to determine whether same-sex couples may exercise the right to marry. Were the Court to uphold the challenged laws as constitutional, it would teach the Nation that these laws are in accord with our society's most basic compact. Were the Court to stay its hand to allow slower, case-by-case determination of the required availability of specific public benefits to same-sex couples, it still would deny gays and lesbians many rights and responsibilities intertwined with marriage.

The respondents also argue allowing same-sex couples to wed will harm marriage as an institution by leading to fewer opposite-sex marriages. This may occur, the respondents contend, because licensing same-sex marriage severs the connection between natural procreation and marriage. That argument, however, rests on a counterintuitive view of opposite-sex couple's decisionmaking processes regarding marriage and parenthood. Decisions about whether to marry and raise children are based on many personal, romantic, and practical considerations; and it is unrealistic to conclude that an opposite-sex couple would choose not to marry simply because same-sex couples may do so. See *Kitchen* v. *Herbert*, 755 F. 3d 1193, 1223 (CA10 2014) ("[I]t is wholly illogical to believe that state recognition of the love and commitment between same-sex couples will alter the most intimate and personal decisions of opposite-sex couples"). The respondents have not shown a foundation for the conclusion that allowing same-sex marriage will cause the harmful outcomes they

Opinion of the Court

describe.  Indeed, with respect to this asserted basis for excluding same-sex couples from the right to marry, it is appropriate to observe these cases involve only the rights of two consenting adults whose marriages would pose no risk of harm to themselves or third parties.

Finally, it must be emphasized that religions, and those who adhere to religious doctrines, may continue to advocate with utmost, sincere conviction that, by divine precepts, same-sex marriage should not be condoned.  The First Amendment ensures that religious organizations and persons are given proper protection as they seek to teach the principles that are so fulfilling and so central to their lives and faiths, and to their own deep aspirations to continue the family structure they have long revered.  The same is true of those who oppose same-sex marriage for other reasons.  In turn, those who believe allowing same-sex marriage is proper or indeed essential, whether as a matter of religious conviction or secular belief, may engage those who disagree with their view in an open and searching debate.  The Constitution, however, does not permit the State to bar same-sex couples from marriage on the same terms as accorded to couples of the opposite sex.

## V

These cases also present the question whether the Constitution requires States to recognize same-sex marriages validly performed out of State.  As made clear by the case of Obergefell and Arthur, and by that of DeKoe and Kostura, the recognition bans inflict substantial and continuing harm on same-sex couples.

Being married in one State but having that valid marriage denied in another is one of "the most perplexing and distressing complication[s]" in the law of domestic relations.  *Williams* v. *North Carolina*, 317 U. S. 287, 299 (1942) (internal quotation marks omitted).  Leaving the current state of affairs in place would maintain and pro-

Opinion of the Court

mote instability and uncertainty. For some couples, even an ordinary drive into a neighboring State to visit family or friends risks causing severe hardship in the event of a spouse's hospitalization while across state lines. In light of the fact that many States already allow same-sex marriage—and hundreds of thousands of these marriages already have occurred—the disruption caused by the recognition bans is significant and ever-growing.

As counsel for the respondents acknowledged at argument, if States are required by the Constitution to issue marriage licenses to same-sex couples, the justifications for refusing to recognize those marriages performed elsewhere are undermined. See Tr. of Oral Arg. on Question 2, p. 44. The Court, in this decision, holds same-sex couples may exercise the fundamental right to marry in all States. It follows that the Court also must hold—and it now does hold—that there is no lawful basis for a State to refuse to recognize a lawful same-sex marriage performed in another State on the ground of its same-sex character.

\*    \*    \*

No union is more profound than marriage, for it embodies the highest ideals of love, fidelity, devotion, sacrifice, and family. In forming a marital union, two people become something greater than once they were. As some of the petitioners in these cases demonstrate, marriage embodies a love that may endure even past death. It would misunderstand these men and women to say they disrespect the idea of marriage. Their plea is that they do respect it, respect it so deeply that they seek to find its fulfillment for themselves. Their hope is not to be condemned to live in loneliness, excluded from one of civilization's oldest institutions. They ask for equal dignity in the eyes of the law. The Constitution grants them that right.

The judgment of the Court of Appeals for the Sixth Circuit is reversed.

*It is so ordered.*

Appendix A to opinion of the Court

# APPENDICES
## A
### State and Federal Judicial Decisions
### Addressing Same-Sex Marriage

## United States Courts of Appeals Decisions

*Adams* v. *Howerton*, 673 F. 2d 1036 (CA9 1982)

*Smelt* v. *County of Orange*, 447 F. 3d 673 (CA9 2006)

*Citizens for Equal Protection* v. *Bruning*, 455 F. 3d 859 (CA8 2006)

*Windsor* v. *United States*, 699 F. 3d 169 (CA2 2012)

*Massachusetts* v. *Department of Health and Human Services*, 682 F. 3d 1 (CA1 2012)

*Perry* v. *Brown*, 671 F. 3d 1052 (CA9 2012)

*Latta* v. *Otter*, 771 F. 3d 456 (CA9 2014)

*Baskin* v. *Bogan*, 766 F. 3d 648 (CA7 2014)

*Bishop* v. *Smith*, 760 F. 3d 1070 (CA10 2014)

*Bostic* v. *Schaefer*, 760 F. 3d 352 (CA4 2014)

*Kitchen* v. *Herbert*, 755 F. 3d 1193 (CA10 2014)

*DeBoer* v. *Snyder*, 772 F. 3d 388 (CA6 2014)

*Latta* v. *Otter*, 779 F. 3d 902 (CA9 2015) (O'Scannlain, J., dissenting from the denial of rehearing en banc)

## United States District Court Decisions

*Adams* v. *Howerton*, 486 F. Supp. 1119 (CD Cal. 1980)

*Citizens for Equal Protection, Inc.* v. *Bruning*, 290 F. Supp. 2d 1004 (Neb. 2003)

*Citizens for Equal Protection* v. *Bruning*, 368 F. Supp. 2d 980 (Neb. 2005)

*Wilson* v. *Ake*, 354 F. Supp. 2d 1298 (MD Fla. 2005)

*Smelt* v. *County of Orange*, 374 F. Supp. 2d 861 (CD Cal. 2005)

*Bishop* v. *Oklahoma ex rel. Edmondson*, 447 F. Supp. 2d 1239 (ND Okla. 2006)

Appendix A to opinion of the Court

*Massachusetts* v. *Department of Health and Human Services*, 698 F. Supp. 2d 234 (Mass. 2010)

*Gill* v. *Office of Personnel Management*, 699 F. Supp. 2d 374 (Mass. 2010)

*Perry* v. *Schwarzenegger*, 704 F. Supp. 2d 921 (ND Cal. 2010)

*Dragovich* v. *Department of Treasury*, 764 F. Supp. 2d 1178 (ND Cal. 2011)

*Golinski* v. *Office of Personnel Management*, 824 F. Supp. 2d 968 (ND Cal. 2012)

*Dragovich* v. *Department of Treasury*, 872 F. Supp. 2d 944 (ND Cal. 2012)

*Windsor* v. *United States*, 833 F. Supp. 2d 394 (SDNY 2012)

*Pedersen* v. *Office of Personnel Management*, 881 F. Supp. 2d 294 (Conn. 2012)

*Jackson* v. *Abercrombie*, 884 F. Supp. 2d 1065 (Haw. 2012)

*Sevcik* v. *Sandoval*, 911 F. Supp. 2d 996 (Nev. 2012)

*Merritt* v. *Attorney General*, 2013 WL 6044329 (MD La., Nov. 14, 2013)

*Gray* v. *Orr*, 4 F. Supp. 3d 984 (ND Ill. 2013)

*Lee* v. *Orr*, 2013 WL 6490577 (ND Ill., Dec. 10, 2013)

*Kitchen* v. *Herbert*, 961 F. Supp. 2d 1181 (Utah 2013)

*Obergefell* v. *Wymyslo*, 962 F. Supp. 2d 968 (SD Ohio 2013)

*Bishop* v. *United States ex rel. Holder*, 962 F. Supp. 2d 1252 (ND Okla. 2014)

*Bourke* v. *Beshear*, 996 F. Supp. 2d 542 (WD Ky. 2014)

*Lee* v. *Orr*, 2014 WL 683680 (ND Ill., Feb. 21, 2014)

*Bostic* v. *Rainey*, 970 F. Supp. 2d 456 (ED Va. 2014)

*De Leon* v. *Perry*, 975 F. Supp. 2d 632 (WD Tex. 2014)

*Tanco* v. *Haslam*, 7 F. Supp. 3d 759 (MD Tenn. 2014)

*DeBoer* v. *Snyder*, 973 F. Supp. 2d 757 (ED Mich. 2014)

*Henry* v. *Himes*, 14 F. Supp. 3d 1036 (SD Ohio 2014)

*Latta* v. *Otter*, 19 F. Supp. 3d 1054 (Idaho 2014)

Cite as: 576 U. S. ____ (2015)          31

Appendix A to opinion of the Court

*Geiger* v. *Kitzhaber*, 994 F. Supp. 2d 1128 (Ore. 2014)

*Evans* v. *Utah*, 21 F. Supp. 3d 1192 (Utah 2014)

*Whitewood* v. *Wolf*, 992 F. Supp. 2d 410 (MD Pa. 2014)

*Wolf* v. *Walker*, 986 F. Supp. 2d 982 (WD Wis. 2014)

*Baskin* v. *Bogan*, 12 F. Supp. 3d 1144 (SD Ind. 2014)

*Love* v. *Beshear*, 989 F. Supp. 2d 536 (WD Ky. 2014)

*Burns* v. *Hickenlooper*, 2014 WL 3634834 (Colo., July 23, 2014)

*Bowling* v. *Pence*, 39 F. Supp. 3d 1025 (SD Ind. 2014)

*Brenner* v. *Scott*, 999 F. Supp. 2d 1278 (ND Fla. 2014)

*Robicheaux* v. *Caldwell*, 2 F. Supp. 3d 910 (ED La. 2014)

*General Synod of the United Church of Christ* v. *Resinger*, 12 F. Supp. 3d 790   (WDNC 2014)

*Hamby* v. *Parnell*, 56 F. Supp. 3d 1056 (Alaska 2014)

*Fisher-Borne* v. *Smith*, 14 F. Supp. 3d 695 (MDNC 2014)

*Majors* v. *Horne*, 14 F. Supp. 3d 1313 (Ariz. 2014)

*Connolly* v. *Jeanes*, ___ F. Supp. 3d ___, 2014 WL 5320642 (Ariz., Oct. 17, 2014)

*Guzzo* v. *Mead*, 2014 WL 5317797 (Wyo., Oct. 17, 2014)

*Conde-Vidal* v. *Garcia-Padilla*, 54 F. Supp. 3d 157 (PR 2014)

*Marie* v. *Moser*, ___ F. Supp. 3d ___, 2014 WL 5598128 (Kan., Nov. 4, 2014)

*Lawson* v. *Kelly*, 58 F. Supp. 3d 923 (WD Mo. 2014)

*McGee* v. *Cole*, ___ F. Supp. 3d ___, 2014 WL 5802665 (SD W. Va., Nov. 7, 2014)

*Condon* v. *Haley*, 21 F. Supp. 3d 572 (S.C. 2014)

*Bradacs* v. *Haley*, 58 F. Supp. 3d 514 (S.C. 2014)

*Rolando* v. *Fox*, 23 F. Supp. 3d 1227 (Mont. 2014)

*Jernigan* v. *Crane*, ___ F. Supp. 3d ___, 2014 WL 6685391 (ED Ark., Nov. 25, 2014)

*Campaign for Southern Equality* v. *Bryant*, ___ F. Supp. 3d ___, 2014 WL 6680570 (SD Miss., Nov. 25, 2014)

*Inniss* v. *Aderhold*, ___ F. Supp. 3d ___, 2015 WL 300593 (ND Ga., Jan. 8, 2015)

Appendix A to opinion of the Court

*Rosenbrahn* v. *Daugaard*, 61 F. Supp. 3d 862 (S. D., 2015)

*Caspar* v. *Snyder*, ___ F. Supp. 3d ___, 2015 WL 224741 (ED Mich., Jan. 15, 2015)

*Searcey* v. *Strange*, 2015 U. S. Dist. LEXIS 7776 (SD Ala., Jan. 23, 2015)

*Strawser* v. *Strange*, 44 F. Supp. 3d 1206 (SD Ala. 2015)

*Waters* v. *Ricketts*, 48 F. Supp. 3d 1271 (Neb. 2015)


## State Highest Court Decisions

*Baker* v. *Nelson*, 291 Minn. 310, 191 N. W. 2d 185 (1971)

*Jones* v. *Hallahan*, 501 S. W. 2d 588 (Ky. 1973)

*Baehr* v. *Lewin*, 74 Haw. 530, 852 P. 2d 44 (1993)

*Dean* v. *District of Columbia*, 653 A. 2d 307 (D. C. 1995)

*Baker* v. *State,* 170 Vt. 194, 744 A. 2d 864 (1999)

*Brause* v. *State*, 21 P. 3d 357 (Alaska 2001) (ripeness)

*Goodridge* v. *Department of Public Health*, 440 Mass. 309, 798 N. E. 2d 941 (2003)

*In re Opinions of the Justices to the Senate*, 440 Mass. 1201, 802 N. E. 2d 565 (2004)

*Li* v. *State*, 338 Or. 376, 110 P. 3d 91 (2005)

*Cote-Whitacre* v. *Department of Public Health*,446 Mass. 350, 844 N. E. 2d 623 (2006)

*Lewis* v. *Harris*, 188 N. J. 415, 908 A. 2d 196 (2006)

*Andersen* v. *King County*, 158 Wash. 2d 1, 138 P. 3d 963 (2006)

*Hernandez* v. *Robles*, 7 N. Y. 3d 338, 855 N. E. 2d 1 (2006)

*Conaway* v. *Deane*, 401 Md. 219, 932 A. 2d 571 (2007)

*In re Marriage Cases*, 43 Cal. 4th 757, 183 P. 3d 384 (2008)

*Kerrigan* v. *Commissioner of Public Health*, 289 Conn. 135, 957 A. 2d 407 (2008)

*Strauss* v. *Horton*, 46 Cal. 4th 364, 207 P. 3d 48 (2009)

Appendix A to opinion of the Court

*Varnum* v. *Brien*, 763 N. W. 2d 862 (Iowa 2009)

*Griego* v. *Oliver*, 2014–NMSC–003, ___ N. M. ___, 316 P. 3d 865 (2013)

