Volume 4

Pages 670 - 990

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE VAUGHN R. WALKER

KRISTIN M. PERRY,                     )
SANDRA B. STIER, PAUL T. KATAMI,      )
and JEFFREY J. ZARRILLO,              )
                                      )
            Plaintiffs,               )
                                      )
VS.                                   ) NO. C 09-2292-VRW
                                      )
ARNOLD SCHWARZENEGGER, in his         )
official capacity as Governor of      )
California; EDMUND G. BROWN, JR.,     )
in his official capacity as           )
Attorney General of California;       )
MARK B. HORTON, in his official       )
capacity as Director of the           )
California Department of Public       )
Health and State Registrar of         )
Vital Statistics; LINETTE SCOTT,      )
in her official capacity as Deputy    )
Director of Health Information &      )
Strategic Planning for the            )
California Department of Public       )
Health; PATRICK O'CONNELL, in his     )
official capacity as                  )
Clerk-Recorder for the County of      )
Alameda; and DEAN C. LOGAN, in his    )
official capacity as                  )
Registrar-Recorder/County Clerk       )
for the County of Los Angeles,        )
                                      ) San Francisco, California
            Defendants.               ) Thursday
_____) January 14, 2010

**TRANSCRIPT OF PROCEEDINGS**

**Reported By:** *Katherine Powell Sullivan, CRR, CSR 5812*
*Debra L. Pas, CRR, CSR 11916*
*Official Reporters - U.S. District Court*

**APPEARANCES**:

| | |
|---|---|
| **For Plaintiffs:** | GIBSON, DUNN & CRUTCHER LLP |
| | 1050 Connecticut Avenue, N.W. |
| | Washington, D.C. 20036-5306 |
| BY: | **THEODORE B. OLSON, ESQUIRE** |
| | **MATTHEW D. MCGILL, ESQUIRE** |

GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, California  90071-3197
BY: **THEODORE J. BOUTROUS, JR., ESQUIRE**
**CHRISTOPHER D. DUSSEAULT, ESQUIRE**

GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, California  94105-2933
BY: **ETHAN D. DETTMER, JR., ESQUIRE**
**ENRIQUE A. MONAGAS, ESQUIRE**
**SARAH E. PIEPMEIER, ESQUIRE**

BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, New York 10504
BY: **DAVID BOIES, ESQUIRE**

BOIES, SCHILLER & FLEXNER LLP
575 Lexington Avenue, 7th Floor
New York, New York  10022
BY: **JOSHUA I. SCHILLER, ESQUIRE**

BOIES, SCHILLER & FLEXNER LLP
1999 Harrison Street, Suite 900
Oakland, California  94612
BY: **JEREMY MICHAEL GOLDMAN, ESQUIRE**
**STEVEN C. HOLTZMAN, ESQUIRE**

**For Plaintiff-**
**Intervenor:**    CITY AND COUNTY OF SAN FRANCISCO
OFFICE OF THE CITY ATTORNEY
One Drive Carlton B. Goodlett Place
San Francisco, California 94102-4682
BY: **THERESE STEWART, DEPUTY CITY ATTORNEY**
**DANNY CHOU**
**CHRISTINE VAN AKEN**
**RONALD P. FLYNN**
**MOLLIE M. LEE**
**DEPUTY CITY ATTORNEYS**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

**APPEARANCES (CONTINUED):**

| | |
|---|---|
| **For Defendant** | MENNEMEIER, GLASSMAN & STROUD |
| **Gov. Schwarzenegger:** | 980 9th Street, Suite 1700 |
| | Sacramento, California  95814-2736 |
| **BY:** | **ANDREW WALTER STROUD, ESQUIRE** |

| | |
|---|---|
| **For Defendant** | STATE ATTORNEY GENERAL'S OFFICE |
| **Edmund G. Brown Jr.:** | 455 Golden Gate Avenue, Suite 11000 |
| | San Francisco, California  94102-7004 |
| **BY:** | **TAMAR PACHTER, DEPUTY ATTORNEY GENERAL** |

STATE OF CALIFORNIA
Department of Justice
Office of the Attorney General
1300 I Street, 17th Floor
Sacramento, California 95814
**BY: GORDON BURNS, DEPUTY SOLICITOR GENERAL**

| | |
|---|---|
| **For Defendant-** | COOPER & KIRK |
| **Intervenors:** | 1523 New Hampshire Avenue, N.W. |
| | Washington, D.C.  20036 |
| **BY:** | **CHARLES J. COOPER, ESQUIRE** |
| | **DAVID H. THOMPSON, ESQUIRE** |
| | **HOWARD C. NIELSON, JR., ESQUIRE** |
| | **NICOLE MOSS, ESQUIRE** |
| | **PETER A. PATTERSON, ESQUIRE** |

ALLIANCE DEFENSE FUND
15100 North 90th Street
Scottsdale, Arizona 85260
**BY: BRIAN W. RAUM, SENIOR COUNSEL**

ALLIANCE DEFENSE FUND
801 G Street NW, Suite 509
Washington, D.C.  20001
**BY: JORDAN W. LORENCE, ESQUIRE**

| | |
|---|---|
| **For Defendant** | OFFICE OF LOS ANGELES COUNTY COUNSEL |
| **Dean C. Logan:** | 500 West Temple Street, Room 652 |
| | Los Angeles, California 90012 |
| **BY:** | **JUDY WHITEHURST, DEPUTY COUNTY COUNSEL** |

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

APPEARANCES (CONTINUED):

**For Defendant**
**Patrick O'Connell:**          OFFICE OF ALAMEDA COUNTY COUNSEL
                                1221 Oak Street, Suite 450
                                Oakland, California  94612
                         BY:  **CLAUDE F. KOLM, DEPUTY COUNTY COUNSEL**
                              **MANUEL MARTINEZ, DEPUTY COUNTY COUNSEL**


**For Mr. Garlow,**             AMERICAN CENTER FOR LAW & JUSTICE
**Mr. McPherson:**              11 West Chestnut Hill Road
                                Litchfield, Connecticut  06759
                         BY:  **VINCENT P. MCCARTHY, ESQUIRE**



                              _   _   _   _

```
1                    P R O C E E D I N G S

2    JANUARY 14, 2010                                    1:00 P.M.

3

4            THE COURT:  Mr. Boutrous, your next witness, please.

5            MR. DUSSEAULT:  Your Honor, the plaintiffs call

6    Dr. Ilan Meyer.

7            THE CLERK:  Raise your right hand, please.

8                            ILAN MEYER,

9    called as a witness for the Plaintiffs herein, having been

10   first duly sworn, was examined and testified as follows:

11           THE WITNESS:  I do.

12           THE CLERK:  Thank you.

13           State your name, please.

14           THE WITNESS:  Ilan Meyer.

15           THE CLERK:  And spell your last name.

16           THE WITNESS:  M-e-y-e-r.

17           THE CLERK:  Your first name.

18           THE WITNESS:  I-l-a-n.

19           THE CLERK:  Thank you.

20                       DIRECT EXAMINATION

21   BY MR. DUSSEAULT:

22   Q.   Good afternoon, Dr. Meyer.

23   A.   Good afternoon.

24   Q.   I would like to start asking you a few questions about

25   your educational background.  Where did you receive your
```

1  undergraduate degree?

2  **A.**    I received a B.A. from Tel Aviv University in Israel.    I

3  received a B.A. from Tel Aviv University, in psychology and

4  special education.

5  **Q.**    Do you have a master's degree?

6  **A.**    Yes.    I received a master's degree in psychology from the

7  New School for Social Research in New York City.

8  **Q.**    Did you do a predoctoral fellowship of any kind?

9  **A.**    Yes.    After the master's degree, I moved to a doctoral

10  program at Columbia University.    And during this program, I had

11  a National Institute of Mental Health Fellowship in psychiatric

12  epidemiology.

13  **Q.**    What is psychiatric epidemiology?

14  **A.**    Psychiatric epidemiology is the study of mental disorders.

15  We are interested in patterns of mental disorders, causes of

16  mental disorders, risks for mental disorders.    Very much like

17  epidemiology of infectious diseases, where we are looking at

18  the infections, but this is concerning psychiatric disorders

19  such as depression, anxiety, and so forth.

20  **Q.**    Dr. Meyer, do you have a Ph.D.?

21  **A.**    I do.

22  **Q.**    From where did you receive it?

23  **A.**    From Columbia University.

24  **Q.**    When did you receive it?

25  **A.**    In 1993.

1  Q.   And in what field did you receive your Ph.D.?

2  A.   The department where I got the Ph.D. is called

3  Sociomedical Sciences.  It's a department that brings together

4  people from various social sciences and studying of public

5  health problems or public health issues.  In my case, mental

6  disorders.  But other people may study other types of

7  disorders.

8  Q.   And did you do a doctoral dissertation?

9  A.   I did.

10  Q.   What was the title of it?

11  A.   The title of it was, "Prejudice and Pride.  Minority

12  Stress and Mental Health in Gay Men."

13  Q.   Did it receive any awards?

14  A.   It was chosen for distinction by the University, which is

15  given to the top 10 percent of dissertations at the university,

16  Columbia University.

17  Q.   Did you do any postdoctoral fellowship?

18  A.   I did.  After finishing my Ph.D., I did three years of

19  postdoctoral work.  They were funded also by the National

20  Institutes of Health, or NIH.

21       The first one was a two-year postdoctoral fellowship

22  at City University of New York, the graduate center.  And that

23  was in health psychology.

24       The second one was at Memorial Sloan-Kettering.  And

25  that was in HIV, AIDS and psychiatry.

1  Q.   Dr. Meyer, let's talk a bit about your employment.  What's

2  your current employment position?

3  A.   I'm an associate professor at the Department of

4  Sociomedical Sciences, the same department where I graduated.

5  I'm also the executive chair for the department, in charge of

6  our masters program, which has about a hundred students a year

7  entering to this master's degree.

8  Q.   This is at Columbia University?

9  A.   Exactly.

10  Q.   At the Mailman School of Public Health?

11  A.   Yes.

12  Q.   Do you chair any programs within your department?

13  A.   Yes.  Well, first, I co-chair what we call the steering

14  committee for the school, entire school.  That is the School of

15  Public Health.

16         And the steering committee is a faculty committee

17  that represents the academic and other issues that the faculty

18  has, in terms of the direction of the school and in terms of

19  programs and so forth.  So we -- so I'm a co-chair of that

20  committee.

21         I also chair the departmental committee on M.P.H.,

22  master's of public health degree.  As I said, I'm in charge of

23  that program.

24         I'm also involved or sit in our curriculum committee,

25  which is the committee that determines what the students should

1    learn in terms of receiving their degrees.

2            I probably have some other committees that I am on.

3    That's quite a bit of --

4    **Q.**   That's a good start.   Thank you.

5            What year did you join the faculty of Columbia

6    University?

7    **A.**   My first appointment, in '94.  But that was while I was

8    still doing my postdoctoral degree.  But I think my full-time

9    appointment is in '96.

10   **Q.**   And you've been there consistently?

11   **A.**   Yes.

12   **Q.**   Let's talk a little bit about what you do professionally.

13   Has your professional -- let me step back.

14           It's been close to 20 years since you got your

15   doctorate?

16   **A.**   It is.

17   **Q.**   Has the professional work you've done over that period

18   focused on any particular topics?

19   **A.**   Yes.  My area of study I would define as social

20   epidemiology.  The terms that are maybe not that

21   self-explanatory, but if I had to explain it, I study the

22   relationship between social issues, social factors in our --

23   the structure of our society, and the way things happen in our

24   society, and health patterns, health outcomes.  And,

25   specifically, mental health outcomes.

1  **Q.**   And that's within the field of social epidemiology?

2  **A.**   That's within the field, I guess, of psychiatric

3  epidemiology.  And social epidemiology would be one approach

4  within that field.

5       **THE COURT:**  Let me see if I have that.  Your area of

6  study is the relationship of social structures and mental

7  health outcomes?

8       **THE WITNESS:**  Yes, within psychiatric epidemiology,

9  which more broadly discusses and studies patterns and causes of

10  mental disorders.

11       **THE COURT:**  Fine.

12  **BY MR. DUSSEAULT:**

13  **Q.**   Dr. Meyer, could you please tell the Court, has your work

14  focused on any particular groups of the population?

15  **A.**   Yes.  Most directly, I have been studying lesbian, gay,

16  and bisexual populations within this area.

17       I have also studied other populations.  I have

18  studied African-Americans.  I have studied other issues, such

19  as asthma and HIV.  But most of my work has been on lesbian,

20  gay, bisexuals and mental health issues.

21  **Q.**   Have you made any presentations at professional

22  conferences in the course of your work?

23  **A.**   Yes, I have made many presentations.  I think most of them

24  are listed in my CV, but maybe not all the major ones.  I would

25  say there were over 40 listed there.

1    Q.   Okay.  Have you received any research grants, sir?

2    A.   Yes, I've received funding for my research.  Currently,

3    I'm a recipient of the Robert Wood Johnson's Foundation's

4    Health Policy Investigator Award.

5              I've received, in the past, grants from the National

6    Institutes of Health, and the National Library of Medicine,

7    from New York State Department of Health, from private

8    foundations, et cetera.

9    Q.   Have you received any awards for your professional work?

10   A.   I have.

11   Q.   What are some of those?

12   A.   Well, I guess, most recently, I received an award for

13   distinguished scientific contribution from the American

14   Psychological Association's Division 44, which is a division of

15   the American Psychological Association that concerns gay,

16   lesbian, and bisexual health.

17   Q.   Have you been a reviewer or editor of any publications?

18   A.   Many times.  That's part of what we do.  I've reviewed

19   many manuscripts that were to be published and would -- would

20   assess them for their value, and recommend to the editor

21   about -- and critique the manuscripts, and so forth.

22             I've also been a guest editor on a couple of

23   journals.  A major one was when I was invited to guest edit the

24   American Journal of Public Health, special issue on lesbian,

25   gay, bisexual and transgender health.

1          This was the first issue that was published on the

2    topic by the *American Journal of Public Health*, which is a very

3    prestigious journal.  It's been around for, I would say, close

4    to a hundred years.

5          It was a very successful issue.  It actually is the

6    first issue that sold out, in the memory of anybody.  Which is

7    a very rare thing for a scientific journal.

8    **Q.**   Not the highest circulation.

9          (Laughter)

10   **A.**   No.  After that, I edited or co-edited another journal.

11   Again, this is a special issue of a journal, so the journal is

12   published regularly.  But I, in this case, edited a special

13   issue of *American Journal of Public Health*.

14         And the second one was a journal that's called *Social*

15   *Science in Medicine*.  In that case, I co-edited with two

16   colleagues a special issue that focused on prejudice and

17   stigma, and their impact in public health, and different issues

18   within public health of how we should think about prejudice and

19   stigma.

20   **Q.**   Have you edited any books, sir?

21   **A.**   Yes.  The I -- in part, because of the success of *American*

22   *Journal of Public Health* issue, I was invited by editors in

23   Springer Publication -- at the time it was *Clure* -- and they

24   asked me to edit a book on lesbian, gay, bisexual and

25   transgender public health issues, which I did with a co-editor

1    also.

2    **Q.**    And have you written any articles?

3    **A.**    Yes.  I have written articles, both peer-reviewed articles

4    and articles that were more of a commentary or editorial

5    nature, and chapters, and so forth.

6    **Q.**    Can you approximate how many articles you've written?

7    **A.**    I think there are 44 peer-reviewed articles listed on my

8    CV right now.  And maybe 12 other types, commentaries, and so

9    forth.

10   **Q.**    Dr. Meyer, do you teach students as part of your position

11   at Columbia?

12   **A.**    Yes.

13   **Q.**    What courses do you teach?

14   **A.**    Currently, I teach three courses.  Not at the same time,

15   but there are three courses I currently teach.  The first one

16   is a course in research methodology, such as how to conduct

17   surveys, and things like that.

18           The -- that's a required course for our students.

19   There are also two seminars that I teach.  One is called,

20   "Prejudice, Stigma, and Discrimination as Social Stressors."

21           And that one is a course on gay and lesbian issues in

22   public health.

23   **Q.**    Dr. Meyer, you have a witness binder in front of you.  If

24   you could turn to the very last tab, which is Plaintiff's

25   Exhibit No. 2328.

1  **A.**   Yes.

2  **Q.**   If you could take a look at that document.

3  **A.**   That's my CV.

4  **Q.**   That's your CV.  That was my question.

5          **MR. DUSSEAULT:**  Your Honor, plaintiffs would tender

6  Dr. Ilan Meyer as an expert in public health, with a focus on

7  social psychology and psychiatric epidemiology.

8          **THE COURT:**  Voir dire?

9          **MR. NIELSON:**  No objection to (inaudible).

10         **THE COURT:**  No objection to him being qualified to

11  offer his opinions?

12         **MR. NIELSON:**  No objection to him being qualified as

13  an expert (inaudible).

14         **THE COURT:**  Very well.

15         **MR. DUSSEAULT:**  And, Your Honor, with respect to the

16  exhibits, to try and keep things efficient, what we have done

17  is, counsel and I have agreed on a list of documents that will

18  be admitted together.

19         I understand that list has been provided to you and

20  to the clerk.  And I'm happy to read them, if it would be

21  better for you, but we could just agree -- I suspect it's not.

22  We could agree that those documents will be admitted.

23         **THE COURT:**  This is five pages.

24         **MR. DUSSEAULT:**  It is.  49 exhibits, I believe.

25         **THE COURT:**  49 exhibits.  If there is no objection,

1  each of these will be admitted.

2           **MR. NIELSON:**  No objection, Your Honor.

3           **THE COURT:**  Thank you, Counsel.

4           (Plaintiffs' Exhibits 900, 922, 923, 926, 927, 955,

5           962, 973, 974, 975, 976, 978, 979, 980, 981, 982,

6           983, 984, 987, 988, 989, 990, 991, 992, 993, 994,

7           995, 996, 997, 998, 999, 1002, 1003, 1004, 1005,

8           1008, 1010, 1011, 1012, 1013, 1014, 1015, 1016, 1020,

9           1168, 1374, 1378, 1471 and 2328 received in

10          evidence.)

11  **BY MR. DUSSEAULT:**

12  **Q.**  Two straightforward questions about those exhibits that

13  were just admitted into evidence.

14           With the exception of three of them, which are

15  Exhibits 973, 975, and 976, is it true that each of the

16  documents that has just been admitted into evidence, that's in

17  your binder, is a document that you've relied on in forming the

18  opinions that you intend to offer in this case?

19  **A.**  Yes.  Based on my examination of this previously, yes.

20  **Q.**  And the three exhibits that I mentioned, 973 -- you can

21  take a look at them, if you like -- 973, 975 and 976, those are

22  documents that came up in the course of your deposition

23  testimony in this case and that were referenced by you in that

24  testimony?

25  **A.**  Yes.  What was the third one?  I'm sorry.

Q.   976.

A.   Okay.  Yes, that is correct.

Q.   Now, Dr. Meyer, do you intend to offer any opinions in this litigation here today?

A.   Yes, I do.

Q.   What opinions do you intend to offer?

A.   Well, my opinion really describes the work that I've been doing, as I described it earlier.  And I would say there are three elements there.

     The first one is on the nature of stigma.  And I will testify to the effect of stigma on gay and lesbian populations with reference to Proposition 8 as an example of a stigma.

     The second part will describe a model of minority stress that is a model that I am credited with authoring, and has been referred to in much of the literature on gay and lesbian health.  And I will describe how social stressors affect gay and lesbian populations.

     And the third part describes the effect of those stressors on health, in particular mental health.

Q.   And on what do you base the opinions that you're going to testify about today?

A.   As I've said, this is a topic of my study for, as you said, for the past 20 years; really, since my work on my dissertation.  And the opinion is based on many research articles, both -- some that I've conducted myself, and many

1  more that were conducted in the field over many years.  And I

2  rely on -- on this body of evidence.

3          A sample of it, I guess, would be what you offered as

4  an exhibit, which is what I relied on in writing a report

5  earlier.

6  **Q.**   So, Dr. Meyer, let's start talking a little more detail

7  about each of these opinions.  Let's start with the first,

8  which you said refers to stigma experienced by gay men and

9  lesbians.

10          Can you define what you mean by "stigma," as you use

11  that word?

12  **A.**   Yes.  And I have to say that I have to be very brief in

13  this description.  The work on stigma has many, many volumes

14  that I'm sure we don't want -- as I said, it's the subject of

15  the whole seminar that I teach.

16          But the most succinct, I guess, description would be

17  that a group in society has some kind of attribute that has

18  been identified to be a negative attribute, that is seen as

19  negative by society.

20          And this attribute is attached to persons who are

21  believed to have this attribute.  And because of having this

22  attribute, they are, therefore, what we call devalued.

23          So, in the example of gay sexual orientation, sexual

24  orientation is identified as such an attribute that people

25  perceive as being a negative attribute.  And, therefore, gay

1  and lesbian people, as a whole -- I don't mean as a whole --

2  the whole person is identified by that identity that is

3  devalued; and, therefore, the whole person is devalued because

4  of that relationship.

5       And stigma, of course, has been applied to many other

6  populations and instances.

7  **Q.**   Are you familiar with a concept referred to as "structural

8  stigma"?

9  **A.**   Yes.

10 **Q.**   What is structural stigma?

11 **A.**   Structural stigma refers to, in a sense, the origins of

12 the stigma and the mechanisms that maintain and enact stigma.

13      So those refer -- by the word "structural" we mean to

14 more solid structures in society, societal institutions such

15 as, of course, the law being an important one, and any other

16 institution that is essential in our society.

17 **Q.**   Explain a little more, if you would, for the Court, the

18 way that laws can play a role in structural stigma.

19 **A.**   Well, laws have a major role in determining access of

20 different -- of the citizens to different -- we call it goods

21 that society can provide to resources, I guess would be the

22 word.  And laws may block or foster access to such resources.

23 In that sense, they enact, perhaps, for a group that is

24 stigmatized -- or, rather, control the access that various

25 groups may have to a particular institution.

1          So, of course, here we're talking about marriage.
2    And that would be an example of, in this case, a very important
3    institution of marriage.

4          And, of course, the law has a role in determining who
5    can access that institution.  And, again, that would be
6    applicable to other types of examples.

7    **Q.**   So once a social -- excuse me, a structural stigma is in
8    place, how does it affect people?

9    **A.**   So, as I said, structural stigmas determine the access
10   that people have to those resources.

11         I rely on the sociologists that talked about the
12   opportunity structures.  The society lays out goals that
13   people -- I don't want to say fault -- internalize.

14         People want to achieve certain goals that we all view
15   as important goals in our lives; such as, career and marriage
16   being two important examples of that.

17         And stigma would, as I said, determine the access
18   that people have to those desired goals, to achieving those
19   desired goals.

20   **Q.**   And has the research found that there are stigmas
21   associated with gay men and lesbians?

22   **A.**   Yes, of course.

23   **Q.**   And what are some examples of such stigma?

24   **A.**   There are really many stigmas and stereotypes that
25   describe kind of how people are perceived.

1          In my work, I have written about the role of intimate

2    relationships and the way intimate relationships have been

3    portrayed.

4          And part of the stereotype that is part of the

5    stigma, the negative attitude or the negative associations with

6    this group, has been for many years that gay people are un --

7    incapable of relationships, of intimate relationships; they may

8    be undesiring, even, of intimate relationships; and that,

9    certainly, they are not successful at having intimate

10   relationships.

11         And when I say this has been a kind of social stigma,

12   I'm talking about how it has been portrayed in various cultural

13   outlets as well as in a more organized way in various social

14   interactions, social institutions.

15   **Q.**   You used the phrase "intimate relationships."  What do you

16   mean by that?

17   **A.**   "Intimate relationships" mean relationships that people

18   have.  Of course, primary among them would be something like a

19   marriage, a husband and a wife.  But, also, other intimate

20   relationships with one's family, one's children, and one's

21   community.

22         And in all of those, again, as people have been

23   described for many years as social isolates, as unconnected,

24   as -- as not as good citizens, in a sense, who partake in

25   society the same way that everybody else.  As a pariah, so to

1 speak.  So that's what stigma does.

2       And, in particular, for gay and lesbian example, I

3 think the issue of intimate relationship because of the nature

4 of what being gay is about who you choose to be with, that has

5 been a strong source of stigma.

6 **Q.**  Dr. Meyer, if you could turn in your binder to Plaintiff's

7 Exhibit 1011, please.

8 **A.**  Yes.

9 **Q.**  And this is one of the documents that you've relied on in

10 forming your opinions?

11 **A.**  Yes.

12 **Q.**  What is Exhibit 1011?

13 **A.**  This is a chapter from a book that I've relied on and that

14 I've used in teaching as an example of -- maybe I should say

15 what the book is.

16       So, this is a chapter from a book that was published

17 in the '60s, late '60s, and was a very popular book.  It was

18 called, "Everything you Ever Wanted to Know About Sex (But Were

19 Afraid to Ask)."

20       It was very, very popular.  It was published in

21 many -- I have a hardcover edition that is the 17th edition of

22 this book, that was published in 1969.  And I personally

23 remember that book.

24       So in this book there are different chapters that aim

25 to educate the public about different issues concerning

1  sexuality.  And this particular chapter is concerning male

2  homosexuality.

3  **Q.**   And this is a book that had wide distribution?

4  **A.**   Absolutely.

5       **MR. DUSSEAULT:**  Could we put up demonstrative 2,

6  please.

