# DEPARTMENT OF EDUCATION

## Office of the Secretary

### 34 CFR Parts 75 and 76

## Office for Civil Rights

### 34 CFR Part 106

## Office of Postsecondary Education

### 34 CFR Parts 606, 607, 608, and 609

[Docket ID ED–2019–OPE–0080]

RIN 1840–AD45

**Direct Grant Programs, State-Administered Formula Grant Programs, Non Discrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, Developing Hispanic-Serving Institutions Program, Strengthening Institutions Program, Strengthening Historically Black Colleges and Universities Program, and Strengthening Historically Black Graduate Institutions Program**

**AGENCY:** Office for Civil Rights, Office of Postsecondary Education, Department of Education.

**ACTION:** Final rule.

**SUMMARY:** In response to Executive Order 13864 (Improving Free Inquiry, Transparency, and Accountability at Colleges and Universities), the Department of Education revises its current regulations to encourage institutions of higher education to foster environments that promote open, intellectually engaging, and diverse debate, including through compliance with the First Amendment to the U.S. Constitution for public institutions and compliance with stated institutional policies regarding freedom of speech, including academic freedom, for private institutions. These regulations also require a public institution to not deny a religious student organization any of the rights, benefits, or privileges that are otherwise afforded to other student organizations. In response to recent decisions from United States Supreme Court's decisions, the Department revises its current regulations governing grant programs authorized under titles III and V of the Higher Education Act of 1965, as amended (HEA), and the eligibility of students to obtain certain benefits under those programs. The Department also revises its current regulations to clarify how educational institutions may demonstrate that they are controlled by a religious organization to qualify for the exemption provided under Title IX, 20 U.S.C. 1681(a)(3), to the extent Title IX or its implementing regulations would not be consistent with the religious tenets of such organization.

**DATES:** This final rule is effective November 23, 2020.

**FOR FURTHER INFORMATION CONTACT:** Sophia McArdle, U.S. Department of Education, 400 Maryland Avenue SW, Room 290–44, Washington, DC 20202. Telephone: 202–453–6318. Email: *Sophia.McArdle@ed.gov.*

If you use a telecommunications device for the deaf (TDD) or a text telephone (TTY), call the Federal Relay Service (FRS), toll free at 1–800–877–8339.

**SUPPLEMENTARY INFORMATION:**

## Executive Summary

*Purpose of this Regulatory Action:* Through these final regulations, the Department reinforces First Amendment freedoms such as the freedom of speech and free exercise of religion. On March 21, 2019, President Trump signed Executive Order 13864, Improving Free Inquiry, Transparency, and Accountability at Colleges and Universities.[1] In response to this Executive Order, as well as the First Amendment, and the Secretary's general authority under 20 U.S.C. 1221e–3, the Department endeavors to ensure that all institutions of higher education, as defined in 20 U.S.C. 1002(a), that receive Federal research or education grants[2] from the Department "promote free inquiry."[3] Denying free inquiry is inherently harmful at any institution of higher education because students are denied the opportunity to learn and faculty members are denied the opportunity to freely engage in research and rigorous academic discourse.

Both Executive Order 13864 and these final regulations are intended to promote the First Amendment's guarantees of free expression and academic freedom, as the courts have construed them; to align with Federal statutes to protect free expression in schools;[4] and to protect free speech on campuses nationwide. Under the Supreme Court's First Amendment jurisprudence protecting the individual's right to his own ideas and beliefs, "no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein."[5] As a result, officials at public institutions may not abridge their students' or employees' expressions, ideas, or thoughts.[6]

In a significant opinion, *Keyishian v. Board of Regents of the University of the State of New York,* the Supreme Court observed, "Our Nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us and not merely to the teachers concerned. That freedom is therefore a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom."[7] Consequently, the First Amendment right of free expression means that public officials may not discriminate against students or employees based on their viewpoints.[8] For example, public institutions cannot charge groups excessive security costs "simply because [these groups and their speakers] might offend a hostile mob."[9] In a landmark opinion, *Tinker v. Des Moines Independent Community School District,* the Supreme Court acknowledged more than half a century ago that "[i]t can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate."[10] These final regulations help ensure that students and teachers will retain their constitutional rights to freedom of speech at public institutions.

Academic freedom is another aspect of freedom of speech, as "[f]reedom of speech secures freedom of thought and belief."[11] Academic freedom is an indispensable aspect of the "freedom of thought and belief" to which individuals across educational institutions, including private ones, may enjoy.[12] It follows that academic freedom is intertwined with, and is a predicate to, freedom of speech itself; and injury to one is tantamount to

---

[1] 84 FR 11402.

[2] Exec. Order No. 13864, section 3(c) defines "federal research or education grants" as "all funding provided by a covered agency directly to an institution but do not include funding associated with Federal student aid programs that cover tuition, fees, or stipends."

[3] *Id.* section 3(a).

[4] 20 U.S.C. 1011a; 20 U.S.C. 4071.

[5] *W. Va. State Bd. of Educ.* v. *Barnette,* 319 U.S. 624, 642 (1943).

[6] *Tinker* v. *Des Moines Ind. Comm. Sch. Dist.,* 393 U.S. 503, 505–07 (1969).

[7] 385 U.S. 589, 603 (1967).

[8] *See, e.g., Rosenberger* v. *Rector & Visitors of Univ. of Va.,* 515 U.S. 819, 829–30 (1995).

[9] *Forsyth Cnty., Ga.* v. *Nationalist Mov't,* 505 U.S. 123, 134–35 (1992); *see also College Republicans of the Univ. of Wash.* v. *Cauce,* No. C18–189–MJP, 2018 WL 804497 (W.D. Wash. Feb. 9, 2018) (holding University of Washington Security Fee Policy violates the students' First Amendment rights to freedom of speech and expression).

[10] 393 U.S. at 506.

[11] *Nat'l Inst. of Family and Life Advocates* v. *Becerra,* 138 S. Ct. 2361, 2379 (2018) (*NIFLA*) (Kennedy, J., concurring).

[12] *Id.*

ELIZABETH HUNTER et al.
v.
U.S. DEPARTMENT OF EDUCATION, et al.
Case No. 6:21-cv-00474 (AA)
**GOV Ex. 7**

ED2.000174

injury to both. Academic freedom's noble premise is that the vigilant protection of free speech unshackled from the demands and constraints of censorship will help generate new thoughts, ideas, knowledge, and even questions and doubts about previously undisputed ideas. Although academic freedom's value derives itself from the fact that its "results . . . are to the general benefit in the long run," academic freedom is also inherently important in a free society.[13]

Academic freedom, just like freedom of speech itself, is predicated on the principle that thoughts, arguments, and ideas should be expressed by individuals and assessed by listeners on their own merit, rather than the censor's coercion. Academic freedom insists on the freedom and power of speech so that the speaker has a fair opportunity to convince the listener of an idea and the listener a fair opportunity to be persuaded. The confluence of free speech and academic freedom is nothing new as far as the United States' educational institutions are concerned. As Yale University, a private American institution of higher learning, acknowledged almost half a century ago: Because "[t]he primary function of a university is to discover and disseminate knowledge by means of research and teaching," "the university must do everything possible to ensure within it the fullest degree of *intellectual freedom*."[14] Yale further deduced that "[t]he history of intellectual growth and discovery clearly demonstrates the need for unfettered freedom, the right to think the unthinkable, discuss the unmentionable, and challenge the unchallengeable."[15] When free speech is suppressed, academic freedom is the casualty many times over, "for whoever deprives another of the right to state unpopular views necessarily also deprives others of the right to listen to those views."[16] Neither harm is tolerable, and these regulations endeavor to protect academic freedom, as a part of free speech, at institutions of higher education.

Executive Order 13864 and the final regulations also align with Federal statutes to protect free inquiry. Congress has expressed that "no student attending an institution of higher education . . . should, on the basis of

participation in protected speech or protected association, be excluded from participation in, be denied the benefits of, or be subjected to discrimination or official sanction under [numerous] education program[s], activit[ies], or division[s] of the institution[s] directly or indirectly receiving financial assistance."[17] Congress has also articulated that "an institution of higher education should facilitate the free and open exchange of ideas," and "students should not be intimidated, harassed, discouraged from speaking out, or discriminated against" on account of their speech, ideas or expression.[18] And since 1871, Congress has made actionable violations of the First Amendment by those acting in an official government capacity, whether on campuses or elsewhere.[19] Congress, thus, disapproves of the suppression of or discrimination against ideas in the academic setting.

To be certain, the Department will honor the institutional mission of private institutions, including their religious mission. To this end, the final regulations do not require a private institution to ensure freedom of speech, including academic freedom, unless it chooses to do so through its own stated institutional policies. Private institutions, however, cannot promise students, faculty, and others opportunities to engage in free speech, including academic freedom, in stated institutional policies without delivering on this promise. These private institutions must comply with whatever stated institutional policies regarding freedom of speech, including academic freedom, that they choose to adopt. Religiously affiliated institutions, in freely exercising their faith, may define their free speech policies as they choose in a manner consistent with their mission. The final regulations do not mandate that religiously affiliated institutions adopt any particular policies in order to participate in the Department's grants and programs. In other words, the final regulations do not require any private institution to adopt a campus free speech policy that

complies with the First Amendment, and the Department cannot force any religiously affiliated school to compromise the free exercise of its religion.

Indeed, these final regulations help protect the right to free exercise of religion for both institutions and students. Generally, the government may not force institutions and students to choose between exercising their religion or participating in a publicly available government benefit program.[20] In accordance with this principle, no religious student organization should be forced to choose between their religion and receiving the benefits, rights, and privileges that other student organizations receive from a public institution. Religious student organizations should be able to enjoy the benefits, rights, and privileges afforded to other student organizations at a public institution. Similarly, institutions that participate in Federal programs under Title III and Title V of the HEA and their students should be able to freely exercise their religion in accordance with the First Amendment and RFRA.[21] Laws and policies which provide public benefits in a way that is "neutral and generally applicable without regard to religion" do not ordinarily offend the First Amendment, but policies that "single out the religious for disfavored treatment" violate the Free Exercise Clause.[22] The Free Exercise Clause " 'protect[s] religious observers against unequal treatment' "[23] and "guard[s] against the government's imposition of 'special disabilities on the basis of religious views or religious status.' "[24] Accordingly, public institutions cannot exclude religious student organizations from receiving neutral and generally available government benefits.[25] These final regulations help ensure that religious institutions as well as their students fully retain their right to free

---

[13] Chairman's Letter to the Fellows of the Yale Corporation, Report of the Committee on Freedom of Expression at Yale, Yale University (Dec. 23, 1974) (Yale Report on Freedom of Expression).

[14] Yale Report on Freedom of Expression, *supra* (emphasis added).

[15] *Id.*

[16] *Id.*

[17] 20 U.S.C. 1011a. In the same section, Congress has defined "protected speech" as "speech that is protected under the first and 14th amendments to the Constitution, or would be protected if the institution of higher education involved were subject to those amendments," 20 U.S.C. 1011a(c)(3); and has defined "protected association" as "the joining, assembling, and residing with others that is protected under the first and 14th amendments to the Constitution, or would be protected if the institution of higher education involved were subject to those amendments," 20 U.S.C. 1011a(c)(2).

[18] 20 U.S.C. 1011a(2)(C)–(D).

[19] 42 U.S.C. 1983.

[20] *Trinity Lutheran,* 137 S. Ct. at 2024.

[21] *Little Sisters of the Poor Saints Peter and Paul Home* v. *Pennsylvania,* 140 S. Ct. 2367 (2020); *Espinoza* v. *Montana Department of Revenue,* 140 S. Ct. 2246 (2020); *Trinity Lutheran Church of Columbia, Inc.* v. *Comer,* 137 S. Ct. 2012 (2017). The Department also considered the Religious Freedom Restoration Act (RFRA), 42 U.S.C. 2000bb, *et seq.,* the United States Attorney General's October 6, 2017 Memorandum on Federal Law Protections for Religious Liberty, Executive Order 13798 (Promoting Free Speech and Religious Liberty), and Executive Order 13831 (Establishment of a White House Faith and Opportunity Initiative).

[22] *Trinity Lutheran,* 137 S. Ct. at 2020.

[23] *Id.* at 2019 (quoting *Church of Lukumi Babalu Aye, Inc.* v. *City of Hialeah,* 508 U.S. 520, 533 (1993)).

[24] *Id.* at 2021 (quoting *Emp't Div., Dep't of Human Res. of Ore.* v. *Smith,* 494 U.S. 872, 877 (1990)).

[25] *Id.* at 2024–25.

exercise of religion with respect to the Department's programs under Title III and V of the HEA.

Finally, Title IX provides that it shall not apply to an educational institution which is controlled by a religious organization if the application of Title IX or its implementing regulations would not be consistent with the religious tenets of such organization but does not directly address how educational institutions demonstrate whether they are controlled by a religious organization.[26] Nor does the statute provide necessary clarity that a recipient can itself be a religious organization that controls its own operations, curriculum, or other features. These final regulations codify existing factors that the Assistant Secretary for Civil Rights uses when evaluating a request for a religious exemption assurance from the Office for Civil Rights and also address concerns that there may be other means of establishing the requisite control. Many of these factors that the Assistant Secretary considers, however, have been included in non-binding guidance dating back more than 30 years. Accordingly, the Department provides clear terms in these final regulations to provide recipients and other stakeholders with clarity regarding what it means to be "controlled by a religious organization." This clarity will create more predictability, consistency in enforcement, and confidence for educational institutions asserting the exemption.

The Department recognizes that religious organizations are organized in widely different ways that reflect their respective theologies. Some educational institutions are controlled by a board of trustees that includes ecclesiastical leaders from a particular religion or religious organization who have ultimate decision-making authority for the educational institutions. Other educational institutions are effectively controlled by religious organizations that have a non-hierarchical structure, such as a congregational structure. The Department does not discriminate against educational institutions that are controlled by religious organizations with different types of structures. Indeed, the Department has long recognized exemptions for educational institutions that are controlled by religious organizations with hierarchical and non-hierarchical structures.

The Department is constitutionally obligated to broadly interpret "controlled by a religious organization" to avoid religious discrimination among institutions of varying denominations.[27] The Department also must take into account RFRA in promulgating its regulations and must not substantially burden a person's exercise of religion through its regulations.[28] The Department's non-exclusive list of criteria for an institution to demonstrate that it is controlled by a religious organization reflect some methods that its Office for Civil Rights has used to evaluate and respond to a recipient's assertion of a religious exemption under Title IX. The final regulations, thus, offer educational institutions different methods to demonstrate that they are eligible to assert an exemption to the extent application of Title IX and its implementing regulations would not be consistent with the institutions' religious tenets or practices.

*Summary of the Major Provisions of this Regulatory Action:* The Department promulgates these final regulations to:

• Require public institutions of higher education that receive a Direct Grant or subgrant from a State-Administered Formula grant program of the Department to comply with the First Amendment, as a material condition of the grant;

• Require private institutions that receive a Direct Grant or subgrant from a State-Administered Formula Grant program of the Department to comply with their stated institutional policies on freedom of speech, including academic freedom, as a material condition of the grant;

• Require that a public institution receiving a Direct Grant or subgrant from a State-Administered Formula Grant program of the Department not deny to a faith-based student organization any of the rights, benefits, or privileges that are otherwise afforded to non-faith-based student organizations, as a material condition of the grant;

• Add a non-exhaustive list of criteria that offers educational institutions different methods to demonstrate that they are controlled by a religious organization and, thus, eligible to claim an exemption to the application of Title IX and its implementing regulations to the extent Title IX and its implementing regulations would not be consistent with the institutions' religious tenets or practices; and

• Amend regulations governing the Developing Hispanic-Serving Institutions Program, Strengthening Institutions Program, Strengthening Historically Black Colleges and Universities Program, and Strengthening Historically Black Graduate Institutions Program by defining "school or department of divinity" to be more consistent with the First Amendment and other Federal laws and by removing language that prohibits use of funds for otherwise allowable activities if they merely relate to "religious worship" and "theological subjects" and replace it with language that more narrowly defines the limitations in a manner consistent with the First Amendment and other Federal laws.

*Costs and Benefits:* The Department estimates that these final regulations would result in one-time costs of approximately $297,770 and would benefit the general public and grantees by improving the clarity of the regulations.

**Timing, Comments, and Changes**

On January 17, 2020, the Secretary published a notice of proposed rulemaking (NPRM) for these parts in the **Federal Register**.[29] The NPRM included proposed regulations that were the same as or substantially similar to regulations that other agencies proposed about the rights and obligations of faith-based organizations with respect to grants.[30] The NPRM also included proposed regulations that other agencies did not include and that were specific to the Department of Education such as regulations regarding free inquiry, Title IX of the Education Amendments Act of 1972, and various programs such as the Developing Hispanic-Serving Institutions Program, Strengthening Institutions Program, Strengthening

---

[26] 20 U.S.C. 1681(a)(3).

[27] *Larson* v. *Valente,* 456 U.S. 228, 244 (1982) ("The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another."); *see also Hosanna-Tabor Evangelical Lutheran Church & Sch.* v. *EEOC,* 565 U.S. 171, 202 (2012) (Alito, J., concurring; joined by Kagan, J.) (arguing that a broad, functionalist interpretation of religious teachers for purposes of the ministerial exception is necessary to be inclusive of faiths like Islam and Jehovah's Witnesses).

[28] *Little Sisters of the Poor Saints Peter and Paul Home,* 140 S. Ct. 2367, 2384 (2020) (stating that a federal agency would be susceptible to claims that a rule was arbitrary and capricious if it did not consider the requirements of RFRA in formulating administrative solutions, and further, that it is not error for a federal agency to look to RFRA as a guide when framing a religious exemption).

[29] Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards, Direct Grant Programs, State-Administered Formula Grant Programs, Developing Hispanic-Serving Institutions Program, and Strengthening Institutions Program, 85 FR 3190 (proposed Jan. 17, 2020).

[30] *Compare* 85 FR 3190, *with* 85 FR 2889 (Department of Homeland Security), 85 FR 2897 (Department of Agriculture), 85 FR 2916 (U.S. Agency for International Development), 85 FR 2921 (Department of Justice), 85 FR 2929 (Department of Labor), 85 FR 2938 (Department of Veterans Affairs), 85 FR 2974 (Department of Health and Human Services), *and* 85 FR 8215 (Department of Housing and Urban Development).

ED2.000176

Historically Black Colleges and Universities Program, and Strengthening Historically Black Graduate Institutions Program. This Final Rule consists of the regulations that are unique to the Department of Education. The remainder of the proposed regulations in the NPRM, including proposed changes to 2 CFR 3474.15, 34 CFR 75.51, 34 CFR 75.52, 34 CFR 75.712, 34 CFR 75.713, 34 CFR 75.714, Appendix A to Part 75, Appendix B to Part 75, 34 CFR 76.52, 34 CFR 76.712, 34 CFR 76.713, and 34 CFR 76.714, as well as the addition of a severability clause in 34 CFR 3474.21, 34 CFR 75.63, and 34 CFR 76.53, will be promulgated through a subsequent final rule. Consequently, there is a new Regulation Identification Number (RIN) for this rule (1840–AD45). Where a severability clause is being added to a subpart for which regulations are included in both final rules, the severability clause is included in only one of the two regulatory packages. However, the severability clauses will apply to all applicable rules, when published, and our explanation of the reasoning for the addition of these clauses in the NPRM continues to apply. This final rule contains changes from the NRPM, which are fully explained in the *Analysis of Comments and Changes* section of this document.

**Public Comment**

In response to our invitation in the NPRM, we received more than 17,000 comments on the proposed regulations. We discuss substantive issues under topical headings, and by the sections of the final regulations to which they pertain.

**Analysis of Comments and Changes**

An analysis of the public comments and a discussion of changes made following publication of the NPRM follow below.

**34 CFR 75.500(b)–(c) and 34 CFR 76.500(b)–(c)—Free Inquiry**

*General Support*

*Comments:* Several commenters expressed general support for the proposed rule's free inquiry provisions in 34 CFR 75.500 and 34 CFR 76.500. Commenters stated that students should not be shielded from ideas that might offend them because that may leave them ill-prepared to compete in the global marketplace of ideas. These commenters expressed concern that policies that insulate students from different perspectives would undermine their ability to think critically. Some commenters stated that the proposed

rule would produce beneficial effects because it would promote intellectually vibrant and ideologically diverse educational communities. Commenters commended the Department for recognizing that the First Amendment applies to public institutions of higher education but not to private institutions of higher education. One commenter emphasized the importance of the Department respecting the role of the courts in assessing the constitutionality of institutional policies and practices that may violate the First Amendment and asserted that the proposed rule appropriately leaves these determinations to the courts. The commenter also expressed support for the Department in leaving private institutions with the choice of whether to extend free speech protections to their students and faculty. This commenter suggested that for the Department to impose First Amendment obligations on private institutions could potentially violate their own First Amendment rights. One commenter expressed concerns regarding the rise of "free speech zone" policies that limit the physical areas where students may engage in demonstrations and other expressive activities, burdensome and potentially biased permitting processes, and overbroad discriminatory harassment policies that may have the effect of stifling free speech on college campuses and violating the First Amendment at public institutions. This commenter expressed some optimism that the proposed rule would alter institutions' risk-benefit analysis when setting and defending their policies and actions, which may result in a significant decrease in restrictive speech codes. Another commenter specifically supported the inclusion of language clarifying that private institutions are free to honor their institutional policies and stated missions, specifically religious missions, particularly as they relate to freedom of speech and academic freedom. They stated that recognizing the autonomy of private institutions in this way respects the freedom that allows for an array of rich, diverse educational options.

*Discussion:* The Department appreciates the general support from commenters for the free inquiry provisions contained in § 75.500(b) and (c), which apply to Direct Grant Programs, and § 76.500(b) and (c), which apply to State-Administered Formula Grant Programs. The Department acknowledges the beneficial effects of requiring public institutions to comply with the First Amendment to the U.S. Constitution as a material

condition for receiving grants from the Department and of requiring private institutions to comply with their own stated institutional policies regarding freedom of speech, including academic freedom, as a material condition for receiving grants from the Department. The beneficial effects may include encouraging both public and private institutions to foster environments that promote open, intellectually engaging, and diverse debate. Free inquiry is an essential feature of our Nation's democracy, and it promotes learning, scientific discovery, and economic prosperity. Indeed, the proposed regulations are intended to promote the First Amendment's guarantees of free expression and academic freedom, as the courts have construed them; to align with Federal statutes to protect free expression in schools; and to protect free speech on campuses nationwide. As one commenter observed, reinforcing intellectual diversity and freedom of speech on college campuses may be especially necessary, given the speech-restrictive policies and actions some institutions have taken in recent years.[31] Furthermore, we agree with commenters who noted it is appropriate for the Department to rely on the judiciary as the primary arbiter of alleged violations of First Amendment freedoms concerning public institutions and alleged violations of free speech protections in stated institutional policies of private institutions. The courts have cultivated a well-developed and intricate body of relevant case law

---

[31] *See In re Awad* v. *Fordham Univ.*, 2019 N.Y. Slip Op. 51418(U) (N.Y. Sup. Ct. Jul. 29, 2019) (holding private university's refusal to recognize a chapter of Students for Justice in Palestine was contrary to the university's mission statement guaranteeing freedom of inquiry); *McAdams* v. *Marquette Univ.*, 914 NW2d 708, 737 (Wis. 2018) (holding private university breached its contract with a professor over a personal blog post because, by virtue of its adoption of the 1940 American Association of University Professors (AAUP) Statement of Principles on Academic Freedom, the post was "a contractually-disqualified basis for discipline"); *Young America's Found.* v. *Napolitano*, Case No. 3:17–cv–02255 (N.D. Cal. Nov. 10, 2017) (Amended Complaint); *id.* (Doc. No. 44) (Statement of Interest by the U.S. Department of Justice, stating that the University of California at Berkeley policies violated the First Amendment); *Shaw* v. *Burke*, Case No. 2:17–cv–02386 (C.D. Cal. Mar. 28, 2017) (Complaint); *id.* (Doc. No. 39) (Statement of Interest by the U.S. Department of Justice, stating that Pierce Community College's policies violated the First Amendment); *see also Community College Agrees to Resolve Free Speech Lawsuit,* Associated Press (Jan. 23, 2018, 11:43 a.m.), *https://www.detroitnews.com/story/news/local/michigan/2018/01/23/constitution-arrest-battle-creek-community-college/109735506/;* Tal Kopan, *Student stopped from handing out Constitutions on Constitution Day sues,* Politico: Under the Radar (Oct. 10, 2013, 2:47 p.m.), *https://www.politico.com/blogs/under-the-radar/2013/10/student-stopped-from-handing-out-constitutions-on-constitution-day-sues-174792.*

and may serve as the primary decision-making body with respect to free speech matters under the final rule. As noted by commenters, these final regulations also accurately recognize that the First Amendment applies to public institutions and not private institutions, and that private institutions may choose stated institutional policies regarding freedom of speech that reflect their values. As explained later in this preamble, only public institutions that are legally required to abide by the First Amendment must do so as a material condition of a grant.

*Changes:* None.

*General Litigation Concerns*

*Comments:* Many commenters expressed concern that the proposed rule would encourage excessive and frivolous litigation that may have harmful effects on institutions of higher education and students. One commenter noted that litigation may not be the ideal way to resolve free speech issues and suggested that other forms of dispute resolution in the educational context may be more immediate and effective. Commenters argued that the proposed rule would result in an increasing number and frequency of speech-related litigation against both public and private institutions, and that this would only increase college and university costs for students. Institutions would have to devote more resources to lawyers and litigation personnel instead of on core educational functions of teaching, research, and service, which would ultimately harm students. One commenter asserted that by tying Federal grant money to the outcome of speech-related disputes, the proposed rule will incentivize plaintiffs' attorneys to add frivolous free speech claims to every lawsuit to pressure institutions to settle. This commenter reasoned that the proposed rule would undermine the Department's free speech goals by discouraging responsive and immediate resolution of free speech claims because institutions would have an incentive to appeal adverse court judgments instead of reaching a post-trial and pre-appeal resolution with plaintiffs. This commenter also suggested that by exposing institutions to the risk of being deemed in violation of a material condition of their grant, the proposed rule would add more pressure on institutions to avoid final adverse judgments by either settling before trial or by appealing the judgment. The commenter expressed concern that the proposed rule may perversely encourage private institutions to eliminate or otherwise limit their stated institutional policies regarding free speech to make it

easier to achieve compliance and reduce the risk of potentially losing Federal funding, and stated that this would have the effect of undermining the Department's goal of protecting free speech. One commenter argued that plaintiffs' attorneys could effectively threaten public institutions with potential loss of Federal funding if they do not agree to their demands, which may undermine the constitutional State sovereign immunity doctrine that is designed to protect States.

Another commenter suggested that by raising the stakes of free speech litigation for institutions, the final regulations may have the unintended effect of pressuring courts not to find such violations. To avoid this potential problem, the commenter suggested an alternative framework where the Department would codify well-established First Amendment standards as set forth by the Supreme Court into the final regulations instead of tying the analysis to the outcome of litigation. This commenter argued that adopting this approach through a formal notice-and-comment regulation would have the added benefit of depoliticizing the enforcement of these rights without the possibility of adverse effects on litigation.

*Discussion:* It is not the intent of the Department to subject public and private institutions to excessive and frivolous litigation, unfairly pressure institutions to change their litigation strategies to avoid unfavorable court judgments, discourage institutions from adopting alternative dispute resolution processes, discourage private institutions from adopting stated institutional policies regarding free speech, increase the costs of higher education and exacerbate affordability issues, distract institutions from their core educational functions, or to otherwise harm students. The Department disagrees that the proposed or final regulations encourage frivolous litigation. Institutions are not required to report any lawsuit against a public institution alleging a violation of First Amendment rights or any lawsuit against a private institution alleging a violation of stated institutional policies regarding freedom of speech, including academic freedom. Additionally, frivolous litigation does not result in a final, non-default judgment against the institution, and an institution's grant from the Department may only be in jeopardy under these final regulations if there is a final, non-default judgment against the institution or an employee acting on behalf of the institution. These final regulations clearly state in §§ 75.500(b)(1) and 76.500(b)(1):

"Absent such a final, non-default judgment, the Department will deem the public institution to be in compliance with the First Amendment." Similarly, these final regulations clearly state in §§ 75.500(c)(1) and 76.500(c)(1): "Absent such a final, non-default judgment, the Department will deem the private institution to be in compliance with its stated institutional policies." Rather than expose institutions to liability from frivolous litigation, the Department anticipates that State and Federal courts will continue to recognize and dismiss any frivolous claims and adjudicate meritorious claims to appropriately vindicate the free speech rights of students, faculty, administrators, and other stakeholders. Nothing in the final regulations prohibits institutions from adopting alternative dispute resolution processes to resolve claims. We acknowledge that some grantees may, in the event that they face a lawsuit alleging violations of the First Amendment or institutional policies regarding freedom of speech, shift their litigation strategies to avoid a final, non-default judgment by a Federal or State court against them. To the extent that they do so, such actions could result in additional costs to grantees that they would not incur in the absence of the rule. However, institutions may shift litigation strategies for other reasons, such as to conserve resources through settlement rather than seeking to prevail in court, or for public relations and reputational purposes. Such violations of the First Amendment or stated institutional policies ultimately result in harm to students with respect to the functions of teaching, research, and service because they will not be exposed to the marketplace of ideas that is essential to learning and education. With respect to any potential costs for failing to comply with the First Amendment or stated institutional policies, the Department does not terminate an institution's grant as a first resort. The Department has not historically suspended or terminated a Federal award or debarred a grantee as the first measure in addressing a violation and instead first attempts to secure voluntary compliance from the grantee. Indeed, the Department's regulations provide that the Department may suspend or terminate a Federal award or debar a grantee, if there is a continued lack of compliance and if imposing additional, specific conditions is not successful.[32] We do not believe it

---

[32] *See* 34 CFR 75.901 (referencing 2 CFR 200.338); 2 CFR 200.338 (stating Federal awarding agency may suspend or terminate an award if

is likely that such violations, if they do occur, would result in a substantial number of grants being terminated unless the institution refuses after a final, non-default judgment to voluntarily comply with the First Amendment or its own stated institutional policies regarding freedom of speech, including academic freedom, or any special conditions that the Department may impose to achieve such compliance. Accordingly, we believe any effect on the litigation strategy of grantees is difficult to predict and would be contingent on the unique facts and circumstances of each case. The Department also wishes to emphasize that courts repeatedly have been called upon to vindicate the free speech rights of students, faculty, and other stakeholders on college campuses. The Department believes that State and Federal courts are appropriate adjudicators of free speech violations under the final rule, and we believe they adjudicate such matters fairly and dispassionately. The Department is the arbiter of the proper penalty, if any, with respect to a public institution that violates the First Amendment or a private institution that violates its own stated institutional policies regarding freedom of speech, including academic freedom. We note that one commenter who raised the issue of State sovereign immunity did not appear to explain exactly how that doctrine would be implicated by potentially withholding grant funds from public institutions for violating First Amendment rights, as determined in a final court judgment issued by a State or Federal court. States are subject to the First Amendment through the Fourteenth Amendment,[33] and Congress may abrogate State sovereign immunity for violations of the First Amendment through legislation under section 5 of the Fourteenth Amendment. The Department's final regulations recognize that Congress provided a right of action in 42 U.S.C. 1983 for violations of the First Amendment by those acting in an official government capacity, whether on campuses or elsewhere.[34] These final regulations do not in any way abrogate

noncompliance cannot be remedied by imposing additional conditions); 34 CFR 76.401.

[33] *De Jonge* v. *Oregon*, 299 U.S. 353, 364 (1937) ("Freedom of speech and of the press are fundamental rights which are safeguarded by the due process clause of the Fourteenth Amendment of the Federal Constitution. . . . The right of peaceable assembly is a right cognate to those of free speech and free press and is equally fundamental."); *Cantwell* v. *Connecticut*, 310 U.S. 296, 303–04 (1940); *Near* v. *Minnesota*, 283 U.S. 697, 707 (1931).

[34] *See, e.g., Edelman* v. *Jordan*, 415 U.S. 651 (1974); *Ex parte Young*, 209 U.S. 123 (1908).

sovereign immunity and instead recognize that employees acting on behalf of a public institution are prone to be sued under 42 U.S.C. 1983, if they violate the First Amendment.

The Department agrees with the general assertion made by one commenter that the formal notice-and-comment rulemaking process may have the benefit of de-politicizing regulatory enforcement. We, however, respectfully disagree with the propositions that First Amendment case law should be codified in the final regulations and that the Department should have responsibility for adjudicating violations. The reality is that First Amendment law is subject to change over time. We considered the possibility that the Department itself should adjudicate claims alleging that a public institution violated the First Amendment or alleging that a private institution violated its stated institutional policies regarding freedom of speech, and the Department ultimately decided against this alternative as both State and Federal courts have a well-developed body of case law concerning First Amendment freedoms as well as breach of contract cases or other claims that may be brought with respect to stated institutional policies.

*Changes:* None.

*Potential False Claims Act (FCA) Liability*

*Comments:* Some commenters stated that the proposed rule would result in a flood of frivolous FCA claims against private institutions under 31 U.S.C. 3729, *et seq.* Commenters were concerned that inaccurate certifications of compliance submitted to the Secretary by private institutions may give rise to FCA liability. One commenter noted that FCA actions may result in treble damages plus sizable penalties, which could create a significant incentive for private individuals or organizations to file *qui tam* cases. Commenters asserted that frivolous FCA litigation would impose substantial costs and disruption on private institutions and result in less, not more, protection of free inquiry and expression. One commenter argued that the preamble wrongly suggested that the Department will treat final judgments of non-compliance with institutional policies on free inquiry and expression as *per se* FCA violations. This commenter suggested such legal reasoning is flawed because the FCA is a standalone statute with different elements that plaintiffs must satisfy by a preponderance of the evidence; these statutory requirements such as the

defendant "knowingly" submitting a false or fraudulent claim for payment or making false statements material to a false or fraudulent claim, apply regardless of a separate court judgment finding non-compliance. The commenter also stated that the proposed rule purportedly linking FCA liability to private institutional policies on free inquiry and expression would create an uneven playing field because FCA liability is generally tied to fairly uniform regulations, statutes, and contractual provisions. And the commenter asserted that the proposed rule failed to provide guidance on what type of conduct would be imputed to a private institution. The commenter cited Supreme Court precedent for the proposition that the government merely claiming a condition is material, as the Department purportedly did in the proposed rule, does not by itself satisfy the materiality requirement under the FCA. Because of these concerns, the commenter recommended that the Department remove language from the preamble that would require private institutions to certify to the Secretary their compliance with institutional policies on free speech as a material condition of an award. Requiring such certification may increase potential FCA exposure, result in a flood of baseless *qui tam* cases, and impose a substantial burden on private institutions. The commenter stated that if the Department opts to retain the certification requirement then it should explicitly clarify that the FCA is an independent statute with standalone requirements that must be proven by a preponderance of the evidence for a court to find a violation.

*Discussion:* The Department wishes to clarify that, and as one commenter correctly observed, the FCA is a separate statute with distinct elements that must be established to prove liability. Indeed, the Department never stated that a private institution's failure to comply with its own stated institutional policies is a *per se* violation of the FCA. Rather, and as the Department clearly noted in the preamble of its NPRM, the Department considers the condition that private institutions comply with their stated institutional policies regarding freedom of speech to be a material condition of the Department's grant. Similarly, the Department considers the condition that public institutions comply with the First Amendment to the U.S. Constitution to be a material condition of the Department's grant. The Department has revised §§ 75.500(b)–(c) and 76.500(b)–(c) to expressly state that such conditions are material conditions

of the Department's grant. The Department correctly noted in its NPRM and maintains its position that if private institutions fail to comply with their own stated institutional policies regarding freedom of speech, including academic freedom, then such noncompliance may satisfy the materiality requirement for FCA liability.[35] The Department also noted in its NPRM that there are no cases directly on point under the False Claims Act because the Department and other Federal agencies have not previously required compliance with stated institutional policies on freedom of speech, including academic freedom, as a material condition of a grant.[36] The Department clearly states that these conditions are material conditions in this final rule to place institutions on adequate notice of the Department's position. However, there are other elements that must be proven to establish FCA liability. A court, and not the Department, will ultimately be the arbiter of liability under the FCA.

The Department is not requiring a private institution to adopt any particular policy regarding freedom of speech, including academic freedom, and private institutions should comply with their stated institutional policies. Private institutions currently may face liability if they do not adhere to their own stated institutional policies.[37] Potential liability under the FCA is another strong incentive for private institutions to comply with their own stated institutional policies, and the gravity of any potential consequence under the FCA serves as an adequate deterrent to guard against institutions making empty promises to its students and faculty. Private institutions should accurately represent their stated institutional policies regarding freedom of speech and adhere to such policies. Freedom of speech, including academic freedom, is of the utmost importance for education and learning, and a private

institution's stated institutional policies reflect the values of that institution. Students may select institutions based on values reflected in stated institutional policies, and students pay tuition and other fees in anticipation that the institution will comply with its stated institutional policies.

We do not wish to eliminate language that would require private institutions to comply with their stated institutional policies as a material condition of a grant and explain the Department's authority to issue such regulations in the "Executive Orders and Other Requirements" section of this preamble. Freedom of speech, including academic freedom, is an integral part of learning and education. Expressly requiring private institutions to comply with their stated institutional policies on freedom of speech, including academic freedom, as a material condition of the Department's grant reinforces the importance of compliance and reminds private institutions of the promises they chose to make to their students, faculty, and other stakeholders.

*Changes:* The Department has revised these final regulations to expressly state in §§ 75.500(b)–(c) and 76.500(b)–(c) that complying with the First Amendment is a material condition of the Department's grant for public institutions and that complying with stated institutional policies regarding freedom of speech, including academic freedom, is a material condition of the Department's grant for private institutions. The Department made a technical correction to § 76.500(b)(2) to state "State or subgrantee" instead of "grantee" to align with § 76.500(b)(1). The Department also made a technical correction to § 76.500(c)(2) to state "State or subgrantee" instead of "grantee" to align with § 76.500(c)(1). These technical corrections also align § 76.500(b)–(c) with the remainder of the regulations in Part 76 of Title 34 of the Code of Federal Regulations, as the regulations in that part refer to States or subgrantees.

*Unequal Treatment Between Institutions*

*Comments:* A handful of commenters raised concerns that the proposed rule would result in unequal treatment of public and private institutions. One commenter asserted that to hold public institutions to the First Amendment while only holding private institutions to their own stated institutional policies is unfair and may raise constitutional concerns. This commenter suggested that application of the proposed rule could create an illogical scenario where a public institution would lose Federal funding for denying recognition to a

student organization that promotes hate speech prohibited by the public institution's policies, but a private institution in the same situation would not.

Commenters also emphasized that tying Federal funding for public institutions to First Amendment compliance and funding for private institutions to compliance with stated institutional policies could result in unfair treatment because different courts and jurisdictions have different jurisprudence. For example, the Department would create an unequal playing field where an institution could lose funding for engaging in the same underlying misconduct as another institution, but the latter did not lose funding because it was in a different jurisdiction. Commenters noted that the First Amendment is a particularly complex area of law, and cases may be decided by sharply divided courts.

One commenter suggested it may be reasonable for public institutions to rely on dissenting First Amendment court opinions. This commenter argued that the Department is incorrectly assuming that First Amendment case law is obvious, that public institutions should anticipate potential developments, and that this unfairness is compounded by the fact that it can take years for appellate courts to resolve conflicting First Amendment jurisprudence.

One commenter asserted that the proposed rule would create an uneven playing field between private institutions. In particular, this commenter reasoned, courts in different jurisdictions could reach different conclusions about whether private institutions violated their stated policies. And courts may also differ on the question of whether institutional policies are legally binding contracts such that violations may or may not give rise to legal remedies. The commenter expressed concern that this potential inconsistency could result in some private institutions losing Federal grant funding but not other private institutions even where the underlying misconduct at issue is fundamentally the same.

*Discussion:* The Department wishes to emphasize that, as a matter of law, public institutions are subject to the First Amendment, but private institutions are not. Public institutions that are legally required to abide by the First Amendment cannot as a matter of law promulgate policies that are in violation of the First Amendment. We also note that the commenter who suggested that holding public institutions to their First Amendment obligations while holding private

---

[35] *See, e.g., Universal Health Servs., Inc.* v. *United States ex rel. Escobar,* 136 S. Ct. 1989, 2002–04 (2016).

[36] 85 FR 3213 n.137.

[37] *See Doe* v. *Univ. of the Sciences,* No. 19–2966 (3d Cir. May 29, 2020) (holding student sufficiently stated a breach of contract claim that the private institution failed to provide procedural fairness as promised in its policy); *McAdams,* 914 N.W.2d at 737 (holding private university breached its contract with a professor over a personal blog post because, by virtue of its adoption of the 1940 AAUP Statement of Principles on Academic Freedom, the post was "a contractually-disqualified basis for discipline"). The Department also noted in its NPRM that "public and private institutions also may be held accountable to the Department for any substantial misrepresentation under the Department's borrower defense to repayment regulations. 34 CFR 668.71." 85 FR 3213 n.137.

institutions to their stated institutional policies may raise constitutional concerns did not provide an explanation as to how constitutional concerns would be implicated. Nothing in this final rule requires private institutions to adopt a particular stated institutional policy regarding freedom of speech, including academic freedom, or to adopt a stated institutional policy regarding free speech at all. As such, it may be possible depending on the unique facts and circumstances of a given case that public institutions and private institutions are treated differently under the final rule even where the alleged violation at issue is the same. Nothing prohibits the Department from treating public institutions differently than private institutions in this regard. Indeed, the Department's policy position aligns with the different treatment between public and private institutions reflected in the law; the law subjects public institutions but not private institutions to the First Amendment through the Fourteenth Amendment, while private institutions are legally subject to their own stated institutional policies.

The Department agrees with commenters who noted that the First Amendment may be a particularly complex area of law. It is precisely for this reason, among others, that this regulation defers to courts as the adjudicators of free speech claims against public and private institutions. The Department believes our judicial system has the requisite expertise and impartiality to render such important decisions. We also acknowledge the reality raised by several commenters that different jurisdictions may have different interpretations of the First Amendment and different interpretations of private institutions' stated institutional policies. Accordingly, it is possible that courts may reach different conclusions with respect to institutions' free speech compliance even where the underlying alleged misconduct is fundamentally the same. Institutions, however, will be most familiar with the First Amendment jurisprudence as well as other case law in the Federal and State courts where they may be sued. Thus, it is fair to hold institutions accountable to the laws that already apply to them. The Department also wishes to remind commenters that nothing in the final rule would preclude the right of institutions to appeal adverse court judgments. This may be especially warranted and in the institution's best interests where, for example, the matter involves an especially complex area of First

Amendment law or where there is a split among courts in the jurisdiction over how to interpret private institutions' stated institutional policies. Under the final rule, the Department cannot find an institution in violation unless and until a State or Federal court of law has rendered a final, non-default judgment against the institution. The final regulations in §§ 75.500(b)(1), (c)(1) and 76.500(b)(1), (c)(1) clearly state: ''A final judgment is a judgment that the . . . institution chooses not to appeal or that is not subject to further appeal.''

*Changes:* None.

*The Department's Approach Is Unnecessarily Punitive*

*Comments:* Some commenters contended that conditioning Federal funding on compliance with the First Amendment and stated institutional policies is too extreme a punishment. Commenters expressed concern that the proposed rule is too broad because it covers not only final non-default court judgments against public institutions or private institutions but also against ''any of its employees acting in their official capacity'' for public institutions or ''employees acting on behalf of the private institution.'' Commenters asserted that this language could have the effect of potentially threatening institutional funding based on the conduct of a single rogue or unthinking employee, even where the institution terminated or otherwise disciplined the employee whose alleged misconduct resulted in an adverse court judgment. One commenter argued that because of this potential unfairness the Department should remove the phrase ''or an employee of the private institution, acting on behalf of the private institution'' from the final rule. Another commenter raised the example of millions of dollars of critical Federal funding being withheld from an institution because of a single employee's error or good-faith misinterpretation of institutional policy. This commenter emphasized the reality that an institution is comprised of many different individuals, including administrators, faculty, and employees, who may have different interpretations of the institution's values and principles, and that the *mens rea* requirement for institutional culpability under the proposed rule is far too low. The commenter reasoned that organizations cannot always prevent rogue employees from violating established policies and procedures.

Another commenter believed it is unfair and illogical to suspend, terminate, or disbar public institutions

from Federal research grants where, for example, the grants are wholly unrelated to First Amendment matters. The commenter expressed concern that students, researchers, and society as a whole may suffer if research and campus programs are ended because of First Amendment litigation unrelated to that program. For example, the commenter noted, a final judgment in a close First Amendment case arising from an unrelated area could lead to the termination of a TRIO grant designed to help first-generation students graduate from college.

A few commenters expressed general concern that the proposed rule leaves the Department with too much latitude in determining how to punish institutions for noncompliance, which could include disbarment. One commenter suggested that the Department could reduce the risk of public backlash by ensuring that the penalty for a violation is proportional to the offense, such as by setting the penalty on a sliding scale dependent on the number of full-time students enrolled at the institution.

*Discussion:* The Department acknowledges the general concerns raised by commenters that conditioning grants on compliance with the First Amendment for public institutions and on compliance with stated institutional policies for private institutions may be unfair, excessively punitive, and harmful to society in some circumstances, and the more specific concerns raised by commenters regarding private institutional liability deriving from employee misconduct. With respect to concerns regarding holding institutions accountable for their employees' misconduct, the Department wishes to emphasize that, under the final regulations, State and Federal courts, and not the Department, will have primary responsibility for determining whether an employee acting in the employee's official capacity violated the First Amendment or whether an employee acting on behalf of a private institution violated its stated institutional policies. The reality is that institutions act through the people who work for them, and the final regulations make clear that institutions will only be held accountable for the actions taken by their employees if the employee was acting on behalf of the private institution. We therefore believe it is important and necessary to retain language in the final rule that would reflect that reality. These final regulations implicate employees that are acting on behalf of the private institution, and the private institution

always may argue that such an employee was not acting on their behalf in any litigation. Similarly, these regulations implicate employees that are acting in their official capacity for the public institution, and public institutions always may argue that such an employee was acting in the employee's personal or individual capacity and not in an official capacity in the litigation. Indeed, lawsuits under 42 U.S.C. 1983 must be against an employee and cannot be against a public institution because public institutions, which are state agencies, have immunity under the Eleventh Amendment.[38] Officials at public institutions may be sued in their official capacity for injunctive relief and not monetary relief,[39] and may be sued in their personal or individual capacity for monetary relief.[40] These regulations provide that public institutions will only be held to account for final judgments against the public institution or against an employee acting in the employee's official and not personal or individual capacity. Courts will consider and determine whether an employee was acting in the employee's official capacity or personal or individual capacity in determining whether a cause of action is properly stated under 42 U.S.C. 1983 and what type of relief is available. With respect to private institutions, factors courts may consider in tort or contract litigation could include whether the violations carried out by the institution's employees were intentional or merely a mistake made in good-faith, whether there was a pattern of misconduct or an isolated incident, whether any breach constitutes a material breach, or whether the institution took prompt and effective remedial action to address the misconduct. The courts' analysis in any final, non-default judgment, thus, will aid the Department in determining whether and how to remedy a violation of the First Amendment with respect to public institutions and a violation of stated institutional policies regarding freedom of speech, including academic freedom, with respect to private institutions. The Department also believes that our judicial system has the

requisite expertise and impartiality to render sound judgments that consider all the relevant facts and circumstances of a given case.

We also wish to emphasize that an adverse court judgment against a public or private institution does not necessarily mean that the Department will implement a permanent or otherwise severe remedial action against the institution. As the proposed rule made clear, the Department has a broad range of remedial actions it may consider in the event a State or Federal court renders an adverse judgment against a public or private institution, and the remedies will be commensurate with the egregiousness of the violation. For example, the Department may impose special conditions aimed at remedying noncompliance, temporarily withhold cash payments pending correction of the institution's deficiency, suspend or otherwise terminate a Federal award, or potentially disbar the institution, as described in Subpart G of Part 75 and Subpart I of Part 76 of Title 34 of the Code of Federal Regulations.[41] It is certainly not the intent of the Department to impede important and beneficial research activities undertaken by public institutions. However, we disagree with the proposition that the First Amendment is not implicated in research grants. Ensuring that public institutions respect the First Amendment, which includes academic freedom, is essential to ensuring the integrity of academic research and the fulfillment of public institutions' educational mission. The First Amendment, which includes academic freedom, may prohibit a public institution from preventing a professor from conducting research on a particular topic or subject matter. As explained in more detail in the "Purpose of this Regulatory Action" section, denying free inquiry is inherently harmful at any institution of higher education because students are denied the opportunity to learn and faculty members are denied the opportunity to freely engage in research and rigorous academic discourse. Securing First Amendment rights for students and faculty is fundamental to education at public institutions.

Moreover, these potential remedial actions are optional in nature. The Department is not legally required to implement any such remedial action; rather, the final rule merely clarifies that we have the legal authority to do so. Depending on the unique facts and

circumstances of a given case, it is possible that the Department would conclude that no remedial action following a final, non-default adverse court judgment against the institution is warranted. Furthermore, we respectfully disagree with one commenter's assertion that the proposed rule leaves the Department with excessive discretion in determining an appropriate remedial action. The NPRM lists several concrete factors that Department officials may consider, such as the actual or potential harm or impact that results or may result from the institution's wrongdoing, the frequency of incidents and/or duration of the wrongdoing, whether there is a pattern or prior history of wrongdoing or whether it was more isolated in nature, the relative positions within the institution of the individuals involved in the wrongdoing, or whether the institution's principals and other supervisory officials tolerated the misconduct.[42] The list of factors debarring officials may consider is non-exhaustive and represents general factors relevant for officials to consider in tailoring potential remedial actions to the severity of an institution's misconduct.[43] The reality is that determining an appropriate remedial action for institutional misconduct is a highly fact-specific inquiry. The Department believes these factors provide adequate notice to institutions and other stakeholders about our decision-making process. It is certainly not the Department's intention to excessively punish institutions or to harm broader societal interests by conditioning grants on public institutions' compliance with the First Amendment and private institutions' compliance with their stated institutional policies.

The Department appreciates the suggestion offered by one commenter to consider penalties on a sliding scale relative to the enrollment size of the institution. Nothing precludes the Department from considering such a factor, if this factor is relevant to a determination of the appropriate remedy. The relative enrollment size of the institution, however, may not be relevant in every situation especially as section 3(c) of Executive Order 13864 defines "Federal research or education grants" as including "all funding provided by a covered agency directly to an institution but do not include funding associated with Federal student aid programs that cover tuition, fees, or stipends." Accordingly, the Federal research or education grants at issue do

[38] *Will* v. *Mich. Dep't of State Police,* 491 U.S. 58, 65–66 (1989); *Pennhurst State Sch. & Hosp.* v. *Halderman,* 465 U.S. 89, 97–99 (1984); *Ex Parte Young,* 209 U.S. 123, 149 (1908); *Collin* v. *Rector & Bd. of Visitors of Univ. of Va.,* 873 F. Supp. 1008, 1013 (W.D. Va. 1995).

[39] *Will,* 491 U.S. at 70–71 & n.10; *Cobb* v. *The Rector and Visitors of the Univ. of Va.,* 69 F. Supp. 2d 815, 823–24 (W.D. Va. 1999).

[40] *Kentucky* v. *Graham,* 473 U.S. 159, 167–68 (1985); *Ridpath* v. *Bd. of Governors of Marshall Univ.,* 447 F.3d 292, 306 (4th Cir. 2006).

[41] 34 CFR 75.901 (cross-referencing 2 CFR 200.338); 34 CFR 76.901; 2 CFR 180.800.

[42] 85 FR 3213.

[43] *Id.; see also* 2 CFR 180.860.

**Federal Register** / Vol. 85, No. 185 / Wednesday, September 23, 2020 / Rules and Regulations    **59925**

not affect Federal student aid programs such as programs under Title IV of the HEA.

*Changes:* None.

*Proposed Modifications*

*Comments:* Commenters proposed several modifications to the proposed rule. One commenter contended that requiring institutions to submit complaints, as distinct from court judgments, is unnecessary because complaints may be unsubstantiated allegations that are irrelevant. This commenter suggested that requiring submission of complaints assumes a level of institutional *mens rea* and culpability that may be unfair.

This commenter also advised the Department to consider providing grants for security to institutions instead of conditioning Federal funding on compliance with the First Amendment or with stated institutional policies. The commenter reasoned that providing grants for security could effectively protect controversial and diverse speakers from being shut down by protesting students. According to this commenter, grants for security may be a more effective way to promote the Department's free speech goals because it is more narrowly focused on preserving the free speech rights of students and staff, as opposed to the proposed rule's disproportionately punitive approach.

Another commenter urged the Department to avoid discouraging private institutions from adopting institutional policies on free speech by holding private institutions that promise free speech protections to the same standards that public institutions are held to under the First Amendment unless their application for Federal grants specifically explains how the private institutions' commitments to free speech deviate from First Amendment obligations. In short, this commenter believed the Department should require private institutions to clearly explain how and why they would like to be held to a lesser standard than public institutions under the First Amendment because that may discourage private institutions from watering down their free speech protections to avoid liability. The commenter argued that the Department should clarify in the final rule that a private institution's acceptance of Federal grant money constitutes a contract with the Department to honor commitments to free speech and academic freedom and specifically state that students and faculty, along with the Federal government, are the intended third-party beneficiaries of the

institution's free speech contractual terms. This commenter reasoned such clarification would foreclose the argument in private lawsuits that an institution's general commitments to free speech and academic freedom are actually subject to undisclosed carve-outs that diverge from the principles of the First Amendment or the core tenets of academic freedom. The commenter also asserted that the Department should require private institutions to publish their certifications (and, if applicable, explain how their standards deviate from obligations imposed by the First Amendment) publicly and prominently on their websites where interested parties such as prospective students, current students, and faculty are likely to visit. According to the commenter, this certification disclosure requirement would have the benefit of enabling those interested parties to choose the school that best fits their values.

*Discussion:* The Department appreciates the many suggested modifications to the final rule offered by commenters. We note that the final rule would not require institutions to submit complaints to the Department. Rather, institutions would have an affirmative obligation to submit only copies of any non-default, final judgment rendered against them in a State or Federal court that a public institution or an employee of the public institution, acting in his or her official capacity, violated the First Amendment or that a private institution or an employee of the private institution, acting in his or her official capacity, violated its stated institutional policy regarding freedom of speech, including academic freedom.

With respect to the suggestion offered by one commenter to provide grants for security as an alternative to the final rule, we acknowledge that such funds may be effective in safeguarding fair opportunities for controversial speakers to present their ideas and for listeners to consider them. However, the Department believes that grants for security without further action will not go far enough to address the problem of the denial of free speech rights across American college campuses. Such grants for security will not prevent public institutions from violating the First Amendment or prevent private institutions from violating their own stated institutional policies regarding freedom of speech, including academic freedom. Moreover, it is not our intention to discourage private institutions from adopting stated institutional policies regarding free speech, including academic freedom. We respect private institutional

autonomy and believe such institutions should retain flexibility to craft policies that best fit the values of their unique educational communities. Imposing an affirmative obligation on private institutions to explain how their stated institutional policies deviate from First Amendment obligations would be intrusive because private institutions are not legally required to abide by the First Amendment. The Department also believes our judicial system is well-equipped to determine whether and in what way institutions' violations of their free speech obligations and commitments are legally actionable under the final regulations. As such, it would be improper for us to operate under the assumption that all commitments made by a private institution in connection with the Department's grants are only contractual in nature, and other laws such as State laws ultimately will determine whether any stated institutional policies constitute a contract. Even if the Department considered these stated institutional policies to constitute a contract, the governing State law or other laws may require a different result. We also note that a private institution's failure to adhere to its own institutional policies can be a contractual breach but it can also be a tort or more. Additionally, we do not wish to specify that only faculty and students are the intended third-party beneficiaries of a private institution's stated institutional policies regarding freedom of speech, including academic freedom. There may be other groups of people who also are third-party beneficiaries of a private institution's stated institutional policies regarding freedom of speech, including academic freedom, and the Department will defer to the State and Federal courts as well as the relevant case law to determine which groups of people are third-party beneficiaries of such stated institutional policies. We believe courts provide neutral, reasoned judgments, as they have long recognized contractual relationships between students and their institutions, and between employees and other stakeholders and their institutions.

The Department carefully considered the potential value to students, employees, and the general public by imposing a disclosure requirement on private institutions to make publicly available their stated institutional policies regarding free speech, including academic freedom. We acknowledge that such a requirement may enable stakeholders to make informed choices and compare institutions. In addition,

we note that the commenter did not suggest a similar disclosure requirement for public institutions, nor provide an explanation as to why such a requirement should not apply. However, we did not propose imposing such a burden on either public institutions or private institutions and do not wish to do so now. Requiring either public or private institutions to post all of their policies regarding the First Amendment or freedom of speech, including academic freedom, respectively, is an enormous undertaking as institutions may have various policies for faculty and students such as policies on curriculum, employee codes of conduct, chalking, posting on bulletin boards, protesting, etc., and each school or department may have their own policies on freedom of expression. To gather all such policies and publicly post them on websites is a burden that the Department does not currently wish to impose at this juncture, although such a burden may be appropriate if private institutions seek to hide or obscure their stated institutional policies in the future. The Department wishes to emphasize that nothing in the final rule would prevent private or public institutions from publicly and prominently disclosing their free speech policies, should they choose to do so. Some institutions may even be required to do so under State laws.[44]

*Changes:* None.

"*Academic Freedom*" *Concerns*

*Comments:* One commenter contended that the Department should remove all reference to "academic freedom" from the final rule. The commenter noted that neither the President's Executive Order nor the Higher Education Act statutory provisions cited in the proposed rule explicitly referenced "academic freedom" or the concept of academic freedom, and argued that the Department appears to mistakenly assume that academic freedom and freedom of speech are coextensive. Academic freedom is a complex concept, and the commenter stated that the Department also failed to distinguish institutional academic freedom from individual academic freedom. For example, the commenter stated, institutions have their own academic freedom to hold their faculty accountable to certain professional standards and to require them to perform their duties with integrity. The commenter reasoned that purported violations of "academic freedom" are an inappropriate basis to withdraw grants.

Instead, the commenter requested that the Department substitute the actual text of the Executive Order into the final rule's language or to otherwise make these changes through sub-regulatory guidance.

*Discussion:* The Department respectfully disagrees with the assertion made by the commenter that all reference to "academic freedom" should be removed from the final regulations. Executive Order 13864 references "stated institutional policies regarding freedom of speech for private institutions," [45] and academic freedom is derived from and squarely rooted in freedom of speech.[46] The Supreme Court of the United States has eloquently explained why respect for freedom of speech, which includes academic freedom, is so critical in higher education:

The essentiality of freedom in the community of American universities is almost self-evident. No one should underestimate the vital role in a democracy that is played by those who guide and train our youth. To impose any strait jacket upon the intellectual leaders in our colleges and universities would imperil the future of our Nation. . . . Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die.[47]

As the Department explains in the "Background—Part 2 (Free Inquiry) section" of the NPRM,[48] the courts have consistently viewed academic freedom as an important and distinct interest with respect to freedom of speech.

Faculty, staff, and other institutional stakeholders have academic freedom interests. This concept of academic freedom is widely recognized as a core value; for example, at least one commenter cited to the well-known and highly regarded American Association of University Professors (AAUP), *1940 Statement of Principles on Academic Freedom and Tenure with 1970 Interpretive Comments* (AAUP's *Statement of Principles on Academic Freedom*).[49] Indeed, courts have held private institutions accountable to the AAUP's *Statement of Principles on Academic Freedom* to the extent such a private school has adopted this statement.[50] Academic freedom is an

indispensable aspect of the freedom of thought and belief to which individuals across educational institutions, including private ones, are entitled. It is intertwined with, and is a predicate to, freedom of speech itself. For example, academic freedom may include faculty rights to choose curriculum, coursework, and other subject matter materials, and to explore avenues of thought in and out of the classroom. Academic freedom may also encompass students' right to pursue truth and knowledge relevant to their fields of study. The rigorous pursuit of truth and knowledge is central to the purpose of an educational institution, and the Department strongly believes that institutional violations of academic freedom rights are a legitimate basis for remedial action. As the President's Executive Order 13864 made clear, the Department is to "take appropriate steps" to "ensure institutions that receive Federal research or education grants promote free inquiry." [51] Simply substituting the Executive Order's text into our final rule would not by itself accomplish the objectives set out by the President. Indeed, the Executive Order's very language contemplates that the Department would exercise at least some discretion in determining the most appropriate means of accomplishing its goals. After careful consideration, the Department believes the approach contained in the final rule, which would entail potential remedial action by the Department only in the event of a non-default and final adverse court judgment against an institution, would most effectively implement this Executive Order. Such an approach respects a private institution's academic freedom because the Department does not require a private institution to adopt any particular stated institutional policy regarding freedom of speech, including academic freedom, and will respect whatever stated institutional policies, if any, that a private institution chooses to adopt.

Lastly, we believe that free inquiry on our Nation's campuses is a fundamentally important subject that deserves a serious rulemaking process. As such, a formal notice-and-comment rulemaking, as opposed to non-binding sub-regulatory guidance, is the most appropriate approach. It also reinforces the Administration's commitment to the rule of law and robust public participation in the development of regulations that govern us.

*Changes:* None.

[44] *See, e.g.,* Va. Code section 23.1–401.1(B).

[45] 84 FR 11401.

[46] *See* 85 FR 3196–99.

[47] *Sweezy* v. *New Hampshire,* 354 U.S. 234, 250 (1957).

[48] 85 FR 3196–99.

[49] *Available at https://www.aaup.org/file/1940%20Statement.pdf.*

[50] *McAdams,* 914 N.W.2d at 737 (holding private university breached its contract with a professor over a personal blog post because, by virtue of its adoption of the 1940 AAUP Statement of Principles

on Academic Freedom, the post was "a contractually-disqualified basis for discipline").

[51] 84 FR 11402.

*Departmental Discretion Over Remedial Actions*

*Comments:* One commenter argued that the trigger for noncompliance under the proposed rule is far too low and urged the Department to establish a higher threshold. The commenter believed that a single adverse court judgment should not by itself justify a loss of Federal funding; the impact of such a penalty is disproportionate. Instead, the Department should deem an institution out of compliance only if there is a pattern of final, non-default judgments finding serious violations of the First Amendment or stated institutional policies. Alternatively, the Department could modify the trigger to only apply where the institution failed to immediately comply with an adverse final court ruling. This commenter also recommended that the Department more clearly define the circumstances under which it may terminate or suspend grant funding. The commenter expressed concern that institutions may not have adequate guidance or sufficiently clear precedent to understand when free speech violations can result in lost funding. The commenter acknowledged that the preamble listed factors that the Department may consider, including: The ''actual or potential harm or impact that results or may result from the wrongdoing,'' the ''frequency of incidents and/or duration of the wrongdoing,'' ''whether there is a pattern or prior history of wrongdoing,'' ''whether the wrongdoing was pervasive within [the institution of higher education],'' and whether the institution's ''principals tolerated the offense.'' However, the commenter contended that the Department still has too much discretion in determining appropriate sanctions. According to the commenter, this may result in politicized judgments and unfair treatment of institutions who engage in the same underlying misconduct. The commenter asserted that the Department should more precisely define the amount of discretion it has in determining sanctions. The commenter suggested, for example, that the Department be allowed to suspend or terminate grant funding only where certain aggravating factors are present, such as a systematic pattern or practice of violations or deliberate indifference by an institution. This commenter also believed that the Department should first be required to work with a given institution to achieve compliance before imposing any sanctions. Another commenter expressed concern that the proposed rule would deem institutions in violation of a material condition of

their Department grant even if the institution cured or otherwise remedied the violation before the court entered an adverse ruling. This commenter urged the Department to consider whether the institution had taken steps to voluntarily cure the underlying violation as a relevant factor in determining appropriate remedies for an institution's non-compliance.

*Discussion:* The Department wishes to emphasize that the final rule will not compel the Secretary to take any particular remedial action with respect to a grant in the event of a final, non-default judgment by a State or Federal court that a public institution violated the First Amendment or a private institution violated its stated institutional policies regarding freedom of speech, including academic freedom. As a matter of course, the Department attempts to secure compliance by voluntary means or by imposing special conditions before turning to more serious remedies, and the Department's final regulations state as much.[52] The final rule includes a broad range of pre-existing potential remedial actions described in subpart G of Part 75 and Subpart I of Part 76 of Title 34 of the Code of Federal Regulations, including imposing special conditions, temporarily withholding cash payments pending correction of the deficiency, suspension or termination of a Federal award, and disbarment. Indeed, the Secretary would retain discretion to, for example, take remedial action where the institution has demonstrated a pattern of non-compliance or deliberate indifference, or opt not to take remedial action where the institution promptly implemented appropriate corrective measures to remedy the violation. The Department also must abide by the Administrative Procedure Act and cannot act in an arbitrary or capricious manner with respect to any institution without facing liability.[53] The Department acknowledges the concerns raised by one commenter that the factors elucidated in the preamble of the NPRM that debarring officials may consider might not provide adequate guidance to institutions in some circumstances and could lead to inconsistent treatment of institutions for engaging in the same misconduct. The Department will use

the same regulatory rubric that it uses to take other remedial actions for violations of a grant condition for the conditions in §§ 75.500(b)–(c) and 76.500(b)–(c), and a violation of the First Amendment for a public institution or a violation of stated institutional policies for a private institution does not merit a completely different regulatory scheme for remedial action. All the same concerns that the commenter raises may be raised about existing grant conditions and the Department's discretion to address them, and experience has not borne out these concerns. The Department uses the existing regulatory scheme to determine the most appropriate remedial action for egregious violations such as fraud or criminal actions such as theft, and the Department examines the unique factual circumstances of each violation before determining what, if any, remedial action is appropriate. Similarly, we believe that, as with all violations of the conditions of a particular grant, decisions regarding appropriate remedies must be made on a case-by-case basis. As a practical matter it is therefore impossible to provide comprehensive and exact guidance to institutions and stakeholders as to precisely how the Department will act in all future cases. The Department needs to retain some flexibility to determine appropriate remedial actions, if any, given the unique facts and circumstances of each case. We also wish to remind commenters that the fundamental question of whether an institution violated free speech rights in the first instance will be decided by the courts, and not the Department. This approach has the additional benefit of de-politicizing the process.

*Changes:* None.

*Timeframe for Submission of Adverse Court Judgments*

*Comments:* One commenter requested that the Department extend the applicable timeframe for institutions to submit notice of a final adverse court judgment to the Department. The commenter noted that in Federal courts, parties generally have 30 days to submit an appeal on a judgment but that there are circumstances when this window should be extended. Some State courts permit longer time periods for submitting appeals. The commenter concluded that the Department should amend the final rule to require institutions to submit notice of any final, non-default court judgment no later than 30 days following the expiration of the period for filing a notice of appeal.

---

[52] *See* 34 CFR 75.901 (cross-referencing 2 CFR 200.338 (Remedies for noncompliance)); 2 CFR 200.338 (''If the Federal awarding agency or pass-through entity determines that noncompliance cannot be remedied by imposing additional conditions, the Federal awarding agency or pass-through entity may take one or more of the following actions, as appropriate in circumstances. . . .'').

[53] 5 U.S.C. 706(2)(A).

*Discussion:* The Department is sympathetic to the idea that institutions should have more time to submit copies of final court judgments. However, applicable appeals periods may vary across jurisdictions, and therefore tying the window for submitting adverse court judgments to such periods may result in conflicting timelines and make it more challenging for the Department to ensure compliance. As a result, the Department is extending the applicable timeframe from the 30 days proposed in the NPRM, to 45 calendar days. As the commenter noted, most Federal courts provide at least 30 days for a party to file an appeal, and allowing an institution 45 days to provide the Department with a copy of the final, non-default judgment will help ensure that the institution has adequate time to decide whether to appeal the judgment. The Department believes that applying a uniform timeline of 45 calendar days for all institutions would serve the interests of clarity, consistency, and ease of administration. Institutions will have 45 calendar days, as opposed to 45 business days, because business days are not uniform across the country. For example, there may be regional holidays that apply for some institutions but not others. As such, the Department believes that using calendar days instead of business days is clearer, more consistent, and will make it easier to ensure compliance.

*Changes:* We have extended the applicable timeframe for institutions to submit copies of final adverse court judgments to the Department from 30 days to 45 calendar days.

## Questions on "Stated Institutional Policies"

*Comments:* One commenter submitted several requests for clarification regarding the phrase "stated institutional policies regarding freedom of speech, including academic freedom" contained in the proposed rule. In particular, the commenter noted that the Department did not clearly define what types of documents constitute "stated institutional policies." For example, it is unclear to what extent a particular document must address "academic freedom" or "free speech" such that compliance with it constitutes a material condition for Federal research and education grants. The commenter also expressed uncertainty as to what makes a given document "institutional." For example, it is unclear whether any department or school within an institution can have its own "institutional" policy or whether the policy must be institution-wide. The commenter also questioned whether the

proposed rule would require private institutions that do not have stated institutional policies to adopt them and, if so, whether the protections offered by their stated institutional policies must be coextensive with First Amendment rights. Lastly, the commenter requested clarity as to whether a private institution's compliance with its stated institutional policies regarding freedom of speech and academic freedom is a material condition even where the institution states that its policies are legally unenforceable. The commenter sought to know whether the proposed rule would require such policies to be enforceable through contract or tort, or at least prohibit private institutions from explicitly framing them as legally unenforceable.

*Discussion:* The Department appreciates the substantive requests for clarification regarding the scope of the phrase "stated institutional policies regarding freedom of speech, including academic freedom" in the proposed rule. We note that whether a given institutional policy is covered by the final rule will be clarified by State and Federal courts first because these courts will determine whether the stated institutional policies concern freedom of speech, which includes academic freedom. The Department will determine that a private institution has not complied with its stated institutional policies only if there is a final, non-default judgment by a State or Federal court to the effect that the private institution or an employee of the private institution, acting on behalf of the private institution, violated its stated institutional policy regarding freedom of speech or academic freedom.

We note that nothing in the final rule necessarily limits covered policies to those that are institution-wide, or requires covered policies to be presented in a particular format. For example, covered policies may include, but do not necessarily have to be presented as, circulars, bulletins, or catalogues. Stated institutional policies also may be in the form of representations made by an institution's employees who are acting on behalf of the institution. For example, an employee acting on behalf of an institution may state that reservations are required to reserve an outdoor space for a demonstration or a protest, and these representations may constitute a stated institutional policy. And it may be possible for a covered policy to be department-specific, or to apply only to students or to employees. Further, and as stated in the preamble of the NPRM, these regulations would not compel private institutions to adopt a particular

stated institutional policy, or to adopt any policy at all. If a private institution chooses to adopt a stated institutional policy regarding free speech, which includes academic freedom, then nothing in the final rule would compel that institution to make its protections coextensive with the First Amendment. And the question of what effect, if any, a statement that a given institutional policy is not legally enforceable has is a matter to be decided by State and Federal courts through litigation.

*Changes:* None.

## 34 CFR 75.500(d) and 34 CFR 76.500(d)—Religious Student Organizations

### Comments in Support

A significant number of commenters advocated that universities should be diverse and inclusive spaces for all students, including religious students. These commenters also stated that religious student organizations make their best contribution to campus life when they retain their distinct religious identity and character and that the proposed regulations would protect religious student organizations' identity and character. Most of these same commenters thanked the Department for the proposed regulations to promote the equal treatment of religious student groups [54] so they can continue to serve their campuses. The Department appreciates the comments in support of these final regulations and includes the comments in support of these final regulations based on the various topics the commenters addressed in describing the benefits of religious student organizations as well as the struggles that religious student organizations face.

*Comments:*

Pluralism and Diversity

Many former participants in religious student groups expressed how religious student groups enhanced their experience at universities because they were given the opportunity to explore personal beliefs and experience and contribute to diversity on campus.

One commenter shared their experience serving in their forty-first year as a campus minister at several different universities and is a member of an association of campus ministers at the university where they serve and in this capacity met and collaborated with university presidents, deans, and a variety of student service departments throughout their time in ministry. This same commenter explained how

---

[54] The Department refers to "religious student organizations" interchangeably as "religious student groups."

**Federal Register** / Vol. 85, No. 185 / Wednesday, September 23, 2020 / Rules and Regulations    **59929**

campus ministers mediate between university governance and student groups to contribute to campus diversity and added that religious groups strive to broaden diversity and enhance inclusivity on college campuses.

One commenter recalled their experience serving in student government at their university, how allowing religious student groups to participate in campus life contributed to mutual understanding and appreciation among a diverse student body. The commenter stated that such diversity makes universities thrive.

Another commenter recalled their experience as a leader of a religious student group where students benefitted from the diversity and inclusivity fostered by religious groups on campus. Students were able to explore faiths and practice their beliefs which many commenters affirmed.

One commenter noted how religious groups are often excluded from conceptions of diversity on college campuses, yet religious organizations contribute to campus diversity. The commenter observed that organizations can only achieve this diversity by organizing with the integrity and conviction afforded by the proposed regulations.

Several students from religious legal societies noted how they were able to fellowship with those in their faith traditions in addition to explore different belief systems in the diverse, intense environment of law school. One of these commenters noted how having a greater variety of religious student groups would have only further increased diversity to benefit the campus.

One commenter observed that religious student groups provide support and opportunities for students. This commenter was able to connect with students of other faiths in this environment and suggested that religious organizations allow students to connect with the "outside world" beyond the university. Another commenter noted how religious student groups contribute to students' needs from a variety of backgrounds—including non-religious students—offering students access to food, finding housing for homeless students, and supported lonely or suicidal students.

One former participant of a religious student group noted how their group especially encouraged multiethnic diversity on campus and how this initiative led to religious student group leaders assisting with training of university dorm leaders on this topic.

Commenters also observed how religious student organizations were inclusive of the broader campus communities. A commenter recalled that all students were invited to participate in the religious organization's discussions and service projects. The commenter clarified that while this religious group worked alongside groups with different beliefs, the commenters' organization was necessarily led by leaders with a distinctive religious perspective. Another commenter shared that the religious organization's religious integrity was essential to its inclusivity as the organization coordinated with other student groups to serve the campus community.

Personal Edification From Religious Student Organizations

Student Health and Well Being

A commenter stated that a religious student group contributed to their health and life trajectory in addition to maturing their own beliefs in college. Another commenter expressed that participation in a religious student group offered social and emotional maturity throughout the commenter's experience. Many commenters described participation in religious student groups as life-changing, transformative, or with great impact on their day-to-day life. Other commenters shared how participation in religious student groups allows for academic, social, and psychological growth. One commenter shared how numerous studies conclude that religion and spirituality predict mental health, self-esteem, and constructive social activities, and at the same time, non-involvement is negatively associated with destructive behaviors such as drug and alcohol abuse, risk-taking, and crime. One commenter shared a story of how they were struggling with substance addiction as a freshman entering university, but participation in a religious student group helped them get clean and become healthy and involved in the university. Another commenter shared how participation in religious student groups has enabled good stress management while in school, enhanced this commenter's holistic thinking and leadership skills, formed life-long friendships, and facilitated positive opportunities to serve the campus and community.

Several commenters shared how religious student groups allow students to thrive in a rigorous environment. A commenter expressed how religious student groups brought healing and helped students through challenges posed by post-graduate studies. Another commenter added that religious student groups are important for students in a time of anxiety.

One commenter shared how they attended a college where religious conversations were encouraged, and they participated in a small group where they talked about real life and real religion. They shared how they were so grateful to have had the opportunity to mature in that environment. They stated that they were not allowed to rest on what they thought might be true, but rather had to discover what was true. They also stated that today's youth are the most anxious generation ever due to a lack of agreed-upon truths that provide a framework for living well, and that the freedom to explore faith in college let them hear about religious thought and the opportunity to find peace there.

Community

A number of supportive commenters were former or current participants in religious student groups expressing how those groups are valuable because they are spaces where community and healthy, wholesome relationships can be formed, and mentorship opportunities are available.

Another commenter shared how participation in a religious student group developed a broader array of relationships across gender, ethnic, cultural, and sexuality lines than any other season of their life and it was specifically because of their involvement with a religious student group. One commenter described religious student groups as unique places in the world where people from any walk of life, social setting, socio-economic background, faith background, sexual orientation, etc., can come together to learn with and from one another.

One commenter described their religious organization as welcoming and creating an open atmosphere in which conversation could be held. Another commenter found that participation in a religious student group made them a more compassionate citizen and informed discussions about justice and faith on campus.

A commenter shared that when they were a college student, the religious groups on their campus contributed the most to campus life, community service, and social justice. The commenter stated that the Black Campus Ministries group, because of their convictions, influenced the university's President to make changes that made the university more accessible for students of color. One commenter shared how being a minority on campus was an intimidating experience, but a religious

**59930    Federal Register** / Vol. 85, No. 185 / Wednesday, September 23, 2020 / Rules and Regulations

student group offered a safe space for building relationships and community.

Several commenters expressed how a religious student group was integral to incorporating this commenter into the campus community and acclimating to a large student body. One commenter expressed how access to a religious student organization provided access to resources that would have been difficult to obtain without a vehicle, in addition to creating a community.

Many commenters described how religious student groups unify and heal campuses. Several commenters noted how religious student groups worked to unify and support campuses after tragic on-campus events. Another commenter expressed that religious student groups provided a place for racial harmony. Another commenter stated that religious student groups preserve diversity when campuses are politically polarized, since the groups welcome students across political lines. A commenter explained how a religious student group initiated a campus-wide debate series which was beneficial to the community beyond just religious students.

One commenter expressed how a religious student group allowed the commenter to form a likeminded community and face challenges posed by law school. One commenter noted how religious student groups provided sanctuary and a safe haven for individuals in law school. A commenter recalled experiences from a religious student group at law school which offered mentorship to first-year law students. Religion was able to inform these students' legal studies, and students were able to explore their beliefs through religious student groups. Additionally, one commenter expressed that participation in a religious sports organization provided support through uniquely challenging experiences presented to student athletes.

Another commenter added that learning how to respect religious beliefs made them a better global citizen. Several commenters recalled programs through their religious student groups which would reach out to and incorporate international students into the student body, and some offered mentorship opportunities.

Several commenters noted that religious student groups create a place for religious students to gather when faculty did not appear welcoming or were hostile towards religious beliefs. Another commenter noted that religious student groups were silenced, hampered, and discriminated against on campus which hurt religious student groups and the greater campus community as a whole.

According to another commenter, the community formed by religious student groups is paramount during transitional periods in students' lives and that some religions are centered around relationships with members of the same faith tradition. A commenter noticed how religious student groups particularly helped at-risk students. A commenter observed how religious student groups provide support to students who are adjusting to and navigating life beyond the guidance of their families. Religious student groups provide spiritual and life guidance with warmth and compassion for students who are settling into their new campus environments, according to several commenters. A commenter noted how religious student groups provide mentorship and emotional support and companionship for students struggling with their home lives or personal challenges.

According to commenters, religious student groups afforded students alternative social opportunities to develop healthy relationships on campus. One commenter shared that participation in a religious student group helped them long for a vision in which the Greek system was healthier and restored to its original intent. They stated that the Greek system has a bad public image and persona, but the commenter believes at its roots was a desire to better men and women around a common set of core ideas and values. Their time with Greek InterVarsity helped them want to advance Greek life on campus that more holistically reflected these original ideas and values than living into the perceived public image of just partying. The commenter believes that those in the Greek system are grown and challenged in this stage of life in such a way that it helps prepare and equip them to serve their communities at large after graduation.

Service

A significant number of commenters discussed the community service that religious student groups perform, including many stories from current and former students about service projects through their religious student organizations. Many commenters shared how they were able to partner with other campus organizations or lead campus initiatives. One Christian campus organization was even given an award for forming successful partnerships with local, national, or international organizations in an effort to make a positive impact on society, according to a commenter from a public university. Religious student groups were where one commenter learned the

power of "us" as opposed to "me" as an individual, and how much positive impact a group with the same mission can have. One commenter expressed how religious student groups build students up to empower them to do good in their communities.

One commenter stated that participation in a religious student group set a foundation for charity and civic duties as a citizen. Another commenter believed that participation in a religious student group helped them to become a more intentional, compassionate person to care for others around them. Several commenters expressed that religious student groups taught them how to care and advocate for the marginalized in society. One commenter shared about how involvement with religious student groups exposed the student to topics related to their major of study such as systemic injustices, caring for the homeless and the marginalized, and how to care for the environment.

Another commenter shared how religious groups would provide services to their campuses like cleaning up after fraternity campuses and working in soup kitchens. One commenter shared how participation enhanced their hospitality skills and ability to contribute to the campus environment.

One former participant in a religious student group shared how a Christian group hosted a collective drive where they could engage the entire campus community to serve called "Love Puerto Rico", in which they collected supplies like generators, tarps, and extension cords that were sent to Puerto Rico to assist in Hurricane Maria relief efforts. Another commenter shared that their religious student group organized activities like serving the homeless, tutoring children, raising money for cancer research, and more similar service projects because of their religious beliefs. One commenter shared how their religious student group set up welcome events during the first weeks of school so students can get to know other students and build relationships on a campus where 95 percent of students commute from around the city. A commenter shared how a religious student group taught them to care about the global issues of the world and played a key role in educating them about fighting human trafficking and partnering broadly within the university to work together to create programs to help others fight human trafficking.

Soft Skills

Multiple commenters shared how participation in religious student organizations can provide opportunities

**Federal Register** / Vol. 85, No. 185 / Wednesday, September 23, 2020 / Rules and Regulations    **59931**

to lead and enhance leadership and other practical skills. A commenter shared that they would not have developed as a leader if they had not joined a religious student group, since other leadership activities such as sororities were selective organizations with limited opportunities. One commenter recounted their experience with leadership in religious student groups which uniquely provided an opportunity to lead in their local community. Another commenter experienced lifelong benefits from the leadership training provided by religious student groups. Multiple commenters noted how involvement with religious student groups improved communication and organizational, in addition, to leadership skills. Another commenter noted how participation in a religious organization was an asset to the campus, as it increased their critical thinking skills, knowledge base, exposure to cultures, and provided a community. A commenter found that participation in a religious student group informed some students' career paths.

Commenters noted the improvement to their educational environment from participation in religious student groups. One commenter noted how religious groups' participation provides a holistic education for students. One commenter recalled how participation in a legal student group throughout law school taught the commenter how to practice the law in the context of their faith, and another law student shared how participation in a religious student group created a forum in which law students could address related topics like the separation of church and state. Another commenter shared they learned to read religious texts and interpret them for themselves.

One commenter added to the discussion on social benefits of religious student groups by noting how they learned to listen and value the perspectives of a diverse group of people—a skill the commenter stated was not taught inside the classroom. Multiple commenters observed how religious student groups provided forums for students to debate ideas. Another commenter described religious student groups as a safe environment to ask hard and meaningful questions. Another commenter elaborated that religious student groups were a space to explore questions of meaning and purpose and learn how to pursue things like social justice, racial reconciliation, and environmental stewardship on the commenter's campus and in the commenter's community. One commenter shared that, during the

1970s, a religious student group guided them to think about social issues like race and class.

One commenter recalled how, although there were sometimes conflicts among groups, allowing student groups to have membership requirements allowed diversity that was a helpful preparatory experience for life. Another commenter added that their experience in a religious student group taught them how to respect others' beliefs and to engage congenially with those who have different religions. One commenter shared how exploring their faith in a Christian student group allowed them to grow to be more accepting of religious differences, more aware of the failings and strengths of their own faith tradition, and more desirous of genuine dialogue between differently-believing students on campus.

One university professor who teaches political science and philosophy described their courses on "church and state" issues, where the class would debate this very issue as it has been a current event for the past few years. The professor was regularly unable to get their students to debate from the side of public universities that wish to discriminate against faith-based groups by requiring them to adopt "university standards" for student leadership of their clubs. The students, whether for faith-based reasons or not, were virtually 100 percent in agreement that clubs should be free to choose their own leaders and write their own constitutions without conforming to the university's requirements.

Administrative Burden on Religious Student Organizations

Several religious student group representatives and commenters expressed relief that State legislatures had passed legislation to protect the integrity of religious student groups and therefore supported these regulations to apply federally. One commenter noted that the Department's adoption of the provision for religious student organizations would bring Federal policy in line with at least 15 States that have enacted laws to this effect.[55]

---

[55] Commenter cited: 2019 Ala. Laws 396 (2019); Ariz. Rev. Stat. Ann. section 15–1863 (2019); Ark. Code Ann. section 60–60–1006 (2019); Idaho Code section 33–107D (2019); S.F. 274, 88th Gen. Ass. 1st Sess. (Iowa 2019); Kan. Stat. Ann. section 60–5311– 5313 (2019); Ky. Rev. Stat. Ann. section 164.348(2)(h) (LexisNexis 2019); La. Stat. Ann. section 17:3399.33 (2018); N.C. Gen. Stat. section 115D–20.2, 116–40.12; Ohio Rev. Code Ann. section 3345.023 (LexisNexis 2019); Okla. Stat. tit. 70, section 70–2119.1 (2014); H.B. 1087, 94th Leg. Assemb., Reg. Sess. (S.D. 2019); Tenn. Code Ann. section 49–7–156 (2017); S.B. 18, 86th Leg. (Tex. 2019); Va. Code Ann. section 23.1–400 (2013).

Derecognition

One university student shared their story of administrative interference in which a State university system refused to allow religious groups to have any faith-based qualifications for their leaders, prompting concern among religious groups that their leaders would not be required to agree with their mission or teach their faith. The commenter explained how the university's rules forced their religious organization to choose between getting registered and risking their specific beliefs being watered down or having strong leaders who could authentically teach the faith while losing their status as a registered group for nearly one year. The group chose not to compromise their beliefs and accept a non-registered status which lost them benefits granted by the university. The group was unable to host all of its usual events since they had to pay for a space on campus in which to hold their meetings at an unsustainable cost.

One commenter shared that well-intended anti-discrimination policies at both public and private universities can be used in an "indiscriminate" manner that nearly undermined the ability of the campus ministry in which the commenter participated. Their group was threatened with de-recognition if they had any faith criteria for their leaders.

A university professor who serves on the national board of a student-focused ministry organization, shared how at their university within the last three years, student groups have been told that they cannot be recognized as a student group because "there are too many Christian groups" on campus or because their leadership is unable to confirm that they will comply with university non-discrimination requirements which directly contravene the religious tenets that the religious groups embrace. Although these decisions were appealed and mostly reversed, the student groups experienced weeks of delay arising from prejudice or misconceptions. The commenter shared that even when the decision was eventually reversed, it unnecessarily exacerbated polarization which discourages discussion and debate of important ideas on campuses.

A college denied the application of a religious student organization because the university alleged that there were "enough of those" religious student organizations. This organization was denied official recognition so it could not use college facilities or be listed as a resource for students.

ED2.000189

A religious student organization at a public university's school of law explained how their student organization, along with other religious organizations, were threatened with exclusion from campus because of their religious beliefs. The university eventually rescinded its proposed policy change that threatened these groups, but the university failed to adopt a written policy to assure religious groups that it would not someday adopt the detrimental policy. This commenter expressed how Federal regulations would help make a final decision for universities.

A representative from an on-campus religious student organization shared how they were actively involved with university service projects and complied with all university requirements set by the university. Yet twice, the organizations faced de-recognition because the religious student group required students to agree with the beliefs and mission of the religious organization. The group spent a year negotiating with the university to resolve the question, and the second time, it was necessary to procure help from State legislators to pass religious protections. This commenter supported expansion of these regulations on the Federal level.

One commenter recalled their involvement with a religious student group and how it was harassed by complaints and even kicked off many college campuses. The people complained that since the religious group required leaders to believe in their way of life that the religious group leaders were discriminating against other religions, so that religious groups would not be able to choose leaders who share their authentic religious beliefs. The commenter wants to see religious student groups treated equally.

One commenter shared that they learned that a public university's student government tried to de-recognize several religious student groups because the groups expected their leaders to agree with their beliefs. While the issue was forgotten for some time, it resurged and distracted the student group leadership from investing in their community.

A former member of a religious student group at a public university shared how the organization submitted its constitution for approval as a registered student organization, but it was rejected because the constitution suggested that student leaders had to agree with the group's fundamental beliefs. The commenter expressed that it appeared the administration was singling out this group because the purpose of the organization is religious. The university did allow the organization to register after a year of effort and forced the organization to change the wording of its constitution.

A current student at a public university shared how the commenter's university student government tried to stop religious student organizations from having faith-based criteria for their leaders. Several students expressed concern that such a requirement would lead to singling out religious groups because other organizations could expect leaders to agree with their purposes, but religious groups could not because their purposes were religious. The administration had to override the student government and agreed that religious student groups could have religious requirements for their leaders.

One commenter, whose husband served as the staff sponsor for a campus Christian fellowship student club at a public university, recalled how their religious student group was banned from campus because of a State university system regulation that forbade student clubs from imposing ideological requirements on their student leaders. After communicating with the religious student group's parent organization, the chancellor of the university system recognized the unconstitutionality of its arbitrary requirement and allowed the club back on campus the following year.

Administrative Delay

A commenter from a public university's school of law shared that it took one year for the university to recognize the commenter's religious student group as a registered student organization; the delay was largely caused by confusion surrounding the organization's desire to have a statement of faith requirement for their board members. The organization felt this was necessary because many of its board members' duties outlined in the by-laws involved leading the group in prayer, worship, Bible studies, and fostering members' spiritual growth. The administration prolonged the decision because it stated that it would have to amend the school's organizational policies to permit faith-based student organizations to require such a statement of faith for board members. The organization was forced to navigate a bureaucratic maze to amend the university's underlying organizational documents and risked the inability to be recognized.

A student leader in a religious student group at a public university recalled how the university announced it was changing its policy so that religious student organizations could not require their leaders to agree with their religious beliefs. Only through official recognition, the commenter recalled, were religious groups able to partner with the atheist club, for example, to host events like public debates. After some struggle, the campus organization collaborated with the university to pass a policy which allowed religious groups to uphold standards for their leaders.

A member of a religious student organization at a law school commented that they attended an event at another local law school with students who had to change the name of their organization because of administrative hurdles.

Denying Access to Resources

A commenter from a public university shared how, on top of facing public criticism because of their beliefs, their religious student group faced lengthy administrative hurdles like a lengthy appeal process to get funding for an event that non-religious groups have never struggled to fund. A commenter who worked with a Catholic student group on more than 100 campuses across the U.S. shared how they have encountered resistance while bringing viewpoint diversity to college campuses. Their organizations had often been deprived from accessing campus facilities, funding, free speech, and even approval from the university based on their orthodox beliefs, even though these chapters help students to think critically and better prepare them for life.

A commenter shared how their religious sorority was allowed to collectively profess its faith while some sister chapters were unable to do so. They stated that difficulties have been caused by the organization's requirements for members to affirm basic religious beliefs, so the national organization had to eliminate the requirement that chapters achieve campus recognition. They stated that this was done to maintain the religious groups' convictions, but the consequences included organization members being unable to acquire space reservations on campus without fees, unable to advertise, and unable to affiliate themselves with the brand name of the university, among other complications.

A community member and advisor for a student organization at a public liberal arts college shared how some of the student leaders were told not to approach students on campus because of a solicitation policy which was enacted to restrict commercial speech or canvassing. The commenter stated that the university rewrote the policy based

on the religious organization's activities to target the group. The religious organization sent a letter from legal counsel to get the university to correct the overbreadth of its solicitation policy.

Other

A legal practitioner who has represented Christian ministries that have faced pressure or exclusion from the campus community because of the group's beliefs and the application of these beliefs to membership and leadership expressed concern about the ongoing confusion about religious organizations' rights.

A campus minister expressed support for the rule because, even though they worked at a private institution, they had seen their colleagues be discriminated against under the guise of nondiscrimination.

A commenter shared that religious student ministry at a public university was an outstanding example of contributing to the campus, yet religious student groups had been discriminated against for upholding and practicing religious teachings that the group espoused.

An attorney shared that they had heard many examples of student groups at the secondary, college and graduate levels who had encountered arbitrary and unfounded opposition from administrators and educators, including two cases reviewed by the U.S. Supreme Court. The commenter observed that the value of diversity has been used to disadvantage religious groups while it is applied more favorably to other groups. This commenter shared that confronting universities about discriminatory policies is expensive, confrontational and time-consuming which depletes resources that could be better used.

A political science professor wrote that they served as a faculty advisor for many of these organizations and had suffered through administrative discrimination and denial of privileges on campus.

Equal Treatment

A commenter expressed support because students need a sanctuary where they can practice their religious beliefs, like the sanctuary that other organizations afford. The commenter worried that culture exempts religious organizations from teachings about tolerance, and that religious organizations are not being treated equally according to the U.S. Constitution.

Commenters overwhelmingly stated that universities should provide services, spaces, and access to diverse student groups, including religious

student groups, on an equal basis. Many commenters expressed that religious students must have equal rights in order for public universities to remain truly tolerant of all people and to protect diversity on campuses.

A commenter shared that universities should safeguard the environment in which students are supposed to express themselves freely, especially regarding freedom of religion. The commenter clarified that separation of church and state as conceived by America's Founding Fathers was not intended to silence religious expression.

A commenter stated that if religious student groups are not being treated equally, then this is discrimination and oppositional to the U.S. Constitution's protection of religious freedom.

Harms Suffered as a Result of Unequal Treatment

Several commenters wrote that stripping students' religious groups of their distinctiveness or kicking them off campus brings hardship and mental stress to students, making universities hostile to these students. Another commenter warned that when these religious groups are threatened by the university for their religious convictions, great stress and anxiety plague student members who then need to use their energy and resources not for studying but instead for fighting for space to exist on campus without harassment. This commenter also described how religious groups provide support and help for their members to be able to thrive as students. Another commenter added that religious student groups allow students to manage stress, while denying equal treatment to religious student groups brings hardship and mental stress. Another commenter wrote that religious student groups can develop students' moral compasses that can decrease depression, drug use, and anxiety that are so common on campus today. A licensed psychologist who formerly participated in a religious student group wrote that these organizations offer critical stress relief through community and provide support, care, and mentorship to the college students.

A commenter wrote that denying religious student groups equal treatment would disadvantage individuals of faith in their formation, expression and service with no benefit to those outside of the faith other than stunting their awareness of the diverse faith culture in which they participate. Another commenter wrote that to deprive and limit campus access is to ensure an education that will lack a capacity for compassion that has always stood ready

to care for the nation's poor and to serve others in time of national calamity or regional crisis.

A national campus ministry wrote of the tremendous loss when a religious student group is refused registered status. They stated that such a group becomes essentially a second-class group, becomes more isolated, and loses credibility with students. It also often experiences considerable (and often prohibitive) financial costs, required to pay for the use of campus facilities that are made available to registered organizations at no cost. The campus community is harmed as well, because diversity is most rich when authentic belief-based expression by both individuals and groups is allowed to flourish.

Contribution to Diversity

Many commenters expressed support for the regulations because they would increase ideological diversity which contributes to a more robust university environment. Some commenters noted the significance of this since public institutions are taxpayer-funded. A significant number of commenters, including organizations that represent various religions stated that universities should be diverse and inclusive spaces for all students and should treat religions equally. These organizations supported the regulations so that religious student groups will be treated fairly. Several commenters clarified that diversity is only achieved when all religions are respected. Some commenters added that religious student groups have a distinctive need to be protected so that organizations can operate with integrity. Many commenters shared that allowing religious student groups to fully express their convictions uniquely contributes to campus diversity.

Many commenters expressed the value of diversity on campuses. One commenter stated that universities should be places where students grapple with different viewpoints, so allowing the diversity that religious student organizations bring would enhance cross-cultural and conflict conversation competencies. A commenter asserted that more diversity leads to a more balanced perspective at universities. A commenter shared that diversity and inclusion are fundamental to students' education and development and granting equal access to these religious student groups would aid diversity and inclusion on campuses. Additionally, a commenter added that diversity and inclusion are measured by how well an institution tolerates students whose opinions and life principles the

**59934**   **Federal Register** / Vol. 85, No. 185 / Wednesday, September 23, 2020 / Rules and Regulations

institution may disagree with and how they are allowed to practice those principles. Another commenter noted that religious diversity increases tolerance.

One commenter contended that an institution prevents diversity on campuses by not allowing religious student groups to practice their religion with integrity. One commenter stated that beliefs cannot be uniform among a freethinking people, so valuing safety over free expression will have a disparate impact on the nation's intelligence.

Many commenters supported the regulation to prevent discrimination against religious student groups seeking to live out their values. One commenter expressed concern over certain ideologies silencing religious, conservative ones. The commenter advocated for more diversity, fed by religious student groups' activity, to create greater diversity of belief, experience, and opinion ultimately to create a more robust university environment for the free exchange of ideas. One commenter expressed concern over their children's college environment where conservative students could face bullying, isolation, among other social repercussions, and emphasized that truly inclusive diversity is needed. Another commenter warned that religious student organizations should not be marginalized simply because other prominent ideologies in society disagree with them. One national women's organization expressed concern over discrimination against religious student groups and emphasized that religious student groups should be treated equally. They supported the new rule because they stated it would bring the Department in line with the President's Executive Order on Improving Free Inquiry, Transparency, and Accountability at Colleges and Universities to protect the First Amendment rights of students of all faiths at public post-secondary institutions.

Social Benefits

A non-profit law firm stated that religion and the social networks and organizations surrounding it are crucial in transmitting civic norms and habits, such as belonging to a community organization, especially a health-related one, youth-serving organizations, neighborhood and civic associations, fraternal and service organizations, and even professional and labor groups.

A commenter wrote these clubs bring vibrancy and diversity of belief, opinion, and experience, creating a more robust university environment to engage in the free exchange of ideas. One commenter expressed the need for free speech and First Amendment protections and shared a 2010 survey of college students which found that only 36 percent agreed with the statement that "it is safe to hold unpopular views on campus." This number drops to 30 percent for seniors, and only 16.7 percent of faculty agreed with the statement. The commenter elaborated that the free market of ideas sharpens students' critical thinking skills. They stated that protecting the First Amendment will save students and universities from costly litigation.

A commenter whose daughter participated in a religious student group shared that religious student groups are places where belief systems and cultures can be explored along with other intellectual pursuits. Another commenter noted how religious student groups afford students the opportunity to explore faith, examine and choose, as an adult, a path they may want to follow. An additional commenter wrote that the university experience is a key time for intellectual development and character formation, so diversity added from religious student groups is profitable to students. Many commenters underscored that students ought to be allowed to learn from a multiplicity of viewpoints to form their own convictions while forming common ground with and respect for other beliefs. They stated that all students need to be taught critical thinking and be exposed to all intellectual and religious ideas so that they can be intelligent, wise, and fair-minded individuals.

Other commenters emphasized how spiritual maturity is important in an educational environment where students are pursuing their future vocations.

A retired university professor supported the proposed regulations because they saw much growth in young people based on the open exchange of ideas, both in the classroom and through extra-curricular activities. The commenter advocated that the Department adopt these regulations so that religious student groups will have the ability to contribute to this exchange from their own religious identity and character.

A commenter wrote how religious student groups increase belonging on campuses. Religious student groups provide students with great encouragement and a place to feel they belong—this is especially needed and true for freshman that have left home and now have 800 people in their history class or 30,000 students on their campus. These religious student groups provide mentorship, leadership, and training. A different commenter stated these activities occur because of the religious organization's unique characteristics. Many commenters shared personal testimonies of how religious student groups created community and life-long friendships, especially amid stress. Another commenter clarified that these institutions are not riddled with hazing, sexual abuse, or similar scandals as are other college organizations. A commenter noted that groups like Hillel and InterVarsity serve important constituencies well in an increasingly polarized society. Another commenter wrote that student's religious and spiritual beliefs are a key part of their identity, and many have a strong desire to connect with other students who share their same identity, yet oftentimes religious student organizations are the most active organizations on campus, and the most welcoming to people of all (or no) spiritual background to their events and activities on campus.

Many commenters unpacked the benefits of spiritual development on students and the campus as a whole. One commenter observed spiritual development is critical to ensuring a stable future for our country. A commenter explained that spiritual development contributes to students' whole moral, conscious, and character growth. Another commenter shared how participation in a religious student group creates spiritual habits that often result in a lifetime of community service. Many commenters observed the community contributions religious student groups make through charity activities, giving, volunteerism, outreach to engage in civil services, etc. Other commenters shared the values that are promulgated by religious student groups including caring for others, community, temperance, leadership, community, justice, gratitude, prudence, and actually much more tolerance than those trying to eliminate them.

Another commenter who serves as a non-profit leader who works predominantly with students of color stated that they believe the community afforded by campus religious organizations significantly aid in the social and academic flourishing of all college students and especially those from historically marginalized communities. A commenter recalled how they had seen a religious student group help homeless students find shelter and food, emotionally hurting students find truth and healing, over-

**Federal Register** / Vol. 85, No. 185 / Wednesday, September 23, 2020 / Rules and Regulations    **59935**

achieving and perfectionistic students find grace, students who lack confidence become leaders of their peers, students take risks to start groups that encourage and support other students who were hurting, and students in general become more loving, competent, and contributing individuals.

Improvements to Educational Environment

One commenter supported the regulations because they stated they would inherently enhance the total cause of public education, and another commenter shared how university cultures are greatly enhanced by the presence of religious organizations. More specifically, a commenter believed one of the most important functions of our universities is to expose students to diverse ideas in order to understand the world and as a means of helping them learn to think logically and rigorously about ideas. Additionally, they stated that universities should help equip students to better discern truth from falsehood, fact from fiction, and wish from reality. Furthermore, a commenter shared that a thriving institution is one that supports a student's moral integrity, which is based upon religious beliefs and not simply academia, which would support student morale and campus well-being. Another commenter echoed the value of diversity, stating that universities are precisely a forum for exploring different and new ideas, and for deepening knowledge in areas of interest. Developing one's own spirituality helps human beings cope better with life's stresses, and religious groups may provide just that support to students on campus.

Concerns With Government Interference or Entanglement

A commenter observed that universities denying religious organizations the ability to impose moral criteria effectively bans the organization. Another commenter expressed discontent over State university administrators deciding which religious student groups are allowed or excluded.

Another commenter stated that these regulations would support the constitutional rights guaranteed under the Establishment Clause—government officials never should be allowed to dictate to religious groups their leadership standards, and government officials should never be able or allowed to penalize religious groups because of their religious beliefs and speech. Commenters stated that a national standard, codified by these regulations,

would provide consistent protection for students' speech and religious freedom regardless of which State a student chooses to move to in order to attend college. Another commenter expanded on the argument that universities should not be picking which groups can receive equal treatment, since public university administrators and faculty are on the public payroll. The commenter stated that they administer public funds, yet they use taxpayer money against members of the public when they (a) deny approval for a group of Christian students to meet in a building on campus, (b) revoke approval to post notices of their events on campus bulletin boards, (c) require sponsorship by a member of the faculty in order to exist on campus, or (d) exclude the group from receiving a share of the distribution of student activity fee revenues because of the group's religious nature. Another religious student group expressed support that the proposed regulations would emphasize that no religion-based discrimination against faith-based entities will be accepted at any stage of the funding process.

Many commenters expressed concern over increasing intolerance of free speech and religious viewpoints which may deviate from mainstream thought on college campuses, noting that many colleges have shown intolerance towards religious organizations by driving them off campuses. Many commenters identified Jewish, Muslim, Catholic, and Protestant organizations, in particular, as targets of religious discrimination. Several commenters posed that university officials were penalizing religious groups specifically because of their beliefs and speech, so they were dictating their leadership standards to the religious groups. A commenter argued that such penalization and dictation of leadership standards violated the Establishment Clause. A few other commenters suggested that students were physically at risk when speaking controversial viewpoints and are not always protected by campus security, so they supported these regulations to provide support and protection to these groups. Another commenter shared that among many other clubs that select leadership based on the alignment with a code of conduct or set of beliefs, people of faith, alone, have been singled out by universities and harassed on the basis of those beliefs. A commenter stated that seemingly offensive speech is not a justification for institutions of higher education which receive Federal funds to disrespect fundamental First

Amendment rights and that the State cannot choose which morality and ideologies it allows. Another commenter added government should neither favor nor oppose religion, so public academic institutions should be handling religious issues exactly the same way as the government, in a completely neutral fashion.

One non-profit organization that supports campus ministries across the United States supported non-discrimination policies and believes that they should be used to protect against invidious discrimination. They stated that non-discrimination requirements should protect, rather than penalize, religious groups that want to retain their distinct religious character. This organization strongly supported the proposed regulations because student organizations need protection from administrative overreach by universities and colleges. According to this organization, the proposed regulations, thus, strengthen current non-discrimination policies.

Another commenter expressed that for a college to kick a group off campus unless they allow leaders who contest the very principles for which the group stands, is a surefire way to destroy religious liberty on campus. The commenter stated that not only are such campus policies unfair to religious groups (and such policies have typically arisen from a desire to single out such groups), but such policies deprive people of their First Amendment rights.

A commenter wrote that denying a religious organization access to a public campus may impede growth toward religion while growth away from religion continues unfettered; this creates a bias against religion and impedes students' religious freedoms. This commenter stated that derecognition is a punitive action and derecognizing religious organizations on public college campuses is a violation of religious freedom.

One commenter expressed strong concerns about anti-conservative, religious bias in America that is being manifested on U.S. campuses, including destruction of property and heckling, among other problems.

Religious Integrity

A significant number of commenters shared that universities do themselves and their students a disservice when a religious student group's ability to retain their distinct religious identity and character is hindered and the group is discriminated against on the basis of religious conviction. The commenters stated that religious student groups make their best contribution to campus

life when they retain their distinct religious identity and character. They contended that the proposed regulations would make that possible on every public campus.

Many commenters expressed that a religious institution should be allowed the freedom to uphold the values it holds close in regard to who it hires, fires, and what activities are allowed on campus based on the particular tenets of their faith practice, corresponding with the value that America places on freedom of religion. They stated that student organizations on college and university campuses should be able to select leaders who share the organizations' goals and mission. But they also noted that religious groups, including Jewish, Muslim, and Catholic student organizations, have been discriminated against for requiring that their leaders uphold and practice the religious teachings that the group espouses.

Many commenters drew analogies regarding organizations' right to choose leadership that reflects their values, priorities, or skills. For example, one commenter drew the analogy that a male football team would not be led by a woman, a female acapella group is not led by a man, Phi Beta Kappa is not led by someone with poor grades. Further, this commenter observed that groups like Phi Beta Kappa are not criticized for discriminating based on intelligence nor fraternities or acapella groups for excluding membership based on sex, so religious organizations should not be considered any differently.

Another commenter supported these proposed regulations and noted that under Title VII of the Civil Rights Act of 1964 ("Title VII"), if a factor such as religion, sex, or national origin, etc., is reasonably necessary in the normal operation of an organization to carry out a particular job function, then that factor is bona fide occupational qualification, and the use of such a factor is not considered discriminatory. A commenter supported the proposed regulations because setting standards for the leaders of our organizations, whether religious or secular, is the best measure to protect the core values, character and mission of such organizations. This commenter stated that a scientific society would quickly lose effectiveness and credibility if it allowed its leadership to be infiltrated by those who do not believe or subscribe to the "scientific method" as the best course for research and scientific discovery. Another commenter noted that leaders sharing basic convictions of the religious organization allowed the commenter to

understand the organization and expect consistency. According to this commenter, leadership sharing these convictions allows for the organization to build upon common ground and grow. The national director of a major nonprofit and interdenominational campus ministry operating hundreds of groups at campuses across the U.S. supported the proposed regulations for reasons related to religious integrity because these proposed regulations recognize the value of association around common interests, reflect protections afforded other associative groups at universities, and affirm that an associative group can and should be led by those who fully agree with the purpose(s) of the group.

A non-profit law firm elaborated that because personnel is policy, any organization dedicated to advancing a particular cause must ensure that those who lead it are actually committed to that cause. Thus, organizations dedicated to advancing a particular cause, whether the College Democrats, the College Republicans, the Christian Medical Association, Chabad on Campus, or any other group formed around a common cause or belief should be permitted to maintain membership and leadership standards that ensure the common cause is furthered.

Another commenter shared that religious organizations' values and beliefs, particularly, make them positive contributors to campus life, so the proposed regulations, which would extend equal treatment to religious student groups, would make the public campus a welcoming environment for all.

A commenter wrote that, based on many conversations they had over the past few years, the ability of each group to retain that its unique religious identity can only be truly protected by regulations such as this—to once and for all end the discrimination that too often happens and lessen the fear of lawsuits if institutions try to protect groups that others want to keep off campus. Another commenter added that further legal protection is needed for religious student groups, given the polarized climate.

Another commenter reflected that faith and interfaith groups have become increasingly sponsored and promoted in the workplace as a part of a larger diversity and inclusion measure. Since universities educate tomorrow's workers, universities should mirror these trends and provide students the opportunity to explore faith during their formative years.

A commenter stated that having a diversity of groups requires

organizations being able to elect their own leaders. This commenter also stated that the Establishment Clause is violated when government officials dictate to religious groups their leadership standards or when such officials penalize religious groups because of their religious beliefs and speech.

One commenter reasoned that denying religious groups their identities makes every organization equal if it is not able to express its core values and beliefs and that having such groups increases understanding and acceptance while allowing college students to grow.

One particular religious group strongly supported the regulations because they support the right of student organizations to maintain core religious beliefs as necessary for group membership and leadership. They contended that students do not lose constitutional rights simply because they step onto a college campus. Public university officials abridge the guarantees of the First Amendment when they limit students' ability to freely assemble and gather around their most deeply held beliefs.

One commenter wrote in support of the proposed rules because education is an area of significant importance in Judaism, and they believe that these proposed rules would help foster a better environment in which Jewish Americans can educate their children. They argued that the proposed regulations would also play an important role in safeguarding the rights of Jewish student organizations on public college campuses.

One commenter reasoned that removing membership/leadership qualifications gives space for leaders with dangerous motives (such as someone seeking to manipulate others) to enter a leadership position, posing a risk to belief-based organizations.

Clarity

A significant number of commenters expressed support for the proposed regulations because they would clarify longstanding confusion over religious organizations' role and rights on university campuses. They noted how these regulations would add clarity for both religious organizations and campus administrators by instituting clear standards.

*Discussion:* The Department appreciates these comments in support and agrees that religious student organizations play an important role at public institutions of higher education. The Department revises §§ 75.500(d) and 76.500(d) to expressly note that the provisions, concerning religious student

organizations, constitute material conditions of the Department's grants. The Department consistently characterized the provisions in §§ 75.500(d) and 76.500(d) in the NPRM as material conditions.[56] The tremendous amount of support for these provisions demonstrates that these regulations are indeed material and necessary to reinforce First Amendment freedoms at public institutions. The Department has revised its other provisions in §§ 75.500(b)–(c) and 76.500(b)–(c) regarding compliance with the First Amendment for public institutions and freedom of speech, including academic freedom, for private institutions to reflect that these provisions are material conditions, consistent with the characterization of these provisions in the NPRM. The Department wishes to note that all of the provisions in §§ 75.500 and 76.500 promulgated through these final regulations are material conditions.

Additionally, commenters described a myriad of ways in which public institutions may treat religious student organizations differently than other student organizations. In response to these comments, the Department revised the parenthetical in §§ 75.500(d) and 76.500(d) that includes a non-exhaustive list of examples of how a public institution may deny a religious organization a right, benefit, or privilege that is otherwise afforded to other student organizations at the public institution. As commenters raised the issue of public institutions denying religious student organizations student fee funds provided to other student organizations and as the Supreme Court of the United States decisively ruled on the distribution of student fee funds to religious student organizations in *Rosenberger* v. *Rector & Visitors of the University of Virginia,*[57] the Department revises the parenthetical to include distribution of student fee funds as one way in which a public institution may treat a religious student organization differently than other student organizations.

*Changes:* The Department revises §§ 75.500(d) and 76.500(d) to state that the provisions related to religious student organizations at public institutions constitute a material condition of the grant. The Department also revises the parentheticals in §§ 75.500(d) and 76.500(d) that include a non-exhaustive list of examples of how a public institution may deny a religious organization a right, benefit, or privilege that is otherwise afforded to

other student organizations at the public institution. The Department specifically includes distribution of student fee funds in this non-exhaustive list. The Department makes a technical correction to § 75.500(d) to refer to grantees that are public institutions to align with the language in the remainder of § 75.500. The Department makes a technical correction to § 76.500(d) to refer to States or subgrantees that are public institutions to align with the language in the remainder of § 76.500(d).

*Comments in Opposition*

Separation of Church and State & Concerns Under the Establishment Clause of the First Amendment

*Comments:* Several commenters asserted that the proposed regulation pertaining to religious student organizations violates the Establishment Clause. One commenter argued that the Establishment Clause bars the government from making accommodations for religion that impose significant burdens on third parties, such as students or nonreligious organizations. Another commenter stated that the final regulation would expand the allowable use of Federal financial assistance to support religious instruction, worship, and proselytization. The commenter noted that the First Amendment prohibits the government from directly funding religious instruction, worship, and proselytization, as the Supreme Court held in *Locke* v. *Davey.*[58] Other commenters maintained that any organization that makes the choice to exclude classes of people based on religion, race, gender identity, or sexual orientation should not receive public tax dollars.

One commenter who identified as a former Episcopal chaplain at a large public university stated that this commenter's campus ministry included a student organization recognized by the university. This commenter noted, however, that there was no expectation that the university help fund the chaplain's ministry and that the funding came entirely through the Episcopal church. This commenter further noted that other campus ministries at that university used this same approach to separation of church and state and advocated that the Department maintain such a separation. Commenters also argued that, because we live in a pluralistic society, it is inappropriate for publicly funded institutions to fund religious student organizations at all.

Commenters maintained that no public funds should support religious student organizations, but rather, churches alone should fund such student groups. These commenters argued that Thomas Jefferson's "wall of separation" is more important than ever in our diverse world. Commenters also stated that the Constitution demands that our children's ability to get an education must never depend on whether they share the religious beliefs of any government-funded organization.

Commenters also contended that the religious exemption violates the Establishment Clause's prohibition on government promotion or advancement of religion. According to this commenter, in *Corporation of Presiding Bishop* v. *Amos,* the Supreme Court explained that the Title VII exemption allows "churches to advance religion," which does not violate the Constitution.[59] The commenter contended that the case would have been different had "the government itself . . . advanced religion through its own activities and influence."[60] The commenter concluded that unlike in *Amos,* here the government itself is involved.

*Discussion:* The Department disagrees with commenters who state that the regulation violates the Establishment Clause. It is a well-established principle that public institutions may provide benefits to religious student organizations without running afoul of the First Amendment. Indeed, "[i]f the Establishment Clause barred the extension of general benefits to religious groups, a church could not be protected by the police and fire departments, or have its public sidewalk kept in repair."[61] More specifically, "the guarantee of neutrality is not offended where, as here, the government follows neutral criteria and evenhanded policies to extend benefits to recipients whose ideologies and viewpoints, including religious ones, are broad and diverse[.]"[62]

---

[59] 483 U.S. 327, 337 (1987).

[60] *Id.*

[61] *Widmar* v. *Vincent,* 454 U.S. 263, 274–75 (1981) (internal quotation marks and citation omitted); *Espinoza* v. *Montana Dep't of Revenue,* 140 S. Ct. 2246, 2254 (2020) ("We have repeatedly held that the Establishment Clause is not offended when religious observers and organizations benefit from neutral government programs.").

[62] *Rosenberger* v. *Rector & Visitors of Univ. of Va.,* 515 U.S. 819, 820–21 (1995) (citation omitted); *see also Widmar,* 454 U.S. at 274 (internal quotation marks removed) ("[A]n open forum in a public university does not confer any imprimatur of state approval on religious sects or practices. As the Court of Appeals quite aptly stated, such a policy would no more commit the University . . . to religious goals than it is now committed to the goals
Continued

---

[56] *See, e.g.,* 85 FR 3191, 3199, 3214.

[57] 515 U.S. 819 (1995).

[58] *Locke* v. *Davey,* 540 U.S. 712 (2004).

Not only is providing benefits to religious student organizations permitted under the Establishment Clause, but withholding benefits from religious student organizations because of their viewpoint or religious character is forbidden under the First Amendment, as the Supreme Court has repeatedly recognized in cases involving institutions of higher education.[63]

Moreover, §§ 75.500(d) and 76.500(d) strengthen the wall of separation between church and state by preventing public university administrators from violating the First Amendment by interfering with religious beliefs or becoming entangled with religion. The Supreme Court has found this kind of interference unconstitutional, like in the case of *Widmar* v. *Vincent*,[64] in which the Court struck down a university policy excluding all religious groups from using school facilities. The Court observed that "the University would risk greater 'entanglement' " between church and state because "the University would need to determine which words and activities fall within 'religious worship and religious teaching.' "[65] Similarly, it is improper for universities to decide what constitutes religious qualifications, or to determine which religious qualifications are acceptable. Indeed, "[a]ccording the state the power to determine which individuals will minister to the faithful also violates the Establishment Clause."[66]

The Department notes that the final rule will not impose constitutionally significant burdens on third parties. First, the rule mandates equal treatment for religious student organizations as compared to their secular counterparts; these final regulations do not favor or disfavor religious student organizations or any particular religion. Second, the U.S. Constitution does not prohibit religious student organizations from excluding students from leadership because they do not meet an organization's religious qualifications, even though such exclusion may be potentially inconvenient or disappointing. Such exclusion under these final regulations is a permissible distinction based on religious belief or conduct. The alternative—requiring faith-based groups to forgo their religious tenets when selecting leadership—violates their freedoms of speech, association, and free exercise. The First Amendment requires public institutions of higher education to refrain from infringing on this ecosystem of liberties unless a public institution adopts a true all-comers policy as explained in the "All-Comers' Policies for Student Organizations" section, below.

Additionally, §§ 75.500(d) and 76.500(d) support, rather than hinder, pluralism, as these regulations prevent public institutions from suppressing or discriminating against ideas in an academic setting. These final regulations ensure that institutions of higher education comply with Congress' mandate to "facilitate the free and open exchange of ideas" and prevent students from being "intimidated, harassed, [or] discouraged from speaking out, or discriminated against" on account of their speech, ideas or expression.[67] The Department thus disagrees with commenters who opined that the rule requires children to share the religious beliefs of a government-funded organization in order to obtain an education. Instead, §§ 75.500(d) and 76.500(d)—which deal exclusively with student organizations, not the school's curriculum—increases the range of religious and ideological diversity to which students are exposed.

The Department notes that existing §§ 75.532 and 76.532 strictly prohibit any State, grantee, or subgrantee from using its grant to pay for religious worship, instruction, or proselytization. These final regulations do not alter §§ 75.532 and 76.532 in any way. Assuming *arguendo* that the holding in *Locke* v. *Davey* requires such restrictions, the Department's existing regulations are consistent with the restrictions that the commenter believes *Locke* requires. The Department's existing regulations, thus, ensure that grants are not used in violation of the Establishment Clause.

Lastly, these final regulations are not contrary to the Establishment Clause principles established in *Corporation of the Presiding Bishop of Church of Jesus Christ of Latter-Day Saints* v. *Amos* because the government is not using its activities or influence to advance or promote religion, but is instead requiring public institutions not to deny to religious student organizations any right, benefit, or privilege that is otherwise afforded to other student organizations at the public institution. It accomplishes exactly what *Corporation of the Presiding Bishop* ruled was permissible: Allowing a religious group to exercise its religion without government interference.[68] As the Supreme Court stated: "A law is not unconstitutional simply because it *allows* churches to advance religion, which is their very purpose."[69]

*Changes:* None.

"All-Comers" Policies for Student Organizations

*Comments:* Several commenters opposed the changes to §§ 75.500(d) and 76.500(d) because they contended colleges have the right to require all student organizations, religious or nonreligious, to comply with nondiscrimination policies to receive funding or recognition in accordance with the holding in *Christian Legal Society* v. *Martinez*.[70] Other commenters contended that the Department should not bar schools from applying neutral, generally applicable policies to religious student organizations. Commenters argued that it is inappropriate for the executive branch to foreclose all-comers policies by public colleges and universities. These commenters argued that these policy decisions are best left to institutions as informed by their own State laws.

Many commenters noted that in *Martinez*, the Supreme Court upheld as constitutional a public university's all-comers policy that required student groups seeking official recognition to allow any student to join and participate in that group, including in elections for leadership positions. The Court held that such policies do not violate the free speech, expressive association, and free exercise rights of the students.[71] The Court also concluded that all-comers policies do not violate the Free Exercise Clause.[72] Rejecting the argument that such policies target religion, the Court explained that exempting religious groups from all-comers policies would provide them "preferential, not equal, treatment."[73]

Commenters also remarked that the proposed regulations would mandate the very same preferential treatment for religious student organizations that the Supreme Court held was not necessary in *Martinez*. Commenters noted that in *Martinez*, the Supreme Court held that where a school implements a nondiscrimination policy requiring

---

of the Students for a Democratic Society, the Young Socialist Alliance, or any other group eligible to use its facilities.").

[63] *Rosenberger*, 515 U.S. at 846; *Healy* v. *James*, 408 U.S. 169, 194 (1972); *Widmar*, 454 U.S. at 277; *see also Martinez*, 561 U.S. at 685.

[64] *Widmar*, 454 U.S. at 274–75.

[65] *Id.* at 272, n.11.

[66] *Hosanna-Tabor Evangelical Lutheran Church & Sch.* v. *E.E.O.C.*, 565 U.S. 171, 188–89 (2012).

[67] 20 U.S.C. 1011a(2)(C)–(D).

[68] *Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints* v. *Amos*, 483 U.S. 327, 337 (1987).

[69] *Id.*

[70] 561 U.S. 661 (2010).

[71] *Id.* at 683.

[72] *Id.* at 697 n.27.

[73] *Id.*

official, school-funded student groups to accept "all-comers," the policy is a reasonable, viewpoint neutral condition governing the formal recognition of student organizations.[74] According to commenters, in *Martinez* the Christian Legal Society argued that being required to accept members who did not share the organization's core beliefs about religion and sexual orientation violated First Amendment rights to free speech, expressive association, and free exercise of religion.[75] The commenters asserted the Court recognized that it is "hard to imagine a more viewpoint-neutral policy than one requiring *all* student groups to accept *all* comers",[76] and that what the group actually sought was "not parity with other organizations, but a preferential exemption from [the school's] policy."[77]

*Discussion:* In *Christian Legal Society* v. *Martinez,* the Supreme Court considered a policy that "mandated acceptance of all comers" meaning that "[s]chool-approved groups must 'allow any student to participate, become a member, or seek leadership positions in the organization, regardless of [her] status or beliefs.' "[78] The Department emphasizes that §§ 75.500(d) and 76.500(d) are consistent with the holding in *Martinez,* as these regulations do not prohibit public colleges and universities from implementing all-comers policies, nor do they bar these institutions from applying neutral, generally applicable policies to religious student organizations. By its very definition, a neutral policy of general applicability binds *all* organizations, and thus is permissible under §§ 75.500(d) and 76.500(d); therefore, an authentic all-comers policy would be neutral and generally applicable.

Under the stipulated facts of *Martinez,* the policy applied to all 60 groups on campus, including "political groups (*e.g.,* the . . . Democratic Caucus and the . . . Republicans), religious groups (*e.g.,* the . . . Jewish Law Students Association and the . . . Association of Muslim Law Students), groups that promote[d] social causes (*e.g.,* both pro-choice and pro-life groups), groups organized around racial or ethnic identity (*e.g.,* the Black Law Students Association, the Korean American Law Society, La Raza Law Students Association, and the Middle Eastern Law Students Association), and groups that focus[ed] on gender or

sexuality (*e.g.,* the Clara Foltz Feminist Association and Students Raising Consciousness at Hastings)."[79] The implications of such a policy were that "the . . . Democratic Caucus cannot bar students holding Republican political beliefs from becoming members or seeking leadership positions in the organization."[80] With respect to a true all-comers policy, pro-choice groups could not bar leadership positions from pro-life individuals; Muslim groups could not bar leadership positions from non-Muslims; the feminist group could not bar leadership positions from misogynists; and so on. Such a policy is constitutional under *Martinez,* but is not required by the U.S. Constitution or under the holding in *Martinez.* Indeed, many public institutions of higher education elect not to implement true all-comers policies due to these obvious practical difficulties.

The final regulations would not, as one commenter suggested, mandate preferential treatment for religious student organizations. In *Martinez,* the religious student organization sought "not parity with other organizations, but a preferential exemption from [the institution's all-comers] policy."[81] Here, the Department requires parity among all organizations. A public institution of higher education may adopt a generally applicable policy, such as an authentic all-comers policy, which applies equally to *all* student organizations and which requires all student organizations to allow any student to participate, become a member, or seek leadership positions in the organization, regardless of the student's status or beliefs. A public institution also may adopt a generally applicable policy that allows *all* student organizations to set their own qualifications for membership and leadership. A public institution also may adopt other types of generally applicable policies with respect to student organizations as long as such policies apply equally to all student organizations, including religious student organizations. None of these scenarios give religious student organizations an exemption or preferential treatment, but merely equal treatment, which is required under the First Amendment.

Ultimately, §§ 75.500(d) and 76.500(d) clarify that public institutions allowing student organizations to restrict membership or hold certain standards for leadership may not implement non-neutral policies that single out religious

student organizations for unfavorable treatment. Numerous public commenters described instances in which disfavored treatment of religious student organizations occurs daily on college campuses nationwide, demonstrating the need for such a rule. Public institutions remain free to adopt generally applicable membership policies, such as an all-comers policy, but a public institution may not selectively enforce its policies to target religious student organizations so as to deny them any right, benefit, or privilege that is otherwise afforded to other student organizations at the public institution.

*Changes:* None.

Religious Student Organizations Should Not Receive Special Protection or Receive Preferential Treatment

*Comments:* Several commenters opposed the final regulations because, by not expanding the exception to other groups with specific viewpoints such as political or affinity groups, they stated the proposed regulations would allegedly grant faith-based student organizations preferential treatment. One commenter noted that student organizations at public colleges and universities constitute a public forum, and that, while these institutions may not discriminate based on viewpoint, they also cannot favor some viewpoints by granting special exemptions only to religious organizations.

Numerous commenters also contended that schools should fund only those groups that serve "the common good" on their campus. Several commenters opined that "strict sectarian groups" do not support the common good. One commenter opined that a religious student group that believes in creationism or a flat Earth should not be equally eligible for money as a physics club. Another commenter contended that, by promulgating this regulation, the Department is attacking science, and the commenter predicted that such attacks will ultimately damage the nation's economy. Commenters also stated that the Department must not require colleges and universities to fund groups that contradict accepted science or discriminate against select groups of students such as LBGTQ+ individuals, racial minorities, or any other recognized group. Other commenters suggested that religious students are not the students that government programs are "actually intended" to help, that religious student groups should refrain from proselytization, and that religious groups experience disfavored treatment because they do not truly work "for the good of all humanity."

---

[74] *Id.* at 669.

[75] *Id.* at 668.

[76] *Id.* at 694.

[77] *Id.* at 669.

[78] *Id.* at 671 (citations omitted).

[79] *Id.* at 709.

[80] *Id.* at 675.

[81] *Id.* at 669.

Commenters opined that the final regulations would allow any religiously affiliated student organization to blackmail universities by claiming to be discriminated against if they did not receive money from their university each time they requested it. Several commenters remarked that schools should be able to discipline student organizations that practice exclusion and bias. Commenters also claimed that, if religious student organizations truly work for the good of all humanity as they say they do, such groups would not proselytize or discriminate against anyone, and therefore they would have no need for these final regulations.

*Discussion:* The Department reiterates that the final regulations do not mandate preferential treatment for faith-based student organizations; instead, the regulatory text requires that religious student organizations not be denied benefits given to any other student group because of their religious nature. Therefore, rather than giving religious student organizations special treatment, the regulation explicitly requires the opposite outcome—that religious student organizations at public institutions be afforded equal treatment.

Indeed, the substance of the numerous oppositional comments confirmed the need for a final rule requiring equal treatment for religious groups. First, contrary to the commenters who opined that religious student organizations do not contribute to the common good, the Department received a tremendous number of comments from students who had benefited personally, academically, and professionally because of participation in religious student groups. These commenters also described numerous ways in which their communities benefited because of service projects carried out by these religious student groups.

Second, while the Department understands that not everyone agrees with the mission or beliefs of religious student organizations, the First Amendment requires public institutions of higher education to refrain from content-based or viewpoint discrimination under the Free Speech Clause and to protect the free exercise of religion under the Free Exercise Clause. Indeed, the Supreme Court has held that "[s]tate power," which public institutions wield, "is no more to be used so as to handicap religions than it is to favor them." [82] Likewise, the Constitution "forbids hostility" toward "all religions," [83] and discrimination in

response to the exercise of a fundamental right—here, by religious student organizations—triggers strict scrutiny under the Equal Protection Clause. [84] Making religious student groups' funding contingent on whether they believe in creationism—or any other religious belief—is forbidden, as the Supreme Court has repeatedly held. [85] Thus, contrary to the arguments of these commenters, religious student organizations, regardless of their religious beliefs, are entitled to the same general benefits as other secular organizations under the First Amendment. Neither the religious group nor the science club should be silenced.

Further, §§ 75.500(d) and 76.500(d) do not enable religious student organizations to discriminate on the basis of protected classes, such as race or sex. It simply allows them to create leadership or membership qualifications based on religious tenets or standards of conduct informed by their religion. Disciplining these organizations for exercising their First Amendment rights, as suggested by one commenter, is forbidden by the Constitution. Further, whether or not a religious group engages in proselytization is not relevant to whether there is a need for these final regulations. The overwhelming number of comments in support of these final regulations demonstrate that there are instances in which religious student organizations are treated unequally and discriminated against on college campuses, and support our determination that these final regulations are necessary to remedy such discrimination against religious student organizations.

Religious student organizations would not be empowered to "blackmail" universities by "claiming" discrimination each time they failed to receive money. If, in fact, a public institution of higher education does not provide religious student organizations a public benefit that is generally available to secular organizations because of the religious character of the student organization, then it *is* engaging in discrimination prohibited by these final regulations and the principles established by the Supreme Court in *Trinity* [86] and *Espinoza*. [87] However,

withholding funds from any student organization under a neutral rule of general applicability is not constitutionally suspect or prohibited under these final regulations. [88]

Finally, the Department disagrees that these final regulations will damage the economy. As discussed comprehensively in the NPRM, the Department has analyzed the costs and benefits of complying with these regulations. We concluded that the regulations impose approximately $297,770 in costs in Year 1, and we are issuing them on a reasoned determination that their benefits justify their costs. Further, we do not believe that the final regulations will result in any significant costs to the Federal government, general public, or recipients of support under the affected programs. If public institutions treat religious student organizations and other student organizations equally, then these public institutions will avoid liability for First Amendment violations, which may even result in a cost savings.

*Changes:* None.

The Proposed Regulations Will Allow Discrimination Against Certain Groups of Students

*Comments:* Several commenters maintained that the proposed regulations are "dangerous" and "harmful" to LGBTQ+ students, women and girls, religious minority students, and "many others." One commenter stated that the changes proposed by the Department are un-Christian and would reward bigotry and hatred by creating a religious right to discriminate against vulnerable groups. Some commenters who identified as parents of LGBTQ+ students opposed these proposed regulations. These commenters were concerned that powerful religious groups in the U.S. would persecute and harm their children openly because these groups fear no reprisal from the government. These commenters also noted that LGBTQ+ students should have the same rights as other students and not be pushed back into more separation.

Commenters also asserted that the proposed regulations fail to address the harm that such an exemption would pose for students who would face discrimination by school-sanctioned student groups. These commenters noted that, because of the central role that access to education plays in

---

[82] *Everson* v. *Bd. of Educ.*, 330 U.S. 1, 18 (1947).

[83] *Lynch* v. *Donnelly*, 465 U.S. 668, 673 (1984).

[84] *See Clark* v. *Jeter*, 486 U.S. 456, 461 (1988).

[85] *Rosenberger*, 515 U.S. at 846; *Healy*, 408 U.S. at 194; *Widmar*, 454 U.S. at 277.

[86] *Trinity Lutheran*, 137 S. Ct. at 2021–22 (holding unconstitutional a policy forcing a religious institution to choose between "participat[ing] in an otherwise available benefit program or remain[ing] a religious institution").

[87] *Espinoza*, 140 S. Ct. at 2261 (application of State's no-aid provision violated the Free Exercise Clause by "cutting families off from otherwise

available benefits if they choose a religious private school rather than a secular one").

[88] RFRA applies to the Department when there is a substantial burden, even if the burden results from a rule of general applicability. 42 U.S.C. 2000bb–1.

personal and professional development, eliminating discrimination in education has long been recognized as a governmental interest of the utmost importance. They cited Supreme Court precedent to support their positions.[89] One commenter stressed the long history of student groups serving as vehicles for discrimination, preventing marginalized students from being fully integrated into student life on university campuses across the country.[90] The commenter claimed that the Department's proposed regulations would return public university campuses to a shameful era in which public universities broadly countenanced discrimination against vulnerable groups of students.

Several commenters opined that the Department is using religious liberty as an excuse to discriminate or hurt other students. Commenters suggested that the Department seems to have proposed these regulations because the Department desires to attack LGBTQ+ students and promote bigotry on university campuses. A commenter suggested that the employees at the Department who helped work on the proposed regulations should move to a theocratic government overseas such as Saudi Arabia or Israel. Several commenters remarked that the Department, by proposing these regulations, is forcing the beliefs of older, white, upper-middle class conservative Christians onto the rest of America.

One commenter stated that the government should never fund discrimination, and that allowing such discrimination raises constitutional concerns. This commenter asserted that the government has a "constitutional obligation" to "steer clear, . . . of giving significant aid to institutions that practice racial or other invidious discrimination." [91]

*Discussion:* The Department disagrees with commenters who state that the final regulations will promote discrimination, bigotry, and hate on college campuses. The Department is not espousing any religious beliefs and is instead requiring public institutions

not to discriminate against religious student organizations, no matter what their religious beliefs may be. These final regulations apply to religious student organizations, including religious minorities and religious groups that have endured persecution. The overwhelming number of comments received in support of these final regulations regarding religious student organizations and recent case law about religious student organizations being denied the rights and benefits afforded to other student organizations at public institutions demonstrate these final regulations are indeed necessary.[92]

Religious freedom, by its definition, promotes tolerance and pluralism because it protects the right of individuals and groups to obey their conscience even when their conscience is at odds with popular beliefs and practices. Additionally, religious freedom constrains State action that would otherwise seek to enforce uniformity of thought or silence dissent. Thus, requiring public institutions to recognize students' First Amendment rights to speech, association, and free exercise will foster a culture that is *more* welcoming of various viewpoints and lifestyles, not less. Accordingly, the Department does not desire to attack any group but instead intends to encourage coexistence among a wide variety of organizations and viewpoints. This will help, not harm, LGBTQ+ students, women, religious minorities, and student organizations of all kinds. Indeed, LGBTQ+ students would be able to organize student organizations that limited membership to only students who identify as LGBTQ+, if a public institution of higher education adopted a generally applicable policy that allowed all student organizations to promulgate membership criteria.

The Department remains committed to eliminating invidious discrimination in the educational setting and vigorously enforces Title VI of the Civil Rights Act of 1964, which prohibits discrimination on the basis of race, color, and national origin, as well as Title IX of the Education Amendments of 1972, which prohibits discrimination on the basis of sex. However, the Department clarifies that excluding individuals from leadership in a student group because of their *beliefs* or *conduct* is not comparable to using the "constitutionally suspect criteria" of a

protected characteristic such as *race* when forming school policies—which is what the Supreme Court struck down in *Norwood* and *Bob Jones University*.[93] As noted above in the comments in support of these final regulations, many commenters described policies in which their religious student organizations required leaders, regardless of their race or sex, to either espouse certain religious *beliefs* or to *conduct* themselves according to the tenets of their faith. Nevertheless, many of these groups were denied recognition by their institutions because of alleged "discrimination." These comments demonstrate that, rather than using religious liberty to further discrimination, institutions are using "tolerance" as an excuse to hurt religious organizations. Depriving student groups of their rights in the name of "anti-discrimination" furthers *religious* discrimination itself, which the Constitution does not tolerate.

The Department does not agree with commenters who suggest that the final regulations reflect a theocratic form of government or are an attempt to force the beliefs of older, white, upper-middle class conservative Christians onto the rest of America. The purpose of the final rule is not to favor a certain viewpoint, but to reestablish neutrality on campuses, which is what the First Amendment requires. Moreover, with neutrality comes ideological and religious pluralism, which is healthy for a democratic society.

The final regulations are intended to protect religious organizations from unconstitutional action stemming from the disapproval of a particular religion or of religion in general.[94] Bias against religion and religious student organizations is a growing problem as many commenters noted that public institutions have become increasingly less diverse and more hostile towards religious student organizations. This trend is caused by institutions moving away from the First Amendment and seeking to establish viewpoint uniformity, which is not good for those in the minority *or* the majority.

Ultimately, the final regulations will ensure that religious student organizations will not be coerced by university administrators to abandon their sincerely held beliefs in lieu of prevailing opinions on college campuses. It will restore to religious student organizations the ability to

[89] *See, e.g., Norwood* v. *Harrison,* 413 U.S. 455, 469 (1973) (holding that Mississippi could not give textbooks to students attending racially segregated private schools because "discriminatory treatment exerts a pervasive influence on the entire educational process"); *see also, e.g., Bob Jones Univ.* v. *United States,* 461 U.S. 574, 604 (1983) (footnote omitted) ("[T]he Government has a fundamental, overriding interest in eradicating racial discrimination in education. . . .")

[90] Commenter cited the Brief of Amicus Curiae of the ACLU et al. at 10–12, *Christian Legal Soc'y,* 561 U.S. 661 (Mar. 15, 2010).

[91] *Norwood,* 413 U.S. at 465–66.

[92] *InterVarsity Christian Fellowship/USA* v. *Univ. of Iowa,* 408 F. Supp. 3d 960 (S.D. Iowa 2019) (currently on appeal to the U.S. Court of Appeals for the 8th Circuit); *Bus. Leaders in Christ* v. *Univ. of Iowa,* 360 F. Supp. 3d 885, 899 (S.D. Iowa 2019) (currently on appeal to the U.S. Court of Appeals for the 8th Circuit).

[93] *Norwood,* 413 U.S. at 469; *Bob Jones Univ.,* 461 U.S. at 604.

[94] *Lukumi,* 508 U.S. at 532 ("[T]he First Amendment forbids an official purpose to disapprove of a particular religion or of religion in general.").

participate at public institutions of higher education on equal footing with all student organizations without disadvantaging or harming any students or organizations.

*Changes:* None.

The Proposed Regulations Are Not Required by Law or Allegedly Violate the Law

*Comments:* Many commenters stated that the Department does not explain the need for what they characterize as a broad exemption for religious student organizations on college campuses. Several commenters argued that no laws, including the Free Exercise Clause, require these final regulations. These commenters noted that, in *CLS* v. *Martinez,* the Court held that CLS, in seeking an exemption from Hastings' across-the-board all-comers policy, sought *preferential, not equal* treatment; the group therefore could not moor its request for accommodation to the Free Exercise Clause.[95] Commenters also stressed that the regulation is not required under Title IV of the HEA. Commenters argued that the proposed regulations violate the clear directive of Executive Order 13864, namely that agencies ''take appropriate steps, *in a manner consistent with applicable law*[.]'' [96]

One commenter maintained that the proposed regulations could conflict with State and/or Federal civil rights laws that require campus all-comers or non-discrimination policies. This commenter noted that Title IX and other Federal and State civil rights laws prohibit public institutions of higher education from discriminating on the basis of sex and other protected characteristics. According to this commenter, public universities also may choose to advance State-law goals through the school's educational endeavors. The commenter opined that in order to ensure full compliance with State and Federal civil rights laws, public colleges and universities often have in place robust non-discrimination policies that apply neutrally to all student organizations. Similarly, another commenter asserted that the proposed regulations offer some public institutions a choice between aligning with State and local non-discrimination laws and maintaining eligibility for Federal grant funding. This commenter contended that colleges and universities that choose to maintain eligibility for Departmental grants by revising their protocols to allow for recognition of faith-based student organizations

without all-comers policies would, in some jurisdictions, expose themselves to a legal challenge grounded in State and local nondiscrimination laws.

One commenter also opined that the proposed regulations include language that is worrisome in its vagueness, as it prohibits public institutions from denying rights to a religious student organization based on the group's ''practices, policies, . . . and leadership standards.'' [97] This commenter contended that this language is untethered to religious beliefs or religious speech. This commenter asserted that the Department should not want colleges and universities to abdicate their responsibility to set reasonable and appropriate standards for student organizations, and it certainly ought not to compel that abdication. This commenter gave the example that no college or university should be encouraged or compelled to turn a blind eye to hazing because it is occurring within a religious student organization.

Another commenter expressed concerns that the proposed regulations may create a scenario in which a public institution of higher education could lose Federal funding for denying recognition to a student organization that promotes hate speech barred by school policies, while a private institution receiving funding under the identical program could censor speech otherwise protected by the First Amendment but which violates the school's internal speech policies. The commenter argued that such an outcome defies reason and would likely not survive constitutional scrutiny.

*Discussion:* The Department disagrees with commenters who state that the Department does not explain the need for the rule. The NRPM noted that courts repeatedly have been called upon to vindicate the rights of dissident campus speakers who do not share the views of the majority of campus faculty, administrators, or students. It also provided numerous examples of cases in which Federal courts found that public universities discriminated against religious student organizations in violation of the First Amendment by withholding funding or denying other rights, benefits, and privileges afforded to secular student organizations.

Sections 75.500(d) and 76.500(d) are wholly consistent with applicable law, including but not limited to Supreme Court precedent, the First Amendment, Title IX, and the HEA. First, regarding Supreme Court precedent, the

Department clarifies that §§ 75.500(d) and 76.500(d) do not, as several commenters stated, prevent institutions from implementing all-comers policies which were upheld in *Martinez,* nor does it constitute an ''exemption'' for religious student groups from all-comers policies. Instead, these final regulations reinforce the First Amendment's mandate that public institutions treat religious student organizations the same as other student organizations. As such, a university does not have to choose between compliance with State law and securing Federal funding in the form of grants; it is free to enforce an all-comers policy, which is permissible under *Martinez,* in order to comply with any State anti-discrimination laws as long as it applies that policy equally to all student organizations as stipulated in *Martinez.* If a public institution chooses not to adopt an all-comers policy, which is also permissible, then the institution cannot require a student organization, including a religious student organization, to open eligibility for membership and leadership to all students. Ultimately, a university has the discretion to choose what kind of policy will best comply with its own State and local anti-discrimination laws.

Additionally, these final regulations are consistent with the U.S. Constitution and governing case law.[98] ''The Free Exercise Clause 'protect[s] religious observers against unequal treatment' and subjects to the strictest scrutiny laws that target the religious for 'special disabilities' based on their 'religious status.' '' [99] The Supreme Court has ''repeatedly confirmed'' that ''denying a generally available benefit solely on account of religious identity imposes a penalty on the free exercise of religion that can be justified only by a state interest of the highest order.'' [100] Most recently in *Espinoza,* the Supreme Court confirmed again: ''This rule against express religious discrimination is no doctrinal innovation. Far from it. As

---

[95] *Martinez,* 561 U.S. at 697 n.27.

[96] 84 FR 11402.

[97] This commenter quotes from §§ 75.500(d) and 76.500(d), as proposed in the NRPM.

[98] These final regulations also are consistent with and in furtherance of the Religious Freedom Restoration Act (RFRA). 20 U.S.C. 2000bb, *et seq.; Little Sisters of the Poor Saints Peter & Paul Home* v. *Pennsylvania,* 140 S. Ct., at 2383–84 (U.S. July 8, 2020). RFRA ''provide[s] very broad protection for religious liberty.'' *Burwell* v. *Hobby Lobby,* 573 U.S. 682, 693 (2014). RFRA applies to the Department, and some of the Department's grantees may essentially act on behalf of the Department in awarding subgrants or administering formula-grant programs. These final regulations as material conditions of a Department's grant under §§ 75.500(d) and 76.500(d) will help ensure that any entity, acting on behalf of the Department with respect to a grant, does not substantially burden a person's free exercise of religion.

[99] *Trinity Lutheran,* 137 S. Ct. at 2019 (quoting *Lukumi,* 508 U.S. at 533).

[100] *Id.*

*Trinity Lutheran* explained, the rule is 'unremarkable in light of our prior decisions.' " [101] Sections 75.500(d) and 76.500(d) are designed to bolster these protections and prevent public institutions from denying rights, benefits, and privileges to religious student organizations because of their religious character. The First Amendment protects religious student organizations' right to free exercise of religion in addition to the freedoms of speech and association, and these final regulations are consistent with the First Amendment, including the Free Exercise Clause, which requires equal treatment of secular and religious student organizations. Given the abundant evidence noted by commenters regarding schools "denying generally available benefits" to religious groups "solely on account of religious identity," these regulations are necessary to make the guarantees in the First Amendment, including the Free Exercise Clause, a reality at public institutions.[102] Similarly, a public institution does not violate Title IX by allowing religious student organizations to have faith-based criteria for their leaders or to otherwise engage in the free exercise of their religion. These final regulations reinforce freedoms guaranteed by the First Amendment. Additionally, the Title IX Final Rule, which became effective on August 14, 2020, expressly states that none of the regulations implementing Title IX requires a recipient of Federal financial assistance to "[r]estrict any rights that would otherwise be protected from government action by the First Amendment of the U.S. Constitution." [103]

With respect to the HEA, the Department acknowledges that these final regulations are not a condition of participation in programs under Title IV of the HEA. These final regulations are consistent with the HEA, which expressly states that "an institution of higher education should facilitate the free and open exchange of ideas" [104] and "students should be treated equally and fairly." [105] Further and as explained

more fully in the "Executive Orders and Other Requirements" section, the Department is authorized under 20 U.S.C. 1221e–3, 20 U.S.C. 3474, and E.O. 13864 to promulgate these final regulations.

Lastly, the Department acknowledges that under these final regulations, a public institution may lose Federal funding for violating the First Amendment—by, for example, prohibiting hate speech,[106] if such hate speech constitutes protected speech under the First Amendment, while a private institution may not lose its funding for engaging in the same conduct. But this distinction between public and private institutions is not unique to these final regulations. It is a well-established principle that private institutions are not bound by the First Amendment.[107] Such an outcome is contemplated by the very text of the First Amendment, which prohibits "Congress" from violating fundamental freedoms and which was later made applicable to the States through the Fourteenth Amendment.[108] Despite this constitutionally mandated distinction, the Department emphasizes that private institutions are still bound by their own "stated institutional policies regarding freedom of speech, including academic freedom" under §§ 75.500(c) and 76.500(c) of these final regulations.

Additionally, these final regulations would not interfere with an institution's ability to enforce an anti-hazing policy, because such a policy would be a neutral, generally applicable rule applied to all student groups. These final regulations are instead intended to address policies that single out religious groups for disparate treatment. To clarify that religious student organizations may not be treated differently on account of their religion, the Department revises §§ 75.500(d) and 76.500(d) to state that public institutions shall not deny to any student organization *whose stated mission is religious in nature* any right, benefit, or privilege that is otherwise afforded to other students organizations at the public institution because of the religious student organization's beliefs,

practices, policies, speech, membership standards, or leadership standards, *which are informed by sincerely held religious beliefs.* These revisions clarify which student organizations may be considered religious by noting that the student organization's own stated mission is religious in nature. These revisions also clarify that beliefs, practices, policies, membership standards, or leadership standards, which are informed by sincerely held religious beliefs, must not constitute the basis for differential treatment from other student organizations, which is consistent with the First Amendment.

*Changes:* The Department revised §§ 75.500(d) and 76.500(d) to clarify that religious student organizations include any student organization whose stated mission is religious in nature. The Department further revised these regulations to clarify that a public institution cannot deny any right, benefit, or privilege that is otherwise afforded to other student organizations at the public institution because of the religious student organization's beliefs, practices, policies, speech, membership standards, or leadership standards, which are informed by sincerely held religious beliefs.

Whether Public Institutions Discriminate Against Religious Organizations

*Comments:* Numerous commenters shared specific instances in which faith-based student organizations *were* discriminated against because of their religious status. As noted in more detail in the "Comments in Support" subsection of the "34 CFR 75.500(d) and 34 CFR 76.500(d)—Religious Student Organizations" section, many different commenters reported, for example, that universities refused to recognize or outright banned religious organizations that used faith-based qualifications to select leadership. As a result, these organizations, if they were even allowed on campus at all, were stripped of university benefits such as funding or facilities, faced bureaucratic hurdles that were not applied to secular organizations, and in one case, could not even approach students on campus because of the university's biased solicitation policy. Commenters noted that even when these institutions reversed their policies, religious student organizations were still subject to administrative delays of up to a year in some cases, faced prejudice and misconceptions, and experienced increased polarization, which discouraged debate.

Conversely, some commenters maintained that religious student

---

[101] *Espinoza,* 140 S. Ct. at 2260 (quoting *Trinity Lutheran,* 137 S. Ct. at 2021) (internal quotation marks and citation omitted).

[102] *Lukumi,* 508 U.S. at 532 ("At a minimum, the protections of the Free Exercise Clause pertain if the law at issue discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons.").

[103] 85 FR 30573 (the Title IX final regulations provide this express statement at 34 CFR 106.6(d)(1)).

[104] 20 U.S.C. 1011a(a)(2)(C).

[105] 20 U.S.C. 1011a(a)(2)(E). Congress also stated in 20 U.S.C. 1011a(a)(2)(F) that "nothing in this paragraph shall be construed to modify, change, or

infringe upon any constitutionally protected religious liberty, freedom, expression, or association."

[106] *Matal* v. *Tam,* 137 S. Ct. 1744, 1765 (2017) ("it is a fundamental principle of the First Amendment that the government may not punish or suppress speech based on disapproval of the ideas or perspectives the speech conveys.").

[107] *Manhattan Cmty. Access Corp.* v. *Halleck,* 139 S. Ct. 1921, 1926 (2019) ("The Free Speech Clause of the First Amendment constrains governmental actors").

[108] *First Nat'l Bank of Bos.* v. *Bellotti,* 435 U.S. 765, 778 (1978).

organizations are already treated equally under the current rules, and the Department failed to include even anecdotal evidence that religious student organizations who wish to restrict their membership or leadership have been treated differently from other types of private groups. A commenter argued that this ''fix'' is the very definition of a solution in search of a problem. A commenter also stated that unofficial student groups often have access to the school's facilities to conduct meetings and the use of chalkboards and generally available bulletin boards to advertise events. According to this commenter, even the Supreme Court, in *CLS* v. *Martinez,* found that the CLS chapter was being treated the same as other private groups on campus, including fraternities, sororities, social clubs and secret societies, which maintained a presence at the university without official status.[109]

*Discussion:* The Department notes the numerous comments recounting instances of discrimination against religious student organizations, in which they were deprived of recognition, funding, or facilities, among other benefits, due to their religious status or character. The Department is revising §§ 75.500(d) and 76.500(d) specifically to remedy these issues of disparate treatment.

We disagree with the commenters who suggest that religious student organizations are always treated equally with respect to secular organizations under the current regulations, and that the Department included no evidence to the contrary. For example, the NPRM cited to *Rosenberger* v. *Rector & Visitors of the University of Virginia,*[110] in which the Supreme Court held that a public institution denying funding to a religious student newspaper but not other secular student newspapers amounted to unlawful viewpoint discrimination under the First Amendment. In addition, the NPRM cited *Business Leaders in Christ* v. *University of Iowa,*[111] in which the Federal district court very recently held that treating a religious student organization differently than other student organizations violated the religious student organization's First Amendment rights to free speech, expressive association, and free exercise of religion. Further, the Department received a tremendous number of comments replete with examples of the differential treatment that faith-based

organizations suffer compared to secular student organizations, only some of which are described above. These anecdotes concerned religious student organizations at hundreds of schools across the country; came from national nonprofit organizations, professors, faculty advisors, students, and lawyers; and described experiences that occurred over decades.

The Department acknowledges that there may be instances when unofficial student groups are granted access to *some* of an institution's facilities or resources, as was the case in *Martinez.*[112] Nevertheless, such access to limited benefits does not cure the constitutional infirmities under the First Amendment when religious student organizations are denied benefits afforded to other student organizations or unequally burdened as compared to other student organizations. And often religious student organizations are denied access to any of an institution's facilities or resources, which, as one commenter expressed, relegates them to second-class status. Singling out religious student organizations for disfavored treatment because of their religious nature or religious viewpoints is precisely what the Supreme Court held impermissible in *Rosenberger* v. *Rector & Visitors of University of Virginia*[113] and *Widmar* v. *Vincent.*[114] Thus, these final regulations are consistent with Supreme Court case law. As explained in more detail in the '''All-Comers' Policies for Student Organizations'' section, these final regulations are consistent with the holding in *Martinez,* which permitted but did not require public institutions to adopt all-comers policies.[115]

*Changes:* None.

*Proposed Modifications & Requests for Clarification*

*Comments:* One commenter expressed the need for private colleges to be included under the regulations for public institutions because of concerns regarding a policy at one private institution requiring student groups to open leadership to any student or lose school recognition. This commenter noted that a loss of recognition results in a loss of access to student activity fee money, low-cost or free university spaces, and recruiting tools.

*Discussion:* This commenter describes what is known as an all-comers policy which, while uncommon in practice, was upheld by the Supreme Court of the United States in *CLS* v. *Martinez.*[116] It is permissible for an institution to implement such a policy under the Department's final regulations, since it is a neutral rule of general applicability. However, absent such an all-comers policy, §§ 75.500(d) and 76.500(d) prevents *public* institutions from failing to recognize religious student organizations because of their faith-based membership or leadership criteria.

The Department further responds that §§ 75.500(d) and 76.500(d)—which are rooted in the First Amendment—do not apply to private institutions because private institutions are not bound by the First Amendment.[117] Private institutions are, however, obligated to uphold their ''stated institutional policies regarding freedom of speech, including academic freedom,'' through §§ 75.500(c) and 76.500(c) of these final regulations. Institutions that violate their own stated institutional policies regarding freedom of speech, including academic freedom, will be found in violation of the material conditions in §§ 75.500(c) and 76.500(c) if there is a final, non-default judgment by a State or Federal court to the effect that the private institution violated such stated institutional policies.[118]

*Changes:* None.

*Comments:* One commenter noted that §§ 75.500(d) and 76.500(d) provide no indication of how the Department will determine that a public college or university has violated the regulation's requirement to treat religious organizations and secular organizations the same. The commenter guessed that, absent indications to the contrary, the Department will make this determination entirely by itself. The commenter opined that this type of inquiry is inappropriate for the Department to engage in and one it is ill-equipped to make.

*Discussion:* The Department has the resources and expertise to determine the narrow issue as to whether a public university has violated the regulation's requirement to not deny a religious student organization any of the rights, benefits, and privileges afforded to other student organizations. Whether religious student organizations are denied the rights, benefits, and privileges as other student organizations is a discrete issue

---

[109] *Martinez,* 561 U.S. at 691.

[110] 515 U.S. 819, 845, 829–30 (1995).

[111] 360 F. Supp. 3d 885, 899 (S.D. Iowa 2019).

[112] *Martinez,* 561 U.S. at 673 (finding school withheld official recognition from Christian Legal Society but allowed it the use of facilities, chalkboards, and generally available campus bulletin boards).

[113] 515 U.S. 819, 845 (1995).

[114] 454 U.S. 263, 277 (1981).

[115] 561 U.S. at 698.

[116] 561 U.S. 661 (2010).

[117] *Manhattan Cmty. Access Corp.,* 139 S. Ct. at 1926.

[118] 34 CFR 75.500(c)(1); 34 CFR 76.500(c)(1).

that the Department may easily investigate. This issue does not involve the full panoply of First Amendment issues that the other regulations in §§ 75.500(b)–(c) and 76.500(b)–(c) present. The Department would only determine whether other student organizations indeed received the right, benefit, or privilege that the religious student organization was allegedly denied because of the religious student organization's beliefs, practices, policies, speech, membership standards, or leadership standards, which are informed by sincerely held religious beliefs. The Department routinely investigates violations of its regulations, and attorneys within the Department's Office of General Counsel regularly advise the relevant office within the Department on any legal issues that arise in an investigation. Unlike investigations of any potential violation of any provision of the First Amendment or any stated institutional policy regarding freedom of speech, including academic freedom, an investigation of the treatment of religious student organizations as compared to other student organizations is limited in scope and presents a discrete issue. An investigation to determine whether religious student organizations are being treated differently than other student organizations is similar to the types of investigations that the Department currently conducts. The Department has developed expertise in investigating, for example, the discrimination or different treatment on the basis of sex under Title IX or on the basis of race, color, and national origin under Title VI. Additionally, §§ 75.500(d) and 76.500(d) expressly indicate ways in which a public institution may treat a religious organization differently from a secular organization, such as by failing to provide full access to the facilities of the public institution, withholding funds from a religious organization, or denying official recognition to a religious organization.

*Changes:* None.

### 34 CFR 75.700 and 34 CFR 76.700—Compliance With the U.S. Constitution, Statutes, Regulations, Stated Institutional Policies, and Applications

*Comments:* One commenter asserted that under §§ 75.700 and 76.700, grantees must comply with *all* relevant statutes, regulations, and approved applications. However, the Department would limit compliance requirements to only specific sections of four statutes and related regulations. The commenter noted the Department's stated rationale that this modification would provide

greater specificity and clarity, however, given the broad range of relevant statutes, regulations, and individual grant program requirements, the commenter believed there is no rational justification to modify these requirements. The commenter did not provide further explanation or clarification for this position.

*Discussion:* The Department wishes to clarify that the current language of §§ 75.700 and 76.700 already requires grantees and subgrantees to comply with all applicable laws, regulations, and approved applications. Statutory and regulatory requirements to which grant recipients must comply already include the prohibition on race discrimination under Title VI, the prohibition on sex discrimination under Title IX, the prohibition on discrimination on the basis of handicap under Section 504 of the Rehabilitation Act of 1973, and the prohibition on age discrimination under the Age Discrimination Act. Section 75.700, as proposed and as promulgated in these final regulations, would clarify that grantees participating in Direct Grant Programs must comply with all of the statutes and provisions in § 75.500, including § 75.500(b) and § 75.500(d) if they are public institutions and § 75.500(c) if they are private institutions. Similarly, § 76.700 would clarify that States and subgrantees participating in State-Administered Formula Grant Programs must comply with all of the statutes and provisions in § 76.500, including § 76.500(b) and § 76.500(d) if they are public institutions and must comply with § 76.500(c) if they are private institutions.

*Changes:* None.

### 34 CFR 106.12   Educational Institutions Controlled by Religious Organizations

During the public comment period, the Department received comments both in support of and in opposition to the proposed regulations about the religious exemption under Title IX. Below, we discuss substantive issues under topical headings, and by the sections of the final regulations to which they pertain.

#### General Support for Proposed Changes to 34 CFR 106.12

*Comments:* Some commenters expressed strong support for the proposed changes to § 106.12. One commenter, for instance, believed that the proposed changes were necessary to ensure the continued protection of religious liberty for religious educational institutions, contending that the proposed regulations, if

finalized, would make clear that Title IX provides institutions with an affirmative defense against accusations of discrimination. Commenters also noted that Title IX does not require permission or recognition from the government before an institution asserts its eligibility for a religious exemption as a defense for a religious belief or the practice dictated by that belief.

Similarly, one commenter supported the Department's acknowledgement of the various ways that an institution may establish its eligibility for a religious exemption under Title IX, and noted that, in prior administrations, responses to letters claiming the religious exemption were significantly delayed. According to the commenter, this caused religious institutions to worry that the Department's Office for Civil Rights (OCR) was considering whether to deem the schools ineligible for the exemption, despite their thoroughly religious character.

One commenter believed that the "application" for an assurance that a school could invoke or maintain a religious exemption had previously been misconstrued by the Department, to the detriment of religious schools and universities, and to the detriment of the values protected by the United States Constitution. The commenter contended that there is no "application process" set forth in the Title IX statute for a religious exemption. The commenter further contended that the Department has no power or authority to review and rule upon a school's religious tenets, or whether a school is justified on the basis of those tenets to invoke an exemption. The commenter stated that not only does the Title IX statute not require such review before a school may invoke a religious exemption, but that the First Amendment would not permit such review.

*Discussion:* The Department appreciates and agrees with the comments that religious liberty must be preserved and protected.[119] In promulgating this regulation, the Department took into account the RFRA[120] and the United States Attorney General's October 6, 2017 Memorandum

---

[119] *See Bostock* v. *Clayton County, Georgia,* 140 S. Ct. 1731, 1754 (2020) (stating, in the Title VII religious exemption context, "We are also deeply concerned with preserving the promise of the free exercise of religion enshrined in our Constitution; that guarantee lies at the heart of our pluralistic society.").

[120] 42 U.S.C. 2000bb–2(4) (referring to 42 U.S.C. 2000cc–5(7)(A) (defining "religious exercise" as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief")). *See also Little Sisters of the Poor Saints Peter & Paul Home* v. *Pennsylvania,* 140 S. Ct. 2367 (2020); *Burwell* v. *Hobby Lobby,* 573 U.S. 682 (2014).

on Federal Law Protections for Religious Liberty.[121] Further, the Department believes that its view of the religious exemption provisions within Title IX avoids unconstitutional discrimination against faith-based entities that would otherwise occur if OCR required that educational institutions fit one specific organizational structure before they can become eligible for a religious exemption.

The Department agrees with the commenter who stated that there is no ''application process'' set forth in the Title IX statute. No part of the statute requires that recipients receive an assurance letter from OCR, and no part of the statute suggests that a recipient must be publicly on the record as a religious institution that claims a religious exemption before it may invoke a religious exemption in the context of Title IX. While the implementing regulations at 34 CFR 106.12 set forth a process for recipients to ''claim'' the exemption by submitting a letter, in writing, to the Assistant Secretary, the Department has eliminated that requirement in the Title IX Final Rule, effective on August 14, 2020, which permits but does not require recipients to submit a letter claiming a religious exemption from Title IX.[122]

The Department further acknowledges that the final regulation promulgated through this rulemaking with respect to § 106.12 provides a non-exhaustive list of criteria that offer educational institutions different methods to demonstrate that they are eligible to claim an exemption to the application of Title IX, 20 U.S.C. 1681, and its implementing regulations, to the extent Title IX and its implementing regulations would not be consistent with the institutions' religious tenets or practices. Title IX, 20 U.S.C. 1681(a)(3), does not directly address how educational institutions demonstrate whether they are controlled by a religious organization. The criteria in 34 CFR 106.12(c) codify existing factors that the Assistant Secretary for Civil Rights uses when evaluating, on a case-by-case basis, a request for a religious exemption assurance from OCR, and also addresses concerns that there may be other means for establishing the necessary control.

While several commenters argued that the best course for OCR is to require

educational institutions to seek an assurance letter describing their religious exemption before a complaint is filed against them, the Department notes that the reasons for the changes to 34 CFR 106.12(b) were addressed in the November 29, 2018 Title IX NPRM,[123] and the recently released Title IX Final Rule, effective August 14, 2020.[124] As explained in the Title IX NPRM and Final Rule, the current version of 34 CFR 106.12(b) could suggest that recipients are required to write a letter to the Assistant Secretary for Civil Rights, and argue that parts of the regulation conflict with a specific tenet of the religious institution. The Department has determined that such a requirement is unnecessary in order to assert certain exemptions, and the Title IX final regulation seeks to codify the Title IX statute's broad statement that ''this section shall not apply to an educational institution which is controlled by a religious organization if the application of this subsection would not be consistent with the religious tenets of such organization.'' The NPRM for these regulations did not propose any changes to 34 CFR 106.12(b). However, some commenters expressed strong agreement with the Department's proposed changes to § 106.12(b) in the November 29, 2018 Title IX NPRM addressing sexual harassment and other topics, especially when coupled with the proposed changes outlined in this January 17, 2020 NPRM for these final regulations. The Department has determined that, in the aggregate, these changes better align the Title IX regulations with the Title IX statute, the First Amendment, and the Religious Freedom Restoration Act, 42 U.S.C. 2000bb, *et seq.* The Department understands the often complex relationships between recipients and controlling religious organizations.

The Department acknowledges that its practices in the recent past regarding assertion of a religious exemption, including delays in responding to inquiries about the religious exemption, may have caused educational institutions to become reluctant to exercise their rights under the Free Exercise Clause of the First Amendment. The Department would like to make sure its regulations are consistent with educational institutions' ability to fully and freely enjoy rights guaranteed under the Free Exercise Clause of the U.S. Constitution and Federal statutes. Accordingly, the

Department chose to engage in notice-and-comment rulemaking to clarify the religious exemption under Title IX.

*Changes:* None.

*General Opposition to Proposed Changes to 34 CFR 106.12*

*Comments:* Many commenters expressed opposition to the proposed changes to § 106.12 because they believed that the changes would allow schools to claim sweeping, almost unlimited religious exemptions to Title IX. These commenters asserted that the proposed rule would make it easier for a broader range of schools to claim a religious exemption, which the commenters often described as a right to discriminate while nevertheless still receiving Federal monies. Some of these commenters stated that the Department should find a Title IX violation in every case of sex discrimination, and protect all students in all schools receiving Federal funds, instead of allowing schools to find ways to shield themselves from liability for discriminatory practices.

Commenters also expressed general opposition to the proposed changes to § 106.12 by way of sharing their personal experiences of being educators, female students, LGBTQ students, parents of LGBTQ students, victims of sexual assault, and students at religious schools. These commenters stated that students who go to religious schools should be equally protected against sex discrimination as all other students, even if the discrimination stems from a religious practice. Commenters argued that sex-based discrimination can result in students like them being disciplined, mistreated, or forced out of school. These commenters asserted that as a result of the proposed changes to § 106.12, female students who were either pregnant or parenting, LGBTQ students, and religious minority students could face enormous costs, such as having to interrupt or end their degree program due to expulsion, losing their tuition payments made up until that point, and missing out on subsequent professional opportunities. Some of these commenters further suggested that religious schools are sometimes the only or best higher education option for these students, even for people who do not identify with the tenets of the religion of the school.

Commenters also expressed specific concerns about potential situations that could result from the proposed changes to § 106.12, including a student who is sexually assaulted on an abstinence-only campus being expelled due to engaging in sexual activity; a school

---

[121] Available at *https://www.federalregister.gov/documents/2017/10/26/2017-23269/federal-law-protections-for-religious-liberty.*

[122] Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 85 FR 30026, 30573 (May 19, 2020).

[123] Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 83 FR 61462 (Nov. 29, 2018).

[124] *See* 85 FR 30573.

being unable to stop another student from forming a club based on hatred of women or LGBTQ students based on purported religious principles, or a school being required to equally offer school resources to such a group on equal terms as other student groups. Other examples posed by the commenters included a student raped on a ''dry'' campus after drinking being expelled after reporting the rape, due to consumption of alcohol in violation of school policies. Alternatively, a school might expel the same student, asserted commenters, for not reporting the rape, and allowing the rapist to continue to pose a threat on campus, even if the failure to report was out of fear of retaliation for drinking. According to commenters, this posed a dilemma for students, who might be disciplined whether or not they reported sexual assault. Commenters described scenarios where schools could not stop a student group or faculty member from bringing a speaker to campus who is known for hate speech and inciting violence; or a gay student at a religious institution who is being harassed, and discloses his sexual orientation as part of his report of the harassment, and who is subsequently expelled by his school, purportedly for his own safety.

One commenter believed that the proposed changes to § 106.12 would condone schools that receive Federal funding looking the other way toward sex discrimination, and would in fact replicate the predatory and violent types of behavior against students that these schools should be working to prevent and respond to. The commenter also asserted that the Department should not allow schools to discriminate against students who are victims and survivors of sexual violence.

Another commenter asserted that expanding or providing religious exemptions under Title IX will allow religious beliefs and religiously-motivated acts to be weaponized against students and families. The commenter believed that schools using religious exemptions will use them to harm and damage the students that they want to target, and religious people and schools will be able to do whatever they want without common sense and oversight. The commenter also questioned whether religious exemptions are automatically reviewed by the Department's Office of the General Counsel or its OCR on an annual basis, or for reasonableness, so that religious exemptions that conflict with recent developments in the law or case law are revoked.

Some commenters expressed agreement with the basic principle that

religious freedom is an important part of the First Amendment, but also expressed opposition to the proposed rule. Other commenters asserted that, as a legal matter, schools receiving money from the Federal government are not allowed to discriminate because of the separation of church and State as required by the Constitution.

One commenter expressed concern that the proposed changes to § 106.12 would create a separate, federally funded system of religious schools that are allowed to define who makes up their student body in narrow, discriminatory ways that undermine the ethics and intent of publicly-funded schools.

*Discussion:* As the Department stated in the NPRM for this rulemaking, the purpose of these proposed amendments is to implement Executive Order 13831 and conform more closely to the Supreme Court's current First Amendment jurisprudence; relevant Federal statutes such as Title IX and RFRA; Executive Order 13279, as amended by Executive Orders 13559 and 13831; and the Attorney General's Memorandum on Religious Liberty.[125] The regulations in 34 CFR part 106 address discrimination on the basis of sex in education programs or activities receiving Federal financial assistance, and the Secretary has authority to regulate with regard to discrimination on the basis of sex in such programs under 20 U.S.C. 1682. The proposed changes to § 106.12(c) of the Title IX regulations will eliminate the need for schools and other stakeholders to consult non-binding guidance to help discern whether an institution is controlled by a religious organization for a religious exemption under Title IX and provides a non-exhaustive list of criteria that is sufficient to establish that an institution is controlled by a religious organization.

The Department understands that some commenters opposed the proposed regulation because they feel that institutions should never be permitted to discriminate on the basis of sex in education programs or activities receiving Federal financial assistance. Many of these commenters characterized the religious exemption under Title IX as the right to discriminate on the basis of sex, which these individuals felt violated the principle of separation of church and State.

In response to these comments, the Department notes that the Title IX statute expressly provides for multiple exceptions to the application of Title IX

to certain entities, including 20 U.S.C. 1681(a)(3) (titled, ''Educational institutions of religious organizations with contrary religious tenets''). While the Establishment Clause is an important part of the Constitution, implementing the religious exemption language expressly contemplated by the Title IX statute does not violate the Constitution or its Establishment Clause. Where, as here, a statute expressly provides for a religious exemption from statutory provisions, the recipient of Federal funds' free exercise of religion, which also is guaranteed under the Constitution, may be infringed by failing to recognize that exemption under the statute.

The Department acknowledges that some commenters felt that proposed § 106.12(c) would allow recipients to shield themselves from losing Federal funds over their discriminatory practices. In response, the Department again reiterates that the Title IX statute, at 20 U.S.C. 1681(a)(3), created an express exemption from the requirements of Title IX for ''educational institutions of religious organizations with contrary religious tenets.'' While our revised § 106.12(c) seeks to clarify eligibility for claiming a religious exemption, the Department will evaluate and respond to all complaints filed with OCR that allege discrimination under Title IX, including allegations that the religious exemption in 20 U.S.C. 1681(a)(3) does not apply to an institution.

The Department understands that some commenters were concerned that religious schools are sometimes the best or only higher education option for students, even for students who do not identify with the tenets of the religion of the school. While the Department is sympathetic to this point, a recipient that meets the criteria for a religious exemption is entitled to the protections that the statute affords it.

The Department recognizes that several commenters remarked upon the ''broad'' language utilized in multiple subsections of proposed § 106.12(c). While the Department does not agree with the assessment by one commenter that the Department is opening the floodgates to ''almost unlimited'' religious exemptions under Title IX, the Department appreciates the thoughtful comments about the ''moral beliefs or practices'' language used in proposed § 106.12(c)(5),[126] and acknowledges that

---

[125] 85 FR 3190–01.

[126] *See* proposed 34 CFR 106.12(c)(5) (''A statement that the educational institution subscribes to specific moral beliefs or practices, and a statement that members of the institution
Continued

the language could be interpreted in an overly broad manner. In response to these and other concerns raised about the "moral beliefs or practices" language, the Department has removed the entirety of proposed § 106.12(c)(5) in the final regulation. This change is discussed in more detail in the "Proposed 34 CFR 106.12(c)(5)'s reference to moral beliefs" section of this preamble.

As discussed in more detail in the "Proposed 34 CFR 106.12(c)(7)" section of this preamble, the Department also received comments that expressed concern about the "other evidence" language used in proposed § 106.12(c)(7). Specifically, some commenters expressed that an educational institution could attempt to meet the criteria of § 106.12(c)(7) with very minimal evidence that they are controlled by a religious institution. In the final regulation, the Department added qualifiers to § 106.12(c)(7) to make clear that "other evidence" must be *sufficient* to establish that an educational institution is controlled by a religious organization, pursuant to 20 U.S.C. 1681(a)(3). In doing so, the Department clarifies that there has to be sufficient "other evidence" to establish control.

The Department notes, in response to commenters who allege that this provision exceeds the scope of the statute by requiring almost no evidence of control by a religious organization, that the "other evidence" must itself establish control by a religious organization, and not merely a tenuous tie to a religious organization. This provision does not expand the permissible scope of the statute to mean that literally any evidence—regardless of the amount of evidence, its relevance, or its persuasiveness—is sufficient to establish a religious exemption.

With respect to arguments that raised concerns about the proposed regulation permitting students to form hate groups on campus, or concerns that schools would be unable to control which speakers are brought to campus, the final regulations do no such thing. A school's ability to assert a religious exemption from Title IX does not affect a school's rights to permit student groups or speakers from forming or speaking on campus. The issues of invited speakers, freedom of association, and campus speech, generally, are complex issues that are evaluated in light of the First Amendment and

community may be subjected to discipline for violating those beliefs or practices.").

associated case law.[127] Section 106.12(c) does not address those complex issues, and it should not be construed as affecting the recipient's rights to address First Amendment issues on their campuses.

The Department thanks the many commenters who shared their personal experiences in attending institutions controlled by religious organizations. Some of these commenters expressed general opposition to the proposed rule because of their fear of the possible consequences to certain groups of individuals attending such institutions, including LGBTQ students, pregnant and parenting students, students who have experienced sexual violence while intoxicated, students who have engaged in sexual activity that is against their religion's teachings, and religious minority students. In particular, one commenter suggested that the Department should not permit educational institutions to discriminate against students who have experienced sexual violence. The Department reiterates that a religious exemption under Title IX is not a wholesale exemption from all provisions pertaining to sex-based discrimination, and that any assertion of an exemption must be based on the religious tenets of a religious organization that controls the educational institution. In this regard, the Department is skeptical that schools will be eligible to assert exemptions from the requirement to respond appropriately to sexual harassment under Title IX or from the prohibition on retaliation against individuals who invoke their rights under Title IX.

One commenter specifically asked if the Department (either OCR or the Office of the General Counsel) would automatically review religious exemptions for reasonableness, on an annual basis. In response, the Department states that it will review assertions of religious exemptions, like all Title IX matters, pursuant to its enforcement authority under Title IX. However, the Department has never, and will not begin now, "automatically reviewing" all religious exemptions under Title IX, on an annual basis. If a complaint is filed, and the complaint alleges that a recipient improperly applied a religious exemption or any other exemption under Title IX, OCR will carefully consider the complaint, evaluate compliance with the statute

[127] *See, e.g., Roberts* v. *U.S. Jaycees,* 468 U.S. 609 (1984) (freedom of association); *Bd. of Regents of Univ. of Wis. Sys.* v. *Southworth,* 529 U.S. 217, 233 (2000) (free speech and free association on a college campus); *Rosenberger* v. *Rector and Visitors of Univ. of, Va.,* 515 U.S. 819 (1995) (viewpoint neutrality and the First Amendment).

and regulations, and respond accordingly. Finally, the Department notes that anyone who believes that a recipient institution has engaged in sex discrimination in violation of Title IX may file a complaint with OCR. Details about filing a complaint are available on OCR's website at *www.ed.gov/ocr/ complaintintro.html.* Additional resources on Title IX are available on OCR's website at *www.ed.gov/ocr/ frontpage/pro-students/sex-pr.html.*

*Changes:* In the final regulation, the Department is removing proposed § 106.12(c)(5) from the non-exhaustive list of criteria for establishing a religious exemption.

In addition, the Department is adding two qualifiers to proposed § 106.12(c)(7), which is § 106.12(c)(6) in the final regulations, to make clear that the other evidence used to meet this final criterion must be *sufficient* to establish that an educational institution is controlled by a religious organization, pursuant to 20 U.S.C. 1681(a)(3).

*Proposed Changes to 34 CFR 106.12 and Relationship to Title IX Generally*

*Comments:* Some commenters asserted that the proposed changes to § 106.12 ignore the purpose of Title IX. These commenters further argued that the proposed changes undermine the mission of OCR by letting institutions allow discrimination by student groups and staff, even when doing so means that the institution would not meet the general duties it would have under Title IX. Some commenters even suggested that OCR was forcing institutions to invoke exemptions from Title IX, in the sense that religious institutions might be forced to invoke a religious exemption, even if they wanted to comply with the general non-discrimination duties of Title IX.

One commenter noted the impact of what happens when students' Title IX rights are ignored. The commenter believed that the proposed changes to § 106.12 would put all students at risk because when one student is affected, it also affects their peers who may witness harassment, be subjected to increased harassment themselves, and may become anxious and unable to concentrate in school. Another commenter was concerned that the proposed changes would require public institutions to fund religious student organizations, even when they discriminate against students protected under Title IX. The commenter believed this contradicts the Supreme Court's opinion in *Christian Legal Society* v. *Martinez,*[128] and would force public

[128] 561 U.S. 661 (2010).

institutions to fund discrimination prohibited by Title IX.

Some commenters expressed general opposition to the proposed changes to § 106.12 and asserted that the Department did not explain how the proposed changes are consistent with the Title IX statute. A commenter asserted that the Department did not explain why the proposed changes are needed to assist qualifying institutions. Finally, a commenter asserted that the Department did not explain why any alleged benefits of the proposed changes are greater than the discriminatory harm faced by students and employees at educational institutions.

*Discussion:* The religious exemption provision of Title IX, 20 U.S.C. 1681(a)(3), does not directly address how educational institutions demonstrate whether they are controlled by a religious organization. As the comments in response to the proposed rule demonstrate, some commenters have taken this lack of clarity to mean that an educational institution can never be controlled by a religious organization, unless the religious organization takes the form of a separate corporate or other legal entity. The criteria in § 106.12(c) helpfully codify existing factors that the Assistant Secretary for Civil Rights uses when evaluating, on a case-by-case basis, requests for a religious exemption assurance from OCR, and while addressing concerns that there may be other means of establishing the necessary control.

Additionally, because many of these factors are contained in non-binding guidance issued to OCR personnel dating back more than 30 years, enacting clear regulatory provisions will provide recipients and other stakeholders with clarity regarding what it means to be "controlled by a religious organization." Here, the Department has authority to regulate with regard to discrimination on the basis of sex under 20 U.S.C. 1682, and the Department has determined that it is necessary to regulate given the statutory silence and genuine ambiguity in regard to the criteria for obtaining a religious exemption under Title IX. These regulations are consistent with the Title IX statute in that they do not contradict, but attempt to clarify, an explicit exception provided for in the Title IX statute.

Of course, no educational institution controlled by a religious organization is required to assert any religious exemption at all. Nor does § 106.12 alter the ability of individual students to pressure a school into asserting a religious exemption to Title IX or declining to assert such an exemption.

Commenters' fears that § 106.12, as proposed, will permit students or student groups to obligate their schools to distribute monies or services in a different manner, based on a religious exemption to Title IX, are incorrect. To the extent that individual students may not be protected by non-discrimination obligations if they attend an educational institution controlled by a religious organization, such a consequence is a result of the Title IX statute itself, and not the regulations.

The Department acknowledges that some commenters felt that the Department did not sufficiently articulate why the proposed changes are needed to assist institutions controlled by religious organizations. As explained above, these proposed revisions conform more closely to the intent of Executive Order 13831 and to the Supreme Court's current First Amendment jurisprudence; relevant Federal statutes such as RFRA; Executive Order 13279, as amended by Executive Orders 13559 and 13831; and the Attorney General's Memorandum on Religious Liberty. The Department has determined that the codification of the factors utilized by OCR in analyzing a religious exemption from Title IX will promote transparency and remove barriers to recipients exercising their First Amendment rights. Further, enacting clear regulations will provide recipients and other stakeholders with clarity regarding what it means to be "controlled by a religious organization." As some commenters argued, some educational institutions were concerned that they might not be eligible for a religious exemption because their religious and organizational structure did not include an external controlling organization. This provision's clarity—which also enshrines specific criteria for "control" into regulations with the force and effect of law, as opposed to non-binding guidance—will create more predictability, consistency in enforcement, and confidence for educational institutions asserting the exemption. The Department carefully considered comments about weighing the anticipated benefits of the proposed regulation against the potential discriminatory harm that may be experienced by students and employees. While the Department appreciates that many commenters were concerned about potential harm to vulnerable populations, the Department asserts that Congress enacted Title IX with explicit exceptions to the requirements of Title IX, and these final regulations do not create new exceptions to the Title IX statute. Instead, the Department is

providing much-needed clarity to the meaning of vague terminology utilized in the statute.

Finally, the Department notes that it has addressed a commenter's concerns pertaining to public institutions funding student organizations that discriminate on the basis of sex, and the Supreme Court's decision in *Christian Legal Society* v. *Martinez*,[129] in the "All-Comers' Policies for Student Organizations" section of this preamble. In short, the Department clarifies that this regulation does not prevent institutions from implementing all-comers policies, which were upheld in *Martinez,* nor does it constitute an "exemption" for religious student groups from all-comers policies. Instead, these final regulations reinforce the First Amendment's mandate that public institutions treat religious student organizations the same as other student organizations. As such, a university does not have to choose between compliance with State law and securing Federal funding in the form of grants; it is free to enforce an all-comers policy in order to comply with any State anti-discrimination laws as long as it applies that policy equally to all student organizations. If a public institution chooses to not adopt an all-comers policy, which is also permissible under *Martinez,* then the institution cannot require a student organization, including a religious student organization, to open eligibility for membership and leadership to all students. Ultimately, a university has the discretion to choose what kind of policy will best comply with its own State and local anti-discrimination laws. In any event, whether a school meets the definition of an educational institution controlled by a religious organization in § 106.12, and further, whether it opts to invoke an exemption from Title IX, do not affect its rights under the First Amendment.

*Changes:* None.

*Impact of Proposed Changes to 34 CFR 106.12 on LGBTQ Individuals*

*Comments:* Many commenters expressed specific concerns that the proposed changes to § 106.12 would create barriers for and cause harm to LGBTQ students, parents, and school employees. Some commenters articulated specific concerns related to LGBTQ students, including direct financial costs like lost tuition for students who are forced to leave their schools; lost wages for employees who are fired for reasons that otherwise would violate Title IX; and, health-

---

[129] 561 U.S. 661 (2010).

related costs like the impact of stress on mental and physical health. One commenter noted that policies that extend equal rights and legal protections are associated with decreased stress levels and improved health outcomes among sex and gender minorities.

Some commenters asserted that the proposed changes to § 106.12 would harm LGBTQ students by referencing specific statistics regarding the experiences of LGBTQ youth in school, including statistics from GLSEN's 2017 National School Climate Survey (GLSEN Survey), to support their assertions. These commenters noted that the GLSEN Survey found that the vast majority of LGBTQ students experienced harassment or assault based on personal characteristics, including sexual orientation, gender expression, gender, religion, race and ethnicity, and disability; seven in ten LGBTQ students experienced verbal harassment based on sexual orientation; more than half of LGBTQ students experienced verbal harassment based on gender expression; more than a third of LGBTQ students missed at least a day of school in the last month because of feeling unsafe at school, and at least two in five students avoided bathrooms and locker rooms because they felt unsafe or uncomfortable; the frequency of verbal harassment based on gender expression increased from 2015 to 2017; and LGBTQ students who experienced high-levels of anti-LGBTQ victimization were nearly twice as likely to report that they do not plan to pursue postsecondary education; and these students had lower GPAs, lower self-esteem, and higher levels of depression.

Other commenters provided statistics related to LGBTQ youth without referencing a specific study, noting that LGBTQ youth are more likely to attempt suicide than heterosexual youth; that almost two-thirds of LGBTQ youth report being personally affected by anti-LGBTQ policies and practices; that 18 percent of LGBTQ students report leaving a school because they felt unsafe or uncomfortable; and that among LGBTQ students who make it to college, 31 percent have experienced a hostile campus environment.

Some commenters noted that a recent assessment of schools seeking religious exemptions found that the vast majority of requesting institutions sought exemptions from Title IX that were related to sexual orientation and gender identity. Commenters contended that these exemptions were invoked in order to facilitate sex discrimination by the institutions. According to these commenters, it is reasonable to expect

the trend to continue under the proposed changes to § 106.12.

One commenter argued that employment discrimination based on sex, including sexual orientation and gender identity, remains a grave problem in the United States. The commenter asserted that although Federal law currently prohibits discrimination based on sex, the proposed changes to § 106.12 would embolden Federal contractors to cite religious beliefs in order to justify religious discrimination.

One commenter expressed concern that, as a practical matter, the proposed changes mean that a student who identifies as LGBTQ or who is a child of LGBTQ parents could be confronted with open anti-LGBTQ hostility by a Department-funded social service program partnering with public schools to provide healthcare screening, transportation, shelter, clothing, or new immigrant services. The commenter also believed that the proposed changes increase the likelihood that these harms will result by requiring the Department to issue special notices informing potential grantees that they can apply to be exempt from generally applicable civil rights laws.

*Discussion:* The Department acknowledges that the religious exemptions sought by some educational institutions have involved the application of Title IX to complex issues involving sexual orientation, gender identity, or transgender status. These educational institutions have often cited their religious texts and tenets when articulating conflicts with Title IX in correspondence with OCR. While the Department understands that some commenters believe that religious exemptions should not be granted when there is a conflict with Title IX stemming from a religious tenet addressing sexual orientation, gender identity, or transgender status, the Department enforces Title IX consistent with applicable statutes, including RFRA, and case law. Title IX does not require the Department to deny otherwise valid religious exemption requests if they relate to sexual orientation, gender identity, or transgender status.

Further, the Department disagrees that these proposed regulations will have a significantly increased negative impact upon LGBTQ individuals, because the final regulations clarify existing statutory exemptions to Title IX and the recipients' eligibility for claiming such exemptions. The religious exemption contained in Title IX has existed since

the statute's enactment in 1972.[130] Since that time, the Department has issued a number of letters in response to educational institutions' correspondence asserting eligibility for a religious exemption, and the Department has stated publicly that it utilizes many of the criteria contained in this proposed regulation when considering such correspondence.[131] The Department cannot predict whether the number of recipients claiming the exemption will increase because (1) OCR's past practice has been to allow recipients to claim a religious exemption even after a complaint has been filed against the recipient, and thus, OCR has never had a concrete number of recipients who are claiming a religious exemption at a given time; and (2) after August 14, 2020 (the effective date of the Title IX Final Rule), it is clear that the recipient is under no obligation to affirmatively notify OCR that they are claiming a religious exemption. In any event, based on public comment, the Department does not believe that there are a significant number of educational institutions who have not previously sought a religious exemption, but would be eligible to do so as a result of these final regulations, which include existing factors from OCR's non-binding guidance.

With respect to commenters alleging that Federal contractors will now be able to discriminate on the basis of sex, the Department notes that this provision only applies to educational institutions that are controlled by a religious organization. The Department is committed to the rule of law and robust enforcement of Title IX's non-discrimination mandate. As a statutory exemption to certain provisions of Title IX exists for educational institutions controlled by a religious organization, the Department must acknowledge and practically administer such an exemption.

*Changes:* None.

*Impact of Proposed Changes to 34 CFR 106.12 on Pregnant and Parenting Individuals*

*Comments:* Many commenters expressed specific concerns that the proposed changes to § 106.12 would negatively impact pregnant and

---

[130] Title IX of the Education Amendments of 1972, Public Law 92–318, 373, 86 Stat. 235 (signed into law on June 23, 1972).

[131] *See, e.g.,* U.S. Dep't of Educ., Office for Civil Rights, Memorandum from William Smith, Acting Assistant Sec'y for Civil Rights, to OCR Senior Staff regarding Title IX Religious Exemption Procedures and Instructions for Investigating Complaints at Institutions with Religious Exemptions (Oct. 11, 1989), available at *https://www2.ed.gov/about/offices/list/ocr/docs/smith-memo-19891011.pdf.*

parenting students. Some of these commenters also expressed specific concerns that the proposed changes would permit discrimination based on seeking reproductive health care, including those who have had an abortion or are unmarried and pregnant. One commenter asserted that the proposed rule would allow colleges and universities to discriminate against a significant portion of the population given that one in four women will have an abortion in their lifetime.

*Discussion:* The Department appreciates and has considered the comments raising concerns that the proposed changes may negatively impact pregnant and parenting students. However, the Department reiterates its disagreement with the contention that the proposed changes will have a significant increased impact on certain students, given that the process to assert eligibility for a religious exemption already exists, and the final rule does not significantly change the scope of educational institutions who are eligible to assert a religious exemption. The Title IX implementing regulations regarding the religious exemption were initially issued on May 9, 1980,[132] and the Department has issued a number of letters addressing religious exemptions on the basis of pregnancy and/or familial status since that time.[133]

In any event, if an educational institution controlled by a religious organization seeks a religious exemption from Title IX for the purposes of treating students differently on the basis of pregnancy or familial status, or having previously sought or obtained an abortion, and the criteria described in § 106.12 are met, the school would have stated a valid religious exemption under Title IX, regardless of the practical consequences of such a finding. These final regulations do not create a religious exemption where there was none.

*Changes:* None.

*Opposition to Religious Exemptions Generally*

*Comments:* Some commenters expressed opposition to the concept of religious exemptions in general. One commenter stated that when a person signs up to a certain profession and to conduct business, like an institution of higher education, they accept certain

obligations, including nondiscrimination on the basis of gender and sexual orientation. The commenter also stated that the concept of religious exemptions is irrational and unworkable and inherently subjective. The commenter asserted that we would not entertain people indulging a religious belief to discriminate against racial groups, and to allow discrimination against sexual groups is equally absurd.

*Discussion:* The Department understands that several commenters' opposition to the proposed changes stemmed from their opposition to religious exemptions generally. However, the Title IX statute explicitly provides for an exception to Title IX for an educational institution which is controlled by a religious organization if the application of Title IX would not be consistent with the religious tenets of that organization. This is one of nine specific exemptions to the prohibition against discrimination on the basis of sex that Congress included in Title IX before adopting the statute.[134] The Department is charged with implementing and administering this law, but it did not create the religious exemption from Title IX, and it has no authority to disregard the statutory text.[135]

*Changes:* None.

*Advance Notice of Religious Exemptions*

Require Advance Notice

*Comments:* Some commenters asserted that the proposed changes to § 106.12 were particularly concerning because students' rights may be denied at exempt institutions with no prior notice, since a school may use the exemption as a defense to a Title IX complaint without ever having officially requested the exemption from the Department. One commenter asserted that the proposed changes to § 106.12 would eliminate the advance notice requirement for religious exemptions. Another commenter opposed the proposed changes to § 106.12 and stated that the current process for obtaining an assurance of an exemption under Title IX is (1) minimally burdensome, (2) provides notice to the public as to what schools are requesting exemptions, and (3) ensures that religion as a basis for the exemption mirrors what is legally permissible.

On the other hand, other commenters expressed support for the Department's position that ''[a]n institution's exempt status is not dependent upon its submission of a written statement to OCR.'' One commenter felt that, although the proposed rule did not propose changes to § 106.12(b), clarification should be added to § 106.12(b) that the law does not require the submission of a letter to claim the religious exemption. One commenter suggested that the Department ought to clarify that schools may inherently assert the religious exemption, rather than having to apply for it. The commenter suggested that the Department modify or eliminate existing § 106.12(b):

Exemption. An educational institution which wishes to claim the exemption set forth in paragraph (a) of this section, shall do so by submitting in writing to the Assistant Secretary a statement by the highest ranking official of the institution, identifying the provisions of this part which conflict with a specific tenet of the religious organization.

The commenter expressed concern that the phrase ''shall do so'' implies a form of application; whereas, the institution should be able to assert that they have the exemption when they meet the criteria in proposed § 106.12(c). Accordingly, the commenter suggested the following revision:

Exemption. An educational institution may assert the exemption set forth in paragraph (a) without prior written assurance from the Department. An educational institution may request such written assurance from the Assistant Secretary but is not required to do so.

One commenter suggested a ''tightening'' of the language in proposed § 106.12(c) to clarify that government approval is not needed for a religious exemption. The commenter believed that the phrases ''sufficient to establish'' and ''is eligible to assert'' could be used to claim that an institution must receive the Department's permission to exercise its right to a religious exemption. The commenter suggested that this section be rephrased to clearly indicate that requests by institutions for Department review and opinion are entirely voluntary in nature.

*Discussion:* The Department has reviewed and considered the comments urging the Department to require advanced publication of an educational institution's religious exemption under Title IX before the institution may claim the exemption. However, the Department declines to adopt a new requirement mandating that educational institutions controlled by religious organizations publicize their invocation

---

[132] The Department notes that the Title IX regulations were amended on November 13, 2000, to include provisions pertaining to single-sex education.

[133] *See* ''Other Correspondence.'' Office for Civil Rights, Department of Education, *https:// www2.ed.gov/about/offices/list/ocr/ correspondence/other.html.*

[134] *See* 20 U.S.C. 1681.

[135] Additionally, the RFRA applies to the Department and ''operates as a kind of super statute, displacing the normal operations of other federal laws,'' often mandating religious accommodations and exemptions. *Bostock* v. *Clayton County, Georgia,* 140 S. Ct. 1731, 1754 (2020).

of a religious exemption to students, employees, or other individuals. The Department is not persuaded that such a mandate would be consistent with the Title IX statute, or beneficial overall.

With respect to some commenters' suggestions that the Department modify § 106.12(b), the Department states that the NPRM for these final regulations did not propose, nor do we make here, changes to § 106.12(b). However, the Department's November 29, 2018, NPRM,[136] and the recently released Title IX Final Rule,[137] both address changes to § 106.12(b).

In regard to the comment requesting that the Department clarify that government approval is not needed in order for a recipient to claim a religious exemption, the Department again reiterates that recipients are not required to request a religious exemption from specific provisions of Title IX. If they meet the criteria for a religious exemption, recipients may simply assert the religious exemption at any time, whether before or after an investigation has been opened. The Department's position and interpretation is clear on this point, especially when coupled with the Title IX Final Rule, and further clarification is not needed.

*Changes:* None.

*Other Concerns Related to Proposed Changes to 34 CFR 106.12*

*Comments:* One commenter expressed concern that the Department did not obtain approval of the proposed rule from the Attorney General, in violation of Executive Order 12250. According to the commenter, Executive Order 12250 requires any NPRM that addresses sex discrimination under Title IX to be reviewed by the Attorney General prior to its publication in the **Federal Register**.[138] The commenter noted that the aforementioned authority (although not the authority to approve final regulations) had been delegated to the Assistant Attorney General for Civil Rights.[139]

One commenter asserted that any changes to the Department's Title IX regulations should be done in coordination with the other Federal agencies that have Title IX regulations. The commenter stated that the proposed

changes to § 106.12 focus on the Department of Education only, even though there are 25 other Federal agencies with Title IX regulations, and most of those agencies provide financial assistance to the same private schools, colleges, and universities that the Department of Education funds. The commenter also asserted that the Department must work with all other Federal agencies to adopt a common set of standards on this common question of which entities are eligible for exemptions to Title IX. The commenter believed that the Regulatory Flexibility Act requires the Department to identify and address all relevant Federal rules that may duplicate, overlap, or conflict with the proposed rule. The commenter also believed that Executive Order 12866 requires the Department to avoid regulations that are inconsistent, incompatible, or duplicative with those of other Federal agencies. The commenter contended that it is not sufficient to merely predict that other agencies will amend their Title IX regulations to comport with the Department's proposed changes to § 106.12 in the future. According to the commenter, dissimilarity in Title IX regulations leads to confusion about how different agency Title IX regulations interact among courts and recipients, as has been the case with single-sex schools and classes and dress codes. The commenter stated that the Department may also struggle with inconsistencies because it has entered into delegation agreements with other Federal agencies to handle complaints of discrimination under Title IX and complaints filed with other agencies may be referred to the Department for handling. According to the commenter, this means that the Department may have to investigate, on behalf of another agency, a Title IX complaint at a private school that the Department believes is exempt from Title IX.

Another commenter was concerned that the proposed rule would eliminate religious freedom protections for college preparation and work-study programs intended to help high school students from low income families prepare for college, and would impact federally funded afterschool and summer learning programs for students in high-poverty, low performing schools.

*Discussion:* First, Executive Order 12250 was signed by President Jimmy Carter on November 2, 1980.[140] This Executive Order states that the Attorney

General shall coordinate the implementation and enforcement by Executive agencies of various nondiscrimination provisions of the following laws:

(a) Title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d *et seq.*).

(b) Title IX of the Education Amendments of 1972 (20 U.S.C. 1681 *et seq.*).

(c) Section 504 of the Rehabilitation Act of 1973, as amended (29 U.S.C. 794).

(d) Any other provision of Federal statutory law which provides, in whole or in part, that no person in the United States shall, on the ground of race, color, national origin, handicap, religion, or sex, be excluded from participation in, be denied the benefits of, or be subject to discrimination under any program or activity receiving Federal financial assistance.[141]

Specifically, section 1–202 of the Executive Order 12250 states:

In furtherance of the Attorney General's responsibility for the coordination of the implementation and enforcement of the nondiscrimination provisions of laws covered by this Order, the Attorney General shall review the existing and proposed rules, regulations, and orders of general applicability of the Executive agencies in order to identify those which are inadequate, unclear or unnecessarily inconsistent.[142]

As it pertains to the aspects of this NPRM that propose changing the Title IX regulations, the Department is in compliance with Executive Order 12250 because the Department submitted this proposed rule for consideration to the Office of Management and Budget (OMB), and OMB initiated a clearance process with the Department of Justice. Pursuant to this OMB clearance process, the Department of Justice has had an opportunity to review the proposed changes to § 106.12. Additionally, the Department is aware that, pursuant to Executive Order 12250, the Attorney General of the United States must *approve* the final text of any changes to regulations pertaining to Title IX before they take effect.[143]

Next, with respect to the concerns about the Department of Education's Title IX regulations diverging from other Federal agency regulations pertaining to Title IX, we begin by noting that the Department of Education's implementing regulations for Title IX are available at 34 CFR 106.1, *et seq.* In contrast, the Title IX common rule, published on August 30, 2000, covers education program providers or recipients that are funded by other Federal agencies, including the Nuclear Regulatory Commission, the Small Business Administration, the National

---

[136] 83 FR 61482, 61496.

[137] 85 FR at 30475–82, 30573–74.

[138] Citing sections 1–202, 1–402 of Executive Order 12250; *see also* Memorandum from Jim Gore, Acting Assistant Attorney General, to Federal Agency Civil Rights Directors regarding Clearance Requirements for Title VI, Title IX, Section 504, and Related Nondiscrimination Regulations and Policy Guidance Documents (Apr. 24, 2018).

[139] 28 CFR 0.51(a).

[140] Exec. Order No.12250, Leadership and Coordination of Nondiscrimination Laws, 45 FR 72995 (Nov. 2, 1980), *https://www.justice.gov/crt/executive-order-12250.*

[141] *See id.*

[142] *Id.* § 1–202.

[143] *Id.* section 1–1.

ED2.000210

Aeronautics and Space Administration, the Department of Commerce, the Tennessee Valley Authority, the Department of State, the Agency for International Development, the Department of Housing and Urban Development, the Department of Justice, the Department of the Treasury, the Department of Defense, the National Archives and Records Administration, the Department of Veterans Affairs, the Environmental Protection Agency, the General Services Administration, the Department of the Interior, the Federal Emergency Management Agency, the National Science Foundation, the Corporation for National and Community Service, and the Department of Transportation.[144]

However, the Department of Education is in a unique position with respect to Federal agencies implementing and enforcing Title IX because, as the common rule acknowledges, the Department is (and has historically been) the lead agency for enforcement of Title IX through its guidance, interpretations, technical assistance, investigative expertise, and the amount of resources that the Department commits to enforcement of Title IX. Despite the assertions of some commenters, there is no requirement that there be perfect parity in Title IX regulations across the Federal agencies. Indeed, differences between the Department's regulations and the common rule exist even apart from this rule.

Given the Department's historical role as a leader in Title IX administration and enforcement, it is appropriate that substantive changes to the Title IX regulations originate with the Department. Once the Department's proposed changes to Title IX are in effect, other Federal agencies may consider whether the Department's changes should be reflected in their own regulations. However, the assertion that the Department is prohibited from amending, or that it would be unworkable to amend, the Department's Title IX regulations because other Federal agencies have Title IX regulations that differ slightly from the Department's regulations is simply not a correct statement of law or policy. We do not believe these final regulations would be inconsistent, incompatible, or duplicative with those of other agencies, and have engaged in the interagency review process through OMB's Office of Information and Regulatory Affairs to

help ensure that this is the case. Further, we discuss our compliance with the Regulatory Flexibility Act in the "Executive Orders and Other Requirements" section of this preamble. The Department acknowledges that it has previously entered into delegation agreements with other Federal agencies to review and enforce complaints filed with those agencies, although OCR has suspended several of these interagency agreements. In any event, if OCR were to accept complaints filed with other agencies as part of a delegation arrangement, OCR would make the necessary coordination efforts to ensure compliance with all laws, including Title IX.

Last, with respect to one commenter who was concerned that the rule would eliminate religious freedom protections for college preparation and work-study programs, § 106.12 would not eliminate existing religious freedom protections for any individual or program. Instead, § 106.12 is designed to codify in part existing OCR guidance with respect to the definition of an educational institution controlled by a religious organization and clarify when such entities are eligible to assert an exemption.

*Changes:* None.

*Proposed 34 CFR 106.12(c)—Definition of "Controlled by" a Religious Organization*

*Comments:* Some commenters expressed general support for § 106.12, noting that a recipient can itself be a religious organization that controls its own operations, curriculum, and other features. One commenter asserted that many of the schools in the Jewish community are entities that are wholly independent from a synagogue or other hierarchical body, and thus are not controlled by a religious organization that maintains a separate legal form. The commenter felt that the list of non-exhaustive factors for claiming a religious exemption represented an understanding that religious institutions may be controlled by religion in different ways, yet they are no less religious. In the same vein, another commenter supported the changes because they stated that some Christian and other religious educational institutions are organized and governed by a local board or body of religious leaders, rather than being operated under a hierarchical organization. According to the commenter, for many of these organizations, local control, free of any denominational or hierarchical organization, is a deeply held religious belief and practice.

One commenter was supportive of the proposed changes to § 106.12(c) because, according to the commenter, these changes would preclude the Department from engaging in unconstitutional differentiation among religious institutions based on their connection (or lack thereof) with any outside entity such as a denomination or religious order.

One commenter expressed gratitude for the six added provisions in proposed § 106.12(c) to help explain the "controlled by" language. The commenter felt that the list would add clarity for schools and stakeholders. Another commenter also believed that the proposed changes to § 106.12(c)(1)–(7) clarified what constitutes an institution that is "controlled by a religious organization." One commenter supported the proposal to clarify the eligibility to assert religious exemptions under Title IX because it will give students clear parameters for whether the institutions they apply to and attend are eligible for religious exemptions. The commenter also argued, separately, that the proposed rule would expand the limited exemption for religious schools in Title IX to a broader range of schools that can claim their First Amendment rights, and suggested that such an expansion could lead to equality for all schools.

One commenter believed that the criteria in proposed § 106.12(c) would prevent the imposition of a government standard of what constitutes a religious identity on institutions established for a religious educational purpose, and protect an individual's and an institution's free exercise and assembly rights. One commenter supported what they called a broad reading of what could qualify as a religious institution because according to the commenter, it would ensure that the freedom of all types of religious institutions are protected.

In addition, some commenters expressed general concern that the Department's proposal would expand the definition in § 106.12(c) of schools controlled by a religious organization in ways that have nothing to do with religion, which would lead to increased discrimination by schools that were not truly religious, and against the students that Title IX was intended to protect.

Some commenters asserted that the proposed changes to the definition of "controlled by" a religious organization in § 106.12(c) would strip the word "control" of its intended meaning, and would virtually adopt an expanded religious exemption for schools "closely identified with the tenets of a religious organization," which the commenter

[144] Title IX Final Common Rule for 21 Federal agencies: Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance (65 FR 52857).

argued was previously rejected by Congress. These commenters believed that if Congress had intended to allow exemptions for educational institutions without regard to the existence of an outside, external religious organization, it would have modeled the language in Title IX on Title VII of the Civil Rights Act of 1964, which allows an exemption for educational institutions without regard to the existence of a religious organization, but instead Congress restricted the religious exemption in Title IX to schools "controlled by" a "religious organization."

One commenter believed that the Department's statement that it is "constitutionally obligated" to broadly interpret the phrase "controlled by a religious organization" to avoid religious discrimination among institutions of varying denominations is an incorrect interpretation of the cannon of statutory avoidance, which does not permit an agency to rewrite a statute. The commenter referred to *Jennings* v. *Rodriguez*,[145] when discussing this proposition. The commenter asserted that if a statutory exemption that is limited to educational institutions "controlled by a religious organization" unconstitutionally discriminates against religious organizations with different types of structures, then the Department's only choice is not to apply the unconstitutional exemption to anyone. The commenter contended that Congress, in 1972 when Title IX was originally passed, and in 1988 when it was amended, would have wanted to enact Title IX without a religious exemption, if a court were to hold that the limited religious exemption it enacted was unconstitutional. The commenter noted that there is no statutory language in Title IX that can be excised from the religious exemption itself if the "controlled by a religious organization" is unconstitutionally limiting, because without this language, the exemption makes no sense. The commenter also asserted that even without the religious exemption in Title IX, an educational institution can invoke the Religious Freedom Restoration Act if it can show that Title IX substantially burdens its exercise of religion.

The commenter further asserted that, if the religious exemption in Title IX as written is unconstitutional, the longstanding course of conduct by Congress demonstrates that it would have wanted Title IX to remain in effect. The commenter noted that Title IX was modeled on Title VI of the Civil Rights Act of 1964, but that Title VI does not

have a religious exemption, and neither do Section 504 of the Rehabilitation Act of 1973 or the Age Discrimination Act of 1975, which were both enacted after Title IX. Thus, the commenter contended that Congress did not think that a religious exemption was necessary in order to place non-discrimination conditions on recipients of Federal financial assistance, even when the type of discrimination was not subject to heightened constitutional scrutiny. The commenter also noted that Congress confronted the question when it reauthorized the statute in 1988 and rejected expanding the religious exemption in Title IX. The commenter also stated that the majority of statutes enacted by Congress addressing sex discrimination by recipients of financial assistance have consistently prohibited sex discrimination without any religious exemptions, including statutes enacted around the same time as Title IX.

One commenter noted that several other Federal statutes enacted around the same time as Title IX provide an exemption involving looser or more informal relationships with religious organizations that do not rise to the level of actual control, which demonstrates that Congress intentionally limited the exemption in Title IX to only instances where an educational institution is controlled by an outside religious organization. This commenter also stated that although courts have not yet interpreted the language "controlled by" in Title IX, cases interpreting similar language in other statutes are instructive. The commenter referenced cases interpreting the Federal Unemployment Tax Act (FUTA) and Fair Housing Act (FHA), where courts have demanded a showing of actual or legal control of an entity's governing body to establish that an entity is "controlled by" a religious organization. According to the commenter, the language of the FHA religious exemption is narrower than that of Title IX and, thus, the courts' narrow interpretation of the FHA exemption demands an even narrower interpretation in the Title IX context.

One commenter asserted the suggestion that one component of an educational institution can be the religious organization has no basis in the statutory text. The commenter stated that this would make language that Congress has specifically included in other statutes redundant and noted that, in authorizing Federal funds to go to private schools after Hurricane Katrina, Congress exempted "a non-public school that is controlled by a religious organization or organized and operated on the basis of religious tenets." The

commenter asserted that the Department has no authority to rewrite Title IX to include language that Congress included elsewhere, but not in Title IX.

One commenter contended that while there may be varied methods of establishing control, it cannot be enough that an educational institution has elected to subscribe to or adopt a particular doctrinal statement or practices because the term "control" suggests a more coercive, two-party relationship. The commenter noted that Congress has defined a "tribally controlled college or university" to mean "an institution of higher education which is formally controlled or has been formally sanctioned, or chartered, by the governing body of an Indian tribe or tribes." The commenter also noted that under ERISA, a pension plan qualifies for the "church plan" exemption if the organization maintaining it is either "controlled by or associated with a church." The commenter further explained that courts use a multi-factor test for determining whether an organization is "associated with" a church, but both the IRS and courts have used the commonsense definition of organizational control: "the ability of church officials to appoint the majority of the trustees or directors of an organization." Thus, the commenter asserted, there is no ground to deviate from such a commonsense definition in interpreting the same language in Title IX.

One commenter asserted that when Congress wants to permit an exemption from non-discrimination laws for educational institutions that have relationships with religious organizations not based solely on control, it knows how to do it, but has done so only rarely. The commenter explained that in other situations, for example, Congress has permitted exemptions for "a non-public school that is controlled by a religious organization or organized and operated on the basis of religious tenets;"[146] for "any educational institution that is affiliated with a religious organization or closely associated with the tenets of a religious organization;"[147] for "a school that is operated by, supervised by, controlled by, or connected to a religious organization;"[148] and for "an institution which is controlled by or

[145] 138 S. Ct. 830, 836 (2018).

[146] Elementary and Secondary Education Hurricane Relief Act, Public Law 109–148, section 107, 119 Stat 2680 (2005).

[147] District of Columbia Appropriations Act, 1990, Public Law 101–168, section 141(b), 103 Stat 1267 (Nov. 21, 1989).

[148] Department of Defense and Full-Year Continuing Appropriations Act, 2011, Public Law 112–10, section 3008, 125 Stat 38.

which is closely affiliated with the tenets of a particular religious organization." [149]

One commenter noted that Congress considered changes to the religious exemption language in Title IX to expand it beyond "control" in 1988 when it expanded the coverage of Title IX in the Civil Rights Restoration Act. The commenter explained that at that time, proponents of an expanded religious exemption in Title IX, including the Department, urged that the language in Title IX be changed to include educational institutions "closely identified with the tenets of a religious organization." [150] The commenter further explained that Congress rejected the proposal to broaden the religious exemption in Title IX, and President Reagan stated that one reason for his veto of the Civil Rights Restoration Act was the "failure to protect the religious freedom of private schools that are closely identified with the religious tenets of, but not controlled by, a religious organization." [151] The commenter believed that the Department has no authority to rewrite Title IX to treat "controlled by" as if it encompassed any other types of relationships because Congress considered and rejected this idea.

One commenter believed that the religious exemption in Title IX must be interpreted narrowly to give effect to the statute's primary purpose to protect students and ensure equal access to education through the vigorous enforcement of civil rights. The commenter stated that the Title IX regulations therefore must, as a default rule, aim primarily to realize Title IX's purpose for preventing and addressing sex discrimination in federally funded entities, and if the Department chooses to change this default expectation, it must provide an extremely compelling justification for doing so. The commenter asserted that the Department offered little justification for its broad interpretation of Title IX's religious exemption in the proposed changes to § 106.12(c). The commenter further asserted that the limited nature of Title IX's religious exemption is further underscored by its legislative history, in both its initial drafting and negotiations over later amendments, which make clear that legislators intended and understood the exemption to be narrow.

One commenter was concerned that, contrary to the plain text of the statute,

the proposed changes to § 106.12(c) would allow a broad range of schools that are not controlled by a religious organization to discriminate against students and employees based on sex. According to the commenter, approximately one fifth of Maryland colleges and universities describe themselves as having a religious affiliation, regardless of whether they are controlled by a religious organization. The commenter contended that the proposed changes would enable these institutions to use Federal funds to legally discriminate against teachers and students, and such an expansion would leave thousands of Maryland students and teachers vulnerable to sexual harassment, retaliation, and unwarranted disciplinary actions.

One commenter asserted that the proposed changes to § 106.12(c) represent an unwarranted expansion of Title IX's religious exemption. The commenter explained that the Title IX statute includes important limitations about which schools can qualify for an exemption and in particular the school needs to be "controlled by a religious organization." According to the commenter, this means that it is not sufficient for a school to be affiliated with a religion or to follow certain religious principles; the school needs to be controlled by another organization, one that has specific religious tenets and is capable of exerting control over a school.

One commenter generally stated that the Department has no authority to violate or rewrite unambiguous law, citing *Chevron* v. *NRDC*,[152] and contended that the expansion of "controlled by" violates the statutory text of Title IX and thus the proposed rule must be withdrawn in its entirety.

*Discussion:* The Department appreciates comments that the rule ensures that educational institutions that are controlled by religious organizations will be protected by § 106.12. However, to be clear, the Department does not agree with the commenter who supported the proposed regulation because, in the commenter's view, the proposed changes to § 106.12 impliedly expanded the eligibility for religious exemptions to all schools, or to all schools that are associated with religious beliefs. That is not the case, and the Department's regulation only addresses those educational institutions that are controlled by a religious organization. Further, the Department agrees with commenters who stated that it would pose challenges, and perhaps constitutional questions, to offer

religious exemptions to some institutions that are controlled by religious organizations but not others, on the sole basis that some religions are required by their tenets not to be associated to an external entity that controls their operations.

The Department understands that some commenters felt that the proposed addition of § 106.12(c) was a departure from a long-established agency protocol pertaining to religious exemptions. However, the Department notes that the provisions in proposed § 106.12(c)(1)–(5) are factors consistent with the Department's past practice in acknowledging an educational institution's religious exemption. For instance, provisions (c)(1) through (c)(3) are consistent with guidance issued by former Assistant Secretary for Civil Rights Harry Singleton to Regional Civil Rights Directors on February 19, 1985.[153] To guide attorneys within OCR as to whether an educational institution may establish "control" by a religious organization, the guidance relied on the March 1977 version of HEW Form 639A, which was issued by the former U.S. Department of Health, Education, and Welfare. Proposed provisions (c)(4) and (5) also are consistent with a letter from Acting Assistant Secretary for Civil Rights William L. Smith to OCR Senior Staff.[154]

The Department received both comments in support of and in opposition to the Department's position that, consistent with prior OCR guidance, an educational institution may itself be the controlling religious organization under Title IX. Section 106.12(c)(6), as proposed, is consistent with longstanding OCR practice in recognizing this principle. For example, OCR has long recognized that a school or department of divinity is an educational institution controlled by a religious organization, without any requirement that the school or department of divinity be controlled by a religious organization that is organized as a separate legal entity from the educational institution itself.

While the Department understands the assertions raised by some

---

[149] Higher Education Amendments of 1992, Public Law 102–325, section 724, 106 Stat 448.

[150] S. Rep. 100–64, at 27 (1987).

[151] 134 Cong. Rec. H1037 (Mar. 22, 1988).

[152] 467 U.S. 837 (1984).

[153] U.S. Dep't of Educ., Office for Civil Rights, Memorandum from Harry Singleton, Assistant Sec'y for Civil Rights, to Regional Civil Rights Directors regarding Policy Guidance for Resolving Religious Exemption Requests (Feb. 19, 1985), available at *www2.ed.gov/about/offices/list/ocr/docs/singleton-memo-19850219.pdf*.

[154] U.S. Dep't of Educ., Office for Civil Rights, Memorandum from William Smith, Acting Assistant Sec'y for Civil Rights, to OCR Senior Staff regarding Title IX Religious Exemption Procedures and Instructions for Investigating Complaints at Institutions with Religious Exemptions (Oct. 11, 1989), available at *https://www2.ed.gov/about/offices/list/ocr/docs/smith-memo-19891011.pdf*.

commenters that an educational institution must be controlled by a separate legal entity in the form of an external religious organization in order to qualify for a religious exemption, those assertions are atextual, and the Department's final regulations recognizes that some educational institutions are organized and governed by a local board or body of religious leaders, rather than being operated under a hierarchical organization. The Title IX statute does not require that an educational institution and a controlling religious organization be separate and distinct entities. Further, the Department has long recognized that these entities can be one and the same, such as in the case of schools of divinity.

Additionally, the Department acknowledges that the statutory text leads to potential ambiguities as to which educational institutions are eligible for exemptions, and over the years, the Department has had to develop a system for evaluating what is sufficient to establish that an educational institution is "controlled by a religious organization." The Department has previously shared the parameters of this system with the public through (1) issuing non-binding agency memoranda [155] and (2) publicly posting the Department's responses to letters seeking a religious exemption from Title IX.[156] These procedures left educational institutions in the difficult position of digging through agency memoranda from the 1980s, and reading dozens of letters from OCR, in order to assess their eligibility for asserting a religious exemption under Title IX. Notably, however, many of these documents—including the document that referenced divinity schools being eligible for religious exemptions—were issued before the events described by one of the commenters above occurred, such as the passage of a statute addressing Hurricane Katrina recovery, or President Ronald Reagan's veto of the Civil Rights Restoration Act. The Department thus disagrees with this commenter, who suggested that OCR lacks regulatory authority for § 106.12 because Congress, in other statutes, suggested a distinction between maintaining religious tenets and being controlled by another legal entity that maintains religious tenets. That a different Congress drafted legislation in a different way does not alter the fact that the Title IX statute, as written, does not contain an independent requirement that the controlling religious organization be a separate legal entity than the educational institution. Indeed, the difference between these two categories of educational institutions appears to be a legal formality, in the sense that this comment could imply that forming a new legal entity on paper, and merely having that entity "control" the educational institution would, in fact, be sufficient to establish eligibility under the control test. Yet under this rationale, even a school of divinity would need to be controlled by an outside organization that is also a religious organization, contrary to over 30 years of OCR practice. Why Congress would desire such an outcome, even as a policy matter—to say nothing of the constitutional questions that might arise by privileging some religious structures over others—is left unaddressed by the commenter.

The Department agrees with commenters who have asserted that the Department has no authority to change the language in the Title IX statute. The Department does not endeavor to change the language of the statute, or to expand it beyond the scope of its text. The Department sees no textual reason that would require limiting 20 U.S.C. 1681(a)(3) exclusively to schools that are controlled by *external* religious organizations. Accordingly, it will continue to recognize that an educational institution may, in some cases, also be the controlling religious organization.

Moreover, as a separate and independent basis for interpreting the text in the manner above, and as the Department explained in the NPRM, and consistent with many comments described above, the Department recognizes that religious organizations are organized in widely different ways that reflect their respective theologies. Some educational institutions are controlled by a board of trustees that includes ecclesiastical leaders from a particular religion or religious organization who have ultimate decision-making authority for the educational institutions. Other educational institutions are effectively controlled by religious organizations that have a non-hierarchical structure, such as a congregational structure. The Department does not discriminate against educational institutions that are controlled by religious organizations on the sole basis that they are organized with different types of internal structures. Indeed, the Department has long recognized exemptions for educational institutions that are controlled by religious organizations with hierarchical and non-hierarchical structures.

As the Supreme Court explained in *Jennings* v. *Rodriguez*,[157] under the constitutional-avoidance canon of statutory interpretation, when statutory language is susceptible to multiple interpretations, a court may avoid an interpretation that raises serious constitutional doubts, and instead may adopt an alternative that avoids those problems. However, the Supreme Court cautioned that, "a court relying on that canon still must interpret the statute, not rewrite it." Here, the Department is not re-writing the statute. The regulatory language is clearly in line with the text of the statute. The Department does recognize, however, that the phrase "controlled by a religious organization," could potentially give rise to different meanings. In that sense, *Chevron* v. *NRDC* does not preclude an agency from adopting a reasonable interpretation that is both consistent with the text of the statute, and that also, avoids potential constitutional conflicts with the First Amendment. Opting to "level down," however, and having the Department enforce Title IX without regard for any assertion of a religious exemption, would require re-writing the statute that Congress passed. If Congress prefers an outcome where no educational institution is allowed to claim a religious exemption from Title IX, as opposed to all educational institutions controlled by a religious organization, it can amend the relevant statute, but the Department of Education cannot act unilaterally.

The Department proposed § 106.12(c)(7) in recognition that neither Congress nor OCR could ever promulgate an exhaustive and exclusive list of criteria by which an educational institution may assert an exemption under Title IX. This provision is consistent with the Department's

[155] *See* U.S. Dep't of Educ., Office for Civil Rights, Memorandum from William Smith, Acting Assistant Sec'y for Civil Rights, to OCR Senior Staff regarding Title IX Religious Exemption Procedures and Instructions for Investigating Complaints at Institutions with Religious Exemptions (Oct. 11, 1989), available at *https://www2.ed.gov/about/offices/list/ocr/docs/smith-memo-19891011.pdf;* U.S. Dep't of Educ., Office for Civil Rights, Memorandum from Harry Singleton, Assistant Sec'y for Civil Rights, to Regional Civil Rights Directors regarding Title IX Religious Exemptions (Aug. 2, 1985), available at *https://www2.ed.gov/about/offices/list/ocr/docs/singleton-memo-19850802.pdf;* U.S. Dep't of Educ., Office for Civil Rights, Memorandum from Harry Singleton, Assistant Sec'y for Civil Rights, to Regional Civil Rights Directors regarding Policy Guidance for Resolving Religious Exemption Requests (Feb. 19, 1985), available at *https://www2 ed.gov/about/offices/list/ocr/docs/singleton-memo-19850219.pdf;* Assurance of Compliance with Title IX, HEW Form 639–A (Mar. 18, 1977), available at *https://www2.ed.gov/about/offices/list/ocr/docs/hew-form-639-a-1977.pdf.*

[156] *See* Department website at *https://www2.ed.gov/about/offices/list/ocr/correspondence/other.html.*

[157] 138 S. Ct. 830, 836 (2018).

established position that an educational institution may show that it is "controlled by a religious organization" through innumerable facts and circumstances that are unique to that educational institution and/or the controlling religious organization.

Finally, the Department has changed the first sentence of proposed § 106.12(c) to clarify and reiterate that an educational institution must be controlled by a religious organization to be eligible to assert a religious exemption from Title IX, and that it is the tenets of the religious organization that are referenced in 20 U.S.C. 1681(a)(3). A few commenters pointed out that the proposed language in § 106.12(c) of the NPRM did not explicitly mention that the recipient must be controlled by a religious organization. The Department understands and appreciates the points raised by these commenters, and the Department has amended the language of § 106.12(c) to include the "controlled by a religious organization" language, and to clarify that the tenets referenced in 20 U.S.C. 1681(a)(3) are those of the religious organization.

*Changes:* The Department has changed the first sentence of proposed § 106.12(c) to further clarify that an educational institution must be controlled by a religious organization, as contemplated under subsection (a), to be eligible to assert a religious exemption.

Change to Longstanding Policy/Need for Such a Change

*Comments:* One commenter asserted that there is no evidence that the proposed changes to the definition of "controlled by" a religious organization in § 106.12(c) are needed. The commenter stated that hundreds of schools have requested religious exemptions under Title IX, and not a single request has been denied. Another commenter asserted that even under the existing criteria for seeking an exemption under Title IX, schools with loose ties to religious organizations have claimed to satisfy the test and sought exemptions.

Some commenters were concerned that the proposed changes would alter the standard for religious exemptions under Title IX, which has been in place for more than 30 years. One of these commenters also was concerned that the proposed changes to § 106.12(c) would replace the longstanding test with a sweeping and vague standard that will create more, rather than less, ambiguity about which schools are eligible for a religious exemption under Title IX, which will create confusion for students and schools. Another of these

commenters also expressed general concern that the new test would add a range of new bases that a school can rely on to claim the exemption.

*Discussion:* The Department does not agree with commenters' arguments that the new provisions create more ambiguity about which educational institutions may assert a religious exemption. The new provisions spell out specific requirements—many of which have been interpreted and applied for decades by OCR—for educational institutions to refer to when considering whether to assert a religious exemption. Additionally, with respect to § 106.12(c)(5), the language references a specific accreditation regulatory provision that educational institutions will be able to review and consider before asserting a religious exemption.

The Department appreciates commenters' concerns but reiterates that the final rule is designed to put into place clear parameters for when an educational institution can be determined to be controlled by a religious organization. Commenters' argument that no educational institution has previously been denied a religious exemption is not a reason to avoid having clear parameters for how to establish control, or to avoid embracing the value of enshrining into regulations, which have the force and effect of law, standards that have only been expressed in non-binding guidance. To be clear, a school that merely has loose ties to religious teachings or principles, without establishing "control" by a religious organization, is not eligible to assert a religious exemption.

*Changes:* None.

*Proposed 34 CFR 106.12(c)—Tenets of the Religious Organization*

*Comments:* Some commenters expressed concern that proposed § 106.12(c) is inconsistent with Title IX because it would permit an educational institution to assert an exemption when application of Title IX would not be consistent with merely its practices (not tenets). The commenters asserted that the term "practices" is vague and ambiguous. The commenters further asserted that the Department has no authority to rewrite the Title IX statute via regulation.

One commenter contended that the exemption in the Title IX statute addresses the religious tenets of the religious organization and not, as the proposed changes to § 106.12(c) would have it, the tenets of the educational institution. The commenter asserted that when Congress wants a school to be exempt based on its own religious tenets, it knows how to do it. The

commenter pointed to the religious exemption provision for the Federal voucher program for DC, which exempts a participating private school "to the extent that the application of" the prohibition against sex discrimination "is inconsistent with the religious tenets or beliefs of the school." The commenter stated that the Department has no authority to rewrite the exemption in Title IX to include language that Congress included elsewhere, but not in Title IX.

*Discussion:* Following review of comments on the NPRM, the Department has re-evaluated whether § 106.12(c) should state that the criterion in § 106.12(c) shall be sufficient to establish that an educational institution may assert a religious exemption to the extent that application of this part would not be consistent with its religious "tenets or practices." After further consideration, the Department has opted to use only the word "tenets," which mirrors the language of the statute.

The Department understands that some commenters asserted that the religious exemption under Title IX only exists when a Title IX obligation conflicts with the religious tenets of a controlling religious organization. As the Department has explained in both the NPRM and throughout this discussion of comments, OCR has long recognized that an educational institution may itself be the controlling religious organization. Thus, an educational institution that itself is a religious organization that controls its own operations may point to its own religious tenets when claiming a religious exemption under Title IX.

*Changes:* The Department removed the word "practices" from the first sentence of § 106.12(c).

*Proposed 34 CFR 106.12(c)(1)–(4)'s Inclusion of the Phrase "a Statement."*

*Comments:* One commenter was concerned that the language in § 106.12(c)(1)–(4) put a burden on the recipient to taken action in claiming the religious exemption by submitting a statement to the Assistant Secretary for Civil Rights. This commenter felt that the recipient should be able to assert the exemption when the recipient meets the criteria, not when they submit a statement to the Assistant Secretary, and that the language implied that a statement would need to be submitted to OCR for consideration.

*Discussion:* The Department seeks to clarify that educational institutions claiming a religious exemption do not need to submit any such statements to OCR. To highlight this point, in the final

regulation, the Department removed the words "a statement" from the beginning of subsections § 106.12(c)(1)–(4).

*Changes:* The Department removed the words "a statement" from § 106.12(c)(1)–(4).

### Proposed 34 CFR 106.12(c)(4)

*Comments:* One commenter asserted that proposed § 106.12(c)(4) would substantially expand the eligibility for a religious exemption to schools that are not, in fact, controlled by religious organizations. This commenter was concerned that there is no requirement in this subsection that a statement of doctrines or religious practices be derived from a religious organization, or that the educational institution have any relationship with a religious organization.

*Discussion:* As the Department has explained in both the NPRM and throughout this discussion of comments, OCR has long recognized that an educational institution may itself be the controlling religious organization in the case of schools of divinity.[158] Thus, an educational institution may point to its own religious tenets when claiming a religious exemption under Title IX.

Under this proposed subsection, there is no requirement that the doctrinal statement or statement of religious practices be derived from an external religious organization. The Department recognizes that religious organizations are organized in different ways that may reflect their respective theologies. The Department does not discriminate against educational institutions that are controlled by religious organizations with different types of structures, including educational institutions that are their own controlling religious organization.

Although these educational institutions may not have a formal legal relationship with another entity that controls their operations, they are nonetheless eligible for a religious exemption under Title IX. The Department does not find the arguments that there must be a specific relationship between the educational institution and an *external* religious organization to be persuasive, given that nothing in the text indicates such a requirement, and the fact that the requirement would seem to impose a legal hurdle that would differently affect different religions, and would have little or no practical policy benefit. These

commenters never explain why Congress would have wanted, as a policy matter, to encourage educational institutions to form external legal entities, and then have those entities "control" the educational institution, before an exemption could be asserted. Additionally, and as a separate basis for § 106.12, the Department is constitutionally obligated to broadly interpret "controlled by a religious organization" to avoid religious discrimination among institutions of varying denominations that have different governance structures.[159]

*Changes:* As discussed above, the Department removed the words "a statement" from § 106.12(c)(1)–(4).

### Proposed 34 CFR 106.12(c)(5)'s Reference to Moral Beliefs

*Comments:* Many commenters were concerned that, under proposed § 106.12(c)(5), a religious exemption may be granted to an institution that "subscribes to specific moral beliefs" without that institution being "controlled" by a religious organization. Some commenters felt that this was a substantial expansion of the religious exemption under Title IX.

Some commenters argued that establishing a "control" test based on moral beliefs would open the door for many more schools—beyond those that are actually controlled by a religious organization—to demand an exemption. Many commenters contended that proposed § 106.12(c)(5) would allow institutions to claim a religious exemption from Title IX, even if they had no meaningful relationship at all with a religious organization. One commenter argued that, under the proposed language, educational institutions may receive religious exemptions even if they believe in secular moral principles.

Some commenters felt that the proposed expansion of the religious exemption under Title IX was unwarranted. One commenter felt that proposed § 106.12(c)(5) would distort the boundaries of the religious exemption beyond any resemblance to the statutory language.

One commenter expressed concern that institutions did not need to identify any particular religion that controls

them, or a religion from which their beliefs stem, to qualify for a religious exemption under proposed § 106.12(c)(5). The commenter felt that, if institutions are not required to tie the religious exemption to a specific religion or religious belief, this proposed subsection would undermine Title IX's protections.

One commenter asserted that proposed § 106.12(c)(5) was the most concerning part of the proposed changes to § 106.12, because it would allow schools to simply state that they "subscribe to specific moral beliefs or practices" to claim a religious exemption, without the institution subscribing to a specific religious belief or being controlled by a specific religious institution. The commenter was worried that this scenario would give any institution carte blanche to expel pregnant or parenting students, ignore sexual harassment in the classroom, or deny women scholarships or jobs based solely on their sex, without having to establish anything related to religious tenets or affiliation.

Some commenters believed that proposed § 106.12(c)(5), in conjunction with other parts of the proposed changes to § 106.12, would render the phrase "controlled by a religious organization" meaningless. One commenter explained that, under proposed § 106.12(c)(5), institutions would no longer be required to demonstrate any connection to a religious organization, let alone that they are controlled by a religious organization.

One commenter asserted that the Department has no authority to transform the religious exemption in § 106.12 into a "moral" exemption, or to extend it to any organization not "controlled by a religious organization." In that vein, one commenter contended that the proposed "moral beliefs" provision was the one that most exemplified the objection that the rule relaxed the requirements for educational institutions to claim an exemption, arguing that a school need not even subscribe to a religious belief to be exempt.

One commenter expressed concern that, if the proposed changes to § 106.12 were adopted, the Department's position would be that schools meet the "controlled by a religious organization" test simply by saying that they "subscribe to specific moral beliefs or practices." The commenter noted that schools seeking an exemption under proposed § 106.12 do not need to point to any particular religious organization that controls them, or a religious organization that those moral beliefs or

---

[158] *See, e.g.,* U.S. Dep't of Educ., *Policy Guidance for Resolving Religious Exemption Requests* (Feb. 19, 1985), *available at www2.ed.gov/about/offices/list/ocr/docs/singleton-memo-19850219.pdf.*

[159] *Larson* v. *Valente,* 456 U.S. 228, 244 (1982) ("The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another."); *see also Hosanna-Tabor Evangelical Lutheran Church & Sch.* v. *EEOC,* 565 U.S. 171, 202 (2012) (Alito, J., concurring; joined by Kagan, J.) (arguing that a broad, functionalist interpretation of religious teachers for purposes of the ministerial exception is necessary to be inclusive of faiths like Islam and Jehovah's Witnesses).

practices come from. Further, the commenter contended that the proposed § 106.12(c)(5) does not even say that those moral beliefs or practices have to be connected to religion at all. Thus, as proposed, according to the commenter, § 106.12 could allow a school with only a tenuous relationship with religion to claim an exemption.

One commenter stated that the "moral beliefs and practices" language in proposed § 106.12(c)(5) is "strikingly ambiguous and wholly unconnected to religion altogether." The commenter stated that moral beliefs are difficult to define and may not have grounding in religious practice; some may be indirectly inspired by religion, but not tied to religion explicitly. The commenter stated that, by conflating moral beliefs with religion, the proposed changes to § 106.12 would open the religious exemption to widespread abuse by institutions with no religious connection that want to limit their obligations and liability under Title IX.

One commenter asserted that the broad language in proposed § 106.12(c)(5) does not clarify the religious exemption, but rather muddles it. This commenter urged the Department to remove the "moral belief" language from this subsection because moral institutions are not the same as religiously-owned institutions, and because the commenter suggested that seeking permission to discriminate on the basis of sex is never an expression of morality.

Other commenters were concerned that proposed § 106.12(c)(5) did not require the governing body of an institution, or a controlling religious organization, to approve the statement of moral beliefs or practices upon which the religious exemption is claimed. One commenter was concerned that the statement of moral beliefs and principles in proposed § 106.12(c)(5) did not have to be included in any official document, it did not have to be enforced consistently, and it did not have to be available to students before an institution could claim the religious exemption. One commenter was concerned that the statement of moral beliefs and principles did not have to be reflected in any official school documents or policies or accompanied by any evidence of prior positions on the stated moral principles. One commenter expressed concern that an educational institution could submit a "statement that the educational institution subscribes to specific moral beliefs or practices, and a statement that members of the institution community may be subjected to discipline for

violating those beliefs or practices," without a requirement that these statements need to be "written, published, or otherwise made available to the institution's community, approved prior to a discriminatory act, or otherwise enforced by the school." One commenter was concerned that proposed § 106.12(c)(5) applies to schools whose "moral beliefs and practices" do not appear in writing, are not consistently enforced, or are simply a post-hoc rationalization asserted to rebut discrimination claims in the context of litigation.

One commenter posited that the statement of moral beliefs and principles would not even need to exist until a student filed a complaint of discrimination, at which time an institution may claim a religious exemption from Title IX based on non-religious moral beliefs. One commenter was concerned that students and employees would have no notice that their school believes itself exempt from Title IX's requirements until after they are harmed by discrimination and ask their school to take protective or remedial action.

One commenter believed that students would feel that that they were protected from sex-based discrimination until they experience such discrimination and try to file a complaint. The commenter was concerned that institutions would then make a disclosure that they are exempt from Title IX requirements.

*Discussion:* As outlined above, the Department received considerable comment on the inclusion of proposed § 106.12(c)(5) in the NPRM. Most of these commenters expressed concern that the "moral beliefs or practices" language would significantly increase the number of institutions that could seek a religious exemption from Title IX. Some commenters opined that the "moral beliefs or practices" language could even apply to secular educational institutions, resulting in an outcome that a secular institution would be claiming a religious exemption from compliance with certain provisions of Title IX.

As stated in the NPRM, the proposed paragraph (c)(5) was based in part on a letter from Acting Assistant Secretary for Civil Rights William L. Smith to OCR Senior Staff.[160] That letter details

[160] U.S. Dep't of Educ., Office for Civil Rights, Memorandum from William Smith, Acting Assistant Sec'y for Civil Rights, to OCR Senior Staff regarding Title IX Religious Exemption Procedures and Instructions for Investigating Complaints at Institutions with Religious Exemptions (Oct. 11, 1989), available at *https://www2.ed.gov/about/offices/list/ocr/docs/smith-memo-19891011.pdf*.

examples of certain information that schools provided in the past to assist OCR's analysis as to whether a religious exemption assurance request is supported, and it specifically includes the "moral belief and practices" language in proposed § 106.12(c)(5). However, after further consideration, the Department agrees with the commenters who have expressed that this language is too expansive. The Department can envision a scenario wherein an educational institution would attempt to utilize § 106.12(c)(5) to avoid Title IX obligations based upon "moral beliefs and practices" that are not even tangentially tied to religion. We believe this criterion is too broad as written and agree with the commenters who expressed concern that this provision could exceed the scope of the statutory text.

The Department acknowledges the concerns that schools could invoke pretextual moral beliefs or quickly develop moral beliefs once they are accused of discrimination. We believe our removal of the provision regarding moral beliefs from the final regulations addresses these commenters' concerns.

*Changes:* The Department removed proposed § 106.12(c)(5) from the non-exhaustive list of criteria for establishing a religious exemption.

*Proposed 34 CFR 106.12(c)(6)*

General Opposition

*Comments:* One commenter expressed concern that proposed § 106.12(c)(6) would permit a religious exemption upon a statement that "the educational institution is asserting that the educational institution is itself the controlling religious organization," provided that the statement "includes, refers to, or is predicated on religious tenets, beliefs, teachings."

One commenter contended that proposed § 106.12(c)(6) would exempt a school from Title IX's requirements when a governing body of a school approves a statement that "includes, refers to, or is predicated upon religious tenets, beliefs, or teachings." The commenter stated that approval of such a statement does not transform a school's governing body into a controlling religious organization as required by Title IX.

One commenter asserted that, under an expansive reading of proposed § 106.12(c)(6), an institution's statement to claim a religious exemption could include a secular statement on any topic, as long as it is simply "predicated upon"—that is, it draws from or is inspired by—religious teachings.

One commenter asserted that, if proposed § 106.12(c)(6) is implemented, "a single, post hoc board-approved statement referring to any religious beliefs would permit an institution to disregard Title IX's prohibitions against sex discrimination." The commenter expressed concern that the statement would not even need to be included in any official document, be enforced consistently, or made available to students. The commenter was also concerned that the statement would not even need to exist until after a student files a complaint for discrimination.

One commenter contended that under proposed § 106.12(c)(6), an institution would be able to get an exemption if it makes a statement that is loosely inspired by religious teachings, even if that statement does not mention religion explicitly.

On the other hand, one commenter supported the clarity added to proposed § 106.12 by the Department, specifically to proposed § 106.12(c)(6) to expressly acknowledge that a recipient can itself be a religious organization that controls its own operations, curriculum, or other features. This commenter noted that it represented many different denominations, as well as non-denominational schools, and that all of the schools are distinctly Christian, but the hierarchy and structure vary. The commenter believed that the non-exhaustive factors in proposed § 106.12(c) represent an understanding that religious institutions may be controlled by religion in different ways, yet are no less religious.

*Discussion:* Proposed § 106.12(c)(6) provided that an educational institution was eligible to assert the exemption if the educational institution had a statement that is approved by its governing board and that includes, refers to, or is predicated upon religious tenets, beliefs, or teachings. This provision echoes the discussion above, stating that a recipient can itself be a religious organization that controls its own operations, curriculum, or other features. In short, an educational institution's assertion of an exemption pursuant to § 106.12(c)(6), is not, without more, a concession that it is controlled by an external religious organization. Instead, the educational institution is asserting that the educational institution is itself the controlling religious organization.

The Department acknowledges some commenters' general disagreement with the proposition that an educational institution could be its own controlling religious organization. However, proposed § 106.12(c)(6) is consistent with longstanding OCR practice in recognizing that the educational institution may itself be the controlling religious organization. For example, OCR has long recognized that a school or department of divinity is an educational institution controlled by a religious organization without any requirement that the school or department of divinity be controlled by an external religious organization. Additionally, § 106.12(c)(6) aligns well with the Department's recently published definition of "religious mission" in 34 CFR 600.2.[161] In that provision, a "religious mission" is defined as "[a] published institutional mission that is approved by the governing body of an institution of postsecondary education and that includes, refers to, or is predicated upon religious tenets, beliefs, or teachings" in the context of regulations about eligibility for Federal student aid under Title IV of the Higher Education Act of 1965, as amended. Where an educational institution has a religious mission, as defined in § 600.2, it may choose to assert an exemption to the extent application of Title IX and its implementing regulations would not be consistent with the institution's religious tenets.

While one commenter asserted that, under an expansive reading of proposed § 106.12(c)(6), an institution's statement to claim a religious exemption could include a secular statement on any topic, as long as it is simply "predicated upon" religious tenets, beliefs, or teachings, the Department notes that this provision is not meant to be read "expansively" or "narrowly." It is meant to be read for what it is: an example of an educational institution that is controlled by a religious organization, because it maintains a religious mission. That a school has and maintains a religious mission, as defined in 34 CFR 600.2, is sufficient to establish that it is an educational institution controlled by a religious institution. Of course, if the school does not meet the definition of an institution with a religious mission, it cannot avail itself of this provision. And with respect to commenters who argued that educational institutions might avail themselves of this provision *after* a complaint with OCR has been filed, the Department thinks that it is unlikely that educational institutions will—consistent with the changes being made to this provision—publish an institutional religious mission merely for the purpose of defending themselves from an OCR complaint. In any event,

no part of the 20 U.S.C. 1681(a)(3) suggests that adopting a religious mission after an OCR complaint is filed is impermissible, or that schools may not assert a religious exemption once OCR receives a complaint involving an educational institution. Indeed, OCR's practice is to evaluate assertions of religious exemptions even after a complaint has been filed. If OCR receives a complaint involving a recipient's adoption of a religious mission after a complaint was filed, or a complaint involving a recipient's assertion of a religious exemption after a complaint was filed, OCR will carefully evaluate and consider the facts and circumstances of that complaint and respond appropriately.

After careful consideration of the comments pertaining to the various structures utilized by the religious institutions and/or the controlling religious organizations, the Department has opted to make changes to the final regulation to even further bring it into line with the Department's recently published definition of "religious mission." The Department's definition of "religious mission" in 34 CFR 600.2 defines "religious mission" as "[a] published institutional mission that is approved by the governing body of an institution of postsecondary education and that includes, refers to, or is predicated upon religious tenets, beliefs, or teachings" in the context of regulations about eligibility for Federal financial student aid under Title IV of the Higher Education Act of 1965, as amended. An educational institution that has a religious mission, as defined in § 600.2, may choose to assert an exemption to the extent application of Title IX and its implementing regulations would not be consistent with the institution's religious tenets. Here, the Department sees merit in aligning this portion of the regulation with the recently adopted definition of "religious mission" in 34 CFR 600.2 in order to promote congruency in the language referencing these same types of recipients across the Department's regulations.

*Changes:* The provision is revised to refer to a "published institutional mission that is approved by the governing body of an educational institution and that includes, refers to, or is predicated upon religious tenets, beliefs, or teachings." The Department will re-number proposed § 106.12(c)(6) to reflect the deletion of proposed § 106.12(c)(5). Accordingly, proposed § 106.12(c)(6) will appear as § 106.12(c)(5) in the final regulation.

---

[161] 84 FR 58834, 58914 (Nov. 1, 2019) (revising definition in 34 CFR 600.2).

*Proposed 34 CFR 106.12(c)(7)*

*Comments:* Some commenters expressed concern about the use of the phrase "other evidence," suggesting that this would lead to an even lower threshold for obtaining a religious exemption under proposed § 106.12(c)(7). One commenter was concerned that proposed § 106.12(c)(7) would invite institutions to seek a religious exemption even when they cannot meet the "demonstrably low" threshold of proposed § 106.12(c)(1)–(6) or identify religious tenets that conflict with Title IX. One commenter expressed concern that proposed § 106.12(c)(7) is a catch-all provision, and that it would permit institutions to establish religious control via any "other evidence," and does not define or otherwise delineate what this "other evidence" may be, or how much of this evidence must exist.

One commenter believed that the proposed § 106.12(c)(7) would provide an avenue by which institutions can incorporate any religious belief to justify non-compliance with Title IX regulations. According to the commenter, if proposed § 106.12(c)(7) is adopted, the end result would likely be that institutions with little-to-no connection to religion would be empowered to engage in federally unchecked sex discrimination with no Federal recourse for harmed individuals.

Some commenters were also concerned that proposed § 106.12(c)(7) would substantially expand the religious exemption language in Title IX to include institutions that are not actually controlled by religious organizations. Some of these commenters were concerned that even schools with only a tenuous connection to a religious institution would request religious exemptions. One commenter asserted that, by interpreting the exemption so broadly and departing so far from Title IX's language, the Department would open the door for many more schools—beyond those that are actually controlled by a religious organization—to demand an exemption.

One commenter opposed proposed § 106.12(c)(7) because, under the expanded criteria proposed for religious exemptions, by its own admission, the Department creates a potential unquantifiable expansion of schools that can claim religious exemptions. According to the commenter, this would increase the likelihood that students and residents will attend schools where discrimination on the basis of sex is permitted.

One commenter stated that, by significantly expanding opportunity to receive an exemption, and therefore expanding the numbers of private, charter, and other schools legally permitted to not comply with Title IX's requirements, the proposed changes would plainly undermine Congress's objective.

Some commenters believed that the proposed changes ignored a long-standing test for religious exemption requests and added an overly broad range of new bases that a school can rely on to claim the exemption.

*Discussion:* The Department appreciated the insightful comments pertaining to the language of § 106.12(c)(7). The Department especially appreciated those comments directed at potential confusion about whether "other evidence," meant any other evidence, regardless of how much or how persuasive the evidence might be.

The Department proposed § 106.12(c)(7) in recognition that Congress did not promulgate an exclusive list of criteria by which an educational institution may assert an exemption under Title IX. Further, the Department acknowledges that there may be ways for an educational institution to establish that it is controlled by a religious organization beyond the criteria articulated in proposed § 106.12(c)(1)–(6). The Department merely seeks to provide flexibility for institutions to assert a religious exemption since there may be innumerable facts and circumstances that an educational institution may wish to use to show that it is "controlled" by a religious organization.

The Department's intent in drafting the proposed § 106.12(c)(7), however, was not to empower schools with tenuous relationships to religious organizations to utilize this "other evidence" criterion to claim an exemption under Title IX. The concerns pertaining to § 106.12(c)(7) have been duly noted by the Department, and in the final regulation, the Department emphasizes that the "other evidence" criterion must include sufficient evidence to establish that the educational institution is, in fact, controlled by a religious organization, pursuant to 20 U.S.C. 1681(a)(3). Indeed, while the point of the provision is to avoid unnecessarily limiting the scope of what type of evidence could establish control by a religious organization, this "other evidence" must be more than, for instance, a scintilla of evidence.

The Department disagrees with the commenters asserting that § 106.12(c)(7) would substantially expand the religious exemption from Title IX. As discussed above, § 106.12(c)(7) was included in this regulation because the Department recognizes that there could be a variety of ways for a recipient to establish that it is eligible for a religious exemption. The Department has always carefully considered the evidence submitted when evaluating a religious exemption from Title IX, and given the wide array of recipients with different structures and belief systems, the Department has determined that it is appropriate to provide some flexibility in the types of evidence that would be sufficient to establish eligibility for the religious exemption. This is not an unquantifiable expansion of the religious exemption, as one commenter asserted. It is, however, an acknowledgment that recipients may use many forms of evidence, including evidence that is not specifically outlined in the other criteria of § 106.12(c), to establish eligibility for the religious exemption. This flexibility is appropriate given the broad religious exemption language in the Title IX statute and given that the Department is subject to the U.S. Constitution, including the Free Exercise Clause, as well as RFRA.

As to the comment that this regulation will allow institutions to incorporate any religious belief into their operations to justify non-compliance with Title IX regulations, and that this will result in institutions with little-to-no connection to religion being empowered to engage in federally unchecked sex discrimination, the Department rejects the assertion that educational institutions will adopt religious beliefs, perhaps as a pretext, in order to avoid their Title IX obligations. Based on public comments, however, the Department has no information to suggest that there are educational institutions that are not currently eligible for a religious exemption, but which will become eligible as a result of this final rule. Additionally, the Department seeks to make clear that abuses of the religious exemption provisions of this regulation will not be unchecked. Individuals who contend that a recipient has improperly claimed a religious exemption from Title IX may file a complaint with OCR. Further, the Department's criteria still require that the recipient to be controlled by a religious organization and, thus, recipients with little-to-no connection to religion would not meet the eligibility standard for claiming the exemption.

*Changes:* The Department has clarified that "other evidence" in § 106.12(c)(6) must be "sufficient to establish" that the educational institution is controlled by a religious

**59962** **Federal Register** / Vol. 85, No. 185 / Wednesday, September 23, 2020 / Rules and Regulations

organization, pursuant to 20 U.S.C. 1681(a)(3). In addition, due to the deletion of proposed § 106.12(c)(5), proposed § 106.12(c)(7) is re-designated as § 106.12(c)(6) in the final regulation.

*Severability*

*Comments:* None.

*Discussion:* We believe that each of the regulations discussed in this preamble would serve one or more important, related, but distinct purposes. We also believe that each of the paragraphs and provisions in 34 CFR 106.12 would serve one or more important, related, but distinct purposes. Each provision in 34 CFR 106.12 provides a distinct value to the Department, recipients, elementary and secondary schools, institutions of higher education, students, employees, the public, taxpayers, the Federal Government, and other recipients of Federal financial assistance separate from, and in addition to, the value provided by the other provisions. To best serve these purposes and parallel to the severability clauses proposed in the NPRM and included in these final regulations, we include a severability provision in 34 CFR 106.12(d) in the final regulations to make clear that these final regulations are designed to operate independently of each other and to convey the Department's intent that the potential invalidity of one provision should not affect the remainder of the provisions. Similarly, the validity of any of the regulations, which were proposed in "Part 1—Religious Liberty" of the NPRM, should not affect the validity of any of the regulations, which were proposed in "Part 2—Free Inquiry" of the NPRM.

*Changes:* The Department adds a severability clause in 34 CFR 106.12(d).

**34 CFR 606.10 (Developing Hispanic-Serving Institutions Program); 34 CFR 607.10 (Strengthening Institutions Program);[162] 34 CFR 608.10 (Strengthening Historically Black Colleges and Universities Program); 34 CFR 609.10 (Strengthening Historically Black Graduate Institutions Program)**

*Comments:* One commenter expressed support for these proposed regulations because the existing regulation may be seen as excluding any school that teaches its students about theology, and, if interpreted in such a manner, the regulation would violate the First Amendment. According to this

commenter, the proposed regulations align with a singular exception in current Supreme Court case law that a government entity may exclude a school or a department whose function is to prepare students to become ministers from an otherwise generally available scholarship program.

One commenter contended that proposed §§ 606.10, 607.10, and 608.10 demonstrate that the Department would allow Federal financial assistance to support religious instruction, religious worship, or proselytization. According to this commenter, the Department is concerned that the current regulations inhibit the ability of institutions to use Federal funds for such activities. This commenter asserted that using Federal funds for such activities is prohibited by the Establishment Clause of the First Amendment and cited *Locke* v. *Davey*[163] to support this assertion.

*Discussion:* We appreciate the comment in support. The commenter who opposed the proposed regulations misunderstood the Department's proposed changes to §§ 606.10, 607.10, and 608.10, which expressly address unallowable activities or activities that a grantee may *not* carry out under a development grant. The Department proposed revising §§ 606.10(c)(3), 607,10(c)(3), and 608.10(c)(3) to expressly prohibit a grantee from using a development grant for "activities or services that constitute religious instruction, religious worship, or proselytization." The Department also proposed revising § 609.10(c)(3) in this same manner. The Department's revisions align §§ 606.10(a)(3), 607.10(a)(3), 608.10(a)(3), and 609.10(a)(3) with the Department's other regulations such as 34 CFR 75.532 and 34 CFR 76.532 that prohibit grants, subgrants, or state-administered formula grants to be used for religious worship, religious instruction, or proselytization. Accordingly, the Department's proposed revisions do not violate the Establishment Clause of the First Amendment or Supreme Court precedent interpreting the Establishment Clause.

*Changes:* None.
*Comments:* None.
*Discussion:* Sections 606.10(a)(4), 607.10(a)(4), 608.10(a)(4), and 609.10(a)(4) provide in relevant part that a "school or department of divinity" means "an institution, or a department of an institution, whose program is solely to prepare students to become ministers of religion or solely to enter into some other religious vocation." The Department is omitting the second

instance of "solely" in the definition of "school or department of divinity" in §§ 606.10(a)(4), 607.10(a)(4), 608.10(a)(4), and 609.10(a)(4) because the second instance of "solely" is redundant. This revision is technical in nature to improve clarity and does not change the meaning of the proposed or final regulation.

*Changes:* The Department omitted the second instance of "solely" in §§ 606.10(a)(4), 607.10(a)(4), 608.10(a)(4), and 609.10(a)(4).

**Executive Orders and Other Requirements**

*Comments:* A commenter argued that the NPRM is unlawful because 20 U.S.C. 1098a (§ 492 of the Higher Education Act of 1965, as amended (HEA)) requires the Department to engage in negotiated rulemaking for the proposed regulations, which it did not do. In that section, Congress used the phrase "pertaining to this subchapter" when describing regulations for which negotiated rulemaking was required, which the commenter interpreted broadly. The commenter also asserted that the HEA's negotiated rulemaking requirement was particularly relevant in this case because the NPRM's RIA stated that "some of the changes proposed in this regulatory action would materially alter the rights and obligations of recipients of Federal financial assistance under Title IV of the HEA." The commenter also argued that the HEA's master calendar requirement (20 U.S.C. 1089(c)(1)) should apply to these regulations, meaning that regulations that have not been published by November 1 prior to the start of the award year will not become effective until the beginning of the second award year after such November 1 date, July 1.

*Discussion:* The negotiated rulemaking requirement in section 492 of the HEA applies only to regulations that implement the provisions of Title IV of the HEA, all of which relate to student aid programs or specific grants designed to prepare individuals for postsecondary education programs. Specifically, Title IV contains seven parts: (1) Part A—Grants to Students at Attendance at Institutions of Higher Education; (2) Part B—Federal Family Education Loan Program; (3) Part C—Federal Work-Study Programs; (4) Part D—William D. Ford Federal Direct Student Loan Program; (5) Part E—Federal Perkins Loans; (6) Part F—Need Analysis; and (7) Part G—General Provisions Relating to Student Financial Assistance Programs.

The requirements of section 492 do not apply to every Department regulation that impacts institutions of

---

[162] The Department notes that 34 CFR 607.10 applies to the Strengthening Institutions Program umbrella, which includes the American Indian Tribally Controlled Colleges and University (TCCU) program and the Alaska Native- and Native Hawaiian-Serving Institutions (ANNH) program.

[163] 540 U.S. 712 (2004).

higher education; instead, they apply exclusively to regulations that implement Title IV of the HEA, in other words, that "pertain to" Title IV of the HEA. Section 492 of the HEA does not apply to regulations implementing programs authorized by other titles of the HEA, such as the discretionary grant programs in Title VI, or the institutional aid programs in titles III and V, all of which impact many institutions that also participate in the Title IV student aid programs.

The statement in the RIA that the proposed regulations "would materially alter the rights and obligations of recipients of Federal financial assistance under Title IV of the HEA" was included in error, and we have corrected the RIA in these final regulations. Because the programs that are the subject of this rulemaking are not implementing the provisions of title IV of the HEA, the negotiated rulemaking requirement does not apply.

Similarly, the title IV master calendar requirements do not apply to these regulations. The HEA provides that "any regulatory changes initiated by the Secretary affecting the programs under [title IV] that have not been published in final form by November 1 prior to the start of the award year shall not become effective until the beginning of the second award year after such November 1 date." [164] While the Department has acknowledged that these regulations would impact institutions that participate in the title IV student assistance programs, among others, that impact does not trigger the master calendar requirement. These final regulations are not part of a "program under Title IV," and the master calendar requirement therefore does not apply.

*Changes:* None.

*Comments:* One commenter stated that the Department did not properly notify and consult with the Small Business Administration early in the rulemaking process, and also that it violated the Regulatory Flexibility Act (5 U.S.C. 601, *et seq.*) (RFA) by failing to identify the costs of the proposed regulations on small entities and businesses or to identify alternatives, and that its treatment of small entities also violated Executive Order 13272. The commenter also asserted that the Department failed to provide the public with information about its regulatory flexibility analysis, specifically how many grant recipients are small entities. The commenter cited data provided in a prior rulemaking about the number of HEA Title IV recipients that were small institutions and stated that the failure to

address or incorporate that data violated both the APA and Executive Order 13563. The commenter also stated that the Department was required to consider and address alternatives for small entities.

*Discussion:* Section 605(b) of the RFA states that an agency need not include an initial regulatory flexibility analysis (5 U.S.C. 603) and final regulatory flexibility analysis (5 U.S.C. 604) if it can certify in the notice of proposed rulemaking or final regulations that the rule does not have a significant economic impact on a substantial number of small entities. Consistent with 5 U.S.C. 605, we can and do make this certification in the final rule. Therefore, the requirements in sections 603 and 604 that the commenter cites, including those related to identification of alternatives for small entities, are not applicable to the NPRM or these final regulations, and the Department has met its obligations under the RFA and Executive Order. The notification requirement the commenter referenced in Executive Order 13272 also does not apply, as it applies to "any draft rules that may have a significant economic impact on a substantial number of small entities." [165] Further, because the certification under 5 U.S.C. 605 that this rule does not have a significant economic impact on a substantial number of small entities is based on the fact that this rule does not result in quantifiable costs, the information the commenter refers to from a prior rulemaking related to the number of HEA Title IV recipients that are small entities was not necessary for the Department's compliance with the RFA and related Executive Order, or the public's understanding of and ability to comment on our RFA certification.

*Changes:* None.

*Comments:* A commenter contended that the Department did not comply with Executive Order 12866 because the NPRM only identified alternatives relating to adopting different regulations and did not identify why the status quo required additional regulation. According to the commenter, the Department acknowledged in the NPRM that the Department has not identified any significant issues with grantees related to a failure to comply with the First Amendment or stated institutional policies regarding freedom of speech, undercutting the Department's argument that these regulations are necessary.

*Discussion:* The Department sufficiently identified the alternatives it

considered in the NPRM. [166] Issuing guidance documents instead of regulations to address the issues discussed in the NPRM, including in "Part 1—Religious Liberty" and "Part 2—Free Inquiry," would prove insufficient because guidance documents are not binding and do not carry the force and effect of law. [167] To address these issues in a clear and enforceable manner, a formal notice-and-comment rulemaking was the most appropriate approach. The Department places conditions on its grants through its regulations, and the Department would not be able to implement the directive in Executive Order 13864 "to ensure institutions that receive Federal research or education grants promote free inquiry, including through compliance with all applicable Federal laws, regulations, and policies" without promulgating regulations. Notice-and-comment rulemaking reinforces our commitment to the rule of law and robust public participation in the development of regulations that govern us.

Despite the guarantees of the First Amendment which applies to public institutions, and despite the ability to choose stated institutional policies at private institutions, courts have been called upon to vindicate the rights of dissident campus speakers, who do not necessarily share the views of the majority of campus faculty, administrators, or students. Without these lawsuits and the added incentive that these final regulations provide, the censorship and suppression of the speech of faculty, other employees, and students could go unredressed. For instance, when a public university, the University of North Carolina Wilmington, denied a promotion to a professor because he had authored newspaper columns about academic freedom, civil rights, campus culture, sex, feminism, abortion, homosexuality, and religion, he sued the university and prevailed. The United States Court of Appeals for the Fourth Circuit concluded that the professor's "speech was clearly that of a citizen speaking on a matter of public concern" and thus, was entitled to constitutional protection. [168] Similarly, the Supreme Court of Wisconsin recently held that a private university breached its contract with a professor over a personal blog post because, by virtue of the adoption of the 1940 AAUP Statement of

---

[164] 20 U.S.C. 1089(c)(1).

[165] Exec. Order No. 13272, section 3(b), 67 FR 53461 (Aug. 16, 2002).

[166] 85 FR 3219.

[167] *Perez* v. *Mortg. Bankers Ass'n,* 575 U.S. 92, 97 (2015).

[168] *Adams* v. *Trs. of the Univ. of N.C.-Wilmington,* 640 F.3d 550, 565 (4th Cir. 2011).

**59964**    **Federal Register** / Vol. 85, No. 185 / Wednesday, September 23, 2020 / Rules and Regulations

Principles on Academic Freedom, the post was "a contractually-disqualified basis for discipline." [169]

Additionally, the United States District Court for the Southern District of California recently held that California State University San Marcos had violated the First Amendment by committing viewpoint discrimination against the pro-life student organization, Students for Life, when allocating grants from the university's mandatory student fee. [170] Recent victories in court cases by religious student groups against their public institutions for violating the First Amendment in denying them the same rights, benefits, and privileges as other student groups also persuaded the Department that regulatory action is necessary to address these problems. [171]

Even cases that have settled demonstrate the denial of free speech rights across American college campuses is a serious issue. For instance, the Yosemite Community College District and its administrators settled a First Amendment lawsuit filed by a student whom a constituent college of that District had stopped from handing out copies of the United States Constitution on Constitution Day in a public part of campus. [172] And the University of California at Berkeley settled a high-profile lawsuit in December 2018 alleging that the university selectively had deployed its vague policies to prevent conservative groups from bringing to campus speakers harboring ideas the university administration just did not like. [173]

A violation of the First Amendment at a public institution or a violation of stated institutional policies regarding freedom of speech, including academic freedom, at a private institution is egregious in education. The hallmark of education includes an opportunity to learn from diverse viewpoints and to consider and be challenged by ideas, opinions, theories, and hypotheses. In enacting the HEA, Congress expressly recognized that "an institution of higher education should facilitate the free and open exchange of ideas" [174] and that "no student attending an institution of higher education on a full- or part-time basis should, on the basis of participation in protected speech or protected association, be excluded from participation in, be denied the benefits of, or be subjected to discrimination or official sanction under any education program, activity, or division of the institution[.]" [175] These regulations align with and advance these legislative goals.

The commenter also contended that there is not a need for regulation because the Department allegedly acknowledged that violations of the First Amendment or stated institutional policies on freedom of speech are rare, but the commenter takes the Department's statements in the NPRM out of context. The Department acknowledged that it is "unaware of any prior instance in which a violation of the First Amendment or institutional policies regarding freedom of speech raised serious concerns about a grantee's ability to effectively carry out a Department grant." [176] We made this statement in the context of final, non-default judgments because the proposed and final regulations state that an institution will only be found to have violated the material condition if there is a final, non-default judgment against that institution. We acknowledge that final, non-default judgments against a public or private institution may be infrequent, but the absence of such a judgment does not necessarily mean that public institutions are complying with the First Amendment or that private institutions are complying with their stated institutional policies regarding freedom of speech, including academic freedom. Individuals may experience a violation of the First Amendment or a stated institutional policy regarding freedom of speech and choose not to file a lawsuit to challenge

a public institution or a private institution. A student or employee may risk their education or employment in filing such a lawsuit. They also may fear retaliation from the institution, their peers, their colleagues, or their supervisors. Additionally, many institutions may choose to settle such disputes such that a court never renders a final, non-default judgment. Accordingly, the lack of a final, non-default judgment against an institution does not mean that a public institution has not violated the First Amendment or that a private institution has not violated its own stated institutional policies regarding freedom of speech, including academic freedom. It may mean that the institution remedied any problem before a lawsuit was filed or during any litigation. Remedying such a problem before a final, non-default judgment is rendered saves institutions the cost of litigation, and remedying any such problem during litigation saves the institution the continued cost of litigation. We believe these final regulations will have the additional benefit of increasing and incentivizing awareness about the importance of upholding the First Amendment for public institutions and of complying with stated institutional policies regarding freedom of speech, including academic freedom, for private institutions. Additionally, the Department stated that "available remedies for the violation [of a material condition of a grant], . . . can include suspension or termination of Federal awards or debarment" and that "decisions regarding appropriate remedies are made on a case by case basis." [177] The Department further acknowledged that the "potential suspension or termination of a Federal award and potential debarment would, in the event that they occurred, represent real costs" but that "such outcomes would be generally unlikely and difficult to meaningfully predict." [178] In this context, the Department stated that "such violations are rare," meaning that such violations of a material condition of a grant that lead to potential suspension or termination of a Federal award and potential debarment are rare. [179] However, the Department believes that violations of the First Amendment and of stated institutional policies regarding freedom of speech, including academic freedom, are a concern for the reasons stated in the NPRM, including the cases cited in the NPRM, and the comments

---

[169] *McAdams*, 914 NW2d at 737 (holding private university breached its contract with a professor over a personal blog post because, by virtue of its adoption of the 1940 AAUP Statement of Principles on Academic Freedom, the post was "a contractually-disqualified basis for discipline").

[170] *See Apodaca* v. *White*, 401 F. Supp. 3d 1040, 1057 (S.D. Cal. 2019).

[171] *InterVarsity Christian Fellowship/USA* v. *Univ. of Iowa*, 408 F. Supp. 3d 960 (S.D. Iowa 2019), *appeal docketed*, No. 19–3389 (8th Cir. Nov. 5, 2019); *Bus. Leaders in Christ* v. *Univ. of Iowa*, 360 F. Supp. 3d 885 (S.D. Iowa 2019), *appeal docketed*, No. 19–1696, (8th Cir. Mar. 3, 2019).}

[172] *See Van Tuinen* v. *Yosemite Cmty. Coll. Dist.*, Case No. 1:13–at–00729, Doc. No. 1 (E.D. Cal. filed Oct. 10, 2013) (Complaint); *Victory: Modesto Junior College Settles Student's First Amendment Lawsuit*, Foundation for Individual Rights in Education (FIRE) (Feb. 25, 2014), *available at www.thefire.org/victory-modesto-junior-college-settles-students-first-amendment-lawsuit/*.

[173] *See Young America's Found.* v. *Napolitano*, Case No. 3:17–cv–02255, Doc. No. 32 (N.D. Cal. filed Apr. 24, 2017) (Amended Complaint); *see also id.* (Doc. No. 44) (Statement of Interest by the United States Department of Justice) (stating that the University of California at Berkeley's policies violated the First Amendment); Jonathan Stempel, *UC Berkeley Settles Lawsuit Over Treatment of Conservative Speakers*, Reuters (Dec. 3, 2018, *available at www.reuters.com/article/us-california-lawsuit-ucberkeley/uc-berkeley-settles-lawsuit-over-*

treatment-of-conservative-speakers-idUSKBN1O22K4.

[174] 20 U.S.C. 1011a(a)(2)(C).

[175] 20 U.S.C. 1011a(a)(1).

[176] 85 FR 3217–18.

[177] *Id.*

[178] *Id.*

[179] *Id.*

that we received about proposed regulations 34 CFR 75.500(b)–(c) and 34 CFR 76.500(b)–(c) confirm that such violations are a concern. The Department has not historically suspended or terminated a Federal award or debarred a grantee as the first measure in addressing a violation and instead attempts to secure voluntary compliance from the State, grantee, or subgrantee. Indeed, the Department's regulations provide that the Department may suspend or terminate a Federal award or debar a grantee, if there is a continued lack of compliance and if imposing additional, specific conditions is not successful.[180] The fact that historically we have rarely taken actions such as suspension or termination and that those instances may be rare and difficult to predict does not in any way detract from the concerns about violations of the First Amendment and stated institutional policies regarding freedom of speech that are addressed in case law, the NRPM, and comments.

*Changes:* None.

*Comments:* One commenter stated that the Department failed to consult Indian Tribal governments in violation of Executive Order 13175 and the Department's consultation policy. The commenter stated that the proposed regulations' imposition of the First Amendment on Tribally-controlled institutions creates Tribal implications and requires consultation under § 5(a) of Executive Order 13175. The commenter also noted that the Department of Housing and Urban Development, in its parallel NPRM, acknowledged that the proposal had Tribal implications and purported to engage in Tribal consultation on that ground.

Commenters also stated that the Department's federalism analysis in the NPRM was erroneous, or that the NPRM should have included such an analysis under Executive Order 13132. One commenter asserted that the proposed rules would have federalism implications, because by creating loopholes and upending the regulatory regime applicable to government-funded entities that espouse religious viewpoints, they would complicate the ability of State and local jurisdictions to safeguard their workforce and enforce generally applicable anti-discrimination laws such as sex discrimination laws, and that they also would cause economic hardships to State and local governments, in the forms of higher unemployment and greater demand for

State and city-funded services. Others asserted that the proposed rules would directly prohibit States from applying their nondiscrimination laws and constitutional protections in the public educational institutions that they fund, putting public schools in the position of having to choose between following State and Federal law as interpreted by the Department. Commenters also asserted that the NPRM was not in compliance with the Unfunded Mandates Reform Act of 1995 (UMRA) because it neither included the requisite analysis, nor qualified for an exemption. In the NRPM, the Department stated that the proposed regulations were exempt under section 4(2) of the UMRA, 2 U.S.C. 1503(2), which excludes any proposed or final Federal regulation that "establishes or enforces any statutory rights that prohibit discrimination on the basis of race, color, religion, sex, national origin, age, handicap, or disability." Commenters asserted that the NPRM instead would create new religious exemptions that surpass the protections found in existing statutes, including RFRA. They stated that the NPRM justified the religious exemptions based on case law, executive orders, and Department of Justice memoranda, and that the RFRA does not create a categorical right that prohibits discrimination. Therefore, they asserted that the exemption from the UMRA was not applicable, and the NPRM should have included a UMRA analysis.

*Discussion:* With regard to Native American tribal consultation, we note that the comment we received was not from a commenter that identified as a Native American Tribe or from a representative of a Native American Tribe. Section 5(a) of Executive Order 13175 requires each agency to have an accountable process to ensure meaningful and timely input by Tribal officials in the development of regulatory policies that have tribal implications. In accordance with Executive Order 13175, Section IV of the Department's Consultation and Coordination with American Indian and Alaska Native Tribal Governments policy,[181] provides that the Department will conduct Tribal consultation regarding actions that have a substantial and direct effect on tribes. The policy lists specific programs that serve Native American students or that have a specific impact on Tribes and provides that for those programs, regulatory

changes or other policy initiatives will often affect Tribes and, thus, may require Tribal consultation. It further provides that for other programs that affect students as a whole, but are not focused solely on Native American students, the Department will include Native American Tribes in the outreach normally conducted with other stakeholders who are affected by the action. Thus, given that the regulations do not have a substantial direct effect on Indian educational opportunities, we did not engage in Tribal consultation. Accordingly, Native American Tribes had the same opportunity to comment on the proposed rules as other stakeholders.

Additionally, we have revised these final regulations to clarify that we are not imposing the First Amendment on any entity, including any institution controlled by a Tribal government, that is not already legally required to abide by the First Amendment to the U.S. Constitution. We note that generally the Bill of Rights, including the First Amendment, does not apply to Tribes and Tribal governments.[182] The Department is revising § 75.500(b) to state: "Each grantee that is an institution of higher education, as defined in 20 U.S.C. 1002(a), that is public and that is legally required to abide by the First Amendment to the U.S. Constitution (hereinafter 'public institution'), must also comply with the First Amendment to the U.S. Constitution . . . as a material condition of the Department's grant." Similarly, the Department is revising § 76.500(b) to state: "Each State or subgrantee that is an institution of higher education, as defined in 20 U.S.C. 1002(a), that is public and that is legally required to abide by the First Amendment to the U.S. Constitution (hereinafter 'public institution'), must also comply with the First Amendment to the U.S. Constitution . . . as a material condition of the Department's grant." The Department notes that "[p]ublic, as applied to an agency, organization, or institution" in 34 CFR 77.1 "means that the agency, organization, or institution is under the administrative supervision or control of a government other than the Federal Government." The Department further notes that in 34 CFR 77.1, "[p]rivate, as applied to an agency, organization, or institution means that it is not under Federal or public supervision or control." Accordingly, if an institution

---

[180] *See* 34 CFR 75.901 (referencing 2 CFR 200.338); 2 CFR 200.338 (stating Federal awarding agency may suspend or terminate an award if noncompliance cannot be remedied by imposing additional conditions).

[181] U.S. Dep't of Educ., Consultation and Coordination with American Indian and Alaska Native Tribal Governments, *available at www2.ed.gov/about/offices/list/oese/oie/tribalpolicyfinal.pdf.*

[182] *Santa Clara Pueblo* v. *Martinez,* 436 U.S. 49, 56 (1978). The Indian Civil Rights Act (ICRA) extended some of the Bill of Rights to tribes, but the ICRA is not the First Amendment to the U.S. Constitution, and the ICRA does not include an Establishment Clause. 25 U.S.C. 1302(a)(1).

is a public institution that is not legally required to abide by the First Amendment to the U.S. Constitution, then that institution is not required to comply with the First Amendment to the U.S. Constitution as a material condition of the Department's grant. The final regulations concerning the First Amendment, thus, do not apply to Tribal institutions that are not legally required to comply with the First Amendment to the U.S. Constitution.

Similarly, § 106.12(c) in these final regulations clarifies the exemption for an educational institution which is controlled by a religious organization if the application of Title IX and its implementing regulations would not be consistent with the religious tenets of such organization pursuant to 20 U.S.C. 1681(a)(3). Indeed, the revisions to these final regulations with respect to parts 106, 606, 607, 608, and 609 of title 34 of the Code of Federal Regulations are consistent with the Indian Civil Rights Act, which contains language similar to almost the entire First Amendment to the U.S. Constitution *except* the Establishment Clause of the First Amendment. The Individual Civil Rights Act provides in relevant part: "No Indian tribe in exercising powers of self-government shall make or enforce any law prohibiting the free exercise of religion, or abridging the freedom of speech, or of the press, or of the right of the people peaceably to assembly and to petition for a redress of grievances." [183]

These final regulations are consistent with the First Amendment and, thus, do not pose federalism concerns because States are legally required to abide by the First Amendment. [184] Requiring public institutions that are legally required to abide by the First Amendment to the U.S. Constitution to also comply with the First Amendment to the U.S. Constitution as a material condition of the Department's grant does not pose any federalism concerns. Such a requirement does not preclude States from enforcing any anti-discrimination laws because any State anti-discrimination law, including laws that prohibit discrimination on the basis of sex, must be consistent with the First Amendment. Similarly, requiring private institutions to comply with their stated institutional policies regarding freedom of speech, including academic freedom, as a material condition of the Department's grant, does not impose any federalism concerns. The Department does not dictate what a private institution's stated institutional policies must be, and private institutions should comply with all applicable laws, including any State's anti-discrimination laws.

Additionally, the First Amendment does not allow public institutions to treat religious student organizations differently based on their status as a religious organization or on account of their sincerely held religious beliefs, and the Department's regulation with respect to religious student organizations at public institutions is consistent with the First Amendment and also the Religious Freedom Restoration Act, 42 U.S.C. 2000bb, *et seq.* ("RFRA"), which applies to the Department and requires the Department not to substantially burden a person's exercise of religion unless certain conditions are satisfied. [185] As the Department explains in the "'All Comers' Policies for Student Organizations" subsection in the "34 CFR 75.500(d) and 34 CFR 76.500(d)—Religious Student Organizations" section, public institutions may choose to adopt a true "all-comers" policy as described in *Christian Legal Society* v. *Martinez*,[186] as long as public institutions do not treat religious student organizations differently than other student organizations under any "all-comers" policy. The Department's revision to 34 CFR 106.12 clarifies a statutory exemption under Title IX for institutions controlled by a religious organization and is consistent with the First Amendment and RFRA. Finally, the revisions to parts 606, 607, 608, 609 of title 34 of the Code of Federal Regulations concern programs under the HEA, that the Department is required to administer, and these revisions are consistent with the First Amendment and also the Religious Freedom Restoration Act, 42 U.S.C. 2000bb, *et seq.,* which applies to the Department.

These final regulations apply to entities that choose to apply for and accept a grant or subgrant, Federal financial assistance, or participate in the Developing Hispanic-Serving Institutions Program, Strengthening Institutions Program, Strengthening Historically Black Colleges and Universities Program, or Strengthening Historically Black Graduate Institutions Program. Any entity may choose not to accept such a grant or subgrant, Federal financial assistance, or forego participating in a program that the Department administers. The commenters do not provide any evidence to support that these final regulations will lead to increased unemployment or any other negative consequence such that States would bear a greater economic burden with respect to increased unemployment or an increased need for State or local services. Accordingly, these final regulations do not pose any federalism concerns.

We disagree with some commenters' characterization of Executive Order 13132. [187] That Order's goal was "to guarantee the division of governmental responsibilities between the national government and the States" and to "further the policies of the Unfunded Mandates Reform Act[.]" [188] The purpose of the Unfunded Mandates Reform Act is, in its own words, "to end the imposition, in the absence of full consideration by Congress, of Federal mandates on State, local, and Tribal governments without adequate Federal funding, in a manner that may displace other essential State, local, and tribal governmental priorities[.]" [189] In other words, when the Federal government imposed an *unfunded* mandate on the States (including local governments) and Tribal governments carrying federalism implications and had effects on State and local laws, this Order required the Federal government to consult with State and local authorities. However, these final regulations are entirely premised as a condition of receiving Federal funds, and the recipient has the right to forgo such funds if the recipient does not wish to comply with these final regulations. Additionally, this Order states: "*To the extent practicable* and permitted by law, no agency shall promulgate any regulation that has federalism implications, that imposes substantial direct compliance costs on State and local governments, *and* that is not required by statute" unless the agency takes a few steps. [190] The use of "and" as well as "to the extent practicable" indicate that each of these requirements must be met before the agency is compelled to take those additional

---

[183] 25 U.S.C. 1302(a)(1).

[184] *De Jonge* v. *Oregon,* 299 U.S. 353, 364 (1937) ("Freedom of speech and of the press are fundamental rights which are safeguarded by the due process clause of the Fourteenth Amendment of the Federal Constitution. . . . The right of peaceable assembly is a right cognate to those of free speech and free press and is equally fundamental."); *Cantwell* v. *Connecticut,* 310 U.S. 296, 303–04 (1940); *Near* v. *Minnesota,* 283 U.S. 697, 707 (1931).

[185] *Burwell* v. *Hobby Lobby Stores, Inc.,* 573 U.S. 682, 719 (2014) (holding "person" within meaning of the Religious Freedom Restoration Act's protection of a person's exercise of religion includes for-profit corporations).

[186] 561 U.S. 661 (2010).

[187] Exec. Order No. 13132, 64 FR 43255 (Aug. 10, 1999).

[188] *Id.*

[189] 2 U.S.C. 1501(2).

[190] Exec. Order 13132, section 6(b), 64 FR 43255 (Aug. 10, 1999) (emphasis added).

steps. These final regulations do not *compel* a recipient to accept grants or subgrants, Federal financial assistance, or any funds through programs under Title III and Title V of the HEA. Moreover, these final regulations are consistent with Title IX and other Federal statutory provisions. Thus, we do not believe that Executive Order 13132 is implicated by these final regulations.

The Unfunded Mandates Reform Act expressly does not apply to "any provision in a proposed or final Federal regulation that enforces constitutional rights of individuals" [191] or that "establishes or enforces any statutory rights that prohibit discrimination on the basis of race, color, religion, sex, national origin, age, handicap, or disability[.]" [192] These final regulations enforce the constitutional rights of individuals by requiring public institutions that are legally required to abide by the First Amendment to also comply with the First Amendment as a material condition of a grant or subgrant under 34 CFR 75.500, 34 CFR 75.700, 34 CFR 76.500, and 34 CFR 76.700. As explained more fully in the "34 CFR 75.500(d) and 34 CFR 76.500(d)—Religious Student Organizations" section, the First Amendment prohibits public institutions from treating religious student organizations differently than other student organizations on the basis of their status as religious organizations or on account of their sincerely held religious beliefs. As explained throughout this preamble and the NPRM, these final regulations help prohibit discrimination on the basis of religion, and these final regulations are consistent with both the First Amendment and RFRA. Additionally, 34 CFR 106.12(c), enforces a statutory exemption for educational institutions controlled by a religious organization with respect to Title IX, which prohibits discrimination on the basis of sex.

*Changes:* The Department revised 34 CFR 75.500 and 34 CFR 76.500 to clarify that only public institutions that are legally required to abide by the First Amendment to the U.S. Constitution must also comply with the First Amendment to the U.S. Constitution as a material condition of the Department's grant.

*Comments:* Commenters asserted that the Department's NPRM did not comply with other Executive orders and statutory requirements. One commenter disputed the Department's treatment of the proposed regulations under

Executive Order 13771, stating that since it imposed costs, the Department should identify two deregulatory actions with cost savings.

In addition, commenters stated that the proposed rule violated the Treasury and General Government Appropriations Act of 1999, note to 5 U.S.C. 601, because it failed to include a Family Policy Making Assessment, which would assess the proposed rules' impact on family wellbeing.

*Discussion:* The Office of Management and Budget's guidance implementing Executive Order 13771 describes the offset required by the Executive Order as meaning that "at least two E.O. 13771 deregulatory actions have been taken per E.O. 13771 regulatory action and that the incremental cost of the E.O. 13771 regulatory action has been appropriately counterbalanced by incremental cost savings from E.O. 13771 deregulatory actions, consistent with the agency's total incremental cost allowance." [193] The memorandum defines a "13771 Regulatory Action" for relevant purposes as a "significant regulatory action as defined in Section 3(f) of E.O. 12866 that has been finalized and that imposes total costs greater than zero." [194] The Department has revised its analysis and has determined that these final regulations impose net costs under Executive Order 13771. In accordance with Executive Order 13771, the Department will identify at least two deregulatory actions.

The provision of the Treasury and General Government Appropriations Act of 1999 cited by commenters pertains to "policies and regulations that may affect family well-being." [195] As the proposed regulations, and these final regulations, did not have a direct effect on families, such an analysis was not required. These final regulations affect institutions that receive a Direct Grant or subgrant from a State-Administered Formula grant program of the Department, which does not have a direct bearing on individual families. Similarly, the revisions to parts 106,

606, 607, 608, and 609, which are described at length in other sections of this preamble, affect institutions and not families. Therefore, the Department, in its assessment of these final regulations has concluded that they will not have a negative effect on families.

*Changes:* The Department has revised its analysis and has determined that these final regulations impose net costs.

*Comments:* Commenters asserted that various provisions of the proposed regulations and RIA were arbitrary and capricious, for reasons such as that the Department failed to provide a reasoned basis or justification for them, or because the proposed rule departed from the prior rules and positions without adequate explanation. Commenters cited various legal authorities to substantiate an agency's responsibility to explain the basis for its decision-making, including when changing position on a given issue. Especially with respect to the religious exemption in proposed § 106.12(c), they asserted that, for instance, the proposed rule included reversal of previous Department positions, failed to provide a reasoned justification or adequate basis, did not provide adequate evidence of the need for the proposed rule or its benefits, and failed to provide an adequate regulatory analysis and consider important evidence regarding the rule's impact. They also asserted that the Department failed to consider the impact of the proposed rules on various stakeholders.

*Discussion:* We agree with commenters that an agency must give adequate reasons for its decisions and consider relevant factors,[196] and that when an agency changes its position, it must display awareness that it is changing position and show that there are good reasons for the new policy. In explaining its changed position, an agency must be "cognizant that longstanding policies may have 'engendered serious reliance interests that must be taken into account. . . . In such cases it is not that further justification is demanded by the mere fact of policy change; [ ] a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy.[197] On the other hand, the agency need not demonstrate . . . that the reasons for the

---

[191] 2 U.S.C. 1503(1).

[192] 2 U.S.C. 1503(2).

[193] Office of Mgmt. & Budget, Exec. Office of the President, M–17–21, *Guidance Implementing Executive Order 13771* (OMB 13771 Guidance), at 4 (Q5) (Apr. 5, 2017), *available at www.whitehouse.gov/sites/whitehouse.gov/files/omb/memoranda/2017/M-17-21-OMB.pdf.*

[194] *Id.* at 3 (defining an E.O. 13771 Regulatory Action as "(i) A significant regulatory action as defined in Section 3(f) of E.O. 12866 that has been finalized and that imposes total costs greater than zero; or (ii) A significant guidance document (*e.g.,* significant interpretive guidance) reviewed by OIRA under the procedures of E.O. 12866 that has been finalized and that imposes total costs greater than zero.").

[195] "Assessment of Federal Regulations and Policies on Families," paragraph (c), note to 5 U.S.C. 601.

[196] *See, e.g., Motor Vehicle Mfrs. Ass'n of United States, U.S., Inc.* v. *State Farm Mut. Automobile Auto. Ins. Co.,* 463 U.S. 29, 43 (1983).

[197] *See Encino Motorcars, LLC* v. *Navarro,* 136 S. Ct. 2117, 2125–(2016) (*quoting FCC* v. *Fox Television Stations, Inc.,* 129 S. Ct. 1800 (2009 *Encino Motorcars, LLC* v. *Navarro,* 136 S. Ct. 2117, 2126 (2016) (quoting *FCC* v. *Fox Television Stations, Inc.,* 556 U.S. 502, 515–16 (2009)).

**59968** **Federal Register** / Vol. 85, No. 185 / Wednesday, September 23, 2020 / Rules and Regulations

new policy are *better* than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better.''[198]

Throughout the NPRM and this preamble, we discuss the reasoned basis for these regulations, and include explanations for any changes in position regarding each provision in the relevant section, including those specifically mentioned by the commenters. Any changes from the proposed regulations are explained in the relevant sections of this preamble, including the Regulatory Impact Analysis (RIA) section. In particular, the ''34 CFR 106.12 Educational Institutions Controlled by Religious Organizations'' section of this preamble addresses many of these arguments in greater depth. We address comments concerning the RIA, including its legal sufficiency, in depth in the RIA section of this final rule.

*Changes:* None.

*Comments:* At least one commenter suggested that Secretary Elisabeth DeVos lacks the authority to issue the NPRM and to promulgate the final regulations because Vice President Michael Pence cast the deciding vote to confirm the Secretary after the Senators were equally divided on her confirmation.[199] The commenter contended that the Vice President is not constitutionally authorized to break a tie for a cabinet member's confirmation, thereby rendering Secretary DeVos' Senate confirmation itself invalid and rendering her actions legally unauthorized.

*Discussion:* We disagree with commenters' concerns that Secretary DeVos might not be constitutionally empowered to issue the NPRM or the final regulations because the Vice President lacked the constitutional prerogative to cast the tie-breaking vote to confirm the Secretary. Because the Vice President *is* constitutionally empowered to cast the tie-breaking vote in executive nominations, President Trump's nomination of Secretary DeVos properly was confirmed by the United States Senate; and Secretary DeVos therefore may function as the Secretary of Education. Article I, § 3, clause 4 of the Constitution confers on the Vice President the power to break ties when the Senators' votes ''be equally

divided.'' Secretary DeVos' service as the Secretary of Education has therefore been lawful and in accordance with the Constitution.

A commenter largely relies on one piece of scholarship to advance this claim.[200] But that source principally concerns the Vice President's power to break Senate ties on *judicial* nominations, not Executive ones. Morse does not develop robustly an argument about the latter. Moreover, Morse acknowledges there is nothing ''conclusive'' about Executive nominations, and argues only that Vice Presidents are without constitutional authority to break ties in judicial nominations.[201] Morse cites three examples from 1806 (Vice President George Clinton voted to confirm John Armstrong as the Minister to Spain), 1832 (Vice President Calhoun cast a tie-breaking vote that defeated the nomination of Martin Van Buren as Minister to Great Britain), and 1925 (Vice President Charles G. Dawes almost cast the tie-breaking vote to confirm President Calvin Coolidge's nominee for attorney general), respectively.[202] But even the evidence in this source points to the fact that the Vice President was always considered to hold the tie-breaking vote for Executive nominations (indeed for all Senate votes). Particularly the nineteenth century examples do seem to show that historically Vice Presidents have enjoyed this widely acknowledged power.[203] Due to this time period's chronological proximity to the Constitution's ratifying generation, this is strong evidence that the original public meaning of the Constitution, left undisputed by intervening centuries of practice, confers the power of breaking Senate ties in executive nominations on Vice Presidents.

As for the argument that the placement of this power in Article I, which generally deals with Congress, meant the power was limited to the legislative votes, this misconceives the context in which the provision exists: that section concerns length of Senate tenure, the roles of congressional personnel, and the Senate's powers, including that of trying impeachments.[204] It is not limited to what the Senate can accomplish but rather encompasses matters about *who*

in the Senate gets to do what, concerning all Senate business. In this section of Article I, the Vice President, *as President of the Senate,* accordingly is given the power to break ties. This was the most logical section in which to put this prerogative of the Vice President. And given how the power to cast tie-breaking votes is left open-ended, the most natural inference is that it applies to *all* Senate votes in *all* Senate business. Consequently, this evidence refutes the commenter's claim about Secretary DeVos' confirmation because: (1) This section in Article I simply concerned the functions and prerogatives of the Senate and its various officers, including the Vice President's general tie-breaking authority; and (2) that the Senate's power to try impeachments is included in the same section means that this section is just as applicable to Executive nominations as to anything else (that neither the commenter nor the article is challenging).[205] This analysis shows that Morse's argument, and transitively that of the commenter, is flawed.

Furthermore, one commenter's reference to Senator King's statement in 1850 as supporting a view that could lead anyone in the present day to conclude Secretary DeVos's Senate confirmation is invalid is unhelpful because the overwhelming weight of text and history is against the merits of this pronouncement. Even at that time, King appears to have been one of a handful of people, if that, to express this view. It was not a widely accepted view, before or after.

Finally, a commenter's citation to John Langford's *Did the Framers Intend the Vice President to Have a Say in Judicial Appointments? Perhaps Not* [206] and the reference to the Federalist Papers also misconceive the constitutional text, design, and history. To be sure, Alexander Hamilton in *The Federalist No. 69* does contrast the New York council at the time,[207] with the Senate of the national government the Framers were devising (''[i]n the national government, if Senate should be divided, no appointment could be made'').[208] The commenter's overall point is unpersuasive. As an initial matter, the Federalist Papers were

---

[198] *Fox Television,* 129 S. Ct. at 1811 (emphasis in original).

[199] U.S. Senate, Vote: On the Nomination (Confirmation Elisabeth Prince DeVos, of Michigan, to be Secretary of Education), Feb. 7, 2017, *available at https://www.senate.gov/legislative/LIS/roll_call_lists/roll_call_vote_cfm.cfm?congress=115&session=1&vote=00054.*

[200] *See* Samuel Morse, *The Constitutional Argument Against the Vice President Casting Tie-Breaking Votes on Judicial Nominees,* 2018 Cardozo L. Rev. de novo 142 (2018) (herein, ''Morse,'' ''the source'' or ''the article'').

[201] *See id.* at 151.

[202] *See id.* at 150–51.

[203] *See id.* at 143–44 n.4.

[204] *See generally* U.S. Const. art. I, sec. 3.

[205] *But see* Morse, *supra* note 196, at 144, 146.

[206] John Langford, *Did the Framers Intend the Vice President to Have a Say in Judicial Appointments? Perhaps Not,* Balkanization (Oct. 5, 2018), available at *https://balkin.blogspot.com/2018/10/did-framers-intend-vice-president-to.html.*

[207] *See* The Federalist No. 69, at 424 (Alexander Hamilton) (Bantam Classic ed., 2003) (''[I]f the [New York] council should be divided the Governor can turn the scale and confirm his own nomination.'').

[208] *Id.*

persuasion pieces to convince the People (as sometimes addressed to "The People of New York," etc.) to accept the Constitution. Therefore, while the Papers supply a framework and understanding closely linked to the Constitution's text by some of the authors of that text, it does not supplant the original public meaning of that text itself. Moreover, all *The Federalist No. 69* refers to is that the President *himself* may not cast the tie-breaking vote in the Senate. The *Vice* President, however, may do so, for he is *not* the Executive.

For much of our Nation's history, including when the Equally Divided Clause was written as part of the original Constitution, the President and the Vice President could be from different parties and fail to get along. This Clause gave the Vice President some power and authority independent of the President. There is an important context behind this. Prior to the Twelfth Amendment's adoption, the Vice Presidency was awarded to the presidential candidate who won the second most number of votes, regardless of which political party he represented.[209] In the 1796 election, for instance, voters chose the Federalist John Adams to be President.[210] But they chose Thomas Jefferson, a Democratic-Republican, as the election's runner-up, so Jefferson became Adams' Vice President.[211] Under the Twelfth Amendment, however, usually Presidents and Vice Presidents are elected on the same ticket. But this does not change the Equally Divided Clause, preserving the Vice President's authority to break Senate ties for executive and other nominations. As a result, any argument to the contrary necessarily ignores the constitutional text, design, and history.

Langford and the commenter at issue also misunderstand what Hamilton actually stated in *The Federalist No. 76*, which was: "A man disposed to view human nature as it is . . . will see sufficient ground of confidence in the probity of the Senate, to rest satisfied not only that it will be impracticable to the Executive to corrupt or seduce a majority of its members; but that the necessity of its co-operation in the business of appointments will be a considerable and salutary restraint upon the conduct of that magistrate." [212] Langford reads this to mean that Alexander Hamilton was saying the

Executive needs a majority of the voting Senators present to confirm nominations.

Langford's interpretation wrongly conflates the necessary with the sufficient, for Hamilton was saying only that it will *suffice* for a President to get a nominee confirmed with a majority of the Senate, not that he *needs* a Senate majority to get his nominee confirmed. This is all the more so because Senators may *abstain* from voting, so not every Senator will necessarily be voting. Doubtless Hamilton knew this because the Constitution gives the Senate the power to decide its own rules, including quorum, *see* U.S. Const. art. I, sec. 5, cl. 1, 2, and therefore, a President need not even "corrupt or seduce" a majority of the *full* Senate, *The Federalist No. 76*; all he needs is a majority of the *voting* Senators. Thus, Hamilton's phrasing indicates not precision but a common parlance. It is, accordingly, too slender a reed (outside the constitutional text, at that) for Langford to base much of his thesis on, providing no support for the commenter's argument.

Langford is also incorrect in saying that "the Framers situated the Senate's 'advice and consent' powers in Article II, not Article I," where the Equally Divided Clause is located, means that the Vice President's tie-breaking power does not apply to nominations. This argument fails because, as noted earlier, it made more sense for the original Constitution's drafters and the ratifying generation to name the Vice President's tie-breaking power right in the same section of Article I when they were spelling out that he would be the President of the Senate. It is a limitation on his role as President of the Senate as well as his prerogative. Article II, by contrast, says what the President can do; and as already noted, when the original Constitution was ratified, the President and the Vice President were two different and often conflicting entities. Langford assumes the modern view that President and Vice President work hand in hand; that was not the original Constitution's presupposition, explaining why Langford's argument (and the commenter's) is flawed.

Langford is also wrong to suggest that because "the Framers explicitly guarded against a closely divided Senate by requiring a two-thirds majority of Senators present to concur in order to consent to a particular treaty," this might show that: "Perhaps the Framers assumed the default rule [of the Vice President's tie-breaking power] would apply whereby a tie goes to the Vice President; perhaps, instead, the Framers meant to provide for the possibility of a divided Senate, in which case the

nomination would fail." However, the real reason for these placements is simple and has been alluded to earlier: The Treaty Clause belongs in Article II because the President is the first mover on treaties; the Senate's role is reactive. Also, the Vice President is a different actor from the President under the Constitution. This placement, therefore, has nothing to do with the Vice President's tie-breaking power, which remains universally applicable across Senate floor votes. And even Langford is inconclusive about the reason for this placement and structure of keeping the Treaty Clause separate from the Equally Divided Clause.

Therefore, the Constitution permits the Vice President to cast the tie-breaking vote for executive nominations. Vice President Pence constitutionally cast the tie-breaking vote to confirm President Trump's nomination of Secretary DeVos. The Secretary is a constitutionally appointed officer functioning in her present capacity and suffers from no want of authority to issue the NPRM or to promulgate the final regulations on this or any other matter pertaining to the Department of Education.

*Changes:* None.

**Length of Public Comment Period/ Requests for Extension**

*Comments:* Several commenters asserted that the 30-day public comment period provided for the NPRM was inadequate. Commenters noted that the proposed regulatory changes were substantive, far-reaching, and complex, as opposed to technical, and requested comment periods of a minimum of 60 days. They noted that the implications of the proposed rules for universities and numerous other stakeholders were immense. One commenter stated this was particularly the case if the proposed rule forms the basis of further action by research agencies per Executive Order 13864, and others pointed out that it is a significant regulatory action. Some commenters asserted that the proposed rules reflected significant shifts in long-term legal interpretations and practices. One commenter noted that the rules, if finalized as proposed, would reject key recommendations that were the result of advisory council deliberations and would reverse rules that were proposed for 60-day comment periods.

Commenters claimed that the 30-day comment period did not afford them a 'meaningful opportunity to comment" as required by the APA and pointed to Executive Orders 12866 and 13563 and the regulatory timeline on *Regulations.gov* suggesting a comment period of 60 days. Commenters noted

[209] See U.S. Const. amend. XII.

[210] See Jerry H. Goldfeder, *Election Law and the Presidency*, 85 Fordham L. Rev. 965, 974–(2016).

[211] *See id.*

[212] The Federalist No. 76, at 465 (Alexander Hamilton) (Bantam Classics ed., 2003).

that the Department had received requests for extensions of the comment period and that failure to extend the comment period was arbitrary and capricious. Commenters stated that the Department did not include a required justification or finding of good cause or exigent circumstances for a comment period of less than 60 days. Some commenters cited to *Housing Study Group* v. *Kemp*,[213] as authority for the proposition that a comment period should not be less than 60 days.

One commenter stated that the proposed rule did not provide a meaningful cost-benefit analysis, estimates of the scope of the rule's impact, or any evidence to support its conclusions, so the need for stakeholders to undertake an analysis of the rules was all the more essential.

*Discussion:* We appreciate commenters' concerns about the length of the comment period. We understand the importance of these final regulations to various stakeholder groups and have proceeded thoughtfully and carefully to develop final regulations that balance varying interests appropriately.

The APA does not mandate a specific length for an NPRM comment period, but states that agencies must "give interested persons an opportunity to participate" in the proceeding.[214] This provision has generally been interpreted as requiring a "meaningful opportunity to comment."[215] Executive Orders 12866 and 13563, which are mirrored by the timeline commenters referenced on *Regulations.gov*, state that a meaningful opportunity to comment on any proposed regulation, in most cases, should include a comment period of not less than 60 days.[216] However, 60 days is not a mandatory timeframe—case law interpreting the APA generally stipulates that comment periods should not be less than 30 days to provide adequate opportunity to comment.[217] In addition, the designation of a regulatory action as "significant" does not automatically require a comment period of longer than 30 days. Contrary to commenters' assertions, the APA does not require a showing of good cause or exigent circumstances for a comment period of less than 60 days,[218] so the

rule is not arbitrary and capricious or rendered invalid by the lack of such a showing in the NPRM.

Commenters cited *Housing Study Group* v. *Kemp* to support the proposition that a 30-day comment period is inadequate. However, that case dealt with an interim final rule, which differs from these final regulations in that an interim final rule takes effect immediately or soon after publication, prior to an agency's receipt and/or analysis of any solicited public comments.[219] That is not the case for these final regulations, which we are promulgating through standard APA notice and comment procedures.

We understand commenters' concerns about having an adequate opportunity to comment on the proposed regulations, but believe that the comment period afforded them an adequate opportunity to do so, on all of the issues in the NPRM including those related to Executive Order 13864. The Department's proposed regulations will not necessarily be determinative of other agencies' implementation of Executive Order 13864; in fact, the other agencies' proposals may differ with respect to implementation of that Executive Order. Further, the Department received over 17,000 comments on the proposed regulations, many representing large constituencies. The large number, complexity, and diversity of comments received indicates that the public had adequate time to comment on the Department's proposals. The length of comment periods in past rulemaking proceedings is not necessarily determinative of the proper comment period length for the present rulemaking. Any shifts in policy or departures from prior practice are explained in the relevant sections of this preamble. In addition, we address comments about the sufficiency of the RIA in the applicable section of this preamble.

*Changes:* None.

*Comments:* In support of their requests for a longer comment period, several commenters noted that the Administration issued nine interconnected, but distinct proposed regulations on the same day. Given the complexity and wide-ranging impacts of the proposed regulations, commenters did not feel that they had sufficient time

to prepare and submit their comments. According to commenters, an individual or entity interested in commenting on one of the agencies' rules would most likely be interested in commenting on all of them. They asserted that each rule required a unique analysis, which the length of the comment period would not allow, and that the short comment period indicated that the Administration was uninterested in public comments. Commenters also referred to an alleged White House statement that the agencies had been working in coordination for months on the proposed rules, and noted this was indicative of the complexity of the task, therefore requiring additional time for comment. One commenter noted that more time was especially appropriate if the Department is to become a model for other agency efforts.

Commenters cited instances of other similar regulations that were published with a longer comment periods, including the related proposed rule published by the Department of Housing and Urban Development (HUD). Commenters stated that this indicates that the Department could have allowed a longer comment period on these proposed regulations and that, since other agencies will need to coordinate with HUD before finalizing their rules, that was another reason to extend the comment period. Other commenters pointed to past revisions of these or similar rules that provided for longer comment periods, including when the Department and other agencies proposed revisions to the same regulations in 2015 and included a 60-day comment period.

*Discussion:* The Department disagrees that the proposal of the agencies' final regulations on the same timeline did not provide the public a meaningful opportunity to comment. The agencies' proposals were very similar in some areas, such that comments on aspects of one agency's regulations could be submitted in response to other agencies' NPRMs with minor changes. The work undertaken by the various agencies to coordinate their NPRMs facilitated the preparation of more streamlined proposals on which the public could comment in a more efficient manner. Although we are not certain of the manner in which one commenter meant that the Department would be a model for other agencies, the Department's proposal was not intended to lead or supersede that of other agencies. Further, any public statements about that work and preparation would have been reflective of the agencies' efforts, not necessarily those required of public commenters.

---

[213] 736 F. Supp. 321 (D.D.C. 1990).

[214] 5 U.S.C. 553(c).

[215] *E.g., Asiana Airlines* v. *F.A.A.,* 134 F.3d 393, 396 (D.C. Cir. 1998).

[216] Exec. Order 12866, Section 6(a), 58 FR 51735 (Oct. 4, 1993); Exec. Order 13563, section 2(b), 76 FR 3821 (Jan. 1, 2011).

[217] *See, e.g., Nat'l Retired Teachers Ass'n* v. *U.S. Postal Serv.,* 430 F. Supp. 141, 147 (D.D.C. 1977).

[218] Instead, 5 U.S.C. 553(b)(B) states that the notice and comment requirements of 553(b) do not apply "when the agency for good cause finds . . .

that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest."

[219] 736 F. Supp. at 334. Moreover, in that case, the court found the agency's own regulations required that, absent good cause, "the public be afforded a minimum of 60 days to submit comments." *Hous. Study Grp.* v. *Kent,* 739 F. Supp. 633, 635 n.6 (D.D.C. 1990) (citing 24 CFR 10.1).

The Department greatly values the public's comments on the proposed regulations but does not believe that a longer comment period was necessary in this case. HUD's regulations were proposed for a longer comment period due to its unique requirements. Specifically, HUD's regulations state that it is HUD's policy "that its notices of proposed rulemaking are to afford the public not less than sixty days for submission of comments." [220] In addition, the length of comment periods in past rulemaking proceedings is not necessarily determinative of the proper comment period length for the present rulemaking; the Department evaluates the appropriate length of a comment period on an individualized basis for each proposed regulation.

*Changes:* None.

*Comments:* Commenters also noted that 20 U.S.C. 6511 was included in authority citations for the proposed regulations. They pointed out that there is no 20 U.S.C. 6511, and inferred that the Department instead intended to cite 20 U.S.C. 6571. Commenters noted that 20 U.S.C. 6571 requires negotiated rulemaking and a 60-day comment period, among other procedural requirements, and stated that the Department did not comply with those requirements. One commenter also questioned how the proposed regulations were authorized by 20 U.S.C. 6571.

Another commenter contended that the Department has no statutory basis for the proposed regulations to require public institutions to comply with certain provisions of the U.S. Constitution, to require private colleges to comply with their own stated institutional policies regarding freedom of speech, including academic freedom, and to require public institutions to treat religious student organizations the same as secular student organizations. This commenter asserted that 20 U.S.C. 1221e–3 and 20 U.S.C. 3474 cannot legally support these proposed regulations.

*Discussion:* The Department inadvertently included 20 U.S.C. 6511, which is currently cited as the authority for some of the Department's existing regulations and is now obsolete, in the authority citations for some of the proposed regulations. We did not intend to cite that section, or 20 U.S.C. 6571, as authority for these regulations. Indeed, 20 U.S.C. 6571 is part of the Elementary and Secondary Education Act of 1965, as amended, which is not a source of authority for these regulations. We have corrected the

authority citations in these final regulations and appreciate that the commenters brought this error to our attention. However, the negotiated rulemaking, 60-day comment period, and other requirements of 20 U.S.C. 6571 are inapplicable to these regulations, so the Department was not required to comply with them.

The Department has authority to promulgate these final regulations under 20 U.S.C. 1221e–3 and 20 U.S.C. 3474, which give the Secretary general authority to make regulations governing the Department's applicable programs and to manage the functions of the Department. These final regulations are consistent with the statutes that govern institutions of higher education. Congress expressly stated in the HEA that "no student attending an institution of higher education on a full- or part-time basis should, on the basis of participation in protected speech or protected association, be excluded from participation in, be denied the benefits of, or be subjected to discrimination or official sanction under any education program, activity, or division of the institution directly or indirectly receiving financial assistance[.]" [221] These final regulations also are consistent with the Equal Access Act, which concerns public secondary schools and states: "It shall be unlawful for any public secondary school which receives Federal financial assistance and which has a limited open forum to deny equal access or a fair opportunity to, or discriminate against, any students who wish to conduct a meeting within that limited open forum on the basis of the religious, political, philosophical, or other content of the speech at such meetings." [222] As explained in more detail in "Part 1—Religious Liberty" and "Part 2—Free Inquiry" of the NPRM, these regulations also were proposed in response to Supreme Court case law, interpreting the First Amendment, such as the United States Supreme Court's decision in *Trinity Lutheran Church of Columbia, Inc.* v. *Comer,*[223] the Religious Freedom Restoration Act, the United States Attorney General's October 6, 2017 Memorandum on Federal Law Protections for Religious Liberty,[224] Executive Order 13798 (Promoting Free

Speech and Religious Liberty),[225] Executive Order 13831 (Establishment of a White House Office Faith and Opportunity Initiative),[226] Executive Order 13864 (Improving Free Inquiry, Transparency, and Accountability at Colleges and Universities).[227] The Department notes that in 2016, the Department issued final regulations expressly to "implement Executive Order 13279, as amended by Executive Order 13559. . . . to guide the policies of Federal agencies regarding the participation of faith-based and other community organizations in programs that the Federal agencies administer." [228] The Department cited the same authority, 20 U.S.C. 1221e–3 and 20 U.S.C. 3474, for its 2015 NPRM [229] and subsequent final regulations issued in 2016,[230] as it did for the NPRM underlying this notice-and-comment rulemaking and these final regulations.

*Changes:* We have revised the authority citations for the final regulations to cite 20 U.S.C. 1221e–3 and 20 U.S.C. 3474.

**Effective Date**

*Comments:* One commenter, a public university, requested that the Department delay the effective date sufficiently far in the future (at least eight months) because institutions may be required to revise their policies. This commenter suggested that the final rule should become effective eight months after publication for consistency with the Higher Education Act's master calendar requirement.

*Discussion:* The Department appreciates the commenter's suggestion; however, the Department does not believe that institutions of higher education will need at least eight months to comply with this final rule. Public institutions of higher education that are already legally required to abide by the First Amendment to the U.S. Constitution will simply also comply with the First Amendment to the U.S. Constitution as a material condition of a grant from the Department under 34 CFR 75.500 and 34 CFR 76.500. Public institutions should not need to review

---

[220] 24 CFR 10.1.

[221] 20 U.S.C. 1011a(a)(1).

[222] 20 U.S.C. 4071(a).

[223] 137 S. Ct. 2012 (2017).

[224] Jeff Sessions, Federal Law Protections for Religious Liberty, Memorandum for All Executive Departments and Agencies (Oct. 6, 2017), *https://www.justice.gov/opa/press-release/file/1001891/download.*

[225] Exec. Order No. 13798, 82 FR 21675 (May 4, 2017).

[226] Exec. Order No. 13831, 83 FR 20715 (May 8, 2018).

[227] Exec. Order No. 13864, 84 FR 11401 (March 26, 2019).

[228] Federal Agency Final Regulations Implementing Executive Order 13559: Fundamental Principles and Policymaking Criteria for Partnerships with Faith-Based and Other Neighborhood Organizations, 81 FR 19355 (Apr. 4, 2016).

[229] 80 FR 47253.

[230] 81 FR 19405–09.

and revise their policies and practices as a result of this final rule. If public institutions review and revise their policies and practices, then the First Amendment and not this final rule dictates whether their policies and practices should change. Similarly, private institutions of higher education must simply comply with their own stated institutional policies regarding freedom of speech, including academic freedom, as a material condition of a grant from the Department under 34 CFR 75.500 and 34 CFR 76.500, and private institutions are not required to adopt any particular policy regarding freedom of speech, including academic freedom. Institutions generally comply with their own stated institutional policies and are prepared to suffer consequences such as breach of contract claims or other complaints for failing to comply with their own stated institutional policies.

The other regulations in this final regulatory action clarify the exemption in Title IX, 20 U.S.C. 1681(a)(3), for educational institutions controlled by a religious organization to the extent Title IX or its implementing regulations are not consistent with the religious tenets of such organization. Similarly, the revisions to 34 CFR parts 606, 607, 608, and 609 remove language that prohibits use of funds for otherwise allowable activities if they merely relate to "religious worship" and "theological subjects" and replace it with language that more narrowly defines the limitations. Such points of clarification do not require eight months of preparation on the part of an institution.

As discussed previously, the master calendar requirements in Title IV of the HEA do not apply to these final regulations. The HEA provides that "any regulatory changes initiated by the Secretary affecting the programs under [Title IV] that have not been published in final form by November 1 prior to the start of the award year shall not become effective until the beginning of the second award year after such November 1 date." [231] These regulations, however, are not promulgated under Title IV of the HEA, and the master calendar requirement does not apply here.

Even though these final regulations do not constitute a "major rule,"[232] such that they may not take effect until 60 days after the date of publication in the **Federal Register**,[233] and even though institutions are not required to review and revise their policies and practices as

a result of this final rule, the Department understands that institutions and recipients of Federal financial assistance may *choose* to review their existing policies and practices to ensure compliance with the First Amendment for public institutions and with their own stated institutional policies concerning freedom of speech, including academic freedom, for private institutions. In case institutions would like to review their existing policies and practices, the Department will set the effective date at 60 days after the date of publication in the **Federal Register**.

*Changes:* None.

**Regulatory Impact Analysis**

*Comments:* A few commenters argued that the Department's cost-benefit analysis was unsubstantiated by evidence and failed to consider broad economic and non-economic impacts, primarily discrimination. These commenters asserted that the Department did not conduct a meaningful cost-benefit analysis.

Some commenters argued that the Department's cost-analysis calculation was incomplete and violates the Administrative Procedure Act and Executive Orders 12866 and 13563. One commenter asserted that these legal requirements were violated because the Department did not assess all costs and benefits or select approaches that maximize net benefits.

Another commenter asserted that the Department violated the Administrative Procedure Act and Executive Order 13563 by not releasing information relevant to the cost estimates. One commenter argued that the Department's claim that the proposed regulations would impose zero costs is false and stated that accurate estimates cannot be developed in the absence of more information from the Department.

One commenter asserted that the Department failed to assess the net economic and non-economic effects of the proposed changes, particularly costs for current and prospective students and for schools themselves. This commenter also contended that the Department must consider costs to current and prospective employees who may face higher rates of sex discrimination by religious schools due to these proposed regulations. This commenter asserted that such individuals may face lost wages, fewer future employment opportunities, and long-term health consequences, as well as the more indirect costs of increased discrimination.

Another commenter asserted that the Department did not cite evidence to support the assertion that the number or

composition of entities asserting the exemption for educational institutions which are controlled by a religious organization would not substantially change and, thus, there would be no quantifiable costs for the proposed regulation, 34 CFR 106.12(c). One commenter expressed concern that proposed § 106.12(c), regarding the exemption for educational institutions which are controlled by a religious organization, would increase sex-based discrimination, particularly hurting students and employees.

Another commenter asserted that the Department's cost-benefit analysis is flawed because it did not consider direct health and financial costs to beneficiaries who may be prevented from accessing safety net programs, experience discrimination and decreased fairness and respect for their rights, the potential cost-shifting to other health or human service agencies, and more confusion and familiarization costs. This commenter contended that the proposed regulations are economically significant because they cover programs totaling hundreds of billions of dollars and expressed concern that the Department did not fulfill Executive Order 12866. This commenter also argued that the Department failed to consider the total effect on the economy and costs as well as potential costs to beneficiaries, families, communities, and funded organizations.

*Discussion:* As an initial matter, we note that the NPRM and its associated Regulatory Impact Analysis (RIA) included two parts—Part 1 related to issues of Religious Liberty and Part 2 related to issues of Free Inquiry. However, this final rule only includes changes to a subset of the provisions originally included in Part 1 (specifically 34 CFR parts 106, 606, 607, 608, and 609) and all of the provisions originally included in Part 2.

The analysis pertinent to the relevant provisions in Part 1 addressed proposed changes to 34 CFR 106.12, 606.10, 606.11, 607.10, 607.11, 608.10, 608.12, 609.10, and 609.12. Of those sections, four are severability clauses.

We note that the analysis pertinent to part 2 addressed proposed changes to seven sections (34 CFR 75.500, 75.684, 75.700, 75.741, 76.500, 76.700, and 76.784). Of those sections, three are severability clauses and two are updated cross-references.

While many commenters were not specific about the sources of their concerns, we do not believe commenters intended to imply that there were economic or non-economic impacts of the severability provisions or cross-

---

[231] 20 U.S.C. 1089(c)(1).
[232] 5 U.S.C. 804(2).
[233] 5 U.S.C. 801(a)(3).

reference updates that were not considered. Severability clauses, generally, do not have any practical effect on the cost implications of any other provisions and only clarify the effectiveness of those provisions in certain circumstances. As such, we generally do not assume severability clauses to have cost implications and decline to do so in this instance. Similarly, updating cross-references does not have any practical effect on cost implications but rather serves only to improve the clarity of regulations. We decline to estimate additional effects from these clauses.

With regard to changes to §§ 75.500 and 76.500, we disagree that there were economic or non-economic impacts, including discrimination, that we failed to consider, or that our analysis was otherwise not meaningful. As noted in the NPRM, the regulatory changes serve primarily to clarify that public institutions must comply with the First Amendment and to require that, in the event there is a final, non-default judgment against them in a State or Federal court alleging a violation thereof, such judgment must be submitted to the Department. Based on our active and ongoing monitoring of grantees, we have not yet been made aware of any significant issues with grantees resulting in final, non-default judgments that a grantee has failed to comply with the First Amendment in large part because grantees are not required to and do not report such judgments or violations to us. We specifically requested the public submit any evidence of such violations to inform our estimates and did not receive any information about the number of final, non-default judgments against a public institution, holding that the public institution violated the First Amendment, or the number of final, non-default judgments against a private institution, holding that the private institution violated a stated institution policy regarding freedom of speech, including academic freedom.

In addition to our request about compliance with the First Amendment, we specifically asked the public to submit relevant information regarding the likely effects—both economic and non-economic—of these changes. In response to that request, members of the public cited potential economic and non-economic effects of increased discrimination. As discussed elsewhere, we did not find these arguments convincing. Despite the lack of persuasive comments, the Department did review our initial assumptions pursuant to commenters' general concerns and were unable to identify

additional likely economic or non-economic impacts. In the absence of additional, specific information regarding the types of impacts commenters believed we failed to consider, we decline to amend our initial assumptions and estimates related to these provisions.

That being said, while we disagree with commenters that the issues they identified should be quantified and included in our analysis of the likely impacts of these final regulations, we do note that our analysis did not include time for grant recipients under 34 CFR parts 75 and 76 to review these final regulations or for a subset of those grantees to engage in a review of their policies as a result of these final rules. We have revised our cost estimates to include these items.

With regard to changes to 34 CFR 106.12(c), which provide greater clarity regarding the statutory exemption in 20 U.S.C. 1681(a)(3) and reflected in 34 CFR 106.12(a), we disagree that there were economic or non-economic impacts, including discrimination, that we failed to consider, or that our analysis was otherwise not meaningful. One commenter alleged that the Department provided no basis on which to substantiate its assumption that this change would not substantially change the number or composition of entities claiming the exemption. However, as noted in the NPRM and this final rule, these changes only clarify and codify in regulations many long-standing practices of the Department. A number of the standards in 34 CFR 106.12(c)(1)–(5) are criteria that have been used by OCR for decades in adjudicating claims to the exemption under 20 U.S.C. 1681(a)(3) and reflected in 34 CFR 106.12(a) and, therefore, it is likely that any entities that contacted the Department about this exemption would have received guidance in accordance with these changes. Informed by public comment, the Department has no information to suggest that a substantial number of educational institutions will be newly eligible to assert a religious exemption under Title IX, where they could not before. We therefore have no evidence to refute and stand by the assumption that these changes would not result in a substantial change in the number or composition of entities asserting the exemption. Further, given that we do not believe that there would be a substantial change in the number or composition of entities asserting the exemption, we have no reason to believe that there would be a substantial increase in the number of individuals affected by the policies and practices of these entities. If an individual feels that

the religious exemption under Title IX and these regulations does not apply to an educational institution, that individual may always file a complaint with OCR. Further, if the assertion of the exemption in 34 CFR 106.12(a) were likely to cause the harms cited by commenters, there should be ample evidence of those harms at the entities already asserting the exemption. We do not have evidence that those harms actually occurred, and commenters did not identify any examples of such. If we do not anticipate any change in the number of individuals affected by the policies and practices of these entities to which the religious exemption applies, and we have no evidence to suggest that the policies and practices of these entities actually generate the harms cited by commenters (including, among others, increased rates of intimate partner violence and psychological abuse and lower rates of cervical cancer screenings), we cannot reasonably attach costs associated with those harms to the changes being made herein. We therefore decline to include costs related to discrimination, lack of access to safety net programs, or costs associated with confusion or familiarization with new providers.

With regard to changes to 34 CFR 606.10, 607.10. 608.10, and 609.10, we disagree that there were economic or non-economic impacts, including discrimination, that we failed to consider, or that our analysis was otherwise not meaningful. As noted in the NPRM, these changes would remove language that prohibits the use of funds for otherwise allowable activities that merely relate to sectarian instruction or religious worship and replace it with language more narrowly defining the limitation. In general, the Department does not estimate costs associated with regulatory changes that only affect the expenditure of Federal funds as all costs associated with compliance are subsidized with Federal grants. At most, such changes could result in transfers across eligible activities or recipients. The Department noted this potential for transfers in the NPRM and specifically requested public feedback on the extent to which these transfers were likely to occur. We received no information from the public on this matter. We therefore retain this as a potential, but unquantified transfer among allowable activities and recipients.

Commenters also asserted potential violations of the Administrative Procedure Act and Executive Orders 12866 and 13563 with respect to additional information they believe the Department should have released to aid them in their review of these estimates,

such as information about grants, grant recipients and effects on small entities. The only non-publicly-available information used in developing those estimates was the Department's active monitoring of our grantees, and the relevant aspects of that information were discussed in the NPRM. We do not believe it would be necessary or appropriate for the Department to release all monitoring records for all grantees, nor would the provision of that information aid commenters in further assessing the reasonableness of our assumptions.

*Changes:* We have revised our cost estimates to include time for grantees to read the rule and review their institutional policies.

**Executive Orders 12866, 13563, and 13771**

*Regulatory Impact Analysis*

Under E.O. 12866, the Office of Management and Budget (OMB) must determine whether this regulatory action is "significant" and, therefore, subject to the requirements of the Executive Order and subject to review by OMB. Section 3(f) of E.O. 12866 defines a "significant regulatory action" as an action likely to result in a rule that may—

(1) Have an annual effect on the economy of $100 million or more, or adversely affect a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or State, local, or Tribal governments or communities in a material way (also referred to as an "economically significant" rule);

(2) Create serious inconsistency or otherwise interfere with an action taken or planned by another agency;

(3) Materially alter the budgetary impacts of entitlement grants, user fees, or loan programs or the rights and obligations of recipients thereof; or

(4) Raise novel legal or policy issues arising out of legal mandates, the President's priorities, or the principles stated in the Executive Order.

Under E.O. 12866, section 3(f)(1), this regulatory action is a significant regulatory action subject to review by OMB.

Under E.O. 13771, for each new regulation that the Department proposes for notice and comment or otherwise promulgates that is a significant regulatory action under E.O. 12866 and that imposes total costs greater than zero, it must identify two deregulatory actions. For FY 2020, any new incremental costs associated with a new regulation must be fully offset by the elimination of existing costs through

deregulatory actions. The final regulations are a significant regulatory action under E.O. 12866, and impose total one-time costs of approximately $297,770. Pursuant to the Congressional Review Act (5 U.S.C. 801 *et seq.*), the Office of Information and Regulatory Affairs designated this rule as not a "major rule," as defined by 5 U.S.C. 804(2).

We have also reviewed these final regulations under E.O. 13563, which supplements and explicitly reaffirms the principles, structures, and definitions governing regulatory review established in E.O. 12866. To the extent permitted by law, E.O. 13563 requires that an agency—

(1) Propose or adopt regulations only on a reasoned determination that their benefits justify their costs (recognizing that some benefits and costs are difficult to quantify);

(2) Tailor its regulations to impose the least burden on society, consistent with obtaining regulatory objectives and taking into account—among other things and to the extent practicable—the costs of cumulative regulations;

(3) In choosing among alternative regulatory approaches, select those approaches that maximize net benefits (including potential economic, environmental, public health and safety, and other advantages; distributive impacts; and equity);

(4) To the extent feasible, specify performance objectives, rather than the behavior or manner of compliance a regulated entity must adopt; and

(5) Identify and assess available alternatives to direct regulation, including economic incentives—such as user fees or marketable permits—to encourage the desired behavior, or provide information that enables the public to make choices.

E.O. 13563 also requires an agency "to use the best available techniques to quantify anticipated present and future benefits and costs as accurately as possible." The Office of Information and Regulatory Affairs of OMB has emphasized that these techniques may include "identifying changing future compliance costs that might result from technological innovation or anticipated behavioral changes."

We are issuing these final regulations only on a reasoned determination that their benefits justify their costs. While the Department is required to estimate the benefits and costs of every regulation, and has considered those benefits and costs for these final regulations, our decision regarding the final regulations rely on legal and policy considerations discussed elsewhere, and not on the estimated cost likely to result

from these final regulations. The approach that the Department chooses upholds the First Amendment to the U.S. Constitution with respect to public institutions of higher education and holds private institutions of higher education accountable to their own stated institutional policies regarding freedom of speech, including academic freedom. The Department's approach with respect to discretionary grant programs under Title III and Title V of the HEA aligns with the most current precedent from the U.S. Supreme Court. The Department also clarifies how educational institutions may demonstrate that they are controlled by a religious organization to qualify for the exemption provided under Title IX, 20 U.S.C. 1681(a)(3), to the extent Title IX or its implementing regulations would not be consistent with the religious tenets of such organization.

We also have determined that this regulatory action does not unduly interfere with State, local, or Tribal governments in the exercise of their governmental functions.

In this regulatory impact analysis, we discuss the need for regulatory action, the potential costs and benefits, assumptions, limitations, and data sources that we considered.

*Need for Regulatory Action*

The Department is revising its regulations in response to the United States Supreme Court's decisions in *Trinity Lutheran Church of Columbia, Inc.* v. *Comer*[234] and consistent with *Espinoza* v. *Montana Dep't of Revenue*[235] as well as *Little Sisters of the Poor Saints Peter and Paul Home* v. *Pennsylvania,*[236] RFRA, the United States Attorney General's October 6, 2017, Memorandum on Federal Law Protections for Religious Liberty, E.O. 13798 (Promoting Free Speech and Religious Liberty),[237] and E.O. 13831 (Establishment of a White House Faith and Opportunity Initiative). Additionally, the Department is revising its regulations to enforce E.O. 13864,[238] Improving Free Inquiry, Transparency, and Accountability at Colleges and Universities.

The Department believes that even a single instance of a violation of the First Amendment at a public institution or a

[234] 137 S. Ct. 2012 (2017).
[235] 140 S. Ct. 2246 (2020).
[236] 140 S. Ct. 2367 (2020).
[237] Att'y Gen. Mem. nn Federal Law Protections for Religious Liberty, Memorandum for All Executive Departments and Agencies (Oct. 6, 2017), *https://www.justice.gov/opa/press-release/file/1001891/download.*
[238] Exec. Order 13864, 84 FR 11401 (Mar. 21, 2019).

single instance of a violation of stated institutional policies regarding freedom of speech, including academic freedom, at a private institution, as adjudicated by a court, is egregious with respect to Federal research or education grants. Such violations deny students the opportunity to learn and also deny teachers and faculty the opportunity to research and engage in rigorous academic discourse. The freedoms in the First Amendment for public institutions and stated institutional policies regarding freedom of speech, including academic freedom, for private institutions are fundamental for education.

Additionally, these final regulations governing the Hispanic-Serving Institutions Program, Strengthening Institutions Program, Strengthening Historically Black Colleges and Universities Program, and Strengthening Historically Black Graduate Institutions Program provide consistency with current Supreme Court case law regarding the Free Exercise Clause and RFRA. These final regulations also help ensure that religious student organizations at public institutions do not have to choose between exercising their religion or participating in a publicly available government benefit program.

Finally, the Department for the first time provides clarity through regulations as to how an educational institution may demonstrate that it is controlled by a religious organization such that Title IX and its implementing regulations would not apply pursuant to 20 U.S.C. 1681(a)(3). The Department previously addressed such matters through guidance which does not have the force and effect of law. These final regulations provide a non-exhaustive list of criteria that is consistent with RFRA and that institutions may choose to use in asserting an exemption under 20 U.S.C. 1681(a)(3).

The Department's need for regulatory action is explained more fully in the NPRM in "Background—Part 1 (Religious Liberty)" and "Background—Part 2 (Free inquiry)." [239]

*Discussion of Costs and Benefits*

The Department has analyzed the costs and benefits of complying with these final regulations. Due to the number of affected entities and recipients, we cannot estimate, with absolute precision, the likely effects of these regulations. However, as discussed below, we estimate that these final regulations will have a one-time net cost of approximately $297,770.

---
[239] 85 FR 3191–99.

*Discussion of Costs, Benefits, and Transfers*

For purposes of these estimates, the Department assumes that approximately 1,500 institutions of higher education are grant recipients under 34 CFR parts 75 and 76. Of those, we assume that approximately 70 percent (1,050) are public institutions and 30 percent (350) are private institutions.[240] We assume that most activities outlined below would be conducted by an attorney at a rate of $102.05 per hour.[241]

We assume that representatives of all 1,500 institutions receiving grants under 34 CFR parts 75 and 76 will review the final rule. We estimate that such review will take, on average, 1 hour per institution for a one-time cost of approximately $209,700. While the Department recognizes that some institutions may take longer to complete this review, we believe many institutions will take far less time, instead relying on high level summaries or overviews, such as those produced by a central office for an entire university system.

**34 CFR Part 75—Direct Grant Programs and 34 CFR Part 76—State-Administered Formula Grant Programs**

Changes to 34 CFR 75.500 and 34 CFR 76.500 clarify public institutions that are grantees or subgrantees and that *already* are legally required to abide by the First Amendment, must comply with the First Amendment as a material condition of the Department's grant. Similarly, private institutions must comply with their own stated institutional policies regarding freedom of speech, including academic freedom, as a material condition of a grant. These final regulations assume that generally, a public institution makes a good faith effort to comply with this material condition unless a State or Federal court renders a final, non-default judgment against the institution or its employee acting in the employee's official capacity, finding that the public institution or such an employee violated the First Amendment. Similarly, these final regulations assume that generally, a private institution makes a good faith effort to comply with its own stated institutional policies regarding freedom

---
[240] Estimates based on analysis of grant awards made by the Department in fiscal year 2018.

[241] Estimates based on a median hourly wage for lawyers employed by colleges, universities, and professional schools, State government owned from the May 2019 National Occupational Employment and Wage Estimates by ownership, published by the Bureau of Labor Statistics (*www.bls.gov/oes/current/611300_2.htm#23–0000*). We have used loaded wage rates, assuming a factor of 2.0 to account for both the employer cost for employee compensation and overhead costs.

of speech, including academic freedom, unless a State or Federal court renders a final, non-default judgment against the institution or its employee acting on its behalf, finding that the private institution or such an employee violated a stated institutional policy regarding freedom of speech, including academic freedom. These final regulations require grantees to submit to the Department a copy of any final, non-default judgment rendered against them by a State or Federal court, finding a violation of the First Amendment for public institutions or finding a violation of a stated institutional policy regarding freedom of speech, including academic freedom, for private institutions. Additionally, the changes prohibit public institutions of higher education from denying religious student organizations any rights, benefits, or privileges afforded to other student organizations because of the religious student organization's beliefs, practices, policies, speech, membership standards, or leadership standards, which are informed by sincerely held religious beliefs.

Generally, the Department assumes that public institutions, to which the First Amendment already applies, make a good faith effort to comply with the First Amendment. As such, we do not believe the majority of institutions will conduct a review of their policies as a result of this final rule. We assume that approximately 15 percent of public institutions of higher education will review their policies to ensure compliance with the First Amendment. We believe such a review will take approximately four (4) hours. We do not assume a more comprehensive or burdensome review process because, as noted above, public institutions have always been required to comply with the First Amendment, and we assume that public institutions are making a good faith effort to comply. We further assume that no private institutions will conduct such a review given that they are only required to comply with their existing policies. However, to the extent that private institutions do choose to conduct such a review (for instance, to verify their continued support of all previously adopted policies), the costs noted herein will be underestimates of the actual costs generated by these final regulations. We therefore assume that approximately 158 institutions will conduct a review of their policies for a total one-time cost of $88,070.

The Department recognizes that the number of final, non-default judgments holding that a public institution or an employee acting on its behalf has violated the First Amendment is unpredictable and may be infrequent.

While the Department is choosing to take a measured approach in these final regulations in finding a public or private institution in violation of the newly added material conditions in §§ 75.500 and 76.500 only when there is a final, non-default judgment against an institution, we believe these final regulations will have the additional benefit of increasing and incentivizing awareness about the importance of compliance generally. These changes are qualitative in nature and, therefore, we have not quantified them as part of this analysis. We note that individuals may experience a violation of the First Amendment or a stated institutional policy regarding freedom of speech and choose not to file a lawsuit to challenge a public institution or a private institution. A student or employee may risk their education or employment in filing such a lawsuit. They also may fear retaliation from the institution, their peers, their colleagues, or their supervisors. Additionally, many institutions may choose to settle such disputes such that a court never renders a final, non-default judgment. Accordingly, the lack of a final, non-default judgment against an institution does not mean that a public institution has not violated the First Amendment or that a private institution has not violated its own stated institutional policies regarding freedom of speech, including academic freedom. It may mean that the institution remedied any problem before a lawsuit was filed or during any litigation. Remedying such a problem before a final, non-default judgment is rendered saves institutions the cost of litigation, and remedying any such problem during litigation saves the institution the continued cost of litigation.

A final, non-default judgment against a public institution for a violation of the First Amendment or against a private institution for stated institutional policies regarding freedom of speech, including academic freedom, may be rare, but such a judgment may signify that the institution refused to remedy any such problem until a State or Federal court ordered it to do so. The Department believes that a single instance of such a violation is egregious. First Amendment rights at public institutions and freedom of speech, including academic freedom, at private institutions are essential to learning and education. Even one violation may have a detrimental effect on students, faculty, and the educational environment. One such instance may chill students', faculty's, and others' protected speech with respect to the First Amendment at

public institutions or permissible speech, including academic freedom, under stated institutional policies. The burden and cost of complying with the First Amendment for public institutions and with stated institutional policies regarding freedom of speech, including academic freedom, for private institutions is a burden and cost that these institutions already must bear. These final regulations do not add any such burden or cost beyond what is discussed above.

To the extent that grantees do have such judgments rendered against them, we believe the cost of submitting a copy to the Department will be negligible. The final rule does not require grantees to submit the information in any particular format or venue, and we believe the requirement could easily and efficiently be addressed by grantees by forwarding a copy of the judgment via email to their project officer. Such an approach likely will take less than thirty minutes to accomplish for an estimated cost of no more than $50 (assuming the work is completed by a lawyer employed by the institution) per submission.

Specifically, regarding the prohibition on denying religious student organizations the rights, benefits, and privileges afforded to other student organizations in §§ 75.500(d) and 76.500(d), we assume no costs associated with ensuring that all student organizations have equal access to generally available resources. To the extent that generally available resources are, as a result of this change, now made available to a wider range of student organizations, this change may result in a small transfer of benefits from existing student organizations to religious student organizations. We believe that the number of student organizations usually operating on each campus likely makes these transfer effects minimal for any given student organization.

As noted above, grantees that are found to be in violation of the First Amendment or their stated institutional policies regarding freedom of speech, including academic freedom, will be considered to be in violation of a material condition of their grant and the Department will consider available remedies for the violation. We do not believe it is likely that such violations, if they do occur, would result in a substantial number of grants being terminated because the Department would first seek to acquire voluntary compliance from the institution with the First Amendment for public institutions or its own stated institutional policies regarding freedom of speech, including academic freedom,

for private institutions, or any special conditions that the Department may impose to achieve such compliance. Accordingly, we do not believe it is likely that such violations will result in any large number of grants being terminated. Further, as with all violations of the conditions of a particular grant, decisions regarding appropriate remedies are made on a case-by-case basis, and we therefore cannot reliably estimate the effects on any particular grantee's awards, even if we assume a failure to comply with the First Amendment. Nonetheless, the potential suspension or termination of a Federal award and potential debarment would, in the event that they occurred, represent real costs to grantees. However, as noted above, we believe such outcomes are generally unlikely and difficult to meaningfully predict. We also note that some grantees or subgrantees may, in the event that they face a lawsuit alleging violations of the First Amendment or institutional policies regarding freedom of speech, shift their litigation strategies to avoid final, non-default judgments against them. To the extent that they did so, such actions could result in additional costs to grantees that would not occur in the absence of the rule. However, as noted above, although such violations do occur, we believe they are difficult to predict with certainty and any effect on the litigation strategy of grantees is case-dependent. As such, we continue to estimate negligible costs associated with this provision.

The addition of 34 CFR 75.684 clarifies that the provisions of this section are severable. We do not anticipate this change to have any quantifiable cost.

Changes to 34 CFR 76.700 add a cross-reference to 34 CFR 76.500. We do not anticipate this change to have any quantifiable cost and may benefit the Department and the general public by improving the clarity of the regulations.

The addition of 34 CFR 76.784 clarifies that the provisions of this section are severable. We do not anticipate this change to have any quantifiable cost.

34 CFR Part 106—Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance

Changes to 34 CFR 106.12 help define the term ''controlled by a religious organization'' for purposes of asserting the exemption under 20 U.S.C. 1681(a)(3) and reflected in § 106.12(a). While these changes provide substantial clarity to regulated entities about how to demonstrate that an educational

institution is controlled by a religious organization, the Department does not believe that they substantially change the number or composition of entities asserting the exemption. To the extent that it would, we believe there could be an expansion of previously eligible entities beginning to assert the exemption due to an increased clarity regarding the regulatory standard for doing so. We do not anticipate this change to have any quantifiable cost.

The addition of 34 CFR 106.12(d) clarifies that the provisions of this section are severable. We do not anticipate this change to have any quantifiable cost.

34 CFR Part 606—Developing Hispanic-Serving Institutions Program

Changes to 34 CFR 606.10 removes language that prohibits the use of funds for otherwise allowable activities that merely relate to sectarian instruction or religious worship and replace it with language more narrowly defining the limitation. The Department also revises the definition of a "school or department of divinity" in a manner that is more consistent with the First Amendment and other Federal laws. We do not anticipate these changes to result in any quantifiable costs. However, it is possible that grantees may shift their use of funds to support activities that are currently prohibited under the broader, current limitation. In the NPRM, the Department noted that it had insufficient information available to quantify this potential transfer at that time and requested information from the public to help us do so. The commenters did not provide any such information and therefore, without sufficient information, we retain this as a potential unquantified transfer.

The addition of 34 CFR 606.11 clarifies that the provisions of this section are severable. We do not anticipate this change to have any quantifiable cost.

34 CFR Part 607—Strengthening Institutions Program

Changes to 34 CFR 607.10 removes language that prohibits the use of funds for otherwise allowable activities that merely relate to sectarian instruction or religious worship and replaces it with language more narrowly defining the limitation. The Department also revises the definition of a "school or department of divinity" in a manner that is more consistent with the First Amendment and other Federal laws. We do not anticipate these changes to result in any quantifiable costs. However, it is possible that grantees may shift their use of funds to support activities that

are currently prohibited under the broader, current limitation. In the NPRM, the Department noted that it had insufficient information available to quantify this potential transfer at that time and requested information from the public to help us do so. The commenters did not provide any such information and we therefore, without sufficient information, we retain this as a potential unquantified transfer.

The addition of 34 CFR 607.11 clarifies that the provisions of this section are severable. We do not anticipate this change to have any quantifiable cost.

34 CFR Part 608—Strengthening Historically Black Colleges and Universities Program

Changes to 34 CFR 608.10 removes language that prohibits the use of funds for otherwise allowable activities that merely relate to sectarian instruction or religious worship and replace it with language more narrowly defining the limitation. The Department also revises the definition of a "school or department of divinity" in a manner that is more consistent with the First Amendment and other Federal laws. We do not anticipate these changes to result in any quantifiable costs. However, it is possible that grantees may shift their use of funds to support activities that are currently prohibited under the broader, current limitation. The Department does not have sufficient information to quantify this potential transfer at this time.

The addition of 34 CFR 608.12 clarifies that the provisions of this section are severable. We do not anticipate this change to have any quantifiable cost.

34 CFR Part 609—Strengthening Historically Black Graduate Institutions Program

Changes to 34 CFR 609.10 removes language that prohibits the use of funds for otherwise allowable activities that merely relate to sectarian instruction or religious worship and replaces it with language more narrowly defining the limitation. The Department also revises the definition of a "school or department of divinity" in a manner that is more consistent with the First Amendment and other Federal laws. We do not anticipate these changes to result in any quantifiable costs. However, it is possible that grantees may shift their use of funds to support activities that are currently prohibited under the broader, current limitation. The Department does not have sufficient information to quantify this potential transfer at this time.

The addition of 34 CFR 609.12 clarifies that the provisions of this section are severable. We do not anticipate this change to have any quantifiable cost.

*Regulatory Alternatives Considered*

The Department considered issuing guidance documents instead of regulations to address the issues discussed in the NPRM, including in "Part 1—Religious Liberty" and "Part 2—Free Inquiry." The Department determined that guidance documents would prove insufficient because guidance documents are not binding and do not carry the force and effect of law.[242] To address these issues in a clear and enforceable manner, a formal notice-and-comment rulemaking was the most appropriate approach. It also reinforces our commitment to the rule of law and robust public participation in the development of regulations that govern us.

The Department considered whether the Department, itself, should adjudicate claims alleging that a public institution violated the First Amendment or alleging that a private institution violated its stated institutional policies regarding freedom of speech. The Department decided against this alternative as both State and Federal courts are adequate guardians of the First Amendment and have a well-developed body of case law concerning First Amendment freedoms. Relying on State and Federal courts to make these determinations decreases the administrative burden on the Department. If the Department were to determine whether First Amendment rights were violated, then the Department officials would have to become experts in the panoply of First Amendment issues, including guarding against any establishment of religion, the free exercise of religion, freedom of speech, freedom of association, freedom of petition, freedom of assembly, and freedom of the press. The Department also would have to become familiar with the governing case law regarding each aspect of the First Amendment that applies to the jurisdiction where a public institution is located. Unlike other Federal agencies, such as the Department of Justice, the Department does not routinely enforce or handle matters regarding the First Amendment and would like to rely on the courts for their expertise in such judgments. With respect to private institutions, the Department would have to become familiar with each private institution's stated institutional policies regarding

[242] *Perez*, 575 U.S. at 97,

freedom of speech, including academic freedom, and each discrete issue that may be presented under such policies. State and Federal courts are well equipped to make necessary factual and legal determinations with respect to stated institutional policies regarding freedom of speech, including academic freedom, that private institutions choose to adopt.

**Regulatory Flexibility Act**

Pursuant to the Regulatory Flexibility Act, the Secretary certifies that these final regulations do not have a significant economic impact on a substantial number of small entities.

The final rule affects all institutions of higher education receiving grants from the Department. In FY 2018, 1,548 IHEs received such awards, totaling approximately $3.3 billion. Approximately 130 of those IHEs qualify as small, receiving approximately $183 million.[243] As described in the *Discussion of Costs and Benefits* section of this notice, the Department estimates that these final regulations will impose one-time costs of approximately $510 per institution that conducts a review of their policies. We do not believe this would represent a significant economic impact on small entities.

**Paperwork Reduction Act of 1995**

Under the final regulations, a public or private institution must submit to the Secretary a copy of certain final, non-default judgments by a State or Federal court. We believe such a submission will take no longer than 30 minutes per judgment. As discussed in the NPRM and in the Discussion of Costs, Benefits, and Transfers above, we do not estimate 10 or more parties will have such judgments to submit to the Department. Therefore, the Paperwork Reduction Act is not implicated.

**Intergovernmental Review**

The programs in parts 606, 607, 608, and 609 of title 34 of the Code of Federal Regulations may be affected by these regulations, and these programs, which include the Developing Hispanic-Serving Institutions Program, Strengthening Institutions Program, Strengthening Historically Black Colleges and Universities Program, and

the Strengthening Historically Black Graduate Institutions Program, are subject to the requirements of Executive Order 12372 and the regulations in 34 CFR part 79. One of the objectives of the Executive Order is to foster an intergovernmental partnership and a strengthened federalism. The Executive Order relies on processes developed by State and local governments for coordination and review of proposed Federal financial assistance.

This document provides early notification of our specific plans and actions for these programs.

**Assessment of Educational Impact**

In the NPRM we requested comments on whether the proposed regulations would require transmission of information that any other agency or authority of the United States gathers or makes available.

Based on the response to the NPRM and on our review, we have determined that these final regulations do not require transmission of information that any other agency or authority of the United States gathers or makes available.

**Accessible Format**

Individuals with disabilities can obtain this document in an accessible format (*e.g.,* Braille, large print, audiotape, or compact disc) on request to the person listed under **FOR FURTHER INFORMATION CONTACT.**

**Electronic Access to This Document**

The official version of this document is the document published in the **Federal Register.** Free internet access to the official edition of the **Federal Register** and the Code of Federal Regulations is available via the Federal Digital System at: *www.gpo.gov/fdsys.* You can view this document at that site, as well as all other documents of this Department published in the **Federal Register,** in text or PDF. To use PDF, you must have Adobe Acrobat Reader, which is available free at the site.

You may also access documents of the Department published in the **Federal Register** by using the article search feature at: *www.federalregister.gov.* Through the advanced search feature at this site, you can limit your search to documents published by the Department.

**List of Subjects**

*34 CFR Part 75*

Accounting, Copyright, Education, Grant programs—Education, Inventions and patents, Private schools, Reporting and recordkeeping requirements.

*34 CFR Part 76*

Accounting, Administrative practice and procedure, American Samoa, Education, Grant programs—education, Guam, Northern Mariana Islands, Pacific Islands Trust Territory, Private schools, Reporting and recordkeeping requirements, Virgin Islands.

*34 CFR Part 106*

Education, Sex discrimination, Civil rights, Sexual harassment

*34 Part 606*

Colleges and universities, Grant programs—education, Reporting and recordkeeping requirements.

*34 Part 607*

Colleges and universities, Grant programs—education, Reporting and recordkeeping requirements.

*34 Part 608*

Colleges and universities, Grant programs—education, Reporting and recordkeeping requirements.

*34 Part 609*

Colleges and universities, Grant programs—education, Reporting and recordkeeping requirements.

**Betsy DeVos,**
*Secretary of Education.*

For the reasons discussed in the preamble, the Secretary of Education amends parts 75, 76, 106, 606, 607, 608, and 609 of title 34 of the Code of Federal Regulations as follows:

**PART 75—DIRECT GRANT PROGRAMS**

■ 1. The authority citation for part 75 continues to read as follows:

**Authority:** 20 U.S.C. 1221e–3 and 3474, unless otherwise noted.

■ 2. Section 75.500 is revised to read as follows:

**§ 75.500  Constitutional rights, freedom of inquiry, and Federal statutes and regulations on nondiscrimination.**

(a) Each grantee shall comply with the following statutes and regulations:

---

[243] For purposes of this analysis, the Department defines a small IHE as a two-year institution with 500 FTE or less or a four-year institution with an enrollment of 1,000 FTE or less.

**Federal Register** / Vol. 85, No. 185 / Wednesday, September 23, 2020 / Rules and Regulations   **59979**

TABLE 1 TO § 75.500(a)

| Subject | Statute | Regulation |
|---|---|---|
| Discrimination on the basis of race, color, or national origin. | Title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d through 2000d–4). | 34 CFR part 100. |
| Discrimination on the basis of sex ................................... | Title IX of the Education Amendments of 1972 (20 U.S.C. 1681–1683). | 34 CFR part 106. |
| Discrimination on the basis of handicap ......................... | Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. 794). | 34 CFR part 104. |
| Discrimination on the basis of age. ................................ | The Age Discrimination Act (42 U.S.C. 6101 *et seq.*) .... | 34 CFR part 110. |

(b)(1) Each grantee that is an institution of higher education, as defined in 20 U.S.C. 1002(a), that is public and that is legally required to abide by the First Amendment to the U.S. Constitution (hereinafter "public institution"), must also comply with the First Amendment to the U.S. Constitution, including protections for freedom of speech, association, press, religion, assembly, petition, and academic freedom, as a material condition of the Department's grant. The Department will determine that a public institution has not complied with the First Amendment only if there is a final, non-default judgment by a State or Federal court that the public institution or an employee of the public institution, acting in his or her official capacity, violated the First Amendment. A final judgment is a judgment that the public institution chooses not to appeal or that is not subject to further appeal. Absent such a final, non-default judgment, the Department will deem the public institution to be in compliance with the First Amendment.

(2) Each grantee that is a public institution also must submit to the Secretary a copy of the final, non-default judgment by that State or Federal court to conclude the lawsuit no later than 45 calendar days after such final, non-default judgment is entered.

(c)(1) Each grantee that is an institution of higher education, as defined in 20 U.S.C. 1002(a), that is private (hereinafter "private institution") must comply with its stated institutional policies regarding freedom of speech, including academic freedom, as a material condition of the Department's grant. The Department will determine that a private institution has not complied with these stated institutional policies only if there is a final, non-default judgment by a State or Federal court to the effect that the private institution or an employee of the private institution, acting on behalf of the private institution, violated its stated institutional policy regarding freedom of speech or academic freedom. A final judgment is a judgment that the private institution chooses not to appeal or that is not subject to further appeal. Absent such a final, non-default judgment, the Department will deem the private institution to be in compliance with its stated institutional policies.

(2) Each grantee that is a private institution also must submit to the Secretary a copy of the final, non-default judgment by that State or Federal court to conclude the lawsuit no later than 45 calendar days after such final, non-default judgment is entered.

(d) As a material condition of the Department's grant, each grantee that is a public institution shall not deny to any student organization whose stated mission is religious in nature and that is at the public institution any right, benefit, or privilege that is otherwise afforded to other student organizations at the public institution (including but not limited to full access to the facilities of the public institution, distribution of student fee funds, and official recognition of the student organization by the public institution) because of the religious student organization's beliefs, practices, policies, speech, membership standards, or leadership standards, which are informed by sincerely held religious beliefs.

(e) A grantee that is a covered entity as defined in 34 CFR 108.3 shall comply with the nondiscrimination requirements of the Boy Scouts of America Equal Access Act, 20 U.S.C. 7905, 34 CFR part 108.

(Authority: 20 U.S.C. 1221e–3 and 3474)

■ 3. Section 75.684 is added to subpart E to read as follows:

**§ 75.684   Severability.**

If any provision of this subpart or its application to any person, act, or practice is held invalid, the remainder of the subpart or the application of its provisions to any person, act, or practice shall not be affected thereby.

(Authority: 20 U.S.C. 1221e–3 and 3474)

■ 4. Section 75.700 is revised to read as follows:

**§ 75.700   Compliance with the U.S. Constitution, statutes, regulations, stated institutional policies, and applications.**

A grantee shall comply with § 75.500, applicable statutes, regulations, and approved applications, and shall use Federal funds in accordance with those statutes, regulations, and applications.

(Authority: 20 U.S.C. 1221e–3 and 3474)

■ 5. Section 75.741 is added to subpart F to read as follows:

**§ 75.741   Severability.**

If any provision of this subpart or its application to any person, act, or practice is held invalid, the remainder of the subpart or the application of its provisions to any person, act, or practice shall not be affected thereby.

(Authority: 20 U.S.C. 1221e–3 and 3474)

**PART 76—STATE–ADMINISTERED FORMULA GRANT PROGRAMS**

■ 6. The authority citation for part 76 continues to read as follows:

**Authority:** 20 U.S.C. 1221e–3 and 3474, unless otherwise noted.

■ 7. Section 76.500 is revised to read as follows:

**§ 76.500   Constitutional rights, freedom of inquiry, and Federal statutes and regulations on nondiscrimination.**

(a) A State and a subgrantee shall comply with the following statutes and regulations:

TABLE 1 TO § 76.500(a)

| Subject | Statute | Regulation |
|---|---|---|
| Discrimination on the basis of race, color, or national origin. | Title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d through 2000d–4). | 34 CFR part 100. |

ED2.000237

TABLE 1 TO § 76.500(a)—Continued

| Subject | Statute | Regulation |
|---|---|---|
| Discrimination on the basis of sex .................................. | Title IX of the Education Amendments of 1972 (20 U.S.C. 1681–1683). | 34 CFR part 106. |
| Discrimination on the basis of handicap .......................... | Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. 794). | 34 CFR part 104. |
| Discrimination on the basis of age .................................. | The Age Discrimination Act (42 U.S.C. 6101 *et seq.*) .... | 34 CFR part 110. |

(b)(1) Each State or subgrantee that is an institution of higher education, as defined in 20 U.S.C. 1002(a), that is public and that is legally required to abide by the First Amendment to the U.S. Constitution (hereinafter "public institution"), must also comply with the First Amendment to the U.S. Constitution, including protections for freedom of speech, association, press, religion, assembly, petition, and academic freedom, as a material condition of the Department's grant. The Department will determine that a public institution has not complied with the First Amendment only if there is a final, non-default judgment by a State or Federal court that the public institution or an employee of the public institution, acting in his or her official capacity, violated the First Amendment. A final judgment is a judgment that the public institution chooses not to appeal or that is not subject to further appeal. Absent such a final, non-default judgment, the Department will deem the public institution to be in compliance with the First Amendment.

(2) Each State or subgrantee that is a public institution also must submit to the Secretary a copy of the final, non-default judgment by that State or Federal court to conclude the lawsuit no later than 45 calendar days after such final, non-default judgment is entered.

(c)(1) Each State or subgrantee that is an institution of higher education, as defined in 20 U.S.C. 1002(a), that is private (hereinafter "private institution") must comply with its stated institutional policies regarding freedom of speech, including academic freedom. The Department will determine that a private institution has not complied with these stated institutional policies only if there is a final, non-default judgment by a State or Federal court to the effect that the private institution or an employee of the private institution, acting on behalf of the private institution, violated its stated institutional policy regarding freedom of speech or academic freedom, as a material condition of the Department's grant. A final judgment is a judgment that the private institution chooses not to appeal or that is not subject to further appeal. Absent such a

final, non-default judgment, the Department will deem the private institution to be in compliance with its stated institutional policies.

(2) Each State or subgrantee that is a private institution also must submit to the Secretary a copy of the final, non-default judgment by that State or Federal court to conclude the lawsuit no later than 45 calendar days after such final, non-default judgment is entered.

(d) As a material condition of the Department's grant, each State or subgrantee that is a public institution shall not deny to any student organization whose stated mission is religious in nature and that is at the public institution any right, benefit, or privilege that is otherwise afforded to other student organizations at the public institution (including but not limited to full access to the facilities of the public institution, distribution of student fee funds, and official recognition of the student organization by the public institution) because of the religious student organization's beliefs, practices, policies, speech, membership standards, or leadership standards, which are informed by sincerely held religious beliefs.

(e) A State or subgrantee that is a covered entity as defined in 34 CFR 108.3 shall comply with the nondiscrimination requirements of the Boy Scouts of America Equal Access Act, 20 U.S.C. 7905, 34 CFR part 108.

(Authority: 20 U.S.C. 1221e–3, 3474)

■ 8. Section 76.684 is added to subpart F to read as follows:

§ 76.684  Severability.

If any provision of this subpart or its application to any person, act, or practice is held invalid, the remainder of the subpart or the application of its provisions to any person, act, or practice shall not be affected thereby.

(Authority: 20 U.S.C. 1221e–3, 3474)

■ 9. Section 76.700 is revised to read as follows:

§ 76.700  Compliance with the U.S. Constitution, statutes, regulations, stated institutional policies, and applications.

A State and a subgrantee shall comply with § 76.500, the State plan, applicable statutes, regulations, and approved

applications, and shall use Federal funds in accordance with those statutes, regulations, plan, and applications.

(Authority: 20 U.S.C. 1221e–3, 3474)

■ 10. Section 76.784 is added to subpart I to read as follows:

§ 76.784  Severability.

If any provision of this subpart or its application to any person, act, or practice is held invalid, the remainder of the subpart or the application of its provisions to any person, act, or practice shall not be affected thereby.

(Authority: 20 U.S.C. 1221e–3 and 3474)

PART 106—NON DISCRIMINATION ON THE BASIS OF SEX IN EDUCATION PROGRAMS OR ACTIVITIES RECEIVING FEDERAL FINANCIAL ASSISTANCE

■ 11. The authority citation for part 106 continues to read as follows:

**Authority:** 20 U.S.C. 1681 *et seq.*, unless otherwise noted.

■ 12. Section 106.12 is amended by adding paragraphs (c) and (d) to read as follows:

§ 106.12  Educational institutions controlled by religious organizations.

*    *    *    *    *

(c) *Eligibility.* Any of the following in paragraphs (c)(1) through (6) of this section shall be sufficient to establish that an educational institution is controlled by a religious organization, as contemplated under paragraph (a) of this section, and is therefore eligible to assert a religious exemption to the extent application of this part would not be consistent with its religious tenets:

(1) That the educational institution is a school or department of divinity.

(2) That the educational institution requires its faculty, students, or employees to be members of, or otherwise engage in religious practices of, or espouse a personal belief in, the religion of the organization by which it claims to be controlled.

(3) That the educational institution, in its charter or catalog, or other official publication, contains an explicit statement that it is controlled by a religious organization or an organ thereof, or is committed to the doctrines

ED2.000238

or practices of a particular religion, and the members of its governing body are appointed by the controlling religious organization or an organ thereof, and it receives a significant amount of financial support from the controlling religious organization or an organ thereof.

(4) That the educational institution has a doctrinal statement or a statement of religious practices, along with a statement that members of the institution community must engage in the religious practices of, or espouse a personal belief in, the religion, its practices, or the doctrinal statement or statement of religious practices.

(5) That the educational institution has a published institutional mission that is approved by the governing body of an educational institution and that includes, refers to, or is predicated upon religious tenets, beliefs, or teachings.

(6) Other evidence sufficient to establish that an educational institution is controlled by a religious organization, pursuant to 20 U.S.C. 1681(a)(3).

(d) *Severability.* If any provision of this section or its application to any person, act, or practice is held invalid, the remainder of this section or the application of its provisions to any person, act, or practice shall not be affected thereby.

### PART 606—DEVELOPING HISPANIC–SERVING INSTITUTIONS PROGRAM

■ 13. The authority citation for part 606 continues to read as follows:

**Authority:** 20 U.S.C. 1101 *et seq.,* unless otherwise noted.

■ 14. Section 606.10 is amended by revising paragraphs (c)(3) and (4) to read as follows:

### § 606.10   What activities may and may not be carried out under a grant?

\*    \*    \*    \*    \*

(c) \* \* \*

(3) Activities or services that constitute religious instruction, religious worship, or proselytization.

(4) Activities provided by a school or department of divinity. For the purpose of this provision, a "school or department of divinity" means an institution, or a department of an institution, whose program is solely to prepare students to become ministers of religion or to enter into some other religious vocation.

\*    \*    \*    \*    \*

### §§ 606.11 through 606.13   [Redesignated as §§ 606.12 through 606.14]

■ 15. Sections 606.11 through 606.13 are redesignated as §§ 606.12 through 606.14.

■ 16. New § 606.11 is added to read as follows:

### § 606.11   Severability.

If any provision of this subpart or its application to any person, act, or practice is held invalid, the remainder of the subpart or the application of its provisions to any person, act, or practice shall not be affected thereby.

(Authority: 20 U.S.C. 1101 *et seq.*)

### PART 607—STRENGTHENING INSTITUTIONS PROGRAM

■ 17. The authority citation for part 607 continues to read as follows:

**Authority:** 20 U.S.C. 1057–1059g, 1067q, 1068–1068h unless otherwise noted.

■ 18. Section 607.10 is amended by revising paragraphs (c)(3) and (4) to read as follows:

### § 607.10   What activities may and may not be carried out under a grant?

\*    \*    \*    \*    \*

(c) \* \* \*

(3) Activities or services that constitute religious instruction, religious worship, or proselytization.

(4) Activities provided by a school or department of divinity. For the purpose of this provision, a "school or department of divinity" means an institution, or a department of an institution, whose program is solely to prepare students to become ministers of religion or to enter into some other religious vocation.

\*    \*    \*    \*    \*

### §§ 607.11 through 607.13   [Redesignated as §§ 607.12 through 607.14]

■ 19. Redesignate §§ 607.11 through 607.13 as §§ 607.12 through 607.14.
■ 20. New § 607.11 is added to read as follows:

### § 607.11   Severability.

If any provision of this subpart or its application to any person, act, or practice is held invalid, the remainder of the subpart or the application of its provisions to any person, act, or practice shall not be affected thereby.

(Authority: 20 U.S.C. 1057 *et seq.*)

### PART 608—STRENGTHENING HISTORICALLY BLACK COLLEGES AND UNIVERSITIES PROGRAM

■ 21. The authority citation for part 608 is revised to read as follows:

**Authority:** 20 U.S.C. 1060 through 1063c, and 1068 through 1068h, unless otherwise noted.

■ 22. Section 608.10 is amended by revising paragraphs (b)(5) and (6) to read as follows:

### § 608.10   What activities may be carried out under a grant?

\*    \*    \*    \*    \*

(b) \* \* \*

(5) Activities or services that constitute religious instruction, religious worship, or proselytization.

(6) Activities provided by a school or department of divinity. For the purpose of this provision, a "school or department of divinity" means an institution, or a department of an institution, whose program is solely to prepare students to become ministers of religion or to enter into some other religious vocation.

\*    \*    \*    \*    \*

■ 23. Section 608.12 is added to subpart B to read as follows:

### § 608.12   Severability.

If any provision of this subpart or its application to any person, act, or practice is held invalid, the remainder of the subpart or the application of its provisions to any person, act, or practice shall not be affected thereby.

(Authority: 20 U.S.C. 1060 through 1063c, and 1068 through 1068h)

### PART 609—STRENGTHENING HISTORICALLY BLACK GRADUATE INSTITUTIONS PROGRAM

■ 24. The authority citation for part 609 is revised to read as follows:

**Authority:** 20 U.S.C. 1060 through 1063c, and 1068 through 1068h, unless otherwise noted.

■ 25. Section 609.10 is amended by revising paragraphs (b)(5) and (6) to read as follows:

### § 609.10   What activities may be carried out under a grant?

\*    \*    \*    \*    \*

(b) \* \* \*

(5) Activities or services that constitute religious instruction, religious worship, or proselytization.

(6) Activities provided by a school or department of divinity. For the purpose of this provision, a "school or department of divinity" means an institution, or a department of an institution, whose program is solely to prepare students to become ministers of religion or to enter into some other religious vocation.

\*    \*    \*    \*    \*

■ 26. Section 609.12 is added to subpart B to read as follows:

### § 609.12   Severability.

If any provision of this subpart or its application to any person, act, or practice is held invalid, the remainder of the subpart or the application of its

ED2.000239

provisions to any person, act, or practice shall not be affected thereby.

(Authority: 20 U.S.C. 1060 through 1063c, and 1068 through 1068h)

[FR Doc. 2020–20152 Filed 9–22–20; 8:45 am]

**BILLING CODE 4000–01–P**

ED2.000240