ELIZABETH HUNTER et al.
v.
U.S. DEPARTMENT OF EDUCATION, et al.
Case No. 6:21-cv-00474 (AA)
**GOV Ex. 8**

**3190**          **Federal Register** / Vol. 85, No. 12 / Friday, January 17, 2020 / Proposed Rules

# DEPARTMENT OF EDUCATION

## 2 CFR Part 3474

## 34 CFR Parts 75, 76, 106, 606, 607, 608, and 609

[Docket ID ED–2019–OPE–0080]

RIN 1840–AD45

## Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards, Direct Grant Programs, State-Administered Formula Grant Programs, Developing Hispanic-Serving Institutions Program, and Strengthening Institutions Program

**AGENCY:** Office of Postsecondary Education, Department of Education.

**ACTION:** Notice of proposed rulemaking.

**SUMMARY:** In response to the United States Supreme Court's decision in *Trinity Lutheran Church of Columbia, Inc.* v. *Comer* (2017), the United States Attorney General's October 6, 2017 Memorandum on Federal Law Protections for Religious Liberty,and Executive Order 13831 (Establishment of a White House Faith and Opportunity Initiative), the Department proposes revising the current regulations regarding the eligibility of faith-based entities to participate in the Department's Direct Grant programs, State-Administered Formula Grant programs, and discretionary grant programs authorized under title III and V of the Higher Education Act of 1965, as amended (HEA), and the eligibility of students to obtain certain benefits under those programs. Additionally, in response to E.O. 13864 (Improving Free Inquiry, Transparent, and Accountability at Colleges and Universities), the Department proposes to revise the current regulations to encourage institutions to foster environments that promote open, intellectually engaging, and diverse debate, including through compliance with the First Amendment for public institutions and compliance with stated institutional policies regarding freedom of speech, including academic freedom, for private institutions.

**DATES:** Comments must be received by the Department on or before February 18, 2020.

**ADDRESSES:** Submit your comments through the Federal eRulemaking Portal or via postal mail, commercial delivery, or hand delivery. We will not accept comments submitted by fax or by email or those submitted after the comment period. To ensure that we do not receive duplicate copies, please submit your comments only once. In addition, please include the Docket ID at the top of your comments.

If you are submitting comments electronically, we strongly encourage you to submit any comments or attachments in Microsoft Word format. If you must submit a comment in Adobe Portable Document Format (PDF), we strongly encourage you to convert the PDF to print-to-PDF format or to use some other commonly used searchable text format. *Please do not submit the PDF in a scanned format.* Using a print-to-PDF format allows the U.S. Department of Education (the Department) to electronically search and copy certain portions of your submissions.

• *Federal eRulemaking Portal:* Go to *www.regulations.gov* to submit your comments electronically. Information on using Regulations.gov, including instructions for accessing agency documents, submitting comments, and viewing the docket, is available on the site under "Help."

• *Postal Mail, Commercial Delivery, or Hand Delivery:* The Department strongly encourages commenters to submit their comments electronically. However, if you mail or deliver your comments about the proposed regulations, address them to Jean-Didier Gaina, U.S. Department of Education, 400 Maryland Avenue SW, Mail Stop 294–20, Washington, DC 20202.

Privacy Note: The Department's policy is to make all comments received from members of the public available for public viewing in their entirety on the Federal eRulemaking Portal at *www.regulations.gov.* Therefore, commenters should be careful to include in their comments only information that they wish to make publicly available.

**FOR FURTHER INFORMATION CONTACT:** For information related to faith-based issues, contact Lynn Mahaffie at (202) 453–7862 or by email at *Lynn.Mahaffie@ed.gov.*

If you use a telecommunications device for the deaf (TDD) or a text telephone (TTY), call the Federal Relay Service (FRS), toll free, at 1–800–877–8339.

**SUPPLEMENTARY INFORMATION:**
*Executive Summary:*
Purpose of Part 1 (Religious Liberty) of This Regulatory Action:

In response to the Supreme Court's decision in *Trinity Lutheran,*[1] E.O. 13798, and the U.S. Attorney General Memorandum on Federal Law Protections for Religious Liberty

(October 6, 2017) (hereinafter "Memorandum on Religious Liberty"),[2] the Department engaged in a full review of its regulations. On July 31, 2018, the Department announced its intent to negotiate regulations relating to the eligibility of faith-based entities to participate in the title IV, HEA programs.[3] The Department ultimately achieved a consensus agreement on those regulations and will publish a separate notice of proposed rulemaking reflecting that agreement. The Department now seeks to apply some of the principles of the consensus agreement, including avoiding unconstitutional discrimination against faith-based entities, to these non-title IV regulations (where negotiated rulemaking is not required), to fulfill the requirements of the Executive orders mentioned above, and to align its regulations with *Trinity Lutheran* and the Memorandum on Religious Liberty. Specifically, the Secretary proposes to:

• Modify Uniform Administrative Requirements to clarify that faith-based organizations and subgrantees are eligible to receive a grant or subgrant under a program of the Department on the same basis as any other private organization, ensure nondiscrimination against faith-based organizations, and strengthen religious freedom protections.

• Modify the Education Department General Administrative Regulations (EDGAR) to clarify that a faith-based organization is eligible to apply for and receive a grant under a program of the Department or subgrant from a State under a State-Administered Formula Grant program of the Department, on the same basis as any other private organization;

• Remove requirements on faith-based organizations that receive a Direct Grant or subgrant from a State-Administered Formula Grant program of the Department to provide assurances or notices where similar requirements are not imposed on non-faith-based organizations;

• Clarify that a faith-based organization that participates in Department-funded programs retains its autonomy, right of expression, religious character, and independence from Federal, State, and local governments;

• Ensure that faith-based and non-faith-based organizations shall, on equal terms, be eligible to obtain, use, and keep grant funds;

---

[1] 137 S. Ct. 2012 (2017).

[2] U.S. Att'y Gen. Memorandum on Federal Law Protections for Religious Liberty (Oct. 6, 2017), *https://www.justice.gov/opa/press-release/file/1001891/download.*
[3] 83 FR 36814.

• Require that the Department's notices or announcements of award opportunities and notices of awards or contracts include language clarifying the rights and obligations of faith-based organizations that apply for and receive Federal funding by stating, among other things, that faith-based organizations may apply for awards on the same basis as any other organization; that the Department will not, in the selection of recipients, discriminate against an organization on the basis of the organization's religious exercise or affiliation; and that a faith-based organization that participates in a federally funded program retains its independence from the government and may continue to carry out its mission consistent with religious freedom protections in Federal law, including the Free Speech and Free Exercise Clauses of the Constitution;

• Incorporate the definition of "religious exercise" from the Religious Freedom Restoration Act of 1993[4] (hereinafter "RFRA") and amend the definition of "indirect Federal Financial assistance" to align more closely with the Supreme Court's decision in *Zelman* v. *Simmons-Harris* (2002);[5]

• Add a non-exhaustive list of criteria that offers educational institutions different methods to demonstrate that they are eligible to claim an exemption to the application of Title IX, 20 U.S.C. 1681, and its implementing regulations to the extent Title IX and its implementing regulations would not be consistent with the institutions' religious tenets or practices; and

• Amend regulations governing the Hispanic-Serving Institutions Program, Strengthening Institutions Program, Strengthening Institutions Program, Strengthening Historically Black Colleges and University Program, and Strengthening Historically Black Graduate Institutions Program by removing language that prohibits use of funds for otherwise allowable activities if they merely relate to "religious worship" and "theological subjects" and replace it with language that more narrowly defines the limitations.

Purpose of Part 2 (Free Inquiry) of This Regulatory Action: In response to the President's E.O. 13864, Improving Free Inquiry, Transparency, and Accountability at Colleges and Universities, the Secretary proposes to ensure institutions of higher education, as defined in 20 U.S.C. 1002(a), that are

public (hereinafter "public institutions of higher education" or "public institutions") and receive Federal research or education grants, as defined in E.O. 13864, from the Department comply with the First Amendment to the United States Constitution. The Secretary also proposes to ensure institutions of higher education, as defined in 20 U.S.C. 1002(a), that are private (hereinafter "private institutions of higher education" or "private institutions") and receive Federal research or education grants, as defined in E.O. 13864, comply with their stated institutional policies, regarding freedom of speech, including academic freedom, by:

• Requiring public institutions that receive a Direct Grant or subgrant from a State-Administered Formula grant program of the Department to comply with the First Amendment, as a material condition of the grant;

• Requiring private institutions that receive a Direct Grant or subgrant from a State-Administered Formula Grant program of the Department to comply with their stated institutional policies on freedom of speech, including academic freedom, as a material condition of the grant; and

• Requiring that a public institution receiving a Direct Grant or subgrant from a State-Administered Formula Grant program of the Department not deny to a faith-based student organization any of the rights, benefits, or privileges that are otherwise afforded to non-faith-based student organizations, as a material condition of the grant.

Summary of the Major Provisions of This Regulatory Action:

To restore religious liberty and prevent discrimination against faith-based organizations and to act in a manner consistent with our obligation to be neutral in matters of religion, we propose to remove and amend regulations that would impose burdens on faith-based organizations, provide special benefits to faith-based organizations, or treat faith-based organizations and religious individuals differently than other organizations or individuals.

To protect and preserve First Amendment freedoms at public institutions and to hold private institutions accountable to stated institutional policies regarding freedom of speech, including academic freedom, we propose to add regulations that require public institutions to comply with the First Amendment as a material condition of a grant and that require private institutions to comply with their stated institutional policies on freedom

of speech, including academic freedom, as a material condition of a grant.

Please refer to the *Summary of Proposed Changes* section of this notice of proposed rulemaking (NPRM) for more details on the major provisions contained in this NPRM.

*Invitation to Comment:* We invite you to submit comments regarding these proposed regulations.

To ensure that your comments have maximum effect in developing the final regulations, we urge you to identify clearly the specific section or sections of the proposed regulations that each of your comments addresses, and provide relevant information and data whenever possible, even when there is no specific solicitation of data and other supporting materials in the request for comment. We also urge you to arrange your comments in the same order as the proposed regulations. Please do not submit comments that are outside the scope of the specific proposals in this NPRM, as we are not required to respond to such comments.

We invite you to assist us in complying with the specific requirements of EOs 12866 and 13563 and their overall requirement of reducing regulatory burden that might result from these proposed regulations. Please let us know of any further ways we could reduce potential costs or increase potential benefits while preserving the effective and efficient administration of the Department's programs and activities.

During and after the comment period, you may inspect all public comments about the proposed regulations by accessing *Regulations.gov.* You may also inspect the comments in person at 400 Maryland Avenue SW, Washington, DC, between 8:30 a.m. and 4:00 p.m., Eastern Time, Monday through Friday of each week except Federal holidays. To schedule a time to inspect comments, please contact one of the persons listed under **FOR FURTHER INFORMATION CONTACT**.

*Assistance to Individuals with Disabilities in Reviewing the Rulemaking Record:* On request, we will provide an appropriate accommodation or auxiliary aid to an individual with a disability who needs assistance to review the comments or other documents in the public rulemaking record for the proposed regulations. To schedule an appointment for this type of accommodation or auxiliary aid, please contact one of the persons listed under **FOR FURTHER INFORMATION CONTACT**.

**Background—Part 1 (Religious Liberty)**

Shortly after taking office in 2001, President George W. Bush signed E.O.

---

[4] 42 U.S.C. 2000bb–2(4) (referring to 42 U.S.C. 2000cc–5(7)(A) (defining "religious exercise" as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief")).

[5] 536 U.S. 639.

13199, Establishment of White House Office of Faith-based and Community Initiatives, 66 FR 8499 (January 29, 2001). That Executive order sought to ensure that ''private and charitable groups, including religious ones, . . . have the fullest opportunity permitted by law to compete on a level playing field'' in the delivery of social services. To do so, it created an office within the White House, the White House Office of Faith-Based and Community Initiatives, which would have primary responsibility to ''establish policies, priorities, and objectives for the Federal Government's comprehensive effort to enlist, equip, enable, empower, and expand the work of faith-based and other community organizations to the extent permitted by law.''

On December 12, 2002, President Bush signed E.O. 13279, Equal Protection of the Laws for Faith-Based and Community Organizations, 67 FR 77141 (December 12, 2002). E.O. 13279 set forth the principles and policymaking criteria to guide Federal agencies in formulating and implementing policies with implications for faith-based organizations and other community organizations, to ensure equal protection of the laws for faith-based and community organizations, and to expand opportunities for, and strengthen the capacity of, faith-based and other community organizations to meet social needs in America's communities. In addition, E.O. 13279 directed specified agency heads to review and evaluate existing policies that had implications for faith-based and community organizations relating to their eligibility for Federal financial assistance for social services programs and, where appropriate, to implement new policies that were consistent with and necessary to further the fundamental principles and policymaking criteria articulated in the order. Consistent with E.O. 13279, the Department promulgated regulations at 2 CFR part 3474, and 34 CFR parts 75 and 76 (''Parts 3474, 75, and 76'').

The Department amended several regulations that imposed unwarranted barriers to the participation of faith-based organizations in Department programs.[6] The amended regulations specifically provided that faith-based organizations are eligible to apply for and to receive funding under Department programs on the same basis as any other private organization, with

respect to programs for which such other organizations are eligible. These regulations also clarified that a religious organization that participated in Department programs would retain its independence and could continue to carry out its mission, including the definition, practice, and expression of its religious beliefs. Pursuant to these regulations, an organization that received a grant from the Department or that received a subgrant from a State under a State-Administered Formula Grant program of the Department would not be allowed to discriminate against a beneficiary or prospective beneficiary of that program on the basis of religion or religious belief. Among other revisions, the regulations clarified that faith-based organizations are eligible to contract with or otherwise receive assistance from grantees and subgrantees, including States, on the same basis as other private organizations.

President Obama maintained President Bush's program but modified it in certain respects. Shortly after taking office, President Obama signed E.O. 13498, Amendments to E.O. 13199 and Establishment of the President's Advisory Council for Faith-Based and Neighborhood Partnerships, 74 FR 6533 (Feb. 9, 2009). This Executive order changed the name of the White House Office of Faith-Based and Community Initiatives to the White House Office of Faith-Based and Neighborhood Partnerships, and it created an Advisory Council that subsequently submitted recommendations regarding the work of the Office.

On November 17, 2010, President Obama signed E.O. 13559, Fundamental Principles and Policymaking Criteria for Partnerships with Faith-Based and Other Neighborhood Organizations, 75 FR 71319 (November 17, 2010). E.O. 13559 made various changes to E.O. 13279 including the following: Making minor and substantive textual changes to the fundamental principles; adding a provision requiring that any religious social service provider refer potential beneficiaries to an alternative provider if the beneficiaries object to the first provider's religious character; adding a provision requiring that the first provider give notice of this right to the potential beneficiaries; and adding a provision that awards must be free of political interference and not be based on religious affiliation or lack thereof. An interagency working group was tasked with developing model regulatory changes to implement E.O. 13279, as amended by E.O. 13559, including provisions that clarified the prohibited uses of direct financial assistance, allowed religious social

services providers to maintain their religious identities, and distinguished between direct and indirect assistance. These efforts eventually resulted in amendments to agency regulations, including the Department's parts 3474, 75, and 76, defining ''indirect assistance'' as government aid to a beneficiary, such as a voucher, that flows to a religious provider only through the genuine and independent choice of the beneficiary.[7]

These regulations imposed burdens on faith-based organizations and treated faith-based organizations differently than other organizations.[8] The regulations not only required that faith-based providers give the notice of the right to an alternative provider specified in E.O. 13559, but also required faith-based providers, but not secular providers, to give written notice to beneficiaries and potential beneficiaries of programs funded with direct Federal financial assistance of various rights, including nondiscrimination based on religion, the requirement that participation in any religious activities must be voluntary and that they must be provided separately from the federally funded activity, and that beneficiaries may report violations.

President Trump has given new direction to the program established by President Bush and continued by President Obama. On May 4, 2017, President Trump issued E.O. 13798, the Presidential Executive Order Promoting Free Speech and Religious Liberty, 82 FR 21675 (May 4, 2017). E.O. 13798 states that ''Federal law protects the freedom of Americans and their organizations to exercise religion and participate fully in civic life without undue interference by the Federal Government. The executive branch will honor and enforce those protections.'' It further directed the Attorney General to ''issue guidance interpreting religious liberty protections in Federal law.''

Pursuant to this instruction, the Attorney General, on October 6, 2017, issued the Memorandum for All Executive Departments and Agencies, ''Federal Law Protections for Religious Liberty,'' 82 FR 49668 (October 26, 2017) (''Memorandum on Religious Liberty'').The Attorney General's Memorandum on Religious Liberty emphasized that individuals and organizations do not give up religious liberty protections by providing social services, and that ''government may not

---

[6] *See* Participation in Education Department Programs by Religious Organizations; Providing for Equal Treatment of All Education Program Participants, 69 FR 31708 (June 4, 2004).

[7] 2 CFR 3474.15; 34 CFR 75.52, 76.52.

[8] Federal Agency Final Regulations Implementing Executive Order 13599: Fundamental Principles and Policymaking Criteria for Partnerships with Faith-Based and Other Neighborhood Organizations, 81 FR 19355, 19373 (Apr. 4, 2016).

exclude religious organizations as such from secular aid programs . . . when the aid is not being used for explicitly religious activities such as worship or proselytization.'' This Memorandum noted that the government, similarly, ''may not discriminate against or impose special burdens upon individuals because of their religious beliefs or status.'' It proceeded to observe that ''[t]he Constitution's protection against government regulation of religious belief is absolute; it is not subject to limitation or balancing against the interests of the government.'' The Attorney General's Memorandum further stated that a law must be both neutral and generally applicable in order to survive constitutional scrutiny: ''[a] law is not *neutral* if it singles out particular religious conduct for adverse treatment; treats the same conduct as lawful when undertaken for secular reasons but unlawful when undertaken for religious reasons; visits gratuitous restrictions Federal Law Protections for Religious Liberty on religious conduct; or accomplishes . . . a religious gerrymander, an impermissible attempt to target [certain individuals] and their religious practices''; whereas, ''[a] law is not *generally applicable* if in a selective manner [it] impose[s] burdens only on conduct motivated by religious belief, including by fail[ing] to prohibit nonreligious conduct that endangers [its] interests in a similar or greater degree than . . . does the prohibited conduct, or enables, expressly or de facto, a system of individualized exemptions.'' (emphases added; citations and internal quotation marks omitted.) Placing unique burdens on religion generally or a religion or religious entity specifically would suffice to invalidate that governmental action.

On May 3, 2018, President Trump signed E.O. 13831, Executive Order on the Establishment of a White House Faith and Opportunity Initiative, 83 FR 20715 (May 3, 2018), amending E.O. 13279 as amended by E.O. 13559, and other related Executive orders. Among other things, E.O. 13831 changed the name of the ''White House Office of Faith-Based and Neighborhood Partnerships'' to the ''White House Faith and Opportunity Initiative''; changed the way that the Initiative is to operate; directed departments and agencies with ''Centers for Faith-Based and Community Initiatives'' to change those names to ''Centers for Faith and Opportunity Initiatives''; and ordered departments and agencies without a Center for Faith and Opportunity Initiatives to designate a ''Liaison for

Faith and Opportunity Initiatives.'' E.O. 13831 also eliminated the alternative provider requirement and alternative provider notice requirement that were imposed by E.O. 13559.

*Alternative Provider and Alternative Provider Notice Requirement*

E.O. 13831 deleted the requirement in E.O. 13559 that faith-based social services providers refer beneficiaries who object to receiving services from them to an alternative provider. Section 1(b) of E.O. 13559 amended section 2 of E.O. 13279, entitled ''Fundamental Principles,'' by, in pertinent part, adding a new subsection (h) to section 2. As amended, section 2(h)(i) provided: ''If a beneficiary or a prospective beneficiary of a social service program supported by Federal financial assistance objects to the religious character of an organization that provides services under the program, that organization shall, within a reasonable time after the date of the objection, refer the beneficiary to an alternative provider.'' Section 2(h)(ii) directed agencies to establish policies and procedures to ensure that referrals are timely and follow privacy laws and regulations; that providers notify agencies of and track referrals; and that each beneficiary ''receives written notice of the protections *set forth in this subsection* prior to enrolling in or receiving services from such program'' (emphasis added). The reference to ''this subsection'' rather than to ''this Section'' indicated that the notice requirement of section 2(h)(ii) was referring only to the alternative provider provisions in subsection (h), not all of the protections in section 2. The Department previously revised its regulations to conform to these provisions.[9]

The alternative provider provisions of E.O. 13559, which E.O. 13831 removed, were not required by the Constitution or any applicable law. Indeed, they are in tension with more recent Supreme Court precedent regarding nondiscrimination against religious organizations and with the Attorney General's Memorandum on Religious Liberty. See *Trinity Lutheran Church of Columbia, Inc.* v. *Comer,* 137 S. Ct. 2012 (2017). The alternative provider provisions of E.O. 13559 require the faith-based organization to provide referrals to secular organizations but do not require secular organizations to provide referrals to any faith-based organizations. These provisions constitute discrimination against an organization because of its religious

status. It is precisely the kind of status-based discrimination that the Supreme Court recently has held the First Amendment's Free Exercise Clause to forbid. See *Trinity Lutheran,* 137 S. Ct. at 2019, 2021–22. The Federal government may no more be complicit in this discrimination part-way through its unfolding than it can initiate it. In addition, as the Supreme Court has reminded us, while ''[p]rivate biases may [sometimes] be outside the reach of the law, . . . . the law cannot, directly or indirectly, give them effect.'' *Palmore* v. *Sidoti,* 466 U.S. 429, 433 (1984). As a consequence, the governmental discrimination committed by the alternative provider provisions of E.O. 13559 is impermissible under *Trinity Lutheran's* construction of the Free Exercise Clause.

As the Supreme Court recently clarified in *Trinity Lutheran,* 137 S. Ct. at 2019: ''The Free Exercise Clause 'protect[s] religious observers against unequal treatment' and subjects to the strictest scrutiny laws that target the religious for 'special disabilities' based on their 'religious status.' '' [10] The Court in *Trinity Lutheran* added: ''[T]his Court has repeatedly confirmed that denying a generally available benefit solely on account of religious identity imposes a penalty on the free exercise of religion that can be justified only by a state interest 'of the highest order.' '' [11] The Department's erstwhile requirements on faith-based organizations that receive a Direct Grant or subgrant from a State-Administered Formula Grant program of the Department to provide assurances or notices imposes a ''special disabilit[y]'' on such organizations ''solely on account of'' their ''religious status'' because similar requirements are not imposed on non-faith-based organizations.[12] The Supreme Court stated in *Zelman* that governmental aid and benefits must be '''made available to both religious and secular beneficiaries on a nondiscriminatory basis.' '' [13] Fifteen years later the *Trinity Lutheran* Court reaffirmed that the government ''cannot exclude individual Catholics,

---

[9] 34 CFR 75.712, 75.713, 76.712, 76.713.

[10] Quoting *Church of Lukumi Babalu Aye, Inc.* v. *City of Hialeah,* 508 U.S. 520, 533 (1993).

[11] *Id.* at 2019 (quoting *McDaniel* v. *Paty,* 435 U.S. 618, 628 (1978] (plurality opinion) (citations omitted]; *see also Mitchell* v. *Helms,* 530 U.S. 793, 827 (2000) (plurality opinion) (''The religious nature of a recipient should not matter to the constitutional analysis, so long as the recipient adequately furthers the government's secular purpose.''); Attorney General's Memorandum on Religious Liberty, principle 6 (''Government may not target religious individuals or entities for special disabilities based on their religion.'').

[12] *Trinity Lutheran,* 137 S. Ct. at 2019 (citations and internal quotation marks omitted).

[13] 536 U.S. at 653–54 (quoting *Agostini* v. *Felton,* 521 U.S. 203, 231 (1997)).

Lutherans, Mohammedans, Baptists, Jews, Methodists, Non-believers, Presbyterians, or the members of any other faith, *because of their faith, or lack of it, from receiving [public] benefits.*" [14] Here, no governmental "interest of the highest order" justifies the discrimination regarding requiring notices and assurances that discriminate against faith-based organizations.[15] To illustrate, under Supreme Court precedent, the governmental desire to "'achiev[e] greater separation of church and State than is already ensured under the Establishment Clause of the Federal Constitution'" is not such an interest.[16] Therefore, the ineluctable inference is that the notice requirement imposed on faith-based organizations violates the Free Exercise Clause.

For these reasons and for the reasons earlier stated, applying the alternative provider requirement categorically to all faith-based providers and not to other providers of federally funded social services is in tension with the nondiscrimination principle articulated in *Trinity Lutheran* and the Attorney General's Memorandum on Religious Liberty.

In addition, the alternative provider requirement could in certain circumstances raise concerns under RFRA. Under RFRA, where the Government substantially burdens an entity's exercise of religion, the Government must prove that the burden is in furtherance of a compelling government interest and is the least restrictive means of furthering that interest. 42 U.S.C. 2000bb–1(b). When a faith-based grant recipient carries out its social service programs, it may engage in an exercise of religion protected by RFRA and certain conditions on receiving those grants may substantially burden the religious exercise of the recipient. *See Application of the Religious Freedom Restoration Act to the Award of a Grant Pursuant to a Juvenile Justice and Delinquency Prevention Act,* 31 O.L.C. 162, 169–71, 174–83 (June 29, 2007). Requiring faith-based organizations to comply with the alternative provider requirement could impose such a burden, such as in a case in which a faith-based organization has a religious objection to referring the beneficiary to an alternative provider that provided services in a manner that violated the organization's religious tenets. *See Burwell* v. *Hobby Lobby*

*Stores, Inc.,* 573 U.S. 682, 720–26 (2014). And it is far from clear that this requirement would meet the strict scrutiny that RFRA requires of laws that substantially burden religious practice. The Department is not aware of any instance in which a beneficiary has actually sought an alternative provider, undermining the suggestion that the interests this requirement serves are in fact important, much less compelling enough to outweigh a substantial burden on religious exercise.

Executive Order 13831 chose to eliminate the alternative provider requirement for good reason. This decision avoids tension with the nondiscrimination principle articulated in *Trinity Lutheran* and the Attorney General's Memorandum on Religious Liberty, avoids problems with RFRA that may arise, and fits within the Administration's broader deregulatory agenda. Revising the regulations to require both faith-based organizations and secular organizations to identify alternative providers is unnecessary, as both faith-based organizations and secular organizations are providing secular social services. In some cases, there may not be two secular organizations that offer the same services. In those circumstances, the secular organization should not lose the opportunity to become a grantee by failing to fulfill a condition of the grant imposed through a regulation, if no second organization—secular or religious—is available to serve as an alternative provider. Some secular organizations also may oppose religion altogether and may oppose informing beneficiaries of faith-based organizations as alternative providers. To the extent consistent with controlling Federal law, both faith-based organizations and secular organizations should have the freedom to interact with their beneficiaries in the manner that these organizations choose. Beneficiaries need not rely on providers for information about other secular or faith-based organizations that provide social services. Beneficiaries are consumers of public information and are capable of researching available providers and making informed decisions about whether to choose to receive social services from secular or faith-based organizations. While a situation hypothetically could arise where a beneficiary, due to a sincerely held religious belief, could not enter a particular religious facility to obtain social services, ED is not aware of such a situation occurring. In any event, a beneficiary confronted with such a choice between adhering to religious

beliefs and receiving social services likely would have a right to relief under RFRA. Accordingly, the Department believes the best policy is to eliminate the burden regarding the identification of an alternative provider altogether instead of imposing a similar burden on secular providers, as all providers offer secular social services.

*Other Notice Requirements*

While E.O. 13559's requirement of notice to beneficiaries was limited to notice of alternative providers, parts 75 and 76, as most recently amended, went further than E.O. 13559 by requiring faith-based organizations that provide social services funded with direct Federal funds to give beneficiaries and potential beneficiaries a much broader notice. Parts 75 and 76 require faith-based organizations to provide a notice of nondiscrimination based on religion; that participation in religious activities must be voluntary and separate in time or space from activities funded with direct Federal funds; and that beneficiaries or potential beneficiaries may report violations of these requirements. This extra notice requirement applies only to faith-based organizations and no others. In other words, a secular organization would not be required to provide the notice, whereas a faith-based organization would be—even if the secular and faith-based organizations were providing identical secular social services.

