# DEPARTMENT OF EDUCATION

**34 CFR Part 106**

[Docket ID ED–2018–OCR–0064]

RIN 1870–AA14

## Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance

**AGENCY:** Office for Civil Rights, Department of Education.

**ACTION:** Final rule.

**SUMMARY:** The Secretary of Education amends the regulations implementing Title IX of the Education Amendments of 1972 (Title IX). The final regulations specify how recipients of Federal financial assistance covered by Title IX, including elementary and secondary schools as well as postsecondary institutions, (hereinafter collectively referred to as "recipients" or "schools"), must respond to allegations of sexual harassment consistent with Title IX's prohibition against sex discrimination. These regulations are intended to effectuate Title IX's prohibition against sex discrimination by requiring recipients to address sexual harassment as a form of sex discrimination in education programs or activities. The final regulations obligate recipients to respond promptly and supportively to persons alleged to be victimized by sexual harassment, resolve allegations of sexual harassment promptly and accurately under a predictable, fair grievance process that provides due process protections to alleged victims and alleged perpetrators of sexual harassment, and effectively implement remedies for victims. The final regulations also clarify and modify Title IX regulatory requirements regarding remedies the Department may impose on recipients for Title IX violations, the intersection between Title IX, Constitutional protections, and other laws, the designation by each recipient of a Title IX Coordinator to address sex discrimination including sexual harassment, the dissemination of a recipient's non-discrimination policy and contact information for a Title IX Coordinator, the adoption by recipients of grievance procedures and a grievance process, how a recipient may claim a religious exemption, and prohibition of retaliation for exercise of rights under Title IX.

**DATES:** These regulations are effective August 14, 2020.

**FOR FURTHER INFORMATION CONTACT:** Alejandro Reyes, U.S. Department of Education, 400 Maryland Avenue SW, Room 4E308, Washington, DC 20202. Telephone: (202) 453–6639. Email: *Alejandro.Reyes@ed.gov*.

If you use a telecommunications device for the deaf (TDD) or a text telephone (TTY), call the Federal Relay Service (FRS), toll free at 1–800–877–8339.

**SUPPLEMENTARY INFORMATION:**

## Table of Contents

Effective Date
Executive Summary
    Purpose of This Regulatory Action
    Summary of the Major Provisions of This Regulatory Action
Timing, Comments, and Changes
Adoption and Adaption of the Supreme Court's Framework To Address Sexual Harassment
    Differences Between Standards in Department Guidance and These Final Regulations
    Definition of Sexual Harassment
    Actual Knowledge
    Deliberate Indifference
Role of Due Process in the Grievance Process
    Due Process Principles
    Summary of § 106.45
    Similarities and Differences Between the § 106.45 Grievance Process and Department Guidance
Public Comment
Analysis of Comments and Changes
Personal Stories
Notice and Comment Rulemaking Rather Than Guidance
General Support and Opposition
    Commonly Cited Sources
    Data—Overview
    Prevalence Data—Elementary and Secondary Schools
    Prevalence Data—Postsecondary Institutions
    Prevalence Data—Women
    Prevalence Data—Men
    Prevalence Data—LGBTQ Persons
    Prevalence Data—Persons of Color
    Prevalence Data—Individuals With Disabilities
    Prevalence Data—Immigrants
    Impact Data
    Cost Data
    Reporting Data
    Stereotypes/Punishment for "Lying"
    False Allegations
General Support and Opposition for Supreme Court Framework Adopted in § 106.44(a)
General Support and Opposition for the Grievance Process in § 106.45
Section 106.30 Definitions
    Actual Knowledge
    Support for Actual Knowledge Requirement and General Safety Concerns
    Student Populations Facing Additional Barriers to Reporting
    Chilling Reporting
    Generally Burdening Complainants
    Employees' Obligations
    Elementary and Secondary Schools
    Large Schools
    Miscellaneous Comments and Questions
Complainant
Consent
Elementary and Secondary Schools
Formal Complaint
    Support for Formal Complaint Definition
    No Formal Complaint Required To Report Sexual Harassment
    Burden on Complainants To File a Formal Complaint
    Anonymous Reporting and Anonymous Filing of Formal Complaints
    Officials Other Than the Title IX Coordinator Filing a Formal Complaint
    Complexity of a Document Labeled "Formal Complaint"
    Parents' and Guardians' Rights To File a Formal Complaint
    Methods of Reporting and Methods of Filing a Formal Complaint
    Miscellaneous Concerns About the Formal Complaint Definition
Postsecondary Institution
Respondent
Sexual Harassment
    Overall Support and Opposition for the § 106.30 Sexual Harassment Definition
    Prong (1) *Quid pro quo*
    Prong (2) *Davis* standard
    *Davis* Standard Generally
    So Severe
    And Pervasive
    Objectively Offensive
    Effectively Denies Equal Access
    Prong (3) Sexual Assault, Dating Violence, Domestic Violence, Stalking
    Gender-Based Harassment
    Supportive Measures
    Overall Support and Opposition
    No-Contact Orders
    Other Language/Terminology Comments
Section 106.44 Recipient's Response to Sexual Harassment, Generally
    Section 106.44(a) "Actual Knowledge"
    The Recipient's Self-Interest
    Burdening the Complainant
    Elementary and Secondary Schools
    Confusion for Employees
    Intersection Between Actual Knowledge and Deliberate Indifference
    Modeling Reporting on the Military System
    Section 106.44(a) "education program or activity"
    General Support and Opposition for "Education Program or Activity" as a Jurisdictional Condition
    Online Sexual Harassment
    Consistency With Title IX Statutory Text
    Constitutional Equal Protection
    Institutional Autonomy and Litigation Risk
    Requests for Clarification
    Section 106.44(a) "Against a Person in the U.S."
    Impact on Study Abroad Participants
    Consistency With Federal Law and Departmental Practice
    Constitutional Equal Protection
    Impact on International or Foreign Exchange Students in the U.S.
    Section 106.44(a) Deliberate Indifference Standard
    Recipient's Response in Specific Circumstances
    Section 106.44(b) Proposed "Safe Harbors," Generally
    Section 106.44(b)(1) Mandate To Investigate Formal Complaints and Safe Harbor
    Proposed § 106.44(b)(2) Reports by Multiple Complainants of Conduct by

ELIZABETH HUNTER et al.
v.
U.S. DEPARTMENT OF EDUCATION, et al.
Case No. 6:21-cv-00474 (AA)
**GOV Ex. 14**

ED2.000157

Same Respondent [Removed in Final Regulations]
Proposed § 106.44(b)(3) Supportive Measures Safe Harbor in Absence of a Formal Complaint [removed in final regulations]
Section 106.44(b)(2) OCR Will Not Re-Weigh the Evidence
Additional Rules Governing Recipients' Responses to Sexual Harassment
Section 106.44(c) Emergency Removal
Overall Support and Opposition to Emergency Removals
Intersection With the IDEA, Section 504, and ADA
Post-Removal Challenges
No Stated Time Limitation for the Emergency Removal
"Removal"
"Individualized Safety and Risk Analysis"
"Provides the Respondent With Notice and an Opportunity To Challenge the Decision Immediately Following the Removal"
How OCR Will Enforce the Provision
Section 106.44(d) Administrative Leave
Section 106.45 Recipient's Response to Formal Complaints
General Requirements for § 106.45 Grievance Process
Section 106.45(a) Treatment of Complainants or Respondents Can Violate Title IX
Section 106.45(b)(1)(i) Equitable Treatment of Complainants and Respondents
Section 106.45(b)(1)(ii) Objective Evaluation of All Relevant Evidence
Section 106.45(b)(1)(iii) Impartiality and Mandatory Training of Title IX Personnel; Directed Question 4 (Training)
Section 106.45(b)(1)(iv) Presumption of Non-Responsibility
Purpose of the Presumption
Students of Color, LGBTQ Students, and Individuals With Disabilities
The Complainant's Right to Due Process Protections
False Allegations
Inaccurate Findings of Non-Responsibility
Recipients Should Apply Dual Presumptions or No Presumption
The Adversarial Nature of the Grievance Process
Supportive Measures
Miscellaneous Concerns
Section 106.45(b)(1)(v) Reasonably Prompt Time Frames
Support
Opposition—Lack of Specified Time Limit
Effects on Recipients
Concerns Regarding Concurrent Law Enforcement Activity
Alternative Proposals
Clarification Requests
Section 106.45(b)(1)(vi) Describe Range or List of Possible Sanctions and Remedies
Section 106.45(b)(1)(vii) Describe Standard of Evidence
Section 106.45(b)(1)(viii) Procedures and Bases for Appeal
Section 106.45(b)(1)(ix) Describe Range of Supportive Measures
Section 106.45(b)(1)(x) Privileged Information
Written Notice of Allegations
Section 106.45(b)(2) Written Notice of Allegations
Retaliation
Warning Against False Statements
Investigative Process
Administrative Burden on Schools
Elementary and Secondary Schools
Confidentiality and Anonymity for Complainants
General Modification Suggestions
General Clarification Requests
Dismissal and Consolidation of Formal Complaints
Section 106.45(b)(3)(i) Mandatory Dismissal of Formal Complaints
Section 106.45(b)(3)(ii)–(iii) Discretionary Dismissals/Notice of Dismissal
Section 106.45(b)(4) Consolidation of Formal Complaints
Investigation
Section 106.45(b)(5)(i) Burdens of Proof and Gathering Evidence Rest on the Recipient
Section 106.45(b)(5)(ii) Equal Opportunity To Present Witnesses and Other Inculpatory/Exculpatory Evidence
Section 106.45(b)(5)(iii) Recipients Must Not Restrict Ability of Either Party To Discuss Allegations or Gather and Present Relevant Evidence
Section 106.45(b)(5)(iv) Advisors of Choice
Supporting Presence and Participation of Advisors
Fairness Considerations
Conflicts of Interest, Confidentiality, and Union Issues
Modification Requests
Section 106.45(b)(5)(v) Written Notice of Hearings, Meetings, and Interviews
Section 106.45(b)(5)(vi) Inspection and Review of Evidence Directly Related to the Allegations, and Directed Question 7
Section 106.45(b)(5)(vii) An Investigative Report that Fairly Summarizes Relevant Evidence
Hearings
Cross-Examination Generally
Support for Cross-Examination
Retraumatizing Complainants
Reducing Truth-Seeking
Demeanor Evaluation Is Unreliable
Trauma Responses
Reliance on Rape Myths
Cross-Examination as a Due Process Requirement
Discourages Participation
Financial Inequities
Changes the Nature of the Grievance Process
Section 106.45(b)(6)(ii) Should Apply to Postsecondary Institutions
False Accusations Occur Infrequently
Excluding Cross-Examination Questions
Section 106.45(b)(6)(i) Postsecondary Institution Recipients Must Provide Live Hearing With Cross-Examination
Self-Representation Versus Cross-Examination Conducted by Advisors
Explain Decision to Exclude Questions
No Reliance on Statements of a Party Who Does Not Submit to Cross-Examination
Rape Shield Protections
Separate Rooms for Cross-Examination Facilitated by Technology; Directed Question 9
Discretion To Hold Live Hearings and Control Conduct of Hearings
Section 106.45(b)(6)(ii) Elementary and Secondary School Recipients May Require Hearing and Must Have Opportunity To Submit Written Questions
Determinations Regarding Responsibility
Section 106.45(b)(7)(i) Single Investigator Model Prohibited
Benefits of Ending the Single Investigator Model
Consistency with Case Law
Alternative Approaches to Ending Single Investigator Model
Chilling Reporting and Other Harmful Effects
Respecting the Roles of Title IX Coordinators and Investigators
Preserving Recipient Autonomy
Consistency With Federal Law and Employment Practices
Limiting the Prohibition of the Single Investigator Model
Requests for Clarification
Section 106.45(b)(7)(i) Standard of Evidence and Directed Question 6
Mandating a Higher Standard of Evidence
Supporting § 106.45(b)(7)(i)
One-Sided Condition on Choice of Evidentiary Standard
Same Evidentiary Standard in Student and Faculty Cases
Requiring the Preponderance of the Evidence Standard
Improving Accuracy of Outcomes
Safety Concerns
Consistency of Standards of Evidence Across Recipients
Standards of Evidence Below the Preponderance of the Evidence
Questioning the Department's Legal Authority
Alternative Approaches and Clarification Requests
Section 106.45(b)(7)(ii) Written Determination Regarding Responsibility Must Include Certain Details
Section 106.45(b)(7)(iii) Timing of When the Decision Becomes Final
[§ 106.45(b)(7)(iv) Title IX Coordinator Responsible for Effective Implementation of Remedies: Addressed Under § 106.45(b)(7)(iii)]
Transcript Notations
Appeals
Section 106.45(b)(8) Appeals
Informal Resolution
Section 106.45(b)(9) Informal Resolution
Supporting and Expanding Informal Resolution
Terminology Clarifications
Written Notice Implications
Voluntary Consent
Safety Concerns Based on Confidentiality
Consistency With Other Law and Practice
Training Requirements
Non-Binding Informal Resolution
Survivor-Oriented Protections
Restorative Justice
Avoiding Formal Process
Electronic Disclosures
Expulsion Through Informal Resolution
Clarification Requests
Recordkeeping
Section 106.45(b)(10) Recordkeeping and Directed Question 8
Clarifying Amendments to Existing Regulations

