ELLEN F. ROSENBLUM
Attorney General
CHRISTOPHER A. PERDUE  #136166
Assistant Attorney General
Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
Telephone: (503) 378-4402
Fax: (503) 378-6306
Email:  chris.perdue@doj.state.or.us

Attorneys for Amicus Curiae


# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON


| | |
|---|---|
| ELIZABETH HUNTER, et al., | Case No.   6:21-cv-00474-AA |
| Plaintiffs, | |
| v. | AMICUS CURIAE BRIEF OF OREGON AND 18 OTHER STATES IN SUPPORT OF PLAINTIFFS |
| U.S. DEPARTMENT OF EDUCATION, et al., | |
| Defendants, | |
| WESTERN BAPTIST COLLEGE d/b/a/ CORBAN UNIVERSITY, et al., | |
| Defendant-Intervenors, | |
| STATE OF OREGON, et al., | |
| Amici Curiae. | |

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................... 1

ARGUMENT ........................................................................................................ 2

    A.   The November 2020 eligibility rule is inconsistent with the text and purpose of Title IX's religious exemption.......................................................................................... 2

        1.   The eligibility rule contravenes the plain text and purpose of Title IX....................... 4

        2.   The Department acted arbitrarily and capriciously when it promulgated the eligibility rule…………………………………………………………………………………8

            a.   The eligibility rule is not supported by the evidence before the Department............. 8

            b.   The Department's stated reasoning is inconsistent and unsupported………………9

            c.   The Department overlooked important aspects of the problem................................ 11

    B.   The August 2020 rule eliminating the requirement that schools invoke the religious exemption in writing compounds the problems created by the eligibility rule........................ 13

CONCLUSION.................................................................................................... 16

# TABLE OF AUTHORITIES

## Cases

*Bob Jones Univ. v. United States,*
   461 U.S. 574 (1983)................................................................................. 11

*Bowen v. Georgetown Univ. Hosp.,*
   488 U.S. 204 (1988).................................................................................. 1

*Burwell v. Hobby Lobby Stores, Inc.,*
   573 U.S. 682 (2014)................................................................................. 11

*Cannon v. Univ. of Chi.,*
   441 U.S. 677 (1979)................................................................................ 2, 7

*City & Cty. of San Francisco v. United States Citizenship & Immigration Servs.,*
   981 F.3d 742 (9th Cir. 2020) ................................................................... 8, 14

*East Bay Sanctuary Covenant v. Garland,*
   994 F.3d 962 (9th Cir. 2020) ...................................................................... 14

*Getty v. Fed. Savs. & Loan Ins. Corp.,*
   805 F.2d 1050 (D.C. Cir. 1986) .................................................................... 9

Page i

*Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*,
    463 U.S. 29 (1983) ........................................................................................ 8, 11, 13

*Nat'l Parks Conservation Ass'n v. EPA*,
    788 F.3d 1134 (9th Cir. 2015) ................................................................................ 9

*Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agric.*,
    499 F.3d 1108 (9th Cir. 2007) .............................................................................. 11

## Statutes & Constitutional Provisions

20 U.S.C. § 1681(a) ............................................................................................................ 7

20 U.S.C. § 1681(a)(3) ........................................................................................ 6, 7, 10, 11

20 U.S.C. § 1687 .............................................................................................................. 12

20 U.S.C. §§ 1681–1688 .................................................................................................... 6

25 U.S.C. § 1801(a)(4) ...................................................................................................... 11

26 U.S.C. § 1402 (g)(1)(C)-(D) ........................................................................................ 10

33 U.S.C. § 907(k)(1)-(2) .................................................................................................. 10

42 U.S.C. § 2000e-2(e) ..................................................................................................... 10

## Other Authorities

134 Cong. Rec. 328 (1988) ............................................................................................ 6, 11

134 Cong. Rec. 334 (1988) ............................................................................................ 6, 11

134 Cong. Rec. 335 (1988) .............................................................................................. 11

134 Cong. Rec. E499 (Mar. 3, 1985) ................................................................................ 12

134 Cong. Rec. H555 (Mar. 2, 1988) ................................................................................ 12

134 Cong. Rec. H565 (Mar. 2, 1988) ................................................................................ 12

134 Cong. Rec. S205 (Jan. 28, 1988) ................................................................................. 6

David Cantor et al., *Report on the AAU Campus Climate Survey on Sexual Assault and Sexual
    Misconduct*, Association of American Universities (Sept. 2015, reissued Oct. 2017) ............ 17

*Hidden Discrimination: Title IX Religious Exemptions Putting LGBT Students at Risk*, Human
    Rights Campaign .......................................................................................................... 17

Page ii

Jaime M. Grant, et al., National Center for Transgender Equality and National Gay and Lesbian
    Task Force, *Injustice At Every Turn: A Report of The National Transgender Discrimination
    Survey* 39 (2011) .................................................................................................... 17
Kif Augustine-Adams, *Religious Exemptions to Title IX*, 65 U. Kan. L. Rev. 327 (2016) .......... 14

