CAROL FEDERIGHI
TX Bar No. 06872950
*Lead Counsel*
ELLIOTT M. DAVIS
NY Reg. No. 4596755
HILARIE E. SNYDER
DC Bar No. 464837

BRIAN M. BOYNTON
Acting Assistant Attorney General
CARLOTTA P. WELLS
Assistant Director
United States Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, DC  20044
Phone: (202) 305-0747
hilarie.e.snyder@usdoj.gov
*Attorneys for Defendants*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
EUGENE DIVISION**

| | |
|---|---|
| ELIZABETH HUNTER, *et al.*,<br><br>　　　　　Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF EDUCATION,<br>*et al.*,<br><br>　　　　　Defendants.<br><br>and<br><br>COUNCIL FOR CHRISTIAN COLLEGES<br>& UNIVERSITIES, WESTERN BAPTIST<br>COLLEGE d/b/a/ CORBAN UNIVERSITY,<br>WILLIAM JESSUP UNIVERSITY and<br>PHOENIX SEMINARY,<br><br>　　　　　Intervenor-Defendants. | Civil Action No. 6:21–cv–00474–AA<br><br><br>**GOVERNMENT DEFENDANTS'<br>DEPOSITION DESIGNATIONS AND<br>OBJECTIONS TO PLAINTIFFS'<br>DESIGNATIONS** |

Government Defendants object to Plaintiffs' deposition designations as described below.
*See* Fed. R. Civ. P. 32. Red text boxes in the attached transcript also identify these objections.
Government Defendants have highlighted in yellow Plaintiffs' designations for the Court's
convenience.

| PAGE/LINE IDENTIFIED BY PLAINTIFF | OBJECTIONS | BASIS OF OBJECTIONS |
|---|---|---|
| 22:22-28:20 | 24:9-25:19 | Outside the Scope of the Topics in the Deposition Notice, Hearsay; FRE 802 |
| 30:11-33:5 | | |
| 36:17-37:3 | | |
| 39:10-40:3 | | |
| 40:14-41:4 | 40:14-41:4 | Question seeks protected information; Deliberative Process Privilege; FRE 501 |
| 42:4-17 | | |
| 49:2-54:8 | | |
| 60:21-67:3 | | |
| 74:5-78:7 | | |
| 78:18-79:7 | | |
| 82:14-86:4 | | |
| 86:21-87:9 | | |
| 88:5-10 | | |
| 99:14-101:20 | 99:14-101:20 | Outside the Scope of the Topics in the Deposition Notice, Hearsay; FRE 802 |
| | 101:6-19 | Outside the Scope of the Topics in the Deposition Notice, Hearsay, Improper Opinion Testimony; FRE 802, 701 |

| | | |
|---|---|---|
| 111:2-8 | | |
| 112:19-115:4 | | |
| 122:13-126:22 | | |
| 128:15-131:11 | | |
| 134:10-136:10 | | |
| 137:5-141:12 | | |
| 142:2-146:17 | 144:4-145:6 | Outside the Scope of the Topics in the Deposition Notice, Hearsay, Speculation, Ambiguous/Vague – FRE 802, 403, 602, 611 |
| | 146:4-17 | Speculation, Ambiguous/Vague –FRE 403, 602, 611 |
| 149:13-150:14 | 149:13-150:14 | Outside the Scope of the Topics in the Deposition Notice, Hearsay – FRE 802 |
| 151:6-152:6 | 151:6-152:6 | Outside the Scope of the Topics in the Deposition Notice, Hearsay – FRE 802 |
| 154:21-155:12 | | |
| 161:17-170:3 | 167:15-170:3 | Misstates Testimony & letter, Ambiguous – FRE 403, 611 |
| 173:1-175:13 | 173:1-175:13 | Outside the Scope of the Topics in the Deposition Notice, Hearsay, Speculation, Improper Opinion Testimony – FRE 802, 403, 602, 611, 701 |
| 177:16-179:13 | 177:16-179:13 | Outside the Scope of the Topics in the Deposition Notice, Hearsay – FRE 802 |
| 180:19-182:12 | 181:3-182:12 | Outside the Scope of the Topics in the Deposition Notice, Hearsay – FRE 802 |
| 188:20-190:1 | 189:10-190:1 | Outside the Scope of the Topics in the Deposition Notice, Hearsay, Speculation, Ambiguous/Vague, Improper Opinion Testimony – FRE 802, 403, 602, 611, 701 |

| 196:12-198:3 | 197:1-11 | Outside the Scope of the Topics in the Deposition Notice, Hearsay, Speculation, Improper Opinion Testimony – FRE 802, 403, 602, 611, 701 |
| 208:12-22 | | |
| 223:13-224:17 | 223:13-224:17 | Outside the Scope of the Deposition Notice, Hearsay, Improper Opinion Testimony– FRE 802, 701 |
| 233:11-240.3 | 238:20-240:3 | Outside the Scope of the Deposition Notice, Hearsay – FRE 802 |

Government Defendants cross-designate the pages and lines below.  These designations are highlighted in purple in the attached deposition transcript.

| PAGE | LINE |
|---|---|
| 36 | 9-16 |
| 40 | 4-13 |
| 41 | 5-20 |
| 86 | 5-20 |
| 155 | 13-22 |
| 156 | 1-22 |
| 157 | 1-22 |
| 158 | 1-22 |
| 159 | 1-13 |
| 170 | 4-5 |
| 226 | 16-22 |
| 227 | 1-22 |
| 228 | 1-2 |

| 262 | 8-16 |
| 263 | 12-18 |

Respectfully submitted,

November 2, 2021                    BRIAN M. BOYNTON
                                   Acting Assistant Attorney General

                                   CARLOTTA WELLS
                                   Assistant Director

                                   */s/ Hilarie E. Snyder*
                                   CAROL FEDERIGHI, TX Bar No. 06872950
                                   *Lead Counsel*
                                   ELLIOTT M. DAVIS, NY Reg. No. 4596755
                                   HILARIE E. SNYDER, DC Bar No. 464837
                                   United States Department of Justice
                                   Civil Division, Federal Programs Branch
                                   P.O. Box 883
                                   Washington, DC  20044
                                   Phone: (202) 305-0747
                                   hilarie.e.snyder@usdoj.gov

                                   *Attorneys for Defendants*

```
 1              UNITED STATES DISTRICT COURT
                    DISTRICT OF OREGON
 2                    EUGENE DIVISION
 3      --------------------------------:
        ELIZABETH HUNTER, et al., on    :
 4      behalf of themselves and all    :
        others similarly situated,      :
 5                                       :
                    Plaintiffs,         :
 6                                       : Case No.
            vs.                          : 6:21-cv-00474-AA
 7                                       :
        U.S. DEPARTMENT OF EDUCATION    :
 8      and SUZANNE GOLDBERG, in her    :
        official capacity as Acting     :
 9      Assistant Secretary for Civil   :
        Rights, U.S. Department of      :
10      Education,                      :
                                         :
11                  Defendants.         :
        --------------------------------:
12
13         REMOTE VIDEO-RECORDED DEPOSITION OF
14                   RANDOLPH WILLS
15
        DATE:           Thursday, October 21, 2021
16
        TIME:           10:09 a.m.
17
        LOCATION:       Remote Proceedings
18
19      REPORTED BY:    Erick M. Thacker, RPR
                        Reporter, Notary
20
21              Veritext Legal Solutions
              1250 Eye Street, NW, Suite 350
22               Washington, D.C. 20005

                                            Page 1
```

Page 2

```
 1        A P P E A R A N C E S
 2  On behalf of Plaintiffs:
 3     PAUL CARLOS SOUTHWICK, ESQUIRE
        JOE BAXTER, ESQUIRE
 4     Paul Southwick Law, LLC
        8532 North Ivanhoe Street
 5     Suite 208
        Portland, Oregon 97203
 6     Paul@paulsouthwick.com
        joe@paulsouthwick.com
 7
 8  On behalf of Defendants
 9     HILARIE E. SNYDER, ESQUIRE
        CAROL FEDERIGHI, ESQUIRE
10     ELLIOTT M. DAVIS, ESQUIRE
        U.S. Department of Justice
11     Civil Division, Federal Programs Branch
        P.O. Box 883
12     Washington, D.C. 20044
        hilarie.e.snyder@usdoj.gov
13     carol.federighi@usdoj.gov
        elliott.m.davis@usdoj.gov
14
15  On behalf of Defendant-Intervenor Western Baptist
    College d/b/a Corban University; William Jessup
16  University; Phoenix Seminary:
17     RYAN J. TUCKER, ESQUIRE
        MARK A. LIPPELMANN, ESQUIRE
18     Alliance Defending Freedom
        15100 North 90th Street
19     Scottsdale, Arizona 85260
        rtucker@ADFlegal.org
20     mlippelmann@ADFlegal.org
21
22
```

Page 3

```
 1        A P P E A R A N C E S (Continued)
 2  On behalf of Defendant-Intervenor Council for
    Christian Colleges & Universities:
 3
        GENE C. SCHAERR, ESQUIRE
 4     JOSHUA J. PRINCE, ESQUIRE
        Schaerr Jaffe LLP
 5     1717 K Street, Northwest
        Suite 900
 6     Washington, D.C. 20006
        gschaerr@schaerr-jaffe.com
 7     jprince@schaerr-jaffe.com
 8      - and -
 9     HERBERT G. GREY, ESQUIRE
        Herbert G. Grey, Attorney at Law
10     4800 SW Griffith Drive
        Suite 320
11     Beaverton, Oregon 97005
        herb@greylaw.org
12
13
    ALSO PRESENT:
14
        Kathryn Ellis, Esq., Department of Education
15
        Lori Talbott, Video Technician
16
17
18
19
20
21
22     (All parties appearing remotely.)
```

Page 4

```
 1          C O N T E N T S
 2  EXAMINATION BY:              PAGE
 3     Counsel for Plaintiffs         8
 4     Counsel for Defendant-Intervenor Council   242
        for Christian Colleges & Universities
 5
        Counsel for Defendants         262
 6
 7        E X H I B I T S
 8  NUMBER        DESCRIPTION        PAGE
 9  Exhibit 1    Notice of Rule 30b)(6) Deposition 45
                of U.S. Department of Education
10
        Exhibit 2    Topic 1 Chart of Title IX       47
11     Complaints, ED1.000001 - 002
12  Exhibit 3    U.S. Department of Education      58
                Office for Civil Rights
13     Case Processing Manual
14  Exhibit 4    U.S. Department of Education      68
                Office for Civil Rights
15     Discrimination Complaint Form
        ED3.000001 - 021
16
        Exhibit 5    NWYMF and OCR Correspondence   119
17     ED4.000001 - 0015 and
        ED4.000150 - 153
18
        Exhibit 6    Bob Jones University Exemption  160
19     Correspondence
20  Exhibit 7    Union College Exemption          163
        Correspondence
21
22
```

Page 5

```
 1          C O N T E N T S (Continued)
 2          E X H I B I T S
 3  NUMBER        DESCRIPTION         PAGE
 4  Exhibit 8    Letters to Students, Educators,  179
 5     and other Stakeholders re
        Executive Order 14021, Notice
 6     of Language Assistance
 7  Exhibit 9    U.S. Department of Justice       184
        Office for Civil Rights
 8     Questions and Answers on the
        Title IX Regulations on Sexual
 9     Harassment (July 2021)
10  Exhibit 10   Baylor University Statement on  216
        Human Sexuality
11  Exhibit 11   Bob Jones University Student     220
        Handbook 2021 - 2022
12
    Exhibit 12   Listing of Recipient            214
13     Institutions, ED2.000241
14
15
16
17
18
19
20
21
22     (*Exhibits attached to transcript.)
```

2 (Pages 2 - 5)

Randolph Wills 30(b)(6) - October 21, 2021

| | |
|---|---|
| 1    P R O C E E D I N G S | 1       VIDEO TECHNICIAN:  -- swear in the |
| 2       VIDEO TECHNICIAN:  Good morning.  We're | 2    witness.  I'm sorry, Ryan.  Go ahead. |
| 3    going on the record at 10:09 a.m. Eastern time on | 3       MR. TUCKER:  Yes.  I spoke earlier.  I |
| 4    October 21st, 2021.  This deposition is being | 4    think it was on mute.  This is Ryan Tucker, |
| 5    conducted using virtual technology, and all | 5    counsel for the intervenors, Corban University, |
| 6    participants are attending remotely.  Audio and | 6    William Jessup and Phoenix Seminary. |
| 7    video recording will continue to take place | 7       Mark Lippelmann is not present now, but |
| 8    unless all parties agree to go off the record. | 8    will join us later in the deposition. |
| 9       This is Media Unit 1 in the | 9       VIDEO TECHNICIAN:  Thank you.  Would |
| 10    video-recorded deposition of U.S. Department of | 10    the court reporter please swear in the witness? |
| 11    Education 30(b)(6) Designee Randolph -- Randolph | 11    WHEREUPON, |
| 12    Wills, taken by counsel for plaintiff in the | 12          RANDOLPH WILLS |
| 13    matter of Elizabeth Hunter, et al. versus U.S. | 13    called as a witness, and having been first duly |
| 14    Department of Education, et al., filed in the | 14    sworn, was examined and testified as follows: |
| 15    United States District Court, District of Oregon, | 15       EXAMINATION BY COUNSEL FOR PLAINTIFFS |
| 16    Eugene Division, Case No. 6:21-cv-00474-AA. | 16    BY MR. SOUTHWICK |
| 17       My name is Lori Talbott from the firm | 17    Q    All right.  Good morning, Mr. Wills. |
| 18    Veritext.  I am the videographer.  The court | 18    My name is Paul Southwick, the attorney |
| 19    reporter is Erick Thacker from the firm Veritext. | 19    representing the plaintiff, and I'll be taking |
| 20    I am not related to any party in this action, nor | 20    your deposition today. |
| 21    am I financially interested in the outcome. | 21       MR. SOUTHWICK:  Before we begin, |
| 22       If there are any objections to | 22    actually, is there a way to pin the witness on |
| Page 6 | Page 8 |
| 1    proceeding, please state them at the time of your | 1    the big screen, Camille, or -- |
| 2    appearance, and we'll begin with the noticing | 2       MR. BAXTER:  See the three dots right |
| 3    attorney, please. | 3    here? |
| 4       MR. SOUTHWICK:  Paul Southwick for | 4       VIDEO TECHNICIAN:  Yes.  Put your |
| 5    plaintiffs. | 5    cursor over Mr. Wills -- |
| 6       MR. BAXTER:  Joe Baxter for plaintiffs. | 6       MR. SOUTHWICK:  Okay.  Got it.  All |
| 7       MS. SNYDER:  Hilarie Snyder, Carol | 7    right.  Thank you. |
| 8    Federighi, Elliott Davis for defendants, and with | 8    BY MR. SOUTHWICK |
| 9    us is agency counsel Kathryn Ellis. | 9    Q    All right, Mr. Wills.  And you |
| 10       MR. SCHAERR:  And on behalf of the -- | 10    understand that you have agreed to provide |
| 11    of CCCU as intervenor, Gene Schaerr, and Herb | 11    testimony today under oath and on behalf of the |
| 12    Grey is with me. | 12    Department of Education? |
| 13       VIDEO TECHNICIAN:  And I also -- I also | 13    A    I understand that. |
| 14    believe we have Mr. Prince and Mr. Tucker with | 14    Q    Great.  I'm going to go over of the |
| 15    us. | 15    ground rules.  First, have you had your |
| 16       MR. PRINCE:  Yes.  Joshua Prince, also | 16    deposition taken before? |
| 17    for CCCU, intervenor. | 17    A    I have. |
| 18       VIDEO TECHNICIAN:  And if the court | 18    Q    Approximately how many times? |
| 19    reporter would -- | 19    A    I've had my deposition taken, I |
| 20       MR. TUCKER:  This is -- | 20    believe, just one time. |
| 21       VIDEO TECHNICIAN:  -- please -- | 21    Q    All right.  Do you remember how long |
| 22       MR. TUCKER:  This is Ryan -- | 22    ago that was? |
| Page 7 | Page 9 |

3 (Pages 6 - 9)

1    A    That was in the late 1970s.  I believe
2  1977.
3    Q    So it's been a few years.  All right.
4  Well, I'll go ahead and go over the ground rules
5  since it's been a while since you've had a
6  deposition.
7        I take it that you have had an
8  opportunity to meet with your counsel in advance
9  of the deposition; is that correct?
10    A    That is correct.
11    Q    All right.  So they might have gone
12  over some of this with you, but I'll just go over
13  it today to get us started.
14        So in this deposition, I will be asking
15  you questions.  You will be providing answers.
16  And for the sake of the court reporter, it's best
17  if you can provide verbal responses rather than
18  any just nodding of head and that sort of a
19  thing.  You understand and are prepared to do
20  that?
21    A    I am.
22    Q    And you understand that in addition to

1    If -- if you know the answer, though,
2  you are required to provide that answer unless
3  instructed by counsel.  Do you understand that?
4    A    I understand that.
5    Q    All right.  One thing that may happen
6  today is there may be objections to some of my
7  questions throughout the day, and sometimes that
8  can cause an interruption in the flow.
9        If an objection makes it so that you
10  can't remember the question I ask, I'd be happy
11  to repeat it, or we can have the court reporter
12  read it back.  But I'd just ask that -- let your
13  lawyer state their full objection and then go
14  ahead and make your response.
15        Also, there are lawyers for other
16  parties that may also be making objections on the
17  record, so I just ask that you let them state
18  their objection, wait till they're done, and then
19  provide your answer.
20        Is that all right?
21    A    Correct.  I understand.
22    Q    Great.  We'll also take some breaks

1  the court reporter, this is also being videoed
2  and that we have a videographer, and there will
3  be a video version of your testimony.
4        Are you aware of that?
5    A    I am aware of that.
6    Q    Is there anything that might prevent
7  you from providing full and accurate testimony
8  today, any illnesses or anything like that?
9    A    There is nothing of that sort.
10    Q    Great.  What I'd ask is -- I'm going to
11  try to be clear with my questions to you, but in
12  the event that you need me to clarify, would you
13  agree to ask me to clarify my questions today if
14  anything is confusing?
15    A    I will do so.
16    Q    Great.  Thank you.  One other thing is
17  that during the course of our discussion, I may
18  ask you questions that you don't know the answer
19  to.  I'd ask that you, you know, don't offer any
20  guesses or anything like that.  I'm looking for
21  information that you -- you know or you
22  reasonably can know.

1  throughout the day, and if you ever need a break,
2  just let me know.  I tend to have breaks every
3  hour or so, and then we'll -- we'll take a lunch
4  break.  But if you need a break for any reason,
5  just let us know.  I'm happy to do that.  I'd
6  just ask if there's a pending question that you
7  do provide an answer to that pending question
8  prior to taking the break.
9        Sound good?
10    A    Sounds good.
11    Q    All right.  Great.  Well, you stated
12  your name, so Randolph Wills.
13        Is Mr. Wills okay for addressing you?
14    A    That's fine.
15    Q    Great.  All right, Mr. Wills.  Can you
16  tell us what your current -- who your current
17  employer is and what your title is there.
18    A    My current employer is the U.S.
19  Department of Education.  My current title is
20  deputy assistant secretary for enforcement for
21  the Office for Civil Rights.
22    Q    All right.  And how long have you been

1 in the Department of Education?
2     A    I've been in the Department of
3 Education for a little over 18 years.
4     Q    And how long in the Office of Civil
5 Rights?
6     A    I've been in the Office for Civil
7 Rights for that entire time.
8     Q    All right.  And can you describe the
9 nature of your role?
10     A    Yes.  I am responsible for overseeing
11 the enforcement compliance work of OCR's 12
12 regional offices.  I do that with the assistance
13 of four enforcement directors, who oversee more
14 directly those regional offices and their
15 compliance work, that compliance work consisting
16 of the evaluation, resolution and -- evaluation,
17 investigation and resolution of complaints, also
18 the investigation of the compliance reviews and
19 directed investigations, and a third component of
20 our enforcement work involves the provision of
21 technical assistance.
22     Q    And how long have you been in the

Page 14

1 role -- your current role?
2     A    I've been in this role since
3 September 2018.
4     Q    And what did you do before that?
5     A    Before that, I served OCR as an
6 enforcement director.
7     Q    Was that in a regional office?
8     A    I was -- no.  I was working out of our
9 headquarters office.
10     Q    And how long were you a director in
11 that capacity?
12     A    I was an enforcement director from
13 summer of 2008 until September of 2018.
14     Q    And you worked out of headquarters that
15 whole time?
16     A    I didn't start working out of
17 headquarters until 2010.
18     Q    Can you tell me a little bit about -- a
19 little bit more specifically about your role,
20 what kinds of activities do you do, what kind of
21 obligations do you have over your regional
22 directors and other directors?

Page 15

1     A    As an enforcement director?  I'm sorry.
2 I didn't understand the reference there.
3     Q    Yeah.  In your current position as --
4 as an -- in your current position, what kind of
5 day-to-day activities do you have or obligations
6 do you have?
7     A    In my day-to-day activities, I have a
8 number of roles.  Some of them are case related
9 in terms of reviewing particularly sensitive
10 cases that our regional offices are addressing.
11 I do that with a group of headquarters personnel,
12 including the acting assistant secretary.
13         I also have numerous administrative
14 duties.  I'm responsible for ensuring that the
15 management of the regional offices is -- is
16 running appropriately.  I'm the hiring official
17 for the enforcement side of OCR.  So when we are
18 hiring, which we're currently doing, I'm -- I am
19 a selecting official, and I'm responsible for
20 ensuring that that process moves forward.
21         I'm responsible, also, for providing
22 considerable input into the budget for our 12

Page 16

1 regional offices.  I also handle -- under certain
2 circumstances, as the deciding official, I handle
3 grievance issues and EEO complaints.
4         I am in very close contact with the
5 assistant secretary.  I -- part of my
6 responsibilities are to provide advice to her on
7 enforcement issues, on our proactive activities
8 in particular with regard to enforcement issues.
9 And I very often, along with some of my
10 colleagues, will weigh in on proposed policy
11 matters, although policy is -- our policy is
12 actually generated out of a different part of
13 OCR.
14     Q    You mentioned proactive enforcement
15 activities.  Could you describe what you mean by
16 that?
17     A    Our proactive enforcement activities
18 are -- there are really two types of proactive
19 enforcement activities.  The first type, which
20 we've done previously for many years, are
21 compliance reviews.  OCR's compliance reviews
22 are -- we generally -- we don't do this every

Page 17

5 (Pages 14 - 17)

1 year, but generally, certainly in the past, we
2 have opened compliance reviews every year.
3      The compliance reviews, we -- the
4 issues that we are investigating -- compliance
5 reviews, again, are proactive on the part of OCR.
6 They don't involve individual complainants.
7 They're not generated by individual complainants.
8 They are opened in areas of particular concern to
9 the secretary, to the assistant secretary.
10      And as a result, those reviews are --
11 when they are opened, we notify not only the
12 recipients -- and they may be elementary and
13 secondary recipients. They may be postsecondary
14 recipients. We notify the recipients. We also
15 notify the representatives and senators in the
16 districts and states where we're opening those
17 reviews. These are very public announcements by
18 OCR of areas of particular concern.
19      The other form of proactive compliance
20 activity that we engage in are known as directed
21 investigations, and both compliance reviews and
22 direct investigations, actually, are described in

Page 18

1 the Case Processing Manual, a copy of which I
2 know you have. Our directed investigations are
3 more ad hoc in nature. They depend -- if -- if
4 OCR has received information that raises concerns
5 about possible violations of law in certain
6 areas, we have the option of opening a directed
7 investigation.
8      These are not preplanned in the way
9 that compliance reviews are. We have a number of
10 open directed investigations at any given time,
11 but they are really directed at issues that we've
12 seen. Whether they come to us through community
13 groups or through media or other sources of
14 information that give rise to concerns that we
15 might have, we can open a directed investigation.
16      So those are our two forms of proactive
17 compliance activities, proactive because they're
18 generated by OCR, by the Department, not by an
19 individual complainant or a group of
20 complainants.
21   Q   And so for -- thank you for that
22 explanation.

Page 19

1      So for the compliance reviews, it's my
2 understanding that OCR has recently opened a
3 number of these with respect to some state
4 education systems regarding COVID issues; is that
5 correct?
6   A   Those are directed investigations.
7 Those are not compliance reviews.
8   Q   Other than those directed
9 investigations, are you aware of any other
10 directed investigations OCR has opened in the
11 last year?
12      MS. SNYDER: Objection. You're outside
13 the scope. If you know, you can answer in your
14 personal capacity.
15      THE WITNESS: No. Those are the only
16 directed investigations that OCR has opened in
17 the past year.
18 BY MR. SOUTHWICK
19   Q   Are you aware of any compliance reviews
20 that OCR has opened in the past year?
21      MS. SNYDER: Objection. Again,
22 outside the scope of the deposition topics. If

Page 20

1 you know, you can answer in your --
2      THE WITNESS: We have --
3      MS. SNYDER: -- personal capacity.
4      THE WITNESS: -- not opened -- we have
5 not opened any compliance reviews in the past
6 year.
7 BY MR. SOUTHWICK
8   Q   During your tenure with the Office of
9 Civil Rights, are you aware of any directed
10 investigations that have been opened with respect
11 to LGBT students?
12      MS. SNYDER: Objection. Again, you're
13 outside the scope of the deposition topics, but
14 if you know, you can answer in your personal
15 capacity.
16      THE WITNESS: To my knowledge, we have
17 not opened any directed investigations
18 specifically targeted to LGBTQ students.
19 BY MR. SOUTHWICK
20   Q   And would the same be true of
21 compliance reviews?
22      MS. SNYDER: Again, objection. You're

Page 21

6 (Pages 18 - 21)

1  outside the scope of the deposition topics.
2        If you know, you may answer in your
3  personal capacity.
4        THE WITNESS:  The same is true for
5  compliance reviews.
6  BY MR. SOUTHWICK:
7     Q    And as your counsel has been making
8  objections and referencing personal capacity, we
9  should go over that as well.
10       Do you understand that, in general, you
11  are here in the capacity as a representative of
12  the Department of Education to provide answers in
13  response to my questions on behalf of the
14  Department?
15    A    I understand that.
16    Q    And -- and -- and so unless otherwise
17  stated, I am going to -- is it fair to assume
18  that unless otherwise stated that you will be
19  providing responses to my questions within that
20  representative capacity?
21    A    Yes.  That is true.
22    Q    Earlier, when you were describing your

Page 22

1  responsibilities in your current role, you
2  mentioned that you are responsible for sensitive
3  OCR complaints or sensitive investigations.
4        Can you describe the general kind of
5  nature of what might make something sensitive
6  like that?
7     A    Yes.  Every administration that I have
8  worked under has maintained a list of what we
9  will call now sensitive cases.  They haven't
10  always all denominated them that way in each
11  administration.
12       But they're a list of cases, of types
13  of cases, of substantive areas and issue areas
14  that an administration is interested in for a
15  variety of reasons and as a result will want to
16  make sure that whatever work is done in those
17  areas aligns with the administration's policy.
18       So we currently have an area of what
19  we'll call sensitive cases.  We don't currently
20  call them that in this administration, but I'm
21  using that term very broadly.  We call them cases
22  of interest.  And they are in areas, in

Page 23

1  substantive areas, whether its Title VI, 504,
2  Title IX, that are of particular interest with
3  regard to the application -- the appropriate
4  application of -- of law and policy.  And so
5  those cases -- certainly, any determinations, any
6  final determinations that we make, that OCR makes
7  in those cases, we review at the headquarters
8  level.  I am not the sole reviewer, however.
9     Q    Can you explain some of the categories
10  of those cases of interest currently?
11       MS. SNYDER:  Objection.  Again,
12  Counsel, you're outside the scope of the topics
13  in the deposition notice.
14       If you know the answer, you can answer
15  in your personal capacity.
16       THE WITNESS:  I'll answer in my
17  personal capacity.  Some of the areas currently
18  that we have -- we've deemed to be cases of
19  interest, areas of interest, are, for example,
20  Title IX sexual harassment, sexual violence,
21  Title VI, racial harassment, disability
22  harassment, COVID-9 [sic] related issues, issues

Page 24

Objection:
FRH 802;
24:9-25:19

1  related to Title VI discipline, Title VI shared
2  ancestry cases.
3        And for a complete list, I would have
4  to consult our -- our list and get back to you,
5  but those are some of the areas that we are --
6  currently have on our cases of interest list.
7  BY MR. SOUTHWICK:
8     Q    During your tenure, have cases
9  involving LGBTQ students been part of this
10  category of cases of interest?
11       MS. SNYDER:  Again, objection.  You're
12  outside the scope of the deposition topics.
13       If you know, you can answer in your --
14       THE WITNESS:  Yes.
15       MS. SNYDER:  -- personal capacity.
16       THE WITNESS:  Yes.  And we are also
17  looking at -- at sexual orientation gender
18  identity cases currently on the cases of interest
19  list.
20  BY MR. SOUTHWICK:
21    Q    What about issues of religious
22  exemption claims under Title IX?  Has that been

Page 25

7 (Pages 22 - 25)

Page 26

```
1    a -- within the realm of cases of interest or
2    sensitive cases during your tenure?
3         MS. SNYDER:  Again -- well, withdrawn.
4         THE WITNESS:  Cases where religious
5    exemptions are at issue have not been during my
6    tenure on the cases of interest or sensitive
7    cases list.  And let me finish.  Until -- until
8    very recently.  But during my tenure, until very
9    recently, they have not been cases that
10   headquarters had to have eyes on before
11   determinations could issue.
12   BY MR. SOUTHWICK
13      Q    And when you say very recently, how --
14   how -- how recent are we talking?  In the last
15   couple of months or weeks?
16      A    We're talking in the last couple of
17   months.
18      Q    And why have cases involving Title IX
19   religious exemptions become part of the cases of
20   interest recently?
21      A    Let me address --
22         MS. SNYDER:  Objection.  Potential
```

Page 27

```
1    speculation and outside the scope.  If you know,
2    you can answer.
3         THE WITNESS:  Okay.  I'd like to
4    address two things.  Cases involving religious
5    exemptions are not currently listed on our cases
6    of interest list.  That is a printed list that's
7    shared with our offices.
8         The area of cases involving religious
9    exemption was something that we didn't add
10   formally to the cases of interest list, but that
11   we made clear to our regional offices that we
12   wanted to have headquarters review of actions
13   taken in any cases involving religious
14   exemptions.
15        That came about because we -- the
16   regional offices began receiving an unusual
17   number of Title IX cases involving religious
18   exemptions and communicated that through their
19   enforcement directors to headquarters personnel,
20   including the assistant secretary, including me.
21        And once we learned that we were
22   receiving multiple cases, which is unusual in
```

Page 28

```
1    this particular area, we did what we have done in
2    the past when we've begun to receive multiple
3    cases addressing very similar or the same issues.
4    We have a great concern to ensure that our
5    response to those cases is consistent across our
6    regional offices, and as you know, we have 12 of
7    them.  We -- a number of those offices, not all
8    12, had received these cases involving religious
9    exemptions.
10        So we determined that it was prudent
11   to, first of all, know about when those cases
12   were coming in, and they continued to come in.
13   This was the notification we received in
14   headquarters about the cases during the initial
15   filings of religious exemption-related cases
16   under Title IX.  But as we learned there were
17   more coming in, we decided that we wanted to --
18   it would be prudent to have a consistent approach
19   to how we in enforcement handle those particular
20   cases.
21   BY MR. SOUTHWICK
22      Q    And was there a memorandum or e-mail
```

Page 29

```
1    communication that went out to the regional
2    offices regarding this issue of religious
3    exemption?
4       A    There was no memorandum or written
5    directive that went out from headquarters to the
6    regional offices regarding this particular area
7    of cases.
8       Q    How was this direction then
9    communicated?
10      A    The direction was communicated by the
11   enforcement directors, who are headquarters
12   personnel.  It was communicated orally.
13      Q    Were there any documentation or any
14   documents that would explain the directives that
15   were to be given?
16      A    I'm sorry.  Could you rephrase that?
17   I'm not sure I understand completely.  Were
18   there --
19      Q    Sure.  It sounds like there was some
20   directive that went out from headquarters to
21   regional offices, and you described that there
22   was the oral component.  I'm just trying to
```

1  determine whether there are any documents that
2  would reflect the nature of that directive.
3      A    There were no -- as far as -- there
4  were no documents issued from headquarters that
5  reflected the nature of that directive.  I can't
6  speak to what might have happened in an
7  individual regional office, but, certainly, there
8  were no documents that embodied that directive
9  that was sent out to the -- to the regional
10 offices.
11     Q    And did that directive come from you?
12     A    The directive came from the assistant
13 secretary -- or the acting assistant secretary.
14 Pardon me.
15     Q    And could you describe the general
16 nature of the directive, the content?
17     A    Generally, yes.  The content of the
18 directive was that headquarters wanted to be made
19 aware of when any of the regional offices
20 received a Title IX complaint where the religious
21 exemption was implicated.  They were continuing
22 to come in, so we wanted to know which offices

Page 30

1  were receiving these so that we knew, you know,
2  where they were.
3          We also informed the offices orally
4  that any action they propose to take with regard
5  to, for example, opening one of those complaints
6  for investigation or dismissing one of those
7  complaints for investigation needed to be vetted
8  by headquarters prior to taking that particular
9  step.
10         I would add that this was not part of
11 the oral directive about, you know, letting us
12 know when you receive these cases, informing and
13 sending up to headquarters a draft for an action
14 that you propose to take, whether it's a proposed
15 opening or a proposed dismissal.
16         I would add that we also shared with
17 the regional offices -- not in the form of a
18 directive of the sort I just described, but we
19 shared with the regional offices language that we
20 wanted the regional offices to use in letters of
21 notification.  Those are letters that we would
22 use if we were opening a case.

