Herbert G. Grey, OSB # 810250
4800 SW Griffith Drive, Suite 320
Beaverton, Oregon 97005-8716
Telephone: (503) 641-4908
Email: herb@greylaw.org

*Counsel for Defendant-Intervenor CCCU*

Gene C. Schaerr, DC Bar # 416368*
Email: gschaerr@schaerr-jaffe.com
Nicholas Miller, MI Bar# P70694*
Email: nmiller@schaerr-jaffe.com
Joshua J. Prince, DC Bar # 1685532*
Email: jprince@schaerr-jaffe.com
Schaerr | Jaffe LLP
1717 K Street NW, Suite 900
Washington, D.C. 20006
Telephone: (202) 787-1060

* Admitted *pro hac vice*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

Eugene Division

|  |  |
|---|---|
| ELIZABETH HUNTER, et al., | No. 6:21-CV-00474-AA |
| Plaintiffs, | |
| v. | |
| U.S. DEPARTMENT OF EDUCATION, et al., | EXPERT DECLARATION OF DR. MARK REGNERUS |
| Defendants, | |
| v. | |
| COUNCIL FOR CHRISTIAN COLLEGES & UNIVERSITIES, WESTERN BAPTIST COLLEGE d/b/a CORBAN UNIVERSITY, WILLIAM JESSUP UNIVERSITY AND PHOENIX SEMINARY, | |
| Defendants-Intervenors. | |

I, Mark Regnerus, am an adult of sound mind and make this statement voluntarily, based upon my own personal knowledge, education, and experience.

## I.    CREDENTIALS & SUMMARY OF OPINIONS

1.    I am a professor of sociology at the University of Texas at Austin. I received my Ph.D. from the University of North Carolina at Chapel Hill in 2000. I became an assistant professor of sociology and director of the Calvin College Center for Social Research in 2001, then became an assistant professor of sociology at UT-Austin in 2002, an associate professor in 2007, and a full professor in 2018.

2.    I have published numerous articles and four books on sexual-relationship behavior and decision-making since 2003.[1] The books, peer-reviewed journal articles, and essays I have written include material on sexual orientation and, more recently, attitudes about (and results of) transgender medicine. I am an experienced peer reviewer, having reviewed dozens of manuscripts in the past decade on these and related topics—including for top journals in both sociology and sex/sexuality studies (e.g., *Archives of Sexual Behavior*, *Journal of Homosexuality*, etc.). I have extensive survey administration experience as well, having fielded three nationally-representative surveys since 2011, and consulted on survey construction for several others, including the National Study of Family Growth and the National Longitudinal Study of Adolescent to Adult Health (or Add Health). A more complete

---

[1] Regnerus, M. D. (2007). *Forbidden fruit: Sex & religion in the lives of American teenagers*. Oxford University Press.; Regnerus, M. & Uecker, J. (2011). *Premarital sex in America: How young Americans meet, mate, and think about marrying*. Oxford University Press.; Regnerus, M. (2017). *Cheap sex: The transformation of men, marriage, and monogamy* Oxford University Press.; Regnerus, M. (2020). *The future of Christian marriage*. Oxford University Press.

review of my professional experience, publications, and research is provided in my curriculum vitae, a copy of which is attached hereto as Exhibit A.

3.    My experience in the area of sexuality research primarily concerns basic methodological matters, involving design, measurement, statistical inference, interpretation of data, and reflections on the research and publication norms that have developed in this new domain in conjunction with media interest and professional and organizational pressures.  This leans not only on my knowledge of the research in this domain, but also on the details of quantitative and qualitative research, subjects I have taught to sociology majors at least 20 times since my appointment on the faculty at the University of Texas.

4.    I have been retained as an expert witness by Schaerr|Jaffe LLP, in connection with this litigation.  I have actual knowledge of the matters stated in this report.  I base the following opinions on my own knowledge, research, experience, and publications, and the work of other academics and writers.  The materials I have used to research and write this report are the standard sources used by other experts in my field.  I am receiving $250 per hour for my time spent preparing this report.  My compensation is not dependent upon the outcome of this litigation or the substance of my opinions.

5.    I have reviewed the newly submitted expert witness reports by Drs. Jonathan Coley, Ilan Meyer, and Joshua Wolff, (all dated October 29, 2021). I have also reviewed the declaration of Shirley Hoogstra, submitted to this Court on October

15, 2021. My remarks below attend to their declarations, as well as offer observations from other studies and legal documents related to this case.

6.      I have no interest in suggesting that the lives of LGBT young adults, including but hardly limited to those attending CCCU-type colleges and universities, are simple ones. There is a developing epidemic of anxiety and depression among young people in general. The REAP survey, about which I have more to say below, revealed that just about half of all students at the surveyed Christian colleges and universities experience loneliness, isolation, and anxiety, while 36 percent report bouts of depression. While LGBT youth appear to experience these even more poignantly, it should be obvious already that many students in these (and other) universities are struggling.

7.      Moreover, I would never dream of endorsing the maltreatment that some LGBT youth have experienced. Just how common and severe such treatment is today is, perhaps, at question. Instead, Christian college administrators, faculty members, and students owe to each other—brothers and sisters all—virtuous acts of friendship, kindness, encouragement, and occasional challenge. This is life together on campus—something I too experienced as an undergraduate at a CCCU member school, and briefly as a faculty member before moving on to a research university. I made more meaningful friendships in one year on the faculty at Calvin College (now Calvin University) than I have in over 19 years at a large, secular, state university.

8.      But to suggest that somehow life for LGBT students at CCCU-type colleges and universities is *inordinately* more challenging is to assert something for

which there is no sustained evidence. In fact, even the REAP study reveals a better portrait than the average college and university. Students at CCCU-type colleges and universities report less alcohol use, less physical and sexual assault and sexual harassment (1-3%), as well as more modest alcohol use (12%) and drug use (5%) when compared with data collected from other samples of LGBT young people during the COVID era.

9.    What follows below is hardly a dismissal of the challenges LGBT students face. Instead, what appears herein is a straightforward assessment of the arguments and claims made in the complaint, the REAP report, and by the Plaintiffs' expert witnesses. I maintain that, in spite of the assertions they make, there is no empirical basis for the push to force CCCU-type Christian colleges and universities to alter their longstanding policies around sexual relationship standards and behaviors or face possible loss of federal funding—most typically in the form of student access to Stafford loans and Pell grants. To hold such colleges and universities hostage in this manner would harm the Plaintiffs' fellow students, and in so doing—if successful—radically limit the diversity of higher educational options in the United States. CCCU-type colleges and universities exist today because students generally value the educational mission offered by the schools, usually pay a premium for it, and want to be taught by their faculty.

## II.    COMPARATIVE DATA ANALYSIS OF THE REAP AND OTHER STUDIES

10.    The Religious Exemption Accountability Project's (REAP) survey merits discussion. It was a survey whose aim is to assess the psychological challenges of

students in Christian colleges, etc. Unfortunately, fielding a survey aimed at understanding the sources of psychological distress in early 2021—and then insinuating blame aimed at the institutions themselves—are invariably confounded with the pronounced, historically unprecedented experience of COVID-era shutdowns, universities going virtual, etc. For comparison, I have stalled an in-person interview-based study of fertility decision-making for nearly two years (so far) precisely because of possible COVID-era confounding. That is, I wouldn't be able to discern the unique effects of COVID-related concerns (vis-à-vis other effects on fertility decision-making) until some degree of normalcy returns and fertility rates stabilize. That the REAP organization pressed forward with a survey during the heart of the COVID-era's university alterations and virtual courses—and fails to mention the pandemic anywhere in the report on the survey—suggests imprudence as well as political rather than scientific motivation. It's not simply unprofessional to fail to discuss this. It's deceptive.

11.    In general, the REAP sample is a massive opt-in list whose generalizability is unclear, even after weighting (on unclear variables). Given that this is essentially a massive convenience sample, it makes no sense to call the figures therein "estimates," since estimates imply—as Dr. Meyer points out on page 7 of his report—a population parameter to which the estimate is referring (and confidence intervals, etc.), and practically presumes a population-based sample. But an opt-in sample like the one the REAP survey is based upon is by definition *not* a population-based sample. Weighting can aid but not solve this challenge.

12.    The most significant limitation of the survey, however, is understanding to what the numbers ought to be compared. The report's authors simply compare LGBT student responses to those of non-LGBT students. There is no comparison group of, say, LGBT secular-university students. Alternately, there was no comparison between the responses of LGBT students at CCCU colleges and those from other non-CCCU schools. All the reader is left to do is to wonder about the meaning of the figures therein and wonder if the differences (between LGBT and heterosexual students) reported therein are larger or smaller or comparable to the differences that would be visible at secular universities or non-CCCU schools, or among LGBT and heterosexual young adults who are not attending college. This was an easy comparison to arrange, and the designers elected not to do it. I can only wonder if it was intentional.

13.    We can, however, consider some of the numbers and wonder how they might compare to students from other universities in the College Pulse's American College Student Panel.

14.    The REAP report notes on page 2 that "[m]ost sexual and gender minority students are closeted," but then remarks that 19% of sexual minority students "report telling no one about their sexual or gender identity," while 56% "have only told five or fewer people." If only 19% have told no one, how does one conclude that most are closeted? (And how exactly do the authors define the term? They don't say.)

15.    Moreover, only five percent of respondents to the REAP report stated that they had ever faced disciplinary action from their college or university (Question 11 of toplines, page 31). Among that small minority (of five percent), 12 percent reported the "sexual code of conduct" as the reason for such action. This means that a mere six-tenths of one percent of all REAP survey respondents, or six in every 1,000 students, reported a sexual code of conduct violation that merited disciplinary action. Since the text states that the survey was administered to "3,000 full-time students currently enrolled in four-year degree programs at taxpayer-funded Christian colleges and universities that explicitly discriminate against LGBTQ+ students," this means that just 18 of the 3000 respondents to the sample were disciplined for this reason. For context, the REAP survey administrators point out that 10% of respondents (or around 300 students) self-identified as a sexual minority, 12% (or 360 students) as non-heterosexual, and "approximately 30%" (or 900 students) if applying a "broader definition that encompasses self-identification and any attraction or experience that is not between a heterosexual female and a heterosexual male." Hence, the number of sexual minorities on campus (10%)—the most conservative number offered—is 17 times as large as the number of students who reported disciplinary action for violating the sexual code of conduct, the very same code that is purported to cause so much anxiety, fear, and purported "condemnation from their campus community." Given these numbers, it is implausible to suggest a causal link between these codes and the students' anxiety.

16.    It is also implausible to suggest based on the data that these codes are administered in a discriminatory, unfair manner. Section V of the REAP report concerns "University Sanctions," which as just noted is a rare occurrence. The report hints at distinctions in sanctions between straight students and sexual and gender minority ones. But given that only 18 out of 3,000 students reported sanctions related to the sexual code of conduct, there are certainly no statistically significant distinctions in how students are treated. This stands in stark contrast to some of the claims made by the Plaintiffs in the Amended Complaint. Moreover, reports of "suggested" sexual orientation or gender identity change efforts are virtually nonexistent, which contrasts with the personal narratives of numerous Plaintiffs. The REAP report speculates that such low numbers are due to the low level of self-revelation, but there is little survey evidence to support this claim (as noted above).

