**Paul Carlos Southwick (OSB 095141)**
**Religious Exemption Accountability Project**
**Paul Southwick Law, LLC**
8532 N. Ivanhoe St. #208,
Portland, OR 97203
Email: paul@paulsouthwick.com
Phone: 503-806-9517

**Timothy R. Volpert (OSB 814074)**
**Tim Volpert PC**
211 NE Hancock St. Ste. 2B
Portland, OR 97212
Email: tim@timvolpertlaw.com
Phone: 503-703-9054

**Alletta S. Brenner (OSB 142844)**
**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Email: ABrenner@perkinscoie.com
Phone: 503-727-2000

**Misha Isaak (OSB 086430)**
**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Email: misaak@perkinscoie.com
Phone: 503-727-2000

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF OREGON
### EUGENE DIVISION

| | |
|---|---|
| Elizabeth HUNTER; et al.,<br>　　　　Plaintiffs,<br>　　v.<br><br>U.S. DEPARTMENT OF EDUCATION; et al.,<br>　　　　Defendants,<br><br>　　v.<br><br>COUNCIL FOR CHRISTIAN COLLEGES & UNIVERSITIES, WESTERN BAPTIST COLLEGE d/b/a CORBAN UNIVERSITY, WILLIAM JESSUP UNIVERSITY AND PHOENIX SEMINARY,<br>　　　　Intervenor-Defendants. | Case No. 6:21-cv-00474-AA<br><br>**PLAINTIFFS' OPPOSITION TO INTERVENOR-DEEFENDANTS' MOTION TO DISMISS**<br><br>ORAL ARGUMENT REQUESTED |

**MEMORANDUM OF LAW**

I. **INTRODUCTION**

The Intervenor-Defendants' argument that the various rights protected by the First Amendment *require* the Title IX religious exemption is easily dismissed. The Supreme Court has already heard and flatly rejected this argument in *Grove City Coll. v. Bell*, 465 U.S. 555 (1984):

> "Grove City's final challenge to the Court of Appeals' decision—that conditioning federal assistance on compliance with Title IX infringes First Amendment rights of the College and its students—warrants only brief consideration. Congress is free to attach reasonable and unambiguous conditions to federal financial assistance that educational institutions are not obligated to accept. *E.g., Pennhurst State School & Hospital v. Halderman*, 451 U.S. 1, 17, 101 S.Ct. 1531, 1539, 67 L.Ed.2d 694 (1981). Grove City may terminate its participation in the [relevant financial aid] program and thus avoid the requirements of § 901(a). Students affected by the Department's action may either take their [financial aid] elsewhere or attend Grove City without federal financial assistance. Requiring Grove City to comply with Title IX's prohibition of discrimination as a condition for its continued eligibility to participate in the [financial aid] program infringes no First Amendment rights of the College or its students."

*Id.* at 575–76.

Aside from the Constitutional arguments briefly addressed above, the Intervenor-Defendants' Motion to Dismiss mostly raises the issues already raised, and heavily briefed, in Government Defendants' Motion to Dismiss and the briefing on the Motion for Temporary Restraining Order and Preliminary Injunction. Plaintiffs will not fully brief all of those arguments again here. Rather, Plaintiffs primarily incorporate their prior arguments and briefing, as outlined below, and more substantively respond to new arguments raised by Intervenor-Defendants.

## II.     ARGUMENT

### A. Plaintiffs' standing is well-established.

Standing has been thoroughly briefed by the parties. Dkt. 56, 11-19; Dkt. 62, 17-19; Dkt. 64, 9-21; Dkt. 86, 7-24; Dkt. 114, 3-4. However, Intervenor-Defendants argue that Plaintiffs do not "claim the Department itself discriminates against LGBTQ+ persons[.]" Dkt. 137, 5. To the contrary, Plaintiffs allege that the Department of Education provides billions in federal funding to religious colleges and universities that discriminate against LGBTQ+ students, has relied on the religious exemption to Title IX to close Title IX complaints filed by LGBTQ+ students, and will continue to do so, that the "Department's conduct discourages LGBTQ+ students from filing Title IX complaints with their educational institutions or with the Department," and that "Plaintiffs' injuries are traceable to the Defendants' actions and inactions." *See e.g.* FAC, ¶¶ 579, 590-91, 593, 602.

