1          IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF OREGON

3                  EUGENE DIVISION

4

ELIZABETH HUNTER, et al.          )
5                                   )
                        Plaintiff,  )  Case No. 6:21-cv-00474-AA
6                                   )
                   v.               )
7                                   )  November 4, 2021
U.S. DEPARTMENT OF EDUCATION,       )
8  et al.,                          )
                                    )
9                       Defendant.  )
                                    )
10                  v.              )
                                    )
11 COUNCIL FOR CHRISTIAN COLLEGES &)
   UNIVERSITIES, WESTERN BAPTIST    )
12 COLLEGE d/b/a CORBAN UNIVERSITY,)
   WILLIAM JESSUP UNIVERSITY and    )
13 PHOENIX SEMINARY,                )
                                    )
14     Defendants-Intervenors.      )
   _____)

15

16

17

18           PRELIMINARY INJUNCTION HEARING

19                    VOLUME 1

20            TRANSCRIPT OF PROCEEDINGS

21      BEFORE THE HONORABLE ANN L. AIKEN

22       UNITED STATES DISTRICT COURT JUDGE

23

24

25

```
 1                    TELEPHONIC or VIDEO APPEARANCES

 2   FOR THE PLAINTIFF(S):
                              PAUL J.C. SOUTHWICK
 3                            Paul Southwick Law, LLC
                              8532 N. Ivanhoe St.
 4                            Suite 208
                              Portland, OR 97203
 5
     FOR THE PLAINTIFF(S):
 6                            MISHA ISAAK
                              Perkins Coie, LLP
 7                            1120 NW Couch Street
                              10th Floor
 8                            Portland, OR 97209

 9   FOR THE PLAINTIFF(S):
                              JOSEPH C. BAXTER
10                            7706 SW 45th Ave No. 76
                              Portland, OR  97219
11
     FOR THE DEFENDANT(S):
12                            ELLIOTT M. DAVIS
                              DOJ-Civ
13                            PO Box 883
                              Washington, DC 20044
14
     FOR THE DEFENDANT(S):
15                            HILARIE SNYDER
                              DOJ-Civ
16                            PO Box 883
                              Washington, DC 20044
17
     FOR THE DEFENDANT(S):
18                            CAROL FEDERIGHI
                              DOJ-Civ
19                            PO Box 883
                              Washington, DC 20044
20
     FOR THE RELIGIOUS SCHOOL INTERVENORS
21                            MARK LIPPELMANN
                              Alliance Defending Freedom
22                            15100 N. 90th Street
                              Scottsdale, AZ 85260
23

24

25
```

1                    TELEPHONIC or VIDEO APPEARANCES

2                              (Continuing)

3   FOR THE RELIGIOUS SCHOOL INTERVENORS
                          RYAN J. TUCKER
4                         Alliance Defending Freedom
                          15100 N. 90th Street
5                         Scottsdale, AZ 85260

6   FOR THE INTERVENOR DEFENDANT(S):
                          GENE SCHAERR
7                         Schaerr Jaffe LLP
                          1717 K. Street NW
8                         Suite 900
                          Washington, DC 20006
9
    FOR THE INTERVENOR DEFENDANT(S):
10                        HERBERT G. GREY
                          Herbert G. Grey
11                        Attorney at Law
                          4800 SW Griffith Drive
12                        Suite 320
                          Beaverton, OR 97005
13
    FOR THE INTERVENOR DEFENDANT(S):
14                        JOSHUA JAMES PRINCE
                          Schaerr Jaffe LLP
15                        1717 K. Street NW
                          Suite 900
16                        Washington, DC 20006

17  FOR THE INTERVENOR DEFENDANT(S):
                          NICHOLAS P. MILLER
18                        Schaerr Jaffe LLP
                          1717 K. Street NW
19                        Suite 900
                          Washington, DC 20006
20

21

22  COURT REPORTER:    Jill L. Jessup, CSR, RMR, RDR, CRR, CRC
                          United States District Courthouse
23                        1000 SW Third Avenue, Room 301
                          Portland, OR 97204
24                        (503)326-8191

25                            *   *   *

1                               INDEX

2    OPENING STATEMENTS:                                PAGE:

3     Opening Statement by Plaintiffs              16

4     Opening Statement for Federal Defendants     28

5     Opening Statement for Intervenors for        37

6     the Religious Schools

7     Opening Statement for Intervenors CCCU        41

8    PLAINTIFFS' WITNESSES:

9    ALEX DURON

10    Direct Examination by Mr. Southwick          45

11    Cross-Examination by Mr. Davis               67

12    Cross-Examination by Mr. Lippelmann          68

13    Redirect Examination by Mr. Southwick        71

14   VERONICA BONIFACIO PENALES

15    Direct Examination by Mr. Southwick          74

16    Cross-Examination by Mr. Davis               102

17    Cross-Examination by Mr. Schaerr             102

18   DR. ILAN MEYER

19    Direct Examination by Mr. Southwick          116

20    Cross-Examination by Mr. Davis               150

21    Cross-Examination by Mr. Schaerr             152

22   AUDREY WOJNAROWISCH

23    Direct Examination by Mr. Southwick          168

24    Cross-Examination by Mr. Davis               187

25    Cross-Examination by Mr. Grey                187

1                              INDEX

2                          (Continuing)

3  PLAINTIFFS' WITNESSES                        PAGE:

4  FAITH ELIZABETH HUNTER

5     Direct Examination by Mr. Southwick          206

6     Cross-Examination by Mr. Davis               223

7     Cross-Examination by Mr. Prince              225

8  KALIE HARGROVE

9     Direct Examination by Mr. Southwick          235

10    Cross-Examination by Mr. Davis               252

11    Cross-Examination by Mr. Lippelmann          253

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                       TRANSCRIPT OF PROCEEDINGS
2                          (November 4, 2021)
3   (Via videoconference:)
4               DEPUTY COURTROOM CLERK:  The District Court for the
5   District of Oregon is now in session.  The Honorable Ann Aiken
6   presiding.
7               THE COURT:  Oh, please be seated.
8               DEPUTY COURTROOM CLERK:  Now is the time set for
9   Civil Case 21-00474.  Hunter, et al. v. U.S. Department of
10  Education, et al. for a preliminary injunction hearing.  If you
11  could please introduce yourselves for the record, beginning
12  with plaintiffs.
13              MR. SOUTHWICK:  Paul Southwick for plaintiffs.
14              MR. ISAAK:  Misha Isaak, from Perkins Coie, for the
15  plaintiffs.
16              MR. BAXTER:  Joe Baxter with plaintiffs.
17              THE COURT:  That's -- could -- Mr. Baxter, you have
18  an echo.  So could you state your name again, and maybe we can
19  make sure we have that clarified, in terms of the technology?
20      Did we lose Mr. Baxter?
21              MR. BAXTER:  Joe Baxter for plaintiffs.
22              THE COURT:  All right.  It's good, but I just want to
23  make sure we have him -- if he's going to talk, we have that --
24  okay.
25              DEPUTY COURTROOM CLERK:  And for defendants?
```

1          MR. DAVIS:  This is Elliott Davis for United States
2   Department of Justice for the federal defendants.
3          THE COURT:  I cannot hear you.  The volume is way too
4   soft.
5          MR. DAVIS:  Can you hear me now, Your Honor?
6          THE COURT:  No.  I can't hear you.  Very vague.
7          MR. DAVIS:  Is this better?
8          THE COURT:  Nope.
9          MR. DAVIS:  We're going to call our technical
10  support.
11         THE COURT:  Yeah, it's just -- it's muffled, and it's
12  faint.
13         MR. DAVIS:  My apologies, Your Honor.  Our technical
14  support is coming.
15         THE COURT:  That's okay.  We have been with ours all
16  morning.
17      Are all the other parties muted?  I hear a lot of rumbling
18  noises too.  When we get to the point where we move forward,
19  I -- unless you're speaking, everybody's mic should be muted.
20         MR. DAVIS:  This is Elliott Davis.  Is this better?
21         THE COURT:  Barely.  I'm watching --
22      How are you doing?  Oh, yeah, you're Samantha.  Why I'm
23  looking at -- so our court reporter is remote?
24         DEPUTY COURTROOM CLERK:  We have Jill.
25         THE COURT:  Oh, it's Jill.

1        MR. DAVIS:  Your Honor we're going to try dialing in

2   from a conference phone, and we're going to do that right now.

3        THE COURT:  All right.

4        IT SPECIALIST:  This is our new audio connection.

5   Can you hear us now?

6        THE COURT:  Yes.

7        IT SPECIALIST:  We'll move that closer to our

8   attorney.

9        THE COURT:  Thank you.

10        MR. DAVIS:  My apologies for that, Your Honor.

11        THE COURT:  That's all right.

12        MR. DAVIS:  My name is Elliott Davis.  I'm with the

13   United States Department of Justice.  With me are my colleagues

14   Carol Federighi and Hilarie Snyder.  And also joining us is

15   Carlotta Wells, Assistant Branch Director with the United

16   States Department of Justice.

17        DEPUTY COURTROOM CLERK:  For Intervenor CCCU?

18    Could you please repeat?

19        THE COURT REPORTER:  This is the court reporter.  I

20   did not hear who just introduced themselves.

21        MR. DUNLAP:  This is Jacob Dunlap.  I'll be a

22   participant observer on behalf of Christian Colleges and

23   Universities.

24        THE COURT:  Go ahead.

25        MR. GREY:  Your Honor, Herb Grey on behalf of CCCU.

 1          THE COURT:  Oh, is that it?

 2          MR. GREY:  My colleagues Gene Schaerr,

 3  Nicholas Miller, and Joshua Prince should also be on.  They

 4  were on.

 5          MR. SCHAERR:  Sorry, Your Honor.  I just got booted

 6  off.

 7      This is Gene Schaerr, representing CCCU, and I believe

 8  Mr. Grey has already introduced the other members of our team.

 9          THE COURT:  And they are present and on the phone?

10          MR. SCHAERR:  They are.

11          THE COURT:  Could they introduce themselves just so

12  we know what connections we have?

13          MR. MILLER:  This is Nicholas Miller with CCCU.

14          MR. PRINCE:  And this is Joshua Prince with CCCU as

15  well.  Thank you, Your Honor.

16          THE COURT:  All right.  Is that everyone?

17          DEPUTY COURTROOM CLERK:  And for the remainder

18  intervenors?

19          MR. LIPPELMANN:  Good morning, Your Honor.  My name

20  is Mark Lippelmann.  I represent the religious school

21  intervenors, Phoenix Seminary, Corban University, and

22  William Jessup University.  I'll allow my colleague, Ryan

23  Tucker, to introduce himself as well.  But I want to make sure.

24  Can you hear my connection all right?

25          THE COURT:  Yes.

```
 1            MR. LIPPELMANN:  Great.  Thank you.

 2            MR. TUCKER:  And this is Ryan Tucker, as

 3  Mr. Lippelmann just alluded to.  I am, likewise, present as an

 4  observer and represent the religious schools.

 5            THE COURT:  All right.  Thank you.

 6       As you can tell, there's a little fragility in the system,

 7  and so I'm going to ask people -- you know, if you can see me,

 8  I will stop people.  I'm happy to use various hand signals as

 9  well as speaking up when we can't hear you.

10       Our court reporter is remote, and so I'm going to count on

11  Ms. Jessup to step up when she can't hear.  It's really

12  important, as well, that people keep their phone on mute

13  because the back noise is very difficult to hear.  This isn't

14  the largest group of people I have had on a conference call or

15  a format like this.  So I have some experience with -- when we

16  have problems how to manage those.  So we'll just take it

17  slowly and make sure we get everything we need.

