CAROL FEDERIGHI
TX Bar No. 06872950
*Lead Counsel*
HILARIE E. SNYDER
D.C. Bar No. 464837

BRIAN M. BOYNTON
Acting Assistant Attorney General
CARLOTTA P. WELLS
Assistant Director
United States Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, DC 20044
Phone: (202) 514-1903
Carol.Federighi@usdoj.gov
*Attorneys for Defendants*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF OREGON
## EUGENE DIVISION

| | |
|---|---|
| ELIZABETH HUNTER, *et al.*, | Civil Action No. 6:21–cv–00474–AA |
| Plaintiffs, | |
| v. | |
| U.S. DEPARTMENT OF EDUCATION, *et al.*, | **GOVERNMENT DEFENDANTS' POST-HEARING BRIEF** |
| Defendants. | |
| COUNCIL FOR CHRISTIAN COLLEGES & UNIVERSITIES, WESTERN BAPTIST COLLEGE d/b/a/ CORBAN UNIVERSITY, WILLIAM JESSUP UNIVERSITY AND PHOENIX SEMINARY, | |
| Intervenor-Defendants. | |

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

BACKGROUND ............................................................................................................. 3

    I.      LEGAL BACKGROUND ................................................................................. 3

    II.     ADMINISTRATIVE PROCESSING OF RELIGIOUS EXEMPTION REQUESTS AND COMPLAINTS OF DISCRIMINATION ............................... 4

    III.    THIS LAWSUIT .............................................................................................. 9

ARGUMENT .................................................................................................................. 10

    I.      PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS ......................................................................................................... 12

          A.     PLAINTIFFS LACK STANDING ....................................................... 13

          B.     PLAINTIFFS' CLAIMS LACK MERIT ............................................... 15

               1.     Plaintiffs Are Unlikely To Succeed on Their Fifth Amendment Claims. ...................................................................................... 15

               2.     Plaintiffs Are Unlikely To Succeed on Their Establishment Clause Claim. ............................................................................... 18

               3.     Plaintiffs Are Unlikely To Succeed on Their RFRA Claim. ........ 21

               4.     Plaintiffs Are Unlikely To Succeed on Their APA Claims. ......... 22

    II.     PLAINTIFFS HAVE NOT DEMONSTRATED IMMINENT, IRREPARABLE HARM ............................................................................................................ 26

    III.    THE BALANCE OF EQUITIES AND PUBLIC INTEREST WEIGH AGAINST AN INJUNCTION ............................................................................................ 31

CONCLUSION ............................................................................................................... 32

# TABLE OF AUTHORITIES

## CASES

*Am. Mfgs. Mut. Ins. Co. v. Sullivan*,
526 U.S. 40 (1999)........................................................................................... 16, 17

*Blum v. Yaretsky*,
457 U.S. 991 (1982)......................................................................................... 16, 17

*Bond v. Brown*,
No. 6:20–cv–1656, 2021 WL 1237114 (D. Or. Apr. 2, 2021).................................. 30

*Brown v. U.S. Forest Serv.*,
465 F. Supp. 3d 1119 (D. Or. 2020), *appeal dismissed*,
2020 WL 5814263 (9th Cir. Aug. 12, 2020)............................................................. 2

*Cannon v. Univ. of Chic.*,
441 U.S. 677 (1979)............................................................................................ 4, 26

*Chevron, U.S.A., Inc. v. Nat. Res, Def. Council, Inc.*,
467 U.S. 837 (1984)......................................................................................... 23, 24

*Comm. Concerning Cmty. Improvement v. City of Modesto*,
583 F.3d 690 (9th Cir. 2009) .................................................................................. 18

*Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos*,
483 U.S. 327 (1987).................................................................................. 18, 19, 20,

*D'Lil v. Best Western Encina Lodge & Suites*,
538 F.3d 1031 (9th Cir. 2008) ................................................................................ 13

*Edge v. City of Everett*,
929 F.3d 657 (9th Cir. 2019) .................................................................................. 12

*Espinoza v. Mont. Dep't of Revenue*,
140 S. Ct. 2246 (2020)........................................................................................... 20

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009)................................................................................................ 22

*Garcia v. Google, Inc.*,
786 F.3d 733 (9th Cir. 2015) .............................................................................. 1, 11

*Gaylor v. Mnuchin*,
919 F.3d 420 (7th Cir. 2019) ............................................................................ 18, 20

*Heckler v. Chaney,*
    470 U.S. 821 (1985) ............................................................................ 28

*Heineke v. Santa Clara Univ.,*
    965 F.3d 1009 (9th Cir. 2020) ........................................................... 16

*Hernandez v. Or. Legislature,*
    521 F. Supp. 3d 1025 (D. Or. 2021) .................................................. 30

*Hobbie v. Unemployment Appeals Comm'n of Fla.,*
    480 U.S. 136 (1987) ............................................................................ 18

*Innovation Law Lab v. Nielsen,*
    310 F. Supp. 3d 1150 (D. Or. 2018) .................................................. 11

*Kreisner v. City of San Diego,*
    1 F.3d 775 (9th Cir. 1993) .................................................................. 19

*Lee v. City of L.A.,*
    250 F.3d 668 (9th Cir. 2001) ............................................................. 17

*Lemon v. Kurtzman,*
    403 U.S. 602 (1971) ....................................................................... 19, 20

*Lugar v. Edmondson Oil Co.,*
    457 U.S. 922 (1982) ............................................................................ 21

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) ............................................................................ 14

*Maxon v. Fuller Theological Seminary,*
    No. 2:19–cv–09969, 2020 WL 6305460 (C.D. Cal. Oct. 7, 2020),
    *appeal pending*, No. 20-56156 (9th Cir. Nov. 18, 2021) ................. 24, 26

*Mayweathers v. Newland,*
    314 F.3d 1062 (9th Cir. 2002) ........................................................... 19

*Medina v. Cath. Health Initiatives,*
    877 F.3d 1213 (10th Cir. 2017) .................................................. 18, 19, 20

*Mont. Env't Info. Ctr. v. Stone-Manning,*
    766 F.3d 1184 (9th Cir. 2014) ........................................................... 14

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.,*
    545 U.S. 967 (2005) ............................................................................ 25

*Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*,
    366 F.3d 930 (D.C. Cir. 2004), *abrogated on other grounds by*,
    *Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178 (D.C. Cir. 2006)............................................. 26

*Norland v. Moynihan*,
    No. 6:12–cv–1641, 2012 WL 12882722 (D. Or. Nov. 2, 2012)............................................. 26

*Ohio Forestry Ass'n v. Sierra Club*,
    523 U.S. 726 (1998)............................................................................................. 14, 32

*Or. Rest. & Lodging Ass'n v. Perez*,
    816 F.3d 1080 (9th Cir. 2016) ........................................................................................ 25

*Pers. Adm'r of Mass. v. Feeney*,
    442 U.S. 256 (1979)....................................................................................................... 18

*Pieszak v. Glendale Adventist Med. Ctr.*,
    112 F. Supp. 2d 970 (C.D. Cal. 2000) ......................................................................... 19, 20

*Planned Parenthood Minn., N.D., S.D v. Rounds.*,
    530 F.3d 724 (8th Cir. 2008) ........................................................................................ 31

*Preskar v. United States*,
    248 F.R.D. 576 (E.D. Cal. 2008) .................................................................................. 27

*Ramos v. Wolf*,
    975 F.3d 872 (9th Cir. 2020) ........................................................................................ 17

*Rendell-Baker v. Kohn*,
    457 U.S. 830 (1982)....................................................................................................... 16

*Simon v. E. Ky. Welfare Rights Org.*,
    426 U.S. 26 (1976)......................................................................................................... 14

*Single Moms, Inc. v. Mont. Power Co.*,
    331 F.3d 743 (9th Cir. 2003) ........................................................................................ 15

*Sutton v. Providence St. Joseph Med. Ctr.*,
    192 F.3d 826 (9th Cir. 1999) .................................................................................... 16, 21

*Townsend v. Jones*,
    No. 2:19–cv–01674, 2020 WL 2311548 (D. Or. May 8, 2020) ............................................. 12

*Trump v. New York*,
    141 S. Ct. 530 (2020)..................................................................................................... 32

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
    429 U.S. 252 (1977) ........................................................................... 17

*Vill. of Bensenville v. Fed. Aviation Admin.*,
    457 F.3d 52 (D.C. Cir. 2006) ........................................................... 21

*Walz v. Tax Comm'n of the City of N.Y.*,
    397 U.S. 664 (1970) ........................................................................... 18

*Williams v. California*,
    764 F.3d 1002 (9th Cir. 2014) ................................................... 19, 20

*Winter v. Natural Resources Defense Council, Inc.*,
    555 U.S. 7 (2008) ................................................................ 2, 10, 11, 12

