**Paul Carlos Southwick (OSB 095141)**
**Religious Exemption Accountability Project**
**Paul Southwick Law, LLC**
8532 N. Ivanhoe St. #208,
Portland, OR 97203
Email: paul@paulsouthwick.com
Phone: 503-806-9517

**Alletta S. Brenner (OSB 142844)**
**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Email: ABrenner@perkinscoie.com
Phone: 503-727-2000

**Timothy R. Volpert (OSB 814074)**
**Tim Volpert PC**
211 NE Hancock St. Ste. 2B
Portland, OR 97212
Email: tim@timvolpertlaw.com
Phone: 503-703-9054

**Misha Isaak (OSB 086430)**
**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Email: misaak@perkinscoie.com
Phone: 503-727-2000

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF OREGON
## EUGENE DIVISION

| | |
|---|---|
| Elizabeth HUNTER; et al., | ) |
| | ) |
| Plaintiffs, | )    Case No. 6:21-cv-00474-AA |
| v. | ) |
| | ) |
| U.S. DEPARTMENT OF EDUCATION; and | )    **PLAINTIFFS' CLOSING** |
| Catherine LHAMON, in her official capacity as | )    **MEMORANDUM IN SUPPORT** |
| Assistant Secretary for the Office of Civil | )    **OF THEIR MOTION FOR** |
| Rights, U.S. Department of Education, | )    **PRELIMINARY INJUNCTION** |
| | ) |
| Defendants, | )    PURSUANT TO FRCP 65 |
| | ) |
| v. | ) |
| | ) |
| COUNCIL FOR CHRISTIAN COLLEGES & | ) |
| UNIVERSITIES, WESTERN BAPTIST | ) |
| COLLEGE d/b/a CORBAN UNIVERSITY, | ) |
| WILLIAM JESSUP UNIVERSITY AND | ) |
| PHOENIX SEMINARY, | ) |
| | ) |
| Intervenor-Defendants | ) |
| | ) |
| | ) |
| | ) |

# TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................ 1

II.   BACKGROUND ................................................................................ 1

III.  SUMMARY OF HEARING TESTIMONY & FINDINGS OF FACT ................. 2

    A.   ALEX DURON'S TESTIMONY ................................................... 2

    B.   VERONICA BONIFACIO PENALES' TESTIMONY ......................... 3

    C.   AUDREY WOJNAROWISCH'S TESTIMONY .............................. 4

    D.   FAITH ELIZABETH HUNTER'S TESTIMONY .............................. 5

    E.   KALIE HARGROVE'S TESTIMONY ......................................... 6

    F.   DR. MEYER'S EXPERT TESTIMONY ....................................... 7

    G.   DR. WOLFF'S EXPERT TESTIMONY ...................................... 9

    H.   DR. WOLFF'S FACT TESTIMONY ....................................... 11

    I.   ALICE YAO'S TESTIMONY ................................................. 11

    J.   RANDOLPH WILLS' TESTIMONY ......................................... 12

    K.   DR. MARK REGNERUS' EXPERT TESTIMONY ......................... 14

IV.  CONCLUSIONS OF LAW ................................................................. 15

    A.   PLAINTIFFS SATISFY TRADITIONAL AND SERIOUS QUESTION TESTS FOR PRELIMINARY INJUNCTION ................................................. 15

    B.   PLAINTIFFS HAVE STANDING AND THEIR CLAIMS ARE RIPE ................. 23

    C.   ADDITIONAL PARTIES ARE UNNECESSARY TO RESOLVE PLAINTIFFS' CLAIMS ...... 26

D.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR SUBSTANTIVE

CLAIMS.    27

1.    *Plaintiffs are likely to succeed on the merits of their Establishment Clause and*

*Substantive Due Process/Equal Protection claims.* ............................................................. 27

2.    *Plaintiffs are Likely to Succeed on the Merits of their APA Claim.* ................. 29

3.    *Plaintiffs are likely to succeed on the merits of their Religious Freedom*

*Restoration Act claim.* .......................................................................................................... 32

**V.    CONCLUSION** ........................................................................................................ **32**

CLOSING MEMORANDUM ISO MOTION
FOR PRELIMINARY INJUNCTION

# TABLE OF AUTHORITIES

<u>**Cases**</u>

*Allen v. Wright*, 468 U.S. 737 (1984) ........................................................................... 24

*Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011) .................................. 15

*Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053 (9th Cir. 2014) ........................................... 21

*Bishop v. Starkville Academy*, 442 F.Supp. 1176 (N.D. Miss. 1977) ........................................... 23

*Boardman v. Pacific Seafood Group*, 822 F.3d 1011 (9th Cir. 2016) ..................................... 15, 18

*Bob Jones University v. U.S.,* 461 U.S. 574 (1983) ..................................................................... 28

*Booth v. Hvass*, 302 F.3d 849 (8th Cir. 2002) .............................................................................. 24

*Bostock v. Clayton County,* 140 S.Ct. 1731 (2020) ..................................................................... 28

*Brumfield v. Dodd*, 425 F.Supp. 528 (E.D. La. 1976) ................................................................. 24

*Christian Legal Soc. Chapter of the University of California v. Martinez,* 561 U.S. 661 (2010) 28

*DeBoer v. Snyder*, 973 F.Supp.2d 757 (E.D. Mich. 2014) .................................................... 14, 15

*Fulton v. City of Philadelphia*, 141 S.Ct. 1868 (2021) ................................................................. 28

*Goldman, Sachs & Co. v. City of Reno*, 747 F.3d 733 (9th Cir. 2014) ........................................ 15

*Green v. Connally,* 330 F. Supp. 1150 (D.D.C. 1971) .................................................................. 23

*Griffin v. County School Board of Prince Edward County*, 377 U.S. 218 (1964) ........................ 23

*Grove City College v. Bell,* 465 U.S. 555 (1984) ........................................................................ 28

*Index Newspapers, LLC v. City of Portland*, 480 F.Supp.3d 1120 (D. Or. Aug. 20, 2020) ......... 19

*Innovation Law Lab v. Nielsen*, 310 F. Supp. 3d 1150 (D. Or. 2018) .......................................... 22

*Landwatch v. Connaughton*, 905 F.Supp.2d 1192 (D. Or. 2012) ................................................. 15

*Lawrence v. Texas*, 539 U.S. 558 (2003) ...................................................................................... 27

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873 (9th Cir. 2009) ...... 16

*Moton v. Lambert*, 508 F.Supp. 367 (N.D. Miss. 1981) ........................................................ 23, 25

*Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656

    (1993) ................................................................................................................................ 25

*Norwood v. Harrison*, 413 U.S. 455 (1973) .................................................................. 23, 26, 28

*Obergefell v. Hodges*, 576 U.S. 644 (2015)............................................................................ 28

*Poindexter v. Louisiana Financial Assistance Commission,* 258 F.Supp. 158 (E.D. La.1966) ... 23

*Roberts v. Jaycees*, 486 U.S. 609 (1984) .................................................................................. 29

*Romer v. Evans*, 517 U.S. 620 (1996)...................................................................................... 27

*Simon v. Eastern Ky. Welfare Rights Organization*, 426 U.S. 26 (1976).................................. 24

*Trinity Lutheran v. Comer*, 137 S.Ct. 2012 (2017)..................................................................... 28

<u>Statutes</u>

20 U.S.C. § 1681(a) ................................................................................................................. 1

34 C.F.R. § 106.12(b) and (c) ................................................................................................ 21

<u>Other Authorities</u>

83 Fed. Reg. at 61482 ............................................................................................................ 31

CLOSING MEMORANDUM ISO MOTION
FOR PRELIMINARY INJUNCTION

## I.    INTRODUCTION

Plaintiffs bring this putative class action against the U.S. Department of Education ("the Department") and Catherine Lhamon, the Department's Assistant Secretary for the Office of Civil Rights ("OCR"), to challenge the religious exemption to Title IX and its implementing regulations as applied to them and other sexual and gender minority students at educational institutions that receive federal financial assistance. Plaintiffs assert claims for violation of the First and Fifth Amendments, the Administrative Procedures Act and the Religious Freedom Restoration Act. Dkt. 35.

