Herbert G. Grey, OSB # 810250
4800 SW Griffith Drive, Suite 320
Beaverton, Oregon 97005-8716
Telephone: (503) 641-4908
Email: herb@greylaw.org

Gene C. Schaerr, DC Bar # 416368*
Email: gschaerr@schaerr-jaffe.com
Nicholas Miller, MI Bar# P70694*
Email: nmiller@schaerr-jaffe.com
Joshua J. Prince, DC Bar # 1685532*
Email: jprince@schaerr-jaffe.com
Schaerr | Jaffe LLP
1717 K Street NW, Suite 900
Washington, D.C. 20006
Telephone: (202) 787-1060

* Admitted *pro hac vice*

*Counsel for Defendant-Intervenor
Council for Christian Colleges &
Universities*

Kristen K. Waggoner, OSB # 067077
 *Lead Counsel*
Email: kwaggoner@ADFlegal.org
David A. Cortman, GA Bar # 188810*
Email: dcortman@ADFlegal.org
Ryan J. Tucker, AZ Bar # 034382*
Email: rtucker@ADFlegal.org
Mark A. Lippelmann, AZ Bar # 036553*
Email: mlippelmann@ADFlegal.org
Alliance Defending Freedom
15100 N. 90th Street
Scottsdale, Arizona 85260
Telephone: (480) 444-0020

* Admitted *pro hac vice*

*Counsel for Defendants-Intervenors
Western Baptist College d/b/a Corban
University, William Jessup University
and Phoenix Seminary*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

### Eugene Division

| | |
|---|---|
| ELIZABETH HUNTER, et al., | No. 6:21-CV-00474-AA |
|         Plaintiffs, | |
|         v. | |
| U.S. DEPARTMENT OF EDUCATION, et al., | DEFENDANTS-INTERVENORS' JOINT POST-HEARING BRIEF |
|         Defendants, | |
|         v. | |

COUNCIL FOR CHRISTIAN
COLLEGES & UNIVERSITIES,
WESTERN BAPTIST COLLEGE d/b/a
CORBAN UNIVERSITY, WILLIAM
JESSUP UNIVERSITY AND PHOENIX
SEMINARY,

     Defendants-Intervenors.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................ii

INTRODUCTION AND SUMMARY ......................................................................... 1

ARGUMENT ............................................................................................................ 4

I.    Plaintiffs have failed to show they will suffer immediate, irreparable
      harm without the requested injunction. ........................................................ 4

      A.  The evidence reconfirms that Plaintiffs have adequate alternative
          remedies. ................................................................................................ 4

      B.  Plaintiffs' concerns about immediate irreparable injury are at best
          speculative and are foreclosed by the evidence. ................................... 6

II.   The evidence reinforces the Court's previous holding that the balance
      of the equities and the public interest favor Defendants. ............................ 12

      A.  Plaintiffs' proposed remedy would harm Christian colleges, which
          offer a more supportive and even superior environment for
          religiously committed LGBTQ+ students than more liberal or non-
          religious schools. ................................................................................... 13

      B.  The public has no interest in encouraging discrimination and
          entanglement that results in less educational diversity for LGBTQ+
          and other minority students.................................................................. 17

III.  The evidence reconfirms that Plaintiffs have little likelihood of success
      on the merits. ............................................................................................... 22

      A.  This Court lacks jurisdiction to grant the injunction, and the
          Plaintiffs lack standing to seek it. ....................................................... 22

      B.  Plaintiffs' requested relief would violate the First Amendment's
          Religion Clauses and the Religious Freedom Restoration Act. ............. 26

      C.  Plaintiffs' APA claims fail because the 2020 Rules merely codified
          the Departments' longstanding internal practices.................................. 29

      D.  Plaintiffs' repeated reliance on a supposed comparison between
          racial discrimination and religious beliefs about sexuality is
          offensive and contrary to the law.......................................................... 31

CONCLUSION........................................................................................................ 35

CERTIFICATE OF COMPLIANCE.......................................................................... 36

CERTIFICATE OF SERVICE.................................................................................. 37

## TABLE OF AUTHORITIES

**Cases**

*Bakersfield City School District v. Boyer,*
   610 F.2d 621 (9th Cir. 1979) ............................................................... 24

*Bostock v. Clayton County,*
   140 S. Ct. 1731 (2020) .............................................................. 33, 34

*Colorado River Indian Tribes v. Town of Parker,*
   776 F.2d 846 (9th Cir. 1985) ................................................................. 6

*Cooper Industrial, Inc. v. Aviall Services, Inc.,*
   543 U.S. 157 (2004) ....................................................................... 25

*D'Lil v. Best Western Encina Lodge & Suites,*
   538 F.3d 1031 (9th Cir. 2008) ............................................................ 23

*Employment Division, Department of Human Resources of Oregon v. Smith,*
   494 U.S. 872 (1990) .................................................................. 19, 34

*Espinoza v. Montana Department of Revenue,*
   140 S. Ct. 2246 (2020) ...................................................... 9, 19, 21, 26

*Federal Communications Commission v. Prometheus Radio Project,*
   141 S. Ct. 1150 (2021) ................................................................... 29

*Fulton v. City of Philadelphia,*
   141 S. Ct. 1868 (2021) ........................................................ 9, 20, 33

*Hernandez v. Commissioner of Internal Revenue,*
   490 U.S. 680 (1989) ....................................................................... 19

*Kling v. County of Los Angeles,*
   633 F.2d 876 (9th Cir. 1980) ............................................................... 4

*Larson v. Valente,*
   456 U.S. 228 (1982) ...................................................... 19, 21, 26, 27

*Lujan v. Defenders of Wildlife,*
   504 U.S. 555 (1992) ....................................................................... 25

*Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission,*
   138 S. Ct. 1719 (2018) ............................................................. 22, 33

*Maxon v. Fuller Theological Seminary,*
   2020 WL 6305460 (C.D. Cal. Oct. 7, 2020) .............................................. 8

*McCarthy v. Fuller,*
    714 F.3d 971 (7th Cir. 2013) ................................................................ 17

*Melendres v. Arpaio,*
    695 F.3d 990 (9th Cir. 2012) ................................................................ 18

*Mitchell v. Helms,*
    530 U.S. 793 (2000) ............................................................................. 19

*Natal v. Christian and Missionary Alliance,*
    878 F.2d 1575 (1st Cir. 1989) ......................................................... 26, 28

*National Labor Relations Board v. Catholic Bishop of Chicago,*
    440 U.S. 490 (1979) ....................................................................... 17, 19

*National Wrestling Coaches Association v. Department of Education,*
    366 F.3d 930 (D.C. Cir. 2004) ............................................................... 5

*Oakland Tribune, Inc. v. Chronicle Publishing Co.,*
    762 F.2d 1374 (9th Cir. 1985) ................................................................ 7

*Obergefell v. Hodges,*
    576 U.S. 644 (2015) ................................................................... 31, 32, 33

*Ohio Forestry Association, Inc. v. Sierra Club,*
    523 U.S. 726 (1998) ....................................................................... 11, 24

*PDK Laboratories Inc. v. United States Drug Enforcement Administration,*
    362 F.3d 786 (D.C. Cir. 2004) ........................................................... 5, 6

*Pena-Rodriguez v. Colorado,*
    137 S. Ct. 855 (2017) ..................................................................... 32, 34

*Preminger v. Principi,*
    422 F.3d 815 (9th Cir. 2005) ............................................................... 17

*Simon v. Eastern Kentucky Welfare Rights Organization,*
    426 U.S. 26 (1976) ............................................................................... 25

