**Paul Carlos Southwick (OSB 095141)**
**Religious Exemption Accountability Project**
**Paul Southwick Law, LLC**
8532 N. Ivanhoe St. #208
Portland, OR 97203
Email: paul@paulsouthwick.com
Phone: 503-806-9517

**Timothy R. Volpert (OSB 814074)**
**Tim Volpert PC**
2111 NE Hancock St. Ste. 2B
Portland, OR 97212
Email: tim@timvolpertlaw.com
Phone: 503-703-9054

**Alletta S. Brenner (OSB 142844)**
**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Email: ABrenner@perkinscoie.com
Phone: 503-727-2000

**Misha Isaak (OSB 086430)**
**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Email: misaak@perkinscoie.com
Phone: 503-727-2000

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## EUGENE DIVISION

| | |
|---|---|
| Elizabeth HUNTER; et al., <br><br> Plaintiffs, <br><br> v. <br><br> U.S. DEPARTMENT OF EDUCATION; and Catherine LHAMON, in her official capacity as Assistant Secretary for the Office of Civil Rights, U.S. Department of Education, <br><br> Defendants, <br><br> v. <br><br> COUNCIL FOR CHRISTIAN COLLEGES & UNIVERSITIES, WESTERN BAPTIST COLLEGE d/b/a CORBAN UNIVERSITY, WILLIAM JESSUP UNIVERSITY AND PHOENIX SEMINARY, <br><br> Intervenor-Defendants. | Case No. 6:21-cv 00474-AA <br><br> **PLAINTIFF'S POST-HEARING REPLY BRIEF** |

I. INTRODUCTION

The evidence offered by Plaintiffs at the Preliminary Injunction Hearing, and in prior briefing, establishes that Plaintiffs have experienced stigmatic harms from the Government Defendants' funding and facilitation of invidious sexual orientation and gender identity discrimination at their educational institutions. Plaintiffs have carried their evidentiary burden and the Court should issue a preliminary injunction and declaratory relief to remedy the ongoing constitutional and statutory violations.

II. ARGUMENT

A. Sexual orientation and gender identity are immutable

Intervenor-Defendants argue that sexual orientation and gender identity are not immutable because they can be fluid for some people. Dkt. 152, pp. 31-32, n. 11. However, the Court should reject Intervenor-Defendants' argument, as the Ninth Circuit has repeatedly recognized that sexual orientation and gender identity are immutable characteristics. *Latta v. Otter*, 771 F.3d 456, 464-65, n. 4 (9th Cir 2014) ("Sexual orientation and sexual identity are immutable" and "are so fundamental to one's identity that a person should not be required to abandon them."); *Perdomo v. Holder*, 611 F.3d 662, 666 (9th Cir. 2010) (same); *Reyes-Reyes v. Ashcroft*, 384 F.3d 782 (9th Cir. 2004) (same and recognizing that "it is well-accepted among social scientists that '[s]exual identity is inherent to one's very identity as a person.... Sexual identity goes beyond sexual conduct and manifests itself outwardly, often through dress and appearance.'"); *Hernandez–Montiel v. I.N.S.*, 225 F.3d 1084, 1093 (9th Cir.2000), *overruled on other grounds by Thomas v. Gonzales*, 409 F.3d 1177, 1187 (9th Cir.2005), *vacated*, 547 U.S. 183 (2006), (sexual orientation and gender identity immutable). The fluidity of sexuality or gender identity for some people does not change the immutable nature of those

characteristics.

Moreover, in *Obergefell*, the Supreme Court reasoned that "[o]nly in more recent years have psychiatrists and others recognized that sexual orientation is both a normal expression of human sexuality and immutable." 576 U.S. at 661. The Court further recognized that, for sexual minorities seeking to marry, "their immutable nature dictates that same-sex marriage is their only real path to this profound commitment." *Id*. at 658.

### B. The educational institutions' discriminatory policies do not benefit Plaintiffs

Intervenor-Defendants portray their discriminatory policies as being beneficial to some religious LGBTQ+ students who wish to practice celibacy or to live as heterosexual or cisgender, despite their sexual orientations or gender identities. Intervenor-Defendants argue that for such students, "the very sexual conduct policies to which Plaintiffs object are valuable—even invaluable— because they assist them in living the Christian lifestyle they wish to live." Dkt. 152, p 16. While that may be true for those students, no evidence has been offered to suggest that such sexual conduct or gender identity policies are beneficial *to Plaintiffs*, who described the pain and suffering they experienced by being expelled, disciplined and denied safe educational environments because of such policies. The government is charged with protecting Plaintiffs from discrimination and has no legitimate interest in supporting discriminatory policies, even if such policies are desired by some LGBTQ+ students. Students seeking environments in which sexual and gender minority identities, relationships and behaviors are subject to discipline could still access such environments by attending private schools that are not publicly funded or regulated by Title IX.

