# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF OREGON
### EUGENE DIVISION

| | |
|---|---|
| Elizabeth HUNTER; et al., on behalf of themselves and all others similarly situated,<br><br>              Plaintiffs,<br>v.<br><br>U.S. DEPARTMENT OF EDUCATION and Suzanne GOLDBERG, in her official capacity as Acting Assistant Secretary for Civil Rights, U.S. Department of Education,<br><br>              Defendants. | Civil Action No. 6:21-cv-00474-AA<br><br>**DECLARATION OF NATHAN BRITTSAN** |

I, Nathan Brittsan, declare:

1. I am over 18 years of age and have personal knowledge of the matters stated in this declaration and would testify truthfully to them if called upon to do so.

2. I am currently a resident of San Jose, California, located in Santa Clara County.

3. I grew up in Northwest Pennsylvania and am the oldest of four brothers. We were raised in a conservative Christian home. As a youth, I attended a Christian elementary and middle school and a public high school.

4. I attended Penn State University but later left my studies for a career in business. I eventually made my way to the Bay Area. I completed my bachelor's degree at San Jose State. I majored in Philosophy in preparation for going to seminary.

5. During my adolescence and college years, I experienced what I thought of as "same-sex attraction." I did not come out to myself as gay until I was 23.

6. As I began accepting that I was gay, I drifted away from the church. But more than a drift, I also felt pushed away from the church,

7. Over time, in my later 20s and 30s, I began to have profound spiritual experiences outside the church.

8. I joined the Gay Christian Network ("GCN"), a network of LGBTQ+ Christians who felt like there was no place for them in the churches of their youth. It felt comforting to find other LGBTQ+ Christians like me.

9. GCN started as an online network but we eventually met in person. We came together for the first time at a conference in Dallas, Texas in 2005. I remained active in GCN for many years.

1
Declaration of Nathan Brittsan

10. When I moved to San Jose, I found a home in Grace Baptist Church. It is a gay affirming Baptist Church. Some friends and I started an LGBTQ+ Bible Study and we met there weekly for about 5 years.

11. During this time, I realized that I was called to ministry.

12. I also met my now husband. We were married by our Senior Pastor in November of 2016.

13. In pursuit of my call, I applied to Fuller Theological Seminary and American Baptist Seminary of the West (now Berkeley School of Theology) in the summer of 2017.

14. I felt like God was calling me to an evangelical seminary like Fuller. I felt like bridge-building needed to be done between the evangelical community and the LGBTQ+ community.

15. I was admitted to Fuller in September 2017.

16. Growing up as a gay man, I am used to seeing and checking boxes that don't fit. There was a section of Fuller's application and student policies that prohibited homosexuality and defined marriage as strictly heterosexual. However, I felt that I could check the box and agree to Fuller's policies in good conscience because I was married and limited my sexual expression to my marriage.

17. I felt comfortable attending Fuller because it had a reputation of being a progressive seminary. Fuller also had Diversity and Title IX policies, and an LGBTQ+ group called OneTable Fuller, that made me feel like I would be welcome at Fuller.

18. However, I attended Fuller for only a few days before being expelled from the school for being married to my husband.

19. Fuller had investigated my marriage shortly before classes started. This investigation arose because I had requested to change my last name for my student email and records to my married name.

20. I plead with Fuller to let me stay and tried to negotiate with Fuller to come to an agreement that would let me finish the quarter.

21. I told Fuller that I would be willing to do whatever it took for them to allow me to remain a student.

22. In response, Fuller told me that "While I appreciate the tone of your appeal and your willingness to try to find a way forward for a quarter, the nature of the issue being appealed makes this problematic."

23. What I took from this statement is: "Your kind is not welcome here."

24. In trying to assert my rights, I communicated with the Title IX officer at Fuller. The Title IX officer at Fuller, who was supposed to be protecting my Title IX rights, told me that Fuller was rejecting me and would not let me finish the quarter.

25. This confused me because the Title IX officer told me that she was personally affirming of me and my marriage and that she attended a church that affirms me and my marriage. Despite that, she told me that it was not her job to advocate for me.

