**Paul Carlos Southwick (OSB 095141)**
**TRIAL ATTORNEY**
**Joseph Baxter (OSB 215137)**
**Paul Southwick Law, LLC**
8532 N. Ivanhoe St. #208
Portland, OR 97203
Email: paul@paulsouthwick.com
Email: joe@paulsouthwick.com
Phone: 503-806-9517

**Timothy R. Volpert (OSB 814074)**
**Tim Volpert PC**
2111 NE Hancock St. Ste. 2B
Portland, OR 97212
Email: tim@timvolpertlaw.com
Phone: 503-703-9054

**Misha Isaak (OSB 086430)**
**Alletta S. Brenner (OSB 142844)**
**Perkins Coie LLP**
1120 N.W. Couch Street, Tenth Floor
Portland, Oregon 97209-4128
Email: ABrenner@perkinscoie.com
Email: misaak@perkinscoie.com
Phone: 503-727-2000

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF OREGON
# EUGENE DIVISION

Elizabeth HUNTER; et al.,

    Plaintiffs,

v.

DEPARTMENT OF EDUCATION; and Catherine LHAMON, in her official capacity as Assistant Secretary for the Office of Civil Rights, U.S. Department of Education,

    Defendants,

COUNCIL FOR CHRISTIAN COLLEGES & UNIVERSITIES, WESTERN BAPTIST COLLEGE d/b/a CORBAN UNIVERSITY, WILLIAM JESSUP UNIVERSITY AND PHOENIX SEMINARY,

    Intervenor-Defendants.

Case No. 6:21-cv-00474-AA

**PLAINTIFFS' SUPPLEMENTAL BRIEF OF NEWLY DISCOVERED FACTS**

## I. SUMMARY OF NEW FACTS

On November 1, 2022, Government Defendants, once again, closed the doors to the Office of Civil Rights ("OCR") on another Plaintiff in this case, Plaintiff Cameron Martinez. In Plaintiff Martinez's case, Government Defendants actually invited Plaintiff Martinez into their office and opened an investigation, then, after making Plaintiff Martinez wait six months, escorted Plaintiff Martinez out of their office and shut the doors. Government Defendants did not shut the doors because Plaintiff Martinez's complaint was untimely or because it failed to state a claim for sexual orientation discrimination. Rather, Government Defendants shut their doors because OCR gave Plaintiff Martinez's university an opportunity to request an assurance of religious exemption, the university requested it, and OCR granted it. OCR then ushered Plaintiff Martinez out the door.

"Central both to the idea of the rule of law and to our own Constitution's guarantee of equal protection is the principle that government and each of its parts *remain open on impartial terms to all who seek its assistance*…A law declaring that in general it shall be more difficult for one group of citizens than for all others to seek aid from the government is itself a denial of equal protection of the laws in the most literal sense." *Romer v. Evans*, 517 U.S. 620, 633-34 (1996) (emphasis added) (internal citations omitted).

Failing to satisfy this basic Equal Protection requirement, Government Defendants continue to shut the Office of Civil Right's door on Plaintiffs by granting religious exemptions to taxpayer-funded religious educational institutions and by dismissing Plaintiffs' Title IX complaints and active investigations. OCR's active role in LGBTQ+ discrimination directly harms Plaintiffs and compounds the indignities, traumas, and economic harms inflicted by Plaintiffs' educational institutions.

Plaintiff Martinez reports that "OCR's dismissal of my complaint makes me feel less equal

PLAINTIFFS' SUPPLEMENTAL BRIEF OF NEW FACTS

Religious Exemption Accountability Project
Paul Southwick Law, LLC

than students at other institutions and less equal than cisgender, heterosexual students at my institution." Declaration of Cameron Martinez ("Martinez Decl."), at ¶ 5. Plaintiff Martinez describes how "The false hope and dismissal from OCR feel like the government is punishing me because of where I went to college and because of my sexual orientation and gender identity." *Id*. at ¶ 6.

Additionally, new research further supports the record in this case, demonstrating, yet again, that non-affirming educational environments lead to increased suicidal ideation for LGBTQ+ college students. And yet, rather than protecting these young, largely powerless and at-risk students, students like Plaintiff Martinez, Government Defendants provide them with false hope, encouraging them to file Title IX complaints and opening investigations into those complaints, only to dash those hopes and reinforce stigma and economic harm by dismissing complaints and investigations after an educational institution requests and receives a religious exemption.

