Case 6:21-cv-00474-AA    Document 179-6    Filed 11/15/22    Page 1 of 20

Southwick, Paul 10/31/2022
For Educational Use Only

303 CREATIVE, LLC & Lorie Smith, Petitioners, v. Aubrey..., 2022 WL 3757343...

2022 WL 3757343 (U.S.) (Appellate Brief)
Supreme Court of the United States.

303 CREATIVE, LLC & Lorie Smith, Petitioners,

v.

Aubrey ELENIS, et al., Respondents.

No. 21-476.
August 30, 2022.

On Writ of Certiorari to the United States Court of Appeals for the Tenth Circuit

**Brief for Ilan H. Meyer, PhD, and Other Social Scientists
and Legal Scholars as Amici Curiae Supporting Respondents**

Elana C. Redfield, The Williams Institute, Ucla School of Law, 1060 Veteran Avenue, Suite 134, Los Angeles, CA 90095, Stephen B. Kinnaird, Counsel of Record, Tor Tarantola, Paul Hastings LLP, 2050 M Street, N.W., Washington, D.C. 20036, (202) 551-1700, stephenkinnaird@paulhastings.com.

**\*i TABLE OF CONTENTS**

| | |
|---|---|
| Table of Authorities | iii |
| Interest of Amici Curiae | 1 |
| Introduction | 3 |
| Summary of Argument | 8 |
| Argument | 11 |
| I. Stigma is a fundamental cause of health inequalities | 11 |
| II. LGB people face discrimination and other minority stressors stemming from anti-LGB stigma | 14 |
| A. LGB people face minority stressors stemming from anti-LGB stigma and prejudice | 14 |
| B. LGB people have endured a long history of stigma and discrimination | 19 |
| C. LGB people continue to experience significant discrimination | 21 |
| D. Exclusion from public accommodations is a minority stressor | 27 |
| \*ii III. Minority stress adversely affects the health, well-being, and relationship quality of LGB people | 29 |
| A. Minority stress negatively impacts the health and wellbeing of LGB people | 29 |
| B. Minority stress negatively impacts same-sex couples' relationship quality | 31 |
| C. Better social and legal conditions are associated with fewer adverse effects of minority stress | 33 |
| D. This research reflects a broad scientific consensus | 35 |
| Conclusion | 38 |
| Appendix: List of Amici | 1a |

**\*iii TABLE OF AUTHORITIES**

*Cases*

| | |
|---|---|
| 🚩 *Arcara v. Cloud Books, Inc.,* 478 U.S. 697 (1986) | 3, 4 |
| 🚩 *Baskin v. Bogin,* 766 F.3d 648 (7th Cir. 2014) | 9, 19 |
| 🚩 *Bd of Dirs. of Rotary Int'l v. Rotary Club of Duarte,* 481 U.S. 537 (1987) | 5 |
| 🚩 *Bostock v Clayton County,* 140 S. Ct. 1731 (2020) | 2, 25, 31 |

| | |
|---|---|
| *Cohen v Cowles Media Co.,* 501 U.S. 663 (1991) ........................ | 4 |
| *Hurley v Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston,* 515 U.S. 557 (1995) ........................................................................ | 7 |
| *Lawrence v. Texas,* 539 U.S. 558 (2003) ........................................ | 9, 19, 31 |
| *Lorain J Co. v United States,* 342 U.S. 143 (1951) ........................ | 4 |
| *Masterpiece Cakeshop, Ltd v Colo. CR. Comm'n,* 138 S. Ct. 1719 (2018) ........................................................................................ | 3 |
| *iv *Obergefell v. Hodges,* 576 U.S. 644 (2015) ........................... | passim |
| *Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Rels.,* 413 U.S. 376 (1973) ........................................................................ | 3 |
| *Roberts v US Jaycees,* 468 U.S. 609 (1984) ................................... | 5, 7, 34, 35 |
| *Romer v. Evans,* 517 U.S. 620 (1996) ............................................ | 9, 19 |
| *Turner Broad Sys., Inc v. FCC,* 512 U.S. 622 (1994) ..................... | 5 |
| *United States v Windsor,* 570 U.S. 744 (2013) ............................... | 9, 19, 31 |
| *Windsor v United States,* 699 F.3d 169 (2d Cir. 2012) ................... | 9, 19 |
| **Constitutional Provisions** | |
| U.S. Const. amend. I .................................................................... | 3, 4, 7 |
| **Statutes** | |
| Colo. Rev. Stat. § 24-34-601 ........................................................ | 3, 6 |
| 2007 Colo. Sess. Laws 1254 ........................................................ | 20 |
| 2008 Colo. Sess. Laws 1596 ........................................................ | 20 |
| *v **Other Authorities** | |
| M.V. Lee Badgett et al., *LGBTQ Economics,* 35 J. Econ. Persps. 141 (2021) ........................................................................................ | 25 |
| Letter from M.V. Lee Badgett, Professor of Econ., Univ. of Mass. Amherst, to Members of the S. Comm. on the Judiciary (Mar. 17, 2021) ............................................................................................ | 22 |
| Kimberly F. Balsam & Dawn M. Szymanski, *Relationship Quality and Domestic Violence in Women's Same-Sex Relationships,* 29 Psych. Women Q. 258 (2005) ........................................................ | 33 |
| Melissa Block, *Accusations of "Grooming" Are the Latest Political Attack-with Homophobic Origins,* NPR (May 11, 2022, 5:27 AM) ..... | 13 |
| Walter Bockting et al., *Adult Development and Quality of Life of Transgender and Gender Nonconforming People,* 23 Current Op. Endocrinology, Diabetes & Obesity 188 (2016) ................................ | 1 |
| *vi Brian B. Boutwell et al., *The Prevalence of Discrimination Across Racial Groups in Contemporary America,* 12 PLoS ONE (Aug. 24, 2017) ........................................................................... | 37 |
| Letter from Todd Brower, Jud. Educ. Dir., Williams Inst., to Members of the S. Comm. on the Judiciary (Mar. 17, 2021) ............... | 24 |
| Ronald T. Campbell & Donald W. Fiske, *Convergent and Discriminant Validation by the Multitrait -Multimethod Matrix,* 56 Psych. Bull. 81 (1959) .................................................................. | 37 |
| Hongjian Cao et al., *Sexual Minority Stress and Same-Sex Relationship Well-Being,* 79 J. Marriage & Fam. 1258 (2017) ............ | 32 |
| Susan D. Cochran & Vickie M. Mays, *Sexual Orientation and Mental Health, in Handbook of Psychology and Sexual Orientation* 204 (Charlotte J. Patterson & Anthony R. D'Augelli eds., 2013) ............... | 30 |

Case 6:21-cv-00474-AA    Document 179-6    Filed 11/15/22    Page 3 of 20
Southwick, Paul 10/31/2022
For Educational Use Only

