August 25, 2022

*VIA COMMENT PORTAL*

Alejandro Reyes, Program Legal Director
Office of the Assistant Secretary for Civil Rights
U.S. Department of Education
400 Maryland Avenue, SW
Washington, DC 20202-0001

**Re:    Comment on the Enforcement of Title IX of the Educational Amendments of 1972, Respectfully Submitted by Interfaith Alliance Foundation**

To Mr. Reyes:

Interfaith Alliance Foundation provides the following comments on the proposed amendment of the regulations implementing Title IX of the Education Amendments of 1972 ("Title IX"), pursuant to the proposed rule "Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance," published in the Federal Register on July 12, 2022, at 87 Fed. Reg. 41390.

Interfaith Alliance Foundation ("IAF") is a national policy and advocacy organization committed to advancing true religious freedom for all Americans. The only national interfaith organization dedicated to protecting the integrity of both religion and democracy, IAF's membership is made up of individuals rather than institutions, in all 50 states and serving overseas in the U.S. military, and adhering to more than 75 faith traditions and belief systems.

 While the notion of religious freedom has been used – and misused – by various groups over the course of our history, IAF's work remains true to the foundational promise of the U.S. Constitution: that every American has the right to believe as we choose, with the secure knowledge that our government will not play favorites or favor religion over non-religion. IAF champions an inclusive vision of religious freedom, where all are free to embrace matters of personal conscience without fear of government intrusion or discrimination.

Our schools and universities are entrusted with the wellbeing of students from diverse backgrounds and experiences. The protections offered by Title IX are essential for creating safer, more equitable environments for women and LGBTQ+ students by ensuring schools are proactive in combating sexual harassment and sex discrimination.

We commend the Department of Education for expanding definitions to better address discrimination based on sex stereotypes and pregnancy, and urge the Department to provide training procedures and clear guidelines to allow Title IX recipients to address sex discrimination

Exhibit J

and support students. We also urge the Department to ensure religious exemptions are appropriately implemented by outlining consistent and transparent guidelines, thereby protecting the right of all students to have equal access to education by strengthening Title IX protections.

## I. Expanded Definitions Better Address Discrimination Based on Sex Stereotypes and Pregnancy

By clarifying that "sex discrimination" encompasses discrimination on the basis of sex stereotypes, sexual orientation, and gender identity, the proposed rule equips educational institutions to support students of all backgrounds and beliefs. It is essential that schools that receive federal financial assistance have clear guidelines to follow when assessing cases of discrimination. The expanded definitions in the proposed regulations are a positive step towards ensuring all instances of discrimination based on sex stereotypes and pregnancy are taken seriously.

LGBTQ+ students have been insufficiently protected under Title IX, as many schools fail to adequately respond to cases of harassment, violence, unequal discipline, and discrimination.[1] Insufficient Title IX protections for LGBTQ+ individuals prevent those students from receiving equal access to education by allowing discriminatory practices and policies to remain in place, leaving students with few ways to remedy instances of harassment and discrimination. We commend the Department for offering distinctions, such as acknowledging the hostile environment created when students are ostracized by others for failing to conform to traditional gender stereotypes,[2] that extend necessary protections to LGBTQ+ students and provide processes to report and remedy harassment. Similarly, clarifying sex discrimination as it relates to pregnancy to include current, past, and potential related conditions more comprehensively meets the needs of students.

Ensuring LGBTQ+ students and those with the ability to become pregnant are protected is essential to the promise of religious freedom; any institution that received public funding must use that funding to ensure all students are supported, not just some. The expanded definitions not only better define the type of discrimination students face, but will also better protect each student's right to equal access to education by providing schools with guidance to deal with discrimination cases.

## II. Schools Must Provide Prompt and Meaningful Support to Students and Employees Affected by Sex-Based Discrimination or Harassment

Title IX facilitates equal access to education for all students, regardless of sex. That mandate includes ensuring that all students feel safe and supported. The Department acknowledged this necessity by requiring recipients to train employees in the school's obligation to support students

---

[1] Kosciw et al., The 2019 National School Climate Survey, 35 (2020)
[2] Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 87 Fed. Reg. 41390 28 (proposed Jul. 12, 2022) (to be codified at 34 C.F.R pt.106)

2

Exhibit J

who are pregnant or with pregnancy-related conditions,[3] but more can and should be done. We respectfully ask the Department to outline training procedures for school employees to create standards that would best help students through all forms of sex-based discrimination or harassment.

The Department also acknowledged that current guidelines do not adequately outline the breadth of recipients' responsibilities to students. Guidance should clarify recipient responsibility to support students dealing with pregnancy or related conditions and extend their duty beyond medical and hospital benefits to day-to-day and academic accommodations.[4]

While the Department's proposed rule posits a requirement to take prompt and effective action against sex discrimination, it fails to clarify how that standard should be met. Religious freedom and non-discrimination are rooted in the same values: equality, justice, and the right to self-determination. Expanding definitions of sex-based discrimination or harassment is a first step in realizing our inclusive vision of religious freedom; the Department must also provide clear guidelines to hold schools accountable to procedure.

### III.     Religious Exemptions to Title IX Should Be Consistent and Transparent

As an organization committed to protecting religious freedom, we recognize that some educational institutions may face a conflict between religious doctrine and the Department's interpretation of Title IX. Religious exemptions to Title IX have an important role in ensuring that religious institutions can operate in a manner consistent with their religious beliefs. Transparency and consistent application, however, are necessary to communicate institutional procedures and expectations to members of their community and the public.

Prior notice of Title IX exemptions allows students to make informed choices about their education and safety. Without it, students will not know whether they may be treated differently than their peers because of their sexual orientation, their gender identity, their reproductive history, or their personal beliefs. Appropriate implementation of religious exemptions also protects schools, who would otherwise be unclear as to what actions would put them at risk for legal challenges or complaints. However, the proposed rule provides little further guidance to institutions and students beyond the acknowledgement that religious exemptions are allowed under Title IX.[5] We urge the Department to clarify this process for institutions seeking religious exemptions to allow them to act in accordance with their beliefs and to ensure students are supported through cases of discrimination.

As a matter of religious freedom, religiously affiliated universities are able to operate in a manner consistent with their religious doctrine. But students should be afforded the same ability to make education decisions based on their own personal beliefs. We urge the Department to

---

[3] Fed. Reg. 41390 *supra* note 2, at 124
[4] Fed. Reg. 41390 *supra* note 2, at 134
[5] Fed. Reg. 41390 *supra* note 2, at 139

Exhibit J

clarify religious exemptions and exercise transparency to ensure all personal beliefs are protected.

## IV.    Conclusion

As a national organization committed to advancing true religion freedom for all Americans, Interfaith Alliance Foundation applauds the Department's restoration of Title IX protections for student survivors of sexual harassment and violence and expansion of protections for LGBTQ+ students. We urge the Department of Education to ensure religious exemptions are appropriately implemented by outlining consistent and transparent guidelines, thereby protecting the right of all students to have equal access to education by strengthening Title IX protections. We also call on the Department to clearly define schools' responsibilities to students who are pregnant or with pregnancy-related conditions and establish training procedures to best-equip employees to support students through cases of discrimination.

Students seeking higher education are often away from home for the first time. They are encountering new people, having new experiences, and discovering their own identity. Schools should nurture students throughout this process and ensure that community members of all beliefs, experiences, and identities can thrive. Through the proposed rule and further guidance, the Biden administration can continue to rightfully use Title IX as a powerful tool to ensure all students are treated with dignity and respect.

Exhibit J

*Submitted via* www.regulations.gov

*Dr. Miguel Cardona*           *Catherine E. Lhamon*
*Secretary of Education*        *Assistant Secretary for Civil Rights*
*U.S. Department of Education U.S. Department of Education*
*400 Maryland Ave. SW*          *400 Maryland Ave. SW*
*Washington, DC 20202*          *Washington, DC 20202*

**Re:  Docket ID ED-2021-OCR-0166,  RIN1870-AA16 Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance**

**COMMENTS TO THE DEPARTMENT OF EDUCATION
NOTICE OF PROPOSED RULE MAKING TO AMEND THE REGULATIONS
IMPLEMENTING TITLE IX OF THE EDUCATION AMENDMENTS OF 1972
CFR PART 106**

Dear Secretary Cardona and Assistant secretary Lhamon:

I submit these comments on behalf of myself as a former Acting Assistant Secretary for Civil Rights (1992-93 and 2000-01) and also the Deputy Assistant Secretary in the Department of Education's (ED) Office of Elementary and Secondary Education from 2002-2007.  I support the Notice of Proposed Rule Making (NPRM) and the overturning and clarification of components established by the former administration's 2020 sexual harassment regulation. The following are comments on specific legal matters that the NPRM addresses, changes or clarifies.

**TITLE IX JURISDICTION**
Restoring the standards and broad mandate established by previous administrations by clarifying that Title IX covers harassment that occurs "off-campus" including at off-campus housing, a fraternity or sorority event, harassment or stalking on line, and studies abroad as long as the harassment denies the ability to participate in or benefit from the education program or activity.  This is a long awaited and much needed clarification.

**DEFINITION OF SEX-BASED HARASSMENT**
Clarifying that a "hostile environment" is shown when it is proven "sufficiently severe or pervasive" both "objectively" and "subjectively" considering frequency of contact when

3

the hostile environment denies or limits a person's ability to participate in or benefit from the education program or activity or have access to the learning environment. Also a much needed and appreciated clarification.

## STANDING to FILE a COMPLAINT

Establishing that a former student or a former employee or a visitor, or prospective student may file a Title IX complaint so long as the harassment  or discrimination was experienced while the survivor was participating or attempting to participate in the federal fund recipient's program or activity is a needed clarification.

## TITLE IX COORDINATORS

Adding effectiveness to the Title IX Coordinator position with the option of assigning one or more designees to carry out some of the recipient's responsibilities, as long as one Title IX coordinator retains ultimate oversight over those responsibilities (§106.8(a)(1)(2)) is an effective addition to the regulation. In the elementary and secondary school settings, a school district could designate a Title IX Coordinator and authorize that person to appoint or oversee building-level coordinators for each school building within the district. This proposal provides a way for the Title IX Coordinator to identify trends within the recipient, coordinate training programs responsive to those trends and to efficiently monitor barriers to address those barriers consistent with proposed §106.44(b).  These changes indicate the need to reissue TIX Coordinator Guidance to clarify responsibilities reflecting the final Title IX regulations after a full review and consideration of the NPRM comments and changes to 34 CFR §106.34.

While I support the majority of the proposals in the NPRM, following are subject areas with which I have suggestions and concerns.

## ACTUAL KNOWLEDGE

The standard for a recipient to have "actual knowledge" and respond to a complaint requires that a sexual harassment complaint be reported to a Title IX coordinator or official with the authority to institute corrective measures.  The list of recipient employees who are not confidential employees and are required to notify the Title IX Coordinator when the employee has information about conduct that may constitute Title IX discrimination is too limiting. In the elementary or secondary context the list should include school bus drivers, street guides, entrance monitors, maintenance workers and other support staff.   In the college and university context identification of employees with this responsibility should include residence assistants, science lab monitors, tech lab monitors, athletic and workout facility workers.  These employees also should receive

Exhibit J

training to be informed of their responsibilities to report conduct that may constitute sex discrimination to the Title IX Coordinator.  See Fed Reg 41572-41573; 34 CFR §106.44.

**FLEXIBILITY**

I support the flexibility provided in the NPRM to choose and tailor effective and fair procedures to address complaints of sex discrimination and other forms of discrimination (such as race, disability, age, etc.) that are consistent with the institution's education environment. The complaint procedure options allow institutions of higher education investigating sex-based harassment involving one or more students to have parties meet separately in individual meetings with a decision maker or to hold a live hearing with a decision maker and answer questions including those submitted by the other party. In all processes all parties would be provided with the right to prepare and to review all relevant information and have the right to due process.  My concern is with the option to hold a live hearing which should be limited as this requirement under the 2020 regulation has been shown to inhibit complaints of sexual harassment and violence being filed and investigated. I have spoken to representatives of Universities who have expressed concern that courtroom-like processes are not necessarily conducive to an educational environment and should be used in special cases.

I have similar concerns with the proposal to permit an educational institution to keep and maintain policies and procedures adopted in reliance on the 2020 regulation requirements as long as they meet current Title IX requirements. However, this flexibility should be viewed carefully for the chilling effect that has been noted on the willingness for survivors to file a complaint when institutions implemented the 2020 sexual harassment guidance. For both of these matters (investigative processes and maintaining 2020 guidance policies) I suggest requiring the recipient to review the Clery data information pre- and post- the 2020 regulations as a self-evaluation component for those wishing to maintain 2020 regulation procedural requirements.

**RELIGIOUS EXEMPTIONS**

The NPRM does not address Title IX's religious exemption which under the 2020 regulation was inappropriately expanded.  First, although the Title IX statute only allows religious exemptions for schools that are "controlled by a religious organization" (20 U.S.C. §1681(a)( 3)).  Current §106.12© allows schools that are not actually controlled by a religious organization to claim a religious exemption from Title IX if, for example, they are a divinity school, they require students to follow certain religious practices, or their mission statement refers to religious beliefs.  Second, there is a need to correct and clarify the process for a

3

recipient to claim a religious exemption. The current controlling 2020 regulation provides that a recipient may claim a religious exemption with no prior notification as a defense to a complaint even after they are under a Title IX investigation. The Title IX statute recognizes a school controlled by a religious organization and governed by religious tenets may be unable to comply with certain Title IX requirements (20 USC §1681).  Under the 1975 regulation (34 CFR §106.12(a) and OCR policy memoranda (Singleton 1985 and Smith 1989) a procedure was established requiring a religiously controlled educational institution seeking a religious exemption to notify ED/OCR of their specific religious tenant that prohibits their following a specific Title IX requirement. Upon receipt of the request OCR would review and respond to the religious institution.  When there is agreement and typically there was, OCR would notify the religiously controlled institution that they have a religious exemption from a specific Title IX requirement.  This policy provided a way for a religiously controlled educational institution and OCR to have an agreement that can be readily understood and known by applicants for admission and employment, students, employees, unions and professional organizations. Reestablishing the former religious exemption policy avoids factual inaccuracy to the Notice of Nondiscrimination that all recipients including religiously controlled recipient educational institutions are required to post and file (34 CFR §106.8.)

**COORDINATION with OTHER ED PROGRAMS**
 I support the proposed inclusion in 34 CFR §106.2 of the definition of "sex-based harassment" and "sexual assault" in the Clery Act, and "dating violence" and "stalking" in the Violence Against Women Act 2022 instead of merely cross-references to the applicable provisions of the respective Acts. In addition I suggest establishing a formal coordination in ED of Title IX with these other departmental programs with similar and overlapping purposes including but not limited to the VAWA 2022, the Clery Act and the Safe Schools Improvement Act. Establishing a coordinating body would provide a much-needed consistency of policies for these important overlapping programs and lead to a more efficient and robust implementation of these programs.  Many of these programs have data reporting requirements from educational institutions regarding violence and unsafe activities and sharing these data maintained by each of the programs would add to more efficient enforcement.

**LGBTQI ISSUES and ATHLETICS**
Additional regulatory and policy guidance are needed in these two areas of Title IX enforcement.  OCR provided in a 1997 Sexual Harassment Guidance and

3

reinforced in 2001 that Title IX covered harassment of a sexual nature directed at gay or lesbian students. OCR also issued guidance in 2016 specifically protecting transgender students from discrimination.  The previous administration rescinded that coverage in 2020.  In response OCR clarified in a Notice of Interpretation 86 FR 32637 (6/22/2021) that Title IX's prohibition on sex discrimination encompasses discrimination on the basis of sexual orientation and gender identity consistent with the Supreme Court's reasoning in **Bostock v.** Clayton County. The reinstatement of this Title IX coverage needs to be supplemented with guidance on issues that continue to be raised in court cases and civil rights complaints.

With respect to athletics participation and Title IX requirements, I note the trans athletes issue has received considerable attention.  State Laws have been passed limiting or prohibiting participation in the women's and girl's athletics program raising the possibility of a Title IX violation. The issue of trans athletes participation especially requires further research and thoughtful discussion in order to provide Title IX guidance on this controversial issue.  I suggest initially identifying the scope and actual numbers of trans athletes, holding listening sessions and looking into how athletic organizations have developed accommodations for trans athletes.  These actions and research will lead to a better understanding of this complex participation issue and can inform OCR guidance.

I would be happy to meet with representatives of the Department to discuss my concerns and suggestions for further action.

Again thank you for the opportunity to comment on the NPRM.

Jeanette Lim Esbrook
Phone:  (H) 703-548-6498  © 202-664-0558
Email: jeanette.esbrook@comcast.net

3

**Clearinghouse on Women's Issues Comments to The Department of Education Notice of Proposed Rule Making to Amend the Regulations Implementing Title IX of The Education Amendments Of 1972**
**34 Cfr Part 106 Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance**
**Docket ID ED-2021-OCR-0166    RIN1870-AA16**

The Clearinghouse on Women's Issues (CWI) submits these comments. CWI, a national nonprofit organization, was established in 1974 to improve the status of women and girls nationally and internationally. We address economic, social, political, and legal issues facing women and girls.  CWI works to eliminate discrimination including sex, age, ethnicity, LGBTQIA or marital status. We are CWI's Co-Presidents and both of us have extensive experience in education equity.

**HIGHLIGHTING THE IMPROVEMENTS IN PROPOSED TITLE IX RULES/REGULATIONS**

These improvements include:
- **Broadening coverage to include all forms of sex discrimination, not just sexual harassment and sexual assault which was emphasized in the 2020 Rules.**

We approve specifying that rights and responsibilities and subsequent implementation procedures for Title IX apply to all forms of sex discrimination not just to sexual harassment and assault which were the primary focus of the 2020 regulations, especially the grievance procedures. One example is the difference between the previous and the new definition of respondent. (Section 106.2, page 41420 column 1). The previous definition for respondent was a perpetrator of conduct that could constitute **sexual harassment**. The proposed definition is an individual who is alleged to have violated the recipients' **prohibition on sex discrimination.** Similarly, grievance procedures should apply to all complaints of sex discrimination including sex-based harassment. (Section 106.45 (b), page 41461.)

- **Eliminating sections of the 1975 Title IX Rules which are outdated because of previously specified end dates.**

These self-evaluation procedures (Section 106.3 (c) and (d). and transition plans from a single sex institution to coed institutions (Section 106.16 and 106.17) expired in 1979. However, similar provisions for self-evaluation and transition to coed institutions are still important options for future Title IX Rules or guidance documents.

- **Eliminating provisions of the 2020 Title IX Rules which inappropriately limit protections for sex discrimination especially related to sexual harassment and assault.**

The details of these improvements are well documented by others and will not be covered in these CWI comments. CWI has signed on to multi organizational comments led by the National Women's Law Center and the Leadership Conference on Civil and

1

Exhibit J

Human Rights which correct the many weakening provisions in the DeVos 2020 Title IX regulations.

- **Adding more specific instructions on protections against pregnancy and parental status related discrimination, LBGTQI+ discrimination, and sex stereotyping.**
  CWI supports adding details on these important issues which weren't covered in the previous Title IX regulations.

### NEEDED IMPROVEMENTS IN THE 2022 PROPOSED TITLE IX RULES ON THE APPOINTMENT OF TITLE IX COORDINATORS

In attempting to provide some detailed guidance on the appointment of Title IX Coordinators, the 2022 proposed Rule probably unintentionally weakened the previous Title IX Rules by adding an exception to the requirement that each recipient, especially local elementary and secondary schools, employ at least one Title IX Coordinator.

Parts of page 41424 of the proposed Rules in the July 12, 2022, Federal Register about designation of a Title IX Coordinator are quoted in italics:

*Current longstanding regulations: Section 106.8(a) requires each recipient to designate at least one employee as the Title IX Coordinator to coordinate its efforts to comply with Title IX's statutory and regulatory requirements.*

The proposed 2022 Rule has two parts. *"Title IX Coordinator"* 106.8(a)(1) page 41424 *a recipient must designate and authorize at least one employee as the "Title IX Coordinator", to coordinate its efforts to comply with the recipient's responsibilities under the Department's Title IX regulations.* [The same as before and is fine with CWI.]

However, there is a problem with the interpretation of the new Section 106.8(a)(2) under "*Delegation to designees*". It proposes *that the (*school district*) Title IX Coordinator may assign one or more designees to carry out some of the recipient's responsibilities, but that one Title IX Coordinator must retain ultimate oversight over those responsibilities.* We agree with ED's reason that the assignment of designees/helpers is an effective way for a recipient that enrolls large numbers of students, employs large numbers of employees, provides services in multiple location, or engages in a large variety of activities to carry out the various Title IX responsibilities. However, the example (on the 3rd column of p.41424) that *For example, in the elementary school and secondary school setting, a school district could designate the Title IX Coordinator and authorize that person to appoint or oversee building-level coordinators for each school building within the district.* **needs to be changed to ensure that each school must have its own Title IX Coordinator whose contact information is listed as specified in (Section 106.8(c)(1).**

**We understand and support that Title IX Coordinators can have designees to help them with certain Title IX responsibilities. But each recipient should still comply**

**with 106.8(a)(1) and have their own school level Title IX Coordinator.The school district Title IX Coordinator could still provide leadership, training and coordination to the individual P-12 school level Title IX Coordinators.**

This proposed weakening of the appointment of a least one Title IX Coordinator in each recipient responsible for implementing Title IX can be fixed by:

- Eliminating the proposed change in the appointment of Title IX Coordinators and keeping 106.8(a)
  OR
- Retaining the proposed changes106.8(a)(1) and 106.8(a)(2), but changing 106.8 (a)(2) to read:
  *the Title IX Coordinator may assign one or more designees to carry out some of the recipient's responsibilities, but that* ~~one~~ **the recipient's** *Title IX Coordinator must retain ultimate oversight over those responsibilities.*

  (The **Title IX Coordinator** refers to the implementing school's Title IX Coordinator. The **recipient** refers to the individual P-12 school or other institution implementing Title IX.)

**Additionally, eliminate the sentences in the top of the third column p. 41424 starting with** *For example, in the elementary school and secondary school setting, a school district could designate the Title IX Coordinator and authorize that person to appoint or oversee building-level coordinators for each school building within the district. These building-level coordinators could carry out some of the Title IX Coordinator's duties, such as providing training or ensuring that grievance procedures are administered correctly in that school building. ..........TO Similarly, a Title IX Coordinator could have designees that oversee compliance with different aspects of the recipient's Title IX.............*

**Revisions of these sections on the appointment of Title IX Coordinators should make it clear that each and all recipients (including sub-recipients such as local schools) should designate their own official Title IX Coordinator to ensure the full implementation of Title IX in their school or other organization.**

Also, ED needs to reissue Title IX Coordinator guidance since the previous 2015 guidance was rescinded in 2020. That guidance can clarify that recipients do not need to employ Coordinators with full-time Title IX Coordinator responsibilities and that they can assign current staff, Title IX Coordinator responsibilities.

<u>**Justifications for making sure that recipients responsible for implementing Title IX employ their own Title IX Coordinator(s) including in individual schools at the P-12 level**</u>.

1. **Past poor implementation of the requirement to have a trained Title IX Coordinator in each recipient organization is no reason to weaken the requirement for some Title IX Coordinators.**

Exhibit J

It is true that over the past 50 years, despite the consistent requirement in the Title IX Regulation, there have been inadequate appointments of Title IX Coordinators at all levels ranging from state education agencies to school districts to local elementary and secondary schools. Research by the Feminist Majority Foundation, the American Association of University Women and the recent report, Title IX at 50, A Report by the National Coalition of Women and Girls in Education, June 2022 (p. 54) have advocated that Title IX implementation would be strengthened if the actual number of well-trained Title IX Coordinators was expanded to all relevant recipient institutions charged with implementing Title IX such as the 98,000 P-12 public schools. Unfortunately, the proposed rule 106.8(a)(2), would exempt some P-12 schools from appointing their own Title IX Coordinator by allowing the school district to instead designate persons who could assume some, but not all Title IX Coordinator responsibilities in these local schools. This would allow the school district Title IX Coordinator to have final authority in these local P-12 schools which would not have their own Title IX Coordinator.

Based on ED estimates there are around 98,000 public P-12 schools. This should establish 98,000 Title IX Coordinators who should receive training in implementing the Title IX Rule. Some recent court rulings have also suggested that private P-12 schools that are tax exempt are also supposed to implement Title IX. This would add another 20,000 schools to the 98,000 public P-12 schools, 17,000 public school districts, 50+ state education agencies, and 7,000 postsecondary institutions, and easily total over 100,000 required Title IX Coordinators.

If Section 106.8(a)(2) is retained, without other effective interventions and more resources, it is unlikely that many of the 17,000 school district Title IX Coordinators would be appointed and trained themselves, or that they would designate school level Title IX Coordinators and provide all 98,000 schools with adequate designees, oversight, and training to prevent and address sex discrimination in education.

2. **Past and proposed Title IX Regulations have given many responsibilities to Title IX Coordinators as they interact with their school's, students, staff, and community members.**

The example given to have School District Title IX Coordinators appoint P-12 school level designees/helpers instead of at least one Title IX Coordinator for each school/recipient is flawed. Each school needs their own official Title IX Coordinator to properly comply with all the responsibilities outlined in the Title IX regulation from the provision of contact information on their website (which is proposed for Section 106.8 (c)(1)) to proper handling of grievance procedures and supporting those who have suffered sex discrimination. Title IX Coordinators would also receive recognition and training for their Title IX work as specified in the proposed Gender Equity in Education Act (GEEA). Additionally, it would be difficult for the school community to identify and work directly with a school district Title IX Coordinator instead of their own school level Title IX Coordinator.

ED has not been clear and consistent that although desired, P-12 Title IX Coordinators are required in each school even though the Title IX regulations have always described Title IX Coordinator responsibilities at the school level. It is especially detrimental that the proposed regulation (106.8 (a)(2) exempts some elementary and secondary schools from having their own Title IX Coordinator as this is a place where all need to learn what sex discrimination is, and how to avoid it.

One clarification that may be helpful is that Title IX Coordinators need not be full time in that position but that they should be continuously trained to provide proactive as well as responsive responsibilities to end sex discrimination in their institution. (This clarification should probably be in the guidance document, not the regulation.)

3. **Full implementation of Title IX is an important goal and trained Title IX Coordinators are essential in its accomplishment.**

Despite its 50-year anniversary, many students and school community members are unaware of their rights and responsibilities under Title IX to end sex discrimination in education. Trained and effective Title IX Coordinators are needed to proactively educate all on ways to end sex discrimination and to prevent it or stop it with appropriate enforcement. Even elementary school children need to learn to avoid sex and gender discrimination. It is especially detrimental that the proposed regulation 106.8 (a)(2) exempts some elementary and secondary schools from having their own Title IX Coordinator as this is an age where all need to learn what sex discrimination is, and how to avoid it.

Title IX Coordinators in their schools can play an active role in identifying and preventing this discrimination. We suspect that except in Connecticut, few P-12 schools have their own Title IX Coordinators but are encouraged by the recent information on postsecondary Title IX Coordinators.

4. **There is no evidence of effectiveness of the proposed example of having school district Title IX Coordinators designate people to carry out some Title IX functions in the individual P-12 schools, while the district level Title IX Coordinator would retain ultimate authority and oversight over these school level designees/helpers.**

Often school districts have hundreds of schools and do not have any history of providing training or technical assistance to help implement Title IX. Also, even if there is no school district Title IX Coordinator, the individual schools are still responsible for implementing Title IX. Additionally, one of the ways to build effective Title IX implementation is to give Title IX Coordinators recognition and resources.  This won't happen if they are not listed on the school website and easily available to the school community.

Exhibit J

CWI is pleased that the proposed regulations are paying some attention to helping Title IX Coordinators accomplish their work at ending sex discrimination in their recipient institutions by mentioning that they can designate others to help them. However, this practice of assigning various staff to help Title IX Coordinators has been common and accepted at all education governance levels. Some of these roles (lawyers, counselors, etc.) are even mentioned in the old and proposed Title IX Regulations.

5. **Accountability and visibility are keyways that ED and Gender Equity Activists throughout the nation can facilitate the widespread effective use of Title IX Coordinators.**

In recent years ED has done more to identify and publicly list Title IX Coordinators so that they can be more easily contacted. The Civil Rights Data Collection (CRDC) now collects contact information on Title IX Coordinators at the school district level. Postsecondary Title IX Coordinators were added to the Clery Act survey requirements. To our knowledge ED has not consistently requested information or contacted Title IX Coordinators at State Education Agencies or in P-12 individual schools expected to implement Title IX.

Connecticut has led the way in collecting information on P-12 school Title IX Coordinators and Title IX Coordinators in many other institutions.  Here is a description by Dr. William Howe, the innovative former CT state Title IX Coordinator, that shows that having P-12 school level Title IX Coordinators are possible and advantageous. It is included with his permission.



Bill Howe                                                    Sun, Aug 28, 2022

**Maybe I can add some perspective to this discussion. For approximately 17 years I was the State of Connecticut Title IX Coordinator. When I assumed the role I found that many school districts did not know who the Title IX Coordinators were and most often they were not trained at all. When it was made known that I was the SEA Title IX Coordinator I started getting about 10 calls a week - either complaints or requests for technical assistance. I convinced the Education Commissioner to issue an annual letter to all school districts requiring them to identify not only their district Title IX Coordinator but also a Title iX Coordinator in every building. We provided training each fall for persons designated as Title IX coordinators.**

**Eventually, the Office for Civil Rights informed me that one of their major concerns was the poor quality of investigation done by school districts. We then added on a separate workshop on conducting an investigation and writing the report. The letter from the Commissioner to the school districts went out every June and the survey had to be completed by 1 September. We followed up to make sure that every district and public school building had an identified Title IX Coordinator and that they were trained. It dramatically affected the number of complaints that I would receive. Nearing the end of**

Exhibit J

**my tenure most of the calls I received were actually requests for technical assistance by Title IX Coordinators. Furthermore, we trained Title IX Coordinators, as well as coordinators for Title VI, Title VII, Sec 504, ADA and the state bullying regulations. We wanted to ensure that Title IX Coordinators could identify civil rights violations and help process them according to district procedures.**

**I can certainly attest to the fact that it has had a profound impact on sexual harassment and discrimination in the state. Parents, guardians, school personnel were very supportive of this practice. The SDE education website lists every public school district - the District and the Title IX Coordinators at the local buildings. The latest data is from 2019. The pandemic has had a profound effect on the ability to collect the data. I am hoping that it will be up-to-date within the next year. I strongly support having a person in every building identified as being knowledgeable about Title IX and knowing how to conduct a proper investigation.**

https://portal.ct.gov/SDE/Title-IX/Title-IX-Coordinators
**Bill Howe**

6. **Title IX Regulations or Policy Directives have done little to foster relationships among governmental entities responsible for implementing Title IX, but the specific example we have objected to about the relationship between school district and school building Title IX Coordinators starts to address this topic.**

Starting with the relationship between school district and their P-12 schools, these relationships should be addressed broadly in the revised Title IX Coordinator Guidance. Research by the Feminist Majority Foundation, Reinvigorating the Role of the Title IX Coordinator: A Requirement and Resource, recommended vertical and horizontal coordination among Title IX Coordinators at the various governmental levels. Vertical coordination would be with state Title IX Coordinators, school district Title IX Coordinators, and individual PK-12 public school Title IX Coordinators. Horizontal coordination would be among Title IX Coordinators with similar responsibilities and with other gender and equity experts and advocates. Thus, leadership by state and school district Title IX Coordinators would still be desired and could achieve the coordination, information sharing, and oversight functions suggested in the example of the school district oversight of school level designees only at the P-12 level. As a reminder, all types of recipients are welcome to employ more than one Title IX Coordinator or designate others to assist Title IX Coordinators. Where multiple people are involved, it is advisable to create teams with different specialties (athletics, academics, employment, sexual harassment, etc.) and appoint a lead Title IX Coordinator. This and many other valuable practices were suggested in the Title IX Coordinator guidance rescinded in 2020.

Full reinstatement of the current delegation of at least one Title IX Coordinator for each recipient expected to fully implement Title IX and ED guidance on the roles and responsibilities of all Title IX Coordinators is badly needed to clarify years of confusing guidance and inadequate employment and accountability information on Title IX Coordinators. It will also provide guidance in forthcoming federal funding legislation such as the Gender Equity Education Act (GEEA) which has been strongly supported

Exhibit J

by FMF, NCWGE and many others and would help pay for the training and federal resources to support Title IX Coordinators, their constituents, and allies.


## IMPORTANT TOPICS THAT SHOULD BE INCLUDED IN THE 2022 TITLE IX OR THE NEXT TITLE IX REGULATIONS

**Religious Exemptions**

The proposed 2022 Title IX Rule failed to correct the inappropriate process for a recipient to claim a religious exemption in the 2020 DeVos regulation. Under that regulation a recipient may claim a religious exemption with no prior notice as a defense even after they are under a Title IX investigation. This process fails the Title IX statute requirement (20 USC §1681) and the 1975 regulation (34 CFR 106.12(a) and policy memoranda (Singleton 1985 and Smith 1989) requiring a religiously controlled educational institution seeking a religious exemption to notify ED/OCR of the religious tenets that prohibit their following a Title IX requirement. While lacking transparency, the pre-2020 agreements between the recipient and OCR at least documented a religious exemption. That process should be restored, but one more step is necessary to protect students and employees who may be vulnerable to discrimination.

Students and parents should be informed of the specifics of any religious exemptions claimed by an educational institution before applying or enrolling. Consequently, assertions of specific religious exemptions should accompany any and all notices of nondiscrimination required pursuant to 34 C.F.R. § 106.8(b). Without such a disclosure, those notices of nondiscrimination are inherently deceptive and lure unsuspecting students and employees to the school who are unaware that the school asserts that it may discriminate against them.


**Dress Codes**

Prohibitions against discrimination in codes of personal appearance on the basis of sex were included in the original HEW 1975 Title IX Regulations, which were reviewed by Congress. However, this regulation was rescinded during the Reagan administration's efforts to eliminate federal regulations.  Discrimination in codes of personal appearance such as dress and grooming codes obviously violate the plain language of Title IX itself as well as the Department's general prohibition of discrimination and the proposed regulation prohibiting discrimination based on stereotypes. The Fourth Circuit recently stated that Title IX applies to dress codes. See Peltier v Charter Day School, Inc. 37 F.4th 104, 128 (4th Cir. 2022) (en banc)

https://www.ca4.uscourts.gov/opinions/201001A.p.pdf. This case showed that requiring girls to wear dresses instead of pants is sex discriminatory under Title IX. We think this nondiscrimination based on appearance should be clearly set forth in this 2022 or near future Title IX Regulations so that recipients are aware of their obligations.


**Single Sex Education**

The 1975 Title IX regulations also prohibited most single sex classes and schools, but this prohibition was substantially weakened in the 2006 Title IX regulations. Unjustifiable single-sex classes rooted in sex stereotypes developed across the country. Although

Exhibit J

the increased sex segregation was partially curtailed by court rulings and detailed OCR guidance on Questions about Single Sex education, (https://www2.ed.gov/about/offices/list/ocr/docs/faqs-title-ix-single-sex-201412.pdf). The 2006 regulations continue to be misinterpreted by school districts and treated as blanket permission to have single-sex classes. Consequently, CWI requests that the 2006 regulations be rescinded.

We would be happy to meet with representatives of the Department to discuss our concerns and suggestions for further action.

Thank you for the opportunity to comment on these proposed Title IX Rules to improve them beyond the 2022 proposed version.

Sue Klein, Ed.D. and Connie Cordovilla, Clearinghouse on Women's Issues, (CWI) Co-Presidents

Exhibit J



RE: Office of Civil Rights NPRM Proposed Title IX Regulations, Guaranteeing an Educational Environment Free from Discrimination on the Basis of Sex, Including Sexual Orientation or Gender Identity

*Document ID: ED-2021-OCR-0166-0001*

*Federal Register Number:2022-13734*

The New York City Alliance Against Sexual Assault and the below New York City 'Enough is Enough' programs respectfully submit this comment as testimony to inform the Department of Education's review of regulations, guidance, and other agency actions under Title IX, and to respectfully request changes to the rule entitled "Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance."

The New York City Alliance Against Sexual Assault (the Alliance) has taken every opportunity to participate in the national discourse surrounding Title IX. The mission of the New York City Alliance Against Sexual Assault is to prevent sexual violence and reduce the harm it causes. Through public education, prevention programming, advocacy for survivors, and the pursuit of legal and policy changes, the Alliance works to disrupt systems and institutions that, unfortunately, can retraumatize survivors when they most need our support. Since New York State Education Law 129B became law, the Alliance has worked with between 12-17 New York City post secondary education institutions in providing campus sexual violence prevention programming to thousands of students, faculty, and staff.

We are pleased that the current Department has moved to draft new regulations that aim to reinstate the purpose of Title IX, gender equity in education. In that spirit we'd like to submit our feedback, informed by the student survivors, campus partners, and communities we strive to serve.

Our comment focuses on the following areas of the proposed rule:

- Ensuring protections for trans students
- Disciplinarity versus criminality
- Supporting the inclusion of explicit protections for pregnant students and students with pregnancy related conditions
- Clarifying how institutions use religious exemptions to Title IX

Ensuring Protections for Trans Students:

We vehemently disagree with the DOE's position to create a separate rule related specifically to gendered athletic eligibility. The rights of trans athletes to an education free from gendered discrimination should not be made separate from Title IX. Collegiate trans athletes are still students and therefore have the right to the same protection as non-collegiate athletes.

Exhibit J

In recent years we have watched a stark increase in violence against trans and non-binary students. 71% of trans and nonbinary youth report experiencing discrimination based on their gender identity and 37% have reported experiencing physical violence based their gender identity. Interconnected to the increase in violence against trans and non-binary students is a flurry of anti-trans legislation across this country. More than 300 anti-trans bills have been proposed in 2022 alone and since 2020 18 states have proposed specific legislation targeting collegiate trans athletes.

The prevailing focus on collegiate trans athletes skews the discourse around trans justice and equity toward a small subset of individuals. According to Inside Higher Ed, there are reportedly 32 total trans athletes in the U.S openly competing in college athletics making up 0.00000167% of the post secondary education student population. The public and political transphobic scrutiny of victorious collegiate trans athletes dominates news cycles and tells the 1.6 million reported trans youth and adults, many of whom attend educational institutions protected by Title IX, that their trans identity has enormous limitations if they choose to pursue collegiate athletics. It is transphobic to separate collegiate trans athletes from Title IX and therefore we strongly ask the DOE to not create a separate rule. Title IX was founded in athletics equity and should remain consistent to its origin.

Disciplinarity versus Criminality:

We believe the DOE should remove the option for live cross examination during Title IX hearings, proposed 106.46. Requiring live cross-examination during hearings for Title IX cases, and not other student disciplinary proceedings, mimics the criminal justice system more than a campus conduct system. Campus conduct systems exist separately from the criminal justice system and have different goals. The Clery Act, as amended by VAWA, requires institutions to notify victims (1) of their right to contact law enforcement and (2) the right not to notify law enforcement. Anecdotally speaking, the majority of students we work with, particularly those from historically marginalized communities, feel unsafe interacting with the criminal justice system and reporting to the police. We see students choose Title IX reporting options more often than police reporting options, as they share they have felt more likely to be believed by a Title IX coordinator over the NYPD. Title IX is not a criminal court process and should not have the option to operate like one.

Supporting the Inclusion of Explicit Protections for Pregnant Students and Students with Pregnancy Related Conditions:

We are in strong support of the department's explicit inclusion of protections for pregnancy, childbirth, false pregnancy, termination of pregnancy, or recovery therefrom, as well as sex-based distinctions based on parental, family, or marital status. Specifically, we support the proposed 34 CFR 106.21(c)(1)-(2), 106.40(a), 106.40(b)(1), 106.57(a)(1), and 106.57(b). While very little research has been conducted regarding discrimination against pregnant, parenting, and/or students with pregnancy related conditions over the last 20 years, we can say anecdotally that discrimination toward this community remains a massive barrier to equitable education. Furthermore, the attacks on reproductive justice leading up to and as a result of the overturning of Roe v. Wade has created a dangerous landscape for students navigating pregnancy, childbirth, false pregnancy, termination of pregnancy, or recovery therefrom. While Title IX has historically implied the protections for pregnant students and students with pregnancy related conditions, we are pleased to have this codified in the final version of the regulations.

Exhibit J

Clarifying How Institutions Use Religious Exemptions to Title IX

Since 1979, religious exemption to Title IX has been an option for schools throughout the country and has been routinely weaponized in ways that discriminate and deny rights to pregnant students, non-binary students, transgender students, and LGBTQ+ students. Joe Baxton of the Religious Excemption Accountability Project (REAP) cites the origins of religious exemption to Title IX have historically been rooted in discrimination against women who had had abortions or had children out of wedlock.

While we are in support of the constitutional right to religious freedom, we do not support the weaponization of that freedom to absolve educational institution's accountability to provide equitable education to all students. Between 2013 and 2021, especially after the 2014 (rescinded in 2017) guidance outlining protections for LGBTQ+ students under Title IX, more than 120 educational institutions claimed exemption from Title IX on the basis of religion. In the 50 years since enactment of Title IX, the Office for Civil Rights has never denied a claim to religious exemption.

The 2020 Title IX Regulations expand the criteria that an institution must meet to be considered controlled by a religious organization. We believe the current proposed rule does not adequately address the ways in which religious exemptions to Title IX have been historically utilized to discriminate against LGBTQ+ students, pregnant students, and students with pregnancy related conditions. We urge the department's final regulations to include narrower criteria for institutions to claim religious exemption to Title IX and eliminate the ability for institutions to retroactively claim a religious exemption to Title IX.

In closing, on behalf the NYC Alliance Against Sexual Assault and those we strive to serve, we strongly encourage the current DOE to ensure that the diverse needs and experiences of students enrolled at city schools are considered in the review to the current regulations. We also welcome any opportunity to provide additional input and information toward this effort. Thank you for your time.

Sincerely,

Sam Skaller, Senior Campus Coordinator, The New York City Alliance Against Sexual Assault

Nicole Maiorano, Enough is Enough and Restorative Justice Coordinator, Kingsbridge Heights Community Center

Shan Huang, Associate Director of Special Programs, Womankind

Exhibit J



11 DUPONT CIRCLE NW
SUITE 800
WASHINGTON, DC 20036
202-588-5180
NWLC.ORG

September 12, 2022

*Submitted via www.regulations.gov*

Dr. Miguel Cardona
Secretary of Education
U.S. Department of Education
400 Maryland Ave SW
Washington, DC 20202

Catherine E. Lhamon
Assistant Secretary, Office for Civil Rights
U.S. Department of Education
400 Maryland Ave SW
Washington, DC 20202

**Re: Docket ID ED–2021–OCR–0166, RIN 1870–AA16, Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance**

Dear Secretary Cardona and Assistant Secretary Lhamon:

The National Women's Law Center ("NWLC") is pleased to submit this comment in response to proposed regulations from the Department of Education ("the Department") under Title IX of the Education Amendments of 1972 ("Title IX").[1]

NWLC is a nonprofit organization that has worked since 1972 to combat sex discrimination and expand opportunities for women and girls in every facet of their lives, including education. Founded the same year as Title IX of the Education Amendments of 1972 was enacted, NWLC has participated in all major Title IX cases before the Supreme Court as counsel[2] or amicus. NWLC is committed to eradicating all forms of sex discrimination in school, including sex-based harassment, discrimination against LGBTQI+ students, discrimination against pregnant and parenting students, and sex discrimination against students who are vulnerable to multiple forms of discrimination, such as girls of color and girls with disabilities. We equip students with the tools to advocate for their own Title IX rights at school, assist policymakers in enforcing Title IX and strengthening protections against sex discrimination, and litigate on behalf of students whose schools fail to adequately address their reports of sex discrimination in violation of Title IX.

As we celebrate the 50th anniversary of Title IX this year, we recognize that much progress has been made to address sex discrimination in education, but that many inequities and challenges remain. Sex-based harassment, including sexual harassment, is both widely prevalent and underreported at all levels of education, and student survivors are often ignored, punished, or otherwise pushed out of school when they ask for help. In addition, LGBTQI+ students face high rates of harassment, assault, and other discrimination based on their sexual orientation and/or gender identity, including an unprecedented wave of attacks on their rights through state policies that especially target transgender students. Furthermore,

---

[1] Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 87 Fed. Reg. 41390 (proposed July 12, 2022) (to be codified at 34 C.F.R. pt. 106), *available at* https://federalregister.gov/d/2022-13734.
[2] *E.g.*, *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167 (2005); *Davis v. Monroe Cnty Bd. of Educ.*, 526 U.S. 629 (1999).

Exhibit J

pregnant and parenting students of all ages face many barriers to completing their education, including inflexible attendance policies; lack of child care, transportation, and lactation spaces; and outright discrimination, all of which make it harder for them to graduate from high school and college.

We appreciate that the Department is taking steps to undo the previous administration's harmful changes to the Title IX regulations by proposing new regulations to effectuate the law's broad and remedial purpose, as Congress intended when it passed Title IX in 1972. At the same time, we note that the Department's proposed regulations do not reach far enough in protecting against sex discrimination in education. To that end, we offer the following comments regarding the Department's proposed regulations: **Part I** discusses protections against sex-based harassment, including how it harms students (p.2-6) and our recommendations on when schools should be required to respond to sex-based harassment (p.6-22), how they should be required to respond (p.22-33), and how they should be required to investigate (p.33-44). **Part II** discusses protections for LGBTQI+ students, including how anti-LGBTQI+ discrimination harms students (p.45) and our recommendations regarding Title IX's scope of protections (p.45-47), participation consistent with gender identity (p.47-49), athletics (p.49-51), and anti-LGBTQI+ harassment (p.51-52). **Part III** discusses protections for pregnant and parenting students, including how discrimination against pregnant and parenting students is harmful (p.52-53) and our recommendations regarding Title IX's scope of protections (p.53-56), access to education programs and activities (p.56-60), and harassment of pregnant and parenting students (p.60-61). **Part IV** discusses other protections against sex discrimination, including our recommendations regarding schools' obligations to address other sex discrimination (p.61), sex-based treatment and separation (p.61-63), and notice of nondiscrimination (p.63-64). **Part V** addresses the Department's Directed Questions (p.64-66).

I.  **Protections Against Sex-Based Harassment**

A.  **Sex-Based Harassment Harms Students' Access to Education.**

***Sexual harassment, sexual assault, dating/domestic violence, and stalking***

Sexual harassment, sexual assault, dating violence, domestic violence, and stalking are prevalent at all levels of education. In grades 7–12, 56 percent of girls and 40 percent of boys are sexually harassed in a given school year,[3] and one in five girls ages 14–18 have been kissed or touched without their consent.[4] About 10 percent of PK–12 students will experience sexual misconduct by a school employee by the time they graduate from high school.[5] Furthermore, in a given year, one in 11 high school girls and one in 14 high school boys experience physical dating violence,[6] and more than a quarter of a million people ages 16–19 are victims of stalking.[7] About 10 percent of PK–12 students will experience sexual misconduct by a school employee by the time they graduate from high school.[8] In college, more than 60 percent of

---

[3] Catherine Hill & Holly Kearl, American Association of University Women, *Crossing the Line: Sexual Harassment at School* 2 (2011), https://www.aauw.org/resources/research/crossing-the-line-sexual-harassment-at-school.
[4] Kayla Patrick & Neena Chaudhry, National Women's Law Center, *Let Her Learn: Stopping School Pushout for Girls Who Have Suffered Harassment and Sexual Violence* 3 (2017), https://nwlc.org/resources/stopping-school-pushout-for-girls-who-have-suffered-harassment-and-sexual-violence [hereinafter NWLC Sexual Harassment Report].
[5] Billie-Jo Grant *et al.*, *A Case Study of K–12 School Employee Sexual Misconduct: Lessons Learned from Title IX Policy Implementation* (Sep. 15, 2017), https://www.ojp.gov/pdffiles1/nij/grants/252484.pdf.
[6] Centers for Disease Control & Prevention, *Preventing Teen Dating Violence* (last updated Mar. 5, 2021), https://www.cdc.gov/violenceprevention/intimatepartnerviolence/teendatingviolence/fastfact.html.
[7] Jennifer L. Truman & Rachel E. Morgan, Dep't of Justice, Office of Justice Programs, *Stalking Victimization, 2016* (Apr. 2021), https://bjs.ojp.gov/content/pub/pdf/sv16.pdf.
[8] Grant *et al.*, *supra* note 5.

Exhibit J

women and men experience sexual harassment.[9] One in four women, one in five transgender and gender-nonconforming students, and one in 15 men are sexually assaulted during their time in college.[10] In addition, during their time in college, one in seven women and one in 10 men experience dating violence, and one in 10 women and one in 33 men are victims of stalking.[11] Unfortunately, these statistics are often higher for marginalized students, including Black and brown girls and women, LGBTQI+ students, pregnant and parenting students, and disabled students.[12]

Despite these high rates of sex-based harassment, few students report it to their schools. Many victims do not report because they believe the incident is "not serious enough" to report because it began consensually, because alcohol and drugs were present, because such incidents seem common, because others' reactions suggest that it is not serious, or because they believe they can handle it themselves.[13] Other common reasons for not reporting include shame and embarrassment, fear of not being believed, fear that no one would do anything to help, and doubt that school resources and responses would actually be helpful if they were provided.[14] Many survivors fear reporting would only make the situation worse: they fear being labeled a "snitch"; facing retaliation from the harasser; suffering negative academic, social, or professional consequences; and being blamed or disciplined by their school.[15] And many survivors simply do not want their harasser to get into trouble, particularly if their harasser is an intimate partner, romantic interest, friend, or someone who is well-liked in their community.[16]

The relatively few students who do ask for help are often ignored or punished instead of receiving the help they need to learn and feel safe in school. Too often, victims who come forward are suspended, expelled, or otherwise disciplined because school officials believe the victim engaged in consensual sexual activity in violation of school rules, or believe the incident was consensual and that the victim made a false accusation.[17] Student survivors are also often disciplined because at the time they were

---

[9] Catherine Hill & Elena Silva, American Association of University Women, *Drawing the Line: Sexual Harassment on Campus* 17, 19 (2005), https://www.aauw.org/app/uploads/2020/02/AAUW-Drawing-the-line.pdf.

[10] David Cantor *et al.*, Association of American Universities, *Report on the AAU Campus Climate Survey on Sexual Assault and Misconduct* ix (Oct. 15, 2019), https://www.aau.edu/key-issues/campus-climate-and-safety/aau-campus-climate-survey-2019 [hereinafter AAU Report].

[11] AAU Report, *supra* note 10, at 52 (dating violence), 55 (stalking).

[12] *See, e.g.*, AAU Report, *supra* note 10, at 13–14 (transgender and gender-nonconforming college students); Joseph G. Kosciw *et al.*, GLSEN, *The 2019 National School Climate Survey: The Experiences of Lesbian, Gay, Bisexual, Transgender, and Queer Youth in Our Nation's Schools* 30 (2020), https://www.glsen.org/research/2019-national-school-climate-survey [hereinafter GLSEN Survey] (LGBTQ youth ages 13–21); NWLC Sexual Harassment Report, *supra* note 4, at 3 (Native, Black, and Latina girls ages 14–18); Kelli Garcia & Neena Chaudhry, National Women's Law Center, *Let Her Learn: Stopping School Pushout for Girls Who Are Pregnant or Parenting* 12 (2017), https://nwlc.org/resources/stopping-school-pushout-for-girls-who-are-pregnant-or-parenting [hereinafter NWLC Pregnant or Parenting Students Report] (pregnant and parenting girls ages 14–18); Karen Schulman *et al.*, National Women's Law Center, *Let Her Learn: Stopping School Pushout for: Girls With Disabilities* 7 (2017), https://nwlc.org/resources/stopping-school-pushout-for-girls-with-disabilities [hereinafter NWLC Girls With Disabilities Report] (disabled girls ages 14–18).

[13] AAU Report, *supra* note 10, at A7-27–A7-33, A7-92–A7-93; GLSEN Survey, *supra* note 12, at 32-34.

[14] AAU Report, *supra* note 10, at A7-27–A7-33, A7-92–A7-93; GLSEN Survey, *supra* note 12, at 32-34; RAINN, *Campus Sexual Violence: Statistics* (last visited Sept. 9, 2022), https://www.rainn.org/statistics/campus-sexual-violence [hereinafter RAINN Statistics].

[15] AAU Report, *supra* note 10, at A7-27–A7-33, A7-92–A7-93; GLSEN Survey, *supra* note 12, at 32-33.

[16] AAU Report, *supra* note 10, at A7-27, A7-30; RAINN Statistics, *supra* note 14.

[17] *See, e.g.*, Sarah Nesbitt & Sage Carson, Know Your IX, *The Cost of Reporting: Perpetrator Retaliation, Institutional Betrayal, and Student Survivor Pushout* 15-16 (Mar. 2021)], https://www.knowyourix.org/thecostofreporting [hereinafter KYIX Report; Tyler Kingkade, *Schools Keep Punishing Girls – Especially Girls of Color – Who Report Sexual Assaults, and the Trump Administration's Title IX Reforms Won't Stop It*, The 74 (Aug. 6, 2019), https://www.the74million.org/article/schools-keep-punishing-girls-especially-students-of-color-who-report-sexual-assaults-and-the-trump-administrations-title-ix-reforms-wont-stop-it; Sarah Brown, *BYU Is Under Fire, Again, for Punishing Sex-Assault Victims*, Chronicle of Higher Education (Aug. 6, 2016), https://www.chronicle.com/article/BYU-Is-Under-Fire-Again-for/244164; Aviva Stahl, *'This Is an Epidemic': How NYC Public Schools Punish Girls for Being Raped*, Vice (June 8, 2016), https://broadly.vice.com/en_us/article/59mz3x/this-is-an-epidemic-how-nyc-public-schools-punish-girls-for-being-raped; Kate Taylor, *Schools Punished Teenagers for Being Victims of Sexual Assault, Complaints Say*, N.Y. Times (June 7, 2016), https://www.nytimes.com/2016/06/08/nyregion/schools-punished-teenagers-for-being-victims-of-sexual-assault-complaints-say.html.

3

Exhibit J

assaulted, they were using drugs or alcohol, or for physically defending themselves against their harassers, for expressing age-appropriate trauma symptoms after the incident, for missing school in order to avoid their harasser, or for merely telling other students about the incident.[18] Sometimes schools force or pressure survivors into enrolling in inferior "alternative" education programs that isolate them from their friends, offer little to no instruction, and deprive them of access to extracurriculars.[19] Unfortunately, schools are more likely to disbelieve and punish girls and women of color (especially Black girls and women), LGBTQI+ students, pregnant and parenting students, and disabled students due to stereotypes that label these students as more "promiscuous," more "aggressive," less credible, and/or less deserving of protection.[20] When schools fail to address sexual harassment, students suffer. Many survivors miss class, receive lower grades, withdraw from extracurricular activities, or leave school altogether because they do not feel safe. Some are even expelled in the wake of their trauma. In college, 34 percent of student survivors of sexual assault end up dropping out.[21]

***Harassment of LGBTQI+ students***

LGBTQI+ students are at especially high risk of experiencing harassment in school—the reality is the majority of LGBTQI+ students can expect to be harassed and assaulted at school because of who they are. Almost 60% of PK-12 LGBTQ students experience sexual harassment in a given school year, such as unwanted touching.[22] Over 25% of PK-12 LGBQ students report being pushed or shoved based on their sexual orientation, with over 20% of LGBTQ students reporting similar instances based on gender or gender expression. About 9-11% of PK-12 LGBTQ students experience more serious assaults based on their identities, such as being injured with a weapon.[23] Over half of LGBTQ girls (52%) report surviving sexual or other violence.[24] At the university level, LGBT students continue to report mistreatment more frequently than their peers, reporting experiences of sexual assault about 5 times more frequently and in-person bullying or harassment about 4 times more frequently than non-LGBT university students.[25]

Even this data likely underrepresents the scope of harassment LGBTQI+ youth encounter when attempting to access an education—these youth are strongly disincentivized from reporting violence and discrimination due to a lack of meaningful support, plus the very real threat of being punished for their own victimization. When LGBTQ students report harassment or assault in PK-12 settings, over 60%

---

[18] KYIX Report, *supra* note 17, at 15–16; NAACP Legal Defense and Education Fund, Inc. & National Women's Law Center, *Unlocking Opportunity for African American Girls: A Call to Action for Educational Equity* 25 (2014), https://nwlc.org/wp-content/uploads/2015/08/unlocking_opportunity_for_african_american_girls_report.pdf.

[19] *E.g.*, Tyler Kingkade, *A High Schooler Says Her School Called Her A "Drama Queen" When She Reported Harassment*, Buzzfeed (Oct. 13, 2017), https://www.buzzfeednews.com/article/tylerkingkade/forced-out-of-high-school-for-reporting-harassment-lawsuits; Mark Keierleber, *The Younger Victims of Sexual Violence in School*, Atlantic (Aug. 10, 2017), https://www.theatlantic.com/education/archive/2017/08/the-younger-victims-of-sexual-violence-in-school/536418.

[20] Rebecca Epstein *et al.*, Georgetown Law Center on Poverty and Inequality, *Girlhood Interrupted: The Erasure of Black Girls' Childhood*, 1-6 (2018), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3000695 [hereinafter Georgetown Law Report]; Laura Dorwart, *The Hidden #MeToo Epidemic: Sexual Assault Against Bisexual Women*, Medium (Dec. 3, 2017), https://medium.com/@lauramdorwart/the-hidden-metoo-epidemic-sexual-assault-against-bisexual-women-95fe76c3330a; Jennie M. Kuckertz & Kristen M. McCabe, *Factors Affecting Teens' Attitudes Toward Their Pregnant Peers*, 16 Y Psi Chi, Int'l Honor Soc'y. Psychol. 33 (2011), https://www.psichi.org/resource/resmgr/journal_2011/spring11jnkuckertz.pdf; Leigh Ann Davis, The Arc, *People with Intellectual Disabilities and Sexual Violence* 2 (Mar. 2011), https://www.thearc.org/document.doc?id=3657 [hereinafter The Arc Brief].

[21] Cecilia Mengo & Beverly M. Black, *Violence Victimization on a College Campus: Impact on GPA and School Dropout*, 18(2) J.C. Student Retention: Res., Theory & Prac. 234, 244 (2015), https://doi.org/10.1177/1521025115584750.

[22] GLSEN Survey, *supra* note 12, at 28.

[23] *Id.* at 29.

[24] Jasmine Tucker & Neena Chaudhry, National Women's Law Center, *Let Her Learn: Stopping School Pushout for LGBTQ Girls* 3 (2017), https://nwlc.org/resource/stopping-school-pushout-for-lgbtq-girls [hereinafter NWLC LGBTQ Girls Report].

[25] Kerith J. Conron *et al.*, UCLA School of Law Williams Institute, *Experiences of LGBTQ People in Four-Year Colleges and Graduate Programs* 16 (May 2022), https://williamsinstitute.law.ucla.edu/publications/lgbtq-colleges-grad-school [hereinafter Williams Institute Report].

Exhibit J

report that school staff either tell them to ignore it or do nothing at all; and, nearly one-tenth of LGBTQ students who report are subsequently disciplined.[26] And LGBTQI+ students face similar harassment without support from faculty in the context of higher education. In one survey, in response to bullying, harassment, assault, or other discrimination they experienced, 73 percent of undergraduate LGBTQ respondents reported that faculty did not know the discrimination was happening; over 7 percent reported faculty knew and did nothing; over 5 percent reported they were disciplined instead of the aggressor.[27] In the same survey, in response to bullying, harassment, assault, or other discrimination they experienced, over 34 percent of LGBTQ graduate students reported that faculty did not know the discrimination was happening; over 25 percent reported that faculty knew and did nothing; and almost 3 percent reported that they were disciplined instead of the aggressor.[28]

These forms of violence against LGBTQI+ youth have far-reaching consequences in education and many other aspects of life. Educational consequences include problems staying focused at school and forced absences, due to a student feeling unsafe. Among LGBTQI+ students at the PK-12 level, those who experience more anti-gay and anti-trans harassment and assault report having lower grades than their LGBTQI+ peers, and are roughly half as likely to be seeking post-secondary education at a university or trade/vocational school. One survey showed that over 39 percent of LGBTQ students overall reported absences from school in the past year, with survey respondents being almost three times as likely to report absences if they experienced harassment or discrimination on the basis of their sexual orientation or gender identity.[29] In another report, over 40 percent of LGBTQ girls reported absences from school due to feeling unsafe or uncomfortable.[30] Because of discrimination and harassment, LGBTQI+ students are pushed out of school at alarming rates. As of 2019, almost a fifth of LGBTQI+ students across the U.S. (17%) report being forced to change schools due to feeling unsafe or uncomfortable.[31]

### Harassment of pregnant and parenting students

Becoming pregnant or a parent can subject students, particularly girls and women, to sexual harassment and unwanted sexual attention, as well as other sex-based harassment based on their pregnancy or related conditions or on their status as parent. Girls who are pregnant or parenting report feeling stigmatized and treated like an outcast in both school and society at large. For example, one young girl in a 2017 focus group explained that her classmates think that "just because you [have] a baby that you are going to sleep with them."[32] In a different study, a pregnant student reported administrators forced her to stand up in front of her entire school during an assembly and announce that she was pregnant. This led to incessant taunts, unwanted touching, and invasive comments by her classmates.[33] Not surprisingly, girls who are pregnant or parenting ranked protection from bullying and harassment among the most important things that schools could do to help them.[34]

Students are caught in a double bind: on the one hand, in a growing number of states, legislators are determined to deny them access to reproductive healthcare. On the other hand, if they become pregnant

---

[26] GLSEN Survey, *supra* note 12, at 34.
[27] Williams Institute Report, *supra* note 25, at 41-42.
[28] *Id.* at 55-56.
[29] GLSEN Survey, *supra* note 12, at 47-48.
[30] NWLC LGBTQ Girls Report, *supra* note 24, at 2.
[31] GLSEN Survey, *supra* note 12, at xvii.
[32] NWLC Pregnant or Parenting Students Report, *supra* note 12, at 11.
[33] Angélica Salceda & Phyllida Burlingame, ACLU of California, *Breaking Down Educational Barriers for California's Pregnant and Parenting Students* (Jan. 2015), https://s3.documentcloud.org/documents/3873022/PPSReport-ACLUNC-1.pdf.
[34] NWLC Pregnant or Parenting Students Report, *supra* note 12, at 4.

Exhibit J

and decide to parent, they are ostracized, harassed, and pushed out of the classroom by an unsupportive school community. Unfortunately, because schools are not required to report instances of pregnancy-related harassment, data of these experiences are lacking. As various jurisdictions restrict students access to reproductive healthcare, however, it is logical to anticipate more students experiencing harassment because of their reproductive decisions.[35]

**B. The Proposed Rules Provide Important Clarity Regarding the Scope of Title IX's Protections Against Sex-Based Harassment and the Initiation of Recipients' Obligation to Respond to Sex-Based Harassment, but Should Better Protect Survivor Autonomy.**

***Definition of sex-based harassment***

We support that the rules' proposed definition of sex-based harassment in § 106.10 would include sexual harassment and other harassment on the basis of sex—which includes harassment on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity[36]—when, as explained in proposed § 106.2, this harassment takes the form of (i) "quid pro quo harassment;" (ii) "hostile environment harassment;" or (iii) sexual assault, dating violence, domestic violence, or stalking.

(i) Quid Pro Quo Harassment

We support the proposed rules' expansion of the scope of quid pro quo harassment. Where § 106.30(a)(1) currently defines sexual harassment to include an "employee of the recipient conditioning the provision of an aid, benefit, or service of the recipient on an individual's participation in unwelcome sexual conduct," proposed § 106.2's definition of sex-based harassment would reach such behavior when undertaken by any "agent[] or other person authorized by the recipient to provide an aid, benefit, or service under the recipient's education program or activity." We also appreciate the preamble's examples of what persons are considered to have "been authorized to provide aid, benefits, or services as part of a recipient's education program," including volunteer coaches; graduate students who teach their own classes or serve as teaching assistants and have teaching roles or are responsible for grading coursework (even if they are not directly employed by a school); independent contractors with whom a school contracts to provide benefits or services to students; people who oversee internships or clinical programs; and members of a school's board of trustees, even if they serve as unpaid volunteers.[37] Expanding the list of persons considered capable of engaging in quid pro quo harassment would help ensure schools respond to a broader array of sexual misconduct, enabling many students to get relief under Title IX where they cannot under the current rules. However, we strongly urge a removal of "unwelcome" from the definition, as quid pro quo harassment should be understood to occur whenever an education aid, benefit, or service is conditioned on sexual activity, without the necessity of determining whether the sexual activity is unwelcome. Conditioning education on sexual activity is necessarily a discriminatory act.

---

[35] *See, e.g.* Kavitha Cardoza, *If More Students Become Pregnant Post-Roe, are we Prepared to Support Them?,* Hechinger Report (July 24, 2022), https://hechingerreport.org/if-more-students-become-pregnant-post-roe-are-we-prepared-to-support-them.
[36] We also urge the Department to go further and include within this definition harassment on the basis of parental, family, caregiver, or marital status (see **Part III.B, Parental, family, and marital status** below).
[37] 87 Fed. Reg. at 41412-13. The preamble explains that the question of whether a person is considered having "been authorized to provide aid, benefits, or services as part of a recipient's education program" for purposes of asserting a claim of quid pro quo harassment is a "fact-specific" inquiry. As such, the examples provided by the Department represents a non-exhaustive list. *Id.*

Exhibit J

Finally, we support the Department making clear at proposed § 106.2(1) that quid pro quo harassment would encompass both a situation where a person "explicitly or impliedly" conditions a benefit on sexual conduct. While the preamble to the current regulations stated quid pro quo harassment "could" encompass "explicit and implicit conduct," this was not included in the text of the current regulations.[38]

### (ii) Hostile Environment Harassment

We also support proposed § 106.2(2) more broadly—and appropriately—defining "hostile environment harassment" as "unwelcome" sex-based conduct that is sufficiently "severe *or* pervasive" that it "denies or limits" a person's ability to participate in or benefit from an education program or activity. This would be a marked improvement over current § 106.30(2), which only reaches sexual harassment that is "severe *and* pervasive" such that it "*effectively denies* a person" equal access to education. In combination with the current rule's mandatory dismissal requirement,[39] this narrow definition prohibits schools from addressing a range of Title IX complaints and harms students in multiple ways.

First, the current rule's "severe *and* pervasive" standard marked an unprecedented departure from the Department's longstanding standard for hostile environment applied from 1997-2020.[40] The current standard creates barriers to reporting by requiring students to endure repeated and escalating levels of harassment before their complaint can even be investigated. In contrast, the proposed rules would require schools to address harassment before it becomes so severe that a student's education has been derailed.

Second, by requiring individuals to establish that harassment was "severe *and* pervasive," the current rules also unjustifiably create a higher standard for establishing unlawful sexual harassment than other kinds of harassment and misconduct prohibited under civil rights laws implemented and enforced by the Department; for example, harassment on the basis of race is governed by the severe *or* pervasive standard, as is harassment on the basis of disability.[41] By imposing this uniquely burdensome standard in sexual harassment matters only, the current rules promote the message that sexual harassment does not warrant the same kind of response as does other forms of harassment, that sexual harassment is less serious than other forms of harassment, and that victims of sexual harassment are less deserving of support than are victims of other forms of harassment. The current rules also force schools to slice and dice complaints from students who experience multiple and intersecting forms of harassment. For example, under the current rules, if a Black girl is harassed based both on her race and sex, and the

---

[38] *See id.* at 41413.

[39] 34 C.F.R. § 106.45(b)(3)(i).

[40] *See generally* Dep't of Educ., Office for Civil Rights, *Questions and Answers on Title IX and Sexual Violence* (Apr. 29, 2014), https://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf [hereinafter 2014 Guidance]; Dep't of Educ., Office for Civil Rights, *Dear Colleague Letter on Sexual Violence* (Apr. 4, 2011), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf [hereinafter 2011 Guidance]; Dep't of Educ., Office for Civil Rights, *Dear Colleague Letter: Harassment and Bullying* (Oct. 26, 2010), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201010.html; Dep't of Educ., Office for Civil Rights, *Dear Colleague Letter* (Jan. 25, 2006), https://www2.ed.gov/about/offices/list/ocr/letters/sexhar-2006.html; Dep't of Educ., Office for Civil Rights, *Revised Sexual Harassment Guidance*, 66 Fed. Reg. 5,512 (issued Jan. 19, 2001; rescinded Aug. 26, 2020), https://www2.ed.gov/about/offices/list/ocr/docs/shguide.pdf [hereinafter 2001 Guidance]; Dep't of Educ., Office for Civil Rights, *Dear Colleague Letter on Prohibited Disability Harassment* (July 25, 2000), https://www2.ed.gov/about/offices/list/ocr/docs/disabharassltr.html [hereinafter 2000 Disability Harassment Guidance]; Dep't of Educ., Office for Civil Rights, *Sexual Harassment Guidance*, 62 Fed. Reg. 12,034 (Mar. 13, 1997), https://www2.ed.gov/about/offices/list/ocr/docs/sexhar01.html; Dep't of Educ., Office for Civil Rights, *Racial Incidents and Harassment Against Students at Educational Institutions; Investigative Guidance*, 59 Fed. Reg. 11,448 (Mar. 10, 1994), https://www2.ed.gov/about/offices/list/ocr/docs/race394.html [hereinafter 1994 Racial Harassment Guidance].

[41] *See e.g.*, 2000 Disability Harassment Guidance, *supra* note 40 (applying "severe or pervasive" standard to harassment on the basis of disability); 1994 Racial Harassment Guidance, *supra* note 40 (applying "severe or pervasive" standard to harassment on the basis of race).

Exhibit J

harassment is only severe *or* pervasive (not severe *and* pervasive), her school apparently must ignore the sex-based taunts and only address the race-based slurs.[42] Or under the current rules, if the harassment she faces is intersectional—*i.e.*, is inextricably based on both her race and sex at the same time, arguably her school must dismiss the entire complaint.

Third, the current rules defining hostile environment harassment provides lesser protections for students than for employees. The standard for workplace hostile environment claims under Title VII, which prohibits workplace sex-based harassment, is whether the harassment is "sufficiently severe *or* pervasive to *alter* the conditions of the victim's employment."[43] However, under the current Title IX rules, a school is only held responsible for hostile environment harassment against a student or other individual if the harassment they experience is "so severe, pervasive, *and* objectively offensive" that it "denies" the student equal access to the school's program or activity. In short, the current rules hold schools to a far lesser standard in addressing the harassment of students—including the sexual harassment and abuse of children under its care—than schools are held to in addressing the same harassment of adult employees. In contrast, the proposed rules, which would require schools to address sex-based harassment if it is so "severe or pervasive" that it "limits" a person's equal access to education, would be much more aligned with the Title VII standards.

However, while we recognize that proposed § 106.2's reinstatement of the Department's longstanding hostile environment standard is a significant improvement over the current rule's standard, we also acknowledge that this standard could still create burdens for survivors, if the required showing that harassment "denies or limits" an individual's ability to participate in or benefit from the education program or activity were interpreted as requiring a showing of a specific educational injury, such as lower grades, as a result of the harassment. While the preamble indicates that making a showing of lower grades is not required, it contemplates that some proof of educational injury is required. Harassment that is severe or pervasive in an educational program or activity can be assumed to have such impact. Therefore, we encourage the Department to make clear in the final rule itself that no such additional educational injury need be shown.

### (iii) Specific Offenses: Sexual Assault, Domestic Violence, Dating Violence, and Stalking

The definitions of "domestic violence," "dating violence," and "sexual assault" should be stronger than the definitions in proposed § 106.2's definition of sex-based harassment.[44] Specifically, to better capture the wide array of abuse and control tactics employed by abusers, and consistent with the definition of "domestic violence" in the 2022 reauthorization of the Violence Against Woman Act's (VAWA 2022),[45] the Department's proposed definition at § 106.2(3)(iii) should include the following from VAWA 2022's definition in defining "domestic violence":

---

[42] *See* Joanna L. Grossman & Deborah L. Brake, *A Sharp Backward Turn: Department of Education Proposes to Protect Schools, Not Students, in Cases of Sexual Violence*, VERDICT (Nov. 29, 2018), https://verdict.justia.com/2018/11/29/a-sharp-backward-turn-department-of-education-proposes-to-protect-schools-not-students-in-cases-of-sexual-violence.

[43] *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993) (emphasis added).

[44] We note that the proposed rules do not include in the definition of the specific offenses an indication of when these offenses will be considered to have occurred under a recipient's education program or activity or when the specific offenses, if occurring outside the recipient's program or activity, will be considered to contribute to a sex-based hostile environment under the recipient's education program or activity. As such, we encourage the Department to clarify these points, so that schools, students, and other individuals protected by Title IX understand what circumstances would trigger a school's obligation to respond under Title IX to these offenses.

[45] 87 Fed. Reg. at 41418.

Exhibit J

> "the use or attempted use of physical abuse or sexual abuse, or a pattern of any other coercive behavior committed, enabled, or solicited to gain or maintain power and control over a victim, *including verbal, psychological, economic, or technological abuse that may or may not constitute criminal behavior.*"[46]

In contrast, proposed (3)(iii) of the sex-based harassment definition in § 106.2 would limit the definition of "domestic violence" to "felony or misdemeanor crimes of violence," which is too limited.

First, while VAWA 2022's definition of "domestic violence" includes conduct that "may or may not constitute criminal behavior," proposed § 106.2 would limit "domestic violence" to only criminally illegal behavior. This ignores the reality that domestic violence often takes the form of repeated patterns of coercive or controlling behavior, which, viewed in isolation or outside the context of power dynamics between an abuser and their victim, may not constitute criminal conduct. As such, we urge the Department to reconsider this limitation and instead adopt a definition of "domestic violence" that includes "abuse that may or may not constitute criminal behavior."

Second, with its limitation to "crimes of violence," the definition of "domestic violence" in proposed (3)(iii) of the sex-based harassment definition would completely ignore the various, common forms of abuse separate from physical violence that survivors of domestic violence face, which are highlighted by the VAWA 2022 definition—including verbal, psychological, economic, and technological abuse. The Department in the preamble justifies its decision not to adopt VAWA 2022's definition of "domestic violence" by explaining that some portions of the definition are "not applicable to Title IX."[47] However, this is untrue. First, research shows that it is common for students to experience domestic violence in ways other than sexual or physical abuse. In one study surveying college students about their experiences with various types of intimate partner violence, over 79 percent of respondents reported experiencing at least one incident of psychological abuse in their relationships.[48] Another survey of college and university women's experiences with intimate partner cyber aggression showed that 73 percent of respondents reported experiencing some type of cyber aggression, including experiencing use of social media platforms to taunt them or sending others a "private, intimate picture or video" of them without their permission.[49] Finally, in another study that surveyed college students about the kinds of control tactics used by their abusers, economic abuse—including stealing money or interfering with scholarship or financial aid disbursements[50]—was reported as a common control tactic.[51] Accordingly, to account for the

---

[46] 34 U.S.C. 1221(a)(12) (emphasis added).
[47] 87 Fed. Reg. at 41418.
[48] Elizabeth M. Avant *et al.*, *Psychological Abuse and Posttraumatic Stress Symptoms in College Students*, 26 J. of Interpersonal Violence 3080, 3088 (2011).
[49] Alison Marganski & Lisa Melander, *Intimate Partner Violence Victimization in the Cyber and Real World: Examining the Extent of Cyber Aggression Experiences and its Association with In-Person Dating*, 33 J. of Interpersonal Violence 1071, 1080-82 (2015). The Department also acknowledges in the preamble that hostile environment harassment includes online harassment, explaining that harassers are making "increasing use of social media and other online platforms…as a form of sex-based harassment," and that "the Department recognizes that online harassment…targeted at students and employees on these media platforms may impact a recipient's education program or activity." The Department goes onto explain that "when an employee has information about sex-based harassment among its students that took place on social media or other online platforms and created a hostile environment in the recipient's education program or activity, the recipient would have an obligation to address that conduct." If the Department recognizes and endorses online harassment as a common form of sex-based harassment, it stands to reason that similar online abuse could constitute a form of domestic violence barred by Title IX. 87 Fed. Reg. at 41440.
[50] Michelle L. Munro-Kramer *et al.*, *The Dynamics of Interpersonal Relationships: Understanding Power and Control Tactics Among College Students*, J. of Interpersonal Violence, at 15 (Sept. 4, 2021), https://journals.sagepub.com/doi/abs/10.1177/08862605211042816.
[51] It should also be noted that economic abuse presents unique risks to LGBTQI+ survivors, where abusers may use exploit their gender identity, sexual orientation, and/or sex characteristics in conjunction with financial control. For example, an abuser, knowing that doing so may pose a risk to the survivor being fired or their safety, may threaten to out the survivor at work; it may also be easier for a same-sex partner to commit or attempt to commit identity theft.

Exhibit J

reality that domestic abusers rely both on physical or sexual violence and various other control tactics to hurt their partners, we urge the Department to incorporate the references to "verbal, psychological, economic, or technological abuse" in VAWA 2022's definition of "domestic violence." Finally, we urge the Department to provide examples in the preamble to the final rules and in supplemental guidance clarifying that this definition of "domestic violence" includes common forms of abuse, including: violence or threats of violence toward the complainant's family members, friends, pets, or property; threats by the respondent to kill themselves; and threats by the respondent to report the victim or the victim's family members to police, immigration officials, child protective services, or a mental health institution.

Regarding the proposed rules' definition of "dating violence," our concerns are similar, as the definition in proposed (3)(ii) of the sex-based harassment definition in § 106.2 would be limited to "violence" committed by a person's romantic or intimate partner—which, like the definition of "domestic violence" in proposed § 106.2(3)(iii), obscures the variety of abuse in addition to physical violence that dating violence can take. As such, we urge the Department to clarify that dating violence includes, but is not limited to, physical, sexual, emotional, verbal, psychological, economic, and technological abuse, which includes violence or threats of violence toward the complainant's family members, friends, pets, or property; threats by the respondent to kill themselves; and threats by the respondent to report the victim or the victim's family members to police, immigration officials, child protective services, or a mental health institution. Also, similar to our recommendations regarding the proposed rules' definition of "domestic violence," we urge the Department to clarify that "dating violence" includes abuse that "may or may not constitute criminal behavior."[52]

Finally, we urge the Department to adopt a more appropriate and broader definition of "sexual assault." The definition at proposed (3)(i) of the sex-based harassment definition in § 106.2 only defines sexual assault as "an offense classified as a forcible or nonforcible sex offense under the uniform crime reporting system of the Federal Bureau of Investigation." This definition, however, relies on a cross reference which could leave individuals and recipients confused about which offenses are covered. We recommend incorporating the following definition of sexual assault (and recommended the same definition in our February 2022 comment on changes to the Civil Rights Data Collection[53]):

> "The intentional touching, over or under clothing, of:
>     (i)  a private body part (which includes the breast, vagina, vulva, penis, testicle, anus, buttock, or inner thigh) of another person, with any body part or object; or
>     (ii) any part of another person's body with a private body part;
> without the consent of one of the people, including instances where the victim is incapable of giving consent, including, for example, because of the victim's temporary or permanent mental or physical incapacity. Classification of these incidents should take into consideration the age of the victim and the age and developmentally appropriate behavior of the respondent."

---

[52] In supplemental guidance regarding domestic violence and dating violence, the Department should also make it clear to schools that "mutual violence" is a myth and cannot exist in instances of intimate partner violence, because one party is consistently exercising power and control over the other. *See* Jessica R., *The Myth of Mutual Abuse,* National Domestic Violence Hotline (last visited Sept. 2, 2022), https://www.thehotline.org/resources/the-myth-of-mutual-abuse. As such, the Department should also make it clear that self-defense by a survivor against any form of intimate partner violence perpetuated by their abuser does not constitute a form of prohibited violence. We also urge the Department to encourage schools to review complaints of intimate partner violence with a lens towards larger patterns of power and control, instead of viewing complaints as single instances of abuse.
[53] National Women's Law Center, *Letter to Dep't of Educ., Re: Agency Information Collection Activities; Comment Request; Mandatory Civil Rights Data Collection (Docket No. ED–2021–SCC–0158, at 86 Fed. Reg. 70831)* at 7-8 (Feb. 11, 2022) https://nwlc.org/resource/nwlc-comments-regarding-department-of-education-data-collection [hereinafter NWLC CRDC Comment].

Exhibit J

A definition like this would help students and schools understand, without having to look up other legal authorities, what sort of contact is prohibited, including by explaining which body parts are considered "private" body parts, as required in the FBI uniform crime reporting system's definition of "fondling," which is one of its categories of "sex offenses."[54] It would also include a wider range of incidents, including where the victim is made to touch the assailant's private body parts, and would explicitly clarify, as was recognized in the preamble to the 2020 Title IX regulations, that the touching of private body parts "over clothing" can constitute sexual assault.[55] Furthermore, by focusing on "intentional" touching, this definition would exclude situations such as those where an individual accidentally bumps against another person in a crowded place. At the same time, "intentional" touching would ensure that incidents like hazing or hate incidents against LGBTQI+ students are included as "sexual assault," even though the incident may not have been done for the purpose of sexual gratification, but rather to assert dominance over the victim, or to express hatred against the victim.

Finally, our recommended definition would properly instruct schools to take into consideration the age of the victim when classifying incidents of sexual assault, consistent with two decades of Department Title IX policy recognizing that, for example, "in the case of younger students, sexually harassing conduct is more likely to be intimidating if coming from an older student."[56] Importantly, we have *not* recommended considering the "developmentally appropriate behavior" of the *victim*, because a victim's "behavior" is never relevant in incidents of sexual assault, as the victim is never responsible for being sexually assaulted. Accordingly, an inquiry into what is "developmentally appropriate" for a victim may open the door to victim-blaming or relying on stereotypes based on the victim's sex (including sexual orientation, gender identity, transgender, nonbinary, or intersex status, pregnancy or parenting status), race, disability, etc. However, it is important to consider the respondent's "developmentally appropriate behavior" when classifying an incident of sexual assault, given that very young respondents and some disabled respondents may engage in sexually harassing behavior without being aware of the nature or implications of their actions.

### *Scope of recipients' obligation to address sex-based harassment and other sex discrimination*

We support the requirement in proposed § 106.11 that schools respond to all sex discrimination, including sex-based harassment, "occurring under [their] education program or activity," which includes conduct that a school has disciplinary control over and conduct that occurs in a building owned or controlled by an officially recognized student organization at a college or university. While we appreciate that proposed § 106.11 clarifies that this would mean schools would be responsible for addressing incidents that occur outside the school's education program or outside the United States, so long as they contribute to a hostile environment in an education program or activity,[57] we urge the Department to expressly state in the final regulations that this includes "off-campus" incidents, as this has been a common source of confusion among students and school officials (including under the current regulations, which also require schools to address some off-campus incidents). The preamble also explains that if a complainant experiences harassment off campus and can show that, due to the harasser's continued presence on

---

[54] Dep't of Justice, Federal Bureau of Investigation, *2021.1 National Incident-Based Reporting System User Manual* (last updated Apr. 15, 2021), *available at* https://www.asucrp.net/uniform-crime-reporting-program/national-incident-based-reporting-system-nibrs/nibrs-manuals.
[55] Dep't of Educ., *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30026, 30176 (May 19, 2020), https://www.federalregister.gov/d/2020-10512.
[56] 2001 Guidance, *supra* note 40, at 7 (instructing schools to consider the "age . . . of the alleged harasser *and the subject or subjects of the harassment*") (emphasis added).
[57] *See also* 87 Fed. Reg. at 41403-04.

Exhibit J

campus or their additional on-campus harassment, the complainant is experiencing a hostile educational environment, the school would have to address this harassment.[58] This would be a marked improvement over current §§ 106.44(a) and 106.45(b)(3)(i), which require schools to dismiss all Title IX complaints of off-campus sexual harassment occurring outside of a school-sponsored program or where the respondent or context of the harassment is not under the school's "substantial control."[59] The Department's proposed change would permit schools to address many Title IX complaints by students who are sexually harassed while studying abroad, at a fraternity that isn't officially recognized by their school or in off-campus housing, or who are harassed or stalked online outside of a school-sponsored program. This change would ensure schools could address more incidents of sex-based harassment, which occurs not only on campus, but also frequently off campus: almost nine in ten college students live off campus,[60] and 41 percent of college sexual assaults involve off-campus parties.[61]

We also appreciate the proposed rules outlining a school's obligations to address off-campus harassment that occurs *outside* of a school-sponsored program so long as it occurs under a school's "program or activity," which includes conduct that "is under the school's disciplinary authority."[62] To illustrate which conduct schools would have to address under this standard, the preamble describes an example in which a teacher sexually harasses a student off campus, stating that such conduct would ''likely'' be considered sexual harassment '''in the program of the school even if the harassment occurs off campus or off school grounds and outside a school-sponsored activity," because the school has disciplinary authority over the teacher in this example.[63] While we appreciate the preamble stating that this example would "likely" create an obligation for a school to respond to this conduct, we ask the Department to clarify that this example would *definitely* require a school to respond under Title IX, since the teacher is clearly under the school's disciplinary authority.

To illustrate a circumstance in which a school would *not* have an obligation to respond to off-campus harassment occurring outside a school's program or activity, the preamble offers an example in which a student is sexually assaulted by a third party while at a nightclub off campus; the student is now experiencing emotional distress due to the assault, and as a result, cannot go to class.[64] The preamble explains that this assault would not be considered to have occurred in the school's program or activity, because the assault happened off campus, and "the respondent is not a representative of the recipient or otherwise a person over whom the recipient exercises disciplinary authority."[65] Thus, the school in the second example would not have to respond under Title IX, and would only be "encouraged" to provide the student supportive measures.[66] We urge the Department to reconsider its conclusion in this second example, and ask that it *requires* rather than encourages schools to provide supportive measures to survivors experiencing off-campus harassment outside a school-sponsored program. Though a school in the second example would not have disciplinary authority over a third-party assailant in the same way it does over a student or school employee, the Department acknowledges in the preamble that schools

---

[58] 87 Fed. Reg. at 41403-04.
[59] *See also* Dep't of Educ., Office for Civil Rights, *Questions and Answers on the Title IX Regulations on Sexual Harassment* 8-10 (July 2021; updated June 28, 2022), https://www2.ed.gov/about/offices/list/ocr/docs/202107-qa-titleix.pdf [hereinafter 2021 Guidance].
[60] Rochelle Sharpe, *How Much Does Living Off-Campus Cost? Who Knows?*, N.Y. TIMES (Aug. 5, 2016), https://www.nytimes.com/2016/08/07/education/edlife/how-much-does-living-off-campus-cost-who-knows.html (87 percent).
[61] United Educators, *Facts From United Educators' Report - Confronting Campus Sexual Assault: An Examination of Higher Education Claims* (2015), https://www.ue.org/sexual_assault_claims_study.
[62] 87 Fed. Reg. at 41402. *See also Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 645-46, 647 (1999).
[63] 87 Fed. Reg. at 41402.
[64] 87 Fed. Reg. at 41403.
[65] 87 Fed. Reg. at 41403.
[66] 87 Fed. Reg. at 41403.

Exhibit J

nevertheless have "disciplinary authority" to issue a no-trespass order against a non-affiliated third party who assaults a student, "even if the recipient otherwise lacks control over the person."[67] Thus, consistent with this position, we ask that the Department "require" schools to provide supportive measures to individuals who report off-campus sex-based harassment, even if the school is not required to respond otherwise by initiating its grievance procedure because the conduct occurs outside a school's program or activity.

***When recipients may dismiss complaints of sex-based harassment and other sex discrimination***

We strongly support the removal of the current requirement, set out in the definition of "formal complaint" at § 106.30, that individuals must be "participating or attempting to participate" in a school program or activity at the time they file their complaint. This means that schools are currently forced to dismiss Title IX sexual harassment complaints brought by prospective students who decide not to enroll at the school; former students after they drop out, transfer, or graduate; or former employees after they leave their jobs. While the current rules make an exception if an individual filing a complaint intends to enroll in a different program of the school, and for an alumnus who intends to stay involved in alumni programs, current § 106.30 still leaves many who experience sexual harassment without recourse under Title IX, including those prospective students, students, and employees who end their connection with a school specifically because of the harassment they experienced there. We support proposed § 106.2 undoing this harmful mandatory dismissal provision by defining "complainant" to include individuals who are not current students or employees, as long as they were "participating or attempting to participate" in the school's program or activity *at the time they experienced sex-based harassment or other sex discrimination*.

Proposed § 106.45(d)(1)(ii) echoes current § 106.45(b)(3)(ii), which allows schools to dismiss a Title IX complaint when the respondent has transferred, graduated, quit, retired, or otherwise left the school. However, proposed § 106.45(d)(4) would ensure that when schools do dismiss a complaint because the respondent is not participating in a school program or activity or is not employed by the school, the school must offer supportive measures to the complainant and take other "prompt and effective steps" to ensure the harassment or discrimination does not continue or recur. As set out in the preamble, these supportive measures and steps could range from barring a respondent who is a former student or employee from the school's campus if they are attending school events and committing further harassment, to leading staff trainings on how to monitor for risks of sex discrimination in a specific class, department, athletic team, or program where discrimination has been previously reported.[68] We urge the Department to outline further examples of what "other appropriate prompt and effective steps" could be in the preamble to the final rules and in supplemental guidance.[69] For example, the Department should explain that these steps may also include, but are not limited to: investigating to determine whether there have been other victims of the respondent and whether other school staff knew about the incident(s) but ignored it or took steps to cover it up; and, after this investigation, scheduling a follow-up interview with the complainant to determine if the supportive measures offered by the Title IX coordinator have been helpful or effective, and whether the complainant experienced ongoing harassment by the respondent.

We also note and support the important distinction the preamble makes between the current and proposed rules. That is, the preamble emphasizes that current § 104.65(b)(3)(ii) permits schools to dismiss complaints if the respondent is "no longer *enrolled*" at the school, whereas the proposed rules

---

[67] 87 Fed. Reg. at 41417-18.
[68] 87 Fed. Reg. at 41446-47.
[69] 87 Fed. Reg. at 41447.

Exhibit J

would only permit schools to dismiss a complaint if the respondent is "not *participating in*" the school's program or activity.[70] As the preamble points out, some student respondents may continue to participate in a school's program or activity, even if they are no longer enrolled in the school, and further, that this participation may impact the complainant's access to the school's program or activity. Under this proposed standard, continued participation might include membership in an alumni organization, volunteering at the school, or attending school events, as well as reaching student respondents at colleges or universities on a school-approved leave intending to return.[71] This broader "not participating in" standard would allow more complainants to get relief under Title IX where they could not under the current rules.

### *What employees must do when they know of possible sex-based harassment or other sex discrimination*

Under the current rules, a higher education institution is only obligated to respond to sexual harassment when employees with the "authority to institute corrective measures" have "actual knowledge" of the harassment. In order to rectify the incentive and opportunities the current rule creates for institutions to sweep harassment under the rug, the proposed rules put forth a reporting scheme that requires certain classes of employees to report sex discrimination, including sex-based harassment, to the Title IX coordinator. The preamble explains that these proposed reporting obligations attempt to strike a balance between protecting survivor autonomy—especially in the context of higher education, where most individuals experiencing sex-based harassment and other forms of sex discrimination are adults—and "ensuring that all recipients provide a nondiscriminatory educational environment" by ensuring robust institutional obligations to respond to sex discrimination.[72] We agree that protecting survivor autonomy and privacy is essential, as is the goal of ensuring schools are taking measures to address and prevent sex discrimination in their programs rather than grasping incentives to ignore it. The following outlines our recommendations on how best to strike the balance between these two goals.

Preserving a survivor's choice and sense of control in the wake of sexual assault or other traumatizing harassment is critical in allowing them to heal; the preamble acknowledges this and also notes that safeguarding survivor autonomy is especially important in the context of higher education, where most survivors are adults.[73] The importance of preserving survivor autonomy following an incident of sexual misconduct or violence is widely endorsed by mental health professionals: Professor of Psychology Ellen Zurbriggen explains that "rape, sexual assault, and sexual harassment are traumatic in part because the victim loses control over [their] own body. A clearly established principle for recovery from these traumatic experiences is to...reestablish a sense of control over one's own fate and future."[74] Similarly, renowned trauma expert, Dr. Judith Herman, has acknowledged: "trauma robs the victim of a sense of power and control over [their] own life; therefore, the guiding principle of recovery is to restore power and control to the survivor…No intervention that takes power away from the survivor can possibly foster [their] recovery, no matter how much it appears to be in [their] immediate best interest."[75] Moreover, preserving survivor

---

[70] 87 Fed. Reg. at 41476.
[71] 87 Fed. Reg. at 41476.
[72] 87 Fed. Reg. at 41432, 41437-38.
[73] 87 Fed. Reg. at 41432, 41437-38.
[74] Letter from Eileen Zurbriggen, Professor of Psychology, *et al.*, to Daniel Hare, Chair, Academic Senate of the University of California System (Oct. 26, 2015), http://ucscfa.org/wp-content/uploads/2015/10/UCSC-faculty-comments-on-SVSHpolicy-10.26.15.pdf (discussing reporting against the survivor's wishes).
[75] Judith L. Herman, *Recovery from Psychological Trauma*, 52 Psychiatry & Clinical Neurosciences 98 (1998).

Exhibit J

autonomy is also essential in supporting a survivor in their ability to continue their education.[76] Research suggests that schools acting against survivors' wishes can lead to educational disengagement, including withdrawal from extracurricular activities, campus life, and academic and honor societies.[77] As such, while we appreciate that proposed §§ 106.2 and 106.44(d) would *allow* schools to designate some employees as "confidential employees" who would not be required to report possible sex-based harassment and other sex discrimination[78] to the Title IX coordinator (and would require those schools to notify students of the confidential employees' identities), we urge the Department to go further to protect survivors' autonomy by instead *requiring* that schools designate one or more confidential employees, with whom survivors can privately discuss their victimization with, without fear that an unwanted report might be made to the Title IX coordinator. We also urge the Department to specify that certain types of employees—most critically, those who work in victims services or advocacy offices, mental health services, and campus resource centers or offices for women, LGTBQI+ students, disability services, and other minority students who are particularly vulnerable to sexual misconduct—must be categorically designated as confidential employees.

We encourage the Department to clarify that confidential employees' responsibilities must include, upon learning of possible sex discrimination, including sex-based harassment, telling the person confiding in them: (i) how to report it to the Title IX coordinator, and (ii) how the Title IX coordinator can help them—by offering supportive measures (even without an investigation), opening an investigation, and/or facilitating an informal resolution. We also ask that the Department require all confidential employees to reduce all of this information to writing and give it to the disclosing individual,[79] for example, in the form of a brief brochure of resources survivors can take with them. The confidential employee must also make clear to the disclosing individual, including in writing, that the confidential employee will not make any report of the alleged discrimination to the recipient institution, to minimize any misunderstanding of the confidential employee's role.

We acknowledge that in PK-12 schools, schools may be limited in keeping some reports of sex-based harassment confidential because of obligations imposed by state mandatory reporting laws requiring many school employees to report possible child abuse to law enforcement. However, for disclosures of sex-based harassment that do not rise to the level of possible child abuse, our recommendation would allow confidential employees in PK-12 schools to serve as a fully confidential resources for children, without reporting to either the Title IX coordinator or to law enforcement. And, to ensure that children in PK-12 schools are fully aware of their options for requesting help, we ask the Department to require confidential employees in PK-12 schools to offer to help a disclosing individual report the harassment or discrimination to the Title IX coordinator (while making clear that they would not do so without the individual's consent).

---

[76] *See e.g.*, Merle H. Weiner, Letter to Dep't of Educ., RE: Docket ID ED-2021-OCR-0166, at 5 (to be submitted to Regulations.gov on or before Sept. 12, 2022) [hereinafter Weiner Comment]; Merle H. Weiner, *A Principled and Legal Approach to Title IX Reporting*, 85 Tenn. L. Rev. 71, 94-95 (2017) [hereinafter Weiner Article].

[77] Weiner Article, at 76; Carly P. Smith, Marina N. Rosenthal, & Jennifer J. Freyd, *The UO Sexual Violence and Institutional Betrayal Campus Survey* 34-36 (Oct. 24, 2014), https://dynamic.uoregon.edu/jjf/campus/SmithRosenthalFreydGSU22-24October2014.pdf.

[78] In addition to the importance of ensuring survivors of sex-based harassment can access confidential resources, we also note the importance of preserving an individual's right to access confidential resources when they have experienced other forms of sex discrimination. For example, LGBTQI+ students and pregnant students experiencing related discrimination may be vulnerable to heightened safety risks in disclosing their LGBTQI+ status or pregnancy status (see below in **Part II.B.**, **Part III.D.**, and **Part V.A.**). As such, it is essential that these students have access to confidential employees with whom they can privately discuss their experiences before deciding whether to report.

[79] This paper trail requirement could also be satisfied by the employee sending this information to the survivor electronically along with their email signature.

Exhibit J

We also urge the Department to provide examples of how schools should inform students of the identities of these confidential employees, including but not limited to: requiring these employees to clearly indicate their confidential status on their office doors, in their email signatures, on their website profiles, in employee directories, and in other relevant locations. In addition, we urge the Department to encourage schools to designate confidential employees proportionally to the number of enrolled students, to clarify that confidential employees may not serve as advisors in Title IX investigations, to encourage schools to enter into memoranda of understanding with local community-based organizations that serve survivors to provide confidential employees, and to encourage schools to designate a diverse set of confidential employees. We make these recommendations after careful consideration and consultation with various stakeholders and experts, and in light of the importance of ensuring that all students have the opportunity to speak with a confidential resource for support and to understand the options available to them before deciding whether to formally make a complaint.

In the PK-12 context, we support proposed § 106.44(c)(1) requiring all non-confidential employees to report possible sex discrimination harming students, including sex-based harassment, to the Title IX coordinator. Our support for this requirement is informed by the fact that students experiencing sex discrimination in the PK-12 context will typically be minors, which affects both the power dynamics present in these situations and considerations regarding student autonomy. Our support for this requirement recognizes, as does the preamble, that PK-12 schools "generally operate under the doctrine of in loco parentis."[80] However, we ask the Department to use a different approach when the alleged victim is an adult employee (or non-employee worker, see p.21-22) in a PK-12 institution, consistent with our below recommendation for responding to adult alleged victims in institutions of higher education.

For institutions of higher education (and other recipients other than elementary and secondary schools), proposed § 106.44(c)(2) would create different reporting obligations for three categories of non-confidential employees: (i) those with "administrative leadership, teaching, or advising roles"; (ii) those with the authority to institute corrective measures; and (iii) all other employees. Further, proposed § 106.44(c)(2) would assign different obligations to these employees based on whether they learn of sex discrimination, including sex-based harassment, against a student or employee, giving employees with administrative leadership, teaching, or advising roles who learn of discrimination *against an employee* the flexibility either to report it to the Title IX coordinator or simply inform the disclosing employee of how to report it themselves, while requiring employees learning of discrimination against a *student* to report it to the Title IX coordinator. While acknowledging the sometimes competing interests at stake in holding institutions responsible for addressing discrimination and protecting the autonomy of those harmed by discrimination, we come down on urging the Department to acknowledge the privacy and autonomy rights of both students in higher education—who are typically adults—and these institutions' employees (and non-employee workers), and accordingly ask the Department to amend its proposed reporting obligations in light of this reality.[81]

First, we agree that employees with the "authority to institute corrective measures" should be required to report all possible sex discrimination, including sex-based harassment, to the Title IX coordinator. We also urge the Department to clarify that these employees' reporting obligations should be clearly communicated to students, so that survivors never find themselves in the devastating position of choosing

---

[80] 87 Fed. Reg. at 41437. Relatedly, we recognize that PK-12 employees are typically also designated as mandatory reporters of child abuse under state laws.
[81] While some students at institutions of higher education are minors, education laws like FERPA give them their own privacy rights, unlike minors in PK-12 schools, whose privacy rights belong to their parents. *See* 20 U.S.C. § 1232g(d).

Exhibit J

to confide in an employee, only to be surprised that the employee must report their victimization to the Title IX coordinator.[82] As such, we ask the Department to require employees with the "authority to institute corrective measures" to post notice of their reporting obligations, for example, on their office doors, in their email signatures, on their website profiles, in employee directories, and in other relevant locations.[83] (This will also help those individuals who do want an institutional response to the discrimination they have experienced better identify those employees empowered to assist them.)

Second, rather than applying a separate set of requirements to employees "with administrative leadership, teaching, or advising roles," and all other non-confidential employees, we ask that the Department simply distinguish between employees with the "authority to institute corrective measures" and all other non-confidential employees. We recommend that, as to this (now larger) category of other non-confidential employees, rather than requiring these employees to report possible sex discrimination, including sex-based harassment, to the Title IX coordinator, the Department instead require them to connect individuals with resources when an individual discloses sex discrimination. Specifically, we recommend that all other non-confidential employees should be required to tell the person disclosing to them: (i) how to report to the Title IX coordinator, and how the Title IX coordinator can help them by offering supportive measures, and, if requested, an investigation or informal resolution; and (ii) how to reach a confidential employee, who can provide confidential supports and services.[84] Additionally, these employees should also be required to ask if the person would like them to report the incident to the Title IX coordinator, and if so, to report it as requested.[85] Finally, we urge the Department to require that all non-confidential employees provide this information in writing to the individual. Not only would documenting this information essentially create a brief brochure of resources survivors can take with them, but the presence or absence of such documentation would also be helpful in demonstrating whether a recipient adequately responded to sex discrimination in a later OCR investigation or lawsuit (see our recommendations below regarding when a school must respond to possible sex discrimination).

By requiring all other non-confidential employees to obtain an individual's consent before reporting the possible sex discrimination to the Title IX coordinator, our recommended approach would prioritize the goal of preserving the autonomy, privacy, and choice of those experiencing sex-based harassment and other forms of sex discrimination, which, as explained above, is crucial in the wake of victimization.[86] The alternative approach proposed by the Department of requiring all higher education employees with "administrative leadership, teaching, or advising roles" to report possible sex-based harassment and other sex discrimination would sweep in an incredibly broad swath of school employees. Not only would this

---

[82] Weiner Comment, *supra* note 76, at 14.

[83] *Id.* at 13-14.

[84] Kathryn J. Holland, Letter to Dep't of Educ., *RE: Docket ID ED-2021-OCR-0166*, at 6-7 (to be submitted on or before Sept. 12, 2022).

[85] Weiner Comment, *supra* note 76, at 10, 12-14; Holland, *supra* note 84, at 6-7.

[86] We acknowledge the complexity inherent in obtaining the consent of multiple victims in a situation wherein they all have been subjected to the same harassment or discrimination by the same respondent, where one or more of the victims do not want to report. For example, Student A might disclose to an employee with the authority to institute corrective measures that they have been sexually harassed by a professor, and that this professor has similarly harassed other students. In doing so, Student A unintentionally discloses the identities of Students B and C as other victims of this professor's harassment, while noting that Students B and C do not want to come forward. The employee reports the incident to the Title IX coordinator and mentions in passing that Students B and C have also experienced the same harassment—despite Students B and C not wanting to report their victimization. Or, say a harasser non-consensually exposes themselves to Students A, B, and C at the same time. Student A discloses to a non-confidential employee and asks the employee to report; however, Students B and C do not want to report or disclose their identities. Upon receiving the employee's report on Student A's behalf, the Title IX coordinator decides to open an investigation into the harassment Student A experienced but needs to interview Students B and C as the only other witnesses to the incident. We ask the Department to issue supplemental guidance to instruct schools on what they can do in these types of situations to protect the privacy of the victims whose identities may be exposed in a report of sex-based harassment or discrimination but who do not want to come forward, while still fully addressing the complaints of those individuals who do wish to proceed.

17

Exhibit J

category include professors, coaches, and academic advisors, but it would apply to graduate students serving as teaching assistants[87] and other student-employees,[88] all of whom students are likely to identify as "safe" resources to discuss their victimization with—leading to the unfortunate surprise that many survivors will be faced with once they realize the person they chose to confide in regarding a sexual assault, for example, is obligated to report their disclosure to the Title IX coordinator. In addition to minimizing a disclosing individual's surprise as to what an employee's reporting obligations are, this approach would protect the autonomy of those experiencing discrimination. It would also forward the Department's goal of "ensuring that all recipients provide a nondiscriminatory educational environment"[89] by enabling individuals to learn about their reporting options and their ability to get support from the Title IX coordinator. Finally, in the case of a student-employee reporting harassment, our recommendation would eliminate the need for an employee to determine whether the person reporting the harassment should be considered a student or an employee for purposes of their reporting obligations under proposed § 106.44(c)(3).

Finally, we also ask that three exceptions be made to employees' obligation to report disclosures of harassment or discrimination when a college or graduate student makes a disclosure: (i) at a public awareness event (*e.g.*, Take Back the Night), (ii) in an application (*e.g.,* disclosure made in a personal statement or interview), or (iii) in an anonymous school climate survey, as students are unlikely to expect that such disclosures would trigger mandatory reporting obligations.[90] However, when Title IX Coordinators or other employees in higher education with the authority to institute corrective measures know of such disclosures, the school could still respond by creating school-wide training and prevention programs and ensuring that students are aware of their reporting options and resources for survivors, as the Department noted in its (now rescinded) 2014 Title IX guidance.[91] Finally, we put forth these exceptions while acknowledging the complexity inherent in balancing students' privacy (and expectations about what might trigger a report) with a recipient's ability to prevent and address sex-based harassment and discrimination in its program or activity.

### *When a recipient has an obligation to respond to sex-based harassment or other sex discrimination*

The current rules do not consider institutions of higher education to have an obligation to respond to sexual harassment unless an employee with the "authority to institute corrective measures" has "actual

---

[87] The preamble provides further clarification on which employees would fall in each category. It explains that: employees with administrative leadership roles "would include deans, coaches, public safety supervisors, and other employees with a similar level of responsibility, such as those who hold positions as assistant or associate deans and directors of programs or activities;" employees with teaching responsibilities "would include any employee with ultimate responsibility for a course, which could include full-time, part-time, and adjunct faculty members as well as graduate students who have full responsibility for teaching and grading students in a course;" and employees with advising roles "would include academic advisors, as well as employees who serve as advisors for clubs, fraternities and sororities, and other programs or activities offered or supported for students by the recipient." 87 Fed. Reg. at 41439.

[88] The preamble explains that, in the case of a person being both a student and an employee, "the Department expects that the person would be required to notify the Title IX Coordinator only of information that may constitute sex discrimination under Title IX that was shared with the person while they were fulfilling their employment responsibilities (e.g., receiving information about sex discrimination from a student during class or office hours)." However, cabining the reporting obligations of, for example, a graduate student working as a teaching assistant, to "class or office hours" does not counter the expectation by a student that a fellow student, albeit one with a teaching role, would have reporting obligations. Also, it is entirely foreseeable that a student would choose to discuss their victimization with a graduate teaching assistant during their office hours, likely so they could do so privately.

[89] 87 Fed. Reg. at 41432, 41437-38.

[90] While the proposed rules do not obligate the Title IX coordinator to do anything in response to possible sex-based harassment disclosed in assignments or at public awareness events, the proposed requirement for employees to report such information to the Title IX coordinator could nevertheless chill student participation in classes and at public awareness events. 87 Fed. Reg. at 41573 (proposed 34 C.F.R. § 106.44(e)).

[91] *See, e.g.*, 2014 Guidance, *supra* note 40, at 24.

Exhibit J

knowledge" of the harassment. Furthermore, the current rules do not consider imputation of knowledge based only on constructive notice to be "actual knowledge" on the part of a PK-12 school or an institution of higher education.[92] This poses significant problems for survivors seeking to file OCR complaints against their school for a failure to respond appropriately to their victimization, as schools are only considered to be on notice and thus required to respond when sexual harassment is reported to an extremely narrow set of employees.

While the proposed rules would set out when *employees* must report possible sex discrimination to the Title IX coordinator, they do not explicitly specify when a *recipient* would have a legal obligation to address possible sex discrimination. In contrast, earlier (now rescinded) guidance clarified the circumstances in which schools were considered to have notice, including constructive notice, of sex-based harassment and other sex discrimination obligating a response.[93] Accordingly, we ask the Department to expressly affirm that recipients will be responsible for addressing possible sex discrimination, including sex-based harassment, when the recipient knew or should have known about the discrimination, which at minimum includes situations in which:

(i)    the Title IX coordinator and/or their designee has notice of possible sex discrimination;
(ii)   any employee at a PK-12 school has notice of possible sex discrimination;
(iii)  an employee at an institution of higher education with the "authority to institute corrective measures" has notice of possible sex discrimination; or
(iv)  any other non-confidential employee at an institution of higher education has notice of possible sex discrimination, *and*
    (A) is asked by the individual disclosing the discrimination to report the incident to the Title IX coordinator, or
    (B) fails to tell the individual disclosing the discrimination how to contact the Title IX coordinator, how to contact a confidential employee, and what the Title IX coordinator can do in response to a report.

Like our recommendations regarding the Department's reporting scheme, these recommendations attempt to balance the autonomy and privacy of those experiencing sex discrimination with the goal of ensuring schools are taking steps to prevent sex-based discrimination in their programs. Specifically, our recommendations seek to prevent the situation of an individual employee's failure to comply with their reporting obligations having the effect of insulating the recipient from any responsibility to address sex discrimination.

Also, similar to now rescinded 2001, 2011, and 2014 guidance and employer liability standards for harassment under Title VII, we ask the Department to clarify that schools are responsible for employee-on-student harassment, regardless of whether or not they have notice of the harassment, if the harassment is enabled or assisted by the authority exercised as an employee or agent of such covered entity.[94] If the Department does not adopt this recommendation, we at least ask the Department to revert

---

[92] 87 Fed. Reg. at 41436.
[93] 2001 Guidance, *supra* note 40, at 10, 12-13, 18.
[94] 2014 Guidance, *supra* note 40, at 4 ("indeed, even if a school was not on notice [of employee-on-student harassment], the school is nonetheless responsible for remedying any effects of the sexual harassment on the student, as well as for ending the sexual harassment and preventing its recurrence, when [an] employee engaged in the sexual activity in the context of the employee's provision of aid, benefits, or services to students (e.g., teaching, counseling, supervising, advising, or transporting students)"); We also urge the Department to revive earlier notice standards for employee-on-student harassment to ensure consistency with the

Exhibit J

to the standard in prior guidance, which is that a school is responsible for employee-on-student harassment, regardless of whether or not it has notice of the harassment, when an employee harasses the student "in the context of the employee's provision of aid, benefits, or services to students (e.g., teaching, counseling, supervising, advising, or transporting students."[95]

To reiterate, we recommend this particular notice structure because of our concerns around protecting the autonomy, choice, and privacy of survivors in the wake of sex-based harassment (see above on p.14-18), so that schools can respect and preserve a survivor's decision whether to report sexual misconduct. We also recommend this notice structure for other sex discrimination matters for similar reasons; for example, this structure would better protect the privacy of LGBTQI+ students and pregnant students, who may not wish for employees to report sex discrimination to the Title IX coordinator without their consent because, as explained below in **Part V.A.** (p.64-65), doing so puts them at risk of being outed as LGBTQI+ or pregnant by creating a written record of their LGBTQI+ or pregnancy status—which is especially dangerous in states that criminalize abortion or force school employees to out LGBTQI+ students to their families. We also acknowledge that just as it is important to preserve the autonomy, choice, and privacy of individuals experiencing sex-based harassment and sex discrimination, it is similarly important to do so for individuals experiencing race or disability discrimination—who may also experience trauma associated with this discrimination and need to retain control over the ensuing process to recover from this trauma. And, like individuals experiencing sex-based harassment or sex discrimination, individuals experiencing race or disability discrimination need to be presented with the same opportunity to access confidential resources with whom they can privately discuss their victimization before deciding whether to make a formal report or complaint. As such, we urge the Department to consider, in consultation with other civil rights advocates focusing on racial and disability justice, how our proposed notice structure might be valuable in the context of race and disability discrimination. [96]

### Who can file a complaint and how they can do so

We support the proposed rules' expansion of what will be considered a complaint of sex discrimination, as reflected in the replacement of the current rules' definition of "formal complaint" with a new definition of "complaint." Specifically, while the current definition of "formal complaint" at § 106.30 only includes written complaints, proposed § 106.2 would include oral complaints as well in the definition of "complaint." In addition, proposed § 106.2 would omit the physical or electronic signature requirement in current §106.30.[97] We support removing the requirement that individuals sign their complaints to facilitate the

---

notice standard employed by Title VII in the context of a supervisor harassing an employee so that students are not required to satisfy a higher burden than employees are in the workplace—that is, if an employee is sexually harassed by their supervisor, the employer is usually strictly liable for the harassment, regardless of whether it otherwise had any notice of the harassment. *See, e.g.*, *Faragher v. City of Boca Raton*, 524 U.S. 775, 792 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998). In the Title VII context, it make sense to impose strict liability on an when a supervisor harasses an employee because the supervisor is a representative of the employee; similarly, in the Title IX context, a school should be deemed to have notice and thus required to address employee-on-student harassment, even if the employee-respondent is the only one with knowledge of the harassment, because the employee-respondent is a representative of the school.

[95] 2014 Guidance, *supra* note 40, at 4.
[96] We also note that the 2020 rules implemented uniquely burdensome procedures for sexual harassment—one of which was an untenable notice scheme that required schools to ignore many incidents of sexual harassment—primarily to reinforce the sexist myth that survivors should not be believed when coming forward about victimization. We reject this myth, which is reflected by our request for the Department to restore longstanding policy prior to the 2020 rules regarding sex-based harassment and sex discrimination, in addition to our recommendations that urge the Department to go further than previous policy to strengthen protections for individuals experiencing sex-based harassment and sex discrimination. Our recommended notice structure, while different from the notice structure for race or disability discrimination, is different only to achieve the goals of protecting the autonomy, choice, and privacy of individuals experiencing sex-based harassment or sex discrimination and could potentially forward the same goals in those contexts.
[97] *See* 87 Fed. Reg. at 41408.

Exhibit J

filing of complaints—particularly for disabled victims who may face challenges that make communication difficult, especially young victims, and survivors whose first language is not English.

We also acknowledge the complexities around proposed § 106.44(f)(5), which would allow a Title IX coordinator to file a complaint of sex-based harassment or discrimination "if necessary to address conduct that may constitute sex discrimination under Title IX in the recipient's education program or activity"—even without the consent of the individual or individuals who experienced sex-based harassment or other sex discrimination.[98] We appreciate the Department's acknowledgement that balancing the important interest of preserving a survivor's autonomy by honoring their wishes not to proceed with a complaint with a school's duties to ensure it is taking steps to prevent and address sex discrimination in its program is complex.[99] We also appreciate the Department's clarification in the preamble of what factors a Title IX coordinator should assess when deciding to file a complaint against the wishes of a survivor of sexual violence or other individual who has experienced sex discrimination, and we ask the Department to reiterate these factors the preamble to the final rule, as well as in supplemental guidance.[100] This represents a marked improvement over what was stated in the preamble to the current rules, which only say that a Title IX coordinator has "flexibility" in making this determination, so long as proceeding with the grievance process "is not clearly unreasonable in light of the known circumstances."[101]

Finally, we recognize that if the Department were to adopt our recommended reporting and notice scheme for institutions of higher education—where only employees with the "authority to institute corrective measures" would be required to report to the Title IX coordinator when they learn of possible sex-based harassment or other sex discrimination (see above)—it would reduce the number of scenarios wherein the Title IX coordinator would be notified of such harassment or discrimination and have to decide whether to override an individual's wishes not to file a complaint. Our goal is not to limit the number of incidents in which a school is required to respond to sex-based harassment; but rather, to balance these two interests by only requiring one class of employees to report to the Title IX coordinator, while requiring all other non-confidential employees to respond when possible sex-based harassment or discrimination is disclosed to them by informing the person of how to contact and report the incident to the Title IX coordinator, giving them the tools to determine whether and how to move forward.

### *Who is protected by Title IX*

We ask the Department to review both the final rule and its preamble to ensure that all language recognizes that Title IX protects all "person[s]" within an "education program or activity."[102] At times, the proposed rule and its preamble suggest that schools only have obligations to students and employees.[103] However, as the Department recognized in the preamble,[104] the Title IX statute uses the word "person," which does not limit Title IX's protections to those with a particular relationship to the school.[105] For

---

[98] *See* 87 Fed. Reg. at 41445.
[99] 87 Fed. Reg. at 41445.
[100] *Id.*
[101] 85 Fed. Reg. at 30131.
[102] 20 U.S.C. § 1681(a).
[103] *E.g.*, 87 Fed. Reg. at 41391, 41396, 41415, 41431, 41515, 41558, 41571.
[104] 87 Fed. Reg. at 41540.
[105] 20 U.S.C. § 1681(a); *see also Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 19 n.33 (2005) ("Title IX's beneficiaries plainly include all those who are subjected to 'discrimination' 'on the basis of sex.'" (emphasis added)); *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 521 (1982) (explaining that "Congress easily could have substituted 'student' or 'beneficiary' for the word 'person' if it had

Exhibit J

example, Title IX protects independent contractors,[106] campus visitors, and other "[m]embers of the public" who "are either taking part or trying to take part of a funding recipient."[107] For these reasons, we ask that, wherever possible and appropriate, the Department to use inclusive language such as "persons," or, when necessary, "workers" rather than "employees."

### C. The Proposed Rules Would Help Ensure that Schools' Response to Sex-Based Harassment and Other Sex Discrimination Is Prompt and Effective, and These Provisions Should Provide Even More Robust Protections.

*Standard of care*

We support proposed § 106.44(a) requiring schools to take "prompt and effective action" to end sex discrimination (including sex-based harassment), prevent it from recurring, and remedy its effects on all people harmed. This would be a welcome return to the standard of care previously required by the Department from 2001 until 2020 for schools' responses to sexual harassment[108] and a much-needed change from the harsh "deliberate indifference" standard at current § 106.44(a), which permits any recipient response to sexual harassment that is not *clearly* unreasonable. The proposed "prompt and effective action" standard would also align with the Department's current standards for harassment based on race, color, national origin, and disability.[109] This is especially important, as the preamble noted,[110] for ensuring consistency when schools respond to intersectional claims of harassment or other discrimination. For example, if a Black girl reports that she is being harassed because of her race and sex, it is illogical to require a school to provide a "prompt and effective action" in response to the race-based harassment and merely a response that is not "deliberately indifferent" to the sex-based harassment, when the harassment at issue is inextricably linked to both her race and sex and cannot be separated. Finally, as the preamble noted,[111] the proposed "prompt and effective action" standard would create a single uniform standard for responding to all types of sex discrimination, instead of maintaining a less stringent standard specifically for sexual harassment than other non-sexual sex discrimination. This is especially important as a tiered standard sends the message that somehow sexual harassment is of less concern than other forms of discrimination.

*Supportive measures*

We support the definition of supportive measures at proposed § 106.2 and the requirement at proposed 106.44(g) for schools to offer supportive measures at no cost to individuals who report sex discrimination, including sex-based harassment, regardless of whether they request an investigation or an informal resolution, and, per proposed § 106.45(d)(4)(i), even if their complaint is dismissed. Supportive measures are one of the most critical ways schools can ensure an individual's equal access to education programs

---

[106] wished to restrict the scope of" the statute, but it had not done so); *Elwell v. Oklahoma ex rel. Bd. of Regents of Univ. of Oklahoma*, 693 F.3d 1303, 1311 (10th Cir. 2012) (Gorsuch, J.) ("Title IX does not limit its coverage at all, outlawing discrimination against any 'person'"); 1 U.S.C. § 1 (defining "person").

[106] For further discussion of Title IX's protections for independent contractors, see Plaintiffs' Brief in Opposition to Motion to Dismiss at 10-22, *Conviser v. DePaul University*, No. 1:20-cv-03-095 (N.D. Ill. July 14, 2021), https://www.publicjustice.net/wp-content/uploads/2021/07/54-Opposition-to-MTD.pdf.

[107] *Doe v. Brown Univ.*, 896 F.3d 127, 132 n.6 (1st Cir. 2018).

[108] 2001 Guidance, *supra* note 40, at 10-12, 14-15, 23.

[109] Dep't of Educ., Office for Civil Rights, *Race and National Origin Discrimination* (last visited Sept. 9, 2022), https://www2.ed.gov/about/offices/list/ocr/frontpage/faq/race-origin.html; 2010 Guidance, *supra* note 40, at 2, 6; 2000 Disability Harassment Guidance, *supra* note 40.

[110] 87 Fed. Reg. at 41433.

[111] *Id.*

Exhibit J

and activities in the face of sex-based harassment, and it is critically important that their availability does not turn on whether or not an investigation is under way. This is especially so because many victims do not want to go through an investigation, whether it is because they are afraid to face their harasser in an adversarial setting, they do not have spare time or energy to prove their victimization while fighting to overcome the detrimental effects of the harassment, they fear retaliation from the harasser or others in the school community, or for a variety of other reasons.**[112]** Furthermore, even if a victim requests an investigation, they may not be able to prove they were harassed, including because there were few or no other witnesses besides their harasser and a lack of physical evidence. Therefore, supportive measures must be available to a complainant even in the absence of a pending investigation, favorable determination, or informal resolution.

We also appreciate proposed § 106.44(g)(1)-(2), which allows schools to temporarily burden a respondent during an investigation in order to protect a complainant's safety or the school environment or to prevent further incidents, including by making "involuntary" changes to a respondent's schedule, "regardless of whether there is or is not a comparable alternative." However, we ask the Department to amend proposed § 106.44(g)(1) to clarify that schools may not make "involuntary" changes to a *complainant's* schedule, as the proposed text currently suggests schools can make "involuntary" changes to any party's schedule. While victims should be free to make voluntary changes to their own schedule, they should not be forced to change their classes, extracurriculars, lunch period or dining hall, dorm, work assignment, etc. in the aftermath of sex-based harassment, as that is when they most urgently need to stay connected to their support network rather than being isolated from people whom they can turn to for help. Allowing schools to temporarily make involuntary changes to a respondent's schedule but not to a complainant's schedule is also consistent with the Department's longstanding policy that supportive measures should "minimize the burden" on the complainant.[113]

We also appreciate the elimination of a reference to "mutual" no-contact orders at proposed § 106.44(g)(1) and the preamble's explanation that schools would be allowed to impose a "one-way no-contact order" (or "non-mutual no-contact order") against a respondent during an investigation.[114] However, we ask the Department to clarify in the regulations themselves that "one-way no-contact orders" would be allowed, as the Department itself recognized that this has been a common point of confusion among schools and students under the current regulations (which also permit one-way no-contact orders).[115] In addition, we urge the Department to direct that one-way no-contact orders are to be the default type of no-contact order when an investigation is pending and to prohibit schools from issuing a mutual no-contact order unless the respondent has filed a cross-complaint filed against the complainant.[116] This would be consistent with decades of expert consensus that mutual no-contact orders are harmful to victims, as the preamble acknowledged,[117] because abusers often manipulate their victims into violating the mutual order,[118] allowing abusers to turn what was intended to be a protective measure for the survivor into a punitive measure against the survivor. This default requirement to issue one-way no-contact orders would also be consistent with the Violence Against Women Act's (VAWA) requirement

---

[112] See **Part I.A** above for a discussion on why sex-based harassment is underreported.
[113] 2014 Guidance, *supra* note 40, at 33; 2011 Guidance, *supra* note 40, at 15-16;
[114] 87 Fed. Reg. at 41450.
[115] 87 Fed. Reg. at 41449, 41450.
[116] This would be subject to our recommended clarification in the text of the regulations that schools may not discipline a complainant for a counter-complaint that the school should have known was filed for the purpose of retaliation—see **Part I.C: Retaliation** below.
[117] 87 Fed. Reg. at 41450.
[118] *E.g.*, Joan Zorza, *What Is Wrong with Mutual Orders of Protection?* 4(5) DOMESTIC VIOLENCE REP. 67 (1999), https://www.civicresearchinstitute.com/online/article.php?pid=18&iid=1005.

Exhibit J

that states receiving VAWA funding must "prohibit issuance of mutual restraining orders of protection except in cases where both parties file a claim and the court makes detailed findings of fact indicating that both parties acted primarily as aggressors and that neither party acted primarily in self-defense."[119]

In addition, we urge the Department to clarify in proposed § 106.44(g) that if a party requests a certain supportive measure and it is "reasonably available," then the school must provide it. Unfortunately, we have often heard from students and families that their schools provide supportive measures that do not actually help them. Our recommended clarification would ensure that individuals who experience sex-based harassment (or other sex discrimination) receive the specific supportive measures they need to restore and preserve their equal access to education. At the same time, our recommendation would not unreasonably burden schools, as they would not be required to provide a requested supportive measure if it is not "reasonably available."

Furthermore, we ask the Department to state in the regulations that if a school is aware that the supportive measure(s) currently offered are ineffective, then the school must modify them or offer additional supportive measures. This is consistent with decisions by a number of federal appellate courts, which require schools to reevaluate their responses if they are shown to be ineffective.[120] It would also be consistent with the Department's approach toward remedies, as explained in the preamble: "if the recipient's initial steps to address the sex-based harassment were insufficient, then it would be required to take additional steps and provide additional remedies to the student to fulfill its obligation under proposed § 106.44."[121]

We also ask the Department to expand the list of examples of supportive measures at § 106.44(g)(1) to include at least some of the following *academic* supportive measures: allowing a complainant to resubmit an assignment or retake an exam; adjusting a complainant's grades or transcript; if the instructor is the harasser, independently re-grading the complainant's work; preserving a complainant's eligibility for a scholarship, honor, extracurricular, or leadership position, even if they no longer meet a GPA, attendance, or credit requirement; and reimbursing tuition or providing a tuition credit to a complainant who does not complete a course due to harassment. We ask this because the list of examples of supportive measures in proposed § 106.44(g)(1) is almost entirely focused on mental and physical safety, and the only example of an academic supportive measure is "extensions of deadlines and other course-related adjustments." We have found from our conversations with students and from partner organizations that work directly with students that the vast majority of students simply do not know what "other course-related adjustments" they can request.

In addition to these changes to the regulatory text, we ask that the Department, upon finalizing the rule, issue supplemental guidance explaining in more detail what other academic, safety, and financial

---

[119] 34 U.S.C. § 10461(c)(1)(C).
[120] *See, e.g., Patterson v. Hudson Area Sch.*, 551 F.3d 438, 449 (6th Cir. 2009) ("Given that [the school district] knew that its methods were ineffective, but did not change those methods, 'a reasonable jury certainly could conclude that at some point during the . . . period of harassment[,] the school district's standard and ineffective response to the known harassment became clearly unreasonable.' "), *abrogated on other grounds, Foster v. Bd. of Regents of Univ. of Mich.*, 982 F.3d 960 (6th Cir. 2020); *Doe v. Sch. Bd. of Broward Cty., Fla.*, 604 F.3d 1248, 1261 (11th Cir. 2010) ("'where a school district has knowledge that its remedial action is inadequate and ineffective, it is required to take reasonable action in light of those circumstances to eliminate the behavior'") (quoting *Vance v. Spencer Cty. Pub. Sch. Dist.*, 231 F.3d 253, 260-61 (6th Cir. 2000)); *see also, e.g., Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 669–71 n.12 (2d Cir. 2012) (applying *Davis v. Monroe* in Title VI claim).
[121] 87 Fed. Reg. at 41423.

Exhibit J

supportive measures complainants can request and schools can offer.[122] This guidance should encourage institutions that provide student housing to offer a range of housing supportive measures to complainants, such as provision of accessible emergency housing (including gender-inclusive housing for transgender and gender-nonconforming students), assistance with breaking off-campus leases to access school-provided emergency housing (*e.g.*, obtaining any necessary certifications, paying lease-breaking fees), waiver of lease breakage fees for school-owned housing, and assistance with reasonable moving expenses when moving to emergency housing.[123]

Finally, we support proposed § 106.44(g)(5), which would prohibit schools from disclosing information about any supportive measure to any person other than the party to whom it was provided to or imposed on unless disclosure is necessary to provide that supportive measure or to restore or preserve the person's access to the education program or activity. For example, school staff who are responsible for implementing supportive measures must be informed of them in order to carry them out effectively—*e.g.*, enforcing a one-way no-contact order in the lunchroom or dining hall, or providing excused absences in excess of a professor's standard policy. It could be necessary to inform a complainant about a supportive measure imposed upon a respondent so that the complainant feels safe returning to school or attending classes and activities—*e.g.*, a no contact order, no-trespass order, or campus escort. However, a respondent should never be informed of any supportive measure provided to the complainant that does not affect the respondent—*e.g.*, extra time on assignments/exams, counseling, or a new campus work assignment (unless the respondent has a no-contact order requiring them to stay away from the complainant's frequent locations).

### *Informal resolution*

In general, we support proposed § 106.44(k) allowing schools to use an informal resolution to resolve reports of sex discrimination, including sex-based harassment, subject to certain safeguards.[124] After all, not all victims of sex-based harassment or other sex discrimination want to go through a formal investigation, and schools should be permitted to use a wide range of solutions to address discrimination, especially in cases where the respondent would like to address and repair the harm they caused. In addition, we support proposed § 106.44(k)(1) prohibiting schools from using informal resolutions to address employee-on-student incidents, as the power differential between students and employees can make it nearly impossible for informal resolutions in such cases to be truly voluntary, authentic, and effective. And we support proposed § 106.44(j) prohibiting schools from disclosing the identity of any

---

[122] In December 2020, we and our partners organizations asked the Department to issue guidance clarifying the current Title IX regulations, including by providing a more detailed list of available supportive measures, especially academic supportive measures. Letter from Allied Advocates for Student Sexual Harassment Victims to Biden-Harris Transition Team, *Recommended clarifications from the Department of Education regarding the new Title IX sexual harassment rule* 8-9 (Dec. 22, 2020), on file with Dep't of Educ. and available upon request. While we were glad to see the Department's 2021 Title IX guidance provided numerous helpful clarifications and illustrative examples regarding the current Title IX regulations, we were disappointed that it did not include more illustrative examples of supportive measures. 2021 Guidance, *supra* note 59, at 18-19.

[123] Know Your IX, Advocates for Youth, The Every Voice Coalition, SafeBAE, and Students and Survivors, *Comment to the Dep't of Educ.*, 12-14 (submitted to Regulations.gov on or before Sept. 12, 2022) [hereinafter Student Advocates Comment].

[124] Proposed § 106.44(k)(1)-(2) would allow schools to use an informal process to resolve a report of sex discrimination as long as: (i) all parties receive notice of their rights and obligations, give consent to the process, can withdraw at any time before the end to do a traditional investigation, and are not required to participate in an informal resolution or to waive their right to an investigation in order to continue accessing any educational benefit; (ii) the facilitator is trained, does not have a conflict of interest or bias; and is not the same person as the investigator or decision-maker; and (iii) the school believes an informal resolution is appropriate (*e.g.*, the alleged conduct would not pose a future risk of harm to others). Proposed § 106.46(j) would allow institutions of higher education to use an informal process to resolve a report of sex-based harassment as long as the parties receive written notice of their rights and obligations.

Exhibit J

participant in an informal resolution, except in limited circumstances, as unauthorized disclosures could chill reporting of sex-based harassment and participation in informal resolutions.

However, we are concerned that the proposed rules could allow some schools to coerce complainants into informal resolutions. For example, PK-12 students are more likely to feel they have no choice other than to consent to an informal resolution if adult school officials are encouraging them to participate in the process and are especially vulnerable to being pressured into whatever resolution is favored by the adult facilitator, whether or not they believe such a resolution to be adequate or responsive to their needs. At some religious schools, informal resolution facilitators may also pressure complainants into informal resolutions by relying on harmful rape myths, like "good girls forgive."[125] Therefore, we urge the Department to strengthen protections against coercion with respect to informal resolutions. First, we ask you to change proposed § 106.44(k)(3) to require all schools in all cases to give "written" notice to the parties of their rights and obligations in an informal resolution. (Proposed § 106.46(j) would only require written notice of rights and obligations in informal resolutions of sex-based harassment at institutions of higher education involving one or more students.) Second, we ask the Department to change proposed § 106.44(k)(2) to require all parties to give "written, informed" consent to an informal resolution (not simply "consent"). Third, we ask the Department to require schools to offer a respondent the option to participate in an informal resolution only after the complainant has agreed, so that the complainant does not feel coerced based on the respondent's consent.[126] This would be consistent with VAWA's definition of "restorative practice," which states that it is "initiated by a victim of the harm."[127]

We support proposed § 106.44(k)(3)(vii)'s prohibition on the parties and the school from using any "information, including records, obtained solely through an informal resolution process" as part of a future Title IX investigation. After all, informal resolutions are most effective for a survivor when the respondent is able to understand and admit they caused sex-based harm, but respondents will be very reluctant to participate in an informal resolution and admit responsibility if they know their admissions could result in future discipline. However, this proposal would not protect respondents' statements from being used in a future civil or criminal legal proceeding. Therefore, we ask the Department to issue supplemental guidance instructing schools on how to create agreements with the parties and with local prosecutors on not using information, including records, obtained solely through an informal resolution process in a civil or criminal legal proceeding.[128]

Furthermore, we recommend that the Department expressly clarify that schools may use a "restorative process" as a type of informal resolution process to resolve sex-based harassment, but that they may not use "mediation" or other "conflict resolution processes." This is because harassment is not a "conflict," where the victim and harasser share blame. Rather, harassment is a type of harm, where there is a victim and a harmer. Conflict resolution processes, including mediation, are inappropriate for resolving sex-based harassment, because such processes assume both the victim and harasser share responsibility for the harassment, can allow harassers to pressure survivors into inappropriate resolutions, and often require direct interaction between the parties, which can be retraumatizing. In contrast, a restorative

---

[125] *E.g.*, Grace Watkins, *Sexual Assault Survivor to Betsy DeVos: Mediation Is Not a Viable Resolution*, TIME (Oct. 2, 2017), http://time.com/4957837/campus-sexual-assault-mediation.
[126] Mary Koss & Mary Achilles, *Restorative Justice Responses to Sexual Assault*, National Online Resource Center on Violence Against Women 8 (Feb. 2008), https://vawnet.org/sites/default/files/materials/files/2016-09/AR_RestorativeJustice.pdf.
[127] 34 U.S.C. § 12291(a)(31)(B).
[128] For sample agreements for parties and prosecutors, *see* Madison Orcutt *et al.*, *Restorative Justice Approaches to the Informal Resolution of Student Sexual Misconduct*, 45 J. COLL. & UNIV. L. 1, 67-69 (June 10, 2020), https://digital.sandiego.edu/soles-faculty/15.

Exhibit J

process can be appropriate for addressing harm, as it requires the harasser to admit that they harmed the victim, center the victim's needs, repair the harm they caused, and change their future behavior. If the Department does not adopt our recommendation, we strongly urge that the Department, at a minimum, prohibit mediation from being used to address situations involving sexual assault, where all of these concerns are significantly magnified.

We also ask the Department to issue supplemental guidance upon finalizing the rule, describing various types of informal resolution processes that would be appropriate under the Title IX regulations. As the preamble noted, for example, PK-12 schools could have the respondent write an apology letter or draw an apology for the complainant.[129] It would also be helpful to give schools more information about restorative practices, including where to request funding for restorative practices (*e.g.*, under VAWA,[130] the Department of Justice's National Center on Restorative Justice,[131] state and private grantors).

Finally, we ask the Department to add the following clarifying language in proposed § 106.44(k)(3)(iii): "That, prior to agreeing to a resolution at the conclusion of the informal resolution process, any party has the right to withdraw from the informal resolution process and to initiate or resume the recipient's grievance procedures." This would ensure there is no confusion about the use of the word "resolution" to refer to the outcome of an "informal resolution process" and would be consistent with the existing language in proposed § 106.44(k)(3)(iv): "That the parties' agreement to a resolution *at the conclusion of the informal resolution process* would preclude the parties from initiating or resuming grievance procedures arising from the same allegations."

### *Retaliation*

We support proposed § 106.2's definition of "retaliation" to reach retaliation against anyone because they reported sex discrimination (including sex-based harassment) or participated or refused to participate in an investigation or informal resolution of such incidents. We also support proposed § 106.71's requirement that recipients prohibit retaliation in its education program or activity and requiring schools to offer supportive measures to individuals who report retaliation (pursuant to proposed § 106.44) and to investigate complaints of retaliation, including peer retaliation (pursuant to proposed § 106.45 or, if applicable, proposed § 106.46).

Given the high prevalence of schools punishing student survivors when they report sex-based harassment (see **Part I.A** above at p.3-4), we also support proposed § 106.71(a)'s express prohibition of schools disciplining complainants for collateral conduct—*i.e.*, non-harassing conduct that "arises out of the same facts and circumstances" as the reported discrimination—(*e.g.*, alcohol or drug use, self-defense, unauthorized access to facilities).[132] This would eliminate the "zero-tolerance" loophole from the 2020 rules' preamble, which currently allows schools to punish students who report sexual harassment for collateral conduct, as long as the school has a policy of always punishing all students for such conduct, regardless of the circumstances.[133] As the preamble to the proposed rules acknowledges, students "will not typically have access to information" about how their school enforces its code of

---

[129] 87 Fed. Reg. at 41454.
[130] 34 U.S.C. § 12291(a)(31)(B), (b).
[131] David Carle, *Leahy Announces $3 Million Grant to Establish National Center On Restorative Justice At Vermont Law School* (Mar. 24, 2020), www.leahy.senate.gov/press/leahy-announces-3-million-grant-to-establish-national-center-on-restorative-justice-at-vermont-law-school.
[132] 87 Fed. Reg. at 41436.
[133] 85 Fed. Reg. at 30536.

Exhibit J

conduct to know whether they are being punished as part of a zero-tolerance policy or experiencing unlawful retaliation.[134] In addition, whether or not a school has a zero-tolerance policy, punishment imposed on a complainant as a result of reporting sex-based harassment or other sex discrimination can be expected to have a harmful chilling effect on such reports.

By the same logic, we urge the Department to remove from proposed § 106.71(a) the provision stating that discipline for collateral conduct is only prohibited retaliation if it is done "for the purpose of interfering with the exercise of any right or privilege secured by Title IX or this part." If the Department retains this requirement in the final rule, it will be very difficult, if not impossible, for any students who are disciplined for collateral conduct to demonstrate retaliation, because students will not typically have access to the information regarding decisionmakers' state of mind to prove that they were disciplined "for the purpose of interfering with" their rights. Moreover, school officials who punish survivors often are not doing it specifically for the purpose of interfering with the student's Title IX rights, but because they are relying on rape myths and sex-based stereotypes to justify discrediting, blaming, and punishing the survivor. Removing this requirement would also make § 106.71(a) more consistent with proposed § 106.2, which defines retaliation to refer to conduct that is done "*[i]* for the purpose of interfering with any right or privilege secured by Title IX or this part, *or [ii]* because the person has reported information, made a complaint, testified, assisted, or participated or refused to participate in any manner in an investigation, proceeding, or hearing under [the Title IX rules]" (emphasis added). In other words, the "for the purpose" requirement does not apply when a person experiences retaliation because of participating or refusing to participate in a Title IX process. Title IX's promise in ensuring schools treat sex discrimination seriously rings hollow if schools are allowed to punish students reporting sex discrimination.

Additionally, while we appreciate proposed § 106.45(h)(5) prohibiting schools from disciplining someone for making a false statement or engaging in consensual sexual conduct based solely on the school's decision of whether sex-based harassment (or other sex discrimination) occurred, we ask the Department to specify such discipline is prohibited retaliation.[135] The preamble states that while such discipline would be prohibited, the Department would not consider it to be retaliation unless the school intended to use the disciplinary process "for the purpose of retaliating" against a person.[136] We urge the Department to expressly state that such discipline would be prohibited retaliation regardless of the school's internal motivations. Again, students will typically not have access to the information necessary to know whether their school is disciplining them after reporting sex discrimination "for the purpose" of retaliation. The Department's reasons for defining retaliation at proposed § 106.71(a) to include any discipline for collateral conduct, regardless of the school's internal enforcement protocols, should apply here too, regardless of the school's internal motivations.

Finally, we ask that the Department clarify in the regulations that retaliation includes:

- Disciplining a complainant for conduct that the school knows or should know "results from" the harassment or other sex discrimination (*e.g.*, missing school, expressing trauma). This would be consistent with the Department's note that schools should "review any disciplinary actions taken against the complainant to determine whether there is a causal connection between the sex-based harassment and the misconduct."[137]

---

[134] 87 Fed. Reg. at 41542.
[135] NWLC has represented multiple sexual assault survivors bringing Title IX retaliation claims because they were disciplined by their schools for allegedly making a "false" statement and/or engaging in "consensual" sexual activity based on their schools' belief that they were not sexually assaulted.
[136] 87 Fed. Reg. at 41490.
[137] 87 Fed. Reg. at 41423.

Exhibit J

- Disciplining a complainant for charges the school knew or should have known were filed for the purpose of retaliation (*e.g.*, a disciplined respondent files a counter-complaint against their victim alleging the victim was the actual harasser). This would be consistent with the Department's note that "[i]f a complainant alleges that another person made a complaint in retaliation for their original complaint, the recipient would be required to determine whether that other person's complaint constituted prohibited retaliation under proposed § 106.71."[138]
- Requiring a complainant to leave an education program (*e.g.*, to take leave, transfer, enroll in "alternative school") after reporting sex discrimination, including sex-based harassment.
- Requiring a complainant to enter a confidentiality agreement as a prerequisite to obtaining supportive measures, an investigation, an informal resolution, or any other Title IX rights; or disciplining a complainant for violating an impermissible confidentiality agreement; unless otherwise permitted by the Title IX regulations.[139] (For example, the Department would allow schools to take reasonable steps to protect the privacy of parties, witnesses, and others while an investigation is pending.[140])

### *Preemption*

We strongly support the proposed removal of current § 106.6(h), which prevents schools from complying with a state or local law that provides stronger protections against sex discrimination than the Title IX regulations. Accordingly, we strongly support proposed § 106.6(b), which would restore the longstanding civil rights principle that federal antidiscrimination law does not preempt stronger state and local protections and accordingly would ensure schools comply with state or local laws that do not conflict with the Title IX regulations and that provide greater protections against sex discrimination, including sex-based harassment.[141] These proposed changes would return Title IX to its proper role as a floor—not a ceiling—for civil rights protections.

### *Removal of respondents*

We support proposed § 106.44(h), which would allow schools to remove a respondent from an education program or activity, subject to an individualized risk and safety analysis, if they present an "immediate and serious" threat to the physical or mental "health or safety" of any person. This would be an improvement from current § 106.44(c), which requires the threat to be "physical" and does not consider how a respondent may pose a serious threat to a complainant's mental health. We also support proposed § 106.44(i), which would allow schools to place any employee respondent (including a student employee) on administrative leave from their employment responsibilities during the pendency of an investigation, subject to federal disability civil rights laws. This would be an improvement from current § 106.44(d), which only allows schools to place "non-student" employee respondents on administrative leave.

---

[138] 87 Fed. Reg. at 41453.
[139] *See* Letter from Equal Rights Advocates, L.L. Dunn Law Firm, PLLC, and 35 Other Survivor Advocate Organizations to Catherine Lhamon, Ass't Sec'y for Civil Rights (June 2, 2022), https://www.equalrights.org/wp-content/uploads/2022/06/20220602-Letter-to-OCR-Regarding-Title-IX-Unconscionable-Agreements.pdf.
[140] 87 Fed. Reg. at 41453.
[141] 87 Fed. Reg. at 41404.

Exhibit J

***Disabled students***

We support proposed § 106.2 defining "student with a disability" consistent with definitions in the Rehabilitation Act of 1973 and the Individuals with Disabilities Education Act. We also appreciate and support proposed § 106.8(e) and § 106.44(g)(7), which would require Title IX coordinators in PK-12 schools to consult with a disabled complainant or respondent's IEP team or Section 504 team and would allow Title IX coordinators at institutions of higher education to consult with their school's disability office, if requested by a disabled complainant or respondent, to ensure compliance with federal disability civil rights laws, including in the implementation of supportive measures.

In addition, we encourage the Department to issue supplemental guidance on ensuring equal access to education for students with disabilities in schools' Title IX responses. The guidance should remind Title IX coordinators to ensure that their Title IX office is accessible to disabled students and that they are coordinating with the Section 504 office.[142] In addition, schools should make disability accommodations available to all individuals, including complainants with preexisting disabilities or who develop new disabilities or exacerbate existing disabilities because of the discrimination they faced.[143] For example, all Title IX materials should be accessible in Plain Language,[144] via augmentative and alternative communication (AAC) devices (*e.g.*, if sex-based harassment causes mutism), and other formats. Furthermore, the guidance should further explain how schools can impose fair and proportionate discipline for sex-based harassment (and other sex discrimination), particularly for respondents who are younger and have developmental disabilities.

***Monitoring and training***

We support proposed § 106.44(b)'s requirement that schools must monitor their programs for barriers to reporting information about sex-based harassment and other sex discrimination and take steps to address any such barriers. We also appreciate the preamble providing examples of how the Title IX coordinator could undertake such efforts, which include: conducting surveys on how often students experience sex discrimination without reporting it; participating in public awareness events to obtain feedback from students and employees about sex discrimination; regularly soliciting anonymous feedback via email from students and employees about barriers they have encountered to reporting sex discrimination; and taking additional measures to eliminate specific barriers to reporting experienced by marginalized student communities, with particular emphasis on the barriers encountered by disabled students or students whose first language is not English.[145] We also ask that the Department provide these examples with additional specific examples of such measures in supplemental guidance after the regulations are finalized.

In addition, we support the training requirement at proposed § 106.8(d)(1) for all employees to be trained on the definitions of and the conduct that would constitute sex discrimination and sex-based harassment, as well as their own obligations and their school's obligations to address such discrimination. We also support the training requirement at proposed § 106.8(d)(2)-(3) for all employees involved in Title IX

---

[142] National Women's Law Center, National Ass'n of Councils on Developmental Disabilities, Association of University Centers on Disabilities & National Disability Rights Network, *Survivor Justice Is Disability Justice* 3 (June 2019), https://nwlc.org/resource/survivor-justice-is-disability-justice.
[143] *Id.* at 2-3.
[144] See examples of policy materials in Plain Language here: Autistic Self-Advocacy Network, *Policy Advocacy Toolkits* (last visited Sept. 9, 2022), https://autisticadvocacy.org/policy/toolkits.
[145] 87 Fed. Reg. at 41436.

Exhibit J

investigations and informal resolutions to be properly trained on their school's obligations to address sex discrimination, the school's grievance procedures, how to serve impartially, and the meaning of relevance in relation to evidence.[146] However, we urge the Department to issue supplemental guidance encouraging schools to provide additional training for all employees, especially confidential employees and Title IX coordinators, on how to serve as resources for survivors in the wake of their victimization. This additional training should emphasize trauma-informed, survivor-centered practices to address the emotional and mental health needs of survivors disclosing sex-based harassment to employees, and should be informed by evidence-based research on the neurobiology of trauma.[147] Training should also address the experiences and needs of survivors from historically marginalized backgrounds, including Black and brown girls and women, LGBTQI+ students, pregnant and parenting students, and disabled students, who are especially vulnerable to all forms of sexual misconduct.[148] This is especially important to prevent schools from relying on negative stereotypes and implicit bias that cast Black and brown girls and women,[149] LGBTQI+ survivors,[150] pregnant and parenting survivors,[151] and disabled survivors[152] as inherently less credible when reporting sexual misconduct. We also recommend that PK-12 employees receive training on how to recognize certain forms of sexual harassment younger victims are especially vulnerable to, including indicators of grooming. In addition, we urge the Department to recommend that schools provide employees involved in the investigation of Title IX complaints (who must assess whether consent was given) with training on consent; we recommend that this training include how the existence of power dynamics and the influence of drugs or alcohol may impact whether consent is freely and voluntarily given.

Finally, we ask that the Department further clarify the scope of this training in supplemental guidance; this guidance should also provide examples of how schools can provide this training, such as by entering into memoranda of understanding with local community-based organizations that serve survivors. We also ask

---

[146] See also 87 Fed. Reg. at 41429.

[147] There is considerable research that outlines the neurobiology of trauma—that is, the way trauma impacts and changes a person's brain chemistry. One study focusing on the impact of childhood trauma explains that, "at any age, experiencing a traumatic event causes activation of the sympathetic nervous system and elevated levels of cortisol. The result of this activation is increased activity of the amygdala, which is responsible for fear and anxiety, and decreased activity in the hippocampus and prefrontal cortex, which are responsible for memory, attention, and executive control." The study goes onto explain that, "because children's brains are not yet fully developed, prolonged or chronic increases in cortisol levels may have negative impacts on normal psychological, cognitive, and socioemotional development," which can resulting in deficits in processing social stimuli, responding to emotional cues, and regulating stress." As a result, in addition to experiencing "behavioral challenges in school," their academic performance might also suffer. See Christopher T. H. Liang et al., *Trauma-Informed Care Training for Educators: Some Preliminary Evidence*, 1 J. of Prevention and Health Promotion 240, 242 (2020). Another study examining the neurobiology of trauma describes that "trauma's impact reaches virtually all body systems," creating "persistent biological alterations" in brain chemistry and brain areas "associated with mood regulation." These changes cause "psychiatric and medical vulnerability," and, in the long term, "essentially leav[e] functional 'scars' in emotional control, learning, and memory." See Linda Grabbe & Elaine Miller-Karas, *The Trauma Resiliency Model: A "Bottom-Up" Intervention for Trauma Psychotherapy*, 24 J. of the Am. Psychiatric Nurses Ass'n 76, 77 (2018).

[148] See, e.g., AAU Report, *supra* note 10, at 13–14 (transgender and gender-nonconforming college students); GLSEN Survey, *supra* note 12 (LGBTQ youth ages 13–21); NWLC Sexual Harassment Report, *supra* note 4, at 3 (Native, Black, and Latina girls ages 14–18); NWLC Pregnant or Parenting Students Report, *supra* note 12 (pregnant and parenting girls ages 14–18); NWLC Girls With Disabilities Report, *supra* note 12 (disabled girls ages 14–18).

[149] See, e.g., Nancy Chi Cantalupo, *And Even More of Us Are Brave: Intersectionality & Sexual Harassment of Women Students of Color*, 42 HARV. J.L. & GENDER 1, 16, 24-29 (2018); Georgetown Law Report, *supra* note 20, at 1 (outlining how girls of color are often stereotyped as "promiscuous" and thus less deserving of protection from sexual misconduct—resulting in their reports of sexual misconduct being dismissed or disbelieved).

[150] See, e.g., Gillian R. Chadwick, *Reorienting the Rules of Evidence*, 39 CARDOZO L. REV. 2115, 2118 (2018), http://cardozolawreview.com/heterosexism-rules-evidence; Dorwart, *supra* note 20 (describing that, because LGBTQI+ individuals are often stereotyped as "hypersexual," "immoral," "deviant," and "attention-seeking," they are frequently disbelieved or blamed for their own victimization when reporting sexual misconduct).

[151] See generally NWLC Pregnant or Parenting Students Report, *supra* note 12, at 11 (explaining the stereotypes that pregnant and parenting students must contend with, such as being viewed as promiscuous or deserving of sexual harassment).

[152] See, e.g., The Arc Brief, *supra* note 20, at 2; Nat'l Inst. of Justice, *Examining Criminal Justice Responses to and Help-Seeking Patterns of Sexual Violence Survivors with Disabilities* 11, 14-15 (2016), https://www.nij.gov/topics/crime/rape-sexual-violence/Pages/challenges-facing-sexual-assault-survivors-with-disabilities.aspx (explaining that disabled survivors are often cast as less credible, especially if they struggle to communicate sexual misconduct due to a cognitive or development disability).

Exhibit J

that supplemental guidance clarify how the training requirements in proposed § 106.8(d) would apply to non-employee agents, and, where possible, how schools could provide training to non-employee agents.[153]

We also urge the Department to mandate trainings for students offered by the Title IX coordinator, or the coordinator's designee, conducted at least once a year. These trainings should be age-appropriate and center on healthy relationships, in addition to the importance of consent and, similar to our above recommendations regarding the training employees must receive, how the existence of power dynamics may impact consent. This training should be accessible and communicated in a way that can be understood and learned by all students, including students with intellectual disabilities and disabilities that limit their verbal and hearing abilities; it should also be culturally competent and designed to meet the needs of marginalized students, including Black and brown girls and women, LGBTQI+ students, pregnant and parenting students, and disabled students, who are at a disproportionate risk of sexual misconduct. Finally, we ask that the Department issue supplemental guidance outlining the goals of this training, which should include ensuring that students come away with an accurate and complete understanding of: (i) how to reach confidential employees, (ii) how to reach and make a report to the Title IX coordinator, (iii) how the Title IX coordinator can help them, including by offering supportive measures and initiating the informal resolution process, and (iv) the resources available to them and the kinds of supportive measures the Title IX coordinator can offer them, including academic support and counseling. We make this recommendation to the Department to ensure that all students are empowered to make informed choices about reporting in the wake of experiencing sex-based harassment or other forms of sex discrimination, in addition to being aware of the resources their schools are obligated to provide them under Title IX.

### Designation of coordinator and recordkeeping

We appreciate that proposed § 106.8(a)(2) would encourage schools to appoint at least one or more designees to fulfill some of the school's responsibilities for recordkeeping, training, and adoption and publication of the school's nondiscrimination policy and grievance procedures. For example, this means, in the PK-12 context, that a Title IX coordinator could oversee the district while appointing designees to manage and carry out responsibilities at each school building in the district—allowing, as the preamble acknowledges, schools that with large numbers of students and employees, to more efficiently and effectively fulfill its obligations under Title IX.[154]

We note proposed § 106.8(f) would maintain the same timeframe as current § 106.45(b)(10)(i)(C) for recordkeeping. Students are often vulnerable to school employees who are repeat offenders, and unlike students, school employees have the ability to harass numerous victims (such as students and fellow employees) during many years or decades at a school. But, like the current rule, proposed § 106.8(f) would permit schools to destroy records involving employee-respondents after seven years, allowing

---

[153] We recognize the difficulty in recommending training for non-employee agents (for example, volunteers and independent contractors) who may work with a school on a very limited basis, or otherwise have varied relationships with a school. As such, we recommend the Department issue supplemental guidance on how schools may provide training for non-employee agents where reasonable based on their relationship with the school.

[154] This is also consistent with the now rescinded 2015 Title IX guidance on the appointment and responsibilities of Title IX Coordinators at all levels, which encouraged school districts to have a Title IX Coordinator at each school (rather than only at the school district level) and required school district Title IX Coordinators to train and assist any local school-based Title IX Coordinators *See* Dear Colleague Letter on Title IX Coordinators (Apr. 24, 2015), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201504-title-ix-coordinators.pdf [hereinafter 2015 Guidance].

Exhibit J

repeat employee offenders to escape accountability despite multiple complaints, investigations, or findings against them that may span over seven years. While we appreciate the Department's statement in the preamble to the 2020 regulations (which would continue to apply in the proposed regulations) that "nothing in the final regulations prevents recipients from keeping their records for a longer period of time if the recipient wishes or due to other legal obligations,"[155] and while we acknowledge the administrative burdens on schools to maintain records for longer periods of time, we urge the Department to consider extending this period in light of the following concerns. First, while we appreciate that this seven-year period is longer than many state laws for personal injury suits (which range from one to six years),[156] we urge the Department to consider the benefits of encouraging schools to keep records for as long as the student attends the school—which, in the case of a PK-12 student, could be 14 years. Second, we ask the Department to consider extending the period during which schools are encouraged to keep records in line with the approach taken by some state laws that permit children who experience sex-based harassment to bring legal claims for up to decades after they turn 18.[157]

### D.  The Proposed Rules on Process for Recipient Investigations of Sex-Based Harassment and Other Sex Discrimination Restore Important Protections and Should Be Further Improved to Ensure Equitable Proceedings.

*Applicability of § 106.46*

Proposed § 106.46 would impose additional requirements to investigations of sex-based harassment at institutions of higher education involving one or more students. In explaining why it would apply additional provisions to this subset of Title IX investigations, the Department notes that "[t]hese additional provisions would not be necessary for other complaints of sex discrimination that often would not involve a *student respondent* facing similar consequences."[158] Consistent with the Department's own rationale, we urge the Department to state in the final regulations that § 106.46 is applicable only to investigations of sex-based harassment at institutions of higher education involving one or more *student respondent(s)*. Narrowing the set of circumstances that require the additional provisions in § 106.46 would give institutions of higher education greater flexibility in creating and implementing grievance procedures involving employee respondents and would avoid unnecessary conflict with requirements regarding discipline of employees set forth in collective bargaining agreements and state and local laws. It would also be consistent with the fact that two of the most significant additional provisions permitted in proposed § 106.46—live hearings and adversarial cross-examination—are only required by binding federal or state court decisions in Title IX proceedings involving student respondents, not employee respondents.[159]

---

[155] 87 Fed. Reg. at 41431; 85 Fed. Reg. at 30411.
[156] Statutes of Limitations, *Negligence / Personal Injury* (last visited Sept. 9, 2022), https://www.statutes-of-limitations.com/case_type/negligence-personal-injury.
[157] *See, e.g.*, Mont. Code § 27-2-216(3)(a) (allowing minors victims of sexual abuse to bring suit for up to 9 years after they turn 18); N.Y. Civ. Prac. L. R. § 208(b) (allowing minor victims of certain forms of sex-based misconduct to bring suit before the age of 55); Va. Code § 8.01-243(D) (allowing minor victims of sexual assault to bring suit for up to 20 years after the cause of action accrues); W. Va. Code § 55-2-15(a) (allowing minor victims of sexual assault to bring suit for up to 18 years after turning 18 or 4 years from discovery of the abuse, whichever is later).
[158] 87 Fed. Reg. at 41462 (emphasis added).
[159] *E.g.*, *Doe v. Univ. of Scis.*, 961 F.3d 203, 215 (3d Cir. 2020); Doe v. Baum, 903 F.3d 575, 581 (6th Cir. 2018); *Doe v. Allee*, 30 Cal. App. 5th 1036, 1039 (Ct. App. 2019). *Cf.* 87 Fed. Reg. 41506-07 (noting that federal district courts in the Sixth Circuit have extended the holding in *Baum* to the employment context).

Exhibit J

***Equitableness***

We support the proposed removal of current 106.44(a), which states, among other things: "A recipient's response must treat complainants and respondents equitably by offering supportive measures as defined in § 106.30 to a complainant, and by following a grievance process that complies with § 106.45 before the imposition of any disciplinary sanctions or other actions that are not supportive measures as defined in § 106.30, against a respondent." As the preamble to the proposed rules notes,[160] this provision improperly suggests that these are the only two actions schools must take in order to provide an equitable response to sexual harassment. Rather, as the titles of proposed §§ 106.45 and 106.46 indicate, schools must comply with all of the provisions in those regulations to meet Title IX's "equitable" requirement.

***Notification of allegations***

Proposed § 106.46(c)(2)(iv) would require institutions of higher education investigating sex-based harassment involving one or more students to inform the parties of any code of conduct that prohibits false statements. The preamble acknowledges that this notification "risks creating the misimpression" that the school believes in the harmful and false rape myth that individuals—primarily women and girls—are especially likely to knowingly make false statements in sex-based harassment matters.[161] We note that this is especially the case given that proposed § 106.45(c), which sets out notice of allegation requirements for other sex discrimination grievances, includes no parallel requirement that the parties be warned of any prohibition on false statements. The preamble assures the reader that the Department does not mean to imply this or that a person's statement is knowingly false merely because the school makes a decision in the other party's favor or because the statement contains unintentional inaccuracies.[162] However, § 106.46 does not require schools to make any of these assurances to complainants, many of whom are already afraid they will not be believed and will likely be deterred from initiating or continuing with an investigation after receiving such a warning. If this requirement is retained in the final rules, we ask the Department to require schools that give this notification to also inform the parties of the prohibition at proposed § 106.45(h)(5), which is that schools may not discipline anyone making a false statement based solely on their determination of whether sex discrimination occurred. We also urge a consistency of approach in § 106.45 and § 106.46 as to any such notice, so as to avoid any implication that false statements are uniquely at issue in sex-based harassment investigations.

We support proposed § 106.46(c)(3), which would, for investigations of sex-based harassment involving one or more students, allow an institution of higher education to delay written notice of the allegations to the parties if it has "legitimate concerns for the safety of any person as a result of providing this notice." As the preamble notes,[163] dating and domestic violence victims are often most vulnerable to violence, including lethal violence, when they attempt to leave their abusers,[164] and notice of a Title IX complaint certainly signals an attempt to leave. Therefore, it is important to allow schools to provide written notice of allegations to the respondent after they have taken sufficient steps to ensure the complainant's safety and the safety of any family or household members, close friends, pets, etc.

---

[160] 87 Fed. Reg. at 41466.
[161] 87 Fed. Reg. at 41494.
[162] *Id.*
[163] 87 Fed. Reg. at 41493.
[164] National Coalition Against Domestic Violence, *Why Do Victims Stay* (last visited Sept. 9, 2022), https://ncadv.org/why-do-victims-stay.

Exhibit J

***Presumption of respondent non-responsibility***

We oppose proposed § 106.45(b)(3), which retains the current rules' requirement for schools to presume that "the respondent is not responsible" for sex-based harassment (or other sex discrimination) until a determination is made at the end of the investigation. Likewise, we oppose proposed § 106.46(c)(2)(i), which would, in investigations of sex-based harassment involving a student at an institution of higher education, require the school to inform both parties of this presumption at the start of an investigation.

This presumption is clearly intended to echo the presumption of innocence in criminal proceedings and is squarely out of place in this context. While no decisionmaker in a school investigative process should presume any result before the investigation is concluded, requiring neutrality, impartiality, and fairness in decision-making is far different from, and indeed contrary to, a mandated presumption of non-responsibility. It is disappointing that rather than addressing any of the numerous concerns raised during the 2020 rulemaking about the current presumption's application to sexual harassment, the Department simply expanded the presumption to apply to all forms of sex discrimination.[165] As we and many stakeholders have pointed out over the last three years, this presumption (and mandated notice of it) is not required in any other type of school proceeding and exacerbates the harmful and false rape myth that people who report sex-based harassment (or other sex discrimination)—primarily women and girls—tend to be lying, which also deters complainants from initiating or continuing with an investigation.

Moreover, the presumption requirement is incompatible with the permissible standards of proof under both the current and proposed rules--*i.e.*, the preponderance of the evidence standard and the clear and convincing evidence standard—and with the non-criminal nature of Title IX investigations. The Supreme Court has repeatedly explained over the last several decades that the presumption of innocence in criminal proceedings is synonymous with the "beyond a reasonable doubt" standard applicable in those proceedings. For example, in 1970, it explained that "[t]he [beyond a reasonable doubt] standard provides concrete substance for the presumption of innocence."[166] In 2006, the Court reasoned that "the force of the presumption of innocence is measured by the force of the showing needed to overcome it, which is proof beyond a reasonable doubt."[167] In 2016, it noted that "if the jury instruction requires the jury to find those elements 'beyond a reasonable doubt,' the defendant has been accorded the procedure that this Court has required to protect the presumption of innocence."[168] American Jurisprudence agrees, explaining that the presumption of innocence "describes the burden of proof. Thus, in that sense, a defendant is presumed innocent unless and until the government proves beyond a reasonable doubt each element of the offense charged."[169] In other words, the presumption of innocence is a component of the "beyond a reasonable doubt" standard.

Since the Department has clearly stated that the "beyond a reasonable doubt" standard is "never appropriate" in Title IX investigations,[170] it should also remove the corresponding presumption requirement from the Title IX regulations. If the Department wishes to ensure that decisionmakers are impartial and the parties feel assured of their school's impartiality, it should simply require schools to notify the parties that "a determination about responsibility" will not be made until the end of an investigation and that *neither* party is presumed to be telling the truth or lying at the outset.

---

[165] 87 Fed. Reg. at 41467-68.
[166] *In re Winship*, 397 U.S. 358, 363 (1970).
[167] *Clark v. Arizona*, 548 U.S. 735, 738 (2006).
[168] *Musacchio v. U.S.*, 577 U.S. 237, 244 (2016) (quoting *Jackson v. Virginia*, 443 U.S. 307 (1979)).
[169] 29 Am. Jur. 2D *Evidence* § 246 (2022) (citing *Holt v. United States*, 218 U.S. 245 (1910))
[170] 87 Fed. Reg. at 41486.

Exhibit J

***Time frame***

We support proposed § 106.45(b)(4)'s requirement that schools set "reasonably prompt timeframes" for all major stages of an investigation of sex discrimination. This would be an improvement over current § 106.45(b)(5)(vi)-(vii), which require investigations to be at least 20 days long and are particularly unworkable for PK-12 schools, as they often need to respond immediately to address and stop harassment, such as by quickly separating children.[171] The Department should also issue supplemental guidance encouraging schools to finish their investigations and make a determination within 60 calendar days (acknowledging that sometimes this will not be possible), consistent with prior (now rescinded) guidance.[172]

We also understand that schools may sometimes need to impose a "reasonable" delay for "good cause." However, we urge the Department to clarify in the regulations what types of situations may constitute "good cause" and to explicitly prohibit schools from imposing more than a "temporary" delay due to a concurrent law enforcement investigation, consistent with the Department's longstanding policy from 2001 to 2020 that "police investigations or reports … do not relieve the school of its duty to respond promptly and effectively."[173]

***Conflicts of interest***

We support proposed §§ 106.45(b)(2) and 106.44(k)(4) requiring Title IX coordinators, investigators, decisionmakers, and informal resolution facilitators not to have a conflict of interest. Many students have reported that, since the 2020 regulations took effect, their schools have designated their general counsel as their Title IX coordinator, making their Title IX responses focused on minimizing the school's liability rather than protecting access to education.[174] We ask the Department to issue supplemental guidance clarifying which roles constitute or may constitute a conflict of interest, consistent with prior, now-rescinded, Department guidance (*e.g.*, general counsel, disciplinary board member, athletics director, dean of students, superintendent, principal).[175]

***Advisors & support persons***

We support proposed §§ 106.46(c)(2)(ii) and 106.46(e)(2), which would, in investigations of sex-based harassment involving one or more students at institutions of higher education, require schools to allow parties to have an advisor of their choice accompany them to any meeting or grievance proceeding and to give advisors equal rights to participate in meetings and proceedings. However, we ask the Department to amend § 106.45 to require institutions of higher education to allow parties to have an advisor of choice in any type of Title IX investigation (not just in investigations of sex-based harassment involving one or more students, per proposed § 106.46). In explaining why investigations under § 106.46 necessitate advisors, the Department notes that complaints of sex-based harassment are different from complaints of other sex discrimination because they involve multiple parties whose conduct and credibility are subjected to scrutiny, are more likely to involve sensitive material and to engender disputes over what evidence is

---

[171] 87 Fed. Reg. at 41457.
[172] 2014 Guidance, *supra* note 40, at 32; 2011 Guidance, *supra* note 40, at 12.
[173] 2001 Guidance, *supra* note 40, at 21.
[174] Student Advocates Comment, *supra* note 123, at 25.
[175] 2015 Guidance, *supra* note 154, at 3; 2014 Guidance, *supra* note 40, at 11-12; 2011 Guidance, *supra* note 40, at 7.

Exhibit J

relevant and what evidence is impermissible, and often involve a student respondent who faces potential disciplinary sanction.[176] We agree that these are strong reasons to require institutions to allow advisors in such cases. We also note that complaints of non-harassing sex discrimination often pit a student complainant against their institution rather than another individual, which means there is an even greater mismatch of power between the complainant and the opposing party. Therefore, it is critical that the Department allow the parties in such cases to have an advisor.

We also support proposed § 106.46(e)(3) permitting schools in investigations of sex-based harassment in higher education involving one or more students to allow the parties to have a support person other than an advisor present during any meeting or proceeding. We ask the Department to include this provision in the final regulations in § 106.45 as well (not just § 106.46). This would be beneficial to many PK-12 students, especially those who are LGBTQI+ or pregnant, who may need a trusted and supportive adult other than a parent, guardian, or authorized legal representative to accompany them to meetings and proceedings to protect their privacy from an unsupportive parent, guardian, or other legal representative. It would also be beneficial to many higher education students. Navigating an investigation of sex discrimination is difficult for people of all ages, and it is even harder for victims who do not have anyone to turn to for emotional support. This is especially true given that in most investigations of sex discrimination other than sex-based harassment at institutions of higher education, students are challenging the decisions of their institution and its officials—a fundamentally intimidating context. Furthermore, higher education students often retain attorneys to serve as their advisors, which means that without a support person, they would be forced to go through an entire investigation with only a relative stranger in the room with them. While these advisors can be very helpful in navigating the legal and technical challenges of a Title IX investigation, we urge the Department to recognize that young adults would greatly benefit from having a family member or close friend to lean on for support and should not be forced to choose between having a skilled advocate and a supportive person help them through an investigation.

### Sexual history evidence

We support proposed 106.45(b)(7)(iii) stating that consent is not implied by consensual "prior sexual conduct" between the parties and urge the Department to strengthen this provision. First, we ask the Department to add that consent is also not implied by a "social" or "romantic" relationship between the parties. This would close the loophole in the current regulations that allows a respondent to introduce evidence of a complainant's "dating or romantic" history, as long as it is not "sexual" history.[177] Second, we ask you to clarify that, consistent with the preamble to the current regulations, "prior" includes any conduct that occurred after the alleged incident but prior to the school's determination.[178] This would recognize that it is not uncommon for victims of sexual assault, dating violence, and other sex-based harassment to continue a sexual, social, and/or romantic relationship with their harasser or abuser for a variety of reasons. For example, the victim may not immediately recognize the conduct as assault; may initiate post-assault as a way to seek closure, regain control, or normalize the assault; may struggle initially to understand how someone whom they thought was a friend or trusted romantic partner could have harmed them; or may continue a social relationship due to fear of ostracization from their common social circle or retaliation from their harasser.[179] Third, we ask the Department to add that consent is not

---

[176] 87 Fed. Reg. at 41496-97.
[177] 85 Fed. Reg. at 30351.
[178] *See* 85 Fed. Reg. at 30350 n.1343, 30354 n.1355 (scope of "prior").
[179] *See* Lynn Hecht Schafran & Claudia Bayliff, Legal Momentum, Nat'l Judicial Educ. Program, *Judges Tell: What I Wish I Had Known Before I Presided in an Adult Victim Sexual Assault Case* 8 (Oct. 30, 2017), https://www.legalmomentum.org/library/judges-tell-what-i-wish-i-had-known-i-presided-adult-victim-sexual-assault-case.

Exhibit J

implied by "evidence of" the complainant's prior sexual conduct (*e.g.*, pregnancy, birth control, sexually transmitted infection), again consistent with the preamble to the current regulations.[180]

We also ask the Department to narrow the prohibition on sexual history evidence in proposed § 106.45(b)(7)(iii), which would prohibit schools from asking questions or using evidence about a complainant's "sexual interests" or "prior sexual conduct" unless the prior sexual conduct: (i) is offered to prove someone other than the respondent was the harasser; or (ii) involves "specific incidents" between the parties and is offered to "prove consent." The second proposed exception is too broad and would encourage schools to make inappropriate inferences about "implied" consent, in violation of the prohibition in both proposed § 106.45(b)(7)(iii) and current § 106.45(b)(6)(vi)-(vii) against using prior sexual conduct as evidence of consent to the alleged incident. Therefore, we urge the Department to narrow the second exception, for example, by allowing "specific incidents" of prior sexual conduct between the parties only if they are used to "prove how the parties *communicated* consent," but not if the incidents are used to prove consent itself.[181]

### Respondent's prior sex-based misconduct

Research has repeatedly shown that students who engage in sex-based harm are often repeat harassers. For example, a 2002 study of 1,882 men found that 63 percent of those who admitted to behaviors constituting rape said they had engaged in those behaviors more than once, either against multiple victims or more than once against the same victim, with an average of 5.8 rapes per harmer.[182] A recent survey published in 2019 of more than 12,000 college men across 49 community and four-year colleges found that repeat harmers are responsible for more than 87 percent of alcohol-involved sexual assaults and engage in an average of at least five instances of sexual misconduct.[183] Callisto, a mobile application that allows college student survivors to find out whether their assailant has assaulted other people before choosing whether to report, estimates based on its data that repeat harmers are responsible for over 90 percent of college sexual assaults and engage in an average of 6 assaults before they graduate.[184] Schools recognize the risks created by serial sex-based harmers creates, yet many either have no procedure in place to decide whether to consider evidence of a respondent's prior sex-based misconduct or flatly refuse to consider such evidence in the absence of a complaint from those other victims.

Therefore, we ask the Department to state in the final regulations that evidence of the respondent's prior sex-based misconduct (often referred to as "pattern evidence") may be relevant. This would be consistent with Rule 415 of the Federal Rules of Evidence, which allows plaintiffs in civil proceedings alleging sexual assault, including child sexual abuse, to introduce evidence of the defendant's prior sexual assaults (and with Rules 413 and 414, which apply to criminal proceedings).[185] Courts have upheld these rules[186] and

---

[180] 85 Fed. Reg. at 30350 n.1343.

[181] If the Department does not adopt our recommendation, we urge you to, at the minimum, revise the last sentence of 106.45(b)(7)(iii) to indicate that the mere fact "that there are similarities in the types of communications related to consent" does not itself demonstrate or imply the complainant's consent and does not preclude a determination that sex-based harassment occurred; this would be consistent with the Department's position in the preamble on this matter. *See* 87 Fed. Reg. at 41472.

[182] David Lisak & Paul M. Miller, *Repeat Rape and Multiple Offending Among Undetected Rapists*, 17 VIOLENCE & VICTIMS 78 (2002).

[183] John D. Foubert *et al.*, *Is Campus Rape Primarily a Serial or One-Time Problem? Evidence from a Multicampus Study*, Violence Against Women 26(3-4) (Mar. 18, 2019), http://dx.doi.org/10.1177/1077801219833820.

[184] Callisto, *Mission and Vision* (last visited Sept. 9, 2022), https://www.projectcallisto.org/about.

[185] Fed. R. Evid. 415.

[186] Susan Webber Wright, *Emroch Lecture: Uncertainties in the Law of Sexual Harassment*, 33 U. RICH. L. REV. 11, 28 (1998).

Exhibit J

broadly interpreted them, admitting pattern evidence even when past sexual misconduct was never charged or when past charges were dismissed.[187]

### Other evidentiary rules

We appreciate that proposed § 106.2 would define "relevant" as follows: "Questions are relevant when they seek evidence that may aid in showing whether the alleged sex discrimination occurred, and evidence is relevant when it may aid a decisionmaker in determining whether the alleged sex discrimination occurred." This would greatly aid school officials in understanding what evidence they can rely upon and share with the parties.

We also support the proposed removal of current § 106.45(b)(5)(vi), which allows the parties to review any evidence "directly related to the allegations…, including the evidence upon which the recipient does not intend to rely in reaching a determination." And we support proposed § 106.45(f)(4), which would require schools to give the parties a description of relevant (and not otherwise impermissible) evidence, as well as proposed § 106.46(e)(6), which would require institutions of higher education investigating sex-based harassment involving one or more students to give the parties either access to relevant (and not otherwise impermissible) evidence or a written report summarizing this evidence. These proposed changes would eliminate the current confusion among parties and schools regarding the difference between "directly related" evidence and "relevant" evidence and would prevent parties from accessing evidence that their schools will not or cannot rely upon in reaching a determination, such as privileged evidence, treatment records, and prohibited sexual history evidence.[188]

We also ask the Department to strengthen the prohibition on impermissible evidence in proposed § 106.45(b)(7). As currently written, § 106.45(b)(7)(i)-(iii) would prohibit schools from using privileged evidence (unless the holder waives the privilege), health records (unless the patient consents to its use), and sexual history evidence (unless it falls into certain narrow exceptions). However, proposed § 106.45(b)(7) does not contain a prohibition on the use of evidence disclosed to a confidential employee. To ensure that individuals who experience sex discrimination can properly turn to confidential employees for help, consistent with the Department's intent in proposing § 106.44(d) regarding confidential employees, we ask the Department to revise proposed § 106.45(b)(7) to prohibit the use of "evidence disclosed to a confidential employee" unless the school obtains the disclosing person's voluntary, written consent for use in the school's investigation.

### Questioning parties and witnesses

We support proposed §§ 106.45(f)(2) and 106.45(g), which would require PK-12 schools to allow all parties to present their witnesses and evidence and, if credibility is at issue, to use a process that enables the decisionmaker to assess the credibility of the parties and witnesses. This would provide PK-12 schools the flexibility needed to address sex discrimination, including sex-based harassment, promptly and appropriately.

We also support the proposed removal of the harmful requirement in current § 106.45(b)(6)(i) that requires institutions of higher education to permit the parties' advisors to conduct direct, live cross-

---

[187] Leslie Berkseth, Kelsey Meany & Marie Zisa, *Rape and Sexual Assault*, 18 Geo. J. Gender & L. 743, 791 (2017).
[188] 87 Fed. Reg. at 41419, 41499.

Exhibit J

examination of the other party and witnesses. Proposed § 106.46(f)(1) would take a more appropriate approach, requiring, where credibility is at issue in investigations of sex-based harassment involving one or more students, questioning to be conducted either: (i) by a decisionmaker at a live hearing or in individual meetings, with suggested questions from the parties; or (ii) by the parties' advisors via cross-examination at a live hearing, as is required in some jurisdictions by court decisions.[189] We agree with the Department that cross-examination is not required to satisfy either Title IX, constitutional due process requirements, or fundamental fairness,[190] and we echo the concern of many stakeholders that direct live cross-examination of the parties is not necessary for reliable determinations of fact, often traumatizing, and often duplicative, as hearing questions tend to elicit information that was already provided during the investigation.[191] Therefore, we support the increased flexibility that the proposed rules would provide for institutions of higher education and encourage the Department to provide further guidance as to how schools can conduct such processes while minimizing reliance on cross-examination when they are not required by the courts to utilize such processes.

In addition, we support proposed § 106.46(f)(1) stating that live questioning (whether through an advisor or a decisionmaker) is not required at all if the credibility of all parties and witnesses is not in dispute or is not relevant to evaluating the allegations. We urge the Department to emphasize this again in supplemental guidance to ensure that institutions of higher education and their students fully understand this beneficial departure from the current regulations.

We oppose the exclusionary rule in proposed § 106.46(f)(4), which would require that, if a party or witness at an institution of higher education does not respond to a question "related to their credibility," the school would have to ignore any statement they make or have made that "supports their position." We are concerned this means that a survivor who refuses to answer a single question "related to their credibility" would have all of their oral and written statements excluded from the evidence, and that this rule could be broadly applied given the Department has not explained how schools would determine whether question is "related to" a person's credibility.[192] The Department could simply direct the decisionmaker to take refusal to answer relevant questions into account in determining what weight to assign to a party's statements, rather than this blanket exclusion of any statement that "supports their position." This solution would address the Department's concern that a party could send an email or voicemail to a friend and then submit those statements without submitting to a credibility assessment.[193] Decisionmakers at institutions of higher education regularly weigh the credibility of statements in other types of student and staff misconduct proceedings based on a totality of the evidence. The Department states in proposed § 106.47 that it intends to respect schools' ability to weigh the evidence in investigations of sex-based harassment, and that the Department would not deem a school to have violated Title IX solely because the Assistant Secretary would have reached a different determination "based on an independent weighing of the evidence." Yet the exclusionary rule in proposed § 106.46(f)(4) would plainly intrude on schools' ability to weigh the evidence and inappropriately deprive decisionmakers of discretion. Furthermore, the Department's proposal to prohibit decisionmakers from making their own

---

[189] *E.g.*, *Doe v. Univ. of Scis.*, 961 F.3d 203 (3d Cir. 2020) (requiring private universities in Pennsylvania investigating sexual misconduct to allow respondents or their advisors to conduct cross-examination at a live hearing); *Doe v. Baum*, 903 F.3d 575, 578, 581 (6th Cir. 2018) (requiring public universities to hold "some sort of" hearing before suspending or expelling a student, and to allow respondents or their advisors to conduct cross-examination if the decision turns on the credibility of any party or witness).
[190] 87 Fed. Reg. at 41505.
[191] 87 Fed. Reg. at 41458.
[192] While proposed § 106.46(f)(4) would instruct decision-makers not to draw any inferences about whether sex-based harassment occurred based "solely" on a person's refusal to respond to questions related to their credibility, a complainant whose statements are excluded would have to rely solely on their witnesses' statements in order to prove their case.
[193] 87 Fed. Reg. at 41509.

Exhibit J

credibility determinations—but only in investigations of sex-based harassment involving one or more students—would arbitrarily exceptionalize statements about alleged sex-based harassment involving a student as inherently less credible than statements about other alleged misconduct (*e.g.*, sex-based harassment involving only employees, other types of sex discrimination, race or disability discrimination). We urge the Department to revise proposed § 106.46(f)(4) to direct decisionmakers to consider any refusal to answer relevant questions in determining the weight to assign a party's statements.

Finally, we support proposed § 106.46(f)(3) prohibiting unclear and harassing questions and allowing schools to apply other rules of decorum equally to the parties. We also support proposed § 106.46(g) requiring hearings to be conducted virtually if any party requests it, although we ask the Department to change "will" to "must" to make the provision clearer.

### Investigative model

Given that institutions need flexibility in the types of grievance procedures they apply for student misconduct proceedings, we support proposed § 106.45(b)(2) allowing (but not requiring) the decisionmaker to be the same person as the investigator or Title IX coordinator. We have heard from a number of coalition partners who work closely with students in Title IX investigations that using a single investigator is more effective and produces more accurate outcomes than using separate investigator(s) and decisionmaker(s). A key reason is because investigators tend to reach people when their memories are fresher, which elicits more accurate statements from the parties and witnesses. In addition, given how long investigations can take, many witnesses are no longer available by the time a hearing is scheduled. For example, one partner shared an example where a hearing was delayed so many times that their client's primary witnesses had not only graduated but moved out of the country. Notably, the witnesses' evidence was already shared with the investigator and included in the investigative report, but the hearing officer chose not to defer to the report because the witnesses could not be questioned at the hearing, even though they had already been questioned by the investigator. As a result, relevant and credible evidence was not relied upon in the school's decision.

In addition, the investigators tend to be more highly trained. As the Department noted, investigators—whether in-house or external—tend to be more highly skilled experts than decisionmakers, who are often drawn from a wider pool of school employees.[194] They are often better trained at conducting trauma-informed questioning, which can make survivors more likely to make complaints and choose to go through an investigation. In contrast, as the Department also noted, decisionmakers often ask duplicative questions that were already answered and documented in the report (and often with greater accuracy while the witness's memory was fresher), which can force survivors to relive painful memories again without any evidentiary benefit to the school.[195] As one advocate shared with us, "It's not unusual for hearing officers to almost completely ignore a very illuminating investigation report and decide everything based on the hearing …, which begs the question of how having a separate fact-finding investigation actually made the process more fair instead of just more traumatic."

Furthermore, some schools may choose to use a single-investigator model in order to better protect the parties' privacy. As the Department noted, having more employees involved in an investigation as decisionmakers increases the likelihood that parties and witnesses are forced to interact with those same

---

[194] 87 Fed. Reg. 41467.
[195] 87 Fed. Reg. at 41458.

Exhibit J

employees again in their classes and activities.[196] This has resulted in students avoiding classes, activities, and athletics opportunities and even changing majors altogether to avoid interacting with employees who now know very painful and traumatic details about their personal lives.[197]

Our position that this model should be permitted in Title IX proceedings is consistent with a recent report by the American Bar Association's Commission on Domestic & Sexual Violence, which recommends that institutions of higher education use investigators to review evidence, interview parties and witnesses in individual meetings, write an investigative report, and make a determination ("Investigative Model").[198] This recommendation was made after conducting extensive research and speaking with advocates for complainants and respondents, Title IX coordinators and investigators, civil and criminal law attorneys, law professors, university counsel, and deans at institutions of higher education, including Historically Black Colleges and Universities (HBCUs) and Tribal Colleges and Universities (TCUs). Notably, the ABA did not recommend using a model where hearing testimony from the parties and witnesses is required.

### Standard of proof

We oppose proposed § 106.45(h)(1), which would require schools to use the preponderance of the evidence standard to investigate sex-based harassment (or other sex discrimination), unless the school uses the clear and convincing evidence standard in all other "comparable" investigations, including for all other types of harassment and discrimination. We urge the Department to require a single standard of proof—the preponderance of the evidence standard—in all Title IX investigations, as it is the only standard that recognizes complainants and respondents have equal stakes in the outcome of an investigation[199] (as the Department itself recognizes[200]), and it is the same standard used by courts in all civil rights and other civil proceedings.[201] If the Department chooses not to require the preponderance standard, it should, at a minimum, clarify that "comparable" investigations include investigations of non-sexual physical assault. Otherwise, schools could believe that they can use the preponderance standard to investigate *physical* assault and the clear and convincing evidence standard to investigate *sexual* assault, other sex-based harassment or discrimination, and all other harassment and discrimination based on race, disability, etc.

### Notice of determination

We support proposed § 106.46(h)(1)(iv), which would, in investigations of sex-based harassment involving one or more students at an institution of higher education where the school decides that sex-based harassment has occurred, require the school to provide written notice to the parties of "any" disciplinary sanctions on the respondent and "whether" any remedies will be provided to the complainant and other students. It is important that both the complainant and respondent are notified of "any"

---

[196] 87 Fed. Reg. at 41467.
[197] *Id.*
[198] American Bar Association, Commission on Domestic & Sexual Violence, *Recommendations for Improving Campus Conduct Processes for Gender-Based Violence* 8, 30, 62-63 (Dec. 10, 2019), https://www.americanbar.org/content/dam/aba/publications/domestic-violence/campus.pdf. Alternatively, the ABA recommends that institutions of higher education use investigators to write an investigative report and use a deliberative panel review the investigative report and ask questions of the investigators and make a determination, with statements from the parties as optional but not required ("Investigation + Deliberative Panel Hybrid Model").
[199] Letter from National Women's Law Center to Kenneth L. Marcus, Ass't Sec'y for Civil Rights, Dep't of Educ., at 33 (Jan. 30, 2019), https://nwlc.org/wp-content/uploads/2019/02/NWLC-Title-IX-NPRM-Comment.pdf.
[200] 87 Fed. Reg. at 41485.
[201] Letter from Leadership Conference on Civil and Human Rights to Kenneth L. Marcus, Ass't Sec'y for Civil Rights, Dep't of Educ., at 7 (Jan. 30, 2019), https://civilrights.org/resource/civil-and-human-rights-community-joint-comment-on-title-ix-nprm.

Exhibit J

sanctions on the respondent (*e.g.*, no-contact order, suspension), as this information is "directly related" to all parties per the Family Educational Rights and Privacy Act,[202] and is necessary information for the complainant to feel safe returning to school or attending classes and activities. At the same time, we agree that the respondent should only be informed of "whether" the complainant received any remedies, as this best protects the complainant's privacy. We ask the Department to clarify in the regulations that schools must separately inform the complainant of "any" remedies they will receive, not merely "whether" they will receive remedies.

By the same logic, we ask the Department to add to proposed § 106.45(h)(2) that schools must follow the same requirements for investigations under § 106.45—*i.e.*, inform the parties of "any" sanctions and "whether" there are remedies, and separately inform the complainant (and others) of "any" remedies they will receive. And we ask the Department to require "written" notice of determinations in investigations under § 106.45 as well. We note that proposed § 106.45 would not require written notice of any information at any stage of any investigation. Even if the Department chooses not to add "written" notice requirements to any other portion of § 106.45, we urge you to require notice of determinations to be written. Too often, we hear from PK-12 students they reported sex-based harassment to their schools and who have not heard back about whether an investigation was initiated or concluded. When they ask for follow-up information weeks or months later, they may be verbally informed of many things—*e.g.*, that an investigation was completed but the complaint was determined to be "unsubstantiated" or "unfounded" so no further action was taken; that the school determined the respondent was not responsible based on a conversation with the respondent and so nothing further can be done; that the school determined the harassment did occur and the school has disciplined the respondent, but the school cannot disclose the sanctions to the complainant "because of FERPA." These are just a few examples from our experience working with student survivors. When PK-12 students do not receive a written determination notifying them with certainty that their complaint has been investigated and a decision has been made, they lose trust in their schools' ability to protect them from sex discrimination and they lack the documentation needed to file a complaint with the Department or with a state or local agency. Requiring all schools to provide written notice under § 106.45 at least once—at the end of an investigation—would not create an unreasonable administrative burden on schools and would ensure that all parties know with certainty what the result of the complaint was.

### *Appeals*

We support proposed § 106.46(i)(1)(i)-(iii), which would, in investigations of sex-based harassment involving a student at institutions of higher education, require the school to offer appeals to both parties based on a procedural irregularity, new evidence, or a Title IX official's bias or conflict of interest that affected the outcome. We also support proposed § 106.46(i)(2), which would allow schools in such investigations to offer additional bases to both parties equally. In addition, we support proposed § 106.46(i)(1) allowing complainants in such investigations to appeal a dismissal of their complaint or of allegations in their complaint.

However, we strongly oppose that portion of proposed § 106.46(i)(1), which would only allow parties in such investigations to "appeal from a determination that sex-based harassment occurred." In practice, this means only respondents (but not complainants) would be permitted to appeal a school's determination.

---

[202] 20 U.S.C. § 1323g(a)(4)(A)(i); *see also* 20 U.S.C. § 1221(d) ("[n]othing in this chapter," including FERPA, "shall be construed to affect the applicability of … [T]itle IX").

Exhibit J

This would be inconsistent with the requirement of "equitable" procedures in both current § 106.8(c) and proposed § 106.8(b)(2), as well as the principle in proposed § 106.46(i)(2) that the bases for appeal be made equally available to all parties. Furthermore, this proposal would be less equitable than current § 106.45(b)(8)(i), which requires schools to allow the parties to "appeal from a determination *regarding* responsibility," meaning that complainants are currently permitted to appeal a finding of non-responsibility. We urge you to ensure the parties' equal rights to appeal in the final rules by permitting appeals from a determination *whether* sex-based harassment occurred.

Furthermore, we urge the Department to ensure that parties at institutions of higher education are afforded the same appeal rights under § 106.45 as they would be under § 106.46. After all, most complaints of non-harassing sex discrimination in higher education do not involve individual respondents as such complaints are typically against the institution, which creates a significant power imbalance between the parties. This necessitates additional procedural safeguards, including the right to appeal based on a procedural irregularity, new evidence, or a conflict of interest or bias, consistent with proposed § 106.46(i)(1)(i)-(iii).

We also ask the Department to require PK-12 schools to provide parties the same appeal rights in investigations of sex-based harassment and other sex discrimination under § 106.45 as they would receive in all other "comparable" investigations, including for all other types of harassment and discrimination, as well as non-sexual physical assault. This would ensure that schools give parties neither fewer nor greater appeal rights in sex discrimination investigations versus other types of investigations, as the former could, in itself, constitute sex discrimination, and the latter could reinforce an exceptionalist approach to addressing sex-based harassment. While the Department states that "the delay associated with an appeal could impair [PK-12 schools'] ability to manage the school environment while sex-based harassment may be ongoing,"[203] nothing would prevent PK-12 schools from continuing to provide supportive measures to the complainant (and the greater school community) while an appeal is ongoing, even if the school's policies do not allow it to impose a sanction until after the appeal is concluded. Moreover, the Department can choose not to require a specific timeframe for appeals under § 106.45 (as is the case in proposed § 106.46 (i)). This would give PK-12 schools the discretion to set their own timeframes for appeals, allowing them to address any concerns about delayed appeals impairing their ability to manage the school environment.

The Department also states that schools need not provide appeals for investigations involving only employees, given some employees are "temporary or at-will employees."[204] We ask the Department to reconsider its proposal to deny employees the right to appeal merely because some states have laws that are hostile to workers' rights.

Finally, we ask the Department to add "the appropriateness of the remedy or sanction" to proposed § 106.46(i)(1)'s list of determinations and decisions for which appeals must be available on the bases set out in § 106.46(i)(1)(i)-(iii). If a procedural irregularity, new evidence, or a conflict of interest or bias led to an inappropriately light or heavy sanction or an inadequate remedy, or if new evidence not reasonably available at the time of the decision would meaningfully impact the remedy or sanction, parties should have an opportunity to appeal.

---

[203] 87 Fed. Reg. at 41489.
[204] *Id.*

Exhibit J

## II.  Protections for LGBTQI+ Students

### A.  Anti-LGBTQI+ Discrimination Harms Students' Access to Education.

In addition to the pervasive harassment described earlier in our comment, LGBTQI+ students struggle to access education due to discriminatory discipline and biased school policies; indeed, over half of PK-12 LGBTQ+ student reported experiencing such disciplinary practices in a 2019 national survey.[205] Many reported the discipline was related to LGBTQI-related expression in schools, which both silences and stigmatizes LGBTQI+ students. This included being disciplined for public displays of affection that are permitted for non-LGBTQ+ students, for speaking about or presenting on LGBTQ-related topics in class or coursework, and for engaging in pro-LGBTQ+ speech, like wearing a t-shirt supporting LGBTQI+ issues.[206]

LGBTQI+ students also often targeted by their schools under codes of conduct that pressure students to comply with cissexist and heteronormative gender roles: in the same 2019 survey, over a quarter of LGBTQ+ students reported being prevented from using bathrooms that matched their gender identity; over a quarter reported being denied the ability to use their chosen names and/or pronouns; nearly a quarter reported experiencing discriminatory dress code enforcement, including being targeted for wearing clothing deemed "inappropriate" based on sex stereotypes and (specifically) cis-centric gender norms; and almost one-tenth reported being prevented from bringing a same-gender date to a school dance.[207]

Finally, LGBTQI+ students are frequently barred or deterred from participating in extracurricular activities, including participating on sports teams consistent with their gender identity, which, as explained further below in **Part II.C.** (p.47-49), prevents them from being able to fully access the benefits of an education: in the same study, over a quarter of respondents were barred from using locker rooms matching their gender identity; over one-tenth reported being barred or discouraged from playing school sports because they were transgender, non-binary, or intersex;[208] and almost a quarter were prevented from starting or promoting participation in a gay-straight alliance club.[209]

The net effect of this institutional discrimination is an increase in stigma, which signals to the student community as a whole that LGBTQI+ students are lesser—and fair targets for harassment and violence.

### B.  The Proposed Rules on the Scope of Protections for LGBTQI+ Students Come at a Crucial Moment and Must Meet the Current Threats.

We strongly support the proposed rule's explicit clarification that sex discrimination includes discrimination on the basis of sexual orientation, gender identity, sex characteristics (including intersex traits), and sex stereotypes.[210] As the Department has recognized in its recent publications,[211] this is crucial to fully

---

[205] GLSEN Survey, *supra* note 12, at 41.
[206] *Id.*
[207] *Id.*
[208] It is also important to note that these figures have likely increased since 2019 due to the high numbers of sports bans introduced to prevent LGBTQI+ students from participating on teams matching their gender identity.
[209] GLSEN Survey, *supra* note 12, at 41.
[210] 87 Fed. Reg. at 41571 (proposed 34 C.F.R. § 106.10).
[211] A recent preliminary injunction of the Department's 2021 *Bostock* implementation guidance was based on reasoning that Title VII and Title IX standards are not comparable (though courts in all circuits have recognized for decades they broadly overlap) and that

Exhibit J

implementing the Supreme Court's holding in *Bostock v. Clayton County*.[212] *Bostock* recognized how sex plays a "necessary and undisguisable role in the decision" to discriminate against an LGBTQI+ individual for "traits or actions [that would not be] questioned in members of a different sex."[213] While the *Bostock* case involved employment discrimination claims under Title VII, multiple appellate courts have already acknowledged its applicability in the Title IX context, in part because the statutes have functionally identical language and decades of overlapping interpretive canon.[214] The clear explanation that LGBTQI+ students are protected under existing law is essential to achieving Title IX's promise of equal access to education for all students, and to implement the Supreme Court's decision in *Bostock v. Clayton County*.[215]

These proposed rules were published at the end of many states' 2022 legislative sessions, in which over 300 bills sought to strip away essential rights from LGBTQI+ people, especially rights of transgender and nonbinary students. Fearmongering from state legislators who chose to demonize some of the LGBTQI+ community's most vulnerable members in hopes of campaign victories must be understood as one point on a spectrum of increasingly pervasive anti-LGBTQI+ violence. In light of these connected threats, all of which especially target transgender students, it is all the more urgent that the Title IX regulations codify explicit protections for LGBTQI+ students.[115]

The Department has an opportunity to strongly enforce Title IX to its full scope and prevent a status quo where a student can safely access school *only if they happen to live in the right place*: 19 percent of the U.S.'s LGBTQ population live in states that censor classroom discussions of LGBTQ people or issues (commonly referred to as "don't say gay or trans" policies);[216] 46 percent of the LGBTQ population reside in states with no law protecting LGBTQ students (including 2% in states that prohibit any local protections against bullying based on LGBTQI+ status);[217] 42 percent of the LGBTQ population reside in states with no laws protecting students' rights to access school facilities, sports teams, or extracurricular clubs without discrimination on the basis of LGBTQI+ status;[218] and 30 percent of the LGBTQ population now live in states with laws that ban transgender and nonbinary students from participating in school sports.[219] All LGBTQI+ people deserve equal protection of the laws and should not have to contend with discrimination simply because they live in a hostile state.

One way the Department can fully meet this crisis moment is by ensuring proposed § 106.10's definition of "sex" accurately captures the full scope of discrimination LGBTQI+ students experience. Specifically, we urge the Department to prohibit discrimination on the basis of "actual or perceived" protected classes, add "transgender or nonbinary status" to the definition of "sex," and clarify that discrimination based on

---

the guidance lacked required notice and comment opportunities (which this proposed rulemaking provides.) *Tenn. v. U.S. Dep't of Educ.*, No. 3:21-cv-308, 2022 WL 2791450 (E.D.T.N., Ju. 15, 2022) (memorandum granting preliminary injunction of guidance interpreting *Bostock*).

[212] *Bostock v. Clayton Cnty.*, 140 S.Ct. 1731 (2020).

[213] *Id.* at 1737.

[214] *See Grimm v. Gloucester Cty. Sch. Bd.*, 972 F.3d 586 (4th Cir. 2020), *as amended* (Aug. 28, 2020), *cert denied*, 141 S.Ct. 2878 (2021); *see also Doe v. Univ. of Scranton*, No. 3:19-CV01486, 2020 WL 5993766, at *5 (M.D. Pa. Oct. 9, 2020).

[215] *Bostock*, 140 S.Ct. at 1747.

[216] These are also known as "don't say gay" or "trans" policies. Movement Advancement Project, *LGBTQ Curricular Laws* (last visited Sept. 9, 2022), https://www.lgbtmap.org/equality_maps/curricular_laws. Although this comment uses the acronym LGBTQI+ throughout, where citing data that does not explicitly study intersex populations, we use more granular labels.

[217] Movement Advancement Project, *Safe School Laws: Anti-Bullying*, https://www.lgbtmap.org/equality-maps/safe_school_laws (last visited Sept. 9, 2022).

[218] Movement Advancement Project, *Safe School Laws: Nondiscrimination*, https://www.lgbtmap.org/equality-maps/safe_school_laws/discrimination (last visited Sept. 9, 2022).

[219] Movement Advancement Project, *Safe School Laws: Bans on Transgender Youth Participation in Sports*, https://www.lgbtmap.org/equality-maps/sports_participation_bans (last visited Sept. 9, 2022).

Exhibit J

"gender expression" is prohibited as a form of discrimination based on gender identity and sex stereotyping. The Department should clarify that Title IX prohibits discrimination based on both "actual" transgender or nonbinary status to reach discriminatory treatment where a student is being treated worse on account of simply being transgender. In other words, the discrimination arises not because a student is girl, but because she is a *transgender* girl. For example, a school that requires all transgender students to use a single-person restroom in the school nurse's office may claim it is not discriminating against any transgender student based on gender identity because it applies this policy to students of various genders. The common thread is discrimination based on transgender status, itself, which echoes the majority framing of but-for sex discrimination in the *Bostock* decision.

In addition to actual status, perceived status is an important category for two reasons. Adding "perceived" would protect students who experience sex discrimination yet might be denied relief under Title IX if a harasser happens to be *mistaken* when targeting them based on their perceived sexual orientation or transgender or nonbinary status. Additionally, it would prevent a student from being denied remedies by their school for discrimination because their school does not believe that they are "really" LGBTQI+ and thus concludes they are not protected from harassment or discrimination on the basis of sexual orientation or transgender status.

Moreover, we recommend that the Department clarify at § 106.10 that students are also protected from discrimination based on their actual or perceived gender expression, which is an aspect of discrimination based on gender identity and sex stereotypes. Gender expression refers to a person's appearance, mannerisms, dress, and other characteristics—importantly, this is not always aligned with a person's gender, or perception of one's core identity. For example, a transgender boy does not stop being a boy if he is coerced into wearing a "girl's uniform" to comply with biased school dress code enforcement.

Finally, we urge the Department to enforce Title IX in a manner that considers the delicate balance in protecting LGBTQI+ students from discrimination with respecting their privacy rights—for instance, avoiding the far-reaching harms of "outing" a student who knows their family is not ready to affirm and support them—while also encouraging students to seek support and involve families who have shown themselves to be energetic allies in supporting LGBTQI+ students. Accordingly, we invite the Department to consider expanding the range of adults who may accompany PK-12 students in proposed § 106.8(c)'s process for prompt and equitable resolutions of complaints and proposed § 106.6(g). LGBTQI+ students would especially benefit from an option to designate a trusted adult other than a parent—such as an adult sibling, aunt or uncle, or mental health counselor—if they do not feel safe and comfortable including a parent in these sensitive proceedings (see **Part I.D: Advisors and support persons** above at p.36-37).

### C. The Proposed Rules on Participation Consistent with Gender Identity Should Provide Greater Clarity on the Application of the *De Minimis* Harm Standard.

We support the § 106.31(a)(2)'s clarification that it would be a *per se* sex-based harm to prevent a student from participating in an education program or activity consistent with their gender, and this will generally violate Title IX because it causes "more than *de minimis* harm." We urge the Department to further clarify that the *de minimis* harm standard applies to all sex-separated programs and activities, unless Congress or the Department has expressly stated otherwise.

We are concerned about the Department's conclusion that Title IX allows greater than *de minimis* harm

Exhibit J

from sex segregation in living facilities in the absence of a clear Congressional statement on this issue.[220] LGBTQI+ students, especially students who are transgender, nonbinary, intersex, or gender nonconforming, are frequently informed by schools that all manner of facilities (essential to accessing school programming and educational opportunities) are considered "living facilities." For example, in cases of schools seeking to discriminate against LGBTQI+ students, courts have characterized restrooms and locker rooms as "living facilities" where schools may tolerate significant sex discrimination, especially against transgender and nonbinary students.[221] These harms may be exacerbated for students with disabilities. For example, a student who has difficulty walking may be denied access to a single-student dorm room in the same building as the school cafeteria on account of sex if that dorm has been designated as a single-sex dorm. Yet that disabled student will be strongly discouraged from seeking Title IX relief given the Department's unnecessarily permissive view that living facilities are held to a separate standard of equal access. (There is significant overlap between sex discrimination against LGBTQI+ students and disabled students, in part because LGBTQI+ people are more likely to be disabled than non-LGBTQI+ people.[222]) All students would benefit from clarifying that all school programming and activities are subject to the *de minimis* harm standard, except for those few, narrow settings in which Congress has stated in unambiguous terms that Title IX "shall not apply" at all.

Correcting this confusion is essential to implementing the proposed rules' promise that students will not be barred from educational opportunities based on sexual orientation or gender identity. As it stands, locations such as locker rooms, restrooms, and overnight accommodations are sites of intense pain and harm for LGBTQI+ students who are subjected to high rates of sex discrimination. Transgender and nonbinary students are singled out and shamed when attempting to access school restrooms at alarming rates.[223] Cisgender LGBQ students may also be prevented from accessing these spaces based on their sexual orientation, such as if school staff prevent a lesbian girl from using the girl's locker room because she is a lesbian.[224] To communicate that schools may not claim impunity from accountability, the Department should clarify that the *de minimis* harm standard applies to living facilities and the other locations discussed above.

It is also a source of confusion for the Department to say in one breath in proposed § 106.31(a) that *all* school programs and activities would be subjected to the *de minimis* harm standard, but also that a separate rulemaking process is required to clarify "eligibility to participate on male and female athletics teams."[225] This approach can only reduce the confidence of school districts wishing to support LGBTQI+ student athletes, who are facing threats and litigation from emboldened transphobic activists and politicians regarding supportive policies *allowing* transgender and nonbinary students to play sports alongside their peers. On the other hand, it signals to districts that are undecided or leaning in favor of exclusionary, anti-LGBTQI+ policies that there genuinely is something different and troublesome about transgender, nonbinary, and intersex student athletes that requires special attention from the federal

---

[220] 87 Fed. Reg. at 41536.
[221] *Grimm*, 972 F.3d at 628.
[222] Movement Advancement Project, *LGBT People With Disabilities* (July 2019), https://www.lgbtmap.org/file/LGBT-People-With-Disabilities.pdf.
[223] *See e.g.*, GLSEN Survey, *supra* note 12, at 41 (28.4 percent of LGBTQ+ youth respondents aged 13-21 reported being prevented from using the bathroom that matched their gender identity at school); Myeshia Price-Feeney *et al.*, *Impact of Bathroom Discrimination on Mental Health Among Transgender and Nonbinary Youth*, 68 J. of Adolescent Health 1142 (2021) (in a study examining the connection between discrimination and poor mental health outcomes in transgender and nonbinary youth from ages 13-24, 58 percent of transgender and nonbinary respondents reported being barred or discouraged from bathrooms aligning with their gender identity, and of those 58 percent, 85 percent reported depressive mood, and 60 percent seriously considered suicide).
[224] GLSEN Survey, *supra* note 12, at 40.
[225] 87 Fed. Reg. at 41538.

Exhibit J

government. A second rulemaking focused on athletics (clearly undertaken in response to intensely targeted hate against LGBTQI+ student athletes) inherently undercuts the statement that school programs and activities are overall properly subject to Title IX's *de minimis* harm standard. We discuss below some steps that would mitigate the harm that has already occurred in this area.

### D.  The Department Must Act with Urgency in Proposing Rules on Athletics Participation.

We urge the Department to issue its forthcoming rule addressing athletics participation as quickly as possible, by the end of 2022, so that it may be finalized together with this set of proposed rules by spring 2023, with sufficient time for schools to update their policies prior to the start of the 2023-2024 school year.

We are concerned that the current proposed rules decline to address exclusion from school sports as an increasingly common form of sex discrimination, faced particularly by transgender, non-binary, and intersex students. Additionally, all girls and women—whether transgender or cisgender, intersex or not—face harassment, invasions of privacy, and exclusion from opportunities from due to gender policing based on sex stereotypes, discriminatory bans, and invasive and inappropriate "sex testing" requirements just to play school sports. Indeed, allowing transgender athletes to participate in school sports correlates in at least two states with increased participation by all girls.[226] CDC data shows that where states adopted transgender-inclusive policies, from 2011-2019 there was no change in girls' participation in high school sports.[227] On the other hand, girls' participation decreased in states with trans-exclusive policies.[228] Such policies, which often include humiliating, and invasive medical requirements, are unscientific and target students entirely based on sex stereotypes. These in turn create new risks of sexual abuse of young student athletes, and disproportionately harm transgender, nonbinary, and intersex people, while also sweeping up cisgender girls and women who do not conform to stereotyped views of femininity. In particular, as a historical matter, there is no disentangling "sex testing" of athletes from a long legacy of racist and sexist abuses used to target Black girls and women and other athletes who do not conform to traditional standards of white femininity.[229]

The forthcoming rule should implement a legal presumption that every student has the right to participate in all school sports, consistent with the student's gender, ideally at all levels of education. We urge the Department to bear in mind that, in practice, any policy seeking to limit sports participation by transgender, nonbinary, and intersex students—at any level of play—will amount in some form or fashion to scrutiny of students' medical history or bodily characteristics and reliance on sex stereotypes. Such restrictions raise grave questions of administrability, equity, and constitutionality, as well as compliance with Title IX's text. As advocates for gender justice, we recognize these ongoing challenges to equity in school sports:

1. There are real and persistent failures to provide equal athletic opportunities for girls and women today—including unequal playing opportunities, unequal investment of institutional resources at every level of competition, and long-running issues of sexual abuse and sex harassment by

---

[226] *See* Shoshana K. Goldberg, Center for American Progress, *Fair Play: The Importance of Sports Participation for Transgender Youth* 14-17 (2021), https://www.americanprogress.org/issues/lgbtq-rights/reports/2021/02/08/495502/fair-play.
[227] *Id.*
[228] *Id.*
[229] Human Rights Watch, "*They're Chasing Us Away from Sport": Human Rights Violations in Sex Testing of Elite Woman Athletes* (Dec. 4, 2020), https://www.hrw.org/report/2020/12/04/theyre-chasing-us-away-sport/human-rights-violations-sex-testing-elite-women.

Exhibit J

coaches and doctors. None of these issues are related in any way to the participation of transgender and nonbinary student athletes.

2.  Although the mere participation of transgender and nonbinary students poses no threat to any other student's rights or opportunities, LGBTQI+ students, their families, educators, and communities advocating for crucial rights have collectively been forced to devote tremendous resources to proving the negative and debating, essentially, these young people's right to exist. This important context, including the real and increasing threats to basic safety that trans students are facing, is critically important context for any action the Department takes.

3.  Any contemplation of policies that allow participation of certain transgender and nonbinary students in athletics to be made contingent on undergoing medical procedures must account for the undue pressure such requirements may place on highly personal medical decisions about the course and timing of medical care, as well as the ways in which access to gender-affirming medical care for transgender youth is being increasingly restricted and criminalized in many jurisdictions. Until transgender youth are no longer systematically forced through incorrect, often traumatic, puberties, there remains a deep injustice in the concept of scrutinizing individual students' medical records and histories for the purposes of determining which LGBTQI+ students should be excluded from school sports, or of making educational opportunities contingent on a course of medical treatment that may not reflect an individual's needs or wishes.

The forthcoming rule should set out an inclusive approach based on data that show the primary educational benefit of sport flows directly from the student's participation. Specifically, the justification for an inclusive rule should recognize that students who play sports are more likely to graduate from high school, go to college, and achieve higher grades and scores on standardized tests.[230] In addition to these academic benefits, sports participation also engenders increased psychological well-being and greater self-confidence in youth, as well as a sense of community amongst their teammates and peers, and teaches students important and unquantifiable lessons about leadership, discipline, and teamwork.[231] The Department should also emphasize that these benefits are especially crucial for transgender, non-binary, and intersex students, as the community and positive self-image associated with sports participation can offer a respite from the stigma and isolation they often face at school and help alleviate the resulting high risk of depression or suicidality they experience.[232] Promoting transgender, nonbinary, and intersex students' participation in sports can also increase the number of safe school spaces available to them; for example, playing sports will give LGBTQI+ students the opportunity to develop a relationship with

---

[230] Elizabeth Tang *et al.*, National Coalition for Women and Girls in Education, *Title IX at 50: A Report by the National Coalition for Women and Girls in Education* 34 (June 2022), https://nwlc.org/resource/ncwge-title-ix-at-50 [hereinafter NCWGE Report].
[231] *See, e.g.*, *id.* at 42; Stacy M. Warner *et al.*, *Examining Sense of Community in Sport: Developing the Multidimensional 'SCS' Scale*, 27 J. of Sport Management 349, 349-50 (2013). Richard Bailey, *Physical Education and Sport in Schools: A Review of Benefits and Outcomes*, 76 J. of Sch. Health 397-401 (2006); Rochelle M. Eime *et al.*, *A Systematic Review of the Psychological and Social Benefits of Participation in Sport for Children and Adolescents: Informing Development of A Conceptual Model of Health through Sport*, 10 Int'l J. of Behavioral Nutrition & Physical Activity 98 (2013).
[232] The Trevor Project, *The Trevor Project Research Brief: LGBTQ & Gender-Affirming Spaces* 3 (2020), https://www.thetrevorproject.org/wp-content/uploads/2021/07/LGBTQ-Affirming-Spaces_-December-2020.pdf. LGBTQI+ youth report high rates of poor mental health and suicidality compared to their cisgender and heterosexual peers, which is linked to a failure by schools to affirm their sexual orientation and/or gender identity. In other words, LGBTQI+ youth attending schools that discriminated against them by preventing them from accessing spaces and facilities matching their gender identities—such as sports teams—were more likely to report attempting suicide than LGBTQI+ youth attending schools that allowed them to access these affirming spaces.

Exhibit J

coaches and other school faculty, who can act as a safe adult to advocate for their protection at school, which is especially crucial if their families are not supportive.

Finally, we stress that it is inappropriate to justify cutting transgender, non-binary, and intersex students off from these crucial benefits of school sports participation by giving disproportionate focus to elite or professional levels of competition. The vast majority of PK-12 athletes do not become intercollegiate athletes, and 98 percent of NCAA student athletes do not continue to the Olympic level.[233]

As transgender girls and women continue to be targeted by school administrators and politicians, and kicked off of their school sports teams in record numbers, it is deeply disappointing that the Department passed up an opportunity to say clearly: all LGBTQI+ students have a right to play school sports without heightened surveillance, reduced privacy, or policies premised on the notion that LGBTQI+ students pose a threat to anyone simply by existing (they do not) or that there is something inherently "unfeminine" about success in school sports (a sex stereotype Title IX was enacted to address). We urge the Department to use the forthcoming rule as a chance to tell LGBTQI+ students that they belong in school and have the same rights as their peers and reverse the deeply troubling trend of state lawmakers attempting to rob LGBTQI+ students—many of them young children—of the chance to play alongside their peers.

### E. The Proposed Rules Should Clarify that Intentional Misgendering Can Constitute Sex-Based Harassment.

We support the provisions in proposed §§ 106.2 and 106.10 that would require schools to address harassment based on sexual orientation, gender identity, sex characteristics (including intersex traits), or sex stereotypes as a form of sex-based harassment. As stated above in **Part II.B** (p.45-47), we urge the Department to also prohibit harassment (and other discrimination) based on "actual or perceived" protected classes, to include "transgender or nonbinary status" in the definition of "sex," and clarify that discrimination based on "gender expression" is prohibited as a form of discrimination based on gender identity and sex stereotyping. And we ask the Department to refer to our other comments above regarding sex-based harassment in **Part I** (p.2-44), which apply equally here to anti-LGBTQI+ harassment.

Often throughout the proposed rule, the Department provides summaries of relevant case law and illustrative examples to explain what constitutes prohibited sex-based harassment. We urge the Department to include similar language and examples to clarify that harassment based on a student's actual or perceived gender identity includes mocking or publicly ridiculing a student using terms of address that are known to be offensive and harmful to the student, which includes misgendering a student by intentionally misusing their pronouns, or title, and/or by deadnaming them by intentionally ignoring their chosen name. Clarifying that intentionally misgendering or deadnaming a student is considered sex-based harassment is not only consistent with recent Department of Education enforcement actions,[234] but is also with Title VII caselaw recognizing that misgendering and/or

---

[233] Joanna Hoffman, Athlete Ally, *Athlete Ally and Chris Mosier Respond to New NCAA Trans Inclusion Policy* (Jan. 20, 2022), https://www.athleteally.org/athlete-ally-mosier-respond-ncaa-new-trans-policy.

[234] The Department has recently investigated schools for failing to address intentional, months-long harassment against transgender students that harmed both mental health and grades. *E.g.*, Dep't of Educ., Office for Civil Rights, *Office for Civil Rights Announces Resolution of Sex-Based Harassment Investigation of Tamalpais Union High School District* (June 24, 2022), https://www.ed.gov/news/press-releases/us-department-educations-office-civil-rights-announces-resolution-sex-based-harassment-

Exhibit J

deadnaming a transgender or nonbinary person can contribute to a hostile workplace environment, thus constituting impermissible sex-based discrimination.[235] Finally, we stress the importance of the Department clarifying the crucial distinction between a simple mistake, such as a teacher inadvertently using the wrong pronoun for a student but then *correcting the error*, and intentional harassment of students through public ridicule and repeated, persistent misgendering and/or deadnaming that causes distress and reduced ability to learn.[236]

### III.  Protections for Pregnant and Parenting Students

#### A.  Discrimination Against Pregnant and Parenting Students Harms Their Access to Education.

Becoming pregnant or a parent should not derail a student's education. Unfortunately, pregnant and parenting students are routinely stigmatized, discriminated against, and denied the resources and support they need to thrive in their educational institutions. As a result, only 51 percent of teenage mothers earn a high school diploma by age 22, compared to 89 percent of girls who do not have a child as a teen.[237] In addition, 33 percent of Black teen mothers and 54 percent of Latina teen mothers never obtain a diploma or GED,[238] and fewer than 2% of all teen mothers graduate college by age 30 leading to decreased opportunities for continuing education and employment.[239] Furthermore, lesbian and bisexual teen girls are more likely than straight teens to become pregnant, and transgender youth are just as likely to become pregnant as cisgender youth.[240] Despite this trend, LGBTQI+ pregnant and parenting students' experiences of intersectional discrimination and their unique needs are largely ignored by educational institutions.[241]

At the college level, almost one quarter of all undergraduate students are parents.[242] Among college student parents, 44 percent work full time while enrolled, and 23 percent are single parents and working

---

investigation-tamalpais-union-high-school-district; *Willits Unified School District Resolution Agreement*, Case No. No. 09-16-1384 (2017) (district will ensure "referring to the Student by other than her female name and by other than female pronouns is considered harassing conduct"); Dep't of Educ., Office for Civil Rights, *City College of San Francisco*, Resolution Agreement, Case No. 09-16-2123 (2017) (school policy should reflect that harassment "can include refusing to use a student's preferred name or pronouns when the school uses preferred names for gender-conforming students or when the refusal is motivated by animus toward people who do not conform to sex stereotypes").

[235] *See Doe v. Triangle Doughnuts, LLC.*, 472 F. Supp. 3d 115 (E.D. Pa. 2020) (citing *Bostock*, 140 S. Ct. 1731 (applying *Bostock*, the court held that the plaintiff's claims of a hostile work environment based on sex stereotypes could proceed because she was misgendered, prevented from using the women's restroom, asked probing questions about her gender identity, and ultimately terminated).

[236] Many educational and mental health organizations, such as the National Association for Secondary School Principals, National Association of School Psychologists, American School Counselors Associations, and National Education Association, recognize the importance of using a student's pronouns and chosen name. *See* National Association for Secondary School Principals, *Position Statement: LGBTQ+ Students and Educators* (last visited Sept. 9, 2022), https://www.nassp.org/top-issues-in-education/position-statements/lgbtq-students-and-educators; National Education Association, *Bostock and Students Rights* (last visited Sept. 9, 2022), https://neaedjustice.org/wp-content/uploads/2020/10/27418-Bostock-and-Student-Rights-Doc2_Final.pdf; National Association of School Psychologists, *Safe and Supportive Schools for Transgender and Gender Diverse Students* (last visited Sept. 9, 2022), https://www.nasponline.org/resources-and-publications/resources-and-podcasts/diversity-and-social-justice/lgbtq-youth/transgender-youth; American School Counselors Association, *Position Statement: The School Counselor and Transgender and Nonbinary Youth* (last visited Sept. 9, 2022), https://www.schoolcounselor.org/Standards-Positions/Position-Statements/ASCA-Position-Statements/The-School-Counselor-and-Transgender-Gender-noncon.

[237] Kate Perper, Kristen Peterson & Jennifer Manlove, *Diploma Attainment Among Teen Mothers*. Child Trends (Jan. 2010), https://www.childtrends.org/wp-content/uploads/2010/01/child_trends-2010_01_22_FS_diplomaattainment.pdf.

[238] *Id.*

[239] Cynthia Costello, Institute for Women's Policy Research, *Pathways to Postsecondary Education for Pregnant and Parenting Teens* (May 2014), https://files.eric.ed.gov/fulltext/ED556724.pdf.

[240] National Women's Law Center, *A Call to Action to Support LGBTQI Pregnant, Expectant, and Parenting Students* (March 2022), https://nwlc.org/resource/a-call-to-action-to-support-lgbtqi-pregnant-expectant-and-parenting-students.

[241] *Id.*

[242] Institute for Women's Policy and Research, *Parents in College by the Numbers* (April 11, 2019), https://iwpr.org/iwpr-issues/student-parent-success-initiative/parents-in-college-by-the-numbers.

Exhibit J

full time while enrolled. In addition, 40 percent of Black women in college are mothers and are more likely to be student parents than their white peers.[243] Despite earning higher GPAs than their non-parenting students,[244] parenting college students are less likely to graduate.[245] This is not due to personal failing, but rather a lack of institutional support and recognition of the unique barriers to college completion for parenting students.[246] Parenting students often experience feeling disconnected from the larger education community and are not aware who they can speak to when they experience discrimination because of their parenting status.[247]

Despite these roadblocks, when educational institutions listen to, support, and prevent discrimination against pregnant and parenting students, these students thrive. While balancing their health, caregiving responsibilities, and educational goals is challenging, these added responsibilities often renew students' dedication to their studies.[248]

The Supreme Court's recent decision in *Dobbs v. Jackson Women's Health Organization*[249] highlights the importance and timeliness of the Departments' proposed rules. The Department plays a critical role in advancing and enforcing the civil rights protections of *all* pregnant and parenting students and workers in educational settings, and helping to ensure that individuals' reproductive decisions do not dictate their educational outcomes, even as those reproductive decisions are under attack as never before in the history of Title IX.

    **B.  The Proposed Rules Should Provide Additional Clarity on Pregnancy-Related Conditions and Stronger Protections Against Discrimination on the Basis of Parental, Family, or Marital Status.**

*Pregnancy or related conditions*

While Title IX has always prohibited recipients from discriminating against students based on their pregnancy or pregnancy-related medical condition, this type of sex-based discrimination is still a frequent occurrence.[250]

---

[243] *Id.*

[244] *Id.*

[245] Renee Ryberg, Rachel Rosenberg & Jessica Warren, Child Trends, *Higher Education Can Support Parenting Students and Their Children with Accessible and Equitable Services* (Jan. 2021), https://www.childtrends.org/publications/higher-education-support-parenting-students-and-their-children-with-accessible-equitable-services.

[246] *See e.g.,* Barbara Gault & Lindsey Reichlin Cruse, Institute for Women's Policy and Research, *Access to Child Care Can Improve Student Parent Graduation Rates* (May 2017), https://iwpr.org/iwpr-general/access-to-child-care-can-improve-student-parent-graduation-rates.

[247] Generation Hope, *National Student Parent Survey Results and Recommendations* (May 2020), https://www.generationhope.org/student-parents-report-2020.

[248] NWLC Pregnant or Parenting Students Report, *supra* note 12, at 1.

[249] *Dobbs v. Jackson Women's Health Org.,* 597 U.S. ___ (2022).

[250] *See e.g.,* Dep't. Educ., Office for Civil Rights, *Salt Lake Community College,* No. 08-22-2021, June 14, 2022), https://www2.ed.gov/about/offices/list/ocr/docs/investigations/more/08222021-a.pdf [hereinafter OCR Findings on Salt Lake Community College] (finding college violated pregnant student's rights under Title IX and Section 504 of the Rehabilitation Act); Dep't. Educ., Office for Civil Rights, *Cal. St. Univ. East Bay*, No. 09-18-2245 (Aug. 1, 2018), https://www2.ed.gov/about/offices/list/ocr/docs/investigations/more/09182245-a.pdf [hereinafter OCR Findings on CSU East Bay] (pregnant student denied accommodations and excused absences); Dep't. Educ., Office for Civil Rights, *Fresno City College,* No. 09-18-2013 (Apr. 10, 2018), https://www2.ed.gov/about/offices/list/ocr/docs/investigations/more/09182013-a.pdf (student denied pregnancy-related absences); *Conley v. Northwest Florida State Coll.*, 145 F. Supp.3d 1073 (N.D. Fla. 2015) (denying recipient's motion to dismiss student's Title IX claim alleging pregnancy discrimination when professor urged pregnant student to not participate in paramedic program).

Exhibit J

We support proposed §§ 106.2 ("pregnancy or related conditions"), 106.21I(2)(ii), 106.40(b)(1), and 106.57(b) prohibiting schools from discriminating against any "person" (including students and employees) based on "current, potential, or past" pregnancy or related conditions and urge the Department to include "perceived" and "expected" pregnancy or related conditions to the list. This language would better fully capture the ways pregnancy stigma and bias prevent equal access to educational opportunities. For example, we recently supported a high school student who had her academic honors designation revoked simply because false rumors spread that she was pregnant and had an abortion. This language would also ensure that students planning to become pregnant are not discriminated against on that basis and that women and girls and others assigned female at birth are not denied opportunities in programs because they might become pregnant.

In addition, we support proposed § 106.2 explicitly adding "lactation" as an example of a related condition, in addition to childbirth and termination of pregnancy. We urge the Department to clarify in the regulations that its enumeration of pregnancy-related conditions is non-exhaustive and that the term "pregnancy-related conditions" also includes mental and physical conditions including, but not limited to gestational diabetes, preeclampsia, mastitis, hyperemesis gravidarum, "morning sickness," fatigue, dehydration, and postpartum depression. Additionally, the Department should clarify that a pregnancy-related condition need not qualify as an ADA disability.

Proposed § 106.40(b)(2) would also require employees who know of a student's pregnancy or related condition to provide the student the Title IX coordinator's contact information for assistance, and proposed § 106.40(b)(3)(i) would require Title IX coordinators to notify the student of their rights if the student or someone with the legal right to act on behalf of the student notifies the Title IX coordinator of the student's pregnancy or related condition. We appreciate the intent behind these requirements but ask the Department to instruct schools in the final regulations and in supplemental guidance on how best to protect student privacy to ensure that school records, including school health records, are not used to support pregnancy-related prosecutions including through documentation indicating whether students who have been pregnant in the past are not currently pregnant.[251]

Additionally, the proposed requirement that a student receives the Title IX Coordinator's contact information "for assistance" is vague and potentially overstates the scope of support Title IX coordinators can provide in states where aiding and abetting abortion is criminalized.[252] Therefore, we ask the Department to clarify that an employee must promptly inform the student (i) how to notify the Title IX coordinator of the student's pregnancy or related conditions *in order to receive information about their rights* and (ii) provide contact information for the Title IX Coordinator. The specificity of this language will clarify the scope of a school's legal obligations to students who are pregnant or have a related condition. The Department should clarify that Title IX's preemption extends to state laws that criminalize aiding and abetting abortion to the extent they directly conflict with recipients' obligations to provide medically

---

[251] *See e.g., Bonamici Leads 60 Colleagues in Calling for Pregnant Students to be Protected Under Title IX,* Press Release, (July 21, 2022), https://bonamici.house.gov/media/press-releases/bonamici-leads-60-colleagues-calling-pregnant-students-be-protected-under-title.

[252] While all students deserve access to reproductive healthcare, including abortions, without penalty, we note that this is crucial for survivors of intimate partner violence. Such survivors experience higher rates of violence when they are pregnant and pregnancy further ties survivors of rape and intimate partner violence to their abusers, making it harder to escape their perpetrator. *See, e.g.,* Donna St. George, *CDC Explores Pregnancy-Homicide Link,* Washington Post (Feb. 23, 2005). https://www.washingtonpost.com/wp-dyn/articles/A45626-2005Feb22.html; Hannah Craig, *Limiting Abortion Rights Keeps DV Victims In Danger* (July 11, 2022), https://www.domesticshelters.org/articles/in-the-news/how-limiting-abortion-rights-keeps-survivors-in-danger.

Exhibit J

necessary absences and reasonable modifications to students with pregnancy-related medical conditions.[253]

Finally, we urge the Department to clarify that Title IX does not permit a school to use pregnancy-related information received through Title IX requirements to be provided to criminal law enforcement officers and to clarify that referring a student to law enforcement based on their termination of pregnancy can violate Title IX's guarantee of equal education access and its prohibition on retaliation.

### *Parental, family, or marital status*

Parenting and caregiving students face unique barriers to accessing and completing their education.[254] Becoming a parent is a primary reason young girls do not complete high school[255] and women account for 72 percent of students who are parents of children living in their household.[256] In addition, 86.4 percent of young (18- to 24-year-old) Black women who are parents were caring for the children on their own, [257] and only 11.3 percent of young women who are parents are in school.[258]

The proposed rules, like the current rules, do not view discrimination based *solely* on parental, family, or marital status as a type of sex discrimination. Rather, proposed §§ 106.21(c)(2)(i), 106.40(a), and 106.57(a)(1)) would only make it unlawful to adopt a policy disadvantaging students, workers or applicants based on their parental, family or marital status if the policy "treats persons differently on the basis of sex." This narrow prohibition is incomplete and already currently leads school administrators to believe that they can discriminate against parenting students (versus non-parenting students) or non-birthing parents (versus birthing parents), as long as they do so equally across genders, despite the fact that such discrimination is likely to have a disparate impact on the basis of sex and is often based on sex stereotypes (such as a stereotype that women or girls who are mothers are likely to neglect their education or that men or boys should not be responsible for providing care to children).

Federal courts have clarified that it is unlawful sex discrimination to use sex-based stereotypes to deny equal education opportunities because of a student's marital or parental status, regardless of how the

---

[253] Alternatively, the Department could explicitly require recipients to provide students who are pregnant or have a related condition with an information packet (similar to the Clery Act's requirement to provide victim resource packets), thereby preempting pregnancy-related criminal statutes. *See, Crosby v. Nat'l Foreign Trade Counsel*, 530 U.S. 363, 373 (2000) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941) (implied conflict preemption only nullifies State action if it is impossible for a private party to comply with both state and federal law or if State law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress) (internal quotations omitted); *see also,* National Right to Life Committee, *Post-Roe Model Abortion Law* (June 15, 2022), https://www.nrlc.org/wp-content/uploads/NRLC-Post-Roe-Model-Abortion-Law-FINAL-1.pdf (prohibiting "knowingly or intentionally giving information to a pregnant woman, or someone seeking the information on her behalf, by telephone, the internet, or any other medium of communication, regarding self-administered abortions or the means to obtain a[n] illegal abortion, knowing that the information will be used, or is reasonably likely to be used, for a self-administered abortion or an illegal abortion").

[254] *See, e.g.,* Alisha Haridasani, *No Time to be a Child,* New York Times (Sept. 25, 2021), https://www.nytimes.com/2021/09/25/us/young-girls-caregiving-covid.html.

[255] NWLC Pregnant or Parenting Students Report, *supra* note 12, at 1.

[256] Data is specific to women ages 18 and older. National Women's Law Center calculations based on August 2021–May 2022 monthly Current Population Survey (CPS) microdata samples, accessed through Sarah Flood *et al.*, Integrated Public Use Microdata Series Current Population Survey (IPUMS CPS): Version 9.0, https://doi.org/10.18128/D030.V9.0.

[257] NWLC calculations using February 2020–April 2022 monthly Current Population Survey (CPS) microdata samples, accessed through Sarah Flood *et al.*, Integrated Public Use Microdata Series Current Population Survey (IPUMS CPS): Version 9.0, https://doi.org/10.18128/D030.V9.0. Caring for children on their own means Black women who indicated the age of their own youngest child in the household is under 18 and indicated they are married but their spouse is not present, separated, divorced, widowed, or never married/single.

[258] *Id.* "In school" means they are in high school or college either part time or full time. "Parents" are those with their own kids living in their household.

Exhibit J

recipient treats parenting students of a different sex.[259] It is also well established that parenting students experience discrimination that relies on outdated sex stereotypes about caregiving, such as the idea that women must be responsible for home and child care. Additionally, the EEOC has long found that harmful gender stereotypes relating to family responsibilities violate Title VII.[260]

We also note that the Department's proposal would exclude from protection other students who may be harmed by gender norms related to caregiving, including expectant non-birthing parents, students who are perceived to be parents, and caregivers who are not parents.

Therefore, because such discrimination consistently has discriminatory impacts based on sex and is deeply bound up in sex stereotypes, we urge the Department to expressly state that schools may not discriminate based on a person's "current, potential, <u>perceived, expected</u>, or past parental, family, marital, or <u>caregiver</u> status." We also ask the Department to define "family status," as existing regulations and guidances do not.

Finally, under the current rules, which are very similar to the proposed rules in their treatment of parental status, we understand that in some instances school staff are sometimes deterred from supporting young mothers because they fear that accommodating birthing mothers without similarly accommodating fathers and other non-birthing parents violates Title IX and, consequently, decide to not accommodate any student parents at all. Therefore, we urge the Department to make clear that providing reasonable modifications and supports to students affected by pregnancy and related conditions or students with caregiving responsibilities does not constitute discrimination against those not so affected or without such responsibilities.

> **C. The Critically Important Proposed Rules on Reasonable Modifications for Pregnancy and Related Conditions, Voluntary Leaves of Absence, and Lactation Supports Should Be Further Strengthened.**

### *Participation*

Despite current § 106.40(b)(3) and proposed § 106.40(b)(1) requiring that pregnant students can only be placed in separate educational programs or activities if their participation in such programs or activities is voluntary, pregnant and parenting students, particularly those in high school, are routinely forced, coerced, or pressured into inferior alternative education programs. Additionally, there is currently no repository of information on which districts or schools have separate programs or services for pregnant and parenting students or the quality of those offerings.[261] We urge the Department to explicitly prohibit schools from requiring pregnant or parenting students to participate in separate programs and to specify that such programs must be "substantially equal" (not merely "comparable") in "purpose, scope, and quality" to those offered to students who are not pregnant or parenting.

We also support proposed § 106.40(b)(6) prohibiting schools from requiring students who are pregnant or have a related condition to provide a certification from their healthcare provider that they can physically

---

[259] *E.g., Tingley-Kelley v. Trustees of Univ. of Pennsylvania*, 677 F. Supp. 2d 764 (E.D. Pa. 2010).
[260] *See, e.g.*, Equal Employment Opportunity Commission, *Unlawful Disparate Treatment of Workers with Caregiving Responsibilities* (May 23, 2007), https://www.eeoc.gov/laws/guidance/enforcement-guidance-unlawful-disparate-treatment-workers-caregiving-responsibilities.
[261] NWLC CRDC Comment, *supra* note 53, at 32.

Exhibit J

participate in a program or activity, except in cases where *all* students are required to provide such certification. This would prevent recipients from relying on generalizations about pregnancy to only require pregnant students to prove they are physically capable of participating in a program or activity.

We also strongly support the Department providing new regulatory clarity regarding reasonable modifications, voluntary leave absence, and lactation spaces in § 106.40(b)(3) (as discussed further below), but we urge the Department to clarify that the obligation to provide reasonable modifications to address pregnancy or related conditions; to allow a student affected by pregnancy or related conditions to take a voluntary leave of absence; and to ensure the availability of a lactation space are obligations of the *recipient*, not just personal obligations of the Title IX coordinator. Proposed § 106.40(b)(3)(ii), (iii), and (iv) specifically charge the Title IX coordinator (and only the Title IX coordinator) with these obligations, which may lead recipients to assert that no other agent or employee of the recipient has a responsibility to comply with these provisions or that the recipient is not responsible for any failure of the Title IX coordinator to meet these obligations.

### *Absences*

Punitive absence policies push pregnant and parenting students out of school by disciplining them for missing class for medical appointments, their own medical recovery and needs, when their children are ill, or if child care arrangements fall through. For example, in a 2017 survey, high school girls who are pregnant or parenting (54 percent) were more likely than girls overall (25 percent) to report they had missed 15 days or more of school in a year.[262] When individual schools or instructors have the discretion to create their own attendance policies, it is likely that pregnant and parenting students' needs will not be considered. Pregnant and parenting students should not have to choose between their health and their education.

We support proposed § 106.40(b)(3)(iii) requiring schools to allow students who are pregnant or have a related condition to take a voluntary leave of absence for as long as deemed medically necessary by their healthcare provider or for as long as the school's policy allows—whichever is longer—and to reinstate students when they return to their prior academic status and, as practicable, extracurricular status. In particular, we support the proposed change allowing any healthcare provider (not just a physician) to determine how much leave is medically necessary, as this recognizes that not all students have easy access to a physician.

However, proposed § 106.40(b)(4) would create an arbitrary and harmful distinction between medically necessary "leave" (*e.g.*, for recovery from pregnancy)—which would have to be granted if requested, pursuant to § 106.40(b)(3) —and short "breaks during class" (*e.g.*, for lactation breaks) or "intermittent absences" (*e.g.* for abortion or recovery therefrom)—which would be classified as "reasonable modifications" and could be approved or denied subject to a Title IX coordinator's discretionary determination that providing such breaks amounts to a "fundamental alteration" of the educational program. Under the proposed rule, students in higher education who take a medically necessary "leave" because a request for a shorter "absence" is denied may also have to deregister during the leave, which may result in ineligibility for critical benefits like housing and healthcare. Therefore, we urge the Department to require schools to presume that medically necessary absences (*e.g.*, prenatal care, lactation breaks, abortion care) are "reasonable modifications" and must be granted.

---

[262] NWLC Pregnant or Parenting Students Report, *supra* note 12, at 7.

Exhibit J

The proposed rules' treatment of absences would also exclude from protection non-birthing parents and caregivers who are not parents but who may need to provide medically necessary care for a child or other dependent. Therefore, we urge the Department to make medically necessary "absences" (not merely a "leave of absence") available to *parenting and caregiving* students (not just to students who are pregnant or have a related condition) for as long as they need to care for a minor child or disabled adult who is sick. Our recommendation would be an expansion of the proposed rules (where the only students entitled to absences would be those who are pregnant, lactating, or recovering from childbirth) and would be consistent with the Department's definition of "parental status" at § proposed 106.2, which would apply to all parents of minor children and disabled adults.

In addition, the Department should not deprive pregnant and postpartum workers[263] at educational institutions of the protections afforded to students. Allowing employers to deny pregnant and postpartum workers job-protected time off would further enshrine the stereotype that motherhood and work are incompatible, enacting the very sex-based exclusion Title IX was meant to eradicate. We urge the Department to clarify at proposed § 106.57(c) that workers are entitled, at minimum, to a voluntary leave of absence while medically necessary, including but not limited to, leave to recover from childbirth; and any other medically necessary time off, such as for pre- and post-natal appointments, and bedrest. We also ask the Department to amend proposed § 106.57(d) to state that, to the extent a recipient maintains a leave policy for employees that is more generous, the recipient must permit the employee to take leave under that policy instead if the employee so chooses.

### *Reasonable modifications*

Proposed §§ 106.40(b)(3), 106.40(b)(3)(ii), and 106.40(b)(4) would require schools to "promptly" make "voluntary and reasonable modifications" to their policies, practices, or procedures because of a student's pregnancy or related condition, unless a modification is "so significant" that it "alters the essential nature" of the school's program or activity. We appreciate the requirement that the modifications must be voluntary, but we note that as written, the language of the proposed rules is somewhat vague as to what is meant by the term and whether it refers to the voluntary acceptance of the modification by the student or the voluntary provision of the modification by the recipient. Therefore, we encourage the Department to explain what is meant by "voluntary" by explicitly stating in the regulations that a recipient shall not force a student to accept a modification that the student does not want or need. Additionally, the proposed "essential nature" qualifier is vague and could encourage schools to deny students who are pregnant, lactating, or accessing abortions of necessary accommodations. Therefore, as set out above, we urge the Department to require educational institutions to presume that medically necessary absences (*e.g.*, for prenatal care, lactation breaks, abortion care) are inherently "reasonable" modifications and must be granted. Additionally, the Department should clarify that if a modification turns out to be ineffective or a requested modification would "fundamentally alter" the program or activity, then the school must engage in a good faith, interactive dialogue to identify other modifications that would meet the student's needs.

It is a common occurrence that a pregnant person has or develops a disability during or as a result of their pregnancy (or as a result of their pregnancy-related condition) and some of these disabilities endure post-partum. In fact, several complaints filed to the Department's Office for Civil Rights involve pregnant students who alleged violations under Title IX *and* federal disability laws including the IDEA or Section

---

[263] *See supra* notes 102-107 and accompanying text.

Exhibit J

504.[264] Upon finalizing the regulations, we urge the Department to issue supplemental guidance instructing schools that, consistent with proposed § 106.8(e), if the Title IX coordinator is administering reasonable modifications to a pregnant student with a documented disability, then the school is required to consult with the student's IEP team and/or Section 504 team.

We oppose proposed § 106.57(c), which would make the right of employees[265] who are pregnant or have a related condition to modifications dependent on the rights of employees with temporary disabilities to access modifications. The Department should extend affirmative rights to modifications to *employees* who are pregnant or have a related condition, just as proposed § 106.40(b) would grant affirmative rights to modifications to students who are pregnant or have a related condition. After all, discrimination based on pregnancy or a related condition is a form of sex discrimination under Title IX, and affected students and employees alike have affirmative rights under Title IX that are independent of other civil rights laws. Moreover, many students, particularly at institutions of higher education, hold paid employment on campus. It would defy logic to guarantee a pregnant student access to a stool to rest while studying in their science lab, but not to guarantee them the same modification while they perform wage labor as a receptionist for the science department at their university. In both contexts, the modification is necessary to ensure that they can fully access the educational environment. Therefore, we urge the Department to issue a final rule clarifying that employees, like students, have an affirmative right to reasonable modifications to the recipient's policies, practices, and procedures, including but not limited to: changes in physical space or supplies; elevator access; adjustments to uniform requirements or dress codes; adjustment of shift start-end time; reduced or modified work schedule; help with manual labor or limits on lifting; desk duty or light duty; and temporary transfer to an alternate position. As with students, such modifications must be provided on an individualized and voluntary basis.

Furthermore, the Department should make similar modifications available to all *parenting and caregiving* students and employees (not just those who are pregnant or have a related condition) for as long as they are caring for a minor child or disabled adult. Under the proposed rules, the only individuals entitled to modifications would be those who are pregnant, lactating, or recovering from childbirth. Our recommendation would make modifications available to all types of caregivers and would be consistent with the Department's definition of "parental status" at proposed § 106.2, which would apply to all parents of minor children and disabled adults.

The proposed rules do not clarify whether schools are allowed to require medical documentation in order to grant requests for reasonable modifications.[266] Where the modification is obvious (*e.g.*, more frequent bathroom or lactation breaks, larger desk), we urge the Department to prohibit schools from requiring students or workers to obtain a certification from their healthcare provider in order to receive that modification and to explicitly state in the final rule that medical documentation is unnecessary in the vast majority of cases. Forcing pregnant and parenting students and workers to get medical documentation for reasonable modifications, particularly very routine or obvious modifications such as bathroom breaks or a larger desk, is unnecessarily burdensome.

We also ask the Department to add more specific examples of modifications for pregnant and parenting students and workers at proposed § 106.40(b)(4)(iii), including accessible parking, academic counseling,

---

[264] *See e.g.,* OCR Findings on Salt Lake Community College, *supra* note 250; OCR Findings on CSU East Bay, *supra* note 250.
[265] Again, this should extend to non-employee workers as well because Title IX protects any "person." *See supra* notes 102-107 and accompanying text.
[266] 87 Fed. Reg. at 41525–41526

Exhibit J

homework assistance to address medically necessary absences, referral to child care or preschool options, and assistance in accessing social assistance programs (e.g., public health care, nutrition assistance)

Finally, we support proposed §§ 106.40(b)(3)(iv), 106.40(b)(4)(iii), and 106.57(e), which would require schools to give lactating students and employees reasonable breaks and a clean, private non-bathroom space to pump breastmilk or breastfeed. We request the Department clarify that lactation spaces must include a flat surface and a chair,[267] and nearby access to running water and a refrigerator in to store expressed milk. The Department should also explicitly state that lactation spaces must be in reasonable proximity to the student's place of study or worker's specific place of work. These are the bare minimum features of a lactation space for it to be functional. What's more, nearly all recipients under Title IX are already required to provide a lactation space to certain employees under the Fair Labor Standards Act.[268] As such, the cost of making these spaces more broadly available should be minimal.

The Department should also clarify in the regulations and in supplemental guidance that if multiple lactating students or workers need access to a lactation space at the same time, recipients should discuss various options with all parties to create a solution that meets everyone's needs. Such options can include using a signage or scheduling system or creating a multi-person space by placing partitions or screens in the space.[269]

We urge the Department to clarify that students and workers still have a right to express milk or breastfeed in places other than designated lactation spaces, if they wish. For example, it may be easier for a professor to express milk in their office, or for a student to nurse at a child care facility. Such a regulation would align with laws in all 50 states, the District of Columbia, Puerto Rico, and the Virgin Islands that allow lactating people to breastfeed in any public or private place they are otherwise allowed to be.[270] This language gives agency to the lactating person and challenges outdated messages that it is shameful or indecent to express breastmilk in public. We also suggest the Department adopt more gender-neutral language, such as "lactating person," "express milk," and "nursing."

### D.  The Proposed Rules' Protections Against Sex-Based Harassment Provide Important Protections for Pregnant and Parenting Students.

We support proposed § 106.40(b)(3)(i)(F) stating that schools must address harassment based on pregnancy or related conditions as a form of sex-based harassment, and we offer the same comments here as for sex-based harassment detailed above in **Part I** (p.2-44). In addition, we ask the Department to instruct schools in the final regulations and in supplemental guidance on how to protect student privacy to ensure that school records regarding harassment based on pregnancy or related conditions (including termination of pregnancy) are not used to support prosecutions related to pregnancy outcomes, including abortion. The Department should also clarify how the Supreme Court's decision in *Dobbs* interacts with other privacy laws affecting students, like the Family Educational Rights and Privacy Act (FERPA) and the

---

[267] *See, e.g.*, N.Y.C. Human Rights, *Frequently Asked Questions: Lactation Accommodation and Model Policy N.Y.C. Admin. Code s8-107(22)* (last visited Sept. 9, 2022), https://www1.nyc.gov/site/cchr/law/lactation-faqs.page [hereinafter NYC Lactation Accommodations FAQ].
[268] 29 U.S.C. 207(r)(1).
[269] NYC Lactation Accommodations FAQ at #21.
[270] National Conference of State Legislatures, *State Breastfeeding Laws* (last visited Sept. 9, 2022), https://www.ncsl.org/research/health/breastfeeding-state-laws.aspx.

Exhibit J

Health Insurance Portability and Accountability Act (HIPAA) and clarify that a student is protected by FERPA if they disclose an abortion to an academic counselor or mental health care provider.

Furthermore, as explained above in **Part III.B: Parental, family, or marital status** (p.55-56), we urge the Department to include harassment based on parental, family, caregiver, or marital status as a type of sex-based harassment and to require schools to address it as such.

### IV.  Other Protections Against Sex Discrimination

#### A.  The Proposed Rules Appropriately Address Not Only Sex-Based Harassment, but also the Range of Other Forms of Sex Discrimination.

The proposed rules would, for the first time, impose more detailed requirements for addressing sex discrimination that is not sexual harassment or other harassment based on sex, including LGBTQI+ status, sex stereotypes, or pregnancy/parenting status. We support an approach that recognizes sex-based harassment as one form of sex discrimination rather than treating it as though it is a fundamentally separate issue. In response to the proposed rules on these other forms of sex discrimination, we offer the same comments here as for sex-based harassment detailed above in **Part I** (p.2-44).

#### B.  The Proposed Rules Should Provide Stronger Protections Against Sex-Based Treatment or Separation.

**De minimis *harm***

We support proposed § 106.31(a)(2) stating that when schools treat individuals differently or separate them on the basis of sex, they cannot do so in a way that subjects a person to "more than *de minimis* harm," unless otherwise expressly permitted by the Title IX regulations. However, the only specific example in proposed § 106.31(a)(2) of what causes "more than *de minimis* harm" is preventing someone from participating in an education program or activity consistently with their gender identity. We urge the Department to provide examples in supplemental guidance of sex-based treatment or separation that causes "more than *de minimis* harm." (See **Part II.C** at p.47-49 above for a more detailed discussion.)

***Dress and appearance codes***

Dress and appearance codes often reflect and perpetuate gender stereotypes. Girls and women of color, especially Black girls and women, and LGBTQI+ students are more likely to be targeted and disciplined for violating dress and appearance codes. These codes frequently reinforce traditional notions of white femininity and the idea that girls' bodies are "shameful" or "vulgar."[271] They can also reinforce rape culture by suggesting that boys and men cannot control their sexual impulses and that girls and women must dress a certain way to avoid sexual harassment.[272] And they often force transgender, nonbinary, and gender-nonconforming students to conform narrowly to traditional gender norms.[273] In addition, dress and grooming codes are often rooted in Eurocentric standards and treat common Black protective hairstyles—

---

[271] National Women's Law Center, *Dress Coded: Black Girls, Bodies, and Bias in DC Schools* 12–14, 19, 22 (2018), https://nwlc.org/resource/dresscoded [hereinafter NWLC Dress Code Report].
[272] *Id.* at 1, 20, 27.
[273] *Id.* at 12, 27.

Exhibit J

such as braids, locs, hair wraps, Bantu knots,[274] or bandanas[275]—as unprofessional and disrespectful. These codes also often include hair length requirements that disproportionately harm Indigenous students, Sikh students, and other students of color for whom wearing long hair may be an important part of their identity.[276] Enforcement of sex discriminatory dress codes against girls and gender-nonconforming students through exclusionary discipline forces them to miss important class time; sends the message that that they do not belong; subjects them to significant public humiliation, stress, and anxiety; and damages their confidence, psychological well-being, and sense of belonging in school.[277]

Unfortunately, the proposed rules do not address dress and appearance codes. We urge the Department to initiate rulemaking under Title IX to explicitly prohibit dress and appearance codes in schools based on sex (including sexual orientation and gender identity), including by restoring and updating the Title IX dress code regulations that were rescinded in 1982 to make clear that sex-separated dress and appearance codes are discriminatory.[278]

### Single-sex regulations

Sex-segregated classes, activities, and schools often rely on debunked misinformation suggesting there are neurological differences between girls and boys requiring different learning environments. In reality, this rationale for sex-segregated education is rooted in sex-based stereotypes; numerous studies by reputable neuroscientists and child development experts have consistently found that cognitive abilities and learning needs differ more *within* groups of girls and boys than *between* them.[279] A 2014 analysis of 184 studies by the American Psychological Association, representing testing of more than 1.6 million PK–12 students, also concluded that sex-segregated education provides no benefits over coeducational schooling.[280] Unfortunately, in 2006, the Department issued Title IX regulations on single-sex education that resulted in a proliferation of sex-segregated classes and schools. As of 2018, nearly 800 coeducational public schools today have at least some sex-segregated programming at the PK–12 level, including academic classes.[281] The United States also has more than 130 all-girl or all-boy public schools, including public charter and magnet schools.[282] Although recent single-sex programs for Black boys have

---

[274] *Id.* at 10; Frederick Reese, *Natural Hair Bias Is the Latest Tool Being Used to Criminalize Black Girls, Marginalize Black Women*, Atlanta Black Star (June 1, 2007), https://atlantablackstar.com/2017/06/01/natural-hair-bias-is-the-latest-tool-being-used-to-criminalize-black-girls-marginalize-black-women; Vanessa King, *Race, Stigma, and the Politics of Black Girls Hair* (2018), https://cornerstone.lib.mnsu.edu/cgi/viewcontent.cgi?article=1762&context=etds.
[275] *See* Amira Rasool, *A High School Student Was Arrested and Suspended for Wearing a Bandana*, Teen Vogue (Aug. 16, 2018), https://www.teenvogue.com/story/high-school-student-arrested-wearing-bandana; *see also* NWLC Dress Code Report, *supra* note 271, at 11.
[276] ACLU of Texas, *Complaints Filed Urging Federal Civil Rights Agencies to Investigate Texas School District's Discriminatory Dress Code* (Mar. 4, 2021), https://www.aclutx.org/en/press-releases/complaints-filed-urging-federal-civil-rights-agencies-investigate-texas-school.
[277] Emily K. Weisburst, *Patrolling Public Schools: The Impact of Funding for School Police on Student Discipline and Long-term Education Outcomes* 27 (2018), https://strategiesforyouth.org/sitefiles/wp-content/uploads/2019/10/PatrollingPublicSchools.pdf; Kelly Wallace, *Do school dress codes end up body-shaming girls?*, CNN Health (May 30, 2017), https://www.cnn.com/2017/05/30/health/school-dress-codes-body-shaming-girls-parenting/index.html; Pooja Patel, *Dress Codes Are Body-Shaming and Sexist*, Nat'l Eating Disorders Ass'n (2015), https://www.nationaleatingdisorders.org/blog/dress-codes-are-body-shaming-and-sexist.
[278] Prior to amendments made in 1982, 34 C.F.R. § 106.31 stated, ". . . in providing any aid, benefit, or service to a student, a recipient shall not, on the basis of sex: . . . Discriminate against any person in the application of any rules of appearance."
[279] NCWGE Report, *supra* note 230, at 44.
[280] Erin Pahlke *et al.*, *The Effects of Single-Sex Compared with Coeducational Schooling on Students' Performance and Attitudes: A Meta-Analysis*, 140(4) Psychological Bulletin 1042-1072 (2014), https://www.apa.org/pubs/journals/releases/bul-a0035740.pdf.
[281] Sue Klein *et al.*, *Tracking Deliberate Sex Segregation in U.S. K-12 Public Schools* 1, Feminist Majority Foundation (2018), https://feminist.org/wp-content/uploads/2020/06/SexSegReport2018.pdf.
[282] *Id.*

Exhibit J

been created with the stated goal of remediating unmet needs and discriminatory history, these programs ignore the same history and unmet need of Black girls.[283]

We were disappointed that the proposed rules do not address the 2006 single-sex regulations. We urge the Department to initiate rulemaking to rescind the 2006 single-sex regulations and ensure that any programs addressing the racial opportunity gap benefit students of all genders equally.

### C. The Proposed Rules Should Ensure That Required Notices of Nondiscrimination Provide Greater Clarity and Accuracy Regarding Recipients' Obligations and Commitments.

*Enumeration of protected classes*

We support proposed § 106.8(c) requiring schools to adopt and publish a policy against sex discrimination and grievance procedures to address complaints of sex discrimination. We also ask the Department to require schools to notify students, families, employees, applicants, and other required groups that the nondiscrimination policy and grievance procedures apply to sexual harassment, sexual assault, dating violence, domestic violence, stalking, and other harassment or discrimination based on sexual orientation, gender identity, sex characteristics (including intersex traits), sex stereotypes, and pregnancy or related conditions (including childbirth, termination of pregnancy, and lactation), so that they know which types of conduct constitute sex discrimination and when they can ask their schools for help.[284]

*Religious exemptions*

In 2020, the previous administration made two changes to the Title IX regulations that allow more schools to discriminate based on sex by claiming a religious exemption, which disproportionately harms women and girls, pregnant and parenting students, students who access or seek access to abortion or birth control, and LGBTQI+ students. First, although the Title IX statute only allows religious exemptions for schools that are "controlled by a religious organization,[285] current § 106.12(c) allows schools that are not actually controlled by a religious organization to claim a religious exemption from Title IX if, for example, they are a divinity school, they require students to follow certain religious practices, or their mission statement refers to religious beliefs. Second, current § 106.12(b) assures schools that they may assert a religious exemption *after* they are already under investigation by the Department for violating Title IX. This means students and employees are not entitled to any prior notice of a school's intent to discriminate based on sex despite current § 106.8(b)(1) and proposed § 106.8(c)(1) requiring schools to notify students, their families, employees, and applicants of schools' anti-sex discrimination policies.

---

[283] *E.g.,* Letter from African American Policy Forum to President Barack Obama, *Why We Can't Wait: Women of Color Urge Inclusion in 'My Brother's Keeper'* (June 17, 2014; updated May 4, 2021), https://www.aapf.org/post/why-we-can-t-wait-women-of-color-urge-inclusion-in-my-brother-s-keeper; Maryland State Department of Education, *Transforming the Culture of Maryland's Schools for Black Boys* (April 2021), https://www.marylandpublicschools.org/stateboard/Documents/2021/0427/MSDETransformCultureforBlackBoy.pdf (relying on Sax and Gurian's theories to recommend establishing single-sex classes targeting Black boys); American Civil Liberties Union, *Leaving Girls Behind: An Analysis of Washington D.C.'s "Empowering Males of Color" Initiative* (May 2016), https://www.aclu.org/report/leaving-girls-behind.
[284] We also urge the Department to prohibit harassment on the basis of parental, family, caregiver, or marital status under Title IX (see **Part III.A: Parental, family, or marital status** above).
[285] 20 U.S.C. § 1681(a)(3).

Exhibit J

Unfortunately, the proposed rules do not address these changes. We urge the Department to swiftly issue proposed Title IX regulations that (i) rescind the 2020 changes to § § 106.12(c) and (ii) change § 106.12(b) to require schools to notify the Department of any religious exemption claims and to publicize any claimed exemptions in their required nondiscrimination notices.

## V.  Directed Questions

### A.  Question 1: FERPA and Title IX.

See above discussion on protecting complainant privacy when providing supportive measures (p.25), when providing notice of the allegations (p.34), when allowing advisors and support persons to participate (p.37), when providing the parties access to evidence (p.39), and when providing notice of the determination (p.42-43).

In addition, we ask the Department to consider ways to protect complainant privacy when a school has notice of possible sex discrimination. Given the complexities that can arise based on employee obligations to report possible sex-based harassment or other sex discrimination to the Title IX coordinator, the Department should issue supplemental guidance instructing schools on how to respond to possible sex-based harassment or other sex discrimination based on sexual orientation or gender identity while protecting the privacy and safety of LGBTQI+ students and employees, who may not wish to be outed to their parents or their school; this issue is especially fraught for minor LGBTQI+ students who attend schools in hostile states with anti-LGBTQI+ laws on the books, where creating a record of a students' LGBTQI+ status could expose them to harm or their families to criminalization.[286] Similarly, we also ask the Department to issue supplemental guidance instructing schools on how to protect the privacy and safety of pregnant students and employees, who are today at increased risk of criminalization if they seek an abortion or have a miscarriage, or provide support or assistance to those seeking an abortion. Such guidance should address the intersections of Title IX obligations with FERPA, HIPAA, and other privacy requirements and considerations, including considerations related to data minimization, protection, and consent. We offer the following categories of hypothetical scenarios to the Department to outline our concerns:

*1. Pregnancy and LGBTQI+ discrimination:* If an employee with reporting obligations under the Title IX rules witnesses firsthand discrimination on the basis of a person's LGBTQI+ status or pregnancy status, that employee would be required to report it to the Title IX coordinator—even without the victim's consent. For example, suppose Dean A and Dean B are in the faculty lounge of University X, a religiously affiliated school that opposes abortion no matter the circumstances, located in a state that has recently criminalized abortion. Dean A tells Dean B about a pregnant student who disclosed her pregnancy to get excused absences from Dean A's class, and that six weeks later, the student tearfully told Dean A she had a miscarriage and needed a third absence to be excused. Dean A tells Dean B that she thinks the student actually had an abortion and says, "If she keeps missing my lectures, I'm just going to fail her." Dean A also tells Dean B that she wants to report the student to the local police to investigate her suspicions about the abortion. Or, suppose a staff member observes a teacher repeatedly using derogatory language, or gendered terms of address to which a particular LGBTQI+ student has repeatedly objected. The staff member is concerned when they observe that the teacher flatly rejects the

---

[286] For example, if a transgender student lives in a state that criminalizes access to gender-affirming care experiences discrimination once they begin transitioning and this is reported to the Title IX coordinator, this report would create a written record that would put their family at risk of criminalization.

Exhibit J

student's concerns and starts becoming hostile toward the student in class, which prompts the staff members to inform the high school principal. Under the proposed rules, the high school principal would have to report the possible sex discrimination to the Title IX coordinator, who would also disclose the discrimination faced by the minor student to their parents. Both examples would result in the school having a written record of the victim's LGBTQI+ status or pregnancy status (and, in the case of a minor experiencing discrimination, result in parental notification). While we recognize the importance of schools being required to address discrimination against these students, we are concerned that this would potentially put these students at risk, particularly in an institution that opposes abortion access or LGBTQI+ identity as a matter of institutional policy. For example, in the case where an employee makes a report of pregnancy discrimination against a student who attends school in a state that criminalizes abortions, and that student either has a miscarriage or obtains an abortion, the school would have a record establishing that the student was formerly pregnant. If someone reports the student[287] for getting an illegal abortion, the police could request this school record establishing that they were formerly pregnant—creating possible broad criminal exposure. And, where an employee makes a report of discrimination against an LGBTQI+ student to the Title IX coordinator, this would result in notice to the student's family in the PK-12 context, which would expose their LGBTQI+ status and risk their safety if their family is not supportive.

*2. Other sex discrimination that discloses LGBTQI+ or pregnancy status:* A student may approach an employee with Title IX reporting obligations to disclose that they were sexually assaulted or experienced dating violence by their partner, and in doing so, either disclose an LGBTQI+ identity, a queer relationship, or a pregnancy. In any of these situations, the employee would have to disclose the sexual assault or dating violence to the Title IX coordinator. Here, while potentially not the focus of a Title IX violation, a description of the incident could nevertheless risk creating a written record of the survivor's LGBTQI+ status (for example, if the employee also discloses the respondent's identity) and/or pregnancy (for example, the employee may mention that the survivor has become pregnant as a result of the assault).

*3. An LGBTQI+ person or pregnant person asks for supportive measures for sex discrimination:* An LGBTQI+ person or pregnant person may approach the Title IX coordinator to access supportive measures in the wake of LGBTQI-related discrimination (for example, to change their schedule so they do not have to continue attending class with their harasser) or pregnancy-related discrimination (for example, to obtain time off from school to go to a prenatal appointment, get an abortion, or recover from a miscarriage). Here, actions by staff or administrators in assessing and implementing supportive measures could lead to, or sometimes effectively require, disclosure and documentation of pregnancy or LGBTQI+ status—again with potential consequences related to both individual-level discrimination and state laws or policies that target LGBTQI+ status or pregnancy.

   **B.  Question 2: Recipient Obligations.**

See above discussion in **Part I** (p.2-44), including our recommended reporting requirements for employees at institutions of higher education when they have notice of possible sex discrimination (p.14-18).

---

[287] We also acknowledge that, in the worst-case scenario, the person reporting the formerly pregnant student may be the Title IX coordinator.

Exhibit J

**C.  Question 3: Single Investigator Model**

See above discussion in **Part I.D** (p.41-42).

**D.  Question 4: Standard of Proof.**

See above discussion in **Part I.D** (p.42).

Thank you for your consideration of our recommendations. If you have any questions, please contact us as set out below.

Thank you,
National Women's Law Center

Emily J. Martin
Vice President for Education & Workplace Justice
emartin@nwlc.org

Shiwali Patel
Director of Justice for Student Survivors
spatel@nwlc.org

Elizabeth Tang
Senior Counsel
etang@nwlc.org

/s/ Auden Perino
Auden Perino
Senior Counsel
aperino@nwlc.org

/s/ Cass Mensah
Cass Mensah
Counsel
cmensah@nwlc.org

/s/ Hunter Iannucci
Hunter Iannucci
Fellow
hiannucci@nwlc.org

Exhibit J



September 12, 2022
Alejandro Reyes
U.S. Department of Education
400 Maryland Ave. SW, PCP–6125
Washington, DC 20202

**Autistic Self Advocacy Network Comments Re: Docket ID ED–2021–OCR–0166, RIN 1870–AA16, Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance**

The Autistic Self Advocacy Network (ASAN)[1] appreciates the opportunity to provide recommendations for the U.S. Department of Education's (Department) Notice of Proposed Rulemaking (NPRM)[2] on proposed amendments to regulations implementing Title IX of the Education Amendments of 1972 (Title IX).

ASAN strongly supports the administration's commitment to enforcing Title IX. We particularly support the extension of Title IX's protections to discrimination due to sexual orientation, sex stereotypes, intersex characteristics, pregnancy,[3] and gender identity.[4]

The NPRM also does much to rectify the 2020 rule's harmful treatment of sexual harassment.[5] Specific provisions ensure people with disabilities' access to appropriate auxiliary aids and services.[6] The NPRM is consistent with President Biden's executive

---

[1] For more information on ASAN, visit https://autisticadvocacy.org/.

[2] Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 87 Fed Reg. 41390, 41390 (Jul. 12, 2022) (to be codified at 34 C.F.R. § 106).

[3] Pregnancy has been protected by Title IX since 1975, but the Department's regulations on pregnancy have not been updated nor clarified since that time. 87 Fed. Reg. at 41394.

[4] 87 Fed. Reg. at 41571.

[5] 87 Fed. Reg. at 41459-513.

[6] 87 Fed. Reg. at 41466, 41497, 41500, 41509, 41570, 41574.

Exhibit J

orders, which advance an ambitious agenda addressing both sex discrimination and racial equity.[7]

The Department's improvements to Title IX's treatment of sexual orientation and gender identity are important to ASAN. Autistic people are much more likely to be LGBTQ than non-autistic people.[8] We are more likely to have our trans identity dismissed or disbelieved. [9] We may be denied appropriate access to sex education.[10] We are bullied and harassed for our LGBTQ status more often, and experience a more hostile school climate.[11] Autistic people are also *three times* more likely than the general population to experience sexual violence.[12]

While the new NPRM represents a strong step in the right direction, it is not perfect. For example, while the proposed rule does add a definition for "student with a disability," it does not go far enough to address the disproportionate sex-based discrimination and harassment faced by students with disabilities. The disproportionate sexual abuse, violence, harassment and discrimination experienced by children, youth, and young adults with disabilities across all educational settings has been well documented.[13]

ASAN's comments make recommendations to improve the rule's treatment of students with disabilities, students who are LGBTQ, and students who are both.

---

[7] Exec. Order No. 13985, 86 Fed. Reg. 7009 (Jan. 25, 2021); Exec. Order No. 13988, 86 Fed. Reg. 7023 (Jan 25, 2021) Exec. Order No. 14021 86 Fed.  Reg. 13803 (Mar 11, 2021).

[8] R. George and M.A. Stokual, *Orientation in Autism Spectrum Disorder*, 11 Autism Research 1, 133-141 (2018), https://pubmed.ncbi.nlm.nih.gov/29159906/; Emily Stembridge, C*hildren with autism report greater gender diversity: study*,. Assoc.  Univ.  Ctrs.  on Disabilities (Aug. 29, 2022), https://www.aucd.org/template/news.cfm?news_id=16118

[9] This is more likely to happen in a psychiatric context. There is little reason to believe that school counselors and psychologists are different. *See* Bryony White, *The Link Between Autism and Trans Identity*, The Atlantic (Nov. 15, 2016) ("Clarke's therapist, for example, the statement says, 'would not approve his starting on hormones until after his autism spectrum disorder—which she referred to as a 'disease'—was 'cured'").

[10] Autistic Self Advocacy Network & Nat'l Partnership for Women & Families, Access, Autonomy, and Dignity: Comprehensive Sexuality Education for People with Disabilities 4-11 (Sept. 2021), *available at* https://www.nationalpartnership.org/our-work/resources/health-care/repro/repro-disability-sexed.pdf.

[11] Joseph G. Kosciw, Emily A. Greytak, Adrian D. Zongrone, Caitlin M. Clark, Nhan L. Truong & GLSEN, The 2017 National School Climate Survey: The Experiences of Lesbian, Gay, Bisexual, Transgender, and Queer Youth in Our Nation's Schools at 90, 91 (2018), *available at* https://www.glsen.org/sites/default/files/2019-10/GLSEN-2017-National-School-Climate-Survey-NSCS-Full-Report.pdf.

[12] Cazalis Fabienne, Reyes Elisabeth, Leduc Séverine, Gourion David, *Evidence That Nine Autistic Women Out of Ten Have Been Victims of Sexual Violence*, 16 Frontiers in Behavioral Neuroscience 13-14(2022), https://www.frontiersin.org/articles/10.3389/fnbeh.2022.852203/full

[13] There are also challenges for some students with disabilities whose behaviors related to their disability may be misunderstood and misconstrued as sexually threatening. Consortium for Constituents with Disabilities, CCD Comments at the Title IX Public Hearing (June, 2021), *available at* https://www.c-c-d.org/fichiers/CCD-Comments-on-Title-IX-hearing-6_11_2021_FINAL.pdf

Exhibit J

**Recommendations for Complaint Procedures**

Accommodations for complaint procedures may be necessary whether a student with a disability is reporting sexual harassment or responding to allegations of sexual harassment against them. ASAN supports the proposed rule's requirement that the Title IX Coordinator(s) work with a student's Individualized Education Plan (IEP) team when a student with a disability is involved in a sex-based discrimination or harassment investigation.[14]

We urge the Department to *require* that Title IX Coordinators in colleges consult with its disability services office or office in charge of implementing Section 504 of the Rehabilitation Act of 1973 whenever an involved student has a disability, rather than recommending it. We understand that sometimes a student with a disability has not established a formal relationship with this office.[15] Nonetheless, if the Title IX Coordinator has a reasonable belief that an involved student has a disability, there is little justification for treating postsecondary students differently.

We additionally urge the Department to include, in its provisions at §106.8(e) concerning consultation with the IEP team, a specific requirement that reasonable accommodations be provided.[16] Reasonable accommodations must be a component of any investigation or proceeding involving a person with a disability. These can include general universal design and accessibility principles such as the use of plain language, physically accessible settings, clearly defined informed consent, and trauma-informed practices. There may also be specific access needs and accommodations based on an individual's specific disability. These can include for autistic people but are not limited to: access to ASL translators, captions for virtual hearings, use of Augmentative and Alternative Communication (AAC) devices, the availability of visual aids and Easy Read materials, and/or a Direct Support Professional (DSP).

**Live Hearings**

ASAN appreciates that the Department has made live hearings with direct cross-examination optional rather than mandatory.[17] Formal hearings may present issues for people with disabilities, sexual harassment and assault survivors, and survivors with disabilities. People with IDD- including autistic people- often have difficulty testifying,[18] and these difficulties are likely to be more prevalent during a sexual harassment investigation. Mandatory live hearings with cross-examination may also cause needless retraumatization.

---

[14] 87 Fed. Reg. at 41570.

[15] 87 Fed. Reg. at 41430.

[16] 87 Fed. Reg. at 41466, 41497.

[17] 87 Fed. Reg. at 41503.

[18] Joanne Morrison, Jill Bradshaw & Glynis Murphy, *Reported communication challenges for adult witnesses with intellectual disabilities giving evidence in court,* 25 The International J. Evidence & Proof 244, 244-45, 256-58 (2021) (describing the typical communication challenges faced by adults with ID in

**Sexual Harassment Investigations**

ASAN opposes the Department's proposed rule stating that if any party "does not respond to questions related to their credibility," *all* of that party's statements supporting their position must be discounted.[19] The Department did not explain which questions relate "to credibility," meaning that the rule could be applied to any question.[20] A school could, therefore, exclude all the statements of a sexual assault victim because they refused to answer a single question.

ASAN recommends that the Department remove this exclusionary rule from the NPRM. We are particularly concerned in light of the difficulties people with IDD, including autistic people, have giving testimony.[21] These difficulties are likely to be more frequent during the high-stress context of a sexual harassment investigation - even during an informal investigation. ASAN emphasizes its recommendation that the Department require schools to provide any reasonable accommodations necessary for people with IDD to participate fully, including extra time to answer questions or a particular way of answering questions if necessary.

**Supportive Measures**

We appreciate the proposed rule's requirement that supportive measures be provided to all people who report that they have experienced sexual harassment, even if their complaint is ultimately dismissed.[22] We strongly support the requirement that the Title IX Coordinator, when providing supportive services, is required to consult with a student with a disability's IEP team in public school.[23]

***Sex-Segregated Programs or Activities***

ASAN supports the proposed rule's clarification that preventing a student from participating in an education program or activity consistent with their gender identity violates Title IX.[24] Specifically, any sex-based exclusion that causes the specific person

---

the United Kingdom, but applicable elsewhere); Katie Maras, Dermot M. Bowler, *Eyewitness Testimony in Autism Spectrum Disorder: A Review*, 44 J. Autism & Developmental Disorders 2682, 2682-697 (2014) (describing both the memory difficulties that characterize autistic people and how this impacts our testimony in a literature review).
[19] 87 Fed Reg. at 41578.
[20] 87 Fed. Reg. at 41503, 509 (describing the Department's reasoning for including this provision).
[21] *Supra* note 17.
[22] 87 Fed. Reg. at 41422.
[23] 87 Fed. Reg. at 41574.
[24] 87 Fed. Reg. at 41534-537.

more than *de minimis* harm violates Title IX.[25] However, the Department should clarify that the *de minimis* harm standard applies to all sex-separated programs and activities such as bathrooms, locker rooms, housing, and other programs and activities.

In most situations, Title IX requires treatment in sex-specific facilities consistent with the person's gender identity.  The Department's definition of "sex" is not dependent on biological sex, meaning that these standards allow for the participation of transgender students.[26] However**,** in certain situations, it is not clear from the rule what would happen when a transgender student wishes to participate. The rule states both that any treatment inconsistent with gender identity causes more than *de minimis harm, and* that there are specific situations  - such as sex-segregated housing - where a school may cause more than *de minimis harm* regardless.[27]

This  lack of clarity may disproportionately impact students with intellectual and developmental disabilities, particularly autistic students, who are more likely to be transgender[28] and may have support needs relating to stability in housing, accessibility, and proximity to the school. ASAN therefore urges the Department to clarify its position when it comes to how the *de minimis* harm standard impacts transgender individuals in sex-specific facilities.

**Athletics**

The Department proposes to issue a separate rule concerning sex-specific athletics, including on whether or not an individual student (including a transgender student) may participate in a particular sex-segregated athletics team.[29]

ASAN opposes the proposed rule's treatment of athletics separately. State legislatures have specifically targeted LGBTQI+ students over the past few years, with most laws focused on excluding transgender student athletes from participating in athletic activities that match their gender identity.[30]

The lack of clarity may disproportionately impact students with intellectual and developmental disabilities, particularly autistic students, who are more likely to be transgender. Students with IDD may also have disability specific support needs relating to their athletics participation, such as the need for consistency in the team they participate in. If the Department fails to preempt state or local laws with clarity on athletics in its final rule, an Autistic student may be forced to change teams, or may be

---

[25] *Id.*

[26] 87 Fed. Reg. at 41537.

[27] 87 Fed. Reg. at 41534-536.

[28]  Emily Stembridge, *supra* note 8.

[29] 87 Fed. Reg. at 41537-538.

[30] Am. Civ. Liberties Union, *Legislation Affecting LBGTQ Rights Across The Country,* ACLU.org (July 1, 2022), https://www.aclu.org/legislation-affecting-lgbtq-rights-across-country.

Exhibit J

banned from joining a sex-specific team in college that they were involved in in high school, causing needless trauma and disruption.

ASAN therefore urges the Department to clarify that transgender, nonbinary, and intersex students have the right to participate in sports consistent with their gender identity and that bans against transgender and intersex students participating in sex-specific sports teams by state or local laws are forms of impermissible sex-based discrimination.

ASAN recognizes the Department's intent to provide a separate NPRM focused on athletics. We therefore urge the Department not to engage in a completely separate rulemaking and to undergo a simultaneous rulemaking that includes athletics in the final Title IX rule.

**Religious Exemption**

The previous administration made two changes to the Title IX regulations that allow some schools to use a "religious exemption" as pretext for sex-based discrimination. These so-called "religious exemptions" disproportionately harm women, girls and nonmasculine presenting students; pregnant and parenting students or students who may become pregnant; students seek or need access to abortion or birth control or who require other forms of reproductive health care, LGBTQI+ students, and students with disabilities.

The 2020 regulations allow schools that are not actually "controlled by a religious organization" to claim a religious exemption from Title IX. The 2020 regulations also allow schools to assert a religious exemption *after* they are already under investigation for a Title IX violation by the Department. This can prevent students and employees from receiving prior notice of sex-based discrimination even though Title IX's regulations require a school to notify students, their families, employees, and applicants of the school's anti-sex discrimination policies.

This lack of proper notice may disproportionately impact students with intellectual and developmental disabilities, particularly Autistic students, who are more likely to be transgender, or have other kinds of gender diversity. Additionally, Autistic students may be more likely, due to cognitive aspects of the disability, to be unaware that a school has such a religious exemption.

The proposed rules do not address this problem. ASAN urges the Department to address this issue through proposed Title IX regulations by rescinding the expansion of eligibility for religious exemptions to institutions that are not controlled by a religious organization. Additionally, the Department should require schools to provide notice of any religious exemption claims to the Department while also requiring schools to make any religious exemptions clear in the required nondiscrimination notices provided to students, families, employees, and applicants.

Exhibit J

ASAN thanks the Department for the opportunity to provide comments, which will further its development of robust, effective regulations on Title IX. For more information on ASAN's positions on Title IX, please contact Larkin Taylor-Parker  at ltaylorparker@autisticadvocacy.org.



Planned Parenthood Federation of America, Inc.

September 12, 2022

**VIA ELECTRONIC TRANSMISSION**

Secretary Miguel Cardona                     Catherine Lhamon
Office of the Secretary                          Assistant Secretary, Office for Civil Rights
U.S. Department of Education                U.S. Department of Education
400 Maryland Avenue SW                     400 Maryland Avenue SW
Washington, DC 20202                          Washington, DC 20202

Re:    **Nondiscrimination on the Basis of Sex in Education Programs or Activities
        Receiving Federal Financial Assistance**

*Docket Number: ED-2021-OCR-0166; RIN: 1870-AA16*

Dear Secretary Cardona and Assistant Secretary Lhamon,

Planned Parenthood Federation of America (Planned Parenthood) submits these comments in response to the proposed rule issued by the U.S. Department of Education (ED or the Department) entitled "Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance."[1] As a trusted health care provider, educator, and advocate, Planned Parenthood appreciates the opportunity to provide input on policy proposals that affect the health of the communities we serve especially at a time of of extreme hostility towards sexual and reproductive health.

Planned Parenthood is the nation's leading sexual and reproductive health care provider and advocate, and a trusted nonprofit source of primary and preventive care for people of all genders in communities across the United States. Each year, Planned Parenthood health centers provide affordable birth control, lifesaving cancer screenings, testing and treatment for sexually transmitted infections, and other essential care to 2.4 million patients. Planned Parenthood health centers also provide abortion services and ensure that all people have accurate information about all of their reproductive health care options. One in five women in the United States has visited a Planned Parenthood health center and the majority of those patients have incomes at or below 150% of the federal poverty level.

---

[1] Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 87 Fed. Reg. 41390 (proposed July 12, 2022) (to be codified at 34 C.F.R. pt. 106), available at https://federalregister.gov/d/2022-13734.

Exhibit J

As the nation's largest sex educator and provider of information on healthy relationships, Planned Parenthood is a critical point of access to care for young people and students. Planned Parenthood is also an expert on meeting people where they are, through innovative apps, chat programs, and culturally responsive care for young people, LGBTQI+ patients, and patients of color. Planned Parenthood health centers ensure that people have accurate information about all of their reproductive health care options, and seek to create a safe environment in which all individuals, including students and young people, are able to access the services and information they need to live full and healthy lives. That includes making critical post-sexual assault care available in many health centers across the country. Additionally, through our Planned Parenthood Generation Action program, our Action Fund organizes young people with over 350 campus groups across the country.

Title IX of the Education Amendments of 1972 (Title IX) states: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."[2] Its critical legacy ensures that schools must be equitable in addressing recruitment, admission, financial assistance, sex-based harassment and assault, treatment of pregnant and parenting students, and other key areas that directly impact a student's meaningful access to education. In the 50 years since its passage, Title IX has played a critical role in preventing sex discrimination in educational institutions and protecting equitable access to education.

Since 1972, Title IX has significantly expanded educational opportunities for girls and women. However, much work remains to be done to fully realize Title IX's aims. Sex-based harassment, especially sexual harassment, is widely prevalent in school settings. LGBTQI+ students also face harassment and discrimination, not only from teachers, administrators, and peers,[3] but increasingly from state policies.[4] Pregnant and parenting students face pronounced barriers to education, compounded by discrimination. The recent Supreme Court decision eliminating the constitutional right to abortion has already made seeking health care more challenging for people who are or who can become pregnant because of overly narrow and vague health exceptions, including limiting medications used for a variety of health conditions and reduced access to abortion.[5] Title IX has significantly further to go to guarantee all students equal educational opportunities free from sex discrimination.

This letter supports the administration's proposal to restore key provisions of the Title IX regulations and advocates for improvements to better meet the moment students are facing nationwide.

---

[2] 20 U.S.C. § 1681(a)

[3] J. G. Kosciw et al., *The 2019 National School Climate Survey: The Experiences of Lesbian, Gay, Bisexual, Transgender, and Queer Youth in Our Nation's Schools*, (2020).

[4] American Civil Liberties Union, *Legislation Affecting LGBTQ Rights Across the Country*, (2022), https://www.aclu.org/legislation-affecting-lgbtq-rights-across-country.

[5] Jared Gans. AMA warns 'patient health is at risk' post-Roe, calls for 'clear guidance' on state abortion laws. The Hill. https://thehill.com/policy/healthcare/3635227-ama-warns-patient-health-is-at-risk-post-roe-calls-for-clear-guidance-on-state-abortion-laws/

Exhibit J

I.    **Planned Parenthood supports the restoration of a faithful understanding of Title IX's protections for survivors of sexual harassment**

**Sex-based harassment remains widespread in education**

Despite Title IX's protections, sex-based harassment remains a widespread barrier to equality in education. Such harassment takes the form of sexual harassment, sexual assault, dating violence, domestic violence, stalking, and other harassment or discrimination based on sexual orientation, gender identity, sex characteristics, sex stereotypes, and pregnancy or related conditions. The statistics documenting such harassment are staggering–and yet, they do not fully capture the scope of sex-based discrimination, because sex-based harassment is chronically underreported at all levels of education.

- **Experiences with harassment:** During college, 62% of women and 61% of men experience sexual harassment. In grades 7–12, more than half of girls and 40% of boys are sexually harassed in any given school year.[6]
- **Underreporting:** Only 12% of college survivors[7] report sexual assault to their schools or the police, a number that will only go up if students cannot report unless they go to someone they may not trust.
- **Reliance on schools:** Some students—especially students of color, undocumented students, LGBTQ students, and students with disabilities—are less likely than their peers to report sexual assault to the police due to increased risk of being subjected to police violence and/or deportation. For these students, schools are often the only avenue for relief.
- **All students:** When survivors come forward, they are often ignored or punished by their schools. Too many survivors end up dropping out of school because they do not feel safe on campus; some are even expelled for lower grades in the wake of their trauma. For example, 34% of college survivors drop out of college.[8]
- **Women and girls of color:** Schools are more likely to ignore or punish women and girls of color who report sexual harassment due to harmful race and sex stereotypes that label them as "promiscuous."[9] Schools are also more likely to punish Black women and girls by labeling them as the "aggressor" when they defend themselves against their harassers or when they respond to trauma because of harmful stereotypes that they are "angry" and "aggressive."[10]

---

[6] National Coalition for Women and Girls in Education, Title IX at 40: Ending Sexual Harassment, https://www.ncwge.org/TitleIX40/Harassment.pdf
[7] US Department of Justice, Raising Awareness About Sexual Abuse: Facts and Statistics, https://www.nsopw.gov/as/education/factsstatistics (Accessed January 28, 2019).
[8] Advocates and Survivors of Sexual Assault Urge Secretary DeVos to Withdraw Title IX Rule, Urge Students and Survivors to Make Their Voices Heard | The U.S. Senate Committee on Health, Education, Labor & Pensions, About | The U.S. Senate Committee on Health, Education, Labor & Pensions (2018), https://www.help.senate.gov/ranking/newsroom/press/murray-hassan-advocates-and-survivors-of-sexual-assault-urg e-secretary-devos-to-withdraw-title-ix-rule-urge-students-and-survivors-to-make-their-voices-heard (last visited Jan 24, 2019).
[9] Tanya Serisier, *Sex Crimes and the Media*, Oxf. Res. Encycl. Criminol. Crim. Justice (2017), https://oxfordre.com/criminology/view/10.1093/acrefore/9780190264079.001.0001/acrefore-9780190264079-e-118.
[10] Why Race Stereotypes Hurt Sexual Assault Survivors. Sexual Trauma Services. https://www.stsm.org/blogs/stsm/why-race-stereotypes-hurt-sexual-assault-survivors (2017).

Exhibit J

- **Pregnant or parenting students:** Schools are more likely to ignore or punish pregnant or parenting students who report sexual harassment due to harmful stereotypes that label them as "promiscuous."[11]" 56% of girls ages 14-18 who are pregnant or parenting are kissed or touched without their consent.[12]
- **LGBTQI+ students:** Schools are more likely to ignore or punish LGBTQI+ students who report sexual harassment due to harmful stereotypes that they are "promiscuous" or draw "attention" to themselves.[13] Nearly 1 in 4 transgender and gender-nonconforming students are sexually assaulted during college.[14]
- **Students with disabilities:** Schools are more likely to ignore or punish students with disabilities who report sexual harassment due to harmful stereotypes that they are "asexual" and due to the fact that they can have greater difficulty describing the harassment they experience.[15] Students with disabilities are 2.9 times more likely than their peers to be sexually assaulted.[16]

**The Trump administration's Title IX rule gutted protections for survivors**
Since its inception in 1972, the Department of Education has issued multiple guidance documents clarifying Title IX obligations. The Trump administration rescinded many of them that focused on sexual assault and harrassment, replacing them instead with a 2020 regulation that required schools to ignore many reports and to apply unfair, burdensome procedures for sexual harrassment investigations that did not apply to any other type of school investigation of student or staff misconduct.[17]

The Trump administration's narrowing of the definition of sexual harrassment led to drastic drops in complaints reported to and investigated by Title IX offices. For example, the University of Michigan reported that their number of Title IX complaints dropped from more than 1,300 in 2019 to 56 in 2021.[18] At the University of Nevada, Las Vegas, 204 Title IX complaints were filed in 2019, compared to 12 in 2021, and the number of cases that met the criteria for formal investigations fell from 27 to zero in the same period.[19] There is no indication the drastic drop in Title IX complaints and investigations was due to a decrease in the occurrence of these incidents, but rather, appear to be the direct result of the Trump-era rule, which limited the

---

[11] Preventing and Responding to Sexual Assault in Schools. Pitt.edu.
https://tristate.pitt.edu/wordpress/wp-content/uploads/2018/10/Preventing-and-Responding-to-Sexual-Harassment.pdf
[12] Preventing and Responding to Sexual Assault in Schools. Pitt.edu.
https://tristate.pitt.edu/wordpress/wp-content/uploads/2018/10/Preventing-and-Responding-to-Sexual-Harassment.pdf
[13] Id.
[14] End Rape on Campus. Prevalence Rates: Trans, Gender Non Conforming, Non Binary Survivors.
http://endrapeoncampus.org/tngb/
[15] Id.
[16] World Health Organization. Violence Against Adults and Children with Disabilities.
https://www.who.int/disabilities/violence/en/
[17] National Women's Law Center, DeVos's New Title IX Sexual Harassment Rule, Explained (May 12, 2020),
https://nwlc.org/resource/devos-new-title-ix-sexual-harassment-rule-explained.
[18] Hollingsworth, Heather. "Campus Sex Assault Rules Fall Short, Prompting Overhaul Call." Associated Press, 16 June 2022,
https://apnews.com/article/politics-sports-donald-trump-education-5ae8d4c03863cf98072e810c5de37048.
[19] Hollingsworth, Heather. "Campus Sex Assault Rules Fall Short, Prompting Overhaul Call." Associated Press, 16 June 2022,
https://apnews.com/article/politics-sports-donald-trump-education-5ae8d4c03863cf98072e810c5de37048.

Exhibit J

definition of sexual harassment and debilitated the process for proper reporting and accountability.

**The Department's proposed rule is a promising step to restoring protections for survivors**

We are encouraged that the Department's proposed rule seeks to return to the original intent of the Title IX statute with regards to protections against sex-based harassment. Specifically, we support:

- Defining sex-based harassment to include sexual harassment and other harassment on the basis of sex (including sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity) when this harassment takes the form of "quid pro quo harassment," "hostile environment harassment," sexual assault, dating violence, domestic violence, or stalking.[20]
- Requiring schools to respond to all sex-based harassment (or other sex discrimination) "occurring under [their] education program or activity," which includes conduct that a school has disciplinary control over or that occurs in a building owned or controlled by an officially recognized student organization at a college or university.[21]
- Removing the 2020 rules' mandatory dismissal provisions, which, among other things, currently require schools to dismiss Title IX complaints of sexual harassment by individuals who were not participating in or attempting to participate in a school program or activity at the time they filed their complaint.[22]
- Requiring schools to take "prompt and effective action" to end sex-based harassment (or other sex discrimination), prevent it from recurring, and remedy its effects on all people harmed.[23]
- Requiring schools to offer supportive measures at no cost to individuals who report sex-based harassment (or other sex discrimination), regardless of whether they request an investigation or an informal resolution,[24] and even if their complaint is dismissed.[25]
- Prohibiting any school or person from retaliating against anyone because they reported sex-based harassment (or other sex discrimination) or participated or refused to participate in an investigation or informal resolution of such incidents.[26]

In addition, we recommend:
- Expanding the list of examples of supportive measures available for students and employees to continue to maintain their participation in educational activities and stay physically and mentally safe.
- Changing the provision that allows schools to designate certain employees as "confidential employees" who can guide students from an option to a requirement.

---

[20] 87 Fed. Reg. at 41569 (proposed 34 C.F.R. § 106.2), 41571 (proposed 34 C.F.R. § 106.10).
[21] 87 Fed. Reg. at 41571 (proposed 34 C.F.R. § 106.11).
[22] 34 C.F.R. § 106.30(a) (defining "formal complaint"); 87 Fed. Reg. at 41567 (proposed 34 C.F.R. § 106.2). While the 2020 rules make an exception if an individual filing a complaint was an applicant who intended to enroll in the school, and for an alumnus who intended to stay involved in alumni programs, this mandatory dismissal provision still currently leaves scores of individuals without protections under Title IX in the wake of sex-based harassment.
[23] 87 Fed. Reg. at 41572 (proposed 34 C.F.R. § 106.44(a)).
[24] 87 Fed. Reg. at 41576 (proposed 34 C.F.R. §§ 106.44(g)).
[25] 87 Fed. Reg. at 41575-76 (proposed 34 C.F.R. §§ 106.45(d)(4)(i)).
[26] 87 Fed. Reg. at 41568 (proposed 34 C.F.R. § 106.2 ("retaliation").

Exhibit J

- Removing the provision from the 2020 regulation that requires schools to presume that the respondent is not responsible for sex-based harassment (or other sex discrimination) until a determination is made and to inform both parties of this presumption.[27] This presumption and its notice is not required in any other type of school proceeding and exacerbates the harmful and false rape myth that people who report sex-based harassment (or other sex discrimination)—primarily women and girls—tend to be lying, which also deters complainants from initiating or continuing with an investigation.

### II.    The administration must expand protections for pregnant and parenting students and employees in light of the loss of the constitutional right to abortion

The Department of Education released the proposed rule the day before the U.S. Supreme Court revoked the constitutional right to abortion. At the time of writing, 16 states have banned abortion. Strengthened protections for pregnant and parenting people in education programs and activities are critical because, as a result of the fall of *Roe v. Wade*, more students and employees will likely be pregnant or parenting due to being unable to access an abortion. Strengthened protections are also needed for students and school employees who have abortions. Students or school employees in states that have banned abortion will need (1) accommodations to be able to access out-of-state abortions and (2) protections to ensure privacy regarding potential harassment based on pregnancy or related conditions. In light of this health care crisis, it is vital that the Department incorporate additional protections for students and employees in the final Title IX regulations.

**A robust definition of pregnancy or related conditions is needed to protect pregnant students and employees and those seeking an abortion**
We strongly support that the Department explicitly defines "pregnancy or related conditions" in the proposed rule to include:
1. Pregnancy, childbirth, termination of pregnancy, or lactation;
2. Medical conditions related to pregnancy, childbirth, termination of pregnancy, or lactation; or
3. Recovery from pregnancy, childbirth, termination of pregnancy, lactation, or their related medical conditions.[28]

A robust definition of pregnancy or related conditions is especially important in a post-*Roe* era. First, as a result of states banning abortion, students and employees who would have otherwise received an abortion may now be forced to carry a pregnancy while participating in educational activities or be forced to seek abortion care out of state, if possible. Strong protections against discrimination on the basis of pregnancy or related conditions is vital to protect this group, whose numbers are expected to grow as abortion steadily becomes less accessible nationwide. Second, enrolled students or employees who work at schools in states that have banned

---

[27] 87 Fed. Reg. at 41575, 41577 (proposed 34 C.F.R. §§ 106.45(b)(3), 106.46(c)(2)(i)). *See also* 34 C.F.R. §§ 106.45(b)(1)(iv), 106.45(b)(2)(i)(B).
[28] 87 Fed. Reg. at 41568 (proposed 34 C.F.R. § 106.2) ("pregnancy or related conditions").

Exhibit J

abortion may now be at higher risk of discrimination than those in states that allow the provision of abortion.

Relatedly, it is important to include explicit privacy protections to ensure that students are not put at greater risk of investigation or legal liability. The proposed rule would require employees who know of a student's pregnancy or related condition to give them the Title IX coordinator's contact information and would require the Title IX coordinator to notify the student of their rights.[29] While we support students being informed of their rights while pregnant, we are concerned that this requirement could pose risks to students who have an abortion or have a miscarriage. We urge the Department to clarify in the final rule that it is a violation of Title IX to discipline or refer students to law enforcement based on termination of pregnancy, or suspected termination of pregnancy. We also ask the Department to issue supplemental guidance on how to protect student privacy (e.g., school records and health records) and clarify that schools may not use documentation of a referral of a pregnant student to the Title IX coordinator in referral to law enforcement.

We ask the Department to clarify in the final rule that the definition of pregnancy or related conditions is not exhaustive and we support the Department's proposed addition of lactation as a pregnancy related condition.

**The inclusion of nondiscrimination protections for perceived and expected pregnancy will better protect students and employees**
The proposed rule prohibit schools from discriminating against any "person" (including students and employees) based on "current, potential, or past" pregnancy or related conditions.[30] We suggest that the Department include "perceived" and "expected" to this list.

**Supplemental guidance on reporting requirements to protect the privacy and safety of pregnant students and employees is needed.**
Pregnant students and employees may be at risk of criminalization if they seek an abortion or have a miscarriage).

**Stronger protections are needed for parenting students**
The proposed rule, like the current rules, would not include discrimination based solely on parental, family, or marital status as a type of sex discrimination.[31] Rather, schools would be prohibited from adopting a policy, practice, or procedure for students, employees, or applicants concerning their current, potential, or past parental, family, or marital status—but only if the school does so in a way that "treats persons differently on the basis of sex."[32]

This means that, for example, school administrators could discriminate against parenting students (versus non-parenting students), as long as they do so equally across genders.

---

[29] 87 Fed. Reg. at 41571 (proposed 34 C.F.R § 106.40(b)(2)).
[30] 87 Fed. Reg. at 41571 (proposed 34 C.F.R. §§ 106.21(c)(2)(ii), 106.40(b)(1)), 41579 (proposed 34 C.F.R. § 106.57(b))
[31] 87 Fed. Reg. at 41571 (proposed 34 C.F.R. § 106.10).
[32] 87 Fed. Reg. at 41571 (proposed 34 C.F.R. §§ 106.21(c)(2)(i), 106.40(a), 41579 (proposed 34 C.F.R. § 106.57(a)(1)).

Exhibit J

However, we know that discrimination against parenting students is likely to have a disparate impact on mothers and birthing people and is often based on sex stereotypes. Therefore, the proposed rule is not sufficient to protect mothers and birthing people. The proposed rule could also create scenarios where school staff refrain from supporting mothers and birthing people, because they are concerned that they are not similarly accommodating fathers and non-birthing people and would be in violation of Title IX. We urge the Department to state that schools may not discriminate based on a person's "current, potential, perceived, expected, or past parental, family, marital, or caregiver status."

**Absences**
We support that the rule requires schools to allow students who are pregnant or who have a related condition to take a voluntary leave of absence for as long as deemed medically necessary by their health care provider (or, if longer, the school's leave policy), and after the student returns, requires the school to reinstate them to their prior academic and extracurricular status.[33] This policy helps accommodate students who, for example, take a leave of absence to recover after childbirth.

The proposed rule does not go far enough, however, to accommodate students who require time away from school to have an abortion or recover from an abortion. Such an intermittent absence would be considered a "reasonable modification" under the proposed rule and, unlike the above described leave of absence, would be approved or denied at the discretion of the Title IX coordinator.[34]

Differentiating between medical care that qualifies for a voluntary leave of absence versus a reasonable modification is unnecessary and has harmful effects. We urge the Department to make medically necessary absences available to all students who are pregnant or have a related condition, and explicitly include any necessary travel time. As states continue to ban abortion, students will have to travel increasing distances to access abortion. It is vital that schools accommodate the lengths that students will have to take to access needed medical care.

Planned Parenthood Generation Action Network is a network of young organizers and activists across the country who organize events on their campuses and in their communities to mobilize advocates for reproductive freedom. In January 2021 the Planned Parenthood Generation Network, a group of over 100,000 volunteer student activists fighting to make their communities safer and healthier, held a meeting about the impending abortion access crisis. Over 70 student leaders from across the 300 associated campuses met to discuss issues impacting student's access to abortion. These leaders named attendance policies a key obstacle in accessing abortion care. It is critical that the Department listen to student activists and make medically necessary absences available to all students who are pregnant or have a related condition.

**Accommodations**
The proposed rule would require schools to "promptly" make "voluntary and reasonable

---

[33] 87 Fed. Reg. at 41572 (proposed 34 C.F.R. § 106.40(b)(3)(iii)).
[34] 87 Fed. Reg. at 41572 (proposed 34 C.F.R. § 106.40(b)(4)(i), (iii)).

Exhibit J

modifications"[35] to their policies, practices, or procedures because of a student's pregnancy or related condition, unless a modification is "so significant" that it "alters the essential nature" of the school's program or activity.[36] Such an accommodation could include a student requesting an extension of time for coursework or rescheduling of examinations to accommodate an intermittent absence for an abortion appointment. The "essential nature" qualifier is too vague and could be used to deny such a request. We urge the final rule to state that if a student requests a certain modification and it is "reasonably available," then the school must provide it.

### III.    Planned Parenthood supports the proposed protections for LGBTQI+ students

**The proposed rule importantly codifies that sex discrimination encompasses anti-LGBTQI+ discrimination**

We strongly support that the proposed rule clearly names anti-LGBTQI+ discrimination as sex discrimination. We applaud the Department for including nondiscrimination protections on the basis of sex stereotypes, sex characteristics (including intersex traits), sexual orientation, and gender identity.[37] This is a critical step to protect LGBTQI+ students in the face of increasing pervasive anti-LGBTQI+ violence and anti-LGBTQI+ state legislation,[38] and necessary to implement the Supreme Court's decision in *Bostock v. Clayton County*.[39]

**Supplemental guidance on reporting requirements to protect the privacy and safety of students is needed for LGBTQI+ students and employees.**

LGTBQI+ students and employees may not wish to be outed to their parents or the school.

**A Title IX athletics rule is urgently needed to protect trans and intersex women and girls in sports**

We urge the Department to quickly release a Title IX athletics rule that would ensure all students, including transgender, non-binary, and intersex students, can participate fully and equally in school sports. This is especially critical as LGBTQI+ students face pervasive discrimination in school, including sexual and verbal harassment, violence, and excessive discipline by faculty. Compounding this is the barrage of vicious legislative attacks on LGBTQI+ students by state lawmakers across the country, including through recently passed state laws that ban transgender, non-binary, and intersex students from participating in sports. students.

Any such rule must affirm transgender, non-binary, and intersex students' rights under Title IX to participate in sports consistent with their gender identity and clarify that state sports bans against transgender, intersex, and non-binary students constitute impermissible sex-based discrimination. We urge that the Department finalize a Title IX athletics rule no later than the beginning of 2023.

---

[35] 87 Fed. Reg. at 41571 (proposed 34 C.F.R. § 106.40(b)(3)), 41572 (proposed 34 C.F.R. § 106.40(b)(3)(ii)).
[36]  87 Fed. Reg. at 41572 (proposed 34 C.F.R. § 106.40(b)(4)).
[37]  87 Fed. Reg. at 41571 (proposed 34 C.F.R. § 106.10).
[38] American Civil Liberties Union, *supra* note 4.
[39] Bostock v. Clayton Cnty., 140 S. Ct. 1731, 1747 (2020)

9

Exhibit J

IV.    **The proposed rule fails to remove Trump-era religious exemptions that disproportionately impact**

The Trump administration's Title IX rules allowed more schools to discriminate based on sex by claiming a religious exemption, which disproportionately harms women and girls, pregnant and parenting students, students who access or seek access to abortion or birth control, and LGBTQI+ students. The 2020 rules expanded religious exemptions in the following ways:

- Although the Title IX statute allows religious exemptions for schools that are "controlled by a religious organization,[40] the 2020 regulations allow schools that are not actually controlled by a religious organization to claim a religious exemption from Title IX if, for example, they are a divinity school, they require students to follow certain religious practices, or their mission statement refers to religious beliefs.[41]
- The 2020 regulations enable schools to assert a religious exemption *after* they are already under investigation by the Department for violating Title IX.[42] This means students and employees are not entitled to any prior notice of a school's intent to discriminate based on sex despite the Title IX regulations requiring schools to notify students, their families, employees, and applicants of schools' anti-sex discrimination policies.[43]

It is vital that the Department remove these expanded religious exemptions in the final rule to adequately protect students from sex-based discrimination.

* * * * *

Thank you for your consideration of our recommendations. If you have any questions, please contact Katrina Kinsolving, Public Policy Manager, at katrina.kinsolving@ppfa.org.

Respectfully,

Laurel Sakai
National Director of Public Policy and Government Affairs
Planned Parenthood Federation of America
1110 Vermont Avenue NW, Suite 300
Washington, DC 20005

---

[40] 20 U.S.C. § 1681(a)(3).
[41] 34 C.F.R. § 106.12(c).
[42] 34 C.F.R. § 106.12(b).
[43] 34 C.F.R. § 106.8(b)(1); 87 Fed. Reg. at 41570 (proposed 34 C.F.R. § 106.8(c)(1)).

10

Exhibit J

**The Leadership Conference on Civil and Human Rights**

1620 L Street, NW    202.466.3311 voice
Suite 1100          202.466.3435 fax
Washington, DC      www.civilrights.org
20036



**Officers**
**Chair**
Judith L. Lichtman
    National Partnership for
    Women and Families
**Vice Chairs**
Derrick Johnson
    NAACP
Thomas A. Saenz
    Mexican American Legal
    Defense and Educational Fund
**Secretary**
Fatima Goss Graves
    National Women's Law Center
**Treasurer**
Lee A. Saunders
    American Federation of State,
    County and Municipal Employees

**Board of Directors**
Gloria L. Blackwell
    AAUW
Ray Curry
    International Union, UAW
Jocelyn Frye
    National Partnership for
    Women and Families
Jonathan Greenblatt
    Anti-Defamation League
Mary Kay Henry
    Service Employees International Union
Damon Hewitt
    Lawyers' Committee for
    Civil Rights Under Law
Janai Nelson
    NAACP Legal Defense and
    Educational Fund, Inc.
David H. Inoue
    Japanese American Citizens League
Benjamin Jealous
    People for the American Way
Virginia Kase Solomón
    League of Women Voters of the
    United States
Samer E. Khalaf
    American-Arab
    Anti-Discrimination Committee
Joni Madison
    Human Rights Campaign
Marc Morial
    National Urban League
Janet Murguía
    UnidosUS
Christian F. Nunes
    National Organization for Women
Rabbi Jonah Pesner
    Religious Action Center
    of Reform Judaism
Rebecca Pringle
    National Education Association
Lisa Rice
    National Fair Housing Alliance
Anthony Romero
    American Civil Liberties Union
Liz Shuler
    AFL-CIO
Fawn Sharp
    National Congress of American Indians
Maria Town
    American Association of
    People with Disabilities
Randi Weingarten
    American Federation of Teachers
John C. Yang
    Asian Americans Advancing Justice |
    AAJC

**President and CEO**
Maya Wiley

September 12, 2022

Alejandro Reyes
US Department of Education
400 Maryland Ave. SW,
PCP-6125
Washington, DC 20202

RE: Docket ID ED-2021-OCR-0166

Dear Mr. Reyes:

On behalf of The Leadership Conference on Civil and Human Rights, a coalition charged by its diverse membership of more than 230 national organizations to promote and protect the civil and human rights of all persons in the United States, and the 43 undersigned organizations, we write in response to the Department of Education's notice of proposed rulemaking published in the Federal Register on July 12, 2022 to amend the regulations implementing Title IX of the Education Amendments of 1972. We urge the department to ensure an educational environment free from discrimination on the basis of sex (including sexual orientation, gender identity, transgender status, sex stereotypes, sex characteristics, or pregnancy and related conditions). We are writing to urge the department to effectuate Title IX's broad purpose by restoring and strengthening protections against sex-based harassment (including sexual harassment), develop robust protections against retaliation, ensure fair disciplinary procedures, clarify and strengthen the role of Title IX coordinators, and ensure appropriate implementation of Title IX's religious exemption.

We appreciate President Biden's 2021 executive order affirming the administration's commitment to enforcing Title IX's protections against all forms of sex discrimination,[1] and the department's subsequent efforts to update the Title IX rule. President Biden's executive orders on racial equity and underserved communities, implementing the landmark *Bostock* ruling, and advancing gender equity and equality collectively called for an "ambitious whole-of-government equity agenda," including through enforcing Title IX's protections for all students "to the fullest extent permissible under law."[2] The executive orders also called

---

[1] Executive Order 14021 of March 8, 2021 (Guaranteeing an Educational Environment Free From Discrimination on the Basis of Sex, Including Sexual Orientation or Gender Identity). Federal Register 86. Mar 11, 2021. 13803. http://federalregister.gov/d/2021-05200.

[2] Executive Order 13985 of January 20, 2021 (Advancing Racial Equity and Support for Underserved Communities Through the Federal Government). Federal Register 86(14). Jan 25, 2021. https://www.federalregister.gov/documents/2021/01/25/2021-01753/advancing-racial-equity-and-support-for-underserved-communities-through-the-federal-government ; Executive Order 13988 of January 20, 2021 (Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation). Federal Register 86(14). Jan 25, 2021. https://www.govinfo.gov/content/pkg/FR-2021-01-25/pdf/2021-01761.pdf ; Executive Order 14021 of March 8, 2021 (Guaranteeing an Educational Environment Free From Discrimination



for including LGBTQ+[*] students in the department's efforts to eliminate sex discrimination, consistent with the requirements of Title IX and the *Bostock* ruling. As a civil rights agency responsible for protecting students from discrimination on the basis of race, color, national origin (including language status), sex (including sexual orientation, gender identity, transgender status, sex stereotypes, sex characteristics, or pregnancy and related conditions), disability, and age, the department must restore and strengthen civil rights protections under Title IX to make schools safer for all students and vigorously enforce Title IX requirements that the department has relied on for decades. Under Title VI of the Civil Rights Act of 1964, Title IX of the Education Amendments of 1972, Section 504 of the Rehabilitation Act of 1973, Title II of the Americans with Disabilities Act of 1990, and the Age Discrimination Act of 1975, the department is responsible for enforcing these laws in response to complaints of discrimination and through proactive compliance reviews, data collection, and technical assistance. The department has an obligation to ensure that all students have equal educational opportunities.

The civil and human rights community provides the following recommendations to restore and strengthen Title IX to ensure an educational environment free from discrimination, protect against sex-based harassment (including sexual harassment), protect against retaliation, ensure fair disciplinary procedures, clarify and strengthen the role of Title IX coordinators, and ensure appropriate implementation of Title IX's religious exemption.

**Ensure an Educational Environment Free From All Forms of Sex Discrimination**

The department must make clear that under Title IX, schools are required to provide all students an educational environment that is free from all forms of sex discrimination, including discrimination based on sexual orientation, gender identity, transgender status, sex stereotypes, sex characteristics (including intersex traits), and pregnancy and related conditions.

*Sexual orientation, gender identity, sex characteristics (including intersex traits), and sex stereotypes*

We support the department recognizing that prohibitions on sex discrimination necessarily include prohibitions on discrimination based on sexual orientation and gender identity. Compared to LGBTQ students who did not experience LGBTQ-related discrimination at school, those who experienced such discrimination at school are almost three times as likely to have missed school in the past month because they felt unsafe or uncomfortable, report lower grade point averages, lower self-esteem, higher levels of depression, and higher rates of school discipline that are indicative of anti-LGBTQ policies that, intentionally or unintentionally, make it effectively "against the rules" to be themselves.[3] Research on adolescent health suggests that the harm of bias-motivated harassment and bullying is especially severe in

---

on the Basis of Sex, Including Sexual Orientation or Gender Identity). Federal Register 86(46). Mar 11, 2021. https://www.govinfo.gov/content/pkg/FR-2021-03-11/pdf/2021-05200.pdf.
[*] We use the term "LGBTQI+" throughout this comment to be inclusive of intersex people, unless referring to a specific document or study. In such instances, we use the terminology that is used in the referred source. For example, President Biden's executive orders refer to the "LGBTQ+" community; as such, we used the same term in this sentence.
[3] Kosciw, J.G., Clark, C.M., Truong, N.L., & Zongrone, A.D. *The 2019 National School Climate Survey*. 2020. https://www.glsen.org/research/2019-national-school-climate-survey.



its effects on student well-being and success.[4] Anti-LGBTQ harassment is associated with a range of adverse educational outcomes on LGBTQ students, including increased absences, lowered grade point averages, and a decreased likelihood of pursuing post-secondary education.[5] Anti-LGBTQ discrimination, including harassment and assault, is also associated with lower self-esteem and higher levels of depression,[6] and The Trevor Project's 2022 national survey found that 45 percent of LGBTQ youth seriously considered attempting suicide in the past year, including more than half (53 percent) of transgender and nonbinary youth.[7] Students who hold multiple marginalized identities experience starker and often unique disparities. LGBTQ youth who are Asian American or Pacific Islander (AAPI), Black, Latino, or Native and Indigenous experience both race-based and anti-LGBTQ discrimination, and they were most likely to skip school due to feeling unsafe, report the lowest levels of school belonging, and experience the highest levels of depression compared to those who experience one or neither form of marginalization.[8]

In addition to verbal and physical harassment, violence, and excessive discipline, LGBTQI+ students experience intentional misgendering and misnaming, refusal to update names and gender markers on records and school systems, denial of access to single-sex spaces and activities, and penalties under dress and grooming codes for failure to conform to sex stereotypes. All forms of such discrimination both deleteriously impact LGBTQI+ students' well-being and academic success and violate their rights under Title IX.

LGBTQI+ youth of color and LGBTQI+ youth with disabilities may be more likely to be disciplined for reporting discrimination given racial disparities and other disparities in disciplinary action: Black, Native American/Alaska Native, Latino, Arab American/Middle Eastern/North African, and multiracial LGBTQ youth experience more school disciplinary action than white LGBTQ youth,[9] and LGBTQ youth with

---

[4] Russell, S.T., Sinclair, K.O., Poteat, V.P., & Koenig, B.W. "Adolescent health and harassment based on discriminatory bias." *American Journal of Public Health*, 102(3): 493–495. 2012. 493-495. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3487669/ ; Birkett, M., Newcomb, M.E., & Mustanski, B. "Does it get better? A longitudinal analysis of psychological distress and victimization in lesbian, gay, bisexual, transgender, and questioning youth." *Journal of Adolescent Health*, 56(3). 2015. 280–285. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4339410/.
[5] Kosciw, J.G., et al. *The 2019 National School Climate Survey*. 2020.
[6] Ibid.
[7] The Trevor Project. *2022 National Survey on LGBTQ Youth Mental Health*. 2022. https://www.thetrevorproject.org/survey-2022/.
[8] Truong, N.L., Zongrone, A.D., & Kosciw, J.G. *Erasure and resilience: The experiences of LGBTQ students of color, Asian American and Pacific Islander LGBTQ youth in U.S. Schools*. 2020. https://www.glsen.org/sites/default/files/2020-06/Erasure-and-Resilience-AAPI-2020.pdf ; Truong, N.L., Zongrone, A.D., & Kosciw, J.G. *Erasure and resilience: The experiences of LGBTQ students of color, Black LGBTQ youth in U.S. Schools*. 2020. https://www.glsen.org/sites/default/files/2020-06/Erasure-and-ResilienceBlack-2020.pdf ; Zongrone, A.D., Truong, N.L., & Kosciw, J.G. *Erasure and resilience: The experiences of LGBTQ students of color, Latinx LGBTQ youth in U.S. Schools*. 2020. https://www.glsen.org/sites/default/files/2020-06/Erasure-and-ResilienceLatinx-2020.pdf ; Zongrone, A.D., Truong, N.L., & Kosciw, J.G. *Erasure and resilience: The experiences of LGBTQ students of color, Native and Indigenous LGBTQ youth in U.S. Schools*. 2020. https://www.glsen.org/sites/default/files/2020-06/Erasure-andResilience-Native-2020.pdf.
[9] Kosciw, J.G., et al. *The 2019 National School Climate Survey*. 2020.

September 12, 2022
Page 4 of 18



disabilities are more likely to experience disciplinary action than LGBTQ youth without disabilities and more likely to be referred to law enforcement as a result.[10]

President Biden's executive orders clearly demand the inclusion of LGBTQ students in the department's efforts to eliminate sex discrimination, consistent with the requirements of Title IX, the *Bostock* ruling, and other relevant case law.[11] We therefore appreciate that the department proposes to create a new section (§106.10 in the proposed regulations) that clarifies the scope of Title IX to define "on the basis of sex" to include all forms of sex discrimination, including discrimination based on sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity. We also support the following changes and recommend that the department preserves them in the final rule:

- Specification of investigation requirements for all forms of sex-based discrimination, including discrimination based on sexual orientation, gender identity, sex characteristics (including intersex traits), and sex stereotypes.
- Application of harassment protections to all forms of sex-based harassment, including harassment based on sexual orientation, gender identity, sex characteristics (including intersex traits), and sex stereotypes.
- Requirement of schools to monitor sex-based discrimination.
- Requirement of schools to publish a nondiscrimination policy and notify students, families, educators, and other school staff of the policy at least annually.

However, we urge the department to require that the forms of sex-based discrimination expressly prohibited under Title IX in proposed §106.10 be fully enumerated in the nondiscrimination policy and required annual notifications thereof.

We further urge the department to use plain language to communicate that preventing a student from accessing or participating in separate gender classes, restrooms, locker rooms, dress or appearance codes, school housing, and overnight accommodations for school trips consistent with their gender identity constitutes prohibited discrimination based on sex. Transgender and nonbinary students commonly face barriers to accesing separate gender programs, activities, and school facilities and recent state actions have exacerbated, encouraged, and even mandated such discrimination. For example, two states have enacted laws barring transgender students from using the bathroom and locker room consistent with their gender identity and others have recently considered legislating discrimination in this area.[12]

Additionally, we were disappointed that the proposed rules were silent on the issue of misgendering and deadnaming transgender and nonbinary students. As explained above, intentional misgendering and/or

---

[10] Palmer, N.A., Greytak, E.A., Kosciw, J.G. *Educational exclusion: Drop out, push out, and school-to-prison pipeline among LGBTQ youth.* 2016. https://www.glsen.org/sites/default/files/2019-11/Educational_Exclusion_2013.pdf.
[11] Executive Order 13988 of January 20, 2021 (Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation). ; Executive Order 14021 of March 8, 2021 (Guaranteeing an Educational Environment Free From Discrimination on the Basis of Sex, Including Sexual Orientation or Gender Identity).
[12] Alabama (H.B. 322, 2022) and Oklahoma (S.B. 615, 2022) have enacted anti-trans school bathroom laws. Arizona (H.B.2314, 2022), South Dakota (H.B. 1005, 2002), and West Virginia (H.B. 3199, 2021) recently considered similar bills.

Exhibit J



deadnaming are common forms of sex-based harassment experienced by transgender and nonbinary students. In a 2019 survey of LGBTQ students, 45 percent of transgender students and 36 percent of nonbinary students reported that they were prevented from using their chosen name and pronouns.[13] Misgendering and deadnaming of transgender and nonbinary students denies them a safe and supportive learning environment; we therefore urge the department to make explicit in the final rule that the persistent, intentional misuse of a name, personal pronouns, or a gendered title constitutes a form of impermissible sex-based discrimination that can create a hostile environment under Title IX.[14]

We are also disappointed that the proposed changes do not address participation in athletics. Furthermore, the language the department uses to explain this decision could be misinterpreted as potentially permitting a categorical ban on the participation of transgender students on separate gender sports teams consistent with their gender identity. State lawmakers have been increasingly emboldened in their violent attacks against LGBTQI+ students. Twenty-nine states as of July 1, 2022 have introduced bills that exclude transgender youth from athletics.[15] Eighteen states have enacted such laws, and many others impose discriminatory barriers to participation in school sports consistent with a student's gender identity.[16] The department must ensure that all students, including transgender, nonbinary, and intersex students, can enjoy the benefits of sports. We urge the department to move forward with urgency on a concurrent rulemaking related to athletics so that a single, consolidated final rule may be published in early 2023. Title IX athletics regulations should include the following:

- Clarification that transgender, nonbinary, and intersex students have rights under Title IX to participate in sports consistent with their gender identity.
- Clarification that state sports bans against transgender, intersex, and non-binary students constitute impermissible sex-based discrimination.
- Clarification that sports bans encourage dangerous and unscientific sex verification practices, which especially harm intersex youth and Black and Brown girls.
- Clarification that Title IX preempts any state law or policy that categorically bans transgender, nonbinary, and intersex students from playing sports or their ability to play sports consistent with their gender identity.

---

[13] GLSEN. *Improving School Climate for Transgender and Nonbinary Youth*. 2021. https://www.glsen.org/sites/default/files/2021-11/GLSEN_Trans%26Nonbinary_ResearchBrief.pdf.
[14] Title VII caselaw indicates that mocking or ridiculing a transgender or nonbinary person by intentionally misgendering or deadnaming can create a hostile environment in violation of Title VII. *See Doe v. Triangle Doughnuts, LLC.*, 472 F. Supp. 3d 115 (E.D. Pa. 2020) (citing *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020) (applying *Bostock*, the court held that, "in addition to being misgendered," an employer deadnaming a transgender woman "was sufficiently severe or pervasive to support her [hostile work environment] claim.").
[15] ACLU. "Legislation Affecting LBGTQ Rights Across The Country." *ACLU.org*. July 1, 2022. https://www.aclu.org/legislation-affecting-lgbtq-rights-across-country.
[16] GLSEN and TransAthlete.com (2022). Navigator: Trans and Nonbinary Athletic Inclusion Policies. https://maps.glsen.org/trans-and-nonbinary-athletic-inclusion-policies/.

Exhibit J

September 12, 2022
Page 6 of 18

 The Leadership Conference

With these changes, the department must make it undeniably clear to states that sports bans on the basis of gender identity is a violation of civil rights law, and that there are consequences to such bans, including the loss of federal funding.

*Pregnancy and related conditions*

We support the department's efforts to ensure that students will not be excluded from participation in, be denied the benefits of, or be subjected to discrimination on the basis of current, past, or potential pregnancy or any conditions related to pregnancy. These include pregnancy, childbirth, termination of pregnancy, lactation, recovery from any of these conditions, and any medical condition related to these conditions.

It is important to remove the barriers that make it difficult for pregnant and parenting students to complete their education. Among teens ages 15 to 19, 2.2 percent give birth to a child.[17] Nearly a third of girls who do not complete high school report that becoming pregnant was a primary factor in their decision to leave school.[18] Only half of teenage mothers earn a high school diploma by age 22, compared with 89 percent of girls who do not have a child during their teenage years.[19] One-third of young mothers never obtain a diploma or GED,[20] and fewer than 2 percent of teenage mothers graduate from college by age 30.[21] Systemic barriers and lack of inclusive policies can lead to student parents having lower levels of college enrollment and completion, higher levels of unmet financial need, and higher levels of debt upon graduation.[22] However, research shows that parenting college students can thrive when given the support they need to succeed. For example, 22 percent of college students are parents, 44 percent of student parents work full time while enrolled, and 23 percent of student parents are single parents and working full time while enrolled.[23] Despite these additional responsibilities, parenting college students tend to have higher grade point averages than their non-parenting peers.[24]

These inequities are the result of institutional barriers and a preventable lack of support for pregnant or parenting students that Title IX must amend. Under current regulations, schools can push out pregnant or parenting students if they miss classes for medical appointments, medical recovery, caretaking responsibilities, or to pump breast milk — thus punishing students for the school's actions to deny

---

[17] Department of Health & Human Services, Centers for Disease Control & Prevention, National Center for Health Statistics. *NCHS Data Brief, Continued Declines in Teen Births in the United States*. 2015. https://www.cdc.gov/nchs/data/databriefs/db259.pdf.
[18] Perper, K., Peterson, K., & Manlove, J. *Diploma Attainment Among Teen Mothers. Child Trends*. Jan 2010. https://www.childtrends.org/publications/diplomaattainment-among-teen-mothers. See also: Tang, E., et al. *Title IX At 50*. June 2022. https://nwlc.org/wp-content/uploads/2022/06/NCWGE-Title-IX-At-50-6.2.22-vF.pdf.
[19] Ibid.
[20] Ibid.
[21] Costello, C.B. "Pathways to postsecondary education for pregnant and parenting teens." *Institute for Women's Policy Research*. 2017. https://files.eric.ed.gov/fulltext/ED556724.pdf.
[22] Pillow, W.S. *Unfit Subjects: Educational Policy and the Teen Mother*. 2004 ; Perper, K, et al. *Diploma Attainment Among Teen Mothers*.
[23] U.S. Government Accountability Office. *Higher Education: More Information Could Help Student Parents Access Additional Federal Student Aid*. Aug 2019. https://www.gao.gov/assets/gao-19-522.pdf.
[24] Institute for Women's Policy Research. *Parents in College: By the Numbers*. Apr. 2019. https://iwpr.org/iwpr-issues/student-parent-success-initiative/parents-in-college-by-the-numbers.

Exhibit J



pregnant or parenting students accommodations.[25] We appreciate that the proposed regulations include further protections against discrimination based on "current, potential, or past" pregnancy or related conditions, including termination of pregnancy, childbirth, lactation, or recovery from any of these conditions, and we urge the department to preserve them in the final rule. These changes include:

- Requiring schools to provide students with the option of reasonable modifications to policies, practices, or procedures due to pregnancy or related conditions; to allow voluntary leaves of absence beyond the medically necessary minimum; and to ensure access to a private and sanitary lactation space that is not a bathroom.
- Clarifying that any leave of absence must be voluntary.
- Prohibiting schools from requiring students who are pregnant or have a related condition to provide certification from a healthcare provider about their ability to participate in an educational activity, unless all students must provide such certification.
- Describing specific actions that the Title IX coordinator must take to prevent discrimination upon learning that a student is pregnant or experiencing related conditions. These actions include informing the student of the school's obligation to prevent sex discrimination, and maintaining grievance procedures that provide for the prompt and equitable resolution of complaints of sex discrimination.

However, we oppose the department's proposals that restrict certain rights for pregnant and parenting students and employees, and we urge you to do the following instead:

- Require schools to grant modifications to students and employees who are pregnant or have a related condition if the modification is requested by the individual and is "reasonably available." The proposed rules do not adequately protect students and employees: They would allow schools to deny a pregnant student's requested modification if it is deemed to "alter the essential nature" of the school's program, which is too broad and vague of a standard.[26] And the proposed rules would only require schools to grant a pregnant employee's requested modification if a similar modification is available to employees with temporary disabilities, which improperly makes pregnant employees' Title IX rights contingent upon other civil rights laws.
- Prohibit discrimination based *solely* on parental, family, or marital status. The proposed rule would not prohibit schools from making a rule based on parental, family, or marital status unless the rule "treats persons differently based on sex."[27] Schools would therefore believe that they could discriminate against parenting students, as long as they do so equally across genders, or that they are barred from offering accommodations to young mothers simply because they do not offer similar accommodations to young fathers and other non-birthing parents.

In addition, we ask the department to strengthen protections for pregnant and parenting students:

---

[25] Tang, E., et al. *Title IX At 50*.
[26] 87 Fed. Reg. at 41572 (proposed 34 C.F.R. § 106.40(b)(4)).
[27] 87 Fed. Reg. at 41571 (proposed 34 C.F.R. §§ 106.10, 106.21(c)(2)(i), 106.40(a), 41579 (proposed 34 C.F.R. § 106.57(a)(1)).



- Prohibit discrimination based on "perceived" or "expected" pregnancy or related conditions, as well as parental, family, marital, or "caregiver" status.
- Prohibit schools from requiring students who are pregnant or have a related condition to participate separately, given that many of these students are pushed by their schools into inferior alternative programs.
- Make medically necessary "absences" available to pregnant and parenting students. The proposed rule would only require schools to grant "leaves of absence" that are medically necessary (e.g., for recovery from pregnancy) but not shorter absences or breaks that are medically necessary (e.g., for lactation breaks, abortion, or recovery therefrom) — which could be approved or denied subject to a Title IX coordinator's discretion.[28]
- Clarify that it is a violation of Title IX to discipline or refer students to law enforcement based on termination of pregnancy.
- Instruct schools on how to protect student privacy to ensure that, in states where abortion is criminalized, school records, including school health records, are not used to prosecute students who have been documented as being pregnant in the past but are not currently pregnant.

## Restore and Strengthen Protections Against Sex-based Harassment, Including Sexual Harassment

Sexual harassment of students is widely prevalent in K-12 schools and higher education, but most students do not report it to their schools. One in five girls ages 14 to 18 have been kissed or touched without their consent,[29] 58 percent of LGBTQ youth ages 13 to 21 are sexually harassed,[30] and children with disabilities are 2.9 times more likely than their peers to be sexually assaulted.[31] In college, one in four women; one in 15 men; and one in four transgender, nonbinary, and gender-nonconforming students are sexually assaulted during their time as undergraduates.[32] College students with disabilities are also more likely to experience sexual assault, as evidenced by a 2018 study where 31.6 percent of undergraduate women with disabilities reported nonconsensual sexual contact involving physical force or incapacitation, compared to 18.4 percent of undergraduate women without a disability.[33] This means that one of every three undergraduate women with a disability had been sexually assaulted during their time at college. Students with disabilities, however, are less likely to be believed when they report and often have greater difficulty describing the harassment they experience.[34] CDC data also suggest that LGBTQI+

---

[28] 87 Fed. Reg. at 41572 (proposed 34 C.F.R. § 106.40(b)(4)(i), (iii)).

[29] National Women's Law Center. *Let Her Learn: Stopping School Pushout for Girls Who Have Suffered Harassment and Sexual Violence*. 2017. https://nwlc.org/resources/stopping-school-pushout-for-girls-who-have-suffered-harassment-and-sexual-violence.

[30] Kosciw, J.G., et al. *The 2019 National School Climate Survey*.

[31] National Women's Law Center. *Let Her Learn: Stopping School Pushout for Girls With Disabilities*. 2017. https://nwlc.org/resources/stopping-school-pushout-for-girls-with-disabilities.

[32] Association of American Universities. *Report on the AAU Campus Climate Survey on Sexual Assault and Misconduct*. Oct. 15, 2019. https://www.aau.edu/key-issues/campus-climate-and-safety/aau-campus-climate-survey-2019.

[33] National Council on Disability. *Not on the Radar: Sexual Assault of College Students with Disabilities*. Jan 2018. https://ncd.gov/publications/2018/not-radar-sexual-assault-college-students-disabilities.

[34] National Institute of Justice. "The Many Challenges Facing Sexual Assault Survivors With Disabilities." *National Institute of Justice*. July 2017. https://nij.gov/topics/crime/rape-sexual-violence/Pages/challenges-facing-sexual-assault-survivors-withdisabilities.aspx ; National Council on Disability. *Mental Health on College Campuses: Investments, Accommodations Needed to Address Student Needs*. July 21, 2017. https://www.ncd.gov/sites/default/files/NCD_Mental_Health_Report_508.pdf.

September 12, 2022
Page 9 of 18



people experience elevated rates of sexual violence across their lifespan, including in K-12 and post-secondary educational settings.[35]

However, few students report these incidents to their schools, often because of shame, fear of retaliation, fear of being ignored or disciplined, and/or fear of police or immigration officials. For instance, only 2 percent of girls ages 14 to 18[36] and only 12 percent of college women[37] who are sexually assaulted report the incident to their schools. The 2019 National School Climate Survey also found that a majority of LGBTQ students who faced harassment or assault did not report it, most commonly because they feared it would not help.[38] When student survivors do come forward, they are often ignored or punished by their schools instead of receiving support.[39] This is especially common for women and girls of color (particularly Black women and girls), LGBTQI+ students, pregnant and parenting students, and disabled students due to stereotypes that label them as more "promiscuous," less credible, and/or less deserving of protection. When schools fail to protect survivors, they suffer in the form of lower grades, lost scholarships, and lost degrees. One in three college survivors end up dropping out altogether.[40]

The Trump administration's Title IX rule in 2020 aimed to silence sexual assault survivors and deny them educational opportunities, and it has allowed schools to do even less to prevent and respond to sexual violence and harassment.[41] Under the current rule, schools are currently required to ignore many reports of sexual harassment because of the overly restrictive definition of sexual harassment. The 2020 rule requires complainants to show that the harassment they experienced was so "severe, pervasive, *and* objectively offensive" that it "effectively *denies*" a complainant access to a school program or activity,[42] where the previous longstanding definition only required a showing that the harassment was "severe *or* pervasive" that it "effectively denies or *limits*" a complainant from accessing a school program or activity.[43] The 2020 rules also require that schools use uniquely burdensome procedures for sexual

---

[35] Chen, J., Walters, M.L., Gilbert, L.K., & Patel, N. "Sexual Violence, Stalking, and Intimate Partner Violence by Sexual Orientation, United States." *Psychol. Violence, 10(1).* 2020. 110–119. https://pubmed.ncbi.nlm.nih.gov/32064141/ ; Johns, M.M., et al. "Transgender Identity and Experiences of Violence Victimization, Substance Use, Suicide Risk, and Sexual Risk Behaviors Among High School Students — 19 States and Large Urban School Districts, 2017." *MMWR Morb. Mortal Wkly. Rep., 68.* 2019. 67–71. https://pubmed.ncbi.nlm.nih.gov/30677012/ ; Kann L., et al. "Sexual Identity, Sex of Sexual Contacts, and Health-Related Behaviors Among Students in Grades 9–12 — United States and Selected Sites, 2015." *MMWR Surveill. Summ., 65(SS-9).* 2016. 1-202. https://www.cdc.gov/mmwr/volumes/65/ss/pdfs/ss6509.pdf.
[36] National Women's Law Center. *Let Her Learn: Stopping School Pushout for Girls Who Have Suffered Harassment and Sexual Violence.*
[37] Association of American Universities. *Report on the AAU Campus Climate Survey on Sexual Assault and Misconduct.*
[38] Kosciw, J.G., et al. *The 2019 National School Climate Survey.*
[39] Nesbitt, S., & Carson, S. "The Cost of Reporting: Perpetrator Retaliation, Institutional Betrayal, and Student Survivor Pushout." *Know Your IX.* 2021. https://www.knowyourix.org/thecostofreporting.
[40] Mengo, C., & Black, B.M. "Violence Victimization on a College Campus: Impact on GPA and School Dropout." *Journal of College Student Retention Research Theory and Practice, 18(2).* 2015. 234-244. https://doi.org/10.1177/1521025115584750.
[41] See: Civil and Human Rights Community Joint Comment on Title IX NPRM. Jan 2019. https://civilrights.org/resource/civil-and-human-rights-community-joint-comment-on-title-ix-nprm/.
[42] 34 C.F.R. § 106.30(a) (defining "sexual harassment").
[43] *See, e.g.,* Department of Education, Office for Civil Rights, *Questions and Answers on Title IX and Sexual Violence* (Apr. 29, 2014; rescinded Sept. 22, 2017), https://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf; Department of Education, Office for Civil Rights, *Dear Colleague Letter: Sexual Violence* (Apr. 4, 2011; rescinded Sept. 22, 2017), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf; Department of Education, Office for Civil Rights, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties*, 66 Fed.



harassment that are not required for any other type of student or staff misconduct, including tilting the process in favor of harassers by requiring schools to presume[44] that the harassment did not occur.[45]

This rule has reinforced unsafe school environments, made it harder for survivors to report abuse,[46] deprived students of their right to an education, and denied students equal protection of the law. When the Trump rule was proposed, nearly 125,000 members of the public spoke out through public comments, with the overwhelming majority registering their strong opposition. Nonetheless, the Trump administration finalized its dangerous rule, which has been challenged in multiple lawsuits filed on behalf of individual student survivors, a student organization, survivor advocacy organizations, and 18 states and the District of Columbia.[47] Students deserve, and the law requires, a department that works to protect all students from discrimination.

The proposed rules do much to restore and strengthen protections for survivors of sexual harassment and violence and ensure fair and equitable processes for all students, employees, and members of campus communities. We support the following changes and recommend that they are retained in the final rule:

- The definition of sexual harassment (proposed §106.2) that includes "quid pro quo" harassment and sexual assault, dating violence, and domestic violence, and aligns "hostile environment" harassment to be consistent with the Title IX standard that existed prior to the 2020 rule. The proposed rule would require that students show that harassment is "sufficiently severe *or* pervasive" both "objectively and subjectively" such that it "denies or *limits* a person's ability to participate in or benefit from…the education program or activity" (italics added for emphasis). These changes will require schools to respond to all forms of sex-based harassment and help more students affected by sex-based harassment get support, compared to the current 2020 standards that are overly restrictive and force students to endure repeated and escalating levels of abuse before their complaints can be investigated.
- The requirement that schools respond to sex-based hostile environment under its education program or activity, regardless of where sex-based harassment contributing to the hostile environment occurred, including off campus or abroad (proposed §106.11).

---

Reg. 5,512 (Jan. 19, 2001; rescinded Aug. 14, 2020), https://www2.ed.gov/about/offices/list/ocr/docs/shguide.html; Department of Education, Office for Civil Rights, *Sexual Harassment Guidance*, 62 Fed. Reg. 12,034 (Mar. 13, 1997).

[44] 34 C.F.R. §§ 106.45(b)(1)(iv), (b)(2)(i)(B).

[45] The Trump Title IX rule included dating violence, domestic violence, and stalking in its definition of "sexual harassment." 34 C.F.R. § 106.30(a). The Trump rule also purports to allow schools to address sexual harassment that must be dismissed under Title IX using a "non-Title IX" school policy instead. See: 34 C.F.R. § 106.45(b)(3)(i) ; Federal Register 85. May 19, 2020. 30283, 30289, 30037-38. Still, the mandatory dismissal of certain Title IX sexual harassment complaints distorts the purpose and effect of Title IX. The statute does not grant schools authority to address sexual harassment—an authority that schools inherently possess—but rather requires them to do so in certain circumstances. The mandatory dismissal rule also promotes confusion. And as a practical matter, it creates uncertainty for complainants and respondents alike, as well as potential liability for schools if their classification of conduct is challenged by either party.

[46] The 2020 rules' unprecedented narrowing of the definition of "sexual harassment" has been especially harmful to students with disabilities by making it harder to report sexual misconduct, as many of these students already experience challenges that make communicating their victimization difficult. Moreover, this compounds the already high risk of sexual misconduct that students with disabilities face.

[47] Young, E. *The 2020 Title IX Regulations and the Lawsuits Against Them: An Analysis and Comparison*. 2020. https://feminist.org/wp-content/uploads/2020/08/Title-IX-Lawsuits-Article-1.pdf.

September 12, 2022
Page 11 of 18

 The Leadership Conference

- The inclusion of complaints by those other than students or employees who were participating or attempting to participate in an education program or activity at the time they experienced sex-based harassment (proposed §106.2).
- The requirement for schools to offer supportive measures to individuals who report sex-based harassment (or other sex discrimination), such as changes to the respondent's schedule or a "one-way no-contact order" against a respondent — regardless of whether the individual requests an investigation or an informal resolution, and even if their complaint is dismissed (proposed §§ 106.2, 106.44(g)-(g)(1), 106.45(d)(4)(i))).
- The removal of the current provision that prevents schools from complying with a state or local law that conflicts with the Title IX regulations and provides greater protections against sex discrimination, including harassment (§ 106.6(h)).

The proposed changes regarding sex-based harassment will protect students better than current regulations by expanding the scope for what counts as sex-based harassment. Furthermore, we urge the department to go further to strengthen protections against sex-based harassment (and other sex discrimination):

- Require (rather than simply allow) schools to designate some employees as "confidential employees," who are not obligated to report possible sex-based harassment (or other sex discrimination) to the Title IX coordinator but must offer confidential support to the reporting individual, including telling them how to contact the Title IX coordinator (proposed § 106.2 ("confidential employee"), 106.44(d)).
- Clarify that when a school chooses to dismiss a complaint because the respondent has left the school, it must take "steps" (proposed § 106.44(f)(6), 106.45(d)(4)(iii))) that include determining whether there were other victims and whether school staff knew about the incident(s) but ignored it, or took steps to cover it up.
- Clarify that if a party requests a certain supportive measure and it is "reasonably available," then the school must provide it (proposed § 106.2 ("supportive measures"); and that if the school is aware that the supportive measure offered are ineffective, then the school must modify it or offer additional supportive measures.[48]

**Develop Robust Protections Against Retaliation**

Title IX prohibits retaliation against those who complain of sex discrimination, in addition to ensuring that schools respond effectively to sex-based harassment (including sexual harassment), including by having "prompt and equitable" grievance procedures.[49] Unfortunately, we know too well how student survivors who summon the courage to report — especially survivors of color, survivors with disabilities,

---

[48] *Doe v. Sch. Bd. of Broward Cty., Fla.*, 604 F.3d 1248, 1261 (11th Cir. 2010) (quoting *Vance v. Spencer Cty. Pub. Sch. Dist.*, 231 F.3d 253, 261 (6th Cir. 2000)).

[49] 34 C.F.R. § 106.71 (2021); see also *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173 (2005) ("Retaliation against a person because that person has complained of sex discrimination is another form of intentional sex discrimination encompassed by Title IX's private cause of action.").



LGBTQI+ survivors, and pregnant or parenting survivors — are often punished when they turn to their schools for help. Students of color, LGBTQI+ students, students with disabilities, and pregnant and parenting students, who face additional discrimination also based on these identities, are most likely to be retaliated against after reporting sexual harassment. Some are disciplined for physically defending themselves against their harassers, acting out in age-appropriate ways in response to trauma, violating nondisclosure agreements imposed by the school by talking to friends about their harassment, and missing school to avoid seeing their harasser.[50] Others are punished for sexual contact on school grounds, based on administrators' conclusions that the contact was "consensual," premarital, or that the accusations of assault were false — meaning these students are punished for their own sexual assaults.[51] Student survivors in college have also increasingly faced retaliation from their assailants, who seek to weaponize school disciplinary proceedings by filing baseless cross-complaints in an effort to silence and punish victims.[52]

The changes that the Trump administration made to the Title IX rule in 2020 utterly failed to create safe and supportive school environments. For example, the 2020 rule allows schools to discipline student survivors for making a "materially false statement in bad faith" without it being considered retaliation under Title IX, as long as the decision to discipline is based solely on the outcome of an investigation. The threat of discipline if a school determines an accusation is "false" deters many student survivors from coming forward to ask for help or initiate an investigation. Like other changes to the rule, this change also especially harms women and girls of color (particularly Black girls who already face disproportionate, discriminatory discipline),[53] pregnant and parenting student survivors, LGBTQI+ student survivors, and student survivors with disabilities who are harassed because they are more likely to have their trauma minimized, be disbelieved, and be blamed due to rape myths and stereotypes that label them as more promiscuous, aggressive, and/or less credible. Even before the 2020 rule, student survivors were being discouraged from reporting in the first place, met with unfair skepticism, blamed, and wrongly disciplined. The current regulations only make it harder for people like them to come forward, and it denies them fair treatment under a system that is supposed to protect them. Title IX has long been

---

[50] National Women's Law Center. *100 School Districts: A Call to Action for School Districts Across the Country to Address Sexual Harassment Through Inclusive Policies and Practices*. 2021. https://nwlc.org/wp-content/uploads/2021/04/100SD-report-5.3.21-vF.pdf ; Cauterucci, C. "BYU's Honor Code Sometimes Punishes Survivors Who Report Their Rapes." *Slate*. Apr 15, 2016. https://slate.com/human-interest/2016/04/byu-s-honor-code-sometimes-punishes-survivors-who-report-their-rapes.html.
[51] See: *S.M. v. Sealy Ind. Sch. Dist.*, No. CV H-20-705, 2021 WL 1599388, at *2-*3 (S.D. Tex. Apr. 23, 2021) ; National Women's Law Center. *100 School Districts*. ; Entin, B. "Miami Gardens 9th-grader says she was raped by 3 boys in school bathroom." *WSVN-TV*. Feb 8, 2018. https://wsvn.com/news/local/miami-gardens-9th-grader-says-she-was-raped-by-3-boys-in-school-bathroom ; Caplan-Bricker, N. "My School Punished Me." *Slate*. Sept 19, 2016. https://slate.com/human-interest/2016/09/title-ix-sexual-assault-allegations-in-k-12-schools.html ; Stahl, A. "'This Is an Epidemic': How NYC Public Schools Punish Girls for Being Raped." *VICE*. June 8, 2016. https://broadly.vice.com/en_us/article/59mz3x/this-is-an-epidemic-how-nyc-public-schools-punish-girlsfor-being-raped.
[52] Nesbitt, S., & Carson, S. "The Cost of Reporting: Perpetrator Retaliation, Institutional Betrayal, and Student Survivor Pushout."
[53] See: Kingkade, T. "Schools Keep Punishing Girls — Especially Students of Color — Who Report Sexual Assaults, and the Trump Administration's Title IX Reforms Won't Stop It." *The 74 Million*. Aug 6, 2019. https://www.the74million.org/article/schools-keep-punishing-girls-especially-students-of-color-who-report-sexual-assaults-and-the-trump-administrations-title-ix-reforms-wont-stop-it/ ; Kingkade, T. "NYC Schools Suspended Sexual Assault Victims Because They're Black: Attorney." *The Huffington Post*. Jun 13, 2016. https://www.huffpost.com/entry/nyc-schools-sexual-assault-victims_n_575ebf51e4b00f97fba8d405.

Exhibit J

September 12, 2022
Page 13 of 18



understood to require a wide range of supportive measures to protect complainants from retaliation,[54] and the department must make clear that complainants are entitled to a wide range of supportive measures, remedies, and protections against retaliation.

We support the department's proposals to strengthen protections against retaliation:

- Prohibiting schools from disciplining someone for non-harassing conduct that "arises out of the same facts and circumstances" as the reported incident (e.g., alcohol or drug use, self-defense) (proposed § 106.71(a)).
- Prohibiting schools from disciplining someone for making a "false" statement or engaging in consensual sexual conduct based solely on the school's decision of whether sex-based harassment (or other sex discrimination) occurred (proposed § 106.45(h)(5)).
- Requiring schools to offer supportive measures to individuals who report retaliation and, if requested, to investigate complaints of retaliation (proposed § 106.71(a)).

And we urge the department to go further by clarifying in the regulations that retaliation includes:

- Disciplining a complainant for conduct that the school knows or should know "results from" the harassment or other discrimination (e.g., missing school, expressing trauma, telling others about being harassed).
- Disciplining a complainant for charges the school knew or should have known were filed for the purpose of retaliation (e.g., a respondent who has been disciplined for sexual assault or dating violence files a counter-complaint against their victim alleging the victim was the actual harasser).
- Requiring a complainant to leave an education program (e.g., to take leave, transfer, enroll in "alternative school") after reporting sex-based harassment (or other sex discrimination).
- Requiring a complainant to enter a confidentiality agreement as a prerequisite to obtaining supportive measures, an investigation, an informal resolution, or any other Title IX rights, unless otherwise permitted by the Title IX regulations.[55]

**Ensure Fair Disciplinary Procedures**

As the department's guidance has long made clear, schools must investigate allegations of sexual harassment using disciplinary procedures that are fair to all parties. For example, combined sex and race stereotypes lead school educators and administrators to "adultify" Black girls, seeing them as more

---

[54] See: U.S. Department of Education. "Questions and Answers on Title IX and Sexual Violence." (Rescinded.) Apr 29, 2014. https://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf ; U.S. Department of Education. "Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties." (Rescinded.) Jan 2001. https://www2.ed.gov/about/offices/list/ocr/docs/shguide.
[55] See Letter from Equal Rights Advocates, L.L. Dunn Law Firm, PLLC, and 35 Other Survivor Advocate Organizations to Catherine Lhamon, Ass't Sec'y for Civil Rights (June 2, 2022), https://www.equalrights.org/wp-content/uploads/2022/06/20220602-Letter-to-OCR-Regarding-Title-IX-Unconscionable-Agreements.pdf.

Exhibit J



promiscuous and less deserving of protection and care than their peers.[56] These stereotypes cause schools to view the sexual harassment reports of Black girls and other girls of color as less serious and to ignore, blame, or punish them instead of launching an investigation. Similarly, schools are less likely to believe LGBTQI+ student survivors due to reliance on stereotypes that they are "hypersexual," "deviant," or bring the "attention" upon themselves.[57] These biases fuel discriminatory responses to reports of harassment or assault and unjust disciplinary practices. For example, a national survey of LGBTQ youth found that 7.3 percent were disciplined after reporting their own victimization to school staff.[58] Black and Indigenous LGBTQ youth were almost twice as likely to report experiencing out-of-school disciplinary action (suspension or expulsion), compared to their white LGBTQ peers.[59] When LGBTQ student survivors don't report being harassed or assaulted — and most don't because they doubt an effective response — they may nonetheless be disciplined for it.[60] Student survivors with disabilities also face challenges when reporting sexual harassment based on schools' reliance on stereotypes that students with disabilities are less credible[61] and because they may have difficulty describing or communicating about the harassment they experienced, especially if they have a developmental or cognitive disability.[62]

Most fundamentally, and contrary to the claims of the previous administration, there is no conflict between protecting student survivors' educational opportunities and ensuring fair disciplinary procedures. There was simply no reason for the department to provide special protections to people accused of sexual harassment that are unavailable to others who face similar sanctions for analogous forms of misconduct. Furthermore, such exceptional treatment of sexual allegations is both rooted in and reinforces exactly the sort of sex stereotyping Title IX forbids.

We support many of the department's proposed changes to the Title IX grievance procedures and urge you to go further:

- Provide further guidance as to how institutions of higher education can conduct questioning while minimizing reliance on cross-examination and live hearings (e.g., having a decision-maker ask

---

[56] Georgetown Law Center on Poverty and Inequality. *Girlhood Interrupted: The Erasure of Black Girls' Childhood*. 2017. https://genderjusticeandopportunity.georgetown.edu/wp-content/uploads/2020/06/girlhood-interrupted.pdf ; McClellan, C. *Our Girls, Our Future: Investing in Opportunity & Reducing Reliance on the Criminal Justice System in Baltimore*. 2018. https://www.naacpldf.org/wp-content/uploads/Baltimore_Girls_Report_FINAL_6_26_18.pdf ; Smith-Evans, L., & George, J. *Unlocking Opportunity for African American Girls: A Call to Action for Educational Equity*. 2014. https://www.naacpldf.org/wp-content/uploads/Unlocking-Opportunity-for-African-American_Girls_0_Education.pdf.

[57] See: Chadwick, G.R. "Reorienting the Rules of Evidence." *Cardozo Law Review, 39(6)*. 2018. http://cardozolawreview.com/heterosexism-rules-evidence ; Dorwart, L. "The Hidden #MeToo Epidemic: Sexual Assault Against Bisexual Women." *Medium*. Dec 3, 2017. https://medium.com/@lauramdorwart/the-hidden-metoo-epidemic-sexualassault-against-bisexual-women-95fe76c3330a.

[58] Kosciw, J.G., et al. *The 2019 National School Climate Survey*.

[59] Ibid.

[60] Ibid.

[61] Davis, L.A. *People with Intellectual Disabilities and Sexual Violence. The Arc*. Mar 2011. https://www.thearc.org/document.doc?id=3657.

[62] Browne, A., Agha, A., Demyan, A., & Beatriz, E. "Examining Criminal Justice Responses To and Help-Seeking Patterns of Sexual Violence Survivors with Disabilities." *U.S. Department of Justice*. 2016. https://www.ojp.gov/pdffiles1/nij/grants/250196.pdf.

Exhibit J

September 12, 2022
Page 15 of 18

 The Leadership Conference

questions of parties and witnesses in individual meetings, including questions submitted by the other party).
- Ensure that students in K-12 schools are afforded the same appeal rights that the department would grant to students at institutions of higher education (proposed § 106.46(i)).

However, we oppose the department's proposals that would create unfair grievance procedures and urge you to do the following instead:

- Require the preponderance standard in all Title IX investigations, as it is the only standard that recognizes complainants and respondents have equal stakes in the outcome of an investigation,[63] and it is the same standard used by courts in all civil rights and other civil proceedings.[64] Alternatively, at a minimum, clarify that "comparable" investigations include investigations of non-sexual physical assault, so that schools do not use the clear and convincing evidence standard to investigate *sexual* assault and other sex, race, and disability discrimination while using the preponderance standard to investigate non-sexual *physical* assault.
- Remove the requirement for schools to presume that the respondent is not responsible for sex-based harassment (or other sex discrimination) until a determination is made and to inform both parties of this presumption (proposed §§ 106.45(b)(3), 106.46(c)(2)(i)). This is not required in any other type of school proceeding and exacerbates the harmful and false rape myth that people who report sex-based harassment (or other sex discrimination) — primarily women and girls — tend to be lying.
- Remove the proposed exclusionary rule, which would require that, if a party or witness at an institution of higher education does not respond to a question "related to their credibility," the school would have to ignore any statement they make that "supports their position" (proposed § 106.46(f)(4)). We are concerned this means that a survivor who refuses to answer a single question related to their credibility would have all of their oral and written statements excluded from the evidence.

**Clarify and Strengthen the Role of Title IX Coordinators**

We agree that the new Title IX regulation should clarify the role of Title IX coordinators in all recipient organizations responsible for implementing Title IX. The new Section 106.8(a)(2) under "Delegation to designee" proposes that the Title IX coordinator may assign one or more designees to carry out some of the recipient's responsibilities, but one Title IX coordinator must retain ultimate oversight over those responsibilities. We agree with the department's reason that this is an effective way for a recipient that enrolls large numbers of students, employs large numbers of employees, provides services in multiple locations, or engages in a large variety of activities to carry out the various Title IX responsibilities. We also encourage the department to affirm that elementary and secondary schools ideally should have their

---

[63] Letter from National Women's Law Center to Kenneth L. Marcus, Ass't Sec'y for Civil Rights, Dep't of Educ., at 33 (Jan. 30, 2019), https://nwlc.org/wp-content/uploads/2019/02/NWLC-Title-IX-NPRM-Comment.pdf.
[64] Letter from Leadership Conference on Civil and Human Rights to Kenneth L. Marcus, Ass't Sec'y for Civil Rights, Dep't of Educ., at 7 (Jan. 30, 2019), https://civilrights.org/resource/civil-and-human-rights-community-joint-comment-on-title-ix-nprm.

Exhibit J



own Title IX coordinators and to encourage the appointment of such school-level coordinators. The school district Title IX coordinator could still provide leadership, training, and coordination to the individual P-12 school level Title IX coordinators. We recognize this provides a way for the school district Title IX coordinator to identify trends among the recipients and coordinate training responsive to the trends identified and to efficiently monitor and address barriers.

These and other changes indicate the need to reissue Title IX coordinator guidance (which was rescinded in 2020) to clarify responsibilities reflecting the final Title IX regulations after a full review and consideration of the NPRM comments. This guidance can clarify that the Title IX coordinator does not need to be assigned full time Title IX coordinator responsibilities.

**Ensure Appropriate Implementation of Title IX's Religious Exemption**

In order to enforce Title IX's broad mandate to prevent sex-based discrimination in education, we urge the department to reconsider the two 2020 rules that made it easier for schools to discriminate in the name of religion. Prior to the 2020 rules, to claim a religious exemption to Title IX, the department required that a school be "controlled by" a religious organization; the 2020 rules greatly expanded this already broad requirement, expanding the ability of schools to claim an exemption to Title IX even if they were not "controlled by" a religious organization.[65] In addition, the 2020 rules explicity assured schools that they would not have to submit advance notice to the department of their intent to discriminate. This change assured schools that they may opt out of Title IX's requirements at any time, including during an Office for Civil Rights (OCR) investigation, and without notice or warning to the department, students, their families, or the public of their intent to rely on the religious exemption in advance of discriminating against them.[66] This rule allows schools to conceal their intent to discriminate against students, exposing them to harm — especially women and girls, LGBTQI+ students, pregnant or parenting students (including those who are unmarried), and students who access or attempt to access birth control or abortion services.[67] By allowing schools to claim exemptions during investigations, schools may use religion as a pretext for their unlawful discrimination.

Many LGBTQI+ people are people of faith, and many seek out a religiously affiliated education.[68] All denominations and traditions have internally varied views on gender and sexuality, so knowing a school's faith tradition is not adequate notice of a school's intention to discriminate. A notice that the institution intends to engage in a practice that would, but for the conflict with a specific tenet of a religious faith, be otherwise unlawful is essential both as a moral and practical matter for students making decisions about their futures, and as a legal matter to ensure consistency with the requirement that all students, applicants, and employees receive notice of a school's Title IX obligations and policies.[69] The department can and

---

[65] 34 C.F.R. § 106.12(c).
[66] 34 C.F.R. § 106.12(b) ; National Women's Law Center. *DeVos's New Title IX Sexual Harassment Rule, Explained*. May 2020. https://nwlc.org/wp-content/uploads/2020/05/Title-IX-Final-Rule-Factsheet-5.28.20-v3.pdf
[67] Green, E. "'Transgender' Could Be Defined Out of Existence Under Trump Administration." *The New York Times*. Oct 21, 2018. https://www.nytimes.com/2018/10/21/us/politics/transgender-trump-administration-sex-definition.html.
[68] Conron, K.J., Goldberg, S.K., & O'Neill, K. "Religiosity Among LGBT Adults." *UCLA School of Law Williams Institute*. Oct 2020. https://williamsinstitute.law.ucla.edu/publications/lgbt-religiosity-us/.
[69] 34 C.F.R. § 106.8.

Exhibit J



should require advance notice as an independent procedural requirement. This notice requirement imposes negligible burdens compared with the potential for fundamentally unfair surprises and harms to students who may be disciplined, expelled, or denied a degree on the basis of sex. Moreover, allowing schools to not disclose their religious exemption is inconsistent with the Title IX rule that requires recipients to provide notice of its nondiscrimination policies.[70] So too is the addition of sweeping criteria that significantly broadened the "controlled by" a religious institution requirement inconsistent with the text and OCR's longstanding enforcement of Title IX. Thus, consistent with the purpose of Title IX, the department must give the exemption a narrow interpretation in order to effectuate Title IX's remedial purpose.[71]

By requiring a school to tell students that it does not discriminate while simultaneously allowing it to opt out of anti-discrimination provisions whenever it chooses, the department created a system that enables schools to actively mislead students. Women, LGBTQI+ students, married or unmarried pregnant and parenting students, and students who access or attempt to access birth control or abortion services could be subject to discrimination or expulsion from school without any notice, thereby affecting their ability to make an informed decision about where to go to school and ensure that they choose a college that will treat them fairly. Students should not have to avoid attending religious colleges and universities simply because of a lack of transparency regarding the institution's intentions to protect their civil rights under Title IX.

Students deserve — and the law requires — that the U.S. Department of Education fulfills its responsibility to protect the civil rights of all students to safeguard equal educational opportunities. Ensuring that all our students are safe and welcomed in schools is incredibly important to our organizations, our partners, and the communities we represent. The administration must make clear that the fundamental American values of fairness and equality will not be abandoned and that schools will provide all students an educational environment free from sex discrimination and violence. If you have any questions, please reach out to Anna Byon (they/them), higher education senior program manager at The Leadership Conference on Civil and Human Rights, at byon@civilrights.org.

Sincerely,

<u>National Organizations:</u>
The Leadership Conference on Civil and Human Rights
The Leadership Conference Education Fund
American Association of University Women
American Atheists
American Humanist Association
Asian Americans Advancing Justice | AAJC

---

[70] 34 C.F.R. § 106.8(b).
[71] National Women's Law Center. *Re: Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards, Direct Grant Programs, State-Administered Formula Grant Programs, Developing Hispanic-Serving Institutions Program, and Strengthening Institutions Program (RIN 1840-AD45)*. Feb 18, 2020. https://nwlc.org/wp-content/uploads/2020/03/NWLC-Comment-on-ED-FBO-and-Religious-Exemption-Rule.pdf.

Exhibit J

September 12, 2022
Page 18 of 18



Autistic Self Advocacy Network
Bazelon Center for Mental Health Law
Center for Learner Equity
Clearinghouse on Women's Issues
Committee for Children
Council of Parent Attorneys and Advocates (COPAA)
Disability Rights Education & Defense Fund
Equal Justice Society
Family Equality
Feminist Majority Foundation
Girls Inc.
GLSEN
Hispanic Federation
Japanese American Citizens League
Lawyers' Committee for Civil Rights Under Law
NAACP Legal Defense and Educational Fund, Inc. (LDF)
National Action Network Washington Bureau
National Center for Learning Disabilities
National Council of Asian Pacific Americans (NCAPA)
National Council of Jewish Women
National Disability Rights Network (NDRN)
National Employment Lawyers Association
National Women's Law Center
OCA-Asian Pacific American Advocates
Secular Coalition for America
Sojourners
SOSSI- Saving Our Sons & Sisters International
Southeast Asia Resource Action Center
Speak Up! Special Education Advocacy
The Advocacy Institute
The Education Trust
Union for Reform Judaism
Women of Reform Judaism

State & Local Organizations:
Agency for Humanity
Education Law Center-PA
Michigan Alliance for Special Education
Michigan Developmental Disabilities Council
The Parents' Place of MD
Wyman

Exhibit J

# OVERWHELMING OPPOSITION:
## THE AMERICAN PUBLIC'S VIEWS ON THE DEVOS TITLE IX RULEMAKING OF 2018-2020



By Thomas Dircks, Lindsey LaForest, Timothy O'Shea, Alice Park, Brittany Van Ryder, & Nancy Chi Cantalupo

Exhibit J

**EXECUTIVE SUMMARY**

On November 29, 2018, then Secretary of Education Betsy DeVos and the U.S. Department of Education ("ED") published a notice of proposed rulemaking ("NPRM") regarding Title IX of the Education Amendment of 1972, 20 U.S.C. §§1681 *et seq*. ("Title IX"), particularly ED enforcement regarding sexual harassment and gender-based violence ("SH-GBV"). This report will discuss data collected by a crowd-research project in which hundreds of volunteers read and collected information from 117,358 of the 124,000+ comments filed in response to the NPRM into a "Big Comment Catalog" ("Catalog"). First, the report reviews the number and percentage of comments that supported or opposed the NPRM's proposals, including by identified subgroup and topic. It then analyzes the themes of the comments filed, first the common concerns of the less than one percent of commenters who supported the NPRM and next of the more than 99 percent who opposed it. The Catalog is available as Appendix B here: https://docs.google.com/spreadsheets/d/14BqFvmExd5NgokLVU_keo0OGSD4lwdSKSWKXEZBDZjo/edit?usp=sharing.

Of the 117,358 cataloged, organized, and examined by the research team (see the Methodology section for an explanation of why the Catalog does not include all 124,000+ comments that ED says were filed in the proceeding), 115,670 comments took a definitive position on the proposals. Of those comments that took a definitive position, more than 99 percent (n: 114,817) opposed the proposed rules while less than one percent (n: 853) supported them.

The predominant theme in the 853 supporters' comments was the belief that ED's Title IX enforcement methods for SH-GBV should imitate the criminal law. These comments favored the NPRM for correcting what supporters alleged were biased procedures that had been tolerated by ED in the past and approved of the NPRM's requirements for live hearings with cross-examination, a heightened evidentiary standard, and protection of the accused's—but not the victim's—"due process" rights.

In part due to how many more commenters opposed the NPRM than supported it, the list of objections was also significantly longer. First, opposers objected to the NPRM's narrowed scope of Title IX protections, including those limiting the types of SH-GBV that would qualify as violating Title IX, reducing the number and type of employees obligated under Title IX to assist a victim-survivor, and decreasing the obligations on funding recipients to address reports in an efficient manner. Of particular concern to opposers were the NPRM's narrowed definitions for various terms, as well as the elimination of Title IX protections with regard to online harassment and off-campus SH-GBV. Second, those who opposed the NPRM addressed the potential harm to survivors, educational institutions, and students' rights caused by the NPRM's criminal law-imitative requirements for internal investigations, disciplinary systems, and a higher standard of evidence. Third, opposers objected to the NPRM's adoption of broad religious exemptions from Title IX and for its disparate impacts on student populations already vulnerable to discrimination, including K-12 students and students who face intersectional discrimination.

This report's authors thank the many volunteers who participated in this project over the last three years (see the Methodology section and Appendix A for a list of volunteers). Without their efforts, the Catalog and this report would not have been possible.

Exhibit J

I. **INTRODUCTION**

> *This proposed rule could not come at a worse time, as instances of sexual harassment and assault are rising in our elementary and secondary schools, and institutions of higher education.*

- Congresswomen Madeleine Dean and Ilhan Omar[1]

Title IX of the Education Amendment of 1972, 20 U.S.C. §§1681 *et seq*. ("Title IX"), and its implementing regulations, 34 C.F.R. part 106, prohibit discrimination on the basis of sex in education programs or activities operated by recipients of Federal financial assistance. The Office for Civil Rights ("OCR") in the U.S. Department of Education ("ED") enforces Title IX and provides guidance to these entities regarding their obligations under Title IX. On November 29, 2018, under the leadership of Secretary of Education Betsy DeVos, ED published in the Federal Register a notice of proposed rulemaking ("NPRM") to amend the Title IX regulations, with a focus on OCR's enforcement of Title IX with regard to sexual harassment and gender-based violence ("SH-GBV"). The NPRM established a 60-day comment period from November 29, 2018, through January 28, 2019, later extended for two days, until January 30, 2019,[2] due to technical difficulties resulting from the 35-day federal government shutdown in December 2018 and January 2019. By the time the comment period had closed, DeVos' ED had received 124,000+ comments filed by the public in response to the NPRM, which were made available on regulations.gov.

In June 2019, after it appeared that the DeVos ED had uploaded all of the 124,000+ comments to regulations.gov, an interdisciplinary research team launched the "crowd-research" project that this report details. Over the next three years, approximately 500 volunteers read and cataloged as many of the comments as the research team could access (over 117,000). Once the catalog was complete, the members of the research team who authored this report organized, examined, and wrote this account of the data aggregated by the catalog.

The catalog indisputably demonstrates that the majority of the comments filed in response to the DeVos NPRM *overwhelmingly opposed* the proposed regulations in the NPRM. Of the 117,358 comments cataloged, 115,670 of the commenters definitively took a position in opposition or in support of the proposed rule. Of those 115,670 comments, 114,817 commenters opposed the proposed rules. Less than one percent—only 853 comments—supported the NPRM's proposals. However, tens of thousands of commenters expressed more than simply their opposition or support of the NPRM's proposed regulations. This report thus reviews, in addition to which comments supported and opposed the DeVos NPRM, the particular topics and provisions of the NPRM that were at the forefront of commenters' minds.

The remainder of this report will discuss this crowd-research project's methodology and the authors' analysis of the data gathered by what the research team nicknamed "the Big Comment Catalog" ("Catalog"). First, this report will review the number and percentage of comments that either supported or opposed the NPRM's proposals, including by identified subgroup and topic. It will then analyze the themes of the comments filed, beginning with a review of the common concerns expressed

---

[1] Congresswoman Madeleine Dean, Comment ED-2018-OCR-0064-11537 (Jan. 29, 2019); and Congresswoman Ilhan Omar, Comment ED-2018-OCR-0064-11606 (Jan. 29, 2019).

[2] Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 83 Fed. Reg. 61462 (Nov. 29, 2018).

2

Exhibit J

by the 853 NPRM supporters, and moving next to the themes in the opposers' comments. The Catalog itself is available as Appendix B.[3]

## II.    METHODOLOGY

The first step in the Big Comment Catalog project's crowd-research effort was to gather into a organized and sortable database several common categories of information about each comment filed. Volunteers willing to read and catalog comments were asked to go to a google site where they could use a series of google forms to: (1) sign up to catalog a certain number of comments, the regulations.gov urls for which the research team would email to them, then (2) answer a series of questions about each comment. As each comment was cataloged, the information was sent into a google spreadsheet that organized the common categories of information for all of the comments into columns. Over the next two and a half years, approximately 500 volunteers, as well as six law student Research Assistants,[4] would "hand-catalog" at least 35,741 comments.

Within approximately two months of the project's launch, volunteers started telling the research team that they were getting the same comment over and over again, just with different commenters' names attached. The research team determined that these were "boilerplate" comments: comments in which a group of commenters all use the same or highly similar text to express their opinion on the DeVos NPRM to the agency. Concerned that the tediousness of cataloging the boilerplate comments would bore and annoy volunteers enough to cease volunteering, research team members Julianna Burchett, Mariko Cool, and Brooke Mascagni devised and implemented a method for identifying the regulations.gov urls for as many boilerplate comments as possible so they could be lifted out of the list of comment urls being sent to volunteers for hand-cataloging.

To catalog these boilerplate comments, the Steptoe & Johnson law firm, which had agreed to act as the project's *pro bono* counsel, made artificial intelligence software available to the research team to electronically catalog them. Volunteer cataloger and computer science professor at the University of Maine, Kenneth R. Bundy, joined the research team and wrote a webscraping program that he then ran on multiple computers for over a month to download about 90,000 comments in a form that could be analyzed using the AI software. Comments with attachments could not be downloaded due to their size and the time and expense they would require to download (Steptoe & Johnson estimated that vendors would charge approximately $100,000 to download all of the comments, those with attachments included). The firm's experts in the AI software[5] then used it to identify over 80,000 comments downloaded by Professor Bundy's webscraping program that repeated one of five different sets of boilerplate language.

Because of the all-volunteer nature of the Big Comment Catalog project and the lack of funds to guarantee that all of the comments were downloaded, the data that the research team was able to collect has several gaps. First, the final spreadsheet that constitutes the Catalog—created by research team member Alice Park, who merged the data gathered from the hand-cataloging with the data from

---

[3] Appendix B is available and downloadable as a google sheet at
https://docs.google.com/spreadsheets/d/14BqFvmExd5NgokLVU_keo0OGSD4lwdSKSWKXEZBDZjo/edit?usp=sharing.
[4] See Appendix A for a list of volunteers, excluding those who requested anonymity.
[5] Special thanks to Matthew Guilland, Kate Bauer, Emily Liu, and Paul Lee from the Steptoe team. Mr. Guilland, in particular, has our gratitude for running specialized analyses for the research team.

Exhibit J

the AI software cataloging, includes 117,421 comments, a difference of about 6800 from the 124,160 regulations.gov indicates were filed and/or available on regulations.gov. Those 6800 may be available through regulations.gov because of inconsistencies in how comments—especially if hand-written—were uploaded to regulations.gov by the DeVos ED. For instance, 17,121 rows of the Catalog indicate that hand-written postcards mailed to ED in response to the DeVos NPRM were mainly uploaded to regulations.gov in PDFs consisting of a single scanned postcard, but occasionally the PDF included two scanned postcards.  When the research team went back, it found that PDFs including multiple scanned postcards added at least six comments to those cataloged.

Alternatively, the 6800 missing comments may not be available on regulations.gov. Regulations.gov in fact provides conflicting information about the number of comments filed. On the one hand, Regulations.gov indicates 124,160 files associated with the rulemaking. On the other hand, an excel spreadsheet available for download from Regulations.gov, which includes (1) the commenter's name and the url of the comment, (2) whether the comment was filed on behalf of an organization, and (3) whether it included an attachment, only lists about 105,000 comments. The near 20,000 comment difference between these numbers questions the accuracy of both numbers. Ultimately, the research team could not determine if some error, either on the DeVos ED's or the research team's part, led to the discrepancy, or if the missing comments were deliberately withheld by DeVos's ED and, if so, why.

Second, with regard to the boilerplate comments, some commenters may have added individualized, substantive points to the boilerplate language they incorporated into their comments. It was impossible to reliably determine how many of such "boilerplate-plus" comments may exist because the boilerplate comments were cataloged via the AI software, and there was no way to reliably measure the addition of substantive points via the software.  The most we could do was determine that approximately 14,000 comments had added language to the boilerplate comment language, but we could not determine how substantive that additional language is without hand-cataloging each of those 14,000+ comments.

Third, the AI software identified 2,648 comments as using language identifying it as one of the five boilerplate comments. However, when the research team looked at some of these comments, they appear to be the result of an online template of some sort that malfunctioned. Because these comments apparently lost specific information that commenters entered into the template and that they intended to be included in their comments, these comments look like boilerplate comments but probably were not intended to be. They are also devoid of any content beyond opposition to the proposed rules.  Such comments are identifiable because they include the directions from the template (e.g.: "In particular, I am concerned about [PICK TWO - THREE POINTS FROM THE RULE YOU WANT TO ADDRESS...").[6] Some catalogers reported that some of these malfunctioning template comments included one part where the template malfunctioned and a second part where the personalized information that the commenter had put into the template was captured. Because the research team did not anticipate that some comments might have lost information due to such a malfunction, the google form did not ask catalogers to identify malfunctioning template emails; therefore, the research team could only determine that up to 2,648 comments appear to have lost some amount of substantive information due to this problem and to categorize them for cataloging purposes as boilerplates.

Fourth, to the extent that some comments were joint comments filed by multiple individual or organizational commenters, the Catalog does not capture that information consistently. For two

---

[6] *See, e.g.,* Individual, Comment ED-2018-OCR-0064-66436 (Jan. 22, 2019).

examples of this undetermined number, a group of 73 law professors filed a comment objecting to the enormous number of legal questions created and left unanswered by the DeVos NPRM,[7] and 902 mental health professionals signed onto a comment in opposition to the NPRM.[8] The google form created by the research team that enabled volunteer catalogers to gather specified categories of data as consistently as possible from each comment cataloged did not include a question asking if a comment included multiple commenters. As a result, the Catalog almost certainly undercounts the number of commenters.

### III.    THE QUANTITATIVE ANALYSIS OF THE COMMENTS

Despite the aforementioned gaps, the Catalog managed to review the comments filed completely enough to confirm what circumstantial evidence had indicated throughout the comment period and via less comprehensive reviews of the comments conducted prior to completion of the Catalog[9]: the American public was almost unanimously opposed to the proposals in DeVos's NPRM. Of the 117,358 comments cataloged, nearly 114,817 opposed the proposed rules. Only 853 comments—less than one percent—of the cataloged-comments supported the DeVos NPRM's proposals. For 1688 of the comments, catalogers did not identify whether the commenter supported or opposed the proposals. Even if all of the 6802 comments that may be missing from the Catalog all supported the proposed regulations, this speculative level of support would still only add five percent (6802 / 124,160).

This overwhelming opposition was also true for every subgroup that catalogers tracked. Although the AI software that cataloged the 81,617 boilerplate comments only tracked whether the comment supported or opposed the DeVos proposals (and all 81,617 uniformly opposed the DeVos proposals), the 35,741 comments that volunteers hand-cataloged collected other information. This information included whether, to the best that the cataloger could determine, the commenter was a Business, Educational Administrator, Educational Institution, Local Government, Non-Governmental Organization, Parent, Student, State or National Governmental Agency, Teacher or Professor, other (unspecified) organization, or other (unspecified) individual. Catalogers did not identify the subgroups to which about 2230 of the commenters belonged, but of the 33,511 comments in which a subgroup was identified, catalogers tracked the following tiny-miniscule percentages of NPRM supporters:

- Other/unspecified individuals: 1.7% in support (439 supporters / 25,389 total)
- Students: 2.7% in support (91 supporters / 3389 total)
- Parents: 10.2% (135 / 1,322 total)
- Teachers/Professors: 4.4% (53 / 1,216)
- Non-governmental organizations: 2.4% (16 / 678)
- Educational institutions: 3.7% (18 / 482)
- Educational Administrators: 3.3% in support (15 supporters / 453 total)
- Other organizations: 6.9% (27 / 393)
- State/National governmental agencies: 3.0% (3 / 101)
- Businesses: 17.6% (9 / 51)
- Local governments: 2.7% (1 / 37)

---

[7] 93 Law Professors, Comment ED-2018-OCR-0064-17567 (Feb. 15, 2019).
[8] 902 Mental Health Professionals and Trauma Specialists, Comment ED-2018-OCR-0064-104088 (Jan. 30, 2019).
[9] *E.g.,* Amended Complaint for Declaratory and Injunctive Relief, Victim Rts. L. Ctr. v. DeVos, No. 1:20-cv- 11104 (D. Mass filed July 20, 2020).

Exhibit J

Th opposition was also true for the common subjects in the comments that were tracked by the catalog and discussed in greater detail in Section IV below:

- Of the 9,495 comments that addressed and took a position on off-campus or online SH-GBV, 9,432 comments (99.3%) opposed the NPRM proposals whereas 63 comments (0.7%) supported them.

- Of the 9,195 comments that addressed and took a position on the NPRM's changes to key definitions, 9,039 comments (98%) opposed the NPRM proposals whereas 156 comments (2%) supported them.

- Of the 5,632 comments that addressed and took a position on live hearings, mediation, and cross-examination, 5,409 comments (96%) opposed the NPRM proposals whereas 223 comments (4%) supported them.

- Of the 4,362 comments that addressed and took a position on the standard of evidence, 4,118 comments (94%) opposed the NPRM proposals whereas 244 comments (6%) supported them.

- Of the 5,460 comments that addressed and took a position on supportive, protective, and/or interim measures or accommodations, 5,355 comments (98.1%) opposed the NPRM proposals whereas 105 comments (1.9%) supported them.

- Of the 2,898 comments that addressed and took a position on religious exemptions, 2,825 comments (97%) opposed the NPRM proposals whereas 73 comments (2.5%) supported them.

- Of the 2,164 comments that addressed and took a position on K-12 education, 2,148 comments (99.3%) opposed the NPRM proposals whereas 16 comments (0.7%) supported them.

These counts do not include the topics that were addressed in the boilerplate comments. Other than the malfunctioning template comment addressed in the Methodology section above, the catalog identified four distinct boilerplate comments.  The first, used in part or in full by 43,456 commenters, provided three slightly different versions of the following statement:

> I am writing to express my outrage and opposition to the Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance proposed rule. This proposed rule will make schools less safe. *[one of three options for varying language inserted here]* More than 1 in 5 women, nearly 1 in 18 men, and more than 1 in 4 transgender and gender-nonconforming students are sexually assaulted in college. During college, 62% of women and 61% of men experience sexual harassment. In grades 7-12, 56% of girls and 40% of boys are sexually harassed in any given school year. Given this epidemic our government should be working to ensure student survivors have more rights and access to resources to continue to pursue their education, not doing everything in its power to intimidate and silence survivors of sexual assault. I implore you to change this rule and to instead center the rights and needs of student survivors in our Title IX process, including considering the additional challenges and barriers faced by students of color, undocumented students, low-income students LGBTQ students, and students with disabilities.

6

Exhibit J

Where the paragraph above notes "*[one of three options for varying language inserted here],*" the catalog tracked the following three variations:

- "I am particularly concerned that schools will only have to intervene when they deem the abuse is pervasive and severe enough, leaving many survivors in the position to prove their abuse is worthy of their school's attention and action."
- "I am particularly concerned that schools will be allowed to ignore sexual violence that happens off-campus even if the survivor is forced to see their abuser in class every day."
- "I am particularly concerned that these rules allow intimidating practices like cross examination that may deter students from reporting."

The catalog tracked five variations of this boilerplate comment total, including the aforementioned three variations for optional language, a variation in which the "particularly concerned" sentence included unique language written by the commenter, and a variation where the commenter did not including a sentence indicating the commenter's particular concerns. These five variations were fairly evenly distributed among the 43,456 comments filed using the common language noted above.

A second boilerplate comment was filed by 33,848 commenters.  Its substantive portion read:

I am writing in response to the Department of Educations (ED) Notice of Proposed Rulemaking (NPRM or proposed rules) to express my strong opposition to the proposed rules relating to sexual harassment as published in the Federal Register on November 29, 2018. Sexual harassment should never be the end of anyone's education. Yet these proposed rules would make schools more dangerous for all students. Schools would be allowed and, in many cases required, to ignore students who report sexual harassment. In many instances, schools would not be responsible for addressing sexual harassment, even when school employees knew about the harassment. Schools would be required to ignore harassment that happens outside of school activities or off school grounds, even if the victim has to see their harasser(s) in class every day, and would be required to ignore all harassment on school grounds until it becomes so severe that it costs students important learning opportunities. And in the rare cases when schools would be required to respond they would be allowed and sometimes required to deny harassment victims due process. If implemented, these rules would allow schools to subject survivors to biased, retraumatizing investigations or mediations that favor named harassers over their victims and would let schools delay even these sham investigations indefinitely at the expense of the affected student's education. ED should immediately withdraw its current proposal and dedicate its efforts to advancing policies that ensure equal access to education for all students, including students who experience sexual harassment.

Finally, two boilerplate comments numbered less than 1000 commenters each. The first, filed by 949 commenters, stated:

I submit this comment in response to the The Secretary of Education's proposed amendments to regulations implementing Title IX of the Education Amendments of 1972 in regard to the remedies available to victims of sexual assault. Rather than making it easier for victims to report and receive the justice they deserve, the amendments instead roll back the rights of students who have been sexually assaulted. This is

7

Exhibit J

unacceptable. These amendments to regulations should be rejected.

The second, numbering 716 comments, includes a bracketed direction to "[Customize your comment],"
but it is not clear how many commenters followed that direction. The comment reads:

> I am writing to you to oppose the draft rules that would change how schools handle
> sexual harassment and assault. All students deserve an education free from
> discrimination and fear. These proposed changes would make schools less safe and
> welcoming for ALL students and undermine the purpose of our civil rights laws.
> STUDENTS DESERVE BETTER! I urge you to change course and protect students' civil
> rights. Changing the definition of sexual harassment, limiting access to employees who
> are required to act, ignoring off-campus conduct, and allowing schools to hide their
> plans to discriminate is unfair and irresponsible [Customize your comment] The job of
> the Department of Education is to protect students from discrimination. STUDENTS
> DESERVE BETTER and it is time that you do your job!

The four boilerplate comments discussed above together number 78,969 comments, whereas
the AI software identified a total of 81,617 boilerplate comments total. This larger number
includes the 2,648 comments discussed above that appear to be the result of a malfunctioning
online template. Due to the malfunction, these comments were cataloged by the AI software,
which only able to capture these comments' general antipathy to the DeVos NPRM. Therefore,
regardless of whether they are "counted" as a boilerplate comment or not, they are included in
the over 99 percent (114,817 / 115,670) of the comments that expressed the American public's
overwhelming opposition to the DeVos NPRM.

**IV.    THEMES FROM THE COMMENTS**

Because volunteers were able to hand-catalog 35,741 comments and the hand-cataloging google
form asked volunteers to gather more information than only the commenter's support or opposition for
the NPRM, the remainder of this report will provide more details about various themes on which
commenters focused. First, this Section will discuss the number of commenters who referenced
research studies, employed legal arguments, and/or shared personal stories to support their position on
the DeVos NPRM.

**A.    Methods Used to Support Comments and Who Used Them**

The hand-cataloging form asked volunteer catalogers to identify—to the extent possible—which
commenters included references to research studies, used legal arguments, and shared personal stories.
Recall that of the 35,741 hand-cataloged comments, 853 comments were cataloged as supporting the
DeVos NPRM, whereas 33,200 opposed the DeVos NPRM. Of these hand-cataloged comments, a greater
percentage of the 853 NPRM-supporters relied on personal stories (220) and legal arguments (159) than
they did research (79). In contrast, nearly a third of the 33,200 NPRM-opposers (10,077) cited to
research whereas a little under ten percent (3,217) included personal stories and closer to six percent
used legal arguments (2,050).

However, it is important to note that, when raw numbers of NPRM-opposers are compared to the
raw numbers of NPRM-supporters, because so many more commenters opposed than supported the
NPRM, exponentially more opposers relied on all three forms of support for their comments than

8

supporters. Indeed, nearly 13 times as many opposers used legal arguments as supporters did (2050/159 = 12.89) and over 14.5 times as many opposers shared personal stories as did supporters (3217/220 = 14.62).

When compared to other supporters, 220 out of 853 DeVos NPRM supporters (25.79%) shared personal stories regarding themselves or someone they know, in contrast to the 9.7 percent of opposers whose comments contained personal stories (3,217 comments) when compared with the full number of NPRM opposers (33,200) whose comments were hand-cataloged. Even fewer commenters, 159 out of 853 supporters (18.6%) and 2,050 out of 33,200 opposers (6.2%), used legal arguments in their comments. Finally, even when compared to other NPRM-supporters, the percentage of supporters using research was very small: only 9.3% (79 / 853) of supporters cited research, whereas 30.4% (10,077 / 33,200) of opposers cited research. As a result, *over 127 times* (10,077 / 79 = 127.56) as many DeVos NPRM-opposers cited research as did NPRM-supporters.

    The seeming extreme reticence of DeVos NPRM-supporters to support their comments with research has two significant implications. First, it suggests that there is in fact very little research supporting NPRM-supporters' position (and therefore the legal and policy choices made in the NPRM itself). Second, because legal arguments are generally strengthened by research-based support, the fact that so few of the NPRM-supporting comments that advanced legal arguments appear to have supported those arguments with research calls into question the strength and accuracy of those arguments. This implication is bolstered by the fundamental misunderstandings of Title IX as a civil rights statute found in many supporters' legal arguments, one aspect of the substantive themes to which the next section turns.

### B.  Themes in DeVos NPRM-Supporters' Comments

*I support reforms to the Title IX/Clery processes to remedy the failure to provide due process to persons accused of sexual harassment . . . The university Title IX/Clery Coordinator [at redacted's school] precipitously and unnecessarily imposed a no-contact and stay away order… The coordinator . . . refused his request for a hearing since she asserted that no penalty had been imposed . . . it stigmatized [redacted] and adversely colored his college experience.*

-Parent[10]

    Supporters of the DeVos NPRM expressed their approval in several variations on an overall belief held by supporters that reports of sexual harassment and gender-based violence should not be handled by schools, although these commenters often conflated the schools that were responding to and investigating such reports with the students making the reports.[11]  Some NPRM-supporters objected to schools' involvement in responding to SH-GBV on the basis that schools are not a part of the criminal legal system. Others argued that schools mishandled such cases—particularly by violating the "due

---

[10] Parent, Comment ED-2018-OCR-0064-18511 (Jan. 29, 2019); Parent, Comment ED-2018-OCR-0064-9422 (Dec. 2, 2018).  Student, Comment ED-2018-OCR-0064-10490 (Jan. 28, 2019).

[11] Some commenters also registered their support for the NPRM's approach to religious exemptions.  *See, e.g.*, Individual, Comment ED-2018-OCR-0064-103800 (Jan. 25, 2019) ("[U]nder the current regulations an educational institution otherwise entitled to the exemption may lose it simply by failing… to affirmatively seek the exemption to which it is entitled. The proposed revised regulations remedy that harsh and unfair consequence,"); Jewish Coalition for Religious Liberty, Comment ED-2018-OCR-0064-10275 (Jan. 28, 2019).

Exhibit J

process" rights of those who the comments said were "falsely accused" of committing SH-GBV—because schools failed to use the same standards for dealing with reports of SH-GBV as the criminal legal system uses. In keeping with the overall patterns noted above, supporters rarely cited to empirical research or data-based studies to support their points. Lastly, to the extent that supporting comments made legal arguments to support of their assertion, those legal arguments often appeared to misunderstand fundamental aspects of Title IX and the differences between civil rights and criminal laws.

Of the comments supporting the NPRM—some even pushing ED to go further to protect the accused party—many came from parents or relatives of someone who the commenter said was falsely accused of sexual misconduct or from accused students themselves. Although many such commenters used the term "falsely accused," their objections did not generally discuss the content of the accusations or seek to show why they were false. The research team also did not find comments that offered explanations regarding why, if the accusations the commenter characterized as false were indeed false, those investigating the case had nevertheless found the accusations to be substantiated and supported by evidence. Instead, these NPRM supporters often spoke interchangeably about the falsity of SH-GBV accusations and the bias of those investigating the accusations, bias which these commenters alleged had significantly impacted the outcome of the case.[12] For instance, one parent complained that: "The adjudicator did not ask the questions my son submitted. The adjudicator was judge and jury. The adjudicator had pre-determined my son guilty."[13] Thus, these comments appear to conflate—without explanation as to why they do so—victim-survivors' accusations with the investigations' conclusions and to view any investigator's conclusion that a victim-survivor's accusation is true as automatic evidence of the investigator's bias.

Commenters in support of the NPRM were also very concerned about the impact that being investigated for committing SH-GBV had—usually on their sons.  Several parents of accused students discussed their sons' emotional struggles, although their comments do not give specific examples of school mistreatment leading to those struggles, and they imply that these struggles occurred regardless of the investigation's outcome:

> In spite of the favorable outcome, my son has been devastated by the entire process. He chose not to go back to the school and today (three years later) he can not bring himself to leave the house. He has cut himself off from all social interaction for fear of being unjustly accused of any misdeed based on this experience.[14]

> His reputation was destroyed, with false information passed on to future campuses through unofficial means . . . Vindicated in the courts but he was so vilified by public opinion he still has to live like a fugitive to avoid reliving the nightmare of an allegation is all it takes to ruin one's life.[15]

> The heartbreak, emotional devastation, crushed hopes, and persistent fear of being slandered and shamed is a pervasive shadow that follows my son and our family with

---

[12] See Student, Comment ED-2018-OCR-0064-6140 (Jan. 5, 2019); Parent, Comment ED-2018-OCR-0064-8639 (Jan. 26, 2019); Parent, Comment ED-2018-OCR-0064-11725 (Jan. 29, 2019); Parent, Comment ED-2018-OCR-0064-31978 (Jan. 30, 2019).

[13] Parent, Comment ED-2018-OCR-0064-11725 (Jan. 29, 2019).

[14] Parent, Comment ED-2018-OCR-0064-8639 (Jan. 26, 2019).

[15] Individual, Comment ED-2018-OCR-0064-104807 (Jan. 29, 2019).

Exhibit J

every breath we take. It is the main reason that I am scared to comment even now. I am deathly afraid to say which college my son attended.[16]

Some parents stated that schools providing support for accused students would make a difference, although whether the "support" contemplated was emotional or oriented towards defending the accused student against SH-GBV allegations was often unclear. For instance, a parent stated that: "There were little to no support [sic] … after the accusations. The staff rallied around the accuser and immediately treated [redacted] as if he were guilty. There was no mindset of 'innocent until proven guilty.' . . . The lack of support led to the trauma he experienced and still experiences. He has felt unheard and unimportant."[17]

This parent's comment touched on another variation of the central theme of NPRM-supporters' comments (that SH-GBV investigations belong in the criminal legal system, not in schools): that schools should respond to SH-GBV in a manner as close to how the criminal system responds to SH-GBV as possible. Many NPRM-supporting comments thus argued that the proposals "fixed" pre-NPRM Title IX procedures that were tipped too heavily in favor of accusers, including by: (1) requiring schools to conduct live hearings with cross-examination, (2) pushing schools to adopt quasi-criminal standards of proof, and (3) providing those accused of committing SH-GBV with the "due process" rights of criminal defendants.[18] As noted at the end of this section, these comments did not address the long- and widely-held view that imitating criminal procedures is not only inappropriate under Title IX and similar civil rights laws, but would actually violate Title IX itself.

With regard to live hearings and cross-examination, several commenters—again dominated by parents of accused students—asserted that such criminal trial elements are "critical to a fair hearing."[19] One parent stated that her son was falsely accused of sexual misconduct and that the school's live hearing was necessary because denying a live hearing "denies the right of the accused to be heard."[20] Another argued that cross-examination is integral to gathering all of the facts and determining the honesty of parties.[21] Many of these commenters shared the sentiment that without these standard trial elements, there is no "due process."[22]

Although live hearings and cross-examination can occur in civil legal system trials as well as criminal ones, the references by this group of commenters to due process rights, "not guilty" findings, and other criminal-trial-related procedural rules, such as exculpatory evidence disclosure requirements, make clear that they are referencing criminal procedures, not civil ones. For example, one parent stated:

> The failure to allow cross-examination by his lawyer, and particularly, the outright dismissal of exculpatory evidence by the Title IX investigators was an egregious violation of his due process rights . . .

---

[16] Parent, Comment ED-2018-OCR-0064-11725 (Jan. 29, 2019).
[17] Parent, Comment ED-2018-OCR-0064-32065 (Jan. 29, 2019).
[18] *See* Parent, Comment ED-2018-OCR-0064-31101 (Jan. 30, 2019); Parent, Comment ED-2018-OCR-0064-8639 (Jan. 26, 2019); Individual, Comment ED-2018-OCR-0064-31206 (Jan. 30, 2019).
[19] Parent, Comment ED-2018-OCR-0064-10613 (Jan. 28, 2019).
[20] Parent, Comment ED-2018-OCR-0064-10719 (Jan. 28, 2019).
[21] Parent, Comment ED-2018-OCR-0064-11072 (Jan. 29, 2019).
[22] Parent, Comment ED-2018-OCR-0064-12005 (Jan. 30, 2019).

11

Exhibit J

> Had my son been tried in an authentic court of law in the US, I have not the slightest
> doubt that all of the exculpatory evidence available - and presented to the Title IX
> investigators - would have guaranteed his swiftly being found not guilty.[23]

A similar reference point can be seen in comments supporting how the NPRM pushed schools to adopt the quasi-criminal "clear and convincing evidence" standard of proof in investigating SH-GBV reports instead of the standard required by at least three previous administrations from both political parties (i.e., the Obama, George W. Bush, and Clinton  administrations): the preponderance of the evidence. [24] First, many commenters referred to the evidentiary standard when supporting the NPRM's adoption of a "presumption of innocence," which is another way of identifying the criminal evidentiary standard of "beyond a reasonable doubt"—a standard which puts an even heavier burden on the victim than the "clear and convincing evidence" standard that the DeVos NPRM purports to support. These commentors often took the stance that in their situation, the accused party was "presumed guilty,"[25] and explicitly referenced criminal legal standards: "Imagine if our criminal justice system operated that way… without the presumption of innocence and without due process."[26]

NPRM-supporters also urged that a clear and convincing evidence standard would avoid the "grave damage that would be done" to the accused's life.[27] One further suggested that the preponderance *had already* done great harm to respondents, but did not provide any actual examples of such harm.[28] These comments also did not address how the quasi-criminal "clear and convincing evidence" standard was appropriate for a civil rights law, or how it compared to the preponderance standard, which is used in enforcing other civil rights statutes.

Although they did not explicitly support the NPRM, another group of commenters' views were consistent with NPRM-supporters' views because they insisted that all SH-GBV reports should be dealt with by criminal law enforcement, not by schools. Instead of seeking to import criminal law-based concepts into Title IX enforcement as NPRM-supporters did, these commenters took the position that investigating campus SH-GBV is beyond the scope of school administrators,[29] who lack proper

---

[23] Parent, Comment ED-2018-OCR-0064-17945 (Jan. 30, 2019). The exculpatory evidence rule comes from *Brady v. Maryland*, 373 U.S. 83 (1963), which requires *prosecutors* in *criminal* court to disclose material evidence tending to prove a defendant's innocence, to the defendant. As this indicates, the *Brady* rule applies only to criminal cases and therefore is inapplicable to civil rights and administrative proceedings such as those which would occur under Title IX and be governed by ED's regulations.

[24] Other themes regarding procedures and standards included that the accused should have access to supportive measures and advisors, the accused should be able to cross examine the accuser, and that the collection of evidence should be done more thoroughly and uniformly. *See* Parent, Comment ED-2018-OCR-0064-11725 (Jan. 29, 2019); Parent, Comment ED-2018-OCR-0064-8639 (Jan. 26, 2019); Parent, Comment ED-2018-OCR-0064-32065 (Jan. 29, 2019); Parent, Comment ED-2018-OCR-0064-10875 (Jan. 28, 2019); Parent, Comment ED-2018-OCR-0064-31978 (Jan. 30, 2019).

[25] *See* Parent, Comment ED-2018-OCR-0064-11725 (Jan. 29, 2019); Student, Comment ED-2018-OCR-0064-6140 (Jan. 5, 2019); Parent, Comment ED-2018-OCR-0064-8639 (Jan. 26, 2019); Parent, Comment ED-2018-OCR-0064-32065 (Jan. 29, 2019); Individual, Comment ED-2018-OCR-0064-104807 (Jan. 29, 2019); Parent, Comment ED-2018-OCR-0064-10875 (Jan. 28, 2019).

[26] Individual, Comment ED-2018-OCR-0064-31206 (Jan. 30, 2019).

[27] Parent, Comment ED-2018-OCR-0064-9037 (Jan. 21, 2019); Individual, Comment ED-2018-OCR-0064-6983 (Jan. 20, 2019). Parent, Comment ED-2018-OCR-0064-9422 (Dec. 2, 2018).  Student, Comment ED-2018-OCR-0064-10490 (Jan. 28, 2019).

[28] Academic, Comment ED-2018-OCR-0064-0409 (Nov. 30, 2018).

[29] *See* Individual, Comment ED-2018-OCR-0064-7961 (Jan. 24, 2019).

Exhibit J

qualifications and training to handle sexual misconduct claims.[30]

In engaging in this comparison, many of these commenters seemed to assume that police and prosecutors would handle SH-GBV reports better than school officials. For instance, one commenter stated: "Campus administrators and coordinators are not qualified to do the work of the police department."[31] Others objected that schools do not have enough authority to properly conduct an investigation and therefore should focus on helping students report to police.[32] Still others expressed concern that schools cover up and keep reports from reaching law enforcement in order to protect the school's reputation,[33] asserting that reporting to law enforcement will prevent universities from dismissing claims without accountability, "allow[ing] schools and churches to hide from justice."[34] Finally, several commenters working on or with campuses argued that campuses are failing to serve accused harassers and student victims alike:

> The perpetrator gets the message that it's a disciplinary matter--that they have behaved badly and will be punished—child and parent type stuff. What they need to learn is that it's a felony and in the world outside their parents' home where they will live the rest of their lives, felonies carry serious consequences like prison sentences . . .  And [the victims] need to know that the authorities--on and off campus--take what happened seriously and that they will seek legal remedies to secure justice.[35]

As demonstrated by this quote, many of the comments in this group expressed high levels of confidence in law enforcement to handle SH-GBV properly and well, but neither provided actual evidence of such competence nor countered ample evidence of criminal law enforcement's mistreatment of SH-GBV victims. These assumptions contrasted starkly with the thirty-percent of NPRM-opposers' comments that cited to research, including studies showing law enforcement failures in responding to SH-GBV reports.[36]

A similar common omission from DeVos NPRM-supporters' comments was any acknowledgement of Title IX's purpose and the fact that Title IX, as interpreted by both courts and ED, has for decades required schools receiving federal funds to prevent and remedy SH-GBV. Even commenters who neither supported nor opposed the NPRM often did not acknowledge this legal fact. They instead urged ED to require schools to outsource all SH-GBV reports to criminal law enforcement, actions that schools cannot take and still comply with Title IX.[37] Likewise, NPRM-supporting comments did not attempt to show how the NPRM's importing criminal procedures into Title IX would help and not hinder schools' compliance with their civil rights law-based obligations to prevent and remedy discrimination against

---

[30] Individual, Comment ED-2018-OCR-0064-11610 (Jan. 29, 2019).

[31] Individual, Comment ED-2018-OCR-0064-11610 (Jan. 29, 2019).

[32] Individual, Comment ED-2018-OCR-0064-11669 (Jan. 29, 2019).

[33] Former Professor and Assistant District Attorney, Comment ED-2018-OCR-0064-12008 (Jan. 30, 2019); Teacher, Comment ED-2018-OCR-0064-0033 (Nov. 29, 2018).

[34] Individual, Comment ED-2018-OCR-0064-6185 (Jan. 7, 2019).

[35] Teacher, Comment ED-2018-OCR-0064-0033 (Nov. 29, 2018).

[36] *E.g.,* Individual, Comment ED-2018-OCR-0064-1035 (Dec. 3, 2018) ("Did you know that 69% of survivors reported police officers discouraged them from filing a report and one-third of survivors had police refuse to take their reports? (Campbell, 2005). This is unacceptable!")

[37] Student, Comment ED-2018-OCR-0064-0755 (Dec. 2, 2018) (attaching article by Nancy Chi Cantalupo, *For the Title IX Civil Rights Movement: Congratulations & Cautions*, 125 YALE L.J. F. 281 (2016), which makes this point at pp. 291-296).

13

their students in the form of SH-GBV. This lack of evidence differs sharply from the comments filed by those who opposed the NPRM, to which this report now turns.

### C. Themes in DeVos NPRM-Opposers' Comments

Because the number of comments that opposed the DeVos NPRM was over 135 times the number of comments that supported the NPRM (114,817 / 853), NPRM-opposers' comments addressed more, as well as more diverse, themes. The following discussion is therefore organized into several thematic categories, including commenters' opposition to how the NPRM's proposed rules would: (1) reduce the scope of Title IX so as to protect many fewer students; (2) change the manner in which some federal-funding recipients were required to investigate and resolve reports of SH-GBV using their internal disciplinary systems; (3) reduce the obligations of federal-funding recipients to provide accommodations or supportive, protective, and/or interim measures to students who experience SH-GBV; (4) allow religious schools to claim an exemption from Title IX after a student or other interested party files a Title IX complaint against the school; and (5) increase and exacerbate discrimination and inequality for K-12 students and student populations that experience intersectional disadvantages based on race, lesser access to economic or other resources, having a disability, being LGTBQIA, etc.

#### i.   Reducing the Scope of Title IX protections from SH-GBV

Many of those who opposed the proposals announced by the DeVos NPRM expressed concerns about the ways in which they would shrink the scope of the protections from sexual harassment and gender-based violence that Title IX would provide to students. Commenters pointed in particular to two methods by which they saw the proposed rules accomplishing this task: first by allowing funding recipients not to address SH-GBV that occurred off-site, such as off-campus, in a study abroad program, and/or online; and second by adopting analytical terms and frameworks so as to narrow as much as possible the "sexual harassment" prohibited by Title IX.

##### a)   Opposing the NPRM's Proposals Regarding Off-Campus and/or Online SH-GBV

*Our rape crisis center worked with a student this past year who was sexual[ly] assaulted by a fellow student in her study abroad program. The student chose to report to local police, and after a frustrating experience with law enforcement, ultimately returned early to the US from her program. She contacted our agency when she was back in the US and she was able to report the incident to the school, and accessed supportive measures which allowed her to maintain her classwork and reintegrate from her abroad program . . . Under the new regulations, this case would no longer fall within the scope of Title IX . . . .*

-Individual[38]

During the public comment period, there were 9,495 comments written and filed by members of the public that addressed off-campus or online sexual harassment, violence, and/or misconduct.  Of the 9,495 comments written and filed, 9,432 comments (99.3%) opposed the DeVos NPRM.  The Catalog tracked 63 comments (0.7%) in support of the NPRM.

Comments that opposed the NPRM proposals relating to off-campus and/or online SH-GBV expressed concern that the NPRM proposals would fail to protect students participating in an

---

[38] Individual, Comment ED-2018-OCR-0064-10651 (Jan. 28, 2019).

14

Exhibit J

"education program or activity" (Title IX's language designating which entities must comply with the statute) if the reported SH-GBV occurred off-site (such as off-campus, in a study abroad program, and/or online). These opposers worried that the NPRM would allow schools to avoid investigating or remediating such off-site incidents despite both how common they are and how they affect students' ability to continue with and succeed (at the same level as they did prior to the SH-GBV) in their education.

For instance, a law professor expressed a common concern that the NPRM's shrinking of Title IX protections was particularly disturbing due to the amount of SH-GBV in education that occurs off-campus and/or online, noting that "The Department itself acknowledges many sexual assaults occur off campus. The Department cites a report that 41% of all rapes of students at institutions of higher education occur off campus, and observes that the proportion is even higher at smaller institutions."[39] Moreover, when considering online harassment, this commenter pointed out how arbitrary application of the NPRM proposals would likely be: "Applying the proposed limitation to cyber harassment, via emails, text messages, or social media platforms, will raise vexing issues, and may turn on fortuitous circumstances such as where the harasser was when he or she sent or posted a message, or whether the cables or any server or WIFI hub involved were on campus."[40]

Opposers expressed even greater concerns regarding the arbitrary, unfair, and harmful effects of the NPRM on all involved, especially victims of SH-GBV.  One student commenter pointed out that:

> The proposed regulation's requirement that schools only investigate conduct that occurred within an educational program misses the relevant inquiry of whether a student is deprived of an equal education because of an educational institution's failure to rectify sex-based discrimination. In fact, it fails to protect victims who are harassed or assaulted outside of an educational program but who are impacted within it.[41]

The law professor quoted above agreed, noting the implications of the DeVos NPRM's position with a hypothetical whereby "a victim who had been raped by a fellow student" off-campus would not be able to rely on Title IX's protections "even if there was compelling evidence of responsibility (e.g., the alleged assailant was arrested and facing prosecution)," and "the school knew about the sexual assault (e.g., the victim had complained to an official authorized to take corrective action, and the assailant's father was on the school board)," but "school officials had done nothing to protect or assist the victim" and ultimately "the assailant's continued presence in her classes had forced the victim to withdraw from school."[42] The rape crisis center staff member whose quote leads this section summed up the unfair and harmful results to which commenters concerned about the off-campus and online harassment limitations objected: "By excluding study abroad programs from the scope of Title IX, the regulations are doing a significant disservice to students, and is taking away resources from students when they are most vulnerable - in an unfamiliar country, far from home, and without a student's typical safety networks."[43]

---

[39] Law Professor, Comment ED-2018-OCR-0064-11751 at 2 (Jan. 29, 2019) (citing 83 Red. Reg. 61487 n. 27, 61493). This commenter also criticized the complexity of drawing such distinctions.
[40] Law Professor, Comment ED-2018-OCR-0064-11751 at 3 (Jan. 29, 2019).
[41] Student, Comment ED-2018-OCR-0064-0011 (Nov. 29, 2018).
[42] Law Professor, Comment ED-2018-OCR-0064-11751 at 1 (Jan. 29, 2019).
[43] Individual, Comment ED-2018-OCR-0064-10651 (Jan. 28, 2019).

15

Exhibit J

b)  **Opposing the NPRM's Definitions of "Sexual Harassment," "Prompt," "Responsible Employee," "Notice," "Actual Notice," and "Deliberate Indifference"**

*By narrowing the definition of "sexual harassment" with respect to Title IX, DeVos would be making it more difficult for students in schools, including K-12 schools, to be protected from sexual harassment. The proposed rules send the message that students should be forced to put up with sexual violence and that some level of sexual harassment is acceptable.*

-  Individual[44]

Commentary on changes to definitions within the regulations was almost entirely confined to opponents of the NPRM. Out of 9,195 comments mentioning this issue, 9,039, or over 98%, were in opposition to the proposed changes. These commenters argued on several fronts that the regulations thinned the definition of sexual harassment to exclude otherwise objectionable conduct, limited the number of employees who would enforce the protections of Title IX, and lowered the standards applied to schools when evaluating their responses to sexual assault and misconduct.

First and most significantly, opponents of the rule argued that the definition of sexual harassment was significantly narrowed. Previous guidance issued in 2001 defined sexual harassment as "unwelcome conduct of a sexual nature . . . includ[ing] unwelcome sexual advances, requests for sexual favors, and other verbal, nonverbal, or physical conduct of a sexual nature."[45] The new regulations raised the bar by requiring a sexual harassment claim to detail "conduct on the basis of sex that satisfies" one of three categories:

- quid pro quo sexual harassment, where "an employee of the recipient [school] conditions the provision of an aid, benefit, or service of the recipient [school] on an individual's participation in unwelcome sexual conduct,"
- hostile educational environment harassment, featuring "unwelcome conduct determined by a reasonable person to be so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the recipient[] [school's] education program or activity," or
- Clery Act violations such as stalking, sexual assault, or domestic violence.[46]

Second, NPRM-opposers made note of the change of "or" to "and" in the phrase defining the type of SH-GBV that required an institutional response: from harassment that was "sufficiently severe, persistent, *or* pervasive to limit a student's ability to participate in or benefit from an education program or activity," to conduct that is "severe, pervasive, *and* objectively offensive."[47] One anonymous commenter asserted that this double requirement renders the definition "under-inclusive" because a single rape may be "severe" but not "pervasive," and the receipt of hundreds of text messages from a stalker may be "pervasive" but not "severe."[48] This under-inclusiveness was not acceptable to many

---

[44] Individual, Comment ED-2018-OCR-0064-31639 (Jan. 30, 2019).

[45] *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties,* U.S. DEP'T OF EDUC. (Jan. 19, 2001), https://www2.ed.gov/about/offices/list/ocr/docs/shguide.html; *See also,* American Association of School Administrators, The School Superintendent's Association, Comment ED-2018-OCR-0064-7411 (Jan. 23, 2019).

[46] *See* Law Professor, Comment ED-2018-OCR-0064-11752 (Jan. 29, 2019).

[47] Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 85 Fed. Reg. 30026 (May 19, 2020).

[48] Individual, Comment ED-2018-OCR-0064-104560 (Jan. 30, 2019).

Exhibit J

commenters: one teacher commented that "One experience of harassment or violence of any kind is one too many and can derail a person from the path they were meant to walk. It can change you forever."[49] The Victim Rights Law Center discussed several harassment scenarios, including ones set forth as harassment by ED itself, in ED's previous guidance documents, as well as scenarios involving young K-12 students (e.g. a middle school student being verbally taunted repeatedly by high schools students about her breasts or genital area), which, even though quite disturbing, might not rise to the "severe and pervasive" level permitting action under the NPRM proposed rules.[50]

Commenters also took issue with changes to several critical terms in the chain of reporting and institutional response, arguing that they similarly narrowed protections and created greater risk of harm to students. Specifically, these commenters opposed the NPRM definitions of "responsible employees," "actual notice," "prompt" and "deliberate indifference."

Many opposing commenters characterized changes modifying the status and obligations of employees deemed "responsible employees" as stripping away protections from survivors by reducing the number and type of funding recipient employees who are obligated under Title IX to assist a victim who reports SH-GBV to them.[51] A survivor argued that this narrowed definition would force survivors to face "extra burden[s] of re-experiencing their trauma while reporting to an unfamiliar office instead of a trusted faculty member who can report for them."[52] The survivor stated that the mandatory report that facilitated the survivor's accessing mental health services would no longer be covered under the updated regulations.[53] Another survivor, parent, and social worker pointed out the particular problems this narrow definition presents for K-12 students: "Expecting young students to know who to go to with what concerns is unrealistic, and the fact that schools will be protected from liability if children choose the "wrong" adult to disclose sexual harassment and abuse to is egregious."[54]

Moreover, NPRM-opposers objected to how the proposed regulations raise the notice requirements for reporting SH-GBV from "constructive notice" to "actual knowledge," once again reducing the obligations of funding recipients to respond to SH-GBV by narrowing the number of school employees who must assist a survivor. For example, one commenter argued that this change would foreclose previously common pathways of reporting, such as coaches, resident advisors, or professors who happen to overhear details of sexual misconduct from the survivor or the perpetrator.[55]

Commenters also took issue with how the DeVos NPRM weakened the meaning of "prompt" by creating a carve-out whereby a funding recipient could delay an SH-GBV investigation "for good cause… [which] may include… concurrent law enforcement activity,"[56] potentially allowing extensions that effectively curtail a sufficient response by the school:

---

[49] Teacher, Comment ED-2018-OCR-0064-7464 (Jan. 23, 2019).

[50] Victim Rights Law Center, Comment ED-2018-OCR-0064-6471, (Jan. 14, 2019).

[51] Student, Comment ED-2018-OCR-0064-104745 (Jan. 29, 2019); Student, Comment ED-2018-OCR-0064-102991 (Dec. 11, 2018); Victim Advocate, Comment ED-2018-OCR-0064-11157 (Jan. 29, 2019).

[52] Survivor, Comment ED-2018-OCR-0064-10215 (Jan. 28, 2019).

[53] Survivor, Comment ED-2018-OCR-0064-10215, (Jan. 28, 2019).

[54] Survivor, Comment ED-2018-OCR-0064-6848 (Jan. 18, 2019).

[55] Victim Advocate, Comment ED-2018-OCR-0064-11157 (Jan. 29, 2019); Eleven Former Career Office of Civil Rights Employees, Comment ED-2018-OCR-0064-8911 at 6 (Jan 28, 2019).

[56] Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 83 Fed. Reg. 61462, 61472, 61497 (Nov. 29, 2018).

Exhibit J

Under the proposed rules, if there is an ongoing criminal investigation, the school would be allowed to delay its Title IX investigation for an unspecified length of time. While criminal investigations seek to punish an abuser for their conduct, Title IX investigations should seek to ensure that complainants are able to access educational opportunities that became inaccessible due to harassment. Students should not be forced to wait months or years until after a criminal investigation is completed in order to seek resolution from their schools.[57]

Finally, commenters opposed the adoption of the "deliberate indifference" standard from the Supreme Court's 1999 finding in *Davis v. Monroe County Board of Education*,[58] often objecting both to the standard itself and to its use outside of its original context: civil lawsuit for money damages against the schools. One commenter asserted that, in the context of OCR's broader powers of Title IX administrative enforcement:

Anti-discrimination law imposes the obligation on those it regulates not to discriminate. It is not enough to hold them responsible only when they engage in egregious institutional misconduct. The deliberate indifference standard must be abandoned and the Department must affirm its commitment to robust nondiscrimination in federally funded educational institutions.[59]

ii.  Recipient Internal Investigation and Disciplinary Systems and Procedures

Many of those who opposed the proposals announced in the NPRM expressed concerns about the ways they would impact the funding recipient's internal investigation obligations and disciplinary systems and procedures. Commenters pointed in particular to four ways in which they saw the DeVos NPRM harming survivors, educational institutions, and student rights protected under Title IX, including by: (1) re-traumatizing survivors through requiring them to undergo live hearings, mediation, and/or cross-examinations by their harassers; (2) adopting a "clear and convincing" standard of evidence; (3) making it more difficult for survivors to access supportive, protective, and/or interim measures or accommodations; and (4) allowing schools to claim broad religious exemptions from Title IX without prior written notice to ED, students, and parents.

a)  **Opposing the DeVos NPRM's Proposals Regarding Live Hearings, Mediation, and Cross-examination**

*I know how gut-wrenching it is to have to see your assaulter's face after the traumatic ordeal. I could not imagine having to endure being cross-examined by him and trying to convince a rapist that what he did was not ok.*

-  *Survivor[60]*

Of the 5,632 comments that addressed and took a position on live hearings, mediation, and cross-examination, 5,409 comments (96%) opposed the NPRM proposals. The concerns expressed most frequently by opposing commenters on this theme include those regarding how the NPRM proposals

---

[57] Healthy Women, Comment ED-2018-OCR-0064-11882 at 13 (Jan. 29, 2019).
[58] *Davis v. Monroe Cty. Bd. of Educ.,* 526 U.S. 629, 119 S.Ct. 1661 (1999).
[59] Individual, Comment ED-2018-OCR-0064-104560 (Jan. 30, 2019).
[60] Individual, Comment ED-2018-OCR-0064-1065, (Dec. 3, 2018)

Exhibit J

would lead to re-traumatization of survivors and related deterrence of victim reporting. Commenters also often discussed the impracticality and administrative burdens of the NPRM's complex standards and procedures, which they noted with disapproval imitate criminal court rules—except that they provide even fewer protections to victims than victims would get in a criminal trial—and in doing so depart from procedures used to investigate and resolve other civil rights cases as well as school student conduct procedures.

The concern about re-traumatization of survivors was shared by many commenters who opposed the proposed changes, including teachers,[61] students,[62] and parents.[63] A comment from Healthy Women, a medical-based national advocacy organization, was typical of such comments when it expressed concern that the use of live hearings and cross-examination could lead an accused's advisors, such as attorneys, to "grill the survivor about the traumatic details of the assault" given the adversarial and contentious nature of cross-examination.[64] Similarly, a survivor who pursued criminal charges for a sexual assault shared that "knowing that cross-examination was going to happen delayed my willingness to report and almost prevented me from following through with the hearing process."[65] The survivor went on to state that when being cross-examined, "fear, intimidation, and terror were [my] only feelings."[66]

Many NPRM-opposers who discussed re-traumatization cited research studies to support their comments, with two particular studies coming up frequently. First, commenters noted a 2005 report which found that women who are sexually assaulted or abused are over twice as likely to have PTSD, depression, and chronic pain following the violence as non-abused women are.[67] Second, commenters discussed research findings that approximately 40% of rape victims suffer from severe emotional distress, often requiring mental health treatment.[68] Commenters noted their acute concern, in light of such information, that the proposed procedural changes are likely to re-traumatize victims.[69]

In addition, a comment by students at Yale Law School noted the "arbitrary and capricious" nature of the distinction drawn in the NPRM that makes live cross-examination optional for elementary and secondary schools—due to the "sensitivities associated with age and developmental ability" for younger students—but mandatory for colleges. The commenters asserted that, by making this distinction, the Department itself recognized the harms of cross-examination and pointed to research about brain development continuing through college to show that similar harms to those the Department acknowledged as harming K-12 students may also affect college students.[70]

---

[61] Teacher, Comment ED-2018-OCR-0064-11673 (Jan. 29, 2019).

[62] Student, Comment ED-2018-OCR-0064-6165 (Jan. 7, 2019).

[63] Parent, Comment ED-2018-OCR-0064-0017 (Nov. 29, 2018).

[64] Healthy Women, Comment ED-2018-OCR-0064-11882 at 11 (Jan. 30, 2019).

[65] Survivor, Comment ED-2018-OCR-0064-7458 (Jan. 23, 2019).

[66] Survivor, Comment ED-2018-OCR-0064-7458 (Jan. 23, 2019).

[67] *E.g.,* Academic Advisor, Comment ED-2018-OCR-0064-2216 (Dec. 5, 2018) (citing SJ Woods, *Intimate Partner Violence and Post-Traumatic Stress Disorder Symptoms in Women: What We Know and Need to Know,* [20(4)] J. OF INTERPERSONAL VIOLENCE, 394 (2005)).

[68] *E.g.,* Academic Advisor, Comment ED-2018-OCR-0064-2216 (Dec. 5, 2018) (citing Ted R. Miller, Mark A. Cohen & Shelli B. Rossman, Victim Costs of Violent Crime and Resulting Injuries, [12(4)] HEALTH AFF. 186 (1993)).

[69] Academic Advisor, Comment ED-2018-OCR-0064-2216 (Dec. 11, 2018) ((citing Ted R. Miller, Mark A. Cohen & Shelli B. Rossman, Victim Costs of Violent Crime and Resulting Injuries, [12(4)] HEALTH AFF. 186 (1993)).

[70] 49 Yale Law School Students, Comment ED-2018-OCR-0064-31321 at 23 (Jan. 30, 2019) (citing Heidi Ledford, *Who exactly counts as an adolescent?*, NATURE (Feb. 21, 2018),

19

Exhibit J

Commenters who opposed the NPRM often linked victim re-traumatization with a tendency to chill victim reporting, as the survivor who pursued criminal charges quoted above confirmed when noting that fear of cross-examination delayed and almost kept the survivor from reporting altogether.[71] Educational institutions and Title IX Coordinators shared similar worries about the proposed changes "chilling effect on a party's willingness to report."[72] The medical-based national advocacy organization's comment elaborated on this point and explained how the NPRM was even less protective than criminal court procedures are:

> Being asked detailed, personal, and humiliating questions often rooted in gender stereotypes and rape myths that tend to blame victims for the assault they experienced would understandably discourage many students – parties and witnesses – from participating in a Title IX grievance process, chilling those who have experienced or witnessed harassment from coming forward.[73]

This organization also expressed concerns with the NPRM's allowing funding recipients to mediate SH-GBV complaints, concerns that were shared by many NPRM opposers, especially with regard to how the proposals would enable schools to pressure victims to "work things out" with their assailant as though "they share responsibility for the assault."[74] This concern was particularly acute, this commenter noted, with regard to minor students in both K-12 and higher education who could be pressured to agree to mediation without informed consent.[75]

Educational institutions expressed an additional concern that the requirements of live hearings and other standard trial elements will be a significant administrative burden for institutions[76] and proposed instead that all parties be able to submit written questions to a fact-finder such as a hearing panel as an alternative to live cross-examination.[77]  One Title IX Coordinator went on to address how live hearings and cross-examination would pressure both students and schools to engage in "a de facto arms race" in which:

> [I]f the respondent hires an attorney, we will face pressure to have an attorney serve as the complainant's advisor as well to ensure fairness . . . While [ED] seeks to alleviate the risks of re-traumatization by allowing the parties to be in separate rooms and by generally limiting questions regarding "the complainant's sexual behavior or predisposition," these measures may be inadequate because they still subject the complainant to real-time questioning by a confrontational advocate.[78]

The medical-based national advocacy organization agreed, adding that the NPRM proposals are

---

https://www.nature.com/articles/d41586-018-02169-w).

[71] Survivor, Comment ED-2018-OCR-0064-7458 (Jan. 23, 2019).

[72] Title IX Coordinator, Comment ED-2018-OCR-0064-68548 (Feb. 15, 2019).

[73] Healthy Women, Comment ED-2018-OCR-0064-11882 at 11 (Jan. 29, 2019) (citing  Sarah Zydervelt et al., *Lawyers' Strategies for Cross-Examining Rape Complainants: Have We Moved Beyond the 1950s?*, [57(1)] THE BRIT. J. OF CRIMINOLOGY 551-69 (2017)).

[74] Healthy Women, Comment ED-2018-OCR-0064-11882 at 11 (Jan. 29, 2019).

[75] Healthy Women, Comment ED-2018-OCR-0064-11882 at 11 (Jan. 29, 2019).

[76] President, Northwestern College, Comment ED-2018-OCR-0064-8538 (Jan. 25, 2019).

[77] Title IX Coordinator, Comment ED-2018-OCR-0064-68566 (Jan. 28, 2019).

[78] Title IX Coordinator, Comment ED-2018-OCR-0064-68566 (Jan. 28, 2019).

20

actually less protective than even criminal procedures:

> Nor would the proposed rules entitle the survivor to the procedural protections that witnesses have during cross-examination in the criminal court proceedings that apparently inspired this requirement; schools would not be required to apply rules of evidence or make a prosecuting attorney available to object or a judge available to rule on objections. The live cross-examination requirement would also lead to sharp inequities if one party can afford an attorney and the other cannot.[79]

In this sense, this organization's comment both objected to the harmful effects of imitating criminal court procedures and pointed out that the NPRM was not even a good or accurate imitation. Other NPRM-opposers expanded upon this analysis by pointing to the relevance that Title IX is a civil rights law, not a criminal law. For example, a law professor stated that:

> Of course, while rape is an act of sex discrimination that violates one's rights on campus, it is also a criminal act. But even though there is overlap between the responsibilities of schools and those of law enforcement, it is crucial to remember that the civil rights/criminal justice system distinction creates a different legal standard for school adjudications as compared to criminal cases.[80]

Furthermore, many commenters noted that the previous standards for Title IX proceedings are consistent with other civil rights standards in educational settings as well as with other disciplinary procedures in academic settings. While the criminal legal system has certain procedures because of the severity of punishments available,[81] educational institutions have less rigorous procedures because the worst punishment available is expulsion, a punishment of significantly less severity than incarceration.[82]

### b) Opposing the DeVos NPRM's Proposals Regarding Standards of Evidence

*The preponderance standard is used by courts in all civil rights cases. It is the only standard of proof that treats both sides equally and is consistent with Title IX's requirement that grievance procedures be "equitable." By allowing schools to use a "clear and convincing evidence" standard, the proposed rule would tilt investigations in favor of respondents and against complainants.*

*-   Healthy Women[83]*

Out of 4,432 comments addressing the standard of evidence in the proposed changes to Title IX procedures, 4,118 comments (94%) opposed the proposed changes. The concerns these commenters expressed included those relating to inconsistency with other, comparable proceedings, increased barriers to harasser accountability, and the incompatibility of the proposed standard with civil rights laws and principles.

Similar to the concerns NPRM-opposers expressed about the use of live hearings, mediation, and

---

[79] Healthy Women, Comment ED-2018-OCR-0064-11882 at 11 (Jan. 29, 2019).
[80] Law Professor, Comment ED-2018-OCR-0064-30469 at 4 (Jan. 30, 2019).
[81] Law Professor, Comment ED-2018-OCR-0064-30469 at 3 (Jan. 30, 2019).
[82] Law Professor, Comment ED-2018-OCR-0064-30469 at 3 (Jan. 30, 2019).
[83] Healthy Women, Comment ED-2018-OCR-0064-11882 at 10 (Feb. 19, 2019).

21

Exhibit J

cross examination, commenters objected that a higher standard of evidence would be inconsistent with other misconduct proceedings in educational institutions and other civil rights enforcement.[84] This inconsistency could lead to confusion for students, faculty, and staff regarding the various proceedings in these settings.[85]

Many students opposed the proposed changes and expressed concern that the possibility of higher standards of evidence would allow many perpetrators to escape accountability.[86] Several students mentioned that sexual harassment cases often involve strictly testimonial evidence because it is an offense that "occurs in the shadows by their very nature" which makes the clear and convincing standard impossible to meet in many circumstances.[87] Thus, an inappropriately high evidentiary standard could allow people who have committed SH-GBV to escape culpability. The Student Union Assembly of University of California Santa Cruz wrote:

> The UCSC Student Union Assembly strongly supports the application of a "preponderance of evidence" standard in cases of sexual assault which maintains an environment where the testimony of both parties is given appropriate weight. The use of the clear and convincing standard in these investigations is wholly inappropriate as it tips the scales against and places an undue burden on the survivor, poorly accounts for the nature of these cases, and can elicit a culture of disbelief.[88]

Several educational institutions noted practical issues as well.  Namely, that because of the proposed rule change, the standard of evidence applied to student complaints may conflict with the standards of evidence in existing contracts for employees:

> The proposed rule appears to offer institutions flexibility, but it will in practice be difficult, if not impossible, for some institutions to use a "preponderance of the evidence" standard under the proposed regulations due to pre-existing faculty contracts or conflicts that could exist with state laws. While we recognize that some institutions may choose to adopt a "clear and convincing" standard, we believe they should be provided a real choice.[89]

The law professor quoted above pointed to the legal basis for the standard of evidence, stating in her comment that Title IX is a civil rights statute and thus the correct evidentiary standard is preponderance of the evidence.[90] She noted that deviating from the preponderance of the evidence standard would be "contrary to well-established civil rights jurisprudence." A teacher also distinguished criminal from school sanctions, stating that the preponderance of the evidence standard is appropriate for the school environment where criminal sanctions such as jail time are not available.[91] This teacher

---

[84] Law Professor, Comment ED-2018-OCR-0064-31987 (Jan. 30, 2019) (attaching manuscript of article by Nancy Chi Cantalupo, *And Even More of Us Are Brave: Intersectionality & Sexual Harassment of Women Students of Color*, 42 HARV. J.L. & GENDER 1 (2019), pp. 5-6, 8, 13-14, 69-72).

[85] *E.g.*, Student, Comment ED-2018-OCR-0064-11114 at 14 (Jan. 30, 2019).

[86] Student, Comment ED-2018-OCR-0064-9410 (Jan. 27, 2019).

[87] Student, Comment ED-2018-OCR-0064-9391 (Jan. 27, 2019).

[88] Student Union Assembly of University of California Santa Cruz, Comment ED-2018-OCR-0064-9065 (Jan. 30, 2019)

[89] President, Northwestern College, Comment ED-2018-OCR-0064-8538 (Jan. 25, 2019).

[90] President, Northwestern College, Comment ED-2018-OCR-0064-8538 (Jan. 25, 2019).

[91] Teacher, Comment ED-2018-OCR-0064-11673 (Jan. 29, 2019).

Exhibit J

noted that although the harshest punishment available in schools is expulsion, it is used in only about 13-30% cases in which fault is found.[92] Finally, a White Paper signed by 115 law professors agreed with such points and articulated numerous additional reasons why the preponderance standard is the appropriate standard for Title IX proceedings.[93]

The medical-based national advocacy organization questioned the reasoning for the proposed option of a higher standard of evidence:

The Department's decision to allow schools to impose a more burdensome standard in sexual assault cases than in any other student misconduct case appears to rely on the unspoken stereotype and assumption that survivors (who are mostly women) are more likely to lie about sexual assault than students who report physical assault, plagiarism or other school disciplinary violations. There is no basis for that sexist belief and in fact men and boys are far more likely to be victims of sexual assault than to be falsely accused of sexual assault.[94]

iii.  Opposing the DeVos NPRM's Proposals Regarding Supportive, Protective, and Interim Measures or Accommodations

*For a survivor of sexual assault, having to interact with the person who assaulted them can cause severe psychological distress, as well as a range of other adverse health effects.*

-Teacher[95]

During the public comment period, members of the public submitted 5,460 comments that addressed supportive, protective, and/or interim measures or accommodations. Of the 5,460 comments written and filed, 5,355 comments (98.1%) opposed the NPRM's proposals.

Some of these commenters focused on how the proposed rules would make it more difficult for survivors to access such measures, which are key supports allowing survivors to continue pursuing their educational aspirations without the harm that can come from additional conflict or interaction with the reported harasser. As one student noted, "Revoking the ability of students to request the removal of their assaulter from their courses and dorms expedites decline in victim's abilities to perform both in and out of school."[96] These commenters criticized how the NPRM would force students to file a formal complaint in order to access supportive measures. For instance, an employee at an academic medical center stated:

Survivors will only be able to access supportive measures such as changes in housing, class schedules, extensions on assignments or extended time on tests if they formally

---

[92] Teacher, Comment ED-2018-OCR-0064-11673 (Jan. 29, 2019) (citing Tyler Kingkade, *Fewer Than One-Third of Campus Sexual Assault Cases Result in Expulsion,* THE HUFFINGTON POST (Dec. 6, 2017), https://www.huffpost.com/entry/campus-sexual-assault_n_5888742).

[93] *E.g.,* National Center for Lesbian Rights, Comment ED-2018-OCR-0064-102845 (Jan. 30, 2019).

[94] Healthy Women, Comment ED-2018-OCR-0064-11882 at 10 (Jan. 29, 2019) (citing Tyler Kingkade, *Males Are More Likely to Suffer Sexual Assault Than to Be Falsely Accused of It,* HUFFINGTON POST (Dec. 8, 2014) [last updated Oct. 16, 2015], https://www.huffingtonpost.com/2014/12/08/false-rape-accusations_n_6290380.html).

[95] Teacher, Comment ED-2018-OCR-0064-11673 (Jan. 29, 2019).

[96] Student, Comment ED-2018-OCR-0064-2822 (Dec. 6, 2018).

Exhibit J

report to the Title IX Coordinator…Given that 90-98% of reported cases of sexual assault are not false (Lisak, 2010), it would not be imprudent to offer these interim support measures to survivors who do not formally report.[97]

Other commenters, particularly educational institutions, objected to the way in which the NPRM's proposals made the parameters for offering supportive measures less clear. These commenters asked for clearer guidance on how to proceed when, for example, class schedules or living arrangements create more difficult and/or dangerous situations for survivors, or how to clearly separate supportive and/or interim measures from corrective measures so that they are not perceived as disciplinary or punitive measures against accused harassers. The National Women's Law Center ("NWLC"), for example, addressed the DeVos NPRM's "non-responsibility presumption," which ED said it proposed to ensure impartiality by the funding recipient until a determination is made. NWLC expressed concern that "[t]he presumption of non-responsibility may [instead] discourage schools from providing crucial supportive measures to complainants, in order to avoid being perceived as punishing respondents.[98]

Commenters were also concerned that ED's proposed rules' lack of clarity regarding when schools are required to provide supportive and/or interim measures or accommodations would deprive many survivors of the option to pursue cases concurrently through their school and via law enforcement. A national advocacy organization urged  ED to clarify that "recipients are required to provide survivors with supportive measures while criminal and school investigations are ongoing."[99] A similar organization concurred, providing examples of schools that had actually "abdicate[d] their obligations to provide survivors with supportive measures,[100] including the following:

> In a North Central High School in rural Indiana, the principal told one girl's family they would wait until the criminal investigation was done "to determine our course of action."[101]

> At another school in Bucks County, Pennsylvania, the school refused to issue a no-contact order to the respondent because he had not been criminally convicted, despite the school's legal obligation to conduct its own investigation.[102]

A third national advocacy organization stated that the NPRM could cause schools to feel "constrained from transferring a named harasser to another class or dorm because it would 'unreasonably burden' him, thereby forcing a survivor to change all of her own class and housing assignments in order to avoid her harasser."[103] The Association for Student Conduct Administration ("ASCA") expressed the common view that "effective interim measures, including…actions restricting

---

[97] Individual, Comment ED-2018-OCR-0064-10191 (Jan. 28, 2019).

[98] National Women's Law Center, Comment ED-2018-OCR-0064-30297 at 37 (Jan. 30, 2019).

[99] National Women's Law Center, Comment ED-2018-OCR-0064-30297 at 37 (Jan. 30, 2019).

[100] Know Your IX, Comment ED-2018-OCR-0064-32105 at 47 (Jan. 30, 2019).

[101] Know Your IX, Comment ED-2018-OCR-0064-32105 at 47 (Jan. 30, 2019) (citing Tyler Kingkade, *High Schools Are Failing Girls Who Report Sexual Assault*, HUFFINGTON POST (Mar. 17, 2016), https://www.huffingtonpost.com/entry/high-schools-sexual-assault-investigations_us_56e05a06e4b065e2e3d45f6f).

[102] Know Your IX, Comment ED-2018-OCR-0064-32105 at 47 (Jan. 30, 2019) (citing Rebecca Grant, *After Reporting Her Rape, a Teen Girl Says She Was Pushed Out of High School*, BROADLY (Nov. 22, 2017, 1:30pm), https://broadly.vice.com/en_us/article/gyj7y7/after-reporting-her-rape-a-teen-girl-saysshe-was-pushed-out-of-high-school).

[103] Healthy Women, Comment ED-2018-OCR-0064-11882 at 12 (Jan. 30, 2019).

Exhibit J

the accused, should be offered and used while cases are being resolved, as well as without a formal complaint."[104]

### iv.    Opposing Religious Exemptions from Title IX Without Prior Written Notice

*It is difficult to conceive of a religious tenet that is inconsistent with prohibiting sexual assault and other forms of sexual harassment. At the very least, it is certainly reasonable to require an educational institution to identify how adopting and enforcing policies against sexual assault and other forms of sexual harassment is in conflict with specific religious tenets.*

*- American Association of University Professors[105]*

Many commentors addressed a specific provision of the proposed changes that would allow religious schools to claim an exemption to Title IX, without prior written notice, after a Title IX complaint has been filed against the school, thus removing the previous requirement that a school make a written request to the Department of Education for a religious exemption prior to any such complaint being filed. An overwhelming majority of these commentors opposed this new provision, with 2,825 comments out of the 2,919 comments (97%) that addressed the religious exemption provision opposing the change.

These NPRM-opposers noted two specific harms that could result from the proposed changes: first that the exemption is so broad as to eliminate the need for religious schools to comply with Title IX at all, and second that the lack of pre-registration or public disclosure of religious exemption status would blind-side survivors whose schools suddenly claimed exemption after the survivor had been harmed.[106] Students[107] and concerned parents objected to the lack of procedural requirements for schools claiming a religious exemption, protesting that such an exemption would be ripe for abuse by educational institutions,[108] and emphasizing the negative effects of such exemptions on students at that institution:

Under the proposed rules, schools would be able to claim a religious exemption from Title IX, a civil rights statute, at any time. Even if a school has never indicated that it qualifies for a religious exemption, it can once it is under investigation for violating Title IX claim that it has no obligation to follow the law. This, obviously, does not give students notice of their school's intent not to protect their civil rights under Title IX, and is particularly harmful to women, LGBTQ students, and married or unmarried pregnant

---

[104] Healthy Women, Comment ED-2018-OCR-0064-11882 at 12 (Jan.20, 2019) (citing Association for Student Conduct Administration, *ASCA 2014 White Paper: Student Conduct Administration & Title IX: Gold Standard Practices for Resolution of Allegations of Sexual Misconduct on College Campuses* (2014), https://www.theasca.org/Files/Publications/ASCA%202014%20White%20Paper.pdf).

[105] American Association of University Professors, Comment ED-2018-OCR-0064-10227 (Jan. 28, 2018).

[106] American Civil Liberties Union (ACLU), Comment ED-2018-OCR-0064-17939 (Jan. 30, 2019); Academic/Think Tank, ED-2018-OCR-0064-0821 (Dec. 2, 2018); National Council of Jewish Women, Comment ED-2018-OCR-0064-105088 at 3 (Jan. 24, 2019) (stating that "This rule states that even if a school receives a religious exemption, they do not have to disclose the fact that they are claiming exemption to students before they engage in discriminatory actions. Schools can claim a religious exemption after the fact to shield themselves from a Title IX violation investigation allowing them to discriminate without any liability.")

[107] Student, Comment ED-2018-OCR-0064-0492, (Dec. 6, 2018).

[108] Student, Comment ED-2018-OCR-0064-0659 (Dec. 6, 2018).

and parenting students.[109]

Elected officials, such as the Women's Caucus of the New York City Council,[110] agreed with such concerns, pointing out that the considered changes would allow some schools to ignore students who report sexual misconduct on a large scale. Faith-based organizations added objections related to the effects of such an exemption on the role of religion and its interaction with law:

> This subsection of the proposed rule is particularly degrading to all faith-based institutions and organizations — religion is not a "get out of jail free" card. As a faith-based organizations, we cannot allow schools to hide behind religion to simply decrease liability and obligation to students. This trivializes the role of religion [in] people's lives throughout the country and disrespectfully manipulates religion as political leverage.[111]

Such opposers often referenced the longstanding and fundamental American philosophy of separation of church and state, arguing that the proposed changes would practice favoritism for religious beliefs over other moral beliefs.[112] Moreover, these commenters objected, permitting religious exemptions to Title IX in the manner of the proposed rules elevates the right to religion over simple protection and causes it to conflict with the laws of the country.[113]

  v.  Disparate Impacts on Certain Student Populations

Many of those who opposed the proposals announced in the DeVos NPRM expressed concerns about the ways they would disparately impact certain student populations. Commenters pointed in particular to two methods by which they saw the NPRM increasing and exacerbating discrimination and inequality for particular student populations. First, the NPRM's proposals require K-12 schools to adopt rules that are not only not tailored to meet the needs of our education systems' youngest and often most vulnerable populations but, in many instances, would be unworkable. Second, the NPRM's proposed rules have an especially discriminatory and disproportionate impact on multiply-minoritized students, such as students of color, LGBTQIA+ students, low-income students, and student with disabilities.

  a)  **Opposing the NPRM's Impacts on K-12 Students**

*While behaviors at this point may well not have the same motivation, however, the seriousness of possible incidents should in no way be minimized. As such, the framework and responsibilities might change, but the need to address children at these ages is just as important, if not more so.*

- High School Teacher[114]

---

[109] Parent, Comment ED-2018-OCR-0064-0019, (Nov. 29, 2018).

[110] Women's Caucus of New York City Council, Comment ED-2018-OCR-0064-104720 (Jan. 30, 2019).

[111] National Council of Jewish Women, Comment ED-2018-OCR-0064-105088 at 3 (April 2, 2019).

[112] *E.g.,* Americans United for Separation of Church and State, Comment ED-2018-OCR-0064-31976 (Jan. 30, 2019); Student, Comment ED-2018-OCR-0064-18423, (Jan. 30, 2019); Teacher, Comment ED-2018-OCR-0064-5184 (Dec. 8, 2018).

[113] *E.g.,* Teacher, Comment ED-2018-OCR-0064-9022 (Jan. 16, 2019).

[114] Teacher, Comment ED-2018-OCR-0064-0928 (Dec. 3, 2018).

26

Although the DeVos NPRM stated that "[t]he proposed rule would apply to all recipients of federal financial assistance, including … elementary and secondary schools," it explicitly sought comments on the applicability of the proposed rules to K-12 schools and where the rules might be "unworkable."[115] Many commenters answered this call and overwhelmingly expressed concerns about the harmful effects of both SH-GBV and the NPRM's proposals on children and teenagers. The vast majority of comments on this topic opposed the proposed regulations: 2,148 of 2,164 comments (99%).

Many K-12 teachers, child advocates, and other community members cited statistics about the prevalence of sexual harassment reported by elementary and secondary school students, emphasizing the need for strong Title IX protections for youth. A children's advocacy center explained that the negative effects of childhood sexual abuse are "wide-reaching and long-lasting," and abuse in childhood has been linked to behavioral and mental issues, as well as increased suicidal ideation.[116] Another organization stated that:

> We are very concerned with several sections of the proposed rules which would decrease protections for adolescent girls. Statistics indicate that nearly 1 in 5 girls between the ages of 14 and 17 have been victims of sexual assault or attempted sexual assault. While it is not clear how many of these assaults were perpetrated by fellow students or in school, there were at least 17,000 official reports of sexual assaults of K-12 students by their peers between 2011 and 2015. In a survey of 1,965 middle and high school students, it was found that between 2010-11, 56% of girls experienced sexual harassment in school.[117]

NPRM-opposers who offered up these statistics often shared a particular concern: that the proposed rule would lead to underreporting of sexual abuse in K-12 educational programs, especially because fewer school employees would be required to report sexual misconduct. These commenters echoed the points made by commenters who objected to the narrowing and limiting effects of the definitions of "sexual harassment," "responsible employee," etc., as well as the NPRM's exclusion of off-campus and online harassment from ED's Title IX enforcement sphere. For example, a national women's rights organization objected to the NPRM because:

> The proposed rules drastically narrow whom a student must tell for their harassment or assault to be investigated by the school, meaning even when students find the courage to talk to the adult school employees they trust, schools would frequently have no obligation to respond. Under the proposed rules, if a lower school age student told an adult school employee (i.e., a lunchtime or recess supervisor) that they had been inappropriately touched or sexually harassed by another student, their school would have no obligation to help them.[118]

A prevention education coordinator at a sexual assault victim advocacy center who works with middle schoolers wrote that because the proposed rule narrowed the definition of sexual harassment, students' complaints could be dismissed if their education is not in immediate jeopardy.

---

[115] Nondiscrimination on The Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 84 Fed. Reg. 61462-01, 61482 (proposed Nov. 29, 2018).

[116] Chicago Children's Advocacy Center, Comment ED-2018-OCR-0064-102975 (Jan. 29, 2019).

[117] Equality Now, Comment ED-2018-OCR-0064-11851 at 1 (Jan. 30, 2019).

[118] National Partnership for Women and Families, Comment ED-2018-OCR-0064-10646 (Jan. 28, 2019).

Exhibit J

To me, it is ludicrous that a school would be required to take action not before a student's education is in jeopardy, but only after their education is in jeopardy. Why would we want to force our schools to wait and play catch up, rather than protect its students from experiencing harassment at all? . . . According to the AAUW Educational Foundation (2011), approximately one third of 7th-12th graders who experienced sexual harassment did not want to go to school as a result of the harassment. If students are not allowed to report sexual harassment when it begins, there is a chance that by the time the sexual harassment has met the criteria of being so severe and pervasive, as outlined in the proposed rule, that they are no longer even attending school to actually make a report.[119]

One mother wrote that after her 15-year-old daughter had been sexually harassed at her high school, her daughter confided in a trusted teacher with whom she felt comfortable sharing the traumatizing information. The mother wrote that the proposed rule would not have allowed the teacher to take action and would have "instead required my daughter to go to an unfamiliar administrator with deeply personal information. Not only does this place an unreasonable burden on the victims, but it severely impacts and lessens the reporting that will occur, allowing more perpetrators to escape consequences and continue harassing victims."[120]

With regard to off-campus and online harassment, the New York State Coalition Against Sexual Assault wrote that, for instance, if a middle school student experienced sexual harassment on social media outside of school hours, their school would be forced to dismiss the complaint "even if the harassment severely impacts the student's ability to participate in or benefit from educational programs or activities."[121]

### b) Opposing the NPRM's Exacerbation of Intersectional Discrimination and Related Inequalities

*DeVos and Marcus are trying to impose new regulations and standards on students who experience sexual harassment or assault, a burden that would fall disproportionately on girls, women, LGBTQ students, students of color, pregnant and parenting students, and students with disabilities. These are exactly the types of discrimination that Title IX and other civil rights laws were created to prohibit. These proposed rules would effectively transform Title IX from a law that protects students into one that shields schools and perpetrators from accountability.*

*- Individual[122]*

Many comments discussed the ways the NPRM would exacerbate other, additional inequalities, as well as intersectional discrimination, faced by certain students. Catalogers did not identify comments that mention discrimination or these communities specifically, so there is no exact number of how many comments discussed these topics. However, some catalogers did independently identify these comments and many large organizations and academic institutions discussed these topics in their comments.

---

[119] Victim Advocacy Center Coordinator, Comment ED-2018-OCR-0064-30389 (Jan. 30, 2019).

[120] Parent, Comment ED-2018-OCR-0064-10206 (Jan. 28, 2019).

[121] New York State Coalition Against Sexual Assault, Comment ED-2018-OCR-0064-104607 at 4 (Jan. 30, 2019).

[122] Individual, Comment ED-2018-OCR-0064-11243 (Jan. 29, 2019).

Like with the commenters who focused on K-12 education, these NPRM-opposers echoed the points made by commenters who objected to the narrowing and limiting effects of the definitions of "sexual harassment," "responsible employee," etc., as well as the NPRM's exclusion of off-campus and online harassment from Title IX's jurisdiction, emphasizing how the NPRM's proposed changes would be even more harmful for these multiply-discriminated-against groups. In addition, many educational institution commenters addressed the disparate impact that the quasi-criminal live hearing, cross-examination, and standard of evidence requirements proposed by the NPRM would have on multiply-marginalized students.

First, many of those comments that discussed additional inequalities and intersectional discrimination discussed the proposed provisions' disparate effects on students from marginalized communities, such as students of color, LGBTQIA+ students, low-income students, and students with disabilities. These commenters provided statistics and cited research documenting the existence of disproportionately high rates of SH-GBV in certain communities and groups, often those that face intersecting forms of discrimination. For instance, the YWCA identified the higher risk of violence that women of color face, noting that "24 percent of Latina girls, 23 percent of Native American girls, and 22 percent of Black girls are kissed or touched without their consent," that "students with disabilities are 2.9 times more likely than their peers to be sexually assaulted," and that "[m]ore than half of LGBTQ students ages 13-21 are sexually harassed at school."[123] Similarly, a comment from the National Center for Transgender Equality noted that "[t]ransgender students are among the most vulnerable to sexual harassment, sexual assault, and other forms of sex-based discrimination," quoting statistics from a 2017 survey showing that 24% of transgender students have experienced rape, 23% have experienced sexual dating violence, and 26% have experienced physical dating violence. [124]

These rates are increased even further the more intersectional identities a student has and the younger a student is:

> 78% of transgender or gender non-conforming youth are sexually harassed during grades K-12, and 12% experience other sexual violence. Those who are Native American, Black, and multi-racial experience higher rates of sexual violence than students of other races, with 58% experiencing harassment or sexual assault.[125]

Second, with regard to the changes in definitions, commenters noted that the new definition of "sexual harassment" would not account for the particular harassment faced by students of color, LGBTIA+ students, and students with disabilities.  In noting how LGBTQIA+ students experience harassment that is different from heterosexual students, the commenter explained that:

> LGBTQ+ are often subjected to harassment in the form of relentless teasing and name calling. Narrowing and limiting the definition of sexual harassment would force LGBTQ+

---

[123] Young Women's Christian Association (YWCA), Comment ED-2018-OCR-0064-18362 at 3 (Jan. 30, 2019).
[124] National Center for Transgender Equality, Comment ED-2018-OCR-0064-11557 at 3 (Jan. 28, 2019) (citing Michelle M. Johns et al., *Transgender Identity and Experiences of Violence Victimization, Substance Use, Suicide Risk, and Sexual Risk Behaviors Among High School Students—19 States and Large Urban School Districts*, 63 MORBIDITY AND MORTALITY WEEKLY REPORT 67, 69 (2017), https://www.cdc.gov/mmwr/volumes/68/wr/pdfs/mm6803a3-H.pdf).
[125] Young Women's Christian Association (YWCA), Comment ED-2018-OCR-0064-18362 at 3 (Jan. 29, 2019).

Exhibit J

to continue to endure harassment and force them to attend class in a hostile environment, in violation of Title IX, because the behavior of their tormentors would not fall within the proposed definition of harassment.[126]

Similarly, the Consortium for Citizens with Disabilities Education Task Force argued that the proposed rule would encourage or require schools to ignore sexual violence and harassment, particularly for cases affecting students with disabilities.[127]

Commenters also objected to the disparate impacts that the proposed change to the definition of "responsible employee" would have.  The new definition would require students to disclose to a smaller and more limited group of employees (in certain cases, only one employee: the Title IX Coordinator). NPRM-opposers discussed this impact on students who experience intersectional discrimination, explaining that these students will likely have fewer employees with whom they feel comfortable reporting and under the NPRM's narrow definition, those employees are less likely to be a "responsible employee." Therefore, reporting of sexual violence by intersectional populations will almost certainly decrease.  For example, LGBTQIA+ students, a student commenter noted, would have to choose between disclosing their sexuality to school staff who they do not trust, making an already traumatic experience more difficult and sometimes even dangerous for these students, or not disclosing at all.[128]

Several commenters discussed how the NPRM would exacerbate the additional barriers that students with disabilities already experience when trying to report sexual violence. A comment by the Consortium for Citizens with Disabilities Education Task Force noted that students with disabilities may be more comfortable reporting to a trusted employee, such as a teacher's aide or school psychologist, rather than a teacher or employee that they do not know.[129] These students may also rely on different methods of communication, "whether it is sign language, interpreters, or technology assisted devises."[130] The disparate impact of a change in the definition of "responsible employee" would be even greater on students who are non-verbal and cannot report what happened to them, a K-12 special education teacher explained.[131] Moreover, these nearly insurmountable barriers can turn into an absolute bar where "[t]here is an absence of procedures to communicate with survivors who are Deaf or hard of hearing and inaccessible support services for students with mobility disabilities."[132]

A special education teacher for K-12 students on the autism spectrum added the effects of poverty to the negative impacts the proposed rule would have on students:

> As a special education teacher that works in a school district with 30% of students homeless/living below the poverty line, there is a correlation with safety and their economic

---

[126] Student, Comment ED-2018-OCR-0064-103191 at 3 (Jan. 23, 2019).

[127] Consortium for Citizens with Disabilities Education Task Force, Comment ED-2018-OCR-0064-14977 at 4 (Jan. 30, 2019).

[128] Student, Comment ED-2018-OCR-0064-103191 at 2 (Jan. 24, 2019).

[129] Consortium for Citizens with Disabilities Education Task Force, Comment ED-2018-OCR-0064-14977 at 5 (Jan. 30, 2019).

[130] Consortium for Citizens with Disabilities Education Task Force, Comment ED-2018-OCR-0064-14977 at 5 (Jan. 30, 2019).

[131] Teacher, Comment ED-2018-OCR-0064-10158 (Jan. 27, 2019).

[132] Consortium for Citizens with Disabilities Education Task Force, Comment ED-2018-OCR-0064-14977 at 5 (Jan. 30, 2019) (citing Nat'l Council on Disability, NOT ON THE RADAR: SEXUAL ASSAULT OF COLLEGE STUDENTS WITH DISABILITIES, 2018, https://ncd.gov/publications/2018/not-radar-sexual-assault-college-students-disabilities).

Exhibit J

status. Many of these students come from abusive homes and have been exposed to some horrific events. I have seen bruises, inappropriate writing on their skin, cuts, and left over tape residue from when a student was hospitalized for getting into their parents' crystal meth… If this new proposed rule goes through, this could put my students into dangerous positions in and out of school.[133]

Commenters also pointed out that the change in definition of "responsible employee" would have negative effects on men and boys, especially male survivors, who the YWCA noted "are far more likely to be victims of sexual assault than to be falsely accused of it."[134] A comment from a law school pointed out that the "responsible employee" change will likely reduce the number of men and boys who are willing to report. Because male survivors can experience additional anxiety when reporting due to potential "skepticism about their masculinity," they may not feel comfortable disclosing to an employee that they do not know well and already trust.[135] This is especially true for men of color, for similar reasons as those for women of color, discussed above.[136]

Third, many comments written by schools and advocacy organizations discussed the greater negative impacts that the NPRM's "increasingly legalistic" live hearing, cross-examination, and other procedural requirements would have on students from marginalized communities.[137] In their comment, YWCA points out that the adversarial process can "reinforce racial and class-based inequities if one party can afford an attorney and the other cannot," especially with the cross-examination requirement.[138] Likewise, one university mentioned the findings of their campus climate survey, as they relate to this issue:

> [W]e heard feedback that students of color in particular may avoid reporting incidents of sexual misconduct because of a lack of trust in adjudicatory systems. Research has also shown that for students who identify as LGBTQ who experience sexual assault, the discrimination they may face surrounding those identities often makes them hesitant to seek help from police, hospitals, or other systems that are supposed to help them. As such, we are particularly concerned that the aspects of the proposed regulations that would require institutions to operate their administrative educational processes like courts of law will lead to less reporting, less use of our institutional grievance procedures, less accountability, and could disproportionally impact students who are from marginalized or minority populations.[139]

The YWCA analyzed the effect that requiring schools to presume the reported harassment did not occur would have on students of color, specifically women and girls.[140] Women and girls of color "face unfair discipline due to race and sex stereotypes," and therefore are already more likely to be punished

---

[133] Teacher, Comment ED-2018-OCR-0064-10158 (Jan. 27, 2019).

[134] Young Women's Christian Association (YWCA), Comment ED-2018-OCR-0064-18362 at 13 (Jan. 30, 2019).

[135] Dean, Rutgers Law School, Comment ED-2018-OCR-0064-18416 at 4 (Jan. 30, 2019) (citing *Men and Sexual Assault*, ASSOCIATION OF ALBERTA SEXUAL ASSAULT SERVICES, https://aasasmedia-library.s3-us-west-2.amazonaws.com/AASAS/wp-content/uploads/2015/07/Men-and-SexualAssault.pdf).

[136] Dean, Rutgers Law School, Comment ED-2018-OCR-0064-18416  at 4 (Jan. 30, 2019).

[137] President, Georgetown University, Comment ED-2018-OCR-0064-17722 at 9 (Jan. 30, 2019).

[138] Young Women's Christian Association (YWCA), Comment ED-2018-OCR-0064-18362 at 12 (Jan. 30, 2019).

[139] President, Georgetown University, Comment ED-2018-OCR-0064-17722at 9 (Jan. 30, 2019).

[140] Young Women's Christian Association (YWCA), Comment ED-2018-OCR-0064-18362 at 9-11 (Jan. 30, 2019).

31

by schools.[141] This comment cites the Department's Civil Rights Data Collection from 2013-14 and 2015-16, which both report that Black women and girls are more likely than white girls to be disciplined, suspended, and expelled, even in as young a grade as preschool.[142] "Schools are also more likely to punish Black women and girls by labeling them as the aggressor when they defend themselves against their harassers or when they respond to trauma because of stereotypes that they are 'angry' and 'aggressive.'"[143] With the presumption that the harassment did not occur, women and girls of color can be at risk of being ignored by their schools for reporting or even face discipline for reporting.

The more legalistic nature of the NPRM's quasi-criminal procedural requirements can create challenges in getting help for students with disabilities, as well, commenters explained. The Consortium for Citizens with Disabilities commented that the NPRM's live hearing and cross examination requirements would put students with disabilities at risk of further harm.[144] "It is well documented that some people with intellectual disability have trouble speaking or describing things in detail, or in proper time sequence, making adversarial proceedings tremendously unhelpful in allegations of sexual harassment, including assault."[145] This comment also mentions the issues that students with disabilities have with getting necessary accommodations for these proceedings, and the NPRM's oversight in not specifying that accommodations must be provided to students with disabilities under the ADA.[146] Finally, another commenter noted that communication issues may prevent students with disabilities from providing appropriate evidence to school officials, making it harder for them to meet the clear and convincing standard of proof.[147]

Fourth and finally, NPRM-opposers discussed the particular negative impacts on LGBTQIA+ students of the NPRM proposal allowing schools to claim a religious exemption after a Title IX complaint has been filed. One commentor perfectly sums up the primary objection with this change:

> The proposal would also allow religious schools to discriminate against LGBTQ students without notice. Students deserve to know if a school intends to deny them admission or kick them out for being LGBTQ before they apply. Schools should be transparent about their beliefs and actions.[148]

[141] Young Women's Christian Association (YWCA), Comment ED-2018-OCR-0064-18362 at 10 (Jan. 30, 2019) (citing *Let Her Learn: A Toolkit to Stop School Pushout for Girls of Color,* NAT'L WOMEN'S L. CTR., 1 (2016), https://nwlc.org/wp-content/uploads/2016/11/final_nwlc_NOVO2016Toolkit.pdf).

[142] Young Women's Christian Association (YWCA), Comment ED-2018-OCR-0064-18362 at 10 (Jan. 30, 2019) (citing U.S. Dep't of Education, Office for Civil Rights, *School Climate and Safety: Data Highlights on School Climate and Safety In Our Nation's Public Schools* (Apr. 2018), https://www2.ed.gov/about/offices/list/ocr/docs/school-climate-and-safety.pdf).

[143] Young Women's Christian Association (YWCA), Comment ED-2018-OCR-0064-18362 at 10 (Jan. 30, 2019) (citing *Unlocking Opportunity for African American Girls: A Call to Action for Educational Equity*, NAACP LEGAL DEF. & EDUC. FUND, INC. & NAT'L WOMEN'S L. CTR., 5, 18, 20, 25 (2014), https://www.naacpldf.org/wp-content/uploads/Unlocking-Opportunity-for-African-American_Girls_0_Education.pdf).

[144] Consortium for Citizens with Disabilities Education Task Force, Comment ED-2018-OCR-0064-14977at 8 (Jan. 30, 2019).

[145] Consortium for Citizens with Disabilities Education Task Force, Comment ED-2018-OCR-0064-14977at 8 (Jan. 30, 2019) (citing Joseph Shapiro, *The Sexual Assault Epidemic No One Talks About*, NPR (Jan. 8, 2018) https://www.npr.org/2018/01/08/570224090/the-sexual-assault-epidemic-no-one-talks-about).

[146] Consortium for Citizens with Disabilities Education Task Force, Comment ED-2018-OCR-0064-14977at 8 (Jan. 30, 2019).

[147] Individual, Comment ED-2018-OCR-0064-121896 (May 16, 2019).

[148] Individual, Comment ED-2018-OCR-0064-12774 (Jan. 20, 2019).

Exhibit J

**V. CONCLUSION**

> *The proposed rules would seriously undermine current protections for students, impair schools' ability to fulfill their obligations under the law, and ultimately, do not align with the Department's goals to end sex discrimination.*

- Congresswoman Ayanna Pressley[149]

The comments that were submitted in response to the DeVos NPRM expressed over and over again (at least 114,817 times) the view of over 99% of commenters that the NPRM's proposals do not support the DeVos ED's stated intention "to effectuate Title IX's prohibition against sex discrimination by requiring recipients to address sexual harassment as a form of sex discrimination in education programs or activities."[150] This report's data cataloging and analysis show that, of the 115,670 comments in which the commenter took a definitive position – in support or in opposition of the NPRM's proposals, only 853 comments – less than one percent – supported the DeVos NPRM proposals. Importantly, the opposition to the NPRM's proposals was true for every subgroup analyzed: Businesses, Educational Administrators, Educational Institutions, Local Governments, Non-Governmental Organizations, Parents, Students, State or National Governmental Agencies, Teachers or Professors, other (unspecified) organizations, and other (unspecified) individuals. This opposition also covered every major change in the NPRM's proposals, addressing the proposals' negative impacts over a myriad of diverse issues, concerns, and student populations.

Despite this massive opposition, on May 6, 2020, Secretary DeVos formalized new regulations that made only minimal changes to the NPRM's proposals. According to DeVos, who announced the issuance of the final rules on May 6, 2020, with an effective date of August 14, 2020, the final regulations are a combination of "years of wide-ranging research, careful deliberation, and critical input."[151]  The data collected by the Big Comment Catalog and summarized in this report shows little evidence that any of the three items on DeVos' list actually influenced the final regulations.  In contrast, DeVos's ED appears to have actively ignored overwhelming evidence of the public's intense and virtually unanimous antipathy to its proposed regulations.

**APPENDIX A**

Volunteer catalogers:

  Nell Aiello

  Shannon Alford

  Kelsey Aliabadi

  Samantha Alvarado

  Yolanda Alvarez

  Ma'ayan Anafi

  Nicholas Andras

---

[149] Congresswoman Ayanna Pressley, Comment ED-2018-OCR-0064-31079 (Jan. 30, 2019).

[150] Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 85 Fed. Reg. 30026 (May 19, 2020).

[151] Annie Grayer, Veronica Stracqualursi, *DeVos Finalizes Regulations That Give More Rights to Rhose Accused of Sexual Assault on College Campuses,* CNN (May 6, 2020) (quoting Betsy DeVos) https://www.cnn.com/2020/05/06/politics/education-secretary-betsy-devos-title-ix-regulations/index.html.

Exhibit J

Isabelle Aragon-Menzel
Taylor Arnett
Olivia Arriviello
Ayesha Audu
Loriann Baggett
Sara Barnes
Sabrina Basma
Melissa Battah
Kira Becker
Madeleine Behr
Claire Berman
Annika Bertelsen
David Bills
Sara Bloch
Ava Blustein
Morgan Bolin
Bram Bonink
Bonnie Braeutigam
Stephanie Bramble
Mia Brill
Sierra Brill
Dawn Broussard
Cary Brown
Victoria Brown
Kenneth Bundy
Judy Burt
Eric Butler
Emma Campbell
Madeleine Cane
Emma Cantus
Alice Cao
Kailah Carden
Johnathan Carr
Samella Carryl
Melissa Chau
Max Chiaramonte
Kathryn Clancy
Julia Colette
Ellen Collier
Eloise Concannon

Exhibit J

Tim Conley
Carolyn Corcoran
Kate Couch
Abigail Crawford
Samantha Crisanti
Katherine Crosby
Stephanie Crosby
Anna Cumming
Christina Dardis
Lydia Dasari
Lauren Dasmalchi
Jean Davis
Cara Day
Katherine Deery
Joann Delenick
Jackson Deterding
Thomas Dircks
Elaine Do
Wendy Dochterman
Molly Dorso
Katie Duke
Andrew Eaton
Kathryn Edgington
Duncan Eigg
Nina Eldredge
Mary Eldridge
Jeffrey Eppley
Julia Eritzian
Maya Erler
Brittany Escobar Solis
Jac Ewasyshyn
Madeline Farhani
Taylor Farzaneh
Tatum Federman
Lindsey Feitz
Rafael Fernandez
Olivia Ferreira
Rakael Fidis
Jesus Figueroa
Ben Fils

Exhibit J

Claire Fisher
Amanda Floray
Erika Flores
Clara Foley
Johanna Folk
Kimberly Forster
Allison Foster
Nicole Frenette
Susan Frietsche
Mariel Galvan
Jessenia Garcia-Morales
Christine Garner
Madeline Gavatorta
Emily Gemar
Katie George
Alexander Gershen
Leora Ghadoushi
Brooke Gilmore
Joshua Graham
Brittany Green
Abigail Greene
Lillian Grieco
MariaElena Gutierrez
Sophia Haane
Lynnaya Hamby
Ginger Harn
Kate Harrison
Camryn Haubner
Elisabeth Heen
Morgan Helfman
Jennie Hemingway
Kathryn Hendricks
Jennifer Henkle
Denise Herrera
Tia Hockenberry
Lauren Hogan
Sophia Hogan
Max Horvath
Nora Howe
Kristen Hu

Exhibit J

Francesca Hyde
Erin Ichimura
Ashley Ifeadike
Savannah Jacobs
Antonette Jefferson
Ejin Jeong
Katie Johansen
Laura Johnson
Grace Johnson
Emma Johnson
Sierra Johnson
Courtney Kaia
Howard Kallem
Claire Kaplan
Rachel Karden
Kayleigh Kenniff
Katelyn Kennon
Dorothy Kennon
Lisa Keshavarz
Celeste Kidd
Matt Killea
Min Jung Kim
Amy Klosterman
Maya Kneip
Almendra Kniep
Brett Kohler
Alexia Kovatsis
Greta Kramer
Angelica Kraska
Jennifer Kucak
Kate Kushner
Lindsey LaForest
Ariel Lasher
Susan Lee
Katharine Lee
Jayne Lester
Hange Liao
Heidi Lockwood
Anastajia Lopez
Samantha Maher Sheahan

Exhibit J

Melinda Manning
Susan Marine
McKenzie Martinez
Isabella Matthews
Mariah McAfee
Sue McCarthy
Hanna McCrum
Sarah McLennan
Catherine McNeel
Shay Mellor
Emily Mensing
Sana Mesiya
Areen Mesrobian
Julie Millisky
Elizabeth Mireles
Tulika Mohanti
Annamaria Morales-Kimball
Marta Morataya
Quincy Morgan
Allison Munden
Jack Murphy
Mel Neal
Eunice Neeley
Daniel Nemeth-Neumann
Jennifer Ngo
Eva Niedermeyer
Patricia Noel
Agnes Norbury
Chaneci Norman
Katherine Norton
Patrick Nyman
Timothy O'Shea
Claris Park
Alice Park
Alexander Parker
Neemi Patel
Susanna Penfield
Michelle Perez
Lindsay Peria
Stephanie Periban Palacios

Exhibit J

Hannah Perinich
Jill Perry
Helen Pham
Brian Pinder
Inna Pletukhina
Kathryn Pogin
Elizabeth Poitras
Rachel Pollan
Haley Purvis
Tiffany Quach
Kathleen Quinn
Rebecca Raskind
Katherine Rawson
Jean Reed
Claudia Ren
Kate Richey
Holly Rider-Milkovich
Susan Rimby
Garth Robillard
Michelle Rodrigues
Venessa Rodriguez
Mary Rogers
Antonio Rosales
Joanna Rosas
Cole Ross
Claire Rutstein
Lauren Ruvo
Yasmeen Saberi
Jana Sabo
Elizabeth Salomon
Cierra Sande
Madeline Sanderford
Karyn Schultz
Rachel Schumacher
Allison Seeley
Lamea "Elle" Shaaban-Magana
Natalie Shafer
Aish Shirahatti
Taite Shomo
Camille Sibel

Exhibit J

Sarah Sievers
Sarah Simmons
Anjali Singapur
Megan Smith
Bianca Solorio
Ryan Spooner
Riley Starling
Tamara Stein
Jennifer Stover
Troy Strange
Tyler Strycula
Karen Tani
John Taylor
Nina Terebessu
Reagan Tierney
Kiana Ting
Toni Tsamasfyros
JD Tschopp
Ari Tuchman
Alice Vachss
Kristina Vadas
Alexis Valenzuela
Brittany Van Ryder
Julie Walker
Sofia Warner
Sophie Warren
Eileen Weinet
Sean Weisman
Mollie Weiss
Kiana Welty
Victoria Wengler
Vicki Wengler
Catharina Westergaard
Brigid Wheeler
Tatum Wheeler
Hannah White
Rexann Whorton
Brooke Williams
Grayson Williams
Merri Wilson

Exhibit J

Hann Woodhouse

Kathryn Wotherspoon

Tallula Wray-Steigman

Micheal Wright

Madison Yates

Siriya Yuttapibool

Amy Zavadil

Mary Zelinka

Katherine Zhao

**APPENDIX B**

Available at:

https://docs.google.com/spreadsheets/d/14BqFvmExd5NgokLVU_keo0OGSD4lwdSKSWKXEZBDZjo/edit?usp=sharing

Exhibit J



**Know Your IX at Advocates for Youth**
1325 G St. NW #980
Washington, DC 20005
knowyourix.org

September 12, 2022

*Submitted via www.regulations.gov*

Dr. Miguel Cardona                          Catherine E. Lhamon
Secretary of Education                      Assistant Secretary, Office for Civil Rights
U.S. Department of Education                U.S. Department of Education
400 Maryland Ave SW                         400 Maryland Ave SW
Washington, DC 20202                        Washington, DC 20202

We write on behalf of Know Your IX, Advocates for Youth, The Every Voice Coalition, SafeBAE, and 307 students and survivors, in response to the Department of Education's Notice of Proposed Rulemaking ("NPRM"), to support many of the changes proposed by the Department, and to urge the Department to alter some of their current proposals to amend rules implementing Title IX of the Education Amendment Act of 1972.

Know Your IX is a survivor- and youth-led project of Advocates for Youth that aims to empower students to end sexual and dating violence in their schools. Know Your IX accomplishes our mission through educating college and high school students in the United States about their legal rights to safe educations free from gender-based harms; training, organizing, and supporting student survivor activists in challenging their educational institutions to address violence and discrimination; and advocating for policy change at the campus, state, and federal levels to ensure meaningful systemic action to end gender violence. Advocates for Youth partners with young people and their adult allies across the U.S. to champion youth rights to bodily autonomy and build power to transform policies, programs and systems to secure sexual health and equity for all youth.

In response to widespread violations of survivors' civil rights, Know Your IX has called upon the Department of Education to strongly enforce Title IX. In 2013, our organizing led to the Office for Civil Rights ("OCR") publishing–for the first time in history–a list of colleges and universities under investigation for sexual violence-related Title IX violations. Just one year later, the number of higher education institutions under investigation for sexual violence-related Title IX violations tripled and continued to rise during the Obama Administration. Further, OCR issued formal findings of noncompliance against several institutions — a turning point in federal Title IX enforcement. Between

Exhibit J

2013 and 2017, student organizing led the Department of Education and the White House to begin tackling the epidemic of sexual violence in education. This gave many of us hope that schools would finally begin to prioritize the safety of their students over their bottom lines and reputations. Sadly, today, we are even farther from Title IX's core commitment: to ensure students are able to learn free from violence.

At the same time, Know Your IX has vigorously supported strong procedural protections for survivors and respondents. As we have repeatedly emphasized throughout our work, disruptions in education can have lasting consequences for both survivors who are forced out of school due to sexual violence and students who are facing discipline for allegedly perpetrating violence. In 2015, Know Your IX published an open letter to university presidents across the country calling for colleges and universities to adopt key procedural protections for complainants and respondents. Know Your IX also reiterated our commitment to fair procedures for complainants and respondents in our 2017 State Policy Playbook, which outlined a series of procedural protections for both parties. And as we have written in our online Fair Process resource, "Know Your IX is committed to fighting for robust procedural protections for students on both sides of school sexual violence cases, because we believe fair process serves all parties and we seek to create a world where no student is ever unfairly denied the opportunity to learn." That is why Know Your IX rejected the Department's efforts to afford respondents special procedural rights at survivors' expense through the 2020 regulation.

We are pleased to see that the Department is working to undo many of the harmful pieces of the 2020 regulation that undermined the gains achieved by students organizing for robust enforcement of student's civil rights and a stronger Title IX rule. The current regulation shields schools from liability for violations of survivors' civil rights by adopting interpretations of Title IX that contravene the statute's text and distort Supreme Court precedent, exceeds the statutory authority of the Department, and subverts Title IX's aims of protecting individual students against sex-based harassment and eliminating sex discrimination in federally-funded programs.

In our comment, we cover the following topics: i) sex discrimination, including the proposed rules defining sex-based harassment when it takes the form of "quid pro quo" harassment, "hostile environment" harassment, sexual assault, dating violence, domestic partner violence, stalking, and intimate partner violence; ii) recipient responsibilities, including confidential and non-confidential employees, prompt and effective action, transparency and students being provided with information on their rights, how to file a formal complaint, and how to access supportive measures following an incident of violence; iii) expanding survivor support, including supportive measures at no cost to the survivor and regardless of whether an informal or formal resolution; iv) grievance procedures, including defining a reasonably prompt timeline, informal resolutions such as mediation, restorative justice, or other conflict

Exhibit J

resolution processes, presumption of the respondent's innocence, cross-examination, and the preponderance of evidence standard; v) preventing retaliation, including the definition of retaliation and restricting schools from requiring students to sign non-disclosure agreements; vii) protections for pregnant and parenting students, including expanding the definition regarding pregnant and parenting students, protection of complainants from retaliation for self-managing abortion and school discipline for self-managing abortion, and the impact of the Supreme Court's Dobbs v. Women's Health Organization on impact students' privacy rights under the Family Educational Rights and Privacy Act (FERPA); viii) protections for LGBTQI+ students, including affirming anti-LGBTQI+ discrimination as a form of discrimination under Title IX and the urgency of addressing athletics participation by the end of 2022 so that it may be finalized with this set of proposed rules by Spring 2023; ix) and lastly, religious exemptions, including the urgent need to swiftly issue proposed Title IX regulations that rescind the 2020 regulations inappropriate expansion of eligibility for religious exemptions and require transparency from schools claiming religious exemptions for Title IX.

In the process of writing our comment, Know Your IX collaborated with The Every Voice Coalition and SafeBAE, two survivor advocacy organizations empowering students to lead policy change to protect and support survivors of sexual violence. Our three organizations held listening sessions in the month of July with K-12 student survivors, college and graduate student survivors, recent alumni, and young people who have had experiences with Title IX over the past several years. Over seventy-five students and young people participated, sharing their experiences with us during the listening sessions or through a written comment form. The experiences that student survivors shared with us have informed the following recommendations in our comment, which are essential for the Department to hear before finalizing their Title IX rule.

We submit this comment in hopes that it will aid the Department in restoring Title IX to its intended purpose of protecting students' equitable access to education.

## II. Sex Discrimination

### *Definition of Sex-Based Harassment.*

We support the proposed rules defining sex-based harassment to include sexual harassment and other harassment on the basis of sex (including sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity) when this harassment takes the form of "quid pro quo harassment," "hostile environment harassment," sexual assault, dating violence, domestic violence, or stalking.[1]

---

[1] 87 Fed. Reg. at 41569 (proposed 34 C.F.R. § 106.2), 41571 (proposed 34 C.F.R. § 106.10).

Exhibit J

We encourage the Department to build on this by taking a more encompassing and informed approach to how domestic, dating, and intimate partner violence is defined. Historically, recipients have struggled to understand and respond to the dynamics of power and control which underpin intimate partner violence (IPV), defined by the Centers for Disease Control and Prevention as "abuse or aggression that occurs in a romantic relationship."[2] In defining IPV, the Department should make it clear that intimate partner violence is characterized by an individual's pattern of controlling or dominating their partner through intimidation, coercion/threats, economic abuse, emotional abuse, gaslighting, denial, and blame, isolation, physical and sexual violence, and/or abuse of social privilege. The Department should make it clear to recipients that "mutual violence" is a myth and cannot exist in instances of IPV, because one party is consistently exercising power and control over the other.[3] The Department should encourage recipients to review complaints of intimate partner violence with a lens towards patterns of power and control instead of viewing complaints as single instances of abuse.

During a listening session, one student survivor shared that they used self defense and was ultimately investigated for defending themselves after filing a Title IX report.[4] They described how a lack of analysis regarding power dynamics in intimate partnership on the part of their school's Title IX administrators contributed to further discrimination against the student: "[My school's Title IX administrators] do not care if I used self defense, or if I can prove it, they just do not look at self defense as a mitigating factor."[5] We found this same pattern to be true in our recent survey of student survivors' experiences reporting to their school. In The Cost of Reporting, several of the survivors who experienced cross-filing shared their attempts at self-defense or reactions to continuous abuse were weaponized against them.[6] One survivor indicated she was going to file a complaint for the nearly two years of abuse she had endured, and so her perpetrator preemptively filed a harassment claim against her. When she went in to talk to the Title IX office in response to the charge against her, she disclosed his extensive abuse. Her report was largely disregarded and she was not made aware of how to formally report the abuse she was facing. This survivor was an art major. Following her disclosure, her abuser stalked her social media to view her art and then reported it—at least ten times over the next year and a half—to the school as harassment. He was neither named nor identified in any of it, but each time, she had to answer to the frivolous and abusive complaints.[7]

---

[2] CDC. *Preventing Intimate Partner Violence.* https://www.cdc.gov/violenceprevention/intimatepartnerviolence/fastfact.html
[3] R., Jessica. The National Domestic Violence Hotline. *The Myth of Mutual Abuse.*
https://www.thehotline.org/resources/the-myth-of-mutual-abuse/
[4] Know Your IX, The Every Voice Coalition, SafeBAE (2022). Student Listening Sessions.
[5] *Id.*
[6] Nesbitt, Sarah, and Carson, Sage. "The Cost of Reporting: Perpetrator Retaliation, Institutional Betrayal, and Student Survivor Pushout." Know Your IX. Advocates For Youth, March 2021. https://www.knowyourix.org/thecostofreporting/
[7] *Id.*

Exhibit J

We also support the proposed rules more broadly—and appropriately—defining "hostile environment harassment" as sufficiently "severe *or* pervasive" sex-based harassment that "denies or limits" a person's ability to participate in or benefit from an education program or activity.[8] This would be a return to the Department's longstanding standard applied from 1997-2020[9] and a marked improvement over the current standard, which requires schools to ignore sexual harassment unless it is "severe *and* pervasive" harassment that "effectively denies" equal access to education.[10] The 2020 standard is antithetical to Title IX's core aim of preventing gender violence from interfering with students' education because it requires recipients to wait until education has already been disrupted in order to respond. Reversing the 2020 standard is especially important as the continuing effects of sexual harassment and rape, including a student's constant fear of seeing their assailant in classes, libraries, extracurricular programs, and other educational programs and activities, can make their educational environment hostile.

We urge the Department to define sex-based harassment to include harassment on the basis of parental, family, caregiver, or marital status. The pregnancy and related conditions section of our comment will explain the necessity of prohibiting harassment based on these identities.

***Location of Harassment.***

Know Your IX supports the proposed rules requiring schools to respond to all sex-based harassment (or other sex discrimination) "occurring under [their] education program or activity," including conduct that a school has disciplinary control over or that occurs in a building owned or controlled by an officially recognized student organization at a college or university.[11] The preamble states that this means schools would be responsible for addressing incidents that occur off-campus or in a study abroad program, so long as it contributes to a hostile environment in school (e.g., due to the harasser's continued presence on campus or their additional harassment of the complainant). We urge the Department to expressly state in the regulations that Title IX covers off-campus school-sponsored activities.[12] This clarification is crucial, as harassment and violence more commonly occurs in off-campus

---

[8] 87 Fed. Reg. at 41569 (proposed 34 C.F.R. § 106.2(2)).

[9] *See, e.g.*, Department of Education, Office for Civil Rights, *Questions and Answers on Title IX and Sexual Violence* (Apr. 29, 2014; rescinded Sept. 22, 2017) [hereinafter 2014 Guidance], https://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf; Department of Education, Office for Civil Rights, *Dear Colleague Letter: Sexual Violence* (Apr. 4, 2011; rescinded Sept. 22, 2017), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf; Department of Education, Office for Civil Rights, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties*, 66 Fed. Reg. 5,512 (Jan. 19, 2001; rescinded Aug. 14, 2020) [hereinafter 2001 Guidance], https://www2.ed.gov/about/offices/list/ocr/docs/shguide.html; Department of Education, Office for Civil Rights, *Sexual Harassment Guidance*, 62 Fed. Reg. 12,034 (Mar. 13, 1997), https://www2.ed.gov/about/offices/list/ocr/docs/sexhar01.html.

[10] 34 C.F.R. § 106.30(2). While we support a return to the broader standard, it still may create burdens for survivors by requiring an inquiry into how a student's education is limited or impacted by harassment. For example, a school might interpret this to require a student to make a showing of lower grades, which would ultimately create a barrier to reporting, because without such a showing, the harassment might not rise to the level of "severe or pervasive" such that it "denies or limits" their ability to participate in or benefit from the education program or activity.

[11] 87 Fed. Reg. at 41571 (proposed 34 C.F.R. § 106.11).

[12] *Id. See also id.* at 41403.

5

locations than on campus.[13] Given that the 2020 regulation required recipients to solely respond to instances of violence that occurred on campus, students who experienced violence in residences, other off campus locations, or while studying abroad were not protected by their school.

 Furthermore, legal precedent illustrates support for the explicit requirement of schools responding to sex-based harassment or discrimination in off-campus settings. In *Crandell v. N.Y. Coll, Osteopathic Med.*, the holding was that school was required to respond to off-campus harassment in an instance where a professor was employed at the school, and the plaintiff alleged that the off-campus incidents created a hostile environment on campus.[14] The case argues that the harassment the plaintiff experienced was within the school's control, as the plaintiff alleged that one professor's conduct made her feel frightened and uncomfortable, causing her to miss class.[15] Furthermore, the case notes that actionable sexual harassment under Title IX is not limited to a current teacher and can include conduct committed by a former teachers, staff and other students if the presence of the perpetrator at the school would be expected to create a hostile environment.[16]

 Similarly, in *Rost ex rel. K.C. v. Steamboat Springs RE-2 Sch. Dist*, the holding cited *Davis*, 526 U.S. at 645, recognizing that – despite the lack of a finding of deliberate indifference on the part of the school – sexual assault occuring outside of the control of the school can create Title IX liability, as long as there is "some nexus between the out-of-school conduct and the school."[17] A 2019 case, *L.E. v. Lakeland Joint Sch. Dist. 272*, also acknowledged the language in *Davis* regarding substantial control.[18] The case's finding was that whether the district had control over the off-campus location where the plaintiff was sexually assaulted by fellow students was immaterial because the plaintiff's claim was not that the district was responsible for the sexual assault itself, but rather that the district failed to adequately address the conduct or implement safeguards at school despite knowledge of the sexual assault.[19] As a result, the plaintiff was subjected to a hostile environment at school.[20] A 2020 case also supports the argument that recipients must be required to address instances of off-campus harassment and discrimination; *DeGroote v. Arizona Bd. of Regents* found that the school exercised substantial control over the harasser and context in which the harassment took place, despite the harassment occurring off campus, due to the location of the initial harassment.[21]

---

[13] Eryn Nicole O'Neal, Brittany E. Hayes, and Andia M. Azimi.Distinguishing Between On-Campus and Off-Campus Sexual Victimization: A Brief Report.Violence and Gender.Mar 2021.53-57.http://doi.org/10.1089/vio.2020.0029
[14] *Crandell v. N.Y. Coll, Osteopathic Med.,* 87 F.Supp 2d 304, 315-16 (S.D.N.Y. 2000)
[15] *Id.*
[16] *Id.*
[17] *See, e.g., Rost ex rel. K.C. v. Steamboat Springs RE-2 Sch. Dist.,* 511 F.3d 1114, 1121 n.1
[18] *L.E. v. Lakeland Joint Sch. Dist. 272,* 403 F. Supp. 3d 888, 900-901 (D. Idaho 2019)
[19] *Id.*
[20] *Id.*
[21] *DeGroote v. Arizona Bd. of Regents,* 2020 WL 10357074 at *8 (D. Ariz. Feb. 7, 2020)

Exhibit J

During listening sessions with college students, they shared that the lack of requirement by the 2020 regulations to address off-campus instances of violence had a detrimental impact on their ability to engage in school. Their school's lack of response created a hostile environment on their campus, making them feel unsafe. One student shared that "[with] off campus assaults not covered, students are left with no support, and [the] case ends up dropped altogether because it doesn't fit under Title IX."

## III. Recipient Responsibilities and Improving Recipient Responses

*Notice of Harassment (Confidential Employees).*

We believe that the proposed rules which allow schools to designate some employees as "confidential employees" is extremely important. Despite high rates of sexual harassment and violence in schools, students across all age groups are not reporting it. Only 2% of girls ages 14-18 who are kissed or touched without their consent tell their school about it.[22] At the college level, only one in ten survivors report sexual assault to their schools.[23] There are a variety of reasons that survivors choose not to report sexual harassment, including: feeling shame and embarrassment, fearing retaliation, fearing discipline by their schools, police, or immigration officials, and not wanting their harasser to get in trouble. Many students also may not report because they may believe that the harassment they experienced wasn't *severe enough* – either because it began consensually or involved alcohol or drugs – and as a result they may blame themselves and think that other people will not take it seriously. Students who are of color, undocumented, LGBTQI+, and/or disabled are often afraid of the criminal legal system because they belong to communities that are often targeted by police and don't want to perpetuate over-criminalization of their own community. Confidential employees open the door for students to feel more comfortable seeking help because it allows students to maintain their autonomy and privacy, which is especially important for survivors, and make an informed decision about what information they want to share with administrators. By breaking down the barriers to seeking support, students are more likely to actually receive support, and by prioritizing student awareness of rights and their agency in decision making, students will undoubtedly be better served.

While we support the Department's decision to allow schools to designate confidential employees, we urge the Department to go one step further by *requiring* that recipients designate at least one or more full-time confidential employees. These confidential employees are not obligated to report the incident to the Title IX coordinator, and upon learning of possible sex-based harassment, are trained to explain to students their rights, how to file a formal report if they choose to do so, and how to access

---

[22] Tang, Elizabeth, and Ashley Sawyer, "100 School Districts: A Call to Action for School Districts Across the Country to Address Sexual Harassment Through Inclusive Policies and Practices," National Women's Law Center.
[23] National Sexual Violence Resource Center. "Statistics About Sexual Violence."
https://www.nsvrc.org/sites/default/files/publications_nsvrc_factsheet_media-packet_statistics-about-sexual-violence_0.pdf

Exhibit J

supportive measures (even without an investigation). These employees' status as confidential should be clearly indicated on their office doors, in their email signatures, on their website profiles, in employee directories, and in other relevant locations. This would protect survivors' autonomy and privacy if they want to speak with a confidential resource for support and learn about their options before deciding whether to formally file a complaint. Similarly, employees who are *not* confidential resources (e.g. responsible employees) should be trained to disclose to students their reporting obligations, both in advance and at the moment of a possible disclosure of an alleged incident of sexual violence, and offer to connect them with a confidential resource if they would like to talk to someone without opening an investigation.

During our listening sessions with students, many college student survivors reported that, when their school did have confidential resources available on-campus, it was often difficult to access services due to understaffing and a lack of funding for these resources and positions. Survivor advocates and counselors often had limited availability, full caseloads, or served other conflicting roles at the school that prevented students from using them as a resource. To ensure that college students are able to receive the support necessary to autonomously decide how to proceed after experiencing violence or discrimination, we urge the Department to require all schools to designate at least one full-time confidential employee who is trauma-informed, who understands school's Title IX policy, who is cross-trained in multiple departments, and who can serve diverse populations.

For K-12 schools, the proposed rules would require all non-confidential employees to report possible sex-based harassment (or other sex discrimination) to the Title IX coordinator. We support this requirement when the survivor is a minor student (as typically is the case in the K-12 context), and recognize obligations imposed by state mandatory reporting laws for minors, but we ask the Department to use a different approach when the survivor is an adult and/or an employee that allows the adult and/or employee to autonomously decide how to proceed and access confidential resources. The Department should still require K-12 schools to employ at least one full-time confidential employee who is trained in trauma-informed care, the school's Title IX policy, is cross-trained in multiple departments, and who can serve diverse populations. This confidential resource is essential for adults, employees, and students at K-12 schools.

Finally, given the complexities with requiring employees to report harassment or other discrimination to the Title IX coordinator, the Department should issue supplemental guidance instructing schools on how to respond to possible harassment or other discrimination while protecting the privacy and safety of LGBTQI+ students and employees (who may not wish to be outed to their parents or the school) and of pregnant students and employees (who may be at risk of criminalization if they seek an abortion or have a miscarriage). Moreover, recipients should have a responsibility under Title IX to

8

Exhibit J

actively, continuously, and widely disseminate transparent, clear, accessible information related to sexual harassment and discrimination—including, but not limited to, details regarding student and employee rights, institutional policies, grievance processes, reporting, accessing support, and violence prevention.

### Standard of Care.

We support the proposed rule requiring schools to take "prompt and effective action" to end sex-based harassment (or other sex discrimination), prevent it from recurring, and remedy its effects on all people harmed.[24] This would be a welcome return to the standard of care previously required by the Department from 2001 until 2020 and a much-needed change from the current rules' harsh "deliberate indifference" standard, which allows recipients to shirk their responsibility to respond to sex-based harassment in a manner that proactively addresses and meets student survivors' needs after experiencing harassment or violence.[25]

### IV. Expanding Survivor Support

### Access to Supportive Measures.

We support the proposed rules which clarify that schools must offer supportive measures at no cost to individuals who report sex-based harassment or discrimination regardless of whether they request an investigation or an informal resolution, and even if their complaint is dismissed. We recognize that interpersonal violence is frequently traumatic and often constitutes an ongoing safety threat and/or educational barrier, and that a lack of adequate or appropriate supportive measures for student survivors—regardless of whether a formal complaint process is pursued or not—inherently impedes affected students' access to numerous educational services, and can directly lead to the proliferation or exacerbation of a hostile environment. Therefore, Know Your IX recommends that the Department explicitly clarify in the regulations that if a party requests a certain supportive measure and it is "reasonably available,"[26] then the school must provide it. With the 2020 regulation still in place, student survivors have shared with Know Your IX that schools are failing to uphold their promises to provide necessary supportive measures to ensure that the survivor can keep up with their classes.[27] One student who attended our listening sessions said they needed academic support – specifically, extensions on assignments – but their school's Title IX Office refused to provide them despite it being a reasonable request.[28] The student shared that, as a result, "I got the worst grades I ever have in my entire life" and

---

[24] 87 Fed. Reg. at 41572 (proposed 34 C.F.R. § 106.44(a)).
[25] 34 C.F.R. § 106.44(a); 2001 Guidance, *supra* note 4, at 10-12, 14-15, 23.
[26] 87 Fed. Reg. at 41569 (proposed 34 C.F.R. § 106.2 ("supportive measures")).
[27] Nesbitt, Sarah, and Carson, Sage. "The Cost of Reporting: Perpetrator Retaliation, Institutional Betrayal, and Student Survivor Pushout." Know Your IX. Advocates For Youth, March 2021. https://www.knowyourix.org/thecostofreporting/
[28] Know Your IX, The Every Voice Coalition, SafeBAE. Student Listening Sessions. July 2022.

Exhibit J

that the experience deeply impacted their ability to engage on campus.[29] Another student survivor shared that they wanted to change their schedule in order to avoid seeing the person who was harassing them, but never received the support from their school's Title IX Office to be able to do so.[30] The Title IX staff who had "handled" their case had left at this time, so they were unable to obtain any schedule changes or any sanctions against their abuser (such as alcohol education or consent trainings).[31] The student shared with us that "The Title IX office was negligent the entire process, but put up the front that they supported me. This experience is not unique to my school."[32]

Schools' failure to adequately provide supportive measures and accommodations is sadly pushing many survivors out of school. In our survey of over 100 student survivors who reported to their school, 39 percent of survivors who reported sexual violence to their schools experienced a substantial disruption in their educations.[33] Broken down, this means that 27 percent of survivors who reported took a leave of absence, 20 percent transferred schools, and nearly 10 percent dropped out of school entirely.[34] Sadly, these numbers are not even fully reflective of the pushout rate of these students–since the publication of this report, even more survivors who shared their story with us have dropped out of school entirely. A large factor in this drop out rate was schools' disregard for survivors' safety, and the role that supportive measures played in ensuring that safety. In fact, 70 percent of survivors who reported to their schools stated they experienced adverse effects on their safety and privacy.[35] These safety concerns led to a plethora of negative impacts, ranging from further physical and psychological harm to increased vulnerability to school drop-out.[36] One survivor obtained a school issued no contact order because they wanted to ensure their perpetrator stayed out of their dorm. Within one week of that order being issued, the school amended it to allow the perpetrator into the survivor's dorm.[37] Another survivor stated that she and several witnesses notified the school when the perpetrator threatened their safety or harassed them. Despite even criminal findings against the perpetrator on related charges, the school chose to take no safety measures, beyond obtaining the perpetrator statement that he would not contact, harass, or harm the survivor.[38] Yet another school defied court orders to protect a survivor entirely. There, the survivor wrote, "the university refused to honor the judge's order for him to stay out of my classroom buildings and told me I would have to take it upon myself to avoid him."[39]

---

[29] *Id.*
[30] *Id.*
[31] *Id.*
[32] *Id.*
[33] Nesbitt, Sarah, and Sage Carson. "The Cost of Reporting: Perpetrator Retaliation, Institutional Betrayal, and Student Survivor Pushout." Know Your IX. Advocates For Youth, March 2021. https://www.knowyourix.org/thecostofreporting/.
[34] *Id.*
[35] *Id.*
[36] *Id.*
[37] *Id.*
[38] *Id.*
[39] *Id.*

Exhibit J

Additionally, we recommend that the Department require schools to monitor the efficacy of supportive measures offered to students. If the school is aware that the supportive measures offered are ineffective, then the school must modify it or offer additional supportive measures.[40] Finally, we ask the Department to expand the list of examples of supportive measures to note the availability of academic supportive measures, so that students and employees are aware of what specific types of help their school can offer to ensure they keep up their grades and stay physically and mentally safe.[41]

We support the proposed rules which clarify distinctions between supportive measures, disciplinary sanctions, and remedies. Noting the definition of supportive measures, which "are intended to preserve or restore a complainant's or respondent's access to the recipient's education program or activity and may be provided to the complainant or respondent, as appropriate, after the Title IX Coordinator has been notified of conduct that may constitute sex discrimination under Title IX," we urge the Department to issue clarification on the coordination and implementation of supportive measures when a student discloses sexual harassment to a confidential resource, such as a counselor or advocate, rather than to the Title IX Coordinator. Forcing a survivor to share their story multiple times to multiple different people in order to receive help is retraumatizing and unnecessarily burdensome.

While we support the Department's clarification requiring schools to provide supportive measures, we recognize that recipients may fail to provide effective supportive measures in a variety of areas. For instance, student-survivors may not be sufficiently informed of the available supportive actions schools can take to protect them and their access to education, ultimately rendering available supportive measures inaccessible. Additionally, schools may fail to fulfill survivor requests for support measures, despite those measures being reasonably available and necessary. Therefore, we urge the Department to mandate that recipients must publish clear information regarding accommodations in student handbooks and on both district and school websites. The Department should require that relevant information be made available at multiple locations to ensure that a broad range of survivors are able to easily locate important information regarding their rights. Published information should include directions detailing how and where students may access available accommodations. As outlined in the rescinded 2011 Dear Colleague Letter, the Department should also require schools to include instructions for filing a formal Title IX complaint, contact information for the Title IX coordinator, and contact information for on and off campus counseling and victim services.[42] Published information should also include concrete

---

[40] *Doe v. Sch. Bd. of Broward Cty., Fla.*, 604 F.3d 1248, 1261 (11th Cir. 2010) (quoting *Vance v. Spencer Cty. Pub. Sch. Dist.*, 231 F.3d 253, 261 (6th Cir. 2000)).

[41] For example, we recommend adding at proposed § 106.44(g)(1): allowing a complainant to resubmit an assignment or retake an exam; adjusting a complainant's grades or transcript; if the instructor is the harasser, independently re-grading the complainant's work; preserving a complainant's eligibility for a scholarship, honor, extracurricular, or leadership position, even if they no longer meet a GPA, attendance, or credit requirement; and reimbursing tuition or providing a tuition credit to a complainant who does not complete a course due to harassment.

[42] U.S. Department of Education Office for Civil Rights, Dear Colleague Letter from Assistant Secretary Russlynn Ali [RESCINDED] pp. 17 (2011).

Exhibit J

examples of available accommodations such as "adjusted course schedule" or "term paper extension" to aid with survivor comprehension.

Additionally, the Department should mandate that schools provide confidential, accessible, and effective mental health support to student survivors. Survivors often suffer from serious mental health concerns in the aftermath of assault,[43] which contribute to, among other problems, poor scholastic outcomes.[44] Student survivors should have unlimited access to free and confidential counseling services as accommodations[45] and schools should ensure that they notify student survivors of these services. Providing survivors with access to mental health services is a vital step in ensuring their equitable access to education:

a.  *The Department should mandate that schools provide student survivors with unencumbered access to on-campus mental health services where possible and easily accessible care from off-campus service providers in other cases.* Where possible, mental health services should be provided to survivors on campus. Where unique circumstances render on-campus service provision impossible, schools should provide cost-free, accessible transportation to and from such services or an alternative means of access, such as telemental health. In addition to scheduled mental health care appointments, schools should provide "on call" counselors to assist student survivors whenever necessary. Many counseling centers based at educational institutions cap the number of free counseling sessions that students can receive. This cap should be removed altogether for student survivors to receive the care they require. Moreover, many counseling centers based at educational institutions have late arrival and no-show fees and policies. These should be relaxed or removed altogether for student survivors to maximize access to care.

b.  *The Department should mandate that student survivors have maximal agency over their mental health care.* Schools should give student survivors, including those who are minors, as much agency and control over the mental health care they receive as is legally possible. Student survivors should be able to choose their care providers from as many options as possible. Student survivors should be included in all decisions about when and how they receive care and what kind of care they receive.

---

[43] International Society for Traumatic Stress Studies. (2018). Sexual assault, sexual abuse, and harassment: Understanding the mental health impact and providing care for survivors. Briefing Paper: Sexual Assault and Harassment.

[44] Simon, C. (2019, March 1). On top of everything else, sexual assault hurts the survivors' grades. The Washington Post. https://www.washingtonpost.com/posteverything/wp/2014/08/06/after-a-sexual-assault-survivors-gpas-plummet-this-is-a-bigger-problem-than-you-think/.

[45] In addition to Title IX, other federal and state laws, such as Section 504 of the Rehabilitation Act and Title II of the Americans with Disabilities Act, may require such accommodations.

Exhibit J

12

c.   *The Department should mandate that schools provide access to mental health care services from counselors who are adequately trained for work with sexual abuse survivors. Counselors who lack specialized training may be ill-equipped to provide effective services to student survivors.*[46]

Another supportive measure that is essential to preserve students' access to educational services is accommodations for housing. We urge the Department to mandate that all residential educational institutions, including K-12 boarding schools, colleges, and universities, provide accessible emergency housing to student survivors. Accessible emergency housing is a critical resource for student survivors, as student survivors frequently face ongoing threats of active physical danger, including repeated assault, and psychological and emotional harm from fear of crossing paths with abusers.[47] During our listening sessions, college students shared that their schools often failed to provide them with housing accommodations, even in situations where it was necessary to ensure the survivor's safety. This lack of response has a silencing impact on reporting, as it sends a message to survivors of harassment, violence, and discrimination that their school will not provide the supportive measures and resources necessary for them to stay in school. One college student survivor shared:

> Even the way that they handled the Title IX process really disincentivized people from reporting… I know someone who went through the process and the respondent was found responsible, but she was the one who had to move her dorm room. So [the school is] doing Title IX, but not really. - Anonymous[48]

When students feel unsafe in or are displaced from their homes, learning becomes impossible. Given these considerations, recipients should reserve a number of vacant rooms or apartments for students who feel unsafe in their living situation in the wake of violence. The choice to move into emergency housing should be at the sole discretion of the student survivor. Schools should never forcibly remove student survivors from regular housing and place them into emergency housing.

Students are much more likely to experience sexual assault in on-campus residence halls than off campus.[49] On campuses, abusers often know where survivors live and have easy access to their

---

[46] Artime, T. M., & Buchholz, K. R. (2016). Treatment for Sexual Assault Survivors at University Counseling Centers. Journal of College Student Psychotherapy, 30(4), 252–261. https://doi.org/10.1080/87568225.2016.1219610

[47] The Right to Safe Housing on College Campuses for Survivors of Sexual Assault, Stalking, Domestic Violence, and Dating Violence. American Civil Liberties Union. (2011, October 1). https://www.aclu.org/other/right-safe-housing-college-campuses-survivors-sexual-assault-stalking-domestic-violence-and.

[48] Know Your IX, The Every Voice Coalition, SafeBAE. Student Listening Sessions. July 2022.

[49] The Right to Safe Housing on College Campuses for Survivors of Sexual Assault, Stalking, Domestic Violence, and Dating Violence. American Civil Liberties Union. (2011, October 1). https://www.aclu.org/other/right-safe-housing-college-campuses-survivors-sexual-assault-stalking-domestic-violence-and.

13

Exhibit J

residences, increasing safety concerns.[50] The Department should require schools to provide lease-breaking assistance to student survivors in the form of informational guidance on how to break campus leases and advocates to assist survivors in the process. The Department should not allow schools to assess any lease breakage fees or other ongoing or punitive costs to student survivors moving from school-owned housing.

The Department should also require parallel informational guidance and advocates for students breaking leases in non-school-owned housing. Where state or local law allows survivors of gender-based violence to break leases free of charge, schools should inform student survivors of and facilitate the process of obtaining any necessary certification. Where such certification cannot be obtained, schools should cover the cost of any lease-breaking and related fees. Schools should also cover the cost of any reasonable moving expenses incurred through a survivor's move to emergency housing.

Finally, the Department should require all residential schools to provide gender-inclusive emergency housing for transgender and gender-nonconforming students. Transgender and gender-nonconforming individuals experience sexual violence at disproportionately high rates,[51] and yet they often have few options for gender-inclusive housing on campus. Emergency housing accommodations must include meaningfully comparable gender-inclusive options.

***Students with Disabilities.***

We support the proposed regulations which newly address the potential intersection of federal disability law with Title IX in elementary school, secondary school, and postsecondary institution contexts. Proposed § 106.8(e) would provide clarification regarding the alignment of Title IX compliance with the requirements of the Individuals with Disabilities Education Act (IDEA) and Section 504 of the Rehabilitation Act of 1973 (Section 504) throughout the recipient's implementation of grievance procedures as discussed in § 106.45, and if applicable § 106.46. individuals who identify as disabled are three times more likely to experience sexual violence than persons who do not identify as disabled.[52] Additionally, individuals who have multiple disabilities experience even higher rates of violence.[53] Historically, schools have failed to meet their obligations to student survivors with disabilities due to factors such as accommodation accessibility issues, inadequate support for students with disabilities, and lack of coordination between Title IX and disability services offices.[54] Therefore, we support the proposed

---

[50] U.S. Department of Education Office for Civil Rights, Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties [RESCINDED] pp. 7 (2001). https://www2.ed.gov/about/offices/list/ocr/docs/shguide.pdf. Source acknowledges that sexual harassment taking place in "personal or secluded areas," such as dormitory rooms and residence halls, can be especially threatening.
[51] Statistics. Know Your IX. (2017, March 13). https://www.knowyourix.org/issues/statistics/.
[52] Bureau of Justice. *Crime Against Persons with Disabilities, 2009-2012.* https://bjs.ojp.gov/library/publications/crime-against-persons-disabilities-2009-2012-statistical-tables
[53] *Id.*
[54] National Women's Law Center. (2020, July 21). *Survivor Justice Is Disability Justice.* https://nwlc.org/resources/survivor-justice-is-disability-justice/.

14

regulations which confirm that if a complainant or respondent is an elementary or secondary student with a disability, the Title IX Coordinator must consult with that student's Individualized Education Program (IEP) team or group of persons knowledgeable about the student such as a section 504 team or other office designed to provide service to students with disabilities. Additionally, to fulfill their legal obligations, the Department should require schools to make Title IX information readily available to student survivors with disabilities in formats that are accessible to this population,[55] and schools must minimize barriers to accessing accommodations.[56]

## V. Grievance Procedures

### *Department's Refusal to Specify Model Investigation Timelines.*

In 2011, the Department of Education adopted the position that Title IX grievance procedures should last "approximately 60 calendar days following receipt of the complaint."[57] However, the guidance also recognized that investigation timelines may vary, given "the complexity of the investigation and the severity and extent of the harassment."[58] Prior to the 2011 Dear Colleague Letter – and Department of Education oversight – schools would frequently force survivors to undergo unnecessarily lengthy and burdensome processes that further traumatized survivors. These long waiting periods led to survivors dropping out of an investigation against their abuser, or out of school entirely. One anonymous survivor who reported prior to the issuance of the 60-day guideline reported to Know Your IX:

> A prompt timeline would have allowed me to finish my education. My investigation was taking so long that it made it impossible to go to class. The case was taking over 280 business days, and I couldn't bear to see him on campus any more [sic], so I dropped out.[59] - Anonymous

The Department's decision to remove the accountability measures that ensured prompt investigations, and instead "require recipients to designate reasonably prompt timeframes for the grievance process."[60] was justified by claiming the prior guidance resulted in "hurried investigations and adjudications, which sacrificed accuracy and fairness for speed."[61] However, the Department failed to offer data demonstrating that a 60-day guideline compromised accuracy and fairness in adjudications.

---

[55] National Council on Disability. (2020, September 17). Not on the Radar: Sexual Assault of College Students with Disabilities. NCD.gov. https://ncd.gov/publications/2018/not-radar-sexual-assault-college-students-disabilities.
[56] Parker, T. (2018). National Conference on Higher Education and Law: 38th, 39th. Pp. 13-14 https://www.researchgate.net/publication/326997956_The_Less_Told_Story_The_Intersection_of_Title_IX_and_Disability.
[57] U.S. DEP'T OF EDUC., OFFICE FOR CIVIL RIGHTS, DEAR COLLEAGUE LETTER:SEXUAL VIOLENCE 12 (2011) (rescinded by the Trump Administration), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf.
[58] *Id.*
[59] Electronic submission received through https://www.handsoffix.org/share-your-story/ (last accessed Jan. 19, 2019).
[60] 83 Fed. Reg. at 61473.
[61] *Id.*

Moreover, although the Department claimed in the context of its administrative enforcement that "[j]ustice delayed is justice denied, and justice for many complainants has been denied for too long,"[62] the agency refused to account for similar delays within schools' investigative processes. In fact, as Know Your IX has found, lengthy investigations are the norm in the Title IX context, and these delays often result in harm to the educational prospects of complainants and respondents.Vague, non-specific guidelines introduce opportunities for widespread non-compliance – regardless of a recipient's intent – making enforcement significantly more difficult. Ambiguous language may encourage recipients—especially those institutions struggling with inadequate staffing or resources— avoid enforcing existing written policies, dismiss complaints prematurely or unfairly, or stretch out pending cases for exorbitant periods of time. We oppose the Department's proposal to not reinstate the 60-day timeline as it will further the harm of the 2020 rule, and weaken the efficacy of the rest of the proposed rule.

***Lengthy Delays in Schools' Investigations of Sexual Violence.***

By failing to define a "reasonably prompt" timeline, the Department's regulation will exacerbate the long delays that routinely occur in recipients' Title IX processes. For example, as one survivor reports:

> It took the University of Cincinnati 519 days to expel the student I endured stalking, harassment and dating violence from while I was a student there. My Title IX investigation took so long, that when I reached out to the department to follow up, my email bounced back as undeliverable. The Title IX Coordinator and her assistant had left the University without anyone following through on my case. When the Interim Coordinator was chosen to temporarily fill the position, she had no evidence of my case existing at all; I had to start my case again from square one! All of the witnesses I provided in April 2014 were contacted in June 2016 to recall information from the 2013-2014 years. I am glad I retained all of the threatening voicemails and harassing texts even though seeing them triggered my PTSD because I was forced to relive the experiences all over to provide the University with my official statement because they failed me the first time. They finally found him responsible, three months after the Hamilton County court system did. My faith in University officials is completely shattered. I still have trauma-related nightmares where I am in that abusive situation again and I call police for help, but no one comes. THAT is what my fear is now. Being harassed and physically assaulted is no longer what I'm afraid of, it's no one helping when I reach out and need it the most. - Megan O.[63]

---

[62] Andrew Kreighbaum. Not Looking for Patterns, INSIDE HIGHER ED (Jun. 16, 2017),
https://www.insidehighered.com/news/2017/06/16/education-department-suggests-less-expansive-approach-ocr-investigations.
[63] Electronic submission received through https://www.handsoffix.org/share-your-story/ (last accessed Jan. 19, 2019).

16

Exhibit J

Another survivor from Michigan State University feared running into her abuser and his wife on campus and faced impacts to her employment on account of the university's delays in investigating her complaint:

> My experience of sexual harassment took place from 2010 to 2012. I filed my initial report with the MSU Office of Institutional Equity ("OIE") on February 19, 2018. The initial meeting with investigators from Kroll was scheduled for March 13. During that meeting, they set the expectation that the investigation would be completed within 30 to 60 days. I didn't think it would take 30, but I never expected that it would ultimately take 184 days. The outcome was in my favor, but it definitely had a negative impact on my mental health. The person who harassed me was a big personality in the community, and I always had to wonder if I would run into him or his wife in public settings, which did happen once. On April 6, I re-sent my witness list to OIE after learning that none of them had been contacted. They responded that the report was to be drafted imminently, but I emailed again on April 25 at which point they said they hoped to send a draft report 'in the next two weeks,' but that the internal review process was, 'out of their hands.' I received the final report on August 22 – 184 days after initially contacting OIE – and was notified that the redacted report had been released to the press on October 31. - Elizabeth B[64]

Other survivors report that long investigations affected their mental health and exacerbated disability-based barriers to their education. As one anonymous survivor told Know Your IX:

> I reported in late July of 2017, the investigation started in early May, and it wrapped up completely in late October 2018. The first extension was because my assailant kept missing meetings and they had a hard time contacting him. The second was because he got a lawyer on the last possible day he could before the hearing and the lawyer had to review the material. I tell people I feel like the hearing was almost more traumatizing than the rape itself. I know that's crazy but reliving that and having five other people who weren't there talk about my rape with me being able to say so little was terrible. And the fact that it was extended to when midterms were starting was extremely difficult. I struggled a lot with flashbacks and symptoms of PTSD associated with the many delays. I had to move because I was unable to sleep well due to the flashbacks. I was lucky because my assailant was found responsible, but the hearing being so late into the semester affected my academics because I started missing classes and sometimes wasn't

---

[64] Electronic submission received through https://www.handsoffix.org/share-your-story/ (last accessed Jan. 19, 2019).

Exhibit J

able to study due to a combination of poor mental health and additional meetings associated with the hearing. I also felt a lot of anxiety associated with the extensions because I didn't know what was going on or what was going to happen. - Anonymous[65]

Students reported extraordinarily and unacceptably long timelines for their Title IX grievance process. These students reported sexual violence because sharing a school with their perpetrators made learning—and surviving—so difficult. But their schools' lack of urgency left them without recourse for months, even years. One survivor's investigation dragged on through her entire time in school. She explained: "I am currently a senior in college and I reported freshman year first semester. I still haven't gotten the results of my case back."[66]

A lack of specified timeline with regards to the grievance process timeline presents as stressful, unclear, and unaccountable to schools, complainants, and respondents alike. Furthermore, the absence of clarity relating to the recommended timeline lacks a trauma-informed approach to grievance processes. Recipients' indifference to students' reports of discrimination, procedural errors, victim-blaming officials, and outrageous delays have a lasting impact: they discourage survivors—and their peers—from seeking help in the future. One graduate student survivor explained that if she had known what she would face when reporting, she would never have gone through with it. Another survivor stated that the whole process destroyed her worldview: "[O]nce you learn that so many systems are designed to hurt people who have already been hurt, and how selfish universities are in handling these incidents… it breaks your trust." The administrative, procedural, and educational consequences of unspecified regulatory language regarding the timeline work to create additional educational barriers for student survivors, increasing the immense burden felt while negating their rights to an accessible and non-discriminatory educational environment.

Moreover, recipients' delays in investigating and resolving cases also have harmful effects on respondents. As one survivor who attended Harvard University reported to Know Your IX, delays in her investigation compromised her job performance and made it difficult for the respondent to find a job in the first place. At the same time, the survivor noted that the respondent in her case was also negatively impacted by the drawn-out timeline. Because the respondent had not technically graduated, the delays in the investigation rendered him unable to get a job during the summer and created uncertainty about whether he would be able to matriculate at graduate school in the fall.[67] These students' cases lasted between 184 days to 519 days, and these delays directly impacted their educational and employment opportunities. Accordingly, when the Department refuses to define a "reasonably prompt" timeline,

---

[65] *Id.*
[66] Know Your IX, The Every Voice Coalition, SafeBAE. Student Listening Sessions. July 2022.
[67] Electronic submission received through https://www.handsoffix.org/share-your-story/ (last accessed Jan. 19, 2019).

Exhibit J

recipients – who are already inclined to drag out investigations until the complainant graduates or drops the case – may operate with impunity.

***The Department's Elimination of the Sixty-Day Guideline.***

Since the Department rescinded its 2011 Dear Colleague Letter and issued guidance and a regulation without a specific recommended timeline, recipients' delays have increased. Following the issuance of 2020 Title IX regulation, Know Your IX conducted interviews with a number of survivors who filed complaints with their schools in the Fall of 2017. Sadly, many students reported that their cases were pending nearly two years later. As one survivor describes:

> I reported in February of 2018 and my report hasn't concluded yet [written January 12th, 2019]. I reported in February but an official investigation wasn't started until May 2018 because my mom came down and asked for a meeting with the Title IX office. The Title IX Officer personally knew who I was accusing, which is why she hadn't opened an investigation. The coordinator tried to get me to drop my case and told me if I moved forward she was going to have him file a counter complaint against me. I got a Title IX lawyer over the summer. I kept reporting the Title IX Coordinator for being biased, but no one did anything until I got a lawyer. - Anonymous, Atlanta GA[68]

Another survivor with an ongoing case at Michigan State University reported to Know Your IX that the school's delay has interfered with her education:

> It's been 9 months since I reported and my case is still not over. It's taking so much out of me and my life. It's made me do poorly in school and decreased my graduate school chances. It's caused friendships to end. It's divided me with my family. The fact that it's been so long isn't even shocking to me, at first I was shocked. Now I realize these investigators just don't care about me and my well-being. This is almost a year of my life I won't get back. Everyday has me fearful of the outcome. I reported to try to find justice but I realize that will never happen. I go to Michigan State and you would think they would care about correcting their past mistakes but just today our president resigned over a disgusting comment about the Nassar victims. Time and time again, Michigan State has shown survivors are not their priority. This investigation has just made me regret the day I reported. I thought having to go to court with my rapist was the worst day of my

---

[68] Electronic submission received through https://www.handsoffix.org/share-your-story/ (last accessed Jan. 19, 2019).

Exhibit J

life, but yesterday I read the report from the OIE office doing the investigation. I've lost everything from this case. I know 100% what happened. The rape isn't even the worst part of the process though, it's the investigation. I can heal from the rape but trying to rebuild every aspect of my life and get back what has been taken from me [by the school] will take so much. -Rebecca R, MSU[69]

### *Defining "Reasonably Prompt" as a Sixty-Day Period.*

Because long delays in schools' investigations create gender and disability-based barriers to students' educations, Know Your IX recommends that the Department define a "reasonably prompt" timeline as a sixty-day period but permit schools to extend the investigation period based on the complexities of the case and the needs of the parties. Adopting such a measure would help ensure a fair process for both complainants and respondents. Furthermore, in other to increase parties' knowledge of standard investigative timelines, Know Your IX also recommends that the Title IX rule include the following language to the effect of:

Grievance procedures should specify the time frame within which: (1) the school will conduct a full investigation of the complaint; (2) both parties receive a response regarding the outcome of the complaint; and (3) the parties may file an appeal, if applicable. Both parties should be given periodic status updates. Recipients must designate reasonably prompt timeframes for the grievance process, defined as approximately 60 calendar days following receipt of the complaint. However, schools may extend investigations for good cause and with notice to the parties if merited by the complexity of the investigation and the severity and extent of the discrimination.

### *Informal Resolutions.*

In general, we support the proposed rules allowing schools to use an informal resolution to resolve student-on-student sex-based harassment (or other sex discrimination), subject to certain safeguards,[70] including a ban on using any information obtained solely through an informal resolution in an investigation.[71] However, we urge the Department to require all parties to give "written consent" to an informal resolution (not simply "consent"). Furthermore, we recommend that the Department expressly clarify that schools may not use mediation or other conflict resolution processes to address sex-based harassment between a complainant and respondent, as harassment (or other discrimination) is not a

---

[69]  Electronic submission received through https://www.handsoffix.org/share-your-story/ (last accessed Jan. 19, 2019).
[70] The proposed rules would allow schools to use an informal process as long as all parties receive written notice of their rights and obligations, give consent to the process, can withdraw at any time before the end to do a traditional investigation, and are not required to participate in an informal resolution or to waive their right to an investigation in order to continue accessing any educational benefit; and as long as the school believes an informal resolution is appropriate (*e.g.*, the alleged conduct would not pose a future risk of harm to others). 87 Fed. Reg. at 41574 (proposed 34 C.F.R. § 106.44(k)(1)-(2)).
[71] 87 Fed. Reg. at 41574 (proposed 34 C.F.R. § 106.44(k)(3)(vii)).

20

Exhibit J

"conflict" where the survivor and harasser share blame. Conflict resolution, including mediation, is inappropriate for resolving sex-based harassment, because such processes assume both the victim and harasser share responsibility for the harassment, can allow harassers to pressure survivors into inappropriate resolutions, and often require direct interaction between the parties, which can be retraumatizing. In contrast, a restorative justice process requires the harasser to take accountability for harming the victim, center the victim's needs, repair the harm they caused, and change their future behavior.

At the same time, Know Your IX urges the Department to work with schools and community-based organizations that are currently conducting restorative justice programs for sexual violence cases to create recommendations for best practices on conducting informal resolutions. We would encourage the Department to issue further guidance on best practices for addressing sex-based harassment and violence with informal resolutions and restorative justice processes, as well as providing further clarification as to what "voluntary" participation entails. Furthermore, we ask the Department to require all schools that use informal resolutions to provide formal training to all individuals involved in administering the proceedings.

### *Assumption of Non-Responsibility Requirement.*

We oppose the Department retaining the harmful rule from the previous administration that currently requires schools to presume that the respondent is not responsible for sex-based harassment (or other sex discrimination) until a determination is made and to inform both parties of this presumption.[72] This formal presumption and notice of such a presumption is not required in any other type of school proceeding. This special protection just for respondents in cases related to sex-based harassment is built upon and exacerbates the harmful and false rape myth that people who report sex-based harassment (or other sex discrimination)—primarily women and girls—are lying.[73] We want to be very clear that we do appreciate the Department's efforts to ensure that schools do not make assumptions one way or the other before the conclusion of an investigation. To meet this intended goal, we would instead recommend that the Department require schools to notify parties that a determination of responsibility will not be made until the end of an investigation.

---

[72] 87 Fed. Reg. at 41575, 41577 (proposed 34 C.F.R. §§ 106.45(b)(iii), 106.46(c)(2)(i)). *See also* 34 C.F.R. §§ 106.45(b)(1)(iv), 106.45(b)(2)(i)(B).
[73]  See generally Kathryn R. Klement et al., Accusers Lie and Other Myths: Rape Myth Acceptance Predicts Judgments Made About Accusers and Accused Perpetrators in a Rape Case, SEX ROLES 81, 16–33 (2019), https://link.springer.com/article/10.1007/s11199-018-0950-4#citeas [https://perma.cc/BZY7-PTS5] (exploring the ways in which police officers and jurors alike rely on rape myths to justify their disbelief of sexual assault victims).

Exhibit J

***Cross-Examination.***

We support the proposed rules addressing K-12 investigations as they allow K-12 schools the flexibility needed to address sex-based harassment (and other sex discrimination) promptly and appropriately.[74] For institutions of higher education, the proposed rules would remove the harmful requirement from the 2020 rules that mandate direct, live cross-examination, and instead allow more flexibility for questioning to be conducted either: (i) by a decision-maker at a live hearing or in individual meetings, with suggested questions from the parties; or (ii) by the parties' advisors via cross-examination at a live hearing. This change is essential as the Department's current cross-examination policy is not legally required under the Mathews balancing test. The Sixth Circuit has clarified that, where due process demands cross examination, written statements will not suffice.[75] Instead, universities "must allow for some form of live questioning."[76] However, such live cross examination need not occur in the form of a direct cross-examination by an advisor. Instead, the Sixth Circuit emphasizes that such questioning must occur "in front of the fact-finder" to allow for credibility assessment "by the university."[77] This emphasis on the audience rather than the actor demonstrates that due process is located in the opportunity of the school to assess credibility, not the opportunity of the respondent (or an advisor of the respondent) to personally or directly question adverse witnesses. Case law plainly requires only that a university has the opportunity to observe the complainant responding to live questioning; the Department's conclusion that an "advisor aligned with [a given] party" must have an opportunity to directly cross examine the complainant and other witnesses,[78] is not plainly required by law.[79]

We support the additional flexibility that the proposed rules would provide for institutions of higher education and encourage the Department to provide further guidance as to how schools can conduct such processes while minimizing reliance on cross-examination. Cross-examination can be an extremely traumatizing process. Survivors have shared with us that cross-examination processes impeded their immediate and long term success:

> My assailant did cross-examine me. I didn't just want to die, I planned to die. I thought about killing myself all of the time. My grades fell, and eventually I sought counseling through the school. That didn't help. I connected with [a] local private therapist. I never got my GPA back up.

---

[74] Under the proposed rules, K12 schools would be required to allow all parties to present their witnesses and evidence and, if credibility is at issue, to use a process that enables the decision-maker to assess the credibility of the parties and witnesses. 87 Fed. Reg. at 41576 (proposed 34 C.F.R. §§ 106.45(f)(2), 106.45(g)).
[75] Doe v. Baum, 903 F.3d 575, 582 (6th Cir. 2018)
[76] *Id.* at 583.
[77] *Id.* at 585, 583.
[78] 83 Fed. Reg. at 61476.
[79] Baum explains that direct cross examination by a respondent of a complainant is unnecessary and could subject the complainant to psychological harm. The ruling in Baum allows for, but does not require, cross examination by an "accused student's agent." 903 F.3d at 583.

22

Exhibit J

Triggering moments and repulsive flashbacks interrupted my studies in undergrad, as well as in law school.[80]

Another student survivor described attempting suicide after being cross-examined in the context of pursuing a restraining order:

I was directly cross examined by my rapist when I later filed a restraining order. That action directly led to a suicide attempt, and there is no doubt in my mind that had she, a year prior, been allowed to cross examine me, I would have attempted then too. The entire process was already grueling and my school was doing nothing to prevent rampant retaliation against me.[81]

However, we oppose the proposed exclusionary rule, which would require that, if a party or witness at an institution of higher education does not respond to a question "related to their credibility," the school would have to ignore any statement they make that "supports their position."[82] We are concerned that this means that a survivor who refuses to answer a single question related to their credibility would have all of their oral and written statements excluded from the evidence, and that this rule could be broadly applied given the Department has not explained how schools would determine whether question is "related to" a person's credibility.[83]

***Standard of Proof.***

The proposed rule would require schools to use the preponderance of the evidence standard to investigate sex-based harassment (or other sex discrimination), unless the school uses the clear and convincing evidence standard in all other "comparable" investigations, including for all other types of harassment and discrimination.[84] We urge the Department to require the preponderance standard in all Title IX investigations, as it is the only standard that recognizes complainants and respondents have equal stakes in the outcome of an investigation,[85] and it is the same standard used by courts in all civil rights and

---

[80] Electronic submission received through https://www.handsoffix.org/share-your-story/ (last accessed Jan. 19, 2019).
[81] Electronic submission received through https://www.handsoffix.org/share-your-story/ (last accessed Jan. 19, 2019).
[82] 87 Fed. Reg. at 41578 (proposed 34 C.F.R. § 106.46(f)(4)).
[83] *Id.* While the proposed rules instruct decision-makers not to draw any inferences about whether sex-based harassment occurred based "solely" on a person's refusal to respond to questions related to their credibility, a complainant whose statements are excluded would have to rely solely on their witnesses' statements in order to prove their case.
[84] *Id.*
[85] Letter from National Women's Law Center to Kenneth L. Marcus, Ass't Sec'y for Civil Rights, Dep't of Educ., at 33 (Jan. 30, 2019), https://nwlc.org/wp-content/uploads/2019/02/NWLC-Title-IX-NPRM-Comment.pdf.

Exhibit J

other civil proceedings.[86] Not requiring preponderance of the evidence rings in contrast to Title IX's objectives by promoting inaccuracy in adjudication: imposing a clear and convincing standard would increase the risk of wrongful findings of non-responsibility and therefore contribute to a denial of the sex-based harassment survivor's educational opportunities. And because it is likely that fewer complainants would file formal reports if a recipient adopted a clear and convincing standard, the Department's proposed regulation, if promulgated, could compromise the recipient's efforts to eliminate sex discrimination from its educational programs.

Further, it essential that the standard of evidence recognizes both parties' equal stake in the case as researchers have found that students already endorse rape myths in overly gendered ways: "among college men, recent data showed that 22% agreed that "women lie about rape to get back at men," and 13% agreed that "a lot of women lead men on and then cry rape.""[87] Other studies have indicated that the rape myths that received the most endorsement were, "He didn't mean to" and "She lied."[88] By allowing schools to question the credibility of harassment survivors more than the credibility of the respondent, the Department of Education may further subordinate the very class of people that Title IX is intended to protect. Numerous academic articles document the fact that individuals that file complaints of sexual assault are judged more harshly than individuals accused of perpetrating sexual assault, particularly when cases "deviate from the 'real rape' stereotype of a violent attack of a stranger on an unsuspecting victim."[89] Moreover, the closer the prior relationship between the parties, the more blame individuals attribute to the alleged survivor, as opposed to the alleged perpetrator.[90] And when survivors are intoxicated, the perpetrator is seen as less likely to be culpable.[91] Research also suggests that individuals who report rape are singled out for unique scrutiny and that perpetrators of robbery may experience higher rates of blame than perpetrators of sexual assault.[92] Survivors of sexual harassment face high rates of stigma when they disclose violence–which often leads to survivors being denied the supportive measures, accommodations, and resources they need to continue to pursue an education. In one study of 102 rape survivors, almost 41% of survivors were called "irresponsible" or told to "get on" with their

---

[86] Letter from Leadership Conference on Civil and Human Rights to Kenneth L. Marcus, Ass't Sec'y for Civil Rights, Dep't of Educ., at 7 (Jan. 30, 2019), https://civilrights.org/resource/civil-and-human-rights-community-joint-comment-on-title-ix-nprm.
[87] Katie Edwards et al., Rape Myths: History, Individual and Institutional-Level Presence, and Implications for Change, 65 SEX ROLES 761, 767 (2011).
[88] Sarah McMahon, Rape Myth Beliefs and Bystander Attitudes Among Incoming College Students, 59 JOURNAL OFAMERICAN COLLEGE HEALTH, 3, 4 (2010).
[89] Mary White Stewart et al., "Real Rapes and "Real Victims": The Shared Reliance On Common Cultural Definitions of Rape, 4 FEMINIST LEGAL STUD. 159, 162-64 (1996).
[90] Id. See also Steffen Bieneck & Barbara Krahne, Blaming the Victim and Exonerating the Perpetrator in Cases of Rape and Robbery: Is There a Double Standard?, 26 J. OF INTERPERSONAL VIOLENCE, 1785, 1793-94 (2011).
[91] Id. Cf. Erica L. Green & Sheryl Gay Stolberg, Campus Rape Policies Get a New Look as the Accused Get DeVos' Ear, N.Y. TIMES (July 12, 2017) (quoting from Assistant Secretary of the Office for Civil Rights Candace Jackson, falsely claiming that most reports of sexual violence "fall into the category of 'we were both drunk,'" and are "not even" as serious as other cases), https://www.nytimes.com/2017/07/12/us/politics/campus-rape-betsy-devos-title-iv-education-trump-candice-jackson.html. N.B. Assistant Secretary Jackson, who played a significant early role in the development of the Department's NPRM, later apologized for her comments.
[92] Steffen Bieneck & Barbara Krahne, Blaming the Victim and Exonerating the Perpetrator in Cases of Rape and Robbery: Is There a Double Standard?, 26 J. OF INTERPERSONAL VIOLENCE, 1785, 1798-90 (2011).

24

Exhibit J

lives.[93] These findings are supported within the academic literature: one researcher found that survivors "receive significant negative reactions including being blamed and disbelieved when disclosing assault; these reactions are related to poorer psychological and physical health outcomes."[94]

If the Department chooses not to require the preponderance standard, it should, at a minimum, clarify that "comparable" investigations include investigations of "non-sexual assault" (*e.g.*, non-sexual physical assault). Otherwise, schools could believe that they can use the preponderance standard to investigate *physical* assault and the clear and convincing evidence standard to investigate *sexual* assault, other sex-based harassment or discrimination, and all other harassment and discrimination based on race, disability, etc.

### *Appeals.*

We support the proposed rule requiring institutions of higher education to offer appeals to both parties based on a procedural irregularity, new evidence, or a Title IX official's bias or conflict of interest that affected the outcome, and allowing them to offer additional bases to both parties equally.[95] However, we urge the Department to ensure that parties are afforded the same appeal rights in K-12 schools as they would be at institutions of higher education.

---

[93] Rebecca Campbell et al., Social Reactions to Rape Victims: Healing and Hurtful Effects on Psychological and Physical Health Outcomes, 16 VIOLENCE & VICTIMS 287, 298-99 (2001).
[94] Rebecca Campbell et al., Social Reactions to Rape Victims: Healing and Hurtful Effects on Psychological and Physical Health Outcomes, 16 VIOLENCE & VICTIMS 287, 291-95 (2001).
[95] 87 Fed. Reg. at 41578 (proposed 34 C.F.R. § 106.46(i)(1)-(2)).

Exhibit J

***Conflicts of Interest.***

We support the Department's requirement that, "any person designated as a Title IX Coordinator, investigator, or decision maker must not have a conflict of interest or bias regarding complainants or respondents generally or regarding a particular complainant or respondent." This requirement is essential to creating a process that survivors' feel they can turn to for help without fear of it being unfair or biased. But we encourage the Department to make clear what roles might constitute a conflict of interest for the Title IX Coordinator, investigators, or decision makers–and to ensure that conflict of interest also includes the positionality of the individuals within the structure of the school. Since prior guidance was rescinded by the Trump administration, survivors have reported their Title IX Coordinators holding clear conflicts of interest that have often been aimed at protecting the school first and foremost. For example, survivors shared with us that following the issuance of the 2020 regulation, their school moved to have their general counsel serve as their Title IX Coordinator, or supervise the Coordinators–placing Title IX as first and foremost about school risk instead of educational access.[96]

## VI. Preventing and Limiting Retaliation Against Student Survivors

We support the Department of Education's clarification (proposed § 106.71) that would build on the current regulations and clarify what types of conduct would constitute prohibited retaliation, including peer retaliation. This clarification is essential to ensure that student survivors are not fearful of experiencing further harm after reporting harassment or violence to their schools. Expanding the definition of retaliation is urgently needed, as sexual harassment is significantly underreported due to a culture of peer retaliation and threat of it, schools' failure to respond to retaliation, and even schools' engaging in institutional retaliation against survivors. Know Your IX's survey found that 70 percent of survivors who reported to their schools stated they experienced adverse effects on their safety and privacy.[97] These safety concerns led to a plethora of negative impacts, ranging from further physical and psychological harm to increased vulnerability to school drop-out.

Furthermore, survivors have shared that the retaliation they face from perpetrators is strikingly similar to litigation abuse, wherein respondents use school disciplinary resources to further abuse. According to our survey, many respondents and schools utilized or threatened to utilize legal systems to control and/or silence survivors.[98] Our survey found two forms of retaliation survivors who reported to their schools experienced at concerningly high rates: retaliatory cross-filing and the threat of defamation suits. The 2020 regulation has contributed to an increased, disturbing trend of survivors experiencing

---

[96] Know Your IX, The Every Voice Coalition, SafeBAE. Student Listening Sessions. July 2022.
[97] Nesbitt, Sarah, and Carson, Sage. "The Cost of Reporting: Perpetrator Retaliation, Institutional Betrayal, and Student Survivor Pushout." Know Your IX. Advocates For Youth, March 2021. https://www.knowyourix.org/thecostofreporting/
[98] *Id* at 17.

Exhibit J

retaliation, hand in hand and institutions failing to provide student survivors with the necessary support after experiencing retaliatory cross-filing or a defamation lawsuit.

### Retaliatory Cross-Filing.

Retaliatory cross-filing occurs when a survivor files a complaint with their school saying they experienced sexual harassment or violence and, as a response, the perpetrator also files a complaint against them alleging that they were in the fact the victim of harassment and/or violence, and the survivor was actually the perpetrator of the abuse. In some cases, the perpetrators may even file first to get ahead of this process. Survey responses from survivors showed that retaliatory cross-filing through the school was similar in tactic and outcome to perpetrators who abused survivors through litigation by cross-filing for protective orders, filing frivolous complaints, relitigation attempts, and prolonging court proceedings. In campus disciplinary systems, as in legal systems, the goal of these tactics was to force survivors and their perpetrators to have to interact through the disciplinary process, drag out the process, control and/or silence the survivor, and drain their time and financial resources. Our survey, *The Cost of Reporting,* found that half of survivors who faced retaliatory cross-filing took a leave of absence or transferred schools. [99]

### Threat of Defamation Suit.

In addition to retaliatory cross-filing, 23% of survivors report being threatened by their perpetrator or the perpetrator's attorney with a defamation lawsuit as retaliation for speaking out, and 19% report being warned by their school of the possibility of a defamation suit. [100] These threats not only silence survivors and prevent others from coming forward, but also constitute retaliation against the survivor, as the threats are a direct result of reporting the sexual harassment. One survivor wrote that her abuser threatened to sue her for defamation if she reported, saying "If you come after me, I'll come after you." Another explained that her perpetrator's family contacted her family, threatening them with a lawsuit unless she dropped her Title IX case. The threats universally inspired fear, discouraged online engagement, and inhibited reporting, because the survivors knew those threats were not empty ones. As one survivor wrote: "Knowing my abuser—he will do anything to retaliate against me." [101]

One survivor shared with Know Your IX her school's failure to respond to retaliation, and the lasting impact it had on her educational experience and future opportunities:

---

[99] *Id* at 19.
[100] *Id* at 21.
[101] *Id* at 21.

Exhibit J

"[My] perpetrator tried to open a case against me for "damaging his reputation" (libel/slander). As a result, [my] school disregarded my existing case and forced us to do mediation (despite my existing no contact order against the perpetrator). During this process, they refused to remove him from classes/extracurriculars with me. I had to quit debate and sacrifice a scholarship, had to endure classes with him, and was stalked on campus for nearly a year." - D.K.

Survivors choose not to report sexual violence to authorities for a multitude of reasons, one of which is a fear that their perpetrator will retaliate or escalate the violence. Fear of retaliation is particularly powerful in deterring female survivors from reporting.[102] The retaliation survivors fear may be social, psychological, or physical. For survivors of intimate partner violence (IPV), the fear of escalated violence in response to reporting is particularly salient; leaving an abusive relationships are the most dangerous time for a survivor. Because IPV is first and foremost about power and control, perpetrators interpret leaving and other pro-separation acts as a loss of power and control over the survivor. In response, perpetrators escalate violence as a way to attempt to regain or maintain that control.[103] The same dynamics are true of stalking.[104] Perpetrators who exert power and control may even escalate to the point of lethality in response to perceptions that they are losing control over the survivor.[105]

### Nondisclosure Agreements.

We urge the Department to issue clarification prohibiting schools from requiring survivors to sign nondisclosure agreements (NDAs) or other agreements as a condition of receiving supportive services or having their Title IX claims investigated. The agreements require survivors and their advisors to agree not to disclose any information about the grievance process, even after it has concluded, or risk expulsion or civil litigation if they fail to comply with their school's terms.[106] These agreements are coercive and retaliatory, and condition access to a school's grievance process on silence and a forfeiture of due process by students, many of whom are minors. This creates unsafe educational environments which disproportionately impact women, girls, LGBTQI+ students, and students from historically marginalized backgrounds. Many students cannot afford legal counsel, and as a result are signing these agreements and unknowingly waiving their rights.[107]

---

[102] Marjorie R. Sable et. at., Barriers to Reporting Sexual Assault for Women and Men: Perspectives of College Students, 55 J. AMER. C. HEALTH 157, 160 (2006).
[103] Ruth E. Fleury et al, When Ending the Relationship Does Not End the Violence, 6 VIOLENCE AGAINST WOMEN 1363, 1378 (2000).
[104] TK Logan & Robert Walker, Stalking: A Multidimensional Framework for Assessment and Safety Planning, 18 TRAUMA, VIOLENCE, & ABUSE 200, 207 (2016).
[105] NAT'L INST. JUST., INTIMATE PARTNER HOMICIDE 22 (2003).
[106] Equal Rights Advocates and L.L. Dunn Law Firm, PLLC, "Letter to OCR Regarding Title IX Unconscionable Agreements," June 2022, 1.
[107] Equal Rights Advocates, "Letter to OCR Regarding Title IX Unconscionable Agreements", 2-5.

Exhibit J

Given the retaliation that survivors experience after reporting to their schools, we ask that the Department clarify in the regulations that prohibitions on retaliation include:

1. Disciplining a complainant for charges the school knew or should have known were filed for the purpose of retaliation (e.g. retaliatory cross-filing)

2. Disciplining a complainant for conduct that results from the harassment or discrimination (e.g. speaking out, expressing trauma, missing school)

3. Requiring a complainant to enter a confidentiality agreement as a prerequisite to obtaining supportive measures, an investigation, an informal resolution, or any other Title IX rights, unless otherwise permitted by the Title IX regulations

## VII. Protections for Pregnant and Parenting Students

### *Definition of Pregnancy and Related Conditions.*

Pregnant, parenting, and students with pregnancy-related conditions are now even more vulnerable to educational inequities given recent political events. The Supreme Court's brazen overturning of *Roe v. Wade* has revealed the truth behind the aphorism "so many things are about abortion because abortion itself is about so many things."[108] There has been a deluge of reporting about how the lives and rights of pregnant people will and have changed since *Roe* was overturned several weeks ago. National Advocates for Pregnant Women have documented over 1,700[109] cases from 1973 to 2020 where pregnant people were arrested or prosecuted for negative pregnancy outcomes. Lack of access to abortion may prevent a pregnant person from obtaining cancer treatment.[110] A pregnant woman in California was sent home when her fallopian tube burst; she was having an ectopic pregnancy, which is potentially fatal.[111] Students face these same threats to bodily autonomy, which obviously implicates education. Thus, to ensure educational equity for students and student survivors more specifically, there must be strong protections for pregnant, parenting, and students with pregnancy-related conditions. We endorse most of the proposed regulation's definitions and procedures concerning pregnancy, parenting, and pregnancy-related conditions. However, the final rule could be stronger by amending the definition of pregnancy and related conditions and their scope of coverage, adding explicit protections for students seeking abortion care, providing clarity regarding certain aspects of Title IX's nondiscrimination

---

[108] Sanger, Carol. Talking About Abortion. https://journals.sagepub.com/doi/abs/10.1177/0964663916668250?journalCode=slsa
[109] "Arrests and Prosecutions of Pregnant Women, 1973-2020 ." National Advocates for Pregnant Women, May 9, 2022. https://www.nationaladvocatesforpregnantwomen.org/arrests-and-prosecutions-of-pregnant-women-1973-2020/.
[110] Boboltz, S. *People Will Still Die In Anti-Abortion States That Have 'Lifesaving' Exceptions*. (HuffPost, 2022), <https://www.huffpost.com/entry/death-risk-pregnancy-despite-lifesaving-exceptions-for-abortion_n_62b715c9e4b04a61736b0aa9> [Accessed 19 August 2022].
[111] Nolan, S. *My Fallopian Tube Burst Due To An Ectopic Pregnancy. An ER Doctor Sent Me Home*. (2022), [online] HuffPost. <https://www.huffpost.com/entry/roe-wade-abortion-ectopic-pregnancy_n_62f52039e4b0288b61a27a35> [Accessed 19 August 2022].

Exhibit J

protections, strengthening reasonable accommodation and leave of absence procedures, and improving lactation spaces.

***Expanded Scope of Coverage.***

The proposed rule defines pregnancy and related conditions as pregnancy, childbirth, termination of pregnancy, or lactation; medical conditions related to pregnancy; and recovery from pregnancy, childbirth, termination of pregnancy, lactation, or their related medical conditions.[112] This definition is a significant improvement from the current Title IX regulation, which lacks an explicit definition of pregnancy and related conditions.[113] We strongly support the Department adding "lactation" as a related condition, especially when comprehensive protections are lacking in other contexts.[114] This is a critical and positive step towards protecting pregnant and parenting students' health and supporting their academic success.

The proposed rule's definition of pregnancy and related conditions further clarifies that schools are prohibited from discriminating against any "person" (including students and employees) based on "current, potential, or past pregnancy or related conditions" and "past parental, family, or marital status."[115] This starkly contrasts from the current regulation, which does not specify the scope of coverage[116] for pregnancy and related conditions. We strongly approve of this expanded scope of coverage. This language provides students with the possible recourse of utilizing Title IX grievance procedures or accessing accommodations when faced with discrimination. In fact, there have been several instances of students experiencing discrimination for current or past pregnancy or related conditions.

In *Wort v. Vierling*,[117] a federal district judge ruled that a high school discriminated against a student on the basis of her past premarital pregnancy in violation of Title IX by dismissing her from the school's National Honor Society (NHS). In *Cazares v. Barber*,[118] a student was also excluded from her school's NHS due to her current pregnancy. Discrimination based on potential pregnancy is also not uncommon. In Louisiana, a public school policed the bodies of young female students based on their childbearing capacity by forcing them to take pregnancy tests and requiring them to undergo home

---

[112] 87 Fed. Reg. at 41568 (proposed 34 C.F.R. § 106.2) ("pregnancy or related conditions").
[113] 34 C.F.R. § 106.2. Elsewhere in the current rule states that recipients are prohibited against discriminating against applicants for admission on the basis of "pregnancy, childbirth, termination of pregnancy, or recovery therefrom" and states that a recipient must treat "disabilities related to pregnancy, childbirth, termination of pregnancy, or recovery therefrom."
[114] Break Time for Nursing Mothers is a provision of a federal law that mandates employers to provide accommodations for breastfeeding, but exempts many occupations from its protection. *See* Fair Labor Standards Act § 7(r) (as amended by the Patient Protection and Affordable Care Act, P.L. 111-148).
[115] 87 Fed. Reg. at 41568 (proposed 34 C.F.R. § 106.2) ("pregnancy or related conditions"), 41571 (proposed 34 C.F.R. §§ 106.21(c)(2)(ii), 106.40(b)(1)), 41579 (proposed 34 C.F.R. § 106.57(b)).
[116] 34 C.F.R. §§ 106.40(a), 106.40(b)(1).
[117] Wort v. Vierling, 778 F.2d 1233, 1234 (7th Cir. 1985).
[118] Cazares v. Barber, 959 F. 2d 753 (9th Cir. 1992).

30

Exhibit J

schooling if they refused,[119] egregiously interfering with their education. Under the proposed rule, these cases would clearly violate Title IX.

Additionally, other government entities have used the Department's proposed scope of coverage in their definitions of pregnancy and related conditions or have recognized discrimination based on current, potential, or past pregnancy. The Department of Health and Human Services recently released guidance about pharmacists' obligations to provide reproductive healthcare services.[120] The guidance specifically states that "under federal civil rights law, pregnancy discrimination includes discrimination based on current pregnancy, past pregnancy, potential or intended pregnancy,[121] and medical conditions related to pregnancy or childbirth." Keeping this language in the final rule promotes synchrony between government entities and guards against discrimination based on speculation about someone's current, past, or potential fertility, parental, familial and marital status.

Finally, and of particular importance, the definition of pregnancy and related condition continues to include abortion ("termination of pregnancy"). This is greatly appreciated and noted at a time when abortion access is dwindling across the country. A day after the Notice of Proposed Rule Making (NPRM) was released on June 23, the Supreme Court reversed *Roe v. Wade*, effectively eliminating the constitutional right to abortion. As of August 12, fourteen states have either banned abortion entirely (Alabama, Arkansas, Mississippi, Missouri, Oklahoma, South Dakota, Kentucky, Louisiana, and Texas) or implemented a ban on abortion beginning at six weeks of pregnancy (Georgia, Ohio, South Carolina, Idaho and Tennessee).[122] Pregnant students residing in these states will likely need to travel out of state for abortion care. While Title IX does not guarantee the right to abortion access, the Department's proposed rule makes explicitly clear that needing an abortion falls under pregnancy and pregnancy-related conditions, and that students have a right to learn in an environment free from discrimination because they sought, obtained, or are recovering from an abortion. Recipients will thus have a responsibility to provide pregnant students with the necessary accommodations to continue their education amidst needing to travel out of state and recover from an abortion. As such, we firmly believe keeping the "termination of pregnancy" language in the final rule will advance accessibility in higher education and meet the needs of students seeking abortion care as nationwide access becomes increasingly limited. Despite all of the protections included in the proposed definition of pregnancy and related conditions, the proposed rule can still be strengthened, especially for students who need abortions.

---

[119] Zegeye, T., *Get Tested Or Get Out: School Forces Pregnancy Tests on Girls, Kicks out Students Who Refuse or are Pregnant.* (American Civil Liberties Union, 2022),
<https://www.aclu.org/blog/speakeasy/get-tested-or-get-out-school-forces-pregnancy-tests-girls-kicks-out-students-who#:~:text=In% 20a%20Louisiana%20public%20school,forced%20to%20undergo%20home%20schooling.> [Accessed 19 August 2022].
[120] U.S. Department of Health and Human Services. *Guidance To Nation's Retail Pharmacies: Obligations Under Federal Civil Rights Laws To Ensure Access To Comprehensive Reproductive Health Care Services.* 2022. https://www.hhs.gov/sites/default/files/pharmacies-guidance.pdf.
[121] U.S. Department of Health and Human Services, *Guidance To Nation's Retail Pharmacies,* 2-3.
[122] Guttmacher Institute. *Interactive Map: US Abortion Policies and Access After Roe.* 2022. https://states.guttmacher.org/policies/

***Further Protections, Including for Termination of Pregnancy and Protection of Abortion Access.***

The definition of pregnancy and related conditions can be ameliorated by adding more specificity. The final version of the rule should change "medical conditions related to pregnancy," expanding this phrase to "health conditions related to pregnancy, including, but not limited to nausea or morning sickness, dehydration, fatigue, increased body temperature, anemia, bladder dysfunction, gestational diabetes, pregnancy-induced hypertension (high blood pressure), infertility or need for fertility treatments, gestational diabetes, hyperemesis, preeclampsia, loss or termination of pregnancy, recovery from childbirth, and lactation conditions such as swelling or leaking of breast tissue or mastitis." "Medical conditions" may be misinterpreted to mean that a student must have a condition that is considered a disability under the American Disabilities Act and could limit students' access to accommodations. Mental health concerns, such as postpartum depression or anxiety, should also qualify as a health condition related to pregnancy. This more extensive definition allows students to access accommodations for conditions that may impact their education.

In addition, lack of access to abortion care is an educational equity issue that marginalizes students, especially student survivors of gender violence. As of the writing of this comment, abortion is banned or mostly banned[123] in seventeen states. Abortion restrictions and bans will only exacerbate existing health disparities, which will undoubtedly impact educational outcomes of pregnant and parenting students due to health complications that make it impossible to continue their education,[124] or due to caring for their child.[125]

Gender violence obviously implicates abortion, as a survivor could become pregnant as a result of rape or intimate partner violence. An unwanted pregnancy can disrupt a student survivor's education and exacerbate their trauma. Pregnancy further ties survivors of rape and intimate partner or domestic violence to their abusers, making it harder to escape their perpetrator(s).[126] Given the hostile abortion landscape and the potential for educational inequities, there needs to be additional protections for student survivors of sexual harassment who need to terminate a pregnancy. We therefore urge the Department to require schools to adopt the following policies:

---

[123] Caroline Kitchener et al., *Abortion is now banned in these states. See where laws have changed.* June 24, 2022. https://www.washingtonpost.com/politics/2022/06/24/abortion-state-laws-criminalization-roe/
[124] Bohanon, Mariah. *Experts Encourage College Campuses To Prepare For Repercussions Of Roe V. Wade's Overturn.* (*Insight Into Diversity*, 2022), https://www.insightintodiversity.com/experts-encourage-college-campuses-to-prepare-for-repercussions-of-roe-v-wades-overturn/.
[125] Wladis, Claire. *OPINION: Many Student-Parents Drop Out Because They Don't Have Enough Time For Their Schoolwork, Research Shows.* (*The Hechinger Report*, 2022), https://hechingerreport.org/opinion-many-student-parents-drop-out-because-they-dont-have-enough-time-for-their-schoolwork-research-shows/.
[126] Craig, Hannah. *Limiting Abortion Rights Keeps DV Victims In Danger.* (*Domesticshelters.Org*, 2022), https://www.domesticshelters.org/articles/in-the-news/how-limiting-abortion-rights-keeps-survivors-in-danger.

Exhibit J

First, in abortion-hostile states, schools must shield complainants and their friends in sexual harassment and sex discrimination grievance procedures from retaliation by perpetrators for self-managing an abortion or "aiding and abetting" the complainant in obtaining an abortion. Second, schools cannot discipline, suspend, expel, and refer to law enforcement students who obtain or self-manage an abortion. As previously discussed, disciplinary action has been used as a tool to punish student survivors[127] for coming forward. This has pushed many student survivors into taking leaves of absences, transferring schools, or dropping out completely.[128] Finally, the Department must clarify how the Supreme Court's decision in *Dobbs v. Jackson Women's Health Organization* will impact students' privacy rights under the Family Educational Rights and Privacy Act (FERPA)[129]. Schools need to protect student privacy to ensure that school records regarding reproductive decisionmaking are not used to prosecute complainants in states where abortion and other reproductive healthcare is criminalized. These policies will help promote educational equity for students who sought and/or obtained an abortion, especially student survivors.

***Solidifying Nondiscrimination Procedures to Protect Students.***

The proposed rule would require schools to explicitly state in their notice of nondiscrimination that they do not discriminate on the basis of sex and prohibits sex discrimination in any education program or activity that it operates, as required by Title IX and its regulations. This notice of nondiscrimination should be amended to state the following: "the recipient does not discriminate on the basis of sex and prohibits sex discrimination, including sexual harassment and discrimination on the basis of pregnancy or related conditions and parental status, in any education program or activity that it operates, as required by Title IX and its regulations, including in admission (unless subpart C of part 106 does not apply) and employment (proposed § 106.8(c)(1)(i))." Students may not know that sex discrimination encompasses pregnancy discrimination. This clear language will allow students to understand their rights under Title IX as it pertains to pregnancy and related conditions and parental status.

The proposed rule also states that a recipient may permit a student based on pregnancy or related conditions to participate voluntarily in a separate portion of its education program or activity provided the recipient ensures that the separate portion is comparable to that offered to students who are not pregnant and do not have related conditions. This section of the proposed rule should be more specific about the

---

[127]  Nesbitt, Sarah, and Carson, Sage. "The Cost of Reporting: Perpetrator Retaliation, Institutional Betrayal, and Student Survivor Pushout." Know Your IX. Advocates For Youth, March 2021. https://www.knowyourix.org/thecostofreporting/
[128] *Id* at 15.
[129] College and university presidents raised concerns about how *Dobbs* will impact higher education, *see* Meghan Brink. *Meeting the Vice President on Abortion*. (Inside Higher Ed, 2022),
https://www.insidehighered.com/news/2022/08/09/vice-president-meets-college-presidents-abortion.

Exhibit J

definitions of "voluntary" and "comparable." Students may opt to participate "voluntarily" in a separate activity, but may have been coerced into doing so. The final version of the rule should define "voluntary" as "of their own volition, not forced or coerced." Additionally, the final version of the rule should reevaluate the definition of comparable. This section of the proposed rule must lastly be amended to explicitly prohibit schools from requiring that pregnant, parenting, or students with pregnancy-related conditions participate in separate activities.

The proposed rule's nondiscrimination section should also explicitly prohibit harassment on the basis of parental, family, caregiver, or marital status. In *Tingley-Kelley v. Trustees of Univ. of Pennsylvania*,[130] the District Court stated that it is unlawful sex discrimination to use sex-based stereotypes to deny equal education opportunities because of a student's marital or parental status.

### *The Proposed Regulations' Reasonable Modification, Leave of Absence, and Lactation Requirements Solidify Protections for Students But Must Be Expanded.*

The Department's proposed rule clarifies an educational institution's obligation to protect students from discrimination based on pregnancy or related conditions, including termination of pregnancy and lactation, by providing reasonable modifications to policies, practices, or procedures, allowing voluntary leaves of absence beyond the medically necessary minimum, and ensuring access to a private and sanitary lactation space that is not a bathroom.[131]

### *1) Reasonable Modifications*

Though the Department of Education has consistently required certain reasonable adjustments be made to protect pregnant students' health and help facilitate their continued education, schools have evidently struggled with implementation. In 2018, a student attending Belmont University College of Law in Nashville, Tennessee, reported returning to school *days* after having an emergency cesarean section– before she was even able to drive or carry her own books– due to pressure and lack of support from the university.[132] Another student experiencing a high-risk pregnancy, reported being told to schedule medical appointments outside of class time to avoid using up absences despite a note from her doctor. She was also not given spring schedule information and early exams.[133] Just two months ago, the U.S. Department of Education's Office for Civil Rights (OCR) determined that Salt Lake Community College in Utah violated Title IX because a professor encouraged a pregnant student to drop a course due to her

---

[130] *Tingley-Kelley v. Trustees of Univ. of Pennsylvania*, 677 F. Supp. 2d 764 (E.D. Pa. 2010)
[131] Proposed 34 C.F.R § 106.40(b)(3).
[132] Steven Hale. *Women Say Belmont Law School Discriminates Against Pregnant Students*. (Nashville Scene, 2019), https://www.nashvillescene.com/news/pithinthewind/women-say-belmont-law-school-discriminates-against-pregnant-students/article_2ee17bf4-5586-5daa-bc95-b87b6c31e0b0.html.
[133] Hale, *Belmont Law School Discriminates*.

Exhibit J

pregnancy, did not engage in an interactive process to provide her with academic adjustments or necessary services during her pregnancy, and did not excuse her pregnancy-related absences or allow her later to submit work following those absences.[134] Providing a student with the option of reasonable modifications is essential to preventing pregnancy-based discrimination and to ensuring equal access to education for students who are pregnant or have a related condition.

We appreciate the proposed rule making it clear that schools *must* "promptly" make "voluntary and reasonable modifications"[135] to their policies, practices, or procedures when needed for pregnancy or related conditions, unless a modification is "so significant" that it "alters the essential nature" of the school's program or activity.[136] It is also explicitly clear that Title IX Coordinators have the authority and responsibility to ensure reasonable accommodations are actually provided to students, including by making certain faculty members understand their obligations to comply. We support these proposed changes. We are happy that students are not required to accept a reasonable modification and must approve them. We believe that this participatory process will empower students to advocate for themselves and foster collaboration between students and schools. We support the requirement that modifications be individually tailored to each pregnant student's needs. As the Department correctly noted, the circumstances surrounding a student's pregnancy will vary widely based on many unique factors.[137] An individualized, holistic approach allows students to feel valued in ways that a generalized approach would not.

Nonetheless, the reasonable modifications section of the proposed rule can be strengthened. The proposed "essential nature" qualifier is much too vague and could possibly encourage recipients to deny students who are pregnant or have a related condition access to reasonable accommodations that would enable them to continue their education. We accordingly recommend the Department state that if a student requests a certain modification and it is "reasonably available," then the school must provide it; and that if a modification turns out to be ineffective, then the school must change it or offer additional modifications. We additionally urge the Department to add more specific examples of modifications (e.g., accessible parking, referral to child care or preschool options)[138] and to clarify that recipients need not require documentation from a healthcare provider in most cases in order to grant requests for reasonable modification. This can be extremely and unnecessarily burdensome for students, especially if the modification is one that is obvious or routine in nature (bathroom break, lactation break).

---

[134] U.S. Department of Education. *U.S. Department of Education's Office for Civil Rights Announces Resolution of Pregnancy Discrimination Investigation of Salt Lake Community College.* (2022), https://www.ed.gov/news/press-releases/us-department-educations-office-civil-rights-announces-resolution-pregnancy-discriminatio n-investigation-salt-lake-community-college.
[135] 87 Fed. Reg. at 41571 (proposed 34 C.F.R. § 106.40(b)(3)), 41572 (proposed 34 C.F.R. § 106.40(b)(3)(ii)).
[136] 87 Fed. Reg. at 41572 (proposed 34 C.F.R. § 106.40(b)(4)).
[137] Proposed 34 C.F.R. § 106.40(b)(4)(i).
[138] The Department can add additional examples of modifications for parenting students at proposed 34 C.F.R. § 106.40(b)(4)(iii).

We further believe that reasonable modification protections should apply at the admissions stage, as similarly required under the ADA and in other employment contexts. The Department should also extend the same rights to reasonable modifications to *employees* who are pregnant or have a related condition as opposed to making such rights solely dependent on what modifications are provided to workers with temporary disabilities. When employees receive accommodations, pregnant workers are able to continue working safely and provide for their growing families, while employers retain an experienced employee.[139] Reasonable modifications should undoubtedly be available to *parenting and caregiving* students and employees as well, as the proposed rule does not entitle them to any. They should specifically be available for as long as the student or employee needs to care for a minor child or disabled adult who is sick, as specified in the Department's proposed definition of parental status.[140] This is consistent with the Department's intention to be inclusive and support students with caregiving responsibilities who have repeatedly raised the need for accommodations.

### 2) Easing access to leave for students who are pregnant or have a related condition

We support the Department's requirement that recipients allow students who are pregnant or have a related condition to take a voluntary leave of absence for as long as deemed medically necessary by their healthcare provider or for as long as the school's policy allows–whichever is longer– and to reinstate students when they return to their prior academic status and, as practicable, extracurricular status.[141] We particularly and very greatly appreciate the proposed rule permitting documentation from any licensed healthcare provider and not just a physician. As previously stated, this advances accessibility in higher education, as it recognizes that not all students can easily access a physician. Many pregnant students receive care from doulas, midwives, registered nurses, lactation consultants, and other non-physicians.

Despite this, the proposed rule does not address what happens when students in higher education who take a medically necessary "leave" are forced to withdraw or deregister from school during the leave, which results in ineligibility for critical benefits such as housing, financial aid, and healthcare. We urge the Department to remedy this by providing guidance to recipients on how to provide medically necessary leave without jeopardizing a student's access to benefits. The proposed rule would additionally create an arbitrary and harmful distinction between medically necessary "leave" (recovery from childbirth)–which must be granted if requested– and short "breaks during class" (lactation or bathroom breaks) or "intermittent absences" (for abortion or recovery therefrom)– which would be classified as "reasonable modifications" that a Title IX Coordinator has the discretion to approve or deny. Non-birthing parents and

---

[139] National Women's Law Center and A Better Balance. *It Shouldn't Be a Heavy Lift: Fair Treatment For Pregnant Workers.* (2013), https://www.shrm.org/hr-today/news/hr-magazine/Documents/ItShouldntBeAHeavyLift.pdf.
[140] 87 Fed. Reg. at 41568 (proposed 34 C.F.R. § 106.2).
[141] 87 Fed. Reg. at 41571 (proposed 34 C.F.R. § 106.40(b)(3)), 41572 (proposed 34 C.F.R. § 106.40(b)(3)(ii)).

Exhibit J

caregivers are further excluded from these protections. Thus, the Department should make medically necessary "absences" available to parenting and caregiving students, in addition to students who are pregnant or have a related condition, for as long as they need to care for a minor child or disabled adult who is sick, as specified in the Department's proposed definition of parental status.[142] Once again, this is consistent with the Department's intention to be inclusive and supportive of students with caregiving needs.

### 3) Lactation Protections

We support the proposed rule requiring schools to provide lactating students and employees with reasonable breaks and a clean, private non-bathroom space for expressing breastmilk or feedings. These requirements reflect existing state and federal workplace lactation laws and ensure that students can fully access and obtain the benefits of a recipient's education program or activity. Experts advise breastfeeding parents to pump roughly every three hours in the early months in order to keep their supply up.[143] An inability to pump may cause students to experience pain or may cause clogged ducts and mastitis (inflammation of breast tissue that sometimes involves infection).[144] Students have a right to lactation accommodations that protect their health and the health of their infant, and ensure that they can continue their education or employment. We consequently ask that The Department retain this language in the final rule.

We urge the Department to clarify however, that lactation spaces must further include the following: a flat surface and chair, access to electricity, and access to running water and a refrigeration space where the student may store expressed breastmilk. Lactation spaces should also be required to be in reasonable proximity to the student's place of study or employee's place of work. Students and employees should not have to travel to distant locations to express breast milk, as it may cause them to miss more class or work than necessary or to skip or delay milk expression, risking painful and often severe health complications as a result.[145] Lactating students should not be forced to choose between their health or their infant's health, and their education.

Lastly, the Department should explicitly state that students and employees are not required to use lactation spaces, as they have a right to pump or breastfeed in non-designated lactation spaces if they so wish. This combats shame and stigma associated with breastfeeding in public. No student should face harassment or other discrimination as a result of their lactation status.

[142] *Id.*
[143] Cari Nazeer. *Breastfeeding Access Is a Workplace Issue.* (TIME, 2022), https://time.com/charter/6193639/breastfeeding-work-pumping/
[144] National Women's Law Center., *Breastfeeding FAQ* (2016), https://nwlc.org/resource/faq-breastfeeding-students/.
[145] The Pregnant Scholar. *Fact Sheet: Protections for Lactating Students.* (2022), https://thepregnantscholar.org/wp-content/uploads/FACT-SHEET-Breastfeeding.pdf

Exhibit J

**Protections for LGBTQI+ Students**

We support the proposed rule's listing of anti-LGBTQI+ discrimination as a form of discrimination under Title IX, including discrimination on the basis of sexual orientation, gender identity, sex characteristics (including intersex traits), status as transgender or nonbinary, and sex stereotypes[146]. In its 2020 ruling in *Bostock v. Clayton County*, the Supreme Court affirmed that discrimination on the basis of a person's being transgender is "inherently" a form of sex discrimination.[147] One student stated that "discrimination is embedded into Title IX [current rules] for queer and nonbinary students."[148] This student felt not believed by their school due to their status in a queer relationship at the time of their abuse.

Nearly one-quarter (24%) of people who were out or perceived as transgender in college or vocational school were verbally, physically, or sexually harassed.[149] More than three-quarters (77%) of those who were out or perceived as transgender at some point between kindergarten and grade twelve experienced some form of mistreatment, such as being verbally harassed, prohibited from dressing according to their gender identity, disciplined more harshly, or physically or sexually assaulted because people thought they were transgender[150]. Seventeen percent (17%) faced such severe mistreatment as a transgender person that they left a K–12 school[151].

According to Youth Risk Behavior Survey data from the Centers for Disease Control and Prevention (CDC), the predicted prevalence of experienced physical dating violence among transgender students is 28.2%, while it is just 7.9% for cisgender students; this means that transgender youth are 3.6 times as likely as cisgender students to report this experience[152]. Transgender students reported forced sex, sexual violence, sexual dating violence and physical dating violence at higher rates than cisgender students. For example, one quarter (25.3%) of transgender youth were ever physically forced to have sexual intercourse in comparison to 7.2% of cisgender youth and more than one-third (35.1%) of transgender youth also reported experiencing sexual violence compared to 9.8% of cisgender students[153].

---

[146] 87 Fed. Reg. at 41571 (proposed 34 C.F.R. § 106.10)
[147] Bostock v. Clayton County, 590 U.S. ___ (2020)
[148] Know Your IX, The Every Voice Coalition, & SafeBAE (2022). Student Listening Sessions.
[149] James, S. E., Herman, J. L., Rankin, S., Keisling, M., Mottet, L., & Anafi, M. (2016). The Report of the 2015 U.S. Transgender Survey. Washington, DC: National Center for Transgender Equality.
[150] James, S. E., Herman, J. L., Rankin, S., Keisling, M., Mottet, L., & Anafi, M. (2016). The Report of the 2015 U.S. Transgender Survey. Washington, DC: National Center for Transgender Equality.
[151] James, S. E., Herman, J. L., Rankin, S., Keisling, M., Mottet, L., & Anafi, M. (2016). The Report of the 2015 U.S. Transgender Survey. Washington, DC: National Center for Transgender Equality.
[152] Perry, JR and Frazer, S (2020). On All Sides: How Race & Gender Influence Health Risk for Transgender Students of Color. Washington, DC: Advocates for Youth. https:// actionnetwork.org/forms/on-all-sides.
[153] Perry, JR and Frazer, S (2020). On All Sides: How Race & Gender Influence Health Risk for Transgender Students of Color. Washington, DC: Advocates for Youth. https:// actionnetwork.org/forms/on-all-sides.

Exhibit J

Similar trends were found for having experienced sexual dating violence and physical dating violence, with higher percentages of transgender youth reporting such experiences[154].

From September to December 2021, 45% of LGBTQI+ youth seriously considered attempting suicide in the past year, including more than half of transgender and nonbinary youth[155]. Additionally, 73% of LGBTQI+ youth report that they had experienced discrimination based on their sexual orientation or gender identity at least once in their lifetime, and those who did attempted suicide at more than twice the rate of those who did not in the past year. LGBTQ+ youth are more than four times as likely to attempt suicide than their peers[156][157].

LGBTQI+ young people report lower rates of attempting suicide when they have access to LGBTQI+-affirming spaces[158]. Many LGBTQI+ youth lack access to affirming spaces, with only 55% of LGBTQI+ youth reporting that their school is LGBTQI+-affirming[159]. Therefore, it is critical that the Biden Administration fulfills the intention of Executive Order 14075, to combat unlawful discrimination and eliminate disparities that harm LGBTQI+ individuals and their families, defend their rights and safety, and pursue a comprehensive approach to delivering the full promise of equality for LGBTQI+ individuals[160]. We agree that the federal government must strengthen supports for LGBTQI+ students in our Nation's schools and other education and training programs[161].

We support the proposed rule clarifying that preventing a student from participating in an education program or activity consistent with their gender identity is *per se* a form of sex-based harm and generally violates Title IX because it causes more than "de minimis" harm[162]. The Department must clarify that the de minimis harm standard applies to all sex-separated programs and activities including, but not limited to, restrooms, locker rooms, overnight accommodations, etc. - unless Congress or the Department has expressly stated otherwise.

We support the proposed rules requiring schools to address harassment based on sexual orientation, gender identity, sex characteristics (including intersex traits), or sex stereotypes as a form of

---

[154] Perry, JR and Frazer, S (2020). On All Sides: How Race & Gender Influence Health Risk for Transgender Students of Color. Washington, DC: Advocates for Youth. https:// actionnetwork.org/forms/on-all-sides.

[155] The Trevor Project (2022). 2022 National Survey on LGBTQ Mental Health. Washington, DC: The Trevor Project. https://www.thetrevorproject.org/survey-2022/assets/static/trevor01_2022survey_final.pdf

[156] Johns, M. M., Lowry, R., Andrzejewski, J., Barrios, L. C., Zewditu, D., McManus, T., et al. (2019). Transgender identity and experiences of violence victimization, substance use, suicide risk, and sexual risk behaviors among high school student–19 states and large urban school districts, 2017. Morbidity and Mortality Weekly Report, 68(3), 65-71.

[157] Johns, M. M., Lowry, R., Haderxhanaj, L. T., et al. (2020). Trends in violence victimization and suicide risk by sexual identity among high school students — Youth Risk Behavior Survey, United States, 2015–2019. Morbidity and Mortality Weekly Report, 69,(Suppl-1):19–27.

[158] The Trevor Project (2022). 2022 National Survey on LGBTQ Mental Health. Washington, DC: The Trevor Project. https://www.thetrevorproject.org/survey-2022/assets/static/trevor01_2022survey_final.pdf

[159] The Trevor Project (2022). 2022 National Survey on LGBTQ Mental Health. Washington, DC: The Trevor Project. https://www.thetrevorproject.org/survey-2022/assets/static/trevor01_2022survey_final.pdf

[160] Exec. Order No. 14075, 3 C.F.R. 1 (2022)

[161] Exec. Order No. 14075, 3 C.F.R. 1 (2022)

[162] 87 Fed. Reg. at 41571 (proposed 34 C.F.R. §§ 106.10, 106.31(a)(2))

Exhibit J

sex-based harassment[163]. We urge the Department to clarify that, consistent with recent Department of Education enforcement actions, harassment based on a student's gender identity clearly includes mocking or publicly ridiculing a student using terms of address that are known to be offensive and harmful to the student. The Department should also clarify the important distinction between a simple mistake, such as a teacher inadvertently using the wrong pronoun for a student but then *correcting the error*, and intentional harassment of students through public ridicule and repeated misgendering that causes distress and reduced ability to learn.

We urge the Department to issue its forthcoming rule addressing athletics participation by the end of 2022 so that it may be finalized with this set of proposed rules by spring 2023. Transgender and nonbinary students cannot wait for a separate rule-making process. In 2021, 83% of transgender and nonbinary youth said that they have worried about transgender people being denied the ability to play sports due to state or local laws[164]. Between 2020 and 2022, 15 states passed laws that restricted the participation of transgender and intersex students on athletic teams and often authorized invasive "sex verification" procedures. One student described the proposed rule's lack of clarity for transgender students in sports as "... dehumanizing, I don't feel like any of these measures actually protect transgender students. You made it so they can apply, but you're not supporting them once they're in school. It appears that they don't see me as a full person."[165]

**Religious Exemptions**

In 2020, the previous administration made two changes to the Title IX regulations that allow more schools to discriminate based on sex by claiming a religious exemption, which disproportionately harms student survivors, pregnant and parenting students, students who access or seek access to abortion or birth control, and LGBTQI+ students. First, although the Title IX statute only allows religious exemptions for schools that are "controlled by a religious organization,"[166] the 2020 regulations allow schools that are not actually controlled by a religious organization to claim a religious exemption from Title IX if, for example, they are a divinity school, they require students to follow certain religious practices, or their mission statement refers to religious beliefs.[167] Second, the 2020 regulations assures schools that they may assert a religious exemption *after* they are already under investigation by the Department for violating Title IX.[168] This means students and employees are not entitled to any prior notice of a school's intent to discriminate based on sex despite the Title IX regulations requiring schools to notify students, their

---

[163] 87 Fed. Reg. at 41569 (proposed 34 C.F.R. § 106.2 ("sex-based harassment")), 41571 (proposed 34 C.F.R. § 106.10)
[164] The Trevor Project (2022). 2022 National Survey on LGBTQ Mental Health. Washington, DC: The Trevor Project.
https://www.thetrevorproject.org/survey-2022/assets/static/trevor01_2022survey_final.pdf
[165] Know Your IX, The Every Voice Coalition, & SafeBAE (2022). Student Listening Sessions.
[166] 20 U.S.C. § 1681(a)(3).
[167] 34 C.F.R. § 106.12(c).
[168] 34 C.F.R. § 106.12(b).

Exhibit J

families, employees, and applicants of schools' anti-sex discrimination policies.[169] Unfortunately, the proposed rules do not address these changes.

In Know Your IX's listening sessions with students, we heard from students at religious schools that they experienced retaliation and pushout from schools after reporting violence due to their school retroactively claiming a religious exemption, effectively avoiding accountability for violating students' civil rights. One college student survivor shared that they were kicked out of their religious school on the basis of their transgender identity. After going through a Title IX process to address the sexual violence they experience, their school's religious exemption was triggered after the fact and weaponized against the student to push them out of school. The student shared that in their experience, "there's no such thing as protection at religious schools that have a Title IX exemption." Another student shared that they felt that religious exemptions serve to protect schools that perpetuate discrimination against students: "When it comes down to it, its government funded discrimination. I paid taxes for the discrimination I faced."

College students also shared how the environment at a school that has a religious exemption leads to a culture of silence, and a lack of responsibility on the part of the recipient to respond to sexual violence.

"[At my religiously exempt school,] sex in general was very taboo. No one wanted to deal with it, it turned into a morality thing. Why are you even having sex at all? I know that that was one of the most consistent things that came up. As well as survivors of the LGBTQ+ community being pressured by the school to stay silent. When it came to handling sexual violence, you can't talk about the fact that this happened to you because this person isn't out yet."[170]

According to the Religious Exemption Accountability Project, the LGBTQI+ students experience considerable challenges at religiously affiliated colleges because of how they identify.[171] From their rates of self-reported depression, anxiety, loneliness, suicidality, sexual assault and harassment, and substance abuse, to their inability to be open about their sexuality or gender identity for fear of rejection and condemnation from their campus community, sexual and gender minority students face significant obstacles that create markedly different and inferior college experiences.[172]

Another student shared how school administrators at their religious school intentionally avoided and prevented students from providing feedback about how the school could better address sexual

---

[169] 34 C.F.R. § 106.8(b)(1); 87 Fed. Reg. at 41570 (proposed 34 C.F.R. § 106.8(c)(1)).

[170] Know Your IX, The Every Voice Coalition, & SafeBAE (2022). Student Listening Sessions.

[171] The Religious Exemption Accountability Project (2021). "The State of Sexual and Gender Minority Students at Taxpayer-Funded Christian Colleges." The Religious Exemption Accountability Project, 2021. https://www.thereap.org/_files/ugd/0ae2d2_9b01481f670f45819315aac806b14336.pdf

[172] The Religious Exemption Accountability Project (2021). "The State of Sexual and Gender Minority Students at Taxpayer-Funded Christian Colleges."

Exhibit J

violence on campus. "During the listening session [on sexual violence] over zoom, the chat was intially on... and then they turned it off when we started talking about how sex is taboo because the school is religious."[173]

We urge the Department to swiftly issue proposed Title IX regulations that (i) rescind the rule inappropriately expanding eligibility for religious exemptions and (ii) require schools to notify the Department of any religious exemption claims and to publicize any exemptions in their required nondiscrimination notices. We urge the Department to correct the extra-statutory definition of an "educational institution which is controlled by a religious organization," require prior submission of religious exemption claims and appropriate notice to students and their families of religious exemptions, and rescind the *ultra vires* provisions requiring public colleges and universities to specially recognize and provide benefits to religious student organizations that fail to comply with basic nondiscrimination requirements that apply to other student groups.

**In Conclusion**

Since 2013, Know Your IX has worked with countless survivors who had their educations compromised and interrupted by experiences of sexual violence and harassment. Since joining Advocates for Youth, which works to works alongside thousands of young people in the U.S. and around the globe as they fight for sexual health, rights, and justice, Know Your IX and Advocates for Youth have supported countless youth activists and student survivors in advocating for a Title IX rule that will protect all students' right to an education free from violence. Many of these survivors filed complaints with the Department of Education, in the hopes that the federal government would take their claims seriously and hold their schools accountable for violations of students' civil rights. Survivors also organized within their school communities and passed state legislation to ensure that their campus communities would be safer and more equitable for future generations of students.

The Department of Education's 2020 regulation was poorly reasoned, ill-supported by existing legal authorities, and improperly operated to the detriment of the class of students that Title IX is intended to protect. Upon being promulgated, it returned our country to an era where schools swept violence under the rug and abused survivors with impunity. Know Your IX and Advocates for Youth have continued to support student survivors through this difficult time, as young people's civil rights are violated by their schools with very few accountability mechanisms.

We are grateful to the Department of Education for proposing a new Title IX regulation that will interrupt the harm that students continue to experience with the 2020 Title IX regulation in place. We urge

---

[173] Know Your IX, The Every Voice Coalition, & SafeBAE (2022). Student Listening Sessions.

Exhibit J

the Department to amend the proposed regulations with the changes we have suggested to ensure that all students can pursue their civil right to an education free from violence and harassment and further meet the Department's commitment to ensuring equitable access to education for all.

Thank you for the opportunity to submit comments on the NPRM. We appreciate the Department of Education's commitment to protect young people from sex discrimination, harassment, and violence in schools.

Sincerely,

Know Your IX, Advocates for Youth

*Joined by,*

The Every Voice Coalition

SafeBAE

And the 307 undersigned student survivors, recent graduates, and young people who will be impacted by the Department of Education's proposed changes to Title IX:

1. A. Lewis, Emerson College, Massachussetts
2. AA, Kansas
3. AD, Moorhead High School, Minnesota
4. AD, Prospect High School, Illinois
5. Addie, Illinois
6. Aela Mansmann, Manhattanville College, New York
7. AH, Pennsylvania
8. AL, Syracuse University, New York
9. Alexandra, New York
10. Allison Hritz, Pennsylvania
11. Allison Jasso, Doane University
12. Alyson, University of Richmond
13. AM, Texas
14. Ambyr Braxton, UMass Amherst
15. Amelia, Trinity College, Connecticut
16. AMK, Massachussetts
17. Amy Mbawuike, University of Pennsylvania
18. Amy Sapp, Illinois
19. Ana M, Binghamton University, New York
20. Andrea Flores, Binghamton University
21. Anna Ezzy, Hawai'i
22. Anna Shields, University of Delaware
23. Annaliese S, Illinois

Exhibit J

24. Annika Shiffer-Delegard, Minnesota
25. Anonymous Recent College Graduate
26. Anonymous Recent College Graduate
27. Anonymous College Student
28. Anonymous Scientist
29. Anonymous High School Student, California
30. Anonymous, Binghamton University, New York
31. Anonymous, Binghamton University, New York
32. Anonymous, Binghamton University, New York
33. Anonymous, Binghamton University, New York
34. Anonymous, Cal Poly San Luis Obispo, California
35. Anonymous, Florida
36. Anonymous, Georgetown University, Pennsylvania
37. Anonymous, Maryland
38. Anonymous, Massachussetts
39. Anonymous, Michigan
40. Anonymous, New York
41. Anonymous, University of North Carolina Chapel Hill
42. Anonymous, University of North Carolina Chapel Hill
43. Anonymous, University of Vermont, Vermont
44. Anonymous, Utah
45. Anonymous, Washington State University
46. AR
47. AR, Kentucky
48. AR, Texas
49. Ari Kane, Georgetown University, Massachusetts
50. Arielle G, Ohio State University
51. AS, Binghamton University, New York
52. Ashley Klein, Virginia
53. AT, Pennsylvania
54. Baylynd Porter, Illinois
55. Beau Nelson, Williams College, Massachussetts
56. Bella T. Fong, California and Massachussetts
57. BreAnn Redcross, University of Oklahoma
58. Bridget L, Harvard University
59. Brooke A. Wharton, California Institute of the Arts
60. C. Kaufman, University of Michigan Ann Arbor
61. CA, Binghamton University, New York
62. Cadence Brown, Marshall County High School
63. Caroline Sliver, Penn State University, Pennsylvania
64. Catherine Henderson, University of Delaware
65. Celene Beth Calderon-Olsen, University of Utah
66. Chance Bonar, Harvard University
67. Cheryl Robison, Texas Christian University

Exhibit J

68. Christina O, Binghamton University
69. Claire Ervin Lee
70. Claire McGlynn
71. Colie, Salem High School, Massachusetts
72. Connie Raper, UNC Chapel Hill, North Carolina
73. Cori Wolfe, Ohio
74. D. Heff, University of Wisconsin - Madison
75. Deepthi M, New York
76. Destiny D Cummings, North Carolina
77. DH, University of Alabama
78. Dharma Koffer
79. Diana, Connecticut
80. DK, New York
81. Dolores Lozano, Baylor University
82. Dominic Bossey, Binghamton University, New York
83. DV, New York
84. DW, Georgetown University, Washington DC
85. E. Kane
86. Eden, Binghamton, New York
87. Edward Geppert, Illinois
88. EKR, Claremont McKenna College
89. Eleanor, Washington University in St. Louis, Missouri
90. Elise Higgins, University of Kansas
91. Elizabeth Giardina, California
92. Elizabeth, Hendrix College, Arkansas
93. Ella Pascucci, Binghamton University, New York
94. Ella Suring, Berkeley High School, California
95. Ellie G, Ohio
96. Ellie H, Iona University, New York
97. Elsa F
98. EM, Tufts University, Massachussetts
99. Emily Harrison, George Washington University, Virginia
100. Emily Patterson, University of Notre Dame
101. Emma Grasso Levine, New York University
102. Emma Phoenix, Denison University
103. EO, Rollins College, Florida
104. ER, Hanover College, Indiana
105. Erin Bergen, Goshen College, Indiana
106. Esther Lastique, Florida
107. Ethan, Florida Atlantic University, Florida
108. EU, Binghamton University
109. Faith Ferber, Washington, DC
110. Frank Belcastro, University of Pittsburgh
111. G Broitman, University of North Carolina Chapel Hill

Exhibit J

112. Gabriel Gomes, Notre Dame University and Columbia University
113. GC, Kansas State University
114. Genevieve Rogers, MIT
115. Gianna Milan, University of Miami, Florida
116. Gillian Mulder, Binghamton University, New York
117. Grace B, St. Olaf College, Minnesota
118. Grace Cunningham, University of Cincinnati, Ohio
119. GV, Sam Houston State University, Texas
120. Hannah C, Florida
121. Hannah Krauss, American University
122. Hazel Anderson, Michigan State University, Michigan
123. Heaven Rubin, Miami Palmetto Senior High School, Florida
124. IM, Colorado College, Colorado
125. IM, University of Colorado Boulder
126. IMSB, Massachusetts
127. Iris DeFino, Binghamton University, New York
128. Isa Bogart, Stanford University
129. Isabel Gurwitch, Binghamton University, New York
130. Isabella Myers, Keene State, New Hampshire
131. Isabella T, Binghamton University, New York
132. IV, New York
133. J Brandon, Wesleyan University
134. J. Powell, Binghamton University, New York
135. JA, Illinois
136. Jacqueline Pham, Evergreen Valley High School, California
137. Jailene Ramos, Harvard College
138. Jane Chischilly, Texas
139. Jarrett Cloud, New Jersey
140. Jaslin Kaur, CUNY Hunter College, New York
141. Jay Yencich, University of Illinois at Chicago
142. Jenna Butler, University of Southern Maine
143. Jessica Arvai
144. Jessica, Florida State University
145. Jessica, University of Louisville, Kentucky
146. JL Angell
147. John Ferrara, Binghamton University, New York
148. Jordan H., Tufts University, Massachusetts
149. Josie Shaw, University of Montevallo, Alabama
150. Julieta, University of California Santa Barbara
151. Justin Atkinson, University of Texas at Austin
152. Justin Thompson, University of Tennessee
153. Justin, University of Pennsylvania
154. Kaitlyn M, Connecticut
155. Karaleigh Saar, Boston University

Exhibit J

156.    Karen, CA
157.    Karen, CSUSM, California
158.    Kate Chisholm, University of Arizona
159.    Kayla Randolph, Emerson College, CT
160.    Kaylee Condon, Sartell High School, Minnesota
161.    Kaylie Keim, University of Hawai'i at Mānoa, Hawai'i
162.    KB, University of Utah
163.    Kelly, Northeastern University, Massachussetts
164.    Kendall Clary, Rhodes College, Tennessee
165.    Kendra Whelan, University of Wisconsin
166.    Kenzie W, Columbia High School, Texas
167.    KH, Oregon
168.    Kirsten, Rutgers, New Jersey
169.    KT Fitzgerald, Binghamton University, New York
170.    Lan Anh Dinh, Massachusetts
171.    Laura C, Binghamton University, New York
172.    Laura Reid, University of Houston, Texas
173.    Lauren Schenk, Macalester College, Minnesota
174.    Lauren Stricker, Columbia University, New York
175.    LC, SUNY Binghamton, New York
176.    LD, Kentucky
177.    LeeAnne Williams, University of Notre Dame
178.    Lena Jones, California
179.    Lhiannon, Massachusetts
180.    Liani, Tufts University, Massachussetts
181.    Liceu Adriano Moreira
182.    Lindsay Stone, Binghamton University, New York
183.    LM, University of Notre Dame
184.    LP, The Cooper Union for the Advancement of Science and Art
185.    Luukia, Seattle University, Washington
186.    M, Ohio
187.    Mackenzie Lovell, Michigan State University, Michigan
188.    Maddie, Suffolk University, Massachussetts
189.    Maddy M, Georgetown University, Alaska
190.    Mads, Cal Poly SLO, California
191.    Makoto Toyoda, Binghamton University
192.    Marin Hart, Illinois
193.    Marla Sohl, Nebraska
194.    Max Dixon, Rhodes College, Tennessee
195.    Maya Corral, Barnard College, New York
196.    MC, Stanford University
197.    MCL, Massachusetts
198.    Meghan, Pennsylvania
199.    Meredith Cook, Maine

47

Exhibit J

200. Meredith Kent-Berman, New York
201. Meredith Kirby, Portland State University, Oregon
202. MF, New York
203. Michelle M
204. Mike M
205. Miriam Nunez Valdovinos, California
206. MJ Borreggine, Harvard University, Massachusetts
207. MM, New York University
208. Mollie McDaniel, Wayne State University, Michigan
209. MT, Binghamton University
210. Muriel Bennett, University of New Hampshire
211. MZ, University of Notre Dame
212. Natalia Fuentes, Harvard College, Massachussetts
213. Netra, NC
214. Nicole Garduno, University of Nevada, Reno
215. Nimisha Srikanth, Texas A&M University, Texas
216. Nisha Seyed, Harvard University, Texas
217. NK, Illinois
218. NKA, Penn State
219. Noah Block, Goucher College
220. Noah Glaser, University of Illinois at Chicago, Illinois
221. Noelle D, New York
222. NS, Minnesota
223. NS, New York
224. Oksana Mykhaylyk, Providence College, Rhode Island
225. Oksana Mykhaylyk, Providence College, RI
226. Olivia Kaufmann. Rhodes College, Tennessee
227. Omny Miranda Martone, Northeastern University and Brown University
228. PD, Tufts University, Massachussetts
229. Phyllis W. Benjamin, Ohio
230. R Kohler, Binghamton University, New York
231. Rachel Barkley, Benjamin N, Cardozo School of Law, New York
232. Rachel Barry, Binghamton University, New York
233. Rachel, Illinois
234. Rahil, Pennsylvania
235. Ranen Miao, Washington University in St. Louis, Missouri (54th Student Body President)
236. Ray Epstein, Temple University, Pennsylvania
237. Rebecca, Illinois
238. Ren Birnholz, Northeastern University, Massachussetts
239. Rivka Reider, Binghamton University, New York
240. Rory Corcoran, Binghamton University, New York
241. Rose L, Head-Royce School, California
242. RS
243. RS, Rhodes College, Tennessee

Exhibit J

244.    Sage Carson, University of Delaware
245.    Sage Galati, Binghamton, New York
246.    Sam Rose Garcia, University of California Berkeley
247.    Samantha Walker, Binghamton University, New York
248.    Sanaa Lanett, Texas
249.    Sandy Rhein
250.    Sara R, Texas
251.    Sarah Gordon, Oklahoma
252.    Sarah Michal Hamid, University of Hawai'i at Mānoa, Hawai'i
253.    Sarah, California
254.    Sarah, Northeastern University, Massachussetts
255.    Sasha, Binghamton University, New York
256.    Savannah Collins-Key, University of Tennessee Knoxville
257.    Savannah Graziano, Northwestern University, Illinois
258.    SB, UNC Chapel Hill
259.    Shayla Smith, Binghamton University, New York
260.    Shelby L, CUNY School of Law, New York
261.    Sheridan Burns, Little Elm High School, Texas
262.    Sherrill Futrell, University of California Berkeley
263.    Shona Harbert, Rhodes College, Tennessee
264.    SJ, Massachusetts
265.    SL, New Jersey
266.    SL, SUNY Binghamton, New York
267.    SL, Vermont
268.    Sophia Calabrese, Binghamton University, New York
269.    Sophia D, Binghamton University, New York
270.    Sophia Stolkey, Hendrix College, Arkansas
271.    Sophie Kulowski, Connecticut
272.    Sophie Prescott, University of New Hampshire
273.    Sophie, Binghamton University, NY
274.    Sophie, Denison University, Ohio
275.    SP, Emory University, Georgia
276.    Sriha, University of California Los Angeles
277.    Steph Black, American University
278.    Stephanie Wu, Palomar College
279.    Steven Tannenbaum, George Washington University, Washington DC
280.    Susan
281.    Susan King, University of North Carolina, North Carolina State University, and University of Tulsa
282.    Suzanne, The New School, New York
283.    Sydney Bush, East Carter High School
284.    Sydney W, Binghamton University, New York
285.    Symone
286.    Tabitha Garringer, Mira Costa High School, California

49

Exhibit J

287.    Tahra Suhan, Michigan
288.    Taite Shomo, Middlebury College, Vermont
289.    Tara Delcarmen, Binghamton University, New York
290.    Tavia Galonski, The University of Akron School of Law
291.    Thomas Nielsen
292.    TL, Binghamton University, New York
293.    Tony Fang, UNLV, Nevada
294.    TT, Lafayette College, Pennsylvania
295.    Ursula, Illinois Institute of Technology
296.    VR, New York
297.    W. Fraser, Binghamton University
298.    Will Schneider, Mira Costa High School, California
299.    XW, North Carolina School of Science and Mathematics
300.    Zay, Queens New York
301.    Zayden Q Bartosh, North Dakota
302.    Zoe Farkas, NYU School of Law, New York
303.    Zoe Levitt, Massachussetts Institute of Technology
304.    Zoë Warczak, New York
305.    Zoë, New York
306.    Zoey Brewer, University of Tennessee, Knoxville
307.    ZS, Delaware

Addendum: Comments from Student Survivors

Survivors need protections that preserve their access to education!

-    Anonymous


I was assaulted in the year 2000. There needs to be a hard end date of 60 days for police and Title IX investigations. Despite a same-day arrest by campus police and DNA evidence, my case was never referred to a prosecutor, and I found the police report in December 2021, which *still* states the investigation is ongoing, and so information cannot be shared, because it might compromise the "investigation." I guess an insider leaked the police report. We need more transparency.

-    Anonymous


as a transgender youth who struggles with mental health in every capacity, i need this. these title IX changes mean everything to people like me, who aren't necessarily always taken seriously. this allows us to take a stand for our rights, and feel the support of a government who truly does stand for freedom. i am both a youth and an advocate, and i have seen firsthand how rulings like this can affect people like me. i know three people who have gone through court cases for sexual assault charges and if they had had more rights and more information of said rights, i believe they would be better off today. as for the anti

Exhibit J

discrimination rulings, i recently had to deal with changing my name at school. i had to invoke title IX, as my requests were being ignored. title IX empowers youth and allows them to be treated as people. please extend this support to survivors of all kinds.

- will schneider

Going through the current Title IX process made me want to quit school and life entirely. Over 8 people I knew got assaulted by one man on campus and we tried to go through the process but the school took his side. There was no protections for all the transgender survivors. That is why I sign. I want things to change. I want people to feel safe going to school. The trauma I experienced should not be the norm and I don't want others to continue to experience it through the Title IX process.

- Hanover Student

one of my best friends was assaulted and i'm signing for her and the other girl that were assaulted by the guy. i'm signing on for the girls that one sophomore date raped. i'm signing on for myself because i have 4 more years of high school and 4 of college. i'm signing on for the untold stories, the ones shared only by scandalized whispers in hallways and and shameful looks at the girl. i'm signing on for my older sister who has taught me everything i know, all i need to know, to keep myself and my friends safe. to not leave my drink unattended. how to be there for my friends. that i am not an object. that no means no. and that it would never be my fault.

- Anonymous

My concerns for my safety were dismissed to protect my stalker's access to optional extra curricular activities. Hardly any action was taken to protect me, and the few actions that were taken were too little too late, allowing him to continue to harass me for several months. After more and more meetings with university officials, I was repeatedly told I wasn't doing the right things even though I was the victim and was severely suffering. Eventually they decided to stop listening to me because Covid was starting to become a thing, and since campus life would be different, it wouldn't matter for them to take any action. This treatment cannot continue and I hate the fact that this continues to happen at my school- both before and after my experience, students have been murdered due to my school's failures and refusals to act.

- Anonymous

I was drugged and raped in my dorm room by another college student at the University of Utah in February 2006. After reporting my rape to campus police, nothing was done to protect me from my assailant. Not even Title IX opted to meet with me, let alone some type of counseling. Campus police

would later inquire about any legal action against the student, however, that call was made to my father and not myself. Of course, no legal action was permitted since I was told, ""that would ruin"" my assailant's life since he was a fraternity member and recent war vet.

- Anonymous


It wasn't until I broke my silence against the U of U and campus police in 2019. I received a "dm" from their Title IX office under a dummy account on Twitter. I would later meet with their office and frankly, it was a waste of time due to the inconsistent ""changes"" they presented on behalf of their current students. It is evident to see nothing had changed since my initial report due to the campus murders of Lauren McCluskey and Zhifan Dong. Lauren was murdered mere feet from where I was raped in 2006. These women also reported their assailants to campus authorities with no follow up or urgency made by police. The blood of these women are forever stained on the U of U campus. The level of my anger knows no bounds when it comes to these particular victims.

- Anonymous


In spring 2021, my psychiatrist would diagnose me with untreated PTSD, severe anxiety and depression due to the lack of mental health treatment post-rape. He then recommended therapy sessions twice a week with a psychiatrist AND therapist to combat my mental health diagnosis.This would leave me with the financial burden of this treatment due to the lack of accountability by the University of Utah. I sought out an attorney in 2021 to see if I could purse legal action against the school but I would later face the inevitable statute of limitations. I am now responsible for all the wrongdoings of Title IX and campus police and I will never EVER remain silent again. I fear Title IX will continue to harm victims and survivors alike and real change needs to happen across the U.S.

- Celene Beth Calderon-Olsen, August 26, 2022


I was in a coercively controlling relationship throughout high school. I was only 13 and he was 17 when it started. At that time I didnt know that your boyfriend could rape you. So I just let it happen. For years. I only realized how bad my abuse was within the last few years. Young adults MUST be educated on topics like relationship violence and coercive control so they can look for the signs. I wish I had known then what I do now.

- Colie

As a former student survivor advocate and co-facilitator of the largest student survivor group in DC, I consistently met students who were being failed by the current Title IX office and services. Schools need to do better for their students and they should be held accountable.

- Anonymous

I helped implement Title IX at my alma mater soon after coercive sexual harassment from a staff member not covered by their harassment policy that was limited to professors at that time-- so no complaint option.

- Anonymous

Students of all ages need protection, and schools have shown they need clear and compelling guidance otherwise they will not act in the best interest of the student or the student body at large.

- Anonymous

Title IX gives women the same opportunities to succeed as men have always had. We cannot go backwards!  Successful women create a successful society and country.

- Anonymous

I am a survivor of a brutal Title IX case against an abusive ex boyfriend in medical school. The school sided with him, and this violent man with a criminal record is now on his way to becoming an MD with the power to abuse patients in addition to women. This must stop. Schools must be accountable for taking action against perpetrators and ensuring that unstable violent criminals are not allowed to enter the medical profession. Otherwise the Larry Nassars of the world will never stop hurting and abusing innocent patients.

- Anonymous

During my time at Portland State University, I had one professor (Anoop) sexually assault me and another professor (Kevin) do something else to me which was worse. I later found out that Kevin has been doing terrible things to students for years. Neither of these men really faced any consequences for their actions. I met Anoop in a strip club where I was working. He asked what I did outside of the club and I said I was a student at PSU. He said he was a teacher there. We talked for a while and then he asked me for a lap dance. During the lap dance, he tried to perform oral sex on me without my consent. I told him I would report him to the school and then he tried to bribe me. The school's investigation found that the he sexually assaulted me, and he even admitted to offering me money after I said I would report him. His

Exhibit J

punishment was taking a workshop about power imbalances. Other students have emailed me to tell me that his behavior in class and on campus also made them uncomfortable after I spoke about what he did on social media. Kevin has faced no consequences at all to my knowledge despite multiple students coming forward and saying that his behavior drove them to the edge of suicide. A district attorney for Multnomah county said that his behavior towards me resembled sex trafficking. It's a long story but to put it in a nutshell he put me in a position where I felt like I had no choice but to sleep with his friend (who was also a former adjunct prof in the same department) and did this while I was having a psychotic episode (I am bipolar), was un-medicated and had completely lost touch with reality. Later the friend was stalking me and Kevin maintained a relationship with him and egged on the stalking. What he did to the other students wasn't quite the same but equally traumatic. He even confessed in writing to having inappropriate relationships with multiple students and still has faced no consequences. He tried to convince me that what happened with him was (direct quote) "a figment of my imagination." I guess that many of his former students must have vivid imaginations. Kevin also sued the school, claiming that they would've protected him better from the emails of a former student if he were a woman. That student was expelled and banned from the campus, and the school failed to grasp that this student was actually Kevin's victim, driven completely nuts by his manipulation and gaslighting. This man is a serial abuser and seems even to have abused Title IX as a means of hurting his victims. Both men still teach at PSU. I was kicked out of a law class called Civil Liberties for bringing up the sexual assault. I have given up on my dreams of going to graduate school. I feel that I have been discriminated against on the basis of my gender and my disability. The school doesn't see it that way.

-   Anonymous


I went through the system in undergrad. Students and survivors deserve better.

-   Anonymous


I was sexually harassed by professors at the two universities in NC and assaulted and battered by a female professor at The University of Tulsa. I only reported the incident in Tulsa, I had to sign a non-disclosure agreement, the university forced me to graduate early and before I met all the requirements for the degree, the Title IX coordinator was an assistant Dean and therefore had a stake in protecting the university, the investigation took over 5 months and witnesses were not interviewed. Please do not forget that professors, not just other students, can and do violate this law, and that a female professor assaulting and battering a student with no sexual violence is also a violation of Title IX.

-   Susan King

Exhibit J

Providence College has failed me when I needed to be protected from my abuser. I had to transfer colleges for my safety due to retaliation from students.

- Anonymous

I had to file a complaint against severe sexual harassment by my advisor/ research head/boss at my University (and in the workplace as i held a research position there) as a graduate student by an individual in power has done long lasting damage that ruined my career and life prospects. We need stronger laws for the protection of women who file against their superiors who hold positions of power. No one should be allowed to have that much power over their young students.  We need stronger laws to protect those women brave enough to take a stand against evil. We need more anti-retaliation laws.

- Anonymous

From one survivor to another, we need protections in place.

- Anonymous

I want to promote and support policy changes that protect survivors and, accordingly, protect everyone.

- Anonymous

As someone who was assaulted on campus during my Freshman year of college and had to navigate through the aftermath of that experience, I believe these changes to Title IX could help provide the support to students that I did not have.

- Anonymous

I'm signing because the Title IX policies on sexual assault, especially at Notre Dame, are vastly insufficient. Title IX is so important to student survivors because schools are required to investigate all reports whereas the legal system has the power to pick and choose which is so corrupt. The Title IX outlet then needs to be adequate to really ensure that perpetrators receive necessary punishment to take accountability for their actions.

- Emily Patterson, University of Notre Dame

We need safer schools.

- Anonymous

Exhibit J

Survivors of sexual violence must be protected and believed, and the right to remain in their place of education and to feel safe is essential.

- Anonymous

Title IX needs to be as survivor-focused as possible.

- Anonymous

I am signing on because, as a student survivor, I demand justice and better resources for survivors in campus settings in order for us to be able to continue our education and feel safe and supported in our school environment. Myself and so many others have been consistently failed by the system in being protected and given the care and action that we needed upon experiencing sexual violence on campus. I hope that not one more survivor has to face the injustices that come with sharing their stories or seeking help at the administrative level, and that the institutional negligence that so many colleges default to will no longer be acceptable. Our stories matter. Our voices matter. We demand better.

- Anonymous

Its protections of LGBTQ students and victims of sex based harassment are long overdue.

- Anonymous

A college campus should not be a dangerous place for women.

- Anonymous

Being a low-income, former foster care youth, I believed being accepted into an Ivy League institution was my ticket to upward mobility. After a life of trauma and setbacks, I thought the universe was rewarding me for not giving up. My vehicle for success became something else I had to survive, as I was stalked on and off campus by a fellow student. The hardest thing about my experience wasn't being believed or taken seriously by administrators. They had a hard time seeing that "someone like me" was being harmed. My upbringing and being socialized on the margins of society didn't make me a respectable or credible victim. My university once again made me a statistic and ultimately pushed me out of my education. We need protections at educational institutions. The system in place is broken. We need more additions to such protections, not more reductions.

- Anonymous

Exhibit J

These changes to Title IX are crucial to support and protect student survivors. In my undergraduate experience, I witnessed the gaping holes in the Title IX process which put survivors into danger and disrupted their education, while ultimately violating their Title IX rights. Institutions must stop sweeping survivors under the rug and instead work with survivors voices to create safer campuses.

-    Anonymous

A person can only be their most successful in school when they and their rights are tangibly protected.

-    Anonymous

As a survivor of domestic violence, I believe it's extremely important to restore protections from sexual harassment and assault, as well as sex-based discrimination, including for LGBTQI+ students who confront discrimination based on their sexual orientation or gender identity. Over the course of the last 6-7 years, I have been fighting a Title IX case against Baylor University for not only their institutional failure, but for all the other survivors. Enough is enough. It's time for a change.

-    Anonymous

When in college, my ex boyfriend was abusive. I had a restraining order against him and was going to court for a domestic violence case against him. During this time, I had a class with him and Temple University said nothing could be done to take me or him out of the class because we both needed the class to graduate. Luckily the professor was understanding and let me finish my assignments without coming to class in person and having to see him.

-    Anonymous

My university failed me by not finding my assaulter responsible for his actions.

-    Anonymous

The underlying rights to protection from harassment on college campuses still haven't been fulfilled.

-    Anonymous

When I was a freshman, an upperclassman warned me not to trust IX to protect me. Throughout my time at college, I only saw those limited protections deteriorate. Thus, when I was assaulted I did not even consider reporting it to be an option for me. I want people to feel safe reporting sexual assault in the future and this is a step towards that future.

-    Anonymous

Exhibit J

I believe in justice for survivors.

- Anonymous

We should without any hesitation be supporting survivors in the biggest ways possible. As a survivor myself, I cannot imagine how impossible it would have been to fight through the misery, pain, sadness, rage, etc without unconditional support from friends, family, and institutions. Whatever is best for survivors should absolutely be in place.

- Samantha Walker

Title IX gives some form of protection even when administrations don't want to do anything – at least they have to do something.

- Anonymous

I was sexually assaulted by coercive consent. The current Title IX standards do not clearly condemn this and my case was overturned. I have also been harassed several times and the current Title IX standards were not able to help me.

- Anonymous

I was a part of the changes that were made during the Trump administration. I was actively supporting multiple peers going through cases on my campus. Without my university grandfathering in old policies, my peers would have been left behind due to changes in cross-examining, location, legal representation, timeline, etc. I am signing this document because it is imperative for the sake of justice that these protections be put in place.

- Anonymous

I signed on to the comment, because I have been organizing against campus sexual violence since 2015, and while some campuses have made improvements since then, large-scale change needs to happen so that students of all ages can attend campuses free of sexual violence. Title IX is important to that change.

- Anonymous

Our kids are under attack in our state saying trans girls cannot play on girls teams and that school staff must use legal names. Our students rights are being violated and the adults are getting away with it while

Exhibit J

at the same time our suicide rates are staggering. Please help save lives. I'm lucky to have survived this state and am moving next year.

- Anonymous, North Dakota

As a graduate teacher, I've watched my undergraduate student survivors be failed by our under-staffed and directionless Title IX department. It's been a heartbreaking and infuriating experience to watch them seek out and never receive justice. Nobody else should go through that.

- Anonymous

Last year, a group of survivors and I held a protest on campus to draw attention to the way our Title IX office was failing. One thing we heard frequently when asking for faculty support was that the college couldn't change anything because then they'd not get the federal funding they needed. It was incredibly disheartening to learn that the school was assigning a monetary value to their students safety like that.

- Anonymous

I am a survivor who was raped and violently assaulted on my college campus by a friend and fellow student in the fall of 2020. I had an absolutely horrible experience with the Title IX office and coordinator at my school. I was not informed of or encouraged to seek proper resources. The way I was interviewed was not trauma-informed at all. The whole process was extremely re-traumatizing and made me feel like the assault was my fault. There were several lines of questioning about my sexual history during my initial interview, with no reasoning for this ever being given by the coordinator during the process. The "investigation process" took months and months, and the sheer length of it was enough to discourage me from pursuing the case, especially since my abuser was a senior about to graduate at the time. The student who raped me was wealthy and had an attorney as his advisor, whom I believe intimidated my school's Title IX office into pressuring me toward an informal resolution, with conditions that I was ultimately not comfortable or satisfied with. The Title IX coordinator at the time in my opinion broke (by 3rd party mediation) the no-contact order that had been put in place between me and him (the respondent): feeding me via email his purported wishes for an informal resolution after months of an ongoing investigation, despite me stating multiple times over the course of the investigation that I wished to pursue a formal hearing. I had a faculty member as my advisor who tried her best but was unfortunately not properly trained in the workings of the Title IX process by the college. All of this pressure and failure of support ultimately led me to give in to the informal demands of the respondent and his attorney. I felt defeated. I was persecuted and reprimanded by school officials for outing the student who assaulted me as a rapist months later, after realizing I was not happy with the outcome of my case or the way I was treated by the

Title IX office. I was even formally charged with (but not found guilty of) violating the student code of conduct for doing so. I started voicing my concern within my campus community, and many other students, fellow survivors, and faculty agreed with me. We protested and compiled a list of coherent demands for better supportive measures for victims of gender-based violence, campus-wide Title IX training, timely reporting, trauma-informed interviewing and effective communication, etc. We (student and faculty organizers) were met with staunch refusal to work with us on any of these points from administrative officials, seemingly out of their fear of breaking/violating any of the Trump-era regulation changes. These regulations need to be reviewed and changed immediately, as every day that goes by without the Trump administration's work being undone, more students are harmed and lives are shattered. American universities like Hendrix College leave students facing life-threatening violence alone and in the dark because they are afraid of breaking federal policy. I urge the Department of Education to please be thorough, fair, and just when writing this legislation that is supposed to protect and support students in their education when the unthinkable happens. Please help us to survive.

- Anonymous

I believe in the rights of students that may have been affected by incidents – either within the school or outside – need to know that they are safe!

- Anonymous

For far too long, survivors of sexual assault and other forms of sex/gender harassment have had their education upended by ineffective responses by schools. Under Betsy DeVos, things became even worse with a new Title IX rule that made it a challenge for survivors to obtain remedies for sexual assaults occurring in off-campus settings, even when having an impact on campus. Moreover, the rule created a requirement for live hearings with cross-examination in the college/university setting that had no place in an educational setting and did nothing to promote a fair process, while creating a number of roadblocks for survivors, turning Title IX into a rule protecting abusers rather than a rule protecting survivors. As someone enrolled in the midst of the abrupt onset of the 2020 Title IX changes during the start of the COVID-19 pandemic, having the protections taken away from off-campus conduct made it impossible to pursue any remedies for an incident taking place off-campus, even though it was almost immediately after a school-sanctioned event took place at an off-campus location. I urge the Department of Education to follow all the recommendations in the above comment to protect the education of all survivors of sexual assault and other forms of sex/gender harassment.

- Anonymous

Exhibit J

60

I've dealt with Title IX issues my whole college career due to my gender & sexual orientations. As a non-binary queer student, more protections are needed to ensure that I am protected and can get the help I need when I inevitably face discrimination on my college campus.

- Mads, CA college student

My Title IX process was traumatizing rather than helpful. The process is so unorganized and I was tossed through the hands of many under-trained staff, ultimately to end up with an agreement with my perpetrator that made it seem as if what he had done was not a crime, and that our solution should require mutual sacrifice. This must change to show survivors we support them and that help is available.

- Anonymous

I was sexually abused, harassed and hunted by faculty as if sexual predation of the students was a game and side-perk of being faculty and staff. The over-whelming sexual predation of vulnerable students was not only condoned by the administration, it was applauded, as the president of the school regularly sexually assaulted his vulnerable chauffeurs, all of whom were young men (mostly teenagers), for whom this was a federal work- study job. Sadly, the unrelenting sexual abuse of children and young people in the arts is grossly under-reported, as children and young adults in the arts count on the "teacher" and/or administrator (usually their abuser) to assist them in providing an entry into their careers.

- Anonymous

Title IX is something I never know about, no one told me. It was something I learned years after my assault. It's important that all students know what rights they have after a sexual assault. We deserve options instead of silence.

- Anonymous

I was r*ped by an employee of my women's college in early 2019. The Title IX investigation lasted a year and was even worse than my experience with the criminal investigation. As Trump era rules took effect, I was maliciously blamed and called a liar by my college for what happened to me by one of their employees.

- Anonymous

As a 2004 graduate from Little Elm High School in Little Elm, TX, I now understand I was surrounded by a cesspool of predators. The way the system is currently set up did not protect me from sexual harassment back then, it did not protect my childhood friend against being groomed and sexually abused

Exhibit J

by our teacher and will not protect my now freshman daughter. I'm speaking up in honor of the two women who bravely shared their horrifying stories on the newly released documentary "Keep This Between Us." Thank you!

- Sheridan Burns

Survivors deserve to have their voices heard when it comes to Title IX policy. We deserve to have our safety and justice prioritized, instead of prioritizing the safety and reputation of universities. We deserve our needs and our healing to be centered in the Title IX process.

- Anonymous

I signed this petition because, though I was not assaulted by a college peer, I have been a victim of sexual assault on several occasions and believe we need to do much more to protect and support survivors! I believe it's important to recognize that our current systems often fail survivors when it comes to creating a proper support system. This can be remedied through the actions outlined in the proposal; such as having a designated full time confidential employee on every campus, and implementing supportive measures accessible to survivors regardless of the resolution they choose.

- Anonymous

Even though my Title IX case is over, it is my hope that this expansion will further support, protect and help my friends and peers that are still in school. Education is a universal human right and we must defend every survivor's access to unimpeded education.

- Anonymous

All students should have the freedom to attend school without the fear of violence. I work with survivors on my campus and I am a survivor myself, and we reserve the right to an education without having our lives jeopardized. It makes the difference when there are policies in place to protect students and when a school will stand to defend its students in every way possible.

- ML

I am one of the current co-leaders of the Women's Student Union at Berkeley High School. Last year we filed a lawsuit against the Department of Education for Title IX violations, leading them to propose this amendment to Title IX. We want to see the amendment take effect across the country and we urge them to listen to young people and pass this immediately.

- Anonymous

Exhibit J

Providence College is a private Catholic college in RI that has used its religion and status as a private institution to deny me various rights to safety and health. I was traumatized over and over throughout the very delayed and dragged-out Title IX investigation. I was harassed by the administration, the counseling center, students, and was the victim of malicious rumors and untruthful statements against me in the investigation. I will continue to suffer from this cumulative PTSD for the rest of my life. My education, career, health (mental/physical/emotional) were impacted which have changed the entire course of my life. My rapist and abuser will never face any social/legal/health/financial/education/career consequences. He will likely do this to other women since he has not faced any consequences, even socially. I have little sisters who will start college and I worry for their safety and future.

- Anonymous

I signed on and demand these changes to Title IX because student survivors deserve better, and should not have to pay for support services or fear retaliation. Additionally, LGBTQ+ student survivors deserve stronger protections.

- Anonymous

Title IX has failed so many people. I know some of them.

- Anonymous

I am currently a PhD student in a STEM field at a public university. During my graduate career, the Title IX/OED office and the Title IX provisions have had a profound and life-saving impact on my life. Last year, my dissertation advisor, a tenured professor, was placed on adminstrative leave following a multitude of sexual harassment, sexual assault, and verbal/physical assault allegations, including my own. The immediate and long-term actions of my university, and the protections they and my department were able to provide myself and others, are the reason that my life and education are still intact today. The policies in place allowed the UT administration, my faculty, and my lab to provide safety and stability after years of being harassed and abused by my advisor. It is a stability that I did not believe was possible to achieve again while being a student here. By the time my former advisor was placed under investigation, multiple current and former students---women and men---had come forward to submit statements detailing sexual and professional degradation, bullying and abuse, and sexual harassment and assault. It should not have taken two decades for this man to be removed from his position and his crimes to come to light. The catalyst was the provisions UT has gained in recent years that made former students feel they could finally come forward with their experiences.

Exhibit J

- Savannah Collins-Key, Ph.D. Candidate, University of Tennessee

The research points to having options for survivors. Title IX can do more harm than good if it does not serve the unique needs of survivors. This comment addresses those needs. We do not need mandated reporting, we need mandated support: it should be entirely up to me what I do with my story, including who hears it. I waited until the day after my graduation in my undergraduate program to report because I was afraid of not being supported. I went to a Catholic school and was afraid of administrators knowing I was sexually active. As a graduate teaching assistant now, my students disclose stories to me. I want my students to have fully informed choices when it comes to reporting. I want them to have many options so they can seek support in the way that they feel is best. No one knows what is best for a survivor at that exact time except that survivor.

- M. Colleen McDaniel

As attacks on abortion and bodily autonomy continue to increase, the need for safety on our campuses is paramount. Allowing survivors of sexual violence on college campuses the tools they need to speak up and feel safe is critical.

- Anonymous

We need to preserve this for our girls!!!

- Anonymous

Protect individuals from harassment!

- Anonymous

Any change meant to protect the freedom to exist as a safe, healthy, and truthful person must be cemented. The rights and lives of our students are investments into the health of this country.

- NF

Title IX protections were part of what saved my life following a PTSD diagnosis after being drugged and raped in grad school. It is essential that we protect all students from gender based discrimination.

- Anonymous

I have had two open investigations for three years and have only been hurt further by this process.

- Anonymous

Exhibit J

As a student, my Title IX complaint would not have been accepted under the DeVos regulations, and the Department of Education would not have picked up my case to force my college into legal compliance. As a student advocate, my clients deserve protections and supportive measures no matter how they engage in processes. And as a Kindergarten teacher, my students deserve to be protected throughout their education no matter their gender identity and expression, sexual orientation, eventual pregnancy status, and experiences with gender-based violence and harassment.

- Anonymous

Student survivors deserve to feel safe in schools!

- Anonymous

Without Title IX, I would not have had the support to continue my education while navigating legal avenues available to me as a victim of the dating/sexual violence, harassment and stalking I endured from another student. The Title IX department at my school offered literal life-saving counseling to me free of charge, moved me to a different section so that my abuser and I would not be in class together, worked with my professors to develop a schedule that both worked with court dates and granted me breaks to stabilize my mental health, and connected me with partners in the community like Women Helping Women to provide additional legal advocacy as I sought a restraining order and pressed criminal charges against my abuser. Everyone deserves a fair chance at education. A fair chance means ensuring Title IX works for victims of sex and/or gender harassment/violence/abuse who need policies in place that grant us the ability to focus on our schoolwork and not all the bullshit others force upon them. I believe the points KYIX has highlighted in their comment provide great examples of how you can show us that you hear and support us. I hope you will take them into consideration.

- Anonymous

I urge the Department to alter some of your current rules pertaining to the Title IX rules of the 1972 Education and Amendment Act.

- Anonymous

As a sex educator, reinforcement of title ix is vital to the safety and support of all students in preventing sexual violence.

- Anonymous

65

Exhibit J

We need to do better – bottom line.

- Anonymous

My college barely even has a Title IX office, and as a survivor, that's offensive. Title IX is meant to allow me to report what happened without fear of repercussions, and that's more valuable than anything. All survivors deserve access to justice. I am especially supportive of including trans and queer students under the new Title IX guidelines, expanding non-discrimination protections to LGBTQIA+ students.

i sign onto this comment because i'm a survivor.

- Anonymous

Healthy Care and Bodily Autonomy should be equitable.

- Anonymous

I signed on to show my support. In college (Western Mich U) I was raped twice. If that counts, I'll need to make comments.

- Anonymous

Title IX covers many topics when it comes to equality and equity, and needs to be protected to keep protecting.

- Anonymous

It is imperative that on campus policy actually reflects the voices of students, especially those of survivors.

- Anonymous

I knew many girls who suffered from SA, myself included, and instead of focusing on healing - they had to battle the school to try and get any form of justice. Most of which never came.

- Anonymous

I work in DV/SA/HT advocacy and many of the stories I've heard occurred in college. Many people did not report due to lack of evidence/fear of retalliation/not being believed. Perpetrators of this violence received no consequences for their actions and are more likely to repeat this behavior in the future, creating many more, preventable victims. This should not be.

Exhibit J

I was sexually assaulted by a friend during the Red Zone of my freshman year at UMiami. One year later, and soon after the toxic Trump-DeVos policy went into effect, I endured—and won—my Title IX case against my rapist, who I later learned was a notorious campus sexual predator.

- Anonymous

Although these were the most emotionally taxing six months of my life, I was so fortunate to come forward to a Title IX investigator who listened to me and never victim-blamed me; to have an advisor/advocate who believed my story and truly cared about my healing by my side throughout the case; and to be surrounded by friends who always saw me as an unbroken person worthy of love and support while I struggled to see myself the same way.

- Anonymous

It goes without saying that earning justice through Title IX played a monumental role in my healing journey and sparked my passion for survivor activism.

- Anonymous

I've listened to dozens of stories that are beautiful yet devastating. The power of #MeToo is real, and it's always mutually comforting to be reminded that as survivors, we are not alone. But my heart especially aches every time I hear from a survivor who who was re-traumatized by their failed experience with Title IX—because their feelings and stories were dismissed by people who were supposed to help them, not hurt them.

- Anonymous

I personally have been affected by gender discrimination. I have almost lost my job at the university because of it and so far the Office of Equal Opportunity can't do anything about it. If these changes were proposed, I'd be able to get the justice I deserve.

- Anonymous

The fact that the government refuses to address safety for LGBTQ+ student means they are deciding to side with those who discriminate. There is no middle ground on the subject and the current Title IX is still with those who discriminate.

- Anonymous

Exhibit J

This is why I—and we—need a strong Title IX rule that's PRO-SURVIVOR. It pains me to think about it, but my story is an anomaly. I'm the only person I know who's won their Title IX case—and I wish I wasn't. From experiencing a loss of self-esteem to suffering from PTSD and depression to undergoing therapy, student survivors of gender-based violence already have tremendous mental health obstacles to overcome on top of the demands of academics and navigating young adulthood. And our schools, specifically our Title IX administrators, should not be another source of obstacles that further derail our lives.

- Anonymous

Exhibit J



September 12, 2022

Dr. Miguel Cardona                          Catherine E. Lhamon
Secretary                                   Assistant Secretary for Civil Rights
U.S. Department of Education                U.S. Department of Education
400 Maryland Avenue SW                      400 Maryland Avenue SW
Washington, DC 20202                        Washington, DC 20202

*Submitted via www.regulations.gov*

Re: ED Docket NO. ED-2021-OCR-0166, RIN 1870-AA16, *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*.

Dear Secretary Cardona and Assistant Secretary Lhamon,

On behalf of the 170,000 members and supporters of the American Association of University Women (AAUW), we are pleased to submit this comment regarding the Department of Education's (the Department) Notice of Proposed Rulemaking (NPRM or proposed rule) on Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, as published in the Federal Register on July 12, 2022.[1] AAUW has long advocated for educational equity for women and girls and supports the strengthening and vigorous enforcement of Title IX. We applaud the Department's NPRM to amend the rules implementing Title IX of the Education Amendments of 1972 (Title IX), which would I) restore protections for students against all sex-based harassment, including sexual harassment; II) clarify protections for lesbian, gay, bisexual, transgender, and queer (LGBTQ+) students; and III) strengthen supports for pregnant and parenting students. We appreciate the Department's commitment and efforts to restore the promise and protections of Title IX.

**I. *Restore protections against sex-based harassment***

When education environments are hostile due to sexual harassment, assault, or violence, students cannot learn and end up missing out on true educational opportunities. Yet sexual harassment, including sexual assault, remains prevalent in K-12 schools and in higher education. AAUW's own research found that nearly half of students in grades 7-12 and two-thirds of college students

---

[1] U.S. Department of Education, Proposed Rule, "Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance," *Federal Register* 87, no. 132 (July 12, 2022): 41390, https://www.federalregister.gov/d/2022-13734.

Exhibit J

face sexual harassment.[2] Further, studies have shown that around 1 in 4 women and 1 in 15 men are sexually assaulted in college[3]—and incidences are often higher for LGBTQ+ students, Black and Brown women, and other marginalized students.[4] Sexual harassment and assault in schools continues to be underreported, however, and research shows that when survivors do report their assaults, many are ignored or punished rather than receive the support they need.[5] Educational equity for women and girls requires fair, responsive, fully-developed campus sexual harassment and assault policies; knowledgeable administrators; and ultimately an end to sexual harassment and violence on campuses.

Title IX regulations implemented in 2020 narrowed the definition of sexual harassment to potentially exclude many students' experiences and altered when and how schools must respond to reports of sexual harassment, applying more burdensome standards in these cases and requiring live hearings and cross-examination.[6] The 2020 rules made it harder for students to come forward about sexual harassment or assault and to get the support they need from their schools. On behalf of our members and supporters, AAUW submitted a comment to the Department strongly opposing these changes.[7]

The proposed rule restores many of the protections against sexual harassment that were gutted by the harmful regulations implemented in 2020, and broadens the scope of harassment to which schools are required to respond. Under the proposed rule, schools are required to respond to complaints of *all* sex-based harassment, including sexual harassment, and to prevent sex-based harassment and discrimination from reoccurring.[8] Importantly, schools would be required to address sex-based harassment that occurs in educational programs and activities on or off-campus—including study abroad programs outside of the United States, if the harassment contributes to a hostile environment.[9] Schools would also be required to address complaints of sex-based harassment if the complainant was participating or trying to participate in a school

---

[2] Catherine Hill and Holly Kearl, *Crossing the Line: Sexual Harassment at School*, (Washington: American Association of University Women, 2011), https://www.aauw.org/resources/research/crossing-the-line-sexual-harassment-at-school/.

[3] David Cantor et al., *Report on the AAU Campus Climate Survey on Sexual Assault and Misconduct*, (Rockville: Association of American Universities, 2019), https://www.aau.edu/key-issues/campus-climate-and-safety/aau-campus-climate-survey-2019.

[4] Elizabeth Tang et al., *Title IX at 50: A Report by the National Coalition for Women and Girls in Education*, (Washington: National Women's Law Center, 2022), https://nwlc.org/resource/ncwge-title-ix-at-50/.

[5] Sarah Nesbitt and Sage Carson, *The Cost of Reporting: Perpetrator Retaliation, Institutional Betrayal, and Student Survivor Pushout*, (Washington: Advocates for Youth, 2021), https://www.knowyourix.org/thecostofreporting/.

[6] U.S. Department of Education, Final Rule, "Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance," *Federal Register* 85, no. 97 (May 19, 2020), https://www.federalregister.gov/d/2020-10512.

[7] American Association of University Women, *AAUW Comments to Department of Education Opposing Proposed Regulatory Changes Regarding Title IX*, January 30, 2019, https://www.aauw.org/app/uploads/2020/02/AAUW-Comments-to-Department-of-Education-Opposing-Proposed-Regulatory-Changes-Regarding-Title-IX-nsa.pdf.

[8] 87 Fed. Reg. at 41572 (proposed 34 C.F.R. § 106.44(a)).

[9] 87 Fed. Reg. at 41571 (proposed 34 C.F.R. § 106.11); The proposed rule returns to the definition of "hostile environment harassment" as sufficiently "severe or pervasive" sex-based harassment that "denies or limits" a person's ability to participate in or benefit from an educational program or activity, as was the standard prior to 2020 (proposed 34 C.F.R. § 106.2(2)).

Exhibit J

program or activity at the time they experienced harassment, even if they are not currently a student or employee of the school.[10] Lastly, we support the provision in the proposed rule that would allow schools to comply with a state or local law that provides greater protections against sex discrimination, including harassment.[11]

The proposed rule similarly strengthens retaliation protections, which would extend to all reports of sex-based harassment.[12] Schools would be required to investigate complaints of retaliation, if requested, and to offer supportive measures to individuals who report retaliation.[13] We urge the Department to clarify that retaliation includes disciplining a complainant for conduct that the school knows or should know "results from" the harassment or discrimination (e.g. missing school, expressing trauma, telling others about being harassed); disciplining a complainant for charges the school knew or should have known were filed for the purpose of retaliation; requiring a complainant to leave an education program after reporting sex-based harassment or other sex discrimination; and requiring a complainant to enter a confidentiality agreement as a prerequisite to obtaining supportive measures, an investigation, informal resolution, or any other Title IX rights, unless otherwise permitted by the Title IX regulations.

Under the proposed rule, schools would be allowed to dismiss a complaint where a respondent has transferred, graduated, or retired, as long as they provide supportive measures and take other "prompt and effective steps"[14] to ensure the harassment or discrimination does not continue or recur. We urge the Department to clarify that when a school chooses to dismiss a complaint because the respondent has left the school, such "steps" may include, but are not limited to, determining whether there were other victims and whether school staff knew about the incident(s) but ignored it, or took steps to cover it up.

The proposed rule further requires schools to provide supportive measures for students regarding all complaints of sex-based harassment, even if the complaint is dismissed.[15] We urge the Department to explicitly clarify that if a party requests a certain supportive measure and it is "reasonably available,"[16] then the school must provide it; and that if the school is aware that the supportive measure offered are ineffective, then the school must modify it or offer additional supportive measures. We further urge the Department to require, rather than simply allow, schools to designate "confidential employees,"[17] who would not be obligated to report to their Title IX coordinator but who could offer students confidential support.

---

[10] 87 Fed. Reg. at 41567 (proposed 34 C.F.R. § 106.2).

[11] 87 Fed. Reg. at 41404; *see also* 34 C.F.R. § 106.6(h).

[12] 87 Fed. Reg. at 41568 (proposed 34 C.F.R. § 106.2 ("retaliation")).

[13] 87 Fed. Reg. at 41579 (proposed 34 C.F.R. § 106.71(a)).

[14] 87 Fed. Reg. at 41573 (proposed 34 C.F.R. §§ 106.44(f)(6)), 41576 (§ 106.45(d)(4)(iii)).

[15] 87 Fed. Reg. at 41573 (proposed 34 C.F.R. § 106.44(g)); 87 Fed. Reg. at 41576 (proposed 34 C.F.R. § 106.45(d)(4)(i)).

[16] 87 Fed. Reg. at 41569 (proposed 34 C.F.R. § 106.2 ("supportive measures")).

[17] 87 Fed. Reg. at 41573 (proposed 34 C.F.R. § 106.44(d)).

Exhibit J

The proposed rule includes provisions that would ensure a fair, prompt, and effective process for all complaints of sex-based discrimination,[18] and would remove the harmful requirement of live cross-examination while allowing schools more flexibility in how they conduct questioning. We urge the Department to provide further guidance as to how institutions of higher education can conduct questioning while minimizing reliance on cross-examination and live hearings.

The proposed rule would require institutions of higher education to offer appeals to both parties based on a procedural irregularity, new evidence, or a Title IX official's bias or conflict of interest that affected the outcome, and allow them to offer additional bases to both parties equally.[19] We urge the Department to afford the same rights to appeals to students in K-12 schools that would be granted to students at higher education institutions.[20]

We oppose, and urge the Department to remove, the requirement for schools to presume that the respondent is not responsible for sex-based harassment (or other sex discrimination) until a determination is made and to inform both parties of this presumption[21]—which is not required in any other school proceeding. Instead, the Department should simply require schools to notify parties that a determination about responsibility will not be made until the end of an investigation and that neither party is presumed to be telling the truth or lying at the outset.

We also oppose the provision that includes an exclusionary rule allowing a survivor's oral and written statements to be dismissed in their Title IX case if they do not respond to a question "related to their credibility,"[22] and urge the Department to remove this provision from the final rule.

Lastly, we urge the Department to, at minimum, clarify regulations on schools' requirement to apply the same standard of proof across "comparable"[23] cases of discrimination, specifically regarding cases of sex-based discrimination including sexual harassment and assault so that schools do not adopt an inappropriately stringent standard for those cases. We further encourage the Department to consider requiring the preponderance of evidence standard in all Title IX investigations, as it is the only standard that recognizes complainants and respondents have equal stakes in the outcome of an investigation.

## II. *Clarify protections for LGBTQ+ students*

For LGBTQ+ students, going to school often includes experiencing bullying and harassment on a regular basis, which impacts their ability to access education and harms their health and

---

[18] 87 Fed. Reg. at 41572 (proposed 34 C.F.R. § 106.44(a)).
[19] 87 Fed. Reg. at 41578 (proposed 34 C.F.R. § 106.46(i)(1)-(2)).
[20] 87 Fed. Reg. at 41578 (proposed 34 C.F.R. § 106.46(i)).
[21] 87 Fed. Reg. at 41575 (proposed 34 C.F.R. §§ 106.45(b)(3)), 41577 (§ 106.46(c)(2)(i)).
[22] 87 Fed. Reg. at 41578 (proposed 34 C.F.R. § 106.46(f)(4)).
[23] 87 Fed. Reg. at 41576 (proposed 34 C.F.R. § 106.45(h)(1)).

4

wellbeing.[24] In 2019, around 7 in 10 LGBTQ students experienced verbal harassment at school based on sexual orientation, and more than half experienced harassment based on gender and gender expression.[25] AAUW research also found that students in grades 7-12 are often targeted for failing to follow norms that are typical for their gender.[26] Transgender and nonbinary students face especially hostile school climates compared to their cisgender peers—13 percent of transgender adults were sexually assaulted when they were in grades pre-K-12,[27] while 1 in 4 transgender, nonbinary, and gender-nonconforming students are sexually assaulted during their time in college.[28]

A wave of anti-LGBTQ+ legislation continues across state legislatures—as of July 2022, legislators in 23 states have introduced anti-LGTQ+ legislation.[29] Currently, two states have enacted laws that prohibit transgender students from using school facilities, including restrooms and locker rooms, in accordance with their gender identity.[30] This discriminatory legislation puts LGBTQ+ students at even greater risk of physical, mental, and emotional harm.[31]

The proposed rule importantly affirms protections for LGBTQ+ students under Title IX by clarifying that prohibited sex discrimination includes discrimination based on sexual orientation, gender identity, sex-related characteristics (including intersex traits), and sex stereotypes (in addition to pregnancy or related conditions).[32] The Department should ensure that these forms of prohibited discrimination are explicitly enumerated in school nondiscrimination policies and required notices of nondiscrimination. Policies which specifically enumerate these protections would provide necessary clarity to students, families, educators, and Title IX coordinators, and are associated with less hostile school climates for LGBTQ+ students.[33]

---

[24] U.S. Government Accountability Office, *K-12 Education: Students' Experiences with Bullying, Hate Speech, Hate Crimes, and Victimization in Schools*, GAO-22-10434, Washington: GAO, 2021. https://www.gao.gov/assets/gao-22-104341.pdf.

[25] Joseph G. Kosciw et al., *The 2019 National Climate Survey: The experiences of lesbian, gay, bisexual, transgender, and queer youth in our nation's schools*¸ (New York: GLSEN, 2020), https://www.glsen.org/research/2019-national-school-climate-survey.

[26] Hill and Kearl, *Crossing the Line: Sexual Harassment at School*.

[27] Sandy E. James et al., *The Report of the 2015 U.S. Transgender Survey*, (Washington: National Center for Transgender Equality, 2016), https://transequality.org/sites/default/files/docs/usts/USTS-Full-Report-Dec17.pdf.

[28] Cantor et al., *Report on the AAU Campus Climate Survey on Sexual Assault and Misconduct*.

[29] "Anti-LGBTQ+ Bills in 2022," Human Rights Campaign, accessed September 7, 2022, https://www.hrc.org/resources/state-maps/anti-lgbtq-bills-in-2021.

[30] Alabama H.B. 322 (2022) and Oklahoma S.B. 615 (2022) ban transgender youth from using restrooms or changing areas aligned with their gender identity.

[31] The Trevor Project, *LGBTQ & Gender-Affirming Spaces*, (West Hollywood: The Trevor Project, 2020), https://www.thetrevorproject.org/research-briefs/lgbtq-gender-affirming-spaces/.

[32] 87 Fed. Reg. at 41571 (proposed 34 C.F.R. § 106.10); These proposed changes are consistent with President Biden's executive orders on the implementation of the Supreme Court's 2020 ruling in *Bostock v. Clayton County* (140 S. Ct. 1731, 1747 (2020)), which confirmed that workers are protected against discrimination based on sexual orientation or gender identity under Title VII.

[33] William J. Hall, "The effectiveness of policy interventions for school bullying: A systematic review," *Journal of the Society for Social Work and Research* 8, no. 1: 45-69. https://pubmed.ncbi.nlm.nih.gov/28344750/; Mark L. Hatzenbuehler and Katherine M. Keyes, "Inclusive Anti-bullying Policies and Reduced Risk of Suicide Attempts in Lesbian and Gay Youth," *Journal of Adolescent Health* 53, no. 1 (2021): S21-S26, https://www.sciencedirect.com/science/article/pii/S1054139X12003540; Ryan M. Kull et al., "Effectiveness of

5

Exhibit J

The proposed rule also clarifies that all students must have access to school facilities consistent with their gender identity (where facilities are separated) as a component of their full participation in schools.[34] We further urge the Department to clarify in plain language that this standard applies to all sex-separated programs and activities, including, but not limited to, restrooms, locker rooms, and overnight accommodations for school trips.

The proposed rule importantly clarifies that harassment and bullying based on sexual orientation, gender identity, sex-related characteristics, and sex stereotypes is prohibited under Title IX. However, the proposed rule fails to explicitly address mocking, ridiculing or the persistent, intentional misuse of names, personal pronouns, or gendered titles as a form of sex-based harassment. Nearly 1 in 4 LGBTQ students in grades 6-12 report being prevented from using their chosen name and pronouns.[35] The use of gender-affirming language, including pronouns, is vital to students' wellbeing—studies have shown that for transgender and nonbinary youth, having their pronouns respected improves mental health outcomes.[36] We strongly urge the Department to include guidance in the final rule that explicitly prohibits the persistent, intentional misuse of names, personal pronouns, or titles as a form of sex-based harassment under Title IX.

Secondly, the proposed rule does not provide regulatory guidance on dress and appearance codes, which effectively leaves room for discriminatory policies and enforcement practices in schools. Where gendered dress codes are enforced, students must be allowed to dress in accordance with their gender identity, and such policies should not be enforced more stringently on certain groups.[37] These clarifications are critical for LGBTQ+ students, particularly transgender and nonbinary students, who may face disciplinary measures for clothing perceived as "inappropriate" according to their sex assigned at birth.[38] The Department should clearly communicate that, where dress or appearance codes are in use, gender-neutral codes best support students' wellbeing and schools' compliance with Title IX, and that schools may nonetheless risk violating Title IX even when a separate gender dress code permits students to dress in accordance with their gender identity.

Lastly, we are deeply concerned that the proposed rule does not address access to athletics, which represents a key component of educational equity under Title IX. Regulations that affirm and protect the inclusion and participation of all students, including transgender and nonbinary students, in school athletics are urgently needed—state legislators introduced 70 transgender

---

school district antibullying policies in improving LGBT youths' school climate," *Psychology of Sexual Orientation and Gender Diversity* 3, no. 4 (2016): 407; Terri Phoenix et al., "Homophobic Language and Verbal Harassment in North Carolina High Schools," Safe Schools North Carolina, 2006, https://eric.ed.gov/?id=ED491454.

[34] 87 Fed. Reg. at 41571 (proposed 34 C.F.R. §§ 106.10, 106.31(a)(2)).

[35] Kosciw et al., *The 2019 National Climate Survey*.

[36] The Trevor Project, *Pronouns Usage Among LGBTQ Youth*, (West Hollywood: The Trevor Project, 2020), https://www.thetrevorproject.org/research-briefs/pronouns-usage-among-lgbtq-youth/.

[37] See "Model Local Education Agency Policy on Transgender and Nonbinary Students," GLSEN, https://www.glsen.org/activity/model-local-education-agency-policy-on-transgender-nonbinary-students.

[38] Kosciw et al., *The 2019 National Climate Survey*.

Exhibit J

athlete bans in the first half of 2022 alone, and such bans are currently enacted in 18 states.[39] These discriminatory policies also harm students who do not conform to sex stereotypes, intersex students (whether transgender or cisgender), and will likely disproportionately harm Black women and girls and other women and girls of color owing to racist and sexist standards which associate femininity with whiteness.

We strongly urge the Department to move swiftly in their rulemaking on athletics—affirming that all students, including transgender, nonbinary, and intersex students, have rights under Title IX to participate in school sports in accordance with their gender identity—so that a single, consolidated rule may be finalized at the beginning of 2023. We further urge the Department to clarify in the final rule that state sports bans against transgender, intersex, or nonbinary students constitute prohibited sex discrimination under Title IX, and that Title IX preempts any state law or policy that categorically bans transgender, nonbinary, and intersex students from playing sports or their ability to play sports consistent with their gender identity.

### III. *Strengthen supports for pregnant and parenting students*

Pregnant and parenting students continue to face discrimination and barriers in access to education, and are often steered toward separate, less rigorous schools or programs. More than 1 in 5 college students—or nearly 4 million undergraduates—are parents, including 1.7 million single mothers.[40] Student parents, 44 percent of whom work full time while enrolled,[41] may also lack other vital supports like paid leave and affordable child care that make it harder for them to complete their education while supporting themselves and their families. Pregnant and parenting students' access to education and completion is not only a gender equity issue but also a racial equity issue, as 51 percent of student parents are people of color.[42] While parenting college students tend to have higher grade-point averages than their non-parenting peers,[43] they are less likely to graduate,[44] largely due to lack of institutional supports and other barriers to completion.

The proposed rule importantly improves regulatory language prohibiting discrimination on the basis of "current, past, or potential pregnancy or related conditions,"[45] including termination of pregnancy, childbirth, lactation, or recovery from any of these conditions. We urge the Department to include "expected" and "perceived" pregnancy or related conditions, as well as explicitly add lactation, childbirth, and termination of pregnancy as a non-exhaustive list of

---

[39] "Trans and Nonbinary Athletic Inclusion Policies," GLSEN, accessed September 7, 2022, https://maps.glsen.org/trans-and-nonbinary-athletic-inclusion-policies/.

[40] Institute for Women's Policy Research, "Parents in College by the Numbers," accessed September 7, 2022, https://iwpr.org/iwpr-issues/student-parent-success-initiative/parents-in-college-by-the-numbers/.

[41] U.S. Government Accountability Office, *K-12 Education*.

[42] Institute for Women's Policy Research, "Parents in College by the Numbers."

[43] Institute for Women's Policy Research, "Parents in College by the Numbers."

[44] Renee Ryberg, Rachel Rosenberg, and Jessica Warren, *Higher Education Can Support Parenting Students and Their Children with Accessible and Equitable Services*, (Bethesda: Child Trends, 2021), https://www.childtrends.org/publications/higher-education-support-parenting-students-and-their-children-with-accessible-equitable-services.

[45] 87 Fed. Reg. at 41568 (proposed 34 C.F.R. § 106.2) ("pregnancy or related conditions"), 41571 (proposed 34 C.F.R. §§ 106.21(c)(2)(ii), 106.40(b)(1)), 41579 (proposed 34 C.F.R. § 106.57(b)).

7

"pregnancy or related conditions." We further urge the Department to expressly state that schools may not discriminate based on a person's "current, potential, *perceived*, *expected*, or past parental, family, marital, or *caregiver* status."[46] These clarifications would affirm protections for students who may be harmed by gender norms related to caregiving, including expectant non-birthing parents, students who are perceived to be parents, and caregivers who are not parents.

The proposed rule strengthens supports for pregnant and parenting students, including ensuring students' access to a clean, private lactation space that is not a bathroom.[47] We urge the Department to clarify that private lactation spaces should include a chair, a flat surface, and access to an electrical outlet, with nearby access to running water and a refrigerator, and that such spaces should be in reasonable proximity to students' specific place of study. The Department should further clarify that pregnant and parenting employees also have a right to these lactation spaces, and that students and employees still have a right to pump or breastfeed in non-designated lactation spaces.

The proposed rule requires schools to provide voluntary and "reasonable modifications"[48] to policies, practices, or procedures for students experiencing pregnancy or related conditions. Supportive attendance policies are particularly critical given caregiving responsibilities, which fall disproportionately onto women. We urge the Department to extend the affirmative right to modifications to both parenting and caregiving students, as well as employees.

The proposed rule would allow, as under current regulations, for student to participate "voluntarily" in a separate portion of their school's program or activity which is "comparable" to that offered to their peers.[49] We urge the Department to clarify that separate programs or activities must be substantially equal "in purpose, scope, and quality" to those offered to students who are not pregnant or parenting and do not have a pregnancy related condition, and to explicitly prohibit schools from requiring pregnant or parenting students to participate separately.

Further, the proposed rule expands leave beyond the minimum period deemed medically necessary by a healthcare provider, if school policy allows.[50] We urge the Department to require schools to presume that medically necessary absences (e.g. for prenatal care, lactation breaks, abortion care) are inherently "reasonable" modifications and must be granted, and to make such absences available to parenting and caregiving students and to employees.

Lastly, the proposed rule expands training requirements for Title IX coordinators and clarifies their responsibilities regarding prevention and responses to discrimination against pregnant and parenting students. Specifically, the proposed rules would require employees who know of a

---

[46] We urge the Department to further define "family status," ensuring the definition is inclusive of non-traditional families including LGBTQ+ families.

[47] 87 Fed. Reg. at 41572 (proposed 34 C.F.R. §§ 106.40(b)(3)(iv), 106.40(b)(4)(iii)), 41579 (proposed 34 C.F.R. § 106.57(e)).

[48] 87 Fed. Reg. at 41572 (proposed 34 C.F.R. § 106.40(a)(4)).

[49] 87 Fed. Reg. at 41571 (proposed 34 C.F.R. § 106.40(b)(1)).

[50] 87 Fed. Reg. at 41572 (proposed 34 C.F.R. § 106.40(b)(3)(iii)).

8

student's pregnancy or related condition to give them the Title IX coordinator's contact information[51] and would require Title IX coordinators to then notify the student of their rights.[52] We ask the Department, however, to instruct schools in the final regulations and in supplemental guidance on how to protect student privacy to ensure that, in states where abortion is criminalized, school records, including school health records, are not used to prosecute students who have been documented as being pregnant in the past but are not currently pregnant. Finally, we urge the Department to clarify that it is a violation of Title IX to discipline or refer students to law enforcement based on termination of pregnancy.

We urge the Department to expand data collection on pregnant and parenting students, including experiences of harassment and discipline, in the Civil Rights Data Collection (CRDC) in order to continue to improve these students' access and success in education. AAUW appreciates that the CRDC includes important, school-specific gender equity points—including data on pregnant and parenting students—that are helpful to advocates, parents, students, educators, and Title IX coordinators nationwide.

## IV. *Appropriate implementation of religious exemptions*

Under Title IX statute, schools that are receiving federal funds and controlled by religious organizations may claim religious exemptions where the application of Title IX is inconsistent with their religious tenets. Unfortunately, religious exemptions have allowed schools to discriminate on the basis of sex, disproportionately harming women, pregnant and parenting students, LGBTQ+ students, and students who access or seek access to abortion or birth control.

Harmful Title IX regulations implemented in 2020 expanded the number of schools that are eligible for religious exemptions[53] and allowed schools to claim religious exemptions without providing any advance notice to the Department of Education or students and their families, including even if a school is under investigation for violating Title IX at that time.[54] This regulation is inconsistent with the Title IX rule requiring schools to provide notice of their nondiscrimination policies,[55] and makes it more difficult for prospective students and their families to make fully informed decisions when choosing a school.

As the proposed rule fails to address religious exemptions, we urge the Department to swiftly issue proposed Title IX regulations that would rescind the 2020 rule inappropriately expanding eligibility for religious exemptions, require schools to notify the Department of any religious exemption claims, and to publish claimed exemptions in their nondiscrimination policies and required notices.

---

[51] 87 Fed. Reg. at 41571 (proposed 34 C.F.R § 106.40(b)(2)).
[52] 87 Fed. Reg. at 41571-72 (proposed 34 C.F.R. § 106.40(b)(3)(i)).
[53] 34 C.F.R. § 106.12(c).
[54] 34 C.F.R. § 106.12(b).
[55] 34 C.F.R. § 106.8(b)(1); 87 Fed. Reg. at 41570 (proposed 34 C.F.R. § 106.8(c)(1)).

9

Exhibit J

*Conclusion*

We urge the Department to implement the recommended changes as outlined in this comment and to finalize the proposed rule swiftly, as students across the country continue to be subject to the harmful Title IX regulations implemented in 2020 under the previous administration. We look forward to working with the Department on the implementation of the final Title IX rule.

Thank you for your consideration of our comment and recommendations for the proposed rule. Please do not hesitate to contact me at blackwellg@aauw.org if you have any questions.

Sincerely,

*Gloria Blackwell*

Gloria L. Blackwell
Chief Executive Officer, American Association of University Women

10

Exhibit J

September 12, 2022

*Submitted via www.regulations.gov*

Dr. Miguel Cardona                                    Catherine E. Lhamon
Secretary of Education                              Assistant Secretary, Office for Civil Rights
U.S. Department of Education                  U.S. Department of Education
400 Maryland Ave SW                            400 Maryland Ave SW
Washington, DC 20202                            Washington, DC 20202

**Re: Docket ID ED–2021–OCR–0166, RIN 1870–AA16, Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance**

Dear Secretary Cardona and Assistant Secretary Lhamon:

As organizations guided by our traditions, our heritage, and fundamental Jewish values, we strongly believe that discrimination has no place in our society, including our schools. The Jewish concept of *Kavod,* that everyone deserves to live life with dignity and respect, is central to what we as a community believe, and what we feel is central to every community's basic teachings. In order to respect one's basic human dignity, everyone must be guaranteed the right to receive an education free of violence.

All student survivors of sex-based discrimination and harassment in school settings deserve robust protections to ensure equal access to education. As we commemorate the 50th anniversary of Title IX, we celebrate this rule and the progress we have made against sex discrimination in education, however, we are concerned that many inequities and challenges remain.

The changes made to Title IX under the previous administration removed protections for survivors and made it more difficult for their institutions to address the violence perpetrated against them. The undersigned organizations agree with President Biden's proposal to increase protections and recourse for students and athletes, but also provide suggestions for additional improvements.

**Religious exemptions.** We urge the Biden Administration to propose additional Title IX regulations to reverse the harmful religious exemption policies in the 2020 Title IX rule that interpreted religious exemption so broadly as to allow schools with only a tenuous relationship with religious institutions to discriminate. Expanding the religious exemption from schools that are "controlled by a religious organization" to schools that merely "subscribe to specific moral beliefs or practices" harms students, employees, and others. Equal access to educational

Exhibit J

programs and activities is the basic tenet of Title IX, and schools that receive federal funding should be required to abide by this provision of civil rights law, with very few exceptions.

**Improving the investigation process.** Under this proposition, schools must conduct "prompt" investigations and set "reasonably prompt timeframes" for all major stages of an investigation of sex-based harassment (or other sex discrimination).[1] We support this requirement that will provide survivors with an opportunity for prompt remedies and closure, however we suggest that the investigation process be further improved to require the preponderance of evidence standard in all Title IX investigations, no longer permitting schools to use the "clear and convincing" standard.

We are in full support of the following aspects of the proposed rule:

**Redefining sex-based harassment.** For the first time, "sex discrimination" under Title IX would include discrimination based on sexual orientation, gender identity, sex-related characteristics (including intersex traits), status as transgender or nonbinary, or sex stereotypes.[2] This means that LGBTQ+ students must be allowed to participate fully in school. This policy change guarantees that every student has the right to express their identity however they choose, and be addressed by staff and students in a manner consistent with their gender.

**Addressing sex-based harassment.** The proposed rule would require schools to take "prompt and effective action" to end sex-based harassment (or other sex discrimination), prevent it from recurring, and remedy its effects on all people harmed.[3] This includes mandating schools to offer supportive measures (at no cost) regardless of whether the student requests an investigation, informal resolution, or their complaint is dismissed.[4] Additionally, under this proposal, retaliation would be prohibited and student survivors shall never be punished in any capacity.

**Supporting pregnant and parenting students.** Schools must provide pregnant and parenting students with the option of reasonable modifications to policies, practices, or procedures due to pregnancy or related conditions, allow voluntary leaves of absence beyond the medically necessary minimum, and ensure access to a private and sanitary lactation space that is not a bathroom. Providing accommodations to pregnant and breastfeeding students is necessary to guarantee true equal access to education.

Join us in urging the Biden Administration to implement these changes to Title IX rules, thereby restoring the integrity of Title IX as an essential tool for fighting against sexual assault, harassment, and discrimination.

---

[1]  87 Fed. Reg. at 41575, 41577 (proposed 34 C.F.R. §§ 106.45(b)(4), 106.46(e)(5)).

[2] 87 Fed. Reg. at 41569 (proposed 34 C.F.R. § 106.2), 41571 (proposed 34 C.F.R. § 106.10).

[3] 87 Fed. Reg. at 41572 (proposed 34 C.F.R. § 106.44(a))

[4]  87 Fed. Reg. at 41575-76 (proposed 34 C.F.R. §§ 106.45(d)(4)(i)).

Exhibit J

Sincerely,
Jewish Women International
Keshet

Joined by:

**<u>National Organizations</u>**
ALEPH: Alliance for Jewish Renewal
Ameinu
Avodah
Bend the Arc: A Jewish Partnership for Justice
Clergy Task Force on Domestic Violence in the Jewish Community
Jewish Labor Committee
National Council of Jewish Women
Network of Jewish Human Service Agencies
Rabbinical Assembly
The Workers Circle
T'ruah: The Rabbinic Call for Human Rights
Union of Reform Judaism
Women of Reform Judaism

**<u>Local Organizations</u>**
Carolina Jews for Justice
Detroit Jews for Justice
IKAR
Jewish Family Service of Atlantic County
Jewish Family Service of Houston
Jews For Racial & Economic Justice (JFREJ)
JF&CS
Project DVORA, Jewish Family Service Seattle
The Greater Washington Jewish Coalition Against Domestic Violence
The Shalom Center
Tivnu: Building Justice

Exhibit J