1981 WL 769745 (U.S.) (Appellate Brief)
Supreme Court of the United States.

BOB JONES UNIVERSITY, Petitioner,

v.

UNITED STATES OF AMERICA, Respondent.

No. 81-3.
October Term, 1981.
November 25, 1981.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**Brief of National Association of Evangelicals As Amicus Curiae in Support of Petitioner.**

Forest D. Montgomery, 1430 K Street, N.W., Washington, D.C. 20005, (202) 628-7911, for amicus curiae.

*i TABLE OF CONTENTS

| | |
|---|---|
| Interest of Amicus Curiae | 2 |
| Statement of the Case | 6 |
| Questions Presented | 9 |
| Summary of Argument | 9 |
| Argument | 13 |
| I. The court below has departed from this Court's teaching in Free Exercise cases | 13 |
| II. The Tank Truck Rentals doctrine is inapplicable to this case | 18 |
| Conclusion | 21 |

*ii TABLE OF CASES

| | |
|---|---|
| *Alexander v. "Americans United,"* 416 U.S. 752 (1974) | 20 |
| *Bob Jones University v. Simon,* 416 U.S. 725 (1974) | 17 |
| *Cantwell v. Connecticut,* 310 U.S. 296 (1940) | 12 |
| *Commissioner v. Tellier,* 383 U.S. 687 (1966) | 13, 19 |
| *Costello Publishing Company v. Rotelle,* slip op. (D.C. Cir. Nov. 10, 1981) | 10 |
| *Green v. Connally,* 330 F.Supp. 1150, aff'd per curiam sub nom. *Coit v. Green,* 404 U.S. 997 (1971) | 17 |
| *Loving v. Virginia,* 388 U.S. 1 (1967) | 16 |
| *McLaughlin v. Florida,* 379 U.S. 184 (1964) | 16 |
| *Prince Edward School Foundation v. United States,* 101 S. Ct. 1408 (1981) | 17 |
| *Runyon v. McCrary,* 427 U.S. 160 (1976) | 21 |
| *iii *Sherbert v. Verner,* 374 U.S. 398 (1963) | 10, 14 |
| *Tank Truck Rentals v. Commissioner,* 356 U.S. 30 (1958) | 12, 18, 19 |
| *Thomas v. Review Board,* 101 S. Ct. 1425 (1981) | 10, 14, 15 |
| *United States v. Ballard,* 322 U.S. 78 (1944) | 11 |
| *Wisconsin v. Yoder,* 406 U.S. 205 (1972) | 10, 15 |

**\*1** The National Association of Evangelicals, with the consent of the parties, submits this brief as amicus curiae in support of Petitioner. The parties have consented to the filing of this brief and their letters of consent have been filed with the clerk pursuant to Rule 36.2.

**\*2** INTEREST OF AMICUS CURIAE

The National Association of Evangelicals ("NAE") is a nonprofit religious corporation exempt under §501(c)(3) of the Internal Revenue Code. NAE is an association of state and local evangelical organizations, colleges, and universities and some 36,000 churches from 74 denominations. NAE serves a constituency of 10-15 million people through its commissions and affiliates. These affiliates include the National Religious Broadcasters, the World Relief Corporation, and the Evangelical Foreign Missions Association. Because of its separatist character and strict theological views, Bob Jones University would consider the limited doctrinal tenets of NAE too "liberal" and thus is not a member or affiliate of NAE.

Evangelicals can and do differ with one another in the interpretation of Scripture. (Most evangelicals would not agree with the view of Bob Jones University that interracial dating and marriage is contrary to Scripture.) But they are united in their affirmation of the truth and inspiration of the Bible, as well as **\*3** the Lordship and Diety of Jesus Christ.

The ominous threat to religious freedom posed by the decision of the court below compels us to submit this brief. No case has gone to such extremes in applying the public policy against racial discrimination. Until this case that public policy had been applied only in situations of *invidious* discrimination, that is, when at least some element of personal bias or prejudice was present.