*Garden State Equality* v. *Dow*, 216 N. J. 314, 79 A. 3d 1036 (2013)

*Ex parte State ex rel. Alabama Policy Institute*, ___ So. 3d ___, 2015 WL 892752 (Ala., Mar. 3, 2015)

34                     OBERGEFELL *v.* HODGES

Appendix B to opinion of the Court

B

State Legislation and Judicial Decisions
Legalizing Same-Sex Marriage

## Legislation

Del. Code Ann., Tit. 13, §129 (Cum. Supp. 2014)
D. C. Act No. 18–248, 57 D. C. Reg. 27 (2010)
Haw. Rev. Stat. §572 –1 (2006) and 2013 Cum. Supp.)
Ill. Pub. Act No. 98–597
Me. Rev. Stat. Ann., Tit. 19, §650–A (Cum. Supp. 2014)
2012 Md. Laws p. 9
2013 Minn Laws p. 404
2009 N. H. Laws p. 60
2011 N. Y Laws p. 749
2013 R. I. Laws p. 7
2009 Vt. Acts & Resolves p. 33
2012 Wash. Sess. Laws p. 199

## Judicial Decisions

*Goodridge* v. *Department of Public Health*, 440 Mass.
309, 798 N. E. 2d 941 (2003)
*Kerrigan* v. *Commissioner of Public Health*, 289 Conn.
135, 957 A. 2d 407 (2008)
*Varnum* v. *Brien*, 763 N. W. 2d 862 (Iowa 2009)
*Griego* v. *Oliver*, 2014–NMSC–003, ___ N. M. ___, 316
P. 3d 865 (2013)
*Garden State Equality* v. *Dow*, 216 N. J. 314, 79 A. 3d
1036 (2013)

Cite as: 576 U. S. ____ (2015)          1

Roberts, C. J., dissenting

# SUPREME COURT OF THE UNITED STATES

————

Nos. 14–556, 14-562, 14-571 and 14–574

————

JAMES OBERGEFELL, ET AL., PETITIONERS
14–556                    *v.*
RICHARD HODGES, DIRECTOR, OHIO
DEPARTMENT OF HEALTH, ET AL.;


VALERIA TANCO, ET AL., PETITIONERS
14–562                    *v.*
BILL HASLAM, GOVERNOR OF
TENNESSEE, ET AL.;


APRIL DeBOER, ET AL., PETITIONERS
14–571                    *v.*
RICK SNYDER, GOVERNOR OF MICHIGAN,
ET AL.; AND


GREGORY BOURKE, ET AL., PETITIONERS
14–574                    *v.*
STEVE BESHEAR, GOVERNOR OF
KENTUCKY

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SIXTH CIRCUIT

[June 26, 2015]

CHIEF JUSTICE ROBERTS, with whom JUSTICE SCALIA
and JUSTICE THOMAS join, dissenting.

Petitioners make strong arguments rooted in social
policy and considerations of fairness. They contend that
same-sex couples should be allowed to affirm their love
and commitment through marriage, just like opposite-sex
couples. That position has undeniable appeal; over the

past six years, voters and legislators in eleven States and the District of Columbia have revised their laws to allow marriage between two people of the same sex.

But this Court is not a legislature. Whether same-sex marriage is a good idea should be of no concern to us. Under the Constitution, judges have power to say what the law is, not what it should be. The people who ratified the Constitution authorized courts to exercise "neither force nor will but merely judgment." The Federalist No. 78, p. 465 (C. Rossiter ed. 1961) (A. Hamilton) (capitalization altered).

Although the policy arguments for extending marriage to same-sex couples may be compelling, the legal arguments for requiring such an extension are not. The fundamental right to marry does not include a right to make a State change its definition of marriage. And a State's decision to maintain the meaning of marriage that has persisted in every culture throughout human history can hardly be called irrational. In short, our Constitution does not enact any one theory of marriage. The people of a State are free to expand marriage to include same-sex couples, or to retain the historic definition.

Today, however, the Court takes the extraordinary step of ordering every State to license and recognize same-sex marriage. Many people will rejoice at this decision, and I begrudge none their celebration. But for those who believe in a government of laws, not of men, the majority's approach is deeply disheartening. Supporters of same-sex marriage have achieved considerable success persuading their fellow citizens—through the democratic process—to adopt their view. That ends today. Five lawyers have closed the debate and enacted their own vision of marriage as a matter of constitutional law. Stealing this issue from the people will for many cast a cloud over same-sex marriage, making a dramatic social change that much more difficult to accept.

ROBERTS, C. J., dissenting

The majority's decision is an act of will, not legal judgment. The right it announces has no basis in the Constitution or this Court's precedent. The majority expressly disclaims judicial "caution" and omits even a pretense of humility, openly relying on its desire to remake society according to its own "new insight" into the "nature of injustice." *Ante*, at 11, 23. As a result, the Court invalidates the marriage laws of more than half the States and orders the transformation of a social institution that has formed the basis of human society for millennia, for the Kalahari Bushmen and the Han Chinese, the Carthaginians and the Aztecs. Just who do we think we are?

It can be tempting for judges to confuse our own preferences with the requirements of the law. But as this Court has been reminded throughout our history, the Constitution "is made for people of fundamentally differing views." *Lochner* v. *New York*, 198 U. S. 45, 76 (1905) (Holmes, J., dissenting). Accordingly, "courts are not concerned with the wisdom or policy of legislation." *Id.*, at 69 (Harlan, J., dissenting). The majority today neglects that restrained conception of the judicial role. It seizes for itself a question the Constitution leaves to the people, at a time when the people are engaged in a vibrant debate on that question. And it answers that question based not on neutral principles of constitutional law, but on its own "understanding of what freedom is and must become." *Ante*, at 19. I have no choice but to dissent.

Understand well what this dissent is about: It is not about whether, in my judgment, the institution of marriage should be changed to include same-sex couples. It is instead about whether, in our democratic republic, that decision should rest with the people acting through their elected representatives, or with five lawyers who happen to hold commissions authorizing them to resolve legal disputes according to law. The Constitution leaves no doubt about the answer.

ROBERTS, C. J., dissenting

## I

Petitioners and their *amici* base their arguments on the "right to marry" and the imperative of "marriage equality." There is no serious dispute that, under our precedents, the Constitution protects a right to marry and requires States to apply their marriage laws equally. The real question in these cases is what constitutes "marriage," or—more precisely—*who decides* what constitutes "marriage"?

The majority largely ignores these questions, relegating ages of human experience with marriage to a paragraph or two. Even if history and precedent are not "the end" of these cases, *ante*, at 4, I would not "sweep away what has so long been settled" without showing greater respect for all that preceded us. *Town of Greece* v. *Galloway*, 572 U. S. ___, ___ (2014) (slip op., at 8).

## A

As the majority acknowledges, marriage "has existed for millennia and across civilizations." *Ante*, at 3. For all those millennia, across all those civilizations, "marriage" referred to only one relationship: the union of a man and a woman. See *ante*, at 4; Tr. of Oral Arg. on Question 1, p. 12 (petitioners conceding that they are not aware of any society that permitted same-sex marriage before 2001). As the Court explained two Terms ago, "until recent years, . . . marriage between a man and a woman no doubt had been thought of by most people as essential to the very definition of that term and to its role and function throughout the history of civilization." *United States* v. *Windsor*, 570 U. S. ___, ___ (2013) (slip op., at 13).

This universal definition of marriage as the union of a man and a woman is no historical coincidence. Marriage did not come about as a result of a political movement, discovery, disease, war, religious doctrine, or any other moving force of world history—and certainly not as a result of a prehistoric decision to exclude gays and lesbi-

ROBERTS, C. J., dissenting

ans. It arose in the nature of things to meet a vital need: ensuring that children are conceived by a mother and father committed to raising them in the stable conditions of a lifelong relationship. See G. Quale, A History of Marriage Systems 2 (1988); cf. M. Cicero, De Officiis 57 (W. Miller transl. 1913) ("For since the reproductive instinct is by nature's gift the common possession of all living creatures, the first bond of union is that between husband and wife; the next, that between parents and children; then we find one home, with everything in common.").

The premises supporting this concept of marriage are so fundamental that they rarely require articulation. The human race must procreate to survive. Procreation occurs through sexual relations between a man and a woman. When sexual relations result in the conception of a child, that child's prospects are generally better if the mother and father stay together rather than going their separate ways. Therefore, for the good of children and society, sexual relations that can lead to procreation should occur only between a man and a woman committed to a lasting bond.

Society has recognized that bond as marriage. And by bestowing a respected status and material benefits on married couples, society encourages men and women to conduct sexual relations within marriage rather than without. As one prominent scholar put it, "Marriage is a socially arranged solution for the problem of getting people to stay together and care for children that the mere desire for children, and the sex that makes children possible, does not solve." J. Q. Wilson, The Marriage Problem 41 (2002).

This singular understanding of marriage has prevailed in the United States throughout our history. The majority accepts that at "the time of the Nation's founding [marriage] was understood to be a voluntary contract between

a man and a woman." *Ante,* at 6. Early Americans drew
heavily on legal scholars like William Blackstone, who
regarded marriage between "husband and wife" as one of
the "great relations in private life," and philosophers like
John Locke, who described marriage as "a voluntary com-
pact between man and woman" centered on "its chief end,
procreation" and the "nourishment and support" of chil-
dren. 1 W. Blackstone, Commentaries *410; J. Locke,
Second Treatise of Civil Government §§78–79, p. 39 (J.
Gough ed. 1947). To those who drafted and ratified the
Constitution, this conception of marriage and family "was
a given: its structure, its stability, roles, and values ac-
cepted by all." Forte, The Framers' Idea of Marriage and
Family, in The Meaning of Marriage 100, 102 (R. George
& J. Elshtain eds. 2006).

The Constitution itself says nothing about marriage,
and the Framers thereby entrusted the States with "[t]he
whole subject of the domestic relations of husband and
wife." *Windsor,* 570 U. S., at ___ (slip op., at 17) (quoting
*In re Burrus,* 136 U. S. 586, 593–594 (1890)). There is no
dispute that every State at the founding—and every State
throughout our history until a dozen years ago—defined
marriage in the traditional, biologically rooted way. The
four States in these cases are typical. Their laws, before
and after statehood, have treated marriage as the union of
a man and a woman. See *DeBoer* v. *Snyder,* 772 F. 3d 388,
396–399 (CA6 2014). Even when state laws did not spec-
ify this definition expressly, no one doubted what they
meant. See *Jones* v. *Hallahan,* 501 S. W. 2d 588, 589 (Ky.
App. 1973). The meaning of "marriage" went without
saying.

Of course, many did say it. In his first American dic-
tionary, Noah Webster defined marriage as "the legal
union of a man and woman for life," which served the
purposes of "preventing the promiscuous intercourse of the
sexes, . . . promoting domestic felicity, and . . . securing the

ROBERTS, C. J., dissenting

maintenance and education of children." 1 An American Dictionary of the English Language (1828). An influential 19th-century treatise defined marriage as "a civil status, existing in one man and one woman legally united for life for those civil and social purposes which are based in the distinction of sex." J. Bishop, Commentaries on the Law of Marriage and Divorce 25 (1852). The first edition of Black's Law Dictionary defined marriage as "the civil status of one man and one woman united in law for life." Black's Law Dictionary 756 (1891) (emphasis deleted). The dictionary maintained essentially that same definition for the next century.

This Court's precedents have repeatedly described marriage in ways that are consistent only with its traditional meaning. Early cases on the subject referred to marriage as "the union for life of one man and one woman," *Murphy* v. *Ramsey*, 114 U. S. 15, 45 (1885), which forms "the foundation of the family and of society, without which there would be neither civilization nor progress," *Maynard* v. *Hill*, 125 U. S. 190, 211 (1888). We later described marriage as "fundamental to our very existence and survival," an understanding that necessarily implies a procreative component. *Loving* v. *Virginia*, 388 U. S. 1, 12 (1967); see *Skinner* v. *Oklahoma ex rel. Williamson*, 316 U. S. 535, 541 (1942). More recent cases have directly connected the right to marry with the "right to procreate." *Zablocki* v. *Redhail*, 434 U. S. 374, 386 (1978).

As the majority notes, some aspects of marriage have changed over time. Arranged marriages have largely given way to pairings based on romantic love. States have replaced coverture, the doctrine by which a married man and woman became a single legal entity, with laws that respect each participant's separate status. Racial restrictions on marriage, which "arose as an incident to slavery" to promote "White Supremacy," were repealed by many States and ultimately struck down by this Court.

ROBERTS, C. J., dissenting

*Loving*, 388 U. S., at 6–7.

The majority observes that these developments "were not mere superficial changes" in marriage, but rather "worked deep transformations in its structure." *Ante*, at 6–7. They did not, however, work any transformation in the core structure of marriage as the union between a man and a woman. If you had asked a person on the street how marriage was defined, no one would ever have said, "Marriage is the union of a man and a woman, where the woman is subject to coverture." The majority may be right that the "history of marriage is one of both continuity and change," but the core meaning of marriage has endured. *Ante*, at 6.

B

Shortly after this Court struck down racial restrictions on marriage in *Loving*, a gay couple in Minnesota sought a marriage license. They argued that the Constitution required States to allow marriage between people of the same sex for the same reasons that it requires States to allow marriage between people of different races. The Minnesota Supreme Court rejected their analogy to *Loving*, and this Court summarily dismissed an appeal. *Baker* v. *Nelson*, 409 U. S. 810 (1972).

In the decades after *Baker*, greater numbers of gays and lesbians began living openly, and many expressed a desire to have their relationships recognized as marriages. Over time, more people came to see marriage in a way that could be extended to such couples. Until recently, this new view of marriage remained a minority position. After the Massachusetts Supreme Judicial Court in 2003 interpreted its State Constitution to require recognition of same-sex marriage, many States—including the four at issue here—enacted constitutional amendments formally adopting the longstanding definition of marriage.

Over the last few years, public opinion on marriage has

ROBERTS, C. J., dissenting

shifted rapidly. In 2009, the legislatures of Vermont, New Hampshire, and the District of Columbia became the first in the Nation to enact laws that revised the definition of marriage to include same-sex couples, while also providing accommodations for religious believers. In 2011, the New York Legislature enacted a similar law. In 2012, voters in Maine did the same, reversing the result of a referendum just three years earlier in which they had upheld the traditional definition of marriage.

In all, voters and legislators in eleven States and the District of Columbia have changed their definitions of marriage to include same-sex couples. The highest courts of five States have decreed that same result under their own Constitutions. The remainder of the States retain the traditional definition of marriage.