7       (Document displayed)

8  **BY MR. DUSSEAULT:**

9  **Q.**   I'm going to ask you about this, but what I would like to

10 do is just read the text into the record so it's clear what

11 you're addressing.

12 **A.**   May I explain something about this?

13 **Q.**   Of course.

14 **A.**   I'm sorry.  So the book is written in a

15 question-and-answer format.  And, basically, the author goes

16 through explaining sexual issues as if there is a question that

17 somebody is asking him about his opinion about various sexual

18 issues, and then he provides the answer.  So this is an excerpt

19 of one of those question and answers?

20 **Q.**   Okay.  So the question posed is:

21       "What about all the homosexuals who live

22       together happily for years?"

23       And the answer is:

24       "What about them?  They are mighty rare birds

25       among the homosexual flock.  Moreover, the

1          'happy' part remains to be seen.  The

2          bitterest argument between husband and wife

3          is a passionate love sonnet by comparison

4          with a dialogue between a butch and his

5          queen.  Live together?  Yes.  Happily?

6          Hardly."

7          Is this text from this book an example of the stigma

8  that you're talking about, sir?

9  **A.**   Yes, I think this is a very dramatic experience of what I

10 was referring to where, in this case, an educational book

11 portrays the relationship between, in this case, gay men as --

12 with great disrespect.  I would say ridicule and contempt.  So

13 that was the kind of -- and one example of what I was referring

14 to.

15 **Q.**   At what stage in life does stigma begin to affect gay men

16 and lesbians?

17 **A.**   Stigma really affects all people in society, because it is

18 a social norm, if you will.  It is something that we all in

19 society learn from a very young age.

20         It affects gay and lesbian -- this particular stigma

21 affects gay and lesbian -- sorry, gay men and lesbians in a

22 particular way because it is about something that is very

23 pertinent to how they think about who they are.

24         In my mind, this kind of stigma on other stereotypes

25 are very impactful, especially at the younger age, and in

1    particular in the time of life where gay men and lesbians,

2    usually during youth, either realize or recognize or know that

3    they're gay, and begin to try to understand what that means to

4    them.

5            And, of course, the most available reference that

6    they would have is the kind of things that they have learned

7    over their lifetime, over their childhood, socialization that

8    we all have been exposed to.

9            So it affects everybody but, certainly, it affects in

10   a very strong way somebody who is maybe coming out and

11   realizing that he or she is gay, and that's what they might

12   believe is what is in line for them.

13   **Q.**   Now, Dr. Meyer, you live in New York, correct?

14   **A.**   That's true.

15   **Q.**   Are you familiar with Proposition 8, the ballot initiative

16   that was passed in California?

17   **A.**   Yes, I am.

18   **Q.**   And what's your basic understanding of what Proposition 8

19   did?

20   **A.**   Well, proposition 8 was a proposition that was voted by

21   voters in California, restricted marriage to a man and a woman;

22   and, in fact, excluding gay men and lesbians from marriage.

23   And it was a constitutional amendment to the California

24   Constitution.

25   **Q.**   In your view, based on your work in this field, is

1   Proposition 8 a form of structural stigma?

2   **A.**   Yes, absolutely.  As I described stigma earlier, I would

3   say that law, and certainly a constitutional part of the law,

4   would be a very strong part of, as I described, the social

5   structures that define stigma, that define access.

6          In a very simple way, you can think of it as a block

7   or gate toward a particular institution, toward attaining a

8   particular goal.  So, in that sense, it is very much fitting in

9   the definition of structural stigma.

10  **Q.**   And in what ways does Prop 8 impose structural stigma on

11  gay men and lesbians in California?

12  **A.**   Well, it imposes by the fact that it denies them access to

13  the institution of marriage.

14         As I said, people in our society have goals that are

15  cherished by all people.  Again, that's part of social

16  convention, that we all grow up raised to think that there are

17  certain things that we want to achieve in life.

18         And, in this case, this Proposition 8, in fact, says

19  that if you are gay or lesbian, you cannot achieve this

20  particular goal.

21  **Q.**   Now, are you aware, sir, that, in California, gay and

22  lesbian couples can register as a domestic partnership?

23  **A.**   Yes, I am.

24  **Q.**   In your view, does that eliminate the structural stigma of

25  Prop 8?

**A.**    No.

**Q.**    Why not?

**A.**    When I talk about Proposition 8 and the institution of marriage, I'm talking about an institution that has a social meaning.

          As I described it, this has to do with the aspirations of people to achieve certain goals.  And I was not referring, and I don't refer to any tangible benefit that maybe are accompanying marriage or a domestic partnership arrangement.

          So my -- what I'm talking about throughout my work and today is really about the symbolic meaning, the social meaning of marriage.

          It is, I think, quite clear that the young children do not aspire to be domestic partners.  But, certainly, the word "marriage" is something that many people aspire to.

          Doesn't mean that everybody achieves that, but at least I would say it's a very common, social, socially-approved goal for people as they think -- for children as they think about their future and for people as they develop relationships.

          For young people, and certainly for people later on, this is a desirable and respected type of goal that if you attain it, it's something that gives you pride and respect.

**Q.**    And do you have an opinion as to whether domestic

1  partnerships enjoy similar symbolic and social meaning?

2  **A.**   I have an opinion.  And that is that, as I said, I don't

3  think it has the same social meaning.  In fact, I don't know if

4  it has any social meaning.

5          I think it has, perhaps, value in terms of the types

6  of benefits that people receive.  But as I was trying to

7  explain, that is not what I'm talking about.  And that's not

8  really relevant to my discussion of stigma.

9  **Q.**   Let's turn, then, to the second opinion you mentioned,

10  which had to do with minority stress.

11         What does "minority stress" mean, as you use that

12  phrase?

13  **A.**   Minority stress -- I've written a lot of articles about

14  it, so I'm trying to, again, be brief.

15         But it basically describes the types of stressors

16  which is -- I have to try to explain, maybe, what stress means,

17  before I do that.  Is it --

18  **Q.**   Let me break it down.  Why don't you tell us what stress

19  means.

20  **A.**   Okay.  So that's perhaps something that's easier to

21  understand.

22         Stress is -- well, everybody knows what stress means.

23  But when we talk about stress, what we talk about is the kinds

24  of events and conditions that happen from the outside, to the

25  person.  And that one of the main definitions is they bring

1  about some kind of change that require adaptation.  In that

2  sense, they are taxing on the person because it requires the

3  person to adjust, so to speak, to this new situation.

4          One of the strongest types of stressors is a life

5  event.  And, certainly, losing a loved one would be a very -- a

6  high magnitude type of an event.  Losing a job is another

7  example of an event.

8          So those are the general -- I've referred to those as

9  general stressors, just because I'm trying to distinguish from

10  the minority stress model that I have written about in regards

11  to gay and lesbian stress.

12          So there's those different -- there are different

13  ways that we think about stress, not just life events.  But,

14  for example, there are also chronic stressors.  So, for

15  example, unemployment, a prolonged -- and there are other types

16  that maybe I can explain later if, you want.

17  **Q.**   Let's talk a bit about the types.  I believe you

18  referenced acute stress.  What would that mean?

19  **A.**   So a life event is an acute stressor.  That's something

20  that has a beginning and end.  It is pretty easily discernible.

21  It happened.

22          And chronic stress is something that is, as I say,

23  prolonged.  Obviously, there could be a relationship between

24  the two.  So losing a job would be a life event, but

25  unemployment that would result from that would be a chronic

1   stress.  So they are not totally distinguished.

2              There are other types of stressors that people have

3   written about.  And, again, this is in general affecting

4   everybody.

5              Another one would be what we sometimes call daily

6   hassles or minor stressors that are just annoyances that happen

7   to people.  Maybe being stuck in traffic for a long time, or

8   being in a long line in bank -- if people still go to banks --

9   or in supermarket, I guess.  So those would be just daily kind

10  of hassles.

11             And there is another type of stress that is a little

12  different and maybe a little harder to understand as to why it

13  is a stress.  And those have been termed "nonevents."  Which

14  means nothing happened.

15             And the reason why a nonevent can be stressful is

16  because it is something that was expected to have happened; so

17  the fact that it didn't happen, in this case, also requires

18  adaptation or adjustment.

19             So, for example, if I've been working in my job for a

20  certain number of years, and I expected after a certain amount

21  of time I would receive a promotion, but I didn't receive that

22  promotion, that could be a nonevent, in a sense, because

23  nothing happened but it was something that I expected and

24  others expected.

25             It's not just any kind of expectation.  So, you know,

1    if I bought a lottery ticket and did not get the prize, would

2    not be the same type.

3           It is something that is normal to expect to happen at

4    a particular time.  Usually, we are talking about milestones

5    over a lifetime.  And, certainly, marriage will be one of those

6    types of expected events.  Having children.

7           If you ask little children, that will be the kind of

8    thing that they will tell you about what might happen to them

9    in the future:  I will marry.  I will have children.  I will be

10   a grandparent.  Things like that, that are easily understood in

11   our society.

12   **Q.**  Are the stressors of the type you are talking about

13   essentially inputs on people's lives, as opposed to the result

14   that they may experience?

15   **A.**  I'm sorry, yes.  So in the research lingo, I guess we

16   would call those the independent factors.  Those are the things

17   that happen from the outside.

18          But in common language, usually, when we talk about

19   stress we think about, also, the outcome, what we call, which

20   is, "I felt stress" means, usually, "I felt some kind of

21   distress because of something that happened."

22          We try to separate those two.  So we try to assess

23   the stressor part, the input, and the outcome that resulted

24   from that stressor, which may -- and, of course, in this case,

25   we study health outcomes.

1 Q.   So now that we've discussed stress, let's go back to this
2 concept of minority stress.  What is minority stress?
3 A.   So minority stress is an extension of this notion of
4 stress, in that it identifies a source of stress that stems, as
5 I described earlier, from social arrangement.  In particular,
6 prejudice, stigma, and discrimination.
7        So in my model, any stress that is related to stigma,
8 prejudice, and discrimination I would designate it as a
9 minority stressor.
10        And, by the way, it could be the exact same type of
11 stressor.  So, for example, losing a job, as I said, is a life
12 event.  But losing a job due to discrimination is a minority
13 stressor of the same life event.
14        And the reason that we distinguish those two is
15 because we know that there's different impact for those types
16 of events.  And, also, because this allows us to assess and
17 measure them, I guess, in a way that is more precise for this
18 purpose of understanding these issues of social determinants.
19 Q.   Thank you, Dr. Meyer.
20        Could you turn to Plaintiffs' Exhibit 1003, in your
21 binder.
22 A.   Yes.
23 Q.   And if you would tell the Court, what is Exhibit 1003?
24 A.   This is an article that was published, that I have
25 written.

1  Q.   And what's the subject of it?

2  A.   So the title of this article is, "Prejudice, Social Stress

3  and Mental Health in Lesbian, Gay, and Bisexual Populations,

4  Conceptual Issues and Research Evidence."

5       I published this in 2003, in the journal

6  *Psychological Bulletin*, which, I might add, is a very

7  prestigious journal in the field of psychology, and quite

8  difficult to get published there.

9       And this article, I would say, best articulates the

10  model of minority stress that I've written about, and has been

11  referred to by many other researchers who've used it as a

12  theoretical background for their own studies.

13       So, in fact, there are several hundred studies that

14  result -- well, I wouldn't say resulted, but, certainly, that

15  have used this article, the ideas in this article, as a

16  resource for their own research.

17  Q.   Now, does the scholarship on minority stress address

18  minority groups other than gay men and lesbians?

19  A.   Well, certainly, the principles -- I have to explain,

20  maybe, something about how I got to this idea of minority

21  stress, and not to take too much credit, maybe.

22       So the ideas behind this theory that are outlined

23  here in this article are not all brand-new ideas that I just

24  made up or came up for this purpose of this article.  Rather,

25  they rely on many, many years of research.

1        So, for example, all the research on stress and life

2    events, and so forth, I did not invent that.  That has been

3    going on, I would say, since the 1950s, people began to be

4    interested in life events as a source of stress and its --

5    sorry, impact on health.

6        So what I have done is articulated this within this

7    particular context of gay, lesbian, and bisexual population.

8    So the literature on gay, lesbian, and bisexual population have

9    used this term, "minority stress" -- which I, by the way, also

10   did not invent, but used somebody else's.  This was a term that

11   I read about in a dissertation that was written on lesbians and

12   mental -- sorry, and life events.  And I thought it was a good

13   term.

14       By the word "minority" here, I mean sexual

15   minorities, which is a term that is used to describe gay men,

16   lesbians and bisexuals.

17       So this refers to gay, lesbian, and bisexual.  As you

18   will see later, most of the things in it are quite specific to

19   gay men and lesbians.  But the general theories behind it apply

20   in broader ways.

21   **Q.**   So let's talk a bit more specifically about it.

22       Are there particular processes through which minority

23   stress manifests itself or can manifest itself in the lives of

24   gay men and lesbians?

25   **A.**   Yes.  So --

1  Q.    What are those?

2  A.    So this has been -- I would say, my main contribution is

3  to articulate what do we exactly mean by that when we say that

4  prejudice and stigma has an impact on people?  And I described

5  those as processes that describe what actually happens, why is

6  that a stressor?

7          And I've described in this article and in other work

8  four types of minority stress processes.  The first one I've

9  called "prejudice events."

10          The second -- I'm sorry.

11  Q.    Why don't you articulate what the four are, and then I'd

12  like to do a little more detail on each.  So if you could just

13  generally describe what the four are.

14  A.    Okay.  So the first one is called "prejudice events,"

15  which encompasses a bunch of concepts.

16          The second one is called "expectations of rejection

17  and discrimination."

18          The third one is "concealing," which refers to hiding

19  your sexual orientation, in this case, or not being out, as we

20  say sometimes.

21  Q.    Okay.

22  A.    And the fourth one is "internalized homophobia," which

23  refers to the internalization of social attitudes by a gay

24  person or a lesbian.

25  Q.    Now, how did you identify these processes?

**A.**    So, as I said, there has been work on each of those

topics, that I relied on that work to bring it together to this

model that is maybe more concise.

While there were work on prejudice -- sorry, on life

events -- and there has been, certainly, a lot of work, for

example, on internalized homophobia, ranging to clinical

psychological literature -- I gathered together those different

sources of research and theory to put it together in this

particular form, to explain the experiences of gay men and

lesbians.

**Q.**    So let's start with the first one you identified,

prejudice events.  What do you money by prejudice events?

**A.**    So just as I described earlier, the general stress,

prejudice events I refer to the types of stressors that are

related to prejudice.

So I already gave an example of being fired due to

discrimination.  That will be a prejudice event.

And this -- in this case, sorry, the prejudice events

echo those four types of stressors that I mentioned earlier.

So that would be the major events, the chronic -- the major

acute events, the chronic stress, the minor events we could

call them, the daily hassles, and the nonevents.

So that is, basically, taking, again, the same

framework and using it here in this context.  As I say, all of

this was not as well-packaged.  So it's not that I just took

1  all of this and copied it into this.  I used a lot of research

2  to develop this.

3  **Q.**  Dr. Meyer, are the events that you describe as prejudice

4  events different from stress events that may be faced by the

5  rest of the population?

6  **A.**  Yes, by definition, they are related to prejudice.

7  **Q.**  Can you give more specific examples of prejudice events?

8  **A.**  Yes.  So in addition to the example I gave that has to do

9  with events related to discrimination, that would include other

10  types of events that people experience.

11      For example, anti-gay violence would be, clearly, a

12  prejudice event, even though it's not a discrimination.  But it

13  is like hate crimes, would be prejudice events in the sense

14  that the person was chosen for this -- to be the victim of this

15  crime because of prejudice.

16      So these are the major events.  Then there are

17  chronic stressors, again, that could be resultant from

18  prejudice.

19      In my studies, for example, I've collected data

20  from -- in the recent study, about 400 gay men and lesbians.

21  And we asked them about life events that happened to them over

22  their entire life.  We have several -- many thousands of life

23  events that each of them described.

24      So there would be chronic things like harassment,

25  that children -- sorry, they were adult, who reported that

1  during their childhood they had been harassed at school.  So

2  that's not an event.  Unless there was an event.  So we assess

3  each of those for what happened and how it happened.

4       But if somebody says, "Somebody called me a name over

5  the entire year that I was in third grade," we would talk about

6  it as a chronic stressor.

7       If somebody said, "I walked down the street and

8  somebody jumped and attacked me and beat me up," that would be

9  an event, and, in this case, a hate crime, probably, but an

10  event related to prejudice.

11       So those are the life events.  There --

12  **Q.**   Can I ask a follow-up question?

13  **A.**   Sorry.

14  **Q.**   Do prejudice events differ in magnitude based on the

15  research?

16  **A.**   So when we say "magnitude," we mean how big the event was.

17  And, usually, what this means is like how much -- going back to

18  the definition in a more technical way, how much change did

19  such an event require, how much adaptation?

20       So that's why I say that losing a job is a very big

21  event.  Maybe -- certainly, the minor events I described,

22  waiting in a line is a very tiny magnitude.

23       But there's another aspect to prejudice event which

24  has been identified, for example, with hate crimes, which is

25  that they have a greater impact psychologically on the person,

1    on the victim of hate crime.

2           And that greater impact has to be -- has -- sorry,

3    has to do not so much with the characteristics of the event,

4    but with the social meaning of the event.

5           So -- and I don't want to -- to talk in this room

6    about anything legal, but, in fact, hate crimes was challenged

7    as a -- whether it could be constitutional.  And one of the

8    reasons why, in my understanding, the Supreme Court allowed it

9    to be a separate crime is, in fact, because of that added

10   social meaning, and the added pain.

11          So that even though it's the same exact crime or the

12   same exact event, when it is attached to prejudice and

13   discrimination and stigma, it has a meaning for the victim that

14   makes it worse.

15          And that's how we -- we described it here, as well.

16   Q.  What has the research shown about who commonly perpetrates

17   these prejudice events in the lives of gay men and lesbians?

18   A.  So when I talk about -- well, "perpetrates" really -- as I

19   described before, I talk about the different levels of, you can

20   say, causes of those events.

21          So at the larger level is, really, the way I

22   described earlier structural stigma.  We sometimes talk about

23   structural prejudice in a similar way.  Those are the things

24   that would determine -- that would be the context for, for

25   example, events.

1          So an event usually is within a larger context.  So

2     we look at both of those.  So a person -- so those are the

3     structural.  And then there are things that we call

4     interpersonal types of events.

5          So the perpetrators might be, on one hand, the state,

6     for example, by creating certain structures.  But, of course,

7     it could -- it is also individuals who do something.  So in the

8     example of the hate crime is the perpetrator.

9          In the case of gay men and lesbians, or sexual

10    minorities, this is quite distinct from other groups that when

11    we think about prejudice.  Unfortunately, often the

12    perpetrators could be family members, even parents and

13    siblings.

14         And some of the stories that we've collected -- we

15    collect them as short narratives -- has been quite dramatic in

16    terms of what some of those respondents reported in terms of

17    what had happened to them in the past.

18         This is, by the way, one of the publications here.

19    And what was -- I don't know if I would say surprising, but

20    what was distinctive about it was how many of them reported

21    family members perpetrating such crimes, really.  It would be

22    things like rape or homelessness, that some of them described.

23         So there is a whole range of potential perpetrators

24    that could be implicated here, in what I'm discussing.

25    Q.   Now, from some of those very serious examples, you also

1   mentioned earlier, I think, a concept of everyday hassles?

2   **A.**   Yes.

3   **Q.**   Are those also prejudice events?

4   **A.**   So in the prejudice literature, we call these daily

5   hassles -- well, some people have called them everyday

6   discrimination events.  That's one word.  There are other terms

7   that have been used to describe those.

8          And in the same way that a hate crime is more

9   significant because of its social meaning that is attached to

10  it, a minor event could have a greater meaning than similar

11  events that -- sorry, could have a greater impact than a

12  similar event that had no such meaning.

13         So one could be just an annoyance, and the other one

14  could be or is representing social disapproval.  And,

15  obviously, they would be felt by the person as -- to be very

16  different.

17  **Q.**   Give us, if you would, a couple of examples of daily

18  hassles the research has looked at in the context of prejudice

19  events.

20  **A.**   Well, there are many.  But, interestingly, I've read the

21  plaintiffs' testimony here, I believe on Monday it was.  I

22  mean, I read it on Tuesday, but the testimony was given on

23  Monday.

24         And I was really struck because one of the things

25  that we hear over and over is forms, filling out forms.  And it

1  is kind of bewildering because, on one hand, you might say,

2  "What's the big deal about filling out a form?"  But gay people

3  do respond to that.

4          And the only way that I can explain it is that it is

5  really not anything about the form.  It is that the form evokes

6  something much larger for the person.  It evokes a social

7  disapproval, a rejection.  And, often, it evokes memories of

8  such events, including large events that have happened maybe in

9  the past.

10         So it is this minor annoyance, most of the time, for

11  most people, to fill out a form.  And they probably would never

12  remember that, if they were asked to talk about what has

13  happened to them.  They would mention major things.

14         But for gay people, I've seen this in -- brought up

15  many times.  There are other type of things that gay people

16  report that, again, might be minor under some circumstances,

17  such as maybe treated in a very unfriendly way by one's

18  partners' parents.

19         And, certainly, it would not be a nice thing for

20  anybody, but for a gay person that may have -- or that does

21  have a very great social meaning of, again, echoing the

22  rejection and disrespect and the -- they have felt in the past

23  and they continue to feel in society.

24         So that is the relationship between the social

25  meaning and those minor events.

1  Q.   There was --

2         **THE COURT:**  Dr. Meyer, you mentioned "forms."  What

3  kind of forms are you talking about?

4         **THE WITNESS:**  I'm sorry.  I mentioned the testimony

5  that was given here, that they talked about forms.

6         What I mean by forms are just any kind of

7  administrative forms that one might have to fill, and in

8  particular where you have to fill your marital status, for

9  example.

10        So a gay person, let's say -- you know, really, what

11 they experience is:  There is no place for me to put anything

12 there.

13        So either they would say, "Well, I'm just going to

14 say single, even though I've been in a relationship for the

15 past 40 years, because I just don't want to get into that.  In

16 this case, it really doesn't matter.  Maybe I'm in a motor

17 vehicle office.  And I don't want to get into this whole

18 explanation with a clerk about what does it mean. "

19        Or there might be -- I think one of the plaintiffs

20 mentioned crossing out things and writing in things.  But my

21 point is, obviously, this is not very demanding to cross out a

22 form and say something else.  And I would say if it was within

23 any other context, nobody would remember that maybe the form

24 was not very well-written and you had to correct something

25 there.  That would not be a memorable event.

1              The only reason that it's memorable is because, as I

2    said, of what it means.  And what it means is social rejection.

3    It echoes the kinds of rejections that I've been describing

4    earlier.

5    Q.   And, Dr. Meyer, to follow up on this, to be sure I

6    understand, you might have applications like at a bank, to open

7    an account, or a lease to get an apartment, or a job

8    application.  Is that the kind of form you're talking about,

9    where there are boxes to describe your status, and not a box

10   that corresponds to your status if you are not married?

11   A.   Absolutely.

12   Q.   There was also some testimony on Monday, I believe, about

13   hassles relating to travel, say, trying to check into a hotel

14   room and get the type of room you reserved.  Would that be --

15   A.   This is very similar, again, where to me it's not so much

16   what happened, but what does it mean to you, to you as a gay

17   person?

18              So, again, a clerk in a hotel asking you about a

19   king-size bed for any couple would really mean nothing.  But

20   for a gay person, it's an area of great sensitivity because it

21   really talks to their rejection and to their rejection of their

22   family members, the people that they feel close to.

23   Q.   Does the fact that you might draw in a box or ultimately

24   get the right size bed make the problem go away for that

25   individual?

1  A.    No, not at all.  Because, again, it is not about anything

2  tangible here.  It's not -- there's nothing really horrible

3  about filling out a form.  Well -- some forms.

4          (Laughter)

5  Q.    There can be.

6  A.    But at least small forms.

7          But, again, it is not about that effort of the

8  filling out a form or explaining even to a clerk something

9  about to clarify maybe some mistake.  That is not what it's

10 about.  It's about, I'm gay and I'm not accepted here.

11 Q.    You also talked, and I think, gave some specific examples

12 about nonevents.  These, although they are called nonevents,

13 are also in the research treated as prejudice events?

14 A.    Right.  They are not all treated as a prejudice event, but

15 when they are related to prejudice then I would call them

16 prejudice nonevents.

17         But they are -- so, for example, somebody may not get

18 a job promotion just because of all kinds of circumstances,

19 that maybe everybody expected them to get.  So that may not be

20 due to prejudice.  But it also could be due to prejudice.

21         Certainly, somebody might not marry for all kinds of

22 reasons, not because of anybody blocking their access to the

23 institution of marriage but for whatever other circumstances in

24 their lives.

25         But it still would be a nonevent that could be

1  significant because other people will begin to ask:  Well, are

2  you married?  Why aren't you married?  Especially if they are

3  of certain ethnic backgrounds where people ask questions like

4  that.

5          So there's expectation that you will get married,

6  that you will have children.  And so when I talk about those as

7  prejudice, it is when those things don't happen because of

8  prejudice.

9          And, again, parallel to everything else I was saying,

10  in this case, it would have that double meaning, both the

11  impact of the actual event, the content of the actual event or,

12  in this case, nonevent, such as not getting married.