Separate and apart from these notice requirements, the Orders clearly set forth the underlying requirements of nondiscrimination, voluntariness, the holding of religious activities separate in time or place from any federally funded activity, and the right to file complaints of violations. Faith-based providers of social services, like other providers of social services, are required to sign assurances that they will follow the law and the requirements of grants and contracts they receive.[17] There is no basis on which to presume that they are less likely to follow the law than other social service providers. See *McDaniel* v. *Paty,* 435 U.S. 618, 629 (1978) (plurality opinion) ("The American experience provides no persuasive support for the fear that clergymen in public office will be less careful of anti-establishment interests or less faithful to their oaths of civil office than their unordained counterparts.").[18] There is

---

[14] *Trinity Lutheran,* 137 S. Ct. at 2020 (quoting *Everson* v. *Bd. of Educ. of Ewing,* 330 U.S. 1, 16 (1947)) (emphasis added).

[15] *Trinity Lutheran,* 137 S. Ct. at 2019 (citations and internal quotation marks omitted).

[16] *Trinity Lutheran,* 137 S. Ct. at 2024 (quoting *Widmar* v. *Vincent,* 454 U.S. 263, 276 (1981)).

[17] *See, e.g.,* 28 CFR 38.7.

[18] *See Mitchell* v. *Helms,* 530 U.S. 793, 856–57 (2000) (O'Connor, J. concurring in judgment) (noting that in *Tilton* v. *Richardson,* 403 U.S. 672 (1971), the Court's upholding of grants to universities for construction of buildings with the limitation that they only be used for secular

thus no need for prophylactic protections that create administrative burdens on faith-based providers and that are not imposed on other providers.

### Definition of Indirect Federal Financial Assistance

E.O. 13559 directed its Interagency Working Group on Faith-Based and Other Neighborhood Partnerships to propose model regulations and guidance documents regarding, among other things, "the distinction between 'direct' and 'indirect' Federal financial assistance." [19] Following issuance of the Working Group's report, a final rule was issued to amend existing regulations to make that distinction, and to clarify that "organizations that participate in programs funded by indirect financial assistance need not modify their program activities to accommodate beneficiaries who choose to expend the indirect aid on those organizations' programs," need not provide notices or referrals to beneficiaries, and need not separate their religious activities from supported programs.[20] In so doing, the final rule attempted to capture the definition of "indirect" aid that the Supreme Court employed in *Zelman*.[21]

In *Zelman*, the Court concluded that a government funding program is "one of true private choice"—that is, an indirect-aid program—where there is "no evidence that the State deliberately skewed incentives toward religious" providers.[22] The Court upheld the challenged school-choice program because it conferred assistance "directly to a broad class of individuals defined without reference to religion" (*i.e.,* parents of schoolchildren); it permitted participation by both religious and nonreligious educational providers; it allocated aid "on the basis of neutral, secular criteria that neither favor nor disfavor religion"; and it made aid available "to both religious and secular beneficiaries on a nondiscriminatory basis." *Id.* at 653–54 (quotation marks omitted). While the Court noted the availability of secular providers, it specifically declined to make its definition of indirect aid hinge on the "preponderance of religiously affiliated private" providers in the city, as that preponderance arose apart from the program; doing otherwise, the Court concluded, "would lead to the absurd result that a neutral school-choice program might be permissible in some

parts of Ohio, . . . but not in" others.[23] In short, the Court concluded that "[t]he constitutionality of a neutral . . . aid program simply does not turn on whether and why, in a particular area, at a particular time, most [providers] are run by religious organizations, or most recipients choose to use the aid at a religious [provider]." [24]

The final rule issued after the Working Group's report included among its criteria for indirect Federal financial assistance a requirement that beneficiaries have "at least one adequate secular option" for use of the Federal financial assistance.[25] In other words, the rule amended regulations to make the definition of "indirect" aid hinge on the availability of secular providers. A regulation defining "indirect Federal financial assistance" to require the availability of secular providers is in tension with the Supreme Court's choice not to make the definition of "indirect aid" hinge on the geographically varying availability of secular providers. The Supreme Court's elucidation in *Zelman* and *Trinity Lutheran* and an impetus to recalibrate the concept of "indirect" aid prompted the Department's policy change. Thus, it is appropriate to amend existing regulations to bring the definition of "indirect" aid more closely into line with the Supreme Court's definition in *Zelman.*

### Overview of Proposed Rule

The purpose of these proposed amendments is to implement Executive Order 13831 and conform more closely to the Supreme Court's current First Amendment jurisprudence; relevant Federal statutes such as RFRA; Executive Order 13279, as amended by Executive Orders 13559 and 13831; and the Attorney General's Memorandum on Religious Liberty. The Secretary proposes to amend part 3474 of title 2 of the Code of Federal Regulations and parts 75, 76, 106, 606, and 607 of title 34 of the Code of Federal Regulations. Title 2 CFR part 3474 pertains to Uniform Administrative Requirements, 34 CFR part 75 of EDGAR pertains to Direct Grant Programs, and 34 CFR part 76 of EDGAR pertains to State-Administered Formula Grant Programs. The regulations in 34 CFR part 106 address discrimination on the basis of sex in education programs or activities receiving Federal financial assistance, and the Secretary has authority to regulate with regard to discrimination on the basis of sex in such programs

under 20 U.S.C. 1682. The regulations in 34 CFR part 606 pertain to the Developing Hispanic-Serving Institutions program, and the regulations are proposed under 20 U.S.C. 1101, *et seq.,* which grants the Secretary program authority to provide grants and related assistance to Hispanic-serving institutions to enable such institutions to improve and expand their capacity to serve Hispanic students and low-income individuals. The regulations in 34 CFR part 607 pertain to the Strengthening Institutions Program, and the regulations are proposed under 20 U.S.C. 1057, *et seq.,* which grants the Secretary authority to carry out a program to improve the academic quality, institutional management, and fiscal stability of eligible institutions to increase their self-sufficiency and strengthen their capacity to make a substantial contribution to the higher education resources of the nation. The regulations in 34 CFR part 608 pertain to the Strengthening Historically Black Colleges and Universities Program, and the regulations are proposed under 20 U.S.C. 1060 through 1063c, which grants the Secretary authority to provide grants to such colleges and universities to improve and expand their capacity to serve Black students and low-income individuals. The regulations in 34 CFR part 609 pertain to the Strengthening Historically Black Graduate Institutions Program, and these regulations also are proposed under 20 U.S.C. 1060 through 1063c, which grants the Secretary authority to provide grants to such graduate institutions to improve and expand their capacity to serve Black students and low-income individuals. In addition to these authorities, the Secretary also has general authority under 20 U.S.C. 1221e–3 and 20 U.S.C. 3474 to promulgate regulations governing the Department's applicable programs and to manage the functions of the Department.

Consistent with these authorities, this proposed rule would amend parts 75 and 76 to conform to Executive Order 13279 and align with *Trinity Lutheran* and the Memorandum on Religious Liberty, by deleting the requirement that a faith-based social services provider must refer beneficiaries objecting to receiving services from them to an alternative provider.

This proposed rule would also make clear that a faith-based organization that participates in Department-funded programs or services shall retain its autonomy; right of expression; religious character; and independence from Federal, State, and local governments. It would further clarify that none of the

---

educational purposes "demonstrate[d] our willingness to presume that the university would abide by the secular content restriction.").

[19] 75 FR 71319, 71321 (2010).

[20] 81 FR 19355, 19358 (2016).

[21] *See* 81 FR 19355, 19361–62 (2016).

[22] *Id.* at 650.

[23] *Id.* at 656–58.

[24] *Id.* at 658.

[25] *See* 81 FR 19355, 19407–19426 (2016).

guidance documents that the Department or any State or local government uses in administering the Department's financial assistance shall require faith-based organizations to provide assurances or notices where similar requirements are not imposed on secular organizations, and that any restrictions on the use of grant funds shall apply equally to faith-based and secular based organizations.

This proposed rule would additionally require that the Department's notices or announcements of award opportunities and notices of awards or contracts include language clarifying the rights and obligations of faith-based organizations that apply for and receive Federal funding. The language will clarify that, among other things, faith-based organizations may apply for awards on the same basis as any other organization; that the Department will not, in the selection of recipients, discriminate against an organization on the basis of the organization's religious exercise or affiliation; and that a faith-based organization that participates in a federally funded program retains its independence from the government and may continue to carry out its mission consistent with religious freedom protections in Federal law, including the Free Speech and Free Exercise clauses of the Constitution.

The proposed rule would directly refer to the definition of "religious exercise" in RFRA and would amend the definition of "indirect Federal Financial assistance" to align more closely with the Supreme Court's definition in *Zelman.*

The proposed rule would also amend 34 CFR 606.10 and 34 CFR 607.10 by removing language that prohibits use of funds for otherwise allowable activities, if they merely relate to "religious worship" and "theological subjects," and replacing it with language that more narrowly defines the limitations. The proposed rule would add paragraph (c) to 34 CFR 106.12 and provide a non-exhaustive list of criteria that offers educational institutions different methods to demonstrate that they are eligible to claim an exemption to the application of Title IX, 20 U.S.C. 1681, and its implementing regulations to the extent Title IX and its implementing regulations would not be consistent with the institutions' religious tenets or practices.

### Background—Part 2 (Free Inquiry)

On March 21, 2019, President Trump signed E.O. 13864, Improving Free Inquiry, Transparency, and Accountability at Colleges and Universities.[26] In response to this Executive order, as well as the First Amendment and the Secretary's general authority under 20 U.S.C. 1221e–3, the Secretary endeavors to ensure that all institutions of higher education, as defined in 20 U.S.C. 1002(a), that receive Federal research or education grants, as defined in E.O. 13864,[27] from the Department actually "promote free inquiry." [28] These proposed regulations are also consistent with the sense of Congress expressed in various Federal statutes such as title IV of the Higher Education Act of 1965 (HEA) [29] and the Equal Access Act (EAA).[30] Because the act and the impact of institutional denial of free inquiry is deleterious at all institutions of higher education, the proposed regulations apply to all such institutions that receive Federal research and education grants. The Secretary, therefore, proposes regulations requiring public institutions to comply with the First Amendment to the U.S. Constitution as a material condition for receiving research and education grants; and requiring private institutions to comply with their own stated institutional policies regarding freedom of speech, including academic freedom, as a material condition for receiving research and education grants.[31] As previously stated, an institution of higher education means an institution of higher education as defined in 20 U.S.C. 1002(a). Under the proposed regulations, if there is a final, non-default judgment that an institution of higher education has violated those requirements, the Department will consider the grantee to be in violation of a material condition of the grant and may pursue available remedies for noncompliance, which include suspension or termination of a Federal award and potentially debarment.[32] Specifically, the Secretary proposes to amend parts 75 and 76 of title 34 of the Code of Federal Regulations. Part 75 of EDGAR pertains to Direct Grant Programs, and part 76 of EDGAR pertains to State-Administered Formula Grant Programs.

Both E.O. 13864 and the proposed regulations are intended to promote the First Amendment's guarantees of free expression and academic freedom, as the courts have construed them; to align with Federal statutes to protect free expression in schools; [33] and to protect free speech on campuses nationwide. Under the Supreme Court's First Amendment jurisprudence protecting the individual's right to his own ideas and beliefs, "no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." [34] As a result, officials at public institutions may not abridge their students' or employees' expressions, ideas, or thoughts.[35] In a landmark opinion, *Tinker* v. *Des Moines Ind. Comm. Sch. Dist.* (1969), the Supreme Court stated more than half a century ago that "[i]t can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." [36]

In a significant opinion, *Keyishian* v. *Bd. of Regents of the Univ. of the State of N.Y.* (1967), the Supreme Court observed, "Our Nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us and not merely to the teachers concerned. That freedom is therefore a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom." [37] Consequently, the First Amendment right of free expression means that public officials may not discriminate against students or employees based on their viewpoints.[38] Under Supreme Court precedent, these principles dictate that public institutions violate the First Amendment if they charge groups excessive security costs "simply because [these groups and their speakers] might offend a hostile mob." [39]

With respect to private institutions, academic freedom is another aspect of freedom of speech. "Freedom of speech secures freedom of thought and

---

[26] 84 FR 11,402.

[27] E.O. 13864, § 3(c) defines "federal research or education grants" as "all funding provided by a covered agency directly to an institution but do not include funding associated with Federal student aid programs that cover tuition, fees, or stipends."

[28] *Id.* (§ 3(a))

[29] 20 U.S.C. 4071.

[30] 20 U.S.C. 4071.

[31] The manner in which the Department of Education implements E.O. 13864 does not bind or affect how other Federal agencies implement this Executive Order.

[32] 34 CFR 75.901 (cross-referencing 2 CFR 200.338); 2 CFR 180.800.

[33] 20 U.S.C. 1011a; 20 U.S.C. 4071.

[34] *W. Va. State Bd. of Educ.* v. *Barnette,* 319 U.S. 624, 642 (1943).

[35] *Tinker* v. *Des Moines Ind. Comm. Sch. Dist.,* 393 U.S. 503, 505–07 (1969).

[36] *Id.* at 506.

[37] 385 U.S. 589, 603.

[38] *See, e.g., Rosenberger* v. *Rector & Visitors of Univ. of Va.,* 515 U.S. 819, 829–30 (1995).

[39] *Forsyth Cty., Ga.* v. *Nationalist Mov't,* 505 U.S. 123, 134–35 (1992); *see also College Republicans of the Univ. of Wash.* v. *Cauce,* No. C18–189–MJP, 2018 WL 804497 (W.D. Wash. Feb. 9, 2018) (holding University of Washington Security Fee Policy violates the students' First Amendment rights to freedom of speech and expression).

belief.'' [40] Academic freedom is an indispensable aspect of the ''freedom of thought and belief'' to which individuals across educational institutions, including private ones, are entitled.[41] It follows that academic freedom is intertwined with, and is a predicate to, freedom of speech itself; and injury to one is tantamount to injury to both. Academic freedom's noble premise is that the vigilant protection of free speech unshackled from the demands and constraints of censorship will help generate new thoughts, ideas and knowledge and even questions and doubts about hitherto undisputed ideas. While academic freedom's high utilitarian value derives itself from the fact that its ''results . . . are to the general benefit in the long run,'' academic freedom is also inherently important because its flourishing inherently is worth defending in a free society.[42]

Academic freedom, just like freedom of speech itself, is predicated on the principle that thoughts, arguments and ideas should be expressed by individuals and assessed by listeners on their own merit, rather than the censor's coercion. Academic freedom insists on the freedom of and on the power of speech so that the speaker has a fair opportunity to convince the listener of an idea and the listener a fair opportunity to thus be persuaded. This insistence on evaluating ideas on the merit of their strength is the highest tribute we pay one another. This preservation of academic freedom is also a ''lesson'' we endeavor ''to carry . . . onward as we seek to preserve and teach the necessity of freedom of speech for the generations to come,'' especially at educational institutions.[43] This homage is the reason that the cultural ethos of academic freedom has set the United States apart as a beacon of freedom in the community of nations for centuries, against the austere challenge we have always faced and may continue to face from ''relentless authoritarian regimes . . . in their attempts to stifle free speech.'' [44]

The confluence of free speech and academic freedom is nothing new as far as the United States' educational institutions are concerned. As Yale

University, a private American institution of higher learning, acknowledged almost half a century ago: Because ''[t]he primary function of a university is to discover and disseminate knowledge by means of research and teaching,'' ''the university must do everything possible to ensure within it the fullest degree of *intellectual freedom.*'' [45] Yale further deduced that ''[t]he history of intellectual growth and discovery clearly demonstrates the need for unfettered freedom, the right to think the unthinkable, discuss the unmentionable, and challenge the unchallengeable.'' [46] When free speech is suppressed, academic freedom is the casualty many times over, ''for whoever deprives another of the right to state unpopular views necessarily also deprives others of the right to listen to those views.'' [47] Neither harm is tolerable, and the proposed regulations endeavor to protect academic freedom, as a part of free speech, across recipient institutions.

E.O. 13864 and the proposed regulations are also aligned with Federal statutes to protect free inquiry. Illustratively, Congress has expressed that ''no student attending an institution of higher education . . . should, on the basis of participation in protected speech or protected association, be excluded from participation in, be denied the benefits of, or be subjected to discrimination or official sanction under [numerous] education program[s], activit[ies], or division[s] of the institution[s] directly or indirectly receiving financial assistance.'' [48] Congress has also articulated that ''an institution of higher education should facilitate the free and open exchange of ideas'', and ''students should not be intimidated, harassed, discouraged from speaking out, or discriminated against'' on account of their speech, ideas or expression.[49] For public secondary schools receiving Federal financial assistance, Congress has made it ''unlawful for any [such institution,] . . . which has a limited open forum[,]

to deny equal access or a fair opportunity to, or discriminate against, any students who wish to conduct a meeting within that limited open forum on the basis of the religious, political, philosophical, or other content of the speech at such meetings.'' [50] Since 1871, Congress has made actionable violations of the First Amendment by those acting in an official government capacity, whether on campuses or elsewhere.[51] Congress, thus, disapproves of the suppression of or discrimination against ideas in the academic setting.

Courts repeatedly have been called upon to vindicate the rights of dissident campus speakers, who do not necessarily share the views of the majority of campus faculty, administrators, or students. Otherwise, the censorship and suppression of the speech of faculty, other employees, and students would go unredressed. For instance, when a public university, the University of North Carolina Wilmington, denied a promotion to a professor because he had authored newspaper columns about academic freedom, civil rights, campus culture, sex, feminism, abortion, homosexuality, and religion, he sued the university and won.[52] The United States Court of Appeals for the Fourth Circuit concluded that the professor's ''speech was clearly that of a citizen speaking on a matter of public concern'' and, thus, was entitled to constitutional protection.[53] Furthermore, the United States District Court for the Southern District of California recently held that California State University San Marcos had violated the First Amendment by committing viewpoint discrimination against the pro-life student organization, Students for Life, when allocating grants from the university's mandatory student fee.[54]

Even cases that have settled demonstrate there is a pervasive problem of the denial of free speech rights across American college campuses. For instance, the Yosemite Community College District and its administrators settled a First Amendment lawsuit filed by a student whom a constituent college of that District had stopped from handing out copies of the United States Constitution on Constitution Day in a public part of

---

[40] *Nat'l Inst. of Family and Life Advocates* v. *Becerra,* 138 S.Ct. 2361, 2379 (2018) (*NIFLA*) (Kennedy, J., concurring).

[41] *Id.*

[42] Chairman's Letter to the Fellows of the Yale Corporation, Report of the Committee on Freedom of Expression at Yale, Yale University (Dec. 23, 1974) (Yale Report on Freedom of Expression).

[43] *NIFLA,* 138 S.Ct. at 2379 (Kennedy, J., concurring).

[44] *Id.*

[45] Yale Report on Freedom of Expression, *supra* (emphasis added).

[46] *Id.*

[47] *Id.*

[48] 20 U.S.C. 1011a. In the same section, Congress has defined ''protected speech'' as ''speech that is protected under the first and 14th amendments to the Constitution, or would be protected if the institution of higher education involved were subject to those amendments''; and has defined ''protected association'' as ''the joining, assembling, and residing with others that is protected under the first and 14th amendments to the Constitution, or would be protected if the institution of higher education involved were subject to those amendments.'' 20 U.S.C. 1011a(c)(2)–(3).

[49] 20 U.S.C. 1011a(2)(C)–(D).

[50] 20 U.S.C. 4071(a).

[51] 42 U.S.C. 1983.

[52] *See Adams* v. *Tr. of the Univ. of N.C.-Wilmington,* 640 F.3d 550 (4th Cir. 2011).

[53] *Id.* at 565.

[54] *See Apodaca, et al.* v. *White, et al.,* 2019 WL 3803698 (S.D. Cal. August 13, 2019).

**3198**    **Federal Register** / Vol. 85, No. 12 / Friday, January 17, 2020 / Proposed Rules

campus.[55] And the University of California at Berkeley settled a high-profile lawsuit in December 2018 when it became clear that the university selectively had deployed its vague policies to prevent conservative groups from bringing to campus speakers harboring ideas the university administration just did not like.[56]

To be certain, the Secretary will honor the institutional mission of private institutions, including their religious mission. To this end, the proposed regulations do not require a private institution to ensure freedom of speech (unless it chooses to do so through its own stated institutional policies). It follows that religiously affiliated institutions, in freely exercising their faith, define their free speech policies as they choose in a manner consistent with their mission. Assuredly, the proposed regulations do not mandate that religiously affiliated institutions adopt such policies in order to participate in the Department's grants and programs. In other words, the proposed regulations do not impose a requirement to adopt a campus free speech policy akin to the First Amendment if doing so would force the school to compromise its Free Exercise Clause guarantee.

Viewed in this light, well-established case law provides that private institutions, although not bound by the First Amendment because they are not state actors,[57] must comply with their stated institutional policies regarding freedom of speech and must deliver on any promised protections through which they attracted at least some students and employees.[58] Breaching

their stated institutional policies can subject a private institution to various private causes of action sounding in both contract and tort, such as breach of contract, negligence, fraud and misrepresentation.[59] As a result, private institutions that mislead prospective students and employees about free expression on their campuses can be held liable in the same way they can be held liable for misrepresenting their academic, cultural, or athletic offerings.[60]

The suppression of free inquiry is a concrete, real harm on campuses today, just as viewpoint discrimination has become an "increasingly prevalent" "poison" to society generally.[61] Some

academic administrators may believe they are doing what's right, that quieting unsavory opinions will lead to a more calm, productive learning environment. But this misperception is one that has allowed hecklers to veto protected First Amendment speech. Instead, under the American democratic system, more speech is the appropriate means to combat ideas and philosophies with which we disagree. And the hecklers and disrupters, to the extent they are violent, are the ones that should be restrained.[62] But more speech and expression is the appropriate means to combat ideas and philosophies with which we disagree. That is the essence of "preserv[ing]" debate and discourse across the "uninhibited marketplace of ideas in which truth will ultimately prevail." [63] By materially conditioning Federal research and education grants on institutional respect for free inquiry, the Department's proposed regulations would help preserve the freedoms, as promised under the First Amendment and in institutional policies, that we cherish and that are essential to education.

When suppressing speech, academic administrators set a detrimental example denigrating free inquiry across the societal spectrum and signaling others to do so. As Justice Brandeis perceptively reminded us almost a century ago, were the authorities to become "lawbreaker[s]," they would "breed[ ] contempt for law;" they would "invite[ ] every man to become

---

[55] *See Van Tuinen* v. *Yosemite Cmty. Coll. Dist. et al.,* Case No. 1:13-at-00729 (E.D. Cal. 2013) (Complaint); *Victory: Modesto Junior College Settles Student's First Amendment Lawsuit,* Foundation for Individual Rights in Education (FIRE), *available at www.thefire.org/victory-modesto-junior-college-settles-students-first-amendment-lawsuit/.*

[56] *See Young America's Found. & Berkeley Coll. Republicans* v. *Napolitano, et al.,* Case No. 3:17-cv-02255 (N.D. Cal. 2017) (Amended Complaint); *see also id.* (Doc. No. 44) (Statement of Interest by the United States Department of Justice, stating that the University of California at Berkeley policies violated the First Amendment); Jonathan Stempel, *UC Berkeley settles lawsuit over treatment of conservative speakers,* Reuters, Dec. 3, 2018, *available at www.reuters.com/article/us-california-lawsuit-ucberkeley/uc-berkeley-settles-lawsuit-over-treatment-of-conservative-speakers-idUSKBN1O22K4.*

[57] *See Manhattan Cmty. Access Corp.* v. *Halleck,* 139 S.Ct. 1921, 1928 (2019) ("[T]he Free Speech Clause prohibits only governmental abridgment of speech. The Free Speech Clause does not prohibit private abridgment of speech.") (citing *Denver Area Ed. Telecomm. Consortium, Inc.* v. *FCC,* 518 U.S. 727, 737 (1996) (plurality opinion); *Hurley* v. *Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.,* 515 U.S. 557, 566 (1995); *Hudgens* v. *NLRB,* 424 U.S. 507, 513 (1976)).

[58] *See, e.g., Dixon* v. *Ala. State Bd. of Educ.,* 294 F.2d 150, 157 (5th Cir. 1961), *cert. denied,* 368 U.S.

930 (1961); *Kashmiri* v. *Regents of Univ. of Calif.* (2007) 156 Cal. App. 4th 809, 824; *Zumbrun* v. *Univ. of S. Calif.* (1972) 25 Cal.App.3d 1, 10–11; *Searle* v. *Regents of Univ. of Calif.* (1972) 23 Cal.App.3d 448, 452;; *Univ. of Miami* v. *Militana,* 184 So.2d 701, 703–04 (Fla.App. 1966); *Anthony* v. *Syracuse Univ.* (1928) 224 App.Div. 487, 489–490 [231 N.Y.S. 435, 438–439]; *John B. Stetson Univ.* v. *Hunt,* 88 Fla. 510, 517 (1925); *Barker* v. *Tr. of Bryn Mawr Coll.,* 278 Pa. 121, 122 (1923); *Goldstein* v. *New York Univ.* (1902) 76 App.Div. 80, 82–83 [78 N.Y.S. 739, 740]; *People ex rel. Cecil* v. *Bellevue Hosp. Med. Coll.* (1891) 60 Hun 107 [14 N.Y.S. 490], *aff'd,* 128 N.Y. 621 [28 NE 253].

[1] *See Kashmiri,* 156 Cal. App. 4th at 824 (quoting *Andersen* v. *Regents of Univ. of Calif.* (1972) 22 Cal.App.3d 763, 769).

[59] *See, e.g., Kashmiri,* 156 Cal. App. 4th at 824; J. Douglas Drushal, *Comment: Consumer Protection and Higher Education—Student Suits Against Schools,* 37 Oh. State L. J. 608, 611–22 (1976).

[60] *See, e.g., Greene,* 271 F.Supp. at 613 (recognizing that assurances given in university catalog are "part of the contract" the student may invoke); *Dixon,* 294 F.2d at 157; *Kashmiri,* 156 Cal. App. 4th at 824 (recognizing that "the basic legal relationship between a student and a private university is contractual in nature"); *Zumbrun,* 25 Cal.App.3d at 10–11 ("The basic legal relation between a student and a private university or college is contractual in nature. The catalogues, bulletins, circulars, and regulations of the institution made available to the matriculant become a part of the contract."); *Searle,* 23 Cal.App.3d at 452 (recognizing "that students have certain contractual rights" in relation to the university); *Militana,* 184 So.2d at 703–04 (stating that "the terms and conditions . . . offered by the publications of the college . . . have some of the characteristics of a contract between the parties, and are sometimes subject to civil remedies in courts of law"); *Anthony,* 224 App.Div. at 489–90 ("Under ordinary circumstances and conditions a person matriculating at a university establishes a contractual relationship . . ."); *John B. Stetson Univ.,* 88 Fla. at 517 ("The relation between a student and an institution of learning privately conducted . . . is solely contractual in character . . ."); *Barker,* 278 Pa. at 122 (same); *Goldstein,* 76 App.Div. at 82–83 (stating that assurances given in a university circular become part of the contract the student may invoke); *Bellevue Hosp. Med. Coll.,* 60 Hun at 107 (same).

[61] *Iancu* v. *Brunetti,* 139 S. Ct. 2294, 2302 (2019) (Alito, J., concurring) ("Viewpoint discrimination is poison to a free society. But in many countries with constitutions or legal traditions that claim to protect freedom of speech, serious viewpoint discrimination is now tolerated, and such discrimination has become increasingly prevalent in this country."); *see also* Cliff Maloney, Jr.,

*Colleges Have No Right to Limit Students' Free Speech,* Time, Oct. 13, 2016, *https://time.com/4530197/college-free-speech-zone/* (Maloney, *No Right*) ("University campuses are now home to a plethora of speech restrictions. From sidewalk-sized 'free-speech zones' to the criminalization of microaggressions, America's college campuses look and feel a lot more like an authoritarian dictatorship than they do the academic hubs of the modern free world. When rolling an inflated free-speech ball around campus, students at the University of Delaware were halted by campus police for their activities. A Young Americans for Liberty leader at Fairmont State University in West Virginia was confronted by security when he was attempting to speak with other students about the ideas he believes in. A man at Clemson University was barred from praying on campus because he was outside of the free-speech zone. And a student at Blinn College in Texas abolished her campus' free-speech zone in a lawsuit after administrators demanded she seek special permission to advocate for self-defense.").