Section 106.3(a) Remedial Action
Section 106.6(d)(1) First Amendment
Section 106.6(d)(2) Due Process
Section 106.6(d)(3) Other Constitutional Rights
Section 106.6(e) FERPA
Background
Comments, Discussion, and Changes
Section 106.6(f) Title VII and Directed Question 3 (Application to Employees)
Section 106.6(g) Exercise of Rights by Parents/Guardians
Section 106.6(h) Preemptive Effect
Section 106.8(a) Designation of Coordinator
Section 106.8(b) Dissemination of Policy
Removal of 34 CFR 106.9(c)
List of Publications
Professional Organizations
Parents of Elementary and Secondary School Students
Subjectivity in Publications' Implication of Discrimination
Judicial Requirements for Sex Discrimination
Implicit Forms of Sex Discrimination
Analogous Provisions in Other Laws
Suggested Modifications
Section 106.8(c) Adoption and Publication of Grievance Procedures
Section 106.8(d) Application Outside the United States
Section 106.12 Educational Institutions Controlled by a Religious Organization
Directed Questions
Directed Question 1: Application to Elementary and Secondary Schools
Directed Question 2: Application Based on Type of Recipient or Age of Parties
Directed Question 5: Individuals With Disabilities
Miscellaneous
Executive Orders and Other Requirements
Length of Public Comment Period/Requests for Extension
Conflicts With First Amendment, Constitutional Confirmation, International Law
Clery Act
Background
Comments, Discussion, and Changes
Different Standards for Other Harassment
Spending Clause
Litigation Risk
Effective Date
Retaliation
Section 106.71 Retaliation Prohibited
Severability
Regulatory Impact Analysis (RIA)
Costs of Sexual Harassment and Assault
Overall Net Effects/Characterization of Savings
Motivation for Rulemaking
The Department's Model and Baseline Assumptions
Data Sources
Other
Section 106.44(a) Supportive Measures
Section 106.45(b)(1)(iii) Title IX Coordinators, Investigators, and Decision-Makers Must Be Properly Trained
Section 106.45(b)(5) Investigation of Formal Complaints
Section 106.45(b)(6) Hearings
Section 106.45(b)(7) Determinations Regarding Responsibility
Section 106.45(b)(8) Appeals
Section 106.45(b)(9) Informal Resolution
Executive Orders 12866, 13563, and 13771
Regulatory Impact Analysis
Need for Regulatory Action
Discussion of Costs, Benefits, and Transfers
Regulatory Alternatives Considered
Accounting Statement
Regulatory Flexibility Act
Paperwork Reduction Act of 1995
Accessible Format
Electronic Access to This Document

**Effective Date**

On March 13, 2020, the President of the United States declared that a national emergency concerning the novel coronavirus disease (COVID–19) outbreak began on March 1, 2020, as stated in ''Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID–19) Outbreak,'' Proclamation 9994 of March 13, 2020, **Federal Register** Vol. 85, No. 53 at 15337–38. The Department appreciates that exigent circumstances exist as a result of the COVID–19 national emergency, and that these exigent circumstances require great attention and care on the part of States, local governments, and recipients of Federal financial assistance. The Department recognizes the practical necessity of allowing recipients of Federal financial assistance time to plan for implementing these final regulations, including to the extent necessary, time to amend their policies and procedures necessary to comply. Taking into account this national emergency, as well as consideration of public comments about an effective date as discussed in the ''Effective Date'' subsection of the ''Miscellaneous'' section of this preamble, the Department has determined that these final regulations are effective August 14, 2020.

**Executive Summary**

*Purpose of This Regulatory Action*

Enacted in 1972, Title IX prohibits discrimination on the basis of sex in education programs and activities that receive Federal financial assistance.[1] In its 1979 opinion *Cannon* v. *University of Chicago*,[2] the Supreme Court stated that the objectives of Title IX are two-fold: first, to ''avoid the use of Federal resources to support discriminatory practices'' and second, to ''provide individual citizens effective protection against those practices.'' [3] The U.S. Department of Education (the ''Department'' or ''we'') may issue rules effectuating the dual purposes of Title IX.[4] We refer herein to Title IX's prohibition on sex discrimination and purposes as described by the Supreme Court as Title IX's non-discrimination mandate.

The Department's predecessor, the Department of Health, Education, and Welfare (HEW), first promulgated regulations under Title IX, effective in 1975.[5] Those regulations reinforced Title IX's non-discrimination mandate, addressing prohibition of sex discrimination in hiring, admissions, athletics, and other aspects of recipients' education programs or activities. The 1975 regulations also required recipients to designate an employee to coordinate the recipient's efforts to comply with Title IX and to adopt and publish grievance procedures providing for prompt and equitable resolution of complaints that a recipient is discriminating based on sex.

When HEW issued its regulations in 1975, the Federal courts had not yet addressed recipients' Title IX obligations with respect to sexual harassment as a form of sex discrimination. In the decades since HEW issued the 1975 regulations, the Department has not promulgated any Title IX regulations to address sexual harassment as a form of sex discrimination. Beginning in 1997, the Department addressed this subject through a series of guidance documents, most notably the 2001 Guidance [6]

---

[1] 20 U.S.C. 1681 (''No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . .'').

[2] 441 U.S. 677 (1979).

[3] *Cannon* v. *Univ. of Chicago,* 441 U.S. 677, 704 (1979).

[4] 20 U.S.C. 1682 (''Each Federal department and agency which is empowered to extend Federal financial assistance to any education program or activity . . . is authorized and directed to effectuate the provisions of section 1681 of this title with respect to such program or activity by issuing rules, regulations, or orders of general applicability which shall be consistent with achievement of the objectives of the statute authorizing the financial assistance in connection with which the action is taken.'').

[5] 40 FR 24128 (June 4, 1975) (codified at 45 CFR part 86). In 1980, Congress created the United States Department of Education. Public Law 96–88, sec. 201, 93 Stat. 669, 671 (1979); Exec. Order No. 12212, 45 FR 29557 (May 2, 1980). By operation of law, all of HEW's determinations, rules, and regulations continued in effect and all functions of HEW's Office for Civil Rights, with respect to educational programs, were transferred to the Secretary of Education. 20 U.S.C. 3441(a)(3). The regulations implementing Title IX were recodified without substantive change in 34 CFR part 106. 45 FR 30802, 30955–65 (May 9, 1980).

[6] U.S. Dep't. of Education, Office for Civil Rights, *Revised Guidance on Sexual Harassment: Harassment of Students by School Employees, Other Students, or Third Parties* (Jan. 19, 2001) (hereinafter, ''2001 Guidance''), *https://www2.ed.gov/about/offices/list/ocr/docs/shguide.pdf.*

(which revised similar guidance issued in 1997 [7]), the withdrawn 2011 Dear Colleague Letter,[8] the withdrawn 2014 Q&A,[9] and the 2017 Q&A.[10] The Department understands that agency guidance is not intended to represent legal obligations; however, we also acknowledge that in part because the Title IX statute and the Department's implementing regulations have (until these final regulations) not addressed sexual harassment, recipients and the Department have relied on the Department's guidance to set expectations about how recipients should respond to sexual harassment and how the Department investigates recipients for possible Title IX violations with respect to responding to sexual harassment.[11] These final regulations impose, for the first time, legally binding rules on recipients with respect to responding to sexual harassment, and the nature of the legal obligations imposed under these final regulations is similar in some ways, and different in some ways, to the way the Department approached this subject in its guidance documents. Those similarities and differences are explained throughout this preamble, including in the ''Adoption and Adaption of the Supreme Court's Framework to Address Sexual Harassment'' and ''Role of Due Process in the Grievance Process'' sections of this preamble.

Prior to these final regulations, the Department's last policy statement on Title IX sexual harassment was its withdrawal of the 2011 Dear Colleague Letter [12] and concomitant issuance of the 2017 Q&A. The 2017 Q&A along with the 2001 Guidance represent the ''status quo'' or ''baseline'' against which these final regulations make further changes to the Department's enforcement of Title IX obligations.[13] However, the withdrawal of the 2011 Dear Colleague Letter and issuance of the 2017 Q&A did not require or result in wholesale changes to the set of expectations guiding recipients' responses to sexual harassment or to many recipients' Title IX policies and procedures. The Department understands from public comments and media reports that many (if not most) recipients chose not to change their Title IX policies and procedures following the withdrawal of the 2011 Dear Colleague Letter and issuance of the 2017 Q&A.[14] This lack of change by recipients is a reasonable response to the following facts: Guidance is not legally enforceable; [15] the 2017 Q&A expressly stated to recipients that the 2017 Q&A was issued as an interim, non-binding interpretation of Title IX sexual harassment responsibilities while the Department conducted rulemaking to arrive at legally binding regulations addressing this subject; [16] and both the 2017 Q&A and the withdrawn 2011 Dear Colleague Letter relied heavily on the 2001 Guidance.[17] The 2017 Q&A along with the 2001 Guidance, and not the withdrawn 2011 Dear Colleague Letter, remain the baseline against which these final regulations make further changes to enforcement of Title IX obligations.

These final regulations largely address the same topics addressed in the Department's current and past guidance, including withdrawn guidance. Throughout this preamble we explain points of difference, and similarity, between these final regulations, and the Department's guidance. As such discussion makes clear, some of the Title IX policies and procedures that

---

[7] U.S. Dep't. of Education, Office for Civil Rights, *Sexual Harassment Guidance: Harassment of Students By School Employees, Other Students, or Third Parties,* 62 FR 12034 (Mar. 13, 1997) (hereinafter, ''1997 Guidance''), *https://www2.ed.gov/about/offices/list/ocr/docs/sexhar01.html#skipnav2.*

[8] U.S. Dep't. of Education, Office for Civil Rights, *Dear Colleague Letter: Sexual Violence* (April 4, 2011) (hereinafter ''2011 Dear Colleague Letter''), *https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf, withdrawn by,* U.S. Dep't. of Education, Office for Civil Rights, *Dear Colleague Letter* (Sept. 22, 2017), *https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf.*

[9] U.S. Dep't. of Education, Office for Civil Rights, *Questions and Answers on Title IX and Sexual Violence* (April 29, 2014) (hereinafter ''2014 Q&A''), *https://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf, withdrawn by,* U.S. Dep't. of Education, Office for Civil Rights, *Dear Colleague Letter* (Sept. 22, 2017), *https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf.*

[10] U.S. Dep't. of Education, Office for Civil Rights, *Q&A on Campus Sexual Misconduct* (Sept. 22, 2017) (hereinafter, ''2017 Q&A''), *https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf.*

[11] For example, OCR found numerous institutions in violation of Title IX for failing to adopt the preponderance of the evidence standard in its investigations of sexual harassment, even though the notion that the preponderance of the evidence standard is the only standard that might be applied under Title IX is set forth in the 2011 Dear Colleague Letter and not in the Title IX statute, current regulations, or other guidance. *E.g.,* U.S. Dep't. of Education, Office for Civil Rights, Letter of Findings to Harvard Law School 7 (Dec. 10, 2014) (''Harvard Law Letter''), *https://www2.ed.gov/documents/press-releases/harvard-law-letter.pdf* (''[I]n order for a recipient's grievance procedures to be consistent with the Title IX evidentiary standard, the recipient must use a preponderance of the evidence standard for investigating allegations of sexual harassment, including sexual assault/violence.'') OCR in its letter of findings against Harvard Law School noted that Harvard's procedures provide that ''formal disciplinary sanctions shall be imposed only upon clear and convincing evidence.'' Harvard Law Letter at 10. OCR found the following: ''This higher standard of proof was inconsistent with the preponderance of the evidence standard required by Title IX for investigating allegations of sexual harassment or violence.'' *Id.; see also* U.S. Dep't. of Education, Office for Civil Rights, Letter of Findings to S. Methodist Univ. 4 (Dec. 11, 2014), *https://www2.ed.gov/documents/press-releases/southern-methodist-university-letter.pdf*; U.S. Dep't. of Education, Office for Civil Rights, Letter of Findings to Princeton Univ. 6, 11, 18 (Nov. 5, 2014), *https://www2.ed.gov/documents/press-releases/princeton-letter.pdf*; U.S. Dep't. of Education, Office for Civil Rights, Letter of Findings to Tufts Univ. 5 (Apr. 28, 2014), *https://www2.ed.gov/about/offices/list/ocr/docs/investigations/more/01102089-a.pdf*; U.S. Dep't. of Education, Office for Civil Rights, Letter of Findings to Yale Univ. 4–5 (June 15, 2012), *https://www2.ed.gov/about/offices/list/ocr/docs/investigations/01112027-a pdf.* Many recipients changed their Title IX policies and procedures to conform to the 2001 Guidance, and then to the 2011 Dear Colleague Letter, in part based on OCR enforcement actions that found recipients in violation for failing to comport with interpretations of Title IX found only in guidance. *E.g.,* Blair A. Baker, *When Campus Sexual Misconduct Policies Violate Due Process Rights,* 26 Cornell J. of Law & Pub. Pol'y 533, 542 (2016) (The 2011 Dear Colleague Letter has ''forced universities to change their former policies drastically, with regards to their specific procedures as well as the standard of proof, out of fear that the Department of Education will pursue their school for a violation of Title IX. In sum, the Dear Colleague Letter applied pressure on colleges to maintain a victim-friendly environment, which is admirable and necessary, but in turn has created a situation that can be insensitive to the accused and 'tilted in favor of the alleged victim.' These situations do not have to be mutually exclusive; and there must be a solution in which victim-friendly is not synonymous with procedurally adverse to respondents.'') (internal citations omitted); Lauren P. Schroeder, *Cracks in the Ivory Tower: How the Campus Sexual Violence Elimination Act Can Protect Students from Sexual Assault,* 45 Loy. Univ. Chi. L. J. 1195, 1202 (2014) (''[Because] Title IX is such a short statute with little direction, schools look to specific guidance materials provided by the Department of Education to determine the specific requirements of Title IX.'').