National Women's Law Center Comment (February 18, 2020) ..................................................... 8

Pub. L. No. 100-259 (1987) ...................................................................................................... 7

Pub. L. No. 109-148, tit. IV, subtit. A, § 107(m)(2)(A), 119 Stat. 2680 (2005) ......................... 10

S. Rep. No 100-64 ............................................................................................................... 8, 12

S. Rep. No. 100-64 ............................................................................... 6, 7, 9, 11, 12, 17

## Rules

26 C.F.R. §1.414 .................................................................................................................. 11

34 C.F.R. § 106.112(c)(5) ................................................................................................... 11

34 C.F.R. § 106.12 .............................................................................................................. 18

34 C.F.R. § 106.12(c)(1) ...................................................................................................... 9

34 C.F.R. § 106.12(c)(1)–(6) ............................................................................................... 9

34 C.F.R. § 106.12(c)(4) ................................................................................................... 9, 10

34 C.F.R. § 106.12(c)(4)-(6) .............................................................................................. 15

34 C.F.R. § 106.12(c)(5) ...................................................................................................... 9

34 C.F.R. § 106.12(c)(5)–(6) ............................................................................................. 15

34 C.F.R. § 106.12(c)(6) ................................................................................................... 9, 15

34 C.F.R. § 106.8 ................................................................................................................ 19

34 C.F.R. §106.12(b) .......................................................................................................... 18

85 Fed. Reg. ............................................................................... 13, 14, 15, 16, 17, 18, 19, 20

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 378-4402 / Fax: (503) 378-6306

## INTRODUCTION

Title IX requires schools to provide educational programs and activities free from sex discrimination, sexual harassment, and sexual violence.  *See* 20 U.S.C. §§ 1681–1688.  To that end, Congress intended Title IX's protections to be interpreted broadly.  *Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204, 208 (1988).  It likewise intended Title IX's exemption—for educational institutions "controlled by a religious organization" with "religious tenets" inconsistent with Title IX's application—to be narrow.  20 U.S.C. § 1681(a)(3); *see also* S. Rep. No. 100-64, at 23; 134 Cong. Rec. 328, 334 (1988) (statement of Sen. Kennedy) ("[a]dmittedly, the control test *is*, and should be a difficult one.") (emphasis added); 134 Cong. Rec. S205 (Jan. 28, 1988) (statement of Senator Danforth) (Senate's rejection of amendment to broaden exemption supports "a very narrow scope of the religious exemption").

But the Department of Education recently promulgated two rules that will significantly change how Title IX is enforced.  The August 2020 rule eliminates the forty-year-old regulation requiring an educational institution to advise the Office for Civil Rights "in writing" if it seeks a religious exemption, permitting the school to invoke the exemption without notice at any time.  The November 2020 rule specified eligibility criteria that reinterpret and substantially expand what it means for a school to be "controlled by a religious organization."  Both rules are inconsistent with the manifest purpose of Title IX, which shows that Congress intended to create a narrow religious exemption and to ensure that students are provided with notice as to whether Title IX provides protection.  Neither rule is supported by the Department's claimed rationales or the evidence before the Department.

The States have a substantial interest in robust enforcement of Title IX to protect students against sex-based discrimination, and the 2020 rule changes will frustrate that interest.  The August 2020 written filing rule deprives students of necessary notice of a school's policies based on its religious practices.  Students are entitled to know before they enroll whether their schools

will comply with Title IX's anti-discrimination, anti-harassment, and anti-retaliation protections. The November 2020 eligibility rule impermissibly broadens the bases on which an educational institution can claim a statutory religious exemption in defiance of Congress' intent to create a narrow exemption.  In combination, the rules harm students and make it more difficult to hold schools accountable for that harm.  Because the rules exceed the Department's statutory authority and are unreasonable, weakening the protections Congress intended when it passed Title IX and the Civil Rights Restoration Act of 1987, Pub. L. No. 100-259 (1987),  this court should set them aside.

## ARGUMENT

**A.    The November 2020 eligibility rule is inconsistent with the text and purpose of Title IX's religious exemption.**

Title IX prohibits educational programs or activities receiving federal funds from excluding, denying benefits to, or subjecting to discrimination any person on the basis of sex.  20 U.S.C. § 1681(a).  The purpose of Title IX was to "end[] federal subsidies of such discrimination . . . [and] to make certain, in the areas of Federal funding, that taxpayer's dollars were not used to initiate or perpetuate . . . bias and prejudice . . . ."  S. Rep. No. 100-64, at 7, 9 (internal citation and quotation marks omitted).  It was likewise intended to protect against sex discrimination. *See Cannon v. Univ. of Chi.*, 441 U.S. 677, 704 (1979) (observing that Congress "wanted to provide individual citizens effective protection" against discriminatory practices).  One narrow exception to Title IX is when an educational institution "is controlled by a religious organization" with "religious tenets" inconsistent with the application of Title IX.  20 U.S.C. § 1681(a)(3).  Congress intended that the religious exemption to be narrow lest it "open a giant loophole and lead to widespread sex discrimination in education."  *See* S. Rep. No. 100-64, at 23.