Page 31

1          We did share that language that was
2  in -- in a memo form, but it's -- I'm
3  distinguishing it from the directive that went
4  out that said we want to be aware of these cases,
5  and any steps you take in these cases, we need to
6  see what your proposed step is in headquarters.
7      Q    So the -- the new language that you're
8  talking about, was that language to be used in
9  the event that an investigation was to be opened
10 or in the event of the dismissal of a complaint
11 or -- or both?
12     A    The new language is to be used in the
13 event a case is going to be opened.  And it is to
14 be used in -- with regard to the opening of a
15 Title IX case.
16     Q    And do you have that language in the
17 materials that you used to prepare for the
18 deposition today?
19     A    Yes.  It's -- the language is
20 incorporated in a sample letter that's provided
21 in the materials that we have.
22     Q    And has that language been -- has that

Page 32

1  language been used at all to this -- strike that.
2          Has -- has this language been used yet
3  in a letter from OCR regarding an actual
4  complaint?
5      A    Yes.  It has been used once.
6      Q    And in what complaint was it used with
7  respect to?
8          MS. SNYDER:  Objection.  Outside the
9  scope of the deposition topics.
10         If you know the answer, you can answer
11 in your personal capacity.
12         THE WITNESS:  The letter issued in a
13 complaint filed against ███████████.
14 BY MR. SOUTHWICK:
15     Q    And can you describe the nature of that
16 complaint against ███████████?
17         MS. SNYDER:  Objection.  You're outside
18 the scope of the deposition topics.
19         If you know the answer, you can respond
20 in your personal capacity.
21         THE WITNESS:  I do not recall the very
22 specific issue that was raised in the ██████

Page 33

9 (Pages 30 - 33)

1 ████████ complaint.

2      It is my recollection that it was an

3 issue raised broadly in the LGBTQ+ area, but I

4 don't remember the specifics of the allegation.

5 BY MR. SOUTHWICK

6    Q    And did you review any documents

7 relating to the ████████████ complaints in

8 preparation for your deposition today?

9    A    I did not.

10    Q    In this new directive process for

11 religious exemption determinations, where --

12 where does the religious exemption question end

13 up at headquarters?  Is there one person in

14 charge of it?  Is there a group of people?

15 Where -- where does it go from the regional

16 office to headquarters?

17      MS. SNYDER:  Objection.  Ambiguous and

18 compound.

19      THE WITNESS:  And, Mr. Southwick, I

20 want to ask, where does the -- where does the

21 religious exemption process -- could you clarify

22 that for me, please?

Page 34

1 BY MR. SOUTHWICK

2    Q    I can.  So if under the new directive a

3 regional office receives a complaint that

4 involves a religious exemption component, my

5 understanding based on your prior testimony is

6 that that complaint is supposed to be sent to

7 headquarters, and so my question is:  Who at

8 headquarters is in charge of handling the

9 religious exemption issues that get sent to

10 headquarters?

11    A    Let me -- let me correct your

12 understanding.  The complaint itself -- we don't

13 require that the complaint itself be -- be sent

14 to headquarters.  We just need to know that a

15 complaint has been filed.  We can certainly look

16 at the complaint through our case management

17 system, but we're not requiring the offices to

18 send the complaint forward.

19      The requirement is that if, for

20 example, the office is recommending that we open

21 the complaint for investigation or if the office

22 is recommending that we dismiss the complaint

Page 35

1 that the proposed opening or dismissal --

2 actually, that document should come forward to

3 headquarters, so -- but we're not asking for a

4 copy of the complaint to be sent up.

5      When -- and, again, if -- I'm sorry to

6 ask you one more time, but the process -- the

7 process you're asking about is related to who in

8 headquarters addresses?

9    Q    So let's say that the Seattle regional

10 office receives a complaint that involves a

11 religious exemption and then makes a

12 recommendation that they want to dismiss that

13 complaint on the basis of the religious

14 exemption.  That would then go to headquarters

15 for a determination; is that correct?

16    A    That is correct.

17    Q    And then who at headquarters would be

18 making that determination?

19    A    There is a group of enforcement

20 personnel, senior enforcement personnel at

21 headquarters, who would be making that

22 determination.  Well, the determination would

Page 36

1 ultimately be made by the acting assistant

2 secretary in discussion with a group of senior

3 management personnel from enforcement.

4    Q    And can you give me the names of the

5 senior enforcement personnel?

6    A    Yes.  I am one of the senior

7 enforcement personnel.  Others are Melanie Velez,

8 who is an acting enforcement director.  That's

9 V-E-L-E-Z.  Another -- and then four enforcement

10 directors, Emily McCarthy, Lisa Chang, Mia

11 Karvonides.  Let's see.  Lisa, Mia, Emily.  Meena

12 Morey Chandra, C-H-A-N-D-R-A.  They're

13 currently in -- two are brand new, so they've

14 just been added.

15      But cases that come to headquarters for

16 review, cases on the cases of interest list and

17 now cases involving Title IX actions that

18 implicate religious exemptions are reviewed by

19 that group.  And I will also include senior

20 personnel -- senior counsel to the assistant

21 secretary, Jasmine Bolton.

22      And we review what's been sent forward.

Page 37

10 (Pages 34 - 37)

**Page 38**

1  We have a discussion about what our thinking is
2  with regard to that, but ultimately the decision
3  may -- a decision in terms of should the document
4  issue or not, do we have further work to do, is
5  made by the assistant -- the acting assistant
6  secretary.
7      Q   And has that group you just described
8  made any recommendations to the acting assistant
9  secretary -- let me rephrase.
10         Was that group that you just described
11  involved in a recommendation regarding ████
12  ████?
13     A   Yes.  That group made a recommendation
14  regarding ████  ████ regarding to -- with
15  regard to the issuance of the letter of
16  notification.
17     Q   And then in the ████  case,
18  that group's recommendation would go up to the
19  acting assistant secretary, who would ultimately
20  make the decision?
21     A   We meet with the acting assistant
22  secretary as a group, so it's not forwarded on.

**Page 39**

1  She's part of the group that meets to discuss
2  cases that come to headquarters for headquarters
3  review.
4         So the decision is made -- for example,
5  the decision in ████ was -- to issue the
6  letter of notification was made in that group
7  after discussion.  The assistant -- the acting
8  assistant secretary endorsed the recommendation
9  we made to issue the letter.
10     Q   And has that group considered any other
11  complaints besides the one involving ████
12  ████?
13     A   Yes, we have.  We considered one other
14  complaint.  It's listed on the complaint chart
15  that you have at Bates 002.  That's Brigham Young
16  University.
17     Q   And which one was that?
18     A   That's Brigham Young University,
19  08212212.  And you can see the actions taken with
20  respect to this complaint.  We issued the
21  dismissal letter after review by headquarters,
22  the headquarters group, and the assent of the

**Page 40**

1  assistant secretary -- the acting assistant
2  secretary.  The dismissal letter issued on
3  October 19th, 2021.
4      Q   And did that group consider any issues
5  relating to the religious exemption to Title IX
6  during its discussion?
7      A   We did not consider those issues for
8  the purpose of endorsing the dismissal.  The
9  dismissal came to us under -- under another
10  rubric that is frequently used, one in OCR under
11  our CPM.  Where a case with the same or similar
12  operative facts is filed in a state or federal
13  court, we dismiss the case in OCR.
14     Q   But did you have any discussions about
15  the religious exemption related to Title
16  IX?
17         MS. SNYDER:  I'm going to object.  I
18  think he might be treading into deliberative
19  issues.  I'm -- and, actually, at this point, I'm
20  going to advise him not to answer that question
21  based on the deliberative process privilege.
22

*Objection: 40:14-41:4 FRE 501, DP Privilege*

**Page 41**

1  BY MR. SOUTHWICK:
2      Q   Are you going to follow your counsel's
3  instruction?
4      A   Yes, I am.
5      Q   Given that the decision with respect to
6  the BYU complaint you just mentioned was made on
7  a non-religious exemption basis, why was the --
8  the headquarters group consulted regarding that
9  complaint?
10     A   Because the complaint implicated a
11  religious exemption issue, and it was one of the
12  complaints we asked the regional offices to make
13  the headquarters group aware of.
14         But it was because of that implication
15  of a religious exemption issue that it came to
16  headquarters, and as we said, any action, whether
17  it's dismissal or opening, needed to come up to
18  headquarters for review prior to any issuance
19  of -- of a letter confirming whatever action
20  you're taking.
21     Q   So other than that BYU complaint and
22  the ████ complaint, has that group

1  considered any other Title IX complaints
2  regarding religious exemption issues?
3      A    We have not.
4      Q    Does that group -- the group that
5  you've described, does it have a name, or is
6  there a way that I can refer to it so that we all
7  know what I'm talking about?
8      A    We've been referred to by various
9  names, but the one we use most often is -- is
10  just HQ or head -- HQ group.
11     Q    Does that HQ group have regular
12  standing meetings?
13     A    Yes.
14     Q    And how frequently does the HQ group
15  meet?
16     A    The HQ group meets one -- at least once
17  a week.
18     Q    And are there specific meetings at
19  which religious exemption issues would be
20  presented, or could they be presented or
21  discussed at any of those HQ meetings?
22     A    The HQ group meets for areas of

Page 42

1  interest other than Title IX, and we also have a
2  regular meeting weekly for cases involving Title
3  IX issues.  But it's much broader than just Title
4  IX cases with religious exemption implications.
5          We review, also, sexual violence cases,
6  sexual harassment cases, gender sex
7  discrimination cases in the Title IX group.  So
8  it's broader than just considering cases
9  involving religious exemptions, but it is a Title
10  IX group, same headquarters group with -- I will
11  add now with -- depending on the nature of the
12  cases we're handling, we may bring somebody in
13  from our program legal group, because we're
14  developing new policy in an area not related to
15  religious exemption cases.
16          But it meets -- that group meets once a
17  week, and that group considered and got the
18  endorsement of the acting assistant secretary to
19  issue the dismissal letter in the Brigham Young
20  case and the opening letter in the ████████████
21  ████████ case.
22     Q    Just to make sure I'm understanding,

Page 43

1  the HQ group Title IX meeting is the meeting at
2  which religious exemption issues would be raised,
3  but along with, you know, whatever other Title IX
4  pressing business HQ group has; is that right?
5      A    That is correct.
6      Q    I also want to clarify when we -- when
7  you reference the BYU dismissal, in the -- the
8  chart that was produced to us today that you've
9  referenced, there are multiple BYU complaints.
10          Have the other two BYU complaints been
11  reviewed by the HQ group?
12     A    No, they haven't.
13     Q    Do you know why?
14     A    Because work is ongoing on those cases.
15  Evaluation work is ongoing.  And no decision --
16  no proposal -- no proposed decision has been made
17  yet by the -- by the regional office handling
18  those evaluations.
19     Q    I'm going to try to use the fancy
20  technology now, so we'll do a test of it.  You
21  should have access to Exhibit Share.  And there
22  will be a marked exhibits folder, and there

Page 44

1  should be only one document in there right now,
2  which has been marked Exhibit 1.
3          Let me know if you're able to find
4  that.
5      A    Yes, I -- I see the document.  I
6  believe it's the notice of 30 -- yeah, 30(b)(6).
7          MR. SOUTHWICK:  All right.  So I just
8  want to introduce Exhibit No. 1 as the notice of
9  the 30(b)(6).
10          (Deposition Exhibit Number 1
11          was marked for identification.)
12  BY MR. SOUTHWICK:
13     Q    And have you seen this document before,
14  Mr. Willis -- Mr. Wills?
15     A    I have.
16     Q    And is it your understanding that you
17  are appearing today in response to this
18  deposition notice?
19     A    That is my understanding.
20     Q    And if you look at page 3 of the
21  Exhibit 1, there are three topics listed.  The
22  first topic is "The status of Plaintiffs' Title

Page 45

12 (Pages 42 - 45)

Randolph Wills 30(b)(6) - October 21, 2021

1 IX complaints."
2         Are you prepared to provide testimony
3 regarding Topic No. 1 today?
4     A   I am.
5     Q   And what did you do to prepare to
6 provide testimony in response to topic 1?
7     A   In response to Topic No. 1, I reviewed
8 documentation that was assembled, including the
9 chart that we just referred to, by personnel,
10 senior personnel in OCR and in enforcement,
11 specifically Acting Enforcement Director Melanie
12 Velez.
13         MR. SOUTHWICK:  Okay.  I'm going to
14 introduce that chart as an exhibit.  It takes a
15 second or two here.  All right.  I believe
16 everyone, the witness and the lawyers -- I
17 believe how Exhibit Share works is that in order
18 to see the new exhibit that I have marked,
19 Exhibit 2, you will need to refresh your screen.
20         So, Mr. Wills, after you've done that,
21 if you could let me know if you see Exhibit 2 in
22 there.

Page 46

1         (Deposition Exhibit Number 2
2         was marked for identification.)
3         THE WITNESS:  I see Exhibit 2, the
4 chart.
5         MR. SOUTHWICK:  All right.  And just
6 since we're now starting to use this Exhibit
7 Share, I'll take it that all counsel are able to
8 access your Exhibit Share, not having any
9 problems?  If anyone's having problems, go ahead
10 and raise it right now, and let's try to take
11 care of it.  All right.  The technology is
12 working for once.  That's great.
13 BY MR. SOUTHWICK:
14     Q   Okay.  Well, I've marked Exhibit 2.
15 And just for the record, Mr. Wills, could you
16 tell me -- describe Exhibit 2 for me.
17     A   Yes.  Exhibit 2 is a listing of
18 complaints, Title IX complaints, that have --
19 wherein religious exemption is implicated.
20         It lists the docket number, the name of
21 the recipient, the date the complaint was
22 received, the current stage of -- of a

Page 47

1 complaint's processing, the regional office, the
2 OCR regional office that is responsible for the
3 processing of the complaint.
4         This is a list that also indicates
5 whether the complainant in the complaint filed
6 with OCR is also a plaintiff in the action we're
7 here for today.
8         It also indicates whether a waiver of
9 OCR's timeliness requirement has been requested
10 and the status of what that waiver request might
11 be.
12         And it also provides a section for a
13 brief description of communication/interaction
14 with the complainant/plaintiff, calling for the
15 date and type of that communication.
16     Q   You referenced the docket number, and I
17 see there that there's a docket number.
18         Is that -- is that a number that OCR
19 will assign when it is -- when it has received a
20 complaint that it is then going to process for
21 evaluation?
22     A   That is correct.  Every complaint

Page 48

1 receives a docket number.
2     Q   All right.  And so it looks to me like
3 all the complaints referenced here have a docket
4 number; is that correct?
5     A   That is correct.
6     Q   And so that means -- having a docket
7 number, that means that the process has at least
8 started on OCR's end; is that right?
9     A   That is correct.
10     Q   All right.  And then you said there's
11 the column recipient.  That's pretty
12 self-explanatory.  The date it was received.
13         I do want to ask -- stage.  So stage
14 here, most of these say eval, which I am -- does
15 that stand for evaluation stage?
16     A   That stands for evaluation, yes.
17     Q   Can you describe to me what the
18 evaluation stage is?
19     A   Yes.  Broadly, the evaluation stage in
20 this -- in the -- what's considered in the
21 evaluation stage is set out in OCR's Case
22 Processing Manual, but an overview occurs during

Page 49

13 (Pages 46 - 49)

Page 50

1  evaluation. This is the -- this is the point in
2  a complaint's life in OCR where we determine,
3  first of all, whether we have jurisdiction,
4  whether the complaint is timely, whether what we
5  have before us is actually even a complaint. And
6  there are provisions in the Case Processing
7  Manual that describe what we would not consider
8  to be a complaint.
9        But generally speaking, we are
10  looking -- as the Case Processing Manual lays
11  out, we're looking at timeliness. If it's not
12  timely, we look to see whether a waiver of the
13  timeliness requirement has been requested. We
14  look to see whether we have subject matter
15  jurisdiction, personal jurisdiction.
16        Also, there -- in many of our cases, we
17  require a consent form signed by the complainant
18  so that we can share a certain amount of personal
19  information in particular with the recipient so
20  that the recipient can provide a response to the
21  complaint. So that is an issue that we generally
22  consider at the -- at the evaluation stage.

Page 51

1        We also consider at the evaluation
2  stage whether the complaint must be dismissed
3  pursuant to any of the dismissal provisions in
4  Section 108 of the Case Processing Manual.
5        Q    And would a religious exemption
6  decision be made at this stage of the proceeding,
7  at the evaluation stage?
8        A    Mr. Southwick, I want to ask you what
9  you mean by a religious exemption decision.
10        Title IX has a religious exemption --
11  strike that.
12        Will religious exemption issues
13  relating to the Title IX religious exemption --
14  will those religious exemption issues be
15  considered by OCR during this evaluation stage?
16        A    Religious exemption issues will be
17  considered by OCR -- they would be considered by
18  OCR if a recipient makes a request for an
19  assurance of exemption either during the
20  evaluation phase or prior to the evaluation
21  phase, and that request is not handled by
22  enforcement. We are the -- we are the complaint

Page 52

1  processing arm.
2        That is a request that ultimately must
3  be decided by the assistant -- acting assistant
4  secretary or the assistant secretary, and the
5  request itself is processed through to the acting
6  assistant secretary or assistant secretary by our
7  program legal group. The enforcement group does
8  not process or weigh in on any religious
9  exemption applications for assurances.
10        Q    Can you explain to me the -- what the
11  program legal group refers to?
12        A    Program legal group is the component of
13  the Office for Civil Rights that is responsible
14  primarily for working closely, of course, with --
15  with political appointees, the assistant
16  secretary, the development of policy,
17  interpretations of the statutes we enforce.
18        They are also responsible for
19  reviewing technical assistance presentations we
20  make to ensure that they're consistent with
21  policy, that we're properly articulating policy
22  of OCR and the law.

Page 53

1        They are also responsible for the
2  collection and implementation and publication of
3  OCR's civil rights data collection, which is, as
4  you may know, a very broad-based collection of
5  data from thousands of institutions around the
6  country concerning all of our statutory areas and
7  issues in those areas, very broadly, is what --
8  that's what the program legal group does.
9        And I will include in that, they are
10  the group that handle -- I'm going to use the
11  word handle or process here -- requests for
12  assurances of religious exemption that are made
13  by -- by religious institutions or allegedly
14  religious institutions. That is their role.
15        The request is sent to headquarters or
16  sent to the assistant secretary. The request is
17  referred to the program legal group for
18  evaluation, for determination of whether
19  additional information is necessary, ultimately,
20  then, for a recommendation that the program legal
21  group will make to the assistant secretary
22  regarding whether the assurance should be sent or

14 (Pages 50 - 53)

1    whether it should not.

2        Q    And when -- you've -- you've used the

3    term assurance.  Are you referring to the

4    regulatory process whereby an educational

5    institution can formally request an assurance of

6    exemption and then receive a response from the

7    Office of Civil Rights?

8        A    Yes, that is correct.  Excuse me.

9        Q    I'd like to know what happens to a

10    complaint that comes in to a regional office.

11    And in that -- in this evaluation stage, are

12    there issues that are reviewed first before

13    others?

14        For example, is timeliness the first

15    issue that gets reviewed, or are all those --

16    subject matter jurisdiction, personal

17    jurisdiction, timeliness, are all those

18    considered together contemporaneously?

19        MS. SNYDER:  Objection.  You're outside

20    the scope of the deposition topics.

21        If you know, you can answer in your

22    personal capacity.

Page 54

1        THE WITNESS:  I'll answer in my

2    personal capacity.

3        Generally speaking -- generally

4    speaking, we don't have an issue with subject

5    matter jurisdiction or personal jurisdiction,

6    generally speaking.  Most of the recipients we're

7    dealing with, we know that we -- we can certainly

8    tell from the allegation whether we have subject

9    matter jurisdiction.  It's -- we're very familiar

10    with most of the entities we deal with in our

11    regional offices, so personal jurisdiction is not

12    generally an issue, either.  Occasionally, but

13    generally speaking, it is not.

14        Timeliness is always a consideration,

15    and along with timeliness -- I made reference

16    earlier to Section 108, the dismissal --

17    dismissal provisions.  One of the other very

18    important dismissal provisions has to do with

19    whether we have enough information to understand

20    the nature of the complaint, enough information

21    from which we could possibly infer discrimination

22    has occurred.

Page 55

1        There is a provision in 108 that says

2    we need to -- basically need to know the who,

3    what, where, when, how and why, and very often we

4    don't get enough information from a complainant.

5    So we will also, at that point, once we determine

6    that there is -- the complaint is timely, it

7    states a claim under one of the laws that we

8    enforce, we have subject matter -- we have

9    personal jurisdiction -- again, which is usually

10    a matter of course -- we will then look to that

11    issue, do we have enough information to go

12    forward to open a complaint.

13        So I -- in my personal capacity, I

14    can't tell you that there is a rigid order that

15    we follow.  We don't do all of this

16    simultaneously, because as I said, for the most

17    part, we -- you know, subject matter jurisdiction

18    is evident generally from our first reading of

19    the complaint.  We will look to timeliness very

20    early on in the process.  We'll look to request for

21    waiver early on in the process.

22        And assuming those hurdles are

Page 56

1    surmounted and they -- which they must be, we'll

2    look to see whether we actually have enough

3    information to go forward.  And that information

4    also may include the date of the incident that

5    we're -- that we're looking at.

6        So it's -- it's not, as I said, a rigid

7    do this first, do that next, do the following

8    third, but it all happens early in the process.

9    BY MR. SOUTHWICK:

10        Q    To clarify some of the terms here, for

11    purposes of personal jurisdiction regarding a

12    Title IX complaint, the main thing or the

13    exclusive factor would be whether or not the

14    educational institution is a recipient of federal

15    financial assistance; is that -- is that right?

16        A    That's -- yes, that is correct.  And

17    that is referred to in -- actually in the Case

18    Processing Manual, Section 102, subsection c.

19        MR. SOUTHWICK:  Let's go ahead and mark

20    our next exhibit as the Case Processing Manual.

21    I'm marking the Case Processing Manual as Exhibit

22    No. 3.  And it might take a minute.  All right.

Page 57

15 (Pages 54 - 57)

1  I think it should be in there now.
2      (Deposition Exhibit Number 3
3      was marked for identification.)
4      MS. SNYDER:  Did yours freeze?
5      THE WITNESS:  Yes.  It's -- I'm opening
6  it right now.  Yes, it's open.  I can see it.
7  BY MR. SOUTHWICK
8    Q    All right.  So is Exhibit 3 the OCR
9  Case Processing Manual that is currently in
10 effect?
11   A    Yes.  This is the -- OCR's Case
12 Processing Manual that went into effect on
13 August 26, 2020.
14   Q    And if you had to just generally
15 describe this manual, how -- how would you
16 describe this manual?  What is -- what is its
17 purpose?
18   A    I would generally describe this manual
19 as the manual that sets forth OCR's case
20 processing procedures.  It is a roadmap to OCR's
21 case processing procedures.
22   Q    And it discusses some of the issues,

Page 58

1  based on race, color, national origin, sex,
2  disability, or age; discrimination in violation
3  of the Boy Scouts of America Equal Access Act of
4  2001, or retaliation for the purpose of
5  interfering with any right or privilege secured
6  by the civil rights laws regulations enforced by
7  OCR, or as a result of making a complaint,
8  testifying, or participating in any manner in an
9  OCR proceeding.
10     It then lists the statutes.
11   Q    And one of those --
12   A    I'm sorry.  Excuse me?
13   Q    Go ahead.  Sorry to interrupt you.
14   A    No, I was going to say it just lists
15 the statutes that grant OCR jurisdiction and
16 authority to investigate complaints that are
17 filed pursuant to the --
18   Q    And one of those statutes is Title IX,
19 correct?
20   A    That is correct.
21   Q    And does the issue of a religious
22 exemption to Title IX -- is that part of the

Page 60

1  personal jurisdiction, subject matter
2  jurisdiction, et cetera; is that -- is that
3  right?
4    A    That's correct.
5      MS. SNYDER:  Object -- objection.
6  Vague.
7      THE WITNESS:  Answering in my personal
8  capacity, yes, it -- it does.
9  BY MR. SOUTHWICK
10   Q    So we went over personal jurisdiction
11 before.  Subject matter jurisdiction, what
12 your -- what is the Office of Civil Rights
13 looking for to establish subject matter
14 jurisdiction over a complaint?
15   A    I'm going to refer you to Section 102,
16 subsection b of the Case Processing Manual, which
17 is a subsection that addresses subject matter
18 jurisdiction.
19     For OCR to establish subject matter
20 jurisdiction, the written information must
21 allege, or OCR must be able to infer from the
22 facts given, an allegation of discrimination

Page 59

1  subject matter jurisdiction analysis, or is that
2  a separate analysis?
3    A    It is part of the subject matter
4  jurisdiction analysis that enforcement staff
5  would engage in if enforcement staff is aware
6  that the institution at issue either has an
7  assurance of a religious exemption or exemptions
8  or it -- that -- that is where -- if we -- if we
9  understand that this institution -- I recognize
10 this institution's been before OCR before, and
11 I'm an investigator in the enforcement area.  And
12 I say, oh, you know, oh, this institution has
13 been across my desk before.  They have, I
14 believe, a religious -- an assurance of religious
15 exemption.  I don't know exactly what that --
16 what the nature of that exemption is, but I
17 believe they have one.
18     At that point, the investigator will
19 contact our program legal group and say, here's
20 the name of the institution, I believe they have
21 a religious exemption.  Program legal will
22 perhaps say yes, they do.  We will then ask, what

Page 61

1   is -- what precisely is that exemption?  What
2   does it cover?
3       If at that point we learn that it
4   covers -- having reviewed the documents that
5   grant it and the assurance of exemption, if -- if
6   we learn that it covers the allegations of the
7   complaint before that investigative staff member,
8   that investigative staff member will draft a
9   dismissal based on lack of subject matter
10  jurisdiction for review by the headquarters
11  group.
12      And then the headquarters group will
13  review all of that documentation and make a
14  determination.  The acting assistant secretary or
15  the assistant secretary would make a
16  determination as to whether that dismissal should
17  issue or not.
18      There are circumstances where a
19  complaint lands on an investigator's desk.  The
20  investigator has no idea whether -- first of all,
21  whether it's possibly a religious institution.
22  Sometimes you can -- a name will suggest that.