17.    The REAP survey report is best compared with survey data on mental health collected elsewhere from LGBTQ+ students enrolled in other universities *during the COVID era.* A survey by Vanderbilt University researchers of 477 LGBT college students ages 18-25 recruited to participate between late April to early June 2020 offers one such comparison. In it, 61% reported frequent mental distress (i.e., 14 or more days per month of "not good" mental health), 65% reported anxiety (i.e., generalized anxiety disorder), and 60% reported major depression (based on the Patient Health Questionnaire 2-item screener).[2] By comparison, 60% of the REAP

---

[2] Gilbert Gonzales, Emilio Loret de Mola, Kyle A. Gavulic, Tara McKay, Christopher Purcell, "Mental Health Needs Among Lesbian, Gay, Bisexual, and Transgender College Students During the COVID-19 Pandemic," Journal of

survey sexual minority respondents reported ever having experienced depression, 64% reported experience of loneliness, and 73% of anxiety, but each of these REAP variables was measured only as a positive (yes/no) response to the question, "During your time at [school name], have you experienced any of the following?" Suffice it to say, comparing an "ever felt" measure with clinical markers is simply not the same.

18.    This Vanderbilt survey of 477 was recruited in part by contacting "LGBT-serving organizations on 254 college campuses." That means the sample comprises a more ideal comparison to the REAP sample, since there would be far fewer "LGBT-serving" organizations on campuses represented by the REAP survey participants.

19.    Another survey—a purported "national" (but nonprobability) survey—fielded during the COVID-19 era (May-August 2020) by University of Maryland public health researchers to LGBTQ+ undergraduate and graduate students (N=565) reported that 65% "met the clinical criteria for moderate or severe psychological distress."[3] Forty percent "often" felt very isolated from others. Compared to before the pandemic, 44% of respondents said they "hid their LGBTQ+ identity from other people more often." When compared with the more blunt measurements in the REAP study, fielded during the same public health crisis, it suggests that the LGBT

Adolescent    Health    67    (2020),    5:    645-648. https://doi.org/10.1016/j.jadohealth.2020.08.006.
    [3] Salerno, J.P., Pease, M., Devadas, J., Nketia, B, & Fish, J.N. (2020). *COVID-19-Related Stress Among LGBTQ+ University Students: Results of a U.S. National Survey*. University of Maryland Prevention Research Center. https://doi.org/10.13016/zug9-xtmi

respondents to the REAP study fared *better* than those interviewed in this pair of pandemic surveys focused on LGBTQ+ students outside of CCCU-type schools.

20.     Another study—a longitudinal cohort study of sexual and gender minority persons (not necessarily students) evaluated by UC-San Francisco and Stanford University researchers—added a COVID-19 data collection point in late March (to late April) 2020, examining the change in symptoms for those respondents with and without depression and generalized anxiety disorder at the time of first interview (June 2019).[4] The follow-up with 2,288 respondents revealed statistically significant leaps in depression and anxiety symptoms since the 2019 survey, but only among those who did *not* display preexisting clinical depression or anxiety conditions. This suggests that the REAP survey—fielded once and during the pandemic—may be displaying inflated "baseline" numbers for LGBTQ student mental health self-reports, a function of the timing of the survey and differential sensitivity to pandemic-induced challenges.

21.     Yet another report issued by Rutgers University, discussed at some length in Dr. Hoogstra's declaration, investigated the responses of "queer-spectrum" and "trans-spectrum" students across several pooled survey efforts, most of which were collected in 2016 and 2017, nearing five years old, on average—compared with the COVID-era surveys explored above. In the Rutgers study, the authors note that

---

[4] Flentje, A., Obedin-Maliver, J., Lubensky, M. E., Dastur, Z., Neilands, T., & Lunn, M. R. (2020). Depression and Anxiety Changes Among Sexual and Gender Minority People Coinciding with Onset of COVID-19 Pandemic. *Journal of general internal medicine*, *35*(9), 2788–2790. https://doi.org/10.1007/s11606-020-05970-4

57% of queer-spectrum students did not agree that their university "is a safe and secure campus," up from 43% of heterosexual students who also disagreed with the statement.[5] Here again, this Rutgers study suggests that, with respect to their perceptions of safety, LGBT youth at CCCU-type colleges are doing better than their peers at secular campuses.

22.     Regardless of the timing, the addition of other COVID-era survey comparisons—ones collected well afield of the Christian college or university about which this case turns—reveals tall challenges for LGBT young adults even within secular and affirming subcultures. This includes those young adults who not only have access to but are known by LGBT-serving campus organizations.[6] In other words, the presumption that "affirmation" alone leads to categorically better mental health outcomes for young adult LGBT students lacks sustained evidence. None of the student data collection efforts discussed above displays consistently better outcomes than what the REAP study learned when it surveyed LGBT students at CCCU-type colleges and universities.

23.     On the contrary, while anxiety and depression levels appear comparable between REAP and the other COVID-era survey reports, the overall rates of substance use, eating disorders, sexual assault, sexual harassment, and physical

---

[5] Greathouse, M., BrckaLorenz, A., Hoban, M., Huesman, R., Rankin, S., & Stolzenberg, E. B. (2018, August). *Queer-spectrum and trans-spectrum student experiences in American higher education: The analyses of national survey findings.* Rutgers University, Tyler Clementi Center. Retrieved from https://rucore.libraries.rutgers.edu/rutgers-lib/60802/

[6] Gonzales et al., 2020.

assault reported by LGBT students in the REAP survey are notably better than those reported among LGBT adolescents in the United States—the feeder population for colleges and universities. The CDC's National Youth Risk Behavior Survey (2015-17) reports that 24% of gay adolescents attested to having experienced sexual violence, 17% reported forced sexual intercourse, and 28% said they'd been bullied at school; 64% had experience with alcohol, and 44% had used marijuana.[7] In the REAP survey, on the other hand, a comparatively small 25% of sexual minority students (of unstated sex) reported alcohol use, 11% said they'd been bullied, 5% said they'd experienced sexual assault, and 1% reported being physically assaulted. Whereas 20% of sexual minority students reported "suicidal thoughts" in the REAP survey, fully 28% of the CDC study's gay adolescents and 46% of the study's lesbian adolescents had considered attempting suicide.

24.    It is not difficult to conclude here that surveying students on mental health matters—especially but not only LGBTQ students—during the COVID era is suboptimal for discerning baseline or "normal" emotional health status. Students who return home from their university studies for extended stays—as occurred in Spring 2020—exhibit different mental health challenges. And yet it is a short leap to conclude that LGBTQ students who returned home were apt to face taller difficulties, on average, than heterosexual students. Hence to make conclusions about comparative mental health between sexual/gender minority students and non-

---

[7] Michelle M. Johns et al., *Violence Victimization, Substance Use, and Suicide Risk Among Sexual Minority High School Students — United States, 2015–2017*, https://www.cdc.gov/mmwr/volumes/67/wr/mm6743a4.htm?s_cid=mm6743a4_e)

minority students from the REAP survey, and then draw conclusions on the effects of CCCU-type schooling, culture, and relationship rules on the mental health of minority students is a poor scientific decision. The survey ought to have been fielded before the COVID crisis, or well after the respondents returned to their campuses (even if some courses remained online). Surveying while respondents were living at home, with all the random and nonrandom challenges that experience presents, is imprudent. Interpreting those data without regard to these dynamics is scientifically reckless.

25.    In sum, while the Plaintiff's complaint and the expert witness reports go to considerable length to imply that the Plaintiffs are in danger—from others and from themselves—if their colleges and universities do not take concrete steps to "affirm" their lifestyle choices or otherwise to make them feel accepted—by creating what expert witness Joshua Wolff identified as "Gender/Sexuality Alliances (GSAs), or by altering their sexual behavior and relationship policies to treat gay and straight relationships alike—the evidence does not show that such steps would make LGBT students at Christian colleges any better off than those attending other institutions. While it is obvious that the Plaintiffs would prefer these steps, it is a leap to suggest that "affirmed" life outside the CCCU context and their campuses is categorically healthier for sexual minorities.

III.    **THE THEOLOGICAL BASIS FOR CODES OF SEXUAL CONDUCT IN AND THE CHALLENGES OF AFFINITY GROUPS FOR CCCU-TYPE SCHOOLS**

26.    GSAs are not necessary to create safety for LGBTQ+ students, since their security has already been demonstrated to be equal or superior at CCCU-type

schools, when compared to other public university venues. Respecting the dignity of all students, insisting upon the virtuous treatment of other students, etc., is a general means of protecting the safety and inherent human rights of all students, regardless of their sexual-identity status.

27.    Furthermore, the creation of GSAs or an equivalent affinity group on CCCU-type campuses may be considered an undue burden on the freedom of these organizations to practice their religion and pursue the mission of the school. How so?

28.    Historically, the forms of Christianity practiced among supporters of the universities and colleges in question here represents a "worldview," wherein revelation has been understood to have been given by God both about his own divine nature but also about human nature. Such revelation is understood to come from the Bible, but also discernible through the order of creation itself. The creation of male and female, made in God's image as described in Genesis 1:27, is definitive Christian theology-based anthropology, which cannot be re-made or re-defined any more than the eternal attributes of God himself. Christian theology-based anthropology also understands humans as a unity of body and soul. The body is not inconsequential nor able to be re-defined at will; believers tend to understand the body as a "temple" that is indwelt by the Holy Spirit (that is, the third member of the Trinitarian God). It is in this Biblical context that many of the sexual boundaries are described in the New Testament, including the limitation of sexual relations between a man and woman bound by life-long marriage commitments. (1 Cor. 6-7).

29.    In traditional Christian thought, moreover, sexuality is commonly understood as a good gift, but one that is particularly sensitive to the boundaries placed around it, for such is believed to be given by an all-knowing and all-good and loving Creator. Same-sex relations are forbidden alike in the Old and New Testaments, as well as consistently throughout two millennia of Christian teaching. In Christian thought, there is no greater dignity that can be given to the human person than that of being made in the image of God, and the body being the very temple of God.

30.    To the extent LGBTQ+ students experience stress as a result of sexuality-related policies at CCCU-type schools, such stress flows in no small part from disagreement with traditional Christian theology on sexuality, and/or behaviors inconsistent with that theology. Consider recent research demonstrating that actions involving "moral incongruence, defined as "the experience of violating one's deeply held moral values," can lead to stress and unhappiness.[8] For instance, studies have shown that men who use pornography but believe that porn use is morally unacceptable are apt to exhibit "depressive symptoms at low frequencies, likely stemming from cognitive stress or dissonance."[9] A similar study showed that men engaging in same-sex sexual behavior, as well as women engaging in nonmarital sex,

---

[8] Perry, S. L., Grubbs, J. B., & McElroy, E. E. (2021). Sex and Its Discontents: How Moral Incongruence Connects Same-Sex and Non-Marital Sexual Activity with Unhappiness. *Archives of Sexual Behavior, 50*(2), 683-694.