Indeed, Defendants directly cause injuries to Plaintiffs, stigmatically and procedurally, by (a) granting assurances of exemption; (b) closing Title IX complaints on the basis of the religious exemption; (c) certifying educational institutions with avowedly discriminatory policies toward LGBTQ+ students as meriting Title VI funds, and (d) providing billions in direct and indirect federal financial assistance to avowedly discriminatory educational institutions. The federal financial assistance itself, as well as the other direct acts of the government described above, apart from any specific conduct by the religious colleges, unconstitutionally funds, supports, and condones invidious discrimination in violation of Plaintiffs' equal protection rights under the Fifth Amendment. *Norwood*, 413 U.S. at 467 (Constitution requires government to "steer clear…of giving significant aid to institutions that practice racial or other invidious discrimination."); *see also Bob Jones University v. Johnson*, at 608, aff'd without published opinion, 529 F.2d 5143 (4th

Cir. 1975) ("Each time the VA approves an application for benefits to be used at Bob Jones, it extends a benefit to whites which it cannot grant to some blacks. While this is an outcome of private discrimination, it is clear that no[t] only is the government prohibited from authoring state sponsored discrimination, it is also prohibited from acquiescence in the discriminatory practices of public or private entities which participate in the federal program.").

Moreover, *Allen v. Wright,* 468 U.S. 737 (1984), is inapposite. Unlike the plaintiffs in *Allen*, the Plaintiffs here actually enrolled, or attempted to enroll, at the avowedly discriminatory educational institutions but were rejected and/or were discriminated against pursuant to school policies.

Intervenor-Defendants also argue that the Department cannot require the religious schools to modify their religious identity, beliefs, and codes, and thus a favorable ruling cannot redress Plaintiffs' alleged injuries. Dkt. 137, 6-7. Not so. To begin, Plaintiffs do not argue that the Court or the Department must require the religious schools to modify their religious identity or beliefs. To the contrary, Plaintiffs allege that "Educational institutions will not need to change their religious beliefs to comply with Title IX, they will need to change their policies and practices that conflict with Title IX's requirements." FAC, ¶ 607. Consequently, if the Court grants Plaintiffs the relief they seek, the Department will need to evaluate the religious schools' student conduct policies and practices for compliance with Title IX and provide LGBTQ+ students at all federally funded educational institutions with the anti-discrimination protections afforded through the Department's administrative processes. FAC, ¶¶ 604, 608.

Some religious educational institutions may decide to refuse federal funding if required to comply with Title IX as a condition of receiving federal funds. Other religious educational institutions will continue to receive federal funds and comply with Title IX, as many similar

educational institutions did during the desegregation of higher education in prior decades. FAC, ¶¶ 605-06. Either way, whether the religious educational institutions stay in or get out of federal funding, the Plaintiffs' injuries stemming from the Government's funding and facilitation of invidious discrimination will be remedied because the Government will be out of the business of funding, facilitating and endorsing invidious discrimination.

### B. Every religious school is not a necessary or indispensable party.

For the reasons already briefed by Plaintiffs, the educational institutions attended by Plaintiffs are not necessary or indispensable parties. Dkt. 114, 4-5. Even if the religious schools were "necessary," they would not be "indispensable" because of the public rights exception to joinder rules. *See, e.g.*, *Makah Indian Tribe v. Verity*, 910 F.2d 555, 561, fn. 6 (9th Cir. 1990). "In a proceeding . . . narrowly restricted to the protection and enforcement of public rights, there is little scope or need for the traditional rules governing the joinder of parties in litigation determining private rights." *Conner v. Burford*, 848 F.2d 1441, 1459 (9th Cir. 1988) (quoting *National Licorice Co. v. National Labor Relations Board*, 309 U.S. 350 (1940)).

#### 1. Plaintiffs' harm is grounded in the federal funding of invidious discrimination.

"The fact that all recipients of aid under a challenged statute have a financial interest in the continuation of that statute does not lead inevitably to a conclusion that all aid recipients *must* be joined as parties. (The nonparty aid recipients could move for intervention under Rule 24 if they are concerned that their interest in this case justify the burden that entering into the litigation would place upon them.)" *Brumfield v. Dodd*, 425 F. Supp. 528, 530 (E.D. La. 1976) (quoting *American Civil Liberties U. of Md. v. Board of Public Wks.*, 357 F. Supp. 877, 884 (D.Md.1972)). It would certainly be "impractical and unnecessarily burdensome to require Plaintiffs to join every other