18       So with that said, I appreciate all the filings.  I think

19  I have read everything that has come in.  I'm prepared to hear

20  opening statements, and so I'll call on the plaintiffs at this

21  time for an opening statement.  Unless there's something else

22  anyone wants to take up or any additional information after

23  conferral that you need to tell me with regard to the mechanics

24  or the proceedings today, I -- I'm happy to have an update and

25  happy to just begin.
```

```
 1              MR. SOUTHWICK:  Your Honor, this is Paul Southwick.
 2    Just as a -- one preliminary matter.  The parties have all
 3    stipulated to authenticity of exhibits.  For purposes of
 4    introducing exhibits, does the Court have a preference?  Do we
 5    want to just deem them all admitted right now or --
 6              THE COURT:  Yes.
 7              MR. SOUTHWICK:  -- go one by one?
 8              THE COURT:  No.  Deem them all admitted.  As long as
 9    everyone agrees that's the stipulation, deem them all admitted
10    now.
11         So on behalf of the plaintiffs, Mr. Southwick, you so
12    stipulate; correct?
13              MR. SOUTHWICK:  Yes.  Plaintiffs stipulate to that.
14              THE COURT:  Mr. Davis, on behalf of the defendant,
15    DOJ, do you so stipulate?
16         MS. SNYDER:  Your Honor, this is Hilarie Snyder.  The
17    DOJ has stipulated to the authenticity but not necessarily the
18    admissibility of the exhibits.
19              THE COURT:  Well, then I guess we have to go one by
20    one, which -- okay.
21              MS. SNYDER:  Thank you, Your Honor.
22              THE COURT:  I appreciate your effort, Mr. Southwick.
23              MR. SOUTHWICK:  Your Honor, this is Paul Southwick.
24    We'll --
25              THE COURT:  What I guess I want to highlight is I was
```

1    hoping we would just -- they would be deemed admitted.  As you

2    know, it's a preliminary injunction hearing, and so, you know,

3    I will be able to weigh and balance the weight to give it in

4    this proceeding, but I want to be very careful of everybody

5    wanting to highlight issues that they want me to look at

6    carefully or look at differently.

7        So if that's -- if that's what the government's intent is

8    and going one at a time matters to them or they can highlight

9    it -- but I really had hoped that we would just deem them and I

10   would sort through them and give them the weight that's

11   necessary under the terms of what's available in terms of the

12   Court's review of evidence under the standard for a preliminary

13   injunction.

14       So, I guess, is that -- I understand your stipulation, but

15   I also want to make sure that you -- I've not misrepresented or

16   am misconstruing anything with the government jumping in as

17   they just did.

18           MS. SNYDER:  Thank you, Your Honor.  Yes.  We

19   understand that the rules are -- of evidence are relaxed in a

20   preliminary injunction hearing.  We're really making this

21   distinction for two reasons.  One is just practical.  For

22   instance, we ourselves have put in exhibits that we may use but

23   may not use, and we didn't want to burden the Court with extra

24   reading or documents that we may end up not highlighting or not

25   needing.

1      Similarly, I can't speak for them, but it appeared, for

2   instance, that others have perhaps done the same thing.

3   There's perhaps impeachment -- potential impeachment that other

4   people have put in.  You know, prior testimony by potential

5   exhibits -- or by potential witnesses that seemingly may or may

6   not be relevant or come in.  And so there's a lot of paper.

7   Some of which, you know, expert reports, prior testimony, would

8   be classic hearsay and, you know, both -- because they are

9   classic hearsay and potentially objectionable and also because

10   it would just mar the Court in a bunch of paper, we certainly

11   don't want to slow things down, and so we have agreed to

12   admissibility -- or, excuse me, we agreed to authenticity, but

13   we thought that the Court should consider admissibility in

14   conjunction with the witnesses' testimony.

15          THE COURT:  I'm sure it will be highlighted for the

16   witnesses' testimony, but I have to tell you if your idea was

17   to reduce the amount of paper we had to go through, it might

18   have been helpful before the hearing because we have gone

19   through everything, and we may have a lot of documents that are

20   duplicates and we have managed that.  We have sorted that, and

21   we've organized that.  It's not unfamiliar to be buried in

22   paper in cases like this.  So we have already done what work,

23   and so I hear you, and I -- you want to highlight issues with

24   regard to particular exhibits with witnesses.  Fine.  But

25   unless there's something more, I'm going to deem them admitted

1   for authenticity, and then you can argue or point out whatever

2   you think you need; but, you know, you all understand there's

3   the -- this is a preliminary injunction code, and so there's

4   not the strict guidance to the rules of evidence; so -- anyway,

5   with that, understood.  But before the fact, paper resolving

6   these issues might have been helpful, but now that we have

7   everything here and we've already got it organized and sorted,

8   I think we have got it handled.

9        All right.  Anything else?

10            MR. SOUTHWICK:  Not for plaintiffs, Your Honor.

11            THE COURT:  Anything for defendants?

12            MR. DAVIS:  Not from the Government defendants,

13   Your Honor.

14            THE COURT:  Intervenors?

15            MR. LIPPELMANN:  Nothing from --

16            MR. SCHAERR:  Nothing --

17            MR. LIPPELMANN:  Go ahead, Gene.

18            MR. SCHAERR:  Nothing from CCCU, Your Honor.

19            MR. LIPPELMANN:  And nothing further from the

20   religious schools, Your Honor.

21            THE COURT:  So just for clarification, how are the

22   intervenors breaking up?  I mean, who is going to handle --

23   have you agreed how you're going to handle various aspects of

24   this or combined efforts?

25            MR. LIPPELMANN:  Yes, Your Honor.  This is

1    Mark Lippelmann for religious schools.    Particularly with

2    respect to the opening statement, I'm mindful that together the

3    intervenors have 15 minutes.    With the Court's permission, I

4    would endeavor to take less than half of that time personally

5    and allow CCCU the remainder to ensure that we stay within that

6    time allotted.

7                    THE COURT:    All right.    With all that being said,

8    let's begin with the opening statement for the plaintiffs.

9                    MR. SOUTHWICK:    Thank you, Your Honor.    This is

10    Paul Southwick.    I'll be making the opening statement.    I will

11    endeavor to screen share a PowerPoint presentation.

12        This worked during practice, and so hopefully it will work

13    now.

14                    THE COURT:    Have we been provided a copy of that?

15                    MR. SOUTHWICK:    Your Honor, can you see this okay?

16                    THE COURT:    I sure can.

17                    MR. SOUTHWICK:    All right.    We have provided the --

18    we have circulated the demonstratives that are part of this

19    slide.    We could send the PowerPoint to the Court if it would

20    like.

21                    THE COURT:    Yes, please.

22                    MR. SOUTHWICK:    Okay.

23        Joe, can you send a copy to Cathy Kramer?

24

25    ///

1                   OPENING STATEMENT BY PLAINTIFFS

2          MR. SOUTHWICK:  Your Honor, again, this is

3   Paul Southwick on behalf of plaintiffs.  This case is brought

4   on behalf of 40 LGBTQ current and former students who attend or

5   have attended taxpayer-funded educational institutions that

6   explicitly discriminate in policy and practice on the basis of

7   sexual orientation and gender identity.

8          The plaintiffs are bringing a challenge to the religious

9   exemption to Title IX as well as a challenge to the 2020

10  implementing regulation changes that occurred during the past

11  administration.

12         So there are essentially two principal challenges.  One is

13  constitutional and one is under the Administrative Procedures

14  Act.

15         So what is this case about?

16         The primary issue of this case is whether or not the

17  Constitution permits the Federal Government to fund religious

18  colleges and universities that practice invidious

19  discrimination against LGBTQ+ students.  Invidious

20  discrimination is a term that you'll see frequently in the

21  briefing.  And what does that mean?  Well, it's essentially

22  unfair or unmerited discrimination.

23         Discrimination not having to do with someone's merit or

24  someone's dignity or worth.

25         Now, this question was asked throughout the 1960s, '70s,

1   and '80s in the context of invidious race discrimination, and
2   the Supreme Court answered this question with a resounding no.
3   So the question before the Court now is whether that should
4   also be a resounding no in the context of sexual orientation
5   and gender identity, and plaintiffs submit that it should.
6        However, beyond the larger constitutional questions,
7   there's also a more narrow question that this Court can decide
8   and still grant the injunctive relief that plaintiffs are
9   seeking.  That more narrow question is whether it was unlawful
10  for the Federal Government, through the 2020 rule changes, to
11  exacerbate the harms of such funding by expanding the religious
12  exemption to Title IX and by eliminating the notice
13  requirement.
14       This goes to the heart of plaintiffs' Administrative
15  Procedure Act challenges.
16       Of note, the Government defendants, while they have moved
17  to dismiss most of plaintiffs' claims on the merits, have not
18  moved to dismiss plaintiffs' APA claims on the merits.
19       Also of note, the recent filing by the attorneys general
20  in support of plaintiffs, the amicus filing, likewise makes the
21  argument that those 2020 rule changes were unlawful.
22       And so the Court, through this proceeding, this
23  preliminary injunction proceeding, could answer the overall
24  constitutional question, or it could answer the more narrow
25  Administrative Procedure Act question.

1          Plaintiffs request that the Court answer them both in

2     favor of plaintiffs, but either one is sufficient to provide at

3     least some relief to the plaintiffs during the proceeding of

4     this case.

5          I provided this chart.  What this chart does is it

6     describes the kinds of harms and stigmas that the Court is

7     going to hear about from the witnesses today.

8          The Court is going to hear from five of the plaintiffs in

9     this case, and it's also going to hear from a couple of

10    experts.  The Court is going to hear a lot about individual

11    stigma and individual harms, and that is -- that's at the

12    smallest core here in this chart.

13         Those individual harms the Court will hear about are

14    suicidality, depression, anxiety, self-harm, things that the

15    individual students are feeling themselves by being members of

16    the LGBTQ community who are from nonaffirming homes or

17    nonaffirming environments.  Plaintiffs are not asking the Court

18    to solve these harms or these stigmas.  The Court is incapable

19    of doing that.

20         However, the next level is interpersonal stigma.

21    Interpersonal stigma and interpersonal harms, those result from

22    things like sexual assault on campus.  Faculty and peer

23    harassment of LGBTQ students on campus and other forms of

24    interpersonal stigma and harms.  Some of those interpersonal

25    stigma and harms are what Title IX is meant to address.  It's

1    meant to provide some form of protection with respect to sexual

2    assault, with respect to harassment and other issues.

3         However, again this Court is not being called on, through

4    this litigation or this proceeding, to remedy the interpersonal

5    stigma.

6         The next level is institutional or structural stigma.

7    This is at the -- this is at the stage of the educational

8    institutions themselves.

9         Now, stigma and harm comes from openly discriminatory

10   institutional policies, such as prohibiting the admission of

11   LGBTQ students or subjecting them to discipline for their

12   relationships or their identities, lack of nondiscrimination

13   protections, and a variety of other things.  These structural

14   stigmas and structural harms reinforce the personal stigma and

15   the individual stigma that the plaintiffs experience.

16        Now, again, this Court is not being called upon to make

17   any ruling or enforcement that will directly impact the

18   education -- the underlying educational institutions.  It's not

19   being called upon to solve those institutional structural

20   stigmas.

21        However, the final layer here is the government and the

22   government's role in structural stigma and in exacerbating and

23   allowing these other stigmas and harms to flourish.  The

24   government stigma comes from the billions of dollars of federal

25   funding, taxpayer funding, for educational institutions that

1    avowedly discriminate.  It also comes from a religious

2    exemption to Title IX, which essentially immunizes these

3    educational institutions in terms of their institutional

4    structural stigma and harms.  It also has to do with the

5    implementing regulations, which include the 2020 rule changes

6    that are at issue in plaintiffs' complaint.  And, finally, it

7    involves the denial of an administrative process.  Title IX

8    provided an administrative process, but plaintiffs are denied

9    access to that process.

10    What plaintiffs' case is about, is it is about remedying

11    and addressing the government's role in this pyramid of stigma

12    and harm, and this government ban is something that the Court

13    can address, either directly through addressing the funding

14    aspect or an order enjoining the Department of Education to

15    enforce Title IX with respect to the educational institutions

16    that plaintiffs attend.

17    By eliminating the government and structural stigma, it

18    will remove the government's stamp of approval of the

19    institutional and interpersonal and individual stigma, and that

20    is the purpose of this case, is to address that top line -- the

21    government's role.

22    As you hear from witnesses and you hear testimony today

23    and tomorrow, it's important to keep in mind what is the --

24    what are the purposes of Title IX?  Title IX was enacted in

25    1972 and has been litigated significantly.  In 1979 the Supreme

1    Court recognized that Title IX, like it's model Title VI,
2    sought to accomplish two related objectives.  First, Congress
3    wanted to avoid the use of federal resources to support
4    discriminatory practices; second, it wanted to provide
5    individual citizens effective protection against those
6    practices.
7        Unfortunately, given the current levels of funding and the
8    current practices of the Department of Education, in
9    combination with the religious exemption and regulations, these
10   two primary purposes are being significantly undermined and
11   are, in fact, essentially unavailable in terms of effective
12   protection for the plaintiffs in this case.
13       The plaintiffs have put forward evidence that at
14   plaintiffs' colleges and universities alone, a handful of
15   institutions, about 28 institutions -- at those 28 institutions
16   alone there's $1.8 billion in a single year of federal
17   financial assistance.  Taxpayer money.  Plaintiffs are
18   taxpayers.  Plaintiffs own taxpayer money flowing to these
19   educational institutions that, again, explicitly discriminate
20   on the basis of sexual orientation and gender identity.
21       And what about having an effective mechanism for remedying
22   individual acts of sex discrimination?  Well, the deck is
23   completely stacked against the plaintiffs.  The evidence will
24   show that there are more than 100,000 LGBT students who attend
25   the more than 200 religious colleges and universities in this

1    country that explicitly discriminate.

2        Now, not all 100,000 of those LGBT students are

3    experiencing expulsion or harassment or other forms of

4    discrimination, but all the plaintiffs are, and they are

5    definitely not alone.  And the research will show that a

6    significant number of that 100,000 experience significant

7    harms.  And it's not just this year; it's not just last year.

8    It's been going on for decades.  Given the number of students

9    and the amount of suffering, you would think that the

10   Department of Education's Office of Civil Rights may have been

11   able to help at least some of these students, but that's not

12   the case.

13       The number of LGBTQ students who have been helped by the

14   Office of Civil Rights, who are like plaintiffs, LGBTQ, and,

15   like plaintiffs, attending these types of institutions, the

16   number of students helped is zero.  They haven't helped a

17   single one of these young people.

18       In stark contrast, the success rate for granting an

19   assurance of exemption to the individual educational

20   institutions, which is essentially their license to

21   discriminate, that success rate is a hundred percent.

22       And so what plaintiffs want to demonstrate to the Court is

23   that this system is really stacked against the plaintiffs and

24   that an assurance of exemption equals an assurance of

25   discrimination against young people like the plaintiffs.

1    The Court is going to hear today from five plaintiffs,

2  including Alex Duron, who is a nurse who was -- recently had

3  his admission to a graduate nursing program rescinded because

4  of his sexual orientation, in the middle of a pandemic.

5    You'll also hear from Veronica Bonifacio Penales, a

6  student at Baylor who is subject to significant harrassment and

7  whose application for an LGBTQ student club and support group

8  has been repeatedly denied by Baylor.

9    The Court will also hear from Audrey Wojnarowisch, a

10  student at George Fox University, and what it's like to be a

11  queer person who experiences sexual assault at one of these

12  campuses.

13    The Court will also hear from Elizabeth Hunter and what

14  it's like to be dragged into the dean's office and grilled

15  about your sexuality for three hours and then summarily

16  stripped of all your privileges on campus.

17    And, finally, the Court is going to hear from Kalie

18  Hargrove, a transgender student and a veteran who paid for

19  their education using the Montgomery GI Bill and only a few

20  months ago was expelled from Lincoln Christian University

21  because of their gender identity.

22    These students are examples of the widespread and systemic

23  discrimination occurring at these institutions.  That is

24  precisely why they're coming to this Court for help.  They're

25  coming to this Court for help not only through the litigation,

but in this preliminary proceeding, because the harms are ongoing and the dangers of retaliation and ongoing harassment are real.

So what do defendants say and why are they wrong?  The defendants will say that these are the wrong plaintiffs.  Not so.  These are the precise plaintiffs who are being harmed.  These are not plaintiffs who are roaming the country in search of a wrong.  They are members of the LGBTQ community, and they are attending or recently attended these institutions that the government is funding and authorizing to discriminate against them.

Defendants will also say this is the wrong time.  Give us more time.  We're going through a process.  We don't know that the suffering is going to really happen or that the religious exemption is going to be used.  Again, not so.  Suffering has been going on for decades.  It's well-documented in the academic literature, in the press; and, moreover, the evidence will show, through Dr. Wolff, that the Government defendants have known of these harms for years, and they have done nothing.  In fact, the only thing they have done is gone backwards by instigating the 2020 rules that have worsened the impact of the religious exemption.

The defendants will also argue that religious beliefs permit government funding and facilitation of invidious discrimination in education.  However, very similar defendants

1    have made these same arguments before regarding invidious

2    discrimination against black students at religious colleges and

3    schools, and the Supreme Court has repeatedly rejected that

4    argument, and the Court should reject it again today.

5          Plaintiffs rely heavily on a case called *Norwood v.*

6    *Harrison*, in which the Court says racial discrimination in

7    state-operated schools is barred by the Constitution.

8          So here, too, the Federal Government could not operate a

9    straights-only or a cisgender-only public school.  That would

10   definitely be barred by the Constitution.  However, it is also

11   axiomatic that a state may not induce, encourage, or promote

12   private persons to accomplish what it is constitutionally

13   forbidden to accomplish.  And, therefore, the *Norwood* court

14   struck down funding for educational institutions practicing

15   invidious racial discrimination.

16         Why the plaintiffs and why this PI hearing?

17         The plaintiffs are here with this Court, with these

18   defendants, because they cannot obtain relief against

19   Government defendants in private lawsuits against their

20   educational institutions.  They are here now because stigma and

21   violations of constitutional rights are ongoing for all

22   plaintiffs, and there are a number of current student

23   plaintiffs who are at schools right now, and they will be

24   denied access to an administrative process that Title IX was

25   supposed to guarantee them.

1    If the Court is to agree that there is either a

2  constitutional violation or Administrative Procedure Act

3  violation, there are a menu of options for remedies.  The Court

4  can either address funding and order the government to withhold

5  funding or to verify that the schools are complying before

6  authorizing additional funding.  That is what happened very

7  frequently in the context of race discrimination.

8    However, the Court can also mandate compliance if it finds

9  a constitutional violation and enjoin OCR and essentially force

10  OCR to maintain compliance with Title IX for these educational

11  institutions.  It can also require compliance based on an APA

12  violation.  Again, enjoining the federal defendants that they

13  must apply Title IX as they do to other educational

14  institutions.

15    And, finally, the most narrow form of relief is regarding

16  plaintiffs' administrative complaints, and the government can

17  enjoin the defendants from using the 2020 regulations to

18  dismiss plaintiffs' pending Title IX complaints.

19    As for plaintiffs' administrative complaints, if the Court

20  decides to go this way, at least some of the complaints are

21  timely and will be subject to dismissal based on the religious

22  exemption.  At least some of the timely complaints are but for

23  the 2020 rules within the jurisdiction of Government

24  defendants.  They would investigate those claims but for those

25  rules.

1       Finally, the Government defendants cannot delay and

2  delect -- and deflect forever.  LGBTQ students are not going to

3  disappear overnight from these schools.  In fact, their

4  presence is growing, and Government defendants are receiving

5  complaints outside of the plaintiff group.

6       And I know I'm a little over time.  I can wrap it up here

7  in about one minute.

8            THE COURT:  Go ahead.

9            MR. SOUTHWICK:  Your Honor, what would be the impact

10  of an administrative complaint remedy?  If the court enjoins

11  use of the 2020 regulations to dismiss plaintiffs' pending

12  Title IX complaints, at least some plaintiffs will be given

13  access to an effective administrative remedy that they will

14  otherwise be denied.  The structural stigma from the government

15  will be lessened.  Mental health outcomes will improve, and

16  you'll hear that from our experts.  The risk of retaliation and

17  harassment will be reduced.

18       And, finally, no funding will be taken from any colleges

19  or universities.  This concern of the Council and other

20  intervenors is misplaced.

21       So, finally, the courts, in recent times, have said our

22  society has come to the recognition that gay persons and gay

23  couples cannot be treated as social outcasts or as inferior in

24  dignity and worth.  For that reason, the laws and the

25  Constitution can and, in some instances, must protect them in

1  the exercise of their civil rights, and that is precisely what

2  the plaintiffs ask of the Court today in this preliminary

3  injunction hearing.

4      Thank you, Your Honor.

5          THE COURT:  Thank you.

6      Mr. Elliott Davis?

7              OPENING STATEMENT FOR FEDERAL DEFENDANTS

8          MR. DAVIS:  Good morning.  May in please the Court,

9  my name is Elliott Davis and -- along with my colleges,

10 Carol Federighi and Hilarie Snyder --

11         THE COURT:  How did you suddenly become muffled and

12 soft-spoken again?

13         MR. DAVIS:  My apologies, Your Honor.  Is this

14 better?

15         THE COURT:  Speak a few words.  Let me hear you.

16         MR. DAVIS:  Can you hear me now?

17         THE COURT:  That's better.

18         MR. DAVIS:  My apologies, Your Honor.

19     Good morning.  May it please the Court.  My name is

20 Elliott Davis and, along with my colleagues, Carol Federighi

21 and Hilarie Snyder, I represent the federal defendants, the

22 United States Department of Education and Catherine Lhamon in

23 her official capacity as the Department of Education Assistant

24 Secretary for Civil Rights.  The Department of Education's

25 Office for Civil Rights, or OCR, is responsible for and fully

1    committed to enforcing Title IX's protections to ensure equal

2    access to education for all students regardless of sex.  This

3    includes making certain that students who have experienced

4    discrimination based on sexual orientation and gender identity

5    have their civil rights fully met.  Defendants are fully

6    committed to robust enforcement of Title IX's protections.

7         OCR carefully considers every Title IX complaint it

8    receives.  Plaintiffs' complaints are no different in that

9    regard.  You will hear that, with just one exception, OCR is

10   currently evaluating all of plaintiffs' Title IX complaints.

11        But in enacting Title IX in 1972, Congress included

12   various exemptions; and, as relevant here, Congress provided

13   that Title IX shall not apply to an educational institution

14   which is controlled by a religious organization if the

15   application of Title IX would not be consistent with the

16   religious tenets of such organization.

17        OCR does not have the power to ignore or defy this

18   decades-old legislative decision; and, to the contrary, the

19   Constitution commands the Executive Branch to take care that

20   the laws be faithfully executed.

21        Plaintiffs moved nearly three months ago for preliminary

22   injunctive relief, arguing that their Title IX complaints were

23   in danger of being dismissed, based on the religious exemption,

24   in a matter of days.  That prediction obviously did not come to

25   pass.  In their initial TRO PI motion, plaintiffs asked the

1  Court for prohibitory and mandatory injunctive relief relating

2  to their particular Title IX complaints.  And in their later

3  motion to amend that briefing, they asked the Court to enter

4  even broader mandatory relief.  That is to order defendants to

5  investigate plaintiffs' colleges and universities.

6      After briefing concluded, the Court declined to grant

7  plaintiffs a temporary restraining order on August 30th.  The

8  Court concluded that plaintiffs had not carried their burden on

9  even a single TRO PI factor necessary to establish their

10  entitlement to prohibitory injunctive relief, let alone the

11  even higher standard for the mandatory relief that they had

12  sought.

13      The Court concluded that, one, plaintiffs had not shown a

14  likelihood of success on the merits on any of their claims;

15  two, plaintiffs had not shown a likelihood of imminent

16  irreparable harm; and, three, plaintiffs had not shown the

17  balance of the equities or public interest favored the

18  injunction.

19      Nothing you will hear over the next two days will alter

20  the Court's earlier correct conclusions.  As a threshold

21  matter, plaintiffs cannot, as a matter of law, establish

22  irreparable harm.  That is because, as we explained in our

23  opposition brief at page 10, based on cases from the Ninth

24  Circuit and the DC Circuit, harm is not irreparable when

25  plaintiffs have an adequate alternate remedy; a point that

 1    plaintiffs did not dispute in their reply.

 2         And as the Court recognized on page 11 of its August 30th

 3    opinion, based on these cases, plaintiffs may file Title IX

 4    lawsuits directly against their respective schools, challenging

 5    the constitutionality of the religious exemption and its

 6    implementing regulations, and may seek appropriate preliminary

 7    injunctive relief in those actions.  That is, I believe, a

 8    direct quote from Your Honor's opinion.  Nor will any of

 9    plaintiffs' evidence demonstrate that plaintiffs' claims are

10    ripe, that plaintiffs have standing, or that plaintiffs' claims

11    are likely to succeed for the reasons that we've explained in

12    our motion to dismiss and in our opposition to plaintiffs' TRO

13    PI motion.

14         In all events, plaintiffs' evidence will add little to the

15    voluminous record that existed when the Court denied

16    plaintiffs' bid for a temporary retraining order over two

17    months ago.

18         At that point, plaintiffs have filed dozens of

19    declarations that included plaintiffs' Title IX complaints,

20    their supporting declarations; Title IX related correspondence

21    between the Department of Education and certain of plaintiffs'

22    educational institutions; and about a half dozen social science

23    surveys and journal publications standing for the proposition

24    that LGBTQ+ students suffer negative mental health consequences

25    when they are discriminated against.

1    And these publications included, at Docket Nos. 49-6,

2    49-10, and 49-16, journal publications of their testifying

3    expert witnesses, Drs. Joshua Wolff and Ilan Meyer.

4    So what evidence will plaintiffs present?

5    Four of the plaintiffs will testify about their claims of

6    discrimination that they leveled in their Title IX complaints

7    and iterations.  All of that has been in the record for months

8    now.  Their declarations were all filed with plaintiffs'

9    original complaint back in March, at Docket No. 1, and their

10   Title IX complaints were filed along with plaintiffs' TRO PI

11   motion at Docket No. 48.

12   You will hear plaintiffs' expert witnesses testify about

13   how discrimination that LGBTQ+ students suffer at educational

14   institutions can lead to serious negative mental and physical

15   outcomes.  Defendants certainly do not dispute that general

16   principle, nor do we do so in our briefing; but those opinions

17   are also already before the Court in the various social science

18   publications that plaintiffs refer to in their PI motion and

19   filed at Docket No 49.  And, in fact, the Court described those

20   opinions as, quote, well-documented, on page 10 of its opinion.

21   One of plaintiffs' testifying experts, Dr. Wolff, will

22   presumably testify about two meetings that he had with various

23   members of the Department of Education.  To the extent that

24   plaintiffs argue, by virtue of these two meetings, defendants

25   were somehow obligated to launch investigations into dozens of

religious schools, defendants will simply note that plaintiffs
have not asked for any such relief in their active complaints.
Such relief would not preserve that status quo.  Plaintiffs do
not satisfy the extremely high standard to obtain mandatory
relief like this, particularly at the PI stage.  And as the
Supreme Court has recognized, agency enforcement decisions are
generally committed to the agency's absolute discretion.

Finally, a nonplaintiff, Kalie Hargrove, will testify
about her expulsion from Lincoln Christian University, a
college attended by none of the actual plaintiffs in this
litigation, and that testimony will not be related to relief
sought by plaintiffs in their briefing, all of which related to
plaintiffs' Title IX complaints and plaintiffs' schools.

In short, plaintiffs' forthcoming evidence does not
meaningfully add to the record that was before the Court when
it denied plaintiffs' motion for a temporary restraining order,
and it thus should not move the needle set by the Court set in
the Court's earlier August 30th opinion.

Indeed, plaintiffs' evidence will not show that they are
likely to suffer imminent or irreparable harm in the absence of
an injunction.  If plaintiffs are concerned that OCR will
eventually deny their Title IX complaints, they may file
private Title IX lawsuits at any time in an effort to obtain
judicial redress for any injuries that they are suffering, nor
will plaintiffs' evidence demonstrate that they are likely to

1    succeed on the merits of any of their claims.

2        As defendants have explained in their briefing, plaintiffs

3    lack standing and their claims are not ripe.

4        The constitutionality of Title IX's religious exemption is

5    a prototypical legal question.  Plaintiffs' RFRA claims fail to

6    follow along with their Establishment Clause claim.  And

7    extrinsic evidence is irrelevant to plaintiffs' APA claims

8    because APA claims are reviewed on the administrative record.

9        Finally, plaintiffs' evidence will not show that the

10   balance of the equities and public interest favor them.

11       The Court's August 30th opinion, on page 10, reflects the

12   Court was well aware of the, quote, "well-documented harms that

13   anti-LGBTQ discrimination has on the LGBTQ+ community."

14       Nevertheless, the Court concluded, on page 11, that the

15   balance of equities and the public -- public interest did not

16   favor plaintiffs for four reasons.  First, plaintiffs had not

17   shown that their Title IX complaints would be dismissed

18   imminently based on the religious exemption; two, plaintiffs

19   had not shown that the defendants had violated their

20   constitutional rights; three, plaintiffs had not shown that the

21   requested relief would result in immediate relief from the

22   physical and mental harms they had alleged; and, four,

23   plaintiffs can file private Title IX lawsuits against the

24   respective institutions and may seek preliminary relief in

25   those direct actions.

Defendants' evidence, on the other hand, will reinforce the Court's conclusions in its August 30th opinion and rebut plaintiffs' earlier baseless allegations that the career civil servants charged with enforcing Civil Rights law at the Department's Office for Civil Rights were, for some reason, scheming to undermine plaintiffs' Title IX complaints.

In stark contrast, Randolph Wills, OCR's Deputy Assistant Secretary for Enforcement, will explain that given the sudden influx of Title IX complaints against seemingly religious institutions filed across a number of OCR's regional offices, the Department determined to ensure that the various regional offices were treating these complaints consistent.

And while OCR has never simply dismissed Title IX complaints based on the religious exemption in a knee-jerk fashion, you will learn that in order to ensure consistency of approach and outcomes, decisions related to these Title IX complaints, such as whether to dismiss them in the evaluation stage for any reason or to open them for investigation, will ultimately be made by the Department's Assistant Secretary for Civil Rights.

Mr. Wills will explain that one of plaintiffs' Title IX complaints has been dismissed, not based on the religious exemption, but because that plaintiff sued her educational institution based on the same operative facts.

Mr. Wills will testify that plaintiffs' remaining Title IX

1   claims remain under evaluation in OCR's regional offices and

2   that there is no mandatory deadline for their resolution.

3       Although OCR's goal is to resolve 80 percent of its

4   Title IX complaints within 180 days of receipt, OCR has many

5   thousands of complaints.  OCR takes the time it needs to

6   carefully evaluate the Title IX -- to carefully evaluate the

7   allegations in the Title IX complaints it receives, and it will

8   do so here.

9       And, of course, the ultimate decision on plaintiffs'

10  Title IX complaints will be made by the assistant secretary.

11      Nor is dismissal based on the religious exemption a

12  foregone conclusion, as plaintiffs have argued.

13      As the Court observed on page 9 of its August 30th

14  opinion, Title IX complaints can be dismissed on a variety of

15  grounds that do not involve the religious exemption.  Title IX

16  complaints may also be open for investigation rather than being

17  dismissed.  OCR does not simply assume that religiously

18  controlled institutions will assert a religious exemption to

19  all Title IX complaints.  The institution must request an

20  assurance of one.  And even to the extent that a religiously

21  controlled institution has an assurance of religious exemption

22  letter on file, you will see that religious exemption

23  assurances are particularized in nature and do not immunize

24  educational institutions engross.

25      Alice Yao, the supervising attorney for the Title IX team

1   at OCR's Program Legal Group, will tell you that the Department

2   is not aware of any institution ever even seeking an assurance

3   of religious exemption from Title IX's harassment regulations,

4   which also covers sexual assault.

5        And as the Department explained in the November 2020 final

6   rule, at 85 FR 59948, quote, "The Department is skeptical that

7   schools will be eligible to assert exemptions from the

8   requirement to respond appropriately to sexual harrassment

9   under Title IX or from the prohibition on retaliation against

10  individuals who invoke their rights under Title IX."

11       Simply put, defendant's evidence will further demonstrate

12  that plaintiffs are not entitled to preliminary injunctive

13  relief.  At the conclusion of this evidentiary hearing,

14  defendants will again ask this Court to deny plaintiffs'

15  preliminary injunction motion.

16       Thank you.

17            THE COURT:  For the intervenors?

18

19       OPENING STATEMENT FOR RELIGIOUS SCHOOL INTERVENORS.

20            MR. LIPPELMANN:  Thank you, Your Honor.  And may it

21  please the Court, my name is Mark Lippelmann, counsel for the

22  religious school intervenors:  Phoenix Seminary, Corban

23  University, and William Jessup University.

24       We have now heard from the perspective of the plaintiffs

25  and from the government, but I would submit that the key to

1  simplifying and resolving this motion is actually to analyze

2  the rights of religious schools.

3       As this Court already rightly recognized in granting

4  intervention, it's the schools' rights that the exemption was

5  created to protect.  With the schools' rights in mind, it

6  becomes clear that plaintiffs' motion for preliminary

7  injunction should be denied for several reasons.

8       First, plaintiffs' request for preliminary injunction was

9  doomed from the start because the Court already denied a

10 temporary restraining order subject to the very same *Winter*

11 factors, and the law has not changed since.

12      And, importantly, the Court recognized that both the

13 plaintiffs' initial and amended motions for -- motions seek

14 mandatory forms of relief.  And that has two important

15 implications for the motion before the Court today.

16      First, it forecloses plaintiffs' attempt to invoke the

17 Ninth Circuit's more relaxed serious questions test, and it

18 elevates plaintiffs' already heightened standard requiring that

19 they go beyond a likelihood of success on the merits to show

20 that the law and facts clearly favor their position.

21      Given the mandatory nature of plaintiffs' requests, the

22 Court's TRO decision and the unchanged state of the law in the

23 last intervening months, there is no factual testimony that

24 plaintiffs could offer today that could justify changing the

25 result under the *Winter* factors.

1       And one last point on the *Winter* analysis that I would
2   like to make is the initial motion for TRO and PI.  In that
3   motion, plaintiffs at least attempted an explanation of the
4   *Winter* factors with respect to injunctive relief relating to
5   the administrative complaints, but plaintiffs' amended motion
6   sought to add relief with no independent attempt to ground that
7   unique relief in the *Winter* factors.

8       So, second, the religious schools' rights affirmatively
9   require the religious exemption, and this is important because
10  it makes it impossible for plaintiffs to establish that the law
11  clearly favors their causes of action to eliminate it.

12      Start with the school's free exercise rights.  Just this
13  summer a unanimous Supreme Court held a nondiscrimination law,
14  like Title IX, would violate the Free Exercise Clause if it
15  allows any secular exceptions but burdens religious exercise by
16  putting religious institutions to a choice of either violating
17  their religious convictions or curtailing their mission.

18      And here, if Title IX were stripped of its religious
19  exemption, enforcement of Title IX would be clearly
20  unconstitutional because the statute allows eight secular
21  exceptions, but it would put religious schools to the choice of
22  violating their convictions or curtailing their mission.

23      Even worse, it could cause them to cease to exist
24  altogether because many schools can't sustain losing the low
25  and middle income students who need financial assistance.

1    So schools' free exercise rights foreclose any suggestion

2    that the law clearly favors plaintiffs' position.

3    The schools' RFRA rights are even more straightforward.

4    Under RFRA, the government can't substantially burden religious

5    exercise unless that burden is the least-restrictive means of

6    advancing a compelling governmental interest.  But without the

7    religious exemption, Title IX would impose a substantial burden

8    by putting schools to that impossible choice, and the Supreme

9    Court recently and repeatedly held that a law that allows any

10   secular exceptions is not the least restrictive means of

11   advancing a governmental interest.  So the schools' RFRA

12   rights, likewise, foreclosed any suggestion that the law

13   clearly favors plaintiffs' position.

14   And third, and finally, I have one note on the APA claim.

15   In plaintiffs' opening statement, Mr. Southwick described two

16   types of plaintiffs' causes of action, two classes of causes of

17   action:  The non-APA causes of action related to the

18   constitutionality of the religious exemption and the APA cause

19   of action.

20   I just want to point out for the Court that the APA claim

21   on its own is insufficient to support the relief that

22   plaintiffs are requesting in the complaint.  Because even if

23   the 2020 rule changes were stricken, which they should not be,

24   the religious exemption would still exist and appear in the

25   statute itself.  It would still exist and appear in the prior

1    version of the regulation, and it would do nothing to change

2    the Department's decades-long longstanding policies and

3    interpretive memos.

4        With that, I would like to defer the remainder of the

5    intervenors' time to my colleagues, counsel for the CCCU.

6

7                OPENING STATEMENT FOR CCCU INTERVENORS

8            MR. SCHAERR:   Thank you.

9        And good morning, Your Honor.   My name is Gene Schaerr,

10   representing Intervenor Council for Christian Colleges and

11   Universities, which has been working hard for many years to

12   help its member institutions provide a loving and supporting

13   environment for members of the LGBT community who wish to

14   attend those institutions.   And as Mr. Southwick said, there

15   are many of them.

16       Let me add just three brief points to the excellent

17   presentations by the Department and the individual religious

18   college and intervenors, and they detailed a number of reasons

19   why the plaintiffs here have no real prospect of succeeding on

20   the merits and cannot show that the equities or the public

21   interest favors a preliminary injunction.   In other words, I

22   think they have well explained why the Court was correct in

23   denying the requested TRO and why it should also deny the

24   requested preliminary injunction.

25       My first point, as will become apparent as the hearing

1    proceeds, is that even if the Court were to ignore the fatal
2    jurisdictional problems with plaintiffs' case and reached the
3    merits, the Court would inevitably find itself at the center of
4    a theological thicket, with the religious colleges, on the one
5    hand, forced to defend their theological views about marriage
6    and human sexuality and the plaintiffs' and their experts, on
7    the other hand, openly or suddenly criticizing those beliefs
8    and trying to convince the Court that they constitute, as
9    Mr. Southwick would put it, invidious discrimination, and that
10    is that they're the moral equivalent of racism.  But that, of
11    course, is a powerful reason that the plaintiffs cannot prevail
12    on the merits.  Because the Establishment Clause prohibits the
13    Court from engaging in or even refereeing what is necessarily a
14    debate about theology.
15        Second, in any event, the effort by plaintiffs' counsel
16    and their experts to paint Christian College's theology-based
17    views about sexuality as bigoted and invidious is foreclosed by
18    at least three recent Supreme Court decisions, including the
19    one that was just mentioned.  Those decisions were all joined
20    by some of the most progressive members of the Supreme Court,
21    including, in all three cases, Justice Breyer and
22    Justice Kagan, and they all make clear that traditional
23    Judeo-Christian views about sexuality and gender identity are
24    not at all to be considered invidious discrimination or -- or
25    equated to racism.

1    And, third, contrary to the other side's claims, we will

2   show that Christian colleges play an important role in the

3   diversity of American higher education, a role that actually

4   benefits, rather than harms, important portions of the LGBT

5   community.

6    As we will see from the evidence, a significant subset of

7   young people who identify as LGBT are also devout Christians

8   and wish to follow traditional Christian teachings about

9   sexuality and gender, and for that subset of the LGBT

10   population -- obviously it's not all -- it's not the entire

11   population, but it is a subset of the population -- for that

12   group Christian colleges perform an important and sometimes

13   even vital service.  And, indeed, those benefits are reflected

14   in Mr. Southwick's admission a few moments ago that LGBT

15   students are choosing to attend Christian colleges in

16   increasing numbers.

17    And you might ask why is that?  Well, those colleges

18   generally provide a supporting and loving atmosphere in which

19   young Christians who identify as LGBT can mature in a setting

20   that encourages them and supports them in living the way that

21   they wish to live rather than being constantly bombarded with

22   temptations to violate their Christian beliefs.  And we'll see

23   proof of those benefits, not just in the evidence that we will

24   provide, but in a study conducted by one of the plaintiffs' own

25   experts.

1        So for at least this subset of the LGBT community,

2   depriving Christian colleges of their Title IX immunity and,

3   thus, for many of them, of their -- well, for all of them, of

4   their ability to offer federal education aid to any of their

5   students, including their LGBT students, would be a real

6   tragedy.  And that's another important reason why the public

7   interest strongly disfavors, rather than favors, the injunction

8   that the plaintiffs seek here.

9        Thank you, Your Honor.

10            THE COURT:  Call your first.

11            MR. SOUTHWICK:  Your Honor, this is Paul Southwick.

12   Our first witness is Alex Duron.  He was on earlier, so let's

13   see -- all right.

14            THE COURT:  I don't see him.

15            MR. SOUTHWICK:  I can see him on my screen and --

16            THE COURT:  Is he wearing a dark hoodie?

17            MR. SOUTHWICK:  Could you turn the light on, Alex,