*Yazzie v. Hobbs*,
    977 F.3d 964 (9th Cir. 2020) ........................................................... 13

## STATUTES

20 U.S.C. § 1681 ................................................................. 3, 6, 19, 30

28 U.S.C. § 2403 ...................................................................................... 27

42 U.S.C. § 2000bb–4 ........................................................................... 21

## RULES

Fed. R. Civ. P. 24 ...................................................................................... 10

## REGULATIONS

34 C.F.R. §§ 100.6–100.11 ...................................................................... 4

34 C.F.R. § 100.7 ...................................................................................... 4

34 C.F.R. Part 106 ............................................................................... 3, 6

34 C.F.R. § 106.12 ........................................................................ *passim*

34 C.F.R. § 106.21 ...................................................................................... 6

34 C.F.R. § 106.23 ...................................................................................... 6

34 C.F.R. § 106.31 ...................................................................................... 6

34 C.F.R. § 106.32 ...................................................................................... 6

34 C.F.R. § 106.34 ............................................................................................... 5

34 C.F.R. § 106.44 ............................................................................................... 6

34 C.F.R. § 106.71 ............................................................................................... 7

34 C.F.R. § 106.81 ............................................................................................... 4

Direct Grant Programs,
    85 Fed. Reg. 59,916 (Sept. 23, 2020) ............................................................ *passim*

Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving
    Federal Financial Assistance,
    85 Fed. Reg. 30,026 (May 19, 2020) .......................................................... 4, 22, 23

## OTHER AUTHORITIES

11A Charles Alan Wright & Arthur R. Miller,
    Fed. Prac. & Proc. § 2948.1 (3d ed.) ............................................................... 26

U.S. Dep't of Educ., Questions and Answers on the Title IX Regulations on Sexual
    Harassment (July 2021),
    https://perma.cc/S4ZL-7LUL ........................................................................... 29

## INTRODUCTION

The evidence presented at the hearing underscores what Defendants U.S. Department of Education ("ED") and Catherine Lhamon, Assistant Secretary for Civil Rights at ED ("Government Defendants"), have maintained all along: ED and its Office for Civil Rights ("OCR") are committed to robust enforcement of Title IX's protections to ensure equal access to education for all students, including LGBTQI+ students. ED certainly does not condone the actions about which Plaintiffs have testified. However, ED adheres to all provisions in the statute, including its religious exemption. The evidence further reveals that OCR carefully considers every Title IX complaint it receives on an individualized basis and is doing so with regard to the pending administrative complaints filed by Plaintiffs in this matter.

Unwilling to wait for OCR to reach final determinations on their complaints, Plaintiffs seek preliminary injunctive relief. Plaintiffs initially sought a prohibitory injunction preventing OCR from dismissing Plaintiffs' administrative complaints pending the outcome of this case. Pls.' Mot. for TRO & Prelim. Inj., at 8, ECF No. 44 ("Pls.' Mot."). Essentially, Plaintiffs seemingly asked this Court to order OCR to pause its work on the administrative complaints, at least insofar as that work may require a determination—one way or the other—about the impact of the Title IX religious exemption.

But Plaintiffs also request mandatory relief and that relief has morphed during the course of this litigation. Indeed, their request for mandatory relief was the focus of the evidence they presented at the hearing. A mandatory injunction "goes well beyond simply maintaining the status quo *pendente lite* [and] is particularly disfavored." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc) (citation omitted). Nonetheless, at various points in this litigation, Plaintiffs have requested mandatory injunctive relief in the form of (1) requiring OCR to begin a compliance review or directed investigation into Plaintiffs' current or former schools, Pls.' Mot. to Amend

TRO Mot. at 13-14, ECF No. 75; (2) directing OCR to rescind already-assured Title IX religious exemption requests, *id*. at 14-15; (3) instructing OCR to complete its investigations of Plaintiffs' administrative complaints without regard to the religious exemption, Pls.' Mot., at 10;[1] and/or (4) order[ing] the government to withhold funding" to schools, Day 1 Tr. at 26:4-5 (Southwick). Whether considered mandatory or prohibitory, *see* Opinion & Order, at 8, ECF No. 88 ("TRO Order"), Plaintiffs also seek an order invalidating the 2020 regulations implementing the religious exemption and requiring OCR to process Plaintiffs' administrative complaints without "using" the regulations, Day 1 Tr. at 26:15-18 (Southwick).

In all events, the analysis starts with the traditional factors articulated in *Winter v. Natural Resources Defense Council, Inc*., 555 U.S. 7, 20 (2008)—irreparable harm, likelihood of success on the merits, balance of the equities, and public interest. In addition, when, as here, a plaintiff requests mandatory relief, "the plaintiff must establish that the law and facts *clearly favor* her position, not simply that she is likely to succeed." *Brown v. U.S. Forest Serv.*, 465 F. Supp. 3d 1119, 1127 (D. Or. 2020) (Aiken, J.) (emphasis in original, internal citations and quotations omitted), *appeal dismissed*, No. 20–35591, 2020 WL 5814263 (9th Cir. Aug. 12, 2020).

In its August 30, 2021 order, this Court considered the *Winter* factors, as well as the heightened mandatory injunction standard, and concluded that Plaintiffs had not carried their burden on even a single factor necessary to establish their entitlement to a temporary restraining order. TRO Order. Although the Court has now heard two and a half days of testimony and

---

[1] *See also* Day 1 Tr. at 26:8-14 ("enjoining the federal defendants that they must apply Title IX as they do to other educational institutions."). "Day 1 TR" refers to the November 4, 2021, hearing transcript, "Day 2 TR" to the November 4, 2021, transcript, and "Day 3 TR" to the November 8, 2021, transcript.

considered many exhibits, nothing presented at that hearing changes the calculus here. Plaintiffs'

preliminary-injunction motion, therefore, should be denied.

## BACKGROUND

The background relevant to Plaintiffs' motion for preliminary relief and the Government

Defendants' legal arguments against granting that motion were set forth initially in the

Government Defendants' Opposition to Plaintiffs' TRO Motion (ECF No. 62). The November

hearing presented additional testimony and evidence for the Court's consideration. The Argument

section below will reprise the same structure presented in the Government Defendants' prior brief

but will add in discussion of the evidence presented at the hearing where relevant and will

summarize other parts of the prior briefing when helpful. For additional explanations, Government

Defendants incorporate by reference their opposition, ECF No. 62, as well as their motion to

dismiss, ECF No. 56 ("Gov. Defs.' Dismiss Mot."), and reply in support of that motion, ECF

No. 92.

## I.    LEGAL BACKGROUND

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be

excluded from participation in, be denied the benefits of, or be subjected to discrimination under

any education program or activity receiving Federal financial assistance . . . ." 20 U.S.C. § 1681(a).

The statute includes several exemptions. *Id*. As relevant here, the religious exemption provides

that the statute "shall not apply to an educational institution which is controlled by a religious

organization if the application of this subsection would not be consistent with the religious tenets

of such organization." *Id*. § 1681(a)(3).

ED's regulations implementing Title IX at 34 C.F.R. Part 106 contain a provision setting

forth the procedures for an institution wishing to invoke the religious exemption. *See* 34 C.F.R.

§ 106.12. In 2020, ED amended this regulation in two ways. First, ED revised the regulation to

clarify that institutions are not required to submit a written statement to the Assistant Secretary for Civil Rights prior to invoking the religious exemption. *See* Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 85 Fed. Reg. 30,026, 30,031, 30,475–82 (May 19, 2020) (the "May 2020 Rulemaking"). The revised regulation now provides that "[a]n educational institution that seeks assurance of the exemption set forth in paragraph (a) of this section *may* do so" by submitting a written request to the Assistant Secretary. 34 C.F.R. § 106.12(b) (emphasis added). But, the regulation specifies, "the institution may . . . raise its exemption by submitting in writing to the Assistant Secretary a statement" after ED "notifies [the] institution that it is under investigation for noncompliance." *Id.*

Second, the Department revised the regulation to add a subsection addressing how educational institutions may demonstrate that they are "controlled by a religious organization" within the meaning of the religious exemption. *See* Direct Grant Programs, 85 Fed. Reg. 59,916, 59,918 (Sept. 23, 2020) (the "September 2020 Rulemaking"). The revised regulation now sets forth a list of six criteria, any one of which "shall be sufficient to establish that an educational institution is controlled by a religious organization." 34 C.F.R. § 106.12(c).