Now before this Court is Plaintiffs' Motion for a Preliminary Injunction. Having considered the briefing on Plaintiffs' Motion, including the declarations and evidence in support, the testimony and other evidence from the Hearing, and the full record in this matter, this Court should grant Plaintiffs' Motion.

## II.    BACKGROUND

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance[.]" 20 U.S.C. § 1681(a). The statute includes a religious exemption, which provides that Title IX "shall not apply to an educational institution which is controlled by a religious organization if the application of this subsection would not be consistent with the religious tenets of such organization[.]" *Id.* § 1681(a)(3).

Between June 23, 2021 and August 2, 2021, thirty-five of the Plaintiffs filed Title IX administrative complaints with OCR. Dkt. 61 ("Swain Decl."), Ex. A-D. On August 5, 2021, Plaintiffs filed a Motion for Temporary Restraining Order ("TRO") and Order to Show Cause Why

CLOSING MEMORANDUM ISO MOTION
FOR PRELIMINARY INJUNCTION

Preliminary Injunction Should Not Issue ("Preliminary Injunction"). Dkt. 44. On August 25, 2021, Plaintiffs moved to Amend their Motion for TRO and Preliminary Injunction. Dkt. 75.

On August 30, 2021, the Court granted Plaintiffs' Motion to Amend their Motion for TRO and Preliminary Injunction but denied Plaintiffs' Motion for TRO. Dkt. 88. The Court then ordered an evidentiary hearing on Plaintiffs' Motion for Preliminary Injunction. Dkt. 89.

The Court held an evidentiary hearing on Plaintiffs' Motion for Preliminary Injunction on November 4, 5 and 8, 2021. Four Plaintiffs testified at the hearing: Alex Duron, Veronica Bonifacio Penales, Audrey Wojnarowisch, and Elizabeth Hunter. One prospective plaintiff, Kalie Hargrove, and two expert witnesses, Dr. Ilan Meyer and Dr. Joshua Wolff, also testified for Plaintiffs. Two government witnesses, Alice Yao and Randolph Wills, testified for Defendants. One expert witness, Dr. Mark Regnerus, testified for Intervenor-Defendants.

### III.    SUMMARY OF HEARING TESTIMONY & FINDINGS OF FACT
#### A.  Alex Duron's Testimony

Plaintiffs' first fact witness was Alex Duron. Alex testified that he was admitted to a graduate nursing degree program at Union University in Tennessee in 2020 but that his admission was rescinded shortly before he was meant to start classes. Tr. 47:1-7. Alex testified that he remembers the day he received the email rescinding his admission "like it was yesterday." *Id.* at 51:10-11. He describes feeling shocked, confused, and eventually realizing that he was essentially being kicked out because of his sexual orientation. *Id.* at 51:14-52:1. Alex testified: "I felt like everything that I worked for, including just being a nurse…I feel like it was just ripped away from me. Just at that moment all my education, everything I worked for, all the letters of recommendation, all that money I spent, the travel, I felt like a complete failure." *Id.* at 52:10-16. Alex's education was delayed by six to seven months because of the admission rescission. *Id.* at 72:18-25.

Alex thought that this was not right and could not be legal, so he looked for ways to fix his situation. Alex testified that in his research he found that the Department had granted Union University a religious exemption from Title IX. *Id*. 54:5-55:8. At that point, Alex felt like there was nothing he could do to rectify the admission rescission. *Id*. Alex testified that as a taxpayer, he "felt like I'm funding my own -- I'm funding my own denial, in a way." *Id*. at 58:20-22. Alex testified that he filed a Title IX complaint with OCR and that he had been interviewed as part of the evaluation of his Title IX complaint. *Id*. at 65:5-66:5.

### B. Veronica Bonifacio Penales' Testimony

Plaintiffs' second fact witness was Veronica Bonifacio Penales. Veronica testified that she is a student at Baylor University in Texas. Veronica testified that the sexual and gender minority students have repeatedly applied for a university sanctioned club for more than ten years but that their requests have been denied because of Baylor's prohibition on student clubs that advocate for an understanding of sexuality contrary to the university's views. Hearing Tr. 77:17-78:2; 95:3-14. Veronica further testified that "not being allowed to be an official Baylor club means we don't have access to student funding. We can't advertise our clubs for people who need it." *Id*. at 80:22-24. Veronica describes feeling relegated to second or even "third-class" status at Baylor because of the club denial. *Id*. at 81:10-14.[1]

Veronica also testified to pervasive harassment because of her sexual orientation and her advocacy for the student club, including sticky notes with a queer slur repeatedly being attached to her dorm door. *Id*. at 84:7-85:10. Veronica described reporting the harassment to Baylor but

---

[1] In the expert report submitted by Dr. Coley, he stated that such clubs "have played significant roles in improving campus climates for LGBTQ students, including by decreasing incidences of bullying or harassment on campus (Coley 2018a; Hughes 2020)." Dkt. 127, p. 9. Dr. Coley's report also states that "LGBTQ students who participate in LGBTQ student groups or LGBTQ student centers are less likely to experience depression and more likely to be able to cope with stressors (Kulick et al. 2017; Pitcher et al. 2018; Woodford et al. 2018)." *Id*.

CLOSING MEMORANDUM ISO MOTION
FOR PRELIMINARY INJUNCTION

testified that essentially nothing was done to protect her and that she was encouraged to attend counselling. *Id.* at 86:16-88-19.

Veronica testified that the Department's grant of a religious exemption from Title IX to Baylor in the past, and its ability to do so in the future, makes her feel unsafe on campus. *Id.* at 98:20-99:3. She testified that it is scary to think about the government not protecting her from Title IX discrimination. *Id.* at 99:4-7. Veronica also testified that she would feel safer and that her rights would be protected if the Department held Baylor accountable for Title IX violations. *Id.* at 101:4-13.  Veronica also testified that "I think the university can have a human sexuality statement put in place but still protect its students from discrimination." *Id.* at 105:19-24.

### C.  Audrey Wojnarowisch's Testimony

Plaintiffs' third fact witness was Audrey Wojnarowisch. Audrey testified that they are a student at George Fox University in Oregon. Audrey testified that "The general message that I have received from George Fox is that queer identities are not -- they're not acceptable. They don't align with the image the University wants…They invite us to give our tuition but not to advocate for our needs." *Id.* at 171:7-12. Audrey testified that "the mental health resources that are available to most students on campus are not necessarily safe for queer students." *Id.* at 175:20-22. "Audrey further testified that "There have been students in the past who have been subjected to conversion therapy at the Health and Counseling Center there, and there's no promise that that won't continue to happen." *Id.* at 176:12-15.

Audrey also testified to being stalked and sexually assaulted by another student. *Id.* at 177:12-15. Audrey testified that she reported her sexual assault to their resident advisor but that a case was not filed with the university's Tile IX team at the time of Audrey's report. *Id.* at 178:15-23. Audrey testified that "It felt, after that experience, that it -- it didn't matter what had happened

to me or what had continued happening to me because the support systems that were in place were clearly not meant for me, and my requests for support were not welcome there." *Id*. at 179:20-24.

Audrey testified that they filed a Title IX complaint with OCR, asking the Department to investigate George Fox's discriminatory policies, which Audrey describes as negatively impacting her until she graduates. *Id*. at 182:2-12. In response to OCR's closure, based on the religious exemption, of a prior Title IX complaint from a transgender student at George Fox University, Audrey testified "It reaffirms the idea I mentioned earlier that no matter how loudly I scream about the kind of help that we need, the systems in place have already decided that we are not -- that we are not important enough to warrant help or support for that…And to maybe put it a little bit more accurately, it's a dark cloud that hangs over our heads every day." *Id*. at 185:13-22. Audrey testified that while they can, and have, filed a Title IX complaint with OCR, "It feels like a door has been closed" and that their complaint "will be to that closed door[.]" *Id*. at 185:23-186:6.