*Tandon v. Newsom,*
    141 S. Ct. 1294 (2021) .......................................................................... 9

*Thomas v. Review Board of the Indiana Employment Security Division,*
    450 U.S. 707 (1981) ............................................................................. 20

*Weinberger v. Romero-Barcelo,*
    456 U.S. 305 (1982) ............................................................................... 4

*Winter v. Natural Resources Defense Council, Inc.,*
   555 U.S. 7 (2008) ........................................................................... 1

*Zepeda v. INS,*
   753 F.2d 719 (9th Cir. 1985) ...................................................... 23

**Statutes**
20 U.S.C. § 1011a(a)(2)(A) ..................................................... 17, 18

20 U.S.C. § 1681(a)(3) ................................................................ 29

**Regulations**
34 C.F.R. § 106.12(c) .................................................................. 30

August Rule, 85 Fed. Reg. 30026 (May 19, 2020) ....................... 29

November Rule, 85 Fed. Reg. 59916 (Sept. 23, 2020) ................. 30

**Other Authorities**
Br. for Am. Psychological Ass'n et al. as Amici Curiae in Support of Pet'rs,
   *Obergefell v. Hodges*, 576 U.S. 644 (2015) (No. 14-556) ......................................... 31

## INTRODUCTION AND SUMMARY

This Court correctly denied Plaintiffs' original and amended TRO motions because Plaintiffs failed to satisfy even one of the factors required under *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008). Order Denying TRO at 6–12, ECF No. 88. Although motions for preliminary injunction are governed by the same standard, Plaintiffs requested an evidentiary preliminary injunction hearing, and the Court patiently received evidence for three days. But, like Plaintiffs' prior maneuver to salvage a deficient injunction request, the evidence introduced at the hearing "does not change the outcome of Plaintiffs' request for preliminary injunctive relief." *See* Order Denying TRO at 5, ECF No. 88. For that reason, and for the reasons already exhaustively addressed in Intervenor's Joint Opposition, ECF No. 109, Plaintiffs' motion should be denied.

Indeed, Plaintiffs' *amended* request for preliminary relief (seeking an order forcing the Department of Education to initiate new investigations) did not contain any reference to the *Winter* factors, much less any showing that Plaintiffs were likely to suffer irreparable harm without the unique amended relief; that the balance of equities favors their amended request; or that the amended relief serves the public interest. *See* Pls.' Mot. to Amend TRO, ECF 75. And Plaintiffs did not present any such evidence at the hearing. Any of these failures alone dooms Plaintiffs' amended request for preliminary injunctive relief.

Plaintiffs' original request for relief fares no better. The Court should start—and finish—its analysis by recognizing that Plaintiffs' case-in-chief did not include any evidence that they are likely to suffer irreparable harm without an injunction

suspending the Department's routine complaint-administration procedures. To the contrary, on cross-examination, the student witnesses admitted that their administrative complaints remain pending,[1] that they have not filed a private lawsuit against their educational institution,[2] and that they failed to file timely administrative complaints within 180 days of the alleged discrimination.[3] And on rebuttal, a witness from the Department confirmed that, while the Department tries to resolve most complaints within 180 days, there is no time requirement for the Department to complete an investigation. Day 2 Tr. 464:4-18 (Randolph Wills). Plaintiffs' lack of affirmative evidence on irreparable harm—and their admissions undermining that indispensable *Winter* factor—alone forecloses their request for injunctive relief.

The motion also fails because Plaintiffs request mandatory relief but do not even attempt to carry their elevated burden of showing that the law and facts "clearly favor" their position. The law has not changed since the Court held that Plaintiffs had failed to show a likelihood of success on the merits of their claims, "let alone that the law and facts clearly favor their position." Order Denying TRO at 6, ECF No. 88. And that conclusion does not even account for the Defendants' threshold jurisdictional arguments, which the Court recognized may also have merit. *Id.* at 7.

---

[1] Day 1 Tr. 67:8-17 (Alex Duron); 102:3-11 (Veronica Bonifacio-Penales); 187:3-6 (Audrey Wajnarowisch); 224:3-5 (Elizabeth Hunter); 252:3-12 (Kalie Hargrove).

[2] Day 1 Tr. 68:5-7 (Alex Duron); 102:12-13 (Veronica Bonifacio-Penales); 187:7-9 (Audrey Wajnarowisch); 224:6-8 (Elizabeth Hunter); 252:13-15 (Kalie Hargrove).

[3] Day 1 Tr. 67:3-10 (Alex Duron); 223:22–224:2 (Elizabeth Hunter).

Finally, no evidence presented at the hearing undermines the Court's conclusion that Plaintiffs failed to show that the equities and public interest tip sharply in their favor. *Id.* at 10–11. In evaluating this factor, the Court previously noted that "Plaintiffs have not shown that dismissal of their complaints on religious exemption grounds is imminent or that defendants have violated their constitutional rights," *id.* at 11, observations that remain unchanged by any evidence presented at the hearing. Moreover, this Court had already considered evidence regarding the alleged psychological impact of religious policies on LGBTQ+ students when it denied Plaintiffs' TRO.  And the hearing presented no evidence that interfering with the Department's routine complaint-processing procedure—the relief Plaintiffs now seek—"would result in immediate protection from the risk of physical, emotional, and psychological harm plaintiffs seek to prevent through [t]his motion." *Id.*

Because Plaintiffs have again failed to carry their heightened burden, this Court should again deny Plaintiffs' request for injunctive relief. Indeed, given the patent weaknesses in Plaintiffs' case—including their failure even to attempt to show that the preliminary injunction they have requested is necessary to or will prevent irreparable injury—it is difficult to see Plaintiffs' case as anything more than an effort to generate additional publicity (and perhaps funding) for their cause.

ARGUMENT

**I.    Plaintiffs have failed to show they will suffer immediate, irreparable harm without the requested injunction.**

The need to demonstrate immediate and irreparable harm and the inadequacy of standard legal recourse is a fundamental requirement for a preliminary injunction. As the Supreme Court has made clear, "[t]he basis for injunctive relief in the federal courts has always been irreparable injury *and* the inadequacy of legal remedies" *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) (emphasis added). Plaintiffs fail to establish either of these requirements.

**A.    The evidence reconfirms that Plaintiffs have adequate alternative remedies.**

As to alternative remedies, this Court has already determined that Plaintiffs could "file private Title IX lawsuits directly against their respective schools, challenging the constitutionality of the religious exemption and its implementing regulations, and may seek appropriate preliminary injunctive relief in those actions." Order Denying TRO at 11, ECF No. 88. Yet Plaintiffs did not even attempt to attempt to rebut this conclusion at the hearing.

Plaintiffs' preliminary-injunction request thus fails out of the gate because they not only have *alternative* remedies available to them, but indeed have *better* alternative remedies than those they are seeking here. As a matter of law, Title IX *administrative* remedies "do not afford individual complainants adequate relief." *Kling v. Cnty. of Los Angeles*, 633 F.2d 876, 879 (9th Cir. 1980). Because of the inadequacy of remedies resulting from administrative proceedings, Plaintiffs can skip the administrative process altogether by suing their schools directly in federal court.

4 - DEFENDANTS-INTERVENORS' JOINT POST-HEARING BRIEF

*See* Order Denying TRO at 11, ECF No. 88 (collecting cases). In those cases, Plaintiffs can challenge "the lawfulness of the Department's policies" if any "defendant university attempts to justify its actions by reference to those policies." *Id.* (quoting *Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 947 (D.C. Cir. 2004)). Accordingly, the Court's earlier legal conclusion on this point was correct.