### C. The Equal Protection limitations of *Norwood* are distinct from the state action doctrine

The Government Defendants argue that Plaintiffs fail to state a Fifth Amendment claim

because their claim "is based on actions taken by private religious colleges and universities- not the federal government." Dkt. 150, p. 16. Defendants then cite to *Rendell-Baker v. Kohn*, 457 U.S. 830,840 (1982), and *Blum v. Yaretsky*, 457 US 991, (1982) for the proposition that "the Government is not responsible for Private conduct." Dkt. 150, p. 16. However, Defendants continue to ignore the responsibility the Government bears for its own conduct, and the Constitutional limitations on government's funding or promotion of invidious discrimination under the doctrine of *Norwood v. Harrison*, 413 U.S. 455, 465 (1973).

While *Rendell-Baker* and *Blum* set a heightened standard for what level of government and private interaction is necessary in order to convert private actors' actions into acts of the state, that standard is distinct from the doctrine and standard under *Norwood*. Moreover, Plaintiffs have met the standard of *Norwood,* even if, assuming *arguendo,* Plaintiffs have not met the standards of *Rendell-Baker* and *Blum*.

Plaintiffs have alleged and proven that the Government's actions themselves directly injure Plaintiffs by stigmatizing them and endorsing the view that Plaintiffs are inferior and less deserving of dignity and respect. Plaintiffs have also consistently emphasized, while Defendants have largely downplayed or ignored, longstanding Supreme Court precedent that holds that the government may not fund private schools that practice racial *or other* invidious discrimination because it "may not induce, encourage, or promote private persons to accomplish what it is constitutionally forbidden to accomplish." *Norwood v. Harrison*, 413 U.S. 455, 465 (1973) (internal citation omitted).

This distinction between the equal protection limitations on government funding of education addressed in *Norwood*, and the state action doctrine at issue *Rendall Baker*/*Blum* was addressed directly by Justice Scalia in his dissent in *United States v. Virginia*, 518 U.S. 515,

PLAINTIFF'S POST-HEARING REPLY BRIEF  4

599-600 (1996). In that case, the government had cited to *Rendall-Baker* and *Blum* to argue that future public support of private single-sex education was not threatened by sex based constitutional protections because "private colleges that are the direct or indirect beneficiaries of government funding are not thereby *necessarily* converted into state actors to which the Equal Protection Clause is then applicable." *Virginia*, 518 U.S. at 599.

To this argument about government funding not necessarily converting private schools into state actors, Justice Scalia responded, "That is true. It is also virtually meaningless." *Id*. Justice Scalia explained:

> The issue will be not whether government assistance turns private colleges into state actors, but whether the government *itself* would be violating the Constitution by providing state support to single-sex colleges. [emphasis added] For example, in *Norwood v. Harrison* [], we saw no room to distinguish between state operation of racially segregated schools and state support of privately run segregated schools. 'Racial discrimination in state-operated schools is barred by the Constitution and 'it is also axiomatic that a state may not induce, encourage or promote private persons to accomplish what it is constitutionally forbidden to accomplish.''; *see also Cooper v. Aaron*, 358 U.S. 1, 19 (1958) ("State support of segregated schools through any arrangement, management, funds, or property cannot be squared with the [Fourteenth] Amendment's command that no State shall deny to any person within its jurisdiction the equal protection of the laws"); *Grove City College v. Bell*, 465 U.S. 555, 565 (1984) (case arising under Title IX of the Education Amendments of 1972 and stating that "the economic effect of direct and indirect assistance often is indistinguishable")."

*Virginia*, 518 U.S. at 599-600 (J. Scalia, Dissenting). As Justice Scalia describes, holding the State accountable for the support and perpetuation of constitutionally impermissible acts under the doctrine of *Norwood* is distinct from holding a private entity constitutionally liable for those acts as state action under *Rendell-Baker* and *Blum*.