26. I requested the opportunity to appeal Fuller's decision. In response, Fuller told me that I would not be allowed to go through the disciplinary and appeal process available to students because I was not a matriculated student.

27. That was false because my student records reflected that I was a matriculated student and I had already been attending classes.

28. I was shocked that Fuller, as a taxpayer funded institution, would be allowed to discriminate against me like this. I thought it must be illegal.

29. I started to email professors and see if anyone would advocate on my behalf. Several professors told me that they disagreed with Fuller's actions and supported me and my marriage.

30. They informed me that Fuller had allowed LGBTQ+ students previously under a "don't ask, don't tell," policy but that new, divisive political influences had led to a crackdown on LGBTQ+ students like me.

31. I felt terrible. The rejection and dishonesty stung and hurt me and my husband, as we were already grieving the recent loss of his mother at the time.

32. I spent two months with my head below the covers. I was depressed and isolated myself.

33. I struggled with whether or not I wanted to go back to seminary.

34. At the time of my expulsion, I spoke with the Director of the Bay Area campus and informed her about my expulsion. She was visibly distraught over what had happened to me. She offered to connect me to one of her colleagues who was gay-affirming and had to leave Fuller because of his gay-affirming theology.

35. I am currently a member of First Baptist Church of Berkley where I attend with my husband. It is part of the American Baptist Churches in the USA ("ABC-USA"). Our church is part of the Association of Welcoming and Affirming Baptists.

36. I am now a seminarian in residence at First Baptist Church of Berkeley and am currently enrolled in Berkeley School of Theology pursuing a M.Div.

37. Once I graduate, I will become eligible for ordination in the ABC-USA.

38. Fuller has defended its treatment of me based on some of its policies. Fuller has a Community Standard: Sexual Standards policy which states, in part, "Fuller Theological Seminary believes that sexual union must be reserved for marriage, which is the covenant between one man and one woman, and that sexual abstinence is required for the unmarried. The seminary believes that premarital, extramarital, and homosexual forms of explicit sexual conduct to be inconsistent with the teaching of Scripture. Consequently, the seminary expects all members of its community…to abstain from what it holds to be unbiblical sexual practices."

39. As a gay man in the church, I felt like I complied with the spirit of this policy because I am married and my sexual expression is confined to my marriage.

40. Fuller should treat my marriage the same way as other marriages.

41. Fuller also has a policy against unlawful discrimination. In this policy, the school says that it does not discriminate on the basis of "race, color…sex, marital status…gender, gender identity, gender expression".

42. The statement goes on to say "Fuller Theological Seminary does not unlawfully discriminate on the basis of sexual orientation. The seminary does lawfully discriminate on the basis of sexual conduct that violates the Community Standard Statement on Sexual Standards. The seminary believes that sexual union must be reserved for marriage, which is a covenant union between one man and one woman. The seminary believes premarital, extramarital, and homosexual forms of sexual conduct to be inconsistent with the teachings of scripture. Therefore, the seminary expects members of its community to abstain from what it holds to be unbiblical sexual practices."

43. This kind of a message, similar to "love the sinner, hate the sin," encourages self-loathing and depression for LGBTQ+ people.

44. Fuller told me that they are lawfully allowed to discriminate based on their religious beliefs and a religious exemption to Title IX. However, I looked in the U.S. Department of Education's online database and there was no record a religious exemption.

45. I informed Fuller of this and they responded by saying that they did not have to write a letter to the Department of Education to claim the exemption in order for them to lawfully assert it.

46. Fuller's actions made me feel like a second-class Christian. They wanted to be rid of me as fast as possible and offered no love or grace.

47. I am participating in this lawsuit in order to protect other LGBTQ+ people from having to go through what I experienced.

48. I am a taxpayer and do not feel that my taxes should be spent furthering the discrimination against me by Fuller.

4

49. I also had taken out loans from the U.S. Department of Education to attend Fuller.

50. Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct, and that this declaration was executed this 7th day of March, 2021.

By: *(signature)*

Nathan Brittsan