Ultimately, Title IX's religious exemption, and OCR's implementation of that exemption, require Plaintiffs like Plaintiff Martinez to either endure unsafe educational environments or to restrict their educational opportunities for their own safety, something Government Defendants do not require of other students. In responding to OCR's recent dismissal of their Title IX complaint, Plaintiff Martinez states "I shouldn't have had to consider my sexual orientation and gender identity as a factor in considering where I went to get an education, nor should that have limited the number of available schools I qualified to attend." *Id*. at ¶ 8.

## II. ANALYSIS

**A. New Research Confirms Harms Caused by Institutional and Government Rejection**

The Trevor Project, a nonprofit devoted to suicide prevention for LGBTQ+ youth, published a research brief on September 28, 2022, entitled "Suicide Risk and Access to Care Among LGBTQ College Students." **Southwick Decl., Ex. A.** According to the Trevor Project's report,

affirming school policies and spaces can help mitigate the mental health disparities faced by LGBTQ+ students. *Id*. at p. 2. According to the Trevor Project's recent data: thirty-three percent (33%) of LGBTQ+ college students seriously considered suicide in the past year and seven (7%) attempted suicide. *Id*. at p. 3. The rates are higher for LGBTQ+ students of color, transgender, and gender non-conforming students. *Id*. Even more troubling, and particularly relevant to this case, where the religious educational institutions at issue do not provide affirming and/or equal access to mental health services, the Trevor Project found that LGBTQ+ students who did not have access to mental health services on campus were nearly four times more likely to attempt suicide (22%) compared to LGBTQ+ students who had access to mental health services (6%). *Id*. at p. 4. The Trevor Project noted that while most campuses generally provide mental health services for students, many of those services are not available, or at least not accessible, to LGBTQ+ students because of barriers to access. *Id*. at p. 4.

The Trevor Project's report also found that access to LGBTQ+ specific services on campus significantly reduced suicide attempts for LGBTQ+ students, reporting that "LGBTQ college students with access to LGBTQ student services through their college had 44% lower odds of attempting suicide in the past year." *Id*. at p. 5. Most colleges in the United States provide access to LGBTQ+ services for their LGBTQ+ students (only 6% of students reporting lack of access). However, at college campuses that LGBTQ+ students report as "not at all supportive" or only "a little bit" supportive, 45% of LGBTQ+ students report having no access to LGBTQ+ services. For the Plaintiffs in this case, LGBTQ+ services are often non-existent, explicitly forbidden, or non-affirming as they reinforce factually inaccurate stereotypes of LGBTQ+ people and their relationships as being disordered or perverted. Such circumstances are dangerous for LGBTQ+ youth because, as the Trevor Project concluded, "Having access to mental health services and LGBTQ services through college is critical for reducing suicide attempts among LGBTQ college

                                                  Religious Exemption Accountability Project
                                                                         Paul Southwick Law, LLC

students." *Id*. at p. 8. The Trevor Project further concluded that "Colleges should be aware that making these services available, accessible, and affirming is critical to the mental health and well-being of LGBTQ students." *Id*. at p. 8.

The Trevor Project also developed the comprehensive "2022 National Survey on LGBTQ Youth Mental Health." **Southwick Decl., Ex. B**. According to the Trevor Project's National Survey, community acceptance of LGBTQ+ people dramatically impacts the rate of LGBTQ+ youth suicide attempt. For communities LGBTQ+ youth deemed as "Very Unaccepting," such as the educational communities at issue in this case, **21% of LGBTQ+ youth who were part of these communities attempted suicide in the prior year.** *Id*. at p. 22 (emphasis added). For communities that LGBTQ+ youth deemed "Very Accepting," the suicide attempt rate decreased to 8%. *Id*. For LGBTQ+ youth who reported being subjected to conversion therapy, **28% attempted suicide in the prior year, with roughly the same percentage of suicide attempts for those LGBTQ+ youth threatened with conversion therapy (27%).** *Id*. at p. 19 (emphasis added). In contrast, for LGBTQ+ youth who were not subjected to or threatened with conversion therapy, the attempted suicide rate decreased to 11%. *Id*.