303 CREATIVE, LLC & Lorie Smith, Petitioners, v. Aubrey..., 2022 WL 3757343...

| | |
|---|---:|
| **\*vii**  Kerith J. Conron & Bianca D.M. Wilson, Williams Inst., *LGBT Youth of Color Impacted by the Child Welfare and Juvenile Justice Systems* (2019) ................................................................... | 24 |
| Jennifer Crocker et al., *Social Stigma, in* 2 The Handbook of Social Psychology 504 (Daniel T. Gilbert et al. eds., 4th ed. 1998) ............... | 11 |
| John F. Dovidio et al., *Aversive Racism and Contemporary Bias, in* The Cambridge Handbook of the Psychology of Prejudice 267 (Chris G. Sibley & Fiona Kate Barlow eds., 2016) ......................................... | 12 |
| David Matthew Doyle & Lisa Molix, *Social Stigma and Sexual Minorities' Romantic Relationship Functioning,* 41 Personality & Soc. Psych. Bull. 1363 (2015) ............................................................ | 32 |
| Katie M. Edwards & Kateryna M. Sylaska, *The Perpetration of Intimate Partner Violence Among LGBTQ College Youth,* 42 J. Youth & Adolescence 1721 (2013) ........................................................... | 33 |
| **\*viii**  Andrew R. Flores et al., *Victimization Rates and Traits of Sexual and Gender Minorities in the United States,* 6 Sci. Advances (Oct. 2, 2020) ................................................................................ | 21 |
| David M. Frost & Allen J. LeBlanc, *Stress in the Lives of Same-Sex Couples, in* LGBTQ Divorce and Relationship Dissolution 70 (Abbie E. Goldberg & Adam P. Romero eds., 2018) ..................................... | 32 |
| David M. Frost & Ilan H. Meyer, *Internalized Homophobia and Relationship Quality Among Lesbians, Gay Men, and Bisexuals,* 59 J. Counseling Psych. 97 (2009) .................................................. | 16 |
| David M. Frost et al., *Couple-Level Minority Stress,* 58 J. Health & Soc. Behav. 455 (2017) ...................................................................... | 32 |
| David M. Frost et al., *Minority Stress and Physical Health Among Sexual Minority Individuals,* 38 J. Behav. Med. 1 (2015) ................... | 17, 31 |
| **\*ix**  David M. Frost et al., *Social Change and Relationship Quality Among Sexual Minority Individuals,* 84 J. Marriage & Fam. 920 (2022) ....................................................................................... | 32 |
| David M. Frost, *Similarities and Differences in the Pursuit of Intimacy Among Sexual Minority and Heterosexual Individuals,* 67 J. Soc. Issues 282 (2011) ........................................................................ | 31 |
| Erving Goffman, *Stigma: Notes on the Management of Spoiled Identity* (1963) ............................................................................... | 10 |
| Mark L. Hatzenbuehler et al., *The Impact of Institutional Discrimination on Psychiatric Disorders in Lesbian, Gay, and Bisexual Populations,* 100 Am. J. Pub. Health 452 (2010) ................. | 34 |
| Mark L. Hatzenbuehler et al., *State-Level Policies and Psychiatric Morbidity in Lesbian, Gay, and Bisexual Populations* 99 Am. J. Pub. Health 2275 (2009) ..................................................................... | 33 |
| **\*x**  Mark L. Hatzenbuehler et al., *Stigma as a Fundamental Cause of Population Health Inequalities,* 103 Am. J. Pub. Health 813 (2013) ................................................................................................ | passim |
| Gregory M. Herek, *Hate Crimes and Stigma -Related Experiences Among Sexual Minority Adults in the United States,* 24 J. Interpersonal Violence 54 (2009) ........................................................ | 16 |
| Gregory M. Herek, *Sexual Stigma and Sexual Prejudice in the United States, in* Contemporary Perspectives on Lesbian, Gay, and Bisexual Identities 65 (Debra A. Hope ed., 2009) ........................... | 15 |
| Gregory M. Herek & Linda D. Garnets, *Sexual Orientation and Mental Health,* Ann. Rev. Clinical Psych. 353 (2007) ....................... | 30 |
| Gregory M. Herek et al., *Psychological Sequelae of Hate Crime Victimization Among Lesbian, Gay, and Bisexual Adults,* 57 J. Consulting & Clinical Psych. 945 (1999) ......................................... | 17 |

| | |
|---|---:|
| **\*xi**  Inst. of Med., *The Health of Lesbian, Gay, Bisexual, and Transgender People* (2011) .................................................. | 35 |
| Michael King et al., *A Systematic Review of Mental Disorder, Suicide, and Deliberate Self Harm in Lesbian, Gay and Bisexual People,* 70 BMC Psychiatry 1 (Aug. 18, 2008) .................................. | 30 |
| Lamda Legal, *When Health Care Isn't Caring* (2010) ........................ | 24 |
| Matt Lavietes, *"Groomer, "Propedophile": Old Tropes Find New Life in Anti-LGBTQ Movement,* NBC News (April 12, 2022, 12:54 PM) ............................................................................................. | 12 |
| Allen J. LeBlanc & David M. Frost, *Couple-Level Minority Stress and Mental Health Among People in Same-Sex Relationships,* 10 Soc'y & Mental Health 276 (2020) ...................................................... | 32, 33 |
| Allen J. LeBlanc et al., *Minority Stress and Stress Proliferation Among Same - Sex and Other Marginalized Couples,* 77 J. Marriage & Fam. 40 (2015) ................................................................................ | 33 |
| **\*xii**  Diane K. Levy et al., Urban Inst., *A Paired-Tested Pilot Study of Housing Discrimination Against Same-Sex Couples and Transgender Individuals* (2017) ................................................................ | 22 |
| Bruce G. Link & Jo C. Phelan, *Conceptualizing Stigma,* 27 Ann. Rev. Socio. 363 (2001) .................................................................................. | 11 |
| Joseph G. Kosciw et al., GLSEN, *The 2015 National School Climate Survey* (2016) ............................................................................. | 23 |
| Lindsay Mahowald et al., Ctr. for Am. Progress, *The State of the LGBTQ Community in 2020* (2020) ............................................................. | 24, 26 |
| Christy Mallory & Brad Sears, Williams Inst., *Evidence of Employment Discrimination Based on Sexual Orientation and Gender Identity*(2015) ................................................................................ | 26 |
| Christy Mallory & Brad Sears, Williams Inst., *Evidence of Discrimination in Public Accommodations Based on Sexual Orientation and Gender Identity*(2016) ............................................................................. | 24, 27 |
| **\*xiii**  Christy Mallory & Brad Sears, Williams Inst., *Evidence of Housing Discrimination Based on Sexual Orientation and Gender Identity* (2016) .............................................................................. | 23 |
| Christy Mallory et al., Williams Inst., *The Economic Impact of Stigma and Discrimination Against LGBT People in Georgia* (2017) . | 22 |
| Christy Mallory et al., Williams Inst., *The Impact of Stigma and Discrimination Against LGBT People in Florida* (2017) .................... | 22 |
| Christy Mallory et al., Williams Inst., *The Impact of Stigma and Discrimination Against LGBT People in Texas* (2017) ....................... | 22 |
| Vickie M. Mays & Susan D. Cochran, *Mental Health Correlates of Perceived Discrimination Among Lesbian, Gay, and Bisexual Adults in the United States,* 91 Am. J. Pub. Health 1869 (2001) .................... | 30 |
| Ilan H. Meyer et al., Williams Inst., *LGBTQ People in the US* (2021) | 21, 26 |
| **\*xiv**  Ilan H. Meyer, *Minority Stress and Mental Health in Gay Men,* 36 J. Health & Soc. Behav. 38 (1995) ................................................. | 15, 18 |
| Ilan H. Meyer, *Prejudice, Social Stress, and Mental Health in Lesbian, Gay, and Bisexual Populations,* 129 Psych. Bull. 674 (2003) ............................................................................................... | 15, 16, 30, 32 |
| Ilan H. Meyer et al., *Social Patterning of Stress and Coping,* 67 Soc. Sci. & Med. 368 (2008) ........................................................................ | 15, 16 |
| Nat'l Acads. of Scis., Eng'g, & Med., *Understanding the Well-Being of LGBTQI\* Populations* (2020) ....................................................... | 35 |
| Off. of Disease Prevention & Health Promotion, U.S. Dep't of Health & Hum. Servs., *Healthy People 2020. Lesbian, Gay, Bisexual, and Transgender Health* ............................................................................ | 36 |

| | |
|---|---|
| Off. of Disease Prevention & Health Promotion, U.S. Dep't of Health & Hum. Servs., *Healthy People 2030' Discrimination* ........................ | 36 |
| *xv  Leonard I. Pearlin, *Stress and Mental Health, in A Handbook for the Study of Mental Health* 161 (Allan V. Horwitz & Teresa L. Scheid eds., 1999) ................................................................ | 14 |
| Julia Raifman et al., *Difference-in-Differences Analysis of the Association Between State Same -Sex Marriage Policies and Adolescent Suicide Attempts,* 171 JAMA Pediatrics 350 (2017) ......... | 34 |
| Ellen D.B. Riggle et al., *Psychological Distress, Well Being, and Legal Recognition in Same-Sex Couple Relationships,* 24 J. Fam. Psych. 82 (2010) .................................................................. | 34 |
| Adam P. Romero et al., Williams Inst., *LGBTPeople and Housing Affordability, Discrimination, and Homelessness* (2020) ..................... | 23 |
| Sharon Scales Rostosky & Ellen D.B. Riggle, *Same-Sex Relationships and Minority Stress,* 13 Current Op. Psych. 29 (2017) .. | 32 |
| *xvi  Sharon Scales Rostosky et al., *Marriage Amendments and Psychological Distress in Lesbian, Gay, and Bisexual (LGB) Adults,* 56 J. Counseling Psych. 56 (2009) ....................................... | 34 |
| Brad Sears et al., Williams Inst., *Documenting Discrimination in State Employment* (2009) ...................................................... | 20 |
| Brad Sears et al., Williams Inst., *LGBTPeople's' Experiences of Workplace Discrimination and Harassment (2021*) ............................ | 25 |
| Hans Selye, *History of the Stress Concept, in Handbook of Stress* 7 (Leo Goldberger & Shlomo Breznitz eds., 2nd ed. 1993) ................... | 14 |
| Hua Sun & Lei Gao, *Lending Practices to Same-Sex Borrowers,* 116 PNAS 9293 (2019) ................................................................. | 24 |
| Peggy A. Thoits, *Stress and Health,* 51 J. Health & Soc. Behav. S41 (2010) ............................................................................... | 15, 17 |
| *xvii  Blair Wheaton, *The Nature of Stressors, in A Handbook for the Study of Mental Health* 176 (Allan V. Horwitz & Teresa L. Scheid eds., 1999) ................................................................ | 14 |
| Letter from Williams Inst. Scholars to Members of the S. Comm. on the Judiciary (Mar. 22, 2021) ........................................... | 22 |
| Bianca D.M. Wilson et al., Williams Inst., *LGBTRenters and Eviction Risk* (2021) ............................................................................ | 23 |
| Joshua R. Wolff et al., *Sexual Minority Students in Non - Affirming Religious Higher Education,* 3 Psych. Sexual Orientation & Gender Diversity 201 (2016) ....................................................... | 23 |