Bob Jones University believes that the Bible forbids interracial marriage. In order to enforce this religious view, the University barred admission of black students prior to September, 1971. After that date married black students were admitted, and since May, 1975, a completely open admissions policy has been in effect. The earlier policy excluding all or most blacks was foil owed as the easiest and most reliable way to protect its religious conviction against interracial dating and marriage. Restrict ions designed to enforce this view continue to exist; discipline is applied with an even hand.

**\*4** The court below has ignored crucial factual differences in the cases it relies upon, such as the total exclusion of blacks from educational institutions. In so doing, it erroneously applies a public policy intended to rid this nation of invidious racial discrimination to a University which admits blacks, but follows a policy with respect to interracial dating and marriage based not on personal bias or prejudice, but sincere religious belief.

NAE is familiar with the University and its strict theological views, including its religiously based nonmiscegenation belief. We would not submit this brief on behalf of the University if we had reason to believe that its professed religious beliefs were being used to mask invidious racial discrimination. In its 1964 Resolutions, NAE addressed "the problem of race prejudice" and called "upon our churches to accelerate the desegregation of their own institutions both in spirit and in practice and the opening of the doors of all sanctuaries of worship to every person, regardless of race or national origin."

**\*5** The basis for our concern is reflected in the dissenting opinion of Judge Widener, in which he states (639 F.2d at 156): "Accepting the foregoing findings of the district court as correct, and even the majority does not claim they are clearly erroneous, and the previous findings of this court and the Supreme Court, as we must, that Bob Jones University is a religious organization, we are dealing in this case not with the right of the government to interfere in the internal affairs of a school operated by a church, but with the internal affairs of the church itself. There is no difference in this case between the government's right to take away Bob Jones' tax exemption and the government's right to take away the tax exemption of a church which has a rule of its internal doctrine or discipline based on race, although that church may not operate a school at all."

We are also deeply disturbed at the precedential potential of the lower court's decision with respect to the Government's use of other clearly defined public policies, such as the policy against sex discrimination, as the basis **\*6** for withdrawing tax exemption. What the Government might view as a violation of the public policy against sex discrimination, evangelicals would consider faithful adherence to Scriptual teaching with respect to the proper roles of women within the church. For example, many evangelical churches do not believe in the ordination of women as pastors or elders. Left intact, the decision of the court below will inevitably be used to justify subordination of religious belief to current notions of public policy, and the compass of §503(c)(3) of the Internal Revenue Code will be merely a function of an ever changing public policy continuum.

STATEMENT OF THE CASE

Bob Jones University has sued the United States for a refund of $21 in FUTA taxes it paid for calendar year 1975. The Government has counterclaimed for approximately $490,000 in unemployment taxes, plus interest, which it asserts are due on returns filed by the University for the years 1971 through 1975.

At issue is revocation by the IRS of  *7  the University's exemption as an organization described in §503(c)(3) of the Internal Revenue Code. IRS contends that §503(c)(3) only exempts organizations which are "charitable" in character; that whether the University is religious in purpose and character is irrelevant; that an organization which violates the public policy against racial discrimination cannot be considered "charitable"; and that the University's policy against interracial dating and marriage-- though it concedes this policy is based on sincere religious belief--violates federal public policy.

The District Court found the University to be a religious organization and therefore the Government's procedure for denying tax exempt status to educational organizations engaging in racial discrimination was inapplicable to it. The District Court also held that the revocation of the University's tax exemption violated its rights under the Free Exercise Clause.

The Court of Appeals, Judge Widener dissenting, reversed. Its decision rests on four pillars:

 *8  1. The University is subject to IRS revenue rulings and procedures prohibiting racial discrimination in private schools because it is an educational institution as well as a religious one. 639 F.2d at 149.

2. The University is not a "charitable" organization because enforcement of its rules relating to interracial dating and marriage violates the government policy against subsidizing racial discrimination in education, public or private. *Id.* at 151.