Petitioners brought lawsuits contending that the Due Process and Equal Protection Clauses of the Fourteenth Amendment compel their States to license and recognize marriages between same-sex couples. In a carefully reasoned decision, the Court of Appeals acknowledged the democratic "momentum" in favor of "expand[ing] the definition of marriage to include gay couples," but concluded that petitioners had not made "the case for constitutionalizing the definition of marriage and for removing the issue from the place it has been since the founding: in the hands of state voters." 772 F. 3d, at 396, 403. That decision interpreted the Constitution correctly, and I would affirm.

## II

Petitioners first contend that the marriage laws of their States violate the Due Process Clause. The Solicitor General of the United States, appearing in support of petitioners, expressly disowned that position before this Court. See Tr. of Oral Arg. on Question 1, at 38–39. The majority nevertheless resolves these cases for petitioners based

10                    OBERGEFELL *v.* HODGES

ROBERTS, C. J., dissenting

almost entirely on the Due Process Clause.

The majority purports to identify four "principles and traditions" in this Court's due process precedents that support a fundamental right for same-sex couples to marry. *Ante*, at 12. In reality, however, the majority's approach has no basis in principle or tradition, except for the unprincipled tradition of judicial policymaking that characterized discredited decisions such as *Lochner* v. *New York*, 198 U. S. 45. Stripped of its shiny rhetorical gloss, the majority's argument is that the Due Process Clause gives same-sex couples a fundamental right to marry because it will be good for them and for society. If I were a legislator, I would certainly consider that view as a matter of social policy. But as a judge, I find the majority's position indefensible as a matter of constitutional law.

### A

Petitioners' "fundamental right" claim falls into the most sensitive category of constitutional adjudication. Petitioners do not contend that their States' marriage laws violate an *enumerated* constitutional right, such as the freedom of speech protected by the First Amendment. There is, after all, no "Companionship and Understanding" or "Nobility and Dignity" Clause in the Constitution. See *ante*, at 3, 14. They argue instead that the laws violate a right *implied* by the Fourteenth Amendment's requirement that "liberty" may not be deprived without "due process of law."

This Court has interpreted the Due Process Clause to include a "substantive" component that protects certain liberty interests against state deprivation "no matter what process is provided." *Reno* v. *Flores*, 507 U. S. 292, 302 (1993). The theory is that some liberties are "so rooted in the traditions and conscience of our people as to be ranked as fundamental," and therefore cannot be deprived without compelling justification. *Snyder* v. *Massachusetts*, 291

ROBERTS, C. J., dissenting

U. S. 97, 105 (1934).

Allowing unelected federal judges to select which un-enumerated rights rank as "fundamental"—and to strike down state laws on the basis of that determination—raises obvious concerns about the judicial role. Our precedents have accordingly insisted that judges "exercise the utmost care" in identifying implied fundamental rights, "lest the liberty protected by the Due Process Clause be subtly transformed into the policy preferences of the Members of this Court." *Washington* v. *Glucksberg*, 521 U. S. 702, 720 (1997) (internal quotation marks omitted); see Kennedy, Unenumerated Rights and the Dictates of Judicial Restraint 13 (1986) (Address at Stanford) ("One can conclude that certain essential, or fundamental, rights should exist in any just society. It does not follow that each of those essential rights is one that we as judges can enforce under the written Constitution. The Due Process Clause is not a guarantee of every right that should inhere in an ideal system.").

The need for restraint in administering the strong medicine of substantive due process is a lesson this Court has learned the hard way. The Court first applied substantive due process to strike down a statute in *Dred Scott* v. *Sandford*, 19 How. 393 (1857). There the Court invalidated the Missouri Compromise on the ground that legislation restricting the institution of slavery violated the implied rights of slaveholders. The Court relied on its own conception of liberty and property in doing so. It asserted that "an act of Congress which deprives a citizen of the United States of his liberty or property, merely because he came himself or brought his property into a particular Territory of the United States . . . could hardly be dignified with the name of due process of law." *Id.,* at 450. In a dissent that has outlasted the majority opinion, Justice Curtis explained that when the "fixed rules which govern the interpretation of laws [are] abandoned, and the theoretical

opinions of individuals are allowed to control" the Constitution's meaning, "we have no longer a Constitution; we are under the government of individual men, who for the time being have power to declare what the Constitution is, according to their own views of what it ought to mean." *Id.*, at 621.

*Dred Scott*'s holding was overruled on the battlefields of the Civil War and by constitutional amendment after Appomattox, but its approach to the Due Process Clause reappeared. In a series of early 20th-century cases, most prominently *Lochner* v. *New York*, this Court invalidated state statutes that presented "meddlesome interferences with the rights of the individual," and "undue interference with liberty of person and freedom of contract." 198 U. S., at 60, 61. In *Lochner* itself, the Court struck down a New York law setting maximum hours for bakery employees, because there was "in our judgment, no reasonable foundation for holding this to be necessary or appropriate as a health law." *Id.,* at 58.

The dissenting Justices in *Lochner* explained that the New York law could be viewed as a reasonable response to legislative concern about the health of bakery employees, an issue on which there was at least "room for debate and for an honest difference of opinion." *Id.,* at 72 (opinion of Harlan, J.). The majority's contrary conclusion required adopting as constitutional law "an economic theory which a large part of the country does not entertain." *Id.,* at 75 (opinion of Holmes, J.). As Justice Holmes memorably put it, "The Fourteenth Amendment does not enact Mr. Herbert Spencer's Social Statics," a leading work on the philosophy of Social Darwinism. *Ibid.* The Constitution "is not intended to embody a particular economic theory . . . . It is made for people of fundamentally differing views, and the accident of our finding certain opinions natural and familiar or novel and even shocking ought not to conclude our judgment upon the question whether statutes embody-

ROBERTS, C. J., dissenting

ing them conflict with the Constitution." *Id.*, at 75–76.

In the decades after *Lochner*, the Court struck down nearly 200 laws as violations of individual liberty, often over strong dissents contending that "[t]he criterion of constitutionality is not whether we believe the law to be for the public good." *Adkins* v. *Children's Hospital of D. C.*, 261 U. S. 525, 570 (1923) (opinion of Holmes, J.). By empowering judges to elevate their own policy judgments to the status of constitutionally protected "liberty," the *Lochner* line of cases left "no alternative to regarding the court as a . . . legislative chamber." L. Hand, The Bill of Rights 42 (1958).

Eventually, the Court recognized its error and vowed not to repeat it. "The doctrine that . . . due process authorizes courts to hold laws unconstitutional when they believe the legislature has acted unwisely," we later explained, "has long since been discarded. We have returned to the original constitutional proposition that courts do not substitute their social and economic beliefs for the judgment of legislative bodies, who are elected to pass laws." *Ferguson* v. *Skrupa*, 372 U. S. 726, 730 (1963); see *Day-Brite Lighting, Inc.* v. *Missouri*, 342 U. S. 421, 423 (1952) ("we do not sit as a super-legislature to weigh the wisdom of legislation"). Thus, it has become an accepted rule that the Court will not hold laws unconstitutional simply because we find them "unwise, improvident, or out of harmony with a particular school of thought." *Williamson* v. *Lee Optical of Okla., Inc.*, 348 U. S. 483, 488 (1955).

Rejecting *Lochner* does not require disavowing the doctrine of implied fundamental rights, and this Court has not done so. But to avoid repeating *Lochner*'s error of converting personal preferences into constitutional mandates, our modern substantive due process cases have stressed the need for "judicial self-restraint." *Collins* v. *Harker Heights*, 503 U. S. 115, 125 (1992). Our precedents have required that implied fundamental rights be "objec-

tively, deeply rooted in this Nation's history and tradition," and "implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Glucksberg*, 521 U. S., at 720–721 (internal quotation marks omitted).

Although the Court articulated the importance of history and tradition to the fundamental rights inquiry most precisely in *Glucksberg*, many other cases both before and after have adopted the same approach. See, *e.g., District Attorney's Office for Third Judicial Dist.* v. *Osborne*, 557 U. S. 52, 72 (2009); *Flores*, 507 U. S., at 303; *United States* v. *Salerno*, 481 U. S. 739, 751 (1987); *Moore* v. *East Cleveland*, 431 U. S. 494, 503 (1977) (plurality opinion); see also *id.,* at 544 (White, J., dissenting) ("The Judiciary, including this Court, is the most vulnerable and comes nearest to illegitimacy when it deals with judge-made constitutional law having little or no cognizable roots in the language or even the design of the Constitution."); *Troxel* v. *Granville*, 530 U. S. 57, 96–101 (2000) (KENNEDY, J., dissenting) (consulting "'[o]ur Nation's history, legal traditions, and practices'" and concluding that "[w]e owe it to the Nation's domestic relations legal structure . . . to proceed with caution" (quoting *Glucksberg*, 521 U. S., at 721)).

Proper reliance on history and tradition of course requires looking beyond the individual law being challenged, so that every restriction on liberty does not supply its own constitutional justification. The Court is right about that. *Ante*, at 18. But given the few "guideposts for responsible decisionmaking in this unchartered area," *Collins*, 503 U. S., at 125, "an approach grounded in history imposes limits on the judiciary that are more meaningful than any based on [an] abstract formula," *Moore*, 431 U. S., at 504, n. 12 (plurality opinion). Expanding a right suddenly and dramatically is likely to require tearing it up from its roots. Even a sincere profession of "discipline" in identify-

ROBERTS, C. J., dissenting

ing fundamental rights, *ante*, at 10–11, does not provide a meaningful constraint on a judge, for "what he is really likely to be 'discovering,' whether or not he is fully aware of it, are his own values," J. Ely, Democracy and Distrust 44 (1980). The only way to ensure restraint in this delicate enterprise is "continual insistence upon respect for the teachings of history, solid recognition of the basic values that underlie our society, and wise appreciation of the great roles [of] the doctrines of federalism and separation of powers." *Griswold* v. *Connecticut*, 381 U. S. 479, 501 (1965) (Harlan, J., concurring in judgment).

B

The majority acknowledges none of this doctrinal background, and it is easy to see why: Its aggressive application of substantive due process breaks sharply with decades of precedent and returns the Court to the unprincipled approach of *Lochner*.

1

The majority's driving themes are that marriage is desirable and petitioners desire it. The opinion describes the "transcendent importance" of marriage and repeatedly insists that petitioners do not seek to "demean," "devalue," "denigrate," or "disrespect" the institution. *Ante*, at 3, 4, 6, 28. Nobody disputes those points. Indeed, the compelling personal accounts of petitioners and others like them are likely a primary reason why many Americans have changed their minds about whether same-sex couples should be allowed to marry. As a matter of constitutional law, however, the sincerity of petitioners' wishes is not relevant.

When the majority turns to the law, it relies primarily on precedents discussing the fundamental "right to marry." *Turner* v. *Safley*, 482 U. S. 78, 95 (1987); *Zablocki*, 434 U. S., at 383; see *Loving*, 388 U. S., at 12. These cases

do not hold, of course, that anyone who wants to get married has a constitutional right to do so. They instead require a State to justify barriers to marriage as that institution has always been understood. In *Loving*, the Court held that racial restrictions on the right to marry lacked a compelling justification. In *Zablocki*, restrictions based on child support debts did not suffice. In *Turner*, restrictions based on status as a prisoner were deemed impermissible.

None of the laws at issue in those cases purported to change the core definition of marriage as the union of a man and a woman. The laws challenged in *Zablocki* and *Turner* did not define marriage as "the union of a man and a woman, *where neither party owes child support or is in prison.*" Nor did the interracial marriage ban at issue in *Loving* define marriage as "the union of a man and a woman *of the same race.*" See Tragen, Comment, Statutory Prohibitions Against Interracial Marriage, 32 Cal. L. Rev. 269 (1944) ("at common law there was no ban on interracial marriage"); *post*, at 11–12, n. 5 (THOMAS, J., dissenting). Removing racial barriers to marriage therefore did not change what a marriage was any more than integrating schools changed what a school was. As the majority admits, the institution of "marriage" discussed in every one of these cases "presumed a relationship involving opposite-sex partners." *Ante*, at 11.

In short, the "right to marry" cases stand for the important but limited proposition that particular restrictions on access to marriage *as traditionally defined* violate due process. These precedents say nothing at all about a right to make a State change its definition of marriage, which is the right petitioners actually seek here. See *Windsor*, 570 U. S., at ___ (ALITO, J., dissenting) (slip op., at 8) ("What Windsor and the United States seek . . . is not the protection of a deeply rooted right but the recognition of a very new right."). Neither petitioners nor the majority cites a

single case or other legal source providing any basis for
such a constitutional right. None exists, and that is
enough to foreclose their claim.

2

The majority suggests that "there are other, more in-
structive precedents" informing the right to marry. *Ante*,
at 12. Although not entirely clear, this reference seems to
correspond to a line of cases discussing an implied funda-
mental "right of privacy." *Griswold*, 381 U. S., at 486. In
the first of those cases, the Court invalidated a criminal
law that banned the use of contraceptives. *Id.*, at 485–
486. The Court stressed the invasive nature of the ban,
which threatened the intrusion of "the police to search the
sacred precincts of marital bedrooms." *Id.,* at 485. In the
Court's view, such laws infringed the right to privacy in its
most basic sense: the "right to be let alone." *Eisenstadt* v.
*Baird*, 405 U. S. 438, 453–454, n. 10 (1972) (internal quo-
tation marks omitted); see *Olmstead* v. *United States*, 277
U. S. 438, 478 (1928) (Brandeis, J., dissenting).

The Court also invoked the right to privacy in *Lawrence*
v. *Texas*, 539 U. S. 558 (2003), which struck down a Texas
statute criminalizing homosexual sodomy. *Lawrence*
relied on the position that criminal sodomy laws, like bans
on contraceptives, invaded privacy by inviting "unwar-
ranted government intrusions" that "touc[h] upon the
most private human conduct, sexual behavior . . . in the
most private of places, the home." *Id.*, at 562, 567.

Neither *Lawrence* nor any other precedent in the pri-
vacy line of cases supports the right that petitioners assert
here. Unlike criminal laws banning contraceptives and
sodomy, the marriage laws at issue here involve no gov-
ernment intrusion. They create no crime and impose no
punishment. Same-sex couples remain free to live together,
to engage in intimate conduct, and to raise their fami-
lies as they see fit. No one is "condemned to live in loneli-

ness" by the laws challenged in these cases—no one. *Ante*, at 28. At the same time, the laws in no way interfere with the "right to be let alone."