13          But for gay men and lesbians, not getting married

14  would also have that social meaning that I just described

15  regarding daily hassles type of things, where not getting

16  married is not just a simple -- it's not really simple either

17  way.  But it's not a fact of their life.

18          It's also a representation of their position in

19  society, of the way society views them, of the kind of respect

20  or, in this case, disrespect that they experience, of the

21  stigma that I described earlier.

22  **Q.**  Now, Dr. Meyer, what, if anything, is the relationship

23  between Proposition 8 and the denial of the right to marry on

24  the one hand and prejudice events, as you described them?

25  **A.**  Well, I think it is quite obvious that Proposition 8, by

1  definition, blocks the marriage institution for gay men and

2  lesbians.  This is basically what it says.

3        So, in that sense, it certainly will be responsible

4  for gay men and lesbian not marrying, and having to explain why

5  I have not married.

6        And by explaining why I have not married, you also

7  have to explain, I'm really not seen as equal.  I'm -- my

8  status is -- is not respected by my state or by my country, by

9  my fellow citizens.

10        So it's -- in the very basic definition of structural

11  stigma, it is a block on the way to achieving desirable goals

12  in life.

13  **Q.**   Now, you've already talked a little bit about some of the

14  plaintiff testimony on Monday.  I was hoping that I could show

15  you a couple examples.

16        **MR. DUSSEAULT:**  Do we have demonstrative 4 handy?

17        And, again, so that the record is clear so as to what

18  you are commenting on, let me read this testimony from

19  plaintiff Paul Katami.

20        **"QUESTION:**  Have you experienced

21        discrimination as a result of being gay.

22        **"ANSWER:**  One example that I remember very

23        clearly is the first time in college, with

24        some gay friends, going to my first gay

25        establishment, like a bar or a restaurant,

```
1           socially.

2               "And we were in an outdoor patio.  And rocks

3           and eggs came flying over the fence of the

4           patio.  We were struck by these rocks and

5           eggs.  And there were slurs.  And, again, we

6           couldn't see who the people were, but we were

7           definitely hit.  And it was a very sobering

8           moment because I just accepted that as, well,

9           that's part of our struggle.  That's part of

10          what we have to deal with."
```

**BY MR. DUSSEAULT:**

**Q.**   In the context of prejudice events, do you have a reaction to this example?

**A.**   Yes.  And, as I said before, regarding form, this just seems like a very familiar type of report that a gay person might report.

And I don't -- I don't mean to tell the plaintiff that their experiences are not unique experiences.  Certainly, within their life they are unique.  But they are really not unique.

(Laughter)

Many people -- sorry.  Many people experience those kind of things.

And I think when I read that what struck me most, almost, may be not what you would notice, but it is that point

1   about it was a very sobering moment.  Because I think that

2   refers to the registration about this is a meaningful point.

3   This is about who I am.  This is something I have to get used

4   to.

5           When Mr. Katami talks about, well, that's part of our

6   struggle.  It is really a moment where he describes recognizing

7   something that has to do with who he is as a gay person.

8           But other elements of this would be that, clearly, I

9   would say, this was related to hate.  In fact, when we assess

10  the -- by the way, when we collect those narratives in my

11  research, we go through a very, very tedious process of

12  analyzing each of those narratives so that we quantify some

13  qualities around them.

14          And one of the things we look at related to hate

15  crime.  And we actually try to use some of the guidelines that

16  police use in determining hate crimes.

17          So, in this case, he mentioned being next to a gay

18  establishment, which would be one element that would help in

19  determining a hate crime.

20          But there's something that I don't know here, for

21  example, whether someone was actually hurt, which would go to

22  the issue of the magnitude.

23          But regardless of that, I think what is clear here,

24  that the meaning of this -- and I would dare say not having

25  talked to Mr. Katami and not really knowing anything behind

1    that -- that perhaps one of the main reasons that it's so

2    memorable was because of that sobering moment, because of that

3    recognition:  I am not the same as other people in society.

4    Somebody can come and just throw stones, or whatever it was,

5    and eggs on me, because they don't like that I am gay.

6    **Q.**   When you were talking earlier about whether or not this

7    was unique, do you mean that this sort of example is, in your

8    research, often relayed by gay men and lesbians?

9    **A.**   Exactly.

10   **Q.**   Let's put up a demonstrative 5, another example.  And this

11   is testimony from another of our plaintiffs, Sandra Stier.

12          (Document displayed)

13          **"QUESTION:**  Are there occasions where you

14          have to fill out forms that ask whether you

15          are married or name of spouse or things like

16          that?

17          **"ANSWER:**  Doctor's offices.  Are you single

18          or are you married or are, you know, divorced

19          even?  But, you know, so I have to find

20          myself, you know, scratching something out,

21          putting a line through it and saying

22          'domestic partner' and making sure I explain

23          to folks what that is, to make sure that our

24          transaction can go smoothly."

25          We talked a good bit about forms already, but what's

1  your reaction?

2  **A.**    Again, that's an example of this form.

3          But, you know, you have to think -- or I guess you

4  have to ask yourself, why would a person remember that type of

5  minor incident?  And, as I mentioned before, I think the

6  meaning of this incident is more important than, in this case,

7  what has actually happened.

8          So, like I said, if there was some error on this

9  form, where it says "Mr." or "Mrs." and somehow the words were

10 not clear and she had to fix that, I don't think she would have

11 reported that as a major -- something that she remembers.

12         But I think it is, again, the message that the forms,

13 in a sense, echoes about rejection and about I'm not equal to

14 other people, to most people who fill this form.

15 **Q.**    So let's move to the second process you talked about,

16 expectations of rejection and discrimination.  What do you mean

17 by that?

18 **A.**    Expectations of rejection and discrimination actually mean

19 exactly what it says.  Expecting rejection and discrimination.

20         But this is a very -- well, to me, interesting

21 process that occurs in populations that are -- that are used to

22 prejudice.  By "used" I mean that they know about the prejudice

23 that exists in society.

24         And what happens is that a person who knows that they

25 might be rejected or discriminated against needs to maintain a

Case 3:09-cv-02292-VRW Document 624 Filed 01/29/21 Page 51 of 185

1  certain vigilance about their interactions in society that

2  would, first of all, guarantee their safety.

3           So an example that I often use when I talk about this

4  is, a gay couple walking down the street.  In my experience,

5  very often, regardless of how friendly their street is, they

6  would have to monitor the kind of affection that they display

7  with each other because perhaps somebody will come and throw

8  stones and eggs, and so forth, because they bring up something

9  the person doesn't like.  And, again, it's not something about

10 them as individuals, but about the fact that they are

11 representing -- sorry, presenting as gay.

12          So this would be one type of, as I call it,

13 vigilance, that you have to be on edge; you have to watch; you

14 have to have a third eye, looking, monitoring your environment.

15          And that is a very stressful thing, if you think

16 about it, that many people don't have to think about any of

17 that when they walk down the street with their partners.

18 **Q.**   Now, does the impact of expectation of rejection,

19 discrimination go away if the rejection or discrimination

20 doesn't happen?

21 **A.**   Well, that's another interesting thing about expectation

22 of rejection and discrimination, is that nothing really has to

23 happen.  And not only that, the persons involved in the -- in

24 that environment may themselves not at all hold any negative

25 attitudes.

1     So in the sense it is the expectation is not that

2   this particular person may harm me.  It is that what I

3   represent may trigger in somebody.  And it could be this

4   person, but maybe it's not.  So it doesn't have to be about

5   anything specific about the persons involved in this

6   interaction.

7     I often give the example of being in a job interview

8   and having to kind of monitor maybe how your -- what you're

9   saying.  And it doesn't mean -- it doesn't matter what the

10  people interviewing you actually think.  It is that you're

11  expecting that, that matters.  That is what is stressful here.

12     In addition to issues of safety, there are, as I just

13  alluded to, issues around social intercourse, where -- since it

14  can just be very embarrassing or awkward.

15     And we know that from stress literature, generally,

16  many times people either choose to avoid those situations,

17  swallow kind of minor incidents of prejudice or slurs, or

18  something, and just kind of move on because they don't want to

19  get into that, so to speak.

20     But the anticipation itself is what I'm talking about

21  as stressful.  You know, whether or not something happens, that

22  has to do with a life event.  But here we are just talking

23  about that anticipation.

24  **Q.**   So what if somebody, concerned about having to be vigilant

25  on the street, just stays inside and doesn't go out, does that

1  solve the problem for them?

2  **A.**   Well, that would be quite a severe punishment for that

3  person.

4       (Laughter)

5  **Q.**   Is there a relationship, as you see it, Dr. Meyer, between

6  Proposition 8's denial of the opportunity to marry and this

7  expectation of rejection and discrimination?

8  **A.**   Yes.

9  **Q.**   What is that connection?

10 **A.**   Well, as I described earlier, in my mind, the

11 Proposition 8, in its social meaning, sends a message that gay

12 relationships are not to be respected; that they are of

13 secondary value, if of any value at all; that they are

14 certainly not equal to those of heterosexuals.

15      And, to me, that's -- in addition to achieving the

16 literal aims of not allowing gay people to marry, it also sends

17 a strong message about the values of the state; in this case,

18 the Constitution itself.  And it sends a message that would, in

19 my mind, encourage or at least is consistent with holding

20 prejudicial attitudes.

21      So that doesn't add up to a very welcoming

22 environment.

23 **Q.**   Let's talk about the third process you identify, which I

24 think you described as concealing the stigmatizing identity.

25 **A.**   Yes.

1  **Q.**  Can you elaborate on that.

2  **A.**    Yes.  If I may just mention one more concept that is

3  related to the stress, as we call it, the stress process,

4  because it's relevant here.

5          And that is the concept of coping.  Coping is part of

6  the stress process.  And when we assess how does a stress

7  affect the outcome, as I mentioned earlier, of health outcome,

8  we really look at the balance between the stress impact and

9  what we call coping.

10          There's a whole bunch of stuff that goes into coping.

11  People talk about social support.  But it is anything that we

12  can say is positive impact on the health, that counters the

13  negative impact of the stressor.

14          The reason I bring it up here, because interesting

15  thing -- so concealing means I'm not going to reveal to other

16  people that I am gay or lesbian.  I'm going to hide that fact.

17          But the interesting relationship with coping is that

18  people conceal, usually, as a coping effort.  They conceal so

19  that they avoid some of the things that I described earlier, so

20  that they are not fired from their job.

21          If you're in the United States military, by law you

22  have to conceal, in that you are not allowed to talk about your

23  homosexuality.

24          So they conceal as an effort to -- in this case, if

25  you are gay and you are in the military, you would conceal so

1   that you don't get fired.

2          But there are many other types of instances where

3   people might find the need to conceal their sexual orientation.

4   They might conceal it because they feel that they will be

5   rejected if other people knew that they were gay.

6          They may conceal it because of their personal safety,

7   in the similar way that I described hate crimes, that they

8   don't want people to recognize them as gay.

9          They might not want to go to a place that is

10  recognized as gay, for fear that somebody might either hurt

11  them, physically hurt them or in other ways hurt them.

12         So there are reasons that people choose to conceal

13  what they, themselves, know about themselves, that they are gay

14  or lesbian.

15         And what the stress process here talks -- so this

16  is -- but what the stress process is, is that there are many

17  ways that this kind of concealment are stressful.  And I've

18  written about, at least, maybe, three ways.

19         And, again, all of this comes from research and

20  literature that is not specific to this topic or to gay

21  population.  This is basing it on general literature in various

22  fields.  In this case, mostly psychology.

23         So, if you want, I can tell you about the particular

24  ways that concealing can be stressful.

25  Q.   If you could briefly just identify what those ways are, it

1  would be helpful.

2  **A.**    So one way is that concealing requires, actually, a very

3  strong cognitive effort.  By "cognitive" I mean the way we

4  think or the way your mind works.

5          So there's a stress that is involved with concealing,

6  because you have to really work hard on this.  It's not

7  something that is -- you know, if you're lying, it's not that

8  easy, always, to keep a lie and to keep it, certainly, for a

9  long period of time.

10          So there is research that has been done about that,

11  that shows that this is, in fact, a very difficult type of

12  thing.

13          I know, for example -- well, I brought up the example

14  of the military.  If you are in the military and you live your

15  life there, and you have to talk to your comrades -- and people

16  talk about, maybe, their girlfriend and boyfriend or whatever.

17  And gay people have been known to maybe change a pronoun, kind

18  of as a way of monitoring that, and say, "Yeah, my girlfriend,"

19  but you really mean your boyfriend.  But, you know, this takes

20  a lot of coordination.  And, you know, you have to remember

21  what you said the week before.  It's all a lie.

22          So people have actually studied this with -- in other

23  context, as I said.  There's a couple of researchers that refer

24  to that.  Their respondents that they were studying said, "This

25  is a private hell," just the effort of concealing.

Q.   The work that's involved?

A.   The cognitive effort.  And they describe in great detail the cognitive work that goes into concealing.  In this case, it was in the work environment.

Q.   Can I ask a follow-up.  In addition to that, does the person who conceals also lose benefits that he or she might receive if he or she were able to express their true self?

A.   Right.  So that's another way that concealment is damaging and stressful.  So, actually, there's several benefits that are associated with that.

The first one is that concealing prevents you from what we call or what people call in psychology "expressed emotion."

Expressed emotion is very simply that you're expressing your emotion.  But it doesn't have to be any deep emotion, just expressing something about yourself.  And that has been shown to be a very positive, psychologically, thing to do.

In fact, people have used it as a form of therapy, to improve people's mental health.  They have used it, for example, in cancer patients, and shown that just writing something, about expressing something not even very intimate, is very helpful psychologically.

So, certainly, hiding something and hiding something that is perceived as being such a core thing about who you are,

1   this is how people talk about:  This is who I am.

2          That doesn't mean that gay people are just that.  But

3   it is a central identity that is important.  And if you want to

4   express who you are, certainly, you wouldn't want to hide that

5   part.

6          There's related to that, also, concept of

7   authenticity, of living an authentic life.  And, certainly,

8   people feel better, in a kind of existential way, by just

9   presenting themselves as they are to the world and in

10  interactions with the world.

11  **Q.**   Does concealment impact a gay man or lesbian's ability to

12  obtain social support?

13  **A.**   Exactly.  As I mentioned earlier, one of the important

14  mechanisms around stress and illness is the ability of people

15  to cope with stress.

16         And one of the beneficial -- I'm sorry, one of the

17  beneficial ways people cope with stress is through social

18  support.  For example, through having a network of friends that

19  you can talk about or an intimate friend that you can talk

20  about things.

21         There are also things that happen through -- for gay

22  people, specifically, what we call affiliation with the gay

23  community.  There are things that maybe you feel maybe other

24  people don't understand, but if you go to a certain community

25  center, or to a center -- sorry, to an event that maybe is like

1    a gay pride, that you get certain benefits from being in that

2    environment that maybe you don't get in other places.

3          And, certainly, if you are concealing your gay

4    identity, you are not going to walk into a gay community center

5    or gay pride event.

6          And, finally, related to that, and especially of

7    concern to me being in public health, in terms of health

8    services, there are many health services that are provided that

9    would provide, I would say, more targeted services to gay and

10   lesbian populations that are more both informed from a medical

11   perspective, for example, about the needs of gay men and

12   lesbians, and also that maybe provide a more welcoming

13   environment.

14         And that, too, will be something that a person who

15   conceals his or her gay identity would not be able to benefit

16   from.

17         So both are affected by the negatives but also from

18   the prevention of the positive type of things that they could

19   have had.

20   Q.   Now, one point I want to clarify here.  Can concealment be

21   absolute in nature?  Meaning the person doesn't tell anyone,

22   ever, what their identity is?

23   A.   I guess it could be.  I don't think that -- certainly, it

24   doesn't have to be that.  And I would think that many people,

25   even if they, for example, conceal at work, they might have

1    some friends that they may have confided with.

2         There's also concealment that will carry more kind of

3    momentary nature, that is not as long-lasting as I was

4    describing.  And that, too, can have -- certainly, is not a

5    pleasant experience.  You know, again, because of the notion

6    that you're really prevented from expressing something about

7    yourself that you don't feel that you should.

8         But the reason that you're concealing it is because,

9    again, of the significance of rejection of the region of

10   disrespect that you would feel if you were to reveal this.

11        So it is not just a simple issue.

12   **Q.**   Let me try and clarify the question.  I believe there was

13   some testimony from one of the plaintiffs on Monday about

14   knowing that he was gay at a very, very young age, but not

15   coming out, if you will, to anyone until about 25.

16        Is that a form of concealment?

17   **A.**   Sounds like it.  And to the extent that he knew that he

18   was gay, or he identified as gay at some earlier point, and

19   recognized or feared, at least, that if he were to reveal this

20   or express this about himself would -- would lead to, again,

21   rejection, discrimination, to losing maybe a relationship.

22   Again, this is, I presume, what the person expected, and that

23   was the motivation to maybe not to reveal his sexual

24   orientation.

25   **Q.**    Okay.  But, alternatively, if somebody, let's say, were

1  open with family or friends, but in particular circumstances

2  chooses to conceal or lie about his or her orientation, just to

3  avoid having to deal with it, is that also --

4  **A.**    That's another example.  As I said, you know, because of

5  Don't Ask, Don't Tell, obviously, if you're there you will have

6  to conceal.  But only in that environment.

7          And you might be able to, on home leave, go back and

8  be your partner or with some friends.  Certainly, you're not

9  going to want to march in a gay pride parade.  So there will

10  be, still, some monitoring, but it doesn't have to be absolute.

11  **Q.**    Dr. Meyer, do you see a connection between the concealment

12  process and Proposition 8 in its denial of marriage rights?

13  **A.**    Well, again, to the extent that we see Proposition 8 as

14  part of the stigma, as something that propagates the stigma, it

15  certainly doesn't send a message that:  It's okay.  You can be

16  who you want to be.  You know, we respect that.  We welcome you

17  as part of the community.

18          It sends the opposite message, in my mind, and,

19  therefore, would -- I would think, add to that pressure, to

20  that social environment that encourages people, some people, to

21  conceal.

22          And, also, when I talk about those effects of

23  Proposition 8, by the way, they don't only affect gay people.

24  They also send the same message to other people who are not

25  themselves gay.

Case 3:09-cv-02292-VRW   Document 624   Filed 01/29/01   Page 62 of 185

1    So, in that sense, it's not just damaging to gay

2  people because they feel bad about their rejection.  It also

3  sends a message that it is okay to reject.  Not only that it is

4  okay, that this is very highly valued by our Constitution to

5  reject gay people, to designate them a different class of

6  people in terms of their intimate relationships.

7  **Q.**  I'd like to show you another example of testimony from our

8  plaintiffs.  This coming from Kristin Perry testimony that was

9  given on Monday.  Again, I'll read it.

10         **"QUESTION:**  Do you, as you go through life

11         every day, feel that -- the other effects of

12         discrimination on the basis of your sexual

13         orientation?

14         **"ANSWER:**  Every day.

15         **"QUESTION:**  Tell us about that.

16         **"ANSWER:**  I have to decide every day if I

17         want to come out everywhere I go and take the

18         chance that somebody will have a hostile

19         reaction to my sexuality, or just go there

20         and buy the microwave we went there to buy,

21         without having to go through that again.  And

22         the decision every day to come out or not

23         come out at work, at home, at PTA, at music,

24         at soccer, is exhausting.  So much of the

25         time I just choose to do as much of that as I

1          can handle doing in any given day."

2          Do you have a reaction to that testimony?

3  **A.**    Yeah.  I think that, again, demonstrates several of the

4  things I have already mentioned, including the expectations of

5  rejection and the need to monitor and maybe sometimes the need

6  to decide:  Is it worth it?  Do I want to get into this whole

7  thing or just avoid it?  But, also, the repetition of it, like

8  how it really is in so many contexts.

9          But I have to say, the word that most jumped at me in

10 this -- it might be not the word that jumped at other people --

11 is the word "exhausting."

12         And the reason that it jumped at me is because

13 "exhausting" has a special meaning in stress research.  In

14 fact, one of the earliest example of stress research was done

15 by a researcher by the name of Hans Selye, S-e-l-y-e.

16         And he described something that he called the general

17 adaptation syndrome.  He studied animals.  But his general

18 adaptation syndrome, basically, echoes what I was just

19 describing.  There is a stressor, there is a coping.  Which he

20 didn't call "coping," but it's some adjustment period.

21         But, in his words, the end of that was exhaustion.

22 So that the result of the stress process was exhaustion.  And

23 he studied animals, and in many case death of those animals

24 that he studied.

25         So when I saw that, that's kind of what it brought to

1   my mind, is Selye's general adaptation syndrome.

2   **Q.**   Let's turn, Dr. Meyer, to the fourth process you

3   described, which you described as internalized homophobia.

4            Tell me what you mean by that.

5   **A.**   So, again, that's a word that has been discussed in

6   different forms, but it really relates to the same thing in the

7   different form, that it has been discussed in the literature.

8            As again, I mentioned, I used existing literature and

9   in terms homophobia has been something that has been discussed

10  a lot in clinical and psychological research, people who talked

11  about how to treat gay patients.

12           And one of the things they noted is that perhaps a

13  very central aspect of treating people who are troubled by

14  whatever symptom that brought them to therapy, is internalized

15  homophobia.  Internalized homophobia refers to the person who

16  is gay or lesbian basically internalizing or taking in negative

17  attitudes, negative notions that are existing in society that

18  he or she has learned through their -- what we call

19  socialization process, through their growing up in our society.

20           And, of course, it is not only gay -- as I said

21  earlier, gay men and lesbians who learn those negative

22  attitudes.  Those are prevalent attitudes.

23           So in learning those attitudes one might learn -- you

24  know, if they read this book by Rubin that I mentioned about

25  what gay relationships might be.

1          And then at some age the person begins to think or

2    realize or recognize or whatever way this happens, Well, I'm

3    gay.  So the natural thing is that everything that everything

4    that I've learned about what it is to be gay, that must be what

5    I am.  And, therefore, if I was impacted by this quote from

6    Rubin, for example, I would say that it will be quite

7    devastating to a young -- or, really, not only young person.

8    If they believe that and thought, Well, this is what is in my

9    future.

10   **Q.**   Now, when you use the word "internalized homophobia" here,

11   do you mean specifically that the person internalizes a fear of

12   themselves --

13   **A.**   No, at all.  When I use the word "homophobia," I use it in

14   the sense of negative attitudes.  Maybe something that is akin

15   to racism or sexism.  Just -- and people use other words, but I

16   use that word because -- well, I have my reasons.  I don't know

17   if you want to hear them.

18          It's a word that is recognizable.  It's a word that

19   is in the dictionary, and I find it just as good a word as some

20   other words that have been proposed.

21          But it basically relates to the negative attitudes

22   that are prevalent in society about gay men and lesbian or

23   about homosexuality in general.

24   **Q.**   Now, within the context of internalized homophobia, are

25   you aware of a concept called the possible self?

**A.**    Yes, I am.  And it's not exactly within the -- it's,

again, another concept, a theory that I have used, borrowed, to

explain some of those processes as they pertain to internalized

homophobia.

**Q.**    And what does it mean?

**A.**    So possible self is a psychological concept that, again, I

did not invent, unfortunately, because it is a very renowned

work.

     And it basically relates to something very

interesting, which is that whoever we are -- and it really

relates to any age -- we don't only look at where we are and

where we were in our past, but we also project into what we

might become.

     So this is what they call the possible self.  What

would possibly could I become or what are the possibilities for

me?  Maybe you can talk about it like that.

     And the work on that showed that this is a very

important construct, not only because it actually helps people

chart a life course of goals and so forth.  It doesn't have to

be, like, super articulated, like a whole life plan.  Just, you

know, like I mentioned earlier.  I will be a mother, you know,

things like that.

     So the possible self is not only important because of

how it projects to the future and how it maybe helps a person

think about the future.  It is also related to what people feel

1  right now.  And having a -- obviously, a more optimistic notion

2  of their future will be associated with feeling better about

3  who you are.

4         And the opposite of that feeling, that you will be

5  blocked from an achieving goals, obviously, will be associated

6  with what we call a lower sense of well-being and maybe just

7  negative feelings about who you are and about your position.

8  **Q.**   And does internalized homophobia lead to a limitation on

9  one's concept of a possible self?

10 **A.**   Right.  I'm sorry.

11        So the relationship is that internalized homophobia

12 speaks very directly to that notion of possible self, because

13 internalized homophobia conveys that there are certain

14 attitudes, certain stereotypes -- negative attitudes, that

15 is -- in the way that gay people have been portrayed, as I

16 described earlier, related to social stigma, related to

17 cultural portrayal, such as the Rubin, but, certainly, it is

18 just one example.  So if you internalize that, you think this

19 is who I'm going to be in the future.