[62] *See, e.g.,* Hayden Williams, *I was assaulted at Berkeley because I'm conservative. Free speech is under attack,* USA Today, Mar. 6, 2019, *available at www.usatoday.com/story/opinion/voices/2019/03/06/berkeley-conservative-students-campus-college-bias-punch-column/3065895002/;* Elizabeth Llorente, *Felony charges filed against alleged attacker of conservative activist at UC-Berkeley,* Fox News, Mar. 5, 2019, *available at www.foxnews.com/us/felony-charges-filed-against-alleged-attacker-of-conservative-activist-at-uc-berkeley.*

[63] *NIFLA,* 138 S.Ct. at 2374 (citations and internal quotation marks omitted).

a law unto himself;'' they would ''invite[ ] anarchy'' and, as a corollary, violence.[64] Suppressed thought and expression are the casualties of the expression-suppressing environment currently prevailing, as evinced, in many institutions.[65] To this end, institutions may not invoke academic freedom selectively and conveniently.[66] Thought suppression on campus is inconsistent with the time-honored principle that freedom of expression, including academic freedom, exists not just for the institutions but also for the students and employees who are part of the educational community.[67] Indeed, the Supreme Court has reminded us that ''[t]he vigilant protection of [such] freedoms is nowhere more vital than in the community of American schools,'' in order to secure the free-expression rights of '' *all* persons, no matter what their calling.' ''[68]

Both E.O. 13864 and the Secretary's proposed regulations are carefully designed to preserve free-inquiry protections. The Secretary has general authority under 20 U.S.C. 1221e–3 and 20 U.S.C. 3474 to promulgate regulations governing the Department's applicable programs and to manage the functions of the Department. The proposed amendments would: (1) Require public institutions that receive a Direct Grant or subgrant from a State-Administered Formula Grant program of the Department to comply with the First Amendment to the U.S. Constitution, as

a material condition of the grant; (2) require private institutions that receive a Direct Grant or subgrant from a State-Administered Formula Grant program of the Department to comply with stated institutional policies regarding freedom of speech, including academic freedom, as a material condition of the grant; and (3) require public institutions that receive a Direct Grant or subgrant from a State-Administered Formula Grant program of the Department not to deny to a religious student organization at the public institution any right, benefit, or privilege that is otherwise afforded to other student organizations at the institution, as a material condition of the grant.

## Summary of Proposed Changes—Part 1 (Religious Liberty)

The proposed regulations would—
• Amend 2 CFR 3474.15 by removing procurement and contracting requirements that apply only to faith-based entities; refer to ''religious exercise'' rather than ''religious character''; require the Department to add notices detailing protections for religious exercise to all its notices or announcements of awards and funding opportunities; prohibit the Department from establishing requirements that apply only to faith-based organizations; clarify that a faith-based organization that contracts with a grantee or subgrantee does not forfeit its independence, autonomy, right of expression, religious character, or authority over its governance nor does it lose protections outlined in the Attorney General's Memorandum on Religious Liberty; clarify that faith-based organizations that contract with a grantee or subgrantee maintain the right to select board members and employees; and clarify that none of the protections in the proposed regulations are meant to advantage one religion over another.
• Add § 3474.21, which would provide that the provisions of these subparts are severable.
• Amend 34 CFR 75.51, by adding language that would not require application for tax-exempt status under section 501(c)(3) of the Internal Revenue Code. If an entity has a sincerely-held religious belief that it cannot apply for status as a 501(c)(3) tax-exempt entity, it may provide evidence sufficient to establish that the entity would otherwise qualify as a nonprofit organization under the Department's criteria in 34 CFR 75.51(b)(1) through (b)(4).
• Amend 34 CFR 75.52 and 76.52 by removing language that presumes faith-based entities are less likely than other social service providers to follow the

law; adding requirements that the Department include language that clarifies religious freedom protections in all its notices and announcements of awards and that is substantially similar to that in proposed Appendices A and B, as revised; adding language that ensures no extra burden will be placed on faith-based organizations that is not also placed on secular organizations; adding language that does not disqualify an otherwise eligible entity from participating in a Department program merely because the entity is faith-based; clarifying the definitions of ''direct'' and ''indirect Federal financial assistance,'' ''pass-through entity,'' and ''religious exercise''; clarifying that a faith-based organization that contracts with a grantee or subgrantee does not forfeit its independence, autonomy, right of expression, religious character, and authority over its governance nor does it lose protections outlined in the Attorney General's Memorandum on Religious Liberty; clarifying that faith-based organizations that contract with a grantee or subgrantee maintain the right to select their board members and employees; and clarifying that none of the specified protections are meant to advantage one religion over another.
• Add §§ 75.63 and 76.53, which would provide that the provisions of these subparts are severable.
• Eliminate written notice and referral requirements in §§ 75.712, 75.713, 76.712, and 76.713, which require that faith-based providers, but not other providers, give notice of the right to an alternative provider.
• Amend §§ 75.714 and 76.714 to conform with the elimination of §§ 75.712, 75.713, 76.712, and 76.713 and remove references thereto; add language requiring compliance with Appendices A and B of parts 75 and 76; and change ''intermediary'' to ''pass-through entity.''
• Revise Appendix A and add Appendix B to parts 75 and 76. Appendices A and B detail religious freedom protections and prohibit discrimination against faith-based organizations in the Department's grant and subgrant programs.
• Add §§ 75.741 and 76.741, which would provide that the provisions of these subparts are severable.
• Add § 106.12(c) to provide a non-exhaustive list of criteria that offers educational institutions different methods to demonstrate that they are eligible to claim an exemption to the application of Title IX, 20 U.S.C. 1681, and its implementing regulations to the extent Title IX and its implementing regulations would not be consistent

---

[64] *Olmstead* v. *U.S.*, 277 U.S. 438, 468 (1928) (Brandeis, J., dissenting), *overruled by Katz* v. *U.S.*, 389 U.S. 347 (1967).

[65] *See, e.g., Iancu*, 139 S. Ct. at 2302; Maloney, *No Right, supra.*

[66] Notably, if institutions invoke academic freedom to preserve their right to shape their own campus demographics, along with pursuing other administrative pursuits, they surely must permit their students, faculty, and staff to invoke its protections too. These institutions may not claim academic freedom for themselves while refusing to let their students, faculty, and staff do the same. *See, e.g.,* Brief for Respondents 25, *Fisher* v. *Univ. of Tex. at Austin*, 136 S.Ct. 2198 (2016) (*Fisher II*) (contending that ''a university is entitled to make an *academic judgment* . . . that the pursuit of [racial] diversity is integral to its [educational] mission.'') (emphasis added; and citations and internal quotation marks omitted); Brief for the Patterson Respondents 16, 37–38, *Gratz* v. *Bollinger*, 539 U.S. 244 (2003) (defending racial preferences in admissions as ''consistent with the *academic freedoms* accorded to universities to determine their own selection processes, which is recognized as a special concern to the First Amendment.'') (emphasis added).

[67] *See generally Tinker* v. *Des Moines Ind. Comm. Sch. Dist.*, 393 U.S. 503 (1969) (vindicating free-speech rights of students under First Amendment); *Pickering* v. *Bd. of Educ.*, 391 U.S. 563 (1968) (same for teachers).

[68] *Shelton* v. *Tucker*, 364 U.S. 479, 487 (1960) (quoting *Wieman* v. *Updegraff*, 344 U.S. 183, 195 (1952) (Frankfurter, J., concurring)) (emphasis added).

with the institutions' religious tenets or practices.

• Amend §§ 606.10, 607.10, 608.10, and 609.10 by removing language that prohibits use of funds for otherwise allowable activities if they merely relate to "religious worship" and "theological subjects" and replace it with language that more narrowly defines the limitations.

• Add §§ 606.11, 607.11, 608.12, and 609.12, which would provide that the provisions of these subparts are severable.

## Summary of Proposed Changes—Part 2 (Free Inquiry)

The proposed regulations would—

• Amend §§ 75.500 and 76.500 by adding language that would require grantees that are public institutions to comply with the First Amendment to the U.S. Constitution, require grantees that are private institutions to comply with stated institutional policies regarding freedom of speech, including academic freedom; and require grantees that are public institutions to treat religious student organizations the same as secular student organizations.

• Add §§ 75.684 and 76.684, which would provide that the provisions of these subparts are severable.

• Amend §§ 75.700 and 76.700 to conform with the changes made in §§ 75.500 and 76.500.

• Add §§ 75.741 and 76.784, which would provide that the provisions of these subparts are severable.

## Significant Proposed Regulations

We discuss substantive issues under the sections of the proposed regulations to which they pertain. Generally, we do not address proposed regulatory provisions that are technical or otherwise minor in effect.

## Significant Proposed Regulations—Part 1 (Religious Liberty)

2 CFR 3474.15 Contracting With Faith-Based Organizations and Nondiscrimination

*Current Regulations:* Paragraph (a) of 2 CFR 3474.15 establishes responsibilities that grantees and subgrantees have in selecting contractors to provide direct Federal services under a program of the Department and impose burdens on faith-based organizations but not secular organizations, such as the burden of identifying an alternative provider. Paragraph (b) of 2 CFR 3474.15 states that a faith-based organization is eligible to contract with grantees and subgrantees, including States, on the same basis as any other private

organization. Paragraph (c) of 2 CFR 3474.15 describes additional burdens such as referral requirements and written notice requirements imposed on faith-based organizations that receive direct Federal financial assistance but not secular organizations that receive this same Federal financial assistance. Paragraph (d) of 2 CFR 3474.15 requires a private organization that engages in explicitly religious activities, such as religious worship, instruction, or proselytization, to offer those activities separately in time or location from any programs or services supported by a contract with a grantee or subgrantee. Paragraph (e) of 2 CFR 3474.15 confirms that a faith-based organization that contracts with a grantee or subgrantee, including a State, may retain its independence, autonomy, right of expression, religious character, and authority over its governance. Paragraph (f) prohibits a private organization that receives a grant or subgrant under a program of the Department from discriminating against beneficiaries or prospective beneficiaries on the basis of religion. Paragraph (g) addresses a religious organization's exemption from the Federal prohibition on employment discrimination on the basis of religion.

*Proposed Regulations:* The proposed revisions to paragraph (a) eliminate the additional burdens imposed on faith-based organizations but not secular organizations and also clarify that grantees and subgrantees must ensure compliance by their subgrantees with the provisions of 2 CFR 3474.15 and any implementing regulations or guidance. The revisions proposed to paragraph (b)(1) of these regulations clarify that faith-based organizations are eligible to participate in the Department's grant programs on the same basis as any other private organization considering any permissible accommodation consistent with Federal law. The proposed revisions to paragraph (b)(2) provide that a notice or announcement of award opportunities and a notice of award or contract should contain language substantially similar to proposed Appendix A and Appendix B, respectively. The proposed regulations add paragraph (b)(3), which provides that no grant document, agreement, covenant, memorandum of understanding, policy, or regulation shall require faith-based organizations to provide assurance or notices where they are not required of non-faith-based organizations. Proposed paragraph (b)(3) also provides that all organizations, including faith-based organizations, must adhere to all program requirements, including those

prohibiting the use of direct Federal financial assistance to engage in explicitly religious activities. Proposed paragraph (b)(4) similarly provides that the Department cannot use any grant document, agreement, etc., to disqualify faith-based organizations from applying for or receiving grants because the organization is motivated or influenced by religious faith to provide social services.

With respect to paragraph (c)(1), the proposed regulations keep the requirement that faith-based organizations not use the grant for religious worship, religious instruction, and proselytization and remove other burdens imposed on faith-based organizations but not secular organizations such as referral requirements. There are no revisions to paragraph (c)(2).

There are only minor, stylistic revisions but no substantive revisions to paragraph (d)(1), which requires a private organization that receives direct Federal financial aid and engages in explicitly religious activities to engage in those activities at a separate time or location from any programs or services funded by a grant from the Department. There are no revisions to paragraph (d)(2).

We add a sentence to paragraph (e)(1) to provide that a faith-based organization retains the protections of law described in the Attorney General's Memorandum on Religious Liberty. We also clarify in paragraph (e)(2) that a faith-based organization that applies for or receives a grant under a program of the Department is not required to conceal religious art, icons, scriptures, etc., from its facilities and may select its board members and employees on the basis of their acceptance of or adherence to the religious tenets of the organization.

We clarify in paragraph (f) that a faith-based organization that receives indirect Federal financial assistance is not required to modify its program activities to accommodate a beneficiary who chooses to expend the indirect aid on the organization's program and may require attendance at all activities that are fundamental to the program.

We propose adding a sentence at the end of paragraph (g) to clarify that an organization qualifying for an exemption from the Federal prohibition on employment discrimination on the basis of religion may select its employees on the basis of their acceptance or adherence to the religious tenets of the organization.

Finally, we propose adding paragraph (h) to provide that the Department will not advantage or disadvantage one

religion over another and will not advantage or disadvantage one religion in favor of a secular organization.

*Reasons:* In *Trinity Lutheran Church of Columbia, Inc.* v. *Comer,* the Supreme Court held that laws and policies may provide benefits in a way that is neutral and generally applicable without regard to religion, but policies that single out the religious for disfavored treatment violate the Free Exercise Clause.[69] The revisions to § 3474.15 remove references to regulations that impose additional burdens on faith-based organizations but not on secular organizations, such as the alternative provider requirement and related notice. These revisions codify well-settled First Amendment jurisprudence that establishes that faith-based organizations should neither suffer a disadvantage nor gain an advantage due to their religious character.

These proposed regulations also seek to address and prevent any confusion about the ability of faith-based organizations to qualify for Department grants. Consistent with the First Amendment and RFRA, these revisions provide that a faith-based organization is eligible to contract with grantees and subgrantees, including States, on the same basis as any other private organization, with respect to contracts for which such other organizations are eligible and considering any permissible accommodation. The revisions to § 3473.15 further clarify that faith-based organizations do not lose the protection of the laws described in the Attorney General's Memorandum on Religious Liberty by accepting Federal financial assistance. For example, these faith-based organizations may continue to select board members and hire employees based on their adherence to the religious tenets of the organization.

The Secretary also proposes changes to § 3474.15 for the reasons stated in "Background—Part 1 (Religious Liberty)" and for the following reasons:

Section 3474.15(a) is proposed to be changed in order to provide clarity.

The Secretary proposes to clarify the text in § 3474.15(b)(1) by eliminating extraneous language and to align it more closely with RFRA. *See, e.g.,* principles 6, 10–15, and 20 of the Attorney General's Memorandum on Religious Liberty, 82 FR 49668 (October 26, 2017); *Application of the Religious Freedom Restoration Act to the Award of a Grant Pursuant to the Juvenile Justice and Delinquency Prevention Act,* 31 Op. O.L.C. 162 (2007) (World Vision Opinion).

The Secretary proposes to clarify the text in § 3474.15(b)(2) and to align the text more closely with the First Amendment and with RFRA. *See, e.g., Zelman; Trinity Lutheran;* principles 2, 3, 6–7, 9–17, 19, and 20 of the Attorney General's Memorandum on Religious Liberty, 82 FR 49668 (October 26, 2017); Exec. Order No. 13279, 67 FR 77141 (December 12, 2002), *as amended by* E.O. 13559, 75 FR 71319 (November 17, 2010), *and* Exec. Order No. 13831, 83 FR 20715 (May 8, 2018).

The Secretary proposes to clarify the text in § 3474.15(b)(3) and align it more closely with the First Amendment, RFRA, and other Federal agency regulations. *See, e.g., Trinity Lutheran;* principles 5, 6, 7, 8, 10–15, and 20 of the Attorney General's Memorandum on Religious Liberty, 82 FR 49668 (October 26, 2017); 28 CFR 38.5(d).

The Secretary proposes to clarify the text in § 3474.15(b)(4) and to align it more closely with the First Amendment, RFRA, and salient Federal agency regulations. *See, e.g., Trinity Lutheran;* principles 5, 6, 7, 8, 10–15, and 20 of the Attorney General's Memorandum on Religious Liberty, 82 FR 49668 (October 26, 2017); 28 CFR 38.5(d).

The Secretary proposes to change § 3474.15(c)(1) in accordance with section 2(b) of E.O. 13831, 83 FR 20715 (May 3, 2018).

In § 3474.15(d)(1), the Secretary proposes to clarify the text by eliminating extraneous language and to align it more closely with E.O. 13559, 75 FR 71319 (November 17, 2010), and E.O. 13279, 67 FR 77141 (December 12, 2002).

In § 3474.15(e)(1) we propose to clarify the text by eliminating extraneous language and to align it more closely with the First Amendment and with RFRA. *See, e.g.,* E.O. 13279, 67 FR 77141 (December 12, 2002), *as amended by* E.O. 13831, 83 FR 20715 (May 8, 2018); principles 9–15, 19, and 20 of the Attorney General's Memorandum on Religious Liberty, 82 FR 49668 (October 26, 2017).

In § 3474.15(e)(2) we propose to clarify the text by eliminating extraneous language, and to align it more closely with the First Amendment and with RFRA. *See, e.g.,* E.O. 13279, 67 FR 77141 (December 12, 2002), *as amended by* E.O. 13831, 83 FR 20715 (May 8, 2018); principles 9–15, 19, and 20 of the Attorney General's Memorandum on Religious Liberty, 82 FR 49668 (October 26, 2017).

In § 3474.15(f) we propose to align the text more closely with the First Amendment and with RFRA. *See, e.g., Zelman;* principles 10–15 of the Attorney General's Memorandum on Religious Liberty, 82 FR 49668 (October 26, 2017).

In § 3474.15(g) we propose to clarify the text by eliminating extraneous language, and to align it more closely with the First Amendment and with RFRA. *See, e.g.,* E.O. 13279, 67 FR 77141 (December 12, 2002), *as amended by* E.O. 13831, 83 FR 20715 (May 8, 2018); principles 9–15, 19, and 20 of the Attorney General's Memorandum on Religious Liberty, 82 FR 49668 (October 26, 2017).

In § 3474.15(h) we propose to align the text more closely with the First Amendment. *See, e.g., Larson* v. *Valente,* 456 U.S. 228 (1982); principle 8 of the Attorney General's Memorandum on Religious Liberty, 82 FR 49668 (October 26, 2017).

### 2 CFR 3474.21 Severability

*Current Regulations:* None.

*Proposed Regulations:* Proposed § 3474.21 would make clear that, if any part of the proposed regulations for part 3474, whether an individual section or language within a section, is held invalid by a court, the remainder would still be in effect.

*Reasons:* We believe that each of the proposed provisions discussed in this preamble would serve one or more important, related, but distinct, purposes. Each provision would provide a distinct value to the Department, grantees, subgrantees, beneficiaries, the public, taxpayers, the Federal government, and institutions separate from, and in addition to, the value provided by the other provisions. To best serve these purposes, we propose to include this administrative provision in the regulations to make clear that the regulations are designed to operate independently of each other and to convey the Department's intent that the potential invalidity of one provision should not affect the remainder of the provisions. Similarly, the validity of any of the provisions in "Part 1—Religious Liberty" should not affect the validity of any of the provisions in "Part 2—Free Inquiry."

### 34 CFR 75.51 How To Prove Nonprofit Status

*Current Regulations:* The current regulations specify how an entity participating in Department programs may prove its nonprofit status. Under 34 CFR 75.51(b)(1) through (b)(4), an applicant may demonstrate its nonprofit status by proving that the Internal Revenue Service has provided such a designation, that a State has provided such a designation under certain circumstances, that the applicant organization's certificate of

---

[69] 137 S. Ct. at 2021–25.

incorporation demonstrates it is a nonprofit organization, or that the applicant's parent organization has received such designation and considers the applicant to be a local affiliate.

*Proposed Regulations:* The proposed regulations clarify that if the applicant would qualify under the existing methods of demonstrating nonprofit status but cannot register with a government agency such as the Internal Revenue Service because of a sincerely-held religious belief, the entity may still qualify as a nonprofit organization as long as the entity otherwise qualifies as a nonprofit organization under § 75.51(b)(1) through (b)(4).

*Reasons:* The Department's current regulations do not require registration with the Internal Revenue Service as the only method for an applicant to show that it is a nonprofit organization. Consistent with the current regulations, the proposed revisions clarify that an entity that has a sincerely-held religious belief that it cannot apply for a determination that they are tax-exempt under section 501(c)(3) of the Internal Revenue Code may still qualify as a nonprofit organization, much like any other organization, by demonstrating that it would otherwise qualify as a nonprofit organization under 34 CFR 75.51(b)(1) through (b)(4).

For the reasons stated in "Background—Part 1 (Religious Liberty)" and in accordance with RFRA, the Department wishes to ensure accommodations for proving nonprofit status are provided if an organization has a sincerely-held religious belief that would prevent it from registering with a State or the Federal government. This principle draws its support from Supreme Court precedent and is consistent with principles 12 and 13 of the Attorney General's Memorandum on Religious Liberty. Namely, Principle 12 of the Attorney General's Memorandum states that "RFRA does not permit the federal government to second-guess the reasonableness of a religious belief"; and Principle 13 states that "[a] governmental action substantially burdens an exercise of religion under RFRA if it bans an aspect of an adherent's religious observance or practice, compels an act inconsistent with that observance or practice, or substantially pressures the adherent to modify such observance or practice."

Several times, both before and after RFRA's enactment, the Supreme Court has instructed that, as far as the sincerity of the asserted religious belief is concerned, neither the courts nor the government may second-guess the "line" the person concerned has drawn between the activities or obligations

consistent with his religious beliefs and those inconsistent with his religious beliefs.[70] Quite simply, "'it is not for [the courts or the government] to say that the line he [has] [drawn] [i]s an unreasonable one,'"[71] let alone weave an opinion on whether these "religious beliefs are mistaken or insubstantial."[72] Instead, the only thing the courts and the government may ask is whether this demarcation springs from the person's "honest conviction."[73] To accommodate organizations that establish such an honest conviction that prevents them from registering as a non-profit, the Department would consider whether such an organization would otherwise qualify as a nonprofit organization under § 75.51(b)(1) through (b)(4). The Department believes that an organization should be able to submit evidence from which it would be readily apparent whether an organization would satisfy these criteria.

§§ 75.52 and 76.52   Eligibility of Faith-Based Organizations for a Grant and Nondiscrimination Against Those Organizations

*Current Regulations:* The current regulations, §§ 75.52 and 76.52, contain parallel provisions for Direct Grant programs and State-Administered Formula Grant programs, respectively. Current paragraph (a) of these provisions makes clear that faith-based organizations are eligible to participate in the Department's grant programs on the same basis as any other private organization. Current paragraph (b) provides that a faith-based organization that receives a grant under a program of the Department is subject to the provisions in §§ 75.532 and 76.532, as applicable. These sections prohibit use of Federal funds for religious purposes. Under current §§ 75.52(c) and 76.52(c), an organization that engages in inherently religious activities, such as religious worship, instruction, or proselytization, must offer those services separately in time or location from services under a program of the Department and participation in those activities must be voluntary. Paragraph (c) also defines direct Federal financial assistance and indirect Federal financial assistance as well as other terms. Under current paragraph (d), a faith-based organization that applies for or receives a grant may retain its religious identity.

Current paragraph (e) prohibits a private organization that receives a grant or subgrant under a Department program from discriminating against beneficiaries or prospective beneficiaries on the basis of religion. Current paragraph (f) addresses a grantee's or subgrantee's contribution of its funds in excess of what is required and current paragraph (g) addresses a religious organization's exemption from the Federal prohibition on employment discrimination on the basis of religion.

*Proposed Regulations:* The revisions proposed to paragraph (a) of these regulations clarify that faith-based organizations are eligible to participate in the Department's grant programs on the same basis as any other private organization. The proposed revisions to paragraph (a)(2) provide that a notice or announcement of award opportunities and a notice of award or contract should contain language substantially similar to proposed Appendix A and Appendix B, respectively. The proposed regulations add paragraph (a)(3), which provides that no grant document, agreement, covenant, memorandum of understanding, policy, or regulation shall require faith-based organizations to provide assurance or notices where they are not required of non-faith-based organizations. Proposed paragraph (a)(3) also provides that all organizations, including faith-based organizations, must adhere to all program requirements, including those prohibiting the use of direct financial assistance to engage in explicitly religious activities. Proposed paragraph (a)(4) similarly provides that the Department cannot use any grant document, agreement, etc., to disqualify faith-based organizations from applying for or receiving grants because the organization is motivated or influenced to provide social services by religious faith.

There are no proposed revisions to paragraph (b), which requires faith-based organizations not to use the grant for religious worship, religious instruction, and proselytization.

There are only minor, stylistic revisions but no substantive revisions to paragraphs (c)(1) and (2), which require a private organization that receives direct Federal financial and engages in explicitly religious activities to engage in those activities at a separate time or location from any programs or services funded by a grant from the Department.

We propose revising the definitions in paragraph (c)(3), adding definitions of terms such as "religious exercise." We also delete references to §§ 75.712 and 75.713, as we are proposing to delete §§ 75.712 and

---

[70] *See Hobby Lobby Stores,* 573 U.S. at 725; *Thomas v. Review Bd. of Ind. Emp't Sec. Div.,* 450 U.S. 707, 715–16 (1981).

[71] *Hobby Lobby Stores,* 573 U.S. at 725 (quoting *Thomas,* 450 U.S. at 715).

[72] *Hobby Lobby Stores,* 573 U.S. at 725.

[73] *Id.* (quoting *Thomas,* 450 U.S. at 716).

75.713 altogether. We propose to revise the definition of direct Federal financial assistance to mean financial assistance received by an entity selected by the government or a ''pass through entity.'' We define a ''pass through entity'' as a nonprofit or nongovernmental organization, acting under a contract, grant, or other agreement with the Federal Government or with a State or local government, that accepts direct Federal financial assistance and distributes that assistance to other organizations. We revise the definition of ''indirect Federal financial assistance'' to refer to financial assistance received by a service provider when the service provider is paid for services rendered as a means of a voucher, certificate, etc., to a beneficiary who is able to make a choice of a service provider. The definition of ''Federal financial assistance'' does not include a tax credit, deduction, exemption, guaranty contract, or use of any assistance of any individual who is the ultimate beneficiary. We incorporate the definition of ''religious exercise'' in RFRA, 42 U.S.C. 2000cc–5(7)(A). We clarify that these definitions would apply to Appendices A and B described below.

We add a sentence to paragraph (d)(1) to provide that a faith-based organization retains the protections of law described in the Attorney General's Memorandum on Religious Liberty. We also clarify in paragraph (d)(2) that a faith-based organization that applies for or receives a grant under a program of the Department is not required to conceal religious art, icons, scriptures, etc., from its facilities and may select its board members on the basis of their acceptance of or adherence to the religious tenets of the organization.

We clarify in paragraph (e) that a faith-based organization that receives indirect Federal financial assistance is not required to modify its program activities to accommodate a beneficiary who chooses to expend the indirect aid on the organization's program and may require attendance at all activities that are fundamental to the program.

There are no proposed changes to paragraph (f).

We propose adding a sentence at the end of paragraph (g) to clarify that an organization qualifying for an exemption from the Federal prohibition on employment discrimination on the basis of religion may select its employees on the basis of their acceptance of or adherence to the religious tenets of the organization.

Finally, we propose adding paragraph (h) to provide that the Department will not advantage or disadvantage one religion over another and will not advantage or disadvantage one religion in favor of a secular organization.

*Reasons:* In *Trinity Lutheran Church of Columbia, Inc.* v. *Comer,* the Supreme Court held that laws and policies may provide benefits in ways that are neutral and generally applicable without regard to religion, but policies that single out the religious for disfavored treatment violate the Free Exercise Clause.[74] The revisions to §§ 75.52 and 76.52 remove references to regulations that impose additional burdens on faith-based organizations but not secular organizations such as the requirement to identify alternative secular providers and provide a written notice. These revisions reflect time-honored First Amendment principles that faith-based organizations should neither suffer a disadvantage nor gain an advantage due to their religious character.

These proposed regulations also seek to address and prevent any confusion about the ability of faith-based organizations to qualify for grants. Consistent with the First Amendment and RFRA, these revisions provide that a faith-based organization is eligible to contract with grantees and subgrantees, including States, on the same basis as any other private organization, with respect to contracts for which such other organizations are eligible and considering any permissible accommodation. The revisions to §§ 75.52 and 76.52 further clarify that faith-based organizations do not lose the protection of the laws described in the Attorney General's Memorandum on Religious Liberty by accepting Federal financial assistance. For example, these faith-based organizations may continue selecting board members based on their adherence to the religious tenets of the organization.

The Secretary proposes changes to §§ 75.52 and 76.52 for the reasons stated in ''Background—Part 1 (Religious Liberty)'' and for the following reasons:

The Secretary proposes to revise § 75.52(a)(1) to clarify the text by eliminating extraneous language and to align it more closely with RFRA. *See, e.g.,* principles 6, 10–15, and 20 of the Attorney General's Memorandum on Religious Liberty, 82 FR 49668 (October 26, 2017); *Application of the Religious Freedom Restoration Act to the Award of a Grant Pursuant to the Juvenile Justice and Delinquency Prevention Act,* 31 Op. O.L.C. 162 (2007) (World Vision Opinion).