[12] The 2014 Q&A (withdrawn at the same time as the 2011 Dear Colleague Letter was withdrawn) expounded on the same approach taken by the Department in the withdrawn 2011 Dear Colleague Letter; throughout this preamble, references to and discussion of the 2011 Dear Colleague Letter may be understood to assume that the same or similar approach was taken in the 2014 Q&A unless otherwise noted.

[13] 2017 Q&A at 1 (''[T]hese questions and answers—along with the [2001 Guidance] previously issued by the Office for Civil Rights—provide information about how OCR will assess a school's compliance with Title IX'' in ''the interim'' while the Department ''engage[s] in rulemaking on the topic of schools' Title IX responsibilities concerning complaints of sexual misconduct, including peer-on-peer sexual harassment and sexual violence.'').

[14] *E.g.,* Alice B. Lloyd, *Colleges Stick With Obama-Era Title IX Guidance,* Washington Examiner (Aug. 2, 2018) (describing the 2017 Q&A and withdrawal of the 2011 Dear Colleague Letter as giving recipients ''the option to adjust their procedures'' for example with respect to which standard of evidence to use in sexual harassment cases, and designating a longer investigation time frame than the 60 calendar day time frame specified in the 2011 Dear Colleague Letter, and describing reasons why most recipients have chosen not to change Title IX policies and procedures).

[15] *Perez* v. *Mortgage Bankers Ass'n,* 575 U.S. 92, 96–98 (2015).

[16] 2017 Q&A at 1.

[17] *Compare* 2017 Q&A at 1–4, 6–7 *with* 2011 Dear Colleague Letter at 2, 3–9, 11, 13.

recipients have in place due to following the 2001 Guidance and the withdrawn 2011 Dear Colleague Letter remain viable policies and procedures for recipients to adopt while complying with these final regulations. Because these final regulations represent the Department's interpretation of a recipient's legally binding obligations, rather than best practices, recommendations, or guidance, these final regulations focus on precise legal compliance requirements governing recipients. In many regards, as discussed throughout this preamble, these final regulations leave recipients the flexibility to choose to follow best practices and recommendations contained in the Department's guidance or, similarly, best practices and recommendations made by non-Department sources, such as Title IX consultancy firms, legal and social science scholars, victim advocacy organizations, civil libertarians and due process advocates, and other experts.

Based on extensive review of the critical issues addressed in this rulemaking, the Department has determined that current regulations do not provide clear direction for how recipients must respond to allegations of sexual harassment because current regulations do not reference sexual harassment at all. Similarly, the Department has determined that Department guidance is insufficient to provide clear direction on this subject because it is not legally enforceable,[18] has created confusion and uncertainty among recipients,[19] and has not adequately advised recipients as to how to uphold Title IX's non-discrimination mandate while at the same time meeting requirements of constitutional due process and fundamental fairness.[20] Therefore, the Department issues these final regulations addressing sexual harassment, to better align the Department's Title IX regulations with the text and purpose of Title IX, the U.S. Constitution, Supreme Court precedent and other case law, and to address the practical challenges facing students, employees, and recipients with respect to sexual harassment allegations in education programs and activities.

The final regulations define and apply the following terms, as discussed in the ''Section 106.30 Definitions'' section of this preamble: ''actual knowledge,'' ''complainant,'' ''elementary and secondary schools,'' ''formal complaint,'' ''postsecondary institution,'' ''respondent,'' ''sexual harassment,'' and ''supportive measures''; each term has a specific meaning under these final regulations. For clarity of understanding when reading this preamble, ''complainant'' means any individual who is alleged to be the victim of sexual harassment, and ''respondent'' means any individual who is reported to be the perpetrator of sexual harassment. A person may be a complainant, or a respondent, even where no formal complaint has been filed and no grievance process is pending. A ''formal complaint'' is a document that initiates a recipient's grievance process, but a formal complaint is not required in order for a recipient to have actual knowledge of sexual harassment, or allegations of sexual harassment, that activates the recipient's legal obligation to respond promptly, including by offering supportive measures to a complainant. References in this preamble to a complainant, respondent, or other individual with respect to exercise of rights under Title IX should be understood to include situations in which a parent or guardian has the legal right to act on behalf of the individual.[21]

Alleged victims of sexual harassment often have options to pursue legal action through civil litigation or by pressing criminal charges. Title IX does not replace civil or criminal justice systems. However, the way in which a school, college, or university responds to allegations of sexual harassment in an education program or activity has serious consequences for the equal educational access of complainants and respondents. These final regulations require recipients to offer supportive measures to every complainant, irrespective of whether the complainant files a formal complaint. Recipients may not treat a respondent as responsible for sexual harassment without providing due process protections. When a recipient determines a respondent to be responsible for sexual harassment after following a fair grievance process that gives clear procedural rights to both parties, the recipient must provide remedies to the complainant.

*Summary of the Major Provisions of This Regulatory Action*

These final regulations are premised on setting forth clear legal obligations that require recipients to: Promptly respond to individuals who are alleged to be victims of sexual harassment by offering supportive measures; follow a fair grievance process to resolve sexual harassment allegations when a complainant requests an investigation or a Title IX Coordinator decides on the recipient's behalf that an investigation is necessary; and provide remedies to victims of sexual harassment.

Regarding sexual harassment, the final regulations:

■ Define the conduct constituting sexual harassment for Title IX purposes;

■ Specify the conditions that activate a recipient's obligation to respond to allegations of sexual harassment and impose a general standard for the sufficiency of a recipient's response, and specify requirements that such a response much include, such as offering supportive measures in response to a report or formal complaint of sexual harassment;

■ Specify conditions that require a recipient to initiate a grievance process to investigate and adjudicate allegations of sexual harassment; and

■ Establish procedural due process protections that must be incorporated into a recipient's grievance process to ensure a fair and reliable factual determination when a recipient investigates and adjudicates a formal complaint of sexual harassment.

Additionally, the final regulations: Affirm that the Department's Office for Civil Rights (''OCR'') may require recipients to take remedial action for discriminating on the basis of sex or otherwise violating the Department's regulations implementing Title IX, consistent with 20 U.S.C. 1682; clarify that in responding to any claim of sex discrimination under Title IX, recipients are not required to deprive an individual of rights guaranteed under

---

[18] For further discussion, see the ''Notice and Comment Rulemaking Rather Than Guidance'' section of this preamble.

[19] Janet Napolitano, ''*Only Yes Means Yes*'': *An Essay on University Policies Regarding Sexual Violence and Sexual Assault,* 33 Yale L. & Pol'y Rev. 387, 393–97 (2015) (The Honorable Janet Napolitano, the President of the University of California, who is a former Governor and Attorney General of Arizona and a former United States Secretary of Homeland Security, writing that OCR's guidance documents ''left [campuses] with significant uncertainty and confusion about how to appropriately comply after they were implemented'' and specifically noted that the ''2011 Dear Colleague Letter generated significant compliance questions for campuses.''); *see also* Task Force on Fed. Regulation of Higher Education, *Recalibrating Regulation of Colleges and Universities* at 12 (2015) (the Task Force on Federal Regulation of Higher Education, appointed by a bipartisan group of U.S. Senators, noting: ''[A] guidance document meant to clarify uncertainty only led to more confusion. A 2011 'Dear Colleague' letter on Title IX responsibilities regarding sexual harassment contained complex mandates and raised a number of questions for institutions. As a result, the Department was compelled to issue further guidance clarifying its letter. This took the form of a 53-page 'Questions and Answers' document [the withdrawn 2014 Q&A] that took three years to complete. Still, that guidance has raised further questions. Complexity begets more complexity.'').

[20] *See* the ''Role of Due Process in the Grievance Process'' section of this preamble.

[21] For further discussion see the ''Section 106.6(g) Exercise of Rights by Parents/Guardians'' subsection of the ''Clarifying Amendments to Existing Regulations'' section of this preamble.

the U.S. Constitution; acknowledge the intersection of Title IX, Title VII, and FERPA, as well as the legal rights of parents or guardians to act on behalf of individuals with respect to Title IX rights; update the requirements for recipients to designate a Title IX Coordinator, disseminate the recipient's non-discrimination policy and the Title IX Coordinator's contact information, and notify students, employees, and others of the recipient's grievance procedures and grievance process for handling reports and complaints of sex discrimination, including sexual harassment; eliminate the requirement that religious institutions submit a written statement to the Assistant Secretary for Civil Rights to qualify for the Title IX religious exemption; and expressly prohibit retaliation against individuals for exercising rights under Title IX.

**Timing, Comments, and Changes**

On November 29, 2018, the Secretary published a notice of proposed rulemaking (NPRM) for these parts in the **Federal Register**.[22] The final regulations contain changes from the NPRM (interchangeably referred to in this preamble as the "NPRM," the "proposed rules," or the "proposed regulations"), and these changes are fully explained in the "Analysis of Comments and Changes" and other sections of this preamble.

Throughout this preamble, the Department uses the terms "institutions of higher education" (or "IHEs") interchangeably with "postsecondary institutions" (or "PSEs"). The Department uses the phrase "elementary and secondary schools" (or "ESEs") interchangeably with "local educational agencies" (or "LEAs" or "K–12").

Throughout this preamble, the Department refers to Title IX of the Education Amendments of 1972, as amended, as "Title IX,"[23] to the Individuals with Disabilities Education Act as the "IDEA,"[24] to Section 504 of the Rehabilitation Act of 1973 as "Section 504,"[25] to the Americans with Disabilities Act as the "ADA,"[26] to Title VI of the 1964 Civil Rights Act as "Title VI,"[27] to Title VII of the 1964 Civil Rights Act as "Title VII,"[28] to section 444 of the General Education Provisions Act (GEPA), which is commonly referred to as the Family Educational Rights and Privacy Act of 1974, as "FERPA,"[29] to the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act as the "Clery Act,"[30] and to the Violence Against Women Reauthorization Act of 2013 as "VAWA."[31]

The Department uses the phrase "Title IX sexual harassment" to refer to the conduct defined in § 106.30 to be sexual harassment as well as the conditions described in § 106.44(a) that require a recipient to respond to sexual harassment under Title IX and these final regulations.[32] When the Department uses the term "victim" (or "survivor") or "perpetrator" to discuss these final regulations, the Department assumes that a reliable process, namely the grievance process described in § 106.45, has resulted in a determination of responsibility, meaning the recipient has found a respondent responsible for perpetrating sexual harassment against a complainant.[33]

Throughout the preamble, the Department references and summarizes statistics, data, research, and studies that commenters submitted. The Department's reference to or summarization of these items, however, does not speak to their level of accuracy. Whether specifically cited or not, we considered all relevant information submitted to us in our analysis and promulgation of these final regulations.

The Department references statistics, data, research, and studies throughout this preamble. Such reference to or summarization of these items does not indicate that the Department independently has determined that the entirety of each item is accurate.

Many commenters referenced the impact of sexual harassment or the proposed rules on individuals who belong to, or identify with, certain demographic groups, and used a variety of acronyms and phrases to describe such individuals; for example, various commenters referred to "LGBT" or "LGBTQ+" and "persons of color" or "racial minorities." For consistency, throughout this preamble we use the acronym "LGBTQ" while recognizing that other terminology may be used or preferred by certain groups or individuals, and our use of "LGBTQ" should be understood to include lesbian, gay, bisexual, transgender, queer, questioning, asexual, intersex, nonbinary, and other sexual orientation or gender identity communities. We use the phrase "persons of color" to refer to individuals whose race or ethnicity is not white or Caucasian. We emphasize that every person, regardless of demographic or personal characteristics or identity, is entitled to the same protections against sexual harassment under these final regulations, and that every individual should be treated with equal dignity and respect.