Shortly after Congress enacted Title IX, the U.S. Department of Health, Education, and Welfare (HEW) issued guidance on how institutions may qualify for Title IX's religious exemption.  In March 1977, for instance, HEW asked that educational institutions receiving

Page 1 -   AMICUS CURIAE BRIEF OF OREGON AND 18 OTHER STATES IN SUPPORT OF
             PLAINTIFFS

federal assistance file an Assurance of Compliance with Title IX.  In that form, it defined a

school "controlled by a religious organization" to mean

> (1) "a school or department of divinity"; or

> (2) a school that "requires its faculty, students or employees to be members of, or otherwise espouse a personal belief in, the religion of the organization by which it claims to be controlled"; or

> (3) a school with a "charter and catalog, or other official publication, contain[ing] explicit statement that it is controlled by a religious organization or an organ thereof or is committed to the doctrines of a particular religion, and the members of its governing body are appointed by the controlling religious organization or an organ thereof, with "a significant amount of financial support from the controlling religious organization of an organ thereof."

*See* S. Rep. No. 100-64, at 23 (quoting form).  In 1985, the Department issued substantially the

same definition.  *See* U.S. Dep't of Educ., Off. for Civil Rights, *Exemptions from Title IX*,

https://tinyurl.com/y5fl2c4m (citing 1985 Policy Memo).

Before the November 2020 Rule change, the website of the Department's Office for Civil

Rights (OCR) contained a substantially similar definition.  Under it, a school would be

considered "controlled by a religious organization" if

> (1) it is a divinity school; or

> (2) it requires employees or students to subscribe to the religion of the controlling organization; or

> (3) its official documents say it is controlled by a religious organization or is committed to the doctrines of a religion, and the members of its governing board are appointed by the controlling religious organization, and it gets "a significant amount of financial support" from the controlling religious organization.

*See* National Women's Law Center Comment, at 19 (February 18, 2020),

https://www.regulations.gov/comment/ED-2019-OPE-0080-17083, (quoting prior rule from

OCR's website).

Page 1 -   AMICUS CURIAE BRIEF OF OREGON AND 18 OTHER STATES IN SUPPORT OF
           PLAINTIFFS
           CP3/mkf/75046868

The new eligibility rule dramatically departs from that well-established understanding of Title IX's narrow religious exemption.  Now a school is considered "controlled by a religious organization" if it shows

> (1) That the educational institution is a school or department of divinity.

> (2) That the educational institution requires its faculty, students, or employees to be members of, or otherwise engage in religious practices of, or espouse a personal belief in, the religion of the organization by which it claims to be controlled.

> (3) That the educational institution, in its charter or catalog, or other official publication, contains an explicit statement that it is controlled by a religious organization or an organ thereof, or is committed to the doctrines or practices of a particular religion, and the members of its governing body are appointed by the controlling religious organization or an organ thereof, and it receives a significant amount of financial support from the controlling religious organization or an organ thereof.

> (4) That the educational institution has a doctrinal statement or a statement of religious practices, along with a statement that members of the institution community must engage in the religious practices of, or espouse a personal belief in, the religion, its practices, or the doctrinal statement or statement of religious practices.

> (5) That the educational institution has a published institutional mission that is approved by the governing body of an educational institution and that includes, refers to, or is predicated upon religious tenets, beliefs, or teachings.

> (6) Other evidence sufficient to establish that an educational institution is controlled by a religious organization, pursuant to 20 U.S.C. 1681(a)(3).

34 C.F.R. § 106.12(c)(1)–(6).

With some exceptions, the first three sub-provisions largely reflect the factors used in longstanding guidance.  *See* S. Rep. No. 100-64, at 23.  But the last three sub-provisions add grounds for the exemption not contemplated by Title IX's text or purpose.

### 1.    The eligibility rule contravenes the plain text and purpose of Title IX.

Several of the new criteria in the eligibility rule run counter to the plain text of Title IX. For starters, sub-provisions 34 C.F.R. §§ 106.12(c)(1), (4), (5), and (6) circumvent the critical statutory element that there must be an "educational institution" that is "controlled by" a

"religious organization." 20 U.S.C. § 1681(a)(3). The plain text of the statute thus requires two entities: the "religious organization" (which holds tenets) and the "educational institution" (which the "religious organization" controls). Had Congress intended exemptions for educational institutions without regard to a separate religious organization, it could have used wording that would more clearly convey that intent. *See* 42 U.S.C. § 2000e-2(e) (Title VII exempting private schools when they are partially "owned, supported, controlled, or managed" by a religious entity or they have curricula "directed toward the propagation of a particular religion"); *see also* Pub. L. No. 109-148, tit. IV, subtit. A, § 107(m)(2)(A), 119 Stat. 2680 (2005) (federal funding bill exempting a "non-public school that is controlled by a religious organization" or (2) "organized and operated on the basis of religious tenets"). Congress did not use those words. The Department's eligibility rule cannot insert what Congress omitted from the text of Title IX.