Page 62

1   Very often, names do not suggest that.  That is
2   one of the reasons why -- assuming other
3   timeliness issues have been met and we have
4   enough information to go forward from
5   which we can infer a possible violation of one of
6   our laws, it's a Title IX case.  We don't know
7   that particular institution.  It may sound like a
8   religious institution or it may not.
9       What we are doing now is set forth in
10  the sample letter that's part of our binder that
11  we've referred to earlier this morning, and that
12  is if we -- if we decide that it's timely or that
13  we're granting a waiver of the timeliness
14  requirement and we have enough information from
15  which we can infer that a possible violation has
16  occurred or is occurring, we will issue a --
17  well, we will propose -- the investigator will
18  propose to open that investigation.
19      So the investigator will propose a
20  letter that looks very much like the one that we
21  have in the binder as a sample letter, including
22  the language that, among other things, states

Page 63

1   that there are exceptions and exemptions to Title
2   IX, without going into the nature of what those
3   are.  And if the recipient intends to -- it
4   informs the recipient that if you intend to apply
5   for an assurance with regard to an exception or
6   exemption, here's how you do it, refers you to
7   the website, which will refer you to make
8   application to the assistant secretary.
9       And in the meantime, OCR will --
10  normally, when we issue letters of notification
11  opening a case, we also attach a data request.
12  And as in our regular practice, we will attach a
13  data request to these letters as well, and the
14  data request will ask whatever it asks for
15  depending on what the allegations of the case
16  are.
17      But we will inform the recipient in
18  that letter of notification, in that new language
19  that I pointed out, that they -- if they intend
20  to make a request for an assurance of an
21  exemption or exception, they are not required to
22  respond to the data request in the time frame

Page 64

1   that they normally would, which is usually 20
2   days.
3       So that -- that's in a situation where
4   we -- an investigator has no idea whether this
5   particular case involves a religious institution
6   or suspects that, well, it looks like a religious
7   institution.  This letter will go out.  And this
8   letter is going out actually now in all Title IX
9   cases, all of them, not ones where we just
10  suspect there might be a religious exemption
11  issue.  It's going on in all Title IX cases, even
12  to institutions we know full well are not
13  religious in nature and may not even have a
14  religious exemption issue.
15      So we will issue that letter --
16  and because we have just started doing this, I
17  don't have a long history to describe of how
18  responses to that letter have been made -- but it
19  may be that the recipient who receives that
20  letter may decide to request an assurance of
21  religious exemption and engage in that process
22  that I just described in broad overview with PLG

Page 65

17 (Pages 62 - 65)

1 up to the assistant secretary level.
2     If that happens and a religious
3 exemption -- and an assurance issues a religious
4 exemption or religious exemptions, the
5 investigative office will learn about that and
6 make a determination as to whether that exemption
7 covers the allegations in the complaint.  And if
8 the investigative staff believes it it does,
9 we'll propose a dismissal.  If it believes it
10 doesn't, the investigation will continue.
11     That is very broadly what the process
12 looks like now, but I -- I do want to be very
13 clear that enforcement staff are not in any way
14 involved in the evaluation of a request for
15 assurance of exemption.  That is the program
16 legal group's responsibility up to the -- the
17 assistant secretary.
18     But we -- once the exemption is granted
19 or is -- is assured or not, we certainly -- the
20 enforcement group will look at that exemption,
21 the extent of the exemption, is it applicable to
22 the issues before us, and a decision will be made

1 there.  But that's not -- that's not making the
2 decision on whether there should be an assurance
3 or not.
4    Q   And has this process been followed with
5 respect to the ███████████ case?
6     MS. SNYDER:  Objection.  You're outside
7 the scope.
8     If you know the answer, you can -- you
9 can do so in your personal capacity.
10     THE WITNESS:  Answering in my personal
11 capacity, the letter of notification issued in
12 ██████ -- I don't know the date it was issued,
13 but it was fairly recently.
14     So I -- I don't know whether ████
15 -- I don't know where they are in the -- whether
16 they requested an assurance or where they are in
17 that process, if so.
18     MR. SOUTHWICK:  Thank you, Mr. Wills.
19 I propose us taking a ten-minute break here, if
20 everyone's all right with that.
21     MS. SNYDER:  That's fine, Paul.
22     THE WITNESS:  I'm fine.  Thank you.

1     MR. SOUTHWICK:  All right.  Let's do
2 that.
3     VIDEO TECHNICIAN:  We are going off the
4 record at 11:21.
5     (Recess 11:21 a.m. to 11:34 a.m.)
6     VIDEO TECHNICIAN:  We are back on the
7 record.  The time is 11:34.  Please proceed.
8 BY MR. SOUTHWICK:
9    Q   Mr. Wills, we're back on the record.
10 And do you understand that you are back under
11 oath, and are you prepared to continue giving
12 testimony today?
13    A   I'm prepared to continue giving
14 testimony.  I understand that I'm under oath.
15     MR. SOUTHWICK:  I'd like to go ahead
16 and introduce our next exhibit, which is going to
17 be a bundle of documents that was produced to us
18 this morning as Topic 3, but I'll be marking this
19 exhibit as Exhibit 4.  And I'm loading it here.
20 All right.  Exhibit 4 should be marked and appear
21 in your marked exhibits folder now.
22     (Deposition Exhibit Number 4

1     was marked for identification.)
2     MS. SNYDER:  Just one moment, Paul.
3 Just a technical glitch.
4     MR. SOUTHWICK:  All righty.
5     MS. SNYDER:  Thank you.
6 BY MR. SOUTHWICK:
7    Q   Mr. Wills, if you could let me know
8 when you're able to access Exhibit 4.
9    A   I have accessed Exhibit 4.
10     MS. SNYDER:  I --
11     MR. SOUTHWICK:  All right.
12     MS. SNYDER:  -- had the technical
13 glitch, Paul.
14     MR. SOUTHWICK:  Oh, you did.  Okay.
15 Yeah.
16     MS. SNYDER:  Sorry.
17     MR. SOUTHWICK:  No worries.  Just so
18 people can get on the right page -- I won't ask
19 any questions, but I'm going to be looking at
20 page 16 of Exhibit 4, which is Bates No.
21 ED3.000016.
22     MS. SNYDER:  We're sorted, Paul, I

Randolph Wills 30(b)(6) - October 21, 2021

1  think, if you're ready.
2        MR. SOUTHWICK:  Okay.  Great.
3  BY MR. SOUTHWICK
4      Q   All right.  Mr. Wills, have you
5  scrolled down to page 16 of Exhibit 4, which
6  should be the letter that I believe you're
7  referring to that went out to ██████ -- or
8  ██████ ████████?
9      A   Yes.  I have -- I have page 16 open.
10     Q   All right.  Could you -- for the
11 record, could you just describe again what the
12 Exhibit 4, pages 16 through 18 -- could you tell
13 me what that letter is?
14     A   Yes.  This is a letter of notification
15 that OCR issues when it is opening a complaint
16 for investigation.  This letter indicates that we
17 have determined that we're opening a particular
18 complaint for investigation.
19        It includes language concerning the
20 assertion of jurisdiction, a statement that we
21 are opening the complaint for investigation, a
22 reference to, you know, our case processing

Page 70

1  procedures, a statement that we're going to be
2  conducting an investigation, a request for data
3  that, as I said earlier, generally accompanies
4  these letters of -- of notification that issue.
5        It also includes, as our letters of
6  notification do, a statement that the particular
7  recipient who receives this letter may not
8  harass, coerce, intimidate, discriminate or
9  otherwise retaliate against an individual because
10 the individual asserts a right or privilege under
11 laws enforced by OCR or files a complaint,
12 testifies, assists, participates in a proceeding
13 under a law enforced by OCR.  If this happens,
14 the individual may file a retaliation complaint
15 with OCR.
16        And then some additional information
17 about the contact person in the particular
18 regional office who would be handling the
19 complaint.
20     Q   And this one's at the Chicago regional
21 office; is that right?
22     A   I'm --

Page 71

1      Q   From the top of the letterhead, it
2  looks like, coming out of Chicago --
3      A   At the top of -- I'm sorry.  Yes.  At
4  the top of the letterhead, this is -- this is the
5  Chicago regional office.
6      Q   And the letter is dated September 24th,
7  2021; is that accurate?
8      A   That is accurate.
9      Q   And then it looks like on the second
10 page of the letter, ED3 17, that it asks for
11 information within 20 calendar days, or the
12 educational institution can request an assurance
13 first.  Is that -- is that accurate?
14     A   That's correct.  The -- these -- the
15 information concerning the recipient's ability or
16 election to request an assurance is actually
17 stated on the prior page, page Bates 16 at the
18 bottom of the second paragraph.  A recipient may
19 do this before responding to the data request
20 below.
21     Q   All right.  So 20 days -- 20 calendar
22 days after September 24th -- let's see -- six --

Page 72

1  and has come and gone just barely.
2        Are you aware of whether or not the --
3  ██████ ████████ has responded to this letter
4  from OCR?
5        MS. SNYDER:  Objection.  Outside the
6  scope.  If you know, you can answer in your
7  personal capacity.
8        THE WITNESS:  I am not aware of a
9  response.  I would have to contact personnel in
10 OCR to determine the answer to that question.
11 BY MR. SOUTHWICK
12     Q   Who would know the answer to that
13 question?
14        MS. SNYDER:  Again, objection.  You're
15 outside the scope of the deposition topics.
16        If you know the answer in your personal
17 capacity, you can answer.
18        THE WITNESS:  My personal capacity, it
19 would be Melanie Velez, who's the acting
20 enforcement director with, at least up until very
21 recently, oversight responsibility for the
22 Chicago regional office.

Page 73

19 (Pages 70 - 73)

Page 74

1    I could also contact directly the
2 regional director of the Chicago regional office
3 for an update, and I'm happy to do so.
4 BY MR. SOUTHWICK
5    Q    I just want to zero in on the language
6 that you were talking about that -- about
7 exemptions and the language that's included in
8 all OCR letters. I believe that that's referred
9 to on the second paragraph of the first page of
10 this letter that's part of Exhibit 4.
11    Can you read the specific language
12 that's included on all the letters --
13    A    Yes.
14    Q    -- from that paragraph?
15    A    Title IX and its implementing
16 regulation contains several exemptions and
17 exceptions from its coverage. See 20 U.S.C.
18 section 1681(a)(1) through (9); 34 C.F.R.
19 sections 106.11 to 106.15; see also OCR's webpage
20 on exemptions from Title IX. If the particular
21 recipient intends to claim an exemption from the
22 application of Title IX and its implementing

Page 75

1 regulation to this complaint, please contact the
2 OCR staff member identified below. The recipient
3 may do this before responding to the data request
4 below.
5    Q    And so the statement there is not
6 limited to claiming a religious exemption, but is
7 related to any of the exemptions allowed under
8 Title IX; is that accurate?
9    A    That's accurate.
10    Q    So I'm just trying to make sure I
11 understand the process here. So my understanding
12 is that if a regional office receives a Title IX
13 complaint, and it involves an educational
14 institution that may claim a religious exemption,
15 and there's some awareness from the OCR level
16 that they would then forward that complaint to --
17 let me back up.
18    Maybe I could ask it this way: Could
19 you describe the difference in how a complaint
20 will be processed when there is already a
21 religious exemption assurance on file at the
22 Office of Civil Rights versus when there is not a

Page 76

1 religious exemption on file, but one might be
2 claimed in the process?
3    A    If the investigative staff member
4 believes or has a recollection that this
5 particular recipient in the past had requested a
6 religious exemption or believes that there may be
7 a religious exemption issue with regard to that
8 particular recipient, based on the individual's
9 knowledge, that investigative staff member would
10 reach out -- would not send a complaint anywhere.
11 It would reach out to our program legal group,
12 the Title IX group in program legal, and
13 request -- first of all, request: Was there an
14 assurance of religious exemption that issued, and
15 if so, please send me a description of -- of the
16 nature of the assurance.
17    If there was an assurance issued, the
18 program legal group staff member will share the
19 assuring letter from the assistant secretary with
20 the investigative staff member, who will then
21 analyze the allegations before him or her and
22 determine preliminarily whether the assurance he

Page 77

1 or she has in hand at this point covers those
2 allegations.
3    If it does, the investigative staff
4 member -- member will propose to dismiss the
5 complaint for lack of subject matter
6 jurisdiction. That proposed dismissal will be
7 forwarded to headquarters for review by the
8 headquarters group.
9    If there is an exemption in place that
10 PLG communicates with the investigative staff
11 member, but it does not clearly cover the
12 allegations that the investigator has in hand,
13 the investigator will open the case -- will
14 propose opening the case for investigation and
15 will send a copy of this draft letter, tailored,
16 of course, to the particular recipient, saying
17 we're opening this case, this is the data we
18 need.
19    It will contain the language I just
20 read about the exception and exemption and the --
21 you don't have to respond to the data request if
22 you intend to move forward with a request for an

20 (Pages 74 - 77)

1  assurance.  That will get sent up to headquarters
2  as well as a proposed opening, as the ▮▮▮▮▮
3  letter was, and a decision will be made by the
4  assistant secretary in consultation with the
5  headquarters group to say, yes, issue the letter
6  or, for some reason -- I don't know what -- might
7  say we need more before we can do so.
8      Q   I'd like to go back to Exhibit 2, which
9  is the chart and -- it should be in the marked
10  exhibits, Exhibit 2.
11      My question on Exhibit 2 is for any of
12  these --
13      MR. DAVIS:  I'm sorry.  Hold on.  I'm
14  sorry.  It's still loading on his computer.
15  Apologies.
16      THE WITNESS:  I have it now.
17  BY MR. SOUTHWICK
18      Q   All right.  On Exhibit 2, which
19  contains the list of the docket numbers for all
20  of the administrative complaints involving
21  plaintiffs in this case, my question is:  For any
22  of these complaints listed on this Exhibit 2, has

Page 78

1  a request been made to the program legal group to
2  provide information regarding an assurance of
3  exemption for the underlying educational
4  institution?
5      A   I do not know the answer to that
6  question.  I would have to consult with personnel
7  in OCR to make that determination.
8      Q   And who at OCR would be able to provide
9  that information to you?
10      A   I would -- I would pose the question
11  first to Melanie Velez, the acting -- the
12  enforcement director who was consolidating
13  information for this litigation.
14      Q   Did you talk with Melanie in
15  preparation from your -- for your deposition
16  today?
17      A   I did, yes.
18      Q   But you didn't ask her about whether or
19  not any of these complaints had approached the
20  program legal office for an assurance of
21  exemption?
22      A   That's correct.  I did not ask that

Page 79

1  question of Melanie.
2      Q   Other than Melanie, who else did you
3  meet with in preparation for your deposition
4  today?
5      A   I -- from OCR, I met with Alice Yao,
6  Y-A-O.  Alice is the team leader of our Title IX
7  team in the program legal group.
8      I met with all the counsel before you
9  today as well from -- both from -- from DOJ and
10  OGC.  Actually, it was an additional attorney
11  from OGC who is not present today that I also met
12  with.
13      Q   How many meetings did you have to
14  prepare for your deposition today?
15      A   I had meetings every day this week, and
16  I had telephone conversations last week.  I don't
17  recall the exact number, but I certainly had, I
18  believe, a couple of telephone conversations last
19  week in preparation for this.  And then I met in
20  person every day this week.
21      Q   Could you approximate the number of
22  hours in total that you spent preparing for this

Page 80

1  deposition in terms of your meetings and phone
2  calls?
3      A   Between 22 and 25 hours, I would
4  estimate.
5      Q   And other than what's contained in the
6  binder, electronic copy of which was provided to
7  us, did you review any documents or e-mails,
8  communications, in preparation for your
9  deposition today?
10      A   I reviewed an e-mail communication --
11  I'm just trying to remember.  An e-mail
12  communication with Alice Yao.
13      Q   What was the nature of that
14  communication?
15      A   It was a communication asking her
16  whether we kept -- whether the PLG OCR website
17  kept a publicly-facing list of recipients that
18  have received assurances of religious exemptions.
19      Q   And did you find out the answer to that
20  question?
21      A   The answer is -- is no, that there is a
22  publicly -- what is publicly available is not a

Page 81

21 (Pages 78 - 81)

1  list, but somewhere on the website that I have
2  never navigated myself, so I can't tell you
3  exactly where, but on the website, there are the
4  letters requesting assurances and the letters of
5  assurance.
6    Q    Is that up to date as far as you know?
7    A    I do not know that.
8    Q    Other than the e-mail correspondence
9  with Alice Yao and the documents in the binder,
10  did you review any other documents or
11  correspondences in preparation for your
12  deposition?
13    A    I did not.
14    Q    In the -- how long is the evaluation
15  stage of an OCR complaint supposed to take?
16    A    There's no requirement in any of OCR's
17  documentation or memos to staff about a period of
18  time limit for evaluation stage or even a
19  recommendation that you should do your evaluation
20  within X number of days.  OCR --
21    Q    As the enforcement officer, do you --
22  do you have any -- do you have any guides, or do

Page 82

1  you just let them kind of at will take however
2  long they want?
3    A    The guide we have -- and this is
4  actually something that's articulated in
5  documents, including in performance plans for all
6  investigative staff, all the way up to my own
7  responsibility.
8        The guide we have is a government
9  performance -- it's -- it's called -- it's the --
10  the acronym is GPRA.  It is an act from decades
11  ago about requiring agencies to set certain
12  productivity goals.
13        Our productivity goal in OCR is that
14  80 percent of the complaints received by OCR are
15  to be resolved within 180 days of receipt.
16        There is a second goal closely related
17  to that that is also published and a part of
18  everyone's performance plan that states that no
19  more than 25 percent of OCR's docket may be over
20  180 days old.
21        So there is that larger goal for the
22  complete resolution of a case, however a case is

Page 83

1  resolved.  It might be resolved by dismissal.  It
2  might be resolved through an insufficient
3  evidence finding.  It might be resolved because
4  we found a violation and entered into a
5  resolution agreement, or we believe there might
6  be a violation but don't have enough evidence to
7  prove it yet, but we still want the recipient to
8  engage in certain activities to correct what is a
9  concern that we've articulated.  That needs to be
10  accomplished within -- according to that
11  particular goal, within 180 days of the filing of
12  the complaint.
13        So while there is no articulated
14  standard for you must complete your -- your
15  evaluations within a fixed period of time, the
16  GPRA goal, which is part of everyone's
17  performance plan and against which, at least
18  partially, significantly, all staff are measured,
19  stands as the motivator, if you will, to move
20  expeditiously in evaluating cases, because the
21  longer a case stays in evaluation -- and during
22  the evaluation stage, an important point to note

Page 84

1  is that in evaluation, generally speaking, not
2  every single instance, but generally speaking, in
3  the vast majority of complaints, there is no
4  communication yet with the recipient.  We have
5  not -- we have not reached out to a recipient
6  until we formally open the case.  They don't know
7  that somebody has filed a complaint against it
8  until we've actually issued a letter of
9  notification.
10        So the longer we're in the phase where
11  we're only speaking to the complainant, we -- if
12  we have enough information, that detracts from
13  the number of days you're going to have to engage
14  with the recipient in what is actually the most
15  meaningful part of an investigation, which is the
16  back and forth with both parties, to complete
17  your investigation within 180 days.
18        So there is -- there's an incentive to
19  work through evaluation expeditiously.  There are
20  reasons why that doesn't happen, a variety of
21  those, but generally speaking -- and I use
22  generally very intentionally here -- there's an

Page 85

22 (Pages 82 - 85)

1  incentive to investigations should not be taking
2  up an extraordinary amount of that time that
3  might be better used in an investigation if we,
4  in fact, open a case for investigation.
5      Q   Do you have any internal benchmarks or
6  goals for the evaluation period in terms of time
7  to process?
8      A   There are no enforcement-wide goals for
9  that.  Regional offices may have their own
10 internal goals for their particular office staff
11 depending on the nature of the complaints they
12 have and the -- the number of complaints the
13 office is dealing with.  They may have those.  I
14 am not aware of any that I can tell you about
15 now.
16      But there are no goals articulated from
17 headquarters, from me or from anybody at
18 enforcement about here are stages that you should
19 try to meet or must meet in the evaluation
20 process.
21      Q   How is OCR performing in terms of
22 meeting that 80 percent within 180 days?

Page 86

1      MS. SNYDER:  Objection.  You're outside
2  the scope of the deposition topics.
3      If you know the answer, you can -- you
4  can answer in your personal capacity.
5      THE WITNESS:  I know the answer because
6  I just reviewed our end of fiscal year data, and
7  we -- and all of -- all of the regional offices
8  met that goal, that particular GPRA goal, this
9  year.
10 BY MR. SOUTHWICK:
11      Q   And just so that I have it and the
12 court reporter, can you spell out the acronym
13 for GPRA?
14      A   Government performance rating --
15 results act.  Government Performance Results Act,
16 I believe.  And I don't know --
17      Q   Okay.
18      A   -- the year of its enactment.
19      Q   Okay.  So like --
20      A   We're --
21      (Inaudible crosstalk.)
22      Q   -- G-P-R-A --

Page 87

1      A   I'm sorry.  I'm sorry.
2      Q   G-P-R-A is what we're looking at in
3  terms of --
4      A   G-P-R-A.  G-P-R-A.
5      Q   Is there an average amount of time that
6  it takes to complete the evaluation stage of a
7  complaint?
8      A   There is.
9      Q   Would you describe that?
10     A   This year -- this year, it was 73 days.
11     Q   I'd like to ask about the timeliness --
12 not the timeliness of processing the complaints,
13 but now going to the timeliness of the complaint
14 itself.
15     And is it accurate that the general
16 window is 180 days from the last discrimination
17 in order to file a timely complaint with OCR?  Is
18 that accurate?
19     MS. SNYDER:  I'm going to object as
20 outside the scope of the deposition.
21     If you know, you can answer in your
22 personal capacity.

Page 88

1      THE WITNESS:  Yes, that is -- that is
2  accurate, what you just stated, Mr. Southwick.
3  BY MR. SOUTHWICK:
4      Q   And then according to the Processing
5  Manual, there's also a procedure to request a
6  waiver, so if we could go ahead and take a look
7  at that.  So that's getting us --
8      A   That's Section 107 of the CPM.
9      Q   Sorry.  My screen is thinking.  All
10 right.  Okay.  So we're looking at Section 107
11 there?
12     A   That's correct.
13     Q   All right.  So I'd like to ask you a
14 couple questions.  We're on Exhibit 3, which is
15 the OCR Processing Manual.  We're looking at
16 Section 107, which is determining whether a
17 waiver should be granted.  I've got the language
18 right in front of me.  I'm going to ask you some
19 specifics there.
20     But can you tell me generally what the
21 waiver process -- what's the purpose of that
22 process and --

Page 89

23 (Pages 86 - 89)

Page 90

1      MS. SNYDER:  Objection.  You're outside
2  the scope of the topics.
3      If you know the answer, you can answer
4  in your personal capacity,
5      THE WITNESS:  Generally, the purpose of
6  that process is to ensure that complainants with
7  certain requests for waivers in certain
8  situations that we deem appropriate still have
9  the ability to file a complaint and have it
10  processed by OCR as opposed to having it
11  dismissed for lack of timeliness.
12  BY MR. SOUTHWICK
13     Q   There are some particular grounds, and
14  like I said, I'm going to ask you about those,
15  but I wanted to know:  Is there -- is there a
16  policy or practice when looking for a waiver --
17  does it matter whether it's 181 days versus 18
18  years, or is that -- is there kind of a zone in
19  which waivers are more readily granted than --
20  than in other cases?
21      MS. SNYDER:  Objection.  Again, outside
22  the scope.  Additionally, it is an ambiguous

Page 91

1  question and speculative.
2      But if you know the answer in your
3  personal capacity, you can respond in -- in that
4  capacity.
5      THE WITNESS:  A request for a waiver
6  could be made in either of the circumstances you
7  just described, Mr. Southwick.
8      I cannot say -- I would be speculating
9  what the result of that request would be, but I
10  will tell you in my personal capacity, it would
11  be hard to imagine that somebody could have a
12  sufficient basis for a waiver to be granted if we
13  received a complaint 18 years after the last
14  alleged act of discrimination, just my
15  observation and years of experience in OCR.
16  BY MR. SOUTHWICK
17     Q   I'd like to ask again on Section 107,
18  and I'd like to ask you in your representative
19  capacity.
20      How does OCR approach waivers when the
21  act of discrimination is outside of the 180 days,
22  but is within one year of the discrimination?

Page 92

1      MS. SNYDER:  Again, objection.  You're
2  outside the topics of the 30(b)(6) deposition.
3      If you know the answer, you can answer
4  in your personal capacity.
5      THE WITNESS:  OCR approaches a request
6  for waiver the same way regardless -- there is --
7  there is -- there is not a provision, written or
8  unwritten, that says if -- if the -- if the
9  complaint is untimely but within one year that it
10  will give any special deference to it.  No, that
11  doesn't exist.  The waiver request must be made.
12  We will listen to the reasons for the request for
13  waiver and make a determination accordingly.
14      But there's no extra weight given to a
15  request if something's -- at least no formal or
16  even informal that I'm ever -- have ever been
17  aware of extra weight given to something that's
18  occurred past the deadline, but within one year.
19  BY MR. SOUTHWICK
20     Q   Wouldn't you agree that it's more
21  likely that OCR would grant a waiver if it was at
22  181 days than the 18 years?

Page 93

1      MS. SNYDER:  Objection.  Again, you're
2  outside the scope.  It's also a speculative
3  question.
4      If you -- if you know the answer, you
5  can answer in your personal capacity.
6      THE WITNESS:  That calls for
7  speculation that I just can't make,
8  Mr. Southwick.  As I said before, we evaluate all
9  waiver requests objectively and make
10  determinations there that way.
11  BY MR. SOUTHWICK
12     Q   Do you keep any data on waiver requests
13  in terms of how many are made, how many are
14  granted, what percentage are granted?
15      MS. SNYDER:  Again, objection.  Outside
16  the topics of the 30(b)(6) deposition.
17      You -- you can answer in your personal
18  capacity if you know.
19      THE WITNESS:  We don't --
20      MR. SOUTHWICK:  Counsel, we can -- we
21  can discuss later off the record, but these
22  objections, I'm not understanding them.  These

1  are pretty consistent with the scope of the
2  deposition as outlined.  We're talking about the
3  OCR Processing Manual, but we can -- we can talk
4  about that further later.
5  BY MR. SOUTHWICK:
6      Q   Go ahead and respond to the question,
7  Mr. Wills.
8          MS. SNYDER:  My -- just to be clear, my
9  objection stands, and I'm happy to discuss
10  whatever you'd like off the record.
11         THE WITNESS:  OCR does not maintain a
12  data set where we can determine -- you know, go
13  in and punch in some information and get a list
14  of cases for which a waiver was requested and the
15  basis of that waiver.
16         That will be recorded in a case file,
17  but it's -- it's not something that we could
18  access reading through individual case files.
19  BY MR. SOUTHWICK:
20      Q   And when we're looking at Exhibit 2,
21  which is the chart of the OCR complaints, it
22  indicates that there are waiver requests and that

Page 94

1  they are all pending; is that accurate?
2      A   Yes, that is accurate.
3      Q   Is the -- is the initial OCR
4  investigator empowered to make a timeliness
5  waiver determination, or does that go higher up
6  the chain?
7      A   Based on the directive from
8  headquarters that we spoke of earlier today, the
9  investigator would be empowered to make a
10  recommendation regarding a waiver or a
11  recommendation regarding timeliness or lack
12  thereof, but that recommendation would need to go
13  forward based on the earlier directive that was
14  delivered orally to the headquarters group for
15  review and assent.
16      Q   Ordinarily, though, when there's not a
17  sensitive or a case of interest, if it's just a
18  regular case, who is empowered to make the
19  timeliness determination?
20         MS. SNYDER:  Objection.  Again, outside
21  the topics and the scope of the 30(b)(6)
22  deposition.  If you -- if you know the answer,

Page 95

1  you can testify in your personal capacity.
2          THE WITNESS:  Yes.  Ordinarily, that
3  determination is made by -- a recommendation is
4  still made by the investigator staff member, the
5  investigative attorney, but that would need to be
6  confirmed and agreed to by the -- a supervising
7  attorney in the office.  Generally, it will be a
8  team leader.
9          There are occasions where a request or
10  a request for waiver is particularly complex that
11  a chief attorney in the office might review it as
12  well before -- in determining whether it could go
13  forward.  That would be made at the office level,
14  but at the very least, a supervisor would have
15  eyes on that request and have to agree to its
16  issuance.
17  BY MR. SOUTHWICK:
18      Q   Does OCR consider a waiver based on the
19  COVID-19 pandemic -- would it consider a request
20  for a waiver on that basis?
21         MS. SNYDER:  Objection.  Again, outside
22  the topics for the 30(b)(6) deposition.

Page 96

1          If you know the answer, you can testify
2  in your personal capacity.
3          THE WITNESS:  I would have to look back
4  in order to -- I can't answer that question right
5  now.  I would have to look back to see whether --
6  how -- how we handled -- and I think it changed
7  over time how we handled issues with complainants
8  and COVID issues.
9          I recall one complaint that we had
10  where a complainant had been very ill with COVID,
11  and we had a great deal of discussion about a
12  waiver, which arguably could have fit into
13  Section 107(b), unable to file a complaint
14  because of incapacitating illness.
15         But beyond that recollection on my
16  part, I would have to consult to see whether
17  we've dealt with COVID and complainants in any
18  other way.  That was particularly salient because
19  of the illness that was caused by COVID or at
20  least exacerbated by COVID.
21  BY MR. SOUTHWICK:
22      Q   Does the Office of Civil Rights

Page 97

25 (Pages 94 - 97)

Randolph Wills 30(b)(6) - October 21, 2021

**Page 98**

1  currently consider complaints based on sexual
2  orientation or gender identity discrimination to
3  be -- does OCR consider itself to have subject
4  matter jurisdiction over complaints involving
5  sexual orientation and gender identity
6  discrimination under Title IX?
7      A   Yes, it does.
8      Q   And when did it make that
9  determination?
10     A   The determination -- let me back up.
11     MS. SNYDER:  Actually, let me object.
12  Again, I think you're beyond the scope of the --
13  of the topics.
14         But if you know in your personal
15  capacity, you can answer in that capacity.
16         THE WITNESS:  Even years ago, OCR would
17  accept cases involving sexual harassment, sexual
18  assault, that involved an LGBTQ student.  That
19  was not an issue in any of the administrations
20  I've worked in.
21         After Bosworth [sic], even in the last
22  administration, we determined that in other

**Page 99**

1  areas, we would accept jurisdiction because of
2  the interpretation of Bosworth [sic] under --
3  under Title IX, prohibition against sex
4  discrimination, for sexual orientation gender
5  identity complaints.
6         But in the harassment context, we --
7  that -- we've for some time dealt with LGBTQ
8  issues.
9  BY MR. SOUTHWICK
10     Q   And just to clarify, are you referring
11  to the Supreme Court decision from 2020, the
12  Bostock decision?
13     A   Yes.
14     Q   So prior to the Bostock decision, the
15  Office of Civil Rights would not accept a
16  complaint of discrimination based on sexual
17  orientation or gender identity under Title IX
18  unless it had to do with harassment or that --
19  that sort of a thing?
20     MS. SNYDER:  Again, objection.  You're
21  outside the topics for the 30(b)(6) deposition.
22         But if -- if you know the answer in

*Objection: FRE 802  99:14-22*

**Page 100**

1  your personal capacity, you can answer in that
2  capacity.
3         THE WITNESS:  We accepted complaints
4  filed by, for example, transgender students,
5  for -- for example, access to facilities in
6  schools, under the Obama administration.  That
7  was certainly one of the first areas that we
8  moved into.  We accepted those complaints
9  under -- under the rubric of sex.
10        As you may know, that was -- that
11  policy was rescinded at the beginning of the
12  Trump administration, and we are now accepting
13  those complaints again.
14  BY MR. SOUTHWICK
15     Q   But there was a period roughly between
16  2017 and 2020 where complaints relating to access
17  to restrooms or housing, locker rooms, for
18  transgender students would not have been accepted
19  within the subject matter jurisdiction of OCR; is
20  that right?
21     MS. SNYDER:  Again, objection.  You're
22  outside the topics on the 30(b)(6) notice.