[9] Perry, S. L. (2018). Pornography Use and Depressive Symptoms: Examining the Role of Moral Incongruence. *Society and Mental Health, 8*(3), 195-213. https://doi.org/10.1177/2156869317728373

while holding convictions that such is "always wrong," were more likely to report unhappiness. Thus, the study concluded: "Sexual behavior per se is not associated with unhappiness, but moral inconsistency or conflict regarding one's sexual behavior is."[10]

31.    LGBTQ+ advocacy groups (like GSAs) on CCCU-type campuses are thought to propose a new, alternative anthropology, one which is irreconcilable with and thus competes with basic tenets of the Christian faith. Rather than human identity being defined by the sexed embodiedness of male and female, human identity now is defined by sexual identity labels or sexual interests. These labels and interests continue to expand in our current culture, and Christianity consistently finds itself "counter-cultural" and must decline the re-definition of human identity upon any sexual basis other than male and female. To accommodate in such a significant matter, is to cease to practice the historic Christian faith.

32.    The Christian church must be free to respond to these cultural shifts, as one scholar writes: "There is, as always,  a culture-wide experience of brokenness: broken marriages, broken families, and broken bodies. And this brokenness must be met. But in order to meet it we must first be able to know it *as broken*. Then too we must know that there is a new level to the brokenness. There is . . . a new substitute anthropology which *promotes* this brokenness, even produces it. Any

---

[10] Perry, S. L., Grubbs, J. B., & McElroy, E. E. (2021). Sex and Its Discontents: How Moral Incongruence Connects Same-Sex and Non-Marital Sexual Activity with Unhappiness. *Archives of Sexual Behavior*, *50*(2), 683-694.

accompaniment of and pastoral care for the broken world we live in therefore would require an intelligent love."[11]

33.    There are many who disagree with Christian sexual ethics and vision as articulated above, but Christians believe that only this theology-based vision leads to ultimate human flourishing. Authentic religious freedom requires allowing Christians to articulate this vision of human sexuality and theology-based anthropology freely and unhindered.

34.    Many Christian colleges form and support various kinds of LGBTQ+ "affinity groups," which provide a gathering place for LGBTQ+ students to support each other in their quest to live out the Christian vision in light of their common circumstances.  Most such colleges, however, do not support LGBTQ+ advocacy groups (like GSAs) because they generally undermine the overall goals of the religious school setting.

35.    Consider that recent research on Gay-Straight Alliances (GSAs) in schools acknowledges that the presence of GSAs affect school climates, defined as "the essence of school life"[12] that "reflects norms, goals, values, interpersonal relationships, teaching, learning and leadership practices, and organizational

---

[11]    McCarthy, Margaret H. (2016). Gender Ideology and the Humanum. *Communio: Body and Gender*, Summer, 274-298. The quote is from p. 296.

[12]    Porta, C. M., Singer, E., Mehus, C. J., Gower, A. L., Saewyc, E., Fredkove, W., & Eisenberg, M. E. (2017). LGBTQ youth's views on gay-straight alliances: building community, providing gateways, and representing safety and support. *Journal of School Health*, *87*(7), 489-497. The quote is from p. 490.

structures."[13]  Thus, the "norms" and "values" in such groups run counter to the Christian schools' missions of forming their students with a Christian worldview and in their faith. Note that research finds that affinity groups like GSAs influence "not only LGBTQ youth, but all youth in school settings."[14] Research lists some of the benefits of GSAs to include  "queer" social events (e.g. "queer prom") and "advocacy."[15] The kind of advocacy as described is a direct challenge to and undermining of the basic Christian beliefs as described above, as some have described the functions of affinity groups as creating "activist movements" for social change—change that runs counter to Christian theology.[16]

36.    Many of the functions that the "affinity" groups seek to achieve are noble and should be expressly pursued by Christian campuses for LGBTQ+ identified members as well as all other students, and that is the creation of community where students can be open and honest and share "emotional connection and social support."[17] In a common Christian understanding, the Body of Christ and the fellowship of believers should be a source of this ultimate support. CCCU-type

---

[13] Ibid, quoting: National School Climate Center. [Accessed August 5, 2016] School climate. 2016. Available at: http://www.schoolclimate.org/climate/; Tableman B, Herron A. School climate and learning. Best Practice Briefs. Dec.2004 31:1–10. [Accessed        September        27th,        2016]        Available        at: http://outreach.msu.edu/bpbriefs/issues/brief31.pdf.

[14] Porta et al. (2017), p. 491.

[15] Ibid, p. 491.

[16] Deming, E., Soule, K., Poulsen, N., & Walker, T. (2014). Gay–straight alliances impact on school climate and lesbian, gay, bisexual, or transgender student well-being. *Vistas Online (ACA Knowledge Center), Article*, *45*, 1-9, p. 2; Russell, S. T., Muraco, A., Subramaniam, A., & Laub, C. (2009). Youth empowerment and high school gay-straight alliances. Journal of youth and adolescence, 38(7), 891-903.

[17] Porta et al. (2017), p. 494.

colleges and universities can and should commit themselves to strive even harder toward this goal for all of their students to form one body and one supportive community, in pursuit of the goal of Christian discipleship and living, no matter their sexual identities or struggles. And those CCCU-type colleges that form such groups generally do so in pursuit of that goal.

37.    Mark Yarhouse, a professor and psychologist who studies persons who live as "celibate gay Christians" as well as same-sex attracted Christians who pursue relationships with the opposite sex, is unflinching in his treatment of a complex subject matter. In a recent nonrepresentative survey he posed several questions to 300 "celibate gay Christians" for the purpose of measuring psychological distress and well-being, Yarhouse noted the diversity in approach among this group. Sixty-six participants remained single and sought to refrain from sexual activity entirely, while another 66 were in what they identified as "mixed orientation marriages," that is between a person with a homosexual or bisexual orientation (gay or bi) and a heterosexual orientation (straight). Just over half (168) said they were abstaining from same-sex sexual behavior but open to a relationship with the opposite sex.[18]

38.    More to the point, Yarhouse describes this sample as "healthier than might be expected," given the challenges they face. On the Depression, Anxiety, and Stress Scale (DASS-21), 80% of this group were in the normal range for depression,

---

[18] Yarhouse, M., Zaporozhets, O. (2021, July 15). The mental health and well-being of celibate gay Christians, https://www.livingout.org/resources/articles/96/the-mental-health-and-well-being-of-celibate-gay-christians#footnotelist_0_3; Yarhouse, M., Zaporozhets, O. (2019). Costly Obedience: What we can learn from the celibate gay Christian community. Zondervan.

with 12% mild, 8% moderate, and 1% experiencing severe depressive symptoms. Higher numbers were assessed in the normal range for anxiety and stress (93% and 94%, respectively). In terms of personal well-being, 63% reported life satisfaction as high (27% as medium and 10% as low). Across the board, more of the respondents in mixed-orientation marriages were apt to score in normal ranges when compared with the other pair of groups.[19]

39.     A unique summary of research on "mixed orientation marriages" (in this case gay men married to straight women) was published a decade ago, and concluded that "[m]ixed-orientation marriages are fraught with complexity."[20] To be sure. The authors go on to detail challenges (e.g., "tension between societal expectations, love for spouse, and same-sex attraction"), but also rewards: "Friendship and love between spouses, along with shared children, led to family life and community integration. These were reported to deter couples from separating and to enhance their general life satisfaction." Bisexual individuals in such unions "reported the greatest difficulty feeling understood by society, but the greatest likelihood of having a satisfying sexual relationship within an enduring marriage." On the other hand, high ratings on scales of pure homosexuality (rather than bisexuality) were correlated with high incidence of divorce.

---

[19] Ibid.
[20] Hernandez, B. C., Schwenke, N. J., and Wilson, C. M. "Spouses in mixed-orientation marriage: A 20-year review of empirical studies," *Journal of Marital and Family Therapy* 37 (2011): 307-318.

40.    My point in discussing Yarhouse is not to establish some sort of baseline expectation of emotional well-being among gay Christians attempting to exhibit chaste lifestyles of one sort or another. Rather, it is to demonstrate that this is a real community whose commitment to particular visions of sexual expression are animated by their Christian faith in ways that are often consonant with the visions expressed by CCCU-type colleges and universities, as these apply to their students. No one is claiming this is simple. No one is claiming that other Christian traditions apart from those represented in the CCCU do not have different visions for what it means to be a gay Christian; plenty do. Rather, it is simply to observe the empirical existence of communities of Christians who value the same vision for sexuality and relationships that is valued by the CCCU (albeit implemented in their distinctive ways). Moreover, it is also to observe that average emotional well-being among this population, measured in various ways, is not poor, but appears above-average, especially when contrasted with some of the estimates discussed earlier. As this sample suggests, sexuality is not emotional destiny.

## IV.    DR. ILAN MEYER'S REPORT

41.    Although most of my remarks about Dr. Ilan Meyer's expert witness report pertain to his work on minority-stress theory, a few words about "conversion therapy" (or SOCE) are in order, in part because they reflect live scholarly debates (but dead political ones) about the etiology and nature of sexuality.

42.    In his extensive report, Dr. Meyer refers to "conversion therapy" techniques on page 17, citing "electric shock" as a form of "physical punishment . . .

intended to condition people against their natural sexual orientation or gender identity." Such a method has been in disfavor for decades. In the 2009 American Psychological Task Force's report *Appropriate Therapeutic Responses to Sexual Orientation*, the most recent study listed involving such a technique was published in 1981—forty years ago. Such techniques are irrelevant to the present and are often invoked as a bogeyman to discredit reasonable, patient-initiated, voluntary therapeutic exploration of a person's unwanted sense of sexual identity, attractions, and behaviors.

43.    Moreover, there is a vast difference between the intentional pursuit of counseling (e.g., cognitive behavioral therapy) to deal with unwanted sexual attractions and those persons who were subjected to such against their will. I will attend to the latter; however, the former is commonly lumped in with the latter, a move which is politically expedient for the pursuit of wholesale bans on any counseling around feelings, impulses, etc., regardless of the age or wishes of the client. Sociologist Paul Sullins is a co-author of a study of 125 men who were exposed to SOCE. Rather than articulating a universal hostility to it, the authors found that "[l]ess than 5% of participants reported experiencing negative changes," an observation that led the authors to conclude that "[o]verall, we found that a large majority of these sexual minority men perceived their engagement in SOCE to enhance their well-being" and that "[r]eports of positive change were stronger and more widely distributed than those of negative change, most strongly for depression, but also for self-esteem, social functioning, self-harm, suicidality, and

alcohol/substance abuse."[21] The reasons why people pursue counseling and psychotherapy matter.

44.    On page 17, Dr. Meyer makes reference to SOCE as encompassing *any* approach "intended to condition people against their natural sexual orientation or gender identity." On the same page, Dr. Meyer further maintains that "LGBT persons need to learn to accept their LGBT identity in the coming out process," implying a sense of inevitability about who they are. Perhaps. But a "natural sexual orientation or gender identity" is not, as Dr. Meyer's assertion suggests, always rooted in birth or from a child's earliest memories, as the term implies and as Dr. Meyer appears to presume.