person who conceivably may be affected by a declaration that the challenged law is unconstitutional on the equal protection and establishment challenges presented." *Martinez v. Clark Cty.*, 846 F. Supp. 2d 1131, 1149 (D. Nev. 2012). Granting every single university represented by Plaintiffs would squander judicial resources and efficiency, delaying and prejudicing this proceeding. Moreover, Intervenor-Defendants inaccurately contend that "Plaintiffs' allegations of harm rest on direct factual allegations about the purported conduct of religious schools that they name in the Amended Complaint." Dkt. 137, 7. This is false. Plaintiffs' allegations of harm rest foremost on the federal funding of avowedly invidious LGBTQ+ discrimination and do not require a finding of liability as to any religious college. It further is unclear why religious schools would have any need to defend against allegations because there are no claims against them in this case. In any event, any factual allegations could be resolved through the use of discovery. Similarly, prior to any action being taken against religious schools by the Department, those religious schools will have an opportunity to respond and defend themselves through the administrative process. *See e.g.* 20 U.S.C. Sec. 1682 (compliance through termination of funding allowed only after "express finding on the record" and "opportunity for hearing").

### 2. Reliance on *Shermoen v. United States* is misplaced.

In *Shermoen*, the indispensable party was an absent Indian tribe, which created an undeniable conflict of interest for the United States, and thereby impaired the adequate representation that existed. *Id.,* 982 F.2d 1312, 1318 (9th Cir. 1992). "The relations of the Indian tribes … has always been an anomalous one and of a complex character." *United States v. Kagama*, 118 U.S. 375, 381 (1886). "Plenary authority over the tribal relations of the Indians has been exercised by Congress from the beginning, and the power has always been deemed a political one, not subject to be controlled by the judicial department of the government." *Lone Wolf v. Hitchcock*,

187 U.S. 553, 565 (1903); *see also Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 72 (1978) (resisting judicial intrusion upon tribal sovereignty in a federal forum). Here, no such conflict of interest exists. Moreover, the legislation giving rise to the cause of action specifically named the two Indian tribes that the court deemed to be necessary parties. *Shermoen*, 982 F.2d at 1316. Thus, because *Shermoen* was decided within the anomalous, complex, and political context of tribal sovereignty, and because the Title IX religious exemption does not name any of the religious schools as specific beneficiaries of the religious exemption, reliance therein is misplaced.

### 3. The Department of Justice and Intervenor-Defendants' joint representation and joint resources is far more than adequate.

"Where the party and the proposed intervenor share the same 'ultimate objective,' a presumption of adequacy of representation applies, and the intervenor can rebut that presumption only with a 'compelling showing' to the contrary." *Perry v. Proposition 8 Official Proponents*, 587 F.3d 947, 951 (9th Cir. 2009). No such showing has been made. Moreover, "[t]here is also an assumption of adequacy when the government and the applicant are on the same side," requiring a "very compelling showing" of inadequacy. *Arakaki v. Cayetano*, 324 F.3d 1078, 1086 (9th Cir. 2003) (citing *United States v. City of L.A.*, 288 F.3d 391, 401-02 (9th Cir. 2002). "This presumption of adequacy is 'nowhere more applicable than in a case where the Department of Justice deploys its formidable resources to defend the constitutionality of a congressional enactment.'" *Freedom from Religion Found., Inc.*, 644 F.3d at 841 (quoting *California ex rel. Lockyer v. United States*, 450 F.3d 436, 444 (9th Cir. 2006)). Here, the current representation by Department of Justice and well-resourced Intervenor-Defendants is more than adequate.

Moreover, this Court already held that Intervenor-Defendants "fail[ed] to make a 'very compelling showing' of inadequate representation" and that any failure "to join necessary parties pursuant to Rules 12(b)(7) and 19" would amount to no more than a difference in litigation

strategy. Dkt. 106, 8-9. Additionally, to the extent the Court entertains a fairness analysis under Rule 19(b), the remedies this Court could order will not prejudice absent parties because, as described above, this Court is not awarding any relief against the schools and the schools will be allowed to defend themselves before any federal funding or other action is taken against them by the Department. This Court can also fashion remedies in a manner to avoid prejudice. Consequently, this Court should not dismiss Plaintiffs' claims for failure to join necessary parties.[1]

### C. The Constitution does not require federal funding of private invidious discrimination against an historically marginalized group.