18   maybe?  A little bit more light or open the window.

19            MR. DURON:  This is Alex Duron.  Can you all see me?

20            THE COURT:  That's much better.  Thank you.

21            MR. SOUTHWICK:  Are we having anyone swear in the

22   witness?

23            THE COURT:  Raise your right hand.

24   ///

25   ///

Duron - D

1                       ALEX DURON,

2    called as a witness in behalf of the Plaintiffs, being first

3    duly sworn, is examined and testified as follows:

4

5              THE WITNESS:  Yes, Your Honor.

6              THE COURT:  Please state your full name and spell

7    your last for the court reporter.

8              THE WITNESS:  My full name is Alex Duron.  It's

9    spelled A-l-e-x.  Last name is D-u-r-o-n.

10

11                  DIRECT EXAMINATION

12   BY MR. SOUTHWICK:

13   Q.    Thank you, Alex.  Thank you for being here today.

14         Could you tell us a little bit about yourself?  Where you

15   currently live, where you grew up, those sorts of things.

16   A.    Currently, I'm living in Fresno, California.  I actually

17   grew up in west Texas, a small town called El Paso, Texas, and

18   I'm currently in anesthesia school, and I'm an RN in ICU.

19   Q.    And could you tell us a little bit about your professional

20   career?  How long have you been in nursing, and how did you

21   start in that field?

22   A.    So I originally started as a surgical tech in the

23   operating room.  I started noticing that there was a lot of

24   nurses around me, and so I decided to go to nursing school.

25         In 2013 I actually graduated, and so since then I have

Duron - D

1   been an intensive care nurse, a registered nurse.

2        And, currently, I wanted to proceed further with my

3   education, and so I decided to attend a graduate school for

4   anesthesia.

5   Q.   Could you tell us a little bit about that application

6   process, how you decided which schools to apply to and those

7   kind of things?

8   A.   So, initially, whenever you need to apply to a school,

9   like anesthesia, it's probably like a two-year process where

10  you need to -- for me retake classes.  Higher level, more

11  science classes.  You need at least four to five letters of

12  recommendation.  You need a minimum of two years of ICU, but I

13  had around seven -- or, actually, six when I applied.

14       The schools that I was kind of searching for were

15  primarily under 35 students.  High attrition rates would just

16  mean that they were able to get students all the way through

17  the three-year program, because it's very vigorous, and also

18  that they had at least a 95 percent pass rate for the

19  first-time test-takers when we get our license.

20  Q.   And what were the schools that you ultimately chose to

21  apply to and focus your efforts on?

22  A.   I tried to apply to -- well, I applied to Baylor, in

23  Houston; I applied to Texas Western University in Forth Worth;

24  Texas Christian University in Forth Worth also; and also Union

25  University was another one that I applied to.

Duron - D

1    Q.    And at some point did you receive an admissions decision

2    from Union University?

3    A.    Yes.  I actually did get from admissions that I was

4    granted admission to their school.

5    Q.    And can you, just for terms of a time frame, tell us what

6    year this was?  Is this 2020?

7    A.    Yes, it was 2020.

8    Q.    And tell us a little bit about that admissions process for

9    Union University.  Did you have to meet with any faculty, or

10   what all did you have to do to get that admission?

11   A.    So of course I had to fill out -- like I said, they sent

12   out an application, which, you know, took me probably two to

13   three months to fill out.  Sent all my transcripts to the

14   school.  Once I did receive an interview, I ended up going

15   to -- I had to fly to Tennessee, obviously, because it was an

16   in-person -- this was pre-COVID.

17        So I flew to Tennessee, and I had to meet with the

18   administrator and three of the faculty members there.  They are

19   pretty much the ones that teach the classes.  It's probably,

20   like, maybe an hour interview.  They just want to know you in

21   full detail; what kind of person you are.  If, you know, you're

22   a good person, pretty much, is what they wanted to find out.

23   And also, you know, rationale of "Why do you want to do this?

24   What's your goals?"

25   Q.    Did they tell you whether or not you had to be a Christian

Duron - D

1  or a particular type of Christian in order to enroll in their

2  graduate nursing program?

3  A.    No.   They pretty much told me that one of my classes in

4  the first semester was going to be a faith-based class.   You

5  know, she said, "You don't have to be a Christian."   Melissa,

6  the director, actually is the one that told me this.   She said,

7  "You don't have to be a Christian.   We're not pushing our faith

8  on you.   We just want to show you what -- what we believe in.

9  We give you a class to educate you on it."   It's more or less

10  to understand what the -- the college believes in.   So that was

11  going to be one of the courses.

12  Q.    And then at some point after your admission, but before

13  you were meant to start the program, COVID hit at some point;

14  is that right?

15  A.    Yes, sir.

16  Q.    And then after COVID hit you were getting closer to

17  starting classes, and were you meant to start classes in -- was

18  that July of 2020?

19  A.    Yes.   It was supposed to be July 27th to the 29th

20  orientation in 2020.

21  Q.    So did you take any steps during the summer of 2020 to

22  prepare for this life transition?

23  A.    I did, actually.   I knew that I wasn't going to have

24  medical insurance for a short period of time, and so I needed

25  to save money, as much as I could.   So, also, I decided that

Duron - D

1   I would -- I had a car that I really didn't need.  It was more

2   of a -- I would call it a nice car.  I decided to sell that car

3   because I just needed to become a lot more frugal compared to

4   the way, I guess, I had been living for the past eight years.

5        And also I had to let my work know, for future reference,

6   you know, that I was going to put in my notice way before two

7   weeks, just -- I gave them, like, an end date.  The school

8   advised me to take at least a month break because it was going

9   to be a very long three years for me.

10       And, of course, I prepared my fiancé, to let him know that

11  I'm going to have to be a little bit, you know, distance at

12  first because I need to make sure that I put my studies first

13  and understand how vigorous this program was.  Because someone

14  can tell you how vigorous it is, but it's always dependent on

15  the person.  So I kind of emotionally prepared my family for

16  it.

17  Q.   And so is your plan that your fiancé would stay at your

18  home in Texas and you would essentially move away for a period

19  of time to start your studies at Union University?

20  A.   Yes.  That was the plan.  Because we had just purchased a

21  home, and we couldn't sell it, obviously, because we would be

22  in debt with it.  And also we have a lot of animals.  So

23  there's no way he could have moved over there either way, and

24  there's -- I was going to be of no help for sure -- I knew

25  that -- for the first couple of years.

Duron - D

1  Q.   How did it feel when you first got that admissions

2  decision?

3  A.   Well, when she called me, I was at work, and she just let

4  me know that I was one of their top choices, which, obviously,

5  I was grateful for.  I was very excited.  And so I pretty much

6  let everybody know within, like, 30 minutes what happened,

7  including family, because it was a step that I had been waiting

8  for, like I said, for a couple of years.  This is a building

9  process.  So I was really excited.  So I kind of started

10  rolling the gears into action to see -- just to make this as

11  easy of a transition for myself as I could because I never

12  lived anywhere else but Texas.

13  Q.   So it sounds like you were, you know, gearing up to start

14  this new stage of your career; excited, telling family and

15  friends.  And then at some point did -- did somewhere along the

16  line a turn was taken for the worst in the situation?

17  A.   Yes.  So I ended up getting a letter from -- at the time I

18  didn't know who it was.  It was the provost of the school.

19       This happened on July the 18, 2020.  He sent me an email

20  on a Saturday to let me know that I was not -- my application

21  was rescinded due to my social media and also to my emergency

22  contact, being my fiancé, and also a housing situation that was

23  not appropriate for the terms of the school.

24  Q.   So was it your understanding that essentially your

25  admission was being rescinded shortly before you were meant to

Duron - D

1   start this program?

2   A.    Yes.   It was a -- whenever I did get it, I -- I honestly,

3   at that time, didn't understand exactly what had happened,

4   again, because I didn't know who this person was.   So a lot of

5   times -- I thought Melissa was the one in power, which is the

6   director, the one that initially pulled me to the school.   So I

7   was --

8        Yeah, that one.   So that's the document exactly that I

9   received per email.

10       So, actually, the day that it did happen, I can remember

11  like it was yesterday.   So I was actually leaving the gym.   I

12  got an email from Union, and I saw it.   Obviously I opened it

13  right away because I was super excited to see, you know, what

14  the next step was.   And I kind of saw "rescinded," and I didn't

15  really -- I don't really hear that word very much, and so I

16  decided to pull over.   I started to read it, and then -- then I

17  realized that I was in complete shock because I understood what

18  it said when it said "social media" and "your intent to live

19  with a partner."

20       So I immediately just -- I couldn't drive for a little

21  bit.   So I stopped and waited.   Then I drove home, and then I

22  told my fiancé to read it, like read it over and over, to

23  explain to me if I'm understanding what this letter says.

24       So, obviously, when I started reading this letter, I

25  realized that I was kicked out of the university pretty much

Duron - D

1  for my sexual orientation, and that's -- I needed more
2  information, and so I wanted to talk to the provost at that
3  time to see exactly what happened.
4  Q.   So how did that feel for you, getting hit with that kind
5  of news?
6  A.   So, initially, just from seeing it, I pretty much felt
7  like a complete failure.  I'll be honest with you.  So when I
8  saw it, for some reason, I just didn't know how to -- how to
9  gauge what had just happened.  So I just looked at my fiancé,
10  and I just told him that I failed.  I felt like everything that
11  I worked for, including just being a nurse, in general, because
12  that's part of the prerequisites, I just feel like -- I feel
13  like it was just ripped away from me.  Just at that moment all
14  my education, everything I worked for, all the letters of
15  recommendation, all that money I spent, the travel, I felt like
16  a complete failure.  So I told my fiancé -- I said, "You know
17  what?  I'm sorry.  I failed."  He didn't understand why I was
18  saying that.
19       At the time I just felt that -- because I always tell
20  people "No matter what happens, you can always have your
21  education to back you up.  Nobody can ever take that away from
22  you."  And at that moment -- that's why I was so confused --
23  because it was ripped away from me.
24       So I pretty much closed the computer, didn't want to talk
25  to anybody.  I just went to my room, went to the closet.  I

Duron - D

1   turned off the light, and I just sat in the corner because I
2   didn't know what else to do.   I was just completely isolated.
3   I'm not a person to be depressed.   I just -- I got a taste of
4   it.   It just is not -- it's not in my genetic code to be
5   depressed.   So I didn't understand how to really do that until
6   my fiancé found me, pulled me out of the room.   I had to
7   explain to him how I felt.
8        He looked me in the eyes and he said, "You know, you're
9   one of those people that hasn't gone through this.   You have
10  never been discriminated against for being gay, and this is
11  your first time," and then it dawned on me when he said that.
12  I literally stared at him and said, "Wow.   This is what this
13  feels like."
14       He says, "Yes, I have had it numerous times.   This is --
15  this is what it is, but you got a hundredfold at just one time.
16  That's why you're so confused about it."
17       So that's kind of where I ended up.
18            MR. SOUTHWICK:   Thanks for sharing that, Alex.
19       So I just want to do one thing that's a little more
20  technical, but since we have to introduce exhibits to get them
21  admitted, I would like to -- I pulled up the exhibit Alex Duron
22  Expulsion Letter, which is listed in plaintiffs' exhibit list,
23  and I would like to move to have this admitted as Plaintiffs'
24  Exhibit No. 1.
25            MR. DAVIS:   No objection from the federal defendants.

Duron - D

1        THE COURT:  It will be received.

2        MR. SOUTHWICK:  All right.  So just to confirm,

3   Exhibit 1 is admitted.

4   BY MR. SOUTHWICK:  (Continuing):

5   Q.    Alex, after you had that conversation with your -- with

6   your fiancé that night, at the some point did you try to figure

7   out "All right.  Is there any way that I can fix this?  Is

8   there anything that I can do about this?"

9   A.    I did, actually.  I have a couple of friends that deal a

10  lot with, you know, legalities and stuff like that.  I

11  researched myself.  And as soon as I started searching, I saw

12  the Title IX, and I read it a couple of times.  I understood

13  exactly what it meant.

14        And so as I started digging further into research, I

15  started finding out that there's a lot of students in the LGBT

16  community that go through this.

17        But, again, I had no idea that this was actually

18  happening.  So I kind of told myself I feel like I can't do

19  anything because this is a hundred percent legal that they can

20  do this to me, and there's nothing I can do about it.

21        So I kind of just sat there in awe and said that

22  there's -- there's nothing I can do.

23  Q.    When you say you were looking at the Title IX aspect, did

24  you find information that Union University had received an

25  exemption to Title IX?

Duron - D

1  A.    Yes.

2  Q.    Is that what you're referring to it?

3  A.    Yeah.  I actually searched, and I think at the time the

4  president of the school was actually from San Antonio, where I

5  had originally lived before Fresno, and so I saw that they had

6  filed for it.  And many other schools had filed for it also.

7  So that's how I knew that Union was protected in that aspect of

8  it.

9         MR. SOUTHWICK:  All right.  At this point I would

10 like to introduce Exhibit No. 2 as the Union University

11 Exemption Assurance from OCR, which I have pulled up on the

12 screen, and it includes the correspondence between OCR and

13 Union University for prior religious exemption as well as the

14 more recent religious exemption covering sexual orientation.

15     Any objections?

16         THE COURT:  Hearing none, it will be received.

17 BY MR. SOUTHWICK: (Continuing):

18 Q.    All right.  Union University Exemption Assurance from OCR

19 is Plaintiffs' Exhibit No. 2.

20     So, Alex, you just talked about finding out that Union

21 University had a religious exemption, and so there was -- you

22 felt like there was nothing you could do about it.  How did you

23 kind of process that yourself or with your spouse -- or, I

24 mean, your fiancé?

25 A.    So I pretty much didn't want to stay quiet about it.  I

Duron - D

1  wanted people to know not only for personal reasons, because I

2  didn't want to explain to every single person why I was still

3  in San Antonio and not in Tennessee for school, and also I

4  wanted people to realize that this stuff is happening still to

5  other people.  So I took it upon myself, with my fiancé, and I

6  wrote on my Facebook, you know, to a bunch of -- I have a lot

7  of medical professionals that are on my Facebook or are

8  connections to.  I put it on there and just explained to

9  them -- I showed them the letter of what happened to me and

10  that this wasn't going to stop me, and I was going to continue

11  to fight for what I think is the best future for me and the way

12  I can help people, getting away from that, I -- so once I did

13  that, I started to realize that there was so many people

14  contacting me that said, "This happened to me too.  I'm glad

15  you're speaking out."  And the medical professionals were not

16  very happy about this decision.

17      And everybody kind of turned back to what I had said and

18  said, "This cannot be legal.  Is it -- is it really the truth?

19  Is this really what happened?"

20      And I'm like "It's a hundred percent legal what they're

21  doing.  They can kick me out just that quickly and just for

22  being, you know, from this type of LGBTQ community."

23  Q.   Now, the graduate nursing program that you were kicked out

24  of, was that an accredited program?

25  A.   It actually is an accredited program.  It's called the

Duron - D

1  COA, and they were the second person that I contacted because,

2  as many people know, in the nursing community, you're not

3  actually allowed to discriminate against any type of patient,

4  and the COA is an accreditation body for anesthesia for a

5  nurse, which is -- which allows Union University to function

6  with their anesthesia program.  So I went that route to see if

7  they could help me.

8  Q.   And at this point was -- was anyone able to help you,

9  whether it was the accreditors or the Federal Government?  Did

10  you find anyone who was able to help you?

11  A.   No.  They pretty much told me -- even the COA turned and

12  said, "We're going to talk to Union about it, and we'll come up

13  with a decision," but they were not going to involve me.

14      They didn't really want to deal with me at that time, and

15  so I pretty much was just left out in the cold to let it pan

16  out for itself.  There was many people in the medical community

17  that were not LGBTQ that wanted to fight for me; but, again, it

18  was a battle that I had to fight, but I wasn't able to because

19  nobody would -- nobody really gave me guidance of where to go.

20  Q.   Did you feel any shame around getting this dismissal

21  letter and going through that whole experience?

22  A.   I did, actually, because I just felt at the time that -- I

23  felt that I -- when I applied to these programs, I felt I had a

24  worth, and I said I can provide -- I can give you what you're

25  looking for as a student.  I can give you good scores.  I will

Duron - D

1    do everything you want me to.  I'll represent your school very

2    well.  Any school that I have gone to, I have always gotten

3    excellent scores.  I always named where I went to, and I always

4    made the school proud of what I was able to provide with their

5    education.

6        So whenever this kind of happened, I just -- I felt like

7    almost ashamed to go -- I couldn't go back to work.  I'll tell

8    you that right now.  I couldn't show my face at that -- the job

9    that I loved -- and I really loved that job that I left --

10   because I felt ashamed, like I failed, and I didn't want to

11   reverse back into my old career because I knew that I needed

12   more autonomy and I knew my worth and I could do better than

13   that.

14   Q.   And as an American, as a taxpayer, as someone who is in a

15   helping profession, how did it feel knowing that your

16   government wasn't even going to be able to help you in this

17   situation?

18   A.   At the time, when it did happen, I felt like I -- it's

19   going to sound weird.  I was like what -- should I pay taxes

20   because I know what it's going to?  I know legally you have to,

21   but I just felt like I'm funding my own -- I'm funding my own

22   denial, in a way.  Like, I'm funding my own rescindce by doing

23   this; like just sending my money out there.  Giving my money,

24   you know, with interest, to the government with loans I have

25   gotten in the past, which has always been an easy thing to do;

Duron - D

1   apply for a loan, give payments, pay it off.  You know, like, I
2   love that part that we're able to do that, to get loans.  But
3   at the same time, I think to myself, I could have been a
4   semester, two semesters in, owed $30,000, and just been cut
5   off, and the Department of Education would have told me "You
6   still need to pay us.  Because it doesn't matter.  They're
7   protected, but you're not protected.  So you still have to pay
8   us our $30,000."
9   Q.  At some point after you made a public disclosure about the
10  discrimination you experienced, did -- did you hear from any
11  other students at Union, whether they were alum or current
12  students, about whether anyone else was experiencing similar
13  things?
14  A.  Yes.  I would have to say that the real question is who
15  did I not hear from?  I heard from people in school that
16  actually -- that went to Union, that were in Union and had
17  graduated from Union, and the best thing that I told them was
18  I -- the current friends that I have at Union, I told them to
19  take me off their Facebook.  Don't communicate with me.  Block
20  my calls.  Don't comment on any of my stuff.  Because, as I
21  read their values, if you even support it, then you can get
22  kicked out.  And the last thing I wanted for them to do was to
23  get kicked out just because they -- they love me and they want
24  to support me, but I would get even more hurt if they would get
25  kicked out because of something -- just a support system that

Duron - D

1    they had.

2        The hardest thing to hear, though, was when I would hear

3    these kids that -- you know, they're growing up.  They're 19,

4    18 years old, telling me how they want to kill themselves; how

5    I heard from somebody that he's on so many medications because

6    he's depressed because he suppressed his sexuality for so long.

7    It almost mentally deteriorated him to a point where he needed

8    psychiatric help, like a psychiatric hospital.  And these kids

9    were coming to me and telling me, you know, "I'm afraid now,

10   like, what to do.  Should I divorce my fiancé?"  Because, you

11   know, they were either, you know, gay, lesbian, whatever they

12   were, and -- or they -- or even -- I even had a straight couple

13   tell me "Now I'm afraid to even live with my girlfriend because

14   we're not married."

15       So I couldn't provide any information because I didn't

16   want to steer them the wrong way.  I just told them, "Read

17   this.  They're super strict.  If they find out any of these

18   things, they're going to kick you out.  You have no protection.

19   You need to understand that."

20           MR. SOUTHWICK:  At some point -- well, I would like

21   to go ahead and introduce a third exhibit at this point, which

22   is the Union University policy language.  I put this up here on

23   my screen, and I would like to introduce this as Exhibit No. 3,

24   if there are no objections.

25           MR. LIPPELMANN:  Mr. Southwick, this is

Duron - D

 1  Mark Lippelmann.  I just have a clarifying question.

 2  Exhibit No. 1, I understand, is the email from Union University

 3  to Mr. Duron, and it -- it references -- it says, "Attached to

 4  this email is Union University's community value statement."

 5  But at least the version I received, I don't believe it had any

 6  attachment to this email.  Can you confirm whether this

 7  document you're -- that you're introducing now is that

 8  attachment or not?

 9          MR. SOUTHWICK:  Alex, can you respond to that

10  question?

11          THE WITNESS:  Yes, it is.  The one I have is the

12  signature version on the second page.  I don't know if you have

13  that one.  It was signed on September the 10th of 2019.  You

14  just have -- you have the email, but the attachment is what you

15  have.  That's the attachment.

16          MR. LIPPELMANN:  Okay.  Great.  Thank you.

17     No objection.

18          THE COURT:  It will be received.

19  BY MR. SOUTHWICK: (Continuing):

20  Q.   All right.  Alex, so when your admission was taken away

21  from you, there were certain code of conduct regulations that

22  were referred to, and you received this policy language.  And

23  there's a section here on sexual impropriety, and it states --

24  was it your understanding that these are behavioral codes

25  required by Union for even at -- for its graduate students,

Duron - D

1  including you?

2  A.    Yes, sir.

3  Q.    And under Sexual Impropriety, it states, "Sexual

4  impropriety includes, but is not limited to, participation in

5  or the appearance of engaging in premarital sex, extramarital

6  sex, homosexuality, homosexual activities, or cohabitation on

7  campus or off campus.  Students may not live with or stay in a

8  hotel room with a non-related peer of the opposite gender, even

9  if the relationship is not sexual.  The promotion, advocacy,

10  defense, or ongoing practice of a homosexual lifestyle,

11  including same-sex dating behaviors, is also contrary to our

12  community values."

13      How did it feel to be denied a graduate nursing degree

14  based off of this kind of statement about homosexuality and

15  homosexual activities?

16  A.    I feel that it wasn't fair.  I don't think that -- as a

17  provider, I don't think that -- once I finish anesthesia

18  school, I really don't think someone is going to -- someone is

19  going to ask me my sexuality.  They are going to tell me, "How

20  many times have you done this before?"  They are going to care

21  if I'm good at it, and they want to know if I would take care

22  of their family member like if they -- if I was like one of

23  their family members.

24      So when I saw this, obviously I thought to myself this has

25  nothing to do with me being a good provider or how smart I am

Duron - D

1  or how well I'm going to be able to serve an underserved

2  community.

3  Q.    And the second or the latter part of this policy regarding

4  the promotion advocacy defense of a homosexual lifestyle, is

5  this what you were referring to when you were talking about

6  wanting to protect current Union students by telling them to

7  not associate with you?

8  A.    Yes.  Just because of this part.  I read it over and over

9  to make sure that nobody else was going to be getting in

10  trouble for what had happened to me.  Once I read that last

11  sentence, I automatically told everybody to just exile me from

12  the island.  I didn't want anybody to communicate with me

13  because I didn't know how far Union was going to take it

14  because of them going through my social media and my fiance's

15  LinkedIn accounts.  I didn't know how far they were going to

16  take it, like, if they saw one small link, that they were going

17  to kick out students.

18         MR. SOUTHWICK:  All right.  I would like to -- the

19  last document I would like to introduce is -- with Alex will be

20  Exhibit No. 4, which is Alex Duron Title IX Complaint.  I've

21  got that pulled up on my screen.

22         Any objections?

23         THE COURT:  Hearing none, it will be received.

24  BY MR. SOUTHWICK: (Continuing):

25  Q.    All right.  Alex, I have Exhibit No. 4, which is your

Duron - D

1  Title IX complaint, and there are pieces that are redacted

2  relating to your address and things like that, but nothing else

3  has been redacted from this document.

4       In this Title IX complaint -- well, first of all, have you

5  seen this Title IX complaint before?

6  A.   Yes, I have.

7  Q.   And in this Title IX complaint, do you describe the

8  experience that you had with Union University?

9  A.   Yes, I do.

10 Q.   And can you tell us why you filed this complaint and what

11 you were hoping would come out of it?

12 A.   I originally -- when I started this with you, I just

13 wanted -- I don't want any other student to go through what I

14 went through.  I want to -- for them to be accepted into the

15 university for -- you know, like a normal university with their

16 GPA recommendations.  How great is the school?  I want to make

17 sure that there's -- I'm not going to get any more emails from

18 students telling me that they went through this; that they're

19 depressed because of this; that their parents forced them to go

20 to a Christian school to, you know, do conversion therapy.

21      There's so many things that in a bucket I could throw and

22 say these are all the things I want to happen.  I just feel

23 that, in my eyes, if this is going to happen, I don't want it

24 to happen with my funding or anybody else in my family that

25 supports me that says, you know, "We don't -- we don't want

Duron - D

1  this to happen to anybody else."  I feel that if it's going to

2  happen and they're allowing it to happen, then it should --

3  they should fund themselves, and I don't want to be paying for

4  this anymore.

5  Q.   And have you gone through any of the interview process

6  with the investigators from the Office of Civil Rights?

7  A.   I believe I spoke to a woman.  I believe you were on the

8  call, though.  Are you just talking about when -- what they

9  asked me about my story and things like that?

10  Q.   Yeah.  Yeah.  So you responded to some questions.

11       And just for everyone, I'm going to use the abbreviated

12  term "OCR" to refer to the Office of Civil Rights, which is a

13  division of the Department of Education.  So I'll refer to it

14  as "OCR."

15       During that OCR interview, what were you trying to

16  communicate to the investigator?

17  A.   I was just trying to let her know because she -- she --

18  actually, from my -- seemed very surprised that this was still

19  going on.  I wanted to display the severity of what -- what had

20  happened.  Like I said, it made me emotionally distraught; but

21  at the same time, like I said, I feel like I'm a very strong

22  individual emotionally.  It takes a lot to knock me down.  So I

23  wanted to express to her that I was building up my education.

24  I was building up my -- you know, my knowledge of anesthesia,

25  to make sure that I'm a good provider, and that I -- I go to a

Duron - D

1  school that is going to accept me for who I am and also that

2  they are going to educate me, and I will make them proud as

3  soon as I come out.  But I wanted her to see the severity of,

4  like, how -- how it impacted me and my family and people around

5  me.

6  Q.   And what was her reaction, or what do you recall the

7  investigator -- how she responded to your statement?

8  A.   I just feel that she was pretty surprised by this because

9  I'm in the medical community.  I felt that she was not really

10 aware that this was going on because she started asking me more

11 in-depth questions as to, like, the hows and whys of what

12 happened.  So I kind of felt like I was telling her a story for

13 the first time ever.  That's what felt like was happening.

14 Q.   Do you remember any discussion of whether or not your

15 complaint was timely or there would need to be a timeliness

16 waiver?

17 A.   To be honest, no, I do not remember.

18       MR. SOUTHWICK:  That's fine.

19    All right.  Well, thank you, Alex.  I really appreciate

20 you sharing your story and your experience with the Court.  I

21 don't have any further questions for you; however, some of the

22 lawyers for the other parties may.

23    So with that, I'll turn it over to -- turn Alex over for

24 any cross.

25       THE COURT:  For the government?

Duron - X

1                       CROSS-EXAMINATION

2   BY MR. DAVIS:

3   Q.    Good morning.   My name is Elliott Davis, and I have just a

4   few questions.

5        Your admission to Union University -- Union University was

6   rescinded in July of 2020; is that correct?

7   A.    Yes, sir.

8   Q.    And you filed a Title IX complaint about that about a year

9   later, in July of 2021; is that correct?

10  A.    Yes, sir.

11  Q.    And, to your knowledge, is that Title IX complaint still

12  pending with the Office for Civil Rights?

13  A.    Yes.

14  Q.    So, to your knowledge, it has not been dismissed; correct?

15  A.    No.

16  Q.    Correct, it has not been dismissed; is that right?

17  A.    Correct.

18  Q.    And you did mention that you were interviewed by a staff

19  member at the Office for Civil Rights.   That interview took

20  place in August of 2021; is that right?

21  A.    I believe so, sir.

22  Q.    Have you filed a Title IX lawsuit directly against Union

23  University?

24  A.    I believe that it was -- yeah, I believe that it was, but

25  I would have to confirm with my attorney.

Duron - X

1    Q.   To be --

2         MR. SOUTHWICK:  I'll just make an objection.  Calls

3    for a legal conclusion.

4    BY MR. DAVIS: (Continuing):

5    Q.   To be clear, apart from this lawsuit, have you filed any

6    lawsuit against Union University?

7    A.   No, sir.

8         MR. DAVIS:  Thank you.  That's all I have.

9         THE COURT:  For the intervenors?

10

11                    CROSS-EXAMINATION

12   BY MR. LIPPELMANN:

13   Q.   Mr. Duron, my name is Mark Lippelmann.  Thank you for your

14   testimony today.  I only have a few questions as well.

15        So, first, can you identify the school that you're

16   currently attending?

17   A.   The school I'm currently attending is in Fresno,

18   California, and it is a nurse anesthesiologist school.

19   Q.   Okay.  Are you currently attending a religious

20   institution?

21   A.   No, sir.

22   Q.   Okay.  Do you currently have any applications pending for

23   admission to a religious institution?

24   A.   No, sir.

25   Q.   Okay.  Let's see.  So do I recall correctly that the time

Duron - X

1  frame of your application to Union University was around the

2  fall of 2019.   Is that correct?

3  A.   Yes, sir.  I had an interview on November 20, 2019.

4  Q.   Okay.  And I know you mentioned several schools that you

5  applied to, but how many schools, in total, did you apply to

6  during that process --

7  A.   I would say --

8  Q.   -- if you recall?

9  A.   I would say, including Union, it would be around four to

10  five.

11  Q.   Okay.  And just for my recollection, could you identify

12  those schools?

13  A.   Texas Western University in Fort Worth; Texas Christian

14  University in Fort Worth; Baylor School of Medicine in Houston;

15  and then Union University in Jackson, Tennessee.

16  Q.   Okay.  And you ultimately decided to attend Union instead

17  of any of those other -- pursuing any of those other schools;

18  correct?

19  A.   I did, yes.

20  Q.   Okay.  At the time you applied for admission to Union

21  University, you knew that Union was a Christian school;

22  correct?

23  A.   Yes, sir.

24  Q.   Did you also know at that time that Union University had a

25  community values statement expressing religious beliefs?

Duron - X

1  A.   At the time of application, no.

2  Q.   Okay.  Let's see.  I would like to share a document quick

3  here.

4       All right.  I'm trying to show you right now a copy of

5  what has been marked as Plaintiffs' Exhibit No. 1, which I'll

6  represent is the email that you described in your direct

7  testimony.  If I could, I would like to direct your attention

8  to the language that I am highlighting here.  The sentence that

9  begins "As part of the application process, you agreed to

10  adhere to and uphold the values and expectations set by the

11  University.  Attached to this correspondence is a copy of Union

12  University's Community -- Community Values Statement for

13  Graduate and Nontraditional Programs which you signed on

14  September 10, 2019."

15      Is it accurate that you received and signed a copy of

16  Union University's value statements prior to your admission?

17  A.   Yes, sir.

18  Q.   Okay.  And did you understand that students of

19  University -- of Union University were expected to live in

20  accordance with the school's policies?

21  A.   Yes, I did that.  I signed that document.  I read over it

22  and understood there was a lot of things on there that were, I

23  guess, against school policy.

24  Q.   Okay.  Were you -- when you signed that document, were

25  you, in fact, willing to live in accordance with that document?

Duron - X/ReD

1  A.    They -- when it's -- when I read that document and that,

2  obviously, I'm not able to live with -- or be -- you know, any

3  homosexual, I think, activities -- I forgot what it said, but I

4  didn't take it so literal, as the way the document said.   I

5  just thought that when I was on the campus I wasn't able to,

6  obviously, kiss, hold my fiance's hand, you know, express any

7  public displays of emotion.   That's the way I took it.

8  Q.    Okay.   Do you agree or disagree with Union's religious

9  beliefs on sexuality?

10  A.    I would say I have to disagree.

11              MR. LIPPELMANN:   Okay.   Thank you.   Those are the

12  only questions that I have, unless CCCU has any remaining

13  questions for the intervenors.

14              MR. SCHAERR:   No questions from CCCU.

15              MR. SOUTHWICK:   Your Honor, this is Paul Southwick.

16  I have just a small amount of redirect.

17              THE COURT:   Go ahead.

18

19                    REDIRECT EXAMINATION

20  BY MR. SOUTHWICK:

21  Q.    Alex, counsel for one of the intervenor defendants asked

22  about what you're doing now.   Could you explain to the Court

23  the program that you are in now and when you were able to apply

24  and get in there?

25  A.    So as soon as I was turned away from Union University,

Duron - ReD

1   thankfully the medical community had reached out to me.  They

2   had come together and they all wanted to see my transcripts and

3   wanted to talk to me on the basis of seeing actually who wanted

4   to take me, and pretty much they displayed all the schools,

5   said "Which one do you want to go to?  Because if you got into

6   Union, you can get into our schools also."

7        So the main one was Fresno, California, called National

8   University.  He promised me that he would -- this, obviously,

9   is a school where everybody's accepted, high diversity, and he

10  just told me it's going to be a very vigorous program, which I

11  expected, for the next three years.  And it's pretty much like

12  a 60 to 70 hours a week study program.  So that's kind of how I

13  ended up over here.

14       But there was multiple decisions for me to be made, not

15  only with living, obviously acceptance, and I didn't want to go

16  into another organization where I was going to feel threatened.

17  Not even in the least.

18  Q.   Alex, did you -- were you able to stay on the same

19  schedule as you would have been at Union, or was your education

20  delayed by a semester or more?

21  A.   It was going to be delayed for sure.  It was delayed,

22  actually, almost seven months -- six to seven months because

23  the programs don't usually start -- well, they would have

24  started, actually, the next month -- most of the programs --

25  but I didn't have time to get all my stuff in.

Duron - ReD

1    Honestly, Paul, I wasn't emotionally ready to jump into

2 another program.  I was still distraught, and I felt that

3 jumping from July to August into another program and moving

4 within a week or two was just not going to work.  I didn't want

5 to fail and look like I wasn't able to do it.  So I had to

6 delay my education until January.

7    And everybody understood why I made the decision.  And

8 then finally after -- then COVID hit.  So I was kind of stuck,

9 anyways, in the city, and so I decided to just take FEMA

10 contracts and work as a nurse at the bedside.

11 Q.    All right.  So you worked as a nurse up until you were

12 able to transition to this new program; is that right?

13 A.    Yes, sir.

14 Q.    And how far along are you in the new program?

15 A.    I am going to complete my first year at the end of

16 December.  So I have, after that, two more years.

17    MR. SOUTHWICK:  Great.  Well, nothing else from me,

18 Alex.

19    I believe that you are -- you're free to go unless there's

20 anything from any other counsel.

21    THE COURT:  Thank you for your time.  Thank you for

22 your testimony.

23    THE WITNESS:  Thank you, Your Honor.

24    THE COURT:  You're welcome.

25    Call your next.

Bonifacio Penales - D

1      MR. SOUTHWICK:  Thank you, Your Honor.  This is

2  Paul Southwick.  I would like to call our next witness,

3  Veronica Bonifacio Penales.  I believe I saw her earlier.

4      There she is.  Great.

5      THE COURT:  If you would raise your right hand.

6

7              VERONICA BONIFACIO PENALES,

8  called as a witness in behalf of the Plaintiffs, being first

9  duly sworn, is examined and testified as follows:

10

11              DIRECT EXAMINATION

12  BY MR. SOUTHWICK:

13  Q.    Thank you, Veronica.  Thank you for being here today.  Can

14  you tell the Court where you are speaking from?

15  A.    Yes.  I'm currently at Baylor University in Waco, Texas.

16  Q.    And what year are you in your studies?

17  A.    I'm a junior.

18  Q.    Great.  Can you tell us a little bit about your

19  background, where you grew up, and that sort of thing?

20  A.    Yeah.  So I am from Shreveport, Louisiana, and I currently

21  live in Waco, Texas for University, of course, and I -- yeah, I

22  graduated from high school in -- and I'm going to graduate in

23  2023, hopefully.

24      THE COURT REPORTER:  I'm sorry.  You cut out.  Can

25  you repeat your answer?

Bonifacio Penales - D

1    THE COURT:  That was the court reporter who did not

2   get your full answer.  So why don't you just ask it again and

3   let's get a complete answer.

4   BY MR. SOUTHWICK: (Continuing):

5   Q.   Sure.  Veronica, I was just asking you about your

6   background.  You know, where you grew up, and that sort of a

7   thing.

8   A.   Yeah.  So I'm from Shreveport, Louisiana.  I currently

9   live in Waco, Texas, as a full-time student.  I graduated from

10   high school in 2015 and will be graduating from Baylor

11   hopefully in 2023.

12   Q.   And what originally drew you to Baylor?  Why did you

13   apply, and how did that whole process go?

14   A.   Yeah.  So Baylor was actually my safety school, and I got

15   in.  It got me the most scholarships.  It was close to home but

16   not too close, especially with my dad getting a little sick and

17   dealing with medical issues.

18       So, yeah, Baylor gave me the most scholarships for my

19   academic honors, and that's why I'm here.

20   Q.   What was it like for you when you first arrived on campus?

21   A.   So the first time I went to campus I attended something

22   called Line Camp, and it was just the incoming freshman

23   program, getting to know your peers, et cetera; and, honestly,

24   I was just a little bit scared of -- just activity that we took

25   part in as Line Camp students.  So I -- I was just a little

Bonifacio Penales - D

1  nervous about that and ended up actually going back in the

2  closet.

3  Q.    So, yeah, could you talk a little bit about that?  About

4  your sexual identity development, how that was in high school,

5  and then how that changed when you got to Baylor?

6  A.    Absolutely.  So I actually came out in a really big way in

7  high school.  During our senior homecoming pep rally -- it was

8  a blackout pep rally; so we were all wearing all black.  I came

9  out with a pride flag in the middle of our alma mater where one

10 specific line says the words "with pride."  It was a great

11 experience.  That was probably one of my favorite coming-out

12 experiences.  It was just done in a super big way and gave me a

13 lot of confidence moving forward as a member of the LGBTQ

14 community in such an out way.

15     However, once I came to Baylor, I just kind of heard about

16 all of the perspectives and just, like, the way religion was

17 kind of everywhere here at the university.  It made me nervous.

18 I didn't really know the people that I was with yet, and so I

19 just decided I might as well play it safe and just go back in

20 the closet in the meantime.

21     But, then, I mean, you enter your actual weeks of college

22 and you realize that these are supposed to be the most

23 formative years of our life.  You can't do that in the closet.

24 That's why I came out when I did.

25 Q.    Sorry.  I muted myself.

Bonifacio Penales - D

1    Tell me a little bit about how you eventually found the
2    queer or LGBTQ community at Baylor, and what was that like for
3    you?
4    A.    Yes.  So I -- I came out on social media on National Bi
5    Visibility Day of that year.  I came out with just a simple
6    post.  It was actually the same picture I used when I came out
7    in high school, and so the day after that -- actually that
8    experience was pretty positive.
9         The day after that we had a football game, and that kind
10   of all went downhill from there.  But, honestly, like, the
11   queer community is here at Baylor.  We're big; we're present,
12   and we're pretty active.  It's just you don't really find them
13   because we don't have the -- the ability to display ourselves
14   appropriately on campus like other clubs can do.  It's either
15   you go out searching for them or they find you because you come
16   out in a loud way.  So, yeah.
17   Q.    And has the Baylor queer community attempted to organize
18   and get any kind of official recognition for the club?
19   A.    Yes.  So this fight actually started way before I became a
20   student here.  It's a ten-year-plus -- I believe this is our
21   eleventh year fighting for national -- or official charter
22   under Baylor University's New Student Programs Handbook, which
23   is kind of what dictates which student organizations are able
24   to be chartered.
25        So what that process looks like is basically the student

Bonifacio Penales - D

1  organization cannot advocate for anything that goes beyond any
2  of Baylor's policies.
3      Gamma is a support group for its students.  So this
4  organization, Gamma Alpha Epsilon, has been trying to get
5  charter and recognition officially from the university, which
6  has not happened and still hasn't happened yet.  But they were
7  kind of the community that took me in when I was facing all of
8  the discrimination that Baylor put us under.  So, you know,
9  without them, it would have been a lot harder.
10  Q.   Can you tell me a little bit about what -- what does it
11  feel like being a member of the LGBTQ community at Baylor,
12  trying to get the support of your university for your support
13  group and then having that denied time and time again?  What --
14  how does that feel?  What is the impact of that on you?
15  A.   Yeah.  So it's kind of a twofold experience.  As a student
16  advocate on campus, I get a lot of Baylor saying no to me in
17  kind of efforts that I push for, and the LGBTQ issue is not any
18  different from that.  So I remember kind of standing up and
19  sticking your neck out and saying, like, "Hey, like, we are
20  present.  We have the support from students, faculty, alumni,
21  and we're just waiting for you to actually, like, listen."
22      And it hurts even more when the University says, "Okay.
23  We're going to be pushing for diversity and inclusivity
24  policies.  We're going to put all of these blanket statements
25  out," but when it comes down to it, the university actually

Bonifacio Penales - D

1    doesn't do anything.

2        So they can start as many initial talks as they want.

3    When it comes down to it and we're discriminated against,

4    there's nothing after.  When we're actually asking for them to

5    officially charter us, there's nothing after.

6        From a more personal perspective, like, I'm honestly so

7    tired of pushing for the same issue, and I know everybody who

8    came before me is tired of that too; but it's not something

9    we're going to stop pushing for because there's only one right

10   answer to this.

11   Q.    Veronica, you talked about some of the efforts and some of

12   the support from the community and how that stands in stark

13   contrast to the University's actions.

14       Can you tell me about some of that -- the faculty and the

15   other student groups?  Tell me about some of that support for

16   the LGBT club.

17   A.    Absolutely.  So the year after I faced all the

18   discrimination on campus, I wrote a bill trying to push for

19   Gamma's charter and faced a lot more discrimination after that.

20   But the efforts that we put in place following the writing of

21   that bill looked like getting faculty senate to write a

22   resolution voicing the support of faculty.  We also had

23   multiple letters from student organizations saying, like, "We

24   support Gamma and their efforts for charter."  We also had a

25   lot of supporting alumni letters, just kind of saying, like,

Bonifacio Penales - D

1  "Yes, we want this to happen," and then what we got in response

2  to that was actually nothing.

3      So that was really, really hard, but we still have all of