## II.   ADMINISTRATIVE PROCESSING OF RELIGIOUS EXEMPTION REQUESTS AND COMPLAINTS OF DISCRIMINATION

Individuals who allege injuries from discriminatory practices at an educational institution receiving federal funds may proceed via two routes to obtain relief. They can sue the educational institution directly in court. *See Cannon v. Univ. of Chic.*, 441 U.S. 677, 717 (1979). Or they can file an administrative complaint with OCR. *See* 34 C.F.R. § 106.81 (incorporating the procedures applicable to Title VI of the Civil Rights Act of 1964, 34 C.F.R. §§ 100.6–100.11); *id.* § 100.7(b).

At the hearing, Deputy Assistant Secretary for Enforcement for the Office for Civil Rights Randolph Wills and Program Legal Group ("PLG") Supervisory Attorney Alice Yao explained

the process by which ED handles Title IX administrative complaints, as well as requests for assurances of religious exemption. *See* Day 2 Tr. at 375:5-408:23 (Yao); 447:8-483:8 (Wills). As they explained, these processes have remained largely unchanged for decades. *See id*. at 397:1-10, 398:20-399:3, 406:18-23 (Yao); 482:18-483:8 (Wills). Two different components within OCR, PLG and Enforcement, assist the Assistant Secretary for Civil Rights ("Assistant Secretary") in, respectively, (1) determining whether to send an assurance of religious exemption letter to an educational institution in response to a written request by the institution and (2) processing administrative complaints of discrimination that potentially implicate the religious exemption. *Id*. at 377:18-378:1, 391:9-12 (Yao); 452:13-22, 472:1-473:5 (Wills).

*First*, educational institutions may write to OCR to request an assurance that the religious exemption applies to them and, when that happens, PLG is "responsible for processing" those requests. Day 2 Tr. at 377:23-378:12, 380:6-19 (Yao). By way of example only, an educational institution might claim that its controlling organization's religious tenets require that only men be trained as religious leaders and, as a result, may seek an exemption from the regulation (34 C.F.R. § 106.34) prohibiting sex discrimination in access to classes. *See id*. at 381:6-12. Upon receipt of one of these letters, PLG drafts a proposed response for the Assistant Secretary, who is the final decision maker. *Id*. at 378:23-379:18.

In considering these requests, ED "look[s] to the information that the educational institution has provided about the controlling organization[,] . . . the tenets that have been articulated in the request and the specific provisions of the Title IX regulations that [the institution] . . . point[s] to for which compliance would conflict with those tenets." Day 2 Tr. at

379:23-380:5 (Yao).[2] ED determines whether "an educational institution . . . is controlled by a religious organization," 20 U.S.C. § 1681(a)(3), using the six factors described in 34 C.F.R. § 106.12(c). Day 2 Tr. at 398:4-407:22 (Yao). Although the regulation was promulgated in September 2020, the criteria reflect ED's decades-old practice, including its practice of permitting educational institutions with internal—not just external—controlling organizations to qualify for the exemption. *Id.*[3] Further, ED generally "take[s] the educational institution's representations [as to religious tenets] as they come . . . in the request." *Id*. at 433:23-434:6, 436:17-438:17; Gov. Ex. 10, Singleton Memo. Once the review is complete, the Assistant Secretary sends a letter to the requestor summarizing the information it provided, including the regulations from which the requestor seeks an exemption, and, if appropriate, assures the requestor that it is exempt from those regulations to the extent that they conflict with the religious tenets. Day 2 Tr. at 382:7-25 (Yao). ED makes available to the public via its electronic reading room both the request and response letters. *Id*. at 383:1-20.

Thus, institutions request and, if appropriate, receive letters assuring them that they are exempt from specific regulations insofar as compliance with those regulations may conflict with their religious tenets. Day 2 Tr. at 379:23-380:23; 382:7-25 (Yao); *see, e.g.,* Pls.' Ex. 2, Union University Exemption Letter. The various regulations are in 34 C.F.R. Part 106 and include, among other things, prohibitions on sex discrimination in admissions, recruitment, activities, and housing. *See, e.g*., 34 C.F.R. §§ 106.21, 106.23, 106.31, 106.32. Although ED also has regulations prescribing how a recipient school must respond to sexual harassment, *id*. § 106.44, and

---

[2] If the institution has not submitted sufficient documentation, PLG drafts a response seeking clarification from the institution. Day 2 Tr. at 379:13-18, 381:25-382:6 (Yao).

[3] *See also* Gov. Ex. 9, HEW Form; Gov. Ex. 10, Singleton Memo; Gov. Ex. 11, Smith Memo; Gov. Ex. 7, September 2020 Rulemaking.

prohibiting retaliation against individuals for asserting any right or privilege secured by Title IX or its regulations, *id.* § 106.71, OCR has never provided an assurance of religious exemption from either of these two regulations and "'is skeptical that schools will be eligible to assert exemptions from'" those regulations. Day 2 Tr. at 384:18-20, 386:7-9, 387:2-17, 440:5-23 (Yao); *see also* Gov. Ex. 7, September 2020 Rulemaking at 59,948.

*Second*, individuals may file administrative complaints with OCR alleging discrimination at an educational institution. Day 2 Tr. at 454:18-22 (Wills). OCR Enforcement evaluates, investigates, and resolves "thousands of . . . [those] complaints." *Id.* at 449:12-23. OCR Enforcement does this work in accordance with the process outlined in OCR's Case Processing Manual. *Id.* at 453:7-14; Gov. Ex. 1, Manual. And although there is no mandatory timeframe within which OCR must complete its work, it has a goal of completing 80% of the 9,000 to 11,000 complaints it receives annually within 180 days of receipt. Day 2 Tr. at 456:17-457:17, 464:4-18 (Wills).

The first step, "evaluation," requires OCR to consider whether the administrative complaint "is something that . . . can [be] subject to further processing," by analyzing one or more of nineteen items, including subject-matter jurisdiction and timeliness. Day 2 Tr. at 455:4-456:16, 459:5-460:20 (Wills). If the complaint fails to meet any one of the nineteen "evaluation" items, then OCR is required to dismiss it. *Id.* at 460:21-461:2. If OCR determines that a particular administrative complaint has met the "evaluation" items, then it opens an investigation of the educational institution during which it gathers information through review of documents and interviews to determine whether the institution "is complying or not complying with" the law. *Id.* at 461:14-464:3. Finally, OCR generally resolves its investigation with a resolution agreement signed by the educational institution if a violation of Title IX has been established or, if not, by issuing a

determination letter concluding that there was insufficient evidence of non-compliance. *Id*. at 464:19-467:7, 468:15-470:8.[4] And at any point, including after the "evaluation" step, OCR will dismiss a complaint if one of the 19 "evaluation" items is no longer met. *Id*. at 467:8-20. OCR Enforcement assigns all newly filed administrative complaints to an investigative staff member who is responsible for guiding it through the process, but the decisions to dismiss a complaint, open it for investigation, and resolve it are made at a supervisory level and not by that staff member. *Id*. at 470:14-471:15.

The religious exemption implicates OCR's subject matter jurisdiction over the administrative complaint. Day 2 Tr. at 473:6-474:12 (Wills). OCR Enforcement can consider an assurance of religious exemption letter (issued by the Assistant Secretary after processing by PLG, *see supra* at 5-7) at any stage in its process of evaluating, investigating, and resolving administrative complaints, but it is most likely to consider an assurance letter during the evaluation stage. *Id*. at 472:1-474:21, 480:5-482:9. During any of those stages, OCR determines whether a religious exemption, as described in the Assistant Secretary's assurance letter, covers the allegations in the complaint. *Id*. at 473:6-474:19, 480:5-482:9; Day 3 Tr. at 538:2-539:12 (Wills). If it does, OCR dismisses the complaint; but, if it does not, OCR proceeds with its consideration of the complaint. Day 2 Tr. at 473:6-474:19 (Wills). By way of example only, when the applicable religious tenet conflicts only with allowing female students access to classes that specifically train for the priesthood, OCR would investigate (and not dismiss) a complaint alleging that the

_____

[4] If OCR determines that an educational institution did not comply with the law and is not able to resolve the matter with the institution, OCR may either refer the matter to the Department of Justice or initiate an administrative proceeding to terminate or suspend federal funds. Gov. Ex. 1, Manual, at 21, 24-25. An educational institution can also sign a resolution agreement before OCR completes its investigation. Day 2 Tr. at 464:24-466:21, 468:15-469-15 (Wills).

institution discriminated against a female student by denying her access to a chemistry course. Day 3 Tr. at 538:2-540:21 (Wills).