### D. Faith Elizabeth Hunter's Testimony

Plaintiffs' fourth fact witness was Faith Elizabeth Hunter ("Elizabeth"). Elizabeth testified that she graduated from Bob Jones University in South Carolina. Elizabeth testified that during her senior year she was a director at the on-campus television station. *Id*. at 208:7-16. She testified that during her senior year, she posted tweets about a book that had LGBTQ+ characters in it and about support for LGBTQ+ people. *Id*. at 209:8-21. Elizabeth testified that as a result, university administration called her into a meeting, attempted to get her to confess to being homosexual, removed her from campus student leadership positions, took away her role at the television station, imposed a monetary fine, and put her on disciplinary probation. *Id*. at 209:14-21; 214:23-25.

Elizabeth testified to feeling suicidal for the first time in her life as a result of her treatment from Bob Jones University. *Id*. at 212:23-213:5. She further testified to feeling completely unsafe

CLOSING MEMORANDUM ISO MOTION
FOR PRELIMINARY INJUNCTION

and like she was being monitored. *Id*. at 213:9-10. She also testified to having to attend mandatory

counseling sessions. *Id*. at 213:10-16; 214:19-22. Elizabeth testified that "I felt like a little zombie

the rest of the semester." *Id*. at 213:23-24.

Elizabeth testified that she has filed a Title IX complaint with OCR and that she has not

filed a lawsuit against her university. *Id*. at 223:25-224:8. She further testified that "I feel if I had

filed this as a student, I would have gotten in more trouble because I would have been having to

file in a Title IX office at Bob Jones, and they would have informed the administration that

someone had filed a complaint that they were being discriminated against based on their sexuality."

*Id*. at 220:3-8. Elizabeth testified that she felt disturbed knowing that OCR and the Department

have given their stamp of approval to her university's treatment of her through the Title IX

religious exemption. *See Id*. at 221:4-21.

### E.  Kalie Hargrove's Testimony

Plaintiffs' fifth fact witness was Kalie Hargrove. Kalie testified that she had been forced to

leave Lincoln Christian University shortly before completing her degree because she is

transgender. Tr. 240:18-242:8. Kalie is a military veteran and was paying for her education through

the Montgomery GI Bill. *Id*. at 237:19-24. Kalie testified that, after being forced to leave her

university, she transferred to another university to continue her studies but was unable to use her

GI Bill for the first semester because she could not obtain approval in time. *Id*. at 253:16-24.

Kalie testified that she received a letter, dated August 26, 2021, forcing her to face

disciplinary action or to leave the school because she is transgender, which, for financial reasons

and because the appeal would have been futile, she described as effectively no choice at all. *Id*. at

240:18-243:8. Kalie testified that she "can remember exactly where I was whenever I saw this. I

was sitting in the parking lot of my – of my oldest kid's school[.]" *Id*. at 244:24-245:1. Kalie

testified that she felt like "everything I had done at that school…like all of that didn't matter…I was numb[.]" *Id*. at 245:14-17.

Kalie further testified that "I actually thought Title IX protected people. I saw -- I knew that Lincoln was a Title IX school. I read their language on discrimination. Unfortunately, a lot of schools will say, 'We don't illegally discriminate.' Yeah, that's misleading because they legally discriminate." *Id*. at 246:16-20. Referring to the religious exemption, Kalie testified that "Title IX means nothing with that loophole, with that exemption." *Id*. at 248:9-10. Kalie testified that colleges like hers "are continuing to lure people in with a guise of being non-discriminative, and it's not true[,]" and that the Department "is funding that…They are funding my discrimination." *Id*. at 250:4-16. Kalie testified that "it's kind of like you put -- you put your money behind what you support, and the truth is the Department of Education is supporting these institutions that are telling me that I shouldn't exist in the same space as them." *Id*. at 250:16-21.

Kalie testified that she was not a named Plaintiff in this litigation but that she intended to request to become a Plaintiff. *Id*. at 248:14-18. In Plaintiffs' recently filed Motion for Leave to File Second Amended Complaint, Kalie is listed as a proposed Plaintiff. Dkt. 148. Kalie filed a Title IX complaint with OCR and has not filed a lawsuit against her university. Tr. 248:19-22; 252:3-20.

### F. Dr. Meyer's Expert Testimony

Plaintiffs called Dr. Meyer, a social epidemiologist, as their first expert witness. Dr. Meyer testified that the government, through its laws and policies, can reinforce the social stigmas Plaintiffs and other sexual and gender minority students experience at educational institutions that treat their identities, relationships, and behaviors as inferior to heterosexual and cisgender identities, relationships, and behaviors. Hearing Tr. 130:13-131:22. Dr. Meyer testified that the

7

CLOSING MEMORANDUM ISO MOTION
FOR PRELIMINARY INJUNCTION

non-affirming policies and practices of Plaintiffs' educational institutions communicate to sexual and gender minority students the message that they cannot live a productive and happy life as members of the community unless they reject their own sexual and gender identities. *See Id*. at 134:2-12. Such policies and practices can result in devastating impacts on the mental health of sexual and gender minority students, including in the form of distress, heightened vigilance ("a very chronic condition of having to be watchful for potential harm, potential rejection, ridiculing"), and internalized homophobia and transphobia. *See Id*. at 135:21-139:25.

Dr. Meyer testified that the psychological distress students experience is compounded by the knowledge that the government will not protect them from discriminatory treatment. *Id*. at 142:17-143:13. Dr. Meyer described Union University's denial of admission to Plaintiff Duron as a major stressful event that takes on heightened impact if based on prejudice towards Duron's sexual orientation. *Id*. at 140:15-141:14. Dr. Meyer further testified that "when it comes from people in authority… -- religious leaders, professors, and certainly governmental actions -- it has a greater force of power because you're kind of alone against the world." *Id*. at 142:7-14.

In his expert report, Dr. Meyer testified that "The plaintiffs in this case experienced stigma enacted by religious institutions in both institutional and interpersonal actions. If they sought help, their pleas were ignored. Stigma was given a seal of approval by the United States Department of Education further enacting homophobia and transphobia. The young plaintiffs found themselves alone against powerful institutions, with their country supporting the actions of the offending educational institution." Meyer Expert Report, Dkt. 126, ¶ 82; *see also* Hearing Tr. 145:18-147:14.

Dr. Meyer testified about feelings of betrayal students are likely to feel when turned away by the Department. "[A]nd you know, if you are wronged and you turn to somebody to try to help you and that someone says, 'No, I don't -- I have nothing to offer here,' you would feel betrayed[.]"

CLOSING MEMORANDUM ISO MOTION
FOR PRELIMINARY INJUNCTION

Tr. at 147:7-14. Dr. Meyer testified that "the fact that it is an authoritative institution," like the Department, makes it "doubly difficult." *Id*.

The Court should find Dr. Meyer's testimony to be fully credible and give it considerable weight.

### G.  Dr. Wolff's Expert Testimony

Plaintiffs called Dr. Wolff, a clinical psychologist, as their second witness. Dr. Wolff testified regarding mental health impacts and disparities for sexual and gender minority students in higher education. Dr. Wolff testified that much of the research on LGBTQ+ students in higher education "shows various types of health, educational, and campus climate disparities. For example, for health disparities, LGBTQ students show higher rates of depression. LGBTQ students, particularly transgender students, show higher rates of suicidal ideation, which is a clinical term for thoughts about having suicide[.]" Hearing Tr. 276:10-15.

Dr. Wolff testified that a student's need to conceal their sexual orientation or gender identity may be "one of the biggest risk factors for whether or not they're going to develop mental health symptoms or have some of those other adverse academic outcomes[.]" *Id*. at 284:1-4. Dr. Wolff testified that this concealment factor is especially present in a college environment where queer or trans identities are penalized and where there are no nondiscrimination protections. *Id*. at 284:7-21.

Dr. Wolff testified that for a lot of sexual and gender minority people, behaviors such as holding hands, displaying signs of affection, or the manner of dress, pronouns, can be important parts of their sexual or gender identity and that such behaviors are "things that make us human" and "how we express affection." *Id*. at 358:10-17. He further testified that suppressing those behaviors through sexual orientation or gender change efforts can also be damaging to students. *Id*. at 358:19-25.

CLOSING MEMORANDUM ISO MOTION
FOR PRELIMINARY INJUNCTION

Dr. Wolff also addressed the difference between an educational institution's religious beliefs and its policies, stating that "the policies themselves are actual behavioral standards that are attached to enforcement mechanism. So that could be a code of conduct on sexual morality." *Id*. at 297:7-16. Dr. Wolff further testified that some religious colleges "can have the same theological beliefs" as the colleges attended by Plaintiffs, but that they do not "attach those [beliefs] to disciplinary policies." *Id*. at 330:2-6.