But even if that had been a factual conclusion, Plaintiffs produced no evidence at the hearing to rebut it. To the contrary, the evidence that was introduced *strengthened* this Court's earlier conclusion. Mr. Wills, for example, agreed that a student whose administrative complaint was dismissed by the Department could "then sue the school for [a] violation of Title IX." Day 3 Tr. 550:25–551:4. He further agreed that any student who exercises her right to sue her school directly would be "free" in that case "to argue that the Title IX exemption is invalid, either in general or as applied to the student's complaint." *Id.* 551:5-9.

To be sure, none of the testifying Plaintiffs has yet taken advantage of this alternative means of relief. Day 1 Tr. 68:5-7 (Alex Duron); 102:12-13 (Veronica Bonifacio Penales); 187:7-9 (Audrey Wojnarowisch); 224:6-8 (Elizabeth Hunter); 252:13-25 (Kalie Hargrove). But they could. And because the "availability of a private cause of action directly against universities that discriminate in violation of Title IX constitutes an adequate remedy that bars" Plaintiffs' requested preliminary injunction, the injunction should be denied. *Nat'l Wrestling Coaches Ass'n*, 366 F.3d at 945. Moreover, this Court could deny the injunction at this step, without even reaching the other factors. *See, e.g.*, *PDK Labs. Inc. v. DEA*, 362 F.3d 786, 799 (D.C.

Cir. 2004) (Roberts, J., concurring in part and concurring in judgment) ("[I]f it is not necessary to decide more, it is necessary not to decide more[.]").

### B. Plaintiffs' concerns about immediate irreparable injury are at best speculative and are foreclosed by the evidence.

But even if this Court reversed its previous determination on the availability of alternative adequate remedies and decided to address the other necessary elements of injunctive relief, it should find that Plaintiffs have failed to demonstrate immediate, irreparable harm because—as this Court has already concluded—it is unclear that the "requested relief would result in immediate protection from the risk of physical, emotional, and psychological harm plaintiffs seek to prevent." Order Denying TRO at 11, ECF No. 88 (emphasis added). That has not changed. Indeed, if the hearing revealed anything, it is that, as discussed in Section II below, such an injunction would more likely *impair* the physical and emotional health of a significant portion of those that Plaintiffs purport to represent. Further, the Plaintiffs have no idea how their administrative complaints will be adjudicated if the Department is prevented from dismissing them on Title IX religious exemption grounds. They may lose on other grounds, and even if they prevail, the schools will not be required or forced to change their policies. Speculative and uncertain injuries and remedies "do[] not constitute irreparable injury." *Colorado River Indian Tribes v. Town of Parker*, 776 F.2d 846, 849 (9th Cir. 1985). And for that reason, this Court was correct when it rejected Plaintiffs claims of irreparable harm because Plaintiffs cannot show that the Department is "likely" to dismiss their complaints because of the religious

exemption rather than for "any other grounds provided in the Case Processing Manual." Order Denying TRO at 9–10, ECF No. 88.

Just as before, the more complete record strengthens the conclusion that Plaintiffs have failed to establish any immediate, irreparable harm that would be remedied by their proposed injunction. *First*, Plaintiffs have not provided evidence that they will be harmed without this Court's *immediate* action. Plaintiffs waited "months, and in many instances years" between the time that they were allegedly harmed and their "initiation of the present action in March 2021." Dep't's Opp'n to Mot. for TRO & Prelim. Injunction at 12, ECF No. 62. And, even after they brought this case, they did not seek injunctive relief until months later. *Id.* This delay strongly "implies a lack of urgency and irreparable harm." *Id.* (quoting *Oakland Trib., Inc. v. Chronicle Publ'g Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985)).

The evidence presented since the TRO motion further undermines any suggestion that harm is imminent. When Plaintiffs first sought a TRO, they claimed that their administrative complaints were in "danger of being dismissed in a matter of days." Pls.' TRO Mot. at 8, ECF No. 44. Hardly. Four months later, all but one complaint remains in the "evaluation stage" even though this Court denied the TRO. Day 3 Tr. 497:6-10.

Moreover, Plaintiffs' amended motion—which asked for more sweeping relief for a small subset of current students—alleged that this Court's intervention was needed immediately, but failed to address *any* of the *Winter* factors with respect to their newly requested relief. Pls.' Mot. to Amend TRO at 13–14, ECF No. 75. An entire

semester has now come and gone without any meaningful evidence that this Court's denial of the TRO led to significant further harm for those students. Their complaints too remain pending.

Further, Plaintiffs' own conduct undermines their claimed need for immediate action. This Court initially sought to give the parties two weeks to respond to each other's post-trial briefs. Day 3 Tr. 637:25–638:2. Despite their burden of demonstrating immediate harm, Plaintiffs pushed back on that suggestion, asking instead that the response briefs be submitted after the holidays. *Id.* 638:5-18. That request is difficult to square with Plaintiffs' burden of demonstrating *immediate* and irreparable harm.

*Second*, there are multiple reasons why the Department might dismiss the complaints that do not turn on the Title IX religious exemption. The Court heard evidence of one such dismissal at the hearing: Mr. Wills testified that a complaint against Brigham Young University was dismissed because the student had filed a complaint with "similar or identical allegations with [the] same operative facts" in federal court. Day 3 Tr. 497:11–498:4. And two complaints against Fuller Theological Seminary should be dismissed for the same reason. *Compare Maxon v. Fuller Theological Seminary*, 2020 WL 6305460 (C.D. Cal. Oct. 7, 2020) (addressing claims by two Plaintiffs here, Joanna Maxon and Nathan Brittsan, against Fuller Theological Seminary) *with* Dep't's Exhibit 3 at 11–12, ECF No. 124-3 (including

administrative complaints by those Plaintiffs against Fuller).[4] The injunction that those Plaintiffs seek can have no impact on their cases.

Other alternative reasons for dismissing Plaintiffs' administrative complaints abound. For example, the Department's Case Processing Manual instructs the Department to "interpret[] its statutes and regulations consistent with the requirements of the First Amendment" and to not take any actions that fail to "comport with First Amendment principles." Day 3 Tr. 548:12-18. As the Intervenors have repeatedly explained, Title IX would be unconstitutional without a religious exemption because it would (1) deny religious schools of the opportunity to participate in a public benefit because of their religious status and (2) allow secular exemptions without similarly exempting religious activities. *See, e.g.*, Intervenors' Joint Mot. to Dismiss at 33–39, ECF No. 137 (citing, among other cases, *Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246, 2254–55 (2020); *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1876–77 (2021); *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021)); *see also* Dep't's Reply to Mot. to Dismiss at 7 n.8, ECF No. 92 (rejecting the claim that the Title IX religious exemption would be generally applicable without the Title IX religious exemption). Thus, even if this Court granted the injunction, the First Amendment (not to mention RFRA) would compel every complaint to be dismissed because those authorities would prevent the Department from granting the relief Plaintiffs seek.

---

[4] That these students were able to also bring their claim in federal court is yet another example of how Plaintiffs have alternative remedies available. *See supra* Part I.A.

Yet another reason why those complaints may be dismissed is that many if not all are untimely. Mr. Wills testified that the Department requires that "complaints be filed within 180 days of the last alleged act of discrimination." Day 3 Tr. 495:3–12. The Department's Exhibit 3 shows that nearly every administrative complaint asked the Department to waive that 180-day timeliness requirement. Dep't's Exhibit 3, ECF No. 124-3. Before Plaintiffs could even get relief from the Title IX religious exemption, the Department would have to decide whether to grant those waiver requests. And yet again, the Department has not yet acted on those requests: For *every* Plaintiff who requested a waiver, the request is still pending.