While Plaintiffs argue that the *Rendell-Baker/Blum* standard has also been met, these factors are admittedly more complex and require a close examination of the relationships between the government and the universities. *See Blum v. Yaretsky*, 457 U.S. 991, 1003 (1982) ("Faithful adherence to the "state action" requirement of the Fourteenth Amendment requires

careful attention to the gravamen of the plaintiff's complaint.").

However, the standard of the *Norwood* doctrine is clearly met here, as the government cannot itself run educational programs that deny access to LGBTQ+ students, nor can it, through funding or other conduct, "induce, encourage or promote" private universities to do so. *See Norwood* at 465.

During the hearing, Plaintiffs testified to the impact of the government's support of their discrimination. Alex Duron testified that as a taxpayer, he "felt like I'm funding my own – I'm funding my own denial, in a way." Tr. At 58:20-22. Veronica Bonificio Penales testified that the Department's grant of a religious exemption from Title IX to Baylor in the past, and its ability to do so in the future, makes her feel unsafe on campus. *Id.* at 98:20-99:3. She testified that it is scary to think about the government not protecting her from Title IX discrimination. Tr. At 99:4-7. Veronica also testified that she would feel safer and that her rights would be protected if the Department held Baylor accountable for Title IX violations. Tr. At 101:4-13.

Audrey Wojnarowisch testified that while they can, and have, filed a Title IX complaint with OCR, "It feels like a door has been closed" and that their complaint "will be to that closed door[.]" Tr. At 185:23-186:6. Elizabeth Hunter testified that she felt disturbed knowing that OCR and the Department have given their stamp of approval to her university's treatment of her through the Title IX religious exemption. *See* Tr. At 221:4-21. Kalie Hargrove testified that colleges like hers "are continuing to lure people in with a guise of being non-discriminative, and it's not true[,]" and that the Department "is funding that…They are funding my discrimination." Tr. At 250:4-16. Kalie testified that "it's kind of like you put – you put your money behind what you support, and the truth is the Department of Education is supporting these institutions that are telling me that I shouldn't exist in the same space as them." *Id.* at

PLAINTIFF'S POST-HEARING REPLY BRIEF

250:16-21

This testimony is evidence that government funding, the Title IX religious exemption regulations, and OCR's actions facilitate, induce, and encourage the discriminatory policies and practices engaged in by private religious universities.

### D. Religious belief does not transform invidious discrimination into benign discrimination

This case is about invidious discrimination in publicly funded education. Invidious discrimination in publicly funded education can arise in the form of racial discrimination, as it did in *Norwood v. Harrison* (excluding Black students, in disregard of their individual merit, from publicly funded religious and secular private schools), sex discrimination, as it did in *U.S. v. Virginia* (excluding women, in disregard of their individual merit, from a publicly funded educational opportunity afforded men), and sexual orientation and gender identity discrimination, as it does here (excluding sexual and gender minority students, in disregard of their individual merit, from publicly funded educational opportunities provided by religious colleges and universities).

It is the invidiousness of the discrimination, and the context of education, that renders government funding impermissible. Invidious discrimination arises when the target of the discrimination does not merit the discrimination and when the effect of the discrimination on the target is harmful. Merriam-Webster defines invidious as "of a kind to cause harm or resentment." In *Norwood*, the Court describes invidious discrimination in education as discrimination based on constitutionally suspect criteria unrelated to individual merit that exerts a pervasive influence on the educational process. *See also Pagan v. Calderon*, 448 F.3d 16, 35-36 (1st Cir. 2006) ("Invidious discrimination means discrimination based on suspect or

quasi-suspect classifications (such as race or gender).").

Here, Plaintiffs' educational institutions' policies and practices that treat sexual and gender minority students' identities, relationships, and behaviors as inferior and worthy of discipline are based on constitutionally suspect criteria (*i.e.* sex, sexual orientation, and gender identity) and are unrelated to individual merit, as a person's sexual orientation and gender identity does not make them any less deserving of access to publicly funded educational programs. Moreover, the discriminatory policies and practices of the publicly funded religious schools exert a pervasive influence on the government's entire system of education because the funding of, and tolerance for, such policies and practices communicates to all students that discrimination against LGBTQ+ students in education is desired, or at least tolerated.

Intervenors contend, however, that their policies and practices are based on honorable and sincerely held religious beliefs, rendering any discrimination they cause Plaintiffs to experience not only permissible but incapable of being considered invidious. While the *Obergefell* majority wrote that "[m]any who deem same-sex marriage to be wrong reach that conclusion based on decent and honorable religious or philosophical premises," the effect of discriminatory policies and practices emanating from those beliefs are no less harmful or damaging to Plaintiffs because the beliefs are honorable or sincerely held. For a transgender student, like Kalie, expelled because of their gender identity, it does not matter whether their college expelled them because it loves them or expelled them because it dislikes them, as they remain expelled, cast out from a publicly funded educational program for reasons wholly unrelated to individual merit.