Moreover, since Plaintiffs' most recent submission to the Court in July 2022, religious colleges and schools have continued to openly and explicitly target and harm LGBTQ+ youth and families by, *inter alia*, demanding that LGBTQ+ students "leave immediately," removing access to affirming health and counseling resources, and denying students access to safe and affirming support groups. *See* **Southwick Decl., Ex. C** (*USA Today* news article entitled "Christian Florida School Tells Parents Gay and Transgender Students Must 'Leave Immediately,'" September 20, 2022); **Ex. D** (*FoxNews.com* article entitled "BYU Removes Pamphlets Advertising Off-campus LGBTQ Resources from New Student Bags," September 4, 2022); **Ex. E** (*Insight into Diversity* article entitled "Samford University Rejects Formation of

PLAINTIFFS' SUPPLEMENTAL BRIEF OF NEW FACTS
Religious Exemption Accountability Project
Paul Southwick Law, LLC

LGBTQ+ Law Student Group," October 25, 2022).

Additionally, on August 30, 2022, Dr. Ilan H. Meyer, PhD, one of Plaintiffs' expert witnesses at the Preliminary Injunction Hearing in November 2021, together with fifty-two other social scientists and legal scholars filed an amicus brief in *303 Creative, LLC and Lorie Smith v. Aubrey Elinis, et al.*, a case currently pending before the U.S. Supreme Court in which the Court will decide whether a commercial website design business must comply with Colorado's anti-discrimination laws prohibiting discrimination against LGBTQ+ people and same-sex marriages. **Southwick Decl., Ex. F**. Dr. Meyer's brief notes that while the business owner in *303 Creative* insists that she harbors no ill will toward LGB persons, as do the Government Defendants and Intervenors in this case, such a consideration "is not relevant to whether the Company is engaged in discriminatory conduct, or to the effects upon LGB persons of that conduct." *Id*. at p. 7. Here too, Government Defendants and Intervenors intentions and attitudes are not relevant to whether Government Defendants are engaged in discriminatory conduct, or enabling and encouraging discriminatory conduct, or whether their conduct that has harmful effects on LGBTQ+ students.

Dr. Meyer's brief reasons that:

> A person might have no ill will toward African Americans *per se* but still hold a sincere belief that people of different races should not mix, and therefor that a restaurant should be able to exclude African Americans and that schools should be segregated. That is still discrimination on the basis of race, and the Company similarly seeks to discriminate on the basis of LGB orientation. LGB people correctly understand such conduct as discrimination against them and, as a result, experience the harms documented by the research presented in this brief.

*Id*. p. 7. Dr. Meyer's brief describes the negative health impacts of sexual orientation discrimination, utilizing the minority stress framework, a framework used by "hundreds of peer-reviewed research articles." *Id*. p. 13. Dr. Meyer's brief states that "this body of work shows that exposure to minority stress negatively affects the health and well-being of LGB people" and that "[t]here is no significant disagreement among social scientists and public-health experts on this

point." *Id*. Dr. Meyer's brief further states that "The National Academies of Sciences, Engineering, and Medicine (NASEM), formerly the Institute of Medicine, concluded that '[t]he disparities affecting [LGBT] populations are driven by experiences of minority stress, which include both structural and interpersonal stigma, prejudice, discrimination, violence, and trauma.'" *Id*. Dr. Meyer's brief notes that "NASEM operates under a congressional charter and provides independent, objective analysis of scientific research.." *Id*. Here, Government Defendants have provided no evidence to counter Dr. Meyer's conclusion regarding minority stress and the discriminatory and harmful impacts of Government Defendants' conduct towards Plaintiffs.

### B. New Research Confirms the Prevalence of LGBTQ+ College Students

On October 3, 2022, the Center for the Study of Partisanship and Ideology published a report entitled, "Diverse and Divided: A Political Demography of American Elite Students, Report No. 7." **Southwick Decl., Ex. G**. The report analyzed responses from 57,000 college students, including students at religious colleges like BYU and Notre Dame. *Id*. p. 5. Of the students surveyed, 23% identified as LGBTQ and 3% identified as gender-nonconforming. *Id.* at p. 6. The report notes, "Importantly, no institution had fewer than 10% LGBTQ students." *Id*. p. 7.