**\*1  INTEREST OF AMICI CURIAE**[1]

Ilan H. Meyer, Ph.D., is Distinguished Senior Scholar for Public Policy at the Williams Institute, UCLA School of Law, and Professor Emeritus of Sociomedical Sciences at Columbia University. Dr. Meyer studies public health issues related to minority health, particularly the relationship of minority status, minority identity, prejudice, and discrimination to health outcomes in sexual and gender minorities. For his work, Dr. Meyer has received the California Psychological Association Distinguished Scientific Contribution in Psychology Award (2018), the American Psychological Association Presidential Citation (2019), and the National Institutes of Health Sexual and Gender Minority Distinguished Investigator Award (2022), among others.

Other amici, listed in the Appendix, include scholars of public health and social science who are recognized experts on the health and wellbeing of sexual minorities, including lesbians, gay men, and bisexuals ("LGB people").[2] Many of **\*2** the amici have

conducted extensive research and authored publications in peer-reviewed academic journals on the effects of discrimination on LGB people. [3] Amici also include legal scholars who are recognized experts on the law and policy affecting LGB people's health and well-being.

This Court and others have relied on work by several of the amici. *See, e.g.,* *Bostock v. Clayton County,* 140 S. Ct. 1731, 1752 (2020) (citing Cary Franklin, **\*3** *Inventing the "Traditional Concept" of SexDiscrimination,* 125 Harv. L. Rev. 1307, 1338 (2012)); *Obergefell v. Hodges,* 576 U.S. 644, 668 (2015) (citing Br. for Gary J. Gates as Amicus Curiae).

As scholars who specialize in issues related to LGB people, amici have a substantial interest in the question before the Court. In particular, amici describe the harmful effects on LGB people when a business or other place of public accommodation discriminates against them on the basis of sexual orientation.

### INTRODUCTION

The Accommodations Clause of the Colorado Anti-Discrimination Act (CADA), like countless state and federal laws that regulate commerce, is neutral and generally applicable. *See Masterpiece Cakeshop, Ltd v Colo. C.R. Comm'n,* 138 S. Ct. 1719, 1727, 1728 (2018). It is not aimed at speech or expressive conduct, nor does it single out particular speakers. [4] It applies broadly to all businesses that qualify as "place[s] of public accommodation"-that is, to businesses that sell **\*4** goods or services to the general public, Colo. Rev. Stat. § 24-34-601(1)-and bars discrimination on enumerated bases, including sexual orientation, *id.* § 24-34-601(2)(a). In short, it bars only exclusionary commercial conduct.

Generally applicable laws that are not directed to speech do not raise First Amendment concerns, even when their enforcement burdens or compels protected speech to some degree. Thus, in *Arcara v. Cloud Books, Inc.,* 478 U.S. 697, 707 (1986), this Court found no First Amendment problem when a bookseller complained that his bookshop was shut down by enforcement of a generally applicable state law that required closure of premises where solicitation of prostitution took place. The Court remarked that "every civil and criminal remedy imposes some conceivable burden on First Amendment protected activities," *id.* at 706, and heightened scrutiny was appropriate only when the law was directed at expressive conduct or inevitably placed a disproportionate burden on the First Amendment activity, *id.* at 707; *see also Lorain J. Co. v. United States,* 342 U.S. 143, 155-56 (1951) (no First Amendment violation where antitrust law prevented newspapers from refusing to sell advertising space to certain businesses); *Cohen v. Cowles Media Co.,* 501 U.S. 663, 670 (1991) (promissory-estoppel law).

"[E]nforcement of such general laws against the press"-and, a fortiori, against businesses **\*5** that offer speech-related services to the public, like 303 Creative-"is not subject to stricter scrutiny than would be applied to enforcement against other persons or organizations." *Cohen,* 501 U.S. at 670. The fact that Smith may find compliance with CADA contrary to her beliefs is of no moment in terms of the First Amendment, any more than a libertarian's objection to tax laws. Blocking enforcement of generally applicable laws based on a regulated person's moral or philosophical objections to them has staggering implications.

Despite the clarity of these principles, Petitioners Smith and 303 Creative (collectively, "the Company") have advocated (Br. 15) that the application of CADA to the Company's web-design business requires strict scrutiny, which means that CADA can be upheld only if it is the least restrictive means of serving a compelling state interest. Such a standard would buck a long line of

this Court's precedents. As Respondents have argued (Br. 25-28), even if CADA singled out expressive conduct-which it does not-it would still warrant only intermediate scrutiny. See *Turner Broad Sys., Inc v. FCC,* 512 U.S. 622, 640 (1994) (applying intermediate scrutiny because a content-neutral law "single[d] out the press").

Nonetheless, CADA's application here withstands even strict scrutiny. Remedying discrimination that excludes certain groups from equal **\*6** participation in economic life is inherently a compelling state interest. See *Bd of Dirs. of Rotary Int'l v Rotary Club ofDuarte,* 481 U.S. 537, 549 (1987); *Roberts v. U.S. Jaycees,* 468 U.S. 609, 626 (1984). But it is especially so here, for not only marketplace exclusion but also the health of LGB persons is at stake. The object of this brief is to inform the Court of the established and extensive social science literature demonstrating that minority stress has proven, detrimental effects on the health of LGB persons, and there is a high risk of such negative effects if this Court were to allow the kind of discriminatory exclusion that the Company wishes to practice.

As the Court weighs the prevention of these harms against the Company's putative speech interests, three considerations are paramount.

First, Smith's insistence that she harbors no ill will toward LGB persons is not relevant to whether the Company is engaged in discriminatory conduct, or to the effects upon LGB persons of that conduct. A person might have no ill will toward African Americans per se but still hold a sincere belief that people of different races should not mix, and therefore that a restaurant should be able to exclude African Americans and that schools should be segregated. That is still discrimination on the basis of race, and the Company similarly seeks to discriminate on the basis of LGB orientation. LGB people correctly understand such conduct as discrimination against **\*7** them and, as a result, experience the harms documented by the research presented in this brief.

Second, the Company has stipulated that it is a "place of public accommodation" and that it "offer[s] services to the public." Pet. App. 189a. As such, it concedes that it is not a purely private and selective vendor open only to certain customers based on religious criteria. It also implicitly concedes that it is not a "place that is principally used for religious purposes," which would exempt it from CADA's definition of a place of public accommodation. Colo. Rev. Stat. § 24-34-601(1).

Finally, the principle that combatting offensive *speech* is not a compelling interest, *see* *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston,* 515 U.S. 557, 579 (1995), is not dispositive here. Rather, this case is about the harm that results from the Company's exclusionary *conduct.* As this Court has held, combatting that harm "plainly serves compelling state interests of the highest order," even when the goods and services at issue involve protected speech. *Roberts,* 468 U.S. at 624 (applied to leadership training and business contacts).

As the remainder of this brief demonstrates, the harm to LGB people of exclusionary conduct is substantial, and preventing it is a compelling interest that outweighs the Company's speech interests under any legal standard.

## \*8  SUMMARY OF ARGUMENT

The core question in this case is whether the First Amendment guarantees a web designer the right to engage in harmful discriminatory conduct directed at same-sex couples, which the State of Colorado seeks to prohibit. Amici submit this brief to provide the Court with essential information about the long history and present-day impacts of discrimination experienced by samesex couples and LGB people generally, as well as the types of harms that the Company's actions could produce. Our research and expertise lead us to the inescapable conclusion that discrimination causes harm to the dignity of LGB people and to their health and well-being.