3. Assuming the revocation of the University's tax exemption impinges upon its Free Exercise rights, the government's interest in eliminating all forms of racial discrimination in education is compelling. *Id.* at 153.

4. The principle of Government neutrality toward religion embodied in the Establishment Clause does not prevent governmental act ion based upon the compelling state interest in the enforcement of the public policy against racial discrimination. And it found that since the only inquiry which the Government would make of the University would be whether the institution maintains racially neutral  *9  policies, no excessive entanglements would be created. *Id.* at 154-155.

### THE QUESTIONS TO WHICH THIS BRIEF IS ADDRESSED

Whether the public policy against invidious racial discrimination, weighed in the balance with the Free Exercise Clause, constitutes a compelling state interest sufficient to justify revoking the tax exemption of a religious-educational organization which has an open admissions policy but enforces religiously based rules against interracial dating and marriage.

Whether the *Tank Truck Rentals* public policy doctrine is applicable where a school's rules against interracial dating and marriage are based on sincere religious belief.

SUMMARY OF ARGUMENT

The "balancing" process employed by the court below in weighing public policy with respect to invidious racial discrimination against the Free Exercise rights  *10  of the University presents a startling and unprecedented departure from the teaching of this Court in such cases as *Wisconsin v. Yoder,* 406 U.S. 205 (1972); *Sherbert v. Verner,* 374 U.S. 398 (1963); and *Thomas v. Review Board,* 101 S. Ct. 1425 (1981). It lacks a careful assessment of the extent of the frustration of public policy against

the University's rights under the Free Exercise Clause. Compare the delicate balancing in "weighing the costs to the national antitrust policies against the needs of free religious exercise" of the court in *Costello Publishing Co. v. Rotelle,* No. 80-2147, slip op. at 26 (D.C. Cir. Nov. 10, 1981). In short, the rationale of the court below is essentially one dimensional--it so elevates the doctrine of compelling state interest that the Free Exercise Clause is totally eclipsed.

The Court of Appeals professes to recognize that the religious belief of the University is sincere and its racial policy *immutable.* 639 F.2d at 148. Yet it finds a pressing need to fashion a "prophylactic rule" to prevent indirect support by Americans of a religious-educational **\*11** organization that believes Scripture forbids interracial dating and marriage. The enforcement of that belief, standing alone, is apparently fatal to any claim to exemption, no matter how color blind the University may be in all other respects. (The University has an open admissions policy and there is no evidence on the record of any inequality of treatment between white students and black students.)

The "balance" the lower court has struck in this case fosters speculation that the court must have been unconvinced of the sincerity of the University's religious belief, its rhetoric notwithstanding. Perhaps the University's view of Scripture seemed far-fetched to the court below. But as this Court stated in *United States v. Ballard,* 322 U.S. 78, 87 (1944), the First Amendment protects adherence to religious views that "might seem incredible, if not preposterous, to most people."

The prophylactic rule of the court below appears virtually absolute, judging from the court's application of that rule **\*12** to the unique facts of this case. Under that rule, it is apparently irrelevant whether racial discrimination proceeds from the worst of motives or the best of intentions; whether from rank prejudice or from a devout desire to obey the perceived will of God.

Surely in a free society whose basic charter nourishes religious pluralism the public policy against invidious racial discrimination leaves room for the University's exercise of a belief that interracial dating and marriage contravenes Scripture. There is no pressing need here, "for the protection of society," *Cantwell v. Connecticut,* 310 U.S. 296, 304 (1940), to sustain the absolutist prophylactic rule announced by the Court of Appea ls.