The majority also relies on Justice Harlan's influential dissenting opinion in *Poe* v. *Ullman*, 367 U. S. 497 (1961). As the majority recounts, that opinion states that "[d]ue process has not been reduced to any formula." *Id., at* 542. But far from conferring the broad interpretive discretion that the majority discerns, Justice Harlan's opinion makes clear that courts implying fundamental rights are not "free to roam where unguided speculation might take them." *Ibid.* They must instead have "regard to what history teaches" and exercise not only "judgment" but "restraint." *Ibid.* Of particular relevance, Justice Harlan explained that "laws regarding marriage which provide both when the sexual powers may be used and the legal and societal context in which children are born and brought up . . . form a pattern so deeply pressed into the substance of our social life that any Constitutional doctrine in this area must build upon that basis." *Id.*, at 546.

In sum, the privacy cases provide no support for the majority's position, because petitioners do not seek privacy. Quite the opposite, they seek public recognition of their relationships, along with corresponding government benefits. Our cases have consistently refused to allow litigants to convert the shield provided by constitutional liberties into a sword to demand positive entitlements from the State. See *DeShaney* v. *Winnebago County Dept. of Social Servs.*, 489 U. S. 189, 196 (1989); *San Antonio Independent School Dist.* v. *Rodriguez*, 411 U. S. 1, 35–37 (1973); *post*, at 9–13 (THOMAS, J., dissenting). Thus, although the right to privacy recognized by our precedents certainly plays a role in protecting the intimate conduct of same-sex couples, it provides no affirmative right to redefine marriage and no basis for striking down the laws at issue here.

Cite as: 576 U. S. ____ (2015)          19

ROBERTS, C. J., dissenting

### 3

Perhaps recognizing how little support it can derive from precedent, the majority goes out of its way to jettison the "careful" approach to implied fundamental rights taken by this Court in *Glucksberg*. *Ante*, at 18 (quoting 521 U. S., at 721). It is revealing that the majority's position requires it to effectively overrule *Glucksberg*, the leading modern case setting the bounds of substantive due process. At least this part of the majority opinion has the virtue of candor. Nobody could rightly accuse the majority of taking a careful approach.

Ultimately, only one precedent offers any support for the majority's methodology: *Lochner* v. *New York*, 198 U. S. 45. The majority opens its opinion by announcing petitioners' right to "define and express their identity." *Ante*, at 1–2. The majority later explains that "the right to personal choice regarding marriage is inherent in the concept of individual autonomy." *Ante*, at 12. This free-wheeling notion of individual autonomy echoes nothing so much as "the general right of an individual to be *free in his person* and in his power to contract in relation to his own labor." *Lochner*, 198 U. S., at 58 (emphasis added).

To be fair, the majority does not suggest that its individual autonomy right is entirely unconstrained. The constraints it sets are precisely those that accord with its own "reasoned judgment," informed by its "new insight" into the "nature of injustice," which was invisible to all who came before but has become clear "as we learn [the] meaning" of liberty. *Ante*, at 10, 11. The truth is that today's decision rests on nothing more than the majority's own conviction that same-sex couples should be allowed to marry because they want to, and that "it would disparage their choices and diminish their personhood to deny them this right." *Ante*, at 19. Whatever force that belief may have as a matter of moral philosophy, it has no more basis in the Constitution than did the naked policy preferences

adopted in *Lochner.*  See 198 U. S., at 61 ("We do not
believe in the soundness of the views which uphold this
law," which "is an illegal interference with the rights of
individuals . . . to make contracts regarding labor upon
such terms as they may think best").

The majority recognizes that today's cases do not mark
"the first time the Court has been asked to adopt a cau-
tious approach to recognizing and protecting fundamental
rights." *Ante*, at 25.  On that much, we agree.  The Court
was "asked"—and it agreed—to "adopt a cautious ap-
proach" to implying fundamental rights after the debacle
of the *Lochner* era.  Today, the majority casts caution
aside and revives the grave errors of that period.

One immediate question invited by the majority's posi-
tion is whether States may retain the definition of mar-
riage as a union of two people.  Cf. *Brown* v. *Buhman*, 947
F. Supp. 2d 1170 (Utah 2013), appeal pending, No. 14-
4117 (CA10).  Although the majority randomly inserts the
adjective "two" in various places, it offers no reason at all
why the two-person element of the core definition of mar-
riage may be preserved while the man-woman element
may not.  Indeed, from the standpoint of history and tradi-
tion, a leap from opposite-sex marriage to same-sex mar-
riage is much greater than one from a two-person union to
plural unions, which have deep roots in some cultures
around the world.  If the majority is willing to take the big
leap, it is hard to see how it can say no to the shorter one.

It is striking how much of the majority's reasoning
would apply with equal force to the claim of a fundamental
right to plural marriage.  If "[t]here is dignity in the bond
between two men or two women who seek to marry and in
their autonomy to make such profound choices," *ante*, at
13, why would there be any less dignity in the bond be-
tween three people who, in exercising their autonomy,
seek to make the profound choice to marry?  If a same-sex
couple has the constitutional right to marry because their

children would otherwise "suffer the stigma of knowing their families are somehow lesser," *ante*, at 15, why wouldn't the same reasoning apply to a family of three or more persons raising children? If not having the opportunity to marry "serves to disrespect and subordinate" gay and lesbian couples, why wouldn't the same "imposition of this disability," *ante*, at 22, serve to disrespect and subordinate people who find fulfillment in polyamorous relationships? See Bennett, Polyamory: The Next Sexual Revolution? Newsweek, July 28, 2009 (estimating 500,000 polyamorous families in the United States); Li, Married Lesbian "Throuple" Expecting First Child, N. Y. Post, Apr. 23, 2014; Otter, Three May Not Be a Crowd: The Case for a Constitutional Right to Plural Marriage, 64 Emory L. J. 1977 (2015).

I do not mean to equate marriage between same-sex couples with plural marriages in all respects. There may well be relevant differences that compel different legal analysis. But if there are, petitioners have not pointed to any. When asked about a plural marital union at oral argument, petitioners asserted that a State "doesn't have such an institution." Tr. of Oral Arg. on Question 2, p. 6. But that is exactly the point: the States at issue here do not have an institution of same-sex marriage, either.

4

Near the end of its opinion, the majority offers perhaps the clearest insight into its decision. Expanding marriage to include same-sex couples, the majority insists, would "pose no risk of harm to themselves or third parties." *Ante*, at 27. This argument again echoes *Lochner*, which relied on its assessment that "we think that a law like the one before us involves neither the safety, the morals nor the welfare of the public, and that the interest of the public is not in the slightest degree affected by such an act." 198 U. S., at 57.

22                    OBERGEFELL *v.* HODGES

Then and now, this assertion of the "harm principle" sounds more in philosophy than law.  The elevation of the fullest individual self-realization over the constraints that society has expressed in law may or may not be attractive moral philosophy.  But a Justice's commission does not confer any special moral, philosophical, or social insight sufficient to justify imposing those perceptions on fellow citizens under the pretense of "due process."  There is indeed a process due the people on issues of this sort—the democratic process.  Respecting that understanding requires the Court to be guided by law, not any particular school of social thought.  As Judge Henry Friendly once put it, echoing Justice Holmes's dissent in *Lochner*, the Fourteenth Amendment does not enact John Stuart Mill's On Liberty any more than it enacts Herbert Spencer's Social Statics.  See Randolph, Before *Roe v. Wade*: Judge Friendly's Draft Abortion Opinion, 29 Harv. J. L. & Pub. Pol'y 1035, 1036–1037, 1058 (2006).  And it certainly does not enact any one concept of marriage.

The majority's understanding of due process lays out a tantalizing vision of the future for Members of this Court: If an unvarying social institution enduring over all of recorded history cannot inhibit judicial policymaking, what can?  But this approach is dangerous for the rule of law.  The purpose of insisting that implied fundamental rights have roots in the history and tradition of our people is to ensure that when unelected judges strike down democratically enacted laws, they do so based on something more than their own beliefs.  The Court today not only overlooks our country's entire history and tradition but actively repudiates it, preferring to live only in the heady days of the here and now.  I agree with the majority that the "nature of injustice is that we may not always see it in our own times."  *Ante*, at 11.  As petitioners put it, "times can blind."  Tr. of Oral Arg. on Question 1, at 9, 10.  But to blind yourself to history is both prideful and unwise.  "The

ROBERTS, C. J., dissenting

past is never dead. It's not even past." W. Faulkner, Requiem for a Nun 92 (1951).

## III

In addition to their due process argument, petitioners contend that the Equal Protection Clause requires their States to license and recognize same-sex marriages. The majority does not seriously engage with this claim. Its discussion is, quite frankly, difficult to follow. The central point seems to be that there is a "synergy between" the Equal Protection Clause and the Due Process Clause, and that some precedents relying on one Clause have also relied on the other. *Ante*, at 20. Absent from this portion of the opinion, however, is anything resembling our usual framework for deciding equal protection cases. It is case-book doctrine that the "modern Supreme Court's treatment of equal protection claims has used a means-ends methodology in which judges ask whether the classification the government is using is sufficiently related to the goals it is pursuing." G. Stone, L. Seidman, C. Sunstein, M. Tushnet, & P. Karlan, Constitutional Law 453 (7th ed. 2013). The majority's approach today is different:

> "Rights implicit in liberty and rights secured by equal protection may rest on different precepts and are not always co-extensive, yet in some instances each may be instructive as to the meaning and reach of the other. In any particular case one Clause may be thought to capture the essence of the right in a more accurate and comprehensive way, even as the two Clauses may converge in the identification and definition of the right." *Ante*, at 19.

The majority goes on to assert in conclusory fashion that the Equal Protection Clause provides an alternative basis for its holding. *Ante*, at 22. Yet the majority fails to provide even a single sentence explaining how the Equal

24                    OBERGEFELL *v.* HODGES

Protection Clause supplies independent weight for its position, nor does it attempt to justify its gratuitous violation of the canon against unnecessarily resolving constitutional questions. See *Northwest Austin Municipal Util. Dist. No. One* v. *Holder*, 557 U. S. 193, 197 (2009). In any event, the marriage laws at issue here do not violate the Equal Protection Clause, because distinguishing between opposite-sex and same-sex couples is rationally related to the States' "legitimate state interest" in "preserving the traditional institution of marriage." *Lawrence*, 539 U. S., at 585 (O'Connor, J., concurring in judgment).

It is important to note with precision which laws petitioners have challenged. Although they discuss some of the ancillary legal benefits that accompany marriage, such as hospital visitation rights and recognition of spousal status on official documents, petitioners' lawsuits target the laws defining marriage generally rather than those allocating benefits specifically. The equal protection analysis might be different, in my view, if we were confronted with a more focused challenge to the denial of certain tangible benefits. Of course, those more selective claims will not arise now that the Court has taken the drastic step of requiring every State to license and recognize marriages between same-sex couples.

IV

The legitimacy of this Court ultimately rests "upon the respect accorded to its judgments." *Republican Party of Minn.* v. *White*, 536 U. S. 765, 793 (2002) (KENNEDY, J., concurring). That respect flows from the perception—and reality—that we exercise humility and restraint in deciding cases according to the Constitution and law. The role of the Court envisioned by the majority today, however, is anything but humble or restrained. Over and over, the majority exalts the role of the judiciary in delivering social change. In the majority's telling, it is the courts, not the

people, who are responsible for making "new dimensions of freedom . . . apparent to new generations," for providing "formal discourse" on social issues, and for ensuring "neutral discussions, without scornful or disparaging commentary." *Ante*, at 7–9.

Nowhere is the majority's extravagant conception of judicial supremacy more evident than in its description—and dismissal—of the public debate regarding same-sex marriage. Yes, the majority concedes, on one side are thousands of years of human history in every society known to have populated the planet. But on the other side, there has been "extensive litigation," "many thoughtful District Court decisions," "countless studies, papers, books, and other popular and scholarly writings," and "more than 100" *amicus* briefs in these cases alone. *Ante*, at 9, 10, 23. What would be the point of allowing the democratic process to go on? It is high time for the Court to decide the meaning of marriage, based on five lawyers' "better informed understanding" of "a liberty that remains urgent in our own era." *Ante*, at 19. The answer is surely there in one of those *amicus* briefs or studies.

Those who founded our country would not recognize the majority's conception of the judicial role. They after all risked their lives and fortunes for the precious right to govern themselves. They would never have imagined yielding that right on a question of social policy to unaccountable and unelected judges. And they certainly would not have been satisfied by a system empowering judges to override policy judgments so long as they do so after "a quite extensive discussion." *Ante*, at 8. In our democracy, debate about the content of the law is not an exhaustion requirement to be checked off before courts can impose their will. "Surely the Constitution does not put either the legislative branch or the executive branch in the position of a television quiz show contestant so that when a given period of time has elapsed and a problem remains unre-

solved by them, the federal judiciary may press a buzzer and take its turn at fashioning a solution." Rehnquist, The Notion of a Living Constitution, 54 Texas L. Rev. 693, 700 (1976). As a plurality of this Court explained just last year, "It is demeaning to the democratic process to presume that voters are not capable of deciding an issue of this sensitivity on decent and rational grounds." *Schuette* v. *BAMN*, 572 U. S. ___, ___ –___ (2014) (slip op., at 16– 17).

The Court's accumulation of power does not occur in a vacuum. It comes at the expense of the people. And they know it. Here and abroad, people are in the midst of a serious and thoughtful public debate on the issue of same-sex marriage. They see voters carefully considering same-sex marriage, casting ballots in favor or opposed, and sometimes changing their minds. They see political leaders similarly reexamining their positions, and either reversing course or explaining adherence to old convictions confirmed anew. They see governments and businesses modifying policies and practices with respect to same-sex couples, and participating actively in the civic discourse. They see countries overseas democratically accepting profound social change, or declining to do so. This deliberative process is making people take seriously questions that they may not have even regarded as questions before.

When decisions are reached through democratic means, some people will inevitably be disappointed with the results. But those whose views do not prevail at least know that they have had their say, and accordingly are—in the tradition of our political culture—reconciled to the result of a fair and honest debate. In addition, they can gear up to raise the issue later, hoping to persuade enough on the winning side to think again. "That is exactly how our system of government is supposed to work." *Post,* at 2–3 (SCALIA, J., dissenting).