20        I mean, of course, it is not as simplistic as that,

21 but that part of that is about, How do I see my future?  How do

22 I see my prospects for the future?  Who will I become?

23        And we have seen that actually in some research.  Gay

24 and lesbian youth had a harder time projecting to the future

25 because they have learned those kind of negative attitudes.

```
 1          In fact, they have had a harder time -- so at a very
 2    young age children -- you know, the most accessible type of
 3    possible self, I think, is the kind of family relation that one
 4    describes.  You know, a very young age people might -- sorry,
 5    little kids might play and say, "I am the wife" and "I am the
 6    mother," things like that.
 7          So for gay youth or gay people, really, at whatever
 8    age they begin to grapple with those issues, this is -- this is
 9    a difficulty.  You know, they have to think, well, how would I
10    be, because is it true that, you know, gay -- homosexuals are
11    not happy together?
12          You have to begin to, in a sense, undo some of those
13    effects and in a sense relearn.  And that was part of what the
14    therapists were talking about, to relearn better attitudes
15    about yourself and about what it is like to be gay.
16    Q.  Dr. Meyer, I would like to show you -- if we could have
17    demonstrative eight -- another example of testimony from Monday
18    from our plaintiffs.  Again, from Kristin Perry.
19              "QUESTION:  What does the institution of
20              marriage mean to you?  Why do you want that?
21              "ANSWER:  Well, I have never really let
22              myself want it until now.  Growing up as a
23              lesbian, you don't let yourself want it,
24              because everyone tells you you are never
25              going to have it."
```

1           Do you have a reaction to that?

2 **A.**    I think that is a pretty perfect example of what I was

3 just describing, where the person recognizing herself, in this

4 case as a lesbian, applies those notions that some of those

5 things that are relevant to other people, such as marriage

6 here, do not apply to me.  I can't hope for that.  That is not

7 part of my possible self.

8           And, I guess, she is implying here, presumably

9 because of her being a plaintiff, at some point she began to

10 recognize that, yes, this is something that I could possibly

11 get access to as well.  So that's exactly the process I was

12 describing earlier.

13 **Q.**    I would like to move to your third and final opinion that

14 you referenced earlier having to do with health outcomes.

15           You have described the stigma attached to being

16 lesbian and gay and the role of minority stress in the lives of

17 gay men and lesbians.

18           Does that stigma and minority stress, according to

19 the research, have an impact or effect on health outcomes for

20 gay men and lesbians?

21 **A.**    Yes.

22 **Q.**    What is that impact?

23 **A.**    Well, as I mentioned earlier, this entire endeavor, this

24 whole stress process that I described, its purpose is to study

25 health determinants, as we call it, of health, the causes of

 1  health and disease.  And there's been literally hundreds of

 2  studies that studied different aspects of this and how it is

 3  associated with health outcomes.

 4          And we know that for gay men and lesbians and, also,

 5  bisexuals, there has been shown a relationship between

 6  experiencing those kinds of stressors and negative health

 7  outcome or adverse health outcomes.

 8          In my area of study those were mental disorders, such

 9  as -- there are three classes that we usually study in

10  community studies.  Those are anxiety disorders, mood

11  disorders, such as depression, substance use disorders.  It is

12  a -- classify disorders.  There are also just what we would

13  call general distress or just feeling something, blue and sad,

14  things like that.  So there are a variety of outcomes that have

15  been studied.

16          On the other side of it, there's also been health

17  behaviors that are associated with stress, and this minority

18  stress; for example, excess smoking, certain eating behavior,

19  drinking.

20          Again, this is true for the general stress

21  literature, as well as for gay and lesbian populations, with, I

22  guess, the point being that gay and lesbian populations are

23  exposed to more of the stress and -- to distress, which is

24  unique and additive to kind of the general stress that, as I

25  mentioned earlier, everybody experiences.  And, therefore, that

1  excess risk, as we call in epidemiological language, that

2  excess risk is associated with excess disease or disorder or

3  whatever the outcome is.

4        So as I said, it could be disorders.  It could also

5  be generalized distress.

6        We have also studied something that's called

7  well-being, which is -- some people refer to as a positive

8  mental health.

9        And there has also been studies that show excess in

10  suicide attempts, in particular, in youth.

11  Q.  And, Dr. Meyer, does the research show that stigma and the

12  minority stress that you talked about contributes to a higher

13  incidence of these adverse mental health consequences or the

14  attempted suicide you talk about in the gay and lesbian

15  population than in the population at large?

16  A.  Yes.  So we look at the relationship between excess risk

17  and -- to see whether it is related to excess in outcome, as we

18  said, of the disease that we are studying.  And there has been

19  pretty consistent findings that show excess disorder or higher

20  level of disorder in gay and lesbian populations as compared to

21  heterosexuals.

22  Q.  I want to be sure we are being clear on a couple of

23  points.

24        Are you saying that being gay or lesbian is in and of

25  itself in any way a mental illness?

1   **A.**   No, not at all.  What I'm saying is that there's risks

2   that is associated with those social arrangement, with the

3   social situation that I described as stigma and prejudice.  And

4   that excess risk is related to excess, as we call it, disorder

5   or to an outcome.  It leads to a certain outcome.

6           And because it is excess, it leads to more of the

7   population that is exposed to the risk.

8           But when we study disorders and risk and outcome

9   relationships, it is never expected that everybody who is

10  exposed to a risk is, therefore, diseased somehow.

11          I mean, even in the area of stress, people who are

12  exposed to the most severe type of stressors, like extreme

13  stressors we call them, like war, doesn't mean that all of them

14  are, therefore, going to be affected with a disease such as

15  PTSD.

16          What we look at is excess and relationship between

17  populations.  As I said before, I studied patterns of diseases,

18  so we want to see does this population have more of this risk

19  and more of this disease.  I don't know if it's clear.

20  **Q.**   And a related point I just want to be clear on.

21          Are you saying that all gay men and lesbians suffer

22  from some form of adverse mental health consequences or even

23  that most do?

24  **A.**   No.  Again, what we look to see is whether this exposure

25  is related to the outcome among some people.

1    I guess another analogy would be when we look at

2 smoking and lung cancer.  So we want to see, do people who

3 smoke have more lung cancer than people who don't smoke?  And

4 that would indicate one indication of the association between

5 those two, but it actually is not the fact that everybody who

6 smokes gets lung cancer.

7    Going back to the gay and lesbian population, most

8 gay men and lesbians are not disordered, but there is an excess

9 in that population as compared to heterosexuals.

10 **Q.**   Do you have a view as to whether the incidents of adverse

11 health consequences of the type that you are describing would

12 be less if we could find a way to reduce the stigma and

13 minority stress experienced by gay men and lesbians?

14 **A.**   Yes, I think that it stems from everything that I was

15 saying.  When we see people have more of this exposure, they

16 have more of the disorder; and people who have less of this

17 exposure, have less of the disorder.

18    So, for example, if we study within a group of -- we

19 all them respondents, study participants.  And we see that some

20 people may have had a lot of those life events and they were of

21 great magnitude.  And then we see that they have more of the

22 outcome that we're studying, maybe depression.

23    And then we see that some other people, for many

24 reasons, didn't have that exposure.  Maybe for particular

25 circumstances in their own environment they were protected from

1  that or whatever other reasons.  And we see that they have

2  fewer -- a lower level of this disorder.

3          So that indicates that more of those stressors are

4  associated with more of the disease, and by definition less of

5  those stressors would be associated with less of that disease,

6  or the diseases that are affected by those.

7  **Q.**   Dr. Meyer, are you familiar with something called Healthy

8  People 2010?

9  **A.**   Yes.

10 **Q.**   What is that?

11 **A.**   We actually refer to that as Healthy People twenty-ten.

12         (Laughter.)

13         **MR. DUSSEAULT:**  I stand corrected.

14 **BY MR. DUSSEAULT:**

15 **Q.**   And what is Healthy People 2010?

16 **A.**   So, just if you tell people Healthy People two thousand

17 and ten, they would probably not know what you are talking

18 about.  We just call it Healthy People twenty-ten.

19         Healthy People is a project of the federal government

20 organized or, I guess, I would say led by the Department of

21 Health and Human Services.  And it is the plan for the nation's

22 health for the decade that is coming up.  So, actually, right

23 now we will be looking for Healthy People 2020.

24         So Healthy People 2010 is the plan for the health of

25 the nation for the decade that started in 2000 and, obviously,

1   is ending now.

2          MR. DUSSEAULT:  Could we put demonstrative three up?

3          (Document displayed)

4   **BY MR. DUSSEAULT:**

5   **Q.**   Do you have that in front of you, sir?

6   **A.**   Yes.

7   **Q.**   And this is text from Healthy People 2010?

8   **A.**   Yes.  And can I explain something about it?

9   **Q.**   Sure.

10  **A.**   Okay.  So Healthy People 2010, the Department of Health

11  and Human Services and many, many -- this is a very long

12  process that involves -- I don't know for exact, but many,

13  many, many professionals and researchers and so forth, both in

14  government and outside of government.

15         And so the main goals that the United States set up

16  for itself in terms of health of the nation, one of the main

17  goals was to reduce health disparities.  Health disparities

18  refer to differences between one population to another

19  population where one population has more in excess of any kind

20  of disorder, whether it's a mental or physical disorder.

21         And this is a section from Healthy People 2010 that

22  describes one of those populations, which is a population

23  defined by sexual orientation, and it has identified them as

24  a -- one of our nation's goals to reduce disparities associated

25  with -- in the health of gay and lesbian populations as

1  compared to heterosexuals.  So that's what this is.

2  **Q.**  Okay.  And let me just read so, again, the record is clear

3  what you are looking at.  It says:

4              "Sexual orientation.  America's gay and

5              lesbian population comprises a diverse

6              community with disparate health concerns.

7              Major health issues for gay men are HIV/Aids

8              and other sexually transmitted diseases,

9              substance abuse, depression and suicide.  Gay

10             male adolescents are two to three times more

11             likely than their peers to attempt suicide.

12             Some evidence suggests lesbians have higher

13             rates of smoking, overweight, alcohol abuse,

14             and stress than heterosexual women."

15             And then we have highlighted the last sentence.

16             "The issues surrounding personal, family, and

17             social acceptance of sexual orientation can

18             place a significant burden on mental health

19             and personal safety."

20             In your view, is this finding from Healthy People

21  2010 relevant to your own opinion as to health outcomes and the

22  relationship to stigma and minority stress?

23  **A.**   I think it basically describes what I was talking about

24  today, and this is pretty much what I describing.

25             **MR. DUSSEAULT:**  Okay.  Can we also show the chart?

1    Do we have the chart?

2            (Document displayed)

3    **BY MR. DUSSEAULT:**

4    **Q.**    As we are reaching the end here, I want to just put a

5    chart up here, which begins with social structure and then has

6    a box on top, "Coping Resources," the top in the middle.  And

7    then bottom middle, "Stress (General and Prejudice-related)."

8    And then on the right "Health Outcomes (Disease)."

9            Can you explain what this chart depicts?

10   **A.**    This is a very, very schematic, simple way of basically

11   demonstrating the causal chain that I was describing to you

12   today that goes from the left to the right, with the health

13   outcomes being our outcome of interest.

14           The social structure and social status are here to

15   the left as determinants of stressors that people experience,

16   as well as coping resources.

17           What we mean by that is that stress and coping

18   resources are not randomly assigned to people in society, but

19   they depend on their own social structures.

20           And it could mean something simple as if you are

21   employed, you can get fired from your job.  But if you are not

22   employed, obviously, you cannot have that kind of event.  So

23   events do not just happen in a random order.

24           Specifically to the topics that I was discussing

25   today, what it shows is the social status and the stigma lead

1   to exposure to specific stress -- stressors, such as the ones

2   that I described that I call minority stress.

3           And I described here both general and

4   prejudice-related to indicate that everybody experiences

5   general stressors, as I described them, or just plain stress,

6   and then there is added prejudice-related stress.

7           And on the top, "Coping Resources" relates to what I

8   was describing before as the protective role of coping.  And in

9   coping -- all of this is very simplistic, but there are a lot

10  more behind each of those boxes, as we just discussed at

11  length; the stress, for example.

12          There is a lot more that can be said about coping,

13  for example, and social support is part of that.  And it

14  basically shows what we look for is how does this whole process

15  affect health outcomes.

16  **Q.**  Dr. Meyer, I want to ask you one last thing as we close

17  here.

18          Do you have a view as to whether the mental health

19  outcomes of gay men and lesbians in California would improve if

20  Prop 8 were not the law of California and gay men and lesbians

21  were permitted to marry?

22  **A.**  I do.

23  **Q.**  What is that view?

24  **A.**  I think consistent with everything that I have said, and

25  consistent with my work on the relevance of the social

1   environment of social structures, and consistent with findings

2   that show that when people are exposed to more stress, they

3   fare worse than when they are exposed to less stress.

4          I think that if California -- and, also, consistent

5   with the things I said earlier in terms of the proscriptive

6   elements of Proposition 8, of the law having a constitutional

7   amendment that basically says, you know, to gay people, you are

8   not welcome here, that the opposite of that clearly would send

9   a positive message.  You are welcome here.  Your relationships

10  are valued.  You are valued.  We don't approve with

11  rejection -- sorry.  We don't approve rejection of you as a gay

12  person as a state.  And that has a very significant power.

13         As we all know, the law in the state is a very

14  important party to creating the social environment.  So clearly

15  it's not the only thing that determines even experiences of

16  prejudice and discrimination, but it is certainly a very major

17  player, major factor, in creating this social environment that

18  I described as prejudicial or stigmatizing.

19  **Q.**   Thank you, Dr. Meyer.

20         **MR. DUSSEAULT:**  Your Honor, I have nothing further at

21  this time.

22         **THE COURT:**  Very well.  Why don't we take 10 minutes,

23  counsel, to get ready for cross-examination.

24         We seem to be falling a little bit behind our

25  schedule and so I'm going to suggest, if it's agreeable with

 1   counsel, that we go a bit past 4:30 so that we can get in today

 2   everything that we had anticipated getting in.

 3        Does that sound reasonable?

 4        **MR. BOUTROUS:**  That sounds great, your Honor.

 5        **THE COURT:**  Very well, good.

 6        (Whereupon there was a recess in the proceedings

 7         from 2:58 p.m. until 3:17 p.m.)

 8        **THE COURT:**  Mr. Boies?

 9        **MR. BOIES:**  Your Honor, to perhaps allay some

10   concerns to the Court about our pace, as I just explained to

11   counsel for the defendants, we believe that we are on pace to

12   finish Wednesday of this coming week.  That is, we believe that

13   we will be able to complete our case using tomorrow, Tuesday

14   and Wednesday.

15        **THE COURT:**  Okay.

16        **MR. BOIES:**  And that is true even if we do not do

17   Ms. Zia today.  I had told the Court that we had hoped to get

18   Ms. Zia in today; but even if we don't get her in today, we're

19   still on target to finish on Wednesday.

20        **THE COURT:**  Well, that's fine.  Is that a suggestion

21   that we not go beyond 4:00 o'clock?

22        **MR. BOIES:**  No, your Honor, it's not, but I did

23   want -- having consulted with counsel for defendants, I think

24   their cross may very well take us somewhat beyond 4:00 o'clock.

25   And I just wanted the Court to know that we could go longer,

```
 1   and Ms. Zia is here, or we could go with Ms. Zia sometime

 2   tomorrow.

 3               THE COURT:  Well, let's just see how far we get and

 4   if we can certainly finish Mr. Meyer, that would be most

 5   helpful, and if we can get in Ms. Zia, that's all to the

 6   better.  But let's take one step at a time.

 7               MR. BOIES:  Thank you, your Honor.

 8               THE COURT:  Cross examine.

 9               MR. NIELSON:  Yes, thank you.  Good afternoon, your

10   Honor.

11                         CROSS EXAMINATION

12   BY MR. NIELSON:

13   Q.   Good afternoon, Professor Meyer.

14   A.   Good afternoon.

15               THE COURT:  You are?

16               MR. NIELSON:  Howard Nielson for the

17   Defendant-Intervenors.

18   BY MR. NIELSON:

19   Q.   I have already put a witness binder on your stand.  You

20   should have that, and it should also have been given to the

21   Court.  And I think we have a couple of witness binders for

22   opposing counsel as well.

23               Professor Meyer, could you turn to tab one of the

24   witness binder?

25               (Witness complied.)
```

1  A.    Yes.

2  Q.    Thank you.  You will find an exhibit there, a document

3  there pre-marked PX 934.

4  A.    Yes.

5  Q.    Can you identify this document?

6  A.    Yes.  It's a research article by Evelyn Hooker published,

7  I believe, in 1954 or so.

8  Q.    Are you familiar with this study?

9  A.    Yes.

10  Q.    Thank you.

11         Now, in his expert report Professor Herek said:

12         "This is now considered a classic study in

13         one of the first methodologically rigorous

14         examinations of the mental health status of

15         homosexuality."

16         Are you familiar with Professor Herek?

17  A.    Yes.

18  Q.    Do you agree with that characterization of the study?

19  A.    Can you repeat just the characterization?

20  Q.    Yes.  He said:

21         "It is now considered a classic study and one

22         of the first methodologically rigorous

23         examinations of the mental health status of

24         homosexuality."

25  A.    Yes.

1   Q.   Now, according to Professor Herek, quote:

2            "Dr. Evelyn Hooker administered a battery of

3            widely-used psychological tests to groups of

4            homosexual and heterosexual males who were

5            matched for age, I.Q. and education.  The men

6            were recruited from non-clinical settings.

7            None of the men was in therapy at the time of

8            the study.  The heterosexual and homosexual

9            groups did not differ significantly in their

10           overall psychological adjustment as rated by

11           independent experts who were unaware of each

12           man's sexual orientation."

13           Do you agree with that description of the study's

14  results?

15  A.   Yes.

16  Q.   Is there not some tension between Dr. Hooker's conclusions

17  and your opinions that LGB individuals suffer from a higher

18  prevalence of adverse mental health outcomes than

19  heterosexuals?

20  A.   Not at all.

21  Q.   Please turn to tab three in the witness binder.

22           (Witness complied.)

23  Q.   And you will see a document that is premarked DIX-1247.

24           THE COURT:  By the way, are you moving in 934, or has

25  it already come in?

1         **MR. NIELSON:**  I'm not sure, but I will ask that I --

2  that that be admitted.

3         **THE COURT:**  All right.  934 is admitted.

4         **MR. DUSSEAULT:**  No objection.

5         (Defendants' Exhibit 934 received in evidence)

6         **MR. NIELSON:**  And I apologize for not doing that at

7  the first.

8  **BY MR. NIELSON:**

9  **Q.**  Okay, your Honor -- excuse me, Professor Meyer.  Now, can

10  you identify this article.

11  **A.**  Which exhibit is it?

12  **Q.**  Tab three.  It's exhibit DIX-1247.

13  **A.**  Okay.  Yes, this is my article.

14  **Q.**  And, in fact, it's the same article that you talked about

15  on your direct examination, correct?

16  **A.**  Correct.

17         **MR. NIELSON:**  And I happened to hear -- both

18  defendants and plaintiffs separately designated this.  I have

19  my copy in front of me.  I will move it into evidence, just as

20  an abundance of caution in case --

21         **MR. DUSSEAULT:**  No objection.

22         **THE COURT:**  Okay.  It came in, however, as

23  Plaintiffs' --

24         **MR. NIELSON:**  It's PX 1003, your Honor.

25         **THE COURT:**  Fine.  Thank you.  We will refer to it as

1    that.

2         **MR. NIELSON:**  All right.

3    **BY MR. NIELSON:**

4    **Q.**   Now, I would like you to look at page 683 of the article,

5    and that's going by the pagination from the journal that it was

6    published in.

7    **A.**   Yes.

8    **Q.**   I'm going to read to you just a few passages from this

9    page just to explore -- explore your opinions that you

10   expressed in this article.

11            The very first, the top of the first column you

12   write:

13            "Despite a long history of interest in the

14            prevalence of mental disorders among gay men

15            and lesbians, methodologically sound

16            epidemiological studies are rare.  The

17            interest in mental health of lesbians and gay

18            men has been clouded by shifts in the social

19            environment within which it was embedded.

20            Before the 1973 declassification of

21            homosexuality as a mental disorder, gay

22            affirmative psychologists and psychiatrists

23            sought to refute arguments that homosexuality

24            should remain a classified disorder by

25            showing that homosexuals were not more likely

1              to be mentally ill than heterosexuals."

2              Now, you wrote that, correct?

3    A.    Yes.

4    Q.    And you believe that's correct?

5    A.    Yes.

6    Q.    Okay.  Thank you.

7              Now, skip down to the next paragraph.  About the

8    middle of the paragraph it's -- it says, "In the social

9    atmosphere of the time."  Do you see that line?  I'm going to

10   read that.  It's about the middle of the next --

11   A.    Yes.

12   Q.    (As read)

13              "In the social atmosphere of the time,

14              research findings were interpreted by gay

15              affirmative researchers conservatively so as

16              to not erroneously suggest that lesbians and

17              gay men had high prevalences of disorder."

18              Now, again, you wrote that, correct?

19   A.    Yes.

20   Q.    And you agree with that?

21   A.    I wrote the entire article.

22   Q.    Yes, okay.

23              (Laughter.)

24   Q.    Then you are different from some of the professors I had.

25   A.    I'm sorry.  I don't mean to...

1  Q.    All right.  And then -- now, at the bottom that paragraph

2  it says:

3              "Thus, most reviewers have concluded that

4              research evidence has conclusively shown that

5              homosexuals did not have abnormally elevated

6              psychiatric symptomatology compared with

7              heterosexuals.  This conclusion has been

8              widely accepted and has been often restated

9              in most current psychological and psychiatric

10             literature."

11             Correct?

12 A.    Yes.

13 Q.    Now, you believe that this quote "widely accepted," and

14 "often restated view" is incorrect?

15 A.    Do I believe that that --

16 Q.    This "widely accepted" and "often restated view" is

17 incorrect?

18 A.    I believe that it was, as I said here -- you mean --

19 Q.    The view that homosexuals did not have abnormally elevated

20 psychiatric symptomatology compared with heterosexuals; that

21 you said that view is widely accepted and often restated.

22             Do you believe that view is incorrect?

23 A.    I said that it was in the past.

24 Q.    Okay, it was in the past.

25             My question, though, is:  Do you believe that is

1  incorrect, that view?

2  **A.**    I have to explain the context of those studies, because --

3  **Q.**    I'm sorry.  I am going to move things along.  You had a

4  chance to explain your views at length on direct.

5  **A.**    Right.

6  **Q.**    And if opposing counsel thinks it is necessary, you can

7  have an opportunity on redirect, but right now I really just

8  want to know "yes" or "no."

9          Do you believe that view -- that past view, if you

10  will, is incorrect?

11  **A.**    I'm sorry.  I cannot answer you like that because we are

12  talking about what we call different generations of studies,

13  and it's just -- if I could explain, I would explain.

14          But, for example, Evelyn Hooker's study was correct.

15  So if you are asking do I feel that it was not correct, it was

16  correct, but I don't think that it addressed the question that

17  you are asking me about the prevalence of disorders.

18  **Q.**    Well, what I'm asking is:  Do you believe that -- in your

19  own words you said:

20          "Homosexuals did not have abnormally elevated

21          psychiatric symptomatology compared with

22          heterosexuals."

23          Do you believe that it is -- that it is correct that

24  homosexuals do not have abnormally elevated psychiatric

25  symptomatology compared with heterosexuals?

**A.**    I don't believe that, as I described the evidence today.

**Q.**    So you believe that is incorrect?

**A.**    As of today, yes.

**Q.**    Okay.  Thank you.

And that view is inconsistent with your testimony in this case, correct?  Not the view you just expressed, the view that is the quoted here?

**A.**    Right.  My view is -- my research evidence that is recent has shown that, in fact, gay and lesbian population do have higher rates of some disorders.

**Q.**    So that opinion is inconsistent with what you said was once the widely accepted and often restated view?

**A.**    Correct.

**Q.**    Thank you.

Look at the next paragraph.  The very first line you say:

"More recently, there has been a shift in the popular and scientific discourse on the mental health of lesbians and gay men.  Gay affirmative advocates have begun to advance minority stress hypothesis claiming that discriminatory social conditions lead to poor health outcomes."

Correct?

**A.**    Yes.

1   Q.   And that is your position, correct?

2   A.   Yes.

3   Q.   Thank you.

4        And I notice you used the -- that one of the

5   citations, in fact, after that sentence is to your own work,

6   correct?

7   A.   Correct.

8   Q.   It says "Meyer, 2001"?

9   A.   Correct.

10  Q.   So you consider yourself a, quote, gay affirmative

11  advocate, correct?

12  A.   I'm considering myself a gay affirmative scientist, and I

13  certainly advocate for the improvement of the social

14  environment for gay men and lesbians, yes.

15  Q.   And the exact words you used here were "gay affirmative

16  advocates."  And you used that in connection with the citation

17  to yourself.

18       So do you believe yourself to be a gay affirmative

19  advocate?

20  A.   Among other things that I am, such as a social scientist.

21  Q.   So, yes, correct?

22  A.   Yes.

23  Q.   All right.  Thank you.

24       And, in fact, you contributed money to the No On 8

25  campaign, correct?

A.    Yes.

Q.    In fact, you did so on two occasions, correct?

A.    I don't remember, but I did contribute to them because I thought that the cause was something that I agreed with.

Q.    All right.  Thank you.

      And please look at tab number four.

      (Witness complied.)

Q.    This is something that we got off the San Francisco Chronicle's data base.  It tracked the Proposition 8 contributions.

      Does this reflect your recollection about your contributions to Proposition 8, to the No On 8 campaign?

A.    I don't have independent recollection, but I don't have any reason to doubt it either, so.

Q.    All right.  Okay.  Thank you.

      All right.  In your testimony, writings and the expert report that I read, I notice that sometimes you refer to the minority stress model and sometimes you refer to the social stress model.  For purposes of your opinions in this case, are those synonyms?