The Secretary proposes to align § 75.52(a)(2) more closely with the First Amendment and RFRA. *See, e.g.,*

*Zelman* v. *Simmons-Harris,* 536 U.S. 639 (2002), *Trinity Lutheran Church of Columbia, Inc.* v. *Comer,* 137 S. Ct. 2012 (2017)); principles 2, 3, 6–7, 9–17, 19, and 20 of the Attorney General's Memorandum on Religious Liberty, 82 FR 49668 (October 26, 2017); E.O. 13279, 67 FR 77141 (December 12, 2002), *as amended by* E.O. 13559, 75 FR 71319 (November 17, 2010), *and* E.O. 13831, 83 FR 20715 (May 8, 2018).

We propose to add § 75.52(a)(3) to align the text more closely with the First Amendment, RFRA, and other Federal regulations. *See, e.g., Trinity Lutheran Church of Columbia, Inc.* v. *Comer,* 137 S. Ct. 2012 (2017); principles 5, 6, 7, 8, 10–15, and 20 of the Attorney General's Memorandum on Religious Liberty, 82 FR 49668 (October 26, 2017); 28 CFR 38.5(d).

We proposed to change § 75.52(a)(4) to align the text more closely with the First Amendment, RFRA, and other Federal regulations. *See, e.g., Trinity Lutheran Church of Columbia, Inc.* v. *Comer,* 137 S. Ct. 2012 (2017); principles 5, 6, 7, 8, 10–15, and 20 of the Attorney General's Memorandum on Religious Liberty, 82 FR 49668 (October 26, 2017); 28 CFR 38.5(d).

In § 75.52(c)(1) we propose to clarify the text by eliminating extraneous language and to align it more closely with E.O. No. 13559, 75 FR 71319 (November 17, 2010), and E.O. 13279, 67 FR 77141 (December 12, 2002).

We propose to revise § 75.52(c)(3)(i) and (c)(3)(ii) to provide clarity.

The Secretary proposes to change § 75.52(c)(3)(ii)(B) to align the text more closely with the First Amendment. *See, e.g., Zelman* v. *Simmons-Harris,* 536 U.S. 639 (2002), *Trinity Lutheran Church of Columbia, Inc.* v. *Comer,* 137 S. Ct. 2012 (2017).

We propose to delete § 75.52(c)(3)(ii)(C) to align the text more closely with the First Amendment. *See, e.g., Zelman* v. *Simmons-Harris,* 536 U.S. 639 (2002); *Trinity Lutheran Church of Columbia, Inc.* v. *Comer,* 137 S. Ct. 2012 (2017).

We propose to change § 75.52(c)(3)(iii) in accordance with E.O. 13279, 67 FR 77141 (December 12, 2002).

We propose to revise § 75.52(c)(3)(iv) to provide clarity.

We propose to change § 75.52(c)(3)(v) to align the text more closely with the definitions used in the RFRA and with the Religious Land Use and Individualized Persons Act of 2000 (RLUIPA), 42 U.S.C. 2000cc–5(7)(A). *See, e.g.,* principles 10–15 of the Attorney General's Memorandum on Religious Liberty, 82 FR 49668 (October 26, 2017).

---

[74] 137 S. Ct. at 2021–25.

In § 75.52(d)(1), we propose to clarify the text by eliminating extraneous language, and to align it more closely with the First Amendment and with RFRA. *See, e.g.,* E.O. 13279, 67 FR 77141 (December 12, 2002), *as amended by* E.O. 13831, 83 FR 20715 (May 8, 2018); principles 9–15, 19, and 20 of the Attorney General's Memorandum on Religious Liberty, 82 FR 49668 (October 26, 2017).

In § 75.52(d)(2) we propose to clarify the text by eliminating extraneous language, and to align it more closely with the First Amendment and with RFRA. *See, e.g.,* E.O. 13279, 67 FR 77141 (December 12, 2002), *as amended by* E.O. 13831, 83 FR 20715 (May 8, 2018); principles 9–15, 19, and 20 of the Attorney General's Memorandum on Religious Liberty, 82 FR 49668 (October 26, 2017).

We proposed to align § 75.52(e) more closely with the First Amendment and with RFRA. *See, e.g., Zelman* v. *Simmons-Harris,* 536 U.S. 639 (2002); principles 10–15 of the Attorney General's Memorandum on Religious Liberty, 82 FR 49668 (October 26, 2017).

In § 75.52(g) we propose to clarify the text by eliminating extraneous language, and to align it more closely with the First Amendment and with RFRA. *See, e.g.,* E.O. 13279, 67 FR 77141 (December 12, 2002), *as amended by* E.O. 13831, 83 FR 20715 (May 8, 2018); princip les 9– 15, 19, and 20 of the Attorney General's Memorandum on Religious Liberty, 82 FR 49668 (October 26, 2017).

We proposed to change § 75.52(h) to align the text more closely with the First Amendment. *See, e.g., Larson* v. *Valente,* 456 U.S. 228 (1982); principle 8 of the Attorney General's Memorandum on Religious Liberty, 82 FR 49668 (October 26, 2017).

In § 76.52(a)(1), we propose to clarify the text by eliminating extraneous language and to align it more closely with RFRA. *See, e.g.,* principles 6, 10–15, and 20 of the Attorney General's Memorandum on Religious Liberty, 82 FR 49668 (October 26, 2017); *Application of the Religious Freedom Restoration Act to the Award of a Grant Pursuant to the Juvenile Justice and Delinquency Prevention Act,* 31 Op. O.L.C. 162 (2007) (World Vision Opinion).

We propose to align § 76.52(a)(2) more closely with the First Amendment and with RFRA. *See, e.g., Zelman* v. *Simmons-Harris,* 536 U.S. 639 (2002); *Trinity Lutheran Church of Columbia, Inc.* v. *Comer,* 137 S. Ct. 2012 (2017); principles 2, 3, 6–7, 9–17, 19, and 20 of the Attorney General's Memorandum on Religious Liberty, 82 FR 49668 (October 26, 2017); E.O. 13279, 67 FR 77141

(December 12, 2002), *as amended by* E.O. 13559, 75 FR 71319 (November 17, 2010), *and* E.O. 13831, 83 FR 20715 (May 8, 2018).

We propose to align § 76.52(a)(3) more closely with the First Amendment, RFRA, and other Federal regulations. *See, e.g., Trinity Lutheran Church of Columbia, Inc.* v. *Comer,* 137 S. Ct. 2012 (2017); 28 CFR 38.5(d); principles 5, 6, 7, 8, 10, 13, and 20 of the Attorney General's Memorandum on Religious Liberty, 82 FR 49668 (October 26, 2017).

We propose to align § 76.52(a)(4) more closely with the First Amendment, RFRA, and other Federal regulations. *See, e.g., Trinity Lutheran Church of Columbia, Inc.* v. *Comer,* 137 S. Ct. 2012 (2017); principles 5, 6, 7, 8, 10–15, and 20 of the Attorney General's Memorandum on Religious Liberty, 82 FR 49668 (October 26, 2017); 28 CFR 38.5(d).

In § 76.52(c)(1) we propose to clarify the text by eliminating extraneous language and to align it more closely with E.O. 13559, 75 FR 71319 (November 17, 2010), and E.O. 13279, 67 FR 77141 (December 12, 2002).

We propose to change § 76.52(c)(3)(i) to provide clarity.

We propose to align § 76.52(c)(3)(ii)(B) more closely with the First Amendment. *See, e.g., Zelman* v. *Simmons-Harris,* 536 U.S. 639 (2002), *Trinity Lutheran Church of Columbia, Inc.* v. *Comer,* 137 S. Ct. 2012 (2017)).

We propose to revise § 76.52(c)(3)(ii)(C) in accordance with section 2(b) of EO 13831, 83 FR 20715 (May 3, 2018).

We propose to revise § 76.52(c)(3)(iii) in accordance with E.O. 13279, 67 FR 77141 (December 12, 2002).

We propose to revise § 76.52(c)(3)(iv) to provide clarity.

We propose to revise § 76.52(c)(3)(v) to align the text more closely with the definitions used in RFRA and with RLUIPA, 42 U.S.C. 2000cc–5(7)(A). *See, e.g.,* principles 10–15 of the Attorney General's Memorandum on Religious Liberty, 82 FR 49668 (October 26, 2017).

In § 76.52(d)(1) we propose to clarify the text by eliminating extraneous language, and to align it more closely with the First Amendment and RFRA. *See, e.g.,* E.O. 13279, 67 FR 77141 (December 12, 2002), *as amended by* E.O. 13831, 83 FR 20715 (May 8, 2018); principles 9–15, 19, and 20 of the Attorney General's Memorandum on Religious Liberty, 82 FR 49668 (October 26, 2017).

We propose to clarify § 76.52(d)(2) by eliminating extraneous language, and to align it more closely with the First Amendment and RFRA. *See, e.g.,* E.O. 13279, 67 FR 77141 (December 12,

2002), *as amended by* E.O. 13831, 83 FR 20715 (May 8, 2018); principles 9–15, 19, and 20 of the Attorney General's Memorandum on Religious Liberty, 82 FR 49668 (October 26, 2017).

We propose to align § 76.52(e) more closely with the First Amendment and RFRA. *See, e.g., Zelman* v. *Simmons-Harris,* 536 U.S. 639 (2002); principles 10–15 of the Attorney General's Memorandum on Religious Liberty, 82 FR 49668 (October 26, 2017).

In § 76.52(g) we propose to clarify the text by eliminating extraneous language, and to align it more closely with the First Amendment and RFRA. *See, e.g.,* E.O. 13279, 67 FR 77141 (December 12, 2002), *as amended by* E.O. 13831, 83 FR 20715 (May 8, 2018); principles 9–15, 19, and 20 of the Attorney General's Memorandum on Religious Liberty, 82 FR 49668 (October 26, 2017).

We propose to align § 76.52(h) more closely with the First Amendment. *See, e.g., Larson* v. *Valente,* 456 U.S. 228 (1982); principle 8 of the Attorney General's Memorandum on Religious Liberty, 82 FR 49668 (October 26, 2017).

**34 CFR 75.63 and 76.53    Severability**

*Current Regulations:* None.

*Proposed Regulations:* Proposed §§ 75.63 and 76.53 would make clear that, if any part of the proposed regulations for part 75, subpart A, or for part 76, subpart A, respectively, whether an individual section or language within a section, is held invalid by a court, the remainder would still be in effect.

*Reasons:* We believe that each of the proposed provisions discussed in this preamble would serve one or more important, related, but distinct, purposes. Each provision would provide a distinct value to the Department, grantees, subgrantees, beneficiaries, the public, taxpayers, the Federal government, and institutions separate from, and in addition to, the value provided by the other provisions. To best serve these purposes, we propose to include this administrative provision in the regulations to make clear that the regulations are designed to operate independently of each other and to convey the Department's intent that the potential invalidity of one provision should not affect the remainder of the provisions. Similarly, the validity of any of the provisions in "Part 1—Religious Liberty" should not affect the validity of any of the provisions in "Part 2—Free Inquiry."

§§ 75.712, 75.713, 76.712, and 76.713 Beneficiary Protections: Written Notice and Referral Requirements

*Current Regulations:* As previously stated, part 75 addresses direct grant programs and part 76 addresses State-Administered Formula Grant programs. Sections 75.712, 75.713, 76.712, and 76.713 contain parallel provisions and require faith-based organizations but not other organizations to follow referral procedures and provide specific written notices to potential beneficiaries.

*Proposed Regulations:* We propose to remove these sections.

*Reasons:* In *Trinity Lutheran Church of Columbia, Inc.* v. *Comer,* the Supreme Court held that laws and policies may provide benefits in ways that are neutral and generally applicable without regard to religion, but policies that single out the religious for disfavored treatment violate the Free Exercise Clause.[75] Sections 75.712 and 76.712 impose an additional burden on faith-based organizations to identify alternative secular providers but do not impose such a burden on secular organizations to identify an alternative faith-based provider or an alternative secular provider. Similarly, §§ 75.713 and 76.713 impose an additional burden on faith-based organizations to provide a written notice that is not required for secular organizations, and this written notice provides a method for filing a complaint against a faith-based organization without providing any method for filing a complaint against a secular organization. We are removing these regulations to comport with Supreme Court jurisprudence that faith-based organizations should neither suffer a disadvantage nor gain an advantage due to their religious character.

The Secretary proposes to remove §§ 75.712, 75.713, 76.712, and 76.713 for the reasons stated in "Background—Part 1 (Religious Liberty)," and to align the Department's regulations more closely with the First Amendment and RFRA. *See, e.g., Zelman* v. *Simmons-Harris,* 536 U.S. 639 (2002), *Trinity Lutheran Church of Columbia, Inc.* v. *Comer,* 137 S. Ct. 2012 (2017); principles 2, 3, 6–7, 9–17, 19, and 20 of the Attorney General's Memorandum on Religious Liberty, 82 FR 49668 (October 26, 2017); E.O. 13279, 67 FR 77141 (December 12, 2002), *as amended by* E.O. 13559, 75 FR 71319 (November 17, 2010), and Exec. Order No. 13831, 83 FR 20715 (May 8, 2018).

34 CFR 75.741 and 76.784    Severability

*Current Regulations:* None.

*Proposed Regulations:* Proposed §§ 75.741 and 76.784 would make clear that, if any part of the proposed regulations for part 75, subpart F, or for part 76, subpart G, whether an individual section or language within a section, is held invalid by a court, the remainder would still be in effect.

§§ 75.714 and 76.714    Subgrants, Contracts, and Other Agreements With Faith-Based Organizations

*Current Regulations:* As previously stated, part 75 addresses Direct Grant Programs and part 76 addresses State-Administered Formula Grant Programs. Sections 75.714 and 76.714 are parallel provisions and provide that if a grantee under a discretionary grant program of the Department has the authority under the grant to select a private organization to provide services supported by direct Federal financial assistance under the program by subgrant, contract, or other agreement, the grantee must ensure compliance with applicable Federal requirements governing contracts, grants, and other agreements with faith-based organizations.

*Proposed Regulations:* We propose to treat religious and secular entities equally with respect to subgrants and other contracts and agreements, by striking references to §§ 75.712 and 75.713 in § 75.714 any by striking references to §§ 76.712 and 76.713 in § 76.714. As explained above, §§ 75.712, 75.713, 76.712, and 76.713 impose additional burdens on faith-based organizations but not secular organizations. We propose to add references to proposed Appendices A and B, which are discussed, below, and also propose to change "intermediary" to "pass-through entity," which is defined in proposed §§ 75.52(c)(3)(iv) and 76.52(c)(3)(iv).

*Reasons:* As previously stated, we are proposing to delete §§ 75.712, 75.713, 75.714, and 76.714 altogether, and deleting references to these regulations in 34 CFR 75.714 and 76.714 is a conforming revision. We also add references to Appendices A and B, and the purpose for these appendices is explained below. We propose to replace "intermediary," which is not defined in these regulations, with "pass through-entity," which is defined in proposed §§ 75.52(c)(3)(iv) and 76.52(c)(3)(iv), respectively, to provide greater clarity.

The Secretary proposes changes to §§ 75.714 and 76.714 for the reasons stated in "Background—Part 1 (Religious Liberty)" and in accordance with Section 2(b) of E.O. 13831, 83 FR 20715 (May 3, 2018).

*Reasons:* We believe that each of the proposed provisions discussed in this preamble would serve one or more important, related, but distinct, purposes. Each provision would provide a distinct value to the Department, grantees, subgrantees, beneficiaries, the public, taxpayers, the Federal government, and institutions separate from, and in addition to, the value provided by the other provisions. To best serve these purposes, we propose to include this administrative provision in the regulations to make clear that the regulations are designed to operate independently of each other and to convey the Department's intent that the potential invalidity of one provision should not affect the remainder of the provisions.

Appendix A to Parts 75 and 76—Form of Required Notice to Beneficiaries

*Current Regulations:* Appendix A to Parts 75 and 76 includes the written notice of beneficiary rights and beneficiary referral request to identify a secular provider. Appendix A is referenced as a requirement for faith-based organizations but not any other organization in 2 CFR 3474.15 as well as 34 CFR 75.52, 76.52, 75.712, 76.712, 75.713, 76.713, 75.714, and 76.714.

*Proposed Regulations:* We propose to revise Appendix A to Parts 75 and 76 and add Appendix B to provide information to faith-based organizations regarding their rights and responsibilities with respect to Department funding opportunities. We eliminate the written notice and referral requirements in Appendix A. Under the proposed rule, Appendix A instead provides language that should be included in notices or announcements of award opportunities, and Appendix B provides language that should be included in a notice of award or contract. Appendices A and B contain substantially similar language, except that Appendix A includes an additional paragraph to expressly state in a notice or announcement of award opportunities that the Department will not discriminate against an organization on the basis of the organization's religious exercise or affiliation and that faith-based organizations may apply for the award on the same basis as any other organization. As previously stated, we propose to revise 2 CFR 3474.15 as well as 34 CFR 75.52, 76.52, 75.714, and 76.714 to require the Department and grantees to include language, substantially similar to that of proposed Appendices A and B, as revised.

*Reasons:* In *Trinity Lutheran Church of Columbia, Inc.* v. *Comer,* the Supreme Court held that laws and policies may

**3206**    **Federal Register** / Vol. 85, No. 12 / Friday, January 17, 2020 / Proposed Rules

provide benefits in a way that is neutral and generally applicable without regard to religion, but policies that single out the religious for disfavored treatment violate the Free Exercise Clause.[76] Under the existing regulations, Appendix A, which is currently referenced as a requirement in 2 CFR 3474.15 and 34 CFR 75.52, 76.52, 75.712, 76.712, 75.713, 76.713, 75.714, and 76.714, imposes an additional burden on faith-based organizations to identify alternative secular providers but does not impose such a burden on secular organizations to identify an alternative faith-based provider or an alternative secular provider. Appendix A also imposes an additional burden on faith-based organizations to provide a written notice that is not required for secular organizations, and this written notice provides a method for filing a complaint against a faith-based organization without providing any method for filing a complaint against a secular organization. These requirements in Appendix A single out the religious for disfavored treatment. We are removing these requirements in accordance with the time-honored First Amendment principle that faith-based organizations should neither suffer a disadvantage nor gain an advantage due to their religious character.

The proposed revisions to Appendix A outline the faith-based organization's right to apply for an award on the same basis as any other organization, right to retain its independence from government interference, and right to continue to carry out its mission consistent with religious freedom protections in Federal law. Appendix A, as revised, also outlines restrictions on the use of direct Federal financial assistance such as using direct Federal financial assistance in contravention of the Establishment Clause and any other applicable requirements. Such language in a notice or announcement of award opportunities will help correct any misconceptions about faith-based organizations' eligibility to qualify for grants and how faith-based organizations may use direct Federal financial assistance.

The Secretary proposes changes to Appendix A for the reasons stated in "Background—Part 1 (Religious Liberty)." Appendix A also is revised to align the text more closely with the First Amendment and with RFRA. *See, e.g., Zelman* v. *Simmons-Harris,* 536 U.S. 639 (2002), *Trinity Lutheran Church of Columbia, Inc.* v. *Comer,* 137 S. Ct. 2012 (2017)); principles 2, 3, 6–7, 9–17, 19, and 20 of the Attorney General's

Memorandum on Religious Liberty, 82 FR 49668 (Oct. 26, 2017); Exec. Order 13279, 67 FR 77141 (Dec. 12, 2002), *as amended by* Exec. Order 13559, 75 FR 71319 (Nov. 17, 2010), and Exec. Order 13831, 83 FR 20715 (May 8, 2018).

Section 106.12    Educational Institutions Controlled by Religious Organizations

*Current Regulations:* Current 34 CFR 106.12(a) addresses the exemption in Title IX, 20 U.S.C. 1681(a)(3), for educational institutions controlled by a religious organization, to the extent that application of Title IX and its implementing regulations would be inconsistent with the religious tenets of the organization.[77]

*Proposed Regulations:* We propose adding paragraph (c) to 34 CFR 106.12 to define the phrase "controlled by a religious organization," as educational institutions, which are controlled by a religious organization, are eligible to assert the exemption.

*Reasons:* Title IX, 20 U.S.C. 1681(a)(3), does not directly address how educational institutions demonstrate whether they are controlled by a religious organization. Nor does the statute provide necessary clarity that a recipient can itself be a religious organization that controls its own operations, curriculum, or other features. The criteria proposed in § 106.12(c) would partly codify existing factors that the Assistant Secretary for Civil Rights uses when evaluating a request for a religious exemption assurance from the Office for Civil Rights, and partly address concerns that there may be other means of establishing the necessary control. Additionally, because many of these factors are contained in non-binding guidance issued to OCR personnel dating back more than 30 years, providing clear terms in regulations would provide recipients and other stakeholders with clarity regarding what it means to be "controlled by a religious organization." This clarity would create

more predictability, consistency in enforcement, and confidence for educational institutions asserting the exemption.

The Department acknowledges that its guidance documents are not binding and do not have the force and effect of law.[78] The Department also lacks the power to bind third parties without appropriate **Federal Register** publication, notice, and comment or by failing to provide constitutional fair notice of its legal requirements before engaging in formal or informal adjudication.[79] The Department believes that it may properly conduct discretionary rulemaking only in the interstices of statutory silence and genuine ambiguity,[80] and that, as a policy matter, it should do so only rarely and cautiously. The Department acknowledges that its practices in the recent past regarding assertion of a religious exemption, including delays in responding to inquiries about the religious exemption, may have caused educational institutions to become reluctant to exercise their rights under the Free Exercise Clause of the First Amendment, and the Department would like educational institutions to fully and freely enjoy rights guaranteed under the Free Exercise Clause of the U.S. Constitution without shame or ridicule. Accordingly, the Department is engaging in notice-and-comment rulemaking to clarify how an educational institution may determine whether it is controlled by a religious organization to assert the religious exemption under Title IX.

The Department recognizes that religious organizations are organized in widely different ways that reflect their respective theologies. Some educational institutions are controlled by a board of trustees that includes ecclesiastical leaders from a particular religion or religious organization who have ultimate decision-making authority for the educational institutions. Other educational institutions are effectively controlled by religious organizations that have a non-hierarchical structure, such as a congregational structure. The Department does not discriminate against educational institutions that are controlled by religious organizations with different types of structures. Indeed, the Department has long recognized exemptions for educational institutions that are controlled by

---

[76] 137 S. Ct. at 2021–25.

[77] To claim this exemption, the current version of 34 CFR 106.12(b) requires recipients to write a letter to the Assistant Secretary stating which parts of the regulation conflict with a specific tenet of the religion. The Department issued a notice of proposed rulemaking on November 29, 2018, 83 FR 61462, to propose revising 34 CFR 106.12(b) to codify the existing practice of recognizing a recipient's religious exemption without expressly requiring submission of a letter. The Department stated in the November 29, 2018 NPRM that the statutory text of Title IX offers an exemption to religious entities without expressly requiring submission of a letter, and the Department believes that such a requirement is unnecessary. This NPRM, however, does not propose any changes to 34 CFR 106.12(b), which will be addressed through the November 29, 2018 NPRM.

[78] *Perez* v. *Mortgage Bankers Ass'n,* 135 S. Ct. 1199, 1204 (2015) (Sotomayor, J.).

[79] *Id.* at 632 (citations omitted).

[80] *See City of Arlington* v. *FCC,* 133 S. Ct. 1863, 1871 (2013); *Chevron U.S.A. Inc.* v. *NRDC, Inc.,* 467 U.S. 837, 843 (1984).

religious organizations with hierarchical and non-hierarchical structures.

The Department is constitutionally obligated to broadly interpret "controlled by a religious organization" to avoid religious discrimination among institutions of varying denominations.[81] The Department also must take into account RFRA in promulgating its regulations and must not substantially burden a person's exercise of religion through its regulations. The Department's various proposed criteria reflect some methods that its Office for Civil Rights has used to evaluate and respond to a recipient's assertion of a religious exemption under Title IX. The proposed non-exhaustive list of criteria offers educational institutions different methods to demonstrate that they are eligible to assert an exemption to the extent application of Title IX and its implementing regulations would not be consistent with the institutions' religious tenets or practices.

The Department is proposing § 106.12(c)(1)–(5), which are factors consistent with the Department's past practice in acknowledging an educational institution's religious exemption. For instance, provisions (c)(1) through (c)(3) are based in part on guidance issued by former Assistant Secretary for Civil Rights Harry Singleton to Regional Civil Rights Directors on February 19, 1985.[82] To guide attorneys within the Office for Civil Rights as to whether an educational institution may establish "control" by a religious organization, the guidance relied on the March 1977 version of HEW Form 639A, which was issued by the former U.S. Department of Health, Education, and Welfare. Proposed provision (c)(1) acknowledges that schools or departments of divinity constitute educational institutions controlled by a religious organization. Proposed provision (c)(2) acknowledges a statement that the educational institution requires its faculty, students, or employees to be members of or otherwise engage in religious practices of, or espouse a personal belief in, the relief of the organization by which it

claims to be controlled suffices to assert the religious exemption. Proposed provision (c)(3) acknowledges educational institutions that have a hierarchical structure or are otherwise controlled by an external religious organization may assert the religious exemption.

Proposed provisions (c)(4) and (c)(5) also are based in part on a letter from Acting Assistant Secretary for Civil Rights William L. Smith to OCR Senior Staff.[83] That letter details examples of certain information that schools provided in the past to assist the Office for Civil Rights' analysis as to whether a religious exemption assurance request is supported. For example, proposed provision (c)(4) recognizes a statement that the educational institution has a doctrinal statement or a statement of religious practices, along with a statement that members of the institution's community must engage in religious practices or espouse a personal religious belief suffices for an educational institution to assert the religious exemption. Proposed provision (c)(5) also acknowledges a statement that the educational institution subscribes to specific moral beliefs or practices, and a statement that members of the institution's community may be subjected to discipline for violating those beliefs or practices may sufficient for an educational institution to assert the religious exemption.

The Department also proposes § 106.12(c)(6) to expressly acknowledge that a recipient can itself be a religious organization that controls its own operations, curriculum, or other features. Proposed § 106.12(c)(6) provides an educational institution is eligible to assert the exemption if the educational institution has a statement that is approved by its governing board and that includes, refers to, or is predicated upon religious tenets, beliefs, or teachings. If an educational institution asserts an exemption pursuant to § 106.12(c)(6), the educational institution is not acknowledging that it is controlled by an external religious organization. Instead, the educational institution is asserting that the educational institution is itself the controlling religious organization. Section 106.12(c)(6), as proposed, is consistent with longstanding OCR practice in recognizing that the educational

institution may itself be the controlling religious organization. For example, OCR has long recognized that a school or department of divinity is an educational institution controlled by a religious organization without any requirement that the school or department of divinity be controlled by an external religious organization. Additionally, § 106.12(c)(6) aligns well with the Department's definition of "religious mission" in § 600.2, which is defined as "[a] published institutional mission that is approved by the governing body of an institution of postsecondary education and that includes, refers to, or is predicated upon religious tenets, beliefs, or teachings" in the context of regulations about eligibility for Federal student aid under title IV of the Higher Education Act of 1965, as amended. An educational institution that has a religious mission, as defined in § 600.2, may choose to assert an exemption to the extent application of Title IX and its implementing regulations would not be consistent with the institution's religious tenets or practices.

Finally, the Department proposes § 106.12(c)(7) in recognition that Congress did not promulgate an exclusive list of criteria by which an educational institution may assert an exemption under Title IX. The Department's criteria essentially provide educational institutions with a safe harbor. The Department's criteria do not in any way limit the methods and means that an educational institution may use to demonstrate eligibility to assert the exemption.

### Section 606.10   What activities may and may not be carried out under a grant?

*Current Regulations:* Under current regulations, funds appropriated under 20 U.S.C. 1101 *et seq.* for the Developing Hispanic-Serving Institutions Program may not support activities or services that merely relate to sectarian instruction or religious worship, without a clear understanding of said relation. The current regulations also define "school or department of divinity," in part, as an institution or program that specifically prepares students "to teach theological subjects," regardless of whether such a program operates with a secular purpose and without determining what such subjects might constitute.

*Proposed Regulations:* We propose to revise the current language, which may be overly broad and vague, with specific prohibitions on activities or services that constitute religious instruction, religious worship, or proselytization,

---

[81] *Larson* v. *Valente,* 456 U.S. 228, 244 (1982) ("The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another."); *see also Hosanna-Tabor Evangelical Lutheran Church & Sch.* v. *EEOC,* 565 U.S. 171, 202 (2012) (Alito, J., concurring; joined by Kagan, J.) (arguing that a broad, functionalist interpretation of religious teachers for purposes of the ministerial exception is necessary to be inclusive of faiths like Islam and Jehovah's Witnesses).