Finally, several provisions in the NPRM have been renumbered in the final regulations.[34] In response to commenters who asked for clarification as to whether the definitions in § 106.30 apply to a term in a specific regulatory provision, some of the regulatory provisions specifically refer to a term "as defined in § 106.30" to provide additional clarity.[35] Notwithstanding these points of additional clarification in certain regulatory provisions, the definitions in § 106.30 apply to the entirety of 34 CFR part 106. For consistency, references in this preamble are to the provisions as numbered in the final, and not the proposed, regulations.

---

[22] 83 FR 61462 (Nov. 29, 2018) (to be codified at 34 CFR pt. 106).

[23] 20 U.S.C. 1681 *et seq.*

[24] 20 U.S.C. 1400 *et seq.*

[25] 29 U.S.C. 701 *et seq.*

[26] 42 U.S.C. 12101 *et seq.*

[27] 42 U.S.C. 2000d *et seq.*

[28] 42 U.S.C. 2000e *et seq.*

[29] 20 U.S.C. 1232g.

[30] 20 U.S.C. 1092(f).

[31] 34 U.S.C. 12291 *et seq.* (formerly codified at 42 U.S.C. 13925).

[32] Section 106.44(a) requires a recipient with actual knowledge of sexual harassment in an education program or activity of the recipient against a person in the United States to respond promptly in a manner that is not deliberately indifferent, meaning not clearly unreasonable in light of the known circumstances.

[33] As noted in the "Executive Summary" section of this preamble, "respondent," "sexual harassment," and "complainant" are defined terms in § 106.30.

[34] Provisions proposed in the NPRM, as renumbered in these final regulations, are:

Proposed § 106.44(b)(2) *eliminated in the final regulations.*

Proposed § 106.44(b)(3) *eliminated in the final regulations.*

Proposed § 106.44(b)(4) *eliminated in the final regulations.*

Proposed § 106.44(b)(5) *in the final regulations as* § 106.44(b)(2).

Proposed § 106.45(b)(3)(i) *in the final regulations as* § 106.45(b)(5)(i).

Proposed § 106.45(b)(3)(ii) *in the final regulations as* § 106.45(b)(5)(ii).

Proposed § 106.45(b)(3)(iii) *in the final regulations as* § 106.45(b)(5)(iii).

Proposed § 106.45(b)(3)(iv) *in the final regulations as* § 106.45(b)(5)(iv).

Proposed § 106.45(b)(3)(v) *in the final regulations as* § 106.45(b)(5)(v).

Proposed § 106.45(b)(3)(vi) *in the final regulations as* § 106.45(b)(6)(ii).

Proposed § 106.45(b)(3)(vii) *in the final regulations as* § 106.45(b)(6)(i).

Proposed § 106.45(b)(3)(viii) *in the final regulations as* § 106.45(b)(5)(vi).

Proposed § 106.45(b)(3)(ix) *in the final regulations as* § 106.45(b)(5)(vii).

Proposed § 106.45(b)(4) *in the final regulations as* § 106.45(b)(7).

Proposed § 106.45(b)(5) *in the final regulations as* § 106.45(b)(8).

Proposed § 106.45(b)(6) *in the final regulations as* § 106.45(b)(9).

Proposed § 106.45(b)(7) *in the final regulations as* § 106.45(b)(10).

[35] *E.g.*, §§ 106.8(c), 106.44(a), 106.45(b) (introductory sentence), 106.45(b)(1)(i), 106.45(b)(2), 106.45(b)(3)(i), 106.45(b)(7).

Citations to ''34 CFR 106.__'' in the body of the preamble and the footnotes are citations to the Department's current regulations and not the final regulations.

**Adoption and Adaption of the Supreme Court's Framework To Address Sexual Harassment**

Seven years after the passage of Title IX, the Supreme Court in *Cannon* v. *University of Chicago*[36] held that a judicially implied private right of action exists under Title IX. Thirteen years after that, in *Franklin* v. *Gwinnett County Public Schools*[37] the Supreme Court held that money damages are an available remedy in a private lawsuit alleging a school's intentional discrimination in violation of Title IX. The *Cannon* Court explained that Title IX has two primary objectives: Avoiding use of Federal funds to support discriminatory practices and providing individuals with effective protection against discriminatory practices.[38] Those two purposes are enforced both by administrative agencies that disburse Federal financial assistance to recipients, and by courts in private litigation. These two avenues of enforcement (administrative enforcement by agencies, and judicial enforcement by courts) have different features: For instance, administrative enforcement places a recipient's Federal funding at risk,[39] while judicial enforcement does not.[40] But the goal of both avenues of enforcement (administrative and judicial) is the same: To further the non-discrimination mandate of Title IX.

In deciding whether to recognize a judicially implied right of private action, the *Cannon* Court considered whether doing so would conflict with administrative enforcement of Title IX. The *Cannon* Court concluded that far from conflicting with administrative enforcement, judicial enforcement would complement administrative enforcement because some violations of Title IX may lend themselves to the administrative remedy of terminating Federal financial assistance, while other violations may lend themselves to a judicial remedy in private litigation.[41] The *Cannon* Court recognized that judicial and administrative enforcement both help ensure ''the orderly enforcement of the statute'' to achieve Title IX's purposes.[42]

In *Franklin,* the Supreme Court acknowledged that sexual harassment and sexual abuse of a student by a teacher may mean the school itself engaged in intentional sex discrimination.[43] The *Franklin* Court held that money damages is an available remedy in a private lawsuit under Title IX, reasoning that even though Title IX is a Spending Clause statute, schools have been on notice since enactment of Title IX that intentional sex discrimination is prohibited under Title IX.[44]

In 1998, six years after *Franklin,* in *Gebser* v. *Lago Vista Independent School District*[45] the Supreme Court analyzed the conditions under which a school district will be liable for money damages for an employee sexually harassing a student. The *Gebser* Court began its analysis by stating that while *Franklin* acknowledged that a school employee sexually harassing a student may constitute the school itself committing intentional discrimination on the basis of sex, it was necessary to craft standards defining ''the contours of that liability.''[46] The *Gebser* Court held that where a school has actual knowledge of an employee sexually harassing a student but responds with deliberate indifference to such knowledge, the school itself has engaged in discrimination, subjecting the school to money damages in a private lawsuit under Title IX.[47] The following year, in 1999, in *Davis* v. *Monroe County Board of Education,*[48] the Supreme Court held that where sexual harassment is committed by a peer rather than an employee, the same standards of actual knowledge and deliberate indifference apply.[49] The *Davis* Court additionally crafted a definition of when sex-based conduct becomes actionable sexual harassment, defining the conduct as ''so severe, pervasive, and objectively offensive'' that it denies its victims equal access to education.[50]

The Supreme Court's *Gebser* and *Davis* cases built upon the Supreme Court's previous Title IX decisions in *Cannon* and *Franklin* to establish a three-part framework describing when a school's response to sexual harassment constitutes the school itself committing discrimination. The three parts of this framework are: Conditions that must exist to trigger a school's response obligations (actionable sexual harassment, and the school's actual knowledge) and the deliberate indifference liability standard evaluating the sufficiency of the school's response. We refer herein to the ''*Gebser/Davis* framework,'' consisting of a definition of actionable sexual harassment, the school's actual knowledge, and the school's deliberate indifference.

The *Gebser/Davis* framework is the appropriate starting point for ensuring that the Department's Title IX regulations recognize the conditions under which a school's response to sexual harassment violates Title IX. Whether the available remedy is money damages (in private litigation) or termination of Federal financial assistance (in administrative enforcement), the Department's regulations must acknowledge that when a school itself commits sex discrimination, the school has violated Title IX.

In crafting the *Gebser/Davis* framework, the Supreme Court emphasized that because a private lawsuit under Title IX subjects a school to money damages, it was important for the Court to set standards for a school's liability premised on the school's knowledge and deliberate choice to permit sexual harassment, analogous to the way that the Title IX statute provides that a school's Federal

---

[36] 441 U.S. 677, 717 (1979).
[37] 503 U.S. 60, 76 (1992).
[38] *Cannon* v. *Univ. of Chicago,* 441 U.S. 677, 704 (1979) (''Title IX, like its model Title VI, sought to accomplish two related, but nevertheless somewhat different, objectives. First, Congress wanted to avoid the use of federal resources to support discriminatory practices; second, it wanted to provide individual citizens effective protection against those practices.'').
[39] 20 U.S.C. 1682.
[40] *Franklin,* 503 U.S. at 76.
[41] *Cannon,* 441 U.S. at 704–06.

[42] *Id.* at 705–06 (''The award of individual relief to a private litigant who has prosecuted her own suit is not only sensible but is also fully consistent with—and in some cases even necessary to—the orderly enforcement of the statute.''); *see also id.* at 707 (''the individual remedy will provide effective assistance to achieving the statutory purposes.'').
[43] *Franklin,* 503 U.S. at 74–75 (holding intentional discrimination by the school is alleged where the school's employee sexually harassed a student).
[44] *Id.* at 74 (noting that under *Pennhurst State Sch. & Hosp.* v. *Halderman,* 451 U.S. 1 (1981), monetary damages may be appropriate to remedy an intentional violation of a Spending Clause statute because entities subject to the statute are on notice that intentional violations of a statute may subject the entity to monetary damages); *see also Gebser* v. *Lago Vista Indep. Sch. Dist.,* 524 U.S. 274, 281 (1998) (noting that in *Franklin,* the plaintiff alleged that ''school administrators knew about the harassment but took no action, even to the point of dissuading her from initiating charges'').
[45] 524 U.S. 274 (1998).
[46] *Id.* at 281 (''*Franklin* thereby establishes that a school district can be held liable in damages in cases involving a teacher's sexual harassment of a student; the decision, however, does not purport to define the contours of that liability. We face that issue squarely in this case.'').
[47] *Id.* at 290.

[48] 526 U.S. 629 (1999).
[49] *Id.* at 650 (holding that ''funding recipients are properly held liable in damages only where they are deliberately indifferent to sexual harassment, of which they have actual knowledge, that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school.'').
[50] *See id.*

*Changes:* None.

### Section 106.12 Educational Institutions Controlled by a Religious Organization

*Comments:* Some commenters expressed support for the changes to § 106.12(b), on the basis that the changes offered additional flexibility to religious educational institutions, and religious freedom is a vital constitutional guarantee. Commenters also elaborated on the benefits of religious freedom, suggesting that religion helps preserve civic virtues, and instills positive moral values for both individuals and communities. Some commenters noted that freedom of religion is specifically contemplated by the U.S. Constitution, in the First Amendment's Free Exercise Clause. Drawing on this fact, commenters noted that the freedom of religion has been a touchstone of American government since the country was founded. Other commenters stated that proposed § 106.12(b) is consistent with the Religious Freedom Restoration Act, since it avoids placing an unnecessary burden on religious institutions. Some commenters noted that proposed § 106.12(b) has the ancillary benefit of avoiding confusion for schools, since many institutions may not obtain a religious exemption before having a complaint against them filed, but now they will know that there is no such duty. The corollary to this point, asserted commenters, is that opponents of a school's religious exemption may not incorrectly argue that a school has ''waived'' a right to invoke a religious exemption.

*Discussion:* The Department appreciates and agrees with the comments in support of § 106.12(b), which align with the Title IX statute, the First Amendment, and the Religious Freedom Restoration Act, 42 U.S.C. 2000bb–1. The final regulations bring § 106.12(b) further in line with the relevant statutory framework in this context, which states that Title IX ''shall not apply to an educational institution which is controlled by a religious organization if the application of this subsection would not be consistent with the religious tenets of such organization,'' 20 U.S.C. 1681(a)(3), and that the term ''program or activity,'' as defined in 20 U.S.C. 1687, ''does not include any operation of an entity which is controlled by a religious organization if the application of section 1681 of this title to such operation would not be consistent with the religious tenets of such organization.''

No part of the statute requires that recipients receive an assurance letter from OCR, and no part of the statute suggests that a recipient must be publicly on the record as a religious institution claiming a religious exemption before it may invoke a religious exemption in the context of Title IX. Nevertheless, the current regulations are not clear on whether recipients may claim the exemption under § 106.12(a) only by affirmatively submitting a letter to the Assistant Secretary for Civil Rights.

However, longstanding OCR practice aligns with the statute, and the final regulations codify OCR's practice. To the extent that a recipient would like to request an assurance letter from OCR, the agency will continue to respond to such requests, as an option for recipients that are educational institutions controlled by a religious organization.

*Changes:* None.