The criteria also override the requirement that educational institutions be controlled by religious organizations with identifiable "tenets" in conflict with Title IX's anti-discrimination mandate. 20 U.S.C. § 1681(a)(3). First, 34 C.F.R. § 106.12(c)(4) enlarges the exemption by including religious "practices" in addition to "tenets." Even if "practices" might relate to or derive from "tenets," a "practice" is not the same thing as a "tenet." *See* 26 U.S.C. § 1402 (g)(1)(C)-(D) (distinguishing between "tenets" and "practice" for purposes of religious exemption); 33 U.S.C. § 907(k)(1)-(2) (referring to "tenets *and* practice" of a recognized church). The term "practices" is vague, ambiguous, and far broader than what is permitted by Title IX's plain text. 20 U.S.C. § 1681(a)(3). Second, the rule permits the "tenets or practices" to belong to the educational institution, not the religious organization controlling it. In doing so, the regulation effectively rewrites the statute's religious exemption, which provides that an "educational institution" may be exempted if it is "controlled by" a "religious organization" and

"the application of this subsection would not be consistent with the religious tenets of *such organization*." 20 U.S.C. § 1681(a)(3) (emphasis added).

Finally, the eligibility rule permits an educational institution to satisfy the "controlled by" requirement by publishing an "institutional mission" that merely "refers to" or "includes" or "is predicated upon" religious "beliefs" or "teachings." 34 C.F.R. § 106.112(c)(5). Mere reference to a religious belief cannot be evidence that an institution is "*controlled* by a religious organization." The term "controlled" suggests, at the least, that a religious organization must have power over decision-making at the institution. *See, e.g.*, 25 U.S.C. § 1801(a)(4) (defining "tribally controlled college or university" to mean "an institution of highest education which is formally controlled, or has been formally sanctioned, or chartered, by the governing body of an Indian tribe or tribes"); 26 C.F.R. §1.414 (defining "controlled" for purposes of ERISA exemption as having the power to appoint the trustees or directors of an organization). Quoting a Bible verse in an institution's mission statement, for instance, does not convey that degree of authority.

Indeed, Congress expressly considered amending Title IX to expand the religious exemption. In 1988, when Congress increased coverage of Title IX in the Civil Rights Restoration Act, some Senators suggested that educational institutions be eligible for the exemption if they are "closely identified with the tenets of a religious organization," not only "controlled by" it. S. Rep. No. 100-64, at 27. Members of Congress disagreed about how broad the exemption *should* be. But they agreed on how broad the exemption *was*. Senator Kennedy, for example, noted that "[a]dmittedly, the control test *is*, and should be, a difficult one." 134 Cong. Rec. 328, 334 (1988) (statement of Sen. Kennedy) (emphasis added). Senator Hatch, opposing the current scope of the exemption, suggested that, in its current form, it was so narrow that few schools could possibly invoke it. *Id.* at 335. In other words, regardless of their differing policy views, those members recognized that the religious exemption, as written, is narrow.

Page 1 -  AMICUS CURIAE BRIEF OF OREGON AND 18 OTHER STATES IN SUPPORT OF PLAINTIFFS
CP3/mkf/75046868

Even the Department observed that, as written, Title IX's "controlled by" test would cause many religious educational institutions to "fall outside the exemption" because many religious educational institutions are controlled by "law boards" or other entities. 134 Cong. Rec. H555 (Mar. 2, 1988) (reprinting letter from William Bennett, Secretary of Education).

Yet Congress rejected the proposed amendment and instead relied on the current "controlled by" wording when it enacted 20 U.S.C. § 1687. As Representative Fish explained, "[t]he key in the religious tenet exemption is the control test" and thus "[t]he assurance that an institution is actually controlled by the religious organization whose tenets it relies upon is essential to keep this exemption from becoming an escape hatch from title IX." 134 Cong. Rec. H565 (Mar. 2, 1988) (Rep. Fish); *see also* S. Rep. 100-64, at 27 ("[T]he committee determined that it is unnecessary and unwise to change the standard for the religious tenet exception."). Representative Bonker agreed that the "controlled by" wording would "insure that this religious exemption is not used as a loophole for institutions to circumvent our antidiscrimination statutes." *Id.* at E499 (Mar. 3, 1985).