*Objection: FRE 802; 100:1-101:20*

**Page 101**

1         But if you know -- if you know, you can
2  answer in your personal capacity.
3         THE WITNESS:  In my personal
4  recollection, that is correct.
5  BY MR. SOUTHWICK
6     Q   What about with respect to a student
7  denied admission or expelled because of a
8  same-sex marriage during the Trump
9  administration?  Would the Office of Civil Rights
10  have accepted a complaint within its subject
11  matter jurisdiction on that basis?
12     MS. SNYDER:  Again, objection.  You're
13  outside the topics of the 30(b)(6) deposition.
14         If you know, you can answer in your
15  personal capacity.
16         THE WITNESS:  I can answer only
17  according to my personal belief, and my belief is
18  that the -- under those circumstances, that
19  administration would not have accepted that
20  complaint for processing.
21  BY MR. SOUTHWICK
22     Q   In making waiver decisions, will the

*Objection FRE 802, 701  101:6-19*

26 (Pages 98 - 101)

1 Office of Civil Rights consider the fact that
2 students who experienced gender identity or
3 sexual orientation discrimination that was not
4 within the subject matter jurisdiction of OCR
5 during the Trump administration -- will it
6 consider those as a factor in making a timeliness
7 decision or a waiver decision?
8     MS. SNYDER: Objection. Again, outside
9 the topics of the 30(b)(6) deposition.
10     If you know, you can answer in your
11 personal capacity.
12     THE WITNESS: The question is -- it's a
13 hypothetical one that's so fact specific --
14     MS. SNYDER: And I'm sorry.
15     THE WITNESS: -- and --
16     MS. SNYDER: Let me -- let me just
17 finish. It's also speculative and ambiguous.
18     But, again, you can answer in your
19 personal capacity if you're able.
20     THE WITNESS: I'm actually not able to
21 answer that in my personal capacity. I don't --
22 I don't know, and I won't speculate as to how

1 that particular factual situation that you
2 hypothesized would be dealt with in a -- in a
3 waiver context.
4 BY MR. SOUTHWICK
5     Q   But don't we have those exact issues in
6 front of the Office of Civil Rights right now in
7 multiple complaints that are on Exhibit 2?
8     MS. SNYDER: Objection. Again, you're
9 outside the topics of the 30(b)(6) deposition.
10     If you know, you can answer in your
11 personal capacity.
12     THE WITNESS: I'd just note that all of
13 those complaints are pending and in process, and
14 I really cannot speculate as to what the result
15 of that process will be.
16 BY MR. SOUTHWICK
17     Q   Has the headquarters group been
18 approached regarding any of the complaints listed
19 in Exhibit 2 with respect to waiver or timeliness
20 issues?
21     A   No, we have not.
22     Q   Do you know whether a waiver will be

1 granted in any of the cases listed on Exhibit 2?
2     MS. SNYDER: Objection. You're asking
3 a speculative question, and it's also outside the
4 scope of the 30(b)(6) deposition.
5     It's also potentially deliberative, and
6 as a result, you know, to the extent he has
7 non-privileged information in his personal
8 capacity, he can answer the question in that
9 capacity, leaving out any privileged information.
10 BY MR. SOUTHWICK
11     Q   Mr. -- Mr. Wills -- Mr. Wills, you are
12 here to testify today on behalf of the Department
13 of Education, and one of the topics is the status
14 of the complaints listed on Exhibit 2. And so
15 what I'm trying to get an understanding of is
16 when are we going to find out whether timeliness
17 waivers are going to be granted for any of the
18 complaints on Exhibit 2.
19     Can you answer that question?
20     A   That's a different question. That
21 question was when, and the prior question was
22 whether.

1     I can't answer that question because we
2 are in process, and the process needs to move to
3 its conclusion. There will be -- there will be a
4 determination made. I cannot tell you when that
5 will be. That calls for speculation on my part
6 that I simply can't make.
7     The process is right now at the
8 regional office level. There are -- regional
9 office level. There will have to be a
10 recommendation from an investigative staff member
11 that is approved, ultimately, by the director of
12 that office to go forward.
13     It will make its way -- it will go to
14 the headquarters group, and, you know, we'll
15 review the determination, the proposed
16 determination, and make a decision at that point.
17     But I cannot tell you when that will be
18 or whether -- or what the determination will be.
19 Each one is fact specific. We will be looking
20 closely at whatever facts are adduced to support
21 the waiver and make the best decision --
22     Q   Have any --

27 (Pages 102 - 105)

1    A   I'm sorry.
2    Q   Have any recommendations been made with
3   respect to waivers for any of the complaints
4   listed in Exhibit 2?
5    A   The headquarters --
6       MS. SNYDER:  Objection.
7       THE WITNESS:  Sorry.
8       MS. SNYDER:  Vague.
9       THE WITNESS:  The headquarters group
10   has not received any recommendations.  I do not
11   know whether recommendations have been made yet
12   within the regional offices.
13   BY MR. SOUTHWICK:
14    Q   And who would know that information?
15    A   I would consult first with Melanie
16   Velez.  I suspect she may not even have that
17   information, but she -- she would be the person
18   who would reach out to the offices to make that
19   request.
20    Q   Putting the waiver issue aside -- so
21   I'm not going to be asking this question about
22   waiver, but it still is about timeliness -- have

Page 106

1   any timeliness recommendations been made by OCR
2   staff with respect to any of the complaints
3   listed in Exhibit 2?
4       MS. SNYDER:  Objection.  I believe
5   you're outside the scope of the 30(b)(6)
6   deposition.  Moreover, the question is ambiguous.
7       If -- if you know, you can answer in
8   your personal capacity.
9       THE WITNESS:  Based on my personal
10   knowledge, no.  Headquarters -- the headquarters
11   group has not -- has not yet received any
12   recommendations regarding timeliness.
13   BY MR. SOUTHWICK:
14    Q   And so who would have that knowledge
15   about timeliness recommendations regarding these
16   complaints?
17       MS. SNYDER:  Again, objection.  The
18   question is vague, calls for speculation, and is
19   outside the scope of the 30(b)(6) topics.
20       If you know the answer, you can answer
21   in your professional capacity -- or excuse me.
22   If you know the answer, you can answer in your

Page 107

1   personal capacity.
2       THE WITNESS:  In my personal capacity,
3   that -- that information, if it is available,
4   if -- if a recommendation has been made at the
5   regional office level regarding timeliness, the
6   regional office director would -- would be aware
7   of that.  I am not.  The headquarters group is
8   not.
9   BY MR. SOUTHWICK:
10    Q   Did you speak with any regional office
11   directors in preparation for your deposition
12   today?
13    A   I did not.
14    Q   Why not?
15       MS. SNYDER:  Objection.
16       THE WITNESS:  I'm sorry to keep -- I'm
17   sorry --
18       MS. SNYDER:  Sorry.  Objection.  I feel
19   like you might be asking privileged information.
20   Can we take a break to consider that, please,
21   before he answers?
22       MR. SOUTHWICK:  Sure.  It's fine with

Page 108

1   me.
2       VIDEO TECHNICIAN:  We are going off the
3   record at -- are we going off the record,
4   Counsel?  Sorry.
5       MR. SOUTHWICK:  Yeah, it's okay.
6       VIDEO TECHNICIAN:  Thank you.
7       MR. SOUTHWICK:  We can go off the
8   record.
9       VIDEO TECHNICIAN:  We are going off the
10   record at 12:24.
11       (Recess 12:24 p.m. to 12:35 p.m.)
12       VIDEO TECHNICIAN:  We are back on the
13   record, and the time is 12:35.  Please proceed.
14   BY MR. SOUTHWICK:
15    Q   Mr. Wills, you took a break at the
16   request of counsel.  Are you prepared to answer
17   the question that was pending right before the
18   break?
19       MS. SNYDER:  So I believe the question
20   was why didn't he consult with somebody during
21   the prep, and we are going to object to that
22   question.  We believe it calls for potentially

Page 109

28 (Pages 106 - 109)

**Page 110**

1  privileged information in the form of
2  attorney-client privilege or possibly attorney
3  work product, and as a result, we're going to
4  advise him not to answer.
5  BY MR. SOUTHWICK:
6      Q    So, Mr. Wills, I don't want to know any
7  attorney-client privileged communications. I'm
8  not asking about that. Outside of anything
9  that's attorney-client privileged, can you
10  respond to my question as, you know, why didn't
11  you prepare by talking to regional directors if
12  so much of this information is available from the
13  regional directors?
14      MS. SNYDER:  Again, I'm going to
15  object. I believe you're asking a question that
16  calls for privileged information, potentially, or
17  would be attorney work product, and I'm going to
18  advise him not to answer.
19  BY MR. SOUTHWICK:
20      Q    Are you going to follow that
21  instruction, Mr. Wills?
22      A    I'm going to follow that instruction,

**Page 111**

1  Mr. Southwick.
2      Q    Mr. Wills, would you expect the OCR
3  80 percent within 180 days standard or goal that
4  we've been discussing -- would you expect that to
5  apply to the complaints that are listed on
6  Exhibit No. 2?
7      A    Yes. It applies to all of our
8  complaints.
9      Q    So it looks to me like most of the
10  complaints that are listed on Exhibit 1 -- excuse
11  me -- Exhibit 2, the chart, that the vast
12  majority of these were filed in late July.
13      There's a couple that are outside of
14  that time frame, but by in large, we're looking
15  at late July. And so we're -- we're three months
16  in, I think, July, August, September, October.
17  So, yeah, we're about three months out from most
18  of these complaints, and timeliness
19  determinations have not been made with respect to
20  any of them.
21      Is that unusual?
22      MS. SNYDER:  Objection. Vague.

**Page 112**

1  Similarly, I believe you're outside the topics of
2  the 30(b)(6). If you know the answer, you can
3  answer in your personal capacity.
4      THE WITNESS:  In my personal capacity,
5  that is not -- I'm not understanding yet what
6  your term unusual means, but in my understanding,
7  that is not unusual. There are any number of
8  complaints that are in evaluation for at least
9  that period of time, hence the average being 72.
10  We have many thousands of complaints.
11  BY MR. SOUTHWICK:
12      Q    But you would expect that, you know,
13  approximately 80 percent of these would have a
14  conclusion to the evaluation stage within the
15  180-day time frame; is that correct?
16      A    That is the goal that's -- we are
17  always striving to meet, yes. That's the first
18  GPRA goal.
19      Q    Mr. Wills, are you aware that certain
20  regional offices began scheduling interviews with
21  several of the complainants earlier in the
22  summer, but then canceled those interviews,

**Page 113**

1  canceled or postponed them? Are you aware of
2  that?
3      A    I am aware of that.
4      Q    Do you know why that occurred?
5      A    I'm sorry, sir. I didn't understand
6  the question. Could you repeat it?
7      Q    Do you know why that occurred, why the
8  cancellations and postponements?
9      A    Yes, I do. It was born of the fact
10  that we had received a number of complaints
11  raising very similar issues against what might be
12  religious institutions. A number of regional
13  offices had informed their appropriate
14  enforcement director, who's a headquarters staff
15  member, that these complaints were coming in,
16  and, indeed, we now have the 36 that we have.
17      But as a result of a number of these
18  complaints coming in, some of them simultaneously
19  to a variety of regional offices, we wanted to be
20  sure that the regional offices would respond
21  consistently and that we were handling these
22  cases -- and they're not identical cases, but

1 they're raising very similar issues. We wanted
2 to be sure that we handled these cases -- we
3 approached the handling and evaluation and
4 investigation of these cases consistently.
5      That is something we have done in other
6 situations involving other types of cases where
7 we have multiple filings coming into an office
8 either from a single filer or from a couple of
9 filers, but they're raising identical issues and
10 it's clear that the -- or it appears to be clear
11 that the cases are related. We have consistently
12 developed approaches to how we're going to deal
13 with those cases going forward. We did that in
14 this case as well.
15      And while we were trying to move
16 forward appropriately and prudently, we paused
17 that -- those interviews in those regional
18 offices that had already been set up, and we
19 said, pull back from those, we will get back to
20 you once we have made a determination that we are
21 going to move forward.
22      We have since made that determination

Page 114

1 that we are going to move forward with interviews
2 where the regional offices deem that an interview
3 is necessary in order for us to have appropriate
4 information to evaluate the complaint.
5      Q   Have any of the educational
6 institutions that are involved in the complaints
7 listed on Exhibit 2 been contacted by OCR with
8 respect to these complaints?
9      A   I don't know. I don't believe so, but
10 I don't know.
11      Q   And who would know that information?
12      A   The regional office where the
13 complaints were filed.
14      Q   And notes from interviews are required
15 to be kept pursuant to the OCR Processing Manual;
16 is that correct?
17      A   That is correct.
18      Q   And are those notes -- are those notes
19 generally available through a FOIA request?
20      MS. SNYDER: Objection. Again, outside
21 the three topics in the 30(b)(6) deposition.
22      If you know the answer, you can testify

Page 115

1 in your personal capacity.
2      THE WITNESS: While an investigation --
3 an evaluation and investigation is ongoing, those
4 notes are not generally available pursuant to a
5 FOIA request.
6 BY MR. SOUTHWICK:
7      Q   However, they become available at the
8 conclusion of an investigation?
9      MS. SNYDER: Again, objection. It's
10 outside the three topics in the deposition
11 notice. If you know, you can answer in your
12 personal capacity.
13      THE WITNESS: I would have to
14 consult -- in my personal capacity, I would have
15 to consult with our FOIA personnel before I could
16 answer that question.
17 BY MR. SOUTHWICK:
18      Q   So it looks like a number of interviews
19 are now being scheduled with respect to several
20 of the complaints listed on Exhibit 2.
21      What generally happens after that
22 interview stage? You know, what happens next in

Page 116

1 the evaluation process?
2      A   Assuming during the interview stage the
3 information that we needed to gather was obtained
4 and there's no one else we need to -- we would
5 need to reach out to and interview in order to
6 gain access to information we needed, after that
7 process, we would make -- we would propose the
8 next step in the -- in the life of that
9 particular case.
10      That might be a proposal to open the
11 complaint for investigation. It might be
12 proposal to dismiss a complaint for any number of
13 the reasons that have been articulated -- have
14 been set forth in the Case Processing Manual.
15 That would normally be a next step.
16      But I want also to add that these are
17 not steps that are mandated. You know, cases
18 present with varying factual situations. That's
19 the nature of the work we do. Next steps are --
20 are -- are determined on a case-by-case basis.
21 But that, generally speaking, is where we would
22 be assuming we obtained enough information to

Page 117

30 (Pages 114 - 117)

1   move forward to our next step in the case, which
2   would generally be an evaluation of should we
3   dismiss, should we go forward.
4      Q   Does OCR expect that at least some of
5   the complaints listed on Exhibit 2 will require
6   headquarters to make a religious exemption
7   determination?
8        MS. SNYDER: Objection. Speculation.
9   If you know, you can answer.
10       THE WITNESS: I do not know the answer
11  to that the question whether -- whether some of
12  these complaints will require headquarters to
13  make a religious exemption assurance
14  determination.
15  BY MR. SOUTHWICK:
16     Q   Then why did you create this new
17  directive and this new process to address those?
18  Didn't -- didn't you just say that you
19  anticipated that happening?
20     A   You asked whether any of these will.
21  It's entirely possible that -- that some
22  recipients will make those -- those requests for

Page 118

1   assurances, absolutely possible, but I don't know
2   which ones will, if they will.
3        It's also possible that every single
4   one of those recipient institutions may decide
5   not to make a request. I don't know that. But
6   in anticipation of that, we provided what we
7   provided in a letter of notification.
8      Q   I'd like to ask you about what happens
9   after a dismissal based on a religious exemption
10  has been decided by OCR.
11       And I'm going to turn to correspondence
12  relating to George Fox University and Northwest
13  Yearly Meeting of Friends that was produced last
14  night, and I'm going to mark it as an exhibit
15  here. I believe we're on Exhibit No. 5 now.
16       All right. I have now introduced what
17  I have marked as Exhibit No. 5.
18       (Deposition Exhibit Number 5
19       was marked for identification.)
20  MR. DAVIS: Mr. Southwick, it's still
21  loading on our computer. My apologies.
22       MR. SOUTHWICK: All right. Yeah. It

Page 119

1   takes a minute. If -- Mr. Wills, do you have it
2   in front of you, the --
3        THE WITNESS: Not on the computer, but
4   I have -- I have a hard copy.
5        MR. SOUTHWICK: Could you just show me
6   the hard copy, just to make sure we're looking at
7   the same thing? Gotcha. All right. That looks
8   right. Thank you.
9        And, Counsel, let me know when it's
10  loaded on your screen.
11       THE WITNESS: It's up. There we are.
12  Yes, sir.
13       MR. SOUTHWICK: All right.
14       MR. DAVIS: This is --
15       MR. SOUTHWICK: It's up.
16       MR. DAVIS: Is this exhibit five pages?
17  I'm sorry. That says --
18       MR. SOUTHWICK: Exhibit 5 should be 19
19  pages.
20       MR. DAVIS: Nineteen pages. Okay.
21       MS. SNYDER: I have 153 pages.
22       MR. DAVIS: Right.

Page 120

1        THE WITNESS: I have -- yeah.
2        MR. SOUTHWICK: For Exhibit 5 in the
3   Exhibit Share?
4        MS. SNYDER: Yes.
5        MR. DAVIS: Maybe we can refer to the
6   -- if I may make a suggestion to refer to pages
7   by Bates number, because perhaps some of those
8   documents are not on the Exhibit Share. I don't
9   know if they're --
10       MS. SNYDER: No, they aren't.
11       MR. SOUTHWICK: I've only got the 19
12  pages on Exhibit Share.
13       THE WITNESS: Nineteen --
14       MR. SOUTHWICK: You might be looking at
15  the physical copy that had a whole bunch of other
16  stuff in it. I'm introducing Exhibit No. 5 as
17  the version that's the marked Exhibit No. 5 in
18  Exhibit Share. For ease of reference, I will
19  also refer to the Bates number.
20       THE WITNESS: Can we make this bigger?
21  Bigger, bigger, bigger, bigger. Let's see.
22  Enlarge. Okay.

Page 121

31 (Pages 118 - 121)

1    MR. SOUTHWICK:  I'm looking at document
2  ED4, zeros, ending in 1.
3    THE WITNESS:  Yes, that -- four zeros
4  ending in 1 is the document -- the letter dated
5  March 9th, 2015, Paul Southwick, referencing --
6    MR. SOUTHWICK:  Yes.
7    THE WITNESS:  -- George Fox University.
8  BY MR. SOUTHWICK
9    Q    Yes.  And this is a three-page letter.
10  And did you review this correspondence in
11  preparation for your deposition?
12    A    I did.
13    Q    And can you tell me what this letter
14  is?
15    A    This is a letter directed to you
16  regarding George Fox University that recites
17  three conditions that OCR uses to determine
18  whether a recipient is considered to be
19  controlled by a religious organization and thus
20  eligible for a Title IX exemption.  It also
21  recites those three conditions on page 2.
22    And then it explains what the

Page 122

1  University claimed in a letter to OCR regarding
2  its assertion that it's controlled by a religious
3  organization.  The University asserted the
4  University is owned by Northwest Yearly Meeting
5  of Friends and that the University's seven board
6  of trustee members must be Friends.
7    With regard to tenets, the University
8  explained, as relevant to your complaint, that
9  its biblical belief is that human beings are
10  created male and female, and that the University,
11  quote, cannot in good conscience support or
12  encourage an individual to live in conflict with
13  biblical principles.  The University explained
14  that, because of its tenets, it would be unable
15  to accommodate a transgender student's request to
16  use facilities or play on athletic teams
17  consistent with that student's gender identity.
18  On the basis of information contained in that
19  letter, the Assistant Secretary granted an
20  exemption in a letter dated May 23rd, 2014.
21    It goes on to state that in your
22  complaint, you alleged that the University is not

Page 123

1  controlled by NWYM and the University's practices
2  that you challenge in your complaint are not
3  based on NWYM's religious tenets.
4    It further states that because the
5  allegations of your complaint fall within the
6  exemption granted on May 23rd, 2014, and because
7  your complaint has also alleged that the
8  University practices about which you complained
9  are not based on the religious tenets of a
10  controlling religious organization, OCR will
11  contact the religious organization identified by
12  the University.  If the organization provides an
13  interpretation of tenets that has a different
14  practical impact than that described by the
15  University, or if the organization denies that it
16  controls the University, the University's
17  exemption will be rescinded and OCR Seattle will
18  proceed with the processing of your original
19  complaint allegation under a new docket number.
20  We will inform you of the outcome of this
21  process, contact information, signed by Seth
22  Galanter, the then principal deputy assistant

Page 124

1  secretary for OCR.
2    Q    Thank you, Mr. Wills.  To clarify where
3  we're at in this letter, is it fair to say that
4  the Office of Civil Rights received a Title IX
5  complaint from a transgender student against
6  George Fox University and that those complaints
7  have the reference numbers listed at the top of
8  the first page?
9    A    That is correct.
10    Q    And it's further accurate that in
11  response to an assurance of religious exemption,
12  the Office of Civil Rights closed that
13  transgender student's Title IX complaints?  Is
14  that accurate?
15    A    That is also accurate.
16    Q    And then this letter further states
17  that because the student challenged whether or
18  not George Fox was controlled by a religious
19  organization that had religious tenets that would
20  be inconsistent with compliance with Title IX,
21  the Office of Civil Rights was going to go ahead
22  and contact the controlling religious

Page 125

32 (Pages 122 - 125)

1    organization, NWYM.  Is that accurate?
2        A    That is accurate.
3        Q    And specifically that last paragraph on
4    page 2, my question there -- you read it.  It
5    describes what they were going to do.
6            Is this the current OCR policy as well
7    for when a complainant challenges the conclusion
8    that an educational institution is controlled by
9    a religious organization with contrary religious
10   tenets?
11           MS. SNYDER:  Objection.  You've assumed
12   facts that aren't in evidence, and the question's
13   ambiguous.
14           THE WITNESS:  Should I --
15           MS. SNYDER:  You can answer.
16   BY MR. SNYDER:
17       Q    You're still required to respond.
18       A    My -- my -- based on my personal
19   knowledge, that is --
20           MS. SNYDER:  No, no.  You can answer.
21           THE WITNESS:  Oh, I can answer.
22           Yes, it is.

Page 126

1    There's the assistant secretary, obviously a
2    political appointee, a principal deputy assistant
3    secretary, also a political appointee, who would
4    oversee -- for example, if we had a principal
5    deputy assistant secretary now, that person would
6    be my boss.
7        Q    But that -- that position is currently
8    vacant; is that right?
9        A    Yes.
10       Q    Okay.  We can go to the -- page 4 of
11   Exhibit 5, which starts on ED4.00004.
12           Do you see that letter dated March 9th,
13   2015?
14       A    Yes, I do.
15       Q    All right.  It's a somewhat lengthy
16   letter, so I'm not going to ask you to read the
17   whole thing, but could you describe in general
18   what the -- what this letter is?
19       A    In general, this is a letter to the
20   superintendent of the Northwest Yearly Meeting of
21   Friends inquiring as to -- it recites the history
22   of the complaint and the fact that there was a

Page 128

1    BY MR. SOUTHWICK
2        Q    To your knowledge, other than this
3    situation with George Fox University, has OCR
4    gone through this process with respect to any
5    other complaints involving a religious exemption
6    within the time period of 2013 to the present?
7            MS. SNYDER:  Objection.  Vague.
8            THE WITNESS:  To my knowledge, OCR has
9    not gone through this -- a process similar to
10   what it went through with George Fox University
11   by contacting a religious organization, to my
12   knowledge.
13   BY MR. SOUTHWICK
14       Q    On page 3, the letter was issued by
15   Seth Galanter, principal deputy assistant
16   secretary.
17           Can you tell me what the position of
18   principal deputy assistant secretary for OCR --
19   what does that position mean?
20       A    The principal deputy assistant
21   secretary is a political appointee.  He or she is
22   second in command, so to speak, of -- of OCR.

Page 127

1    question raised regarding the control issue with
2    regard to this organization.  And so it's a
3    letter requesting information regarding control
4    that NY -- NWYM has of the university and
5    specific religious -- and also for information
6    concerning specific religious tenets that were
7    asserted in the original case, certainly in the
8    original request for assurance of religious
9    exemption.
10       Q    And so this letter reflects the Office
11   of Civil Rights contacting the denomination that
12   allegedly controlled George Fox University; is
13   that accurate?
14       A    That is accurate.
15       Q    And to your knowledge, has OCR engaged
16   in this process or sent a similar letter on any
17   other occasion?
18       A    To my knowledge, OCR has not engaged in
19   this -- in a similar process or sent a similar
20   letter.
21       Q    And then if we could continue on.  Page
22   7 of Exhibit 5, it starts at ED4.000007, dated

Page 129

**Page 130**

1  March 25th, 2015. This appears to be a
2  five-page -- or actually longer -- nine-page
3  correspondence between the superintendent of
4  Northwest Yearly Meeting and Seth Galanter,
5  Office of Civil Rights.
6        You reviewed this correspondence in
7  preparation for your deposition; is that right?
8     A  Yes, I did.
9     Q  And can you explain in general what
10  this letter is?
11    A  Yes, I can. In general, this is a --
12  pardon me for a second. Scroll up.
13        In general, this is a response to
14  Mr. Galanter's prior request concerning
15  information -- more information about control and
16  religious tenets with regard to the George Fox
17  University, this -- this instant response by the
18  Northwest Yearly Meeting of Friends providing the
19  information requested in Mr. Galanter's prior
20  letter.
21    Q  And then, finally, starting on page 16
22  of Exhibit 5, there is a final correspondence.

**Page 131**

1  And could you -- dated August 19th, 2015, from
2  Catherine Lhamon to Becky Ankeny.
3        Can you describe what this
4  correspondence is?
5     A  Yes. This is correspondence to the
6  Northwest Yearly Meeting of Friends that based on
7  the information that the Northwest Yearly Meeting
8  of Friends provided in response to Mr. Galanter's
9  request, this is the assistant secretary's
10  granting of an assurance of exemption, a
11  religious exemption, based on that information.
12    Q  And do you know why this letter
13  ultimately came from Ms. Lhamon rather than
14  Mr. Galanter?
15    A  I'm hesitating because I'm looking at
16  the date.
17        I believe this is because -- I'm not
18  sure when -- when Catherine Lhamon was confirmed
19  as assistant secretary. It may have been because
20  she had just -- several months prior to being
21  confirmed, but I don't know -- I don't know that
22  for a fact. I would have to consult a variety of

**Page 132**

1  my colleagues to -- to nail that down in terms of
2  dates, but -- or there may be another reason for
3  it. I don't know whether she was unavailable to
4  make the request for information letter. She may
5  have asked her principal to do that. It may have
6  had nothing to do with her confirmation. So I
7  don't know is my answer.
8     Q  The series of correspondence that we've
9  looked at, it discusses a standard for the
10  control test to determine whether or not an
11  educational institution is controlled by a
12  religious organization, and it -- you know, OCR
13  explains the test there, and Northwest Yearly
14  Meeting of Friends provides information in
15  response to that test.
16        Can you tell me what the current
17  control test is that the Office of Civil Rights
18  uses to determine whether or not an educational
19  institution is controlled by a religious
20  organization?
21    A  Yes. The current -- the current
22  control test is set forth at 34 C.F.R. section

**Page 133**

1  106.12. It became effective November 23rd, 2020.
2  And it's in our binder.
3     Q  And do you have an understanding of why
4  the control test changed?
5        MS. SNYDER: Objection. Assumes
6  something that's not in evidence.
7        THE WITNESS: Based on my personal -- I
8  would refer you to the comment and discussion
9  after the rule, where all of the rationale --
10  well, first of all, all the comments, both
11  positive and negative, regarding any change were
12  set forth and where the Department set forth its
13  discussion and rationale for whatever decision it
14  made vis-à-vis the new -- this regulation.
15  BY MR. SOUTHWICK:
16    Q  Is the Department currently considering
17  changing those regulations again?
18        MS. SNYDER: Objection. That's outside
19  the scope of the 30(b)(6) notice, and it's
20  speculative.
21        If you know the answer in your personal
22  capacity, you can answer in that capacity.

34 (Pages 130 - 133)

Page 134

1     THE WITNESS: I do not know the answer
2 in my personal capacity.
3 BY MR. SOUTHWICK
4     Q   To receive the benefit of the religious
5 exemption, the educational institution must meet
6 the control test, but is also required to
7 identify its religious tenets that would conflict
8 with compliance with Title IX; is that correct?
9     A   That's correct.
10     Q   So I was asking you about the control
11 test part. Now I'm going to ask you about the
12 second part, which is the contrary religious
13 tenets.
14         How does OCR determine whether or not a
15 controlling religious organization's religious
16 tenets would conflict with compliance with Title
17 IX?
18     A   To answer that question, I will refer
19 you to a long-standing process in OCR articulated
20 first in earlier memorandum and guidance to OCR.
21 Bear with me. That was first set forth on
22 February 19th, 1985, by Harry Singleton, who was

Page 135

1 the assistant secretary for civil rights at the
2 time. This memorandum is included in your
3 binder.
4         This -- the subject of the memorandum
5 is Policy Guidance for Resolving Religious
6 Exemption Requests. And I'm going to refer you
7 to Bates page 048 under the subheading of tenets,
8 which sets forth the direction given by the
9 assistant secretary to field staff for addressing
10 that issue.
11         And I'll just share what's written
12 here. OCR cannot question what institution
13 representatives claim as their beliefs. Only
14 where one tenet clearly contradicts another could
15 OCR question the institution policies based on
16 those contradictory tenets.
17         And, remember, this is in the context
18 of addressing a complaint that's been filed with
19 OCR alleging discrimination by a religious
20 institution.
21         The guidance -- the basic guidance here
22 is that OCR is not to question -- engage in a

Page 136

1 questioning at that level of the religious tenets
2 articulated by an organization. That deference,
3 if you will, or leniency has been historically
4 how OCR has addressed that particular issue.
5 That hasn't changed over the years, to my
6 knowledge, and I've seen no evidence of that.
7     Q   Is -- this policy which you've just
8 read from in ED2.000048, is that codified in any
9 regulations governing OCR?
10     A   Not to my knowledge.
11     Q   So it's informal, internal guidance?
12         MS. SNYDER: Objection. It's off topic
13 and -- from the 30(b)(6) notice and potentially
14 calls for a legal conclusion.
15         But if -- if you haven't -- if you --
16 if you know in your personal capacity, you can
17 answer in that capacity.
18         THE WITNESS: I would characterize it
19 as OCR's practice, so...
20 BY MR. SOUTHWICK
21     Q   Other than -- and so is your testimony
22 that OCR continues to follow this guidance as

Page 137

1 indicated in this memorandum, the Singleton
2 memorandum from 1985? Is it OCR's current
3 practice to follow this guidance?
4     A   I'm sorry. Could you repeat that?
5     Q   Is it OCR's current practice that it
6 will follow this guidance from the 1985 Singleton
7 memorandum regarding religious tenets?
8     A   With regard to the principles that are
9 set forth here, yes, it will and has.
10     Q   But, ultimately, OCR will make the
11 final determination on whether or not there are
12 contrary religious tenets that excuse compliance
13 with Title IX; is that accurate?
14     A   That is accurate.
15     Q   And that will be made by the assistant
16 secretary for OCR; is that right?
17     A   That's correct. That would be elevated
18 to the assistant secretary's level.
19     Q   In the document that we're looking at,
20 where it talks about unless one tenet clearly
21 contradicts another, what does that mean?
22     A   I don't know what -- what the author of

35 (Pages 134 - 137)

1  this document had in mind by that, and I haven't
2  taken time to imagine what contradictory
3  religious tenets might look like.  So I can't
4  answer that question what does that mean.
5      Q    There's a statement at the end of the
6  paragraph:  Under no circumstances should OCR
7  appear to be interpreting the Bible.
8          Could you explain your understanding of
9  that?
10     A    Again, I don't know what was in the
11 mind of the author of the document, but just
12 looking at the words just recited there, it's a
13 caution to OCR not to engage in theological
14 speculation or reach theological conclusions, and
15 that would include interpreting verses that a
16 recipient might put forward as evidence of a
17 religious tenet or religious belief.  It's --
18 it's very cautionary language, obviously, and, I
19 believe, point of concern for excess
20 entanglement.
21     Q    And if you look at the second
22 paragraph, though, it's talking about whether a

Page 138

1  general assertion of biblical or Christian
2  principles would be sufficient to excuse
3  compliance.
4          Could you read that second paragraph
5  for me there from the tenet section?
6      A    Sure.  Unfortunately, many institutions
7  have not been so clear regarding the tenets of
8  the religious organization as to quote sections
9  of the Bible.  For example, many institutions
10 have requested exemption from the marital and
11 parental status sections of the regulation,
12 106.21(c) 106.40, 106.57 and 106.60.  Several of
13 these institutions state that only these
14 sections -- only -- pardon me.
15         Several of these institutions state
16 only that these sections prevent them from
17 screening students and employees whose behavior
18 is not in accordance with the, quote, Christian,
19 unquote, or, quote, biblical morals, unquote,
20 followed by the institution.  You should accept
21 these very general tenets for those sections of
22 the regulation regarding marital and parental

Page 139

1  status of students and employees.  Section as
2  noted above.  Since the prohibitions in these
3  sections are so specific, for all other sections
4  of the regulation, which are more complex, you
5  should require that the institutions be more
6  specific than to simply claim Christian or
7  biblical morals as tenets.
8      Q    And the statement that you just read
9  there, is that consistent with OCR's current
10 policy and practice on this issue?
11     A    I don't have any examples that I can
12 offer you of where that's been used, but it -- to
13 my understanding, it is still consistent with
14 OCR's -- or OCR's practice is consistent with
15 what's stated here.
16     Q    And then could you read the third
17 paragraph under the tenet section?
18     A    Yes.  In granting an exemption, OCR may
19 reserve its authority by stating that the
20 exemption is limited to the extent that
21 compliance with the Title IX regulation conflicts
22 with the religious tenets followed by the

Page 140

1  institution.  See Tab C, form letter 2, paragraph
2  2.  Excuse me.  This permits a potential
3  complainant an opportunity to dispute those
4  tenets, at which time OCR may contact the
5  appropriate religious organization for an
6  explanation of the practical application of the
7  tenets.
8      Q    And that's what happened with respect
9  to the George Fox complaint and Northwest Yearly
10 Meeting of Friends; is that accurate?
11     A    Yes.  That is precisely what happened
12 with regard to the George Fox University issues.
13     Q    In enforcing Title IX, OCR enforces not
14 just the statute, but the implementing
15 regulations; is that correct?
16     A    That is --
17     Q    And those --
18     A    -- correct.
19     Q    And those concern a number of areas,
20 housing, admissions, sexual assault and
21 harassment and a variety of other regulations; is
22 that accurate?