45.    For example, the American Academy of Pediatrics (AAP) policy statement on the care and support for transgender and gender-diverse children and adolescents holds that the self-recognition of gender identity "develops over time" and yet "[f]or some people, gender identity can be fluid, shifting in different contexts."[22] Indeed, Columbia University sociologist Tey Meadow reports in her article on the production of legal gender classifications: "Many courts look to medical

---

[21] Sullins DP, Rosik CH and Santero P. Efficacy and risk of sexual orientation change efforts: a retrospective analysis of 125 exposed men [version 2; peer review: 2 approved] F1000Research 2021, 10:222 https://doi.org/10.12688/f1000research.51209.2

[22] Rafferty, J. & Committee on Psychosocial Aspects of Child and Family Health.(2018). Ensuring comprehensive care and support for transgender and gender-diverse children and adolescents, 142 *Pediatrics* 4 e20182162; doi: https://doi.org/10.1542/peds.2018-2162.

definitions of sex…. yet there is no consensus about when gender change actually happens."[23]

46.    Sexual orientation, meanwhile, appears both more discernible and more stable for men than for women.[24] Dr. J. Michael Bailey, a well-regarded psychologist and behavioral geneticist best known for his work on the etiology of sexual orientation, maintains women's sexual orientation is much more sensitive to social influence and more subject to personal decision-making.[25] Others agree. University of Utah psychologist Dr. Lisa Diamond has long claimed the same about women's sexual orientation, as has Dr. Jane Ward, a sociologist of sex, gender, and queer politics at UC-Riverside, who captures the dilemma that survey self-report data pose to the idea of immutability: "[I]f we all really believed that sexual orientation was congenital—or present at birth—then no one would ever worry that social influences

---

[23]    Meadow, T. (2010).    "A rose is a rose": On producing legal gender classifications, *Gender & society 24*(6), 814–837, p. 824. https://doi.org/10.1177/0891243210385918

[24] Roy F. Baumeister, "Gender Differences in Erotic Plasticity: The Female Sex Drive as Socially Flexible and Responsive," Psychological Bulletin 126 (2000): 347-374; Lisa M. Diamond, *Sexual Fluidity: Understanding Women's Love and Desire* (Cambridge, MA: Harvard University Press, 2008); Lisa M. Diamond, "Was It a Phase? Young Women's Relinquishment of Lesbian/Bisexual Identities over a 5-Year Period," *Journal of Personality and Social Psychology* 84 (2003), 352–364; Lisa Diamond, "Development of Sexual Orientation Among Adolescent and Young Adult Women," *Developmental Psychology* 34 (1998): 1085-1095; Illouz, *Why Love Hurts*; Letitia Anne Peplau and Linda D. Garnets, "A New Paradigm for Understanding Women's Sexuality and Sexual Orientation," *Journal of Social Issues* 56 (2000): 329-350.

[25] J. Michael Bailey, "What is Sexual Orientation, and Do Women Have One?" in *Contemporary Perspectives on Lesbian, Gay, and Bisexual Identities*, ed. Debra A. Hope (New York: Springer, 2009), 43-64. The quote is from page 60.

could have an effect on our sexual orientation. But I think that in reality, we all know that sexual desire is deeply subject to social, cultural, and historical forces."[26]

47.    Rather, Dr. Meyer applies a framework of understanding male homosexuality, in which a more robust pattern of stability is commonly discerned, to reach blanket assertions about sexual orientation and gender identity, domains which—if including women—tend to display far more instability than he lets on. Hence, Dr. Meyer's references to a "natural" sexual orientation or gender identity imply a decidedly male "bias," one that is decreasingly reflected in research conclusions.

48.    Dr. Meyer also discusses numerous studies that purport to document the deleterious effects of social stigma on the psychological and physical health of sexual minorities. One manuscript of his that he does not discuss, however, is a recent publication based on the Williams Institute's new, large, five-year survey data collection effort aimed to understand differences between "generations" of LGBT adults: those aged 18-25, 34-41, and 52-59, dubbed the "equality," "visibility," and "pride" generations. In it, Dr. Meyer and his coauthors observe higher suicide behavior among the youngest cohort of LGBT adults—those who have experienced the least overt stigma and the greatest levels of social acceptance, and who witnessed what many hold to be the signal social achievement, the advent of nationwide same-

---

[26] Jane Ward, "No One is Born Gay (or Straight): Here Are 5 Reasons Why," paragraph 12, *Social (In)Queery* [Online] March 18, 2013. Available: http://socialinqueery.com/2013/03/18/no-one-is-born-gay-or-straight-here-are-5-reasons-why. [January 29, 2014].

sex civil marriage. And yet these developments have not yielded greater mental health. Instead, the "equality" generation displays "no signs that the improved social environment attenuated their exposure to minority stressors," but rather displays worse psychological distress and suicide behavior.[27]

49.     Nor is there any merit to the claim that the relationship/sexual conduct policies of CCCU-type institutions are increasing the risk of suicide among LGBTQ+ students.  The 2021 Meyer et al. study based on the Generations data observes that 30 percent of *all* 18-25-year-old LGBT persons reported a suicide attempt in their lifetime. Yet, remarkably, the share of 34-41-year-old and 52-59-year-old LGBT Americans who reported a suicide attempt in their lifetime is lower (24 and 21 percent, respectively) than the youngest cohort, despite far more years to have done so.

50.     That the "equality" generation of LGBT Americans is in worse emotional shape than the older pair of cohorts studied, despite the latter's far longer experience with social disapproval, signals obvious weakness in the minority stress theory's fit, for if in fact social stigma is a central cause of stress, there should be less stress for this youngest generation, given lower social stigma. But instead of reckoning with this, leaning on his own claims (page 7) that the "scientific method allows for testing of theory-based hypotheses that can be nullified using statistical analyses and causal

---

[27] Meyer IH, Russell ST, Hammack PL, Frost DM, Wilson BDM (2021) Minority stress, distress, and suicide attempts in three cohorts of sexual minority adults: A U.S. probability sample. *PLoS ONE* 16(3): e0246827. https://doi.org/10.1371/journal.pone.0246827. The quotes here are from the study's abstract.

inference," Dr. Meyer (and his coauthors) double down. They assert in the face of the evidence that in spite of the clear diminution of anti-LGBT stigma in the United States—especially among young people—the results somehow "speak to the endurance of cultural ideologies such as homophobia and heterosexism and accompanying rejection of and violence toward sexual minorities."

51.    I am hardly the only social scientist who thinks the minority-stress theory has obvious limitations. Michael Bailey, mentioned above, maintains that minority stress theory is prematurely credited with explaining mental health disparities. Bailey asserts that "[t]he minority stress model has relied exclusively on self-report data to quantitate stigmatization" but that "[t]he accuracy of such self-report data is plausibly influenced by individual temperament."[28] That is, vulnerability to stress and stigma are not only experienced by minorities. Moreover, resilience to the same is not out of the question, and may have to do with temperament. In other words, minority stress theory tends to lack a clear sense of agency on the part of persons.

52.    Bailey continues, citing the possibility of "an alternative model postulating a reversed direction of effect." That is, the minority stress model is criticized for not being able to distinguish causal directionality, or "whether prejudice and discrimination lead to a greater likelihood of developing mental health problems,

---

[28]    Bailey, J. Michael. (2020). The minority stress model deserves reconsideration, not just extension. *Archives of Sexual Behavior*, *49*(7), 2265-2268.  The quote is from p. 2266.

or whether mental health problems lead to a greater likelihood of experiencing—or perceiving—prejudice and discrimination."[29]

The concern about overreach on the part of minority stress theory and its proponents has led to the expression of supplementary theories, including a "rejection sensitivity model" for understanding sexual minority health.[30] That is, an approach that—among other things—considers the role of "perception" in stigma-related experiences. This means that not all instances of self-reported stigma may be equally valid (e.g., if it were subject to external observation). This may help explain, in part, the Generations survey's observation of statistically identical levels of self-reported verbal insults or abuse "since age 18" as reported by 18-25-year-olds, 34-41-year-olds, *and* 52-59-year-olds. If true, it would have to mean that stigmatizing behavior like insults and verbal abuse have surged of late rather than receded, as most maintain—and that the oldest LGBT cohort experienced far less stigma than believed. Alternately, viewed through the lens of the rejection sensitivity model, perhaps LGBT young adults *perceive* more stigmatizing and antagonistic behavior aimed in their direction than is actually being exhibited. If this is true—and it is admittedly difficult to discern—then Dr. Wolff's remark (on page 18) about the American Psychological Association's appeal to the U.S. Department of Education "to investigate allegations

---

[29] The quote is from Zucker, K. J., Lawrence, A. A., & Kreukels, B. P. (2016). Gender dysphoria in adults. Annual Review of Clinical Psychology, 12, 217–247, but it also appears in Bailey, *supra* n.28.

[30] Feinstein, B. A., 2020, "The rejection sensitivity model as a framework for understanding sexual minority mental health," *Archives of Sexual Behavior* (2020) 49:2247–2258 https://doi.org/10.1007/s10508-019-1428-3.

of harm" is an invitation to scrutinize *far more events* of less egregious nature (on average) than were experienced by the oldest cohort of LGBT Americans.

53.     One of the underdiscussed aspects of this case is the staggering lack of self-efficacy and internalized locus of control that is simply presumed of LGBTQ young adults. Instead, what is assumed is a crippling inability to respond to perceived conditions around them and make decisions about their own lives. In sum, there is a presumed lack of agency—not only in these three expert witness reports but throughout much of the literature on LGBT health outcomes. It may well be real— after all, it seems to characterize the Plaintiffs, who appear to reflect the "equality" cohort in Meyer et al.'s 2021 study using his own Generations data. But the oldest cohort in that study would not recognize this lack of agency. Many of them built alternative institutions rather than do the more laborious work of "unraveling heteronormativity" in more traditional institutions.

54.     Moreover, in spite of the surge in support for LGBT Americans, evident in Gallup historical polling, [31] Dr. Meyer's study reports that the youngest LGBT adults report higher rates of "everyday discrimination" and "internalized homophobia," and far higher levels of psychological distress than older LGBT adults, even while they report higher "connection with the LGBT community" and no difference in the level of "felt stigma." This is the situation despite the fact that the youngest cohort reported consistently (and statistically significantly) lower rates of

---

[31]    Gallup, *LGBT Rights*, https://news.gallup.com/poll/1651/gay-lesbian-rights.aspx.

physical and sexual assaults, robbery, and threats of violence than the oldest cohort of LGBT adults. What does one make of this conundrum? This is not to blame them, or to say that they, like so many of their age cohorts, are not suffering from distress. But the actual source of this distress is what is in question, and these clear contrasts must be considered if we are to understand and respond in ways that actually will help. In contrast to the authors' consistent appeal to the stable presence of homophobia, heterosexism, rejection, and violence, one is prompted to wonder if perhaps the youngest generation of LGBT adults—represented in this case by the Plaintiffs—feels more poignantly forces of rejection, competition, and violence from their own peers?[32] This is empirically unclear—and seldom discussed—territory.