Neither the Free Exercise Clause, the Free Speech Clause, the Establishment Clause, First Amendment association rights, nor the Religious Freedom Restoration Act (RFRA) requires the federal funding of invidious discrimination. *See* freedom from discrimination cases: *Norwood v. Harrison*, 413 U.S. 455 (1973); *Bob Jones University v. United States*, 461 U.S. 574 (1983); *Grove City Coll. v. Bell*, 465 U.S. 555 (1984); *Christian Legal Soc. Chapter of the University of California v. Martinez*, 561 U.S. 661 (2010). To be sure: The Supreme Court has never upheld religious exemptions that facilitate the federal funding of discrimination against an historically marginalized group. Dkt. 114, 10 (listing cases).

### 1. The Free Speech Clause does not require the federal funding of private discrimination.

Curtailing the federal funding of invidious discrimination infringes no speech rights. Indeed, a "prohibition of discrimination as a condition for continued eligibility in [a federal financial assistance program] infringes no First Amendment rights" of educational institutions. *See*

---

[1] Intervenor-Defendants also argue that this Court lacks personal jurisdiction over the religious colleges mentioned in the complaint. However, to the extent it is relevant to the Court's analysis, and Plaintiffs argue it should not be, this Court would clearly have jurisdiction over George Fox University.

*Grove City Coll.*, 465 U.S. at 575-76. While Intervenor-Defendants' essentially assert that "neutrality" mandates the federal funding of invidious discrimination, indeed the opposite is true. *See Norwood*, 413 U.S. at 467 (Constitution requires government to "steer clear…of giving significant aid to institutions that practice racial or other invidious discrimination.").

Moreover, Intervenor-Defendants contention that the Title IX religious exemption protects against chilling and restricting speech based on the content and viewpoint of the speaker is premature and without merit. *See* dkt. 137, 37. The relief sought by Plaintiffs does not require the Court to adjudicate any free speech issues. To the extent that free speech issues arise in the context of a future government enforcement action, the Department will be required to comply with the First Amendment. Moreover, any educational institution subject to an enforcement action could raise its free speech rights at that time.

### 2. Association rights do not require the federal funding of invidious private discrimination.

Intervenor-Defendants contend that "the government may not invade an organization's expression by forcing "inclusion of an unwanted person in a group" if doing so affects "the group's ability to advocate public or private viewpoints." Dkt. 137 at 38 (citing *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000)). However, Intervenor-Defendants' reliance on *Dale* is misplaced because *Dale* was not a government funding case. In the context of government funding for education, the government can, and often must, allow all Americans, even "unwanted persons," to benefit from it equally. *Norwood v. Harrison*, 413 U.S. 455 (1973); *Bob Jones University v. United States*, 461 U.S. 574 (1983); *Grove City Coll. v. Bell*, 465 U.S. 555 (1984); *Christian Legal Soc. Chapter of the University of California v. Martinez*, 561 U.S. 661 (2010).

8

PLAINTIFFS' OPPOSITION TO INTERVENOR-DEFENDANTS' MOTION TO DISMISS

### 3. Intervenor-Defendants' claims of Establishment Clause violations are premature, speculative, and not relevant to this motion.

Intervenor-Defendants claim that if the religious exemption were removed, "every religious school in the country would be under constant review by the [DOE] to determine Title IX eligibility." Dkt. 137, 39. This claim is speculative and premature, and an inquiry into how Title IX might possibly interact with religious universities in the future is outside of the scope of this motion. Assuming *arguendo* that Intervenor-Defendants' claim is relevant to this motion, Intervenor-Defendants fail to demonstrate that the Establishment Clause prohibits government regulation of religiously controlled educational institutions that receive taxpayer funding.

Intervenor-Defendants cite to *Natal v. Christian and Missionary All.*, 878 F.2d 1575 (1st Cir. 1989) for the premise that the Establishment Clause forbids the government– including courts– from constantly reviewing "religious policy, administration, and governance." *Natal,* 878 F.2d at 1578. Yet, *Natal* does not stand for that proposition, but rather stands for the proposition that government may not decide internal religious "controversies over religious doctrine and practice…" *Id.* at 1577. In *Natal*, the plaintiff was a clergyman who wished the court to review his religious employer's internal policies to ensure they had been correctly applied, which would have entailed a "judicial intrusion into, rules, policies, and decisions which are unmistakably of ecclesiastical cognizance." *Id.* at 1566–67. Such a determination of the internal religious controversies involving doctrine and practice are not relevant here. Any government review of policies would not weigh in on the validity or veracity of religious doctrine and practice. Rather, it would determine if schools existing policies and practices are compliant with civil rights anti-discrimination requirements, and whether they would have a discriminatory effect on students.