4  these letters from multiple groups of people who encompass what

5  Baylor calls "the Baylor family," saying, like, "We support

6  this."

7      We're just waiting on Baylor to listen.

8      We have also hosted multiple, like, marches and, like,

9  events on campus that have shown faculty support because of the

10  faculty in attendance, and it's great.

11 Q.   That's wonderful.

12      What are some of the practical impacts of not being a

13  chartered club?  Does that affect, you know, where you are

14  allowed to meet or the money that you have or how your club is

15  perceived by other students on campus?  Can you talk about

16  that?

17 A.   Yeah.  So probably in year ten of the fight, Gamma was

18  finally able to request a room for club meetings.  Granted,

19  it's probably not enough to hold the amount of students who

20  want to attend, so we're limited in the number of kids we're

21  allowed to actually have in these events, especially with COVID

22  being a factor.  But basically not being allowed to be an

23  official Baylor club means we don't have access to student

24  funding.  We can't advertise our clubs for people who need it.

25      Like, if I was a student who came out and faced so much

Bonifacio Penales - D

1  discrimination and I didn't know Gamma existed, you don't have

2  the support that I did when I went through all my

3  discrimination because Gamma is not allowed to advertise, et

4  cetera, et cetera.

5      But it's on so much more of the principle as well, where

6  Baylor won't even say, like, "Yes, like we recognize our LGBTQ

7  students and the support group that they have," and that's

8  honestly where a lot of the pain and sadness comes from the

9  students who are in this organization.

10 Q.   Does it make you and the other LGBTQ students feel like

11 you're essentially relegated to second-class status at Baylor?

12 A.   Yeah.  I would even say third-class because the other

13 minority students even come before us, but they're still not

14 the basis of a regular student.

15 Q.   You shared or you referenced a little bit of how important

16 it was to find the queer community, even though it's kind of

17 underground and not official, and that it was really important

18 for you to have that when you were going through your own

19 experience of discrimination.  Could you talk a little bit

20 about that and kind of when that started for you personally?

21 A.   Right.  So I would say that Gamma support kind of

22 immediately happened after I came out because, again, it was

23 with an Instagram post, and I tagged the organization because I

24 happened to know it existed because I did a lot of my own

25 personal research after Line Camp and being so scared to be out

Bonifacio Penales - D

1    as a freshman, and so I tagged them in my post, and they

2    reached out, and they were like, "This was beautiful."  Like,

3    "You need to let us know if anything happens."  And, you know,

4    that tone of voice already, like, seemed like they already

5    expected something to happen.  Granted, giving everything on

6    campus, that's understandable.

7         So when they reached out, I was like, "Okay.  Amazing."

8         I did a lot more work with them throughout my work as a

9    student senator and writing that bill advocating for their

10   charter, but the biggest issue is unless you know Gamma exists

11   or even, like, want to kind of explore whether or not this

12   university has an LGBTQ organization, if you are not actively

13   searching or being reached out to by Gamma, which they do a

14   great job already, you don't know that the support groups

15   exists, and you are kind of stuck in the dark.

16   Q.   Just to clarify on the Gamma group, which is the LGBT

17   support group, it sounds like, based on your testimony, that

18   the student government officially endorsed the club, the

19   faculty government endorsed the club, and that a variety of

20   minority student organizations, sororities, fraternities

21   others, also gave that kind of endorsement.  Is that a fair

22   characterization?

23   A.   Yes.  I would also add that our alumni network also voiced

24   their support in accordance with all those other groups.

25   Q.   And despite all of that support from pretty much every

Bonifacio Penales - D

1    aspect of the university community, did Baylor approve the

2    Gamma charter when it was submitted in this past -- the spring

3    of 2021?

4    A.    No.  All we got was a promise from Baylor to look into

5    solutions.  But, honestly, to me, and as a student activist, it

6    just sounds like they're creating more initial talks with no

7    concrete action after; so no.

8    Q.    And you mentioned earlier that, you know, you had started

9    to voice your support for getting a bill to get this charter

10   going, and I believe you experienced some harassment or

11   discrimination.  Can you talk to us about any of the specific

12   instances of harassment or discrimination at Baylor?

13   A.    Yes.  So I specifically remember after -- actually, before

14   the -- before the actual bill was seen in senate, literally

15   hours before, when we were still prepping, we got an email from

16   a student, and it was sent to all of the senators, just kind of

17   saying, like, "If you support this LGBTQ group, you support an

18   adulterous club," et cetera, et cetera.  So that was one

19   instance.

20         Following that and the actual passing of the bill,

21   immediately, the next day, *The Lariat*, our school newspaper,

22   kind of put the news out that it had passed.  So the University

23   knew about it.  People would --

24              THE COURT:  You just froze.  Wait.  You just froze.

25   Can you go back?

Bonifacio Penales - D

1          THE WITNESS:  I'm so sorry.

2          THE COURT:  You need to go back to where I stopped

3    hearing you.  You talked about what you received about the

4    adulterous club, and then I would start -- I would pick up what

5    you had to say after that.

6          THE WITNESS:  Yes, ma'am.

7      So, yes, we got an email -- all the senators did --

8    saying, "Do not pass this bill.  Because if you pass this bill,

9    you are supporting an adulterous club."  So that was definitely

10   super emotionally jarring right before we present this bill to

11   a bunch of students.

12       And so after the bill passed, students immediately knew

13   about it the next day because our school newspaper reported it

14   since it was a pretty big deal on campus.  And throughout the

15   next few weeks I started getting sticky notes.  I got a Bible

16   left on my dorm -- I got a Bible, and it kind of, like,

17   highlighted notes that were super homophobic or had pages

18   dog-eared where it talked about how homophobia -- or homosexual

19   behavior is against the Bible, et cetera, supposedly.  And

20   then -- yes, so those are the sticky notes.

21   BY MR. SOUTHWICK: (Continuing):

22   Q.   Veronica, I'm just putting this image up just as a

23   demonstrative.  Are these some of the sticky notes you were

24   talking about?  And can you tell us how there came to be so

25   many and what this was like for you?

Bonifacio Penales - D

1  A.    Yes.   So, actually, this photo was taken way before. I had

2  a lot more that it couldn't even fit on the sign by the end of

3  the semester.   But I woke up one morning and there was a sticky

4  note on my door and, you know, it says what it says, and I took

5  it down and I was like, okay, well, somebody really has strong

6  thoughts.   I'm just not going to report it, considering how I

7  haven't had any success reporting before.

8       It started off kind of slow and then it picked up.  So it

9  started, like, once a week, and then it picked up to every

10  other day, and then it picked up to every day.

11      Again, I didn't report it until one of my friends came

12  knocking on my door on a test day, because we just had a test,

13  like, super early, so she woke up before I did, and she saw the

14  note.   And she was like, "This is not okay.  You have to report

15  this.  Like, how many have you gotten?"  Et cetera, et cetera.

16      So I didn't report it until my friend pushed me to; but,

17  yeah, I just got so many of these notes that -- I don't know.

18  Q.   And how did the notes make you feel?  Did you feel -- did

19  they make you feel like an outsider, like you weren't safe?

20  Could you talk about that?

21  A.    Yeah.   So, I mean, I started -- I started feeling unsafe

22  on campus, especially living in the dorms that I lived in,

23  where I had a two-year contract and couldn't break lease, way

24  before, like, probably immediately after I came out, things

25  just got weird.   And so when this happened my second year, I

Bonifacio Penales - D

1    was like, okay, like, you can't -- there's -- what else are you

2    going to do about it?  Report it when nothing else happens

3    after that?  So I just started distancing myself from the

4    community anyway.  I was in my dorm less and less.

5         But, honestly, my thoughts were just like I just hope

6    other people don't start putting more notes in because the view

7    of this dorm, this university, is pretty clear already.  I

8    don't know.  I just -- I hated it.  My mental health shot down

9    after this.  So --

10   Q.   I can imagine.

11        At some point it sounds like you did report it.  Could you

12   tell us again who you reported it to and then how that

13   process -- how that process went and if anything came of it?

14   A.   Right.  Specifically, the notes, or do you want me to

15   start with the first reporting process?

16   Q.   You can go ahead and start with the first reporting

17   process, yeah.

18   A.   Okay.  So when I came out, again, at first, it was with an

19   Instagram post.  The following day I had a football game, and

20   it was a specific tailgate for my honors college.  So one of my

21   friends painted a rainbow on my thigh.  I posted that picture,

22   and that's the photo that got a lot of hate comments.

23        I deleted the comments but not -- after I -- I

24   screen-shotted them, and so I reported that instance first.

25   Specifically because the one -- there were multiple comments,

Bonifacio Penales - D

1  but the one that, like, hurt the most was one that said hashtag

2  F-A-G runner, because I was a flag runner during the game, and

3  I reported it to HRC leadership, who was kind of just, like,

4  the exec committee of my dorms, and my residence hall director,

5  and I said, like, "Hey, like, this woman is on our leadership

6  committee, and I don't think that is very representative of

7  what the HRC stands for," and so he told me, "Okay.  Thank you

8  for bringing this to our attention.  We'll look into it."  He

9  referred me to the counseling office, referred me to the

10 chaplain, and then said, "Okay.  Next semester she's not going

11 to be on the leadership committee."

12      And that was the example of my first reporting.

13      The next semester I was the one who wasn't on the

14 leadership committee and she still was.  Fair enough.

15 Whatever.

16      And then that's when they started pushing me to go to

17 counseling and kind of like saying, like, "You need to go to

18 counseling," and sending me numerous emails, making it seem

19 suggestive in saying, like, "We think this would be good for

20 you," but it was pretty clear that they were, like, "Go to

21 counseling."

22      I had a few talks with my chaplain as well, and that

23 pretty much summed up the Instagram reporting.

24      With regards to the sticky note reporting, again, like I

25 said, I didn't report it until after my friend pushed it --

Bonifacio Penales - D

1  pushed me to report it because of the experience I had before.

2  I talked to my community leader, who was kind of like the RA of

3  my hall, and she said that she was going to report it to the

4  residence hall director, as well as seeing where that next step

5  is, and just keep me in the loop.

6       So she took pictures.  She sent it to Alex, our residence

7  hall director, and then I didn't hear back for a couple of

8  weeks.  I still got the notes.  So I asked him again, like,

9  "Hey, do you have any updates for me?"  And it was,

10 essentially, kind of like, "We passed this on to the

11 higher-ups.  I don't have any updates, but I will let you know

12 when I do."  I haven't heard back since.

13      Again, I think I also got referred to the counseling

14 office; but other than that, that's basically the extent of the

15 reporting process.

16 Q.   So essentially you experienced all the harassment that you

17 described and you reported it on two separate occasions, and

18 essentially nothing was done?  Is that fair to say?

19 A.   Yes.

20 Q.   Did it feel a little bit like you were being punished for

21 reporting by them suggesting to go see a counselor, or how --

22 how did that feel for you?

23 A.   I felt like I was being referred to the counseling office

24 so that they could ask me about being a part of the LGBTQ

25 community but maybe not necessarily because I was reporting

Bonifacio Penales - D

1  these issues.  It's just that that seemed to be their scapegoat

2  for the solution of this, and that kind of hurt a lot too.

3          MR. SOUTHWICK:  Let's see.  My camera's battery

4  appears to have died, but I'll just keep going without it, if

5  that's okay, and I'll change out the battery between witnesses.

6          THE COURT:  That's fine.

7  BY MR. SOUTHWICK: (Continuing):

8  Q.   So, Veronica, in addition to the Instagram harassment, the

9  F-A-G note harassment, and the Bible being left with passages

10  underlined for you, have you experienced any other kinds of

11  either harassment or discrimination while at Baylor?

12  A.   Yes.  So a lot of the stuff happens on the regular now,

13  and you either just shrug your shoulders or -- you know,

14  because it happens all the time, but a few -- a few do stick

15  out to me.

16          So one instance was when I was in the dorms, and we had a

17  late study session.  Visitation times end, I believe, at 1:00

18  a.m., and so I had -- one of my friends who actually lived -- I

19  lived on the third floor; she lived on the second floor, and

20  she just got done studying, and we were just going to go to my

21  room and make some Ramen, you know, just regular late-night

22  stuff.  And we had a CL who -- again, community leader.  He was

23  making rounds, and he literally stopped us right as soon as we

24  got off the elevator.  And he was like, "Who are you?  Do you

25  have your ID?  Are you a student here?  Do you even live in

Bonifacio Penales - D

1   this dorm?"  To my friend.

2       That was just weird because Audrey has lived there for as

3   long as I have, and we're both pretty active in that community.

4   So I thought it was absolutely absurd for him to be stopping

5   one of my friends, especially when further down the hall there

6   was a group of, like, eight, or so, guys with a bunch of girls

7   who lived in, like, the dorms, and they were leaving, but he

8   didn't stop them.  And visitation times only apply to guys on

9   the girls' side.  So I don't really know what the issue with

10  that was, but I just felt so, like -- I don't know.  Like, that

11  was just wrong.  I thought it was.

12  Q.   Did it feel like you were being targeted because you were

13  with someone of the same sex and you were both part of the

14  LGBTQ community?

15  A.   Yeah.  I felt targeted, shamed.  I don't know.  He came

16  out for no reason at all especially because he should have

17  known that that student lived in that dorm.

18      Yeah, I know I felt so embarrassed for some -- for no

19  reason at all.  I don't know.  I was so demoted.  But, yeah,

20  that was one instance.

21      There's been a few with professors, as well, where they

22  kind of just treat you a little differently.  I know this made

23  me -- there's one woman professor, who I'm actually still in

24  her class, she makes me more uncomfortable than any other

25  professor I've ever had because she teaches in a women and

Bonifacio Penales - D

1  gender studies class, literally talking about equality every
2  single class time.  But she targets me in class, and I don't
3  know if it's because I'm Asian or if it's because I'm part of
4  the community, but she would make sure to especially crane her
5  neck over my desk to make sure I'm not working on anything
6  else.
7       There was one instance where we were studying outside and
8  we were spaced out enough to not have masks on.  We were
9  vaccinated, and so I didn't have my mask on, and neither did
10 she.  She was in the middle of lecture.  She just stops, and
11 she's just looking dead at me, and she goes, "Why are you
12 staring at me?  It's scaring me," in front of the whole class.
13 And, I don't know, I felt like I wanted to throw up after that,
14 but I was -- I was like "It's because you're talking, and I'm
15 trying to pay attention," but just having to stop in the middle
16 of class to say that -- I don't know.  I hated the way it made
17 me feel, and no student should be feeling like that, especially
18 when they're just trying to pay attention, so --
19 Q.   Thanks for sharing that.
20      I want to ask a little bit about kind of the general
21 culture at Baylor around dating, if there's, like, a Ring by
22 Spring type culture there, and are heterosexual students
23 allowed to, you know, display affection and that kind of a
24 thing?  Can you talk a little bit about that?
25 A.   Yeah, Ring by Spring is definitely something that is

Bonifacio Penales - D

1    celebrated here.  There's also something called an MRS degree
2    that people say exists on campus; but, yeah, like, people get
3    engaged in the middle of campus all the time if they're in a
4    heterosexual relationship.  So stuff like that is seen all
5    throughout campus.  PDA is very much a thing between
6    heterosexual individuals on campus, and it's pretty much, like,
7    normal for them too.  But if anyone in the LGBTQ community were
8    to do it, you know, they would get some weird looks or, like,
9    somebody would say something about how they should stop.
10       I remember one instance I was walking across the student
11   union building, and there were two guys who happened to just,
12   like, share a kiss, and they were told to put their masks on.
13   I thought that was interesting because nobody else talks about
14   masks any other time, so --
15   Q.   Veronica, would you feel safe or comfortable showing a --
16   you know, nonsexual affection, whether holding hands or, you
17   know, cuddling someone who is of the same sex, like a partner
18   of the same sex?  Would you feel safe and comfortable doing
19   that or not?
20   A.   I wouldn't.  We've also talked about, within Gamma groups,
21   how a lot of us aren't, just because the call-out itself causes
22   a lot more pain than them just, like, just not being -- we
23   would rather not have to show our affection if the call-out
24   that results from it just causes pain.  We will save that for
25   somewhere else, which is sad, because it shouldn't be that way.

Bonifacio Penales - D

1  Q.   All right.  Veronica, I'm going to try to show you a few

2  documents.  So I'm going to put them here on the screen.  The

3  first document I would like to go over with you is the Baylor

4  University Statement on Human Sexuality, and this is on -- this

5  is on plaintiffs' exhibit list as Baylor policy language.  I

6  would like to introduce this as Exhibit No. 5.

7         THE COURT:  Hearing no objections, it'll be received.

8  BY MR. SOUTHWICK:  (Continuing):

9  Q.   All right.  Veronica, this is Exhibit No. 5, and I imagine

10 that you are at least somewhat familiar with Baylor's Statement

11 on Human Sexuality.  So have you seen this before?

12 A.   I have, yes.

13 Q.   All right.  And I'm just going to read a few -- a couple

14 parts of it.

15       So, first of all, it says, "Baylor University welcomes all

16 students into a safe and supportive environment in which to

17 discuss and learn about a variety of issues, including those of

18 human sexuality."

19       Would you say that that statement feels true for you?  Do

20 you feel like it's a safe and supportive environment, or do you

21 have a different perspective?

22 A.   I don't think that's true.  I think it's a very

23 pick-and-choose environment.

24 Q.   The statement goes on to say "The University affirms the

25 biblical understanding of sexuality is a gift from God.

Bonifacio Penales - D

1   Christian churches across the ages and around the world have

2   affirmed purity and singleness and fidelity in marriage between

3   a man and a woman as the biblical norm.  Temptations to deviate

4   from this norm include both heterosexual sex outside of

5   marriage and homosexual behavior."

6        I would like to ask you about that phrase "homosexual

7   behavior."  Do you feel like you have an understanding of what

8   is permitted or not permitted for people who are bisexual or

9   gay or lesbian at Baylor?

10  A.   No.  Because, specifically, I don't know sometimes what

11  they mean by "behavior," because sometimes people get yelled at

12  for trivial things with, like, in the context of homosexual

13  behavior, but I know for sure that me and the whole community

14  here, we just know that it's not allowed.  Anything.  And

15  Baylor has -- like, they can say, "You standing this close to

16  her is not allowed."  Essentially, that's what it feels like.

17  But they don't really give us specific dictations about what

18  "behavior" is defined as.  We just know that homosexuality is

19  not allowed.  That's the vibe of the whole university.

20  Q.   Does it feel like Baylor is essentially, you know,

21  criminalizing same-sex relationships and identities for its

22  LGBTQ students on campus?

23  A.   Yes.

24  Q.   Is it true that you could be subjected to discipline if

25  you are turned in for engaging in homosexual behavior?

Bonifacio Penales - D

1  A.   I haven't seen it, but I know it's true.  Yeah, I haven't
2  seen it.
3  Q.   Now I'd like to ask about this final line here.  "It is
4  thus expected that Baylor students will not participate in
5  advocacy groups which promote understandings of sexuality that
6  are contrary to biblical teaching."
7       Is it your understanding that this is the part of Baylor's
8  policy that is used to deny the LGBTQ student club on campus?
9  A.   Yes.  But I don't think it's a valid argument because we
10 have never been an advocacy group.  We have always been a
11 support group, and it just feels like Baylor thinks that the
12 way we support students is our advocacy when it's clearly not
13 that case.  Nobody's pushing for a, quote/unquote, "gay
14 agenda."
15 Q.   All right.  The second page of the Baylor policy language
16 document that we have is this sexual conduct, and this -- this
17 is from the Student Code of Conduct book.  And, let's see, the
18 policy is very similar to the language we read from the human
19 sexuality statement; however, this is in terms of what students
20 can or cannot be punished for, and it says, "thus, It is
21 expected that Baylor students, faculty, and staff will engage
22 in behaviors consistent with this understanding of human
23 sexuality."
24      How does that make you feel as a member of the LGBT
25 community, knowing that not only does Baylor have this human

Bonifacio Penales - D

1  sexuality policy but it also has essentially a criminal code of

2  conduct for you about sexual conduct?

3  A.    Yeah, I think it's just wrong.  It makes me feel like

4  Baylor honestly just doesn't care about its LGBTQ students or,

5  like, a lot of its students.  It's just so backwards.

6  Q.    At the end of this policy language, the University states

7  that under no circumstances may this policy be construed to

8  waive any of the rights granted to Baylor University under the

9  exemption issued to the University on September 26, 1985, by

10  the U.S. Department of Education, covering certain regulations

11  under Title IX of the Education Amendments of 1972 or under the

12  religious exemption Section 702 Title VII of the Civil Rights

13  Act of 1964.

14      Veronica, are you generally familiar with Title IX and its

15  prohibition on sex discrimination?

16  A.    Yes.

17  Q.    And do you have an understanding of whether or not Baylor

18  has asserted any type of religious exemption to allow it to not

19  comply with certain parts of Title IX?

20  A.    Yes?  Yes.

21  Q.    I could say that in a different way.

22  A.    Okay.

23          MR. SOUTHWICK:  Let's go ahead and pull up the Baylor

24  religious exemption.  So I would like to introduce the Baylor

25  Exemption Assurance as Exhibit No. 6.

Bonifacio Penales - D

1          Any objections?

2                MR. LIPPELMANN:  No objection from the religious

3    school intervenors.

4                THE COURT:  Thank you.  It will be received.

5    BY MR. SOUTHWICK: (Continuing):

6    Q.   All right.  Veronica, I'm not going to -- this is

7    Exhibit No. 6.  I'm not going to make you answer a lot of

8    detailed questions about this document.  You can see on the

9    first page here that this is a document from 1976, at least,

10   from Baylor University to the Department's Office of Civil

11   Rights.  And this is well before you were born; so I'm not

12   going to ask you too much here about it, but I did want to go

13   through it a little bit.

14          And, essentially, as you look through this document, it

15   talks about Baylor's views on premarital unchastity, on

16   pregnancy, termination of pregnancy, and a variety of other

17   factors.  And this is the document that Baylor used to get a

18   religious exemption from compliance with certain aspects of

19   Title IX regarding those issues.

20          And then you can see that the -- further down, that this

21   was responded to quite a bit later, about ten years later, by

22   the Department of Education, and in there -- on the screen it

23   says, "Baylor University is hereby exempted from the

24   requirements of certain sections of the Title IX regulations,"

25   and then it lists those specifically.

Bonifacio Penales - D

1    I can represent to you that there's nothing in here

2  specifically about gender identity or human sexuality, but it

3  does discuss sexual immorality in general.

4    As a student at Baylor University, as -- as a woman, as a

5  member of the queer community, how does it feel knowing that

6  Baylor has historically sought and received a religious

7  exemption from Title IX from the Department of Education?  How

8  does that feel for you as a student?

9  A.    I don't think it's right, and I also don't think the

10  Department of Education is granting its exemptions.

11    Baylor doesn't deal with minority issues in a way that

12  should be dealt with.  We obviously know how they're dealing

13  with LGBTQ issues.  Don't -- women's issues on campus are --

14  like, they have been historically not good.  So, like, I

15  honestly don't understand why Baylor has been receiving such

16  exemptions.

17    And if they continue to receive exemptions, then they

18  should be held accountable for what those exemptions mean on

19  behalf of actually supporting and caring for its students.

20  Q.    Does it make you feel less safe as a student at Baylor

21  knowing that Baylor has in the past and could again get a

22  religious exemption to immunize itself from complying with

23  Title IX?

24  A.    Yes.  Especially now that we have no other basis of

25  getting Baylor to be held accountable or, like, no other

Bonifacio Penales - D

1   support from people who are supposed to be caring about our

2   education in a supportive environment.  Who are we supposed to

3   ask for help now if Baylor doesn't listen?

4   Q.   And if Baylor doesn't listen and -- what if the government

5   doesn't listen to you either?

6   A.   Then that feels terrible.  Obviously, just hearing that is

7   scary, but that's what it kind of feels like right now, so --

8   Q.   Well, Veronica, the last document I would like to ask you

9   about is the Title IX complaint that you filed, and I've got it

10  up here right now.  And this is listed on plaintiffs' exhibit

11  list as Veronica Penales' Title IX Complaint.  I would like to

12  introduce it as Exhibit No. 7.

13             MR. DAVIS:  No objection from the federal defendants.

14             THE COURT:  Thank you.

15       Anything from the intervenors?

16       Hearing nothing, it will be received.

17  BY MR. SOUTHWICK:  (Continuing):

18  Q.   All right.  Veronica, can you see the Title IX complaint I

19  have up here on the screen?

20  A.   Yeah.

21  Q.   And have you seen this document before?

22  A.   Yes.

23  Q.   And this is the Title IX complaint that you filed with the

24  Office of Civil Rights; is that correct?

25  A.   Yes.

Bonifacio Penales - D

1  Q.    And it looks like -- if we kind of look down here, it

2  looks like you filed it -- keep on going down -- on July 23 of

3  2021.  So that is this year.  Does that sound about right?

4  A.    Yes.

5  Q.    And in it you describe a lot of the experiences that you

6  shared with the Court today, and I want to ask you, you know,

7  why -- why did you file this Title IX complaint; and, you know,

8  what are you hoping comes out of it?

9  A.    Right.  So Baylor is trying to become a Tier 1 research

10 university.  It's trying to up its reputation as this

11 university that is amazing and cares about its students and

12 pushes for diversity and inclusivity, commitments, and policy.

13 Everything that sounds right on paper.  But I took part in this

14 lawsuit essentially because Baylor needs to realize what it's

15 doing, how it's hurting its students, and how its perpetuating

16 such a harmful and toxic educational environment for minority

17 students, especially students in the LGBTQ community.

18     I just don't think it's right for it to continue kind of

19 subjecting all of its students to harrassment and

20 discrimination and other harms on campus when, even if we are

21 willing to report these issues, nothing -- nothing gets done.

22 So where's the support there?

23     I don't know.  I just think it's not right not to -- it's

24 just not right to be continuing this kind of environment where

25 we get discriminated against, and there's nothing that gets

Bonifacio Penales - D

1   done.   But Baylor can continue to keep pushing and saying that

2   they're doing everything they can in the name of diversity and

3   inclusivity when it's clearly not true.

4   Q.   Veronica, would it make you feel safer and like your

5   rights would be protected if the Federal Government was willing

6   to hold Baylor accountable for any violations of Title IX that

7   you have reported?   Would that make you feel safer and like

8   your rights were more protected?

9   A.   Yes.   Because that would honestly make me feel like I'm

10  protected by the law, which I should be as a student in

11  America.   It also tells me that the government doesn't care

12  about people's rights to discriminate versus a student's right

13  to exist on a campus like Baylor.

14          MR. SOUTHWICK:   Well, thank you very much, Veronica,

15  for sharing your experiences with us.   I know that some of them

16  are difficult to talk about.

17      I don't have any further questions for you right now.   So

18  I'll turn it over to counsel for other parties.   They might

19  have some other questions for you, and that's -- that's it for

20  me for now.   Thank you.

21          THE COURT:   Mr. Davis?

22  ///

23

24

25

Bonifacio Penales - X

1                           CROSS-EXAMINATION

2    BY MR. DAVIS:

3    Q.    Good afternoon.  Just a few questions.  You testified that

4    you filed your Title IX complaint with the Department of

5    Education a few months ago; is that correct?

6    A.    Yes.

7    Q.    And, to your knowledge, is that complaint still pending

8    with the Department of Education?

9    A.    I'm not sure.

10   Q.    Okay.  Have you heard that it was denied?

11   A.    I have not.

12   Q.    Have you filed any lawsuit directly against Baylor?

13   A.    No.

14            MR. DAVIS:  Thank you.  That's all I have.

15            THE COURT:  For the intervenors?

16            MR. SCHAERR:  Yes, Your Honor.

17

18                           CROSS-EXAMINATION

19   BY MR. SCHAERR:

20   Q.    And hello, Ms. Penales.  Thank you for taking the time to

21   speak with us today.  You're obviously very bright and

22   articulate and would make a great lawyer if you choose that

23   path.

24        I have just a few questions, and I hope you won't take any

25   of them as denigrating in any way of the pain and distress that

Bonifacio Penales - X

1  you have described for the Court today.  Is that okay?

2  A.    Absolutely.

3  Q.    Okay.  Now, despite the pain that you have experienced at

4  Baylor, am I correct that you have no information suggesting

5  that the Department of Education ever directed Baylor to enact

6  the policies that you object to?

7  A.    No.  But has the DOE yelled at Baylor for having these

8  policies in place?  I feel like there should be some kind of

9  accountability for its universities.

10  Q.    So your complaint, to the extent it involves the

11  Department of Education, it's that they failed to do something

12  that you think they should have done; is that correct?

13  A.    Yes.

14  Q.    Is that fair?

15  A.    Yes.

16  Q.    Okay.  Are you aware of the Department ever directly

17  encouraging students or faculty, or others, to discriminate

18  against others of the LGBTQ community?

19  A.    No.

20  Q.    And are you also aware that the Department considers

21  Title IX to protect LGBTQ students from discrimination?

22  A.    Yes.  But not Baylor's Title IX.

23  Q.    Okay.  Now, if -- if your lawsuit or the lawsuit that

24  you're participating in were successful in eliminating the

25  religious exemptions applied to LGBTQ students, are you aware

Bonifacio Penales - X

1    that Baylor would be free to retain its positons on marriage

2    and sexuality?

3                    MR. SOUTHWICK:  Objection.  Speculation.

4    BY MR. SCHAERR: (Continuing):

5    Q.    Well, what is your understanding of the effect of

6    abolishing Baylor's Title IX exemption?

7                    MR. SOUTHWICK:  Same objection.  Calls for a legal

8    conclusion.

9                    THE COURT:  She may not know.  Do you have any idea?

10                   THE WITNESS:  I have no idea.

11                   THE COURT:  Go ahead.

12   BY MR. SCHAERR: (Continuing):

13   Q.    But if Baylor lost the ability to offer federal financial

14   assistance to its students, that would make it more difficult

15   for LGBTQ students and all other students who may want to

16   attend Baylor to do that.  Is that -- is that correct?

17   A.    It's already difficult for us.

18   Q.    Okay.

19   A.    Yeah.

20   Q.    All right.  Now, Ms. Penales, you knew at the time that

21   you entered Baylor that it was a Baptist school; right?

22   A.    Right.

23   Q.    And you obviously chose to attend; right?

24   A.    Right.

25   Q.    And you have been able to remain there or you have

Bonifacio Penales - X

1   remained there for a couple of years now; right?

2   A.    Right.

3   Q.    And when you started school at Baylor, you understood that

4   Baylor had this Statement on Human Sexuality that we have

5   discussed before; right?

6   A.    Right.

7   Q.    And did you understand that Baylor considered that

8   statement to be grounded in the Bible?

9         MR. SOUTHWICK:  Objection.  Speculation.

10        THE WITNESS:  Yes.

11        THE COURT:  Overruled.  She answered the question.

12   BY MR. SCHAERR: (Continuing):

13   Q.    And you understood, did you not, that all Baylor students

14   were expected to live according -- to live in according -- I'm

15   sorry -- to live in accordance with that statement; correct?

16   A.    Correct.  But I also don't think that students should be

17   subjected to discrimination even if those policies are in

18   place.

19   Q.    Okay.  So I -- I gather from that and other comments that

20   you have made, that you disagree with some of Baylor's beliefs

21   about human sexuality.  Is that fair?

22   A.    Yes.  Yes.  I think the university can have a human

23   sexuality statement put in place but still protect its students

24   from discrimination.

25   Q.    Okay.  Well, let's look again at Baylor's statement.  I

Bonifacio Penales - X

1    think this is Plaintiffs' Exhibit 5.  And let's -- let's look
2    at the -- at the second sentence, which says that Baylor,
3    quote, "affirms the biblical understanding of sexuality as a
4    gift from God."
5        Did I read that correctly?
6    A.   Yes, you did.
7    Q.   Okay.  And Mr. Southwick also read portions of this to you
8    earlier, and he read the remainder of the paragraph which talks
9    about Christian churches across the ages and around the world
10   having affirmed purity and singleness and fidelity in marriage
11   between a man and a woman as the biblical norm.
12       You're familiar with that statement; right?
13   A.   Very much so.
14   Q.   And it goes on to say that temptations to deviate from
15   this norm include both heterosexual sex outside of marriage and
16   homosexual behavior; right?
17   A.   Right.
18   Q.   And you understand that that statement is also based on
19   Baylor's understanding of the Bible?
20   A.   Yes.
21   Q.   Okay.  And do you agree, in whole or in part, with that
22   statement?
23   A.   No.  I think that if we're reading policy for policy, we
24   should also look at the commitment to diversity policy that
25   Baylor has where it says love thy neighbor are not just words.

Bonifacio Penales - X

1  They're not just words; they are way of life.  Baylor's policy
2  is confusing.  So I understand why we're kind of reading it
3  sentence by sentence, but I don't agree.
4  Q.   Okay.  So which -- which portion of this policy do you
5  disagree with?
6  A.   Well, essentially, Baylor is saying it's welcome to all
7  students in a safe and supportive environment.  Bottom line,
8  it's not that way for all students because it's not for the
9  LGBTQ community.  I can go as far as saying it's not that way
10  for minority students as well.
11      Also, the ability to discuss and learn about a variety of
12  issues, including those of human sexuality, we have had
13  multiple talks with Baylor leadership.  Granted, the students
14  are receptive to these talks.  It just seems like the Baylor
15  leadership isn't.
16      Great.  They understand the Bible's norms.  I agree with
17  that.  The Bible could be translated to say that the norm is
18  between a man and a woman for marriage, but I don't think that
19  it can say homosexual behavior is not allowed when it also
20  states that heterosexual sex outside of marriage is not
21  allowed, when clearly some behavior that has been shown on
22  campus is indicative of heterosexual sex.  There's a lot that
23  can be, you know, used.
24  Q.   So you -- so it sounds like you disagree with Baylor when
25  they -- when they say that heterosexual sex outside of marriage

Bonifacio Penales - X

1  and homosexual behavior should be avoided.  Is that fair?

2  A.    Yes.

3  Q.    Okay.  And do you think that Baylor is misunderstanding

4  the Bible when it says that?

5  A.    I don't know how Baylor interprets the Bible.

6          MR. SOUTHWICK:  Objection.  This is harassing

7  Veronica.

8          THE COURT:  The objection is sustained.  Let's move

9  on.  I don't know that this is helpful to what I have to

10  decide.

11          MR. SCHAERR:  Okay.

12  BY MR. SCHAERR: (Continuing):

13  Q.    Okay.  Let's turn now to a document that has been marked

14  for identification as CCCU Exhibit 13, and if we could -- my

15  colleague, Josh, will share that on the screen.

16      Ms. Penales, can you read the title of that document?

17  A.    Human Sexuality at Baylor University.

18  Q.    Okay.  And are you familiar with that document?

19  A.    I don't think that I have -- oh, yes.  Very much so.

20  Q.    Okay.  So let's look at the -- at the last few sentence --

21  sentences of the first paragraph, which says that Baylor

22  acknowledges the complexity of issues surrounding human

23  sexuality and desires to engage in this conversation with

24  humility, prayerfulness, and convicted civility.

25      Do you see that portion of the statement?

Bonifacio Penales - X

1   A.   Yes, sir.

2   Q.   And then they go on to say, "We believe Baylor is in a

3   unique position to support our students, including those who

4   identify as LGBTQ, because of our Christian mission and the

5   significant campus-wide resources available."  Is that -- is

6   that correct?

7   A.   It's --

8            THE COURT REPORTER:  I'm sorry.  You froze.  I didn't

9   get the answer.

10           THE COURT:  She didn't get the answer to the last

11   question before this question.

12           THE WITNESS:  Sorry.

13           THE COURT:  So, Jill, maybe it's helpful --

14           THE WITNESS:  I believe I answered that the document

15   does indeed say what the gentlemen read above.

16           MR. SCHAERR:  Okay.

17           THE COURT:  Thank you.

18   BY MR. SCHAERR: (Continuing):

19   Q.   And so it's fair to say that according to this document

20   Baylor welcomes those who identify as LGBTQ; correct?

21   A.   According to the document, yes; according to Baylor,

22   actually, absolutely not.

23   Q.   Okay.  And I assume you're aware that there's some

24   religious schools that would kick a student out merely for

25   identifying as LGBTQ; is that correct?

Bonifacio Penales - X

1  A.   Yes.  Does that university still have the same exemption
2  as Baylor?
3  Q.   And consistent with Baylor's guiding principles that we
4  have read, you have been allowed to remain at Baylor despite
5  identifying as LGBTQ; isn't that correct?
6  A.   It is correct.
7  Q.   And Baylor merely asked that while you're a student that
8  you refrain from violating its Statement on Human Sexuality.
9  Is that accurate?
10 A.   I merely asked not to be discriminated against as a
11 student; but, yes, that would be accurate.
12 Q.   Okay.  And that's because, given it's Christian theology
13 or its understanding of Christian theology and its worldview,
14 it believes that the Statement on Human Sexuality reflects
15 biblical principles; right?
16         MR. SOUTHWICK:  Objection.  You keep asking her to be
17 a Baylor witness, but that's causing speculation.
18         MR. SCHAERR:  I'm just asking her her understanding
19 of Baylor's position.
20         THE COURT:  Go ahead and answer.
21         THE WITNESS:  I do understand Baylor's position.
22 BY MR. SCHAERR: (Continuing):
23 Q.   And you understand that it's based on Baylor's Christian
24 theology and worldview as they understand it; correct?
25 A.   I will say I don't know how to answer that question

Bonifacio Penales - X

1  because I don't understand Baylor's Christian worldview because

2  it's so hypocritical.  It does -- it says one thing and it says

3  another, so --

4  Q.   But you understand that their position is based on their

5  understanding of Christian theology; right?

6  A.   Yes, but they don't have one Christian theology position.

7           THE COURT:  Let's move on.  It's not helpful to the

8  discussion, and it's not helpful to the decision-maker, and we

9  have been going since 9:00.  It's a quarter to 12:00, and we

10  have a number of witnesses remaining.

11           MR. SCHAERR:  Okay.  I have no further questions,

12  Your Honor.  Thank you.

13           THE WITNESS:  Thank you.

14           THE COURT:  You're welcome.

15       Redirect, Counsel?

16           MR. SOUTHWICK:  Nothing from me, Your Honor.  This is

17  Paul Southwick.

18           THE COURT:  Thank you.

19       Thank you very much for your time and your testimony.  I

20  believe you are excused.

21       And I'm happy to start another witness, and we'll go at

22  least 15, or so, minutes and get started.

23           MR. SOUTHWICK:  All right.  Thank you, Veronica.

24           THE WITNESS:  Thank you.

25           MR. SOUTHWICK:  Plaintiffs' next witness is -- we can

Bonifacio Penales - X

1   go ahead and get started with.  This is going to be one of our

2   expert witnesses.  Dr. Ilan Meyer.  And we can go ahead and get

3   started.

4           THE COURT:  I kind of hate to start with your

5   expert -- you know, taking that expert's time and bifurcating

6   it -- because we'll need to take a lunch break.  You don't have

7   another student witness that you can start with?

8           MR. SOUTHWICK:  I -- I could check.

9       What I would propose is we could start with Dr. Meyer and

10  kind of get into his background and credentials and then we can

11  dive into more of the meat of it after lunch.

12          THE COURT:  That's fine.  Let's do that so we use the

13  time.

14          MR. SOUTHWICK:  All right.  Dr. Meyer, I believe

15  you're on, if you could start your video up.

16          THE COURT:  If you would -- if he would start to

17  speak, he would -- and his video is on, he will emerge on my

18  screen, but right now I don't have anybody.

19          MR. SOUTHWICK:  All right.  Dr. Meyer, are you there?

20      Sorry, Your Honor.  It says he's on.  I don't think

21  anybody can see him.  So we're going to give him a call and see

22  if he's having a tech issue here.

23          THE COURT:  Sure.

24          MR. SCHAERR:  Your Honor, if I could take a moment

25  before we get to Dr. Meyer.  I neglected to move -- move for

Bonifacio Penales - X

1   the admission of Exhibit 13.  CCU Exhibit 13.  I would like to
2   do that at this time.
3           THE COURT:  Any objection?
4       Hearing none, it's received.
5           MR. SCHAERR:  Thank you, Your Honor.
6           THE COURT:  All right.  You're here, but your video
7   and microphone are not connecting.
8           MR. SOUTHWICK:  Just an update.  We can see Dr. Meyer
9   on the list of participants, but we cannot hear you.
10          THE COURT:  Looks like he's muted.
11          MR. SOUTHWICK:  We see you, Dr. Meyer.  We can't hear
12  you.  You have to unmute your audio.  That's it.  Oh, I thought
13  I could --
14          THE COURT:  He should pop up as a full screen, but
15  it's not happening.
16          MR. SOUTHWICK:  We could have him dial in.  We could
17  send him the dial-in information so he can call from his phone.
18          DR. MEYER:  I can do that.
19          MR. SOUTHWICK:  Oh, we can hear you now.
20          THE COURT:  I can't hear him.  So --
21          DR. MEYER:  Can you hear me?
22          THE COURT:  Now, a little bit, but not very well.
23          DR. MEYER:  I don't know what else I can do on my
24  side.
25          THE COURT:  Jill, are you able to hear?

Bonifacio Penales - X

1          DR. MEYER:  Do you want me to call in?

2          THE COURT REPORTER:  Yes, I can, Your Honor.

3          THE COURT:  It's a volume issue for me.  I can hear

4  you if I listen carefully.

5          MR. DAVIS:  This is Elliott Davis.  When we dialed

6  in, it seems like the audio is better for the Court.  That

7  might be a good course of action here.

8          DR. MEYER:  I can try to dial in.  I have the

9  information.

10          THE COURT:  I think for the purposes of what we're

11  going to do on the gathering of the vitae and expertise, why

12  don't we just go ahead, and then maybe we can call in for the

13  afternoon portion.

14          MR. SOUTHWICK:  All right.

15          DR. MEYER:  Okay.

16          MR. SOUTHWICK:  Okay.  You sound a little bit better,

17  Dr. Meyer.  That's good.  Just speak as -- you know, speak up

18  as you can.

19      Plaintiffs are ready if you want to swear in the -- if the

20  Court would like to swear in the witness.

21          THE COURT:  If he will speak again, he will move into

22  the picture.  Could you say -- could you say something, please,

23  Dr. Meyer?

24          MR. SOUTHWICK:  We just lost him.

25          THE COURT:  Dr. Meyer, are you there?

Bonifacio Penales - X

1      Now I don't have any sound.

2          MR. SOUTHWICK:  Yeah, I don't see him.

3          THE COURT:  I think this might be a message.  Maybe

4 we should take our noon recess now and see if we can get IT to

5 work on it when they're not under the gun right now, and we

6 should be maybe up and running.  Everything is kind of

7 resolved.  So I think we should be able to make it work.

8      Why don't we come back at 1:00.

9          MR. SOUTHWICK:  All right.  Thank you, Your Honor.

10         THE COURT:  Thank you.  We're in recess.

11                 (Lunch break taken.)

12         DEPUTY COURTROOM CLERK:  Hi.  This is Cathy.

13     Jill, are you there?  And is everyone ready?

14         THE COURT REPORTER:  I'm here, Cathy.

15         MR. SOUTHWICK:  Paul Southwick for the plaintiffs.  I

16 think plaintiffs are ready to go.

17         MR. DAVIS:  Federal defendants are ready.

18         MR. SCHAERR:  Intervenor CCCU is ready to go.

19         MR. LIPPELMANN:  Intervenor religious schools are

20 also prepared.

21         DEPUTY COURTROOM CLERK:  Great.  Thank you.

22         THE COURT:  Do we have everything worked out on the

23 technology end?

24         MR. SOUTHWICK:  Yes, Your Honor.  This is

25 Paul Southwick.  We do.

Meyer - D

1          THE COURT:  Great.  All right.  So call your witness.

2          MR. SOUTHWICK:  All right.  Plaintiffs' next witness