The Assistant Secretary is the final decision maker regarding whether an administrative complaint potentially implicating the religious exemption should be dismissed, opened for investigation, and/or resolved. Day 2 Tr. at 479:5-11 (Wills). And, in evaluating, investigating, and resolving administrative complaints, OCR currently will consider, and historically has considered, an assurance letter requested and received at any time by the educational institution, including after the administrative complaint has been filed. *Id.* at 481:7-483:8 (Wills); *id.* at 393:4-394:14, 396:10-398:3 (Yao); *see also* Gov. Ex. 14, May 2020 Rulemaking at 30,475. Moreover, if, during the course of OCR's consideration, an administrative complainant contests the recipient school's eligibility for the exemption, OCR may send a letter to the controlling organization seeking clarification in order to determine whether it should rescind any assurance. Day 2 Tr. at 391:13-393:3 (Yao).

## III.    THIS LAWSUIT

Plaintiffs are current and former students who identify as LGBTQI+ and who attend, attended, or sought to attend certain religious educational institutions. First Am. Class Action Compl. ¶¶ 1, 13–51, ECF No. 35 ("FAC"). On March 29, 2021, they filed the present suit against ED as a putative class action to challenge the religious exemption as applied to LGBTQI+ students at Christian colleges and universities. Compl. ¶¶ 1–6, ECF No. 1. Plaintiffs amended their complaint on June 7, 2021, and they now assert five causes of action based on the First and Fifth Amendments, the Administrative Procedure Act, and the Religious Freedom Restoration Act. FAC ¶¶ 621–708.

In June, July, and August 2021, after Plaintiffs filed their First Amended Complaint, most of the Plaintiffs filed administrative complaints with OCR for the first time, alleging discrimination

on the basis of sex at their current or former colleges and universities. *See* Pls.' Mot. at 11. Shortly thereafter, Plaintiffs filed their present motion for a temporary restraining order and a preliminary injunction, asserting that their recently filed administrative complaints "are in danger of being dismissed in a matter of days" and accordingly seeking "an order enjoining Defendants and their agents from dismissing Plaintiffs' Title IX complaints" based on application of the religious exemption. *Id*. at 8.

This Court denied the TRO motion on August 30, 2021. TRO Order, at 12. Plaintiffs then requested a November hearing on their preliminary injunction motion. Status Conference, ECF No. 89. Prior to that hearing, on October 8, 2021, the Court granted motions to intervene filed by three Christian universities and an association of Protestant Christian institutions of higher learning, holding that they would be permitted to intervene pursuant to Federal Rule of Civil Procedure 24(b)(1)(B). Op. & Order, ECF No. 106. And on November 4, 5, and 8, the Court heard testimony and received evidence from all parties in conjunction with Plaintiffs' motion for a preliminary injunction. ECF Nos. 140, 141, 142.

With one exception, all of Plaintiffs' administrative complaints remain pending with OCR. Gov. Ex. 3, ECF No. 124-3 (Status Chart); Day 3 Tr. at 497:6-498:9 (Wills). In addition to the pending preliminary injunction motion, both the Government Defendants and the Intervenor-Defendants have filed motions to dismiss.

## ARGUMENT

A plaintiff seeking preliminary injunctive relief must show that: (1) the plaintiff is likely to succeed on the merits; (2) the plaintiff is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in the plaintiff's favor; and (4) an injunction is in the public interest. *Winter*, 555 U.S. at 20. Further, as this Court already recognized, when a plaintiff requests a "mandatory injunction," the "already high standard" granting relief is "further

heightened," and the plaintiff must "establish that the law and facts *clearly favor* her position, not simply that she is likely to succeed." *Innovation Law Lab v. Nielsen*, 310 F. Supp. 3d 1150, 1156–57 (D. Or. 2018) (quoting *Garcia*, 786 F.3d at 740); *see* TRO Order at 6.

Despite three days of testimony, Plaintiffs have not established that they are entitled to preliminary injunctive relief under either the heightened or standard version of the *Winter* factors. First, none of the evidence presented to the Court relates to, let alone bolsters, the issue of whether Plaintiffs are likely to succeed on the merits of any of their claims, which are purely legal issues. And while some of the evidence presented at the hearing may be relevant to the threshold issues of standing and ripeness, which are mixed questions of law and fact, that evidence does not support a resolution of those issues in Plaintiffs' favor. Rather, the evidence shows that OCR has not made any decisions on the applicability of the religious exemption to Plaintiffs' Title IX administrative claims (and may not need to do so). As a result, Plaintiffs' challenges to OCR's application of that exemption are unripe.

The evidence adduced at the hearing is even less relevant to Plaintiffs' APA claim, because review of APA claims is limited to an administrative record. In any event, the evidence shows that the regulatory revisions challenged by Plaintiffs codified but did not change OCR's practices. Accordingly, Plaintiffs lack standing to assert their APA claims because they have not been injured by the regulatory changes. Further, their claims that such modest regulatory changes are arbitrary and capricious have no merit.

Second, Plaintiffs have failed to demonstrate harm caused by the Government Defendants' actions that is imminent and irreparable and that could be redressed by injunctive relief against the government. As a matter of law, Plaintiffs have not shown and cannot show that they would suffer irreparable injury in the absence of a preliminary injunction because they have an adequate

alternative remedy to the pending administrative complaint process, namely, a private Title IX lawsuit against their schools. In addition, as already noted, most of the relief Plaintiffs are seeking is mandatory, not prohibitory, in nature, and they have not made a sufficiently high showing as to irreparable injury nor as to the remaining *Winter* factors to warrant this relief. Nor have Plaintiffs shown how a prohibitory injunction enjoining dismissal of their complaints based on the religious exemption would afford them any relief. The government testimony shows that there are numerous other bases on which the pending complaints could be validly dismissed, including, notably, lack of timeliness, Day 2 Tr. at 459:5-461:2 (Wills), and there is no certainty that any of the schools at issue have obtained, or will seek at any future stage of the process to obtain, an applicable religious exemption assurance, *id*. at 440:24-441:2; Day 3 Tr. at 543:7-23 (Wills). Thus, it is far from certain that OCR will need to consider the application of the religious exemption to resolve any of Plaintiffs' complaints. Moreover, Plaintiffs' delay before seeking preliminary injunctive relief— in some cases, many years after the alleged harm they experienced at their schools—also militates against granting such relief.

Finally, nothing presented at the hearing should change the Court's prior conclusion that the balance of the equities and the public interest weigh against preliminary relief here.

## I.     PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS

In determining whether to award preliminary injunctive relief, a "[l]ikelihood of success on the merits is the most important factor." *Edge v. City of Everett*, 929 F.3d 657, 663 (9th Cir. 2019) (citation omitted). "[I]f a movant fails to meet this threshold inquiry, [a court] need not consider the other factors." *Id.* Moreover, a plaintiff must demonstrate "a *clear* likelihood of either success on the merits or irreparable harm to warrant . . . mandatory injunctive relief." *Townsend v. Jones*, No. 2:19–cv–01674, 2020 WL 2311548, at *1 (D. Or. May 8, 2020) (Aiken, J.) (emphasis

added). Plaintiffs' testimony about the harm they experienced at their religious colleges and universities establishes neither that they have standing to sue the Government Defendants nor that their challenges to the religious exemption have basis in law. Accordingly, the Court should deny Plaintiffs' motion for preliminary injunction.

### A.   PLAINTIFFS LACK STANDING

"At th[e] preliminary injunction stage," Plaintiffs "must make a clear showing of each element of standing." *Yazzie v. Hobbs*, 977 F.3d 964, 966 (9th Cir. 2020) (per curiam). As explained in greater detail in Government Defendants' Motion to Dismiss (Gov. Defs.' Dismiss Mot. at 11–19), Plaintiffs do not make such a showing, and the hearing only confirmed this fact.

Most importantly, Plaintiffs have neither alleged nor demonstrated a sufficiently ripe injury-in-fact. *See* Gov. Defs.' Dismiss Mot. at 12–15. Plaintiffs' FAC purports to raise as-applied challenges to the religious exemption. But, even if the Court were to consider post-FAC events,[5] the evidence presented at the hearing confirms that, with one exception, Plaintiffs have not obtained administrative determinations from ED as to any of the underlying conduct alleged in the FAC. Thus, because Plaintiffs' administrative complaints are pending, there is no agency determination for this Court to review. Moreover, the sole administrative determination reached to date by ED resulted in dismissal of the complaint because there was a pending, related federal lawsuit, and not as a result of application of the religious exemption, *see* Day 3 Tr. at 497:11-498:4 (Wills); Gov. Ex. 3, at 2 (entry for Markowski complaint). With respect to the pending complaints, therefore, unless and until OCR applies the religious exemption as the basis for dismissing any of

---

[5] In determining standing, the Court should confine its consideration to the facts as they existed at the time the complaint was filed and not consider the evidence submitted with Plaintiffs' present motion regarding post-FAC events. *See D'Lil v. Best Western Encina Lodge & Suites*, 538 F.3d 1031, 1036 (9th Cir. 2008).

the administrative complaints, court consideration of the issues involved is premature, and Plaintiffs lack a sufficiently ripe injury. *See Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 732–33 (1998); *Mont. Env't Info. Ctr. v. Stone-Manning*, 766 F.3d 1184, 1190 (9th Cir. 2014) (stating that controversy involving an agency decision may ripe if "the court can make a firm prediction that . . . the agency will deny the application by virtue of the [challenged] rule").