Dr. Wolff testified that sexual and gender minority students at non-affirming religious colleges that do attach beliefs to disciplinary policies can face a variety of consequences for violating those policies. "And so those consequences included academic probation or some sort of suspension that may not be permanent; I mentioned earlier mandatory referrals to the campus counseling center, which may or may not include the goal of changing sexual orientation or gender identity; restrictions on campus -- so we heard from students who said that they couldn't go in certain dorms as a result of being disciplined -- and, in an extreme case, expulsion." *Id*. at 303:3-18. Dr. Wolff testified that "sexual minority students at the non-affirming religious universities in our sample reported significantly higher levels of depression than those identified as gay and bisexual in the general college student population." *Id*. at 314:25-315:3. Dr. Wolff further testified that not all sexual and gender minority students at non-affirming religious colleges are doing poorly but that "there is a range of how students are doing. Some are doing well, and some are really struggling like some of the plaintiffs that we've heard from." *Id*. at 338:5-9.

Dr. Wolff testified that non-discrimination and anti-harassment policies create "verifiable improvements in academic outcomes and in reduced thoughts of suicide." *Id*. 318:17-23. He also testified that participation in sexual and gender minority support groups and clubs "has the potential for decreasing some of those feelings of isolation, rejection, [and] loneliness[.]" *Id*. at

10

CLOSING MEMORANDUM ISO MOTION
FOR PRELIMINARY INJUNCTION

331:5-10. Dr. Wolff testified that "several studies do show a link between discriminatory policies toward LGBTQ people and increased mental distress." *Id*. at 319:20-22. Dr. Wolff further testified that "even if someone didn't plan to get married, just knowing that your state didn't see you as an equal, that your state was not going to grant you a marriage license, that that was psychologically harmful, even if that person never showed up to the county clerk's office to request a marriage license." *Id*. at 320:12-20.

The Court should find Dr. Wolff's testimony to be fully credible and give it considerable weight.

### H. Dr. Wolff's Fact Testimony

As a fact witness, Dr. Wolff testified that he and his colleagues met twice with OCR, in 2016 and again in 2021, to discuss their research and make recommendations. He testified that at these meetings, they informed OCR about the mental health disparities and concerns for LGBTQ students at non-affirming religious colleges. *Id*. at 362:20-24. Dr. Wolff testified that he and his colleagues made several recommendations to OCR. "The first is for OCR to clarify where Title IX exemptions may not apply," for example, adopting a position that 'the religious exemption doesn't apply if you know of a student being harassed or bullied on campus and you don't intervene -- you don't do anything to stop that.' We asked OCR to clarify that that would not necessarily be covered under Title IX exemption." *Id*. at 362:25-363:10. They also recommended that OCR "ask for greater transparency about what a Title IX exemption means and who's requested it and why they've requested it." *Id*. at 365:10-12.

### I. Alice Yao's Testimony

Defendants called Alice Yao as their first witness. Yao testified that OCR has never denied a properly requested assurance of religious exemption. Tr. 384:1-17. Yao also testified that OCR

would be skeptical of requests for religious exemption from Title IX's regulations prohibiting retaliation but that, even in the context of retaliation, "[i]f all the criteria are met for the religious exemption, and the controlling organization has confirmed the application of the religious tenet, or the application of the Title IX provision conflicts with the religious tenet, then, yes, I think that OCR would grant the assurance of the religious exemption." *Id*. at 387:11-17; 435:11-16. Yao further testified that OCR "can issue [an] assurance of exemption even in the context of a pending Title IX complaint." *Id*. 421:18-23.

Yao was questioned about a statement from the Singleton Memo which reads: "For all other sections of the regulation, which are more complex, you should require that institutions be more specific than to simply claim Christian or biblical morals as tenets." *Id*. at 438:9-17. Yao then testified that OCR's current practice is to require institutions to be more specific than to simply claim Christian or biblical morals as tenets if they're trying to request exemption from OCR's regulations. *Id*.

**J.  Randolph Wills' Testimony**

Defendants called Randolph Wills as their second witness. Wills testified that OCR's goal is to fully resolve 80% of complaints within 180 days of receipt. Tr. 457:1-13. Wills further testified that the average time to complete the evaluation stage for Title IX complaints was 73 days, and acknowledged that most of Plaintiffs' complaints have been in the evaluation stage for over 100 days. *Id*. at 510:2-17. Wills described that OCR changed their processes earlier this year in ways that impacted Plaintiffs' complaints, ensuring that, among other things, "any action that the regional offices proposed would actually have to come to headquarters for review by headquarters and approval by the Assistant Secretary." *Id*. at 499:12-22. Wills testified that this change in procedures put Plaintiffs' complaint evaluation process temporarily on hold. *Id*. at

CLOSING MEMORANDUM ISO MOTION
FOR PRELIMINARY INJUNCTION

510:18-23. However, he testified that all of Plaintiffs' complaints had resumed the evaluation stage, and that "none are being held back." *Id*. at 511:1-22.

Wills reiterated testimony from his deposition that OCR can investigate discriminatory policies in addition to discrete discriminatory acts, and that "OCR has subject matter jurisdiction to investigate discriminatory policies." *Id*. at 534:7-15. On cross-examination, when asked whether a current student who had alleged injuries stemming from a discriminatory policy, like the Bob Jones University policy, would be stating a claim within the subject-matter jurisdiction of OCR, setting aside the religious exemption, Wills responded that "…generally speaking, that would weigh in favor of opening a complaint for investigation." *Id*. at 536:8-14.

Will testified that current OCR policy, consistent with the 1989 Smith Memo (Government Exhibit 11), is to "carefully assess whether [the assurance of exemption] covers, completely, all of the allegations of the complaint," such that, for example, when an entity has received an assurance of exemption from a regulation because of a religious tenet limiting the training of future ministers to only men, that this would not necessarily mean that the religious exemption would allow women to be excluded from courses in chemistry. *Id.* at 538:15-540:11.

Wills further testified that he was "not aware of a situation where an assurance of exemption has issued from the Assistant Secretary that covers the allegations of a complaint filed by an LGBTQ student where OCR has not dismissed the complaint for lack of jurisdiction." *Id*. at 531:17-532:9. Wills further testified that for those Plaintiffs who attend educational institutions that do not currently have an assurance of religious exemption, such students "would have no way of knowing" whether or not, or to what extent, their Title IX rights are going to be protected by OCR. *Id*. at 543:24-544:10.

CLOSING MEMORANDUM ISO MOTION
FOR PRELIMINARY INJUNCTION

**K.  Dr. Mark Regnerus' Expert Testimony**

Intervenor-Defendants called one expert witness, Dr. Mark Regnerus. Dr. Regnerus testified that college-age sexual and gender minority students are struggling in other settings besides religious colleges. *Id*. at 578:11-21. Dr. Regnerus further testified that he was unaware of data to suggest that the struggles faced by sexual and gender minority students are more prevalent at religious colleges than they are at secular colleges. *Id*. at 578:22-579:15. Dr. Regnerus spent significant time critiquing the methodology of the REAP study, but provided little hearing testimony undermining the methodology of the studies relied on by Drs. Myer and Wolff. *Id*. at 579:1-589:5.

Dr. Regnerus also testified that he agreed with Plaintiffs' experts that there are, at a minimum, a significant number of LGBT students who attend CCCU-type colleges. *Id*. at 600:5-10.  Dr. Regnerus further testified that he considers there to be a mental health crisis among sexual and gender minority young people in general. *Id*. at 611:6-11. He also testified that it is widely acknowledged that "antigay discrimination can diminish psychological and physical health." *Id*. at 621:13-18. Dr. Regnerus further testified that, on the issue of structural stigma, at least some of the sexual and gender minority student population at Plaintiffs' colleges could feel some kind of stigmatic harm or feeling of exclusion from policies that prohibit same-sex sexual conduct, even if they do not actually get disciplined pursuant to the policy. *Id*. at 627:1-7.