Moreover, evidence from the hearing shows that, for many Plaintiffs, their untimeliness may be dispositive. Alex Duron, for example, graduated from Union University in July of 2020 but waited until July 2021 to file his complaint. Day 1 Tr. 67:5-10. The same is true for Elizabeth Hunter, who waited more than two years after she graduated from Bob Jones University before she filed her complaint, and now has a "functioning job with a news program." Day 1 Tr. 223:22–224:2; 232:20-24. How these students and others like them, who have either graduated or transferred out of religious schools, will be harmed if this Court denies the injunction has simply not been demonstrated.

*Third*, even without any of the procedural hurdles to Plaintiffs' administrative complaints, Plaintiffs are still not guaranteed success if their complaints continue. As the Department explained, "Plaintiffs are . . . not guaranteed a favorable outcome even if [the Department] were to process their complaints." Dep't's Opp'n to Mot. to

Dismiss at 11, ECF No. 62. It is entirely possible that the Department will find that Plaintiffs' factual allegations fail to state a claim. Accordingly, to assume that their claims are meritorious would be to engage in even more speculation. Perhaps for this reason, the Supreme Court has cautioned against the federal courts interfering with pending administrative actions until their effects are concretely felt by the parties. *See infra*, Part III.A (citing *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 732–33 (1998)).

In sum, Plaintiffs have adequate alternative remedies and have failed to demonstrate any need for this Court to protect them from any immediate, irreparable harm. Plaintiffs' motion can be denied on that ground alone.

## II. The evidence reinforces the Court's previous conclusion that the balance of the equities and the public interest favor Defendants.

Plaintiffs have also failed to rebut this Court's prior conclusion that neither the balance of the equities nor the public interest supports their request. Order Denying TRO at 10–12, ECF No. 88. They initially claimed they are not seeking to have the Court "take away the federal funding from any educational institutions." Mot. at 10, ECF No. 44. They have since changed their tune, and now ask this Court to take the remarkable step of directing the Department, after a lengthy and invasive investigation, to "initiate administrative proceedings to refuse to continue to grant financial assistance from the Department to non-compliant" religious schools. Mot. to Amend TRO at 14, ECF No. 75. Their requested injunction, if granted, would thus undeniably further the goal of eliminating federal loans and grants to students at religious schools. Without that funding, many religious schools may be forced to close. But even those that could shoulder the loss without closing would experience enormous financial hardships.

Ironically, this outcome would harm many of those that Plaintiffs purport to represent, as well as many other students. The denial of federal loans and grants would devastate the ability of low-income students, including LGBTQ+ students, and many ethnic and racial minorities, to attend Christian schools. Decl. of S. Hoogstra ¶ 10, ECF No. 109-1. This outcome would be deeply detrimental not only to the public's general interest in diverse educational opportunities for minorities of various backgrounds, but also to the public interest in providing appropriate educational opportunities for members of the LGBTQ+ community. In particular, hearing

testimony from both sides showed that LGBTQ+ persons with Christian commitments, including but not limited to those who believe in the biblical sexual ethic as traditionally understood, would likely be harmed by the requested injunction.

### A. Plaintiffs' proposed remedy would harm Christian colleges, which offer a more supportive and even superior environment for religiously committed LGBTQ+ students than more liberal or non-religious schools.

The evidence at the hearing showed that Plaintiffs' requested injunction would likely harm certain religiously committed LGBTQ+ students. That evidence includes several studies showing that LGBTQ+ students in general do measurably worse than their heterosexual/cis-gender peers at *both* religious and secular/public colleges. Day 3 Tr. 576:15–578:14 (Mark Regnerus Ph.D.) (exploring the ways that Dr. Myer found that LGBTQ+ youth are struggling at even higher rates than older LGBTQ+ cohorts); 578:17–589:5 (comparing the REAP study with other studies addressing the mental health of LGBTQ+ students at religious and non-religious schools); *see also* Regnerus Expert Decl. ¶¶ 10–25, ECF No. 139 (same). As CCCU's expert Dr. Mark Regnerus explained, although the comparison between these studies is not perfect, they help to illustrate that LGBTQ+ students at religious schools share more common experiences with their counterparts at secular/public institutions than Plaintiffs suggest, and in many important respects, do better at conservative Christian schools. Day 3 Tr. 584:3-8 (Mark Regnerus, Ph.D.).

That conclusion is confirmed by the declaration testimony of CCCU president Shirley Hoogstra. As she explained in her declaration, in important respects, LGBTQ+ students fare far better at religious schools than they do at their secular,

public counterparts. Hoogstra Decl. ¶¶ 12–17, ECF No. 109-1. Dr. Regnerus agreed, testifying that "LGBT students who are in non-CCCU schools report at least as high, if not higher, rates of emotional health challenges, depression, anxiety, [and] suicidality" than their peers at religious colleges. Day 3 Tr. 584:3-8. He also agreed that it is only at CCCU-type institutions that LGBTQ+ students who "want[] to live a celibate lifestyle" find "support" in an understanding environment of their coreligionists who "care deeply about people and want to help them do . . . difficult things." *Id.* 605:12-24.

On this critical point, Plaintiffs' own expert, Dr. Joshua Wolff, agreed with Dr. Regnerus. Dr. Wolff acknowledged that religiously committed LGBTQ+ students do better at conservative Christian schools, in terms of depression, anxiety, and general adjustment, than at more progressive and "LGBT-friendly" schools that allow gay/straight alliances and more permissive behavioral standards.

Indeed, Dr. Wolff co-authored a 2016 study that showed that students from conservative Christian colleges (including "evangelical" colleges) showed lower levels of anxiety and depression than students at more "progressive" Christian schools that had more flexible behavioral standards and might allow gay/straight alliance clubs. When Dr. Wolff was asked about his 2016 report, he answered:

> Q. Students who attended other Christian schools" -- which is the category that you have the evangelicals in -- "reported significantly fewer symptoms of depression and social anxiety than students at Catholic, mainline Protestant, and Mormon NARUs." Is that what you reported?
>
> A. Yes.

Day 2 Tr. 335:1-7. He confirmed these findings, as well as his present belief in them, later in his testimony when he reconfirmed his view from his 2016 study that the positive outcomes for LGBTQ+ students were associated with the congruency between the school's teachings and these LGBTQ+ students' own religious beliefs, which Dr. Wolff calls "non-affirming":

> Q. [Y]ou say, "A possible explanation for why evangelical students did not report more depressive symptoms and social anxiety than those in other schools could be that students who find non-affirming theological positions and environments congruent with their religious beliefs would likely not be distressed by them."
>
> A. Sure. I stand by that statement.

Day 2 Tr. 335:17-25.

Dr. Wolff's explanation for this superiority of performance and health in Christian LGBTQ+ students on conservative Christian campuses is that these campuses likely provide important spiritual support for those students. As his own 2016 report explained, "religion may offer a *substantial amount of comfort and source of community* to many [sexual minority] individuals who find incongruence with their sexual orientation and their faith."[5]

Moreover, the vast majority of LGBTQ+ students who attend religious schools—and certainly the Plaintiffs who testified—are well aware of those schools' sexual lifestyle guidelines when they apply and enroll. Hoogstra Decl. ¶¶ 20–21, ECF No. 109-1 ("9 out of 10" LGBTQ+ students at religious schools "were aware" about

---

[5] Intervenor CCCU's Exh. 6 at 208, ECF No. 121-6 (emphasis added).

their school's policies at the time of matriculation); Day 1 Tr. 69:20–70:17 (Alex Duron); 105:3-16 (Veronica Bonifacio Penales); 195:21–196:7 (Audrey Wojnarowisch); 227:13–228:3 (Elizabeth Hunter); 236:14-19 (Kalie Hargrove) (explaining that she chose Lincoln Christian University because of its religious character). Despite this, given the difference in tuition costs between Christian colleges and other alternatives, those students generally choose to pay a "premium" to attend. Regnerus Expert Decl. ¶ 9, ECF No. 139. Thus, even if some of them disagree with the school's policies on sexuality, they overlook their disagreement when they decide to enroll and remain.