////

### E. Plaintiffs' claims are ripe

Plaintiffs' claims are ripe for all the reasons previously briefed, including because of the ongoing stigmatic harms caused by the government's funding and by the religious exemption statute and regulations themselves. Plaintiffs' claims are also ripe with respect to their pending Title IX complaints. However, Government Defendants contend that "because Plaintiffs' administrative complaints are pending, there is no agency determination for this Court to review" and that OCR "may not need to" make "any decisions on the applicability of the religious exemption to Plaintiffs' Title IX administrative claims." Dkt. 150, 18, 20. This Court should reject Government Defendants' contentions because the injuries and harms perpetuated by them against Plaintiffs are inevitable and nearly certain to continue.

Principally, Plaintiffs' claims are ripe under the Ninth Circuit's firm prediction rule. Although it is unclear "exactly how likely an event must be for a court to make a firm prediction that it will occur," firm predictions have been found when injuries are (1) inevitable or (2) nearly certain. *See Mont. Envtl. Info. Ctr. v. Stone-Manning*, 766 F.3d 1184, 1190-91 (9th Cir. 2014). The standard has been applied by this Circuit to challenge regulations in other cases as well. *See, e.g.*, *Freedom to Travel Campaign v. Newcomb*, 82 F.3d 1431, 1436 (9th Cir. 1996) (applying the firm prediction rule to challenge regulations governing travel to Cuba); *Immigrant Assistance Project of L.A. Cnty. Fed'n of Labor (AFL-CIO) v. INS*, 306 F.3d 842, 861-62 (9th Cir. 2002) (applying the firm prediction rule to challenge INS policies and practices).

Here, this Court can easily make a firm prediction that OCR will apply the religious exemption to at least one of the Plaintiffs' Title IX administrative complaints for several reasons. Historically, defendants have used the religious exemption to dismiss Title IX

PLAINTIFF'S POST-HEARING REPLY BRIEF                                                                 9

complaints filed by sexual and gender minority students against their educational institutions. *See e.g.* Hearing Tr. 515:21-25 (Testimony that OCR dismissed a transgender student's discrimination complaint against George Fox University based on the religious exemption to Title IX); *Id.* at 522:23-523:8 (Dismissal of a student's Title IX complaint against Spring Arbor University based on religious exemption); *see also Id.* at 531:17-532:9 (Wills' testimony that he is unaware of a situation where OCR has granted assurance of an exemption covering the allegations of a complaint, where OCR had not dismissed a complaint based on the exemption.). Thus, this Court should rely on history and the evidence already presented to make a firm prediction that OCR will apply the religious exemption to at least one of Plaintiffs' Title IX administrative complaints.

Moreover, as described in Plaintiffs Closing Memorandum, OCR's handling of Plaintiffs' Title IX complaints is uncharacteristically prolonged. Randolph Wills testified for Defendants that OCR's goal is to fully resolve 80% of complaints within 180 days of receipt and that the average time to complete the evaluation stage for Title IX complaints was 73 days. Hearing Tr. 457:1-13; 510:2-17. Wills acknowledged that most of Plaintiffs' complaints have been in the evaluation stage for over 100 days. *Id.* at 510:2-17. That was over two months ago now.[1] Given OCR's guidelines, and the amount of time that has passed from when the complaints were first filed, this Court may make a firm prediction that OCR will apply the religious exemption to at least one of Plaintiffs' Title IX administrative complaints prior to a ruling on the merits of this case.

Additionally, just last week, on January 7, 2022, Plaintiffs received correspondence

---

[1] There are currently forty-one (41) Title IX administrative complaints submitted by Plaintiffs and putative Plaintiffs still pending in the evaluation stage. Of which, eight (8) are current students and at least an additional (ten) 10 also fall within the 180-day rule. The first complaint was filed over two hundred (200) days ago.

from OCR regarding putative Plaintiff Kalie Hargrove's complaint against Lincoln Christian University (Lincoln). Lincoln has not claimed a religious exemption from Title IX and its implementing regulations. *See* dkt. 150, 6-7. OCR's letter stated:

> OCR enforces Title IX of the Education Amendments of 1972 (Title IX), 20 U.S.C. §§ 1681 - 1688, and its implementing regulation at 34 C.F.R. Part 106, which prohibit discrimination on the basis of sex in any education program or activity operated by a recipient of Federal financial assistance. As a recipient of Federal financial assistance from the Department, the University is subject to Title IX. Title IX and its implementing regulation contain several exemptions and exceptions from their coverage. *See* 20 U.S.C. §§ 1681(a)(1)-(9); 34 C.F.R. §§ 106.11-106.15; *see also* OCR's webpage on exemptions from Title IX. *The University may claim an exemption from the application of Title IX and its implementing regulation to this complaint by contacting OCR.*
>
> OCR is opening an investigation into the complaint. Please understand that opening an investigation does not mean that OCR has made a decision about the complaint. During the investigation, OCR is neutral; OCR will collect and analyze the evidence it needs in order to make a decision about the complaint. OCR will ensure that its investigation addresses the complaint allegation and complies with OCR's *Case Processing Manual*.
>
> Southwick Declaration, Exhibit A (Lincoln Christian University Investigation Letter)

(emphasis added). Kalie's complaint is timely and heartbreaking, clearing the 180-day rule and other jurisdictional hurdles. *See* U.S. Dep't of Educ. Off. for Civil Rights Case Processing Manual, Dkt. 60-24 at 6-9. However, despite bestowing Kalie with a sliver of hope by opening the investigation into the discrimination, Lincoln has been notified of the investigation and will almost certainly proceed to claim a religious exemption from Title IX. *See* Hearing Tr. 507:7-11.[2] Moreover, if Lincoln claims a religious exemption at any point during the investigation and resolution process and OCR determines it applies, the complaint will be dismissed, *id.* at 508:3-12, slamming the door on Kalie of any administrative remedy.

Consequently, this Court should reject Defendants' assertion that it "may not need to"

---

[2] OCR has given Lincoln 20 days to respond to its letter opening the investigation. Southwick Declaration, Ex. B.

make any decisions on the applicability of the religious exemption to Plaintiffs' Title IX administrative claims. The impending dismissal of Kalie's complaint based on the religious exemption is nearly certain, further injuring, harming, and stigmatizing a brave veteran and student who has been through enough. Like many of the Plaintiffs, Kalie's case demonstrates the invidious discrimination by universities against sexual and gender minority students across the country—many in the absence of any assurance of exemption—that is upheld and emboldened by the Department's funding and OCR's implementation of controlling regulations.

In sum: This Court is well positioned to make a firm prediction that OCR will apply the religious exemption to dismiss at least one of Plaintiffs' Title IX complaints based on the evidence demonstrating (1) widespread invidious discrimination based on sexual orientation and gender identity; (2) OCR's historical practice of dismissing claims alleging such discrimination based on religious exemption; (3) the uncharacteristically delayed evaluation of Plaintiffs' Title IX complaints, which have been pending far past the normal times in which complaints are evaluated or resolved; (4) and OCR's open investigation concerning the discrimination against putative Plaintiff Hargrove based on gender identity discrimination at Lincoln Christian University. Therefore, considering the weight of evidence demonstrating Government Defendants' current and ongoing harms, injuries, and deprivation of rights against sexual and gender minority students at taxpayer-funded religious colleges, Plaintiffs' claims are ripe for review.

### F.  Alternatives to consider

Plaintiffs believe their Motion is ripe and request that the Court issue a remedy of injunctive and declaratory relief as soon as possible. However, to the extent the Court

determines that Plaintiffs may be entitled to a remedy but that their requests for injunctive and declaratory relief are not yet ripe, Plaintiffs ask the Court to refrain from ruling on this Motion, or to deny this Motion without prejudice to refile, and to set a status conference at a future date to review the status of Plaintiffs' Title IX administrative complaints.

### III.   CONCLUSION

For the foregoing reasons, and based on the argument and evidence presented at the Preliminary Injunction Hearing and in related briefing, Plaintiffs respectfully request that the Court grant their Motion for Preliminary Injunction.

Dated: January 10, 2022

                                                  s/ Paul Carlos Southwick

**Paul Carlos Southwick**
**(OSB 095141)**
**TRIAL ATTORNEY**
**Religious Exemption**
**Accountability Project**
**Paul Southwick Law, LLC**
8532 N. Ivanhoe St. #208,
Portland, OR 97203
Email: paul@paulsouthwick.com
Phone: 503-806-9517