### C. New Comments on Government Defendants' Current Title IX Rulemaking Further Demonstrate APA and Constitutional Violations

On July 12, 2022, Government Defendants published notice of new Title IX federal rulemaking that will codify sexual orientation and gender identity protections under Title IX's federal regulations.[1] However, the federal rulemaking does not propose any changes to the Trump-era regulations that expanded the scope of the religious exemption to Title IX and that eliminated the notice requirement for claiming a religious exemption. Plaintiffs challenge these

---

[1] https://www.federalregister.gov/documents/2022/07/12/2022-13734/nondiscrimination-on-the-basis-of-sex-in-education-programs-or-activities-receiving-federal

Trump-era regulations as unlawful under the Administrative Procedures Act and U.S. Constitution. *See e.g.* Dkt. 44 at pp. 33-39; Dkt. 143 at pp. 15-18.

Many civil rights organizations filed comments opposing Government Defendants' failure to change the unjustified and unlawful expansion of the religious exemption to Title IX and removal of the notice requirement. **Southwick Decl., Ex. J**. In these comments, the civil rights organizations rightly criticize Government Defendants for failing to act to protect the public, including LGBTQ+ college students, from undisclosed religious exemption claims and religious exemption claims by educational institutions that do not qualify for the exemption according to the terms of the statute. Among the comments are the following:

*The Interfaith Alliance Foundation*, a national interfaith organization dedicated to protecting the integrity of religion and democracy, comments that "Prior notice of Title IX exemptions allows students to make informed choices about their education and safety. Without it, students will not know whether they may be treated differently than their peers because of their sexual orientation, their gender identity, their reproductive history, or their personal beliefs. Appropriate implementation of religious exemptions also protects schools, who would otherwise be unclear as to what actions would put them at risk for legal challenges or complaints." ***Id*. at p. 3.**

*The Clearinghouse on Women's Issues*, a national nonprofit dedicated to improving the status of women and girls, comments that the current regulatory processes are "inherently deceptive and lure unsuspecting students and employees to the school who are unaware that the school asserts that it may discriminate against them," that the "proposed 2022 Title IX Rule failed to correct the inappropriate process for a recipient to claim a religious exemption in the 2020 DeVos regulation," that under the current regulations "a recipient may claim a religious exemption with no prior notice as a defense even after they are under a Title IX investigation," and noting that the current process "fails the Title IX statute requirement (26 USC § 1681) and the 1975 regulation

(34 CFR 106.12(a))" and the Singleton (1985) and Smith (1989) policy memoranda. *Id.* at p. 17.

*The New York City Alliance Against Sexual Assault* comments that religious exemption to Title IX "has been routinely weaponized in ways that discriminate and deny rights to pregnant students, non-binary students, transgender students, and LGBTQ+ students." *Id.* at p. 21.

*The National Women's Law Center* comments that anti-LGBTQI+ discrimination harms students' access to education and that the "net effect of this institutional discrimination is an increase in stigma, which signals to the student community as a whole that LGBTQI+ students are lesser—and fair targets for harassment and violence" and stating that the Trump/Devos regulatory changes "allow more schools to discriminate…which disproportionately harms women and girls, pregnant and parenting students, students who access or seek access to abortion or birth control, and LGBTQI+ students." *Id.* at pp. 66, 84.

*The Planned Parenthood Federation of America* comments that it "is vital" that the Department remove the Trump/Devos-era expanded religious exemptions "to adequately protect students from sex-based discrimination." *Id.* at 104.

*The Leadership Conference on Civil and Human Rights*, a coalition of more than 230 national organizations to promote and protect the civil and human rights of all people, comments that the 2020 Trump/Devos rule changes "greatly expanded" the religious exemption to Title IX, that the current rules allow "schools to conceal their intent to discriminate against students, exposing them to harm—especially women and girls, [and] LGBTQI+ students…," and noting that many LGBTQI+ people are people of faith, and as such, may seek out a religiously affiliated education, and, because religious traditions have varied views on gender and sexuality, even within their own traditions, "knowing a school's faith tradition is not adequate notice of a school's intention to discriminate," and that "By requiring a school to tell students that it does not discriminate while simultaneously allowing it to opt out of anti-discrimination provisions whenever it chooses, the

department created a system that enables schools to actively mislead students." ***Id*. at p. 120-121.**