To prevent discriminatory harm to LGB people, providers of services to the public must be expected to comply with antidiscrimination laws. The Company argues that it should be exempt from these expectations due to Smith's religious beliefs, despite the fact that she wishes to offer a commercial service to the general public. But the Company is not a religious institution; it is a business. Same-sex couples, and LGB people generally, may expect some religious institutions to disapprove of their relationships and marriages. However, same-sex couples should not have this expectation when engaging with businesses in the marketplace.

LGB people also understand that a business that rejects same-sex couples is hostile to them *9 as LGB individuals, not just to their weddings. Should this Court accept the Company's position, it would guarantee a marketplace that is segregated into businesses that are open to same-sex couples and those that are not. Engaging in commercial activities in such a segregated marketplace will have both *tangible* and *symbolic stress*- ful effects on LGB consumers. LGB people will bear the burden of finding businesses that do not discriminate against them, a process that may entail significant harm to their dignity and wellbeing.

LGB people are no strangers to discrimination and violence. As the Seventh Circuit has explained, "homosexuals are among the most stigmatized, misunderstood, and discriminatedagainst minorities in the history of the world." *Baskin v. Bogin,* 766 F.3d 648, 658 (7th Cir. 2014); *accord Windsor v. United States,* 699 F.3d 169, 182 (2d Cir. 2012) ("It is easy to conclude that homosexuals have suffered a history of discrimination."), *aff'd,* 570 U.S. 744 (2013). But this Court has repeatedly ruled that such harm to the dignity of LGB people is of constitutional proportion. *See, e.g., Obergefell v. Hodges,* 576 U.S. 644, 681 (2015). This Court's decisions recognizing some of these harms [5] have helped *10 LGB people live with dignity. And yet, many of these harms persist.

As we will show, the minority-stress literature converges on one conclusion: when a place of public accommodation refuses to serve LGB people because of their sexual orientation or their desire to marry a same-sex partner, that refusal causes minority stress. Minority stress is experienced as additive stress to the general stress all people experience. And that added stress has powerful tangible and symbolic implications for LGB people. In turn, decades of social-science and public-health research have shown that stress adversely impacts the health and well-being of LGB people. In comparison with heterosexual people, this excess stress (*minority stress*) leads to excess adverse mental and physical health outcomes, including depression, sub-stance use, and suicide attempts.

*11 Discrimination against LGB people in the marketplace, even if non-discriminating alternatives are available, imposes real harms on LGB people's mental and physical health. States have a compelling interest in addressing these harms by prohibiting discrimination.

## ARGUMENT

### I. Stigma is a fundamental cause of health inequalities.

The concept of *stigma* was first suggested in 1963 by sociologist Erving Goffman [6]; it has since risen as a conceptual framework in the social sciences and has been identified as a fundamental cause of health disparities among populations defined by social status (e.g., LGB people versus heterosexuals). Stigma refers to the social process of attributing low regard to a member of a disliked social group, such as LGB people, racial and ethnic minorities, religious minorities, and people with disabilities, among others. It is "a social identity that is devalued."[7] Link and Phelan identified as essential elements of stigma interrelated components of "labeling, stereotyping, *12 separation, status loss, and discrimination" in the context of differences in social

power. [8] Racism is an example of stigma, but "the stigma concept encompasses multiple statuses and characteristics, such as sexual orientation ...; thus, stigma can be seen as broader in scope than racism." [9]

Hatzenbuehler, Phelan, and Link defined stigma as a fundamental cause of health disparities in the United States, in that stigma underpins several processes that lead to poor health. [10] These processes include impeding the availability of resources (money, education, prestige) and beneficial social relationships, and increasing the experience of stress. These stigma-induced processes lead, in turn, to adverse mental and physical health outcomes.

Stigma is referred to as a *fundamental cause* of health disparities because it is resistant to change across historical periods. For example, while the Jim Crow laws may have gone by the wayside, they have been replaced by less overt forms of racism that researchers call *aversive* **\*13** *racism*. [11] Similarly, while same-sex marriages have become more accepted in American society, there has been evolving stigma against LGBT people-for example, the recent resurgence of accusations that LGBT people are "groomers" who aim to corrupt young school children. [12] Thus, over time, stigma produces new mechanisms for exclusion and discrimination and increases stress-related stigma in members of the target minority group. [13]

Below, we discuss the specific impacts of stigma on LGB people.

### \*14 II. LGB people face discrimination and other minority stressors stemming from anti-LGB stigma.

#### A. LGB people face minority stressors stemming from anti-LGB stigma and prejudice.

Because of widespread anti-LGB stigma, experiences of discrimination and rejection are among significant minority stressors that adversely impact LGB people's health and wellbeing. A stressor is "any condition having the potential to arouse the adaptive machinery of the individual." [14] Stress can be described, using an engineering analogy, as the load relative to the supportive surface. [15] Like a surface that may **\*15** break when the load weight exceeds the surface's capacity to withstand the load, so too can stress reach a breaking point beyond which an organism may reach "exhaustion." [16] A stressor is stressful because it requires an adaptation effort by the individual exposed to it. [17] Research over decades has shown that stress causes mental and physical disorders, such as self-rated poor health, chronic health conditions, disabilities, high blood pressure, psychological distress, and anxiety and depressive disorders. [18]

LGB people are exposed to stressors that stem from anti-LGB stigma, which researchers refer to as *minoritystress*. [19] In addition, all people (including LGB people) are exposed to *general* **\*16** stressors, which do not stem from anti-LGB stigma. LGB and non-LGB people may also experience stigma stressors related to other identities, such as their race/ethnicity. [20] Because minority stress relates to stigma against LGB people, it is unique to them. Thus, minority stress refers to *excess* exposure to stress by LGB people as compared with heterosexuals, which requires special adaptation by LGB individuals. [21] Adaptation is a stress response that can have physical and psychological implications. Because any stress can cause mental and physical disorders, the excess exposure to minority stress among LGB people, as compared with heterosexuals, confers an excess risk for diseases caused by stress. [22]

**\*17** Minority stress is defined by specific stress processes, including, among others, *prejudice events and conditions* and *expectations of rejection and discrimination*. [23] *Prejudice events and conditions* refers to large and small events and conditions that stem from societal anti-LGB stigma. Thus, being fired from a job is a general stressor that could affect any person, but it is classified as a prejudice event-or a minority stressor-when it is motivated by discrimination against LGB people.

Minority stress has both structural and interpersonal manifestations. Structural stigma refers to exclusion from resources and advantages available to heterosexuals, such as the historical exclusion of LGB people from the institution of marriage prior to *Obergefell*. Legally sanctioned exclusion from the marketplace, advocated by the Company here, would be a form of structural stigma. Structural stigma can also lead to stressful events through the experience of interpersonal interactions that are perpetrated by individuals, such as hate crimes, discriminatory employment and housing practices, or legally sanctioned rejection and discrimination.

Because of the social significance of stigma, a discriminatory event may be perpetrated by one person, but it carries a symbolic message of social disapprobation. The added symbolic value makes **\*18** a prejudice event more damaging to the victim's psychological health than a similar event not motivated by prejudice.[24] This exemplifies an important quality of minority stress: prejudice events and conditions have a powerful impact because they convey deep cultural meaning.[25] Minority-stress events can be characterized as either major (e.g., being fired from a job) or seemingly minor, "everyday" events (e.g., being refused service at a restaurant). Even "[a] seemingly minor event, such as a slur directed at a gay man, may evoke deep feelings of rejection and fears of violence [seemingly] disproportionate to the event that precipitated them."[26] Therefore, assessment of stressors related to stigma and prejudice must consider not only the tangible impact of stress-typically defined as the amount of adaptation required by the event-but also the symbolic meaning of the experience within the social context.

**\*19** In sum, stressors are ubiquitous in our society and experienced by LGB and heterosexual people alike. But LGB people are uniquely exposed to minority stressors that stem from stigma toward them. This added source of stress exposes LGB people to excess stress compared with heterosexuals and leads to excess adverse health outcomes in LGB as compared with heterosexual populations.

### B. LGB people have endured a long history of stigma and discrimination.

LGB people have faced a long, painful history of public and private discrimination in the United States. In *Obergefell,* this Court observed that gay and lesbian people have been "prohibited from most government employment, barred from military service, excluded under immigration laws, targeted by police, and burdened in their rights to associate." 576 U.S. at 661; *see also* *United States v Windsor,* 570 U.S. at 770 ("The avowed purpose and practical effect of the law here in question are to impose a disadvantage, a separate status, and so a stigma upon all who enter into same-sex marriages made lawful by the unquestioned authority of the States."); *Lawrence,* 539 U.S. at 575 (discussing stigma from criminal sodomy statutes); *Romer,* 517 U.S. at 632 (discussing animus in anti-LGB legislation). Speaking to both public and private discrimination, the Seventh Circuit has explained **\*20** that "homosexuals are among the most stigmatized, misunderstood, and discriminated-against minorities in the history of the world, the disparagement of their sexual orientation, implicit in the denial of marriage rights to same-sex couples, is a source of continuing pain to the homosexual community." *Baskin v. Bogin,* 766 F.3d 648, 658 (7th Cir. 2014); *accord* *Windsor v. United States,* 699 F.3d 169, 182 (2d Cir. 2012) ("It is easy to conclude that homosexuals have suffered a history of discrimination."), *aff'd,* 570 U.S. 744 (2013).