The court below also erred in its expansive interpretation of *Tank Truck Rentals v. Commissioner,* 356 U.S. 30 (1958). That case involved public policy as the basis for denying specific expenses directly attributable to illegal acts; it did not concern public policy as the basis for denying the complete exemption of an **\*13** organization due to a particular practice based upon sincerely held religious beliefs. Moreover, the Court of Appeals broadened the application of the *Tank Truck* doctrine contrary to this Court's decision in *Commissioner v. Tellier,* 383 U.S. 687, 693-694 (1966), which indicates that, if anything, the *Tank Truck* doctrine is to be confined rather than expanded.

## ARGUMENT

### I.

### THE COURT BELOW HAS DEPARTED FROM THIS COURT'S TEACHING IN FREE EXERCISE CASES

In upholding revocation of Bob Jones University's tax exemption, the court below forces the University to choose between its rights under the Free Exercise Clause and the receipt of a government benefit otherwise available. While the freedom to act in pursuit of religious beliefs is admittedly not absolute, as is the freedom to believe, only a compelling state interest justifies an abridgement of that freedom. We submit that the court below has failed to accord certain decisions of this Court interpreting the Free Exercise Clause the weight they deserve.

**\*14** In *Thomas v. Review Board,* 101 S. Ct. 1425, 1431 (1981),this Court once again affirmed a principle of long standing--"that a person may not be compelled to choose between the exercise of a First Amendment right and participation in an otherwise available public program." (Actually, the University cannot abandon the practice of its immutable religious belief, though the court below suggests that course, without being hypocritical.) We recognize that the lower court did not have the benefit of

this Court's thinking in that case, but the long established principle expounded in *Thomas* had been thoroughly discussed in *Sherbert v. Verner,* 374 U.S. 398 (1963).

In *Sherbert* this Court stressed that "appellant's declared ineligibility for benefits derives solely from the practices of her religion, but the pressure upon her to forego that practice is unmistakable." *Id., at 404*. This Court reiterated the same principle when in *Thomas v. Review Board* it stated: "Where the state conditions receipt of an important benefit upon conduct proscribed by a religious faith, or where it denies such a benefit because **\*15** of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs, a burden upon religion exists. While the compulsion may be indirect, the infringement upon free exercise is nonetheless substantial." 101 S. Ct. at 1432.

In revoking the tax exemption of the University, the Government has put severe financial pressure on the University to modify its behavior and to violate its religious beliefs. The question thus narrows to whether the Government can "justify an inroad on religious liberty by showing that it is the least restrictive means of achieving some compelling state interest." *Ibid.* As this Court observed in *Thomas*, quoting from *Wisconsin v. Yoder,* " '[t]he essence of all that has been said and written on the subject is that only those interests of the highest order can overbalance legitimate claims to the free exercise of religion.' " *Ibid.*

That the University's beliefs with respect to interracial dating and marriage are a matter of sincere religious conviction **\*16** is an undisputed fact on the record. It is thus beyond question that Bob Jones asserts a legitimate claim under the Free Exercise Clause. Hence the ultimate question becomes whether the public policy against invidious racial discrimination justifies revocation of the University's tax exempt ion.

The Court below has equated the University's sincere religious belief that Scripture forbids miscegenation with invidious racial discrimination. That is evident from the many cases relied upon by the court below which involve situations where blacks were excluded from admission to educational institutions or were otherwise the victims of racial prejudice. In support of its indiscriminate concept of racial discrimination, the Court of Appeals relies upon such Equal Protection cases as *Loving v. Virginia,* 388 U.S. 1 (1967)(law prohibiting interracial marriage unconstitutional) and *McLaughlin v. Florida,* 379 U.S. 184 (1964) (interracial cohabitation law invalid). Such racially motivated laws from a bygone white supremacy era were obviously prompted by blatant racial prejudice. We fail to see their **\*17** relevance where a University's disciplinary rule is based upon sincerely held religious beliefs.