But today the Court puts a stop to all that. By deciding

ROBERTS, C. J., dissenting

this question under the Constitution, the Court removes it from the realm of democratic decision.  There will be consequences to shutting down the political process on an issue of such profound public significance.  Closing debate tends to close minds.  People denied a voice are less likely to accept the ruling of a court on an issue that does not seem to be the sort of thing courts usually decide.  As a thoughtful commentator observed about another issue, "The political process was moving . . . , not swiftly enough for advocates of quick, complete change, but majoritarian institutions were listening and acting.  Heavy-handed judicial intervention was difficult to justify and appears to have provoked, not resolved, conflict."  Ginsburg, Some Thoughts on Autonomy and Equality in Relation to *Roe v. Wade*, 63 N. C. L. Rev. 375, 385–386 (1985) (footnote omitted).  Indeed, however heartened the proponents of same-sex marriage might be on this day, it is worth acknowledging what they have lost, and lost forever: the opportunity to win the true acceptance that comes from persuading their fellow citizens of the justice of their cause.  And they lose this just when the winds of change were freshening at their backs.

Federal courts are blunt instruments when it comes to creating rights.  They have constitutional power only to resolve concrete cases or controversies; they do not have the flexibility of legislatures to address concerns of parties not before the court or to anticipate problems that may arise from the exercise of a new right.  Today's decision, for example, creates serious questions about religious liberty.  Many good and decent people oppose same-sex marriage as a tenet of faith, and their freedom to exercise religion is—unlike the right imagined by the majority— actually spelled out in the Constitution.  Amdt. 1.

Respect for sincere religious conviction has led voters and legislators in every State that has adopted same-sex marriage democratically to include accommodations for

28                          OBERGEFELL *v.* HODGES

religious practice. The majority's decision imposing same-sex marriage cannot, of course, create any such accommodations. The majority graciously suggests that religious believers may continue to "advocate" and "teach" their views of marriage. *Ante*, at 27. The First Amendment guarantees, however, the freedom to "*exercise*" religion. Ominously, that is not a word the majority uses.

Hard questions arise when people of faith exercise religion in ways that may be seen to conflict with the new right to same-sex marriage—when, for example, a religious college provides married student housing only to opposite-sex married couples, or a religious adoption agency declines to place children with same-sex married couples. Indeed, the Solicitor General candidly acknowledged that the tax exemptions of some religious institutions would be in question if they opposed same-sex marriage. See Tr. of Oral Arg. on Question 1, at 36–38. There is little doubt that these and similar questions will soon be before this Court. Unfortunately, people of faith can take no comfort in the treatment they receive from the majority today.

Perhaps the most discouraging aspect of today's decision is the extent to which the majority feels compelled to sully those on the other side of the debate. The majority offers a cursory assurance that it does not intend to disparage people who, as a matter of conscience, cannot accept same-sex marriage. *Ante*, at 19. That disclaimer is hard to square with the very next sentence, in which the majority explains that "the necessary consequence" of laws codifying the traditional definition of marriage is to "demea[n] or stigmatiz[e]" same-sex couples. *Ante*, at 19. The majority reiterates such characterizations over and over. By the majority's account, Americans who did nothing more than follow the understanding of marriage that has existed for our entire history—in particular, the tens of millions of people who voted to reaffirm their States' enduring defini-

ROBERTS, C. J., dissenting

tion of marriage—have acted to "lock . . . out," "disparage," "disrespect and subordinate," and inflict "[d]ignitary wounds" upon their gay and lesbian neighbors. *Ante*, at 17, 19, 22, 25. These apparent assaults on the character of fairminded people will have an effect, in society and in court. See *post*, at 6–7 (ALITO, J., dissenting). Moreover, they are entirely gratuitous. It is one thing for the majority to conclude that the Constitution protects a right to same-sex marriage; it is something else to portray everyone who does not share the majority's "better informed understanding" as bigoted. *Ante*, at 19.

In the face of all this, a much different view of the Court's role is possible. That view is more modest and restrained. It is more skeptical that the legal abilities of judges also reflect insight into moral and philosophical issues. It is more sensitive to the fact that judges are unelected and unaccountable, and that the legitimacy of their power depends on confining it to the exercise of legal judgment. It is more attuned to the lessons of history, and what it has meant for the country and Court when Justices have exceeded their proper bounds. And it is less pretentious than to suppose that while people around the world have viewed an institution in a particular way for thousands of years, the present generation and the present Court are the ones chosen to burst the bonds of that history and tradition.

\*    \*    \*

If you are among the many Americans—of whatever sexual orientation—who favor expanding same-sex marriage, by all means celebrate today's decision. Celebrate the achievement of a desired goal. Celebrate the opportunity for a new expression of commitment to a partner. Celebrate the availability of new benefits. But do not celebrate the Constitution. It had nothing to do with it.

I respectfully dissent.

Cite as: 576 U. S. ____ (2015)          1

SCALIA, J., dissenting

# SUPREME COURT OF THE UNITED STATES

————

Nos. 14–556, 14-562, 14-571 and 14–574

————

JAMES OBERGEFELL, ET AL., PETITIONERS
14–556          *v.*
RICHARD HODGES, DIRECTOR, OHIO
DEPARTMENT OF HEALTH, ET AL.;

VALERIA TANCO, ET AL., PETITIONERS
14–562          *v.*
BILL HASLAM, GOVERNOR OF
TENNESSEE, ET AL.;

APRIL DeBOER, ET AL., PETITIONERS
14–571          *v.*
RICK SNYDER, GOVERNOR OF MICHIGAN,
ET AL.; AND

GREGORY BOURKE, ET AL., PETITIONERS
14–574          *v.*
STEVE BESHEAR, GOVERNOR OF
KENTUCKY

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SIXTH CIRCUIT

[June 26, 2015]

JUSTICE SCALIA, with whom JUSTICE THOMAS joins,
dissenting.

I join THE CHIEF JUSTICE's opinion in full. I write separately to call attention to this Court's threat to American democracy.

The substance of today's decree is not of immense personal importance to me. The law can recognize as marriage whatever sexual attachments and living arrangements it wishes, and can accord them favorable civil consequences, from tax treatment to rights of inheritance.

Those civil consequences—and the public approval that conferring the name of marriage evidences—can perhaps have adverse social effects, but no more adverse than the effects of many other controversial laws. So it is not of special importance to me what the law says about marriage. It is of overwhelming importance, however, who it is that rules me. Today's decree says that my Ruler, and the Ruler of 320 million Americans coast-to-coast, is a majority of the nine lawyers on the Supreme Court. The opinion in these cases is the furthest extension in fact—and the furthest extension one can even imagine—of the Court's claimed power to create "liberties" that the Constitution and its Amendments neglect to mention. This practice of constitutional revision by an unelected committee of nine, always accompanied (as it is today) by extravagant praise of liberty, robs the People of the most important liberty they asserted in the Declaration of Independence and won in the Revolution of 1776: the freedom to govern themselves.

## I

Until the courts put a stop to it, public debate over same-sex marriage displayed American democracy at its best. Individuals on both sides of the issue passionately, but respectfully, attempted to persuade their fellow citizens to accept their views. Americans considered the arguments and put the question to a vote. The electorates of 11 States, either directly or through their representatives, chose to expand the traditional definition of marriage. Many more decided not to.[1] Win or lose, advocates for both sides continued pressing their cases, secure in the knowledge that an electoral loss can be negated by a later electoral win. That is exactly how our system of govern-

─────────

[1] Brief for Respondents in No. 14–571, p. 14.

SCALIA, J., dissenting

ment is supposed to work.[2]

The Constitution places some constraints on self-rule—constraints adopted *by the People themselves* when they ratified the Constitution and its Amendments. Forbidden are laws "impairing the Obligation of Contracts,"[3] denying "Full Faith and Credit" to the "public Acts" of other States,[4] prohibiting the free exercise of religion,[5] abridging the freedom of speech,[6] infringing the right to keep and bear arms,[7] authorizing unreasonable searches and seizures,[8] and so forth. Aside from these limitations, those powers "reserved to the States respectively, or to the people"[9] can be exercised as the States or the People desire. These cases ask us to decide whether the Fourteenth Amendment contains a limitation that requires the States to license and recognize marriages between two people of the same sex. Does it remove *that* issue from the political process?

Of course not. It would be surprising to find a prescription regarding marriage in the Federal Constitution since, as the author of today's opinion reminded us only two years ago (in an opinion joined by the same Justices who join him today):

> "[R]egulation of domestic relations is an area that has long been regarded as a virtually exclusive province of the States."[10]

—————

[2] Accord, *Schuette* v. *BAMN*, 572 U. S. ___, ___–___ (2014) (plurality opinion) (slip op., at 15–17).

[3] U. S. Const., Art. I, §10.

[4] Art. IV, §1.

[5] Amdt. 1.

[6] *Ibid.*

[7] Amdt. 2.

[8] Amdt. 4.

[9] Amdt. 10.

[10] *United States* v. *Windsor*, 570 U. S. ___, ___ (2013) (slip op., at 16) (internal quotation marks and citation omitted).

"[T]he Federal Government, through our history, has deferred to state-law policy decisions with respect to domestic relations."[11]

But we need not speculate. When the Fourteenth Amendment was ratified in 1868, every State limited marriage to one man and one woman, and no one doubted the constitutionality of doing so. That resolves these cases. When it comes to determining the meaning of a vague constitutional provision—such as "due process of law" or "equal protection of the laws"—it is unquestionable that the People who ratified that provision did not understand it to prohibit a practice that remained both universal and uncontroversial in the years after ratification.[12] We have no basis for striking down a practice that is not expressly prohibited by the Fourteenth Amendment's text, and that bears the endorsement of a long tradition of open, widespread, and unchallenged use dating back to the Amendment's ratification. Since there is no doubt whatever that the People never decided to prohibit the limitation of marriage to opposite-sex couples, the public debate over same-sex marriage must be allowed to continue.

But the Court ends this debate, in an opinion lacking even a thin veneer of law. Buried beneath the mummeries and straining-to-be-memorable passages of the opinion is a candid and startling assertion: No matter *what* it was the People ratified, the Fourteenth Amendment protects those rights that the Judiciary, in its "reasoned judgment," thinks the Fourteenth Amendment ought to protect.[13] That is so because "[t]he generations that wrote and ratified the Bill of Rights and the Fourteenth Amendment did not presume to know the extent of freedom in all of its

—————

[11] *Id.,* at ___ (slip op., at 17).

[12] See *Town of Greece* v. *Galloway,* 572 U. S. ___, ___–___ (2014) (slip op., at 7–8).

[13] *Ante*, at 10.

SCALIA, J., dissenting

dimensions . . . . "[14]  One would think that sentence would continue: ". . . and therefore they provided for a means by which the People could amend the Constitution," or perhaps ". . . and therefore they left the creation of additional liberties, such as the freedom to marry someone of the same sex, to the People, through the never-ending process of legislation."  But no.  What logically follows, in the majority's judge-empowering estimation, is: "and so they entrusted to future generations a charter protecting the right of all persons to enjoy liberty as we learn its meaning."[15]  The "we," needless to say, is the nine of us.  "History and tradition guide and discipline [our] inquiry but do not set its outer boundaries."[16]  Thus, rather than focusing on *the People's* understanding of "liberty"—at the time of ratification or even today—the majority focuses on four "principles and traditions" that, *in the majority's view*, prohibit States from defining marriage as an institution consisting of one man and one woman.[17]

This is a naked judicial claim to legislative—indeed, *super*-legislative—power; a claim fundamentally at odds with our system of government.  Except as limited by a constitutional prohibition agreed to by the People, the States are free to adopt whatever laws they like, even those that offend the esteemed Justices' "reasoned judgment."  A system of government that makes the People subordinate to a committee of nine unelected lawyers does not deserve to be called a democracy.

Judges are selected precisely for their skill as lawyers; whether they reflect the policy views of a particular constituency is not (or should not be) relevant.  Not surprisingly then, the Federal Judiciary is hardly a cross-section

---

[14]*Ante*, at 11.

[15]*Ibid*.

[16]*Ante*, at 10–11.

[17]*Ante,* at 12–18.

6                      OBERGEFELL *v.* HODGES

SCALIA, J., dissenting

of America.  Take, for example, this Court, which consists
of only nine men and women, all of them successful law-
yers[18] who studied at Harvard or Yale Law School.  Four
of the nine are natives of New York City.  Eight of them
grew up in east- and west-coast States.  Only one hails
from the vast expanse in-between.  Not a single South-
westerner or even, to tell the truth, a genuine Westerner
(California does not count).    Not a single evangelical
Christian (a group that comprises about one quarter of
Americans[19]), or even a Protestant of any denomination.
The  strikingly  unrepresentative  character  of  the  body
voting on today's social upheaval would be irrelevant if
they  were  functioning  as *judges*, answering  the  legal
question whether the American people had ever ratified a
constitutional provision that was understood to proscribe
the traditional definition of marriage.  But of course the
Justices in today's majority are not voting on that basis;
*they say they are not*.  And to allow the policy question of
same-sex  marriage  to  be  considered  and  resolved  by  a
select, patrician, highly unrepresentative panel of nine is
to violate a principle even more fundamental than no
taxation without representation: no social transformation
without representation.

II

But  what  really  astounds  is  the  hubris  reflected  in
today's judicial Putsch.  The five Justices who compose
today's majority are entirely comfortable concluding that

───────────

[18]The predominant attitude of tall-building lawyers with respect to
the questions presented in these cases is suggested by the fact that the
American Bar Association deemed it in accord with the wishes of its
members to file a brief in support of the petitioners.  See Brief for
American Bar Association as *Amicus Curiae* in Nos. 14–571 and 14–
574, pp. 1–5.
[19]See Pew Research Center, America's Changing Religious Land-
scape 4 (May 12, 2015).

Scalia, J., dissenting

every State violated the Constitution for all of the 135 years between the Fourteenth Amendment's ratification and Massachusetts' permitting of same-sex marriages in 2003.[20] They have discovered in the Fourteenth Amendment a "fundamental right" overlooked by every person alive at the time of ratification, and almost everyone else in the time since. They see what lesser legal minds— minds like Thomas Cooley, John Marshall Harlan, Oliver Wendell Holmes, Jr., Learned Hand, Louis Brandeis, William Howard Taft, Benjamin Cardozo, Hugo Black, Felix Frankfurter, Robert Jackson, and Henry Friendly— could not. They are certain that the People ratified the Fourteenth Amendment to bestow on them the power to remove questions from the democratic process when that is called for by their "reasoned judgment." These Justices *know* that limiting marriage to one man and one woman is contrary to reason; they *know* that an institution as old as government itself, and accepted by every nation in history until 15 years ago,[21] cannot possibly be supported by anything other than ignorance or bigotry. And they are willing to say that any citizen who does not agree with that, who adheres to what was, until 15 years ago, the unanimous judgment of all generations and all societies, stands against the Constitution.