A.    No.

Q.    Are they essentially synonyms for purposes of your opinion here?

A.    Well, one is a case of the other, so they refer to similar theories, but the minority stress, per se, is the theory that I

1  described earlier, as I described those stressors that are

2  specific to gays and lesbians.

3           But it's -- the social stress is kind of like a

4  broader category that would fit in it.  So I don't know if you

5  want to say that that's a synonym or not, but the minority

6  stress is one of the models that are used as a -- within the, I

7  would say, rubric of social stress.

8  **Q.**   When we are talking about stress received by disadvantaged

9  groups, would the social stress theory or the social stress

10 model and minority stress model be synonyms?

11 **A.**   I think, as I just explained, the minority stress is

12 usually used to the gay and lesbian population because, for

13 example, it as things like internalized homophobia or -- that

14 are specific.

15          But in the social stress, for example, with

16 African-Americans I would say the most prominent article

17 discussed racism and stress, which is --

18 **Q.**   Okay.  But --

19 **A.**   -- is parallel I guess.

20 **Q.**   So minority stress is a subset of social stress?

21 **A.**   Right, right, but I --

22 **Q.**   Okay.  Thank you.

23          And sometimes you use the word "minority stress

24 theory."  Sometimes you say "minority stress model."  Is that

25 essentially synonymous?

1  **A.**    Yes.  The -- yes, I guess.

2  **Q.**    Thank you.

3          All right.  I just wanted to clarify that, because

4  you used these -- these were different words in some of our

5  articles and I just want to make sure that we're on the same

6  page.

7  **A.**    Sure.

8  **Q.**    Now, the social stress model or, if you will, the minority

9  stress model predicts the individual's --

10         (Court reporter interruption.)

11 **Q.**    The social stress model or the minority stress model, I

12 guess I should say the minority stress model, predicts that

13 individuals who are members of disadvantaged groups receive

14 more stress than individuals who are not members of those

15 groups, correct?

16 **A.**    Yes, and that would be true of the social stress as well.

17 **Q.**    Okay.  So in that case they are synonyms?

18 **A.**    Yes.

19 **Q.**    Okay.  Thank you.

20         And the model predicts that as a result of social

21 stress or as a result of minority stress, individuals who are

22 members of disadvantaged groups will have worse mental health

23 outcomes than individuals who are not members of those groups,

24 correct?

25 **A.**    Yes.

1  **Q.**  All right.  And at least as a theoretical matter, those

2  two premises should apply to other disadvantaged groups,

3  correct?

4  **A.**  That I would say is a question that is of great interest,

5  but I cannot say correct or incorrect on the way that you

6  described it.

7  **Q.**  Okay.  Even as a theoretical matter, you can't say that

8  that's correct?

9  **A.**  As a theoretical matter, we look at commonalities and

10  divergences across populations in order to probe our theories

11  and to understand how things work.  So there are commonalities

12  as the way that you described them, yes.

13  **Q.**  And --

14  **A.**  There are also dissimilarities, of course.  So we -- we

15  try to analyze the balance of those in learning about

16  theoretical issues.

17  **Q.**  Okay.  I would like you to turn to tab number eight in the

18  witness binder.

19          (Witness complied.)

20  **A.**  Yes.

21  **Q.**  And you'll find a document pre-marked DIX-2519.

22  **A.**  Yes.

23  **Q.**  Can you identify that document?

24  **A.**  Yes.  That's an interview that I -- I was interviewed by

25  this person, David Van Nuys, and I believe it's a transcription

 1 | of that interview.  It was an oral, you know, internet radio
 2 | interview.
 3 | **Q.**   Yes, thank you.
 4 |        And in that interview you discussed some of the
 5 | studies and work that you have conducted, correct?
 6 | **A.**   Yes.
 7 | **Q.**   All right.  Thank you.
 8 |        **MR. NIELSON:**  Your Honor, I would like to move
 9 | DIX-2519 into evidence.
10 |        **MR. DUSSEAULT:**  No objection.
11 |        **THE COURT:**  Very well.
12 |        (Defendants' Exhibit 2519 received in evidence.)
13 |        **MR. NIELSON:**  Okay.  Thank you.
14 | **BY MR. NIELSON:**
15 | **Q.**   And I would like to look at the third page of the exhibit.
16 | **A.**   Yes.
17 | **Q.**   Sorry.  I want to look at the second to the bottom
18 | paragraph on that page, and it says:
19 |        "So some of the findings that we had, for
20 |        example, is when we look at stress exposure.
21 |        So we wanted to study each aspect of this
22 |        theory because a lot of the elements of the
23 |        stress theory, especially when it comes to
24 |        social stress, are often assumed but not
25 |        tested.  And we wanted to test carefully the

1                entire process.  So the first hypothesis --

2                you know, it's a pretty big hypothesis, there

3                are a lot of different studies about that --

4                is do disadvantaged groups, in fact, have

5                more stress."

6        Correct?  So that -- that doesn't distinguish gays

7   and lesbians from other disadvantaged groups, correct?

8   **A.**   Right.  That will be a general test of the social stress

9   model.  As you said, the first assumption is the disadvantaged

10  is associated with added stress.

11  **Q.**   Right, right.  And I would like to go up earlier on that

12  page, your second full response.  You say:

13               "So around this, I designed the study and the

14               study included 524 men and women who were New

15               York City residents.  And there were people

16               who were in those different groups that we

17               can identify based on this so that we can

18               test this theory.  So they were gay and

19               lesbian bisexual versus heterosexual; they

20               were women versus men; and they were black

21               and Latino versus white.  And we looked at

22               those three disadvantaged statuses and to

23               what extent those disadvantaged statuses are

24               related to an increase in stressors as the

25               theory would say, and to what extent, if they

1      do have those increases in stressors, do

2      they, in fact, lead to certain mental

3      disorder."

4  A.   Yes.

5  Q.   So at least as a theoretical matter, the social stress

6  theory would predict that for each of those three groups, the

7  disadvantaged group would experience more stress and have worse

8  mental health outcomes, correct?

9  A.   Correct.

10  Q.   All right.  Thank you.

11      Turning back to LGB, the LGB individuals in

12  particular.  You believe that as a result of -- you believe

13  that due, in part, to minority status, the LGB population has

14  about twice as many mental health disorders as heterosexuals,

15  including mood, anxiety and substance use disorders, correct?

16  A.   Yes.

17  Q.   And you also believe that the LGB population suffers from

18  a higher prevalence of mood anxiety or substance use problems

19  that do not meet criteria for a formal psychiatric order, but

20  are nevertheless indicative of stress, correct?

21  A.   Yes.

22  Q.   Okay.  Thank you.

23      And you also believe that LGB individuals have lower

24  levels of well-being than heterosexuals, correct?

25  A.   Yes.

1  Q.   And you believe there is a higher incidence of suicide

2  attempts among the LGB individuals compared to heterosexual

3  individuals, correct?

4  A.   Repeat, please?

5  Q.   You believe that there's a higher incidence of suicide

6  attempts among LGB individuals than among heterosexual

7  individuals?

8  A.   Yes.

9  Q.   Okay.  And where one LGB individual suffers from minority

10  stress, it would tend to affect the other partner as well,

11  correct?

12         (Brief pause.)

13  Q.   Let me rephrase that.

14         When an LGB individual is in a relationship, intimate

15  relationship with another individual, where one LGB individual

16  suffers from minority stress, it would tend to affect the other

17  partner as well, correct?

18  A.   I think that's true of all partners.  When something bad

19  happens to one of them, surely it will affect the other.

20  Q.   So it's a yes, correct?

21  A.   Yes.

22  Q.   Okay.  Thank you.

23  A.   I just would say it's not unique to LGB in this case.

24  Q.   Okay.  It's not unique, but it would be true?

25  A.   Yes.

1 **Q.** Okay. Thank you.

2 **A.** I assume -- you know, it's kind of theoretical. I would

3 assume that it would affect the other person, too, who is -- if

4 his loved one experienced something.

5 **Q.** And specifically if one of the members of the partnership

6 or the marriage, whatever it might be, if they suffered -- one

7 member suffered from minority stress, it would increase general

8 stress on the relationship and would have a negative impact on

9 their satisfaction, correct?

10 **A.** Yes. Some of the stressors -- you know, this is in

11 general, kind of an average.

12      So some of those stressors would definitely have this

13 effect. And I particularly studied internalized homophobia as

14 an example of that type of effect, but there might be more

15 minor things that may not have this effect.

16 **Q.** Okay. Thank you.

17      Now, you believe that the adverse mental health

18 outcomes among the LGB population that you believe you have

19 identified are due, in part, to minority stress, correct?

20 **A.** Yes.

21 **Q.** Emphasis on "due in part."

22 **A.** It's not that I identified all those differences. There

23 are many studies and even in the article that we just

24 discussed, I rely on other studies by summarizing them, but --

25 **Q.** My question is really getting --

1      **MR. DUSSEAULT:**  Could I object to the extent counsel

2  is interrupting the answers?  He is asking the question and the

3  witness is answering and he needs to be permitted to answer.

4      **MR. NIELSON:**  I'll try and be careful.  I'm trying to

5  move things along, but...

6      **THE COURT:**  All right.  Well, maybe you can point

7  your questions and the witness can point his answers and,

8  hopefully, you will meet in the middle.

9      (Laughter.)

10  **A.**   I was just making the point that you said that I found

11  those -- the evidence about a higher prevalence, and I just

12  made the point that it is not all my studies.

13  **BY MR. NIELSON:**

14  **Q.**   Correct.  Thank you.  And I appreciate your making that

15  clear.

16      My question, though, what I'm really getting at is:

17  These mental health outcomes can also result from other causes,

18  correct?

19  **A.**   Yes.

20  **Q.**   And some of those causes would be unrelated to stress,

21  correct?

22  **A.**   Yes.

23  **Q.**   And some -- even for stress-related causes, some of those

24  stressors would be not related to minority stress, correct?

25  **A.**   Yes.

1  Q.   General stressors, I think you -- is the term you used --

2  A.   Yes.

3  Q.   -- correct?

4       Okay.  Thank you.

5       And those sorts of general stressors are not

6  dependent on membership in a disadvantaged group, correct?

7  A.   Correct.

8  Q.   All right.  At least as a theoretical matter, the social

9  stress model would predict that women experience more stress

10 than men, correct?

11 A.   It's correct with some -- it's correct that we would look

12 for that prediction, yes.

13 Q.   Okay.  Thank you.

14      And in this interview, as you describe your work, you

15 actually found that men and women did not have different levels

16 of overall stress, correct?

17 A.   Yes.

18 Q.   And this is something that's also found in the general

19 literature, correct?

20 A.   Yes.

21 Q.   So regarding gender, the expectations of social stress

22 theory, the disadvantaged group, in this case women, would have

23 more exposure to stress is not verified by your studies,

24 correct?

25 A.   Yes.

1   Q.   And this expectation, the social stress theory regarding

2   women, is not verified by many other studies either, correct?

3   A.   Yes.

4   Q.   Thank you.

5        And the social stress model would predict that

6   African-Americans and Latinos suffer from a higher prevalence

7   of mental disorders than non-Hispanic whites, correct?

8   A.   As a group, yes.

9   Q.   Thank you.

10       Now, in the study that you describe in this

11  interview, you, in fact, found that African-Americans and

12  Latinos do not have more stress -- or, excuse me, they do have

13  more stress than non-Hispanic whites, correct?

14  A.   Correct.

15  Q.   But you found that African-Americans and Latinos do not

16  have more mental disorders than whites, correct?

17  A.   Correct.

18  Q.   And this is a finding that's not unique to this study,

19  correct?

20  A.   Yes.

21  Q.   This finding seems to be valid because it's been shown

22  with other populations in general studies, correct?

23  A.   I think -- other populations, you mean that studied the

24  same thing?  Other studies, yeah.

25  Q.   Yes, okay.  I was actually just quoting directly from your

 1  words --

 2  A.    Yeah.   Other studies that use other samples and so forth,

 3  yes.

 4  Q.    Please look at the third paragraph of your first full

 5  answer on page four.  And, again, we're still in this interview

 6  you gave.

 7         And it starts with "However."  Can you see that,

 8  Professor Meyer?

 9  A.    Page four --

10  Q.    Your first full answer.  It's about the middle of the

11  page.  And I'm going to read that to you.  You say:

12              "However, regarding the blacks and Latinos,

13              we found an interesting finding.

14         And, in fact, that just repeats what I said, so I'm

15  going to skip to the middle --

16  A.    Okay.

17  Q.    -- where it says:

18              "So blacks and Latinos have more stress, but

19              they don't have more mental disorders.  So

20              that's very bewildering, again, from the

21              social stress perspective because you

22              question whether your theory is correct.  If

23              they have more stress and the stress is a

24              cause of disorders, which is what this whole

25              study is about, then how come they don't show

1              more disorders?"

2              Okay.  Now, you wrote that, correct?

3    **A.**    Yes.

4    **Q.**    Or, rather, you said it probably, because it was an

5    interview.

6    **A.**    Right, but probably have written something like that as

7    well.

8    **Q.**    Okay.  And the social stress model would also predict that

9    within the LGB community, African-Americans and Latino LGB

10   individuals, would suffer from a higher prevalence of mental

11   disorders than white non-Hispanic individuals, correct?

12   **A.**    I'm sorry.  The study that you quoted before was about

13   African-American and Latino gay and lesbian people.

14   **Q.**    Yes.  I --

15   **A.**    Are you asking now a different --

16   **Q.**    Well, in the study we just talked about, you said this was

17   true in the general population as well.

18   **A.**    Right.  So it's true -- but the study that I conducted was

19   about black and Latino gay men and lesbians as compared to

20   white gay men and lesbians.

21   **Q.**    All right.  And I want you to look at another study you

22   did that's -- that's clearly -- more clearly pointed just at

23   that within the LGB group.  But I take your point, so thank you

24   for clarifying that.

25   **A.**    Okay.

1  **Q.**   But let me ask one clarifying question.

2       The general pattern, you said in this article, is

3  true for non-LGB as well, correct, for both men versus women

4  and for the ethnicity and race groups?

5  **A.**   I would limit it to African-Americans versus white,

6  because it's a little complicated with Latinos; but, yes,

7  African-Americans versus white.

8  **Q.**   Okay.  But -- but the social stress model would predict

9  that within the LGB community, African-American and Latino LGB

10  individuals would suffer from a higher prevalence of mental

11  disorders than white non-Hispanic LGB individuals, correct?

12  **A.**   That was a hypothesis that we tested, yes.

13  **Q.**   Thank you.

14       And you tested that because that's what the social

15  stress theory or the minority stress theory would predict,

16  correct?

17  **A.**   We tested because we wanted to see whether -- there's

18  actually an alternative prediction, too.  So it's a little bit

19  more complex than the way you are describing it.  But we -- we

20  test the hypothesis because we always pose one side of the

21  hypothesis.

22       In fact, in this matter of gay and lesbian, which we

23  call kind of having dual minority identities, the one theory or

24  one hypothesis that they would have more -- because they now

25  have two kind of minority identities or disadvantaged, but the

1    other theory was that they actually would do better because

2    somehow their experience as black and exposed to racism would

3    somehow give them special coping ability so that when they deal

4    with the gay homophobia, that they can somehow do better.

5              So those are the two sides, and we certainly posed

6    the hypothesis as one side when we tested it.

7    Q.    Well, two questions.  First of all, do you consider that a

8    very parsimonious explanation?

9              And I don't mean your words.  I mean as a theoretical

10   matter.  Is that a parsimonious theory?

11   A.    Parsimonious in what way?

12   Q.    In the way you use it in the social sciences.  And you

13   have used that word.

14   A.    Exactly, but I have used it in different contexts, so --

15   Q.    My understanding is that parsimonious means simple, and

16   that in the social sciences -- in science in general a simpler

17   answer is preferred to a more complex one, as long as they both

18   fit the data, is that correct?

19   A.    You want me to say if that is preferable in social

20   sciences?

21   Q.    Yes.

22   A.    There is disagreements about that.  So a more parsimonious

23   explanation is preferable if you look to kind of -- in some

24   ways, you know, you are looking for the pithiest and

25   most simple, as you said, explanation that can explain the

1    widest phenomenon.

2           But on the other side of parsimony, there are people

3    and, you know, a study that -- a philosophy of sciences that

4    say that parsimony is not good because it doesn't allow you to

5    understand the details and the workings; that it could

6    oversimplify, in other words.

7           So that is a debatable thing.  But, certainly, we are

8    interested in those questions of parsimony in the way that may

9    be referred to.

10   **Q.**   Okay.

11   **A.**   So we are interested in those questions.  We want to see,

12   is it parsimonious?  Is it explaining a cross situation and a

13   cross populations and so forth.  It's certainly what makes my

14   work interesting.

15   **Q.**   Okay.  Thank you.

16          Now, please, look at tab nine in the witness binder.

17          (Witness complied.)

18   **Q.**   And you will find a document that's pre-marked DIX-1253?

19   **A.**   Yes.

20   **Q.**   Can you identify this document?

21   **A.**   Yes.  That's an article I published in the *American*

22   *Journal of Public Health* in 2008.

23   **Q.**   Thank you.

24          **MR. NIELSON:**  And, your Honor, I would like to

25   introduce DIX-1253 into evidence.

1      **MR. DUSSEAULT:**  No objection.

2      **THE COURT:**  1253 is admitted.

3          (Defendants' Exhibit 1253 received in evidence.)

4      **MR. NIELSON:**  Thank you.

5  BY MR. NIELSON:

6  **Q.**  And this document describes a study that you conducted,

7  correct?

8  **A.**  Yes.

9  **Q.**  Thank you.

10          And, please, look at the top -- there's three columns

11  actually, but look in the first page, the top of the first

12  column -- or the second column, the middle column?

13  **A.**  Uh-huh.

14  **Q.**  And now you stated a minute ago that you were -- you were

15  not inclined to agree with my statement that the social stress

16  theory would predict that black and Latino lesbians -- well,

17  LGB individuals would have more mental disorders than white

18  non-Hispanic LGB individuals.

19          But I would like to read that to you.  It says,"

20  Social stress theories" --

21  **A.**  I don't think I said that.

22  **Q.**  Well, do you agree with that?

23  **A.**  Can you repeat it?

24  **Q.**  Okay.  The social stress model would also predict that

25  within the LGB community African-American and Latino LGB

1    individuals would suffer from a higher prevalence of mental

2    disorders than white non-Hispanic individuals, correct?

3    **A.**    Yes.  I said that was the hypothesis we tested.

4    **Q.**    Okay.

5    **A.**    So I didn't disagree with that, but I also said that there

6    is -- there is a debate, you know, that we tried to address in

7    studying this topic.  So there is one side and the other side

8    in terms of the dual identity.  That's what I was saying

9    earlier.

10            So that was the hypothesis we tested --

11   **Q.**    Now, the --

12            (Court reporter interruption.)

13   **Q.**    Have you completed your answer?

14   **A.**    Yes.

15   **Q.**    I apologize.

16            Now, the first sentence here says:

17            "Social stress theories lead us to expect

18            that compared with socially advantaged

19            groups, disadvantaged groups are at a higher

20            risk for mental disorders."

21   **A.**    Yes.

22   **Q.**    You agree with that statement, correct?

23   **A.**    Yes.

24   **Q.**    So we, thus, hypothesized, one, that black and Latino

25   lesbians, gay men and bisexual individuals have more mental

1    disorders than do white lesbian gay men and bisexual

2    individuals because they are more -- exposed to more stress

3    related to prejudice, discrimination -- excuse me, prejudice

4    and discrimination associated with their race, ethnicity?

5    **A.**    Correct.

6    **Q.**    All right.  And you believe that hypothesis followed from

7    the social stress theory, correct?

8    **A.**    Yes.

9    **Q.**    Thank you.

10            All right.  And then in this study you found that

11   African-Americans and Latino lesbians, gay men and --

12            (Court reporter interruption.)

13   **Q.**    And in this study you found that African-American and

14   Latino lesbians, gay men and bisexual individuals did not have

15   a higher disorder prevalence than did white participants,

16   correct?

17   **A.**    Than the white lesbian, gay men and bisexuals.

18   **Q.**    Correct.

19   **A.**    Yes.

20   **Q.**    And I guess the white non-Hispanic lesbian, gay men and

21   bisexuals.

22   **A.**    Right.

23   **Q.**    And this finding was contrary to your hypothesis, correct?

24   **A.**    Right.

25   **Q.**    All right.  Thank you.

1          And you found that African-American lesbians, gay men

2   and bisexuals have significantly fewer disorders than did white

3   participants, correct?

4   **A.**    I think in some of the findings that was significantly

5   fewer, yes.

6   **Q.**    Okay.  And let's look at -- let's look at page -- this

7   first page in the third column, and I will read starting with

8   the second paragraph -- the second sentence, it says:

9          "Contrary to our hypothesis, black and Latino

10         lesbians, gay men and bisexual individuals

11         did not have a higher disorder prevalence

12         than did white participants.  Indeed, black

13         lesbians, gay men and bisexual individuals

14         had significantly fewer disorders than did

15         white participants."

16  **A.**    Right.  The black --

17  **Q.**    Okay.  So that is correct?

18  **A.**    Yes.  But the -- yes.

19  **Q.**    Okay.  Thank you.

20         And you found that the prevalence of disorders among

21  Latino lesbians, gay men and bisexual individuals was similar

22  to that --

23         (Court reporter interruption.)

24  **Q.**    Okay, sorry.

25         And you found that the prevalence of disorders among

1   Latino lesbians, gay men and bisexual individuals was similar

2   to that of white lesbians, gay men and bisexual individuals,

3   correct?

4   **A.**   With the exception of serious suicide attempts, that is

5   correct.  But we found them to have a higher prevalence of

6   serious suicide attempts in history.

7   **Q.**   But not of disorders generally, correct?

8   **A.**   Of those three disorders, right.

9   **Q.**   Okay.  Thank you.

10        And men and women did not differ substantially in

11  disorder prevalence, correct?

12  **A.**   Correct.

13  **Q.**   In terms of implications to social stress theory, this

14  study reported inconsistent findings, correct?

15  **A.**   Within the context of this particular questions that were

16  raised in this study, but it is not inconsistent with the

17  general -- what I testified to, which was about the difference

18  between gay, lesbian and heterosexual.

19        So within that gay and lesbian group, there was not

20  the finding that supported the idea that if you had an added --

21  sorry, an added minority identity, that that will add more

22  disorders to you.

23        But as a group, they had more disorders than

24  heterosexuals --

25  **Q.**   Correct.  But the --

1   A.   -- which is not reported here because this is just looking

2 at one particular aspect of it.

3   Q.   But the results regarding race, ethnicity were

4 inconsistent with your predictions made on the basis of social

5 stress theory, correct?

6   A.   Again, within the context of that, yes.

7   Q.   Thank you. And these results regarding race and ethnicity

8 were inconsistent with other's predictions made on the basis of

9 social stress theory, correct?

10   A.   What is it? With other peoples, yes.

11   Q.   Yes, thank you.

12       And you found it notable that the race ethnicity

13 patterns reported here among lesbians, gay men and bisexual

14 individuals were similar to race differences found among

15 heterosexual individuals in general population studies,

16 correct?

17   A.   Yes. But, again, as a group, they were all elevated; but

18 the differences within the group of gay men, lesbians were

19 consistent in that sense of that hypothesis that I tested,

20 although there were some differences. But I don't think it's

21 relevant to what you are asking right now.

22   Q.   No, I understand that.

23       And you stated that you believed that further

24 research needs to explain the seeming contradiction of social

25 stress predictions, correct?

 1  A.    Absolutely.  We always think that further research is

 2  necessary.

 3  Q.    Yes.

 4  A.    That's what we do.

 5  Q.    That's how you stay in business.

 6           (Laughter.)

 7  Q.    And some lawyers predict that litigation is always

 8  necessary, too.  But, thank you.

 9           The social stress model would also predict that

10  within the LGB community, racial and ethnic minorities would

11  suffer from lower levels of well-being than whites, correct?

12  A.    Yes.  The same rationale.

13  Q.    And the social stress model would predict that within the

14  LGB community, racial and ethnic minorities would suffer from a

15  higher prevalence of depression than whites, correct?

16  A.    I think -- is it repeating the same thing we discussed,

17  because --

18  Q.    I just asked you about mental disorders, which I

19  understood it to be the subject of the study we just read.

20           Now I'm asking about well-being first, and then

21  suicide attempts second.

22  A.    Oh, okay.  I'm sorry.

23           So regarding well-being.  Again, it will be the same

24  basic pattern.  You would -- on one hand, the social stress

25  part of it would say they have another minority identity,

 1  therefore, they should have more disorder.

 2          The coping, I guess, hypothesis you can say would say

 3  the opposite.

 4          And with regard to suicide, yes, you would expect

 5  them to have more.

 6  Q.   Okay.  So the answer is that the social model -- the

 7  stress model would predict that within the LGB community,

 8  racial and ethnic minorities would suffer from a higher

 9  prevalence of depression than whites?

10  A.   Yes.

11  Q.   Is that correct?

12          And I apologize, I misspoke.  The study I'm going to

13  look at next is about depression and well-being.

14  A.   Okay.

15  Q.   Okay.  Thank you.

16          Now, please turn to tab 10 in the witness binder.

17          (Witness complied.)

18  Q.   You will find a document that's pre-marked DIX-1252.  And

19  can you identify this document?

20  A.   Yes.  That's another study from the same -- sorry.

21  Another paper that was published from the same study, looking

22  at the different outcomes that you mentioned actually, and it

23  was published in the *American Journal of Orthopsychiatry* in

24  2009.