[82] U.S. Dep't of Ed., Office for Civil Rights, Policy Guidance for Resolving Religious Exemption Requests (Feb. 19, 1985), *available at https://www2.ed.gov/about/offices/list/ocr/docs/singleton-memo-19850219.pdf.*

[83] U.S. Dep't of Ed., Office for Civil Rights, Memorandum to OCR Senior Staff regarding Title IX Religious Exemption Procedures and Instructions for Investigating Complaints at Institutions with Religious Exemptions (Oct. 11, 1989), *available at https://www2.ed.gov/about/offices/list/ocr/docs/smith-memo-19891011.pdf.*

which is consistent with 34 CFR 75.532 and 76.532. We more narrowly define a school or department of divinity as constituting programs of study meant only to prepare students to become ministers of religion or to enter into some other religious vocation.

*Reasons:* The current regulations may be interpreted in an overly broad manner so as to violate the First Amendment. Preventing an institution from using development grants to carry out any activities or services that relate to sectarian instruction or religious worship may prevent even a secular institution from teaching a class about various religions or discussing how these different religions engage in worship. Accordingly, we seek to narrow this regulation to prevent institutions from using development grants for activities or services that constitute religious instruction, religious worship, or proselytization, which is consistent with 34 CFR 75.532 and 76.532. Sections 75.532 and 76.532 prohibit any grantee from using its grant to pay for religious instruction, religious worship, or proselytization.

The current regulations also prohibit an institution from using a development grant for activities provided by a school or department of divinity and defines a school or department of divinity as an institution, or department, or program of instruction designed to prepare the students to teach theological subjects. There may be some ambiguity concerning what it means to prepare the students to teach theological subjects since "the study of theology does not necessarily implicate religious devotion or faith." [84] The funding restrictions thus could be interpreted to apply even to programs in which theology is treated as a subject of scholarly interest, without any devotional affiliation or religious creed. Such restrictions could cover departments with Ph.D. programs in religious studies that approach theology through an academic lens— sociological, anthropological, philosophical, or otherwise. For example, this regulation may prohibit an institution from using a grant for a secular department of religion that prepares students to teach various religions in a comparative religion course. The Department proposes to delete this language and clarify that an institution may not use development grants for activities provided by a school or department that is solely to prepare

students to become ministers of religion or enter some other religious vocation.[85]

These revisions align the text more closely with the First Amendment, RFRA, and the Religious Land Use and Individualized Persons Act of 2000, 42 U.S.C. 2000cc–5(7)(A). *See e.g., Trinity Lutheran Church,* 173 S. Ct. at 2012; principles 2–4, 6–8, 10–11, 13, and 20 of the Attorney General's Memorandum on Religious Liberty, 82 FR 49668 (Oct. 26, 2017); Exec. Order 13279, 67 FR 77141 (Dec. 12, 2002), *as amended by* Exec. Order 13559, 75 FR 71319 (Nov. 17, 2010), *and* Exec. Order 13831, 83 FR 20715 (May 8, 2018).

34 CFR 606.11   Severability

*Current Regulations:* None.
*Proposed Regulations:* Proposed § 606.11 would make clear that, if any part of the proposed regulations for part 606, subpart A, whether an individual section or language within a section, is held invalid by a court, the remainder would still be in effect.

*Reasons:* We believe that each of the proposed provisions discussed in this preamble would serve one or more important, related, but distinct, purposes. Each provision would provide a distinct value to the Department, grantees, subgrantees, beneficiaries, the public, taxpayers, the Federal government, and institutions separate from, and in addition to, the value provided by the other provisions. To best serve these purposes, we propose to include this administrative provision in the regulations to make clear that the regulations are designed to operate independently of each other and to convey the Department's intent that the potential invalidity of one provision should not affect the remainder of the provisions. Similarly, the validity of any of the provisions in "Part 1—Religious Liberty" should not affect the validity of any of the provisions in "Part 2—Free Inquiry."

Section 607.10   What activities may and may not be carried out under a grant?

*Current Regulations:* Under current regulations, funds appropriated under 20 U.S.C. 1057 *et seq.* for the Strengthening Institutions Program (SIP) may not support activities or services that merely relate to sectarian instruction or religious worship, without a clear understanding of said relation. The current regulations also define "school or department of divinity," in part, as an institution or program that specifically prepares students "to teach theological subjects,"

regardless of whether such a program operates with a secular purpose and without determining what such subjects might constitute.

*Proposed Regulations:* We propose to revise the current language, which may be overly broad and vague, with specific prohibitions on activities or services that constitute religious instruction, religious worship, or proselytization, which is consistent with 34 CFR 75.532 and 34 CFR 76.532. We more narrowly define a school or department of divinity as constituting programs of study meant only to prepare students to become ministers of religion or to enter into some other religious vocation.

*Reasons:* The current regulations may be interpreted in an overly broad manner so as to violate the First Amendment. Preventing an institution from using development grants to carry out any activities or services that relate to sectarian instruction or religious worship may prevent even a secular institution from teaching a class about various religions or discussing how these different religions engage in worship. Accordingly, we seek to narrow this regulation to prevent institutions from using development grants for activities or services that constitute religious instruction, religious worship, or proselytization, which is consistent with 34 CFR 75.532 and 34 CFR 76.532. Sections 75.532 and 76.532 prohibit any grantee from using its grant to pay for religious instruction, religious worship, or proselytization.

The current regulations also prohibit an institution from using a development grant for activities provided by a school or department of divinity and defines a school or department of divinity as an institution, or department, or program of instruction designed to prepare the students to teach theological subjects. There may be some ambiguity concerning what it means to prepare the students to teach theological subjects since "the study of theology does not necessarily implicate religious devotion or faith." [86] The funding restrictions thus could apply to programs in which theology is treated as a subject of scholarly interest, without any devotional affiliation or religious creed. Such restrictions could cover departments with Ph.D. programs in religious studies that approach theology through an academic lens—sociological, anthropological, philosophical or otherwise. For example, this regulation

---

[84] *See Locke* v. *Davey,* 540 U.S. 712, 734 (2004) (Thomas, J., dissenting); *see also* The Compact Oxford English Dictionary 2040 (2d ed. 1989) (defining theology as the "study or science which treats of God, His nature and attributes, and His relations with man and the universe").

[85] *See Locke* v. *Davey,* 540 U.S. 712 (2004).

[86] *See Locke* v. *Davey,* 540 U.S. 712, 734 (2004) (Thomas, J., dissenting); *see also* The Compact Oxford English Dictionary 2040 (2d ed. 1989) (defining theology as the "study or science which treats of God, His nature and attributes, and His relations with man and the universe").

**Federal Register** / Vol. 85, No. 12 / Friday, January 17, 2020 / Proposed Rules **3209**

may prohibit an institution from using a grant for a secular department of religion that prepares students to teach various religions in a comparative religion course. Accordingly, the Department proposes to delete this language and clarify that an institution may not use development grants for activities provided by a school or department that is solely to prepare students to become ministers of religion or enter some other religious vocation.[87]

These revisions align the text more closely with the First Amendment, RFRA, and the Religious Land Use and Individualized Persons Act of 2000, 42 U.S.C. 2000cc–5(7)(A). *See e.g., Trinity Lutheran Church,* 173 S. Ct. at 2012; principles 2–4, 6–8, 10–11, 13, and 20 of the Attorney General's Memorandum on Religious Liberty, 82 FR 49668 (Oct. 26, 2017); Exec. Order 13279, 67 FR 77141 (Dec. 12, 2002), *as amended by* Exec. Order 13559, 75 FR 71319 (Nov. 17, 2010), *and* Exec. Order 13831, 83 FR 20715 (May 8, 2018).

**34 CFR 607.11    Severability**

*Current Regulations:* None.
*Proposed Regulations:* Proposed § 607.11 would make clear that, if any part of the proposed regulations for part 607, subpart A, whether an individual section or language within a section, is held invalid by a court, the remainder would still be in effect.

*Reasons:* We believe that each of the proposed provisions discussed in this preamble would serve one or more important, related, but distinct, purposes. Each provision would provide a distinct value to the Department, grantees, subgrantees, beneficiaries, the public, taxpayers, the Federal government, and institutions separate from, and in addition to, the value provided by the other provisions. To best serve these purposes, we propose to include this administrative provision in the regulations to make clear that the regulations are designed to operate independently of each other and to convey the Department's intent that the potential invalidity of one provision should not affect the remainder of the provisions. Similarly, the validity of any of the provisions in "Part 1—Religious Liberty" should not affect the validity of any of the provisions in "Part 2—Free Inquiry."

Section 608.10    What activities may and may not be carried out under a grant?

*Current Regulations:* Under current regulations, funds appropriated under 20 U.S.C. 1060 through 20 U.S.C. 1063c

for the Strengthening Historically Black Colleges and Universities Program may not support activities or services that merely relate to sectarian instruction or religious worship, without a clear understanding of said relation. The current regulations also define "school or department of divinity," in part, as an institution or program that specifically prepares students "to teach theological subjects," regardless of whether such a program operates with a secular purpose and without determining what such subjects might constitute.

*Proposed Regulations:* We propose to revise the current language, which may be overly broad and vague, with specific prohibitions on activities or services that constitute religious instruction, religious worship, or proselytization, which is consistent with 34 CFR 75.532 and 76.532. We more narrowly define a school or department of divinity as constituting programs of study meant only to prepare students to become ministers of religion or to enter into some other religious vocation.

*Reasons:* The current regulations may be interpreted in an overly broad manner so as to violate the First Amendment. Preventing an institution from using development grants to carry out any activities or services that relate to sectarian instruction or religious worship may prevent even a secular institution from teaching a class about various religions or discussing how these different religions engage in worship. Accordingly, we seek to narrow this regulation to prevent institutions from using development grants for activities or services that constitute religious instruction, religious worship, or proselytization, which is consistent with 34 CFR 75.532 and 76.532. Sections 75.532 and 76.532 prohibit any grantee from using its grant to pay for religious instruction, religious worship, or proselytization.

The current regulations also prohibit an institution from using a development grant for activities provided by a school or department of divinity and defines a school or department of divinity as an institution, or department, or program of instruction designed to prepare the students to teach theological subjects. There may be some ambiguity concerning what it means to prepare the students to teach theological subjects since "the study of theology does not necessarily implicate religious devotion or faith."[88] The funding restrictions

thus could be interpreted to apply even to programs in which theology is treated as a subject of scholarly interest, without any devotional affiliation or religious creed. Such restrictions could cover departments with Ph.D. programs in religious studies that approach theology through an academic lens— sociological, anthropological, philosophical, or otherwise. For example, this regulation may prohibit an institution from using a grant for a secular department of religion that prepares students to teach various religions in a comparative religion course. The Department proposes to delete this language and clarify that an institution may not use development grants for activities provided by a school or department that is solely to prepare students to become ministers of religion or enter some other religious vocation.[89]

These revisions align the text more closely with the First Amendment, RFRA, and the Religious Land Use and Individualized Persons Act of 2000, 42 U.S.C. 2000cc–5(7)(A). *See e.g., Trinity Lutheran Church,* 173 S. Ct. at 2012; principles 2–4, 6–8, 10–11, 13, and 20 of the Attorney General's Memorandum on Religious Liberty, 82 FR 49668 (Oct. 26, 2017); Exec. Order 13279, 67 FR 77141 (Dec. 12, 2002), *as amended by* Exec. Order 13559, 75 FR 71319 (Nov. 17, 2010), *and* Exec. Order 13831, 83 FR 20715 (May 8, 2018).

**34 CFR 608.12    Severability**

*Current Regulations:* None.
*Proposed Regulations:* Proposed § 608.12 would make clear that, if any part of the proposed regulations for part 608, subpart B, whether an individual section or language within a section, is held invalid by a court, the remainder would still be in effect.

*Reasons:* We believe that each of the proposed provisions discussed in this preamble would serve one or more important, related, but distinct, purposes. Each provision would provide a distinct value to the Department, grantees, subgrantees, beneficiaries, the public, taxpayers, the Federal government, and institutions separate from, and in addition to, the value provided by the other provisions. To best serve these purposes, we propose to include this administrative provision in the regulations to make clear that the regulations are designed to operate independently of each other and to convey the Department's intent that the potential invalidity of one provision should not affect the remainder of the provisions. Similarly, the validity of any of the provisions in "Part 1—Religious

---

[87] *See Locke,* 540 U.S. at 712.

[88] *See Locke* v. *Davey,* 540 U.S. 712, 734 (2004) (Thomas, J., dissenting); *see also* The Compact Oxford English Dictionary 2040 (2d ed. 1989) (defining theology as the "study or science which treats of God, His nature and attributes, and His relations with man and the universe").

[89] *See Locke* v. *Davey,* 540 U.S. 712 (2004).

Liberty'' should not affect the validity of any of the provisions in ''Part 2—Free Inquiry.''

Section 609.10   What activities may and may not be carried out under a grant?

*Current Regulations:* Under current regulations, funds appropriated under 20 U.S.C. 1060 through 20 U.S.C. 1063c for the Strengthening Historically Black Graduate Institutions Program may not support activities or services that merely relate to sectarian instruction or religious worship, without a clear understanding of said relation. The current regulations also define ''school or department of divinity,'' in part, as an institution or program that specifically prepares students ''to teach theological subjects,'' regardless of whether such a program operates with a secular purpose and without determining what such subjects might constitute.

*Proposed Regulations:* We propose to revise the current language, which may be overly broad and vague, with specific prohibitions on activities or services that constitute religious instruction, religious worship, or proselytization, which is consistent with 34 CFR 75.532 and 76.532. We more narrowly define a school or department of divinity as constituting programs of study meant only to prepare students to become ministers of religion or to enter into some other religious vocation.

*Reasons:* The current regulations may be interpreted in an overly broad manner so as to violate the First Amendment. Preventing an institution from using development grants to carry out any activities or services that relate to sectarian instruction or religious worship may prevent even a secular institution from teaching a class about various religions or discussing how these different religions engage in worship. Accordingly, we seek to narrow this regulation to prevent institutions from using development grants for activities or services that constitute religious instruction, religious worship, or proselytization, which is consistent with 34 CFR 75.532 and 76.532. Sections 75.532 and 76.532 prohibit any grantee from using its grant to pay for religious instruction, religious worship, or proselytization.

The current regulations also prohibit an institution from using a development grant for activities provided by a school or department of divinity and defines a school or department of divinity as an institution, or department, or program of instruction designed to prepare the students to teach theological subjects. There may be some ambiguity concerning what it means to prepare the

students to teach theological subjects since ''the study of theology does not necessarily implicate religious devotion or faith.'' [90] The funding restrictions thus could be interpreted to apply even to programs in which theology is treated as a subject of scholarly interest, without any devotional affiliation or religious creed. Such restrictions could cover departments with Ph.D. programs in religious studies that approach theology through an academic lens— sociological, anthropological, philosophical, or otherwise. For example, this regulation may prohibit an institution from using a grant for a secular department of religion that prepares students to teach various religions in a comparative religion course. The Department proposes to delete this language and clarify that an institution may not use development grants for activities provided by a school or department that is solely to prepare students to become ministers of religion or enter some other religious vocation.[91]

These revisions align the text more closely with the First Amendment, RFRA, and the Religious Land Use and Individualized Persons Act of 2000, 42 U.S.C. 2000cc–5(7)(A). *See e.g., Trinity Lutheran Church,* 173 S. Ct. at 2012; principles 2–4, 6–8, 10–11, 13, and 20 of the Attorney General's Memorandum on Religious Liberty, 82 FR 49668 (Oct. 26, 2017); Exec. Order 13279, 67 FR 77141 (Dec. 12, 2002), *as amended by* Exec. Order 13559, 75 FR 71319 (Nov. 17, 2010), *and* Exec. Order 13831, 83 FR 20715 (May 8, 2018).

34 CFR 609.12   Severability

*Current Regulations:* None.
*Proposed Regulations:* Proposed § 609.12 would make clear that, if any part of the proposed regulations for part 609, subpart B, whether an individual section or language within a section, is held invalid by a court, the remainder would still be in effect.

*Reasons:* We believe that each of the proposed provisions discussed in this preamble would serve one or more important, related, but distinct, purposes. Each provision would provide a distinct value to the Department, grantees, subgrantees, beneficiaries, the public, taxpayers, the Federal government, and institutions separate from, and in addition to, the value provided by the other provisions. To best serve these purposes, we propose to

include this administrative provision in the regulations to make clear that the regulations are designed to operate independently of each other and to convey the Department's intent that the potential invalidity of one provision should not affect the remainder of the provisions. Similarly, the validity of any of the provisions in ''Part 1—Religious Liberty'' should not affect the validity of any of the provisions in ''Part 2—Free Inquiry.''

**Significant Proposed Regulations Part 2 (Free Inquiry)**

(Sections 75.500 and 76.500) Constitutional Rights, Freedom of Inquiry, and Federal Statutes and Regulations on Nondiscrimination

*Current Regulations:* As previously noted, part 75 addresses direct grant programs, and part 76 addresses State-Administered Formula Grant Programs. Sections 75.500 and 76.500 of title 34 require grantees, States, and subgrantees to comply with various nondiscrimination laws and regulations.

*Proposed Regulations:* We propose to amend these regulations by requiring public institutions of higher education that are grantees or subgrantees to comply with the First Amendment to the U.S. Constitution, as a material condition of the grant; to require private institutions of higher education that are grantees or subgrantees to comply with their stated institutional policies regarding freedom of speech, including academic freedom, as a material condition of the grant; and to require public institutions to ensure faith-based student organizations are treated the same as secular student organizations, as a material condition of the grant.

The Department will determine that a public institution has not complied with the First Amendment only if there is a final, non-default judgment by a State or Federal court that the public institution or an employee of the public institution, acting in his or her official capacity, violated the First Amendment. Similarly, the Department will determine that a private institution has not complied with stated institutional policies regarding freedom of speech or academic freedom only if there is a final, non-default judgment by a State or Federal court to the effect that the private institution or an employee of the private institution, acting on behalf of the private institution, violated its stated institutional policy regarding freedom of speech or academic freedom. Both public and private institutions will be required to submit to the Secretary a copy of any such non-default, final judgment.

---

[90] *See Locke* v. *Davey,* 540 U.S. 712, 734 (2004) (Thomas, J., dissenting); *see also* The Compact Oxford English Dictionary 2040 (2d ed. 1989) (defining theology as the ''study or science which treats of God, His nature and attributes, and His relations with man and the universe'').

[91] *See Locke* v. *Davey,* 540 U.S. 712 (2004).

*Reasons:* The President's E.O. 13864 states that "it is the policy of the Federal Government to encourage institutions to foster environments that promote open, intellectually engaging, and diverse debate, including through compliance with the First Amendment for public institutions and compliance with stated institutional policies regarding freedom of speech for private institutions," and directs covered agencies, including the Department, to take necessary steps to ensure grantees and subgrantees comply with all Federal laws, regulations, and policies, including the First Amendment. The Department proposes these regulations for the reasons previously explained in the section "Background—Part 2 (Free Inquiry)" and for the reasons described below.

The proposed regulations would require public institutions to comply with the First Amendment to the United States Constitution as a material condition for receiving grants, including protections for freedom of speech, including academic freedom. Similarly, the proposed regulations would require private institutions to comply with their stated institutional policies regarding freedom of speech, including academic freedom, as a material condition for receiving grants.

The First Amendment applies to public institutions, and under the First Amendment, "no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." [92] As a result, officials at public institutions may not discriminate against their students' or employees' on the basis of their religious, political, philosophical, or ideological affinities, convictions, thoughts, ideas, or beliefs.[93] "It can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." [94] The First Amendment's protections apply as much as in cyberspace as they do in physical space.[95] "[T]he government," furthermore, "offends the First Amendment when it imposes financial burdens on certain speakers based on the content of their expression." [96] Consequently, the First Amendment presumptively prohibits officials at public institutions from discriminating

against others based on their viewpoints.[97]

While the government may choose to preclude certain subjects from a limited public forum it has created, "the specific motivating ideology or the opinion or perspective of the speaker" or speech cannot be "the rationale for the restriction." [98] "[A] forum [may exist] more in a metaphysical than in a spatial or geographic sense," perhaps as online fora or mandatory fee systems, but the traditional principles of forum analysis apply.[99] The restrictions themselves must be reasonable and viewpoint-neutral.[100] The courts skeptically will pierce the government's proffered justification and evaluate whether the actual motivation for excluding certain kinds of speech is illegitimate, for example, oppression of or antagonism towards certain kinds of speech.[101] Specifically, if the government is not "confining" this limited public forum "to the limited and legitimate purposes for which it was created" and instead is selectively choosing content in order to exclude viewpoints it disfavors, the First Amendment violation will be deemed to be "blatant." [102] Such a restriction is no less repugnant to the First Amendment than the government's outright antagonism and suppression of *some select* views would be.[103]

Like the freedom of speech, the freedoms of press, of assembly and of association too are cornerstones of the First Amendment. The First Amendment exemplifies our national commitment to "robust political debate" because it guarantees the freedoms of speech, press, assembly and therefore association.[104] Regarding the freedom of press, it is well-established that "a major purpose of that Amendment was to protect the free discussion of governmental affairs," through the means of a free press.[105] "The First Amendment's guarantee of 'the freedom of speech, or of the press' prohibits a wide assortment of government restraints upon expression, but the core abuse against which it was directed was the scheme of licensing laws implemented by the monarch and Parliament to contain the 'evils' of the

printing press in 16th- and 17th-century England." [106] As the Supreme Court has recognized, "[t]he Constitution specifically selected the press, which includes not only newspapers, books, and magazines, but also humble leaflets and circulars to play an important role in the discussion of public affairs." [107] Accordingly, "the press serves and was designed to serve as a powerful antidote to any abuses of power by governmental officials and as a constitutionally chosen means for keeping officials elected by the people responsible to all the people whom they were selected to serve." [108] As a result, "[s]uppression of the right of the press to praise or criticize governmental agents and," more broadly, "to clamor and contend for or against change, . . . muzzles one of the very agencies the Framers of our Constitution thoughtfully and deliberately selected to improve our society and keep it free."[109] Even if the press is trying to "influence [someone's] conduct by their activities" or otherwise to have a "coercive impact" on them, it is still entitled to full First Amendment protection.[110] Nor can the government suppress press that is merely "offensive," "so long as the means are peaceful." [111] Under the First Amendment, the government may not indulge in the business of determining which "communication . . . meet[s]" or fails to satisfy the "standards of acceptability." [112] Therefore, the Supreme Court has also held that "[a]ny prior restraint on expression comes to th[e] [c]ourt[s] with a 'heavy presumption' against its constitutional validity." [113]

Furthermore, the First Amendment protects the freedom of peaceable assembly. The Supreme Court has recognized that "[t]he right of peaceable assembly is a right cognate to . . . free speech and . . . is *equally fundamental.*" [114] This protection encompasses "classically political speech" such as political protests and demonstrations; indeed, it "operates at

---

[92] *Barnette,* 319 U.S. at 642.

[93] *See Tinker,* 393 U.S. at 505–07.

[94] *Id.* at 506.

[95] *See, e.g., Packingham* v. *North Carolina,* 137 S.Ct. 1730, 1735–36 (2017); *Reno* v. *Am. Civil Liberties Union,* 521 U.S. 844, 868 (1997).

[96] *Rosenberger* v. *Rector & Visitors of Univ. of Va.,* 515 U.S. 819, 828–29 (1995).

[97] *See, e.g., id.* at 829–30.

[98] *Id.* at 829 (citing *Perry Ed. Ass'n* v. *Perry Local Educators' Ass'n,* 460 U.S. 37, 46 (1983)).

[99] *Rosenberger,* 515 U.S. at 830.

[100] *See Cornelius* v. *NAACP Legal Defense and Ed. Fund, Inc.,* 473 U.S. 788, 806 (1985).

[101] *See Rosenberger,* 515 U.S. at 828–35.

[102] *Id.* at 829.

[103] *See Perry Ed. Ass'n,* 460 U.S. at 46.

[104] *Hustler Magazine* v. *Falwell,* 485 U.S. 46, 51 (1988).

[105] *Mills* v. *Ala.,* 384 U.S. 214, 218 (1966).

[106] *Thomas* v. *Chicago Park Dist.,* 534 U.S. 316, 320 (2002).

[107] *Mills,* 384 U.S. at 219 (citing *Lovell* v. *City of Griffin,* 303 U.S. 444 (1938)).

[108] *Mills,* 384 U.S. at 219.

[109] *Id.*

[110] *Org. for a Better Austin* v. *Keefe,* 402 U.S. 415, 419 (1971).

[111] *Id.*

[112] *Id.; see also Barnette,* 319 U.S. at 642.

[113] *Org. for a Better Austin,* 402 U.S. at 419 (quoting *Carroll* v. *President and Comm'rs of Princess Anne,* 393 U.S. 175, 181 (1968); *Bantam Books, Inc.* v. *Sullivan,* 372 U.S. 58, 70 (1963)).

[114] *De Jonge* v. *Ore.,* 299 U.S. 353, 364 (1937) (emphasis added).

the core of the First Amendment."[115] The Supreme Court has held that "constitutional rights may not be denied simply because of hostility to their assertion or exercise," which means that the government decision-maker's disagreement with the content of the speech or their fear of potential disorder is no justification for interfering with nonviolent and orderly demonstrations and protests.[116] Governmental interference with assemblies in which the "peaceful expression of unpopular views" is conducted violates the First Amendment.[117] In fact, the Supreme Court has even asserted that the First Amendment's protections are most necessary, and certainly appropriate, when speech "'invite[s] dispute,'" "'induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger.'"[118] This is because, whether expressed in assemblies or elsewhere, "[s]peech is often provocative and challenging. It may strike at prejudices and preconceptions, and have profound unsettling effects as it presses for acceptance of an idea."[119] "[U]nless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest," the freedoms of assembly (and speech) are "protect[ions] against censorship or punishment."[120] This constitutional assurance is designed to guard against the "standardization of ideas either by legislatures, courts, or dominant political or community groups."[121] The right to peaceable assembly, along with free speech, is central to our system of Republican government. As Chief Justice Hughes wrote for the Supreme Court in 1931, "[t]he maintenance of the opportunity for free political discussion to the end that government may be responsive to the will of the people and that changes may be obtained by lawful means, an opportunity essential to the security of the Republic, is a fundamental principle of our constitutional system." That concept rings as true today as it did almost nine decades ago.

The First Amendment also protects the freedom of association. As the Supreme Court observed in a seminal

case near the peak of the Civil Rights Movement, the freedom of association's venerable root is "the close nexus between the freedoms of speech and assembly."[123] The Supreme Court has long deemed the axiom "that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of . . . freedom of speech" to be "beyond debate."[124] Under Supreme Court jurisprudence, "it is [constitutionally] immaterial whether the beliefs sought to be advanced by association pertain to political, economic, religious or cultural matters."[125] Even restrictions on the freedom of association that do not outright proscribe such a freedom might violate the First and Fourteenth Amendments.[126] For example, because there exists a "vital relationship between freedom to associate and privacy in one's associations," "[c]ompelled disclosure of membership in an organization engaged in advocacy of particular beliefs" is in tension with the freedom of association.[127] In practice, even "the likelihood of a substantial restraint upon the exercise by . . . members [of an organization] of their right to freedom of association"

contravenes the First Amendment.[128] All this merges together to mean that even "[governmental] action which *may* have the effect of curtailing the freedom to associate is subject to the closest [judicial] scrutiny" under the First and Fourteenth Amendments.[129]

With respect to private institutions, the proposed regulations require they comply with their own stated institutional policies regarding freedom of speech, including academic freedom, as previously discussed in the section "Background—Part 2 (Free Inquiry)." Private institutions are often required by law to deliver what they have promised, including what they have promised about freedom of speech, including academic freedom, through their own policies.[130] As noted earlier, the private institution's failure to adhere to its own institutional policies can be a contractual breach but it can also be a tort or more. The most commonplace and obvious example is the contractual relationship between a student and his or her academic institution, as courts have recognized such a relationship for more than a century.[131] "[B]y the act of matriculation, together with payment of required fees, a contract between the student and the institution is created . . . .'"[132] The institution's catalogues, bulletins, circulars, registration materials, and rules and regulations— and even faculty, curriculum, requirements, costs, facilities and special programs—made available to or known by the matriculating student— may constitute part of that contract.[133] Private institutions often attract and keep, students and employees by assuring them of robust freedom of speech policies; this bargained-for exchange typically constitutes a

---

[115] *Boos* v. *Barry,* 485 U.S. 312, 318 (1988).

[116] *Cox* v. *Louisiana,* 379 U.S. 536, 550 (1965) (citations and internal quotation marks omitted).

[117] *Edwards* v. *South Carolina,* 372 U.S. 229, 237 (1963).

[118] *Id.* (quoting *Terminiello* v. *Chi.,* 337 U.S. 1, 5 (1949)).