*Comments:* Commenters noted that religious educational institutions themselves are vital for American society, noting that schools, among other religious institutions, have contributed to the alleviation of social ills through philanthropic and humanitarian projects. Religious educational institutions, suggested commenters, are necessary for religious freedom, and the proposed rules are consistent with the robust views of religious freedom that have been expressed by the U.S. Constitution, the U.S. Supreme Court, and Congress itself when it enacted Title IX. To that end, commenters noted that the Federal government ought to be making it easier for religious institutions to operate and thrive, not harder. Commenters noted that it would be a waste of a school's resources to apply for a religious exemption assurance letter, when no letter is in fact needed to invoke a religious exemption to Title IX. At least under the proposed rule, asserted the commenters, the Department's entanglement with a religious institution's tenets might be limited to those cases where a complaint is filed, or where the school affirmatively requests an exemption assurance letter.

*Discussion:* The Department appreciates the positive feedback on the proposed revisions in § 106.12(b) and believes that the Department's prior practice and the revisions to § 106.12(b) in these final regulations have the effect of promoting religious freedom. The final regulations codify longstanding OCR practices, and are consistent with the Title IX statute.

*Changes:* None.

*Comments:* Some commenters discussed current § 106.12, as well as the practice of OCR. Commenters stated that the status quo requires a religious institution to affirmatively request an exemption, and that imposing such a duty inappropriately places the burden on religious educational institutions. Instead, the commenters suggested, the burden would more appropriately be placed on the government, by having to disprove the application of a religious exemption. Indeed, commenters suggested that the status quo could occasionally be turned against religious educational institutions, by denying religious exemptions or forcing schools to wait an excessively long period of time before obtaining a letter of assurance from OCR.

*Discussion:* Contrary to commenters who suggested that the status quo requires schools to affirmatively request an assurance letter from OCR, OCR has previously interpreted the current regulation to mean that a school can invoke a religious exemption even after OCR has received a complaint regarding the educational institution. Additionally, the Department views both the status quo and the final regulations to require a recipient to invoke and establish its eligibility for an exemption, and does not view the final regulations as placing the burden on the Federal government to disprove any claim for religious exemption. However, it may be correct that many schools and individuals—such as these commenters themselves—have incorrectly read current § 106.12 to mean that a recipient must always seek or receive an assurance letter from OCR to assert the religious exemption before any complaint is filed against the school, if a religious exemption is to be invoked. These final regulations clarify that this is not the case.

*Changes:* None.

*Comments:* In the same vein, many commenters supported § 106.12(b) because the provision alleviated the need for schools to request an assurance letter in order to invoke a religious exemption. That purported need, the commenters asserted, was inconsistent with the authority granted by Congress to the Department of Education in Title IX itself. It was better, the commenters argued, to simply allow schools the option to obtain the assurance ahead of time, but not require it. Commenters suggested that forcing religious institutions to jump through hoops in order to invoke a religious exemption imperils schools' deeply held religious beliefs. At least one commenter stated that religious educational institutions have a natural tendency to reduce their interactions with government, and thus allowing schools to maintain a religious

exemption to Title IX even absent an assurance letter was appropriate.

*Discussion:* The proposed revisions to § 106.12(b) codifies OCR's practice of permitting recipients to invoke a Title IX religious exemption without having obtained an assurance letter. However, the Department agrees with the concern that the current regulation is not as clear as it could be on this point, and that appears to have resulted in some confusion among recipients who were unaware of OCR's existing practice.

*Changes:* None.

*Comments:* Some commenters noted that § 106.12(b) will aid religious educational institutions, and assist with their legal compliance regimes under Title IX. For instance, one commenter asserted that a religious educational institution that had single-sex classes would understand that they do not have to comply with the single-sex provisions of the current Title IX regulations and instead would simply be able to maintain a religious exemption generally, if the classes were based on religious tenets or practices. In other cases, commenters stated, schools would be able to maintain more flexibility in their school policies, such as whether to allow students who were assigned one sex at birth to use the intimate facilities assigned to another sex; whether to offer birth control as part of their health services; and how to structure dormitory and other housing policies.

*Discussion:* The Department appreciates the positive feedback on § 106.12(b) and agrees with commenters that stated that the final regulations will assist recipients with complying with Title IX. The final regulations codify longstanding OCR practices, and are consistent with the Title IX statute.

*Changes:* None.

*Comments:* Many commenters suggested that the proposed change in § 106.12(b) is a good way to prevent future administrations from maintaining a hostile posture toward religious educational institutions. These commenters suggested that the process of compelling a school to write a request letter to the Assistant Secretary for Civil Rights, and then waiting for OCR to respond, may raise fears that the Federal government is passing judgment on religious institutions, or that hostility toward certain categories of exemptions could trigger additional delays, or perhaps unduly close scrutiny of whether a religious educational institution really is eligible for such an exemption. Commenters also suggested that close scrutiny of religious exemption requests excessively entangles OCR with religious educational institutions.

*Discussion:* The Department is mindful of the concerns that educational institutions controlled by a religious organization sometimes express that OCR "entangles" itself with a recipient's religious practices by scrutinizing them too closely, or by delaying the issuance of an assurance letter (even when such delay is due to administrative backlogs and is not an intentional delay). The Department appreciates the positive feedback on § 106.12(b) and believes that the final regulations will help the Department and its OCR administer these final regulations consistent with the U.S. Constitution by minimizing entanglement issues. The final regulations codify longstanding OCR practices, and are consistent with the Title IX statute.

*Changes:* None.

*Comments:* Some commenters sought to address concerns about religious exemptions generally, suggesting that religious institutions need to rely on Title IX less than other schools, since some acts—like sexual harassment or sexual assault—are generally considered abhorrent sins under most religious persuasions. Some comments mentioned Christianity, in particularly, as a religion that is committed to promoting the safest environment for students, free from discrimination and harassment. In that vein, commenters stated that Christian principles have caused Christian colleges to be exceptionally diligent in protecting students and employees from sexual harassment and sexual assault. Some commenters stated that it is inappropriate for a school to invoke a religious exemption in order to escape Title IX liability, since religious values disfavor discrimination, and discrimination is generally against a religious moral code. Commenters also stated that religious exemptions are contrary to the Bible, in that the Bible condemns sexual harassment and assault, and religious institutions should be leading the charge against such misconduct. One commenter stated that God made beings different from each other, and discrimination against students is contrary to God's creation.

*Discussion:* The Department appreciates the commenter's concerns and perspectives. The Department notes that the religious exemption applies only to the extent application of this part would not be consistent with the religious tenets of such organization. Through 20 U.S.C. 1682, Congress authorized the Department to effectuate the provisions of Title IX, which includes a religious exemption. The Department does not take a position on whether it is appropriate for a school to invoke such an exemption and is effectuating the provisions of Title IX, including the religious exemption that Congress provided in 20 U.S.C. 1681(a)(3) through these final regulations, which are consistent with the First Amendment and the Religious Freedom Restoration Act.

*Changes:* None.

*Comments:* Several commenters noted that they supported § 106.12(b) because of its breadth, reading the provision to mean that any school, even with a minor religious affiliation, would be eligible for a religious exemption. The commenters asserted that this was the correct approach, and that the Department was wise to embrace such a broad religious exemption.

*Discussion:* Title IX and current § 106.12 provide that they do not apply to an "educational institution which is controlled by a religious organization to the extent application of this part would not be consistent with the religious tenets of such organization." The Department does not consider the final regulations to be broader than the scope of the current regulations or the statute.

*Changes:* None.

*Comments:* One commenter argued that there is a potential internal contradiction between § 106.8 and proposed § 106.12. While a recipient may have a duty to issue a general notice of non-discrimination, the commenter argued that they might—at the same time—maintain a religious exemption that permitted such discrimination. The commenter argued that this would allow schools to mislead students by sending out a misleading non-discrimination notice. The commenter contended that this "bait and switch" would undermine OCR's credibility, and would mean that students at religious institutions will be deterred from filing complaints. To solve this problem, the commenter suggested schools claiming a religious exemption should have to include such a statement in the non-discrimination notice mandated by § 106.8.

*Discussion:* Recipients are permitted to distribute publications under § 106.8(b)(2)(ii) that clarify that the recipient may treat applicants, students, or employees differently on the basis of sex to the extent "such treatment is permitted by Title IX or this part." Nothing in the final regulations mandates that recipients deceive applicants, students, or employees regarding their non-discrimination practices, and recipients that assert a

religious exemption are not required to misstate their actual policies when disseminating their Title IX policy under § 106.8. Indeed, if a recipient provided inaccurate or false information in any notification required under § 106.8, then the recipient would not be in compliance with § 106.8. We note that nothing in the final regulations supersedes any other contractual or other remedy that an applicant, student, or employee may have against a recipient based on an alleged misstatement or false statement. Students at schools that assert a religious exemption also may always file a complaint with OCR.

*Changes:* None.

*Comments:* Numerous commenters expressed opposition to religious exemptions as a general matter, suggesting that such exemptions are commonly used to discriminate against students or employees, cause harm to students and employees, and often are not adequately disclosed in a public and transparent way so as to give students and employees appropriate notice that they would not be protected by Title IX. These commenters argued that the interests underlying the protection of civil rights outweigh the need to protect a religious institution's discomfort regarding student behavior. Students at religious institutions, including LGBTQ students, asserted the commenters, deserve protection just as much as all other students. Commenters asserted that the Department owes a duty to students to protect their civil rights and argued that the proposed rules run contrary to that duty.

In the same vein regarding transparency, some commenters argued that permitting recipients to invoke religious exemptions without having to make a public statement will pit students against their own schools. The commenters say that since a school is designed to cultivate critical thinkers, depriving students of transparency runs counter to this interest. Additionally, commenters stated that students who seek abortions, hormone therapy, or access to intimate facilities that are sex-segregated, may feel like their own school does not protect them, and may feel betrayed by their own institution, leading to an environment of distrust on campus. Worse, the commenters say, some students could feel bullied, threatened, or harassed once students see that the school itself is openly discriminating against its students. Commenters noted that the same could be true for employees, and not just students.

Commenters argued that even if a school is entitled to assert a religious exemption, proposed § 106.12(b) goes too far because it seems to encourage schools to lie in wait before formally invoking the religious exemption. Commenters stated that religious educational institutions should have a legal obligation to give students notice prior to enrolling or working at a school maintaining a religious exemption. For that reason, commenters stated, § 106.12(b) is in tension with the OCR's usual assurance process for all recipients of Federal education funds, which requires a school to assure the Department that it will comply with non-discrimination laws as a condition of receiving Federal education dollars. Another commenter argued that for private religious elementary and secondary schools that educate students as part of their Free and Appropriate Public Education, it is highly troubling for parents not to know about Title IX exemptions prior to enrollment. One commenter alleged that allowing a recipient to invoke a religious exemption after a complaint has been filed with OCR is contrary to the due process principles that these final regulations are attempting to preserve and protect.

*Discussion:* In response to the comments about the propriety of having any religious exemption or the need to protect civil rights over religious freedom, the Department notes that Title IX itself guarantees the religious exemption and these final regulations do not change our long-standing practice of honoring and applying the religious exemption in the appropriate circumstances. As some commenters in support of § 106.12(b) noted, the proposed regulations do not prevent OCR from investigating a complaint simply because the complaint involves an educational institution controlled by a religious organization. The recipient must additionally invoke a religious exemption based on religious tenets. Moreover, this does not prevent OCR from investigating or making a finding against a recipient if its religious tenets do not address the conduct at issue. In those cases, OCR will proceed to investigate, and if necessary, make a finding on the merits.

The Department also appreciates the feedback on the potential policy implications of the proposed rule; however, the Department is limited by the Title IX statute,[1725] and cannot make changes to the final regulations that are inconsistent with the statute, regardless of the policy implications addressed by commenters. As mentioned, the final regulations codify longstanding OCR practices, and are consistent with the Title IX statute. The Department does not believe that its current practice or the final regulations violate the U.S. Constitution. The Department further asserts that § 106.12(b) in these final regulations is consistent with the First Amendment, including the Free Exercise Clause as well as the Establishment Clause, because the Department is not establishing a religion and is instead respecting a recipient's right to freely exercise its religion. Additionally, § 106.12(b) in these final regulations is consistent with the Religious Freedom Restoration Act, 42 U.S.C. 2000bb *et seq.,* which applies to the Department, and requires the Department not to substantially burden a person's exercise of religion unless certain conditions are satisfied.[1726] As the Title IX statute does not require a recipient to request and receive permission from the Assistant Secretary to invoke the religious exemption, requiring a recipient to do so may constitute a substantial burden that is not in furtherance of a compelling government interest or the least restrictive means of furthering that compelling government interest under the Religious Freedom Restoration Act, 42 U.S.C. 2000bb–1. Such a requirement also is unnecessary in light of the other requirements in these final regulations that a recipient notify students, prospective students, and others about the recipient's non-discrimination statement as well as its grievance procedures and grievance process to address sex discrimination, including sexual harassment.