Congress's rejection of the amendment to replace the control test with a "closely identified" test reaffirmed the original purpose of Title IX. Congress intended that Title IX "be given the broadest interpretation," S. Rep. No. 100-64, at 7, to provide individuals with effective protection against sex discrimination and harassment. *Cannon.*, 441 U.S. at 704 (1979). A "narrow reading of the law" would undermine Congress's goal of "address[ing] forcefully the shameful treatment of" vulnerable people by recipients of federal funding. S. Rep. No. 100-64, at 9. "Congress understood that these goals could be achieved if the Federal government used its power and authority to end discrimination." *Id.* at 7. In other words, Congress created robust protection against federally funded discrimination in schools with the intent of making its anti-discrimination mandate apply to as many institutions as possible. By increasing the number of

schools legally permitted to avoid Title IX's requirements where there is no true control by a

religious institution, the new eligibility rule thwarts Congress's clear intent.

> **2.**      **The Department acted arbitrarily and capriciously when it promulgated the eligibility rule.**

A rule is arbitrary and capricious in violation of the APA if the agency "has relied on

factors which Congress has not intended it to consider, entirely failed to consider an important

aspect of the problem, offered an explanation for its decision that runs counter to the evidence

before the agency," or makes a determination that is "so implausible that it could not be ascribed

to a difference in view or the product of agency expertise." *City & Cty. of San Francisco v.*

*United States Citizenship & Immigration Servs.*, 981 F3d 742, 759 (9th Cir. 2020) (quoting

*Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463

U.S. 29, 43 (1983)).  For three reasons, the Department's eligibility rule is arbitrary and

capricious: (1) the rule lacks support in the evidence before the Department; (2) the

Department's stated reasoning is inconsistent and unsupported; and (3) the Department

overlooked important aspects of the problem that the rule addresses.

> **a.**      **The eligibility rule is not supported by the evidence before the Department.**

The Department claimed that the November 2020 eligibility rule was necessary because

the statutory standard might be confusing.  *See* 85 Fed. Reg. at 3206.  The Department also

explained that it needed to codify the existing factors used for determining a religious exemption

and to "address concerns that there may be other means of establishing the necessary control."

85 Fed. Reg. at 3206.  It further stated that the proposed rule would create "more predictability,

consistency in enforcement, and confidence for educational institutions asserting the exemption."

*Id.*; *see also* 85 Fed. Reg. at 59949 (citing same reasons).

But the Department cited no evidence of confusion among educational institutions

regarding qualification requirements under the previous guidance.  To the contrary, for more

Page 1 -   AMICUS CURIAE BRIEF OF OREGON AND 18 OTHER STATES IN SUPPORT OF
            PLAINTIFFS
            CP3/mkf/75046868

than forty years between 1972 and 2015, no religious exemption requests were denied.  Kif Augustine-Adams, *Religious Exemptions to Title IX*, 65 U. Kan. L. Rev. 327 (2016).  And the Department pointed to no instances of a school expressing "reluctan[ce]" to invoke an exemption because of confusion about the meaning of "controlled by a religious organization."  85 Fed. Reg. at 59946.  The Department merely speculated that the statutory exemption created confusion or reluctance.  Such "conclusory statements" do not reflect reasoned decision-making.  *Getty v. Fed. Savs. & Loan Ins. Corp.*, 805 F.2d 1050, 1057 (D.C. Cir. 1986).

> **b.    The Department's stated reasoning is inconsistent and unsupported.**

"[A]n internally inconsistent analysis is arbitrary and capricious."  *Nat'l Parks Conservation Ass'n v. EPA*, 788 F.3d 1134, 1141 (9th Cir. 2015).  That observation applies here.  Again, the Department claimed that the lack of specific eligibility criteria might cause institutions that want to claim the exemption to "become reluctant to exercise their rights." 85 Fed. Reg. at 3206.  Yet it also suggested that the proposed changes would likely not change the number or types of entities claiming the exemptions. 85 Fed. Reg. at 3219. Contradicting that prediction, the Department then acknowledged that *more* institutions might seek the exemption because of the "increased clarity regarding the regulatory standard for doing so." *Id.*  When one part of the Department's reasoning belies another part, the Department is not viewing an issue reasonably.  *See Nat'l Parks Conservation Ass'n*, 788 F.3d at 1141.

Moreover, if the qualifications for the exemption were confusing, the eligibility rule would only worsen the problem.  The previous criteria for a religious exemption were sufficiently clear for the Department to grant exemptions to almost every school that applied under them.  If the process had in fact been confusing for the last four decades, hundreds of schools likely would not have secured exemptions and a larger portion would have failed to secure them.  *See* Augustine-Adams, *supra*, at 327 (noting that "the score is 285 to 0, religious exemptions recognized versus those denied").  And, if anything, the added criteria—sub-

Page 1 -   AMICUS CURIAE BRIEF OF OREGON AND 18 OTHER STATES IN SUPPORT OF PLAINTIFFS
CP3/mkf/75046868

provisions (c)(4)–(6)—will cause new confusion.  The added criteria use vague, indefinite terms, such as "practice," "teachings, and "[o]ther evidence."  34 C.F.R.106.12(c)(6).  And they conflate key terms that the statute makes distinct—"educational institution" with "religious organization", "tenets" with "practices," and "refer[] to" with "controlled by."  By adding more criteria, justified by no problem in particular, the Department has only muddled the regulatory standard.