Page 141

36 (Pages 138 - 141)

**Page 142**

1    A    That's accurate.

2    Q    And is it OCR's understanding that an
3 educational institution can claim a religious
4 exemption to any of those implementing
5 regulations?

6    A    Yes.  It's OCR's understanding that a
7 religious institution can claim an exemption to
8 any of those, yes.

9    Q    And that would include an educational
10 institution being allowed to claim a religious
11 exemption relating to the retaliation
12 regulations; is that correct?

13    A    That is correct.  It could claim an
14 exemption relating to the retaliation.

15    Q    And in that case, the Office of Civil
16 Rights would not provide protections for a
17 student who had been retaliated against for
18 filing a Title IX complaint; is that correct?

19    A    That would be the case only if OCR --
20 it's an assurance of -- of -- an exemption from
21 that particular provision.  The claim is not --
22 you can claim whatever you want to claim.  You

**Page 143**

1 can claim an exemption to any portion of this.
2 OCR -- I believe you'll see in the -- and have
3 seen in the -- in the -- in the comment and
4 discussions to both rules, you'll see that
5 there -- you know, that issue was raised.  I
6 believe the response by the Department at that
7 time was it is skeptical about the viability of
8 such a claim.  There's no indication that such a
9 claim has ever been made.

10    But, again, I want to draw a
11 distinction between yes, you can -- you can
12 assert a claim and you will receive an assurance.
13 That's a very different discussion.  So while you
14 can make that claim, I -- again, as -- as the
15 Department expressed, it is skeptical as to the
16 viability of such a claim.

17    Likewise, asserting -- making a claim
18 for exemption from institution -- recipient
19 institution's obligations under Title IX.
20 There's a Title IX regarding sexual harassment or
21 sex-based discrimination.  No such complaint --
22 no such claim has ever been made, at least

**Page 144**

1 according to the Department in its discussion
2 following the rule, so, likewise -- but the claim
3 certainly could be made.

4    Q    But if an educational institution
5 asserted a religious exemption claiming something
6 along the lines of these allegations or
7 retaliation are actually a form of biblical
8 discipline that we've imposed on a student, and
9 in exercise of biblical discipline, we're
10 requesting a religious exemption from the
11 retaliation provisions, wouldn't the Office of
12 Civil Rights have to abide by the exhortation of
13 the policy guidance from the Singleton memo and
14 defer to the religious educational institution
15 on -- on that point?

16    MS. SNYDER:  Objection.  Your question
17 is -- calls for speculation, is vague.  I -- I
18 believe it's also off the three topics that we've
19 agreed to for the 30(b)(6) deposition.

20    With those objections in mind, if -- if
21 you know the answer, you can answer in your
22 personal capacity.

*Objection;
FRE 802,
403, 602;
611;*

*144:4-145:6*

**Page 145**

1    THE WITNESS:  I do not know the answer
2 because that causes me to speculate on something,
3 and these -- these situations are very fact
4 specific.  I -- I can't speculate as to what
5 OCR's determination would be under those
6 circumstances.

7 BY MR. SOUTHWICK:

8    Q    So in Exhibit 2, you know, we have the
9 complaints of many of the plaintiffs.  That's the
10 chart of complaints.  And several of these
11 complainants are current students, and several of
12 the current students are concerned about
13 retaliation from their educational institutions
14 because they have filed these complaints.

15    As the Office of Civil Rights
16 representative, can you assure them that your
17 office will protect them from retaliation in
18 response to the filing of these Title IX
19 complaints in Exhibit 2?

20    A    OCR can assure them that if they
21 believe they are being retaliated against or were
22 retaliated against that they can file a complaint

**Page 146**

1  with OCR alleging that retaliation and that OCR
2  will evaluate and, if appropriate, investigate
3  and resolve that complaint.
4      Q   And could also dismiss that complaint
5  on the basis of the religious exemption if such
6  an exemption was raised and applied; is that
7  correct?
8      MS. SNYDER:  Object -- objection.
9  Speculation.
10      THE WITNESS:  Yeah.  I -- I can't
11  answer that.  It's really calling for speculation
12  that I can't engage in at that point.
13      But I -- I do want to emphasize that --
14  that if a student is retaliated against or has
15  been retaliated against, they have that option
16  and would -- I would recommend -- urge them to
17  exercise it, to file a complaint of retaliation.
18      MS. SNYDER:  Paul?
19      MR. SOUTHWICK:  Yes.
20      MS. SNYDER:  Yeah.  Sorry.  It's about
21  1:30 here.  I'm just wondering -- I don't want
22  to him to fade away on us, so -- it's past our

*Objection; FRE 403, 602, 611; 146:4-17*

**Page 147**

1  lunchtime.  So I'm just wondering kind of what
2  your -- what your schedule is and when you
3  anticipate taking a lunch break.
4      MR. SOUTHWICK:  I couldn't hear the
5  last part, but if you'd like to take a lunch
6  break now, that is fine with me.
7      MS. SNYDER:  No.  Sorry.  I'll try --
8  I'll try this.  Maybe you can hear this way.  I
9  said it's about 1:30.  It's a little -- it's
10  almost 1:30 here, and I just want to make sure
11  that he has something to eat for lunch.  It
12  doesn't have to be this minute if you're in the
13  middle of some questions, but I was wondering
14  what your schedule is.
15      MR. SOUTHWICK:  Yeah, we can take a
16  lunch break now.  How long do you think you'll
17  need for a lunch break?
18      MS. SNYDER:  Hold on for -- just give
19  us a minute.
20      VIDEO TECHNICIAN:  Counsel, would you
21  like to go off the record at this time?
22      MS. SNYDER:  Sorry.  Yeah.  Just give

**Page 148**

1  us two minutes.  Thank you.  Off the record.
2      MR. SOUTHWICK:  Yeah, we can go off the
3  record.
4      VIDEO TECHNICIAN:  Thank you.  We are
5  going off the record at 1:23.
6      (Whereupon, at 1:23 p.m., a
7      luncheon recess was taken.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

**Page 149**

1      A F T E R N O O N   S E S S I O N
2          (2:14 p.m.)
3      VIDEO TECHNICIAN:  We are back on the
4  record.  The time is 2:14.  Please proceed.
5  WHEREUPON,
6          RANDOLPH WILLS
7  was called for continued examination, and having
8  been previously duly sworn, was examined and
9  testified further as follows:
10      EXAMINATION BY COUNSEL FOR PLAINTIFFS
11      CONTINUED
12  BY MR. SOUTHWICK:
13      Q   Mr. Wills, has OCR ever evaluated the
14  impact of the religious exemption to Title IX,
15  the impact of that on LGBTQ students at
16  educational institutions receiving federal
17  financial assistance?
18      MS. SNYDER:  Objection.  That is
19  outside the scope of the three deposition topics.
20      If you know, you can answer in your
21  personal capacity.
22      THE WITNESS:  In my personal capacity,

*Objection: FRE 802; 149:13-22*

38 (Pages 146 - 149)

**Page 150**

1    not to my knowledge would be my response.
2    BY MR. SOUTHWICK:
3        Q    Has OCR ever been presented with
4    information regarding the negative impact of the
5    religious exemption on LGBTQ students?
6        MS. SNYDER:  Again, objection.  That's
7    outside the scope of the 30(b)(6) topics.  But if
8    you know, you can answer in your personal
9    capacity.
10       THE WITNESS:  In my personal capacity,
11   I know that information was provided through the
12   comments, all of which are included in the
13   binder.
14   BY MR. SOUTHWICK:
15       Q    And when you say comments, you're
16   referring to comments submitted during the 2020
17   rulemakings?
18       A    That's correct.  Yes.
19       Q    Were you involved in the evaluation of
20   those comments?
21       A    I was --
22       MS. SNYDER:  Objection.  Outside the

Objection: FRE 802; 150:1-14

**Page 151**

1    scope of the 30(b)(6) notice.  But if you know,
2    you can answer in your personal capacity.
3        THE WITNESS:  I was not involved in the
4    review and evaluation of those comments.
5    BY MR. SOUTHWICK:
6        Q    Earlier we were talking about the
7    process that an educational institution can go
8    through to request an assurance of religious
9    exemption.  I want to ask:  Has OCR ever denied a
10   request for assurance of religious exemption?
11       MS. SNYDER:  Again I'm going to object.
12   That's outside the topics of the 30(b)(6)
13   deposition, but if you know, you can answer in
14   your personal capacity.
15       THE WITNESS:  In my personal capacity,
16   it is my understanding that OCR has not denied a
17   request for assurance of religious exemption on
18   the merits, that is to say based on information
19   provided by a recipient institution.
20       But it's also my understanding that
21   some requests have been received by OCR, and they
22   did not cite to a regulation that existed or they

Objection: FRE 802; 151:6-22

**Page 152**

1    made a request that was unnecessary because their
2    particular situation was covered by another
3    provision in -- in Title IX in the regulation.  I
4    don't know whether I would qualify those as
5    denials, but I'm given to understand that that
6    has happened in the past.
7    BY MR. SOUTHWICK:
8        Q    Are there any other circumstances under
9    which -- under which an assurance did not issue
10   other than those that you just described?
11       MS. SNYDER:  Again, objection.  Outside
12   the topics for the 30(b)(6).
13       But if you know in your personal
14   capacity, you can answer in that capacity.
15       THE WITNESS:  I am not aware of any
16   other circumstances under which an exemption did
17   not issue or an assurance did not issue with
18   regard to a religious exemption.
19   BY MR. SOUTHWICK:
20       Q    Earlier we discussed OCR closing or
21   administratively dismissing the complaint of the
22   transgender student from George Fox University.

Objection; FRE 802; 152:1-6

**Page 153**

1    Do you recall our earlier discussion about that?
2        A    I do.
3        Q    My new question is:  Other than that
4    complaint, has OCR dismissed any other complaints
5    on the basis of a religious exemption from the
6    time period of 2013 to the present?
7        MS. SNYDER:  Again, objection.  Outside
8    the topics for the 30(b)(6).
9        But if you -- if you know, you can
10   answer in your personal capacity.
11       THE WITNESS:  I don't know in my
12   personal capacity.  I would -- I would have to
13   seek information from -- from OCR to answer that
14   question more thoroughly, but I -- I'm --
15   BY MR. SOUTHWICK:
16       Q    And who at OCR would have that
17   information?
18       A    That information would be available
19   just through our regional offices.  I've just
20   shared some information with you about our
21   recordkeeping.  We have a case management system
22   that records a lot of data and information about

39 (Pages 150 - 153)

1  each complaint that we receive and compliance
2  reviews that we initiate or directed
3  investigations we initiate.
4       Our complaint -- complaint management
5  system does not include a field that indicates
6  whether a religious exemption was at issue in a
7  particular complaint.
8       So while that would be recorded, that's
9  not a field that I could -- I could go into the
10  case management system like I can now and punch
11  in a code and bring up a list of all complaints
12  that allege violations of Title VI with regards
13  to discipline in, you know, a certain state, for
14  example.  We don't have that capacity with our
15  case management system.
16       So I would have to rely on the memories
17  of folks in the regional offices or look at
18  actual documents that were attached to a case,
19  which would be a case-by-case search, in order to
20  determine the answer to that.
21    Q    Has OCR ever granted an assurance of
22  religious exemption without identifying a

Page 154

1  controlling organization?
2    A    Yes.
3    Q    Can you tell me about that?
4    A    Yes.  I'm aware of two cases where OCR
5  granted an assurance of religious exemption
6  without there being a controlling external
7  religious organization.  I've reviewed
8  documentation with regard to Bob Jones University
9  and with regard to Colorado Christian University,
10  both of which cases present a situation where
11  there was not an outside religious organization
12  that controlled the institution.
13    Q    And why were -- why were the exemptions
14  granted in those cases?
15    A    There is -- in the -- in the letter of
16  assurance in the Bob Jones University matter, the
17  letter of assurance that was signed by Catherine
18  Lhamon as the assistant secretary, she signed and
19  issued the letter on June 17th, 2016.  She
20  recited what was presented by the Bob Jones
21  University in support of its request for an
22  assurance of a religious exemption.

Page 155

1       And the -- her letter, as does the
2  letter requesting the assurance, makes reference
3  to the University's board of trustees and states
4  as follows.  This -- I'm reading from Assistant
5  Secretary Lhamon's letter.
6       Your request explains that members of
7  the University's Board of Trustees, which, quote,
8  completely controls, end quote, the University
9  are, quote, like-minded Christians who are
10  required annually to reindicate consent to the
11  University Creed, end quote.  According to your
12  letter, the Creed states that the, quote, general
13  nature and object of, end quote, the University
14  is to, quote, conduct an institution of learning,
15  ellipsis, giving special emphasis to the
16  Christian religious and the ethics revealed in
17  the Holy Scriptures, end quote.  Your letter goes
18  on to state that, quote, Board members must also
19  annually read and consent to the mission
20  statement, as well as the general objectives that
21  the University has set forth in the bylaws and
22  charter and the University's philosophy of

Page 156

1  education statement, end quote.  You explain that
2  faculty are also required to, quote, affirm --
3  quote, to affirm the University Creed, ellipsis,
4  since -- since the creed is foundational to all
5  that, bracket, the University, end bracket, does,
6  including what is taught in its classes, end
7  quote.
8       That paragraph is followed immediately
9  by a statement made by the acting -- the then
10  assistant acting -- the then assistant secretary
11  as follows:  You request -- you request an
12  exemption to the extent that Title IX or its
13  implementing regulations, quote, are interpreted
14  to reach, bracket, the University's, end bracket,
15  selection of its president, and any other
16  positions at the -- bracket, the University, end
17  bracket, for which ordination is a qualification.
18       The letter proceeds on page 2 to
19  indicate that a request -- requesting a religious
20  exemption from certain provisions of Title IX,
21  quote, to the extent that Title IX or its
22  accompanying regulations are interpreted to

Page 157

40 (Pages 154 - 157)

**Page 158**

1 include selection of conference speakers or
2 reach, bracket, the University's, end bracket,
3 selection of Bible preachers in any other
4 context. You explain that the University, quote,
5 president selects speakers at his discretion, end
6 quote, for University conferences or other events
7 and that both, quote, men and women have spoken
8 at events conferences, end quote, because, quote,
9 speakers who will not preach the Bible need not
10 be ordained, end quote.
11        I'm just sharing this as a reiteration
12 of the request.
13        There is a listing that follows on page
14 2 of the -- the requested -- the subsections of
15 106 from -- for which an exemption was --
16 assurance of exemption was requested, followed
17 immediately by the statement in the letter from
18 Assistant Secretary Lhamon: The University is
19 exempt from these provisions to the extent that
20 they prohibit discrimination on the basis of sex
21 in the University's decision to fill positions
22 requiring ordination and select Bible preachers

**Page 159**

1 for University conferences and events, and
2 compliance would conflict with the controlling
3 organization's tenets.
4        There's no further reference in the
5 letter to religious organization, an external
6 religious organization, simply what I recited at
7 the beginning of my reading here.
8        Q   Is it your understanding that the
9 granting of that exemption to Bob Jones
10 University was inconsistent with the guidelines
11 and regulations in place at the time the
12 exemption was granted?
13        A   That's not my understanding.
14        Q   And so why did that school qualify as a
15 controlling religious organization when none
16 could be identified?
17        MS. SNYDER:  Objection.
18 Mischaracterizes the testimony.
19        THE WITNESS:  I -- at the moment, I --
20 I can't answer your question.  I may be able to
21 do so a little later on, but I, at the moment,
22 cannot.

**Page 160**

1        MR. SOUTHWICK:  So I've introduced --
2 if you refresh your marked exhibits, I've
3 introduced two new exhibits, Exhibit 6, which
4 includes this Bob Jones University
5 correspondence, and then Exhibit 7, which
6 includes Union University correspondence.  And
7 then I would like to compare these two documents.
8 You can let me know if you've been able to pull
9 them up.
10        (Deposition Exhibit Number 6
11 was marked for identification.)
12        MR. DAVIS:  Paul, we can pull up, I
13 think, one at a time, so we're pulling up Exhibit
14 6 first.
15        MR. SOUTHWICK:  You should be able to
16 pop them into a different window or a different
17 tab.
18        Mr. Wills, I'd like to look at Exhibit
19 6, page -- page 6.
20        MR. DAVIS:  You can search for Exhibit
21 6, page 6.
22        THE WITNESS:  Okay.  I am looking at

**Page 161**

1 Exhibit 6, page 6, letter from --
2        MR. SOUTHWICK:  Great.
3        THE WITNESS:  -- Bob Jones University,
4 dated April 1st, yes.
5 BY MR. SOUTHWICK
6    Q   Yeah.  And that's what we were just
7 looking at.  If you can go to the next page, page
8 7, that first paragraph, if you could read from
9 where it starts from "also, in the unlikely
10 event."  You can read the rest of that paragraph.
11    A   Page 7. I'm sorry.  I -- are we still
12 in the letter of April 1st, 2016?
13    Q   No.  This is the --
14        MR. DAVIS:  It's page 7 up there.
15        THE WITNESS:  Oh, page. 7. I'm sorry.
16 All right.  I have found it.
17        MR. SOUTHWICK:  There we go.
18        THE WITNESS:  Top of the page.  The
19 paragraph reads as follows:  "Please note that
20 this letter should not be construed to grant
21 exemption from the requirements of Title IX and
22 the regulation other than as stated above.  In

41 (Pages 158 - 161)

1  the event that OCR receives a complaint against
2  your institution, we are obligated to determine
3  initially whether the allegations fall within the
4  exemption here granted.  Also, in the unlikely
5  event that a complainant alleges that the
6  practices followed by the institution are not
7  based on the religious tenets identified in your
8  request, OCR is obligated to identify a
9  controlling organization to contact to verify
10  those tenets.  If the organization provides an
11  interpretation of tenets that has a different
12  practical impact than that described by the
13  institution, or if the organization denies that
14  it controls the institution, this exemption will
15  be rescinded."
16       MR. SOUTHWICK:  Thank you.  And that
17  was reading from Exhibit 6 regarding
18  correspondence with Bob Jones University.
19       I'd like you to open Exhibit 7, which
20  is correspondence between OCR and Union
21  University.  And I'd like you to start looking at
22  page 10 of Exhibit 7, which should be a

Page 162

1  March 24th, 2015 letter from OCR to the president
2  of Union University.  Let me know when you've
3  located that.
4       (Deposition Exhibit Number 7
5       was marked for identification.)
6       THE WITNESS:  Page 10.  I've located
7  the exhibit.  All right.  I have located page 10
8  of the exhibit.
9  BY MR. SOUTHWICK:
10       Q   All right.  And I don't need you to
11  read everything, but just making sure we're on
12  the same one, this starts with "Dear President
13  Oliver" and March 24th, 2015?
14       A   That's correct.  It's the same one.
15       Q   All right.  And, you know, there's a
16  two-page letter, and this appears to be a letter
17  from OCR granting Union -- granting Union
18  University a assurance of religious exemption.
19       Is that accurate?
20       A   That is accurate.
21       Q   All right.  And I'd like to go to the
22  last full paragraph on page 11, which is a very

Page 163

1  similar paragraph to the paragraph that you just
2  read from Exhibit 6 regarding Bob Jones
3  University.
4       However, this paragraph states:  "Also,
5  in the unlikely event that a complainant alleges
6  that the practices followed by the institution
7  are not based on the religious tenets of the
8  controlling organization, OCR is obligated to
9  contact the controlling organization to verify
10  those tenets."
11       Is that an accurate reading there?
12       A   That is an accurate reading.
13       Q   All right.  Do you notice the
14  difference in this letter compared to the Bob
15  Jones University letter?
16       Specifically, in this letter, Exhibit 7
17  says OCR is obligated to contact the controlling
18  organization; whereas, in Exhibit 6, with respect
19  to Bob Jones University, it says that OCR is
20  obligated to identify a controlling organization
21  to contact.
22       Is that an accurate reading of the

Page 164

1  document?
2       A   I -- before I answer, let me have a
3  look at the document.
4       Mr. Southwick, could you point out
5  again what you're asking me about with regard to
6  the differences between these paragraphs?
7       Q   Sure.  I wonder if I can highlight
8  here -- is there a highlight function?  No.
9  Okay.  All right.  Well, the specific language --
10       A   I -- I actually see the difference.
11  Sorry for the delay, but I found it.
12       Q   That's all right.
13       A   The Union letter recites:  "Also, in
14  the unlikely event that a complainant alleges
15  that the practices followed by the institution
16  are not based on the religious tenets of the
17  controlling organization, OCR is obligated to
18  contact the controlling organization to verify
19  those tenets," which differs from the sentence in
20  the Bob Jones letter, which reads, "Also, in the
21  unlikely event that a complainant alleges that
22  the practices followed by the institution are not

Page 165

**Page 166**

1  based on the religious tenets identified in your
2  request, OCR is obligated to identify a
3  controlling organization to contact to verify
4  those tenets."
5       The difference being --
6    Q   So why is OCR using different language
7  with respect to these two educational
8  institutions?
9       MS. SNYDER:  Objection.  This is
10 outside the scope.  I believe we had a time limit
11 of September 1st, 2013 going forward on our -- on
12 our agreement.  This appears to be a letter from
13 the '70s that you're asking him to compare.  So
14 object to the scope of -- I believe you're
15 outside the topics.
16      And if you know the answer, you may
17 respond in your personal capacity --
18      THE WITNESS:  I do not --
19      MR. SOUTHWICK:  Specifically --
20      THE WITNESS:  -- know the answer.
21      MR. SOUTHWICK:  Just to clarify the
22 record, these are both from -- this one is

**Page 167**

Objection FRE 403, 611 167:15-22

1  March 20 -- Exhibit 7 is March 24th, 2015, and
2  Exhibit 6 is June 17th, 2016.  So they are within
3  that time frame.
4  BY MR. SOUTHWICK:
5    Q   My question to you, Mr. Wills, is:
6  Exhibit 6, would it -- the ordinary reading of
7  that statement, OCR is obligated to identify a
8  controlling organization, wouldn't that imply
9  that OCR has not, in fact, identified a
10 controlling organization?
11   A   That may be one reading.  That's a
12 possible reading of that sentence.  I can't say
13 definitively whether that was the intention in
14 drafting the sentence in that particular way.
15   Q   Looking at Exhibit 6, the letter where
16 it says OCR is obligated to identify a
17 controlling organization to contact, it doesn't
18 appear that anywhere else in that letter that OCR
19 does identify a controlling organization.
20      Is that accurate?
21      MS. SNYDER:  Objection.  Misstates his
22 testimony and the letter.

**Page 168**

Objection FRE 403, 611 168:1-169:22

1       THE WITNESS:  Your question,
2  Mr. Southwick, is -- could you repeat that for
3  me, please?  It doesn't appear that OCR has
4  identified another controlling -- a controlling
5  organization elsewhere in the letter?
6  BY MR. SOUTHWICK
7    Q   Yeah.  In Exhibit 6, the June 17th,
8  2016 letter, the letter recites what Bob Jones
9  University has told OCR about the university's
10 governance structure, but there's actually no
11 conclusion that a controlling organization exists
12 with respect to Bob Jones University; isn't
13 that --
14      MS. SNYDER:  Objection.
15 BY MR. SOUTHWICK
16   Q   -- fair to say?
17      MS. SNYDER:  Objection.  Misstates his
18 testimony and the letter.
19      THE WITNESS:  Is there a question?
20 I --
21      MS. SNYDER:  Uh-huh.
22

**Page 169**

1  BY MR. SOUTHWICK:
2    Q   Can you identify anywhere in this
3  letter where OCR makes a conclusion that there is
4  a controlling organization?  Because the only
5  thing I can see is the recitation of what Bob
6  Jones University has said and then OCR's
7  conclusion that it would have to identify a
8  controlling organization.
9    A   I agree.
10      MS. SNYDER:  Objection.
11      THE WITNESS:  Oh, sorry.
12      MS. SNYDER:  It's ambiguous and
13 misstates the letter and his earlier testimony.
14      THE WITNESS:  In my personal capacity
15 reading the letter, I agree that there's no
16 reference -- no other reference -- there's no
17 reference in the letter to a religious
18 organization.  There's no -- there's no naming of
19 a religious organization.  There's no reference
20 to a religious organization elsewhere in the
21 letter.
22

**Objection FRE 403, 611 170:1-3**

1  BY MR. SOUTHWICK:
2     Q   Or indeed a controlling organization?
3     A   A controlling organization.  Yes.
4        MS. SNYDER:  Objection.  Misstates his
5  testimony and the letter.
6  BY MR. SOUTHWICK:
7     Q   Mr. Wills, are you familiar with any of
8  the underlying allegations in the complaints that
9  are included in the chart that the Department
10  produced, which is Exhibit 2 for this deposition,
11  the chart that lists all the complaints?
12        Are you familiar with the underlying
13  allegations at all?
14     A   I am familiar broadly with the
15  allegations.  I have not read all of the
16  complaints, and I could not recite for you what
17  the specific allegations are in those complaints.
18     Q   I'm going to ask you some questions
19  about some of the allegations in there.  We
20  might -- we might go into detail on one or two,
21  but I can -- I can tell you that certain of the
22  complaints allege discrimination on the basis of

Page 170

1  complaint.  I haven't read any of the interviews,
2  if there have been interviews, or any further
3  information that we have, which I would want to
4  do before I would say definitively, yes, we would
5  assert jurisdiction.
6  BY MR. SOUTHWICK:
7     Q   So are you saying that it's the
8  Department's current position that an educational
9  institution can discriminate against someone
10  because they've entered into a same-sex marriage?
11     A   No, I am not --
12     Q   I thought your --
13     A   -- saying that.
14     Q   -- earlier testimony was that people
15  are now being protected on the basis of sexual
16  orientation and gender identity.
17     A   Right.  But you're asking me to reach a
18  conclusion about a hypothetical or a specific
19  case which I don't have before me.  But I am not
20  saying that it's the Department's position that
21  we would not exercise jurisdiction under these
22  circumstances.