55.    Alternately, the youngest cohort of LGBT adults exhibits greater sensitivity to (or memory of) perceived slights, quicker presumptions of prejudice, and lower threshold for interpreting others' behavior toward them as insulting or abusive than do older cohorts of LGBT adults. It is impossible to say, from the study's data as presented, but when the youngest cohort (which is between age 18 and 25) reports statistically identical rates of lifetime verbal insults or abuse since age 18 as do their older LGBT counterparts, it suggests there may be something to the "rejection sensitivity" model noted above.

56.    Other revelations from the Generations study highlight possible reasons for the greater psychological challenges among the youngest LGBT cohort. In

---

[32] Hobbes, M., Together Alone (2017). https://highline.huffingtonpost.com/articles/en/gay-loneliness/.

particular, the youngest report first sex with a same-sex partner at just over age 16, two years younger than those now 34-41 and three years younger than those now age 52-59. Lower average age at first sexual experience is consonant with more poignant challenges.[33]

57.    What relevance does the unmentioned study of Dr. Meyer's have for the present case? Plenty. It suggests that previous eras of LGBT students at Christian colleges and universities were apt to have understood the unique rules (about sexual relationships, etc.) as the norm, and either abided by them, surreptitiously thwarted them, or simply elected to avoid the institution in the first place—selecting a university that seemed less concerned with such rules. The Plaintiffs in this case, on the other hand, represent the "Equality" cohort in the Generations study by being quicker to perceive discrimination, sense injustice, feel stigmatized, and suffer psychological distress—all despite the fact that even most of the colleges and universities they attend have more informal support, produce more likeminded friendships, and boast a student body that is more tolerant than previous eras. Their expectations of equality in how Christian theological traditions understand sexuality, the meaning and purpose and validity of sexual relationships—in sum, the morality of nonmarital relationships and the boundaries of marriage—are simply far different than previous eras of LGBT students. Their grievance is portrayed as with the

---

[33] Osorio, A., Lopez-del Burgo, C., Carlos, S., & de Irala, J. (2017). The sooner, the worse? Association between earlier age of sexual initiation and worse adolescent health and well-being outcomes. *Frontiers in psychology*, *8*, 1298.

institution—their own college or university—and yet at bottom the difference is with the Christian theological tradition that animates these institutions.

58.    That appears to be Dr. Meyer's approach. For example, on page 12 of his report, Dr. Meyer cites and discusses the Williams Institute's report entitled "Religiosity among LGBT Adults in the US," which estimates that just over 3 million LGBT adults are moderately religious and an additional 2.2 million are highly religious.[34] From there, Dr. Meyer speculates that LGBT adults who (choose to) "belong to non-affirming denominations are particularly vulnerable to stigma and stress[.]" Yet from Dr. Hoogstra's declaration, we know that this group—LGB students who know about a given school's policy on sexuality at the time of matriculation—makes up around 90 percent of all LGB students. Hoogstra Decl. ¶¶ 20–21. Once there, many silently disagree with them (40%). But many others chose those schools precisely because of their sex-related policies (31.3%). *Ibid.* For these students, the goal of religious higher education seems in part to find a way to reconcile their faith with their sexual orientation or gender identity. *Id.* ¶ 22. And CCCU-type institutions provide communities in which they can do so.

59.    Since the vast majority, if not all, of students at Christian colleges and universities are not forced to be enrolled there, this case raises the question about why students who report feelings of distress, irritation, or anger at their

---

[34] Conron, K. J., Goldberg, S. K., & O'Neill, K. (2020). Religiosity among LGBT adults in the US. Los Angeles, CA: The Williams Institute at UCLA School of Law. https://williamsinstitute.law.ucla.edu/wp-content/uploads/LGBT-Religiosity-Oct-2020.pdf

administration's policies do not simply respond by transferring to another university. There are an extraordinary number of them, after all. Indeed, several examples from the Amended Complaint would prompt many readers to wonder why such a student was interested in a Christian higher education at all. But they were, and plenty appear to remain so.

## V.  DR. JOSHUA WOLFF'S REPORT

60.    Dr. Wolff studies what he identifies (on page 4 of his report) as "the intersections of religion, spirituality, and campus climate on the lives of LGBTQ+ students who attend" colleges similar to those represented by the CCCU.

61.    In his expert witness report, Dr. Wolff lists the various ways in which LGBTQ+ students at such colleges and universities "may" or "can" experience what he describes as "unique" challenges, including: verbal and sexual harassment, threats, assaults, jokes, slurs, instances of incivility and social rejection, insufficient support, etc. What the reader is treated to, however, is little sense of just *how much* more these things actually are (rather than "may" be) experienced at CCCU-type schools than elsewhere. As with the REAP survey, there is no sense of "just how much worse" life is for LGBTQ+ persons at Christian colleges than elsewhere. The reality, as I have shown above using multiple sources of empirical data above, is striking—it is no worse, and very likely better.

62.    Instead, Dr. Wolff treats the reader to a litany of non-specific, non-comparative claims at multiple points in his report that lack a sense of effect size by repeatedly using phrases like "are associated with," "more likely to," "significantly

higher," "higher rates," etc. Such terms signal non-specific effect sizes along with implied causal directionality—without actual numbers, rates, effect sizes, etc. This is particularly evident on page 11, where he could have stated percentages of the 213 sexual minority students who reported elevated clinical symptoms of depression, anxiety, eating concerns, substance use, etc., but does not. He does, however, articulate the percentage (37%) that have experienced bullying or harassment (on page 12). These, he maintains, "*were more likely* to report symptoms of depression." How much more likely?

63.    Dr. Wolff notes a study of his that "found that LGB youth living in counties that had higher concentrations of non-affirming faith communities had increased rates of alcohol abuse and more sexual partners[.]" This, of course, has nothing inherently to do with the religiousness of LGB youth or their peers or neighbors, much less how such youth—especially those who believe in Christian sexual ethics—would fare in CCCU-type schools.[35]

64.    In describing the experiences of participants in his 2017 study, Dr. Wolff further notes that participants "shared a common experience of sadness and remorse over lost opportunities to fully explore and be known authentically as they looked back at past experiences" at their respective Christian colleges. This is not unique to

---

[35] County-level data, moreover, is a primary sampling unit whose efficacy is difficult to defend, in comparison to census tracts or blocks. After all, counties range in population from the millions (e.g., Cook County, Los Angeles County, Harris County) to the very few.

LGBTQ+ students. Many of us look back at our college days with some regrets about friendships that went unformed or underdeveloped, opportunities missed, etc.

65.     Moreover, there is little information provided here about the sample of Dr. Wolff's interviewees—how they came to be in the study, and if—like in the REAP survey—there is a comparison group of non-LGBT students interviewed. In my experience and observation, and as explained by Dr. Hoogstra, LGBT students at CCCU-type schools are generally comprised of those who support the school's mission and live at peace with their school's sexuality and relationship policies—and then there are those like the Plaintiffs to this case, who do not. Whether Dr. Wolff's interviewees comprise the former as well as the latter is unclear, at least from his report.

66.     Instead, in a remark about mandatory referrals to campus counseling centers for violating policies about gender norms and expressions, he asserts that "some students reported" that such centers "may have the goal of changing sexual orientation and/or gender identity to comply with religious norms." I commend him for his honesty in expressing what the students reported. However, the statement suggests that the unclear number of students who reported this did not actually know that this was a goal of the counseling center. Moreover, the REAP survey (page 24, Section V on University Sanctions) suggests this is rarely the case.

67.     Dr. Wolff concludes aptly, on page 13, that "the relationship between campus policies and mental health is probably complex and weird." Indeed, surprisingly little evidence has been brought forward in this case to suggest that

campus sexuality policies—the very thing the Plaintiffs are contesting in the complaint—are demonstrably associated with poor LGBT student outcomes.

68.    Finally, LGBT students enrolled at the kind of evangelical college widely represented in the CCCU display, in Dr. Wolff's own published work, "significantly fewer symptoms of depression and social anxiety" than students at Catholic and Mainline Protestant colleges and universities, which are on average far more progressive regarding behavioral policies and norms, and certainly more likely to have GSAs.[36] Dr. Wolff seems puzzled by this result, and yet acknowledges that "religion may offer a substantial amount of comfort and source of community to many SM (sexual minority) students who find incongruence with their sexual orientation and their faith," with a reference to Mark Yarhouse's work.[37] I could not have said it better.

## VI.    DR. JONATHAN COLEY'S REPORT

69.    Dr. Coley poses an obvious (and good) question in his expert witness report, namely why LGBTQ students wish to attend Christian colleges and universities in the first place. His interview-based study of LGBTQ students at four institutions reveals an interesting selection, since three of the four schools are not known for having demanding sexuality and relationship behavior policies.

---

[36] Wolff, J. R., Himes, H. L., Soares, S. D., Kwon, E. M., "Sexual minority students in non-affirming religious higher education: Mental health, outness, and identity," Psychology of Sexual Orientation and Gender Diversity 3 (2016), 201-212. The quote is from 207.

[37] Ibid., page 208.

70.    Another project of Dr. Coley's is the construction of an ambitious database of university policies on LGBTQ matters, in particular student handbook "bans on 'homosexual acts' or 'homosexual behavior'" which Dr. Coley notes—but does not detail—"often carried the same penalties as bans on 'rape' or 'incest'" (page 5). And yet to repeat what we've learned from the REAP survey—almost no students (six out of every 1,000) reported running afoul of their school's sexual code of conduct to the point where the violation merited disciplinary action. Thus, it is difficult to see how these codes could have any real, systematic negative impact on students' emotional health.

71.    Further, on page 7 of his report, Dr. Coley estimates the size of the population of LGBTQ students that are "impacted" by their Christian university's discriminatory policies. He surmises that "[I]f a similar percentage of students at CCCU institutions identify as LGBTQ, there are likely over 70,000 LGBTQ students at CCCU institutions alone. Alternately, the more liberal estimate of 30% of students who report same-sex attractions or past same-sex sexual behavior would yield 133,500 LGBTQ students in CCCU schools. All of this is speculative, but unproblematic. However, Dr. Coley presumes a random process by which LGBTQ young adults decide where to go to college, one in which no self-selectivity is involved. This is ironic, since most young adults seem to display all manner of self-selection processes regarding higher education, weighing cost, prestige, availability of desired major, family influences, peer influences, etc. I mention this only because the fact that self-selectivity is not imagined here by Dr. Coley reveals something that

animates many research conclusions about the lives of LGBT young adults—that is, a presumptive lack of self-efficacy.