Not only does *Natal* simply not foreclose government review of religious institutional policies, Intervenor-Defendants' specter of rogue enforcement actions that might violate the

9
PLAINTIFFS' OPPOSITION TO INTERVENOR-DEFENDANTS' MOTION TO DISMISS

Establishment Clause are entirely speculative. The Department currently enforces Title IX at religious universities that do not claim a religious exemption without violating the Establishment Clause and would continue to be capable of constitutional enforcement of Title IX if its exemption were either limited or removed.

### 4. The Title IX religious exemption is not affirmatively required by the Establishment Clause, Free Exercise Clause or RFRA.

Plaintiffs previously briefed some of the Establishment Clause, Free Exercise Clause and RFRA arguments raised by Intervenor-Defendants and incorporate those arguments herein. *See e.g.* Dkt. 114, 6-9. Clearly, "although the Constitution does not proscribe private bias, it places no value on discrimination as it does on the values inherent in the Free Exercise Clause. Invidious private discrimination may be characterized as a form of exercising freedom of association protected by the First Amendment, but it has never been accorded affirmative constitutional protections." *Norwood*, 413 U.S. at 469-470; Dkt. 64, 20-21; Dkt. 114, 6-8. Additionally, the Establishment Clause requires neutrality—not the federal funding of invidious discrimination—otherwise, a religious accommodation will devolve into religious exceptionalism. *See Corp. of Presiding Bishop v. Amos*, 483 U.S. 327, 334-35 (1987) ("[a]t some point, accommodation may devolve into 'an unlawful fostering of religion.'") (internal citation and quotation marks omitted); Dkt. 114, 9; Dkt. 44, 23-25.

Intervenor-Defendants argue that "If Title IX were stripped of its religious exemption and interpreted to reach sexual orientation and gender identity, the law would substantially burden schools' religious exercise by putting them to the choice of approving relationships inconsistent with their beliefs or curtailing their mission—potentially closing their doors—due to loss of enrollment among low- and middle-income students who need financial assistance to pursue education." Dkt. 137, 34. Intervenor-Defendants primarily rely on *Fulton v. City of Philadelphia*, 141 S. Ct. 1868 (2021).

But Intervenor-Defendants' reliance on *Fulton* is misplaced. In *Fulton*, the adoption agency in question could not continue its mission of providing foster homes to children, as without a contract and license from the city of Philadelphia, it simply could not provide foster services at all. *Id*. at 1885 (Justice Alito, Thomas, and Gorsuch concurring) ("As is typical in other jurisdictions, no private charitable group may recruit, vet, or support foster parents in Philadelphia without the City's approval."). Here, in contrast, private universities are not comparably dependent on the government to be allowed provide their services. Rather, they have options, including the option to continue to offer their educational services without receiving federal funds. *See Grove City Coll.*, 465 U.S. at 575-76 ("Grove City may terminate its participation in the [relevant financial aid] program and thus avoid the requirements of § 901(a)."); *see also Cornelius v. Benevolent Protective Order of Elks*, 382 F. Supp. 1182, 1189 (D. Conn. 1974) ("it is one thing to sue on Fourteenth Amendment grounds to halt state assistance to an otherwise private entity; it is quite another to seek on those grounds to restrain the entity in its own conduct. If the latter suit is successful, the entity may have no choice but to alter its practices; if the former suit is successful, the entity can choose between continuing to practice racial discrimination at the cost of forfeiting further state assistance, or abandoning its discriminatory practices and policies so that the state might constitutionally continue its assistance.").

Moreover, the Court's decision in *Fulton* is limited to its unique circumstances. The Court noted "the uniquely selective nature of foster care certification." *Fulton*, 141 S. Ct. at 1881. And the exemptions at issue in *Fulton* involved far different exemptions than those at issue here with respect to Title IX because the challenged policy in that case involved a "formal system of entirely discretionary exceptions." *Id.* at 1878.

However, Intervenor-Defendants argue, based on *Fulton*, that "so long as the government provides any exemption to Title IX's general prohibition against sex discrimination, it must preserve the religious exemption." Dkt. 137, 35. Intervenor-Defendants stretch *Fulton* too far. As noted above, the exemption at issue in *Fulton* was an entirely discretionary exemption that allowed the Commissioner to provide an exemption, for any reason, in the Commission's sole discretion. *Fulton*, 141 S. Ct. at 1878. The holding of *Fulton* is that, in exercising that discretion, the Commissioner could not refuse to extend that type of discretionary exemption to cases of religious hardship without a compelling reason. *Id.* Here, there is no exemption to Title IX that allows government defendants to provide an exemption from Title IX for any reason at their sole discretion.