3    is Dr. Meyer.

4          THE COURT:  Mr. Meyer, you have yet to appear on my

5    screen, so I -- there you are.  There.  As soon as you speak,

6    you will pop up, but you weren't speaking.

7       I'll ask you to raise your right hand.

8

9                     DR. ILAN MEYER,

10   called as a witness in behalf of the Plaintiffs, being first

11   duly sworn, is examined and testified as follows:

12

13         THE WITNESS:  I do.

14         THE COURT:  Thank you very much.  For the court

15   reporter, would you please state your full name and spell your

16   last.

17         THE WITNESS:  Ilan Meyer, M-e-y-e-r.

18         THE COURT:  Go ahead.

19

20                  DIRECT EXAMINATION

21   BY MR. SOUTHWICK:

22   Q.   Thank you, Dr. Meyer.  I appreciate you being here today.

23   Do you understand that you are being called by plaintiffs as an

24   expert witness today?

25   A.   I do.

Meyer - D

1  Q.    All right.  Before I ask the Court to formally qualify you

2  as an expert, I'm going to ask you a few questions about your

3  background.

4       Where are you currently employed and in what capacity?

5  A.    I'm a distinguished senior scholar at UCLA Criminal Law

6  Williams Institute in Los Angeles, California.

7  Q.    And can you --

8       In Los Angeles, California.  Great.

9       Can you inform the Court or explain to the Court what the

10 Williams Institute is?

11 A.    We're a research center that focuses on sexual orientation

12 and gender identity policy and law issues.

13 Q.    And how long have you been at the Williams Institute?

14 A.    Ten years.

15 Q.    And prior to your time at the Williams Institute, were you

16 at Columbia University in New York City?

17 A.    Yes.  I was a professor at Columbia University in

18 sociomedical sciences.

19 Q.    And is that also where you received your Ph.D.?

20 A.    It is.

21 Q.    And what is your Ph.D. in?

22 A.    It's in sociomedical sciences, which is an

23 interdisciplinary program in public health and social science,

24 and my social science is social psychology.  So it's a

25 combination of social science theories and information and

Meyer - D

1   public health, specifically bibliological methods of
2   investigation of population health.
3   Q.   Great.  And did you prepare a report in advance of today's
4   hearing?
5   A.   I did.
6           MR. SOUTHWICK:  All right.  I have pulled up
7   Dr. Meyer's expert witness report on my screen here, and it's
8   at the end of plaintiffs' exhibit list.  So I would just like
9   to formally introduce Dr. Meyer's report to be admitted as
10  Plaintiffs' Exhibit No. 8.
11          THE COURT:  Any objections?
12          MR. DAVIS:  The federal defendants object on hearsay
13  grounds, Your Honor.
14          THE COURT:  Anyone else?
15      It'll be received, and the objection is overruled.
16  BY MR. SOUTHWICK: (Continuing):
17  Q.   All right.  Dr. Meyer, I pulled up Exhibit No. 8, which is
18  your expert report.  You may also have a copy in front of you.
19  I'm going to go through some of this throughout the day, but
20  first I would like to just look at paragraph 6 of your report,
21  which talks about your area of study.  A lot of us are not
22  familiar with this area of social epidemiology or social
23  science.  So can you just explain a little bit more regarding
24  paragraph 6 and your particular area of expertise in this
25  field?

Meyer - D

1   A.    Yes.   So epidemiology is the study of diseases and
2   patterns and risk factors for such diseases, and social
3   epidemiology specifically looks at social conditions, social
4   arrangements, legal policy issues, and how they impact
5   population health.   And by "population health," I mean to
6   differentiate it from clinical care, which is it's focusing on
7   individual patients.
8   Q.    And your particular expertise in this area, is it with the
9   lesbian, gay, bisexual, and transgender community, otherwise
10  known as the LGBT community?
11  A.    Yes.
12  Q.    How long have you been studying or producing academic
13  research and literature on this topic?
14  A.    Really my entire career.   I started working on some of
15  those issues from my dissertation work, which was completed in
16  1992.   And I have been working on these and other related
17  issues since then, including issues related to race, ethnicity,
18  gender, and sexual orientation.
19  Q.    And have you published in this field?
20  A.    Yes, I have.
21  Q.    And approximately how many academic -- peer-reviewed
22  academic papers would you say that you have published in
23  this -- in this field?   Just an approximate number.
24  A.    I think about 120 or 130 published peer-reviewed journals
25  and maybe some more in the form of chapters and books.

Meyer - D

1  Q.   All right.  And you were retained by plaintiffs to provide

2  some particular testimony relating to today's proceeding; is

3  that true?

4  A.   Correct.

5  Q.   So I would like to refer you to paragraph 17 of your

6  report where it notes that you have been asked by counsel to

7  provide an opinion about the impact of social environment on

8  the health and well-being of LGBT people; in particular, young

9  people, like plaintiffs, who are at high schools and

10  educational institutions for higher education at the time of

11  incidents related to this litigation.  Is that your

12  understanding of the scope of your testimony today?

13  A.   It is.

14       MR. SOUTHWICK:  So, Your Honor, I would like to offer

15  Dr. Meyer as plaintiffs' expert witness for the scope of the

16  testimony just described.

17       THE COURT:  Hearing no objection, that's noted and

18  granted.

19  BY MR. SOUTHWICK: (Continuing):

20  Q.   All right.  Dr. Meyer, you've provided this report.

21  You've discussed some of the work that you have done in this

22  field, and now I would like to walk through parts of your

23  report.

24       Since we have limited time in today's proceedings, I'm not

25  going to go through each and every paragraph.  You have

Meyer - D

1    provided a very detailed report and the Court and all counsel

2    have a copy of that.  But I would like us to go ahead and start

3    a little bit on paragraphs -- starting at paragraph 28, and so

4    I will just give everyone a moment to get to this section.

5         And this is towards the beginning, where you discuss

6    homosexuality, sexual identity, and gender identity.  We have

7    been using a lot of terms in the litigation.  Sexual and gender

8    minorities or LGBTQ, sexual orientation, gender identity.  Just

9    as we're getting started today, could you provide some

10   clarification to these terms, as you understand them, and

11   outline them in this section of your report?

12   A.    Yes.  So as I indicated, actually, in 29, sexual

13   orientation is defined in at least three ways:  Sexual

14   behavior, attraction, and identity.  The term "sexual

15   minorities" generally would reflect people who are -- have

16   interest in or have actually had behavior, meaning sex, or are

17   identified as LGB or some word that is similar to the -- not

18   similar, but is suggestive of the same concept of same-sex

19   interest.  There are terms, such as "queer" and "pansexual,"

20   that would go under the same umbrella.

21        Homosexuality is, of course, an older term that refers to

22   a similar concept.  Gender identity refers, again, to

23   individuals whose gender is different than their sex assigned

24   at birth.  They can be transgender.  They can be not identified

25   as transgender; meaning, a transgender woman who was assigned

Meyer - D

 1  male at birth now identifies as a woman, not necessarily

 2  transgender, but we would include a person like that in the

 3  term "gender minority."

 4  Q.    Great.   Thank you for those explanations.

 5        I also want to turn to paragraph 31 in this section where

 6  you talk about homosexuality being classified as a mental

 7  disorder prior to 1973.  I don't need you to go on extensively

 8  about that, but can you explain what happened in 1973 with the

 9  classification?

10  A.    Well, prior to '73 there were a lot of studies and debates

11  within psychiatry, American psychiatry, that at the same time

12  were thinking about revising the classification system and,

13  among this research, was a new focus on homosexuality, which,

14  in the previous -- in the previous iteration of this manual,

15  homosexuality was classified as a mental disorder.

16        In 1973 it was removed from this classification so that

17  the next manual that was published after '73, in 1980, it was

18  removed and is considered now, both in the American and

19  worldwide medical and psychiatric profession, as a normal

20  expression of human sexuality.

21  Q.    So is it fair to say that there's consensus among the

22  scientific community that homosexuality is no longer considered

23  a pathology or a deviancy but is, in fact, now a normal or

24  healthy variant of sexuality?

25  A.    Yes.   Definitely.   For the past 20 to 50 -- 50 years,

Meyer - D

1  probably.

2  Q.   And has there been an understanding -- was there a

3  significant change in the scientific literature in your field,

4  after 1973 in terms of analyzing the LGBT population?

5  A.   Well, there were changes, including leading to 1973; and,

6  as I said, debates.  But the research in this field has been

7  evolving and continues to evolve, yes.

8  Q.   All right.  And people can experience their sexual

9  orientation or they can come to an awareness of their sexual

10  orientation at different stages of their lives.  And in

11  paragraph 34 you discuss how high school and college age, which

12  is the age of the young people -- most of the people who are

13  the plaintiffs in this case, most of them would fall within

14  that range.  You explain that high school and college is a

15  particularly vulnerable time for LGBT people.

16      Could you explain a little bit further why that is?

17  A.   Well, that has to do with the developmental tasks, as we

18  call them, of young people, which, at that age, involves kind

19  of figuring who you are, your identity; and this is, of course,

20  also a time where sexual feelings develop and many people begin

21  to identify as lesbian, gay, bisexual, or at least question

22  their heterosexual -- presumed heterosexual orientation because

23  most people presume heterosexual orientation until this is

24  beginning to be raised in their mind based on their experiences

25  as a question.  So that's why that is a particularly important

Meyer - D

1  period.

2  Q.    In the following paragraph, 35, you describe what I think

3  is commonly referred to as the coming -- coming-out process.

4      Could you discuss paragraph 35 a little bit?

5  A.    Yes.  It's consistent with what I just said.  People begin

6  to maybe question.  Sometimes it's more complicated and

7  difficult; sometimes less so.  But it is a process that

8  psychologists describe as "coming out" which doesn't refer only

9  to telling people about your sexuality, which is part of it,

10  but it's really referring to coming to terms with it and -- and

11  really, ideally, living to accepting yourself as a gay,

12  bisexual, or lesbian person in a healthy way that would allow

13  to develop relationships and achieve life goals.

14  Q.    And is it fair to say that for transgender or gender

15  nonconforming people that there's often a similar type of

16  coming-out process and that's what you describe generally in

17  paragraph 36?

18  A.    Yes.  It's a little different but similar in its

19  trajectory, where people who are transgender describe that it's

20  something they always knew but maybe were afraid to confront

21  until a particular point in time; and, by the way, those times

22  are changing with younger generations kind of moving earlier in

23  their lifespan, compared to older generations.  But it's a

24  similar process of needing to discover oneself and accept

25  oneself.

Meyer - D

1    Q.    So it sounds like it's fair to say that process is

2    happening earlier than in past generations.   Would you --

3    A.    Yes.

4    Q.    -- would you also say -- oh, go ahead.

5    A.    Sorry.  Go ahead.

6    Q.    Would you also say that younger people are coming out as

7    LGBT in greater numbers, as well, than in prior generations?

8    A.    Yes, that is correct.

9    Q.    Looking at paragraph 37, you talk about how the coming

10   process out -- the coming-out process -- excuse me -- how that

11   can look very different, depending on whether you are in a

12   supportive environment or not, whether that environment is your

13   home life, your religious community, or wherever you find

14   yourself, and you note in 37 that in contrast a rejecting

15   environment, such as family members or religious institutions,

16   can disrupt or delay the coming-out process and bring about

17   adverse mental and physical health outcomes and suicide

18   ideation and attempts.

19        Could you talk about that a little bit more?

20   A.    Yes.  So what brings about the adverse health outcomes is

21   the rejection.   And, you know, as I was saying before, during

22   the coming-out period, the person has been negotiating their

23   own feelings, their own sense of who they are, kind of

24   recognition that they might be a sexual minority.   They're gay

25   or lesbian or bisexual or queer, or whatever terms they use,

Meyer - D

1   and if they are in an environment where that is rejected,

2   obviously that makes the process of self-acceptance more

3   difficult.

4        I would say that in religious -- what I would call

5   nonaffirming religious organizations, if the person is a member

6   of such a religion or the family is, that makes it even harder

7   for both the person and the family, I would say, to accept a

8   person who is gay or bisexual or lesbian and to provide to them

9   a supportive environment and supportive messages that would

10  counteract what they have learned probably for their entire

11  life about homosexuality.

12  Q.   And when you -- when you discuss here the family structures

13  structures as well as religious institutions, would it also be

14  accurate to say that school environments, a religious school or

15  religious college or university environment that is a rejecting

16  or nonaffirming environment, would also -- could also disrupt

17  or delay the coming-out process?

18  A.   Yes.  Absolutely.

19       Again, high school and college.  College, in particular,

20  has a kind of different space in this process because that's

21  often the time where young people leave their home, maybe for

22  the first time.  Maybe they have new influences on their lives

23  and maybe, to some extent, more freedom to explore their

24  nonconforming gender or sexual identities.  So high school, I

25  think, is a little more difficult.  Again, it's much more

Meyer - D

1   difficult, depending on their home environment.  It could be

2   more welcoming to people who are in a more accepting high

3   school or family but very difficult if you are not in -- if

4   you're in a rejecting family or high school that doesn't have

5   any opportunities for affirmation or for even learning about

6   what it means to be lesbian, gay, bisexual, or transgender.

7   Q.   Thank you, Dr. Meyer.

8        I want to turn to the next section of your report, which

9   is entitled, "Minority Stress and the Health of LGBT People,"

10  and the first section, A, is "Stigma, prejudice, and

11  discrimination against LGBT people have been widespread."

12       For people, again, who are not familiar with the

13  literature in this area, could you give a general explanation

14  of your understanding of minority stress?

15  A.   Yeah.  Well, I mean, this section first discusses the

16  prevalence of an antigay, which we call homophobia or

17  anti-transgender, which is transphobia, feelings and ideologies

18  in many cultures and definitely in the United States, and that

19  is kind of the backdrop against which people who are LGBT have

20  to find ways to express themselves.

21       So that is just how -- the level of stigma and prejudice

22  that is -- differs by location, society, family; but it has

23  been, as I said, existing for many decades.

24       As far as minority stress, this is my first theoretical

25  work and then empirical work that comes to explain how that

Meyer - D

1    environment can impact the health and well-being of LGBT

2    people.  As I said before, this is the kind of social

3    epidemiological aspect of it where I've taken what we know

4    about disease causation -- for example, distress process is not

5    something unique, obviously, to LGBT people, but I have

6    examined it within the context of social processes, laws,

7    policies, and environments, and how that environment translates

8    into the experience of specific stressors in the lives of LGBT

9    people.

10   Q.    Thank you for walking us through that.

11         Let's go ahead and take a look at some of these paragraphs

12   in this section.  You mentioned 38, which talks about the

13   decades of stigma, and the second sentence in paragraph 38

14   talks about how LGBT and heterosexual cisgender people

15   internalize and sometimes even propagate stigma and stereotypes

16   about LGBT people.

17         Can you -- can you discuss what you mean by that?

18   A.    Well, just as I said, everybody in society is socialized

19   to varying degrees in the sense that heterosexuality is the

20   norm, is the accepted and preferred way, and so that

21   socialization applies to both straight cisgender and gay or

22   LGBT people.

23         If you take, you know, a more concrete example -- if you

24   have a family who attends church every Sunday or more than

25   that, if one or more of them are LGBT, they all hear the same

Meyer - D

1  message, and that message has been for many years and continues

2  to be in many places that of rejection, and the reason, as I

3  say in my report, and, you know, describing it as obscene, and

4  also attaching to it all kinds of stereotypes, for example,

5  that if you are LGBT you might be not able to form

6  relationships to have intimacy, to -- so you will be lonely as

7  an adult.  You will never have children.  You will never have a

8  family.  You know, there has been a lot of stereotypes related

9  to the AIDS epidemic, which perhaps, maybe, is beginning to

10  subside.  I am not sure.  But that if you're a boy and you --

11  you talk about being gay, the immediate stereotype would be,

12  "Well, you could die from AIDS or you might -- or you will die

13  from AIDS."

14      So this is the way that stereotypes and stigma is attached

15  to the life of the person who is coming out or is exploring

16  their sexual or gender identity.

17  Q.   And so for a student, like the plaintiffs, who are, you

18  know, in the 18- to 21-year-old range, who are going to live on

19  a residential campus, and if that campus maintains policies

20  that say things such as homosexual relationships are forbidden,

21  homosexual behavior is forbidden, being transgender is

22  forbidden, I mean, if there are policies and practices in place

23  at those kinds of institutions, is it fair to say that that

24  would be part of this socialization that you are referring to

25  that can impact both the LGBT students on that campus but also

Meyer - D

1   the heterosexual and cisgender students who would be receiving

2   that same message of stigma?  Is that fair?

3   A.   That's correct.  The only thing I would add is that that

4   would be a -- a confirmation of what they have heard already

5   before they got to the school.  So that's not the first time

6   this message is being relayed to them because that is a very,

7   as I said, prevalent message, and I would tend to think that

8   especially in nonaffirming religions you would hear that

9   message a lot.

10       So before they even attended the school, they came with

11   that understanding, and that is being reconfirmed to them by

12   the school.

13   Q.   On paragraph 39 you talk about how this socialization

14   process has led to widespread prejudice and stigma against the

15   LGBT community and then you break the stigma out into

16   structural, interpersonal, and personal.

17       So I would like you to just focus on the structural

18   stigma, and you provided a definition there in paragraph 39 as

19   a form of -- as a form of symbolic violence in which structures

20   such as communities, institutions, or governments perpetrate

21   violence through the laws, policies, and community mores that

22   restrict and forcibly reshape transgender or LGB individuals.

23       Could you unpack that a little bit more for us?

24   A.   So it's basically saying that structures, such as laws and

25   policies, can determine for an individual their experiences in

Meyer - D

1   society.  So to the extent that we know that LGBT people are

2   exposed -- are victimized more often than cisgender

3   heterosexual people, to the extent that the institution does

4   not protect them, then there is a connection between the

5   structural and the interpersonal or the personal experience of

6   the person.

7           So they are all related, of course; but the point here is

8   that you cannot just go to one person who is perpetrating some

9   kind of act and think that that started and ended with that

10  person, but that person was also embedded in a larger system,

11  that person was socialized with homophobia and transphobia.

12  They were socialized that it's okay maybe to attack LGBT people

13  and that maybe it's even just, et cetera.  So there's a

14  relationship between the structural, interpersonal, and the

15  individual experience.

16  Q.   And would it be fair to say that structural stigma in the

17  form of institutional policies, such as policies at colleges

18  and universities or through the government, either by its laws

19  or policies, that institutions and governments can have the

20  ability to reinforce such stigmas or stereotypes of LGBT

21  people?

22  A.   Yes, that is exactly what it means.

23  Q.   All right.  And on paragraph 41 you say that this process

24  of socialization and the stigma that we have been discussing

25  has had many damaging effects for LGBT people, and I think you

Meyer - D

1  described some of them.  Could you kind of list for the Court

2  and for all of us some of the negative impacts of this

3  prejudice and stigma for LGBT people?

4  A.   Well, I listed two examples here, but I list more of them

5  in the preceding sections; but, again, if people are socialized

6  to think that LGBT people are evil or sinful, are not to be

7  accepted, that would explain an increase in violent attacks

8  against them, and we actually see that in national statistics

9  of violent victimizations where LGBT people are much more

10  likely to be assaulted than cisgender heterosexual.  So that's

11  just one way that this is manifested.

12  Q.   So I would like to turn to the part of your report now

13  which discusses religion as a source of structural stigma.  And

14  before we get fully into this, I believe your report

15  distinguishes between affirming religions and nonaffirming

16  religions.  So can you discuss that, in general, and how that

17  informs your opinions here about religion as a source of

18  structural stigma?

19  A.   Yeah.  Well, I mean, we are very aware in public health

20  that religion can have a very positive impact on the health of

21  individuals who are a part of -- part of the religion.   In

22  many, many ways it can have a positive impact; and, therefore

23  when we think about religion in the context of LGBT people, we

24  really think about accepting versus not accepting in the same

25  way I was talking about families or institutions that have

Meyer - D

1  rules and regulations that are supportive and affirmative --

2  and affirming versus rejecting.

3      In the same way, affirming religions are religions that

4  provide accepting positive messages to LGBT people and

5  religions that are nonaffirming are religions that I would say

6  probably view homosexuality as a sin and LGBT people as sinners

7  and, therefore, are obviously rejecting of their sexual

8  orientation and gender identity.

9  Q.   And is it your opinion that these nonaffirming religious

10  viewpoints on homosexuality in the United States had an impact

11  on the development of the legal system in the United States, in

12  terms of criminalizing sodomy and other types of criminal and

13  civil laws?

14  A.   Well, this is based on historical analysis.  This is

15  really not my research, but this is more like a background

16  from -- from work that I have read about how both in the

17  sciences and the law religion has a huge impact, obviously,

18  beginning in the 14th, 15th Century in articulating the place

19  and how homosexuality is to be viewed, and that's been

20  incorporated into law through the common law in European

21  countries and in colonial countries, such as in Africa and some

22  Asian countries; and it also has been incorporated into

23  medicine, to be honest, as original -- as medicine was

24  developed, there was not the huge distance between medicine and

25  religion and some ideologies were transferred into medicine and

Meyer - D

1   into current thinking, perhaps.

2   Q.    On paragraph 45, you go into this a little bit further,

3   and in a second sentence of 45 you state that nonaffirming

4   religions send to their LGBT congregants a clear message that

5   they are sinners, that they cannot live a productive and happy

6   life as members of the community unless they reject their own

7   sexual and gender identities.

8        And, Dr. Meyer, would this be true whether the religious

9   community is a church or a -- could it also be true of a

10  religious school or a religious college environment?  Would

11  that be fair to say?

12  A.    Absolutely, yes.

13  Q.    And then you end the paragraph by saying, "The authority

14  of religion and religious figures as leaders of moral and

15  ethical life can have a devastating effect on LGBT members who

16  are rejected for who they are."

17       Could you say a little bit more about the effect?

18  A.    Yeah.  Well, again, it has to do with being socialized and

19  growing up in a religion with a lot of positive aspects to many

20  people and positive memories and, I guess, adoration of the

21  leaders of the church or if it's a school of professors,

22  et cetera, and then to find that those people that you look up

23  to and their religion that you viewed yourself as a part of and

24  a member of and got a lot of emotional rewards for that, that

25  that family is rejecting you, it's devastating and difficult

Meyer - D

1  for LGBT religious people.

2  Q.   So, Dr. Meyer, in light of what you have been talking

3  about, for a young person, let's say one of the plaintiffs or

4  any number of the plaintiffs, actually, if they grow up in

5  these kind of nonaffirming religious environments and, let's

6  say, they remain closeted through high school and they find

7  themselves in a similar nonaffirming religious college

8  environment but for the first time are living on their own, are

9  starting to explore their sexuality, finding other people,

10  other students who are also identifying as LGBT or somewhere on

11  that spectrum, would you -- would you say that for a student in

12  that kind of an environment, would it be healthy -- would it be

13  healthy for a student in that kind of environment to remain

14  closeted about their sexual orientation or -- let me -- let me

15  ask -- let me ask it a different way.

16      I believe you have already testified that there are

17  students who grow up in these religious environments and who

18  are closeted as kids and then may come to college and for the

19  first time start exploring their sexuality.  Is that accurate?

20  A.   Yeah.

21  Q.   And a student who does that, who is doing that kind of

22  exploration in the context of a nonaffirming religious college,

23  where they could be punished either merely for coming out or be

24  punished because of their relationships or their displays of

25  their LGBT identity, would you expect that student to

Meyer - D

1   experience some of these forms of stigma or negative effects

2   that you would be talking about?

3   A.   Yes.   Absolutely.   I think I talk about it in a letter in

4   the report.   I don't know if you are going to want to get to

5   that, but there are serious consequences to concealing your

6   sexual orientation and gender identity for LGBT people; that

7   is, on one hand, protecting them from some harm but, on the

8   other hand, exposes them to a lot of stress and distress.

9   Q.   Thank you for forecasting that.   We will look at that in a

10  little bit.   Momentarily.

11       I would like to look a little bit further on in -- let's

12  see here.   I would like to go down to paragraph 54.   And

13  paragraph 54 is the start of a section of your report about

14  specific minority stress processes.   And you identify four

15  pathways:   A, B, C, and D.

16       Could you give us a brief summary or description of each

17  of these, starting with A?   Chronic and acute prejudice events

18  and conditions.

19  A.   Yes.   So as I said before, the minority stress theory

20  model explains how a social environment is translated into the

21  experience of stress for the person, and those are four ways.

22  There's an additional one at the bottom of this paragraph

23  referring to gender.

24       So these four ways include experiences of what we call in

25  stress research life events, which are everything that

Meyer - D

1  happened, like being attacked, a victim of violence.  They

2  include acute and chronic conditions.  So an acute condition

3  would be such an attack; a chronic condition can be anything

4  that is prolonged.  Some -- some people, if, in fact, reported

5  a chronic bullying in school, that happens over time, months at

6  a time, and then -- so this is the kind of life events,

7  tradition of life -- of stress research.

8      Then there are -- the three other ones, I think, that have

9  to do with the impact of the environment on the person;

10 psychology, if you will.  So knowing that you could be attacked

11 if you walk down the street with a same-sex partner or if you

12 are seen as a gender minority in any kind of obvious way that

13 other people might see, this knowledge would lead to stress in

14 the sense of needing to be vigilant in your walking down the

15 street.

16     But this vigilance is itself very stressful.  In fact,

17 it's kind of the very definition of stress.  It's the flight --

18 fight-or-flight response, as many people are familiar with

19 that, that creates a lot of physiological changes in the body.

20 And for LGBT people that is a very chronic condition of having

21 to be watchful for potential harm, potential rejection,

22 ridiculing.  So that's the expectations.

23     Concealing, as we just discussed, is what many people have

24 to do or they feel that they have to do in order to protect

25 themselves.  But that has many, many negative implications that

Meyer - D

1  I can explain more now, but I do list them later if you're

2  going to go down there.

3      And then internalization is really, in some ways, the most

4  difficult part because that is where the social environment, in

5  a sense, inhabits the person.  Like, the person has accepted

6  all the negative portrayals of what it is like to be an LGBT

7  person.  And now this young kid or college student -- you know,

8  high school or college student internalizes all of this

9  throughout their life, and now they direct this to themselves.

10     So I might be gay, i.e., I might be lonely; I might be

11  rejected; I might go to hell because that is what I have heard

12  in church.  That's what I've heard in my family; that's what

13  I've heard in my school.  So the internalization is kind of a

14  very insidious stressor.

15     And as far as gender -- transgender people, another type

16  of stressor is gender affirmation, or rather gender

17  nonaffirmation, and that is when people purposefully --

18  sometimes not purposefully, but I would think especially

19  purposefully refuse to use the correct gender, pronouns, refuse

20  to refer to the correct name of the person that might be

21  different than the name that they were on their birth

22  certificate, things like that.  So those are the, I would say,

23  five general groups of processes.

24  Q.   I wanted to hone in, just a little bit, on the

25  conditions -- or, excuse me, the processes B and C.

Meyer - D

1        In B you were talking about the vigilance required by the

2   expectation of rejection or the expectation of punishment or

3   violence and then also the concealing or hiding of one's LGBT

4   identity.

5        As you were, you know, reviewing the complaint, you

6   probably read a lot of these kinds of experiences from the

7   plaintiffs.

8        Would you expect LGBT young people, like the plaintiffs,

9   who are living in these educational environments where their

10  identities and relationships are regulated, are penalized, and

11  are looked down upon, would you expect those students to be

12  exhibiting signs of vigilance and of needing at times to

13  conceal or hide their identity for their own protection?

14  A.   Yeah.  I would imagine that that is a common experience.

15  It is not uncommon for LGBT people in nonreligious

16  institutions.  So, again, it could vary by where you are and

17  when you are there, but it is a pretty common experience for

18  LGBT people to feel that they need to hide in order to protect

19  themselves.

20  Q.   Would you agree that these stressors -- the vigilance or

21  the concealing, internalization, and even chronic and acute

22  prejudice -- would you agree that the more affirming and safe

23  of an environment that the LGBT person is in, the less these

24  stressors are going to be a problem for them?

25  A.   Yes.  Of course.

Meyer - D

1  Q.   So I would like to -- I'm going to move down in your
2  report a bit here to paragraph 62, and paragraph 62 is still
3  under the Prejudicial Events and Conditions section.

4      Paragraph 62 talks about the symbolic value of prejudice
5  regarding stressful events.  And so elsewhere in your report
6  you say that everyone undergoes stressful events; right?
7  People lose their jobs; people get sick.  Sometimes you don't
8  get admitted into the college you wanted to go to, and that can
9  be a stressful event.  However, your -- I believe that your
10 report on paragraph 62 talks about how that kind of a stressful
11 event takes on new and greater symbolic meaning when the basis
12 of the rejection or the -- you know, the negative event is
13 rooted in prejudice based on sexual orientation and gender
14 identity.

15     So earlier we had a plaintiff, Alex Duron, testify about
16 having the admission to his graduate nursing degree program
17 rescinded from Union University because of his sexual
18 orientation and how that devastated him.

19     And so is paragraph 62, in the symbolic -- the symbolic
20 value of a stressful event based on prejudice, would you say
21 that it's fair to say that that example of someone having their
22 admission rescinded and -- anyone having your admission
23 rescinded to a graduate program is stressful, but it takes on
24 added meaning and added impact because it's based on prejudice?
25 A.   Yes.  Absolutely.  And, in this case, if you -- the

Meyer - D

1   example that you gave me was a pretty major event, what we

2   would call a rejection from a school; but this is even true for

3   what sometimes people call minor or micro events where the --

4   the meaning of the event is that you are being rejected because

5   you're saying because you are homosexual, because there's no

6   room for people like you in the world, and that becomes --

7   almost overwhelms the actual event.

8        So there's kind of two aspects to understanding the event.

9   There is, in fact, the devastation of harm or hurt that comes

10  from what actually happened, and that is more pronounced

11  because of what it means.  It means "My society is rejecting

12  who I am, and in the -- it's who I am in ways that I cannot

13  change it."  You know, again, it's a very unique experience

14  with people who are stigmatized.

15       As I said, it could even be a more minor type of event

16  that would -- because of the same reason, because of the

17  symbolic meaning behind it, because of the message behind it,

18  and because of the way the message behind it connects with

19  messages you've heard throughout your life.  You have heard it

20  in church; you have heard it from your parents; you have heard

21  it from your teachers, from movies and newspaper articles, or

22  whatever -- everything that -- what we refer to as a

23  socialization experience that I talked about before, and this

24  is just like a confirmation and a continued assault based on

25  who you are that you cannot change.

Meyer - D

1    Q.   And would you agree that this kind of extra symbolic --

2    this prejudice that you can feel or this symbolic exclusion

3    grounded in prejudice, that can come from -- it could come from

4    an employer, it could come from an educational institution, and

5    it could also come from the government's action itself?

6    A.   Absolutely.

7         And I would say that when it comes from people in

8    authority, like you mentioned earlier -- religious leaders,

9    professors, and certainly governmental actions -- it has a

10   greater force of power because you're kind of alone against the

11   world.  It's different when it's a friend or a peer that says

12   something that is rejecting than when your government says

13   something that is rejecting.  There's obviously a lot more

14   power to the government action than to a peer that you can

15   dismiss easily -- or not easily but could potentially dismiss

16   more easily.

17   Q.   All right.  I would like to draw your attention next to

18   paragraph 65.  This was under the heading of "Expectations of

19   Rejection and Discrimination" and talking about vigilance again

20   here.

21        So what I want to ask is in the context of the student

22   experiences in this case, where LGBT young people are

23   experiencing institutional discrimination from their school,

24   they have also had a lot of the personal internalized

25   homophobia, messages from family, and would -- would you agree

Meyer - D

1  that if they are at an institution where there is no

2  nondiscrimination protection based on -- for sexual orientation

3  or gender identity, and beyond not having any nondiscrimination

4  protection, there are actually affirmative policies that can

5  punish your identity or your behaviors and, beyond that, the

6  government office that is meant to protect you -- in this case,

7  the Office of Civil Rights -- has also not ever come in to

8  protect you and is, in fact, giving permission to the school to

9  carry out the discriminatory acts, would you agree that in that

10  kind of environment the LGBT young people are going to need to

11  be especially vigilant and will -- and that this kind of a

12  factor will be more strongly at play in their lives?

13  A.    Yes.

14  Q.    All right.  I would like to go to paragraph 69, which is

15  under "Concealing Stigmatizing Identity," and you did touch on

16  this elsewhere, and so I -- I don't want to go too much into

17  it.  I actually want to go to 71 here, though, because I think

18  you raised something I would like you to discuss, and you

19  discussed how concealing your identity can itself be a

20  significant stressor, and I think you said that you might have

21  some more to say about this, and I believe this is in -- where

22  in the report you do, and you say there are three main reasons

23  why.  Could you -- could you describe those for us, please.

24  A.    Yes.  I -- well, what I identified was three processes

25  that make concealing hard.  First of all, if you are concealing

Meyer - D

1  something that is true about yourself, that is not an easy

2  task, and, you know, if -- especially in an environment where

3  you live with people and you see them every day, such as a

4  school or work, the research has shown that even in a --

5  cognitively, this is just difficult to keep straight in your

6  mind, so to speak, in the sense of what did you tell this

7  person or that person?  And when people say, "What did you do

8  this weekend?" and, "Who did you go with?" and, "Do you have a

9  girlfriend or boyfriend?" and gay people have used pronouns to

10  deceive that it was a same-sex partner, let's say, this is all

11  difficult just on the cognitive level.  That can be very

12  stressful.  You may be mixed up, confused; say something to one

13  thing and not anything to another.  Lying is not easy -- you

14  know, being a good liar is not easy.

15      The second part is that there's been a lot of research in

16  psychology and health psychology about what is called expressed

17  emotion, and there's -- there's benefit, it turns out, for

18  people to express honestly who they are, to have a sense of

19  their experience being valid by the way of expressing it and by

20  honestly sharing with others emotions and experiences; and,

21  obviously, by definition, concealing deprives you of that.

22      And third, and maybe this really connects with some other

23  aspect of the minority stress process, but concealing prevents

24  you from connecting with others who are LGBT, from other

25  organizations that provide services for LGBT people, for

Meyer - D

1   messages that are more positive that would counteract the

2   negative messages that you may be receiving or may have

3   received throughout your life.

4       So, you know, by connecting to LGBT media and LGBT movies,

5   LGBT literature, you might see different portrayals of what

6   it's like to be LGBT that are not necessarily idolized but are

7   more honest and ring more true to you and are not just negative

8   and not just stigmatizing.

9       And you really -- part of concealing is that you can't

10  have any indications that -- you know, you can't even have a

11  book in your dorm room that is clearly of a gay interest if

12  you're trying to hide yourself.  Maybe if you are straight, you

13  might be able to read it; but if you are gay and you are hiding

14  it, you would never get this book to be next to you.

15      And so there are many, many ways in which concealing

16  deprives LGBT people of -- of the good way of living and of

17  having a well-balanced life.

18  Q.   Thank you, Dr. Meyer.  And I'm almost finished with my

19  direct questioning, but I do want to point to the last two

20  paragraphs I want to go over with you.  The first one is

21  paragraph 82, and this is where you make some conclusions about

22  stigma enacted in institutional, interpersonal, and

23  internalized fears, and this is where you make some statements

24  and conclusions that are highly specific and relevant to the

25  case, and so I want to ask you about some of these.

Meyer - D

1      In paragraph 82 you -- you talk about how a young

2   religious person might find themselves at one of these schools

3   and why -- you know, why they might end up there and what it's

4   like.  And about halfway through paragraph 82 there's a

5   sentence that starts, "Once at the school, rather than finding

6   support, they found derision and rejection from the religious

7   authorities they relied on for guidance and comfort.  When they

8   tried to seek help through an appeal to the Department of

9   Education, they discovered that the United States Department of

10  Education sided with the rejecting institution by exempting the

11  institution from Title IX."

12      So for this part, Dr. Meyer, we're talking about the

13  letters or the assurances of exemption that the Department of

14  Education has been issuing to these religious educational

15  institutions; is that right?

16  A.   Yes.

17  Q.   And then you go on and you say, "The plaintiffs in this

18  case experienced stigma enacted by religious institutions in

19  both institutional and interpersonal actions.  If they sought

20  help, their pleas were ignored.  Stigma was given a seal of

21  approval by the United States Department of Education further

22  enacting homophobia and transphobia.  The young plaintiffs

23  found themselves alone against powerful institutions, with

24  their country supporting the actions of the offending

25  educational institution."

Meyer - D

1    I just want to ask you a little bit about this.  You made
2   a statement in here about how the Department of Education has
3   given its seal of approval to these stigmas and injuries.
4   Could you talk a little bit about what you mean by that in the
5   context of, you know, the minority stress and the stigma that
6   we have been talking about today?
7   A.    Well, again, I think it's the role that the United States
8   Government has as -- kind of as a guiding authority in cases in
9   our lives, in general; and you know, if you are wronged and you
10  turn to somebody to try to help you and that someone says, "No,
11  I don't -- I have nothing to offer here," you would feel
12  betrayed, I think.  And the fact that it is an authoritative
13  institution, whether in the school or in the Department of
14  Health, I think that's doubly difficult.

15      If I might say, you know, I mentioned at the beginning how
16  people get to those institutions, and I think it's -- it's
17  important to note that people who go there go there because
18  they have a lot of positive associations with religion, and
19  they want their community.  You know, I've interviewed, not
20  necessarily individually, personally, but through research,
21  many people who are religious, and they are very adamant
22  about -- they want to be accepted by their religion.  They
23  don't want to be -- they don't want to go away from religion,
24  and I think that's something that is often missed.  I know I
25  have presented papers, and they go, "Why don't they just

Meyer - D

1  leave?"  I think it's easier said for people who are not part

2  of a religion or part of a group that they cherish.

3      So when they go in, I imagine, as young people, it may be

4  against all odds, but they still wish to be accepted, and I

5  think that's why the damage is even worse when you're expecting

6  that or when you hope for that, at least, and it doesn't

7  happen.

8  Q.   Right.  So there's that -- that hunger for acceptance from

9  your religious community, from your school or college; and

10 when, instead of acceptance, you get rejection and then you

11 also get rejection or showed the door from the government, your

12 ultimate conclusion here is that that can lead to adverse

13 health outcomes for LGBT people.  And I believe that you

14 described some of those elsewhere in the paper.

15     The last bit that I want to ask you about is on

16 paragraph 85, and this is also about health outcomes.  And it

17 looks to me that based on this paragraph, 85, that where the

18 government has provided nondiscrimination protections it has

19 improved the mental health outcomes for LGBTQ people.  Is that

20 fair to say?  And could you just say a little bit more about

21 that?

22 A.   Yeah, definitely.  I mean, there are several studies that

23 look at the general issue.  We refer to them as ecological

24 studies.  So they don't look specifically at what happened to

25 each individual in this sample, let's say, in the study, but

Meyer - D

1  they look at differences between people based on county or

2  state or even nation -- there have been studies in Europe.  And

3  what they show overall is that where there are protections

4  there is a protective -- as we call it in public health,

5  protective effect on the health.  In other words, where you

6  have legal recognition and protections, there is associated

7  with it an improvement in the health outcomes of LGBT people.

8          MR. SOUTHWICK:  Well, thank you, Dr. Meyer.  I don't

9  have any further direct questions.  But some of the lawyers for

10  the other parties may have some questions for you, and I may do

11  some follow-up after they're done, depending on how it goes,

12  but thank you for your testimony today.

13          THE WITNESS:  You're welcome.

14          THE COURT:  Before we begin and I call on Mr. Davis

15  for the government, I would ask that you not go to the podium,

16  Mr. Davis, and you ask your questions from the seated position

17  where we have good mic coverage.  We were having too much

18  difficulty having you at the podium.  So if you would please

19  remain seated, that would be appreciated by the court reporter

20  and by all of us listening.

21      Go ahead.

22      Did we lose people?

23      We don't any sound for you, Mr. Davis.  No sound from the

24  DOJ.

25          MR. DAVIS:  This is Elliott Davis.  Can you hear me

Meyer - X

1    now?

2              THE COURT:  Yes.  Thank you.

3              MR. DAVIS:  I apologize.  Our conference line went

4    out, apparently.

5              THE COURT:  Not a problem.  Proceed.

6              MR. DAVIS:  Am I okay to proceed?

7              THE COURT:  Go ahead.

8

9                    CROSS-EXAMINATION

10   BY MR. DAVIS:

11   Q.   Good afternoon, Dr. Meyer.  I just have a few questions

12   for you.

13   A.   Good afternoon.

14   Q.   In paragraph 18 of your report, you state, quote, "I have

15   not personally met with plaintiffs or evaluated plaintiffs'

16   claims regarding their experiences in school."  Is that

17   correct?

18   A.   Yes.

19   Q.   And then you go on to state, quote, "My knowledge of this

20   case was gained from reading one document provided to me by

21   counsel."

22       Is that correct?

23   A.   Yes.

24   Q.   And the one document that is the source of your knowledge

25   about this case is the first amended complaint; is that right?

Meyer - X

1  A.   Yes.  I would amend that I received another document
2  yesterday, but it's -- at the time of writing this, it was
3  correct.
4  Q.   What document did you receive yesterday?
5  A.   I received the report of Dr. Mark Regnerus.
6  Q.   Okay.  So apart from that report and the first amended
7  complaint, that comprises your knowledge of this case.  Is that
8  fair to say?
9  A.   Correct.
10  Q.   Are you aware that the first amended complaint that you
11  reviewed predates all of plaintiffs' Title IX complaints in
12  this case?
13  A.   I -- no.
14  Q.   Okay.  Are you aware that all but one of plaintiffs'
15  Title IX complaints are still being evaluated by the Department
16  of Education?
17  A.   No.
18  Q.   And are you aware that the one Title IX complaint that was
19  dismissed was dismissed for reasons other than the religious
20  exemption?
21  A.   No.
22       MR. DAVIS:  Okay.  No further questions.  Thank you.
23       THE COURT:  For the intervenors?  Do you have
24  questions?
25       MR. SCHAERR:  Yes, Your Honor.

Meyer - X

1                           CROSS-EXAMINATION

2    BY MR. SCHAERR:

3    Q.   Good afternoon, Doctor.  I'm Gene Schaerr.  I'm

4    representing Council for Christian Colleges and Universities.

5    Thank you for being with us today.

6         I would like to begin by showing you what has been marked

7    for identification as CCCU Exhibit 20.  I'll have my colleague

8    bring it up on the screen for us.

9         Do you recognize this article?

10   A.   Yes, sir.

11   Q.   Okay.  Can you identify it by reading the name of the

12   article and its lead author?

13   A.   Yes.  It's an article that I published this year.  It's

14   called -- it's titled, "Minority stress, distress, and suicide

15   attempts in three cohorts of sexual minority adults:  A U.S.

16   probability sample."

17   Q.   Did you prepare this study as part of a broader study

18   called Generations?

19   A.   Yes, sir.

20   Q.   Am I correct that in this study you did not consider

21   religious colleges or other religious organizations; right?

22   A.   Correct.

23   Q.   In this study, is it fair to say that you divided LGBTQ

24   people into three cohorts?

25   A.   More precisely, they were LGBQ, you can say.  There were

Meyer - X

1    no transgender people here; but, yes, you're correct.

2    Q.    You call these cohorts, the Pride Group, defined as anyone

3    born between 1956 and '63.  You had another group called the

4    Visibility Group, consisting of people born between 1974 and

5    1981.  And then you had a final group called the Equality Group

6    defined as anybody born between 1990 and 1997.

7         Is that how you broke down this group of people?

8    A.    Yes.

9    Q.    Okay.  And the last cohort, the Equality Group, is roughly

10   the group that is currently either in college or is recently

11   graduated.  Is that fair?

12   A.    Yes.

13   Q.    So the members of that group were still largely children

14   when the Supreme Court struck down anti-sodomy laws in 2003;

15   correct?

16   A.    Yes.

17   Q.    And at the oldest, the people in this group were about 25

18   years old when the Supreme Court found a right to same-sex

19   marriage in 2015?

20   A.    Yes.

21   Q.    All right.  Now, let's turn to table 3 on page 10.  Just

22   look at that for a moment.

23        Is it fair to say that your research found that the

24   Equality Group was the least likely of the three cohorts to

25   have experienced some form of conversion therapy?

Meyer - X

1   A.   I believe that there were no changes in that.  No

2   differences in the level of conversion therapy experiences.

3   Q.   Okay.

4   A.   So --

5   Q.   Well, it was -- wasn't it 6.15 percent for the Equality

6   Group?

7   A.   Yeah.  If you go to the right further, I will be able to

8   explain what I mean.

9   Q.   Okay.

10  A.   Yeah.  So --

11  Q.   And --

12  A.   So you're right, that nominally this was lower, but our

13  conclusion is that they -- it did not differ based on the

14  statistical test that is described in the last three columns.

15  Q.   Okay.  So lower but not statistically significant.  Is

16  that fair?

17  A.   Yes.  Correct.

18  Q.   And then in your -- in your study, it appears that the

19  members of the Equality Group were also the least likely to

20  be -- to be beaten, attacked, or sexually assaulted.  Is that

21  fair?

22  A.   The members of the Equality -- again, looking nominally at

23  these numbers, yes.

24  Q.   It was 37 --

25  A.   I would -- I would point out, if you don't mind, one

Meyer - X

1  thing.  When you have lifetime measures, you actually generally

2  expect the younger group to have the least exposure because

3  they literally have less time to have experienced something.

4      So if you compare a 60-year-old to a 25-year-old, the

5  60-year-old will have more time in their lifespan.

6      So those measures are since age 18, and you're right that

7  they had less experiences of that.

8  Q.    Okay.  Fair enough.

9      And the percentage there is 37.33 percent for the Equality

10  Group; correct?

11  A.    Correct.

12  Q.    All right.  And at least in nominal terms, this group was

13  also the least likely to have been threatened with violence?

14  A.    Yes.

15  Q.    Is that fair?

16  A.    Yes.

17  Q.    And, again, at least nominally, they were the least likely

18  to be -- to have been verbally insulted?

19  A.    Yes.

20  Q.    Okay.  I -- again, I'm not considering the statistical

21  differences, but yes.

22      Okay.  Well, let's turn just for a moment to page 12 of

23  this study.  Is it fair to say that you began your research

24  with the hypothesis that because of these and other advances

25  younger sexual minority people, to quote you, would fair better

Meyer - X

1   than their older peers psychologically.  Is that fair?

2   A.    Correct.

3   Q.    Okay.  But as it turned out, your research didn't actually

4   support that conclusion; correct?

5   A.    Correct.

6   Q.    Okay.  And, in fact, you concluded on page 13 that our

7   findings are clearly inconsistent with the hypothesis.  Is that

8   fair?

9   A.    Correct.

10  Q.    Okay.  And so is it fair to say that your research showed

11  that despite lives being better on nearly every metric you

12  considered, at least nominally, the Equality Group was, in

13  general, the most likely to attempt suicide.  Is that fair?

14  A.    I don't agree with life is better.

15  Q.    Okay.

16  A.    What we -- to be clear, what we base our assumption or the

17  hypothesis on was the global changes in the status of

18  homosexuality, about attitudes about homosexuality, and some of

19  the legal milestones that you -- that you talk about earlier

20  with sodomy and same-sex marriage.

21       What we're looking at here is that the experiences of the

22  young people definitely show still very -- extremely high

23  levels of those things.

24       So the -- the hypothesis that we came up with was not

25  supported in two ways.  Number one, their life experiences were

Meyer - X

1  not improved significantly; and then, number two, the

2  consequent mental health outcome did not improve.

3      But I'm just pointing out that we did not conclude that

4  their life experiences were better.  We did this as an a priori

5  hypothesis based on the legal and social indicators.

6  Q.   Okay.  So is it fair to say that despite the legal and

7  other -- other advances that we have discussed, that -- that

8  the members of this cohort, the youngest cohort, attempted --

9  well, faced -- faced psychological difficulty equal to or

10 greater than that of the older cohorts?

11 A.   Yes.

12 Q.   Okay.  Now, isn't it fair to say, Dr. Meyer, that LGBT

13 identifying students at evangelical Christian colleges are an

14 exception to the overall trend of declining psychological

15 outcomes among LGBT people in your Equality Group?

16 A.   As I said, I did not look at students in religious

17 colleges in this report.  I don't have that information,

18 unfortunately.

19 Q.   Okay.  Well, are you -- are you familiar with a 2016 study

20 by Dr. Wolff, whom we'll hear from a little bit later, that

21 compares outcomes from LGBT-identifying students at evangelical

22 Christian colleges with other college-age LGBT students?

23 A.   I'm not, I'm sorry to say.

24 Q.   You have not reviewed that study?

25 A.   I haven't.

Meyer - X

1          MR. SCHAERR:  Okay.  Your Honor, at this time I would

2    like to move for admission of Exhibit 20.

3          MR. SOUTHWICK:  No objection.

4          MR. SCHAERR:  Okay.  Thank you.

5          THE COURT:  Wait.  I didn't hear from the other

6    party.

7          MR. DAVIS:  No objection from the federal defendants.

8          THE COURT:  Thank you very much.  It will be

9    received.

10          MR. SOUTHWICK:  Can you keep track of these?

11      They have admitted -- oops.

12          THE COURT:  The intervenors have introduced one

13    exhibit, and I think your mic is on, Mr. Southwick.

14      So continue.

15          MR. SOUTHWICK:  Thank you.

16          MR. SCHAERR:  May I proceed, Your Honor?

17          THE COURT:  Yes.

18          MR. SCHAERR:  Thank you.

19    BY MR. SCHAERR: (Continuing):

20    Q.   Now, Dr. Meyer, you refer to your report, at page 17, to

21    what you call people's natural sexual orientation or gender

22    identity.  Now, by "natural," do you mean to imply a single

23    orientation that is stable and perhaps inborn?

24    A.   No.

25    Q.   What do you mean by "natural," then?

Meyer - X

1  A.    It means that, as I said earlier, people's sexual

2  orientation is considered by medical and psychological

3  authorities as being a natural expression of human --

4  variability in human sexualities.  So it doesn't -- it doesn't

5  imply theology as your question was suggesting.

6  Q.    Okay.  In your opinion, can sexual orientation or gender

7  identity be at least somewhat fluid and not necessarily fixed

8  from one's earliest years?

9  A.    Yes.

10  Q.    Okay.  Well, given that, is it possible, say, for a young

11  woman to have a romantic relationship with another young woman

12  and then decide that, no, she's going to pursue relationships

13  only with men?

14  A.    I mean, I wouldn't say that she decides.  When we talk

15  about fluidity and sexual orientation, it talks again about

16  kind of a natural process.

17      I think when you talk about deciding, that has been --

18  that has been shown to not be effective in the sense that

19  sexual orientation change efforts based on people committing to

20  a certain decision, that is not naturally reflecting their true

21  feelings and true experiences.

22      So while it is possible to have fluid sexual orientation

23  over the lifetime, that does not mean -- there's no direct

24  relationship between that and saying that I can decide tomorrow

25  morning that I'm going to be gay and then I will start to have

Meyer - X

1  a fulfilling sexual relationship with men.  That -- it's not

2  like a momentary decision or commitment but rather, as I said,

3  a natural fluid process that some people do find themselves

4  changing, so to speak, their -- the sexual orientation over

5  time or making decisions that they feel more comfortable with a

6  man, even though this hypothetical woman had a relationship

7  with a woman in the past.

8       It's not based on, kind of, will, usually.

9  Q.   So you agree that the kind of transformation that I have

10  described in my hypothetical about the young woman could occur.

11  You're just saying that it would be a natural process rather

12  than a decision on her part?

13  A.   Exactly.

14  Q.   And do you believe that people who are bisexual do not

15  have a choice as to whether they will act on their attraction

16  towards people of the same sex or people of a different sex?

17  A.   Again, I don't think it's a choice as much as bisexual

18  people are, I would say, open to a relationship with both men

19  and women.  It doesn't mean that they can decide at any moment

20  any more than a heterosexual person can decide to have a

21  relationship with somebody that they're not really attracted

22  to, they do not have shared interests, or whatever it is that

23  makes an intimate relationship.

24       But for a bisexual person, there is the possibility that

25  they might be attracted and find an intimate relationship with

Meyer - X

1  a person who is a man or a woman, but it doesn't necessarily
2  mean that it will be both.  Obviously, they could be in a
3  monogamous relationship with a woman or with a man for the rest
4  of their lives even though they are bisexual.
5  Q.   So you don't think a bisexual woman can simply decide,
6  "I'm going to be only open to relationships with men and not
7  open to relationships with women"?
8  A.   I think that is not the way, normally, relationships work.
9  But I guess if they're open to both and they decide to
10 completely block one side of that, you could argue that that is
11 possible.  But now we're really in a hypothetical area.
12     The relationships don't normally work like that.  It's not
13 that clear of a decision process.  I think there's more complex
14 elements that come into how people pair up and develop intimate
15 relationships.
16 Q.   But you agree that somebody could make that decision even
17 for religious reasons; correct?
18 A.   I mean, they could make a decision, of course.
19 Q.   Okay.  And, now, is it -- so is it possible that a
20 Christian school's policy about permissible relationships could
21 become acceptable to a young woman who decides that she wishes
22 to conclude a relationship with a woman and willingly commit to
23 the kind of opposite-sex relationship that the Christian
24 school's policy permits?
25          MR. SOUTHWICK:  Objection.  Calls for multiple levels

Meyer - X

1  of speculation and incomplete hypotheticals.

2       THE COURT:  Why don't you rephrase your question,

3  Counsel.

4       MR. SCHAERR:  Sure.

5  BY MR. SCHAERR:  (Continuing):

6  Q.   Well, let's -- let's take the example of our -- of the

7  woman we have been discussing, hypothetically.  Suppose she's a

8  student at a Christian school -- okay? -- and that the school

9  has the kind of policy that we have been discussing now, in

10  this case, that the plaintiffs object to.  In your view, is it

11  possible for a young woman in that situation to decide that

12  she -- that she wants to -- that -- to conclude the

13  relationship with the woman that she's been involved in and

14  simply commit to limiting herself to the kind of opposite sex

15  relationships that the Christian school's policy would permit?

16       MR. SOUTHWICK:  Same objections.

17       THE COURT:  Overruled.

18     Go ahead, if you can answer the question.

19       THE WITNESS:  I think that that would not be a

20  healthy approach to addressing a person like that because it is

21  basically what we have been discussing, which is a rejection of

22  her bisexual identity.  So you are framing it in a way that

23  says, well, because she's bisexual, she can block that part,

24  feel rejected on that part of herself, which is her

25  bisexuality, which defines her, presumably; but she can just

Meyer - X

1   choose to, by force of will, ignore that part of herself and

2   become heterosexual.

3       To some extent, I understand what you're asking, but I

4   don't believe that is a healthy way of supporting a young

5   person who is bisexual.

6   BY MR. SCHAERR: (Continuing):

7   Q.   Okay.  But you -- but you agree it would be possible for

8   her to make that choice?

9   A.   I mean, people make all kinds of choices or decisions.

10  Sometimes they're successful and many times they are not, and

11  we have seen -- now I'm talking of anecdotal experiences of

12  people who committed to marriages who are themselves gay and

13  bisexual and even after years have come to talk about how

14  difficult it was for them because they did not feel that it was

15  their true self and their true expression of love.

16      So, again, if you ask what is possible, many things are

17  possible, of course; but if you ask me, as a public health

18  expert, if that would be a direction that I would recommend in

19  terms of the mental health of the student, I would say no.

20  Q.   So you believe people are defined by their sexualities.

21  Is that fair?

22  A.   I mean, to the extent that we're talking about intimate

23  relationships, it is an important, obviously, defining

24  characteristic.

25  Q.   Okay.  Well, let me move on to a different topic.  In

Meyer - X

1  paragraph 46 of your declaration and again in your testimony

2  today, you claim that religions can have a seriously adverse

3  effect on LGBT adults; correct?

4  A.    Excuse me.  Which paragraph?

5  Q.    I believe it's paragraph 46 of your declaration, which I

6  think you referred to today or you may have.

7  A.    Yes.  I just wanted to make sure I have it.  Yes.

8  Q.    Okay.  Now, if a school merely expresses a theological

9  belief that homosexual activity is wrong, is that problematic,

10 in your view?

11          MR. SOUTHWICK:  Objection.  Speculation.

12          THE COURT:  Overruled.

13 You know, I'm being indulgent.  Most of this is not really

14 helpful to the issues I need to address.  It's maybe -- I'm

15 allowing people to explore it, but I really would be happy if

16 we could sort of focus on what I need to address.  I think I've

17 understood what this witness has to say and what his expertise

18 is and what his report is about, and I am not seeing -- the

19 cross is not necessarily illuminating things I might want to

20 know about, but you can continue if you wish.

21          MR. SCHAERR:  Well, Your Honor, let me just finish up

22 quickly on this point, if I may.

23          THE COURT:  Sure.

24 BY MR. SCHAERR: (Continuing):

25 Q.    Now, earlier today you used the term "sinful" to describe

1    the views of religious groups about homosexual conduct;

2    correct?

3    A.    I have, yeah.

4    Q.    Can I infer from your discussion today that you disagree

5    with the claims of many religious organizations that it's

6    sinful to engage in sexual activity outside of a traditional

7    man-woman marriage?

8            MR. SOUTHWICK:  Objection.  Dr. Meyer's personal

9    theological beliefs are not up for examination today.

10            MR. SCHAERR:  It's certainly relevant to bias.

11            THE COURT:  Overruled.

12        Go ahead.  Answer the question.

13            THE WITNESS:  Do I agree -- I honestly don't

14    understand the question.

15        Can you repeat it, please?

16    BY MR. SCHAERR: (Continuing):

17    Q.    Do you disagree with the claims of many religious

18    organizations that it's sinful to engage in sexual activity

19    outside of a traditional man-woman marriage?

20    A.    I honestly cannot have a view on that.  I understand that

21    some religious -- religions, this is their view, and what I was

22    referring to is basically reiterating what they're saying.

23        Do I agree with a religion?  That would be presumptuous of

24    me to agree or disagree with the religion, but I do agree that

25    it is harmful for people who are marked as sinful.  That was my

 1   only comment.

 2       I'm not trying to make a comment about the righteousness

 3   of the religion, obviously.

 4           MR. SCHAERR:  Okay.  I have no other questions.

 5   Thank you.

 6           THE WITNESS:  Thank you.

 7           THE COURT:  Any additional questions from the other

 8   intervenor?

 9           MR. LIPPELMANN:  No, Your Honor.  Thank you.

10           THE COURT:  Thank you.

11       Redirect?

12           MR. SOUTHWICK:  This is Paul Southwick.  Nothing,

13   Your Honor.

14           THE COURT:  Thank you.  May this witness be excused?

15           THE WITNESS:  Thank you.

16           THE COURT:  Thank you.  I appreciate your time and

17   your testimony.

18           MR. SOUTHWICK:  Your Honor, might I have a two-minute

19   rest break before we start with the next witness?

20           THE COURT:  Sure.  We'll take a five- or ten-minute

21   break and everyone can use the facilities.

22           MR. SOUTHWICK:  All right.  And just for

23   everyone's -- just to kind of get a heads-up, I think that

24   these next two witnesses will be faster than the prior

25   witnesses.  So I'm just being mindful of time.

1      THE COURT:  Thank you for your heads-up.  I

2  appreciate it.

3      We'll take five or ten minutes here.

4                    (Recess taken.)

5      THE COURT:  We're all back.  Call your next witness.

6      MR. SOUTHWICK:  Your Honor, this is Paul Southwick,

7  and plaintiffs would like to call Audrey Wojnarowisch as their

8  next witness.

9      THE COURT:  Please say something so I can have you

10  pop up on the screen.  If you wouldn't mind, just say your

11  name.

12      MS. WOJNAROWISCH:  Hello.  This is me.  I'm Audrey.

13      THE COURT:  Thank you.  What that does is it enlarges

14  you so I can see you.  Please raise your right hand.

15      MS. WOJNAROWISCH:  Makes sense.

16

17                  AUDREY WOJNAROWISCH,

18  called as a witness in behalf of the Plaintiffs, being first

19  duly sworn, is examined and testified as follows:

20

21      THE WITNESS:  I do.

22      THE COURT:  Thank you.  Please -- you can put your

23  hand down.  Please state your full name and please spell your

24  last.

25      THE WITNESS:  My name is Audrey Wojnarowisch.  My

Wojnarowisch - D

1    last name is spelled W-o-j-n-a-r-o-w-i-s-c-h.

2           THE COURT:  Thank you.  Go ahead.  Go ahead, Counsel.

3

4                      DIRECT EXAMINATION

5    BY MR. SOUTHWICK:

6    Q.    Let me apologize for not getting your last name correct.

7    I think I had it correct before.

8    A.    No, you're totally fine.

9    Q.    Well, thank you for being here today.  I know that this is

10   not something that every college student does, and so I

11   appreciate your bravery for being here.

12          Could you tell the Court just a little bit about yourself,

13   where you grew up, what kind of an environment and home you

14   grew up in, and cover a little bit of that before we get to

15   George Fox?

16   A.    Sure.  Absolutely.  I am -- I have always lived in Oregon.

17   I grew up in Portland in kind of the southeast Portland

18   suburban area in an incredibly conservative and religious

19   household.  My dad grew up in the Russian Orthodox church and

20   my mom and her family grew up in the Catholic church, and I

21   spent my childhood living with them and four siblings and went

22   to George Fox right out of high school.

23   Q.    Great.  And how old were you when you first applied to

24   George Fox University?

25   A.    I was 17 at the time.

Wojnarowisch - D

1   Q.   And how old are you now and what year are you in in

2   school?

3   A.   I'm 21 right now, and I'm a senior at Fox, just finishing

4   up my last couple of semesters.

5   Q.   Great.  Tell me a little bit about what it was like

6   applying to George Fox.  Why did you apply, and why did you

7   ultimately choose to go there?

8   A.   Well, it was a nerve-racking experience.  Applying for

9   college, I think, always is, but my -- the reasons that I had

10  for choosing George Fox had nothing to do with my gender or

11  sexuality at the time.  I was interested in going to a smaller

12  university.  I had been homeschooled for a long period of time,

13  and I was worried about kind of getting lost in a bigger

14  school.

15       George Fox University is known specifically for their

16  Be Known promise, that their students will be known by name and

17  somewhat intimately by their professors and the staff at the

18  school, and that was especially appealing to me.

19       I wanted to go to a Christian school.  I devoutly practice

20  my own faith, and that was important for me to continue

21  independently at college.  And I wanted to be not too far from

22  my family who lives just about 30 minutes away from campus now.

23  Q.   And what was it like for you when you first arrived on

24  campus?  What was that first week like?

25  A.   It was fun for about the first two days, and after that

Wojnarowisch - D

1  kind of initial welcome weekend thrill of being exposed to

2  college for the first time, the sheen kind of wore away, and it

3  quickly became obvious that it was going to be a really long

4  and difficult experience.

5  Q.   You referenced your gender identity and sexuality a little

6  bit, but could you talk about that and how you thought about

7  that when you were in your high school years and then how you

8  continued to think about it when you got to Fox?

9  A.   Yeah.  It was always there, but it was something I

10  decidedly did not unpack while I lived with my parents.  It

11  wasn't a safe environment to do so, and there -- there was

12  no -- there was no opportunity.  It wasn't -- it was -- it

13  would have been extremely dangerous for me to have tried to

14  push those boundaries at the time, and I -- I was pretty -- I

15  had my head down.

16      When I got to college, I had control over my time for the

17  first time ever and over who I was going to be friends with and

18  the places that I was going to go, and so it was a natural time

19  for me to start unpacking all different parts of my identity,

20  to decide the things in my life that were going to be important

21  to me, and to begin expressing myself in the ways that felt

22  natural to me rather than the ones that were imposed upon me.

23  And my gender and sexuality was a part of that.

24      I identify as both bisexual and nonbinary, and that was

25  quite a process to begin unpacking it at George Fox as it

Wojnarowisch - D

1  became pretty immediately obvious that while I had more freedom
2  to express myself and be who I am outside of my parents'
3  household, it certainly was not going to be a loving and
4  accepting environment to do that at George Fox either.
5  Q.   Would you describe it as a safe and supportive
6  environment, or would you describe it differently?
7  A.   Not in the slightest.  The general message that I have
8  received from George Fox is that queer identities are not --
9  they're not acceptable.  They don't align with the image the
10 University wants.  We are allowed to attend silently as long as
11 we are not ourselves too much or too apparently.  They invite
12 us to give our tuition but not to advocate for our needs.
13 Q.   Was there a period at George Fox where you started to feel
14 some sense of hope and safety because of events that were
15 unfolding?
16 A.   Yeah.  During my sophomore year there was another student
17 on campus, a delightful friend, who was a senior at the time
18 and who came out as a gay man in a beautiful performance in
19 front of most of the student body.  It was -- it happened in
20 the chapel on campus during a live student event.  It was
21 beautiful.  The reaction from most of the student body in the
22 room at that moment was celebratory and inviting, and he won
23 the contest by popular vote of the students there.  And in that
24 moment the support for that student was so tangible and real
25 that it -- it was encouraging, and the kind of social movement

Wojnarowisch - D

1   that followed in the coming days, weeks, and months, it felt
2   like if there was ever going to be a time where it was
3   relatively safe to come out publicly on campus, that was going
4   to be it, and then the demand for -- for people to speak up and
5   share their experiences had -- it had never been so real to me.
6   So if there was going to be a time to speak, whether I was
7   truly ready or not, that was the moment that it was going to
8   be.  So I began to come out publicly then.
9   Q.   And at some point were those -- those hopes for feelings
10  of safety and belonging, at some point were those dashed by the
11  University?
12  A.   Yeah.  Students came together shortly after this
13  performance to put together subcommittees and groups, and the
14  University attempted to placate those for a while.  There were
15  listening sessions and town halls where professors and faculty
16  and board members sat in front of queer students and appeared
17  to listen to our heart-wrenching testimonies of our experiences
18  dealing with all forms of discrimination, being ignored, and
19  feeling physically unsafe and in danger; and, ultimately, no
20  changes were made at the university after those hearings.
21  Q.   And after the student's performance and the groundswell of
22  support from the student body, did the administration issue any
23  kind of response or official communication in response?
24  A.   Yeah.  Yes.  A few days following the performance, the
25  president of the University sent out a mass email communication

Wojnarowisch - D

1  to the entire student body reminding students of the lifestyle

2  policy that states marriage is between a man and a woman and

3  sex is reserved for marriage, et cetera; reminding that the way

4  the University interprets the Bible that homosexuality is a

5  sin, et cetera, et cetera.  And it was so incredibly

6  disproportionate, it felt, that the University would respond to

7  one student's moments of vulnerability and subsequent

8  acceptance with bullying from the highest chair of

9  administration at our school that he would feel it was

10  important to send out an email reminder of the school's

11  beliefs.  Because the student shared something that didn't have

12  anything to do with marriage or sexuality; just that he wanted

13  to be himself.

14  Q.   What kind of impact did the University's response have on

15  you and the other queer students that you were spending time

16  with?

17  A.   It was a difficult time just to exist as a queer person on

18  campus.  That email and the response to the student coming out

19  were the only subject of conversation on campus for weeks

20  after.  It was a hot topic for debate in classrooms, in

21  cafeterias, in residence halls.  It was impossible to get away

22  from.

23      Students and professors and just everyone constantly

24  debating our right to exist and why we would choose to exist at

25  a Christian University, it was -- tensions were so high, and it

Wojnarowisch - D

1  felt as though because we couldn't go anywhere without hearing

2  about whether people thought that we should be allowed at Fox

3  or why we were at Fox or our -- our education in those weeks --

4  we felt so incredibly unimportant because the whole time for it

5  we were advocating for ourselves in our own living spaces.

6  Q.    Thanks for sharing that, Audrey.

7        I want to ask you a few more questions about your

8  experiences at Fox, and some of these might be of a sensitive

9  nature.  So if you, you know, want me to ask something

10  differently or you need time, just let me know.

11  A.    Sure.

12  Q.    In your declaration in support of your Title IX complaint

13  and this lawsuit, you talked about, you know, George Fox's

14  policies.  You referenced the lifestyle policies, the policies

15  against homosexuality, and also some of the experiences that

16  you have had there, and you talk about how the policies affect

17  you and your -- I think the statement you made was "These

18  school policies affect me and my brain.  They affect my

19  development and my family.  They also prevent me from getting

20  the mental health and mentoring support that I need."

21        Could you talk to us a little bit more about that, about

22  some of the mental health impacts, the kinds of -- the kinds of

23  impact that you have experienced for your mental health and

24  barriers to getting the kind of support that you would need?

25  A.    Yeah.  The queer experience, at least for me, at its very

Wojnarowisch - D

 1  core, has to do with constantly breaking down and building back
 2  up to understand my own identity.  I have had to disassemble my
 3  gender and sexuality in my own head in order to understand what
 4  is it that I am and why I didn't turn out to be what it is that
 5  my parents and the rest of the world, it seems, expected I was
 6  going to be, and I -- I have had to tear apart the religious
 7  beliefs that I was given by my parents and -- and try to
 8  rebuild them and understand why I believe what I believe.  I
 9  have had to disassemble the criticism that I have received from
10  superiors at my school, that I received from my parents, that I
11  received from friends and former friends who criticized the
12  decisions that I have made about how I choose to live and
13  accept myself.
14      A huge part of being queer for me has been experiencing
15  rejection from family and experiencing financial, emotional,
16  relational independence far before I was ready.  I have had to
17  care for myself in ways that I was so incredibly unprepared to
18  do.  During these such formative years, being 17, 18, 19,
19  and -- and learning how I'm going to -- learning how I'm going
20  to interact with the world, the -- the mental health resources
21  that are available to most students on campus are not
22  necessarily safe for queer students.
23      The services that would be most important for me to be
24  able to access because of the level of rejection and the
25  tumultuous experience that is trying to reconcile one's gender

Wojnarowisch - D

1  and sexuality and religion and identity and relationships all

2  together, I needed mental health resources.  I needed help

3  coping with depression and anxiety.  I needed badly to be

4  diagnosed with ADHD and had no -- no support from the school

5  in -- in trying to sort all of that out for myself.

6      That was a huge setback for me and a huge part of my

7  college experience, unfortunately.

8  Q.   And is that, at least in part, because even the on campus

9  counseling center is required to abide by George Fox's

10 lifestyle policies regarding homosexuality?  Is that part of

11 why as a queer student you don't feel safe going there?

12 A.   Absolutely.  Yeah.  There have been students in the past

13 who have been subjected to conversion therapy at the Health and

14 Counseling Center there, and there's no promise that that won't

15 continue to happen.

16     The Health and Counseling Center is also governed by

17 school policy and lifestyle policies that would prevent them

18 from advising me on my gender and sexuality in a way that would

19 be healthy for me.  So, yeah, not a safe place to go.

20 Q.   So when you arrived at Fox, in your declaration, you

21 describe that you met an initial group of queer people and

22 that, as is true with any people, whether queer, straight, what

23 have you, but not everyone is a safe person and that you had an

24 experience with someone who is really not safe for you.

25     Could you -- could you talk to us about how -- how you met

Wojnarowisch - D

1  that person and what -- what that person did to you?

2  A.    Absolutely.   Yeah, I mean, in my first few days and weeks

3  of school, just like anybody else during the welcome and

4  initiation period of college, I was trying to make as many

5  friends as possible and look for people that I had things in

6  common with.   I was looking for people in my major, people that

7  I shared interests with, and that included my queer identity,

8  and I was looking for other people who were interested in

9  theology that accepted queer people.   And through that kind of

10  experience, I happened to meet a person at school who was not

11  safe.

12      And during my first and second semester at school

13  especially, I was stalked, followed, harassed, sexually

14  harassed, and eventually sexually assaulted by another student

15  on campus.   I received hundreds of text messages and phone

16  calls from this person, though I never gave them my phone

17  number.   They eventually found my school schedule somehow.

18  They followed me from one class to another, had a friend follow

19  me from one class to another.   One night they had a -- they

20  sent a friend to my dorm room to confront me in the hallway of

21  my residence hall, which was a terrifying experience, as I -- I

22  wasn't out to, I mean, any of those people yet.   I felt like I

23  had no control over the narrative about me that was kind of

24  quickly sweeping around my very small Christian university, and

25  I felt completely powerless and unsafe, especially after the

Wojnarowisch - D

1    sexual assault that I experienced.  Yeah.

2    Q.   Being -- thank you for sharing that.

3         Surviving the sexual assault and the kind of stalking and

4    harassment that you described is difficult for anyone.  Do you

5    feel like it was made more difficult because of your queer

6    identity and the identity of the person who assaulted you?

7    A.   Yeah.  Because I -- because we were talking about my -- my

8    very first months on campus, I -- I hadn't come out to many

9    people yet.  There were -- I hadn't gone through the process,

10   obviously, of figuring out who was safe and who wasn't and what

11   kind of people in this new environment I was going to be able

12   to trust.  So I didn't have a social support network yet to

13   rely on, and the infrastructure of support that was meant to be

14   built into the university didn't work for me.

15        I had to go to my RA to report the sexual assault, and I

16   was informed that my RA reported that to her superior, who's

17   called the area coordinator -- just the boss of all resident

18   advisors on campus.  The job of my RA is to supervise all of

19   the 20 girls who lived in that dorm hall and to take care of us

20   specifically in situations such as this, but whether it be

21   because of my resident advisor or her superior area

22   coordinator, a case was never even filed with the Title IX team

23   at my university, and I received no support from the school.

24        I had to negotiate with this person who had sexually

25   assaulted me.  For my own safety, I had to pretend to be

Wojnarowisch - D

1  friends, to placate them.  I had to pacify friends and their

2  relationships so that they would stay out of it and stop making

3  it worse.  It was continually a pretty terrifying experience,

4  yeah, for -- for several years.

5  Q.   And you stated in your declaration that when you reported

6  to your RA the sexual assaults that you asked your RA to keep

7  your sexuality confidential --

8  A.   Yes.

9  Q.   -- so that you wouldn't lose friends and get in trouble

10 with the school.

11      Can you tell us a little bit more about that and also how

12 your RA reacted to that?

13 A.   She was very uncomfortable with that piece of information,

14 specifically.  It was so uncomfortable for me to have to

15 approach someone who -- in a moment where in order to reach out

16 for support I had to bear myself in a way I wasn't used to, in

17 a new way, and to come out to a person that I didn't know,

18 really, and I could tell wasn't supportive of me, didn't agree

19 with my identity, had her own opinions about potentially why

20 this may have occurred.  It felt, after that experience, that

21 it -- it didn't matter what had happened to me or what had

22 continued happening to me because the support systems that were

23 in place were clearly not meant for me, and my requests for

24 support were not welcome there.

25 Q.   So thank you for talking about all that, Audrey, and I --

Wojnarowisch - D

1  I'm going to be introducing a few documents to you.

2  A.    Sure.

3  Q.    This might be a little strange.   We're doing it over the

4  computer.   And the first one that I'm going to introduce is

5  your Title IX complaint.

6         MR. SOUTHWICK:   So this is under plaintiffs' exhibit

7  list Audrey's Title IX Complaint, and I believe that this will

8  be Plaintiffs' Exhibit No. 9.

9         Any objections?

10         THE COURT:   Hearing none, it will be admitted.

11         MR. SOUTHWICK:   All right.   I'm going to share my

12  screen here.

13  BY MR. SOUTHWICK: (Continuing):

14  Q.    So Audrey you have already walked us through most of the

15  statements in the declaration; so I'm not going to have you do

16  that again, but I --

17  A.    Sure.

18  Q.    I do want to acknowledge, first of all, that you did file

19  this Title IX complaint, and you've seen this document before;

20  is that right?

21  A.    Yes, that's right.

22  Q.    And can you explain to the Court why you filed this,

23  essentially?   You know, what are you hoping to come out of

24  making this report and filing this Title IX complaint?

25  A.    During this whole experience, I was essentially silenced,

Wojnarowisch - D

1   whether that be -- I mean, not whether it be -- because of both
2   implicit and explicit biases from the university.  My hope in
3   filing the report is that my voice be heard the way that it
4   should have been when I initially requested support.  I hope
5   that future students who experience things like this on the
6   campus that I have spent the last four years will not feel like
7   they have to suffer alone.  I hope that it will be seen that
8   these incredibly explicit and obvious forms of discrimination
9   do exist, happen, and badly need to be corrected and avoided in
10  the future.
11  Q.   It looks here, Audrey, that you filed this on July 24,
12  2021.  That was July.  We're in November.  It's been several
13  months.  Has the Department of Education's Office of Civil
14  Rights done anything to help you in response to the complaint
15  that you filed at this point in time?
16  A.   No.  Shortly after the case went public, the Title IX team
17  at my university contacted me to set up a meeting of what
18  seemed like an attempt to try to save face.  Nothing came from
19  that meeting.  This sexual assault happened years ago now, and
20  the person who assaulted me no longer attends the university.
21  So there's virtually nothing that they can do to act as though
22  they support me at this point.
23       But other than that particular person from my university's
24  Title IX team, no one has reached out to me, no.
25  Q.   And in your Title IX complaint, in addition to the

Wojnarowisch - D

1  personal experiences with sexual assault and the other personal

2  experiences that you described, you've also asked the

3  Department of Education to evaluate or investigate George Fox

4  University's anti-LGBT policies.  Is that fair to say?

5  A.    Absolutely.

6  Q.    And you're still living under those policies as a student;

7  is that right?

8  A.    Yes.  And will be until I graduate.

9  Q.    And would you say that those school policies themselves

10  have a negative impact on your feeling of safety and belonging

11  at the school?

12  A.    Yeah.  Any time another student feels as though I don't

13  belong here or shouldn't belong here, they have -- they have

14  literature to point to to support that claim.  The University

15  not only has explicit belief about my particular identity

16  listed in their lifestyle standards, which is a value-packed

17  term all by itself, the -- they have imposed a particular

18  interpretation of the Bible on their student body.  I believe

19  in the Bible.  I go to church.  I love Jesus profoundly.  It's

20  a huge part of my life and a reason that I chose to go to a

21  Christian school.  But this is -- this is not, by any means,

22  the only interpretation of these scriptures that have been

23  cited, and I -- I find it perpetually discouraging that

24  scripture is weaponized against my own identity to force me

25  into silence or compliance.

Wojnarowisch - D

1      MR. SOUTHWICK:  All right.  I would like to -- I have

2  this George Fox University policy language.  I would like to

3  introduce this as Plaintiffs' Exhibit No. 10.

4      THE COURT:  No objection?

5      Not hearing any, it will be received.

6  BY MR. SOUTHWICK: (Continuing):

7  Q.   I'm not going to ask you to go through this any further

8  because you've already discussed it, Audrey.  Thank you for

9  that.

10  A.   Sure.

11      MR. SOUTHWICK:  The last two documents I'd like to

12  introduce with respect to Audrey are going to be the George Fox

13  Exemption Assurance as Exhibit No. 11 and the correspondence

14  between OCR and NWYMF, George Fox, as Exhibit No. 12.

15      THE COURT:  Any objections?

16      I'm hearing none.  It will be received.  Both of them.

17  BY MR. SOUTHWICK: (Continuing):

18  Q.   So, Audrey, I have introduced as Exhibit 11 and 12 some

19  correspondence between OCR, which is the Office of Civil

20  Rights, and the Northwest Yearly Meeting of Friends.  And the

21  Northwest Yearly Meeting of Friends is the denomination that

22  George Fox is familiar -- is affiliated with.  Is that your

23  understanding?

24  A.   Yes, that's correct.

25  Q.   And then I'm also introducing the George Fox Exemption

Wojnarowisch - D

1   Assurance, which is a packet of documents in which George Fox

2   has request and received religious exemptions over the years,

3   religious exemptions from Title IX, including a religious

4   exemption relating to gender identity and a transgender student

5   at George Fox who had experienced housing discrimination.

6        Are you somewhat familiar with these documents that I've

7   described?  Not that you're an expert or anything, but are you

8   somewhat familiar with them?

9   A.   I am familiar with them, yes.

10  Q.   So the documents reveal that in 2015 a -- a transgender

11  student at George Fox filed a Title IX complaint and that after

12  a process back and forth with the Office of Civil Rights and

13  the denomination and the University, eventually the Department

14  of Education's Office of Civil Rights closed --

15  administratively closed the transgender student's complaint on

16  the basis of a religious exemption to Title IX.

17       Are you generally familiar with that?

18  A.   I am, yes.

19  Q.   And so my question to you, Audrey, is given that the

20  Office of Civil Rights has already given a religious exemption

21  to George Fox to allow it to discriminate against a transgender

22  student, how does that make you feel as a queer student who has

23  also experienced similar types of discrimination and harassment

24  at George Fox University?

25  A.   Well, this is incredibly relevant, as you said, to my own

Wojnarowisch - D

1   life.  This is a student who attended George Fox, not too long
2   before I did, who experienced similar forms of discrimination
3   from similar parties that I'm experiencing -- from the
4   president of the University at this bottom -- at the bottom of
5   this document.  Robin Baker is still the president of the
6   University.  I've spoken to him many times about similar
7   issues.

8       I have spent by far more time at George Fox advocating for
9   my own needs and right to exist than I have spent on my actual
10  education.  It's been an eternally long process.  It's part of
11  my everyday life, and it's incredibly discouraging to see that
12  a decision has already been made.

13      That is so far above my head.  It reaffirms the idea I
14  mentioned earlier that no matter how loudly I scream about the
15  kind of help that we need, the systems in place have already
16  decided that we are not -- that we are not important enough to
17  warrant help or support for that.

18      Queer students at religious schools are a bargaining chip
19  to be negotiated in arguments about our rights.  So it is --
20  it's discouraging, to say the very least.  And to maybe put it
21  a little bit more accurately, it's a dark cloud that hangs over
22  our heads every day.
23  Q.   And does it feel like, given the Office of Civil Rights'
24  response to the transgender student and George Fox's ongoing
25  discriminatory policies, does it -- does it feel like the

Wojnarowisch - D

1  Department of Education is closing a door on you and preventing

2  you from being able to assert the Title IX rights that you

3  might otherwise have?

4  A.   Yeah.   Absolutely.   It feels like a door has been closed

5  that I can -- with my request, but it will be to that closed

6  door, yes.

7               MR. SOUTHWICK:   Well, thank you very much, Audrey,

8  for sharing today with us.   I don't have any further direct

9  questions at this time.   Some of the other lawyers might have

10 some questions for you.   I'll still be here, and I might ask

11 you some follow-up, depending on their questioning, but thank

12 you very much for your testimony today.

13              THE WITNESS:   Absolutely.   Thank you.

14              THE COURT:   Counsel for the Department of Justice, go

15 ahead.

16              MR. DAVIS:   Good afternoon.   Can you hear me,

17 Your Honor?

18              THE COURT:   I believe I can.

19     Can you hear, Ms. Jessup?

20              THE WITNESS:   Yes.

21              THE COURT REPORTER:   Yes, I can.

22              THE COURT:   Go ahead.

23

24

25

Wojnarowisch - X