Plaintiffs also have not sufficiently alleged, or shown, the other required elements of standing, causation and redressability, as set forth in more detail in the Government Defendants' Motion to Dismiss (pages 15–19), to which the Court is referred. First, Plaintiffs have not provided evidence to demonstrate that their claimed injuries are "fairly . . . trace[able] to the challenged action of" the Government Defendants. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976)). Plaintiffs allege that their educational institutions discriminated against them and that, as a result of the religious exemption, OCR will refuse to investigate their complaints. But Plaintiffs have not shown a plausible causal connection between these two events, and, accordingly, Plaintiffs' injuries resulting from the actions of the institutions cannot fairly be attributed to the Government Defendants. *See* Gov. Defs.' Dismiss Mot. at 15-16. Further, Plaintiffs' claims of stigmatic injury fail because it is the alleged conduct of Plaintiffs' educational institutions—not of the federal government—that stigmatizes Plaintiffs. The religious exemption is facially neutral and Plaintiffs have neither alleged nor shown any indicia of discriminatory intent on the part of Congress in enacting the statute or on the part of ED in enforcing it.

Plaintiffs' testimony also did not establish that the relief sought would be likely to redress their injuries. Plaintiffs can only speculate that the institutions involved would alter their policies if they no longer could claim a religious exemption. *See, e.g.,* Day 1 Tr., at 226:9-227:7 (Hunter).

Such speculation is insufficient to establish a "likelihood" of redressability. The institutions may well decline federal funding, as they would be permitted to do, which, as Plaintiffs acknowledge, *see* Pls.' Mot. at 26, would mean that Title IX would not apply to them. Accordingly, whether the relief Plaintiffs seek will actually redress their alleged injuries is speculative—and not sufficiently likely to establish standing. *See* Gov. Defs.' Dismiss Mot. at 16-19.

**B.    PLAINTIFFS' CLAIMS LACK MERIT**

As to the merits, none of the evidence at the hearing should alter the Court's prior conclusion that Plaintiffs are unlikely to succeed on their First, Second, Fourth, and Fifth Causes of Action.[6] *See generally* TRO Order at 7 ("[D]efendants' jurisdictional arguments are not clearly meritless and, at best, plaintiffs have shown serious questions going to the merits of their claims."); *id.* at 8 ("[A]t this stage it is far from clear that defendants' conduct violates plaintiffs' constitutional rights."). These claims raise legal issues to which the factual evidence provided by Plaintiffs is at most of only limited relevance.

**1.    Plaintiffs Are Unlikely To Succeed on Their Fifth Amendment Claims.**

Plaintiffs' First Cause of Action, which asserts equal-protection and substantive-due-process claims under the Fifth Amendment, fails to state a viable claim because it is based on actions taken by private religious colleges and universities—not the federal government. *See generally* Gov. Defs.' Dismiss Mot. at 19–25. As explained in greater detail in Defendants' motion to dismiss, the Constitution "protects individual rights only from *government* action, not from *private* action." *Single Moms, Inc. v. Mont. Power Co.*, 331 F.3d 743, 746 (9th Cir. 2003).

---

[6] Plaintiffs have not argued that they are likely to succeed on their Third Cause of Action, claiming alleged violations of various First Amendment rights. *Compare* Pls.' Reply at 24-35 *with* FAC ¶¶ 659-671; *see also* TRO Order at 6 n.1.

"[C]onstitutional standards" may be "invoked only when it can be said that the State is *responsible* for the *specific conduct* of which the plaintiff complains." *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982) (second emphasis added). This government-action requirement "excludes from its reach 'merely private conduct, no matter how discriminatory or wrongful'." *Am. Mfgs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999). The Ninth Circuit "start[s] with the presumption that private conduct does not constitute governmental action," *Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 835 (9th Cir. 1999) (quoting *Blum*, 457 U.S. at 1002), and that presumption "may be overcome" only "in limited circumstances," *Heineke v. Santa Clara Univ.*, 965 F.3d 1009, 1012 (9th Cir. 2020).

Plaintiffs seek to hold Defendants responsible for the alleged discriminatory conduct of certain private colleges. *See generally* FAC ¶¶ 1–5, 629, 635–637. The government conduct Plaintiffs challenge is limited to: (i) the fact that "the government provides public funds" to religious colleges and universities, *id.* ¶ 5; and (ii) the government's issuance of religious exemption letters and "[t]he Department's [supposed] inaction" in the face of the complained-of private conduct at issue, *id.* ¶ 2; *see also* Pls.' Reply in Supp. of Mot. for TRO & PI, at 9, ECF No. ("Pls.' Reply"). These allegations do not transform private conduct into governmental conduct. *See Blum*, 457 U.S. at 1004. As to funding, the Supreme Court has made clear that even when a private school derives "virtually all of [its] income . . . from government funding," "the school's receipt of public funds does not make the [school's] decisions acts of the State." *Rendell-Baker v. Kohn*, 457 U.S. 830, 840 (1982); *see also Blum*, 457 U.S. at 1011 ("That programs undertaken by the [government] result in substantial funding of the activities of a private entity" does not "demonstrat[e] that the [government] is responsible for decisions made by the entity."); *Heineke*, 965 F.3d at 1013 (quoting *Rendell-Baker*, 457 U.S. at 840).

Nor do the federal government's actions applying the religious exemption as required by the statute transform the private conduct of religious colleges and universities into governmental action subject to constitutional scrutiny. The Supreme Court has explained that "state inaction" or "legislative decision[s] not to intervene in" certain "dispute[s]"—like the religious exemption here—do not transform private action into government action. *Am. Mfgs. Mut. Ins. Co.*, 526 U.S. at 53–54; *accord Blum*, 457 U.S. at 1004–05 ("Mere approval of or acquiescence in the initiatives of a private party is not sufficient to justify holding the State responsible for those initiatives under the terms of the Fourteenth Amendment."). "[O]ur cases," the Supreme Court reasoned, "will not tolerate the imposition of [constitutional] restraints on private action by the simple device of characterizing the State's inaction as 'authorization' or 'encouragement.'" *Am. Mfgs. Mut. Ins. Co.*, 526 U.S. at 54.

Plaintiffs' equal-protection claim also falters because Plaintiffs have demonstrated no discriminatory intent or purpose behind the religious exemption. *See generally* Gov. Defs.' Dismiss Mot. at 25–27 (more-detailed discussion). "[P]roof of . . . discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Ramos v. Wolf*, 975 F.3d 872, 896 (9th Cir. 2020) (quoting *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977)). "Where," as here, "the challenged governmental policy is 'facially neutral,'"—that is, the religious exemption itself draws no distinction between organizational religious tenets that address LGBTQI+ students and those that do not—"proof of its disproportionate impact on an identifiable group can satisfy the intent requirement only if it tends to show that some invidious or discriminatory purpose underlies the policy." *Lee v. City of L.A.*, 250 F.3d 668, 686 (9th Cir. 2001). In other words, Plaintiffs must show that Congress "selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable

group." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). But Plaintiffs have not presented any evidence that Congress intended to discriminate against LGBTQI+ students when it enacted Title IX and its religious exemption. And where, as here, Plaintiffs present "no evidence of intentional discrimination, then the court assumes that the challenged actions were not based on discrimination and must inquire only whether the actions were rationally related to a legitimate governmental interest." *Comm. Concerning Cmty. Improvement v. City of Modesto*, 583 F.3d 690, 703 (9th Cir. 2009). The religious exemption is rationally related to the legitimate governmental interest in accommodating religious practices. *See Hobbie v. Unemployment Appeals Comm'n of Fla.*, 480 U.S. 136, 144–45 (1987) ("[T]he government may (and sometimes must) accommodate religious practices and . . . it may do so without violating the Establishment Clause.").[7]

## 2. Plaintiffs Are Unlikely To Succeed on Their Establishment Clause Claim.

Plaintiffs are also unlikely to succeed on their Second Cause of Action, which challenges the religious exemption on Establishment Clause grounds. *See generally* Gov. Defs.' Dismiss Mot. at 29–34 (explaining that Plaintiffs' Establishment Clause claim should be dismissed). Courts— including the Supreme Court—have regularly rejected Establishment Clause challenges to narrowly drawn exemptions designed to protect the autonomy of religious institutions. *See, e.g.*, *Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327 (1987) (Title VII's religious exemption); *Walz v. Tax Comm'n of the City of N.Y.*, 397 U.S. 664 (1970) (religious exemption to state property taxes); *Gaylor v. Mnuchin*, 919 F.3d 420, 432 (7th Cir. 2019) (federal tax exemption for church-provided parsonages); *Medina v. Cath. Health Initiatives*, 877 F.3d 1213, 1230–34 (10th Cir. 2017) (ERISA's church-plan exemption); *Pieszak*

---

[7] Plaintiffs are also unlikely to succeed on their substantive-due-process claim for the additional independent reasons set forth in the government's motion to dismiss at pages 28–29.