To the extent testimony from Dr. Regnerus, or his expert report, undermines the testimony of Drs. Meyer and Wolff, the Court should give Dr. Regnerus' testimony minimal weight. In evaluating Dr. Regnerus' testimony in a previous case in federal court on similar issues, *DeBoer v. Snyder*, 973 F.Supp.2d 757 (E.D. Mich. 2014), the judge's opinion criticized Dr. Regnerus' methodology and stated that "The Court finds Regnerus' testimony entirely unbelievable and not

worthy of serious consideration." *Id.* at 567:15-21; 571:16-23. Despite this criticism, Dr. Regnerus testified that he stands by the methodology and conclusions of his study on which his testimony in the *DeBoer* case was based. *Id.* at 567:12-14. Moreover, Dr. Regnerus testified that he is not a clinical psychologist and is not an expert on mental health outcomes for sexual and gender minority students. *Id.* at 572:5-10.

## IV.    CONCLUSIONS OF LAW

### A. Plaintiffs Satisfy Traditional and Serious Question Tests for Preliminary Injunction

To obtain a preliminary injunction under the traditional test, one or more Plaintiffs must demonstrate that (1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in their favor, and (4) an injunction is in the public interest. *Goldman, Sachs & Co. v. City of Reno*, 747 F.3d 733, 738 (9th Cir. 2014). "A threat of irreparable harm is sufficiently immediate to warrant preliminary injunctive relief if the plaintiff 'is likely to suffer irreparable harm *before a decision on the merits can be rendered*.'" *Boardman v. Pacific Seafood Group*, 822 F.3d 1011, 1023 (9th Cir. 2016) (internal citations omitted) (emphasis added).

The Ninth Circuit recognizes that a preliminary injunction may also issue where plaintiffs raise serious questions going to the merits and where the balance of hardships tips sharply in the plaintiffs' favor. *Landwatch v. Connaughton*, 905 F.Supp.2d 1192 (D. Or. 2012) (granting preliminary injunction on basis of serious question doctrine); *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (serious questions test). Plaintiffs satisfy either test.

Plaintiffs seek some remedies in the form of a prohibitive injunction and some remedies in the form of a mandatory injunction. Unlike a "prohibitory injunction," which "prohibits a party from taking action and preserve[s] the status quo pending a determination of the action on the

CLOSING MEMORANDUM ISO MOTION
FOR PRELIMINARY INJUNCTION

merits[,]" "[a] mandatory injunction orders a responsible party to take action." *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 878-79 (9th Cir. 2009) (internal quotation marks omitted). "The status quo . . . means the last, uncontested status which preceded the pending controversy." *Id*. at 879 (internal quotation marks omitted). Mandatory injunctions are disfavored and subject to a heightened standard.

Here, Plaintiffs seek some relief in the form of a prohibitory injunction. Plaintiffs ask the Court to order Defendants to do one or more of the following: (1) refrain from issuing further assurances of religious exemption; (2) stay OCR's evaluation of Plaintiffs' Title IX administrative complaints; (3) or, in the alternative to a stay, refrain from dismissing Plaintiffs' complaints on the basis of the religious exemption during OCR's ongoing evaluation; and (4) prohibit enforcement of the August 2020 and November 2020 Final Rules. These requests do not alter the status quo between the parties that preceded this present Motion. Consequently, they should be considered requests for a prohibitory injunction and subject to the traditional or serious questions tests described above.

When the Court denied Plaintiffs' Motion for TRO, based on the record then before the Court, it could not find that Plaintiffs showed a likelihood of success on the merits of their Fifth Amendment, Establishment Clause, APA, or RFRA claims. Dkt. 88, p. 6. The Court stated that "at this stage it is far from clear that defendants' conduct violates plaintiffs' constitutional rights." *Id*. at p. 8. The Court stated that, "at best, plaintiffs have shown serious questions going to the merits of their claims." Dkt. 88, p. 7. However, even if Plaintiffs satisfied the serious questions element, the Court nevertheless determined that Plaintiffs had not yet "shown a likelihood of irreparable harm or that the balance of the equities or public interest favor the injunction." Dkt. 88, p. 8.

CLOSING MEMORANDUM ISO MOTION
FOR PRELIMINARY INJUNCTION

However, in light of the evidence presented at the Hearing, including the weight that should be given to the parties' fact and expert witnesses, the Court should now conclude that Plaintiffs have shown a likelihood of success on the merits of one or more of their claims, a likelihood of irreparable harm, that the balance of the equities tips in their favor, or tips sharply in their favor for purposes of the serious questions test, and that a prohibitory injunction is in the public interest.

One of the specific remedies sought by Plaintiffs relates to their Title IX administrative complaints. Plaintiffs previously described those complaints as at risk of being dismissed "any day now." Admittedly, such imminent dismissals did not come to pass. Plaintiffs filed their administrative complaints between June and August of 2021. Since then, only one complaint has been dismissed by OCR, and not because of the religious exemption to Title IX. There remains little evidence of when OCR might reach a determination on each Plaintiff's complaint. The various complaints are being processed by several different OCR regional offices. OCR has a Case Processing Manual, which outlines the general process the OCR offices follow to investigate and resolve complaints. U.S. Dep't of Educ. Off. for Civil Rights Case Processing Manual. Dkt. 60-24. But the manual does not include or impose a timeline on the evaluation process used to determine whether to dismiss or investigate complaints and the government witnesses at the Hearing did not provide a timetable. *Id*. at 5–13.

However, the evidence from the Hearing and 30(b)(6) deposition showed the following new facts : (1) all of Plaintiffs complaints have now been acknowledged by OCR regional offices and assigned a case number; (2) OCR instigated a pause on all of Plaintiffs' complaints over the summer to determine how to evaluate them in light of the religious exemption issues but that pause has now been lifted; (3) OCR interviews and evaluations have resumed; (4) the average time to complete the evaluation stage is 73 days; (5) eighty percent (80%) of the complaints received by

CLOSING MEMORANDUM ISO MOTION
FOR PRELIMINARY INJUNCTION

OCR are supposed to be fully resolved, meaning not only evaluated but fully resolved, within 180 days of receipt; (6) all OCR regional office met the eighty percent (80%) within 180 days goal this past year; and (7) no more than twenty-five percent (25%) of OCR's docket is supposed to be over 180 days old. *See* Hearing Tr. 456:21-457:17; 509:12-20; 510:2-17; 511:1-22; *see also* Dkt. 133 (Deposition Tr. Designations), pp. 83:16-20; 87:5-9.

Given that Plaintiffs' complaints are now beyond the 73-day mark, and are nearing the 180-day mark, and that OCR has already dismissed one of Plaintiffs' complaints, albeit for a different reason than the religious exemption, the Court should find it likely that OCR will dismiss at least one or more of Plaintiffs' complaints prior to a decision on the merits in this case. *Boardman*, 822 F.3d at 1023 ("A threat of irreparable harm is sufficiently immediate to warrant preliminary injunctive relief if the plaintiff 'is likely to suffer irreparable harm before a decision on the merits can be rendered.'").

In *Boardman*, the plaintiffs sought an injunction to prohibit an acquisition that would have diluted competition in the marketplace. The defendants argued "that there is no immediate danger of irreparable harm because they have terminated the proposed acquisition that led to this suit, and they have stipulated with the Oregon Attorney General that they would not enter a purchase transaction with Ocean Gold entities while the Attorney General's investigation is pending." *Id*. at 1023. The Court noted, however, that defendants "may terminate the stipulation with 60–days' notice to the Oregon Attorney General and the district court." *Id*.

The Court found that, even though no such termination had occurred, the plaintiffs "established a sufficient likelihood that, in the absence of preliminary injunctive relief, they would suffer irreparable harm before a trial on the merits could be held" based on, *inter alia*, "the limited nature of Defendants' proposed stipulation….Defendants' history of negotiating an acquisition for

CLOSING MEMORANDUM ISO MOTION
FOR PRELIMINARY INJUNCTION

many months in secret before notifying Plaintiffs; and [] the fact that Defendants may terminate their stipulation with 60–days' notice." *Id*. at 1023; s*ee also Index Newspapers, LLC v. City of Portland*, 480 F.Supp.3d 1120 (D. Or. Aug. 20, 2020) (applying *Boardman* and noting that "Plaintiffs' irreparable injury here is not nearly as attenuated as *Boardman* and indeed is much more immediate because it could happen without any prior notice to the Court.")