Many other LGBTQ+ students, nearly a third of them by some counts, report that they *support* what Plaintiffs call their schools' "non-LGBT-affirming" positions on sexuality. Hoogstra Decl. ¶ 20, ECF No. 109-1. For these students, the very sexual conduct policies to which Plaintiffs object are valuable—even invaluable—because they assist them in living the Christian lifestyle they wish to live. Day 3 Tr. 606:8-11 (Mark Regnerus, Ph.D.) (CCCU-type schools "help students become … not just better educated but more mature Christians, even if, at any given day or weekend, lots of them don't really wish to be."). As Dr. Regnerus explained, the interests of religious schools align perfectly with the interests of such students because helping them achieve a more mature Christianity is a "challenge that's central" to religious schools' "identity as organizations." *Id.* 606:12-13.

Should Plaintiffs prevail, this large group of LGBTQ+ students will be denied the opportunity to attend a school where they can integrate their personal religious

beliefs and identities into the larger Christian learning community, and benefit from the comfort and support they receive there. Hoogstra Decl. ¶¶ 22–23, ECF No. 109-1; Day 3 Tr. 605:12–606:13 (Mark Regnerus, Ph.D.). The requested preliminary injunction is accordingly not in their interest, or in the interest of the broader public who desires to see them flourish. And this equitable consideration militates strongly against the requested preliminary injunction.

### B. The public has no interest in encouraging discrimination and entanglement that results in less educational diversity for LGBTQ+ and other minority students.

Plaintiffs' request should also be denied because it would harm "the significant public interest" both in "upholding First Amendment principles," *Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005) (citations omitted), and in fostering educational diversity, 20 U.S.C. § 1011a(a)(2)(A).

1.    One such problem, as discussed more fully in Section III.B., is that the injunction would hinder and limit the religious expression of religious schools by inviting excessive government entanglement of the sort that the First Amendment forbids. *See, e.g., NLRB v. Cath. Bishop of Chicago*, 440 U.S. 490, 502 (1979) (The First Amendment forbids any inquiry that "will necessarily involve inquiry into the good faith of the position asserted by the [school] and its relationship to the school's religious mission."); *McCarthy v. Fuller*, 714 F.3d 971, 976 (7th Cir. 2013) (If the "authorized religious body has resolved the religious issue, the court may not question the resolution."). As CCCU explained in its discussion of the public interest in its joint preliminary-injunction response (at 40), it is always in the public interest to prevent

such constitutional violations. *See also Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012).

2.      Granting the injunction would harm the public interest in yet another way: It would limit the diversity of educational options available for young people, especially low-income and minority students. Indeed, in acting to protect religious colleges in the accreditation context, Congress has expressly recognized that "the diversity of institutions *and educational missions* is one of the key strengths of American higher education." *See* 20 U.S.C. § 1011a(a)(2)(A) (emphasis added).

The risk to the constitutional rights of religious schools and to the diversity of higher education is nowhere more apparent than here, where Plaintiffs have asked this Court to require the Department to investigate "the colleges and universities attended by Plaintiffs." Mot. to Amend TRO at 13, ECF No. 75. Plaintiffs attempt to avoid the serious constitutional questions raised by that request by meekly suggesting that this Court could instruct the Department to exempt "belief, doctrinal[,] and mission statements" from their requested review. *Id.* at 14.

But Plaintiffs' request to not examine belief and doctrine is not a serious one, as the policies on sexuality and gender that Plaintiffs wrongly suggest violate Title IX are rooted in religious belief, including the institutions' understanding of biblical teaching. Thus, if the Court granted the injunction, it would effectively force the Department to parse the beliefs and policies of Plaintiffs' schools to decide which theological approaches to sexuality and gender were acceptable, and which were not. *See* Hoogstra Decl. ¶¶ 5–7, ECF No. 109-1. As explained in Part III.B below, that

entanglement would itself violate the Constitution. *Cath. Bishop*, 440 U.S. at 502 ("[T]he very process of inquiry leading to findings and conclusions" may "impinge on rights guaranteed by the religious clauses."); *Mitchell v. Helms*, 530 U.S. 793, 828 (2000) (plurality opinion) ("It is well established, in numerous other contexts, that courts should refrain from trolling through a[n] … institution's religious beliefs."); *Employment Division v. Smith*, 494 U.S. 872, 887 (1990) ("[W]e have warned that courts must not presume to determine the place of a particular belief in a religion or the plausibility of a religious claim."); *Hernandez v. Comm'r*, 490 U.S. 680, 699 (1989) ("It is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds.").

3.    Yet another problem posed by Plaintiffs' proposed injunction is that it would likely lead to improper religious discrimination, in violation of decisions such as *Espinoza v. Montana Department of Revenue*, 140 S. Ct. 2246 (2020), and *Larson v. Valente*, 456 U.S. 228 (1982), by allowing the government both (1) to place unlawful choices before religious schools and (2) to prefer religious schools with certain religious views over religious schools without them.[6]

As to the first point, by attacking the Title IX religious exemption, Plaintiffs are asking the Court to force the Department to coerce religious schools into abandoning their beliefs and practices by denying federal funding to those schools with beliefs on marriage and sexuality with which the Plaintiffs disagree. Just last

---

[6] A more complete treatment of these cases is included below in Part III.B.

term, the Supreme Court explained that placing such a choice before religious organizations is a *per se* substantial burden on their beliefs. *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1876 (2021) ("[I]t is plain that the City's actions have burdened CSS's religious exercise by putting it to the choice of curtailing its mission or approving relationships inconsistent with its beliefs."); *see also Thomas v. Rev. Bd. of Indiana Emp. Sec. Div.*, 450 U.S. 707, 716 (1981) ("[A] person may not be compelled to choose between the exercise of a First Amendment right and participation in an otherwise available public program."). As Intervenors have previously explained at length, that substantial burden would then trigger—and fail—strict scrutiny both under the Religious Freedom Restoration Act and under the First Amendment because of Title IX's many secular exemptions. *See* Intervenors' Joint Reply to Mot. to Dismiss at 21–24, ECF No. 147.

As to the second point, any school that succumbed to the government's coercive threat would be stripped of its spiritual identity and character. Plaintiffs are thus wrong—and offensively so—in suggesting that these schools can simply sacrifice their religious identities and practices for their students to qualify for government aid. Hoogstra Decl. ¶¶ 9–10, ECF No. 109-1. As CCCU explained in its motion to intervene, those identities and practices are the "oxygen that gives [religious schools] life." CCCU's Mot. to Intervene at 8, ECF No. 26. And those schools that did not succumb to the threat would—because of their religious beliefs—be denied access to federal funding while other religious schools received it, effectively establishing a regime where "one religious denomination" is "officially preferred over another" in

violation of the Establishment Clause's "clearest command." *Larson v. Valente*, 456 U.S. 228, 244 (1982).

In sum, granting the injunction would require the Department to place an impossible choice before religious schools across the country and likely result in billions of dollars of federal funding being stripped from students at religious institutions solely because of those institutions' religious beliefs and practices. The Constitution forbids this Court from reaching that result. *See, e.g., Espinoza*, 140 S. Ct. at 2254–55.