In *Overwhelming Opposition: the American Public's Views on the DeVos Title IX Rulemaking of 2018-2020,* the comment provides a compilation report that analyzes data collected by a crowd-research project in which volunteers analyzed information from 117,358 of the comments filed in response to the Trump/Devos rulemaking, reporting that "Of the 2,898 comments that addressed and took a position on [expansion of] religious exemptions, 2,825 comments (97%) opposed the NPRM proposals whereas 73 comments (2.5%) supported them." ***Id*. at p. 129.** The *Overwhelming Opposition* comment reports that opponents of expansion argued that the religious exemption "is so broad as to eliminate the need for religious schools to comply with Title IX at all, and [] that the lack of pre-registration or public disclosure of religious exemption status would blind-side survivors whose schools suddenly claimed exemption after the survivor had been harmed." ***Id*. at p. 148**. The comment also notes that faith-based organizations also opposed the 2020 expansion of the religious exemption because it "trivializes the role of religion [in] people's live throughout the country and disrespectfully manipulates religion as political leverage." ***Id*. at 149** (quoting from comment by National Council of Jewish Women).

*Know Your IX*, a survivor- and youth-led project of *Advocates for Youth* that aims to empower students to end sexual and dating violence in their schools, comments that in its "listening sessions with students, we heard from students at religious schools that they experienced retaliation and pushout from schools after reporting violence due to their school retroactively claiming a religious exemption, effectively avoiding accountability for violating students' civil rights" and that "one college student survivor shared that they were kicked out of their religious school on the basis of their transgender identity" after starting a sexual violence Title IX process, with the student reporting that "there's no such thing as protection at religious schools that have a Title IX exemption," and that other college students reported that the

Religious Exemption Accountability Project
Paul Southwick Law, LLC

environment at a college with a religious exemption "leads to a culture of silence, and lack of responsibility on the part of the [federal funding] recipient to respond to sexual violence." *Id*. at **204-05**.

*Jeanette Lim Esbrook*, a former Acting Assistant Secretary for Civil Rights (1992-93 and 2000-01), comments that the current regulations allow schools "that are not actually controlled by a religious organization to claim a religious exemption" and that the prior notice requirement "provided a way for a religiously controlled educational institution and OCR to have an agreement that can be readily understood and known by applicants for admission and employment, students, employees, unions and professional organizations" and that reestablishing the notice requirement would avoid "factual inaccuracy to the Notice of Nondiscrimination that all recipients including religiously controlled recipient educational institutions are required to post and file (34 CFR § 106.8)." *Id*. **at pp. 7-8.**

### D. The Government Defendants' New Conduct Further Supports Plaintiffs' Standing, Injury, Causation & Redressability Arguments

On July 27, 2001, Plaintiff Cameron Martinez filed a Title IX complaint against La Sierra University in OCR Case No. 09-21-2314. On May 3, 2022, OCR, having determined that Plaintiff Martinez stated a timely and valid Title IX complaint, opened an investigation into their allegations of discrimination. Plaintiff Martinez stated that "It was very empowering and validating to have the Department of Education's Office of Civil Rights (OCR) open an investigation into my Title IX complaint. It finally felt like someone was seeing me and taking my allegations seriously." Martinez Decl., ¶ 2.

In response to OCR's investigation into Plaintiff Martinez' Title IX complaint, and in an effort to have the investigation dismissed, La Sierra University requested an assurance of religious exemption from OCR on June 10, 2022. In a letter dated July 20, 2022, OCR granted La Sierra University an assurance of religious exemption to the provisions of Title IX pertinent

to the open investigation. Several months later, on November 1, 2022, OCR dismissed Plaintiff Martinez's Title IX complaint on the grounds that it lacked jurisdiction because of the assurance of religious exemption it granted to La Sierra University.[2]

In response to OCR's dismissal of Plaintiff Martinez's complaint, Plaintiff Martinez reports feeling like OCR gave them "a false hope." Martinez Decl., ¶ 3. Plaintiff Martinez states that "To have my complaint denied entirely, compounds and reinforces the pain inflicted by my university, is discriminatory, and is retraumatizing to me." *Id*. Plaintiff Martinez further reports that "OCR's dismissal of my complaint makes me feel less equal than students at other institutions and less equal than cisgender, heterosexual students at my institution." *Id*. at ¶ 5. Plaintiff Martinez describes how "The false hope and dismissal from OCR feel like the government is punishing me because of where I went to college and because of my sexual orientation and gender identity." *Id*. at ¶ 6.