This history is well-documented. In Colorado specifically, a 1992 legislative report noted that LGB people "have been found to experience discrimination in access to employment, housing, military service, commercial space, public accommodations, health care, and educational facilities on college campuses."[27] Colorado amended its antidiscrimination law in 2007 and again in 2008 to **\*21** address many of these same forms of discrimination against LGB people.[28]

### C. LGB people continue to experience significant discrimination.

Despite advances to protect the autonomy and equality of LGB people under the U.S. Constitution and some state and local laws, research shows that violence, mistreatment, and discrimination remain persistent and pervasive. One study has shown that LGB and transgender people are nearly four times as likely to experience violent attacks.[29] But anti-LGBT discrimination often manifests in the form of day-to-day interactions related to meeting basic needs. In a study of a nationally representative sample of LGBT people, almost half reported that they had generally been treated with less courtesy (45%) and less respect (44%) than non-LGBT people.[30]

Research has documented the discrimination and harassment that LGB people continue to **\*22** face in almost all aspects of public life,[31] including in employment,[32] housing,[33] education,[34] **\*24** health care,[35] financial services,[36] government programs,[37] the judicial system,[38] and public accommodations.[39] The employment context provides a clear example. In a study conducted in **\*25** 2021, one year after this Court decided *Bostock,* over 45% of LGBT workers reported experiencing unfair treatment at work at some point in their lives, including being fired, not hired, or harassed because of their sexual orientation or gender identity.[40] Nearly one-third (31.1%) of LGBT respondents reported experiencing employmentbased discrimination or harassment during the five-year period prior to the study.[41] Other studies have assessed employment discrimination using experimental methods, such as by submitting matching pairs of resumes.[42] Results showed that LGBTQ candidates were significantly less likely than "effectively identical" non-LGBTQ candidates to be invited for an interview or to be offered a job.[43] An analysis of employment-discrimination complaints filed with state enforcement agencies (in 22 states that protected against LGBT discrimination) between 2008 and **\*26** 2014 showed that complaints of discrimination based on sexual orientation and gender identity were filed at a similar rate by LGBT workers as complaints of discrimination based on race or sex were filed by people of color or women, respectively (between 4 and 5 complaints per 10,000 workers in the relevant class).[44]

Most relevant to the present case, research shows that LGB people continue to experience discrimination by public accommodations when they seek goods and services in the marketplace. For example, in a nationally representative study of LGB people, 24% reported receiving poorer service in restaurants and stores.[45] Similarly, another recent study found that, of the 36% of LGBT people who had experienced discrimination within the past year, 51% said the experience occurred in a public space, such as a store.[46] Complaints filed with state enforcement agencies between 2008 and 2014 suggest that LGBT people continue to experience discrimination in **\*27** public accommodations at rates similar to those of women and people of color (between about 1 and 4 complaints filed per 100,000 people in the relevant class).[47] Data from Colorado are similar.[48]

### D. Exclusion from public accommodations is a minority stressor.

Based on the large body of research on minority stress, amici conclude that a wedding vendor's declining to serve same-sex couples would be a prejudice event-a type of minority stresswhich would subject LGB persons to indignities that have both tangible and symbolic impacts.

The potential pitfalls an LGB couple may encounter in finding a business willing to serve them demonstrate the basic premise of minority stress as an *excess* stress: the extra burden of finding an alternative vendor adds to the stress of planning a wedding as compared with heterosexual couples. Presuming an alternative business can be found at all, this added burden is unique to the class of customers who are shunned by the website designer for planning a same-sex wedding.

If a segregated marketplace becomes the norm, same-sex couples can expect to encounter **\*28** such struggles in other areas of commerce that involve commodified speech or expression. A rejected customer may not always be able to find an appropriate and timely replacement because an alternative business may not be available or because the immediacy of the particular need may limit the choice of businesses available in the area. *See, e.g.,* First Am. Compl. at ¶¶ 26, 27, 34, *Zawadski v Brewer Funeral Services, Inc.,* No. 55CI1:17-cv-00019-CM, (Miss. Cir. Ct., filed Mar. 7, 2017) (widower alleging funeral home refused to transport and cremate deceased samesex spouse because of their sexual orientation, leaving the decedent's body without proper storage for hours and the family scrambling to find alternative funeral services).

Being discriminated against by service providers in the marketplace is stressful, as it requires LGB people to expend greater effort and expense to secure the services or goods provided to non-LGB people.[49] It is even more stressful because it conveys to the LGB person discriminated **\*29** against that they are inferior, evoking deep feelings of rejection informed by prior experiences of rejection and discrimination. Moreover, the possibility of public rejection from services and goods creates a stigmatizing social environment. As we discuss next, minority stress and a stigmatizing social environment adversely impact LGB people's health and well-being.

### III. Minority stress adversely affects the health, well-being, and relationship quality of LGB people.

#### A. Minority stress negatively impacts the health and well-being of LGB people.

Stigma is a "fundamental social cause" of disease in that it "influences multiple disease outcomes through multiple risk factors among a substantial number of people."[50] This makes stigma "a central driver of morbidity and mortality at a population level."[51] Stigma leads to poor health outcomes by blocking resources "of money, knowledge, power, prestige, and beneficial social connections,"[52] increasing social isolation, limiting social support, and increasing stress.[53]

**\*30** Decades of research have demonstrated the negative effects of minority stress on the health and well-being of LGB people. Studies have concluded that minority-stress processes are related to an array of mental health problems, including depressive symptoms, substance use, and suicide ideation and attempts.[54]

Several studies have also demonstrated links between minority-stress factors and some physical health problems. For example, one study found that LGB people who had experienced a prejudice-related stressful life event were about three times more likely than those who did not experience such an event to have suffered a serious **\*31** physical health problem over a one-year period.[55] This effect remained statistically significant even after controlling for the experience of other non-prejudicial stress events and other factors known to affect physical health. Thus, prejudice-related stressful life events were more damaging to the physical health of LGB people than similar stressful life events that did not involve prejudice.

#### B. Minority stress negatively impacts same-sex couples' relationship quality.

LGB people have the same aspirations for achieving intimate relationships as heterosexuals, but they face greater social barriers to maintaining long-term relationships.[56] This Court's decisions in *Lawrence, Windsor, Obergefell,* and *Bostock* have helped remove some major barriers. But minority stress remains a burden for same-sex partners. Studies indicate that minority stress in LGB people's lives may negatively **\*32** affect couples' relationship quality.[57] While different-sex and same-sex couples all experience general stressors-such as stressors related to finances or household chores-same-sex couples experience additional minority stressors that stem from the stigmatization of same-sex relationships.[58] Stigma surrounding same-sex relationships

can also contribute to feelings of internalized homophobia among people in same-sex relationships, [59] which has been shown to be detrimental to relationship quality among sexual *33 minority individuals. [60] The mental-health effects of stigma can also strain relationships. [61]

### C. Better social and legal conditions are associated with fewer adverse effects of minority stress.

Studies have used multiple approaches to study the impact of stigma and minority stress, including assessing the relationship between antidiscrimination laws and LGB health. One study found that LGB people who lived in states without laws extending protections to sexual minorities-for example, in employment or hatecrime laws-demonstrated higher levels of mental health problems compared to those living in states with laws that provide such protections. [62] *34 Similarly, another study found that denying marriage rights to same-sex couples had a negative effect on the mental health of lesbians and gay men, regardless of their relationship status. [63] A study that looked at national variations in marriage laws prior to *Obergefell* showed that a state's permitting same-sex marriage was associated with a seven-percent reduction in the proportion of high school students reporting suicide attempts. [64]

This research demonstrates the critical importance of the state's interest in combatting discrimination, providing empirical support for what this Court observed in *Roberts:* that public accommodation laws "protect[] the State's citizenry from a number of serious social and personal *35 harms" by ensuring that members of historically disadvantaged groups can participate as full members of civic society. 468 U.S. at 625.