Judge Widener states in his dissenting opinion: "This is a case of first impression so far as the Supreme Court is concerned, as well as the Courts of Appeals." 639 F.2d at 158. That is correct. As Justice Rehnquist states in his dissenting opinion in *Prince Edward School Foundation v. United States,* cert. denied, 101 S. Ct. 1408 n.1 (1981): "This court summarily affirmed the District Court's decision *sub nom.* in *Coit v. Green,* 404 U.S. 997 (1971), but we later explained in *Bob Jones University v. Simon,* 416 U.S. 725, 740, n. 11 \*\*\* that this affirmance lacks precedential weight because no adversarial controversy remained in *Green* by the time the case reached the Court." Moreover, the district court in *Green* observed: "We are not now called upon to consider the hypothetical inquiry whether tax-exemption or tax-deduction status may be available to a religious school that practices acts of racial restriction because of the requirements of the religion." **\*18** *Green v. Connally,* 330 F. Supp. 1150, 1169 (D.D.C. 1981). To the extent that Congress has considered the question, as Judge Widener pointedly observes, it has raised grave doubts about the validity of the public policy rationale of the court below. 639 F.2d at 160-161.

## ARGUMENT

## II.

### THE *TANK TRUCK RENTALS* DOCTRINE IS INAPPLICABLE TO THIS CASE

When a school excludes blacks for racial reasons or otherwise discriminates against black students, that racial discrimination is rightly characterized as invidious and pervasive. We assume, for the sake of argument, that in such cases the doctrine of

*Tank Truck Rentals v. Commissioner,* 356 U.S. 30 (1958) could arguably be applied on an equally pervasive basis to revoke the exemption of the offending institution. But that is plainly not the case here. -There is simply no authoritative source for applying the *Tank Truck Rentals* public policy doctrine as the basis for revoking the exemption of a religion-based school which admits black students on an equal footing with white **\*19** students, and treats black and white students alike with respect to all its disciplinatory rules, including rules against interracial dating and marriage founded on sincere religious belief.

The guarded comments of this Court in *Commissioner v. Tellier,* 383 U.S. 687, 693-694 (1966), indicating that the *Tank Truck Rentals* doctrine should be confined rather than expanded, are ignored by the court below on the theory that *Tank Truck* involved a profit-making, computational situation. Therefore, as matters now stand, there are virtually no constraints on the IRS in its expansive application to the §503(c)(3) exempt organization area of *Tank Truck Rentals.*

The severe financial impact of the *Tank Truck Rentals* doctrine as applied to the unique facts of this case is only symptomatic of a greater problem. We do not relish IRS branching out in additional public policy areas such as discrimination on the basis of sex, age, or physical handicap. What, in principle, is to prevent IRS from questioning the "charitable" character of offending exempt organizations **\*20** in these other public policy areas? As former Commissioner of Internal Revenue Kurtz has stated with respect to the racial discrimination issue, questions in this area are sensitive and put the IRS "on the cutting edge of developing national policy." Remarks before the PLI Seventh Biennial Conference, Jan. 9, 1978, excerpts reprinted in 127 Cong. Rec. H5396 (daily ed. July 30, 1981) (remarks of Rep. Philip Crane).

In our view, the Commissioner should not be "on the cutting edge of developing national policy." We share the concerns of Justice Blackmun expressed in his dissenting opinion in *Alexander v. "American United,"* 416 U.S. 752, 774-775 (1974): "[W]here the philanthropic organization is concerned, there appears to be little to circumscribe the almost unfettered power of the Commissioner. This may be very well so long as one subscribes to the particular brand of social policy the Commissioner happens to be advocating at the time \*\*\*, but application of our tax laws should not operate in so fickle a fashion. Surely, social policy in the first instance is a matter for legislative **\*21** concern." (Footnote omitted.) Similar sentiments were expressed in *Runyon v. McCrary,* 427 U.S. 160, 212 (1976) (Justice White, joined by Justice Rehnquist, dissenting).

## CONCLUSION

For the foregoing reasons, the decision of the Court of Appeals should be reversed.

Respectfully submitted,

FOREST D. MONTGOMERY,

Attorney for Amicus Curiae.

November 1981