The opinion is couched in a style that is as pretentious as its content is egotistic. It is one thing for separate concurring or dissenting opinions to contain extravagances, even silly extravagances, of thought and expression; it is something else for the official opinion of the Court to do so.[22] Of course the opinion's showy profundities are often

——————

[20] *Goodridge* v. *Department of Public Health*, 440 Mass. 309, 798 N. E. 2d 941 (2003).

[21] *Windsor*, 570 U. S., at ___ (Alito, J., dissenting) (slip op., at 7).

[22] If, even as the price to be paid for a fifth vote, I ever joined an opinion for the Court that began: "The Constitution promises liberty to all within its reach, a liberty that includes certain specific rights that

profoundly incoherent. "The nature of marriage is that,
through its enduring bond, two persons together can find
other freedoms, such as expression, intimacy, and spiritu-
ality."[23] (Really? Who ever thought that intimacy and
spirituality [whatever that means] were freedoms? And if
intimacy is, one would think Freedom of Intimacy is
abridged rather than expanded by marriage. Ask the
nearest hippie. Expression, sure enough, *is* a freedom, but
anyone in a long-lasting marriage will attest that that
happy state constricts, rather than expands, what one can
prudently say.) Rights, we are told, can "rise . . . from a
better informed understanding of how constitutional
imperatives define a liberty that remains urgent in our
own era."[24] (Huh? How can a better informed under-
standing of how constitutional imperatives [whatever that
means] define [whatever that means] an urgent liberty
[never mind], give birth to a right?) And we are told that,
"[i]n any particular case," either the Equal Protection or
Due Process Clause "may be thought to capture the es-
sence of [a] right in a more accurate and comprehensive
way," than the other, "even as the two Clauses may con-
verge in the identification and definition of the right."[25]
(What say? What possible "essence" does substantive due
process "capture" in an "accurate and comprehensive
way"? It stands for nothing whatever, except those free-
doms and entitlements that this Court *really* likes. And
the Equal Protection Clause, as employed today, identifies
nothing except a difference in treatment that this Court

--------

allow persons, within a lawful realm, to define and express their
identity," I would hide my head in a bag. The Supreme Court of the
United States has descended from the disciplined legal reasoning of
John Marshall and Joseph Story to the mystical aphorisms of the
fortune cookie.

[23] *Ante,* at 13.
[24] *Ante,* at 19.
[25] *Ibid.*

*really* dislikes. Hardly a distillation of essence. If the opinion is correct that the two clauses "converge in the identification and definition of [a] right," that is only because the majority's likes and dislikes are predictably compatible.) I could go on. The world does not expect logic and precision in poetry or inspirational pop-philosophy; it demands them in the law. The stuff contained in today's opinion has to diminish this Court's reputation for clear thinking and sober analysis.

\*     \*     \*

Hubris is sometimes defined as o'erweening pride; and pride, we know, goeth before a fall. The Judiciary is the "least dangerous" of the federal branches because it has "neither Force nor Will, but merely judgment; and must ultimately depend upon the aid of the executive arm" and the States, "even for the efficacy of its judgments."[26] With each decision of ours that takes from the People a question properly left to them—with each decision that is unabashedly based not on law, but on the "reasoned judgment" of a bare majority of this Court—we move one step closer to being reminded of our impotence.

---

[26]The Federalist No. 78, pp. 522, 523 (J. Cooke ed. 1961) (A. Hamilton).

Cite as: 576 U. S. ____ (2015)          1

THOMAS, J., dissenting

# SUPREME COURT OF THE UNITED STATES

————

Nos. 14–556, 14-562, 14-571 and 14–574

————

JAMES OBERGEFELL, ET AL., PETITIONERS
14–556          v.
RICHARD HODGES, DIRECTOR, OHIO
DEPARTMENT OF HEALTH, ET AL.;


VALERIA TANCO, ET AL., PETITIONERS
14–562          v.
BILL HASLAM, GOVERNOR OF
TENNESSEE, ET AL.;


APRIL DEBOER, ET AL., PETITIONERS
14–571          v.
RICK SNYDER, GOVERNOR OF MICHIGAN,
ET AL.; AND


GREGORY BOURKE, ET AL., PETITIONERS
14–574          v.
STEVE BESHEAR, GOVERNOR OF
KENTUCKY

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SIXTH CIRCUIT

[June 26, 2015]

JUSTICE THOMAS, with whom JUSTICE SCALIA joins,
dissenting.

The Court's decision today is at odds not only with the
Constitution, but with the principles upon which our
Nation was built. Since well before 1787, liberty has been
understood as freedom from government action, not enti-
tlement to government benefits. The Framers created our

Constitution to preserve that understanding of liberty. Yet the majority invokes our Constitution in the name of a "liberty" that the Framers would not have recognized, to the detriment of the liberty they sought to protect. Along the way, it rejects the idea—captured in our Declaration of Independence—that human dignity is innate and suggests instead that it comes from the Government. This distortion of our Constitution not only ignores the text, it inverts the relationship between the individual and the state in our Republic. I cannot agree with it.

## I

The majority's decision today will require States to issue marriage licenses to same-sex couples and to recognize same-sex marriages entered in other States largely based on a constitutional provision guaranteeing "due process" before a person is deprived of his "life, liberty, or property." I have elsewhere explained the dangerous fiction of treating the Due Process Clause as a font of substantive rights. *McDonald* v. *Chicago*, 561 U. S. 742, 811–812 (2010) (THOMAS, J., concurring in part and concurring in judgment). It distorts the constitutional text, which guarantees only whatever "process" is "due" before a person is deprived of life, liberty, and property. U. S. Const., Amdt. 14, §1. Worse, it invites judges to do exactly what the majority has done here—"'roa[m] at large in the constitutional field' guided only by their personal views" as to the "'fundamental rights'" protected by that document. *Planned Parenthood of Southeastern Pa.* v. *Casey*, 505 U. S. 833, 953, 965 (1992) (Rehnquist, C. J., concurring in judgment in part and dissenting in part) (quoting *Griswold* v. *Connecticut*, 381 U. S. 479, 502 (1965) (Harlan, J., concurring in judgment)).

By straying from the text of the Constitution, substantive due process exalts judges at the expense of the People from whom they derive their authority. Petitioners argue

THOMAS, J., dissenting

that by enshrining the traditional definition of marriage in their State Constitutions through voter-approved amendments, the States have put the issue "beyond the reach of the normal democratic process."  Brief for Petitioners in No. 14–562, p. 54.  But the result petitioners seek is far less democratic.  They ask nine judges on this Court to enshrine their definition of marriage in the Federal Constitution and thus put it beyond the reach of the normal democratic process for the entire Nation.  That a "bare majority" of this Court, *ante,* at 25, is able to grant this wish, wiping out with a stroke of the keyboard the results of the political process in over 30 States, based on a provision that guarantees only "due process" is but further evidence of the danger of substantive due process.[1]

## II

Even if the doctrine of substantive due process were somehow defensible—it is not—petitioners still would not have a claim.  To invoke the protection of the Due Process Clause at all—whether under a theory of "substantive" or "procedural" due process—a party must first identify a deprivation of "life, liberty, or property."  The majority claims these state laws deprive petitioners of "liberty," but the concept of "liberty" it conjures up bears no resemblance to any plausible meaning of that word as it is used in the Due Process Clauses.

_____

[1] The majority states that the right it believes is "part of the liberty promised by the Fourteenth Amendment is derived, too, from that Amendment's guarantee of the equal protection of the laws."  *Ante,* at 19.  Despite the "synergy" it finds "between th[ese] two protections," *ante,* at 20, the majority clearly uses equal protection only to shore up its substantive due process analysis, an analysis both based on an imaginary constitutional protection and revisionist view of our history and tradition.

4                   OBERGEFELL *v.* HODGES

Thomas, J., dissenting

A

1

As used in the Due Process Clauses, "liberty" most likely refers to "the power of loco-motion, of changing situation, or removing one's person to whatsoever place one's own inclination may direct; without imprisonment or restraint, unless by due course of law." 1 W. Blackstone, Commentaries on the Laws of England 130 (1769) (Blackstone). That definition is drawn from the historical roots of the Clauses and is consistent with our Constitution's text and structure.

Both of the Constitution's Due Process Clauses reach back to Magna Carta. See *Davidson* v. *New Orleans*, 96 U. S. 97, 101–102 (1878). Chapter 39 of the original Magna Carta provided, "No free man shall be taken, imprisoned, disseised, outlawed, banished, or in any way destroyed, nor will We proceed against or prosecute him, except by the lawful judgment of his peers and by the law of the land." Magna Carta, ch. 39, in A. Howard, Magna Carta: Text and Commentary 43 (1964). Although the 1215 version of Magna Carta was in effect for only a few weeks, this provision was later reissued in 1225 with modest changes to its wording as follows: "No freeman shall be taken, or imprisoned, or be disseised of his freehold, or liberties, or free customs, or be outlawed, or exiled, or any otherwise destroyed; nor will we not pass upon him, nor condemn him, but by lawful judgment of his peers or by the law of the land." 1 E. Coke, The Second Part of the Institutes of the Laws of England 45 (1797). In his influential commentary on the provision many years later, Sir Edward Coke interpreted the words "by the law of the land" to mean the same thing as "by due proces of the common law." *Id.,* at 50.

After Magna Carta became subject to renewed interest in the 17th century, see, *e.g., ibid.,* William Blackstone referred to this provision as protecting the "absolute rights

THOMAS, J., dissenting

of every Englishman." 1 Blackstone 123. And he formu-
lated those absolute rights as "the right of personal secu-
rity," which included the right to life; "the right of personal
liberty"; and "the right of private property." *Id.*, at 125.
He defined "the right of personal liberty" as "the power of
loco-motion, of changing situation, or removing one's
person to whatsoever place one's own inclination may
direct; without imprisonment or restraint, unless by due
course of law." *Id.*, at 125, 130.[2]

The Framers drew heavily upon Blackstone's formula-
tion, adopting provisions in early State Constitutions that
replicated Magna Carta's language, but were modified to
refer specifically to "life, liberty, or property."[3] State

––––––––––

[2] The seeds of this articulation can also be found in Henry Care's
influential treatise, English Liberties. First published in America in
1721, it described the "three things, which the Law of *England* . . .
principally regards and taketh Care of," as "*Life*, *Liberty* and *Estate*,"
and described habeas corpus as the means by which one could procure
one's "Liberty" from imprisonment. The Habeas Corpus Act, comment.,
in English Liberties, or the Free-born Subject's Inheritance 185 (H.
Care comp. 5th ed. 1721). Though he used the word "Liberties" by itself
more broadly, see, *e.g., id.,* at 7, 34, 56, 58, 60, he used "Liberty" in a
narrow sense when placed alongside the words "Life" or "Estate," see,
*e.g., id.,* at 185, 200.

[3] Maryland, North Carolina, and South Carolina adopted the phrase
"life, liberty, or property" in provisions otherwise tracking Magna
Carta: "That no freeman ought to be taken, or imprisoned, or disseized
of his freehold, liberties, or privileges, or outlawed, or exiled, or in any
manner destroyed, or deprived of his life, liberty, or property, but by
the judgment of his peers, or by the law of the land." Md. Const.,
Declaration of Rights, Art. XXI (1776), in 3 Federal and State Constitu-
tions, Colonial Charters, and Other Organic Laws 1688 (F. Thorpe ed.
1909); see also S. C. Const., Art. XLI (1778), in 6 *id.,* at 3257; N. C.
Const., Declaration of Rights, Art. XII (1776), in 5 *id.,* at 2788. Massa-
chusetts and New Hampshire did the same, albeit with some altera-
tions to Magna Carta's framework: "[N]o subject shall be arrested,
imprisoned, despoiled, or deprived of his property, immunities, or
privileges, put out of the protection of the law, exiled, or deprived of his
life, liberty, or estate, but by the judgment of his peers, or the law of the
land." Mass. Const., pt. I, Art. XII (1780), in 3 *id.,* at 1891; see also

Thomas, J., dissenting

decisions interpreting these provisions between the founding and the ratification of the Fourteenth Amendment almost uniformly construed the word "liberty" to refer only to freedom from physical restraint.  See Warren, The New "Liberty" Under the Fourteenth Amendment, 39 Harv. L. Rev. 431, 441–445 (1926).  Even one case that has been identified as a possible exception to that view merely used broad language about liberty in the context of a habeas corpus proceeding—a proceeding classically associated with obtaining freedom from physical restraint.  Cf. *id.,* at 444–445.

In enacting the Fifth Amendment's Due Process Clause, the Framers similarly chose to employ the "life, liberty, or property" formulation, though they otherwise deviated substantially from the States' use of Magna Carta's language in the Clause.  See Shattuck, The True Meaning of the Term "Liberty" in Those Clauses in the Federal and State Constitutions Which Protect "Life, Liberty, and Property," 4 Harv. L. Rev. 365, 382 (1890).  When read in light of the history of that formulation, it is hard to see how the "liberty" protected by the Clause could be interpreted to include anything broader than freedom from physical restraint.  That was the consistent usage of the time when "liberty" was paired with "life" and "property."  See *id.,* at 375.  And that usage avoids rendering superfluous those protections for "life" and "property."

If the Fifth Amendment uses "liberty" in this narrow sense, then the Fourteenth Amendment likely does as well.  See *Hurtado* v. *California*, 110 U. S. 516, 534–535 (1884).  Indeed, this Court has previously commented, "The conclusion is . . . irresistible, that when the same phrase was employed in the Fourteenth Amendment [as was used in the Fifth Amendment], it was used in the same sense and with no greater extent." *Ibid*.  And this

---

N. H. Const., pt. I, Art. XV (1784), in 4 *id.,* at 2455.

THOMAS, J., dissenting

Court's earliest Fourteenth Amendment decisions appear to interpret the Clause as using "liberty" to mean freedom from physical restraint. In *Munn* v. *Illinois*, 94 U. S. 113 (1877), for example, the Court recognized the relationship between the two Due Process Clauses and Magna Carta, see *id.,* at 123–124, and implicitly rejected the dissent's argument that "'liberty'" encompassed "something more . . . than mere freedom from physical restraint or the bounds of a prison," *id.,* at 142 (Field, J., dissenting). That the Court appears to have lost its way in more recent years does not justify deviating from the original meaning of the Clauses.

2

Even assuming that the "liberty" in those Clauses encompasses something more than freedom from physical restraint, it would not include the types of rights claimed by the majority. In the American legal tradition, liberty has long been understood as individual freedom *from* governmental action, not as a right *to* a particular governmental entitlement.