25          **MR. NIELSON:**  Your Honor, this is also an exhibit

 1    that was designated by both parties.  I believe the plaintiffs

 2    designated it as Exhibit No. 999.  And it may have been among

 3    that list that Mr. Dusseault submitted, though I can't recall.

 4              **THE COURT:**  It is.

 5              **MR. NIELSON:**  Okay.  Thank you.

 6              **THE COURT:**  So that's in.

 7              **MR. NIELSON:**  It's in?  All right.  Thank you.

 8    **BY MR. NIELSON:**

 9    **Q.**   Now, this document describes another study you have

10    conducted, correct?

11    **A.**   It's the same study.  It's a different analysis on the

12    same -- the same sample that was in the other paper we just

13    discussed.  So it's the same people, but a different outcome,

14    as you mentioned.

15    **Q.**   All right.  So it's the same study, but a different aspect

16    of that study?

17    **A.**   Exactly.

18    **Q.**   All right, thank you.

19              And in this study you did not find decreased

20    well-being or increased depression in racial ethnic minority

21    respondents as a whole, correct?

22    **A.**   In the -- again, those are the gay and lesbian black

23    and -- yes.  Consistent with what we were just saying with the

24    other study, yes.

25    **Q.**   Right.  And this finding was contrary to your hypotheses

1  stemming from minority stress theory about the added stress

2  that racial, ethnic, minority status would place on --

3          (Court reporter interruption.)

4  **Q.**    Sorry.

5          And this finding was contrary to your hypotheses

6  stemming from minority stress theory about the added stress

7  that racial, ethnic, minority status would place on LGB

8  individuals, correct?

9  **A.**    Yes.

10  **Q.**    And your finding regarding mental health and well-being of

11  African-American LGB persons is consistent with results of

12  studies of the general population that found that despite

13  greater exposure to discrimination and prejudice,

14  African-Americans do not have a higher prevalence of most

15  common mental disorders than whites, correct?

16  **A.**    Yes.

17  **Q.**    And studies have found this is true with respect to both

18  the general population and LGB populations, correct?

19  **A.**    Again, it's correct in the sense of black versus white

20  LGB, but the LGB versus heterosexuals, which is what I was

21  testifying to, that was higher.

22          But in the general population, meaning non- -- well,

23  not necessarily gay samples, the finding is that as you

24  described it.

25  **Q.**    Okay.  And we will turn to the studies of heterosexuals

1    versus LGB individuals immediately after this exhibit, but I'm

2    testing the minority stress theory generally, which is why I'm

3    exploring some of the work you've done relating to gender and

4    race.

5    **A.**    Okay.

6    **Q.**    Now, other studies have shown that African-Americans, in

7    fact, have higher self-esteem and well-being than whites,

8    correct?

9    **A.**    That's in the general population.

10   **Q.**    Yes.

11   **A.**    Yes.

12   **Q.**    Look at page eight of this exhibit.  And, again, we are at

13   tab 10.

14         Starting about halfway down in the middle of the

15   paragraph at the bottom of the second column, I'm going to read

16   that to you.  It says:

17              "That our results show inconsistent support

18              for minority stress hypotheses should lead to

19              a reexamination and, if necessary,

20              elaboration of the minority stress model.  We

21              are particularly struck by the finding that

22              black LGB respondents, clearly a

23              disadvantaged social group in American

24              society, do not show higher levels of

25              depressive symptoms and lower levels of

1          well-being than their white counterparts.

2          This finding clearly challenges minority

3          stress theory.  That this finding is

4          consistent with findings about black/white

5          differences and well-being in the general

6          population, as well as findings regarding

7          differences and prevalence of mental

8          disorders between black and white LGB,

9          strengthens our confidence that these

10         findings are not a result of some bias in

11         our study."

12         Those are your words, correct?

13  A.    Yes.

14  Q.    And does that fairly summarize --

15  A.    That's one of the conclusions that we came to, yes.

16  Q.    Okay.  And turn over the page to the next paragraph, the

17  top of the page nine in the first column.  It says:

18         "The lack of parsimony in our results

19         represents a challenge in social stress

20         theory.  It suggests that the theory cannot

21         be applied uniformly and that greater

22         definitions and distinctions are necessary in

23         future research."

24         Correct?

25  A.    Correct.

1   **Q.** And we discussed parsimony a minute ago, correct?

2   **A.** It is saying exactly what I said, that -- I guess, the

3   word "challenge" needs to be explained.

4          What I'm saying here is that we need to examine,

5   because of those differences, the commonalities and

6   divergences, we need to try to better -- we would call it

7   specify the model; that it will be a better model predicting

8   those types of outcomes so that they -- so we can explain them

9   better.

10  **Q.** But you said that it means that the theory cannot be

11  applied uniformly and that greater definition and distinctions

12  are necessary, correct?

13  **A.** Exactly.

14  **Q.** All right. Thank you.

15         Please turn to tab 11 in the witness binder, and

16  you'll find a document pre-marked DIX-1246.

17         (Witness complied.)

18  **Q.** Can you identify this document?

19  **A.** 1246?

20  **Q.** Yes. It's tab 11.

21  **A.** Yes. That's an article that I wrote that was published in

22  the *Journal of Health and Social Behavior* in 1995.

23  **Q.** Thank you.

24         **MR. NIELSON:** And, again, this is one that was

25  designated by the plaintiffs as 1002, your Honor, and I believe

1    that it is in evidence.

2            THE COURT:  Very well.

3            MR. DUSSEAULT:  No objection.

4            MR. NIELSON:  Correct?

5            MR. DUSSEAULT:  I'm sorry?

6            MR. NIELSON:  1002, PX 1002.  Could I have opposing

7    counsel confirm that that was admitted?

8            THE COURT:  Yes.  1002?

9            MR. NIELSON:  Yes.

10           THE COURT:  Is in.

11           MR. NIELSON:  Okay.  Thank you.

12   BY MR. NIELSON:

13   Q.   Okay.  Now, this document discusses a study you conducted,

14   correct?

15   A.   Yes.  This was my dissertation study.

16   Q.   This was your doctoral dissertation, you said?

17   A.   This was based on the dissertation.  This is a publication

18   that came out of it, yes.

19   Q.   Okay.  Thank you.

20           All right.  Now, please look at page 39 in the middle

21   of the -- well, towards the top of the second column, about

22   three sentences into the first full paragraph, you write:

23           "It has been predicted that, if minority

24           position is stressful, and if the stress is

25           related to psychological distress, the

1              minority groups must have higher rates of

2              distress than non-minority groups.  But

3              studies that compared rates of distress and

4              disorder between blacks and whites, women and

5              men, and homosexuals and heterosexuals did

6              not confirm such predictions, leading some

7              researchers to refute minority stress

8              conceptualizations."

9         And the study goes on to list a number of citations,

10    a number of studies, including -- I believe I count nine on,

11    quote, gay/straight differences, correct?

12    **A.**   Right.

13    **Q.**   So those studies, at least, do not support the social

14    stress model as it applies to LGB individuals, correct?

15    **A.**   Those are the studies that I was referring to before when

16    you asked me the questions about Evelyn Hooker and so forth

17    that in the past demonstrated that.

18         And as I also said in many of the publications, that

19    the studies in the 90's are the ones that began to use more

20    advanced accepted methods that begin to show this difference.

21         And, in fact, the point of this article is to show

22    the support for minority stress.  And this is the article that,

23    actually, I first introduced the concept and demonstrated how

24    it does work.  In other words, it is supported.  So this was

25    just the introduction to this.

1  Q.  All right.  Thank you.

2       But these studies that you cite here you characterize

3  as studies that compared rates of distress and disorder between

4  homosexuals and heterosexuals and did not confirm such

5  predictions.

6       And the predictions to which you are referring

7  earlier in that sentence already:

8           "It has been predicted that, if minority

9           position is stressful, and if this stress is

10          related to psychological distress, then

11          minority groups must have higher rates of

12          distress than non-minority groups."

13          Correct?

14 A.  So those older studies did not show that, as we     showed

15 --

16 Q.  Sorry --

17 A.  -- yesterday.

18 Q.  All right.  So those studies, at least, were inconsistent

19 with your model, correct?

20 A.  Yes.

21 Q.  Okay.  Thank you.

22       And your 1995 study did not look at inter-group

23 comparisons, correct?  By "intergroup comparisons" I mean

24 comparisons between heterosexuals and LGB individuals.

25 A.   No.  I did this most fully in the 2003 article that we

1    discussed earlier.

2    **Q.**    Yes.  But in 1995 you did not, correct?

3    **A.**    This was looking at a group of gay men.

4    **Q.**    And, in fact, in that article you stated that -- just

5    lower down to the page, you say:

6                    "I suggest that we must reexamine our

7                    reliance on evidence from intergroup

8                    comparisons of rates of distress.  Despite

9                    the intuitive appeal of this approach,

10                   numerous methodological problems lead to

11                   bias, making it difficult to interpret the

12                   evidence from studies using this approach."

13                   Correct?

14   **A.**    This refers to -- you know, we refer to different

15   generations of studies in psychiatric epidemiology.  There was

16   a huge shift in understanding how to do studies like that.

17           So I'm saying here, what I said in that -- what you

18   are quoting, that those older articles are not a good

19   indication for the assessment of those differences because they

20   didn't use sampling methodologies that would be correct, that

21   would allow us to make -- to draw those conclusions.  They

22   didn't at the time have diagnostic criteria that were that

23   clear, and they certainly did not have any measures to assess

24   those.

25           So there were a lot of methodological problems in

1   those earlier studies, including the studies that we were

2   discussing earlier when you quoted some of the, again, early

3   studies that do not talk to the effect off prevalence.

4        So they would have been two groups of gay versus

5   straight, but they were not studies of prevalence in the

6   population.  So, therefore, they are not reliable as an

7   estimate of the difference in the prevalence.

8   **Q.**   Okay.  But you said -- you suggest -- quote:

9        "I suggest that we must reexamine reliance on

10        evidence from intergroup comparisons of rates

11        of disorder (sic)."

12        Correct?

13   **A.**   Yes.  Because of that problem, and other issues that I

14   think I list here.

15   **Q.**   Okay.  And thank you.

16        And that's why you did not conduct an intergroup

17   study in 1995, correct?

18   **A.**   I wouldn't say that is why I didn't conduct it, but I was

19   using this study as another anchor on this problem, on this

20   question.

21        As I said, we used -- we tried to use different

22   approaches to study the same problem from different sides so

23   that we can see convergences and inconsistencies so that we

24   can, by looking at those, improve our way that we understand

25   the problem and the theories.  That is not unique, you know, to

1    these studies.

2         For example, there was a time that people thought

3    that all cancers are caused by some kind of a genetic mutation.

4    And then they find studies that don't confirm that and,

5    therefore, they go on and investigate further and they say, Oh,

6    some studies, some -- sorry -- cancers are caused by an

7    infectious agent.  So that's what I mean by improving the

8    model.  So now we understand something a little better about

9    how cancer is caused.

10        So in the same way we always try to challenge our

11   results and our studies using different methodologies,

12   different ways of assessing the basic theory that, you know, we

13   discussed here as social stress and use it -- so when I say the

14   word "challenge," we use it to further study things that are

15   discovered in, let's say, inconsistencies.  So some of the

16   inconsistencies that you described are now the subject of

17   further investigation.

18   **Q.**   Okay.  Thank you.

19        But you found -- your findings in this study

20   contrasted with the previous evidence compiled on minority

21   stress, correct?

22   **A.**   Well, this study was looking within a group of gay men.

23   It contrasts with those older studies that, as I said, did not

24   show the differences.

25        But as I also said, there were studies that were not

1   up to par in terms of how we assess those issues now in terms

2   of their ability to represent the population prevalence or the

3   proportion of people in the population that have the disorder.

4   **Q.**   All right.   I'm not asking about the methodology of the

5   previous studies.   I'm just asking whether your findings in

6   this study were inconsistent with those studies?

7   **A.**   I mean, I guess you could -- I think I would say that the

8   older studies were inconsistent with this new finding.

9   **Q.**   Okay.   And please turn to page 51, if you would, please,

10  sir?

11  **A.**   Yeah.

12          (Witness complied.)

13  **Q.**   Okay, Professor Meyer, let's -- right in the middle of the

14  second column on page 51, you write:

15          "These findings contrast with previous

16          evidence compiled on minority stress.   When

17          studies compared rates of disorder or

18          distress between minority and non-minority

19          groups, we found little evidence that

20          minority stress is related to adverse mental

21          health."

22          Correct?

23  **A.**   Yes.   Those are those old studies that I mentioned.

24  **Q.**   Thank you.

25          And in the last -- in the last paragraph of that

1    page, a little farther down, you say:

2            "Certainly the issue of rates of disorder and

3            distress cannot be sidestepped and will have

4            to be addressed, too.  But if the present

5            findings are convincing, we must address the

6            question of rates of difference with this

7            evidence in mind.  The issue, thus, becomes

8            one of explaining why there are no

9            differences in rates of disorder between

10           minority and non-minority populations and how

11           such findings could be consistent with the

12           evidence that not just social conditions do,

13           in fact, have adverse mental health effects."

14           And you wrote that, correct?

15   A.    Yes.

16   Q.    Okay.  Thank you.

17   A.    It's kind of what I was just trying to explain as well,

18   that --

19   Q.    Thank you.

20           Let's turn back to tab three.  And we discussed this

21   document a moment ago and it's in evidence, so we can go

22   straight to it.

23           **THE COURT:**  Tab?

24           **MR. NIELSON:**  Three, your Honor.

25

1   **BY MR. NIELSON:**

2   **Q.**   And this is your 2003 article where you did look at

3   intergroup comparisons, correct?

4   **A.**   Correct.

5   **Q.**   Yes, thank you.

6            And in the middle --

7            **THE COURT:**   Page?  What page?

8            **MR. NIELSON:**   That was just a general question, your

9   Honor.

10           **THE COURT:**   I thought you were about ready to read

11  something.

12           **MR. NIELSON:**   I am.

13  **BY MR. NIELSON:**

14  **Q.**   Now I will direct -- ask you, Professor Meyer, to turn to

15  page 684.

16           (Witness complied.)

17  **Q.**   Okay.  Please look at the second sentence of the first

18  full paragraph.  It starts, "In drawing."

19  **A.**   Uh-huh.

20  **Q.**   (As read)

21           "In drawing a conclusion about whether LGB

22           groups have higher prevalences of mental

23           disorders, one should proceed with caution.

24           The studies are few, methodologies and

25           measurements are inconsistent and trends in

1           the findings are not always easy to

2           interpret.  Although several studies show

3           significant elevation in prevalence of

4           disorders in LGB people, some do not."

5      So at the time you wrote this, you believed that, at

6  least, some of the previous studies were inconsistent with the

7  minority stress model, correct?

8  **A.**   We are talking still about the same studies that were the

9  older studies.  And the reason that I did this paper is to use

10  only the better studies, the ones that can actually answer the

11  question, and that's what the findings in this paper

12  demonstrate.

13  **Q.**   Okay.  Thank you.

14      Now, please look at page 685.  Look at page 685 and

15  look at the second full paragraph on the page.  You describe --

16  well, I will just read it:

17           "Two studies assess the risk for completed

18           suicides among gay men.  These studies assess

19           the prevalences of homosexuality among

20           completed suicides and found no

21           overrepresentation of gay and bisexual men,

22           concluding that LGB populations are not at

23           increased risk for suicide.  Thus, findings

24           from studies of completed suicides are

25           inconsistent with studies finding the LGB

1          groups are at higher risk of suicide ideation

2          and attempts than heterosexuals."

3          And then in the last sentence of that paragraph  you

4     say:

5          "Considering the scarcity of studies, the

6          methodological challenges and the greater

7          potential for bias in studies of completed

8          suicide, it is difficult to draw firm

9          conclusions from their apparent refutation of

10         minority stress theory."

11         Correct?

12    **A.**   This concerns a particular type of study that looks at

13    completed suicide -- as those people who are dead -- and,

14    therefore, it is -- there are only two of those and it is very

15    hard to assess the proportion of people there who were gay.

16         So that's why I said that it is hard to draw

17    conclusions for those two studies.

18    **Q.**   But at least on their face they -- you describe them as

19    presenting an apparent refutation of minority stress theory,

20    correct?

21    **A.**   Apparent, yes.  But I also say in the same paragraph that

22    the methodological problems would preclude you from drawing

23    those conclusions.

24    **Q.**   All right.  And you said it was --

25         "Considering the scarcity of studies, the

Case 3:09-cv-02292-VRW   Document 121-4   Filed 01/29/10   Page 132 of 185

1          methodological challenge and greater

2          potential for bias, it's difficult to draw

3          firm conclusions."

4          That is correct.

5  **A.**   About this particular issue of completed suicides.

6  **Q.**   Yes.  Thank you.

7          Now, your 2003 study did conclude that LGB

8  individuals have a higher prevalence of mental disorders than

9  heterosexuals, correct?

10 **A.**   Yes.

11 **Q.**   Okay.

12 **A.**   As I said before, this was not my study.  This was what we

13 call a meta-analysis, which is a method of gathering data and

14 information from other studies.  So I -- I looked at the other

15 studies and came up with the statistics that describe the

16 aggregate of those studies.

17          So the purpose of that is to get a better handle on

18 those estimates because you are using not just one study, but

19 several studies that are available to you.

20 **Q.**   Correct.  And you -- you relied on two types of studies,

21 correct; studies that targeted LGB groups using non-probability

22 samples, and studies that used probability samples of the

23 general populations that allowed identification of LGB versus

24 heterosexual groups, correct, in your meta-analysis?

25 **A.**    I looked at all of those studies, but in conclusions I

1  relied only on the studies that used probability samples.

2       The studies that don't use probability samples are

3  exactly the ones we were discussing earlier and which is why I

4  said that you cannot really draw good conclusions from them in

5  terms of estimating prevalence.

6       So I looked at, I think, all of the studies that were

7  available going back, I think, to the 70's.  And so when I --

8  when you say "rely," I certainly looked at all of those, but in

9  the meta-analysis I -- as most people do, you create a

10  selection criteria for which studies you want to include and.

11  In this case there were -- I looked specifically at the ones

12  that were community studies that are very large and that

13  involve probability samples, because probability samples allow

14  us to then estimate back into the population the proportions,

15  the prevalences as we called them.

16  **Q.**  So when you say -- you looked at the first type of

17  non-probability study, but you ultimately didn't rely on that,

18  is that your explanation?

19  **A.**  In the meta-analysis.

20  **Q.**  So the meta-analysis was based only on the -- well,  let

21  me get your exact words.  It's the -- well, the probability

22  samples of the general population that allowed identification

23  --

24  **A.**  I think I did both, and I show -- but in terms of drawing

25  conclusion -- I looked at different things, but in terms of

1  drawing conclusion about prevalences, I relied on those studies

2  that are probability studies and --

3  **Q.**    Okay.  Thank you.  I wasn't clear on that from reading the

4  article, and I appreciate that clarification.

5          So let's talk just about those probability studies

6  then.  The second group of studies you reviewed, the

7  population -- well, the population-based studies do suffer from

8  some methodological deficiencies, correct?

9  **A.**    The population-based studies?

10  **Q.**    Yes.

11  **A.**    All studies suffer from methodological deficiencies, but

12  the population based studies are the best ones that we have to

13  addresses this question.

14          Those are very large population-based studies that

15  the entire United States Public Health Service relies on.

16  Those were the only evidence we have for prevalences of mental

17  disorders in the United States.

18  **Q.**    Thank you.

19          And because none of these studies was a priori

20  designed to assess mental health of the LGB groups, they were

21  not sophisticated in the measurement of sexual orientation,

22  correct?

23  **A.**    Yes.  Those were general population studies and the LGB

24  group were basically -- whoever happened to have been gay

25  within the general population was included by virtue of the

1    probability sampling.

2    **Q.**   The studies classified respondents as "homosexual" or

3    "heterosexual" only on the basis of past sexual behavior,

4    rather than using a more complex matrix that assessed identity

5    and attraction in addition to sexual behavior, correct?

6    **A.**   I actually -- if I said that, I assume it's correct, but I

7    actually don't remember that all of them used even the exact

8    same.

9          But they usually would choose one measure and,

10   therefore, they don't have a more complex measure.  I -- I

11   don't remember independent that they all used the exact same

12   measure that you just quoted, but --

13   **Q.**   Please look at page 685 in the second column.  It's the

14   last full paragraph on that page, so it's above the carryover.

15   And about part way down, I'm going to read it to you, it says

16   -- after the sentence -- the first sentence says that:

17               "...they, too, suffer from methodological

18               deficiencies."

19               But then I'll start reading in full.  It says:

20               "This is because none of these studies was a

21               priori designed to assess mental health of

22               LGB groups.  As a result, they were not

23               sophisticated in the measurement of sexual

24               orientation.  The studies classified

25               respondents as homosexual or heterosexual

1              only on the basis of past sexual behavior.

2              In one year," and there is a citation to a

3              study, "in five years," and another citation,

4              "or over the lifetime," and a third citation,

5              "rather than using a more complex matrix that

6              assessed identity and attraction in addition

7              to sexual behavior," and another citation.

8              "The problem of measurement could have

9              increased potential error due to

10             misclassification which, in turn, could have

11             led to selection bias."

12             Does that refresh your recollections?

13  **A.**    Yes.  I don't know if I'm referring here to a particular

14  group or study, but let me just say that if this is true about

15  all the studies that I use, but it may be.  But in general,

16  this is true the way you described it.

17             There have been studies of this nature that use not

18  just this one thing, but they all use a selected measure that

19  they find the most relevant to their purpose.

20             So I just can't confirm that all of the ones here --

21  I would actually be surprised if they all used this exact same

22  measure, but --

23  **Q.**    Well, just answer that -- I'm sorry.  Go ahead.

24  **A.**    Basically, the main point that they do not use the more

25  complex ways of measuring that I agree with.

1  **Q.**   Thank you.

2         And these population studies also suffer because they

3  included a very small number of LGB people, correct?

4  **A.**   Correct.  But let me just say, this is why I conducted the

5  meta-analysis, which allows you to, in a sense, increase your

6  sample because you are then aggregating all of them.

7         But, on the other hand, you are limited by some --

8  maybe some comparisons that you might want to do.  But to

9  conduct the meta-analysis I aggregated them to overcome this

10 problem of small sample sizes.

11 **Q.**   And, please, look at page 688, if you would.  And starting

12 at the middle of the carryover paragraph, as you see it on 688,

13 you write:

14         "My use of a meta-analytic technique to

15         estimate combined ORs somewhat corrects this

16         deficiency, but it is important to remember

17         that a meta-analysis cannot overcome problems

18         on the studies in which it is based."

19         Correct?

20 **A.**   It cannot overcome all the problems, but in this

21 particular example that you used, it certainly overcomes the

22 problem of the sample size.  That's because you are adding all

23 of those sample together.

24         But as I said, there is no method that is like a

25 hundred percent perfect, but it specifically overcomes the

1   problem of both sample size and, also, what we call sampling

2   error.  So that if you just rely on one sample, you might have

3   some specific biases connected with that; but if you aggregate,

4   you know, five samples, then that error will get lost within

5   that bigger number of studies.  So that's what it does.

6        But it certainly doesn't, for example, overcome the

7   issue of measurement because they all -- you know, you can't

8   change the measures that they use.  So it depends on what, you

9   know, you are talking about.

10  **Q.**   So it may overcome sample size, but it wouldn't overcome a

11  lack of precision in the definition of LGB individuals,

12  correct?

13  **A.**   I didn't say there was a lack of precision.  But if there

14  were a lack of precision -- I said they didn't use as a -- the

15  measure that they did use could have been precise, but they

16  didn't use a more complex measure.

17       But it wouldn't overcome measurement -- we call it

18  measurement error, although it would help, because of that

19  question -- because of that issue that I just said related to

20  sampling error.

21       So, again, the best way to explain it is that when

22  you take -- even if one study has an error and maybe another

23  one has another error, when you aggregate them all together,

24  they all part of it; but the larger pattern that you see will

25  emerge despite different errors that will get -- they are much

1  better than if you just relied on the one study with the error

2  or with the bias.

3  Q.   But still a meta-analysis cannot overcome all the problems

4  in the study on which it's based, correct?

5  A.   No.

6  Q.   And it's important to interpret results of a meta-analyses

7  with caution on the critical perspective, correct?

8  A.   Absolutely, yeah.

9  Q.   All right.  And in this 2003 study, you described your

10  conclusions as:

11            "Inconsistent with research and theoretical

12            writings that can be described as a minority

13            resilience hypothesis which claims that

14            stigma does not negatively affect

15            self-esteem."

16            Correct?

17  A.   Yes.

18  Q.   And you described your conclusions as:

19            "Inconsistent with studies that showed that

20            blacks do not have a higher prevalence of

21            mental disorders than whites as expected by

22            minority stress formulations."

23            Correct?

24  A.   Yes.

25  Q.   You stated:

1            "Further research must address this apparent

2            contradiction."

3            Correct?

4   **A.**    Yes.

5   **Q.**    And please look at 688 again.  I guess if you are still

6   there, that would be great.

7   **A.**    Yes.