[119] *Terminiello,* 337 U.S. at 5.

[120] *Id.*

[121] *Id.*

[122] *Stromberg* v. *Calif.,* 283 U.S. 359, 369 (1931).

[123] *NAACP* v. *Ala.,* 357 U.S. 449, 460 (1958) (citing *Thomas* v. *Collins,* 323 U.S. 516, 530 (1945); *De Jonge,* 299 U.S. at 364).

[124] *NAACP,* 357 U.S. at 460.

[125] *Id.*

[126] Even though the Supreme Court's *NAACP* opinion is formally based on the Due Process Clause of the Fourteenth Amendment, its First Amendment foundations are incontrovertible. *See NAACP,* 357 U.S. at 451, 460. After all, that opinion repeatedly invokes the freedoms of speech, assembly and of course association. *See id.* at 453, 460, 461. It was just that during this period, some Members of the Supreme Court, including this opinion's author, the second Justice Harlan, preferred to recognize the substantive component of the Due Process Clause of the Fourteenth Amendment as the independent and stand-alone basis for certain constitutional rights, rather than resorting to the Bill of Rights, which starts out with the First Amendment, as made applicable to the States through the Due Process Clause of the Fourteenth Amendment. *See, e.g., Poe* v. *Ullman,* 367 U.S. 497, 541–45 (1961) (Harlan, J., dissenting) (stating that "it is not the particular enumeration of rights in the first eight Amendments which spells out the reach of Fourteenth Amendment due process, but rather, as was suggested in another context long before the adoption of that Amendment, those concepts which are considered to embrace those rights which are . . . fundamental; which belong . . . to the citizens of all free governments, for the purposes [of securing] which men enter into society.") (citations and internal quotation marks omitted); *id.* at 89 (Black, J., dissenting) ("I would follow what I believe was the original purpose of the Fourteenth Amendment—to extend to all the people of the nation the complete protection of the Bill of Rights.").

[127] *NAACP,* 357 U.S. at 462 (citing *U.S.* v. *Rumely,* 345 U.S. 41, 56–58 (1953); *Am. Commc'n Ass'n* v. *Douds,* 339 U.S. 382, 402 (1950)).

[128] *NAACP,* 357 U.S. at 462.

[129] *Id.* at 461–62 (emphasis added).

[130] *See, e.g., Greene,* 271 F.Supp. at 613; *Zumbrun,* 25 Cal.App.3d at 10–11; *Searle,* 23 Cal.App.3d at 452; *Militana,* 184 So.2d at 703–04; *Anthony,* 224 App.Div. at 489–90; *Barker,* 278 Pa. at 122; *Goldstein,* 76 App.Div. at 82–83; *Bellevue Hosp. Med. Coll.,* 60 Hun at 107.

[131] *See, e.g., Greene,* 271 F.Supp. at 613; *Dixon,* 294 F.2d at 157; *Kashmiri,* 156 Cal. App. 4th at 824; *Zumbrun,* 25 Cal.App.3d at 10–11; *Searle,* 23 Cal.App.3d at 452; *Militana,* 184 So.2d at 703–04; *Anthony,* 224 App.Div. at 489–90; *John B. Stetson Univ.,* 88 Fla. at 517; *Barker,* 278 Pa. at 122; *Goldstein,* 76 App.Div. at 10; *Wickstrom* v. *N. Idaho Coll.* (1986) 111 Idaho 450, 452; *see also* 34 CFR 685.222(c).

[132] *Kashmiri,* 156 Cal. App. 4th at 824 (quoting *Andersen* v. *Regents of Univ. of Calif.* (1972) 22 Cal.App.3d 763, 769).

[133] *DeMarco* v. *Univ. of Health Sci.* (1976) 352 NE2d 356, 361–62; for the doctrine of specific promises in the educational context, *see also Johnson* v. *Schmitz,* 119 F.Supp.2d 90, 93 (D.Conn. 2000); *Zumbrun,* 25 Cal.App.3d at 10; *Wickstrom* v. *N. Idaho Coll.* (1986) 111 Idaho 450, 452; *see also* 34 CFR 685.222(c).

contract.[134] Such specific promises, particularly when contained in the institution's stated institutional policies, "confer[] duties upon [the institution] which cannot be arbitrarily disregarded and may be judicially enforced." [135] "[A] court that is asked to enforce an asserted 'contract' between a student and his university must examine the oral and written expressions of the parties in light of the policies and customs of the particular institution."[136] Consequently, private institutions' failure to enforce these protections or their enforcing these protections selectively is often actionable in court on claims sounding in contract, tort, or otherwise.

The condition that private institutions comply with their stated institutional policies regarding freedom of speech is a material condition, including for purposes of liability under the Federal False Claims Act(FCA), 31 U.S.C. 3729, *et seq.*[137] Private institutions are subject to *qui tam* actions under the FCA.[138] Actions under the FCA permit either the

Attorney General or a private party known as a *relator* to initiate a civil action alleging fraud on the Government.[139] The Secretary may require institutions to certify they have complied with their own freedom of expression policies as a material condition for receiving education grants. If these institutions fail to so certify, the Secretary may deny these institutions grants. If private institutions so certify but do not abide by their own stated institutional policies on free speech, including academic freedom, their conduct may give rise to a cause of action under the FCA. A relator, including the private institution's student or employee, may have standing to file a lawsuit under the FCA against the private institution.

Both E.O. 13864 and these proposed regulations rely upon the judiciary as the primary arbiter of alleged violations of First Amendment freedoms concerning public institutions and free speech protections in stated institutional policies regarding private institutions. The courts have cultivated a well-developed and intricate body of case law in this area. The courts, accordingly, are well situated to serve as the primary body to "enforc[e] the First Amendment [and other free-speech protections, including those protecting academic freedom] as properly understood, '[t]he very purpose of [much of which] was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts.' " [140]

The burden and cost to the Department of tracking every litigation proceeding in the United States that implicates the First Amendment with respect to public institutions or that implicates stated institutional policies on freedom of speech, including academic freedom, with respect to private institutions is great. It is much easier for an institution of higher education to track any litigation against it. Accordingly, the institution of higher education subject to a final judgment would be required to submit a copy of the final judgment for a violation of the First Amendment, in the case of a public institution, or for a violation of stated institutional policies regarding freedom of speech, including academic freedom, in the case of private institutions, to the Secretary no later

than 30 days after the final judgment is entered.

Under the proposed regulations, if there is a final, non-default judgment that an institution has violated the First Amendment or stated institutional policies regarding freedom of speech, including academic freedom, the Department would consider the grantee to be in violation of a material condition of the grant consistent with its other regulations and procedures. The Department may pursue existing remedies for noncompliance, which include imposing special conditions, temporarily withholding cash payments pending correction of the deficiency, suspension or termination of a Federal award, and potentially debarment, as described in Subpart G of Part 75 and Subpart I of Part 76 of Title 34 of the Code of Federal Regulations.[141]

With respect to Direct Grant Programs under Part 75 of Title 34 of the Code of Federal Regulations, the Department has authority to initiate a suspension or debarment proceeding under 2 CFR part 180, if the Department first determines that non-compliance cannot be remedied by imposing additional conditions.[142] Prior to pursuing a suspension or debarment proceeding, the Department may choose to temporarily withhold cash payments pending correction of the deficiency, disallow all or part of the cost of the activity or action not in compliance, wholly or partly suspend or terminate the Federal award, or withhold further Federal awards for the project or program.[143] Factors that a debarring official may consider include, but are not limited to, the following: The "actual or potential harm or impact that results or may result from the wrongdoing," the "frequency of incidents and/or duration of the wrongdoing," "whether there is a pattern or prior history of wrongdoing," "whether the wrongdoing was pervasive within [the institution of higher education]," "the kind of positions held by the individuals involved in the wrongdoing," "whether [the institution's] principals tolerated the offense," and "[o]ther factors that are appropriate in the circumstances of a particular case." [144] Upon taking any remedy for non-compliance, the Department will provide an institution an opportunity to object and provide

---

[134] *See, e.g., Johnson,* 119 F.Supp.2d at 93 ("Because a student bases his or her decision to attend a college or university, in significant part, on the documents received concerning core matters, such as faculty, curriculum, requirements, costs, facilities and special programs, application of contract principles based on these documents and other express or implied promises," consistent with certain limitations, "appears sound."); *DeMarco,* 352 NE2d at 361–62 ("A contract between a private institution and a student confers duties upon both parties which cannot be arbitrarily disregarded and may be judicially enforced.").

[135] *DeMarco,* 352 NE2d at 362; *see also Ross* v. *Creighton Univ.,* 957 F.2d 410, 415–17 (7th Cir. 1992); *Kashmiri,* 156 Cal. App. 4th at 826; *Reynolds* v. *Sterling Coll., Inc.* (2000) 170 Vt. 620, 621; *CenCor, Inc.* v. *Tolman* (Colo. 1994) 868 P.2d 396; *Steinberg* v. *Chi. Med. Sch.* (1977) 371 NE2d 634.

[136] *Banerjee* v. *Roberts,* 641 F.Supp. 1093, 1106 (D.Conn. 1986).

[137] *See, e.g., Universal Health Servs., Inc.* v. *United States ex rel. Escobar,* 136 S. Ct. 1989, 2002–04 (2016). There are no cases directly on point under the False Claims Act because the Department and other Federal agencies have not required compliance with stated institutional policies on free speech, including academic freedom, as a material condition of a grant. The Department notes that public and private institutions also may be held accountable to the Department for any substantial misrepresentation under the Department's borrower defense to repayment regulations. 34 CFR 668.71.

[138] *See, e.g., United States ex rel. Hendow* v. *Univ. of Phoenix,* 461 F.3d 1166 (9th Cir. 2006) (holding relators, former enrollment counselors, properly alleged a cause of action against Phoenix University under the FCA for knowingly making false promises to comply with the incentive compensation ban to become eligible to receive Federal student aid under Title IV of the Higher Education Act of 1965, as amended). More recently, in March 2019 Duke University agreed to pay the Federal government $112.5 million to resolve allegations that it violated the FCA by submitting applications and progress reports that contained falsified research on Federal grants to National Institutes of Health (NIH) and to the Environmental Protection Agency (EPA). *United States ex rel. Thomas* v. *Duke Univ., et al.,* No. 1:17–cv–276 (M.D.N.C. 2019).

[139] 31 U.S.C. 3730.

[140] *See Janus* v. *Am. Fed'n of State, Cty., and Mun. Employees, Council 31,* 138 S.Ct. 2448, 2486 n.28 (2018) (quoting *Barnette,* 319 U.S. at 638).

[141] 34 CFR 75.901 (cross-referencing 2 CFR 200.338); 34 CFR 76.901; 2 CFR 180.800.

[142] 34 CFR 75.901(a); 2 CFR 200.338(d). The Department may impose additional conditions on the grantee to remedy noncompliance. 2 CFR 200.207.

[143] 2 CFR 200.338.

[144] 2 CFR 180.860.

information and documentation challenging the action.[145]

With respect to State-Administered Formula Grant Programs under Part 76 of Title 34 of the Code of Federal Regulations, if a state-administered formula grant program does not have implementing regulations, the Secretary implements the program under the authorizing statute and, to the extent consistent with the authorizing statute, under the General Education Provisions Act (GEPA), 20 U.S.C. 1221, *et seq.,* and the regulations in 34 CFR part 76.[146] The Department's Office of Administrative Law Judges conducts recovery of funds hearings pursuant to Section 452 of GEPA, hearings regarding the withholding of payments pursuant to Section 455 of GEPA, cease and desist hearings pursuant to Section 456 of GEPA, and other proceedings designated by the Secretary.[147] The regulations of the Office of Administrative Law Judges for purposes of enforcement are set forth in 34 CFR part 81.

The Department disburses billions of dollars each year through discretionary grant competitions. While each of these programs has unique purposes and goals, no student at a public institution should give up his or her constitutional rights in order to obtain educational services provided through a grant. At private institutions, the Department expects a fair, even-handed application of stated campus free speech policies, just as it expects institutions to accurately reflect their policies on numerous other matters. The Department will hold a private institution to its stated institutional policy on freedom of speech, including academic freedom, and will not require a private institution to adopt any particular policy on freedom of speech or academic freedom. As previously explained, religiously affiliated institutions may continue to avail themselves of their Free Exercise rights under the U.S. Constitution, and the Department must enforce E.O. 13864 in a manner that is consistent with applicable law, including the First Amendment.[148]

Finally, we propose to prohibit discrimination on the basis of religion by requiring public institutions that receive Federal research or education grants, as defined in E.O. 13864, to treat religious and nonreligious student

organizations the same, by prohibiting the denial of any right, benefit, or privilege to a religious student organization that is otherwise afforded to other student organizations. We acknowledge that this proposed regulation is not a condition of participation in programs under title IV of the Higher Education Act, as amended. Student organizations enable individuals sharing common characteristics or beliefs to unite towards common goals, even if those goals are not shared by a majority of the student body or the public institution's administration.[149] This right to expressive association includes the right of a student organization to limit its leadership to individuals who share its religious beliefs without interference from the institution or students who do not share the organization's beliefs.[150] Student organizations also have the right to support their membership, help members to carry out the goals of the organization in accordance with its religious mission, and define criteria for accepting new members. Student organizations at public educational institutions should be able to restrict membership and leadership in their student organization on the basis of acceptance of or adherence to the religious beliefs and tenets of the organization. Under the proposed regulations, a public institution that fails to afford religious student organizations the same rights, benefits, and privileges provided to other student organizations would be considered in violation of a material condition of the grant, and the Department could pursue existing remedies for noncompliance, which include imposing special conditions, temporarily withholding cash payments pending correction of the deficiency, suspension or termination of a Federal award, and potentially debarment.[151]

**34 CFR 75.684 and 76.684    Severability**

*Current Regulations:* None.

*Proposed Regulations:* Proposed §§ 75.684 and 76.684 would make clear that, if any part of the proposed regulations for part 75, subpart E, or for part 76, subpart F, whether an individual section or language within a section, is held invalid by a court, the remainder would still be in effect.

*Reasons:* We believe that each of the proposed provisions discussed in this preamble would serve one or more important, related, but distinct,

purposes. Each provision would provide a distinct value to the Department, grantees, subgrantees, beneficiaries, the public, taxpayers, the Federal government, and institutions separate from, and in addition to, the value provided by the other provisions. To best serve these purposes, we propose to include this administrative provision in the regulations to make clear that the regulations are designed to operate independently of each other and to convey the Department's intent that the potential invalidity of one provision should not affect the remainder of the provisions. Similarly, the validity of any of the provisions in "Part 1—Religious Liberty" should not affect the validity of any of the provisions in "Part 2—Free Inquiry."

**Sections 75.700 and 76.700    Compliance With the U.S. Constitution, Statutes, Regulations, Stated Institutional Policies, and Applications**

*Current Regulations:* Sections 75.700 and 76.700 require grantees and subgrantees to comply with all applicable laws, regulations, and approved applications.

*Proposed Regulations:* We propose to amend these sections to also include a reference to §§ 75.500 and 76.500.

*Reasons:* The Department proposes these regulations for the reasons previously explained in the section "Background—Part 2 (Free Inquiry)." The Department also would like to provide more specificity and clarity on the laws and regulations that apply to grantees and subgrantees as well as strengthen compliance with nondiscrimination requirements, especially by promoting, protecting, and preserving free speech protections as stated in institutional policies at private educational institutions.

**34 CFR 75.741 and 76.784    Severability**

*Current Regulations:* None.

*Proposed Regulations:* Proposed §§ 75.741 and 76.784 would make clear that, if any part of the proposed regulations for part 75, subpart F, or for part 76, subpart G, whether an individual section or language within a section, is held invalid by a court, the remainder would still be in effect.

*Reasons:* We believe that each of the proposed provisions discussed in this preamble would serve one or more important, related, but distinct, purposes. Each provision would provide a distinct value to the Department, grantees, subgrantees, beneficiaries, the public, taxpayers, the Federal government, and institutions separate from, and in addition to, the value provided by the other provisions. To

---

[145] 2 CFR 200.341.

[146] 34 CFR 76.1(b).

[147] 20 U.S.C. 1234; 34 CFR 76.901.

[148] Section 3(a) of E.O. 13864 states that covered agencies must advance the policy articulated in the Executive Order in a manner consistent with applicable law, including the First Amendment.

[149] *See, e.g., Rosenberger,* 515 U.S. at 829–37; *Bus. Leaders in Christ* v. *Univ. of Iowa,* 360 F. Supp. 3d 885, 899 (S.D. Iowa 2019).

[150] *Id.*

[151] 34 CFR 75.901 (cross-referencing 2 CFR 200.338); 2 CFR 180.800.

best serve these purposes, we propose to include this administrative provision in the regulations to make clear that the regulations are designed to operate independently of each other and to convey the Department's intent that the potential invalidity of one provision should not affect the remainder of the provisions. Similarly, the validity of any of the provisions in "Part 1—Religious Liberty" should not affect the validity of any of the provisions in "Part 2—Free Inquiry."

Executive Orders 12866, 13563, and 13771

Regulatory Impact Analysis

Under E.O. 12866, the Office of Management and Budget (OMB) must determine whether this regulatory action is "significant" and, therefore, subject to the requirements of the Executive order and subject to review by OMB. Section 3(f) of E.O. 12866 defines a "significant regulatory action" as an action likely to result in a rule that may—

(1) Have an annual effect on the economy of $100 million or more, or adversely affect a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or State, local, or Tribal governments or communities in a material way (also referred to as an "economically significant" rule);

(2) Create serious inconsistency or otherwise interfere with an action taken or planned by another agency;

(3) Materially alter the budgetary impacts of entitlement grants, user fees, or loan programs or the rights and obligations of recipients thereof; or

(4) Raise novel legal or policy issues arising out of legal mandates, the President's priorities, or the principles stated in the Executive order.

Under E.O. 12866, section 3(f)(1), some of the changes proposed in this regulatory action would materially alter the rights and obligations of recipients of Federal financial assistance under title IV of the HEA. Therefore, OMB has determined that this is a significant regulatory action subject to review by OMB. Also, under E.O. 12866 and the Presidential Memorandum "Plain Language in Government Writing," the Secretary invites comment on how easy these regulations are to understand in the *Clarity of the Regulations* section.

Under E.O. 13771, for each new regulation that the Department proposes for notice and comment or otherwise promulgates that is a significant regulatory action under E.O. 12866 and that imposes total costs greater than zero, it must identify two deregulatory

actions. For FY 2019, any new incremental costs associated with a new regulation must be fully offset by the elimination of existing costs through deregulatory actions. The proposed regulations are a significant regulatory action under E.O. 12866 but do not impose total costs greater than zero. Accordingly, the Department is not required to identify two deregulatory actions under E.O. 13771.

We have also reviewed these proposed regulations under *E.O. 13563*, which supplements and explicitly reaffirms the principles, structures, and definitions governing regulatory review established in E.O. 12866. To the extent permitted by law, *E.O. 13563* requires that an agency—

(1) Propose or adopt regulations only on a reasoned determination that their benefits justify their costs (recognizing that some benefits and costs are difficult to quantify);

(2) Tailor its regulations to impose the least burden on society, consistent with obtaining regulatory objectives and taking into account—among other things and to the extent practicable—the costs of cumulative regulations;

(3) In choosing among alternative regulatory approaches, select those approaches that maximize net benefits (including potential economic, environmental, public health and safety, and other advantages; distributive impacts; and equity);

(4) To the extent feasible, specify performance objectives, rather than the behavior or manner of compliance a regulated entity must adopt; and

(5) Identify and assess available alternatives to direct regulation, including economic incentives—such as user fees or marketable permits—to encourage the desired behavior, or provide information that enables the public to make choices.

E.O. 13563 also requires an agency "to use the best available techniques to quantify anticipated present and future benefits and costs as accurately as possible." The Office of Information and Regulatory Affairs of OMB has emphasized that these techniques may include "identifying changing future compliance costs that might result from technological innovation or anticipated behavioral changes."

We are issuing these proposed regulations only on a reasoned determination that their benefits justify their costs. Based on the analysis that follows, the Department believes that these regulations are consistent with the principles in E.O. 13563.

We also have determined that this regulatory action does not unduly interfere with State, local, or Tribal

governments in the exercise of their governmental functions.

In this regulatory impact analysis, we discuss the need for regulatory action, the potential costs and benefits, assumptions, limitations, and data sources, as well as regulatory alternatives we considered.

**Need for Regulatory Action**

The Department is proposing to revise the regulations described in "Part 1—Religious Liberty" of the Preamble in response to the United States Supreme Court's decision in *Trinity Lutheran Church of Columbia, Inc.* v. *Comer*,[152] the United States Attorney General's October 6, 2017, Memorandum on Federal Law Protections for Religious Liberty pursuant to E.O. 13798 (Promoting Free Speech and Religious Liberty),[153] and E.O. 13831 (Establishment of a White House Faith and Opportunity Initiative). Additionally, the Department is proposing to revise the regulations described in "Part 2- Free Inquiry" of the preamble to enforce E.O. 13864,[154] Improving Free Inquiry, Transparency, and Accountability at Colleges and Universities. The Department's need for regulatory action is explained more fully in "Background—Part 1 (Religious Liberty)" and "Background—Part 2 (Free inquiry)" in the Preamble.

**Discussion of Costs and Benefits**

The Department has analyzed the costs and benefits of complying with these proposed regulations. Due to the number of affected entities and recipients, we cannot estimate, with absolute precision, the likely effects of these proposed regulations. However, as discussed below, we do not believe that these proposed regulations would result in any significant costs to the Federal government, general public, or recipients of support under the affected programs.

**Discussion of Costs, Benefits, and Transfers**

2 CFR 3474.15

Proposed changes to 2 CFR 3747.15(a) would remove explanations of other provisions in the section and clarify that grantees and subgrantees are responsible

---

[152] 137 S. Ct. 2012 (2017).

[153] U.S. Att'y Gen. Mem. on Federal Law Protections for Religious Liberty (Oct. 6, 2017), *https://www.justice.gov/opa/press-release/file/1001891/download.*

[154] E.O. 13864 of March 21, 2019, "Improving Free Inquiry, Transparency, and Accountability at Colleges and Universities," *https://www.federalregister.gov/documents/2019/03/26/2019-05934/improving-free-inquiry-transparency-and-accountability-at-colleges-and-universities.*

**3216**    **Federal Register** / Vol. 85, No. 12 / Friday, January 17, 2020 / Proposed Rules

for ensuring the compliance of their subgrantees with all pertinent requirements. These changes would clarify the existing requirements on grantees and remove extraneous text from the regulation. This change is projected to have no effect.

Proposed changes to 2 CFR 3474.15(b)(1) would remove extraneous language and align the text more closely to the RFRA. We do not anticipate this change to have any quantifiable cost and may benefit the Department and general public by improving the clarity of the regulations.

Proposed changes to 2 CFR 3474.15(b)(2) would clarify the language and align the text more closely with RFRA. We do not anticipate this change to have any quantifiable cost and may benefit the Department and general public by improving the clarity of the regulations.

The proposed addition of 2 CFR 3474.15(b)(3) would clarify that organizations with religious character are eligible to participate in Department programs on the same basis as other organizations. The language mirrors language already included in other statutes and applicable regulations. We do not anticipate this change to have any quantifiable cost and may benefit the Department and general public by improving the clarity of the regulations and expanding the potential applicant pool for Department programs.

The proposed addition of 2 CFR 3474.15(b)(4) would clarify that organizations motivated or influenced by religious faith to provide social services are eligible to participate in Department-funded programs on the same basis as other organizations. The language mirrors language already included in other statutes and applicable regulations. We do not anticipate this change to have any quantifiable cost and may benefit the Department and general public by improving the clarity of the regulations and expanding the potential applicant pool for Department programs.

Proposed changes to 2 CFR 3474(c)(1) would align with the terms of section 2(b) of E.O. 13831. We do not anticipate this change to have any quantifiable cost and may benefit the Department and general public by improving the clarity of the regulations.

Proposed changes to 2 CFR 3474(d)(1) would remove extraneous language and align it more closely to the terms of E.O. 13279, as modified. We do not anticipate this change to have any quantifiable cost and may benefit the Department and general public by improving the clarity of the regulations.

Proposed changes to 2 CFR 3474.15(e)(1) would clarify the text and align the text more closely with RFRA. We do not anticipate this change to have any quantifiable cost and may benefit the Department and general public by improving the clarity of the regulations.

Proposed changes to 2 CFR 3474.15(e)(2) would remove extraneous language and align the text more closely with RFRA. We do not anticipate this change to have any quantifiable cost and may benefit the Department and general public by improving the clarity of the regulations.

Proposed changes to 2 CFR 3474.15(f) would align the text more closely with the RFRA. We do not anticipate this change to have any quantifiable cost and may benefit the Department and general public by improving the clarity of the regulations.

Proposed changes to 2 CFR 3474.15(g) would align the text more closely with the RFRA. We do not anticipate this change to have any quantifiable cost and may benefit the Department and general public by improving the clarity of the regulations.

The proposed addition of 2 CFR 3474.15(h) would align the text of this section more closely with the First Amendment. We do not anticipate this change to have any quantifiable cost and may benefit the Department and general public by improving the clarity of the regulations.

### 34 CFR Part 75

### 34 CFR 75.51

The proposed addition of 34 CFR 75.51(b)(5) would provide additional clarity to organizations with sincerely held religious beliefs that they may otherwise qualify as a nonprofit organization under the terms of this section. We do not anticipate this change would have any quantifiable cost, but may result in transfers among recipients of Federal funds or beneficiaries of Department programs to the extent that organizations with sincerely held religious beliefs preventing their application for tax-exempt status under section 501(c)(3) of the Internal Revenue Code are currently excluded from such opportunities. However, the Department does not have sufficient information available to quantify this impact at this time. The Department invites members of the public to provide relevant data on this issue.

### 34 CFR 75.52

Proposed changes to 34 CFR 75.52(a) would align the text more closely with the First Amendment, RFRA, and other

Federal regulations. We do not anticipate this change to have any quantifiable cost and may benefit the Department and general public by improving the clarity of the regulations.

Proposed changes to 34 CFR 75.52(c)(1) would eliminate extraneous language and align the text more closely with E.O. 13559 and E.O. 13279. We do not anticipate this change to have any quantifiable cost and may benefit the Department and general public by improving the clarity of the regulations.

Proposed changes to 34 CFR 75.52(c)(3)(i) through (iv) would eliminate extraneous language to clarify the regulations and align the text more closely with the First Amendment. We do not anticipate this change to have any quantifiable cost and may benefit the Department and general public by improving the clarity of the regulations.

Proposed changes to 34 CFR 75.52(c)(v) would align the text more closely with definitions used in the RFRA. We do not anticipate this change to have any quantifiable cost and may benefit the Department and general public by improving the clarity of the regulations.

Proposed changes to 34 CFR 75.52(d), (e), and (g) would eliminate extraneous language and align the text more closely with the First Amendment and RFRA. We do not anticipate this change to have any quantifiable cost and may benefit the Department and general public by improving the clarity of the regulations.

The proposed addition of 34 CFR 75.52(h) would align the text of this section more closely with the First Amendment. We do not anticipate this change to have any quantifiable cost and may benefit the Department and general public by improving the clarity of the regulations.

### 34 CFR 75.63

The proposed addition of 34 CFR 75.63 would clarify that the provisions of this section are severable. We do not anticipate this change to have any quantifiable cost.

### 34 CFR 75.500

Proposed changes to 34 CFR 75.500 would clarify that grantees that are public institutions must comply with the First Amendment and require grantees to submit to the Department a copy of any non-default, final judgment rendered against them in a State or Federal court alleging a violation of the First Amendment. Generally, the Department assumes that public institutions comply with the First Amendment, and therefore we assume negligible costs associated with this

ED2.000145

proposed change.[155] Such an assumption of compliance is based on the Department's active monitoring of its grant portfolio. The Department has not identified any significant issues with grantees related to a failure to comply with the First Amendment and therefore does not anticipate any such issues moving forward. However, we are also aware that there are potentially scenarios in which grantees have had judgments issued against them related to a failure to comply with the First Amendment or institutional policies related to freedom of speech that we have been unaware of because such findings were not material to the effective operation of the grant. To the extent that such judgments have been issued in the past, we invite the public to provide the Department with examples so that we may update our estimates accordingly.

To the extent that grantees do have such judgments rendered against them, we believe the cost of compliance with this requirement would be negligible. The proposed rule does not require grantees to submit the information in any particular format or venue, and we believe the requirement could easily and efficiently be addressed by grantees by forwarding a copy of the judgment via email to their project officer. Such an approach would likely take less than one minute to accomplish with a *de minimis* effect on operating costs.