Section 106.8 requires all recipients to notify applicants for admission and employment, students, parents or legal guardians of elementary and secondary school students, employees, and all unions or professional organizations holding collective bargaining or professional agreements with the recipient of its non-discrimination on the basis of sex as well as its grievance procedures and grievance process, including how to report or file a complaint of sex discrimination, how to report or file a formal complaint of sexual harassment, and how the recipient will respond. Additionally, § 106.8(b)(2)(ii) provides that a recipient

---

[1725] 20 U.S.C. 1681(a)(3) ("[T]his section shall not apply to an educational institution which is controlled by a religious organization if the application of this subsection would not be consistent with the religious tenets of such organization").

[1726] *Burwell* v. *Hobby Lobby Stores, Inc.,* 573 U.S. 682 (2014) (holding "person" within meaning of the Religious Freedom Restoration Act's protection of a person's exercise of religion includes for-profit corporations).

must not use or distribute a publication stating that the recipient treats applicants, students, or employees differently on the basis of sex except as such treatment is permitted by Title IX or these final regulations. Accordingly, students and prospective students should receive adequate notice of the recipient's non-discrimination statement as well as its grievance procedures and grievance process regarding sex discrimination, including sexual harassment, and such notice is consistent with due process principles. Such transparency helps guard against any misunderstandings, irrespective of whether a school asserts a religious exemption.

The religious exemption in Title IX, 20 U.S.C. 1681(a)(3), applies to an educational institution which is controlled by a religious organization, and students and prospective students likely will know whether an educational institution is controlled by a religious organization so as not to be surprised by a recipient's assertion of such a religious exemption. Additionally, the Department also notes that under § 106.8(b)(1) any person can inquire about the application of Title IX to a particular recipient by inquiring with the recipient's Title IX Coordinator, the Assistant Secretary, or both.

OCR is unaware of a religious school claiming an exemption from Title IX's obligations to respond to sexual harassment on the basis that such a response conflicts with the religious tenets of an organization controlling the religious school. As the Department explains more thoroughly in the ''Gender-based harassment'' subsection of the ''Sexual Harassment'' subsection of the ''Section 106.30 Definitions'' section, these final regulations focus on prohibited conduct. The Department believes any person may experience sex discrimination, irrespective of the identity of the complainant or respondent.

Nothing in the final regulations mandates that recipients deceive applicants, students, or employees regarding their non-discrimination practices, a recipient remains free to describe its religious exemption on its website, and nothing in the final regulations supersedes any other contractual or other remedy that an applicant, student, or employee may have against a recipient based an alleged misstatement or false statement.

*Changes:* None.

*Comments:* Some commenters ascribed particularly nefarious motives to recipients, arguing that schools often intentionally deceive applicants to the school in order to obtain application fees or tuition revenues. These commenters alleged that religious educational institutions deliberately hid their purported exemptions from Title IX and would then blindside students once they were already enrolled in school. One commenter suggested bigoted university officials would use religious exemptions as a fig leaf to impose personal beliefs, such as denying transgender students medical coverage for hormone therapy.

*Discussion:* Nothing in these final regulations mandates that recipients deceive applicants, students, or employees regarding their non-discrimination practices, and nothing in the final regulations supersedes any other contractual or other remedy that an applicant, student, or employee may have against a recipient based an alleged misstatement or false statement. On the contrary, as explained above, these final regulations including § 106.8, promote transparency by requiring a recipient to provide notice of its non-discrimination statement as well as its grievance procedures and grievance process to address sex discrimination, including sexual harassment. Additionally, § 106.8(b)(1) allows inquiries about the application of Title IX and this part to a recipient to be referred to the recipient's Title IX Coordinator, to the Assistant Secretary, or both.

The Department disagrees with the suggestion that religious exemptions are tools for bigotry or should not be provided due to such characterizations. The First Amendment to the Constitution protects religious exercise, and Congress placed a religious exemption in Title IX and numerous other statutes. The Department's experience is that exemptions for religious liberty overwhelmingly serve to advance freedom and diversity in education, not bigotry. To the extent that an official of a recipient invokes a religious exemption ''as a fig leaf'' in order to impose only personal beliefs, that recipient would not qualify for a religious exemption because the religious exemption requires the application of Title IX and its regulations to be inconsistent with the religious tenets of a religious organization and not just inconsistent with personal beliefs.

*Changes:* None.

*Comments:* Some commenters ascribed nefarious motives to the Department. Commenters asserted that the people drafting the proposed rules would not be in favor of religious exemptions if their wives, mothers, or daughters were the victims of sexual assault. One stated that honoring women and girls' rights is what Jesus calls for and implied that the proposed regulations go against this principle. Some commenters objected that the inclusion of religious exemptions is clearly a political decision made by politicians in this administration who seek to avoid accountability for their own sexual misconduct. Other commenters stated that the drafters of the proposed rules do not have the interests of students at heart, and that the proposed rules are intentionally designed to institutionalize patriarchy and homophobia. Other commenters stated that the inclusion of the religious exemption provision was a political decision to curry favor with religious institutions and warned the Department not to divide people. Another commenter suggested that the provision was an effort by Secretary Betsy DeVos to establish a Christian fascist nation that favors a fundamentalist strain of Christianity.

*Discussion:* Although the Department appreciates the feedback on the proposed rule, it rejects the assumptions of these commenters. As stated above, the Department's goals for these final regulations are to establish a grievance process that is rooted in due process principles of notice and opportunity to be heard and that ensures impartiality before unbiased officials. Specifically, these goals are to (i) improve perceptions that Title IX sexual harassment allegations are resolved fairly and reliably, (ii) avoid intentional or unintentional injection of sex-based biases and stereotypes into Title IX proceedings, and (iii) promote accurate, reliable outcomes, all of which effectuate the purpose of Title IX to provide individuals with effective protection from discriminatory practices, including remedies for sexual harassment victims. As stated above, § 106.12 reflects the statutory exemption for religious educational institutions granted by Congress, and the religious exemption applies only to the extent that the tenets of a religious organization controlling a religious educational institution conflict with the application of Title IX.

These final regulations apply to prohibit certain conduct and apply to anyone who has experienced such conduct, irrespective of a person's sexual identity or orientation. The Department believes that these final regulations provide the best protections for all persons, including women and people who identify as LGBTQ, in an education program or activity of a recipient of Federal financial assistance who experience sex discrimination, including sexual harassment.

Contrary to commenters' assertions, these final regulations do not establish a religion, and § 106.12(b) applies to all religions and not just Christianity.

The Department disagrees that these final regulations are patriarchal. These final regulations empower complainants with a choice to consider and accept supportive measures that a recipient must offer under § 106.44(a) and/or to file a formal complaint to initiate a grievance process under § 106.45.

The Department does not seek to curry favor with a particular population of recipients or individuals. The Department seeks to effectuate Title IX's non-discrimination mandate consistent with the U.S. Constitution, including the First Amendment, as well as other Federal laws such as the Religious Freedom Restoration Act.

*Changes:* None.

*Comments:* Some commenters suggested that religious educational institutions could manipulate the revisions to § 106.12(b) to their benefit. For instance, one commenter asserted that a school might wait to see how a Title IX investigation by OCR is going, and then if OCR is on the verge of issuing a finding in the case, the school might invoke a religious exemption at the last minute. Other commenters stated that a school might invoke a religious exemption as a way to retaliate against students, or would abuse the ability to invoke a religious exemption even when the school's tenets do not strictly contradict Title IX. One commenter asserted that recipients of all religious persuasions will suffer, when the public assumes that all religious schools discriminate against students.

Another commenter suggested that OCR ought to closely scrutinize claims of religious exemptions, and that schools should not receive any deference when invoking a religious exemption or arguing that their tenets conflict with Title IX. The commenter argued that this would be like letting a corporation verify or change its own tax status while being investigated by the Internal Revenue Service, *e.g.,* moving to non-profit status in the middle of a tax fraud investigation.

*Discussion:* The Department appreciates the feedback on the potential policy implications of the proposed rules and believes that some of the commenters misunderstand § 106.12(b). Section 106.12(b) states: "In the event the Department notifies an institution that it is under investigation for noncompliance with this part and the institution wishes to assert an exemption set forth in paragraph (a) of this section, the institution may at that time raise its exemption by submitting in writing to the Assistant Secretary a statement by the highest ranking official of the institution, identifying the provisions of this part which conflict with a specific tenet of the religious organization, whether or not the institution had previously sought assurance of an exemption from the Assistant Secretary." When the Department notifies a recipient that it is under investigation for noncompliance with this part or a particular section of this part, the recipient identifies the provisions of this part which conflict with a specific tent of the religious organization. Of course, a recipient must know what it is under investigation for, in order to assert an applicable exemption such as a religious exemption. Nonetheless, a recipient cannot invoke a religious exemption "at the last minute" because the recipient must be an educational institution which is controlled by a religious organization, and such control by a religious organization is not something that occurs "at the last minute." The educational institution must have been controlled by a religious organization when the alleged noncompliance occurred, and the educational institution is only exempt from Title IX and these final regulations to the extent that Title IX or these final regulations are not consistent with the religious tenets of such organization.

Additionally, retaliation is strictly prohibited under § 106.71, and a recipient cannot invoke a religious exemption to retaliate against a person. Similarly, a recipient may only assert an exemption to the extent that Title IX or these regulations are not consistent with the religious tenets of the religious organization that controls an educational institution.

The Department is not aware of any assumption that all educational institutions which are controlled by a religious organization engage in discriminatory practices, and the Department's experience has not been that all educational institutions which are controlled by a religious organization engage in discriminatory practices.

Under long-standing OCR policy, OCR's practice is generally to avoid questioning the tenet that an educational institution controlled by a religious organization has invoked to cover the conduct at issue. OCR does not believe it is in a position, generally, to scrutinize or question a recipient's sincerely held religious beliefs, and the First Amendment likely prohibits questioning the reasonableness of a recipient's sincerely held religious beliefs. However, recipients are not entitled to any type of formal deference when invoking eligibility for a religious exemption, and recipients have the duty to establish their eligibility for an exemption, as well as the scope of any exemption. These final regulations, including § 106.12(b), make no changes to the conditions that must apply in order for a religious educational institution to qualify for the religious exemption.

*Changes:* None.

*Comments:* Some commenters stated that the Department failed to adequately provide a rationale for changing current 34 CFR 106.12(b) in the manner proposed in § 106.12(b), and argued that the Department failed to disclose the potential negative impacts of this change. The commenters suggested that the proposed rules ought to more carefully explain how compliance with Title IX is burdensome for religious institutions, given that the current procedures, according to commenters, are exceptionally generous to religious institutions. Additionally, these commenters stated that the Department should reassess the religious exemption to weigh more heavily a school's potential to be dishonest and to discriminate.

Commenters stated that they favored what they considered to be current OCR practice, under which, commenters asserted, most requests for exemptions came by letter before a complaint was opened, and under which OCR posts a publicly-available list of all schools that had invoked an exemption. Commenters contended that the Obama-era approach was popular among students and faculty, and was fair to all parties. Commenters also suggested that a requirement to force religious institutions to submit assurance requests ahead of time saves agency resources for OCR, so the preamble's assertion that the prior practice is confusing and burdensome is an absurd thing to say. Commenters argued that proceeding with this rationale will mean violating the Administrative Procedure Act, because the current procedures are not confusing or burdensome, as set forth clearly in the current regulation. Commenters argued that the current procedures require religious institutions to establish which tenets of their religion are in conflict with Title IX, whereas the proposed regulations would not require schools to fully elaborate which of their tenets are contradicted by Title IX.

*Discussion:* The Department appreciates the feedback on the potential policy implications of the proposed rule. The Department acknowledges that its practices in the

recent past regarding assertion of a religious exemption, including delays in responding to inquiries about the religious exemption and publicizing some requests for a religious exemption, may have caused educational institutions to become reluctant to exercise their rights under the Free Exercise Clause of the First Amendment, and the Department would like educational institutions to fully and freely enjoy rights guaranteed under the Free Exercise Clause of the U.S. Constitution without shame or ridicule. The Department may be liable for chilling a recipient's First Amendment rights and also is subject to the Religious Freedom Restoration Act. The Department properly engaged in this notice-and-comment rulemaking to clarify that the Department, consistent with 20 U.S.C. 1681, will not place any substantial burden on a recipient that wishes to assert the religious exemption under Title IX.

The Department is giving due weight to Congress' express religious exemption for recipients in Title IX, and Congress did not require a recipient to first seek assurance of such a religious exemption from the Department. The First Amendment and the Religious Freedom Restoration Act, which apply to the Department as a Federal agency, cause the Department to err on the side of caution in not hindering a recipient's ability to exercise its constitutional rights.

Based on at least some commenters asserting that recipients needed more clarity on the current regulations, the Department respectfully disagrees with commenters arguing that confusion and burdens have not resulted from the text of the current regulations. In any event, the final regulations codify longstanding OCR practices, and are consistent with the Title IX statute.