The Department also gave short shrift to students' reliance interests on the previous guidance.  *See* Comment on Behalf of 20 States at 13–14, online at https://www.regulations.gov/comment/ED-2019-OPE-0080-17760, (describing those interests). Under the previous guidance, students could tell which schools might claim a religious exemption by inquiring whether schools had explicit statements in official publications identifying that they are governed directly by a religious organization or require certain beliefs or practices among its students, faculty, employees or receive significant funding from a controlling religious organization.  Under the new eligibility rule, students may be far less certain if the school they chose to attend has published "refer[ence] to" a religious belief in its institutional mission or has "other evidence" on hand sufficient to invoke the religious exemption.  34 C.F.R. § 106.12(c)(5)–(6).  Despite that reliance interest, the Department offered no justification beyond its assurance that the rules permit no more exemptions than the statute itself.  85 Fed. Reg. at 59951 ("These final regulations do not create a religious exemption where there was none."). But, again, that answer merely begs the question whether the rule's grounds for exemption comport with the statute.  As explained above, they do not.  And the Department's response fails to address how students, without any notice of the Department's broader understanding, might have relied on a narrower interpretation of the statute in choosing which schools to apply to and eventually attend.

Page 1 -   AMICUS CURIAE BRIEF OF OREGON AND 18 OTHER STATES IN SUPPORT OF
              PLAINTIFFS

Finally, the Department summarily asserted that it must "take into account [the Religious Freedom Restoration Act (RFRA)] in promulgating its regulations" and must avoid "substantially burden[ing] a person's exercise of religion through its regulations." 85 Fed. Reg. at 3207; 85 Fed. Reg. at 59950. But RFRA does not justify these regulations. Even if a private school brought a RFRA claim, the government has a compelling interest in "eradicating discrimination" based on sex and other protected characteristics and may do so by withholding funding or subsidies from institutions. *See Burwell v. Hobby Lobby Stores, Inc.,* 573 U.S. 682, 733 (2014) ("The Government has a compelling interest in providing an equal opportunity to participate in the workforce without regard to race, and prohibitions on racial discrimination are precisely tailored to achieve that critical goal."); *see also Bob Jones Univ. v. United States,* 461 U.S. 574, 591, 604 (1983) (concluding that the "[g]overnment has a fundamental, overriding interest in eradicating racial discrimination in education," which warrants denial of tax exemptions to discriminatory private schools). Given Title IX's clear anti-discrimination purpose, the government could readily answer any potential RFRA challenge. The Department's RFRA concerns were misplaced.

     **c.**    **The Department overlooked important aspects of the problem.**

The Department acted arbitrarily and capriciously when it failed to recognize how the eligibility rule will cause harm to students by creating conditions for discrimination, harassment, and assault. *See Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agric.,* 499 F.3d 1108, 1117 (9th Cir. 2007) (observing that an agency's decision is arbitrary and capricious if, among other things, the agency failed to consider "all relevant factors"); *State Farm*, 463 U.S. at 43 (noting that it is arbitrary and capricious to fail to consider "an important aspect of the problem"). In the Department's view, the eligibility criteria merely clarify, but do not add to, the statutory standard under which a school may claim a religious

exemption.  85 Fed. Reg. at 59950–51.  By clarifying the statute, the Department reasoned, the rules permit only what the statute already allows.  *Id.*

In fact, the criteria effectively broadened the definition of "controlled by a religious organization" beyond the statute's plain text.  And by expanding the criteria for schools to receive religious exemptions, the rule makes discrimination, harassment, and assault more likely at schools that do not protect against and are not accountable for those consequences.  The rule means that, with permission from the federal government, schools may deny housing to students who do not conform to specific gender stereotypes.  They may withhold financial aid from a student who is pregnant out of wedlock.  They may even expel students who are LGBTQ.  *See, e.g.*, S. Rep. No. 100-64, at 22–23 (discussing the various request letters regarding practices sought to be exempt from Title IX); *Hidden Discrimination: Title IX Religious Exemptions Putting LGBT Students at Risk*, Human Rights Campaign, 3, https://tinyurl.com/yx7xbv2q (finding that 33 schools enrolling 73,000 students had obtained waivers that allow them to discriminate against LGBT students in admissions, housing, athletics, financial aid, and more).[1] And schools may do so even when they are not actually "controlled by a religious organization." Those consequences are incompatible with the narrow religious exemption Congress intended to create.