Page 172

1  the student entering into a same-sex marriage.
2        So my question to you is:  Would OCR
3  consider an allegation of discrimination based on
4  a same-sex marriage to be within the subject
5  matter jurisdiction of OCR?
6     A   The allegation being that the
7  individual was discriminated against, however
8  that was, by the institution because they entered
9  into a same-sex marriage?
10     Q   Correct.
11     A   Again, I don't --
12        MS. SNYDER:  I'm going to object based
13  on -- I believe that's outside the topics.
14        And if you know the answer, you can
15  answer in your personal capacity.
16        THE WITNESS:  Well, in my personal
17  capacity -- but, again, this is -- this is a
18  process.  These are fact-specific situations.  I
19  don't want to assert jurisdiction when I've not
20  examined all the facts and how the case has been
21  presented.  It is possible that OCR would assert
22  jurisdiction there, but I haven't read the

Page 171

1     Q   So let me ask more specifically.
2        In the context of a complaint that was
3  not involving religious exemption issues, so
4  let's say a public university or a secular
5  private university where there's no religious
6  exemption issue, if a student filed a Title IX
7  complaint with OCR that said the following:  I
8  married a same sex partner, and as a result of
9  that, I was expelled from the institution, my
10  question to you is:  Would OCR have subject
11  matter jurisdiction over that type of an
12  allegation?
13        MS. SNYDER:  Objection.  Speculation.
14  It also is outside the topics in the 30(b)(6)
15  notice.
16        You can answer in your personal
17  capacity if you know.
18        THE WITNESS:  In my personal capacity,
19  I would say that we would assert jurisdiction, in
20  my personal capacity.
21        But I do want to note again that I
22  am -- I don't wish to speculate, but I would --

Page 173

**Objection; FRE 802, 403, 602, 611, 701; 173:1-22**

44 (Pages 170 - 173)

**Page 174**

1  in my personal capacity, I would say, yes, we
2  would assert jurisdiction over that claim
3  under -- based on -- discrimination based on sex
4  under our current interpretation of Bosworth
5  [sic], yes.
6  BY MR. SOUTHWICK:
7       Q   And would the same also be true with
8  respect to a student who was denied housing -- a
9  transgender student who was denied housing
10  consistent with their gender identity?
11       MS. SNYDER:  Objection.  I believe you
12  are beyond the topics in the 30(b)(6) notice and
13  are asking a speculative question.
14       You can answer in your personal
15  capacity if you know.
16       THE WITNESS:  In my personal capacity,
17  my answer is yes, we would assert jurisdiction.
18  BY MR. SOUTHWICK:
19       Q   And if a student filed a Title IX
20  complaint with OCR saying that their public or
21  secular private college denied the student a
22  right to start an LGBTQ student group or a club,

*Objection; FRE 802; 403, 602, 611  701  174:1-175:13*

**Page 175**

1  would OCR have subject matter jurisdiction over
2  that type of a complaint?
3       MS. SNYDER:  Again, objection.
4  Speculation.  Also outside the topics in the
5  30(b)(6) notice.
6       You can answer in your personal
7  capacity if you know.
8       THE WITNESS:  In -- only in my personal
9  capacity, what my recommendation would be, we
10  would -- we would look carefully at that case, as
11  we would at all these, but about the formation of
12  a club, I would recommend assertion of
13  jurisdiction.  So we'd certainly be --
14  BY MR. SOUTHWICK
15       Q   So I know -- I know your counsel has
16  been talking about personal capacity.  I would
17  like to know in your representative capacity --
18  and maybe I can ask it this way.  What I'm trying
19  to understand -- and the reason -- the reason I'm
20  asking this is because, you know, we have a
21  variety of complaints that have been filed, and
22  they have a variety of allegations of

**Page 176**

1  discrimination based on sexual orientation and
2  gender identity.  And what I'm trying to find out
3  is what does OCR generally consider to be
4  unlawful discrimination based on sexual
5  orientation or gender identity such that it would
6  have subject matter jurisdiction, aside from
7  issues of religious exemption or timeliness.
8       So maybe I could answer -- ask it this
9  way:  What kind of protections does the Office of
10  Civil Rights offer to LGBTQ students regarding
11  their Title IX rights?  What kinds of things are
12  protected?  Does it include housing?  Does it
13  include the right to marriage?  What kinds of
14  things are protected?
15       MS. SNYDER:  Okay.  Objection.
16  Compound question.  Ambiguous.  Speculation.
17  You're also outside the topics in the 30(b)(6)
18  notice.
19       You can answer that question in your
20  personal capacity if you know.
21       THE WITNESS:  In my personal capacity,
22  this -- this is a -- what you laid out in your

**Page 177**

1  question, the areas that you laid out, is a
2  fairly new consideration for OCR.  I can tell you
3  that OCR is interested in interpreting its
4  jurisdiction over SOGI, sexual orientation gender
5  identity complaints, broadly and is committed to
6  doing so.
7       I refrain here from giving you
8  a definitive answer in every single hypothetical
9  you raise because, again, I don't have a full set
10  of facts before me, but I am very comfortable
11  asserting that the -- that OCR is currently
12  interpreting its jurisdiction with regard to sex,
13  sexual orientation, gender identity, broadly and
14  fairly.
15  BY MR. SOUTHWICK
16       Q   When looking at the purpose of the
17  Office of Civil Rights, would you agree that a
18  purpose of the Office of Civil Rights is to
19  prevent sex discrimination in educational
20  institutions that receive federal financial
21  assistance?
22       MS. SNYDER:  Objection.  Outside the

*Objection; FRE 802; 177:16-22*

45 (Pages 174 - 177)

**Objection; FRE 802; 178:1-179:13**

```
Page 178
 1   scope of the 30(b)(6) notice.
 2        You can answer the question in your
 3   personal capacity if you know.
 4        THE WITNESS:  I agree with that, yes.
 5   BY MR. SOUTHWICK:
 6        Q    And would you agree that the religious
 7   exemption to Title IX restricts the Office of
 8   Civil Rights' ability to prevent discrimination
 9   at certain educational institutions that receive
10   federal financial assistance and claim a
11   religious exemption?
12        MS. SNYDER:  Objection.  That's outside
13   the topics in the 30(b)(6) notice.  If -- and
14   outside the scope.  If you -- if you know, you
15   can answer in your personal capacity.
16        THE WITNESS:  I agree that sending an
17   assurance that a religious exemption exists under
18   certain circumstances can -- I'm sorry.  Rephrase
19   the end of your question.
20   BY MR. SOUTHWICK
21        Q    It can restrict the ability of OCR to
22   prevent sex discrimination at certain educational
```

```
Page 179
 1   institutions.
 2        A    Yes, as a --
 3        MS. SNYDER:  Again, objection.  Outside
 4   the scope of the 30(b)(6) notice.
 5        If -- you can answer in your personal
 6   capacity if you know.
 7        THE WITNESS:  I agree that in certain
 8   circumstances, it can restrict the ability of OCR
 9   to address discrimination at a recipient
10   institution.
11        MR. SOUTHWICK:  Sorry.  Bear with me.
12   I'm trying to pull up another exhibit here.  All
13   right.  I'm marking what I will introduce as
14   Exhibit 8.  You can probably refresh your screen
15   now.  Exhibit 8 is a letter to students,
16   educators, and other stakeholders regarding
17   Executive Order 14021.
18        (Deposition Exhibit Number 8
19        was marked for identification.)
20   BY MR. SOUTHWICK
21        Q    Mr. Wills, let me know when you've had
22   a chance to pull that exhibit up.
```

```
Page 180
 1        A    I've pulled the exhibit up.
 2        Q    All right.  Looking at Exhibit 8, have
 3   you seen this document before?
 4        A    I have not read this document before.
 5        Q    I don't need you to read it out loud,
 6   but I'd like you to take a moment to familiarize
 7   yourself with the document.  And then just let me
 8   know when you've had a chance to do so.
 9        A    I've perused the document.
10        Q    Did somebody have their hand up, or is
11   that -- did I accidently do that?
12        A    Oh, did I hit something?
13        VIDEO TECHNICIAN:  It looks like Mr.
14   Wills accidently did that.
15        THE WITNESS:  Sorry.
16        MR. SOUTHWICK:  Okay.  I just wondered
17   if counsel or someone had a question.
18   BY MR. SOUTHWICK
19        Q    All right.  Thank you, Mr. Wills.  This
20   is Exhibit 8, and I'm going to look at page 2.
21   And page 2 appears to be a start of a letter from
22   the assistant secretary dated April 6th, 2021; is
```

**Objection; FRE 802; 181:3-22**

```
Page 181
 1   that accurate?
 2        A    That's correct.
 3        Q    And then the second paragraph starts,
 4   "Yet sex discrimination, including sexual
 5   harassment, which encompasses sexual violence,
 6   continues to threaten equal access for students
 7   of all ages."
 8        Would you agree with the assistant
 9   secretary's statement?
10        MS. SNYDER:  Objection.  Outside the
11   topics in the 30(b)(6) notice.
12        You can answer in your personal
13   capacity if you know.
14        THE WITNESS:  I strongly agree with the
15   acting assistant secretary's statement you just
16   read.
17   BY MR. SOUTHWICK
18        Q    And then how about the second one?
19   "Experiencing sex discrimination in any form can
20   derail a student's opportunity to learn,
21   participate, and thrive in and outside of the
22   classroom, including in extracurricular
```

46 (Pages 178 - 181)

**Objection**

**FRE 802;**

**182:1-12**

1  activities and other educational settings."
2       MS. SNYDER:  Again --
3  BY MR. SOUTHWICK:
4       Q   Do you agree with that statement from
5  the assistant secretary?
6       MS. SNYDER:  Again, objection.  Outside
7  the topics on the -- the scope of the topics in
8  the 30(b)(6).
9       You can answer in your personal
10  capacity if you know.
11       THE WITNESS:  I agree with that
12  statement.
13  BY MR. SOUTHWICK:
14       Q   So I'd like you to answer in -- I'd
15  also like your response on -- this letter was
16  included on the Department of Education's website
17  along with a bunch of other resources regarding
18  LGBT students.
19       And my question to you about this
20  letter is:  Is this letter used as guidance for
21  the Office of Civil Rights in making
22  determinations regarding Title IX complaints that

Page 182

1       But it is not an internal guidance
2  document that lays out specifics on how you
3  analyze jurisdiction in certain circumstances or
4  what are the next steps you should take in an
5  investigation of a case that asserts a violation
6  of law under one of these circumstances.
7       MR. SOUTHWICK:  I'm going to introduce
8  another exhibit.  It will be marked as Exhibit 9.
9  Give me a second.  All righty.  Okay.  Exhibit 9
10  should be uploading.  It's a little bit longer --
11  a little bit bigger of a file.  There, it should
12  be up right now.
13       (Deposition Exhibit Number 9
14       was marked for identification.)
15  BY MR. SOUTHWICK:
16       Q   While people are loading it, I can
17  describe Exhibit 9.  It is a document entitled
18  "Questions and Answers on the Title IX
19  Regulations on Sexual Harassment," dated
20  July 2021.
21       Mr. Wills, can you just let me know
22  when you've had a chance to pull that up?

Page 184

1  are reviewed by the office?
2       MS. SNYDER:  Objection.  Outside the
3  scope of the 30(b)(6) notice.
4       You can answer in your personal
5  capacity if you know.
6       THE WITNESS:  This is not an internal
7  guidance document.  It's a document -- a
8  statement of principle and a statement of
9  approach that is generally -- that's circulated
10  to the -- to the public generally, to recipients,
11  to complainants, advocacy groups, parents, to
12  anyone who might have occasion to read it.
13       It's not an internal guidance document,
14  but it states a principle and a direction that
15  the Department is taking that will certainly
16  influence -- it doesn't go into specifics about
17  how we investigate cases or what steps we take to
18  analyze evidence or any such thing, but it states
19  a direction and principles that -- that -- to
20  which OCR is committed, and that, of course, is a
21  broad principle guidance for our movement forward
22  in investigating cases.

Page 183

1       A   I've -- I've pulled up the document.
2       Q   All right.  So the last exhibit we
3  looked at was a letter from the assistant
4  secretary where -- and you described it as, you
5  know, stating some of the principles, but not an
6  internal guidance.
7       Is this Q and A -- what kind of a
8  document is this Q and A?  Is this internal
9  guidance, external guidance?
10       A   This is -- this is external guidance.
11  This is guidance that's available to any member
12  of the public.  And it's a compilation of
13  questions that the Department -- that OCR has
14  received from many members of the public with
15  regard to the Title IX regulations on sexual
16  harassment.
17       Q   So let's see.  If you look down in the
18  table of contents, the last section or chapter
19  heading is XVII, religious exemptions, and that
20  takes you down to page 32.  I think if you click
21  on it, it will auto take you there.  And I'm --
22  I'd like to ask you some questions about this.

Page 185

47 (Pages 182 - 185)

1 So let me know when you're -- when you're at
2 religious exemptions.
3     A   I am on that page, 17, religious
4 exemptions.
5     Q   Great.
6        MS. SNYDER:  I'm sorry, Counsel.  What
7 page?
8        MR. SOUTHWICK:  It's page 32.  It's
9 page 42 if you're looking at the Exhibit Share
10 numbers, but if you're looking at the number on
11 the document itself, it's page 32 of the
12 document.  Questions 66 and 67.
13 BY MR. SOUTHWICK
14     Q   And I'll just ask you, Mr. Wills:  Did
15 you -- did you review this -- this section of the
16 document in advance of your deposition today?
17     A   I did not review this particular
18 section or this -- I did not review this
19 document.  I've seen the document before.  I've
20 read parts of it, read parts of it.  I did not
21 review this section at all, so I certainly have
22 not done so in preparation for today's

Page 186

1 deposition.
2     Q   All right.  If you wouldn't mind taking
3 a moment just to review the question and answer
4 for 66 and 67, and then let me know when you've
5 had a chance to review those.
6     A   I have reviewed the response to
7 every -- both questions and the responses to
8 them.
9     Q   I'd like to ask you about -- well,
10 first of all, earlier you said that the -- this
11 document was created and -- did you say in
12 response to -- was it questions from the public,
13 or was it in response to some kind of public
14 hearing or comment, or why was this overall
15 document created?
16     A   I --
17        MS. SNYDER:  Objection.  Compound.
18        THE WITNESS:  I can't say with
19 specificity.  It was -- it was created, I know,
20 in response to comments and questions.
21        Where those -- the source of those or
22 whether it was as a result of a hearing or -- we

Page 187

1 also get a number of questions that come to us
2 directly from -- from recipients, from
3 complainants, from advocacy groups into our --
4 what's called our open center.
5        So I don't know that all of the
6 questions here were questions that were raised
7 during hearings, their hearing, although they
8 might have been.  But they may also have included
9 questions that we receive, as we do very
10 frequently now through our open center, and then
11 forwarded for a response.
12        So I don't know the source exactly of
13 all the questions, but I have a fairly good idea
14 where they might be coming from.
15 BY MR. SOUTHWICK
16     Q   And do you have a sense of where the
17 requests regarding these two questions were
18 coming from?
19     A   I do not.
20     Q   I'd like to look at the third paragraph
21 of the answer for 66, which states:  "The 2020
22 amendments state that a school is not required to

Page 188

1 seek a written assurance of its religious
2 exemption under Title IX before claiming the
3 exemption, and the regulations state that a
4 school can invoke a religious exemption after OCR
5 has received a complaint regarding the school."
6        Is this description consistent with
7 your understanding of OCR's current policy and
8 practice on this issue?
9     A   Yes, it is.
10     Q   Given the standard, a student could
11 attend an educational institution not knowing
12 whether or not their rights under Title IX will
13 be able to be protected by OCR; is that accurate?
14        MS. SNYDER:  Objection.  Outside the
15 scope of the 30(b)(6) notice, and, additionally,
16 it's speculative and ambiguous.
17        You can answer in your personal
18 capacity if you know.
19        THE WITNESS:  In my personal capacity,
20 I believe that that could be the case, that a
21 student could attend an institution not knowing
22 whether that institution had an assurance of a

Page 189

Objection;
FRE 403,
602, 611,
802, 701:

189:10
-22

48 (Pages 186 - 189)

Objection;
FRE 403,
602, 611, 701
802; 190:1

**Page 190**

1  religious exemption.
2  BY MR. SOUTHWICK
3      Q   Is OCR concerned about the consumer
4  protection aspect of not providing notice to
5  students?
6          MS. SNYDER:  Objection.  Outside the
7  topics in the 30(b)(6) notice.
8          If you know, you can answer in your
9  personal capacity.
10         THE WITNESS:  I don't know the answer
11  to that question.
12  BY MR. SOUTHWICK
13     Q   OCR has not even considered the
14  transparency, notice, consumer protection issues
15  regarding schools that it funds with federal
16  financial assistance -- it hasn't had any concern
17  with those issues?
18         MS. SNYDER:  Objection.  Outside the
19  scope of -- of the 30(b)(6) notice.  It's,
20  additionally, an ambiguous question.
21         You can answer in your personal
22  capacity if you know.

**Page 191**

1          THE WITNESS:  I don't personally know
2  whether OCR has any concern related to what you
3  just said.  I am tempted to speculate.  I won't.
4  But OCR is deeply committed to the protection of
5  all students in educational environments, deeply
6  committed to that, and that in conjunction with
7  what I said earlier about our approach to sexual
8  orientation should suggest to you something about
9  OCR.
10         But I am not -- in this capacity, I am
11  speaking on my own behalf, but I just remind you
12  of what I've said earlier and also what I just
13  said about OCR's commitment to ensuring that all
14  students have a safe educational environment.
15  BY MR. SOUTHWICK
16     Q   In Question 67, it asks whether a
17  student is allowed to file a complaint with OCR
18  against a school that has obtained an assurance
19  of a religious exemption from OCR, and the answer
20  is yes.
21         Is that accurate?
22     A   Yes, that's correct.  Students may

**Page 192**

1  always file a complaint with OCR.
2      Q   So students may always file a
3  complaint.  However, that complaint may be
4  dismissed based on the assertion of a religious
5  exemption or an assurance of religious exemption;
6  is that right?
7      A   It may be dismissed only if the
8  assurance of -- if the religious exemption that
9  the assistant secretary assured covers the
10  specific allegations of the complaint.
11         It certainly wouldn't be dismissed
12  simply on the strength of the assertion of -- of
13  a religious exemption.  It would only be assured
14  on the assurance of one and only if that one or
15  those exemptions were -- actually addressed what
16  was alleged in the complaint.
17     Q   I want to give you an example.  It's a
18  specific example from one of our plaintiffs, and
19  this relates to Union University.  We looked at
20  that correspondence about Union University
21  earlier.  They have a religious exemption
22  assurance.

**Page 193**

1          This student's name is Alex Duron.
2  He's listed in Exhibit 2.  And he was -- his
3  admission to a nursing program at Union
4  University was rescinded after the university
5  discovered that he had a same-sex partner.
6          Alex -- Alex describes being devastated
7  by having his admission rescinded because of his
8  sexual orientation, and having gone to look on
9  OCR's website and found that Union had a
10  religious exemption, and Alex describes that as
11  having discouraged him from even trying to file
12  anything with OCR.
13         Would you agree that -- that when an
14  assurance of religious exemption is on file that
15  that can have a chilling effect on whether or not
16  students at those institutions will even file a
17  Title IX complaint with OCR?
18         MS. SNYDER:  Objection.  The question
19  calls for speculation.  It's also outside the
20  scope of the 30(b)(6) topics.
21         If you know, you can answer in your
22  personal capacity.

49 (Pages 190 - 193)

THE WITNESS: Well, I don't know, because I don't know the mind of -- of students who might realize that there's an exemption and what they would do.

So I -- I wouldn't speculate as to what conclusion they may -- they might draw about an institution if they discover that it has a religious exemption. I would be uncomfortable, and it would probably be unfair to do that. I can't speak on behalf of students and what they might feel upon learning such a thing.

BY MR. SOUTHWICK

Q   Has OCR considered the impact that its religious exemption letters have on LGBT students at institutions that have these religious exemptions on file?

MS. SNYDER: Again, objection. Outside the 30(b)(6) topics. You can answer in your personal capacity if you know.

THE WITNESS: I do not know in my personal capacity whether -- whether OCR has given consideration to that impact. But I would

Page 194

reiterate my earlier answer about OCR's concerns, and, you know, you can draw any inference you like from that.

But I personally do not know whether, you know, somebody at a high level or the assistant secretary has said to me, yes, we're -- we're interested in this, we're looking at it. I don't know everything that the assistant secretary and the people in program legal group are assessing or all of their conversations. I'm not -- that's not part of what I'm attached to in the -- in OCR.

So I can't say that -- that they are, but I certainly cannot say that they are not concerned.

BY MR. SOUTHWICK

Q   Would you agree that the religious exemption to Title IX presents an additional roadblock for some students who are attempting to get protections from OCR for the discrimination they experience?

MS. SNYDER: Again, objection. That's

Page 195

outside the 30(b)(6) topic -- topics and outside the scope. It's also speculative.

If -- if you know, you can answer in your personal capacity.

THE WITNESS: I would reiterate and answer -- liken to the one I just gave. You know, I don't want to speculate as to what a student's response would be to learning that there's a religious exemption or whether that is a barrier to that particular student's filing a complaint.

BY MR. SOUTHWICK

Q   We talked earlier that, you know, OCR's -- or one of OCR's purposes is to protect students from sex discrimination.

Would you agree that, in general, the -- the enforcement mechanism or the enforcement activities of OCR are one of the primary ways that OCR can protect students from sex discrimination?

A   Yes. I -- I strongly agree with that statement.

Page 196

Q   And would you agree that OCR's complaint process empowers students to assert their Title IX rights?

MS. SNYDER: Objection. Outside the scope of the 30(b)(6) topic and speculative.

If you know, you can answer in your personal capacity.

THE WITNESS: In my personal capacity, I agree that it does empower students to assert their rights, students and other individuals to assert their rights.

BY MR. SOUTHWICK

Q   All right. I'd like to ask you some questions again going back to the subject matter jurisdiction of OCR and -- and, again, I'm trying to understand that fully with respect to how that would apply to the Title IX complaints of the plaintiffs that are included on Exhibit 2.

My understanding is that OCR can investigate claims from students regarding discrimination and that the discrimination could be discriminatory policies at the institution, as

Page 197

Objection; FRE 802, 403,602, 611; 701
197:1-11

50 (Pages 194 - 197)

1   well as specific acts of discrimination at the
2   institution.  Is that accurate?
3     A    That is accurate.
4     Q    And when looking at -- strike that.
5         Is OCR aware of the -- beyond the Title
6   IX complaints that have been identified in
7   Exhibit 2, has OCR been made aware of sexual
8   orientation or gender identity discrimination
9   occurring at religiously affiliated educational
10  institutions that are subject to its personal
11  jurisdiction?
12        MS. SNYDER:  Objection.  Outside the
13  topics -- outside the scope of the topics for the
14  30(b)(6) deposition.
15        If you know, you can answer in your
16  personal capacity.
17        THE WITNESS:  I don't know for a fact,
18  but -- that would be speculation, but I would --
19  I will venture speculation here.  That may have
20  been raised in the -- the hearings, the Title IX
21  hearings.  They were quite lengthy.  We received
22  a lot of feedback.  I can't quantify it for you.

Page 198

1   That was -- those hearings were handled by our
2   program legal group and certainly the assistant
3   secretary.
4         But it seems reasonable to me that
5   feedback was received from the LGBTQ+ community
6   under those circumstances.  And I have not yet
7   read transcripts of all of that.  They're quite
8   lengthy.
9   BY MR. SOUTHWICK
10    Q    You stated earlier that a directed
11  investigation or a compliance review could be
12  opened in response to news reports or advocacy
13  groups bringing issues to OCR's attention; is
14  that correct?
15    A    Those -- those -- that -- those are two
16  elements that we would consider in determining
17  whether to open a directed investigation or a
18  compliance review.  There are further
19  considerations for compliance reviews.  But for
20  directed investigations, those are two triggers,
21  if you will, that we would consider in
22  determining whether it's appropriate to open a

Page 199

1   directed investigation.
2         So, yes.  Not exclusively, but, yes,
3   they would be elements that we would consider.
4     Q    Has the Office of Civil Rights --
5   strike that.
6         Based on numerous media accounts within
7   the last year and in years prior, there appears
8   to be widespread LGBTQ discrimination at hundreds
9   of educational institutions that receive federal
10  financial assistance.
11        Is OCR generally aware of those
12  reports?
13        MS. SNYDER:  Objection.  Outside the
14  scope of the 30(b)(6) notice or -- excuse me --
15  outside the scope of the topics in the 30(b)(6)
16  notice.  If you know in your personal capacity,
17  you can answer.
18        THE WITNESS:  Yes.  Generally, OCR is
19  aware of reports of -- of discrimination of any
20  sort and certainly discrimination against LGBTQ+
21  students.  Yes.
22

Page 200

1   BY MR. SOUTHWICK
2     Q    So why isn't OCR doing anything about
3   it?
4         MS. SNYDER:  Objection.  Outside the
5   scope of the topics in the 30(b)(6) notice and
6   similarly makes -- misstates prior testimony.
7         If -- if you know, you can answer in
8   your personal capacity.
9         THE WITNESS:  Well, in my personal
10  capacity, I disagree with the statement that
11  OCR's doing -- isn't doing anything about it.
12        OCR -- we've just looked at some
13  documents today that are very public-facing
14  documents that are signaling to many communities,
15  including the LGBTQ+ community, that OCR is
16  welcoming -- at least they're coming in and
17  filing complaints.  We've done a lot of outreach.
18  We had a wonderful video for LGBTQ+ students that
19  the acting assistant secretary and general
20  counsel and I believe an acting from HHS made.
21        We are sending -- as part of what we're
22  doing, we are sending very different messages to

Page 201

51 (Pages 198 - 201)

Randolph Wills 30(b)(6) - October 21, 2021

1  those communities now. This is, as you know, a
2  relatively new administration. We just yesterday
3  had a new assistant secretary confirmed. There
4  will be movement. There already has been
5  movement. As I said before, OCR is deeply
6  committed, particularly in this administration,
7  to equity and ensuring that all students have
8  equal access to an education, to a quality
9  education.
10      We have made very deliberate strides
11  and announcements to the LGBTQ+ community about,
12  yes, we are open, yes, please come to us, yes, we
13  will -- we will address complaints that you bring
14  to us, but please do bring them.
15      So that's, in my opinion, speaking in
16  my personal capacity here, a very important step,
17  very important statements to have made to
18  communities. That word is out. The doors are
19  open. And so I think we have taken steps. I
20  think we've taken some very important steps.
21      There are more steps to be taken. I'm
22  not going to speculate here has to what those

Page 202

1  steps would be. That's not my role. And I don't
2  know what they are, but I -- I do know that given
3  the start we've made and the direction we're
4  moving in, there will be steps.
5  BY MR. SOUTHWICK
6      Q   And those advances, you know, they
7  apply without caveat for students who are at a
8  public institution or at a secular private
9  educational institution. Would you agree?
10      A   All students --
11      MS. SNYDER: Objection.
12      THE WITNESS: Oh, I'm sorry.
13      MS. SNYDER: Objection. You're outside
14  the scope of the 30(b)(6) notice.
15      You can answer in your personal
16  capacity if you know.
17      THE WITNESS: In my personal capacity,
18  those are made without distinction between
19  students at public or private institutions.
20  They're made available -- the message is for all
21  students.
22

Page 203

1  BY MR. SOUTHWICK
2      Q   Well, you would agree, though, that
3  there is a pretty big asterisk for students who
4  are at religious educational institutions that
5  are claiming a religious exemption to
6  discriminate against LGBTQ students because there
7  has to be a caveat in all that messaging for
8  those students; isn't that accurate?
9      MS. SNYDER: Objection. Outside the
10  topics in the 30(b)(6) notice. Similarly,
11  ambiguous question.
12      If -- you can answer in your personal
13  capacity if you know.
14      THE WITNESS: I don't know if it's a
15  big asterisk, but we've certainly just reviewed
16  that in -- in the Q&A, in the July 2021 Q&A, and
17  the last 66 and 67 are questions that address
18  that issue for students who are at religious
19  institutions who may request assurances of
20  religious exemption or have assurance of
21  religious exemptions.
22

Page 204

1  BY MR. SOUTHWICK
2      Q   So there are -- there are more than 200
3  educational institutions that receive federal
4  financial assistance that explicitly discriminate
5  against LGBTQ students in both policy and
6  practice. They validly do.
7      Can you see how for LGBTQ students at
8  those institutions, they might view themselves as
9  standing at OCR's door knocking, knocking,
10  knocking, and feeling a sense of betrayal when
11  the doors that are open for students at secular
12  institutions or public institutions get closed on
13  them?
14      MS. SNYDER: Objection. Outside the
15  topics in the 30(b)(6) notice -- or outside the
16  scope of the topics in the 30(b)(6) notice.
17  Additionally, speculative and argumentative.
18      If -- you can answer in your personal
19  capacity if you are able.
20      THE WITNESS: As I've said in response
21  to previous -- similar previous questions, I'm
22  not going to speculate on how students feel or

Page 205

52 (Pages 202 - 205)

1 what their thinking is about OCR.
2      It would -- it is likely that whatever
3 frustration or however students felt, however
4 LGBTQ students felt about this particular aspect
5 of Title IX religious exemptions piece was shared
6 during the course of the recent hearings that we
7 had on the proposed new Title IX regulations.  I
8 would hope so.  But I am not going to speculate
9 and say, yes, I'm sure that's how they feel or,
10 no, I'm sure that's -- or I'm sure they don't
11 feel that way.
12      MR. SOUTHWICK:  All right.  Why don't
13 we take a little ten-minute break here.
14      THE WITNESS:  Sure.
15      MS. SNYDER:  Paul, do you have a sense
16 of kind of where you are as far as timing?
17      MR. SOUTHWICK:  We talked about --
18 yeah.  We won't be going past 6:30 your time.
19      Do the intervenors plan on asking any
20 questions, or no?  We didn't really discuss that.
21      MR. SCHAERR:  Yes, I -- I think we'd
22 like to ask just a very few questions.

Page 206

1      MS. SNYDER:  I'm sure I'm going to have
2 some follow-up, too, so just for your
3 information.
4      MR. SOUTHWICK:  Okay.  Yeah.  I think,
5 you know, I'll -- yeah, I think I will go another
6 hour or so, and then we can probably turn it over
7 to the rest of you.
8      MS. SNYDER:  Thank you for the update.
9      MR. SOUTHWICK:  Okay.
10      VIDEO TECHNICIAN:  Is it okay to go off
11 the record at this time?
12      MR. SOUTHWICK:  Yes, please.
13      VIDEO TECHNICIAN:  We are going off the
14 record at 3:26.
15      (Recess 3:26 p m. to 3:50 p.m.)
16      VIDEO TECHNICIAN:  We are back on the
17 record.  The time is 3:50.  Please proceed.
18      MS. SNYDER:  Paul, may I -- may I
19 quickly say something so as not to forget?  We
20 are going to --
21      MR. SOUTHWICK:  Sure.
22      MS. SNYDER:  The witness is going to

Page 207

1 exercise the right to read and sign.  I just
2 wanted to make sure I got it on the record and
3 didn't forget.  Thank you.
4      MR. SOUTHWICK:  No problem.
5 BY MR. SOUTHWICK
6      Q    Mr. Wills, I'd like to go back to the
7 OCR Processing Manual a little bit.  Let's see
8 here.  I've got to remember which number that one
9 is.
10      A    Three.
11      Q    Three.  Thank you.  All right.
12      Mr. Wills, it's my understanding that
13 anyone can really file a Title IX complaint with
14 OCR.  You don't have to be a current student or
15 even necessarily directly connected to the
16 institution in order to file a complaint; is that
17 correct?
18      A    That is correct.
19      Q    But if you're going to file a
20 complaint, then you need to file it on behalf of
21 someone or on behalf of a group; is that correct?
22      A    That's correct.

Page 208

1      Q    So in a situation where -- looking at
2 some of the Title IX complaints that we've got in
3 our Exhibit 2, some of those were filed by alumni
4 of some of these educational institutions, and
5 while they experienced some discrimination
6 themselves, some of that was a while ago.  But
7 their complaints also complain about the current
8 policies at some of these educational
9 institutions and the impact that those policies
10 have on the LGBTQ+ students at those schools.
11      So my question to you is:  Is it within
12 the subject matter jurisdiction of OCR to
13 evaluate a complaint when someone like an alum
14 submits a Title IX complaint on behalf of a group
15 of current students who are part of a
16 historically marginalized group?
17      MS. SNYDER:  Objection.  Outside the
18 scope of the 30(b)(6) topics and potentially
19 speculative.  You -- you -- and you can answer in
20 your personal --
21      THE WITNESS:  Please repeat --
22      MS. SNYDER:  -- capacity if you can.