72.    In reality, it makes sense to admit that most LGBTQ students enrolled at CCCU-type schools are there *because they wanted to be*. Students think hard about where to go to college, and tend to weigh the costs and benefits of their options. Rather than conclude out of hand that the average LGBTQ Christian enrolled at a CCCU-type school thinks quite similarly to the Plaintiffs in this case, it is likely to be more accurate that such students are more likely than the Plaintiffs to wish to follow the Christian ideal of chastity in relationships—whether successful or not. To hold that sexual relationships traditionally viewed in Christianity as illicit are not in fact wrong (i.e., sinful, etc.) is simply to attempt to rewrite the theological history of those Christian denominations that gave rise to organizations like those represented in the CCCU. For Christians of all stripes, Christianity often requires a "costly obedience,"[38] and conservative, religious students tend to both need and want encouragement and support to live out the tenets of their faith.

73.    Finally, Dr. Coley advocates for the formation of LGBTQ student groups as well as institutional centers, and criticizes those colleges and universities he studied which do not permit such centers or formal group recognition. While there are many laudable reasons for hosting or joining such a group, one obvious reason why CCCU-type schools are reticent to officially recognize such groups is for a pair of

---

[38] Yarhouse, M., Zaporozhets, O. (2019). *Costly Obedience: What we can learn from the celibate gay Christian community*. Zondervan.

the reasons for which Dr. Coley states such groups to exist—that is to foster "romantic relationships" and "opportunities for activism." These are two principles which such universities may well perceive as being contrary to their relationship policies, and violations of which they reasonably believe would themselves prompt stress and other negative outcomes in their students.

## VII.    CONCLUDING OBSERVATIONS

74.    The battle over civil same-sex marriage lasted for decades in the United States. But it did not yield the power to coerce Christian churches into conducting same-sex marriages. This is akin to what the Plaintiffs seek to accomplish—but by judicial fiat. That is, they wish to force Christian colleges and universities—many of which sport hundreds of thousands of alumni who wished to attend and worked hard to graduate from them—to undo their relationship policies, which are expressions of their theological and religious beliefs and commitments, or face possible closure due to the inability of students to merit Stafford loans or Pell grants, a situation that would (in reality) force many students to look elsewhere for their degree.

75.    Forcing a university to choose between their theology and financial survival—their deeply-rooted policies on human sexuality or their (ubiquitous) dependence on federal student loan dollars—is a false choice. The only winners if such schools are forced to choose would be those universities—and those parents and students—with the deepest pockets. A victory for the students here would not yield justice, no matter what the outcome, because schools that elect to decline federal funding would either close or lay off scores of employees, and reduce course offerings.

What student desires that? Alternately, if the school elects to drop its sexuality and relationship policies in order to stay financially afloat, that decision would inject a significant secularizing effect and altering the Christian character of the school. The Plaintiffs' peers would no longer be attending the kind of institution they sought prior to this suit. The third way, of course, is the most prudent one, and it's all about a self-selective imperative: respect the diverse nature of American higher educational options, and thereby allow students to choose the kind of school that fits their own values.

76.     Finally, there is a monumental media-stimulated psychological crisis occurring among youth in general, LGBT and otherwise, that has yielded elevated suicidality rates and poorer mental health among adolescents and young adults. To suggest that Christian colleges and universities are uniquely at fault for a small portion of this massive trend is not simply to miss the primary sources of psychological threats today. It's to reverse course and to place blame on institutions in which students are—on average—more apt to thrive. It is scapegoating.

77.     I have reached my conclusions to a reasonable degree of certainty using the same information and studies relied on by other experts in my field. I make the foregoing statements based on my knowledge, information, belief, and experience, under penalty of perjury.

November 2, 2021

Mark Regnerus

**CERTIFICATE OF SERVICE**

I hereby certify that I served the foregoing document was served on all counsel of record in this case by ECF and by email.

DATED this 2nd day of November, 2021.

/s/ Gene C. Schaerr
Gene C. Schaerr
*Counsel for Defendant-Intervenor CCCU*

**EXHIBIT A**

# MARK REGNERUS
(November 2021)

Department of Sociology                              Office: CLA 3.524
The University of Texas at Austin                    Phone: (512) 232-6307
Mail Code A1700                                      Email: regnerus@prc.utexas.edu
Austin, TX 78712

## EDUCATION

Ph.D., Sociology, University of North Carolina at Chapel Hill, 2000.

M.A., Sociology, University of North Carolina at Chapel Hill, 1997.

B.A., Sociology, with high honors, Trinity Christian College, 1993.

## PROFESSIONAL APPOINTMENTS

2018–Present: Professor, Department of Sociology, The University of Texas at Austin.

2007–2018: Associate Professor, Department of Sociology, The University of Texas at Austin.

> 2002–2014: Faculty Research Associate, Population Research Center, The University of Texas at Austin.

2002–2007: Assistant Professor, Department of Sociology, The University of Texas at Austin.

2001–2002: Assistant Professor of Sociology, Department of Sociology and Social Work, and Director, Center for Social Research, Calvin College.

2000–2001: Postdoctoral Research Associate, Carolina Population Center.

## PUBLICATIONS

### Books

Regnerus, Mark. 2020. *The Future of Christian Marriage*. New York, NY: Oxford University Press. (268 pages)

> Reviewed or discussed in *Journal for the Scientific Study of Religion, Publishers Weekly, National Review, Choice, World, Public Discourse,* and *Christianity Today.*

Regnerus, Mark. 2017. *Cheap Sex: The Transformation of Men, Marriage, and Monogamy*. New York, NY: Oxford University Press. (262 pages)

> Reviewed in *The Atlantic Monthly, Commentary, Washington Post, New York, Humanum, Men & Masculinities, Public Discourse, National Review, Claremont Review of Books, Nevada Appeal, Jet, Contemporary Sociology,* and *The Globe and Mail.*

Regnerus, Mark and Jeremy Uecker. 2011. *Premarital Sex in America: How Young Americans Meet, Mate, and Think about Marrying*. New York, NY: Oxford University Press. (295 pages)

Reviewed in *American Journal of Sociology*; *BYU Studies Quarterly*; *Commentary*; *Contemporary Sociology*; *Culture, Health & Sexuality*; *First Things*; *Horizons*; *INTAMS Review*; *Journal of Family Theory & Review*; *Journal of Popular Romance Studies*; *Journal of Youth and Adolescence*; *Mercatornet*; *Public Discourse*; *Sex Roles*; *The New Republic*; and *The New York Times*.

Regnerus, Mark D. 2007. *Forbidden Fruit: Sex and Religion in the Lives of American Teenagers*. New York: Oxford University Press. (304 pages)

Reviewed in *American Journal of Sociology*, *Contemporary Sociology*, *Journal of Youth and Adolescence*, *Journal of Sex Research,* and *The New Yorker*.

## Peer-Reviewed Journal Articles (including Accepted and In Press)

Regnerus, Mark and Brad Vermurlen. 2021. "Attitudes toward Hormonal and/or Surgical Interventions for Adolescents Experiencing Gender Dysphoria." Forthcoming, *Archives of Sexual Behavior*.

Regnerus, Mark. 2020. "Understanding How the Social Scientific Study of Same-Sex Parenting Works," *Annals of Social Science* 12 (3): 43-60.  https://doi.org/10.18290/rns20483-3

Regnerus, Mark, Joseph Price, and David Gordon. 2017. "Masturbation and Partnered Sex: Substitutes or Complements?" *Archives of Sexual Behavior* 46: 2111-2121.

Regnerus, Mark. 2017. "Is Structural Stigma's Effect on the Mortality of Sexual Minorities Robust? A Failure to Replicate the Results of a Published Study." *Social Science & Medicine* 188: 157-165.

Regnerus, Mark, David Gordon, and Joseph Price. 2016. "Documenting Pornography Use in America: A Comparative Analysis of Methodological Approaches." *The Journal of Sex Research* 53(7): 873-881.

Price, Joseph, Rich Patterson, Mark Regnerus, and Jacob Walley. 2016. "How Much More XXX is Generation X Consuming? Evidence of Changing Attitudes and Behaviors Related to Pornography Since 1973." *The Journal of Sex Research* 53(1): 12-20.

Regnerus, Mark. 2012. "How Different are the Adult Children of Parents who have Same-Sex Relationships? Findings from the New Family Structures Study." *Social Science Research* 41: 752-770.

Woodberry, Robert D., Jerry Z. Park, Lyman A. Kellstedt, Mark D. Regnerus, and Brian Steensland. 2012. "The Measure of American Religious Traditions: Theoretical and Measurement Considerations." *Social Forces* 91(1): 65-73.

Uecker, Jeremy E. and Mark D. Regnerus. 2010. "Bare Market: Campus Sex Ratios, Romantic Relationships, and Sexual Behavior." *The Sociological Quarterly* 51: 408-435.

McFarland, Michael J., Jeremy E. Uecker, and Mark D. Regnerus. 2010. "The Role of Religion in Shaping Sexual Frequency and Satisfaction: Evidence from Married and Unmarried Older Adults." *The Journal of Sex Research* 47: 1-12.

Stokes, Charles E. and Mark D. Regnerus. 2009. "When Faith Divides Family: Religious Discord and Adolescent Reports of Parent-Child Relations." *Social Science Research* 38: 155-167.

Hill, Terrence D., Amy M. Burdette, Mark Regnerus, and Ronald J. Angel. 2008. "Religious Involvement and Attitudes Toward Parenting Among Low-Income Urban Women." *Journal of Family Issues* 29(7): 882-900.

Uecker, Jeremy E., Nicole Angotti, and Mark D. Regnerus. 2008. "Going Most of the Way: 'Technical Virginity' Among American Adolescents." *Social Science Research* 37: 1200-1215.

Uecker, Jeremy E., Mark D. Regnerus, and Margaret L. Vaaler. 2007. "Losing My Religion: The Social Sources of Religious Decline in Early Adulthood." *Social Forces* 85(4): 1-26.

Regnerus, Mark D. and Jeremy E. Uecker. 2007. "Religious Influences on Sensitive Self-Reported Behaviors: The Product of Social Desirability, Deceit, or Embarrassment?" *Sociology of Religion* 68(2): 145-163.

Regnerus, Mark D. and Viviana Salinas. 2007. "Religious Affiliation and AIDS-based Discrimination in Sub-Saharan Africa." *Review of Religious Research* 48(4): 385-401.

Trinitapoli, Jenny and Mark D. Regnerus. 2006. "Religion and HIV Risk Behaviors among Married Men: Initial Results from a Study in Rural Sub-Saharan Africa" *Journal for the Scientific Study of Religion* 45: 505-528.

Regnerus, Mark D. and Jeremy Uecker. 2006. "Finding Faith, Losing Faith: The Prevalence and Context of Religious Transformations during Adolescence." *Review of Religious Research* 47: 217-237.

Regnerus, Mark D. and Amy Burdette. 2006. "Religious Change and Adolescent Family Dynamics." *The Sociological Quarterly* 47: 175-194.

Regnerus, Mark D. and Laura B. Luchies. 2006. "The Parent-Child Relationship and Opportunities for Adolescents' First Sex." *Journal of Family Issues* 27: 159-183.

Regnerus, Mark D. and Christian Smith. 2005. "Selection Effects in Studies of Religious Influence." *Review of Religious Research* 47: 23-50.

Regnerus, Mark D. 2005. "Talking about Sex: Religion and Patterns of Parent-Child Communication about Sex and Contraception." *The Sociological Quarterly* 46: 81-107.