The *Fulton* analysis would be different if Title IX contained an exemption that allowed the Assistant Secretary for OCR to determine, in their sole discretion, whether to excuse compliance with Title IX for any reason, but then categorically refused to consider religious liberty interests when making discretionary exemption determinations. But that is not the case before the Court. There is no such Title IX exemption. Rather, the Title IX religious exemption elevates interests of religious organizations and religious tenets above the interests of secular organizations and secular tenets, causing the Establishment Clause violations as analyzed elsewhere in this and earlier briefing.

Similar to their *Fulton* argument, Intervenor-Defendants also contend that *Tandon v. Newson*, 141 S. Ct. 1294 (2021) mandates the religious exemption to Title IX. However, Intervenor-Defendants likewise stretch the holding of *Tandon* too far. In *Tandon*, the court held that laws "are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat *any* comparable secular activity more favorably than

12
PLAINTIFFS' OPPOSITION TO INTERVENOR-DEFENDANTS' MOTION TO DISMISS

religious exercise." *Id.* at 1296 (emphasis in original). First, the context of this case is not comparable to *Tandon*, which involved emergency administrative regulations regarding COVID-19 that the Court described as containing "myriad exceptions and accommodations for comparable activities." *Id*. at 1298. The issue in *Tandon* was also primarily about whether certain precautions could be taken to curb the spread of COVID-19, determining that "[w]here the government permits other activities to proceed with precautions, it must show that the religious exercise at issue is more dangerous than those activities even when the same precautions are applied." *Id*. at 1297. Here, public health restrictions are not at issue, nor is an analysis of what precautions might be taken to accomplish the government's stated objective.

In any event, Intervenor-Defendants have not articulated how any of the other Title IX exemptions treat comparable secular activities more favorably than religious exercise. Nor could they, as the other exemptions either benefit religious, as well as secular, private undergraduate institutions, 1681(a)(1),(5), or are for non-comparable institutions or activities, *i.e.* military academies, fraternities, sororities, Boys State or Girls State type conferences, father-son or mother-daughter activities, and beauty pageant scholarships, 1681(a)(4),(6-9). Consequently, to the extent *Fulton* or *Tandon* applies here, Title IX, with the religious exemption removed, would satisfy their requirements.

Intervenor-Defendants also argue that Title IX would violate RFRA without the current religious exemption because it is not the least restrictive means of furthering the government's compelling interest in combating sex, sexual orientation and gender identity discrimination. Dkt. 137, 35-36. However, as with non-discrimination statutes addressing race discrimination, Title IX is the least restrictive means to remedy sex discrimination in education. *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 733 (2014) ("The Government has a compelling interest in providing

13
PLAINTIFFS' OPPOSITION TO INTERVENOR-DEFENDANTS' MOTION TO DISMISS

an equal opportunity to participate in the workforce without regard to race, and prohibitions on racial discrimination are precisely tailored to achieve that critical goal.").

### D. Plaintiffs properly stated all claims.

#### 1. Title IX forbids discrimination based on sex, including sexual orientation and gender identity

Intervenor-Defendants argue that Plaintiffs fail to state any claim for relief because Title IX does not forbid sexual orientation or gender identity discrimination. Dkt. 137, 30-33. Plaintiffs previously briefed this issue at Dkt. 114, 11, and Defendants briefed this issue at Dkt. 56, 6-7. In light of *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), where the Court determined that sex discrimination under Title VII includes sexual orientation and gender identity discrimination, this Court should determine that Title IX's prohibition on sex discrimination likewise includes a prohibition on sexual orientation and gender identity discrimination.

#### 2. Plaintiffs properly stated an Administrative Procedures Act claim.

The parties previously briefed certain aspects of Plaintiffs' APA claims. Dkt. 44, 33-39; Dkt. 62, 29-33; Dkt. 64, 25-28. Additionally, on November 1, 2021, the State of Oregon and 18 other states filed an amicus curiae brief in support of Plaintiffs' APA claims. Dkt. 132 ("Amicus Brief of Oregon"). Plaintiffs adopt and incorporate the arguments in the Amicus Brief of Oregon to the extent that they support Plaintiffs' claims. For the Court's reference, Plaintiffs highlight below several portions of the arguments that Plaintiffs adopt.