```
 1                         CROSS-EXAMINATION
 2   BY MR. DAVIS:
 3   Q.    I just have a couple of questions.
 4         To your knowledge, your Title IX complaint remains pending
 5   with the Department of Education; correct?
 6   A.    To my knowledge, yes.
 7   Q.    And have you filed any lawsuits directly against
 8   George Fox University?
 9   A.    No, I have not.
10           MR. DAVIS:  Thank you.  No further questions.
11           THE COURT:  For the intervenors?
12
13                         CROSS-EXAMINATION
14   BY MR. GREY:
15   Q.    May I call you "Audrey" to save myself your last --
16   mispronouncing your last name?
17   A.    You most certainly can.
18   Q.    My name is Herb Grey.  I'm one of the lawyers for the
19   coalition for Christian Colleges and Universities, and I had
20   some questions.
21         I want to say, first of all, I understand a lot of your
22   testimony describes fairly difficult and traumatic things, and
23   I don't want to make those things worse.  So I'm going to touch
24   on some of those things but only to establish timelines and
25   things like that.
```

Wojnarowisch - X

1      So as you reflect on your experience at George Fox, do you

2   have a sense that George Fox adopted these policies you've

3   talked about voluntarily, or are they -- is that something that

4   the Department of Education required them to do?

5   A.    I'm not --

6           MR. SOUTHWICK:   Objection.   Speculation.

7           MR. GREY:   Well, she started to answer.   I'm not sure

8   I caught her answer.

9           THE COURT:   I'm not sure she has an answer for you.

10   I think she was saying she didn't necessarily have an answer,

11   but go ahead.

12      Go ahead.   Can you answer his question?

13           THE WITNESS:   I -- I don't believe that I'm really

14   qualified to answer that, no.

15   BY MR. GREY: (Continuing):

16   Q.    Well, is it your understanding that George Fox adopted

17   those policies on their own voluntarily, or do you have an

18   understanding one way or the other?

19   A.    Again, I'm not an expert on George Fox's interactions with

20   the Department of Education and only in my own experience, but

21   I would say that George Fox's policies are supported by the

22   Department of Education, and that's what I'm here to speak

23   about.

24   Q.    Okay.   But in terms of the communications you described

25   that you have had with the University, they rely on their own

Wojnarowisch - X

1   policies.   That's what is communicated to you?

2   A.   They form policies that are then supported by the

3   Department of Education, yes.

4   Q.   And why do you say they're supported by the Department of

5   Education?

6   A.   The exemptions that they have requested have been granted

7   by those parties, yes.

8   Q.   Okay.   I know it was a long time ago, before you were even

9   born, but do you know how Title IX even came to be?

10  A.   Again, I am not a legal expert.   I'm here only to talk

11  about my own experience in college.

12  Q.   So if I told you it was passed by Congress, would that be

13  surprising to you?

14  A.   No.

15  Q.   I'm sorry.   You've frozen.

16        MR. SOUTHWICK:   Audrey, it looks like you might have

17  frozen there.

18        THE COURT:   Now she's gone.

19        MR. SOUTHWICK:   Oh, she's coming back.   They're

20  coming back.

21        THE WITNESS:   I believe I lost connection for a

22  moment there.   If I missed a question, I apologize.

23        THE COURT:   You did lose connection, and I think the

24  answer to your -- the question about how Title IX was developed

25  I think was still standing or was in front of you, and you

Wojnarowisch - X

1  froze when you started to give that answer.

2         THE WITNESS:  Gotcha.  Yes.  Apologies.

3      No, I -- I don't think that would surprise me.  It sounds

4  like that's how laws come to be.

5  BY MR. GREY: (Continuing):

6  Q.   Okay.  And whatever action that the Department of

7  Education does, in terms of enacting regulations, it's based on

8  what the -- the statute that Congress passed.  Does that sound

9  right?

10         MR. SOUTHWICK:  Objection.  Objection.  Calling for

11  legal conclusion.

12         MR. GREY:  I'm just asking for --

13         THE COURT:  I'm just going to say this -- how is this

14  helpful to the decision I need to make?  So let's ask questions

15  and get to points that relate to what I -- the decisions I need

16  to make.

17  BY MR. GREY: (Continuing):

18  Q.   Okay.  So if I understood your testimony, what you're

19  really asking for is for the religious exemption to go away.

20  Is that what -- what you're desiring here today?

21         MR. SOUTHWICK:  Objection.  Misstates prior

22  testimony, but you can answer, Audrey, to the best you can.

23         THE WITNESS:  Yeah.  I'm asking that queer students

24  be protected in the spaces that we deserve to be.  I -- yes, as

25  I've already stated in my testimony, my request is that the

Wojnarowisch - X

1  exemptions that have been granted to George Fox no longer stand
2  so that no barriers exist between me and the support that I
3  believe that I deserved to get.
4  BY MR. GREY: (Continuing):
5  Q.   And if the religious exemption goes away, do you have any
6  thought about how that might impact the policies that
7  George Fox has in place going forward?
8  A.   Yeah, I think it'd be really --
9           MR. SOUTHWICK:  Objection.  Again, speculation.
10          THE COURT:  Do you want to go ahead and answer?  Go
11 ahead and answer the question.
12    Again, these are not necessarily helpful to the decider
13 today.
14          THE WITNESS:  Yeah, I -- I think it's exciting to
15 imagine a university where transgender students are treated
16 with bodily autonomy and human respect and queer students are
17 allowed to access the resources that they need to live and
18 thrive as people who are conscious of their own decisions and
19 able to be themselves without fear for their lives and safety.
20 That sounds like a future I would enjoy imagining, yes.
21 BY MR. GREY: (Continuing):
22 Q.   Okay.  So if, for some reason, George Fox lost Title IX
23 funding -- well, let me back up.
24    My understanding, from your declaration, is that you
25 received federal financial aid during the time that you have

Wojnarowisch - X

1  been at Fox.  Is that correct?

2  A.    I do receive financial aid, yes.

3  Q.    Okay.  And would you be able to go to George Fox if you

4  didn't have that financial aid?

5  A.    I can speculate about how financial means would be met

6  otherwise, but because that's not the case, that's not

7  something I have had to explore.  Yes, scholarships can be

8  obtained in other ways.  I'm sure I would still be able to

9  attend Fox.

10 Q.    Okay.  So let me go back to the assault that you

11 described, which I understand was a fairly traumatic thing.  So

12 the stalking and the -- the assault that you described, can you

13 tell us roughly the time frame for that?

14 A.    Yeah.  I'm not prepared at the moment to give incredibly

15 specific details.  I'd probably have to look at a calendar, but

16 it occurred over my first two semesters at Fox.  So, yes, I met

17 this person during the first few weeks of school and had some

18 form of contact with them for the next two semesters, and then

19 still, unfortunately, longer after the sexual assault occurred.

20       So probably the first or second semester.

21 Q.    So if I understand correctly, you started at Fox in the

22 fall of 2018?

23 A.    Uh-huh.

24 Q.    So it would have been in the 2018 to early 2019 time

25 frame?

Wojnarowisch - X

1   A.    Yes.

2   Q.    Okay.  And did I understand that the person that assaulted

3   you was somebody that you had met through the queer group that

4   you initially got acquainted with at Fox?

5   A.    No.  That's not true.  Actually, I met this student at a

6   public campus event.  A school dance.

7   Q.    Okay.  And you indicated that you had been led to believe

8   that once you reported to your RA that there was going to be a

9   Title IX report filed.  Do you -- when did you have the

10  discussions about that Title IX report?

11  A.    At the time that the sexual assault occurred, and I --

12  it's a given that at that time that a Title IX report would be

13  filed.  I am aware that Title IX has been revised recently, but

14  at the time, it is mandatory that once a report of that is

15  given to a mandatory reporter, like an RA, an investigation is

16  automatically launched, which did not happen.

17  Q.    Okay.  And was that in 2018 or 2019?

18  A.    That was in 2019.

19  Q.    Okay.  And when did you find out that a Title IX report

20  hadn't happened?

21  A.    As a freshman in high school -- sorry.  Pardon me.  I

22  misspoke.  As a freshman in college, with a fairly limited

23  understanding of the legal processes surrounding Title IX, I

24  perhaps didn't realize as soon as I should have that I should

25  have been contacted immediately by the Title IX team if a case

Wojnarowisch - X

1  had been filed.  That's the process that normally would have

2  occurred.  I would have received an email from Title IX

3  saying -- offering various kinds of support and also informing

4  me that they were going to launch that mandatory investigation

5  of my case.

6     After a somewhat significant amount of time had passed and

7  nothing happened was when I realized that a report had not been

8  filed, and I -- I looked into it a few months later to find

9  that one had not been filed at all, yes.

10 Q.   And about when did you figure that out?

11 A.   Later on in 2019.

12 Q.   Okay.  So you described earlier your decision to go to Fox

13 and reasons why you picked Fox.

14    So do I understand that you wanted the religious school

15 environment?  Was that part of the reason you chose Fox?

16 A.   Yes.  I -- I'm a Christian and I chose Fox, in part,

17 because I wanted to continue developing my faith and practicing

18 that and also to --

19 Q.   You're breaking up again, I'm afraid, Audrey.

20          THE COURT:  Can you go back and just -- you're

21 still -- now you're gone.

22          THE WITNESS:  I apologize again for the connection.

23 I missed a question.

24          THE COURT:  You were explaining why you chose to go

25 to George Fox.  So that's the rough approximation of the

Wojnarowisch - X

1   question.  Why don't you go back.  Because your answer was

2   spotty, if you could sort of state it -- restate it.

3           THE WITNESS:  Yes, I will.  In part, I chose George

4   Fox because I wanted to attend a Christian university.  I am a

5   Christian and wanted to continue practicing my faith.  I also

6   chose the school because of its physical proximity to my family

7   and my siblings and because I wanted to attend a school of a

8   particular size.  Yes, that was one of the main reasons that I

9   chose Fox.

10  BY MR. GREY: (Continuing):

11  Q.    And at some time during the admission and enrollment

12  process, did you become aware of George Fox's lifestyle

13  statement?

14  A.    Uh-huh.  The lifestyle statement is something that you

15  have to sign in order to attend Fox.  So that happened during

16  the admission process, yes.

17  Q.    Did you, in fact, see that and sign it?

18  A.    Yes, I did.

19  Q.    And if we can show Exhibit -- CCCU Exhibit 11.

20        Can you bring that up, Josh?

21        Does that look like the Community Lifestyle Statement?

22  A.    I'm still waiting for it to appear on my screen, but I

23  imagine so.

24  Q.    Can you see it now?

25            THE COURT:  It's on my screen.

Wojnarowisch - X

1          THE WITNESS:  Yes, that is the lifestyle policy.

2  Uh-huh.

3  BY MR. GREY:  (Continuing):

4  Q.    And does that look like the same one that you saw and

5  signed back before you started at Fox?

6  A.    Yes.

7          MR. GREY:  Okay.  We would move for admission of

8  Exhibit -- CCCU Exhibit 11, please.

9          MR. SOUTHWICK:  No objection.

10          THE COURT:  Hearing no objection, we'll go ahead and

11  admit it.

12  BY MR. GREY:  (Continuing):

13  Q.    You also had a discussion already with Mr. Southwick about

14  the -- I believe it was the community standards policy that he

15  showed to you.

16          Do you remember that?

17  A.    Yes.  I'm not aware whether that's a separate document

18  necessarily, but yes.

19  Q.    Yeah, it is a -- it is a separate document.  So it was

20  Plaintiffs' Exhibit 10?

21  A.    Yeah.

22  Q.    And in terms of the -- in terms of the basis for this

23  Community Lifestyle Statement and the lifestyle standards that

24  have already been discussed, do you understand those to be

25  based on the Bible?

Wojnarowisch - X

 1             MR. SOUTHWICK:  Objection.  Calls for speculation.

 2             THE COURT:  Overruled.

 3             THE WITNESS:  It is a highly speculative question.

 4   Let me see how best to -- I understand that the Bible is cited

 5   in it, and I understand that those who wrote it believe it to

 6   be based on the teachings of the Bible, although that is not

 7   the same conclusion that I have come from -- come to from my

 8   reading of the Bible and my practicing of Christianity.

 9   BY MR. GREY: (Continuing):

10   Q.    So you just have a different view of what the Bible says

11   about these particular subjects than what George Fox has

12   expressed in these documents?

13   A.    Yes.

14   Q.    Okay.  At the time that you came to Fox, did you have a

15   different belief or understanding about those documents?

16   A.    No.  I believe that -- I believe in the Bible, and I

17   believe that my identities are seen and loved by God, and I

18   disagree with those documents on the basis of that belief.

19   Q.    Okay.  And if we can put up CCCU Exhibit 11.  Do you have

20   the supporting LGBT document?  There.

21         Have you seen this particular document before?

22   A.    I have.  Yes, I have seen this document before.

23   Q.    Okay.  And I'm going to go out on a limb and assume that

24   you have a different view of how things play out at George Fox

25   than what's described here.

Wojnarowisch - X

1  A.    Yes.   Earlier, during my testimony here, I mentioned that

2  George Fox has taken several steps to save face, mostly for

3  press, and I would consider this absolutely to be one of them.

4  This document says that LGBTQ students are seen and welcome.

5  And while, again, we're welcome to give our tuition, we are not

6  welcome to receive support or request the kind of

7  accommodations that we need to survive and thrive at school.

8  So I think this is a completely hollow statement, yes.

9  Q.    Okay.   And, again, referring to the Community Lifestyle

10 Statement, do you recall a portion that says, "We believe the

11 Bible teaches that all persons are created in God's image and

12 that God actively seeks renewed relationships with every

13 individual.   We are bound, therefore, to regard each person

14 with love and respect, citing Romans 12:9-21, I Corinthians 13,

15 and Ephesians 4.   So we avoid discrimination, abusive and

16 manipulative actions."

17      So do you understand that George Fox, in this statement,

18 is calling for people to be civil and respectful and loving to

19 each other?

20 A.    I think that most people would say that they respect other

21 people regardless of whether their actions reflect that.

22 George Fox included.

23      MR. GREY:   So I would offer the -- this statement

24 about the supporting LGBTQ students at George Fox into

25 evidence.

Wojnarowisch - X

1           MR. SOUTHWICK:  No objection.

2           THE COURT:  Not hearing anything else, it will be

3    received.

4    BY MR. GREY: (Continuing):

5    Q.    So I'm getting near the end here; but, initially, in

6    paragraph 14 of your March 23, 2021, declaration, you said

7    after you came out, quote, "campus felt safe for me more than

8    it ever had before."

9           Do you remember making that statement?

10   A.    Yes, I did.  That was in regard to the support from other

11   queer students that came together to advocate for ourselves and

12   each other, including Reed, that student who I had mentioned

13   had come out in a public performance.  That was referring to a

14   kind of intra-community support, not support from the

15   University or student population at large.  I felt safe with my

16   peers and other queer students.

17   Q.    Okay.  And then later on, in paragraph 34, you say, quote,

18   "I do not feel safe on campus."

19   A.    That's true.

20   Q.    Can you help me understand how that is different from what

21   you just said?

22   A.    Yeah.  After the student came out publicly and was

23   received by an outpouring of support from other queer students,

24   and we took that opportunity to -- to come together in a way I

25   hadn't seen before.  Queer students felt, for a moment, that it

Wojnarowisch - X

1   was -- that they could reach out and look for each other, I
2   think.  It was a moment where closeted primarily queer students
3   at Fox realized that they weren't alone, and that if they --
4   there might be other students who shared experiences like their
5   own, and I found a great deal of other queer students who had
6   gone through similar experiences to my own who had experienced
7   rejection from family, who had experienced sexual assault, who
8   had experienced discrimination from the University, who'd been
9   silenced and quieted, and we found a sense of safety and
10  solidarity in one another.
11       It was safe for the first time for us to speak out loud
12  the experiences that we had had where we felt belittled and
13  trodden over, and we were accepted by each other, and that was
14  a really radical moment in my own life where I felt like I was
15  seen and understood by people who shared my belief system.
16  These are other Christians who had experienced things similar
17  to me and -- and knew me in a way that was new to me.
18       However, I was stalked, followed, sexually harassed,
19  sexually assaulted on campus, and it was largely ignored by the
20  University and the people who were employed specifically to
21  protect me.  So I felt unsafe on campus but safe with my queer
22  peers.
23  Q.   And then later on in that same declaration, in
24  paragraph 41, you said, quote, "The first group of LGBTQ+
25  people I met was not safe."

Wojnarowisch - X

1        Can you describe a little bit what you meant by that?

2   A.   Yeah.  The first people that I met on campus, one of them

3   would ultimately go on to sexually assault me.  So that

4   doesn't -- it was an unsafe experience.

5        So I would point out it sounds as though my words are

6   being twisted a little bit.  The experience of going into an

7   entirely new community -- George Fox was a completely new place

8   to me.  I had visited campus only twice before paying tuition

9   and rolling and moving in on campus.  This was a completely new

10  group of people that I had never met before, and I didn't even

11  know the kind of person that I wanted to be there.  It was

12  going to be a long process of opening up and exploring what

13  college was going to look like for me, as -- as I think most

14  high school students look forward to.

15       And it's extremely common in the first semester of college

16  for vulnerable incoming students to experience sexual assault.

17  There's a period in that first semester where the likelihood of

18  that statistically goes up an incredible amount.  So I -- that

19  experience isn't unique to me, and it's not really unique

20  because the person who sexually assaulted me happened to be

21  another queer person.  It was because I was in a completely new

22  environment and still trying to find out who I wanted to be and

23  what kind of -- what kind of friend groups I was going to be a

24  part of, and those were difficult decisions to make.  Ones that

25  were not -- I wasn't protected by the University during them is

1  what I'm trying to say.

2  Q.    Okay.  So one thing I did not see in any of your

3  declarations is any sort of a description that you were afraid

4  of any kind of disciplinary action or getting kicked out of

5  school.  Do I have that right -- that you have not experienced

6  that?

7  A.    I have not experienced that kind of retaliation from the

8  University yet, though I don't believe it's out of character

9  from the University; and if such retaliation were to happen, I

10 would not be protected.

11 Q.    Okay.  So let me close with this question:  Given how

12 difficult it is, and I understand what you have shared here and

13 how difficult it's been, why did you choose to stay at

14 George Fox all this time?

15 A.    That's a complicated question but, again, one I have had

16 to answer a great many times.  The -- the reasons that I chose

17 George Fox initially didn't change.  I wanted to go to a

18 university to continue learning about and growing my faith.  I

19 studied theology at the school that I go to.  It's part of --

20 it's something that I believe in and want to be intertwined in

21 my education.  I came to a Christian school because I love

22 Jesus and I wanted to continue to learn about ministry.  I

23 wanted to stay close to my family.  It's important to me that I

24 am in close proximity to my siblings so that I'm able to

25 protect and provide for them.  It's important to me that I go

Wojnarowisch - X

1  to a school where I feel like my professors are accessible to

2  me.  The classroom sizes are small enough.  There are a hundred

3  billion different factors that go into choosing a university.

4  And the reasons that I chose Fox remained important to me.

5       What I didn't sign on for when I went to Fox was to

6  experience discrimination on the basis of gender and sexuality.

7  That's not an inherent part of Christianity, and it's -- it's

8  not -- it's not a given.  It's not something that I deserve to

9  experience nor should I have expected it.

10      Yeah, that's my answer.  The reasons that I enrolled in

11  Fox are the same reasons that I stayed.

12           MR. GREY:  Very good.  I appreciate your candor and

13  your vulnerability.  That's all the questions I have.

14           THE WITNESS:  Thank you.

15           MR. SOUTHWICK:  Thank you, Audrey.  Nothing further

16  from plaintiffs.

17           THE COURT:  May I ask you a question?  I don't

18  believe you have told us your major.  What's your major?

19           THE WITNESS:  Sure.  I'm a double degree student,

20  actually.  So I'm earning one degree in English and a separate

21  undergraduate degree in sociology with a minor in theology.

22           THE COURT:  And this has sort of been tapped into but

23  not really covered.  You said you had a number of scholarships

24  at George Fox.  How are you financially able to attend college?

25           THE WITNESS:  I am completely financially independent

Wojnarowisch - X

1    from my parents.  I receive no financial support from them at

2    all.  So the way that I'm able to attend college is through

3    student loans, both private and federal, grants through the

4    state, FAFSA funding at the federal level, and scholarships

5    that are -- come from George Fox based on the departments that

6    I have chosen to be active in, as well as a couple of

7    independent scholarships that have to do with organizations I

8    volunteered with.

9              THE COURT:  And I guess I, again, heard maybe

10   something more when you talked about it.  It would appear that

11   when you were early at George Fox and you came out, is that

12   when you were -- became financially independent?  You were very

13   quickly made independent?

14             THE WITNESS:  Yes, that's right.  I have been

15   attending college in some form or fashion since I was 15 or 16.

16   I started going to community college and paying for that out of

17   pocket on my own.  Attending college wasn't something my

18   parents were really willing or interested in providing for

19   financially, and I knew that for quite some time.  But because

20   of the relational strain of me moving out of my parents' house,

21   which was not really something that they wanted, and also the

22   strain of me coming out and into myself and becoming a person

23   that wasn't exactly what they -- exactly what they wanted when

24   they had kids, we -- we have a very fractured relationship, and

25   I haven't received any kind of financial support from them

Wojnarowisch - X

1  since then, not for housing or bills or medical or anything

2  like that.

3  　　　　　THE COURT:  And you said you were just a few terms

4  away from graduating; correct?  Graduating --

5  　　　　　THE WITNESS:  Yeah, that's right.  I have this

6  semester to finish up and one more, and then I'm finished.

7  　　　　　THE COURT:  What are your plans?

8  　　　　　THE WITNESS:  I would like to go to law school.  I'm

9  interested in civil rights.

10  　　　　　THE COURT:  Very fair answer.  Thank you for your

11  time.  I appreciate your testimony.  I appreciate your candor,

12  and I think you will make an impressive lawyer.

13  　　　　　THE WITNESS:  Thank you so much for your time and for

14  hearing me.

15  　　　　　MR. SOUTHWICK:  Thank you, Audrey.

16  　　　　　THE COURT:  May this witness be excused?

17  　　　　　MR. SOUTHWICK:  Yes.

18  　　　　　THE COURT:  Thank you.

19  　　　Next witness.

20  　　　　　MR. SOUTHWICK:  Plaintiffs' next witness is

21  Elizabeth Hunter, and I believe she has appeared on the screen.

22  　　　　　THE COURT:  Yes, she has.  If you can say just

23  anything, it will pop your screen up.  Except I think you have

24  to turn on your mic.  I think you're on mute.

25  　　　　　MS. HUNTER:  There we go.  I should be great now.

Hunter - D

1          THE COURT:  Ms. Hunter, would you raise your right
2   hand.

3

4                    FAITH ELIZABETH HUNTER,
5   called as a witness in behalf of the Plaintiffs, being first
6   duly sworn, is examined and testified as follows:

7

8          THE WITNESS:  I do.
9          THE COURT:  Please state your full name for the
10  record and spell your last.
11         THE WITNESS:  Faith Elizabeth Hunter.  Last name
12  H-u-n-t-e-r.
13         THE COURT:  Thank you.  Go ahead.

14

15                   DIRECT EXAMINATION
16  BY MR. SOUTHWICK:
17  Q.   All right.  Thank you.  So your full name is
18  Faith Elizabeth Hunter, but you go by "Elizabeth"; is that
19  right?
20  A.   That's correct.
21  Q.   Great.  So I'll refer to you as "Elizabeth" during our
22  questioning today.
23       Can we start just by telling us a little bit about where
24  you grew up and what kind of home environment that was for you?
25  A.   So I grew up in Texas -- in parts of Texas.  I was born in

Hunter - D

1  the Carolinas, I then moved to Texas when I was 6.  I was in

2  foster care until the age of 9, and then I was rehomed to a

3  conservative Christian family who many people would consider an

4  occult.  They were part of the Advanced Training Institute cult

5  group, and I lived with them until I was 20, and then I went to

6  Bob Jones University.

7  Q.   And so how did you make that transition from the religious

8  community and family that you described to -- to going to

9  Bob Jones?

10 A.   So I had always wanted to go to college, and I had told

11 that -- I had told my parents I had wanted to go to school

12 since I was, like, 13 or 14.  They made it pretty clear to me

13 that if I went to a secular school that they would disown me.

14 If I went to even a pretty conservative Christian school, like

15 Baylor, my dad told me he would disown me.

16      So I had very few options, and I applied to Bob Jones

17 because my parents used Bob Jones homeschooling books, and so I

18 assumed Bob Jones was not on the disownment list.  I was proven

19 correct there.  I applied and was accepted to start in 2015,

20 so --

21 Q.   So you said you were about 20 years old when you started

22 as a freshman?

23 A.   Yes.  I think I turned 21 my freshman year.

24 Q.   What did you want to study at Bob Jones?

25 A.   So I started out with a major that my parents told me was

Hunter - D

1   acceptable to becoming a homemaker, which was education, and I

2   had homeschooled my two younger sisters.  So I really loved

3   teaching.  It's something that -- I love storytelling and

4   teaching.  But once I started in education, I realized that I

5   like journalism more.  So I switched to journalism, and I

6   focused on TV reporting for local TV news.

7   Q.   And did you do any -- did you have an on-campus job or

8   internship at Bob Jones for that?

9   A.   Yes.  So starting my junior year, I worked with

10  WBJU Media, which was our on-campus TV station.

11       In my senior year, I was the campus TV station director.

12  So I ran a staff of, like, 12 students, and we did weekly TV

13  news broadcasts, and that was exactly what I wanted to do when

14  I graduated.  So it worked out perfectly.  It was what I was

15  passionate about.  It took most of my week, and I absolutely

16  loved that part of my life.

17  Q.   And at some point did something happen at Bob Jones that

18  took that away?

19  A.   Yes.  So starting my junior year, I started to realize

20  that I was not straight.  And I had not ever, like, dated

21  anyone or, like, actively engaged in any, like, relationship

22  dating life, but I started to tell some friends that I thought

23  I was queer and I started to be, like, following people online

24  who were LGBTQ and Christian, because I was trying to

25  understand if I could be, and so starting my senior year, I had

Hunter - D

1   been online in these communities.  And I said on June 1st,

2   because I was not on campus, and so I thought it was, like,

3   fine for me to say whatever I wanted on Twitter, since I was

4   not a student on -- in June I was not a student.  I said,

5   "Happy Pride," and made some other, like, Pride Month comments,

6   without outing myself.  I just was like "Happy Pride" to people

7   who are queer, and I never named myself as LGBTQ.

8        And then in the -- as the semester went on, when my senior

9   year started, I was reading several books that had LGBTQ

10  characters in them.  I was writing a book that had a LGBTQ

11  character in it.  I met my favorite author, who wrote one of

12  these books, and, like, took a picture with her and had several

13  other tweets that, I guess, showed support for LGBTQ people,

14  and in November of my senior year I was called into a meeting

15  with my school administration.  And because of my support for

16  LGBTQ people, they had assumed that I was queer.  They forcibly

17  tried to out me and get me to confess to being homosexual.  And

18  through the process of that, I was removed from my campus

19  student leadership position.  I was fired from the TV station.

20  I was not allowed to work with it anymore, and I was put on

21  disciplinary probation.

22  Q.   That seems like a lot to change pretty fast.

23  A.   It was.  It was a huge --

24  Q.   What was that -- yeah, what was that shock like for you?

25  How did it feel?  You were in your senior year.  Tell us what

Hunter - D

1  that experience was like.

2  A.    Yeah.  So I had always been, like, a pretty good student.

3  I absolutely loved being in college.  And while I disagreed

4  with my school about several different things, specifically

5  with, like, political stuff and how they responded and how male

6  students treated other women on campus, I had never, like, been

7  an adversary.  I had never gotten in trouble for anything my

8  entire time there.

9        And so then to be called in with a meeting with, like, the

10  head of Student Life, like one of the top three men on campus,

11  and to have my entire Twitter, like, printed and gone one by

12  one through dozens of Tweets and everything to be taken out of

13  context and for them to be told that I was incendiary and a

14  troublemaker and I couldn't even work with something like the

15  TV station because I could no longer represent the University

16  because I might be queer and -- and I was not actively, like,

17  out to anyone, and so they were assuming my sexuality and then

18  forcing me to renounce same-sex marriage that the Supreme Court

19  had at that time ruled was legal and something I could not do

20  as a person.  As a Christian, I don't think it was my right to

21  tell somebody whether they can or cannot marry.  And, yet, the

22  University said I must agree with them on their policy or I

23  would lose -- like, I would be on disciplinary probation.

24        And I was just, like, absolutely shocked that I didn't

25  have freedom of thought.  And that was not something I had

Hunter - D

1  signed away when I signed my student life conduct.  That was

2  not listed in the code of conduct, that I had to agree with the

3  University.  It -- and then for my sexuality, we -- sexuality

4  to be assumed just because I -- that I'm a supportive person of

5  LGBTQ people was a shock to me, and there was nothing I could

6  do to convince them I was either straight or queer because they

7  had already made up their mind.

8  Q.   Can you take us into that room a little bit?  Where did

9  you meet?  How long did you meet?  What was that meeting like?

10  A.   Well, it was in the Student Life office, and it was -- it

11  started Friday at 2:00.  I had work at 4:00, but I had to miss

12  work for it.  So it was from 2:00 to 5:00.  It was, like, three

13  hours, and I was just -- I felt like I was a member of the

14  Inquisition, where, like -- like, I was just raked over the

15  coals for three hours and was told if I reached out for help

16  that would show I was not repentant and therefore I would

17  actually be expelled as a student.

18       They didn't want to expel me because they said they didn't

19  want me to return to my parents' house because my parents --

20  were terrible people and they didn't want me to return there.

21  And they -- but they said if I didn't return to my parents,

22  they assumed I would reach out to LGBTQ people online, and they

23  didn't want me to do that.  So they said, "We are not going to

24  expel you.  We want you to stay a student because we want you

25  to repent and be right and renounce any homosexuality," and I

Hunter - D

1  really didn't have any other options.  Like, I'm going to

2  graduate in one semester, and I can't -- if I leave Bob Jones

3  my credits won't transfer in many ways, and at that point I

4  was, like, 23, 24 years old.  I think I was 24.  I might have

5  turned 24 the next -- I can't remember.  Math is not my strong

6  suit.  But I felt very cornered.

7       And, yeah, I was completely voiceless in many ways.  I was

8  not there to defend myself.  I was there to be accused and then

9  punished.

10 Q.   And how did that impact the remainder of your time at

11 Bob Jones?  How did things change for you?

12 A.   Well, not only did I lose, like, a vital part of my life,

13 which was the TV station and my work, but I -- I lost other

14 positions.  I was a leader in my school society, which is like

15 a sorority, but a Christian college version.  I lost my

16 position in leadership there.  I ended up dropping out of the

17 sorority because I felt like everyone -- or the society because

18 I felt like everyone knew what had happened, and I was, like,

19 really embarrassed, and I just dropped out and lost, like, a

20 sisterhood that I had had for three years and did not get to

21 graduate with the graduating seniors in that society.  So that

22 was really, really hard.

23      And I had -- I was -- for the first -- I had never been

24 suicidal until that.  I remember the weekend after I was just

25 like, "I do not want to live anymore" because I didn't -- I

Hunter - D

1   didn't feel like -- like, the entire TV station staff knew what

2   had happened.  These kids I worked with, like 12 students, and,

3   like, my department head with the journalism staff, the

4   journalism department, emailed me.  He was like, "I heard what

5   happened.  I'm praying for you."

6       I felt like everyone on campus assumed I was queer at this

7   point, even though I never had come out.  Even at that point I

8   did not -- could not have told you what my sexuality was,

9   except that I didn't feel like I was straight.  I felt

10  completely unsafe, and I was being monitored.  So I got in

11  trouble on a Friday.  I was in a required counseling session on

12  Monday, and they -- the person who had spoken to me on Friday

13  came into the meeting and not only was he upset about what

14  time -- or what I had said to another student about what had

15  happened, but he told me I had misrepresented the school in

16  telling another student why I got in trouble.

17      He had also told me that he -- like, the quote -- I would

18  quote -- he said, "We saw you privated your Twitter at, like,

19  3:48."  So I knew, like, my entire online presence and

20  everything I said was being monitored.  So I lost any ability

21  to just be myself because everything I said online was being

22  completely watched.

23      And I just -- I felt like a little zombie the rest of the

24  semester.  I was graduating in May, and so I just put my head

25  down and did my homework.  And it was really hard because the

Hunter - D

1   following February they had a conference on marriage and

2   sexuality.  So for five days they brought in all these speakers

3   who just spoke about how homosexuality -- like, LGBTQ

4   identities don't exist, and it was -- it was really, really

5   difficult because even voicing a differing opinion could get me

6   in trouble.  So I just had to sit through daily messages and

7   sermons and lessons on this.

8       And before that point, before my senior year, I would have

9   easily, like, talked to other students and been like, "What do

10  you think?"  And I felt like it was safe to have a different

11  opinion.  But at that point, my senior year, I had to just be

12  completely silent.  And if anyone knows me, being silent is

13  just not comfortable for me at all.

14      And it was extremely hard to feel like I -- that I was

15  monitored and watched the rest of the year.

16  Q.   And so, Elizabeth, you were put on a form of disciplinary

17  probation?

18  A.   That's correct.

19  Q.   You were terminated from your on-campus position in the

20  media department.  You were sent to mandatory counseling with

21  the Dean of Women; is that right?

22  A.   That's correct.

23  Q.   And in addition to that, you were forced to pay a monetary

24  fine to Bob Jones?

25  A.   That's correct.  For violating the student code of

Hunter - D

1   conduct.  But when I violated the student code of conduct, the

2   school did not list anything that I violated.  They just said

3   that I violated the spirit of the code of conduct because I did

4   not break any rules; so I just existed as myself, and they said

5   that violated the spirit of their student handbook.

6            MR. SOUTHWICK:  I would like to go ahead and

7   introduce a couple of exhibits, and one of those is the Bob

8   Jones University Student Handbook.  So let me make sure I have

9   this pulled up correctly, and I'll share my screen.

10       Plaintiffs' exhibit list includes the Bob Jones University

11   policy language, which is this student handbook, and I would

12   like to introduce this as Plaintiffs' Exhibit No. 13.

13            THE COURT:  Hearing no objection, it's received.

14   BY MR. SOUTHWICK: (Continuing):

15   Q.   Elizabeth, I want to read some of this policy language and

16   then I'll --

17   A.   Can I ask a question?

18   Q.   Sure.

19   A.   Can I ask is this this year's or 2018?  Which handbook is

20   this?

21   Q.   Good question.  I believe that this is the current --

22   yeah, 2021.

23   A.   Because it said advocacy for LGBTQ rights is prohibited,

24   but I do not believe that was prohibited in the 2018 handbook.

25   I just noticed that, and I believe that is an add -- something

Hunter - D

1   they added after I got in trouble.

2   Q.   Gotcha.   Thanks for that clarification.

3        Let me see.   All right.   So this is the current handbook,

4   and it sounds like there may have been some language added, as

5   you just testified, in the aftermath of the discipline against

6   you.

7        But do you recall that during the period in which you were

8   at Bob Jones there was some policy language -- aside from

9   advocacy, there was some policy language regarding homosexual

10  conduct, same-sex dating, and those kinds of things?

11  A.   If I -- yes.   I remember reading it when -- before I

12  signed the handbook, and it felt like it was a statement of

13  doctrine.   Like, we believe marriage is between a man and a

14  woman.   And Bob Jones is a university.   It is not a

15  Christian -- it's not, like, a denominational school.   So there

16  are lots of differences of doctrine among professors and

17  students, and I felt like the handbook allowed me to -- like, I

18  could sign it and also doctrinally disagree and I would still

19  be fine, if that makes sense.

20  Q.   Yeah.   That's a good explanation.

21       I want to ask you about some of the specific language and

22  how it makes you feel as someone who was a student there.

23       I'm just going to read this -- this paragraph.   And,

24  again, the advocacy piece, it sounds like, was not there at the

25  time.

Hunter - D

1    All right.  So Bob Jones University's current policy

2    language says:  Consistent with our commitment to God's design

3    for gender identity, the public advocacy for or act of altering

4    one's biological sex through medical transition or transgender

5    expression is prohibited.  Any same-sex dating or advocacy for

6    such is also prohibited.

7        Being someone from the LGBTQ community who was exploring

8    their sexuality while a student at Bob Jones, how does this

9    kind of policy language make you feel?

10   A.   Well, I feel very uncomfortable with it because students

11   come to these schools and, as you grow, you learn more about

12   yourselves and as -- the same with me.  I grew and learned more

13   about myself.  And even exploring who you are as a person is

14   prohibited, in a way, because you cannot advocate for -- like,

15   you cannot accept public policy that is inclusive of LGBTQ

16   people.

17       I remember, as a student, many times people would say,

18   "Well, I don't agree with -- like, I would never be in a

19   same-sex marriage, but like, same-sex marriage is the law of

20   the land.  You should treat LGBTQ people fairly."  And that was

21   a common statement, like, students and I would make in our

22   public policy debates in a public policy class, such as

23   political science or even journalism; and at this point, in

24   this -- the manner in which the handbook is laid out, we can't

25   even advocate for good public policy that treats all people

Hunter - D

1    constitutionally right under what the Supreme Court has ruled

2    are equal rights because even advocacy for LGBTQ people is now

3    prohibited.

4        And it's not just me saying this.  I have had current

5    students reach out to me and tell me that they feel unsafe

6    because they support LGBTQ people, not that they are queer

7    themselves, even though some of them might be, but even having

8    an LGBTQ friend is not safe anymore.

9    Q.    I want to point your attention to elsewhere in that

10   Bob Jones University policy and catalog.  There's an

11   Appendix B, and it describes further statements about human

12   sexuality and -- at the university, and this section I will

13   read from is Context for Human Sexuality.  And towards the

14   middle, there's a paragraph that states, "Furthermore, the

15   Bible specifically names as sinful and prohibits any form of

16   sexual activity between persons of the same sex, polygamy,

17   incest, bestiality, adultery, and fornication of any sort,

18   including pornography."

19       How does it feel to be lumped in with bestiality, incest,

20   and adultery?  How does that feel to you, given everything you

21   have experienced in your life?

22   A.    I feel like it's absolutely disgusting.  Polygamy -- well,

23   I should say incest, bestiality, those sorts of things,

24   actively harm and create victims, whereas my sexuality doesn't

25   create victims.  It's not harmful to society in the way that

Hunter - D

1  bestiality and incest and other harmful sexual activities are,

2  and it's just contrary to the general consensus among the

3  scientific community about how human sexuality works.

4  Q.    Thank you, Elizabeth.

5        MR. SOUTHWICK:  I want to introduce Exhibit No. 14,

6  which is Elizabeth's Title IX Complaint.

7        Any objections?

8        THE COURT:  Hearing none, it will be received.

9  BY MR. SOUTHWICK: (Continuing):

10  Q.    Elizabeth, you've already testified today to a lot of what

11  is in this Title IX complaint, but I just want to note for the

12  record that you filed this on July 24th of 2021.  And what are

13  you -- why did you file it?  What are you hoping that it

14  accomplishes?

15  A.    Well, I think the Department of Education and the Office

16  of Civil Rights should protect my civil right to have existed

17  as a student at Bob Jones.  I shouldn't have been discriminated

18  against because of my assumed sexuality.  And Title IX is

19  supposed to protect our civil rights, including our sexuality

20  and the rights of who we are and who we exist as, and that is

21  what I -- I hope to see the Department of Ed taking action to

22  protect not only me but other students in similar situations.

23  Q.    And is it your understanding that when you were a student

24  going through the grueling experience that you described, that

25  because of the religious exemption to Title IX, you would

Hunter - D

1  essentially not have had access to the Office of Civil Rights.

2  Is that your understanding?

3  A.   That's correct.   I -- I feel if I had filed this as a

4  student, I would have gotten in more trouble because I would

5  have been having to file in a Title IX office at Bob Jones, and

6  they would have informed the administration that someone had

7  filed a complaint that they were being discriminated against

8  based on their sexuality.

9  Q.   That's an important point, Elizabeth.   And is it your --

10 because we -- we've seen this pop up, and I believe it's your

11 experience that Title IX offices at Bob Jones University,

12 they're often either run by the same people or in communication

13 with the Honor Code office.   The same office that can punish

14 students for being LGBTQ is the only office you would

15 essentially have available for making a claim of

16 discrimination.   Is that your understanding?

17 A.   That is correct.

18       MR. SOUTHWICK:   All right.   And the final document

19 I'd like to introduce with respect to Elizabeth would be

20 Exhibit No. 15.   Bob Jones University Exemption Assurance.

21    Any objections?

22       THE COURT:   I don't hear any.   Go ahead.   It's

23 received.

24 BY MR. SOUTHWICK: (Continuing):

25 Q.   Elizabeth, are you familiar, at least somewhat, with the

Hunter - D

1    history of Bob Jones University requesting and receiving

2    religious exemptions from the Office of Civil Rights?

3    A.    I am.

4    Q.    And it looks like there's been a number of exemption

5    requests, as indicated in this document.  Some of them have to

6    do with reproductive rights; others have to do with gender and

7    sexuality.  And as the documents show, all of the exemption

8    requests have been approved.  And I want to ask you how -- you

9    know, how does it feel, knowing that your own government has

10   given its stamp of approval to Bob Jones' policies and

11   practices that harmed you so greatly while you were a student?

12   A.    It's very disturbing.  Especially when you realize that

13   the government doesn't have to.  The IRS actively took

14   Bob Jones to court because of their interracial dating ban, and

15   they highlighted the discrimination that Bob Jones perpetuated

16   until the early 2000s, and they lost their nonprofit status for

17   it.  So we know the government has the teeth.  I should say the

18   enforcement.  They can enforce -- like, they can enforce laws

19   that protect people, and they're choosing not to.  And they

20   have, in the past, taken Bob Jones to court for allowing

21   discrimination.

22        It wasn't under Title IX.  It was for their nonprofit

23   status.  So it's two different.  I want to make you sure I'm

24   aware that it's two different things.  I want to say that

25   there's not lacking in precedent for enforcement of fighting

Hunter - D

1  for nondiscrimination.

2  Q.    You referenced the interracial dating ban that was the

3  subject of the 1983 Supreme Court case, and you stated just now

4  that that ban was in effect until the year 2000.  Is that

5  correct?

6  A.    I think the early 2000s.  I'm not an expert on Bob Jones'

7  history.  It was obviously not in effect when I went there, but

8  people still talked about it.

9  Q.    And I believe that you said in one of your classes it was

10  actually raised by another student in the context of, you know,

11  how can Bob Jones maintain these anti-LGBT policies and get

12  federal funding and exempt tax status when it wasn't allowed to

13  do that under -- with respect to interracial marriage?

14      Could you describe that incident for us?

15  A.    Yeah.  We had a meeting -- a class that was taught by one

16  of the administrators.  So I take this with a lot more weight

17  because an administrator of the school told us this.  But in

18  our class, someone raised this question of would -- how would

19  Bob Jones respond if in -- in a similar situation to what

20  happened with their interracial dating ban, and the

21  administrator said it would be difficult to prove in court that

22  this is actually our religious belief because we already told

23  them that interracial dating -- banning it was a religious

24  belief of ours, and then we changed our mind.  So what is to

25  say we won't change our mind with LGBTQ on campus when we

Hunter - D/X

1  previously already changed our minds about a belief we took all

2  the way to the Supreme Court?

3  Q.    And as I think that you hinted at a little bit, is it your

4  understanding that Bob Jones is continuing to discriminate

5  against LGBT students under the policies that we've just looked

6  at and that you've, in fact, heard from some current students

7  who are experiencing that kind of suffering?

8  A.    Yes, that is -- that is -- all of that is true.  That is

9  my understanding.

10         MR. SOUTHWICK:  Well, thank you, Elizabeth.  Thank

11  you very much for your testimony.  I don't have any further

12  questions for you at the moment, but some of the lawyers for

13  the other parties may.

14     Thank you very much.

15         THE COURT:  Mr. Davis, for the Department of Justice

16  go ahead.

17

18                    CROSS-EXAMINATION

19  BY MR. DAVIS:

20  Q.    Good afternoon.  Can you hear me okay?

21  A.    I can.

22  Q.    I just have a few questions for you.  You graduated from

23  Bob Jones University in May of 2019; is that correct?

24  A.    That's correct.

25  Q.    And your Title IX complaint was filed with the Department

Hunter - X

1  of Education in July of 2021?

2  A.    That's correct.

3  Q.    And to your knowledge, your Title IX complaint remains

4  pending with the Department of Education; is that correct?

5  A.    That's correct.

6  Q.    Have you filed any lawsuit directly against Bob Jones

7  University?

8  A.    I have not.

9            MR. DAVIS:  No further questions.  Thank you.

10           THE COURT:  For the intervenors?

11     Excuse me?  For the intervenors?  Anyone?

12           MR. LIPPELMANN:  No questions for the religious

13  school intervenors.

14           THE COURT:  I don't see Mr. Schaerr, and I don't

15  see -- I don't see the other intervenor lawyer who was just --

16  just crossed.

17           MR. SCHAERR:  We're here, Your Honor, and Mr. Prince

18  is going to do this examination.  He's trying to get his

19  microphone working.

20           THE COURT:  Okay.

21           MR. PRINCE:  That's correct.  Can you hear me,

22  Your Honor?

23           THE COURT:  You're muffled.

24           MR. PRINCE:  Can you hear me?

25           THE COURT:  You're still muffled.

Hunter - X

1                          CROSS-EXAMINATION

2     BY MR. PRINCE:

3     Q.    Ms. Hunter, thank you for taking the time to talk to me

4     today.  My name is Joshua Prince.  I am representing the

5     Council for Christian Colleges and Universities.  I don't have

6     very many questions for you.  Many of the questions that I had

7     were already asked by the Government defendants.  So I'll keep

8     this very -- as short as I can.

9           To begin, and I'm sure you've heard this sentiment

10    expressed with the questioning of the other plaintiffs, I have

11    no desire today to undermine the testimony that you have given

12    or the things that you've experienced, and I want to set that

13    as a baseline.

14          I do just have a few questions.  In your testimony, I

15    didn't hear any suggestion that the Department of Education

16    pushed the policies that you object to onto Bob Jones

17    University.  Is there any information that you have to suggest

18    otherwise?

19    A.    No, there is not.

20               MR. SOUTHWICK:  Objection.  Speculation.

21               THE COURT:  Go ahead and answer the question.

22               THE WITNESS:  I was going to say I don't have any

23    evidence to the contrary.

24    BY MR. PRINCE: (Continuing):

25    Q.    And you have no personal knowledge of the Department of

Hunter - X

1   Education ever encouraging students to discriminate against

2   their LGBT peers; is that correct?

3   A.   That's correct.

4   Q.   And at least currently you are aware that the Department

5   of Education considers Title IX to protect students on the

6   basis of sexual orientation and gender identity; is that

7   correct?

8   A.   That's correct, yes.

9   Q.   Now, I was wondering what your understanding was as to

10  what would happen if you were successful in having the Title IX

11  religious exemption removed from Bob Jones University.

12       Do you have -- do you have a general idea of what would

13  occur?

14  A.   I would -- let me say this:  I know removing Title IX

15  religious exemptions doesn't automatically change university

16  policies because the universities can just remove themselves

17  from receiving federal funding, and I understand that is a

18  possibility, and many universities have said they would do

19  that.

20       But for universities who have changed their policies in

21  the past, like Bob Jones changed their policies and now

22  receives nonprofit status because they no longer uphold

23  discrimination and -- with interracial dating, I think it could

24  move the clock forward on universities, such as Bob Jones and

25  others, understanding that holding onto homophobia in Christian

Hunter - X

1   practice is not a beneficial part of their university.  It is

2   not a tradition that they need to keep.

3        And while I don't believe that the Department of Education

4   can force them to change our policies, I believe the -- the

5   idea of them losing their religion exemption exception could

6   move the clock forward on them one day changing those policies

7   as they did with interracial dating bans.

8   Q.   I understand that that's your testimony; but as you sit

9   here today, you don't have any direct knowledge that Bob Jones

10  affirmatively would change its policy in the absence of federal

11  funding; is that accurate?

12  A.   That is accurate.

13  Q.   Ms. Hunter, you testified that at the time that you

14  entered Bob Jones University you knew it was a Christian

15  school; is that right?

16  A.   That right.

17  Q.   And if I understood your declaration, one of the reasons

18  that you went to it was because it was a Christian school.  Is

19  that accurate as well?

20  A.   That is accurate.

21  Q.   And you understood at the time that Bob Jones had a

22  document called Its Position on Marriage and Human Sexuality;

23  is that right?

24  A.   That right.

25  Q.   And you understood at the time that those students who

Hunter - X

1  were enrolled at Bob Jones University were expected to follow

2  that policy; correct?

3  A.   Yes, that right.

4  Q.   And from what I understand, you largely followed it

5  throughout your time at Bob Jones.  Is that accurate?

6  A.   That is completely accurate.

7  Q.   I'm going to turn to what we have premarked as the

8  Defendant Intervenor CCCU's Exhibit 14.  If you'll bear with

9  me, I'm in charge of my own exhibits here, and so I will do my

10 best to work through this as smoothly as possible.

11      Can you see my screen here?

12 A.   That's correct.  I can see it, yeah.

13 Q.   And do you recognize this document?

14 A.   Yes.  It's the student handbook.

15 Q.   And was it the student handbook at the time that you were

16 at Bob Jones University?

17 A.   It looks like it's from 2016 to 2017; so yes.

18      MR. PRINCE:  Your Honor, at this time I move for the

19 admission of CCCU's Exhibit 14.

20      MR. SOUTHWICK:  No objection.

21      THE COURT:  Thank you.  It will be received.

22 BY MR. PRINCE: (Continuing):

23 Q.   Now, I understand that the policy has changed slightly

24 since -- since you were there, which is one of the reasons that

25 I wanted to talk specifically about the handbook at the time

Hunter - X

1   that you were a student.

2   A.    I appreciate that.

3   Q.    I've turned to Appendix B.   Do you see that there?

4   A.    Yes, I do.

5   Q.    And is this the position on marriage and human sexuality

6   that we previously discussed?

7   A.    I'm -- there could be differences.   Or are you talking

8   about what you have just asked me about?

9   Q.    The one I asked about, yes.   Yeah.

10   A.    Okay.   Thank you.

11   Q.    I understand that your counsel asked you some questions

12   about the context for human sexuality in the handbook.   I don't

13   want to belabor that point, but I do want to talk very briefly

14   about some things that were skipped over in the list of things

15   that Bob Jones University considered to be contrary to biblical

16   views.   Is that okay?

17   A.    Yes.   Yeah.

18   Q.    Sure.   So we read this sentence together in your direct

19   examination, and what it says is "Furthermore, the Bible

20   specifically names as sinful and prohibits any form of sexual

21   activity between persons of the same sex."

22        Did I read that correctly?

23   A.    You did.

24   Q.    But what was skipped over, I know -- I couldn't help but

25   notice -- is the reason that Bob Jones lists.   And as I read

1   it, it says, "Romans 1:26-27; I Corinthians 6:9-10; and

2   I Timothy 1:10."  Is it fair to say those are scriptural

3   verses?

4   A.   You can say they're verses from scripture, yes.

5   Q.   Specifically from the New Testament; right?

6   A.   Yes.

7   Q.   So at least Bob Jones considers its policy on human

8   sexuality to be based in biblical truths; is that accurate?

9            MR. SOUTHWICK:  Objection.  Calls for speculation.

10           THE COURT:  Sustained.  Let's move on.

11  BY MR. PRINCE: (Continuing):

12  Q.   Let's go down to the statement about human -- sorry -- the

13  statement about gender identity.

14       Do you see that?

15  A.   I do see that.

16  Q.   This says that God created man and woman in His image as

17  two distinct but equal genders which he intends to use for His

18  glory.

19       Did I read that correctly?

20  A.   You did.

21  Q.   And here, again, Bob Jones includes Genesis 1:26-27.  Is

22  it fair to say that that is a scripture from the Old Testament?

23  A.   It is.

24  Q.   Now, during your direct examination -- and I'll stop

25  sharing the screen here.

Hunter - X

1    During your direct examination, one of the things you used
2    to describe this policy is it was disgusting.  Do I remember
3    that correctly?
4    A.    I think I used "disturbing."
5    Q.    Disturbing.  My apologies.
6    A.    It's -- who knows?
7    Q.    It's been a very long day, and I certainly understand
8    that.
9         So if I misheard, I apologize.  But disturbing works, as
10    well, if that was your testimony.
11         So based on your use of what word, is it fair to say that
12    you disagree with the theological understanding as expressed in
13    the Bob Jones Student Handbook?
14    A.    Yes.  But I think I was saying that I would find it
15    disturbing that people would lump bestiality with homosexuality
16    because -- or incest because someone who abuses children is not
17    the same as some -- or animals is not the same as someone who
18    lives with someone that they love.
19    Q.    I understand.
20    A.    I'm not -- there's -- I am not sure if I'm disagreeing
21    with the theology there or the cultural implications of that
22    statement.
23    Q.    So let me try to rephrase that slightly, then.
24         Is it fair to say that you disagree with Bob Jones'
25    understanding on the biblical grounding for its human sexuality

232

Hunter - X

1  policy?

2  A.   Yes.

3           MR. PRINCE:  I have no further questions, Your Honor.

4           THE COURT:  Any redirect?

5           MR. SOUTHWICK:  Nothing further from plaintiffs,

6  Your Honor.

7           THE COURT:  Ms. Hunter, I have a question.  It was

8  raised that you were given a fine by the school.  No one said

9  the amount.  Do you remember the --

10          THE WITNESS:  If I recall correctly, it was $75.

11          THE COURT:  $75.  And you've graduated; is that

12  correct.

13          THE WITNESS:  I have.

14          THE COURT:  You kept your head down and graduated.

15          THE WITNESS:  I did.

16          THE COURT:  What are you doing now?

17          THE WITNESS:  I'm a news producer.

18          THE COURT:  Where do you work?

19          THE WITNESS:  I -- can I keep that off the record?

20          THE COURT:  You're -- so you have a functioning job

21  with a news program?

22          THE WITNESS:  Yes.  And my new station has asked that

23  I not -- because I live in the same town as Bob Jones; so

24  they've asked me not to name them.

25          THE COURT:  More than fair.  I appreciate that.

1    Thank you very much for your time today.  It was very

2  helpful.  Thank you.

3            THE WITNESS:  Thank you.

4            MR. SOUTHWICK:  Thank you, Elizabeth.

5            THE COURT:  You may be excused.  You're free to go.

6    Further witnesses for the plaintiff?

7            MR. SOUTHWICK:  All right.  Your Honor, we have two

8  final witnesses today.  We have Kalie, and then we have our

9  final expert witness.

10    I know that we're at 4:47.  If the Court is able to go

11  past the 5:00 hour, up to 6:00, I think that we might be able

12  to get through both of these witnesses.

13            THE COURT:  It would have been nice to know this a

14  little earlier.

15            MR. SOUTHWICK:  Sorry about that.

16    Kalie, hang tight.

17            THE COURT:  We really didn't have a heads-up, and I

18  have -- there's some plans that have to be addressed.  We'll do

19  the one witness.  We'll do Ms. Hargrove, and then we'll save

20  the expert for tomorrow.

21    It appears, in looking at this submission for what we have

22  for witnesses, that that will mean you have -- you'll finish,

23  and then we'll have the Randolph Willis and Ms. Yao and then

24  the intervenor's witness.  So I think we'll be able to get

25  through tomorrow.  I don't necessarily think we need to go

1    until -- go tonight.  So you might want to excuse your expert

2    so they're not waiting for time to see me.  I think that just

3    makes sense.

4                MR. SOUTHWICK:  All right.  Thank you, Your Honor.

5    We will.

6                THE COURT:  I just want to note for the record that I

7    have full-time externs who have been working on this, and they

8    had to leave a little early to attend a class they had, and I

9    want to make sure that they have as much access to the record

10   as possible, and so I -- in order to make sure that they have a

11   participation in this hearing, I don't want to have an expert

12   witness when they're not here.

13               MR. SOUTHWICK:  Understood.

14               THE COURT:  Thank you.  Call your next.

15               MR. SOUTHWICK:  All right.  Our next witness is

16   Kalie Hargrove.

17               THE COURT:  Ms. Hargrove, if you just say something,

18   you'll pop up.  Can you just --

19               MS. HARGROVE:  Hi.

20               THE COURT:  There you go.

21        Please raise your right hand.

22   ///

23   ///

24   ///

25   ///

Hargrove - D

1                      KALIE HARGROVE,

2   called as a witness in behalf of the Plaintiffs, being first

3   duly sworn, is examined and testified as follows:

4

5            THE WITNESS:  I do.

6            THE COURT:  Thank you.  Please state your full name,

7   spelling your last, and then I'll turn it over to your counsel

8   for direct examination.

9        Go ahead.

10           THE WITNESS:  My name is Kalie Hargrove.  Hargrove is

11  spelled H-a-r-g-r-o-v-e.

12           THE COURT:  Thank you.

13       Go ahead.

14

15                    DIRECT EXAMINATION

16  BY MR. SOUTHWICK:

17  Q.   Thank you.  Good evening, Kalie.  I know it's a little bit

18  late where you are.  Are you speaking to us from Atlanta today?

19  A.   A suburb; but, yeah.

20  Q.   Atlanta area.

21       All right.  Well, thanks for being here with us today.  I

22  really appreciate you taking your time for this testimony.  I

23  would like to ask a few, kind of, background questions.  If you

24  could let the Court know where you grew up and where you

25  eventually went for college.

Hargrove - D

1   A.    Yeah.  So I grew up in Oregon.  I did -- I was born in

2   Klamath Falls but grew up 17 out of my 18 years in Brookings,

3   Oregon, and all 12 years of school in Brookings, Oregon.  I

4   grew up in a very Christian home, part of -- part of the

5   Independent Christian Church there, and grew up in kind of a

6   community within that Independent Christian Church.  And

7   because of the -- because of the type of community it is, it

8   was very interconnected.  There's only a couple Bible colleges

9   that were associated with that tradition, one of them being

10  Boise Bible College in Idaho.

11      So after graduating Boise Bible College -- or after

12  graduating high school, I went to Boise Bible College.  Did

13  four years and got a bachelor's degree in worship ministry.

14      But during that time, that last year, I kind of wanted to

15  shift away from music and do something more -- more scholarly

16  within Christian education and decided to go to -- go to

17  Lincoln Christian University, which is the -- which is one of

18  the few seminaries that offers a master of divinity within the

19  Independent Christian Church tradition.  And so, actually, I

20  went to Lincoln Christian University in 2009, and I did three

21  semesters there; but, unfortunately, the -- the economy and the

22  fact that I had gotten -- recently gotten married and we had

23  recently had a kid, it was not easy to stay in school and

24  support my family.  So I -- I left Lincoln, and I joined the

25  Air Force, and I spent just under nine years in the Air Force.

Hargrove - D

1        But during the last about a year I decided to take classes
2    again, again at Lincoln, because that's where I had started.
3    It was still my tradition.  And so I took two classes, starting
4    in 2019, in the -- took two classes while I was still in the
5    military for both the fall semester and the spring semester,
6    and then I actually left the military a year early on my
7    contract because I left as a conscientious objector because I
8    felt because of my religious beliefs that I couldn't continue
9    to take part in -- in killing people, essentially, because it's
10   kind of what I -- what I was doing in the military.
11       So once I left, I started taking classes full time.  I
12   took classes full time fall 20 -- fall of 2020 and spring of
13   2021 and then one class during the summer of 2021 at Lincoln.
14   Q.   Thank you, Kalie.  That's a helpful explanation of how you
15   got from Oregon all the way out to Lincoln Christian.
16       And you were taking classes online, I take it, given that
17   you live in Georgia and Lincoln is in Illinois; is that right?
18   A.   Correct.
19   Q.   And were you paying for your education, at least in part,
20   with the Montgomery GI Bill because of your military service?
21   A.   Correct.  So, yeah, I paid for all of my schooling during
22   that second portion using my Montgomery GI Bill before -- when
23   I had gone before, I used student loans; but, then, you know, I
24   used the military -- I used the military help or aid.
25   Q.   Wonderful.

Hargrove - D

1    At some point in the last year, or so, would you -- would
2  you feel comfortable talking to the Court about your gender
3  identity and your transition?
4  A.   Yeah.  So I -- I decided to go back to Lincoln because,
5  again, like I said, it was my tradition and it was a school I
6  went to before.  And so I reapplied.  I -- I registered.  I got
7  everything all ready.  I was all set for classes.  And I did
8  that in the spring, leading up to that fall of 2019, when I was
9  going to take classes; but then in the summer of 2019, after --
10 I mean, it was after a very long process of evaluating what I
11 believed, looking at the Bible, understanding what I understood
12 of human gender and sexuality and, like, after an incredibly
13 long process, like, that summer, I finally accepted the fact
14 that I was transgender and came to that realization during that
15 summer.
16    Do you want me to keep going on that?
17 Q.   Yeah.  So that was the summer -- this past summer; is that
18 right?
19 A.   No.  So that was -- that was the summer of 2019.  And at
20 that point, like, I didn't know what I was going to do.  Like,
21 I didn't start transitioning or anything.  I knew that I was
22 transgender; but, I mean, there's just a big difference in
23 recognizing something and knowing what you're going to do about
24 it.
25    I started -- I made the decision and started taking

Hargrove - D

1  hormones in April of 2020 and started the process of
2  transitioning then, and -- yeah.
3  Q.   And how is that -- and you're -- you're a parent and
4  you're a spouse.  So how has that been as a parent and a spouse
5  and transitioning and going to school?  How did you do with
6  managing all of that?
7  A.   I mean, it was a lot.  There was a lot going on at that
8  time just because of that.  Because my wife and I had our
9  entire, like, relationship thinking that we were, you know,
10  cisgender heterosexual, and that's just -- it wasn't true.

11      So there -- like, obviously, like, the relationship
12  between my wife and I somewhat changed.  Not actually too
13  terribly much, but I think there was a lot of worry that there
14  was going to be a lot of change.  But, I mean, honestly, we --
15  we had already, like, had what would be considered opposite
16  gender roles for our cultural -- you know, our cultural world.
17  So, like, a lot of things didn't really change between that;
18  but, like, that uncertainty of not knowing what was going to
19  happen.

20      My kids, it was confusing for them at first; but, like,
21  honestly, my kids have been some of the -- some of the most
22  supportive and easiest to understand.  But one of, like, the
23  biggest stressors between me and my wife -- or not necessarily
24  between us, but, like, for us, is the fact that we both come
25  from incredibly conservative families.

Hargrove - D

 1      My -- my wife is a missionary kid.  Like multi-generation.

 2  My -- like I said, I went to Boise Bible College.  My grandpa

 3  went to Boise Bible College and was the second graduating class

 4  of that university, if I remember right.  It was like second or

 5  third.  I had multiple uncles go to Boise Bible College and

 6  graduate, and all of them became preachers.  So, like, me

 7  coming out to them was -- it -- things didn't go well.  My

 8  parents still -- still hardly talk to me or, like, accept my

 9  gender identity.  I -- like, my wife's parents don't hardly

10  talk to us anymore either.

11      So, like, yeah, that put -- that puts a strain on our

12  relationship.  Especially, like, in that in-between time,

13  whenever, like, we know that this is coming but we haven't told

14  them yet, and so, like, you know -- like, it's almost, like,

15  relationships have -- have an expiration date, and we were

16  worried that that was true.  And whenever -- whenever I came

17  out to them, it proved to be right.

18  Q.   And so during this process of your transition, the changes

19  for you and your family, how close did you get to completing

20  your degree at Lincoln Christian University?

21  A.   So I was basically -- I was basically five classes away,

22  according to, like, the class list.  When it came up as six

23  because one of the classes was a three-semester, one-credit,

24  like, internship or mentorship, and I was on the third credit

25  of those three; but, essentially, I -- I had three real

Hargrove - D

1  classes -- should have had three real classes this semester, of

2  fall 2021, and then two more classes of spring 2022, and I was

3  done.

4      And, actually, I would be finishing the program with three

5  extra credits.

6  Q.   And then at some point this past summer, something

7  happened that changed the course of your educational program;

8  is that right?

9  A.   Correct.  So the school found out that I am transgender

10 and that I made the decision to transition, and they simply

11 sent me an email, giving me, basically, an ultimatum of either

12 I drop out within, like, that grace period of the semester

13 where I can drop out and not be charged for the credits, or I

14 could -- I could stay in the semester, face charges, and -- I

15 mean, essentially reading between the lines, be kicked out

16 because -- because I'm transgender.

17     And so, like, facing that -- I really didn't have a choice

18 other than to drop out.  Because, you know, I don't necessarily

19 have a few thousand dollars just laying around.  Like I said,

20 my education was being funded by the Montgomery GI Bill which

21 means I pay the school and then -- then the VA pays me;

22 however, if I don't finish a semester, I have to pay back all

23 the money that -- that the VA gives me.

24     So, like, in theory, like, I'm just paying back money that

25 they gave me, but I would still have to be paying for those

Hargrove - D

1  credits and, like, that's a few thousand dollars.  You know,

2  I -- we're -- we're currently a single-income family while I

3  try to go to school.  We don't just have a few thousand dollars

4  to blow on me getting expelled from school.  That -- I mean, so

5  it's not really a choice.  Whenever it comes down to it, it --

6  I was -- I mean, essentially I was strongarmed into leaving so

7  it would look like it was my choice.  But there was no choice.

8  Let's be honest.

9  Q.   Kalie, I'm sharing my screen here and putting up a copy of

10  what I believe is the letter, and I have redacted your name

11  because they were using your dead name, and so I just went

12  ahead and redacted that.  But is this the letter you're

13  referring to that essentially -- you know, effectively expelled

14  you, even though they did give you an opportunity to go through

15  an appeals process, which was pretty much stacked against you.

16  But this is the letter you were referring to; is that right?

17  A.   Correct.

18  Q.   And this is dated August 26, 2021.  So that's just a

19  couple of months ago; is that right?

20  A.   Yes.  Correct.

21         MR. SOUTHWICK:  And I would like to introduce this as

22  Exhibit No. -- Plaintiffs' Exhibit No. 16.  Any objections?

23         THE COURT:  I'm hearing none.  It will be received.

24  BY MR. SOUTHWICK: (Continuing):

25  Q.   And just for everyone's clarification, I just want to make

Hargrove - D

1  sure -- is it clear to you from this document -- and I'll

2  highlight some language there -- that the basis for this

3  disciplinary action and pushing you out of the school was

4  that -- as it states here, "It seems you have chosen to

5  identify as and live as a transgender woman."  So is it -- was

6  it your understanding that that was the basis for the action

7  taken against you?

8  A.    Correct.

9  Q.    And looking in here, just to clarify a few things, it

10  says, "If you choose to remain enrolled at LCU, this matter

11  will be referred to the disciplinary committee for further

12  action."

13       And so is that what you were discussing?  Essentially,

14  yes, you are transgender.  If the school is going to discipline

15  you for that, there's no point of going through the

16  disciplinary committee because you would essentially lose out

17  and have to pay the government back money for your education.

18  Is that what you were referring to?

19  A.    Correct.  Like, you just look at it, and that's basically

20  what it says.  A disciplinary committee.  And if you find

21  out -- a disciplinary committee is just made up of people from

22  the school.  Like, there's no, like -- there's no, like, third

23  party; there's no, like, whatever.  But then when it comes down

24  to it, yeah, I'm transgender.  I admit that.  I'm okay with

25  admitting that.  I'm proud of who I am.

Hargrove - D

1    But I would -- like, seriously, I chose to be transgender

2  and live as a transgender woman?  No.  I am transgender.  I

3  have always been transgender.  I maybe didn't realize it for a

4  long time, but that is what I have always been.  So I didn't

5  choose to be transgender.

6    But you read -- you read this, and it's clear that they --

7  they just -- they don't care.  They see me -- see me and who I

8  am as my identity as a choice that I made and don't see me as

9  a -- the real person.  They see me as an idea, an issue that

10  can be discussed by a disciplinary committee.  Like, it's --

11  it's not right.

12    For me to go in and face a disciplinary committee that's

13  already decided that because I'm transgender I shouldn't exist

14  at their school, like, there's no winning that.  And to enter

15  that type of situation would have been detrimental to my -- to

16  my mental health on top of having to deal with being kicked out

17  of school for who -- being who I am in the first place.

18  Q.   So I wanted to ask you, Kalie, you know, you've -- being

19  someone who has served her country and who's a taxpayer and was

20  using the GI bill to pay for their school, what was your

21  reaction to getting kicked out of school like this?  How did it

22  feel?

23  A.   It really sucks.

24    Like, I can remember exactly where I was whenever I saw

25  this.  I was sitting in the parking lot of my -- of my oldest

Hargrove - D

1   kid's school, and I got a buzz that an email came in.  I looked

2   at it.  It was from the school, and it -- the email said,

3   "Notice of charge"; but I misread it and read "Notice of

4   change."  And I was like, all right, well, what -- what's

5   changed?  So I opened up the email and then it says, "Please

6   see, like, notice of charge," or whatever.  I read it "change"

7   again.  And so I, like, opened up the attachment, thinking,

8   like, maybe it's because of a new advisor, because that had

9   just happened, because my old advisor had left.  You know, I

10  don't know.

11      I opened it up just to find out that.  "Oh, here, we found

12  out you're transgender.  You either leave the school, or you're

13  going to go against a disciplinary committee."

14      And, like, that moment of just realizing that everything

15  that I had done at that school, everything that I had done,

16  like, in Bible college, like all of that didn't matter.  Like,

17  I was numb when I read it.  But like -- like you said, I am a

18  parent.  I have -- I have kids.  I couldn't process my emotions

19  yet because I had to pick up my -- I had to pick up my kid.  I

20  had to drive home.  I had to make dinner.  I had to finish

21  living, you know, my normal life.  So I -- I pushed it down as

22  much as I could and was numb for a few hours.

23      I got my kids in bed, and I went upstairs and just broke

24  down and cried and, like, it was awful.  Like, I don't -- like,

25  it's really hard to explain because the Independent Christian

Hargrove - D

1  Church, its nondenominational, okay.  They don't have an
2  oversight denomination, a hierarchy, or whatever.  They are
3  loosely attached to each other based off of the fact that they
4  are an Independent Christian Church.  And because of that, they
5  often look to the schools and the universities to be kind of
6  that guiding light for the denomination or whatever you call
7  it -- a nondenominational group.
8       So, in essence, this school kicking me out and being,
9  like, "No, you're no longer welcome here," is not just losing
10 my school, like, it's losing the entire tradition that I've had
11 for over 30 years.  And just in one letter where they are able
12 to take who I am, everything that I have done, and reduced it
13 down to "You have chosen," they are not even dealing with me as
14 a person.  They are dealing with me as an issue.  People are
15 not issues.
16      And, yeah, you know, I actually thought Title IX protected
17 people.  I saw -- I knew that Lincoln was a Title IX school.  I
18 read their language on discrimination.  Unfortunately, a lot of
19 schools will say, "We don't illegally discriminate."  Yeah,
20 that's misleading because they legally discriminate.  There is
21 a legal way for them to discriminate against people like me.
22      So I thought Title IX meant something.  I thought I would
23 be protected.  I friggin' served my country.  I gave up nine
24 years of my life and killed more people than I can say to
25 essentially uphold an idea that I should be discriminated

Hargrove - D

1    against because these institutions believe I shouldn't exist in

2    their presence.

3         And going further, like, not only that, at the same time,

4    and I -- yeah, you know, I do take full credit for this or

5    full, like, admission of this.  I used my own personal social

6    media to say that I got kicked out of seminary.  You know,

7    personal thing.  I put it on my personal social media, and it

8    ended up a lot of people seen it.  I have literally had

9    hundreds of people specifically reach out to me to tell me that

10   being kicked out of school was good; that being kicked -- that

11   they wanted to contact the school and thank them for kicking me

12   out.

13        I had somebody tell me, "Oh, it's too bad you're a

14   Christian because Christians can't commit suicide."  I

15   literally have people telling me to kill myself because they

16   believe that I shouldn't exist in the same world as them, and I

17   get that that -- those people aren't the school, but the school

18   is perpetuating a world view and an idea that people like me

19   shouldn't exist.  They are giving the foundation of a world

20   view that -- that people are able to take up and tell me that I

21   should kill myself.

22        I just checked the Human Rights Campaign, and this year

23   has matched last year in number of transgender people that have

24   been killed, and there's still almost two months left.  People

25   want transgender people killed.  These schools are literally

Hargrove - D

1   using a religious exemption to -- to -- to discriminate.   And

2   people see that schools can discriminate and they see that it's

3   okay, and they act in a way that perpetuates that.

4        And Title IX is supposed to be there to protect me.

5   Title IX is supposed to be there to protect students, but

6   they're -- but these institutions are told that they can

7   discriminate against me to maintain this world view that it's

8   okay to discriminate against transgender people, and it just

9   means nothing.   Title IX means nothing with that loophole, with

10  that exemption.

11       Nobody is safe if there's an exemption.

12  Q.   Well, thank you, Kalie, for sharing that.   I think you

13  explained the situation very well.

14       Now, I do want to note for the record, because some of the

15  lawyers might ask you about this, but you currently are not a

16  named plaintiff in this litigation; but do you anticipate

17  requesting to be made a plaintiff in this case?

18  A.   Yes.

19  Q.   And have you recently filed a Title IX complaint with the

20  Office of Civil Rights against Lincoln Christian University

21  for -- for them kicking you out in August of this year?

22  A.   Yes.

23  Q.   Now, I want to read some language.   The plaintiffs, in one

24  of our briefs, we cite a case.   *Johnson v. Lincoln Christian*

25  *College*.   It was called Lincoln Christian College at the time.

Hargrove - D

1   And this was in the 1980s.  This is -- this is, I believe, one

2   of the first known instances of a college expelling an LGBTQ

3   student, and I want to read the language because I think that

4   it's eerily reminiscent of what you have been describing.  I'll

5   share this just as a demonstrative here.

6       Ewald was the dean, and Johnson was the gay student.  The

7   case describes -- says, "You all told Johnson that he would be

8   dismissed from LCC" -- again the same institution as you

9   attended -- "because of his alleged homosexuality and that the

10  reason for his dismissal would be stamped across his

11  transcript.  From that meeting, Johnson understood that he

12  would be dismissed regardless of what had happened at the

13  hearing" -- a disciplinary hearing.  "Afraid that the

14  accusation of homosexuality being imprinted on his transcript

15  would destroy his career goal, Johnson withdrew from LCC."

16      Would you say that you felt and experienced something very

17  similar to that, but with respect to your gender identity, by

18  this very same institution?

19  A.   Yes.  And I would like to add when I first went to Lincoln

20  in 2009 the student that showed me around specifically told me

21  that they -- that Lincoln had been in some local news because

22  they had kicked out a lesbian student.  So Lincoln -- Lincoln

23  has a history of discrimination against LGBTQ that it does not

24  appear they intend to change.

25  Q.   So, lastly, Kalie, can you explain why you filed the

Hargrove - D

1    Title IX complaint?  What are you hoping to accomplish by

2    filing that complaint and by joining the lawsuit as a plaintiff

3    in this case?

4    A.    I mean, so it's really plain and simple.  The

5    U.S. Department of Education is picking a side.  They're

6    picking a side by providing financial aid to these institutions

7    because -- because of their decision to have this exemption,

8    these schools are continuing to lure people in with a guise of

9    being non-discriminative, and it's not true.  They use

10   language, because they probably have lawyers tell them what

11   language to use, that makes it seem like they -- the students

12   won't face discrimination, but it's not true.  It's all a lie.

13   It's an exemption that gives them the ability to discriminate.

14        And the fact is that the U.S. Department of Education is

15   funding that.  By providing aid, they are funding that.  They

16   are funding my discrimination.  I am paying tax dollars to fund

17   my discrimination.  The -- this -- it's -- I mean, it's kind of

18   like you put -- you put your money behind what you support, and

19   the truth is the Department of Education is supporting these

20   institutions that are telling me that I shouldn't exist in the

21   same space as them.  They're telling me that my history and

22   tradition in that tradition is not valid.  That's telling me

23   that even though I came to accept myself as transgender because

24   I took the lessons and principles and everything that they

25   taught at this seminary and I actually applied them and came to

Hargrove - D

1  the conclusion that who I am is not only okay but I reflect the

2  creativity of a creative God.  I learned that at this

3  institution, and they kicked me out.

4       And the U.S. Department of Education is continuing to side

5  with them and will continue to side with them until they

6  actually do something about the religious exemption, and you --

7  that means that they are siding with discrimination.  It means

8  that they are siding with perpetuating the world view that it's

9  okay for LGBTQ people to be discriminated on in public because

10  a school is a public place.  That's what the Department of

11  Education is siding with.

12       And the thing is is that they're siding with an idea that

13  I shouldn't exist instead of siding with people.  I'm a real

14  person.  Title IX is supposed to be there to protect me, but

15  it's not.  It's actually there to maintain my discrimination.

16            MR. SOUTHWICK:  Thank you, Kalie.  That was very well

17  put.  I don't have any further questions on behalf of

18  plaintiffs.

19       Kalie, some of the other lawyers might have some questions

20  for you.

21            THE COURT:  Mr. Davis, for the Government, go ahead.

22

23

24

25

Hargrove - X

1                        CROSS-EXAMINATION

2    BY MR. DAVIS:

3    Q.    Good evening.  I have just a few questions.  You mentioned

4    that you filed a Title IX complaint with the Department of

5    Education; correct?

6    A.    Correct.

7    Q.    And you filed that complaint just last week; is that

8    right?

9    A.    Correct.

10   Q.    And, to your knowledge, that Title IX complaint remains

11   pending with the Department of Education; is that right?

12   A.    Correct.

13   Q.    Have you filed any lawsuit directly against Lincoln

14   Christian University?

15   A.    So, no, because why would I whenever there's a legal -- a

16   legal way for them to discriminate against me?  Like, it's

17   legal for them to do it.  Why would I do that?  I'm saying that

18   that needs to change; that that shouldn't be legal.  So, no, I

19   haven't sued them because they legally discriminated against

20   me.

21   Q.    And you don't plan on suing them; is that right?

22   A.    I don't have a case.  If Paul tells me I have a case, then

23   maybe I will.  But let's be honest.  I'm here and -- I'm here

24   in this hearing right now because there is no case because it's

25   legal.  It's legal discrimination.

Hargrove - X

1        MR. DAVIS:  Thank you.  No further questions.

2        THE COURT:  For the intervenors?

3

4                    CROSS-EXAMINATION

5  BY MR. LIPPELMANN:

6  Q.   Hi, Kalie.  My name is Mark.  Thank you for your testimony

7  today.  I only have a few questions.  First, are you currently

8  enrolled as a student at any religious institution?

9  A.   I am.

10  Q.   Okay.  Which school are you -- are you enrolled in?

11  A.   I am enrolled at United Theological Seminary of the Twin

12  Cities.

13  Q.   And when were you admitted to United Theological Seminary?

14  A.   About three weeks after I got -- after I left Lincoln.

15  Q.   Okay.

16  A.   Because they specifically saw what happened to me and

17  reached out to me and got me into classes this semester, and I

18  had to -- you know, I brought up money before with Lincoln.  I

19  had to make that decision.  I'm taking fewer class this

20  semester because that's what I could afford.  Because I am not

21  able to use my GI bill this semester because I have to get that

22  approved before the semester starts.  So being kicked -- being

23  kicked out of Lincoln meant I can't use my GI bill this

24  semester.

25        And, again, that's legal because of religious exemption.

Hargrove - X

1   Q.    Okay.   You mentioned -- I believe the time frame was

2   summer of 2019.   You said it was as -- a result of theological

3   reflection on God's creation that led to your transgender

4   identity; is that correct?

5   A.    Yeah.

6   Q.    Did I understand your statement on direct?

7   A.    Oh, correct.   That's what I said.

8         And, actually, if you read the evidence that was placed

9   on -- it mentions an article where I share my -- in the article

10  I share my experience, and it was brought up with the last

11  witness where Genesis was brought up, and my understanding of

12  gender comes directly from Genesis.   Because, in Genesis, God

13  creates light and dark; day and night.   But God also creates --

14  did I say "Jesus"?   I meant God, if I said "Jesus."

15        God creates day and night, but God also creates dawn and

16  dusk.   God creates the separation of water between water and

17  land, but also there's swamps.   God separates water in the --

18  to the sky and on -- underneath the land, but there's also fog.

19  God creates animals that live in the sea and in the air but

20  also created mosquitoes.   So every single category of creation

21  that there is has a spectrum, and so I got to -- God created

22  them male and female and used the same logic that -- none of

23  the other categories were meant to be understood as fixed,

24  binary categories; so why is male and female?

25        So that was the basis of my theological changing point.

Hargrove - X

1    And so, yeah, like, I saw the end of the last plaintiff

2  that referenced Genesis, and that is a really weak argument

3  because it's an inconsistent reading of Genesis 1.

4  Q.    So it sounds like you have -- you've developed some strong

5  opinions about the interpretation -- the proper interpretation

6  of Genesis.

7    Is it fair to say that you disagree with Lincoln Christian

8  College's interpretation on that subject?

9  A.    Once you show me their interpretation of gender

10  specifically, I will answer that question; but if you look at

11  their handbook, they do not reference scripture whenever they

12  talk about gender identity.  They only say that it is

13  considered unbiblical and sexual immorality.

14    So as far as I can tell, they do not base it -- base

15  gender identity as a -- something that they derived from

16  scripture since they do not reference it like they do with

17  homosexuality.

18  Q.    Okay.  Fair enough.

19    So whether it's based in scripture or not, is it fair to

20  say that you disagree, as a matter of theology, on whether

21  becoming transgender is sinful?

22  A.    I mean, that -- I can't answer that question.  It's an

23  Independent Christian Church University.  It is foundationally

24  non-credal.  So that is kind of like the gold -- the golden

25  star of the denomination is that it's not credal.  So they

Hargrove - X

1   don't necessarily have, like, a theological position on it.

2       Do I know that they -- do I know that they are unaccepting

3   of transgender people?  Yeah.  They kicked me out.  So I -- I'm

4   not a hundred percent sure on the answer that you're looking

5   for because it sounds like you're asking for their theological

6   basis and my understanding of their theological basis, but I

7   don't know it because it's a non-credal -- its a non-credal

8   seminary.

9           MR. LIPPELMANN:  Okay.  Those are all the questions

10  that I have.  Thank you.

11          THE COURT:  Anyone else?  Redirect?

12          MR. SOUTHWICK:  Nothing further for plaintiffs,

13  Your Honor.

14          THE COURT:  Thank you very, very much for your time

15  and your testimony.  I appreciate it greatly, and we went a

16  little long.  I hope we didn't impinge too much on your

17  evening.  Thank you, and thank you for taking the time.  You're

18  excused.

19          MR. SOUTHWICK:  Thank you very much, Kalie.

20          THE WITNESS:  Thanks.

21          THE COURT:  So for purposes of tomorrow, are -- so

22  we're in good shape.  Am I correct?

23          MR. SOUTHWICK:  I believe so.  Our expert has

24  confirmed that he can go first in the morning.

25          THE COURT:  Thank you.  Please express my gratitude

 1   for his willingness to be flexible.

 2        And then everybody else will be ready after that?

 3        Everybody is on mute.  I can't hear.

 4             MR. DAVIS:  My apologies.  Can you hear me now?

 5             THE COURT:  I sure can.

 6             MR. DAVIS:  Great.  The federal defendants will be

 7   ready after that, Your Honor.  Thank you.

 8             THE COURT:  And the intervenors?  You're all

 9   coordinated?

10             UNIDENTIFIED SPEAKER:  Yes, Your Honor.  We'll be

11   ready.

12             THE COURT:  All right.  Is there anything I need to

13   know for tomorrow?  Any heads-up?  Anything?  If not, have a

14   good evening.  We'll recess, and I'll see you tomorrow at

15   9:00 in the morning.

16             MR. SOUTHWICK:  Thank you, Your Honor.

17             THE COURT:  We'll be here early.  People will be here

18   early if you need to get on and test everything out so we can

19   start on time.

20        Thank you.  Have a good evening.

21                       (Hearing concluded.)

22

23

24

25

1                 C E R T I F I C A T E

2              Elizabeth Hunter, et al. v.

3         U.S. Department of Education, et al.

4                  6:21-cv-00474-AA

5             Preliminary Injunction Hearing

6                  November 4, 2021

7        I certify, by signing below, that the foregoing is a true

8  and correct transcript, to the best of my ability, of the video

9  conference proceedings heard via video conference, taken by

10 stenographic means.  Due to the audio-visual connection,

11 parties appearing via speakerphone or cell phone or wearing

12 masks due to coronavirus, speakers overlapping when speaking,

13 speakers not identifying themselves before they speak, fast

14 speakers, the speaker's failure to enunciate, background noises

15 and/or other technical difficulties that occur during video

16 conference proceedings, this certification is limited by the

17 above-mentioned reasons and any technological difficulties of

18 such proceedings occurring over the video conference at the

19 United States District Court of Oregon in the above-entitled

20 cause.

21        A transcript without an original signature, conformed

22 signature, or digitally signed signature is not certified.

23 /s/Jill L. Jessup, CSR, RMR, RDR, CRR, CRC

24 ─────────────────────────────

25 Official Court Reporter          Signature Date: 11/17/2021
   Oregon CSR No. 98-0346           CSR Expiration Date:  9/30/2023