*v. Glendale Adventist Med. Ctr.*, 112 F. Supp. 2d 970, 996–97 (C.D. Cal. 2000) (religious exemption to California's Fair Employment and Housing Act). The religious exemption in Title IX likewise passes constitutional muster.

"Establishment Clause violations are determined according to the three-pronged test articulated in *Lemon v. Kurtzman*," 403 U.S. 602, 612-13 (1971). *Williams v. California*, 764 F.3d 1002, 1013–14 (9th Cir. 2014). "A statute or regulation will survive an Establishment Clause attack if (1) it has a secular legislative purpose, (2) its primary effect neither advances nor inhibits religion, and (3) it does not foster excessive government entanglement with religion." *Id.* at 1014. The religious exemption passes each of these prongs.

*First*, the religious exemption has a secular purpose. "A practice will stumble on the [secular] purpose prong 'only if it is motivated *wholly* by an impermissible purpose.'" *Kreisner v. City of San Diego*, 1 F.3d 775, 782 (9th Cir. 1993) (emphasis added). Here, there is a more-than-plausible secular purpose to the religious exemption to Title IX: as the Supreme Court recognized, "it is a permissible legislative purpose to alleviate significant governmental interference with the ability of religious organizations to define and carry out their religious missions." *Amos*, 483 U.S. at 335; *accord, e.g.*, *Pieszak*, 112 F. Supp. 2d at 996–97. By "protect[ing] the exercise of religion in institutions from unwarranted and substantial infringement," the religious exemption promotes "a secular legislative purpose." *Mayweathers v. Newland*, 314 F.3d 1062, 1068 (9th Cir. 2002) (holding that the Religious Land Use and Institutionalized Persons Act of 2000 "intends a secular legislative purpose").

*Second*, the primary effect of the religious exemption neither advances nor inhibits religion. "A law is not unconstitutional simply because it *allows* churches to advance religion, which is their very purpose." *Amos*, 483 U.S. at 337. "For a law to have forbidden 'effects' under *Lemon*, it must

be fair to say that the *government itself* has advanced religion through its own activities and influence." *Id.* Nor is it relevant to the Establishment Clause analysis that the federal government provides funding to religiously controlled educational institutions, because the government *also* provides funding to educational institutions that are not religiously controlled. The Supreme Court "ha[s] repeatedly held that the Establishment Clause is not offended when religious observers and organizations benefit from neutral government programs." *Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246, 2254 (2020).

*Finally*, the religious exemption does not entangle the government with religion—let alone excessively so. "A relationship results in an excessive entanglement with religion if it requires 'sustained and detailed' interaction between church and State 'for enforcement of statutory or administrative standards.'" *Williams*, 764 F.3d at 1015–16 (quoting *Lemon*, 403 U.S. at 621). The religious exemption requires nothing of the sort. To the contrary, religious exemptions like Title IX's *disentangle* government from religion, "effectuat[ing] a more complete separation of the two." *Amos*, 483 U.S. at 339; *see Gaylor*, 919 F.3d at 434 (though "some level of church-state interaction is unavoidable," "[t]he alternative" to the religious exemption would be "more entangling"); *Medina*, 877 F.3d at 1234 ("[F]ar from entangling the government in the affairs of religious institutions, [ERISA's] church-plan exemption avoids the entanglement that would likely occur in its absence."); *Pieszak*, 112 F. Supp. 2d at 997 ("The [Fair Employment and Housing Act] exemption clearly creates a strong separation between church and state.") Indeed, Ms. Yao's testimony illustrates how OCR has applied the exemption, consistent with its original purpose, to minimize such entanglement, relying on information submitted by the organization with regard to religious tenets without externally "verify[ing]" it. *See* Day 2 Tr. at 379:23-380:5, 381:13-18, 433:23-434:6.

### 3.   Plaintiffs Are Unlikely To Succeed on Their RFRA Claim.

Plaintiffs are unlikely to succeed on their Fifth Cause of Action, which asserts a Religious Freedom Restoration Act ("RFRA") claim against the religious exemption. Plaintiffs argue that the religious exemption burdens their exercise of religion and thus violates RFRA. *See* Pls.' Mot. at 39–42.  But, under RFRA, "the party charged with the deprivation must be a person who may fairly be said to be a [governmental] actor." *Sutton*, 192 F.3d at 835 (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982), alternation in original). Defendants do not doubt that many of the Plaintiffs "exercise their religious beliefs through how they love" and "how they embrace and live out their sexuality and gender identity," Pls.' Mot. at 40, but their religious beliefs are allegedly being burdened by private entities, not the government. *See also, e.g.*, *Vill. of Bensenville v. Fed. Aviation Admin.*, 457 F.3d 52, 57 (D.C. Cir. 2006) ("[A] federal agency's determination that a City's expansion plan is eligible for federal funding does not render the City's implementation of the plan tantamount to federal action that is the source of the burden on the free exercise of religion."). And the government's creation or recognition of an exemption does not constitute the government action necessary to produce a RFRA violation, if the exemption is otherwise consistent with the Establishment Clause. *See* 42 U.S.C. § 2000bb–4 (providing in part that "[g]ranting government funding, benefits, or exemptions, to the extent permissible under the Establishment Clause, shall not constitute a violation of this chapter"),

### 4.   Plaintiffs Are Unlikely To Succeed on Their APA Claims.

Finally, Plaintiffs are also not likely to succeed on their APA claims as they cannot establish that they have standing to assert these claims, let alone that the regulatory revisions made by ED in 2020 are arbitrary and capricious.

The evidence presented at the hearing establishes that the rule revisions were not a change in agency practice; rather, they largely codified OCR's existing practice and clarified a few issues

on which ED had not yet formally spoken. *See* 85 Fed. Reg. at 30,475 (explaining that the changes codified "longstanding OCR practice"); 85 Fed. Reg. at 59,918, 59,949 (explaining that the criteria "codify existing factors" that had been included "in non-binding guidance dating back more than 30 years," in addition to "addressing concerns that there may be other means of establishing the requisite control"); *see also* Day 2 Tr. at 397:1-10, 398:20-399:3 (Yao). These regulatory changes do not directly or indirectly apply to Plaintiffs, nor have Plaintiffs explained how any of the institutions they attend are more likely to qualify for a religious exemption under the revised regulations than they would have been previously. Indeed, as Plaintiffs recognize, Pls.' Reply at 26, OCR has never denied a request for a religious exemption, except in a few very technical situations, *see* Day 2 Tr. at 384:1-17 (Yao), undermining any argument that the amended regulation has made it easier to qualify or changed the institutions eligible for an exemption. Plaintiffs therefore have not met their burden to establish that these changes would cause them harm, a required element of standing to bring these claims.

Plaintiffs' arguments that the rules are arbitrary and capricious likewise are without merit. First, ED sufficiently addressed the basis for the rules in its rulemakings (*cf.* Pls.' Mot. at 36-37) and did not need to provide the "more detailed justification" required when the regulatory revisions constitute a policy "reversal." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 514-15 (2009) (finding "no basis in the Administrative Procedure Act or in our opinions for a requirement that all agency change be subjected to more searching review"). Second, ED adequately considered the reliance, health, and safety interests of LGBTQI+ students in promulgating the revisions, Pls.' Mot. at 37–38, fully acknowledging commenters' "personal experiences in attending institutions controlled by religious organizations." 85 Fed. Reg. at 59,948. But ED explained during its rulemakings that it "disagree[d]" with the commenters "that these proposed regulations will have

a significantly increased negative impact upon LGBTQ individuals" because it was not significantly *changing* the regulatory regime but rather "clarify[ing] existing statutory exemptions to Title IX," which have "existed since the statute's enactment in 1972," as well as "the recipients' eligibility for claiming such exemptions." *Id.* at 59,950. As a result, "the Department does not believe that there are a significant number of educational institutions who have not previously sought a religious exemption, but would be eligible to do so as a result of these final regulations, which include existing factors from OCR's non-binding guidance." *Id.*