Here, the likelihood of irreparable injury is established because: (1) trial on the merits of this action has not been scheduled; (2) Defendants testified to general timeframes of Title IX complaint evaluation and resolution that have been, or likely will be, exceeded prior to resolution of this case through trial on the merits, (3) Defendants' have a history of dismissing Title IX complaints based on the religious exemption, and (4) Defendants can dismiss Plaintiffs' Title IX complaints at any time without notice.

In denying Plaintiffs' Motion for TRO, this Court also previously determined that "[a]lthough it is possible OCR might dismiss some of the complaints under the religious exemption, the Court cannot, at this stage, find that OCR is likely to do so, as opposed to dismissing on any other grounds provided in the Case Processing Manual. *See* Case Processing Manual (doc. 60-24) at 10–12 (listing circumstances under which "OCR will dismiss an allegation, or if appropriate, the complaint"). " Dkt. 88, pp. 9-10.

However, in light of the full record, including the new testimony from the Hearing and 30(b)(6) deposition, the Court should now find that it is likely that OCR will dismiss at least one of the Plaintiffs' complaints on the basis of the religious exemption. Many of the Plaintiffs are, or were, current students at the time they filed their administrative complaints, and they complained of ongoing harm from discriminatory policies and/or specific acts of discrimination that are timely pursuant to the OCR Processing Manuel. *See e.g*. Hearing Testimony from current students Audrey

and Veronica. Moreover, as admitted by Defendants, complaints against ongoing discriminatory policies are the proper subject of an OCR investigation. Dkt. 133, p. 60 of 74 (Depo. Tr. 223:13-224:17); Hearing Tr. 534:7-15; 536:8-14. Under such circumstances, the OCR complaints from Plaintiffs who remain current students, and plaintiffs who were students at the time the complaints were submitted to OCR, are likely to be found timely pursuant to the 180-day timeliness requirement of the OCR Processing Manual.

Moreover, aside from the Title IX complaints submitted by three Plaintiffs involved in civil litigation against their educational institutions, Defendants have put forward no evidence indicating that the Title IX complaints submitted by other Plaintiffs are likely to be dismissed because of such litigation.

Moreover, Plaintiffs introduced evidence showing that OCR has a history of dismissing Title IX complaints based on the religious exemption to Title IX, even where the exemption was retroactively applied. Consequently, the Court should find that it is likely that at least one of Plaintiffs' Title IX complaints will be dismissed based on the religious exemption prior to resolution of this case through a trial on the merits.

Additionally, in denying Plaintiffs' Motion for TRO, this Court reasoned that "although an investigation of plaintiffs' complaints could eventually reduce the discrimination and other harms plaintiffs' and other LGBTQ+ students face at plaintiffs' schools, it is not clear from the record that plaintiffs' requested relief would result in immediate protection from the risk of physical, emotional, and psychological harm plaintiffs seek to prevent through his motion." Dkt. 88, p. 11. However, Plaintiffs are not seeking immediate protection from the discrimination and harms done to them by their educational institutions. Rather, Plaintiffs seek immediate protection from the discrimination and harms done to them by the Department, including the stigma and dignitary

CLOSING MEMORANDUM ISO MOTION
FOR PRELIMINARY INJUNCTION

harms. Plaintiffs' requested relief would, at least in part, immediately halt the government's endorsement of the discrimination Plaintiffs' experience from their educational institutions. The harms stemming from that endorsement are what Plaintiffs seek to remedy through this Motion. To the extent the harms Plaintiffs seek to prevent were not clear from the record prior to the Hearing, they are clear now.

This Court also previously held that "preliminary injunctive relief in this action is not plaintiffs' 'only viable remedy' for harms caused by plaintiffs' schools or on their campuses." Dkt. 88, p. 11. The Court stated that, "[f]or example, plaintiffs may file private Title IX lawsuits directly against their respective schools, challenging the constitutionality of the religious exemption and its implementing regulations, and may seek appropriate preliminary injunctive relief in those actions." Dkt. 88, p. 11. However, Plaintiffs' present Motion seeks a remedy for the harms caused by Defendants. Even if Plaintiffs can challenge the constitutionality of the Title IX religious exemption through a private lawsuit against their schools, Plaintiffs are unable to obtain relief against Defendants through a lawsuit against their schools. OCR's administrative processes, and the Department's funding, would be unaffected by a favorable ruling against Plaintiffs' educational institutions.

Additionally, regarding Plaintiffs' request for an injunction prohibiting enforcement of the 2020 Final Rules, "injunctions that prohibit enforcement of a new law or policy," are to be construed as prohibitory and subject only to the standard preliminary injunction inquiries. *Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1061 (9th Cir. 2014). Here, the religious exemption was enacted decades ago. Consequently, the standard for new law or policy does not apply. However, the evidence and argument, including argument from *amici*, Dkt. 132, has shown that the 2020 Amendments to 34 C.F.R. § 106.12(b) and (c) do present a change in the law, and likely

CLOSING MEMORANDUM ISO MOTION
FOR PRELIMINARY INJUNCTION

at least some change in policy. In light of the evidence and argument now before the Court, the Court should find that an injunction to prohibit enforcement of the 2020 Final Rules should be construed as a prohibitory injunction and analyzed under that standard.

Plaintiffs also ask the Court to order Defendants to do one or more of the following: (1) investigate the schools attended by plaintiffs for compliance with the sexual orientation and gender identity requirements of Title IX and its implementing regulations, begin negotiations seeking voluntary compliance from noncompliant schools, and, if need be, initiate enforcement proceedings against schools that remain noncompliant; and (2) rescind or void previously granted Title IX religious exemption assurances. Mot. to Amend. (Dkt. 75) at 14–15. These are affirmative steps, aimed at altering the existing status quo between the parties, and thus constitute requests for a mandatory injunction.

When a plaintiff requests a "mandatory injunction," the "already high standard" for success on the merits is "further heightened," and the plaintiff must "'establish that the law and facts *clearly favor* her position, not simply that she is likely to succeed.'" *Innovation Law Lab v. Nielsen*, 310 F. Supp. 3d 1150, 1156–57 (D. Or. 2018) (quoting *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (emphasis in *Garcia*)). In denying Plaintiffs' Motion for TRO, based upon review of the record then before the Court, the Court could not find that the law and facts clearly favored Plaintiffs' position and determined that, "at best, plaintiffs have shown serious questions going to the merits of their claims." Dkt. 88, p. 7.

However, in light of the testimony and evidence from the Hearing and the 30(b)(6) deposition, and the arguments described above, Plaintiffs have made a sufficient showing for a mandatory injunction.

CLOSING MEMORANDUM ISO MOTION
FOR PRELIMINARY INJUNCTION

### B. Plaintiffs Have Standing and their Claims Are Ripe

Plaintiffs have standing to challenge statutes and regulations that fund or otherwise endorse discrimination at educational institutions they attend, attended, or attempted to attend. *Norwood v. Harrison*, 413 U.S. 455, 471 (1973); *see also Griffin v. County School Board of Prince Edward County*, 377 U.S. 218, 231-33 (1964) (finding standing and equal protection violation where Black school children sued the County School Board to, *inter alia*, enjoin payment of public funds to support private schools which excluded students on account of race).