But even if it did not, this Court should decline Plaintiffs' invitation to significantly impair religious higher education for students around the country. *See* Hoogstra Decl. ¶ 23, ECF No. 109-1 (explaining that students, who will have to look elsewhere for loans and support, will suffer if the requested relief is granted). No evidence at the hearing remotely calls into question Intervenors' showing that enjoining the use of Title IX's religious exemption would harm students at religious schools around the country by diminishing the educational choices for low-income students, including LGBTQ+ students and other minorities. The Title IX religious exemption has been the status quo for decades.[7] Because of its protections, hundreds of religious colleges and schools have been able to provide tailored educational opportunities in a spiritual context to hundreds of thousands of such students who find that such schools provide them a "substantial amount of comfort and source of

---

[7] That alone is an independent reason to deny the exemption. *See* Order Denying TRO at 5–6, ECF No. 88.

community."[8] Thus, the balance of equities and the public interest in diverse educational option for all persons weigh sharply against the requested injunction.

## III.   The evidence reconfirms that Plaintiffs have little likelihood of success on the merits.

Plaintiffs have also failed to show that they are likely to succeed on the merits of their claims, for multiple independent reasons. Preliminarily, Plaintiffs have failed to establish that this Court has jurisdiction to enjoin administrative proceedings against religious colleges not before it and, even if it had such jurisdiction, that Plaintiffs have standing. Plaintiffs' requested relief would also violate the Religion Clauses of the First Amendment and the Religious Freedom Restoration Act, and their attack on the lawfulness of the August and November Rules ignores the administrative record and decades of the Departments' internal policies. Finally, Plaintiffs are wrong to suggest that the religious beliefs of their schools are comparable to race discrimination, and any decision that disparages those beliefs would impermissibly depart from the "religious neutrality that the Constitution requires." *Masterpiece Cakeshop, Ltd. v. Colorado C.R. Comm'n,* 138 S. Ct. 1719, 1724 (2018).

### A. This Court lacks jurisdiction to grant the injunction, and the Plaintiffs lack standing to seek it.

Plaintiffs face an uphill battle before even getting to the merits of their claims. As both the Intervenors and the Department explained in depth, their motion is riddled with jurisdictional problems. Intervenors' Joint Response at 11–16, ECF No.

---

[8] Intervenor CCCU's Exh. 6 at 208, ECF No. 121-6.

109; Dep't's Opp'n to Mot. for Prelim. Injunction at 17–19, ECF No. 62. No evidence introduced at the hearing has overcome these jurisdictional hurdles.

*First*, as the Intervenors explained in their response to the motion (at 12–13), even if this Court rejects their claim that the religious schools are necessary parties to this case as a general matter, "they are unquestionably necessary when resolving a motion to enjoin the dismissal of separate investigations *against them*." Plaintiffs have no response to that fundamental unfairness. Instead, in their Reply, they reiterated their incorrect argument that the schools need not be parties to this case in general. *See* Pls.' Reply at 4–5, ECF No. 114. But the relief requested by Plaintiffs now is limited to current proceedings before the Department, involving several specific schools. And it would be an extraordinary expansion of the judicial power for this Court to exercise jurisdiction over administrative actions not before it, without the presence of all parties to those actions. *See Zepeda v. INS*, 753 F.2d 719, 727 (9th Cir. 1985).

*Second*, in any event, the administrative complaints that were the subject of the hearing are not properly before the Court. As the Department and the Intervenors have already explained, this Court must take the facts "as they were at the time of the Amended Complaint." Intervenors' Response at 15, ECF No. 109 (citing *D'Lil v. Best Western Encina Lodge & Suites*, 538 F.3d 1031, 1036 (9th Cir. 2008); Dep't's Opp'n at 17, ECF No. 62 (same). Plaintiffs are only now trying to remedy that defect by seeking leave to amend their Complaint so that it references—for the first time— the administrative actions they sought to enjoin four months ago. The redlined

proposed Second Amended Complaint adds a new line for each administrative complaint filed, thereby tacitly admitting the inadequacy of the operative Amended Complaint. *See* Pls.' Exh. 2 ¶¶ 13–60, ECF No. 148-2.[9]

*Third*, it is far too early to say that Plaintiffs have been harmed by the religious exemption. The Supreme Court has instructed federal courts to wait until the administrative process has been "formalized" to ensure that their "effects [are] felt in a concrete way by the challenging parties." *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 732–33 (1998). For that reason, as Intervenors explained, "[j]udicial intervention in uncompleted administrative proceedings, absent a statutory mandate, is strongly disfavored." Intervenors' Joint Response at 15, ECF No. 109 (quoting *Bakersfield City Sch. Dist. v. Boyer*, 610 F.2d 621, 626 (9th Cir. 1979)). Because Plaintiffs' administrative complaints are still pending, this Court should avoid intervening in the resulting uncompleted administrative proceedings. *See* Day 3 Tr. 497:6-10.

*Fourth*, Plaintiffs still cannot show that the harm they alleged is fairly traceable to the Department. Indeed, multiple witnesses testified that they lacked any direct knowledge about whether the Department has drafted policies on sexuality or gender at religious schools or encouraged or supported discrimination against LGBTQ+ students in any way. Day 1 Tr. 103:3-22 (testimony of Veronica Bonifacio Penales); 225:14–226:8 (testimony of Elizabeth Hunter). The Department's

---

[9] Intervenors oppose Plaintiffs' eleventh-hour request to amend their Complaint a second time and will formalize its opposition in due time.

witnesses, who do have such knowledge, affirmatively rejected any suggestion that the Department has done so. Day 2 Tr. 440:5–441:11 (Alice Yao); Day 3 Tr. 547:10-22 (Randolph Wills).

That should be the end of the standing inquiry. As Intervenors have long explained, where, as here, it is the independent actions of third parties not before the Court that have allegedly caused the harm, that harm cannot fairly be traced to the defendants, and relief will not address the harm. Intervenors' Mot. to Dismiss at 3–7, ECF No. 137 (citing *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 41–42 (1976)). Nothing presented at the hearing remedies that fundamental failure of either the Amended Complaint or the instant motion. Nor was any evidence sufficient to overcome this Court's correct conclusion in its Order denying the TRO that the record is silent on whether "plaintiffs' requested relief would result in immediate protection from the risk of physical, emotional, and psychological harm plaintiffs seek to prevent through this motion." Order Denying TRO at 11, ECF No. 88. Because both causation and redressability are necessary elements of standing, and because Plaintiffs failed to demonstrate either at the hearing or in the motion, Plaintiffs still lack standing, and their preliminary-injunction request should be denied. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–62 (1992).[10]

---

[10] Moreover, as Intervenors explained in their recent Reply to their Motion to Dismiss (at 4 & n.3), Plaintiffs' attempts to overcome their lack of standing by citing cases that didn't address standing fail. Only those cases where standing was directly at issue provide guidance on standing. *Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 170 (2004) (issues that "merely lurk in the record" but are not ruled upon by the Court, "are not to be considered as having been so decided as to constitute precedents").