Plaintiff Martinez states that, for taxpayer-funded educational institutions like her own, "I shouldn't have had to consider my sexual orientation and gender identity as a factor in considering where I went to get an education, nor should that have limited the number of available schools I qualified to attend." *Id*. at ¶ 8. "Providing federal taxpayer funds to these institutions, taxes that I bear the burden of, and then barring me from equal participation in the resulting funded educational programs, is demeaning and is second-class citizenship. It is the government's stamp of approval of an idea that I am somehow less than, or undeserving, because of a deeply important aspect of my being." *Id*. at ¶ 9.

Plaintiff Martinez, and the other Plaintiffs in this case, are systematically excluded from

---

[2] OCR similarly granted a religious exemption to Colorado Christian University ("CCU"), which had requested the exemption after OCR opened an investigation into Plaintiff Journey Mueller's discrimination complaint against CCU. Southwick Decl., Ex. I. However, OCR has yet, as of today's date, to dismiss Plaintiff Mueller's complaint, though a dismissal is likely forthcoming.

PLAINTIFFS' SUPPLEMENTAL BRIEF OF NEW FACTS
Religious Exemption Accountability Project
Paul Southwick Law, LLC

taxpayer-funded educational opportunities that provide access to full participation in the U.S. economy. They are excluded because of factors that have nothing to do with their character or academic merits. Rather, they are excluded because of their sexual orientation and gender identity. The Government Defendants facilitate and actively participate in this exclusion, which includes exclusion of Plaintiffs from unique educational opportunities in the fields of nursing, education, engineering, biology and business that are available to straight and cisgender students.

The educational and economic opportunities offered by religious educational institutions are unique because other educational institutions do not offer the same combination of available degrees and certifications, student-faculty ratios, geographic locations, financial aid packages, quality, reputation, and other factors. *See e.g. 303 Creative LLC v. Elenis*, 6 F.4th 1160, 1180 (10th Cir. 2021) (creating a religious exemption from Colorado's anti-discrimination law "would necessarily relegate LGBT consumers to an inferior market because Appellants' unique services are, by definition, unavailable elsewhere")

Moreover, if a Plaintiff is denied unique educational opportunities at a religious college, Plaintiffs may apply, but are not guaranteed access to, different educational and economic opportunities at other educational institutions, as Plaintiffs may not qualify due to academic requirements, geography, cost or other impediments.

Consequently, the religious exemption to Title IX offends the Constitution's equal protection guarantee because it renders OCR, a civil rights office within the federal government, closed, or at the very least, open only on partial terms, to students like Plaintiff Martinez who seek its assistance. The Supreme Court has long held that "The guaranty of 'equal protection of the laws is a pledge of the *protection* of equal laws.'" *Romer,* 517 U.S. at 634 (emphasis added) (internal citations omitted). Here, Plaintiffs are denied the protection of equal laws in the most literal sense, as Title IX, because of its religious exemption, denies Plaintiffs many of the protections

Religious Exemption Accountability Project
Paul Southwick Law, LLC

that it guarantees to other students. *See Seattle's Union Gospel Mission v. Woods*, 197 Wash.2d 231, 250-52 (Wash. 2021), *cert. denied*, 142 S. Ct. 1094 (Mar. 21, 2022) (Washington Supreme Court determined that religious exemption in Washington State's Law Against Discrimination violates protections for sexual orientation and same-sex marriage implicit in the Washington Constitution's Privileges and Immunities Clause, Art. I, § 12, as applied to claims of a non-minister, requiring court to narrow statutory religious exemption to apply only to claims of a minister covered by the Supreme Court's ministerial exception jurisprudence).

Here too, the Court should determine that Title IX's religious exemption, as applied to Plaintiff Martinez and the other Plaintiffs in this case, violates the U.S. Constitution's Equal Protection and Establishment Clauses. Given this conclusion, the Court should either eliminate or, at the very least, narrow the scope of the religious exemption so that it only applies to discrimination claims that would be barred by the First Amendment (*e.g.* claims by plaintiffs that involve ministerial positions or positions otherwise protected by the ministerial exception or church autonomy doctrine).

### III. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant Plaintiffs' Motion for Preliminary Injunction.

Dated: November 15, 2022                                    s/ Paul Carlos Southwick

**Paul Carlos Southwick**
**(OSB 095141)**
**TRIAL ATTORNEY**
**Religious Exemption**
**Accountability Project**
**Paul Southwick Law, LLC**
8532 N. Ivanhoe St. #208,
Portland, OR 97203
Email: paul@paulsouthwick.com
Phone: 503-806-9517