### D. This research reflects a broad scientific consensus.

To date, hundreds of peer-reviewed research articles have used the minority-stress framework. By and large, this body of work shows that exposure to minority stress negatively affects the health and well-being of LGB people. There is no significant disagreement among social scientists and public-health experts on this point. The National Academies of Sciences, Engineering, and Medicine (NASEM), formerly the Institute of Medicine, concluded that "[t]he disparities affecting [LGBT] populations are driven by experiences of minority stress, which include both structural and interpersonal stigma, prejudice, discrimination, violence, and trauma." [65] NASEM operates under a congressional charter and provides independent, objective analysis of scientific research. Other leading public-health authorities, including the U.S. Department of Health and Human Services, have also recognized *36 stigma as a cause of health disparities between LGB and heterosexual populations. [66]

In a brief supporting the Company, a group of six academics disputes the precise mechanisms by which discrimination harms LGB health. *See* Br. of Scholars of Fam. & Sexuality as Amici Curiae in Supp. of Pet'rs 4. But these academics agree that "the proposition that anti-gay discrimination can diminish psychological and physical health is widely acknowledged." *id.* Their methodological critiques center on the difficulty of proving causation-a difficulty that attends observational studies generally, and which social scientists routinely address, including through *37 the use of diverse methods of study. [67] These difficulties do not undermine the consensus that even these six amici acknowledge-that discrimination negatively affects the health of LGB people. [68]

### *38 CONCLUSION

The scientific literature converges on one conclusion: discrimination by places of public accommodation hurts the health and well-being of LGB people. If this Court should find that the First Amendment prevents Colorado from remedying such harms, our Constitution will be made a source of stigma rather than dignity for LGB people.

The judgment of the court of appeals should be affirmed.

Respectfully submitted,

ELANA C. REDFIELD

THE WILLIAMS INSTITUTE

UCLA SCHOOL OF LAW

1060 Veteran Avenue

Suite 134

Los Angeles, CA 90095

STEPHEN B. KINNAIRD

*Counsel of Record*

TOR TARANTOLA

PAUL HASTINGS LLP

2050 M Street, N.W.

Washington, D.C. 20036

(202) 551-1700

stephenkinnaird@paulhastings.com

**Appendix not available.**

## Footnotes

1      No counsel for any party authored this brief in whole or in part, and no person or entity, other than the amici and their counsel, made any monetary contribution intended to fund the preparation or submission of this brief. Petitioners filed

|   |   |
|---|---|
| | their blanket consent to the filing of amicus briefs on March 10, 2022, and Respondents filed their blanket consent on April 11, 2022. |
| 2 | The outcome of this case will also implicate the rights of transgender people, including those in same-sex and opposite-sex relationships. Research shows that stigma and prejudice against transgender people can adversely affect their health and well-being. *See, e.g.,* Walter Bockting et al., *Adult Development and Quality of Life of Transgender and Gender Nonconforming People,* 23 Current Op. Endocrinology, Diabetes & Obesity 188, 188 (2016). But given the facts of this case, this brief focuses primarily on the effects of stigma and prejudice on LGB people. |
| 3 | *Sexual minorities* and *gender minorities* are terms social- and public-health scientists often use to refer to LGB and transgender people, respectively; LGBTrefers to lesbian, gay, bisexual, and transgender people. In this brief we refer primarily to LGB people. When referring to the community, or when making statements to refer to both sexual and gender minorities, we use the term *LGB*T. It is also important to note that LGBT people include diverse populations in terms of race and ethnicity, socioeconomic status, state and region of residence, and other characteristics and, thus, experience LGBT discrimination at the intersection of these varied characteristics. |
| 4 | The Communications Clause does prohibit businesses from advertising policies that violate CADA's Accommodations Clause. *See* Colo. Rev. Stat. § 24-34-601(2)(a). But because the advertising of unlawful commercial conduct is not protected by the First Amendment, the constitutionality of the Communications Clause stands or falls with the constitutionality of the Accommodations Clause. *See* Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Rels., 413 U.S. 376, 389 (1973). |
| 5 | *See, e.g.,* Obergefell, 576 U.S. at 681 (fundamental right to marry is guaranteed to same-sex couples by the Due Process and Equal Protection clauses of the Fourteenth Amendment); United States v. Windsor, 570 U.S. 744, 749-52 (2013) (Defense of Marriage Act violates the Due Process Clause of the Fifth Amendment); Lawrence v. Texas, 539 U.S. 558, 578 (2003) (right to intimate consensual sexual conduct is protected by the Due Process Clause of the Fourteenth Amendment); Romer v. Evans, 517 U.S. 620, 623-24 (1996) (Equal Protection Clause bars state constitutional amendment prohibiting the extension of antidiscrimination protections to LGB people). |
| 6 | *See generally* Erving Goffman, *Stigma: Notes on the Management of Spoiled Identity* (1963). |
| 7 | Jennifer Crocker et al., *Social Stigma, in 2 The Handbook of Social Psychology* 504, 505 (Daniel T. Gilbert et al. eds., 4th ed. 1998). |
| 8 | Bruce G. Link & Jo C. Phelan, *Conceptualizing Stigma,* 27 Ann. Rev. Socio. 363, 363 (2001). |
| 9 | Mark L. Hatzenbuehler et al., *Stigma as a Fundamental Cause of Population Health Inequalities,* 103 Am. J. Pub. Health 813, 813 (2013). |
| 10 | *See id.* |
| 11 | *See* John F. Dovidio et al., *Aversive Racism and Contemporary Bias, in The Cambridge Handbook of the Psychology of Prejudice* 267, 267 (Chris G. Sibley & Fiona Kate Barlow eds., 2016). |
| 12 | *See, e.g.,* Matt Lavietes, *"Groomer," "Pro-pedophile": Old Tropes Find New Life in Anti-LGBTQ Movement,* NBC News (April 12, 2022, 12:54 PM), https://www.nbcnews.com/nbc-out/out-politics-andpolicy/groomer-pedophile-old-tropes-find-new-life-antilgbtq-movement-rcna23931 [https://perma.cc/QBC9-GKDR]; Melissa Block, *Accusations of "Grooming" Are the Latest Poltical Attack-with Homophobic Origins,* NPR (May 11, 2022, 5:27 |

Case 6:21-cv-00474-AA    Document 179-6    Filed 11/15/22   Page 16 of 20

Southwick, Paul 10/31/2022
For Educational Use Only

303 CREATIVE, LLC & Lorie Smith, Petitioners, v. Aubrey..., 2022 WL 3757343...

AM), https://www.npr.org/2022/05/11/1096623939/accusations-grooming-political-attackhomophobic-origins [https://perma.cc/8BH4-844T].

13  *See* Hatzenbuehler et al., *supra* note 9, at 816-17.

14  Leonard I. Pearlin, *Stress and Mental Health, in A Handbook for the Study of Mental Health* 161, 163 (Allan V. Horwitz & Teresa L. Scheid eds., 1999). Here we use *stress* to mean the *exposure* to a stressful event or condition (in common language it also refers to the resultant *feeling* of stress). Researchers typically distinguish between stress *exposure* (e.g., a stressful event such as being victimized by violence) and the potential *outcome* of the stress, which is measured as mental or physical health (e.g., psychological *distress). See* Pearlin, *supra,* at 175.

15  *See* Blair Wheaton, *The Nature of Stressors, in A Handbook for the Study of Mental Health* 176, 177 (Allan V. Horwitz & Teresa L. Scheid eds., 1999).

16  Hans Selye, *History of the Stress Concept, in Handbook of Stress* 7, 10 (Leo Goldberger & Shlomo Breznitz eds., 2nd ed. 1993).

17  *Seeid.;* Pearlin, *supra* note 14, at 163.

18  Peggy A. Thoits, *Stress and Health,* 51 J. Health & Soc. Behav. S41, S44-45 (2010).

19  *See, e.g.,* Ilan H. Meyer, *Minority Stress and Mental Health in Gay Men,* 36 J. Health & Soc. Behav. 38, 38 (1995) [hereinafter Meyer, *Minority Stress];* Ilan H. Meyer, *Prejudice, Social Stress, and Mental Health* in *Lesbian, Gay, and Bisexual Populations,* 129 Psych. Bull. 674, 674 (2003) [hereinafter Meyer, *Prejudice]; cf.* Ilan H. Meyer et al., *Social Patterning of Stress and Coping,* 67 Soc. Sci. & Med. 368, 371 (2008) [hereinafter Meyer et al., *Social Patterning* (examining "social stress theory").

20  *See* Hatzenbuehler et al., *supra* note 9, at 813.