The founding-era understanding of liberty was heavily influenced by John Locke, whose writings "on natural rights and on the social and governmental contract" were cited "[i]n pamphlet after pamphlet" by American writers. B. Bailyn, The Ideological Origins of the American Revolution 27 (1967). Locke described men as existing in a state of nature, possessed of the "perfect freedom to order their actions and dispose of their possessions and persons as they think fit, within the bounds of the law of nature, without asking leave, or depending upon the will of any other man." J. Locke, Second Treatise of Civil Government, §4, p. 4 (J. Gough ed. 1947) (Locke). Because that state of nature left men insecure in their persons and property, they entered civil society, trading a portion of their natural liberty for an increase in their security. See

*id.,* §97, at 49.  Upon consenting to that order, men obtained civil liberty, or the freedom "to be under no other legislative power but that established by consent in the commonwealth; nor under the dominion of any will or restraint of any law, but what that legislative shall enact according to the trust put in it." *Id.,* §22, at 13.[4]

This philosophy permeated the 18th-century political scene in America.  A 1756 editorial in the Boston Gazette, for example, declared that "Liberty in the *State of Nature*" was the "inherent natural Right" "of each Man" "to make a free Use of his Reason and Understanding, and to chuse that Action which he thinks he can give the best Account of," but that, "in Society, every Man parts with a Small Share of his *natural* Liberty, or lodges it in the publick Stock, that he may possess the Remainder without Controul."  Boston Gazette and Country Journal, No. 58, May 10, 1756, p. 1.  Similar sentiments were expressed in public speeches, sermons, and letters of the time.  See 1 C.

―――――――――

[4]Locke's theories heavily influenced other prominent writers of the 17th and 18th centuries.  Blackstone, for one, agreed that "natural liberty consists properly in a power of acting as one thinks fit, without any restraint or control, unless by the law of nature" and described civil liberty as that "which leaves the subject entire master of his own conduct," except as "restrained by human laws."  1 Blackstone 121–122.  And in a "treatise routinely cited by the Founders," *Zivotofsky* v. *Kerry, ante,* at 5 (THOMAS, J., concurring in judgment in part and dissenting in part), Thomas Rutherforth wrote, "By liberty we mean the power, which a man has to act as he thinks fit, where no law restrains him; it may therefore be called a mans right over his own actions."  1 T. Rutherforth, Institutes of Natural Law 146 (1754).  Rutherforth explained that "[t]he only restraint, which a mans right over his own actions is originally under, is the obligation of governing himself by the law of nature, and the law of God," and that "[w]hatever right those of our own species may have . . . to restrain [those actions] within certain bounds, beyond what the law of nature has prescribed, arises from some after-act of our own, from some consent either express or tacit, by which we have alienated our liberty, or transferred the right of directing our actions from ourselves to them."  *Id.,* at 147–148.

Thomas, J., dissenting

Hyneman & D. Lutz, American Political Writing During the Founding Era 1760–1805, pp. 100, 308, 385 (1983).

The founding-era idea of civil liberty as natural liberty constrained by human law necessarily involved only those freedoms that existed *outside of* government.  See Hamburger, Natural Rights, Natural Law, and American Constitutions, 102 Yale L. J. 907, 918–919 (1993).  As one later commentator observed, "[L]iberty in the eighteenth century was thought of much more in relation to 'negative liberty'; that is, freedom *from*, not freedom *to*, freedom from a number of social and political evils, including arbitrary government power."  J. Reid, The Concept of Liberty in the Age of the American Revolution 56 (1988).  Or as one scholar put it in 1776, "[T]he common idea of liberty is merely negative, and is only the *absence of restraint*."  R. Hey, Observations on the Nature of Civil Liberty and the Principles of Government §13, p. 8 (1776) (Hey).  When the colonists described laws that would infringe their liberties, they discussed laws that would prohibit individuals "from walking in the streets and highways on certain saints days, or from being abroad after a certain time in the evening, or . . . restrain [them] from working up and manufacturing materials of [their] own growth."  Downer, A Discourse at the Dedication of the Tree of Liberty, in 1 Hyneman, *supra*, at 101.  Each of those examples involved freedoms that existed outside of government.

B

Whether we define "liberty" as locomotion or freedom from governmental action more broadly, petitioners have in no way been deprived of it.

Petitioners cannot claim, under the most plausible definition of "liberty," that they have been imprisoned or physically restrained by the States for participating in same-sex relationships.  To the contrary, they have been able to cohabitate and raise their children in peace.  They

have been able to hold civil marriage ceremonies in States
that recognize same-sex marriages and private religious
ceremonies in all States. They have been able to travel
freely around the country, making their homes where they
please. Far from being incarcerated or physically re-
strained, petitioners have been left alone to order their
lives as they see fit.

Nor, under the broader definition, can they claim that
the States have restricted their ability to go about their
daily lives as they would be able to absent governmental
restrictions. Petitioners do not ask this Court to order the
States to stop restricting their ability to enter same-sex
relationships, to engage in intimate behavior, to make
vows to their partners in public ceremonies, to engage in
religious wedding ceremonies, to hold themselves out as
married, or to raise children. The States have imposed no
such restrictions. Nor have the States prevented petition-
ers from approximating a number of incidents of marriage
through private legal means, such as wills, trusts, and
powers of attorney.

Instead, the States have refused to grant them govern-
mental entitlements. Petitioners claim that as a matter of
"liberty," they are entitled to access privileges and benefits
that exist solely *because of* the government. They want,
for example, to receive the State's *imprimatur* on their
marriages—on state issued marriage licenses, death certif-
icates, or other official forms. And they want to receive
various monetary benefits, including reduced inheritance
taxes upon the death of a spouse, compensation if a spouse
dies as a result of a work-related injury, or loss of consor-
tium damages in tort suits. But receiving governmental
recognition and benefits has nothing to do with any un-
derstanding of "liberty" that the Framers would have
recognized.

To the extent that the Framers would have recognized a
natural right to marriage that fell within the broader

THOMAS, J., dissenting

definition of liberty, it would not have included a right to governmental recognition and benefits. Instead, it would have included a right to engage in the very same activities that petitioners have been left free to engage in—making vows, holding religious ceremonies celebrating those vows, raising children, and otherwise enjoying the society of one's spouse—without governmental interference. At the founding, such conduct was understood to predate government, not to flow from it. As Locke had explained many years earlier, "The first society was between man and wife, which gave beginning to that between parents and children." Locke §77, at 39; see also J. Wilson, Lectures on Law, in 2 Collected Works of James Wilson 1068 (K. Hall and M. Hall eds. 2007) (concluding "that to the institution of marriage the true origin of society must be traced"). Petitioners misunderstand the institution of marriage when they say that it would "mean little" absent governmental recognition. Brief for Petitioners in No. 14–556, p. 33.

Petitioners' misconception of liberty carries over into their discussion of our precedents identifying a right to marry, not one of which has expanded the concept of "liberty" beyond the concept of negative liberty. Those precedents all involved absolute prohibitions on private actions associated with marriage. *Loving* v. *Virginia*, 388 U. S. 1 (1967), for example, involved a couple who was criminally prosecuted for marrying in the District of Columbia and cohabiting in Virginia, *id.,* at 2–3.[5] They were each sen-

―――――――

[5]The suggestion of petitioners and their *amici* that antimiscegenation laws are akin to laws defining marriage as between one man and one woman is both offensive and inaccurate. "America's earliest laws against interracial sex and marriage were spawned by slavery." P. Pascoe, What Comes Naturally: Miscegenation Law and the Making of Race in America 19 (2009). For instance, Maryland's 1664 law prohibiting marriages between "'freeborne English women'" and "'Negro Sla[v]es'" was passed as part of the very act that authorized lifelong

12                OBERGEFELL *v.* HODGES

THOMAS, J., dissenting

tenced to a year of imprisonment, suspended for a term of
25 years on the condition that they not reenter the Com-
monwealth together during that time. *Id.,* at 3.[6]  In a
similar vein, *Zablocki* v. *Redhail,* 434 U. S. 374 (1978),
involved a man who was prohibited, on pain of criminal
penalty, from "marry[ing] in Wisconsin or elsewhere"
because of his outstanding child-support obligations, *id.,*
at 387; see *id.,* at 377–378.  And *Turner* v. *Safley,* 482
U. S. 78 (1987), involved state inmates who were prohib-
ited from entering marriages without the permission of the
superintendent of the prison, permission that could not be
granted absent compelling reasons, *id.,* at 82.  In *none* of
those cases were individuals denied solely governmental

─────────
slavery in the colony.  *Id.,* at 19–20.  Virginia's antimiscegenation laws
likewise were passed in a 1691 resolution entitled "An act for suppress-
ing outlying Slaves."  Act of Apr. 1691, Ch. XVI, 3 Va. Stat. 86 (W.
Hening ed. 1823) (reprint 1969) (italics deleted).  "It was not until the
Civil War threw the future of slavery into doubt that lawyers, legisla-
tors, and judges began to develop the elaborate justifications that
signified the emergence of miscegenation law and made restrictions on
interracial marriage the foundation of post-Civil War white suprem-
acy."  Pascoe, *supra,* at 27–28.

  Laws defining marriage as between one man and one woman do not
share this sordid history.  The traditional definition of marriage has
prevailed in every society that has recognized marriage throughout
history.  Brief for Scholars of History and Related Disciplines as *Amici
Curiae* 1.  It arose not out of a desire to shore up an invidious institu-
tion like slavery, but out of a desire "to increase the likelihood that
children will be born and raised in stable and enduring family units by
both the mothers and the fathers who brought them into this world."
*Id.,* at 8.  And it has existed in civilizations containing all manner of
views on homosexuality.  See Brief for Ryan T. Anderson as *Amicus
Curiae* 11–12 (explaining that several famous ancient Greeks wrote
approvingly of the traditional definition of marriage, though same-sex
sexual relations were common in Greece at the time).

  [6]The prohibition extended so far as to forbid even religious ceremo-
nies, thus raising a serious question under the First Amendment's Free
Exercise Clause, as at least one *amicus* brief at the time pointed out.
Brief for John J. Russell et al. as *Amici Curiae* in *Loving* v. *Virginia,*
O.T. 1966, No. 395, pp. 12–16.

Thomas, J., dissenting

recognition and benefits associated with marriage.

In a concession to petitioners' misconception of liberty, the majority characterizes petitioners' suit as a quest to "find . . . liberty by marrying someone of the same sex and having their marriages deemed lawful on the same terms and conditions as marriages between persons of the opposite sex." *Ante,* at 2. But "liberty" is not lost, nor can it be found in the way petitioners seek. As a philosophical matter, liberty is only freedom from governmental action, not an entitlement to governmental benefits. And as a constitutional matter, it is likely even narrower than that, encompassing only freedom from physical restraint and imprisonment. The majority's "better informed understanding of how constitutional imperatives define . . . liberty," *ante,* at 19,—better informed, we must assume, than that of the people who ratified the Fourteenth Amendment—runs headlong into the reality that our Constitution is a "collection of 'Thou shalt nots,'" *Reid* v. *Covert,* 354 U. S. 1, 9 (1957) (plurality opinion), not "Thou shalt provides."

### III

The majority's inversion of the original meaning of liberty will likely cause collateral damage to other aspects of our constitutional order that protect liberty.

### A

The majority apparently disregards the political process as a protection for liberty. Although men, in forming a civil society, "give up all the power necessary to the ends for which they unite into society, to the majority of the community," Locke §99, at 49, they reserve the authority to exercise natural liberty within the bounds of laws established by that society, *id.,* §22, at 13; see also Hey §§52, 54, at 30–32. To protect that liberty from arbitrary interference, they establish a process by which that society can

Thomas, J., dissenting

adopt and enforce its laws.  In our country, that process is primarily representative government at the state level, with the Federal Constitution serving as a backstop for that process.  As a general matter, when the States act through their representative governments or by popular vote, the liberty of their residents is fully vindicated.  This is no less true when some residents disagree with the result; indeed, it seems difficult to imagine *any* law on which all residents of a State would agree.  See Locke §98, at 49 (suggesting that society would cease to function if it required unanimous consent to laws).  What matters is that the process established by those who created the society has been honored.

That process has been honored here.  The definition of marriage has been the subject of heated debate in the States.  Legislatures have repeatedly taken up the matter on behalf of the People, and 35 States have put the question to the People themselves.  In 32 of those 35 States, the People have opted to retain the traditional definition of marriage.  Brief for Respondents in No. 14–571, pp. 1a–7a.  That petitioners disagree with the result of that process does not make it any less legitimate.  Their civil liberty has been vindicated.

B

Aside from undermining the political processes that protect our liberty, the majority's decision threatens the religious liberty our Nation has long sought to protect.

The history of religious liberty in our country is familiar: Many of the earliest immigrants to America came seeking freedom to practice their religion without restraint.  See McConnell, The Origins and Historical Understanding of Free Exercise of Religion, 103 Harv. L. Rev. 1409, 1422–1425 (1990).  When they arrived, they created their own havens for religious practice.  *Ibid.*  Many of these havens were initially homogenous communities with established

THOMAS, J., dissenting

religions. *Ibid.* By the 1780's, however, "America was in the wake of a great religious revival" marked by a move toward free exercise of religion. *Id.,* at 1437. Every State save Connecticut adopted protections for religious freedom in their State Constitutions by 1789, *id.,* at 1455, and, of course, the First Amendment enshrined protection for the free exercise of religion in the U. S. Constitution. But that protection was far from the last word on religious liberty in this country, as the Federal Government and the States have reaffirmed their commitment to religious liberty by codifying protections for religious practice. See, *e.g.,* Religious Freedom Restoration Act of 1993, 107 Stat. 1488, 42 U. S. C. §2000bb *et seq.*; Conn. Gen. Stat. §52–571b (2015).

Numerous *amici*—even some not supporting the States—have cautioned the Court that its decision here will "have unavoidable and wide-ranging implications for religious liberty." Brief for General Conference of Seventh-Day Adventists et al. as *Amici Curiae* 5. In our society, marriage is not simply a governmental institution; it is a religious institution as well. *Id.,* at 7. Today's decision might change the former, but it cannot change the latter. It appears all but inevitable that the two will come into conflict, particularly as individuals and churches are confronted with demands to participate in and endorse civil marriages between same-sex couples.