8   **Q.**    You write:

9            "One problem which can provide a plausible

10           alternative explanation for the findings

11           about prevalences of mental disorders in LGB

12           individuals is that bias related to cultural

13           differences between LGB and heterosexual

14           persons inflates reports about history of

15           mental health symptoms.  It is plausible that

16           cultural differences between LGB and

17           heterosexual individuals cause a response

18           bias that led to overestimation of mental

19           disorders among LGB individuals.  This would

20           happen if, for example, LGB individuals were

21           more likely to report mental health problems

22           than heterosexual individuals."

23           And then your article goes on to identify several

24   reasons why LGB individuals might be more likely to report

25   mental health problems than heterosexual individuals, correct?

1  A.    Yes.   That is one of the possible limitations in the sense

2  that, you know, we look at -- as I said earlier when I

3  described the methodology of working on studies, we look at all

4  kinds of potential explanations and try to address them, assess

5  whether or not they are feasible, whether or not they threaten

6  the conclusion and so forth.   So this is one of the things I

7  considered in looking at this evidence.

8  Q.    And you found -- and you said in your study that:

9          "To the extent that such a response bias

10          exists, it would have led researchers to

11          overestimate the prevalence of mental

12          disorders in LGB groups."

13          Correct?

14  A.    To the extent that it exists, it would.

15  Q.    And, all right.   In his expert report Professor Herek

16  wrote:

17          "In addition, lesbian, gay, bisexual people

18          face other stressors.   For example, because

19          the Aids epidemic has had a disproportionate

20          impact on the gay male community in the

21          United States, many gay and bisexual men have

22          experienced the loss of a life partner, and

23          gay, lesbian and bisexual people alike have

24          experienced extensive losses in their

25          personal social networks resulting from the

```
 1                    death of close friends and acquaintances.
 2                    Treatment related to multiple losses is
 3                    linked to higher levels of depressive
 4                    symptoms."
 5               Do you agree with that statement?
 6          MR. DUSSEAULT:  Your Honor, could I ask for a
 7  citation and page?
 8          MR. NIELSON:  It's Paragraph 31, note 13 of the Herek
 9  report.  That's at tab two, if you would like to look at that.
10  And it's on --
11  A.   I'm sorry.  What page?
12  BY MR. NIELSON:
13  Q.   Tab two, it's and it's Paragraph 31.
14  A.   Okay.
15  Q.   It appears to be on -- starts at the bottom of page 10.
16  It's in the footnote.  If you would like to look at that, I
17  read it.  I won't ask you to read it aloud, but if you just
18  look at what he writes in that footnote.
19  A.   Which footnote?
20  Q.   13.  It starts at the bottom of page 10.
21  A.   You want me to read what it says?
22  Q.   Just to yourself.
23  A.   Oh, okay.
24  Q.   My question is:  Do you agree with that statement?  I
25  already read --
```

1  **A.**   Yes.  He's actually referring to something that I wrote

2  apparently, yes.

3  **Q.**   Okay.  Thank you.

4       **MR. NIELSON:**  Your Honor, I still have a fair amount

5  of material.  Do you want me to continue?

6       **THE COURT:**  Keep plowing.

7       **MR. NIELSON:**  Yes, sir.  Yes, your Honor.

8  **BY MR. NIELSON:**

9  **Q.**   Please turn to tab 13 in the witness binder, Professor

10 Meyer.

11 **A.**   Yes.

12       (Witness complied.)

13 **Q.**   You will see a document pre-marked DIX-1249.

14 **A.**   Yes.

15 **Q.**   Can you identify that document?

16 **A.**   That's another article that I wrote, which was published

17 last year in 2009 in a journal that's called *Journal of*

18 *Counseling Psychology*.

19 **Q.**   Thank you.

20       **MR. NIELSON:**  And, your Honor, we had a slight

21 technical difficulty with this document.  The PDF version that

22 we provided plaintiffs and, perhaps, the Court inadvertently

23 had an exhibit stamp on each page and so that obscured some of

24 the words.

25       We have corrected that problem in this hard copy, and

1   we can provide corrected PDFs to the plaintiffs and the Court,

2   if that's necessary.

3           THE COURT:  The copy in my binder looks fine.

4           MR. NIELSON:  The hard copy is correct.  The PDF, I

5   believe, had the exhibit stamp on every page.

6           THE COURT:  All right.  Well, why don't you correct

7   that?

8           MR. NIELSON:  We will take care of that, but I assume

9   there is no prejudice since the citation was evident and

10  Professor Meyer wrote it.

11          And I would like to move that into evidence,

12  DIX-1249, the version without the exhibit stamps on every page.

13          THE COURT:  Fine.

14          MR. NIELSON:  Thank you.

15          THE COURT:  1249 is admitted.

16          (Defendants' Exhibit 1249 received in evidence.)

17  BY MR. NIELSON:

18  Q.   Please look at page 23, Professor Meyer.

19  A.   Yes.

20  Q.   You write:

21          "But here lies the first problem for

22          researchers of LGB populations.  The

23          population's definition is elusive."

24          So defining the LGB population as a potential

25  methodological problem in comparing mental health outcomes of

1   LGB individuals to mental health outcomes of non-LGB

2   individuals, correct?

3   **A.**   Where is it?  I assume that it is correct.

4   **Q.**   Well, that last question I didn't read from your report.

5   So if you disagree with it, let me know.

6         You wrote that:

7         "Here lies the first problem for researchers

8         of LGB populations."

9   **A.**   Where is that?

10  **Q.**   I'm sorry.  It's page 23, the second column, the bottom

11  paragraph, about the middle.  It's a carryover paragraph.

12  **A.**   Okay.

13  **Q.**   You write:

14        "But here lies the first problem for

15        researchers of LGB populations.  The

16        population's definition is elusive."

17        And then I asked you this question:  Is defining the

18  LGB population a potential methodological problem in comparing

19  rates -- or comparing mental health outcomes of LGB individuals

20  to mental health outcomes of non-LGB individuals?

21  **A.**   Is it...

22  **Q.**   A potential methodological problem?

23  **A.**   I'm not sure what you mean, what kind of problem.  As I

24  said, in this article defining the population, regardless of

25  LGB or any population, is the first step in conducting a study.

1  And any study faces the challenge of definition of the

2  population because if you want to sample, you cannot -- you

3  know, you have to know who it is that you are sampling from,

4  and there is a variety of steps that one takes in doing this.

5          This is nothing specific to LGB populations, and some

6  of the quotes I use here are just methodological issues.

7          So when you say it causes a problem, I don't exactly

8  see that as a problem.  I see it as just, this is part of what

9  we do when we design a study.  We --

10  **Q.**   Okay.

11  **A.**   -- look through all of those issues.

12  **Q.**   My question was whether it causes a -- raises a potential

13  problem.

14  **A.**   You know, I can come up with scenarios, I guess, but I

15  cannot answer that question in that generic form.  I would have

16  to see what exactly we're talking about.

17          It doesn't create a problem in principle, the fact

18  that we have questions of definition.  As I said, all studies

19  start with questions of definition.  So that fact doesn't

20  create a problem.

21  **Q.**   Now, in the article we were just looking at you noted that

22  the population-based studies, one of the methodological

23  problems they suffered from was that they did not use a

24  sophisticated definition of the LGB population, correct?

25  **A.**   That's not exactly how I said it.  What I said is that

1  they used a -- that's, perhaps, a limitation that they used one

2  type of a definition, but I -- I mean, obviously, I didn't

3  think that there was that great of a problem and, obviously,

4  the reviews of this journal didn't think it was that great of a

5  problem, and the people who quote it -- you know, it's not --

6  you are trying to suggest that it's some big problem.  It's

7  not.

8  **Q.**  Well, I would like to explore that based on what you wrote

9  in this article.

10        As you said in the first line, "The population's

11  definition is elusive," correct?

12  **A.**  The population definition is elusive in every study.  This

13  is one of the greatest sampling methodologies.  Sudman devotes

14  a lot of effort to try to address that and I quoted it here.

15        As I said, this is the first step of trying to

16  establish a study.  If I wanted to study men, I would have to

17  define what age group, is there any particular residence that

18  I'm interested in or a region of the country.

19        This is just basic survey methodology.  This is the

20  first step you have to define.  And it is -- it is challenging,

21  you know.  If you are interested in issues related to birth

22  problems, are you going to study women of a particular age who

23  are -- you know, so those are just normal things.

24        What is a Latino?  Do you include Mexicans or do you

25  include Puerto Ricans?  This is what I'm talking about, that

Case 3:09-cv-02292-VRW   Document 421   Filed 01/25/10   Page 148 of 185

1  this is the issue that sampling methodologies confront as they

2  design a study.  And this is the first step, is to define a

3  population, which we call the general population.  Then you

4  define the sampling population, which is a more specific

5  definition of where you want to sample from.  And there's

6  further problems and issues of definition.

7  **Q.**  Let's talk about the first question you said, the general

8  sample, not specific sample for LGB individuals.

9       Is there a correct definition of the general LGB

10  population?

11  **A.**  Is there one correct definition?  As I explained in this

12  article, the definition depends on your purpose in the

13  research.  So just as there is no correct definition of Latino,

14  there is no correct or one correct -- it is correct if it is

15  responsive to the research questions that you are trying to

16  answer.

17       So it is only correct in that sense that, did you do

18  a good job in defining the population so that you are getting

19  at the population that you intending to study?  You know, we

20  talk about the kind of theoretical population and the actual

21  population.  So it is correct only in the sense that you

22  correctly sample the population of intention.

23       So if I wanted to study last Latinos and I defined it

24  as Mexicans and Puerto Ricans, there is nothing incorrect about

25  it because I didn't include another Latino group, if that's

1    what I was interested in.

2            So in the same sense here, there is a variety of ways

3    that you can measure what we are calling here in a general way

4    LGB.  So, for example, you might want to measure the behavior

5    as the only thing that you are interested in, in which case

6    that will be a correct thing, if it makes sense for your

7    purpose.

8    **Q.**   Okay.  So I want to ask you two "yes" or "no" questions,

9    if it's possible.

10           First, there is no one correct definition of the LGB

11   population, correct?

12   **A.**   For the purpose of particular research.

13   **Q.**   Okay.  Second, definitions of sexual minorities vary,

14   correct?

15   **A.**    All definitions, by definition, vary.  If you are

16   talking about definitions, they vary.

17   **Q.**   Let's be more concrete.  Let's look at page 24, the first

18   full paragraph.  You write -- and this is starting with the

19   second -- yes, the second sentence of the first full paragraph

20   in the first column on page 24.

21           You write:

22           "Researchers have distinguished among sexual

23           identity, sexual behavior and attraction.

24           Although these overlap -- that is, a person

25           who is attracted to same-sex individuals may

1              also have sex with same-sex individuals --

2              this overlap is not great.  Only among

3              15 percent of women and 24 percent of men do

4              the three categories overlap."

5  **A.**   In this particular study that I quoted, yes.

6  **Q.**   So we have three partially, but only partially overlapping

7  concepts that have been used by researchers to define the LGB

8  population; sexual identity, sexual behavior and attraction,

9  correct?

10 **A.**   Again, they might have used just one of them or they might

11 have used more.  So those are three ways of defining that

12 people have used in the field, yes.

13 **Q.**   And some researchers may use a combination of those,

14 correct?

15 **A.**   Exactly.

16 **Q.**   All right.  And let's break this down.  First of all,

17 sexual identity.  Identity labels -- and even whether a person

18 uses an LGB identity label at all -- vary across generations,

19 racial ethnic groups, geographical regions, education levels

20 and other group characteristics, correct?

21 **A.**   Yes.

22 **Q.**   Not all LGB individuals define themselves as LGB until

23 some developmental tasks along the coming-out process have been

24 achieved, correct?

25 **A.**   Yes.

1  Q.   This means that at any point some people who answer
2  truthfully that they are not LGB will, at a later point, define
3  themselves as LGB, correct?
4  A.   Yes, exactly, because they haven't yet -- I referred
5  before to the coming-out process.
6       So at some point you might talk to a person and they
7  would either hide it or have not yet defined themselves like
8  that, and that they would truthfully answer no to the question.
9  Q.   Thank you.
10      And, furthermore, because of cultural diversity, some
11  people who engage in same-sex behavior, who may be considered
12  by others as sexual minorities and who may be of interest to
13  the researcher, would not identify themselves as LGB, nor
14  consider themselves a sexual minority by any name, regardless
15  of the researcher's definition, correct?
16  A.   Yes.
17  Q.   So it's possible that the same individual may honestly
18  give different answers when asked about his or her sexual
19  identity at different times in his life, correct?
20  A.   Yes.
21  Q.   And it's possible that an individual who engages in
22  same-sex behavior may honestly not identify himself or herself
23  as LGB, correct?
24  A.   Yes.
25  Q.   And both of these -- well, that assumes -- both of those

 1  questions assume that an individual gives an honest answer when

 2  asked his or her sexual identity, but it's also possible that

 3  some individuals will not give an honest answer to that

 4  question, correct?

 5  **A.**  Obviously, that's possible, that people would not give an

 6  honest answer.

 7  **Q.**  And, in fact, for LGB individuals, there may be particular

 8  reasons why they would -- might be reluctant to answer that

 9  question, correct?

10  **A.**  Yes.  As I described before, concealing would be that --

11  what I would refer to that.

12  **Q.**  Thank you.

13       Let's turn next to sexual behavior.  Behavior --

14  behavioral definitions also vary, correct?

15  **A.**  Behavioral definitions of what?

16  **Q.**  Of sexual orientation.

17  **A.**  I'm not sure what you -- I guess they could differ in this

18  time frame that people might have looked at, yes.

19  **Q.**  Yes.  So they could look at different time periods,

20  correct?

21  **A.**  Right.

22  **Q.**  All right.  And because more people have same-sex sex in

23  adolescence, defining sexual orientation as "sexual behavior

24  ever" includes more people than defining it in the past year,

25  correct?

**A.**    Right.  But that will be true for anything.  If you look

at "ever," you get more.

**Q.**    For example, you could ask someone whether they were

African-American ever or African-American in the last year?

**A.**    That would actually -- that is a very interesting

phenomenon, but that is also possible.

African-American is an identity, so the identity part

of it could vary and, in fact, it does vary.

People who move into the United States, for example,

who are by our definition African-Americans may not describe

themselves as African-American or even black.

And there are studies that show that people who come,

for example, from the Caribbean who are dark colored, their

parents don't describe themselves as black, but their

offsprings after being educated in the United States and

socialized do.

So it -- definitions always vary.  Certainly, with

African-Americans, the term itself is relatively recent.  Black

was used before that.  And Negro was used even before that.

Senator Reid got into trouble for using that term.

So those identities change and they are responsive to

the social context in many different ways, but -- obviously,

the population itself doesn't change, but how people refer to

themselves might change.

**Q.**    Okay.  But for LGB individuals, the variance in the time

1    period you are looking at can lead to significantly different

2    estimates, correct, of the population?

3    **A.**    As I said, again, that is true for anything.  We always

4    look at lifetime, for example, versus one year.  So if you look

5    at the one-year rate of a disorder, it will be a lot less than

6    a lifetime.

7    **Q.**    Thank you.

8            Now, there are also different ways in which a

9    definition of sexual orientation that focuses on attraction

10   might vary, correct?

11   **A.**    Yes.

12   **Q.**    All right.  Now the size of the LGB population might vary

13   a great deal depending on how sexual orientation is defined,

14   correct?

15   **A.**    Right.

16   **Q.**    Thank you.

17           And please look at tab 12 in the witness binder.  You

18   will find an Exhibit pre-marked DIX-1248.

19           (Witness complied.)

20   **A.**    Wait, I'm sorry.  Oh, 1248, yes.

21   **Q.**    And can you identify this document?

22   **A.**    Umm --

23   **Q.**    I apologize.  It doesn't have a cover sheet.  It's an

24   article you wrote with Laura Dean and others entitled "Lesbian,

25   Gay, Bisexual and Transgender Health Findings and Concerns"

1 | that was published in the *Journal of Gay and Lesbian Medical*

2 | *Association*.  Is that the document?

3 | **A.**   Yes.  That is -- that is actually a report that tries to

4 | summarize some of the findings, health findings.

5 |          **MR. NIELSON:**  And I believe this is also PX 1004,

6 | which I believe is in evidence.

7 |          **THE COURT:**  I can check that.

8 |          **MR. NIELSON:**  Could I ask the Court to confirm that

9 | that is Laura Dean, Meyer findings in the "Lesbian, Gay,

10 | Bisexual and Transgender Health Findings and Concerns"?

11 |          **MR. DUSSEAULT:**  Correct.

12 |          **MR. NIELSON:**  Okay.  So that's in evidence.

13 | **BY MR. NIELSON:**

14 | **Q.**   All right.  Please look at page 135 in the exhibit.  It's

15 | a lengthy exhibit.  And that's towards the -- not quite the

16 | end, but towards the end.

17 | **A.**   Yes.

18 |          (Witness complied.)

19 | **Q.**   And in the second full paragraph in the second column you

20 | write:

21 |              "Recent national studies estimating the

22 |              percentage of the population that falls into

23 |              each of the three broad dimensions of

24 |              identity, behavior and attraction show that

25 |              one to four percent of the population

1          identifies as lesbian or gay, two to

2          six percent of the population reports some

3          same-sex behavior in the previous five years,

4          and up to 21 percent of the population

5          reports same-sex attraction at least once in

6          adulthood."

7          And I will skip the citations.

8          And then you go on to say:

9          "Therefore, depending upon how it is defined

10         and measured, 1 to 21 percent of the

11         population could be classified as lesbian or

12         gay to some degree with the remainder

13         classified as bisexual or heterosexual to

14         some degree."

15         Correct?

16  **A.**    If that's what it says here.  And, obviously, again,

17  depending -- you can -- depending on the definition that you

18  use for the finding of population, you will get different

19  rates.  If it's more expansive, inclusive, then you will get a

20  high rate than if it is less expansive and inclusive.

21  **Q.**    Now, 1 to 21 percent seems like a great deal of variance.

22  **A.**    I don't think anybody would say that attraction is a true

23  measure of LGB, what we are talking about.

24         So I think one of the things is when you -- when you

25  measure things, you realize that it is not exactly the way you

1  think it is.

2         So attraction is a very, very fluid thing in the

3  sense that, for example, I -- a woman tends to have less

4  inhibitions about saying, oh, this other person is attractive.

5  That doesn't make her a lesbian because she said that.  So

6  that's why I'm saying, it's a definitional thing.

7         For me, in my studies, I use identity, which is the

8  standard that we use in the U.S. census, for example -- not in

9  LGB, which is not measured, but, let's say, on race.  So, you

10 know, those things are the same issues in measuring any kind of

11 group's identity.

12        If you wanted to, for example, measure race by skin

13 tone, you will find that you will have a huge number of people

14 who maybe have a darker skin tone, but are not identified as

15 black.

16        So to me, the attraction -- personally, as a

17 researcher, I don't use the attraction definition because I

18 find it very broad.  And I use the identity when I am

19 interested in issues, such as the ones we discussed today; but

20 I might use behavior if I'm interested, for example, in

21 HIV-related risk.

22        So every researcher uses definition based on the

23 purpose of their study or survey or whatever it is.

24 **Q.**   Okay, thank you.

25        **MR. NIELSON:**  And, your Honor, I had more

1  methodological questions, but I'm going to skip ahead.  I think

2  we have dwelled on that long enough.

3          **MR. DUSSEAULT:**  Your Honor, may I raise one issue,

4  just simply to note we have not had a chance to look at 1004.

5  And while it is Meyer and Dean, it's not the same article as

6  Defendants' 1248.  We don't have an objection to Defendants'

7  1248, but we didn't want the record to reflect they were the

8  same.

9          **MR. NIELSON:**  Thank you for -- I appreciate that

10  clarification.

11          And, your Honor, I would move DIX-1248 into evidence

12  then.

13          **THE COURT:**  Very well.  So admitted.

14          (Defendants' Exhibit 1248 received in evidence.)

15          **MR. NIELSON:**  Thank you.

16  **BY MR. NIELSON:**

17  **Q.**  Now, Professor Meyer, it's your opinion that limiting

18  marriage to opposite-sex couples causes minority stress for LGB

19  individuals, correct?

20  **A.**  That limiting -- can you repeat?

21  **Q.**  Yes.  Now, it is your opinion that limiting marriage to

22  opposite-sex couples causes minority stress for LGB

23  individuals, correct?

24  **A.**  Yes, as I described earlier.

25  **Q.**  And it's your opinion that minority stress causes a higher

1  prevalence of mental disorders, a higher prevalence of certain

2  symptoms of distress that don't rise to the level of formal

3  disorders; including mood, anxiety and substance use problems,

4  lower levels of well-being and higher incidents of suicide

5  attempts, correct?

6  **A.**   Correct.

7  **Q.**   Now, does limiting marriage to opposite-sex couples cause

8  minority stress for all gays and lesbians or only for lesbians

9  or gay couples who wish to marry?

10 **A.**   I would say all, because of -- as I explained earlier, it

11 is the message you send.

12        So you can think about the event of marriage in a

13 sense and say, well, this would only affect those people who

14 want to marry.  But the message that I described earlier of

15 rejection or disapproval, clearly applies to all gay people.

16 So they would all -- you know, I can't predict what every

17 single person that sees this, but there would be something that

18 affects the rest of the social environment regardless if you

19 are personally interested in getting married.

20        It is the message, in this case in the constitutional

21 amendment, that demonstrates -- that is of interest, or the

22 meaning as I said before, the social meaning.

23 **Q.**   So it affects all of them and not just those, not -- all

24 LGB and not just those wishing to marry, correct?

25 **A.**   It has the potential to effect -- you know, I never said

1    that -- minority stress doesn't affect of single person in the

2    same way.  It is a potential.

3  Q.    Thank you for that clarification.

4          Are you aware that same-sex marriage has been legal

5    since 2004 in Massachusetts?

6  A.    Yes.

7  Q.    Do LGB individuals suffer from a lower prevalence of

8    mental health disorders in Massachusetts than in California?

9  A.    Well, the first answer is I don't really know, but that's

10   now how I -- I wouldn't expect it exactly in that way that you

11   are suggesting; that that would be the test of that, because

12   Massachusetts is not, you know, an isolate in the United States

13   and, you know, it would be more complicated for me to assess.

14         So that alone would not change everything.  So it's

15   just one aspect of it.  And, certainly, I would think that

16   people in Massachusetts who are gay would feel more supported

17   and welcome, so to speak.  So in that sense, it would reduce

18   the stress that they have somewhat.

19  Q.    But your answer is you don't know, correct?

20  A.    Well, I don't -- I don't have the data on that.

21  Q.    You don't have data?

22  A.    Right.

23  Q.    Okay.  Thank you.

24         Do LGB individuals suffer from a lower prevalence of

25   mood, anxiety and substance use problems that do not meet the

1  criteria for formal psychiatric disorders in Massachusetts and

2  in California?

3  **A.**   Again, the study wasn't done in the way that you are

4  describing it, although a study was done looking at states

5  where there's greater rights for gay and lesbian people, and it

6  did show those things that you are alluding to.

7            So it wasn't exactly done in the way that you are

8  saying.  It wasn't Massachusetts versus California.  But in

9  general in the United States states that offer more

10 protections, gay and lesbian populations there fare better than

11 in states that do not offer such protections.

12           So to the extent that you can use that as a

13 suggestion that it does have this effect that you are alluding

14 to, but I don't know of a study that compared California to

15 Massachusetts on any of those outcomes.

16 **Q.**   Okay.  And I was planning to ask you about the other

17 outcomes, but the answer would be the same?

18 **A.**   Right.  I don't know of a study that tested it either way.

19 **Q.**   Thank you.

20           Are you aware that same-sex marriage has been legal

21 since 2001 in the Netherlands?

22 **A.**   I am going to believe you on that.  I'm aware that it's

23 legal.

24 **Q.**   I will represent to you that it was.

25 **A.**   Okay.

1   Q.   Do LGB individuals suffer from a lower prevalence of

2   mental disorders in the Netherlands than in California?

3   A.   I -- I actually don't know the answer to that, although

4   there are studies that -- I don't know the answer to that.

5   Q.   Would your answer be the same if I asked about the other

6   outcomes you identified?

7   A.   Right.  I don't -- I don't know the comparison.  Honestly,

8   I don't know that I can tell you the rates of all the disorders

9   specifically to California, so I couldn't compare them.

10          Most of the studies that I relied on were national

11   studies that were not separated by state.

12   Q.   Okay.  Thank you.

13          Now, you are aware that California allows same-sex

14   couples to register as domestic partners, correct?

15   A.   Yes, I've learned that.

16   Q.   And you believe that, quote, domestic partnership has

17   almost no meaning, and, to some extent, it's incomprehensible

18   to people as a social institution, correct?

19   A.   Yes.

20   Q.   And I apologize, I said "quote."  That's -- that was from

21   your deposition?

22   A.   Correct.

23   Q.   And for opposing counsel's benefit, I'll identify that as

24   the transcript at page 80, 9 to 11.

25   A.   I believe I talked about it today, as well.

1   Q.   Yes.  And you believe that domestic partnership reduces

2   the value of same-sex intimate relationships, correct?

3   A.   Reduces -- yes.

4   Q.   Okay.  And if domestic partnership and marriage were both

5   available to same-sex couples, you think they would probably

6   not choose domestic partnership, correct?

7   A.   I would think that.

8            THE COURT:  How are you doing on time, Mr. Nielson?

9            MR. NIELSON:  Fifteen minutes?

10           THE COURT:  All right.

11           MR. NIELSON:  I'll try.  That may be slightly

12  optimistic, but I'm cutting a lot of -- I'm trying to cut a lot

13  of chaff from the wheat.