As noted above, grantees who are found to be in violation of the First Amendment or their institutional policies regarding freedom of speech will be considered to be in violation of a material condition of their grant and the Department will consider available remedies for the violation, which can include suspension or termination of Federal awards or debarment. As noted above, the Department is unaware of any prior instance in which a violation of the First Amendment or institutional policies regarding freedom of speech raised serious concerns about a grantee's ability to effectively carry out a Department grant. As such, we do not believe it is likely that such violations,

if they do occur, would likely result in any large number of grants being terminated. Further, as with all violations of the conditions of a particular grant, decisions regarding appropriate remedies are made on a case by case basis, and we would therefore not be able to reliably estimate the effects on any particular grantee's awards, even if we assume a failure to comply with the First Amendment. Nonetheless, the potential suspension or termination of a Federal award and potential debarment would, in the event that they occurred, represent real costs to grantees. However, as noted above, we believe such outcomes would be generally unlikely and difficult to meaningfully predict. We also note that some grantees may, in the event that they face a lawsuit alleging violations of the First Amendment or institutional policies regarding freedom of speech, shift their litigation strategies to avoid non-default, summary judgments against them. To the extent that they did so, such actions could result in additional costs to grantees that would not occur in the absence of the rule. However, as noted above, we believe such violations are rare and any effect on the litigation strategy of grantees would be highly speculative and case-dependent. As such, we continue to estimate negligible costs associated with this provision.

However, we invite the public to submit any relevant information regarding the likely impact of this proposed change, including any relevant estimates of the number of relevant complaints filed against grantees in any given year.

### 34 CFR 75.684

The proposed addition of 34 CFR 75.684 would clarify that the provisions of this section are severable. We do not anticipate this change to have any quantifiable cost.

### 34 CFR 75.700

Proposed changes to 34 CFR 75.700 would add a cross-reference to 34 CFR 75.500. We do not anticipate this change to have any quantifiable cost and may benefit the Department and general public by improving the clarity of the regulations.

### 34 CFR 75.712

The proposed deletion of 34 CFR 75.712 would remove a requirement that applies only to faith-based organizations and not other entities. The removal of this requirement likely would result in some cost savings for faith-based organizations. However, the Department does not have adequate information

available at this time to estimate those savings. We invite the public to submit information on the extent to which the removal of these requirements would result in cost savings for faith-based organizations.

### 34 CFR 75.713

The proposed deletion of 34 CFR 75.713 would remove a requirement that applies only to faith-based organizations and not other entities. The removal of this requirement likely would result in some cost savings for faith-based organizations. However, the Department does not have adequate information available at this time to estimate those savings. We invite the public to submit information on the extent to which the removal of these requirements would result in cost savings for faith-based organizations.

### 34 CFR 75.714

Proposed changes to 34 CFR 75.714 would make conforming edits reflecting the proposed elimination of §§ 75.712 and 75.713 and require compliance with Appendices A and B of that part. We do not anticipate this change to have any quantifiable cost and may benefit the Department and general public by improving the clarity of the regulations.

### 34 CFR 75.741

The proposed addition of 34 CFR 75.741 would clarify that the provisions of this section are severable. We do not anticipate this change to have any quantifiable cost.

### 34 CFR part 76

### 34 CFR 76.52

Proposed changes to 34 CFR 76.52(a) would align the text more closely with the First Amendment, RFRA, and other Federal regulations. We do not anticipate this change to have any quantifiable cost and may benefit the Department and general public by improving the clarity of the regulations.

Proposed changes to 34 CFR 76.52(c)(1) would remove extraneous language and align the text more closely with E.O. 13559. We do not anticipate this change to have any quantifiable cost and may benefit the Department and general public by improving the clarity of the regulations.

Proposed changes to 34 CFR 76.52(c)(ii)(B) would align the text more closely with the First Amendment. We do not anticipate this change to have any quantifiable cost and may benefit the Department and general public by improving the clarity of the regulations.

Proposed changes to 34 CFR 76.52(c)(ii)(C) would revise the text in accordance with section 2(b) of E.O.

---

[155] Not all of the reasonably-anticipated impacts of this proposed rule would be categorized as costs, cost savings or benefits. Consider, for example, the proposal that charging student groups for extra security if they invite controversial speakers to campus would be considered an impermissible violation on speech, and suppose that student groups A and B both invite speakers to campus, but only A invites controversial speakers and thus, in the absence of the rule, is charged greater security fees than B. If charging A and B equal fees would be a permissible compliance option (or a reasonably likely change brought about by the rule, even if not actually necessary for compliance), then the impact should be described as a rule-attributable transfer of value from B to A.

ED2.000146

13831. We do not anticipate this change to have any quantifiable cost and may benefit the Department and general public by improving the clarity of the regulations.

Proposed changes to 34 CFR 76.52(c)(3)(iii) would revise the text in accordance with E.O. 13279. We do not anticipate this change to have any quantifiable cost and may benefit the Department and general public by improving the clarity of the regulations.

Proposed changes to 34 CFR 76.52(c)(3)(v) would align the text more closely with definitions in RFRA. We do not anticipate this change to have any quantifiable cost and may benefit the Department and general public by improving the clarity of the regulations.

Proposed changes to 34 CFR 76.52(d)(1) would remove extraneous language and align the text more closely with the First Amendment and RFRA. We do not anticipate this change to have any quantifiable cost and may benefit the Department and general public by improving the clarity of the regulations.

Proposed changes to 34 CFR 76.52(d)(2) would remove extraneous language and align the text more closely with the First Amendment. We do not anticipate this change to have any quantifiable cost and may benefit the Department and general public by improving the clarity of the regulations.

Proposed changes to 34 CFR 76.52(e) would align the text more closely with the First Amendment and RFRA. We do not anticipate this change to have any quantifiable cost and may benefit the Department and general public by improving the clarity of the regulations.

Proposed changes to 34 CFR 76.52(g) would remove extraneous language and align the text more closely with the First Amendment and RFRA. We do not anticipate this change to have any quantifiable cost and may benefit the Department and general public by improving the clarity of the regulations.

The proposed addition of 34 CFR 76.52(h) would align the text of the section more closely with the First Amendment. We do not anticipate this change to have any quantifiable cost and may benefit the Department and general public by improving the clarity of the regulations.

### 34 CFR 76.53

The proposed addition of 34 CFR 76.53 would clarify that the provisions of this section are severable. We do not anticipate this change to have any quantifiable cost.

### 34 CFR 76.500

Proposed changes to 34 CFR 76.500 would clarify that grantees that are

public institutions must comply with the First Amendment and require grantees to submit to the Department a copy of any compliant filed against them in a State or Federal court, alleging a violation of the First Amendment. Generally, the Department assumes that public institutions comply with the First Amendment, and therefore we assume negligible costs associated with this proposed change. Such an assumption of compliance is based on the Department's active monitoring of its grant portfolio. The Department has not identified any significant issues with grantees related to a failure to comply with the First Amendment and therefore does not anticipate any such issues moving forward. However, we are also aware that there are potentially scenarios in which grantees have had judgments issued against them related to a failure to comply with the First Amendment or institutional policies related to freedom of speech that we have been unaware of because such findings were not material to the effective operation of the grant. To the extent that such judgments have been issued in the past, we invite the public to provide the Department with examples so that we may update our estimates accordingly.

To the extent that grantees do have such judgments rendered against them, we believe the cost of compliance with this requirement would be negligible. The proposed rule does not require grantees to submit the information in any particular format or venue, and we believe the requirement could easily and efficiently be addressed by grantees by forwarding a copy of the judgment via email to their project officer. Such an approach would likely take less than one minute to accomplish with a *de minimis* effect on operating costs.

As noted above, grantees who are found to be in violation of the First Amendment or their institutional policies regarding freedom of speech will be considered to be in violation of a material condition of their grant and the Department will consider available remedies for the violation, which can include suspension or termination of Federal awards or debarment. As noted above, the Department is unaware of any prior instance in which a violation of the First Amendment or institutional policies regarding freedom of speech raised serious concerns about a grantee's ability to effectively carry out a Department grant. As such, we do not believe it is likely that such violations, if they do occur, would likely result in any large number of grants being terminated. Further, as with all violations of the conditions of a

particular grant, decisions regarding appropriate remedies are made on a case by case basis, and we would therefore not be able to reliably estimate the effects on any particular grantee's awards, even if we assume a failure to comply with the First Amendment. Nonetheless, the potential suspension or termination of a Federal award and potential debarment would, in the event that they occurred, represent real costs to grantees. However, as noted above, we believe such outcomes would be generally unlikely and difficult to meaningfully predict. We also note that some grantees may, in the event that they face a lawsuit alleging violations of the First Amendment or institutional policies regarding freedom of speech, shift their litigation strategies to avoid non-default, summary judgments against them. To the extent that they did so, such actions could result in additional costs to grantees that would not occur in the absence of the rule. However, as noted above, we believe such violations are rare and any effect on the litigation strategy of grantees would be highly speculative and case-dependent. As such, we continue to estimate negligible costs associated with this provision.

However, we invite the public to submit any relevant information regarding the likely impact of this proposed change, including any relevant estimates of the number of relevant complaints filed against grantees in any given year.

### 34 CFR 76.684

The proposed addition of 34 CFR 76.684 would clarify that the provisions of this section are severable. We do not anticipate this change to have any quantifiable cost.

### 34 CFR 76.700

Proposed changes to 34 CFR 76.700 would add a cross-reference to 34 CFR 76.500. We do not anticipate this change to have any quantifiable cost and may benefit the Department and general public by improving the clarity of the regulations.

### 34 CFR 76.712

The proposed deletion of 34 CFR 76.712 would remove a requirement that applied only to faith-based organizations and not other entities. The removal of this requirement likely would result in some cost savings for faith-based organizations. However, the Department does not have adequate information available at this time to estimate those savings. We invite the public to submit information on the extent to which the removal of these

requirements will result in cost savings for faith-based organizations.

**34 CFR 76.713**

The proposed deletion of 34 CFR 76.713 would remove a requirement that applied only to faith-based organizations and not other entities. The removal of this requirement likely would result in some cost savings for faith-based organizations. However, the Department does not have adequate information available at this time to estimate those savings. We invite the public to submit information on the extent to which the removal of these requirements will result in cost savings for faith-based organizations.

**34 CFR 76.714**

Proposed changes to 34 CFR 76.714 would make conforming edits reflecting the proposed elimination of §§ 76.712 and 76.713. We do not anticipate this change to have any quantifiable cost and may benefit the Department and general public by improving the clarity of the regulations.

**34 CFR 76.784**

The proposed addition of 34 CFR 76.784 clarifies that the provisions of this section are severable. We do not anticipate this change to have any quantifiable cost.

**34 CFR Part 106**

Proposed changes to 34 CFR 106.12 would define the term ''controlled by a religious organization'' for purposes of asserting the exemption under § 106.12(a). While these changes would provide substantial clarity to regulated entities about the standards for asserting the exemption, the Department does not believe that it would substantially change the number or composition of entities asserting the exemption. To the extent that it would, we believe there would be an expansion of previously eligible entities beginning to assert the exemption due to an increased clarity regarding the regulatory standard for doing so. We do not anticipate this change to have any quantifiable cost.

**34 CFR Part 606**

Proposed changes to 34 CFR 606.10 would remove language that prohibits the use of funds for otherwise allowable activities that merely relate to sectarian instruction or religious worship and replace it with language more narrowly defining the limitation. We do not anticipate these proposed changes to result in any quantifiable costs. However, it is possible that grantees may shift their use of funds to support activities that are currently prohibited

under the broader, current limitation. The Department does not have sufficient information available to quantify those effects at this time. We invite the public to submit relevant information about the extent to which grantees under this program participate in such activities and would be likely to shift their use of Federal funds in response to this change.

The proposed addition of 34 CFR 606.11 would clarify that the provisions of this section are severable. We do not anticipate this change to have any quantifiable cost.

**34 CFR Part 607**

Proposed changes to 34 CFR 607.10 would remove language that prohibits the use of funds for otherwise allowable activities that merely relate to sectarian instruction or religious worship and replace it with language more narrowly defining the limitation. We do not anticipate these proposed changes to result in any quantifiable costs. However, it is possible that grantees may shift their use of funds to support activities that are currently prohibited under the broader, current limitation. The Department does not have sufficient information available to quantify those effects at this time. We invite the public to submit relevant information about the extent to which grantees under this program participate in such activities and would be likely to shift their use of Federal funds in response to this change.

The proposed addition of 34 CFR 607.11 would clarify that the provisions of this section are severable. We do not anticipate this change to have any quantifiable cost.

**Alternatives Considered**

The Department is issuing these proposed regulations upon a reasoned determination that their benefits justify their costs. In choosing among alternative regulatory approaches, the Department selected the approach that it believes maximizes net benefits. With respect to the regulations proposed in Part 1—Religious Liberty, it is the reasoned determination of the Department that this proposed action would, to a significant degree, eliminate costs that have been incurred by faith-based organizations as they complied with the requirements of section 2(b) of E.O. 13559, while not adding any other requirements on those organizations. The Department considered whether to impose requirements, similar to those imposed solely on faith-based organizations, on all organizations and decided against such an alternative for the reasons discussed in the preamble.

With respect to the regulations proposed in Part 2—Free Inquiry, the Department considered whether the Department, itself, should adjudicate claims alleging that a public institution violated the First Amendment or alleging that a private institution violated its stated institutional policies regarding freedom of speech. The Department decided against this alternative as both State and Federal courts are the best guardians of the First Amendment and have a well-developed body of case law concerning First Amendment freedoms.

**Clarity of the Regulations**

E.O. 12866 and the Presidential memorandum ''Plain Language in Government Writing'' require each agency to write regulations that are easy to understand. The Secretary invites comments on how to make these proposed regulations easier to understand, including answers to questions such as the following:

• Are the requirements in the proposed regulations clearly stated?

• Do the proposed regulations contain technical terms or other wording that interferes with their clarity?

• Does the format of the proposed regulations (use of headings, paragraphing, etc.) aid or reduce their clarity?

• Would the proposed regulations be easier to understand if we divided them into more (but shorter) sections? (A ''section'' is preceded by the symbol ''§'' and a numbered heading; for example, § 106.9 Dissemination of policy.)

• Could the description of the proposed regulations in the **SUPPLEMENTARY INFORMATION** section of this preamble be more helpful in making the proposed regulations easier to understand? If so, how?

• What else could we do to make the proposed regulations easier to understand?

To send any comments that concern how the Department could make these proposed regulations easier to understand, see the instructions in the **ADDRESSES** section of the preamble.

**Regulatory Flexibility Act Certification**

The Secretary certifies that these proposed regulations would not have a significant economic impact on a substantial number of small entities. As described in the *Discussion of Costs and Benefits* section of this notice, the Department does not estimate that any of the proposed changes would result in quantifiable costs and, in some instances, the proposed revisions would reduce burden on particular types of entities, including small entities.

## Paperwork Reduction Act of 1995

Under the proposed regulations, a public or private institution must submit to the Secretary a copy of certain non-default, final judgments by a State or Federal court. We believe such a submission would take no longer than 30 minutes per judgment.

## Unfunded Mandates Reform Act

Section 4(2) of the Unfunded Mandates Reform Act of 1995, 2 U.S.C. 1503(2), excludes from coverage under that Act any proposed or final Federal regulation that ''establishes or enforces any statutory rights that prohibit discrimination on the basis of race, color, religion, sex, national origin, age, handicap, or disability.'' Accordingly, this rulemaking is not subject to the provisions of the Unfunded Mandates Reform Act.

## Intergovernmental Review

These programs are not subject to E.O. 12372 and the regulations in 34 CFR part 79.

## Assessment of Educational Impact

In accordance with section 411 of the General Education Provisions Act (GEPA), 20 U.S.C. 1221e–4, the Secretary particularly requests comments on whether the proposed regulations would require transmission of information that any other agency or authority of the United States gathers or makes available.

*Accessible Format:* Individuals with disabilities can obtain this document in an accessible format (*e.g.,* braille, large print, audiotape, or compact disc) on request to the program contact person listed under **FOR FURTHER INFORMATION CONTACT.**

*Electronic Access to This Document:* The official version of this document is the document published in the **Federal Register**. You may access the official edition of the **Federal Register** and the Code of Federal Regulations at *www.govinfo.gov*. At this site you can view this document, as well as all other documents of this Department published in the **Federal Register**, in text or PDF. To use PDF you must have Adobe Acrobat Reader, which is available free at the site.

You may also access documents of the Department published in the **Federal Register** by using the article search feature at: *www.federalregister.gov*. Specifically, through the advanced search feature at this site, you can limit your search to documents published by the Department.

(Catalog of Federal Domestic Assistance Number does not apply.)

## List of Subjects

### 2 CFR Part 3474

Accounting, Auditing, Colleges and universities, State and local governments, Grant programs, Grants administration, Hospitals, Indians, Nonprofit organizations, Reporting and recordkeeping requirements.

### 34 CFR Part 75

Accounting, Copyright, Education, Grant programs-Education, Inventions and patents, Private schools, Reporting and recordkeeping requirements.

### 34 CFR Part 76

Accounting, Administrative practice and procedure, American Samoa, Education, Grant programs-education, Guam, Northern Mariana Islands, Pacific Islands Trust Territory, Private schools, Reporting and recordkeeping requirements, Virgin Islands.

### 34 Part 606

Colleges and universities, Grant programs-education, Reporting and recordkeeping requirements.

### 34 Part 607

Colleges and universities, Grant programs-education, Reporting and recordkeeping requirements.

### 34 Part 608

Colleges and universities, Grant programs-education, Reporting and recordkeeping requirements.

### 34 Part 609

Colleges and universities, Grant programs-education, Reporting and recordkeeping requirements.

Dated: December 10, 2019.

**Betsy DeVos,**

*Secretary of Education.*

For the reasons discussed in the preamble, the Secretary of Education proposes to amend part 3474 of title 2 of the Code of Federal Regulations and parts 75, 76, 106, 606, 607, 608 and 609 of title 34 of the Code of Federal Regulations, respectively, as follows:

## TITLE II—GRANTS AND AGREEMENTS

## PART 3474—UNIFORM ADMINISTRATIVE REQUIREMENTS, COST PRINCIPLES, AND AUDIT REQUIREMENTS FOR FEDERAL AWARDS

■ 1. The authority citation for part 3474 continues to read as follows:

**Authority:** 20 U.S.C. 1221e–3, 3474, and 2 CFR part 200, unless otherwise noted.

■ 2. Revise § 3474.15 to read as follows:

## § 3474.15  Contracting with faith-based organizations and nondiscrimination.

(a) This section establishes responsibilities that grantees and subgrantees have in selecting contractors to provide direct Federal services under a program of the Department. Grantees and subgrantees must ensure compliance by their subgrantees with the provisions of this section and any implementing regulations or guidance.

(b)(1) A faith-based organization is eligible to contract with grantees and subgrantees, including States, on the same basis as any other private organization, with respect to contracts for which such organizations are eligible and considering any permissible accommodation.

(2) In selecting providers of goods and services, grantees and subgrantees, including States, must not discriminate for or against a private organization on the basis of the organization's religious exercise or affiliation and must ensure that the award of contracts is free from political interference, or even the appearance of such interference, and is done on the basis of merit, not on the basis of religion or religious belief, or lack thereof. Notices or announcements of award opportunities and notices of award or contracts shall include language substantially similar to that in Appendix A and B, respectively, to 34 CFR part 75.

(3) No grant document, agreement, covenant, memorandum of understanding, policy, or regulation that is used by a grantee or subgrantee in administering Federal financial services from the Department shall require faith-based organizations to provide assurances or notices where they are not required of non-faith-based organizations. Any restrictions on the use of grant funds shall apply equally to faith-based and non-faith-based organizations. All organizations that participate in Department programs or services, including organizations with religious character or affiliation, must carry out eligible activities in accordance with all program requirements, subject to any required or appropriate religious accommodation, and other applicable requirements governing the conduct of Department-funded activities, including those prohibiting the use of direct financial assistance to engage in explicitly religious activities.

(4) No grant document, agreement, covenant, memorandum of understanding, policy, or regulation that is used by a grantee or subgrantee shall disqualify faith-based organizations from participating in Department-

ED2.000149

funded programs or services because such organizations are motivated or influenced by religious faith to provide social services, or because of their religious exercise or affiliation.

(c)(1) The provisions of 34 CFR 75.532 and 76.532 that apply to a faith-based organization that is a grantee or subgrantee also apply to a faith-based organization that contracts with a grantee or subgrantee, including a State.

(2) The requirements referenced under paragraph (c)(1) of this section do not apply to a faith-based organization that provides goods or services to a beneficiary under a program supported only by indirect Federal financial assistance, as defined in 34 CFR 75.52(c)(3) and 76.52(c)(3).

(d)(1) A private organization that provides direct Federal services under a program of the Department and engages in explicitly religious activities, such as worship, religious instruction, or proselytization, must offer those activities separately in time or location from any programs or services funded by the Department through a contract with a grantee or subgrantee, including a State. Attendance or participation in any such explicitly religious activities by beneficiaries of the programs and services supported by the contract must be voluntary.

(2) The limitations on explicitly religious activities under paragraph (d)(1) of this section do not apply to a faith-based organization that provides services to a beneficiary under a program supported only by indirect Federal financial assistance, as defined in 34 CFR 75.52(c)(3) and 76.52(c)(3).

(e)(1) A faith-based organization that contracts with a grantee or subgrantee, including a State, will retain its independence, autonomy, right of expression, religious character, and authority over its governance. A faith-based organization that receives Federal financial assistance from the Department does not lose the protections of law.

**Note 1 to paragraph (e)(1):** Memorandum for All Executive Departments and Agencies, From the Attorney General, "Federal Law Protections for Religious Liberty" (Oct. 6, 2017) (describing federal law protections for religious liberty).

(2) A faith-based organization that contracts with a grantee or subgrantee, including a State, may, among other things—
(i) Retain religious terms in its name;
(ii) Continue to carry out its mission, including the definition, development, practice, and expression of its religious beliefs;
(iii) Use its facilities to provide services without concealing, removing,

or altering religious art, icons, scriptures, or other symbols from these facilities;
(iv) Select its board members on the basis of their acceptance of or adherence to the religious tenets of the organization; and
(v) Include religious references in its mission statement and other chartering or governing documents.

(f) A private organization that contracts with a grantee or subgrantee, including a State, may not discriminate against a beneficiary or prospective beneficiary in the provision of program goods or services on the basis of religion or religious belief, a refusal to hold a religious belief, or refusal to attend or participate in a religious practice. However, an organization that participates in a program funded by indirect Federal financial assistance need not modify its program activities to accommodate a beneficiary who chooses to expend the indirect aid on the organization's program and may require attendance at all activities that are fundamental to the program.

(g) A religious organization's exemption from the Federal prohibition on employment discrimination on the basis of religion, in section 702(a) of the Civil Rights Act of 1964, 42 U.S.C. 2000e–1(a), is not forfeited when the organization contracts with a grantee or subgrantee. An organization qualifying for such an exemption may select its employees on the basis of their acceptance of or adherence to the religious tenets of the organization.

(h) No grantee or subgrantee receiving funds under any Department program or service shall construe these provisions in such a way as to advantage or disadvantage faith-based organizations affiliated with historic or well-established religions or sects in comparison with other religions or sects.

(Authority: 20 U.S.C. 1221e–3 and 3474; 2 CFR part 200, E.O. 13559)

■ 3. Add § 3474.21 to read as follows:

**§ 3474.21  Severability.**

If any provision of this part or its application to any person, act, or practice is held invalid, the remainder of the part or the application of its provisions to any person, act, or practice shall not be affected thereby.

(Authority: 20 U.S.C. 1221e–3 and 3474)

**TITLE 34—EDUCATION**

**PART 75—DIRECT GRANT PROGRAMS**

■ 4. The authority citation for part 75 continues to read as follows:

**Authority:** 20 U.S.C. 1221e–3 and 3474, unless otherwise noted.

■ 5. In § 75.51, revise paragraphs (b)(3) and (4) and add paragraph (b)(5) to read as follows:

**§ 75.51  How to prove nonprofit status.**

\*    \*    \*    \*    \*

(b) \* \* \*
(3) A certified copy of the applicant's certificate of incorporation or similar document if it clearly establishes the nonprofit status of the applicant;
(4) Any item described in paragraphs (b)(1) through (3) of this section if that item applies to a State or national parent organization, together with a statement by the State or parent organization that the applicant is a local nonprofit affiliate; or
(5) For an entity that holds a sincerely-held religious belief that it cannot apply for a determination as an entity that is tax-exempt under section 501(c)(3) of the Internal Revenue Code, evidence sufficient to establish that the entity would otherwise qualify as a nonprofit organization under paragraphs (b)(1) through (b)(4) of this section.

■ 6. Revise § 75.52 to read as follows:

**§ 75.52  Eligibility of faith-based organizations for a grant and nondiscrimination against those organizations.**

(a)(1) A faith-based organization is eligible to apply for and to receive a grant under a program of the Department on the same basis as any other organization, with respect to programs for which such other organizations are eligible and considering any permissible accommodation. The Department shall provide such religious accommodation as is consistent with Federal law, the Attorney General's Memorandum of October 6, 2017 (Federal Law Protections for Religious Liberty), and the Religion Clauses of the First Amendment to the U.S. Constitution.

(2) In the selection of grantees, the Department may not discriminate for or against a private organization on the basis of the organization's religious exercise or affiliation and must ensure that all decisions about grant awards are free from political interference, or even the appearance of such interference, and are made on the basis of merit, not on the basis of religion or religious belief, or the lack thereof. Notices or announcements of award opportunities and notices of award or contracts shall include language substantially similar to that in Appendices A and B, respectively, to this part.

(3) No grant document, agreement, covenant, memorandum of

understanding, policy, or regulation that is used by the Department shall require faith-based organizations to provide assurances or notices where they are not required of non-faith-based organizations. Any restrictions on the use of grant funds shall apply equally to faith-based and non-faith-based organizations. All organizations that receive grants under a program of the Department, including organizations with religious character or affiliation, must carry out eligible activities in accordance with all program requirements, subject to any required or appropriate religious accommodation, and other applicable requirements governing the conduct of Department-funded activities, including those prohibiting the use of direct financial assistance to engage in explicitly religious activities.

(4) No grant document, agreement, covenant, memorandum of understanding, policy, or regulation that is used by the Department shall disqualify faith-based organizations from applying for or receiving grants under a program of the Department because such organizations are motivated or influenced by religious faith to provide social services, or because of their religious exercise or affiliation.

(b) The provisions of § 75.532 apply to a faith-based organization that receives a grant under a program of the Department.

(c)(1) A private organization that applies for and receives a grant under a program of the Department and engages in explicitly religious activities, such as worship, religious instruction, or proselytization, must offer those activities separately in time or location from any programs or services funded by a grant from the Department. Attendance or participation in any such explicitly religious activities by beneficiaries of the programs and services funded by the grant must be voluntary.

(2) The limitations on explicitly religious activities under paragraph (c)(1) of this section do not apply to a faith-based organization that provides services to a beneficiary under a program supported only by "indirect Federal financial assistance."

(3) For purposes of 2 CFR 3474.15, 34 CFR 75.52, 75.714, and Appendices A and B to this part, the following definitions apply:

(i) *Direct Federal financial assistance* means financial assistance received by an entity selected by the government or a pass-through entity (under this part) to carry out a service (*e.g.*, by contract, grant, or cooperative agreement).

References to *Federal financial assistance* will be deemed to be references to direct Federal financial assistance, unless the referenced assistance meets the definition of *indirect Federal financial assistance.*

(ii) *Indirect Federal financial assistance* means financial assistance received by a service provider when the service provider is paid for services rendered by means of a voucher, certificate, or other similar means of government-funded payment provided to a beneficiary who is able to make a choice of a service provider. Federal financial assistance provided to an organization is *indirect* under this definition if—

(A) The government program through which the beneficiary receives the voucher, certificate, or other similar means of government-funded payment is neutral toward religion; and

(B) The organization receives the assistance as the result of the genuine, independent choice of the beneficiary.

(iii) *Federal financial assistance* does not include a tax credit, deduction, exemption, guaranty contract, or the use of any assistance by any individual who is the ultimate beneficiary under any such program.

(iv) *Pass-through entity* means an entity, including a nonprofit or nongovernmental organization, acting under a contract, grant, or other agreement with the Federal Government or with a State or local government, such as a State administering agency, that accepts direct Federal financial assistance as a primary recipient or grantee and distributes that assistance to other organizations that, in turn, provide government-funded social services.

(v) *Religious exercise* has the meaning given to the term in 42 U.S.C. 2000cc–5(7)(A).