With respect to publishing a list of all recipients who have received assurances from OCR, OCR declines to set forth any formal policy in the final regulations. Such lists are necessarily incomplete, since they do not adequately describe the scope of every exemption, and because many recipients that are eligible for religious exemptions may nevertheless not seek assurance letters from OCR. However, nothing in the final regulations addresses publishing such a list, one way or another. In any event, correspondence between OCR and recipient institutions, including correspondence addressing religious exemptions, is subject to Freedom of Information Act requirements.

*Changes:* None.
*Comments:* Commenters argued that OCR's practice regarding religious exemptions has worked since 1975, and that the time period between 1975 and the present day spans numerous presidencies across both Democrat and Republican administrations. One commenter stated that no religious exemption request has ever been denied, so addressing this topic in formal rulemaking is unnecessary.

Commenters contended that the change to the text of the religious exemption regulation is not responsive to any specific issue or wrong, and that the current regulation appropriately burdens the institution, as opposed to students.

Commenters also stated that the revisions to § 106.12(b) would largely remove the Department and OCR out of the religious exemption process, since students may not challenge a school's assertion of a religious exemption during the school's handling of a complaint. That would be problematic, asserted commenters, because students would be blindsided by assertions of exemptions that have not yet been evaluated or ruled on by the Department and OCR, so a student challenging an exemption, asserted commenters, would have their complaint ignored or stayed while they waited for OCR to rule on the validity of the exemption assertion.

Commenters suggested that placing the burden on a party not invoking the exemption is discordant with other areas of law, such as many States' requirement that parents submit a religious objection to immunizations in writing, or that an entity bear the burden of establishing its entitlement to tax-exempt status. Indeed, say the commenters, the Department administers the Clery Act, which is another statute that burdens schools by requiring them to collect and report information.

*Discussion:* The Department disagrees with commenters that assert § 106.12(b) should not be part of this notice-and-comment rulemaking. Some commenters have asserted that the current § 106.12(b) has caused confusion, and the Department wishes to clarify that neither Title IX nor these final regulations require a recipient to request an assurance of a religious exemption under 20 U.S.C. 1681(a)(3). Additionally, the Department wishes to avoid liability under the First Amendment and the Religious Freedom Restoration Act, and to the extent that § 106.12(b) may be ambiguous or vague, the Department would like to take this opportunity to revise § 106.12(b) to be even more consistent with Title IX, the First Amendment, and the Religious Freedom Restoration Act.

Section 106.12(b) as proposed and as included in these final regulations does not burden students as the recipient must still invoke the exemption. Indeed, a recipient must still demonstrate that it is an educational institution which is controlled by a religious organization and that the application of Title IX or its implementing regulations would not be consistent with the religious tenets of such organization. The student does not bear the burden with respect to the religious exemption.

The Department also disagrees that a complaint is placed on hold while the Department considers a recipient's religious exemption. The Department processes complaints in the normal course of business and will consider any religious exemption in the normal course of an investigation just as it considers other exemptions under Title IX during an investigation. Accordingly, a student will not suffer from any delays in the Department's processing of a complaint as a result of the revisions to § 106.12(b).

There also should not be any delays with respect to the recipient's processing of a student's complaint such as a formal complaint under §§ 106.44 and 106.45. Section 106.44(a) requires a recipient with actual knowledge of sexual harassment in an education program or activity of the recipient against a person in the United States to respond promptly in a manner that is not deliberately indifferent. Section 106.12(b) clarifies that a recipient does not need to submit a statement in writing to the Assistant Secretary to assert a religious exemption before asserting an exemption and, thus, there is no need for the Department to intervene or delay any complaint of sex discrimination, including a formal complaint of sexual harassment, that the recipient is processing to determine whether the recipient qualifies for a religious exemption.

Students should not be blindsided and may always inquire about the application of Title IX and its implementing regulations to the recipient's Title IX Coordinator, to the Assistant Secretary, or both. Additionally, a recipient that is an educational institution must be controlled by a religious organization in order to assert an exemption under Title IX, 20 U.S.C. 1681(a)(3), and students likely will know whether the educational institution is controlled by a religious organization.

The Department reiterates that the burden remains on the recipient to establish and assert a religious exemption to Title IX, 20 U.S.C. 1681(a)(3). Congress expressly requires

postsecondary institutions that receive Federal student financial aid through the programs authorized by Title IV of the Higher Education Act of 1965, as amended, to make certain reports, including reports to the Department. The Department's regulations, implementing the Clery Act, address the reporting requirements that Congress enacted. Congress, however, did not require educational institutions to report a religious exemption to the public or to the Department under Title IX, and the Department declines to impose any burden on the constitutional rights of recipients of Federal financial assistance that Congress did not impose. Additionally, as previously explained, the First Amendment and the Religious Freedom Restoration Act may prohibit any such additional burdens.

*Changes:* None.

*Comments:* One commenter objected to any form of assurance letter being sent by OCR, on the basis that such a process caused an undue entanglement with religion. The commenter suggested that the statute simply apply on its own terms, without the need for OCR to closely scrutinize the tenets of a religious educational institution.

*Discussion:* The Department appreciates feedback on the proposed rule. The process of applying to OCR for an assurance letter is entirely optional, and nothing in the final regulations requires a school to obtain an assurance letter prior to invoking a religious exemption. The Department therefore sees no entanglement problem in allowing recipients to request an assurance letter, and generally avoids scrutinizing or questioning the theological tenets or sincerely held religious beliefs of a recipient that invokes the religious exemption in Title IX.[1727]

*Changes:* None.

*Comments:* Several commenters asserted that the final regulations ought to be changed such that recipients are not entitled to religious exemptions under Title IX. Some commenters stated that the topic of religious exemptions might not be a significant one, and that it was unclear how many recipients had truly avoided an investigation or finding under Title IX due to a religious exemption. The commenter suggested that instead of modifying the regulations, the better course would be to study the issue further and determine how many recipients had successfully invoked a religious exemption to avoid a Title IX compliance issue in the last three to five years.

*Discussion:* The Department appreciates the feedback on § 106.12(b) but does not believe it is necessary to examine OCR records to report on how many recipients have successfully invoked a religious exemption under Title IX. This is because the Title IX statute provides a religious exemption for recipients, and the Department cannot eliminate the religious exemption in the Title IX statute through its regulations. In any event, the final regulations codify longstanding OCR practices, and both the final regulations and OCR practice are consistent with the Title IX statute.

*Changes:* None.

*Comments:* A commenter suggested that part of the process ought to be a publication of a book by OCR that contains the full list of recipients that have obtained an assurance letter. Some commenters suggested, apart from a book, that OCR ought to publish on its website a list of all recipients that have obtained a religious exemption assurance letter. Another commenter suggested that OCR at least require recipients to inform a student who has filed a complaint that the recipient has invoked a religious exemption, particularly if no assurance letter has been previously requested. These measures, asserted commenters, would increase transparency for students and employees who may attend or work for educational institutions that maintain exemptions from Title IX.

*Discussion:* The Department appreciates the feedback on the proposed rule. When OCR receives a complaint involving a recipient that invokes a religious exemption, OCR will proceed in accordance with OCR's Case Processing Manual, including with respect to notifying a complainant that the recipient has invoked a religious exemption. OCR's current practice does not require OCR to keep a complainant apprised of developments in an ongoing investigation of a recipient, and the Department has not proposed any procedural changes to the manner in which it processes complaints in this notice-and-comment rulemaking so as to give the public notice to comment on such a proposal. A complainant currently receives the opportunity to appeal the Department's determination with respect to a complaint or the dismissal of a complaint and may raise any concerns about a recipient's religious exemption as well as other matters on appeal.[1728] The Department does not wish to treat a religious exemption, which Title IX provides and which the Department is required to honor under Title IX and in abiding by the First Amendment and the Religious Freedom Restoration Act, differently than any other exemption from Title IX that a recipient may invoke. Title IX provides exemptions other than a religious exemption in 20 U.S.C. 1681(a) (*e.g.,* exemptions for membership policies of social fraternities or sororities, father-son or mother-daughter activities, scholarship awards in ''beauty'' pageants). The Department does not notify a complainant of a recipient's invocation of other exemptions provided in Title IX when the Department is processing a complaint and declines to do so for a religious exemption. Nothing in the final regulations prevents a recipient from informing the complainant of its invocation of a religious exemption. The Department notes that any person may direct an inquiry about the application of Title IX to a particular recipient to the recipient's Title IX Coordinator, the Assistant Secretary, or both, pursuant to § 106.8(b)(1).

On the subject of OCR publishing a book, list of names, or copies of the assurance letters that have been provided to recipients that address a recipient's eligibility for a religious exemption, the Department often posts such correspondence on the OCR website. Additionally, such documents are subject to Freedom of Information Act requests, and attendant rules regarding public disclosure of commonly-requested documents. The Department does not believe that publishing a book or a list of names of recipients that have asserted eligibility for a religious exemption is necessary, and the final regulations do not address that issue, one way or another.

*Changes:* None.

*Comments:* Some commenters stated that they would prefer the Department to at least encourage recipients to post information about Title IX religious exemptions on the recipient's website, so that people who are actively looking for that information can find it easily. Other commenters suggested that a recipient maintaining a religious exemption ought to be compelled to publish such information in their materials and policies, *i.e.,* a student handbook, or a website.

*Discussion:* The Department generally does not include in its regulations specific types of advice or encouragement for recipients and believes that the Title IX statute and § 106.12 appropriately guide recipients

---

[1727] 20 U.S.C. 1681(a)(3).

[1728] U.S. Dep't. of Education, Office for Civil Rights, *Case Processing Manual* § 307 Appeals, *https://www2.ed.gov/about/offices/list/ocr/docs/ocrcpm.pdf.*

as to the scope and application of the religious exemption under Title IX.

The Department does not require recipients to publish any exemptions from Title IX under 20 U.S.C. 1681(a)(3) that may apply to the recipient and does not wish to single out the religious exemption for special or different treatment. The Department believes that the requirements in these final regulations provide sufficient transparency. As previously stated, § 106.8 requires all recipients to notify applicants for admission and employment, students, parents or legal guardians of elementary and secondary school students, employees, and all unions or professional organizations holding collective bargaining or professional agreements with the recipient of its notice of non-discrimination on the basis of sex as well as its grievance procedures and grievance process, including how to report or file a complaint of sex discrimination, how to report or file a formal complaint of sexual harassment, and how the recipient will respond. Additionally, § 106.8(b)(2)(ii) provides that a recipient must not use or distribute a publication stating that the recipient treats applicants, students, or employees differently on the basis of sex except as such treatment is permitted by Title IX or these final regulations. Accordingly, students and prospective students should receive adequate notice of the recipient's non-discrimination statement as well as its grievance procedures and grievance process regarding sex discrimination, including sexual harassment, and such notice is consistent with due process principles. Such transparency helps guard against any misunderstandings, irrespective of whether a school asserts a religious exemption.

The religious exemption in Title IX, 20 U.S.C. 1681(a)(3), applies to an educational institution which is controlled by a religious organization, and students and prospective students likely will know whether an educational institution is controlled by a religious organization so as not to be surprised by a recipient's assertion of such a religious exemption. Additionally, the Department also notes that under § 106.8(b)(1) any person can inquire about the application of Title IX to a particular recipient by inquiring with the recipient's Title IX Coordinator, the Assistant Secretary, or both.

*Changes:* None.

*Comments:* Some commenters suggested that the religious exemptions language be altered, to carve out conduct that would be considered a crime. Other commenters suggested that the Department should clarify how a school that maintains a religious exemption ought to interact with a school that does not maintain a religious exemption, if an incident involves two students, one from each type of school. Specifically, a commenter asked whether a school with a religious exemption has a duty to cooperate with another school that was investigating a Title IX incident involving one of its students. Another commenter asked the Department to clarify whether a recipient that invoked a religious exemption still had the duty to provide the full extent of the grievance procedures in § 106.45.

*Discussion:* The Department appreciates these nuanced questions about how recipients can comply with the final regulations under specific fact patterns. Generally, religious exemptions cannot be invoked to avoid punishment for criminal activity, and absent a specific example, the Department believes asserting a religious exemption to avoid punishment for a crime is unrealistic under Title IX. In any event, the Department does not punish recipients for criminal activity. The Department enforces the non-discrimination mandate in Title IX, which prohibits discrimination on the basis of sex.

With respect to the other factual scenarios that commenters present, the Department and OCR are willing to provide technical assistance to recipients who seek answers to individual factual circumstances, or to stakeholders who may file complaints against recipients eligible for religious exemptions, but we do not believe it is appropriate to attempt to answer these questions at this stage and without the benefit of a complete set of facts.

As with any regulation under Title IX, including § 106.45, an educational institution that is controlled by a religious institution is exempt from Title IX or its implementing regulations only to the extent that Title IX or one of its implementing regulations would not be consistent with the religious tenets of such organization.

*Changes:* None.