---

[1]    For instance, in a 2011 National Transgender Discrimination Survey, one-fifth of transgender students reported that they were denied gender-appropriate housing, and five percent reported outright denial of campus housing. Jaime M. Grant, et al., National Center for Transgender Equality and National Gay and Lesbian Task Force, *Injustice At Every Turn: A Report of The National Transgender Discrimination Survey* 39 (2011), https://tinyurl.com/yytzpbwl.  LGBT college students also suffer from higher rates of sexual assault and misconduct on campuses nationwide, and transgender and gender nonconforming students specifically report particularly high rates of sexual assault and misconduct.  David Cantor et al., *Report on the AAU Campus Climate Survey on Sexual Assault and Sexual Misconduct*, Association of American Universities 13-14 (Sept. 2015, reissued Oct. 2017). Expanding the exemption only increases the likelihood and perpetuation of these discriminatory practices in more schools for more students.

The Department received evidence that the costs of such discrimination are immense. Students at all grade levels are already subject to significant rates of sexual harassment. *See* Comment on Behalf of 20 States at 4 (citing studies). In addition to direct physical and psychological harm, these experiences work other injuries. Women who have been physically or psychologically abused use more mental-health services and incur greater total health expenditures each year. *See* Comment on Behalf of 20 States at 5–6 (citing studies). Victims of intimate partner violence, sexual violence, or stalking cumulatively lose 741 million productive days (lost work or school days) and suffer a $110 billion loss in short-term productivity. *Id.* at 15 (citing studies). Through healthcare and public benefit systems, the States must bear those added costs, as discrimination and its pernicious effects increase at schools exempted from Title IX's protections. *See id.* By essentially ignoring those aspects of the problem, the Department acted unreasonably in promulgating the eligibility rule.

**B.    The August 2020 rule eliminating the requirement that schools invoke the religious exemption in writing compounds the problems created by the eligibility rule.**

In addition to the eligibility rule, in August 2020, the Department promulgated a rule amending 34 C.F.R. § 106.12 to eliminate the requirement that an educational institution "shall" advise the Office for Civil Rights "in writing" if it seeks a religious exemption. Under the new rule, an educational institution "may" advise the OCR in writing but need not do so unless the Department notifies the institution that it is under investigation for noncompliance with the religious exemption. 34 C.F.R. §106.12(b). In promulgating that rule, the Department acted arbitrarily and capriciously, because it disregarded the available evidence and overlooked important aspects of the problem. *State Farm*, 463 U.S. at 43 (observing that an agency acts arbitrarily and capriciously where it ignores evidence or important aspects).

The Department asserted that the rule was necessary to avoid "confusing" and "burdensome" requirements on religious institutions that qualify for the exemption. 85 Fed. Reg. at 61482. In response to concerns that the rule might keep students in the dark about a school's

anti-discrimination policy, the Department explained that another regulation, including 34 C.F.R. § 106.8, provides notice by informing students that a school may not discriminate based on sex and may not distribute materials suggesting that it can.  85 Fed. Reg. at 30477–78.

This explanation disregarded the available evidence.  *See East Bay Sanctuary Covenant v. Garland*, 994 F.3d 962, 9803 (9th Cir. 2020) (concluding that rule was arbitrary and capricious where agency failed to consider or even acknowledge contrary evidence).  Although the Department described the notice requirement as "confusing," it cited no basis for that confusion, and the available evidence belies the point.  *See* 83 Fed. Reg. at 61482.  Under the previous rule, schools faced only minimal procedural burdens in seeking the religious exemption.  They needed only to send a letter explaining why the exemption applied to them.  Over five decades, hundreds of schools secured exemptions without any apparent confusion or complaints about the burden involved.

The Department also overlooked the significant impacts of the amendment.  *See City & County of San Francisco v. United States Citizenship & Immigration Servs.*, 981 F.3d 742, 759–61 (9th Cir. 2020) (concluding that agency acted arbitrarily and capriciously where it failed to address consequences of rule on people rule was supposed to protect).  The amendment will likely cause more students to unknowingly enroll in schools that believe themselves exempt from Title IX, even though the schools have not invoked the exemption publicly.  Students should know before they enroll whether their school will claim an exemption from federal discrimination law.  They should not have to wait until after they become a victim of discrimination that their school considers itself exempt from Title IX's anti-discrimination, anti-harassment, and anti-retaliation rules.  Nor should schools be allowed to wait to assert their exemption from Title IX until after a complainant comes forward with an allegation.

The Department's answer— that its regulations do not "mandate[] that recipients deceive . . . students"—hardly responds to the problem.  85 Fed. Reg. at 30478.  The problem is not that

the rule *requires* deception.  The problem is that it facilitates such deception by allowing schools to conceal important information about their exemption status.  The Department acknowledged that schools have financial incentives to recruit students and thus to omit information that might make a difference to those students.  *Id.*  Schools will have little reason to publicize that they are exempt from Title IX, as the Department suggested.  *See* 85 Fed. Reg. at 30478 (describing that possibility).  And students will have no reliable way to check an institution's status when a school need not file anything invoking the exemption unless and until it must respond to a Title IX complaint.

As a consequence, a student who is subject to discrimination and files a complaint may be surprised to learn that the school claims a religious exemption permitting it not only to discriminate against the student but also to retaliate against the student for complaining.  This result is utterly incongruous with the intent of Congress in banning sex discrimination at publicly funded educational institutions subject to a narrow exemption for schools controlled by religious organizations.

///

///

///

///

///

///

///

///

///

///

///

Page 1 -   AMICUS CURIAE BRIEF OF OREGON AND 18 OTHER STATES IN SUPPORT OF
            PLAINTIFFS
            CP3/mkf/75046868

**CONCLUSION**

The Department's new rules create an unlawful "escape hatch" undermining Title IX's broad mandate to schools by expanding its religious exemption far beyond Title IX's text or purpose and making it difficult for students to know a school's Title IX status.  Because the rules impermissibly make sex-based discrimination at schools more likely, and schools less accountable for it, this court should declare them unlawful.

DATED:  November 1, 2021.

Respectfully submitted,

ELLEN F. ROSENBLUM  #753239
Attorney General
BENJAMIN GUTMAN  #160599
Solicitor General

MICHAEL C. KRON  #074328
Assistant Attorney General

/s/  Christopher A. Perdue
CHRISTOPHER A. PERDUE  #136166
Assistant Attorney General
chris.perdue@doj.state.or.us

Attorneys for Amicus Curiae
State of Oregon

Additional Counsel for Amici Curiae:

ROB BONTA
Attorney General of California
1300 I Street
Sacramento, CA 94244

WILLIAM TONG
Attorney General of Connecticut
55 Elm Street
Hartford, CT 06106

KATHLEEN JENNINGS
Attorney General of Delaware
820 North French Street
Wilmington, DE 19801

KARL A. RACINE
Attorney General for the District of
Columbia
441 4th Street, NW
Washington, D.C. 20001

Page 1 -   AMICUS CURIAE BRIEF OF OREGON AND 18 OTHER STATES IN SUPPORT OF
PLAINTIFFS
CP3/mkf/75046868

CLARE E. CONNORS
Attorney General of Hawaii
425 Queen Street
Honolulu, Hawaii 96813

BRIAN E. FROSH
Attorney General of Maryland
200 Saint Paul Place
Baltimore, Maryland 21202

DANA NESSEL
Attorney General of Michigan
P.O. Box 30212
Lansing, Michigan 48909

ANDREW J. BRUCK
Acting Attorney General of New Jersey
Richard J. Hughes Justice Complex
25 Market Street, 8th
Floor, West Wing
Trenton, NJ 08625

LETITIA JAMES
Attorney General of New York
28 Liberty St., 23rd Floor
New York, NY 10005

JOSH SHAPIRO
Attorney General of Pennsylvania
Strawberry Square
Harrisburg, PA 17120
(717) 787-3391

MARK R. HERRING
Attorney General of Virginia
202 North 9th Street
Richmond, VA 23219

KWAME RAUOL
Attorney General of Illinois
100 West Randolph Street
Chicago, IL 60601

MAURA HEALEY
Attorney General of Massachusetts
One Ashburton Place
Boston, MA  02108

KEITH ELLISON
Attorney General of Minnesota
102 State Capitol
75 Rev. Dr. Martin Luther King Jr. Blvd.
St. Paul, MN 55155

HECTOR BALDERAS
Attorney General of New Mexico
408 Galisteo Street
Santa Fe, NM 87501

AARON D. FORD
Attorney General of Nevada
100 North Carson Street
Carson City, NV 89701

THOMAS J. DONOVAN, JR.
Attorney General of Vermont
Office of the Attorney General
109 State Street
Montpelier, Vermont 05609-1001

ROBERT W. FERGUSON
Attorney General of Washington
1125 Washington Street SE
Olympia, WA  98504-0100

Page 1 -   AMICUS CURIAE BRIEF OF OREGON AND 18 OTHER STATES IN SUPPORT OF
          PLAINTIFFS
          CP3/mkf/75046868

CERTIFICATE OF COMPLIANCE

The undersigned hereby certifies that this brief complies with the applicable word-count limitation under LR 7-2(b) because it contains less than 35 pages and less than 11,000 words, including headings, footnotes, and quotations, but excluding the caption, table of contents, table of cases and authorities, signature block, exhibits, and any certificates of counsel.

/s/  Christopher A. Perdue
_____
CHRISTOPHER A. PERDUE  #136166
Assistant Attorney General
chris.perdue@doj.state.or.us

Attorney for Amicus Curiae
State of Oregon

Page 1 -    CERTIFICATE OF COMPLIANCE
CP3/mkf/75046868