Page 209

1    THE WITNESS:  Please repeat the
2  question.  I got a statement out of that, but I
3  didn't hear the question.
4  BY MR. SOUTHWICK
5    Q   Sure.  My question is:  Will OCR accept
6  a complaint, Title IX complaint, that alleges
7  sexual orientation discrimination under Title IX,
8  but not against the complainant themselves, but
9  against a group of LGBTQ+ students at a
10  particular educational institution?
11    Is that a complaint that OCR would
12  accept, or would it reject that type of a
13  complaint?
14    MS. SNYDER:  Objection.  Outside the
15  topics -- the scope of the topics in the 30(b)(6)
16  deposition.  It's also potentially speculative
17  and ambiguous.
18    And you can answer in your personal
19  capacity if you can.
20    THE WITNESS:  I understand.  First
21  observation is, we don't use the verbs accept and
22  reject in OCR.  They're not -- those are not

1  verbs that we use in our practice.
2    The complaint that you just described
3  or any complaints similar to what you just
4  described can be filed with OCR.  We use the term
5  filed.  They certainly can be filed.
6    They will be evaluated, as are all
7  complaints, and a determination will be made as a
8  result of the evaluation as to whether we should
9  go forward and open the complaint for
10  investigation or whether the complaint should be
11  dismissed.  But they can certainly be filed.
12  BY MR. SOUTHWICK
13    Q   All right.  I want to ask a question
14  about a document that was produced to us this
15  morning.  We're trying to get it uploaded on
16  Exhibit Share, but struggling here with that.
17  It's part of topic 2.2 PDF.  The Bates number I
18  can give you is ED2.000241.  And on the table of
19  contents, it's topic 2K, school list.  We're
20  trying to get it on Exhibit Share, but if you've
21  got it in paper, you can start --
22    A   ED2.000241.  Yes.

1    Q   That's correct.  Yeah.  And it should
2  be a one-pager that's got three columns,
3  recipient, assurance of religious exemption
4  letter, and plaintiff.
5    Do you see that?
6    A   I see that.
7    Q   All right.  So we were just presented
8  with this document today.  Is this a document
9  that you reviewed in preparation for your
10  deposition?
11    A   Yes, it is.
12    Q   And can you tell me what this document
13  is?
14    A   This document is a listing of recipient
15  institutions, and it contains -- I didn't count
16  however many there are there, but a listing of
17  recipient institutions.
18    It also indicates whether that
19  particular recipient institution has an assurance
20  of religious exemption letter.  And it also names
21  the plaintiff associated with that particular
22  institution or the --

1    Q   And --
2    A   -- plaintiffs.
3    Q   And what is the purpose of this
4  document?
5    MS. SNYDER:  Objection.  Vague.
6  Ambiguous.
7    THE WITNESS:  I'm not going to
8  speculate as to the purpose of the document that
9  I wasn't part of drafting, but I take from the
10  reading of the document on its face that it --
11  what it tells me is that, for example, Baylor
12  University has -- on record, there is a record of
13  Baylor having received an assurance of religious
14  exemption letter.
15    And -- and this is an inference on my
16  part, but the listing of the plaintiffs,
17  Tidwell-Davis, Picker and Penales, suggests to me
18  that they may also be complainants in an
19  administrative proceeding, an administrative
20  complaint before OCR.
21  BY MR. SOUTHWICK
22    Q   Do you know if this document is being

1 used to guide any of the OCR staff who are
2 evaluating the complaints that are part of
3 Exhibit 2?
4    A   I do not know that.
5    Q   And then referring back to our
6 discussion earlier today, would it be fair to say
7 that if one of the plaintiffs listed on this --
8 oh, sorry. Let me stop. We have uploaded now as
9 Exhibit 12 this document in Exhibit Share,
10 introducing it as Exhibit 12.
11          (Deposition Exhibit Number 12
12          was marked for identification.)
13 BY MR. SOUTHWICK
14    Q   So I guess I'll just start with the
15 first one there, the Azusa Pacific University.
16 No exemption assurance letter. Plaintiff is
17 Jonathan Jones.
18          So assuming Jonathan Jones otherwise
19 stated a Title IX complaint that was timely and
20 within the subject matter jurisdiction of OCR, my
21 understanding based on our earlier conversations
22 is that because Azusa Pacific University does not

Page 214

1 have an assurance of religious exemption letter,
2 OCR would open up an investigation and then allow
3 Azusa Pacific University the opportunity to
4 assert a religious exemption before having to
5 comply with other aspects of the investigation;
6 is that correct?
7    A   That is correct, yes.
8    Q   However, looking at the second one,
9 which is Baylor University, because Baylor
10 University already has an assurance of religious
11 exemption letter, OCR -- to the extent it had to
12 get there, OCR would review that assurance of
13 religious exemption letter, and the complaint
14 could be dismissed right then and there without
15 opening up an investigation if OCR determines
16 that the complaint comes within the assurance
17 letter. Is that accurate?
18    A   That is accurate to the extent that the
19 investigative staff in the regional office was
20 aware that this was an institution that had in
21 its possession an assurance of religious
22 exemption, which is what I described earlier

Page 215

1 today. If there is that level of awareness, then
2 that is -- then what you described is accurate.
3    Q   All right. I uploaded in -- I uploaded
4 into the marked exhibits Nos. 10 and 11. We can
5 go ahead and open up Exhibit 10 first. I'll --
6          (Deposition Exhibit Number 10
7          was marked for identification.)
8          THE WITNESS: I've opened it.
9 BY MR. SOUTHWICK
10    Q   Okay. I'll represent to you that
11 Exhibit 10 is a document from Baylor University.
12 It says student policies and procedures, and it
13 provides a statement on human sexuality.
14          I'd ask: Can you read the first
15 paragraph there?
16    A   Yes.
17          "Baylor University welcomes all
18 students into a safe and supportive environment
19 in which to discuss and learn about a variety of
20 issues, including those of human sexuality. The
21 University affirms the biblical understanding of
22 sexuality as a gift from God. Christian churches

Page 216

1 across the ages and around the world have
2 affirmed purity in singleness and fidelity in
3 marriage between a man and a woman as the
4 biblical norm. Temptations to deviate from this
5 norm include both heterosexual sex outside of
6 marriage and homosexual behavior. It is thus
7 expected that Baylor students will not
8 participate in advocacy groups which promote
9 understandings of sexuality that are contrary to
10 biblical teaching."
11    Q   Have you reviewed any policies on human
12 sexuality like this at educational institutions
13 like Baylor? Have you seen any of these kinds of
14 policies before?
15          MS. SNYDER: Objection. Outside the
16 scope of the 30(b)(6) deposition.
17          You can answer in your personal
18 capacity if you're able.
19 BY MR. SOUTHWICK
20    Q   Let me -- then let me back up and lay
21 some foundation here. So Baylor University is
22 one of the universities at issue in three of the

Page 217

55 (Pages 214 - 217)

1  complaints that are the subject of this
2  deposition.  That would be Justin Tidwell-Davis,
3  Jake Picker and Veronica Penales.  And the
4  policies are relevant to OCR analysis; isn't that
5  correct?
6      You don't have to wait for your lawyer
7  to give you an indication.
8    A   Okay.  Well, there were two questions.
9  First, have I reviewed -- have I seen a policy
10 like this before, and is this policy germane to
11 OCR's analysis?
12     I have not seen this policy or any one
13 like it before that articulated what I just read
14 to you.  And this would be information that we
15 would consider in the evaluation of a complaint.
16   Q   This kind of policy --
17   A   Evaluation -- excuse me.  I can correct
18 myself.  I said we consider this information in
19 the evaluation of a complaint.  It may come as
20 part of a complaint.  It may be an attachment to
21 a complaint.  It certainly would be taken into
22 consideration as we take -- as we take into

Page 218

1  capacity if you know.
2      THE WITNESS:  I cannot give a
3  definitive answer to that question.  It's --
4  there's a distinct possibility that it would be
5  problematic, but I can't give you a definitive
6  answer to that.  There are a lot of
7  considerations and discussions that we would --
8  we have around policies that on their face are
9  problematic, but -- so I can't give you
10 a definitive yes on that question.
11     MR. SOUTHWICK:  All right.  If we could
12 look at Exhibit No. 11.  I'll represent to you
13 that this is the Bob Jones University Student
14 Handbook for the current academic year, 2021 to
15 2022.
16     (Deposition Exhibit Number 11
17     was marked for identification.)
18 BY MR. SOUTHWICK:
19   Q   I don't know of a fast way to jump
20 through this, but, basically, if you can scroll
21 down or toggle down to page 51.  And then just
22 let me know when you've got there.  And you might

Page 220

1  consideration any attachments that complainants
2  bring to us in a complaint.  So, yes, as part of
3  that process, but I can't speak for what PLG
4  would do if this were to accompany a request for
5  assurance of a religious exemption.
6    Q   Would a policy like this which
7  prohibits homosexual behavior or advocacy for
8  homosexual behavior, if this were not at a
9  religious educational institution, would a policy
10 like this be in violation of OCR regulations
11 against sexual orientation and gender identity
12 discrimination?
13     MS. SNYDER:  I'm sorry.  Paul, could
14 you repeat the question?
15     MR. SOUTHWICK:  Could the court
16 reporter read the question back for us?
17     (Whereupon, the reporter read the
18     record as requested.)
19     MS. SNYDER:  Objection.  That's outside
20 the scope of the 30(b)(6) notice or the -- the
21 scope of the topics in the 30(b)(6) notice.
22     You can answer in your personal

Page 219

1  need to use the magnifying glass to make it a
2  little bigger to read, at least I do.  And what
3  I'm looking for on page 51 is the position on
4  human sexuality.
5    A   I have found it.
6    Q   All right.  Could you please read the
7  position on human sexuality at Bob Jones
8  University?
9    A   "The New Testament exhorts believers to
10 strive to live morally pure and sexually
11 undefiled lives even in the midst of an immoral
12 and sexually permissive culture," with a
13 citations to the New Testament, 1 Thessalonians
14 4:1-9.
15     "This biblical mandate stands behind
16 our desire to create and cultivate a culture that
17 promotes and protects healthy relationships.  In
18 line with the scriptural teaching on sexual
19 morality and the reality that students face many
20 types of sexual temptation, we wish to encourage
21 single students to live holy lives, abstaining
22 from all sexual relationships, and married

Page 221

56 (Pages 218 - 221)

**Page 222**

1  students to be faithful in marriage and to their
2  spouse.  Therefore, any sexual activity outside
3  the context of a biblically defined marriage
4  between one man and one woman is prohibited."
5  Q  And if you could --
6  A  Additionally --
7  Q  -- continue on.
8  A  I'm continuing.  I'm sorry.
9  "Additionally, any sexual behavior that
10  is inconsistent with these standards -- including
11  sexual intercourse, other sexually intimate forms
12  of touching and sexual communication in written,
13  verbal or visual form -- is prohibited even when
14  consensual."
15  "Consistent with our commitment to
16  God's design for gender identity, the public
17  advocacy for or act of altering one's biological
18  sex through medical transition or transgender
19  expression is prohibited.  Any same-sex dating or
20  advocacy for such is also prohibited.  BJU's
21  perspective on gender identity also applied to --
22  but is not limited to -- the use of bathrooms,

**Page 223**

1  locker rooms, student housing, attire policies
2  and participating in sex-specific university
3  groups, clubs and organizations."
4  "A fuller statement of BJU's position
5  on human sexuality and gender identity can be
6  found in Appendix B.  We realize that these
7  issues are increasingly complicated ones with
8  which many believers struggle, and we want to be
9  a help to any students who need and desire help.
10  The Student Life and Student Care staff are
11  available to meet with students who are
12  struggling."
13  Q  Thank you.  Now I want to ask you
14  about -- specifically about paragraph 3, which
15  talks about gender identity and has pretty clear
16  prohibitions on medical transition, transgender
17  expression, same-sex dating or advocacy for
18  same-sex dating and also clearly states that
19  transgender students are not allowed to use
20  bathrooms, locker rooms, housing or attire that
21  is inconsistent with their biological birth sex.
22  Now, assuming that Bob Jones University

*Objection:*

*FRE 802 701*

*223:13-22*

**Page 224**

1  was not a religious educational institution,
2  would you agree that this kind of a policy would
3  be in violation of OCR's regulations
4  preventing -- or prohibiting sexual orientation
5  and gender identity discrimination?
6  MS. SNYDER:  Objection.  You are
7  outside the topics of the -- of the scope of the
8  30(b)(6) deposition.
9  You can answer the question in your
10  personal capacity if you're able.
11  THE WITNESS:  Based on my personal
12  capacity and -- and knowledge, the policy and --
13  and the implementation of the policy would
14  violate our interpretation of the prohibition on
15  sex discrimination in the -- this was made clear
16  several years ago by the administration -- by the
17  Obama administration.
18  BY MR. SOUTHWICK
19  Q  And then again more recently by the
20  Biden --
21  A  Again --
22  (Inaudible crosstalk.)

*Objection:*

*FRE 802 701*

*224:1-17*

**Page 225**

1  Q  -- administration, correct?
2  I do want to go back to the -- I
3  appreciate your answer.  However, you do
4  recognize or agree that one of the plaintiffs in
5  this litigation and a plaintiff who has filed a
6  Title IX administrative complaint did so against
7  Bob Jones University; is that correct?
8  The lead plaintiff, Elizabeth Hunter,
9  filed a Title IX complaint against Bob Jones
10  University; is that correct?  You can look at the
11  list on Exhibit 2.
12  A  Yes.  I see Elizabeth Hunter has filed
13  a complaint against Bob Jones University.  Yes.
14  11212234.  Yes.
15  Q  And so Bob Jones University's policies
16  with respect to sexual orientation or gender
17  identity would be relevant to OCR's analysis of
18  that complaint; isn't that right?
19  A  Yes.  This would -- if this were
20  submitted with a complaint, yes, we would -- we
21  would certainly consider this in the evaluation
22  of the complaint at the enforcement level.  I'm

57 (Pages 222 - 225)

1  not speaking about a consideration of this as
2  part of a process of seeking an assurance of
3  religious exemption, which is handled by program
4  legal group.
5       MR. SOUTHWICK:  Let's -- if we can just
6  go off the record for a minute or two, I think
7  I'm about to wrap up, but I'd just like to
8  consult with my counsel over here.  We're almost
9  done with our part.
10      MS. SNYDER:  Take your time.
11      VIDEO TECHNICIAN:  We are going off the
12  record at 4:17.
13      (Recess 4:17 p.m. to 4:33 p.m.)
14      VIDEO TECHNICIAN:  We are back on the
15  record.  The time is 4:33.  Please proceed.
16      THE WITNESS:  Mr. Southwick, before we
17  proceed, I would like, if you will -- there was a
18  question you posed to me earlier in the day that
19  I was at the time unable to answer, and it was a
20  question with respect to Bob Jones University and
21  Colorado Christian College.  The question was
22  about the -- the basis for granting an exemption

Page 226

1  when there was no outside religious organization
2  that either of those institutions pointed to as
3  controlling.
4       And I was unable to answer the question
5  at the time, but I'd like to offer an answer at
6  this point, and that is that determination and,
7  also, the basis for subsection 4 in the
8  November 2020 regulation is drawn from the Smith
9  memorandum from 1989 and -- which is found -- the
10  particular section is found on page 2 of that
11  memorandum, ED2.000077.
12      Subsection 1, which states that a
13  doctrinal statement with a notation that specific
14  members of the institution community must espouse
15  a personal belief in the religion or doctrinal
16  statement, hyphen -- or dash -- this is
17  sufficient evidence that the institution is,
18  quote-unquote -- quote, controlled, unquote, by a
19  religious organization under 106.12(a) for
20  purposes of claiming a religious exemption, a
21  reference to see tab B, page 4 of the
22  February 19, 1985 guidance.

Page 227

1       I just wanted to pose that as my answer
2  at this point.  Thank you.
3       VIDEO TECHNICIAN:  And, Mr. Wills, this
4  is the Lori, the videographer, and I believe
5  you're hitting the microphone a little bit, so
6  just FYI.  Thank you.
7       THE WITNESS:  I'm sorry.
8       VIDEO TECHNICIAN:  Thank you.
9  BY MR. SOUTHWICK
10  Q   All right, Mr. Wills.  I'm almost done
11  with my questioning for today.  Thank you for
12  your time today.  I've just got a few to wrap up.
13      I did want to look at the OCR -- excuse
14  me -- the OCR Processing Manual again, which is
15  Exhibit 3, and I wanted to ask specifically about
16  Section 109, First Amendment Principles.  Just
17  let me know when you've been able to locate that.
18  A   I've located it.
19  Q   All right.  There's a paragraph there.
20  I've read it a few times.  I'm not quite sure
21  what it means, and I was just wondering if you
22  might be able to explain what does it mean that

Page 228

1  OCR does not have jurisdiction to enforce the
2  First Amendment to the Constitution, but
3  throughout the process will interpret its
4  statutes and regulations consistent with the
5  requirements of the First Amendment.
6       To the extent you can, maybe if you can
7  just kind of clarify what -- what all this means.
8       MS. SNYDER:  Okay.  I'm going to object
9  to the question as outside the topics -- outside
10  the scope of the topics in the Rule 30(b)(6)
11  notice.  You can answer in your personal capacity
12  if you're able.
13      THE WITNESS:  Thank you.  In my
14  personal capacity, this provision of the Case
15  Processing Manual is a recent addition.  It was
16  inserted into the Case Processing -- Case
17  Processing Manual in the August 2020 iteration.
18  To the extent that I have any knowledge about
19  this, I'll share that with you.
20      The first sentence is in there to
21  indicate that we do not handle complaints that
22  come to us with allegations that my First

Page 229

1  Amendment rights have been violated, which would
2  call upon us to exercise jurisdiction that we do
3  not have, which is to interpret the First
4  Amendment and determine whether a particular
5  student's rights have been violated under the
6  First Amendment.
7       My understanding of the second portion
8  of this, OCR -- "all actions taken by OCR must
9  comport with First Amendment principles," my
10 understanding of that is that OCR would not, for
11 example, require a recipient to enter into a
12 resolution agreement that contains a provision
13 perhaps with regard to harassment and -- certain
14 kinds of verbal harassment that would arguably
15 violate or impinge upon a student's First
16 Amendment rights.
17      But I have no further elucidation I can
18 provide as to the meaning of that particular
19 section.
20 BY MR. SOUTHWICK
21   Q   Mr. Wills, are you aware that in this
22 litigation that this deposition is a part of that

Page 230

1  there is a motion -- there is a preliminary
2  injunction hearing scheduled for November 4th and
3  5th in this case relating to the processing of
4  these Title IX complaints?  Are you generally
5  aware of that?
6    A   I'm generally aware of that; however,
7  with not much specificity.
8    Q   Part of the request for relief,
9  plaintiffs are asking for a declaration from the
10 judge instructing OCR to not enforce the Title IX
11 religious exemption with respect to the
12 complaints that are part of Exhibit 2.
13      To the extent that the plaintiffs are
14 successful in obtaining such a order from the
15 Court, my question is, you know, what would
16 happen with respect to these Title IX complaints?
17 Would they be processed similar to other
18 complaints, then, just following the regular OCR
19 Processing Manual guidelines?
20      MS. SNYDER:  Objection.  The question
21 goes outside the scope of the topics in the Rule
22 30(b)(6) deposition.  Additionally, it is

Page 231

1  speculative and ambiguous.
2       You can answer in your personal
3  capacity if you are able.
4       THE WITNESS:  Mr. Southwick, if I can
5  reiterate -- you're asking me if -- if an
6  injunction were granted prohibiting OCR from
7  either issuing assurances or using assurances of
8  religious exemptions in -- in analyzing cases
9  going forward, if that preliminary injunction
10 were granted, would OCR proceed with an
11 investigation?
12      MS. SNYDER:  Okay.  Again, just for the
13 record, objection.  It's speculative.  It's
14 ambiguous, and it's outside the scope of the
15 topics in the Rule 30(b)(6) deposition.
16      You can answer in your personal
17 capacity if you're able.
18      THE WITNESS:  I really can't answer
19 that, because I don't know what the decision
20 would be with regard to moving past the
21 preliminary injunction.  I simply don't know what
22 the answer would be.

Page 232

1  BY MR. SOUTHWICK
2    Q   Well, what I'm really -- what I'm
3  really getting at, I guess, is:  If OCR does open
4  up investigations and it makes a finding that
5  there had been a violation, according to the
6  Processing Manual, there -- there are a few tools
7  in OCR's tool belt that it can use in order to
8  come to a resolution with the educational
9  institution; is that correct?
10   A   That is correct.
11   Q   And what would be the most common form
12 of resolution when there's -- when -- when a
13 complaint has been properly stated and OCR is
14 going to do some kind of enforcement?  What's the
15 most common enforcement action?
16   A   If OCR continues with an investigation
17 and during the course of that investigation, in
18 its review of evidence during the course of that
19 investigation, has -- has not yet made a finding
20 of violation, doesn't have enough evidence yet to
21 state definitively that there has been a
22 violation of law, but has concerns -- and we use

Page 233

59 (Pages 230 - 233)

**Page 234**

1  the term concerns very deliberately.  We have not
2  yet found a violation, but we have concerns.  We
3  think there are problems that we need to address.
4  That is the most -- and we've -- we've gotten a
5  request from the recipient institution to resolve
6  the case.
7       If we think that's appropriate to
8  resolve, we will ask the institution to enter
9  into a resolution agreement prior to the
10  conclusion of the investigation and a finding of
11  violation to address the concerns that we have
12  seen in our review of the evidence that we've
13  obtained in the case.
14       That is OCR's most frequent type of
15  resolution agreement.  We have many more of those
16  than we do resolution agreements that address
17  violations that we found as a result of a
18  complete investigation.  We have a number of
19  agreements that actually address both, where we
20  have found violations and we have concerns about
21  other portions of what we've seen, but for the
22  most part, talking about resolution agreements

**Page 235**

1  with recipients, the agreements that I first
2  described that we enter into prior to the
3  conclusion of an investigation that we think is
4  appropriate, that the recipient has asked for,
5  that is our most frequently used type of
6  resolution.
7       And those resolution agreements are
8  monitored by OCR with -- in exactly the same way
9  that resolution agreements where we found
10  violations are.
11       Q    Okay.  So there's resolution agreements
12  prior to a finding of violation, and that's the
13  most common.  And then there can also be
14  resolution agreements after a finding of
15  violation.
16       What other kinds of enforcement actions
17  does OCR take?
18       A    Well, we can also at the -- at the
19  conclusion of an investigation make a finding of
20  insufficient evidence to support a conclusion
21  that there's been a violation of law.  That is
22  certainly one of the actions we take.  In

**Page 236**

1  resolving cases, that is a type of resolution, as
2  are resolutions with a grievance and violation
3  findings.
4       Other types of resolutions include
5  dismissals.  We may learn in the course of an
6  investigation, for example, that a particular
7  complainant has determined to file a case
8  alleging the same operative facts or similar
9  operative facts in court, and we would certainly
10  dismiss at that point as well.
11       So we have dismissal -- dismissal
12  options as resolution types, insufficient
13  evidence findings resolution types, prior to
14  conclusion of an investigation, after the
15  investigation is concluded.
16       We also have available, again, if OCR
17  deems it appropriate, what's denominated in the
18  Case Processing Manual as facilitated resolution
19  between the parties, generally not available in
20  complex cases, but there are any number of cases,
21  present single-issue cases where the parties are
22  actually interested in resolving the matter

**Page 237**

1  themselves, most frequently used in a disability
2  context.  We act in those circumstances as a
3  mediator.  The parties work out an agreement of
4  their own.  OCR does not monitor that agreement.
5  So that's -- that's one further resolution option
6  available from the CPM.
7       Q    And if OCR and the educational
8  institution are not able to reach a resolution
9  agreement after a finding of violation, what
10  enforcement options are available to OCR at that
11  point?
12       A    The enforcement options available,
13  if after attempts to negotiate a resolution
14  agreement fail, there are a number of interim
15  procedural steps we take.  We issue a letter of
16  impasse.
17       If that letter is unsuccessful in
18  bringing the -- bringing the recipient into an
19  agreement, we will issue a letter of impending
20  enforcement action, which is one more step in the
21  process indicating that, again, these are the
22  efforts we've made.  These are the violations

60 (Pages 234 - 237)

we've found.  You've -- we rehearse all of the
efforts we've made to -- to resolve the agreement
and inform the recipient at that point that
failure to enter into an agreement within a
certain specified time frame that can vary from
case to case that we will take enforcement
action.
    Enforcement action can take one of two
forms for OCR.  We can take administrative
enforcement action, which means we would
basically take the case to the Office of Hearings
and Appeals in the Department of Education and,
basically, in an administrative forum, relitigate
the case from the beginning.
    We can also -- also have the option to
refer the matter to the Department of Justice for
whatever action they may elect to take to enforce
the rights that we've identified that have been
violated.
    Q   And so those -- all those different
options, those would be exhausted before the
federal financial assistance would ever be

Page 238

withdrawn from an educational institution; is
that accurate?
    A   That is accurate.
    MS. SNYDER:  Objection.
    THE WITNESS:  Sorry.
    MS. SNYDER:  You're outside the scope
of the topics in the deposition notice.
    If you know the answer, you can answer
in your personal capacity.
    THE WITNESS:  Yes, that -- that is
accurate.
BY MR. SOUTHWICK:
    Q   And to your knowledge, has OCR or the
Department of Justice ever withheld federal
financial assistance as a result of an OCR
finding of a violation?
    MS. SNYDER:  Objection.  Outside the
scope of the topics listed in the 30(b)(6)
notice.
    You can answer in -- in your personal
capacity if you're able.
    THE WITNESS:  To my knowledge and in my

Page 239

experience at OCR, that has not been the case.
There's been no withdrawal -- withdrawal of
funds.
    MR. SOUTHWICK:  Thank you, Mr. Wills --
    THE WITNESS:  That's to the best -- to
my knowledge.
    MR. SOUTHWICK:  Thank you, Mr. Wills.
I appreciate your time today.  I don't have any
questions at this time.  However, other attorneys
are likely to be asking you questions, and I
might do some follow-up after they're done
depending on the nature of their questioning.
    And I will also just note that this was
a 30(b)(6) deposition for three limited topics
for the purpose of obtaining evidence in advance
of the preliminary injunction hearing, and so
plaintiffs reserve their right to keep the
deposition open with respect to other topics as
discovery proceeds to the extent the Court allows
and also will keep the deposition open to the
extent that the witness was unable to respond to
questions due to lack of preparation.

Page 240

    With that, nothing further from
plaintiffs at this time.
    MS. SNYDER:  Why don't the intervenors
go ahead and ask their questions first, if that's
okay, and then -- and then we may have some
follow-up questions on our end.
    MR. SCHAERR:  Mark -- Mark or Ryan,
does one of you want to go first, or shall I go?
    MR. LIPPELMANN:  You can go first,
Gene.
    MR. SCHAERR:  All right.  Well, hello,
Mr. Wills.  I am -- I am Gene Schaerr, and I'm
representing the intervenor, Council on Christian
Colleges & Universities.
    VIDEO TECHNICIAN:  Counsel, your audio
is breaking up.
    MR. SCHAERR:  I'm sorry.  Let me see if
I can -- (inaudible) if that's all right and see
if that helps.  Can you hear me better now?
    VIDEO TECHNICIAN:  Yes.
    THE WITNESS:  Yes, I can.
    MR. SCHAERR:  All right.  Sorry about

Page 241

Objection; FRE 802; 240:1-3

Objection: FRE 802 238:20-239:22

61 (Pages 238 - 241)

1 that. I had -- I thought I had a strong Internet
2 connection here.
3       EXAMINATION BY COUNSEL FOR
4       DEFENDANT-INTERVENOR COUNCIL FOR
5       CHRISTIAN COLLEGES & UNIVERSITIES
6 BY MR. SCHAERR
7   Q  Anyway, Mr. Wills, thank you for being
8 with us today, and thank you for all the time
9 that you've already devoted to this process.
10      To your knowledge, has the Department
11 or OCR ever instructed religious schools to enact
12 policies related to human sexuality?
13      MS. SNYDER: I'm going to object. It's
14 outside the scope of the topics enumerated in the
15 deposition notice.
16      You can answer the question in your
17 personal capacity if you're able.
18      THE WITNESS: To my knowledge, OCR has
19 never instructed -- instructed a religious
20 institution to institute any policies with regard
21 to human sexuality.
22

Page 242

1 BY MR. SCHAERR
2   Q  Okay. To your knowledge, has the
3 Department or OCR ever assisted a religious
4 school in drafting a policy on human sexuality or
5 gender?
6      MS. SNYDER: Again, I'm going to
7 object. The matters are outside the scope of the
8 30(b)(6) notice.
9      You can answer in your personal
10 capacity if you're able.
11      THE WITNESS: To my knowledge, OCR has
12 never engaged in such assistance.
13      MR. SOUTHWICK: Counsel, I wonder if it
14 makes sense for us to give you a standing
15 objection on the ground that you've just
16 articulated.
17      MS. SNYDER: I -- I don't -- I'm not
18 sure that that's -- I like the idea of the
19 efficiency, but I'm not sure that's going to cut
20 it if it -- if there's actually a dispute about
21 this. So I think I'm going to have to keep doing
22 it. I'm sorry.

Page 243

1      MR. SCHAERR: Okay. And I -- you know,
2 my -- some of my questions are -- you -- as you
3 point out, are not within the scope of the three
4 topics in the 30(b)(6) notice, but they are
5 within the scope of the questions asked by
6 plaintiff's counsel, so that's why I'm asking
7 them.
8 BY MR. SCHAERR
9   Q  Does the Department or OCR have a
10 process for reviewing or approving policies on
11 human sexuality or gender drafted by religious
12 schools?
13      MS. SNYDER: Again, objection. Outside
14 the scope of the topics.
15      You can answer in your personal
16 capacity if you're able.
17      THE WITNESS: To my knowledge, there is
18 no -- OCR does not have an approval process
19 whereby an institution would submit a policy to
20 OCR for approval.
21 BY MR. SCHAERR
22   Q  And to your knowledge, has the

Page 244

1 Department ever encouraged any religious school
2 to discriminate against or otherwise -- or
3 otherwise mistreat any member of the LGBTQ
4 community?
5      MS. SNYDER: Again, objection. It's
6 outside the scope of the topics listed in the
7 Rule 30(b)(6) deposition.
8      You can answer that question in your
9 personal capacity if you're able.
10      THE WITNESS: To my knowledge, OCR has
11 never encouraged under any circumstances that an
12 institution mistreat LGBTQ+ students.
13 BY MR. SCHAERR
14   Q  Or discriminate against them?
15      MS. SNYDER: Same objection.
16      Again, you can answer in your personal
17 capacity if you're able.
18      THE WITNESS: To my knowledge, OCR has
19 never encouraged a religious institution to
20 discriminate against LGBTQ+ students.
21 BY MR. SCHAERR
22   Q  Okay. Now, when deciding whether the

Page 245

62 (Pages 242 - 245)

1 religious exemption applies in a given case, what
2 does OCR review?
3    A   I believe I articulated this earlier,
4 but I'll repeat that the -- that the review,
5 first of all, is conducted by OCR's program legal
6 group, which is not the same, obviously, as the
7 enforcement group.  I'm a deputy assistant
8 secretary for enforcement.
9        But PLG, whenever -- when a request for
10 issuance of an assurance of religious exemption
11 is received by headquarters, the request is
12 forwarded to the -- our Title IX team and the
13 program legal group.  The program legal group
14 reviews the request.
15        If the program legal group determines
16 that additional information is necessary in order
17 to make a recommendation as to a determination on
18 the request, the program legal group will make
19 that request to -- they will make that known to
20 the deputy assistant secretary for policy, who's
21 the head of the program legal group, and to the
22 assistant secretary.

Page 246

1        And based on the assistant secretary's
2 decision in collaboration with the deputy
3 assistant secretary for policy, the assistant
4 secretary may at that point say, yes, I agree you
5 need additional information, and a letter
6 requesting the additional information should
7 issue.  Currently, the practice is that that
8 letter will issue over the signature of the
9 deputy assistant secretary for policy.
10        Once that additional information is
11 received, assuming it's sufficient for the PLG
12 group to make a determination, the group -- the
13 attorneys in the PLG group will draft a letter
14 for signature by the assistant secretary.  In --
15 in all the cases I've ever experienced, the
16 letter will recommend to the acting assistant
17 secretary, the assistant secretary, that the
18 assurance of a religious exemption or exemptions
19 issue.
20        If upon review of that letter the
21 assistant secretary agrees with the analysis and
22 conclusion, he or she will sign the letter and

Page 247

1 send it to the recipient -- to the -- to the
2 religious institution, the recipient institution.
3    Q   Thank you.  And as part of that
4 approval process, I gather that -- that OCR
5 reviews the institution's religious beliefs and
6 tenets to the extent that they're relevant to the
7 exemption, right?
8    A   Counsel, when you say reviews the
9 religious beliefs, I want to draw your attention
10 to -- in answering that question, I want to draw
11 your attention to an exhibit in the binder.  This
12 is the Singleton memo.
13        I'm looking at ED2.000048.  I just want
14 to call your attention to the statement in the
15 first paragraph under tenets.  "OCR cannot
16 question what institutional representatives claim
17 as their beliefs."
18        So there is a review, yes, but under
19 these circumstances.  It's not questioning.  It's
20 not delving into them at that level, at the
21 initial request for an assurance level.
22    Q   Okay.  Does -- in your experience or

Page 248

1 observation, does OCR ever question the sincerity
2 of the asserted religious beliefs or tenets?
3    A   In my experience, I don't believe that
4 there's ever been a time when they've questioned
5 the -- OCR has questioned the sincerity of
6 beliefs or tenets of a religious institution that
7 is seeking an assurance of religious exemption.
8    Q   Okay.  And to your knowledge, has OCR
9 ever denied an application for a religious
10 exemption because a religious school failed to
11 provide adequate documentation of its beliefs?
12        MS. SNYDER:  Objection.  I believe that
13 goes beyond the scope of the 30(b)(6) deposition
14 topics.
15        You can answer in your personal
16 capacity if you're able.
17        THE WITNESS:  I don't know that -- that
18 OCR has ever denied a religious institution
19 because it has not provided sufficient
20 information.
21        I believe that what I just described to
22 you in terms of the program legal group needing

Page 249

63 (Pages 246 - 249)

1  additional information and making a request
2  approved by the assistant secretary for that
3  information indicates that OCR would attempt to
4  get that information.
5      If it were incomplete, I -- I don't
6  know of any situation where OCR has denied a
7  request even -- denied a request for an assurance
8  of exemption after it's sought information and
9  hasn't received exactly what it needs.  It's my
10  understanding that reaching out again is
11  sufficient.  They frequently get the information
12  they need, and PLG can move forward.
13  BY MR. SCHAERR
14    Q  Okay.  Now, a couple of times in its
15  briefing in this case, the Department has said
16  that it, quote, does not condone the sexuality
17  and/or gender policies of the religious schools
18  whose policies have been called into question in
19  this -- in this lawsuit.
20      Do you -- do you know what the
21  Department meant by that?
22      MS. SNYDER:  Objection.  That is

Page 250

1  outside the topics in the 30(b)(6) deposition
2  notice.  It is also -- calls for speculation and
3  is ambiguous.
4      You can answer in your personal
5  capacity if you're able.
6      THE WITNESS:  The only answer I
7  can give --
8      MR. SOUTHWICK:  This is Paul Southwick,
9  and I, for the plaintiffs' side, join in the
10  objection.
11      THE WITNESS:  The only answer I have is
12  I take the words at face value.  The Department
13  --
14      MR. SCHAERR:  Okay.
15      THE WITNESS:  -- does not condone those
16  policies.
17  BY MR. SCHAERR
18    Q  All right.  Are you aware of any
19  employees at OCR or in the Department who have
20  expressed disapproval of or disagreement with
21  those policies?
22      MS. SNYDER:  Objection.  Outside the

Page 251

1  scope of the topics listed in the 30(b)(6)
2  notice.  Similarly, it calls for speculation and
3  is an ambiguous question.
4      If you're able to answer in your
5  personal capacity, you can.
6      THE WITNESS:  I'm not aware of anyone
7  in the Department who's expressed an opinion one
8  way or the other with regard to those policies.
9  BY MR. SCHAERR
10    Q  Okay.  I -- I assume that you're
11  generally familiar with the Supreme Court's
12  decision in Obergefell versus Hodges, right, the
13  case dealing with same-sex marriage?
14    A  Yes, I am generally familiar with that
15  case.
16    Q  Let me read you a statement from
17  Justice Kennedy's majority opinion and -- and ask
18  you to tell me if the Department agrees or
19  disagrees with it.
20      He said, quote, Many who deem same-sex
21  marriage to be wrong reach that conclusion based
22  on decent and honorable religious or

Page 252

1  philosophical premises.
2      MS. SNYDER:  Objection.  That is
3  outside the scope of the topics listed in the
4  30(b)(6) deposition.  Additionally, it's
5  argumentative and speculative.
6      If you can answer the question in your
7  personal capacity, you may.
8      MR. SOUTHWICK:  I join those
9  objections.
10      MR. SCHAERR:  Can you tell me
11  whether --
12      THE WITNESS:  Would you repeat --
13      MR. SCHAERR:  -- the Department
14  agrees --
15      THE WITNESS:  Would you repeat the --
16  does -- does the Department agree or disagree
17  with the statement from Justice --
18      MR. SCHAERR:  With that --
19      THE WITNESS:  -- Kennedy?
20      MR. SCHAERR:  -- statement, yes.
21      MS. SNYDER:  Again -- again, the same
22  objection.  Speculation.  Argumentative.  And

Page 253

64 (Pages 250 - 253)

1  it's outside the scope of the topics.
2       You can answer that question in your
3  personal capacity if you're able.
4       THE WITNESS:  I can't answer on behalf
5  of the Department, that question on behalf of the
6  Department.
7  BY MR. SCHAERR
8    Q   Okay.  Do you -- do you personally
9  agree or disagree with that statement?
10      MS. SNYDER:  Same objection.  Outside
11  the scope of the 30(b)(6) topics, and it is
12  ambiguous.
13      You can answer in your personal
14  capacity if you're able.
15      THE WITNESS:  I'm not able to answer
16  that question in my personal capacity, no.
17      MR. SCHAERR:  Okay.
18      THE WITNESS:  Would you read the -- I'm
19  sorry.  Read the statement again.
20      MR. SCHAERR:  Yes.  He said, "Many who
21  deem same-sex marriage to be wrong reach that
22  conclusion based on decent and honorable

Page 254

1  religious or philosophical premises."
2       MS. SNYDER:  Again, same objection.
3  Outside the scope.  It calls for speculation and
4  it's argumentative.
5       If you can answer that in your personal
6  capacity, if you're able.
7       THE WITNESS:  No, I can't.
8  BY MR. SCHAERR
9    Q   Okay.  Here's another statement from
10  Justice Kennedy's opinion -- and this is the last
11  one I'll read -- discussing the implications of
12  his opinion for religious groups.  And, again,
13  I'll read it and -- ask you if the Department
14  agrees or disagrees with it.
15      He said, "It must be emphasized that
16  religions and those who adhere to religious
17  doctrines may continue to advocate with utmost
18  sincere convention that, by divine precepts,
19  same-sex marriage should not be condoned."
20      MS. SNYDER:  Objection.  It's outside
21  the topics listed in the 30(b)(6) notice.  It
22  also potentially calls for speculation and is

Page 255

1  argumentative.
2       If you -- if you can answer the
3  question in your personal capacity, you may.
4       THE WITNESS:  I can't answer the
5  question in my personal capacity.
6  BY MR. SCHAERR
7    Q   You say you cannot answer it in your
8  personal capacity?
9    A   No.
10    Q   Okay.
11    A   And certainly can't on behalf of the
12  Department.
13    Q   All right.  On -- on September 28th,
14  Mr. Southwick tweeted an explanation of the
15  policy view that underlies this lawsuit.  Let me
16  read that statement and let you tell me whether
17  the Department agrees or disagrees with his view.
18      He said, "Taxpayer funding, whether
19  state or federal money, should not be used to
20  support schools that discriminate against or
21  exclude LGBTQ students - end of story."
22      Can you tell me whether the Department

Page 256

1  or OCR agrees or disagrees with that statement of
2  policy?
3       MS. SNYDER:  Objection.  Outside the
4  topics -- outside the scope of the topics in the
5  30(b)(6) deposition.  Also potentially calls for
6  speculation.  It's ambiguous and argumentative.
7       You can answer that question in your
8  personal capacity if you're able.
9       THE WITNESS:  I cannot tell you whether
10  the Department agrees or disagrees with that
11  statement you just read.
12  BY MR. SCHAERR
13    Q   Okay.  And in your personal capacity,
14  can you tell me whether you agree or disagree
15  with it?
16    A   I--
17      MS. SNYDER:  Objection.  That's outside
18  the topics in the 30(b)(6) deposition notice.
19  Similarly, argumentative.  Ambiguous.
20      If you can answer in your personal
21  capacity, you may.
22      THE WITNESS:  I cannot do so.

Page 257

65 (Pages 254 - 257)

Page 258

```
1        MR. SCHAERR:  Okay.  Well, thank you.
2   That's all the questions I have.
3        VIDEO TECHNICIAN:  Are there any
4   further questions or anything further for the
5   record?
6        MR. LIPPELMANN:  This is Mark
7   Lippelmann.  I'm counsel for the religious school
8   intervenors, Corban University, William Jessup
9   University and Phoenix Seminary.
10       Mr. Wills, thank you for your time
11  today.  I have no further questions beyond what
12  Mr. Schaerr just asked.
13       MS. SNYDER:  So is that it for the
14  intervenors?
15       MR. SCHAERR:  Yes.
16       MR. LIPPELMANN:  Yes.
17       MS. SNYDER:  Okay.  I believe I have
18  some follow-up questions, but I'd like to take a
19  break to go over my notes and consult with my
20  counsel, co-counsel.  So I'd like to take maybe
21  like a 20-minute or so break, if that's okay, and
22  go off the record.
```

Page 259

```
1        MR. SOUTHWICK:  That's fine with
2   plaintiffs.
3        VIDEO TECHNICIAN:  Thank you.  We are
4   going off the record at 5:07.
5        (Recess 5:07 p.m. to 5:37 p.m.)
6        VIDEO TECHNICIAN:  We are back on the
7   record.  The time is 5:37.  Please proceed.
8        MS. SNYDER:  Thank you.  I will say at
9   the start, we are down to one mike.  We had some
10  battery issues, so if you have trouble hearing
11  either me or the witness, please -- please let us
12  know.
13       MR. SOUTHWICK:  Gene, you're on mute.
14       MR. SCHAERR:  I'm sorry.  As I
15  mentioned in the chat a minute ago, I have two
16  quick follow-up questions about Exhibit 2.  Can I
17  go ahead and ask those first before you get
18  started?
19       MS. SNYDER:  Sure.
20  BY MR. SCHAERR
21    Q   Mr. Wills, if you could look again at
22  Exhibit 2, which I know you discussed extensively
```

Page 260

```
1   with plaintiffs' counsel.  Is it fair to say
2   that -- that all of the complaints reflected on
3   that chart were made outside the 180-day
4   timeliness window?
5        MS. SNYDER:  Objection.  I believe that
6   misstates the chart.
7        MR. SOUTHWICK:  Join the objection.
8   BY MR. SCHAERR
9    Q   Well, there's a -- there's a column
10  there that says 180-day waiver requested.
11       Do you see that, Mr. Wills?
12    A   Yes, I do see that.
13    Q   And the only -- the only reason to
14  indicate that a -- that a waiver might be needed
15  is if the -- is if the complaint was outside the
16  180-day window; isn't that correct?
17       MS. SNYDER:  Objection.  That calls for
18  speculation.  It's also outside the scope of the
19  30(b)(6) notice.
20       You can answer in your personal
21  capacity if you're able.
22       MR. SOUTHWICK:  Objection.  Lacks
```

Page 261

```
1   foundation.
2        THE WITNESS:  In my personal capacity,
3   that may indicate that the filing was outside of
4   the 180-day window.  I have not reviewed the
5   complaints, and there's often additional
6   information we need to determine whether
7   something is actually outside the 180-day window.
8        It may -- it may be that these cases
9   are.  It may be that some of these cases are not,
10  but I can't say definitively that this means they
11  were all filed outside the 180-day window.
12       I have not examined the complaints
13  myself, and I've not examined any attachments
14  that those complaints might have submitted or
15  interviewed anybody about these complaints.  So I
16  cannot make that definitive statement.  It's a
17  possibility, but that's as far as I could --
18  could state for you.
19  BY MR. SCHAERR
20    Q   Okay.  So assuming a complaint is filed
21  outside the 180-day window, before that complaint
22  could proceed, OCR would have to make a
```

66 (Pages 258 - 261)

| | |
|---|---|
| 1 determination as to the requested exemption from | 1 also at Bates ED2.000241? |
| 2 that 180-day requirement, correct? | 2    A   Yes.  I do recall being asked questions |
| 3    A   That is correct. | 3 about this listing of recipient institutions. |
| 4       MR. SCHAERR:  Thank you.  That's all | 4    Q   Okay.  Do you recall Mr. Southwick |
| 5 I've got. | 5 asked you some questions about the process that |
| 6       EXAMINATION BY COUNSEL FOR DEFENDANTS | 6 OCR enforcement would -- would do in considering |
| 7 BY MS. SNYDER | 7 complaints in conjunction with -- specifically, |
| 8    Q   Do you recall earlier in the day being | 8 the example, I believe, was Baylor University. |
| 9 asked some questions about the Northwest Yearly | 9       Do you recall being asked questions |
| 10 Meeting correspondence? | 10 about the process OCR may consider in evaluating |
| 11    A   I do. | 11 the complaints against Baylor University? |
| 12    Q   Okay.  So I believe Exhibit 5 is that | 12    A   Yes, I recall those questions. |
| 13 correspondence.  Could you confirm that for me? | 13    Q   And I believe you said that if the |
| 14    A   That is correct.  Exhibit 5 is | 14 investigator is aware of the existence of the |
| 15 correspondence with -- with regard to George Fox | 15 assurance letter on file for Baylor that it's |
| 16 University and Northwest Yearly Meeting. | 16 possible that the complaint could be dismissed in |
| 17    Q   Other than the -- the example in | 17 the evaluation stage; is that correct? |
| 18 Exhibit 5, are you aware of any other instance in | 18    A   That is correct, dependent upon the |
| 19 which the complainant or their counsel challenged | 19 nature and extent of the exemption that was |
| 20 the criteria for the religious exemption in | 20 assured. |
| 21 conjunction with OCR's enforcement consideration | 21    Q   Could you explain what you mean by that |
| 22 of a complaint? | 22 last clause? |
| Page 262 | Page 264 |

| | |
|---|---|
| 1    A   I am not aware of any other example of | 1    A   Yes.  The investigator would need to |
| 2 that, where there's -- | 2 have a description of the exemption, the |
| 3    Q   Okay. | 3 particular section of that particular regulation |
| 4    A   -- been a challenge to a religious | 4 that was -- for which the recipient institution |
| 5 exemption under those -- on those grounds. | 5 was exempted, and would have to determine whether |
| 6       VIDEO TECHNICIAN:  Sorry.  I couldn't | 6 the allegations in the complaint were covered |
| 7 hear you.  Could you repeat that? | 7 by -- in other words, were covered by that |
| 8       THE WITNESS:  Could you repeat the | 8 particular exemption.  If they were, that would |
| 9 question, and I'll repeat the answer? | 9 mean we would no longer have subject matter |
| 10       MS. SNYDER:  Sure. | 10 jurisdiction. |
| 11 BY MS. SNYDER | 11    Q   What if the investigator conducted that |
| 12    Q   Other than the example in Exhibit 5, | 12 review and believed or determined that the -- |
| 13 are you aware of any other instance in which a | 13 that the assurance letter did not match the |
| 14 complainant or their counsel challenged the | 14 allegations in the complaint? |
| 15 criteria for the religious exemption in | 15    A   Under those circumstances, if the |
| 16 conjunction with OCR enforcement's consideration | 16 investigator determined that the assurance -- the |
| 17 of a complaint? | 17 exemption did not match -- did not cover the |
| 18    A   I am not aware of any such instance. | 18 allegations in the complaint, the complaint would |
| 19    Q   If you could, please, go to Exhibit 12. | 19 be open for investigation by issuance of the |
| 20    A   Yes. | 20 letter of notification of which we have a sample |
| 21    Q   That is the school list.  Do you recall | 21 here that would include the language about |
| 22 being asked questions about Exhibit 12, which is | 22 exceptions and exemptions. |
| Page 263 | Page 265 |

1    Q    And is that the investigator's sole
2   decision?
3    A    By no means.
4    Q    Okay.  So who is the decision-maker in
5   that circumstance?
6    A    Under those circumstances, as I -- as I
7   testified considerably earlier today, all of
8   those cases, all actions taken with regard to
9   these cases must be forwarded -- a proposed
10  action must be forwarded to headquarters for
11  review.
12       The headquarters group, composed of,
13  among others, the assistant secretary for
14  enforcement, myself and senior counsel, would
15  review the recommendation, and it would be the
16  assistant secretary's decision as to whether that
17  dismissal or any other action, formal action,
18  should be taken with regard to that complaint.
19   Q    Similarly, if the investigator believed
20  that the -- the exemption in the assurance letter
21  matched the allegations in the complaint such
22  that OCR did not have subject matter

Page 266

1   jurisdiction, is it the investigator's sole
2   decision that makes that determination?
3    A    It is not.  Similar to what I just
4   described, the investigator would compose a
5   letter of notification issue opening the
6   complaint with all the language that we've
7   described before.  That proposal would be
8   reviewed by the headquarters group, and the
9   decision would ultimately be made by the
10  assistant secretary.
11   Q    Okay.  I think I asked a confusing
12  question.  What if the investigator believes that
13  the assurance of -- of religious exemption letter
14  applies to the allegations in the complaint such
15  that OCR would not have jurisdiction?
16   A    Oh, I'm sorry.
17   Q    Who is making the decision in that
18  circumstance?
19   A    Ultimately, the assistant secretary.
20  All that -- any action taken with regard to those
21  complaints, whether it's opening those complaints
22  or dismissing those complaints, has to be

Page 267

1   reviewed at this point by the headquarters group,
2   and the decision will be made ultimately by the
3   assistant secretary.
4    Q    Earlier in the deposition, you
5   mentioned a regulation.  I know you have that
6   regulation in your binder.  Could you flip to it?
7   And we've produced it to everybody.
8        If you could go to the regulation which
9   is 34 C.F.R. section 106.12.
10   A    Uh-huh.
11   Q    And if you could read aloud the
12  introduction to paragraph c.
13   A    Paragraph c, Eligibility.  Any of the
14  following in paragraphs (c)(1) through (6) of
15  this section shall be sufficient to establish
16  that an educational institution is controlled by
17  a religious organization, as contemplated under
18  paragraph (a) of this section, and is therefore
19  eligible to assert a religious exemption to the
20  extent application of this part would not be
21  consistent with its religious tenets, colon.
22  One, that the educational institution --

Page 268

1    Q    That's okay.  Perfect.
2    A    All right.
3    Q    If you could, please, also in your
4   binder, go to -- it is in your binder.  It is a
5   Federal Register site, 85 Federal Register 59916,
6   issued September 23rd, 2020.  If you could please
7   go to what is Bates labeled ED2.000213, which is
8   actually page 59955 of the notice.
9    A    I've reached that page.
10   Q    And if you could just please read to
11  yourself the paragraph in the third column that
12  begins, "The Department understands."
13       Do you see that?
14   A    I see it.
15   Q    Through page ED2.000215, which is page
16  59957 of the Federal Register site, the first --
17  the -- midway through the first column, which
18  ends "assert a religious exemption."
19       Do you see that?
20   A    First column in 59957?
21   Q    Yes, sir.  About halfway through.
22  So -- so, again, just read to yourself, please,

Page 269

68 (Pages 266 - 269)

1 on page 59955 of the register or ED2.000213, the
2 portion that begins "The Department understands"
3 in the third column, and stop on page ED2.000215,
4 which is page 59957, the part that ends "to be
5 eligible to assert a religious exemption."
6     Could you read that part to yourself,
7 please.
8   A   Okay.  I've completed my reading.
9   Q   Okay.  If you could, then, go back to
10 the regulation that we were looking at, 34 C.F.R.
11 106.12.
12   A   Okay.
13   Q   You've previously read the introductory
14 paragraph c from the regulation.  Do you see
15 there that then there is a list of six
16 paragraphs?
17   A   I see them, the six paragraphs.
18   Q   Okay.  Do you know what the source of
19 those six enumerated paragraphs are?
20   A   Yes.
21   Q   Could you tell me, please?
22   A   The source of paragraphs 1, 2 and 3 are

Page 270

1 the -- first articulated in the March 1977
2 notice, the Federal Register.
3     Paragraph 4, I believe I referred to
4 the -- the Acting Assistant Secretary Smith's
5 guidance, where that -- this -- it's 1989
6 guidance for OCR, which I will (inaudible).
7     Yes, paragraph 4 is -- is articulated
8 in the memorandum from Acting Assistant Secretary
9 Smith issued on October 11th, 1989.  I'm looking
10 at page ED2.000077, subsection or paragraph 1
11 listed on -- on that page, which recites that a
12 doctrinal statement with a notation that specific
13 members of the institution community must espouse
14 a personal belief in a religion or doctrinal
15 statement, this is sufficient evidence that
16 the institution is, quote, controlled, end quote,
17 by a religious organization under section
18 106.12(a) for purposes of claiming these
19 exemptions.
20   Q   Okay.
21   A   Section -- paragraph 5 in the
22 regulation is -- is discussed in what I just

Page 271

1 read, and I will share that.  The numbering of
2 the section is different here.
3     Section 106.12(c)(6), which actually is
4 now in the regulation 106(c)(5), That the
5 educational institution has a published
6 institutional mission that is approved by a
7 governing body of an educational institution and
8 that includes, refers to, or is predicated upon
9 religious tenets, beliefs, or teachings.
10     The Department's analysis of that is
11 section 106.12(c)(6), as proposed, is consistent
12 with longstanding OCR practice in recognizing
13 this principle.  For example, OCR has long
14 recognized that a school or department of
15 divinity is an educational institution controlled
16 by a religious organization without any
17 requirement that the school or department of
18 divinity be controlled by a religious
19 organization that is organized as a separate
20 legal entity from the educational institution
21 itself.
22     While the Department understands the

Page 272

1 assertions raised by some commenters --
2 commenters that an educational institution must
3 be controlled by a separate legal entity in the
4 form of an external religious organization in
5 order to qualify for religious exemption, those
6 assertions are atextual, and the Department's
7 final regulations recognizes -- should be
8 recognize -- that some educational institutions
9 are organized and governed by a local board or
10 body of religious leaders rather than being
11 operated under a hierarchical organization.  The
12 Title IX statute does not require that an
13 educational institution and a controlling
14 religious organization be separate and distinct
15 entities.  Further, the Department has long
16 recognized that these entities can be one and the
17 same, such as in a case of schools of divinity.
18     Additionally, the Department
19 acknowledges that the statutory text leads to
20 potential ambiguities as to which educational
21 institutions are eligible for exemptions, and
22 over the years, the Department has had to develop

Page 273

69 (Pages 270 - 273)

1 a system for evaluating what is sufficient to
2 establish that an educational institution is,
3 quote, controlled by a religious organization,
4 end quote.
5     The Department has previously shared
6 the parameters of this system with the public
7 through, one, issuing nonbinding agency
8 memoranda; and, two, publicly posting the
9 Department's responses to letters seeking a
10 religious exemption from Title IX.  These
11 procedures left educational institutions in the
12 difficult position of digging through agency
13 memoranda from the 1980s and reading dozens of
14 letters from OCR in order to assess their
15 eligibility for asserting a religious exemption
16 under Title IX.
17     Notably, however, many of these
18 documents, including the document that referenced
19 divinity schools being eligible for religious
20 exemptions, were issued before the events
21 described by one of the commenters above
22 occurred, such as the passage of a statute

Page 274

1 sufficient to establish eligibility under the
2 control test.  Yet under this rationale, even a
3 school of divinity would need to be controlled by
4 an outside organization that is also a religious
5 organization, contrary to over 30 years of OCR
6 practice.  Why Congress would desire such an
7 outcome even as a policy matter, to say nothing
8 of the constitutional questions that might arise
9 by privileging some religious structures over
10 others, is left unaddressed by the commenter.
11 The Department --
12    Q   So let me stop you.  Is --
13    A   Okay.
14    Q   Is it -- is it correct to say that the
15 source of the exemptions -- or excuse me -- that
16 the source of the -- of paragraphs 1 through 6 is
17 listed in -- is -- is as you described as -- as
18 well as listed more specifically in the Federal
19 Register?
20    A   Yes, that is accurate.
21    Q   And in particular the citation that we
22 were referring to from September 23rd, 2020?

Page 276

1 addressing Hurricane Katrina recovery or
2 President Reagan's veto of the Civil Rights
3 Restoration Act.  The Department thus disagrees
4 with this commenter who suggests that the OCR
5 lacks regulatory authority for section 106.12 --
6 .12 because Congress in other statutes suggested
7 a distinction between maintaining religious
8 tenets and being controlled by another legal
9 entity that maintains legal tenets.  That a
10 different Congress drafted legislation in a
11 different way does not alter the fact that the
12 Title IX statute, as written, does not contain an
13 independent requirement that the controlling
14 religious organization be a separate legal entity
15 than the educational institution.
16     Indeed, the difference between these
17 two categories of educational institutions
18 appears to be a legal formality, in the sense
19 that this comment could imply that forming a new
20 legal entity on paper and merely having that
21 entity, quote, control, end quote, the
22 educational institution would in fact be

Page 275

1    A   That's correct.
2     MS. SNYDER:  Thank you.  Nothing
3 further.
4     MR. SOUTHWICK:  Nothing further from
5 plaintiffs.
6     VIDEO TECHNICIAN:  Okay.  Thank you,
7 everyone.  One moment, please, and I'll take us
8 off the record.
9     This concludes today's testimony given
10 by Randolph Wills.  The total number of Media
11 Units used was 5.  All media will be retained by
12 Veritext.  And we're going off the record at
13 6:04.  Thank you.
14     (Whereupon, at 6:04 p.m., the
15     deposition of RANDOLPH WILLS
16     was adjourned.)
17
18     * * * * *
19
20
21
22

Page 277

70 (Pages 274 - 277)

**CERTIFICATE OF NOTARY PUBLIC**

1  
2    I, ERICK M. THACKER, the officer before whom
3  the foregoing deposition was taken, do hereby
4  certify that the witness whose testimony appears
5  in the foregoing deposition was duly sworn by me;
6  that the testimony of said witness was taken by
7  me in stenotype and thereafter reduced to
8  typewriting under my direction; that said
9  deposition is a true record of the testimony
10  given by said witness; that I am neither counsel
11  for, related to, nor employed by any of the
12  parties to the action in which this deposition
13  was taken; and, further, that I am not a relative
14  or employee of any counsel or attorney employed
15  by the parties hereto, nor financially or
16  otherwise interested in the outcome of this
17  action.

ERICK M. THACKER
18  
Notary Public in and for the
19  Commonwealth of Virginia
20  

My commission expires:
21  August 31, 2024
22  Notary Registration No.: 7184488

Page 278

---

1  Randolph Wills
   c/o Hilarie E  Snyder, Esquire
2  U S  Department of Justice
   P O  Box 883
3  Washington, D C  20044
4  
   IN RE:  Elizabeth Hunter, et al  vs  U S
5     Department of Education, et al
6  Dear Mr  Wills:
7     The enclosed transcript of your deposition in
   the above-captioned case is submitted to you on
8  Tuesday, October 26, 2021, for your signature
   and any changes in form or substance you wish to
9  make  All changes will become part of your sworn
   testimony
10  
   After you have read the transcript, please
11  sign the Acknowledgment of Deponent  In addition,
   an Errata Sheet is attached for you to list any
12  change and the reason why such change is being
   made
13  
   Please return the original signed
14  Acknowledgment of Deponent and the Errata Sheet
   to Veritext Legal Solutions, 1250 Eye Street,
15  Northwest, Suite 350, Washington, D C
   20005, no later than 30 days after the date stated
16  above  You can also fax a copy prior to sending
   the originals to (202)857-8577
17  
   If you fail to return the above-referenced
18  pages within the time allowed, the transcript may
   be used as if signed by you
19  
   Yours,
20  
   Erick M  Thacker, RPR
21  Reporter/Notary
22  cc:  Paul Carlos Southwick, Esq

Page 280

---

**ACKNOWLEDGMENT OF DEPONENT**

1  
2    I, RANDOLPH WILLS, do hereby acknowledge I
3  have read and examined the foregoing pages of
4  testimony, and the same is a true, correct and
5  complete transcription of the testimony given by
6  me, and any changes or corrections, if any, appear
7  in the attached errata sheet signed by me.
8  
9  
10  
11  
12  

----------------        --------------------
13  Date                RANDOLPH WILLS
14  
15  
16  
17  
18  
19  
20  
21  
22  

Page 279

---

1  Elizabeth Hunter, et al  vs  U S  Department of
   Education, et al
2  
   Randolph Wills (#4843618)
3  
        E R R A T A   S H E E T
4  
   PAGE_____LINE_____CHANGE_____
5  
   _____
6  
   REASON_____
7  
   PAGE_____LINE_____CHANGE_____
8  
   _____
9  
   REASON_____
10  
   PAGE_____LINE_____CHANGE_____
11  
   _____
12  
   REASON_____
13  
   PAGE_____LINE_____CHANGE_____
14  
   _____
15  
   REASON_____
16  
   PAGE_____LINE_____CHANGE_____
17  
   _____
18  
   REASON_____
19  
20  
21  
   _____
22  RANDOLPH WILLS            Date

Page 281

71 (Pages 278 - 281)