Regnerus, Mark D., Christian Smith, and Brad Smith. 2004. "Social Context in the Development of Adolescent Religiosity." *Applied Developmental Science* 8: 27-38.

Regnerus, Mark D. 2003. "Linked Lives, Faith, and Behavior: An Intergenerational Model of Religious Influence on Adolescent Delinquency." *Journal for the Scientific Study of Religion* 42: 189-203.

Regnerus, Mark D. 2003. "Moral Communities and Adolescent Delinquency: Religious Contexts and Community Social Control." *Sociological Quarterly* 44: 523-554.

Regnerus, Mark D. 2003. "Religion and Positive Adolescent Outcomes: A Review of Research and Theory." *Review of Religious Research* 44: 394-413.

Regnerus, Mark D. and Glen H. Elder, Jr. 2003. "Religion and Vulnerability among Low-Risk

Adolescents." *Social Science Research* 32: 633-658.

Regnerus, Mark D. and Glen H. Elder, Jr. 2003. "Staying on Track in School: Religious Influences in High and Low-Risk Settings." *Journal for the Scientific Study of Religion* 42: 633-649.

Rostosky, Sharon S., Mark D. Regnerus, and Margaret L.C. Wright. 2003. "Coital Debut: The Role of Religiosity and Sex Attitudes in the Add Health Survey." *Journal of Sex Research* 40: 358-367.

Smith, Christian, Robert Faris, Melinda Lundquist Denton, and Mark D. Regnerus. 2003. "Mapping American Adolescent Subjective Religiosity and Attitudes of Alienation Toward Religion: A Research Report." *Sociology of Religion* 64: 111-133.

Regnerus, Mark D. 2002. "Friends' Influence on Adolescent Theft and Minor Delinquency: A Developmental Test of Peer-Reported Effects." *Social Science Research* 31: 681-705.

Smith, Christian, Melinda Denton, Robert Faris, and Mark D. Regnerus. 2002. "Mapping American Adolescent Religious Participation." *Journal for the Scientific Study of Religion* 41: 597-612.

Ge, Xiaojia, Glen H. Elder, Jr., Mark D. Regnerus, and Christine Cox. 2001. "Pubertal Transitions, Overweight Self Perceptions, and Adolescent Psychosomatic Adjustment: Gender and Ethnic Differences." *Social Psychology Quarterly* 64: 363-375.

Regnerus, Mark. 2000. "Shaping Schooling Success: A Multi-level Study of Religious Socialization and Educational Outcomes in Urban Public Schools." *Journal for the Scientific Study of Religion* 39: 363-370.

Steensland, Brian, Jerry Park, Mark Regnerus, Lynn Robinson, Bradford Wilcox, and Robert Woodberry. 2000. "The Measure of American Religion: Toward Improving the State of the Art." *Social Forces* 79: 291-318.

Regnerus, Mark, David Sikkink, and Christian Smith. 1999. "Voting with the Christian Right: Contextual and Individual Patterns of Electoral Influence." *Social Forces* 77 (4): 1375-1401.

Regnerus, Mark and Christian Smith. 1998. "Selective Deprivatization among American Religious Traditions: The Reversal of the Great Reversal." *Social Forces* 76: 1347-72.

Regnerus, Mark, Christian Smith, and David Sikkink. 1998. "Who Gives to the Poor?  The Role of Religious Tradition and Political Location on the Personal Generosity of Americans toward the Poor." *Journal for the Scientific Study of Religion* 37: 481-493.

**Peer-Reviewed Book Chapters**

Regnerus, Mark D. 2010. "Religion and Adolescent Sexual Behavior." In *Religion, Families, and Health: Population-Based Research in the United States* (Christopher G. Ellison and Robert A. Hummer, editors), pp 61-85. New Brunswick, NJ: Rutgers University Press.

Regnerus, Mark D. 2005. "Adolescent Delinquency." Pp. 259-276 in Helen Rose Ebaugh (ed.), *Handbook of Religion and Social Institutions*. New York: Kluwer/Plenum.

Sikkink, David and Mark Regnerus. 1996. "For God and the Fatherland: Protestant Symbolic Worlds and the Rise of German National Socialism." Pp. 133-147 in Christian Smith (ed.), *Disruptive Religion: The Force of Faith in Social Movement Activism*.  New York: Routledge.

**Non-Peer-Reviewed Journal Articles and Book Chapters**

Regnerus, Mark D. 2020. "Measurement and Analytic Vulnerabilities in the Study of Structural Stigma." (Commentary). *Social Science & Medicine* 244: 112567.

Regnerus, Mark D. 2019. "Sexual Media as Competition in the Heterosexual Relationship Market" (Commentary). *Archives of Sexual Behavior* 48: 2279-2281.

Regnerus, Mark. 2019. "Comment on Barbara Risman's review of Cheap Sex: The Transformation of Men, Marriage, and Monogamy." *Contemporary Sociology* 48: 130-131.

Regnerus, Mark D. 2018. "Reproducing Homes: Intergenerational Transmission of Marriage and Relationship Legacy." In *The Home: Multidisciplinary Reflections* (Antonio Argandoña, editor). Cheltenham, UK: Edward Elgar. 24 pp.

Regnerus, Mark D. 2015. "The Family as First Building Block." In *The Thriving Society*: *On the Social Conditions of Human Flourishing* (James R. Stoner, Jr. and Harold James, editors), pp 49-66. Princeton, NJ: The Witherspoon Institute.

Regnerus, Mark. 2012. "Contemporary Mating Market Dynamics, Sex-Ratio Imbalances, and Their Consequences." *Society* 49: 500-505.

Regnerus, Mark. 2012. "Parental Same-Sex Relationships, Family Instability, and Subsequent Life Outcomes for Adult Children: Answering Critics of the New Family Structures Study with Additional Analyses." *Social Science Research* 41: 1367-1377.

Regnerus, Mark D. 2010. "Sexual Behavior in Young Adulthood." The Changing Spirituality of Emerging Adults Project. 16 pp.

Regnerus, Mark D. 2009. "Imitation Sex and the New Middle Class Morality" (chapter 6 of *Forbidden Fruit*), reprinted in *Speaking of Sexuality: Interdisciplinary Readings, 3rd Edition* (Nelwyn B. Moore, J. Kenneth Davidson, and Terri D. Fisher, editors). New York, NY: Oxford University Press.

Regnerus, Mark D. and Jeremy E. Uecker. 2007. "How Corrosive Is College to Religious Faith and Practice?" Social Science Research Council. 6 pp.

- Reprinted as Regnerus, Mark D., and Jeremy E. Uecker. 2008. "College Students Value Religion." *Opposing Viewpoints in Context: America's Youth*. Jamuna Carroll, editor. Farmington Hills, MI: Greenhaven Press. link.galegroup.com/apps/doc/EJ3010300238/OVIC?u=txshracd2598&xid=ea8e31f3. 7 pp.

Regnerus, Mark D., Christian Smith, and Melissa Fritsch. "Religion in the Lives of American Adolescents: A Review of the Literature." A Research Report of the National Study of Youth and Religion, No. 3. Chapel Hill, NC: University of North Carolina, 2003.

Regnerus, Mark D. "Living up to Expectations." Report, Center for Research on Religion and Urban Civil

Society, University of Pennsylvania, 2003.

Regnerus, Mark D. "Making the Grade: The Influence of Religion upon the Academic Performance of Youth in Disadvantaged Communities." Report, Center for Research on Religion and Urban Civil Society, University of Pennsylvania, 2001.

Regnerus, Mark. "Challenges to Liberal Protestant Identity and Diversity Work: a Qualitative Study." *Sociological Analysis* 1998, 1: 139-149.

## Book Reviews

Review of: *Nationalizing Sex: Fertility, Fear, and Power*, Richard Togman (New York: Oxford University Press, 2019). In *Review of Politics* 82: 500-502 (2020).

Review of: *Charitable Choices: Religion, Race, and Poverty in the Post-Welfare Era*, John P. Bartkowski and Helen A. Regis (New York: NYU Press). In *Social Forces* 82: 861-863 (2003).

Review of: *They Still Pick Me Up when I Fall: The Role of Youth Development and Community Life*, Diana Mendley Rauner (New York: Columbia University Press). In *Social Forces* 79: 1545-1547 (2001).

## Select Essays and Op-Eds (all sole-authored)

"Weak Data, Small Samples, and Politicized Conclusions on LGBT Discrimination." *Public Discourse*, January 12, 2020.

"New Data Show 'Gender-Affirming' Surgery Doesn't Really Improve Mental Health. So Why are the Study's Authors Saying It Does?" *Public Discourse*, November 13, 2019.

"Does 'Conversion Therapy' Hurt People who Identify as Transgender? The New JAMA Psychiatry Study Cannot Tell Us." *Public Discourse*, September 18, 2019.

"Queering Science." First Things, December 2018.

"The Death of Eros." *First Things*, October 2017.

"Can Same-Sex Marriage Really Reduce Teen Suicide?" *Public Discourse*, February 24, 2017. 4 pp.

"Hijacking Science: How the 'No Differences' Consensus about Same-Sex Households and Children Works." *Public Discourse*, October 14, 2016. 5 pp.

"Making Differences Disappear: The Evolution of Science on Same-Sex Households." *Public Discourse*, May 12, 2015. 4 pp.

"Minecraft over Marriage." *First Things*, March 31, 2015. 5 pp.

"The Good-Enough Marriage." *First Things*, December 4, 2014. 4 pp.

"The Pornographic Double-Bind." *First Things*, November 11, 2014. 3 pp.

"Diversity as Slogan and Reality." *First Things*, October 9, 2014. 3 pp.

"Resurrecting the Dead in America." *First Things*, September 11, 2014. 4 pp.

"The Government's in Your Bedroom, but This Time It's Okay." *National Review*, July 16, 2014. 3 pp.

"'Right Side of History,' or Primed to Say Yes?" *National Review*, August 20, 2013. 5 pp.

"Assessing the Australian Study." *National Review*, June 6, 2013. 3 pp.

"Sex is Cheap: Why Young Men Have the Upper Hand in Bed, Even When They're Failing in Life."
    *Slate*, February 25, 2011. (9th-most read *Slate* article of 2011.) 4 pp.

"Freedom to Marry Young." *Washington Post*, April 26, 2009. 2 pp.

**RESEARCH GRANTS**

Principal Investigator, "The Relationships in America Survey Project." $328,426 grant from the Austin
    Institute, January 2014-September 2014. (Approved, 100% under PI's supervision)

Principal Investigator, "The New Family Structures Study." $640,000 grant from the Witherspoon Institute,
    May 2011-August 2013. (Approved, 100% under PI's supervision)

Principal Investigator, "The New Family Structures Study (supplementary assistance)." $90,000 grant from
    the Bradley Foundation, Nov 2011-Nov 2012. (Approved, 100% under PI's supervision)

Principal Investigator, "The New Family Structures Study." $55,000 planning grant from the Witherspoon
    Institute, Oct 2010-June 2011. (Approved, 100% under PI's supervision)

Principal Investigator, "The New Pentecostals and Political and Social Activism." $9,565 grant from the
    National Science Foundation (Dissertation Improvement Grant, for Nicolette Manglos), 2010-2011.
    (Approved but returned)

Co-Investigator, "Developing Health Behaviors in Middle Adolescence" (Lynn Rew, PI, The University of
    Texas at Austin School of Nursing). $1,276,919 grant from the National Institute of Nursing
    Research, 2006-2011. (Approved, <5% under Regnerus' supervision). R01-NR009856.

Principal Investigator, "Testing Differences: The Transfer and Transformation of HIV Testing from the
    West to Sub-Saharan Africa." $7,500 grant from the National Science Foundation (Dissertation
    Improvement Grant, for Nicole Angotti), 2008-2009. (Approved)

Co-Investigator, "Religious Organizations, Local Norms, and HIV in Africa" (Susan Watkins, PI,
    University of Pennsylvania). $864,000 grant from the National Institute of Child Health and Human
    Development, June 2005-May 2008. (Regnerus is PI of $279,000 sub-contract to The University of
    Texas at Austin). R01-HD050142-01.

Seed grant for "Sex and Emotional Health in Emerging Adulthood." $4,000 grant from the Population
    Research Center and $2,000 grant from the College of Liberal Arts, The University of Texas at
    Austin, 2007.

**SELECT INVITED PRESENTATIONS**

"The Future of Christian Marriage."

- University of Mary, Bismarck, ND, April 2021
- Faulkner University, Montgomery, AL, March 2021

"The Transformation of Men, Marriage, and Monogamy." Universidad Francisco de Vitoria, Madrid, November 2018.

Author meets critics panel on *Cheap Sex: The Transformation of Men, Marriage, and Monogamy*. Society for the Scientific Study of Religion, Las Vegas, NV, October 2018.

"The Transformation of Men, Marriage, and Monogamy." Archdiocese of Denver, September 2018.

Author meets critics panel on *Virgin Nation: Sexual Purity and American Adolescence* (by Sara Moslener, Oxford University Press, 2016). American Academy of Religion, San Antonio, TX, November 2016.

"Intergenerational Transmission of Marriage and Relationship Legacy." Home Renaissance Foundation, London, United Kingdom, November 2015.

"The Future of Marriage and Family in America." University of St. Thomas, Houston, TX, March 2015.

"The New Family Structures Study and the Challenges of Social Science." Brigham Young University, Provo, UT, October 2014.

"Sex in America: Sociological Trends in American Sexuality." Ethics and Religious Liberty Commission, Nashville, TN, April 2014.

"Premarital Sex in America." Department of Sociology, University of North Carolina at Chapel Hill, Chapel Hill, NC, January 2012.

Book discussion session on *Premarital Sex in America*. Society for the Study of Emerging Adulthood, Providence, RI, October 2011.

"The Future of Sex and Marriage in American Evangelicalism." National Association of Evangelicals Advisory Board, Washington, D.C., October 2011.

Heyer Lecture. Austin Presbyterian Theological Seminary, Austin, TX, September 2011.

Thematic session on "The Cultural War and Red/Blue Divide: Re-examining the Debate Demographically and Behaviorally." American Sociological Association, Las Vegas, NV, August 2011.

"Sexual Economics: The Forces Shaping How Young Americans Meet, Mate, and Marry." Heritage Foundation, Washington, D.C., May 2011.

"Marital Realities, Current Mindsets, and Possible Futures." Institute of Marriage and Family Canada, Ottawa, Canada, May 2011.

Panel on "Teen Pregnancy: What Is California Doing Right?" Zócalo Public Square, Los Angeles, CA, December 2010.

"Marriage and Parenthood in the Imagination of Young Adults." Baby Makes Three: Social Scientific Research on Successfully Combining Marriage and Parenthood (seminar), Princeton, NJ, June 2010.

"Saving Marriage Before It Starts." Q Conference, Lyric Opera, Chicago, IL, April 2010.

"The Price of Sex in Contemporary Heterosexual Relationships." TEDxUT, The University of Texas at Austin, Austin, TX, April 2010.

"Love and Marriage in the Minds of Emerging Adults." Child Trends and Heritage Foundation, Washington, D.C., October 2009.

"Forbidden Fruit? Sex and Religious Faith in the Lives of Young Americans." Baylor University, Waco, TX, September 2007.

"Great Expectations: Culture, Emotion, and Disenchantment in the Sexual Worlds of Young Americans." Bay Area Colloquium on Population, Berkeley, CA, September 2007.

## CONFERENCE PRESENTATIONS

"The Math Behind Declining Christian Marriage," Society for the Scientific Study of Religion, Las Vegas, NV, October 2018.

"Consent and the Presumption of the Exchange Theory of Relationship Behavior." Paper presented at the annual meeting of the American Political Science Association, Boston, MA, September 2018.

"Is There a Recession in Marriage among Western Christians?" Paper presented at the annual meeting of the Society for the Scientific Study of Religion, Atlanta, GA, October 2016.

"Gender and Heterosexual Sex." Panel discussion at the annual meeting of the American Sociological Association, New York, NY, August 2013.

"The New Family Structures Study: Introduction and Initial Results." Paper presented at the annual meeting of the Population Association of America, San Francisco, CA, May 2012.

"Religious Distinctions in Nonmarital Romantic Relationship Formation" (with Ellyn Arevalo). Paper presented at the annual meeting of the Society for the Scientific Study of Religion, Milwaukee, WI, October 2011.

"Premarital Sexual Initiation and Fertility among Pentecostal Adolescents in Brazil." Paper presented at the annual meeting of the Population Association of America, Washington, D.C., April 2011.

"Red Sex, Blue Sex: Distinguishing Political Culture and Religious Culture in the Sexual Decisions of Young Americans." Paper presented at the annual meeting of the Society for the Scientific Study of Religion, Denver, CO, October 2009.

"Bare Market: Campus Sex Ratios and Romantic Relationships" (with Jeremy Uecker). Paper presented at the annual meeting of the Population Association of America, Detroit, MI, May 2009.

"Religion and Sexual Initiation in Brazil" (with Ana Paula Verona). Paper presented at the annual meeting of the Population Association of America, Detroit, MI, April 2009.

## ADVISING

Ph.D. Committees in the Department of Sociology (Year Degree Awarded, * Co-Chair/Co-Supervisor, ** Chair/Supervisor)

2016   Jennifer McMorris
2015   Stanley Kasun
2015   Nina Palmo
2012   Nicolette Manglos **
2012   Catherine McNamee
2011   Charles Stokes
2010   Nicole Angotti **
2010   Georgina Martínez Canizales
2010   Viviana Salinas
2010   Jeremy Uecker **
2010   Ana Paula Verona
2008   Margaret Vaaler
2008   Sara Yeatman
2007   Amy Burdette *
2007   Bryan Shepherd
2007   Jenny Trinitapoli **
2007   Elisa Zhai

M.A. Committees in the Department of Sociology (Year Degree Awarded, * Co-Chair/Co-Supervisor, ** Chair/Supervisor)

2013   Ellyn Arevalo *
2012   Kristen Redford **
2011   David McClendon **
2010   Aida Ramos Wada
2008   Nicolette Manglos **
2007   Andrea Henderson
2006   Jeremy Uecker **

Undergraduate Thesis Supervision for Honors, Plan II, BDP (Year Degree Awarded, * Reader, ** Supervisor)

2019   Clarisa Trevino **
2014   Tiffany Fong *
2011   Mary Lingwall **
2008   Hong Nguyen **

Ph.D. Committees at other universities (Year Degree Awarded)

2018   Yana Mikhaylova, Higher School of Economics, Moscow

## DEPARTMENTAL AND UNIVERSITY SERVICE

Member, Executive Committee, Department of Sociology, 2012-2014

Member, Graduate Admissions Committee, Department of Sociology, 2012-2014

Member, Promotion and Tenure Committee, Department of Sociology, 2012-2014

Member, Undergraduate Research Award Selection Committee, College of Liberal Arts, 2010-2012

Guest presenter, Peer Educator Sexual Health courses, University Health Services, 2008-2012

Presenter, Orange Jackets' Week of Women, Tejas Club, Spring 2011

Moderator, Thesis Symposium, Plan II Honors Program, 2011

Member, Graduate Steering Committee, Department of Sociology, 2010-2011

Member, Promotion and Tenure Committee, Department of Sociology, 2010-2011

Member, Executive Committee, Department of Sociology, 2009-2011

Presenter, TEDxUT, The University of Texas at Austin, Spring 2010

Member, Governing Board, Population Research Center, 2009-2010

Member, Graduate Admissions Committee, Department of Sociology, 2009-2010

Presenter, Sexual Health Panel, Tejas Club, Fall 2009

Member, Graduate Steering Committee, Department of Sociology, 2007-2009

Participant and presenter, Faculty Fellows Program, The University of Texas at Austin, 2007-2009

Chair, Religion Faculty Search Committee, Department of Sociology, Fall 2008

Member, Population Junior Faculty Search Committee, Department of Sociology, Fall 2007

Member, Speaker Colloquium Committee, Department of Sociology, Fall 2007

**PROFESSIONAL SERVICE AND ORGANIZATIONAL MEMBERSHIP**

Co-organizer and session chair, *The Moynihan Report at 50: Reflections, Realities, and Prospects*. Princeton University, Princeton, NJ, October 30-31, 2015

Distinguished Article Award Committee member, American Sociological Association (Religion Section), 2010-2011

- Committee chair, 2011

Editorial Board member, *Interdisciplinary Journal of Research on Religion*, 2005–2011

Editorial Board member, *Journal for the Scientific Study of Religion*, 2004–2011

Distinguished Article Award Committee member, Society for the Scientific Study of Religion, 2009-2010

- Committee chair, 2010

Nominating Committee member, Society for the Scientific Study of Religion, 2007-2009

Jack Shand Research Award Committee member, Society for the Scientific Study of Religion, 2005-2007

Council member, American Sociological Association (Religion Section), 2004-2007


Member of:

American Academy of Religion, 2017-2019
Population Association of America, 2004-2018
Society for the Scientific Study of Religion, 1996-present

Ad-hoc reviewer for:

*American Journal of Sociology*, *American Sociological Review*, *Archives of Sexual Behavior*, *Biodemography and Social Biology, Gender & Society, Interdisciplinary Journal of Research on Religion, International Journal of Environmental Research and Public Health, Journal for the Scientific Study of Religion, Journal of Adolescent Health, Journal of Behavioral Addictions, Journal of Family Issues, Journal of Health and Social Behavior, Journal of Homosexuality, Journal of Marriage and Family, Journal of Psychology and Christianity, Pediatrics, Perspectives on Psychological Science, Review of Religious Research, Social Forces, Social Problems, Social Psychology Quarterly, Social Science & Medicine, Social Science Quarterly, Social Science Research, Sociological Forum, Sociological Inquiry, The Sociological Quarterly,* National Institutes of Health (2007), National Science Foundation (2010, one review), Templeton Foundation (2012, 2019)