The November 2020 control test rule is inconsistent with the text and purpose of Title IX's religious exemption. Dkt. 132, 2-13. As stated in the Amicus Brief of Oregon: "Had Congress intended exemptions for educational institutions without regard to a separate religious organization, it could have used wording that would more clearly convey that intent. *See* 42 U.S.C.

§ 2000e-2(e) (Title VII exempting private schools when they are partially 'owned, supported, controlled, or managed' by a religious entity or they have curricula 'directed toward the propagation of a particular religion'); *see also* Pub. L. No. 109-148, tit. IV, subtit. A, § 107(m)(2)(A), 119 Stat. 2680 (2005) (federal funding bill exempting a 'non-public school that is controlled by a religious organization' or (2) 'organized and operated on the basis of religious tenets'). Congress did not use those words. The Department's eligibility rule cannot insert what Congress omitted from the text of Title IX." Dkt. 132, 5.

Moreover, the November 2020 rule "is arbitrary and capricious: (1) the rule lacks support in the evidence before the Department; (2) the Department's stated reasoning is inconsistent and unsupported; and (3) the Department overlooked important aspects of the problem that the rule addresses." Dkt. 132, 8. Indeed, "The added criteria use vague, indefinite terms, such as 'practice,' 'teachings,' and '[o]ther evidence.' 34 C.F.R.106.12(c)(6). And they conflate key terms that the statute makes distinct—'educational institution' with 'religious organization', 'tenets' with 'practices,' and 'refer[] to' with 'controlled by.' By adding more criteria, justified by no problem in particular, the Department has only muddled the regulatory standard." Dkt. 132, 9.

Similarly, Plaintiffs allege in their FAC that "[]the November 2020 Final Rule was arbitrary and capricious because Defendants failed to provide adequate reasoned analysis, properly balance costs and benefits, consider and respond to comments, consider all relevant statutory factors, consider reasonable alternatives, or explain the inconsistencies between their position and the full record of research and policy findings before it." FAC, ¶ 676.

The Amicus Brief of Oregon also articulates why RFRA does not justify the November 2020 control test rule. "But RFRA does not justify these regulations. Even if a private school brought a RFRA claim, the government has a compelling interest in 'eradicating discrimination'

15
PLAINTIFFS' OPPOSITION TO INTERVENOR-DEFENDANTS' MOTION TO DISMISS

based on sex and other protected characteristics and may do so by withholding funding or subsidies from institutions. *See Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 733 (2014) ('The Government has a compelling interest in providing an equal opportunity to participate in the workforce without regard to race, and prohibitions on racial discrimination are precisely tailored to achieve that critical goal.'); *see also Bob Jones Univ. v. United States*, 461 U.S. 574, 591, 604 (1983) (concluding that the '[g]overnment has a fundamental, overriding interest in eradicating racial discrimination in education,' which warrants denial of tax exemptions to discriminatory private schools)." Dkt. 132, 11.

The Amicus Brief of Oregon further argues that the Department overlooked important aspects of the problem in that "by expanding the criteria for schools to receive religious exemptions, the rule makes discrimination, harassment, and assault more likely at schools that do not protect against and are not accountable for those consequences." Dkt. 132, 11-12. Plaintiffs make similar allegations in their FAC. *See* ¶¶ 677, 678.

Similarly, the August 2020 rule eliminating the notice requirement for invoking the religious exemption is unlawful, arbitrary and capricious, and compounds the problems created by the eligibility rule. Dkt. 132, 13-15. "Although the Department described the notice requirement as 'confusing,' it cited no basis for that confusion, and the available evidence belies the point. *See* 83 Fed. Reg. at 61482." Dkt. 132, 14. Moreover, "The amendment will likely cause more students to unknowingly enroll in schools that believe themselves exempt from Title IX, even though the schools have not invoked the exemption publicly." Dkt. 132, 14.

As noted by the Amicus Brief of Oregon, the Department did not properly account for these concerns. "The Department's answer— that its regulations do not 'mandate[] that recipients deceive . . . students'—hardly responds to the problem. 85 Fed. Reg. at 30478. The problem is not

16
PLAINTIFFS' OPPOSITION TO INTERVENOR-DEFENDANTS' MOTION TO DISMISS

that the rule requires deception. *The problem is that it facilitates such deception by allowing schools to conceal important information about their exemption status.* The Department acknowledged that schools have financial incentives to recruit students and thus to omit information that might make a difference to those students. *Id*. Schools will have little reason to publicize that they are exempt from Title IX, as the Department suggested. *See* 85 Fed. Reg. at 30478 (describing that possibility)." Dkt. 132, 14-15 (emphasis added).

Similarly, Plaintiffs allege that [t]he August 2020 Final Rule was arbitrary and capricious for similar reasons. FAC, ¶ 693. Plaintiffs also allege that "Religious educational institutions rely on the August 2020 Final Rule to maintain vague and indeterminate policies and practices with respect to compliance with Title IX as applied to LGBTQ+ students" and "exposes more LGBTQ+ students to the risk of abuse, harassment and loss of their constitutional rights." FAC, ¶¶ 695-96.

Consequently, Plaintiffs have stated claims under the Administrative Procedures Act sufficient to survive a Motion to Dismiss. At a minimum, discovery is necessary to determine the strength of Plaintiffs' allegations.

### 3. Plaintiffs properly stated an Equal Protection Claim.

Intervenor-Defendants argue that Title IX's religious exemption is facially neutral and subject to only rational-basis review unless it was adopted with an "invidious" purpose to discriminate on another basis. Dkt. 137, 26. However, Plaintiffs have made this very allegation in the FAC: "Congress enacted Title IX to combat sex discrimination. Congress enacted the religious exemption to permit discrimination based on sex, sexual orientation and gender identity." FAC, ¶ 601.

Intervenor-Defendants accuse Plaintiffs of relying on a disparate-impact theory to support their Equal Protection claims. Dkt. 137, 25-26. Intervenor-Defendants cite to *Pers. Adm'r of Mass.*

*v. Feeney*, 442 U.S. 256, 272 (1979), in support of their argument. *Feeney* held that "[w]hen the basic classification is rationally based, uneven effects upon particular groups within a class are ordinarily of no constitutional concern." *Id*. at 272.

However, *Feeney* went on to hold that "[i]f the classification itself, covert of overt, is not based upon gender, the second question is whether the adverse effect reflects invidious gender-based discrimination. In this second inquiry, impact provides an 'important starting point,' but purposeful discrimination is 'the condition that offends the Constitution.'" *Id*. at 274 (internal citations omitted); *see also Brown v. City of Oneonta, New York*, 221 F.3d 329, 337 (2000) ("Or, a plaintiff could identify a facially neutral law or policy that has been applied in an intentionally discriminatory manner."); *U.S. v. Steele*, 461 F.2d 1148, 1151 (9th Cir. 1972) (the Supreme Court "established the principle that equal protection of the law is denied when state officials enforce a valid statute in a discriminatory fashion[.]"); *Yick Wo v. Hopkins*, 118 U.S. 356, 373-374 (1886) ("Though the law itself be fair on its face and impartial in appearance, yet, if it is applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances, material to their rights, the denial of equal justice is still within the prohibition of the constitution.").

Consequently, to the extent the Court determines that the religious exemption is neutral on its face, Plaintiffs have still properly alleged an Equal Protection claim because they have alleged that the religious exemption adversely affects LGBTQ+ students, is applied in a discriminatory fashion, and that the purpose of the exemption was to allow discrimination based on sex, sexual orientation, and gender identity. FAC, ¶¶ 590-92, 601, 609, 623-24. In any event, such determinations should not be made at the motion to dismiss stage but should be reserved for summary judgment after discovery.

### 4. Plaintiffs properly stated Establishment Clause, Substantive Due Process, First Amendment, and RFRA claims.

As previously briefed, Plaintiffs have properly stated claims under the Establishment Clause, First Amendment rights, Substantive Due Process, and RFRA. Dkt. 44, 22-33, 39-41; Dkt. 64, 25-35; Dkt. 86, 25-28, 30-33; Dkt. 114, 8-10. Additionally, Plaintiffs' First Amendment claims regarding freedom of religion, speech, assembly and association are properly stated because Plaintiffs' claims are against the government action, not against the private action of the educational institutions. FAC ¶¶ 659-71.

### III. CONCLUSION

Plaintiffs incorporate their briefing from Dkt. 44, 64, 75, 86, and 114 on all issues raised by Defendants and Intervenor-Defendants. For the foregoing reasons, Plaintiffs respectfully request this Court deny Intervenor-Defendants' Joint Motion to Dismiss.

Date: November 16, 2021

s/ Paul Carlos Southwick

**Paul Carlos Southwick**
**(OSB 095141)**
**TRIAL ATTORNEY**
**Religious Exemption**
**Accountability Project**
**Paul Southwick Law, LLC**
8532 N. Ivanhoe St. #208,
Portland, OR 97203
Email: paul@paulsouthwick.com
Phone: 503-806-9517