Plaintiffs also criticize the August 2020 rule for "eliminating transparency and notice requirements" by making it clear that institutions need not file written (and potentially publicly available) requests for religious exemptions as a prerequisite to claiming the exemption. Pls.' Mot. at 38–39. But both the rulemaking and the hearing testimony make clear that it is OCR's longstanding practice that an institution is not required to request or obtain written assurance of an exemption prior to relying on it in a pending administrative complaint. *See also* Day 2 Tr. at 482:18-483:8 (Wills); *id.* at 393:4-394:14, 396:10-398:3 (Yao). Moreover, ED explained that its regulatory revision "bring[s] § 106.12(b) further in line with the relevant statutory framework in this context," because "[n]o part of the statute requires that recipients receive an assurance letter from OCR, and no part of the statute suggests that a recipient must be publicly on the record as a religious institution claiming a religious exemption before it may invoke a religious exemption in the context of Title IX." 85 Fed. Reg. at 30,475. ED thus found that its interpretation was required by the statutory language. Under the first step of the *Chevron* framework, if "Congress has directly spoken to the precise question at issue," both the court and the agency "must give effect to the unambiguously expressed intent of Congress." *Chevron, U.S.A., Inc. v. Nat. Res, Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984). Indeed, a court in this Circuit has agreed with ED's

interpretation of the statute here—in a private Title IX lawsuit brought by two of the plaintiffs in this case, Joanna Maxon and Nathan Brittsan—concluding that Plaintiffs' interpretation of 34 C.F.R § 106.12 "would contradict the intent of Congress, as evidenced by the plain language of Section 1681. . . . Construing the language of the statute, the Religious Organization Exemption does not condition an educational institution's liability under Section 1681 on its submission of a written claim for exemption." *Maxon v. Fuller Theological Seminary*, No. 2:19–cv–09969, 2020 WL 6305460, at *6 (C.D. Cal. Oct. 7, 2020) (granting motion to dismiss), *appeal pending,* No. 20–56156 (9th Cir. arg. Nov. 18, 2021). This Court should reach the same result.

With regard to the November 2020 Rule's codification of certain criteria by which an institution can establish that it is "controlled by a religious organization," Plaintiffs contend that the new rule "permits educational institutions that are not controlled by religious organizations to claim a religious exemption" and thereby "arbitrarily expand[s]" the religious exemption beyond its statutory text. Pls.' Mot. at 34–36. They appear to be contending that the new provision deviates from the statute in not requiring the controlling religious organization to be a separate entity from the institution—another argument also pursued by Plaintiffs Maxon and Brittsan in their private Title IX suit. *See Maxon*, 2020 WL 6305460, at *7–8. However, ED properly concluded that the statute is "silent or ambiguous" as to whether a controlling "religious organization" needs to be a separate entity from the institution claiming the exemption. *See* 85 Fed. Reg. at 59,946. Under the *Chevron* framework, if "the statute is silent or ambiguous with respect to the specific issue," the court should defer to the agency's interpretation so long as it is "based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843. That is true "even if the agency's reading differs from what the court believes is the best statutory interpretation." *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs*., 545 U.S. 967, 980 (2005); *see also Or. Rest. & Lodging Ass'n v.*

*Perez*, 816 F.3d 1080, 1086 (9th Cir. 2016) (agency's construction entitled to controlling weight "[e]ven if we believe the agency's construction is not the *best* construction"). Accordingly, the Court must defer to ED's interpretation here because it is based on a permissible construction of the statute reached after notice-and-comment rulemaking.

ED considered that "religious organizations are organized in widely different ways that reflect their respective theologies" and that it did not wish to "discriminate against educational institutions that are controlled by religious organizations with different types of structures." 85 Fed. Reg. at 59,918; *see also* Day 2 Tr. at 405:9-15 (Yao) (stating that OCR's past practice was to recognize "that educational institutions may have a variety of different governing structures"); *id.* at 407:10-22. It also determined that it was "constitutionally obligated to broadly interpret 'controlled by a religious organization' to avoid religious discrimination among institutions of varying denominations." 85 Fed. Reg. at 59,918. Accordingly, ED reasonably concluded that an institution could be "controlled" by its own board of directors or similar internal structure—that is, that the educational institution and the controlling religious organization "can be one and the same." *Id.* at 59,956; *see also* Day 2 Tr. at 405:9-15, 405:24-406:23 (Yao) (stating that OCR's past practice was to recognize "that the religious organization need not be a separate legal entity from the educational institution" and giving examples). ED further explained that it did not intend to grant exemptions to institutions that had "merely a tenuous tie to a religious organization" and that the provision "does not expand the permissible scope of the statute to mean that literally any evidence—regardless of the amount of evidence, its relevance, or its persuasiveness—is sufficient to establish a religious exemption." 85 Fed. Reg. at 59,948. The *Maxon* court upheld ED's interpretation, finding it to be reasonable "considering the apparent ambiguity of the term 'religious organization.'" *See Maxon*, 2020 WL at 6305460, at *8 ("[A]lthough the text of the

Religious Organization Exemption may be read to require the 'religious organization' and 'educational institution' to be two separate entities, the ordinary meaning of the term 'organization' is sufficiently broad to include the board of directors."). Plaintiffs have not shown a likelihood that they will be able to obtain a different result here.

## II.    PLAINTIFFS HAVE NOT DEMONSTRATED IMMINENT, IRREPARABLE HARM

Despite almost three days of testimony, Plaintiffs have not demonstrated harm caused by the Government Defendants' actions that is imminent and irreparable and that could be redressed by injunctive relief against the government. For this reason as well, Plaintiffs are not entitled to preliminary injunctive relief.

*First*, as a matter of law, Plaintiffs have not shown and cannot show that they would suffer irreparable injury in the absence of a preliminary injunction because they have an adequate alternative remedy to the pending administrative complaint process. *See* 11A Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. § 2948.1 (3d ed.) ("[A] preliminary injunction usually will be denied if it appears that the applicant has an adequate alternate remedy in the form of . . . other relief."); *Norland v. Moynihan*, No. 6:12–cv–1641, 2012 WL 12882722, at *1 (D. Or. Nov. 2, 2012) (Aiken, J.) (no irreparable harm where, *inter alia*, "plaintiff is able to address the legality of the forcible entry and detainer action in the state courts"). That is, as the Court recognized in its August 30 opinion, TRO Order at 11-12, Plaintiffs may file Title IX lawsuits directly against their respective schools. In those suits Plaintiffs can raise their claims of discrimination and also challenge the constitutionality of the religious exemption and its implementing regulations. *See Cannon v. Univ. of Chic.*, 441 U.S. at 706 n.41 & 717; *Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 947 (D.C. Cir. 2004) ("challenges to the lawfulness of the Department's policies in fact may be aired in a suit against a university, to the extent that the defendant university

attempts to justify its actions by reference to those policies"), *abrogated on other grounds by Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178 (D.C. Cir. 2006); *Preskar v. United States*, 248 F.R.D. 576, 584 (E.D. Cal. 2008) (Title VI's "implied right of action is an 'adequate' remedy to redress the discrimination allegedly suffered by plaintiffs").

Indeed, several of the plaintiffs have in fact initiated such suits—the lawsuit by Maxon and Brittsan is discussed in the government's prior briefing, and the evidence at the hearing showed that a third plaintiff, Ashtin Markowski, had done so as well. *See* Day 3 Tr. at 497:11-498:4 (Wills); Gov. Ex. 3, at 2 (entry for Markowski complaint); *Markowski v. Brigham Young Univ.*, Civil No. 2:20-cv-000872-JNP (D. Utah filed Dec. 11, 2020). It is irrelevant for these purposes that the government is not an original party in such suits. A plaintiff may still challenge the constitutionality of the religious exemption (as Maxon and Brittsan have done on appeal), and the United States may elect to intervene after being notified by the court of the challenge. 28 U.S.C. 2403(a) (in an action where the United States is not a party "wherein the constitutionality of any Act of Congress affecting the public interest is drawn in question, the court shall certify such fact to the Attorney General, and shall permit the United States to intervene for presentation of evidence, if evidence is otherwise admissible in the case, and for argument on the question of constitutionality").

*Second,* even if an adequate alternative remedy did not exist (and, to be clear, it does), Plaintiffs have not shown a sufficient likelihood of imminent irreparable injury to establish that they are entitled to mandatory injunctive relief directing the government to take some form of affirmative action, such as to investigate alleged abuses at the schools or to withdraw funding. Plaintiffs must show a "clear" likelihood of imminent, irreparable injury to entitle them to

mandatory relief, and they fail to do so.[8] Many of the students are no longer at their schools, *see* Gov. Defs.' Dismiss Mot. at 15-16, and Plaintiffs' evidence does not establish that any of them, whether at the schools or not, currently face a sufficient likelihood of imminent harm to warrant the drastic injunctive relief they seek.

*Third*, Plaintiffs have not presented evidence that establishes that they are likely to suffer irreparable injury that could be addressed by the prohibitory injunction they seek. According to Plaintiffs' opening brief, they seek to enjoin Government Defendants from using the religious exemption and/or the 2020 regulations to dismiss Plaintiffs' pending Title IX complaints, which, they asserted months ago, was imminent. Pls.' Mot. at 9; *see id.* at 43. But such an injunction would not address their claimed injuries. An injunction prohibiting OCR from dismissing their complaints on the basis of the religious exemption would likely merely introduce a partial pause in processing but not necessarily result in an investigation of their schools.

Most fundamentally, Plaintiffs have not established that the "pause" in processing that they seek would even affect their cases, as they have not shown that the religious exemption will necessarily be applied in their situations. Rather, the evidence presented at the hearing reveals that a variety of outcomes could occur. First, OCR could validly dismiss their complaints for other reasons, as it has already done for one complaint. Day 2 Tr. at 459:5-461:2 (Wills); Day 3 Tr. at 497:11-498:4 (Wills). As Mr. Wills testified, and as the Court already recognized, Title IX complaints can be dismissed on a variety of grounds that do not involve the religious exemption. TRO Order at 9-10.

---

[8] Moreover, Plaintiffs' focus on such affirmative relief falls afoul of the well-established principle that agency enforcement decisions, and, in particular, its decision not to take enforcement action, are generally committed to the agency's absolute discretion. *See Heckler v. Chaney*, 470 U.S. 821, 831-32 (1985).

Further, the evidence does not show that all the schools at issue will seek religious exemptions with regard to all the claims at issue. As Defendants' witnesses explained, OCR does not simply assume that religiously controlled institutions will assert a religious exemption to all Title IX complaints—the institution must request assurance of one. *See, e.g.,* Day 2 TR, at 481:7-23 (Wills). And religious-exemption assurances are particularized in nature, as the 1985 Baylor assurance letter in Plaintiffs' Exhibit 6 demonstrates. That is, an exemption is specific to particular activities or regulatory provisions, and does not exempt religious institutions from all of the agency's Title IX regulations across the board. *See* Pls.' Ex. 6, at 4, ECF No. 118-13 (granting assurances of religious exemptions for regulations relating to marital, parental, or pregnancy status and for regulations implicated by restriction of the ministry to men and stating that "[t]his letter should not be construed to grant exemption from any section of the Title IX regulation not specifically mentioned"). For example, as the Department made clear in the September 2020 final rule, "the Department is skeptical that schools will be eligible to assert exemptions from the requirement to respond appropriately to sexual harassment under Title IX or from the prohibition on retaliation against individuals who invoke their rights under Title IX." 85 Fed. Reg. at 59,948. OCR evaluates each complaint on an allegation-by-allegation basis to determine if the existing exemption applies. *See* 20 U.S.C. § 1681(a)(3) (religious exemption applies only to the extent that "the application of" Title IX "would be inconsistent with the religious tenets of [the controlling religious] organization"); U.S. Dep't of Educ., Questions and Answers on the Title IX Regulations on Sexual Harassment (July 2021) at 32, https://perma.cc/S4ZL-7LUL ("A religious exemption is not a blanket exemption from Title IX, and a school's religious exemption extends only as far as the conflict between the Title IX regulations and the religious tenets of the controlling religious organization."); Day 2 Tr. at 473:6-474:19, 480:5-482:9 (Wills); Day 3 Tr. at 538:2-539:12 (Wills).

Plaintiffs produced no evidence that dismissal of their administrative complaints based on the religious exemption is imminent or even probable. Indeed, the evidence presented indicates that OCR is evaluating the complaints to determine whether a host of threshold considerations are met, of which application of the religious exemption is just one. *See supra* at 7-9. A "pause" in processing will simply prevent OCR from making an administrative determination. The Court should decline to order such a pause and allow OCR's administrative processing of the remaining complaints to continue unimpeded; indeed, that is the only way that Plaintiffs' claims could become ripe enough for this Court to review.

*Third*, Plaintiffs' delay before seeking preliminary injunctive relief also militates against granting such relief. Several months if not years passed between the alleged discriminatory conduct and Plaintiffs' initiation of the present action in March 2021. *See* Compl.[9] And even after Plaintiffs amended their complaint in June 2021, they did not move for preliminary injunctive relief immediately, delaying until August 5, 2021. Further, although this Court denied Plaintiffs' motion for a temporary restraining order in August, Plaintiffs requested a hearing date in November. Plaintiffs cannot delay seeking injunctive relief and then claim urgency necessitating an "'extraordinary and drastic remedy,'" *Hernandez v. Or. Legislature*, 521 F. Supp. 3d 1025, 1032 (D. Or. 2021). *See Bond v. Brown*, No. 6:20–cv–1656, 2021 WL 1237114, at *2 (D. Or. Apr. 2, 2021) (Aiken, J.) ("Plaintiff did not commence this action or seek an injunction until September 23, 2020, more than six months after the statewide emergency was declared. This weighs against finding that Plaintiff faces an emergent irreparable harm.").

---

[9] *See, e.g.*, Hunter Decl., ECF No. 1–1, ¶¶ 6–35 (describing conduct that took place between 2015 and 2019); Day 1 Tr. at 223:22-24 (Hunter) (stating she graduated in May 2019); Duron Decl., ECF No. 1–3, ¶¶ 29–47 (describing conduct that took place in July 2020); Day 1 Tr. at 50:13-23 (Duron) (same) & Pls.' Ex. 1.

### III.    THE BALANCE OF EQUITIES AND PUBLIC INTEREST WEIGH AGAINST AN INJUNCTION

Finally, Plaintiffs' evidence has not shown that the balance of the equities and the public interest favors them. The Court's TRO Order reflects that the Court was quite aware of the well-documented harms that anti-LGBTQI+ discrimination has on the LGBTQI+ community. TRO Order at 10. Nevertheless, the Court concluded that the balance of equities and the public interest did not favor Plaintiffs, for four reasons: (1) Plaintiffs had not shown that their Title IX complaints would be dismissed imminently based on the religious exemption; (2) Plaintiffs had not shown that Defendants have violated their constitutional rights; (3) Plaintiffs had not shown that their requested relief would result in immediate relief from the physical and mental harms they have alleged; and (4) Plaintiffs can file private Title IX lawsuits against their respective institutions and may seek appropriate preliminary relief in those direct actions. *Id.* at 11. Plaintiffs have presented no new facts sufficient to alter these conclusions.

In addition, the Court should consider that "governmental policies implemented through legislation or regulations developed through presumptively reasoned democratic processes . . . should not be enjoined lightly." *Planned Parenthood Minn., N.D., S.D v. Rounds.*, 530 F.3d 724, 732 (8th Cir. 2008). Enjoining a longstanding statute and duly-enacted regulations—based on what Plaintiffs simply *predict* Defendants will do—would intrude on the domains of the coordinate branches of government and thus violate separation-of-powers principles.

Moreover, the Court should also consider that the parties and the Court will benefit from the agency's determination as to whether the religious exemption applies in whole or in part to Plaintiffs' administrative complaints. Having leveled a variety of complaints against a number of different institutions, Plaintiffs now ask the Court to bar the Government Defendants from processing and resolving those complaints in the normal course, and seek to prospectively

invalidate Title IX's religious exemption and regulations based on predicted future events. But federal courts are not supposed to leapfrog agencies by engaging in such "premature adjudication" and "entangling themselves in abstract disagreements over administrative policies." *Ohio Forestry Ass'n*, 523 U.S. at 732–33 (1998). Rather, the point of the ripeness doctrine is "to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Id.* "Letting the Executive Branch's decisionmaking process run its course not only brings more manageable proportions to the scope of the parties' dispute, but also ensures that we act as judges, and do not engage in policymaking properly left to elected representatives." *Trump v. New York*, 141 S. Ct. 530, 536 (2020).

## CONCLUSION

For the foregoing reasons, and for the reasons stated in the government's prior briefs at ECF Nos. 56, 62 and 92, Plaintiffs' motion for a preliminary injunction should be denied.

DATED:  December 6, 2021                    Respectfully submitted,

                                            BRIAN M. BOYNTON
                                            Acting Assistant Attorney General

                                            CARLOTTA P. WELLS
                                            Assistant Director, Federal Programs Branch

                                            /s/ *Carol Federighi*
                                            CAROL FEDERIGHI, TX Bar No. 06872950
                                            *Lead Counsel*
                                            HILARIE.E.SNYDER, DC Bar No. 464837
                                            United States Department of Justice
                                            Civil Division, Federal Programs Branch
                                            P.O. Box 883
                                            Washington, DC  20044
                                            Phone: (202) 514-1903
                                            Carol.Federighi@usdoj.gov

                                            *Attorneys for Defendants*