In *Norwood*, the Court explained that when textbook expenses are "born by the State, the economic consequence is to give aid to the enterprise; if the school engages in discriminatory practices the State by tangible aid in the form of textbooks thereby gives support to such discrimination. Racial discrimination in state-operated schools is barred by the Constitution and '(i)t is also axiomatic that a state may not induce, encourage or promote private persons to accomplish what it is constitutionally forbidden to do." 413 U.S. at 464-65 (internal citations omitted); *see also Bishop v. Starkville Academy*, 442 F.Supp. 1176 (N.D. Miss. 1977) (holding that Black schoolchildren "who contend that the state defendants' actions … constitute significant aid to private schools which may be racially discriminatory have 'alleged such a personal stake in the controversy' as to warrant (their) invocation of federal court jurisdiction and to justify exercise of (this) court's remedial powers on (their) behalf.'"); *Moton v. Lambert*, 508 F.Supp. 367 (N.D. Miss. 1981), (finding standing for parents of Black children who challenged state assistance to private discriminatory schools); *Green v. Connally,* 330 F. Supp. 1150, 1164 (D.D.C. 1971): ("This is a 'rule of thumb,' delineating an *a fortiori* case of unconstitutional state action, which does not derogate from the standing of Negro school children to launch a challenge in case of 'any amount of state support to help found segregated schools or to help maintain such schools'".); *Poindexter v. Louisiana Financial Assistance Commission,* 258 F.Supp. 158, 164 (E.D. La.1966) (finding

23

CLOSING MEMORANDUM ISO MOTION
FOR PRELIMINARY INJUNCTION

standing and denying motion to dismiss class action by Black students attacking constitutionality of Louisiana statutes), *repeated and incorporated in Poindexter v. Louisiana Financial Assistance Comm'n,* 275 F.Supp. 833, 845 (E.D.La.1967) (permanent injunction) *aff'd mem.* 389 U.S. 571 (1968); *Brumfield v. Dodd*, 425 F.Supp. 528 (E.D. La. 1976) (granting injunction in action by Black students and their parents against school officials challenging state statutory scheme for providing books, materials and funds for student transportation to students attending racially segregated religious and secular private schools).

Moreover, *Allen v. Wright*, 468 U.S. 737 (1984), supports, rather than undermines, Plaintiffs' standing. Unlike the plaintiffs in *Allen*, the Plaintiffs here actually enrolled, or attempted to enroll, at the avowedly discriminatory educational institutions but were rejected and/or were discriminated against pursuant to school policies. Plaintiffs are not LGBTQ+ students from Hawaii "roaming the country" and filing lawsuits against state government support for anti-LGBTQ+ schools in Maine. *See Allen*, 468 U.S. at 756 (seeking to avoid circumstances where "a [B]lack person in Hawaii could challenge the grant of a tax exemption to a racially discriminatory school in Maine," utilizing the courts merely to "vindicate the interests of concerned bystanders."). As the Eight Circuit has noted, "A taxpayer whose tax money is used in a discriminatory manner suffers no injury under the Equal Protection Clause *unless and until an expenditure facilitates discrimination against him or her.*" *Booth v. Hvass*, 302 F.3d 849, 854 (8th Cir. 2002) (emphasis added). Here, Plaintiffs have not merely shown that taxpayer money has been used in a discriminatory manner, but they have also shown that taxpayer money is being used to facilitate discrimination against them.

Additionally, *Simon v. Eastern Ky. Welfare Rights Organization*, 426 U.S. 26, 41–42 (1976) does not alter the standing and causation analysis presently before the Court because *Simon* did not overrule *Norwood* and because *Simon* did not involve invidious discrimination against a

protected class. *See Moton v. Lambert*, 508 F.Supp. 367 (N.D. Miss. 1981) ("Since *Norwood* was not overruled by the *Simon* Court, we deem it controlling. *Simon* may also be distinguished from the case sub judice since it did not involve the question of racial discrimination prohibited by the fourteenth amendment."); *see also Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993) ("When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier in order to establish standing. The 'injury in fact' in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit.").

Plaintiffs' alleged injuries are also sufficiently ripe. To begin, Plaintiffs allege ongoing stigmatic and psychological injuries caused by continuing violations of their constitutional and statutory rights through the Department's funding, the statutory religious exemption, and the Department's administrative regulations. Moreover, as articulated above, the evidence shows that at least some of Plaintiffs' Title IX administrative complaints are sufficiently at risk of dismissal based on the religious exemption to Title IX. Additionally, defendants have historically used the religious exemption to dismiss Title IX complaints filed by sexual and gender minority students against their educational institutions. *See e.g.* Hearing Tr. 515:21-25 (Testimony that OCR dismissed a transgender student's discrimination claim against George Fox University based on the religious exemption to Title IX); *Id*. at 522:23-523:8 (Dismissal of a student's Title IX complaint against Spring Arbor University based on religious exemption); *see also Id*. at 531:17-532:9 (Wills' testimony that he is unaware of a situation where OCR has granted assurance of an

exemption covering the allegations of a complaint, where OCR had not dismissed a complaint based on the exemption.).

### C.  Additional Parties Are Unnecessary to Resolve Plaintiffs' Claims

The educational institutions attended by plaintiffs are not indispensable parties to this litigation. In a strikingly similar case, a federal court held that individual private schools that were practicing racial discrimination were not indispensable parties to a case in which the plaintiffs' challenged the state's funding of such schools. *Brumfield v. Dodd*, 425 F. Supp. 528, 530-31 (E.D. La. 1976) (citing *Norwood v. Harrison*, 413 U.S. 455, 471 (1972)). In that case, the court also cited a similar case that challenged constitutionality of a "statute authorizing state aid to non-profit private colleges and universities," stating that "[t]he fact that all recipients of aid under a challenged statute have a financial interest in the continuation of that statute does not lead inevitably to a conclusion that all aid recipients must be joined as parties." *Brumfield*, 425 F. Supp at 530 (quoting *American Civil Liberties U. of Md. v. Board of Public Wks.*, 357 F. Supp. 877 (D. Md. 1972)).

To begin, for Plaintiffs' requests for a prohibitory injunction, the Court is not being asked to order discontinuation of funding to any educational institution or to direct Defendants to start an investigation or enforcement action with respect to any educational institution. Moreover, before any enforcement action or funding decision would potentially be taken against any educational institution at an unknown future date as a result of an order from this Court, such educational institution would be afforded the opportunity to defend itself through the administrative process. *See Norwood,* 413 U.S. at 471 ("The proper injunctive relief can be granted without implying a finding that all the private schools alleged to be receiving textbook aid are in fact practicing restrictive admission policies.").

CLOSING MEMORANDUM ISO MOTION
FOR PRELIMINARY INJUNCTION

Moreover, the CCCU, Religious Colleges and Defendants can adequately represent the interests of the other religious schools potentially interested in the outcome of this case. CCCU describes itself as "the largest association of protestant Christian institutions of higher learning" and eighteen of its member colleges are named in the complaint. Dkt. 26 (CCCU Motion to Intervene), at 13, 15. To quote the CCCU: "Because the interests 'asserted in this lawsuit' are 'undifferentiated among members and similar to the interests and claims' of CCCU, it would be more efficient to allow CCCU to assert the standing of its members than require each individual member to intervene." *Id*. at 17.

### D.  Plaintiffs are Likely to Succeed on the Merits of their Substantive Claims.

#### 1.  Plaintiffs are likely to succeed on the merits of their Establishment Clause and Substantive Due Process/Equal Protection claims.

The merits of Plaintiffs' Establishment Clause and Substantive Due Process/Equal Protection claims have been briefed at length. Plaintiffs will not repeat such briefing here but offer the following summary of the law on these issues.

In 1972, when Congress enacted Title IX, protections for sexual and gender minority Americans were not recognized by any branch of the federal government. At the time, a Congressional act that provided funding for, or that endorsed or facilitated, discrimination against sexual and gender minority students, was of no concern. Such federal action did not offend constitutional rights or widely held social values recognized at the time.

Nearly fifty years later, our society has now come to a place where our laws can no longer treat sexual and gender minority Americans as social outcasts or as inferior in dignity and worth. Our highest Court now recognizes that governments can no longer criminalize homosexual behavior, *Lawrence v. Texas*, 539 U.S. 558 (2003), or target sexual and gender minorities for exclusion from civil rights protections, *Romer v. Evans*, 517 U.S. 620 (1996). Likewise, our highest Court now recognizes that same-sex marriage is a fundamental right, *Obergefell v. Hodges*,

CLOSING MEMORANDUM ISO MOTION
FOR PRELIMINARY INJUNCTION

576 U.S. 644 (2015), and that civil rights laws prohibiting sex discrimination include protections for sexual and gender minorities, *Bostock v. Clayton County,* 140 S.Ct. 1731 (2020). Given these fundamental changes to our jurisprudence, and the promises Defendants have now made to sexual and gender minority students, exemptions to civil rights laws that allow the government to fund educational institutions that avowedly discriminate against sexual and gender minority students, or that immunize a subset of institutions from liability for the harm they cause such students, must be carefully reviewed. If the exemption endorses invidious discrimination against sexual and gender minority students, such an exemption likely fails any level of scrutiny, as the government cannot claim a legitimate interest in such endorsement. *Norwood, supra; Bob Jones University v. U.S.,* 461 U.S. 574 (1983)*, Grove City College v. Bell,* 465 U.S. 555 (1984); *Christian Legal Soc. Chapter of the University of California v. Martinez,* 561 U.S. 661 (2010) (law school's policy requiring officially recognized religious student groups to comply with school's nondiscrimination policy regarding sexual orientation did not violate First Amendment).

The religious nature of the exemption to Title IX at issue before this Court does not substantially change the equal protection analysis because Title IX falls within the realm of Spending Clause legislation, where non-discrimination restrictions on federal funding are not only permissible, but often required. While our highest Court has held that the government cannot categorically exclude religious organizations from federal funding programs, *Trinity Lutheran v. Comer*, 137 S.Ct. 2012 (2017), or deny them access to exemptions to non-discrimination requirements that are available to non-religious organizations, *Fulton v. City of Philadelphia*, 141 S.Ct. 1868 (2021), those concerns are not at issue here. If the Court grants Plaintiffs' requested relief, religious educational institutions can continue to receive federal funding for their educational programs, and they can still benefit from the other exemptions to Title IX. Moreover,

CLOSING MEMORANDUM ISO MOTION
FOR PRELIMINARY INJUNCTION

religious educational institutions will not be required to change their beliefs in order to comply with Title IX, as Title IX and its implementing regulations do not address beliefs. Rather, Title IX addresses discriminatory policies and conduct. Discriminatory policies and conduct may be favored by some religious educational institutions, as they have been favored at many public and secular private educational institutions throughout our history. However, community favor of discriminatory conduct, whether based on religious belief or secular belief, cannot justify government endorsement of invidious discrimination in education. *See Roberts v. Jaycees*, 486 U.S. 609 (1984) ("[A]cts of invidious discrimination…cause unique evils that government has a compelling interest to prevent…Accordingly…such practices are entitled to no constitutional protection."). Moreover, if religious educational institutions wish to continue their discriminatory conduct, they may do so by forgoing federal funding, which will take them out of the realm of Title IX.

Here, the testimony from the Hearing shows that the religious exemption to Title IX endorses invidious discrimination against Plaintiffs and other sexual and gender minority students attending taxpayer funded educational institutions. Consequently, the exemption cannot withstand scrutiny under any level of review and Plaintiffs are entitled to a remedy.

### 2.  Plaintiffs are Likely to Succeed on the Merits of their APA Claim.

Plaintiffs previously briefed the merits of their APA claims. Plaintiffs offer the following additional arguments arising from the Hearing and from the Amicus Brief filed by State Attorneys General, Dkt. 132, in favor of Plaintiffs' APA claims.

The States of Oregon, California, Connecticut, Delaware, Hawaii, Illinois, Maryland, Massachusetts, Michigan, Minnesota, New Jersey, New Mexico, New York, Nevada, Pennsylvania, Vermont, Virginia, and Washington, and the District of Columbia (collectively "the

CLOSING MEMORANDUM ISO MOTION
FOR PRELIMINARY INJUNCTION

States") filed an amicus brief in support of Plaintiffs' APA claims challenging the August 2020

Final Rule and the November 2020 Final Rule (collectively "the Final Rules"). Dkt 135, pp. 1-2.

The Final Rules harm students by significantly altering Title IX enforcement, upending a

forty-year-old regulation requiring notice to the detriment of students' reliance interests, and

substantially broadening the religious exemption. The Final Rules violate Title IX's purpose and

Congress' intent and are unsupported by evidence or the Departments' rationale. Dkt. 132 at 5.

"[T]he rules harm students, place them at higher risk of being victims of sex discrimination, and

make it more difficult to hold schools accountable for the resulting harm." Dkt. 135 at 3.

The November 2020 Final Rule unlawfully broadens the narrow religious exemption by

expanding the interpretation of "controlled by a religious organization," in violation of the text and

purpose of Title IX to protect against sex discrimination.  By adding additional interpretive criteria

"not contemplated by Title IX's text or purpose," the rule violates the requirement that educational

institutions be controlled by religious organizations with identifiable 'tenets' in conflict with Title

IX's anti-discrimination mandate." *Id*. at 6; *see also id*. at 9, 11. The additional interpretive criteria

are not supported by Congress' intent or the text or purpose of Title IX. *Id*. at 10, 12. Indeed, on

several occasions, the narrowness of the religious exemption has been affirmed by Congress and

the Department. *Id*. at 10-11 (citing examples). "In other words, Congress created robust protection

against federally funded discrimination in schools with the intent of making its antidiscrimination

mandate apply to as many institutions as possible." *Id*. at 11. The November 2020 Final Rule is

unlawful.

The November 2020 Final Rule is arbitrary and capricious because of (1) insufficient

evidence; (2) inconsistent and unsupported reasoning; and (3) disregarded considerations. First,

CLOSING MEMORANDUM ISO MOTION
FOR PRELIMINARY INJUNCTION

the Department relied of speculation and conclusory statements, not on reasoned decision-making. *Id*. at 12.

Second, the Department relied on inconsistent analyses, contradicting statements, and incompatible reasoning to ultimately muddle the regulatory standard. Dkt. 135 at 13-14. Moreover, the Department failed to address students' reliance on a narrower interpretation of the statute. *Id*. at 14. Similarly, the Department failed to assert any RFRA challenge that could not easily be answered "[g]iven Title IX's clear anti-discrimination purpose" and the government's compelling interest in eradicating discrimination. *Id*. at 15.

Third, the Department disregarded important considerations, such as the harmful impact of the rule in "creating conditions for discrimination, harassment, and assault." *Id*. Moreover, the Department disregarded the important consideration on the burdensome costs on states resulting from sex discrimination, such as increased health expenditures. *Id*. at 17. The Department also appears to have disregarded the research and recommendations of testifying witness Dr. Wolff and his colleagues when presented with such information in 2016. Tr. 362:20-363:10; 365:10-12.

Additionally, the August 2020 Final Rule unlawfully deprives students of notice. The August 2020 Final Rule is arbitrary and capricious because it disregarded contrary evidence, such as how "[o]ver five decades, hundreds of schools secured exemptions without any apparent confusion or complaints about the burden," in contrast to the Department's assertion that the notice requirement was "confusing." *Id*. at 18 (citing 83 Fed. Reg. at 61482). "Students should know before they enroll whether their school will claim an exemption from federal discrimination law." *Id*. at 18. The absence of effective notice for students facilitates "deception by allowing schools to conceal important information about their exemption status." *Id*. at 19. "This result is utterly incongruous with the intent of Congress in banning sex discrimination at publicly funded

CLOSING MEMORANDUM ISO MOTION
FOR PRELIMINARY INJUNCTION

educational institutions subject to a narrow exemption for schools controlled by religious organizations." *Id.*

Thus, for the aforementioned reasons, the Final Rules are unlawful, arbitrary, and capricious, with the ultimate harm befalling on vulnerable students.

> ### 3. Plaintiffs are likely to succeed on the merits of their Religious Freedom Restoration Act claim.

Plaintiffs previously briefed the merits of their RFRA claim and incorporate that briefing herein.

## V.    CONCLUSION

Based on the Hearing, and the record and arguments in this matter, Plaintiffs respectfully request that the Court grant their Motion for a Preliminary Injunction.

Date: December 6, 2021

<u>s/ Paul Carlos Southwick</u>

**Paul Carlos Southwick
(OSB 095141)
TRIAL ATTORNEY
Religious Exemption
Accountability Project
Paul Southwick Law, LLC**
8532 N. Ivanhoe St. #208,
Portland, OR 97203
Email: paul@paulsouthwick.com
Phone: 503-806-9517

CLOSING MEMORANDUM ISO MOTION
FOR PRELIMINARY INJUNCTION