**B. Plaintiffs' requested relief would violate the First Amendment's Religion Clauses and the Religious Freedom Restoration Act.**

But even if this Court finds no jurisdictional problems, it should still deny the motion. In addition to the reasons identified in the Intervenors' Opposition Brief, ECF No. 109, the evidence presented at the hearing confirms that the rights of religious schools prevent courts from granting Plaintiffs' requested relief. As the Intervenors have previously shown, the Establishment Clause's "clearest command" is that "one religious denomination cannot be officially preferred over another," *Larson v. Valente*, 456 U.S. 228, 244 (1982), and the Free Exercise Clause forbids the government from using a school's religious affiliation to deny it and its students access to religiously neutral and generally available federal funding, *Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246, 2256 (2020). Reply to Mot. to Dismiss at 24–25, ECF No. 147. Furthermore, the Establishment Clause forbids the government—including courts— from constantly reviewing religious "policy, administration, and governance." *Natal v. Christian and Missionary All.*, 878 F.2d 1575, 1578 (1st Cir. 1989). Put plainly, Plaintiff's requested relief would violate the Religion Clauses and entangle this Court in a thicket of theological disputes.

Even a cursory review of their motion confirms this conclusion. Plaintiffs' motion, for example, takes aim at "*non-affirming* faith-based colleges and universities (NFBCUs)," Mot. for TRO at 11, ECF No. 44 (emphasis added). But Dr. Wolff's expert report and testimony confirmed that determining whether an institution, policy,

speaker, message, or therapy is "non-affirming" would require the Court to scrutinize schools' "theological beliefs" to evaluate what they believe to be "sinful" and "morally wrong." Wolff Expert Report at 1 n.1, ECF No. 125. At the hearing, he testified that the Court's theological scrutiny would require "going through the school's code of conduct, their theological statements, perhaps their honor code," and "gleaning the explicit expectations or theology around that." Day 2 Tr. 355:2-11 (Joshua Wolff, Ph.D.). Intervenors' agree: Plaintiffs' requested relief would require the Court to review and scrutinize schools' theological beliefs in violation of the Establishment Clause.

But Plaintiffs' requested relief would violate the Religion Clauses for yet another reason: It would create an impermissible denominational preference. *See Larson*, 456 U.S. at 244. After all, granting their requested relief would require the government to prefer religious schools with certain religious views over religious schools without them. And at every step, the government would be forced to conduct invasive investigations of schools with certain religious beliefs that it would not impose on schools with different religious beliefs. Moreover, the harm would only continue at the conclusion of this invasive process, as the government would allow students to use financial aid at schools that lack unpopular beliefs or policies on gender and sexuality while students who attend schools with such beliefs would be denied funding. And, regardless of a school's religious beliefs, the injunction would violate the Establishment Clause by requiring the government to monitor schools' religious beliefs and policies to determine Title IX eligibility. *See Natal*, 878 F.2d at

1578. The Court should avoid this constitutional quagmire by denying Plaintiffs' motion.

Indeed, the hearing confirmed that this dispute ultimately stems from nothing more than a fundamentally *theological* disagreement between Plaintiffs and the schools they chose to attend. Plaintiffs testified that they disagree with their schools' interpretation of the Bible and their theological conclusions regarding gender and sexual morality. Day 1 Tr. 196:22–197:18 (Audrey Wajnarowisch) ("Q: So you just have a different view of what the Bible says about these particular subjects than what George Fox has expressed in these documents? A: Yes."); 231:7–232:2 (Elizabeth Hunter) ("Q: Is it fair to say that you disagree with Bob Jones' understanding on the biblical grounding for its human sexuality policy? A: Yes."); 71:8-10 (Alex Duron); 105:19–108:2 (Veronica Bonifacio-Penales). One Plaintiff even expressed disagreement with the school of another Plaintiff. *Id.* 255:1-3 (Kalie Hargrove) (calling an interpretation of the Bible that she disagreed with a "really weak argument because it's an inconsistent reading of Genesis 1"). This Court should not wade into this theological disagreement between the religious schools and their students. Nor should it require the Department to.

Because the requested relief would violate schools' constitutional rights and embroil the Court in hotly contested theological disputes, Plaintiffs cannot demonstrate a likelihood of success on the merits.

**C. Plaintiffs' APA claims fail because the 2020 Rules merely codified the Departments' longstanding internal practices.**

Plaintiffs also failed to show a likelihood of success on the merits of their claim that the August and November Rules are arbitrary and capricious because the Department "failed to provide sufficiently reasoned explanation or adequately consider" LGBTQ+ students. Pls.' TRO Mot. at 36–39, ECF No. 44.

As the Intervenors recently explained in their Reply to their Motion to Dismiss (at 15–19, ECF No. 147), the Department went out of its way during the notice-and-comment period to consider the rights of LGBTQ+ students. The four corners of the rule thus belie Plaintiffs' conclusory allegation. Because all the Supreme Court requires for a rule to survive arbitrary-and-capricious review is that the rule be "reasonable and reasonably explained," *Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021), and both rules clear that hurdle, neither rule is arbitrary or capricious.

The rules also satisfy that requirement because, as Ms. Yao testified at the hearing, the rules are nothing more than the codification of longstanding department practices. The August Rule, for example, reiterated that "OCR has previously interpreted the current regulation to mean that a school can invoke a religious exemption, even after OCR has received a complaint." Day 2 Tr. 397:16-23 (quoting 85 Fed. Reg. 30026, 30475 (May 19, 2020)). That longstanding interpretation is entirely consistent with the Title IX religious exemption, which is categorical and says *nothing* about whether religious schools need to seek permission from the Department before invoking its protections. 20 U.S.C. § 1681(a)(3).

The November Rule similarly codified longstanding policies by adding provisions to 34 C.F.R. § 106.12(c) that were consistent with "guidance issued by former Assistant Secretary for Civil Rights Harry Singleton to Regional Civil Rights Directors on February 19th, 1985," a "1989 Memo from Acting Assistant Secretary Smith," "longstanding OCR practice" recognizing "that a school . . . is an educational institution controlled by a religious organization without any requirement that the school . . . be controlled by a religious organization that is organized as a separate legal entity from the educational institution itself," and other practices providing "some flexibility in the types of evidence that would be sufficient to establish eligibility for the religious exemption." Day 2 Tr. 402:3-17; 406:1-7; 407:10-20 (quoting 85 Fed. Reg. 59916, 59955, 59961 (Sept. 23, 2020)). In sum, the August and November Rules are not new. Instead, they reflect decades of the Department's policies.

Given this unrebutted testimony, this Court's previous conclusion that Plaintiffs had not shown a likelihood of success on the merits on their APA claim should be reaffirmed. Order Denying TRO at 6, ECF No. 88.

### D. Plaintiffs' repeated reliance on a supposed comparison between racial discrimination and religious beliefs about sexuality is offensive and contrary to the law.

One final reason why Plaintiffs cannot show a likelihood of success on the merits is that their entire theory depends on the idea that traditional biblical views on sexuality and gender are equivalent to invidious discrimination based on race. *See, e.g.,* Day 1 Tr. 16:16–17:5 (Plaintiffs' opening statement); Pls.' Reply to Mot. for TRO at 7, ECF No. 64; Pls.' Opp'n to Dep't's Mot. to Dismiss at 8, ECF No. 86. That view is not only offensive and wrong but, if adopted by this Court or the Department, would itself violate the First Amendment.

1.    Most clearly, Plaintiffs' own experts conceded that, unlike race, sexual orientation and gender identity can be fluid. Dr. Meyer testified that sexual orientation, for example, can change over the course of a lifetime. Day 1 Tr. 159:22-23. He also testified that fluidity is a "natural" process, *id.* 160:1-7, but then tempered that claim by testifying that a person's sexual orientation is "not based on … will, usually," *id.* 160:8. He then conceded that some people who are same-sex-attracted "mak[e] decisions" that they will only pursue romantic relationships with people of the opposite sex. *Id.* 160:5-8. CCCU's expert, Dr. Regnerus, similarly spoke about how the "wider academic community" has been increasingly recognizing the "role of fluidity, both in sexual orientation and in gender [identity]." Day 3 Tr. 606:21-24.[11]

---

[11] These experts are not alone. Even groups that support robust legal protections for LGBTQ+ groups recognize that a person's sexual orientation is sometimes impacted or shaped by voluntary choices. *See*, *e.g.*, Br. for Am. Psychological Ass'n et al. as Amici Curiae in Support of Pet'rs, at 8–9, *Obergefell v. Hodges*, 576 U.S. 644 (2015)

The existence of some fluidity in sexuality forecloses Plaintiffs' comparison of race discrimination to supposed discrimination based on sexual orientation or gender identity. No one's race changes with time; but for many, sexual orientation or gender identity might undergo a substantial shift.

2. Even ignoring the biological differences between race and the sexuality-related categories at issue here, this Court should reject Plaintiffs' invitation to conflate race with sexuality. And it should do so because the Supreme Court has long treated racial bias—which "implicates unique historical, constitutional, and institutional concerns," *Pena-Rodriguez v. Colorado*, 137 S. Ct. 855, 868 (2017)—differently than it treats other types of alleged discrimination.

Multiple Supreme Court decisions in the last few years highlight this point. The *Obergefell* majority, for example, emphasized that "[m]any who deem same-sex marriage to be wrong reach that conclusion based on decent and honorable religious or philosophical premises." 576 U.S. at 672. The Court then expressly emphasized that the "First Amendment ensures that religious organizations and persons are given proper protection as they seek to teach the principles that are so fulfilling and

---

(No. 14-556) (citing a study showing that "5% of gay men and 16% of lesbians" have either "a fair amount" or "a great deal" of choice about their sexual orientation).

To be sure, the majority opinion in *Obergefell* cited this brief in dicta to suggest that sexual orientation is "immutable." *Obergefell v. Hodges*, 576 U.S. 644, 661 (2015). It is unclear how the Court reached that conclusion from a brief showing that sexual orientation is indeed fluid for at least some gay men and some lesbians. In any event, the evidence introduced at the hearing directly contradicts the idea that sexual orientation is "immutable" for everyone.

so central to their lives and faiths, and to their own deep aspirations to continue the family structure they have long revered." *Id.* at 679–80.

Cases decided in *Obergefell*'s wake show that the Court was not just paying lip service to the First Amendment when it discussed the protections retained by people exercising "decent and honorable" religious beliefs on sexual orientation and, it follows, gender identity. In *Masterpiece Cakeshop*, for example, the Court condemned as "inappropriate" and "impermissible" several statements from the Colorado Civil Rights Commission showing hostility to a baker's religious beliefs. *Masterpiece Cakeshop*, 138 S. Ct. at 1729. And when asked whether Philadelphia can constitutionally deny a Catholic foster care agency "an accommodation" that would let it keep serving Philadelphia's children if that agency refuses, for religious reasons, to "certify same-sex couples to be foster parents due to its religious beliefs about marriage," the Court unanimously said no. *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1874, 1882 (2021).

Moreover, the Court's concern with protecting religious beliefs and practices permeates even those cases where the intersection of religious practice and sexual-orientation/gender-identity protections is not directly at issue, but is foreseeable. In *Bostock v. Clayton County,* 140 S. Ct. 1731 (2020), for example, the Court expressed its "deep[] concern[]" that its holding reading sexual-orientation and gender-identity protections into Title VII "may require some employers to violate their religious convictions." 140 S. Ct. at 1753–54. The Court then listed multiple substantive protections afforded to religious employers to help them avoid Title VII liability for

religious choices and beliefs to ensure that its holding would "preserv[e] the promise of the free exercise of religion enshrined in our Constitution"—a "guarantee" that the Court wrote "lies at the heart of our pluralistic society." *Id.* at 1754. Among those protections were Title VII's religious exemption, the First Amendment, and the Religious Freedom Restoration Act, which the Court said acts as a "kind of super statute, displacing the normal operation of other federal laws." *Id.*

It is unlikely that the Court would ever provide such a roadmap for employers to avoid liability in a case involving race discrimination. But, in a growing number of cases, it has treated religious beliefs and practices related to sexual orientation and gender identity as both of both respect and constitutional protection. This different treatment in cases involving sexual-orientation and gender-identity protections confirms what the Court said in *Pena-Rodriguez*: Because of our country's unique history with race, the Constitution treats race-based discrimination differently.

It would thus be inappropriate for this Court to adopt Plaintiffs' clumsy comparison between racial discrimination and Biblical beliefs on sexuality and gender. Doing so would violate the Supreme Court's repeated teaching that no government entity can:

- "punish the expression of religious doctrines it believes to be false";
- "impose special disabilities on the basis of religious views or religious status"; or
- "lend its power to one or the other side in controversies over religious authority or dogma."

*Smith*, 494 U.S. at 877. To accept Plaintiffs' attempts to equate racial bias with what the Supreme Court has called "decent and honorable" views on sexual orientation or

gender identity would be to violate each of *Smith*'s prohibitions. And that is yet another reason for this Court to conclude that Plaintiffs have no likelihood of success on the merits.

## CONCLUSION

This Court correctly denied the TRO. Because the evidence at the hearing only reconfirmed the conclusions on which that denial was based, the Court should likewise deny the motion for a preliminary injunction.

Respectfully submitted.

/s/ Gene C. Schaerr
Gene C. Schaerr, DC Bar # 416368*
Email: gschaerr@schaerr-jaffe.com
Nicholas Miller, MI Bar# P70694*
Email: nmiller@schaerr-jaffe.com
Joshua J. Prince, DC Bar # 1685532*
Email: jprince@schaerr-jaffe.com
Schaerr | Jaffe LLP
1717 K Street NW, Suite 900
Washington, D.C. 20006
Telephone: (202) 787-1060

/s/ Herbert G. Grey
Herbert G. Grey, OSB # 810250
4800 SW Griffith Drive, Suite 320
Beaverton, Oregon 97005-8716
Telephone: (503) 641-4908
Email: herb@greylaw.org

* Admitted *pro hac vice*

*Counsel for Defendant-Intervenor Council for Christian Colleges & Universities*

December 6, 2021

/s/ Mark A. Lippelmann
Kristen K. Waggoner, OSB # 067077
  *Lead Counsel*
Email: kwaggoner@ADFlegal.org
David A. Cortman, GA Bar # 188810*
Email: dcortman@ADFlegal.org
Ryan J. Tucker, AZ Bar # 034382*
Email: rtucker@ADFlegal.org
Mark A. Lippelmann, AZ Bar # 036553*
Email: mlippelmann@ADFlegal.org
Alliance Defending Freedom
15100 N. 90th Street
Scottsdale, Arizona 85260
Telephone: (480) 444-0020

* Admitted *pro hac vice*

*Counsel for Defendants-Intervenors Western Baptist College d/b/a Corban University, William Jessup University and Phoenix Seminary*

35 - DEFENDANTS-INTERVENORS' JOINT POST-HEARING BRIEF

## CERTIFICATE OF COMPLIANCE

This brief complies with the length limit requirements set by this Court at the hearing because it contains less than 35 pages.

December 6, 2021

/s/ Gene C. Schaerr
Gene C. Schaerr
*Counsel for Defendant-Intervenors*
*Council for Christian Colleges &*
*Universities*

## CERTIFICATE OF SERVICE

I hereby certify that on December 6, 2021, I served this document on all counsel of record by ECF and by email.

/s/ Gene C. Schaerr
Gene C. Schaerr
*Counsel for Defendant-Intervenors*
*Council for Christian Colleges &*
*Universities*