21  *See* Meyer et al., *Social Patterning, supra* note 19, at 376; *cf.* Gregory M. Herek, *Sexual Stigma and Sexual Prejudice in the United States, in Contemporary Perspectives on Lesbian, Gay, and Bisexual Identities* 65, 67 (Debra A. Hope ed., 2009); Gregory M. Herek, *Hate Crimes and Stigma-Related Experiences Among Sexual Minority Adults in the United States,* 24 J. Interpersonal Violence 54, 57 (2009); Meyer, *Prejudice, supra* note 19, at 676; David M. Frost & Ilan H. Meyer, *Internalized Homophobia and Relationship Quality Among Lesbians, Gay Men, and Bisexuals,* 59 J. Counseling Psych. 97, 97 (2009).

22  Meyer et al., *Social Patterning, supra* note 19, at 368.

23  Meyer, *Prejudice, supra* note 19, at 680-82.

24  David M. Frost et al., *Minority Stress and Physical Health Among Sexual* Minority *Individuals,* 38 J. Behav. Med. 1, 1 (2015) [hereinafter Frost et al., *Minority Stress and Physical Health];* Gregory M. Herek et al., *Psychological Sequelae of Hate Crime Victimization Among Lesbian, Gay, and Bisexual Adults,* 57 J. Consulting & Clinical Psych. 945, 945 (1999); Thoits, *supra* note 18, at S45.

25  Meyer, *Minority Stress, supra* note 19, at 41-42.

26  *Id.* at 42.

27  *See* Brad Sears et al., Williams Inst., *Documenting Discrimination in State Employment* 7-4 (2009) (quoting Report on Ballot Proposals of the Legislative Counsel of Colorado General Assembly, An Analysis of 1992 Ballot

Case 6:21-cv-00474-AA    Document 179-6    Filed 11/15/22    Page 17 of 20

Southwick, Paul 10/31/2022
For Educational Use Only

303 CREATIVE, LLC & Lorie Smith, Petitioners, v. Aubrey..., 2022 WL 3757343...

| | |
|---|---|
| | Proposals, Research Publ. No. 369, at 9-12 (1992)), https://williamsinstitute.law.ucla.edu/publications/lgbtdiscrim-state-employment/ [https://perma.cc/D4WS-9QFE]. |
| 28 | *See* 2007 Colo. Sess. Laws 1254 (employment); 2008 Colo. Sess. Laws 1596 (places of public accommodation). |
| 29 | Andrew R. Flores et al., *Victimization Rates and Traits of Sexual and Gender Minorities in the United States,* 6 Sci. Advances 5 (Oct. 2, 2020), https://www.science.org/doi/10.1126/sciadv.aba6910. |
| 30 | Ilan H. Meyer et al., Williams Inst., *LGBTQ People in the U.S.* 21 tbl.9 (2021). |
| 31 | *See, e.g.,* Letter from Williams Inst. Scholars to Members of the S. Comm. on the Judiciary (Mar. 22, 2021), available at https://williamsinstitute.law.ucla.edu/wpcontent/uploads/Testimony-E quality-Act- State-Governments-Mar-2021.pdf [https://perma.cc/UQF3-6PGR]; *see also* Christy Mallory et al., Williams Inst., *The Impact of Stigma and Discrimination Against LGBT People in Florida* 25-32 (2017), https://williamsinstitute.law.ucla.edu/wp-content/uploads/Impact-LGBT-Discrimination-FL-Sep-2017.pdf [https://perma.cc/Q7MA-UHRQ]; Christy Mallory et al., Williams Inst., *The Economic Impact of Stigma and Discrimination Against LGBT People in Georgia* 25-32 (2017), https://williamsinstitute.law.ucla.edu/wpcontent/uploads/Impact-LGBT-Discrimination-GA-Jan-2017.pdf [https://perma.cc/HK4Q-RN3A]; Christy Mallory et al., Williams Inst., *The Impact of Stigma and Discrimination Against LGBT People in Texas* 25-31 (2017), https://williamsinstitute.law.ucla.edu/wp-content/uploads/ Impact-LGBT-Discrimination-TX-Apr-2017.pdf [https://perma.cc/34JP-6N5B]. |
| 32 | *See, e.g.,* Letter from M.V. Lee Badgett, Professor of Econ., Univ. of Mass. Amherst, to Members of the S. Comm. on the Judiciary (Mar. 17, 2021), available at https://williamsinstitute.law.ucla.edu/wp-content/uploads/ Testimony-E quality-Act-LGBT-Employment-Mar-2021.pdf [https://perma.cc/Z4PH-FWV5] (discussing employment discrimination experienced by LGB and transgender people). |
| 33 | *See, e.g.,* Diane K. Levy et al., Urban Inst., *A Paired-Tested Pilot Study of Housing Discrimination Against Same-Sex Couples and Transgender Individuals* xiii (2017), https://www.urban.org/sites/default/files/publication/91486/2017.06.27_hds_lgt_final_report_report_finalized_0.pdf [https://perma.cc/7YML-GNDP]; Adam P. Romero et al., Williams Inst., *LGBT People and Housing Affordabiity, Discrimination, and Homelessness* 4 (2020); Christy Mallory & Brad Sears, Williams Inst., *Evidence of Housing Discrimination Based on Sexual Orientation and Gender Identity1* (2016), https://williamsinstitute.law.ucla.edu/wp-content/uploads/LGBT-Housing-Discrimination-US-Feb-2016.pdf [https://perma.cc/69X5-S4GJ]. <br><br> LGBT people are also more likely to rent their homes and thus have less stable housing. SeeBianca D.M. Wilson et al., Williams Inst., *LGBT Renters and Eviction Risk* 2 (2021), https://williamsinstitute.law.ucla.edu/wp-content/uploads/LGBT-Eviction-Risk-Aug-2021.pdf [https://perma.cc/55JS-X7TF]. |
| 34 | *See, e.g.,* Joseph G. Kosciw et al., GLSEN, *The 2015 National School Climate Survey* xvi-xvii (2016), https://www.glsen.org/sites/default/files/2020-01/GLSEN2015NationalSchoolClimate% 20Survey–NSCS˙-FullReport.pdf [https://perma.cc/PV7V-8F87]; Joshua R. Wolff et al., *Sexual Minority Students in Non-Affirming Religious Higher Education,* 3 Psych. Sexual Orientation & Gender Diversity 201, 201 (2016). |
| 35 | *See* Lamda Legal, *When Health Care Isn't Caring* 5- 6 (2010), https://www.lambdalegal.org/sites/default/files/publications/downloads/whcic-report_when-health-care-isnt-caring.pdf [https://perma.cc/R39K-D6PS]. |
| 36 | SeeHua Sun & Lei Gao, *Lending Practices to Same-SexBorrowers,* 116 PNAS 9293, 9293 (2019). |

Case 6:21-cv-00474-AA   Document 179-6   Filed 11/15/22   Page 18 of 20
Southwick, Paul 10/31/2022
For Educational Use Only

303 CREATIVE, LLC & Lorie Smith, Petitioners, v. Aubrey..., 2022 WL 3757343...

37  *See, e.g.,* Kerith J. Conron & Bianca D.M. Wilson, Williams Inst., *LGBT Youth of Color Impacted by the Child Welfare and Juvenile Justice Systems* 4-5 (2019), https://wiliamsinstitute.law.ucla.edu/wp-content/uploads/LGBTQ-YOC-Social-Services-Jul-2019.pdf [https://perma.cc/VMC8-CCUG].

38  *See, e.g.,* Letter from Todd Brower, Jud. Educ. Dir., Williams Inst., to Members of the S. Comm. on the Judiciary (Mar. 17, 2021), available at https://williamsinstitute.law.ucla.edu/wp-content/uploads/Testimony-E quality-Act-Judicial-System-Mar-2021.pdf [https://perma.cc/WS7V-X5G4].

39  *See* Christy Mallory & Brad Sears, Williams Inst., *Evidence of Discrimination in Public Accommodations Based on Sexual Orientation and Gender Identity* 1 (2016) [hereinafter Mallory & Sears, *Public Accommodations*], https://williamsinstitute.law.ucla.edu/wp-content/uploads/LGBT-Public-Accomm-Discrimination-Feb-2016.pdf [https://perma.cc/ZTX8-WV7M]; Lindsay Mahowald et al., Ctr. for Am. Progress, *The State of the LGBTQ Community in 2020,* at 4 (2020), https://www.americanprogress.org/wp-content/uploads/2020/10/LGBTQpoll-report.pdf [https://perma.cc/ME47-3XEC].

40  Brad Sears et al., Williams Inst., *LGBT People's' Experiences of Workplace Discrimination and Harassment* 32 tbl.2 (2021), https://williamsinstitute.law.ucla.edu/wpcontent/uploads/Workplace-Discrimination-Sep-2021.pdf [https://perma.cc/VH4G-NC8J].

41  *Id.* at 1.

42  *See* M.V. Lee Badgett et al., *LGBTQ Economics,* 35 J. Econ. Persps. 141, 159 (2021).

43  *Id.*

44  Christy Mallory & Brad Sears, Williams Inst., *Evidence of Employment Discrimination Based on Sexual Orientation and Gender Identity* 1 (2015), https://williamsinstitute.law.ucla.edu/wp-content/uploads/LGBT-Employment-Discrimination-US-Oct-2015.pdf [https://perma.cc/9PV9-B2N9].

45  Meyer et al., *LGBTQ People in the US, supra* note 30, at 21 tbl.9.

46  Mahowald et al., *supra* note 39, at 4.

47  Mallory & Sears, *Public Accommodations, supra* note 39, at 1.

48  *See id.* at 4.

49  Comparisons of LGB and heterosexual people throughout our analysis assume everything else being equal in terms of other sources of potential discrimination, such as minority racial/ethnic identity. Of course, other forms of discrimination would similarly apply to LGB people and heterosexuals. Thus, racial discrimination would apply equally to Black heterosexual and LGB people, but only the LGB people would experience the additional anti-LGB discrimination.

50  Hatzenbuehler et al., *supra* note 9, at 813.

51  *Id.*

52  *Id.* at 814.

53  *Id.* at 815.

Case 6:21-cv-00474-AA   Document 179-6   Filed 11/15/22   Page 19 of 20

Southwick, Paul 10/31/2022
For Educational Use Only

303 CREATIVE, LLC & Lorie Smith, Petitioners, v. Aubrey..., 2022 WL 3757343...

54   *See* Vickie M. Mays & Susan D. Cochran, *Mental Health Correlates of Perceived Discrimination Among Lesbian, Gay, andBisexualAdults in the UnitedStates,* 91 Am. J. Pub. Health 1869, 1869, 1871 tbl.1 (2001); Gregory M. Herek & Linda D. Garnets, *Sexual Orientation and Mental Health,* Ann. Rev. Clinical Psych. 353, 359-60 (2007); Michael King et al., *A Systematic Review of Mental Disorder, Suicide, and Deliberate Self Harm in Lesbian, Gay and Bisexual People,* 70 BMC Psychiatry 1 (Aug. 18, 2008), https://bmcpsychiatry.biomedcentral.com/track/pdf/10.1186/1471-244X-8-70.pdf [https://perma.cc/K5M3-2BBZ]; Meyer, *Prejudice, supra* note 19, at 679-80; Susan D. Cochran & Vickie M. Mays, *Sexual Orientation and Mental Health, in Handbook of Psychology and Sexual Orientation* 204, 208-09 (Charlotte J. Patterson & Anthony R. D'Augelli eds., 2013).

55   Frost et al., *Minority Stress and Physical Health, supra* note 24, at 1.

56   *See* David M. Frost, *Similarities and Differences* in *the Pursuit of Intimacy Among Sexual Minority and Heterosexual Individuals,* 67 J. Soc. Issues 282, 294 (2011).

57   *See* Hongjian Cao et al., *Sexual Minority Stress and Same-Sex Relationship Well-Being,* 79 J. Marriage & Fam. 1258, 1258 (2017); David Matthew Doyle & Lisa Molix, *Social Stigma and Sexual Minorities' Romantic Relationship Functioning,* 41 Personality & Soc. Psych. Bull. 1363, 1363 (2015); Sharon Scales Rostosky & Ellen D.B. Riggle, *Same-Sex Relationships and Minority Stress,* 13 Current Op. Psych. 29, 29 (2017); David M. Frost & Allen J. LeBlanc, *Stress in the Lives of Same-Sex Couples, in LGBTQ Divorce and Relationship Dissolution* 70, 72-73 (Abbie E. Goldberg & Adam P. Romero eds., 2018); David M. Frost et al., *Social Change and Relationship Quality Among Sexual Minority Individuals,* 84 J. Marriage & Fam. 920, 920 (2022).

58   *See* David M. Frost et al., *Couple-Level Minority Stress,* 58 J. Health & Soc. Behav. 455, 456 (2017); Meyer, *Prejudice, supra* note 19, at 678.

59   *See* Allen J. LeBlanc & David M. Frost, *Couple-Level Minority Stress and Mental Health Among People in Same-Sex Relationships,* 10 Soc'y & Mental Health 276, 277 (2020).

60   *See* Kimberly F. Balsam & Dawn M. Szymanski, *Relationship Quality and Domestic Violence in Women's Same-Sex Relationships,* 29 Psych. Women Q. 258, 258 (2005); Katie M. Edwards & Kateryna M. Sylaska, *The Perpetration of Intimate Partner Violence Among LGBTQ College Youth,* 42 J. Youth & Adolescence 1721, 1721 (2013).

61   *Cf.* LeBlanc & Frost, *supra* note 59, at 287; Allen J. LeBlanc et al., *Minority Stress and Stress Proliferation Among Same-Sex and Other Marginalized Couples,* 77 J. Marriage & Fam. 40, 40 (2015).

62   *See* Mark L. Hatzenbuehler et al., *State-Level Policies and Psychiatric Morbidity in Lesbian, Gay, and Bisexual Populations* 99 Am. J. Pub. Health 2275, 2275 (2009).

63   *See* Ellen D.B. Riggle et al., *Psychological Distress, Well-Being, and Legal Recognition* in *Same-Sex Couple Relationships,* 24 J. Fam. Psych. 82, 82 (2010); *see also* Sharon Scales Rostosky et al., *Marriage Amendments and Psychological Distress* in *Lesbian, Gay, and Bisexual (LGB)Adults,* 56 J. Counseling Psych. 56, 56 (2009); Mark L. Hatzenbuehler et al., *The Impact of Institutional Discrimination on Psychiatric Disorders* in *Lesbian, Gay, andBisexual Populations,* 100 Am. J. Pub. Health 452, 452 (2010).

64   Julia Raifman et al., *Difference-in-Differences Analysis of the Association Between State Same-Sex Marriage Policies and Adolescent Suicide Attempts,* 171 JAMA Pediatrics 350, 350 (2017).

65   Nat'l Acads. of Scis., Eng'g, & Med., *Understanding the Well-Being of LGBTQI*Populations* 8 (2020) (citation omitted); *see also* Inst. of Med., *The Health of Lesbian, Gay, Bisexual, and Transgender People* 7 (2011).

| | |
|---|---|
| 66 | *See* Off. of Disease Prevention & Health Promotion, U.S. Dep't of Health & Hum. Servs., *Healthy People 2020: Lesbian, Gay, Bisexual, and Transgender Health,* https://www.healthypeople.gov/2020/topics-objectives/topic/lesbian-gay-bisexual-and-transgender-health [https://perma.cc/YL6N-TLFF] (last visited Aug. 18, 2022); Off. of Disease Prevention & Health Promotion, U.S. Dep't of Health & Hum. Servs., *Healthy People 2030: Discrimination,* https://health.gov/healthypeople/priorityareas/social-determinants-health/literature-summaries/discrimination [https://perma.cc/B3YG-75SR] (last visited Aug. 18, 2022) (describing "[d]iscrimination as a social determinant of health"). |
| 67 | *Cf. Ronald T. Campbell & Donald W. Fiske, Convergent and Discriminant Validation by the Multitrait-Multimethod Matrix,* 56 Psych. Bull. 81, 81 (1959). |
| 68 | Their brief also misinterprets one study of racial discrimination, asserting that "less than half of one percent of reported discrimination was due to sexual orientation, even among LGB respondents." Br. 9 (footnote omitted) (citing Brian B. Boutwell et al., *The Prevalence of Discrimination Across Racial Groups in Contemporary America,* 12 PLoS ONE 5 (Aug. 24, 2017), https://journals.plos.org/plosone/article/file?id= 10.1371/journal.pone.0183356&type=printable [https://perma.cc/Y4HB-QTV6]). But the analyses in that study "were limited to racial differentiation," and "if [the] analyses were conducted based on sex or sexual orientation, the results may differ." Boutwell et al., *supra,* at 7. Their brief also questions whether the Company's planned acts of discrimination would, on their own, affect an LGB person's health. *See* Br. 5. This is difficult to evaluate in this case's hypothetical posture. But regardless of whether any single instance of discrimination triggers a health problem for a particular customer, the stigma and burdens of a segregated market-which a rulingfor the Company would require-contribute broadly to health inequalities. *See supra pp.* 27-31. |

---

**End of Document**                                                   © 2022 Thomson Reuters. No claim to original U.S. Government Works.