The majority appears unmoved by that inevitability. It makes only a weak gesture toward religious liberty in a single paragraph, *ante,* at 27. And even that gesture indicates a misunderstanding of religious liberty in our Nation's tradition. Religious liberty is about more than just the protection for "religious organizations and persons . . . as they seek to teach the principles that are so fulfilling and so central to their lives and faiths." *Ibid.* Religious liberty is about freedom of action in matters of religion generally, and the scope of that liberty is directly correlated to the civil restraints placed upon religious

16                    OBERGEFELL *v.* HODGES

                    THOMAS, J., dissenting

practice.[7]

Although our Constitution provides some protection against such governmental restrictions on religious practices, the People have long elected to afford broader protections than this Court's constitutional precedents mandate. Had the majority allowed the definition of marriage to be left to the political process—as the Constitution requires—the People could have considered the religious liberty implications of deviating from the traditional definition as part of their deliberative process. Instead, the majority's decision short-circuits that process, with potentially ruinous consequences for religious liberty.

## IV

Perhaps recognizing that these cases do not actually involve liberty as it has been understood, the majority goes to great lengths to assert that its decision will advance the "dignity" of same-sex couples. *Ante,* at 3, 13, 26, 28.[8] The flaw in that reasoning, of course, is that the Constitution contains no "dignity" Clause, and even if it did, the government would be incapable of bestowing dignity.

Human dignity has long been understood in this country to be innate. When the Framers proclaimed in the Declaration of Independence that "all men are created equal"

———————

[7] Concerns about threats to religious liberty in this context are not unfounded. During the hey-day of antimiscegenation laws in this country, for instance, Virginia imposed criminal penalties on ministers who performed marriage in violation of those laws, though their religions would have permitted them to perform such ceremonies. Va. Code Ann. §20–60 (1960).

[8] The majority also suggests that marriage confers "nobility" on individuals. *Ante,* at 3. I am unsure what that means. People may choose to marry or not to marry. The decision to do so does not make one person more "noble" than another. And the suggestion that Americans who choose not to marry are inferior to those who decide to enter such relationships is specious.

Thomas, J., dissenting

and "endowed by their Creator with certain unalienable Rights," they referred to a vision of mankind in which all humans are created in the image of God and therefore of inherent worth. That vision is the foundation upon which this Nation was built.

The corollary of that principle is that human dignity cannot be taken away by the government. Slaves did not lose their dignity (any more than they lost their humanity) because the government allowed them to be enslaved. Those held in internment camps did not lose their dignity because the government confined them. And those denied governmental benefits certainly do not lose their dignity because the government denies them those benefits. The government cannot bestow dignity, and it cannot take it away.

The majority's musings are thus deeply misguided, but at least those musings can have no effect on the dignity of the persons the majority demeans. Its mischaracterization of the arguments presented by the States and their *amici* can have no effect on the dignity of those litigants. Its rejection of laws preserving the traditional definition of marriage can have no effect on the dignity of the people who voted for them. Its invalidation of those laws can have no effect on the dignity of the people who continue to adhere to the traditional definition of marriage. And its disdain for the understandings of liberty and dignity upon which this Nation was founded can have no effect on the dignity of Americans who continue to believe in them.

*        *        *

Our Constitution—like the Declaration of Independence before it—was predicated on a simple truth: One's liberty, not to mention one's dignity, was something to be shielded from—not provided by—the State. Today's decision casts that truth aside. In its haste to reach a desired result, the majority misapplies a clause focused on "due process" to afford substantive rights, disregards the most plausible

18                      OBERGEFELL *v.* HODGES

                        THOMAS, J., dissenting

understanding of the "liberty" protected by that clause, and distorts the principles on which this Nation was founded.  Its decision will have inestimable consequences for our Constitution and our society.  I respectfully dissent.

Cite as: 576 U. S. ____ (2015)          1

ALITO, J., dissenting

# SUPREME COURT OF THE UNITED STATES

————————

Nos. 14–556, 14-562, 14-571 and 14–574

————————

JAMES OBERGEFELL, ET AL., PETITIONERS
14–556        *v.*
RICHARD HODGES, DIRECTOR, OHIO
DEPARTMENT OF HEALTH, ET AL.;


VALERIA TANCO, ET AL., PETITIONERS
14–562        *v.*
BILL HASLAM, GOVERNOR OF
TENNESSEE, ET AL.;


APRIL DeBOER, ET AL., PETITIONERS
14–571        *v.*
RICK SNYDER, GOVERNOR OF MICHIGAN,
ET AL.; AND


GREGORY BOURKE, ET AL., PETITIONERS
14–574        *v.*
STEVE BESHEAR, GOVERNOR OF
KENTUCKY

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SIXTH CIRCUIT

[June 26, 2015]

JUSTICE ALITO, with whom JUSTICE SCALIA and JUSTICE
THOMAS join, dissenting.

Until the federal courts intervened, the American people
were engaged in a debate about whether their States
should recognize same-sex marriage.[1]  The question in

————————

[1] I use the phrase "recognize marriage" as shorthand for issuing mar-

2                    OBERGEFELL *v.* HODGES

ALITO, J., dissenting

these cases, however, is not what States *should* do about
same-sex marriage but whether the Constitution answers
that question for them.  It does not.  The Constitution
leaves that question to be decided by the people of each
State.

I

The Constitution says nothing about a right to same-sex
marriage, but the Court holds that the term "liberty" in
the Due Process Clause of the Fourteenth Amendment
encompasses this right.  Our Nation was founded upon the
principle that every person has the unalienable right to
liberty, but liberty is a term of many meanings.  For clas-
sical liberals, it may include economic rights now limited
by government regulation.  For social democrats, it
may include the right to a variety of government benefits.
For today's majority, it has a distinctively postmodern
meaning.

To prevent five unelected Justices from imposing their
personal vision of liberty upon the American people, the
Court has held that "liberty" under the Due Process
Clause should be understood to protect only those rights
that are "'deeply rooted in this Nation's history and tradi-
tion.'"  *Washington* v. *Glucksberg*, 521 U. S. 701, 720–721
(1997).  And it is beyond dispute that the right to same-sex
marriage is not among those rights.  See *United States* v.
*Windsor*, 570 U. S. ___, ___ (2013) (ALITO, J., dissenting)
(slip op., at 7).  Indeed:

"In this country, no State permitted same-sex mar-
riage until the Massachusetts Supreme Judicial Court
held in 2003 that limiting marriage to opposite-sex
couples    violated    the    State    Constitution.    See
*Goodridge* v. *Department of Public Health*, 440 Mass.

_____

riage licenses and conferring those special benefits and obligations
provided under state law for married persons.

ALITO, J., dissenting

309, 798 N. E. 2d 941.  Nor is the right to same-sex
marriage deeply rooted in the traditions of other na-
tions.  No country allowed same-sex couples to marry
until the Netherlands did so in 2000.

   "What [those arguing in favor of a constitutional
right to same sex marriage] seek, therefore, is not the
protection of a deeply rooted right but the recognition
of a very new right, and they seek this innovation not
from a legislative body elected by the people, but from
unelected judges.  Faced with such a request, judges
have cause for both caution and humility." *Id.,* at ___
(slip op., at 7–8) (footnote omitted).

   For today's majority, it does not matter that the right to
same-sex marriage lacks deep roots or even that it is
contrary to long-established tradition.  The Justices in the
majority claim the authority to confer constitutional pro-
tection upon that right simply because they believe that it
is fundamental.

## II

   Attempting to circumvent the problem presented by the
newness of the right found in these cases, the majority
claims that the issue is the right to equal treatment.
Noting that marriage is a fundamental right, the majority
argues that a State has no valid reason for denying that
right to same-sex couples.  This reasoning is dependent
upon a particular understanding of the purpose of civil
marriage.  Although the Court expresses the point in
loftier terms, its argument is that the fundamental pur-
pose of marriage is to promote the well-being of those who
choose to marry.  Marriage provides emotional fulfillment
and the promise of support in times of need.  And by bene-
fiting persons who choose to wed, marriage indirectly
benefits society because persons who live in stable, ful-
filling, and supportive relationships make better citizens.
It is for these reasons, the argument goes, that States

encourage and formalize marriage, confer special benefits on married persons, and also impose some special obligations. This understanding of the States' reasons for recognizing marriage enables the majority to argue that same-sex marriage serves the States' objectives in the same way as opposite-sex marriage.

This understanding of marriage, which focuses almost entirely on the happiness of persons who choose to marry, is shared by many people today, but it is not the traditional one. For millennia, marriage was inextricably linked to the one thing that only an opposite-sex couple can do: procreate.

Adherents to different schools of philosophy use different terms to explain why society should formalize marriage and attach special benefits and obligations to persons who marry. Here, the States defending their adherence to the traditional understanding of marriage have explained their position using the pragmatic vocabulary that characterizes most American political discourse. Their basic argument is that States formalize and promote marriage, unlike other fulfilling human relationships, in order to encourage potentially procreative conduct to take place within a lasting unit that has long been thought to provide the best atmosphere for raising children. They thus argue that there are reasonable secular grounds for restricting marriage to opposite-sex couples.

If this traditional understanding of the purpose of marriage does not ring true to all ears today, that is probably because the tie between marriage and procreation has frayed. Today, for instance, more than 40% of all children in this country are born to unmarried women.[2] This de-

——————

[2] See, *e.g.,* Dept. of Health and Human Services, Centers for Disease Control and Prevention, National Center for Health Statistics, D. Martin, B. Hamilton, M. Osterman, S. Curtin, & T. Matthews, Births: Final Data for 2013, 64 National Vital Statistics Reports, No. 1, p. 2 (Jan. 15, 2015), online at http://www.cdc.gov/nchs/data/nvsr/nvsr64/

Cite as: 576 U. S. ____ (2015)           5

ALITO, J., dissenting

velopment undoubtedly is both a cause and a result of changes in our society's understanding of marriage.

While, for many, the attributes of marriage in 21st-century America have changed, those States that do not want to recognize same-sex marriage have not yet given up on the traditional understanding. They worry that by officially abandoning the older understanding, they may contribute to marriage's further decay. It is far beyond the outer reaches of this Court's authority to say that a State may not adhere to the understanding of marriage that has long prevailed, not just in this country and others with similar cultural roots, but also in a great variety of countries and cultures all around the globe.

As I wrote in *Windsor*:

"The family is an ancient and universal human institution. Family structure reflects the characteristics of a civilization, and changes in family structure and in the popular understanding of marriage and the family can have profound effects. Past changes in the understanding of marriage—for example, the gradual ascendance of the idea that romantic love is a prerequisite to marriage—have had far-reaching consequences. But the process by which such consequences come about is complex, involving the interaction of numerous factors, and tends to occur over an extended period of time.

"We can expect something similar to take place if same-sex marriage becomes widely accepted. The long-term consequences of this change are not now known and are unlikely to be ascertainable for some

—————

nvsr64_01.pdf (all Internet materials as visited June 24, 2015, and available in Clerk of Court's case file); cf. Dept. of Health and Human Services, Centers for Disease Control and Prevention, National Center for Health Statistics (NCHS), S. Ventura, Changing Patterns of Non-martial Childbearing in the United States, NCHS Data Brief, No. 18 (May 2009), online at http://www.cdc.gov/nchs/data/databrief/db18.pdf.

6                 OBERGEFELL *v.* HODGES

time to come.  There are those who think that allow-
ing same-sex marriage will seriously undermine the
institution of marriage.  Others think that recogni-
tion of same-sex marriage will fortify a now-shaky
institution.

  "At present, no one—including social scientists, phi-
losophers, and historians—can predict with any cer-
tainty what the long-term ramifications of widespread
acceptance of same-sex marriage will be.  And judges
are certainly not equipped to make such an assess-
ment.  The Members of this Court have the authority
and the responsibility to interpret and apply the Con-
stitution.  Thus, if the Constitution contained a provi-
sion guaranteeing the right to marry a person of the
same sex, it would be our duty to enforce that right.
But the Constitution simply does not speak to the is-
sue of same-sex marriage.  In our system of govern-
ment, ultimate sovereignty rests with the people, and
the people have the right to control their own destiny.
Any change on a question so fundamental should be
made by the people through their elected officials."
570 U. S., at ___ (dissenting opinion) (slip op., at 8–10)
(citations and footnotes omitted).

### III

  Today's decision usurps the constitutional right of the
people to decide whether to keep or alter the traditional
understanding of marriage.  The decision will also have
other important consequences.

  It will be used to vilify Americans who are unwilling to
assent to the new orthodoxy.  In the course of its opinion,
the majority compares traditional marriage laws to laws
that denied equal treatment for African-Americans and
women.  *E.g.*, *ante*, at 11–13.  The implications of this
analogy will be exploited by those who are determined to
stamp out every vestige of dissent.

ALITO, J., dissenting

Perhaps recognizing how its reasoning may be used, the majority attempts, toward the end of its opinion, to reassure those who oppose same-sex marriage that their rights of conscience will be protected. *Ante*, at 26–27. We will soon see whether this proves to be true. I assume that those who cling to old beliefs will be able to whisper their thoughts in the recesses of their homes, but if they repeat those views in public, they will risk being labeled as bigots and treated as such by governments, employers, and schools.

The system of federalism established by our Constitution provides a way for people with different beliefs to live together in a single nation. If the issue of same-sex marriage had been left to the people of the States, it is likely that some States would recognize same-sex marriage and others would not. It is also possible that some States would tie recognition to protection for conscience rights. The majority today makes that impossible. By imposing its own views on the entire country, the majority facilitates the marginalization of the many Americans who have traditional ideas. Recalling the harsh treatment of gays and lesbians in the past, some may think that turnabout is fair play. But if that sentiment prevails, the Nation will experience bitter and lasting wounds.

Today's decision will also have a fundamental effect on this Court and its ability to uphold the rule of law. If a bare majority of Justices can invent a new right and impose that right on the rest of the country, the only real limit on what future majorities will be able to do is their own sense of what those with political power and cultural influence are willing to tolerate. Even enthusiastic supporters of same-sex marriage should worry about the scope of the power that today's majority claims.

Today's decision shows that decades of attempts to restrain this Court's abuse of its authority have failed. A lesson that some will take from today's decision is that

8                    OBERGEFELL *v.* HODGES

preaching about the proper method of interpreting the Constitution or the virtues of judicial self-restraint and humility cannot compete with the temptation to achieve what is viewed as a noble end by any practicable means. I do not doubt that my colleagues in the majority sincerely see in the Constitution a vision of liberty that happens to coincide with their own. But this sincerity is cause for concern, not comfort. What it evidences is the deep and perhaps irremediable corruption of our legal culture's conception of constitutional interpretation.

Most Americans—understandably—will cheer or lament today's decision because of their views on the issue of same-sex marriage. But all Americans, whatever their thinking on that issue, should worry about what the majority's claim of power portends.