14           THE COURT:  The longer we talk, the less wheat

15  that's ...

16  BY MR. NIELSON:

17  Q.   Please turn to page -- or tab 14 in the witness binder.

18           I'm going to represent to you that this is a

19  California statute governing domestic partnerships.

20  A.   Okay.

21  Q.   And I'm going to read you part of this.  And we could read

22  it all, but I am not going to read it all.

23           If you look at section A, it says:

24           "Registered domestic partners shall have the

25           same rights, protections, and benefits, and

```
1                      shall be subject to the same
2                      responsibilities, obligations and duties
3                      under law, whether they derive from statutes,
4                      administrative regulations, court rules,
5                      government policies, common law, or any other
6                      provisions or sources of law as are granted
7                      to and imposed upon spouses."
8               Were you aware that California law treated domestic
9  partners in this manner?
10 A.   I'm not aware of all of the legal issues around it, but I
11 was aware that it is at least approximate in the same rights
12 and benefits.
13              But, as I said, I wasn't in my testimony or in my
14 reports talking about those benefits and rights.  I was talking
15 about the social meaning and the social message that marriage
16 conveys.  So I wasn't studying that particular aspect of the --
17 Q.   So that does not, in any way, change the opinions that
18 you've offered in the case?
19 A.   No.  It certainly is a good thing that they offer
20 benefits, but I'm just saying that's not what I was focusing
21 on.  My focus is on the social meaning, the social place of
22 that --
23 Q.   You --
24 A.   -- of marriage.
25 Q.   I'm sorry.  Are you complete?
```

1  **A.**   I'm sorry.

2  **Q.**   Do you believe that domestic partnerships stigmatize gay

3  and lesbian individuals?

4        **THE COURT:**  I'm sorry, what was the question?

5  **BY MR. NIELSON:**

6  **Q.**   Do you believe that domestic partnerships stigmatize gay

7  and lesbian individuals?

8  **A.**   Yes.

9  **Q.**   Okay.  Please look at tab 15 in the witness binder.

10       You will see a document premarked DIX1067.  And, as

11 you can see, it's a letter from California Assembly Member

12 Jackie Goldberg.  And, as you can see, it concerns legislation

13 titled "AB205."

14 **A.**   I'm going to take your word on that.

15 **Q.**   And if you look at the heading under it, it says:

16            "AB205 will provide registered domestic

17            partners with a number of significant new

18            rights, benefits, responsibilities and

19            obligations."

20       And I'm going to represent to you that this -- that

21 AB205 was enacted into law, and the principal portion of that

22 law as amended was the statute we were just looking at.

23 **A.**   Okay.

24 **Q.**   Okay.  Please turn to the last page of the exhibit.  And

25 please look at the italics, the italicized statement about two

1  and a half inches up from the bottom of the page.

2  **A.**     Uh-huh.  Yes.

3  **Q.**     It says:

4              "This bill is sponsored by Equality

5              California.  Other advocacy organizations

6              that collaborated on the drafting of this

7              bill included Lambda Legal Defense and

8              Education Fund, National Center for Lesbian

9              Rights, and ACLU."

10 **A.**     Yes.

11 **Q.**     Are you familiar with Equality California?

12 **A.**     Yes.  I believe they are the organization that opposed

13 Proposition 8.

14 **Q.**     Right.  And, in fact, you contributed money to the

15 Equality California's No On 8 campaign, correct?

16 **A.**     I should become familiar with them.

17              (Laughter)

18 **Q.**     Do you believe Equality California would sponsor

19 legislation that stigmatizes LGB individuals?

20 **A.**     Do I believe that they intend to stigmatize?  No.

21              But I think that that doesn't change my answer to the

22 question about domestic partnership.  So whatever their

23 intention was, I'm sure, to better the lives of gay and lesbian

24 individuals in California, but, nonetheless, having a second

25 type of an institution that is clearly not the one that is

1   desired by most people is stigmatizing.

2   **Q.**   All right.  And if I were to ask you the same question

3   about the involvement of Lambda Legal Defense and Education

4   Fund, National Center for Lesbian Rights, and the ACLU, your

5   answer would be the same, correct?

6   **A.**   Exactly.

7   **Q.**   All right.  Thank you.

8            **MR. NIELSON:**  Your Honor, I would like to move

9   DIX1067 into evidence.

10           **MR. DUSSEAULT:**  No objection.

11           **THE COURT:**  Very well, 1067 is in.

12           (Defendants' Exhibit 1067 received in evidence.)

13  **BY MR. NIELSON:**

14  **Q.**   I'd like to direct your attention to tab 18.  You'll find

15  a document premarked DIX1020.  Can you identify this document?

16  **A.**   I got it.

17           I don't believe I've seen it before.  It says,

18  "Article Proposition 8 and the future of American Same-Sex

19  Marriage Activism."  But I have not read it before, I believe.

20  **Q.**   And who is the author?

21  **A.**   Jeffrey Redding.

22  **Q.**   Are you familiar with Jeffrey Redding?

23  **A.**   No.  I -- I don't think so.  I don't remember the name.

24  **Q.**   All right.  I'm going to -- I won't question you about

25  that document then.

```
 1          Have you done any research to determine whether,

 2   since it adopted AB205 -- and that's this bill we were just

 3   talking about -- LGB individuals in California suffer from

 4   worse mental health outcomes than LGB individuals in any

 5   jurisdiction that recognizes same-sex relationships as

 6   marriages?
```

**A.**   No.

**Q.**   Okay.  Now, at your deposition -- I would like you to turn

to -- you made a statement, and I want to confirm that it was,

in fact, a statement that you made.  And it's -- turn to tab 7,

if you would.  That's a transcript of your deposition.  And

look at page 149.  And the pages are a little confusing.

There's four on each page.

**A.**   That's okay.

**Q.**   And it's actually page 38 in the continuous pagination at

the bottom, if that's helpful.

**A.**   I got it.

          **MR. DUSSEAULT:**  Your Honor, I'd object if it's not

being offered to impeach anything.

          **THE COURT:**  Why are you offering it?

          **MR. NIELSON:**  I was going to ask him whether he

agreed with it.  Perhaps I should ask him whether he agreed

with it, first.  And then if he doesn't --

          **THE COURT:**  Why don't you ask him the statement --

          **MR. NIELSON:**  Yes, exactly.

Case 3:09-cv-02292-VAWHO Document 1431 Filed 01/29/121 Page 306 of 185

1          **THE COURT:**  -- without referring to the deposition.

2          **MR. NIELSON:**  Right.

3     **BY MR. NIELSON:**

4     **Q.**  When you speak of a gay and lesbian person whose intimate

5     relationship has not been granted societal approval, would that

6     include gays and lesbians who are in a domestic partnership?

7     **A.**   Yes, in the same sense that I discussed earlier, about the

8     social meaning of marriage versus domestic partnership.

9     **Q.**   Okay.  Now, let's look at the deposition transcript.  It's

10    lines -- page 149, line 16 through 20.  And you can continue

11    past that, if you need to, for context.

12         Could you -- you don't need to read it aloud, but

13    could you read that and tell me whether you gave that testimony

14    at your deposition.

15    **A.**   Did I give this --

16    **Q.**   Did you say this at your deposition?

17    **A.**   I don't have an independent recollection, but I read it

18    here and I presume that's correct.

19    **Q.**   Okay.  And the statement -- the answer you gave to the

20    question today was "yes."

21         And the answer at your deposition was:

22              "No.  I describe here -- when I talk about

23              these unions in the sense of the impact on

24              stigma, I'm really not considering domestic

25              partners, domestic partnership.  And,

1              admittedly, they have many benefits,

2              including maybe something that you were

3              referring to just recently.  But in terms of

4              the impact that I'm referring to here, I

5              wasn't talking about domestic partnerships."

6         And, as you said, you have no reason to think that

7    you didn't give that testimony, correct?

8    **A.**    Right.  But I'm really not sure what the context of this

9    is and what -- what we were talking about before, so I don't

10   know that it is replicating the question that I just agreed to.

11        But my answer is that, you know, what I just told you

12   is what I still believe.  I don't know that that necessarily in

13   any way contradicts that.

14        **MR. DUSSEAULT:**  Your Honor, if it's being offered for

15   impeachment, could I add additional language in the interest of

16   the rule of completeness?

17        **THE COURT:**  Very well.

18        **MR. DUSSEAULT:**  I'll just read it in, so it's part of

19   the record, as well.  This is from page 153, starting at line

20   3.

21             **"QUESTION:**  Perhaps domestic partnership is

22             confusing and not well understood.  Does it

23             minimize the significance of the

24             relationship?

25             **"ANSWER:**  Yes, because, as I explained

1          before, domestic partnership is compared with

2          marriage.  It refers to a similar thing.  It

3          refers to a couple being together, let's say

4          to a union.  And, therefore, when you use

5          'domestic partners,' an obvious comparison

6          would be with marriage.  Now, in this case or

7          in any case, really, domestic partnership is

8          offered clearly as a secondary option, not as

9          the most desirable option."

10         **THE COURT:**  Very well.  Shall we move on,

11    Mr. Nielson?

12         **MR. NIELSON:**  Yes, we shall.

13    **BY MR. NIELSON:**

14    **Q.**   Professor Meyer, you believe that laws are perhaps the

15    strongest of social structures that uphold and enforce stigma,

16    correct?

17    **A.**   Yes.  I believe I wrote that.

18    **Q.**   Yes.  As we've discussed, California recognizes same-sex

19    relationships as domestic partnerships with essentially all the

20    rights of marriage, correct?

21    **A.**   Yes, I have to -- again, I have no knowledge of the law,

22    specifically, but I understand that that's the case.

23    **Q.**   Are you aware that California law prohibits discrimination

24    on the basis of sexual orientation in housing?

25    **A.**   I'll take your word for that.  I think I know that, but...

1   Q.   Are you aware that California law prohibits discrimination

2   on the basis of sexual orientation in businesses' provisions of

3   services?

4   A.   Again, I'm not independently aware, necessarily, of all

5   the legal issues of protection, but I -- I'm aware now that you

6   tell me that.

7   Q.   Okay.  Are you aware that California law prohibits

8   discrimination on the basis of sexual orientation in

9   employment?

10  A.   The same answer.

11  Q.   Okay.  And I could go on and on.  And in the interest of

12  time, I won't.  But let me just ask you this:

13          Leaving aside the question of marriage, are you aware

14  of any other state whose laws reflect less structural stigma

15  than California?

16  A.   Leaving aside the question of marriage?  As I said, I'm

17  not as familiar with the details of the protections either here

18  or in other states, so it's going to be a very -- I cannot

19  answer that.

20  Q.   Okay.  So the answer is, "I don't know," correct?

21  A.   I just cannot answer that.  I don't know what the

22  different legal -- I would have to study this and look at this.

23  Q.   Understood.  Thank you.

24          Now, you talked about Proposition 8 sending a message

25  about the value of gay and lesbian relationships, in your

 1  direct testimony.  Did you intend by that to offer an opinion

 2  about the purposes of the people who drafted or voted for

 3  Proposition 8?

 4  **A.**   No.

 5          **MR. NIELSON:**  All right.  No further questions, Your

 6  Honor.

 7          **THE COURT:**  Very well.  Any redirect?

 8          **MR. DUSSEAULT:**  Yes, Your Honor.

 9          **THE COURT:**  Mr. Dusseault.

10                    <u>**DIRECT EXAMINATION**</u>

11  **BY MR. DUSSEAULT:**

12  **Q.**   Good afternoon, Dr. Meyer.

13  **A.**   Good afternoon.

14  **Q.**   Almost evening, but I'll say afternoon.

15          Just a couple things I wanted to follow up on.

16  Mr. Nielson spent a good bit of time this afternoon talking

17  about your work in minority stress and social stress theory,

18  and the implications of that work with respect to groups, not

19  gay and lesbian individuals but, let's say, racial minorities.

20  Do you recall that?

21  **A.**   Yes.

22  **Q.**   Okay.  Now, is the point of this discussion that you have

23  found in some of the research that certain racial or ethnic

24  minorities, while they experience some stressors as a result of

25  minority status, may not experience the same health effects as

1    a result?

2    **A.**    Correct.  That specifically with African-Americans, or

3    blacks, in the United States.

4    **Q.**    Now, Doctor --

5    **A.**    And I should just correct.  This is not that I found this,

6    but this is a finding that definitely is in the literature.

7    It's not all my studies empirically, but there are studies -- I

8    found it in the sense that I read about it and so forth.

9    **Q.**    Okay.  Now, Dr. Meyer, do you have any views as to any

10   differences between, let's say, the African-American minority

11   community and the minority community of gay men and lesbians

12   that might explain some of the differences in terms of the

13   outcomes that flow from stressors?

14   **A.**    Well, of course, as I mentioned, the reason we look at

15   differences in the patterns of results is exactly to, as I

16   said, improve our models.

17          And one of the things that we, therefore, analyze --

18   and it's not just me -- it would begin to look at, well, what

19   is different between those two populations that might help us

20   understand the workings of these social stressors.

21          In terms of African-American findings, there are

22   several areas of further study that we're interested in.

23          The first one that is most often advanced is the --

24   and I'm discussing this in comparison to gay and lesbian

25   here -- is that while African-Americans are definitely exposed

1  to racism, in their socialization process, especially earlier

2  on, they are typically exposed to greater benefits of the

3  resources that I described before as coping and social support,

4  for the very simple fact that they typically grow up in black

5  communities.

6          Of course, there might be some unique experiences,

7  but there's evidence that being socialized by your family and

8  educated about racism, being -- taking part in, for example,

9  institutions, black churches that have for, really, decades if

10 not centuries, been in place to combat the effects of racism,

11 all the messages of racism.  So as a person growing up and

12 being socialized, an African-American person benefits from this

13 social support affiliation.

14         As I described earlier, regarding gay and lesbian

15 people, that is not how they grow up.  Most gay and lesbian

16 people, like most people in society, internalize very negative

17 attitudes, and they do not have along the way access to gay

18 supportive services, and so forth, until a later point where

19 they have already come out and, you know, really made the big

20 step of affiliating themself with some of the support.

21         So this is one thing --

22 **Q.**  Before you move on, let me be sure I understand this.  So

23 in the African-American community, for example, typically, an

24 African-American youth growing up would commonly be surrounded

25 by African-American siblings, parents, grandparents, perhaps

1  community, church friends, et cetera.  Is that right?

2  **A.**    Correct.

3  **Q.**    But with gay men and lesbians growing up, they may not

4  have the same community support and socialization support?

5  **A.**    I would say they definitely do not have the --

6  **Q.**    Okay.

7  **A.**    -- those type of -- the equivalent type of support

8  addressing gay and lesbian -- an affirmative gay and lesbian

9  approach.  As I said, it's almost -- it's actually the

10  opposite.

11         And many times we found within even families gay and

12  lesbian individuals are shunned or are harmed in many ways,

13  including violence.  So it's almost like the direct opposite of

14  the support.

15         **THE COURT:**  Are you talking about African-American

16  gays and lesbians or nonAfrican-American gays and lesbians?

17         **THE WITNESS:**  Thank you, Your Honor.

18         In this comparison, we're comparing the overall

19  African-American nongay with overall white nongay.

20         In a previous response --

21         **THE COURT:**  I see.

22         **THE WITNESS:**  -- we were discussing a different study

23  that looked at gay African-American versus gay white, in which

24  I was talking about the added element of racism.

25         But, as Mr. Nielson pointed out, this finding is also

Case 3:09-cv-02292-WHO Document 414 Filed 01/29/10 Page 309 of 285

1    true in the general population, nongay population, where

2    African-Americans also have lower rates.  And, therefore,

3    that's why this analogy -- it makes sense in the way that I was

4    answering.

5    **BY MR. DUSSEAULT:**

6    **Q.**   But when comparing the gay and lesbian population to the

7    African-American nongay population, your testimony is that

8    there is more socialization and support in the African-American

9    community that may explain a difference in certain outcomes?

10   **A.**   Yes.  That's one of the differences that may explain.

11          **THE COURT:**  More socialization and support among --

12          **THE WITNESS:**  Nongay --

13          **THE COURT:**  Wait a minute.  More socialization and

14   support for African-American gays and lesbians?

15          **THE WITNESS:**  Nongay.

16          **THE COURT:**  Nongays.

17          **THE WITNESS:**  So let me just clarify.

18          We're talking about two different comparisons that

19   are joined only by the general theoretical perspective of how a

20   social stress could affect people.

21          So the analogy here is that African-Americans being

22   themselves, of course, subject to racism should have a parallel

23   finding that we find in the gay versus straight in

24   African-American nongay with white nongay.

25          It's very different, but you expect some kind of a

1  parallel that the stress related to prejudice is affecting

2  them, then it should affect also blacks.

3          And the questions here were, well, why isn't it true

4  for nongay African-Americans versus nongay white where it's

5  true for gay versus straight, regardless of color?

6          So this is really going to a whole different area

7  that is not pertinent, specifically, to what I testified

8  regarding gay and lesbian population.  This is expanding

9  towards an analysis of broader sociological theories, and

10  looking at some parallels in the findings across groups and

11  across ideas.

12  **BY MR. DUSSEAULT:**

13  **Q.**  Right.  And let me clarify.  The line of questioning that

14  I want to follow up on now was a line of questioning from

15  Mr. Nielson, suggesting that the -- if the theory of minority

16  stress is taken from the gay and lesbian minority population to

17  the African-American minority population, would you expect

18  exactly the same health outcomes; and does that fact that you

19  might not see the same health outcomes in some way suggest that

20  the model doesn't work.

21          Do you recall that discussion?

22  **A.**  Right.  And my answer is that it does not indicate that

23  the model doesn't work.  It indicates that there are

24  differences in the characteristics of the -- that this is not a

25  perfect comparison.

1          There are differences in the characteristics of race,

2     in terms of blacks versus white nongays, and that from that

3     comparison and the comparison of gay versus straight, a major

4     difference is that blacks are socialized with a lot of -- with

5     a variety of access to support for their race, that comes to

6     counter some of the effects of racism; whereas, gays are

7     socialized with homophobia and without, in their families and

8     original communities, say, access to this -- to a similar

9     gay-related affirmation.

10    **Q.**   In some of the exhibits we've seen today, we've seen the

11    term "minority stress" and the term "social stress."  Are those

12    the same things?

13    **A.**   As I responded to Mr. Nielson, social stress can be maybe

14    thought of as a broader category.  And within that, in the

15    African-American comparison, people have talked about racism as

16    stress.  In the nongay African-American versus white, people

17    have discussed it as a racism as stress.

18          So I would put it within the general social stress

19    approach, because here we're looking at racism; whereas, in my

20    examples with gay and lesbian versus heterosexuals, we're

21    looking at homophobia and some of the other things.

22          So they're not obviously the same, but there's some

23    theoretical parallel there in the way that you study those

24    different populations, the different comparisons.

25    **Q.**   But when you use the term "minority stress" in your

1    research, are you referring, generally, to all minorities, or

2    specifically to gays and lesbians?

3    **A.**   No.   As I said, minority stress, which is a term that I

4    helped popularize, refers to sexual minorities.   And it is

5    almost exclusively used in the literature with reference to

6    sexual minorities and, I would dare say, many times referring

7    to my own articles on that matter.

8    **Q.**   And the four processes that we spent a fair amount of time

9    on this afternoon, that embody minority stress, are those

10   processes of general application, or specific to the gay and

11   lesbian population?

12   **A.**   Obviously, they are specific to the gay and lesbian

13   population.

14   **Q.**   Let me ask about one in particular: concealment.

15          Would concealment be a similarly significant issue

16   when you're talking about the gay and lesbian population, as

17   compared to a racial minority such as the African-American

18   population?

19   **A.**   Not -- not at all in the same way, for obvious reasons.

20   Although, the -- the answer is no.

21          There are some instances where somebody may be able

22   to conceal his black identity, but it is -- mostly, we don't

23   think of concealment when we think about the model of racism.

24   **Q.**   Let me also ask you, in this comparison of the gay and

25   lesbian minority to the African-American minority, about the

 1    issue of structural stigma.  And you talked about the role of

 2    law.

 3              Today in America, are African-Americans subject to

 4    legal structural stigma in any way comparable to Prop 8?

 5    **A.**   Well, obviously, as I said, this will be another

 6    difference between the two populations.  When I was saying

 7    there are several differences, this is a major difference.

 8              I believe that, at least since 1964, there are no

 9    legal types of racism in the United States.  So in terms of the

10    power of the law and the state, there is no endorsement of

11    racism.

12              That does not mean that racism has abated.  But,

13    certainly, it is not parallel to what we were discussing today

14    in terms of the structures of the law.

15    **Q.**   Is there any racial minority in the United States that's

16    denied the right to marry?

17    **A.**   I don't think so.  But...

18    **Q.**   With this issue of the extent to which a theory of

19    minority stress or social stress applies to, let's say, a

20    racial minority group, does any of the discussion or findings

21    in that area in any way undermine your view that minority

22    stress operates in the lives of gay and lesbian people and

23    adversely affects health?

24    **A.**   No.  And there's no evidence for that.  There's no real

25    challenge in terms of findings that are this -- confirming.

1   Certainly, not all the findings are always perfectly as you

2   would like them, but there's -- majority of the studies done in

3   the field, as I said -- and many of them that I quote -- do not

4   lead me to have doubt in the veracity of what I was testifying

5   to.

6          And the situation with African-Americans, as I said,

7   is of great interest to me, as is the issue around gender; that

8   is, men versus women.  It is something that I am very motivated

9   to study.  But it is really because of my intellectual

10  curiosity and interest in, as I said, specifying the model

11  better, understanding how do these differences that we were

12  just describing, for example -- and there are others -- how do

13  they play into this causal change that I was describing

14  earlier.

15         So it is of interest, but it doesn't lead me to doubt

16  anything regarding the specific case of minority stress in

17  lesbian and gay men and bisexuals, which has been my work.

18  **Q.**   Now, Dr. Meyer, Mr. Nielson asked you a series of

19  questions where he presented you with a hypothesis and then he

20  would ask you whether a particular study or analysis was

21  inconsistent with that hypothesis.  Do you recall that?

22  **A.**   Yes.

23  **Q.**   Is one of the purposes of a study to test whether a

24  hypothesis is true or not true?

25  **A.**   That is the purpose of a study.

**Q.**   Mr. Nielson also asked you about stigma in domestic

partnerships, and he read you some examples of certain rights

groups supporting domestic partnerships.  Do you recall that?

**A.**   Yes.

**Q.**   Ask just a couple of follow-up questions about that.

Assume, hypothetically, that you have no right to

marry for gay and lesbian people, and no right to domestic

partnership.  Is it your view that gay and lesbian people are

stigmatized?

**A.**   They're stigmatized as I showed, regardless of this.  This

is, as I said, an added block in the stigmatization and, I

think, a very important and forceful one in the sense that it

has the power of the state and all that.  But it is not the

only stigma, if I understand your question.

**Q.**   Hypothetically, if you had a state in which there was no

right to marry and no right to domestic partnership, is it your

view that that would stigmatize gay and lesbian people?

**A.**   Well, I think not having the right to marry would

stigmatize them in the same way that it stigmatizes them in

this case.

**Q.**   And then, alternatively, if in the same state gay and

lesbian people are denied the right to marry but they are given

a domestic partnership that is valued differently by society,

would you view that to be a stigmatic effect as well?

**A.**   Of course.  In a sense, you're actually making a clearer

1    statement of stigmatization when you have this dual system,

2    because it is not only that you're denying them the marriage,

3    you're also saying this marriage is highly valued and,

4    therefore, you cannot get that part so we're giving you

5    something that we're calling something else.

6           So in some ways you could say, at least in the way

7    that, again, is not in some general way, but you could say that

8    the message is even more severe.  But, of course, it's kind of

9    a silly comparison, because I agree.

10          I would say that if the state does not offer

11   marriage, that alone is a stigma.  But, certainly, if you have

12   two sides to this, and you're saying you can only get to the

13   back of the bus, that is quite more stigmatizing.

14   Q.   Thank you.

15          MR. DUSSEAULT:  I have nothing further.

16          THE COURT:  Very well.

17          Thank you, Dr. Meyer.  You may step down.

18          THE WITNESS:  Thank you.

19          THE COURT:  And I think we'll perhaps pass on Ms. Zia

20   until tomorrow morning.

21          (Laughter)

22          THE COURT:  Is that agreeable to everybody?

23          MR. BOIES:  Yes, Your Honor.

24          THE COURT:  All right.  See you all at 8:30 tomorrow

25   morning.

**CERTIFICATE OF REPORTERS**

We, KATHERINE POWELL SULLIVAN and DEBRA L. PAS, Official Reporters for the United States Court, Northern District of California, hereby certify that the foregoing proceedings in C 09-2292 VRW, **Kristin M. Perry, et al. vs. Arnold Schwarzenegger, in his official capacity as Governor of California, et al**., were reported by us, certified shorthand reporters, and were thereafter transcribed under our direction into typewriting; that the foregoing is a full, complete and true record of said proceedings at the time of filing.


_____/s/ Katherine Powell Sullivan_____


Katherine Powell Sullivan, CSR #5812, RPR, CRR
U.S. Court Reporter



_____/s/ Debra L. Pas_____

Debra L. Pas, CSR #11916, RMR CRR
U.S. Court Reporter


Friday, January 15, 2010