**Note 1 to paragraph (c)(3):** The definitions of *direct Federal financial assistance* and *indirect Federal financial assistance* do not change the extent to which an organization is considered a recipient of Federal financial assistance as those terms are defined under 34 CFR parts 100, 104, 106, and 110.

(d)(1) A faith-based organization that applies for or receives a grant under a program of the Department will retain its independence, autonomy, right of expression, religious character, and authority over its governance. A faith-based organization that receives Federal financial assistance from the Department does not lose the protections of law.

**Note 1 to paragraph (d)(1):** Memorandum for All Executive Departments and Agencies, From the Attorney General, "Federal Law

Protections for Religious Liberty" (Oct. 6, 2017) (describing federal law protections for religious liberty).

(2) A faith-based organization that applies for or receives a grant under a program of the Department may, among other things—

(i) Retain religious terms in its name;

(ii) Continue to carry out its mission, including the definition, development, practice, and expression of its religious beliefs;

(iii) Use its facilities to provide services without concealing, removing, or altering religious art, icons, scriptures, or other symbols from these facilities;

(iv) Select its board members and employees on the basis of their acceptance of or adherence to the religious tenets of the organization; and

(v) Include religious references in its mission statement and other chartering or governing documents.

(e) An organization that receives any Federal financial assistance under a program of the Department shall not discriminate against a beneficiary or prospective beneficiary in the provision of program services or in outreach activities on the basis of religion or religious belief, a refusal to hold a religious belief, or refusal to attend or participate in a religious practice. However, an organization that participates in a program funded by indirect Federal financial assistance need not modify its program activities to accommodate a beneficiary who chooses to expend the indirect aid on the organization's program and may require attendance at all activities that are fundamental to the program.

(f) If a grantee contributes its own funds in excess of those funds required by a matching or grant agreement to supplement federally funded activities, the grantee has the option to segregate those additional funds or commingle them with the funds required by the matching requirements or grant agreement. However, if the additional funds are commingled, this section applies to all of the commingled funds.

(g) A religious organization's exemption from the Federal prohibition on employment discrimination on the basis of religion, in section 702(a) of the Civil Rights Act of 1964, 42 U.S.C. 2000e–1, is not forfeited when the organization receives financial assistance from the Department. An organization qualifying for such exemption may select its employees on the basis of their acceptance of or adherence to the religious tenets of the organization.

(h) The Department shall not construe these provisions in such a way as to

advantage or disadvantage faith-based organizations affiliated with historic or well-established religions or sects in comparison with other religions or sects.

(Authority: 20 U.S.C. 1221e–3 and 3474, E.O. 13559)

■ 7. Add § 75.63 to read as follows:

**§ 75.63    Severability.**

If any provision of this subpart or its application to any person, act, or practice is held invalid, the remainder of the subpart or the application of its provisions to any person, act, or practice shall not be affected thereby.

(Authority: 20 U.S.C. 1221e–3 and 3474)

■ 8. Revise § 75.500 to read as follows:

**§ 75.500    Constitutional rights, freedom of inquiry, and Federal statutes and regulations on nondiscrimination.**

(a) Each grantee shall comply with the following statutes and regulations:

| Subject | Statute | Regulation |
|---|---|---|
| Discrimination on the basis of race, color, or national origin. | Title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d through 2000d–4). | 34 CFR part 100. |
| Discrimination on the basis of sex ..................... | Title IX of the Education Amendments of 1972 (20 U.S.C. 1681–1683). | 34 CFR part 106 |
| Discrimination on the basis of handicap ............ | Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. 794) | 34 CFR part 104. |
| Discrimination on the basis of age .................... | The Age Discrimination Act (42 U.S.C. 6101 *et seq.*) .............. | 34 CFR part 110. |

(b) Each grantee that is an institution of higher education, as defined in 20 U.S.C. 1002(a), that is public (hereinafter "public institution") must also comply with the First Amendment to the U.S. Constitution, including protections for freedom of speech, association, press, religion, assembly, petition, and academic freedom. The Department will determine that a public institution has not complied with the First Amendment only if there is a final, non-default judgment by a State or Federal court that the public institution or an employee of the public institution, acting in his or her official capacity, violated the First Amendment. A final judgment is a judgment that the public institution chooses not to appeal or that is not subject to further appeal. Absent such a final, non-default judgment, the Department will deem the public institution to be in compliance with the First Amendment.

(1) Each grantee that is a public institution also must submit to the Secretary a copy of the final, non-default judgment by that State or Federal court to conclude the lawsuit no later than 30 days after such final, non-default judgment is entered.

(c) Each grantee that is an institution of higher education, as defined in 20 U.S.C. 1002(a), that is private (hereinafter "private institution") must comply with its stated institutional policies regarding freedom of speech, including academic freedom. The Department will determine that a private institution has not complied with these stated institutional policies only if there is a final, non-default judgment by a State or Federal court to the effect that the private institution or an employee of the private institution, acting on behalf of the private institution, violated its stated institutional policy regarding freedom of speech or academic freedom. A final

judgment is a judgment that the private institution chooses not to appeal or that is not subject to further appeal. Absent such a final, non-default judgment, the Department will deem the private institution to be in compliance with its stated institutional policies.

(1) Each grantee that is a private institution also must submit to the Secretary a copy of the final, non-default judgment by that State or Federal court to conclude the lawsuit no later than 30 days after such final, non-default judgment is entered.

(d) A public institution shall not deny to a religious student organization at the public institution any right, benefit, or privilege that is otherwise afforded to other student organizations at the public institution (including full access to the facilities of the public institution and official recognition of the organization by the public institution) because of the beliefs, practices, policies, speech, membership standards, or leadership standards of the religious student organization.

(e) A grantee that is a covered entity as defined in 34 CFR 108.3 shall comply with the nondiscrimination requirements of the Boy Scouts of America Equal Access Act, 20 U.S.C. 7905, 34 CFR part 108.

(Authority: 20 U.S.C. 1221e–3 and 3474)

■ 9. Add § 75.684 to read as follows:

**§ 75.684    Severability.**

If any provision of this subpart or its application to any person, act, or practice is held invalid, the remainder of the subpart or the application of its provisions to any person, act, or practice shall not be affected thereby.

(Authority: 20 U.S.C. 1221e–3 and 3474)

■ 10. Revise § 75.700 to read as follows:

**§ 75.70    0 Compliance with the U.S. Constitution, statutes, regulations, stated institutional policies, and applications.**

A grantee shall comply with § 75.500, applicable statutes, regulations, and approved applications, and shall use Federal funds in accordance with those statutes, regulations, and applications.

(Authority: 20 U.S.C. 1221e–3 and 3474)

**§ 75.712    [Removed and Reserved]**

■ 11. Remove and reserve § 75.712.

**§ 75.713    [Removed and Reserved]**

■ 12. Remove and reserve § 75.713.

■ 13. Revise § 75.714 to read as follows:

**§ 75.714    Subgrants, contracts, and other agreements with faith-based organizations.**

If a grantee under a discretionary grant program of the Department has the authority under the grant to select a private organization to provide services supported by direct Federal financial assistance under the program by subgrant, contract, or other agreement, the grantee must ensure compliance with applicable Federal requirements governing contracts, grants, and other agreements with faith-based organizations, including, as applicable, §§ 75.52 and 75.532, Appendices A and B to this part, and 2 CFR 3474.15. If the pass-through entity is a nongovernmental organization, it retains all other rights of a nongovernmental organization under the program's statutory and regulatory provisions.

(Authority: 20 U.S.C. 1221e–3 and 3474, E.O. 13559)

■ 14. Add § 75.741 to read as follows:

**§ 75.741    Severability.**

If any provision of this subpart or its application to any person, act, or practice is held invalid, the remainder of the subpart or the application of its provisions to any person, act, or practice shall not be affected thereby.

(Authority: 20 U.S.C. 1221e–3 and 3474)

■ 15. Revise Appendix A to part 75 to read as follows:

### Appendix A to Part 75—Notice or Announcement of Award Opportunities

Faith-based organizations may apply for this award on the same basis as any other organization, as set forth at, and subject to the protections and requirements of, part 75 and 42 U.S.C. 2000bb *et seq.* The Department will not, in the selection of recipients, discriminate against an organization on the basis of the organization's religious exercise or affiliation.

A faith-based organization that participates in this program will retain its independence from the government and may continue to carry out its mission consistent with religious freedom protections in Federal law, including the Free Speech and Free Exercise clauses of the Constitution, 42 U.S.C. 2000bb *et seq.*, 238n, 18113, 2000e–1(a) and 2000e–2(e), and 12113(d), and the Weldon Amendment, among others. Religious accommodations may also be sought under many of these religious freedom protection laws.

A faith-based organization may not use direct financial assistance from the Department in contravention of the Establishment Clause or any other applicable requirements. Such an organization also may not, in providing services funded by the Department, discriminate against a program beneficiary or prospective program beneficiary on the basis of religion, a religious belief, a refusal to hold a religious belief, or a refusal to attend or participate in a religious practice.

■ 16. Add a new Appendix B to part 75, to read as follows:

### Appendix B to Part 75—Notice of Award or Contract

A faith-based organization that participates in this program retains its independence from the government and may continue to carry out its mission consistent with religious freedom protections in Federal law, including the Free Speech and Free Exercise clauses of the Constitution, 42 U.S.C. 2000bb *et seq.*, 238n, 18113, 2000e–1(a) and 2000e–2(e), and 12113(d), and the Weldon Amendment, among others. Religious accommodations may also be sought under many of these religious freedom protection laws.

A faith-based organization may not use direct financial assistance from the Department in contravention of the Establishment Clause or any other applicable requirements. Such an organization also may not, in providing services funded by the Department, discriminate against a program beneficiary or prospective program beneficiary on the basis of religion, a religious belief, a refusal to hold a religious belief, or a refusal to attend or participate in a religious practice.

### PART 76—STATE-ADMINISTERED FORMULA GRANT PROGRAMS

■ 17. The authority citation for part 76 continues to read as follows:

**Authority:** 20 U.S.C. 1221e–3 and 3474, unless otherwise noted.

■ 18. Revise § 75.52 to read as follows:

### § 76.52  Eligibility of faith-based organizations for a grant and nondiscrimination against those organizations.

(a)(1) A faith-based organization is eligible to apply for and to receive a subgrant under a program of the Department on the same basis as any other private organization, with respect to programs for which such other organizations are eligible and considering any permissible accommodation. A State pass-through entity shall provide such religious accommodation as would be required to a recipient under Federal law, the Attorney General's Memorandum of October 6, 2017 (Federal Law Protections for Religious Liberty), and the Religion Clauses of the First Amendment to the U.S. Constitution.

(2) In the selection of subgrantees and contractors, States may not discriminate for or against a private organization on the basis of the organization's religious exercise or affiliation and must ensure that all decisions about subgrants are free from political interference, or even the appearance of such interference, and are made on the basis of merit, not on the basis of religion or religious belief, or a lack thereof. Notices or announcements of award opportunities and notices of award or contracts shall include language substantially similar to that in Appendices A and B, respectively, to 34 CFR part 75.

(3) No grant document, agreement, covenant, memorandum of understanding, policy, or regulation that is used by States in administering a program of the Department shall require faith-based organizations to provide assurances or notices where they are not required of non-faith-based organizations. Any restrictions on the use of subgrant funds shall apply equally to faith-based and non-faith-based organizations. All organizations that receive a subgrant from a State under a State-Administered Formula Grant program of the Department, including organizations with religious character or affiliation, must carry out eligible activities in accordance with all program requirements, subject to any required or appropriate religious accommodation, and other applicable requirements governing the conduct of Department-funded activities, including those prohibiting the use of direct financial assistance in contravention of the Establishment Clause.

(4) No grant document, agreement, covenant, memorandum of

understanding, policy, or regulation that is used by States shall disqualify faith-based organizations from applying for or receiving subgrants under a State-Administered Formula Grant program of the Department because such organizations are motivated or influenced by religious faith to provide social services, or because of their religious exercise or affiliation.

(b) The provisions of § 76.532 apply to a faith-based organization that receives a subgrant from a State under a State-Administered Formula Grant program of the Department.

(c)(1) A private organization that applies for and receives a grant under a program of the Department and engages in explicitly religious activities, such as worship, religious instruction, or proselytization, must offer those activities separately in time or location from any programs or services funded by a subgrant from a State under a State-Administered Formula Grant program of the Department. Attendance or participation in any such explicitly religious activities by beneficiaries of the programs and services supported by the subgrant must be voluntary.

(2) The limitations on explicitly religious activities under paragraph (c)(1) of this section do not apply to a faith-based organization that provides services to a beneficiary under a program supported only by "indirect Federal financial assistance."

(3) For purposes of 2 CFR 3474.15 and 34 CFR 76.52 and 76.714, the following definitions apply:

(i) *Direct Federal financial assistance* means financial assistance received by an entity selected by the government or a pass-through entity (under this part) to carry out a service (*e.g.,* by contract, grant, or cooperative agreement). References to "Federal financial assistance" will be deemed to be references to direct Federal financial assistance, unless the referenced assistance meets the definition of "indirect Federal financial assistance."

(ii) *Indirect Federal financial assistance* means financial assistance received by a service provider when the service provider is paid for services rendered by means of a voucher, certificate, or other means of government-funded payment provided to a beneficiary who is able to make a choice of service provider. Federal financial assistance provided to an organization is *indirect* under this definition if—

(A) The government program through which the beneficiary receives the voucher, certificate, or other similar means of government-funded payment is neutral toward religion; and

(B) The organization receives the assistance as the result of the genuine, independent choice of the beneficiary.

(iii) *Federal financial assistance* does not include a tax credit, deduction, exemption, guaranty contract, or the use of any assistance by any individual who is the ultimate beneficiary under any such program.

(iv) *Pass-through entity* means an entity, including a nonprofit or nongovernmental organization, acting under a contract, grant, or other agreement with the Federal Government or with a State or local government, such as a State administering agency, that accepts direct Federal financial assistance as a primary recipient or grantee and distributes that assistance to other organizations that, in turn, provide government-funded social services.

(v) *Religious exercise* has the meaning given to the term in 42 U.S.C. 2000cc–5(7)(A).

**Note 1 to paragraph (c)(3):** The definitions of *direct Federal financial assistance* and *indirect Federal financial assistance* do not change the extent to which an organization is considered a *recipient* of *Federal financial assistance* as those terms are defined under 34 CFR parts 100, 104, 106, and 110.

(d)(1) A faith-based organization that applies for or receives a subgrant from a State under a State-Administered program of the Department will retain its independence, autonomy, right of expression, religious character, and authority over its governance. A faith-based organization that receives Federal financial assistance from the Department does not lose the protection of law.

**Note 1 to paragraph (d)(1):** Memorandum for All Executive Departments and Agencies, From the Attorney General, "Federal Law Protections for Religious Liberty" (Oct. 6, 2017) (describing federal law protections for religious liberty).

(2) A faith-based organization that applies for or receives a subgrant from a State under a State-administered formula grant program of the Department may, among other things—

(i) Retain religious terms in its name;

(ii) Continue to carry out its mission, including the definition, development, practice, and expression of its religious beliefs;

(iii) Use its facilities to provide services without concealing, removing, or altering religious art, icons, scriptures, or other symbols from these facilities;

(iv) Select its board members and employees on the basis of their acceptance of or adherence to the religious tenets of the organization; and

(v) Include religious references in its mission statement and other chartering or governing documents.

(e) An organization that receives any Federal financial assistance under a program of the Department shall not discriminate against a beneficiary or prospective beneficiary in the provision of program services or in outreach activities on the basis of religion or religious belief, a refusal to hold a religious belief, or refusal to attend or participate in a religious practice. However, an organization that participates in a program funded by indirect financial assistance need not modify its program activities to accommodate a beneficiary who chooses to expend the indirect aid on the organization's program and may require attendance at all activities that are fundamental to the program.

(f) If a State or subgrantee contributes its own funds in excess of those funds required by a matching or grant agreement to supplement federally funded activities, the State or subgrantee has the option to segregate those additional funds or commingle them with the funds required by the

matching requirements or grant agreement. However, if the additional funds are commingled, this section applies to all of the commingled funds.

(g) A religious organization's exemption from the Federal prohibition on employment discrimination on the basis of religion, in section 702(a) of the Civil Rights Act of 1964, 42 U.S.C. 2000e–1, is not forfeited when the organization receives financial assistance from the Department. An organization qualifying for such exemption may select its employees on the basis of their acceptance of or adherence to the religious tenets of the organization.

(h) The Department shall not construe these provisions in such a way as to advantage or disadvantage faith-based organizations affiliated with historic or well-established religions or sects in comparison with other religions or sects.

(Authority: 20 U.S.C. 1221e–3, 3474, and 6511(a))

■ 19. Add § 76.53 to read as follows:

**§ 76.53   Severability.**

If any provision of this subpart or its application to any person, act, or practice is held invalid, the remainder of the subpart or the application of its provisions to any person, act, or practice shall not be affected thereby.

(Authority: 20 U.S.C. 1221e–3, 3474, and 6511(a))

■ 20. Revise § 76.500 to read as follows:

**§ 76.500   Constitutional rights, freedom of inquiry, and Federal statutes and regulations on nondiscrimination.**

(a) A State and a subgrantee shall comply with the following statutes and regulations:

| Subject | Statute | Regulation |
|---|---|---|
| Discrimination on the basis of race, color, or national origin. | Title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d through 2000d–4). | 34 CFR part 100. |
| Discrimination on the basis of sex ..................... | Title IX of the Education Amendments of 1972 (20 U.S.C. 1681–1683). | 34 CFR part 106. |
| Discrimination on the basis of handicap ............ | Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. 794) | 34 CFR part 104. |
| Discrimination on the basis of age ................... | The Age Discrimination Act (42 U.S.C. 6101 *et seq.*) .............. | 34 CFR part 110. |

(b) Each State or subgrantee that is an institution of higher education, as defined in 20 U.S.C. 1002(a), that is public (hereinafter "public institution") must also comply with the First Amendment to the U.S. Constitution, including protections for freedom of speech, association, press, religion, assembly, petition, and academic

freedom. The Department will determine that a public institution has not complied with the First Amendment only if there is a final, non-default judgment by a State or Federal court that the public institution or an employee of the public institution, acting in his or her official capacity, violated the First Amendment. A final

judgment is a judgment that the public institution chooses not to appeal or that is not subject to further appeal. Absent such a final, non-default judgment, the Department will deem the public institution to be in compliance with the First Amendment.

(1) Each grantee that is a public institution also must submit to the

**3226**    **Federal Register** / Vol. 85, No. 12 / Friday, January 17, 2020 / Proposed Rules

Secretary a copy of the final, non-default judgment by that State or Federal court to conclude the lawsuit no later than 30 days after such final, non-default judgment is entered.

(c) Each State or subgrantee that is an institution of higher education, as defined in 20 U.S.C. 1002(a), that is private (hereinafter ''private institution'') must comply with its stated institutional policies regarding freedom of speech, including academic freedom. The Department will determine that a private institution has not complied with these stated institutional policies only if there is a final, non-default judgment by a State or Federal court to the effect that the private institution or an employee of the private institution, acting on behalf of the private institution, violated its stated institutional policy regarding freedom of speech or academic freedom. A final judgment is a judgment that the private institution chooses not to appeal or that is not subject to further appeal. Absent such a final, non-default judgment, the Department will deem the private institution to be in compliance with its stated institutional policies.

(1) Each grantee that is a private institution also must submit to the Secretary a copy of the final, non-default judgment by that State or Federal court to conclude the lawsuit no later than 30 days after such final, non-default judgment is entered.

(d) Each State or subgrantee that is a public institution shall not deny to a religious student organization at the public institution any right, benefit, or privilege that is otherwise afforded to other student organizations at the public institution (including full access to the facilities of the public institution and official recognition of the organization by the public institution) because of the beliefs, practices, policies, speech, membership standards, or leadership standards of the religious student organization.

(e) A State or subgrantee that is a covered entity as defined in 34 CFR 108.3 shall comply with the nondiscrimination requirements of the Boy Scouts of America Equal Access Act, 20 U.S.C. 7905, 34 CFR part 108.

(Authority: 20 U.S.C. 1221e–3, 3474, and 6511(a))

■ 21. Add § 76.684 to read as follows:

**§ 76.684   Severability.**

If any provision of this subpart or its application to any person, act, or practice is held invalid, the remainder of the subpart or the application of its provisions to any person, act, or practice shall not be affected thereby.

(Authority: 20 U.S.C. 1221e–3, 3474, and 6511(a))

■ 22. Revise § 76.700 to read as follows:

**§ 76.700   Compliance with the U.S. Constitution, statutes, regulations, stated institutional policies, and applications.**

A State and a subgrantee shall comply with § 76.500, the State plan and applicable statutes, regulations, and approved applications, and shall use Federal funds in accordance with those statutes, regulations, plan, and applications.

(Authority: 20 U.S.C. 1221e–3, 3474, and 6511(a))

**§ 76.712   [Removed and Reserved]**

■ 23. Remove and reserve § 76.712.

**§ 76.713   [Removed and Reserved]**

■ 24. Remove and reserve § 76.713.

■ 25. Revise § 76.714 to read as follows:

**§ 76.714   Subgrants, contracts, and other agreements with faith-based organizations.**

If a grantee under a State-administered formula grant program of the Department has the authority under the grant or subgrant to select a private organization to provide services supported by direct Federal financial assistance under the program by subgrant, contract, or other agreement, the grantee must ensure compliance with applicable Federal requirements governing contracts, grants, and other agreements with faith-based organizations, including, as applicable, §§ 76.52 and 76.532, and 2 CFR 3474.15. If the pass-through is a nongovernmental organization, it retains all other rights of a nongovernmental organization under the program's statutory and regulatory provisions.

(Authority: 20 U.S.C. 1221e–3 and 3474, E.O. 13559)

■ 26. Add § 76.784 to read as follows:

**§ 76.784   Severability.**

If any provision of this subpart or its application to any person, act, or practice is held invalid, the remainder of the subpart or the application of its provisions to any person, act, or practice shall not be affected thereby.

(Authority: 20 U.S.C. 1221e–3 and 3474)

## PART 106—NONDISCRIMINATION ON THE BASIS OF SEX IN EDUCATION PROGRAMS OR ACTIVITIES RECEIVING FEDERAL FINANCIAL ASSISTANCE

■ 27. The authority citation for part 106 continues to read as follows:

**Authority:** 20 U.S.C. 1681 *et seq.*, unless otherwise noted.

■ 28. In § 106.12, add paragraph (c) to to read as follows:

**§ 106.12   Educational institutions controlled by religious organizations.**

\*    \*    \*    \*    \*

(c) Any of the following shall be sufficient to establish that an educational institution is eligible to assert an exemption to the extent application of this part would not be consistent with its religious tenets or practices:

(1) A statement that the educational institution is a school or department of divinity.

(2) A statement that the educational institution requires its faculty, students, or employees to be members of, or otherwise engage in religious practices of, or espouse a personal belief in, the religion of the organization by which it claims to be controlled.

(3) A statement that the educational institution, in its charter or catalog, or other official publication, contains an explicit statement that it is controlled by a religious organization or an organ thereof, or is committed to the doctrines or practices of a particular religion, and the members of its governing body are appointed by the controlling religious organization or an organ thereof, and it receives a significant amount of financial support from the controlling religious organization or an organ thereof.

(4) A statement that the educational institution has a doctrinal statement or a statement of religious practices, along with a statement that members of the institution community must engage in the religious practices of, or espouse a personal belief in, the religion, its practices, or the doctrinal statement or statement of religious practices.

(5) A statement that the educational institution subscribes to specific moral beliefs or practices, and a statement that members of the institution community may be subjected to discipline for violating those beliefs or practices.

(6) A statement that is approved by the governing body of an educational institution and that includes, refers to, or is predicated upon religious tenets, beliefs, or teachings.

(7) Other evidence establishing that an educational institution is controlled by a religious organization.

\*    \*    \*    \*    \*

## PART 606—DEVELOPING HISPANIC-SERVING INSTITUTIONS PROGRAM

■ 29. The authority citation for part 606 continues to read as follows:

**Authority:** 20 U.S.C. 1101 *et seq.*, unless otherwise noted.

■ 30. In § 606.10, revise paragraphs (c)(3) and (4) to read as follows:

### § 606.10  What activities may and may not be carried out under a grant?

\*    \*    \*    \*    \*

(c) \* \* \*

(3) Activities or services that constitute religious instruction, religious worship, or proselytization.

(4) Activities provided by a school or department of divinity. For the purpose of this provision, a ''school or department of divinity'' means an institution, or a department of an institution, whose program is solely to prepare students to become ministers of religion or solely to enter into some other religious vocation.

\*    \*    \*    \*    \*

### §§ 606.11 through 606.13    [Redesignated as §§ 606.12 through 606.14]

■ 31. Redesignate §§ 606.11 through 606.13 as §§ 606.12 through 606.14.
■ 32. Add new § 606.11 to read as follows:

### § 606.11  Severability.

If any provision of this subpart or its application to any person, act, or practice is held invalid, the remainder of the subpart or the application of its provisions to any person, act, or practice shall not be affected thereby.

(Authority: 20 U.S.C. 1101 *et seq.*)

## PART 607—STRENGTHENING INSTITUTIONS PROGRAM

■ 33. The authority citation for part 607 continues to read as follows:

**Authority:** 20 U.S.C. 1057–1059g, 1067q, 1068–1068h unless otherwise noted.

■ 34. In § 607.10, revise paragraphs (c)(3) and (4) to read as follows:

### § 607.10  What activities may and may not be carried out under a grant?

\*    \*    \*    \*    \*

(c) \* \* \*

(3) Activities or services that constitute religious instruction, religious worship, or proselytization.

(4) Activities provided by a school or department of divinity. For the purpose of this provision, a ''school or department of divinity'' means an institution, or a department of an institution, whose program is solely to prepare students to become ministers of religion or solely to enter into some other religious vocation.

\*    \*    \*    \*    \*

### §§ 607.11 through 607.13    [Redesignated as §§ 607.12 through 607.14]

■ 35. Redesignate §§ 607.11 through 607.13 as §§ 607.12 through 607.14.
■ 36. Add new § 607.11 to read as follows:

### § 607.11  Severability.

If any provision of this subpart or its application to any person, act, or practice is held invalid, the remainder of the subpart or the application of its provisions to any person, act, or practice shall not be affected thereby.

(Authority: 20 U.S.C. 1057 *et seq.*)

## PART 608—STRENGTHENING HISTORICALLY BLACK COLLEGES AND UNIVERSITIES PROGRAM

■ 37. The authority citation for part 608 is revised as follows:

**Authority:** 20 U.S.C. 1060 through 1063c, and 1068 through 1068h, unless otherwise noted.

■ 38. In § 608.10, revise paragraphs (b)(5) and (6) to read as follows:

### § 608.10  What activities may be carried out under a grant?

\*    \*    \*    \*    \*

(b) \* \* \*

(5) Activities or services that constitute religious instruction, religious worship, or proselytization.

(6) Activities provided by a school or department of divinity. For the purpose of this provision, a *school or department of divinity* means an institution, or a department of an institution, whose program is solely to prepare students to become ministers of religion or solely to enter into some other religious vocation.

\*    \*    \*    \*    \*

■ 39. Add § 608.12 to read as follows:

### § 608.12  Severability.

If any provision of this subpart or its application to any person, act, or practice is held invalid, the remainder of the subpart or the application of its provisions to any person, act, or practice shall not be affected thereby.

(Authority: 20 U.S.C. 1060 through 1063c, and 1068 through 1068h)

## PART 609—STRENGTHENING HISTORICALLY BLACK GRADUATE INSTITUTIONS PROGRAM

■ 40. The authority citation for part 609 is revised to read as follows:

**Authority:** 20 U.S.C. 1060 through 1063c, and 1068 through 1068h, unless otherwise noted.

■ 41. In § 609.10, revise paragraphs (b)(5) and (6) to read as follows:

### § 609.10  What activities may be carried out under a grant?

\*    \*    \*    \*    \*

(b) \* \* \*

(5) Activities or services that constitute religious instruction, religious worship, or proselytization.

(6) Activities provided by a school or department of divinity. For the purpose of this provision, a *school or department of divinity* means an institution, or a department of an institution, whose program is solely to prepare students to become ministers of religion or solely to enter into some other religious vocation.

\*    \*    \*    \*    \*

■ 42. Add § 609.12 to read as follows:

### § 608.12  Severability.

If any provision of this subpart or its application to any person, act, or practice is held invalid, the remainder of the subpart or the application of its provisions to any person, act, or practice shall not be affected thereby.

(Authority: 20 U.S.C. 1060 through 1063c, and 1068 through 1068h)

[FR Doc. 2019–26937 Filed 1–16–20; 8:45 am]

**BILLING CODE 4000–01–P**