*Comments:* One commenter suggested a minor revision to § 106.12(b) to make clear that any future claims of institutional religious exemption under the proposed regulations are not predetermined by the scope or nature of any prior claims submitted in writing to the Assistant Secretary: ". . . whether or not the institution had previously sought assurance of the *an* exemption from the Assistant Secretary *as to that provision or any other provision of this part.*"

*Discussion:* The Department agrees with the reasoning behind this change and changes "the" to "an" as the commenter suggested. The Department does not believe the commenter's other suggested phrase, "as to that provision or any other provision of this part" is necessary to adequately explain the scope and application of this provision.

*Changes:* The word "the" has been changed to "an" in the final sentence of § 106.12(b) of the final regulations.

*Comments:* One commenter suggested that the Department ought to go beyond the proposed rule, and promulgate a definition for what it means to be "controlled by a religious organization," so that recipients and the public would know which institutions are in fact eligible for religious exemptions, since there has been confusion previously. Additionally, the commenter asked that the definition take account of and be consistent with Supreme Court case law interpreting the Establishment Clause of the First Amendment.

*Discussion:* Although the Department appreciates this feedback, it declines to make any changes to these final regulations because the scope of proposed changes to § 106.12 was limited by the Department's proposal to change § 106.12(b) but not subsection (a). The Department decided to address what it means to be controlled by a religious organization for purposes of the religious exemption in Title IX through a subsequent notice of proposed rulemaking.[1729] The Department will continue to offer technical assistance regarding compliance with these final regulations.

*Changes:* None.

### Directed Questions [1730]

*Directed Question 1: Application to Elementary and Secondary Schools*

*Comments:* Some commenters commended the proposed rules for including elementary and secondary schools, suggesting that their inclusion would have a positive impact on these schools for Title IX purposes. Another commenter asserted that elementary and secondary schools, too, have sexual harassment issues that they must confront; it is not only a problem in

---

[1729] 85 FR 3190.

[1730] The Department addresses comments submitted in response to the NPRM's Directed Questions 3–4, and 6–9, throughout sections of this preamble to which such directed questions pertain. For example, Directed Question 3 inquired about applicability to the proposed rules to employees, and comments responsive to that directed question are addressed in the "Section 106.6(f) Title VII and Directed Question 3 (Application to Employees)" subsection of the "Clarifying Amendments to Existing Regulations" section of this preamble.

establishing the system and an administrative assistant will spend 8 hours doing so. With respect to postsecondary institutions, we assume recipients are less likely to use a paper filing system and are likely to use an electronic database for managing such information. Therefore, we assume it will take a Title IX Coordinator 24 hours, an administrative assistant 40 hours, and a database administrator 40 hours to set up the system for a total Year 1 estimated cost of approximately $39,114,530 for 16,606 elementary and secondary schools, 6,766 postsecondary institutions, and 600 other entities that are recipients of Federal financial assistance. Given their size and organizational complexity, we assume that other entities that are recipients of Federal financial assistance that are not elementary and secondary schools or postsecondary institutions will face the same time burdens associated with complying as elementary and secondary schools.

In later years, we assume that the systems will be relatively simple to maintain. At the elementary and secondary school level as well as for other recipients of Federal financial assistance that are not elementary and secondary schools or postsecondary institutions, we assume it will take the Title IX Coordinator 2 hours and an administrative assistant 4 hours to do so. At the postsecondary institution level, we assume 4 hours from the Title IX Coordinator, 40 hours from an administrative assistant, and 8 hours from a database administrator. In total, we estimate an ongoing cost of approximately $15,189,260 per year.

We estimate that elementary and secondary schools and other recipients of Federal financial assistance will take 12 hours and postsecondary institutions will take 104 hours to establish and maintain a recordkeeping system for the required sexual harassment documentation during Year 1. In out-years, we estimate that elementary and secondary schools and other recipients of Federal financial assistance will take 6 hours annually and postsecondary institutions will take 52 hours annually to maintain the recordkeeping requirement for Title IX sexual harassment documentation. The total burden for this recordkeeping over three years is 398,544 hours for elementary and secondary schools, 1,407,328 hours for postsecondary institutions, and 14,400 for other recipients of Federal financial assistance. The Department calculates burden over a seven-year period because § 106.45(b)(10)(i) requires recipients to maintain certain records for a period of seven years. The total burden for this recordkeeping requirement over seven years is 797,088 hours for elementary and secondary schools, 2,814,656 hours for postsecondary institutions, and 28,800 hours for other recipients of Federal financial assistance. Collectively, we estimate the burden over seven years for elementary and secondary schools, postsecondary institutions, and other recipients of Federal financial assistance for recordkeeping of Title IX sexual harassment documents will be 3,640,544 hours under OMB Control Number 1870–NEW.

COLLECTION OF INFORMATION

| Regulatory section | Information collection | OMB Control No. and estimated burden [change in burden] |
|---|---|---|
| 106.45(b)(2) | This regulatory provision requires recipients to provide parties with written notice when investigating a formal complaint. | OMB 1870–NEW. The burden over the first seven years will be $2,650,654 and 35,958 hours. |
| 106.45(b)(9) | This regulatory provision requires recipients to provide written notice to parties wishing to participate in informal resolution of a formal complaint. | OMB 1870–NEW. The burden over the first seven years will be $2,650,654 and 35,958 hours. |
| 106.45(b)(10) | This regulatory provision requires recipients to maintain certain documentation related to Title IX activities. | OMB 1870–NEW. The burden over the first seven years will be $130,250,090 and 3,640,544 hours. |
| TOTAL | | $135,551,398; 3,712,460 hours. |

**Accessible Format**

Individuals with disabilities can obtain this document in an accessible format (*e.g.,* Braille, large print, audiotape, or compact disc) on request to the person listed under **FOR FURTHER INFORMATION CONTACT**.

**Electronic Access to This Document**

The official version of this document is the document published in the **Federal Register**. Free internet access to the official edition of the **Federal Register** and the Code of Federal Regulations is available via the Federal Digital System at: *www.gpo.gov/fdsys*. You can view this document at that site, as well as all other documents of this Department published in the **Federal Register**, in text or PDF. To use PDF, you must have Adobe Acrobat Reader, which is available free at the site.

You may also access documents of the Department published in the **Federal Register** by using the article search feature at: *www.federalregister.gov*. Through the advanced search feature at this site, you can limit your search to documents published by the Department.

**List of Subjects in 34 CFR Part 106**

Education, Sex discrimination, Civil rights, Sexual harassment.

**Betsy DeVos,**
*Secretary of Education.*

For the reasons discussed in the preamble, the Secretary amends part 106 of title 34 of the Code of Federal Regulations as follows:

**PART 106—NONDISCRIMINATION ON THE BASIS OF SEX IN EDUCATION PROGRAMS OR ACTIVITIES RECEIVING FEDERAL FINANCIAL ASSISTANCE**

■ 1. The authority citation for part 106 continues to read as follows:

   **Authority:** 20 U.S.C. 1681 *et seq.,* unless otherwise noted.

■ 2. Section 106.3 is amended by revising paragraph (a) to read as follows:

**§ 106.3   Remedial and affirmative action and self-evaluation.**

   (a) *Remedial action.* If the Assistant Secretary finds that a recipient has discriminated against persons on the basis of sex in an education program or activity under this part, or otherwise violated this part, such recipient must take such remedial action as the Assistant Secretary deems necessary to

remedy the violation, consistent with 20 U.S.C. 1682.

\* \* \* \* \*

■ 3. Section 106.6 is amended by revising the section heading and adding paragraphs (d), (e), (f), (g), and (h) to read as follows:

### § 106.6  Effect of other requirements and preservation of rights.

\* \* \* \* \*

(d) *Constitutional protections.* Nothing in this part requires a recipient to:

(1) Restrict any rights that would otherwise be protected from government action by the First Amendment of the U.S. Constitution;

(2) Deprive a person of any rights that would otherwise be protected from government action under the Due Process Clauses of the Fifth and Fourteenth Amendments of the U.S. Constitution; or

(3) Restrict any other rights guaranteed against government action by the U.S. Constitution.

(e) *Effect of Section 444 of General Education Provisions Act (GEPA)/Family Educational Rights and Privacy Act (FERPA).* The obligation to comply with this part is not obviated or alleviated by the FERPA statute, 20 U.S.C. 1232g, or FERPA regulations, 34 CFR part 99.

(f) *Title VII of the Civil Rights Act of 1964.* Nothing in this part may be read in derogation of any individual's rights under title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e *et seq.* or any regulations promulgated thereunder.

(g) *Exercise of rights by parents or guardians.* Nothing in this part may be read in derogation of any legal right of a parent or guardian to act on behalf of a ''complainant,'' ''respondent,'' ''party,'' or other individual, subject to paragraph (e) of this section, including but not limited to filing a formal complaint.

(h) *Preemptive effect.* To the extent of a conflict between State or local law and title IX as implemented by §§ 106.30, 106.44, and 106.45, the obligation to comply with §§ 106.30, 106.44, and 106.45 is not obviated or alleviated by any State or local law.

\* \* \* \* \*

■ 4. Section 106.8 is revised to read as follows:

### § 106.8  Designation of coordinator, dissemination of policy, and adoption of grievance procedures.

(a) *Designation of coordinator.* Each recipient must designate and authorize at least one employee to coordinate its efforts to comply with its responsibilities under this part, which employee must be referred to as the ''Title IX Coordinator.'' The recipient must notify applicants for admission and employment, students, parents or legal guardians of elementary and secondary school students, employees, and all unions or professional organizations holding collective bargaining or professional agreements with the recipient, of the name or title, office address, electronic mail address, and telephone number of the employee or employees designated as the Title IX Coordinator pursuant to this paragraph. Any person may report sex discrimination, including sexual harassment (whether or not the person reporting is the person alleged to be the victim of conduct that could constitute sex discrimination or sexual harassment), in person, by mail, by telephone, or by electronic mail, using the contact information listed for the Title IX Coordinator, or by any other means that results in the Title IX Coordinator receiving the person's verbal or written report. Such a report may be made at any time (including during non-business hours) by using the telephone number or electronic mail address, or by mail to the office address, listed for the Title IX Coordinator.

(b) *Dissemination of policy*—(1) *Notification of policy.* Each recipient must notify persons entitled to a notification under paragraph (a) of this section that the recipient does not discriminate on the basis of sex in the education program or activity that it operates, and that it is required by title IX and this part not to discriminate in such a manner. Such notification must state that the requirement not to discriminate in the education program or activity extends to admission (unless subpart C of this part does not apply) and employment, and that inquiries about the application of title IX and this part to such recipient may be referred to the recipient's Title IX Coordinator, to the Assistant Secretary, or both.

(2) *Publications.* (i) Each recipient must prominently display the contact information required to be listed for the Title IX Coordinator under paragraph (a) of this section and the policy described in paragraph (b)(1) of this section on its website, if any, and in each handbook or catalog that it makes available to persons entitled to a notification under paragraph (a) of this section.

(ii) A recipient must not use or distribute a publication stating that the recipient treats applicants, students, or employees differently on the basis of sex except as such treatment is permitted by title IX or this part.

(c) *Adoption of grievance procedures.* A recipient must adopt and publish grievance procedures that provide for the prompt and equitable resolution of student and employee complaints alleging any action that would be prohibited by this part and a grievance process that complies with § 106.45 for formal complaints as defined in § 106.30. A recipient must provide to persons entitled to a notification under paragraph (a) of this section notice of the recipient's grievance procedures and grievance process, including how to report or file a complaint of sex discrimination, how to report or file a formal complaint of sexual harassment, and how the recipient will respond.

(d) *Application outside the United States.* The requirements of paragraph (c) of this section apply only to sex discrimination occurring against a person in the United States.

■ 5. Section 106.9 is revised to read as follows:

### § 106.9  Severability.

If any provision of this subpart or its application to any person, act, or practice is held invalid, the remainder of the subpart or the application of its provisions to any person, act, or practice shall not be affected thereby.

■ 6. Section 106.12 is amended by revising paragraph (b) to read as follows:

### § 106.12  Educational institutions controlled by religious organizations.

\* \* \* \* \*

(b) *Assurance of exemption.* An educational institution that seeks assurance of the exemption set forth in paragraph (a) of this section may do so by submitting in writing to the Assistant Secretary a statement by the highest ranking official of the institution, identifying the provisions of this part that conflict with a specific tenet of the religious organization. An institution is not required to seek assurance from the Assistant Secretary in order to assert such an exemption. In the event the Department notifies an institution that it is under investigation for noncompliance with this part and the institution wishes to assert an exemption set forth in paragraph (a) of this section, the institution may at that time raise its exemption by submitting in writing to the Assistant Secretary a statement by the highest ranking official of the institution, identifying the provisions of this part which conflict with a specific tenet of the religious organization, whether or not the institution had previously sought assurance of an exemption from the Assistant Secretary.

\* \* \* \* \*

■ 7. Add § 106.18 to subpart B to read as follows: